## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| JOANN INC., *et al.*,[1] | ) | Case No. 25-10068 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## DECLARATION OF MICHAEL PRENDERGAST, INTERIM CHIEF EXECUTIVE OFFICER, IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I,      Michael Prendergast, declare under penalty of perjury:

1.      I am the Interim Chief Executive Officer of Debtor JOANN Inc. and an officer of the above-captioned debtors and debtors in possession (collectively, the *"Debtors"* and, together with their non-debtor affiliate, the *"Company"* or *"JOANN"*).

2.      I was appointed as the Company's Interim Chief Executive Officer in May 2024. I am also a Managing Director in Alvarez & Marsal's Consumer and Retail Group. I have been with Alvarez & Marsal since 2018, and during my tenure, I have served as an interim leader for other retailers. I have more than 20 years of experience in providing turnaround services for companies in the retail industry. I hold a Bachelor's Degree in Business Management from the University of Phoenix and completed executive training courses at the University of Chicago, Booth School of Business.

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: JOANN Inc. (5540); Needle Holdings LLC (3814); Jo-Ann Stores, LLC (0629); Creative Tech Solutions LLC (6734); Creativebug, LLC (3208); WeaveUp, Inc. (5633); JAS Aviation, LLC (9570); joann.com, LLC (1594); JOANN Ditto Holdings Inc. (9652); Dittopatterns LLC (0452); JOANN Holdings 1, LLC (9030); JOANN Holdings 2, LLC (6408); and Jo-Ann Stores Support Center, Inc. (5027). The Debtors' mailing address is 5555 Darrow Road, Hudson, Ohio 44236.

3.      I am authorized to submit this Declaration on behalf of the Debtors in the above-captioned chapter 11 cases (collectively, the "Chapter 11 Cases").  In my capacity as Interim Chief Executive Officer, I am responsible for overseeing the financial and operational activities of the Debtors, including, but not limited to, monitoring cash flow, business relationships, workforce issues, and financial planning, and providing overall direction and leadership for the Company, including overseeing the work of the Company's other executives and management of employees, assisting the Board of Directors of JOANN Inc. in making and implementing major corporate decisions, and determining the optimal path to maximize the value of the Company under evolving (and challenging) circumstances.

4.      I am generally familiar with the Debtors' business, operations, financial matters, operating results, business plans, actual and projected cash flows, and underlying books and records. Except as otherwise indicated, all facts set forth in this declaration (this "Declaration") are based on my personal knowledge, my discussions with other members of the Debtors' management team, employees, and advisors, my review of relevant documents, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition.  If called to testify, I would testify competently to the facts set forth in this Declaration.

5.      On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions (the "Petitions") in the United States Bankruptcy Court for the District of Delaware (the "Court") commencing cases for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").  I submit this Declaration (a) to describe the Debtors' business and background, the circumstances that led to the Debtors' chapter 11 filings, and the Debtors' goals in these Chapter 11 Cases, and (b) in support of the Debtors' Petitions and the "first-day"

2

motions and applications that are being filed with the Court concurrently herewith (collectively, the "First Day Motions").

**PRELIMINARY STATEMENT**

6.     Starting with the humblest of beginnings in the 1940s, JOANN has been an American institution over the last 80 years, steadily growing into the nation's category leader in sewing and fabrics with one of the largest assortments of arts and crafts products. Unfortunately, like many retail companies, and despite strong customer support, JOANN has been forced to adjust to a post-COVID economy that saw a general withdrawal from the consumer spending highs experienced during COVID.  As a result, JOANN faced a common problem among retailers following the pullback from COVID-level spending:  it had an otherwise healthy post-COVID business burdened by an outsized capital structure and operational cost center. This created liquidity constraints that impaired JOANN's ability to service its funded debt. Ultimately, with the support of its lenders across its then approximately $1 billion funded debt capital structure, JOANN filed for chapter 11 in early 2024 to implement a prepackaged plan of reorganization (the "Prior Cases"): indeed, sophisticated parties across the capital structure believed that JOANN had the potential for long-term success if its funded debt obligations could be meaningfully reduced, and without the need for operational adjustments that could only be implemented through the tools of the Bankruptcy Code.

7.     JOANN emerged from the Prior Cases in April 2024 and immediately turned to implementing its post-emergence business plan.  Unfortunately, unanticipated inventory challenges post-emergence, coupled with the prolonged impact of an excessively sluggish retail economy, put JOANN back into an untenable debt position.

8.     The Company's inventory challenges were particularly acute and unexpected. Recognizing that the Prior Cases left general unsecured creditors unimpaired, the post-emergence

business plan was premised in part on the Company's vendors continuing to service the Company at levels commensurate with pre-emergence levels. Instead, the Company faced an unexpected ramp-down, and, in some cases, the entire cessation of production of key JOANN inventory items in the post-emergence period. The retreats of in-stock levels had significant effects on JOANN's core business, and when in-stock levels eventually dropped by upwards of 10%, JOANN entered a new phase of operational distress that was not anticipated as part of the Prior Cases or its post-emergence business plan.

9.      JOANN worked diligently to identify the root cause of its supply issues—the halting of production by vendors and the full extent thereof—and chart a path through the prolonged restart times associated with most of its products. The Company promptly put in place a plan to address the inventory shortages and bring JOANN back to its historic in-stock levels. Although the Company has seen marked improvements in inventory management and revenue in the past several months, the unfortunate reality is that the inventory challenges did irreparable harm to JOANN's ability to service its restructured funded debt.

10.     As retail companies know all too well, inventory challenges can create swift and devastating ripple effects. Facing a liquidity wall under its Prepetition ABL and FILO Facilities triggered by the inventory challenges and their subsequent effect on near-term cash receipts and borrowing capacity, and no actionable line of sight to remedy those challenges while responsibly operating the business, the Debtors filed these Chapter 11 Cases to (a) manage the effects of the Debtors' mid-2024 supply shortages, (b) continue the prepetition sale process commenced by the Company's proposed investment banker, Centerview Partners, LLC ("Centerview"), and (c) accomplish the foregoing in a manner that provides an opportunity for interested parties to

participate, while recognizing the harsh reality that an elongated chapter 11 process can often sound the death knell for retail companies.

11.     Recognizing that delicate balance, the Debtors filed these Chapter 11 Cases with a "stalking horse" bid from Gordon Brothers Retail Partners, LLC and an agreement on the use of Cash Collateral to provide certainty that, subject to Court approval, the Debtors do have a path to delivering as much value as possible under challenging circumstances and a path to a responsible exit from chapter 11.  Nevertheless, the Debtors believe that JOANN's business remains strong, and the core operational proposition that encouraged stakeholders to see the Company through its Prior Cases with minimal disruption remains true.  Indeed, during the 2024 calendar year, JOANN had approximately $2 billion in net sales.  To that end, the Debtors intend to continue the marketing process commenced four weeks ago by Centerview to explore value-maximizing business alternatives.

12.     To familiarize this Court with the Debtors, their business, the circumstances leading to the commencement of the Chapter 11 Cases, the objectives of the Chapter 11 Cases, and the relief the Debtors are seeking in the First Day Motions, this Declaration is organized as follows:

- **Part I** describes the Debtors' corporate history, operations, organizational structure, and capital structure.

- **Part II** describes the circumstances leading to the commencement of these Chapter 11 Cases.

- **Part III** describes the anticipated path forward for these Chapter 11 Cases.

- **Part IV** and **<u>Exhibit A</u>** hereto provide the support for the First Day Motions.

I.      **COMPANY BACKGROUND**

A.      **The Debtors' Business Operations**

1.      *JOANN's History and Business Overview*

21.     JOANN is the nation's category leader in sewing and fabrics and offers one of the largest assortments of arts-and-crafts products.  The Company's story began in 1943 when German immigrants founded the "Cleveland Fabric Shop" in Cleveland, Ohio.  By 1963, the Company had grown to 18 stores, and the founders decided to rename the store "Jo-Ann Fabrics"—a combination of the names of the two families' daughters, Joan and Jacqueline Ann.

22.     Over the subsequent years, Jo-Ann Fabrics experienced unparalleled growth.  By 1969, the Company was publicly listed on the American Stock Exchange, and in 1976 the Company joined the New York Stock Exchange.  JOANN opened its 500th store in 1980 and by 1998, following the acquisition of two fabric companies, had become the largest fabric and crafts retailer in the United States. The same year, the business was renamed Jo-Ann Stores Inc. and rebranded all stores operating under other names to "Jo-Ann Fabrics."  In 2011, JOANN was purchased by Leonard Green & Partners and taken private.

23.     While COVID-19, often referred to as the "retail apocalypse," caused irreparable disruption and harm to many retailers, the global pandemic led to a surge in demand for JOANN's products.  Shelter in place and mask mandates drove customers to JOANN stores to purchase supplies for not only DIY projects but also masks and other personal protective equipment.  JOANN experienced a 23.5% increase in sales from fiscal year 2020 to fiscal year 2021.[2]  The

---

[2]     The Company's fiscal year ends on the Saturday closest to January 31 of the named year.  For example, the 2020 fiscal year ended on February 1, 2020, the 2021 fiscal year ended on January 30, 2021, and the 2022 fiscal year ended on January 29, 2022.

Company went public again in March 2021, with its shares listed on the NASDAQ, trading under the ticker symbol "JOAN."

24.     Despite an increase in business during the pandemic, the Company nevertheless faced the same challenges faced by nearly all retailers at the time: competition from online retailers and increased merchandise costs.  On March 18, 2024, JOANN Inc. and certain then-debtor affiliates filed for chapter 11 bankruptcy in the District of Delaware to implement a prepackaged plan of reorganization focused solely on reducing the Company's funded debt load.  The Debtors entered the Prior Cases with a transaction support agreement with a majority of its financial stakeholders and received commitments for approximately $132 million in new financing and related financial accommodations.  The Company emerged from the Prior Cases on April 30, 2024 as a private company and its shares were no longer listed on the NASDAQ.

### 2.     Overview of the Debtors' Operations

#### a.     Product Segments

25.     JOANN offers three product segments: (a) Sewing; (b) Arts and Crafts and Home Décor; and (c) Additional Non-Merchandise Services.  During the 2024 calendar year, JOANN had net sales of approximately $2 billion, of which $900 million was attributable to Sewing, $1.1 billion was attributable to Arts and Crafts and Home Décor, and $19 million was attributable to the Additional Non-Merchandise Services category.

