**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| GETTY IMAGES HOLDINGS, INC., *et al.*,[1] | ) | Case No. 26-11643 (JKS) |
| Debtors. | ) | (Joint Administration Requested) |

**DECLARATION OF MITCHELL (CHASE) BRANTLEY, SENIOR DIRECTOR AT ALVAREZ & MARSAL NORTH AMERICA, LLC, IN SUPPORT OF THE DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL AND OBTAIN POSTPETITION FINANCING; (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; (III) PROVIDING ADEQUATE PROTECTION; (IV) MODIFYING THE AUTOMATIC STAY; (V) SCHEDULING A FINAL HEARING; AND (VI) GRANTING RELATED RELIEF**

I, Mitchell (Chase) Brantley, hereby declare under penalty of perjury:

1. I am a Senior Director at Alvarez & Marsal North America, LLC ("A&M"), the proposed financial advisor to the above-captioned debtors and debtors in possession (collectively, the "Debtors").

2. I submit this declaration (this "Declaration") in support of the *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral and Obtain Postpetition Financing, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Providing Adequate Protection, (IV) Modifying the Automatic Stay, (V) Scheduling a*

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Getty Images Holdings, Inc. (4229); Griffey Midco (DE), LLC (7122); Abe Investment Holdings, Inc. (5107); Getty Images, Inc. (7556); Getty Images (US), Inc. (8819); Getty Images News Services (PRC), Inc. (1849); and Getty Images (Seattle), Inc. (6863). The location of the Debtors' service address for purposes of these chapter 11 cases is: 605 5th Ave. S. Suite 400, Seattle, WA 98104.

*Final Hearing, and (VI) Granting Related Relief* (the "DIP Motion"),[2] filed contemporaneously herewith. The DIP Motion seeks, among other things, authorization for the Debtors to obtain up to $143.0 million of non-priming, secured debtor-in-possession financing (the "DIP Facility") from Koch Equity Development LLC and/or its affiliates (collectively, the "DIP Lenders"), consisting of (a) $85.0 million of Interim Initial DIP Loans available upon entry of the Interim Order, (b) $28.0 million of Final DIP Loans available upon entry of the Final DIP Order, and (c) $30.0 million of Delayed-Draw DIP Commitments available upon entry of the Interim Order, subject to the delayed-draw conditions specified in the DIP Documents, as well as authorization for the Debtors' continued use of Cash Collateral.

3. Although A&M is expected to be compensated for its work as the Debtors' proposed financial advisor in these chapter 11 cases (the "Chapter 11 Cases"), I am not being compensated separately for this Declaration or testimony in connection therewith. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my discussions with the Debtors' management team, other members of the A&M team, and the Debtors' other advisors, my review of information concerning the Debtors' operations, financial affairs, and restructuring initiatives, and my views based upon my experience and knowledge. I am above 18 years of age, and I am competent to testify, and if called as a witness, I could and would testify competently to the facts set forth in this Declaration on that basis.

2 Capitalized terms used but not otherwise defined shall have the meanings ascribed to them in (a) the DIP Motion; (b) DIP Credit Agreement; (c) the Interim Order; (d) the Restructuring Support Agreement; or (e) the First Day Declaration, as applicable.

**Background and Qualifications**

4. A&M is a leading restructuring consulting firm with extensive experience providing high quality, specialized management and restructuring advisory services to debtors and distressed companies. Specifically, A&M's core services include turnaround advisory services, interim and crisis management, revenue enhancement, claims management, and creditor and risk management advisory services. A&M provides a wide range of debtor advisory services targeted at stabilizing and improving a company's financial position, including: (a) developing or validating forecasts, business plans, and related assessments of strategic positions; (b) monitoring and managing cash, cash flow, and supplier relationships; (c) assessing and recommending cost reduction strategies; and (d) designing and negotiating financial restructuring packages. In addition, A&M provides advice on specific aspects of the turnaround process and helps manage complex constituency relations and communications. A&M is known for its ability to work alongside company management and key constituents during chapter 11 restructurings to develop a feasible and executable plan of reorganization.

