**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| GETTY IMAGES HOLDINGS, INC., *et al.*,[1] | ) | Case No. 26-11643 (JKS) |
| Debtors. | ) | (Joint Administration Requested) |

**DECLARATION OF ADAM PREISS, SENIOR MANAGING DIRECTOR OF GUGGENHEIM SECURITIES, LLC IN SUPPORT OF THE DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL AND OBTAIN POSTPETITION FINANCING; (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; (III) PROVIDING ADEQUATE PROTECTION; (IV) MODIFYING THE AUTOMATIC STAY; (V) SCHEDULING A FINAL HEARING; AND (VI) GRANTING RELATED RELIEF**

I, Adam Preiss, hereby declare under penalty of perjury:

1. I am a Senior Managing Director of Guggenheim Securities, LLC ("Guggenheim Securities"), an investment banking firm with principal offices located at 330 Madison Avenue, New York, New York 10017. Guggenheim Securities is the proposed investment banker to the above-captioned debtors and debtors in possession (collectively, the "Debtors").

2. I submit this declaration (this "Declaration") in support of the *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral and Obtain Postpetition Financing, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Providing Adequate Protection, (IV) Modifying the Automatic Stay, (V) Scheduling a*

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Getty Images Holdings, Inc. (4229); Griffey Midco (DE), LLC (7122); Abe Investment Holdings, Inc. (5107); Getty Images, Inc. (7556); Getty Images (US), Inc. (8819); Getty Images News Services (PRC), Inc. (1849); and Getty Images (Seattle), Inc. (6863). The location of the Debtors' service address for purposes of these chapter 11 cases is: 605 5th Ave. S. Suite 400, Seattle, WA 98104.

*Final Hearing, and (VI) Granting Related Relief* (the "DIP Motion"),[2] filed contemporaneously herewith. The DIP Motion seeks, among other things, authorization for the Debtors to obtain up to $143.0 million of non-priming, secured debtor-in-possession financing (the "DIP Facility") from Koch Equity Development LLC and/or its affiliates (collectively, the "DIP Lenders"), consisting of (a) $85.0 million of Interim Initial DIP Loans available upon entry of the Interim Order, (b) $28.0 million of Final DIP Loans available upon entry of the Final Order, and (c) $30.0 million of Delayed-Draw DIP Commitments available upon entry of the Interim Order, subject to the delayed-draw conditions specified in the DIP Documents, as well as authorization for the Debtors' continued use of Cash Collateral.

3. Although Guggenheim Securities is expected to be compensated for its work as the Debtors' proposed investment banker in these Chapter 11 Cases, I am not being compensated separately for this Declaration or testimony in connection therewith. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other Guggenheim Securities professionals, the Debtors' other professional advisors, and the Debtors' management team, my review of relevant documents, or my experience, knowledge, and information concerning the Debtors' operations and financial condition. I am over 18 years of age. I am competent to testify, and if called as a witness, I could and would testify competently to the facts set forth in this Declaration.

## Background and Qualifications

4. Guggenheim Securities is a full-service investment banking firm providing financial advisory services, including with respect to mergers and acquisitions, capital raising, and

---

[2] Capitalized terms used but not otherwise defined shall have the meanings ascribed to them in (a) the DIP Motion; (b) DIP Credit Agreement; (c) the Interim Order; (d) the Restructuring Support Agreement; or (e) the First Day Declaration, as applicable.

restructuring advice, across a broad range of industries. Guggenheim Securities and its senior professionals have extensive experience with respect to the reorganization and restructuring of distressed companies, both out of court and in chapter 11 proceedings.

5. My experience includes representing companies, boards, creditors, and other stakeholders in a variety of situations across a broad range of industries, including in-court and out-of-court engagements such as the following: PT Garuda Indonesia (Persero) Tbk., Liberty Communications of Puerto Rico LLC, DISH Network Corporation, OneWeb Global Limited, Claire's Stores Inc., the Commonwealth of Puerto Rico, CXLoyalty, Inc. (formerly known as Affinion Group Holdings, Inc.), Energy Future Holdings Corp. (TXU Corp.), 21st Century Oncology, Inc., NII Holdings, Inc. (Nextel International), Lehman Brothers Holdings Inc., and Eastman Kodak Company.

