IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| _____ ) | |
| In re: ) | Chapter 11 |
| ) | |
| JOANN INC., *et al.*, ) | Case No. 25-10068 (CTG) |
| ) | |
| ) | (Jointly Administered) |
| Debtors. ) | |
| ) | Re:  Docket Nos. 14, 113 |
| ) | |
| ) | Obj. Deadline: 2/4/25 at 4:00 p.m. |
| ) | Hearing Date: 2/11/25 at 2:00 p.m. |
| _____ ) | |

**OBJECTION OF CERTAIN UTILITY COMPANIES TO THE MOTION
OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (I) APPROVING
THE DEBTORS' PROPOSED ADEQUATE ASSURANCE OF PAYMENT FOR FUTURE
UTILITY SERVICES, (II) APPROVING THE DEBTORS' PROPOSED
PROCEDURES FOR RESOLVING ADEQUATE ASSURANCE REQUESTS, (III)
PROHIBITING UTILITY PROVIDERS FROM ALTERING, REFUSING, OR
DISCONTINUING SERVICE, (IV) AUTHORIZING CERTAIN FEE PAYMENTS FOR
PREPETITION SERVICES PERFORMED, AND (V) GRANTING RELATED RELIEF**

Arizona Public Service Company ("APS"), Virginia Electric

and Power Company d/b/a Dominion Energy Virginia ("DEV"),

Dominion Energy South Carolina, Inc. ("DESC"), Georgia Power

Company ("Georgia Power"), Salt River Project ("SRP"), Southern

California Edison Company ("SCE"), Southern California Gas

Company ("SoCalGas"), Baltimore Gas and Electric Company ("BGE"),

PECO Energy Company ("PECO"), Delmarva Power & Light Company

("DPL"), Atlantic City Electric Company ("ACE"), The Potomac

Electric Power Company ("Pepco"), Commonwealth Edison Company

("ComEd"), Tampa Electric Company ("TEC"), Peoples Gas System,

Inc. ("Peoples Gas"), Entergy Arkansas, LLC ("Entergy AR"),

Entergy Louisiana, LLC ("Entergy LA"), Entergy Mississippi, LLC ("Entergy MS"), Entergy Texas, Inc. ("Entergy TX"), Constellation NewEnergy, Inc. ("CNE"), Constellation NewEnergy – Gas Division, LLC ("CNEG"), CenterPoint Energy Resources Corp. ("CERC"), New York State Electric & Gas Corporation ("NYSEG"), Rochester Gas and Electric Corporation ("RG&E") and Florida Power & Light Company ("FPL") (collectively, the "Utilities"), hereby object to the *Motion of Debtors For Entry of Interim and Final Orders (I) Approving the Debtors' Proposed Adequate Assurance of Payment For Future Utility Services, (II) Approving the Debtors' Proposed Procedures For Resolving Adequate Assurance Requests, (III) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Service, (IV) Authorizing Certain Fee Payments For Prepetition Services Performed, and (V) Granting Related Relief* (the "Utility Motion")(Docket No. 14), and set forth the following:

## Introduction

The Debtors' Utility Motion improperly seeks to shift the Debtors' obligations under Section 366(c)(3) of the Bankruptcy Code from seeking to modify the amounts of the adequate assurance of payment requested by the Utilities under Section 366(c)(2) to setting the form and amounts of the adequate assurance of payment acceptable to the Debtors. This Court should not permit the

2

Debtors to avoid the plain language and requirements of Section 366(c).

Through the Utility Motion, the Debtors seek to have this Court approve their proposed form of adequate assurance of payment, which is a bank account containing $1,570,363.22 that supposedly reflects approximately one-half of the Debtors' average monthly utility charges (the "Bank Account").  The Utility Service List attached at Exhibit "C" to the Utility Motion reflects that the Bank Account would contain the following on behalf of the Utilities:  (a) APS - $12,993.96; (b) DEV - $0; (c) DESC - $0; (d) SRP - $0; (e) SCE - $0; (f) SoCalGas - $2,593.59; (g) Entergy AR - $0; (h) Entergy LA - $1,367.72; (i) Entergy MS - $0; (j) Entergy TX - $0; (k) CNE - $6,033.30; (l) CNEG - $1,084.95, (m) TEC - $0; (n) Peoples Gas - $171.32; (o) CERC - $4,522.76; (p) NYSEG - $2,747.57; (q) RG&E - $2,005.05; (r) BGE - $0; (s) ACE - $314.02; (t) DPL - $630.93; (u) PECO - $0; (v) Pepco - $0; (w) ComEd - $9,130.45; (x) Georgia Power - $0; and (y) FPL - $0.

Although not requested in the Utility Motion, Exhibit "C" reflects that the Debtors are apparently proposing that the Bank Account would contain $0 for a number of the Utilities because those Utilities held prepetition deposits or other forms of prepetition security.  As an initial matter, the Debtors did not request in the Utility Motion that supposed two-week amounts to

3

be contained in the Bank Account would be net of any prepetition
security held by a utility company.  Additionally, even if the
Debtors propose that monies contained in the Bank Account should
be net of prepetition security, such a proposal would not make
sense because the Debtors do not know if any prepetition security
will remain after the payment of prepetition charges, or if
prepetition deposit amounts will remain after recoupment of
prepetition deposits against prepetition debt pursuant to Section
366(c)(4) of the Bankruptcy Code.

