IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| JOANN INC., *et al.*,[1] | Case No. 25-10068 (CTG) |
| Debtors | **Related Docket Nos. 16 and 17** |

**LIMITED OMNIBUS OBJECTION OF IG DESIGN GROUP AMERICAS, INC. TO SALE PROCEDURES MOTION AND CONTRACT PROCEDURES MOTION**

Now comes IG Design Group Americas, Inc., and its affiliates, including, but not limited to, Simplicity Creative Corp., and The McCall Pattern Company, Inc. (collectively, "**DGA**"), by and through counsel, hereby submits its limited omnibus objection and reservation of rights ("**Objection**") to (a) the *Motion of Debtors for Entry of an Order (I) Approving Bidding Procedures, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Stalking Horse Agreement, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts and Leases, (VII) Approving the Sale of Assets, and (VIII) Granting Related Relief* ("**Sale Procedures Motion**") [Docket No. 17], which includes a Proposed Sale Schedule with a proposed Sale Hearing (if there is no Auction) on February 14, 2025; and (b) *Motion of Debtors for Entry of an Order (I) Authorizing and Approving Procedures to Reject or Assume Executory Contracts and Unexpired Leases, and (II) Granting Related Relief* [Docket No. 16] ("**Lease Rejection Procedures**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: JOANN Inc. (5540); Needle Holdings LLC (3814); Jo-Ann Stores, LLC (0629); Creative Tech Solutions LLC (6734); Creativebug, LLC (3208); WeaveUp, Inc. (5633); JAS Aviation, LLC (9570); joann.com, LLC (1594); JOANN Ditto Holdings Inc. (9652); Dittopatterns LLC (0452); JOANN Holdings 1, LLC (9030); JOANN Holdings 2, LLC (6408); and Jo-Ann Stores Support Center, Inc. (5027). The Debtors' mailing address is 5555 Darrow Road, Hudson, Ohio 44236.

**Motion**"), filed by the above-captioned debtors and debtors-in-possession ("**Debtors**") and respectfully states as follows in support thereof.

## FACTUAL BACKGROUND

1. On January 15, 2025 ("**Petition Date**"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code ("**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware.

Pre-Petition Consignment Agreement

2. Prior to the Petition Date, DGA and Debtors entered into a consignment agreement ("**Consignment Agreement**"), pursuant to which the DGA periodically consigned goods ("**Consigned Goods**") in the form of sewing patterns to Debtors for sale in the Debtors stores across the country. Debtors report sales of Consigned Goods to DGA on a daily basis and make weekly payments to DGA of a portion of the purchase price, in accordance with the terms of the Consignment Agreement. The remaining portion the sale proceeds is retained by the Debtors. A redacted copy of the Consignment Agreement is provided herewith as **Exhibit A**.

3. The DGA retains ownership of all the Consigned Goods, as well as the proceeds from the sale of Consigned Goods. At all times during their consignment relationship, including under the Consignment Agreement, the parties acknowledged and agreed that all right, title, and interest in and to any Consigned Goods belonged to the DGA. The Consignment Agreement expressly provides:

> Section 3    "The Parties acknowledge that Supplier [DGA] holds legal title to, and sole ownership of, all Products currently in Customer's [Debtors'] possession or control in its retail stores and at any Customer warehouses or other locations."

4. As of the Petition Date, DGA had approximately 11 million units of consigned products at Debtors' stores, or approximately 12,000 units per store. Debtors are required to

maintain the Consigned Goods in cabinets provided by DGA at each of Debtors' retail locations to ensure that the Consigned Goods remain segregated from Debtors' other retail goods. The cabinets are provided by DGA to the Debtors, and such cabinets are the property of the Debtors. *See* Consignment Agreement, Section 3, (Existing Cabinets and Fixtures).

5. Furthermore, DGA perfected its interests in the Consigned Goods and sale proceeds thereof by filing valid UCC-1 financing statements. *See* **Exhibit B**. These UCC-1 filings amend prior UCC filings made on, *inter alia*, April 13, 2023.

6. The Consignment Agreement also requires the Debtors to use "commercially reasonable efforts (at least equal to such efforts utilized by Customer with respect to other merchandise inventory offered for sale a Customer's retail stores) to maintain the Products in merchantable condition and to safeguard the Products from theft and shrink." *See* Consignment Agreement, pg. 3.

