**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| JOANN INC., *et al.*,[1] | Case No. 25-10068 (CTG) |
| Debtors. | (Jointly Administered) |
| | Hearing Date: March 6, 2025, at 2:00 p.m. (Eastern Time) |
| | Objection Deadline: February 18, 2025, at 4:00 p.m. (Eastern Time) |

**MOTION OF IG DESIGN GROUP AMERICAS, INC. TO (A) COMPEL
THE DEBTORS TO ASSUME OR REJECT EXECUTORY
CONTRACT, AND (B) MODIFY THE AUTOMATIC STAY**

IG Design Group Americas, Inc., and its affiliates, including, but not limited to, Simplicity Creative Corp., and The McCall Pattern Company, Inc. (collectively, "**DGA**"), by and through counsel, hereby submit this *Motion (A) to Compel the Debtors to Assume or Reject Executory Contract, and (B) to Modify the Automatic Stay* ("**Motion**"), seeking entry of an order pursuant to sections 361, 363(e) and 365(d)(2) of title 11 of the United States Code ("**Bankruptcy Code**"), and Rule 6006 of the Federal Rules of Bankruptcy Procedure ("**Bankruptcy Rules**"), and Rules 2002-1 and 9006-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware ("**Local Rules**"), (i) directing the above captioned Debtors ("**Debtors**") to assume or reject the Consignment Agreement (as defined *infra*) at least 14 days prior to the closing of any transaction resulting in the liquidation of the Debtors or the rejection of any leases, and (ii) to Modify the Automatic Stay substantially in the form attached hereto. In support of this Motion, DGA respectfully states as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: JOANN Inc. (5540); Needle Holdings LLC (3814); Jo-Ann Stores, LLC (0629); Creative Tech Solutions LLC (6734); Creativebug, LLC (3208); WeaveUp, Inc. (5633); JAS Aviation, LLC (9570); joann.com, LLC (1594); JOANN Ditto Holdings Inc. (9652); Dittopatterns LLC (0452); JOANN Holdings 1, LLC (9030); JOANN Holdings 2, LLC (6408); and Jo-Ann Stores Support Center, Inc. (5027). The Debtors' mailing address is 5555 Darrow Road, Hudson, Ohio 44236.

**JURISDICTION AND VENUE**

1. The Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware dated as of February 29, 2012. This is a core proceeding under 28 U.S.C. § 157(b).

2. Venue of these cases and this Motion is proper in this district under 28 U.S.C. §§ 1408 and 1409.

3. The statutory predicates for the relief requested in this Motion are Bankruptcy Code sections 361, 363(e) and 365(d)(2), Bankruptcy Rule 6006, and Local Rules 2002-1 and 9006-1. Pursuant to Local Rule 9013-1(f), DGA consents to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

**BACKGROUND**

4. On January 15, 2025 ("**Petition Date**"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code ("**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware.

Pre-Petition Consignment Agreement

5. Prior to the Petition Date, DGA and Debtors entered into a consignment agreement ("**Consignment Agreement**"), pursuant to which the DGA periodically consigned goods ("**Consigned Goods**") in the form of sewing patterns to Debtors for sale in the Debtors stores across the country. Debtors report sales of Consigned Goods to DGA on a daily basis and Debtors make weekly payments to DGA of a portion of the purchase price, in accordance with

the terms of the Consignment Agreement. The remaining portion the sale proceeds is retained by the Debtors. A redacted copy of the Consignment Agreement is provided herewith as **Exhibit A**.

6. The DGA retains ownership of all the Consigned Goods, as well as the proceeds from the sale of Consigned Goods. At all times during their consignment relationship, including under the Consignment Agreement, the parties acknowledged and agreed that all right, title, and interest in and to any Consigned Goods belonged to the DGA. The Consignment Agreement expressly provides:

> Section 3  "The Parties acknowledge that Supplier [DGA] holds legal title to, and sole ownership of, all Products currently in Customer's [Debtors'] possession or control in its retail stores and at any Customer warehouses or other locations."

