## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| JOANN INC., *et al.*,[1] | Case No. 25-10068 (CTG) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket Nos. 6, 15 & 17** |
| | **Hearing Date: Feb. 11, 2025 at 2:00 p.m. (ET)** |
| | **Obj. Deadline: Feb. 6, 2025 at 4:00 p.m. (ET)[2]** |

### UNITED STATES TRUSTEE'S OMNIBUS OBJECTION TO: (1) MOTION OF DEBTORS FOR ENTRY OF AN ORDER, *INTER ALIA*, APPROVING BIDDING PROCEDURES AND SCHEDULING CERTAIN DATES AND DEADLINES WITH RESPECT THERETO; (2) MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS, *INTER ALIA*, AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL; AND (3) MOTION OF DEBTORS FOR ENTRY OF AN ORDER, *INTER ALIA*, EXTENDING TIME TO FILE CERTAIN BANKRUPTCY SCHEDULES AND STATEMENTS

Andrew R. Vara, the United States Trustee for Region Three (the "U.S. Trustee"), through

his undersigned counsel, hereby objects (this "Objection") to the following motions of the above-

captioned debtors:

(a) *Motion of Debtors for Entry of an Order (I) Approving Bidding Procedures, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Stalking Horse Agreement, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts and Leases, (VII)*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: JOANN Inc. (5540); Needle Holdings LLC (3814); Jo-Ann Stores, LLC (0629); Creative Tech Solutions LLC (6734); Creativebug, LLC (3208); WeaveUp, Inc. (5633); JAS Aviation, LLC (9570); joann.com, LLC (1594); JOANN Ditto Holdings Inc. (9652); Dittopatterns LLC (0452); JOANN Holdings 1, LLC (9030); JOANN Holdings 2, LLC (6408); and Jo-Ann Stores Support Center, Inc. (5027). The Debtors' mailing address is 5555 Darrow Road, Hudson, Ohio 44236.

[2] Extended for the U.S. Trustee.

*Approving the Sale of Assets, and (VIII) Granting Related Relief* [D.I. 17] (the "<u>Bidding Procedures Motion</u>");

(b) *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Creditors, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [D.I. 6] (the "<u>Cash Collateral Motion</u>"); and

(c) *Motion of Debtors for Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, Statements of Financial Affairs, and Rule 2015.3 Financial Reports, and (II) Granting Related Relief* [D.I. 15] (the "<u>Motion to Extend</u>," and collectively with the Bidding Procedures Motion and the Cash Collateral Motion, the "<u>Motions</u>").[3]

In support of this Objection, the U.S. Trustee respectfully states:

## PRELIMINARY STATEMENT

1. The Court should deny the Bidding Procedures Motion for the following separate and independent reasons:

(a) **The Debtors have failed to provide adequate notice of the proposed sale and related deadlines.** If the Court approves the proposed bidding procedures, creditors and potential bidders not already included in the bid process will receive one day's notice of the bid deadline, two days' notice of the sale objection deadline and three days' notice of the sale hearing. While these proposed deadlines were included in the Bidding Procedures Motion, the Debtors contemporaneously served that motion on fewer than 100 unique parties. The Debtors attempted to address these deficiencies by filing and serving two conflicting versions of a *Notice of Potential Sale Hearing*. But the Debtors have not filed a service list for these notices, and in any event, they are only notice of the Debtors' request for relief, and not any Court-approved deadlines. The Court should not authorize the Debtors to sell the rights to liquidate their entire enterprise without requiring them to first provide adequate notice.

(b) **The Debtors have failed to provide adequate disclosures regarding the assets to be sold.** The proposed sale assets include all claims and causes of action other than those arising under the proposed Stalking Horse

---

[3] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motions.

Agreement. This includes avoidance actions under the Bankruptcy Code and state law and all other causes of action. But the Debtors have not filed any bankruptcy schedules or statements and have not otherwise disclosed the scope or value of prepetition transfers and claims (including those involving insiders). The Court should not authorize the Debtors to commence the sale process without first requiring them to make full disclosures on sufficient notice to creditors and parties in interest.

(c)     **The Stalking Horse Bidder is not entitled to bid protections.** The Stalking Horse Bidder is an affiliate of one of the Debtors' prepetition lender parties who, in that capacity, had access to information regarding the Debtors' business and financial condition. The burden on the Stalking Horse Bidder to conduct due diligence was lower than it would have been on a true third-party bidder. Moreover, the Stalking Horse Bidder did not require bid protections to induce its bid (and the Debtors do not assert otherwise) because it had an interest in its affiliate being paid in full from the sale proceeds. Finally, the bid protections result in a minimum initial overbid of $2.2 million, which will further chill bidding on top of the accelerated sale process and lack of disclosures.

(d)     **The Court should not approve a super-super-priority expense claim.** The proposed Stalking Horse Agreement provides for the Stalking Horse Bidder to receive a super-priority administrative expense claim. But the Bankruptcy Code only provides for super-priority expense claims in two scenarios, neither of which applies here. Moreover, neither the Bankruptcy Code nor the Bankruptcy Rules provide for multiple layers of super-priority expense claims, and the Court should not grant that relief here.

(e)     **The Court should not grant an affiliate of the Stalking Horse Bidder consultation rights.** The proposed Bidding Procedures provide for "Consultation Parties" who enjoy consultation rights with respect to, among other things, the evaluation of bids and the implementation of the bidding procedures. These Consultation Parties include an affiliate of the Stalking Horse Bidder. The bidding procedures do not provide for any safeguards against information sharing or collusion by the Stalking Horse Bidder and its affiliate. Granting consultation rights to an affiliate of the Stalking Horse Bidder – including with respect to the evaluation of bids and the disclosure of due diligence materials – will discourage bidding.

(f)     **The Debtors must provide evidence regarding the sale of personally identifiable information.** The assets to be sold include customer lists and customer data, but the Debtors have not addressed whether the sale requires the appointment of a consumer privacy ombudsman. The Court should require the Debtors to address this issue before approving any bidding procedures.

2.      The U.S. Trustee has raised additional informal comments and objections with the Debtors regarding the Bidding Procedures Motion, some of which are described in more detail herein. The U.S. Trustee reserves all rights with respect to such comments and objections if the parties are unable to resolve them consensually before the hearing on the Bidding Procedures Motion.

