**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| JOANN INC., *et al.*,[1] | ) | Case No. 25-10068 (ARP) |
| Debtors. | ) | (Jointly Administered) |
| | ) | **Re: Docket Nos. 6 and 106** **Hearing Date: Feb. 11, 2025 at 2:00 p.m. (ET)** **Obj. Deadline: Feb. 7, 2025 at Noon (ET) (as extended)** |

**OBJECTION TO DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED CREDITORS, ETC.**

GC Ambassador Courtyard LLC, MP Elko, LLC, and MGP XII Sunrise Village, LLC (collectively, the "Objecting Landlords") hereby file their limited objection (the "Limited Objection") to the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Creditors, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [D.I. 6] (the "Cash Collateral Motion") and the entry of a final order thereon, and respectfully represent as follows:

## PRELIMINARY STATEMENT

1. This is a "Chapter 22" bankruptcy, with Debtors having emerged from a prior prepackaged Chapter 11 bankruptcy, In re JOANN, Inc., et al., Case No. 24-10418 (CTG), at the end of April 2024 (the "Prior Chapter 11"). The primary objective of the Prior Chapter 11 was a

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: JOANN Inc. (5540); Needle Holdings LLC (3814); Jo-Ann Stores, LLC (0629); Creative Tech Solutions LLC (6734); Creativebug, LLC (3208); WeaveUp, Inc. (5633); JAS Aviation, LLC (9570); joann.com, LLC (1594); JOANN Ditto Holdings Inc. (9652); Dittopatterns LLC (0452); JOANN Holdings 1, LLC (9030); JOANN Holdings 2, LLC (6408); and Jo-Ann Stores Support Center, Inc. (5027). The Debtors' mailing address is 5555 Darrow Road, Hudson, Ohio 44236.

financial restructuring effectuated through the equitization of significant existing secured debt. The Prior Chapter 11, unfortunately, did not result in a healthy enterprise, as Debtors experienced operational and supply issues in the months following emergence that culminated in the filing of these cases. Now, Debtors seek to sell substantially all of their assets for the benefit of their Prepetition ABL Lenders and Prepetition FILO Lenders.[2]

2. As discussed below, this Court should not enter a final order with respect to Debtors' Cash Collateral Motion that fails to provide adequate protection to Debtors' lessors, including Objecting Landlords, as to accruing post-petition occupancy costs that are not clearly provided for by the Cash Collateral Motion and Approved Budget. Debtors should not be permitted to waive their rights under Bankruptcy Code sections 506(c) and 552 and funds should be made available to provide some assurance of the payment of January stub rent and accruing post-petition lease obligations, particularly given the risk of administrative insolvency in these Chapter 11 cases. Here, any relief under the Cash Collateral Motion needs to better balance the competing interests of Debtors, their lenders, landlords and other stakeholders.

**FACTUAL AND PROCEDURAL BACKGROUND**

3. On January 15, 2025 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). On January 16, 2024, this Court entered its order authorizing joint administration of these Chapter 11 cases [D.I. 103]. No trustee or examiner has been appointed and Debtors continue to operate their business and manage their properties as debtors-in-possession pursuant to Bankruptcy Code §§ 1107 and 1108. On January 28, 2025, pursuant to section 1102(a)(1) of the Bankruptcy Code,

[2] Capitalized terms not otherwise defined shall have the same meaning as set forth in the Cash Collateral Motion.

the U.S. Trustee appointed an official committee of unsecured creditors in the Chapter 11 Cases (the "Committee") [D.I. 198].

