## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------- x
                                                         :   Chapter 11
In re:                                                   :
                                                         :   Case No. 25-10068 (CTG)
JOANN INC., et al.,¹                                     :
                                                         :   (Jointly Administered)
                    Debtors.                             :
                                                         x   Ref. Docket Nos. 6, 17
-------------------------------------------------------
```

### PRELIMINARY OMNIBUS OBJECTION OF THE AD HOC TERM LOAN GROUP TO THE DEBTORS' (I) BIDDING PROCEDURES MOTION AND (II) CASH COLLATERAL MOTION

The Ad Hoc Term Loan Group,[2] hereby submits this preliminary omnibus objection (the

"<u>Preliminary Objection</u>") to the:

(i) *Motion of Debtors for Entry of an Order (I) Approving Bidding Procedures, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Stalking Horse Agreement, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts and Leases, (VII) Approving the Sale of Assets, and (VIII) Granting Related Relief* (the "<u>Bidding Procedures Motion</u>," and the proposed bidding procedures annexed thereto, the "<u>Bidding Procedures</u>") [Dkt. No. 17]; and*

(ii) *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Creditors, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Dkt. No. 6] (the "<u>Cash Collateral Motion</u>" and, with the Bidding Procedures Motion, the "<u>Motions</u>").

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: JOANN Inc. (5540); Needle Holdings LLC (3814); Jo-Ann Stores, LLC (0629); Creative Tech Solutions LLC (6734); Creativebug, LLC (3208); WeaveUp, Inc. (5633); JAS Aviation, LLC (9570); joann.com, LLC (1594); JOANN Ditto Holdings Inc. (9652); Dittopatterns LLC (0452); JOANN Holdings 1, LLC (9030); JOANN Holdings 2, LLC (6408); and Jo-Ann Stores Support Center, Inc. (5027). The Debtors' mailing address is 5555 Darrow Road, Hudson, Ohio 44236.

[2] The members of which are lenders under the Debtors' prepetition Credit Agreement, dated as of April 30, 2024 (as amended, restated, supplemented, or otherwise modified, the "<u>Term Loan Credit Agreement</u>," the loans issued thereunder the "<u>Term Loan</u>," and lenders thereunder the "<u>Term Lenders</u>"), and are set forth in the *Verified Statement of the Ad Hoc Term Loan Group Pursuant to Bankruptcy Rule 2019* [Dkt. No. 54].

Discovery concerning the issues raised herein is ongoing. The Ad Hoc Term Loan Group reserves the right to supplement and amend this Preliminary Objection, to raise further and other objections to the Motions and the form of any interim or final order, and to introduce evidence prior to or at any hearing regarding the Motions in the event the Ad Hoc Term Loan Group's objections are not resolved prior to such hearing. Filed contemporaneously herewith is the Declaration of Andrew K. Glenn in support of the Preliminary Objection.[3] In support of the Preliminary Objection, the Ad Hoc Term Loan Group further states as follows:

**<u>PRELIMINARY STATEMENT</u>**

1.      The circumstances of this Chapter 22 filing in general, and the relief requested in the Motions specifically, are extraordinary.[4] Just four months after the Debtors emerged from Chapter 11, the FILO Agent – a Gordon Brothers affiliate – unilaterally imposed a reserve against the ABL/FILO borrowing base, citing unspecified business deterioration as the purported basis for imposition of the reserve. The notice was, in the Debtors' own words, a "highly unusual and not customary or reasonable use of discretion" by the FILO Agent. The Debtors warned that the reserve would directly impact the Debtors' liquidity position and potentially cause irreparable and permanent harm to their business. But Gordon Brothers (which is also an affiliate of a FILO Lender) did not relent. The Debtors' admonition proved correct, and the coercive reserve ultimately forced the Debtors into an expedited fire sale to Gordon Brothers with illegal terms that dictate the ABL/FILO Lenders will be the *only* creditors likely to receive any recovery.

2.      The Debtors seek approval of a Stalking Horse Agreement pursuant to which Gordon Brothers would acquire substantially all of the Debtors' assets – ***including the Term***

---

[3]    Citations to "Ex. _" refer to exhibits attached to the Glenn Declaration.

[4]    Capitalized terms used but not defined in this Preliminary Statement shall have the meanings given to those terms in the Background section of this Preliminary Objection. Capitalized terms used but not defined in this Preliminary Objection shall have the meanings given to those terms in the Motions.

*Lenders' first-lien collateral* – without paying any consideration whatsoever to the Term Lenders. Instead, the Debtors propose to use the approximately $80 million of purchase price in excess of the full amount of ABL/FILO Facility to wind down the estate, without providing any adequate protection to the Term Lenders. All of that cash is either the Term Priority Collateral, the ABL/FILO Priority Collateral or their proceeds on which the Term Lenders have a first-priority lien upon repayment of the ABL/FILO Facility. To repeat, the Debtors are looking to consummate a sale that *gives away* the Term Lenders' collateral in exchange for *zero* consideration to the Term Lenders and then propose to use the Term Lenders' cash collateral to fund the estate's administrative costs, without the consent of, or providing any adequate protection to, the Term Lenders. The Debtors' proposed conversion of the Term Lenders' collateral for no consideration violates bedrock principles of bankruptcy and Constitutional law.

