## Exhibit 1

*Execution Version*

SECURITY AGREEMENT

dated as of April 30, 2024

among

NEEDLE HOLDINGS LLC,
as the Borrower,

JOANN HOLDINGS 2, LLC,
as Holdings,

THE SUBSIDIARY GUARANTORS PARTY HERETO FROM TIME TO TIME

and

WILMINGTON SAVINGS FUND SOCIETY, FSB,
as Collateral Agent

# TABLE OF CONTENTS

Page

## ARTICLE I

### Definitions

Section 1.01.   Credit Agreement ........................................................................................ 1
Section 1.02.   Other Defined Terms ................................................................................... 2

## ARTICLE II

### Pledge of Securities

Section 2.01.   Pledge ......................................................................................................... 7
Section 2.02.   Delivery of the Pledged Collateral ............................................................. 8
Section 2.03.   Representations, Warranties and Covenants ............................................... 9
Section 2.04.   Certification of Limited Liability Company and Limited Partnership
                Interests ..................................................................................................... 11
Section 2.05.   Registration in Nominee Name; Denominations ...................................... 11
Section 2.06.   Voting Rights; Dividends and Interest ...................................................... 11
Section 2.07.   Collateral Agent Not a Partner or Limited Liability Company Member ... 13

## ARTICLE III

### Security Interests in Personal Property

Section 3.01.   Security Interest ........................................................................................ 14
Section 3.02.   Representations and Warranties ................................................................ 16
Section 3.03.   Covenants .................................................................................................. 19
Section 3.04.   Other Actions ............................................................................................ 21

## ARTICLE IV

### Special Provisions Concerning IP Collateral

Section 4.01.   Grant of License to Use Intellectual Property .......................................... 22
Section 4.02.   Protection of Collateral Agent's Security ................................................. 23

## ARTICLE V

### Remedies

Section 5.01.   Remedies Upon Default ............................................................................ 25
Section 5.02.   Application of Proceeds ............................................................................ 27

i

ARTICLE VI

Indemnity, Subrogation and Subordination

ARTICLE VII

Miscellaneous

Section 7.01.  Notices ...................................................................................................28
Section 7.02.  Waivers; Amendment .............................................................................29
Section 7.03.  Collateral Agent's Fees and Expenses; Indemnification .......................29
Section 7.04.  Successors and Assigns...........................................................................30
Section 7.05.  Survival of Representations and Warranties............................................30
Section 7.06.  Counterparts; Effectiveness; Several Agreement ...................................30
Section 7.07.  Severability .............................................................................................31
Section 7.08.  GOVERNING LAW, ETC. .....................................................................31
Section 7.09.  WAIVER OF RIGHT TO TRIAL BY JURY...........................................32
Section 7.10.  Headings .................................................................................................32
Section 7.11.  Security Interest Absolute ......................................................................32
Section 7.12.  Termination or Release ..........................................................................32
Section 7.13.  Additional Restricted Subsidiaries.........................................................33
Section 7.14.  Collateral Agent Appointed Attorney-in-Fact .......................................33
Section 7.15.  General Authority of the Collateral Agent.............................................35
Section 7.16.  Collateral Agent's Duties.......................................................................35
Section 7.17.  Recourse; Limited Obligations ..............................................................35
Section 7.18.  Mortgages ..............................................................................................36
Section 7.19.  ABL Intercreditor Agreement................................................................36

SCHEDULES

Schedule I       -    Subsidiary Guarantors
Schedule II      -    Pledged Equity; Pledged Debt
Schedule III     -    Commercial Tort Claims
Schedule IV      -    UCC Filing Offices

EXHIBITS

Exhibit I        -    Form of Security Agreement Supplement
Exhibit II       -    Form of Information Certificate
Exhibit III      -    Form of Trademark Security Agreement
Exhibit IV       -    Form of Patent Security Agreement
Exhibit V        -    Form of Copyright Security Agreement

This SECURITY AGREEMENT, dated as of April 30, 2024 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, this "<u>Agreement</u>"), among NEEDLE HOLDINGS LLC, a Delaware limited liability company (the "<u>Borrower</u>"), JOANN HOLDINGS 2, LLC, a Delaware limited liability company ("<u>Holdings</u>"), the Subsidiary Guarantors set forth on <u>Schedule I</u> hereto and WILMINGTON SAVINGS FUND SOCIETY, FSB, as Collateral Agent for the Secured Parties (as defined below).

Reference is made to the Credit Agreement, dated as of April 30, 2024 (as amended, restated, amended and restated, extended, renewed, replaced, refinanced, supplemented and/or otherwise modified from time to time, the "<u>Credit Agreement</u>"), among the Borrower, Holdings, the Lenders party thereto from time to time, and Wilmington Savings Fund Society, FSB, as Administrative Agent for the Lenders and Collateral Agent for the Secured Parties.

The Lenders have agreed to extend credit to the Borrower subject to the terms and conditions set forth in the Credit Agreement, the Hedge Banks have agreed to enter into and/or maintain one or more Secured Hedge Agreements and the Cash Management Banks have agreed to enter into and/or maintain Cash Management Services, on the terms and conditions set forth in the Credit Agreement, in such Secured Hedge Agreements and in such Cash Management Services, as applicable. The obligations of the Lenders to extend such credit, the obligation of the Hedge Banks to enter into and/or maintain such Secured Hedge Agreements and the obligation of the Cash Management Banks to enter into and/or maintain such Cash Management Services, are, in each case, conditioned upon, among other things, the execution and delivery of this Agreement by each Grantor (as defined below). The Borrower is a grantor hereunder and the other Grantors are affiliates of the Borrower and of one another and will derive substantial direct and indirect benefits from (i) the extensions of credit to the Borrower pursuant to the Credit Agreement, (ii) the entering into and/or maintaining by the Hedge Banks of Secured Hedge Agreements with the Borrower and/or one or more of its Restricted Subsidiaries, and (iii) the entering into and/or maintaining by the Cash Management Banks of Cash Management Services with the Borrower and/or one or more of its Restricted Subsidiaries, and are willing to execute and deliver this Agreement in order to induce the Lenders to extend such credit, the Hedge Banks to enter into and/or maintain such Secured Hedge Agreements and the Cash Management Banks to enter into and/or maintain such Cash Management Services. The ABL Intercreditor Agreement governs the relative rights and priorities of the Secured Parties and the ABL Secured Parties (as defined below) in respect of the Term Priority Collateral (as defined below) and the ABL Priority Collateral (as defined below) (and with respect to certain other matters as described therein). Accordingly, the parties hereto agree as follows:

## ARTICLE I

### Definitions

Section 1.01.  <u>Credit Agreement</u>.

(a)     Capitalized terms used in this Agreement, including the preamble and introductory paragraphs hereto, and not otherwise defined herein have the meanings specified in the Credit Agreement.

(b)     Unless otherwise defined in this Agreement or in the Credit Agreement, terms defined in Article 8 or 9 of the UCC (as defined below) are used in this Agreement as such terms are defined in such Article 8 or 9.

(c)     The rules of construction specified in Article I of the Credit Agreement also apply to this Agreement.

Section 1.02.   Other Defined Terms.  As used in this Agreement, the following terms have the meanings specified below:

"ABL Agent" has the meaning assigned that term in the ABL Intercreditor Agreement.

"ABL Documents" has the meaning assigned that term in the ABL Intercreditor Agreement.

"ABL Priority Collateral" has the meaning assigned that term in the ABL Intercreditor Agreement.

"ABL Secured Parties" has the meaning assigned that term in the ABL Intercreditor Agreement.

"Accommodation Payment" has the meaning assigned to such term in Article VI.

"Account(s)" means "accounts" as defined in Section 9-102 of the UCC, and also means a right to payment of a monetary obligation, whether or not earned by performance, (a) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (b) for services rendered or to be rendered, or (c) arising out of the use of a credit or charge card or information contained on or for use with the card.

"Account Debtor" means any Person who is or who may become obligated to any Grantor under, with respect to or on account of an Account.

"After-Acquired Intellectual Property" has the meaning assigned to such term in Section 4.02(f).

"Agreement" has the meaning assigned to such term in the introductory paragraph hereto.

"Allocable Amount" has the meaning assigned to such term in Article VI.

"Article 9 Collateral" has the meaning assigned to such term in Section 3.01(a).

"Bankruptcy Event of Default" means any Event of Default under Section 8.01(f) of the Credit Agreement.

"Blue Sky Laws" has the meaning assigned to such term in Section 5.01.

2

"Borrower" has the meaning assigned to such term in the introductory paragraph to this Agreement.

"Closing Date Grantor" has the meaning assigned to such term in Section 2.02 of this Agreement.

"Collateral" means the Article 9 Collateral and the Pledged Collateral.

"Collateral Account" means any Cash Collateral Account (as defined in the Credit Agreement), which cash collateral account shall be maintained with the Collateral Agent for the benefit of the relevant Secured Parties.

"Control" means (i) in the case of each Deposit Account, "control," as such term is defined in Section 9-104 of the UCC, (ii) in the case of any Security Entitlement, Uncertificated Securities or Certificated Securities. "control," as such term is defined in Section 8-106 of the UCC, and (iii) in the case of any Securities Account, Commodity Account or Commodity Contract, "control," as such term is defined in Section 9-106 of the UCC.

"Control Agreement" means an effective account control agreement establishing control over a Deposit Account or Securities Account, as Applicable, in favor of the Collateral Agent, in each case in form and substance reasonably satisfactory to the Collateral Agent.

"Copyright License" means any written agreement, now or hereafter in effect, granting any right to any third party under any Copyright now or hereafter owned by any Grantor or that such Grantor otherwise has the right to license, or granting any right to any Grantor under any Copyright now or hereafter owned by any third party, and all rights of such Grantor under any such agreement.

"Copyrights" means all of the following now owned or hereafter acquired by or assigned to any Grantor: (a) all copyright rights in any work subject to the copyright laws of the United States or any other country, whether as author, assignee, transferee or otherwise, whether registered or unregistered and whether published or unpublished, (b) all registrations and applications for registration of any such copyright in the United States or any other country, including registrations, recordings, supplemental registrations and pending applications for registration in the USCO, including those copyright registrations and registration applications in the USCO listed in Section III of the Information Certificate and all: (i) rights and privileges arising under applicable Law with respect to such Grantor's use of such copyrights, (ii) reissues, renewals, and extensions thereof and amendments thereto, (iii) income, fees, royalties, damages, claims and payments now or hereafter due and/or payable with respect thereto, including damages and payments for past, present or future infringements thereof, (iv) rights corresponding thereto throughout the world and (v) rights to sue for past, present or future infringements thereof.

"Credit Agreement" has the meaning assigned to such term in the second introductory paragraph hereto.

"Debtor Relief Laws" has the meaning to such term in the Credit Agreement.

3

"Discharge of ABL Obligations" has the meaning assigned to that term in the ABL Intercreditor Agreement.

"Domain Names" means all Internet domain names and associated URL addresses in or to which any Grantor now or hereafter has any right, title or interest.

"Equipment" means (x) any "equipment" as such term is defined in Article 9 of the UCC and in any event, shall include, but shall not be limited to, all machinery, equipment, furnishings, appliances, furniture, fixtures, tools, and vehicles now or hereafter owned by any Grantor in each case, regardless of whether characterized as equipment under the UCC and (y) and any and all additions, substitutions and replacements of any of the foregoing and all accessions thereto, wherever located, whether or not at any time of determination incorporated or installed therein or attached thereto, and all replacements therefor, together with all attachments, components, parts, equipment and accessories installed thereon or affixed thereto.

"Excluded Equity Interests" has the meaning assigned to such term in Section 2.01 of this Agreement.

"Excluded Property" has the meaning assigned to such term in Section 3.01 of this Agreement.

"General Intangibles" has the meaning provided in Article 9 of the UCC and shall in any event include all choses in action and causes of action and all other intangible personal property of every kind and nature (other than Accounts) now owned or hereafter acquired by any Grantor, as the case may be, including corporate or other business records, indemnification claims, contract rights (excluding rights under leases, whether entered into as lessor or lessee, but including Swap Contracts and other agreements), goodwill, registrations, franchises, tax refund claims and any letter of credit, guarantee, claim, security interest or other security held by or granted to any Grantor.

"Grant of Security Interest" means a Grant of Security Interest in certain IP Collateral in the form of Exhibit III, IV or V attached hereto.

"Grantor" means the Borrower, Holdings and each Subsidiary Guarantor.

"Holdings" has the meaning assigned to such term in the introductory paragraph hereto.

"Information Certificate" means a certificate substantially in the form of Exhibit II, completed and supplemented with the schedules and attachments contemplated thereby, and duly executed by a Responsible Officer of the Borrower.

"Intellectual Property" means all intellectual and similar property of every kind and nature, including: Patents, Copyrights, Licenses, Trademarks, Domain Names, trade secrets, proprietary technical and business information, proprietary know how, show how or other data or information, software, databases, all other proprietary information, registrations and all additions, improvements and accessions to any of the foregoing.

4

"IP Collateral" means the Collateral consisting of Intellectual Property.

"License" means any Patent License, Trademark License, Copyright License or other license or sublicense agreement granting rights under Intellectual Property to which any Grantor is a party.

"Patent License" means any written agreement, now or hereafter in effect, granting to any third party any right to develop, commercialize, import, make, have made, offer for sale, use or sell any invention on which a Patent, now or hereafter owned by any Grantor or that any Grantor otherwise has the right to license, is in existence, or granting to any Grantor any such right with respect to any invention on which a Patent, now or hereafter owned by any third party, is in existence, and all rights of any Grantor under any such agreement.

"Patents" means all of the following now owned or hereafter acquired by any Grantor: (a) all letters patent of the United States or the equivalent thereof in any other country, all registrations and recordings thereof, and all applications for letters patent of the United States or the equivalent thereof in any other country, including registrations, recordings and pending applications in the USPTO or any similar offices in any other country, including those U.S. Patents and patent applications in the USPTO listed in Section III of the Information Certificate, and (b) all (i) rights and privileges arising under applicable Law with respect to such Grantor's use of any patents, (ii) inventions and improvements described and claimed therein, (iii) reissues, divisions, continuations, renewals, extensions and continuations-in-part thereof and amendments thereto, (iv) income, fees, royalties, damages, claims and payments now or hereafter due and/or payable with respect to any of the foregoing including damages and payments for past, present or future infringements thereof, (v) rights corresponding thereto throughout the world and (vi) rights to sue for past, present or future infringements thereof.

"Pledged Collateral" has the meaning assigned to such term in Section 2.01.

"Pledged Debt" has the meaning assigned to such term in Section 2.01.

"Pledged Equity" has the meaning assigned to such term in Section 2.01.

"Pledged Securities" means any Promissory Notes, stock certificates, unit certificates, limited or unlimited liability membership certificates or other Securities or Instruments now or hereafter included in the Pledged Collateral, including all Pledged Equity, Pledged Debt and all other certificates, instruments or other documents representing or evidencing any Pledged Collateral.

"Promissory Note" has the meaning provided in Article 9 of the UCC.

"Secured Obligations" means the "Obligations" as defined in the Credit Agreement; it being acknowledged and agreed that the term "Secured Obligations" as used herein shall include each extension of credit under the Credit Agreement and all obligations of the Loan Parties and their respective Subsidiaries which arise under the Loan Documents (including the Guaranty) or with respect to Obligations in respect of Secured Hedge Agreements or Cash Management Obligations, in each case, whether outstanding on the date of this Agreement or extended or arising from time to time after the date of this Agreement.

"<u>Secured Parties</u>" has the meaning provided in the Credit Agreement.

"<u>Securities Act</u>" has the meaning assigned to such term in <u>Section 5.01</u>.

"<u>Security</u>" means a "security" as such term is defined in Article 8 of the UCC and, in any event, shall include any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"<u>Security Agreement Supplement</u>" means an instrument substantially in the form of <u>Exhibit I</u> hereto.

"<u>Security Interest</u>" has the meaning assigned to such term in <u>Section 3.01(a)</u>.

"<u>Term Priority Collateral</u>" has the meaning assigned that term in the ABL Intercreditor Agreement.

"<u>Trademark License</u>" means any written agreement, now or hereafter in effect, granting to any third party any right to use any Trademark now or hereafter owned by any Grantor or that any Grantor otherwise has the right to license, or granting to any Grantor any right to use any Trademark now or hereafter owned by any third party, and all rights of any Grantor under any such agreement (not including vendor or distribution agreements that allow incidental use of Intellectual Property rights in connection with the sale or distribution of such products or services).

"<u>Trademarks</u>" means all of the following now owned or hereafter acquired by any Grantor: (a) all trademarks, service marks, trade names, corporate names, company names, business names, fictitious business names, trade styles, trade dress, logos, other source or business identifiers, designs and general intangibles of like nature, the goodwill of the business symbolized thereby or associated therewith, all registrations and recordings thereof, and all registration and recording applications filed in connection therewith, including registrations and registration applications in the USPTO or any similar offices in any State of the United States or any other country or any political subdivision thereof, and all extensions or renewals thereof, including those United States trademarks registered with or applied for at the USPTO listed in Section III of the Information Certificate, (b) all rights and privileges arising under applicable Law with respect to such Grantor's use of any trademarks, (c) all extensions and renewals thereof and amendments thereto, (d) all income, fees, royalties, damages and payments now and hereafter due and/or payable with respect to any of the foregoing, including damages, claims and payments for past, present or future infringements thereof, (e) all rights corresponding thereto throughout the world and (f) all rights to sue for past, present and future infringements or dilutions thereof or other injuries thereto.

"<u>UCC</u>" means the Uniform Commercial Code as in effect from time to time in the State of New York; <u>provided</u> that, if by reason of mandatory provisions of law, perfection, or the

effect of perfection or non perfection or the priority of a security interest in any Collateral or the availability of any remedy hereunder is governed by the Uniform Commercial Code as in effect in a jurisdiction other than New York, "UCC" means the Uniform Commercial Code as in effect in such other jurisdiction solely for purposes of the provisions hereof relating to such perfection or effect of perfection or non perfection or priority or availability of such remedy, as the case may be.

"UFCA" has the meaning assigned to such term in Article VI.

"UFTA" has the meaning assigned to such term in Article VI.

"USCO" means the United States Copyright Office.

"UPSTO" means the United States Patent and Trademark Office.

