**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re:<br><br>JOANN INC., *et al.*,[1]<br><br>　　　　　　　　　Debtors. | Chapter 11<br><br>Case No. 25–10068 (CTG)<br><br>(Jointly Administered)<br><br>**Re: Docket Nos. 6, 17, 106**<br>**Hearing Date: February 11, 2025 at 2:00 p.m.**<br>**Objection Deadline: February 6, 2025 at 5:00 p.m.**[2] |

**OMNIBUS OBJECTION OF THE OFFICIAL COMMITTEE**
**OF UNSECURED CREDITORS TO DEBTORS' MOTIONS (I) FOR**
**ENTRY OF AN ORDER APPROVING BIDDING PROCEDURES AND**
**STALKING HORSE AGREEMENT; AND (II) FOR ENTRY OF A**
**FINAL ORDER AUTHORIZING THE USE OF CASH COLLATERAL**

The Official Committee of Unsecured Creditors (the "Committee") of JOANN

Inc., *et al.*, the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"),

by and through its proposed undersigned counsel, hereby files this omnibus objection

(the "Objection") to:

(1) *Motion of Debtors for Entry of an Order (I) Approving Bidding Procedures, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Stalking Horse Agreement, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts and Leases, (VII) Approving the Sale of Assets, and (VIII) Granting Related Relief* (the "Bidding Procedures Motion"); and

(2) *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Creditors, (III) Modifying the Automatic Stay, (IV) Scheduling a Final*

---

[1]　　The Debtors in these chapter 11 cases are: JOANN Inc.; Needle Holdings LLC; Jo-Ann Stores, LLC; Creative Tech Solutions LLC; Creativebug, LLC; WeaveUp, Inc.; JAS Aviation, LLC; joann.com, LLC; JOANN Ditto Holdings Inc.; Dittopatterns LLC; JOANN Holdings 1, LLC; JOANN Holdings 2, LLC; and Jo-Ann Stores Support Center, Inc.

[2]　　Extended as to the Committee with the consent of the Debtors.

*Hearing, and (V) Granting Related Relief* (the "Cash Collateral Motion," and together with the Bidding Procedures Motion, the "Motions").[3]

In support of this Objection, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT[4]

1.      The Debtors emerged from their first bankruptcy on April 30, 2024, after implementing a prepackaged plan that restructured debt, but made no operational changes.  Nine months later, the Debtors commenced these cases to implement a wholesale liquidation and seek this Court's approval to do so in less than 30 days.  The stalking horse bid from Gordon Brothers, an affiliate of FILO lender and agent 1903P, will result in the loss of 19,000 jobs, leave landlords for approximately 800 locations without a tenant, and leave hundreds of suppliers without a customer.  The Debtors and their lenders take no blame for this devastating result.  Instead, in their pleadings and at the first day hearing both seek to cast the blame on the vendors, owed over $100 million, that refused to ship goods.  Having retained advisors one week ago, the Committee intends to test these allegations to determine the cause of this devasting collapse of this company.

2.      The Debtors and the prepetition ABL and FILO Lenders orchestrated a timeline that deprives the Committee any opportunity to fulfill its statutory obligations to creditors.  The Debtors enter bankruptcy with a bid from Gordon Brothers that will pay off the ABL and FILO Lenders in full, including Gordon Brothers affiliate 1903P.  This payoff leaves nothing for unsecured creditors.  Nothing for unsecured creditors because the bid includes not

---

[3]      Docket Nos. 6 and 17.  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motions or the First Day Declaration (as defined below), as applicable.

[4]      Capitalized terms not defined in this Preliminary Statement shall have the meanings ascribed to such terms elsewhere in this Objection.

just inventory, but all potential litigation claims and avoidance actions, including preference claims against insiders and the Lenders themselves.

3.      The sale timeline, coupled with a 17-day challenge period, is designed to prevent the Committee from investigating potentially valuable claims.  The Committee has only 8 days from this Objection to investigate every conceivable claim against a panoply of parties, including (i) the Prepetition Agents and Lenders involved in the Debtors' three tranches of prepetition secured debt; and (ii) all of their affiliates, including Gordon Brothers, and the Debtors' current and former insiders.  Absent the Committee completing its investigation and simultaneously drafting and filing a standing motion and complaint in the next 8 days, all such claims will effectively be released.

4.      The sale timeline will also chill bidding and curtail the Debtors' ability to identify a going-concern bidder to salvage the JOANN brand, save jobs, keep tenants for landlords and maintain a customer for vendors.  The Committee, the Debtors' creditors, and the 19,000 employees deserve more time.  Time to allow the sale process to play out and allow the Committee to investigate the factors that caused JOANN to devolve from a financial restructuring just nine months ago to complete liquidation.

5.      The ABL and FILO Lenders will undoubtedly contend that there is no money for an extended process.  This is a red herring.  Not only did the ABL and FILO Lenders cripple the Debtors' liquidity by imposing $90 million in reserves in the months leading up to these cases, but they seek to be immediately paid off in full upon the closing of the sale.  Liquidity exists if the Lenders would allow it.  The company should not be deprived of a competitive bidding process that may salvage even a portion of the business because the parties in control want a quick sale.

6.      Equally, if not more troubling, is the shoestring budget proposed by the Debtors and the ABL and FILO Lenders that creates a risk of administrative insolvency.  That risk is being born entirely by the Debtors' landlords and vendors through delayed payments of legitimate stub rent and 503(b)(9) claims.  While the ABL and FILO Lenders want immediate payment upon closing, they want landlords and vendor to wait months – some to the very end of these cases – for payment.  Moreover, the Gordon Brothers bid purchase agreement improperly caps payments for stub rent at $9 million and 503(b)(9) claims at $30 million with no evidence that these amounts are sufficient.

7.      Ironically, the entire liquidation process hinges on Gordon Brothers' ability to sell inventory supplied by the vendors using the landlords' premises.  The landlords and vendors who made this process possible should not have to bear the risk of non-payment. The Lenders can easily reserve a portion of the sale proceeds to cover all stub rent and 503(b)(9) claims.  For their part, the Debtors can conduct an expedited reconciliation process.  If not, the Lenders should not be entitled to advance waivers under sections 506(c) and 552(b).

8.      The Bidding Procedures and the proposed final cash collateral order contain several other issues that must be modified: (i) 1903P should not be a consultation party in any discussions pertaining to the Gordon Brothers bid; (ii) the ABL and FILO Lenders should not have consent rights over a bid that fully pays their obligations; (iii) adequate protection should be limited to a proven diminution in value and any adequate protection payments must be subject to disgorgement; (iv) payment of sale proceeds must be subject to the Committee's challenge rights and disgorgement; (v) the Committee must receive notice of budget modifications; and (vi) the investigation budget must be increased.

9.      The Committee is willing to work with the Debtors to achieve a value-maximizing result under the circumstances.  To do so, however, the Debtors and the ABL and FILO Lenders must agree to a rational sale timeline, an appropriate budget that protects priority and administrative creditors, and provide the Committee a realistic opportunity to conduct an investigation.

