**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| JOANN INC., *et al.*,[1] | ) Case No. 25-10068 (CTG) |
| Debtors. | ) (Jointly Administered) |

**DECLARATION
OF NICHOLAS HAUGHEY
IN SUPPORT OF DEBTORS'
MOTION FOR ENTRY OF AN ORDER
(I) AUTHORIZING AND APPROVING THE CONDUCT OF STORE
CLOSING SALES, WITH SUCH SALES TO BE FREE AND CLEAR OF ALL
LIENS, CLAIMS, AND ENCUMBRANCES AND (II) GRANTING RELATED RELIEF**

I, Nicholas Haughey, hereby declare under penalty of perjury:

1. I am a Senior Director with Alvarez & Marsal North America, LLC, (together with its wholly-owned subsidiaries and independent contractors and employees of its professional service provider affiliates, all of which are wholly-owned by its parent company and employees, "A&M"), a restructuring advisory services firm with numerous offices throughout the country.

2. I submit this declaration (the "Declaration") in support of the *Motion of Debtors for Entry of an Order (I) Authorizing and Approving the Conduct of Store Closing Sales, With*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: JOANN Inc. (5540); Needle Holdings LLC (3814); Jo-Ann Stores, LLC (0629); Creative Tech Solutions LLC (6734); Creativebug, LLC (3208); WeaveUp, Inc. (5633); JAS Aviation, LLC (9570); joann.com, LLC (1594); JOANN Ditto Holdings Inc. (9652); Dittopatterns LLC (0452); JOANN Holdings 1, LLC (9030); JOANN Holdings 2, LLC (6408); and Jo-Ann Stores Support Center, Inc. (5027). The Debtors' mailing address is 5555 Darrow Road, Hudson, Ohio 44236.

*Such Sales to Be Free and Clear of All Liens, Claims, and Encumbrances and (II) Granting Related Relief* (the "Store Closing Motion").

3.  Unless otherwise indicated, the statements set forth in this Declaration are based upon (a) my personal knowledge of the Debtors' business, (b) information learned from my review of relevant documents, (c) information I received from the team at A&M or the Debtors' management team and other advisors, or (d) my experience as a restructuring professional. I am not being specifically compensated for this testimony other than through payments that are proposed to be received by A&M as a professional retained by the Debtors, subject to this Court's approval.

**Qualifications**

4.  I have been a financial advisor to stressed and distressed companies for more than fifteen years. I have a bachelor's degree in finance from Wofford College as well as a Master of Science in Accountancy degree from the University of Notre Dame. I am a member of the Turnaround Management Association and the American Bankruptcy Institute.

5.  A&M is a restructuring consulting firm with extensive experience providing high quality, specialized management and restructuring advisory services to debtors and distressed companies, including turnaround advisory services, revenue enhancement, claims management, and creditor and risk management advisory services. My recent representative restructuring engagements include (a) Red Lobster, a restaurant chain with approximately 550 locations in the U.S. and Canada and more than 25 franchised locations in Latin America and Asia; (b) Dean Foods, a leading food and beverage company and the largest processor and direct-to-store distributor of fresh fluid milk and other dairy and dairy case products in the United States with 58 processing facilities across 29 states; and (c) GT Real Estate Holdings, a specialty real estate

investment company created to develop and construct a new headquarters and practice facility for the Carolina Panthers NFL team.

6.     A&M was initially engaged by the Debtors in February 2023 and has assisted the Debtors in multiple capacities since then, including as financial advisor in the Debtors' 2024 restructuring.  The Debtors will seek to retain A&M in these chapter 11 cases to provide the Debtors with an interim chief executive officer, chief financial officer, and other engagement personnel to manage the Debtors' day-to-day operations and restructuring efforts.  A&M supported the Debtors' analysis of the store portfolio and has worked closely with the Debtors' management team to develop a store closure plan centered on value maximization and an asset disposition strategy based on proceeds realizable through the sale of certain owned inventory ("Inventory") and store fixtures, furniture, and equipment (collectively, "FF&E" and together with the Inventory, "Store Closing Assets").  I am generally familiar with the Debtors' capital structure, day-to-day operations, business plan, transformation, and cost-reduction strategies, liquidity, relationships with suppliers and partners, business and financial affairs, and books and records.

**The Store Closings and Store Closing Procedures**

**A.     The Store Closings.**

7.     The Debtors commenced these chapter 11 cases while undergoing a strategic marketing process for the sale of all or substantially all of their assets and a proposed "stalking horse" agency agreement with Gordon Brothers Retail Partners, LLC ("GBRP") for the right to liquidate all of the Debtors' assets (the "Stalking Horse Bid").  The Debtors also sought and received relief in these chapter 11 cases to continue operating as a going concern, and without a material reduction in store count.  As the sale process has progressed, and prospective bidders have continued to conduct diligence and refine their bids, the Debtors, with the assistance of their advisors, identified a subset of stores that are unlikely to be considered or included in any going

concern bid. I understand that no parties involved in the Debtors' marketing process have expressed an interest in acquiring this subset of stores.

8. Given the expense of operating each of the Debtors' stores, I believe it is in the best interest of the Debtors' estates to immediately commence Store Closing Sales at this subset of stores so the Debtors can reduce the administrative costs of the Debtors' ordinary course operations, expedite the liquidation of ABL Priority Collateral located at the Initial Closing Stores and in the distribution centers, and begin the process of reducing the Company's store footprint.

9. I understand that, historically, holidays are a period of increased revenue generation for the Debtors and that this is particularly true of holidays falling on an extended weekend that have historically been associated with retail-wide sales events, such as Presidents' Day. I believe that commencing the Store Closing Sales over the upcoming holiday weekend presents the Debtors with a significant opportunity to meet or beat the Debtors' revenue projections from store closing sales by maximizing foot traffic and aligning with consumer expectations around retail sales events. Delaying the commencement of Store Closing Sales until after the holiday weekend may hinder the Debtors' revenue generation from the Store Closing Sales and cause the Debtors to miss a critical window for potential revenue maximization.

