**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| JOANN INC., *et al.*,[1] | ) | Case No. 25-10068 (CTG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re:  D.I. 6, 17, 285, 305, 323, 335, & 338** |

---

**OMNIBUS RESPONSE OF BANK OF AMERICA, N.A.,
AS PREPETITION ABL AGENT, TO OBJECTIONS TO THE CASH
COLLATERAL MOTION AND THE BIDDING PROCEDURES MOTION**

Bank of America, N.A., in its capacity as the Prepetition ABL Agent under the ABL/FILO

Credit Agreement, files this response ("Response") to:[2]

a)    *Preliminary Omnibus Objection of the Ad Hoc Term Loan Group to the Debtors' (I) Bidding Procedures Motion and (II) Cash Collateral Motion* (the "Ad Hoc Preliminary Objection") [D.I. 335];

b)    *Omnibus Objection of the Official Committee of Unsecured Creditors to Debtors' Motions (I) for Entry of an Order Approving Bidding Procedures and Stalking Horse Agreement; and (II) for Entry of a Final Order Authorizing the Use of Cash Collateral* (the "Committee Objection") [D.I. 338];

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: JOANN Inc. (5540); Needle Holdings LLC (3814); Jo-Ann Stores, LLC (0629); Creative Tech Solutions LLC (6734); Creativebug, LLC (3208); WeaveUp, Inc. (5633); JAS Aviation, LLC (9570); joann.com, LLC (1594); JOANN Ditto Holdings Inc. (9652); Dittopatterns LLC (0452); JOANN Holdings 1, LLC (9030); JOANN Holdings 2, LLC (6408); and Jo-Ann Stores Support Center, Inc. (5027). The Debtors' mailing address is 5555 Darrow Road, Hudson, Ohio 44236.

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the *Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Creditors, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "Interim Cash Collateral Order"), including the form of final order contemplated therein (the "Final Cash Collateral Order") [D.I. 106], or, as applicable, in the bidding procedures (the "Bidding Procedures") attached as Exhibit 1 to the proposed *Order (I) Approving Bidding Procedures, (II) Scheduling Certain Dates and Deadlines, (III) Approving the Form and Manner of Notice, (IV) Approving the Stalking Horse Agreement, (V) Establishing Notice and Procedures for the Assumption and Assignment of Assumed Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts and Leases, (VII) Approving the Sale of Assets, and (VIII) Granting Related Relief* [D.I. 17].

c)      *United States Trustee's Omnibus Objection to: (1) Motion of Debtors for Entry of an Order, Inter Alia, Approving Bidding Procedures and Scheduling Certain Dates and Deadlines With Respect Thereto; (2) Motion of Debtors for Entry of Interim and Final Orders, Inter Alia, Authorizing the Debtors to Use Cash Collateral; and (3) Motion of Debtors for Entry of an Order, Inter Alia, Extending Time to File Certain Bankruptcy Schedules and Statements* (the "U.S. Trustee Objection") [D.I. 285];

d)      *Wilmington Savings Fund Society, FSB's Joinder to Preliminary Omnibus Objection of the Ad Hoc Term Loan Group to the Debtors' (I) Bidding Procedures Motion and (II) Cash Collateral Motion* [D.I. 305]; and

e)      *Joinder to Preliminary Objection of the Ad Hoc Term Loan Group to the Debtors' (I) Bidding Procedures Motion and (II) Cash Collateral Motion* [D.I. 323], filed by Orchard Yarn and Thread Company Inc. d/b/a Lion Brand Yarn Company.

In support of this Response, the Prepetition ABL Agent states as follows:

## PRELIMINARY STATEMENT

1.      The proposed Final Cash Collateral Order and Bidding Procedures are the result of extensive negotiations and a carefully considered compromise among the Debtors, the Prepetition ABL Agent, and the Prepetition FILO Agent.[3]  These orders govern the funding of this chapter 11 process as well as the sale process to ensure a value maximizing result.  Before the Petition Date, the Debtors, the Prepetition ABL Agent, and the Prepetition FILO Agent worked to establish a process that would allow the Debtors to market their business, secure necessary funding, and maintain administrative solvency while meeting senior secured obligations.  After weeks of analysis and negotiation, the parties agreed on a set of orders, including the Cash Collateral Order to fund operations and the Bidding Procedures to guide the sale process within a defined structure.

