**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| JOANN INC., *et al.*, | Case No. 25-10068 (CTG) |
| Debtors.[1] | (Jointly Administered) |
| | **Re: Docket Nos. 285, 305, 323, 335, 338** |

**OMNIBUS REPLY OF 1903P LOAN AGENT, LLC,**
**AS FILO AGENT, TO OBJECTIONS TO THE**
**CASH COLLATERAL MOTION AND THE BIDDING PROCEDURES MOTION**

1903P Loan Agent, LLC ("1903P" or the "FILO Agent"), in its capacity as FILO Documentation Agent under the above-captioned Debtors' prepetition senior secured first in, last out term loan facility (the "FILO Facility"),[2] hereby files this omnibus reply (this "Reply") to: (i) the *United States Trustee's Omnibus Objection to: (1) Motion of Debtors for Entry of an Order, inter alia, Approving Bidding Procedures and Scheduling Certain Dates and Deadlines With Respect Thereto; (2) Motion of Debtors for Entry of Interim and Final Orders, inter alia, Authorizing the Debtors to Use Cash Collateral; and (3) Motion of Debtors for Entry of an Order, inter alia, Extending Time to File Certain Bankruptcy Schedules and Statements* [Dkt. No. 285]

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: JOANN Inc. (5540); Needle Holdings LLC (3814); Jo-Ann Stores, LLC (0629); Creative Tech Solutions LLC (6734); Creativebug, LLC (3208); WeaveUp, Inc. (5633); JAS Aviation, LLC (9570); joann.com, LLC (1594); JOANN Ditto Holdings Inc. (9652); Dittopatterns LLC (0452); JOANN Holdings 1, LLC (9030); JOANN Holdings 2, LLC (6408); and Jo-Ann Stores Support Center, Inc. (5027). The Debtors' mailing address is 5555 Darrow Road, Hudson, Ohio 44236.

[2] As detailed in the Objections (as defined herein), the Debtors entered into the $100 million FILO Facility as an amendment to the $500 million senior secured asset-based revolving loan facility (the "ABL Facility") with Bank of America, N.A., as administrative agent (the "ABL Agent"). Both the ABL Facility and the FILO Facility are documented by that certain Second Amended and Restated Credit Agreement, dated as of April 30, 2024 (as amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time and in effect immediately prior to the Petition Date, the "ABL/FILO Credit Agreement"), pursuant to which the Debtors obtained exit financing in connection with their prior chapter 11 bankruptcy cases before this Court (the "Prior Bankruptcy Cases").

(the "U.S. Trustee's Objection") filed by the United States Trustee for Region Three (the "U.S. Trustee"); (ii) the *Preliminary Omnibus Objection of the Ad Hoc Term Loan Group to the Debtors' (I) Bidding Procedures Motion and (II) Cash Collateral Motion* [Dkt. No. 335] (together with the joinders filed thereto,[3] collectively, the "Ad Hoc Term Loan Group Objection") filed by the certain Term Lenders signatory thereto (the "Ad Hoc Term Loan Group") and the Joinder Parties, and (iii) the *Omnibus Objection of the Official Committee of Unsecured Creditors to Debtors' Motions (I) for Entry of an Order Approving Bidding Procedures and Stalking Horse Agreement; and (II) for Entry of a Final Order Authorizing the Use of Cash Collateral* [Dkt. No. 338] (the "Committee Objection" and, together with the U.S. Trustee Objection and the Ad Hoc Term Loan Group Objection, collectively, the "Objections"),[4] filed by the Official Committee of Unsecured Creditors (the "Committee" and, together with the U.S. Trustee, the Ad Hoc Term Loan Group, and the Joinder Parties, collectively, the "Objectors").

The FILO Agent is filing this Reply without the benefit of having received and reviewed the supplemental objections that presumably will be filed by the Committee and the Ad Hoc Term Loan Group to incorporate discovery voluntarily provided by the FILO Agent on an expedited basis. Additionally, the FILO Agent is engaged in active discussions with the Committee, the Ad Hoc Term Loan Group, and the Debtors, which the FILO Agent is optimistic will result in a consensual resolution. However, the FILO Agent files this Reply to correct the false narrative

---

[3]    *Wilmington Savings Fund Society, FSB's Joinder to Preliminary Omnibus Objection of the Ad Hoc Term Loan Group to the Debtors' (I) Bidding Procedures Motion and (II) Cash Collateral Motion* [Dkt. No. 305], filed by Wilmington Savings Fund Society ("WSFS"); *Joinder to Preliminary Omnibus Objection of the Ad Hoc Term Loan Group to the Debtors' (I) Bidding Procedures Motion and (II) Cash Collateral Motion* [Dkt. No. 323], filed by Orchard Yarn and Thread Company Inc. d/b/a Lion Brand Yarn Company ("Lion Brand" and, together with WSFS, collectively, the "Joinder Parties").

