<u>**Exhibit B**</u>

**Redline**

*Execution Version*

# AMENDED & RESTATED AGENCY AGREEMENT

This Agency Agreement ("Agreement") is made as of ~~January~~February 1~~5~~4, 2025, by and between (a) JOANN Inc. (together with its subsidiaries listed on Annex 1, the "Merchant") and (b) Gordon Brothers Retail Partners, LLC ("Agent"; and together with Merchant each a "Party" and collectively the "Parties").

## Section 1.  Recitals

WHEREAS, on January 15, 2025 (the "Petition Date"), Merchant commenced voluntary chapter 11 bankruptcy cases (the "Bankruptcy Cases") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

WHEREAS, Merchant entered into that certain Second Amended and Restated Credit Agreement (the "Credit Agreement") dated as of April 30, 2024, by and among Jo-Ann Stores, LLC, as borrower, the other Loan Parties thereto, Bank of America, N.A., as administrative agent and collateral agent (the "ABL Agent"), and 1903P Loan Agent, LLC, as FILO Documentation Agent (as defined in the Credit Agreement) (the "FILO Agent"); ~~and~~

WHEREAS, on the Petition Date, Merchant and Agent executed the Agency Agreement, dated January 15, 2025 (the "Original Agency Agreement"); and

WHEREAS, Merchant operates retail stores and desires that Agent act as Merchant's exclusive agent for the purposes of, except as set forth in the Store Closing Procedures Order, and effective only from and after the Closing:

(a)     selling all of the Merchandise (as hereinafter defined) from Merchant's retail store locations identified on Exhibit 1(a)(1) attached hereto (each a "Store" and collectively the "Stores"), distribution centers (including e-commerce facilities) identified on Exhibit 1(a)(2) attached hereto (each a "Distribution Center" and collectively, the "Distribution Centers"), wholesale channels or any other channel by means of a "going out of business," "store closing," "sale on everything," "everything must go," or similar sale as described further below (the "GOB Sale"), with the nature and manner of advertising the GOB Sale being in Agent's sole discretion, subject to the terms and conditions of this Agreement and the Sale Guidelines and Approval Order (each as defined below);

(b)     marketing and selling, or otherwise designating the purchasers of the furniture, furnishings, trade fixtures, machinery, equipment, office supplies, Supplies (as defined below), conveyor systems, racking, rolling stock, and other tangible personal property (collectively, "FF&E") owned by Merchant as of the Closing, wherever located ("Owned FF&E");

(c)     designating the purchasers, assignees, sublessees, or other transferees of any or all of Merchant's unexpired leases of non-residential real property (together with all amendments, extensions, modifications, and other material documents related thereto, each a "Lease" and all such Leases collectively, the "Leases") and

executory contracts (together with all amendments, extensions, modifications, and other material documents related thereto, each a "Contract" and all such Contracts collectively, the "Contracts"), in each case excluding any Leases or Contracts that may be rejected as permitted and in accordance with the procedures under the Approval Order (defined below) and subject to the assumption and assignment procedures to be incorporated into the Approval Order;

(d)     marketing and selling, or otherwise designating the purchasers, assignees, and/or licensees of any or all IP Rights owned by Merchant (the "Intellectual Property"); and

(e)     marketing and selling, or otherwise designating the purchasers, licensees, and/or assignees of any or all of Merchant's right, title, and interest in and to other real or tangible property (such right, title and interest, the "Other Assets" and, collectively with Merchant's right, title, and interest in and to the Merchandise, Owned FF&E, Leases, Contracts, and Intellectual Property, the "Assets"). For the avoidance of doubt, the Other Assets (x) include but are not limited to all cash on hand in the Merchant's retail store locations, cash in transit, cash in bank accounts, Merchant's interest in and rights with respect to cash posted as collateral for letters of credit or bonds, receivables (including credit card receivables), refunds of any nature, deposits, security deposits, credit card processing float, payment processor reserves, real property, sublease income, proceeds of retail sales of Merchandise in all of the Debtors' retail store locations from and after the Closing,; and (y) claims and causes of action arising under chapter 5 of the Bankruptcy Code and similar state law ("Avoidance Actions"), and, except as provided for in Section 16.21(d), all other claims and causes of action, including but not limited to commercial tort claims, based on facts and circumstances existing as of the Closing, whether or not ~~theretofore~~therefore discovered or asserted ("Other Causes of Action"); provided, that neither the Agent, nor any Person claiming by, through, or on behalf of the Agent (including by operation of law, sale, assignment, conveyance, or otherwise) shall pursue, prosecute, litigate, institute, or commence an action based on, assert, sell, use defensively, convey, assign or file any claim or cause of action that relates to an Avoidance Action or Other Cause of Action against, in each case, a related party of the Merchant; provided, further, that Other Assets shall not include any Excluded Assets.

NOW, THEREFORE, in consideration of the Purchase Price (as defined below) and the mutual covenants and agreements set forth in this Agreement, the Parties hereby amend and restate the Original Agency Agreement, and agree as follows:

**Section 2. Appointment of Agent/Approval Order**. As soon as practicable after entry of the Bid Procedures Order, but in any event, no later than two (2) business days after entry of the Bid Procedures Order, Merchant shall file in the Bankruptcy Cases a motion, if necessary, and a proposed form of order (the "Approval Order") in form and substance satisfactory to the

Prepetition ABL Agent and the Prepetition FILO Agent (as defined in the Cash Collateral Order (as defined herein)) and the Agent.  The Approval Order shall, among other things:

(a)    find that:

    (i)    this Agreement is in the best interest of Merchant, its estate and creditors, and other parties-in-interest;

    (ii)    the Parties entered into this Agreement in good faith pursuant to Section 363(m) of the Bankruptcy Code and without collusion as described in Section 363(n) of the Bankruptcy Code;

    (iii)    time is of the essence in effectuating this Agreement and proceeding with the GOB Sale at the Stores uninterrupted;

    (iv)    Merchant's decision to enter into this Agreement and perform its obligations under this Agreement is a reasonable exercise of Merchant's sound business judgment consistent with its fiduciary duties and is in the best interests of Merchant, its estate, its creditors, and other parties-in-interest; and

    (v)    this Agreement was negotiated in good faith and at arms' length and Agent is entitled to the protections of section 363(m) and 364(e) of the Bankruptcy Code; and

(b)    order, adjudge, and decree that:

    (i)    this Agreement and all of the transactions contemplated hereby are approved in their entirety;

    (ii)    the Parties are authorized to continue to take any and all actions as may be necessary or desirable to implement this Agreement and each of the transactions contemplated hereby;

    (iii)    following the satisfaction of the Debt Payoff, the Initial Wind-Down Payment, and the Initial Central Services Payment (each as defined herein) (together, the "Initial Purchase Price Funding"), and in accordance with this Agreement, and subject to Agent's compliance with its other obligations hereunder, Agent shall have the exclusive right to market and sell, or otherwise designate the purchasers, licensees, and/or assignees of, any or all of the Assets free and clear of all liens, claims, and encumbrances thereon (other than Permitted Encumbrances) without further order of the Bankruptcy Court;

    (iv)    the sale, license, transfer, or other conveyance of any Assets (other than the Assets being sold pursuant to the GOB Sale, as to which no further notice shall be required) reflected in notices filed in the Bankruptcy Cases from time to time by Agent, substantially in the

form annexed hereto as Exhibit 2(b)(iv) (each an "Asset Designation Notice"), shall be automatically effective on the date reflected in the applicable Asset Designation Notice and subject to the satisfaction of any closing conditions reflected therein, and the sale or other conveyance of such Assets shall be free and clear of all liens, claims, and encumbrances (other than Permitted Encumbrances) without further order of the Bankruptcy Court; provided, however, that nothing in the Approval Order shall inhibit the ability of Agent to seek other or further orders of the Court in connection with the sale or other disposition of any Assets;

(v)  the form of Asset Designation Notice is approved;

(vi)  subject to Agent's compliance with its payment obligations under this Agreement and the Approval Order, Agent is authorized to execute, in the name of and as agent for Merchant, any and all deeds, bills of sale, and other instruments or documents necessary to effectuate the sale, transfer, or other conveyance of any of the Assets, none of which instruments or documents shall require Merchant to incur any obligations or other liabilities beyond the terms of this Agreement;

(vii) following the satisfaction of the Initial Purchase Price Funding, all proceeds (cash or otherwise or payments from insurance on the Assets or Merchandise) of or from any of the Assets or Additional Agent Merchandise except as otherwise set forth in this Agreement and exclusive of amounts to pay Sales Taxes ("Proceeds"), including but not limited to all Proceeds arising from the sale, lease, licensing, assignment, or other disposition of any of the Assets and all service or other revenue received in the Stores, shall be the sole property of Agent, and Agent shall be entitled to retain all Proceeds for its own account;

(vii)  (viii) following the occurrence of the Closing, and the satisfaction of the Initial Purchase Price Funding, Merchant and any trustee appointed in the Bankruptcy Cases or any successor cases thereto shall hold the Assets (other than the Assets being sold through the GOB Sale) strictly in trust for the benefit of Agent and, as such, the Assets shall not constitute property of Merchant's bankruptcy estate pursuant to and consistent with 11 U.S.C. § 541(b)(1) at any time following the Closing;

(viii)  (ix) following the satisfaction of the Initial Purchase Price Funding, any Proceeds or Additional Agent Merchandise Proceeds received by, or that otherwise come into the possession of, Merchant at any time after the Closing shall be segregated and held strictly in trust for the benefit of Agent, shall not be commingled with Merchant's own assets, and, as such, shall not become property of Merchant's

bankruptcy estate pursuant to and consistent with 11 U.S.C. §541(b)(1), and shall be paid over to Agent promptly, but in any event, not later than in connection with each Weekly Sale Reconciliation;

(ix)    (x) following the satisfaction of the Initial Purchase Price Funding, and solely to the extent that any Assets or, Proceeds, or Additional Agent Merchandise Proceeds are, notwithstanding the Approval Order, subsequently determined to constitute property of Merchant's estate, but subject to Agent's obligation to pay Expenses and fund the Wind-Down Payments, Agent shall have first priority, senior security interests and liens on all such Assets and, Proceeds, and Additional Agent Merchandise Proceeds, which liens shall be deemed automatically perfected and (x) the Merchant shall be expressly prohibited from granting any security interests or liens on the Assets and, Proceeds, and Additional Agent Merchandise Proceeds thereof and (y) to the extent that any security interest or lien is granted or otherwise attaches, voluntarily or involuntarily, (other than the security interests and liens in favor of the Agent) to any Assets or, Proceeds, or Additional Agent Merchandise Proceeds, such security interests and liens shall be *void ab initio* without further order of the Court; provided that nothing in the Approval Order shall inhibit Agent's ability, and the Approval Order shall expressly authorize Agent, to take any action Agent deems appropriate to perfect and enforce security interests and liens granted in its favor;

(x)    (xi) following the satisfaction of the Initial Purchase Price Funding and subject to Agent's obligation to pay Expenses and fund the Wind-Down Payments, until all Assets have been sold or otherwise disposed of, and solely to the extent that any Assets or, Proceeds, or Additional Agent Merchandise Proceeds are, notwithstanding the Approval Order, subsequently determined to constitute property of Merchant's estate, Agent shall have a superpriority administrative expense claim, which is senior to all other administrative expense claims (including any other superpriority administrative expense claims) against Merchant to the extent of any amounts owing from Merchant to Agent in connection with this Agreement, including as a result of any breach of this Agreement and/or as a result of any Proceeds or Additional Agent Merchandise Proceeds being in Merchant's possession;

(xi)    (xii) the Lease/Contract Designation Rights are approved, and Agent is authorized to designate the assignees of any or all of the Contracts and Leases pursuant thereto;

(xii)    (xiii) Agent shall have the exclusive right to use the Stores and all other Assets for the purpose of conducting the GOB Sale, free of any interference from any entity or person, subject to compliance with this

Agreement (including payment of Expenses and Wind-Down Payments) the Sale Guidelines (as defined below) and Approval Order;

(xiii)    (xiv) Agent, as the exclusive agent for Merchant, is authorized to conduct, advertise, post signs, utilize sign-walkers, and otherwise promote the GOB Sale as a "going out of business", "store closing", "sale on everything", "everything must go", or similarly themed sale, in accordance with the Sale Guidelines (as the same may be modified and approved by the Bankruptcy Court), subject to compliance with the Sale Guidelines, the Approval Order, and all applicable federal, state, and local laws, regulations and ordinances, including, without limitation, all laws and regulations relating to advertising, privacy, consumer protection, occupational health and safety and the environment, together with all applicable statutes, rules, regulations and orders of, and applicable restrictions imposed by, governmental authorities (collectively, the "Applicable General Laws"), other than all applicable laws, ordinances, rules, regulations, or licensing requirements in respect of "going out of business", "store closing" or similarly-themed sales (collectively, the "Liquidation Sale Laws"); provided, however, that notwithstanding any other provision in the Approval Order, no party waives any rights to argue any position with respect to whether the conduct was in compliance with the Approval Order and/or any applicable law, or that the enforcement of such applicable law is preempted by the Bankruptcy Code;

(xiv)    (xv) provided that the GOB Sale is conducted in accordance with and subject to the Sale Guidelines and the Approval Order, and in light of provisions in the laws of many Governmental Units (as defined in the Bankruptcy Code) that exempt court-ordered sales from their provisions, Agent and Merchant, to the extent applicable, will be presumed to be in compliance with any Liquidation Sale Laws and are authorized to conduct the GOB Sale in accordance with the terms of the Approval Order and the Sale Guidelines without the necessity of further showing compliance with any such Liquidation Sale Laws;

(xv)    (xvi) Agent may use all Intellectual Property consistent with Merchant's ordinary course of business usage and in connection with the conduct of the GOB Sale;

(xvi)    (xvii) unless otherwise ordered by the Bankruptcy Court, all newspapers and other advertising media in which the GOB Sale is advertised shall be directed to accept the Approval Order as binding and to allow the Parties to consummate the transactions provided for in this Agreement, including, without limitation, conducting and

advertising the GOB Sale in the manner contemplated by this Agreement;

(xvii)      (xviii) unless otherwise ordered by the Bankruptcy Court, all utilities, landlords, creditors, and other interested parties and all persons acting for or on their behalf shall not interfere with or otherwise impede the conduct of the GOB Sale, or institute any action in any forum other than the Bankruptcy Court that in any way directly or indirectly interferes with or obstructs or impedes the conduct of the GOB Sale;