26.     JOANN offers several subcategories within the Sewing product segment, including (a) seasonally themed fabrics, (b) a variety of fabrics for a wide range of uses such as home improvement, décor, and fashion projects, (c) sewing machines, and (d) other sewing supplies. The Arts and Crafts and Home Décor segment includes, among other things, (a) yarn and yarn accessories, (b) crafting materials, technology and organizers, (c) seasonal décor, and (d) cake

decorating materials.  The Additional Non-Merchandise Services include shared freight revenue, revenue from subletting store space, and non-merchandise services such as revenue from subscriptions to Debtor Creativebug, LLC's online content.

### b.      Sourcing and Distribution

27.      JOANN has multiple domestic and international supply sources for each of its product categories.  In the 2024 fiscal year, JOANN sourced approximately 65% of its purchases from domestic suppliers, and the remaining purchases were sourced from foreign suppliers located in Pakistan, India, Vietnam, and China, among other countries.  More than one-third of the Company's foreign-sourced products come from China and are purchased by non-Debtor Jo-Ann Trading (Shanghai) Co., Ltd., a wholly-owned foreign subsidiary of Debtor Jo-Ann Stores, LLC.

28.      Purchasing for the Debtors' stores is performed centrally through JOANN's store support center rather than by individual stores.  Once purchased, merchandise is directed to either one of the Debtors' three distribution centers in Hudson, Ohio; Visalia, California; or Opelika, Alabama (each a "Distribution Center") or its e-commerce fulfillment center in West Jefferson, Ohio.  Each Distribution Center is responsible for supplying merchandise to stores in a specific geographical region, typically on a weekly basis, with each Distribution Center supplying a roughly equal portion of the Company's outbound merchandise.  Additionally, the Distribution Centers ship select products ordered by customers through joann.com directly to the customers' homes, with the balance of e-commerce orders fulfilled directly from stores, through JOANN's e-commerce fulfillment center, or directly from vendors.

### 3.      Retail Channels

29.      JOANN's products are available to customers online or in one of the Company's brick-and-mortar stores.  In 2024, approximately 86% of sales revenue was generated in-store.  As

of the Petition Date, JOANN has approximately 800 stores in 49 states, all of which are operated from leased premises.

30.     In 2024, approximately 14% of JOANN's annual sales revenue was generated through the Company's e-commerce offerings such as through joann.com and the Company's mobile app.  JOANN's e-commerce sales are primarily fulfilled through JOANN's brick-and-mortar stores and the Company's e-commerce fulfillment center, and a small portion of orders are fulfilled from the Company's Distribution Centers or directly by vendors.

### 3.     JOANN's Team Members

43.     As of the Petition Date, JOANN has approximately 19,000 employees (the "Employees"), of which 3,400 are employed full-time and 15,600 are employed part-time. 1,300 Employees are salaried, and 17,700 Employees are paid on an hourly basis. Approximately 17,500 Employees work in the Company's retail stores, and a vast majority are paid hourly. Approximately 300 of the Company's employees are unionized, all of whom work at the Hudson, Ohio Distribution Center and are represented by the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union.

### C.     The Debtors' Prepetition Corporate and Capital Structure

### 1.     The Debtors' Corporate Structure

31.     JOANN has 13 wholly-owned subsidiaries, including 12 Debtors in these Chapter 11 Cases and one foreign non-Debtor subsidiary. The Company's corporate organizational structure is reflected in the following chart:



### 2. The Debtors' Prepetition Capital Structure

44. As of the Petition Date, the Debtors have approximately $615.7 million in total funded debt obligations, consisting of the following outstanding principal amounts: (a) $352.4 million under the ABL Facility (consisting of Revolving Loans and issued Letters of Credit) (each as defined below), (b) $109.9 million under the FILO Term Loan Facility (as defined below), and (c) $153.4 million under the Prepetition Term Loan Facility (as defined below).

| Prepetition Facilities | Maturity | Approximate Outstanding Principal Amount |
|---|---|---|
| ABL Facility (Revolving Loans and issued Letters of Credit) | June 22, 2027 | $352.4 million |
| FILO Term Loan Facility | June 22, 2027 | $109.9 million |
| Term Loan Facility | April 30, 2028 | $153.4 million |
| **Total Funded Debt Obligations** | | **$615.7 million** |

### a.    The ABL Facility and FILO Facility

45.     Debtor Jo-Ann Stores, LLC, as borrower, JOANN Holdings 2, LLC, as parent, Needle Holdings LLC, as holdings, Bank of America, N.A., as administrative agent and as collateral agent (the "Prepetition ABL Agent"), 1903P Loan Agent, LLC, as documentation agent (the "Prepetition FILO Agent"), and the lenders party thereto from time to time (the "Prepetition ABL Lenders") entered into that certain Second Amended and Restated Credit Agreement, dated as of April 30, 2024 (as amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time and in effect immediately prior to the Petition Date, the "ABL/FILO Credit Agreement").    The ABL/FILO Credit Agreement was entered into to provide exit financing to the Debtors in connection with the Debtors' emergence from the Prior Cases.

46.     The ABL/FILO Credit Agreement provides the Debtors with access to a maximum aggregate amount of $500 million in revolving credit commitments (the "ABL Facility"), with the availability of such commitments being subject to a monthly determination of the Borrowing Base (as defined therein) and reduced by the amount, if any, of Letters of Credit (as defined therein) issued thereunder.    In addition, the ABL/FILO Credit Agreement provides for $100 million of term loans under a first in, last out term loan facility (the "FILO Term Loan Facility," such lenders under the FILO facility, the "Prepetition FILO Lenders," and the FILO facility together with the ABL Facility, the "Prepetition ABL and FILO Facilities").    The Prepetition ABL and FILO Facilities mature on June 22, 2027.    As of the Petition Date, an aggregate balance of approximately $352.4 million remains outstanding under the ABL Facility, consisting of $331.6 million outstanding in Revolving Loans (as defined in the ABL/FILO Credit Agreement), and $20.8 million in existing Letters of Credit, and an aggregate balance of approximately

$109.9 million remains outstanding under the FILO Term Loan Facility.  The Prepetition ABL and FILO Facilities are secured by substantially all of the assets of the borrower and the guarantors under the ABL/FILO Credit Agreement, subject to certain limitations and exceptions, including first priority security interests in:  (a) all credit card receivables and bank accounts, other than bank accounts which constitute identifiable proceeds of Term Loan Priority Collateral (as defined below); (b) cash, money, and cash equivalents (other than identifiable proceeds of Term Loan Priority Collateral); (c) all deposit accounts, securities accounts, and commodities accounts, in each case except for any such accounts which constitute Term Loan Priority Collateral; (d) all inventory; and (e) documents, general intangibles, instruments, chattel paper, commercial tort claims, supporting obligations, letter-of-credit rights, books and records, and collateral security and guarantees evidencing, governing, or relating to any of the items referred to in foregoing (as more fully described in the ABL/FILO Credit Agreement, the "ABL Priority Collateral"). The respective rights of the Prepetition ABL Lenders as between themselves with respect to, among other things, their security interests in the ABL Priority Collateral, the treatment of proceeds thereof, as well as certain rights of first refusal and consent rights are governed by the ABL/FILO Credit Agreement.

### b.      The Term Loan Facility

47.      Debtor Needle Holdings, LLC, as borrower, JOANN Holdings 2, LLC, as holdings, Wilmington Savings Fund Society, FSB, as administrative agent (the "Prepetition Term Loan Agent"), and the lenders party thereto from time to time (the "Prepetition Term Loan Lenders") entered into that certain Credit Agreement, dated as of April 30, 2024 (as amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time and in effect immediately prior to the Petition Date, the "Prepetition Term Loan Credit Agreement"), pursuant

to which the Prepetition Term Loan Lenders provided the Debtors a senior secured term loan facility in an aggregate principal amount of approximately $153.8 million (the "Prepetition Term Loan Facility").  The Prepetition Term Loan Facility matures on April 30, 2028.  As of the Petition Date, a balance of approximately $153.4 million remains outstanding under the Prepetition Term Loan Facility.  The Prepetition Term Loan Facility is secured by a security interest in substantially all of the assets of the borrower and the guarantors under the Prepetition Term Loan Credit Agreement, subject to certain limitations and exclusions, including first priority security interests in:  (a) equipment, fixtures, real property, intercompany indebtedness between or among the Debtors or their affiliates, intellectual property, and all equity interests held by the Debtors and their affiliates (subject to certain customary exceptions); (b) except to the extent constituting ABL Priority Collateral, all instruments, commercial tort claims, documents, and general intangibles; (c) except to the extent constituting ABL Priority Collateral, any deposit accounts, securities accounts, or commodity accounts that are intended to solely contain Term Loan Priority Collateral, and the contents thereof; (d) all other collateral other than ABL Priority Collateral (including proceeds thereof); and (e) all collateral security and guarantees with respect to the foregoing and all cash, money, insurance proceeds, instruments, securities, and financial assets received as proceeds of the foregoing (as more fully described in the Prepetition Term Loan Credit Agreement, the "Term Loan Priority Collateral").

### c.      The ABL and Term Loan Intercreditor Agreement

48.     The respective contractual rights of the Prepetition ABL Lenders and the Prepetition Term Loan Lenders with respect to their shared collateral are governed by that certain Second Amended and Restated Intercreditor Agreement, dated as of April 30, 2024 (as amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time,

the "ABL and Term Loan Intercreditor Agreement"), by and between the Prepetition ABL Agent and the Prepetition Term Loan Agent. The ABL and Term Loan Intercreditor Agreement governs, among other things, the division of collateral into ABL Priority Collateral and Term Loan Priority Collateral, the priority of liens and application of proceeds with respect thereto, as well as the respective rights of the Prepetition ABL Lenders and the Prepetition Term Loan Lenders in connection with certain bankruptcy matters.

### d.     The Prepetition Agreement Among FILO Lenders

49.     Pursuant to that certain Amended and Restated Agreement Among Lenders, dated as of April 30, 2024, by and among the Prepetition FILO Lenders and the Prepetition FILO Agent (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Prepetition Agreement Among FILO Lenders"), the Prepetition FILO Lenders and the Prepetition FILO Agent have agreed, among other things,  to the respective rights, obligations, and priorities of each class of the Prepetition FILO Lenders with respect to matters set forth therein.