5. I am a Senior Director with A&M's Restructuring & Turnaround practice in Los Angeles, and I specialize in financial restructuring and operational turnarounds. I have over eleven years of restructuring and financial advisory experience, and my primary focus areas include working capital and liquidity management, contingency planning, cash flow forecasting, business plan preparation and review, and operational and strategic solutions for companies in distressed situations. I have represented clients in various stages of the restructuring process, including chapter 11 and out-of-court restructurings, across both private and public companies in various industries, including cryptocurrencies and data centers, retail, oil and gas, manufacturing, paper, and media. My notable engagements include FTX Recovery Trust (and previously FTX Trading Ltd during its chapter 11 proceedings), Celsius Network, Seadrill Limited, Valaris plc, Legacy

Reserves, Toys "R" Us, Payless ShoeSource, and Verso Corporation. I earned a bachelor's degree in finance from the University of Arizona.

6. A&M was retained in August 2026 to advise the Debtors on contingency planning and liquidity needs. Over the course of its engagement, A&M has evaluated the Debtors' operations and cash requirements to operate their business during these Chapter 11 Cases, including by assisting in the development of the Debtors' near-term cash flow forecasts. In addition, A&M has assisted the Debtors in the review of the Debtors' business plan, the assessment of strategic alternatives, and financing-related workstreams.

7. Immediately following its engagement, A&M began obtaining diligence from the Debtors and evaluating the Debtors' operations and near-term liquidity requirements for potential strategic alternatives and, subsequently, for the debtor-in-possession financing process. A&M, under my supervision, has worked with the Debtors' restructuring professionals and key members of the Debtors' business—including, but not limited to, members of the finance, legal, and operations leadership teams—to evaluate and understand the Debtors' cash flows, financial reporting, and general operations, and has become well-acquainted with the Debtors' capital structure, liquidity needs, and business operations.

**The Debtors' Capital Structure and the DIP Facility**

8. As of October 21, 2026 (the "Petition Date"), the Debtors had approximately $1,456.0 million in total funded debt obligations, consisting of approximately $1,186.0 million of secured funded indebtedness and approximately $270.0 million of unsecured funded indebtedness. The following table depicts the Debtors' prepetition funded indebtedness as of the Petition Date:

| Type of Debt | Maturity | Approx. Amount Outstanding ($ in millions) |
|---|---|---|
| **Secured Debt** | | |
| $150MM Revolving Credit Facility | May 4, 2028 | $150 |
| $1.04BN Senior Secured USD Term Loan due 2030 | February 21, 2030 | $40 |
| €407MM Senior Secured EUR Term Loan due 2030 | February 21, 2030 | $456 |
| 11.250% Senior Secured Notes due 2030 | February 21, 2030 | $540 |
| **Total Secured Debt** | | **$1,186** |
| **Unsecured Debt** | | |
| 9.750% Senior Unsecured Notes due 2027 | March 1, 2027 | $5 |
| 14.000% Senior Unsecured Notes due 2028 | March 1, 2028 | $265 |
| **Total Unsecured Debt** | | **$270** |
| **Total** | | **$1,456** |

9. To facilitate the restructuring transactions contemplated by the Restructuring Support Agreement, the Debtors secured commitments from KED to provide (or cause its affiliates to provide) the DIP Facility on a fully consensual basis. The DIP Facility provides an aggregate DIP Commitment of up to $143.0 million, consisting of $85.0 million of Interim Initial DIP Loans, $28.0 million of Final DIP Loans, and $30.0 million of Delayed-Draw DIP Commitments, and provides for the consensual use of Cash Collateral. All proceeds of the DIP Facility will be deposited into the Segregated DIP Account and may be withdrawn only in accordance with the Approved Budget, subject to Permitted Variances, or to fund the Carve Out.

**<u>The Debtors' Immediate Need for Access to the DIP Facility and Cash Collateral</u>**

10. I am familiar with the DIP Facility, the material terms thereof, and the Debtors' immediate liquidity needs. Based on my experience in the restructuring industry generally and my experience with the Debtors in particular, I believe that approval of the DIP Facility and continued use of Cash Collateral is essential for the Debtors to maintain operations in the ordinary course and to implement the restructuring contemplated by the Restructuring Support Agreement.

11. As described in the First Day Declaration, the Debtors have faced significant financial challenges in the months leading up to the Petition Date. Before the Petition Date, the Debtors' revolving credit facility was fully drawn, and the Debtors' forecast shows projected liquidity falling below the minimum level of liquidity the Debtors require to operate their business through the end of October 2026, as described below. Accordingly, the Debtors need immediate access to the DIP Facility and the use of Cash Collateral to administer these Chapter 11 Cases, avoid value-destructive business disruption, and continue to fund payroll, vendor and licensor payments, and other ordinary-course costs of their business.