6. Prior to joining Guggenheim Securities, I was a Managing Director and partner at Millstein & Co., a financial advisory firm, where I focused on advising on restructuring matters from 2012 to 2018. Prior to that, I worked in the restructuring group at Lazard Frères & Co. LLC from 2009 to 2012. Prior to my work as an investment banker, I served for one year as a law clerk to the Honorable Stephen F. Williams of the U.S. Court of Appeals for the District of Columbia Circuit. I received a Bachelor of Arts degree in Political Science, with a minor in Business Administration, from the University of California, Berkeley and a Juris Doctor, with highest honors, from the University of Chicago Law School.

7. Members of my team and I have been working with the Debtors since June 2026. Since the commencement of this engagement, Guggenheim Securities has rendered investment banking advisory services to the Debtors in connection with their evaluation of strategic alternatives and financing options in light of the Debtors' financial position, including the debtor-

in-possession financing process described below. My colleagues and I have worked with the Debtors' management, the special committees of the board of directors of Getty Images Holdings, Inc. and of the other Debtors (collectively, the "Special Committees"), and the other professionals retained by the Debtors, and have become familiar with the Debtors' capital structure, financial condition, liquidity needs, and business operations.

**The Debtors' Need for Postpetition Financing**

8. As set forth in the DIP Motion and the Brantley DIP Declaration, the Debtors require immediate access to postpetition financing to fund operations, preserve going-concern value, and implement the restructuring contemplated by the Restructuring Support Agreement. As of the Petition Date, the Debtors had approximately $1,456.0 million of total funded debt outstanding, of which approximately $1,186.0 million is secured by substantially all of the assets of the applicable Debtors (subject to certain thresholds and limitations, including 35% of the interests in first-tier foreign subsidiaries).

9. I understand that the Debtors' financial advisor, Alvarez & Marsal North America, LLC ("A&M"), analyzed the Debtors' liquidity needs and that the size of the DIP Facility was informed by that analysis, as described in the Brantley DIP Declaration. I further understand from A&M that, absent the DIP Facility, the Debtors project a liquidity need of approximately $83.5 million through the week ending November 21, 2026.

**The Debtors' Efforts to Obtain Postpetition Financing**

10. Starting in mid-September 2026, members of my team and I, at the direction of the Debtors and the Special Committees, began to have discussions with certain stakeholders regarding raising potential debtor-in-possession ("DIP") financing should the Debtors commence cases under the Bankruptcy Code. Both the Consenting Secured Lenders, through their advisors at Houlihan Lokey Capital, Inc. ("Houlihan Lokey"), and the Plan Sponsors, through their advisors

at Rothschild & Co US Inc. and Moelis & Company LLC, indicated that they would be unwilling to provide DIP financing on a fully unsecured basis. On September 22, 2026, the Consenting Secured Lenders, through Houlihan Lokey, delivered a proposal for DIP financing to the Debtors. That financing proposal included, among other items, a requirement that 100% of the Debtors' assets, including the unencumbered equity for first-tier foreign subsidiaries, be pledged as collateral, exit and certain other fees, and a requirement that the DIP be repaid in cash unless the Consenting Secured Lenders agreed to alternate treatment. Subsequently, the Plan Sponsors delivered a competing DIP proposal that had materially better economic terms, including on rate and fees. As detailed further below, after further rounds of negotiations, the Plan Sponsors' DIP proposal was ultimately agreed to in the form of the DIP Facility.

11. Beginning in October 2026, members of my team and I, at the direction of the Debtors and the Special Committees, conducted a marketing process to determine if the Debtors could raise DIP financing on terms better than those found in the DIP Facility. As part of that process, Guggenheim Securities contacted twelve potential third-party financing sources, which was in addition to the discussions previously held with the Consenting Secured Lenders and the Plan Sponsors. The parties contacted included those who regularly provide DIP financing, a subset of whom had previously expressed interest in providing financing to the Debtors and a further subset of whom had already been given access to material diligence information regarding the Debtors. Of those twelve parties, eight expressly indicated they would pass on the opportunity because they did not believe they could provide terms that would be competitive to those in the DIP Facility. Two did not provide any indication they would be willing to provide a DIP financing. Two parties expressed potential interest in providing a DIP. One of those parties indicated that they would only provide a competitive DIP if they could be granted a first lien on all of the Debtors'

assets. The advisors to the Consenting Secured Lenders indicated they would not consent to such a financing. The other potentially interested party has not provided a fulsome indication of the economic terms they would require nor a fully actionable proposal at this time.