This Court should reject the Debtors' proposed Bank
Account because:  (1) The Utilities bill the Debtors on a
monthly basis and provide the Debtors with generous payment
terms pursuant to applicable state law, tariffs, regulations
and/or contracts, such that a supposed two-week account, less
prepetition security held by the Debtors' utility companies,
maintained by the Debtors is not sufficient in amount or in form
to provide the Utilities with adequate assurance of payment; (2)
Section 366(c) of the Bankruptcy Code specifically defines the
forms of adequate assurance of payment in Section 366(c)(1),
none of which include a segregated bank account; (3) the
proposed amounts to be contained in the Bank Account would be
net of any prepetition security even though the Debtors did not
request such relief in the Utility Motion; (4) the Debtors are
proposing that the Bank Account would contain $0 on behalf of

4

APS, DEV, DESC, SRP, SCE, Entergy AK, Entergy MS, Entergy TX, TEC, BGE, PECO, Pepco, Georgia Power and FPL; and (5) Even if this Court were to improperly consider the Bank Account as a form of adequate assurance of payment for the Utilities (which it should not), and two-week amounts were actually contained in the Bank Account for all of the Utilities, this Court should reject it as an insufficient form of adequate assurance of payment for the reasons set forth in Section A.1. of this Objection.

As discussed below, the Debtors filed the *Motion of Debtors For Entry Of An Order (I) Authorizing and Approving Procedures To Reject or Assume Executory Contracts and Unexpired Leases, and (II) Granting Related Relief* (the "Lease Rejection Procedures Motion")(Docket No. 16). The Lease Rejection Procedures Motion does not include proposed procedures or requirements for the Debtors to timely contact the applicable Utilities to terminate utility service to any Debtor locations as of a proposed lease rejection date. As such, there is no way for a Utility to know when the Debtors no longer require service at a store location or facility where (i) store closings have been completed or a Debtor facility is closed, or (ii) a lease is rejected. Outside of bankruptcy, applicable state law and/or tariffs require the Debtors to close accounts when they no longer require utility service. Accordingly, the Debtors should

5

be required to close their accounts with the Utilities on the date that the Debtors no longer require post-petition utility service or remain administratively obligated for the payment of such charges until they close the applicable account(s).

The Utilities are seeking the following cash deposits from the Debtors, which are amounts that they are authorized to obtain pursuant to applicable state law or contract:  (a) APS - $97,009 (2.5-month); (b) DEV - $37,948 (2-month); (c) DESC - $23,635 (2-month); (d) SRP - $74,572 (2-month); (e) SCE - $656,773 (2-month); (f) SoCalGas - $16,781 (2-month); (g) Entergy AR - $2,420 (2-month); (h) Entergy LA - $18,080 (2-month); (i) Entergy MS - $11,220 (2-month); (j) Entergy TX - $5,240 (2-month); (k) CNE - $68,000 (2-month); (l) CNEG - $2,800 (2-month); (m) TEC - $25,770 (2-month); (n) Peoples Gas - $680 (2-month); (o) CERC - $20,320 (2-month); (p) NYSEG - $21,240 (2-month); (q) RG&E - $13,520 (2-month); (r) BGE - $17,561 (2-month); (s) ACE - $1,400 (2-month); (t) DPL - $2,160 (2-month); (u) PECO - $43,635 (2-month); (v) Pepco - $5,960 (2-month); (w) ComEd - $43,125 (2-month); (x) Georgia Power - $25,060 (2-month); and (y) FPL - $164,620 (2-month).  Based on all of the foregoing, this Court should deny the Utility Motion as to the Utilities because the amounts of the Utilities' post-petition deposit requests are reasonable under the circumstances and should not be modified.

## Facts

## Procedural Facts

1.    On January 15, 2025 (the "Petition Date"), the Debtors commenced their cases under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") that are now pending with this Court.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to Bankruptcy Code Sections 1107(a) and 1108.

2.    The Debtors' Chapter 11 bankruptcy cases are being jointly administered.

## The Utility Motion

3.    On the Petition Date, the Debtors filed the Utility Motion.

4.    On January 17, 2025, the Court entered the *Interim Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment For Future Utility Services, (II) Approving the Debtors' Proposed Procedures For Resolving Adequate Assurance Requests, (III) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Service, (IV) Authorizing Certain Fee Payments For Prepetition Services Performed, and (V) Granting Related Relief* (the "Interim Utility Order")(Docket No. 113).  The Interim Utility Order set (i) an objection deadline of February 4, 2025 and (ii) the final hearing on the Utility Motion to take place on February 11, 2025 at 10:00 a.m.