7. With respect to store closings, the Consignment Agreement expressly provides the following:

> Section 4    "Store Closings If [Debtor] determines to close a store, shall notify Supplier [DGA], and Supplier may elect to: (i) have the Products on hand at such store returned to Suppler or (ii) have Customer liquidate such Products under the normal store liquidation process and discard any remaining Productions upon the store close date.  If Supplier instructs Customer to return Products on at a store that is closing, Supplier will pay the freight costs and will be responsible to reimburse Customer for store labor costs."

8. With regard to termination, the Consignment Agreement expressly provides that:

> Section 9    "Obligations Upon Expiration or Termination    Upon expiration or termination of this agreement, Supplier [DGA] may elect to: (i) have the products on hand at Customer's stores and/or warehouses returned to the Supplier or (ii) have Customer liquidate such Products for a period of up to twelve (12) months …."

Section 9   "If Supplier instructs Customer to return Products, Supplier will pay the freight costs and, if termination is not due to the default or breach by Supplier, Customer will be responsible for store labor costs."

<u>Interim Cash Collateral Order</u>

9.    The Debtors and senior secured creditors acknowledged that the proceeds of the Consigned Goods are solely the Cash Collateral of DGA and are to be paid to DGA outside of the approved cash collateral budget. *See Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Creditors, (III) Modifying Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 106] ("**Interim Cash Collateral Order**"). Paragraph 31 of the Interim Cash Collateral Order relates to Consigned Goods, and states:

> **Consigned Goods.** Notwithstanding anything to the contrary set forth in this Interim Order, the collateral of the Prepetition Secured Creditors, including but not limited to the Prepetition Collateral, and Cash Collateral, shall not include (a) any goods received by the Debtors on a consignment basis (whether pre- or post-petition, and solely to the extent properly perfected) from IG Design Group Americas, Inc. and its affiliates, including Simplicity Creative Corp., and The McCall Pattern Company, Inc. (collectively "DGA") and/or West Broadway Distribution Services, LLC ("WBDS"); and (b) any identifiable proceeds of any such consigned goods, including, but not limited to, all identifiable proceeds from pre-petition sales of consigned goods, which proceeds of such pre-petition sales shall be promptly paid to DGA and/or WBDS after completion of a reconciliation by the parties. Nor shall the Prepetition Secured Creditors possess any superpriority claims, including but not limited to the Adequate Protection Superpriority Claims, over any such goods received by the Debtors from DGA and/or WBDS on a consignment basis (whether pre- or post-petition, and solely to the extent properly perfected) or the identifiable proceeds of any such consigned goods; provided that the Debtors may continue to operate and perform (subject to the Approved Budget) under the applicable agreements governing the goods described in this paragraph, including selling such goods and remitting proceeds as provided therein. Further, nor shall any such goods received by the Debtors from DGA and/or WBDS on a consignment basis (whether pre- or post-petition) or the proceeds of any such consigned goods be subject to the Carve Out.

<u>Sales Procedures Motion</u>

10.   The Debtors have noticed for hearing on February 11, 2025, among other motions, the Sale Procedures Motion. As more fully set forth therein, the Sale Procedures Motion seeks

entry of the "**Sales Procedures Order**" and approval of, among other things, the Bidding Procedures (as defined therein) and approving the "stalking horse" agency agreement ("**Liquidator Agreement**") with Gordon Brothers Retail Partners, LLC, as agent ("**Liquidator**"), for the right to liquidate all of the Debtors' assets in the event the Debtors do not receive a higher or otherwise better offer.

11. Under the terms of the Liquidator Agreement, the Liquidator would acquire all of the Debtors' merchandise to be sold as part of a going out of business sale. The Liquidator may also sell the furniture, furnishings, trade fixtures, etc. (referred to as "Owned FF&E" in the Liquidator Agreement). *See* Sale Procedures Motion (pg. 98 of 209).

12. DGA's Consigned Goods are not Debtors' merchandise. As such, the Liquidator Agreement acknowledges that consigned goods are "Excluded Goods." *See* Sales Procedure Order (pg. 111 of 209). Neither the Sales Procedure Motion nor the Liquidator Agreement provide any procedures or mechanism for removal of the Consigned Goods from Debtors' approximately 825 retail locations.

<u>Lease Rejection Procedures Motion</u>

13. The Debtors have also noticed for hearing on February 11, 2025, the Lease Rejection Procedures Motion. In the motion, the Debtors seek approval of the "**Lease Rejection Procedures Order**," which would provide a 7-day notice period for rejection of executory leases. However, the Lease Rejection Procedures Order does not provide any mechanism or procedure for the removal of Consigned Goods prior to the rejection of executory leases and the surrender of possession.