7. As of the Petition Date, DGA had approximately 11 million units of consigned products at Debtors' stores, or approximately 12,000 units per store. Debtors are required to maintain the Consigned Goods in cabinets provided by DGA at each of Debtors' retail locations to ensure that the Consigned Goods remain segregated from Debtors' other retail goods. The cabinets are provided by DGA to the Debtors, and such cabinets are the property of the Debtors. *See* Consignment Agreement, Section 3 (Existing Cabinets and Fixtures).

8. Furthermore, DGA perfected its interests in the Consigned Goods and sale proceeds thereof by filing valid UCC-1 financing statements. *See* **Exhibit B**. These UCC-1 filings amend prior UCC filings made on, *inter alia*, April 13, 2023.

9. The Consignment Agreement requires the Debtors to use "commercially reasonable efforts (at least equal to such efforts utilized by Customer with respect to other merchandise inventory offered for sale a Customer's retail stores) to maintain the Products in merchantable condition and to safeguard the Products from theft and shrink." *See* Consignment

Agreement, pg. 3. With regard to termination, the Consignment Agreement expressly provides that:

Section 9   "Upon expiration or termination of this agreement, Supplier [DGA] may elect to: (i) have the products on hand at Customer's stores and/or warehouses returned to the Supplier or (ii) have Customer liquidate such Products for a period of up to twelve (12) months …."

Section 9   "If Supplier instructs Customer to return Products, Supplier will pay the freight costs and, if termination is not due to the default or breach by Supplier, Customer will be responsible for store labor costs."

Interim Cash Collateral Order

10.  The Debtors and senior secured creditors acknowledged that the proceeds of the Consigned Goods are solely the Cash Collateral of DGA and are to be paid to DGA outside of the approved cash collateral budget. *See Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Creditors, (III) Modifying Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 106] ("**Interim Cash Collateral Order**"). Paragraph 31 of the Interim Cash Collateral Order relates to Consigned Goods, and states:

> **Consigned Goods.** Notwithstanding anything to the contrary set forth in this Interim Order, the collateral of the Prepetition Secured Creditors, including but not limited to the Prepetition Collateral, and Cash Collateral, shall not include (a) any goods received by the Debtors on a consignment basis (whether pre- or post-petition, and solely to the extent properly perfected) from IG Design Group Americas, Inc. and its affiliates, including Simplicity Creative Corp., and The McCall Pattern Company, Inc. (collectively "DGA") and/or West Broadway Distribution Services, LLC ("WBDS"); and (b) any identifiable proceeds of any such consigned goods, including, but not limited to, all identifiable proceeds from pre-petition sales of consigned goods, which proceeds of such pre-petition sales shall be promptly paid to DGA and/or WBDS after completion of a reconciliation by the parties. Nor shall the Prepetition Secured Creditors possess any superpriority claims, including but not limited to the Adequate Protection Superpriority Claims, over any such goods received by the Debtors from DGA and/or WBDS on a consignment basis (whether pre- or post-petition, and solely to the extent properly perfected) or the identifiable proceeds of any such consigned goods; provided that the Debtors may continue to operate and perform (subject to the Approved Budget) under the applicable agreements governing the goods described in this paragraph, including selling such goods and remitting proceeds as provided therein. Further, nor shall any such goods received by the Debtors from DGA

and/or WBDS on a consignment basis (whether pre- or post-petition) or the proceeds of any such consigned goods be subject to the Carve Out.

Sales Procedures Motion

11. The Debtors have noticed for hearing on February 11, 2025, among other motions, the *Motion of Debtors for Entry of an Order (I) Approving Bidding Procedures, (II) Scheduling Certain Dates and Deadlines With Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Stalking Horse Agreement, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts and Leases, (VII) Approving the Sale of Assets, and (VIII) Granting Related Relief* [Docket No. 17] ("**Sale Procedures Motion**"). As more fully set forth therein, the Sale Procedures Motion seeks approval of, among other things, the Bidding Procedures (as defined therein) and approving the "stalking horse" agency agreement ("**Liquidator Agreement**") with Gordon Brothers Retail Partners, LLC, as agent ("**Liquidator**"), for the right to liquidate all of the Debtors' assets in the event the Debtors do not receive a higher or otherwise better offer.

12. Under the terms of the Liquidator Agreement, the Liquidator would acquire all of the Debtors' merchandise, to be sold as part of a going out of business sale. The Liquidator may also sell the furniture, furnishings, trade fixtures, *etc*. (referred to as "Owned FF&E" in the Liquidator Agreement). *See* Sale Procedures Motion (pg. 98 of 209).