3.      The Court should also deny final approval of the Cash Collateral Motion because it violates the Local Rules with respect to challenge procedures. The Debtors ask the Court to terminate all parties' challenge rights thirty days into these cases and eleven days after the Committee (defined herein) appeared through counsel. This is particularly inequitable because, as noted above, the Debtors want the Court to terminate the challenge period and simultaneously authorize the transfer and injunction of virtually all estate causes of action before the Debtors have made any disclosures with respect to prepetition transfers and claims. This is a request for relief parties in interest might expect to see in a proposed chapter 11 plan long after the Debtors and their representatives had made all required disclosures in the cases on notice to parties in interest.

4.      Finally, the Court should deny the Motion to Extend for many of the reasons discussed above. A free and clear sale under section 363 of the Bankruptcy Code requires transparency and adequate notice. Here, the Debtors are seeking authority to wait until over a month after the proposed sale closes to file their bankruptcy schedules and statements. This leaves the Court, creditors and potential bidders in the dark as to both the scope and value of the assets to be sold, and whether the proposed terms of the sale are sufficient to prevent the Debtors' administrative insolvency after such sale has been consummated.

5.      Accordingly, and for the reasons set forth in more detail herein, the U.S. Trustee respectfully requests that the Court deny the Motions.

**JURISDICTION AND STANDING**

6.      This Court has jurisdiction to hear and determine the Motions and this Objection pursuant to: (i) 28 U.S.C. § 1334; (ii) applicable order(s) of the United States District Court of the District of Delaware issued pursuant to 28 U.S.C. § 157(a); and (iii) 28 U.S.C. § 157(b)(2).

7.      Pursuant to 28 U.S.C. § 586, the U.S. Trustee is charged with overseeing the administration of chapter 11 cases filed in this judicial district. The duty is part of the U.S. Trustee's overarching responsibility to enforce the bankruptcy laws as written by Congress and interpreted by the Courts. *See Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog").

8.      The U.S. Trustee has standing to be heard on this Objection pursuant to 11 U.S.C. § 307. *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that U.S. Trustee has "public interest standing" under 11 U.S.C. § 307, which goes beyond mere pecuniary interest).

**BACKGROUND**

A.      **The Chapter 11 Cases**

9.      On January 15, 2025 (the "Petition Date"), the above-captioned debtors and debtors in possession (collectively, the "Debtors") each filed a voluntary petition for relief pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code," or "Code"), in the United States Bankruptcy Court for the District of Delaware (this "Court"), thereby commencing the above-captioned chapter 11 cases (the "Chapter 11 Cases").

10.     The Debtors continue to manage and operate their business as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

11.     The Debtors' proposed professionals include: (a) Kirkland & Ellis, LLP ("K&E") as proposed bankruptcy co-counsel; (b) Cole Schotz P.C. ("Cole Schotz") as proposed bankruptcy co-counsel; and (c) Centerview Partners, LLC ("Centerview," and collectively with K&E and Cole Schotz, the "Debtor Professionals") as proposed investment banker. As of the date hereof, none of the Debtor Professionals has filed a retention application in the Chapter 11 Cases.

12.     On January 28, 2025, pursuant to section 1102(a)(1) of the Bankruptcy Code, the U.S. Trustee appointed an official committee of unsecured creditors in the Chapter 11 Cases (the "Committee"). D.I. 198. On January 31, 2025, counsel for the Committee entered its appearance in the Chapter 11 Cases. D.I. 239.

13.     As of the date hereof, no trustee or examiner has been requested in the Chapter 11 Cases.

**B.    The Motion to Extend**

14.     On the Petition Date, the Debtors filed the Motion to Extend seeking, among other things, to extend the deadlines to file their (a) bankruptcy schedules (collectively, "Schedules"), (b) statements of financial affairs ("SOFAs"), and (c) Bankruptcy Rule 2015.3 reports ("2015.3 Reports"). D.I. 15.

15.     The Debtors seek an extension through March 11, 2025 to file their Schedules and SOFAs. *Id.* at ¶ 1. They seek an extension through the later of (a) thirty days after the section 341 meeting in the Chapter 11 Cases, and (b) fifty-five days after the Petition Date to file their 2015.3 Reports. *Id.* As of the date hereof, the Debtors have not filed any of their Schedules, SOFAs or 2015.3 Reports.

C.    **The Bidding Procedures Motion and Proposed Bidding Procedures**

16.    The Bidding Procedures Motion, proposed Bidding Procedures and documents filed in support thereof include the following terms and provisions relevant to this Objection.

**i.    The Stalking Horse Bidder**

17.    By and through the Bidding Procedures Motion, the Debtors seek authority to enter into an Agency Agreement (the "Stalking Horse Agreement") granting Gordon Brothers Retail Partners, LLC (the "Stalking Horse Bidder") the exclusive right to liquidate all of the Debtors' Assets. D.I. 17, ¶ 2.

18.    Upon information and belief, including representations by the Debtor Professionals, the Stalking Horse Bidder is an affiliate of 1903P Loan Agent, LLC. Prior to the Petition Date, certain Debtors, Bank of America, N.A., 1903P Loan Agent, LLC, and certain lenders party thereto entered into that certain *Second Amended and Restated Credit Agreement*, dated as of April 30, 2024 (the "ABL/FILO Credit Agreement"). *Declaration of Michael Prendergast, Interim Chief Executive Officer, in Support of Chapter 11 Petitions and First Day Motions* [D.I. 5] (the "Prendergast Declaration," or "Prendergast Decl."), ¶ 45. 1903P Loan Agent, LLC is the "Prepetition FILO Agent" with respect to the ABL/FILO Credit Agreement. *Id.*

19.    The Debtors do not disclose the affiliation between the Stalking Horse Bidder and the Prepetition FILO Agent in the Bidding Procedures Motion or any of the documents filed in support thereof. The Stalking Horse Agreement provides that the Stalking Horse Bidder will pay to the Prepetition FILO Agent "for the benefit of the FILO Lenders … the amount in cash necessary to indefeasibly pay in full in cash all Prepetition FILO Obligations[.]" D.I. 17, Proposed Order, Ex. 2, § 3.1(a)(ii).

20.    The Stalking Horse Agreement further provides that the Stalking Horse Bidder will sell all of the Debtors' Merchandise "by means of a 'going out of business,' 'store closing,' 'sale

on everything,' 'everything must go,' or similar sale" as described therein (the "GOB Sale"). *Id.*
at § 1(a).