4. Objecting Landlords are each lessors of nonresidential real property leases, located at (1) Ambassador Row, Lafayette, Louisiana (landlord GC Ambassador Courtyard LLC), (2) Elko Junction, Elko, Nevada (MP Elko, LLC), and (3) Sunrise Village, Citrus Heights, California (MGP XII Sunrise Village, LLC) operated by Debtors as "Party City" retail stores. It cannot be seriously disputed that each of Debtors' leases with Objecting Landlords is for premises in a "shopping center," as that term is defined in Section 365(b)(3) of the Bankruptcy Code. *See*, *e.g.*, *In re Joshua Slocum, Ltd*., 922 F.2d 1081, 1087 (3d Cir. 1990); *In re Three A's Holdings, LLC*, 364 B.R. 550, 560 (Bankr. D. Del. 2007).

5. On January 15, 2025, as part of its "first day" motions, Debtors filed their Cash Collateral Motion, seeking use of the Cash Collateral of the Prepetition Secured Creditors during these Chapter 11 cases. According to the Debtors, as of the Petition Date, Debtors had only $8.4 million total cash on hand, all of which constitutes Cash Collateral.

6. As previously described, Debtors are pursuing a marketing and sale process, and not reorganizing as a going concern, and the Prepetition Secured Creditors are not contributing any "new money" to the administration of these Chapter 11 cases. Indeed, as described in the "first day" Dwyer Declaration (Exhibit B to the Cash Collateral Motion), Debtors need the use of cash collateral "to complete the marketing process described in the Bidding Procedures Motion" and without the use of Cash Collateral "the Debtors would not be able to achieve a higher offer than the Stalking Horse Bid or even consummate the transactions contemplated by the Stalking Horse." Dwyer Declaration at ¶ 12.

7. On January 15, 2025, Debtors filed the *Motion of Debtors for Entry of an Order (I) Approving Bidding Procedures, (II) Scheduling Certain Dates and Deadlines with Respect*

*Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Stalking Horse Agreement, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts and Leases, (VII) Approving the Sale of Assets, and (VIII) Granting Related Relief* [D.I. 17] (the "Bidding Procedures Motion"). The Bidding Procedures Motion seeks to approval of a process for the sale of substantially all of Debtors' assets, with Gordon Brothers Retail Partners ("GBRP"), an affiliate of 1903P Loan Agent, LLC, the Prepetition FILO Agent, serving as the proposed stalking horse for the liquidation of substantially all of Debtors' assets. The proposed GBRP transaction would satisfy the obligations owed to the Prepetition ABL Lenders and Prepetition FILO Lenders.

8. On January 16, 2025, this Court entered its *Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Creditors, (III) Modifying Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relie*f [D.I. 106] (the "Interim Order").

**ARGUMENT**

**I. There are Legitimate Questions Regarding the Proposed Budget and Who Should Bear the Risk of Administrative Insolvency**

9. Debtors' cash flow forecast and budget (defined as the "Approved Budget"), Exhibit 4 to the Interim Order, may fairly be characterized as "high level," with broad "Operating Expenses" and "Wind-Down Coasts" categories that thwart meaningful analysis as to their adequacy or completeness. The Approved Budget appears to be on a "shoestring," showing persistent negative cash flow and raising legitimate questions regarding the bankruptcy estate's administrative solvency. There is no evidence, or even assurance, that the Approved Budget completely provides for accruing February and March 2025 rental obligations while Debtors engage in their sale and marketing process and potential chain-wide liquidation.

10. Objecting Landlords' concerns regarding the adequacy of the Approved Budget are not limited to ordinary rent. Under most modern "triple net" leases, including Debtors' leases with Objecting Landlords, common area maintenance, real estate tax and/or insurance obligations are billed monthly on an estimated basis, subject to annual reconciliations and adjustments. These reconciliations usually occur, in the ordinary course, in the first few months of the following calendar year (i.e., 2024 reconciliations would be billed in February or March of 2025). There is no clear evidence that the Approved Budget adequately provides for these accruing post-petition lease obligations, which must be timely performed under the mandate of Bankruptcy Code section 365(d)(3); *see also Centerpoint Properties v. Montgomery Ward Holding Corp.* (*In re Montgomery Ward Holding Corp.*), 268 F.3d 205, 211-12 (3d Cir. 2001) ("[T]here is no basis in the text [of § 365(d)(3)] for distinguishing [real estate tax reimbursements] from rent and numerous other obligations of tenants" in "the universe of obligations coming within the scope of § 365(d)(3).").