3. The relief requested in the Motions is also improper because:

    i. The Debtors propose a truncated sale timeline, which affords potential bidders *less than 24 hours* after the scheduled hearing on the Bidding Procedures Motion to complete diligence and submit a binding, irrevocable bid effectively forecloses any competitive bidding;

    ii. The Bidding Procedures require that any competing bid contain a cash component sufficient to satisfy the ABL/FILO obligations in full, which, in violation of section 363(k) of the Bankruptcy Code, effectively precludes any credit bid by the Term Lenders on the Term Priority Collateral;

    iii. The Bidding Procedures propose to sell all of the Debtors' causes of action, including any claims against Gordon Brothers and the ABL/FILO Lenders for their actions in connection with this Chapter 22 filing for no consideration, without any disclosure, investigation or valuation of those claims;

    iv. The Bidding Procedures propose to make the FILO Agent, a Gordon Brothers affiliate, a "Consultation Party" with broad consent rights concerning the sale process; and

    v. The Debtors propose to grant the ABL/FILO Lenders a first-priority adequate protection lien on the proceeds of the sale of the

Debtors' leases. That is inconsistent with the plain terms of the Intercreditor Agreement, which provides that the Debtors' leasehold interests and the proceeds thereof are Term Priority Collateral.

In sum, the Debtors want to force the Term Lenders to finance these Chapter 11 cases so the ABL/FILO Lenders get paid in full while an affiliate of their agent, Gordon Brothers, acquires the Debtors' assets on the cheap, at warp speed, with no meaningful market test, leaving the Term Lenders with nothing while paying creditors that are subordinate to the Term Lenders. This is an abuse of the Chapter 11 process.

4.    The Court should not approve the patently illegal Stalking Horse Agreement, and should (i) extend the sale timeline by thirty (30) days to give all parties in interest a meaningful opportunity to work together toward a value-maximizing sale of the Debtors' assets in Chapter 11, (ii) modify the Bidding Procedures to ensure that the Term Lenders have the right and practical ability to credit bid, (iii) exclude the Debtors' causes of action from the sale so they are preserved for the benefit of the estate, (iv) remove the FILO Agent's consultation rights, (v) set a briefing schedule in order to make a determination concerning the allocation of the purchase price between the Term Priority Collateral and ABL Priority Collateral (as required under the Intercreditor Agreement) to ensure the Term Lenders are adequately compensated for their collateral (and keep *all* cash proceeds from the sale – including any amounts earmarked for payment to the ABL/FILO lenders in escrow pending such determination), (vi) deny the Debtors' request to grant the ABL/FILO Lenders a first-priority adequate protection lien on the proceeds of the sale of leases, and (vii) deny the use of any cash collateral generated by any sale proceeds given the Debtors' demonstrable inability to adequately protect the Term Lenders.

4

**BACKGROUND**

I.   **The Debtors' Prepetition Funded Debt Obligations**.

5.      As of the Petition Date, the Debtors had approximately $615.7 million in total funded debt obligations, consisting of the following principal amounts: (i) a $352.4 million revolving credit facility (the "ABL Facility") issued under the ABL/FILO Credit Agreement, by and among Debtor Jo-Ann Stores, LLC, as Borrower, Debtor JOANN Holdings 2, LLC, as Parent, Debtor Needle Holdings LLC, as Holdings, Bank of America, N.A., as Administrative Agent and as Collateral Agent (the "ABL Agent"), 1903P Loan Agent, LLC, as Documentation Agent (the "FILO Agent"), and the lenders party thereto from time to time; (ii) a $109.9 million term loan (the "FILO Term Loan" and, together with the ABL Facility, the "ABL/FILO Facility" and the lenders thereunder, collectively, the "ABL/FILO Lenders") issued under the ABL/FILO Credit Agreement; and (iii) the $153.4 million Term Loan issued under the Term Loan Credit Agreement (together with the ABL/FILO Facility, the "Prepetition Facilities" and the lenders thereunder, collectively, the "Prepetition Lenders").

| Prepetition Facilities | Maturity Date | Principal Outstanding |
|---|---|---|
| ABL Facility | June 22, 2027 | $352.4 million |
| FILO Term Loan | June 22, 2027 | $109.9 million |
| Term Loan | April 30, 2028 | $153.4 million |
| **Total Funded Debt** | | **$615.7 million** |

II.   **The Loan Documents Governing the Debtors' Prepetition Funded Debt Obligations**.

6.      To secure the Prepetition Facilities, the Debtors granted the Prepetition Lenders a lien on substantially all of their assets (the "Collateral") pursuant to (i) that certain Security Agreement, dated as of April 30, 2024 (as amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time and in effect immediately prior to the Petition Date, the "Term Loan Security Agreement"), by and among Debtor Needle

Holdings LLC, as Borrower, Debtor Joan Holdings 2, LLC, as Holdings, the Subsidiary Guarantors party thereto, and Wilmington Savings Fund Society, FSB, as Collateral Agent (the "Term Agent"), and (ii) that certain Amended and Restated Security Agreement, dated as of April 30, 2024 (as amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time and in effect immediately prior to the Petition Date, the "ABL/FILO Security Agreement"), by and among Debtor Jo-Ann Stores, LLC, as Borrower, Debtor Needle Holdings LLC, as Holdings, Debtor, Jo-Ann Holdings 2, LLC, as Parent, the Subsidiary Guarantors party thereto, and Bank of America, N.A., as Collateral Agent.  Ex. 1 (Term Loan Security Agreement) § 3.01; Ex. 2 (ABL/FILO Security Agreement) § 3.01. The Term Agent filed financing statements to perfect the Term Lenders' liens on "*all assets*" of the Debtors, "*whether now existing or hereafter acquired, including, without limitation, all products and proceeds thereof*."  Ex. 3 (UCC-1 Financing Statements) (emphasis added).