## ARTICLE II

## Pledge of Securities

Section 2.01.  Pledge.  As security for the payment or performance, as the case may be, in full of the Secured Obligations, each Grantor hereby assigns and pledges to the Collateral Agent, its successors and assigns, for the benefit of the Secured Parties, and hereby grants to the Collateral Agent, its successors and assigns, for the benefit of the Secured Parties, a continuing security interest in, all of such Grantor's right, title and interest in, to and under (a) (i) all Equity Interests directly held by it (including those Equity Interests listed on Schedule II ) and (ii) any other Equity Interests obtained in the future directly by such Grantor and the certificates representing all such Equity Interests (the foregoing clauses (i) and (ii) collectively, the "Pledged Equity"), in each case including all dividends, distributions, return of capital, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the Pledged Equity and all warrants, rights or options issued thereon or with respect thereto; provided that the Pledged Equity shall not include (A) more than 65% of the issued and outstanding Equity Interests entitled to vote of (x) each Subsidiary that is a Foreign Subsidiary that is directly owned by the Borrower, Holdings or by any Subsidiary Guarantor and (y) each Subsidiary that is a Domestic Subsidiary that is directly owned by the Borrower, Holdings or by any Subsidiary Guarantor and that is a disregarded entity for United States federal income tax purposes substantially all of the assets of which consist of Equity Interests in one or more Foreign Subsidiaries, (B) any Equity Interest of any Person (other than a wholly owned Subsidiary), to the extent not permitted or restricted by the terms of such Person's organizational or joint venture documents or other agreements with holders of such Equity Interests, (C) any Equity Interest if, to the extent and for so long as the pledge of such Equity Interest hereunder is prohibited by any applicable Law, including any requirement to obtain the consent of any Governmental Authority (other than to the extent that any such prohibition would be rendered ineffective pursuant to the UCC or any other applicable Law); provided that such Equity Interest shall cease to be an Excluded Equity Interest pursuant to this clause (C) at such time as such prohibition ceases to be in effect, (D) any Equity Interest that the Borrower and the Administrative Agent (acting at the Direction of the Required Lenders) shall have agreed in writing to treat as an Excluded Equity Interest for purposes hereof on account of the cost of

7

pledging such Equity Interest hereunder (including any material adverse tax consequences to Holdings and its Affiliates resulting therefrom) being excessive in view of the benefits to be obtained by the Secured Parties therefrom (any Equity Interests excluded pursuant to clauses (A) through (D) above, the "Excluded Equity Interests"); (b)(i) the Promissory Notes and any Instruments evidencing indebtedness owned by it (including those listed opposite the name of such Grantor on Schedule II) and (ii) any Promissory Notes and Instruments evidencing indebtedness obtained in the future by such Grantor (the foregoing clauses (i) and (ii) collectively, the "Pledged Debt"), in each case including all interest, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all Pledged Debt; (c) all other property that may be delivered to and held by the Collateral Agent pursuant to the terms of this Section 2.01; (d) subject to Section 2.06, all payments of principal or interest, dividends, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of, in exchange for or upon the conversion of, and all other Proceeds received in respect of, the securities referred to in clauses (a), (b) and (c) above; (e) subject to Section 2.06, all rights and privileges of such Grantor with respect to the securities and other property referred to in clauses (a), (b), (c) and (d) above; and (f) all Proceeds of, and Security Entitlements in respect of, any of the foregoing (the items referred to in clauses (a) through (f) above being collectively referred to as the "Pledged Collateral").

TO HAVE AND TO HOLD the Pledged Collateral, together with all right, title, interest, powers, privileges and preferences pertaining or incidental thereto, unto the Collateral Agent, its successors and assigns, for the benefit of the Secured Parties, forever; subject, however, to the terms, covenants and conditions hereinafter set forth.

Section 2.02.    Delivery of the Pledged Collateral.

(a)    On the Closing Date (in the case of any Grantor that grants a Lien on any of its assets hereunder on the Closing Date (each, including, for the avoidance of doubt, the Borrower, a "Closing Date Grantor")) or on the date on which it signs and delivers its first Security Agreement Supplement (in the case of any other Grantor), each Grantor shall deliver or cause to be delivered to the Collateral Agent, for the benefit of the applicable Secured Parties, any and all Pledged Securities (other than any Uncertificated Securities, but only for so long as such Securities remain uncertificated); provided that Promissory Notes and Instruments evidencing Indebtedness shall only be so required to be delivered to the extent required pursuant to paragraph (b) of this Section 2.02.  Thereafter, whenever such Grantor acquires any other Pledged Security (other than any Uncertificated Securities, but only for so long as such Securities remain uncertificated), such Grantor shall promptly (and in any event within thirty (30) days after receipt by such Grantor (or such longer period as the Administrative Agent (acting at the Direction of the Required Lenders) may agree in its reasonable discretion)) deliver or cause to be delivered to the Collateral Agent such Pledged Security as Collateral; provided that Promissory Notes and Instruments evidencing Indebtedness shall only be so required to be delivered to the extent required pursuant to paragraph (b) of this Section 2.02.

(b)    As promptly as practicable (and in any event within thirty (30) days after the creation of such Indebtedness for borrowed money owed to a Grantor by any Person other than a Loan Party (or such longer period as the Administrative Agent (acting at the Direction of

the Required Lenders) may agree in its reasonable discretion)), each Grantor will cause any Indebtedness for borrowed money having an aggregate principal amount equal to or in excess of $5,000,000 owed to such Grantor by any Person (other than a Loan Party) to be evidenced by a duly executed Promissory Note or Instrument and such Promissory Note or Instrument shall be promptly (and in any event within thirty (30) calendar days of such event, or such later date as the Administrative Agent (acting at the Direction of the Required Lenders) may agree in its reasonable discretion) pledged and, subject to the ABL Intercreditor Agreement, delivered to the Collateral Agent, for the benefit of the Secured Parties, in a manner reasonably satisfactory to the Collateral Agent.

(c)     Upon delivery to the Collateral Agent, (i) any Security Certificate or Promissory Note representing Pledged Collateral shall be accompanied by undated stock or note powers, as applicable, duly executed in blank or other undated instruments of transfer duly-executed in blank reasonably satisfactory to the Collateral Agent and by such other instruments and documents as the Collateral Agent may reasonably request and (ii) all other property comprising part of the Pledged Collateral shall be accompanied by such instruments and documents as the Collateral Agent may reasonably request.  Each delivery of Pledged Securities shall be accompanied by a schedule describing such Pledged Securities, which schedule shall be deemed to supplement Schedule II and be made a part hereof; provided that failure to provide any such schedule hereto shall not affect the validity of such pledge of such Pledged Securities. Each schedule so delivered shall supplement any prior schedules so delivered.

(d)     [Reserved].

(e)     The assignment, pledge and security interest granted in Section 2.01 are granted as security only and shall not subject the Collateral Agent or any other Secured Party to, or in any way alter or modify, any obligation or liability of any Grantor with respect to or arising out of the Pledged Collateral.

Section 2.03.    Representations, Warranties and Covenants.  Each Grantor represents, warrants and covenants, to and with the Collateral Agent, for the benefit of the Secured Parties, that:

(a)     Schedule II sets forth, as of the Closing Date and as of each date on which a supplement to Schedule II is delivered pursuant to Section 2.02(c), a true and correct list of (i) all the issued and outstanding units of each class of the Equity Interests of the issuer thereof represented by the Pledged Equity directly owned beneficially, or of record, by such Grantor specifying the issuer and certificate number (if any) of, and the number and percentage of ownership represented by, such Pledged Equity and (ii) all the Pledged Debt owned by such Grantor (other than checks to be deposited in the ordinary course of business), including all Promissory Notes and Instruments required to be pledged hereunder;

(b)     the Pledged Equity issued by the Borrower, each other Grantor or their respective Subsidiaries and the Pledged Debt (solely with respect to Pledged Debt issued by a Person other than any Grantor or any of their respective Subsidiaries, to the best of each Grantor's knowledge) have been duly and validly authorized and issued by the issuers thereof and (i) in the case of Pledged Equity (other than Pledged Equity consisting of limited liability

company interests or partnership interests which, pursuant to the relevant organizational or formation documents, cannot be fully paid and non assessable), are fully paid and nonassessable and (ii) in the case of Pledged Debt (solely with respect to Pledged Debt issued by a Person other than any Grantor or any of their respective Subsidiaries to the best of each Grantor's knowledge), are legal, valid and binding obligations of the issuers thereof, subject to applicable Debtor Relief Laws and general principles of equity (whether considered in a proceeding in equity or at law);

(c)     Each of the Grantors (i) holds the Pledged Securities indicated on Schedule II as owned by such Grantor free and clear of all Liens, other than (A) Liens created by the Collateral Documents and, subject to the ABL Intercreditor Agreement, the ABL Documents and (B) other Liens expressly permitted pursuant to Section 7.01 of the Credit Agreement, (ii) will make no assignment, pledge, hypothecation or transfer of, or create or permit to exist any security interest in or other Lien on, the Pledged Collateral, other than (A) Liens created by the Collateral Documents and the ABL Documents, subject to the ABL Intercreditor Agreement, and (B) other Liens expressly permitted pursuant to Section 7.01 of the Credit Agreement, and (iii) will defend its title or interest thereto or therein against any and all Liens (other than the Liens permitted pursuant to this Section 2.03(c)), however arising, of all Persons whomsoever;

(d)     except for (i) restrictions and limitations imposed by the Loan Documents or securities laws generally or by Liens expressly permitted pursuant to Section 7.01 of the Credit Agreement and (ii) in the case of Pledged Equity of Persons that are not Subsidiaries, transfer restrictions that exist at the time of acquisition of Equity Interests in such Persons, the Pledged Equity is and will continue to be freely transferable and assignable, and none of the Pledged Equity is or will be subject to any option, right of first refusal, shareholders agreement, charter or by-law or other organizational document provisions or contractual restriction of any nature that would reasonably be expected to prohibit, impair, delay or otherwise affect in any manner material and adverse to the Secured Parties the pledge of such Pledged Equity hereunder, the sale or disposition thereof pursuant hereto or the exercise by the Collateral Agent of rights and remedies hereunder;

(e)     each of the Grantors has the power and authority to pledge the Pledged Collateral pledged by it hereunder in the manner hereby done;

(f)     no consent or approval of any Governmental Authority, any securities exchange or any other Person is necessary to the validity and perfection of the pledge effected hereby (other than such as have been obtained and are in full force and effect);

(g)     by virtue of the execution and delivery by the Grantors of this Agreement, when any Pledged Securities are delivered to the Collateral Agent in accordance with this Agreement, the Collateral Agent will (i) obtain a legal, valid and first-priority (subject only to any nonconsensual Liens permitted pursuant to Section 7.01 of the Credit Agreement and, subject to the ABL Intercreditor Agreement, Liens granted to the ABL Agent pursuant to the ABL Documents or to any other agent or trustee pursuant to any Permitted Refinancing of the ABL Facilities) perfected Lien upon and security interest in such Pledged Securities as security for the payment and performance of the Secured Obligations, (ii) have Control of such Pledged Securities and (iii) assuming that neither the Collateral Agent nor any of the Secured Parties have "notice of an adverse claim" (as defined in Section 8-105 of the UCC) with respect to such

10

Pledged Securities at the time such Pledged Securities are delivered to the Collateral Agent, be a protected purchaser (within the meaning of Section 8-303 of the UCC) thereof;

(h)     the pledge effected hereby is effective to vest in the Collateral Agent, for the benefit of the Secured Parties, the rights of the Collateral Agent in the Pledged Collateral as set forth herein; and

(i)     subject to the terms of this Agreement and the ABL Intercreditor Agreement and to the extent permitted by applicable Law, each Grantor hereby agrees that upon the occurrence and during the continuation of an Event of Default, it will comply with instructions of the Collateral Agent with respect to the Equity Interests in such Grantor that constitute Pledged Equity hereunder that are not certificated without further consent by the applicable owner or holder of such Pledged Equity.

Section 2.04.   Certification of Limited Liability Company and Limited Partnership Interests.  Each Grantor acknowledges and agrees that, to the extent any interest in any limited liability company or limited partnership controlled by any Grantor and pledged under Section 2.01 is a "security" within the meaning of Article 8 of the UCC and is governed by Article 8 of the UCC, such interest shall be represented by a certificate.  Each Grantor further acknowledges and agrees that with respect to any interest in any limited liability company or limited partnership controlled on or after the date hereof by such Grantor and pledged hereunder that is not a "security" within the meaning of Article 8 of the UCC, such Grantor shall at no time elect to treat any such interest as a "security" within the meaning of Article 8 of the UCC, nor shall such interest be represented by a certificate, unless such election and such interest is thereafter represented by a certificate that is promptly delivered to the Collateral Agent, subject to the ABL Intercreditor Agreement, pursuant to the terms hereof.

Section 2.05.   Registration in Nominee Name; Denominations.  If an Event of Default shall have occurred and be continuing and the Collateral Agent shall have given the Borrower notice of its intent to exercise such rights, (a) the Collateral Agent, on behalf of the Secured Parties, shall have the right (in its sole and absolute discretion) to cause each of the Pledged Securities to be transferred of record into the name of the Collateral Agent and (b) the Collateral Agent shall have the right to exchange the certificates representing Pledged Securities for certificates of smaller or larger denominations for any purpose consistent with this Agreement; provided that, notwithstanding the foregoing, if a Bankruptcy Event of Default shall have occurred and be continuing, the Collateral Agent shall not be required to give the notice referred to above in order to exercise the rights described above.  Each Grantor will promptly give to the Collateral Agent copies of any notices received by it with respect to Pledged Securities registered in the name of such Grantor.  Each Grantor will take any and all actions reasonably requested by the Collateral Agent to facilitate compliance with this Section 2.05.

Section 2.06.   Voting Rights; Dividends and Interest.

(a)     Unless and until an Event of Default shall have occurred and be continuing and the Collateral Agent shall have notified the Borrower that the rights of the Grantors under this Section 2.06 are being suspended:

(i)     Each Grantor shall be entitled to exercise any and all voting and/or other consensual rights and powers inuring to an owner of Pledged Securities or any part thereof for any purpose consistent with the terms of this Agreement, the Credit Agreement and the other Loan Documents; provided that such rights and powers shall not be exercised in any manner that could materially and adversely affect the rights inuring to a holder of any Pledged Securities or the rights and remedies of any of the Collateral Agent or the other Secured Parties under this Agreement, the Credit Agreement or any other Loan Document or the ability of the Secured Parties to exercise the same.

(ii)     The Collateral Agent shall promptly execute and deliver to each Grantor, or cause to be executed and delivered to such Grantor, all such proxies, powers of attorney and other instruments as such Grantor may reasonably request in writing for the purpose of enabling such Grantor to exercise the voting and/or consensual rights and powers it is entitled to exercise pursuant to subparagraph (i) above, in each case as shall be specified in such request and be in form and substance reasonably satisfactory to the Collateral Agent (acting at the Direction of the Required Lenders).

(iii)     Each Grantor shall be entitled to receive and retain any and all dividends, interest, principal and other distributions paid on or distributed in respect of the Pledged Securities, to the extent (and only to the extent) that such dividends, interest, principal and other distributions are permitted by, and otherwise paid or distributed in accordance with, the terms and conditions of the Credit Agreement, the other Loan Documents and applicable Laws; provided that any noncash dividends, interest, principal or other distributions that would constitute Pledged Equity or Pledged Debt, whether resulting from a subdivision, combination or reclassification of the outstanding Equity Interests of the issuer of any Pledged Securities or received in exchange for Pledged Securities or any part thereof, or in redemption thereof, or as a result of any merger, consolidation, acquisition or other exchange of assets to which such issuer may be a party or otherwise, shall be and become part of the Pledged Collateral, and, if received by any Grantor, shall not be commingled by such Grantor with any of its other funds or property but shall be held separate and apart therefrom, shall be held in trust for the benefit of the Collateral Agent and the other Secured Parties and shall be forthwith delivered to the Collateral Agent in the same form as so received (with any necessary endorsement reasonably requested by the Collateral Agent (acting at the Direction of the Required Lenders)).  So long as no Event of Default has occurred and is continuing, the Collateral Agent shall promptly deliver to each Grantor (at the expense of such Grantor) any Pledged Securities in its possession if requested to be delivered to the issuer thereof in connection with any exchange or redemption of such Pledged Securities.

(b)     Upon the occurrence and during the continuance of any Event of Default, after the Collateral Agent shall have notified the Borrower of the suspension of the rights of the Grantors under Section 2.06(a), then all rights of any Grantor to dividends, interest, principal or other distributions that such Grantor is authorized to receive pursuant to Section 2.06(a)(iii) shall cease, and all such rights shall thereupon become vested in the Collateral Agent, which shall have the sole and exclusive right and authority to receive and retain such dividends, interest, principal or other distributions.  All dividends, interest, principal or other distributions received by any Grantor contrary to the provisions of this Section 2.06 shall be held in trust for the benefit

12

of the Collateral Agent and the other Secured Parties, shall be segregated from other property or funds of such Grantor and shall be forthwith delivered to the Collateral Agent upon demand in the same form as so received (with any necessary stock or note powers and other instruments of transfer reasonably requested by the Collateral Agent (acting at the Direction of the Required Lenders)).  Any and all money and other property paid over to or received by the Collateral Agent pursuant to the provisions of this paragraph (b) shall be retained by the Collateral Agent in an account to be established by the Collateral Agent upon receipt of such money or other property and shall be applied in accordance with the provisions of Section 5.02.  After all Events of Default have been cured or waived and the Borrower has delivered to the Collateral Agent a certificate to such effect, the Collateral Agent shall promptly repay to each Grantor (without interest) all dividends, interest, principal or other distributions that such Grantor would otherwise be permitted to retain pursuant to the terms of Section 2.06(a)(iii) in the absence of any such Event of Default and that remain in such account, and such Grantor's right to receive and retain any and all dividends, interest, principal and other distributions paid on or distributed in respect of the Pledged Securities shall be automatically reinstated.