## BACKGROUND

### I.      General Background

10.      On January 15, 2025 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with this Court.  Since the Petition Date, the Debtors have remained in possession of their assets and have continued to operate and manage their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

11.      On January 28, 2025, the Office of the United States Trustee for Region 3 appointed a nine-member Committee consisting of: (i) Advantus, Corp.; (ii) Brother International Corp.; (iii) Gwen Studios LLC; (iv) Kimco Realty Corporation; (v) Low Tech Toy Club LLC; (vi) Ormo Ithalat Ihracat A.S.; (vii) Regency Centers, L.P; (viii) Simon Property Group, Inc.; and (ix) SunYin (HK) Holding Limited.[5]

12.      The Committee selected Kelley Drye & Warren LLP as its lead counsel and Pachulski Stang Ziehl & Jones LLP as Delaware co-counsel.  The Committee also selected Province, Inc. to serve as its financial advisor.

---

[5]      Docket No. 198.

## II.    Company History and the 2024 Bankruptcy

13.    The Debtors are a sewing and fabrics retailer founded in 1943 and offer one of the largest assortments of arts-and-crafts products.[6]  As of the Petition Date, the Debtors operated 800 stores across 49 states and employed approximately 19,000 employees.[7]

14.    The precursors to these chapter 11 cases predate the Debtors' first chapter 11 proceedings commenced on March 15, 2024 (the "2024 Bankruptcy").[8]  In March 2021, the Debtors went public.[9]  By 2022, JOANN was facing increased competition, rising interest rates, an overleveraged balance sheet, and diminishing liquidity.[10]

15.    At the time, the Debtors were party to a $500 million ABL facility with Bank of America, N.A. (the "Prior ABL Facility"), as administrative agent (the "ABL Agent"). In March 2023, the company amended the Prior ABL Facility to add a $100 million first-in last-out facility (the "Prior FILO Facility") with 1903P Loan Agent, LLC ("1903P Agent"), as FILO agent (the "FILO Agent"), and 1903 Partners, LLC ("1903 Partners" and, together with 1903P Agent, "1903P") and Centerbridge Credit CS, L.P. as FILO lenders.[11] The Debtors were also party to a $675 million term loan facility with Bank of America, N.A. as administrative agent.[12]

---

[6]    *See Declaration of Michael Prendergast, Interim Chief Executive Officer, In Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), at ¶ 21.  Docket No. 5.

[7]    *Id.* at ¶¶ 29, 43.

[8]    *In re Joann Inc., et al.*, Case No. 24-10418 (CTG) (Bankr. D. Del.) (the "Prior Case").

[9]    First Day Declaration, at ¶ 23.

[10]    *Id.* at ¶¶ 59, 61.

[11]    *Declaration of Scott Sekella, Chief Financial Officer and Executive Vice President, in Support of Chapter 11 Petitions and First Day Motions* (the "Prior Case First Day Declaration"), at ¶¶ 45–46.  Case No. 24-10418, at Docket No. 2.

[12]    *Id.* at ¶ 49.

16.    In October 2023, eight months after 1903P became involved, JOANN entered into consulting agreements with Gordon Brothers to renegotiate hundreds of the company's store leases.[13]   As the Court is aware, 1903P is an affiliate of Gordon Brothers Retail Partners, LLC, the current stalking horse bidder (collectively, with all affiliates, "<u>Gordon Brothers</u>").[14]

17.    In June 2023, the Debtors retained Alvarez & Marsal North America, LLC, the Debtors' current financial advisor, to assist with cost-reduction initiatives and to assist in developing a long-term forecast model.[15]   On March 15, 2024, the Debtors commenced the 2024 Bankruptcy to implement a balance sheet restructuring through a prepackaged plan of reorganization (the "<u>2024 Plan</u>").[16]   As highlighted by the Debtors in the Prior Case First Day Declaration, JOANN was the category leader of sewing products in the United States, garnering a one-third market share for that sector.[17]   Of JOANN's then 815 stores, the company boasted that 96% were four-wall positive (*i.e.*, generating positive cash flow at the store level) on a trailing twelve-month basis.[18]   JOANN also highlighted that in fiscal year 2023, it achieved approximately $2.2 billion in net sales.[19]

18.    As JOANN stated, "[n]otwithstanding the company's operational strengths, the Debtors are burdened by substantial funded debt and have faced diminishing

---

[13]    *Id.* at ¶ 64.

[14]    *Id.*

[15]    *Id.* at ¶ 10.

[16]    Prior Case, Case No. 24-10418 at Docket Nos. 1, 303-1.

[17]    Prior Case First Day Declaration, at ¶ 8.

[18]    *Id.*

[19]    *Id.*

liquidity due to, among other things, market headwinds and rising interest rates . . . ."[20] Given the purported operational strength of the business, JOANN commenced the prepackaged 2024 Bankruptcy to restructure the Debtors' balance sheet and position the company to succeed in the post-pandemic market.[21] Under the 2024 Plan, JOANN reduced its then existing $1.06 billion in secured debt in half by converting approximately $500 million in term loan debt into equity and refinancing the Prior ABL Facility and the Prior FILO Facility.[22]

19.     Notably, the Debtors did not utilize the 2024 Bankruptcy to implement any operational changes, reduce their store footprint, or address any issues with their distribution network. All 815 stores remained open and JOANN paid all of its unsecured creditors, including vendors and landlords, in full, in the ordinary course of business.

20.     As part of this restructuring, the Prior ABL Facility and Prior FILO Facility were amended and restated. The Debtors emerged with a $500 million revolving credit facility (the "ABL Facility") and a $100 million term loan facility (the "FILO Facility," and together with the ABL Facility, the "ABL/FILO Facilities") with the existing ABL and FILO lenders, including 1903P (each a "Lender," collectively the "ABL and FILO Lenders").[23] The Debtors' term loan lenders (the "Term Loan Lenders") also provided the Debtors with an

---

[20]     *Id*. at ¶ 9.

[21]     *Id*. at ¶ 16.

[22]     Prior Case, *Order (I) Approving the Disclosure Statement and (II) Confirming the First Amended Prepackaged Joint Plan of Reorganization of JOANN Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code,* Case No. 24-10418, Docket No. 303, at ¶ 31.