10. As further described in the Store Closing Motion, beginning the Store Closing Sales as soon as possible will allow the Debtors to preserve value for all stakeholders and protect the Debtors' administrative solvency. Accordingly, I believe that beginning the Store Closing Sales as soon as practicable is a sound exercise of the Debtors' business judgment and in the best interest of their estates.

**B.**     **Gift Card Program and Refund and Exchange Policy**

11.     To support the Store Closing Sales, the Debtors have also determined that certain modifications to the Debtors' Gift Card Program and Refund and Exchange Policy are necessary. Specifically, I believe it is necessary for the Debtors to (a) stop accepting gift cards online and at the Debtors' retail locations beginning fourteen (14) days after entry of the Order, (b) stop accepting refunds, returns or exchanges on merchandise beginning fourteen (14) days after entry of the Order, and (c) sell inventory at all stores on a "final basis." In my experience, such modifications are typical in conducting store closings and necessary to ensure closing sales provide the intended benefits. I understand that the changes to the Gift Card Program and Refund and Exchange Policy will be posted online and in stores.

12.     I understand the Debtors filed the Bidding Procedures Motion and Customer Programs Motion on the Petition Date, and parties in interest received notice of the motions. Pursuant to the Bidding Procedures Motion, the Debtors proposed a sale hearing on February 14, 2025, and sought relief to commence store closing sales immediately following entry of an order approving the Stalking Horse Bid. The Debtors, in consultation with their advisors, prepared a budget for these chapter 11 cases (the "Budget") that projected store closing sales commencing on February 15, 2025. Pursuant to the Customer Programs Motion, the Debtors sought relief to honor gift cards and returns of merchandise until fourteen (14) days following the consummation of any sale transaction.

13.     Pursuant to the Store Closing Motion, the Debtors are seeking authority to commence Store Closing Sales, and discontinue honoring gift cards and refunds, returns, or exchanges of merchandise, on substantively the same timeline proposed in the Bidding Procedures Motion and Customer Programs Motion, respectively. Accordingly, the relief sought in the Store

Closing Motion does not materially change the Budget and will allow the Debtors to remain in compliance with the Budget.

**C.     The Store Closing Procedures.**

14.     Based on my experience with other retail chapter 11 debtors, I believe that implementing the Store Closing Procedures as set forth in the Store Closing Motion will provide the best and most efficient means for the Debtors to sell the Store Closing Assets and maximize value for the Debtors' estates.  The Debtors expect the Store Closing process to take approximately 8 to 13 weeks for each store and, once initiated, can be halted in the Debtors' business judgment.  The Store Closing Procedures and the relief being sought in the Store Closing Motion will authorize, not require, the Debtors to initiate Store Closing Sales.  The proposed Store Closing Procedures provide the Debtors with necessary flexibility at this juncture of the chapter 11 cases.  Pursuant to the Store Closing Procedures, the Debtors will have the authority to commence Store Closing Sales to maximize revenue, and will also maintain the flexibility to include a Closing Store as part of a going concern sale if needed.

15.     Accordingly, I believe that the relief requested in the Store Closing Motion is integral to preserving estate assets and maximizing the value of the estates.  Such relief will permit the Debtors to continue negotiations with key stakeholders and conclude their sale process.  Furthermore, I believe that the Store Closing Procedures will establish fair and uniform procedures to assist the Debtors in commencing the liquidation of stores that I understand are not likely to be considered or included in any going concern bid.

**D.     Liquidation Sale Laws and Lease Restrictions.**

16.     I have been advised that certain states in which the Debtors operate stores have or may have licensing or other requirements governing the conduct of store closing, liquidation, or

other inventory clearance sales, including, without limitation, state, provincial, and local laws, statutes, rules, regulations, and ordinances (collectively, the "Liquidation Sale Laws").  I have further been advised that the Liquidation Sale Laws may establish licensing, permitting or bonding requirements, waiting periods, time limits, bulk sale restrictions, and augmentation limitations that would otherwise apply to the Store Closing Sales.  Additionally, many of the applicable leases of the Closing Stores restrict the Debtors' ability to conduct store closing sales including through "go-dark" provisions.  Absent relief from the Court, such requirements will hamper the Debtors' ability to maximize value in selling their Store Closing Assets.

17.     One of the most important factors in maximizing value in the context of a store closing sale is the ability to drive a message to the consumer that creates urgency to purchase. Thus, being able to advertise and use signage that delivers a message such as "store closing" is critical to obtain the necessary consumer traffic to the stores to drive sales and maximize value from the Store Closing Sales.  If the Debtors cannot increase sales volume through advertising that communicates urgency, the Debtors may incur additional liabilities to the detriment of their estates. I believe that forcing the Debtors to comply with the Liquidation Sales Laws and restrictive lease provisions would negatively impact sales at the Closing Stores and impair the Debtors' ability to generate value through the Store Closing Sales to the detriment of the Debtors' estates. Accordingly, I believe that the Store Closing Procedures and relief requested in the Store Closing Motion is necessary to balance the Debtors' ability to maximize the value of their estates while affording the Debtors' landlords with a fair and reasonable process to voice their opposition.

## Conclusion

18.     Based on the foregoing, I submit that the relief requested in the Store Closing Motion is in the best interest of the Debtors' estates and should therefore be approved.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Respectfully Submitted,
Dated: February 12, 2025

*/s/ Nicholas Haughey*
Nicholas Haughey
Senior Director
Alvarez and Marsal North America, LLC