2.      Now, the Committee and the Ad Hoc Term Loan Group (as defined in the Ad Hoc Preliminary Objection) seek to unwind these agreements, introducing unnecessary risk to the

---

[3]      While the hearing on the Final Cash Collateral Order has been adjourned, the Prepetition ABL Agent expects that hearing to take place no later than the date of the sale hearing.  Given the integrated nature of the orders, the Prepetition ABL Agent addresses both in this Response but reserves the right to supplement this Response as necessary.  For the avoidance of doubt, the Prepetition ABL Agent notes that certain Milestones under the Interim Cash Collateral Order have been missed and reserves all rights with respect thereto.

estate.[4]  However, the proposed orders include provisions that are standard in retail bankruptcy cases and offer critical protections for secured creditors permitting the use of their cash collateral to fund the process.

3.      The Prepetition ABL Agent does not oppose the Committee's review of these orders.  However, objections to (or concerns with) the timeline do not justify stripping away key creditor protections, particularly given the budget's projection of administrative solvency and the Debtors' business judgment that the timeline is reasonable under the circumstances.  The Committee's reliance on *Big Lots* to justify an extended timeline is also misplaced.  That case appears to have resulted in unpaid administrative claims, an outcome that the Debtors and the Prepetition ABL Agent are determined to prevent here, within reason.  The Prepetition ABL Agent will not support a prolonged process absent clear evidence that it would generate additional value while also protecting the interests of the ABL and FILO Lenders.  No such evidence has been presented to date, and these cases continue to be funded entirely from the collateral securing the Prepetition ABL and FILO Obligations.

4.      The allegations raised by the Ad Hoc Term Loan Group lack substance.  These lenders were aware of the Debtors' financial challenges but offered no meaningful solutions.  Their sale concerns can either be addressed through appropriate modifications to the orders or dismissed entirely.  As explained below, the Prepetition ABL Agent does not intend to support the closing of any sale that includes both ABL Priority Collateral and Term Priority Collateral unless such sale complies with the Prepetition Credit Documents (including the ABL and Term Loan Intercreditor Agreement).[5]

---

[4]      The parties have been negotiating agreed forms of orders; however, those discussions remain ongoing as of the time of this filing.

[5]      The Prepetition ABL Agent remains hopeful that the parties can reach a resolution that would facilitate the sale of both the ABL Priority Collateral and the Term Priority Collateral.  The Prepetition ABL Agent has been in

5.      The Committee's and the U.S. Trustee's requests to extend the Challenge Deadline are similarly unfounded.  The Challenge Deadline is reasonable given the necessity of a short timeline and the Debtors' prior Chapter 11 proceedings, which confirmed the validity of the ABL Facility less than a year ago.  A longer Challenge Deadline will only cause further disruption, as the Prepetition ABL Agent will not consent to proceeds of the ABL Priority Collateral being used to fund wind-down expenses or other junior claims unless and until the Prepetition ABL Obligations are "Paid in Full," as defined in the Cash Collateral Order (including, for the avoidance of doubt, the expiration of the Challenge Deadline).

## **BACKGROUND**

### A.  *Prior Bankruptcy Proceedings*

6.      On March 18, 2024, the Debtors commenced their first chapter 11 proceedings with a prepackaged joint chapter 11 plan supported by a majority of stakeholders.  This included holders of 80% of the outstanding principal amount of loans under the Debtors' term loan facility, such as the Ad Hoc Term Loan Group, the Prepetition ABL Lenders, the Prepetition FILO Lenders, and the Prepetition Term Loan Lenders.  *See* Case No. 24-10418, D.I. 15.

7.      The prior chapter 11 cases were funded through a backstopped senior secured DIP-to-exit term loan facility totaling up to $142 million.  *See* Case No. 24-10418, D.I. 303.  This financing was provided by a group of prepetition secured creditors and additional financing parties, with Wilmington Savings Fund Society, FSB serving as agent (the "2024 DIP Financing").  *See id*.  This Court confirmed the joint chapter 11 plan, as amended, on April 25, 2024 (the "2024 Confirmation Order"), and the plan became effective on April 30, 2024.  *See* Case No. 24-10418, D.I. 288, 303, 318.

---

communication with all relevant parties regarding such a resolution, including counsel for the Prepetition Term Loan Agent and the Ad Hoc Term Loan Group.

8.     Under the 2024 Confirmation Order (and the plan thereunder), the 2024 DIP Financing was converted into an exit term loan facility, a majority of claims under the prepetition secured term loan were equitized, and the Debtors entered into the ABL/FILO Credit Agreement and related agreements, including the ABL and Term Loan Intercreditor Agreement. *See* 2024 Confirmation Order ¶¶ 31-34.

9.     Under the Prepetition ABL and FILO Documents, the Prepetition ABL Lenders provided the Debtors with a $500 million asset-based revolving credit facility, which included a $125 million letter of credit sublimit, while the Prepetition FILO Lenders provided a $100 million FILO loan.  The Prepetition ABL/FILO Obligations are secured by first-priority security interests and liens on the ABL Priority Collateral, as well as second-priority security interests and liens on the Term Priority Collateral.