[4]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Objections, as applicable.

12531532

constructed by the Committee and the Ad Hoc Term Loan Group.[5]  Because the Objections are built around this false narrative and contrary to the substantial evidence, they are meritless and should be rejected.  In support of this Reply, the FILO Agent respectfully states as follows:

## REPLY

1.      Nine months after emerging from the Prior Bankruptcy Cases, the Debtors once again sought chapter 11 relief after unresolved business issues, combined with significant vendor defections and "the prolonged impact of an excessively sluggish retail economy", put their business on a path of sharp decline.[6]  In the Debtors' business judgment, "the unfortunate reality is that the inventory challenges did irreparable harm to JOANN's ability to service its restructured funded debt."[7]

2.      The Committee and the Ad Hoc Term Loan Group refuse to accept this reality and have instead sought to proffer an alternate narrative that would allow them to extract undue value from the ABL/FILO Lenders.  They emphasize that the FILO Agent is affiliated with the same corporate group as the Stalking Horse Bidder, Gordon Brothers Retail Partners, LLP ("GBRP").  But that observation is legally irrelevant, because this Court has repeatedly recognized there is nothing improper about affiliated lenders and liquidators working on the same cases.  *See, e.g., In re Brookstone Holdings Corp.*, 592 B.R. 27, 31 (Bankr. D. Del. 2018); *In re Christmas Tree Shops, LLC*, No. 23-10576 (TMH) (Bankr. D. Del. May 31, 2023).

---

[5]     This Reply is not a comprehensive response to all objections filed to the Cash Collateral Motion or Bidding Procedures Motion (as defined herein).  The FILO Agent does not concede any points to which it does not directly respond, and it expressly reserves all of its rights with respect to the Objectors' allegations.

[6]     *See Declaration of Michael Prendergast, Interim Chief Executive Officer, In Support of Chapter 11 Petitions and First Day Motions* [Dkt. No. 5] (the "First Day Declaration") at ¶¶ 7–10.

[7]     *Id.* at ¶ 9.

12531532

3.     The Committee and the Ad Hoc Term Loan Group now speculate that the second bankruptcy was the result of a sinister plot by the FILO Agent to weaponize an availability reserve to drive the business into the arms of GBRP.  The facts — including the sworn evidence submitted by the Debtors explaining the reasons for their dismal financial performance and the filing of these cases — bely their story.  Indeed, the only reserve imposed by the FILO Agent (the "<u>FILO Availability Reserve</u>") was based on the FILO Agent's reasonable business judgment and pursuant to its Permitted Discretion[8] under the express terms of the ABL/FILO Credit Agreement.  The FILO Availability Reserve was a $10 million reserve implemented nearly half a year prior to the Petition Date, and was a fraction of the reserve that the FILO Agent could have established based on the substantial justifications cited to the Debtors in support of the reserve before it was actually implemented in September 2024.  Months later, in December 2024, the ABL Agent exercised its own Permitted Discretion to impose two additional reserves of $30 million and $50 million.

4.     The ABL/FILO Lenders each voluntarily provided substantial document discovery and a corporate witness to testify about numerous broad topics identified by the Committee and the Ad Hoc Term Loan Group on a significantly expedited basis.  Indeed, the FILO Agent produced (i) its completed document production to both parties on Sunday, February 2 – days before the Committee even served its document requests – and (ii) its witness on Friday, February 7 – the date requested by both the Committee and the Ad Hoc Term Loan Group.  The FILO Agent's production includes all non-privileged documents concerning the Debtors, the availability reserves, and communications between the FILO Agent and GBRP.  As detailed further herein, in light of the 1903P and other relevant parties' expedited production in response to the Committee's

---

[8]     "Permitted Discretion" is defined in the ABL/FILO Credit Agreement as "a determination made by the Administrative Agent, the FILO Documentation Agent or the Collateral Agent (as applicable) in good faith in the exercise of its reasonable (from the perspective of an asset-based lender) business judgment."

and the Ad Hoc Term Loan Group's discovery requests, an extension of the Challenge Deadline is wholly unnecessary.

5.          Although the Committee and the Ad Hoc Term Loan Group focus on discovery confirming that the Debtors' representatives disagreed with the justifications for imposing all three reserves,[9] that unsurprising revelation is not evidence of improper conduct by the ABL/FILO Lenders.  The FILO Agent's substantial justifications for imposing the FILO Availability Reserve were provided to the Debtors back in August and September of 2024 (before the FILO Availability Reserve was actually implemented), and they are summarized below.  Against the backdrop of this chapter 22 filing and the evidence offered by the Debtors (and every other party), there can be no serious argument that the FILO Availability Reserve is what precipitated this bankruptcy.