(xviii)     (xix) the Bankruptcy Court retains exclusive jurisdiction over the enforcement and interpretation of, and over and all matters arising from, this Agreement;

(xix)       (xx) Merchant is directed to provide weekly reporting to Agent of all amounts expended for Expenses and the Central Services Expenses as set forth in the Central Services Budget;

(xx)        (xxi) Merchant shall make its books and records reasonably available to Agent;

(xxi)       (xxii) Agent shall not be liable for any claims against Merchant except as expressly provided for in this Agreement and Merchant shall not be liable for any claims against Agent except as expressly provided for in this Agreement;

(xxii)      (xxiii) all payments made by Merchant on account of the Central Services Expenses shall be made pursuant to, and solely in accordance with, the Central Services Budget (on a line item basis);

(xxiii)     (xxiv) Agent shall neither have nor incur any obligation to advance or fund any amounts to or for Merchant except as set forth in this Agreement;

(xxiv)      (xxv) any amendment to or other modification of the Central Services Budget shall only be effective upon approval by Agent in its sole discretion;

(xxv)       (xxvi) Agent is authorized to sell the Additional Agent Merchandise on the terms set forth herein, subject to the Sale Guidelines;

(xxvi)      (xxvii) Except as provided for herein, following the occurrence of the Closing, neither the Merchant nor any other entity acting on its behalf or as its successor (including but not limited to the any statutory committee appointed in the Bankruptcy Cases and any chapter 7 or 11 trustee) may recover from the Agent any costs or expenses of preserving, or disposing of, any of the Assets, this Agreement shall be binding on any chapter 7 or 11 trustee, and any subsequently appointed

chapter 7 trustee is authorized to and shall conduct the business of the Merchant for the limited purposes of complying with and executing under and in accordance with this Agreement, all of the foregoing without further order of the Court;

(xxvii)    ~~(xxviii)~~ Agent and its designees are granted derivative standing to pursue the Avoidance Actions (subject to Section 11.2(f) below) and Other Causes of Action in the name of and/or on behalf of Merchant;

(xxviii)    ~~(xxix)~~ in the event any of the provisions of the Approval Order are modified, amended or vacated by a subsequent order of the Bankruptcy Court or any other court, Agent shall be entitled to the protections provided in Bankruptcy Code sections 363(m) and 364(e) and, no such appeal, modification, amendment or vacatur shall affect the validity and enforceability of the GOB Sale or the liens or priority authorized or created under this Agreement or the Approval Order;

(xxix)    ~~(xxx)~~ neither Agent nor any entity comprising Agent is or shall be a mere continuation of Merchant or otherwise subject to successor liability in connection with any of the Assets;

(xxx)    ~~(xxxi)~~ upon receipt by the ABL Agent and FILO Agent and certain other persons of the Debt Payoff as directed in the Payoff Letters pursuant to Section 3.1(a) of this Agreement, all ongoing commitments under the Credit Agreement shall be canceled and terminated;

(xxxi)    ~~(xxxii)~~ to the extent Agent has not designated the Agent or other assignee of any Assets (any Assets so not designated by such date, the "Residual Assets") as of May 31, 2025 (as may be amended by written agreement of the Parties, the "Asset Designation Rights Termination Date"), (1) ownership of all cash (on hand, in the bank, in transit, posted in respect of letters of credit or bonds or otherwise), credit card processing float, accounts receivable, notes receivable, credit card receivables, other receivables, deposits, security deposits, proceeds of retail sales in all of the Debtors' retail store locations, rights to refunds, other rights to payment, Intellectual Property, and, subject to Section 7.1, ownership of all Remaining Merchandise, comprising Residual Assets shall vest in Agent or its designee, and (2) ownership of all other Residual Assets shall revert to the Debtors' estates, each on the Designation Rights Termination Date;

(xxxii)    ~~(xxxiii)~~ the Final Reconciliation (as defined below), once agreed to by Merchant and Agent, shall be automatically deemed approved pursuant to Bankruptcy Code section 105(a) and Rule 9019 of the

8

Federal Rules of Bankruptcy Procedure without further order of the Bankruptcy Court or action by any party; and

(xxxiii)   (xxxiv) this Agreement, the Approval Order, and all provisions hereof and thereof are binding on any successor to Merchant, including but not limited to any chapter 7 or chapter 11 trustee, and subject to Agent's obligation to pay Expenses and fund the Wind-Down Payments, any such successor shall continue to hold all Assets and, Proceeds, and Additional Agent Merchandise Proceeds strictly in trust for the benefit of Agent.

**Section 3.  Consideration to Merchant and Agent.**

3.1         Purchase Price.  The aggregate consideration being provided to Merchant in exchange for Agent's rights and Merchant's obligations under this Agreement is as follows (collectively, the "Purchase Price"):

(a)   Debt Payoff.  On the Closing Date, in accordance with payoff letters by each of the ABL Agent (the "ABL Payoff Letter") and FILO Agent (the "FILO Payoff Letter" and, together with the ABL Payoff Letter, the "Payoff Letters") in form and substance satisfactory to each such party, Agent shall:

(i)   to the ABL Agent, for the benefit of the ABL Lenders (as defined in the Cash Collateral Order), and certain other persons as directed in the ABL Payoff Letter, (a) pay the amount in cash necessary to indefeasibly pay in full in cash all Prepetition Revolving Obligations (as defined in the Cash Collateral Order), including, without limitation, all outstanding principal, accrued interest, fees, costs and expenses (including, without limitation, all attorneys' fees, costs and expenses), and (b) provide and/or post cash collateral for (and/or replacement of) any issued and outstanding letters of credit (in form and substance acceptable the Prepetition ABL Agent), in each case in accordance with and as set forth in the ABL Payoff Letter (such amounts and other consideration, the "ABL Payoff"); and

(ii)   pay to the FILO Agent, for the benefit of the FILO Lenders, and certain other persons as directed in the FILO Payoff Letter, the amount in cash necessary to indefeasibly pay in full in cash all Prepetition FILO Obligations (as defined in the Cash Collateral Order), including, without limitation, all outstanding principal, accrued interest, fees, costs and expenses (including, without limitation, all attorneys' fees, costs and expenses) and make whole obligations, all as set forth in the FILO Payoff Letter (such amounts and other consideration, the "FILO Payoff" and, together with the ABL Payoff, the "Debt Payoff").

(b)   Wind-Down Funding.  At Closing, Agent shall make an initial cash payment to Merchant equal to sixty-five percent (65%) of the Wind-Down Budget (the "Initial Wind-Down Payment").  Thirty (30) days after the Closing, Agent shall make a second cash payment to Merchant equal to thirty-five percent (35%) of Wind-Down Budget (the "Second Wind-Down Payment" and, together with the Initial Wind-Down Payment, the "Wind-Down Payments").  The Wind-Down Payments shall not exceed the amounts set forth in Exhibit 3.1(b) (the "Wind-Down Budget"); provided, however, that, solely with respect to the 503(b)(9) Claim

subcategory of the Wind-Down Budget, any amounts that have not been expended by Merchant as of the Designation Rights Termination Date shall be returned to Agent upon the earlier of (i) the dismissal or conversion of the Bankruptcy Cases; or (ii) the effective date of a plan of liquidation of Merchant.  With respect to the 503(b)(9) Claim subcategory, Merchant agrees not to make any payments until the date that is 60 days from the Closing (unless extended upon mutual agreement between Merchant and Agent).  Merchant shall keep Agent informed on a timely basis of its efforts to reconcile 503(b)(9) claims and shall use best efforts to negotiate settlements with respect to the 503(b)(9) claims, in consultation with Agent.

(c)    Central Services Funding.    At Closing, Agent shall make an initial cash payment to Merchant equal to the agreed upon estimated amount to be incurred in the two weeks following Closing, in an amount set forth in the Central Services Budget (the "Initial Central Services Payment").  After Closing, from time to time, Agent, upon request by the Merchant, shall make additional payments to Merchant on account of the Central Services Expenses (the "Subsequent Central Services Payments" and, together with the Initial Central Services Payment, the "Central Services Payments").  The Central Services Payments are subject to and to be used solely as set forth in the budget and schedule attached as Exhibit 3.1(c) hereto (as may be amended from time to time by agreement of the Parties, subject to approval by Agent in its sole discretion, the "Central Services Budget").  Merchant shall provide Agent with a register of all payments Merchant intends to issue for Central Services Expenses at least one business day before issuance, which register shall identify the amounts and expense categories of such payments.  Any portion of the Subsequent Central Services Payments not expended by Merchant as of the Designation Rights Termination Date shall be returned to Agent upon the earlier of (i) the dismissal or conversion of the Bankruptcy Cases; or (ii) the effective date of a plan of liquidation of Merchant.  For the avoidance of doubt, Agent's obligation to fund the Central Services Payments shall not exceed the Central Services Budget; provided, however, that, in accordance with Section 4.1, Agent shall be responsible for the payment of any Central Services Expenses in excess of the Central Services Budget to the extent such expenses are incurred at the direction of the Agent, to facilitate Agent's conduct under this Agreement, or otherwise as agreed by the Agent in writing.

(d)    Expenses.  Subject to and only upon Closing, Agent shall be responsible for the payment of all Expenses pursuant to Section 4.1 below.

3.2    Consideration to Agent.

(a)    Proceeds.    Upon the occurrence of the Closing and following the satisfaction of the Initial Purchase Price Funding, all Proceeds (including proceeds from Additional Agent Merchandise) shall be the exclusive property of Agent, subject to distribution in accordance with the waterfall set forth below:

(i)    First, to Agent in the amount of the sum of the Purchase Price, which, for the avoidance of doubt, shall include the Debt Payoff, the Wind Down Payments, Central Services Payments, and all Expenses pursuant to Section 4.1.

(ii)    *Second*, to the Agent, as consideration for serving as liquidation agent regarding the Assets, the following fee (the "Liquidation Fee") for each Asset category as follows:

1.  Merchandise:  [two (2)]% of the aggregate Retail Price of Merchandise sold as part of the GOB Sale;

2.  FF&E:  [twenty (20)]% of Proceeds from the sale, transfer, or conveyance of any FF&E;

3.  Real Estate:  [ten (10)]% of Proceeds from the sale, transfer, or conveyance of any Lease; and

4.  Intellectual Property:  [ten (10)]% of Proceeds from the sale, transfer, or conveyance of any Intellectual Property; and

5.  Other Assets:  [ten (10)]% of Proceeds from the sale, transfer, or conveyance of any Other Assets.

(iii)    *Thereafter*, all Net Proceeds shall be distributed [thirty-five 35]% to the Term Loan Agent and [sixty-five 65]% to Agent.

(b)    Additional Agent Merchandise Proceeds.  All Additional Agent Merchandise Proceeds shall be the exclusive property of Agent.

(c)    (b) Assets and Proceeds Held in Trust.  Merchant shall hold all of the Assets in trust for the benefit of Agent.  Any Proceeds or Additional Agent Merchandise Proceeds received by, or that otherwise come into the possession of, Merchant at any time after the Closing shall be segregated and held strictly in trust for the benefit of Agent, shall not be commingled with Merchant's own assets, shall not become property of Merchant's bankruptcy estate, and shall be paid over to Agent promptly upon receipt by Merchant or upon notice received by Merchant from Agent, but in any event no later than the Weekly Sale Reconciliation.

(d)    (c) Remaining Merchandise.  To the extent that there is Merchandise remaining at the Sale Termination Date (the "Remaining Merchandise"), such Remaining Merchandise shall be deemed automatically transferred to Agent free and clear of all liens, claims, and encumbrances (other than Permitted Encumbrances).  Agent and its affiliates shall be authorized to sell or otherwise dispose of the Remaining Merchandise with all logos, brand names, and other Intellectual Property intact, and shall be authorized to advertise the sale of the Remaining Merchandise using the Intellectual Property.

3.3    Proceeds of GOB Sales.

(a)    Following the satisfaction of the Initial Purchase Price Funding, Agent may (but shall not be required to) establish its own accounts (including without limitation credit card accounts and systems), dedicated solely for the deposit of the Proceeds and Additional Agent Merchandise Proceeds of the GOB Sales (including Proceeds from Additional Agent Merchandise) (the "GOB Sale Proceeds") and the disbursement of amounts payable to Agent in

connection with the GOB Sales (the "<u>Agency Accounts</u>"); and Merchant shall promptly, upon Agent's reasonable request, execute and deliver all necessary documents to open and maintain the Agency Accounts, at no additional cost to Merchant; <u>provided</u>, <u>however</u>, Agent shall have the right, in its sole and absolute discretion, to continue to use the Merchant Designated Deposit Accounts (as defined below) as the Agency Accounts in which case the Merchant Designated Deposit Accounts shall be deemed to be Agency Accounts.  Agent shall exercise sole signatory authority and control with respect to the Agency Accounts.  The Agency Accounts shall be dedicated solely to the deposit of GOB Sale Proceeds and other amounts contemplated by this Agreement in connection with the GOB Sale and the distribution of amounts payable hereunder in connection with the GOB Sale.  Merchant shall not be responsible for, and Agent shall pay as an Expense hereunder, all bank fees and charges, including wire transfer charges, related to the GOB Sale and the Agency Accounts.  Following Agent's notice to Merchant of Agent's designation of the Agency Accounts (other than the Merchant Designated Deposit Accounts), all GOB Sale Proceeds (including credit card GOB Sale Proceeds) shall be deposited into the Agency Accounts.

(b)     Agent shall have the right to use Merchant's credit card facilities, including Merchant's credit card terminals and processor(s), credit card processor coding, Merchant's identification number(s) and existing bank accounts for credit card transactions relating solely to the GOB Sale; provided, that, Agent's use of any such credit card facilities is in compliance with Applicable General Laws and industry standards, including the Payment Card Industry Data Security Standard ("<u>PCI-DSS</u>").  In the event that Agent elects to use Merchant's credit card facilities, Merchant shall process credit card transactions on behalf of Agent and for Agent's account, applying Merchant's customary practices and procedures.  Without limiting the foregoing, Merchant shall make reasonable efforts to (i) cooperate with Agent to download data from all credit card terminals each day during the Sale Term to effect settlement with Merchant's credit card processor(s), and (ii) take such other actions necessary to process credit card transactions on behalf of Agent under Merchant's identification number(s).  At Agent's request, Merchant shall cooperate with Agent to establish Merchant's identification numbers under Agent's name to enable Agent to process all such credit card GOB Sale Proceeds for Agent's account.  Merchant shall not be responsible for, and Agent shall pay as an Expense hereunder, all credit card fees, charges, and chargebacks related to the GOB Sale, whether received during or after the Sale Term.  Agent shall not be responsible for, as an Expense or otherwise, any credit card fees, charges, or chargebacks relating to periods prior to the Closing.