### e.     Unsecured Debt

50.     In addition to their funded debt, the Debtors have customary unsecured debt, including amounts owed to trade vendors and landlords.  JOANN routinely incurs fixed, liquidated, and undisputed payment obligations in the ordinary course of business to various third-party providers of goods and services.  These include obligations owed to JOANN's extensive network of vendors, on whom JOANN relies to supply merchandise. A majority of these vendors conduct business with JOANN on a purchase order-by-purchase order basis and are paid on prearranged terms.  As of the Petition Date, the Debtors estimate that approximately $133 million of merchandise trade debt is due and outstanding, of which approximately $30 million is on account of goods provided to the Debtors within the twenty days leading up to the Petition Date.

As discussed in greater detail in the Store Support Motion,[3] certain of these claims are entitled to statutory priority, including under section 503(b)(9) of the Bankruptcy Code, or may give rise to liens in favor of shippers or warehousemen in the event they go unpaid.

51.     In addition to trade debt, JOANN's stores are operated exclusively from leased premises.  The Debtors accrue approximately $26 million in lease and occupancy-related expenses each month, a substantial portion of which is reflected on the Debtors' books as a liability at any given time.

### f.     Equity Interests

52.     The Debtors transitioned from a publicly traded to a privately held company upon emergence from the Prior Cases.  JOANN Inc. issued new equity interests to holders of its prepetition secured debt and debtor in possession financing facility on account of their claims.  As of the Petition Date, JOANN Inc. has 200,000,000 shares of common stock authorized, of which 100,000,003 shares of common stock are outstanding.  The Debtors have no preferred shares outstanding.

### D.     Restructuring Focused Initiatives

### 1.     Cost-Cutting Initiatives

53.     Since emerging from the Prior Cases, and in working to respond to the unanticipated vendor constraints following emergence, the Company has implemented cost-cutting measures to further streamline operations and alleviate liquidity-related pressures.  In furtherance of these efforts, in September 2024, JOANN expanded Alvarez & Marsal Consumer and Retail Group, LLC's ("A&M CRG") engagement to assist with the Company's ongoing efforts

---

[3]     *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) Store Support Vendors, (B) Lien Claimants, and (C) 503(B)(9) Claimants, (II) Confirming Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief.*

to realize cost savings, and, in turn, rebuild profitability and EBITDA (the "Close the Gap Project").[4]  During the fourth quarter of 2024, the Company, with A&M CRG's assistance, focused their efforts on optimizing costs across major spend areas such as COGS, distribution costs, and SG&A (selling, general and administrative).   Such efforts included, among other things, renegotiating vendor contracts, securing critical inventory, and implementing cost-saving policy changes.

54.     The Company's efforts have borne fruit.  Since September 2024, the Close the Gap Project has resulted in more than $34 million of savings across margin, logistics, store operations, and corporate functions, ultimately allowing JOANN to exceed projections in December and post its first positive year over year comparable sales since July 2023.

### 2.     *Retention of Advisors and Contingency Planning*

55.     Shortly after emerging from the Prior Cases, the Company realized that ongoing operational and financial concerns were still looming that would require the support of strategic advisors.  Alvarez & Marsal had been engaged to provide interim management and other services, including in connection with the Company's restructuring efforts.  On December 9, 2024, JOANN retained Centerview to assist with certain investment banking services in connection with a sale of some or all of the Debtors' assets and potential financing options (including pursuant to a potential chapter 11 process).  Finally, on December 20, 2024, JOANN retained Kirkland & Ellis LLP ("Kirkland") as restructuring counsel to assist with these efforts, including with respect to a potential chapter 11 filing.

---

[4]     A&M CRG's engagement on the Close the Gap Project terminated prepetition.

### 3.    Corporate Governance Measures

56.    In June 2024, shortly after emerging from the Prior Cases, JOANN announced the appointment of a new Board of Directors (the "Board") consisting of five members, and on November 27, 2024, the Board formed a special committee (the "Special Committee") comprised of four Board members.  Most recently, in connection with the consideration of strategic alternatives and in consultation with its advisors, the Company conducted a review of its existing corporate governance infrastructure and determined that it was in the best interest of the Company and its stakeholders to expand the composition of the Board.  Accordingly, the Board appointed Pamela Corrie and Jill Frizzley to serve as independent directors on December 16 and December 27, 2024, respectively.[5]

57.    On December 27, 2024, the Board also determined that it would be in the best interest of the Company to reconstitute the Special Committee to be comprised solely of Ms. Corrie and Ms. Frizzley. At a high level, the Board delegated the tasks of reviewing, analyzing, and making recommendations to the Board regarding a corporate transaction, including a chapter 11 filing, to the Special Committee.

## II.    EVENTS LEADING TO THE COMMENCEMENT OF THESE CHAPTER 11 CASES

58.    JOANN emerged from the Prior Cases with a de-levered capital structure and a comprehensive plan to reduce overhead expenses, right-size its workforce, establish competitive pricing strategies, and capitalize on JOANN's loyal customer base and steady revenue streams. However, external market headwinds across the retail industry and complications in JOANN's

---

[5]    Ms. Corrie was previously a member of the Board from March 13, 2024 to April 30, 2024.

vendor relationships made it impossible for JOANN to service its post-emergence funded debt and continue to operate as a going concern, necessitating these Chapter 11 Cases.

**A.      Post-Bankruptcy Initiatives Were Stunted by Macroeconomic Headwinds**

59.      Over the last year, the retail industry has faced a stagnant retail economy, marred by persistent inflation and high interest rates.  JOANN was not immune to these macroeconomic forces, and it attempted to implement its post-emergence plan in the face of these significant headwinds.

*1.      Inflation and High Interest Rates Restricted JOANN's Post-Emergence Growth*

60.      Inflation and rising interest rates continue to plague the retail industry. As a result, nearly twice as many U.S. retailers filed for bankruptcy in 2024 than 2023, and thousands of retail stores closed over the last twelve months.  While consumer spending generally appeared to improve in the latter half of 2024, inflation-fatigued consumers tended to spend their dollars on essentials and low-cost goods, as opposed to craft, décor, and similar products offered by JOANN.

61.      Inflation continued to increase throughout the summer and fall of 2024, and consumers continued to limit discretionary spending, forcing retailers to choose between increased prices or lower profit margins. This led to a sector-wide decline in retail sales in April 2024 and continued depressions in retail spending into the summer months.  The struggles in the retail industry forced many retailers to cut prices at the same time JOANN was attempting to implement its post-emergence business plan.  Indeed, after JOANN emerged from bankruptcy in April 2024, one of its key competitors announced lower prices on over 5,000 items in their arts, crafts, DIY, and home décor product categories.  Further, JOANN's loyal customer base had become accustomed to competitive pricing in the relatively consolidated arts-and-crafts and home goods

industries, making it further difficult for JOANN to react to macroeconomic pressures across the retail sector that were applying downward pressure on margins.

**B.     Unanticipated Inventory Challenges Post Emergence Unsustainably Depressed Revenue Against Projections**

62.     In attempting to effectuate its post-emergence business plan, JOANN faced major, unforeseen inventory and re-stocking challenges that prevented JOANN from realizing the revenue projections it needed to achieve post-emergence to continue as a viable going concern. Those inventory and restocking challenges, when combined with the aforementioned macroeconomic factors, proved insurmountable and require relief in these Chapter 11 Cases.

> **1.     JOANN Relies on Consistently High In-Stock Levels to Satisfy Its Loyal Customer Base and Drive Revenue**

63.     The Company enjoys a loyal customer base that trust the reliability, quality, and availability of JOANN's products, particularly JOANN's in-store selection. Consumers prefer to touch, see, and feel many of JOANN's core products, such as yarn and sewing material, for which it is the market leader.  Because JOANN's customer base relies on the ability to experience products in person, the success of these product segments is predicated on availability and in-stock rates. JOANN typically seeks to maintain, and historically has maintained, in-stock levels at or above 90% to accommodate its loyal base.

64.     JOANN's in-stock performance has significant knock-on effects across its product lines, because JOANN's customers are "project customers."  A project customer comes into the store intending to buy all the materials needed to complete a project.  On average, JOANN customers purchase between five and six products per trip.  But when the store is missing items necessary to complete the "project," customers will put their basket down, abandon the purchase altogether, and plan to return when all project items become available.  This means that if JOANN has a stock shortage on a specific product, the associated revenue impact can be exponential and

impact a number of related products that would fall into the same 'basket' as the out-of-stock product. This impact is generally margin agnostic. Thus, higher margin items—*i.e.* sewing machines—suffer when the store lacks the customer's desired inputs, such as sewing thread.

65.     The behavior of JOANN's consumers makes maintaining in-stock levels a critical aspect of JOANN's operational success.

### 2.     *Vendor Uncertainty Set in Motion an Unforeseen and Delayed Supply Crunch*

66.     As discussed above, the business plan following the Prior Cases was premised, in part, on vendors shipping on terms largely commensurate with pre-bankruptcy levels in the post-emergence, particularly because such vendors were not impaired under the Prior Cases. Against all expectations, however, and unbeknownst to JOANN, many suppliers began halting production of key JOANN retail items and ramping down entire production lines following the Prior Cases for products that were critical to JOANN's post-emergence business plan. This created a snowball effect with respect to those vendors who were continuing to provide product, resulting in tighter credit limits, shortened payment terms, partial shipments, and increased prices.

### 3.     *Efforts to Remedy Unforeseen Product Issues Provide an Incomplete Solution*

67.     While implementing the post-emergence business plan, JOANN's struggle with stocking key items continued to deepen as time went on, ultimately reaching historical lows. The Company experienced significant inventory and stocking issues that saw in-stock levels dip well below 90% in the summer of 2024—the lowest levels the Company has experienced in over a decade. JOANN initially took steps to provide sufficient financial assurances to its vendors to enable prepetition flow of product to JOANN's stores. But despite providing adequate financial reassurance to vendors and receiving corresponding commitments to prepetition supply terms from vendors, JOANN's in-stock levels continued to suffer throughout the late summer and into the fall

of 2024. One of JOANN's strongest product segments, sewing, suffered stocking issues into and through fall 2024. Revenue and profitability fell linearly with the record-low in-stock levels, making it difficult to service even the restructured debt load resulting from the Prior Cases.