12. A&M, under my supervision, advised and assisted the Debtors in determining how much postpetition financing would be required to operate the Debtors' business and fund the administrative costs of these Chapter 11 Cases. As part of this evaluation, A&M assisted in the development of the Debtors' 13-week cash flow forecast (the "<u>Initial Approved Budget</u>," a summary version of which is attached as Exhibit 1 to the Interim DIP Order). The Initial Approved Budget takes into account anticipated operating receipts and disbursements during the projected period and considers a number of factors, including, but not limited to, the effect of the chapter 11 filing on the customer, contributor, licensor, and vendor obligations, professional fees, the Adequate Protection Payments, and the operational performance of the underlying business.

**The Debtors' Minimum Liquidity Requirement**[3]

13. Based on A&M's analysis of the Debtors' historical and projected cash flows, and discussions with the Debtors' management team, I believe the Debtors require a baseline minimum liquidity of approximately $20.0 million to operate their business in the ordinary course. That figure, however, overstates the amount of cash actually available to the Debtors to fund disbursements. Approximately $5.0 million of the $20.0 million baseline consists of timing related to customer and distribution-partner receipts that have been invoiced or collected by third parties but not yet received into the Debtors' accounts and therefore cannot be used to make payments, as well as cash in transit related to the normal course movement of cash within the Debtors' cash management system. Additionally, there is approximately $5.0 million of restricted cash required to be held as a minimum balance in certain of the Debtors' bank accounts.

14. I believe that approximately $20.0 million of baseline liquidity is the minimum the Debtors need to operate a global business of their size and complexity. Among other things, the Debtors must be able to fund, on a weekly and monthly basis: (a) payroll and benefits for their employees, freelancers and contingent workforce, which total approximately $15.0 million per month; (b) royalty and other payments to the global contributors and content partners whose imagery and video make up the Debtors' collection, which total approximately $20.0 million per month; and (c) payments to licensors, technology and hosting providers, and other essential vendors, which total approximately $15.0 million per month. The Debtors' receipts do not

[3] The minimum liquidity, restricted cash, and available cash figures set forth in paragraphs 13 and 14 of this Declaration reflect only the cash requirements of the Debtors, consistent with the Initial Approved Budget, which reflects the Debtors' projected receipts and disbursements and upon which the sizing of the DIP Facility is based. The approximately $50.0 million minimum liquidity requirement described in the DIP Motion and the First Day Declaration reflects the requirements of the Debtors and their non-Debtor affiliates, on a consolidated basis, to operate their business in the ordinary course. Of that amount, approximately $20.0 million is attributable to the Debtors, which is the minimum cash requirement used in sizing the DIP Facility, and approximately $30.0 million is attributable to the Debtors' non-Debtor affiliates.

fluctuate materially due to seasonality or month end, although certain concentrations do exist periodically. Disbursements such as payroll and contributor payments occur on a fixed schedule, creating the potential for intra-month swings in cash. The baseline minimum cash of $20.0 million provides sufficient liquidity for the Debtors to absorb ordinary timing differences between receipts and disbursements without altering payments to employees, contributors, or vendors. As of the Petition Date, the Debtors' cash on hand was approximately $21 million, of which approximately $18 million was available, below the $20 million baseline minimum liquidity.

**Sizing of the DIP Facility**

15. Based on the Initial Approved Budget, absent access to the DIP Facility, the Debtors project an ending cash deficit of approximately $63.5 million as of the week ending November 21, 2026.[4] Taking into account the Debtors' minimum cash requirement of approximately $20.0 million, the Debtors' liquidity need through that date is approximately $83.5 million. The Debtors have limited their interim request to the amount necessary to avoid immediate and irreparable harm between entry of the Interim Order and the Final Hearing, and expect to draw the $28.0 million of Final DIP Loans only following entry of the Final Order.

16. I believe that the full $85.0 million of Interim Initial DIP Loans is necessary, and that a smaller interim draw would expose the Debtors to unacceptable risk, for several reasons. *First*, the Debtors' projected cash need through the week ending November 21, 2026 alone is approximately $83.5 million. *Second*, the Final DIP Loans will not be available until entry of the Final Order, and the Debtors cannot be certain of the date of the Final Hearing; the interim draw must therefore fund the Debtors through the Final Hearing even if it is delayed. *Third*, the DIP

[4] $63.5 million cash deficit is based on ending cash of $65.6 million on November 21, 2026, less DIP Facility proceeds of $113 million and $16.1 million of cash held in the Funded Reserve Account.