12. Ultimately, no party has offered terms as favorable to the Debtors as the DIP Facility. The DIP Facility is fully consensual among the Debtors' secured and unsecured funded debt creditors and does not prime any Prepetition Lien or Permitted Prior Lien on the Prepetition Collateral, which avoids any priming or cash collateral litigation at the outset of these Chapter 11 Cases. Based on my involvement in the marketing process and the negotiation of the DIP Facility, I believe that the DIP Facility, taken as a whole, is the best financing option presently available to the Debtors under the facts and circumstances of these Chapter 11 Cases.

**Negotiation of the DIP Facility**

13. Because the Plan Sponsors hold existing equity interests in the Debtors, and because an affiliate of one of them is the proposed DIP Lender, the Debtors' evaluation and negotiation of the DIP Facility was directed by the Special Committees. The Special Committees are each advised by their own counsel. I and other members of the Guggenheim Securities team regularly reported to the Special Committees and the Debtors' management team regarding the status of the financing process and negotiations.

14. Over the course of several weeks, the Debtors and the DIP Lenders, with the assistance of their respective legal and financial advisors, negotiated the terms of the DIP Facility. During that time, the parties exchanged term sheets and mark-ups and participated in multiple calls to negotiate the terms of the DIP Facility. All negotiations between the Debtors and the DIP Lenders, each of whom was represented by experienced counsel and financial advisors, in my view, were conducted at arm's length and in good faith, and culminated in the terms of the DIP Facility set forth in the DIP Motion, which the Special Committees approved.

**The Terms of the DIP Facility**

15. I believe that the terms of the DIP Facility are favorable to the Debtors' estates. The DIP Facility does not prime any Prepetition Lien or Permitted Prior Lien on the Prepetition Collateral, and does not roll up any prepetition debt. It carries no commitment fee, no upfront fee, no backstop premium, no original issue discount, and no call protection, and requires no amortization. Interest accrues at Term SOFR plus 5.00% per annum and is paid in kind (and capitalized to principal on each interest payment date) rather than in cash, preserving estate liquidity, with a default rate equal to the then-applicable rate plus 2.00% per annum, which is also payable in kind. The sole fee is a DIP Exit Fee equal to 2.0% of the outstanding DIP Loans, which is payable only if the Restructuring Support Agreement is terminated pursuant to Section 12.01(d)[3] or Section 12.02(b)[4] thereof.

16. Furthermore, the DIP Loans are not required to be repaid in cash at emergence. If the Plan is consummated, the DIP Claims will be equitized on the Restructuring Effective Date in accordance with the ECL, and the principal amount of any Delayed-Draw DIP Loans outstanding on the Restructuring Effective Date will be exchanged for 100% of the New Preferred Interests. As a result, the estates obtain the full benefit of up to $143.0 million of new-money financing

3 Section 12.01(d) of the Restructuring Support Agreement provides that the Restructuring Support Agreement may be terminated by the applicable Consenting Stakeholders if the board of directors, board of managers, or similar body of any Company Party determines, after consulting with outside counsel, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal (as defined in the Restructuring Support Agreement).

4 Section 12.02(b) of the Restructuring Support Agreement provides that any Company Party (as defined in the Restructuring Support Agreement) may terminate the Restructuring Support Agreement if the board of directors, board of managers, or similar governing body of any Company Party determines, after consulting with external counsel, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal; provided that any termination pursuant to clause (ii) is effective only upon delivery of an Alternative Restructuring Notice (as defined in the Restructuring Support Agreement).

without any cash outlay at emergence, which is a material benefit compared with a facility that must be refinanced or repaid in cash on the effective date of a plan.

17. Based on my experience with DIP financings and Guggenheim Securities' review of the terms of debtor-in-possession financings in comparable chapter 11 cases, I believe that the economic terms of the DIP Facility, including its pricing, fee structure, and interest rate, are within or below market terms for DIP financings of comparable size and type. I also believe, based on my discussions with the Debtors' advisors, that the other terms of the DIP Facility, including the Segregated DIP Account mechanics, the Minimum Liquidity Covenant, the Milestones, and the Remedies Notice Period, are customary and usual under the circumstances.

**Conclusion**

18. In sum, given the outreach to potential financing sources and the nature of the negotiations described above, I believe that the DIP Facility represents the best financing option presently available to the Debtors under the facts and circumstances of these Chapter 11 Cases, that its terms are customary and usual, and that it was negotiated at arm's length and in good faith.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: October 21, 2026
Wilmington, Delaware

*/s/ Adam Preiss*
Adam Preiss
Senior Managing Director
Guggenheim Securities, LLC