5.    The Debtors claim that they pay approximately $4 million each month for utility services, calculated as a historical average payment for the twelve-month period ending December 31, 2024.  Utility Motion at ¶ 14.

6.    Through the Utility Motion, the Debtors seek to avoid the applicable legal standards under Bankruptcy Code Sections 366(c)(2) and (3) by seeking Court approval for their own proposed form of adequate assurance of payment, which is the Bank Account containing $1,570,363.22 which supposedly reflects approximately one-half of the Debtors' average monthly utility charges.  Utility Motion at ¶ 16.

7.    The Utility Service List attached at Exhibit "C" to the Utility Motion reflects that the Bank Account would contain the following on behalf of the Utilities:  (a) APS - $12,993.96; (b) DEV - $0; (c) DESC - $0; (d) SRP - $0; (e) SCE - $0; (f) SoCalGas - $2,593.59; (g) Entergy AR - $0; (h) Entergy LA - $1,367.72; (i) Entergy MS - $0; (j) Entergy TX - $0; (k) CNE - $6,033.30; (l) CNEG - $1,084.95; (m) TEC - $0; (n) Peoples Gas - $171.32; (o) CERC - $4,522.76; (p) NYSEG - $2,747.57; (q) RG&E - $2,005.05; (r) BGE - $0; (s) ACE - $314.02; (t) DPL - $630.93; (u) PECO - $0; (v) Pepco - $0; (w) ComEd - $9,130.45; (x) Georgia Power - $0; and (y) FPL - $0.  Although not requested in the Utility Motion, Exhibit "C" to the Utility Motion appears to reflect that the Debtors are proposing that the Bank Account

8

would contain $0 for a number of the Utilities because they held prepetition deposits or other forms of prepetition security. Additionally, even if the Debtors' propose that monies contained in the Bank Account should be net of prepetition security, such a proposal would not make sense because the Debtors do not know if any prepetition security will remain after the payment of prepetition charges, or if prepetition deposit amounts will remain after recoupment of prepetition deposits against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code.

8.   The Debtors propose to "deposit" $1,570,363.22 into the Bank Account, and refer to the monies contained in the Bank Account as the "Adequate Assurance Deposit." Utility Motion at ¶ 16.  However, monies contained in an escrow account controlled by a customer of a utility such as the proposed Bank Account are not recognized by any state public utility commission as a "cash deposit" provided by a customer to a utility.  Section 366(c) of the Bankruptcy Code specifically defines the forms of adequate assurance of payment in Section 366(c)(1), none of which include a segregated utility bank account.  Indeed, the Debtors state that "Section 366(c)(1) of the Bankruptcy Code enumerates what constitutes 'assurance of payment,' including a cash deposit, letter of credit, certificate of deposit, surety bond, prepayment, or other mutually agreed form of security."  Utility

9

Motion at ¶ 27.  Simply put, the Debtors are not proposing to provide any of their utilities with cash deposits as adequate assurance of payment pursuant to Section 366(c) of the Bankruptcy Code.

9.   The proposed Bank Account is not acceptable to the Utilities and should not be considered relevant by this Court because Sections 366(c)(2) and (3) do not allow the Debtors to establish the form or amount of adequate assurance of payment. Under Sections 366(c)(2) and (3), this Court and the Debtors are limited to modifying, if at all, the amount of the security sought by the Utilities under Section 366(c)(2).

10.   The Debtors claim that to the best of their knowledge, there are no defaults or arrearages with respect to their obligations for prepetition utility services.  Utility Motion at ¶ 14.  However, even if true, Section 366(c)(3)(B)(ii) expressly provides that in making an adequate assurance of payment determination, a court may not consider a debtor's timely payment of prepetition utility charges.

11.   The Utility Motion does not address why the Bank Account would be underfunded with supposedly two-weeks of utility charges, less any prepetition security held by a Utility, when the Debtors know that the Utilities are required by applicable state laws, regulations, tariffs or contracts to bill the Debtors monthly.  Moreover, the Debtors presumably want

10

the Utilities to continue to bill them monthly and provide them with the same generous payment terms that they received prepetition.  Accordingly, if the Bank Account is relevant, which the Utilities dispute, and two-week amounts were actually contained in the Bank Account for each of the Utilities, the Debtors need to explain: (A) Why they are only proposing to deposit supposed two-week amounts into the Bank Account; and (B) How such an insufficient amount could even begin to constitute adequate assurance of payment for the Utilities' monthly bills.

12.  Furthermore, the Utility Motion does not address why this Court should consider modifying, if at all, the amounts of the Utilities' adequate assurance requests pursuant to Section 366(c)(2).  Rather, without providing any specifics, the Utility Motion merely states that the Bank Account, "in conjunction with the Debtors' ability to pay for future Utility Services in accordance with past practice," constitutes sufficient adequate assurance of payment.  Utility Motion at ¶ 18.

## The Debtors' Cash Collateral Motion

13.  On the Petition Date, the Debtors filed the *Motion of Debtors For Entry of Interim and Final Orders (I) Authorizing the Debtors To Use Cash Collateral, (II) Granting Adequate Protection To Prepetition Secured Creditors, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "Cash Collateral Motion") (Docket No. 6).