14. The Lease Rejection Procedures Order further appears to provide that all goods left at the location of rejected lease will be abandoned. *See* Section 2.h of the Contract Procedures

Motion, pg. 26 of 47 ("Absent a timely objection, any and all property located on the Debtors' leased premises on the Rejection Date of the applicable lease of nonresidential real property shall be deemed abandoned").

**ARGUMENT**

15. DGA objects to the entry of Sales Procedures Order and the Lease Rejection Procedures Order because such orders do not comply with the store closing procedure terms of the Consignment Agreement and because such orders do not permit DGA sufficient and reasonable time to remove its Consigned Goods from Debtors' approximately 825 stores and do not propose any procedures to accomplish same. As such, entry of the orders would create an unreasonable risk that the Consigned Goods will be lost, damaged, or destroyed and thus fails to adequately protect DGA.

16. To the extent that the Consignment Agreement remains executory and is not rejected, the Debtors must comply with the terms of the Consignment Agreement with respect to any and all store closings resulting from entry of either or both of the Sale Procedures Order or the Lease Rejection Procedures Order.

17. In addition, specifically with respect to the Sales Procedures Order, the proposed Sale Hearing on February 14, 2025, does not provide DGA with sufficient time or any mechanism to remove or safeguard the Consigned Goods. As explained above, the Consigned Goods are not included in the sale to the Liquidator and the Debtors Sale Procedures Motion does not explain what would happen to the Consign Goods, including whether DGA would have an opportunity to retrieve such Consigned Goods if the sale to the Liquidator occurs prior to the rejection of the Consignment Agreement. Put another way, absent rejection of the Consignment Agreement, the automatic stay prevents DGA from retrieving the Consigned Goods prior to the sale to the

Liquidator. In addition, part of the assets to be sold by the Liquidator are the cabinets that house the Consigned Goods. This places the Consigned Goods at great risk of being lost, damaged, or, destroyed.

18. Further, the Lease Rejection Procedures Order provides for only 7-days notice of a lease rejection, which is not sufficient time for DGA to coordinate removal of the Consigned Goods prior to surrender of the Debtors' retail locations to landlords. DGA also objects to the proposed Lease Rejection Procedures Order because it fails to provide any mechanism or procedure for DGA to retrieve its Consigned Goods after the issuance of a lease rejection notice.

19. Accordingly, DGA respectfully requests:

   a. That the proposed Sales Procedures Order be amended to:

      i. require the Debtors to comply with the store close procedures set forth in the Consignment Agreement;

      ii. provide at least 14-days' notice between prior to the closing of any liquidation sale;

      iii. provide that upon the issuance of notice of Debtors' intent to liquidate, that DGA be granted access and authority to immediately remove the Consigned Goods from the Debtors' stores (including during store business hours and outside of business hours);

      iv. require any liquidator to provide adequate protection to DGA by agreeing to secure the Consigned Goods for a period of four weeks so that the Consigned Goods will not be damaged, destroyed, or sold (unless such sales are agreed to by DGA) to retail consumers while the Consigned Goods remain in the Debtors stores during a liquidation and that any liquidator provide DGA with reasonable access to remove its Consigned Goods;

   b. That the proposed Lease Rejection Procedures Order be amended to:

      i. require the Debtors to comply with the store close procedures in the Consignment Agreement;

      ii. specifically include mention of the Consigned Goods in the required notice to be issued to landlords as potentially being left in

  the leased premises, and provide information to the landlord about consigned goods, including DGA's contact information;

iii. increase the 7-day notice period to 14 days; and

iv. grant DGA authority and access to immediately remove its Consigned Goods from the Debtors' stores (including during store business hours and outside of business hours) upon the filing of a lease rejection notice.

## RESERVATION OF RIGHTS

20. DGA reserves all rights to amend or supplement this Objection and to make such other and further objections as it may deem necessary and appropriate, as more information becomes available.

Dated: February 4, 2025  
   Wilmington, Delaware

**CHIPMAN BROWN CICERO & COLE, LLP**

/s/ *William E. Chipman, Jr.*
William E. Chipman, Jr. (No. 3818)
Mark D. Olivere (No. 4291)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone: (302) 295-0191
Email: chipman@chipmanbrown.com
   olivere@chipmanbrown.com

and

James B. Sowka (Admitted *Pro Hac Vice*)
**SEYFARTH SHAW LLP**
233 South Wacker Drive, Suite 8000
Chicago, Illinois 60606
Telephone: 312.460.5325
Email: jsowka@seyfarth.com

*Attorneys for IG Design Group Americas, Inc.*