13. DGA's Consigned Goods are not Debtors' merchandise. As such, the Liquidator Agreement acknowledges that consigned goods are "Excluded Goods." *See* Sales Procedure Order (pg. 111 of 209). Neither the Sales Procedure Motion nor the Liquidator Agreement provide any procedures or mechanism for removal of the Consigned Goods from Debtors' approximately 825 retail locations.

Assumption and Rejection Procedures Motion

14.     The Debtors have also noticed for hearing on February 11, 2025, the *Motion of Debtors for Entry of an Order (I) Authorizing and Approving Procedures to Reject or Assume Executory Contracts and Unexpired Leases, and (II) Granting Related Relief* [Docket No. 16] ("**Lease Rejection Procedures Motion**").  As more fully set forth in the Lease Rejection Procedures Motion, the Debtors seek approval of, among other things, a 7-day notice period for rejection of executory leases.  The Lease Rejection Procedures Motion does not provide any mechanism or procedure for the removal of Consigned Goods prior to the rejection of executory leases and the surrender of possession.

15.     The Lease Rejection Procedures Motion also fails to provide adequate assurance that the Consigned Goods will be safeguarded after a store lease is rejected.  *See* Section 2.h of the Contract Procedures Motion, pg. 26 of 47 ("Absent a timely objection, any and all property located on the Debtors' leased premises on the Rejection Date of the applicable lease of nonresidential real property shall be deemed abandoned").

## RELIEF REQUESTED

16.     DGA respectfully requests entry of an order (i) compelling the Debtors, pursuant to Bankruptcy Code section 365(d)(2) and Bankruptcy Rule 6006(b), to assume or reject the Consignment Agreement at least 14 days prior to the closing of any transaction resulting in the liquidation of the Debtors or the rejection of any leases , and (ii) temporarily modify or lifting the automatic stay, pursuant to Bankruptcy Code section 362(d)(1), to provide DGA sufficient time to remove the Consigned Goods from the Debtors' approximately 825 stores.

A. **The Debtors Should be Compelled to Assume or Reject the Consignment Agreement at Least 14 Days Prior to the Closing of Any Transaction Resulting in the Liquidation of the Debtors or the Rejection of any Leases.**

17. The Court should compel the Debtors to assume or reject the Consignment Agreement at least 14 days prior to the closing of any transaction resulting in the liquidation of the Debtors or the rejection of any leases.

18. Pursuant to Bankruptcy Code section 365(d)(2), a debtor has until plan confirmation to decide whether to assume or reject an executory contract. *See* 11 U.S.C. § 365(d)(2). However, section 365(d)(2) further provides that the Court has the power to compel a debtor to assume or reject an executory contract within a specified period of time:

> In a case under chapter 9, 11, 12 or 13 of this title, the trustee may assume or reject an executory contract . . . of the debtor at any time before the confirmation of a plan *but the court, on the request of any party to such contract or lease, may order the trustee to determine within a specified period of time whether to assume or reject such contract . . . .*

11 U.S.C. § 365(d)(2) (emphasis added).

19. "Congress intended this provision to 'prevent parties in contractual or lease relationships with the debtor from being left in doubt concerning their status vis-a-vis the estate.'" *Univ. Med. Ctr. v. Sullivan (In re Univ. Med. Ctr.)*, 973 F.2d 1065, 1079 (3d Cir. 1992) (citing S. Rep. No. 989, 95th Cong., 2d Sess. 59 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5845).

20. Although the Bankruptcy Code provides chapter 11 debtors with "breathing space" within which to determine whether a particular executory contract should be assumed or rejected, such "breathing space . . . is not without limits." *See In re Enron Corp.*, 279 B.R. 695, 702 (Bankr. S.D.N.Y. 2002). The limit placed on the time for the debtor's assumption/rejection determination by case law and commentators is "reasonableness." The determination of what constitutes a reasonable time to assume or reject a particular executory contract is within the bankruptcy court's discretion and is determined in light of the particular facts of each case. *See In*

*re Adelphia Commcns. Corp.*, 291 B.R. 283, 292 (Bankr. S.D.N.Y. 2003) ("The determination of what constitutes a reasonable time to assume or reject is within the bankruptcy court's discretion based on the particular facts of each case."); *In re G-I Holdings, Inc.*, 308 B.R. 196, 213 (Bankr. D.N.J. 2004) ("What constitutes a reasonable time is left to the bankruptcy court's discretion in light of the circumstances of the particular case.").