### ii.    The Proposed Sale Timeline

21.     The Debtors propose the following dates and deadlines in connection with the
proposed sale:

| Date and Time | Event or Deadline |
|---|---|
| February 12, 2025, at 5:00 p.m. | Bid Deadline |
| February 13, 2025 | Notice of Winning Bidder and Cancellation of Auction (if no Auction) |
| February 13, 2025 | Sale Objection Deadline to the Stalking Horse Bid |
| February 14, 2025, at 10:00 a.m. | Auction (if any) |
| February 14, 2024, at 10:00 a.m. (subject to Court availability) | Sale Hearing (if no Auction) |
| February 15, 2025 (or as soon as reasonably practicable thereafter) | Notice of Winning Bidders (if there is an Auction) |
| February 18, 2025, at 5:00 p.m. | Sale Objection Deadline for Winning Bid(s) (if there is an Auction) |
| February 22, 2025, at 10:00 a.m. (subject to Court availability) | Sale Hearing (if there is an Auction) |

22.     Under the Debtors' proposed schedule, the Court would approve the sale of
substantially all of their assets to the Stalking Horse Bidder thirty days after they entered
bankruptcy. If the Court approves the proposed Bidding Procedures, then parties in interest would
receive: (a) one day's notice of the Court-approved Bidding Procedures before the Bid Deadline;
(b) two days' notice of the Court-approved Sale Objection Deadline; and (c) three days' notice of
the Court-approved Auction or Sale Hearing date, as the case may be.

### iii.    The Sale of Assets Includes Avoidance Actions and Other Causes of Action

23.    The Assets to be sold to the Stalking Horse Bidder pursuant to the Stalking Horse Agreement include "Avoidance Actions," "Other Causes of Action," and the "Proceeds" therefrom. D.I. 17, p. 9 (demonstrative); *id.* at Proposed Order, Ex. 2, §§ 1(e) and 2(b)(viii).

24.    "Avoidance Actions" includes "claims and causes of action arising under chapter 5 of the Bankruptcy Code and similar state law." *Id.* at Proposed Order, Ex. 2, § 1(e). "Other Causes of Action" includes "all other claims and causes of action, including but not limited to commercial tort claims, based on facts and circumstances existing as of the Closing, whether or not theretofore discovered or asserted[.]" *Id.*

25.    The Stalking Horse Agreement provides that:

> *[N]either the [Stalking Horse Bidder], nor any Person claiming by, through or on behalf of the [Stalking Horse Bidder]* (including by operation of law, sale, assignment, conveyance or otherwise) *shall pursue*, prosecute, litigate, institute or commence an action based on, assert, sell, use defensively, convey, assign, or file *any claim or cause of action that relates to an Avoidance Action or Other Cause of Action against, in each case, a related party of the [Debtors.]*

*Id.* (emphasis added). Neither the Stalking Horse Agreement nor any other document filed in connection with the Bidding Procedures Motion defines who or what constitutes a "related party" of the Debtors. Moreover, the Stalking Horse Agreement does not limit this injunction to claims and causes of action brought against a "related party" in its capacity as such.

### iv.    The Sale of Assets Includes "Customer Information."

26.    The Stalking Horse Agreement provides that the Assets to be sold include the Debtors' "IP Rights." *Id.* at § 1(d). "IP Rights" includes, among other things, "all customer information, customer lists, and related documentation and information." *Id.* at § 16.21(e).

27.    The Bidding Procedures Motion does not address whether a consumer privacy ombudsman is required in light of the Debtors' applicable privacy policies as of the Petition Date.

v.      **The Expense Reimbursement**

28.     The proposed Bidding Procedures provide for an expense reimbursement to the

Stalking Horse Bidder of up to $2,100,000, including:

> (i) up to $500,000 to cover the Stalking Horse Bidder's reasonable out-of-pocket
> costs and expenses, associated with due diligence and professionals' fees and
> expenses associated with, among other things, negotiating, drafting and obtaining
> approval of the Stalking Horse Agreement and (ii) up to $1,600,000 for any actual
> reasonable costs incurred to acquire signage for a "going out of business sale" (the
> "Expense Reimbursement").

D.I. 17, Proposed Order, Ex. 1, § 7.

29.     The Stalking Horse Bidder is not required to serve as a Back-Up Bidder in the event

that it is outbid. *Id.* at § 12.

vi.     **An Affiliate of the Stalking Horse Bidder is a Consultation Party**

30.     The Bidding Procedures provide for certain "Consultation Parties" who enjoy

consultation rights with respect to certain aspects of the Bidding Procedures, Auction and sale:

> The Debtors shall consult with the Consultation Parties in good faith regarding the
> sale process for the Assets and the Sale Transactions, including evaluation of any
> and all Bids, scheduling and operation of the Auction (if applicable), selection of a
> Winning Bid … , negotiation of the purchase agreement or agency agreement, as
> applicable, as well as any modifications of these Bidding Procedures. The Debtors
> shall also provide to the Consultation Parties and their advisors regular reports
> concerning the sale process, including parties contacted, proposals received, and
> any due diligence requested by potential purchasers.

*Id.* at § 3. These Consultation Parties include, among others, the Prepetition FILO Agent. *Id.* As

noted above, the Prepetition FILO Agent is an affiliate of the Stalking Horse Bidder.

31.     The issues on which the Debtors must consult with the Consultation Parties include,

among other things:

> (a)     whether a Potential Bidder is an Acceptable Bidder [*id.* at § 4.];
>
> (b)     whether to provide or withhold due diligence materials requested by
>         bidders [*id.* at § 5];

(c)     whether a bid constitutes a Qualified Bid [*id.*];

(d)     the minimum amount by which a Bid's proposed Purchase Price must exceed the Stalking Horse Bid [*id.* at § 6.2];

(e)     whether a bidder has provided satisfactory evidence of its financial ability to perform [*id.* at § 6.6];

(f)     the value of any Initial Assets Overbid [*id.* at § 6.18];

(g)     the Baseline Bid for any Auction [*id.* at § 11]; and

(h)     the conduct of the Auction, including procedural and related rules announced or amended at and during the Auction [*id.*].