11. The 24-week Approved Budget also makes no clear provision for the ultimate payment of January "stub rent." Since Debtors' leased premises were used by Debtors in the operation of their businesses throughout the month of January 2025, Debtors' landlords, including Objecting Landlords, have administrative expense claims for that use and occupancy, yet the provisions made for the ultimate payment of stub rent claims are not clear.

12. Bankruptcy Code section 503(b)(1)(A) provides for the allowance of administrative expenses, including in particular, the actual, necessary costs and expenses of preserving the bankruptcy estate. "When third parties are induced to supply goods or services to the debtor-in-possession . . . the purposes of [§ 503] plainly require that their claims be afforded priority." *In re Jartran, Inc.*, 732 F.2d 584, 586 (7th Cir. 1984); *In re Goody's Family Clothing, Inc.*, 392 B.R. 604, 609 (Bankr. D. Del. 2008).

13. As the Court held in *In re Goody's Family Clothing, Inc.*, 392 B.R. at 614, "the mere fact that the Debtors are occupying the Landlords' premises is sufficient, in and of itself, to establish that payment for that use and occupancy is an actual, necessary expense of preserving the Debtors' estates under section 503(b)(1). Moreover, the amount of the administrative claim for that use and occupancy is the fair market value, which is presumably the lease rate unless there is evidence to the contrary."

14. Debtors' counsel has represented that $9 million in stub rent is provided for in the Approved Budget, to be paid after the Prepetition ABL/FILO Obligations are paid. While such sum is not explicitly identified in the Approved Budget, it appears to be part of the $31.2 million in Wind-Down Costs budgeted for the week of April 26, 2025, two months after the ABL/FILO Obligations are proposed to be paid and three months after the Debtors and Prepetition Secured Creditors received the benefit of the use and occupancy of Debtors' store locations and the revenues derived therefrom, the very basis for a stub rent claim for January stub rent. No explanation is offered for the magnitude of this delay in payment, while numerous other administrative priority creditors involved in the sale and wind-down process are being paid. In the interim, Debtors' landlords bear the risk of potential administrative insolvency in these Chapter 11 cases, without adequate protection of their interests.

## II. Any Final Order Approving the Cash Collateral Motion Should Adequately Protect Landlords and Not Waive Debtors' Rights Under Bankruptcy Code sections 506(c) and 552(b)

15. Section 506(c) of the Bankruptcy Code allows a debtor to charge the costs of preserving or disposing of a secured lender's collateral to the collateral itself. 11 U.S.C. § 506(c). This provision ensures that the cost of liquidating a secured lender's collateral is not paid from unsecured recoveries. *See, e.g.*, *Precision Steel Shearing v. Fremont Fin. Corp. (In re Visual Indus., Inc.)*, 57 F.3d 321, 325 (3d Cir. 1995) ("[S]ection 506(c) is designed to prevent a windfall

to the secured creditor"); *Kivitz v. CIT Group/Sales Fin., Inc.*, 272 B.R. 332, 334 (D. Md. 2000) (stating that "the reason for [section 506(c)] is that unsecured creditors should not be required to bear the cost of protecting property that is not theirs"); *In re Codesco Inc.*, 18 B.R. 225, 230 (Bankr. S.D.N.Y. 1982) ("The underlying rationale for charging a lienholder with the costs and expenses of preserving or disposing of the secured collateral is that the general estate and unsecured creditors should not be required to bear the cost of protecting what is not theirs.").[3] Similarly, the "equities of the case" exception in Bankruptcy Code section 552(b) allows a debtor, creditors' committee or other party-in-interest to exclude post-petition proceeds from pre-petition collateral on equitable grounds, including to avoid having unencumbered assets fund the cost of a secured lender's foreclosure or other disposition of assets. 11 U.S.C. § 552(b).