7.     The Prepetition Lenders' contractual rights, obligations, and relative priority with respect to the Collateral are governed by that certain Second Amended and Restated Intercreditor Agreement, dated as of April 30, 2024 (as amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time, the "Intercreditor Agreement"), by and between the ABL Agent and the Term Agent.  Pursuant to the Intercreditor Agreement, (a) the Term Lenders have (x) a first priority security interest in, among other things, (i) equipment, fixtures, and real property, including any "leasehold interest, easement, or license and any other right to use or occupy real property,"[5] (ii) intellectual property, (iii) except to the extent constituting ABL Priority Collateral, all instruments, commercial tort claims, documents, and general intangibles, (iv) deposit accounts, securities accounts, or commodity accounts that are intended to contain

---

[5]     Intercreditor Agreement § 1.2, Definitions, "Real Property."

solely Term Priority Collateral or identifiable proceeds of Term Priority Collateral indebtedness between or among the Debtors or their affiliates, and (v) collateral other than ABL Priority Collateral (as defined below), including proceeds thereof (the "Term Priority Collateral"), and (y) a second priority interest in the ABL/FILO Priority Collateral; and (b) the ABL/FILO Lenders have a (x) first priority security interest in, among other things, (i) inventory, (ii) cash, money, and cash equivalents (other than identifiable proceeds of Term Priority Collateral), (iii) credit card receivables and bank accounts, other than bank accounts which constitute identifiable proceeds of Term Priority Collateral, and (iv) deposit accounts, securities accounts, and commodities accounts, in each case except for any such accounts which constitute Term Priority Collateral (the "ABL/FILO Priority Collateral"), and (b) a second priority interest in the Term Priority Collateral.

| Term Priority Collateral | ABL/FILO Priority Collateral |
| --- | --- |
| Equipment, fixtures, real property (including leasehold interests) | Inventory |
| Intellectual property | Cash, money, and cash equivalents |
| Commercial tort claims, documents, and general intangibles | Credit card receivables and bank accounts |
| Deposit accounts, securities accounts, or commodity accounts containing Term Priority Collateral or identifiable proceeds of Term Priority Collateral | Deposit accounts, securities accounts, and commodities accounts |
| All collateral other than ABL Priority Collateral, including proceeds thereof | |

Ex. 4 (Intercreditor Agreement) § 1.2, Definitions, "Term Priority Collateral," "ABL Priority Collateral;" *see also Declaration of Michael Prendergast in Support of Chapter 11 Petitions and First Day Motions* ("First Day Declaration") [Dkt. No. 5] ¶¶ 46, 47.

8.      Upon the discharge of the ABL/FILO Facility obligations, (i) *all ABL/FILO Priority Collateral and all proceeds thereof must be applied to the payment of the Term Loan*

***obligations***, and (ii) the ABL Agent must turn over to the Term Agent any Collateral as to which a lien may be perfected through possession or control by the secured party. Ex. 4 (Intercreditor Agreement) §§ 4.1(b), (e). The Intercreditor Agreement explicitly allows the Term Lenders to (i) object to a Section 363(f) sale of the ABL Priority Collateral if the sale would extinguish the Term Lenders' lien on any sale proceeds that are not applied to the ABL/FILO obligations (the "Excess ABL/FILO Collateral Proceeds"), and (ii) seek adequate protection with respect to any Excess ABL/FILO Collateral Proceeds. *Id.* §§ 6.4, 6.3.

9.    In the event of a sale of Collateral that includes both Term Priority Collateral and ABL Priority Collateral, the Intercreditor Agreement requires that the Prepetition Lenders negotiate in good faith concerning the allocation of the purchase price between the Term Priority Collateral and ABL Priority Collateral. *Id.* § 6.4. If the parties cannot reach an agreement, either party may ask the Court to determine such an allocation. *Id.*

III.    **The Chapter 22 Cases.**

10.    The Debtors blame these Chapter 22 cases on purported macroeconomic headwinds and unforeseen inventory challenges they allegedly faced after they emerged from their first Chapter 11 cases in April 2024. *See* First Day Declaration ¶¶ 58–69. But that narrative is misleading. In reality, these Chapter 22 cases were precipitated by, and filed for the sole benefit of Gordon Brothers and the ABL/FILO Lenders.

11.    On August 16, 2024, less than four months after the Debtors emerged from their first Chapter 11 cases, Kyle Shonak, in his capacity as Senior Managing Director of the FILO Agent – ***a Gordon Brothers affiliate*** – sent the Debtors a "Notice of Availability Reserve" establishing a reserve that removed $10 million of availability from the ABL/FILO borrowing base (the "Reserve Notice"). Ex. 5 (Reserve Notice) at 1. The ABL/FILO Lenders imposed this reserve on the purported basis that the Debtors had underperformed relative to the business plan, failed to

secure improved trade terms from vendors on the projected timeline, and were suffering "adverse conditions related to inventory levels and mix which have contributed to lagging sales." *Id.*

12.    On August 20, 2024, the Debtors responded to the Reserve Notice explaining that the reserve conditions had not been met. Ex. 6 (Response to Reserve Notice) at 2. The Debtors advised Mr. Shonak and the ABL/FILO Lenders that the imposition of a reserve was improper for multiple reasons, including that:

i.    ***The Reserve Notice did not set forth with any specificity which reserve triggers the ABL/FILO Lenders were invoking****.* The notice referred "generally to missed forecasts, adverse inventory mix and lagging sales without any evidence of the same in a manner that ties to the contractual requirements" for imposing a reserve. The Debtors also noted that they had not received any notice from Bank of America, N.A., as collateral agent, alleging any collateral impairment.