(c)    Upon the occurrence and during the continuance of an Event of Default, after the Collateral Agent shall have notified the Borrower of the suspension of the rights of the Grantors under Section 2.06(a), then all rights of any Grantor to exercise the voting and consensual rights and powers it is entitled to exercise pursuant to Section 2.06(a)(i), and the obligations of the Collateral Agent under Section 2.06(a)(ii), shall cease, and all such rights shall thereupon become, subject to the rights of the ABL Agent under the ABL Intercreditor Agreement, vested in the Collateral Agent, which shall have the sole and exclusive right and authority to exercise such voting and consensual rights and powers; provided that, unless otherwise directed by the Required Lenders, the Collateral Agent shall have the right from time to time following and during the continuance of an Event of Default to permit the Grantors to exercise such rights.  After all Events of Default have been cured or waived and the Borrower has delivered to the Collateral Agent a certificate to such effect, each Grantor shall have the exclusive right to exercise the voting and/or consensual rights and powers that such Grantor would otherwise be entitled to exercise pursuant to the terms of Section 2.06(a)(i), and the obligations of the Collateral Agent under Section 2.06(a)(ii) shall be reinstated.

(d)    Any notice given by the Collateral Agent to the Borrower suspending the rights of the Grantors under this Section 2.06, (i) shall be given in writing, (ii) may be given with respect to one or more of the Grantors at the same or different times and (iii) may suspend the rights of the Grantors under Sections 2.06(a)(i) or (iii) in part without suspending all such rights (as specified by the Collateral Agent in its sole and absolute discretion) and without waiving or otherwise affecting the Collateral Agent's rights to give additional notices from time to time suspending other rights so long as an Event of Default has occurred and is continuing.  Notwithstanding anything to the contrary contained in Section 2.06(a), (b) or (c), if a Bankruptcy Event of Default shall have occurred and be continuing, the Collateral Agent shall not be required to give any notice referred to in said Sections in order to exercise any of its rights described in such Sections, and the suspension of the rights of each of the Grantors under each such Section shall be automatic upon the occurrence of such Bankruptcy Event of Default.

Section 2.07.    Collateral Agent Not a Partner or Limited Liability Company Member.  Nothing contained in this Agreement shall be construed to make the Collateral Agent

or any other Secured Party liable as a member of any limited liability company or as a partner of any partnership and neither the Collateral Agent nor any other Secured Party by virtue of this Agreement or otherwise (except as referred to in the following sentence) shall have any of the duties, obligations or liabilities of a member of any limited liability company or as a partner in any partnership. The parties hereto expressly agree that, unless the Collateral Agent shall become the absolute owner of Pledged Equity consisting of a limited liability company interest or a partnership interest pursuant hereto, this Agreement shall not be construed as creating a partnership or joint venture among the Collateral Agent, any other Secured Party, any Grantor and/or any other Person.

## ARTICLE III

## Security Interests in Personal Property

Section 3.01. Security Interest.

(a)    As security for the payment or performance, as the case may be, in full of the Secured Obligations, each Grantor hereby grants to the Collateral Agent, its successors and assigns, for the benefit of the Secured Parties, a security interest (the "Security Interest") in, all of such Grantor's right, title and interest in, to or under any and all of the following assets and properties, whether now owned or at any time hereafter acquired by such Grantor or in which such Grantor now has or at any time in the future may acquire any right, title or interest (collectively, the "Article 9 Collateral"):

      (i)      all Accounts;

      (ii)      all Chattel Paper;

      (iii)      all Documents;

      (iv)      all Equipment;

      (v)      all General Intangibles;

      (vi)      all Instruments;

      (vii)      all Inventory;

      (viii)      all Investment Property;

      (ix)      all books and records pertaining to the Article 9 Collateral;

      (x)      all Goods and Fixtures;

      (xi)      all Money, cash, cash equivalents and Deposit Accounts;

      (xii)      all Letter-of-Credit Rights;

      (xiii)      all Commercial Tort Claims described on Schedule III from time to time;

14

(xiv)    the Collateral Account, and all cash, Money, Securities and other investments deposited therein;

(xv)    all Supporting Obligations;

(xvi)    all Security Entitlements in any or all of the foregoing;

(xvii)    all Intellectual Property; and

(xviii)    to the extent not otherwise included, all Proceeds and products of any and all of the foregoing and all collateral security and guarantees given by any Person with respect to any of the foregoing;

provided that "Collateral" shall not include any of the following assets or property, each being an "Excluded Property": (i) any "intent to use" trademark application, until such time as a "Statement of Use" or an "Amendment to Allege Use" is accepted for an application by the USPTO, (ii) the Excluded Equity Interests, (iii) any specifically identified asset with respect to which the Collateral Agent (acting at the Direction of the Required Lenders) has confirmed in writing to the Grantors its reasonable determination, in consultation with the Borrower, that the costs or other consequences (including adverse tax consequences) of providing a security interest is excessive in view of the practical benefits to be obtained by the Secured Parties, (iv) any assets securing purchase money obligations or Capitalized Lease Obligations permitted to be incurred under the Credit Agreement, to the extent that the terms of the agreements relating to such Lien prohibit the security interest under this Agreement from attaching to such assets, (v) any particular asset, if the pledge thereof or the security interest therein is prohibited by applicable Law other than to the extent such prohibition is rendered ineffective under the UCC or other applicable Law notwithstanding such prohibition, (vi) any rights of a Grantor arising under or evidenced by any contract, lease, instrument, license or agreement to the extent the pledges thereof and security interests therein are prohibited or restricted by such contract, lease, instrument, license or other agreement, (including any requirement to obtain the consent of any Governmental Authority or third party) other than Proceeds and receivables thereof, except to the extent (x) the pledge of such rights is deemed effective under the UCC or other applicable Law or principle of equity notwithstanding such prohibition or restriction, or (y) such prohibition or restriction is deemed ineffective under the UCC or other applicable Law or principle of equity, or (vii) any governmental licenses or state or local franchises, charters and authorizations, to the extent security interests in such licenses, franchises, charters or authorizations are prohibited or restricted thereby (except to the extent such prohibition or restriction is deemed ineffective under the UCC or other applicable Law or principle of equity).  Each Grantor shall, if requested to do so by the Collateral Agent, use commercially reasonable efforts to obtain any such required consent that is reasonably obtainable with respect to Collateral described in clause (vi) above which the Collateral Agent (acting at the Direction of the Required Lenders) reasonably determines to be material.

(b)    Each Grantor hereby irrevocably authorizes the Collateral Agent for the benefit of the Secured Parties at any time and from time to time to file in any relevant jurisdiction any financing statements or continuation statements (including fixture filings) with respect to the Collateral or any part thereof and amendments thereto that (i) describe the

Collateral covered thereby in any manner that the Administrative Agent or Collateral Agent (acting at the Direction of the Required Lenders) reasonably determines is necessary or advisable to ensure the perfection of the security interest in the Collateral granted under this Agreement including indicating the Collateral as all assets or all personal property of such Grantor or words of similar effect and (ii) contain the information required by Article 9 of the UCC of each applicable jurisdiction for the filing of any financing statement or amendment, including (A) whether such Grantor is an organization, the type of organization and any organizational identification number issued to such Grantor and (B) in the case of a financing statement filed as a fixture filing, a sufficient description of the real property to which such Article 9 Collateral relates.  Each Grantor agrees to provide such information to the Collateral Agent promptly upon request.

(c)    The Security Interest is granted as security only and shall not subject the Collateral Agent or any other Secured Party to, or in any way alter or modify, any obligation or liability of any Grantor with respect to or arising out of the Article 9 Collateral.

(d)    Each Grantor hereby further authorizes the Collateral Agent to file a Grant of Security Interest substantially in the form of Exhibit III, IV or V, as applicable, covering relevant IP Collateral consisting of Patents (and Patents for which applications are pending), registered Trademarks (and Trademarks for which registration applications are pending) and registered Copyrights (and Copyrights for which registration applications are pending) with the USPTO or USCO (or any successor office), as applicable, and such other documents as may be necessary or advisable for the purpose of perfecting, confirming, continuing, enforcing or protecting the Security Interest granted by such Grantor hereunder, without the signature of such Grantor, and naming such Grantor, as debtor, and the Collateral Agent, as secured party.

Section 3.02.    Representations and Warranties.  Each Grantor represents and warrants to the Collateral Agent and the Secured Parties that:

(a)    Each Grantor owns or has rights to use (not subject to any Liens other than (i) the Security Interest granted pursuant to this Agreement, (ii) any nonconsensual Lien that is expressly permitted pursuant to Section 7.01 of the Credit Agreement and has priority as a matter of law and (ii) any other Lien that is expressly permitted pursuant to Section 7.01 of the Credit Agreement and which, in the case of Liens permitted pursuant to Section 7.01(y) of the Credit Agreement, are subject at all times to the ABL Intercreditor Agreement) the Article 9 Collateral with respect to which it has purported to grant a Security Interest hereunder, and has full power and authority to grant to the Collateral Agent the Security Interest in such Article 9 Collateral pursuant hereto and to execute, deliver and perform its obligations in accordance with the terms of this Agreement, without the consent or approval of any other Person other than any consent or approval that has been obtained.

(b)    The Information Certificate has been duly executed by each Grantor and delivered to the Collateral Agent on the Closing Date and the information set forth therein, including the full legal name of each Grantor and its jurisdiction of organization, taken as a whole, is true and correct in all material respects as of the Closing Date.  Upon the timely completion of the filing of UCC financing statements (including fixture filings, as applicable), prepared based upon the information provided to the Collateral Agent in the Information

16

Certificate, in the filing offices specified in <u>Schedule IV</u> of this Agreement (or specified by notice from the applicable Grantor to the Collateral Agent after the Closing Date in the case of filings, recordings or registrations required by Section 6.11 of the Credit Agreement and the Collateral and Guarantee Requirement), the Security Interest of the Collateral Agent in respect of all Article 9 Collateral in which a security interest may be perfected by the filing, recording or registering of a financing statement in a filing office in the United States (or any political subdivision thereof) and its territories and possessions pursuant to the UCC in such jurisdictions will constitute a legal, valid and perfected security interest in favor of the Collateral Agent (for the benefit of the Secured Parties). Each Grantor represents and warrants that, as of the Closing Date, fully executed Grants of Security Interest in the form attached as <u>Exhibit III</u>, <u>IV</u> or <u>V</u>, as applicable, containing a description of all IP Collateral consisting of United States Letters Patent and pending applications for same, Trademarks registered with the USPTO and pending applications for same or Copyrights registered with the USCO and pending applications for same, as applicable, have been delivered to the Collateral Agent for recording by the USPTO and USCO, as applicable, pursuant to 35 U.S. C. §261, 15 U.S.C., §1060 or 17 U.S.C. §205 and the regulations thereunder.

(c)     The Security Interest constitutes (i) a legal and valid security interest in all the Article 9 Collateral securing the payment and performance of the Secured Obligations and (ii) subject to the filings and due recordation of the fully executed Grants of Security Interest in the forms attached as <u>Exhibits III</u>, <u>IV</u> and <u>V</u>, each as described in <u>Section 3.02(b)</u>, a perfected security interest in all Article 9 Collateral in which a security interest may be perfected by filing, recording or registering a financing statement in the United States (or any political subdivision thereof) and its territories and possessions pursuant to the applicable UCC. The Security Interest is and shall be prior to any other Lien on any of the Article 9 Collateral, other than (i) any non-consensual Lien that is expressly permitted pursuant to Section 7.01 of the Credit Agreement and has priority as a matter of law and (ii) any other Lien that is expressly permitted pursuant to Section 7.01 of the Credit Agreement and which, in the case of Liens permitted pursuant to Section 7.01(r) of the Credit Agreement, are subject at all times to the ABL Intercreditor Agreement.

(d)     None of the Grantors has filed or consented to the filing of (i) any financing statement or analogous document under the UCC or any other applicable Laws covering any Article 9 Collateral, (ii) any assignment in which any Grantor assigns any Article 9 Collateral or any security agreement or similar instrument covering any Article 9 Collateral with the USPTO or the USCO which agreement or instrument is still in effect, or (iii) any assignment in which any Grantor assigns any Article 9 Collateral or any security agreement or similar instrument covering any Article 9 Collateral with any foreign governmental, municipal or other office, which financing statement or analogous document, assignment, security agreement or similar instrument is still in effect, except, in each case, with respect to the Security Interest and such other Liens expressly permitted pursuant to Section 7.01 of the Credit Agreement.

(e)     All Commercial Tort Claims of each Grantor where the amount of the damages claimed by such Grantor is in excess of $5,000,000 in existence on the date of this Agreement (or on the date upon which such Grantor becomes a party to this Agreement) are described on <u>Schedule III</u> hereto.

17

(f)  Except as could not reasonably be expected to have a Material Adverse Effect or as otherwise permitted by the Credit Agreement, with respect to the IP Collateral:

(i)  such Grantor is the exclusive owner of all right, title and interest in and to the IP Collateral or has the right or license to use the IP Collateral subject only to the terms of the Licenses;

(ii)  to the knowledge of the Grantor, the operation of such Grantor's business as currently conducted does not conflict with, infringe, misappropriate, misuse or otherwise violate the Intellectual Property rights of any third party;

(iii)  the IP Collateral set forth on the Information Certificate includes all of the Patents, (excluding for those purposes those items included in the definition of "patents" set forth in(b)(i), (b)(ii), (b)(iv), (b)(v) and (b)(vi) of said definition), trademark registrations and applications, copyright registrations and applications registered or applied for in the USPTO or USCO, as applicable, owned by such Grantor as of the date hereof;

(iv)  the IP Collateral is subsisting and has not been adjudged invalid or unenforceable in whole or in part, and to such Grantor's knowledge, is valid and enforceable.  Such Grantor is not aware of any uses of any material item of IP Collateral that could be expected to lead to such item becoming invalid or unenforceable;

(v)  such Grantor has made or performed all filings, recordings and other acts and has paid all required fees to maintain and protect its interest in each and every item of IP Collateral registered or applied for in the USPTO or USCO, as applicable, in full force and effect, and to protect and maintain its interest therein;

(vi)  no claim, action, suit, investigation, litigation or proceeding has been asserted or is pending or threatened in writing against such Grantor (A) based upon or challenging or seeking to deny or restrict the Grantor's rights in or use of any of the IP Collateral, (B) alleging that any services provided by, processes used by, or products manufactured or sold by, such Grantor infringe, misappropriate, misuse or otherwise violate any patent, trademark, copyright or any other Intellectual Property right of any third party, or (C) alleging that the IP Collateral is being licensed or sublicensed in violation or contravention of the terms of any license or other agreement.  To such Grantor's knowledge, no Person is engaging in any activity that infringes, misappropriates, misuses or otherwise violates the material IP Collateral or the Grantor's rights therein.  The consummation of the transactions contemplated by the Loan Documents will not result in the termination or impairment of any of the IP Collateral;

(vii)  with respect to each License: (A) such License is valid and binding and in full force and effect; (B) such Grantor has not received any written notice of termination or cancellation under such License; (C) such Grantor has not received any written notice of a breach or default under such License; and (D) neither such Grantor nor, to such Grantor's knowledge, any other party to such License is in breach or default thereof in any material respect, and to such Grantor's knowledge no event has occurred that, with

18

notice or lapse of time or both, would constitute such a breach or default or permit termination, modification or acceleration under such License; and

(viii)    to such Grantor's knowledge, (A) none of the material trade secrets of such Grantor has been used, divulged, disclosed or appropriated to the detriment of such Grantor for the benefit of any other Person other than such Grantor; (B) no employee, independent contractor or agent of such Grantor has misappropriated any material trade secrets of any other Person in the course of the performance of his or her duties as an employee, independent contractor or agent of such Grantor; and (C) no employee, independent contractor or agent of such Grantor is in default or breach of any material term of any employment agreement, non disclosure agreement, assignment of inventions agreement or similar agreement or contract relating in any way to the protection, ownership, development, use or transfer of such Grantor's material IP Collateral.

Section 3.03.  Covenants.

(a)    The Borrower agrees to promptly (and in any event within thirty (30) calendar days of such event, or such later date as the Administrative Agent (acting at the Direction of the Required Lenders) may agree in its reasonable discretion) notify the Collateral Agent of any change (i) in the legal name of any Grantor, (ii) in the identity or type of organization or corporate structure of any Grantor, (iii) in the jurisdiction of organization of any Grantor, (iv) in the location of any Grantor under the UCC, (v) in the organizational identification number, if any, of any Grantor or (vi) in the chief executive office of any Grantor. In addition, if any Grantor does not have an organizational identification number on the Closing Date (or the date such Grantor becomes a party to this Agreement) and later obtains one, the Borrower shall promptly (and in any event within thirty (30) calendar days of such event, or such later date as the Administrative Agent (acting at the Direction of the Required Lenders) may agree in its reasonable discretion) thereafter notify the Collateral Agent of such organizational identification number and shall take all actions reasonably satisfactory to the Collateral Agent (acting at the Direction of the Required Lenders) to the extent necessary to maintain the Security Interest (and the priority thereof) of the Collateral Agent in the Collateral intended to be granted hereby fully perfected and in full force and effect.  The Loan Parties agree not to effect or permit any change referred to in the preceding sentence unless all filings, publications and registrations, have been made (or will be made in a timely fashion) under the UCC or other applicable Law that are required in order for the Collateral Agent to continue at all times following such change to have a valid, legal and perfected first priority security interest to the extent required under the Loan Documents (subject only to (i) any nonconsensual Lien that is expressly permitted pursuant to Section 7.01 of the Credit Agreement and has priority as a matter of law and (ii) Liens expressly permitted pursuant to Section 7.01 of the Credit Agreement and which, in the case of Liens permitted in respect of the ABL Facilities pursuant to Section 7.01 of the Credit Agreement, are subject to the ABL Intercreditor Agreement) in all the Collateral for its own benefit and the benefit of the other Secured Parties.

(b)    Each Grantor shall, at its own expense, take any and all commercially reasonable actions necessary to defend title to the Article 9 Collateral against all Persons, except with respect to Article 9 Collateral that such Grantor determines in its reasonable business judgment is no longer necessary or beneficial to the conduct of the business, and to defend the

19

Security Interest of the Collateral Agent in the Article 9 Collateral and the priority thereof against any Lien not permitted pursuant to Section 7.01 of the Credit Agreement.

(c)        At the time of delivery of a Compliance Certificate pursuant to Section 6.02(a) of the Credit Agreement in connection with the delivery of annual financial statements with respect to the preceding fiscal year pursuant to Section 6.01(a) of the Credit Agreement, the Borrower shall deliver to the Collateral Agent a certificate executed by a Responsible Officer of the Borrower setting forth the information required pursuant to the Information Certificate or confirming that there has been no change in such information since the date of such certificate or the date of the most recent certificate delivered pursuant to this Section 3.03(c).