[23]     Second Amended and Restated Credit Agreement*, dated as of April 30, 2024, among Debtor Needle Holdings, LLC, as Borrower, JOANN Holdings 2, LLC, as Parent, Needle Holdings LLC, as Holdings, Bank of America, N.A., as Administrative Agent, Collateral Agent, and Issuer, 1903P as FILO Documentation Agent, and the other Lenders party thereto (as modified, the "ABL/FILO Credit Agreement"); First Day Declaration, at ¶ 46.

approximately $153.8 million term loan facility (the "Term Loan Facility," and together with the ABL/FILO Facilities, the "Prepetition Facilities").[24]

21.    Notably, as a condition to financing the FILO Facility, 1903P required that the existing consulting agreements between the Debtors and Gordon Brothers be assumed and amended to include an agency agreement for Gordon Brothers to sell the Debtors' assets in the event of a subsequent bankruptcy filing.[25]    The FILO Facility prohibited the Debtors from terminating the Gordon Brothers consulting agreements as long as the FILO Facility remained outstanding.[26]    Kyle Shonak, the Chief Transaction Officer at Gordon Brothers, executed the ABL/FILO Credit Agreement on behalf of 1903P, as FILO Agent, and GB Funding, as last out lender.[27]

22.    The 2024 Plan was confirmed on April 25, 2024, and went effective on April 30, 2024.[28]    The company emerged poised for success.    The Debtors had $86 million of liquidity via the exit facilities and 96% of stores were "four-wall" cash flow positive.[29]    The financial projections projected an adjusted EBITDA of $152 million in 2025 and $201 million in 2026.[30]

---

[24]    Credit Agreement, dated as of April 30, 2024, among Debtor Needle Holdings, LLC, as Borrower, JOANN Holdings 2, LLC, as Holdings, Wilmington Savings Fund Society, FSB, as Administrative Agent, and the other Lenders party thereto (as amended, restated, waived or otherwise modified, the "Prepetition Term Loan Credit Agreement").

[25]    2024 Plan, Ex. C (the "FILO Facility Commitment Letter"), attached to the FILO Facility Commitment Letter as Exhibit A is the Exit FILO Facility Term Sheet (the "Exit FILO Facility Term Sheet"); ABL/FILO Credit Agreement, at § 4.1(i).

[26]    Exit FILO Facility Term Sheet, at 5; ABL/FILO Credit Agreement, at § 9.15.

[27]    ABL/FILO Credit Agreement, at 216.

[28]    Prior Case, Case No. 24-10418 at Docket Nos. 303, 318.

[29]    Prior Case First Day Declaration, at ¶ 8.

[30]    Prior Case, Case No. 24-10418 at Docket No. 16, Ex. D (Disclosure Statement).

23.    The debt incurred upon exit from the 2024 Bankruptcy is the foundation of the Debtors' current debt obligations.  As of the Petition Date, the Debtors had approximately $615.7 million of outstanding secured debt, consisting of (i) $352.4 million under the ABL Facility (the "ABL Obligations"), (ii) $109.9 million under the FILO Facility (inclusive of a make-whole premium) (the "FILO Obligations," and together with the ABL Obligations, the "Prepetition ABL/FILO Obligations"); and (iii) $153.4 million under the Term Loan Facility (the "Prepetition Term Loan Obligations").[31]

24.    In addition to the prepetition obligations, the Debtors estimate they owed general unsecured creditors approximately $133 million as of the Petition Date, including claims arising under section 503(b)(9) of the Bankruptcy Code, but excluding any lease rejection damages for the Debtors' 800 store leases or other potential contract rejection damages.[32]

25.    The Prepetition ABL/FILO Obligations are purportedly secured by first priority liens over credit card receivables, cash, deposit, securities, and commodity accounts, and inventory (collectively, the "ABL Priority Collateral") and by second priority liens over the Term Loan Priority Collateral (as defined below)).[33]  The Prepetition Term Loan Obligations are purportedly secured by first priority liens over all equipment, real property, and intellectual property, and, solely to the extent not ABL Priority Collateral, all instruments, commercial tort claims, documents, general intangibles, and equity interests held by the guarantors under the Prepetition Term Loan Credit Agreement (collectively, "Term Loan Priority Collateral") and by

---

[31]    Cash Collateral Motion, at ¶ 18.

[32]    First Day Declaration, at ¶ 50.

[33]    Amended and Restated Security Agreement, dated as of April 30, 2024, among Jo-Ann Stores, LLC, as Borrower, Needle Holdings LLC, as Holdings, JOANN Holdings 2, LLC as Parent, Bank of America, N.A., as Collateral Agent, and certain Subsidiary Guarantors thereto, at § 3.01.

second priority liens over the ABL Priority Collateral.[34]  The relative rights of the Lenders are governed by intercreditor agreements.[35]

26.    Less than 9 months following the Debtors' prepackaged financial restructuring, the Debtors have again commenced bankruptcy – this time to implement a full-chain liquidation through a $544 million sale to Gordon Brothers.

27.    Since the Committee only selected advisors on January 30, it has not yet had the opportunity to conduct an investigation into either the prepetition liens and claims or the facts underlying this precipitous decline to a full chain liquidation.  A liquidation that will leave landlords of 800 locations without tenants, hundreds of suppliers without buyers, 19,000 employees without jobs, and unsecured creditors with no chance of a recovery.  The Committee has recently received loan packages, which it is in the process of reviewing.  Given the expedited timeline proposed for these cases, the Committee has also served discovery and deposition notices on the Debtors, Centerview Partners, LLC ("Centerview"), Alvarez & Marsal North America, LLC ("A&M"), the ABL Agent and the FILO Agent.[36]

### III.    Post-2024 Bankruptcy Decline

28.    The Debtors and the ABL and FILO Lenders blame the Debtors' vendors for the descent to a full-chain liquidation.  The Debtors allege that vendors delayed or refused to

---

[34]    Security Agreement, dated as of April 30, 2024, among Needle Holdings LLC, as Borrower, JOANN Holdings 2, LLC, as Holdings, Wilmington Savings Fund Society, FSB as Collateral Agent, and certain Subsidiary Guarantors thereto, at § 3.01.

[35]    Second Amended and Restated Intercreditor Agreement, by and between Bank of America, N.A., as ABL Agent, and Wilmington Savings Fund Society, FSB as term loan agent, dated as of April 30, 2024.

[36]    Docket Nos. 266–75.

send shipments starting in May 2024, leading to dramatic drops in inventory levels.[37]  The Committee has served discovery to validate or refute this unsubstantiated assertion.

29.      What the Committee understands at this early phase is that the Debtors experienced operational and financial issues prior to or immediately after emerging from bankruptcy.  For the thirteen week period ending August 3, 2024, the company faced a net loss of $92 million and adjusted EBITDA of negative $43 million.[38]  The Debtors' auditors, however, believed that the Debtors had sufficient liquidity to cover working capital, capital expenditures, and debt service needs for at least the next twelve months.[39]

30.      Following the 2024 Bankruptcy, the Debtors retained A&M, their financial advisor during the 2024 Bankruptcy, to provide interim management services.[40]  In September 2024, the Debtors expanded A&M's role to include implementing cost-saving measures and negotiating with vendors.[41]  The Debtors and A&M allegedly reduced costs and secured inventory, allowing the Debtors to exceed its projections in December.[42]

31.      Prior thereto, in August 2024, the FILO Agent imposed a $10 million reserve under the terms of the ABL/FILO Credit Agreement.[43]  In December 2024, the ABL Agent imposed two reserves totaling $80 million, which crippled the Debtors' liquidity.[44]

---

[37]      First Day Declaration, at ¶¶ 67–69.