10.     As is typical and standard in any asset-based credit facility, the ABL/FILO Credit Agreement permits the agents to implement reserves against the applicable borrowing base to limit availability, ensuring that advances under the facility remain within the agreed-upon collateral coverage formula.  As stated in the ABL/FILO Credit Agreement, "Availability Reserves" means:

> [S]uch reserves as the Administrative Agent (solely with respect to the Borrowing Base) or the FILO Documentation Agent (solely with respect to the FILO Borrowing Base) from time to time determines in its Permitted Discretion[6] as being appropriate (a) to reflect impediments to the Collateral Agent's ability to realize upon the Current Asset Collateral, (b) to reflect claims and liabilities that the Administrative Agent or the FILO Documentation Agent determines will need to be satisfied in connection with the realization upon the Current Asset Collateral, or (c) to reflect criteria, events, conditions, contingencies or risks which adversely affect any component of the Borrowing Base of the FILO Borrowing Base, the Current Asset Collateral or the validity or enforceability

---

[6]     "<u>Permitted Discretion</u>" under the ABL/FILO Credit Agreement "means a determination made by the Administrative Agent, the FILO Documentation Agent or the Collateral Agent (as applicable) in good faith in the exercise of its reasonable (from the perspective of an asset-based lender) business judgment."  ABL/FILO Credit Agreement at p. 53.

of this Agreement or the other Loan Documents or any material remedies of the Secured Parties hereunder or thereunder. . . .   The amount of any Availability Reserve established or increased by the Administrative Agent or the FILO Documentation Agent shall (i) have a reasonable relationship to the event, condition or other matter that is the basis for the Availability Reserve and (ii) be limited to such Availability Reserves and changes as (1) the Administrative Agent determines, in its Permitted Discretion, are appropriate based on the analysis of facts or events first occurring or first discovered by the Administrative Agent after the Second Restatement Date or that differ from facts or events occurring and known to the Administrative Agent on the Second Restatement Date or (2) the FILO Documentation Agent determines, in its Permitted Discretion, are appropriate based on the analysis of facts or events first occurring or first discovered by the FILO Documentation Agent after the Second Restatement Date or that differ from facts or events occurring and known to the FILO Documentation Agent on the Second Restatement Date . . . .

ABL/FILO Credit Agreement at pp. 4-5.

## B. *Events Leading to the Commencement of These Chapter 11 Cases*

11.    The Debtors emerged from the 2024 bankruptcy proceedings with a "de-levered capital structure and a comprehensive plan to reduce overhead expenses, right-size its workforce, establish competitive pricing strategies, and capitalize on JOANN's loyal customer base and steady revenue streams." First Day Declaration ¶ 58.[7]  However, as the Debtors explain, "external market headwinds across the retail industry and complications in JOANN's vendor relationships made it impossible for JOANN to service its post-emergence funded debt and continue to operate as a going concern, necessitating these Chapter 11 Cases." *Id*.  More specifically, "JOANN faced major, unforeseen inventory and re-stocking challenges that prevented JOANN from realizing the revenue projections it needed to continue as a viable going concern.  Those inventory and

---

[7]    *See Declaration of Michael Prendergast, Interim Chief Executive Officer, in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") [D.I. 5].

restocking challenges, when combined with . . . macroeconomic factors, proved insurmountable and require relief in these Chapter 11 Cases." First Day Declaration ¶ 62.

12.     By the summer of 2024, the Prepetition ABL Agent had grown concerned about the Debtors' liquidity and operational challenges and communicated the need for a comprehensive 2025 plan.  In October 2024, the Debtors began holding weekly conference calls with the Prepetition ABL Agent and the Prepetition FILO Agent to discuss the Debtors' financial position and liquidity outlook for the first quarter of 2025.  In November 2024, the Debtors provided a 2025 plan that outlined three potential paths forward, two of which projected a more than $50 million liquidity shortfall (in early 2025) and would have required a bankruptcy filing.  Based on the Debtors' projections, it became clear that, without a substantial infusion of capital, bankruptcy was a likely outcome.  Given the Prepetition ABL Agent's experience with the costs of such proceedings—particularly in light of the Debtors' 2024 bankruptcy—as well as its discussions with the Debtors regarding those costs, the Prepetition ABL Agent, pursuant to the ABL/FILO Credit Agreement, established a reserve based on its determination of the anticipated costs that would likely need to be satisfied in such proceedings.[8]

13.     As discussions continued regarding a viable path forward, the likelihood of alternative solutions diminished in the absence of significant new funding or third-party interest. During this time, the Prepetition ABL Agent received and shared with the Debtors preliminary findings from Hilco Valuation Services, LLC ("Hilco"), indicating a significant 7% increase in liquidation expenses that would reduce the net orderly liquidation value of the inventory by more than $50 million.  In response, and pursuant to the ABL/FILO Credit Agreement, the Prepetition

---

[8]     It should not be lost on the parties that the Approved Budget under the Interim Cash Collateral Order shows payment of expenses in excess of $100 million *in the interim period* without a significant paydown of the Prepetition ABL Obligations.