6.          In contrast, the FILO Availability Reserve, as well as the two reserves subsequently imposed by the ABL Agent, have allowed these bankruptcy cases to be funded solely by the use of the ABL/FILO Lenders' cash collateral.  To protect their secured interests in their collateral in the face of its ongoing diminution in value, the ABL/FILO Lenders negotiated necessary protections, including the Proposed Timeline (as defined herein).   These protections are appropriate and should be approved.

> **I.     Implementation of the FILO Availability Reserve Was Proper Under the ABL/FILO Credit Agreement and Represented a Conservative Response to the Debtors' Prepetition Circumstances.**

7.          To aid this Court in evaluating the facts and circumstances discussed herein, the FILO Agent has attached hereto the following Exhibits:

- **Exhibit A** is the Notice of Availability Reserve sent by the FILO Agent to the Debtors on August 16, 2024.

---

[9] ███████████████

12531532

- **Exhibit B** is an email and an attachment sent to the Debtors by the FILO Agent's representatives on August 30, 2024 summarizing the reasons for imposing the FILO Availability Reserve.
- **Exhibit C** is the reserve correction notice sent by the FILO Agent to the Debtors on September 6, 2024, after the Debtors' calculation of the FILO Borrowing Base did not implement the FILO Availability Reserve (the "Reserve Correction Notice").
- **Exhibit D** is the detailed letter sent by the FILO Agent to the Debtors on September 13, 2024, further documenting the basis for implementation of the FILO Availability Reserve.
- **Exhibit E** (filed under seal) is the relevant portion of the deposition transcript of Kyle B. Shonak, the corporate representative of the FILO Agent, taken on February 7, 2025.
- **Exhibit F** (filed under seal) is the relevant portion of the deposition transcript of Ryan T. Kielty, the corporate representative of Centerview Partners (investment banker to the Debtors), taken on February 7, 2025.
- **Exhibit G** (filed under seal) is the relevant portion of the deposition transcript of Jeffrey Dwyer, the Debtors' Interim Chief Financial Officer, taken on February 8, 2025.
- **Exhibit H** (filed under seal) is the relevant portion of the deposition transcript of Jennifer Cann, the corporate representative of the ABL Agent, taken on February 10, 2025.

8.    These documents alone — which recite the justifications supporting the FILO Agent's exercise of its Permitted Discretion in imposing the FILO Availability Reserve and refer to calls during which the FILO Agent discussed these issues with the Debtors and their representatives before the FILO Availability Reserve was implemented in early September — refute the arguments advanced by the Committee and the Ad Hoc Term Loan Group that the FILO Agent acted in bad faith and in violation of the ABL/FILO Credit Agreement in imposing the $10 million reserve.  Indeed, the only evidence offered in support of these assertions is a series of letters sent by the Debtors explaining why they disagreed with the justifications provided by the FILO Agent.  But the ABL/FILO Credit Agreement does not require the Debtors to agree with the implementation of the FILO Availability Reserve, and evidence of their disagreement is not evidence of improper conduct by the FILO Agent.

9.    Contrary to the Committee's assertion that the Debtors emerged from the Prior Bankruptcy Cases "poised for success," almost immediately upon emergence from the Prior

12531532

Bankruptcy Cases, the Debtors significantly underperformed relative to their business plan. In the months following their emergence, the Debtors missed sales and cash receipts forecasts on a weekly basis, failed to secure improved trade terms from vendors on the projected timeline, and suffered adverse conditions related to inventory levels and mix, which contributed to lagging sales.[10]

10.     For example, as of July 2024 month-end, the Debtors' fiscal year to date adjusted EBITDA was $71.1 million below the level projected in their post-restructuring business plan ($-47.6 million actual, versus $23.6 million plan).[11] The Debtors' three-month year-over-year sales trend had decreased 9.9% and continued to trend downward.[12] Contrary to the insinuations made by the Committee and the Ad Hoc Term Loan Group during depositions, the FILO Agent did not impose the FILO Availability Reserve solely because the Debtors habitually under-performed their never-ending amended business projections. Instead, this lower-than-expected financial performance impaired the net orderly liquidation value ("NOLV") of the Debtors' inventory, which significantly threatened the FILO Lenders' recovery in a downside scenario.[13]

11.     In addition, the FILO Agent soon uncovered irregularities with respect to the Debtors' financial reporting. The FILO Agent conducted a physical inventory count at a sample set of the Debtors' stores and determined that the Debtors had materially underestimated the ongoing level of inventory "shrink" (which refers to a negative discrepancy between the recorded amount of inventory and the actual amount on hand, caused by factors like theft, damage, or

---

[10]     *See* **Exhibit A** at -507.