(c)     Unless and until Agent establishes its own Agency Accounts (other than the Merchant Designated Deposit Accounts), all GOB Sale Proceeds and other amounts contemplated by this Agreement (including credit card GOB Sale Proceeds), shall be collected by Merchant and deposited on a daily basis into depository accounts owned in the name of Merchant and designated solely for the deposit of GOB Sale Proceeds and other amounts contemplated by this Agreement (including credit card GOB Sale Proceeds), and the disbursement of amounts payable to or by Agent hereunder (the "<u>Merchant Designated Deposit Accounts</u>").  All funds in the Merchant Designated Deposit Accounts shall at all times be held in trust for the benefit of Agent.  The Merchant Designated Deposit Accounts shall be cash collateral accounts, with all cash, credit card payments, checks and similar items of payment, deposits and any other amounts in such accounts being GOB Sale Proceeds or other amounts contemplated hereunder, and Merchant hereby grants to Agent a first-priority senior security

interest in and lien upon each of the Merchant Designated Deposit Accounts and all funds on deposit in such accounts from and after the Closing.

(d)    Merchant shall take all actions necessary to designate Agent as an authorized signer on all Merchant Designated Deposit Accounts and to grant Agent the ability to initiate wire transfers from such Merchant Designated Deposit Accounts.

(e)    On each business day to the extent practicable, Merchant shall promptly pay to Agent by wire transfer all funds in the Merchant Designated Deposit Accounts (including, without limitation, GOB Sale Proceeds, GOB Sale Proceeds from credit card sales, and all other amounts) deposited into the Merchant Designated Deposit Accounts for the prior day(s).

**Section 4.  Expenses.**

4.1        Subject to and only upon Closing, Agent shall be responsible for all "Expenses," which shall be paid by Agent in accordance with Section 4.3 below.  As used herein, "Expenses" shall mean the actual operating expenses that arise solely after Closing through the Sale Termination Date, that are incurred at the direction of the Agent, to facilitate Agent's conduct under this Agreement, or otherwise as agreed to by the Agent in writing, which are strictly limited to the following expenses:

(a)    actual hourly or salaried payroll, as applicable, with respect to all Retained Employees and any temporary labor engaged for the GOB Sale that are used in connection with conducting the GOB Sale for actual days/hours worked;

(b)    any amounts related to (i) benefits arising, accruing or attributable to the period between the Closing and the Sale Term:  (w) vacation days or vacation pay, (x) sick days or sick leave or any other form of paid time off, (y) maternity leave or other leaves of absence, and (z) ERISA coverage and similar contributions, and (ii) any amounts payable by Merchant for benefits (including FICA, unemployment taxes, workers' compensation and healthcare insurance, but excluding Excluded Payroll Benefits) for Retained Employees used in the GOB Sale (the "Payroll Benefits");

(c)    subject to Section 6.1, the actual Occupancy Expenses ~~in the amounts shown on Exhibit 4.1(c)~~;

(d)    Retention Bonuses, if applicable, for Retained Employees, as provided for in Section 9.4 below;

(e)    advertising and direct mailings initiated by Agent relating to the GOB Sale, Store interior and exterior signage and banners procured by Agent, and sign-walkers or drivers procured by Agent, in each case relating to the GOB Sale;

(f)    credit card fees, bank card fees, and chargebacks and credit/bank card discounts with respect to Merchandise sold in the GOB Sale;

13

(g)      bank service charges (for Store, corporate accounts, and Agency Accounts), check guarantee fees, and bad check expenses to the extent directly attributable to the GOB Sale;

(h)      costs for additional Supplies at the Stores necessary to conduct the GOB Sale as solely to the extent requested by Agent;

(i)      all fees and charges required to comply with applicable laws in connection with the GOB Sale solely to the extent agreed to by Agent;

(j)      Store cash theft and other Store cash shortfalls in the registers;

(k)      any Central Services Expenses in excess of the Central Services Budget to the extent such expenses are incurred at the direction of the Agent, to facilitate Agent's conduct under this Agreement, or otherwise as agreed to by the Agent in writing.

(l)      the Distribution Center Expenses;

(m)      postage, courier and overnight mail charges requested by Agent to the extent relating to the GOB Sale;

(n)      third party payroll processing expenses associated with the GOB Sale; and

(o)      costs of transfers initiated by Agent of Merchandise and Additional Agent Merchandise between and among the Stores and Distribution Centers during the Sale Term, including delivery and freight costs, it being understood that Agent shall be responsible for coordinating such transfer of Merchandise.

Notwithstanding anything herein to the contrary, there will be no double counting or double payment of Expenses to the extent that Expenses appear or are contained in more than one Expense category.

As used herein, the following terms have the following respective meanings:

(i)      "Central Services Expenses" means the actual costs and expenses, including related to Merchant's central administrative services necessary for the GOB Sale, including, but not limited to, operation of the IT systems, internal payroll processing, MIS services, cash and inventory reconciliation, data processing and reporting, information technology updates, functionality and maintenance of the corporate headquarters, legal, human resources, accounting, and functionality and maintenance of Merchant's e-commerce site for purposes of advertising the GOB Sale (collectively, "Central Services").

(ii) "Excluded Payroll Benefits" means (i) the following benefits arising, accruing or attributable to the period prior to Closing or after the Sale Termination Date, if any: (w) vacation days or vacation pay, (x) sick days or sick leave or any other form of paid time off, (y) maternity leave or other leaves of absence, and (z) ERISA coverage and similar contributions and/or (ii) any payments due under WARN Act or similar state laws.

14

(ii)    (iii) "Distribution Center Expenses" means the actual costs and expenses, including use and Occupancy Expenses and Distribution Center employee payroll, both hourly and salary, and other obligations, of the operations of the Distribution Centers, and the actual costs and expenses (including outbound freight) related to the processing, transfer, and consolidation of Merchandise, Additional Agent Merchandise, and supplies in the Distribution Centers and from the Distribution Centers to the Stores, and all actual costs and expenses associated with Agent's on-site supervision of the Stores, corporate offices and Distribution Centers, including (but not limited to) any and all fees, wages, taxes, third party payroll costs and expenses, and deferred compensation of Agent's field personnel, travel to, from or between the Stores, corporate offices, and Distribution Centers, and out-of-pocket and commercially reasonable expenses relating thereto (including reasonable and documented corporate travel to monitor and manage the GOB Sale).

(iii)    "Excluded Payroll Benefits" means (i) the following benefits arising, accruing or attributable to the period prior to Closing or after the Sale Termination Date, if any: (w) vacation days or vacation pay, (x) sick days or sick leave or any other form of paid time off, (y) maternity leave or other leaves of absence, and (z) ERISA coverage and similar contributions and/or (ii) any payments due under WARN Act or similar state laws.

(iv)    "Occupancy Expenses" means base rent, percentage rent, HVAC, utilities, CAM, storage costs, real estate and use taxes, Merchant's association dues and expenses, utilities expenses, cash register maintenance, routine repairs, building maintenance, trash and snow removal, housekeeping and cleaning expenses, local and long-distance telephone and internet/wifi expenses, security (including, without limitation, security systems, courier and guard service, building alarm service and alarm service maintenance), and rental for furniture, fixtures and equipment; provided that the Occupancy Expenses shall not exceed shall not exceed the amount set forth on Exhibit 4.1(c).

(v)    "Third Party" means, with reference to any Expenses to be paid to a Third Party, a party which is not affiliated with or related to Merchant.

(vi)    Notwithstanding any other provision of this Agreement to the contrary, "Expenses" shall not include any other costs, expenses or liabilities payable by Merchant not provided for herein, all of which shall be paid solely by Merchant.

4.2    Payment of Expenses.

Subject to and only upon Closing, Agent shall be responsible for the payment of all Expenses out of Proceeds (or from Agent's own accounts if and to the extent there are insufficient Proceeds). All Expenses incurred during each week of the GOB Sale (i.e. Sunday through Saturday) shall be paid by Agent to or on behalf of Merchant, or paid by Merchant and thereafter reimbursed by Agent as provided for herein; provided, however, in the event that the actual amount of an Expense is unavailable on the date of the reconciliation (such as payroll), Merchant and Agent shall agree to an estimate of such amounts, which amounts will be reconciled once the actual amount of such Expense becomes available. To the extent necessary or appropriate, Agent shall work with Merchant in good faith to fund Expenses in advance as needed to ensure the timely payment thereof. Agent and/or Merchant may review or audit the

Expenses at any time. To the extent such Expenses are paid by Merchant, Merchant shall provide Agent with payments that Merchant intends to issue for such Expenses at least one business day before issuance, which register shall identify amounts and expense categories of such payments.

**Section 5. <u>Merchandise</u>.**

5.1 <u>Merchandise Subject to This Agreement</u>.

(a) "Excluded Goods" means all (1) goods that are not owned by Merchant, including but not limited to goods that belong to sublessees, licensees, department lessees, or concessionaires of Merchant and (2) goods held by Merchant on memo, on consignment (except to the extent otherwise agreed by the applicable consignor), or as bailee. Merchant shall be solely responsible for the disposition and/or abandonment of all Excluded Goods and all costs, expenses, and obligations associated therewith. Agent shall incur no cost, expense, or obligation in connection with any Excluded Goods.

(b) "Merchandise" means all goods owned by Merchant for resale as of the occurrence of the Closing, wherever located, including, for clarity, all goods that are on-order or in-transit as of the Closing, other than Excluded Goods.

5.2 <u>Valuation</u>.

(a) "Cost Value" shall mean, with respect to each item of Merchandise, the lower of (i) the lower of (x) the actual cost of such item and (y) the lowest cost of such item as reflected in the Merchandise File and (ii) the Retail Price.

(a) (b) "Retail Price" shall mean with respect to each item of Merchandise, the lower of the lowest ticketed, marked, shelf, Merchandise File, or other file price as reflected in Merchant's books and records for such item excluding point of sale, temporary markdowns.

(b) (c) "Merchandise File" shall mean ["7..37.10 Project Thread – Current Inventory By Article.xlsx" and all subsequent and/or refreshed files received by Agent from and after the date of this Agreement.Thread-Inventory By Article (FW 52).xlsx", the column labeled "Chain Retail Price."][1]

---

[1] Subject to further review and confirmation.

5.3        Inventory Count.

During the Sale Term, for purposes ~~of counting the Merchandise and~~ determining the Liquidation Fee related to Merchandise ~~Threshold~~, Merchant and Agent shall jointly keep (i) a strict count of gross register receipts from the sale of Merchandise, less applicable taxes and excluding any prevailing Sale-related discounts ~~("Gross Rings")~~, and (ii) cash reports of sales within each Store. Register reports shall show for each item sold the ~~Cost Value and~~ Retail Price for such item and the markdown or discount, if any, specifically granted by the Agent. All such records and reports shall be made available to Merchant and Agent during regular business hours upon reasonable notice.

**Section 6.  Sale Term.**

6.1        Term.  Subject to satisfaction of the conditions precedent set forth in Section 10 hereof, the GOB Sale shall commence at each Store on a date determined by Agent in its sole discretion after the occurrence of the Closing (the "Sale Commencement Date") and shall end at each Store no later than May 31, 2025 (the "Sale Termination Date", and the period from the Sale Commencement Date to the Sale Termination Date as to each Store being the "Sale Term").  Agent may, in its discretion, earlier terminate the GOB Sale on a Store-by-Store basis or close a Distribution Center, upon written notice to Merchant at least five (5) days prior to the end of a calendar month (a "Vacate Notice") and vacate such Store or Distribution Center, in accordance with Section 6.2, by the end of such calendar month (the "Vacate Date"); provided, however, that Agent's obligations to pay all Expenses, including Occupancy Expenses, for each Store or Distribution Center, as applicable, subject to a Vacate Notice shall continue only until the applicable Vacate Date.

6.2        Vacating the Stores.  At the conclusion of the GOB Sale, Agent agrees to leave each Store in "broom clean" condition, ordinary wear and tear excepted, except for unsold items of Owned FF&E which may be abandoned by Agent in place in a neat and orderly manner pursuant to Section 7 below.  Agent shall vacate each Store or Distribution Center on or before the earlier of (a) the Sale Termination Date or, if applicable, (b) the Vacate Date, as provided for herein, at which time Agent shall surrender and deliver the Store or Distribution Center premises, and, if in Agent's possession, keys, to Merchant unless the applicable Lease is being conveyed pursuant to the Lease/Contract Designation Rights.  Notwithstanding the foregoing, Agent's obligations to pay all Expenses for the Stores and Distribution Centers shall be limited as provided for in Section 6.1.

**Section 7.  FF&E/ Merchandise.**

7.1        Abandonment of FF&E/Merchandise.  Agent shall be authorized to abandon any and all FF&E or Remaining Merchandise, whether owned or not by Merchant, in place without any cost or liability to Agent.  For the avoidance of doubt, Agent shall have no responsibility whatsoever with respect to FF&E that is not owned by Merchant; provided that nothing in this Section 7 shall limit Agent's rights with respect to Owned FF&E under the Asset Designation Rights or with respect to leased FF&E under the Lease/Contract Designation Rights.