68.     In connection with an extended period of inadequate in-stock levels despite JOANN having addressed the vendor financial issues that it perceived to be limiting supply, the Company audited its supply chain in fall 2024 and discovered that many vendors did not promptly resume prepetition production levels after the Company emerged from bankruptcy in April 2024, if at all. Certain vendors that did increase production or return to normal production levels did so only sporadically, such that they could not regularly meet the Company's need for product or produce sufficient product to meet the inventory shortfalls that the Company was facing post-emergence. When vendors were finally able to deliver product in large amounts to try and make up for the inventory shortfalls, the vendors delivered product in batch sizes much larger than ordinary course, which overloaded freight receiving capacities and complicated shipment to stores and stocking of product.

69.     In the fall of 2024, following the results of its audit, the Company placed additional emphasis on restoring in-stock percentages to historical levels. But the products stocked by the Company generally require approximately 120 days lead time.  As a result, even by the time the Company diagnosed the root cause of its supply chain delays and the failures to restart production by its vendors, the Company still needed many additional months to return to normal in-stock levels.  Nevertheless, in-stock levels recovered slowly.  As they did, top-line revenue and profitability also improved—as had been expected, but not realized, in the period immediately following the Company's Prior Cases.  By the time the Company turned around in-stock levels, its

liquidity had suffered too greatly to allow the Company to service its reduced debt load while responsibly operating the business, ultimately necessitating these Chapter 11 Cases.

## III.    ANTICIPATED PATH FORWARD

70.    Against the backdrop of inventory shortages, unpredictable delivery schedules, and a resulting reduction in borrowing availability under its existing credit facilities, the Debtors filed these Chapter 11 Cases with three primary goals. *First* and foremost, the Debtors are focused on responsibly operating the business for key operational stakeholders, including employees, vendors, and customers, which requires continued access to cash under the supervision of the Bankruptcy Court. *Second*, the Debtors need to ensure Centerview can complete its marketing process. As recent performance has shown, this Company has going-concern potential if given an opportunity to achieve that potential. *Third*, the Debtors need sufficient liquidity and access to liquidity to accommodate the foregoing, while ensuring these Chapter 11 Cases do not languish and crater under the weight of themselves.

## IV.    FACTS SUPPORTING RELIEF SOUGHT IN FIRST DAY MOTIONS

71.    I am familiar with the information contained in each First Day Motion and believe that the relief sought in each motion: (a) is vital to enabling the Debtors to make the transition to, and operate in, chapter 11 with minimal employee attrition and disruption to their business, and without loss of productivity or value, (b) constitutes a critical element in the Debtors' ability to successfully maximize value for the benefit of their estates, and (c) is a prudent exercise of the Debtors' business judgement.  A description of the relief requested and the facts supporting each of the First Day Motions is detailed in **Exhibit A**.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: January 15, 2025
      Hudson, Ohio
                                          */s/Michael Prendergast*
                                          Michael Prendergast
                                          Interim Chief Executive Officer

**Exhibit A**

**Evidentiary Support for First Day Motions**

## EVIDENTIARY SUPPORT FOR FIRST DAY MOTIONS[1]

**I. Administrative and Procedural Motions.**

    **A.**     **Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Serve Certain Parties in Interest by Email, (B) Approve the Form and Manner of Service of the Notice of Commencement, (C) Redact or Withhold Certain Confidential Information of Customers, and (D) Redact Certain Personally Identifiable Information of Individuals, and (II) Granting Related Relief (the "Creditor Matrix Motion").**

    1.     Pursuant to the Creditor Matrix Motion, the Debtors seek entry of interim and final orders (a) authorizing the Debtors to (i) serve certain parties in interest by email, (ii) approve the form and manner of service of the notice of commencement of these chapter 11 cases, (iii) redact or withhold certain confidential information of customers, and (iv) redact certain personally identifiable information of individuals; and (b) granting related relief.

    2.     *Authorization to Provide Service via Email or a One Page Notice of the Bankruptcy By Mail*.  I believe that serving notices by traditional mail is cost-prohibitive given the size of the Debtors' creditor matrix and the total amount of cash collateral available to fund these chapter 11 cases.  Serving notices by traditional mail would drain a material amount of the Debtors' available cash at a time when such funds could instead be used to support the Debtors' restructuring efforts.  In addition, email service will help alleviate administrative burdens.  Accordingly, the Debtors request authority to serve all required notice (and other documents) by email, or, where a customer's email address is unavailable to the Debtors, serve a one-page notice of the bankruptcy by first class mail.

---

[1]   Capitalized terms used but not defined have the meanings ascribed to them in the applicable First Day Motion filed contemporaneously herewith.  All exhibits attached to the applicable First Day Motion or interim or final order thereof are incorporated by reference herein.

3.     ***Redaction of Certain Confidential Information of Customers***.  The Debtors' customer list, and related customer data, is an important and valuable asset of the Debtors, and it is vital that the Debtors maintain their customer list in strict confidence.  In addition, privacy and data protection regulations have been enacted in key jurisdictions in which the Debtors and their non-Debtor affiliate do business.  Accordingly, cause exists to authorize the Debtors to redact from any paper filed or to be filed the names, home addresses, and email addresses of the Debtors' customers.

4.     ***Redaction of Certain Personally Identifiable Information***.  I believe that it is appropriate to authorize the Debtors to redact from any paper filed or to be filed with the Court in these chapter 11 cases, including, but not limited to, the Creditor Matrix, Schedules and Statements, and any related affidavits of service, the home and email addresses of natural persons—including the Debtors' individual equity holders, customers, employees, and independent contractors—because, respectively, (a) such information can be used to perpetrate identity theft and phishing scams or to locate survivors of domestic violence, harassment, or stalking under 11 U.S.C. § 107(c)(1), and (b) disclosure risks exposing the Debtors to potential civil liability and significant financial penalties.

5.     ***Approving the Form and Manner of the Service of the Notice of Commencement of these Chapter 11 Cases***.  I believe that it is appropriate to authorize the Debtors to use Kroll, the Debtors' proposed Claims and Noticing Agent, to undertake all mailings and email service, as applicable, directed by the Court or the U.S. Trustee or as required by the Bankruptcy Code or Bankruptcy Rules, including serving the Notice of Commencement on all parties listed on the Creditor Matrix to advise them of the meeting of creditors under section 341 of the Bankruptcy Code.  This will maximize efficiency in administering these chapter 11 cases and will ease

administrative burdens that would otherwise fall upon the Court and the U.S. Trustee. Accordingly, I believe allowing the Claims and Noticing Agent to undertake all mailings and email service, including the Notice of Commencement, is in the best interests of the Debtors' estates.

6.      For the foregoing reasons, I believe that the relief requested in the Creditor Matrix Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

**B.      Motion of Debtors for Entry of an Order (I) Directing the Joint Administration of Chapter 11 Cases, and (II) Granting Related Relief (the "<u>Joint Administration Motion</u>").**

7.      Pursuant to the Joint Administration Motion, the Debtors seek entry of an order directing procedural consolidation and joint administration of these chapter 11 cases.  Given the integrated nature of the Debtors' operations, joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest.  Many of the motions, hearings, and orders in these chapter 11 cases will affect each Debtor entity.  The entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings, objections, or multiple hearings on common issues.  Joint administration also will allow the Office of the United States Trustee for the District of Delaware and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.

8.      Moreover, joint administration will not adversely affect the Debtors' constituencies because this motion seeks only administrative, not substantive, consolidation of the Debtors' estates.  Parties in interest will not be harmed by the relief requested; instead, parties in interest will benefit from the (a) cost reductions associated with the joint administration of these chapter 11 cases and (b) ease of reference to one main case docket of JOANN Inc. throughout the chapter 11 cases.  For the foregoing reasons, I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

**C.**    **Application of Debtors for Entry of an Order (I) Authorizing the Appointment of Kroll Restructuring Administration LLC as the Claims and Noticing Agent Effective as of the Petition Date, and (II) Granting Related Relief (the "<u>Kroll Retention Application</u>").**

9.    Pursuant to the Kroll Retention Application, the Debtors seek entry of an order appointing Kroll Restructuring Administration LLC ("<u>Kroll</u>") as claims and noticing agent (the "<u>Claims and Noticing Agent</u>") in the Debtors' chapter 11 cases effective as of the Petition Date including assuming full responsibility for the distribution of notices, and maintenance, processing, and docketing of proofs of claim filed in these chapter 11 cases, in each case, pursuant to the terms of the engagement agreement, dated January 3, 2025, between the Debtors and Kroll.

10.    Based on my discussions with the Debtors' advisors, I believe that the Debtors' selection of Kroll to act as the Claims and Noticing Agent is appropriate under the circumstances, is in the best interests of the estates, and satisfies the Claims Agent Protocol.  Moreover, it is my understanding, based on all engagement proposals obtained and reviewed, that Kroll's rates are competitive and comparable to the rates charged by their competitors for similar services.

11.    The Debtors anticipate that there will be hundreds of thousands of persons and entities to be noticed in these chapter 11 cases.  In light of the number of parties in interest and the complexity of the Debtors' business, the appointment of a claims and noticing agent is in the best interests of the Debtors' estates, their creditors, and all other parties in interest because it will provide the most effective and efficient means of and relieve the Debtors and/or the Clerk's office of the administrative burden of, noticing and processing proofs of claim.  For the foregoing reasons, I believe that the relief requested in the Kroll Retention Application is in the best interest of the Debtors' estates, their creditors, and all other parties in interest.

## II. Operational Motions.

A. **Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain Insurance, Surety Coverage, and Letters of Credit Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto, (B) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, Surety Bonds, and Letters of Credit, and (C) Continue to Pay Broker Fees, and (II) Granting Related Relief (the "Insurance Motion").**

12.     Pursuant to the Insurance Motion, the Debtors seek entry of interim and final orders (a) authorizing, but not directing, the Debtors to (i) maintain coverage under the Insurance Policies, Surety Bonds, and Letters of Credit and pay any related obligations and (ii) renew, amend, supplement, extend, or purchase insurance, surety coverage, and letters of credit in the ordinary course of business and consistent with prepetition practice, and (iii) continue to pay certain broker fees, and (b) granting related relief.