Documents require the Debtors to maintain at least $15.0 million of liquidity at all times. *Finally*, all DIP proceeds will be held in the Segregated DIP Account and may be withdrawn only to fund payments contemplated by the Approved Budget for the following two weeks (plus the Permitted Variance of 20%) or to fund the Carve Out, so drawing the full interim amount does not give the Debtors access to cash beyond their budgeted needs.

17. The $30.0 million of Delayed-Draw DIP Commitments may be used only to make the Delayed-Draw Payments set forth in the "Delayed Draw Uses"[5] section of the Approved Budget, or to replenish Delayed-Draw Payments made after the Petition Date with the Debtors' cash on hand, provided that such cash on hand was not proceeds of the Delayed-Draw DIP Commitments.

18. Based on my industry experience, my familiarity with the Debtors' operations, and extensive discussions with the Debtors' management team and advisors, including a team from A&M acting under my supervision, I believe that the Initial Approved Budget presents a reasonable estimate of the Debtors' cash sources and needs during the period it covers, and that the Debtors will be able to maintain the $15.0 million Minimum Liquidity Covenant and operate within the Permitted Variances during that period. Additionally, I believe that the Initial Approved Budget will be adequate, considering all projected cash flows, to pay all administrative expenses due or accruing during the period covered by the Initial Approved Budget. The Initial Approved Budget also reflects the estimated professional fees for these Chapter 11 Cases. Further, I believe that the DIP Facility is essential to the preservation of the Debtors' estates and will provide the Debtors with sufficient liquidity to continue their operations in the normal course, fund the

---

5 The "Delayed Draw Uses" row of the Initial Approved Budget is limited to certain specified, non-ordinary-course payments that are not otherwise funded by the Interim Initial DIP Loans or the Final DIP Loans, including possible payments to the Canada Revenue Agency and certain other limited contingencies. The Initial Approved Budget does not currently forecast any Delayed-Draw Payments.

administration of these Chapter 11 Cases, and allow the Debtors to implement the restructuring contemplated by the Restructuring Support Agreement.

19. Importantly, access to the liquidity provided by the DIP Facility and Cash Collateral will provide a strong, clear message to the Debtors' customers, contributors, licensors, vendors, employees, and contract counterparties that the Debtors' operations are appropriately funded and that the chapter 11 filing will not impact the Debtors' business operationally. Specifically, access to liquidity will communicate that the Debtors are able to continue meeting the needs of their customers, compensate their employees, and pay contributors, licensors, and vendors for goods and services. Additionally, access to the DIP Facility and Cash Collateral will provide the Debtors with sufficient funds to administer these Chapter 11 Cases, and thereby enable the Debtors to continue their efforts to preserve and maximize the value of their estates during these prepackaged Chapter 11 Cases. Absent the liquidity provided by the DIP Facility and Cash Collateral, the Debtors will not be able to operate their business in the ordinary course or consummate the restructuring transactions contemplated by the Restructuring Support Agreement, which would materially impair stakeholder recoveries.

20. I believe that the DIP Facility and the use of Cash Collateral are in the best interests of the Debtors and their estates. Without access to the DIP Facility, I believe the Debtors lack sufficient funds to operate their enterprise, continue paying their debts as they come due, and cover the projected costs of these Chapter 11 Cases. Accordingly, the DIP Facility and access to Cash Collateral are critical to the Debtors' ability to fund their operations while providing sufficient liquidity at the outset of these Chapter 11 Cases, and are an essential component to reassure customers, contributors, and business partners and protect normal-course operations while the Debtors pursue their restructuring.

**Conclusion**

21. In light of the Debtors' circumstances, I believe that access to the DIP Facility and Cash Collateral will ensure the Debtors have sufficient funds to preserve and maximize the value of their estates, pursue their restructuring goals, and responsibly administer these Chapter 11 Cases while implementing the transactions contemplated by the Restructuring Support Agreement and the Plan. Obtaining this financing, in my view, will allow for a successful reorganization of the Debtors, which will maximize value for the benefit of their creditors, employees, contributors, vendors, and other stakeholders who will benefit from the Debtors' continued operation. For the reasons set forth in this Declaration, I submit that it would be appropriate for the Court to approve the DIP Facility and the use of Cash Collateral as contemplated by the DIP Motion.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: October 21, 2026
Wilmington, Delaware

*/s/ Mitchell (Chase) Brantley*
Mitchell (Chase) Brantley
Senior Director
Alvarez & Marsal North America, LLC