14.   On January 16, 2025, the Court entered the *Interim Order (I) Authorizing the Debtors To Use Cash Collateral, (II) Granting Adequate Protection To Prepetition Secured Creditors, (III) Modifying Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "Interim Cash Collateral Order") (Docket No. 106).

15.   The Interim Cash Collateral Order approved a carve-out for payments to the Debtors' professionals incurred prior to the delivery of a Carve-Out Trigger Notice, plus an additional $500,000 after delivery of a Carve-Out Trigger Notice (the "Carve-Out").   Interim Cash Collateral Order at pages 35-36.

16.   The Debtors have the following Milestones: (i) on or before 10 days after the Petition Date – the Debtors shall have filed a motion requesting, and within 26 calendar days after the Petition Date, shall have obtained on order extending the lease assumption/rejection period, such that the lease assumption/rejection period shall be 210 days after the Petition Date; (ii) on or before 26 days after the Petition Date – entry of an order approving the Bid Procedures Motion; (iii) on or before 26 days after the Petition Date – entry of Final Cash Collateral Order; (iv) on or before 28 days after the Petition Date – deadline for submission of bids for the Sale shall have occurred; (v) on or before 30 days after the Petition Date – the Debtors shall have concluded the auction (if any) for the Sale;

12

(vi) on or before 8 days after the conclusion of the auction (if any) – Debtors shall have obtained an order approving a winning bid for the Sale  (the "Sale Order"); (vii) on or before 2 business days after entry of the Sale Order – the Debtors shall have consummated the Approved Sale (and if the Approved Sale is for a full-chain liquidation, the Debtors shall have commenced the full-chain liquidation); and (viii) on or before the earlier of (a) the closing of the Approved Sale and (b) February 14, 2025 – the Prepetition ABL/FILO Obligations shall have been paid in full.  Exhibit "3" to the Interim Cash Collateral Order.

17.  Attached as Exhibit "4" to the Interim Cash Collateral Order is a 20-week Approved Budget (the "Budget").  It is unclear if the Budget includes a line-item for the payment of post-petition utility charges because the version of the Budget attached at Exhibit "4" does not include line-item descriptions. As such, it is not apparent from the Budget whether sufficient funds have in fact been budgeted for the timely (and full) payment of the Debtors' post-petition utility charges.

## The Debtors' Trade Claims Motion

18.  On the Petition Date, the Debtors filed the *Motion of Debtors For Entry of Interim and Final Orders (I) Authorizing the Debtors To Pay Certain Prepetition Claims of (A) Store Support Vendors, (B) Lien Claimants, and (C) 503(b)(9) Claimants, (II) Confirming Administrative Expense Priority of Outstanding Orders,*

*and (III) Granting Related Relief* (the "Trade Claims Motion") (Docket No. 8). Through the Trade Claims Motion, the Debtors sought authority to pay Trade Claims of Store Support Vendors, 503(b)(9) and Lien Claims in an amount up to $6,570,000 on an interim basis, and up to $37 million on a final basis. Trade Claims Motion at ¶ 8.

19. On January 17, 2025, the Court entered the *Interim Order (I) Authorizing the Debtors To Pay Certain Prepetition Claims of (A) Store Support Vendors, (B) Lien Claimants, and (C) 503(b)(9) Claimants, (II) Confirming Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief* (the "Interim Trade Claims Order")(Docket No. 109). The Interim Trade Claims Order authorized the Debtors to pay Trade Claims up to an aggregate amount of $6,570,000 on an interim basis. Interim Trade Claim Order at ¶ 3.

20. The Debtors' state in Paragraph 8 of the Utility Motion that "[u]interrupted Utility Services are essential to the Debtors' ongoing business operations and, hence, the overall success of these chapter 11 cases." However, the Trade Claims Motion does not reflect that the Debtors sought Court authority to pay prepetition utility charges.

## The Bid Procedures Motion

21. On the Petition Date, the Debtors filed the *Motion of Debtors For Entry of an Order (I) Approving Bidding Procedures,*

*(II) Scheduling Certain Dates and Deadlines With Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Stalking Horse Agreement, (V) Establishing Notice and Procedures For the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts and Leases, (VII) Approving the Sale of Assets, and (VIII) Granting Related Relief* (the "Bid Procedures Motion") (Docket No. 17).

22.   The Debtors have received a "stalking horse" agency agreement with Gordon Brothers Retail Partners, LLC (the "Stalking Horse Bidder").  Bid Procedures Motion at ¶ 2.

23.   The Debtors propose the following sale schedule: (i) February 12, 2025 – bid deadline; (ii) February 13, 2025 – notice of winning bidder and cancellation of auction (if no auction); (iii) February 13, 2025 – sale objection deadline to the Stalking Horse Bid; (iv) February 14, 2025 at 10:00 a.m. – auction (if any); (v) February 14, 2025 at 10:00 a.m. – sale hearing (if no auction); (vi) February 15, 2025 – notice of winning bidder(s) (if there is an auction); (vii) February 18, 2025 – sale objection deadline for winning bid(s) (if there is an auction); and (viii) February 22, 2025 at 10:00 a.m. – sale hearing (if there is an auction).  Bid Procedures Motion at ¶ 14.