21. Among the factors that courts have used to determine what may constitute "reasonable time" for the purposes of section 365(d)(2) are the following: (a) the nature of the interests at stake; (b) the balance of harm to the litigants; (c) the good to be achieved; (d) the safeguards afforded to the parties; (e) whether the action to be taken is so in derogation of Congress' scheme as to be said to be arbitrary; and (f) the broad purpose of Chapter 11, which is to permit successful rehabilitation of debtors. *In re Monroe Well Serv., Inc.*, 83 B.R. 317, 323 (Bankr. E.D. Pa. 1988).

22. Here, the factors strongly weigh in favor of the Debtors being required to assume or reject the Consignment Agreement at least 14 days prior to the closing of any transaction resulting in the liquidation of the Debtors or the rejection of any leases:

(a). <u>The nature of the interests at stake</u>:

23. DGA has approximately 11 million units of Consigned Goods at stake. DGA is exploring options for removal of such Consigned Goods from Debtors' approximately 825 retail locations. However, to the extent that the Debtors' proposed sale to the Liquidator is approved, the Consigned Goods would not be included in such sale, leaving the disposition of the Consigned Goods an open question to solved under the Debtors' proposed liquidation procedures.

(b).     <u>The balance of the harm to the litigants</u>:

24.     Virtually all of the harm is solely borne by DGA. To the extent that the Debtors intend to proceed with a liquidation and/or reject the Consignment Agreement, it is critical that DGA has adequate time to remove its Consigned Goods before they are lost, damaged, or destroyed.

25.     As explained above, the Consigned Goods are not included in the sale to the Liquidator and the Debtors Sale Procedures Motion does not explain what would happen to the Consign Goods, including whether DGA would have an opportunity to retrieve such Consigned Goods if the sale to the Liquidator occurs prior to the rejection of the Consignment Agreement. Put another way, absent rejection of the Consignment Agreement, the automatic stay prevents DGA from retrieving the Consigned Goods prior to the sale to the Liquidator. Part of the assets to be sold by the Liquidator are the cabinets that house the Consigned Goods. This places the Consigned Goods at great risk of being lost, damaged, or, destroyed.

26.     Further, Debtors' Lease Rejection Procedures Motion only proposes to provide 7-days notice of lease rejections before Debtors' retail properties are surrendered to landlords. The motion also fails to set forth what would happen to Consigned Goods once a lease rejection becomes effective. Therefore, it is unclear whether the Debtors are proposing to comply with their obligations under the Consignment Agreement, under which DGA can elect to require Debtors to return the Consigned Goods to DGA at DGA's cost. Moreover, 7-days' notice is simply not sufficient notice for DGA to make arrangements to remove the Consigned Goods given the more than 800 locations involved. If the goods cannot be removed prior to rejection, DGA's goods would then be under the control of the Landlord and presumably outside the jurisdiction of the Bankruptcy Court. This would result in a tremendous amount of risk to DGA.

27. Finally, there is limited harm to the Debtors in granting the requested relief. While requiring the rejection or assumption by the at least 14 days prior to the closing of any transaction resulting in the liquidation of the Debtors or the rejection of any leases may delay the potential closing of a sale to the Liquidator, it would provide the Debtors with more time to find a going-concern buyer – which all parties agree would be the best possible result.

(c). <u>The safeguards afforded to the parties</u>:

28. As of now, the Debtors are not proposing any safeguards for DGA or its Consigned Goods with respect to either the lease rejection procedures or the proposed liquidation sale. Establishing a reasonable deadline for the Debtors to assume or reject the Consignment Agreement prior to the rejection of any leases and the closing of any transaction resulting in a liquidation would help ensure that DGA has sufficient time to recover the Consigned Goods.