**vii.     Stalking Horse Bidder's Super-Super-Priority Administrative Claim Status**

32.     The Stalking Horse Agreement provides that:

[F]ollowing the satisfaction of the Initial Purchase Price Funding and subject to [the Stalking Horse Bidder's] obligation to pay Expenses and fund the Wind-Down Payments, until all Assets have been sold or otherwise disposed of, and solely to the extent that any Assets or Proceeds  are, notwithstanding the Approval Order, subsequently determined to constitute property of [the Debtors'] estate, *[the Stalking Horse Bidder] shall have a superpriority administrative expense claim, which is senior to all other administrative expense claims (including any other superpriority administrative expense claims)* against [the Debtors] to the extent of any amounts owing from [the Debtors] to [the Stalking Horse Bidder] in connection with this Agreement, including as a result of any breach of this Agreement and/or as a result of any Proceeds being in [the Stalking Horse Bidder's] possession.

D.I. 17, Proposed Order, Ex. 2, § 2(b)(xi) (emphasis added).

33.     While unclear, the apparent basis for the super-super-priority administrative expense claim is that the Debtors are purportedly granting the Stalking Horse Bidder postpetition "first priority, senior security interests and liens on all … Assets and Proceeds" that are "determined to constitute property of [the Debtors'] estate," notwithstanding entry of an order approving the Stalking Horse Agreement. *Id.* at § 2(b)(x).

viii.    **Miscellaneous Provisions**

34.    The U.S. Trustee has provided the Debtors with informal comments and objections regarding other discrete provisions of the Bidding Procedures and Stalking Horse Agreement, including without limitation the following:

(a)    The reservation of rights language in paragraph 4 of the Proposed Order and section 16 of the Bidding Procedures;

(b)    The provision in paragraph 23 of the Proposed Order authorizing the Debtors to partially assume or assume and assign executory contracts;

(c)    Section 2(b)(xxxii) of the Stalking Horse Agreement providing that the Final Reconciliation will be deemed automatically approved pursuant to section 105(a) of the Code and Bankruptcy Rule 9019.

35.    The U.S. Trustee and the Debtors continue to discuss these and other comments and objections in good faith. Although the U.S. Trustee is hopeful that the parties will resolve these issues prior to the hearing on the Bidding Procedures Motion, the U.S. Trustee reserves the right to raise any and all objections with respect to these and any other aspect of the Bidding Procedures Motion and supporting documents at such hearing.

D.    <u>**The Cash Collateral Motion**</u>

36.    The Debtors filed the Cash Collateral Motion on the Petition Date. D.I. 6.

37.    On January 16, 2025, the Court entered the *Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Creditors, (III) Modifying Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [D.I. 106] (the "<u>Interim Cash Collateral Order</u>").

38.    The Interim Cash Collateral Order provides, among other things, that the deadline for parties in interest to file a "Challenge" shall be:

> *<u>[T]he earlier of (i) the date of the hearing approving a sale of substantially all of the Debtors' assets</u>* or confirming a plan of reorganization of the Debtors and (ii) seventy-five (75) days from the date of entry of this Interim Order … ; provided

that approval of (i) as part of the Challenge Deadline is *subject to the entry of a Final Order granting such relief*[.]

D.I. 106, ¶ 29 (emphasis added).

39.     A "Challenge," as defined in the Interim Cash Collateral Order, includes "an adversary or contested matter … (b) asserting or prosecuting *any Avoidance Action or any other claims*, counterclaims or causes of action, objections, contests or defenses against any Prepetition Secured Creditors," among others, "in connection with or related to the Prepetition Credit Documents, the Prepetition Secured Obligations, the Prepetition Liens and the Prepetition Collateral." *Id.* at ¶ 29 n.8 (emphasis added).

## OMNIBUS OBJECTION

### I.     THE COURT SHOULD DENY THE BIDDING PROCEDURES MOTION.

#### A.     The Proposed Bidding Procedures Fail to Provide Adequate Notice to Parties in Interest.

40.     The Debtors' proposed timeline fails to provide sufficient notice of the sale to the Debtors' creditors and to potential bidders who are not already involved in the bid process. The Debtors propose a total of only *three days* between the hearing on Bidding Procedures and the Sale Hearing. During those three days, the Debtors propose to serve the Sale Notice, evaluate any bids received, conduct an Auction (unless they, in concert with an affiliate of the Stalking Horse Bidder, determine to reject any and all other Qualified Bids), file a notice of the Winning Bidder, serve that notice on contract counterparties and (if there is no Auction) hold a Sale Hearing.

41.     Concurrently, potential bidders will receive twenty-four hours' notice of the Court-approved Bid Deadline, and creditors and parties in interest will receive forty-eight hours' notice of the Court-approved Sale Objection Deadline. Put simply, this is not adequate notice. In

particular, parties in interest receiving mail service[4] will likely receive no prior written notice of the Court-approved Bid Deadline or Sale Objection Deadline. At a minimum, parties in interest should receive fourteen days' notice of the Sale Objection Deadline.

42.     The Debtors may argue that two days' notice of the Sale Objection Deadline is sufficient because such deadline was set forth in the Bidding Procedures Motion filed on the Petition Date. However, the *Affidavit of Service* [D.I. 66] filed with respect to, among other things, the Bidding Procedures Motion, reflects that the motion was served upon the following parties:

(a)     The Core/2002 Service List – this includes 85 parties comprised primarily of the Debtors' Top 30 List, prepetition lenders and various State Attorneys General [D.I. 66, Ex. A];

(b)     The Banks Email Service List – this includes six banks [*id.* at Ex. C]; and

(c)     The Bidding Procedures Email Service List – this only includes the Stalking Horse Bidder and its counsel [*id.* at Ex. G].

All in all, fewer than 100 unique parties received contemporaneous service of the Bidding Procedures Motion.

43.     Because the Debtors have not filed their Schedules and SOFAs, the Court and parties in interest do not know exactly how large the creditor body is. But a few of the Debtors' disclosures in the Chapter 11 Cases are illustrative. The Debtors estimate that they have between $1 billion and $10 billion in prepetition liabilities. D.I. 1, Item 16. The Debtors operate approximately 800 stores in 49 states, all of which are operated from leased premises. Prendergast Decl., ¶ 29. They have approximately 19,000 employees. *Id.* at ¶ 43. As of the Petition Date, the Debtors estimate that they have approximately $133 million of outstanding merchandise trade debt. *Id.* at ¶ 50. The Debtors accrue $26 million in monthly lease and occupancy-related expenses.

---

[4] Parties receiving mail service includes all creditors and potential bidders who have not previously consented in writing to receiving notices via email from the Debtors.