16. Under the performance date theory with respect to post-petition real property lease obligations utilized in the Third Circuit (*see*, *e.g.*, *In re Montgomery Ward Holding Corp*.,), since January rent and charges under Debtors' real property leases became due on January 1, prior to the Petition Date, Objecting Landlords would not have a claim for unpaid January rent and charges under Bankruptcy Code section 365(d)(3). Objecting Landlords nevertheless have administrative expense claims under Bankruptcy Code section 503(b)(1)(A) for the use and occupancy of the leased premises during the stub rent period (January 15-31) as an actual, necessary cost of preserving Debtors' estates. *See, e.g.*, *In re Goody's Family Clothing Inc.*, 610 F.3d 812, 817-20 (3d Cir. 2010).

17. There should be little doubt that these Chapter 11 cases are being run for the primary benefit of Debtors' Prepetition Secured Creditors. Debtors' landlords, including Objecting

[3] It is well-settled, however, that administrative claimants do not have an independent right to seek payment of otherwise unsatisfied claims under Bankruptcy Code section 506(c) from property encumbered by a secured creditor's lien since the statute reserves that right to a trustee (or debtor-in-possession in a Chapter 11 case). *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6, 120 S. Ct. 1942, 1947 (2000).

Landlords, are involuntary creditors in these Chapter 11 cases and bear the risk of potential administrative insolvency, while the Prepetition Secured Creditors benefit from the continued operation of Debtors' business through Adequate Protection Payments, the payment of significant fees and expenses, and the opportunity to realize on their Prepetition Collateral through a liquidating Chapter 11 process, including the potential satisfaction of their claims through the GBRP Stalking Horse Bid. As a result, Debtors' Prepetition Secured Creditors must accept the costs and risks associated with those benefits, including payment of necessary administrative expenses incurred by Debtors in these Chapter 11 cases. *See, e.g.*, *In re Scopetta-Senra Partnership III,* 129 B.R. 700, 701 (Bankr. S.D. Fla. 1991) (landlord that leased auto dealership premises to debtor, without payment of administrative rent, provided benefit to secured creditors through the continued use of the premises to sell the vehicles to enable repayment to the secured creditors); *In re So Good South Potato Chip Co*., 116 B.R. 144, 146 (Bankr. E.D. Mo. 1990) (where the trustee declined to pursue a Section 506(c) surcharge claim, the failure of secured creditor to pay for storage of collateral at premises leased by debtor would otherwise "result in a windfall benefit to the secured creditor to the detriment of a third party."); *In re Issac Cohen Clothing Corp*., 39 B.R. 199, 201 (Bankr. S.D.N.Y. 1984) (granting surcharge because lender "clearly benefited from the property being stores on the [landlord's] premises"). The Prepetition Secured Creditors' role and objective in these cases should not be without burden or expense. It has been observed that bankruptcy courts "should not ignore the basic injustice of an agreement in which a debtor, acting out of desperation, has compromised the rights of unsecured creditors." *In re FCX, Inc*., 54 B.R. 833, 838 (Bankr. E.D.N.C. 1985); *accord, In re Defender Drug Stores, Inc*., 145 B.R. 312, 317 (9th Cir. BAP 1992) (recognizing that debtors-in-possession "generally enjoy little negotiating power" with secured lenders, "particularly where the lender has a prepetition lien on cash collateral.").