ii.    ***The Reserve Notice did not provide any evidence, backup or support that tied the $10 million reserve to the alleged event or condition that formed the basis for the imposition of the reserve****.* "On its face," the notice failed to demonstrate that the $10 million reserve "bears a reasonable relationship to the circumstances identified as the purported basis for imposition of the reserve."

iii.    ***Imposing a reserve related to inventory would be a "double hit" to the borrowing base*** because decreased levels of inventory (if any) were already directly reflected in the borrowing base.

iv.    The ABL/FILO Lenders and the Gordon Brothers' affiliated FILO Agent did not consult with the Administrative Agent prior to sending the Reserve Notice, as they were required to do under the ABL/FILO Credit Agreement.

v.    ***The imposition of a reserve "due to alleged, unspecified business deterioration is highly unusual and not a customary or reasonable use of discretion by agents in ABL debt facilities***, which are underwritten on the assets included in the Borrowing Base as calculated in accordance with the negotiated terms of the credit documents, not the business's cash flow or performance."

*Id.* at 2–3 (emphasis added). The Debtors emphasized that the imposition of a reserve would "***directly impact JOANN's liquidity position and could run the risk of irreparable and permanent harm to our business*** at a time when we are not in default, have been fully transparent with all lender constituencies about our business plan and performance, and continue to work diligently to manage and grow our business heading into our high season." *Id.* at 3.

13.     In the ensuing months, the Debtors apparently resolved their inventory issues and improved their top-line revenue and profitability. *See* First Day Declaration ¶ 69. But the ABL/FILO Lenders did not relent.  Their "highly unusual and not customary or reasonable" reserve ultimately forced the Debtors into a freefall bankruptcy where the ABL/FILO Lenders are the *only* creditors proposed to receive any recovery.

14.     On January 15, 2025, just nine months after the Debtors emerged from bankruptcy, the Debtors filed Chapter 11 for a second time. The Debtors filed these Chapter 11 cases with the stalking horse agency agreement (the "Stalking Horse Agreement") with Gordon Brothers in hand. Putting Gordon Brothers' collusion with the ABL/FILO Lenders on full display, the same Mr. Shonak who, in his capacity as FILO Agent, signed the Reserve Notice that precipitated these cases, executed the Stalking Horse Agreement, this time in his capacity as Gordon Brothers' Chief Transaction Officer. *See* Bidding Procedures Motion, Ex. 2.

## IV.   **The Motions.**

15.     The Bidding Procedures Motion seeks approval of the Stalking Horse Agreement, which proposes to sell substantially all of the Debtors' assets, including Term Priority Collateral – intellectual property, furnishings, fixtures, equipment, leasehold interests – to Gordon Brothers in exchange for (the "Stalking Horse Bid") (i) payment of the ABL/FILO Facility obligation in full, in cash, with prepayment premium, and (ii) a cash payment of approximately $80 million to wind down the estate (the "Excess Collateral Proceeds"). *See* Stalking Horse Agreement § 1, 5.1(b),

Ex. 3.1(b), (c); *see also* Bidding Procedures Motion at 9, 10, 18. Upon the discharge of the ABL/FILO Facility obligations, Gordon Brothers would be granted a first priority, senior security interest on all acquired assets and the proceeds thereof, and the Term Lenders' liens would be released. *See* Stalking Horse Agreement § 14; *see also* Bidding Procedures Motion at 16. The Term Lenders would receive **nothing** on account of the Term Priority Collateral or the Excess Collateral Proceeds, on which the Term Lenders indisputably have a first-priority lien (*see supra* ¶ 7). Instead, the Debtors propose to take $80 million of Term Lenders' cash collateral to confirm a plan and to pay subordinated creditors.

16.    The Bidding Procedures require that any competing bid contain *a cash component sufficient to satisfy the ABL/FILO obligations in full.* Bidding Procedures § 6.2. They also propose a truncated sale timeline that affords the Debtors just **four weeks** from the Petition date – with two intervening holidays – to find an alternative to Gordon Brothers' stalking horse bid.

| Date and Time | Event or Deadline |
|---|---|
| February 12, 2025, at 5:00 p.m. | Bid Deadline |
| February 13, 2025 | Notice of Winning Bidder (if no Auction) |
| February 14, 2025, at 10:00 a.m. | Auction |
| February 14, 2025, at 10:00 a.m. | Sale Hearing (if no Auction) |
| February 15, 2025 | Notice of Winning Bidder(s) (if there is an Auction) |
| February 18, 2025, at 5:00 p.m. | Sale Objection Deadline |
| February 22, 2025, at 10:00 a.m. | Sale Hearing (if there is an Auction) |

Bidding Procedures Motion ¶ 7.

17.    The Cash Collateral Motion seeks approval of the Debtors' and the ABL/FILO Lenders' agreement to use the Prepetition Lenders' cash collateral to administer these cases and wind down the estate. It is undisputed that the estate does not have sufficient assets to grant the

Term Lenders any adequate protection with respect to the $80 million in Excess Collateral Proceeds. The Cash Collateral Motion also seeks to grant the ABL/FILO Lenders a first-priority adequate protection lien on the proceeds of any sale leases despite the fact that the Intercreditor Agreement unambiguously provides that leasehold interests are Term Priority Collateral.