(d)        Subject to Sections 3.03(i) and (j), each Grantor agrees, at its own expense, upon written request of the Collateral Agent, to execute, acknowledge, deliver and cause to be duly filed all such further instruments and documents and take all such actions as the Collateral Agent may from time to time reasonably request to preserve, protect and perfect the Security Interest and the Collateral Agent's security interest for the benefit of the Secured Parties in the Pledged Collateral and the rights and remedies created hereby, including the payment of any fees and Taxes required in connection with the execution and delivery of this Agreement, the granting of the Security Interest and the filing of any financing statements (including fixture filings) or other documents in connection herewith or therewith.  If any amount payable under or in connection with any of the Article 9 Collateral (other than by a Loan Party) that equals or exceeds $5,000,000 (or, in the case of ABL Priority Collateral, $2,000,000) shall be or become evidenced by any Promissory Note or Instrument, such Promissory Note or Instrument shall be promptly (and in any event within thirty (30) calendar days of such event, or such later date as the Administrative Agent (acting at the Direction of the Required Lenders) may agree in its reasonable discretion) pledged and, subject to the ABL Intercreditor Agreement, delivered to the Collateral Agent, for the benefit of the Secured Parties, in a manner reasonably satisfactory to the Collateral Agent (acting at the Direction of the Required Lenders).

(e)        After the occurrence and during the continuance of an Event of Default, the Collateral Agent may discharge past due Taxes, assessments, charges, fees, Liens, security interests or other encumbrances at any time levied or placed on the Article 9 Collateral and not permitted pursuant to Section 7.01 of the Credit Agreement, and may pay for the maintenance and preservation of the Article 9 Collateral to the extent any Grantor fails to do so as required by the Credit Agreement, this Agreement or any other Loan Document and within a reasonable period of time after the Collateral Agent has requested that it do so, and each Grantor jointly and severally agrees to reimburse the Collateral Agent in accordance with Section 7.03(a); provided that nothing in this paragraph shall be interpreted as excusing any Grantor from the performance of, or imposing any obligation on the Collateral Agent or any Secured Party to cure or perform, any covenants or other promises of any Grantor with respect to Taxes, assessments, charges, fees, Liens, security interests or other encumbrances and maintenance as set forth herein or in the other Loan Documents.

(f)        If at any time any Grantor shall take a security interest in any property of an Account Debtor or any other Person the value of which equals or exceeds $2,000,000 to secure payment and performance of an Account or related contracts, such Grantor shall promptly

assign such security interest to the Collateral Agent for the benefit of the Secured Parties. Such assignment need not be filed of public record unless necessary to continue the perfected status of the security interest against creditors of and transferees from the Account Debtor or other Person granting the security interest.

(g)    Each Grantor (rather than the Collateral Agent or any Secured Party) shall remain liable (as between itself and any relevant counterparty) to observe and perform all the conditions and obligations to be observed and performed by it under each contract, agreement or instrument relating to the Article 9 Collateral, all in accordance with the terms and conditions thereof, and each Grantor jointly and severally agrees to indemnify and hold harmless the Collateral Agent and the Secured Parties from and against any and all liability for such performance pursuant to Section 7.03(b).

(h)    [Reserved]

(i)    Notwithstanding anything in this Agreement to the contrary other than the filing of a UCC financing statement as provided in Section 3.02(b), (i) no actions shall be required to perfect the security interest granted hereunder in Letter-of-Credit Rights, motor vehicles, other assets subject to certificates of title except to the extent perfection of a security interest therein may be accomplished by the filing of a financing statement in appropriate form in the applicable jurisdiction under the UCC, (ii) no Grantor shall be required to complete any filings or other action with respect to the perfection of the security interests created hereby in any jurisdiction outside of the United States or any State thereof and (iii) the Grantors shall not be required to take any of the actions contemplated herein with respect any Collateral as to which the Collateral Agent and the Borrower shall have determined in their reasonable discretion and agreed in writing that the costs of obtaining such a security interest or taking such action are excessive in relation to the value of the security to be afforded thereby or as otherwise agreed by the Collateral Agent.

(i)    Notwithstanding anything to the contrary in this Agreement, none of the Grantors shall be required to enter into any Control Agreement, except that each Grantor shall enter into Control Agreements with respect to any Deposit Account, Securities Account or Commodity Account, for the benefit of the Collateral Agent to the extent and at such time such Grantor enters into a control agreement for such Deposit Account, Securities Account or Commodity Account for the benefit of the ABL Agent pursuant to the terms of the ABL Documents.

Section 3.04.    Other Actions.  In order to further insure the attachment, perfection and priority of, and the ability of the Collateral Agent to enforce, the Security Interest, each Grantor agrees, in each case at such Grantor's own expense and subject to the ABL Intercreditor Agreement, to take the following actions with respect to the following Article 9 Collateral:

(a)    Instruments.  If any Grantor shall at any time hold or acquire any Instruments constituting Collateral and evidencing an amount equal to or in excess of $5,000,000 (or, in the case of ABL Priority Collateral, $2,000,000 such Grantor shall promptly (and in any event within thirty (30) days after receipt by Grantor of such Instrument (or such longer period as

the Administrative Agent (acting at the Direction of the Required Lenders) may agree in its reasonable discretion)) endorse, assign and deliver the same to the Collateral Agent for the benefit of the Secured Parties, accompanied by such undated instruments of transfer or assignment duly executed in blank as the Collateral Agent may from time to time reasonably request.

(b)     Investment Property.  Except to the extent otherwise provided in Article II, if any Grantor shall at any time hold or acquire any Certificated Securities, such Grantor shall promptly (and in any event within thirty (30) days after receipt by Grantor (or such longer period as the Administrative Agent (acting at the Direction of the Required Lenders) may agree in its reasonable discretion)) of such Certificated Securities endorse, assign and deliver the same to the Collateral Agent for the benefit of the applicable Secured Parties, accompanied by such undated instruments of transfer or assignment duly executed in blank as the Collateral Agent (acting at the Direction of the Required Lenders) may from time to time reasonably request.

(c)     Commercial Tort Claims.  If any Grantor shall at any time after the date of this Agreement acquire a Commercial Tort Claim in an amount (taking the greater of the aggregate claimed damages thereunder or the reasonably estimated value thereof) of $5,000,000 or more, such Grantor shall promptly (and in any event within thirty (30) days after acquisition by Grantor (or such longer period as the Administrative Agent (acting at the Direction of the Required Lenders) may agree in its reasonable discretion)) notify the Collateral Agent thereof in a writing signed by such Grantor and provide supplements to Schedule III describing the details thereof and shall grant to the Collateral Agent a security interest therein and in the proceeds thereof, all upon and subject to the terms of this Agreement.

## ARTICLE IV

### Special Provisions Concerning IP Collateral

Section 4.01.   Grant of License to Use Intellectual Property.  Without limiting the provisions of Section 3.01 hereof or any other rights of the Collateral Agent as the holder of a Security Interest in any IP Collateral, for the purpose of enabling the Collateral Agent to exercise rights and remedies under this Agreement at such time as the Collateral Agent shall be lawfully entitled to exercise such rights and remedies, each Grantor hereby grants to the Collateral Agent, for the benefit of the Secured Parties, an irrevocable, nonexclusive license (exercisable without payment of royalty or other compensation to the Grantors) to use, license or sublicense any of the IP Collateral now owned or hereafter acquired by such Grantor, and wherever the same may be located (whether or not any License by and between any Grantor and any other Person relating to the use of such IP Collateral may be terminated hereafter), and including in such license reasonable access to all media in which any of the licensed items may be recorded or stored and to all computer software and programs used for the compilation or printout thereof, provided, however, that any license and any sublicense granted by the Collateral Agent to a third party shall be subject to and include reasonable and customary terms necessary to preserve the existence, validity and value of the affected IP Collateral, including without limitation, provisions requiring the continuing confidential handling of trade secrets, requiring the use of appropriate notices and prohibiting the use of false notices, protecting and maintaining the

22

quality standards of the Trademarks in the manner set forth below (it being understood and agreed that, without limiting any other rights and remedies of the Collateral Agent under this Agreement, any other Loan Document or applicable Law, nothing in the foregoing license grant shall be construed as granting the Collateral Agent rights in and to such IP Collateral above and beyond (x) the rights to such IP Collateral that each Grantor has reserved for itself and (y) in the case a License, the extent to which such Grantor has the right to grant a sublicense to such License hereunder).

The use of such license by the Collateral Agent may only be exercised, at the option of the Collateral Agent, during the continuation of an Event of Default; provided that any license, sublicense or other transaction entered into by the Collateral Agent in accordance herewith shall immediately and automatically terminate at such time as the Collateral Agent is no longer lawfully entitled to exercise its rights and remedies under this Agreement.  Nothing in this Section 4.01 shall require a Grantor to grant any license that is prohibited by any rule of law, statute or regulation, or is prohibited by, or constitutes a breach or default under or results in the termination of any contract, license, agreement, instrument or other document evidencing, giving rise to or theretofore granted, with respect to such property or otherwise unreasonably prejudices the value thereof to the relevant Grantor.  In the event the license set forth in this Section 4.01 is exercised with regard to any Trademarks, then the following shall apply: (i) all goodwill arising from any licensed or sublicensed use of any Trademark shall inure to the benefit of the relevant Grantor; (ii) the licensed or sublicensed Trademarks shall only be used in association with goods or services of a quality and nature consistent with the quality and reputation with which such Trademarks were associated when used by the relevant Grantor prior to the exercise of the license rights set forth herein; and (iii) at the relevant Grantor's request and expense, licensees and sublicensees shall provide reasonable cooperation in any effort by such Grantor to maintain the registration or otherwise secure the ongoing validity and effectiveness of such licensed Trademarks, including, without limitation the actions and conduct described in Section 4.02 below.

Section 4.02.    Protection of Collateral Agent's Security.

(a)       Except to the extent permitted by Section 4.02(h) below or the Credit Agreement, or to the extent that failure to act could not reasonably be expected to have a Material Adverse Effect, with respect to existing registration or pending application of each item of its IP Collateral for which such Grantor has standing to do so, each Grantor agrees to take, at its expense, all reasonable steps, including, without limitation, in the USPTO and the USCO to (i) maintain the validity and enforceability of any USPTO or USCO registered IP Collateral and maintain such USPTO or USCO IP Collateral in full force and effect, and (ii) pursue the registration and maintenance of each Patent, Trademark, or Copyright application or registration application pending with the USCO or USPTO, now or hereafter included in such IP Collateral of such Grantor, including, without limitation, the payment of required fees, the filing of responses to office actions issued by the USPTO or USCO, the filing of applications for renewal or extension, the filing of affidavits under Sections 8 and 15 of the U.S. Trademark Act, the filing of divisional, continuation, continuation-in-part, reissue and renewal applications or extensions, the payment of maintenance fees and the participation in interference, reexamination, opposition, cancellation, infringement and misappropriation proceedings.

23

(b)     Except to the extent permitted by Section 4.02(h) below, or to the extent that failure to act could not reasonably be expected to have a Material Adverse Effect, no Grantor shall do or permit any act or knowingly omit to do any act whereby any of its USPTO or USCO registered IP Collateral may lapse, be terminated, or become invalid or unenforceable or placed in the public domain (or in case of a trade secret, lose its competitive value).

(c)     Except to the extent that failure to so notify could not reasonably be expected to have a Material Adverse Effect, in the event that any Grantor becomes aware that any item of the IP Collateral is being infringed or misappropriated by a third party, such Grantor shall promptly notify the Collateral Agent and shall take such actions, at its expense, as such Grantor reasonably deems appropriate under the circumstances to protect or enforce such IP Collateral, including, without limitation, suing for infringement or misappropriation and for an injunction against such infringement or misappropriation.

(d)     Each Grantor shall use proper statutory notice as commercially practical in connection with its use of each item of its IP Collateral, except to the extent permitted by Section 4.02(h) below, or to the extent that failure to act could not reasonably be expected to have a Material Adverse Effect.

(e)     Except to the extent permitted by Section 4.02(h) below or the Credit Agreement, or to the extent that failure to act could not reasonably be expected to have a Material Adverse Effect, each Grantor shall take all reasonable steps to preserve and protect each item of its USPTO or USCO registered IP Collateral, including, without limitation, maintaining the quality of any and all products or services used or provided in connection with any of the USPTO registered Trademarks, consistent with the quality of the products and services as of the date hereof, and taking all reasonable steps necessary to ensure that all licensed users of any of the USPTO registered Trademarks abide by the applicable license's terms with respect to the standards of quality.

(f)     Each Grantor agrees that, should it obtain an ownership or other interest in any IP Collateral after the Closing Date (the "After-Acquired Intellectual Property") (i) the provisions of this Agreement shall automatically apply thereto, and (ii) any such After-Acquired Intellectual Property and, in the case of Trademarks, the goodwill symbolized thereby, shall automatically become part of the IP Collateral subject to the terms and conditions of this Agreement with respect thereto.

(g)     Once every fiscal quarter of the Borrower, each Grantor shall sign and deliver to the Collateral Agent an appropriate Security Agreement Supplement and related Grant of Security Interest with respect to USPTO or USCO applications for registration or registrations of IP Collateral owned by it as of the last day of such fiscal quarter, to the extent that such IP Collateral is not covered by any previous Security Agreement Supplement (and Grant of Security Interests) so signed and delivered by it.  In each case, it will promptly cooperate as reasonably necessary to enable the Collateral Agent to make any necessary or reasonably desirable recordations with the USCO or the USPTO, as appropriate.

(h)     Notwithstanding the foregoing provisions of this Section 4.02 or elsewhere in this Agreement, nothing in this Agreement shall prevent any Grantor from

24

abandoning or discontinuing the use or maintenance of any or its IP Collateral, electing not to protect or seek registration of any unissued or unregistered IP Collateral, or from failing to take action to enforce license agreements or pursue actions against infringers, if such Grantor determines in its reasonable business judgment that such abandonment, discontinuance, or failure to take action is desirable in the conduct of its business.

## ARTICLE V

## Remedies

Section 5.01.  Remedies Upon Default.  Upon the occurrence and during the continuance of an Event of Default, subject to the ABL Intercreditor Agreement, it is agreed that the Collateral Agent shall have the right to exercise any and all rights afforded to a secured party under this Agreement, the UCC or other applicable Law, and, subject to the ABL Intercreditor Agreement, also may (i) require each Grantor to, and each Grantor agrees that it will at its expense and upon request of the Collateral Agent forthwith, assemble all or part of the Collateral as directed by the Collateral Agent and make it available to the Collateral Agent at a place and time to be designated by the Collateral Agent that is reasonably convenient to both parties; (ii) exercise any and all rights and remedies of any of the Grantors under or in connection with the Collateral, or otherwise in respect of the Collateral; provided that the Collateral Agent shall provide the applicable Grantor with notice thereof prior to or promptly after such exercise; (iii) if any Grantor fails to perform or comply with any of its agreements contained herein, withdraw any and all cash or other Collateral from any Collateral Account and apply such cash and other Collateral to the payment of any and all Secured Obligations in the manner provided in Section 5.02 of this Agreement; (iv) subject to the mandatory requirements of applicable Law and the notice requirements described below, sell or otherwise dispose of all or any part of the Collateral securing the Secured Obligations at a public or private sale in accordance with the UCC or at any broker's board or on any securities exchange, for cash, upon credit or for future delivery as the Collateral Agent shall deem appropriate and (v) with respect to any IP Collateral, on demand, cause the Security Interest to become an assignment, transfer and conveyance of any of or all such IP Collateral (provided that no such demand may be made unless an Event of Default has occurred and has continued for thirty (30) consecutive days) by the applicable Grantors to the Collateral Agent, or license or sublicense, whether general, special or otherwise, and whether on an exclusive or nonexclusive basis, any such IP Collateral throughout the world on such terms and conditions and in such manner as the Collateral Agent shall determine, provided, however, that such terms shall include all terms and restrictions that customarily are required to ensure the continuing validity and effectiveness of the IP Collateral at issue, such as, without limitation, notice, quality control and inurement provisions with regard to Trademarks, patent designation provisions with regard to Patents, and copyright notices and restrictions on decompilation and reverse engineering of copyrighted software, and confidentiality protections for trade secrets.  Each Grantor acknowledges and recognizes that (a) the Collateral Agent may be unable to effect a public sale of all or a part of the Collateral consisting of Securities by reason of certain prohibitions contained in the Securities Act of 1933, 15 U.S.C. § 77 (as amended and in effect, the "Securities Act") or the securities laws of various states (the "Blue Sky Laws"), but may be compelled to resort to one or more private sales to a restricted group of purchasers who will be obliged to agree, among other things, to acquire such Securities for their own account, for investment and not with a view to the distribution or resale thereof, (b) private

25

sales so made may be at prices and upon other terms less favorable to the seller than if such Securities were sold at public sales, (c) neither the Collateral Agent nor any other Secured Party has any obligation to delay sale of any of the Collateral for the period of time necessary to permit such Securities to be registered for public sale under the Securities Act or the Blue Sky Laws, and (d) private sales made under the foregoing circumstances shall be deemed to have been made in a commercially reasonable manner.  To the maximum extent permitted by applicable Law, each Grantor hereby waives any claim against any Secured Party arising because the price at which any Collateral may have been sold at a private sale was less than the price that might have been obtained at a public sale, even if the Collateral Agent accepts the first offer received and does not offer such Collateral to more than one offeree.  Upon consummation of any such sale the Collateral Agent shall have the right to assign, transfer and deliver to the purchaser or purchasers thereof the Collateral so sold.  Each such purchaser at any sale of Collateral shall hold the property sold absolutely, free from any claim or right on the part of any Grantor, and each Grantor hereby waives (to the extent permitted by applicable Law) all rights of redemption, stay and appraisal which such Grantor now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted.