[38]      JOANN Inc., Consolidated Financial Statements, Thirteen Weeks Ended August 3, 2024 (Successor) (the "August 3 Financial Statement").  A copy of the August 3 Financial Statement is attached hereto as **Exhibit A**.

[39]      *Id.*, at 27.

[40]      First Day Declaration, at ¶ 55.

[41]      *Id*. at ¶ 53.

[42]      *Id*. at ¶ 54.

[43]      1903P Loan Agent, LLC's Letter Regarding a Notice of Availability Reserve, dated August 16, 2024.  A copy of this letter is attached hereto as **Exhibit B**.

32.     At the same time as the ABL and FILO Lenders were imposing reserves, A&M prepared a "Transform to Amplify" presentation (the "<u>Transform Plan</u>") outlining a path to profitability by right-sizing store count and restructuring the business.[45]  The Transform Plan recommended using the bankruptcy process to reject 175 leases at unprofitable locations, reduce inventory levels, and reduce annual spend.[46]  It is not clear what, if anything, happened with the Transform Plan other than that none of the ABL, FILO or Term Loan Lenders stepped forward to try and salvage the Debtors' business.

33.     On December 9, 2024, the Debtors retained Centerview as investment banker to market the company.[47]  The Bidding Procedures Motion provides no detail on Centerview's prepetition marketing process.  There is no information on the scope of outreach, the level of interest, and whether competing bids were received.

34.     On December 20, 2024, the ABL Agent took control of the Debtors' cash, directing all cash to accounts held at Bank of America, N.A.[48]  On the same date, the Debtors retained Kirkland & Ellis LLP as restructuring counsel.[49]

35.     On December 27, 2024, the Debtors created a special committee (the "<u>Special Committee</u>") comprised of two newly appointed independent directors to bless the bankruptcy filing.[50]  The Debtors' pleadings do not mention any investigation conducted by the

---

[44]     Bank of America, N.A.'s Letters Regarding Notices of Establishment of Reserve, dated December 6, 2024 and December 17, 2024.  A copy of this letter is attached hereto as **Exhibit C**.

[45]     Alvarez & Marsal Consumer & Retail Group, "Transform to Amplify" JOANN Presentation, dated December 2024.  A copy of this presentation is attached hereto as **Exhibit D**.

[46]     *Id*.

[47]     *Id*. at ¶ 55.

[48]     Cash Collateral Motion, at ¶ 27.

[49]     First Day Declaration, at ¶ 55.

[50]     First Day Declaration, at ¶ 56.

Special Committee, and it seems unlikely one was done given the directors were selected approximately two weeks before the Petition Date.

## IV.    The Gordon Brothers Sale and Bid Procedures

36.    Just nine months after the 2024 Bankruptcy, the Debtors commenced these chapter 11 cases to pursue a full-chain liquidation pursuant to a bid from Gordon Brothers (the "GB Bid").

37.    If approved, the GB Bid will mark the end of the JOANN business. Gordon Brothers will conduct going out of business sales at all 800 retail locations and all distribution centers to conclude by May 31, 2025.[51]  Not coincidentally, the GB Bid is an amount that is barely sufficient to: (i) pay off all $462 million of debt outstanding under the ABL/FILO Facilities – including affiliate 1903P's debt and a FILO make-whole provision; and (ii) fund a liquidation plan process that will deliver no value to unsecured creditors.  The GB Bid leaves nothing behind to monetize for unsecured creditors.  Furthermore, and without explanation, the GB Bid includes all of the Debtors' causes of action, including insider claims.  Adding insult to injury, the GB Bid also includes avoidance actions, including preference claims, leaving unsecured creditors not only with no recovery, but potentially subject to preference exposure.[52]

38.    While the GB Bid does provide $39 million for 503(b)(9) claims and stub rent claims, this amount is a cap, creating the very real risk of administrative insolvency.[53]  The GB Bid also requires the Debtors to negotiate down valid 503(b)(9) claims for the benefit of Gordon Brothers, not the estates or the Debtors' creditors.[54]

---

[51]    Docket No. 17, Exhibit A-2 (the "Stalking Horse Agreement"), at § 6.1.

[52]    *Id*. at §§ 1, 5.1(b).

[53]    *Id.* at Ex. 3.1(b).

[54]    *Id.*

39. The Debtors, in concert with Gordon Brothers and the ABL and FILO Lenders, including 1903P, are dictating the following expedited sale timeline that will chill bidding and all but eliminate the Debtors' ability to secure viable alternative bids:[55]

| Date and Time | Event or Deadline |
|---|---|
| February 12, 2025 | Bid Deadline |
| February 13, 2025 | Sale Objection Deadline to GB Bid |
| February 14, 2025 | • Auction (if any) *or* <br> • Sale Hearing (if no Auction) |
| February 18, 2025 | Sale Objection Deadline (if there is an Auction) |
| February 21, 2025 | Sale Hearing (if there is an Auction) |

## V.    The Cash Collateral Motion

40. Rather than provide new financing to fund a rational process, the ABL and FILO Lenders propose the limited use of cash collateral to fund an expedited process to liquidate their collateral without any assurance of administrative.  In return, the ABL and FILO Lenders seek a litany of protections designed to foster their own interests, while undermining the Committee's ability to adequately represent the interest of unsecured creditors.

41. Of particular concern are the following:

- the predetermination of diminution in value;[56]

- replacement liens on unencumbered assets, including the proceeds of avoidance actions;[57]

- adequate protection superpriority claims with recourse to unencumbered assets, including the proceeds of avoidance actions;[58]

---

[55]    Bidding Procedures Motion, at ¶ 14.

[56]    Docket No. 106 ("Interim Cash Collateral Order"), at ¶ 4(a).

[57]    *Id.*

[58]    *Id.* at ¶ 4(c).

- only $50,000 for the Committee to investigate all of the Lenders;[59] and

- the waiver of all rights under sections 506(c) and 552(b).[60]

42.     Upon the closing of the GB Bid, the ABL and FILO Lenders will be paid down $453 million in the week ending February 22.[61]   And while the budget contemplates a $9 million payment of stub rent for landlords whose locations are being utilized by the Debtors, such payments are not scheduled to be made until the end of June.   Similarly, the $30 million allocated for 503(b)(9) claims will not be paid until the end of April or later.   These amounts represent a cap under the GB Bid but the actual amount of stub rent and 503(b)(9) claims is uncertain.   As a result, while the ABL and FILO Lenders receive their payments immediately, administrative creditors must wait months and bear the risk of nonpayment.

43.     The Debtors' stipulations grant releases to the Lenders, including 1903P in its multiple roles, as well as 1903P's affiliates, including Gordon Brothers).   The releases extend to any liability arising from the Prepetition Facilities or the Prepetition Collateral.[62]   While these stipulations are standard, the temporal limitations on the Committee's ability to investigate and bring a challenge to the validity of these stipulations are not.   The proposed final cash collateral order will truncate the Challenge Deadline to February 14, the date of the sale hearing.   This leaves the Committee just 8 days to complete its investigation and commence a challenge.   This is a practical impossibility and a far cry from the April 1 deadline established under the *Local*

---

[59]     *Id.* at ¶ 19.