ABL Agent implemented a $50 million reserve, subject to adjustment upon receipt of Hilco's final appraisal and resulting modifications to the borrowing base, which had not been completed before the Petition Date.

14.    Notably, the $50 million reserve was based on Hilco's findings regarding increased liquidation expenses and did not account for the anticipated reduction in underlying sale prices for the inventory, which would further reduce the net orderly liquidation value.  Thus, once the Hilco appraisal was finalized, the borrowing base would have been reduced by more than $50 million (as the initial Hilco findings only accounted for increased expected expenses), exceeding the initial reserve implemented by the Prepetition ABL Agent.  Based on the advice of a third-party appraiser, the Prepetition ABL Agent reasonably implemented a reserve to account for forthcoming modifications to the borrowing base components.  The Debtors did not formally object to either of the reserves implemented by the Prepetition ABL Agent; rather, they and the Prepetition ABL Agent continued to work constructively toward a value maximizing process.

15.    As part of its consent to the budget and sale process, the Prepetition ABL Agent required (as is typical) that the Debtors obtain a stalking horse bid capable of paying the Prepetition ABL Obligations in full at closing from the ABL Priority Collateral.  The Debtors ultimately selected the Stalking Horse Bid, subject to a process designed to solicit higher and better offers. Based on the timeline set forth in the Bidding Procedures and the Approved Budget, the Prepetition ABL Agent consented to the use of cash collateral.

## **RESPONSE**

### A.  *The Ad Hoc Term Loan Group's Allegations are Baseless*.

16.    The Ad Hoc Preliminary Objection contains numerous unsupported and incorrect accusations.  While the Prepetition ABL Agent reserves all rights with respect to these claims, certain assertions warrant a response.

17.     *First*, it is disingenuous to assert that "these Chapter 22 cases were precipitated by, and filed for the sole benefit of Gordon Brothers and the ABL/FILO Lenders."  Ad Hoc Preliminary Objection ¶ 10.  Upon information and belief, the members of the Ad Hoc Term Loan Group (the "<u>Ad Hoc Term Lenders</u>") were fully aware of the Debtors' financial condition and need for capital (or alternative funding) at the end of 2024, yet they took no action.  Their current attempt to challenge the Prepetition ABL Agent's actions—undertaken in accordance with loan documents approved by, among others, the Ad Hoc Term Lenders[9]—to maintain the Debtors' asset-based loan within the borrowing base parameters disregards fundamental principles of asset-based lending.  Moreover, a simple review of the Approved Budget confirms that the process currently is structured as an administratively solvent case, with over $100 million in expenses set to be paid from the ABL Priority Collateral in the interim period alone.

18.     *Second*, the Ad Hoc Term Lenders devote several paragraphs to discussing a reserve implemented by the "ABL/FILO Lenders" in August 2024.  *See* Ad Hoc Preliminary Objection ¶¶ 11-13.  However, as the Reserve Notice (as defined in the Ad Hoc Preliminary Objection) makes clear, that reserve was established by the Prepetition FILO Agent, not the Prepetition ABL Agent or any of the Prepetition ABL Lenders.  The Prepetition ABL Agent takes no position on the Prepetition FILO Agent's decision to implement the August 2024 reserve, nor is it required to, as the Prepetition FILO Agent has independent rights to establish reserves under the loan documents.

19.     However, the Prepetition ABL Agent disputes the Ad Hoc Term Lenders' claim (and inaccurate quotation) that the "[*ABL/FILO Lenders'*] highly unusual and not customary or

---

[9]     The Ad Hoc Term Lenders were part of a lender group that, in the 2024 bankruptcy proceedings, provided a term loan facility later rolled into or repaid from the current Term Loan Facility upon emergence.  Each of the current underlying credit facility documents was approved by this Court with the consent of the agents and lenders in those 2024 bankruptcy proceedings.

reasonable" reserve ultimately forced the Debtors into a freefall bankruptcy where only the ABL/FILO Lenders are proposed to receive any recovery.  Ad Hoc Preliminary Objection ¶ 13 (emphasis added).  The Debtors never directed this quoted statement at any actions taken by the Prepetition ABL Agent or the Prepetition ABL Lenders, as the August 2024 reserve was not implemented by them.  Furthermore, the lenders' reserves were implemented pursuant to the loan documents *in response to external* factors that raised concerns about the company's liquidity and availability.  The Prepetition ABL Agent therefore expressly reserves all rights with respect to the Ad Hoc Term Lenders' characterization of the Debtors' statements as if they had been directed against the Prepetition ABL Agent and the Prepetition ABL Lenders.