[11]     *See* **Exhibit D** at -968.

[12]     *See id.* at -969; **Exhibit B** at -715.

[13]     *See* **Exhibit B** at 716-717; **Exhibit A** at -507.

12531532

administrative errors).[14]   The Debtors calculated shrink at 1.4% using a historical percentage of sales method, while the result of the FILO Agent's analysis concluded that actual shrink averaged approximately 2.7%.[15]

12.     Based on the combination of (i) overestimated NOLV and (ii) higher-than-reported shrink, as of August 2024, the FILO Agent concluded in its reasonable business judgment that the Debtors had overstated the FILO Borrowing Base (as defined in the ABL/FILO Credit Agreement) by approximately $25.4 million.[16]   The FILO Borrowing Base is critical because it determines the amount that the Debtors may borrow from the FILO Lenders.   If the FILO Borrowing Base is overstated by a certain amount and the FILO Lenders continue to lend against it, they are essentially lending "naked" (unsecured by collateral) on the overstated portion.

13.     The overstatement of the FILO Borrowing Base thus posed a serious risk to the FILO Agent.   Hence, after carefully analyzing the Debtors' material deterioration in financial performance, inventory challenges, and other issues, on August 16, 2024, the FILO Agent notified the Debtors and the ABL Agent of the establishment of the $10 million FILO Availability Reserve against the FILO Borrowing Base.[17]

14.     The FILO Agent determined that the FILO Availability Reserve was appropriate (i) "to reflect the impediments to the [FILO Agent's] ability to realize upon [its collateral]" and/or (ii) "to reflect criteria, events, conditions, contingencies or risks which adversely affect any

---

[14]     *See* **Exhibit B** at -716, -718; **Exhibit D** at -969.

[15]     *See* **Exhibit D** at -969.

[16]     *See id.* (noting $17 million overstatement of the FILO Borrowing Base due to overestimation of NOLV, and $8.5 million overstatement of the FILO Borrowing Base due to underestimation of shrink); **Exhibit B** at -716.

[17]     *See* **Exhibit A** at -507.

- 8 -

component of the Borrowing Base or the FILO Borrowing Base, [or] [the FILO Agent's collateral]."[18]  This was well within the FILO Agent's "Permitted Discretion."[19]

15.    The Ad Hoc Term Loan Group alleges that the FILO Agent "did not provide any evidence, backup or support" tying the FILO Availability Reserve to the Debtors' deteriorating financial conditions.[20]  To the contrary, the FILO Agent undertook in-depth analyses of the financial and operating conditions of the Debtors' stores.[21]  As a result of these analyses, the FILO Agent concluded that it was contractually entitled to implement a reserve of *$25.4 million* (the amount by which the FILO Borrowing Base was overstated).[22]  However, the FILO Agent exercised its Permitted Discretion to implement the FILO Availability Reserve only in the amount of $10 million.  The FILO Availability Reserve thus represented an effort to minimize disruption to the Debtors' operations while protecting the FILO Lenders' interest in their collateral.

16.    The Ad Hoc Term Loan Group makes much of the fact that the Debtors believed the FILO Availability Reserve could harm the Debtors' liquidity position.[23]  However, Jeffrey Dwyer (the Debtors' Interim Chief Financial Officer) testified ███████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

---

[18]    See ABL/FILO Credit Agreement at 4–5 (definition of "Availability Reserves").

[19]    *Id.* at 53.

[20]    Ad Hoc Term Loan Group Objection at ¶ 12(ii).

[21]    See **Exhibit D** at -968 (explaining that, since the Debtors' emergence from the Prior Bankruptcy Cases, the FILO Agent had (i) tracked financials and collateral levels to various projections, including the monthly business plan dated March 12, 2024, and other weekly forecasts; (ii) conducted monthly store visits to visually inspect items, such as potential holes in inventory in-stocks, foot traffic, staffing, overall store conditions, etc.; and (iii) observed recent test counts at a sample set of five stores).

[22]    *See id.*; █████████████████████████████████
████████

[23]    *See* Ad Hoc Term Loan Group Objection at ¶ 12.

12531532

██████████ [24] ████████████████████████████████████████████████████

████████████████████

17.     The FILO Agent's analyses did not show that the FILO Availability Reserve would cause the Debtors to default on any of the covenants in the ABL/FILO Credit Agreement.[25]  More fundamentally, the potential for a reserve to constrain a company's liquidity position does not mean that a secured lender is not contractually entitled to implement a reserve.  If this were the case, secured lenders would ***never*** be entitled to implement reserves prior to exercising more drastic enforcement remedies.  As the representative of the FILO Lenders — who face the greatest risk of deterioration of the Debtors' inventory due to their junior position in the Debtors' capital stack as compared to the ABL Lenders — it was the FILO Agent's obligation to protect the interests of the FILO Lenders via implementation of the FILO Availability Reserve.  The fact that the ABL Agent chose not to implement a reserve at the time the FILO Agent implemented the FILO Availability Reserve is not evidence of improper conduct by the FILO Agent, particularly considering the ABL Lenders' superior position relative to the FILO Lenders.