**Section 8.  Conduct of the GOB Sale.**

8.1        Rights of Agent.  Subject to entry of the Approval Order, in addition to any other rights granted to Agent elsewhere in this Agreement, Agent shall be permitted to conduct the GOB Sale as a "going out of business," "store closing," "sale on everything," "everything must go," or similarly themed sale throughout the Sale Term, without compliance with any Liquidation Sale Laws, subject to the Approval Order.  Agent shall conduct the GOB Sale in the name of and on behalf of Merchant in a commercially reasonable manner and in compliance with the terms of this Agreement and Applicable General Laws and subject to the Approval Order.  Agent shall conduct the GOB Sale in accordance with the sale guidelines attached hereto as Exhibit 8.1 (the "Sale Guidelines").  In addition to any other rights granted to Agent hereunder in conducting the GOB Sale, Agent shall have the right:

(a)        to establish GOB Sale prices and discounts and Store hours;

(b)        except as otherwise expressly included as an Expense, to use without charge during the Sale Term all FF&E, IT Systems, existing Supplies, intangible assets (including Merchant's name, logo and tax identification numbers and, other Intellectual Property), Store keys, case keys, security codes and safe and lock combinations required to gain access to and operate the Stores, and any other assets of Merchant located at the Stores or Distribution Centers (whether owned, leased, or licensed), solely to the extent such use does not violate any Applicable General Law;

(c)        (i) subject to satisfaction of Agent's payment obligations under this Agreement, to be provided by Merchant with central office facilities, central administrative services and personnel to process and perform Central Services and provide other central office services reasonably necessary for the GOB Sale; (ii) to use reasonably sized offices located at Merchant's central office facility to effect the GOB Sale; and (iii) to use all customer lists, mailing lists, email lists, and web and social networking sites and other Intellectual Property utilized by Merchant in connection with its business (to the extent such items can be segregated to the Stores or Distribution Centers and solely in connection with the GOB Sale and subject to Applicable General Laws and any other restrictions requested by Merchant in order for Merchant and Agent to comply with Merchant's privacy policies, contracts, agreements, or applicable laws governing the use and dissemination of personal or confidential information, including consumer personal data);

(d)        to establish and implement advertising, signage and promotion programs consistent with the "going out of business," "store closing," "sale on everything," "everything must go," or similarly themed sale, including without limitation by means of media advertising, and similar interior and exterior signs and banners, and the use of sign walkers or drivers, each at Agent's sole cost as an Expense;

(e)        to include Additional Agent Merchandise in the GOB Sale in accordance with Section 8.9; and

18

(f)     to transfer Merchandise between and among the Stores and Distribution Centers.

8.2     <u>Terms of Sales to Customers; Final/As Is Sales</u>.  During the Sale Term, all sales of Merchandise and Additional Agent Merchandise will be "final sales" and "as is," and appropriate signage and sales receipts will reflect the same.  Agent shall not warrant the Merchandise in any manner, but will, to the extent legally permissible, pass on all manufacturers' warranties to customers.  Except as otherwise provided herein, during the Sale Term, all sales will be made only for cash or nationally recognized bank credit or debit cards.  Upon entry of the Approval Order, Agent shall not accept or honor coupons during the Sale Term.  Agent shall clearly mark all receipts for the Merchandise sold at the Stores during the Sale Term so as to distinguish the sale of such Merchandise from the goods sold prior to the Sale Commencement Date.

8.3     <u>Tax Matters</u>.

(a)     During the Sale Term, all sales, use, excise, gross receipts and other taxes attributable to sales of Merchandise and Additional Agent Merchandise, as indicated on Merchant's point of sale equipment (other than taxes on net income) payable to any taxing authority having jurisdiction (collectively, "<u>Sales Taxes</u>") shall be added to the sales price of Merchandise and Additional Agent Merchandise and collected by Agent, on Merchant's behalf, at the time of sale.  All Sales Taxes shall be deposited into a segregated account designated by Merchant and Agent solely for the deposit of such Sales Taxes (the "<u>Sales Taxes Account</u>").  For the avoidance of doubt, Merchant will have payment authority on the Sales Taxes Account from inception until Merchant no longer has any obligation with respect to the payment of Sales Taxes hereunder.  For any Sales Taxes Account that Agent obtains control or payment authority over, Agent agrees to remit any funds in such Sales Taxes Account to Merchant.  Merchant shall prepare and file all applicable reports and documents required by the applicable taxing authorities with respect to Sales Taxes incurred on transactions processed under Merchant's identification number(s), and Merchant shall promptly pay all such Sales Taxes from the Sales Taxes Account.  Merchant will be given access to the computation of gross receipts for verification of all such tax collections.  Provided that Agent performs its responsibilities in accordance with this Agreement, Agent shall have no further obligation to Merchant, any taxing authority, or any other party, and Merchant shall indemnify and hold harmless Agent from and against any and all reasonable out-of-pocket costs, including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties, which Agent sustains or incurs as a result or consequence of the failure by Merchant to promptly pay such taxes to the proper taxing authorities and/or the failure by Merchant to promptly file with such taxing authorities all reports and other documents required by applicable law to be filed with or delivered to such taxing authorities.  If Agent fails to perform its responsibilities in accordance with this <u>Section 8.3</u>, and provided Merchant complies with its obligations hereunder, Agent shall indemnify and hold harmless Merchant from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties which Merchant sustains or incurs as a result or consequence of the failure by Agent to collect Sales Taxes and/or the failure by Agent to promptly deliver any and all reports and other documents required to enable Merchant to file any

requisite returns with such taxing authorities. Agent shall use commercially reasonable efforts to cooperate with Merchant to obtain any tax refunds in respect of Sales Taxes.

(b)     Notwithstanding anything in this Agreement to the contrary, nothing in this Agreement shall be interpreted as establishing the federal, state, or local tax consequences of the transactions contemplated by this Agreement.

(c)     Agent shall, and shall cause each of its respective affiliates to, use commercially reasonable efforts to cooperate and consult with Merchant with respect to applicable Sales Taxes matters and other tax matters reasonably associated with the transactions contemplated by this Agreement, including the preparation and filing of applicable tax reports, returns, and documents (including applicable allocations of purchase price) required by the applicable taxing authorities with respect thereto and any audit, litigation, or other proceeding with respect thereto.

(d)     Agent shall be responsible for all documentary, stamp, transfer (including real property transfer), motor vehicle registration, sales, use, value added, excise, and other similar non-income taxes and all filing and recording fees (and any interest, penalties and additions with respect to such taxes and fees) arising from or relating to the consummation of the transactions contemplated by this Agreement (collectively, "Transfer Taxes"), regardless of the party on whom liability is imposed under the provisions of the applicable laws relating to such Transfer Taxes. Merchant and Agent will consult and cooperate on a reasonable basis in preparing and timely filing all tax returns, declarations, reports, estimates, information returns or other statements (collectively, "Tax Returns") with respect to any Transfer Taxes and will cooperate on a reasonable basis and otherwise take reasonable best efforts to obtain any available exemptions from or reductions in such Transfer Taxes.

(e)     Merchant shall provide to Agent a properly completed and duly executed IRS Form W-9 on behalf of each ~~Selling E~~entity listed on Annex 1 on or prior to the Closing Date.

8.4          Supplies.  Agent shall have the right to use, without charge, all existing supplies located at the Stores, Distribution Centers and corporate office(s), including, without limitation, boxes, bags, paper, twine and similar sales materials (collectively, "Supplies"); provided, however, that the term "Supplies" does not include any IT System. In the event that additional Supplies are required in any of the Stores during the GOB Sale, Merchant agrees to promptly provide the same to Agent, if available, for which Agent shall reimburse Merchant at Merchant's cost therefor as set forth in Section 4 hereof.

8.5          Returns of Merchandise.  After the Closing Date, Merchant shall modify its return policy such that all sales are "final" as of the Closing Date. Agent shall accept returns of goods sold by Merchant for fourteen (14) days following the Closing Date. Following such date, the Agent shall have no obligation to accept returns of goods sold.

8.6          Gift Certificates, Credits.  By the Closing Date, Merchant shall use commercially reasonable best efforts to modify its gift certificate, coupon, and loyalty program policies such that Merchant's gift cards, gift certificates, coupons and credits will only be

accepted during the fourteen (14) day period following the Closing and that Merchant's loyalty program will be terminated as of the Closing. Following such date, Agent shall have no obligation to accept gift cards, gift certificates, coupons and credits or honor any of Merchant's loyalty programs during the Sale Term. After the Petition Date, Merchant shall discontinue the sale of gift certificates and gift cards and use commercially reasonable best efforts to direct any third-party merchants to stop the sale of such gift certificates and gift cards.

8.7       <u>Right to Monitor</u>. Merchant shall have the right to monitor the GOB Sale and activities attendant thereto and to be present in the Stores during the hours when the Stores are open for business; <u>provided</u> that Merchant's presence does not unreasonably disrupt the conduct of the Sale. Merchant shall also have a right of access to the Stores at any time in the event of an emergency situation and shall promptly notify Agent of such emergency.

8.8       <u>Sale Reconciliation</u>. On each Wednesday during the Sale Term, Agent and Merchant shall cooperate to reconcile the sales of Merchandise and Additional Agent Merchandise, the sale of FF&E, Expenses, make payments/setoffs on account of the GOB Sale Proceeds and reconcile such other GOB Sale-related items as either party shall reasonably request, in each case for the prior week or partial week (i.e. Sunday through Saturday), all pursuant to procedures agreed upon by Merchant and Agent (the "<u>Weekly Sale Reconciliation</u>"). Within thirty (30) days after the end of the Sale Term, or as soon as practicable thereafter, Agent and Merchant shall complete a final reconciliation of the Sale (the "<u>Final Reconciliation</u>"), the written results of which shall be certified by representatives of each of the Merchant and Agent as a final settlement of accounts between the Merchant and Agent with respect to the GOB Sale. Within five (5) days after the completion of the Final Reconciliation and execution of a settlement letter including an appropriate mutual release for the benefit of Merchant and Agent, Agent shall pay to Merchant, or Merchant shall pay to Agent, as the case may be, any and all amounts due the other pursuant to the Final Reconciliation. The Approval Order shall provide that the Final Reconciliation, once agreed to by Merchant and Agent, shall be automatically deemed approved pursuant to Bankruptcy Code section 105(a) and Rule 9019 of the Federal Rules of Bankruptcy Procedure without further order of the Bankruptcy Court or action by any party. During the Sale Term, and thereafter until all of Merchant's and Agent's obligations under this Agreement have been satisfied, Merchant and Agent shall have reasonable access to each other's records with respect to the GOB Sale (including, but not limited to Merchandise, Additional Agent Merchandise, GOB Sale Proceeds, and Expenses) to review and audit such records.

8.9       <u>Additional Agent Merchandise</u>.

(a)       Agent shall be entitled to include in the Sale additional merchandise procured by Agent, which is of like kind as, and no lesser quality than, the Merchandise located in the Stores or Distribution Centers ("<u>Additional Agent Merchandise</u>"). Agent shall be responsible for payment of all costs associated with any Additional Agent Merchandise. All ~~proceeds of the sale of~~ Additional Agent Merchandise <u>Proceeds</u> shall remain the exclusive property of Agent.

(b)       The Additional Agent Merchandise shall be at all times subject to the control of Agent. If requested by Agent, Merchant shall, at Agent's expense, ensure the

Additional Agent Merchandise and, if required, promptly file any proofs of loss with regard to same with Merchant's insurers.

(c)    Any transactions relating to the Additional Agent Merchandise are, and shall be construed as, a true consignment from Agent to Merchant.  Merchant acknowledges, and the Approval Order (as and when applicable) shall provide, that the Additional Agent Merchandise shall be consigned to Merchant as a true consignment under Article 9 of the Uniform Commercial Code in effect in the State of Delaware (the "UCC").  Agent is hereby, and shall be through the Approval Order, granted a first priority security interest in and lien upon (i) the Additional Agent Merchandise and (ii) the Additional Agent Merchandise Proceeds, which security interest shall be deemed perfected pursuant to the Approval Order without the requirement of filing UCC financing statements or providing notifications to any prior secured parties; provided that Agent is hereby authorized to deliver any notices and file any financing statements and amendments thereof under the applicable UCC identifying Agent's interest in the Additional Agent Merchandise and any proceeds from the sale thereof as consigned goods thereunder and Merchant as the consignee therefor, and Agent's security interest in such Additional Agent Merchandise and Additional Agent Merchandise pProceeds.

(d)    Agent shall provide signage in the Stores notifying customers that the Additional Agent Merchandise has been included in the Sale.

8.10    Force Majeure.  If any casualty, act of war or terrorism, act of God, or epidemic or pandemic prevents the conduct of business in the ordinary course at any Store for a period in excess of five (5) consecutive days (a "Force Majeure Event"), such Store and the Merchandise located at such Store may, in Agent's sole discretion, be eliminated from the Sale and considered to be deleted from this Agreement as of the first date of such event, and Agent and Merchant shall have no further rights or obligations hereunder with respect thereto; provided, however, that the proceeds of any insurance attributable to such Merchandise shall constitute Proceeds hereunder and there shall be no adjustment to the Purchase Price.

## Section 9.   Employee Matters.

9.1    Merchant's Employees.    Subject to the Central Services Budget and payment of Expenses, Agent may use Merchant's employees in the conduct of the GOB Sale to the extent Agent deems necessary for the GOB Sale, and Agent may select and schedule the number and type of Merchant's employees required for the GOB Sale.  Agent shall identify any such employees to be used in connection with the GOB Sale (each such employee, a "Retained Employee") prior to the Sale Commencement Date.  Notwithstanding the foregoing, Merchant's employees shall at all times remain employees of Merchant.  Agent's selection and scheduling of Merchant's employees shall at all times comply with all applicable collective bargaining agreements, laws and regulations.  Merchant and Agent agree that, except to the extent that wages and benefits of Retained Employees constitute Expenses hereunder, nothing contained in this Agreement and none of Agent's actions taken in respect of the GOB Sale shall be deemed to constitute an assumption by Agent of any of Merchant's obligations relating to any of Merchant's employees including, without limitation, Worker Adjustment Retraining Notification Act ("WARN Act") claims and other termination type claims and obligations, or any other amounts required to be paid by statute or law; nor shall Agent become liable under any

employment agreement, collective bargaining agreement, or be deemed a joint or successor employer with respect to such employees. For the avoidance of doubt, Merchant shall be responsible for providing any required notice under the WARN Act or state laws with respect to its employees and otherwise comply with the WARN Act or state laws with respect to any "plant closing" or "mass layoff" (as defined in the WARN Act) or group termination or similar event affecting the employees, whether before or after the date of this Agreement. Merchant shall not, without the prior consent of Agent, raise the salary or wages or increase the benefits for, or pay any bonuses or other extraordinary payments to, any Store or Distribution Center employees prior to the Sale Termination Date. Merchant shall not transfer any employee in anticipation of the GOB Sale nor any Retained Employee during the Sale Term, in each case without Agent's prior consent, not to be unreasonably withheld. To the extent reasonably requested in writing by Agent, and at Agent's expense, Merchant shall use commercially reasonable efforts to hire additional temporary employees to facilitate the GOB Sale, which employees shall constitute Retained Employees for purposes of this Agreement.