13.     The Debtors' ability to maintain the Insurance Policies, to renew, amend, supplement, extend, or purchase the same as needed, and to enter into new insurance policies as needed in the ordinary course of business, is essential to preserving the value of the Debtors' estates.  Moreover, in many instances, insurance is required by statutes, rules, regulations, and contracts that govern the Debtors' commercial activities, including the requirements of the Office of the United States Trustee for the District of Delaware that a debtor maintain adequate coverage given the circumstances of its chapter 11 case.

14.     *The Insurance Policies and Surety Bonds*.  In the ordinary course of business, the Debtors maintain approximately 46 Insurance Policies administered by various third-party insurance carriers, as well as approximately 130 Surety Bonds.  The Insurance Policies provide coverage for, among other things, general commercial liability, crime, casualty, cargo, cyber, worker's compensation and employer's liability, directors' and officers' liability, key man, first-party property losses, and various other liability and property losses.  The total amount paid

in annual and other premiums and payments associated with the Insurance Policies is approximately $13.5 million in the aggregate. The Surety Bonds are issued in favor of certain third parties, often governmental units or other public agencies, to secure the payment or performance of certain obligations. The total paid in annual premiums for the Surety Bonds is approximately $107,000 in the aggregate. As of the Petition Date, the Debtors estimate that outstanding premiums of approximately $3.5 million in the aggregate are due and owing on account of the Insurance Policies. Because all of the Insurance Policies are vital to efficiently administer the Debtors' estates during the pendency of these Chapter 11 Cases, the Debtors seek authority, but not direction, to pay any prepetition amounts due and owing in connection with the Insurance Policies in the ordinary course of business and consistent with prepetition practice.

15. **_Brokers Fees_**. The Debtors typically obtain the Insurance Policies through Aon Risk Services Central, Inc. ("Aon" or the "Broker"). The Broker, among other things, (a) assists the Debtors in obtaining comprehensive insurance and surety coverage for their operations in a cost-effective manner, (b) provides claim services, and (c) provides certain risk control and support services throughout the applicable policy periods for the Insurance Policies (collectively, the "Broker Services"). In exchange for these services, the Debtors pay broker commissions and, in some circumstances, certain other contingent forms of compensation from the Insurance Carriers, which are typically incorporated into the premiums of the Insurance Policies and paid at the same time the Debtors pay their premiums. In 2024, the Debtors paid Aon approximately $280,000 on account of the Broker Services. In addition to the Broker Services, the Debtors engage Aon to provide actual services, including risk forecasting and other services to improve the Debtors' insurance efficiency and risk profile. The Debtors pay approximately $54,000 annually on account of such actuarial services (together with the fees on account of the

Broker Services, the "Broker Fees").  As of the Petition Date, the Debtors believe they are current with Aon on account of Broker Fees.  However, out of an abundance of caution and to ensure uninterrupted coverage under the Insurance Policies, the Debtors seek authority, but not direction, to pay any prepetition Broker Fees and to continue to honor their obligations to the Broker as they come due in the ordinary course of business on a postpetition basis consistent with past practice.

16.     For the foregoing reasons, I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to facilitate a timely and efficient process to maximize the value of the Debtors' estates for the benefit of all stakeholders.

**B.      Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate the Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions, and (II) Granting Related Relief (the "Cash Management Motion").**

17.     Pursuant to the Cash Management Motion, the Debtors seek entry of interim and final orders: (a) authorizing the Debtors to (i) continue to operate their Cash Management System and maintain their existing Bank Accounts, (ii) honor certain prepetition obligations related thereto, (iii) maintain existing Business Forms in the ordinary course of business, and (iv) continue to perform the Intercompany Transactions consistent with historical practices, and (b) granting related relief.

18.     In the ordinary course of business, the Debtors, together with their non-Debtor affiliate, maintain the Cash Management System to facilitate the efficient operation of their business, as illustrated on Exhibit 1 annexed to the Interim Order and Final Order attached to the Cash Management Motion.  The Cash Management System is similar to those commonly employed by businesses comparable in size and scale to the Debtors to help control funds, ensure cash availability for each entity, and reduce administrative expenses by facilitating the movement

of funds among multiple entities.  The Debtors use the Cash Management System in the ordinary course of their business to collect, transfer, and disburse funds generated from their operations and to facilitate cash monitoring, forecasting, and reporting.  I believe that it is critical that the Debtors' Cash Management System remain in place on a postpetition basis, as any further disruption would have an immediate adverse effect on the Debtors' businesses and operations to the detriment of the Debtors' estates and to their stakeholders.  Accordingly, to minimize disruption, the Debtors request authority, but not direction, to continue operating their Cash Management System in the ordinary course on a postpetition basis, consistent with historical practices.

19.     ***The Bank Accounts and Flow of Funds***.  As of the Petition Date, the Debtors maintain 826 bank accounts (each, a "Bank Account" and, collectively, the "Bank Accounts") all of which are owned and controlled by the Debtors.  Debtor Jo-Ann Stores, LLC ("Jo-Ann Stores") holds 803 Bank Accounts on behalf of a specific one of the Debtors' retail stores.  Jo-Ann Stores also holds:  (a) eight (8) depository accounts; (b) a main concentration account; (c) a funding account; and (d) seven (7) assorted disbursement accounts, (e) one (1) Dormant Account, and (f) one (1) inactive account.  The remaining Bank Accounts consist of two (2) main accounts held by Debtors JOANN Inc., and Creative Tech Solutions LLC ("Creative Tech Solutions"), one (1) operating account held by Debtor Jo-Ann Stores Support Center, Inc. ("JASSC"), and one (1) operating account held by Dittopatterns LLC.

20.     The Debtor Bank Accounts are held at the following institutions:

- 15 Bank Accounts held at Bank of America;

- 2 Bank Accounts held at Heartland Bank and Trust Company;

- 1 Bank Account held at JPMorgan Chase Bank, N.A.;

- 23 Bank Accounts held at KeyBank National Association;

- 42 Bank Accounts held at The PNC Financial Services Group, Inc.;

- 15 Bank Accounts held at Regions Financial Corporation;

- 371 Bank Accounts held at U.S. Bank National Association; and

- 357 Bank Accounts held Wells Fargo Bank, N.A.

21.    ***Compliance with the U.S. Trustee Guidelines and Section 345 of the Bankruptcy Code***.  The Debtors' Bank Accounts are maintained at Banks that are well-capitalized and sophisticated financial institutions.  All of the Banks are insured by the FDIC.  With the exception of Heartland, all of the Banks are Authorized Depositories.  The Debtors maintain one store-level Bank Account and one corresponding Depository Account at Heartland.  Heartland is a well-capitalized, financially stable, and reputable financial institution.  The amounts in the Heartland Accounts are well below the FDIC-insured limits and are swept daily to the Jo-Ann Stores Main Account.

22.    I believe that requiring the Debtors to transfer any of the Heartland Accounts to a designated Authorized Depository would place an excessive administrative burden on the Debtors, particularly where all of the Bank Accounts are held at well-capitalized and sophisticated financial institutions that are insured by the FDIC.  To the extent the Court determines that the requirements of section 345(b) of the Bankruptcy Code or the U.S. Trustee Guidelines are not satisfied, the Debtors request a thirty (30) day suspension of such requirements, subject to the Debtors' rights to seek further extensions.

23.    ***Bank Fees***.  The Debtors incur periodic service charges and other fees in connection with maintaining and operating the Bank Accounts.  As of the Petition Date, the Debtors estimate that they owe approximately $150,000 in prepetition Bank Fees.  The Debtors request authority, but not direction, to pay any prepetition Bank Fees for prepetition transactions that are charged postpetition and to continue to pay the Bank Fees in the ordinary course on a postpetition basis.

24.    ***Intercompany Transactions***.   In the ordinary course of business, the Debtors routinely maintain and engage in business transactions with each other (such transactions, the "Intercompany Transactions"), resulting in intercompany receivables and payables (the "Intercompany Claims").   The Debtors generally account for and record all Intercompany Transactions and Intercompany Claims in their centralized accounting system, the results of which are recorded on the Debtors' balance sheets and regularly reconciled.

25.    Most Intercompany Transactions are conducted pursuant to intercompany trade arrangements.   Debtors Joann.com LLC and Jo-Ann Stores are each party to separate service agreements with Debtor JASSC (each, a "Support Services Agreement").   Pursuant to the Support Services Agreements, JASSC provides certain administrative support services in exchange for an annual fee.   Services provided include, among others, administrative, financial planning and budgeting, marketing and public relations, risk management, logistics, merchandising support, human resources, IT, inventory management, web development and other consulting and advisory services.   For the twelve-month period ending December 31, 2024, Joann.com and Jo-Ann Stores LLC paid JASSC approximately $150 million in total pursuant to the Support Services Agreements.

26.    Instead of transferring cash between different entities' Bank Accounts to pay amounts owed under the Support Services Agreements, Joann.com, Jo-Ann Stores, and JASSC are each party to an intercompany note (each, an "Intercompany Note").   Under each Intercompany Note, the applicable maker owes the lesser of $1,000,000 or the aggregate unpaid amount of all advances by the applicable obligor on behalf of such maker pursuant to the Support Services Agreement between such parties.   Debtor Jo-Ann Stores is also party to two leases with Debtor JASSC, which are for one of the Debtors' store premises and a distribution center, both

located in Hudson, Ohio. Rent under the leases accrues monthly to the balance of the Intercompany Note for which Debtor Jo-Ann Stores is the maker. Debtor Creativebug, LLC is also party to an intercompany note in favor of JASSC and accounts for advances made by JASSC to Creativebug.

27.    Additionally, the Debtors have historically transacted with Jo-Ann Trading (Shanghai) Co., Ltd. ("JATS" or the "non-Debtor Affiliate"), a wholly-owned foreign subsidiary of Debtor Jo-Ann Stores. JATS and Jo-Ann Stores are party to a services contract to assist with the sourcing of merchandise from China. The Debtors do not intend to make any payments or distributions to JATS during the pendency of these chapter 11 cases under the JATS Services Agreement.