## The Lease Rejection Procedures Motion

24.   On the Petition Date, the Debtors filed the Lease

15

Rejection Procedures Motion (Docket No. 16).

25.   The Lease Rejection Procedures Motion does not set forth procedures or requirements for the Debtors to timely contact the applicable Utilities to terminate utility service to any Debtor stores or locations as of a lease rejection date.

### Facts Regarding CNE

26.   CNE provides electricity and related services to the Debtors pursuant to an Electricity Supply Agreement – Fixed Price Solutions, and a Retail Electric Suppler Agreement (collectively, the "Electricity Agreements") that set forth the terms and conditions concerning CNE's provision of electricity and related services to the Debtors.  CNE has continued to provide the Debtors with electricity and related services pursuant to the Electricity Agreements since the Petition Date.

27.   Pursuant to the Electricity Agreements, the Debtors receive approximately one month of electricity and related services before CNE issues a bill.  Once a bill is issued, the Debtors have approximately 20 days to pay the bill.  Accordingly, the Debtors could receive at least two months of electricity and related services before CNE could terminate the Electricity Agreements after a post-petition payment default.

28.   CNE is requesting a two-month cash deposit of $68,000 as adequate assurance of payment from the Debtors, which is an amount it can obtain from the Debtors pursuant to the terms and

conditions of the Electricity Agreements.

## Facts Regarding CNEG

29.  CNEG provides natural gas and related services to the Debtors pursuant to Debtors pursuant to several Commercial Natural Gas Sales Agreements (collectively, the "Gas Agreements") that set forth the terms and conditions concerning CNEG's provision of natural gas and related services to the Debtors. CNEG has continued to provide the Debtors with natural gas and related services pursuant to the Gas Agreements since the Petition Date.

30.  Pursuant to the Gas Agreements, the Debtors receive approximately one month of natural gas and related services before CNEG issues a bill.  Once a bill is issued, the Debtors have approximately 15 days to pay the applicable bill. Accordingly, the Debtors could receive more than two months of natural gas and related services before CNEG could terminate the Gas Agreements after a post-petition payment default.

31.  CNEG is requesting a two-month cash deposit of $2,800 as adequate assurance of payment from the Debtors, which is an amount it can obtain from the Debtors pursuant to the terms and conditions of the Gas Agreements.

## Facts Regarding the Utilities Other Than CNE and CNEG

32.  Each of the Utilities provided the Debtors with prepetition utility goods and/or services, and have continued to

17

provide the Debtors with utility goods and/or services since the Petition Date.

33. Under the Utilities' billing cycles, the Debtors receive approximately one month of utility goods and/or services before the Utility issues a bill for such charges. Once a bill is issued, the Debtors have approximately 20 to 30 days to pay the applicable bill. If the Debtors fail to timely pay the bill, a past due notice is issued and, in most instances, a late fee may be subsequently imposed on the account. If the Debtors fail to pay the bill after the issuance of the past due notice, the Utilities issue a notice that informs the Debtors that they must cure the arrearage within a certain period of time or their service will be disconnected. Accordingly, under the Utilities' billing cycles, the Debtors could receive at least two months of unpaid charges before the utility could cease the supply of goods and/or services for a post-petition payment default.

34. To avoid the need to bring witnesses and have lengthy testimony regarding the Utilities regulated billing cycles, the Utilities request that this Court, pursuant to Rule 201 of the Federal Rules of Evidence, take judicial notice of the Utilities' billing cycles. Pursuant to the foregoing request and based on the voluminous size of the applicable documents, the Utilities' website links to their tariffs and/or state laws, regulations and/or ordinances are set forth in **Exhibit "A"** attached hereto.

35.   Subject to a reservation of the Utilities' right to supplement their post-petition deposit requests if additional accounts belonging to the Debtors are subsequently identified, the Utilities' estimated prepetition debt and post-petition deposit requests are as follows:

| Utility | No. of Accts. | Est. Prepet. Debt | Dep. Request |
|---|---|---|---|
| APS | 6 | $21,138.39 | $97,009 (2.5-month) |
| DEV | 13 | $14,360 | $37,948 (2-month) |
| DESC | 6 | $7,094.76 | $23,635 (2-month) |
| SRP | 6 | $13,196.30 | $74,572 (2-month) |
| SCE | 40 | To be supplemented | $656,773 (2-month) |
| SoCalGas | 23 | $6,214.28 | $16,781 (2-month) |
| Entergy AR | 1 | $905 | $2,420 (2-month) |
| Entergy LA | 3 | $9,185.48 | $18,080 (2-month) |
| Entergy MS | 2 | $4,075 | $11,220 (2-month) |
| Entergy TX | 1 | $1,185 | $5,240 (2-month) |
| TEC | 4 | $11,938.94 | $25,770 (2-month) |
| Peoples Gas | 6 | $824.12 | $680 (2-month) |
| CERC | 18 | $13,432.28 | $20,320 (2-month) |
| NYSEG | 9 | To be supplemented | $21,240 (2-month) |
| RG&E | 6 | To be supplemented | $13,520 (2-month) |
| BGE | 6 | $25,066.02 | $17,561 (2-month) |
| ACE | 1 | $764.35 | $1,400 (2-month) |
| DPL | 2 | n/a | $2,160 (2-month) |