(d). <u>Whether the action to be taken is so in derogation of Congress' scheme that the court may be said to be arbitrary</u>:

29. Congress established the bankruptcy courts with broad equitable powers. *See* 11 U.S.C. § 105(a). Furthermore, Congress expressly permitted bankruptcy courts to shorten the time for debtors to make their assumption/rejection decisions. *See* 11 U.S.C. § 365(d)(2). This Court will not be acting in an arbitrary manner if it, in accordance with these statutory provisions, compels the Debtors to make their decision to assume or reject the Consignment Agreement at least 14 days prior to the closing of any transaction resulting in the liquidation of the Debtors or the rejection of any leases, especially in light of the extremely condensed marketing and sale timeline proposed by Debtors.

(e). <u>The broad purpose of Chapter 11 - to permit successful rehabilitation of debtor</u>:

30. The requested deadline for Debtors to assume or reject the Consignment Agreement could be structured to occur at or after the conclusion of the deadline for the

submission of competing bid so as to avoid impacting the Debtors' rehabilitation efforts. Therefore, this factor has been satisfied.

***

31. Based on the foregoing, it would be entirely prejudicial to DGA if the Consigned Goods are required to remain in Debtors' stores until the commencement of a liquidation without any procedures for the safeguarding and return of the Consigned Goods. In order to prevent harm to DGA, the Debtors should be compelled to assume or reject the Consignment Agreement at least 14 days prior to the closing of any transaction resulting in the liquidation of the Debtors or the rejection of any leases.

**B.    The Automatic Stay Should Be Lifted to Allow DGA to Remove Consigned Goods From Debtors Stores Pursuant to 11 U.S.C. § 362(d)(1).**

32. Bankruptcy Code section 362(a) provides for the automatic stay, which prevents the Debtors terminating the Agreement without the Court's approval. Pursuant to Section 362(d)(1) "[o]n request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay…for cause, including the lack of adequate protection of an interest in property of such party in interest."

33. The bankruptcy code does not define "cause" as used in Section 362(d)(1) except for including lack of adequate protection as an example. *In re Trump Entm't Reports, Inc.*, 526 B.R. 116, 120 (Bankr. D. Del. 2015). "Cause is a flexible concept and courts often conduct a fact intensive, case-by-case balancing test, examining the totality of the circumstances to determine whether sufficient cause exists to lift the stay." *In re The SCO Group, Inc.*, 395 B.R. 852, 856 (Bankr. D. Del. 2007); *see also In re Cont'l Airlines, Inc.*, 152 B.R. 420, 424 (D. Del. 1993) ("There is no rigid test for determining whether sufficient cause exists to modify an automatic

stay. Rather, in resolving motions for relief for 'cause' from the automatic stay courts generally consider the policies underlying the automatic stay in addition to the competing interests of the debtor and the movant.").

34. Here, the Consigned Goods belong to DGA, not the Debtors, and are not included in the proposed sale to the Liquidator. If there are no going concerns bids for the Debtors, the Consignment Agreement will be rejected. Under such a scenario, DGA would need sufficient time to remove the Consigned Goods from the stores. Accordingly, there is good cause to modify the automatic stay so that DGA can recover their Consigned Goods from the Debtors' stores.

[*This portion of page intentionally left blank*.]

**WHEREFORE**, DGA respectfully requests that the Court enter an Order (i) compelling the Debtors to either assume or reject the Consignment Agreement at least 14 days prior to the closing of any transaction resulting in the liquidation of the Debtors or the rejection of any leases, (ii) modify the automatic stay, and (iii) grant such other and further relief as the Court may deem proper.

Dated: February 4, 2025
       Wilmington, Delaware

**CHIPMAN BROWN CICERO & COLE, LLP**

*/s/ William E. Chipman, Jr.*
William E. Chipman, Jr. (No. 3818)
Mark D. Olivere (No. 4291)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone:    (302) 295-0191
Email: chipman@chipmanbrown.com
       olivere@chipmanbrown.com

       and

James B. Sowka (Admitted *Pro Hac Vice*)
**SEYFARTH SHAW LLP**
233 South Wacker Drive, Suite 8000
Chicago, Illinois 60606
Telephone:    312.460.5325
Email: jsowka@seyfarth.com

*Attorneys for IG Design Group Americas, Inc.*