*Id.* at ¶ 51. As of the Petition Date, the Debtors had $55 million in outstanding obligations related to their Gift Card program. D.I. 9, ¶ 12. The Debtors' Top 30 list includes vendors from all over the world, including China, Hong Kong, India, Pakistan, Turkey and Vietnam. D.I. 1, pp. 11-13. Against this backdrop, it would be improper and inequitable to impute service on fewer than 100 entities to the Debtors' entire creditor body and all other parties in interest, much less potential bidders not already involved in the sale process. *See, e.g.*, Del. Bankr. L.R. 2002-1(b) (requiring that "all motions" filed in chapter 11 cases (subject to exceptions not applicable here) be served upon, among others, "all parties whose rights are affected by the motion").

44.    Similarly, the Debtors may argue that two days' notice of the Sale Objection Deadline is sufficient because they filed and served two conflicting versions of a *Notice of Potential Sale Hearing* on January 23 and January 24, 2025. D.I. 176, 181 (withdrawal of D.I. 176) and 182.[5] The Debtors have not filed an affidavit of service with respect to these notices, so it is unclear how many creditors and parties in interest actually received them. In any event, and as the name suggests, a *Notice of Potential Sale Hearing* is only notice of *the Debtors' request for relief*. It is not notice of Court-approved bidding procedures and sale-related deadlines. To the extent that the Court or the Debtors amend any of the requested relief in the Bidding Procedures Motion, in particular the proposed timeline, the *Notice of Potential Sale Hearing* will not provide effective notice of anything. The same is true if the Debtors ultimately conduct an Auction and select an alternative Winning Bidder. Moreover, imputing notice to parties in interest based on a

---

[5] Docket Number 176 listed the date of the Sale Hearing (if there is an Auction) as February 22, 2025 at 10:00 a.m. (subject to Court availability). Docket Number 182 lists the date of the Sale Hearing (if there is an Auction) as February 21, 2025 at 10:00 a.m. (subject to Court availability). Somewhat confusingly, the Bidding Procedures Motion lists the date of the Sale Hearing (if there is an Auction) as February 22, 2025 at 10:00 a.m. (subject to Court availability).

*Notice of Potential Sale Hearing* fundamentally undermines the notice requirements in the Bankruptcy Code and Bankruptcy Rules with respect to the use, lease and sale of estate property.

**B.     The Debtors Have Failed to Provide Adequate Disclosures with Respect to the Assets to Be Sold.**

45.     The Debtors propose to transfer to the Stalking Horse Bidder all claims and causes of action other than those "claims, causes of action or other rights under" the Stalking Horse Agreement itself. D.I. 17, Proposed Order, Ex. 2, §§ 1(e), 16.21(d)(iv). This includes the transfer of all Avoidance Actions and all Other Causes of Action. *Id.* at § 1(e). The Stalking Horse Bidder and its designees "are granted derivative standing to pursue the Avoidance Actions … and Other Causes of Action in the name of and/or on behalf of" the Debtors, subject to the terms of the Stalking Horse Agreement. *Id.* at § 2(b)(xxviii). Following satisfaction of the Initial Purchase Price Funding, the Stalking Horse Bidder and/or its designees will be entitled to all Proceeds of the Avoidance Actions and Other Causes of Action they choose to pursue. *Id.* at § 2(b)(vii). But both the Stalking Horse Bidder and "any Person claiming by, through or on behalf of" the Stalking Horse Bidder are enjoined from commencing any Avoidance Actions or Other Causes of Action against the Debtors' undefined "related parties." *Id.* at § 1(e).

46.     Likewise, the Interim Cash Collateral Order provides that, subject to the entry of a final cash collateral order granting such relief, the deadline to commence a Challenge against the Prepetition Secured Creditors – including any Avoidance Action or Other Cause of Action – will be the Sale Hearing. D.I. 106, ¶ 29.

47.     Thus, if the Court approves the proposed Bidding Procedures and enters the proposed final cash collateral order, then parties in interest (including, notably, the Committee) will lose their rights, thirty days into these Chapter 11 Cases, to investigate and prosecute

Avoidance Actions and Other Causes of Action against both (a) the Debtors' undefined "related parties," and (b) the "Prepetition Secured Creditors."

48.    Critically, the Debtors have not filed Schedules and SOFAs in these cases. As such, the Court and parties in interest are completely in the dark as to prepetition transfers to third parties (including insiders and other "related parties") and potential claims and causes of action that could be irrevocably transferred and enjoined by operation of the Court's orders.

49.    The Court should not grant this relief. The Court and parties in interest have no information as to the scope and value of Avoidance Actions and Other Causes of Action in these cases. Without such information, including a fulsome record supporting the Debtors' business judgment in transferring these claims, the Court cannot approve the sale, and should not approve the Bidding Procedures setting the sale process in motion.

50.    Moreover, the transfer of and injunction against claims involving the Debtors' "related parties" is problematic. To the extent "related parties" includes directors, officers or other insiders, the Debtors have the burden of showing that the proposed sale satisfies the heightened scrutiny applied to insider transactions. *In re TSIC, Inc.*, 428 B.R. 103, 113 (Bankr. D. Del. 2010). To the extent "related parties" includes the Debtor Professionals, the Debtors are asking the Court to approve this relief without the benefit of receiving the Debtor Professionals' retention applications and Rule 2014 disclosures.[6] Indeed, this is one reason why parties might typically expect to see such relief sought in a chapter 11 plan. Namely, the debtor's plan would normally be

---

[6] The U.S. Trustee only raises the issue of the Debtor Professionals' retention applications to illustrate that the speed of this proposed transaction results in the Court and parties in interest having much less information than they normally would when evaluating the propriety of a proposed 363 sale. This includes the Debtor Professionals' disclosures of connections (if any) with the Debtors, the Prepetition Secured Parties, the Stalking Horse Bidder and its affiliates, other potential/qualified bidders, creditors, and other parties in interest.

filed only after the debtor had already submitted its required bankruptcy disclosures, filed retention applications, appeared for a section 341 meeting and filed and served a disclosure statement on notice. Authorizing the Debtors to transfer and enjoin all estate causes of action before these boxes have been checked is procedurally improper and premature.

### C.   The Stalking Horse Bidder is Not Entitled to the Expense Reimbursement.

51.     Bid protections must be sought and analyzed under Bankruptcy Code section 503(b). *See In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010) ("[A] bidder must seek a break-up fee under 11 U.S.C. § 503(b)[.]") (citing *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl., Energy, Inc.)*, 181 F.3d 527, 535 (3d Cir. 1999)).