18. Under these circumstances, landlords, including Objecting Landlords, are entitled, at a minimum, to adequate protection under Bankruptcy Code section 363(e) with respect to the payment of post-petition occupancy costs. The purpose of adequate protection "is to [e]nsure that the creditor receives the value for which [he] bargained prebankruptcy." *MBank Dallas, N.A. v. O'Connor* (*In re O'Connor*), 808 F.2d 1393, 1396 (10th Cir. 1987). It is well-settled that real property lessors are entitled to seek adequate protection. *See, e.g.*, *Memphis-Shelby County Airport Authority v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 783 F.2d 1283, 1286-87 (5th Cir. 1986) (recognizing landlord's right to adequate protection); *In re P.J. Clarke's Restaurant Corp*., 265 B.R. 392, 404 (Bankr. S.D.N.Y. 2001) (noting that a "landlord's right to adequate protection seems to follow clearly from the language of §363(e) . . . ."); *In re Ernst Home Center, Inc*., 209 B.R. 955, 965-66 (Bankr. W.D. Wash. 1997); *In re MS Freight Distribution, Inc*., 172 B.R. 976, 980 n.4 (Bankr. W.D. Wash. 1994) ("Section 363(e) by its express terms authorizes an entity whose property is to be leased by the debtor to seek adequate protection."); *In re RB Furniture, Inc*., 141 B.R. 706, 713 (Bankr. C.D. Cal. 1992) (adequate protection under § 363(e) may even be broader that the rights provided lessors under § 365(d)(3) given that it "is a fluid concept that reflects all the circumstances surrounding a debtor's use of property.").

19. While clear provisions for the prompt payment of "stub rent" and other accruing post-petition rent obligations are plainly preferred,[4] in the absence of an explicit commitment to make sufficient funds available to ensure administrative solvency, including payment of stub rent and on-going post-Petition Date rent obligations, the preservation of the Debtors' ability to surcharge the Prepetition Secured Creditors for the cost of preservation and disposition of the

[4] The mere allowance of an administrative priority claim for accruing post-petition rents is not adequate protection. *In re Attorneys Office Management, Inc*., 29 B.R. 96, 99 (Bankr. C.D. Cal. 1983) ("In §361(3) it is made clear that an administrative claim under §503(b)(1) in itself will not constitute adequate protection.").

Collateral through ongoing operations pending a sale transaction, including the ongoing occupancy costs for Debtors' leased locations, would be a form of adequate protection. Accordingly, the Prepetition Secured Creditors should not be permitted to escape any responsibility for occupancy costs through attempted waivers of the bankruptcy estates' rights under Bankruptcy Code sections 506(c) and 552, as sought by the Cash Collateral Motion. *See* Interim Order at ¶¶ J, 22 and 24.

20. In denying a Section 506(c) waiver in *In re Sports Authority Holdings, Inc.*, Case No. 16-10527 (MFW) (Bankr. D. Del.), Judge Walrath observed that where a Chapter 11 case is being run for the "benefit of the lenders," then "the lenders are going to have to pay the cost of that. And that includes all administrative. It includes the rent." April 26, 2016 hearing transcript [Docket No. 1463] at 194:10 to 195:16; *see also Southwest Securities, FSB v. Segner (In re Domistyle, Inc.)*, 811 F.3d 691, 696 (5th Cir. 2015) (concluding that "a secured creditor should not reap the benefit of actions taken to preserve the secured creditor's collateral without shouldering the cost.").[5]

21. Debtors should not be allowed to waive their statutory ability to compel their secured lenders to "pay to play" in these Chapter 11 cases. Any final order approving the Cash Collateral Motion should not waive Debtors' rights under Bankruptcy Code sections 506(c) and 552(b).

[5] Another approach was taken by Judge Isgur in *In re CEC Entertainment, Inc.*, Case No. 20-33163 (MI) (Bankr. S.D. Tex. 2020), where the debtors' proposed financing budget failed to provide sufficient funds for the payment of stub rent and other post-petition lease obligations. In that case, Judge Isgur conditioned approval of post-petition financing on the establishment of a $13 million "Rent Reserve Account" to support ultimate payment, subject to adjustment or consensual reduction based upon agreement between the debtors and their landlord. *In re CEC Entertainment, Inc.*, Case No. 20-33163 (MI) (Bankr. S.D. Tex. October 13, 2020) [D.I.. 1118] (*Order (I) Authorizing the Debtors To (A) Obtain Postpetition Financing, (B) Grant Senior Secured Liens and Superpriority Administrative Expense Claims, etc*. at ¶ 39).