V.    **The Term Lenders' Effort to Protect their Rights in these Cases.**

18.    The Term Lenders were entirely excluded from the negotiation of the Stalking Horse Agreement, which proposes to sell the Term Lenders' collateral to Gordon Brothers for no consideration payable to them. Nor were the Term Lenders given any information concerning the estimated value of their Collateral or allocation of the sale proceeds between the ABL/FILO Priority Collateral and the Term Priority Collateral. The Term Lenders have served discovery requests and deposition notices to obtain this information, which should have been provided prior to the Debtors filing these cases. That discovery process is ongoing.

19.    To protect their rights in their Collateral, the Term Lenders intend to place a credit bid. Accordingly, the Term Lenders respectfully request that the Court modify the proposed Bidding Procedures to provide that a credit bid by the Term Lenders is deemed a "Qualified Bid," as discussed in more detail below (*infra* ¶ 25).

**OMNIBUS OBJECTION**

I.    **There Is No Factual or Legal Basis for Approving the Bidding Procedures or the Stalking Horse Agreement.**

20.    Bidding procedures should be approved only where, unlike here, "they provide a benefit to the estate by maximizing the value of the assets." *In re Dura Auto. Sys., Inc*., No. 06-11202 KJC, 2007 WL 7728109, at *90 (Bankr. D. Del. Aug. 15, 2007); *see also In re Mushroom Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (debtors have "a fiduciary duty to protect and maximize the estate's assets"). To accomplish this goal, bidding procedures must promote competitive bidding

and provide for a "provide for fair and efficient resolution of bankrupt estates." *In re Fin'l News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1992); *see also In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 537 (3d Cir. 1999) (bidding procedures that promote competitive bidding provide a benefit to a debtor's estate).

21.     While the sale process may be guided by the Debtors' business judgment, the Court must determine whether the bidding procedures are fair and reasonable. *See* Hr'g Tr. at 7:6-13, *In re Am. Safety Razor Co., LLC*, Case No. 10-12351 (MFW) (Bankr. D. Del. Sept. 30, 2010) ("I don't think, as the debtors suggest, that my consideration of bid procedures is based on the business judgment rule. I need not accept the debtors' business judgment with respect to process. The Bankruptcy Code and Rules and the process under the Bankruptcy Code are all matters for the debtor – for the Court's determination as to what is fair and reasonable. In fact, I think that's my only role in this case: to determine what is fair for all the parties.").

22.     The Debtors did not (and cannot) show that the Bidding Procedures and the Stalking Horse Agreement are fair or reasonable. The *only* parties who stand to benefit from the Stalking Horse Agreement are the ABL/FILO Lenders who would be paid in full and Gordon Brothers who orchestrated this Chapter 22 filing to buy the Debtors' assets on the cheap. The Term Lenders would receive ***nothing*** on account of the Term Priority Collateral. Nor would the Term Lenders receive any of the $80 million Excess Collateral Proceeds. Instead, the Debtors propose to use the Term Lenders' cash collateral to wind down the estate for the sole benefit of the ABL/FILO Lenders (and creditors whose claims are legally subordinated to Term Loans). That is not an appropriate use of Chapter 11, and the fact that the Debtors have proposed demonstrably unfair sale terms and a patently illegal use of the proceeds thereof casts substantial doubt on the integrity of the process.

23.     The Bidding Procedures are also improper because they (i) propose a truncated timeline, (ii) effectively preclude any credit bid by the Term Lenders, (iii) propose to sell all of the Debtors' causes of action, including all tort claims, without any investigation or valuation of those claims, and (iv) grant the FILO Agent certain consent rights, even though its affiliate, Gordon Brothers, is the Stalking Horse bidder.

24.     *First*, the Debtors propose a truncated sale timeline that would effectively preclude any third-party from competing against the Stalking Horse bid.  The Court should not permit any bidding procedures that chill bidding.  *See In re Crown Vill. Farm, LLC*, 415 B.R. 86, 93 n.4 (Bankr. D. Del. 2009) (courts should "not allow anything to chill an active marketing and auction process."). The Bidding Procedures seek to accomplish the sale at warp speed, without any attempt by the Debtors or their professionals to value the assets, or a reasonable time and opportunity for prospective third-party purchasers to participate in the sale process.  The proposed timeline requires potential bidders to complete diligence and submit a binding and irrevocable bid by February 12, 2025 – *less than 24 hours* after the scheduled hearing on the Bidding Procedures Motion and just a few weeks after the Motion was filed.