The Collateral Agent shall give the applicable Grantors ten (10) days' prior written notice (which each Grantor agrees is reasonable notice within the meaning of Section 9-611 of the UCC or its equivalent in other jurisdictions) of the Collateral Agent's intention to make any sale of Collateral.  Such notice, in the case of a public sale, shall state the time and place for such sale and, in the case of a sale at a broker's board or on a securities exchange, shall state the board or exchange at which such sale is to be made and the day on which the Collateral, or portion thereof, will first be offered for sale at such board or exchange. Any such public sale shall be held at such time or times within ordinary business hours and at such place or places as the Collateral Agent may fix and state in the notice (if any) of such sale. The Collateral Agent may conduct one or more going out of business sales, in the Collateral Agent's own right or by one or more agents and contractors.  To the extent permitted by applicable Law, such sale(s) may be conducted upon any premises owned, leased, or occupied by any Grantor.  The Collateral Agent and any such agent or contractor, in conjunction with any such sale, may augment the Inventory with other goods (all of which other goods shall remain the sole property of the Collateral Agent or such agent or contractor).  Any amounts realized from the sale of such goods which constitute augmentations to the Inventory (net of an allocable share of the costs and expenses incurred in their disposition) shall be the sole property of the Collateral Agent or such agent or contractor and neither any Grantor nor any Person claiming under or in right of any Grantor shall have any interest therein.  At any such sale, the Collateral, or portion thereof, to be sold may be sold in one lot as an entirety or in separate parcels, as the Collateral Agent may (in its sole and absolute discretion) determine.  The Collateral Agent shall not be obligated to make any sale of any Collateral if it shall determine not to do so, regardless of the fact that notice of sale of such Collateral shall have been given.  The Collateral Agent may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned. In case any sale of all or any part of the Collateral is made on credit or for future delivery, the Collateral so sold may be retained by the Collateral Agent until the sale price is paid by the purchaser or purchasers thereof, but the Collateral Agent shall not incur any liability in case any such purchaser or purchasers shall fail to take up and pay for the Collateral so sold and, in case

of any such failure, such Collateral may be sold again upon like notice.  At any public (or, to the extent permitted by applicable Law, private) sale made pursuant to this Agreement and in accordance with the UCC, any Secured Party may bid for or purchase, free (to the extent permitted by applicable Law) from any right of redemption, stay, valuation or appraisal on the part of any Grantor (all said rights being also hereby waived and released to the extent permitted by applicable Law), the Collateral or any part thereof offered for sale and may make payment on account thereof by using any claim then due and payable to such Secured Party from any Grantor as a credit against the purchase price, and such Secured Party may, upon compliance with the terms of such sale made in accordance with the UCC, hold, retain and dispose of such Collateral or any part thereof without further accountability to any Grantor therefor.  For purposes of determining the Grantors' rights in the Collateral, a written agreement to purchase the Collateral or any portion thereof shall be treated as a sale thereof; the Collateral Agent shall be free to carry out such sale made in accordance with the UCC pursuant to such agreement and no Grantor shall be entitled to the return of the Collateral or any portion thereof subject thereto, notwithstanding the fact that after the Collateral Agent shall have entered into such an agreement all Events of Default shall have been remedied and the Secured Obligations paid in full, provided, however, that such agreements shall include all terms and restrictions that are customarily required to ensure the continuing validity and effectiveness of the IP Collateral at issue, such as, without limitation, quality control and inurement provisions with regard to Trademarks, patent designation provisions with regard to patents, and copyright notices and restrictions on decompilation and reverse engineering of copyrighted software, and protecting the confidentiality of trade secrets.  As an alternative to exercising the power of sale herein conferred upon it, the Collateral Agent may proceed by a suit or suits at law or in equity to foreclose this Agreement and to sell the Collateral or any portion thereof pursuant to a judgment or decree of a court or courts having competent jurisdiction or pursuant to a proceeding by a court appointed receiver.  Any sale pursuant to the provisions of this Section 5.01 shall be deemed to conform to the commercially reasonable standards as provided in Section 9-610(b) of the UCC or its equivalent in other jurisdictions.

By accepting the benefits of this Agreement and each other Collateral Document, the Secured Parties expressly acknowledge and agree that this Agreement and each other Collateral Document may be enforced only by the action of the Collateral Agent and that no other Secured Party shall have any right individually to seek to enforce or to enforce this Agreement or to realize upon the security to be granted hereby, it being understood and agreed that such rights and remedies may be exercised by the Collateral Agent for the benefit of the Secured Parties upon the terms of this Agreement and the other Collateral Documents.

Section 5.02.  Application of Proceeds.  Subject to the ABL Intercreditor Agreement, the Collateral Agent shall apply the proceeds of any collection or sale of Collateral, including any Collateral consisting of cash, in accordance with the provisions of Section 8.03 of the Credit Agreement.  The Collateral Agent shall have absolute discretion as to the time of application of any such proceeds, moneys or balances in accordance with this Agreement.  Upon any sale of Collateral by the Collateral Agent (including pursuant to a power of sale granted by statute or under a judicial proceeding), the receipt of the Collateral Agent or of the officer making the sale shall be a sufficient discharge to the purchaser or purchasers of the Collateral so sold and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to the Collateral Agent or such officer or be answerable in any

27

way for the misapplication thereof.  It is understood and agreed that the Grantors shall remain jointly and severally liable to the extent of any deficiency between the amount of the proceeds of the Collateral and the aggregate amount of the Secured Obligations.

## ARTICLE VI

## Indemnity, Subrogation and Subordination

Upon payment by any Grantor of any Secured Obligations, all rights of such Grantor against the Borrower or any other Grantor arising as a result thereof by way of right of subrogation, contribution, reimbursement, indemnity or otherwise shall in all respects be subordinate and junior in right of payment to the prior payment in full in cash of all the Secured Obligations (other than (i) contingent indemnity obligations for then unasserted claims; (ii) obligations and liabilities under Secured Hedge Agreements as to which arrangements satisfactory to the applicable Hedge Bank shall have been made; or (iii) Cash Management Obligations as to which arrangements satisfactory to the applicable Cash Management Bank shall have been made) and the termination of all Commitments to any Loan Party under any Loan Document.  If any amount shall erroneously be paid to the Borrower or any other Grantor on account of (i) such subrogation, contribution, reimbursement, indemnity or similar right or (ii) any such indebtedness of the Borrower or any other Grantor, such amount shall be held in trust for the benefit of the Secured Parties and shall forthwith be paid to the Collateral Agent to be credited against the payment of the Secured Obligations, whether matured or unmatured, in accordance with the terms of the Credit Agreement and the other Loan Documents.  Subject to the foregoing, to the extent that any Grantor (other than the Borrower) shall, under this Agreement or the Credit Agreement as a joint and several obligor, repay any of the Secured Obligations (an "Accommodation Payment"), then the Grantor making such Accommodation Payment shall be entitled to contribution and indemnification from, and be reimbursed by, each of the other Grantors in an amount equal to a fraction of such Accommodation Payment, the numerator of which fraction is such Grantor's Allocable Amount and the denominator of which is the sum of the Allocable Amounts of all of the Grantors.  As of any date of determination, the "Allocable Amount" of each Grantor shall be equal to the maximum amount of liability for Accommodation Payments which could be asserted against such Grantor hereunder and under the Credit Agreement without (a) rendering such Grantor "insolvent" within the meaning of Section 101 (31) of the Bankruptcy Code, Section 2 of the Uniform Fraudulent Transfer Act ("UFTA") or Section 2 of the Uniform Fraudulent Conveyance Act ("UFCA"), (b) leaving such Grantor with unreasonably small capital or assets, within the meaning of Section 548 of the Bankruptcy Code, Section 4 of the UFTA, or Section 5 of the UFCA, or (c) leaving such Grantor unable to pay its debts as they become due within the meaning of Section 548 of the Bankruptcy Code or Section 4 of the UFTA, or Section 5 of the UFCA.

## ARTICLE VII

## Miscellaneous

Section 7.01.  Notices.  All communications and notices hereunder shall (except as otherwise expressly permitted herein) be in writing and given as provided in Section 10.02 of

the Credit Agreement.  All communications and notices hereunder to a Grantor other than the Borrower shall be given in care of the Borrower.

Section 7.02.   Waivers; Amendment.

(a)    No failure or delay by the Collateral Agent in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Collateral Agent hereunder and under the other Loan Documents are cumulative and are not exclusive of any other rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section 7.02, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default or Event of Default, regardless of whether the Collateral Agent or any other Secured Party may have had notice or knowledge of such Default or Event of Default at the time.

(b)    Subject to the ABL Intercreditor Agreement, neither this Agreement nor any provision hereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Collateral Agent and the Grantor or Grantors with respect to which such waiver, amendment or modification is to apply, subject to any consent required in accordance with Section 10.01 of the Credit Agreement; provided that (i) no such waiver, amendment, or modification shall require the consent of any Hedge Bank or Cash Management Bank except as expressly provided in Section 10.01 of the Credit Agreement and (ii) the Borrower may amend any Schedule referred to herein after the date hereof to reflect any change in facts after the date hereof if necessary in connection with the making of any representation set forth herein.

Section 7.03.   Collateral Agent's Fees and Expenses; Indemnification.

(a)    The parties hereto agree that the Collateral Agent shall be entitled to reimbursement of its expenses incurred hereunder as provided in Section 10.04 of the Credit Agreement.

(b)    Without limitation of its indemnification obligations under the other Loan Documents, each Grantor jointly and severally agrees to indemnify the Collateral Agent and the other Indemnitees (as defined in Section 10.05 of the Credit Agreement) against, and hold each Indemnitee harmless from, any and all liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses and disbursements (including, without limitation, all Attorney Costs of ArentFox Schiff LLP and the Specified Lender Advisors, and, if reasonably necessary, one local counsel in each relevant jurisdiction material to the interests of all Indemnitees taken as a whole), as provided in Section 10.05 of the Credit Agreement.  No Indemnitee nor any Grantor shall have any liability and each party hereby waives, any claim against any other party to this Agreement or any Indemnitee, for any special, punitive, indirect or consequential damages relating to this Agreement or arising out of its activities in connection

29

herewith or therewith (whether before or after the Closing Date) (other than, in the case of any Grantor, in respect of any such damages incurred or paid by an Indemnitee to a third party).

(c)    Any such amounts payable as provided hereunder shall be additional Secured Obligations secured hereby and by the other Collateral Documents.  The provisions of this Section 7.03 shall remain operative and in full force and effect regardless of the termination of this Agreement or any other Loan Document, the repayment of any of the Secured Obligations, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, any resignation of the Administrative Agent, Collateral Agent, or any investigation made by or on behalf of the Collateral Agent or any other Secured Party.  All amounts due under this Section 7.03 shall be payable within twenty (20) Business Days after written demand therefor.

Section 7.04.   Successors and Assigns.  Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the permitted successors and assigns of such party; and all covenants, promises and agreements by or on behalf of any Grantor or the Collateral Agent that are contained in this Agreement shall bind and inure to the benefit of their respective permitted successors and assigns.  Except as provided in Section 10.07 of the Credit Agreement, no Grantor may assign any of its rights or obligations hereunder without the written consent of the Collateral Agent.

Section 7.05.   Survival of Representations and Warranties.  Without limitation of any provision of the Credit Agreement or Section 7.03 hereof, all representations and warranties made by the Grantors in this Agreement and in the certificates or other instruments delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the Lenders and shall survive the execution and delivery hereof and thereof, regardless of any investigation made by any such Lender or on its behalf and notwithstanding that the Collateral Agent or any Lender may have had notice or knowledge of any Default or Event of Default or incorrect representation or warranty at the time any credit is extended under the Credit Agreement, and shall continue in full force and effect until this Agreement is terminated as provided in Section 7.12 hereof, or with respect to any individual Grantor until such Grantor is otherwise released from its obligations under this Agreement in accordance with the terms hereof.

Section 7.06.   Counterparts; Effectiveness; Several Agreement.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which when taken together shall constitute one and the same instrument.  Delivery by telecopier or by electronic PDF copy of an executed counterpart of a signature page to this Agreement shall be effective as delivery of an original executed counterpart of this Agreement.  This Agreement shall become effective when it shall have been executed by each Closing Date Grantor (and, with respect to each Person that becomes a Grantor hereunder following the Closing Date, on the date of delivery of a Security Agreement Supplement by such Grantor) and the Collateral Agent and thereafter shall be binding upon and inure to the benefit of each Grantor and the Collateral Agent and the other Secured Parties and their respective permitted successors and assigns, subject to Section 7.04 hereof.  This Agreement shall be construed as a separate agreement with respect to each Grantor and may be amended, restated, modified, supplemented,

waived or released with respect to any Grantor without the approval of any other Grantor and without affecting the obligations of any other Grantor hereunder.

Section 7.07.  <u>Severability</u>.  If any provision of this Agreement is held to be invalid, illegal, or unenforceable, the legality, validity and enforceability of the remaining provisions of this Agreement shall not be affected or impaired thereby.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 7.08.  <u>GOVERNING LAW, ETC.</u>

(a)    THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

(b)    THE GRANTORS AND THE COLLATERAL AGENT EACH IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK CITY IN THE BOROUGH OF MANHATTAN AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT.  EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  EACH PARTY HERETO AGREES THAT THE COLLATERAL AGENT RETAINS THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO BRING PROCEEDINGS AGAINST ANY GRANTOR IN THE COURTS OF ANY OTHER JURISDICTION IN CONNECTION WITH THE EXERCISE OF ANY RIGHTS UNDER THIS AGREEMENT OR THE ENFORCEMENT OF ANY JUDGMENT.

(c)    THE GRANTORS AND THE COLLATERAL AGENT EACH IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT IN ANY COURT REFERRED TO IN PARAGRAPH (b) OF THIS SECTION.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

Section 7.09.   WAIVER OF RIGHT TO TRIAL BY JURY.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 7.10.   Headings.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

Section 7.11.   Security Interest Absolute.  All rights of the Collateral Agent hereunder, the Security Interest, the grant of a security interest in the Pledged Collateral and all obligations of each Grantor hereunder shall be absolute and unconditional irrespective of (a) any lack of validity or enforceability of the Credit Agreement, any other Loan Document, the Secured Hedge Agreements, any Cash Management Services, any agreement with respect to any of the Secured Obligations or any other agreement or instrument relating to any of the foregoing, (b) any change in the time, manner or place of payment of, or in any other term of, all or any of the Secured Obligations, or any other amendment or waiver of or any consent to any departure from the Credit Agreement, any other Loan Document, the Secured Hedge Agreements, any Cash Management Services, or any other agreement or instrument, (c) any exchange, release or non perfection of any Lien on other collateral, or any release or amendment or waiver of or consent under or departure from any guarantee, securing or guaranteeing all or any of the Secured Obligations or (d) subject only to termination of a Grantor's obligations hereunder in accordance with the terms of Section 7.12, but without prejudice to reinstatement rights under Section 2.04 of the Guaranty, any other circumstance that might otherwise constitute a defense available to, or a discharge of, any Grantor in respect of the Secured Obligations or this Agreement other than the payment in full of the Secured Obligations.

Section 7.12.   Termination or Release.

(a)     This Agreement, the Security Interest and all other security interests granted hereby shall automatically terminate with respect to all Secured Obligations when all the outstanding Secured Obligations (other than (A) contingent indemnification obligations with respect to then unasserted claims and (B) Secured Obligations in respect of obligations that may thereafter arise with respect to Obligations in respect of Secured Hedge Agreements and Cash Management Obligations, in each case, not yet due and payable; unless the Collateral Agent has received written notice, at least two (2) Business Days prior to the proposed date of any such release of the Security Interest, stating that arrangements reasonably satisfactory to the applicable Cash Management Bank or Hedge Bank, as the case may be, in respect thereof have

not been made) shall have been paid in full in cash, and the Lenders have no further commitment to lend under the Credit Agreement.

(b)      The Security Interest in any Collateral shall be automatically released in the circumstances set forth in Section 9.11(a) of the Credit Agreement or upon any release of the Lien on such Collateral in accordance with Section 9.11(b) or (d) of the Credit Agreement.

(c)      In connection with any termination or release pursuant to paragraph (a) or (b) above, the Collateral Agent shall promptly execute and deliver to any Grantor, at such Grantor's expense, all documents that such Grantor shall reasonably request to evidence such termination or release.  Any execution and delivery of documents pursuant to this <u>Section 7.12</u> shall be without recourse to or warranty by the Collateral Agent.

(d)      At any time that the respective Grantor desires that the Collateral Agent take any of the actions described in immediately preceding clause (c), it shall, upon request of the Collateral Agent, deliver to the Collateral Agent an officer's certificate certifying that the release of the respective Collateral is permitted pursuant to paragraph (a) or (b).  The Collateral Agent shall have no liability whatsoever to any Secured Party as the result of any release of Collateral by it as permitted (or which the Collateral Agent in good faith believes to be permitted) by this <u>Section 7.12</u>.

Section 7.13.    <u>Additional Restricted Subsidiaries</u>.  Pursuant to Section 6.11 of the Credit Agreement, certain Restricted Subsidiaries of the Loan Parties that are direct or indirect wholly owned Material Domestic Subsidiaries (and not Excluded Subsidiaries) and that were not in existence or were not otherwise Restricted Subsidiaries on the date of the Credit Agreement are required to enter in this Agreement as Grantors upon becoming Restricted Subsidiaries.  Upon execution and delivery by the Collateral Agent and a Restricted Subsidiary of a Security Agreement Supplement, such Restricted Subsidiary shall become a Grantor hereunder with the same force and effect as if originally named as a Grantor herein.  The execution and delivery of any such instrument shall not require the consent of any other Grantor hereunder.  The rights and obligations of each Grantor hereunder shall remain in full force and effect notwithstanding the addition of any new Grantor as a party to this Agreement.

Section 7.14.    <u>Collateral Agent Appointed Attorney-in-Fact</u>.