[60]     *Id.* at ¶¶ 22, 24.

[61]     *Id*. at ¶ H.

[62]     Interim Cash Collateral Order, at ¶¶ F, 21, 29.

*Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware* (the "Local Rules").[63]

## OBJECTION

## I.    The Bidding Procedures Should be Modified

### A.    The Sale Timeline is Unreasonable

44.     The purpose of bidding procedures is to facilitate the fair sale of a debtor's assets through a process that will maximize value for the benefit of all creditors.[64]  The Debtors have an affirmative obligation to develop a bid process that will maximize value.[65]  Courts have routinely held that procedures that will have a chilling effect on the bidding process should not be approved.[66]

45.     The ABL and FILO Lenders, including 1903P, appear to have orchestrated an unreasonably short sale timeline to insulate the GB Bid from competition.  The Bidding Procedures require bids by February 12, one day after the Bidding Procedures hearing.  If no bids are received, sale objections are due February 13 with a hearing on February 14.  If bids are received, there will be an auction on February 14, with objections due February 18 and a sale hearing on February 21.  This timeline is not an exercise of business judgement that creates an

---

[63]     Local Rule 4001-2(a)(i)(Q).

[64]     *Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564–65 (8th Cir. 1997); *In re E-Z Convenience Stores, Inc.*, 289 B.R. 45, 55 (Bankr. M.D. N.C. 2003) (denying sale because the auction procedures were patently unfair and inequitable); *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998 (noting that the purpose of bid procedures is to facilitate an open and fair public sale designed to maximize value for the estate); *In re Reading Broad., Inc.*, 386 B.R. 562, 575 (Bankr. E.D. Pa. 2008) (same).

[65]     *In re Mataldyne Corp.*, 409 B.R. 661, 667–68 (Bankr. S.D.N.Y. 2009).

[66]     *See, e.g.*, *In re President Casinos, Inc.*, 314 B.R. 784, 786 (Bankr. E.D. Mo. 2004) (declining to approve procedures that chilled bidding); *In re Jon J. Peterson, Inc.*, 411 B.R. 131, 137 (Bankr. W.D.N.Y. 2009) (noting that unless the bid process remains fair and equitable, competitors will refrain from participating which is necessary to assure the highest possible value); *In re America West Airlines, Inc.*, 166 B.R. 908, 912–13 (Bankr. D. Ariz. 1994) (denying bid procedure that did not induce competitive bidding).

open and fair process to solicit a going-concern bid to save JOANN.  Instead, it is designed by the ABL and FILO Lenders to ensure their repayment with no regard for other stakeholders.  The timeline should be extended given the limited prepetition marketing and dual positions of 1903P and Gordon Brothers.

46.     When a section 363 sale benefits an insider, the transaction is not subject to a deferential business judgement standard.[67]  Insider-driven sales are subject to heightened scrutiny.[68]  While not a statutory insider, the Gordon Brothers-1903P relationship vis-à-vis the Debtors warrants careful scrutiny because the process effectively provides them with blanket releases and shields the GB Bid from competition.

47.     Rationalizing the timeline is critical.  If the GB Bid is approved, 19,000 employees will lose their jobs, landlords for 800 store locations will lose a tenant, and suppliers will lose a business partner, with untold consequences to their businesses.

48.     The Debtors will undoubtedly raise liquidity as the basis for the expedited timeline.  Liquidity concerns in the budget are a red herring and reverse engineered by the ABL and FILO Lenders who imposed significant prepetition reserves that crippled the Debtors.  Gordon Brothers has been intimately involved since the Debtors emerged from the 2024

---

[67]     *See, e.g.*, *In re AIG Fin. Prods. Corp.*, 651 B.R. 463, 476 (Bankr. D. Del. 2023); *Crown Vill. Farm, LLC v. Arl. L.L.C. (In re Crown Vill. Farm, LLC)*, 415 B.R. 86, 93 (Bankr. D. Del. 2009); *Official Comm. of Unsecured Creditors of Enron Corp. v. Enron Corp. (In re Enron Corp.)*, 335 B.R. 22, 28 (S.D.N.Y. 2005).

[68]     *In re Crown Vill. Farm, LLC*, 415 B.R. at 93 (holding that "[t]he sale process will be under the close scrutiny of the Court as required where the stalking horse is an insider"); *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims (In re Papercraft Corp.)*, 211 B.R. 813, 823 (W.D. Pa. 1997), *aff'd*, 160 F.3d 982 (3d Cir. 1998) ("[I]nsider transactions are subjected to rigorous scrutiny and when challenged, the burden is on the insider not only to prove the good faith of a transaction but also to show the inherent fairness from the viewpoint of the corporation and those with interests therein."); *see also In re Summit Global Logistics, Inc.*, 2008 Bankr. LEXIS 896, *27–28 (Bankr. D.N.J. Mar. 26, 2008) (quoting *In re Medical Software Solutions*, 286 B.R. 431, 445 (Bankr. D. Utah 2002) ("[W]hen a pre-confirmation [section] 363(b) sale is of all, or substantially all, of the Debtor's property, and is proposed during the beginning stages of the case, the sale transaction should be closely scrutinized, and the proponent bears a heightened burden of proving the elements necessary for authorization")).

Bankruptcy.  If a February 14 or February 21 sale hearing were so critical, the Debtors, the ABL and FILO Lenders, and Gordon Brothers should have filed these cases earlier.

49.    Despite their assertions to the contrary and dispersions cast at their vendors, the Debtors are not victims of circumstance.  1903P and Gordon Brothers have used this playbook before in recent cases such Big Lots, Party City, and Soft Surroundings, among others.  These parties have a history of collaborating to compel a liquidation for their own benefit to the direct detriment of creditors.

50.    The Committee's request to extend the timeline is reasonable and will allow interested parties time to conduct diligence and submit bids.

**B.    The Bidding Procedures Should be Modified**

51.    In addition to extending the timeline, the Court should not approve the Bidding Procedures Motion without modifications to address the following:

- Consultation Rights: 1903P should not have consultation rights over any matters concerning the sale unless the GB Bid is withdrawn.

- Purchase Price:  The Purchase Price for competing bids must equal or exceed the Expense Reimbursement and Prepetition ABL/FILO Obligations with a defined dollar amount.

- Credit Bid:  The right to credit bid must be subject to the Committee's challenge rights under section 363(k) of the Bankruptcy Code and paragraph 29 of the Interim Cash Collateral Order.

- Qualified Bids:  The Debtors must provide the Committee with copies of all bids upon receipt given the truncated sale timeline.

- Adequate Assurance of Future Performance:  The Bidding Procedures should set (i) a deadline for Debtors to provide adequate assurance of future performance; and (ii) a cure and assumption objection deadline allowing counterparties sufficient time to review and object.