**B.  *The Committee's Specific Objections to the Cash Collateral Order Lack Merit.***

20.    The Committee has not shown that its proposed elimination or modification of provisions in the negotiated Final Cash Collateral Order would leave the lenders adequately protected for the use of their Cash Collateral.  The protections in the Final Cash Collateral Order result from arms'-length negotiations between the Debtors and the lenders, both of which were advised by financial professionals who agreed that the lenders would be adequately protected only with the full package of protections set forth in the Final Cash Collateral Order.  The Committee offers no evidence that its proposed deletions and modifications would preserve adequate protection for the lenders—in fact, it acknowledges that these provisions are standard.  *See* Committee Objection ¶ 71.

21.    The provisions the Committee challenges, both individually and collectively, are essential to the lenders' adequate protection package *and* the timeline pursued under the Bidding Procedures.  These provisions were required by the lenders as a condition of consenting to the use of Cash Collateral and have been routinely approved by courts overseeing retail bankruptcy cases nationwide.  *See, e.g.*, *In re New Rue21 HoldCo, Inc*., Case No. 24-10939 (BLS), D.I. 310

(Bankr. Del. June 17, 2024); *In re Tupperware Brands Corp.*, Case No. 24-12156 (BLS), D.I. 384

(Bankr. Del. Nov. 11, 2024); *In re JOANN, Inc.*, Case No. 24-10418 (CTG), D.I. 224 (Bankr. Del.

Apr. 12, 2024); *In re Wheel Pros, LLC*, Case No. 24-11939 (JTD), D.I. 252 (Bankr. Del.

Oct. 15, 2024); *In re LL Flooring Holdings, Inc.*, Case No. 24-11680 (BLS), D.I. 219 (Bankr. Del.

Sept. 4, 2024). The Prepetition ABL Agent addresses the Committee's primary objections below.

> **I.    The Section 506(c) and 552(b) Waivers and Stipulations are Necessary and Appropriate.**

22.    The Committee objects to the Final Cash Collateral Order's waiver of (1) the

Debtors' ability to surcharge the lenders' collateral under section 506(c) of the Bankruptcy Code

and (2) the "equities of the case" exception under section 552(b).    Numerous courts have

recognized, however, that a section 506(c) waiver can be a fundamental component of a financing

arrangement negotiated between a debtor and its secured lenders.    Here, the lenders have agreed

to the Debtors' use of Cash Collateral to support the marketing and sale process, placing them in

the role of secured lenders entitled to such protections.    *See, e.g., In re Antico Mfg. Co., Inc.*,

31 B.R. 103, 106 n.1 (Bankr. E.D.N.Y. 1983) (noting in response to an objection to a section 506(c)

waiver, "[c]ertainly, the paragraph in question is not so detrimental or improper as to jeopardize

the loss of the entire financing package").

23.    These provisions are not only regularly included in cash collateral orders[10] but are

particularly appropriate here.    The agents and lenders have already agreed to carve-outs from their

collateral and to the ongoing payment of numerous administrative expenses, which effectively

function as an agreed surcharge.    This includes permitting the use of their Cash Collateral to fund

these proceedings, even though doing so has resulted—and will continue to result—in the

---

[10]    *See, e.g., In re New Rue21 HoldCo, Inc.*, Case No. 24-10939 (BLS), D.I. 310 (Bankr. Del. June 17, 2024); *In re SunPower Corp.*, Case No. 24-11649 (CTG), D.I. 863 (Bankr. Del. Oct. 18, 2024); *In re Lannett Co., Inc.*, Case No. 23-10559 (JKS), D.I. 230 (Bankr. Del. June 7, 2023).

depletion of their collateral.  Under these circumstances, the agents and lenders cannot accept the additional risk of further surcharges on their collateral or any impairment of the extent or validity of their liens under section 552 of the Bankruptcy Code.