18.     When viewed in context based on the evidence, the Committee's and Ad Hoc Term Loan Group's allegations that the FILO Availability Reserve "crippled the Debtors," and that the FILO Agent and GBRP "[collaborated] to compel a liquidation for their own benefit to the direct detriment of creditors," do not hold up.[26]  The FILO Agent worked to ensure the Debtors were given every opportunity to succeed and maximize the value of their business enterprise.  To that end, the FILO Agent diligently engaged with the Debtors and their advisors, including by requesting to meet with the Debtors' management and advisors to discuss in even more detail the

---

[24]     **Exhibit G** at 127:3–17; *see also id.* at 125:20–22, 126:1–10, 130:13–19.

[25]     ████████████████████████████

[26]     *See* Committee Objection at ¶¶ 48–49; Ad Hoc Term Loan Group Objection at ¶ 10.

12531532

issues raised by the FILO Agent.[27]  The Debtors declined to meet with the FILO Agent until September 25, 2024 — weeks after implementation of the FILO Availability Reserve following the issuance of the Reserve Correction Notice on September 6.[28]

19.    The FILO Availability Reserve, implemented months before the Petition Date, did not force the Debtors into its second chapter 11 cases, nor could it have.  Mr. Dwyer testified that ███████████████████████████████████████████████████████████[29]  He also testified that ████████████████████████████████████████████████████████

████████████████████████████████████████████████[30] ████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████[31]

20.    Additionally, Jennifer Cann, as corporate representative of the ABL Agent, testified that ██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████[32]

21.    Grasping at straws, the Debtors, at the time, and the Ad Hoc Term Loan Group, █ ████████████████████, have suggested that the FILO Agent did not properly consult with the ABL Agent prior to sending the August 16, 2024 notice regarding the FILO Availability Reserve.

---

[27]    *See* **Exhibit D** at -970–971.

[28]    *See id.*

[29]    *See* **Exhibit G** at 60:16–22, 61:1–9.

[30]    *See id.* at 131:8–15 (█████████████████████████████████████████ █████████████); 132:5–22, 133:1–2.

[31]    *See id.*; *see also* **Exhibit F** at 30:13–25, 31:1–17.

[32]    *See* **Exhibit H** at 136:19–22, 137:1–3.

12531532

That suggestion is incorrect and irrelevant. 

[33] In any case, there is no dispute that

.[34]

22.      The Debtors have almost $600 million in funded debt.[35]  The $10 million FILO Availability Reserve did not "make or break" the Debtors' ability to run their business.  As extensively discussed in the First Day Declaration, these bankruptcy cases are the result of a confluence of factors, including macroeconomic headwinds and a stagnant retail economy, vendor uncertainty, and supply chain issues that precipitated in-stock inventory to plummet to the lowest levels the Debtors had experienced in over a decade.[36]  The FILO Availability Reserve was simply a prudent response to these issues.  It was not intended to, nor did it, force an otherwise unnecessary bankruptcy filing.

## II.    1903P's Status as a Proposed Consultation Party Is a Standard and Necessary Arrangement and Creates No Conflict of Interest.

23.      The Objectors argue that GBRP and 1903P, as affiliated entities, colluded to force the sale of the Debtors' assets to GBRP and shield the Stalking Horse Bid from competition.[37]  This is a fanciful story untethered from reality.

---

[33]    **Exhibit C** at -869; **Exhibit H** at 135:20–136:5.

[34]    **Exhibit C** at -869–70; **Exhibit H** at 136:8–14.

[35]    *See* First Day Declaration at ¶ 44.

[36]    *See id.* at ¶¶ 59–69.

[37]    *See* Committee Objection at ¶¶ 46, 73; U.S. Trustee Objection at ¶ 63; Ad Hoc Term Loan Group Objection at ¶ 27.

12531532

24.     As a gatekeeping item, Mr. Dwyer testified that ███████████████

████████████████████████████████████████████████████████████

████████████████████████████████████.[38]

25.     Additionally, GBRP and 1903P are wholly separate and distinct entities that operate independent business units and are subject to independent contractual arrangements.  Throughout the negotiation of the Stalking Horse Bid, GBRP and 1903P were represented by separate outside counsel and the primary day-to-day activities of each entity were performed by different employees.  The Objectors highlight the fact that GBRP and 1903P are affiliates.  But that alone does not suggest wrongdoing.  To the contrary, it is commonplace for this Court and other bankruptcy courts to approve arrangements whereby affiliated entities hold separate roles in the same chapter 11 case.