9.2     Termination of Employees. Agent may in its discretion stop using any Retained Employee at any time during the GOB Sale, subject to the conditions provided for herein. In the event that Agent desires to cease using any Retained Employee, Agent shall notify Merchant at least seven (7) days prior thereto in writing; provided, however, that, in the event that Agent determines to cease using an employee "for cause" (such as dishonesty, fraud or breach of employee duties), the seven (7) day notice period shall not apply; provided that Agent shall notify Merchant immediately after such discontinuance. Contemporaneous with providing such notice, Agent shall provide to Merchant all information and other materials in Agent's knowledge, possession or control concerning supporting Agent's determination to terminate any Retained Employee "for cause." From and after the date of this Agreement and until the Sale Termination Date, Merchant shall not transfer or dismiss employees of the Stores or Distribution Centers except "for cause" without Agent's prior consent, not to be unreasonably withheld. Notwithstanding the foregoing, Agent shall not have the right to terminate the actual employment of any employee, but rather may only cease using such employee in the GOB Sale and paying any Expenses with respect to such employee (and all decisions relating to the termination or non-termination of such employees shall at all times rest solely with Merchant). Notwithstanding any other provision hereof, Agent will indemnify and hold Merchant harmless from and against any and all costs or expenses incurred (including, without limitation, reasonable attorneys' fees) in connection with any claims by Retained Employees arising from Agent's conduct in connection with Retained Employees.

9.3     Payroll Matters. During the Sale Term, Merchant shall process the payroll for all Retained Employees and any former employees and temporary labor engaged for the GOB Sale. Each Wednesday of each week during which payroll is being paid by Merchant (or such other date as may be reasonably requested by Merchant to permit the funding of the payroll accounts before such payroll is due and payable) during the Sale Term, Agent shall transfer to Merchant's payroll accounts an amount equal to the payroll for Retained Employees plus related payroll taxes, workers' compensation and benefits for each such week, to the extent such amount constitutes Expenses hereunder.

9.4        Employee Retention Bonuses.  Subject to approval by the Bankruptcy Court, Agent may, in its sole discretion, pay, as an Expense, retention bonuses and/or severance pay ("Retention Bonuses"), which bonuses shall be inclusive of payroll taxes, but as to which no severance benefits shall be payable to such Retained Employees who do not voluntarily leave employment, are not otherwise entitled to receive severance pay, and are not terminated "for cause," as Agent may determine in its reasonable and good faith discretion.  Subject to approval by the Bankruptcy Court, the amount of such Retention Bonuses shall be in an amount to be determined by Agent, in its reasonable and good faith discretion, and shall be payable within thirty (30) days after the Sale Termination Date and shall be processed through Merchant's payroll system.

**Section 10.  Conditions Precedent and Subsequent.**

(a)        Agent shall consummate the transactions contemplated under this Agreement (the "Closing") by February 1422, 2025 or, if there is an Auction, February 27, 2025 (the "Closing Date") subject only to the satisfaction of the following conditions, unless specifically waived in writing by Agent in its reasonable discretion:

(i)        The Petition Date shall have occurred no later than January 15, 2025;

(ii)        On the Petition Date, Merchant shall have filed a motion and proposed form of Bid Procedures Order;

(iii)        On or before February 12, 2025, Merchant shall have filed a motion seeking approval to commence store closing sales in a manner directed by Agent;

(iv)        The Bankruptcy Court shall have entered an order approving Merchant's motion seeking approval to commence store closing sales (the "Store Closing Procedures Order");

(v)        (iii) The Bankruptcy Court shall have entered an order approving the use of cash collateral (the "Cash Collateral Order") on a final basis no later than February 1026, 2025;

(vi)        (iv) The Bankruptcy Court shall have entered the Bid Procedures Order on a final basis no later than February 104, 2025;

(vii)        (v) The bid deadline under the Bid Procedures Order shall be no later than February 128, 2025;

(viii)        (vi) The Auction, if any, under the Bid Procedures Order shall be no later than February 214, 2025;

(ix)        (vii) The Bankruptcy Court shall have entered the Approval Order no later than February 214, 2025, provided, however, that no Auction has occurred;

(x)    If an Auction has occurred, the Bankruptcy Court shall have entered the Approval Order no later than February 26, 2025;

(xi)    (viii) The Bankruptcy Court shall have entered an order, pursuant to Section 365(d)(4) of the Bankruptcy Code, extending the Merchant's time to assume or reject the leases for the Stores to the date that is 210 days after the Petition Date;

(xii)    (ix) The Termination Declaration Date, as defined in the Cash Collateral Order, shall not have occurred;

(xiii)    (x)    (A) All representations and warranties of Merchant in Section 11.1 (other than the representations and warranties set forth in Sections 11.1(a), (b), and (c)) shall be true and correct, except where the failure to be true and correct has not had and would not reasonably be expected to have a material adverse effect on the Assets taken as a whole, (B) all representations and warranties of Merchant in Sections 11.1(a), (b), and (c) shall be true and correct in all material respects as of the Closing, and (C) Merchant shall have in all material respects performed the obligations and complied with the covenants required by this Agreement to be performed or complied with by it prior to the Closing;

(xiv)    (xi) No chapter 11 trustee has been appointed and the Merchant's bankruptcy cases have not been converted to cases under Chapter 7 of the Bankruptcy Code;

(xv)    (xii) There shall not have been a variance greater than five percent (5%) of the expenses set forth in "Total Expenses/Wind Down Costs" line item of the cash collateral budget without the written consent of Agent; and

(xvi)    (xiii) All of the Parties shall have executed this Agreement.

(b)    The willingness of Merchant to enter into the transactions contemplated under this Agreement, and the occurrence of the Closing, are directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by Merchant, with the prior written consent of the Prepetition ABL Agent and the Prepetition FILO Agent to the extent such waiver would materially affect their interests:

(i)    No judgment enacted, promulgated, issued, entered, amended or enforced by any governmental authority or any applicable law shall be in effect enjoining or otherwise prohibiting consummation of the transactions contemplated hereby;

(ii)    All representations and warranties of Agent hereunder shall be true and correct in all material respects as of the Closing, and Agent shall have in all material respects performed the obligations and complied with the covenants required by this Agreement to be performed or complied with by it prior to the Closing;

(iii)    The ABL Agent, the FILO Agent and any other persons designated by them have received full and indefeasible payment in cash (or other consideration as applicable) of all Debt Payoff specified in the Payoff Letters on the Closing Date; and

(iv)    All of the Parties shall have executed this Agreement.

**Section 11.  Representations, Warranties and Covenants.**

    11.1    Merchant's Representations and Warranties.  Merchant hereby represents and warrants in favor of Agent as follows:

    (a)    As of the date of this Agreement and at the Closing, Merchant (i) is duly organized, validly existing and in good standing under the laws of the State of its organization; (ii) has all requisite corporate power and authority to own, lease and operate the Assets and to carry on its business as presently conducted; (iii) is duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which the Stores are located, except, in each case, to the extent that the failure to be in good standing or so qualified would not reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder; and (iv) has paid when due all United States Trustee fees.

    (b)    Subject only to entry of the Approval Order, Merchant, as of the date of this Agreement and at the Closing, has the right, power and authority to execute and deliver this Agreement and each other document and agreement contemplated hereby (collectively, together with this Agreement, the "Agency Documents") and to perform fully its obligations thereunder. Subject only to entry of the Approval Order, Merchant has taken all necessary actions required to authorize the execution, delivery and performance of the Agency Documents, and no further consent or approval is required for Merchant to enter into and deliver the Agency Documents, to perform its obligations thereunder and to consummate the Sale, except for any such consent the failure of which to be obtained would not reasonably be expected to prevent or materially delay or impair the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder.  Subject only to entry of the Approval Order, each of the Agency Documents has been duly executed and delivered by Merchant and, upon the due authorization, counter-execution, and delivery of this Agreement by Agent, constitutes the legal, valid and binding obligation of Merchant enforceable in accordance with its terms.

    (c)    Merchant, as of the date of this Agreement and at the Closing, owns good and valid title to all of the Assets, free and clear of all security interests, liens, claims and encumbrances of any nature other than the security interests securing the Prepetition Secured Obligations (as defined in the Cash Collateral Order) and Permitted Encumbrances.

    (d)    Since January 1, 2024, Merchant has maintained its pricing files, including but not limited to the Merchandise File, in the ordinary course of business, and prices charged to the public for goods are the same in all material respects as set forth in such pricing files, including but not limited to the Merchandise File, for the periods indicated therein, all pricing files, including but not limited to the Merchandise File, and records are true and accurate in all material respects as to the actual cost to Merchant for purchasing the goods referred to therein and as to the selling price to the public for such goods without consideration of any point of sale discounts, as of the dates and for the periods indicated therein.  Merchant represents that (i) the ticketed prices of all items of Merchandise do not and shall not include any Sales Taxes and (ii)

all registers located at the Stores are programmed to correctly compute all Sales Taxes required to be paid by the customer under applicable law, as such calculations have been identified to Merchant by its retained service provider.

(e)     Merchant has ticketed or marked all goods and items of inventory received and currently located at the Stores or Distribution Centers in a manner consistent with similar Merchandise located at the Stores or Distribution Centers, and in accordance with Merchant's ordinary course past practices and policies relative to pricing and marking goods and inventory.

(f)     Since January 1, 2025, Merchant has not purchased for or transferred to or from the Stores or Distribution Centers any inventory or goods outside the ordinary course.

(g)     To Merchant's knowledge after reasonable inquiry, all Merchandise is in compliance in all material respects with all applicable federal, state and local product safety laws, rules and standards.

(h)     Since January 1, 2024, Merchant has paid all self-insured or Merchant-funded employee benefit programs for Store employees, including health and medical benefits and insurance and all proper claims made or to be made in accordance with such programs.

(i)     Since January 1, 2025, Merchant has not taken any actions with the intent of increasing the Expenses of the Sale as compared to ordinary course operations prior to the Sale Commencement Date, including without limitation increasing salaries or other amounts payable to employees; except to the extent an employee was due an annual raise in the ordinary course.

(j)     Other than filing the Bankruptcy Case, no action, arbitration, suit, notice, or legal, administrative or other proceeding before any court or governmental body is pending, by or against Merchant, or has been settled or resolved, or to Merchant's knowledge, is threatened against or affects Merchant, relative to Merchant's business or properties, or which questions the validity of this Agreement, in any case, that would reasonably be expected to adversely affect the conduct of the Sale.

(k)     ~~As of the Petition Date, the aggregate Cost Value of the Merchandise included in the Sale is estimated to be not less than $538,300,000.~~

11.2    <u>Merchant's Covenants.</u>

(a)     Merchant, during the Sale Term, (i) will continue to be duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which the Stores are located, except, in each case, to the extent that the failure to be in good standing or so qualified would not reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder; and (ii) will continue to pay when due all United States Trustee fees.

(b)      Merchant shall not create, incur, assume or suffer to exist any security interest, lien or other charge or encumbrance (other than Permitted Encumbrances) upon or with respect to any of the Assets.  From and after the Closing, subject to the Central Services Budget and Agent's satisfaction of its payment obligations under this Agreement, Merchant shall use commercially reasonable efforts to perform such tasks and services as are reasonably necessary, in the ordinary course to maintain and preserve the Assets in saleable condition and to maintain good and valid title to all of the Assets at all times until all Assets have been sold or otherwise disposed of, and such other tasks and services as Agent may otherwise reasonably request in connection with the GOB Sales, including but not limited to paying all ad valorem taxes and utilities when due, performing all routine maintenance in the ordinary course, and renewing all necessary licenses and registrations.

(c)      Except as necessary to comply with Merchant's obligations under the Store Closing Procedures Order, Tthrough the Sale Commencement Date, Merchant shall continue to ticket or mark all goods and items of inventory received at the Stores or Distribution Centers in a manner consistent with similar Merchandise located at the Stores or Distribution Centers, and in accordance with Merchant's ordinary course past practices and policies relative to pricing and marking goods and inventory.

(d)      Except as necessary to comply with Merchant's obligations under the Store Closing Procedures Order, Tthrough the Sale Commencement Date, Merchant shall transfer inventory or goods to or from Distribution Centers in the ordinary course and shall not deviate from that schedule.

(e)      Except as necessary to comply with Merchant's obligations under the Store Closing Procedures Order, Tthrough the Sale Commencement Date Merchant shall not, purchase for or transfer to or from the Stores or Distribution Centers any inventory or goods outside the ordinary course.

(f)      Merchant shall provide Agent with reasonable access to and/or copies of its historic policies and practices, if any, regarding product recalls, as Agent may reasonably request prior to the Sale Commencement Date.

(g)      Subject to the Agent satisfying its payment obligations under this Agreement, Merchant shall, throughout the Sale Term, maintain in good working order, condition, and repair all cash registers, heating systems, air conditioning systems, elevators, escalators and all other mechanical devices necessary for the conduct of the GOB Sale at the Stores in the ordinary course.  Except as otherwise restricted by the Bankruptcy Code upon filing of the Bankruptcy Case, and absent a bona fide dispute, throughout the Sale Term, Merchant shall remain current on all expenses and payables necessary or appropriate for the conduct of the GOB Sale.

(h)      Subject to payment of Expenses and other obligations under this Agreement by Agent, and approval by the Bankruptcy Court, Merchant will continue to pay all self-insured or Merchant-funded employee benefit programs for Store employees, including

health and medical benefits and insurance and all proper claims made or to be made in accordance with such programs.

(i)      Payment of Expenses and other obligations under this Agreement by Agent, and approval by the Bankruptcy Court, Merchant will continue to pay throughout the Sale Term all self-insured or Merchant-funded employee benefit programs for Store employees, including health and medical benefits and insurance and all proper claims made or to be made in accordance with such programs.

(j)      Except as necessary to comply with Merchant's obligations under the Store Closing Procedures Order, Merchant shall not throughout the Sale Term take any actions with the intent of increasing the Expenses of the Sale as compared to ordinary course operations prior to the Sale Commencement Date, including without limitation increasing salaries or other amounts payable to employees; except to the extent an employee was due an annual raise in the ordinary course.

(k)      Prior to the execution of this Agreement, Merchant has provided Agent reasonable access to all pricing and cost files, including but not limited to the Merchandise File, and data files, inter-Stores transfer logs, markdown schedules, invoices, style runs and all other documents relative to the price, mix and quantities of inventory located at the Stores and the Distribution Centers or on order or in transit.