28.    I believe that any discontinuation of the Intercompany Transactions would unnecessarily disrupt the Cash Management System and the Debtors' operations to the detriment of the Debtors, their creditors, and other stakeholders. Accordingly, the Debtors seek authority, but not direction, to continue to engage in Intercompany Transactions and grant administrative expense status under section 364 of the Bankruptcy Code to Intercompany Claims as a result of postpetition Intercompany Transactions. For the avoidance of doubt, the Debtors are not seeking relief to perform Intercompany Transactions with the non-Debtor Affiliate.

29.    ***Business Forms***. As part of the Cash Management System, the Debtors utilize numerous business forms in the ordinary course of their business, including letterhead, purchase orders, invoices, and checks. The U.S. Trustee Guidelines require that the Banks print "Debtor in Possession" and the bankruptcy case number on checks issued after the Petition Date. With respect to any checks that are generated electronically after the Petition Date, the Debtors will update such checks to indicate their status as "Debtor in Possession" and the bankruptcy case numbers.

However, out of an abundance of caution, the Debtors request that, to the extent there are any pre-printed checks and other Business Forms, the Court authorize the Debtors' continued use of all such Business Forms in existence immediately before the Petition Date, without reference to the Debtors' status as debtors in possession to minimize expenses to their estates and avoid confusion on the part of employees, customers, vendors, and suppliers during the pendency of these chapter 11 cases.

30.    For the foregoing reasons, I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest.

**C.      Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain and Administer Their Customer Programs and (B) Honor Prepetition Obligations, and (II) Granting Related Relief (the "<u>Customer Programs Motion</u>").**

31.    The Debtors historically have provided certain pricing incentives, discounts, and other accommodations to their customers to attract and maintain positive customer relationships. The Debtors believe that their ability to continue, modify, or terminate the Customer Programs and to honor any obligations thereunder is necessary to retain their reputation, comply with their legal obligations, meet competitive market pressures, and ensure customer satisfaction. This will ensure that the Debtors may retain current customers, attract new ones, and, ultimately, enhance revenue and profitability for the benefit of all the Debtors' stakeholders. In light of the importance of the Customer Programs to the Debtors' businesses, the Debtors request authority to continue to honor obligations related to these programs in the ordinary course of business as described in the Customer Programs Motion.

32.    ***Gift Cards***. In the ordinary course of business, the Debtors have available for purchase in their stores prepaid, non-expiring gift cards (the "<u>Gift Cards</u>"). Gift Cards are also

issued in connection with certain returns of products. They can be redeemed in stores or online for products at a later date. The Debtors believe that honoring all outstanding Gift Cards is essential to maintaining a healthy relationship with their customers and mitigating potential adverse publicity resulting from the bankruptcy filings. As of the Petition Date, the Debtors estimate that they have Gift Cards with an aggregate value of approximately $55 million outstanding that have not yet been redeemed. The Debtors request that the Court authorize the Debtors to modify the Gift Cards such that Customers may only continue to redeem Gift Cards for fourteen days following the consummation of any sale transaction, solely with respect to those purchased or issued prepetition.

33. *Promotions*. In the ordinary course of business, the Debtors regularly conduct sales promotions in their stores, online, and through direct mail campaigns, as well as under the Debtors' JOANN Smiles rewards program (collectively, the "Promotions"). The Debtors' Promotions have included, for instance, pricing discounts, "buy x get y" offers, birthday rewards, and other similar Promotions. The Debtors believe that the Promotions are in the best interest of the customers, as well as in their own best interests to help to grow the client base and inure to the benefit of the estates. The Promotions do not require any cash expenditures from the Debtors. Accordingly, as of the Petition Date, the Debtors believe there are no outstanding prepetition amounts owed on account of the Promotions. The Debtors seek authority to discontinue the JOANN Smiles reward program as of the consummation of any sale transaction and to continue to utilize Promotions other than the JOANN Smiles reward program, including redeeming any coupons issued prepetition pursuant to the Promotions and honoring any obligations in connection therewith whether arising prior to or after the Petition Date, in the ordinary course for up to fourteen days following the consummation of any sale transaction.

34.    ***Refund and Exchange Policy***. In the ordinary course of business, the Debtors accept returns or exchanges from their customers if a customer is not satisfied with their purchase for any reason with no time limits on the date of return (the "Refund and Exchange Policy").  Under the Refund and Exchange Policy, a customer is entitled to either (a) a refund of the full purchase price of the product if the return is accompanied by an original sales receipt or packing slip or (b) an exchange or store credit in the form of a Gift Card based on the lowest price of the product of the last ninety days.  With respect to sewing machines sold by the Debtors specifically, any such machine purchased from the Debtors that was damaged can be brought by the purchaser to a retail location of the Debtors to be exchanged for a non-damaged machine.  The Debtors believe that continuing its Refund and Exchange Policy is in the best interest of the customers as well as in their own best interests to help to maintain their strong relationships with customers.  While, on average, the Debtors processed approximately $5.1 million per month of refunds and exchanges during the twelve-month period prior to the Petition Date, these expenditures only arise when a return or exchange is requested.  Accordingly, as of the Petition Date, the Debtors believe there are no outstanding prepetition amounts owed on account of the Refund and Exchange Policy, and the Debtors seek authority to continue to utilize the Refund and Exchange Policy for up to fourteen days following the consummation of any sale transaction and to honor any obligations in connection therewith whether arising prior to or after the Petition Date for up to fourteen days following the consummation of any sale transaction.  Additionally, the Debtors also seek authority to modify the Refund and Exchange Policy such that all sales are considered "final" as of the Closing Date.

35.    ***Charitable Programs***. In the ordinary course of business, the Debtors participate in a number of charitable programs (the "Charitable Programs"), partnering with organizations such

as the Children's Miracle Network, St. Jude's Children's Hospital, and Susan G. Komen. These Charitable Programs include corporate donations for sponsorships as well as donations collected from customers at checkout that are then passed on to charitable partners. The customer donations program is operated through a coinbox system as well as a point-of-sale system. The Debtors believe that continuing the Charitable Programs is in the best interest of the Debtors because it helps them maintain a benevolent reputation and ensures that they are able to leverage their success to the benefit of the communities in which they operate. As of the Petition Date, the Debtors had approximately $1.3 million in donations payable under the point-of-sale system and approximately $300,000 in donations payable under the coinbox system. The Debtors request that the Court authorize the Debtors to continue operating their Charitable Programs, without interruption, in the ordinary course of business and to honor their prepetition obligations thereunder totaling $1.6 million.

36.     For the foregoing reasons, I believe that the relief requested in the Customer Programs Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest.

**D.     Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief (the "Wages Motion").**

37.     Pursuant to the Wages Motion, the Debtors seek entry of interim and final orders (a) authorizing, but not directing, the Debtors to:  (i) pay prepetition wages, salaries, other compensation, and reimbursable expenses on account of the Compensation and Benefits (as defined in the Wages Motion) and (ii) continue to administer the Compensation and Benefits programs in the ordinary course, including payment of certain related prepetition obligations, and (b) granting related relief.

38.     As of the Petition Date, the Debtors' workforce comprises 19,000 employees (the "Employees") whose skills and knowledge are essential to the Debtors' assets, operations, and ability to pursue a value maximizing sale or sales in these chapter 11 cases.  The Debtors engage Contractors (as defined in the Wages Motion) in a variety of capacities, such as independent contractors, temporary staff, and independent consultants, to provide interim or specialty services for certain targeted transactions or projects on an as-needed basis, including back-office functions such as information technology and human resources support.  The Contractors provide flexibility to the Debtors' workforce and enables the Debtors to meet their operational needs in a cost-effective and efficient manner.  The Contractors are sourced and paid through approximately fifteen staffing agencies.  The Contractors were, and will continue to be, an important supplement to the efforts of the Debtors' Employees.  Together, the Employees and Contractors perform a variety of critical functions throughout the Debtors' business, including, among other things, operating and managing the Debtors' retail stores and distribution centers, procuring raw materials and goods, and providing necessary administrative, managerial, and financial support services.

39.     The Debtors offer certain Health and Welfare Benefits to eligible Employees, including the Medical and Dental Plans, Vision Plan, Pre-Tax Contribution Health Savings Accounts, Life and Disability Program, Workers' Compensation Program, and Other Employee Benefit Programs.  Additionally, the Debtors offer Employee Assistance Programs that pair Employees with certain face-to-face counseling services, eldercare support, legal consultation, financial education and planning, adoption, as well as identity theft prevention and recovery.

40.     In many instances, the Debtors' Employees and Contractors rely exclusively on their Compensation and Benefits to pay their daily living expenses and to support their families. Employees and Contractors will be exposed to significant financial hardship and may leave the

employ of the Company to the detriment of the estates in the event the Debtors are not permitted to continue paying wages and salaries, providing employee benefits, and maintaining existing employee programs in the ordinary course of business.

41.     In addition, the Debtors also seek to pay all costs incidental to the Employee Compensation and Benefits programs.  As set forth below, the Debtors seek authority, but not direction, to pay, remit, or reimburse, as applicable, the following aggregate prepetition amounts on account of the Compensation and Benefits programs set forth in the table below:

| Compensation & Benefits | Interim Amount |
|---|---|
| **Compensation and Withholding Obligations** | **$16,730,000** |
| Employee Wages | $6,200,000 |
| Contractor Compensation | $2,000,000 |
| Paid Leave Benefits | $110,000 |
| Union Employee Severance Plans | $0 |
| WARN Act Obligations | N/A |
| Withholding Obligations | $8,000,000 |
| Reimbursable Expenses | $40,000 |
| Non-Insider Bonus Programs | $300,000 |
| Union Obligations | $80,000 |
| **Health and Welfare Benefits** | **$12,800,000** |
| Medical and Dental Plans | $7,000,000 |
| Vision Plan | $100,000 |
| Pre-Tax Contribution Health Savings Accounts | N/A |
| Life and Disability Programs | $600,000 |
| Employee Assistance Programs | $0 |
| Workers' Compensation Program | $5,100,000 |
| Other Employee Benefit Programs | $0 |
| **Total** | **$29,530,000** |

42.     For all of these reasons, the Debtors would suffer immediate and irreparable harm to their business without the relief sought in the Wages Motion.  The Debtors' Employees and Contractors are critical to the Debtors' efforts to pursue a value maximizing sale or sales.  For the foregoing reasons, I believe the relief requested in the Wages Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

E.    **Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) Store Support Vendors, (B) Lien Claimants, and (C) 503(B)(9) Claimants, (II) Confirming Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief (the "Store Support Motion").**

43.    In the ordinary course, the Debtors' business depends on a wide variety of vendors that provide goods and services essential to the continued operation, maintenance, and safety of the Debtors' retail stores and distribution centers.  Prior to these chapter 11 cases, the Debtors identified a limited number of vendors whose goods and services are needed to continue operating the Debtors' retail locations and to support the sale of the Debtors' merchandise, including any potential "going out of business," "store closing," or "everything must go" sales (the "GOB Sales") that may commence during these chapter 11 cases.  In addition, the Debtors depend on a network of domestic and international freight providers to transport merchandise to the Debtors' stores. Access to these goods and services is necessary for the Debtors to continue operating their stores and generating revenue, in order to facilitate the Debtors' ongoing sale process, and to maximize the value of the Debtors' estates.  Accordingly, the Debtors seek authorization to pay the prepetition claims solely to those vendors and trade counterparties necessary to continue operations, facilitate any GOB Sales, if necessary, and preserve the value of their estates during these chapter 11 cases.