| Utility | No. of Accts. | Est. Prepet. Debt | Dep. Request |
| --- | --- | --- | --- |
| PECO | 16 | $31,108.27 | $43,635 (2-month) |
| Pepco | 2 | To be supplemented | $5,960 (2-month) |
| ComEd | 20 | $25,066.02 | $43,125 (2-month) |
| Georgia Power | 8 | To be supplemented | $25,060 (2-month) |
| FPL | 29 | $64,627.32 | $164,620 (2-month) |

36.  DESC held a prepetition surety bond in the amount of $26,980 that it will make a demand upon for unpaid prepetition charges.

37.  SRP held a prepetition surety bond in the amount of $80,000 that it will make a demand upon for unpaid prepetition charges.

38.  SCE is the beneficiary of an Irrevocable Standby Letter of Credit in the amount of $278,000 that it will make a demand upon for unpaid prepetition charges.

39.  Entergy LA held prepetition cash deposits totaling $6,630.35 that it recouped against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code.  No prepetition deposit amount remains after recoupment.

40.  TEC held prepetition cash deposits totaling $24,542 that it recouped against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code.  Any prepetition deposit amount remaining after recoupment can be applied to the TEC post-petition deposit request.

20

41.    Peoples Gas held prepetition cash deposits totaling $445 that it recouped against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code.  No prepetition deposit amount remains after recoupment.

42.    BGE held prepetition cash deposits totaling $26,224 that it recouped against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code.  Any prepetition deposit amount remaining after recoupment can be applied to the BGE post-petition deposit request.  BGE also held a surety bond in the amount of $23,540.

43.    PECO held prepetition cash deposits totaling $30,578.04 that it recouped against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code.  No prepetition deposit amount remains after recoupment.

44.    Pepco held prepetition cash deposits totaling $4,640 that it will recoup against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code.  Any prepetition deposit amount remaining after recoupment can be applied to the Pepco post-petition deposit request.

45.    ComEd held prepetition cash deposits totaling $45,730 that it will recoup against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code.  Any prepetition deposit amount remaining after recoupment can be applied to the ComEd post-petition deposit request.

21

46.  Georgia Power held a prepetition surety bond in the amount of $49,390 that it will make a demand upon for unpaid prepetition charges.

47.  FPL held three prepetition surety bonds totaling $193,395 that it will make demands upon for unpaid prepetition charges.

### Discussion

**A.    THE UTILITY MOTION SHOULD BE DENIED AS TO THE UTILITIES.**

Sections 366(c)(2) and (3) of the Bankruptcy Code provide:

> (2) Subject to paragraphs (3) and (4), with respect to a case filed under chapter 11, a utility referred to in subsection (a) may alter, refuse, or discontinue utility service, if during the 30-day period beginning on the date of the filing of the petition, the utility does not receive from the debtor or the trustee adequate assurance of payment for utility service that is satisfactory to the utility;

> (3)(A) On request of a party in interest and after notice and a hearing, the court may order modification of the amount of an assurance of payment under paragraph (2).

As set forth by the Supreme Court of the United States, "[i]t is well-established that 'when the statute's language is plain, the sole function of the courts - at least where the disposition required by the text is not absurd - is to enforce it according to its terms.'" *Lamie v. United States Trustee*, 540 U.S. 526, 534, 124 S. Ct. 1023, 157 L. Ed. 2d 1024 (2004) (*quoting Hartford Underwriters Ins. Co.* v. *Union Planters Bank, N. A.,* 530 U.S. 1, 6, 120 S. Ct. 1942, 147 L. Ed. 2d 1 (2000)).

*Rogers v. Laurain (In re Laurain)*, 113 F.3d 595, 597 (6th Cir. 1997) ("Statutes . . . must be read in a 'straightforward' and 'commonsense' manner."). A plain reading of Section 366(c)(2) makes clear that a debtor is required to provide adequate assurance of payment satisfactory to its utilities on or within thirty (30) days of the filing of the petition. *In re* Lucre, 333 B.R. 151, 154 (Bankr. W.D. Mich. 2005). If a debtor believes the **amount** of the utility's request needs to be modified, then the debtor can file a motion under Section 366(c)(3) requesting the court to modify the **amount** of the utility's request under Section 366(c)(2).

In this case, the Debtors filed the Utility Motion to improperly shift the focus of their obligations under Section 366(c)(3) from modifying the amount of the adequate assurance of payment requested under Section 366(c)(2) to setting the form and amount of the adequate assurance of payment acceptable to the Debtors. Accordingly, this Court should not reward the Debtors for their failure to comply with the requirements of Section 366(c), and it should deny the Utility Motion as to the Utilities.