52.     The Court's analysis of bid protections under section 503(b) "must be made in reference to general administrative expense jurisprudence. In other words, the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." *In re O'Brien*, 181 F.3d at 535. "[T]ermination fees are subject to the same general standard used for all administrative expenses under 11 U.S.C. § 503[.]" *In re Energy Future Holdings Corp.*, 904 F.3d 298, 313 (3d Cir. 2018).

53.     A break-up fee must be structured to encourage, not discourage, competing bids. *See In re O'Brien*, 181 F.3d at 535 ("[T]he assurance of a break-up fee may serve to induce an initial bid (a permissible purpose), it may also serve to advantage a favored purchaser over other bidders by increasing the cost of acquisition to the other bidders (an impermissible purpose)."). Even if a break-up fee would benefit the estate, the Court must still determine "whether the proposed fee's potential benefits to the estate outweigh any potential harms, such that the fee is actually necessary to preserve the value of the estate." *In re Energy Future Holdings*, 904 F.3d at 314 (*citing In re O'Brien*, 181 F.3d at 535 (quotation marks omitted)).

54.     Applied here, the Court should deny approval of the Expense Reimbursement. The Stalking Horse Bidder is an affiliate of the Prepetition FILO Agent, who will be paid in full through the proposed sale. Thus, the Stalking Horse Bidder had an interest in the sale's approval and would have been prepared to make the Stalking Horse Bid even without the Expense Reimbursement. Indeed, the Debtors do not contend in the Bidding Procedures Motion or any of the supporting documents that the Stalking Horse Bidder would not have entered into the Stalking Horse Agreement if it did not include the Expense Reimbursement. Instead, the Debtors' only support for the Expense Reimbursement appears to be that courts in this district have granted expense reimbursements with similar *economic* terms, without any analysis as to the facts and circumstances warranting bid protections in those cases. D.I. 17, ¶ 40 (collecting cases).

55.     Moreover, as an affiliate of the Prepetition FILO Agent, the Stalking Horse Bidder had advance access to information regarding the Debtors, their business and their financial health. Thus, the burden on the Stalking Horse Bidder to conduct due diligence was substantially less than it would be for other potential bidders, and the Expense Reimbursement is not necessary to defray the costs of that due diligence.

56.     Additionally, the practical effect of approving the Expense Reimbursement is that the minimum initial overbid amount will be approximately $2,200,000. This an exorbitant price of entry just to bid on the Debtors' assets and will likely chill bidding – particularly in light of the already limited time for bidders to conduct due diligence and formulate an appropriate bid.

57.     Accordingly, the Court should not approve the Expense Reimbursement. To the extent that the Debtors seek "super-super-priority administrative expense claim" status for the Expense Reimbursement, the Court should also deny that relief for the reasons set forth in more detail in <u>Section I.D</u> herein.

**D.    The Stalking Horse Bidder is Not Entitled to Super-Super-Priority Administrative Expense Claim Status.**

58.    The Bankruptcy Code provides for "superpriority" claim status only in sections 364(c)(1) and 507(b). Those sections exclusively address (a) parties providing postpetition financing, and (b) secured creditors who have received insufficient "adequate protection" for the postpetition diminution in value of their collateral. The Stalking Horse Bidder is neither.

59.    Initially, the Debtors attempt to convert the Stalking Horse Bidder into a secured creditor by granting it postpetition first priority liens on Assets and Proceeds that are, "notwithstanding the Approval Order, subsequently determined to constitute property of the [Debtors'] estate … subject to [the Stalking Horse Bidder's] obligation to pay Expenses and fund the Wind-Down Payments[.]" D.I. 17, Proposed Order, Ex. 2, § 2(b)(x). But the Stalking Horse Bidder is purchasing assets, not providing financing, and these purported liens are not securing any new debt.[7] To the contrary, in this scenario, the validity of the purported liens is "subject" to the Stalking Horse Bidder's obligation to pay the Debtors, not the other way around. To the extent the Debtors seek to use these purported liens as a basis for a superpriority administrative expense claim, that attempt must fail.

60.    Likewise, the Court should deny super-super-priority claim status for the Expense Reimbursement, to the extent that the Debtors seek such relief. D.I. 17, Proposed Order, Ex. 2(b)(xi) (granting the Stalking Horse Bidder a superpriority administrative expense claim to the extent of "any amounts" owing from the Debtors to the Stalking Horse Bidder "in connection with" the Stalking Horse Agreement). For the reasons articulated above, the Expense Reimbursement is

---

[7] The Debtors do not specify which sections of the Bankruptcy Code authorize these postpetition liens. The Debtors are not obtaining credit or incurring debt, yet these "first priority, senior security interests" on property of the estate will prime all other secured creditors with no evidence of such creditors' consent or adequate protection.

not entitled to superpriority claim status. That is, the Expense Reimbursement does not fall within the scope of sections 364(c) or 507(b).

61.     Even if the postpetition liens or the Expense Reimbursement provided legitimate bases for a superpriority claim (they do not), the Debtors still could not grant the Stalking Horse Bidder "a superpriority administrative expense claim, which is senior to all other administrative expense claims (*including other superpriority administrative expense claims*)[.]" *Id.* (emphasis added). Nothing in the Bankruptcy Code or the Bankruptcy Rules authorizes multiple layers of superpriority claims. Moreover, permitting a Stalking Horse Bidder affiliated with the Debtors' Prepetition FILO Agent to prime administrative expense claimants has no basis in the Bankruptcy Code, is inconsistent with Third Circuit precedent and should not be allowed. *See In re O'Brien*, 181 F.3d at 535 (Court's analysis of bid protections under section 503(b) "must be made in reference to *general administrative expense jurisprudence*.") (emphasis added).

E.     **The Court Should Not Authorize an Affiliate of the Stalking Horse Bidder to Be a Consultation Party with Respect to the Bidding Procedures and Sale.**

62.     The Stalking Horse Agreement provides that the Prepetition FILO Agent shall be a Consultation Party. In that capacity, the Prepetition FILO Agent will have consultation rights with respect to, among other things, "evaluation of any and all Bids, scheduling and operation of the Auction (if applicable), [and] selection of a Winning Bid[.]" D.I. 17, Proposed Order, Ex. 1, § 3. This includes, specifically, the adequacy of other parties' bids (including whether to reject any and all Qualified Bids), whether to provide due diligence to interested bidders, the amount of the minimum overbid required with respect to the Stalking Horse Bid, and whether another bidder should be the Winning Bidder.