## III. <u>Any Final Order Must Contain Language (1) Limiting the Scope of the Adequate Protection Liens and (2) Limiting the Remedies of the Prepetition Secured Creditors in the Event of Default, Consistent With the Interim Order</u>

22. Any final order on the Cash Collateral Motion should provide that any Adequate Protection Liens do not encumber, and "the Postpetition Collateral shall not include," Debtors' nonresidential leasehold interests "unless the applicable lease permits the granting of such liens (but shall include the proceeds of the sale or disposition of such leases)," tracking the provisions of the Interim Order. *See* Interim Order at ¶ 13(a)(1). Similarly, the related "carve-out" with respect to Debtors' interests in security deposits and insurance proceeds (Interim Order at ¶ 13(a)) should be contained in any final order on the Cash Collateral Motion.

23. Any final order on the Cash Collateral Motion should also make it clear that the Prepetition Secured Parties do not have unrestricted rights of access to use and occupy Debtors' leased premises following a Cash Collateral Termination Event. Notwithstanding any remedies purported to be granted by the Prepetition Credit Documents, there is no basis for a bankruptcy court to grant a non-debtor party rights to use and occupy real property leased by a debtor outside the parameters of Section 365. *See, e.g.*, *In re Antwerp Diamond, Inc.*, 138 B.R. 865, 866-69 (Bankr. N.D. Ohio 1992). Any final order approving the Cash Collateral Motion should maintain the limitations on lender access in the exercise of remedies contained in the Interim Order (*see* Interim Order at ¶ 13(b)), consistent with similar limitations in other major Chapter 11 cases and applicable state law.

## IV. <u>JOINDER</u>

24. To the extent not inconsistent with the foregoing, Objecting Landlords join in the objections to the Cash Collateral Motion and entry of a final order thereon filed by Debtors' other landlords and the Committee.

## V. RESERVATION OF RIGHTS

25. Objecting Landlords each reserve their respective rights to further object to the relief sought by the Cash Collateral Motion based upon any new information provided by Debtors or the Prepetition Secured Creditors or upon any different relief requested by Debtors.

## VI. CONCLUSION

26. For the foregoing reasons, Debtors should not be permitted to waive their statutory rights and remedies to compel the Prepetition Secured Parties to "pay to play" in these Chapter 11 cases. The payment of accruing post-petition lease obligations and January stub rent must be adequately provided for in any Approved Budget. Any final order approving the Cash Collateral Motion should not waive Debtors' rights under Bankruptcy Code sections 506(c) and 552(b).

Dated: February 7, 2025
Wilmington, Delaware

Respectfully submitted,

*/s/ Laurel D. Roglen*
Leslie C. Heilman (DE 4716)
Laurel D. Roglen (DE 5759)
Nicholas J. Brannick (DE 5721)
Margaret Vesper (DE 6995)
BALLARD SPAHR LLP
919 North Market Street, 11th Floor
Wilmington, DE 19801-3034
Tel: (302) 252-4465
Fax: (302) 252-4466
Email: heilmanl@ballardspahr.com
roglenl@ballardspahr.com
brannickn@ballardspahr.com
vesperm@ballardspahr.com

and

Ivan M. Gold (admission *pro hac vice* pending)
ALLEN MATKINS LECK GAMBLE
MALLORY & NATSIS LLP
Three Embarcadero Center, 12th Floor
San Francisco, CA 94111
Telephone: (415) 837-1515
Facsimile: (415) 837-1516
E-mail: igold@allenmatkins.com

*Attorneys for GC Ambassador Courtyard LLC, MP Elko, LLC, and MGP XII Sunrise Village, LLC*