25.     *Second*, the Bidding Procedures effectively preclude any credit bid by the Term Lenders on their own collateral. As currently drafted, the Bidding Procedures require that all bids contain *a cash component sufficient to satisfy the ABL/FILO obligations in full.* Bidding Procedures § 6.2. This requirement guts the Term Lenders' right to credit bid. The right to credit bid is entirely illusory because the Term Lenders have to *also* put up more than $400 million in cash to become qualified bidders. Although the proposed Bidding Procedures do claim to allow secured creditors the right to credit bid, the practical impact of § 6.2 eviscerates this right.  Pursuant to Section 363(k) of the Bankruptcy Code, secured creditors are entitled to credit on their collateral

unless "the court *for cause* orders otherwise." 11 U.S.C. § 363(k) (emphasis added). The Debtors do not even attempt to justify their wholesale abrogation of the Term Lenders' statutory right to credit bid on their own collateral. Abrogating the Term Lenders' right to credit bid also violates the Intercreditor Agreement, which provides that the ABL Agent – a "Consultation Party" under the Bidding Procedures – shall not "take any action that would interfere with any Exercise of Secured Creditor Remedies undertaken by the Term Agent or any Term Secured Party . . . with respect to the Term Priority Collateral." Ex. 4 (Intercreditor Agreement) § 2.2. The Bidding Procedures clearly "interfere" with the Term Lenders' ability to credit bid and otherwise exercise remedies with respect their collateral.

26.    *Third*, the Debtors propose to sell all of the Debtors' causes of action without any investigation or valuation of those claims. This includes potential causes of action against Gordon Brothers and the ABL/FILO Lenders for their *actions* in connection this Chapter 22 filing. Discovery into these potential causes of action will take time – time which is not afforded under the current expedited sale timeline. The causes of action have not been valued (and cannot properly be valued) as part of the Section 363 sale process. The resolution of any such claims is not at all necessary to consummate a sale of the business assets (or to confirm a Chapter 11 plan). There is no legitimate reason that such claims should be included in any sale or released in any transaction for no consideration, as the Debtors propose to do.

27.    *Fourth*, the Bidding Procedures grant the FILO Agent, a Gordon Brothers affiliate, certain consent rights. The Bidding Procedures propose to make the FILO Agent a "Consultation Party" and would require that the Debtors consult with Gordon Brother's affiliate regarding the sale process for the Assets and the Sale Transactions, including evaluation of any and all Bids, scheduling and operation of the Auction (if applicable), selection of a Winning Bid, negotiation of

15

the purchase agreement or agency agreement, as applicable, as well as any modifications of these Bidding Procedures. *See* Bidding Procedures Motion ¶ 20. That is a clear conflict of interest and entirely inappropriate. The FILO Agent cannot dictate the terms of a sale where its affiliate is the Stalking Horse bidder.

28.     These issues are especially problematic because the Debtors concede that the Stalking Horse Bid has not been market-tested (Bidding Procedures Motion ¶ 2).  Indeed, there was no marketing process *at all* prior to this Chapter 22 filing. The Bidding Procedures Motion states that in the weeks leading up to the Petition Date, they commenced a "comprehensive marketing process in pursuit of one or more value-maximizing transactions" for potential sales of the Debtors assets. *Id.* ¶ 1. The Debtors allege that those efforts "bore fruit" in the form of the Stalking Horse Agreement with Gordon Brothers. *Id.* ¶ 2. That, again, is misleading. In reality, the Debtors and Gordon Brothers negotiated the Stalking Horse Agreement in connection with the Debtors' first Chapter 11 cases and a draft of that agreement. *Notice of Filing of Redacted Plan Supplement* [Dkt. No. 214-1, Ex. G]. The Debtors and Gordon Brothers simply took that pre-negotiated agreement and added a purchase price that *just so happens* to be *just enough* to pay the ABL/FILO Lenders in full and wind down the estate, leaving everyone else with nothing.

29.     Discovery concerning the suspicious circumstances of this sweetheart deal and the allocation of the purchase price between the Term Priority Collateral and ABL Priority Collateral has only just begun. Without this information, the Term Lenders cannot adequately participate in these cases or protect their interest in the Collateral.

30.     For these reasons, the Court should not approve the patently illegal Stalking Horse Agreement and should (i) extend the sale timeline by at least 30 days to provide all parties in interest an opportunity to work together toward a value maximizing sale of the Debtors' assets, (ii)

modify the Bidding Procedures to ensure that the Term Lenders have the right and practical ability to credit bid, and (iii) exclude the Debtors' causes of action from the sale so they are preserved for the benefit of the estate.

31.     Pursuant to Section 6.4 of the Intercreditor Agreement, the Term Lenders also hereby request that, unless the parties are able to reach a settlement prior to the hearing on the Motions, the Court make a determination concerning the allocation of the purchase price between the Term Priority Collateral and ABL Priority Collateral. In the event of a combined sale of both the ABL/FILO and Term Collateral, the Intercreditor Agreement requires the ABL Agent to negotiate an allocation of the purchase price among the different collateral pools in good faith and, failing a negotiated settlement, to submit the allocation dispute to this Court (*see* supra ¶ 9). Proposing to sell the Term Priority Collateral without any compensation to the Term Lenders is not a good faith negotiation.[6]

32.     In addition, the Intercreditor Agreement requires that any sale of the Term Lenders' Collateral be "commercially reasonable." Ex. 4 (Intercreditor Agreement) § 4.1(d). The Intercreditor Agreement also requires the ABL Agent to cooperate with the Term Lenders in connection with any effort to sell Term Priority Collateral. *Id.* § 3.6(b). The agent's abuse of this process to seek to accomplish a commercially unreasonable sale of the Collateral is a breach of the Intercreditor Agreement and the Term Lenders reserve their rights to seek relief against the ABL/FILO Lenders and agents in connection with this process.