(a)      Each Grantor hereby appoints the Collateral Agent the true and lawful attorney-in-fact of such Grantor for the purpose of carrying out the provisions of this Agreement and taking any action and executing any instrument that the Collateral Agent reasonably may deem necessary or advisable to accomplish the purposes hereof at any time after and during the continuance of an Event of Default, which appointment is irrevocable and coupled with an interest.  Without limiting the generality of the foregoing, the Collateral Agent shall have the right, subject to the ABL Intercreditor Agreement, upon the occurrence and during the continuance of an Event of Default and (unless a Bankruptcy Event of Default has occurred and is continuing, in which case no such notice shall be required) upon and after delivery of notice by the Collateral Agent to the Borrower of its intent to exercise such rights, with full power of substitution either in the Collateral Agent's name or in the name of such Grantor (i) to receive, endorse, assign and/or deliver any and all notes, acceptances, checks, drafts, money orders or

33

other evidences of payment relating to the Collateral or any part thereof; (ii) to demand, collect, receive payment of, give receipt for, and/or settle, compromise, adjust and give discharges and releases of all or any of the Collateral; (iii) to sign the name of any Grantor on any invoice or bill of lading relating to any of the Collateral; (iv) to send verifications of Accounts to any Account Debtor; (v) to commence and prosecute any and all suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect or otherwise realize on all or any of the Collateral or to enforce any rights in respect of any Collateral; (vi) to settle, compromise, compound, adjust or defend any actions, suits or proceedings relating to all or any of the Collateral; (vii) to notify, or to require any Grantor to notify, Account Debtors to make payment directly to the Collateral Agent or to a Collateral Account and adjust, settle or compromise the amount of payment of any Account or related contracts; (viii) to make, settle and adjust claims in respect of Collateral under policies of insurance and to endorse the name of such Grantor on any check, draft, instrument or any other item of payment with respect to the proceeds of such policies of insurance and for making all determinations and decisions with respect thereto; (ix) to use, sell, assign, transfer, pledge, make any agreement with respect to or otherwise deal with all or any of the Collateral, and to do all other acts and things necessary to carry out the purposes of this Agreement, as fully and completely as though the Collateral Agent were the absolute owner of the Collateral for all purposes; (x) to institute any foreclosure or other realization proceedings that the Collateral Agent may deem appropriate in its reasonable discretion; (xi) appoint a receiver for the properties and assets of each Grantor and each Grantor hereby consents to such rights and such appointment and hereby waives any objection such Grantor may have thereto or the right to have a bond or other security posted by the Collateral Agent or any Secured Party, and remove and replace any such receiver from time to time; (xii) withdraw all monies or securities held in any account for application to the Obligations in accordance with the Credit Agreement; (xiii) accelerate any note pledged to the Collateral Agent pursuant to this Security Agreement which may be accelerated in accordance with its terms, and take any other lawful action to collect upon any such note (including, without limitation, to make any demand for payment thereon); and (xiv) execute and deliver all assignments, conveyances, statements, financing statements, renewal financing statements, security agreements, affidavits, notices and other agreements, instruments and documents that the Collateral Agent may determine necessary in order to perfect and maintain the security interests and liens granted in this Security Agreement and in order to fully consummate all of the transactions contemplated herein; provided that nothing herein contained shall be construed as requiring or obligating the Collateral Agent to make any commitment or to make any inquiry as to the nature or sufficiency of any payment received by the Collateral Agent, or to present or file any claim or notice, or to take any action with respect to the Collateral or any part thereof or the moneys due or to become due in respect thereof or any property covered thereby.  The Collateral Agent and the other Secured Parties shall be accountable only for amounts actually received as a result of the exercise of the powers granted to them herein, and neither they nor their officers, directors, employees or agents shall be responsible to any Grantor for any act or failure to act hereunder, except for their own gross negligence or willful misconduct or that of any of their Affiliates, directors, officers, employees, counsel, agents or attorneys-in-fact.

(b)    All acts in accordance with the terms of this Section 7.14 of said attorney or designee are hereby ratified and approved by the Grantors.  The powers conferred on the Collateral Agent, for the benefit of the Secured Parties, under this Section 7.14 are solely to

protect the Collateral Agent's interests in the Collateral and shall not impose any duty upon the Collateral Agent or any Secured Party to exercise any such powers.

Section 7.15.  <u>General Authority of the Collateral Agent</u>.  By acceptance of the benefits of this Agreement and any other Collateral Documents, each Secured Party (whether or not a signatory hereto) shall be deemed irrevocably (a) to consent to the appointment of the Collateral Agent as its agent hereunder and under such other Collateral Documents, (b) to confirm that the Collateral Agent shall have the authority to act as the exclusive agent of such Secured Party for the enforcement of any provisions of this Agreement and such other Collateral Documents against any Grantor, the exercise of remedies hereunder or thereunder and the giving or withholding of any consent or approval hereunder or thereunder relating to any Collateral or any Grantor's obligations with respect thereto, (c) to agree that it shall not take any action to enforce any provisions of this Agreement or any other Collateral Document against any Grantor, to exercise any remedy hereunder or thereunder or to give any consents or approvals hereunder or thereunder except as expressly provided in this Agreement or any such Collateral Documents and (d) to agree to be bound by the terms of this Agreement and any such Collateral Document.

Section 7.16.  <u>Collateral Agent's Duties</u>.

(a)  Except for the safe custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder, the Collateral Agent shall have no duty as to any Collateral, including perfecting, maintaining, monitoring, preserving or protecting the security interest in the Collateral, or as to ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relative to any Collateral, whether or not any Secured Party has or is deemed to have knowledge of such matters, or as to the taking of any necessary steps to preserve rights against any parties or any other rights pertaining to any Collateral.  The Collateral Agent shall be deemed to have exercised reasonable care in the custody and preservation of any Collateral in its possession if such Collateral is accorded treatment substantially equal to that which it accords its own property.

(b)  For purposes of clarity, and without limiting any rights, protections, immunities or indemnities afforded to either the Administrative Agent or Collateral Agent hereunder, phrases such as "satisfactory to the Administrative Agent/Collateral Agent," "approved by the Administrative Agent/Collateral Agent," "acceptable to the Administrative Agent/Collateral Agent," "as determined by the Administrative Agent/Collateral Agent," "in the Administrative Agent/Collateral Agent's discretion," "selected by the Administrative Agent/Collateral Agent," "elected by the Administrative Agent/Collateral Agent," "requested by the Administrative Agent/Collateral Agent," and phrases of similar import that authorize and permit the Administrative Agent/Collateral Agent to approve, disapprove, determine, act or decline to act in its discretion shall be subject to the Administrative Agent/Collateral Agent receiving written direction from the Required Lenders (or such other number or percentage of the Lenders as expressly required under the Credit Agreement) to take such action or to exercise such rights.

Section 7.17.  <u>Recourse; Limited Obligations</u>.  This Agreement is made with full recourse to each Grantor and pursuant to and upon all the warranties, representations, covenants and agreements on the part of such Grantor contained herein, in the Credit Agreement and the

other Loan Documents and otherwise in writing in connection herewith or therewith, with respect to the Secured Obligations of each applicable Secured Party.  It is the desire and intent of each Grantor and each applicable Secured Party that this Agreement shall be enforced against each Grantor to the fullest extent permissible under applicable Law applied in each jurisdiction in which enforcement is sought.

Section 7.18.   <u>Mortgages</u>.  In the event that any of the Collateral hereunder is also subject to a valid and enforceable Lien under the terms of a Mortgage and the terms thereof are inconsistent with the terms of this Agreement, then with respect to such Collateral, the terms of such Mortgage shall control in the case of fixtures, letting and licenses of, and contracts, and agreements relating to any owned real property, and the terms of this Agreement shall control in the case of all other Collateral.

Section 7.19.   <u>ABL Intercreditor Agreement</u>.

(a)      Notwithstanding anything herein to the contrary, the Liens granted to the Collateral Agent under this Agreement and the exercise of the rights and remedies of the Collateral Agent hereunder and under any other Collateral Document are subject to the provisions of the ABL Intercreditor Agreement.  In the event of any conflict between the terms of the ABL Intercreditor Agreement and this Agreement or any other Collateral Document, the terms of the ABL Intercreditor Agreement shall govern and control.  Notwithstanding anything to the contrary herein, the Collateral Agent acknowledges and agrees that no Grantor shall be required to take or refrain from taking any action at the request of the Collateral Agent with respect to the Collateral if such action or inaction would be inconsistent with the terms of the ABL Intercreditor Agreement.

(b)      Subject to the foregoing, to the extent the provisions of this Agreement (or any other Collateral Documents) require the delivery of, or control over, ABL Priority Collateral to be granted to the Collateral Agent at any time prior to the Discharge of ABL Obligations, then delivery of such ABL Priority Collateral (or control with respect thereto, (and any related approval or consent rights)) shall instead be granted to the ABL Agent, to be held in accordance with the ABL Documents and subject to the ABL Intercreditor Agreement.

(c)      Furthermore, at all times prior to the Discharge of ABL Obligations, the Collateral Agent is authorized by the parties hereto to effect transfers of ABL Priority Collateral at any time in its possession (and any "control" or similar agreements with respect to ABL Priority Collateral) to the ABL Agent.

(d)      Notwithstanding anything to the contrary herein but subject to the ABL Intercreditor Agreement, in the event the ABL Documents provide for the grant of a security interest or pledge over the assets of any Grantor and such assets do not otherwise constitute Collateral under this Agreement or any other Loan Document, such Grantor shall (i) promptly grant a security interest in or pledge such assets to secure the Secured Obligations, (ii) promptly take any actions necessary to perfect such security interest or pledge to the extent set forth in the ABL Documents and (iii) take all other steps reasonably requested by the Collateral Agent in connection with the foregoing.

36

(e)     Nothing contained in the ABL Intercreditor Agreement shall be deemed to modify any of the provisions of this Agreement, which, as among the Grantors and the Collateral Agent shall remain in full force and effect in accordance with its terms.

[Signature Pages Follow]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

**NEEDLE HOLDINGS LLC,** as the Borrower

By: _____

Name:  Scott Sekella

Title:  Interim Office of the Chief Executive Officer, Executive Vice President, Chief Financial Officer and Treasurer

**JOANN HOLDINGS 2, LLC,** as Holdings

By: _____

Name:  Scott Sekella

Title: Interim Office of the Chief Executive Officer, Executive Vice President, Chief Financial Officer and Treasurer

Signature Page to Term Loan Security Agreement

**SUBSIDIARY GUARANTORS**:

**JO-ANN STORES, LLC**

By: _____
    Name: Scott Sekella
    Title:   Interim Office of the Chief Executive
    Officer, Executive Vice President, Chief Financial
    Officer and Treasurer

**JO-ANN STORES SUPPORT CENTER, INC.**

By: _____
    Name: Scott Sekella
    Title:   Vice President and Treasurer

**JOANN.COM, LLC**

By: _____
    Name: Scott Sekella
    Title:   Vice President and Treasurer

**CREATIVEBUG, LLC**

By: _____
    Name: Scott Sekella
    Title:   Vice President and Treasurer

**CREATIVE TECH SOLUTIONS LLC**

By: _____
    Name: Scott Sekella
    Title:   Vice President and Treasurer

**WEAVEUP, INC.**

By: _____
    Name: Scott Sekella
    Title:   Vice President and Treasurer

Signature Page to Term Loan Security Agreement

**JOANN DITTO HOLDINGS INC.**

By: _____
  Name: Scott Sekella
  Title:  Vice President and Treasurer

**JAS AVIATION, LLC**

By: _____
  Name: Scott Sekella
  Title:  Vice President and Treasurer

**DITTOPATTERNS LLC**

By: _____
  Name: Scott Sekella
  Title:  Vice President and Treasurer

**COLLATERAL AGENT:**

**WILMINGTON SAVINGS FUND SOCIETY, FSB**, as Collateral Agent

By: _____
Name:  Raye Goldsborough
Title:    Vice President

<u>SCHEDULE I</u>
<u>TO SECURITY AGREEMENT</u>

<u>SUBSIDIARY GUARANTORS</u>

| <u>Name of Entity</u> | <u>Type of Organization</u> | <u>Jurisdiction of Organization</u> |
|---|---|---|
| Jo-Ann Stores, LLC | Limited Liability Company | Ohio |
| joann.com, LLC | Limited Liability Company | Ohio |
| Jo-Ann Stores Support Center, Inc. | Corporation | Ohio |
| Creativebug, LLC | Limited Liability Company | Delaware |
| Creative Tech Solutions LLC | Limited Liability Company | Delaware |
| WeaveUp, Inc. | Corporation | Delaware |
| JOANN DITTO HOLDINGS INC. | Corporation | Ohio |
| JAS Aviation, LLC | Limited Liability Company | Ohio |
| Dittopatterns LLC | Limited Liability Company | Delaware |

SCHEDULE II
TO SECURITY AGREEMENT

EQUITY INTERESTS

| Issuer | Number of Certificate | Registered Owner | Number and Class of Equity Interest | Percentage of Equity Interests |
|---|---|---|---|---|
| Needle Holdings LLC | N/A | JOANN Holdings 2, LLC | N/A | 100% |
| Jo-Ann Stores, LLC | N/A | Needle Holdings LLC | N/A | 100% |
| joann.com, LLC | N/A | Jo-Ann Stores, LLC | N/A | 100% |
| Jo-Ann Stores Support Center, Inc. | 1 | Jo-Ann Stores, LLC | 1 share of common stock | 100% |
| Creativebug, LLC | N/A | Jo-Ann Stores, LLC | N/A | 100% |
| Creative Tech Solutions LLC | N/A | Jo-Ann Stores, LLC | N/A | 100% |
| Jo-Ann Trading (Shanghai) Co., Ltd. | N/A | Jo-Ann Stores, LLC | N/A | 65% |
| WeaveUp, Inc. | N/A | Jo-Ann Stores, LLC | 100 shares of common stock | 100% |
| JOANN Ditto Holdings Inc. | N/A | Jo-Ann Stores, LLC | 100 shares of common stock | 100% |
| JAS Aviation, LLC | N/A | Jo-Ann Stores, LLC | N/A | 100% |
| Dittopatterns LLC | N/A | JOANN DITTO HOLDINGS INC. | N/A | 100% |

PROMISSORY NOTES

None.

<u>SCHEDULE III</u>
<u>TO SECURITY AGREEMENT</u>

<u>COMMERCIAL TORT CLAIMS</u>

None.

<u>SCHEDULE IV</u>
<u>TO SECURITY AGREEMENT</u>

<u>UCC FILINGS</u>

| <u>Type of Filing</u> | <u>Loan Party</u> | <u>Filing Office</u> |
|---|---|---|
| UCC-1 | JOANN Holdings 2, LLC | Delaware Secretary of State |
| UCC-1 | Needle Holdings LLC | Delaware Secretary of State |
| UCC-1 | Jo-Ann Stores, LLC | Ohio Secretary of State |
| UCC-1 | Jo-Ann Stores Support Center, Inc. | Ohio Secretary of State |
| UCC-1 | WeaveUp, Inc. | Delaware Secretary of State |
| UCC-1 | Joann.com, LLC | Ohio Secretary of State |
| UCC-1 | JAS Aviation, LLC | Ohio Secretary of State |
| UCC-1 | JOANN DITTO HOLDINGS INC. | Ohio Secretary of State |
| UCC-1 | Dittopatterns LLC | Delaware Secretary of State |
| UCC-1 | Creativebug, LLC | Delaware Secretary of State |
| UCC-1 | Creative Tech Solutions LLC | Delaware Secretary of State |

EXHIBIT I
TO SECURITY AGREEMENT

FORM OF SECURITY AGREEMENT SUPPLEMENT

SUPPLEMENT NO. __ dated as of _____ __, 20__ (this "Supplement"), to the Security Agreement dated as of April 30, 2024 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Security Agreement"), among NEEDLE HOLDING LLC, a Delaware limited liability (the "Borrower"), JOANN Holdings 2, LLC, a Delaware limited liability company ("Holdings"), the Subsidiary Guarantors thereto and WILMINGTON SAVINGS FUND SOCIETY, FSB, as Collateral Agent for the Secured Parties.

A.    Reference is made to (i) the Credit Agreement, dated as of April 30, 2024 (as amended, restated, extended, renewed, replaced, refinanced, supplemented and/or otherwise modified from time to time, the "Credit Agreement"), by, among others, the Borrower, Holdings, the Lenders party thereto, and Wilmington Savings Fund Society, FSB, as Administrative Agent for the Lenders and Collateral Agent for the Secured Parties and (ii) the Guaranty (as defined in the Credit Agreement).

B.    Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Credit Agreement and the Security Agreement, as applicable.

C.    The Grantors have entered into the Security Agreement in order to induce the Lenders to make Loans.  Section 7.13 of the Security Agreement provides that additional Subsidiaries of the Grantors may become Grantors under the Security Agreement by execution and delivery of an instrument substantially in the form of this Supplement.  The undersigned Subsidiary (the "New Subsidiary") is executing this Supplement in accordance with the requirements of the Credit Agreement to become a Grantor under the Security Agreement in order to induce the Lenders to make additional Loans and as consideration for Loans previously made.

Accordingly, the Collateral Agent and the New Subsidiary agree as follows:

Section 1.    In accordance with Section 7.13 of the Security Agreement, the New Subsidiary by its signature below becomes a Grantor under the Security Agreement with the same force and effect as if originally named therein as a Grantor and the New Subsidiary hereby (a) agrees to all the terms and provisions of the Security Agreement applicable to it as a Grantor thereunder and (b) represents and warrants (after giving effect to this Supplement) that the representations and warranties made by it as a Grantor thereunder are true and correct on and as of the date hereof; provided that, to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all respects as of such earlier date.  In furtherance of the foregoing, the New Subsidiary, as security for the payment and performance in full of the Secured Obligations does hereby create and grant to the Collateral Agent, its successors and assigns, for the benefit of the Secured Parties, their successors and assigns, a Security Interest in and Lien on all of the New Subsidiary's right, title and interest in and to the Collateral (as defined in the Security Agreement) of the New Subsidiary as set forth in

the Security Agreement.  Each reference to a "<u>Grantor</u>" in the Security Agreement shall be deemed to include the New Subsidiary as if originally named therein as a Grantor.  The Security Agreement is hereby incorporated herein by reference.

Section 2.    The New Subsidiary represents and warrants to the Collateral Agent and the other Secured Parties that this Supplement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity (whether considered in a proceeding in equity or at law).

Section 3.    This Supplement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Supplement shall become effective when the Collateral Agent shall have received a counterpart of this Supplement that bears the signature of the New Subsidiary and the Collateral Agent has executed a counterpart hereof.  Delivery of an executed signature page to this Supplement by facsimile or electronic (including.pdf file) transmission shall be as effective as delivery of a manually signed counterpart of this Supplement.

Section 4.    The New Subsidiary hereby represents and warrants that the Information Certificate and updated schedules to the Security Agreement attached hereto as <u>Schedule I</u> have been duly executed by such New Subsidiary and delivered to the Collateral Agent and the information set forth therein, including the full legal name of the New Subsidiary and its jurisdiction of organization, is true and correct in all material respects as of the date hereof.

Section 5.    Except as expressly supplemented hereby, the Security Agreement shall remain in full force and effect.