- Reservation of Rights:  Section 16 of the Bidding Procedures is overbroad and allows the ABL and FILO Lenders consent rights over any and all changes that may impose any burden.  The Bidding Procedures should limit the ABL and FILO

Lenders' consent rights to new rules, procedures, or modifications that would (x) require the ABL and FILO Lenders to include a deposit as part of a credit bid or (y) impose additional on their rights to Credit Bids or to be deemed a Qualified Bidder.

### C.    The GB Bid Should Not be Approved

52.    The sale to Gordon Brothers cannot be approved in its current form.  The GB Bid is just enough to satisfy the ABL and FILO obligations in full, but puts administrative creditors at risk of nonpayment and leaves nothing for unsecured creditors.  To add insult to injury, Gordon Brothers is acquiring all litigation claims, including against 1903P, officers, directors, and other parties who played a role in the Debtors' decline.  Gordon Brothers is also acquiring the right to pursue preference actions against vendors.  There is no reason that unsecured creditors, already reeling from the loss on their claims and a customer, should be subject to preference actions.  In short, the GB Bid leaves nothing for the Committee to monetize for unsecured creditors, and grants litigation targets, including insiders a de facto release.

### II.    <u>The Cash Collateral Motion Should Be Denied Unless Modified</u>

### A.    Absent Budget Modifications the Lender Protections Should Be Limited

53.    The Debtors, in concert with the ABL Lenders, FILO lenders and Gordon Brothers, have formulated a shoestring budget that fails to protect priority and administrative creditors.  The GB Bid provides just enough money to fully pay off the ABL and FILO Lenders (including a yet to be validated make-whole payment) and allows the Debtors to pursue a liquidating plan with no articulated purpose.

54.    The ABL and FILO Lenders will be paid down contemporaneously with the closing of the sale to Gordon Brothers.  Over the next 3.5 months, Gordon Brothers will use the Debtors' leased store locations to liquidate the vendor-supplied inventory for profit.  And while the ABL/FILO Lenders will receive a significant paydown at closing, landlords and

vendors will be forced to wait several months for payment of their stub rent and 503(b)(9) claims.  As the budget projects no money left at the end of these cases, the deferred payments place the entire risk of administrative insolvency squarely on the backs of those creditors.

55.     The deferral of valid administrative and priority claims should not be permitted given the slew of recent retail liquidations that have teetered on the verge of, or fallen into, administrative insolvency.[69]  The Debtors and the ABL and FILO Lenders orchestrated this bankruptcy and implemented reserves that crippled liquidity.  The budget is shoestring because cash will be used to fully payoff the ABL and FILO Lenders, including with unmatured interest – not because the Debtors lack cash.  At a minimum, the budget must provide for prompt payment of priority and administrative claims.

56.     Importantly, the GB Bid imposes a $30 million cap for 503(b)(9) claims.  Neither the Committee nor this Court have transparency into how this amount was calculated or whether it will be sufficient.  The Debtors should be required to demonstrate that $30 million is sufficient to pay 503(b)(9) claims in full.

57.     Equally important is the payment of stub rent.  The GB Bid allocates $9 million for payment of stub rent claims.  Once again, there is no certainty that this amount is sufficient.  Perhaps more troubling, the Debtors propose to defer payment of stub rent to the very end of these cases.  This is particularly offensive, where, as here, Gordon Brothers will use the landlords' premises to sell inventory for the next 3.5 months.  The delay in payment of stub rent improperly shifts the risk of administrative insolvency to the landlords.

---

[69]     *See, e.g.*, *Big Lots*, *Inc., et al*., Case No. 24-11967 (JKS) (Bankr. D. Del. 2024); *Party City Holdco Inc.,* Case No. 24-90621 (ARP) (Bankr. S.D. Tex. 2024); *Tuesday Morning Corporation, et al.*, Case No. 23-90001 (ELM) (N.D. Tex. 2023).

58.    Simply put, the ABL and FILO Lenders don't have to receive over $450 million upon closing of the sale.  A 10% holdback reserve would avoid shifting the risk of nonpayment of administrative and priority claims to creditors.

59.    Absent an unequivocal commitment to timely pay all administrative and priority claims in full, the litany of protections sought by the ABL and FILO Lenders should be denied, including the advance waivers of sections 506(c) and 552(b).[70]  Section 506(c) allows a debtor to charge the costs of preserving or disposing of a secured lender's collateral to the collateral itself.[71]  This provision ensures that the cost of liquidating a secured lender's collateral is not paid from unsecured creditor recoveries.[72]  Courts have widely recognized that section 506(c) waivers are not to be granted lightly.[73]  Indeed, some courts explicitly provide that the waiver is not permitted without a creditor committee's consent.[74]

60.    The "equities of the case" exception in section 552(b) allows a debtor, committee or other party-in-interest to exclude postpetition proceeds from prepetition collateral on equitable grounds, including to avoid having unencumbered assets fund the cost of a secured

---

[70]    Interim Cash Collateral Order, at ¶¶ 22, 24.

[71]    *See* 11 U.S.C. § 506(c).

[72]    *See, e.g.*, *Precision Steel Shearing v. Fremont Fin. Corp. (In re Visual Indus., Inc.)*, 57 F.3d 321, 325 (3d Cir. 1995) (noting that "section 506(c) is designed to prevent a windfall to the secured creditor"); *Kivitz v. CIT Group/Sales Fin., Inc.*, 272 B.R. 332, 334 (D. Md. 2000) ("[T]he reason for [section 506(c)] is that unsecured creditors should not be required to bear the cost of protecting property that is not theirs.").

[73]    *See, e.g.*, *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 12 (2000) (finding that section 506(c) is a rule of fundamental fairness for all parties in interest and authorizing the surcharge of a secured lender's collateral where reasonable and appropriate).

[74]    *See In re Mortgage Lenders Network, USA, Inc.*, Case No. 07-10146 (PJW), Hr'g Tr. [Docket No. 346], at p. 21 (Bankr. D. Del. March 20, 2007) (noting that without the committee's prior approval, the section 506(c) waiver may not be approved).

lender's foreclosure. Working together, sections 506(c) and 552(b) are "designed to prevent a windfall to the secured creditor[.]"[75]

61.    The facts here are similar to those in *In re Sports Authority Holding*, where this Court denied the advance waivers of sections 506(c) and 552(b).[76] In that case, the debtors requested approval of a DIP facility that (i) proposed to pay off the prepetition lenders immediately upon an expedited sale; (ii) granted the lenders a surcharge waiver; and (iii) failed to adequately fund administrative and priority claims, including stub-rent and 503(b)(9) claims. In denying the surcharge waiver, Judge Walrath ruled:

> But in a case where the landlords and other administrative claims are clearly not budgeted or being paid while the . . . secured lenders' collateral is being liquidated and their secured claim is being paid, I have a serious problem with that. And I think the fix is no 506(c) waiver for anybody. And to the extent that administrative claims are not paid at the end of this case, there will be a claim against the lenders for those costs under 506(c) to the extent they were necessary for the preservation or realization of their collateral.[77]

62.    To the extent the ABL and FILO Lenders wish to receive the benefits of a chapter 11 process undertaken for their benefit, they must timely pay the costs. Absent reasonable assurances of such payment, and a process to implement those payments in a timely fashion, the Court should not approve the section 506(c) and 552(b) waivers.