**II.      Adequate Protection Liens on Unencumbered Assets are Necessary and Permitted by the Bankruptcy Code.**

24.      The Bankruptcy Code instructs that unencumbered assets as of the Petition Date should be considered when obtaining post-petition financing.  *See* 11 U.S.C. § 364(c)(2).  The same principle applies to the use of cash collateral.  When adequate protection is required for a lienholder's interest in property under section 363(e), one expressly permitted method is to grant not only replacement liens on existing collateral but also additional liens on other assets.  *See* 11 U.S.C. § 361(2).  As a result, liens on unencumbered assets have become a standard means of providing adequate protection.

25.      This approach is particularly appropriate here, where the secured parties' prepetition collateral is continuously used without replenishment.  The liens on unencumbered assets are strictly limited to protecting against any reduction in the value of the agents' and lenders' collateral as of the Petition Date.  This relief is tailored to safeguard both the agents and lenders, as well as other creditors and interested parties, all of whom benefit from the orderly sale process currently underway.

26.      The Committee disregards that the replacement liens granted under the proposed Final Cash Collateral Order apply only to the extent of any diminution in value.  *See* Interim Cash Collateral Order ¶ 4(a).  If there is no diminution in collateral value, the replacement liens secure no claim.  The Committee's argument is therefore misplaced in suggesting that proof of diminution in value must be established before replacement liens can be approved to secure against such a loss.

27.    Furthermore, as reflected in the Approved Budget, whose assumptions the Committee does not dispute, the use of the lenders' Cash Collateral reduces the lenders' available collateral. The lenders have taken on risk by funding the sale process and allowing their Cash Collateral to be used for the Debtors' operating expenses during this period, including subordination to the Carve Out.

28.    Although the Bankruptcy Code expressly recognizes that liens on unencumbered assets are an appropriate form of adequate protection, creditors' committees often object, as the Committee does here, to liens on the proceeds of chapter 5 actions. Any funds paid out before the Petition Date that are subject to avoidance or recovery by the estate almost certainly originated from the collateral or from the agents and lenders. If those funds are recovered, it is logical that they should first be used to make the lenders whole.

29.    The Committee also objects to the Cash Collateral Order's provision stating that "[u]pon entry of the [Final Cash Collateral Order], and subject to approval by this Court therein, none of the Prepetition Secured Creditors shall be subject to the equitable doctrine of 'marshaling' or any other similar doctrine with respect to any of the Postpetition Collateral or Prepetition Collateral." Interim Cash Collateral Order ¶ 23. The doctrine of marshaling allows a court to require a senior secured creditor to satisfy its claim first from property of the debtor in which a junior secured creditor lacks an interest, thereby protecting the junior secured creditor's interest in property subject to both senior and junior secured claims. *See In re Tampa Chain Co., Inc.*, 53 B.R. 772, 777 (Bankr. S.D.N.Y. 1985). Only a secured creditor can invoke the doctrine of marshaling. *See Galey & Lord, Inc. v. Arley Corp. (In re Arlco, Inc.)*, 239 B.R. 261, 274 (Bankr. S.D.N.Y. 1999) (holding that unsecured creditors have no right to invoke the doctrine of

- 13 -

marshaling).  Because the Committee represents unsecured creditors, and marshaling applies exclusively to secured parties, this doctrine has no bearing on the Committee or its interests.

<b>III.      The Challenge Deadline is Reasonable Under the Circumstances.</b>

30.      Given the necessity of a short timeline—driven by the Approved Budget, collateral coverage, and the conditions to closing under the Stalking Horse Agreement—and the likelihood that any potential buyer of the Debtors' assets will require a release of the Prepetition ABL Agent's lien on the collateral being sold, the Prepetition ABL Agent cannot allow the sale of its collateral and the funding of all wind-down amounts and junior claims before the lenders have been Paid in Full (as defined in the Cash Collateral Order).  If the Challenge Period were to extend beyond the sale closing date, the Prepetition ABL Obligation would not be considered "Paid in Full" under the Final Cash Collateral Order.  As a result, the Prepetition ABL Agent would need to either withhold consent to the sale, require that no junior claims (and only necessary and consented-to expenses) are paid until the Prepetition ABL Obligations have been fully satisfied, or demand a significant reserve to indemnify and protect the Prepetition ABL Agent and the lenders from any potential claims or other indemnity costs that remain, until determined otherwise by this Court, fully secured obligations under the ABL Facility.

31.      In short, under the existing Stalking Horse Agreement, the Prepetition ABL Agent would require, at a minimum, that the "Wind-Down Payments" and the "Wind-Down Budget" be expressly escrowed for the benefit of, and subject to the liens and claims of, the Prepetition ABL and FILO Obligations (subject to the Prepetition Credit Documents, as applicable).  Without such an escrow or indemnity reserve, the Prepetition ABL Obligations (including indemnity obligations and expenses related to defending against any potential claims) would be left without any source of repayment notwithstanding the fact that those potential claims or challenges are unlikely to be

successful—an oversecured creditor should not be left with outstanding obligations after an *unsuccessful* challenge while junior claims are paid from the oversecured creditor's collateral.