26.     In *In re Brookstone Holdings Corp.*, the Bankruptcy Court for the District of Delaware noted that affiliates of a liquidating consultant "might be called upon or invited to play other roles in the case as circumstances may require," including, for the avoidance of doubt, "buying estate assets or even serving as a lender."  592 B.R. 27, 31 (Bankr. D. Del. 2018).  Other courts have consistently found that debtors are permitted to engage store closing liquidators, even where affiliates of those liquidators are involved in the same case.  *See, e.g.*, *In re Sam Ash Music Corp.*, No. 24-14727 (SLM) (Bankr. D.N.J. June 5, 2024) (overruling an objection of the U.S. Trustee asserting that the store closing consultant's connection to the DIP Lender was disqualifying); *In re Christmas Tree Shops, LLC*, No. 23-10576 (TMH) (Bankr. D. Del. May 31, 2023) (approving the assumption of a store closing agreement where the liquidator's affiliates occupied the roles of prepetition lender, DIP lender, consignor of inventory and a potential stalking

---

[38]     *See* **Exhibit G** at 136:22–137:7, 138:8–14.

horse bidder); *In re Christopher & Banks Corp.*, No. 21-10269 (ABA) (Bankr. D.N.J. Feb. 8, 2021) (overruling an objection of the U.S. Trustee asserting that the store closing consultant's connections to certain affiliates acting as secured creditors and the stalking horse bidder was disqualifying).  The Objectors do not, and cannot, explain why this common and court-endorsed practice is inappropriate here.

27.     Nor does information sharing between GBRP and 1903P present any special cause for alarm.  Any secured lender and liquidator would share certain information, whether the secured lender and liquidator were affiliated or not.  For example, secured lenders often engage closely with liquidators when a borrower's financial performance or the value of its working capital assets is deteriorating.  This dialogue allows the secured lender to more precisely understand the likely outcome in a liquidation (including timing considerations) so it can protect its collateral value while giving the borrower as much flexibility as possible to evaluate restructuring options.

28.     Finally, with respect to 1903P's status as a Consultation Party pursuant to the proposed Bidding Procedures, the Objectors conflate the terms "consultation" and "consent." Contrary to the Objectors' assertions, 1903P lacks any ability to "block and tackle for the Stalking Horse Bidder in the evaluation of competing bids and facilitation of an Auction."[39]  As in nearly every bankruptcy case, as the agent of certain senior secured parties, 1903P has an obligation to its lenders to ensure that the value of the Debtors' assets is maximized in any sale; thus, it is necessary for the FILO Agent to have the opportunity to consult with the Debtors throughout the sale process.  However, 1903P has no "veto."[40]  It is ***not*** entitled to instruct the Debtors to reject a bid that offers the highest and best offer for the Debtors' assets — nor would it align with 1903P's

---

[39]     *See* U.S. Trustee Objection at ¶ 63; *see also* Ad Hoc Term Loan Group Objection at ¶ 27.

[40]     *Contra* Committee Objection at ¶ 73.

12531532

interests as a secured lender to do so.  Such discretion is the Debtors' alone, who have every incentive to maximize the value of their assets, and whose directors and officers owe a fiduciary duty to stakeholders to do so.

### III.   There Is No Cause to Extend the Challenge Deadline.

29.   The Objectors have failed to show cause exists to extend the Challenge Deadline and related dates and deadlines set forth in the proposed final cash collateral order (the "Proposed Timeline").  As explained by the Debtors in the Bidding Procedures Motion and the Cash Collateral Motion, the Proposed Timeline is the best way to maximize the value of the Debtors' assets for the benefit of all stakeholders.[41]  The purpose of the Proposed Timeline is not to freeze out competing bids or to foil the Committee's investigation of legitimate causes of action.  Rather, it is to prevent a scenario whereby the Debtors' assets become unmarketable because of ballooning administrative claims that inhibit the ability of bidders to purchase the assets without leaving the estate administratively insolvent – a risk that the Committee itself has acknowledged.[42]

30.   First, it is highly unlikely that an extension of the Proposed Timeline would create value to the Debtors' estates that would not be realized under the Proposed Timeline.  ██████

████████████████████████████████████████████████████████████████████████████

---

[41]   *See Motion of Debtors for Entry of an Order (I) Approving Bidding Procedures, (II) Scheduling Certain Dates and Deadlines With Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Stalking Horse Agreement, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts and Leases, (VII) Approving the Sale of Assets, and (VIII) Granting Related Relief* [Dkt. No. 17] (the "Bidding Procedures Motion") at ¶ 15; *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Creditors, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Dkt. No. 6] (the "Cash Collateral Motion") at ¶ 13.