(l)      Merchant hereby acknowledges that, as of and after the date of this Agreement, Agent intends to begin to make arrangements for the purchase of Additional Agent Merchandise from Agent's suppliers of goods as well as Merchant's existing suppliers of goods. To assist Agent in that regard, from and after the date of this Agreement, Merchant shall use Merchant's best efforts to assist and cause Merchant's employees to assist Agent with Agent's efforts to negotiate orders with Merchant's suppliers for goods that Agent is interested in purchasing as Additional Agent Merchandise and to assist Agent with creating SKUs in and otherwise updating Merchant's systems for and in connection with all such Additional Agent Merchandise.

(m)      Except as necessary to comply with Merchant's obligations under the Store Closing Procedures Order, Merchant (i) shall not, prior to or after the Sale Commencement Date, offer any promotions or discounts at the Stores, through the e-commerce sites, social media sites, any other retail location, or any other promotional or retail sales channel owned or controlled directly by Merchant, except as detailed on Exhibit 11.2(m) (the "Promotional Calendar") and (ii) shall make commercially reasonable efforts to notify third party websites or social media sites of such restrictions.

(n)      Merchant shall discontinue its current return program and shall stop the sale of gift cards as of the execution date of this Agreement.

(o)      Merchant shall operate the Stores in accordance with the terms of the Store Closing Procedures Order, including, but not limited to Agent approving signage package to Stores, discounting cadence and staffing and supervision, in each case, in accordance with such terms.

11.3        <u>Agent's Representations, Warranties and Covenants</u>.    Agent hereby represents, warrants and covenants in favor of Merchant as follows:

(a)        Agent: (i) is duly and validly existing and in good standing under the laws of the State of its organization; (ii) has all requisite power and authority to carry on its business as presently conducted and to consummate the transactions contemplated hereby; (iii) is duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including, in the case of the entities comprising Agent, all jurisdictions in which the Stores are located, except, in each case, to the extent that the failure to be in good standing or so qualified would not reasonably be expected to have a material adverse effect on the ability of Agent to execute and deliver this Agreement and perform fully its obligations hereunder.

(b)        Agent: (i) has the right, power and authority to execute and deliver each of the Agency Documents to which it is a party and to perform fully its obligations thereunder; (ii) has taken all necessary actions required to authorize the execution, delivery and performance of the Agency Documents, and no further consent or approval is required on the part of Agent for Agent to enter into and deliver the Agency Documents, to perform its obligations thereunder and to consummate the transactions contemplated thereby, and (iii) has duly executed and delivered each of the Agency Documents and, assuming the due authorization, execution, and delivery of this Agreement by Merchant, constitutes the legal, valid and binding obligation of Agent enforceable in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, and similar laws affecting the rights of creditors generally and by general principles of equity.  No court order or decree of any federal, state or local governmental authority or regulatory body is in effect that would prevent or impair, or is required for, Agent's consummation of the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor, other than as provided herein.  No contract or other agreement to which Agent is a party or by which Agent is otherwise bound will prevent or impair the consummation of the transactions contemplated by this Agreement.

(c)        No action, arbitration, suit, notice or legal administrative or other proceeding before any court or governmental body has been instituted by or against Agent, or has been settled or resolved or, to Agent's knowledge, has been threatened against or affects Agent, which questions the validity of this Agreement or any action taken or to be taken by Agent in connection with this Agreement or which, if adversely determined, would have a material adverse effect upon Agent's ability to perform its obligations under this Agreement.

(d)        The GOB Sale shall be conducted in compliance with all applicable state and local laws, rules and regulations and Merchant's leases and other agreements, except as otherwise provided for in this Agreement, the Sale Guidelines or the Approval Order.

(e)        Absent prior consent by Merchant, Agent will not cause any non-emergency repairs or maintenance (emergency repairs are repairs necessary to preserve the security of a Store premise or to ensure customer safety) to be conducted at the Stores.

(f)     Agent will have at the Closing and at any time payments are required to be made by Agent under this Agreement hereunder or under the other Agent documents sufficient funds available in cash to pay the Purchase Price and any Expenses and any other fees and expenses incurred by or otherwise required to be paid by Agent in connection with the transactions contemplated by this Agreement.

(g)     Assuming (i) the satisfaction or waiver of the conditions set forth in <u>Section 10</u>, and (ii) the accuracy of the Express Representations (without regard to any knowledge or materiality qualifications contained therein), Agent and its subsidiaries will be Solvent.  Agent is not entering into the transactions contemplated by this Agreement with the intent to hinder, delay or defraud either present or future creditors of Agent, Merchant or their respective subsidiaries.  For purposes of this Agreement, "Solvent," when used with respect to any Person, means that such Person (i) will not be insolvent as defined in section 101 of the Bankruptcy Code, (ii) has property with fair value greater than the total amount of their debts and liabilities, contingent, subordinated or otherwise (it being understood that the amount of contingent liabilities at any time shall be computed as the amount that, in light of all the facts and circumstances existing at such time, can reasonably be expected to become an actual or matured liability), (iii) has assets with present fair salable value not less than the amount that will be required to pay their liability on their debts as they become absolute and matured, (iv) will be able to pay its debts and liabilities, subordinated, contingent or otherwise, as they become absolute and matured, and (v) are not engaged in business or a transaction, and are not about to engage in business or a transaction, for which they have unreasonably small capital.

(h)     As of the date of this Agreement, there are no contracts, undertakings, commitments, agreements or obligations, whether written or oral, between Agent, on the one hand, and any member of the management of Merchant or its respective board of directors (or applicable governing body of any Affiliate of any Person within Merchant), any holder of equity or debt securities of Merchant, or any lender or creditor of Merchant or any Affiliate of Merchant, on the other hand, (a) relating in any way to the Assets or the transactions contemplated by this Agreement, or (b) that would be reasonably likely to prevent, restrict, impede or affect adversely the ability of Merchant or any of its Affiliates to entertain, negotiate or participate in any such transactions.

(i)     Except for the representations and warranties expressly contained in <u>Section 11.1</u> (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) (the "<u>Express Representations</u>") (it being understood that Agent and its affiliates and representatives have relied only on such Express Representations), Agent acknowledges and agrees, on its own behalf and on behalf of its affiliates and representatives, that neither Merchant, any of its Affiliates, nor any other Person on behalf of Merchant or any of its Affiliates makes, and neither Agent nor any of its affiliates and representatives has relied on, is relying on, or will rely on the accuracy or completeness of any express or implied representation or warranty with respect to Merchant, the any of the Assets, or any businesses or liabilities of Merchant or its Affiliates, or with respect to any information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person, including in any "dataroom" or elsewhere to Agent or any of its affiliates or representatives on behalf of Merchant or any of its Affiliates or representatives.  Without limiting the foregoing, neither Merchant, any of its affiliates nor or any

of its or their representatives nor any other Person will have or be subject to any Liability whatsoever to Agent, or any other Person, resulting from the distribution to Agent or any of its Affiliates or representatives, or Agent's or any of its Affiliates' or Representatives' use of or reliance on, any such information, including in any dataroom or otherwise in expectation of the transactions or any discussions with respect to any of the foregoing information or otherwise.

(j)    Agent acknowledges and agrees, on its own behalf and on behalf of its affiliates and representatives, that it will not assert, institute, or maintain, and will cause each of its affiliates and representatives not to assert, institute or maintain, any Action that makes any claim contrary to the agreements and covenants set forth in Section 11.3(f).

## Section 12.  Efforts.

12.1    Subject to the terms and conditions of this Agreement, each of the Agent and Merchant shall cooperate with each other and use (and shall cause its affiliates to use) its reasonable best efforts (unless, with respect to any action, another standard of performance is expressly provided for herein) to promptly (i) take, or cause to be taken, all actions, and do, or cause to be done, and assist and cooperate with each other in doing, all things necessary, proper or advisable to cause the conditions to Closing to be satisfied as promptly as reasonably practicable and to consummate and make effective, in the most expeditious manner reasonably practicable, the Ttransactions, including preparing and filing promptly and fully all documentation to effect all necessary filings, notices, petitions, statements, registrations, submissions of information, applications and other documents, (ii) obtain all approvals, consents, registrations, waivers, permits, authorizations, orders and other confirmations from any governmental authority or third party necessary, proper or advisable to consummate the transactions contemplated hereby, (iii) execute and deliver any additional instruments necessary to consummate the transactions contemplated hereby and (iv) defend or contest in good faith any action brought by a third party that could otherwise prevent or impede, interfere with, hinder or delay in any material respect the consummation of the transactions contemplated hereby.

## Section 13.  Insurance.

13.1    Merchant's Liability Insurance.    Until the Designation Rights Termination Date or as otherwise earlier directed by Agent or set forth in this Agreement, Merchant shall continue to maintain, subject to the satisfaction by Agent of its payment obligations under this Agreement, in such amounts as it currently has in effect, all of its liability insurance policies, including but not limited to commercial general liability, products liability, comprehensive public liability, auto liability and umbrella liability insurance, covering injuries to persons and property in, or in connection with, the Assets and/or Merchant's operation of its business and the Stores and Distribution Centers; and Merchant shall make commercially reasonable efforts to cause Agent to be named as an additional named insured (as its interest may appear) with respect to all such policies.  Merchant shall make commercially reasonable efforts to deliver to Agent certificates evidencing such insurance setting forth the duration thereof and naming Agent as an additional named insured.  All such policies shall require at least thirty (30) days' prior notice to Agent of cancellation, non-renewal or material change.  In the event of a claim under any such policies, Merchant shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder (which shall be reimbursed as an Expense), unless

it is determined that liability arose by reason of the willful misconduct or grossly negligent acts or omissions of Agent, or Agent's employees, independent contractors or agents, in which case Agent shall be solely responsible for any such deductibles, retentions or self-insured amounts. Merchant shall not make any change in the amount of any deductibles or self-insurance amounts on or after the date of this Agreement without Agent's prior written consent or unless such a change is required by the relevant insurer(s) in connection with a renewal or extension of the policy.

13.2    <u>Merchant's Casualty Insurance</u>.    Until the Designation Rights Termination Date, as otherwise earlier directed by Agent, or, if earlier, until the sale or other disposition of all Assets covered by such policies, Merchant shall continue to maintain, subject to the satisfaction by Agent of its payment obligations under this Agreement, all of its presently existing property casualty coverage related to the Assets (including but not limited to fire, flood, wind, hail, natural disaster, theft, and extended coverage casualty insurance). From and after the Closing, Merchant will make commercially reasonable efforts to cause all such policies to also name Agent as an additional named insured or loss payee, as applicable (as its interest may appear). In the event of a loss to the Assets on or after the Closing, all proceeds of such insurance shall constitute Proceeds hereunder after subtraction of any expenses reasonably incurred securing such proceeds. Merchant shall make commercially reasonable efforts to deliver to Agent certificates evidencing such insurance, setting forth the duration thereof and naming Agent as an additional insured or loss payee, as applicable. Merchant will make commercially reasonable efforts to provide thirty (30) days' prior notice to Agent of cancellation, non-renewal or material change. Merchant shall not make any change in the amount of any deductibles or self-insurance amounts on or after the date of this Agreement without Agent's prior written consent or unless such a change is required by the relevant insurer(s) in connection with a renewal or extension of the policy. Upon the sale, conveyance, or other disposition of any Asset specifically identified in any of Merchant's casualty insurance policies, Merchant may, with the Agent's prior consent (such consent not to be unreasonably withheld or delayed), cancel the casualty coverage specifically applicable to such Asset.

13.3    <u>Agent's Insurance</u>.  Agent shall maintain, at Agent's cost (as an Expense) and in such amounts as Agent currently has in effect, commercial general liability policies covering injuries to persons and property in or in connection with Agent's agency at the Stores and shall cause Merchant to be named as an additional insured with respect to such policies. Agent shall deliver to Merchant certificates evidencing such insurance policies setting forth the duration thereof and naming Merchant as an additional insured, in form and substance reasonably satisfactory to Merchant. In the event of a claim under any such policies, Agent shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder, unless it is determined that liability arose by reason of the willful misconduct or grossly negligent acts or omissions of Merchant or Merchant's employees, independent contractors or agents (other than Agent or Agent's employees, agents or independent contractors). Agent shall not make any change in the amount of any deductibles or self-insurance amounts prior to the Sale Termination Date without Merchant's prior written consent.

13.4       Worker's Compensation Insurance.  Merchant shall, at all times while any employees are in its employ, maintain in full force and effect workers' compensation insurance (including employer liability insurance) in compliance with all statutory requirements.

13.5       Risk of Loss.  Without limiting any other provision of this Agreement, Merchant acknowledges that Agent is conducting the GOB Sale on behalf of Merchant solely in the capacity of an agent, and that in such capacity (a) except for any Additional Agent Merchandise, Agent shall not be deemed to be in possession or control of the Stores, Distribution Centers, or the assets located therein or associated therewith, or of Merchant's employees located at the Stores or Distribution Centers, and (b) except as expressly provided in this Agreement, Agent does not assume any of Merchant's obligations or liabilities with respect to any of the foregoing.  Agent shall not be deemed to be a successor employer.  Merchant and Agent agree that, subject to the terms of this Agreement, Merchant shall bear all responsibility for liability claims of customers, employees, and other persons arising from events occurring at the Stores during and after the Sale Term, except to the extent any such claim arises from the acts or omissions of Agent, or its supervisors, agents, independent contractors, or employees located at the Stores (an "Agent Claim").  In the event of any liability claim that Merchant and Agent agree is not an Agent Claim, Merchant shall administer such claim and shall present such claim to Merchant's liability insurance carrier in accordance with Merchant's policies and procedures existing immediately prior to the Sale Commencement Date, and shall provide a copy of the initial documentation relating to such claim to Agent at the address listed in this Agreement.  To the extent that Merchant and Agent agree that a claim constitutes an Agent Claim, Agent shall administer such claim and shall present such claim to its liability insurance carrier, and shall provide copies of the initial documentation relating to such claim to Merchant.  In the event that Merchant and Agent cannot agree whether a claim constitutes an Agent Claim, each party shall present the claim to its own liability insurance carrier, and a copy of the initial claim documentation shall be delivered to the other party to the address designated for delivery of notices hereunder.

13.6       Merchant Indemnification.  From and after the Closing, Merchant shall indemnify and hold Agent, and its officers, directors, employees, agents, representatives, and independent contractors (collectively, "Agent Indemnified Parties") harmless from and against all claims, causes of action, demands, penalties, losses, liability, damage, or other obligations, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from or related to: (a) Merchant's material breach of or failure to comply with any of its agreements or covenants contained in this Agreement, in each case, solely to the extent such covenant or agreement requires performance after the Closing; (b) any consumer warranty or products liability claims relating to Merchandise; (c) any harassment or any other unlawful, tortious, or otherwise legally actionable treatment of any customers, employees or agents of Agent by Merchant or any of their respective representatives (other than Agent); and (d) the willful misconduct of Merchant or its respective officers, directors, employees, agents (other than Agent) or representatives.