44.    ***Store Support Vendor Claims.***  Prior to filing these chapter 11 cases, the Debtors and their advisors carefully reviewed and analyzed the Debtors' books and records and consulted with key personnel to identify the vendors who supply the essential goods and services necessary to maintain the Debtors' operations, conduct any GOB sales, if necessary, and pursue a value-maximizing sale or sales of the Debtors' assets (such vendors, the "Store Support Vendors").

45.    The Debtors' Store Support Vendors include, among others:  (a) suppliers who provide the Debtors with goods necessary (i) to facilitate and support any necessary GOB Sales

(*e.g.*, store supplies such as register tape, inventory tags, and bags) or (ii) for the safe and efficient operation of the Debtors' stores and distribution centers (e.g., boxes, cleaning supplies, signage); and (b) service providers who provide critical support to the Debtors' operations, including, among other things, shipping, freight, IT, facilities management and maintenance, and digital marketing.

46.     Failure to pay prepetition claims held by the Store Support Vendors and accrued in the ordinary course of business (collectively, the "Store Support Vendor Claims") could cause such Store Support Vendors to refuse to provide the goods and services necessary for the Debtors' continued operations.  The Debtors believe that any failure to maintain the Store Support Vendors would materially harm the Debtors' ability to achieve a value-maximizing sale of the Debtors' assets.

47.     As of the Petition Date, the Debtors estimate that there is an aggregate of approximately $5,100,000 in prepetition amounts outstanding on account of the Store Support Vendor Claims.  Accordingly, the Debtors seek authority, in their sole discretion and business judgment, to make payments on account of Store Support Vendor Claims in an aggregate amount not to exceed $2,700,000, all of which shall be available upon entry of the Interim Order, which amount represents the Debtors' best estimate as to what aggregate amounts must be paid to the Store Support Vendors to continue an uninterrupted supply of critical goods and services.

48.     ***Lien Claims.***  The Debtors rely on services from parties, including shippers and warehousemen (collectively, the "Lien Claimants"), who may hold, or claim to hold, a variety of statutory, common law, or possessory liens (collectively, the "Lien Claims") that, if asserted, could materially impair the Debtors' postpetition operations.  The Lien Claimants are generally comprised of those vendors whose continued services are deemed critical to moving merchandise that has already been purchased to the Debtors' stores and distribution centers.  Specifically, the

Debtors depend on the services of various domestic and foreign freight providers, common carriers, truckers, air transporters, rail carriers, and parcel shipping providers to transport merchandise which is currently in the possession of such parties. Additionally, the Debtors store certain merchandise and inventory at warehouse facilities owned by third parties. Without such merchandise arriving as scheduled to the Debtors' distribution centers and stores, the Debtors will not be able to meet customer demands, to the detriment of the Debtors' estates.

49.     In the event that the Debtors fail to remit payment owed to certain Lien Claimants, those Lien Claimants are likely to assert possessory liens, and may refuse to deliver or release goods in their possession until their claims are satisfied and their liens are redeemed. The Lien Claimants' retention of the Debtors' merchandise and supplies would bring the Debtors' operations to a halt and negatively affect their ability to generate revenue and successfully administer these chapter 11 cases.

50.     As of the Petition Date, the Debtors estimate that there is approximately $15,500,000 in aggregate amounts outstanding on account of the Lien Claims. The Debtors intend to pay prepetition Lien Claims only where they believe, in their business judgment, that the benefits to their estates from making such payments will exceed the costs, including the expenses and delay of contesting asserted liens, to their estates. Accordingly, the Debtors seek authority, in their business judgment, to make payments on account of Lien Claims in an aggregate amount not to exceed $4,300,000, of which $3,870,000 shall be available upon entry of the Interim Order and the remaining $430,000 upon entry of the Final Order.

51.     ***503(b)(9) Claims.*** The Debtors receive shipments of merchandise on a rolling basis to restock the stores to meet customer demand. As a result, the Debtors may have received goods from various vendors within the twenty-day period immediately preceding the Petition Date

(collectively, the "503(b)(9) Claimants," and together with the Store Support Vendors and the Lien Claimants, the "Trade Claimants"), thereby giving rise to prepetition claims under section 503(b)(9) of the Bankruptcy Code (the "503(b)(9) Claims"). The Debtors' relationship with certain of their vendors, including most of the 503(b)(9) Claimants, are not governed by long-term contracts. Instead, the Debtors obtain goods on an order-by-order basis, subject to applicable payment terms. As a result, a 503(b)(9) Claimant may refuse to supply new orders if the Debtors do not pay the 503(b)(9) Claims. Such refusal would compound the existing inventory restocking issues that continue to plague the Debtors and compromise the value of the Debtors' business.

52.     The Debtors estimate that they owe approximately $30,000,000 on account of goods delivered within the twenty days immediately preceding the Petition Date, that are due and owing as of the Petition Date, or which will become due and owing on an interim basis pending entry of the Final Order, the value of which may be entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.

53.     Accordingly, the Debtors seek authority, in their business judgment to make payments on account of 503(b)(9) Claims in an aggregate amount not to exceed $30,000,000, which represents the Debtors' best estimate as to what aggregate amount must be paid to the 503(b)(9) Claimants for the continued supply of critical goods and services.

54.     ***Outstanding Orders.*** Prior to the Petition Date and in the ordinary course of business, the Debtors may have ordered goods that will not be delivered until after the Petition Date (the "Outstanding Orders"). In the mistaken belief that they would be general unsecured creditors of the Debtors' estates with respect to such goods, certain suppliers may refuse to ship or transport such goods (or may recall such shipments) with respect to such Outstanding Orders

unless the Debtors issue substitute purchase orders postpetition—potentially disrupting the Debtors' operations and requiring the Debtors to expend substantial time and effort in issuing such substitute orders. Because the Outstanding Orders are likely administrative expenses of the Debtors' estates, the Debtors request that the Court confirm the administrative expense priority of the Outstanding Orders and authorize the Debtors to pay amounts due on account of Outstanding Orders in the ordinary course of business.

55. For the foregoing reasons, I believe that the relief requested in the Store Support Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

**F.     Motion of Debtors for Entry of Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock and (II) Granting Related Relief (the "<u>NOL Motion</u>").**

56. Pursuant to the NOL Motion, the Debtors seek entry of interim and final orders: (a) approving certain notification and hearing Procedures related to certain transfers of, or declarations of worthlessness with respect to Debtor JOANN Inc.'s existing classes (or series) of Common Stock or any Beneficial Ownership therein; (b) directing that any purchase, sale, other transfer of, or declaration of worthlessness with respect to Beneficial Ownership of Common Stock in violation of the Procedures shall be null and void *ab initio*; and (c) granting related relief.

57. The Debtors currently estimate that they will have, as of the end of February 1, 2025, approximately $100 million of 163(j) Carryforwards. The Debtors may generate substantial additional Tax Attributes in the upcoming tax year, including during the pendency of these chapter 11 cases, and subject to further analysis may have a "net unrealized built-in loss.[2] The Tax

---

[2]   If the Debtors have a net unrealized built-in loss, then sol-called "recognized built-in losses" that are deducted prior to the expiration of a five-year limitation period may otherwise be limited under section 382 of the IRC. The Debtors have not yet determined whether they have a net unrealized built-in loss.

Attributes are potentially of significant value to the Debtors and their estates because the Tax Attributes may offset U.S. federal taxable income or U.S. federal tax liability in future years. Additionally, the Debtors may utilize such Tax Attributes to offset any taxable income generated by transactions consummated during these chapter 11 cases (including, if applicable, with respect to any.  The relief requested is expected to preserve the value of the Tax Attributes to the benefit of the Debtors' stakeholders.

58.     Additionally, the Debtors seek to establish procedures only to monitor those types of transactions that would pose a serious risk under the ownership change test pursuant to sections 382 and 383 of the IRC and to preserve the Debtors' ability to seek substantive relief if it appears that a proposed transfer or declaration of worthlessness could jeopardize the Debtors' utilization of the Tax Attributes.  Because the Tax Attributes are of significant value to the Debtors and their estates, an ownership change of Common Stock may negatively impact the Debtors' utilization of the Tax Attributes.  Accordingly, it is necessary to closely monitor certain transfers of Beneficial Ownership of Common Stock so as to be in a position to act expeditiously to prevent such transfers or worthlessness deductions, if necessary, with the purpose of preserving the Tax Attributes.  By establishing and implementing such Procedures, the Debtors will be in a position to object to "ownership changes" that threaten their ability to preserve the value of their Tax Attributes for the benefit of the estates.

59.     For the foregoing reasons, I believe the relief requested in the NOL Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

G.     **Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Prepetition and Postpetition Taxes and Fees and (II) Granting Related Relief (the "<u>Taxes Motion</u>").**

60.     Pursuant to the Taxes Motion, the Debtors seek entry of interim and final orders (a) authorizing the Debtors to (i) negotiate, remit, and pay (or use tax credits to offset) Taxes and

Fees in the ordinary course of business that are payable or become payable during these chapter 11

cases, including obligations arising on account of an Audit or voluntary disclosure or Assessment,

without regard to whether such obligations accrued or arose before or after the Petition Date, and

(ii) undertake the Tax Planning Activities, and (b) granting related relief.