      **1.    The Debtors' Proposed Bank Account Is Not Relevant And Even If It Is Considered, It Is Unsatisfactory Because It Does Not Provide the Utilities With Adequate Assurance of Payment.**

This Court should not even consider the Bank Account as a

form of adequate assurance of payment because: (1) It is not relevant because Section 366(c)(3) provides that a debtor can only modify "the amount of an assurance of payment under paragraph (2)"; and (2) The Bank Account is not a form of adequate assurance of payment recognized by Section 366(c)(1)(A).  Moreover, even if this Court were to consider the Bank Account, the Bank Account is an improper and otherwise unreliable form of adequate assurance of future payment for the following reasons:

1. Unlike the statutorily approved forms of adequate assurance of payment, the Bank Account is not something held by the Utilities.  Accordingly, the Utilities have no control over how long the Bank Account will remain in place.

2. It is underfunded from the outset because even if the Debtors were to place two-week amounts in the Bank Account for the Utilities, the Utilities issue monthly bills and by the time a default notice is issued, the Debtors will have received approximately 60 days of commodity or service.

3. The Debtors should not reduce the amount of the Bank Account on account of the termination of utility services to a Debtor account until the Debtors confirm that all post-petition charges on a closed account are paid in full.

4. The Debtors propose that the Bank Account $0 on behalf of APS, DEV, DESC, SRP, SCE, Entergy AK, Entergy MS, Entergy TX, TEC, BGE, PECO, Pepco, Georgia Power and FPL.

Accordingly, this Court should not approve the Bank Account as adequate assurance as to the Utilities because the Bank Account: (a) Is not the **form** of adequate assurance

requested by the Utilities; (b) Is not a form recognized by Section 366(c)(1)(A); and (c) Is an otherwise unreliable form of adequate assurance.

### 2. The Utility Motion Should Be Denied As To The Utilities Because The Debtors Have Not Set Forth Any Basis For Modifying The Utilities' Requested Deposits.

In the Utility Motion, the Debtors fail to address why this Court should modify the amounts of the Utilities' requests for adequate assurance of payment.  Under Section 366(c)(3), the Debtors have the burden of proof as to whether the amounts of the Utilities' adequate assurance of payment requests should be modified.  *See In re Stagecoach Enterprises, Inc.*, 1 B.R. 732, 734 (Bankr. M.D. Fla. 1979) (holding that the debtor, as the petitioning party at a Section 366 hearing, bears the burden of proof).  However, the Debtors do not provide this Court with any evidence or factually supported documentation to explain why the amounts of the Utilities' adequate assurance requests should be modified.  Accordingly, this Court should deny the relief requested by Debtors in the Utility Motion and require the Debtors to comply with the plain requirements of Section 366(c) with respect to the Utilities.

B.    **THIS COURT SHOULD ORDER THE DEBTORS TO PROVIDE THE ADEQUATE ASSURANCE OF PAYMENT REQUESTED BY THE UTILITIES PURSUANT TO SECTION 366 OF THE BANKRUPTCY CODE.**

Section 366(c) was amended to overturn decisions such as *Virginia Electric and Power Company v. Caldor, Inc.*, 117 F.3d 646 (2d Cir. 1997), holding that an administrative expense, without more, could constitute adequate assurance of payment in certain cases.  Section 366(c)(1)(A) specifically defines the forms that assurance of payment may take as follows:

> (i) a cash deposit;
> (ii) a letter of credit;
> (iii) a certificate of deposit;
> (iv) a surety bond;
> (v) a prepayment of utility consumption; or
> (vi) another form of security that is mutually agreed upon between the utility and the debtor or the trustee.

Section 366 of the Bankruptcy Code was enacted to balance a debtor's need for utility services from a provider that holds a monopoly on such services, with the need of the utility to ensure for itself and its rate-payers that it receives payment for providing these essential services. *See In re Hanratty*, 907 F.2d 1418, 1424 (3d Cir. 1990).  The deposit or other security "should bear a reasonable relationship to expected or anticipated utility consumption by a debtor." *In re Coastal Dry Dock & Repair Corp.*, 62 B.R. 879, 883 (Bankr. E.D.N.Y. 1986). In making such a determination, it is appropriate for the Court

26

to consider "the length of time necessary for the utility to effect termination once one billing cycle is missed." *In re Begley*, 760 F.2d 46, 49 (3d Cir. 1985).