63.     The Court should not grant this relief because the Prepetition FILO Agent is an affiliate of the Stalking Horse Bidder. It should not have the ability to block and tackle for the Stalking Horse Bidder in the evaluation of competing bids and facilitation of an Auction.

64.     The Debtors apparently recognize the potential chilling effect that this type of arrangement could have on bidding in other scenarios. For example, the Bidding Procedures expressly provide that if one of the Prepetition ABL and FILO Lenders "submits a Bid or otherwise is a participant with respect to any active Bid," then the bidding lender will no longer be a Consultation Party, and the other Prepetition ABL and FILO Lenders "shall not share or otherwise discuss" information not otherwise available to all Acceptable Bidders "with the bidding Prepetition ABL and FILO Lender." *Id.* at § 3 n.3. In other words, non-bidding Prepetition ABL and FILO Lenders are barred from sharing information with bidding Prepetition ABL and FILO Lenders that is not available to all other bidders. The Bidding Procedures do not even include this minimal layer of protection against information sharing between the Prepetition FILO Agent and the Stalking Horse Bidder.

   **F.     The Debtors Must Provide Evidence Regarding the Sale of PII.**

65.     The Bidding Procedures Motion does not provide sufficient information for the Court or parties in interest to determine whether a consumer privacy ombudsman needs to be appointed to protect personally identifiable information ("PII") about individuals. Section 363(b)(1) of the Bankruptcy Code provides:

> (b)(1) The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate, except that if the debtor in connection with offering a product or a service discloses to an individual a policy prohibiting the transfer of personally identifiable information about individuals to persons that are not affiliated with the debtor and if such policy is in effect on the date of the commencement of the case, then the trustee may not sell or lease personally identifiable information to any person unless –

(A) such sale or lease is consistent with such policy; or

(B) after appointment of a consumer privacy ombudsman in accordance with section 332, and after notice and a hearing, the court approves such sale or such lease –

(i) giving due consideration to the facts, circumstances, and conditions of such sale or such lease; and

(ii) finding that no showing was made that such sale or such lease would violate applicable nonbankruptcy law.

11 U.S.C. § 363(b)(1).

66.     Section 332 of the Bankruptcy Code provides:

(a) If a hearing is required under section 363(b)(1)(B), the court shall order the United States Trustee to appoint, not later than 7 days before the commencement of the hearing, 1 disinterested person (other than the United States Trustee) to serve as the consumer privacy ombudsman in the case and shall require that notice of such hearing be timely given to such ombudsman.

(b) The consumer privacy ombudsman may appear and be heard at such hearing and shall provide to the court information to assist the court in its consideration of the facts, circumstances, and conditions of the proposed sale or lease of personally identifiable information under section 363(b)(1)(B).

11 U.S.C. § 332(a), (b).

67.     The Stalking Horse Agreement provides that the Assets to be sold include the Debtors' "IP Rights." D.I. 17, Proposed Order, Ex. 2, § 1(d). "IP Rights" includes, among other things, "all customer information, customer lists, and related documentation and information[.]" *Id.* at § 16.21(e).

68.     The U.S. Trustee previously requested copies of all the Debtors' applicable privacy policies. As of the date of this Objection, the U.S. Trustee has not received such privacy policies. The Debtors do not address in the Bidding Procedures Motion whether the IP Rights includes

individuals' PII, what their privacy policies provide for with respect to customer PII or whether a consumer privacy ombudsman is required.

69.      The Court should not approve the proposed Bidding Procedures unless the Debtors (a) establish through admissible evidence that a consumer privacy ombudsman is not required under the Bankruptcy Code, or (b) amend the proposed order granting the Bidding Procedures Motion to direct the U.S. Trustee to appoint a consumer privacy ombudsman. Because an evidentiary predicate is necessary on this point, the U.S. Trustee reserves argument until the record at the hearing is closed.

**G.      Miscellaneous Objections to Approval of the Bidding Procedures**

70.      The U.S. Trustee has submitted informal comments and objections to the Debtors regarding several other discrete provisions of the proposed Bidding Procedures and related documents. These include, without limitation, the following.

71.      *Reservation of Rights*: paragraph 4 of the Proposed Order authorizes the Debtors, in consultation with the Consultation Parties, to amend the Court-approved Bidding Procedures without further Court order. D.I. 17, Proposed Order, ¶ 4. Likewise, section 16 of the proposed Bidding Procedures authorizes the Debtors, in consultation with the Consultation Parties, to "reject[] any or all Bids or Qualified Bids." *Id.* at Proposed Order, Ex. 1, § 16. These provisions are overbroad. With respect to amending the Bidding Procedures without Court order, this renders the process of seeking Court approval and providing notice to parties in interest meaningless. The Debtors should specifically limit the aspects of the Bidding Procedures that they need the ability to amend, rather than providing a non-exhaustive list. Similarly, allowing the Debtors and the Consultation Parties (including the Stalking Horse Bidder's affiliate) to veto any and all Qualified Bids renders the process of becoming a Qualified Bidder meaningless and further discourages bidding.

24

72.    *Partial Assumption of Executory Contracts*: paragraph 23 of the Proposed Order provides that nothing in the order "shall be deemed to limit the Debtors' or the Winning Bidder's ability to negotiate partial assumption and/or assumption and assignment of Contracts with Contract Counterparties on a consensual basis." *Id.* at Proposed Order, ¶ 23. But an executory contract may not be assumed in part and rejected in part. *See, e.g.*, *In re Fleming Cos., Inc.*, 499 F.3d 300, 308 (3d Cir. 2007) (citing *In re ANC Rental Corp.*, 277 B.R. 226, 238 (Bankr. D. Del. 2002)); *see also In re NewPage Corp.*, 2017 WL 571478, at *4 (Bankr. D. Del. Feb. 3, 2017) (quoting and citing *In re Physiotherapy Holdings, Inc.*, 538 B.R. 225, 229 (D. Del. 2015)). The Court should not approve this provision of the Bidding Procedures.