## II.     **There Is No Factual or Legal Basis for Approving the Nonconsensual Use of the Term Lenders' Cash Collateral**

---

[6]     On January 29, 2025, the Term Agent sent a notice to the ABL Agent invoking the Intercreditor Agreement's requirement that the ABL Agent negotiate the allocation of sale proceeds in good faith and asking the ABL Agent for a proposed allocation between the ABL/FILO Facility and the Term Loan. As of the date of this filing, the ABL Agent has not sent the Term Agent any proposed allocation. Ex. 7 (Notice to ABL Agent).

33.     Section 363(c)(2) of the Bankruptcy Code unequivocally prohibits a debtor-in-possession from using cash collateral unless (i) the secured creditor consents to the use of such funds or (ii) the court authorizes the use of cash collateral in accordance with the other provisions of 11 U.S.C. § 363. *See* § 363(c)(2). Thus, in the absence of the secured creditor's consent, cash collateral may only be accessed "with the approval of the court, which requires adequate protection of the adverse interest." 3 COLLIERS ON BANKRUPTCY ¶ 363.03[4] (16th ed. 2024); *see also Matter of Gilda Gradenigo, Inc.*, 80 B.R. 666, 669 (Bankr. D. Del. 1987) ("[C]ash collateral . . . cannot be used absent consent of each entity having an interest in it.").

34.     If, as here, the secured creditor does not consent, the debtor bears the burden of establishing, prior to the use of the collateral, that a secured creditor's interest is adequately protected. *See* 11 U.S.C. § 363(e) ("on request of an entity that has an interest in property ... proposed to be used ... by the trustee, the court, with or without a hearing, shall prohibit or condition such use ... as is necessary to provide adequate protection of such interest ...."); *see also In re Grant Broad. of Phila., Inc.*, 75 B.R. 819, 822 (E.D. Pa. 1987) ("[I]n a § 363(c)(2) hearing, the Debtor has the burden of proof on all issues except the validity, priority, and extent of the alleged secured party's security interest, including all other component elements relevant to the 'issue of adequate protection'").

35.     A secured creditor is entitled to adequate protection – as a matter of right, not merely a matter of discretion – when the estate proposes to use the creditor's collateral and when the creditor is stayed from enforcing its interests. *See* 11 U.S.C. §§ 361, 362(d), 363(e); 3 COLLIERS ON BANKRUPTCY ¶ 361.02 (16th ed. 2024) (citing H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 339, at 343-44 (1977)). The right to adequate protection is rooted in the Fifth Amendment of the United States Constitution and is recognized as a property right afforded the

18

highest protection under the law. *See* H.R. Rep. No. 595, at 339 (1977) ("The concept is derived from the fifth amendment protection of property interests"); *In re Keystone Camera Prods. Corp.*, 126 B.R. 177, 183 (Bankr. D.N.J. 1991) ("A secured creditor has a constitutional right to have the value of its secured claim on the petition date preserved.").

36.     Indeed, for over eighty years, the Supreme Court has recognized that security interests are property rights protected by the Takings Clause of the Fifth Amendment. *See Wright v. Union Central Life Ins. Co.,* 311 U.S. 273, 61 S. Ct. 196, 85 L. Ed. 184 (1940); *see also United States v. Security Indus. Bank*, 459 U.S. 70, 103 S. Ct. 407 (1982) (categorizing the right of a secured "creditor in the collateral" as a "traditional property right").[7] Given its Constitutional underpinnings, the statutory requirement of adequate protection is a weighty one. "A finding of adequate protection should be premised on facts, or projections grounded on a firm evidentiary basis." *In re Mosello*, 195 B.R. 277, 292 (Bankr. S.D.N.Y. 1996). The Debtors do not come close to meeting this high bar.

37.     The loan documents unambiguously grant the Term Lenders a first-priority lien on the proceeds of any sale of Term Priority Collateral as well as the proceeds of any ABL Priority Collateral that are not applied to the ABL/FILO obligations. *See supra* ¶ 7. The Stalking Horse Bid contemplates, at a minimum, $80 million in cash proceeds that will not be applied to the Term Loans but, rather, to wind down the estate for the benefit of other parties. Allowing the Debtors' business to operate pending a sale, in and of itself, is not a form of adequate protection at all, and merely

---

[7]     *In re George Ruggiere Chrysler-Plymouth, Inc*., 727 F.2d 1017, 1019 (11th Cir. 1984) ("[S]ecurity interests are 'property rights' protected by the Fifth Amendment from public taking without just compensation"); *In re DeSardi*, 340 B.R. 790, 797 (Bankr. S.D. Tex. 2006) (holding that in order to honor the federal constitution's protection of property rights set forth in the Fifth Amendment, where cash collateral usage is to be compelled, secured creditor must be provided with the benefit of its original bargain); *In re Townley*, 256 B.R. 697, 700 (Bankr. D.N.J. 2000) ("The right of a secured creditor to the value of its collateral is a property right protected by the Fifth Amendment.") (*citing In re Johnson*, 63 B.R. 550, 551 (Bankr. D. Colo. 1986)).

asserting that funding is necessary to maintain operations of the Debtors' business cannot form the basis of an adequate protection finding. *See In re Fontainebleau Las Vegas Holdings, LLC*, 434 B.R. 716, 751-54 (S.D. Fla. 2010) (holding that the fact that post-petition financing was necessary to prevent liquidation does not provide adequate protection, and that any preservation or enhancement of "the value of collateral must be viewed side-by-side with the decrease in value of a creditor's interest."); 3 COLLIER ON BANKRUPTCY ¶ 361.03[5][b] (16th ed. 2024) ("[I]n those situations in which the collateral is to be consumed in the business or is otherwise expected to decline in value over time, preservation of the status quo by passive means is impossible.").