Section 6.    **THIS SUPPLEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

Section 7.    In case any one or more of the provisions contained in this Supplement should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and in the Security Agreement shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction).  The parties hereto shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

Section 8.    All communications and notices hereunder shall be in writing and given as provided in Section 7.01 of the Security Agreement.

Section 9.    The New Subsidiary agrees to reimburse the Collateral Agent for its reasonable and documented out-of-pocket expenses in connection with this Supplement,

including all Attorney Costs of counsel for the Collateral Agent, in each case as and to the extent provided in Section 7.03(a) of the Security Agreement.

**IN WITNESS WHEREOF**, the New Subsidiary and the Collateral Agent have duly executed this Supplement to the Security Agreement as of the day and year first above written.

[NAME OF NEW SUBSIDIARY]


By: _____
Name:
Title:
Legal Name:
Jurisdiction of Formation:
Location of Chief Executive Office:


WILMINGTON SAVINGS FUND SOCIETY, FSB, as Collateral Agent


By: _____
Name:
Title:

<u>SCHEDULE I TO SECURITY AGREEMENT SUPPLEMENT</u>

<u>[ATTACH COMPLETED INFORMATION CERTIFICATE FOR NEW SUBSIDIARY AND ALL SCHEDULES TO SECURITY AGREEMENT, UPDATED FOR NEW SUBSIDIARY]</u>

<u>EXHIBIT II</u>
<u>TO SECURITY AGREEMENT</u>

<u>Form of Information Certificate</u>

See Attached.

*Execution Version*

## INFORMATION CERTIFICATE

April 30, 2024

In connection with (i) that certain Credit Agreement dated as of the date hereof (the "Term Loan Credit Agreement") by and among Needle Holdings LLC, a Delaware limited liability company (the "TL Borrower"), JOANN Holdings 2, LLC., a Delaware limited liability company ("TL Holdings"), the other Loan Parties party thereto (the "TL Loan Parties") the Lenders from time to time party thereto and Wilmington Savings Fund Society, FSB, as Administrative Agent and Collateral Agent and (ii) that certain Second Amended and Restated Credit Agreement, dated as of the date hereof (the "ABL Credit Agreement"; capitalized terms used but not otherwise defined herein shall have the same meanings as in the Term Loan Credit Agreement or the ABL Credit Agreement, as applicable), among JOANN Holdings 2, LLC, a Delaware limited liability company ("ABL Parent"), Needle Holdings LLC, a Delaware limited liability company ("ABL Holdings"), Jo-Ann Stores, LLC, an Ohio limited liability company (the "ABL Borrower"), the other Loan Parties party thereto (the "ABL Loan Parties" and collectively, with the TL Borrower, TL Holdings, the TL Loan Parties, ABL Parent, ABL Holdings, and the ABL Borrower, the "Companies" and individually, each a "Company"), the Lenders party thereto, 1903P Loan Agent, LLC, as documentation agent for the FILO Facility, and Bank of America, N.A. as Administrative Agent and Collateral Agent, each Company hereby certifies as follows:

## I.   Current Information

**A.**   **Legal Name, Organizations, Corporate Functions, Jurisdiction of Organization and Organizational Identification Number**.   The full and exact legal name (as it appears in its certificate or articles of organization, limited liability membership agreement, or similar organizational documents, in each case as amended to date), the type of organization, the corporate function, the jurisdiction of organization and the state organizational identification number and federal taxpayer identification number) of each Company are as follows:

| Name of Company | Type | Corporate Function | Jurisdiction | Organizational ID Number | Federal Tax ID Number |
|---|---|---|---|---|---|
| JOANN Holdings 2, LLC | Limited Liability Company | Holding Company | Delaware | 3420219 | N/A |
| Needle Holdings LLC | Limited Liability Company | Holding Company | Delaware | 4914615 | 27-4503814 |
| Jo-Ann Stores, LLC | Limited Liability Company | Operating Company | Ohio | 222082 | 34-0720629 |
| joann.com, LLC | Limited Liability Company | Operating Company | Ohio | 1744067 | 95-4761594 |
| Jo-Ann Stores Support Center, Inc. | Corporation | Operating Company | Ohio | 1822863 | 26-3855027 |
| Creativebug, LLC | Limited Liability Company | Operating Company | Delaware | 5545700 | 47-1053208 |
| Creative Tech Solutions LLC | Limited Liability Company | Operating Company | Delaware | 6450422 | 82-1996734 |
| WeaveUp, Inc. | Corporation | Operating Company | Delaware | 5756134 | 47-4135633 |
| JOANN Ditto Holdings Inc. | Corporation | Holding Company | Ohio | 4581679 | 86-3449652 |
| Dittopatterns LLC | Limited Liability Company | Operating Company | Delaware | 6325024 | 88-2140452 |
| JAS Aviation, LLC | Limited Liability Company | Inactive | Ohio | 2184964 | 46-2589570 |

**B.**    **Chief Executive Offices, Mailing Addresses and other Locations**.  The chief executive office address and the preferred mailing address and any other location in which each Company maintains any collateral or any books and records relating thereto of each Company are as follows:

### Information related to Corporate Offices

| Name of Company | Address of Chief Executive Office | Mailing Address (if different) | Location where Books and Records are Kept (if different) |
|---|---|---|---|
| JOANN Holdings 2, LLC | 5555 Darrow Road Hudson, OH 44236 | Same. | Same. |
| Needle Holdings LLC | 5555 Darrow Road Hudson, OH 44236 | Same. | Same. |
| Jo-Ann Stores, LLC | 5555 Darrow Road Hudson, OH 44236 | Same. | Same. |
| joann.com, LLC | 5555 Darrow Road Hudson, OH 44236 | Same. | Same. |
| Jo-Ann Stores Support Center, Inc. | 5555 Darrow Road Hudson, OH 44236 | Same. | Same. |
| Creativebug, LLC | 2560 Ninth Street, Units 314 and 316, Berkeley, CA 94710 | Same. | 5555 Darrow Road Hudson, OH 44236 |
| Creative Tech Solutions LLC | 5555 Darrow Road Hudson, OH 44236 | Same. | Same. |
| WeaveUp, Inc. | 5555 Darrow Road Hudson, OH 44236 | Same. | Same. |
| JOANN Ditto Holdings Inc. | 5555 Darrow Road Hudson, OH 44236 | Same. | Same. |
| Dittopatterns LLC | 5555 Darrow Road Hudson, OH 44236 | Same. | Same. |
| JAS Aviation, LLC | 5555 Darrow Road Hudson, OH 44236 | Same. | Same. |

### Information related to Owned Distribution Centers

None.

### Information related to Leased Distribution Centers

| Name of Company | Addresses of Leased Distribution Centers | Description of Assets |
|---|---|---|
| Jo-Ann Stores, LLC | 1020 Enterprise Parkway West Jefferson, OH 43162 | 832,600 square foot distribution center location on a 61.64 -acre site. |
| Jo-Ann Stores, LLC | 2500 North Plaza Drive Visalia, CA 93291 | 630,000 square foot distribution center located on an 80-acre site. |
| Jo-Ann Stores, LLC | 3101 Anderson Road Opelika, AL 36801 | 705,000 square foot distribution center located on a 105-acre site. |
| Jo-Ann Stores, LLC | 5555 Darrow Road Hudson, OH 44236 | 1,170,000 square foot distribution center located on a 99-acre site. |

**Information related to Leased Store Locations**

See attached Exhibit A.

      **C.**    **Warehousemen, Bailees, etc.**  Except as set forth below, no persons (including warehousemen, international customs brokers, international freight forwarders, international common carriers or other similar bailees) other than the Companies have possession of any assets (including goods, inventory and equipment) of any Company having a fair market value in excess of $150,000:

**Information related to Warehouseman, Bailees, Etc.**

| Address | County | Description of Assets and Value[1] | Nature of Possession |
|---|---|---|---|
| Preston Texas Storage[2]<br>11700 Preston Road #810<br>Dallas, TX 75230 | Dallas | Fixtures with value of $163,776 | Warehouseman |
| CBTS<br>2940 Highland Ave. Suite 150<br>Cincinnati, OH 45212 | Hamilton | Hardware with value of $463,284 | Warehouseman |
| Novaks<br>16 Fort Monroe Industrial Pkwy<br>Monroeville OH 44847 | Huron | Fixtures with value of $577,499 | Warehouseman |

**Information related to International Freight Forwarders, Common Carriers, Etc.**

| Name | Address | Nature of Possession |
|---|---|---|
| Ocean Network Express PTE Ltd. | 7 Straits View, #16-01 Marina One East Tower, Singapore 018936 | Common Carrier |
| Orient Overseas Container Line Limited | 31/F, Harbour Centre, Wanchai, Hong Kong | Common Carrier |
| Century Distribution Systems | 4860 Cox Road, Suite 210 Glen Allen, VA 23060 | Freight Forwarder and Consolidator |
| Hyundai Merchant Marine | Tower 1, Parc.1, 108 Yeoui-daero, Seoul 07335, Republic of Korea | Common Carrier |
| CEXQ – Century Express | 4860 Cox Road, Suite 210 Glen Allen, VA 23060 | Common Carrier/NVOCC |
| APEX Logistics International Inc. | 18554 S Susana Rd, Compton, CA 90221, United States | Common Carrier/NVOCC |
| TopOcean Consolidation Services Inc. | 2727 Workman Mill Road City of Industry, CA 90601 | Common Carrier/NVOCC |
| Toll Holdings Limited | 380 St Kilda Road, Melbourne, Victoria, 3004, Australia | Common Carrier/NVOCC |

---

[1] Stated values reflect the net book value as of February 23, 2024.

[2] Note that the Preston location is in the basement of one of our store locations, and therefore within our control.

| Name | Address | Nature of Possession |
|---|---|---|
| Expolanka Holdings PLC | 10, Milepost Avenue, Colombo 03, Sri Lanka | Air Forwarder |
| AG Container Transport d/b/a Pappas Trucking LLC | 433 London Groveport Road, Lockbourne OH 43137 | Dray Carrier |
| Alto Systems | 2867 Surveyor Street, Pomona CA 91768 | Consolidator |
| American Global Logistics | 309 E. Paces Ferry Road NE, Suite 800, Atlanta GA 30305 | Common Carrier/NVOCC |
| Campbells | 134 Laurel Drive, Pitman NJ 08071 | Consolidator |
| Delmar | 10636 Cote de Liesse, Montreal Quebec, Canada H8T 1A5 | Common Carrier/NVOCC/Customs Broker |
| Evergreen | One Evertrust Plaza, Jersey City NJ 07302 | Common Carrier |
| Expeditors International | 1015 Third Avenue, 12th Floor, Seattle WA 98104 | Common Carrier/NVOCC/Customs Broker |
| Hapag-Lloyd | 3 Ravinia Drive, Suite 1600, Atlanta GA 30346 | Common Carrier |
| Horizon Midwest Inc. | 8777 Rockside Road, Cleveland OH 44125 | Dray Carrier |
| Maersk Agency USA | 180 Park Avenue, Florham Park NJ 07932 | Common Carrier |
| Rohlig USA LLC | 6909 Engle Road, Unit A-1, Middleburg Heights OH 44130 | Common Carrier/NVOCC |
| Total Distribution Services | 1081 Walker Street, #230, Cypress CA 90630 | Dray Carrier |
| TRX Southwest Inc. | 8777 Rockside Road, Cleveland OH 44125 | Dray Carrier |
| TTSI-Premium Transport Services Inc. | 18735 South Ferris Place, Rancho Domingues CA 90220 | Dray Carrier |

**D.**     **Changes in Names, Jurisdiction of Organization or Corporate Structure**.  Except as set forth below, no Company has used any other corporate or organizational name or changed its name, jurisdiction of organization or its corporate structure in any way (e.g. by merger, consolidation, change in corporate form, change in jurisdiction of organization or otherwise) within the past five (5) years:

| Date of Change | Description of Change |
|---|---|
| April 5, 2022 | Ditto Products LLC changed its name to Creative Tech Solutions LLC |
| March 4, 2022 | Pinetree Merger Company, a Delaware corporation merged into WeaveUp, Inc. |
| September 10, 2021 | JOANN International, Inc. changed its name to JOANN Ditto Holdings Inc. |
| September 8, 2020 | Loriini, LLC changed its name to Ditto Products LLC |
| February 22, 2022 | Jo-Ann Stores, LLC registered a fictitious name of JAS LLC |
| March 16, 2023 | Newco Jodito LLC changed its name to Dittopatterns LLC |

**E.**     **Acquisitions of Equity Interests or Assets**.  Except as set forth below, no Company has acquired the controlling equity interests of another entity or substantially all the assets of another entity within the past five (5) years:

| Date of Acquisition | Description of Acquisition |
|---|---|
| June 10, 2021 | Jo-Ann Stores, LLC acquisition of Zibbet Holdings Pty Ltd. |

| Date of Acquisition | Description of Acquisition |
|---|---|
| March 4, 2022 | Pinetree Merger Company, a Delaware corporation, merged into WeaveUp, Inc. |
| March 4, 2024 | JOANN Ditto Holdings Inc. acquisition of 100% of membership interests of Dittopatterns LLC |

**F.**    **Corporate Ownership and Organizational Structure**.  Attached as Exhibit B hereto is a true and correct organizational chart showing the ownership of the TL Borrower and the ABL Borrower, each Guarantor and their respective Subsidiaries.

## II.    Investment Related Property

**A.**    **Securities.**  Set forth below is a list of all equity interests owned by the Companies together with the type of organization which issued such equity interests (e.g. corporation, limited liability company, partnership or trust):

| Issuer | Type | # of Shares Owned | Total Shares Outstanding | Owner | Certificate No. | Par Value |
|---|---|---|---|---|---|---|
| Needle Holdings LLC | Corporation | 100% interest | N/A | JOANN Holdings 2, LLC | Uncertificated | N/A |
| Jo-Ann Stores, LLC | Limited Liability Company | 100% interest | N/A | Needle Holdings LLC | Uncertificated | N/A |
| joann.com, LLC | Limited Liability Company | 100% interest | N/A | Jo-Ann Stores, LLC | Uncertificated | N/A |
| Jo-Ann Stores Support Center, Inc. | Corporation | 1 | 1 | Jo-Ann Stores, LLC | 1 | 0.00 |
| Creativebug, LLC | Limited Liability Company | 100% interest | N/A | Jo-Ann Stores, LLC | Uncertificated | N/A |
| Creative Tech Solutions LLC | Limited Liability Company | 100% interest | N/A | Jo-Ann Stores, LLC | Uncertificated | N/A |
| Jo-Ann Trading (Shanghai) Co., Ltd. | Wholly Foreign-Owned Enterprise | 100% interest | N/A | Jo-Ann Stores, LLC | Uncertificated | N/A |
| WeaveUp, Inc. | Corporation | 100 | 100 | Jo-Ann Stores, LLC | Uncertificated | 0.01 |
| JOANN Ditto Holdings Inc. | Corporation | 100 | 100 | Jo-Ann Stores, LLC | Uncertificated | 1.00 |
| JAS Aviation, LLC | Limited Liability Company | 100% interest | N/A | Jo-Ann Stores, LLC | Uncertificated | N/A |
| Dittopatterns LLC | Limited Liability Company | 100% | N/A | JOANN DITTO HOLDINGS INC. | Uncertificated | N/A |

**B.**    **Securities Accounts.**  Set forth below is a list of all securities accounts of each Company where Company maintains securities or other assets:

None.

**C.**    **Deposit Accounts.**

Set forth on the attached Exhibit C is a list of all bank accounts (checking, savings, money market or the like but excluding accounts used solely as a petty cash or payroll account) of each Company, including the name of each entity that holds each account and stating if such account is required to be subject to a control agreement pursuant to the Security Agreement.

**D.**    **Instruments.**  Set forth below is a list of all instruments and chattel paper held by or payable to the Companies in the principal amount of greater than $150,000.

| Maker | Holder | Principal Amount as of the date of Issuance (or delivery) | Date of Promissory Note/Instrument | Maturity Date |
|---|---|---|---|---|
| Creative Tech Solutions LLC | Jo-Ann Stores, LLC | Up to $2,000,000 | May 21, 2020 | Demand |

## III.    Intellectual Property

Set forth below is a list of all copyrights registered with the United States Copyright Office, patents issued by the United States Patent and Trademark Office, trademarks registered with the United States Patent and Trademark Office and other intellectual property owned or licensed by any Company:

See attached Exhibit D (Copyrights), Exhibit E (Patents), Exhibit F (Trademarks) and Exhibit G (Domain Name Registrations).

## IV.    Commercial Tort Claims.  The Companies currently have the following commercial tort claims against other parties in an amount in excess of $150,000.

None.

## V.    Real Property.

**A.**    Set forth below is a list of all (i) real property owned by each Company located in the United States as of the date hereof and which is required to be encumbered by a Mortgage and fixture filing pursuant to the terms of the ABL Credit Agreement, which real property includes all real property owned by each Company as of the date hereof having a value, as reasonably determined in good faith by such Company, in excess of $5,000,000 (such real property, the "Mortgaged Property"), (ii) common names, addresses and uses of each Mortgaged Property (stating improvements located thereon) and (iii) other information relating thereto required by such Schedule.

### Owned Real Property:

None.

**B.**    Set forth below are the filing offices for the Mortgages to be delivered as of the Closing Date pursuant to the terms of the Credit Agreement with respect to the Mortgaged Property.

None.

**IN WITNESS WHEREOF**, the undersigned hereto have caused this Information Certificate to be executed as of the date above first written by its officer thereunto duly authorized.