**B.    The Challenge Deadline Should Be Extended and the Investigation Budget Increased**

63.    The Committee has until February 14 to commence a challenge to the Debtors' Stipulations set forth in the Interim Cash Collateral Order. That is only 8 days from the

---

[75]    *In re Visual Indus., Inc.*, 57 F.3d at 325.

[76]    Case No. 16-10527 (MFW) (Bankr. D. Del. Apr. 26, 2016) [Docket No. 1415]. Excerpts from the transcript are attached hereto as **Exhibit E**.

[77]    *Id.* at 195:6-16.

date of this Objection and just two weeks after the Committee retained professionals. That includes investigating and bringing a challenge to: (i) the validity and extent of liens and claims of three sets of secured lenders; (ii) stipulations that there are no challenges – including recharacterization and subordination – against the Prepetition Secured Creditors and **any affiliates**; (iii) stipulations that the Debtors have no claims against such parties with respect to the Prepetition Credit Documents, the Prepetition Secured Obligations, the Prepetition Liens, **or otherwise**; (iv) a release of the Prepetition Secured Creditors and numerous related parties, **including affiliates from any liability**.

64.    Eight days is not enough to complete an investigation into all of these parties, in all of their different capacities, and to draft and file a standing motion and complaint. Notably, in addition to the release of those claims, Gordon Brothers – an affiliate of lender and agent 1903P – proposes to acquire all of the Debtors' claims, including chapter 5 avoidance actions and commercial tort claims. In short, the Committee has 8 days to investigate every conceivable cause of action the Debtors may possess that could provide unsecured creditors with a recovery.

65.    There is no way for the Committee can accomplish this, much less on the $50,000 budget provided for the investigation. A committee is presumed to have 75 days from the entry of an interim cash collateral order to conduct an investigation and raise a challenge, which here would provide the Committee until April 1. The ABL and FILO Lenders have insisted that the Challenge Deadline be shortened to the date of the sale hearing, currently scheduled for February 14. Approving the February 14 deadline would unreasonably truncate the challenge period under the Local Rules by 47 days. Given that neither the ABL Lenders nor the FILO Lenders are credit bidding for the Debtors' assets, there is no reason for the Challenge

Period to terminate upon the sale hearing date.  Even assuming the proposed sale timeline is approved, the Challenge Period can extend past sale closing and any payments made to the ABL and FILO Lenders can be subject to disgorgement.

66.    It bears emphasis that, upon information and belief, the Debtors did not conduct their own investigation into causes of action that could bring value to creditors.  The Committee is not aware that the Special Committee of purported independent directors, appointed less than 45 days ago, has conducted an investigation.  The only party who will do so is the Committee.

67.    The Challenge Period must be extended to April 1, 2025, subject to extension by consent or further Court order and the Committee's investigation budget must be increased.

## C.    The Adequate Protection Package Should Be Limited

68.    These chapter 11 cases are being run for the benefit of the ABL and FILO Lenders, including 1903P, who will be paid in full, plus a make-whole.  Accordingly, the Court should narrowly tailor the adequate protection package to safeguard general unsecured creditors.

69.    Upon entry of the final cash collateral order, the Lenders will receive a lien on, and a superpriority claim against, avoidance actions and other previously unencumbered collateral.[78]  Both are inappropriate and contrary to the interests of the estates given the facts of these cases.  Avoidance Actions belong to the Debtors' creditors, not the Debtors.[79]  Avoidance powers are intended to allow a debtor-in-possession or a trustee to recover certain payments for

---

[78]    Interim Cash Collateral Order, at ¶ 4(a).

[79]    *See Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.)*, 226 F.3d 237, 243–47 (3d Cir. 2000) (holding that a fraudulent transfer claim belongs to creditors and not to a chapter 11 debtor-in-possession); *Official Comm. of Unsecured Creditors  v. Goold Electronics Corp. (In re Goold Electronics Corp.)*, 1993 WL 408366, *3–4 (N.D. Ill. Sept. 22, 1993) (vacating lien on preference actions granted under financing order).

the benefit of unsecured creditors.[80]  Avoidance Actions should not be pursued for the exclusive benefit of a secured creditor (or potentially in these cases – Gordon Brothers).[81]

70.    Here, a lien on the proceeds of avoidance actions is particularly troublesome, when avoidance claims may exist against the Lenders and other insiders.  Those parties should not be allowed to use the cash collateral order to extinguish their potential liability for any such claims, especially when the Challenge Period has not expired.

71.    The ABL and FILO Lenders also seek an inappropriate predetermination as to their right to adequate protection on account of the Debtors' use of cash collateral, among other things.[82]  That is not the standard, and the burden is on the Lenders to prove any diminution in value.  Adequate protection serves the goal of "safeguard[ing] the secured creditor from diminution in the value of its interest during the Chapter 11 reorganization."[83]  While adequate protection functions to preserve a secured creditor's position postpetition, it is not intended to enhance their position.[84]  It is well-established that a secured creditor does not suffer a diminution in value where it receives the liquidation value of its collateral.[85]  To receive

---

[80]    *See Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. Partnership IV*, 229 F.3d 245, 250 (3d Cir. 2000) (stating, "when recovery is sought under section 544(b) of the Bankruptcy Code, any recovery is for the benefit of all unsecured creditors"); *Mellon Bank, N.A. v. Glick (In re Integrated Testing Prods. Corp.)*, 69 B.R. 901, 904 (D.N.J. 1987) (finding that only the trustee, acting on behalf of all creditors, has a right to recover payments made as preferences).

[81]    *See id.* (recognizing that avoidance actions should be pursued for the benefit of all unsecured creditors).

[82]    Interim Cash Collateral Order, at ¶ 4.

[83]    *In re 495 Central Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992).

[84]    *See In re Pine Lake Village Apartment Co.*, 19 B.R. 819, 824 (Bankr. S.D.N.Y. 1982) ("Neither the legislative history nor the [Bankruptcy] Code indicate that Congress intended the concept of adequate protection to go beyond the scope of protecting the secured claim holder from a diminution in the value of the collateral securing the debt.").

[85]    *See In re George Ruggiere Chrysler-Plymouth, Inc.*, 727 F.2d 1017, 1020 (11th Cir. 1984) (for adequate protection purposes, the value of collateral is based upon what a creditor would have received if it were to sell the collateral at a wholesale price); *In re Case*, 115 B.R. 666, 670 (B.A.P. 9th Cir. 1990) (noting that for adequate protection purposes, "the possibility of forced liquidation would be assumed"); *In re Salem*

adequate protection, a secured creditor must "prove this decline in value—or the threat of a decline—in order to establish a prima facie case."[86]

72.    As a result, the proposed adequate protection should be limited to any proven diminution in value.  To the extent the Lenders believe the value of their collateral has diminished during these cases, they retain the right to assert such claim.

**D.    The Events of Default and Milestones Undermine a Meaningful Sale Process**

73.    1903P and the ABL Agent have consent rights over any sale.  If the Debtors attempt to sell their assets without the Lenders' consent, it constitutes an event of default and a cash collateral termination event.  1903P has every incentive to force the sale to Gordon Brothers so it can be paid in full while its affiliate takes all remaining value.  Given this clear conflict, the final cash collateral order must confirm that 1903P and the ABL agent cannot veto any bid that satisfies the ABL and FILO Obligations in full.

**E.    Additional Objectionable Provisions**

74.    In addition to the foregoing, the following provisions are objectionable to the Committee for the reasons stated below:

- _Releases_: Releases should be limited to the Lenders/Prepetition Agents and solely in their capacities as such.

- _Adequate Protection Payments_: Adequate protection payments must be subject to disgorgement or recharacterization as principal payments in the event of a successful challenge.

- _Budget_:  The Committee should be a consultation party and receive notice of any updates or modifications to the budget.

---

_Plaza Assocs._, 135 B.R. 753, 758 (Bankr. S.D.N.Y. 1992) (secured creditor adequately protected where debtor used cash collateral to preserve overall value of collateral by paying necessary operating expenses).

[86]    _In re Gunnison Ctr. Apts., LP_, 320 B.R. 391, 396 (Bankr. D. Colo. 2005); _In re Elmira Litho, Inc._, 174 B.R. 892, 902 (Bankr. S.D.N.Y. 1994).

- <u>No Marshaling</u>: The equitable doctrine of marshalling should not be waived.

## **CONCLUSION**

WHEREFORE, the Committee respectfully requests that the Court (i) deny the Motions unless modified as set forth herein; and (ii) grant such other and further relief as the Court deems just and proper.

Dated:    Wilmington, Delaware
          February 6, 2025

                            **PACHULSKI STANG ZIEHL & JONES LLP**

                            By: *James E. O'Neill*
                            Bradford Sandler (DE Bar No. 4142)
                            James E. O'Neill (DE Bar No. 4042)
                            919 North Market Street 17th Floor
                            P.O. box 8705
                            Wilmington, DE 19899-8705 (Courier 19801)
                            Tel: (302) 652-4100
                            Fax: (302) 652-4400
                            Email: bsandler@pszjlaw.com
                                      joneill@pszjlaw.com

                            and

                            **KELLEY DRYE & WARREN LLP**
                            Eric R. Wilson (admitted *pro hac vice*)
                            Jason R. Adams (admitted *pro hac vice*)
                            Maeghan J. McLoughlin (admitted *pro hac vice*)
                            3 World Trade Center
                            175 Greenwich Street
                            New York, New York 10007
                            Tel: (212) 808-7800
                            Fax: (212) 808-7897
                            Email: ewilson@kelleydrye.com
                                      jadams@kelleydrye.com
                                      mmcloughlin@kelleydrye.com

                            *Proposed Counsel to the Official Committee of*
                            *Unsecured Creditors of JOANN Inc., et al.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 6th day of February, 2025, a true and correct copy of the above and foregoing was caused to be served by email upon the parties listed below.

*/s/ James E. O'Neill*
James E. O'Neill

Cole Schotz P.C.
Patrick J. Reilley, Esq.
Stacy L. Newman, Esq.
Michael E. Fitzpatrick, Esq.
Jack M. Dougherty, Esq.
500 Delaware Avenue
Suite 1410
Wilmington, Delaware 19801
Email:  preilley@coleschotz.com
        snewman@coleschotz.com
        mfitzpatrick@coleschotz.com
        jdougherty@coleschotz.com

Kirkland & Ellis LLP
Joshua A. Sussberg, P.C.
Aparna Yenamandra, P.C.
601 Lexington Avenue
New York, New York 10022
Email:joshua.sussberg@kirkland.com
aparna.yenamandra@kirkland.com

Kirkland & Ellis LLP
Anup Sathy, P.C.
Jeffrey Michalik, Esq.
Lindsey Blumenthal, Esq.
333 West Wolf Point Plaza
Chicago, Illinois 60654
Email: anup.sathy@kirkland.com
jeff.michalik@kirkland.com
lindsey.blumenthal@kirkland.com

*Proposed Counsel to the Debtors and Debtors in Possession*

Office of the United States Trustee
District of Delaware
Malcolm M. Bates, Esq.
844 King Street, Suite 2207
Lockbox 35
Wilmington, DE 19801
Email:  malcolm.m.bates@usdoj.gov

Gibson, Dunn & Crutcher LLP
Scott Greenberg, Esq.
Kevin Liang, Esq.
Josh Brody, Esq.
200 Park Avenue
New York, New York 10166,
Email:  SGreenberg@gibsondunn.com
        KLiang@gibsondunn.com
        JBrody@gibsondunn.com

*Counsel to the Prepetition Term Loan Lender Ad Hoc Group*

Morgan, Lewis & Bockius LLP
Christopher L. Carter, Esq.
Marjorie Crider, Esq.
One Federal Street
Boston, Massachusetts 02110
Email: christopher.carter@morganlewis.com
        marjorie.crider@morganlewis.com

-and-

Morgan, Lewis & Bockius LLP
David K. Shim, Esq.
One State Street
Hartford CT 06103-3178
Email:   david.shim@morganlewis.com

-and-

Reed Smith LLP
Kurt F. Gwynne, Esq.
Jason D. Angelo, Esq.
1201 North Market Street
Suite 1500
Wilmington, DE 19801
 Email: kgwynne@reedsmith.com
      jangelo@reedsmith.com

*Counsel to the Prepetition ABL Agent*

Choate Hall & Stewart LLP
John Ventola, Esq.
Jonathan Marshall, Esq.
2 International Place
Boston, Massachusetts 02110
Email:  jventola@choate.com
      jmarshall@choate.com

-and-

DLA PIPER LLP (US)
Stuart M. Brown, Esq.
Matthew S. SarnaEsq.
1201 North Market Street
Suite 2100
Wilmington, Delaware 19801
Email:   stuart.brown@us.dlapiper.com
      matthew.sarna@us.dlapiper.com

*Counsel to the Prepetition FILO Agent*

ArentFox Schiff LLP
Jeffrey Gleit, Esq.
1301 Avenue of the Americas
42nd Floor
New York, New York 10019
Email: jeffrey.gleit@afslaw.com

-and-

Jonathan Bagg, Esq.
1717 K Street NW
Washington, D.C. 20006
Email:  jonathan.bagg@afslaw.com

-and-

Matthew Bentley, Esq.
233 South Wacker Drive
Suite 7100
Chicago, Illinois 60606
Email: matthew.bentley@afslaw.com

*Counsel to the Prepetition Term Loan Agent*