32.    The Prepetition ABL Agent recognizes the time constraints the Committee faces. However, the ABL Facility, along with its liens and collateral package, was approved by the Court less than a year ago, and there have been no allegations that the Prepetition ABL Agent acted outside its rights under the ABL/FILO Credit Agreement.  The Prepetition ABL Agent has already produced documents in response to the Committee's discovery requests and has sat for a deposition.  To date, the Committee has not identified any colorable claims or causes of action requiring extensive investigation.

33.    If the Challenge Period is not shortened as set forth in the proposed Final Cash Collateral Order, the Prepetition ABL Agent, as things currently stand, will not consent to the sale and release of its liens or to the use of proceeds from its priority collateral unless the Prepetition ABL Obligations have been Paid in Full at closing or the Prepetition ABL Agent has otherwise given its consent.

34.    The remainder of the Committee's objections can be resolved.  The Prepetition ABL Agent does not object to the Committee's request that the releases in the Final Cash Collateral Order be limited to the agents and lenders "solely in their capacities as such."  The Prepetition ABL Agent also generally agrees that adequate protection payments made to the agents and lenders could be subject to disgorgement *if* the Court determines such a result is appropriate.  As discussed at the first-day hearing, there is no need at this stage to determine the outcome of a hypothetical challenge, and the Prepetition ABL Agent is not limiting (nor does the order contain language limiting) the Court's ability to determine an appropriate remedy in the event of a successful challenge.  Additionally, the Prepetition ABL Agent has no objection to the Committee having

consultation rights (but not consent rights) over the Approved Budget and receiving notice of any updates or modifications.

C. *The Bid Procedures are Appropriate.*

35.    The necessity of the proposed timeline, as well as the purchase price and any potential adjustments due to fluctuations in inventory or expenses, is driven by collateral value—not by any arbitrary constraints, as the Committee and the Ad Hoc Term Lenders suggest.  The Prepetition ABL Agent strongly preferred for the Debtors to enter these proceedings with *any* stalking horse agreement in place, as securing a baseline bid provides greater confidence in cash collateral budget discussions.  This, in turn, allows for certain payments to junior creditors ahead of senior secured lenders, as is the case here.  To that end, the Debtors successfully obtained a stalking horse agreement that satisfies the senior secured lenders and is also currently expected to maintain the estate's administrative solvency.

36.    This timeline is not unusual in retail cases where an extended timeline can decrease values for all creditors.  The bid deadline is set 28 days from the Petition Date, with a sale hearing scheduled two to nine days later.  *See In re New Rue21 Holdco, Inc., et al.*, Case No. 24-10939 (Bankr. D. Del. May 23, 2024) (BLS), D.I. 194 at p.13 (bid deadline set 26 days from the petition date, with the sale hearing 28 days from the petition date); *In re Brooks Bros. Grp., Inc., et al.*, Case No. 20-11785 (Bankr. D. Del. Aug. 3, 2020) (CSS), D.I. 285 at ¶¶ 8, 20 (bid deadline 29 days from the petition date, with the sale hearing 37 days from the petition date); *In re Charlotte Russe Holding, Inc., et al.*, Case No. 19-10210 (Bankr. D. Del. Feb. 21, 2019) (LSS), D.I. 199 at ¶¶ 7, 15 (bid deadline 28 days from the petition date, with the sale hearing 31 days from the petition date).

37.    Likewise, the Ad Hoc Term Loan Group's claim that a breach of the ABL and Term Loan Intercreditor Agreement has occurred (or will occur) is incorrect.  The Prepetition ABL Agent does not dispute that under section 6.4 of the Intercreditor Agreement, if a sale includes

both "ABL Priority Collateral and Term Priority Collateral," then "either [the Prepetition ABL Agent or the Prepetition Term Loan Agent] may apply to the court in such Insolvency Proceeding to make a determination of such allocation, and the court's determination shall be binding upon the [Prepetition ABL Agent and the Prepetition Term Loan Agent]."  Glenn Declaration, Ex. 4, Intercreditor Agreement § 6.4.[11]  However, while the Debtors currently are seeking approval of the stalking horse agreement, any formal allocation request remains premature unless and until a sale including both ABL Priority Collateral and Term Priority Collateral is approved (or perhaps up for approval).  Nonetheless, the parties have been engaged in discussions to resolve potential allocation issues before the sale hearing or even prior to the approval of the stalking horse bidder.

38.    If those discussions do not result in a resolution and a sale goes forward involving both ABL Priority Collateral and Term Priority Collateral, the Prepetition ABL Agent will honor its obligations under the Intercreditor Agreement.[12]  The Ad Hoc Term Lenders suggest that no good faith negotiations have taken place.  *See* Ad Hoc Preliminary Objection ¶¶ 31-32.  The Prepetition ABL Agent disagrees with this assertion.  Nevertheless, to the extent the Debtors seek approval of a sale or sales involving ABL Priority Collateral and Term Priority Collateral, the

---

[11]    *See Declaration of Andrew K. Glenn in Support of the Preliminary Omnibus Objection of the Ad Hoc Term Loan Group to the Debtors' (I) Bidding Procedures Motion and (II) Cash Collateral Motion* (the "Glenn Declaration") [D.I. 336].

[12]    Because any Intercreditor Agreement issues are premature, the Prepetition ABL Agent will not respond in full to the remainder of the Ad Hoc Term Lenders' incorrect interpretation of other provisions of the Intercreditor Agreement at this time.  However, the Prepetition ABL Agent notes that (i) the reference to section 4.1(d)'s "commercially reasonable" requirement is misplaced, as the current proposed sale is not "by the Secured Party," and, in any event, it is unlikely that a bankruptcy court-approved sale could be deemed not "commercially reasonable," and (ii) assuming section 3.6(b) is currently applicable, the Prepetition ABL Agent is not aware of any request to "cooperate with the Term Secured Parties and/or the Term Agent in connection with any efforts made by the Term Secured Parties and/or the Term Agent to sell the Term Priority Collateral."

Prepetition ABL Agent agrees that any such sale(s) must be in accordance with the terms of the Prepetition Credit Documents, including the Intercreditor Agreement.[13]

**D.  *The U.S. Trustee's Objections to the Cash Collateral Order Lack Merit.***

39.    The U.S. Trustee objects to entry of the Final Cash Collateral Order, arguing that the Challenge Deadline violates Local Rule 4001-2(a)(i)(Q), which requires "at least seventy-five (75) days from the entry of the initial interim [financing] order" for parties to investigate and commence Challenges.  U.S. Trustee Objection ¶ 75.  However, as discussed in Section B.III, *supra*, the Challenge Deadline set forth in the Interim Cash Collateral Order is justified under the circumstances.  DEL. BANKR. L.R. 1001-1(d).

40.    The U.S. Trustee also contends that the Cash Collateral Motion violates Local Rule 4001-2(a) because the Interim Cash Collateral Order incorporates the Debtors' prepetition financing documents, which have not been made part of the record in these chapter 11 cases.  *See* U.S. Trustee Objection ¶ 75, n. 8.  However, the ABL/FILO Credit Agreement was docketed at D.I. 290 and approved by this Court in the 2024 bankruptcy proceedings.  *See* Case No. 24-10418, D.I. 290, 303.  Additionally, the Prepetition ABL Agent has no objection to the Debtors providing copies of the Prepetition Credit Documents to any creditor upon reasonable written request, subject to confidentiality terms agreed upon by the lenders.

---

[13]    Likewise, the Prepetition ABL Agent takes no issue with the Prepetition Term Loan Agent (or the lenders) credit bidding—so long as the credit bid is consistent with and in accordance with the Prepetition Credit Documents, including the Intercreditor Agreement.

Dated: February 13, 2025           Respectfully submitted,
      Wilmington, DE

By:    */s/ Jason D. Angelo*
          Kurt F. Gwynne (No. 3951)
          Jason D. Angelo (No. 6009)
          **REED SMITH LLP**
          1201 N. Market Street, Suite 1500
          Wilmington, DE 19801
          Telephone: +1.302.778.7500
          Facsimile:  +1.302.778.7575
          Email:  kgwynne@reedsmith.com
                jangelo@reedsmith.com

          -and-

          Andrew J. Gallo (admitted *pro hac vice*)
          Christopher L. Carter (admitted *pro hac vice*)
          Nathaniel P. Bruhn (admitted *pro hac vice*)
          David K. Shim (admitted *pro hac vice*)
          **MORGAN, LEWIS & BOCKIUS LLP**
          One Federal Street
          Boston, MA 02110-1726
          Telephone: +1.617.341.7700
          Facsimile:  +1.617.341.7701
          Email:  andrew.gallo@morganlewis.com
                christopher.carter@morganlewis.com
                nathaniel.bruhn@morganlewis.com
                david.shim@morganlewis.com

          *Counsel to Bank of America, N.A., as Prepetition ABL Agent*