[42]   Committee Objection at ¶ 38; ████████████████████████████████████

████████████████████████████████████████████



███ [43] As Ryan Kielty, corporate representative of Centerview Partners, the Debtors' investment banker, testified, ██████████████████████████████████████████████ ████████████████████████████████████████ [44] Mr. Kielty emphasized that ████████████████████████████████████████████████████ ██████████████████████ [45] Mr. Kielty stated that ████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████. [46]

31.    Second, the Committee and Ad Hoc Term Loan Group have sufficient time to evaluate potential claims, which are cabined to a limited timeframe in this case. [47] The FILO Agent has promptly and comprehensively responded to the Committee's and the Ad Hoc Term Loan Group's requests for information. On Friday, January 28, 2025, the FILO Agent received the *First Request for Production of Documents from the Ad Hoc Term Loan Group to the FILO Agent*. By Sunday, February 2, 2025, the FILO Agent had completed production of responsive documents,

---

[43]    *See* **Exhibit F** at 36:5–8; 43:23–24 ██████████████████████████ ███████.

[44]    *Id.* at 37:2–5.

[45]    *Id.* at 94:3–5.

[46]    *Id.* at 93:17–94:20 ███████████████████████████████████ ████████████████████████████████████████.

[47]    Pursuant to the *Prepackaged Joint Plan of Reorganization of JOANN Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [Dkt. No. 15] confirmed in connection with the Prior Bankruptcy Cases (the "2024 Plan"), each of the ABL Agent, FILO Agent, and ABL/FILO Lenders received broad releases from both the Debtors and third parties. Among other claims, the 2024 Plan released claims related to (i) the management, ownership, or operation of the Debtors or the non-Debtor affiliates, (ii) the subject matter of, or the transactions, events, circumstances, acts or omissions giving rise to, any claim or interest that is treated in the Restructuring Transactions, including the negotiation, formulation, or preparation of the Restructuring Transactions, (iii) the debtors' and non-debtor affiliates' in- or out-of-court restructuring efforts, (iv) the TSA, the Definitive Documents, the ABL Facility Documents, the Term Loan Documents, the DIP Facility Documents, the Exit Facilities Documents (and any financing permitted thereunder), the Chapter 11 Cases, or any Restructuring Transaction, or (v) any other act or omission, transaction, agreement, event, or other occurrence related to any of the foregoing from the dawn of time until the 2024 Bankruptcy Emergence Date (each as defined in the 2024 Plan). Therefore, as a practical matter, any potential causes of action are cabined to the limited timeframe of April 30, 2024 through the current date.

12531532

totaling approximately 1,924 documents — a little over 7,600 pages. The FILO Agent responded to the Committee's requests for discovery with similar speed, serving responses on February 5, 2025, *the day after* the Committee served its requests. Moreover, the FILO Agent made Kyle Shonak, as corporate representative of the FILO Agent, available for a seven-hour deposition by both the Ad Hoc Term Loan Group and the Committee on Friday, February 7, 2025, the date noticed by the Committee. The Debtors and other key parties have been similarly forthcoming with discovery on an expedited timeline. Thus, any additional time would be utilized only for the purposes of negotiating a global resolution, rather than investigating documents and potential claims. As aforementioned, the FILO Agent is already engaged in active discussions with the Ad Hoc Term Loan Group and the Committee to resolve all issues pursuant to a global settlement. Thus, an extension of time is not needed.

32.     Third, an extension of the Challenge Deadline will unnecessarily freeze the sale process and grind these cases to a halt more generally, ballooning the risk of administrative insolvency while exposing the ABL/FILO Lenders to a material risk of nonpayment. Both the Interim Cash Collateral Order and the proposed final cash collateral order dictate that (i) the Debtors may not propose or support any plan of reorganization or liquidation or sale of all or substantially all of the Debtors' assets that does not require that the obligations pursuant to the ABL/FILO Credit Agreement be Paid in Full (as defined in the Interim Cash Collateral Order), unless the Debtors obtain the written consent of each of the ABL Agent and the FILO Agent, and (ii) the ABL/FILO Lenders shall not be deemed Paid in Full until the Challenge Deadline has passed.[48]

---

[48]     *See Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Creditors, (III) Modifying Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Dkt. No. 106] (the "Interim Cash Collateral Order") at ¶ 27; H n. 5 ("No facility or its obligations thereunder shall be deemed to have been Paid in Full until such time as, (a) . . . the Challenge

33.     In other words, a sale that does not pay the ABL/FILO Lenders in full cannot close unless the ABL/FILO Lenders consent to such treatment, and the ABL/FILO Lenders cannot be Paid in Full until the Challenge Deadline has passed.  Even if the ABL/FILO Lenders *did* consent to alternative treatment and a Challenge was permitted to continue beyond the closing of a sale, the Debtors would then be required to fund the ABL/FILO Lenders' contingent indemnification obligations relating to a Challenge.[49]  It is difficult, if not impossible, to address these issues with a fixed amount set aside in escrow, because the amounts of the indemnification obligations and future interest are not subject to accurate estimation given the uncertainty around litigation of a Challenge.  Such a situation would bring these chapter 11 cases to a complete stop while all parties waited for the Challenge Period to lapse.

34.     Fourth, the ABL/FILO Lenders are funding these cases and the sale process through the use of their cash collateral.  The risk taken on by the ABL/FILO Lenders necessitates the protections that the ABL/FILO Lenders have negotiated, including (i) waivers of section 506(c) and 552(b) of the Bankruptcy Code, (ii) narrowly tailored liens on unencumbered assets, and (iii) the Proposed Timeline, which is par for the course in retail cases with a risk of administrative insolvency.

35.     In summary: (i) a Challenge Deadline extension is wholly unnecessary in light of the 1903P and other relevant parties' expedited production in response to the Committee's and the Ad Hoc Term Loan Group's discovery requests, and (ii) further delay will not create value to these

---

Deadline (as defined herein) shall have passed without the timely and proper commencement of a Challenge, or, if a Challenge is timely and properly asserted prior to the Challenge Deadline, upon the final, nonappealable disposition of such Challenge, (b) any and all applicable adequate protection payments have been made, and (c) . . . a countersigned payoff letter has been received by the . . . FILO Agent . . . in form and substance satisfactory to the . . . FILO Agent . . . in its sole discretion, including a release from any further obligations or subordination with respect to the Carve Out").

[49]     *See* Interim Cash Collateral Order at ¶ 16.

estates; to the contrary, an extension of time risks forfeiting the highest and best offer for the Debtors' business and plunging these cases into administrative insolvency. 1903P respectfully submits that there is no reason for this Court to extend the Proposed Timeline, which presents the best opportunity for the Debtors to market their assets and complete a sale to a value-maximizing bidder. Any such extension would only impede the Debtors' ability to conduct an orderly sale and/or liquidation of their assets for the benefit of their creditors.

36.     Therefore, if the Challenge Period is extended beyond what is set forth in the proposed final cash collateral order, the FILO Agent will not consent to the sale and release of its liens, or to the use of proceeds from its priority collateral, unless the obligations pursuant to the ABL/FILO Credit Agreement have been Paid in Full at closing or the ABL Agent and FILO Agent have otherwise provided written consent.

## CONCLUSION

37.     For the reasons set forth herein, 1903P respectfully asserts that the Court should overrule the Objections and grant the Bidding Procedures Motion, the Cash Collateral Motion, and any other relief that the Court deems necessary and proper.

*[Remainder of Page Intentionally Left Blank]*

12531532

Dated: February 13, 2025
Wilmington, Delaware

Respectfully submitted,

  /s/ Stuart M. Brown
Stuart M. Brown (DE 4050)
Matthew S. Sarna (DE #6578)
**DLA PIPER LLP (US)**
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
Email: stuart.brown@us.dlapiper.com
        matthew.sarna@us.dlapiper.com

-and-


John F. Ventola
G. Mark Edgarton
Jonathan D. Marshall
M. Hampton Foushee
Alexandra Thomas
Choate, Hall & Stewart LLP
Two International Place
Boston, Massachusetts 02110
Telephone: (617) 248-5000
Facsimile: (617) 248-4000
Email:  jventola@choate.com
        medgarton@choate.com
        jmarshall@choate.com
        hfoushee@choate.com
        athomas@choate.com

*Counsel for 1903P Loan Agent, LLC*

## CERTIFICATE OF SERVICE

I, Stuart M. Brown, hereby certify that on February 13, 2025, I (i) caused a true and correct copy of the redacted *Omnibus Reply of 1903P Loan Agent, LLC as Filo Agent, to Objections to the Cash Collateral Motion and the Bidding Procedures Motion* to be served upon all parties entitled to service via CM/ECF; and (ii) caused a true and correct copy of the unredacted and unsealed *Omnibus Reply of 1903P Loan Agent, LLC as Filo Agent, to Objections to the Cash Collateral Motion and the Bidding Procedures Motion* to be served upon counsel to the Debtors, counsel to the Committee, counsel to the Ad Hoc Term Loan Group, and the U.S. Trustee.

Dated: February 13, 2025

_/s/ Stuart M. Brown_
Stuart M. Brown (DE 4050)