13.7       Agent Indemnification.

34

(a)    From and after the Closing, Agent shall indemnify and hold Merchant and its respective officers, directors, employees, agents and representatives harmless from and against all claims, causes of action, demands, penalties, losses, liability, damage, or other obligations, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to: (a) Agent's material breach of or failure to comply with any of its agreements, or covenants, contained in this Agreement, in each case, solely to the extent such covenant or agreement requires performance after the Closing; (b) any claims by any party engaged by Agent as an employee or independent contractor arising out of such employment; (c) any harassment or any other unlawful, tortious or otherwise legally actionable treatment of any customers, employees or agents of Merchant by Agent or any of its representatives; (d) any consumer warranty or products liability claims relating to Additional Agent Merchandise; (e) as set forth in Section 8.3 above; (f) the willful misconduct of Agent, its officers, directors, employees, agents or representatives.

(b)    Agent shall indemnify Merchant (and their respective estates) for up to $10,000,000.00 on account of any ~~A~~administrative ~~E~~expense ~~C~~claim or ~~P~~priority ~~T~~tax ~~C~~claim attributable to the tax consequences associated with the elimination or cancellation of, transfer of, or withdrawal from the Key Man Insurance ~~P~~policy ~~P~~program provided for under certain Pre-1986 Corporate Owned Life Insurance policies issued in 1984 and 1985 by Provident Life and Accident Insurance Company (the "<u>Key Man Insurance Policies</u>" and any associated tax liability, the "<u>Key Man Insurance Tax Liability</u>") upon the tax becoming payable to the relevant taxing authority.  Merchant shall use best efforts to, and reasonably cooperate with, Agent and its professionals in efforts to, mitigate and/or offset the amount of any Key Man Insurance Tax Liability, including by evaluating the availability of any tax attributes that could reduce or eliminate the Key Man Insurance Tax Liability, considering the appropriate classification of any Key Man Insurance Tax Liability, considering structuring alternatives to monetize the Key Man Insurance Policies or otherwise preventing any Key Man Insurance Tax Liability from arising. For the avoidance of doubt, Agent shall be entitled to the net proceeds (if any), after payment of any associated tax liability, of the Key Man Insurance Policies, including if such proceeds become due and payable prior to the Merchant's withdrawal.

**Section 14.  <u>Agent's Security Interest</u>.**

(a)    Upon the occurrence of the Closing and satisfaction of the Debt Payoff, Agent is hereby granted first priority, senior security interests in and liens upon all Assets, all Proceeds <u>and Additional Agent Merchandise Proceeds</u>, and any proceeds thereof, which security interests and liens shall be deemed by the Approval Order to be automatically perfected.  The Approval Order shall grant Agent relief from the automatic stay, and nothing in the Approval Order shall inhibit Agent's ability, to take any action Agent deems appropriate to perfect such security interests and liens.  From and after the Closing, the Merchant shall not grant any other party any security interests in or liens upon the Assets, Proceeds, <u>Additional Agent Merchandise Proceeds,</u> or proceeds thereof.  Any security interests in or liens upon the Assets prior to the Closing and satisfaction of the Debt Payoff shall attach to the Purchase Price as of the Closing.

(b)    <u>Subject to, and subordinated to, the Carve Out, as defined in the Cash Collateral Orde, U</u>~~u~~pon the occurrence of the Closing and until all Assets have been sold or otherwise disposed of <u>and the Merchant receives the full amount of the Wind-Down Budget,</u>

Agent shall have a superpriority administrative expense claim against Merchant, which is senior to all other administrative expenses (including any other superpriority –administrative expense claims, not including amounts subject to the Carve Out) to the extent of any amounts owing from Merchant to Agent in connection with this Agreement, including as a result of any breach of this Agreement.

**Section 15.  Designation Rights.**

15.1    Lease/Contract Designation Rights.

(a)     Upon the occurrence of the Closing and until the earlier to occur of (i) the end of the Lease/Contract Designation Rights Period applicable to a particular Lease or Contract and (ii) May 31, 2025 (as may be amended by written agreement of the Parties, the "Designation Rights Termination Date"), Agent shall have the exclusive right to designate the purchasers, assignees, sublessees, or other transferees of Merchant's right, title, and interest in and to any or all of the Leases and Contracts (the "Lease/Contract Designation Rights") upon the terms and conditions agreed upon between Agent and such designee.

(b)     Merchant shall cooperate reasonably with Agent to arrange for the sale, sublease, assignment, and other transfer, as applicable, of the Leases and Contracts, with such sale and assignment to be on such terms as Agent deems acceptable in its sole and absolute discretion.  Without limiting the generality of the foregoing, Merchant agrees (1) to provide Agent with all due diligence materials and information as Agent shall reasonably request in connection with its efforts to market and attempt to sell or otherwise dispose of the Leases and Contracts (including complete copies thereof and any abstracts prepared with respect thereto, and all communications with the counterparties thereunder, all property surveys, all environmental reports and tax and utility records), with Agent to bear all reasonable third party out-of-pocket costs and expenses relating thereto, in all cases to the extent reasonably available to Merchant, and (2) to cooperate with Agent, its agents, and any potential purchasers assignees, sublessees, or other transferees of any of the Leases and/or Contracts.

(c)     Solely to the extent requested by Agent, Merchant shall exercise renewal and/or extension options under the Leases and Contracts.

(d)     At any time prior to the end of the Lease/Contract Designation Rights Period applicable to a particular Lease or Contract, Agent shall have the right, which right may be exercised at any time and from time to time, to file a Lease/Contract Assumption Notice in the Bankruptcy Cases designating the purchasers, assignees, sublessees, or other transferees (which may in certain circumstances be Agent, any of the entities comprising Agent, any of their respective affiliates, and/or a new entity created by any of the foregoing) of one or more Leases and/or Contracts (which may occur without further order of the Bankruptcy Court pursuant to the Approval Order) and setting forth the proposed cure amount due pursuant to section 365 of the Bankruptcy Code.  The Approval Order shall provide that (a) the counterparties to the Leases or Contracts identified in any Lease/Contract Assumption Notice shall have ten (10) days to object to the proposed assumption and assignment, (b) if no objection to the proposed assumption and assignment of a Lease or Contract is timely received, such Lease or Contract shall, upon payment of the applicable cure payment, if any, to the applicable counterparty, automatically be deemed

assumed by Merchant and sold, assigned, or otherwise transferred to the purchasers, assignees, or other transferees identified in the Lease/Contract Assumption Notice pursuant to sections 363 and 365 of the Bankruptcy Code, without further order of the Bankruptcy Court or further action by any person or entity, and (c) if an objection to the proposed assumption and assignment of a Lease or Contract is timely received, such Lease or Contract shall not be assumed or assigned until such objection is resolved by agreement of the applicable counterparty or order of the Bankruptcy Court.

(e)     The designee under any Lease/Contract Assumption Notice shall be required, if requested by the applicable counterparty, to provide adequate assurance of future performance with respect to such Lease or Contract if the applicable counterparty so requests. Merchant shall have no responsibility for any cure amounts with respect to any Lease or Contract assumption and assignment.

15.2    <u>Asset Designation Rights</u>

(a)     Upon the occurrence of the Closing, Agent shall have the exclusive right to market and sell, and/or otherwise designate the purchasers, transferees, and/or assignees of (which may in certain circumstances be Agent, any of the entities comprising Agent, any of their respective affiliates, and/or a new entity created by any of the foregoing), any or all of the Assets free and clear of all liens, claims, and encumbrances thereon (other than Permitted Encumbrances), without further order of the Bankruptcy Court (the "<u>Asset Designation Rights</u>"). Agent is authorized to execute, in the name of and as agent for Merchant, any and all deeds, bills of sale, and other instruments or documents necessary to effectuate the sale, transfer, or other conveyance of any of the Assets, none of which instruments or documents shall require Merchant to incur any obligations or other liabilities beyond the terms of this Agreement.

(b)     Pursuant to the Approval Order, the sale or other conveyance of any Assets reflected in Asset Designation Notices filed in the Bankruptcy Cases from time to time by Agent shall be automatically effective on the date reflected in the applicable Asset Designation Notice and subject to the satisfaction of any closing conditions reflected therein, and the sale, transfer, or other conveyance of such Assets shall be free and clear of all liens, claims, and encumbrances (other than Permitted Encumbrances) without further order of the Bankruptcy Court; <u>provided</u>, <u>however</u>, that nothing in the Approval Order shall inhibit the ability of Agent to seek other or further orders of the Court in connection with the sale or other disposition of any Assets.

(c)     The costs of maintaining the Assets available for marketing and sale shall constitute Expenses.  All costs of effectuating assumption and assignment shall be deemed an Expense hereunder.

15.3     Agent Dropout Rights.  At any time prior to the expiration of the Lease/Contract Designation Rights Period or the Designation Rights Termination Date (as applicable), Agent shall have the right, upon five (5) days' written notice (the "Dropout Notice Period"), which right may be exercised at any time and from time to time in Agent's sole and absolute discretion, to provide notice to Merchant (each such notice, a "Dropout Notice") of Agent's election to discontinue its efforts to market and attempt to sell, assign, transfer, license, designate the acquirer or purchaser, or otherwise dispose of any Asset (each, a "Dropout Asset" and, collectively, the "Dropout Assets").  Upon the effective date of any Dropout Notice, (i) Agent shall have no further obligation or liability with respect to the subject Dropout Asset, and (ii) Merchant shall thereafter be solely responsible for all such Dropout Asset(s) from and after the effective date of the Dropout Notice.  Upon expiration of the Dropout Notice Period, all rights to the Dropout Assets shall revert to Merchant, and Merchant may dispose of such Dropout Asset in such manner as Merchant may elect, and one hundred percent (100%) of all proceeds realized upon a disposition of such Dropout Asset shall be the exclusive property of Merchant (and shall not constitute Proceeds).  The delivery of a Dropout Notice shall not result in a reduction of the Purchase Price payable hereunder.  Prior to the expiration of the Dropout Notice Period, the Agent, in its sole and absolute discretion, may withdraw any Dropout Notice upon written notice to Merchant.  Effective upon the conclusion of the Designation Rights Termination Date, and without any further act by or on behalf of the Agent (such date, the "Deemed Drop Out Date"), Agent shall be deemed to have provided Merchant with a Dropout Notice (the "Deemed Drop Out Notice") for all remaining Assets (other than Assets that were subject to a prior Asset Designation Notice, which Deemed Drop Out Notice shall be deemed effective as of the Deemed Drop Out Date).

**Section 16.  Miscellaneous.**

16.1     Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers.  Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to the Closing) of the Parties set forth in this Agreement or in any other Agency Document, will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing.  Each covenant and agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and if no term is specified, then for five years following the Closing, and nothing in this Section 16.1 will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement.

16.2     Expenses.  Except with respect to the expense reimbursement provided for in Section 16.19 herein, whether or not the Closing takes place, except as otherwise provided herein, all fees, costs and expenses (including fees, costs and expenses of representatives) incurred in connection with the negotiation of this Agreement, the performance of this Agreement and the other Agent Documents and the consummation of the transactions contemplated by this Agreement will be paid by the Party incurring such fees, costs and expenses.

38

16.3        Notices.  All notices and communications provided for pursuant to this Agreement shall be in writing and sent by electronic mail and will be deemed to have been given (a) when personally delivered, (b) when transmitted by electronic mail (having obtained electronic delivery confirmation thereof), if delivered by 5:00 P.M. local time of the recipient on a business day and otherwise on the following business day, (c) the day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third business day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective Party at the number, electronic mail address or street address, as applicable, set forth below, or at such other number, electronic mail address or street address as such Party may specify by written notice to the other Party:

**If to Merchant:**

JOANN Inc.
5555 Darrow Rd.
Hudson, Ohio 44236
Attn:   Ann Aber
Email: ann.aber@joann.com

*With copies (which shall not constitute notice) to*:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attn:   Joshua A. Sussberg, P.C. and Aparna Yenamandra, P.C.
Email: joshua.sussberg@kirkland.com; aparna.yenamandra@kirkland.com

-and-

Kirkland & Ellis LLP
333 West Wolf Point Plaza
Chicago, Illinois 60654
Attn:   Anup Sathy, P.C; Jeffrey Michalik; and Lindsey Blumenthal
Email: anup.sathy@kirkland.com; jeff.michalik@kirkland.com; and
        lindsey.blumenthal@kirkland.com

**If to Agent:**

GORDON BROTHERS RETAIL PARTNERS, LLC
101 Huntington Street, 11th Floor
Boston, Massachusetts 02119
                    Attn:    Rick Edwards; Joseph Malfitano; and David Braun
Email: redwards@gordonbrothers.com; jmalfitano@gordonbrothers.com;
        and dbraun@gordonbrothers.com

*With copies (which shall not constitute notice) to:*

Katten Muchin Rosenman LLP
50 Rockefeller Plaza
New York, New York 10020
Attn: Steven J. Reisman and Cindi M. Giglio
Email: sreisman@katten.com; cgiglio@katten.com

16.4        Governing Law/Exclusive Jurisdiction.

(a)        Jurisdiction and Exclusive Venue.  Each of the Parties irrevocably agrees that any Action of any kind whatsoever, including a counterclaim, cross-claim, or defense, regardless of the legal theory under which any liability or obligation may be sought to be imposed, whether sounding in contract or in tort or under statute, or whether at law or in equity, or otherwise under any legal or equitable theory, that may be based upon, arising out of, or related to this Agreement or the negotiation, execution, or performance of this Agreement or the Transactions and any questions concerning the construction, interpretation, validity and enforceability of this Agreement (each, an "Agreement Dispute") brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the Court of Chancery of the State of Delaware (or if such court lacks jurisdiction, any other state or federal court sitting in the State of Delaware) (the "Chosen Courts"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any Agreement Dispute.  Each of the Parties agrees not to commence any Agreement Dispute except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order, decree or award rendered by any Chosen Courts, and no Party will file a motion to dismiss any Agreement Dispute filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of forum non conveniens.  The Parties irrevocably agree that venue would be proper in any of the Chosen Court, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of any Agreement Dispute.  Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 10.3. Nothing in this Agreement will affect the right of any Party to serve process in any other manner permitted by Law.

(b)        Governing Law; Waiver of Jury Trial.  Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement and any Agreement Dispute will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

(c)        EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY AGREEMENT DISPUTE IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY

AGREEMENT DISPUTE. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH AGREEMENT DISPUTE WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY AGREEMENT DISPUTE, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 16.4(c).

16.5     Amendments. This Agreement may not be modified except in a written instrument executed by all of the Parties.

16.6     No Waiver. No consent or waiver by any Party, express or implied, to or of any breach or default by the other in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other Party of the same or any other obligation of such Party. Failure on the part of any Party to complain of any act or failure to act by the other Party or to declare the other Party in default, irrespective of how long such failure continues, shall not constitute a waiver by such Party of its rights hereunder.

16.7     Currency. All reference to dollars in this Agreement and all schedules, exhibits, and ancillary documents related to this Agreement shall refer to U.S. dollars.

16.8     Successors and Assigns. This Agreement shall inure to the benefit of and be binding upon Agent and, subject to entry and the terms of the Approval Order, Merchant and their respective successors and assigns, including, but not limited to, any chapter 11 or chapter 7 trustee; provided, however, that this Agreement may not be assigned by any of the Parties without the prior written consent of the other.

16.9     Third Party Beneficiaries. Except as otherwise expressly provided herein, nothing expressed or referred to in this Agreement will be construed to give any Person other than (i) for purposes of Section 16.10, the Non-Recourse Persons, and (ii) the Parties hereto and such permitted assigns, any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

16.10     Non-Recourse. This Agreement may only be enforced against, and any Action based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement. Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or advisor of any Party (each, a "Non-Recourse Person") will have any liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or liabilities of any of

the parties to this Agreement or for any Agreement Dispute and (ii) in no event shall any Party have any shared or vicarious liability, or otherwise be the subject of legal or equitable claims, for the actions or omissions (including through equitable claims (such as unjust enrichment) not requiring proof of wrongdoing committed by the subject of such claims) of any other Person, and each of such Persons are intended third party beneficiaries of this Section 16.10 and shall be entitled to enforce this Section 16.10 as if a party directly hereto.

16.11     Construction.  The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Person.  The headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and will in no way restrict or otherwise modify any of the terms or provisions hereof.

16.12     No Right of Set-Off.  Agent, on its own behalf and on behalf itself and its Affiliates and representatives and its and their respective successors and permitted assigns, hereby waives any rights of set-off, netting, offset, recoupment or similar rights that any of them has or may have with respect to the payment of the Debt Payoff or Wind-Down Payments or any other payments to be made by Agent pursuant to this Agreement or any other document or instrument delivered by Agent in connection herewith.

16.13     Fiduciary Obligations.  Nothing in this Agreement, or any document related to the Transactions, will require Merchant or any of its Affiliates or any of their respective managers, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations or applicable law.

16.14     Execution in Counterparts.  This Agreement may be executed in one or more counterparts.  Each such counterpart shall be deemed an original, but all such counterparts together shall constitute one and the same agreement.  This Agreement, to the extent signed and delivered by means of a facsimile machine, electronic mail, or other electronic transmission in which the actual signature is evident, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of any Party, each other Party shall re-execute original forms hereof and deliver them to all other Parties.  No Party shall raise the use of a facsimile machine, electronic mail, or other electronic transmission in which the actual signature is evident to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine, electronic mail or other electronic transmission in which the actual signature is evident as a defense to the formation of a contract and each Party forever waives such defense.  In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the Party against which enforcement is sought.

16.15     Section Headings.  The headings of sections of this Agreement are inserted for convenience only and shall not be considered for the purpose of determining the meaning or legal effect of any provisions hereof.

16.16     Wiring of Funds.  All amounts required to be paid under any provision of this Agreement shall be made by wire transfer of immediately available funds no later as 2:00 p.m. (Eastern Time) on the date that such payment is due, so long as all information necessary to complete the wire transfer has been received by the payor by 10:00 a.m. (Eastern Time) on the date that such payment is due.  In the event that the date on which any such payment is due is not a business day, then such payment shall be made by wire transfer on the next business day.

16.17     Nature of Remedies.  No failure to exercise and no delay in exercising, on the part of Agent, any right, remedy, power, privilege or adjustment hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, privilege, or adjustment hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, privilege, or adjustment.

16.18     Entire Agreement.  This Agreement contains the entire agreement between the Parties with respect to the transactions contemplated hereby and supersedes and cancels all prior agreements, including, but not limited to, all proposals, letters of intent or representations, written or oral, with respect thereto.  In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.

16.19     Bidding and Auction.  In consideration of Agent conducting its due diligence and entering into this Agreement, Merchant shall pay Agent (on the first business day following the entry of the approval order and consummation of such other transaction or such later date as Agent may agree) an expense reimbursement of (x) up to $500,000 to cover Agent's reasonable out-of-pocket costs and expenses, associated with due diligence and professionals' fees and expenses associated with, among other things, negotiating, drafting, and obtaining approval of this Agreement, and (y) up to $1,600,000 for any actual, reasonable costs incurred to acquire signage ("Signage") for the Sale (together (x) and (y), the "Expense Reimbursement"). Upon the filing of the Bankruptcy Cases, Merchant shall promptly file a motion for the approval of the terms reflected in this Section 16.19 consistent with an order that is acceptable to the Agent (the "Bid Procedures Order").

16.20     Potential Joint Ventures.  Agent shall have the right, in its sole discretion, to form a contractual joint venture with additional entities to serve as "Agent" hereunder as to this Agreement.  However, Gordon Brothers Retail Partners, LLC shall remain liable for all liabilities and obligations of Agent hereunder.

16.21     Certain Definitions.

(a)     "Action" means any action, suit, litigation, arbitration, mediation, audit, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding) or prosecution, of any kind whatsoever, whether sounding in contract or tort, or whether at law or

in equity, or otherwise under any legal or equitable theory, commenced, brought, conducted or heard by or before any governmental body.

      (b)    "Additional Agent Merchandise Proceeds" means all proceeds (cash or otherwise or payments from insurance on the Additional Agent Merchandise) from the sale of any Additional Agent Merchandise, net of Sales Taxes.

      (c)    (b) "Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management, affairs and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

      (d)    (c) "Contract" means Merchant's right, title, and interest in and to executory contracts (together with all amendments, extensions, modifications, and other material documents related thereto).

      (e)    (d) "Excluded Assets" means:

      (i)    all documents prepared or received by Merchant or any of its affiliates or on their behalf in connection with the sale of the Assets, this Agreement or the other Agency Documents, the transactions contemplated by this Agreement, or the Bankruptcy Case, including (a) all records and reports prepared or received by Merchant or any of its Affiliates or representatives in connection with the sale of the Assets or the transactions contemplated by this Agreement, including all analyses relating to the business of Merchant or any of its Affiliates so prepared or received, (b) all bids and expressions of interest received from third parties with respect to the acquisition of any of Merchant's or any of its Affiliates' businesses or assets, (c) all privileged materials, documents and records of Merchant or any of its Affiliates, (d) copies of the documents, materials and data related to liabilities prior to the Closing, (e) confidentiality agreements with prospective purchasers of the Assets, and (f) any other files or records to the extent relating to any Excluded Assets or liabilities or the Bankruptcy Case;

      (ii)    all current and prior insurance policies or employee benefit plans of Merchant or any of its Affiliates, including for the avoidance of doubt all director and officer insurance policies, and all rights and benefits of any nature of Merchant or any of its Affiliates with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries;

      (iii)    all equity interests;

      (iv)    Merchant's claims, causes of action or other rights under this Agreement, including the Purchase Price, or any agreement, certificate, instrument, or other document executed and delivered between Merchant or its Affiliates and Agent or any of its Affiliates or designees in connection with the transactions contemplated by this Agreement, or any other agreement between Merchant or any of its Affiliates and Agent or any of its Affiliates or designees entered into on or after the date hereof;

(v)     the Funded Reserve Account, as defined in the Cash Collateral Order;

(vi)    all liabilities or other amounts owing from Merchant or any of its Affiliates;

(vii)   all IT Systems; and

(viii)  tax attributes of Merchant and its Affiliates other than those transferring to Agent by operation of applicable tax law, and, for the avoidance of doubt, other than the proceeds of any tax refunds or credits of Merchant and its Affiliates realized in cash or by reduction of a cash tax liability in lieu of cash that otherwise could have been received.

(f)     (e) "IP Rights" means all intellectual property rights throughout the world including all U.S. and foreign rights in any of the following: (a) patents, patent applications, patent disclosures and inventions (whether or not protectable under patent law), together with all reissues, continuations, continuations-in-part, revisions, divisionals, extensions, and reexaminations in connection therewith; (b) trademarks, service marks, trade names (in each case, whether registered or unregistered), domain names, logos, design rights, corporate names, and registrations and applications for registration thereof and goodwill associated with any of the foregoing (collectively, "Trademarks"); (c) copyrights and copyrightable works (registered or unregistered) and registrations and applications for registration thereof; (d) computer programs (whether in source code, object code, or other form), computer software, firmware, data, databases, and rights therein, and all documentation, including user manuals and training materials, programmers' annotations, notes, and other work product used to design, plan, organize, maintain, support or develop, or related to any of the foregoing (collectively, "Software"); (e) confidential and proprietary information, trade secrets and know-how, and all other inventions, proprietary processes, formulae, models, and methodologies (collectively, together with Software, "Trade Secrets"); (f) all customer information, customer lists, and related documentation and information; and (g) all rights and remedies (including the right to sue for and recover damages) against past, present, and future infringement, misappropriation, or other violation relating to any of the foregoing.

(g)     (f)     "IT Systems" means all (i) Software, computers, computer systems, servers, hardware, telecommunications and network equipment firmware, middleware, websites, databases, networks, servers, workstations, routers, hubs, switches, data communication equipment and lines, telecommunications equipment and lines, co-location facilities and equipment, and all other information technology equipment and related items of automated, computerized or software systems, including any outsourced systems and processes and the data transmitted thereby or thereon, in each case owned, leased or licensed by Merchant or used in or relied on in connection with the business of Merchant.

(h)     "Net Proceeds" means Proceeds less amounts set forth in Section 3.2(a)(i) and (ii).

(i)     (f) "Permitted Encumbrances" means (i) encumbrances for utilities and taxes not yet due and payable, or that are being contested in good faith, or the nonpayment of

which is permitted or required by the Bankruptcy Code, (ii) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments that do not, individually or in the aggregate, adversely affect the operation of the Assets and, in the case of the Leases, that do not, individually or in the aggregate, adversely affect the use or occupancy of the respective leased real property, (iii) applicable zoning laws, building codes, land use restrictions and other similar restrictions imposed by law, (iv) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the ordinary course for amounts not yet due and payable or that are being contested by appropriate proceedings, (v) real estate taxes, assessments and other governmental levies, fees or charges imposed with respect to real property which are not yet due or that are being contested in good faith, (vi) licenses granted on a non-exclusive basis, and (vi) solely prior to Closing, any encumbrances that will be removed or released by operation of the Approval Order.

(j)    (g) "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, organization, estate, governmental body or other entity or group.

(k)    "Proceeds" means all proceeds (cash or otherwise or payments from insurance on the Assets or Merchandise) from the sale of any Assets, other than the sale of any Additional Agent Merchandise, net of Sales Taxes.

(l)    "Term Agent" means Wilmington Savings Fund Society, FSB, in its capacities as administrative agent and collateral agent for the financial institutions, lenders and investors party from time to time to the Term Credit Agreement, dated as of April 30, 2024 (as amended).

16.22    Rules of Interpretation.  Unless otherwise expressly provided in this Agreement, the following will apply to this Agreement, the Schedules and any other certificate, instrument, agreement or other document contemplated hereby or delivered hereunder.

(a)    The terms "hereof," "herein" and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement, section, clause, schedule and exhibit references contained in this Agreement are references to sections, clauses, schedules and exhibits in or to this Agreement, unless otherwise specified.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(b)    Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed (even if not actually followed) by the words "without limitation." Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

(c)      The words "to the extent" shall mean "the degree by which" and not simply "if."

(d)      When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded.  If the last day of such period is a day other than a business day, the period in question will end on the next succeeding business day.

(e)      Words denoting any gender will include all genders, including the neutral gender.  Where a word is defined herein, references to the singular will include references to the plural and vice versa.

(f)      The word "will" will be construed to have the same meaning and effect as the word "shall".  The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

(g)      All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(h)      Any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived.

(i)      Any reference to any particular Bankruptcy Code or Tax Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; provided that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Bankruptcy Code or Tax Code section or Law, the reference to such Bankruptcy Code or Tax Code section or Law means such Bankruptcy Code or Tax Code section or Law as in effect at the time of such violation or noncompliance or alleged violation or non-compliance.

(j)      A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and assigns, but only if such successors and assigns are not prohibited by this Agreement.

(k)      A reference to a Person in a particular capacity excludes such Person in any other capacity or individually.

*[signature page follows]*

47

IN WITNESS WHEREOF, the Parties hereby execute this Agreement by their respective duly authorized representatives as a sealed instrument as of the day and year first written above.

**Merchant:**

**JOANN INC.**

By: _____

Name: Jeff Dwyer

Title:   Interim Chief Financial Officer

**Agent:**

**GORDON BROTHERS RETAIL PARTNERS, LLC**


By: _____
Name:  Rick Edwards
Title: Head of North American Retail

## **List of Exhibits**

Exhibit 1(a)(1)        Stores
Exhibit 1(a)(2)        Distribution Centers
Exhibit 2(b)(iv)       Form of Asset Designation Notice
Exhibit 3.1(b)         Wind-Down Budget
Exhibit 3.1 (c)        Central Services Budget
~~Exhibit 4.1(c)        Per Store Occupancy Expenses~~
Exhibit 8.1            Sale Guidelines
Exhibit 11.2(m)    Promotional Calendar

## Annex 1

JOANN INC.
Creative Tech Solutions LLC
Creativebug, LLC
Dittopatterns LLC
JAS Aviation, LLC
JOANN DittoHoldings Inc.
JOANN Holdings 1, LLC
JOANN Holdings 2, LLC
Jo-Ann Stores, LLC
Jo-Ann StoresSupport Center, Inc.
joann.com, LLC
Needle Holdings, LLC
WeaveUp, Inc.