61.     In the ordinary course of business, the Debtors collect, withhold, and incur:

(a) income and franchise taxes; (b) property taxes; (c) sales and use taxes; (d) customs and import

duties; (e) licensing and permitting fees, as well as other governmental taxes, fees, assessments,

interest, penalties, and additions to tax, and (f) fees to a third-party tax services provider

(collectively, the "Taxes and Fees").[3]  The Debtors pay or remit the Taxes and Fees to various

governmental authorities, including taxing authorities (collectively, the "Taxing Authorities"),

identified in a schedule attached as Exhibit C to the Taxes Motion.[4]  Taxes and Fees are generally

remitted and paid by the Debtors through checks and electronic funds transfers that are processed

through their banks and other financial institutions.  From time to time, the Debtors may also

receive tax credits for overpayments or refunds with respect to Taxes and Fees.  The Debtors

generally use these credits in the ordinary course of business to offset against future Taxes and

Fees or cause the amount of such credits to be refunded to the Debtors.  The Debtors estimate that

approximately $33.5 million in Taxes and Fees is outstanding as of the Petition Date, of which

$27.9 million will be owed during the first twenty-one days of these chapter 11 cases.

---

[3]     Other than with respect to any potential Audits or Assessments, the Taxes Motion does not seek relief with respect to the Debtors' collection and remittance of employee-related taxes and withholdings, which are instead addressed in the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief*, filed contemporaneously herewith.

[4]     Although **Exhibit C** to the Taxes Motion is intended to be comprehensive, the Debtors may have inadvertently omitted Authorities from **Exhibit C**.  The Debtors request relief with respect to Taxes and Fees payable to all Authorities, regardless of whether such Authority is specifically identified in **Exhibit C** to the Taxes Motion.

62.     Additionally, the Debtors are now and may be in the future subject to routine audit investigations on account of tax returns and/or tax obligations ("Audits") during these chapter 11 cases, including as a result of any voluntary disclosure agreements or similar procedural mechanisms (if applicable).  Audits may result in additional prepetition Taxes and Fees being assessed against the Debtors, including late payment of Taxes and Fees (such additional Taxes and Fees, "Assessments").[5]  Accordingly, the Debtors seek authority to pay or remit tax obligations on account of Audits or Assessments as they arise in the ordinary course of business and consistent with prepetition practice, including as a result of any resolutions of issues addressed in an Audit or amounts arising in connection with a voluntary disclosure.

63.     The Debtors pay the Taxes and Fees to the Taxing Authorities on a periodic basis, remitting them weekly, monthly, quarterly, semi-annually, or annually depending on the nature and incurrence of the particular category of Taxes and Fees, each of which is further discussed below.  The Debtors seek authority pursuant to the Taxes Motion to pay and remit all prepetition and postpetition obligations on account of Taxes and Fees, including where:  (a) Taxes and Fees accrue or are incurred postpetition; (b) Taxes and Fees accrued or were incurred prepetition but were not paid prepetition or were paid in an amount less than actually owed; (c) Taxes and Fees paid prepetition by the Debtors were lost or otherwise not received in full by any of the Taxing Authorities; or (d) Taxes and Fees incurred for prepetition periods may become due after the commencement of these chapter 11 cases, including as a result of Audits.  In addition, for the

---

[5]     Nothing in the Taxes Motion, or any related order, constitutes or should be construed as an admission of liability by the Debtors with respect to any of the Taxes and Fees, including in connection with any Audit (or voluntary disclosure) or Assessment.  The Debtors expressly reserve all rights with respect to all Taxes and Fees, including in connection with any Audit (or voluntary disclosure) and the right to contest any Assessments claimed to be due as a result of any Audit.

avoidance of doubt, the Debtors seek authority, but not direction, to pay Taxes and Fees for so-called "straddle" periods (*i.e.*, periods that include the Petition Date).[6]

64.     Finally, the Debtors seek authority to undertake certain typical activities related to tax planning, including (a) converting Debtor entities from one form to another (*e.g.*, converting an entity from a corporation to a limited liability company) via conversion, merger, or otherwise ("Entity Conversions"); (b) making certain tax elections (including with respect to the tax classification of Debtor entities) ("Entity Classification Elections"); (c) changing the position of Debtor entities within the Debtors' corporate structure ("Entity Movements"); and (d) modifying or resolving intercompany motions and moving assets or liabilities among Debtor entities ("Asset and Liability Movements" and, together with the Entity Conversions, Entity Classification Elections, and Entity Movements, the "Tax Planning Activities"), in each case, if doing so will not alter the substantive rights of the Debtors' stakeholders in these chapter 11 cases.

65.     The Taxes and Fees are summarized as follows:

| Category | Description | Approximate Amount Accrued and Unpaid as of Petition Date | Approximate Amount Due During the First 21 Days |
|---|---|---|---|
| Income and Franchise Taxes | The Debtors pay income, withholding, franchise, gross receipts, and similar taxes to federal, state, and local Authorities in the United States. The amount of Income and Franchise taxes incurred is based on the jurisdictions in which the Debtors do business, generally payable on a quarterly or annual basis. Because the Debtors experienced losses for the 2025 fiscal year, subject to further analysis they are not currently aware of material Income and Franchise Taxes that are owed. | $0 | $0 |

---

[6]     The Debtors reserve their rights with respect to the proper characterization of any "straddle" Taxes and Fees and to seek reimbursement of any portion of any payment made that ultimately is not entitled to administrative or priority treatment.

| Category | Description | Approximate Amount Accrued and Unpaid as of Petition Date | Approximate Amount Due During the First 21 Days |
|---|---|---|---|
| Property Taxes | The Debtors incur taxes related to certain real and personal property holdings, payable as such taxes come due in the ordinary course of business, on a monthly or annual basis. | $7,000,000 | $1,350,000 |
| Sales and Use Taxes | The Debtors collect and remit sales and use taxes and related taxes and fees to the Authorities in various jurisdictions in connection with the sale and use of goods and services in such jurisdictions.  Generally, the Debtors remit sales and use taxes to the applicable Taxing Authority monthly in arrears.  Some Taxing Authorities are paid on a weekly basis, and on most business days the Debtors remit some amount of Sales and Use Taxes. | $20,000,000 | $20,000,000 |
| Customs and Import Duties | The Debtors remit taxes and related fees to Authorities imposed for importing goods from outside the United States. | $6,500,000 | $6,500,000 |
| License and Permit Fees | The Debtors pay Taxes and Fees related to compliance with regulatory requirements, including periodic licensing, permitting, reporting and similar requirements, generally payable on an annual basis, depending on the specific Tax or Fee. License and Permit Fees are typically paid in advance.  The Debtors do not believe there are any obligations to make payment of License and Permit Fees outstanding as of the Petition Date. | $0 | $0 |
| Tax Service Provider | Fees incurred for services of the Tax Service Provider in the ordinary course of business, including calculating Property Taxes and Sales and Use Taxes and remitting such taxes to the Authorities on the Debtors' behalf. | $2,000 | $2,000 |
| **Total** | | $33,502,000 | $27,852,000 |

66.     For all of these reasons, the Debtors would suffer immediate and irreparable harm to their business without the relief sought in the Taxes Motion.  For the foregoing reasons, I believe such relief requested in the Taxes Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

H.     **Motion of Debtors for Entry of Interim and Final Orders (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, (III) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Service, (IV) Authorizing Certain Fee Payments for Prepetition Services Performed, and (V) Granting Related Relief (the "<u>Utilities Motion</u>").**

67.     Pursuant to the Utilities Motion, the Debtors seek entry of interim and final orders, (a) approving the Debtors' proposed adequate assurance of payment for future utility services, (b) approving the Debtors' proposed procedures for resolving additional adequate assurance requests, (c) prohibiting utility providers from altering, refusing or discontinuing services, (d) authorizing the payment of prepetition fees to the Utility Service Administrators, and (e) granting related relief.

68.     In the ordinary course of their business, the Debtors obtain electricity, natural gas, water, waste management (including sewer and trash), internet, telecommunications, and other similar services from a number of utility providers.  Although the Debtors pay some of their Utility Providers directly for Utility Services, the Debtors pay a vast majority of their Utility Providers indirectly through third-party utility service administrators Engie Insight Services Inc. and Digital Mobile Innovations LLC.   The Debtors pay approximately $4 million each month for Utility Services, calculated as a historical average payment for the twelve-month period ended December 31, 2024, excluding Utility Services billed directly to the Debtors' landlords.  The Debtors are not in default or arrearages with respect to their obligations for prepetition Utility Services.

69.     The Debtors intend to satisfy postpetition obligations owed to the Utility Providers in the ordinary course of business and in a timely manner.   Cash held by the Debtors, cash generated in the ordinary course of business, and the Debtors' anticipated access to cash collateral will provide sufficient liquidity to pay the Debtors' Utility Service obligations in accordance with their prepetition practice during the pendency of these chapter 11 cases.  To provide additional

28

assurance of payment, the Debtors propose to deposit $1,570,363.22 into a segregated account. The Adequate Assurance Deposit represents an amount equal to approximately one-half of the Debtors' average monthly cost of Utility Services, as of the Petition Date, calculated as the historical average payment for the twelve-month period ending December 31, 2024.

70.     I submit that the Debtors' proposed Adequate Assurance Procedures will provide a streamlined process for Utility Providers to address potential concerns with respect to the Proposed Adequate Assurance, while allowing the Debtors to continue their operations uninterrupted. Further, I believe uninterrupted Utility Services are essential to the Debtors' ongoing business operations and, hence, the overall success of these chapter 11 cases.  The Debtors' business operations require uninterrupted electricity, internet, heat, water, and other utility services to operate.  Specifically, the Debtors must maintain constant communication with their customers to properly serve their needs, which requires a dependable provision of Utility Services. Additionally, the Utility Services are essential for the Debtors to operate their corporate offices and other facilities, including their sales offices and installation and warehouse facilities.  Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtors' business operations would be severely disrupted.   Such disruption would adversely affect customer goodwill and employee and salesperson relations, which, in turn, would jeopardize the Debtors' sale and fulfillment efforts.

71.     For the foregoing reasons, I believe such relief sought in the Utilities Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.