The Utilities bill the Debtors on a monthly basis for the charges already incurred by the Debtors in the prior month.  They then provide the Debtors with 20 to 30 days to pay the bill, the timing of which is set forth in applicable state laws, tariffs, regulations, and/or contracts.  Based on the foregoing state-mandated or contract-mandated billing cycles, the minimum period of time the Debtors could receive service from the Utilities before termination of service for non-payment of post-petition bills is approximately two (2) months.  Moreover, even if the Debtors timely pay their post-petition utility bills, the Utilities still have potential exposure of approximately 60 days or more based on their billing cycles.  Furthermore, the forms and amounts of the Utilities' adequate assurance requests are the forms and amounts that the applicable public service commission, which is a neutral third-party entity, or contract permits a Utility to request from its customers.  The Utilities are not taking the position that the cash deposits that they are entitled to obtain under applicable state law or contract are binding on this Court, but instead are introducing those forms and amounts as evidence of the forms and amounts that the applicable

27

regulatory entity or contract permit the Utilities to request from their customers.

In contrast, the Debtors failed to address in the Utility Motion why this Court should modify, if at all, the amounts of the Utilities' adequate assurance of payment requests, which is the Debtors' statutory burden.  Instead, the Debtors merely asked this Court to approve the Bank Account supposedly containing approximately two-weeks of the Debtors' utility charges, less any prepetition security held by the Debtors' utility companies.  The Debtors did not provide an objective, much less an evidentiary, basis for their proposed adequate assurance in the form of the Bank Account.  Moreover, in contrast to the improper treatment proposed to the Utilities, the Debtors have made certain Trade Vendors and post-petition professionals are favored creditors over the Utilities by ensuring (i) to pay Trade Claims of Store Support Vendors, 503(b)(9) and Lien Claims in an amount up to $6,570,000 on an interim basis, and up to $37 million on a final basis, and (ii) the post-petition bills/expenses of Debtors' counsel are paid, even in the event of a post-petition default on the use of DIP financing and cash collateral, by obtaining a $500,000 professionals' carve-out for the payment of their fees/expenses after a default and a guarantee of payment for fees incurred up to a default.

Additionally, the Debtors' proposed lease rejection procedures do not include proposed procedures or requirements for the Debtors to timely contact the applicable Utilities to terminate utility service to any Debtor locations as of a proposed lease rejection date. As such, there is no way for a Utility to know when the Debtors no longer require service at a store location or facility where (i) store closings have been completed or a Debtor facility is closed, or (ii) a lease is rejected. Outside of bankruptcy, applicable state law and/or tariffs require the Debtors to close accounts when they no longer require utility service. The Debtors should be required to close accounts with the Utilities when they no longer require post-petition service for such accounts, or otherwise they should remain administratively responsible for such charges until they do close the applicable account(s).

Despite the fact that the Utilities continue to provide the Debtors with admittedly crucial post-petition utility goods/services on the same generous terms that were provided prepetition, with the risk of non-payment, the Debtors are seeking to deprive the Utilities of any adequate assurance of payment for which they are entitled to receive for continuing to provide the Debtors with post-petition utility goods/services. Against this factual background, it is reasonable for the

Utilities to seek and be awarded the full security that they have requested herein.

WHEREFORE, the Utilities respectfully request that this Court enter an order:

1.  Denying the Utility Motion as to the Utilities;

2.  Awarding the Utilities the post-petition adequate assurance of payments pursuant to Section 366 in the amount and form satisfactory to the Utilities, which is the form and amount requested herein;

3.  Require the Debtors to close accounts with the Utilities when they no longer require post-petition service from the Utility for that account or remain administratively responsible for such charges until they do close the account(s); and

4.  Providing such other and further relief as the Court deems just and appropriate.

Dated: January 31, 2025          WHITEFORD, TAYLOR & PRESTON LLC

                                 /s/ *William F. Taylor, Jr.*
                                 William F. Taylor, Jr. (#2936)
                                 600 North King Street, Suite 300
                                 Wilmington, Delaware 19801
                                 Telephone: (302) 353-4145
                                 Facsimile:  (302) 357-3270
                                 E-mail: wtaylor@whitefordlaw.com

                                 and

LAW FIRM OF RUSSELL R. JOHNSON III, PLC
Russell R. Johnson III (VSB No. 31468)
John M. Craig (VSB No. 32977)
2258 Wheatlands Drive
Manakin-Sabot, Virginia  23103
Telephone: (804) 749-8861
E-mail:russell@russelljohnsonlawfirm.com
john@russelljohnsonlawfirm.com

*Counsel for Arizona Public Service
Company, Virginia Electric and Power
Company d/b/a Dominion Energy
Virginia, Dominion Energy South
Carolina, Inc., Georgia Power Company,
Salt River Project, Southern
California Edison Company, Southern
California Gas Company, Baltimore Gas
and Electric Company, PECO Energy
Company, Delmarva Power & Light
Company, Atlantic City Electric
Company, The Potomac Electric Power
Company, Commonwealth Edison Company,
Tampa Electric Company, Peoples Gas
System, Inc., Entergy Arkansas, LLC,
Entergy Louisiana, LLC, Entergy
Mississippi, LLC, Entergy Texas, Inc.,
Constellation NewEnergy, Inc.,
Constellation NewEnergy – Gas
Division, LLC, CenterPoint Energy
Resources Corp., New York State
Electric & Gas Corporation, Rochester
Gas and Electric Corporation and
Florida Power & Light Company*