73.    *Automatic Approval of the Final Reconciliation*: the Stalking Horse Agreement provides that within thirty days after the end of the Sale Term, the Debtors and the Stalking Horse Bidder shall complete a final settlement of accounts between the Debtors and the Stalking Horse Bidder with respect to the GOB Sale (the "Final Reconciliation"). D.I. 17, Proposed Order, Ex. 2, § 8.8. The Stalking Horse Agreement further provides that once the Debtors and the Stalking Horse Bidder have agreed on the Final Reconciliation, such Final Reconciliation "shall be automatically deemed approved pursuant to Bankruptcy Code section 105(a) and Rule 9019 of the Federal Rules of Bankruptcy Procedure without further order of the Bankruptcy Court or action by any party." D.I. 17, Proposed Order, Ex. 2, § 2(b)(xxxii). The Court should not grant this relief. The burden is on the Debtors to demonstrate by a preponderance of the evidence that the settlement satisfies the requirements imposed by Bankruptcy Rule 9019 and the Third Circuit's decision in *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996). *See, e.g.*, *In re Capmark Fin. Grp., Inc.*, 438 B.R. 471, 509-10 (Bankr. D. Del. 2010) (citations omitted). The Court should not relieve the

Debtors of their burden and approve a future settlement, sight unseen, without any transparency from the Debtors or the Stalking Horse Bidder.

74.     The U.S. Trustee has raised additional objections with respect to the Bidding Procedures Motion that the parties continue to discuss in good faith. If the parties are unable to resolve such objections before the hearing on bidding procedures, the U.S. Trustee reserves the right to raise any and all objections at such hearing.

## II.     THE COURT SHOULD DENY THE CASH COLLATERAL MOTION ON A FINAL BASIS AS TO SHORTENING THE CHALLENGE DEADLINE.

75.     The Debtors are seeking to terminate the Challenge Deadline thirty days into the Chapter 11 Cases, and approximately eleven days after the Committee appeared through counsel. This would cut off the rights of parties in interest, including the Committee, to investigate and prosecute Challenges against the Prepetition Secured Parties including Avoidance Actions and Other Causes of Action. D.I. 106, ¶ 29. The Court should deny this relief because it violates Local Rule 4001-2(a), which requires the Debtors to provide "at least seventy-five (75) days from the entry of the initial interim [financing] order" for parties to investigate and commence Challenges. Del. Bankr. L.R. 4001-2(a)(i)(Q).[8]

76.     Moreover, and as a practical matter, the Committee has already noticed discovery in the Chapter 11 Cases that will be relevant to the Committee's investigation of prepetition conduct and potential Challenges. The Committee's discovery includes noticed depositions of the Debtors [D.I. 266], Centerview [D.I. 268], Bank of America, N.A. [D.I. 270], Alvarez & Marsal Holdings, LLC [D.I. 272] and the Prepetition FILO Agent [D.I. 274]. The Court should decline to

---

[8] The Cash Collateral Motion violates Local Rule 4001-2(a) for the separate and independent reason that the Interim Cash Collateral Order and proposed final cash collateral order are both made subject to the Debtors' prepetition financing documents, which financing documents have never been made part of the record in the Chapter 11 Cases. Del. Bankr. L.R. 4001-2(a)(ii).

shorten the Challenge Deadline to ensure that the Committee (and any other party in interest) has sufficient time to complete its investigation and commence any Challenges as it sees fit.

77.    The Court should also deny this relief for many of the same reasons discussed in Section I.B above. Namely, the Debtors have not filed their Schedules and SOFAs, leaving the Court and parties in interest with no information as to the scope of the Debtors' prepetition transfers and claims (including transfers and claims involving insiders). Moreover, three days after the final hearing on cash collateral relief, the Debtors are seeking to sell and transfer to the Stalking Horse Bidder all Avoidance Actions and Other Causes of Action that could otherwise be brought as Challenges. The Stalking Horse Bidder would then be automatically enjoined, both directly and derivatively, from prosecuting any such Avoidance Actions or Other Causes of Action against any "related party" of the Debtors. Taken together, the provisions of the final cash collateral order and Stalking Horse Agreement are procedurally improper and undermine the policies of transparency and due process that form the basis of challenge procedures in this district.

## III.    THE COURT SHOULD DENY THE MOTION TO EXTEND.

78.    The Debtors are seeking authority to file their Schedules, SOFAs and 2015.3 Reports more than a month after the proposed Sale Hearing. The Court should not grant this relief. Doing so would essentially authorize a blind sale of the Debtors' entire enterprise with no transparency to the Court, creditors or other parties in interest. In fact, the lack of transparency goes beyond the Debtors' failure to file their Schedules and SOFAs; neither the Debtors nor the Stalking Horse Bidder have provided any valuation or other evidence in support of the Stalking Horse Bid. The Debtors have not submitted so much as a declaration in support of the proposed Bidding Procedures, much less the proposed sale relief to be heard just three days later.

79.    The Debtors voluntarily chose to pursue a chapter 11 sale process and should be required to pay the freight to reap the benefits of that process. This includes, at the very minimum,

providing disclosures with respect to the assets to be sold, evidence in support of the proposed sale terms and sufficient notice for creditors, potential bidders and other parties in interest to make an informed decision about whether to bid or support the sale. Therefore, the Court should deny the Motion to Extend and require the Debtors to file their mandatory disclosures and attend the section 341 meeting before the Court approves any sale of substantially all of the Debtors' assets.

## RESERVATION OF RIGHTS

80.    The U.S. Trustee leaves the Debtors to their burden of proof and reserves any and all rights, remedies and obligations to, among other things: (i) complement, supplement, augment, alter or modify this Objection; (ii) assert any objection; (iii) file any appropriate motion; (iv) conduct any and all discovery as may be deemed necessary or as may be required; and (v) assert such other grounds as may become apparent upon further factual discovery.

**WHEREFORE**, the U.S. Trustee respectfully requests that the Court enter an order or orders: (i) denying the Motions; and (ii) granting such other and further relief as the Court deems just and equitable.

Dated: February 5, 2025                    Respectfully submitted,

**ANDREW R. VARA**
**UNITED STATES TRUSTEE**
**REGIONS 3 AND 9**

By: */s/ Malcolm M. Bates*
    Malcolm M. Bates
    Trial Attorney
    United States Department of Justice
    Office of the United States Trustee
    J. Caleb Boggs Federal Building
    844 N. King Street, Room 2207, Lockbox 35
    Wilmington, DE 19801
    Telephone: (302) 573-6491
    Email:  Malcolm.M.Bates@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I, Malcolm M. Bates, hereby certify that on February 5, 2025, I caused to be served a copy of the foregoing Objection by electronic service on the registered parties via the Court's CM/ECF system and courtesy copies were served via email on parties in interest.

Dated: February 5, 2025                    */s/ Malcolm M. Bates*
                                           Malcolm M. Bates