38.     As the Supreme Court has warned, a debtor cannot rely on purported exigent circumstances to avoid the Bankruptcy Code's priority scheme. *See Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 471 (2017) ("We cannot alter the balance struck by the statute, not even in rare cases."). Nor can it weaponize the bankruptcy process to trample a secured creditor's state law rights. *See Harrington v. Purdue Pharma L. P.*, 603 U.S. 204, 227 (2024). The Term Lenders have not released their liens on the Collateral and the Debtors cannot misuse the Section 363 sale process to force them to do so for no consideration.

39.     The Debtors' proposed taking of the Term Lenders' property for no consideration violates bedrock principles of bankruptcy and constitutional law. The Debtors have no hope of a successful reorganization, and every dollar they spend pursuing a sale that will benefit only the ABL/FILO Lenders causes irreparable injury to the Term Lenders. The Debtors' proposed use of Term Lenders' cash collateral to pay administrative and other claims instead of the Term Lenders flies in the face of the legally valid liens the Term Lenders have on such cash. The Cash Collateral Motion should be denied to the extent it seeks approval to use any cash collateral generated by any sale proceeds.

40.     The Cash Collateral Motion and proposed cash collateral order also improperly seeks to grant the ABL/FILO Lenders a first-priority adequate protection lien on the proceeds of the sale of any leases. Proposed Interim Order ¶ 4(a), fn. 6. The Intercreditor Agreement unambiguously provides that "Real Property," and any proceeds thereof, constitute "Term Priority Collateral." Intercreditor Agreement § 1.2. The Intercreditor Agreement defines "Real Property" as "any right, title or interest in and to real property, including any fee interest, *leasehold interest*, easement, or license and *any other right to use or occupy real property*." *Id.* (emphasis added). The Debtors' attempt to grant the ABL/FILO Lenders priority over the proceeds of the sale of any leases is plainly inconsistent with the Intercreditor Agreement. The Cash Collateral Motion should also be denied to the extent it seeks to grant the ABL/FILO Lenders a first-priority adequate protection lien over the proceeds of the sale of any leases.

## RESERVATION OF RIGHTS

41.     Given the short timing between the filing of the Motions and the objection deadline and hearing thereon, the Ad Hoc Term Loan Group expressly reserves all rights, claims, defenses and remedies, including, without limitation, to supplement and amend this Objection, to raise further and other objections to the Motions and the form of any interim or final order, and to introduce evidence prior to or at any hearing regarding the Motions in the event the Ad Hoc Term Loan Group's objections are not resolved prior to such hearing.

## CONCLUSION

42.     The Court should not approve the patently illegal Stalking Horse Agreement, and should (i) extend the sale timeline by thirty (30) days to give all parties in interest a meaningful opportunity to work together toward a value-maximizing sale of the Debtors' assets in Chapter 11, (ii) modify the Bidding Procedures to ensure that the Term Lenders have the right and practical

ability to credit bid, (iii) exclude the Debtors' causes of action from the sale so they are preserved for the benefit of the estate, (iv) remove the FILO Agent's consultation rights, (v) set a briefing schedule in order to make a determination concerning the allocation of the purchase price between the Term Priority Collateral and ABL Priority Collateral (as required under the Intercreditor Agreement) to ensure the Term Lenders are adequately compensated for their collateral (and keep *all* cash proceeds from the sale – including any amounts earmarked for payment to the ABL/FILO lenders in escrow pending such determination), (vi) deny the Debtors' request to grant the ABL/FILO Lenders a first-priority adequate protection lien on the proceeds of the sale of leases, and (vii) deny the use of any cash collateral generated by any sale proceeds given the Debtors' demonstrable inability to adequately protect the Term Lenders.

[*Remainder of page intentionally left blank*]

Dated: February 6, 2025
      Wilmington, Delaware

Respectfully submitted,

*/s/ Matthew B. Harvey*

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
Donna L. Culver (DE No. 2983)
Robert J. Dehney, Sr. (DE No. 3578)
Matthew B. Harvey (DE No. 5186)
Brenna A. Dolphin (DE No. 5604)
1201 North Market Street, 16th Floor
Wilmington, Delaware 19801
Telephone: (302) 658-9200
E-mail:  rdehney@morrisnichols.com
       mharvey@morrisnichols.com
       bdolphin@morrisnichols.com

-and-

**GLENN AGRE BERGMAN & FUENTES LLP**
Andrew K. Glenn (admitted *pro hac vice*)
Kurt A. Mayr (admitted *pro hac vice*)
Agustina G. Berro (admitted *pro hac vice*)
Malak S. Doss (admitted *pro hac vice*)
Esther Hong (admitted *pro hac vice*)
1185 Avenue of the Americas, 22nd Floor
New York, New York 10036
Telephone: (212) 970-1600
Email: aglenn@glennagre.com
      kmayr@glennagre.com
      aberro@glennagre.com
      mdoss@glennagre.com
      ehong@glennagre.com

-and-

**GIBSON, DUNN & CRUTCHER LLP**
Scott J. Greenberg (admitted *pro hac vice*)
Joshua Brody (admitted *pro hac vice*)
C. Lee Wilson (admitted *pro hac vice*)
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Email:  SGreenberg@gibsondunn.com
      JBrody@gibsondunn.com
      CLWilson@gibsondunn.com

*Attorneys for the Ad Hoc Term Loan Group*