**COMPANIES:**

**JOANN HOLDINGS 2, LLC**

By: _____
     Name: Scott Sekella
     Title: Interim Office of the Chief Executive Officer,
          Executive Vice President, Chief Financial
          Officer and Treasurer

**NEEDLE HOLDINGS LLC**

By: _____
     Name: Scott Sekella
     Title: Interim Office of the Chief Executive Officer,
          Executive Vice President, Chief Financial
          Officer and Treasurer

**JOANN.COM, LLC**

By: _____
     Name: Scott Sekella
     Title: Vice President & Treasurer

**JO-ANN STORES SUPPORT CENTER, INC.**

By: _____
     Name: Scott Sekella
     Title: Vice President & Treasurer

**JO-ANN STORES, LLC**

By: _____
     Name: Scott Sekella
     Title: Senior Vice President, Chief Financial
     Officer & Treasurer

**CREATIVEBUG, LLC**

By: _____
     Name: Scott Sekella
     Title: Vice President & Treasurer

**CREATIVE TECH SOLUTIONS LLC**

By: _____
    Name: Scott Sekella
    Title: Vice President & Treasurer

**WEAVEUP, INC.**

By: _____
    Name: Scott Sekella
    Title: Vice President & Treasurer

**JOANN DITTO HOLDINGS INC.**

By: _____
    Name: Scott Sekella
    Title: Vice President & Treasurer

**DITTOPATTERNS LLC**

By: _____
    Name: Scott Sekella
    Title: Vice President & Treasurer

**JAS AVIATION, LLC**

By: _____
    Name: Scott Sekella
    Title: Vice President & Treasurer

*Signature Page to Information Certificate*

**<u>Exhibit A</u>**

**<u>Leased Store Locations</u>**

**<u>[attached]</u>**

**Exhibit B**

Corporate Organizational Chart

## JOANN INC. ORGANIZATIONAL STRUCTURE



**Exhibit C**

**Deposit Accounts**

| Company | Account Number | Type of Account | Name & Address of Financial Institutions | DACA Requirement |
|---------|----------------|-----------------|------------------------------------------|------------------|
| Jo-Ann Stores, LLC | 4427216208 | DDA/Corp Checking | Bank of America<br>100 West 33rd St<br>New York, NY 10001 | Y |
| Jo-Ann Stores, LLC | 4427216020 | DDA/Corp Checking | Bank of America<br>100 West 33rd St<br>New York, NY 10001 | N |
| Jo-Ann Stores, LLC | 4427217650 | DDA/Corp Checking | Bank of America<br>100 West 33rd St<br>New York, NY 10001 | N |
| Jo-Ann Stores, LLC | 4427217647 | DDA/Corp Checking | Bank of America<br>100 West 33rd St<br>New York, NY 10001 | Y |
| Jo-Ann Stores, LLC | 4427217621 | DDA/Corp Checking | Bank of America<br>100 West 33rd St<br>New York, NY 10001 | N |
| Jo-Ann Stores, LLC | 3359491613 | DDA/Corp Checking | Bank of America<br>100 West 33rd St<br>New York, NY 10001 | N |
| Jo-Ann Stores, LLC | 3359008433 | DDA/Corp Checking | Bank of America<br>100 West 33rd St<br>New York, NY 10001 | N |
| Jo-Ann Stores Support Center, Inc. | 4451034663 | DDA/Corp Checking | Bank of America<br>100 West 33rd St<br>New York, NY 10001 | N |
| Jo-Ann Stores, LLC | 4451305059 | DDA/Corp Checking | Bank of America<br>100 West 33rd St<br>New York, NY 10001 | Y |
| Jo-Ann Stores, LLC | 4451449957 | DDA/Corp Checking | Bank of America<br>100 West 33rd St<br>New York, NY 10001 | N |
| Jo-Ann Stores, LLC | 4963500665 | DDA/Corp Checking | Wells Fargo<br>P.O. Box 63020<br>San Francisco, CA 94163 | Y |
| Jo-Ann Stores, LLC | 475000870 | DDA/Corp Checking | JP Morgan Chase Bank<br>Northeast Market, P.O. Box 659754<br>San Antonio, TX 78265 | N |
| Creative Tech Solutions LLC | 4451428554 | DDA/Corp Checking | Bank of America<br>100 West 33rd St<br>New York, NY 10001 | Y |
| Jo-Ann Stores, LLC | 440103861 | DDA/Corp Checking | Heartland Bank<br>925 Shouting Park Road<br>Peru, IL 61354 | N |
| Jo-Ann Stores, LLC | 359681720645 | DDA/Corp Checking | Keybank National Bank<br>127 Public Square, MC: OH-01-27-0725<br>Cleveland, OH 44114 | N |
| Jo-Ann Stores, LLC | 359681720652 | DDA/Corp Checking | Keybank National Bank<br>127 Public Square, MC: OH-01-27-0725<br>Cleveland, OH 44114 | N |
| Jo-Ann Stores, LLC | 000000023800108 | Concentration Account | Keybank National Bank<br>127 Public Square, MC: OH-01-27-0725<br>Cleveland, OH 44114 | Y |
| Jo-Ann Stores, LLC | 1002422447 | Concentration Account | PNC<br>1900 East 9th Street, Locator: 01-2067<br>Cleveland, OH 44114 | Y |
| Jo-Ann Stores, LLC | 0001099555 | Concentration Account | Regions Bank<br>One Indiana Square, Suite 902<br>Indianapolis, Indiana 46204 | N |
| Jo-Ann Stores, LLC | 153910113486 | Concentration Account | U.S. Bank<br>1350 Euclid Ave, Suite 1100, MA:CN-OH-RN11<br>Cleveland, OH 44115 | Y |
| Jo-Ann Stores, LLC | 9440100804 | Concentration Account | Wells Fargo<br>P.O. Box 63020<br>San Francisco, CA 94163 | Y |

**Exhibit D**

**Copyrights**

**[attached]**

**Exhibit E**

**Patents**

**[attached]**

**Exhibit F**

**Trademarks**

**[attached]**

**Exhibit G**

**Domain Name Registrations**

**[attached]**

<u>EXHIBIT III</u>
<u>TO SECURITY AGREEMENT</u>

**[FORM OF] TRADEMARK SECURITY AGREEMENT**

This TRADEMARK SECURITY AGREEMENT (as amended, amended and restated, supplemented or otherwise modified from time to time, the "***Trademark Security Agreement***") dated _____ __, 20__, is made by the Persons listed on the signature pages hereof (collectively, the "***Grantors***") in favor of Wilmington Savings Fund Society, FSB, as collateral agent (the "***Collateral Agent***") for the Secured Parties (as defined in the Credit Agreement referred to below).

Reference is made to (i) the Credit Agreement, dated as of April 30, 2024 (as amended, restated, amended and restated, extended, renewed, replaced, refinanced, supplemented and/or otherwise modified from time to time, the "***Credit Agreement***"), among Needle Holdings LLC, JOANN Holdings 2, LLC, the Lenders party thereto from time to time and Wilmington Savings Fund Society, FSB, as Administrative Agent and Collateral Agent, (ii) each Secured Hedge Agreement and (iii) each agreement relating to Cash Management Services. The Lenders have agreed to extend credit to the Borrower subject to the terms and conditions set forth in the Credit Agreement, the Hedge Banks have agreed to enter into and/or maintain one or more Secured Hedge Agreements and the Cash Management Banks have agreed to enter into and/or maintain Cash Management Services, on the terms and conditions set forth in the Credit Agreement, in such Secured Hedge Agreements or agreements relating to Cash Management Services, as applicable.

WHEREAS, as a condition precedent to the Lenders extension of such credit, the obligation of the Hedge Banks to enter into and/or maintain such Secured Hedge Agreements and the obligation of the Cash Management Banks to enter into and/or maintain such Cash Management Services, each Grantor has executed and delivered that certain Security Agreement dated April 30, 2024, made by the Grantors to the Collateral Agent (as amended, amended and restated, supplemented or otherwise modified from time to time, the "***Security Agreement***").

WHEREAS, under the terms of the Security Agreement, the Grantors have granted to the Collateral Agent, for the benefit of the Secured Parties, a security interest in, among other property, certain Intellectual Property of the Grantors, and have agreed as a condition thereof to execute this Trademark Security Agreement for recording with the U.S. Patent and Trademark Office and other governmental authorities.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Grantor agrees as follows:

SECTION 1.   <u>Terms</u>.  Terms defined in the Credit Agreement and Security Agreement and not otherwise defined herein are used herein as defined in the Credit Agreement and Security Agreement.

SECTION 2.   <u>Grant of Security</u>.  Each Grantor hereby grants to the Collateral Agent, its successors and assigns, for the benefit of the Secured Parties a continuing security interest in all of the Grantor's right, title and interest in, to and under the Trademarks, including

the registered Trademarks and Trademark registration applications set forth on <u>Schedule A</u> attached hereto.

SECTION 3.    <u>Security for Obligations</u>.  The grant of a security interest in the Trademarks by each Grantor under this Trademark Security Agreement is made to secure the payment or performance, as the case may be, in full of the Secured Obligations.

SECTION 4.    <u>Recordation</u>.  Each Grantor authorizes and requests that the Commissioner for Trademarks and any other applicable government officer record this Trademark Security Agreement.

SECTION 5.    <u>Execution in Counterparts</u>.  This Trademark Security Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Delivery of an executed signature page to this Trademark Security Agreement by facsimile, PDF or other electronic transmission shall be as effective as delivery of an original executed counterpart of this Trademark Security Agreement.

SECTION 6.    <u>Security Agreement</u>.  This Trademark Security Agreement has been entered into in conjunction with the provisions of the Security Agreement.  Each Grantor does hereby acknowledge and confirm that the grant of the security interest hereunder to, and the rights and remedies of, the Collateral Agent with respect to the Collateral are more fully set forth in the Security Agreement, the terms and provisions of which are incorporated herein by reference as if fully set forth herein.

[Remainder of this page intentionally left blank]

     **IN WITNESS WHEREOF**, the undersigned have executed this Trademark Security Agreement as of the date first above written.

          [NAME OF GRANTOR], Grantor

          By: _____

          Name:

          Title:

          WILMINGTON SAVINGS FUND SOCIETY, FSB, as Collateral Agent and Grantee

          By: _____

          Name:

          Title:

SCHEDULE A

| MARK | SERIAL/REG. NO. | APP./REG. DATE |
|------|-----------------|----------------|
|      |                 |                |
|      |                 |                |
|      |                 |                |
|      |                 |                |
|      |                 |                |
|      |                 |                |
|      |                 |                |
|      |                 |                |
|      |                 |                |
|      |                 |                |

EXHIBIT IV
TO SECURITY AGREEMENT

**[FORM OF] PATENT SECURITY AGREEMENT**

This PATENT SECURITY AGREEMENT (as amended, amended and restated, supplemented or otherwise modified from time to time, the "***Patent Security Agreement***") dated _____ __, 20__, is made by the Persons listed on the signature pages hereof (collectively, the "***Grantors***") in favor of Wilmington Savings Fund Society, FSB, as collateral agent (the "***Collateral Agent***") for the Secured Parties (as defined in the Credit Agreement referred to below).

Reference is made to (i) the Credit Agreement, dated as of April 30, 2024 (as amended, restated, amended and restated, extended, renewed, replaced, refinanced, supplemented and/or otherwise modified from time to time, the "***Credit Agreement***"), among Needle Holdings LLC, JOANN Holdings 2, LLC, the Lenders party thereto from time to time and Wilmington Savings Fund Society, FSB, as Administrative Agent and Collateral Agent, (ii) each Secured Hedge Agreement and (iii) each agreement relating to Cash Management Services. The Lenders have agreed to extend credit to the Borrower subject to the terms and conditions set forth in the Credit Agreement, the Hedge Banks have agreed to enter into and/or maintain one or more Secured Hedge Agreements and the Cash Management Banks have agreed to enter into and/or maintain Cash Management Services, on the terms and conditions set forth in the Credit Agreement, in such Secured Hedge Agreements or agreements relating to Cash Management Services, as applicable.

WHEREAS, as a condition precedent to the Lenders extension of such credit, the obligation of the Hedge Banks to enter into and/or maintain such Secured Hedge Agreements and the obligation of the Cash Management Banks to enter into and/or maintain such Cash Management Services, each Grantor has executed and delivered that certain Security Agreement dated April 30, 2024, made by the Grantors to the Collateral Agent (as amended, amended and restated, supplemented or otherwise modified from time to time, the "***Security Agreement***").

WHEREAS, under the terms of the Security Agreement, the Grantors have granted to the Collateral Agent, for the benefit of the Secured Parties, a security interest in, among other property, certain Intellectual Property of the Grantors, and have agreed as a condition thereof to execute this Patent Security Agreement for recording with the U.S. Patent and Trademark Office and other governmental authorities.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Grantor agrees as follows:

SECTION 1.    Terms.  Terms defined in the Credit Agreement and Security Agreement and not otherwise defined herein are used herein as defined in the Credit Agreement and Security Agreement.

SECTION 2.    Grant of Security.  Each Grantor hereby grants to the Collateral Agent, its successors and assigns, for the benefit of the Secured Parties a continuing security

interest in all of the Grantor's right, title and interest in, to and under the Patents, including the Patents set forth on Schedule A attached hereto.

SECTION 3.    Security for Obligations.  The grant of a security interest in the Patent by each Grantor under this Patent Security Agreement is made to secure the payment or performance, as the case may be, in full of the Secured Obligations.

SECTION 4.    Recordation.  Each Grantor authorizes and requests that the Commissioner for Patents and any other applicable government officer record this Patent Security Agreement.

SECTION 5.    Execution in Counterparts.  This Patent Security Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Delivery of an executed signature page to this Patent Security Agreement by facsimile, PDF or other electronic transmission shall be as effective as delivery of an original executed counterpart of this Patent Security Agreement.

SECTION 6.    Security Agreement.  This Patent Security Agreement has been entered into in conjunction with the provisions of the Security Agreement.  Each Grantor does hereby acknowledge and confirm that the grant of the security interest hereunder to, and the rights and remedies of, the Collateral Agent with respect to the Collateral are more fully set forth in the Security Agreement, the terms and provisions of which are incorporated herein by reference as if fully set forth herein.

[Remainder of this page intentionally left blank]

      **IN WITNESS WHEREOF**, the undersigned have executed this Patent Security Agreement as of the date first above written.

[NAME OF GRANTOR], Grantor


By: _____
Name:
Title:


WILMINGTON SAVINGS FUND SOCIETY,
FSB, as Collateral Agent and Grantee


By: _____
Name:
Title:

SCHEDULE A

| PATENT | PATENT NO. | FILING/ISSUE DATE |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

EXHIBIT V
TO SECURITY AGREEMENT

**[FORM OF] COPYRIGHT SECURITY AGREEMENT**

This COPYRIGHT SECURITY AGREEMENT (as amended, amended and restated, supplemented or otherwise modified from time to time, the "***Copyright Security Agreement***") dated _____ __, 20__, is made by the Persons listed on the signature pages hereof (collectively, the "***Grantors***") in favor of Wilmington Savings Fund Society, FSB, as collateral agent (the "***Collateral Agent***") for the Secured Parties (as defined in the Credit Agreement referred to below).

Reference is made to (i) the Credit Agreement, dated as of April 30, 2024 (as amended, restated, amended and restated, extended, renewed, replaced, refinanced, supplemented and/or otherwise modified from time to time, the "***Credit Agreement***"), among Needle Holdings LLC, JOANN Holdings 2, LLC, the Lenders party thereto from time to time and Wilmington Savings Fund Society, FSB, as Administrative Agent and Collateral Agent, (ii) each Secured Hedge Agreement and (iii) each agreement relating to Cash Management Services. The Lenders have agreed to extend credit to the Borrower subject to the terms and conditions set forth in the Credit Agreement, the Hedge Banks have agreed to enter into and/or maintain one or more Secured Hedge Agreements and the Cash Management Banks have agreed to enter into and/or maintain Cash Management Services, on the terms and conditions set forth in the Credit Agreement, in such Secured Hedge Agreements or agreements relating to Cash Management Services, as applicable.

WHEREAS, as a condition precedent to the Lenders extension of such credit, the obligation of the Hedge Banks to enter into and/or maintain such Secured Hedge Agreements and the obligation of the Cash Management Banks to enter into and/or maintain such Cash Management Services, each Grantor has executed and delivered that certain Security Agreement dated April 30, 2024, made by the Grantors to the Collateral Agent (as amended, amended and restated, supplemented or otherwise modified from time to time, the "***Security Agreement***").

WHEREAS, under the terms of the Security Agreement, the Grantors have granted to the Collateral Agent, for the benefit of the Secured Parties, a security interest in, among other property, certain Intellectual Property of the Grantors, and have agreed as a condition thereof to execute this Copyright Security Agreement for recording with the U.S. Copyright Office and other governmental authorities.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Grantor agrees as follows:

SECTION 1.    Terms.  Terms defined in the Credit Agreement and Security Agreement and not otherwise defined herein are used herein as defined in the Credit Agreement and Security Agreement.

SECTION 2.    Grant of Security.  Each Grantor hereby grants to the Collateral Agent, its successors and assigns, for the benefit of the Secured Parties a continuing security interest in all of the Grantor's right, title and interest in, to and under the Copyrights and

exclusive Copyright Licenses, including the registered Copyrights and Copyright applications and exclusive Copyright Licenses pertaining to registered Copyrights set forth on <u>Schedule A</u> attached hereto.

SECTION 3.    <u>Security for Obligations</u>.    The grant of a security interest in the Copyrights and exclusive Copyright Licenses by each Grantor under this Copyright Security Agreement is made to secure the payment or performance, as the case may be, in full of the Secured Obligations.

SECTION 4.    <u>Recordation</u>.    Each Grantor authorizes and requests that the Commissioner for Copyrights and any other applicable government officer record this Copyright Security Agreement.

SECTION 5.    <u>Execution in Counterparts</u>.    This Copyright Security Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Delivery of an executed signature page to this Copyright Security Agreement by facsimile, PDF or other electronic transmission shall be as effective as delivery of an original executed counterpart of this Copyright Security Agreement.

SECTION 6.    <u>Security Agreement</u>.    This Copyright Security Agreement has been entered into in conjunction with the provisions of the Security Agreement.  Each Grantor does hereby acknowledge and confirm that the grant of the security interest hereunder to, and the rights and remedies of, the Collateral Agent with respect to the Collateral are more fully set forth in the Security Agreement, the terms and provisions of which are incorporated herein by reference as if fully set forth herein.

[Remainder of this page intentionally left blank]

**IN WITNESS WHEREOF**, the undersigned have executed this Copyright Security Agreement as of the date first above written.

[NAME OF GRANTOR], Grantor

By: _____
Name:
Title:

WILMINGTON SAVINGS FUND SOCIETY, FSB, as Collateral Agent and Grantee

By: _____
Name:
Title:

SCHEDULE A

**COPYRIGHTS**

| COPYRIGHT | COPYRIGHT NO. | APP./REG. DATE |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

**COPYRIGHT LICENSES**

| AGREEMENT | PARTIES | DATE | SUBJECT MATTER |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |