**<u>Exhibit 1</u>**

**Further Revised Bidding Procedures Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| JOANN INC., *et al.*,[1] | ) | Case No. 25-10068 (CTG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: Docket No. 17** |

**ORDER (I) APPROVING BIDDING
PROCEDURES, (II) SCHEDULING CERTAIN DATES AND DEADLINES
WITH RESPECT THERETO, (III) APPROVING THE FORM AND MANNER OF
NOTICE THEREOF, (IV) APPROVING THE STALKING HORSE AGREEMENT,
(V) ESTABLISHING NOTICE AND PROCEDURES FOR THE ASSUMPTION
AND ASSIGNMENT OF ASSUMED CONTRACTS AND LEASES, (VI) AUTHORIZING
THE ASSUMPTION AND ASSIGNMENT OF ASSUMED CONTRACTS AND LEASES,
(VII) APPROVING THE SALE OF ASSETS, AND (VIII) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession

(collectively, the "Debtors") for entry of an order (this "Order"), (a) authorizing and approving the

Bidding Procedures attached hereto as **Exhibit 1**, (b) approving the terms of the Stalking Horse

Agreement attached as **Exhibit 2** and the Stalking Horse Bid as a Qualified Bid, (c) establishing

certain related dates and deadlines, (d) approving the form and manner of notice of the Auction

and the Sale Transactions, attached hereto as **Exhibit 3** (the "Sale Notice"), (e) approving the form

and manner of notice of the Winning Bidder(s) if there is no auction attached hereto as

**Exhibit 4(a)**, and, if there is an auction, the form and manner of notice of the Winning Bidder(s)

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: JOANN Inc. (5540); Needle Holdings LLC (3814); Jo-Ann Stores, LLC (0629); Creative Tech Solutions LLC (6734); Creativebug, LLC (3208); WeaveUp, Inc. (5633); JAS Aviation, LLC (9570); joann.com, LLC (1594); JOANN Ditto Holdings Inc. (9652); Dittopatterns LLC (0452); JOANN Holdings 1, LLC (9030); JOANN Holdings 2, LLC (6408); and Jo-Ann Stores Support Center, Inc. (5027). The Debtors' mailing address is 5555 Darrow Road, Hudson, Ohio 44236.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or the Bidding Procedures, as applicable.

attached hereto as **Exhibit 4(b)** (collectively, the "Notice of Winning Bidder" and "**Exhibit 4**"), (f) approving the Assumption and Assignment Procedures, including the notices of potential assumption and proposed cure amounts attached hereto as **Exhibit 5** (the "Cure Notice"), and (g) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and the United States District Court for the District of Delaware having jurisdiction over this matter pursuant to 28 U.S.C. § 1334, which was referred to the Court under 28 U.S.C. § 157 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate and no other or further notice need or shall be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein, if any, at a hearing before this Court on February 14, 2025 (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is **HEREBY FOUND AND DETERMINED THAT**:[3]

---

[3]     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.   To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.   To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

Jurisdiction and Venue.  The United States District Court for the District of Delaware has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, which was referred to the United States Bankruptcy Court for the District of Delaware (the "Court") under 28 U.S.C. § 157 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.    This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

Statutory and Legal Predicates.  The statutory and legal predicates for the relief requested in the Motion are sections 105(a), 363, 365, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007, 9008, and 9014 and Local Rules 1075-1, 2002-1, and 9013-1.  The Debtors have articulated good and sufficient reasons for the Court to grant the relief requested in the Motion.

Sale Process.  The Debtors and their advisors have been engaging with a number of potential interested parties to solicit and develop the highest and otherwise best offers for the Assets.

Bidding Procedures.   The Debtors have articulated good and sufficient business reasons for the Court to approve the bidding procedures attached hereto as **Exhibit 1** (the "Bidding Procedures").   The Bidding Procedures are fair, reasonable and appropriate, and are designed to maximize the value of the proceeds of one or more sales (the "Sale Transactions") of the Debtors' assets (the "Assets").  The Bidding Procedures were negotiated in good faith and at arm's-length and are reasonably designed to promote a competitive and robust bidding process to generate the greatest level of interest in the Assets.

Stalking Horse Bidder.  The Expense Reimbursement payable under the Stalking Horse Agreement shall be deemed an actual and necessary cost of preserving the Debtors' estates within

the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code and treated as an allowed administrative expense claim against the Debtors' estates pursuant to sections 503(b) and 507(a)(2) of the Bankruptcy Code.

Sale Notice.    The Sale Notice, substantially in the form attached hereto as **Exhibit 3**, is reasonably calculated to provide interested parties with timely and proper notice of the Auction (if any) and any Sale Transaction with respect to the Assets, including, without limitation:  (a) the date, time, and place of the Auction; (b) the Bidding Procedures; (c) the deadline for filing objections to the Sale Transactions and entry of an order approving any Sale Transactions; and (d) notice of the proposed assumption and assignment of Contracts to the Winning Bidder(s), if any.

Assumption and Assignment Provisions.    The Debtors have articulated good and sufficient business reasons for the Court to approve the assumption and assignment procedures set forth herein (the "Assumption and Assignment Procedures"), which are fair, reasonable, and appropriate.    The Assumption and Assignment Procedures comply with the provisions of section 365 of the Bankruptcy Code and Bankruptcy Rule 6006.

Notice of Winning Bidder.    The Notice of Winning Bidder, substantially in the form attached hereto as **Exhibit 4**, is reasonably calculated to provide interested parties with timely and proper notice of any proposed Sale Transaction with respect to the Assets, including, without limitation:  (a) the Winning Bidder(s) for the Assets, (b) the Back-Up Bidder(s), if applicable, (c) the key terms of the proposed Sale Transaction, and (d) the date, time, and place of the Sale Hearing.

Cure Notice.    The Cure Notice, the form of which is attached hereto as **Exhibit 5**, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice

of the Assumption and Assignment Procedures, as well as any and all objection deadlines related thereto, and no other or further notice shall be required for the Motion and the procedures described therein (including the Assumption and Assignment Procedures), except as expressly required herein.

Notice. Notice of the Motion, the proposed Bidding Procedures, the proposed Assignment and Assumption Procedures, and the Hearing was (i) appropriate and reasonably calculated to provide all interested parties with timely and proper notice, (ii) in compliance with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules and the Local Rules and (iii) adequate and sufficient under the circumstances of the Debtors' chapter 11 cases, such that no other or further notice need or shall be required or provided except as set forth in the Bidding Procedures and the Assumption and Assignment Procedures. A reasonable opportunity to object and be heard regarding the relief granted herein has been afforded to all parties in interest.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

The Motion is GRANTED as set forth herein.

All objections to the relief granted in this order (the "Order") that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are hereby overruled and denied on the merits with prejudice.

**A.    The Bidding Procedures**

1.    The Bidding Procedures attached hereto as **Exhibit 1** are hereby approved, are incorporated herein by reference, and shall govern the Bids and proceedings related to any sale of the Assets and the Auction (if any) in all respects.   The procedures and requirements set forth in the Bidding Procedures, including those associated with submitting a Qualified Bid, are fair, reasonable, and appropriate, and are designed to maximize recoveries for the benefit of the

Debtors' estates, creditors, and other parties in interests.   The Debtors are authorized to take any and all actions necessary or appropriate to implement the Bidding Procedures.

2.      The failure to specifically include or reference any particular provision of the Bidding Procedures in the Motion or this Order shall not diminish or otherwise impair the effectiveness of such procedures, it being the Court's intent that the Bidding Procedures are approved in their entirety, as if fully set forth in this Order.

3.      Subject to this Order and the Bidding Procedures, the Debtors, in the exercise of their reasonable business judgment and in a manner consistent with their fiduciary duties and applicable law, in consultation with the Consultation Parties, shall have the right to, in each case with respect to any Assets being sold pursuant to the Bidding Procedures, (a) determine which Qualified Bid is the highest or otherwise best offer for the applicable Assets, (b) reject any Bid that the Debtors determine is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code or the Bidding Procedures, or (iii) contrary to the best interests of the Debtors' estates and their creditors, and (c) impose such other terms and conditions upon Qualified Bidders as the Debtors determine to be in the best interests of the Debtors' estates in these chapter 11 cases.

4.      Subject to this Order and the Bidding Procedures, the Debtors shall have the right, in their reasonable business judgment and in a manner consistent with their fiduciary duties and applicable law, in consultation with the Consultation Parties, to modify the Bidding Procedures, including to, among other things, (a) extend or waive deadlines or other terms and conditions set forth therein, (b) adopt new rules and procedures for conducting the bidding and the Auction process, (c) provide reasonable accommodations to the Stalking Horse Bidder, or (d) otherwise modify the Bidding Procedures to further promote competitive bidding for and maximizing the

value of the Assets, as applicable; *provided* that such extensions, waivers, new rules and procedures, accommodations, and modifications (except as are consented to or otherwise approved or permitted in accordance with the Bidding Procedures) (i) do not conflict with and are not inconsistent with this Order, the Bidding Procedures, the Bankruptcy Code, or any order of the Court and (ii) are as promptly as practicable communicated to each Qualified Bidder or at the Auction (if any); *provided further*, that notwithstanding anything herein to the contrary, any such extensions, waivers, new rules and procedures, accommodations, and modifications pursuant to this paragraph 4 shall not, in any way or manner, abrogate, limit, or impair any party's right to Credit Bid.

5.    If the Debtors, in consultation with the Consultation Parties, determine not to conduct an Auction for the Assets, then the Debtors shall file a notice with the Court of such determination within one (1) calendar day of making such determination.

6.    The Debtors shall consult with the Consultation Parties in good faith regarding the sale process for the Assets and the Sale Transactions, including evaluation of any and all Bids, scheduling and operation of the Auction (if applicable), and selection of a Winning Bid, as well as any modifications of the Bidding Procedures, subject to and in accordance with the Bidding Procedures; *provided* that, the Debtors shall not consult with a Consultation Party regarding the evaluation of Bids or the selection of a Winning Bid if such Consultation Party has submitted a competing Bid, unless and until the Consultation Party unequivocally revokes in writing its Bid and waives its right to further bid; *provided*, *further*, that immediately upon any Consultation Party's secured debt (as applicable) being indefeasibly paid in full in cash (and, with respect to the Prepetition ABL/FILO Obligations, being "Paid in Full" as defined in the Cash Collateral Order),

such Consultation Party shall immediately no longer be a Consultation Party under the Bidding Procedures.

7.      Except for the Expense Reimbursement provided to the Stalking Horse Bidder, no person or entity participating in the Debtors' sale process under the Bidding Procedures shall be entitled to any expense reimbursement, break-up fees, "topping" fees, termination fees, or other fees, payments, or reimbursements whatsoever in connection with any Bid, preparation thereof, or participation at the Auction (if any) or generally under the Bidding Procedures; and, by submitting a Bid, such person or entity shall be deemed to have forever waived its right to request or to file with the Court any request for allowance or payment of any such expense reimbursement or fee(s), whether by virtue of section 503(b) of the Bankruptcy Code or otherwise.

8.      Any deposit provided by the Stalking Horse Bidder or other Qualified Bidder (as required under the Bidding Procedures or the Stalking Horse Agreement) shall be held in escrow by the Debtors or their agent and shall not become property of the Debtors' bankruptcy estates unless and until released from escrow to the Debtors pursuant to the terms of the Bidding Procedures, the applicable escrow agreement, or an order of the Court.

**B.      The Stalking Horse Agreement and Expense Reimbursement.**

9.      The Debtors are authorized to enter into the Stalking Horse Agreement with Gordon Brothers Retail Partners, LLC, an affiliate of the Prepetition FILO Agent ("Gordon Brothers"), for the purchase and sale of the Assets attached as **Exhibit 2**, and the terms of the Stalking Horse Agreement are hereby approved, subject to this Order; *provided, however*, that, in accordance with the Bidding Procedures, the rights of all parties in interest to object to (a) the terms and provisions of the Stalking Horse Agreement, and (b) any sale of the Assets or Sale Transaction involving Gordon Brothers (including, for the avoidance of doubt, the sale of any causes of action, including tort claims) are fully preserved.  Gordon Brothers shall be deemed the Stalking Horse Bidder and

a Qualified Bidder, and Gordon Brothers' Bid contemplated by the Stalking Horse Agreement shall be deemed a Qualified Bid and, for avoidance of doubt, need not comply with each Bid Requirement.

10.    The Expense Reimbursement for the Stalking Horse Bidder is approved in its entirety, and the amount of such Expense Reimbursement shall be an allowed administrative expense claim under section 503(b) of the Bankruptcy Code.  The Debtors are authorized and directed to pay any amounts that may become due to the Stalking Horse Bidder on account of the Expense Reimbursement on the terms set forth in the Stalking Horse Agreement.  For the avoidance of doubt, no other Qualified Bidder for the Assets shall be entitled to any form of expense reimbursement.

**C.    Important Dates and Deadlines.**

11.    The following dates and deadlines are hereby approved:

| Date and Time (all times in prevailing Eastern Time) | Event or Deadline |
|---|---|
| February 18, 2025, at 5:00 p.m. | Bid Deadline |
| February 19, 2025 | Notice of Winning Bidder and Cancellation of Auction (if no Auction) |
| February 20, 2025 | Sale Objection Deadline to the Stalking Horse Bid |
| February 21, 2025, at 10:00 a.m. | Auction (if any) |
| February 21, 2025, at 9:30 a.m. | Sale Hearing (if no Auction) |
| The earlier of five (5) hours after the Auction is completed or 12:00 p.m. the calendar day after the Auction is completed. | Notice of Winning Bidder(s) (if there is an Auction) |
| February 22, 2025 | Serve Cure Notice, if applicable |
| February 25, 2025, at 5:00 p.m. | Sale Objection Deadline for Winning Bid(s) (if there is an Auction) |
| February 26, 2025, at 2:00 p.m. | Sale Hearing (if there is an Auction) |

12.     The deadline by which Bids for any Assets, as applicable, must be ***actually received*** by the Debtors and their advisors (as set forth in the Bidding Procedures) is **February 18, 2025, at 5:00 p.m. (prevailing Eastern Time)** (the "Bid Deadline").

13.     Each Qualified Bidder participating in the Auction, if any, shall be required to confirm that it has not engaged in any collusion with respect to any bidding (including preparing or submitting its Bid(s)) or the Sale Transactions, as set forth in the Bidding Procedures; and the Auction, if any, shall be transcribed or otherwise recorded.

14.     The Debtors shall file with the Court the Notice of Winning Bidder, identifying the identity of the Winning Bidder(s) (as applicable), the amount of the Winning Bid(s) (as applicable), and, if the Winning Bidder (as applicable) is a credit bidder, what portion of its bid is a credit bid and what portion (if any) is cash, by:  **February 19, 2025** if there is not an Auction, and by the earlier of five (5) hours after the Auction is completed, or 12:00 p.m. (prevailing Eastern Time) the calendar day after the Auction is completed**,** if there is an Auction.  If the Winning Bidder is a special purpose entity, the notice shall also identify the entity or entities that are its primary equity holders, or otherwise control, the special purpose entity.

15.     Objections to the proposed order approving any Winning Bid(s) (and/or designation of a Back-Up Bid(s), as applicable) (the "Sale Order," and such objections, "Sale Objections") must be made on or before:  **February 20, 2025, at 5:00 p.m. (prevailing Eastern Time)** to the Stalking Horse Bid, or **February 25, 2025, at 5:00 p.m. (prevailing Eastern Time)** (the "Sale Objection Deadline") if there is an Auction, and the Sale Order shall be in form and substance acceptable to the Prepetition ABL Agent and the Prepetition FILO Agent; *provided*, *however*, to the extent any Winning Bid(s) is, in part or in whole, the result of a Credit Bid, any order approving the sale of the relevant assets pursuant to such Credit Bid shall additionally be in form and

substance acceptable to such credit bidder whose Credit Bid is deemed the Winning Bid.  All Sale

Objections must:  (a) be in writing; (b) conform to the applicable provisions of the Bankruptcy

Rules and the Local Rules; (c) state with particularity the legal and factual basis for the Sale

Objection and the specific grounds therefor; and (d) be filed with the Court and served so as to be

***actually received*** by the following parties (the "Notice Parties") no later than the Sale

Objection Deadline:

| Proposed Co-Counsel to the Debtors | Proposed Co-Counsel to the Debtors |
|---|---|
| Kirkland & Ellis LLP<br>601 Lexington Ave<br>New York, New York 10022<br>Aparna Yenamandra, P.C.<br>(aparna.yenamandra@kirkland.com)<br><br>-and-<br><br>Kirkland & Ellis LLP<br>333 West Wolf Point Plaza<br>Chicago, Illinois 60654<br>Jeffrey Michalik (jeff.michalik@kirkland.com)<br>Lindsey Blumenthal<br>(lindsey.blumenthal@kirkland.com) | Cole Schotz P.C.<br>500 Delaware Avenue, Suite 1410<br>Wilmington, Delaware 19801,<br>Patrick J. Reilley (preilley@coleschotz.com)<br>Stacy L. Newman (snewman@coleschotz.com)<br>Michael E. Fitzpatrick<br>(mfitzpatrick@coleschotz.com)<br>Jack M. Dougherty (jdougherty@coleschotz.com) |
| **Proposed Investment Banker to the Debtors** | **The Prepetition Term Loan Agent and Counsel Thereto** |
| Centerview Partners, LLC<br>31 West 52nd Street, 22nd Floor<br>New York, New York 10019<br>Karn Chopra (kchopra@centerview.com)<br>Ryan Kielty (rkielty@centerview.com)<br>Daniel Bendetson (dbendetson@centerview.com) | ArentFox Schiff LLP<br>1301 Avenue of the Americas, 42nd Floor<br>New York, New York 10019<br>Jeffrey Gleit (jeffrey.gleit@afslaw.com)<br>Jonathan Bagg (jonathan.bagg@afslaw.com)<br>Matthew Bentley (matthew.bentley@afslaw.com) |
| **The Prepetition ABL Agent and Counsel Thereto** | **The Prepetition FILO Agent and Counsel Thereto** |
| Morgan, Lewis & Bockius LLP<br>One Federal Street<br>Boston, Massachusetts 02110<br>Marjorie Crider (marjorie.crider@morganlewis.com)<br>Christopher L. Carter<br>(christopher.carter@morganlewis.com)<br><br>- and -<br><br>Reed Smith LLP<br>1201 North Market Street, Suite 1500<br>Wilmington, Delaware 19801<br>Kurt F. Gwynne (kgwynne@reedsmith.com)<br>Jason D. Angelo (jangelo@reedsmith.com) | Choate, Hall & Stewart LLP<br>2 International Place<br>Boston, Massachusetts 02110<br>John F. Ventola (jventola@choate.com)<br>Jonathan D. Marshall (jmarshall@choate.com)<br><br>- and -<br><br>DLA Piper LLP (US)<br>1201 N Market St. Suite 2100<br>Wilmington, Delaware 19801<br>Stuart Brown (stuart.brown@us.dlapiper.com) |

| Office of the United States Trustee (Region 3) | Proposed Counsel to the Official Committee of Unsecured Creditors |
| --- | --- |
| The Office of the United States Trustee<br>844 King Street<br>Suite 2207, Lockbox 35<br>Wilmington, Delaware 19801<br>Malcolm M. Bates (malcolm.m.bates@usdoj.gov) | Kelley Drye & Warren LLP<br>3 World Trade Center<br>New York, New York 10007<br>Jason R. Adams (jadams@kelleydrye.com)<br>Eric R. Wilson (ewilson@kelleydrye.com)<br>Maeghan J. McLoughlin (mmcloughlin@kelleydrye.com)<br><br>- and -<br><br>Pachulski Stang Ziehl & Jones LLP<br>919 N. Market Street<br>Suite 1700<br>Wilmington, Delaware 19801<br>Brad Sandler (bsanlder@pszjlaw.com)<br>James O'Neill (joneill@pszjlaw.com) |
| **The Prepetition Term Loan Lender Ad Hoc Group and Counsel Thereto** | |
| Gibson, Dunn & Crutcher LLP<br>200 Park Avenue<br>New York, New York 10166<br>Scott Greenberg (SGreenberg@gibsondunn.com)<br>Josh Brody (JBrody@gibsondunn.com)<br>Kevin Liang (KLiang@gibsondunn.com)<br><br>-and-<br><br>Glenn Agre Bergman & Fuentes LLP<br>1185 Avenue of the Americas, 22nd Floor<br>New York, New York 10035<br>Andrew Glenn (aglenn@glennagre.com)<br>Kurt Mayr (kmayr@glennagre.com)<br>Agustina Berro (aberro@glennagre.com)<br>Malak Doss (mdoss@glennagre.com)<br>Esther Hong (ehong@glennagre.com)<br><br>-and-<br><br>Morris, Nichols, Arsht & Tunnell  LLP<br>1201 North Market Street, 16th Floor<br>Wilmington, Delaware 19801<br>Donna Culver (dculver@morrisnichols.com)<br>Robert Dehney (rdehney@morrisnichols.com)<br>Matthew Harvey (mharvey@morrisnichols.com)<br>Brenna Dolphin (bdolphin@morrisnichols.com) | |

16.     If any party fails to timely file with the Court and serve a Sale Objection by the Sale Objection Deadline or otherwise abide by the procedures set forth in the Bidding Procedures

regarding an objection to the Sale Transaction, such party shall be barred from asserting, at the Sale Hearing or otherwise, any objection to the relief requested in the Motion or to the consummation and performance of the Sale Transaction, including the transfer of the applicable Asset(s) to the applicable Winning Bidder(s) free and clear of all liens, claims, interests, and encumbrances pursuant to section 363(f) of the Bankruptcy Code, and shall be deemed to "consent" to the Sale Transaction for purposes of section 363(f) of the Bankruptcy Code.

17.     For the avoidance of doubt, the Prepetition ABL Agent, the Prepetition ABL Lenders, the Prepetition FILO Agent, the Prepetition FILO Lenders, the Prepetition Term Loan Lenders, and the Prepetition Term Loan Agent fully reserve all of their rights with respect to a Sale Objection, the Sale Transaction, and the Sale Order, including, without limitation, with respect to the allocation of the sale proceeds and the distribution of such sale proceeds for any Sale Transaction that involves the sale of both ABL Priority Collateral and Term Loan Priority Collateral pursuant to the terms of the Prepetition Credit Documents.

18.     The Court will hold a hearing to consider approval of the Sale Transaction(s) on **February 21, 2025 at 9:30 a.m. (prevailing Eastern Time)**, if there is not an Auction, and **February 26, 2025 at 2:00 p.m. (prevailing Eastern Time)**, if there is an Auction (the "Sale Hearing").  The Sale Hearing may be adjourned in accordance with the Bidding Procedures by announcement in open court or on the Court's calendar without any further notice required.  In the event counterparties to Assigned Contracts (as defined below) raise objections or may raise objections to the proposed assumption, assumption and assignment, cure, adequate assurance in connection with a Sale Transaction or Winning Bid that are not due before or resolved at or prior to the Sale Hearing, the Sale Transaction may be approved at the Sale Hearing; *provided* that such objection shall be set for a later hearing, the date of which shall be determined at the Sale Hearing

or such later date, and such Assigned Contract shall not be assumed, assigned, or otherwise treated under the Sale Transaction unless and until such objection is overruled or otherwise resolved.

**E.      Credit Bidding**

19.      Subject to the terms of the Cash Collateral Order, including with respect to any Challenge, any bidder holding a perfected security interest in any of the Assets may seek to credit bid all, or a portion of, such bidder's claims for its respective collateral in accordance with section 363(k) of the Bankruptcy Code (each such bid, a "Credit Bid"); *provided*, that such Credit Bid complies with the terms of the Bidding Procedures and (to the extent applicable) the Prepetition Credit Documents.  Any Credit Bid that complies with the applicable terms of the Bidding Procedures shall be a Qualified Bid without requiring a good faith deposit, and the applicable Prepetition ABL Lenders, Prepetition ABL Agent, Prepetition FILO Lenders, Prepetition FILO Agent, Prepetition Term Loan Agent, or Prepetition Term Loan Lenders shall (subject to the Prepetition Credit Documents) be deemed a Qualified Bidder for purposes of any such Credit Bid.

**F.      Notice of Sale Transactions**

20.      The Sale Notice, substantially in the form attached to this Order as **Exhibit 3**, is approved with respect to the Auction which may be held under the Bidding Procedures.  Within one (1) business day of the entry of this Order, the Debtors shall cause the Sale Notice to be filed and served (including by e-mail, where applicable) upon parties in interest and, along with the Motion, this Order, and all of this Order's exhibits and schedules, posted on the Debtors' restructuring webpage at https://cases.ra.kroll.com/Joann2025 (or such other applicable URL) (the "Case Webpage").  Any changes in location, date, and time of the auction shall be filed with the Court and provided on the Case Webpage.

21.     Within one (1) business day after entry of this Order or as soon as reasonably practicable thereafter, the Debtors shall place a publication version of the Sale Notice for one day in *The New York Times* (national edition) and post it onto the Case Webpage.  Such notice shall be deemed sufficient and proper notice of the Bidding Procedures, the Sale Transactions, and the Auction (if any) with respect to known interested parties and no other or further notice shall be required.

22.     By the earlier of five (5) hours after the Auction (if any) is completed or 12:00 p.m. (prevailing Eastern Time) the calendar day after the Auction is completed, and in accordance with the Bidding Procedures, the Debtors will file on the docket the Notice of Winning Bidder substantially in the form attached to this Order as **Exhibit 3**.

**G.      Assumption and Assignment Procedures.**

23.     The Assumption and Assignment Procedures below are hereby approved in all respects and shall be the procedures by which the Debtors will notify any counterparties (the "Contract Counterparties") to executory contracts and unexpired leases with the Debtors (the "Contracts") of proposed cure amounts in the event the Debtors determine to assume and assign such Contracts in connection with the Sale Transactions.  Within two (2) days of the Auction, if any, for any Sale Transaction, to the extent the Debtors seek to assume and assign an executory contract and/or unexpired lease, the Debtors will provide via first class mail and/or email (to the extent email is reasonably known) information of all proposed forms of adequate assurance of future performance they have received from the Stalking Horse Bidder or each Winning Bidder and Back-up Bidder, as applicable, to Contract Counterparties and their counsel, if known. Requests by contract or lease counterparties to receive adequate assurance information via e-mail in addition to, or in lieu of, first class mail, may be made to Debtors' counsel at:

aparna.yenamandra@kirkland.com, jeff.michalik@kirkland.com, and lindsey.blumenthal@kirkland.com.

24.     Nothing in this Order shall be deemed to limit the Debtors' or the Winning Bidder's ability to negotiate assumption and/or assumption and assignment of amended or modified Contracts with Contract Counterparties on a consensual basis.

a. **Cure Notice**.  No later than fourteen (14) calendar days prior to any Cure Objection deadline, the Debtors shall file with the Court and serve via first class mail, electronic mail, (if the recipient has consented, in writing, to receiving electronic notices), or overnight delivery, the Cure Notices, attached hereto as **Exhibit 5**, on the Contract Counterparties at the notice address in the applicable lease or contract, and their counsel of record, if know, and the Consultation Parties, and post the Cure Notice to the Case Webpage.

b. **Content of Cure Notice**.  The Cure Notice shall notify the applicable Contract Counterparties that the Contracts may be subject to assumption and assignment in connection with the Sale, and contain the following information:  (i) a list of the applicable Contracts that may be assumed or assumed and assigned in connection with the Sale (the "Assigned Contracts," and each individually, an "Assigned Contract"); *provided* that any Assigned Contracts which are unexpired leases shall identify the address of the leased premises and any corresponding store number, as applicable; (ii) the applicable Contract Counterparties; (iii) the Debtors' good faith estimates of the proposed amount necessary to cure all monetary defaults, if any, under each Assigned Contract (the "Cure Costs"); and (iv) the deadline by which any Contract Counterparty to an Assigned Contract must file an objection to the proposed assumption, assignment, cure, and/or adequate assurance and the procedures relating thereto (the "Cure Objection"); *provided* that service of a Cure Notice does not constitute an admission that such Assigned Contract is an executory contract or unexpired lease or that such Assigned Contract will be assumed at any point by the Debtors or assumed and assigned pursuant to any Winning Bid.

c. **Cure Payments**.  The payment of the applicable Cure Costs and cure of any non-monetary defaults by the Debtors and/or the Winning Bidder, as applicable shall (i) effect a cure of all defaults existing thereunder, (ii) compensate for any actual pecuniary loss to such counterparty resulting from such default, and (iii) together with the assumption of the ultimately assumed Assigned Contract by the Debtors and the assignment of such Assigned Contract to the Winning Bidder, constitute adequate assurance of future performance thereof.

d. **Cure Objections**.  Cure Objections, if any, to a Cure Notice must:  (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, the Local Rules, and any order governing the administration of these chapter 11 cases;

(iii) state with specificity the nature of the objection and, if the Cure Objection pertains to the proposed Cure Costs, state the cure amount alleged to be owed to the objecting Contract Counterparty, together with any applicable and appropriate documentation in support thereof; *provided* that the Debtors may modify any Cure Objection deadline by filing a notice of such modification on the Court's docket.

e.   **Effects of Filing a Cure Objection**.  A properly filed Cure Objection will reserve such objecting party's rights against the Debtors only with respect to the assumption and assignment of the Assigned Contract at issue, and/or objection to the accompanying Cure Costs, as set forth in the Cure Objection, but will not constitute an objection to the remaining relief requested in the Sale Order.

f.   **Dispute Resolution**.  Any Cure Objection to the assumption or assumption and assignment of an Assigned Contract or Cure Costs that remains unresolved after the Sale Hearings shall be heard at the next regularly scheduled omnibus hearing in these cases, or such later date as may be agreed upon by the parties or fixed by the Court.  To the extent that any Cure Objection cannot be resolved by the parties, such Contract shall be assumed and assigned only upon satisfactory resolution of the Cure Objection, to be determined by the Court after notice and a hearing.  If a Cure Objection is not satisfactorily resolved, the Winning Bidder may determine that such Contract should not be assumed and assigned, in which case the Winning Bidder(s) will not be responsible for any Cure Costs in respect of such contract. Notwithstanding the foregoing, if a Cure Objection relates solely to the Cure Costs (any such objection, a "Cure Dispute"), the applicable Assigned Contract may be assumed by the Debtors and assigned to the Winning Bidder provided that the cure amount the Contract Counterparty asserts is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code (or such lower amount as agreed to by the Contract Counterparty) is deposited in a segregated account by the Debtors pending the Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

g.   **Supplemental Cure Notice**.  If the Debtors discover Contracts inadvertently omitted from the Cure Notice or a Winning Bidder identifies other Contracts that it desires to assume or assume and assign in connection with the sale, the Debtors may, after consultation with such Winning Bidder, at any time in accordance with the Debtors' rights under the Bankruptcy Code, including any extension pursuant to section 365(d)(4) of the Bankruptcy Code as approved by this Court, supplement the Cure Notice with previously omitted Contracts, or modify a previously filed Cure Notice, including by modifying the previously stated Cure Costs associated with any Contracts (the "Supplemental Cure Notice").

h.   **Objection to the Supplemental Cure Notice**.  Any Contract Counterparty listed on the Supplemental Cure Notice may file an objection (a "Supplemental Cure Objection") only if such objection is to the proposed assumption or assumption and assignment of the applicable Contracts or the proposed Cure Costs, if any, modified by the Supplemental Cure Notice.   All Supplemental Cure Objections must: (i) state, with specificity, the legal and factual basis for the objection as well

17

as what Cure Costs are required, if any; (ii) include appropriate documentation in support thereof; and (iii) be filed no later than 5:00 p.m. (prevailing Eastern Time) on the date that is fourteen (14) calendar days following the date of service of such Supplemental Cure Notice, which date will be set forth in the Supplemental Cure Notice.

i.   **Dispute Resolution of Supplemental Cure Objection**. If a Contract Counterparty files a Supplemental Cure Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute, the Debtors shall seek an expedited hearing before the Court to determine the Cure Costs, if any, and approve the assumption of the relevant Contracts. If there is no such objection, then the Debtors shall obtain an order of this Court fixing the Cure Costs and approving the assumption of any Contract listed on a Supplemental Cure Notice. Notwithstanding the foregoing, if a Supplemental Cure Objection relates solely to a Cure Dispute, the applicable Assigned Contract may be assumed by the Debtors and assigned to the Winning Bidder provided that the cure amount the Contract Counterparty asserts is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code (or such lower amount as agreed to by the Contract Counterparty) is deposited in a segregated account by the Debtors pending the Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

## H.   Miscellaneous.

25.   All persons and entities that participate in the applicable Auction (if any) or bidding for any Assets during the sale process under the Bidding Procedures shall be deemed to have knowingly and voluntarily (i) consented to the core jurisdiction of the Court to enter any order related to the Bidding Procedures, the Auction (if any), or any other relief requested in the Motion or granted in this Order, and (ii) waived any right to a jury trial in connection with any disputes relating to the Bidding Procedures, the Auction, or any other relief requested in the Motion or granted in this Order.

26.   This Order shall be binding on the Debtors and its successors and assigns, including any chapter 7 or chapter 11 trustee or other fiduciary appointed for the estates of the Debtors.

27.   Notwithstanding anything to the contrary set forth in this Order, whether or not that certain Pattern Supply Agreement dated as of December 15, 2023 (the "Consignment Agreement") by and between Debtors and IG Design Americas, Inc. ("DGA") and its affiliates has been rejected

pursuant to section 365 of the Bankruptcy Code, then, with respect to any and all retail store closings notices issued by Debtors prior to the entry of a Sale Order, Debtors agree to and shall (i) comply with the terms of the Consignment Agreement, including but not limited to, the "Store Closings" provisions set forth in Section 3 thereof;[4] and (ii) grant DGA, and its agents and assigns, reasonable access (including before, during, and after store business hours) to immediately remove the Consigned Goods from any and all closing retail stores.  Further, with respect to the arguments asserted in DGA's Omnibus Limited Objection [Docket No. 258] (the "Objection") that pertain to the terms of any subsequent order or orders that the Debtors may request be entered pursuant to section 363 of the Bankruptcy Code approving a sale or transfer of some or all of the Debtors' assets, including the terms of any related asset purchase agreements and/or agency agreements, DGA's Objection is hereby continued to such sale hearing without need for DGA to file and serve any further objection; *provided*, *however*, that nothing herein shall limit DGA's rights to assert further objections to any such sales noticed for hearing by the Debtors.

28.    All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

29.    To the extent that there may be any inconsistency between the terms of the Motion, the Stalking Horse Agreement, the Bid Procedures, and this Order, the terms of this Order shall govern.

30.    Notwithstanding the relief granted in this Order and any actions taken pursuant to such relief (including any payment made in accordance with this Order), nothing in this Order is

---

[4]    Section 3 of the Consignment Agreement entitled "Store Closings" provides:  "If Customer [Debtors] determines to close a store, Customer shall notify Supplier [DGA], and Supplier may elect to: (i) have the Products on hand at such store returned to Supplier or (ii) have Customer liquidate such Products under the normal store liquidation process and discard any remaining Products on hand at a store that is closing, Supplier will pay the freight costs and will be responsible to reimburse Customer for store labor costs."

intended as or shall be construed or deemed to be: (a) an implication or admission as to the amount of, basis for, or validity of any particular claim against the Debtors under the Bankruptcy Code or other applicable non-bankruptcy law; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission, or finding that any particular claim is an administrative expense claim, other priority claim, or otherwise of a type specified or defined in this Order or the Motion or any order granting the relief requested by the Motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors' or any other party in interest's claims, causes of action, or other rights under the Bankruptcy Code or any other applicable law; (h) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code; (i) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in the Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens; (j) a waiver of the obligation of any party in interest to file a proof of claim; or (k) otherwise affecting the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract or unexpired lease. Any payment made pursuant to this Order is not intended and should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

31.     Any non-Debtor party to a nonresidential lease of real property retains any and all rights to (a) object the any proposed assumption and assignment of any such lease under section 365 of the Bankruptcy Code, and (b) raise any and all  facts, claims, issues, rights, remedies, and/or defenses in connection thereto.

32.     Notwithstanding anything to the contrary in this Order or the Bidding Procedures, the rights of the Prepetition ABL Agent and the Prepetition FILO Agent under the Cash Collateral Order [5] (and the Prepetition Credit Documents referenced therein) to consent to the Sale Transaction(s) (and any terms and conditions thereof) of any portion of their collateral, including, without limitation, any Assets, are expressly preserved and not waived or impaired by the Bidding Procedures or this Order.  For the avoidance of doubt, nothing in this Order or the Bidding Procedures shall amend or impair any provision of the Cash Collateral Order (including the Milestones therein) or the rights of the Prepetition ABL Agent and the Prepetition FILO Agent thereunder.

33.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

34.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

35.     The Debtors are authorized to make non-substantive changes to the Bidding Procedures, the Assumption and Assignment Procedures, and any related documents without further order of the Court, including, without limitation, changes to correct typographical and grammatical errors.

---

[5]     "Cash Collateral Order" means any interim or final order approving the use of cash collateral, and any budgets in connection therewith governing any such use of cash collateral, whichever is then in effect, as applicable.

36.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

37.     This Court shall retain jurisdiction over any and all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order.

## Exhibit 1

## Bidding Procedures

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| JOANN INC., *et al.*,[1] | ) | Case No. 25-10068 (CTG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## BIDDING PROCEDURES

On January 15, 2025 (the "<u>Petition Date</u>"), JOANN Inc. and the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "<u>Bankruptcy Code</u>"), in the United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>").

Thereafter, on [●], 2025, the Court entered the *Order (I) Approving Bidding Procedures, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Stalking Horse Agreement, (V) Establishing Notice and Procedures for the Assumption and Assignment of Assumed Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts and Leases, (VII) Approving the Sale of Assets, and (VIII) Granting Related Relief* [Docket No. [●]] (the "<u>Bidding Procedures Order</u>"), by which the Court approved the bidding procedures set forth herein (these "<u>Bidding Procedures</u>").[2]

These Bidding Procedures set forth the process by which the Debtors are authorized to conduct a marketing and sale process (including pursuant to an Auction (as defined below), if any) for the sale or sales of some, all, or substantially all of the Debtors' assets (the "<u>Sale Transactions</u>").

The ability of the Debtors to undertake and consummate any Sale Transaction shall be subject to competitive bidding as set forth in these Bidding Procedures and approval of any Sale Transaction by the Court.  The Debtors will consider bids for any or all of the Assets in a single bid from a single bidder or in multiple bids from multiple bidders.  Any bid for less than all of the Assets, even if such bid is the highest or otherwise best bid for such Assets, is subject to higher or

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: JOANN Inc. (5540); Needle Holdings LLC (3814); Jo-Ann Stores, LLC (0629); Creative Tech Solutions LLC (6734); Creativebug, LLC (3208); WeaveUp, Inc. (5633); JAS Aviation, LLC (9570); joann.com, LLC (1594); JOANN Ditto Holdings Inc. (9652); Dittopatterns LLC (0452); JOANN Holdings 1, LLC (9030); JOANN Holdings 2, LLC (6408); and Jo-Ann Stores Support Center, Inc. (5027).  The Debtors' mailing address is 5555 Darrow Road, Hudson, Ohio 44236.

[2]  Unless otherwise specified herein, capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Bidding Procedures Order, its respective motion filed at Docket No. 17, the Cash Collateral Order, or its respective motion, filed at Docket. No. 6.

otherwise better bids for packages of Assets that may include such Assets. Additionally, any bid on all of the Assets is subject to bids on individual Assets or packages of Assets that are, in the aggregate, higher or otherwise better bids. The Debtors may determine in their discretion, following consultation with the Consultation Parties, whether to proceed with a Sale of any Asset pursuant to these Bidding Procedures.

## 1.  ASSETS TO BE AUCTIONED

The Debtors are seeking to sell all of their assets, or any portion thereof to the person or entity making the most value maximizing bid through the process outlined in these Bidding Procedures. These assets include, but are not limited to, the Debtors' going-concern business, unexpired leases, executory contracts, equipment, inventory, supplies, intellectual property, insurance proceeds, prepaid expenses and deposits, and books and records, in each case, free and clear of all liens, claims, interests, or other encumbrances (collectively, the "Assets").

## 2.  KEY DATES AND DEADLINES

| Date and Time (all times in prevailing Eastern Time) | Event or Deadline |
|---|---|
| February 18, 2025, at 5:00 p.m. | Bid Deadline |
| February 19, 2025 | Notice of Winning Bidder and Cancellation of Auction (if no Auction) |
| February 20, 2025 | Sale Objection Deadline to the Stalking Horse Bid |
| February 21, 2025, at 10:00 a.m. | Auction (if any) |
| February 21, 2025, at 9:30 a.m. | Sale Hearing (if no Auction) |
| The earlier of five (5) hours after the Auction is completed or 12:00 p.m. the calendar day after the Auction is completed. | Notice of Winning Bidder(s) (if there is an Auction) |
| February 22, 2025 | Serve Cure Notice, if applicable |
| February 25, 2025, at 5:00 p.m. | Sale Objection Deadline for Winning Bid(s) (if there is an Auction) |
| February 26, 2025, at 2:00 p.m. | Sale Hearing (if there is an Auction) |

## 3.  SUBMISSIONS TO THE DEBTORS; CONSULTATION PARTIES

All submissions to the Debtors required or permitted to be made under these Bidding Procedures must be directed to each of the following persons or entities unless otherwise provided:

3.1.  Debtors:  JOANN Inc., Attn.: Ann Aber, EVP, Chief Legal & HR Officer (ann.aber@joann.com).

3.2.   <u>Debtors' Proposed Counsel</u>:  (i) proposed co-counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn.: Aparna Yenamandra, P.C. (aparna.yenamandra@kirkland.com), Kirkland & Ellis LLP, 333 West Wolf Point Plaza, Chicago, Illinois 60654, Attn.: Jeffrey Michalik (jeff.michalik@kirkland.com), and Lindsey Blumenthal (lindsey.blumenthal@kirkland.com); and (ii) Cole Schotz P.C., 500 Delaware Avenue, Suite 1410, Wilmington, Delaware 19801, Attn.: Patrick J. Reilley (preilley@coleschotz.com), Stacy L. Newman (snewman@coleschotz.com), Michael E. Fitzpatrick (mfitzpatrick@coleschotz.com), and Jack M. Dougherty (jdougherty@coleschotz.com).

3.3.   <u>Debtors' Proposed Investment Banker</u>:  Centerview Partners, LLC, 31 West 52nd Street, 22nd Floor, New York, New York 10019, Attn.: Ryan Kielty (rkielty@centerview.com), Karn Chopra (kchopra@centerview.com), and Daniel Bendetson (dbendetson@centerview.com).

3.4.   <u>Prepetition ABL Agent</u>: (i) Morgan, Lewis & Bockius LLP, One Federal Street, Boston, Massachusetts 02110, Attn: Marjorie Crider and Christopher L. Carter (marjorie.crider@morganlewis.com and christopher.carter@morganlewis.com), and (ii) Reed Smith LLP, 1201 North Market Street, Suite 1500, Wilmington, Delaware 19801, Attn: Kurt F. Gwynne and Jason D. Angelo (kgwynne@reedsmith.com and jangelo@reedsmith.com).

3.5.   <u>Centerbridge</u>: Proskauer Rose LLP, 1 International Place, Boston, Massachusetts 02110, Attn: Charles A. Dale (cdale@proskauer.com) and Adam Nowicki (anowicki@proskauer.com).

3.6.   <u>Prepetition Term Loan Agent</u>: ArentFox Schiff LLP, 1301 Avenue of the Americas, 42nd Floor, New York, New York 10019, Attn: Jeffrey Gleit (jeffrey.gleit@afslaw.com), Jonathan Bagg (jonathan.bagg@afslaw.com), and Matthew Bentley (matthew.bentley@afslaw.com).

3.7.   <u>Prepetition Term Loan Lender Ad Hoc Group</u>: (i) Gibson, Dunn & Crutcher LLP, 200 Park Avenue New York, New York 10166, Attn.: Scott Greenberg (SGreenberg@gibsondunn.com), Josh Brody (JBrody@gibsondunn.com), and Kevin Liang (KLiang@gibsondunn.com), (ii) Glenn Agre Bergman & Fuentes LLP, 1185 Avenue of the Americas, 22nd Floor, New York, New York 10035, Attn: Andrew Glenn (aglenn@glennagre.com), Kurt Mayr (kmayr@glennagre.com), Agustina Berro (aberro@glennagre.com), Malak Doss (mdoss@glennagre.com), and Esther Hong (ehong@glennagre.com), and (iii) Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, 16th Floor, Wilmington, Delaware 19801, Attn: Donna Culver (dculver@morrisnichols.com), Robert Dehney (rdehney@morrisnichols.com), Matthew Harvey (mharvey@morrisnichols.com), and Brenna Dolphin (bdolphin@morrisnichols.com).

The "Consultation Parties" are (A) the Prepetition ABL Agent, (B) Centerbridge Credit CS, L.P., in its capacity as a Prepetition FILO Lender ("Centerbridge"), (C) the Official Committee of Unsecured Creditors (the "Committee"), (D) the Prepetition Term Loan Agent, and (E) the Prepetition Term Loan Lender Ad Hoc Group; *provided* that any Consultation Party, including any member of the Committee, who submits a Bid (as defined below), including a Credit Bid, for any Assets in connection with these Bidding Procedures, or is a participant in any active Bid with respect to any Asset(s), shall immediately no longer be a Consultation Party with respect to the evaluation and qualification of competing Bids, or with respect to seeking and/or obtaining information about other Bids, unless and until such party unequivocally revokes its Bid in writing and waives its right to continue in the bidding process or further bid, but shall remain a Consultation Party for other purposes set forth in these Bidding Procedures; *provided*, *further*, that immediately upon any Consultation Party's secured debt (as applicable) being indefeasibly paid in full in cash, such Consultation Party shall immediately no longer be a Consultation Party under these Bidding Procedures.[3]  Materials and information provided by the Debtors or their advisors to the advisors to any Consultation Party may be shared with such Consultation Party, subject in all respects to these Bidding Procedures, the Bidding Procedures Order, and the respective Confidentiality Agreement entered into by and among or otherwise agreed to between each such Consultation Party and the Debtors.

Subject to the terms herein, the Debtors shall consult with the Consultation Parties in good faith regarding the sale process for the Assets and the Sale Transactions, including evaluation of any and all Bids, scheduling and operation of the Auction (if applicable), selection of a Winning Bid (as defined below), negotiation of the purchase agreement or agency agreement, as applicable, as well as any modifications of these Bidding Procedures.  Subject to the terms herein, the Debtors shall also provide to the Consultation Parties and their advisors regular reports concerning the sale process, including parties contacted, proposals received, and any due diligence requested by potential purchasers.

## 4. POTENTIAL BIDDERS & ACCEPTABLE BIDDERS

To participate in the bidding process or otherwise be considered for any purpose under these Bidding Procedures, a person or entity interested in consummating a Sale Transaction (a "Potential Bidder") must deliver or have previously delivered to the Debtors and each of their advisors the following documents and information (unless the Debtors, in their reasonable business judgment after consultation with the Consultation Parties, choose to waive any of the requirements set forth in this Section 4 for any Potential Bidder):

4.1.  an executed confidentiality agreement on terms acceptable to the Debtors (a "Confidentiality Agreement");

---

[3]  If any Consultation Party submits a Bid or otherwise is a participant with respect to any active Bid, the other non-bidding members of such Consultation Party shall remain Consultation Parties; *provided* that such bidding Consultation Party shall be precluded from receiving or reviewing information or documentation not otherwise available to all Acceptable Bidders, and the other non-bidding members of such Consultation Party shall not share or otherwise discuss such information with the bidding members of such Consultation Party.

4.2.    other than pursuant to a Credit Bid by a Secured Party that solely includes collateral subject to a first lien on such collateral by the Secured Party submitting the Credit Bid, sufficient information that the Potential Bidder has or can reasonably obtain the financial capacity to close a purchase of the targeted assets, the adequacy of which must be acceptable to the Debtors, in consultation with the Consultation Parties (i.e., no financing out); and

4.3.    any other information or documentation that the Debtors reasonably request.

The Debtors, in their reasonable business judgment and in consultation with the Consultation Parties, (subject to the terms herein) will determine and notify each Potential Bidder whether such Potential Bidder has submitted adequate documents so that such Potential Bidder may proceed to conduct due diligence and submit a Bid (as defined below) (such Potential Bidder, an "Acceptable Bidder"); *provided* that any bidder submitting a Credit Bid shall automatically be deemed an Acceptable Bidder.  The Debtors shall promptly inform the Consultation Parties of any entity that becomes an Acceptable Bidder.

The Debtors may, in their reasonable business judgment, conduct a process for the sale of unsold assets that are not included in any Winning Bid(s) (as defined below), subject to the Cash Collateral Order.[4]

## 5.    DUE DILIGENCE

The Debtors, with their advisors, have established an electronic data room (the "Data Room") that provides standard and customary diligence materials, including information to allow Acceptable Bidders to submit a Qualified Bid (as defined below).

Only Acceptable Bidders shall be eligible to receive due diligence information and access to the Data Room and to additional non-public information regarding the Debtors.  Subject to the other terms herein, the Debtors may provide to each Acceptable Bidder reasonable due diligence information, as requested by such Acceptable Bidder in writing, as soon as reasonably practicable after such request.  For all Acceptable Bidders, the due diligence period will end on the Bid Deadline.  The Debtors may, in their reasonable business judgment after consultation with the Consultation Parties, but shall have no obligation to, furnish any additional due diligence information to any person following the Bid Deadline.

The Debtors shall not furnish any confidential information relating to the Assets, liabilities of the Debtors, or the Sale Transactions to any person except to an Acceptable Bidder or to such Acceptable Bidder's duly authorized representatives subject to the applicable Confidentiality Agreement.  The Debtors and their advisors shall coordinate all reasonable requests from Acceptable Bidders for additional information and due diligence access; *provided* that the Debtors may decline to provide such information to Acceptable Bidders who, at such time and in the Debtors' reasonable business judgment, have not established, or who have raised doubt, that such Acceptable Bidder intends in good faith to, or has the capacity to, consummate a Sale Transaction;

---

[4]    "Cash Collateral Order" means any interim or final order approving the use of cash collateral, and any budgets in connection therewith governing any such use of cash collateral, whichever is then in effect, as applicable.

*provided*, *further*, that the foregoing proviso shall not apply to a Secured Party who submits a Credit Bid that solely includes collateral subject to a first lien on such collateral by the Secured Party submitting the Credit Bid.

Neither the Debtors nor any of their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Assets (a) to any person or entity who is not an Acceptable Bidder or (b) if and to the extent doing so would (1) violate any law to which the Debtors are subject, including any privacy law, (2) result in the disclosure of any trade secrets of third parties in breach of any contract with such third party, (3) violate any legally-binding obligation of any Debtor with respect to confidentiality, non-disclosure or privacy, or (4) jeopardize protections afforded to any Debtor under the attorney-client privilege or the attorney work product doctrine (*provided* that, in case of each of clauses (1) through (4), the Debtors shall use commercially reasonable efforts to (x) provide such access as can be provided (or otherwise convey such information regarding the applicable matter as can be conveyed) without violating such privilege, doctrine, contract, obligation or law and (y) provide such information in a manner without violating such privilege, doctrine, contract, obligation, or law).

The Debtors, in consultation with the Consultation Parties, also reserve the right to withhold any diligence materials that the Debtors determine are sensitive or otherwise not appropriate for disclosure, including to an Acceptable Bidder whom the Debtors determine in consultation with the Consultation Parties is a competitor of the Debtors, a potential competitor of the Debtors, or is affiliated with any competitor of the Debtors. Neither the Debtors nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not determined to be an Acceptable Bidder.

**All due diligence requests directed to the Debtors must be directed to: Ryan Kielty (rkielty@centerview.com) and Daniel Bendetson (dbendetson@centerview.com).**

**Each Potential Bidder or Acceptable Bidder shall comply with all reasonable requests for information and due diligence access made by the Debtors, their advisors, regarding such Potential Bidder or Acceptable Bidder, as applicable, and its contemplated Sale Transaction. Failure by a Potential Bidder or Acceptable Bidder to comply with reasonable requests for additional information and due diligence access will be a basis for the Debtors to determine that the Potential Bidder or Acceptable Bidder, as applicable, is not a Qualified Bidder. Failure by a Qualified Bidder to comply with such requests for additional information and due diligence access will be a basis for the Debtors, after consultation with the Consultation Parties, to determine that a bid made by a Qualified Bidder is not a Qualified Bid.**

6.    **BID REQUIREMENTS.**

Any proposal, solicitation, or offer to consummate a Sale Transaction (each, a "Bid") must be submitted in writing and must satisfy the following requirements (collectively, the "Bid Requirements"):

6.1.    **Proposed Sale Transaction.** Each Bid must clearly propose a Sale Transaction as to the Assets. Each Bid must specify (1) which of such Assets—with as much specificity as is possible—are to be included in the proposed Sale Transaction

(the "<u>Acquired Assets</u>"), (2) to the extent such Bid is for substantially all of the Assets, which Assets, if any, are to be excluded from the proposed Sale Transaction (the "<u>Excluded Assets</u>"), (3) the liabilities and obligations, including any debt and cure costs to be assumed (the "<u>Assumed Liabilities</u>"), and (4) as applicable, whether the Acceptable Bidder intends to operate the Debtors' business as a going concern, acquire certain Assets, or otherwise liquidate the business.  For the avoidance of doubt, all Assets held by non-Debtor subsidiaries shall be presumed to be Excluded Assets.

6.2.   **Purchase Price.**  Each Bid must (a) clearly specify the purchase price to be paid, assuming a purchase of the applicable Assets and assumption of any Assumed Liabilities (the "<u>Purchase Price</u>"); (b) identify separately any cash and non-cash components (which non-cash components shall be limited only to Credit Bids and Assumed Liabilities) of the Purchase Price in United States dollars; and (c) indicate the allocation of the Purchase Price among the applicable Assets.  To the extent any Bid includes ABL Priority Collateral, the Purchase Price shall exceed the Stalking Horse Bid by at least the aggregate sum of (1) the Expense Reimbursement for the Assets and (2) a cash component sufficient to satisfy the "Obligations" under the ABL/FILO Credit Agreement and the Prepetition ABL/FILO Obligations (including the cash collateralization of all obligations related to letters of credit and contingent exposure, as applicable) to be Paid in Full (each as defined in the Cash Collateral Order) on the closing of the Sale Transaction; *provided*, *however*, that the Debtors reserve the right to approve joint Bids that satisfy the foregoing conditions and are acceptable to the Prepetition ABL Agent and the Prepetition FILO Agent (and in accordance with the Prepetition Credit Documents and the Cash Collateral Order).

6.3.   **Deposit.**  Other than a Credit Bid by a Secured Party that solely includes collateral subject to a first lien on such collateral by the Secured Party submitting the Credit Bid, each Bid must be accompanied by a cash deposit equal to ten percent (10%) of the applicable aggregate Purchase Price (the "<u>Deposit</u>"), to be held in one or more escrow accounts on terms acceptable to the Debtors and the Consultation Parties; *provided* that the Debtors, in their reasonable business judgment and in consultation with the Consultation Parties, may elect to waive or modify the requirement of a Deposit on a case-by-case basis.  To the extent the Purchase Price of a Bid is increased, at any time or from time to time, whether prior to commencement of the Auction or during the Auction, the amount of the Deposit shall automatically increase accordingly (to be equal to ten percent 10% of any increased Purchased Price) and the corresponding Potential Bidder will pay into escrow the amount of such increase, as promptly as practicable, and in any event within one business day, following such increase.  Without limiting the foregoing, if a Purchase Price is increased in order to make a bid into a Qualified Bid, the Debtors may, in consultation with the Consultation Parties, condition participation of the applicable Potential Bidder at the Auction on such Potential Bidder paying the then full amount of the Deposit into escrow prior to commencement of the Auction or such participation.  For the avoidance of doubt, a Bid that is comprised of both a Credit Bid and cash consideration does not need to include a Deposit.

6.4. **Transaction Documents.** Each Bid must be accompanied by an executed form of purchase agreement or agency agreement, which the Debtors shall make available to Acceptable Bidders via the Debtors' electronic data room pursuant to the due diligence process, with respect to the proposed Sale Transaction, including the exhibits, schedules, and ancillary agreements related thereto and any other related material documents integral to such Bid.

6.5. **Back-Up Bidder Commitment.** Each Bid must include a written commitment by the applicable Potential Bidder to serve as a Back-Up Bidder (as defined below) in the event that such Potential Bidder's Bid is not selected as the Winning Bid; *provided* that the foregoing shall not apply to any Potential Bidder that (1) both (a) qualifies as a Secured Party (as defined below) and (b) submits a Credit Bid; or (2) is the Stalking Horse Bidder.

6.6. **Proof of Financial Ability to Perform.** Other than a Credit Bid by a Secured Party that solely includes collateral subject to a first lien on such collateral by the Secured Party submitting the Credit Bid, to the extent that a Bid is not accompanied by evidence of the Potential Bidder's capacity to consummate the Sale Transaction set forth in its Bid with cash on hand, each Bid must include unconditional committed financing from a reputable financing institution, documented to the satisfaction of the Debtors in consultation with the Consultation Parties, that demonstrates that the Potential Bidder has:  (i) received sufficient debt and/or equity funding commitments to satisfy the Potential Bidder's Purchase Price and other obligations under its Bid; and (ii) adequate working capital financing or resources to finance going concern operations for the applicable Assets and the proposed Sale Transaction.  Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions reasonably acceptable to the Debtors, in consultation with the Consultation Parties.

6.7. **Contingencies; No Financing or Diligence Outs.**  Each Bid shall not be conditioned on the obtaining or the sufficiency of financing or any internal approval, or on the outcome or review of due diligence.

6.8. **Identity.**  Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid—including each equity holder or other financial backer of the Potential Bidder if such Potential Bidder is an entity formed for the purpose of consummating the proposed Sale Transaction contemplated by such Bid—and the complete terms of any such participation.  Each Bid must also fully disclose whether any current or former officer, director, or equity holder of the Debtors, or any entity affiliated with any current or former officer, director, or equity holder of the Debtors, will be bidding or otherwise participating in connection with such Bid, including any employment or compensation arrangements being negotiated or agreed to between the Qualified Bidder and any employee of the Debtors.  Under no circumstances shall any undisclosed insiders, principals, equity holders, or financial backers of the Debtors be associated with any Bid.  Each Bid should also include contact information for

the specific person(s) and counsel whom the Debtors (and their advisors) should contact regarding such Bid.

6.9.    **Authorization.**  Each Bid must contain evidence acceptable to the Debtors that the Potential Bidder has obtained authorization or approval from its board of directors (or a comparable governing body) with respect to the submission of its Bid and the consummation of the Sale Transaction contemplated by such Bid.

6.10.   **Contracts and Leases.**  Each Bid must identify each and every executory contract and unexpired lease to be assumed and assigned in connection with the proposed Sale Transaction (collectively, the "Assigned Contracts").  Each Bid must be accompanied by adequate assurance of future performance under all Assigned Contracts, which shall include audited and unaudited financial statements for the past two (2) years, including all supplements or amendments thereto; tax returns; bank account statements; a summary of any proposed assignee's proposed use of the premises; a summary of the proposed assignee's and any guarantor's, as applicable, retail experience and present retail operations; the business contact for any proposed assignee; and such other documentation as the Debtors may request (the "Adequate Assurance Package").  The Adequate Assurance Package should be submitted in its own compiled PDF document.

6.11.   **As-Is, Where-Is.**  Each Bid must include a written acknowledgement and representation that:  (1) the Potential Bidder has had an opportunity to conduct due diligence regarding the Sale Transaction prior to making its offer; (2) the Potential Bidder has relied solely upon its own independent review, investigation, or inspection of any documents in making its Bid; (3) except as may be set forth in Definitive Sale Documents (as defined below) concerning such Bid, the Potential Bidder did not rely, and is not relying upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, by the Debtors or their advisors or other representatives regarding the Sale Transaction, the completeness of any information provided in connection therewith or the Auction, if any, or otherwise; and (4) the Potential Bidder did not engage in any collusive conduct and acted in good faith in submitting its Bid.

6.12.   **No Break-Up Fee or Reimbursement of Expenses.**  Each Bid, with the exception of the Stalking Horse Bid, must expressly state and acknowledge that such Potential Bidder shall not be entitled to, and shall not seek, any transaction break-up fee, termination fee, expense reimbursement, working fee, or similar type of payment. Each Bid must expressly waive any claim or right to assert any substantial contribution administrative expense claim under section 503(b) of the Bankruptcy Code or the payment of any broker fees or costs in connection with bidding for any of the Assets and/or otherwise participating in the Auction or the sale process.

6.13.   **Transition Services.**  Each Bid must state or otherwise estimate the types of transition services, if any, the Potential Bidder would require of and/or provide to the Debtors, including an estimate of the time any such transition services would

be required of and/or provided to the Debtors, if the Potential Bidder's Bid were selected as the Winning Bid for the applicable Assets.

6.14. **Commitment to Close.**  Each Bid must include a commitment to close as soon as practicable and state the expected date of closing of the Sale Transaction, which for the avoidance of doubt must be either on or before the date specified in <u>Section 2</u> of these Bidding Procedures.

6.15. **Irrevocable Bid**.  Each Bid must contain a statement by the applicable Potential Bidder acknowledging and agreeing that such Bid and each of its provisions is binding upon the Potential Bidder and irrevocable in all respects.

6.16. **Compliance with Bidding Procedures**.  Each Bid must contain a covenant that the applicable Potential Bidder will comply in all respects with the terms of these Bidding Procedures and the Bidding Procedures Order.

6.17. **Combination Bids.**  For Bids that contemplate a purchase of multiple categories of Assets, each Bid must specify: (i) allocation of the Purchase Price across each Asset; (ii) for Bids that include unexpired leases specifically, the Purchase Price must be allocated across each individual property included in the Bid; and (iii) Bids must indicate whether the offer is on an "all or none" basis in the event that the Potential Bidder is outbid for certain Assets contemplated in the Bid.

6.18. **Initial Assets Overbid.**  Any incremental Bids that comply with the terms set forth in <u>Section 11(ii)</u> of these Bidding Procedures (each an "<u>Overbid</u>") regarding all or substantially all of the Assets must have a value to the Debtors, in the Debtors' exercise of their reasonable business judgment, after consultation with their advisors and the Consultation Parties that is at least the sum of (i) one hundred thousand United States dollars ($100,000.00) more than the value offered under the Stalking Horse Agreement *plus* (ii) the Expense Reimbursement (the "<u>Initial Assets Overbid</u>").

Notwithstanding anything contained in these Bidding Procedures to the contrary, the Debtors reserve the right to, in consultation with the Consultation Parties, consider any bid submitted by a landlord for the termination or assignment of one or more of such landlord's own unexpired leases (such leases, "<u>Locations</u>" and each such bid, a "<u>Landlord Bid</u>"), which may include a purchase price composed of a (i) cash component, and/or (ii) a non-cash component that represents a valid and undisputed "credit" for any unpaid amounts validly due under the lease for such Location (a "<u>Landlord Credit</u>").  The Debtors may, in their reasonable business judgment and in consultation with the Consultation Parties, consider a Landlord Credit to be applied to reduce the cash consideration for the applicable Location.  A Landlord Bid may qualify as a Qualified Bid even if such bid does not fully comply with the Bid Requirements set forth above, as applicable, and as may be modified pursuant to this paragraph; *provided* that the bidding landlord (A) may submit a form of lease termination agreement or assumption and assignment agreement in lieu of the requirements in section 6.4 herein, (B) shall not be required to comply with section 6.3 herein,

except with respect to the cash component of any Landlord Bid, and (C) shall not be required to include in its Bid the requirements of sections 6.6, 6.8, 6.10, 6.13, and 6.18 herein.

By submitting a Bid, each Potential Bidder is agreeing, and shall be deemed to have agreed, to abide by and honor the terms of these Bidding Procedures and to refrain from (A) submitting a Bid after conclusion of the Auction (if any) or (B) seeking to reopen the Auction (if any) once closed. **The submission of a Bid shall constitute a <u>binding and irrevocable</u> offer (a) for the Winning Bidder, until consummation of the proposed Sale Transaction, (b) for the Back-Up Bidder (if any), as provided in these Bidding Procedures, including <u>Section 12</u> hereof, and (c) for any bidder other than the Winning Bidder, the Back-Up Bidder, or any Secured Party that submitted a Credit Bid, until two (2) business days after entry of the Court's order approving the Winning Bid and (if applicable) the Back-Up Bid for the applicable Assets (each, as applicable, a "<u>Sale Order</u>"), which shall be in form and substance acceptable to the Prepetition ABL Agent and the Prepetition FILO Agent, and each Bid must include a written acknowledgment and representation to such effect.**

## 7.    STALKING HORSE BIDDER.

In connection with the Stalking Horse Agreement and in recognition of the Stalking Horse Bidder's expenditure of time, energy, and resources, the Debtors are authorized and directed to provide (i) up to $500,000 to cover the Stalking Horse Bidder's reasonable out-of-pocket costs and expenses, associated with due diligence and professionals' fees and expenses associated with, among other things, negotiating, drafting, and obtaining approval of the Stalking Horse Agreement and (ii) up to $1,600,000.00 for any actual, reasonable costs incurred to acquire signage for a "going out of business" sale (the "<u>Expense Reimbursement</u>").  For the avoidance of doubt, no other Qualified Bidder for the Assets shall be entitled to any form of bid protections.

## 8.    BID DEADLINE.

Any Bid for the Assets must be transmitted via email (in .pdf or similar format) to the Debtors and their advisors (as specified in <u>Section 3</u> hereof) so as to be **actually received by such parties** on or before **February 18, 2025, by 5:00 p.m. (prevailing Eastern Time)** (the "<u>Bid Deadline</u>").

The Debtors shall promptly provide the Consultation Parties copies of all Bids received by the Debtors within one (1) hour of the Bid Deadline.

## 9.    QUALIFIED BIDS & QUALIFIED BIDDERS.

A Bid is a "<u>Qualified Bid</u>" if the Debtors, in their reasonable business judgment and in consultation with the Consultation Parties, determine that such Bid (A) satisfies the Bid Requirements set forth above and (B) is reasonably likely to be consummated if selected as the Winning Bid (or Back-Up Bid, as applicable) for the applicable Assets; *provided* that the Stalking Horse Bid and any Credit Bid shall constitute and be deemed a Qualified Bid and, for the avoidance of doubt, need not comply with each Bid Requirement.  For the avoidance of doubt, Combination Bids (including any Credit Bids) may constitute a Qualified Bid.

An Acceptable Bidder that submits a Qualified Bid is a "Qualified Bidder" with respect to the Assets to which such Qualified Bid relates; *provided* that the Stalking Horse Bidder shall constitute and be deemed a Qualified Bidder.  To the extent that any Prepetition ABL Agent, Prepetition ABL Lender, Prepetition FILO Agent, Prepetition FILO Lender, Prepetition Term Loan Agent, or Prepetition Term Loan Lender submits a Credit Bid in accordance with Section 10 herein, and such Credit Bid is otherwise permitted by and in accordance with the Prepetition Credit Documents, such bid shall be a Qualified Bid, and such applicable Prepetition ABL Agent, Prepetition ABL Lender, Prepetition FILO Agent, Prepetition FILO Lender, Prepetition Term Loan Agent, or Prepetition Term Loan Lender shall be a Qualified Bidder with respect to such Bid.

As soon as reasonably practicable after the applicable Bid Deadline, the Debtors will notify each Acceptable Bidder whether such party is a Qualified Bidder and shall provide the Consultation Parties' counsel with a copy of each Qualified Bid.  If an Acceptable Bidder's Bid is determined not to be a Qualified Bid, the Debtors will refund such Acceptable Bidder's Deposit (if any) on the date that is three business days after the Bid Deadline.

Between the date that the Debtors notify an Acceptable Bidder that it is a Qualified Bidder and the date set for the Auction, the Debtors may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder.  Without the prior written consent of the Debtors following consultation with the Consultation Parties, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the Purchase Price, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; *provided* that any Qualified Bid may be improved at the Auction (if any) as set forth herein.  Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures.

Notwithstanding anything herein to the contrary, the Debtors, in consultation with the Consultation Parties, reserve the right to work with (A) Potential Bidders and Acceptable Bidders to aggregate two or more Bids into a single consolidated Bid prior to the applicable Bid Deadline and (B) Qualified Bidders to aggregate two or more Qualified Bids into a single Qualified Bid prior to the conclusion of the Auction (if any).  The Debtors, in consultation with the Consultation Parties, reserve the right to cooperate with any Acceptable Bidder to cure any deficiencies in a Bid that is not initially deemed to be a Qualified Bid.  The Debtors, in consultation with the Consultation Parties, may accept a single Qualified Bid or multiple Bids that, if taken together in the aggregate, would otherwise meet the standards for a single Qualified Bid (in which event those multiple Qualified Bidders shall be treated as a single Qualified Bidder and their Bid a single Qualified Bid for purposes of the Auction (if any)).

## 10.    RIGHT TO CREDIT BID.

Subject to the terms of the Cash Collateral Order, including with respect to any Challenge, the Prepetition Credit Documents (as applicable), and section 363(k) of the Bankruptcy Code, any Qualified Bidder that has a valid and perfected lien on any Assets of the Debtors' estates (a "Secured Party") shall be entitled to credit bid all or a portion of the face value of such Secured Party's claims against the Debtors toward the Purchase Price specified in such Qualified Bidder's Bid (a "Credit Bid"); *provided* that a Secured Party shall be entitled to credit bid its claim(s) only

with respect to Assets that are subject to a valid and perfected lien in favor of such Secured Party as to such claim(s).

## 11.    AUCTION.

If the Debtors receive two or more Qualified Bids with respect to the same or overlapping Assets or group of Assets, the Debtors may, in consultation with the Consultation Parties, conduct an auction (the "Auction") to determine the Winning Bidder (or Back-Up Bidder, as applicable) with respect to such Assets.  In such event, the Debtors will (A) notify all Qualified Bidders of the highest or otherwise best Qualified Bid with respect to the applicable Assets, as determined by the Debtors in their reasonable business judgment and in consultation with the Consultation Parties (each such Qualified Bid, a "Baseline Bid") and (B) provide copies of the documents setting forth the terms of the Baseline Bid(s) to all Qualified Bidders, in each case, as soon as reasonably practicable after the Bid Deadline and in any event no later than prior to the commencement of the Auction.  The Debtors' determination of which Qualified Bid constitutes the Baseline Bid shall consider any factors the Debtors, in their reasonable business judgment and in consultation with the Consultation Parties, deem relevant to the value of the Qualified Bid to the Debtors' estates.

If the Debtors, in consultation with the Consultation Parties, determine that they have received no Qualified Bids other than the Stalking Horse Bid or they have received only a single Qualified Bid, then the Auction will not occur, and the Stalking Horse Bid or the Qualified Bid will be deemed to be the Winning Bid(s) for the Assets to which the Stalking Horse Bid or Qualified Bid relates.  If the Debtors make such a determination, the Debtors shall file a notice with the Court within one business day of making such determination.

If the Debtors receive two or more Qualified Bids for the same Assets, the Auction may take place on or after **February 21, 2025,** at a time to be announced by the Debtors in consultation with the Consultation Parties, via remote video and/or in person at the Debtors' election, and shall be conducted in a timely fashion according to the procedures set forth below (the "Auction Procedures").

## AUCTION PROCEDURES

**(i)**     **The Debtors Shall Conduct the Auction(s); General Provisions.**  The Debtors, with the assistance of their advisors, shall direct and preside over any Auction and shall consult with the Consultation Parties throughout the Auction process.  At the commencement of the Auction, the Debtors, in consultation with the Consultation Parties (1) may announce procedural and related rules governing the Auction, including time periods available to all Qualified Bidders to submit any successive Bid(s) and (2) shall describe the terms of the Baseline Bid.  Only incremental Bids that comply with the terms set forth in Section 11(ii) of these Bidding Procedures shall be considered Overbids.  Overbids shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders.  The Debtors, in consultation with the Consultation Parties, shall determine in their reasonable business judgment whether an incremental Bid is an Overbid.  The Debtors shall maintain a written transcript of all Bids made and announced at the Auction, including the Baseline Bid, all Overbids, and the Winning Bid (or Back-Up Bid, as applicable) (as defined below).

Only Qualified Bidders, the Debtors, the Consultation Parties and each of their respective legal and financial advisors, any creditor in these chapter 11 cases, (including members of the Committee) and any other parties specifically invited or permitted to attend by the Debtors, shall be entitled to attend the Auction, and the Qualified Bidders shall appear at the Auction in person and may speak or bid themselves or through duly authorized representatives.  Except as otherwise permitted by the Debtors in consultation with the Consultation Parties, only Qualified Bidders shall be entitled to bid at the Auction.

The Debtors and the Consultation Parties have the right to request any additional information that will allow the Debtors to make a reasonable determination as to a Qualified Bidder's financial and other capabilities to consummate the transactions contemplated by their proposal and any further information that the Debtors and the Consultation Parties believe is reasonably necessary to clarify and evaluate any Bid made by a Qualified Bidder during the Auction.

The Debtors may, subject to Section 16 of these Bidding Procedures, and with the consent of the Prepetition ABL Agent and the Prepetition FILO Agent, announce at the Auction modified or additional procedures for conducting the Auction or otherwise modify these Bidding Procedures.

**(ii)**     **Terms of Overbids.**  Each Overbid must comply with the following terms:

(a)     Minimum Overbid Increment.    At the commencement of the initial solicitation of Overbids, the Debtors, in consultation with the Consultation Parties, shall announce the minimum increment by which any Overbid must exceed the applicable Baseline Bid, which amount shall not be lower than one-hundred thousand United States Dollars ($100,000); *provided* that the first Overbid with regard to the Assets shall be the Initial Assets Overbid.

At the commencement of each subsequent round of solicitation of Overbids, the Debtors shall announce the minimum increment by which any Overbid must exceed the Prevailing Highest Bid (as defined below) at such time. The Debtors may, in their reasonable business judgment and in consultation with the Consultation Parties, announce increases or reductions to the applicable minimum Overbid increment at any time during the Auction.

(b)    <u>Conclusion of Each Overbid Round</u>.  Upon the solicitation of each round of Overbids, the Debtors may announce a deadline by which time any Overbids must be submitted to the Debtors (an "<u>Overbid Round Deadline</u>"); *provided* that the Debtors, in their reasonable business judgment and after consultation with the Consultation Parties, may extend any Overbid Round Deadline.

(c)    <u>Overbid Alterations</u>.  An Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable in the aggregate to the Debtors' estates than any prior Qualified Bid or Overbid, as determined in the Debtors' reasonable business judgment and after consultation with the Consultation Parties, but shall otherwise comply with the terms of these Bidding Procedures.

(d)    <u>Announcing Highest Bid</u>.  Subsequent to each Overbid Round Deadline, the Debtors shall announce whether the Debtors, in consultation with the Consultation Parties, have identified an Overbid as being higher or otherwise better than, in the initial Overbid round, the Baseline Bid or, in subsequent rounds, the Overbid previously designated by the Debtors as the prevailing highest or otherwise best Bid (the "<u>Prevailing Highest Bid</u>"). The Debtors shall describe to all applicable Qualified Bidders the material terms of any new Overbid designated by the Debtors as the Prevailing Highest Bid, as well as the value attributable by the Debtors to such Prevailing Highest Bid.

(iii)    **Consideration of Overbids.**  The Debtors reserve the right, in their reasonable business judgment and in consultation with the Consultation Parties, to adjourn the Auction one or more times, to, among other things (1) facilitate discussions between the Debtors and Qualified Bidders, (2) allow Qualified Bidders the opportunity to consider how they wish to proceed, and (3) provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment, may require, that the Qualified Bidder has sufficient internal resources or has received sufficient and sufficiently unconditional financing commitments to consummate the proposed Sale Transaction at the prevailing Overbid amount.

(iv)    **Closing the Auction.**  The Auction shall continue until there is only one Qualified Bid for a particular group of Assets that the Debtors determine, in their reasonable business judgment, with the consent of the Prepetition ABL Agent and the Prepetition FILO Agent not to be unreasonably withheld, and in consultation with

the Consultation Parties, to be the highest or otherwise best Qualified Bid for the applicable assets.  Such Qualified Bid shall be designated the "<u>Winning Bid</u>" (or Back-Up Bid, as applicable, and the Qualified Bidder who submitted the Winning Bid, the "<u>Winning Bidder</u>") with respect to its proposed Acquired Assets, at which time the Auction with respect to such Assets shall be closed; *provided* that (1) such Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then Prevailing Highest Bid; and (2) the Debtors' designation of a Qualified Bid as a Winning Bid (or Back-Up Bid, as applicable) shall be subject to and conditioned on finalization of definitive documentation and the Court's approval of such Winning Bid (or Back-Up Bid, as applicable), applicable regulatory and third-party approvals, and the consummation of the Sale Transaction contemplated thereby.  As soon as reasonably practicable after the designation of a Winning Bid (or Back-Up Bid, as applicable), the Debtors, in consultation with the Consultation Parties, shall finalize definitive documentation to implement the terms of such Winning Bid (or Back-Up Bid, as applicable) and cause such definitive documentation to be filed with the Court.

Notwithstanding anything to the contrary herein, the Debtors shall not, without the consent of the Prepetition ABL Agent and the Prepetition FILO Agent, select a Winning Bid unless such Winning Bid, either individually or in combination with other Winning Bids, as applicable, provides for the satisfaction of the "Obligations" under the ABL/FILO Credit Agreement and the Prepetition ABL/FILO Obligations (including the cash collateralization of all obligations related to letters of credit and contingent exposure, as applicable) to be Paid in Full (each as defined in the Cash Collateral Order) on the closing of the Sale Transaction.

(v) **<u>No Collusion; Good Faith Offer</u>.**  Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that (1) such Qualified Bidder has not engaged in any collusion with respect to the bidding process (2) such Qualified Bidders' Qualified Bid is a good faith and irrevocable offer and such Qualified Bidder intends to consummate the Sale Transaction contemplated by its Qualified Bid if such Qualified Bid is the Winning Bid (or Back-Up Bid, as applicable) with respect to the applicable Acquired Assets, and (3) will serve as Back-Up Bid.

(vi) **<u>Rejection of Bids</u>.**  The Debtors, in their reasonable business judgment, in consultation with the Consultation Parties, may reject, at any time prior to the conclusion of the Auction, any Bid that the Debtors determine, after consultation with the Consultation Parties, is (1) inadequate or insufficient, (2) not in conformity with the requirements of the Bankruptcy Code and/or these Bidding Procedures, or (3) contrary to the best interests of the Debtors, their estates, their creditors, and other stakeholders.

## 12.    DESIGNATION OF A BACK-UP BIDDER.

If for any reason the Winning Bidder fails to consummate the Qualified Bid within the time permitted after the entry of the Sale Order approving the Sale to the Winning Bidder, then the

Qualified Bidder or Qualified Bidders with the next-highest or otherwise second-best Bid (each, a "Back-Up Bidder"), as determined by the Debtors after consultation with the Consultation Parties, and with the consent of the Prepetition ABL Agent and the Prepetition FILO Agent, at the conclusion of the Auction and announced at that time to all the Qualified Bidders participating therein the Debtors, (A) shall provide written notice to the Back-Up Bidder and file and serve a notice of intent to proceed with the Back-Up Bidder and (B) schedule a telephonic status conference, which may be expedited, upon reasonable notice under the circumstances (which shall be no less than three (3) business days), at which time a briefing and hearing schedule will be established for those landlords and counterparties to executory contracts that do not consent to a proposed assumption and assignment to the Back-Up Bidder; *provided* that the forgoing shall not apply to any Potential Bidder that (1) both (a) qualifies as a Secured Party and (b) submits a Credit Bid; or (2) is the Stalking Horse Bidder.

Upon designation of the Back-Up Bidder at the Auction, the Back-Up Bid must remain open and irrevocable until the earlier of (1) the closing of the transactions contemplated by the Winning Bid notwithstanding any outside date set forth in such Back-Up Bidder's proposed purchase agreement and (2) the date that is four months following the conclusion of the Auction.

## 13.    FIDUCIARY OUT.

Notwithstanding anything to the contrary in these Bidding Procedures or any document filed with or entered by the Court, nothing in these Bidding Procedures or the Bidding Procedures Order shall require a Debtor or its board of directors, board of managers, or similar governing body to take any action or to refrain from taking any action with respect to the Sale Transactions or these Bidding Procedures solely to the extent such Debtor or governing body determines in good faith, in consultation with counsel, that taking or failing to take such action, as applicable, would be inconsistent with applicable law or its fiduciary obligations under applicable law.

Further, notwithstanding anything to the contrary in these Bidding Procedures or any document filed with or entered by the Court, until the entry of the Sale Order, the Debtors and their respective directors, managers, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the right to:  (A) consider, respond to, and facilitate alternate proposals for sales or other transactions involving any or all of the Assets (each, an "Alternate Proposal"); (B) provide access to non-public information concerning the Debtors to any entity or enter into confidentiality agreements or nondisclosure agreements with any entity; (C) maintain or continue discussions or negotiations with respect to Alternate Proposals; (D) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiations of Alternate Proposals; and (E) enter into or continue discussions or negotiations with any person or entity regarding any Alternate Proposal.

## 14.    "AS IS, WHERE IS."

Consummation of the Sale Transactions will be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors or their estates, except as specifically accepted and agreed to by the Debtors in the executed definitive written documentation for the Sale Transactions (the "Definitive Sale Documents").  Unless otherwise specifically accepted and agreed to by the Debtors in Definitive Sale Documents, all of the

Debtors' right, title, and interest in and to the Assets disposed of in the Sale Transaction will be transferred to the Winning Bidder (or Back-Up Bidder, as applicable) free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests in accordance with sections 363(f) of the Bankruptcy Code and subject to the terms and conditions of the Cash Collateral Order.

By submitting a Bid, each bidder will be deemed to acknowledge and represent that it (A) has had an opportunity to conduct adequate due diligence regarding the Debtors and the proposed Sale Transaction prior to making its Bid, (B) has relied solely on its own independent review, investigation, and inspection of any document, including executory contracts and unexpired leases, in making its Bid, and (C) did not rely on or receive from any person or entity (including any of the Debtors or their advisors or other representatives) any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, with respect to the Sale Transaction or the completeness of any information provided in connection with the Sale Transaction or the Auction (if any), except as may be set forth in Definitive Sale Documents.

## 15.    COMMISSIONS.

The Debtors shall be under no obligation to pay any commissions, fees, or expenses to any Potential Bidder's agent, advisor, or broker.  All commissions, fees, or expenses for any such agents, advisors, or brokers shall be paid by the applicable Potential Bidder at such Potential Bidder's discretion.  In no case shall any commissions, fees, or expenses for any Potential Bidder's agent, advisor, or broker be deducted from any proceeds derived from any Sale Transaction for the Assets.  This <u>Section 15</u> shall not apply to any Expense Reimbursement that becomes payable pursuant to the terms of the Stalking Horse Agreement.

## 16.    RESERVATION OF RIGHTS.

The Debtors may, in consultation with the Consultation Parties,[5] be entitled to modify these Bidding Procedures in their reasonable business judgment in consultation with the Consultation Parties, or impose, at or prior to the Auction (if any), additional customary terms and conditions on a Sale Transaction, including:    (A) extending the deadlines set forth in these Bidding Procedures;  (B) adjourning the Auction at the Auction; (C) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction (if any); (D) canceling the Auction; and (E) rejecting any or all Bids or Qualified Bids; *provided* that any such modifications are not inconsistent with the Bidding Procedures, the Bankruptcy Code or any order of the Court entered in connection herewith.  All such modifications and additional rules will be communicated to each of the Consultation Parties, Potential Bidders, and Qualified Bidders; *provided* that, to the extent such modifications occur at the Auction, disclosure of such modifications is limited to those in attendance at the Auction; *provided*, *further* that (i) the Debtors

---

[5]    If any Consultation Party submits a Bid or otherwise is a participant with respect to any active Bid, the other non-bidding members of such Consultation Party shall remain Consultation Parties; *provided* that such bidding Consultation Party shall be precluded from receiving or reviewing information or documentation not otherwise available to all Acceptable Bidders, and the other non-bidding members of such Consultation Party shall not share or otherwise discuss such information with the bidding members of such Consultation Party.

shall not amend these Bidding Procedures, the Bidding Procedures Order, or the bidding process to modify their obligations to consult with the Prepetition ABL Agent or the Prepetition FILO Agent without the consent of such parties or further order of the Bankruptcy Court, (ii) any extension of the deadlines set forth in these Bidding Procedures that breaches a Milestone set forth in the Cash Collateral Order shall require the consent of the Prepetition ABL Agent and the Prepetition FILO Agent, and (iii) notwithstanding anything to the contrary herein, the Debtors shall not adopt new rules, procedures, or deadlines, or otherwise modify these Bidding Procedures or the Bidding Procedures Order in a manner that alters, limits, or imposes additional burdens on the rights of the Prepetition ABL Agent, the Prepetition FILO Agent or the Prepetition Term Loan Agent, including (x) requiring the Prepetition ABL Agent, the Prepetition FILO Agent, or the Prepetition Term Loan Agent to include a deposit as part of a Credit Bid (subject to the Prepetition Credit Documents) or (y) imposing additional conditions on their rights to Credit Bid (subject to the Prepetition Credit Documents) or to be deemed a Qualified Bidder (and their Bids deemed Qualified Bids).

Notwithstanding anything to the contrary in these Bidding Procedures or the Bidding Procedures Order, the rights of the Prepetition ABL Agent and the Prepetition FILO Agent under the Cash Collateral Order (and the Prepetition Credit Documents referenced therein) to consent to the Sale (and any terms and conditions thereof) of any portion of their collateral, including, without limitation, any Assets, are expressly preserved and not waived or impaired by these Bidding Procedures or the Bidding Procedures Order.  For the avoidance of doubt, nothing in these Bidding Procedures or the Bidding Procedures Order shall amend or impair any provision of the Cash Collateral Order (including the Milestones therein) or the rights of the Prepetition ABL Agent and the Prepetition FILO Agent thereunder.

Each reference in these Bidding Procedures and the Bidding Procedures Order to "consultation" (or similar phrase) with the Consultation Parties shall mean consultation in good faith.

## 17.     CONSENT TO JURISDICTION.

All Qualified Bidders at the Auction shall be deemed to have consented to the jurisdiction of the Court and waived any right to a jury trial in connection with any disputes relating to the Auction or the construction and enforcement of these Bidding Procedures.

## 18.     SALE HEARING.

The Court shall hold a hearing to consider approval of the Winning Bid(s) (and Back-Up Bid(s), as applicable) and the Sale Transactions contemplated thereby (the "Sale Hearing").  **The Sale Hearing shall be held on February 21, 2025, if there is not an Auction, and February 26, 2025, if there is an Auction.  The Sale Hearing may be continued to a later date by the Debtors, in consultation with the Consultation Parties, by sending written notice to all Qualified Bidders and Consultation Parties prior to, or by making an announcement at, the**

**Sale Hearing.  No further notice of any such continuance will be required to be provided to any bidder or other party.**

19.    **RETURN OF DEPOSIT.**

Any Deposits provided by Qualified Bidders shall be held in one or more escrow accounts on terms acceptable to the Debtors.  Any such Deposits will be returned to Qualified Bidders that are not Winning Bidders (or Back-Up Bidders, as applicable) on the date that is three business days after the Auction (if any).  Any Deposit provided by a Winning Bidder (or Back-Up Bidder, as applicable) shall be applied to the Purchase Price of the applicable Sale Transaction at closing.

If a Winning Bidder (or Back-Up Bidder, as applicable) fails to consummate the Sale Transaction contemplated by its Winning Bid (or Back-Up Bid, as applicable) because of a breach by such Winning Bidder (or Back-Up Bidder, as applicable), the Debtors will not have any obligation to return any Deposit provided by such Winning Bidder (or Back-Up Bidder, as applicable), which may be retained by the Debtors as liquidated damages, in addition to any and all rights, remedies, or causes of action that may be available to the Debtors and their estates.

## **Exhibit 2**

**Stalking Horse Agreement**

*Execution Version*

<u>**AMENDED & RESTATED AGENCY AGREEMENT**</u>

This Agency Agreement ("<u>Agreement</u>") is made as of February 14, 2025, by and between (a) JOANN Inc. (together with its subsidiaries listed on <u>Annex 1</u>, the "<u>Merchant</u>") and (b) Gordon Brothers Retail Partners, LLC ("<u>Agent</u>"; and together with Merchant each a "<u>Party</u>" and collectively the "<u>Parties</u>").

## Section 1. <u>Recitals</u>

WHEREAS, on January 15, 2025 (the "<u>Petition Date</u>"), Merchant commenced voluntary chapter 11 bankruptcy cases (the "<u>Bankruptcy Cases</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>").

WHEREAS, Merchant entered into that certain Second Amended and Restated Credit Agreement (the "<u>Credit Agreement</u>") dated as of April 30, 2024, by and among Jo-Ann Stores, LLC, as borrower, the other Loan Parties thereto, Bank of America, N.A., as administrative agent and collateral agent (the "<u>ABL Agent</u>"), and 1903P Loan Agent, LLC, as FILO Documentation Agent (as defined in the Credit Agreement) (the "<u>FILO Agent</u>");

WHEREAS, on the Petition Date, Merchant and Agent executed the Agency Agreement, dated January 15, 2025 (the "<u>Original Agency Agreement</u>"); and

WHEREAS, Merchant operates retail stores and desires that Agent act as Merchant's exclusive agent for the purposes of, except as set forth in the Store Closing Procedures Order, and effective only from and after the Closing:

(a) selling all of the Merchandise (as hereinafter defined) from Merchant's retail store locations identified on <u>Exhibit 1(a)(1)</u> attached hereto (each a "<u>Store</u>" and collectively the "<u>Stores</u>"), distribution centers (including e-commerce facilities) identified on <u>Exhibit 1(a)(2)</u> attached hereto (each a "<u>Distribution Center</u>" and collectively, the "<u>Distribution Centers</u>"), wholesale channels or any other channel by means of a "going out of business," "store closing," "sale on everything," "everything must go," or similar sale as described further below (the "<u>GOB Sale</u>"), with the nature and manner of advertising the GOB Sale being in Agent's sole discretion, subject to the terms and conditions of this Agreement and the Sale Guidelines and Approval Order (each as defined below);

(b) marketing and selling, or otherwise designating the purchasers of the furniture, furnishings, trade fixtures, machinery, equipment, office supplies, Supplies (as defined below), conveyor systems, racking, rolling stock, and other tangible personal property (collectively, "<u>FF&E</u>") owned by Merchant as of the Closing, wherever located ("<u>Owned FF&E</u>");

(c) designating the purchasers, assignees, sublessees, or other transferees of any or all of Merchant's unexpired leases of non-residential real property (together with all amendments, extensions, modifications, and other material documents related thereto, each a "<u>Lease</u>" and all such Leases collectively, the "<u>Leases</u>") and

executory contracts (together with all amendments, extensions, modifications, and other material documents related thereto, each a "Contract" and all such Contracts collectively, the "Contracts"), in each case excluding any Leases or Contracts that may be rejected as permitted and in accordance with the procedures under the Approval Order (defined below) and subject to the assumption and assignment procedures to be incorporated into the Approval Order;

(d)     marketing and selling, or otherwise designating the purchasers, assignees, and/or licensees of any or all IP Rights owned by Merchant (the "Intellectual Property"); and

(e)     marketing and selling, or otherwise designating the purchasers, licensees, and/or assignees of any or all of Merchant's right, title, and interest in and to other real or tangible property (such right, title and interest, the "Other Assets" and, collectively with Merchant's right, title, and interest in and to the Merchandise, Owned FF&E, Leases, Contracts, and Intellectual Property, the "Assets").  For the avoidance of doubt, the Other Assets (x) include but are not limited to all cash on hand in the Merchant's retail store locations, cash in transit, cash in bank accounts, Merchant's interest in and rights with respect to cash posted as collateral for letters of credit or bonds, receivables (including credit card receivables), refunds of any nature, deposits, security deposits, credit card processing float, payment processor reserves, real property, sublease income, proceeds of retail sales of Merchandise in all of the Debtors' retail store locations from and after the Closing; and (y) claims and causes of action arising under chapter 5 of the Bankruptcy Code and similar state law ("Avoidance Actions"), and, except as provided for in Section 16.21(d), all other claims and causes of action, including but not limited to commercial tort claims, based on facts and circumstances existing as of the Closing, whether or not therefore discovered or asserted ("Other Causes of Action"); provided, that neither the Agent, nor any Person claiming by, through, or on behalf of the Agent (including by operation of law, sale, assignment, conveyance, or otherwise) shall pursue, prosecute, litigate, institute, or commence an action based on, assert, sell, use defensively, convey, assign or file any claim or cause of action that relates to an Avoidance Action or Other Cause of Action against, in each case, a related party of the Merchant; provided, further, that Other Assets shall not include any Excluded Assets.

NOW, THEREFORE, in consideration of the Purchase Price (as defined below) and the mutual covenants and agreements set forth in this Agreement, the Parties hereby amend and restate the Original Agency Agreement, and agree as follows:

**Section 2.  Appointment of Agent/Approval Order**.  As soon as practicable after entry of the Bid Procedures Order, but in any event, no later than two (2) business days after entry of the Bid Procedures Order, Merchant shall file in the Bankruptcy Cases a motion, if necessary, and a proposed form of order (the "Approval Order") in form and substance satisfactory to the Prepetition ABL Agent and the Prepetition FILO Agent (as defined in the Cash Collateral Order (as defined herein)) and the Agent.  The Approval Order shall, among other things:

(a) find that:

    (i) this Agreement is in the best interest of Merchant, its estate and creditors, and other parties-in-interest;

    (ii) the Parties entered into this Agreement in good faith pursuant to Section 363(m) of the Bankruptcy Code and without collusion as described in Section 363(n) of the Bankruptcy Code;

    (iii) time is of the essence in effectuating this Agreement and proceeding with the GOB Sale at the Stores uninterrupted;

    (iv) Merchant's decision to enter into this Agreement and perform its obligations under this Agreement is a reasonable exercise of Merchant's sound business judgment consistent with its fiduciary duties and is in the best interests of Merchant, its estate, its creditors, and other parties-in-interest; and

    (v) this Agreement was negotiated in good faith and at arms' length and Agent is entitled to the protections of section 363(m) and 364(e) of the Bankruptcy Code; and

(b) order, adjudge, and decree that:

    (i) this Agreement and all of the transactions contemplated hereby are approved in their entirety;

    (ii) the Parties are authorized to continue to take any and all actions as may be necessary or desirable to implement this Agreement and each of the transactions contemplated hereby;

    (iii) following the satisfaction of the Debt Payoff, the Initial Wind-Down Payment, and the Initial Central Services Payment (each as defined herein) (together, the "Initial Purchase Price Funding"), and in accordance with this Agreement, and subject to Agent's compliance with its other obligations hereunder, Agent shall have the exclusive right to market and sell, or otherwise designate the purchasers, licensees, and/or assignees of, any or all of the Assets free and clear of all liens, claims, and encumbrances thereon (other than Permitted Encumbrances) without further order of the Bankruptcy Court;

    (iv) the sale, license, transfer, or other conveyance of any Assets (other than the Assets being sold pursuant to the GOB Sale, as to which no further notice shall be required) reflected in notices filed in the Bankruptcy Cases from time to time by Agent, substantially in the form annexed hereto as Exhibit 2(b)(iv) (each an "Asset Designation Notice"), shall be automatically effective on the date reflected in the applicable Asset Designation Notice and subject to the satisfaction of any closing

conditions reflected therein, and the sale or other conveyance of such Assets shall be free and clear of all liens, claims, and encumbrances (other than Permitted Encumbrances) without further order of the Bankruptcy Court; provided, however, that nothing in the Approval Order shall inhibit the ability of Agent to seek other or further orders of the Court in connection with the sale or other disposition of any Assets;

(v)     the form of Asset Designation Notice is approved;

(vi)    subject to Agent's compliance with its payment obligations under this Agreement and the Approval Order, Agent is authorized to execute, in the name of and as agent for Merchant, any and all deeds, bills of sale, and other instruments or documents necessary to effectuate the sale, transfer, or other conveyance of any of the Assets, none of which instruments or documents shall require Merchant to incur any obligations or other liabilities beyond the terms of this Agreement;

(vii)   following the occurrence of the Closing, and the satisfaction of the Initial Purchase Price Funding, Merchant and any trustee appointed in the Bankruptcy Cases or any successor cases thereto shall hold the Assets (other than the Assets being sold through the GOB Sale) strictly in trust for the benefit of Agent and, as such, the Assets shall not constitute property of Merchant's bankruptcy estate pursuant to and consistent with 11 U.S.C. § 541(b)(1) at any time following the Closing;

(viii)  following the satisfaction of the Initial Purchase Price Funding, any Proceeds or Additional Agent Merchandise Proceeds received by, or that otherwise come into the possession of, Merchant at any time after the Closing shall be segregated and held strictly in trust for the benefit of Agent, shall not be commingled with Merchant's own assets, and, as such, shall not become property of Merchant's bankruptcy estate pursuant to and consistent with 11 U.S.C. §541(b)(1), and shall be paid over to Agent promptly, but in any event, not later than in connection with each Weekly Sale Reconciliation;

(ix)    following the satisfaction of the Initial Purchase Price Funding, and solely to the extent that any Assets, Proceeds, or Additional Agent Merchandise Proceeds are, notwithstanding the Approval Order, subsequently determined to constitute property of Merchant's estate, but subject to Agent's obligation to pay Expenses and fund the Wind-Down Payments, Agent shall have first priority, senior security interests and liens on all such Assets, Proceeds, and Additional Agent Merchandise Proceeds, which liens shall be deemed automatically perfected and (x) the Merchant shall be expressly prohibited from granting any security interests or liens on the Assets, Proceeds, and Additional Agent Merchandise Proceeds thereof and (y) to the extent that any security interest or lien is granted or otherwise attaches, voluntarily or

4

involuntarily, (other than the security interests and liens in favor of the Agent) to any Assets, Proceeds, or Additional Agent Merchandise Proceeds, such security interests and liens shall be *void ab initio* without further order of the Court; <u>provided</u> that nothing in the Approval Order shall inhibit Agent's ability, and the Approval Order shall expressly authorize Agent, to take any action Agent deems appropriate to perfect and enforce security interests and liens granted in its favor;

(x)     following the satisfaction of the Initial Purchase Price Funding and subject to Agent's obligation to pay Expenses and fund the Wind-Down Payments, until all Assets have been sold or otherwise disposed of, and solely to the extent that any Assets, Proceeds, or Additional Agent Merchandise Proceeds are, notwithstanding the Approval Order, subsequently determined to constitute property of Merchant's estate, Agent shall have a superpriority administrative expense claim, which is senior to all other administrative expense claims (including any other superpriority administrative expense claims) against Merchant to the extent of any amounts owing from Merchant to Agent in connection with this Agreement, including as a result of any breach of this Agreement and/or as a result of any Proceeds or Additional Agent Merchandise Proceeds being in Merchant's possession;

(xi)     the Lease/Contract Designation Rights are approved, and Agent is authorized to designate the assignees of any or all of the Contracts and Leases pursuant thereto;

(xii)     Agent shall have the exclusive right to use the Stores and all other Assets for the purpose of conducting the GOB Sale, free of any interference from any entity or person, subject to compliance with this Agreement (including payment of Expenses and Wind-Down Payments) the Sale Guidelines (as defined below) and Approval Order;

(xiii)     Agent, as the exclusive agent for Merchant, is authorized to conduct, advertise, post signs, utilize sign-walkers, and otherwise promote the GOB Sale as a "going out of business", "store closing", "sale on everything", "everything must go", or similarly themed sale, in accordance with the Sale Guidelines (as the same may be modified and approved by the Bankruptcy Court), subject to compliance with the Sale Guidelines, the Approval Order, and all applicable federal, state, and local laws, regulations and ordinances, including, without limitation, all laws and regulations relating to advertising, privacy, consumer protection, occupational health and safety and the environment, together with all applicable statutes, rules, regulations and orders of, and applicable restrictions imposed by, governmental authorities (collectively, the "<u>Applicable General Laws</u>"), other than all applicable laws, ordinances, rules, regulations, or licensing requirements in respect of "going out of business", "store closing" or similarly-themed sales

(collectively, the "Liquidation Sale Laws"); provided, however, that notwithstanding any other provision in the Approval Order, no party waives any rights to argue any position with respect to whether the conduct was in compliance with the Approval Order and/or any applicable law, or that the enforcement of such applicable law is preempted by the Bankruptcy Code;

(xiv)    provided that the GOB Sale is conducted in accordance with and subject to the Sale Guidelines and the Approval Order, and in light of provisions in the laws of many Governmental Units (as defined in the Bankruptcy Code) that exempt court-ordered sales from their provisions, Agent and Merchant, to the extent applicable, will be presumed to be in compliance with any Liquidation Sale Laws and are authorized to conduct the GOB Sale in accordance with the terms of the Approval Order and the Sale Guidelines without the necessity of further showing compliance with any such Liquidation Sale Laws;

(xv)    Agent may use all Intellectual Property consistent with Merchant's ordinary course of business usage and in connection with the conduct of the GOB Sale;

(xvi)    unless otherwise ordered by the Bankruptcy Court, all newspapers and other advertising media in which the GOB Sale is advertised shall be directed to accept the Approval Order as binding and to allow the Parties to consummate the transactions provided for in this Agreement, including, without limitation, conducting and advertising the GOB Sale in the manner contemplated by this Agreement;

(xvii)    unless otherwise ordered by the Bankruptcy Court, all utilities, landlords, creditors, and other interested parties and all persons acting for or on their behalf shall not interfere with or otherwise impede the conduct of the GOB Sale, or institute any action in any forum other than the Bankruptcy Court that in any way directly or indirectly interferes with or obstructs or impedes the conduct of the GOB Sale;

(xviii)    the Bankruptcy Court retains exclusive jurisdiction over the enforcement and interpretation of, and over and all matters arising from, this Agreement;

(xix)    Merchant is directed to provide weekly reporting to Agent of all amounts expended for Expenses and the Central Services Expenses as set forth in the Central Services Budget;

(xx)    Merchant shall make its books and records reasonably available to Agent;

(xxi)    Agent shall not be liable for any claims against Merchant except as expressly provided for in this Agreement and Merchant shall not be

liable for any claims against Agent except as expressly provided for in this Agreement;

(xxii)    all payments made by Merchant on account of the Central Services Expenses shall be made pursuant to, and solely in accordance with, the Central Services Budget (on a line item basis);

(xxiii)   Agent shall neither have nor incur any obligation to advance or fund any amounts to or for Merchant except as set forth in this Agreement;

(xxiv)    any amendment to or other modification of the Central Services Budget shall only be effective upon approval by Agent in its sole discretion;

(xxv)     Agent is authorized to sell the Additional Agent Merchandise on the terms set forth herein, subject to the Sale Guidelines;

(xxvi)    Except as provided for herein, following the occurrence of the Closing, neither the Merchant nor any other entity acting on its behalf or as its successor (including but not limited to the any statutory committee appointed in the Bankruptcy Cases and any chapter 7 or 11 trustee) may recover from the Agent any costs or expenses of preserving, or disposing of, any of the Assets, this Agreement shall be binding on any chapter 7 or 11 trustee, and any subsequently appointed chapter 7 trustee is authorized to and shall conduct the business of the Merchant for the limited purposes of complying with and executing under and in accordance with this Agreement, all of the foregoing without further order of the Court;

(xxvii)   Agent and its designees are granted derivative standing to pursue the Avoidance Actions (subject to Section 11.2(f) below) and Other Causes of Action in the name of and/or on behalf of Merchant;

(xxviii)  in the event any of the provisions of the Approval Order are modified, amended or vacated by a subsequent order of the Bankruptcy Court or any other court, Agent shall be entitled to the protections provided in Bankruptcy Code sections 363(m) and 364(e) and, no such appeal, modification, amendment or vacatur shall affect the validity and enforceability of the GOB Sale or the liens or priority authorized or created under this Agreement or the Approval Order;

(xxix)    neither Agent nor any entity comprising Agent is or shall be a mere continuation of Merchant or otherwise subject to successor liability in connection with any of the Assets;

(xxx)     upon receipt by the ABL Agent and FILO Agent and certain other persons of the Debt Payoff as directed in the Payoff Letters pursuant to Section 3.1(a) of this Agreement, all ongoing commitments under the Credit Agreement shall be canceled and terminated;

(xxxi)    to the extent Agent has not designated the Agent or other assignee of any Assets (any Assets so not designated by such date, the "Residual Assets") as of May 31, 2025 (as may be amended by written agreement of the Parties, the "Asset Designation Rights Termination Date"), (1) ownership of all cash (on hand, in the bank, in transit, posted in respect of letters of credit or bonds or otherwise), credit card processing float, accounts receivable, notes receivable, credit card receivables, other receivables, deposits, security deposits, proceeds of retail sales in all of the Debtors' retail store locations, rights to refunds, other rights to payment, Intellectual Property, and, subject to Section 7.1, ownership of all Remaining Merchandise, comprising Residual Assets shall vest in Agent or its designee, and (2) ownership of all other Residual Assets shall revert to the Debtors' estates, each on the Designation Rights Termination Date;

(xxxii)    the Final Reconciliation (as defined below), once agreed to by Merchant and Agent, shall be automatically deemed approved pursuant to Bankruptcy Code section 105(a) and Rule 9019 of the Federal Rules of Bankruptcy Procedure without further order of the Bankruptcy Court or action by any party; and

(xxxiii)    this Agreement, the Approval Order, and all provisions hereof and thereof are binding on any successor to Merchant, including but not limited to any chapter 7 or chapter 11 trustee, and subject to Agent's obligation to pay Expenses and fund the Wind-Down Payments, any such successor shall continue to hold all Assets, Proceeds, and Additional Agent Merchandise Proceeds strictly in trust for the benefit of Agent.

**Section 3.  Consideration to Merchant and Agent.**

3.1        Purchase Price.  The aggregate consideration being provided to Merchant in exchange for Agent's rights and Merchant's obligations under this Agreement is as follows (collectively, the "Purchase Price"):

(a)    Debt Payoff.  On the Closing Date, in accordance with payoff letters by each of the ABL Agent (the "ABL Payoff Letter") and FILO Agent (the "FILO Payoff Letter" and, together with the ABL Payoff Letter, the "Payoff Letters") in form and substance satisfactory to each such party, Agent shall:

(i)    to the ABL Agent, for the benefit of the ABL Lenders (as defined in the Cash Collateral Order), and certain other persons as directed in the ABL Payoff Letter, (a) pay the amount in cash necessary to indefeasibly pay in full in cash all Prepetition Revolving Obligations (as defined in the Cash Collateral Order), including, without limitation, all outstanding principal, accrued interest, fees, costs and expenses (including, without limitation, all attorneys' fees, costs and expenses), and (b) provide and/or post cash collateral for (and/or replacement of) any issued and outstanding letters of credit (in form and substance acceptable the Prepetition ABL

8

Agent), in each case in accordance with and as set forth in the ABL Payoff Letter (such amounts and other consideration, the "ABL Payoff"); and

(ii)     pay to the FILO Agent, for the benefit of the FILO Lenders, and certain other persons as directed in the FILO Payoff Letter, the amount in cash necessary to indefeasibly pay in full in cash all Prepetition FILO Obligations (as defined in the Cash Collateral Order), including, without limitation, all outstanding principal, accrued interest, fees, costs and expenses (including, without limitation, all attorneys' fees, costs and expenses) and make whole obligations, all as set forth in the FILO Payoff Letter (such amounts and other consideration, the "FILO Payoff" and, together with the ABL Payoff, the "Debt Payoff").

(b)     Wind-Down Funding.  At Closing, Agent shall make an initial cash payment to Merchant equal to sixty-five percent (65%) of the Wind-Down Budget (the "Initial Wind-Down Payment").  Thirty (30) days after the Closing, Agent shall make a second cash payment to Merchant equal to thirty-five percent (35%) of Wind-Down Budget (the "Second Wind-Down Payment" and, together with the Initial Wind-Down Payment, the "Wind-Down Payments").  The Wind-Down Payments shall not exceed the amounts set forth in Exhibit 3.1(b) (the "Wind-Down Budget"); provided, however, that, solely with respect to the 503(b)(9) Claim subcategory of the Wind-Down Budget, any amounts that have not been expended by Merchant as of the Designation Rights Termination Date shall be returned to Agent upon the earlier of (i) the dismissal or conversion of the Bankruptcy Cases; or (ii) the effective date of a plan of liquidation of Merchant. With respect to the 503(b)(9) Claim subcategory, Merchant agrees not to make any payments until the date that is 60 days from the Closing (unless extended upon mutual agreement between Merchant and Agent).  Merchant shall keep Agent informed on a timely basis of its efforts to reconcile 503(b)(9) claims and shall use best efforts to negotiate settlements with respect to the 503(b)(9) claims, in consultation with Agent.

(c)     Central Services Funding.  At Closing, Agent shall make an initial cash payment to Merchant equal to the agreed upon estimated amount to be incurred in the two weeks following Closing, in an amount set forth in the Central Services Budget (the "Initial Central Services Payment").  After Closing, from time to time, Agent, upon request by the Merchant, shall make additional payments to Merchant on account of the Central Services Expenses (the "Subsequent Central Services Payments" and, together with the Initial Central Services Payment, the "Central Services Payments").  The Central Services Payments are subject to and to be used solely as set forth in the budget and schedule attached as Exhibit 3.1(c) hereto (as may be amended from time to time by agreement of the Parties, subject to approval by Agent in its sole discretion, the "Central Services Budget").  Merchant shall provide Agent with a register of all payments Merchant intends to issue for Central Services Expenses at least one business day before issuance, which register shall identify the amounts and expense categories of such payments.  Any portion of the Subsequent Central Services Payments not expended by Merchant as of the Designation Rights Termination Date shall be returned to Agent upon the earlier of (i) the dismissal or conversion of the Bankruptcy Cases; or (ii) the effective date of a plan of liquidation of Merchant.  For the avoidance of doubt, Agent's obligation to fund the Central Services Payments shall not exceed the Central Services Budget; provided, however, that, in accordance with Section 4.1, Agent shall be responsible for the payment of any Central Services Expenses in excess of the Central Services Budget to the extent such expenses are incurred at the direction of

the Agent, to facilitate Agent's conduct under this Agreement, or otherwise as agreed to by the Agent in writing.

(d)    Expenses.  Subject to and only upon Closing, Agent shall be responsible for the payment of all Expenses pursuant to Section 4.1 below.

3.2    Consideration to Agent.

(a)    Proceeds.  Upon the occurrence of the Closing, all Proceeds shall be the exclusive property of Agent, subject to distribution in accordance with the waterfall set forth below:

(i)    *First,* to Agent in the amount of the sum of the Purchase Price, which, for the avoidance of doubt, shall include the Debt Payoff, the Wind Down Payments, Central Services Payments, and all Expenses pursuant to Section 4.1.

(ii)    *Second*, to the Agent, as consideration for serving as liquidation agent regarding the Assets, the following fee (the "Liquidation Fee") for each Asset category as follows:

1.    Merchandise:   [two (2)]% of the aggregate Retail Price of Merchandise sold as part of the GOB Sale;

2.    FF&E:  [twenty (20)]% of Proceeds from the sale, transfer, or conveyance of any FF&E;

3.    Real Estate:  [ten (10)]% of Proceeds from the sale, transfer, or conveyance of any Lease; and

4.    Intellectual Property:  [ten (10)]% of Proceeds from the sale, transfer, or conveyance of any Intellectual Property; and

5.    Other Assets:  [ten (10)]% of Proceeds from the sale, transfer, or conveyance of any Other Assets.

(iii)    *Thereafter*, all Net Proceeds shall be distributed [thirty-five 35]% to the Term Loan Agent and [sixty-five 65]% to Agent.

(b)    Additional Agent Merchandise Proceeds.  All Additional Agent Merchandise Proceeds shall be the exclusive property of Agent.

(c)    Assets and Proceeds Held in Trust.  Merchant shall hold all of the Assets in trust for the benefit of Agent.  Any Proceeds or Additional Agent Merchandise Proceeds received by, or that otherwise come into the possession of, Merchant at any time after the Closing shall be segregated and held strictly in trust for the benefit of Agent, shall not be commingled with Merchant's own assets, shall not become property of Merchant's bankruptcy estate, and shall be paid over to Agent promptly upon receipt by Merchant or upon notice received by Merchant from Agent, but in any event no later than the Weekly Sale Reconciliation.

(d)    <u>Remaining Merchandise</u>.  To the extent that there is Merchandise remaining at the Sale Termination Date (the "<u>Remaining Merchandise</u>"), such Remaining Merchandise shall be deemed automatically transferred to Agent free and clear of all liens, claims, and encumbrances (other than Permitted Encumbrances).  Agent and its affiliates shall be authorized to sell or otherwise dispose of the Remaining Merchandise with all logos, brand names, and other Intellectual Property intact, and shall be authorized to advertise the sale of the Remaining Merchandise using the Intellectual Property.

3.3        <u>Proceeds of GOB Sales</u>.

(a)    Following the satisfaction of the Initial Purchase Price Funding, Agent may (but shall not be required to) establish its own accounts (including without limitation credit card accounts and systems), dedicated solely for the deposit of the Proceeds and Additional Agent Merchandise Proceeds of the GOB Sales (the "<u>GOB Sale Proceeds</u>") and the disbursement of amounts payable to Agent in connection with the GOB Sales (the "<u>Agency Accounts</u>"); and Merchant shall promptly, upon Agent's reasonable request, execute and deliver all necessary documents to open and maintain the Agency Accounts, at no additional cost to Merchant; <u>provided</u>, <u>however</u>, Agent shall have the right, in its sole and absolute discretion, to continue to use the Merchant Designated Deposit Accounts (as defined below) as the Agency Accounts in which case the Merchant Designated Deposit Accounts shall be deemed to be Agency Accounts. Agent shall exercise sole signatory authority and control with respect to the Agency Accounts. The Agency Accounts shall be dedicated solely to the deposit of GOB Sale Proceeds and other amounts contemplated by this Agreement in connection with the GOB Sale and the distribution of amounts payable hereunder in connection with the GOB Sale.  Merchant shall not be responsible for, and Agent shall pay as an Expense hereunder, all bank fees and charges, including wire transfer charges, related to the GOB Sale and the Agency Accounts.  Following Agent's notice to Merchant of Agent's designation of the Agency Accounts (other than the Merchant Designated Deposit Accounts), all GOB Sale Proceeds (including credit card GOB Sale Proceeds) shall be deposited into the Agency Accounts.

(b)    Agent shall have the right to use Merchant's credit card facilities, including Merchant's credit card terminals and processor(s), credit card processor coding, Merchant's identification number(s) and existing bank accounts for credit card transactions relating solely to the GOB Sale; provided, that, Agent's use of any such credit card facilities is in compliance with Applicable General Laws and industry standards, including the Payment Card Industry Data Security Standard ("<u>PCI-DSS</u>").  In the event that Agent elects to use Merchant's credit card facilities, Merchant shall process credit card transactions on behalf of Agent and for Agent's account, applying Merchant's customary practices and procedures.    Without limiting the foregoing, Merchant shall make reasonable efforts to (i) cooperate with Agent to download data from all credit card terminals each day during the Sale Term to effect settlement with Merchant's credit card processor(s), and (ii) take such other actions necessary to process credit card transactions on behalf of Agent under Merchant's identification number(s).  At Agent's request, Merchant shall cooperate with Agent to establish Merchant's identification numbers under Agent's name to enable Agent to process all such credit card GOB Sale Proceeds for Agent's account. Merchant shall not be responsible for, and Agent shall pay as an Expense hereunder, all credit card fees, charges, and chargebacks related to the GOB Sale, whether received during or after the Sale

11

Term.  Agent shall not be responsible for, as an Expense or otherwise, any credit card fees, charges, or chargebacks relating to periods prior to the Closing.

(c)      Unless and until Agent establishes its own Agency Accounts (other than the Merchant Designated Deposit Accounts), all GOB Sale Proceeds and other amounts contemplated by this Agreement (including credit card GOB Sale Proceeds), shall be collected by Merchant and deposited on a daily basis into depository accounts owned in the name of Merchant and designated solely for the deposit of GOB Sale Proceeds and other amounts contemplated by this Agreement (including credit card GOB Sale Proceeds), and the disbursement of amounts payable to or by Agent hereunder (the "Merchant Designated Deposit Accounts").  All funds in the Merchant Designated Deposit Accounts shall at all times be held in trust for the benefit of Agent.  The Merchant Designated Deposit Accounts shall be cash collateral accounts, with all cash, credit card payments, checks and similar items of payment, deposits and any other amounts in such accounts being GOB Sale Proceeds or other amounts contemplated hereunder, and Merchant hereby grants to Agent a first-priority senior security interest in and lien upon each of the Merchant Designated Deposit Accounts and all funds on deposit in such accounts from and after the Closing.

(d)      Merchant shall take all actions necessary to designate Agent as an authorized signer on all Merchant Designated Deposit Accounts and to grant Agent the ability to initiate wire transfers from such Merchant Designated Deposit Accounts.

(e)      On each business day to the extent practicable, Merchant shall promptly pay to Agent by wire transfer all funds in the Merchant Designated Deposit Accounts (including, without limitation, GOB Sale Proceeds, GOB Sale Proceeds from credit card sales, and all other amounts) deposited into the Merchant Designated Deposit Accounts for the prior day(s).

**Section 4.  Expenses.**

4.1          Subject to and only upon Closing, Agent shall be responsible for all "Expenses," which shall be paid by Agent in accordance with Section 4.3 below.  As used herein, "Expenses" shall mean the actual operating expenses that arise solely after Closing through the Sale Termination Date, that are incurred at the direction of the Agent, to facilitate Agent's conduct under this Agreement, or otherwise as agreed to by the Agent in writing, which are strictly limited to the following expenses:

(a)      actual hourly or salaried payroll, as applicable, with respect to all Retained Employees and any temporary labor engaged for the GOB Sale that are used in connection with conducting the GOB Sale for actual days/hours worked;

(b)      any amounts related to (i) benefits arising, accruing or attributable to the period between the Closing and the Sale Term:  (w) vacation days or vacation pay, (x) sick days or sick leave or any other form of paid time off, (y) maternity leave or other leaves of absence, and (z) ERISA coverage and similar contributions, and (ii) any amounts payable by Merchant for benefits (including FICA, unemployment taxes, workers' compensation and healthcare insurance, but excluding Excluded Payroll Benefits) for Retained Employees used in the GOB Sale (the "Payroll Benefits");

(c)       subject to <u>Section 6.1</u>, the actual Occupancy Expenses;

(d)       Retention Bonuses, if applicable, for Retained Employees, as provided for in <u>Section 9.4</u> below;

(e)       advertising and direct mailings initiated by Agent relating to the GOB Sale, Store interior and exterior signage and banners procured by Agent, and sign-walkers or drivers procured by Agent, in each case relating to the GOB Sale;

(f)       credit card fees, bank card fees, and chargebacks and credit/bank card discounts with respect to Merchandise sold in the GOB Sale;

(g)       bank service charges (for Store, corporate accounts, and Agency Accounts), check guarantee fees, and bad check expenses to the extent directly attributable to the GOB Sale;

(h)       costs for additional Supplies at the Stores necessary to conduct the GOB Sale as solely to the extent requested by Agent;

(i)       all fees and charges required to comply with applicable laws in connection with the GOB Sale solely to the extent agreed to by Agent;

(j)       Store cash theft and other Store cash shortfalls in the registers;

(k)       any Central Services Expenses in excess of the Central Services Budget to the extent such expenses are incurred at the direction of the Agent, to facilitate Agent's conduct under this Agreement, or otherwise as agreed to by the Agent in writing.

(l)       the Distribution Center Expenses;

(m)       postage, courier and overnight mail charges requested by Agent to the extent relating to the GOB Sale;

(n)       third party payroll processing expenses associated with the GOB Sale; and

(o)       costs of transfers initiated by Agent of Merchandise and Additional Agent Merchandise between and among the Stores and Distribution Centers during the Sale Term, including delivery and freight costs, it being understood that Agent shall be responsible for coordinating such transfer of Merchandise.

Notwithstanding anything herein to the contrary, there will be no double counting or double payment of Expenses to the extent that Expenses appear or are contained in more than one Expense category.

As used herein, the following terms have the following respective meanings:

(i)       "<u>Central Services Expenses</u>" means the actual costs and expenses, including related to Merchant's central administrative services necessary for the GOB Sale, including, but not limited to, operation of the IT systems, internal payroll processing, MIS services,

cash and inventory reconciliation, data processing and reporting, information technology updates, functionality and maintenance of the corporate headquarters, legal, human resources, accounting, and functionality and maintenance of Merchant's e-commerce site for purposes of advertising the GOB Sale (collectively, "Central Services").

(ii)    "Distribution Center Expenses" means the actual costs and expenses, including use and Occupancy Expenses and Distribution Center employee payroll, both hourly and salary, and other obligations, of the operations of the Distribution Centers, and the actual costs and expenses (including outbound freight) related to the processing, transfer, and consolidation of Merchandise, Additional Agent Merchandise, and supplies in the Distribution Centers and from the Distribution Centers to the Stores, and all actual costs and expenses associated with Agent's on-site supervision of the Stores, corporate offices and Distribution Centers, including (but not limited to) any and all fees, wages, taxes, third party payroll costs and expenses, and deferred compensation of Agent's field personnel, travel to, from or between the Stores, corporate offices, and Distribution Centers, and out-of-pocket and commercially reasonable expenses relating thereto (including reasonable and documented corporate travel to monitor and manage the GOB Sale).

(iii)    "Excluded Payroll Benefits" means (i) the following benefits arising, accruing or attributable to the period prior to Closing or after the Sale Termination Date, if any: (w) vacation days or vacation pay, (x) sick days or sick leave or any other form of paid time off, (y) maternity leave or other leaves of absence, and (z) ERISA coverage and similar contributions and/or (ii) any payments due under WARN Act or similar state laws.

(iv)    "Occupancy Expenses" means base rent, percentage rent, HVAC, utilities, CAM, storage costs, real estate and use taxes, Merchant's association dues and expenses, utilities expenses, cash register maintenance, routine repairs, building maintenance, trash and snow removal, housekeeping and cleaning expenses, local and long-distance telephone and internet/wifi expenses, security (including, without limitation, security systems, courier and guard service, building alarm service and alarm service maintenance), and rental for furniture, fixtures and equipment.

(v)    "Third Party" means, with reference to any Expenses to be paid to a Third Party, a party which is not affiliated with or related to Merchant.

(vi)    Notwithstanding any other provision of this Agreement to the contrary, "Expenses" shall not include any other costs, expenses or liabilities payable by Merchant not provided for herein, all of which shall be paid solely by Merchant.

4.2    Payment of Expenses.

Subject to and only upon Closing, Agent shall be responsible for the payment of all Expenses out of Proceeds (or from Agent's own accounts if and to the extent there are insufficient Proceeds).    All Expenses incurred during each week of the GOB Sale (*i.e.* Sunday through Saturday) shall be paid by Agent to or on behalf of Merchant, or paid by Merchant and thereafter reimbursed by Agent as provided for herein; provided, however, in the event that the actual amount of an Expense is unavailable on the date of the reconciliation (such as payroll), Merchant and

Agent shall agree to an estimate of such amounts, which amounts will be reconciled once the actual amount of such Expense becomes available.  To the extent necessary or appropriate, Agent shall work with Merchant in good faith to fund Expenses in advance as needed to ensure the timely payment thereof.  Agent and/or Merchant may review or audit the Expenses at any time.  To the extent such Expenses are paid by Merchant, Merchant shall provide Agent with payments that Merchant intends to issue for such Expenses at least one business day before issuance, which register shall identify amounts and expense categories of such payments.

**Section 5.  Merchandise.**

      5.1                  Merchandise Subject to This Agreement.

      (a)      "Excluded Goods" means all (1) goods that are not owned by Merchant, including but not limited to goods that belong to sublessees, licensees, department lessees, or concessionaires of Merchant and (2) goods held by Merchant on memo, on consignment (except to the extent otherwise agreed by the applicable consignor), or as bailee.  Merchant shall be solely responsible for the disposition and/or abandonment of all Excluded Goods and all costs, expenses, and obligations associated therewith.  Agent shall incur no cost, expense, or obligation in connection with any Excluded Goods.

      (b)      "Merchandise" means all goods owned by Merchant for resale as of the occurrence of the Closing, wherever located, including, for clarity, all goods that are on-order or in-transit as of the Closing, other than Excluded Goods.

      5.2      Valuation.

      (a)      "Retail Price" shall mean with respect to each item of Merchandise, the Merchandise File price as reflected in Merchant's books and records for such item excluding point of sale, temporary markdowns.

      (b)      "Merchandise File" shall mean ["7..37_Project Thread-Inventory By Article (FW 52).xlsx", the column labeled "Chain Retail Price."][1]

      5.3      Inventory Count. During the Sale Term, for purposes determining the Liquidation Fee related to Merchandise, Merchant and Agent shall jointly keep (i) a strict count of gross register receipts from the sale of Merchandise, less applicable taxes and excluding any prevailing Sale-related discounts, and (ii) cash reports of sales within each Store. Register reports shall show for each item sold the Retail Price for such item and the markdown or discount, if any, specifically granted by the Agent.  All such records and reports shall be made available to Merchant and Agent during regular business hours upon reasonable notice.

**Section 6.  Sale Term.**

      6.1                  Term.  Subject to satisfaction of the conditions precedent set forth in Section 10 hereof, the GOB Sale shall commence at each Store on a date determined by Agent in

---

[1]    Subject to further review and confirmation.

its sole discretion after the occurrence of the Closing (the "Sale Commencement Date") and shall end at each Store no later than May 31, 2025 (the "Sale Termination Date", and the period from the Sale Commencement Date to the Sale Termination Date as to each Store being the "Sale Term"). Agent may, in its discretion, earlier terminate the GOB Sale on a Store-by-Store basis or close a Distribution Center, upon written notice to Merchant at least five (5) days prior to the end of a calendar month (a "Vacate Notice") and vacate such Store or Distribution Center, in accordance with Section 6.2, by the end of such calendar month (the "Vacate Date"); provided, however, that Agent's obligations to pay all Expenses, including Occupancy Expenses, for each Store or Distribution Center, as applicable, subject to a Vacate Notice shall continue only until the applicable Vacate Date.

6.2     Vacating the Stores.  At the conclusion of the GOB Sale, Agent agrees to leave each Store in "broom clean" condition, ordinary wear and tear excepted, except for unsold items of Owned FF&E which may be abandoned by Agent in place in a neat and orderly manner pursuant to Section 7 below.  Agent shall vacate each Store or Distribution Center on or before the earlier of (a) the Sale Termination Date or, if applicable, (b) the Vacate Date, as provided for herein, at which time Agent shall surrender and deliver the Store or Distribution Center premises, and, if in Agent's possession, keys, to Merchant unless the applicable Lease is being conveyed pursuant to the Lease/Contract Designation Rights.  Notwithstanding the foregoing, Agent's obligations to pay all Expenses for the Stores and Distribution Centers shall be limited as provided for in Section 6.1.

## Section 7.  FF&E/ Merchandise.

7.1     Abandonment of FF&E/Merchandise.  Agent shall be authorized to abandon any and all FF&E or Remaining Merchandise, whether owned or not by Merchant, in place without any cost or liability to Agent.  For the avoidance of doubt, Agent shall have no responsibility whatsoever with respect to FF&E that is not owned by Merchant; provided that nothing in this Section 7 shall limit Agent's rights with respect to Owned FF&E under the Asset Designation Rights or with respect to leased FF&E under the Lease/Contract Designation Rights.

## Section 8.  Conduct of the GOB Sale.

8.1     Rights of Agent.  Subject to entry of the Approval Order, in addition to any other rights granted to Agent elsewhere in this Agreement, Agent shall be permitted to conduct the GOB Sale as a "going out of business," "store closing," "sale on everything," "everything must go," or similarly themed sale throughout the Sale Term, without compliance with any Liquidation Sale Laws, subject to the Approval Order.  Agent shall conduct the GOB Sale in the name of and on behalf of Merchant in a commercially reasonable manner and in compliance with the terms of this Agreement and Applicable General Laws and subject to the Approval Order.  Agent shall conduct the GOB Sale in accordance with the sale guidelines attached hereto as Exhibit 8.1 (the "Sale Guidelines").  In addition to any other rights granted to Agent hereunder in conducting the GOB Sale, Agent shall have the right:

(a)     to establish GOB Sale prices and discounts and Store hours;

16

(b)     except as otherwise expressly included as an Expense, to use without charge during the Sale Term all FF&E, IT Systems, existing Supplies, intangible assets (including Merchant's name, logo and tax identification numbers and, other Intellectual Property), Store keys, case keys, security codes and safe and lock combinations required to gain access to and operate the Stores, and any other assets of Merchant located at the Stores or Distribution Centers (whether owned, leased, or licensed), solely to the extent such use does not violate any Applicable General Law;

(c)     (i) subject to satisfaction of Agent's payment obligations under this Agreement, to be provided by Merchant with central office facilities, central administrative services and personnel to process and perform Central Services and provide other central office services reasonably necessary for the GOB Sale; (ii) to use reasonably sized offices located at Merchant's central office facility to effect the GOB Sale; and (iii) to use all customer lists, mailing lists, email lists, and web and social networking sites and other Intellectual Property utilized by Merchant in connection with its business (to the extent such items can be segregated to the Stores or Distribution Centers and solely in connection with the GOB Sale and subject to Applicable General Laws and any other restrictions requested by Merchant in order for Merchant and Agent to comply with Merchant's privacy policies, contracts, agreements, or applicable laws governing the use and dissemination of personal or confidential information, including consumer personal data);

(d)     to establish and implement advertising, signage and promotion programs consistent with the "going out of business," "store closing," "sale on everything," "everything must go," or similarly themed sale, including without limitation by means of media advertising, and similar interior and exterior signs and banners, and the use of sign walkers or drivers, each at Agent's sole cost as an Expense;

(e)     to include Additional Agent Merchandise in the GOB Sale in accordance with Section 8.9; and

(f)     to transfer Merchandise between and among the Stores and Distribution Centers.

8.2     Terms of Sales to Customers; Final/As Is Sales.  During the Sale Term, all sales of Merchandise and Additional Agent Merchandise will be "final sales" and "as is," and appropriate signage and sales receipts will reflect the same.  Agent shall not warrant the Merchandise in any manner, but will, to the extent legally permissible, pass on all manufacturers' warranties to customers.  Except as otherwise provided herein, during the Sale Term, all sales will be made only for cash or nationally recognized bank credit or debit cards.  Upon entry of the Approval Order, Agent shall not accept or honor coupons during the Sale Term.  Agent shall clearly mark all receipts for the Merchandise sold at the Stores during the Sale Term so as to distinguish the sale of such Merchandise from the goods sold prior to the Sale Commencement Date.

8.3          <u>Tax Matters</u>.

(a)          During the Sale Term, all sales, use, excise, gross receipts and other taxes attributable to sales of Merchandise and Additional Agent Merchandise, as indicated on Merchant's point of sale equipment (other than taxes on net income) payable to any taxing authority having jurisdiction (collectively, "<u>Sales Taxes</u>") shall be added to the sales price of Merchandise and Additional Agent Merchandise and collected by Agent, on Merchant's behalf, at the time of sale.  All Sales Taxes shall be deposited into a segregated account designated by Merchant and Agent solely for the deposit of such Sales Taxes (the "<u>Sales Taxes Account</u>").  For the avoidance of doubt, Merchant will have payment authority on the Sales Taxes Account from inception until Merchant no longer has any obligation with respect to the payment of Sales Taxes hereunder.  For any Sales Taxes Account that Agent obtains control or payment authority over, Agent agrees to remit any funds in such Sales Taxes Account to Merchant.  Merchant shall prepare and file all applicable reports and documents required by the applicable taxing authorities with respect to Sales Taxes incurred on transactions processed under Merchant's identification number(s), and Merchant shall promptly pay all such Sales Taxes from the Sales Taxes Account.  Merchant will be given access to the computation of gross receipts for verification of all such tax collections.  Provided that Agent performs its responsibilities in accordance with this Agreement, Agent shall have no further obligation to Merchant, any taxing authority, or any other party, and Merchant shall indemnify and hold harmless Agent from and against any and all reasonable out-of-pocket costs, including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties, which Agent sustains or incurs as a result or consequence of the failure by Merchant to promptly pay such taxes to the proper taxing authorities and/or the failure by Merchant to promptly file with such taxing authorities all reports and other documents required by applicable law to be filed with or delivered to such taxing authorities.  If Agent fails to perform its responsibilities in accordance with this <u>Section 8.3</u>, and provided Merchant complies with its obligations hereunder, Agent shall indemnify and hold harmless Merchant from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties which Merchant sustains or incurs as a result or consequence of the failure by Agent to collect Sales Taxes and/or the failure by Agent to promptly deliver any and all reports and other documents required to enable Merchant to file any requisite returns with such taxing authorities.  Agent shall use commercially reasonable efforts to cooperate with Merchant to obtain any tax refunds in respect of Sales Taxes.

(b)          Notwithstanding anything in this Agreement to the contrary, nothing in this Agreement shall be interpreted as establishing the federal, state, or local tax consequences of the transactions contemplated by this Agreement.

(c)          Agent shall, and shall cause each of its respective affiliates to, use commercially reasonable efforts to cooperate and consult with Merchant with respect to applicable Sales Taxes matters and other tax matters reasonably associated with the transactions contemplated by this Agreement, including the preparation and filing of applicable tax reports, returns, and documents (including applicable allocations of purchase price) required by the applicable taxing authorities with respect thereto and any audit, litigation, or other proceeding with respect thereto.

(d)          Agent shall be responsible for all documentary, stamp, transfer (including real property transfer), motor vehicle registration, sales, use, value added, excise, and other similar non-income taxes and all filing and recording fees (and any interest, penalties and additions with

respect to such taxes and fees) arising from or relating to the consummation of the transactions contemplated by this Agreement (collectively, "Transfer Taxes"), regardless of the party on whom liability is imposed under the provisions of the applicable laws relating to such Transfer Taxes. Merchant and Agent will consult and cooperate on a reasonable basis in preparing and timely filing all tax returns, declarations, reports, estimates, information returns or other statements (collectively, "Tax Returns") with respect to any Transfer Taxes and will cooperate on a reasonable basis and otherwise take reasonable best efforts to obtain any available exemptions from or reductions in such Transfer Taxes.

(e)    Merchant shall provide to Agent a properly completed and duly executed IRS Form W-9 on behalf of each entity listed on Annex 1 on or prior to the Closing Date.

8.4    Supplies.  Agent shall have the right to use, without charge, all existing supplies located at the Stores, Distribution Centers and corporate office(s), including, without limitation, boxes, bags, paper, twine and similar sales materials (collectively, "Supplies"); provided, however, that the term "Supplies" does not include any IT System.  In the event that additional Supplies are required in any of the Stores during the GOB Sale, Merchant agrees to promptly provide the same to Agent, if available, for which Agent shall reimburse Merchant at Merchant's cost therefor as set forth in Section 4 hereof.

8.5    Returns of Merchandise.  After the Closing Date, Merchant shall modify its return policy such that all sales are "final" as of the Closing Date.  Agent shall accept returns of goods sold by Merchant for fourteen (14) days following the Closing Date.  Following such date, the Agent shall have no obligation to accept returns of goods sold.

8.6    Gift Certificates, Credits.  By the Closing Date, Merchant shall use commercially reasonable best efforts to modify its gift certificate, coupon, and loyalty program policies such that Merchant's gift cards, gift certificates, coupons and credits will only be accepted during the fourteen (14) day period following the Closing and that Merchant's loyalty program will be terminated as of the Closing.  Following such date, Agent shall have no obligation to accept gift cards, gift certificates, coupons and credits or honor any of Merchant's loyalty programs during the Sale Term.  After the Petition Date, Merchant shall discontinue the sale of gift certificates and gift cards and use commercially reasonable best efforts to direct any third-party merchants to stop the sale of such gift certificates and gift cards.

8.7    Right to Monitor.  Merchant shall have the right to monitor the GOB Sale and activities attendant thereto and to be present in the Stores during the hours when the Stores are open for business; provided that Merchant's presence does not unreasonably disrupt the conduct of the Sale.  Merchant shall also have a right of access to the Stores at any time in the event of an emergency situation and shall promptly notify Agent of such emergency.

8.8    Sale Reconciliation.  On each Wednesday during the Sale Term, Agent and Merchant shall cooperate to reconcile the sales of Merchandise and Additional Agent Merchandise, the sale of FF&E, Expenses, make payments/setoffs on account of the GOB Sale Proceeds and reconcile such other GOB Sale-related items as either party shall reasonably request, in each case for the prior week or partial week (i.e. Sunday through Saturday), all pursuant to procedures agreed upon by Merchant and Agent (the "Weekly Sale Reconciliation").  Within

thirty (30) days after the end of the Sale Term, or as soon as practicable thereafter, Agent and Merchant shall complete a final reconciliation of the Sale (the "Final Reconciliation"), the written results of which shall be certified by representatives of each of the Merchant and Agent as a final settlement of accounts between the Merchant and Agent with respect to the GOB Sale.  Within five (5) days after the completion of the Final Reconciliation and execution of a settlement letter including an appropriate mutual release for the benefit of Merchant and Agent, Agent shall pay to Merchant, or Merchant shall pay to Agent, as the case may be, any and all amounts due the other pursuant to the Final Reconciliation.   The Approval Order shall provide that the Final Reconciliation, once agreed to by Merchant and Agent, shall be automatically deemed approved pursuant to Bankruptcy Code section 105(a) and Rule 9019 of the Federal Rules of Bankruptcy Procedure without further order of the Bankruptcy Court or action by any party.  During the Sale Term, and thereafter until all of Merchant's and Agent's obligations under this Agreement have been satisfied, Merchant and Agent shall have reasonable access to each other's records with respect to the GOB Sale (including, but not limited to Merchandise, Additional Agent Merchandise, GOB Sale Proceeds, and Expenses) to review and audit such records.

      8.9                Additional Agent Merchandise.

      (a)      Agent shall be entitled to include in the Sale additional merchandise procured by Agent, which is of like kind as, and no lesser quality than, the Merchandise located in the Stores or Distribution Centers ("Additional Agent Merchandise").  Agent shall be responsible for payment of all costs associated with any Additional Agent Merchandise.  All Additional Agent Merchandise Proceeds shall remain the exclusive property of Agent.

      (b)      The Additional Agent Merchandise shall be at all times subject to the control of Agent.  If requested by Agent, Merchant shall, at Agent's expense, ensure the Additional Agent Merchandise and, if required, promptly file any proofs of loss with regard to same with Merchant's insurers.

      (c)      Any transactions relating to the Additional Agent Merchandise are, and shall be construed as, a true consignment from Agent to Merchant.  Merchant acknowledges, and the Approval Order (as and when applicable) shall provide, that the Additional Agent Merchandise shall be consigned to Merchant as a true consignment under Article 9 of the Uniform Commercial Code in effect in the State of Delaware (the "UCC").  Agent is hereby, and shall be through the Approval Order, granted a first priority security interest in and lien upon (i) the Additional Agent Merchandise and (ii) the Additional Agent Merchandise Proceeds, which security interest shall be deemed perfected pursuant to the Approval Order without the requirement of filing UCC financing statements or providing notifications to any prior secured parties; provided that Agent is hereby authorized to deliver any notices and file any financing statements and amendments thereof under the applicable UCC identifying Agent's interest in the Additional Agent Merchandise and any proceeds from the sale thereof as consigned goods thereunder and Merchant as the consignee therefor, and Agent's security interest in such Additional Agent Merchandise and Additional Agent Merchandise Proceeds.

      (d)      Agent shall provide signage in the Stores notifying customers that the Additional Agent Merchandise has been included in the Sale.

8.10 <u>Force Majeure</u>. If any casualty, act of war or terrorism, act of God, or epidemic or pandemic prevents the conduct of business in the ordinary course at any Store for a period in excess of five (5) consecutive days (a "<u>Force Majeure Event</u>"), such Store and the Merchandise located at such Store may, in Agent's sole discretion, be eliminated from the Sale and considered to be deleted from this Agreement as of the first date of such event, and Agent and Merchant shall have no further rights or obligations hereunder with respect thereto; <u>provided</u>, <u>however</u>, that the proceeds of any insurance attributable to such Merchandise shall constitute Proceeds hereunder and there shall be no adjustment to the Purchase Price.

## Section 9.  <u>Employee Matters.</u>

9.1 <u>Merchant's Employees</u>. Subject to the Central Services Budget and payment of Expenses, Agent may use Merchant's employees in the conduct of the GOB Sale to the extent Agent deems necessary for the GOB Sale, and Agent may select and schedule the number and type of Merchant's employees required for the GOB Sale. Agent shall identify any such employees to be used in connection with the GOB Sale (each such employee, a "<u>Retained Employee</u>") prior to the Sale Commencement Date. Notwithstanding the foregoing, Merchant's employees shall at all times remain employees of Merchant. Agent's selection and scheduling of Merchant's employees shall at all times comply with all applicable collective bargaining agreements, laws and regulations. Merchant and Agent agree that, except to the extent that wages and benefits of Retained Employees constitute Expenses hereunder, nothing contained in this Agreement and none of Agent's actions taken in respect of the GOB Sale shall be deemed to constitute an assumption by Agent of any of Merchant's obligations relating to any of Merchant's employees including, without limitation, Worker Adjustment Retraining Notification Act ("<u>WARN Act</u>") claims and other termination type claims and obligations, or any other amounts required to be paid by statute or law; nor shall Agent become liable under any employment agreement, collective bargaining agreement, or be deemed a joint or successor employer with respect to such employees. For the avoidance of doubt, Merchant shall be responsible for providing any required notice under the WARN Act or state laws with respect to its employees and otherwise comply with the WARN Act or state laws with respect to any "plant closing" or "mass layoff" (as defined in the WARN Act) or group termination or similar event affecting the employees, whether before or after the date of this Agreement. Merchant shall not, without the prior consent of Agent, raise the salary or wages or increase the benefits for, or pay any bonuses or other extraordinary payments to, any Store or Distribution Center employees prior to the Sale Termination Date. Merchant shall not transfer any employee in anticipation of the GOB Sale nor any Retained Employee during the Sale Term, in each case without Agent's prior consent, not to be unreasonably withheld. To the extent reasonably requested in writing by Agent, and at Agent's expense, Merchant shall use commercially reasonable efforts to hire additional temporary employees to facilitate the GOB Sale, which employees shall constitute Retained Employees for purposes of this Agreement.

9.2 <u>Termination of Employees</u>. Agent may in its discretion stop using any Retained Employee at any time during the GOB Sale, subject to the conditions provided for herein. In the event that Agent desires to cease using any Retained Employee, Agent shall notify Merchant at least seven (7) days prior thereto in writing; <u>provided</u>, <u>however</u>, that, in the event that Agent determines to cease using an employee "for cause" (such as dishonesty, fraud or breach of employee duties), the seven (7) day notice period shall not apply; <u>provided</u> that Agent shall notify

Merchant immediately after such discontinuance. Contemporaneous with providing such notice, Agent shall provide to Merchant all information and other materials in Agent's knowledge, possession or control concerning supporting Agent's determination to terminate any Retained Employee "for cause." From and after the date of this Agreement and until the Sale Termination Date, Merchant shall not transfer or dismiss employees of the Stores or Distribution Centers except "for cause" without Agent's prior consent, not to be unreasonably withheld. Notwithstanding the foregoing, Agent shall not have the right to terminate the actual employment of any employee, but rather may only cease using such employee in the GOB Sale and paying any Expenses with respect to such employee (and all decisions relating to the termination or non-termination of such employees shall at all times rest solely with Merchant). Notwithstanding any other provision hereof, Agent will indemnify and hold Merchant harmless from and against any and all costs or expenses incurred (including, without limitation, reasonable attorneys' fees) in connection with any claims by Retained Employees arising from Agent's conduct in connection with Retained Employees.

9.3     Payroll Matters. During the Sale Term, Merchant shall process the payroll for all Retained Employees and any former employees and temporary labor engaged for the GOB Sale. Each Wednesday of each week during which payroll is being paid by Merchant (or such other date as may be reasonably requested by Merchant to permit the funding of the payroll accounts before such payroll is due and payable) during the Sale Term, Agent shall transfer to Merchant's payroll accounts an amount equal to the payroll for Retained Employees plus related payroll taxes, workers' compensation and benefits for each such week, to the extent such amount constitutes Expenses hereunder.

9.4     Employee Retention Bonuses. Subject to approval by the Bankruptcy Court, Agent may, in its sole discretion, pay, as an Expense, retention bonuses and/or severance pay ("Retention Bonuses"), which bonuses shall be inclusive of payroll taxes, but as to which no severance benefits shall be payable to such Retained Employees who do not voluntarily leave employment, are not otherwise entitled to receive severance pay, and are not terminated "for cause," as Agent may determine in its reasonable and good faith discretion. Subject to approval by the Bankruptcy Court, the amount of such Retention Bonuses shall be in an amount to be determined by Agent, in its reasonable and good faith discretion, and shall be payable within thirty (30) days after the Sale Termination Date and shall be processed through Merchant's payroll system.

**Section 10. Conditions Precedent and Subsequent.**

(a)     Agent shall consummate the transactions contemplated under this Agreement (the "Closing") by February 22, 2025 or, if there is an Auction, February 27, 2025 (the "Closing Date") subject only to the satisfaction of the following conditions, unless specifically waived in writing by Agent in its reasonable discretion:

(i)     The Petition Date shall have occurred no later than January 15, 2025;

(ii)     On the Petition Date, Merchant shall have filed a motion and proposed form of Bid Procedures Order;

(iii)    On or before February 12, 2025, Merchant shall have filed a motion seeking approval to commence store closing sales in a manner directed by Agent;

(iv)    The Bankruptcy Court shall have entered an order approving Merchant's motion seeking approval to commence store closing sales (the "Store Closing Procedures Order");

(v)    The Bankruptcy Court shall have entered an order approving the use of cash collateral (the "Cash Collateral Order") on a final basis no later than February 26, 2025;

(vi)    The Bankruptcy Court shall have entered the Bid Procedures Order on a final basis no later than February 14, 2025;

(vii)    The bid deadline under the Bid Procedures Order shall be no later than February 18, 2025;

(viii)    The Auction, if any, under the Bid Procedures Order shall be no later than February 21, 2025;

(ix)    The Bankruptcy Court shall have entered the Approval Order no later than February 21, 2025, provided, however, that no Auction has occurred;

(x)    If an Auction has occurred, the Bankruptcy Court shall have entered the Approval Order no later than February 26, 2025;

(xi)    The Bankruptcy Court shall have entered an order, pursuant to Section 365(d)(4) of the Bankruptcy Code, extending the Merchant's time to assume or reject the leases for the Stores to the date that is 210 days after the Petition Date;

(xii)    The Termination Declaration Date, as defined in the Cash Collateral Order, shall not have occurred;

(xiii)    (A) All representations and warranties of Merchant in Section 11.1 (other than the representations and warranties set forth in Sections 11.1(a), (b), and (c)) shall be true and correct, except where the failure to be true and correct has not had and would not reasonably be expected to have a material adverse effect on the Assets taken as a whole, (B) all representations and warranties of Merchant in Sections 11.1(a), (b), and (c) shall be true and correct in all material respects as of the Closing, and (C) Merchant shall have in all material respects performed the obligations and complied with the covenants required by this Agreement to be performed or complied with by it prior to the Closing;

(xiv)    No chapter 11 trustee has been appointed and the Merchant's bankruptcy cases have not been converted to cases under Chapter 7 of the Bankruptcy Code;

(xv)    There shall not have been a variance greater than five percent (5%) of the expenses set forth in "Total Expenses/Wind Down Costs" line item of the cash collateral budget without the written consent of Agent; and

(xvi)    All of the Parties shall have executed this Agreement.

(b)    The willingness of Merchant to enter into the transactions contemplated under this Agreement, and the occurrence of the Closing, are directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by Merchant, with the prior written consent of the Prepetition ABL Agent and the Prepetition FILO Agent to the extent such waiver would materially affect their interests:

(i)    No judgment enacted, promulgated, issued, entered, amended or enforced by any governmental authority or any applicable law shall be in effect enjoining or otherwise prohibiting consummation of the transactions contemplated hereby;

(ii)    All representations and warranties of Agent hereunder shall be true and correct in all material respects as of the Closing, and Agent shall have in all material respects performed the obligations and complied with the covenants required by this Agreement to be performed or complied with by it prior to the Closing;

(iii)    The ABL Agent, the FILO Agent and any other persons designated by them have received full and indefeasible payment in cash (or other consideration as applicable) of all Debt Payoff specified in the Payoff Letters on the Closing Date; and

(iv)    All of the Parties shall have executed this Agreement.

**Section 11.  <u>Representations, Warranties and Covenants</u>.**

11.1    <u>Merchant's Representations and Warranties</u>.  Merchant hereby represents and warrants in favor of Agent as follows:

(a)    As of the date of this Agreement and at the Closing, Merchant (i) is duly organized, validly existing and in good standing under the laws of the State of its organization; (ii) has all requisite corporate power and authority to own, lease and operate the Assets and to carry on its business as presently conducted; (iii) is duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which the Stores are located, except, in each case, to the extent that the failure to be in good standing or so qualified would not reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder; and (iv) has paid when due all United States Trustee fees.

(b)    Subject only to entry of the Approval Order, Merchant, as of the date of this Agreement and at the Closing, has the right, power and authority to execute and deliver this Agreement and each other document and agreement contemplated hereby (collectively, together with this Agreement, the "<u>Agency Documents</u>") and to perform fully its obligations thereunder. Subject only to entry of the Approval Order, Merchant has taken all necessary actions required to authorize the execution, delivery and performance of the Agency Documents, and no further consent or approval is required for Merchant to enter into and deliver the Agency Documents, to

perform its obligations thereunder and to consummate the Sale, except for any such consent the failure of which to be obtained would not reasonably be expected to prevent or materially delay or impair the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder.   Subject only to entry of the Approval Order, each of the Agency Documents has been duly executed and delivered by Merchant and, upon the due authorization, counter-execution, and delivery of this Agreement by Agent, constitutes the legal, valid and binding obligation of Merchant enforceable in accordance with its terms.

(c)     Merchant, as of the date of this Agreement and at the Closing, owns good and valid title to all of the Assets, free and clear of all security interests, liens, claims and encumbrances of any nature other than the security interests securing the Prepetition Secured Obligations (as defined in the Cash Collateral Order) and Permitted Encumbrances.

(d)     Since January 1, 2024, Merchant has maintained its pricing files, including but not limited to the Merchandise File, in the ordinary course of business, and prices charged to the public for goods are the same in all material respects as set forth in such pricing files, including but not limited to the Merchandise File, for the periods indicated therein, all pricing files, including but not limited to the Merchandise File, and records are true and accurate in all material respects as to the actual cost to Merchant for purchasing the goods referred to therein and as to the selling price to the public for such goods without consideration of any point of sale discounts, as of the dates and for the periods indicated therein.  Merchant represents that (i) the ticketed prices of all items of Merchandise do not and shall not include any Sales Taxes and (ii) all registers located at the Stores are programmed to correctly compute all Sales Taxes required to be paid by the customer under applicable law, as such calculations have been identified to Merchant by its retained service provider.

(e)     Merchant has ticketed or marked all goods and items of inventory received and currently located at the Stores or Distribution Centers in a manner consistent with similar Merchandise located at the Stores or Distribution Centers, and in accordance with Merchant's ordinary course past practices and policies relative to pricing and marking goods and inventory.

(f)     Since January 1, 2025, Merchant has not purchased for or transferred to or from the Stores or Distribution Centers any inventory or goods outside the ordinary course.

(g)     To Merchant's knowledge after reasonable inquiry, all Merchandise is in compliance in all material respects with all applicable federal, state and local product safety laws, rules and standards.

(h)     Since January 1, 2024, Merchant has paid all self-insured or Merchant-funded employee benefit programs for Store employees, including health and medical benefits and insurance and all proper claims made or to be made in accordance with such programs.

(i)     Since January 1, 2025, Merchant has not taken any actions with the intent of increasing the Expenses of the Sale as compared to ordinary course operations prior to the Sale Commencement Date, including without limitation increasing salaries or other amounts payable to employees; except to the extent an employee was due an annual raise in the ordinary course.

(j)     Other than filing the Bankruptcy Case, no action, arbitration, suit, notice, or legal, administrative or other proceeding before any court or governmental body is pending, by or against Merchant, or has been settled or resolved, or to Merchant's knowledge, is threatened against or affects Merchant, relative to Merchant's business or properties, or which questions the validity of this Agreement, in any case, that would reasonably be expected to adversely affect the conduct of the Sale.

11.2    Merchant's Covenants.

(a)     Merchant, during the Sale Term, (i) will continue to be duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which the Stores are located, except, in each case, to the extent that the failure to be in good standing or so qualified would not reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder; and (ii) will continue to pay when due all United States Trustee fees.

(b)     Merchant shall not create, incur, assume or suffer to exist any security interest, lien or other charge or encumbrance (other than Permitted Encumbrances) upon or with respect to any of the Assets.  From and after the Closing, subject to the Central Services Budget and Agent's satisfaction of its payment obligations under this Agreement, Merchant shall use commercially reasonable efforts to perform such tasks and services as are reasonably necessary, in the ordinary course to maintain and preserve the Assets in saleable condition and to maintain good and valid title to all of the Assets at all times until all Assets have been sold or otherwise disposed of, and such other tasks and services as Agent may otherwise reasonably request in connection with the GOB Sales, including but not limited to paying all ad valorem taxes and utilities when due, performing all routine maintenance in the ordinary course, and renewing all necessary licenses and registrations.

(c)     Except as necessary to comply with Merchant's obligations under the Store Closing Procedures Order, through the Sale Commencement Date, Merchant shall continue to ticket or mark all goods and items of inventory received at the Stores or Distribution Centers in a manner consistent with similar Merchandise located at the Stores or Distribution Centers, and in accordance with Merchant's ordinary course past practices and policies relative to pricing and marking goods and inventory.

(d)     Except as necessary to comply with Merchant's obligations under the Store Closing Procedures Order, through the Sale Commencement Date, Merchant shall transfer inventory or goods to or from Distribution Centers in the ordinary course and shall not deviate from that schedule.

(e)     Except as necessary to comply with Merchant's obligations under the Store Closing Procedures Order, through the Sale Commencement Date Merchant shall not, purchase for or transfer to or from the Stores or Distribution Centers any inventory or goods outside the ordinary course.

(f)     Merchant shall provide Agent with reasonable access to and/or copies of its historic policies and practices, if any, regarding product recalls, as Agent may reasonably request prior to the Sale Commencement Date.

(g)     Subject to the Agent satisfying its payment obligations under this Agreement, Merchant shall, throughout the Sale Term, maintain in good working order, condition, and repair all cash registers, heating systems, air conditioning systems, elevators, escalators and all other mechanical devices necessary for the conduct of the GOB Sale at the Stores in the ordinary course.  Except as otherwise restricted by the Bankruptcy Code upon filing of the Bankruptcy Case, and absent a bona fide dispute, throughout the Sale Term, Merchant shall remain current on all expenses and payables necessary or appropriate for the conduct of the GOB Sale.

(h)     Subject to payment of Expenses and other obligations under this Agreement by Agent, and approval by the Bankruptcy Court, Merchant will continue to pay all self-insured or Merchant-funded employee benefit programs for Store employees, including health and medical benefits and insurance and all proper claims made or to be made in accordance with such programs.

(i)     Payment of Expenses and other obligations under this Agreement by Agent, and approval by the Bankruptcy Court, Merchant will continue to pay throughout the Sale Term all self-insured or Merchant-funded employee benefit programs for Store employees, including health and medical benefits and insurance and all proper claims made or to be made in accordance with such programs.

(j)     Except as necessary to comply with Merchant's obligations under the Store Closing Procedures Order, Merchant shall not throughout the Sale Term take any actions with the intent of increasing the Expenses of the Sale as compared to ordinary course operations prior to the Sale Commencement Date, including without limitation increasing salaries or other amounts payable to employees; except to the extent an employee was due an annual raise in the ordinary course.

(k)     Prior to the execution of this Agreement, Merchant has provided Agent reasonable access to all pricing and cost files, including but not limited to the Merchandise File, and data files, inter-Stores transfer logs, markdown schedules, invoices, style runs and all other documents relative to the price, mix and quantities of inventory located at the Stores and the Distribution Centers or on order or in transit.

(l)     Merchant hereby acknowledges that, as of and after the date of this Agreement, Agent intends to begin to make arrangements for the purchase of Additional Agent Merchandise from Agent's suppliers of goods as well as Merchant's existing suppliers of goods. To assist Agent in that regard, from and after the date of this Agreement, Merchant shall use Merchant's best efforts to assist and cause Merchant's employees to assist Agent with Agent's efforts to negotiate orders with Merchant's suppliers for goods that Agent is interested in purchasing as Additional Agent Merchandise and to assist Agent with creating SKUs in and otherwise updating Merchant's systems for and in connection with all such Additional Agent Merchandise.

(m)     Except as necessary to comply with Merchant's obligations under the Store Closing Procedures Order, Merchant (i) shall not, prior to or after the Sale Commencement Date, offer any promotions or discounts at the Stores, through the e-commerce sites, social media sites, any other retail location, or any other promotional or retail sales channel owned or controlled directly by Merchant, except as detailed on Exhibit 11.2(m) (the "Promotional Calendar") and (ii) shall make commercially reasonable efforts to notify third party websites or social media sites of such restrictions.

(n)     Merchant shall discontinue its current return program and shall stop the sale of gift cards as of the execution date of this Agreement.

(o)     Merchant shall operate the Stores in accordance with the terms of the Store Closing Procedures Order, including, but not limited to Agent approving signage package to Stores, discounting cadence and staffing and supervision, in each case, in accordance with such terms.

11.3     Agent's Representations, Warranties and Covenants.   Agent hereby represents, warrants and covenants in favor of Merchant as follows:

(a)     Agent: (i) is duly and validly existing and in good standing under the laws of the State of its organization; (ii) has all requisite power and authority to carry on its business as presently conducted and to consummate the transactions contemplated hereby; (iii) is duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including, in the case of the entities comprising Agent, all jurisdictions in which the Stores are located, except, in each case, to the extent that the failure to be in good standing or so qualified would not reasonably be expected to have a material adverse effect on the ability of Agent to execute and deliver this Agreement and perform fully its obligations hereunder.

(b)     Agent: (i) has the right, power and authority to execute and deliver each of the Agency Documents to which it is a party and to perform fully its obligations thereunder; (ii) has taken all necessary actions required to authorize the execution, delivery and performance of the Agency Documents, and no further consent or approval is required on the part of Agent for Agent to enter into and deliver the Agency Documents, to perform its obligations thereunder and to consummate the transactions contemplated thereby, and (iii) has duly executed and delivered each of the Agency Documents and, assuming the due authorization, execution, and delivery of this Agreement by Merchant, constitutes the legal, valid and binding obligation of Agent enforceable in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, and similar laws affecting the rights of creditors generally and by general principles of equity.   No court order or decree of any federal, state or local governmental authority or regulatory body is in effect that would prevent or impair, or is required for, Agent's consummation of the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor, other than as provided herein. No contract or other agreement to which Agent is a party or by which Agent is otherwise bound will prevent or impair the consummation of the transactions contemplated by this Agreement.

(c)    No action, arbitration, suit, notice or legal administrative or other proceeding before any court or governmental body has been instituted by or against Agent, or has been settled or resolved or, to Agent's knowledge, has been threatened against or affects Agent, which questions the validity of this Agreement or any action taken or to be taken by Agent in connection with this Agreement or which, if adversely determined, would have a material adverse effect upon Agent's ability to perform its obligations under this Agreement.

(d)    The GOB Sale shall be conducted in compliance with all applicable state and local laws, rules and regulations and Merchant's leases and other agreements, except as otherwise provided for in this Agreement, the Sale Guidelines or the Approval Order.

(e)    Absent prior consent by Merchant, Agent will not cause any non-emergency repairs or maintenance (emergency repairs are repairs necessary to preserve the security of a Store premise or to ensure customer safety) to be conducted at the Stores.

(f)    Agent will have at the Closing and at any time payments are required to be made by Agent under this Agreement hereunder or under the other Agent documents sufficient funds available in cash to pay the Purchase Price and any Expenses and any other fees and expenses incurred by or otherwise required to be paid by Agent in connection with the transactions contemplated by this Agreement.

(g)    Assuming (i) the satisfaction or waiver of the conditions set forth in Section 10, and (ii) the accuracy of the Express Representations (without regard to any knowledge or materiality qualifications contained therein), Agent and its subsidiaries will be Solvent.  Agent is not entering into the transactions contemplated by this Agreement with the intent to hinder, delay or defraud either present or future creditors of Agent, Merchant or their respective subsidiaries. For purposes of this Agreement, "Solvent," when used with respect to any Person, means that such Person (i) will not be insolvent as defined in section 101 of the Bankruptcy Code, (ii) has property with fair value greater than the total amount of their debts and liabilities, contingent, subordinated or otherwise (it being understood that the amount of contingent liabilities at any time shall be computed as the amount that, in light of all the facts and circumstances existing at such time, can reasonably be expected to become an actual or matured liability), (iii) has assets with present fair salable value not less than the amount that will be required to pay their liability on their debts as they become absolute and matured, (iv) will be able to pay its debts and liabilities, subordinated, contingent or otherwise, as they become absolute and matured, and (v) are not engaged in business or a transaction, and are not about to engage in business or a transaction, for which they have unreasonably small capital.

(h)    As of the date of this Agreement, there are no contracts, undertakings, commitments, agreements or obligations, whether written or oral, between Agent, on the one hand, and any member of the management of Merchant or its respective board of directors (or applicable governing body of any Affiliate of any Person within Merchant), any holder of equity or debt securities of Merchant, or any lender or creditor of Merchant or any Affiliate of Merchant, on the other hand, (a) relating in any way to the Assets or the transactions contemplated by this Agreement, or (b) that would be reasonably likely to prevent, restrict, impede or affect adversely the ability of Merchant or any of its Affiliates to entertain, negotiate or participate in any such transactions.

(i)     Except for the representations and warranties expressly contained in Section 11.1 (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) (the "Express Representations") (it being understood that Agent and its affiliates and representatives have relied only on such Express Representations), Agent acknowledges and agrees, on its own behalf and on behalf of its affiliates and representatives, that neither Merchant, nor any of its Affiliates, nor any other Person on behalf of Merchant or any of its Affiliates makes, and neither Agent nor any of its affiliates and representatives has relied on, is relying on, or will rely on the accuracy or completeness of any express or implied representation or warranty with respect to Merchant, the any of the Assets, or any businesses or liabilities of Merchant or its Affiliates, or with respect to any information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person, including in any "dataroom" or elsewhere to Agent or any of its affiliates or representatives on behalf of Merchant or any of its Affiliates or representatives.  Without limiting the foregoing, neither Merchant, any of its affiliates nor or any of its or their representatives nor any other Person will have or be subject to any Liability whatsoever to Agent, or any other Person, resulting from the distribution to Agent or any of its Affiliates or representatives, or Agent's or any of its Affiliates' or Representatives' use of or reliance on, any such information, including in any dataroom or otherwise in expectation of the transactions or any discussions with respect to any of the foregoing information or otherwise.

(j)     Agent acknowledges and agrees, on its own behalf and on behalf of its affiliates and representatives, that it will not assert, institute, or maintain, and will cause each of its affiliates and representatives not to assert, institute or maintain, any Action that makes any claim contrary to the agreements and covenants set forth in Section 11.3(f).

**Section 12.  Efforts.**

12.1         Subject to the terms and conditions of this Agreement, each of the Agent and Merchant shall cooperate with each other and use (and shall cause its affiliates to use) its reasonable best efforts (unless, with respect to any action, another standard of performance is expressly provided for herein) to promptly (i) take, or cause to be taken, all actions, and do, or cause to be done, and assist and cooperate with each other in doing, all things necessary, proper or advisable to cause the conditions to Closing to be satisfied as promptly as reasonably practicable and to consummate and make effective, in the most expeditious manner reasonably practicable, the transactions, including preparing and filing promptly and fully all documentation to effect all necessary filings, notices, petitions, statements, registrations, submissions of information, applications and other documents, (ii) obtain all approvals, consents, registrations, waivers, permits, authorizations, orders and other confirmations from any governmental authority or third party necessary, proper or advisable to consummate the transactions contemplated hereby, (iii) execute and deliver any additional instruments necessary to consummate the transactions contemplated hereby and (iv) defend or contest in good faith any action brought by a third party that could otherwise prevent or impede, interfere with, hinder or delay in any material respect the consummation of the transactions contemplated hereby.

**Section 13.  Insurance.**

13.1        Merchant's Liability Insurance.  Until the Designation Rights Termination Date or as otherwise earlier directed by Agent or set forth in this Agreement, Merchant shall continue to maintain, subject to the satisfaction by Agent of its payment obligations under this Agreement, in such amounts as it currently has in effect, all of its liability insurance policies, including but not limited to commercial general liability, products liability, comprehensive public liability, auto liability and umbrella liability insurance, covering injuries to persons and property in, or in connection with, the Assets and/or Merchant's operation of its business and the Stores and Distribution Centers; and Merchant shall make commercially reasonable efforts to cause Agent to be named as an additional named insured (as its interest may appear) with respect to all such policies.  Merchant shall make commercially reasonable efforts to deliver to Agent certificates evidencing such insurance setting forth the duration thereof and naming Agent as an additional named insured.  All such policies shall require at least thirty (30) days' prior notice to Agent of cancellation, non-renewal or material change.  In the event of a claim under any such policies, Merchant shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder (which shall be reimbursed as an Expense), unless it is determined that liability arose by reason of the willful misconduct or grossly negligent acts or omissions of Agent, or Agent's employees, independent contractors or agents, in which case Agent shall be solely responsible for any such deductibles, retentions or self-insured amounts.  Merchant shall not make any change in the amount of any deductibles or self-insurance amounts on or after the date of this Agreement without Agent's prior written consent or unless such a change is required by the relevant insurer(s) in connection with a renewal or extension of the policy.

13.2        Merchant's Casualty Insurance.  Until the Designation Rights Termination Date, as otherwise earlier directed by Agent, or, if earlier, until the sale or other disposition of all Assets covered by such policies, Merchant shall continue to maintain, subject to the satisfaction by Agent of its payment obligations under this Agreement, all of its presently existing property casualty coverage related to the Assets (including but not limited to fire, flood, wind, hail, natural disaster, theft, and extended coverage casualty insurance).  From and after the Closing, Merchant will make commercially reasonable efforts to cause all such policies to also name Agent as an additional named insured or loss payee, as applicable (as its interest may appear).  In the event of a loss to the Assets on or after the Closing, all proceeds of such insurance shall constitute Proceeds hereunder after subtraction of any expenses reasonably incurred securing such proceeds.  Merchant shall make commercially reasonable efforts to deliver to Agent certificates evidencing such insurance, setting forth the duration thereof and naming Agent as an additional insured or loss payee, as applicable.  Merchant will make commercially reasonable efforts to provide thirty (30) days' prior notice to Agent of cancellation, non-renewal or material change.  Merchant shall not make any change in the amount of any deductibles or self-insurance amounts on or after the date of this Agreement without Agent's prior written consent or unless such a change is required by the relevant insurer(s) in connection with a renewal or extension of the policy.  Upon the sale, conveyance, or other disposition of any Asset specifically identified in any of Merchant's casualty insurance policies, Merchant may, with the Agent's prior consent (such consent not to be unreasonably withheld or delayed), cancel the casualty coverage specifically applicable to such Asset.

13.3        <u>Agent's Insurance</u>.  Agent shall maintain, at Agent's cost (as an Expense) and in such amounts as Agent currently has in effect, commercial general liability policies covering injuries to persons and property in or in connection with Agent's agency at the Stores and shall cause Merchant to be named as an additional insured with respect to such policies.  Agent shall deliver to Merchant certificates evidencing such insurance policies setting forth the duration thereof and naming Merchant as an additional insured, in form and substance reasonably satisfactory to Merchant.  In the event of a claim under any such policies, Agent shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder, unless it is determined that liability arose by reason of the willful misconduct or grossly negligent acts or omissions of Merchant or Merchant's employees, independent contractors or agents (other than Agent or Agent's employees, agents or independent contractors).  Agent shall not make any change in the amount of any deductibles or self-insurance amounts prior to the Sale Termination Date without Merchant's prior written consent.

13.4        <u>Worker's Compensation Insurance</u>.  Merchant shall, at all times while any employees are in its employ, maintain in full force and effect workers' compensation insurance (including employer liability insurance) in compliance with all statutory requirements.

13.5        <u>Risk of Loss</u>.  Without limiting any other provision of this Agreement, Merchant acknowledges that Agent is conducting the GOB Sale on behalf of Merchant solely in the capacity of an agent, and that in such capacity (a) except for any Additional Agent Merchandise, Agent shall not be deemed to be in possession or control of the Stores, Distribution Centers, or the assets located therein or associated therewith, or of Merchant's employees located at the Stores or Distribution Centers, and (b) except as expressly provided in this Agreement, Agent does not assume any of Merchant's obligations or liabilities with respect to any of the foregoing. Agent shall not be deemed to be a successor employer.  Merchant and Agent agree that, subject to the terms of this Agreement, Merchant shall bear all responsibility for liability claims of customers, employees, and other persons arising from events occurring at the Stores during and after the Sale Term, except to the extent any such claim arises from the acts or omissions of Agent, or its supervisors, agents, independent contractors, or employees located at the Stores (an "<u>Agent Claim</u>").  In the event of any liability claim that Merchant and Agent agree is not an Agent Claim, Merchant shall administer such claim and shall present such claim to Merchant's liability insurance carrier in accordance with Merchant's policies and procedures existing immediately prior to the Sale Commencement Date, and shall provide a copy of the initial documentation relating to such claim to Agent at the address listed in this Agreement.  To the extent that Merchant and Agent agree that a claim constitutes an Agent Claim, Agent shall administer such claim and shall present such claim to its liability insurance carrier, and shall provide copies of the initial documentation relating to such claim to Merchant.  In the event that Merchant and Agent cannot agree whether a claim constitutes an Agent Claim, each party shall present the claim to its own liability insurance carrier, and a copy of the initial claim documentation shall be delivered to the other party to the address designated for delivery of notices hereunder.

13.6        <u>Merchant Indemnification</u>.  From and after the Closing, Merchant shall indemnify and hold Agent, and its officers, directors, employees, agents, representatives, and independent contractors (collectively, "<u>Agent Indemnified Parties</u>") harmless from and against all claims, causes of action, demands, penalties, losses, liability, damage, or other obligations,

including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from or related to: (a) Merchant's material breach of or failure to comply with any of its agreements or covenants contained in this Agreement, in each case, solely to the extent such covenant or agreement requires performance after the Closing; (b) any consumer warranty or products liability claims relating to Merchandise; (c) any harassment or any other unlawful, tortious, or otherwise legally actionable treatment of any customers, employees or agents of Agent by Merchant or any of their respective representatives (other than Agent); and (d) the willful misconduct of Merchant or its respective officers, directors, employees, agents (other than Agent) or representatives.

13.7        <u>Agent Indemnification</u>.

(a)      From and after the Closing, Agent shall indemnify and hold Merchant and its respective officers, directors, employees, agents and representatives harmless from and against all claims, causes of action, demands, penalties, losses, liability, damage, or other obligations, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to: (a) Agent's material breach of or failure to comply with any of its agreements, or covenants, contained in this Agreement, in each case, solely to the extent such covenant or agreement requires performance after the Closing; (b) any claims by any party engaged by Agent as an employee or independent contractor arising out of such employment; (c) any harassment or any other unlawful, tortious or otherwise legally actionable treatment of any customers, employees or agents of Merchant by Agent or any of its representatives; (d) any consumer warranty or products liability claims relating to Additional Agent Merchandise; (e) as set forth in Section 8.3 above; (f) the willful misconduct of Agent, its officers, directors, employees, agents or representatives.

(b)      Agent shall indemnify Merchant (and their respective estates) for up to $10,000,000.00 on account of any administrative expense claim or priority tax claim attributable to the tax consequences associated with the elimination or cancellation of, transfer of, or withdrawal from the Key Man Insurance policy program provided for under certain Pre-1986 Corporate Owned Life Insurance policies issued in 1984 and 1985 by Provident Life and Accident Insurance Company (the "<u>Key Man Insurance Policies</u>" and any associated tax liability, the "<u>Key Man Insurance Tax Liability</u>") upon the tax becoming payable to the relevant taxing authority. Merchant shall use best efforts to, and reasonably cooperate with, Agent and its professionals in efforts to, mitigate and/or offset the amount of any Key Man Insurance Tax Liability, including by evaluating the availability of any tax attributes that could reduce or eliminate the Key Man Insurance Tax Liability, considering the appropriate classification of any Key Man Insurance Tax Liability, considering structuring alternatives to monetize the Key Man Insurance Policies or otherwise preventing any Key Man Insurance Tax Liability from arising. For the avoidance of doubt, Agent shall be entitled to the net proceeds (if any), after payment of any associated tax liability, of the Key Man Insurance Policies, including if such proceeds become due and payable prior to the Merchant's withdrawal.

## Section 14. <u>Agent's Security Interest</u>.

(a)      Upon the occurrence of the Closing and satisfaction of the Debt Payoff, Agent is hereby granted first priority, senior security interests in and liens upon all Assets, all

Proceeds and Additional Agent Merchandise Proceeds, and any proceeds thereof, which security interests and liens shall be deemed by the Approval Order to be automatically perfected. The Approval Order shall grant Agent relief from the automatic stay, and nothing in the Approval Order shall inhibit Agent's ability, to take any action Agent deems appropriate to perfect such security interests and liens. From and after the Closing, the Merchant shall not grant any other party any security interests in or liens upon the Assets, Proceeds, Additional Agent Merchandise Proceeds, or proceeds thereof. Any security interests in or liens upon the Assets prior to the Closing and satisfaction of the Debt Payoff shall attach to the Purchase Price as of the Closing.

(b)     Subject to, and subordinated to, the Carve Out, as defined in the Cash Collateral Orde, upon the occurrence of the Closing and until all Assets have been sold or otherwise disposed of and the Merchant receives the full amount of the Wind-Down Budget, Agent shall have a superpriority administrative expense claim against Merchant, which is senior to all other administrative expenses (including any other superpriority –administrative expense claims, not including amounts subject to the Carve Out) to the extent of any amounts owing from Merchant to Agent in connection with this Agreement, including as a result of any breach of this Agreement.

## Section 15. <u>Designation Rights.</u>

15.1     <u>Lease/Contract Designation Rights.</u>

(a)     Upon the occurrence of the Closing and until the earlier to occur of (i) the end of the Lease/Contract Designation Rights Period applicable to a particular Lease or Contract and (ii) May 31, 2025 (as may be amended by written agreement of the Parties, the "<u>Designation Rights Termination Date</u>"), Agent shall have the exclusive right to designate the purchasers, assignees, sublessees, or other transferees of Merchant's right, title, and interest in and to any or all of the Leases and Contracts (the "<u>Lease/Contract Designation Rights</u>") upon the terms and conditions agreed upon between Agent and such designee.

(b)     Merchant shall cooperate reasonably with Agent to arrange for the sale, sublease, assignment, and other transfer, as applicable, of the Leases and Contracts, with such sale and assignment to be on such terms as Agent deems acceptable in its sole and absolute discretion. Without limiting the generality of the foregoing, Merchant agrees (1) to provide Agent with all due diligence materials and information as Agent shall reasonably request in connection with its efforts to market and attempt to sell or otherwise dispose of the Leases and Contracts (including complete copies thereof and any abstracts prepared with respect thereto, and all communications with the counterparties thereunder, all property surveys, all environmental reports and tax and utility records), with Agent to bear all reasonable third party out-of-pocket costs and expenses relating thereto, in all cases to the extent reasonably available to Merchant, and (2) to cooperate with Agent, its agents, and any potential purchasers assignees, sublessees, or other transferees of any of the Leases and/or Contracts.

(c)     Solely to the extent requested by Agent, Merchant shall exercise renewal and/or extension options under the Leases and Contracts.

(d)     At any time prior to the end of the Lease/Contract Designation Rights Period applicable to a particular Lease or Contract, Agent shall have the right, which right may be

exercised at any time and from time to time, to file a Lease/Contract Assumption Notice in the Bankruptcy Cases designating the purchasers, assignees, sublessees, or other transferees (which may in certain circumstances be Agent, any of the entities comprising Agent, any of their respective affiliates, and/or a new entity created by any of the foregoing) of one or more Leases and/or Contracts (which may occur without further order of the Bankruptcy Court pursuant to the Approval Order) and setting forth the proposed cure amount due pursuant to section 365 of the Bankruptcy Code.  The Approval Order shall provide that (a) the counterparties to the Leases or Contracts identified in any Lease/Contract Assumption Notice shall have ten (10) days to object to the proposed assumption and assignment, (b) if no objection to the proposed assumption and assignment of a Lease or Contract is timely received, such Lease or Contract shall, upon payment of the applicable cure payment, if any, to the applicable counterparty, automatically be deemed assumed by Merchant and sold, assigned, or otherwise transferred to the purchasers, assignees, or other transferees identified in the Lease/Contract Assumption Notice pursuant to sections 363 and 365 of the Bankruptcy Code, without further order of the Bankruptcy Court or further action by any person or entity, and (c) if an objection to the proposed assumption and assignment of a Lease or Contract is timely received, such Lease or Contract shall not be assumed or assigned until such objection is resolved by agreement of the applicable counterparty or order of the Bankruptcy Court.

(e)     The designee under any Lease/Contract Assumption Notice shall be required, if requested by the applicable counterparty, to provide adequate assurance of future performance with respect to such Lease or Contract if the applicable counterparty so requests. Merchant shall have no responsibility for any cure amounts with respect to any Lease or Contract assumption and assignment.

15.2    Asset Designation Rights

(a)     Upon the occurrence of the Closing, Agent shall have the exclusive right to market and sell, and/or otherwise designate the purchasers, transferees, and/or assignees of (which may in certain circumstances be Agent, any of the entities comprising Agent, any of their respective affiliates, and/or a new entity created by any of the foregoing), any or all of the Assets free and clear of all liens, claims, and encumbrances thereon (other than Permitted Encumbrances), without further order of the Bankruptcy Court (the "Asset Designation Rights").  Agent is authorized to execute, in the name of and as agent for Merchant, any and all deeds, bills of sale, and other instruments or documents necessary to effectuate the sale, transfer, or other conveyance of any of the Assets, none of which instruments or documents shall require Merchant to incur any obligations or other liabilities beyond the terms of this Agreement.

(b)     Pursuant to the Approval Order, the sale or other conveyance of any Assets reflected in Asset Designation Notices filed in the Bankruptcy Cases from time to time by Agent shall be automatically effective on the date reflected in the applicable Asset Designation Notice and subject to the satisfaction of any closing conditions reflected therein, and the sale, transfer, or other conveyance of such Assets shall be free and clear of all liens, claims, and encumbrances (other than Permitted Encumbrances) without further order of the Bankruptcy Court; provided, however, that nothing in the Approval Order shall inhibit the ability of Agent to seek other or further orders of the Court in connection with the sale or other disposition of any Assets.

(c)     The costs of maintaining the Assets available for marketing and sale shall constitute Expenses.  All costs of effectuating assumption and assignment shall be deemed an Expense hereunder.

15.3     Agent Dropout Rights.  At any time prior to the expiration of the Lease/Contract Designation Rights Period or the Designation Rights Termination Date (as applicable), Agent shall have the right, upon five (5) days' written notice (the "Dropout Notice Period"), which right may be exercised at any time and from time to time in Agent's sole and absolute discretion, to provide notice to Merchant (each such notice, a "Dropout Notice") of Agent's election to discontinue its efforts to market and attempt to sell, assign, transfer, license, designate the acquirer or purchaser, or otherwise dispose of any Asset (each, a "Dropout Asset" and, collectively, the "Dropout Assets").  Upon the effective date of any Dropout Notice, (i) Agent shall have no further obligation or liability with respect to the subject Dropout Asset, and (ii) Merchant shall thereafter be solely responsible for all such Dropout Asset(s) from and after the effective date of the Dropout Notice.  Upon expiration of the Dropout Notice Period, all rights to the Dropout Assets shall revert to Merchant, and Merchant may dispose of such Dropout Asset in such manner as Merchant may elect, and one hundred percent (100%) of all proceeds realized upon a disposition of such Dropout Asset shall be the exclusive property of Merchant (and shall not constitute Proceeds).  The delivery of a Dropout Notice shall not result in a reduction of the Purchase Price payable hereunder.  Prior to the expiration of the Dropout Notice Period, the Agent, in its sole and absolute discretion, may withdraw any Dropout Notice upon written notice to Merchant.  Effective upon the conclusion of the Designation Rights Termination Date, and without any further act by or on behalf of the Agent (such date, the "Deemed Drop Out Date"), Agent shall be deemed to have provided Merchant with a Dropout Notice (the "Deemed Drop Out Notice") for all remaining Assets (other than Assets that were subject to a prior Asset Designation Notice, which Deemed Drop Out Notice shall be deemed effective as of the Deemed Drop Out Date).

## Section 16.  Miscellaneous.

16.1     Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers.  Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to the Closing) of the Parties set forth in this Agreement or in any other Agency Document, will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing.  Each covenant and agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and if no term is specified, then for five years following the Closing, and nothing in this Section 16.1 will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement.

16.2     Expenses.  Except with respect to the expense reimbursement provided for in Section 16.19 herein, whether or not the Closing takes place, except as otherwise provided herein, all fees, costs and expenses (including fees, costs and expenses of representatives) incurred in connection with the negotiation of this Agreement, the performance of this Agreement and the

other Agent Documents and the consummation of the transactions contemplated by this Agreement will be paid by the Party incurring such fees, costs and expenses.

16.3        <u>Notices</u>.  All notices and communications provided for pursuant to this Agreement shall be in writing and sent by electronic mail and will be deemed to have been given (a)  when personally delivered, (b) when transmitted by electronic mail (having obtained electronic delivery confirmation thereof), if delivered by 5:00 P.M. local time of the recipient on a business day and otherwise on the following business day, (c) the day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third business day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective Party at the number, electronic mail address or street address, as applicable, set forth below, or at such other number, electronic mail address or street address as such Party may specify by written notice to the other Party:

**<u>If to Merchant</u>:**

JOANN Inc.
5555 Darrow Rd.
Hudson, Ohio 44236
Attn:   Ann Aber
Email: ann.aber@joann.com

*With copies (which shall not constitute notice) to*:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attn:   Joshua A. Sussberg, P.C. and Aparna Yenamandra, P.C.
Email: joshua.sussberg@kirkland.com; aparna.yenamandra@kirkland.com

-and-

Kirkland & Ellis LLP
333 West Wolf Point Plaza
Chicago, Illinois 60654
Attn:   Anup Sathy, P.C; Jeffrey Michalik; and Lindsey Blumenthal
Email: anup.sathy@kirkland.com; jeff.michalik@kirkland.com; and
        lindsey.blumenthal@kirkland.com

**<u>If to Agent</u>:**

GORDON BROTHERS RETAIL PARTNERS, LLC
101 Huntington Street, 11th Floor
Boston, Massachusetts 02119
Attn:    Rick Edwards; Joseph Malfitano; and David Braun
Email: redwards@gordonbrothers.com; jmalfitano@gordonbrothers.com;

and dbraun@gordonbrothers.com

*With copies (which shall not constitute notice) to:*

Katten Muchin Rosenman LLP
50 Rockefeller Plaza
New York, New York 10020
Attn: Steven J. Reisman and Cindi M. Giglio
Email: sreisman@katten.com; cgiglio@katten.com

16.4      <u>Governing Law/Exclusive Jurisdiction</u>.

(a)      <u>Jurisdiction and Exclusive Venue</u>.  Each of the Parties irrevocably agrees that any Action of any kind whatsoever, including a counterclaim, cross-claim, or defense, regardless of the legal theory under which any liability or obligation may be sought to be imposed, whether sounding in contract or in tort or under statute, or whether at law or in equity, or otherwise under any legal or equitable theory, that may be based upon, arising out of, or related to this Agreement or the negotiation, execution, or performance of this Agreement or the Transactions and any questions concerning the construction, interpretation, validity and enforceability of this Agreement (each, an "<u>Agreement Dispute</u>") brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the Court of Chancery of the State of Delaware (or if such court lacks jurisdiction, any other state or federal court sitting in the State of Delaware) (the "<u>Chosen Courts</u>"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any Agreement Dispute.  Each of the Parties agrees not to commence any Agreement Dispute except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order, decree or award rendered by any Chosen Courts, and no Party will file a motion to dismiss any Agreement Dispute filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of forum non conveniens.  The Parties irrevocably agree that venue would be proper in any of the Chosen Court, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of any Agreement Dispute. Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 10.3. Nothing in this Agreement will affect the right of any Party to serve process in any other manner permitted by Law.

(b)      <u>Governing Law; Waiver of Jury Trial</u>.  Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement and any Agreement Dispute will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

(c)      EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY AGREEMENT DISPUTE IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED

BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY AGREEMENT DISPUTE.  EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH AGREEMENT DISPUTE WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.  EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY AGREEMENT DISPUTE, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 16.4(c).

16.5     Amendments.  This Agreement may not be modified except in a written instrument executed by all of the Parties.

16.6     No Waiver.  No consent or waiver by any Party, express or implied, to or of any breach or default by the other in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other Party of the same or any other obligation of such Party.  Failure on the part of any Party to complain of any act or failure to act by the other Party or to declare the other Party in default, irrespective of how long such failure continues, shall not constitute a waiver by such Party of its rights hereunder.

16.7     Currency.  All reference to dollars in this Agreement and all schedules, exhibits, and ancillary documents related to this Agreement shall refer to U.S. dollars.

16.8     Successors and Assigns.  This Agreement shall inure to the benefit of and be binding upon Agent and, subject to entry and the terms of the Approval Order, Merchant and their respective successors and assigns, including, but not limited to, any chapter 11 or chapter 7 trustee; provided, however, that this Agreement may not be assigned by any of the Parties without the prior written consent of the other.

16.9     Third Party Beneficiaries.  Except as otherwise expressly provided herein, nothing expressed or referred to in this Agreement will be construed to give any Person other than (i) for purposes of Section 16.10, the Non-Recourse Persons, and (ii) the Parties hereto and such permitted assigns, any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

16.10     Non-Recourse.  This Agreement may only be enforced against, and any Action based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement.  Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or advisor of any Party (each, a "Non-Recourse Person") will have any liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or liabilities of any of the

parties to this Agreement or for any Agreement Dispute and (ii) in no event shall any Party have any shared or vicarious liability, or otherwise be the subject of legal or equitable claims, for the actions or omissions (including through equitable claims (such as unjust enrichment) not requiring proof of wrongdoing committed by the subject of such claims) of any other Person, and each of such Persons are intended third party beneficiaries of this <u>Section 16.10</u> and shall be entitled to enforce this <u>Section 16.10</u> as if a party directly hereto.

16.11    <u>Construction</u>.  The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Person.  The headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and will in no way restrict or otherwise modify any of the terms or provisions hereof.

16.12    <u>No Right of Set-Off</u>.  Agent, on its own behalf and on behalf itself and its Affiliates and representatives and its and their respective successors and permitted assigns, hereby waives any rights of set-off, netting, offset, recoupment or similar rights that any of them has or may have with respect to the payment of the Debt Payoff or Wind-Down Payments or any other payments to be made by Agent pursuant to this Agreement or any other document or instrument delivered by Agent in connection herewith.

16.13    <u>Fiduciary Obligations</u>.  Nothing in this Agreement, or any document related to the Transactions, will require Merchant or any of its Affiliates or any of their respective managers, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations or applicable law.

16.14    <u>Execution in Counterparts</u>.  This Agreement may be executed in one or more counterparts.  Each such counterpart shall be deemed an original, but all such counterparts together shall constitute one and the same agreement.  This Agreement, to the extent signed and delivered by means of a facsimile machine, electronic mail, or other electronic transmission in which the actual signature is evident, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of any Party, each other Party shall re-execute original forms hereof and deliver them to all other Parties.  No Party shall raise the use of a facsimile machine, electronic mail, or other electronic transmission in which the actual signature is evident to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine, electronic mail or other electronic transmission in which the actual signature is evident as a defense to the formation of a contract and each Party forever waives such defense.  In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the Party against which enforcement is sought.

16.15    <u>Section Headings</u>.  The headings of sections of this Agreement are inserted for convenience only and shall not be considered for the purpose of determining the meaning or legal effect of any provisions hereof.

16.16   <u>Wiring of Funds</u>.  All amounts required to be paid under any provision of this Agreement shall be made by wire transfer of immediately available funds no later as 2:00 p.m. (Eastern Time) on the date that such payment is due, so long as all information necessary to complete the wire transfer has been received by the payor by 10:00 a.m. (Eastern Time) on the date that such payment is due.  In the event that the date on which any such payment is due is not a business day, then such payment shall be made by wire transfer on the next business day.

16.17   <u>Nature of Remedies</u>.  No failure to exercise and no delay in exercising, on the part of Agent, any right, remedy, power, privilege or adjustment hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, privilege, or adjustment hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, privilege, or adjustment.

16.18   <u>Entire Agreement</u>.  This Agreement contains the entire agreement between the Parties with respect to the transactions contemplated hereby and supersedes and cancels all prior agreements, including, but not limited to, all proposals, letters of intent or representations, written or oral, with respect thereto.  In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.

16.19   <u>Bidding and Auction</u>.  In consideration of Agent conducting its due diligence and entering into this Agreement, Merchant shall pay Agent (on the first business day following the entry of the approval order and consummation of such other transaction or such later date as Agent may agree) an expense reimbursement of (x) up to $500,000 to cover Agent's reasonable out-of-pocket costs and expenses, associated with due diligence and professionals' fees and expenses associated with, among other things, negotiating, drafting, and obtaining approval of this Agreement, and (y) up to $1,600,000 for any actual, reasonable costs incurred to acquire signage ("<u>Signage</u>") for the Sale (together (x) and (y), the "<u>Expense Reimbursement</u>").  Upon the filing of the Bankruptcy Cases, Merchant shall promptly file a motion for the approval of the terms reflected in this <u>Section 16.19</u> consistent with an order that is acceptable to the Agent (the "<u>Bid Procedures Order</u>").

16.20   <u>Potential Joint Ventures</u>.  Agent shall have the right, in its sole discretion, to form a contractual joint venture with additional entities to serve as "Agent" hereunder as to this Agreement.  However, Gordon Brothers Retail Partners, LLC shall remain liable for all liabilities and obligations of Agent hereunder.

16.21   <u>Certain Definitions.</u>

(a)   "<u>Action</u>" means any action, suit, litigation, arbitration, mediation, audit, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding) or prosecution, of any kind whatsoever, whether sounding in contract or tort, or whether at law or in

equity, or otherwise under any legal or equitable theory, commenced, brought, conducted or heard by or before any governmental body.

(b)        "<u>Additional Agent Merchandise Proceeds</u>" means all proceeds (cash or otherwise or payments from insurance on the Additional Agent Merchandise) from the sale of any Additional Agent Merchandise, net of Sales Taxes.

(c)        "<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "<u>control</u>" (including the terms "<u>controlled by</u>" and "<u>under common control with</u>") means the possession, directly or indirectly, of the power to direct or cause the direction of the management, affairs and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

(d)        "<u>Contract</u>" means Merchant's right, title, and interest in and to executory contracts (together with all amendments, extensions, modifications, and other material documents related thereto).

(e)        "<u>Excluded Assets</u>" means:

(i)        all documents prepared or received by Merchant or any of its affiliates or on their behalf in connection with the sale of the Assets, this Agreement or the other Agency Documents, the transactions contemplated by this Agreement, or the Bankruptcy Case, including (a) all records and reports prepared or received by Merchant or any of its Affiliates or representatives in connection with the sale of the Assets or the transactions contemplated by this Agreement, including all analyses relating to the business of Merchant or any of its Affiliates so prepared or received, (b) all bids and expressions of interest received from third parties with respect to the acquisition of any of Merchant's or any of its Affiliates' businesses or assets, (c) all privileged materials, documents and records of Merchant or any of its Affiliates, (d) copies of the documents, materials and data related to liabilities prior to the Closing, (e) confidentiality agreements with prospective purchasers of the Assets, and (f) any other files or records to the extent relating to any Excluded Assets or liabilities or the Bankruptcy Case;

(ii)        all current and prior insurance policies or employee benefit plans of Merchant or any of its Affiliates, including for the avoidance of doubt all director and officer insurance policies, and all rights and benefits of any nature of Merchant or any of its Affiliates with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries;

(iii)        all equity interests;

(iv)        Merchant's claims, causes of action or other rights under this Agreement, including the Purchase Price, or any agreement, certificate, instrument, or other document executed and delivered between Merchant or its Affiliates and Agent or any of its Affiliates or designees in connection with the transactions contemplated by this Agreement, or any other agreement between Merchant or any of its Affiliates and Agent or any of its Affiliates or designees entered into on or after the date hereof;

(v)     the Funded Reserve Account, as defined in the Cash Collateral Order;

(vi)     all liabilities or other amounts owing from Merchant or any of its Affiliates;

(vii)     all IT Systems; and

(viii)     tax attributes of Merchant and its Affiliates other than those transferring to Agent by operation of applicable tax law, and, for the avoidance of doubt, other than the proceeds of any tax refunds or credits of Merchant and its Affiliates realized in cash or by reduction of a cash tax liability in lieu of cash that otherwise could have been received.

(f)     "IP Rights" means all intellectual property rights throughout the world including all U.S. and foreign rights in any of the following: (a) patents, patent applications, patent disclosures and inventions (whether or not protectable under patent law), together with all reissues, continuations, continuations-in-part, revisions, divisionals, extensions, and reexaminations in connection therewith; (b) trademarks, service marks, trade names (in each case, whether registered or unregistered), domain names, logos, design rights, corporate names, and registrations and applications for registration thereof and goodwill associated with any of the foregoing (collectively, "Trademarks"); (c) copyrights and copyrightable works (registered or unregistered) and registrations and applications for registration thereof; (d) computer programs (whether in source code, object code, or other form), computer software, firmware, data, databases, and rights therein, and all documentation, including user manuals and training materials, programmers' annotations, notes, and other work product used to design, plan, organize, maintain, support or develop, or related to any of the foregoing (collectively, "Software"); (e) confidential and proprietary information, trade secrets and know-how, and all other inventions, proprietary processes, formulae, models, and methodologies (collectively, together with Software, "Trade Secrets"); (f) all customer information, customer lists, and related documentation and information; and (g) all rights and remedies (including the right to sue for and recover damages) against past, present, and future infringement, misappropriation, or other violation relating to any of the foregoing.

(g)     "IT Systems" means all (i) Software, computers, computer systems, servers, hardware, telecommunications and network equipment firmware, middleware, websites, databases, networks, servers, workstations, routers, hubs, switches, data communication equipment and lines, telecommunications equipment and lines, co-location facilities and equipment, and all other information technology equipment and related items of automated, computerized or software systems, including any outsourced systems and processes and the data transmitted thereby or thereon, in each case owned, leased or licensed by Merchant or used in or relied on in connection with the business of Merchant.

(h)     "Net Proceeds" means Proceeds less amounts set forth in Section 3.2(a)(i) and (ii).

(i)     "Permitted Encumbrances" means (i) encumbrances for utilities and taxes not yet due and payable, or that are being contested in good faith, or the nonpayment of which is

permitted or required by the Bankruptcy Code, (ii) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments that do not, individually or in the aggregate, adversely affect the operation of the Assets and, in the case of the Leases, that do not, individually or in the aggregate, adversely affect the use or occupancy of the respective leased real property, (iii) applicable zoning laws, building codes, land use restrictions and other similar restrictions imposed by law, (iv) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the ordinary course for amounts not yet due and payable or that are being contested by appropriate proceedings, (v) real estate taxes, assessments and other governmental levies, fees or charges imposed with respect to real property which are not yet due or that are being contested in good faith, (vi) licenses granted on a non-exclusive basis, and (vi) solely prior to Closing, any encumbrances that will be removed or released by operation of the Approval Order.

(j)    "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, organization, estate, governmental body or other entity or group.

(k)    "Proceeds" means all proceeds (cash or otherwise or payments from insurance on the Assets or Merchandise) from the sale of any Assets, other than the sale of any Additional Agent Merchandise, net of Sales Taxes.

(l)    "Term Agent" means Wilmington Savings Fund Society, FSB, in its capacities as administrative agent and collateral agent for the financial institutions, lenders and investors party from time to time to the Term Credit Agreement, dated as of April 30, 2024 (as amended).

16.22    Rules of Interpretation.    Unless otherwise expressly provided in this Agreement, the following will apply to this Agreement, the Schedules and any other certificate, instrument, agreement or other document contemplated hereby or delivered hereunder.

(a)    The terms "hereof," "herein" and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement, section, clause, schedule and exhibit references contained in this Agreement are references to sections, clauses, schedules and exhibits in or to this Agreement, unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(b)    Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed (even if not actually followed) by the words "without limitation." Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

(c)    The words "to the extent" shall mean "the degree by which" and not simply "if."

(d)     When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded.  If the last day of such period is a day other than a business day, the period in question will end on the next succeeding business day.

(e)     Words denoting any gender will include all genders, including the neutral gender.  Where a word is defined herein, references to the singular will include references to the plural and vice versa.

(f)     The word "will" will be construed to have the same meaning and effect as the word "shall".  The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

(g)     All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(h)     Any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived.

(i)     Any reference to any particular Bankruptcy Code or Tax Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; provided that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Bankruptcy Code or Tax Code section or Law, the reference to such Bankruptcy Code or Tax Code section or Law means such Bankruptcy Code or Tax Code section or Law as in effect at the time of such violation or noncompliance or alleged violation or non-compliance.

(j)     A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and assigns, but only if such successors and assigns are not prohibited by this Agreement.

(k)     A reference to a Person in a particular capacity excludes such Person in any other capacity or individually.

*[signature page follows]*

IN WITNESS WHEREOF, each Party hereby executes this Agreement by their respective duly authorized representatives as a sealed instrument as of the day and year first written above.

**Merchant:**

**JOANN INC.**

By: _Jeffrey Dwyer_ (signed)
─────────────────────────────
Name:  Jeff Dwyer

Title:  Interim Chief Financial Officer

**Agent:**

**GORDON BROTHERS RETAIL PARTNERS, LLC**

By: _Rick Edwards_

               DocuSigned by:

               8DBA48849AC540D...

Name:  Rick Edwards

Title: Head of North American Retail

**<u>List of Exhibits</u>**

| | |
|---|---|
| Exhibit 1(a)(1) | Stores |
| Exhibit 1(a)(2) | Distribution Centers |
| Exhibit 2(b)(iv) | Form of Asset Designation Notice |
| Exhibit 3.1(b) | Wind-Down Budget |
| Exhibit 3.1 (c) | Central Services Budget |
| Exhibit 8.1 | Sale Guidelines |
| Exhibit 11.2(m) | Promotional Calendar |

**Annex 1**

JOANN INC.
Creative Tech Solutions LLC
Creativebug, LLC
Dittopatterns LLC
JAS Aviation, LLC
JOANN DittoHoldings Inc.
JOANN Holdings 1, LLC
JOANN Holdings 2, LLC
Jo-Ann Stores, LLC
Jo-Ann StoresSupport Center, Inc.
joann.com, LLC
Needle Holdings, LLC
WeaveUp, Inc.

**Exhibit 1(a)(1)**

**<u>Stores</u>**

**Jo-Ann Stores**

**Exhibit 1(a)(1)**

**Store List**

| Store No. | Store | Address | City | State | Zip Code | Open Date | Square Ft |
|---|---|---|---|---|---|---|---|
| 168 | Creekside Plaza | 1830 E Parks Hwy Ste A122 | Wasilla | AK | 99654 | 07/03/98 | 12,243 |
| 2545 | University Center | 3801 Old Seward Highway | Anchorage | AK | 99503 | 08/13/20 | 30,637 |
| 2114 | Gavora Mall | 250 3Rd St Ste1 | Fairbanks | AK | 99701 | 09/23/05 | 35,800 |
| 557 | Soldotna Plaza | 35535 Kenai Spur Hwy | Soldotna | AK | 99669 | 09/12/92 | 12,525 |
| 1096 | Nugget Mall | 8745 Glacier Hwy | Juneau | AK | 99801 | 03/14/03 | 22,176 |
| 2169 | Riverchase Promenade | 1709 Montgomery Hwy S | Hoover | AL | 35244 | 09/11/09 | 25,677 |
| 2010 | Cox Creek Plaza | 354 Cox Creek Pkwy | Florence | AL | 35630 | 08/27/10 | 17,542 |
| 2184 | Huntsville Plaza | 5900 B University Drive | Huntsville | AL | 35806 | 02/04/11 | 15,459 |
| 2376 | Mobile Festival Centre | 3725 Airport Blvd, Unit 100-C | Mobile | AL | 36608 | 08/30/13 | 21,364 |
| 2177 | Eastchase Market SC | 7951 Eastchase Pkwy | Montgomery | AL | 36117 | 01/31/10 | 30,247 |
| 2497 | Freestanding | 1702 Veterans Memorial Pkwy East | Tuscaloosa | AL | 35404 | 03/30/17 | 10,098 |
| 1894 | Spring Creek Centre | 3835 North Mall Ave | Fayetteville | AR | 72703 | 08/27/10 | 19,284 |
| 2453 | Scottsdale Center | 206 S Promenade Blvd | Rogers | AR | 72758 | 10/04/15 | 18,000 |
| 2498 | Fort Smith Marketplace | 7609 Rogers Avenue | Fort Smith | AR | 72903 | 02/16/17 | 11,985 |
| 2483 | University Plaza | 2813 E Nettleton Avenue | Jonesboro | AR | 72401 | 09/29/16 | 11,987 |
| 2297 | Lakewood Village | 2637 Lakewood Village Drive | No Little Rock | AR | 72116 | 04/13/12 | 18,452 |
| 2349 | Shackleford Crossing | 2616 S Shackleford Rd, Ste A | Little Rock | AR | 72205 | 08/30/13 | 14,000 |
| 1831 | South Riordan Ranch Road | 1514 S Riordan Ranch St | Flagstaff | AZ | 86001 | 01/07/11 | 17,520 |
| 2186 | Riverview Mall | 2303 Miracle Mile Road | Bullhead City | AZ | 86442 | 02/04/11 | 23,545 |
| 1305 | Buckhorn Plaza | 6136 E Main St | Mesa | AZ | 85205 | 10/04/90 | 9,967 |
| 1404 | Santa Fe Square | 965 S Gilbert Rd | Mesa | AZ | 85204 | 05/14/96 | 21,638 |
| 1913 | North Valley S/C | 8195 W Bell Rd Ste M-3 | Peoria | AZ | 85382 | 07/31/98 | 40,734 |
| 1917 | Ahwatuckee Foothills Towne Center | 5021 E Ray Rd | Phoenix | AZ | 85044 | 09/02/99 | 46,535 |
| 1965 | Desert Ridge Market Place | 21001 N Tatum Blvd | Phoenix | AZ | 85050 | 10/18/01 | 45,000 |
| 2075 | Santan Village Marketplace | 2753 S. Market Street | Gilbert | AZ | 85295 | 08/12/05 | 35,000 |
| 2132 | Alameda Crossing | 1717 N Dysart Road | Avondale | AZ | 85392 | 10/20/06 | 25,308 |
| 2137 | The Riverview at Dobson | 825 N Dobson Road | Mesa | AZ | 85201 | 06/15/07 | 35,000 |
| 2210 | Tri Valley Plaza | 1325 E. Florence Blvd | Casa Grande | AZ | 85122 | 07/28/11 | 15,045 |
| 2281 | Queen Creek Marketplace | 21238 S. Ellsworth Loop Road | Queen Creek | AZ | 85142 | 05/18/12 | 19,920 |
| 2522 | Arcadia Fiesta SC | 3049 East Indian School Road | Phoenix | AZ | 85016 | 10/25/18 | 16,000 |
| 1859 | Village At The Boulder | 1260 Gail Gardner Way | Prescott | AZ | 86305 | 02/08/06 | 22,400 |
| 2042 | East Broadway Blvd | 7255 East Broadway Blvd | Tucson | AZ | 85710 | 03/19/04 | 36,454 |
| 2302 | Oracle Wetmore | 4380 N. Oracle Rd. Ste 150 | Tucson | AZ | 85705 | 02/03/13 | 16,050 |
| 2330 | Sahuarita Plaza | 18785 S I-19 Frontage Rd, Suite 113 | Green Valley | AZ | 85614 | 07/26/13 | 13,043 |
| 1014 | Ming Retail Center | 3010 Ming Ave | Bakersfield | CA | 93304 | 05/07/98 | 20,284 |
| 2429 | Ridgecrest Town Center | 700 North China Lake Unit C | Ridgecrest | CA | 93555 | 08/29/14 | 20,000 |
| 920 | Skypark Plaza | 2485 Notre Dame Blvd Ste 310 | Chico | CA | 95928 | 01/24/97 | 20,664 |
| 2084 | River Park Plaza | 8062 N Blackstone Ave | Fresno | CA | 93720 | 02/08/06 | 35,000 |
| 2428 | Clovis Crossing Shopping Center | 1065 Herndon Ave. | Clovis | CA | 93611 | 05/16/14 | 18,000 |
| 1152 | Los Coyotes Centers | 3588 Palo Verde Ave | Long Beach | CA | 90808 | 02/01/74 | 12,000 |
| 1288 | La Verne Plaza | 2086 Foothill Blvd Ste A | La Verne | CA | 91750 | 06/21/79 | 11,350 |
| 1447 | Towne House Plaza | 9901 Adams Ave | Huntington Beach | CA | 92646 | 04/01/98 | 19,000 |
| 1798 | Costco Plaza | 2115 W Commonwealth Ave | Alhambra | CA | 91803 | 05/31/94 | 13,472 |
| 1803 | Foothill Blvd. | 2160 Foothill Blvd | La Canada | CA | 91011 | 01/12/87 | 8,400 |
| 1873 | Former Warehouse Music | 5255 Lakewood Blvd | Lakewood | CA | 90712 | 03/12/10 | 14,850 |
| 1919 | Del Amo Fashion Center | 21800 Hawthorne Blvd Ste 100 | Torrance | CA | 90503 | 11/05/99 | 50,000 |
| 1954 | Porter Ranch Town Center | 19819 Rinaldi St | Northridge | CA | 91326 | 06/09/00 | 45,000 |
| 2069 | Destination Eight | 39818 10Th Street W. | Palmdale | CA | 93551 | 08/12/05 | 35,328 |
| 2119 | Buena Park Promenade | 5885 Lincoln Avenue | Buena Park | CA | 90620 | 11/06/05 | 35,872 |
| 2126 | Von Karmen Plaza | 2170 Barranca Pkwy | Irvine | CA | 92606 | 07/26/06 | 35,700 |
| 2374 | Pride Center | 22914 W Victory Blvd | Woodland Hills | CA | 91367 | 08/30/13 | 28,434 |
| 2389 | Freestanding (former Albertson's) | 1000 South Central Avenue | Glendale | CA | 91204 | 11/08/13 | 33,699 |
| 2406 | La Cienega Square | 1250 S La Cienega Blvd | Los Angeles | CA | 90035 | 03/07/14 | 20,300 |
| 2442 | Fullerton Crossroads | 3300 Yorba Linda Boulevard | Fullerton | CA | 92831 | 05/15/15 | 20,100 |
| 2449 | Covina Town Square | 1460 North Azusa Avenue | Covina | CA | 91722 | 04/10/15 | 25,196 |
| 2452 | Centre Point Village | 26583 Carl Boyer Drive | Santa Clarita | CA | 91350 | 04/10/15 | 24,970 |
| 2523 | Orange Park Plaza | 1411 N. Tustin Streets | Orange | CA | 92867 | 11/08/18 | 18,547 |
| 2526 | Foothill Ranch Towne Center South | 26742 Portola Parkway | Foothill Ranch | CA | 92610 | 11/15/18 | 22,500 |
| 2546 | Riverside Woodman Plaza | 13730 Riverside Drive | Sherman Oaks | CA | 91423 | 04/07/20 | 46,956 |
| 2568 | Former Ralph's Market | 27871 La Paz Rd | Laguna Niguel | CA | 92677 | 01/19/24 | 31,518 |
| 2583 | Westridge Plaza | 1310 S Beach Blvd | La Habra | CA | 90631 | 08/21/23 | 28,021 |
| 1782 | Standiford Avenue | 200 Standiford Ave | Modesto | CA | 95350 | 09/13/87 | 19,400 |
| 2420 | Monte Vista Crossing | 2717 Countryside Drive | Turlock | CA | 95380 | 11/07/14 | 18,000 |
| 812 | Harris Street | 510 Harris St | Eureka | CA | 95503 | 04/26/76 | 15,990 |
| 2202 | Sonora Crossroads | 1151 Sanguinetti Road | Sonora | CA | 95370 | 11/11/11 | 17,440 |
| 2441 | Grocery Outlet SC | 11 N State Highway 49-88 | Jackson | CA | 95642 | 10/02/14 | 12,564 |
| 1223 | Conejo Valley Plaza | 1516 N Moorpark Rd | Thousand Oaks | CA | 91360 | 01/20/00 | 30,000 |
| 1809 | Shopping At The Rose | 2351 N Rose Ave | Oxnard | CA | 93036 | 10/15/93 | 15,000 |
| 1818 | Santa Susana Plaza | 2242 Tapo St | Simi Valley | CA | 93063 | 07/15/85 | 22,869 |
| 2353 | Freestanding | 1175 Dana Drive | Redding | CA | 96003 | 04/12/13 | 28,588 |
| 1440 | Country Side Center | 2250 Griffin Way | Corona | CA | 92879 | 11/08/97 | 20,540 |
| 1920 | Commons At Temecula | 40462 Winchester Rd | Temecula | CA | 92591 | 02/18/00 | 35,150 |

# Jo-Ann Stores
## Exhibit 1(a)(1)
### Store List

| Store No. | Store | Address | City | State | Zip Code | Open Date | Square Ft |
|---|---|---|---|---|---|---|---|
| 2096 | Orange Tree Marketplace | 1625 W Lugonia Avenue | Redlands | CA | 92374 | 03/22/06 | 35,350 |
| 2142 | Monterey Marketplace II | 72765 Dinah Shore Dr | Rancho Mirage | CA | 92270 | 08/02/08 | 31,419 |
| 2270 | High Desert Gateway | 12779 Main Street | Hesperia | CA | 92340 | 03/08/12 | 20,004 |
| 2422 | Riverside Plaza | 3635 Riverside Plaza Dr. Ste.240 | Riverside | CA | 92506 | 05/16/14 | 15,131 |
| 2527 | Village West Shopping Center | 2981 West Florida Avenue (Unit G1) | Hemet | CA | 92545 | 06/27/19 | 21,398 |
| 2529 | Chino Town Square | 5545 Philadelphia St | Chino | CA | 91710 | 06/27/19 | 18,369 |
| 2590 | Town Center Square | 10930 Foothill Blvd | Rancho Cucamonga | CA | 91730 | 07/31/24 | 37,355 |
| 1568 | Arden Square | 3130 Arden Way | Sacramento | CA | 95825 | 11/28/95 | 19,500 |
| 1771 | Westgate S/C | 375 W Main St Ste E | Woodland | CA | 95695 | 12/13/87 | 12,024 |
| 2033 | Elk Grove Marketplace | 8509 Bond Road | Elk Grove | CA | 95624 | 09/17/04 | 35,000 |
| 2082 | Fairway Commons | 5811 Five Star Blvd | Roseville | CA | 95678 | 05/13/05 | 35,000 |
| 2203 | Folsom Square | 1010 East Bidwell Street | Folsom | CA | 95630 | 10/07/11 | 17,270 |
| 2542 | Sunrise Village Shopping Center | 5489 Sunrise Blvd | Citrus Heights | CA | 95610 | 03/10/22 | 27,150 |
| 2444 | Westridge Center | 1425 N. Davis Road | Salinas | CA | 93907 | 10/03/14 | 16,355 |
| 1011 | Fletcher Hills Town & Country | 2756 Fletcher Pkwy | El Cajon | CA | 92020 | 11/14/97 | 27,384 |
| 1464 | Camino Town & Country S/C | 2227 S El Camino Real Ste C | Oceanside | CA | 92054 | 01/26/97 | 17,262 |
| 1843 | Poway Center | 12313 Poway Rd | Poway | CA | 92064 | 12/01/87 | 20,250 |
| 1845 | Point Loma Plaza | 3633 Midway Dr | San Diego | CA | 92110 | 07/03/99 | 14,950 |
| 1886 | Bay Plaza S/C | 1410 E Plaza Blvd Ste A | National City | CA | 91950 | 02/01/89 | 13,300 |
| 2559 | Grand Plaza | 177 South Las Posas Road | San Marcos | CA | 92078 | 09/08/22 | 40,000 |
| 112 | Tamal Vista Blvd. | 245 Tamal Vista Blvd | Corte Madera | CA | 94925 | 01/01/75 | 12,450 |
| 730 | South El Camino Real | 1948 S El Camino Real | San Mateo | CA | 94403 | 01/30/92 | 14,008 |
| 871 | Peninsula Boardwalk | 308 Walnut St | Redwood City | CA | 94063 | 12/01/96 | 16,336 |
| 2133 | Park & Shop | 1675 B Willow Pass Road | Concord | CA | 94520 | 03/22/06 | 38,088 |
| 2150 | El Cerrito Plaza | 300 El Cerrito Plz | El Cerrito | CA | 94530 | 07/11/08 | 34,310 |
| 2189 | Amador Plaza Rd | 7177 Amador Plaza Road | Dublin | CA | 94568 | 05/20/11 | 25,377 |
| 2271 | Greenhouse Marketplace | 699 Lewelling Blvd Suite 230 | San Leandro | CA | 94579 | 07/26/12 | 25,000 |
| 2533 | Westlake Shopping Center | 423 Westlake Center (Second Level) | Daly City | CA | 94015 | 10/24/19 | 22,900 |
| 605 | Portal Plaza | 19765 Stevens Creek Blvd | Cupertino | CA | 95014 | 08/15/84 | 17,614 |
| 1787 | Tennant Station S/C | 225 Tennant Sta | Morgan Hill | CA | 95037 | 03/26/93 | 14,720 |
| 1878 | Safeway SC | 4950 Almaden Expy Ste 10 | San Jose | CA | 95118 | 04/30/10 | 23,563 |
| 2200 | Freestanding (Former Circuit City) | 1535 South Bradley Road | Santa Maria | CA | 93454 | 05/20/11 | 19,014 |
| 154 | Industrial Drive | 3620 Industrial Dr | Santa Rosa | CA | 95403 | 12/29/91 | 15,000 |
| 1763 | Expressway Mall | 425 Rohnert Park Expy W | Rohnert Park | CA | 94928 | 09/01/92 | 20,000 |
| 1877 | Stadium Center | 2210 Daniels St | Manteca | CA | 95337 | 04/30/10 | 20,807 |
| 2474 | Park West Place | 10916-B Trinity Parkway | Stockton | CA | 95219 | 06/30/16 | 18,192 |
| 850 | Vacaville Commons | 2051 Harbison Dr | Vacaville | CA | 95687 | 01/30/93 | 15,052 |
| 2473 | Sequoia Plaza | 3930 S. Mooney Blvd | Visalia | CA | 93277 | 10/20/16 | 21,282 |
| 2462 | Raley's Center | 704 West Onstott Rd | Yuba City | CA | 95991 | 11/06/15 | 19,794 |
| 1674 | Arapahoe Village S/C | 2440 Arapahoe Ave | Boulder | CO | 80302 | 11/01/87 | 17,258 |
| 2062 | First & Main Town Center | 3795 Bloomington St | Colorado Springs | CO | 80922 | 10/29/04 | 35,000 |
| 1095 | Southwest Commons | 8601 W Cross Dr Unit Sm | Littleton | CO | 80123 | 03/14/03 | 25,650 |
| 1672 | Aurora City Square | 13861 E Exposition Ave | Aurora | CO | 80012 | 10/20/86 | 15,500 |
| 1858 | Marketplace At Northglenn | 341 W 104Th Ave # 3 | Northglenn | CO | 80234 | 11/22/02 | 21,916 |
| 2055 | Yosemite Park Mall | 9090 East Phillips Place | Centennial | CO | 80112 | 10/29/04 | 35,350 |
| 2071 | Saddle Rock Village | 7360 South Gartrell Road | Aurora | CO | 80016 | 03/25/05 | 35,000 |
| 2179 | University Hills | 2580 South Colorado Blvd | Denver | CO | 80222 | 06/04/10 | 26,300 |
| 2234 | Freestanding, Former Circuit City | 10750 W Colfax Ave # 100 | Lakewood | CO | 80215 | 09/02/11 | 20,970 |
| 2390 | Westminster City Center | 9250 Sheridan Blvd #200 | Westminster | CO | 80031 | 07/25/14 | 23,261 |
| 2124 | The Marketplace at Centerra | 1601 Fall River Drive | Loveland | CO | 80538 | 03/22/06 | 35,231 |
| 2228 | Thunderbird Plaza | 2701 S. College Ave. Unit 160 | Fort Collins | CO | 80525 | 02/03/12 | 22,220 |
| 2238 | Mesa Mall | 2424 Highway 6 & 50. Space 0015 | Grand Junction | CO | 81505 | 11/10/11 | 14,150 |
| 2013 | Pueblo Mall | 3449 Dillon Dr | Pueblo | CO | 81008 | 07/16/10 | 15,350 |
| 2182 | Shop Rite Plaza | 143 Federal Rd | Brookfield | CT | 06804 | 11/05/10 | 12,859 |
| 701 | Clinton Commons S/C | 274 E Main St | Clinton | CT | 06413 | 05/30/92 | 10,000 |
| 1924 | Plaza At Buckland Hills | 1440 Pleasant Valley Rd | Manchester | CT | 06042 | 10/07/98 | 45,900 |
| 1942 | Berlin Turnpike | 3105 Berlin Tpke | Newington | CT | 06111 | 10/01/99 | 39,239 |
| 2266 | Freshwater Plaza | 136 Elm Street, Suite A | Enfield | CT | 06082 | 02/03/12 | 13,865 |
| 2411 | Shop Rite Plaza | 774 Queen St. | Southington | CT | 06489 | 02/02/14 | 19,693 |
| 976 | Hamden Mart S/C | 2300 Dixwell Ave | Hamden | CT | 06514 | 05/02/06 | 25,494 |
| 2123 | Milford Crossing | 1405 Boston Post  Road | Milford | CT | 06460 | 06/19/07 | 35,000 |
| 2367 | Torrington Plaza | 39 South Main St | Torrington | CT | 06790 | 03/07/14 | 15,848 |
| 1607 | Ames S/C | 117 Salem Tpke | Norwich | CT | 06360 | 01/01/91 | 14,006 |
| 630 | Centre At Dover | 283 N Dupont Hwy Ste F | Dover | DE | 19901 | 08/21/91 | 11,602 |
| 2063 | Christiana Town Center | 341 W Main St | Newark | DE | 19702 | 08/06/04 | 36,250 |
| 173 | Merchants Crossing S/C | 15201 N Cleveland Ave Ste 400 | Fort Myers | FL | 33903 | 06/02/93 | 16,000 |
| 1922 | South Plaza | 4610 S Cleveland Ave | Fort Myers | FL | 33907 | 11/17/98 | 45,000 |
| 2537 | Coconut Pointe | 8072 Mediterranean Drive | Estero | FL | 33928 | 09/19/19 | 18,322 |
| 816 | Mariner Plaza | 224B Eglin Pkwy Ne | Fort Walton Beach | FL | 32547 | 01/12/93 | 15,750 |
| 2580 | Shoppes at Paradise Key | 4437 Commons Dr. | Destin | FL | 32541 | 03/31/23 | 33,875 |
| 1595 | Volusia Plaza | 2400 W International Spdwy Blvd | Daytona Beach | FL | 32114 | 09/11/08 | 22,352 |
| 2391 | The Esplanade At Butler Plaza | 3202 Sw 35Th Blvd | Gainesville | FL | 32608 | 02/02/14 | 36,185 |

**Jo-Ann Stores**

**Exhibit 1(a)(1)**

**Store List**

| Store No. | Store | Address | City | State | Zip Code | Open Date | Square Ft |
|---|---|---|---|---|---|---|---|
| 1925 | Argyle S/C | 6001 Argyle Forest Blvd Ste 11 | Jacksonville | FL | 32244 | 09/11/98 | 48,945 |
| 2039 | St Johns Town Center | 10261 River Marsh Drive Ste 149 | Jacksonville | FL | 32246 | 02/11/05 | 35,000 |
| 2335 | Village of Amelia | 463877 State Road 200 | Yulee | FL | 32097 | 07/26/13 | 14,000 |
| 312 | North Lakeland Plaza | 4241 Us Highway 98 N | Lakeland | FL | 33809 | 03/31/00 | 19,100 |
| 902 | Shops At Avenue O | 1522 3Rd St Sw | Winter Haven | FL | 33880 | 11/19/95 | 12,375 |
| 135 | Flagler Park Plaza | 8257 W Flagler St | Miami | FL | 33144 | 02/01/91 | 12,016 |
| 583 | JOANN Fabrics Plaza | 10875 Caribbean Blvd | Miami | FL | 33189 | 01/01/80 | 19,557 |
| 968 | The Greenery | 7706 N Kendall Dr | Miami | FL | 33156 | 06/03/88 | 18,490 |
| 1023 | Pompano Marketplace | 1131 S Federal Hwy | Pompano Beach | FL | 33062 | 10/19/97 | 20,200 |
| 1044 | Hollywood Blvd | 4700 Hollywood Blvd | Hollywood | FL | 33021 | 03/28/97 | 19,880 |
| 1452 | Riverwalk Shopping Plaza | 1632 S Federal Hwy | Boynton Beach | FL | 33435 | 02/01/97 | 14,938 |
| 1596 | Margate Shopping Center | 3340 Nw 62Nd Ave | Margate | FL | 33063 | 08/21/08 | 21,441 |
| 1862 | Shoppes at Isla Verde | 940 S State Road 7 | Wellington | FL | 33414 | 09/11/08 | 21,600 |
| 2144 | 11251 Pines Blvd. | 11251 Pines Blvd | Pembroke Pines | FL | 33026 | 08/15/08 | 27,109 |
| 2167 | The Fountains | 801 South University Dr Suite 75 | Plantation | FL | 33324 | 06/24/11 | 20,000 |
| 2435 | Northlake Commons | 3942 Northlake Blvd | West Palm Beach | FL | 33403 | 04/28/16 | 25,345 |
| 2077 | The Shoppes at Naples Center | 6424 Naples Blvd Suite 501 | Naples | FL | 34109 | 07/28/06 | 24,816 |
| 998 | The Landings | 4934 S Tamiami Trl | Sarasota | FL | 34231 | 10/01/97 | 20,411 |
| 1107 | Venice Village | 4143 Tamiami Trl S Bay 20 | Venice | FL | 34293 | 08/10/90 | 10,080 |
| 2282 | Shoppes at University Center | 8441 Cooper Creek Blvd | Bradenton | FL | 34201 | 11/09/12 | 20,303 |
| 1244 | Shady Oaks Shopping Center | 2405 Sw 27Th Ave | Ocala | FL | 34471 | 06/28/02 | 25,304 |
| 772 | Village Market Place | 365 E Burleigh Blvd | Tavares | FL | 32778 | 11/01/94 | 20,306 |
| 1598 | Village Crossroads | 540 N Us Hwy 441 | Lady Lake | FL | 32159 | 08/21/08 | 21,600 |
| 1908 | Colonial Landing | 3562 E Colonial Dr | Orlando | FL | 32803 | 02/27/98 | 37,308 |
| 1915 | Brantley Square | 924 W State Road 436 Ste 1450 | Altamonte Springs | FL | 32714 | 02/13/98 | 50,228 |
| 2032 | Waterford Lakes Town Center | 825 N Alafaya Trail | Orlando | FL | 32828 | 11/21/03 | 35,000 |
| 2058 | Target At Kissimmee West | 4801 W Irlo Bronson Memorial Hwy | Kissimmee | FL | 34746 | 02/11/05 | 35,000 |
| 2131 | Town Center Plaza | 120 N Entrance Road | Sanford | FL | 32771 | 02/08/06 | 36,988 |
| 2139 | Orlando Market | 3379 Daniels Road | Winter Garden | FL | 34787 | 09/28/07 | 35,314 |
| 2118 | Shoppes of West Melbourne | 1537 W New Haven Ave | West Melbourne | FL | 32904 | 09/23/05 | 35,759 |
| 2298 | 23rd Street Plaza | 413 East 23Rd Street | Panama City | FL | 32405 | 07/26/13 | 20,579 |
| 2109 | Tradewinds S/C | 6601 N. Davis Highway Ste 25 | Pensacola | FL | 32504 | 08/12/05 | 35,190 |
| 2164 | Square One Shopping Center | 3563 Nw Federal Hwy | Jensen Beach | FL | 34957 | 04/03/09 | 28,004 |
| 1484 | Bayshore Village | 4265 Tamiami Trl Unit I | Port Charlotte | FL | 33980 | 06/25/92 | 9,500 |
| 2279 | Century Town Center | 5921 20Th St. Unit B | Vero Beach | FL | 32966 | 04/13/12 | 11,048 |
| 736 | Capitol Plaza | 1802 Thomasville Rd | Tallahassee | FL | 32303 | 07/14/94 | 18,765 |
| 333 | Lakewood Plaza | 4387 Commercial Way | Spring Hill | FL | 34606 | 03/02/97 | 14,000 |
| 1333 | Home Depot Plaza | 10057 Us Highway 19 | Port Richey | FL | 34668 | 11/17/06 | 35,000 |
| 1861 | Market Square at Tampa Palms | 6234 Commerce Palms Blvd | Tampa | FL | 33647 | 08/21/08 | 21,600 |
| 1958 | Plaza At Citrus Park | 12635 Citrus Plaza Dr | Tampa | FL | 33625 | 11/09/00 | 45,965 |
| 1959 | Lake Brandon Plaza S/C | 11215 Causeway Blvd | Brandon | FL | 33511 | 04/26/01 | 41,947 |
| 2025 | Tyrone Corners SC | 2500 66Th St N | Saint Petersburg | FL | 33710 | 07/18/03 | 34,076 |
| 2031 | Curlew Crossing | 2343 Curlew Road | Dunedin | FL | 34698 | 08/21/03 | 41,865 |
| 2534 | Freestanding | 3055 Atlanta Highway | Athens | GA | 30606 | 09/19/19 | 21,500 |
| 1549 | Douglas Corners S/C | 9439 Highway 5 | Douglasville | GA | 30135 | 10/08/99 | 24,000 |
| 1921 | Pleasant Hill Square | 2255 Pleasant Hill Rd Ste 200 | Duluth | GA | 30096 | 04/07/00 | 26,000 |
| 1960 | North Point Commons | 965 N Point Dr | Alpharetta | GA | 30022 | 11/09/00 | 38,418 |
| 2005 | Presidential Commons | 1630 Scenic Hwy N Ste O | Snellville | GA | 30078 | 11/09/00 | 37,312 |
| 2016 | Fayette Pavilion | 250 Pavilion Pkwy | Fayetteville | GA | 30214 | 10/01/01 | 42,000 |
| 2359 | Conyers Plaza | 1380 Dogwood Drive | Conyers | GA | 30013 | 05/17/13 | 24,920 |
| 2364 | Newnan Pavilion | 1074 Bullsboro Drive, Unit #6 | Newnan | GA | 30265 | 08/30/13 | 18,239 |
| 2412 | Suburban Plaza | 2655 N. Decatur Road | Decatur | GA | 30033 | 04/28/16 | 20,035 |
| 2414 | Lakeland Plaza | 540 A Lakeland Plaza | Cumming | GA | 30040 | 11/07/14 | 17,793 |
| 2547 | Freestanding | 501 Roberts Ct | Kennesaw | GA | 30144 | 07/16/20 | 42,059 |
| 2143 | Richmond Plaza | 3435 Wrightsboro Road | Augusta | GA | 30909 | 05/16/08 | 36,736 |
| 2247 | Golden Isles Plaza | 137 Golden Isles Plaza Parkway | Brunswick | GA | 31520 | 02/03/12 | 14,663 |
| 1583 | Columbus Park Crossing | 5555 Whittlesey Blvd  Ste 2900 | Columbus | GA | 31909 | 09/11/08 | 21,000 |
| 2239 | Lakeshore Marketplace | 834-A Dawsonville Highway | Gainesville | GA | 30501 | 07/29/11 | 19,800 |
| 1891 | Shoppes at River Crossing | 5080 Riverside Dr Ste 1300 | Macon | GA | 31210 | 07/16/10 | 20,331 |
| 2400 | Tifton Mall | 612 Virginia Ave North | Tifton | GA | 31794 | 04/11/14 | 16,233 |
| 1021 | Savannah Centre | 7400 Abercorn St | Savannah | GA | 31406 | 09/19/97 | 15,650 |
| 2490 | Willow Lake Crossing | 2951 Watson Blvd | Warner Robins | GA | 31093 | 09/29/16 | 12,277 |
| 1650 | Lincoln Center | 632 Lincoln Way | Ames | IA | 50010 | 12/01/85 | 12,000 |
| 2306 | Lindale Mall | 255 Collins Road Ne | Cedar Rapids | IA | 52402 | 08/31/12 | 20,600 |
| 1645 | Village S/C | 902 W Kimberly Rd Ste 41 | Davenport | IA | 52806 | 03/31/01 | 25,200 |
| 2249 | Metro North Shopping Center | 1205 Se 16Th Court, Suite 200 | Ankeny | IA | 50021 | 03/09/12 | 18,250 |
| 2556 | Valley Court Shopping Center | 9999 University Avenue | Clive | IA | 50325 | 07/28/22 | 33,330 |
| 2540 | Plaza 20 | 2600 Dodge Street (Suite A-1)- Temp | Dubuque | IA | 52003 | 10/24/19 | 18,000 |
| 2509 | Iowa City Marketplace | 1676 Sycamore Street | Iowa City | IA | 52240 | 05/10/18 | 27,000 |
| 2333 | Muscatine Mall | 1903 Park Avenue | Muscatine | IA | 52761 | 03/08/13 | 14,719 |
| 2399 | Willow Creek Crossing | 500 Indianhead Drive | Mason City | IA | 50401 | 10/03/14 | 18,000 |
| 2416 | Burlington Commons | 3200 Agency Street, Ste 110 | Burlington | IA | 52601 | 11/07/14 | 18,000 |

**Jo-Ann Stores**

**Exhibit 1(a)(1)**

**Store List**

| Store No. | Store | Address | City | State | Zip Code | Open Date | Square Ft |
|---|---|---|---|---|---|---|---|
| 2499 | The Marketplace | 3271 Marketplace Drive  Suite: C1 | Council Bluffs | IA | 51501 | 06/22/17 | 20,310 |
| 2208 | Crossroads Commons | 1407 Flammang Drive | Waterloo | IA | 50702 | 06/24/11 | 18,197 |
| 796 | Federal Way Plaza | 3275 S Federal Way | Boise | ID | 83705 | 11/19/94 | 16,000 |
| 1683 | Karcher Mall | 1509 Caldwell Blvd | Nampa | ID | 83651 | 03/31/01 | 21,120 |
| 2162 | Milwaukee Market Place | 1085 N. Milwaukee St | Boise | ID | 83704 | 03/02/09 | 37,783 |
| 2326 | Silver Lake Mall | 200 West Hanley Ave Suite 1101 | Coeur D Alene | ID | 83815 | 03/08/13 | 18,335 |
| 2192 | Grand Teton Plaza | 2408 South 25Th East | Idaho Falls | ID | 83404 | 03/11/11 | 24,000 |
| 1692 | American Plaza | 840 Blue Lakes Blvd N | Twin Falls | ID | 83301 | 08/10/84 | 11,985 |
| 2469 | Palouse Mall | 1854 W. Pullman Road | Moscow | ID | 83843 | 02/16/17 | 17,680 |
| 2183 | Pocatello Square | 1790 Hurley Dr. | Pocatello | ID | 83201 | 11/10/10 | 13,427 |
| 2552 | Bloomington Commons | 1719 E Empire Street | Bloomington | IL | 61704 | 10/29/21 | 21,828 |
| 2290 | Champaign Town Center | 722 West Town Center Blvd. | Champaign | IL | 61822 | 04/12/12 | 17,642 |
| 138 | Rivercrest Centre | 4917 Cal Sag Rd | Crestwood | IL | 60445 | 01/27/91 | 14,000 |
| 140 | Danada Square West S/C | 36 Danada Sq W | Wheaton | IL | 60189 | 07/22/91 | 12,629 |
| 957 | Four Flaggs S/C | 8245 W Golf Rd | Niles | IL | 60714 | 11/19/89 | 16,985 |
| 1579 | Norridge Marketplace | 4514 N Harlem Ave | Norridge | IL | 60706 | 10/08/97 | 14,558 |
| 1589 | Countryside Plaza | 20 Countryside Plaza | Countryside | IL | 60525 | 05/13/06 | 26,653 |
| 2024 | Naper West Plaza | 526 S State Route 59 | Naperville | IL | 60540 | 08/21/03 | 36,493 |
| 2048 | Bloomingdale Court | 362 W Army Trail Rd  Ste 230 | Bloomingdale | IL | 60108 | 10/29/04 | 25,802 |
| 2057 | Marketplace at Vernon Hills | 413 N Milwaukee Ave  Unit  500 | Vernon Hills | IL | 60061 | 02/11/05 | 40,024 |
| 2065 | The Shoppes At Geneva Commons | 714 Commons Drive | Geneva | IL | 60134 | 09/17/04 | 35,350 |
| 2103 | Lake View Plaza | 15752  S. La Grange Rd | Orland Park | IL | 60462 | 05/13/06 | 34,050 |
| 2113 | Town & Country SC | 373 E Palatine Road | Arlington Heights | IL | 60004 | 11/04/05 | 36,400 |
| 2117 | Riverfront Plaza | 2639 N. Elston Ave | Chicago | IL | 60647 | 09/23/05 | 43,233 |
| 2176 | Chestnut Court | 7511 Lemont Rd Ste 101 | Darien | IL | 60561 | 10/16/09 | 25,000 |
| 2198 | High Point Centre | 441 E Roosevelt Rd Space #410 | Lombard | IL | 60148 | 09/02/11 | 17,040 |
| 2220 | Joliet Commons | 2741 Plainfield Road | Joliet | IL | 60435 | 06/24/11 | 15,000 |
| 2259 | Shops At Fox River | 3310 Shoppers Drive | Mchenry | IL | 60050 | 03/09/12 | 17,172 |
| 2386 | Joffco Square | 555 W. Roosevelt Road | Chicago | IL | 60607 | 11/08/13 | 16,651 |
| 2465 | Freestanding | 2391 County Line Road | Algonquin | IL | 60102 | 11/06/15 | 19,875 |
| 2455 | Village Mall | 2917 North Vermillion Suite C17 | Danville | IL | 61832 | 07/24/15 | 16,427 |
| 2476 | Freestanding Building | 3911 16Th Street | Moline | IL | 61265 | 10/27/16 | 16,900 |
| 2587 | Bradley Commons | 2056 N State Rt. 50 (Unit 15) | Bourbonnais | IL | 60914 | 08/21/23 | 21,421 |
| 503 | Quincy Mall | 425 N 32Nd St | Quincy | IL | 62301 | 08/18/78 | 15,193 |
| 521 | University Plaza S/C | 1332 E Main St | Carbondale | IL | 62901 | 02/10/92 | 12,004 |
| 527 | Eagle Center | 1920 N Henderson St | Galesburg | IL | 61401 | 09/27/96 | 14,040 |
| 2250 | Sterling Lincoln Center | 3201 East Lincolnway | Sterling | IL | 61081 | 08/31/12 | 15,000 |
| 2324 | Peru Mall | 3940 Route 251 Suite A1 | Peru | IL | 61354 | 11/09/12 | 15,000 |
| 2418 | Freeport Shopping Center | 1611 South West Avenue | Freeport | IL | 61032 | 07/25/14 | 18,018 |
| 2438 | Cross County Mall | 700 Broadway East | Mattoon | IL | 61938 | 08/24/14 | 13,670 |
| 1637 | Metro S/C | 4700 N University St | Peoria | IL | 61614 | 11/01/92 | 20,200 |
| 2586 | State Street Market | 6360 E. State Street | Rockford | IL | 61108 | 11/10/23 | 28,500 |
| 2246 | Former Circuit City | 3051 W. Wabash Avenue | Springfield | IL | 62704 | 11/11/11 | 22,000 |
| 2156 | Commerce Plaza | 10865 Lincoln Trl | Fairview Heights | IL | 62208 | 03/27/09 | 25,546 |
| 607 | Whitehall Plaza | 3483 W 3Rd St | Bloomington | IN | 47404 | 08/19/98 | 28,365 |
| 2068 | The Shoppes Of Schererville | 715 Us Highway 41 | Schererville | IN | 46375 | 03/25/05 | 35,266 |
| 2373 | Merrillville Plaza | 1916 E 80Th Ave No 14 | Merrillville | IN | 46410 | 02/02/14 | 26,008 |
| 2503 | Eastbrook Plaza | 2610 25Th Street | Columbus | IN | 47201 | 10/05/17 | 14,329 |
| 2532 | Market Centre | 4024 Elkhart Road #25 | Goshen | IN | 46526 | 05/09/19 | 21,494 |
| 2128 | Shoe Carnival Towne Centre | 929 N Green River Rd | Evansville | IN | 47715 | 02/08/06 | 37,227 |
| 2108 | JOANN Mall | 4616 Coldwater Rd | Fort Wayne | IN | 46825 | 08/12/05 | 35,400 |
| 1910 | Castle Glen Plaza | 8714 Castle Creek Parkway East Dr | Indianapolis | IN | 46250 | 08/15/97 | 35,264 |
| 1966 | Avon Town Square | 10401 E Us Highway 36 | Avon | IN | 46123 | 08/19/01 | 28,000 |
| 2030 | Greenwood Pavilion | 1260 Us 31 North | Greenwood | IN | 46142 | 10/10/03 | 35,007 |
| 2229 | Washington Plaza | 10030 East Washington Street | Indianapolis | IN | 46229 | 07/29/11 | 21,500 |
| 2312 | Greenbriar Shopping Center | 1361 86Th Street West | Indianapolis | IN | 46260 | 08/31/12 | 21,500 |
| 1863 | Kokomo Shopping Center | 2130 E Markland Ave | Kokomo | IN | 46901 | 07/03/09 | 20,700 |
| 1149 | Sagamore @ 26 Shopping Center | 311 Sagamore Pkwy N | Lafayette | IN | 47904 | 11/01/74 | 18,728 |
| 2569 | Waterford North | 1025 Veterans Pkwy | Clarksville | IN | 47129 | 11/14/22 | 24,961 |
| 566 | Lake Park S/C | 4333 Franklin St | Michigan City | IN | 46360 | 02/01/93 | 15,000 |
| 525 | Northwest Plaza | 1625 W Mcgalliard Rd | Muncie | IN | 47304 | 09/13/75 | 18,000 |
| 328 | Five Points Mall | 1129 N Baldwin Ave Ste 32 | Marion | IN | 46952 | 11/10/71 | 11,160 |
| 573 | Wal-Mart Plaza | 3527 E Main St | Richmond | IN | 47374 | 10/23/92 | 13,600 |
| 889 | Pilgrim Place S/C | 1406 Pilgrim Lane | Plymouth | IN | 46563 | 10/03/92 | 10,048 |
| 899 | Vincennes Plaza | 630 Niblack Blvd # 6 | Vincennes | IN | 47591 | 01/10/93 | 16,750 |
| 995 | Angola Plaza | 2010 N Wayne St Ste G | Angola | IN | 46703 | 01/15/90 | 7,500 |
| 2439 | Town Fair Center | 1224 James Ave | Bedford | IN | 47421 | 06/15/14 | 12,175 |
| 2515 | Germantown Center | 3703 N. Newton St | Jasper | IN | 47546 | 05/10/18 | 14,036 |
| 665 | Wilshire Plaza | 5612 Grape Rd | Mishawaka | IN | 46545 | 05/18/97 | 21,690 |
| 2424 | Broadmoor Plaza | 1131 E. Ireland Road | South Bend | IN | 46614 | 05/16/14 | 16,527 |
| 2165 | Honey Creek Commons | 5705 Us Hwy 41 | Terre Haute | IN | 47802 | 08/07/09 | 25,127 |
| 1926 | Overland Park S/C | 11401 Metcalf Ave | Overland Park | KS | 66210 | 08/24/98 | 42,810 |

**Jo-Ann Stores**

**Exhibit 1(a)(1)**

**Store List**

| Store No. | Store | Address | City | State | Zip Code | Open Date | Square Ft |
|---|---|---|---|---|---|---|---|
| 2070 | West 63Rd Street | 11215 West 63Rd Street | Shawnee | KS | 66203 | 06/25/04 | 35,488 |
| 2481 | Park Plaza | 2108 W 27Th Street | Lawrence | KS | 66047 | 10/27/16 | 14,148 |
| 2344 | West Loop Shopping Center | 1000 West Loop Place, Ste 120 | Manhattan | KS | 66502 | 11/08/13 | 22,000 |
| 1046 | Central Mall | 2259 S 9Th St Ste 38 | Salina | KS | 67401 | 10/16/98 | 16,159 |
| 2434 | Crosswinds Commons | 1133 Sw Wanamaker Rd Ste 200 | Topeka | KS | 66604 | 02/01/15 | 24,709 |
| 2193 | North Rock Road | 3665 North Rock Road | Wichita | KS | 67226 | 03/11/11 | 26,398 |
| 2460 | Westgate Market | 6930 W. Kellogg Drive | Wichita | KS | 67209 | 03/10/16 | 22,182 |
| 2261 | Houston Lakes | 87 Spiral Drive | Florence | KY | 41042 | 03/09/12 | 23,936 |
| 2489 | Towne Centre | 219 Towne Drive | Elizabethtown | KY | 42701 | 10/27/16 | 12,000 |
| 2392 | Ashland Towne Center | 500 Winchester Ave, Suite 700 | Ashland | KY | 41101 | 11/08/13 | 19,190 |
| 2538 | Crossroads SC | 125 East Reynolds Road, Suite 110 | Lexington | KY | 40517 | 09/19/19 | 30,000 |
| 2145 | Shelbyville Road Plaza | 4600 Shelbyville Rd Ste 280 | Louisville | KY | 40207 | 11/14/08 | 30,236 |
| 2343 | Trademart Shopping Center | 14569 N Us Highway 25 E, Unit 26 | Corbin | KY | 40701 | 03/08/13 | 15,000 |
| 2419 | Barren River Plaza | 376 North L Rogers Wells Blvd | Glasgow | KY | 42141 | 05/16/14 | 17,163 |
| 2233 | Owensboro Towne Center | 5241 Frederica St. Space #3 | Owensboro | KY | 42301 | 07/29/11 | 13,560 |
| 2486 | Power Center | 1804 Macarthur Blvd | Alexandria | LA | 71301 | 05/18/17 | 16,327 |
| 2269 | Siegen Lane Marketplace | 10545 South Mall Drive | Baton Rouge | LA | 70809 | 03/09/12 | 22,000 |
| 2256 | Ambassador Row | 3559 Ambassador Caffery Parkway | Lafayette | LA | 70503 | 11/11/11 | 28,000 |
| 2363 | Village at Northshore | 105 Northshore Blvd Suite 135 | Slidell | LA | 70460 | 03/08/13 | 20,125 |
| 2508 | Westside North Shopping Center | 91 Westbank Expressway Ste 490 | Gretna | LA | 70053 | 10/05/17 | 17,935 |
| 2544 | Wilshire Plaza | 725 Veterans Blvd | Metairie | LA | 70005 | 08/06/20 | 20,250 |
| 2504 | Bayou Walk Shopping Center | 6634 Youree Drive | Shreveport | LA | 71105 | 02/15/18 | 23,500 |
| 814 | Christmas Tree Promenade | 665 Iyannough Rd | Hyannis | MA | 02601 | 10/28/92 | 17,645 |
| 107 | Middleton Market Place | 232A South Main St | Middleton | MA | 01949 | 09/04/92 | 18,500 |
| 403 | Hanover Commons | 1302 Washington St | Hanover | MA | 02339 | 05/16/92 | 13,280 |
| 408 | Worcester Road | 244 Worcester Rd | Natick | MA | 01760 | 12/02/92 | 20,300 |
| 472 | Westford Valley Mkt | 174 Littleton Rd | Westford | MA | 01886 | 06/26/92 | 11,620 |
| 777 | Middlesex Commons | 43 Middlesex Tpke | Burlington | MA | 01803 | 12/11/92 | 15,000 |
| 858 | Treble Cove Plaza | 199 Boston Rd | North Billerica | MA | 01862 | 05/24/92 | 12,754 |
| 1610 | Village Mall | 436 Broadway | Methuen | MA | 01844 | 04/10/87 | 14,600 |
| 2161 | Broadway Shopping Center | 1073 Broadway | Saugus | MA | 01906 | 11/14/08 | 22,500 |
| 2403 | Walpole Mall | 96 Providence Highway | East Walpole | MA | 02032 | 11/07/14 | 24,760 |
| 292 | Dalton Ave Plaza | 457 Dalton Ave | Pittsfield | MA | 01201 | 12/15/91 | 12,000 |
| 177 | Dartmouth Town Ctr | 454 State Rd | North Dartmouth | MA | 02747 | 04/06/91 | 12,000 |
| 477 | Shaw'S Plaza | 300 New State Hwy | Raynham | MA | 02767 | 09/15/91 | 15,775 |
| 2129 | North Attleboro Marketplace | 1360 South Washington St Unit 3 | North Attleboro | MA | 02760 | 09/08/06 | 35,000 |
| 2565 | Ann & Hope Plaza | 85 Highland Avenue | Seekonk | MA | 02771 | 11/11/22 | 21,700 |
| 677 | Holyoke Plaza | 2267 Northampton St | Holyoke | MA | 01040 | 09/03/87 | 15,120 |
| 826 | Big Y Plaza | 433 Center St Ste B | Ludlow | MA | 01056 | 12/25/91 | 15,228 |
| 1609 | Hampshire Mall | 367 Russell St Ste A06 | Hadley | MA | 01035 | 11/22/02 | 15,000 |
| 418 | Milford Plaza | 91 Medway Rd Ste#3 | Milford | MA | 01757 | 06/06/92 | 23,250 |
| 1611 | Old Shrewsbury Village | 1000 Boston Tpke | Shrewsbury | MA | 01545 | 04/14/00 | 20,000 |
| 1879 | Mall at Whitney Field | 100 Commercial Rd Space H | Leominster | MA | 01453 | 04/28/10 | 18,304 |
| 245 | Annapolis Plaza | 150 Jennifer Rd Ste C | Annapolis | MD | 21401 | 09/28/91 | 10,562 |
| 395 | Westminster S/C | 20 Englar Rd | Westminster | MD | 21157 | 09/07/90 | 14,000 |
| 722 | Garrison Forest Plaza | 10377 Reisterstown Rd | Owings Mills | MD | 21117 | 10/30/99 | 15,296 |
| 1906 | Columbia Crossing | 6161 Columbia Crossing Dr | Columbia | MD | 21045 | 06/05/98 | 45,218 |
| 1912 | Tollgate Plaza | 615 Bel Air Rd Ste F | Bel Air | MD | 21014 | 06/05/98 | 46,000 |
| 2090 | Perring Plaza | 1951 Joppa Road | Parkville | MD | 21234 | 10/29/04 | 34,421 |
| 640 | Lavala Plaza S/C | 1313 National Hwy | Lavale | MD | 21502 | 11/12/77 | 9,000 |
| 480 | South End S/C | 1109 Maryland Ave | Hagerstown | MD | 21740 | 11/09/95 | 17,344 |
| 431 | Patuxent Crossing | 22576 Macarthur Blvd Ste 300 | California | MD | 20619 | 11/06/94 | 14,058 |
| 106 | Diamond Square S/C | 2A Bureau Dr | Gaithersburg | MD | 20878 | 02/16/79 | 15,000 |
| 123 | Beltway Plaza Mall | 6200 Greenbelt Rd | Greenbelt | MD | 20770 | 01/31/98 | 14,000 |
| 1951 | Frederick County S/C | 1003-C West Patrick St. | Frederick | MD | 21702 | 06/08/99 | 39,063 |
| 2148 | Brandywine Crossing | 15920 Crain Highway Se | Brandywine | MD | 20613 | 04/03/09 | 25,310 |
| 2381 | Fox Run Shopping Center | 521 N. Solomon'S Island Rd, Ste 34 | Prince Frederick | MD | 20678 | 11/08/13 | 12,020 |
| 2382 | Westfield Wheaton Plaza | 11160 Veirs Mill Road, Unit 180 | Wheaton | MD | 20902 | 10/04/13 | 22,218 |
| 873 | Stillwater Avenue | 710 Stillwater Ave | Bangor | ME | 04401 | 08/13/92 | 23,400 |
| 875 | Auburn Plaza | 732 Center St | Auburn | ME | 04210 | 07/15/92 | 12,189 |
| 410 | Jfk Mall | 180 Jfk Plz | Waterville | ME | 04901 | 11/25/91 | 12,500 |
| 329 | Topsham Fair Mall | 49 Topsham Fair Mall Rd Ste 17 | Topsham | ME | 04086 | 05/17/97 | 17,900 |
| 429 | Pine Tree S/C | 1064 Brighton Ave | Portland | ME | 04102 | 05/04/92 | 21,025 |
| 176 | Oak Valley Center | 2897 Oak Valley Dr | Ann Arbor | MI | 48103 | 12/01/90 | 12,750 |
| 2004 | Valley View Center S/C | 3737 Carpenter Rd | Ypsilanti | MI | 48197 | 04/26/01 | 45,000 |
| 2377 | Minges Creek Plaza | 5420 Beckley Road, Suite M | Battle Creek | MI | 49015 | 08/30/13 | 19,790 |
| 492 | Majestic Square | 2950 Center Ave | Essexville | MI | 48732 | 08/02/96 | 14,672 |
| 306 | Grosse Pointe Farms | 18850 Mack Ave | Grosse Pointe | MI | 48236 | 07/01/71 | 17,000 |
| 351 | Twenty-Fourth Avenue | 4405 24Th Ave | Fort Gratiot | MI | 48059 | 06/06/93 | 20,000 |
| 539 | New Towne Centre | 44740 Ford Rd | Canton | MI | 48187 | 11/04/05 | 35,303 |
| 690 | Madison Place S/C | 32065 John R Rd | Madison Heights | MI | 48071 | 02/06/04 | 35,861 |
| 733 | Bloomfield Village Sq | 4107 Telegraph Rd | Bloomfield Hills | MI | 48302 | 10/10/03 | 28,000 |

# Jo-Ann Stores
## Exhibit 1(a)(1)
### Store List

| Store No. | Store | Address | City | State | Zip Code | Open Date | Square Ft |
|---|---|---|---|---|---|---|---|
| 753 | Lapeer S/C | 1865 W Genesee St | Lapeer | MI | 48446 | 11/01/95 | 12,650 |
| 1927 | Shelby Town Center | 14367 Hall Rd | Shelby Township | MI | 48315 | 04/23/99 | 31,941 |
| 1933 | West Oaks II | 43570 W Oaks Dr # B-3 | Novi | MI | 48377 | 11/05/99 | 49,675 |
| 1940 | Freestanding (Former Circuit City) | 20550 E. 13 Mile Road | Roseville | MI | 48066 | 08/30/13 | 32,863 |
| 1948 | The Crossings At Taylor | 23877 Eureka Rd | Taylor | MI | 48180 | 09/01/00 | 45,000 |
| 1962 | The Auburn Mile | 600 Brown Rd | Auburn Hills | MI | 48326 | 07/18/00 | 44,015 |
| 2003 | Brighton Mall | 8449 W Grand River Ave | Brighton | MI | 48116 | 07/22/01 | 36,280 |
| 2061 | Hampton Plaza | 2105 S Rochester Road | Rochester Hills | MI | 48307 | 10/29/04 | 37,500 |
| 2104 | Independence Market Place | 23125 Outer Drive | Allen Park | MI | 48101 | 09/23/05 | 35,000 |
| 2277 | White Lake Market Place | 9052 Highland Road | White Lake | MI | 48386 | 07/26/12 | 25,660 |
| 2405 | Livonia Commons | 13489 Middlebelt Rd | Livonia | MI | 48150 | 11/07/14 | 24,100 |
| 2407 | Waterside Market Place | 50809 Waterside Drive | Chesterfield | MI | 48051 | 02/01/15 | 25,000 |
| 1590 | Courtland Center | 4190 E Court St Ste 101 | Burton | MI | 48509 | 02/08/06 | 26,000 |
| 2017 | Genessee Commons S/C | G3603 Miller Rd | Flint | MI | 48507 | 04/26/01 | 42,901 |
| 2163 | The Shoppes At Centerpoint | 3665 28Th St Se | Grand Rapids | MI | 49512 | 03/27/09 | 38,500 |
| 2274 | Former Best Buy | 3900 Alpine Ave. Nw Suite B | Comstock Park | MI | 49321 | 02/03/12 | 22,500 |
| 2378 | Century Center | 3323 Century Center St Sw | Grandville | MI | 49418 | 08/30/13 | 21,177 |
| 305 | Felch Street Plaza | 12635 Felch St Ste 60 | Holland | MI | 49424 | 06/07/98 | 15,194 |
| 2122 | Wisner Street Plaza | 1099 N Wisner St | Jackson | MI | 49202 | 11/04/05 | 37,232 |
| 498 | Toy'S R'Us Plaza | 6151 S Westnedge Ave | Portage | MI | 49002 | 04/04/94 | 20,016 |
| 2022 | Frandor S/C | 533 Mall Ct | Lansing | MI | 48912 | 03/14/03 | 30,077 |
| 2332 | Westland Shopping Center | 3750 West Saginaw Street | Lansing | MI | 48917 | 11/09/12 | 20,084 |
| 2116 | Lake Crossings | 5663 Harvey Street | Norton Shores | MI | 49444 | 11/04/05 | 35,350 |
| 2555 | Scottdale Plaza | 1800 M-139 Unit A | Benton Harbor | MI | 49022 | 07/28/22 | 25,470 |
| 279 | Southland Plaza | 2576 S Main St | Adrian | MI | 49221 | 12/01/96 | 12,103 |
| 294 | Northwest Plaza | 1910 N Saginaw Rd | Midland | MI | 48640 | 06/14/88 | 15,000 |
| 348 | Bear Point Plaza | 2686 Us Highway 23 S | Alpena | MI | 49707 | 02/01/89 | 13,000 |
| 414 | East Bay Plaza | 724 Munson Ave | Traverse City | MI | 49686 | 08/01/73 | 22,606 |
| 1594 | Bear Creek Plaza | 1608 Anderson Rd | Petoskey | MI | 49770 | 11/07/08 | 20,026 |
| 1869 | Indian Hills Plaza | 4208 E. Bluegrass Rd Ste A | Mount Pleasant | MI | 48858 | 04/28/10 | 21,060 |
| 2521 | Ferris Commons | 1250 W. Perry Avenue | Big Rapids | MI | 49307 | 10/25/18 | 15,000 |
| 1901 | Saginaw Square | 2920 Tittabawassee Rd | Saginaw | MI | 48604 | 11/15/97 | 31,000 |
| 697 | Irongate Mall | 990 W 41St St Ste 2 | Hibbing | MN | 55746 | 10/24/79 | 15,750 |
| 2477 | Burning Tree Plaza | 5115 Burning Tree Plaza | Duluth | MN | 55811 | 10/13/16 | 17,682 |
| 2191 | Madison East Mall | 1400 Madison Avenue Suite #500 | Mankato | MN | 56001 | 02/03/11 | 19,080 |
| 473 | Bonaventure Plaza | 1635 Plymouth Rd | Minnetonka | MN | 55305 | 06/01/92 | 18,000 |
| 1876 | Crossroads of Roseville | 1649 W. County Rd B2 | Roseville | MN | 55113 | 03/05/10 | 23,023 |
| 1902 | Tamarack Village | 8208 Tamarack Vlg | Woodbury | MN | 55125 | 08/07/97 | 45,215 |
| 1935 | Arbor Lakes S/C | 12550 Elm Creek Blvd N | Maple Grove | MN | 55369 | 11/19/99 | 46,000 |
| 1941 | Riverdale Village | 12779 Riverdale Blvd Nw | Coon Rapids | MN | 55448 | 04/07/00 | 45,850 |
| 1952 | Apple Valley Square | 7614 150Th St W | Apple Valley | MN | 55124 | 02/18/00 | 45,384 |
| 2026 | Yorktown Mall | 3411 Hazelton Rd | Edina | MN | 55435 | 08/21/03 | 34,066 |
| 2263 | Elk Park Center | 19154 Freeport Street Nw | Elk River | MN | 55330 | 11/09/11 | 18,009 |
| 2283 | Dean Lakes | 4120 Dean Lakes Boulevard | Shakopee | MN | 55379 | 05/18/12 | 17,040 |
| 2596 | Birch Run Station | 1717 Beam Avenue | Maplewood | MN | 55109 | 10/23/24 | 27,000 |
| 863 | Hutchinson Mall | 1060 Highway 15 | Hutchinson | MN | 55350 | 06/19/83 | 13,060 |
| 1666 | Paul Bunyan Mall | 1401 Paul Bunyan Dr Nw Ste 60 | Bemidji | MN | 56601 | 06/17/93 | 14,766 |
| 1864 | Kandi Mall | 1605 1St St S | Willmar | MN | 56201 | 11/07/08 | 17,519 |
| 1892 | Westgate Mall | 14136 Baxter Drive Suite 120 | Brainerd | MN | 56401 | 10/01/10 | 15,945 |
| 2166 | Viking Plaza Mall | 3015 Highway 29 South | Alexandria | MN | 56308 | 10/01/10 | 18,336 |
| 2404 | Faribo West Mall | 200 Western Ave Nw, Suite C10 | Faribault | MN | 55021 | 02/02/14 | 14,544 |
| 2573 | Rochester Marketplace | 3839 Marketplace Drive NW | Rochester | MN | 55901 | 04/03/23 | 23,725 |
| 518 | Division Street Plaza | 3332 W Division St | Saint Cloud | MN | 56301 | 07/12/75 | 20,600 |
| 2289 | Rockbridge Shopping Center | 509 East Nifong | Columbia | MO | 65201 | 02/03/13 | 19,002 |
| 1577 | Capital Mall | 3600 Country Club Dr Spc 408 | Jefferson City | MO | 65109 | 01/04/97 | 17,043 |
| 2273 | Northpark Mall | 101 N Range Line Road, Suite 354 | Joplin | MO | 64801 | 08/31/12 | 22,659 |
| 1918 | Bolger Square | 3810 Crackerneck Rd | Independence | MO | 64055 | 11/19/99 | 46,350 |
| 2091 | Platte Purchase Plaza | 2201 Nw Barry Road | Kansas City | MO | 64154 | 11/04/05 | 35,406 |
| 2257 | Belton Marketplace | 1153 E. North Avenue | Belton | MO | 64012 | 03/09/12 | 21,000 |
| 1649 | Primrose Market Place | 3370 S Glenstone Ave | Springfield | MO | 65804 | 06/11/99 | 16,000 |
| 1495 | Hillcrest Plaza | 603 N Belt Hwy | Saint Joseph | MO | 64506 | 10/03/99 | 14,350 |
| 2153 | Central Plaza | 15355 Manchester Rd | Ballwin | MO | 63011 | 05/05/09 | 30,244 |
| 2178 | Mid Rivers | 5610 Suemandy Rd | St Peters | MO | 63376 | 07/16/10 | 34,250 |
| 2219 | Former Circuit City | 6910 S. Lindbergh Blvd | Saint Louis | MO | 63125 | 07/29/11 | 28,575 |
| 2294 | Twin City Plaza | 101 Twin City Mall | Crystal City | MO | 63019 | 03/07/12 | 15,614 |
| 2310 | Deer Creek Shopping Center | 3200 Laclede Station Rd | Saint Louis | MO | 63143 | 03/08/13 | 19,710 |
| 2361 | Phoenix Center | 1976 Phoenix Center Drive | Washington | MO | 63090 | 10/04/13 | 15,000 |
| 2268 | The Junction | 6361 I-55 North | Jackson | MS | 39213 | 02/03/12 | 18,036 |
| 1874 | Southaven Town Center | 6535 Towne Center Crossing | Southaven | MS | 38671 | 02/05/10 | 18,243 |
| 2225 | Big Oaks Crossing | 3875 North Gloster Street | Tupelo | MS | 38804 | 05/20/11 | 22,000 |
| 2315 | Market Place | 2833 King Avenue West | Billings | MT | 59102 | 07/26/12 | 20,000 |
| 2585 | Holiday Village Mall | 1200 10th Ave S | Great Falls | MT | 59405 | 11/08/24 | 21,062 |

# Jo-Ann Stores

**Exhibit 1(a)(1)**

**Store List**

| Store No. | Store | Address | City | State | Zip Code | Open Date | Square Ft |
|---|---|---|---|---|---|---|---|
| 791 | Holiday Village | 1900 Brooks St | Missoula | MT | 59801 | 02/01/94 | 24,265 |
| 856 | Butte Plaza Mall | 3100 Harrison Ave | Butte | MT | 59701 | 11/24/95 | 9,000 |
| 1695 | Gallatin Valley Mall | 2825 W Main St Unit S | Bozeman | MT | 59718 | 01/08/01 | 20,020 |
| 1696 | Shopko Plaza | 3131 N Montana Ave | Helena | MT | 59602 | 09/20/02 | 12,000 |
| 1697 | Brookstone Square | 2165 Hwy 2 East Suite E | Kalispell | MT | 59901 | 06/12/00 | 18,000 |
| 2284 | Overlook Village | 80 South Tunnel Road Suite 30 | Asheville | NC | 28805 | 05/17/12 | 22,835 |
| 2352 | Blue Ridge Mall | 1800 Four Seasons Blvd, Space D1 | Hendersonville | NC | 28792 | 05/17/13 | 14,826 |
| 2248 | Carolina Pavilions | 9523 South Blvd | Charlotte | NC | 28273 | 11/11/11 | 23,500 |
| 2426 | Monroe Mall | 2115 W. Roosevelt Blvd, Suite 111 | Monroe | NC | 28110 | 05/16/14 | 20,059 |
| 1078 | Oakcreek Village S/C | 4600 Chapel Hill Blvd Ste 8 | Durham | NC | 27707 | 01/29/00 | 16,051 |
| 1098 | Cross Creek Plaza | 1800 Skibo Rd | Fayetteville | NC | 28303 | 10/10/03 | 20,905 |
| 2252 | Berkley Mall | 625 N Berkeley Blvd #H | Goldsboro | NC | 27534 | 11/08/13 | 15,313 |
| 1511 | The Shoppes On Market | 4644 W Market St | Greensboro | NC | 27407 | 08/06/98 | 19,175 |
| 2318 | Morganton Heights | E132 Morganton Heights Blvd | Morganton | NC | 28655 | 11/08/13 | 12,500 |
| 2480 | Valley Crossing | 2102 Us Hwy 70 Se | Hickory | NC | 28602 | 09/29/16 | 7,780 |
| 2205 | Mooresville Consumer Square | 221 Norman Station Blvd. Suite 2211 | Mooresville | NC | 28117 | 06/23/11 | 12,000 |
| 1074 | Centrum At Crossroads | 2420 Walnut St | Cary | NC | 27518 | 03/30/00 | 24,975 |
| 1478 | The Falls Centre | 4412 Falls Of Neuse Rd Ste 101 | Raleigh | NC | 27609 | 07/20/97 | 18,250 |
| 2253 | Sutters Creek Crossing | 572 Sutter'S Creek Blvd | Rocky Mount | NC | 27804 | 04/12/12 | 14,355 |
| 1471 | University Centre | 352 S College Rd Ste 24 | Wilmington | NC | 28403 | 08/13/92 | 14,000 |
| 2562 | Silas Creek Crossing | 3208 Silas Creek Parkway | Winston-Salem | NC | 27103 | 10/27/22 | 27,410 |
| 2243 | Gateway Mall | 2700 State Street, Suite C | Bismarck | ND | 58503 | 03/08/12 | 15,975 |
| 1865 | TJ Maxx Plaza | 4340 13Th Ave S Ste 101 | Fargo | ND | 58103 | 11/07/08 | 19,952 |
| 653 | Columbia Junction Mall | 2781 32Nd Ave S | Grand Forks | ND | 58201 | 08/10/91 | 12,000 |
| 172 | Town & Country S/C | 1015 S Broadway | Minot | ND | 58701 | 04/30/92 | 11,981 |
| 2371 | East Park Plaza | 220 N 66Th St Ste 270 | Lincoln | NE | 68505 | 05/17/13 | 31,650 |
| 2175 | Baker Square | 13415 W Center Rd | Omaha | NE | 68144 | 11/05/10 | 31,837 |
| 2456 | Wolf Creek Plaza | 10521 S. 15Th Street | Bellevue | NE | 68123 | 04/10/15 | 23,865 |
| 266 | Newington Park | 2064 Woodbury Ave Ste 302 | Newington | NH | 03801 | 10/17/92 | 22,500 |
| 824 | Seacoast S/C | 270 Lafayette Rd Unit 8 | Seabrook | NH | 03874 | 11/23/91 | 12,000 |
| 2301 | Rochester Crossing | 160 Washington St Ste 606 | Rochester | NH | 03839 | 05/18/12 | 13,037 |
| 2564 | Nashua Mall Plaza | 31 Gusabel Avenue | Nashua | NH | 03063 | 09/02/22 | 37,113 |
| 132 | Hooksett Village Shops | 1328 Hooksett Rd | Hooksett | NH | 03106 | 06/09/90 | 12,500 |
| 830 | Belknap Mall S/C | 12 Old State Rd | Belmont | NH | 03220 | 09/19/92 | 16,395 |
| 904 | Capitol S/C | 80 Storrs St Ste 5 | Concord | NH | 03301 | 06/01/85 | 18,872 |
| 1614 | Target Plaza | 200 S Main St Rt 12A | West Lebanon | NH | 03784 | 03/22/91 | 15,573 |
| 545 | Festival At Hamilton S/C | 3926 Festival At Hamilton | Mays Landing | NJ | 08330 | 01/09/92 | 11,910 |
| 593 | Shrewsbury Plaza | 1026 Broad St | Shrewsbury | NJ | 07702 | 11/01/76 | 15,000 |
| 1106 | Colonia Plaza | 1272 State Rt 27 | Colonia | NJ | 07067 | 06/01/72 | 15,700 |
| 2217 | Freestanding (Former Comp USA) | 30 A & S Drive | Paramus | NJ | 07652 | 06/24/11 | 30,000 |
| 2341 | Roxbury Mall | 281-28 Rt 10E | Succasunna | NJ | 07876 | 02/03/13 | 30,425 |
| 2383 | Riverdale Crossing | 48 Route 23 | Riverdale | NJ | 07457 | 10/04/13 | 21,807 |
| 2409 | 1379 Hooper Avenue | 1379 Hooper Avenue | Toms River | NJ | 08753 | 03/07/14 | 20,000 |
| 2089 | Centerton Square | 66 Centerton  Road | Mount Laurel | NJ | 08054 | 05/13/05 | 35,350 |
| 2355 | Garden State Pavillion | 2234 W Marlton Pike Rd Plot E3 | Cherry Hill | NJ | 08002 | 05/17/13 | 25,287 |
| 2558 | Deptford Plaza | 1120 Hurffville Road | Deptford | NJ | 08096 | 10/26/22 | 40,003 |
| 551 | Mercer On One | 3371 Brunswick Ave | Lawrenceville | NJ | 08648 | 02/02/76 | 18,115 |
| 1524 | Cottonwood West Shopping Center | 10131 Coors Blvd Nw Ste D3 | Albuquerque | NM | 87114 | 11/15/97 | 16,000 |
| 1669 | Wyoming Blvd Northeast | 2240 Wyoming Blvd Ne | Albuquerque | NM | 87112 | 01/01/86 | 24,000 |
| 2576 | Plaza Farmington | 3558 E Main St | Farmington | NM | 87402 | 10/24/22 | 20,020 |
| 1309 | Pan America Plaza | 1711 E University Ave | Las Cruces | NM | 88001 | 08/01/81 | 9,550 |
| 1668 | Plaza Princessa S/C | 3140 Cerrillos Rd Ste B | Santa Fe | NM | 87507 | 02/05/85 | 12,000 |
| 1769 | Carson Mall | 1344 S Stewart St | Carson City | NV | 89701 | 10/01/90 | 10,240 |
| 1903 | Best In The West S/C | 2160 N Rainbow Blvd | Las Vegas | NV | 89108 | 09/27/97 | 46,140 |
| 2015 | Sunmark Plaza | 651 Marks St | Henderson | NV | 89014 | 08/21/01 | 42,000 |
| 2204 | Elko Junction | 2759 Mountain City Hwy | Elko | NV | 89801 | 09/02/11 | 15,000 |
| 1774 | Peckham Square | 3750 Kietzke Ln | Reno | NV | 89502 | 06/01/91 | 24,700 |
| 1602 | Village Square | 19 Clifton Country Rd | Clifton Park | NY | 12065 | 01/09/92 | 10,500 |
| 1929 | Northway Mall | 1440 Central Ave Ste 2 | Albany | NY | 12205 | 09/26/00 | 45,491 |
| 2579 | Parkway Plaza | 3120 Vestal Parkway East | Vestal | NY | 13850 | 05/19/23 | 30,000 |
| 455 | Niagara Square | 2429 Military Rd | Niagara Falls | NY | 14304 | 03/27/89 | 13,001 |
| 1930 | Burlington Plaza | 1551 Niagara Falls Blvd | Amherst | NY | 14228 | 11/06/98 | 38,668 |
| 1932 | McKinley Milestrip Plaza | 3540 Mckinley Pkwy | Blasdell | NY | 14219 | 05/21/99 | 48,592 |
| 2087 | JOANN Plaza | 4101 Transit Road  Ste 1 | Williamsville | NY | 14221 | 09/17/04 | 38,903 |
| 1868 | Southern Tier Crossing | 1530 County Route 64 | Horseheads | NY | 14845 | 09/11/09 | 20,331 |
| 206 | Queensbury Plaza | 756 Upper Glen St Ste 15 | Queensbury | NY | 12804 | 10/18/95 | 15,260 |
| 2342 | Cayuga Mall | 2309 N Triphammer Rd, Unit 1 | Ithaca | NY | 14850 | 04/12/13 | 18,350 |
| 645 | Kingston Plaza | 1385 Ulster Ave | Kingston | NY | 12401 | 06/19/96 | 14,678 |
| 153 | Salisbury Plaza | 580 Old Country Rd | Westbury | NY | 11590 | 05/09/98 | 15,574 |
| 257 | Great South Bay S/C | 735 W Montauk Hwy | West Babylon | NY | 11704 | 04/28/00 | 18,469 |
| 2241 | Midway Plaza | 965 Central Park Ave | Scarsdale | NY | 10583 | 09/02/11 | 31,843 |
| 2567 | Sayville Plaza | 5159 Sunrise Hwy | Bohemia | NY | 11716 | 04/05/23 | 31,484 |

# Jo-Ann Stores
## Exhibit 1(a)(1)
## Store List

| Store No. | Store | Address | City | State | Zip Code | Open Date | Square Ft |
|---|---|---|---|---|---|---|---|
| 301 | Chautauqua Mall | 318 E Fairmount Ave Rm 106 | Lakewood | NY | 14750 | 04/15/71 | 11,612 |
| 358 | Riverside Plaza | 162 Clinton St # 2 | Cortland | NY | 13045 | 08/01/72 | 14,132 |
| 461 | The Shoppes at Dove Creek | 4908 State Hwy 30 Ste#8 | Amsterdam | NY | 12010 | 09/11/97 | 14,000 |
| 822 | K-Mart Plaza | 228 W Main St Ste 12 | Malone | NY | 12953 | 12/21/91 | 10,408 |
| 1089 | Tops Plaza | 2503B W State Street | Olean | NY | 14760 | 01/24/03 | 17,855 |
| 2195 | Arsenal Plaza | 1283 Arsenal Street | Watertown | NY | 13601 | 06/24/11 | 18,795 |
| 2356 | Fairview Plaza | 160 Fairview Avenue Suite # 83 | Hudson | NY | 12534 | 11/08/13 | 15,360 |
| 898 | Dunning Farms S/C | 88 Dunning Rd Ste 23 | Middletown | NY | 10940 | 12/05/92 | 16,000 |
| 1603 | Poughkeepsie Plaza Mall | 2600 South Rd | Poughkeepsie | NY | 12601 | 11/15/93 | 11,370 |
| 631 | Wegmans Plaza | 2157 Penfield Rd | Penfield | NY | 14526 | 11/16/92 | 15,675 |
| 1943 | Southtown Plaza | 3333 W Henrietta Rd Ste 90 | Rochester | NY | 14623 | 11/05/99 | 45,460 |
| 1949 | JOANN / Petsmart Plaza | 3042 Ridge Rd W | Rochester | NY | 14626 | 11/04/99 | 25,000 |
| 2211 | Roseland Center | 3225 State Route 364 | Canandaigua | NY | 14424 | 05/20/11 | 19,389 |
| 2064 | Towne Center At Fayetteville | 330 Towne Center Dr | Fayetteville | NY | 13066 | 06/25/04 | 35,252 |
| 2264 | Marketfair North | 4154 State Route 31 | Clay | NY | 13041 | 11/11/11 | 26,878 |
| 1604 | New Hartford S/C | 120 Genesee St | New Hartford | NY | 13413 | 01/24/01 | 25,000 |
| 171 | Darrow Road | 5381 Darrow Rd | Hudson | OH | 44236 | 11/17/95 | 46,700 |
| 417 | Tri-County Plaza | 1500 Canton Rd | Akron | OH | 44312 | 08/31/83 | 13,600 |
| 2021 | Acme Plaza | 3977 Medina Rd | Akron | OH | 44333 | 10/31/02 | 29,198 |
| 1900 | Belden Parke Crossing | 5487 Dressler Rd Nw | North Canton | OH | 44720 | 06/01/97 | 46,042 |
| 1621 | Village Crossing | 10400 Reading Rd | Evendale | OH | 45241 | 03/28/01 | 17,138 |
| 2147 | Arbor Square | 8125 Arbor Square Drive | Mason | OH | 45040 | 02/05/09 | 29,768 |
| 2181 | Eastgate Crossing | 4530 Eastgate Blvd. | Cincinnati | OH | 45245 | 02/02/11 | 16,730 |
| 2240 | Colerain Towne Center | 10166 Colerain Avenue | Cincinnati | OH | 45251 | 10/07/11 | 23,500 |
| 2513 | Indian Springs Shopping Center | 3177 Princeton Road | Hamilton | OH | 45011 | 06/21/18 | 22,400 |
| 2589 | Hyde Park Plaza | 3872 C Paxton Avenue] | Cincinnati | OH | 45209 | 07/16/24 | 24,393 |
| 1586 | Southland S/C | 6901 Pearl Rd | Middleburg Heights | OH | 44130 | 09/17/04 | 29,887 |
| 1592 | Medina Grande Shoppes | 5005 Grande Blvd | Medina | OH | 44256 | 05/03/06 | 24,126 |
| 1907 | Erie Commons | 8000 Plaza Blvd | Mentor | OH | 44060 | 02/27/98 | 35,984 |
| 1923 | Great Northern S/C | 26337 Brookpark Rd | North Olmsted | OH | 44070 | 09/18/98 | 45,161 |
| 2272 | Golden Gate | 1533 Golden Gate Plaza, Suite #153 | Mayfield Heights | OH | 44124 | 05/18/12 | 23,528 |
| 2410 | Midway Market Square | 380 Market Drive | Elyria | OH | 44035 | 03/07/14 | 25,594 |
| 523 | Edgewood Plaza | 1216 N Memorial Dr | Lancaster | OH | 43130 | 11/23/96 | 15,000 |
| 866 | Park Plaza | 789 Hebron Rd | Heath | OH | 43056 | 06/15/95 | 15,200 |
| 1928 | Polaris Towne Centre | 1265 Polaris Pkwy | Columbus | OH | 43240 | 03/26/99 | 45,650 |
| 1947 | The Festival At Sawmill | 2747 Festival Ln | Dublin | OH | 43017 | 11/05/99 | 48,737 |
| 2001 | Easton Square | 3880 Morse Rd | Columbus | OH | 43219 | 09/28/00 | 51,950 |
| 2012 | Taylor Square S/C | 2891 Taylor Rd | Reynoldsburg | OH | 43068 | 06/18/01 | 42,420 |
| 2054 | Lincoln Village Plaza | 4600 W Broad Street | Columbus | OH | 43228 | 03/19/04 | 30,743 |
| 603 | Beavercreek Towne Centre | 2850 Centre Dr Ste G | Fairborn | OH | 45324 | 07/01/97 | 19,800 |
| 608 | Shiloh Springs Plaza | 5001 Salem Ave | Dayton | OH | 45426 | 03/26/77 | 18,172 |
| 944 | Miami Valley Crossing | 1256 E Ash St | Piqua | OH | 45356 | 05/02/01 | 27,500 |
| 2136 | South Towne Centre | 2270 Miamisburg Centerville Rd | Dayton | OH | 45459 | 05/03/06 | 36,293 |
| 227 | Lima Center | 2720 Elida Rd | Lima | OH | 45805 | 09/08/89 | 16,608 |
| 975 | Springfield S/C | 594 N Lexington Springmill Rd | Mansfield | OH | 44906 | 07/27/06 | 35,000 |
| 284 | St Clair Plaza | 15765 State Route 170 Ste 1 | East Liverpool | OH | 43920 | 11/25/83 | 12,000 |
| 309 | Potter Village | 1212 Oak Harbor Rd | Fremont | OH | 43420 | 08/01/71 | 13,120 |
| 384 | Zane Plaza | 1080 N Bridge St | Chillicothe | OH | 45601 | 02/01/73 | 10,032 |
| 2227 | New Towne Mall | 400 Mill Ave Se Suite 15 | New Philadelphia | OH | 44663 | 06/24/11 | 26,579 |
| 2242 | Northtowne East | 1001 N. Clinton St. Ste 01 | Defiance | OH | 43512 | 10/07/11 | 22,527 |
| 2380 | Athens Mall | 743 E. State Street, Suite O | Athens | OH | 45701 | 07/26/13 | 20,152 |
| 2448 | Former Home Depot | 1991 Tiffin Avenue | Findlay | OH | 45840 | 02/01/15 | 21,073 |
| 506 | Lafayette Center | 448 Pike St | Marietta | OH | 45750 | 11/20/89 | 9,000 |
| 2451 | Crossings at Sandusky | 756 Crossings Road | Sandusky | OH | 44870 | 03/06/15 | 16,000 |
| 308 | Springfield Plaza S/C | 1608J Upper Valley Pike Ste C9 | Springfield | OH | 45504 | 09/25/92 | 12,800 |
| 378 | Hollywood City Center | 282 S Hollywood Blvd | Steubenville | OH | 43952 | 11/30/72 | 15,800 |
| 379 | Reynolds Plaza | 2559 S Reynolds Rd | Toledo | OH | 43614 | 11/01/75 | 17,193 |
| 2300 | Freestanding (frm Circuit City) | 4948 Monroe St | Toledo | OH | 43623 | 04/13/12 | 31,903 |
| 2459 | Ohio Valley Mall | 67800 Mall Ring Rd Unit 305 | St. Clairsville | OH | 43950 | 08/28/15 | 16,398 |
| 2502 | Boulevard Centre at Eastwood Mall | 5555 Youngstown Warren Road #14 | Niles | OH | 44446 | 02/15/18 | 22,341 |
| 2519 | Shops @ Boardman Park | 441 Boardman Poland Road | Youngstown | OH | 44512 | 05/10/18 | 28,881 |
| 2393 | Lawton Towne Center | 449 Nw 2nd St | Lawton | OK | 73501 | 07/25/14 | 18,000 |
| 2291 | Bradford Plaza | 519 N Main St. | Stillwater | OK | 74075 | 05/17/12 | 15,047 |
| 2358 | Shawnee Mall | 4901 N. Kickapoo Street | Shawnee | OK | 74804 | 10/04/13 | 13,863 |
| 2267 | Rockwell Plaza | 8345 N. Rockwell Avenue | Oklahoma City | OK | 73132 | 02/03/12 | 24,400 |
| 2548 | Champtions Centre | 530 Ed Noble Parkway | Norman | OK | 73072 | 09/08/22 | 30,244 |
| 2557 | Union Plaza | 10007 E 71st St | Tulsa | OK | 74133 | 09/08/22 | 34,392 |
| 2168 | Pioneer Crossing | 61284 S Highway 97 | Bend | OR | 97702 | 10/01/10 | 23,290 |
| 2397 | Freestanding | 732 Sw 6Th Street | Redmond | OR | 97756 | 11/08/13 | 15,300 |
| 2216 | Corvallis Crossing | 932 Nw Circle Blvd | Corvallis | OR | 97330 | 05/20/11 | 18,656 |
| 800 | Mohawk Market Place | 2122 Marcola Rd | Springfield | OR | 97477 | 08/22/92 | 14,040 |
| 2317 | Freestanding | 1024 Green Acres Road | Eugene | OR | 97408 | 11/09/12 | 20,491 |

# Jo-Ann Stores

## Exhibit 1(a)(1)

### Store List

| Store No. | Store | Address | City | State | Zip Code | Open Date | Square Ft |
|---|---|---|---|---|---|---|---|
| 1739 | Poplar Drive | 2350 Poplar Dr | Medford | OR | 97504 | 02/01/90 | 19,980 |
| 792 | Bi-Mart Plaza | 2248 Santiam Hwy Se | Albany | OR | 97322 | 06/01/81 | 13,500 |
| 870 | Miracle Village S/C | 4069 Nw Logan Rd | Lincoln City | OR | 97367 | 06/15/94 | 18,500 |
| 915 | Cascade Square | 1324 W 6Th St | The Dalles | OR | 97058 | 11/01/85 | 12,000 |
| 1591 | Sw 4Th Ave | 2255 Sw 4Th Ave | Ontario | OR | 97914 | 11/11/05 | 25,600 |
| 1731 | Pony Village Mall | 1611 Virginia Ave | North Bend | OR | 97459 | 07/01/87 | 17,522 |
| 2232 | Un-Named Shopping Center | 180 Se Neptune Drive, Suite A | Warrenton | OR | 97146 | 02/03/12 | 16,214 |
| 2311 | Grants Pass Shopping Center | 1090 Northeast E Street | Grants Pass | OR | 97526 | 08/31/12 | 16,500 |
| 2321 | Jefferson Square | 2880 South 6Th Street | Klamath Falls | OR | 97603 | 10/05/12 | 22,839 |
| 2461 | Roseburg Marketplace | 1438 Nw Garden Valley Blvd | Roseburg | OR | 97471 | 03/10/16 | 18,000 |
| 633 | Mcminnville Town Ctr | 1401 N Highway 99W | Mcminnville | OR | 97128 | 01/28/93 | 12,000 |
| 1742 | Molalla Avenue | 1842 Molalla Ave | Oregon City | OR | 97045 | 10/01/89 | 20,000 |
| 2101 | Crossroads at Orenco Station | 7270 Ne Butler St | Hillsboro | OR | 97124 | 11/04/05 | 35,399 |
| 2120 | Tigard Shopping Plaza | 11945 Sw Pacific Hyw Ste 250 | Tigard | OR | 97223 | 11/04/05 | 32,108 |
| 2396 | Canyon Place | 4005 Sw 117Th Street | Beaverton | OR | 97005 | 11/08/13 | 17,442 |
| 2554 | Former Salvation Army | 10174 SE 82nd Avenue | Clackamas | OR | 97086 | 04/30/22 | 40,259 |
| 2582 | Gresham Town Fair | 604 NW Eastman Pkwy | Gresham | OR | 97030 | 05/18/23 | 24,948 |
| 2218 | Lancaster Mall | 783 Lancaster Dr. Ne. Suite #133 | Salem | OR | 97301 | 06/24/11 | 26,218 |
| 145 | Macarthur Towne Center | 2570 Macarthur Rd Ste 1 | Whitehall | PA | 18052 | 09/01/97 | 31,000 |
| 1073 | Pleasant Valley S/C | 3415 Pleasant Valley Blvd, Ste 78 | Altoona | PA | 16602 | 04/16/99 | 14,220 |
| 485 | Summit Town Center | 7200 Peach St Unit 150 | Erie | PA | 16509 | 03/18/91 | 15,000 |
| 1131 | West Shore Plaza | 1200 Market St | Lemoyne | PA | 17043 | 09/01/74 | 20,125 |
| 2160 | Colonial Commons | 5084 Jonestown Rd | Harrisburg | PA | 17112 | 10/10/08 | 25,500 |
| 2338 | University Park S/C | 1425 Scalp Ave, Space 110 | Johnstown | PA | 15904 | 04/12/13 | 18,614 |
| 181 | Parkview Plaza | 838 Plaza Blvd | Lancaster | PA | 17601 | 04/01/91 | 17,014 |
| 644 | Cedar Crest Sq S/C | 1860 Quentin Rd | Lebanon | PA | 17042 | 01/04/90 | 14,000 |
| 372 | South Park Plaza | 18921 Park Avenue Plz | Meadville | PA | 16335 | 01/07/93 | 18,000 |
| 387 | Dubois Mall | 5456 Shaffer Rd | Du Bois | PA | 15801 | 02/12/73 | 18,000 |
| 495 | Lincoln Way East S/C | 1678 Lincoln Way E # 7 | Chambersburg | PA | 17201 | 11/04/95 | 12,432 |
| 692 | Regency Mall | 1570 Oakland Ave | Indiana | PA | 15701 | 05/25/01 | 14,965 |
| 2345 | Susquehanna Valley Mall | 1 Susquehanna Valley Mall Dr, D6 | Selinsgrove | PA | 17870 | 03/08/13 | 12,958 |
| 615 | Norriton Square S/C | 45 E Germantown Pike | Norristown | PA | 19401 | 09/27/91 | 12,250 |
| 1185 | Gateway S/C | 153 E Swedesford Rd | Wayne | PA | 19087 | 10/01/75 | 12,000 |
| 1588 | Quakertown Plaza | 1465 W Broad St  Ste 20 | Quakertown | PA | 18951 | 03/25/05 | 22,888 |
| 1626 | Montgomery Commons S/C | 1200 Welsh Rd | North Wales | PA | 19454 | 09/09/91 | 9,812 |
| 2078 | Ashbridge Square | 931 E Lancaster Ave | Downingtown | PA | 19335 | 02/11/06 | 28,258 |
| 2092 | The Court At Oxford Valley | 320 Commerce Blvd | Fairless Hills | PA | 19030 | 02/11/05 | 36,525 |
| 2111 | Marple Crossroads | 400 S. State Rd | Springfield | PA | 19064 | 09/23/05 | 30,600 |
| 2303 | Concordville Town Center | 600 Town Centre Drive Suite D-108 | Glen Mills | PA | 19342 | 07/26/12 | 13,199 |
| 2354 | Creekview Center | 397 Easton Rd | Warrington | PA | 18976 | 04/12/13 | 24,825 |
| 2357 | Boulevard Plaza | 11000 Roosevelt Blvd | Philadelphia | PA | 19116 | 11/08/13 | 30,330 |
| 2512 | The Shops at Coventry | 351 West Schuylkill Rd | Pottstown | PA | 19465 | 05/10/18 | 14,310 |
| 221 | Great Southern S/C | 1155 Washington Pike | Bridgeville | PA | 15017 | 06/01/77 | 22,461 |
| 224 | Pullman Square | 160 Pullman Sq | Butler | PA | 16001 | 10/23/93 | 16,905 |
| 683 | Tri-County Plaza | 360 Tri County Ln | Belle Vernon | PA | 15012 | 07/01/79 | 10,560 |
| 970 | Southland Four Seasons | 513 Clairton Blvd | Pittsburgh | PA | 15236 | 08/01/88 | 18,960 |
| 2045 | Ross Towne Center | 7375 Mcknight Road | Pittsburgh | PA | 15237 | 03/19/04 | 38,542 |
| 2050 | Cranberry Mall | 20111 Rt 19 | Cranberry Twp | PA | 16066 | 02/06/04 | 36,301 |
| 2051 | William Penn Hwy | 3700 William Penn Highway | Monroeville | PA | 15146 | 02/06/04 | 36,500 |
| 2053 | Robinson Town Centre | 1800 Park Manor Blvd Unit 5 | Pittsburgh | PA | 15205 | 03/19/04 | 40,684 |
| 2059 | Greengate Centre | 1600 Greengate Centre Blvd | Greensburg | PA | 15601 | 03/25/05 | 35,250 |
| 2447 | Pittsburgh Mills | 133 Pittsburgh Mills Circle | Tarentum | PA | 15084 | 03/06/15 | 21,903 |
| 2286 | Former Borders | 1075 Woodland Road | Reading | PA | 19610 | 04/13/12 | 25,023 |
| 507 | West Side Mall | 150 W Side Mall Ste 150 | Edwardsville | PA | 18704 | 07/07/02 | 24,000 |
| 2574 | Dickson City Crossing | 638 Commerce Blvd | Dickson City | PA | 18519 | 09/02/22 | 20,000 |
| 236 | Suburban Plaza | 505 Benner Pike | State College | PA | 16801 | 11/17/92 | 16,960 |
| 200 | TJ Maxx Plaza | 1746 E 3Rd St | Williamsport | PA | 17701 | 06/07/91 | 10,400 |
| 1103 | South York Crossing | 2136 S Queen St | York | PA | 17403 | 03/07/98 | 16,316 |
| 2262 | North Point Plaza | 1150 Carlisle Street Suite #3 | Hanover | PA | 17331 | 02/03/12 | 14,335 |
| 235 | Hermitage Towne Plaza | 2481 E State St | Hermitage | PA | 16148 | 10/17/91 | 13,960 |
| 2125 | Marketplace Center | 1500 Bald Hill Road  Ste A | Warwick | RI | 02886 | 09/08/06 | 35,000 |
| 2492 | Market Place Shopping Center | 123 Marketplace Drive | Anderson | SC | 29621 | 09/29/16 | 11,250 |
| 2328 | Ashley Crossing | 2243 Ashley Crossing Dr, Suite C | Charleston | SC | 29414 | 04/12/13 | 15,074 |
| 2351 | Main St Marketplace | 1215-B North Main Street | Summerville | SC | 29483 | 05/17/13 | 23,125 |
| 1126 | Fountain S/C | 1200 Charleston Hwy | West Columbia | SC | 29169 | 04/19/99 | 15,000 |
| 2172 | Northpointe Commons | 10050 Two Notch Rd Ste 13 | Columbia | SC | 29223 | 08/27/10 | 21,500 |
| 2201 | Florence Mall | 1945 West Palmetto Street #270 | Florence | SC | 29501 | 03/11/11 | 14,501 |
| 2314 | Cross Pointe Plaza | 840 Woods Crossing Road | Greenville | SC | 29607 | 07/26/13 | 18,000 |
| 2566 | Seaboard Commons | 1120 Seaboard St | Myrtle Beach | SC | 29577 | 07/29/22 | 32,500 |
| 2207 | Westgate Crossing | 660 Spartan Blvd. | Spartanburg | SC | 29301 | 06/24/11 | 25,000 |
| 2511 | University Mall | 930 22Nd Avenue S. | Brookings | SD | 57006 | 02/15/18 | 12,335 |
| 2475 | Haines Station Plaza | 2255 N Haines Avenue | Rapid City | SD | 57701 | 10/13/16 | 11,622 |

# Jo-Ann Stores
## Exhibit 1(a)(1)
### Store List

| Store No. | Store | Address | City | State | Zip Code | Open Date | Square Ft |
|---|---|---|---|---|---|---|---|
| 516 | Plaza 41 (Former Holz Haus) | 2725 West 41St Street | Sioux Falls | SD | 57105 | 10/05/12 | 21,110 |
| 2171 | Hamilton Village | 2020 Gunbarrel Road Suite 198 | Chattanooga | TN | 37421 | 10/01/10 | 24,200 |
| 2479 | Governors Square Plaza | 2831 Wilma Rudolph | Clarksville | TN | 37040 | 02/16/17 | 26,079 |
| 2194 | The Columns | 1185 Vann Dr | Jackson | TN | 38305 | 07/29/11 | 15,000 |
| 2494 | Johnson City Plaza | 108 Johnson City Plaza Dr | Johnson City | TN | 37601 | 02/16/17 | 8,000 |
| 2500 | Kingsport Shopping Center | 1409 East Stone Drive | Kingsport | TN | 37660 | 06/22/17 | 14,300 |
| 2313 | Harvest Park Shopping Center | 4627 Greenway Drive | Knoxville | TN | 37918 | 11/09/12 | 15,000 |
| 2563 | The Centre at Deane Hill | 276 Morrell Road | Knoxville | TN | 37919 | 08/12/22 | 40,000 |
| 2536 | Shops of Forest Hill | 3150 Village Shops Drive (Temp) | Germantown | TN | 38138 | 10/03/19 | 24,970 |
| 1893 | Towne Centre | 1923 Old Fort Pkwy | Murfreesboro | TN | 37129 | 08/27/10 | 20,010 |
| 1905 | Cool Springs Market | 2000 Mallory Ln Ste 270 | Franklin | TN | 37067 | 07/19/97 | 43,000 |
| 2135 | Providence Marketplace | 401 S Mount Juliet Rd Ste 640 | Mount Juliet | TN | 37122 | 07/27/06 | 35,384 |
| 2305 | Village Of Rivergate | 2088 Gallatin Pike North | Madison | TN | 37115 | 08/30/13 | 33,741 |
| 2170 | Governors Crossing | 208 Collier Dr | Sevierville | TN | 37862 | 08/27/10 | 12,000 |
| 2402 | Northgate Mall | 1600 Jackson St. Northgate Mall | Tullahoma | TN | 37388 | 05/16/14 | 15,000 |
| 2482 | Park Central Shopping Center | 3206 South Clack Drive | Abilene | TX | 79606 | 10/13/16 | 21,500 |
| 1001 | Shops At Soncy | 3220 S Soncy Rd | Amarillo | TX | 79124 | 09/25/01 | 30,000 |
| 2140 | Shops at Arbor Walk | 10515 N Mo Pac Expy Bldg 1 | Austin | TX | 78759 | 03/09/07 | 35,000 |
| 2155 | University Oaks | 201 University Oaks Blvd | Round Rock | TX | 78665 | 03/05/09 | 25,000 |
| 2571 | Southpark Meadows | 9500 S IH 35 Frontage Rd | Austin | TX | 78748 | 12/07/22 | 35,000 |
| 1102 | Dowlen Town Center | 4035 N Dowlen Road | Beaumont | TX | 77706 | 02/08/06 | 22,033 |
| 1268 | Tejas Center | 725 E Villa Maria Rd  Ste 4100 | Bryan | TX | 77802 | 03/02/78 | 15,140 |
| 1032 | Staples Crossing S/C | 5625 S Padre Island Dr # B | Corpus Christi | TX | 78412 | 02/23/01 | 26,700 |
| 1227 | East Mockingbird Lane | 6330 E Mockingbird Ln | Dallas | TX | 75214 | 07/01/76 | 17,959 |
| 1291 | Village At Collin Creek | 700 Alma Dr | Plano | TX | 75075 | 04/01/97 | 25,014 |
| 2027 | South Frisco Village | 2930 Preston Rd Ste 800 | Frisco | TX | 75034 | 04/25/03 | 35,000 |
| 2035 | William D Tate Ave | 1250 William D Tate Ave | Grapevine | TX | 76051 | 06/13/03 | 26,185 |
| 2036 | Preston Forest S C | 11700 Preston Rd #810 | Dallas | TX | 75230 | 07/18/03 | 48,686 |
| 2083 | Market Street Village | 1439 W Pipeline Rd | Hurst | TX | 76053 | 10/29/04 | 35,384 |
| 2106 | Ridgemar Town Square | 1400 Green Oaks Rd | Fort Worth | TX | 76116 | 07/01/05 | 36,805 |
| 2134 | Arlington Highlands S/C | 137 Merchants Row Ste 165 | Arlington | TX | 76018 | 10/20/06 | 35,000 |
| 2197 | The Plaza At Rockwall | 1049 E. I.H. 30 | Rockwall | TX | 75087 | 09/02/11 | 15,000 |
| 2212 | Rayzor Ranch | 2640 West University Dr | Denton | TX | 76201 | 05/17/13 | 21,890 |
| 2265 | Hulen Fashion Center | 5212 S Hulen Street | Fort Worth | TX | 76132 | 11/11/11 | 21,795 |
| 2296 | Towne Center | 2050 West University Dr Suite 250 | Mc Kinney | TX | 75070 | 07/26/12 | 20,331 |
| 2501 | Midlothian Towne Crossing | 2000 F.M. 663 St 500 | Midlothian | TX | 76065 | 10/26/17 | 15,000 |
| 2560 | Lakepointe Towne Crossing | 715 Hebron Parkway | Lewisville | TX | 75057 | 10/26/22 | 33,862 |
| 2575 | Marketplace at Towne Centre | 19105 Lyndon B Johnson Fwy | Mesquite | TX | 75150 | 11/14/22 | 23,755 |
| 2446 | Yarbrough Plaza | 10501 Gateway Blvd W Bld 9 | El Paso | TX | 79925 | 02/01/15 | 27,515 |
| 1402 | Copperfield Crossing | 15520 Fm 529 Rd | Houston | TX | 77095 | 01/07/96 | 14,500 |
| 1433 | Willowchase Center | 12918 Willow Chase Dr | Houston | TX | 77070 | 05/16/14 | 20,918 |
| 2152 | Baybrook Village | 1529 W Bay Area Blvd | Webster | TX | 77598 | 11/14/08 | 29,668 |
| 2206 | Colony Square | 16626 Southwest Freeway | Sugar Land | TX | 77479 | 03/11/11 | 27,134 |
| 2226 | Price Plaza | 1219 North Fry Road | Katy | TX | 77449 | 07/29/11 | 33,890 |
| 2292 | Woodlands Home Center | 25415 Interstate 45 Ste D | Spring | TX | 77380 | 04/13/12 | 34,450 |
| 2415 | Witte Plaza | 9960 Old Katy Rd | Houston | TX | 77055 | 04/11/14 | 25,000 |
| 2561 | Meyerland Plaza | 290 Meyerland Plaza | Houston | TX | 77096 | 07/28/22 | 33,733 |
| 2570 | Deerbrook Marketplace | 20424 US-59 | Humble | TX | 77338 | 05/19/23 | 39,581 |
| 1488 | Rockridge Plaza | 5217 82Nd St Unit 123 | Lubbock | TX | 79424 | 03/31/94 | 15,595 |
| 2464 | Pharr Town Center | 500 N. Jackson Rd | Pharr | TX | 78577 | 11/17/16 | 20,157 |
| 2325 | Chimney Rock | 6351 E. Hwy 191 | Odessa | TX | 79762 | 05/17/13 | 13,160 |
| 2157 | The Pavillions | 25 Ne Loop 410 Ste 114 | San Antonio | TX | 78216 | 10/10/08 | 33,735 |
| 2251 | Bandera Pointe | 11655 Bandera Road | San Antonio | TX | 78250 | 02/03/12 | 25,000 |
| 2387 | Interstate Plaza | 1671 Ih-35 South, Suite 208 | New Braunfels | TX | 78130 | 02/02/14 | 17,979 |
| 2485 | City Base Landing | 3142 Se Military Drive Suite 126 | San Antonio | TX | 78235 | 10/27/16 | 15,200 |
| 2308 | Sherman Commons | 4127 N Hwy 75 | Sherman | TX | 75090 | 07/26/12 | 20,451 |
| 2572 | The Village at Cumberland Park | 8950 S Broadway Ave | Tyler | TX | 75703 | 10/26/22 | 28,751 |
| 2445 | Central Texas Marketplace | 4633 S. Jack Kultgen Expy Unit 104 | Waco | TX | 76706 | 04/10/15 | 25,000 |
| 1752 | South Main Street | 190 S Main St | Logan | UT | 84321 | 12/01/91 | 20,839 |
| 2180 | Renaissance Square | 622 South Main Street | Cedar City | UT | 84720 | 10/15/10 | 19,424 |
| 2365 | Gardner Towne Center | 2089 West Hwy 40 | Vernal | UT | 84078 | 03/04/14 | 15,032 |
| 2107 | Family Center at Riverdale | 4978 South 1050 West | Riverdale | UT | 84405 | 11/04/05 | 35,347 |
| 2295 | Centerville Marketplace | 302 North Marketplace Dr | Centerville | UT | 84014 | 04/13/12 | 23,815 |
| 2334 | Clinton Towne Center | 1803 West 1800 North Suite G1 | Clinton | UT | 84015 | 07/26/12 | 23,985 |
| 1756 | The Family Center At Orem | 172 E University Pkwy | Orem | UT | 84058 | 11/16/01 | 27,873 |
| 2331 | American Fork Shopping Center | 640 East State Road | American Fork | UT | 84003 | 07/26/12 | 25,436 |
| 2379 | Northgate Shopping Center | 1082 N Main Street | Spanish Fork | UT | 84660 | 03/06/15 | 21,931 |
| 2074 | The Crossroads of Taylorsville | 5790 S Redwood Rd | Taylorsville | UT | 84123 | 08/06/04 | 40,057 |
| 2121 | Draper Retail Center | 268 E 12300 S | Draper | UT | 84020 | 04/29/06 | 35,000 |
| 2213 | Freestanding (Former Albertsons) | 852 N Main St | Tooele | UT | 84074 | 05/20/11 | 15,000 |
| 2528 | Former Dan's Market | 2330 E. 3000 South (Temp) | Salt Lake City | UT | 84109 | 06/27/19 | 23,445 |
| 2329 | Cotton Mill Shopping Center | 720 W. Telegraph | Washington | UT | 84780 | 07/26/12 | 23,500 |

# Jo-Ann Stores
## Exhibit 1(a)(1)
## Store List

| Store No. | Store | Address | City | State | Zip Code | Open Date | Square Ft |
|---|---|---|---|---|---|---|---|
| 2505 | New River Valley Center | 145 Shoppers Way | Christiansburg | VA | 24073 | 06/21/18 | 20,525 |
| 2255 | Rio Hill SC | 1774 Rio Hill Center | Charlottesville | VA | 22901 | 04/12/12 | 21,080 |
| 2309 | River Ridge Mall | 3405 Candlers Mountain Rd | Lynchburg | VA | 24502 | 11/09/12 | 14,174 |
| 2454 | Village of Martinsville | 240 Commonwealth Blvd W | Martinsville | VA | 24112 | 10/02/15 | 14,957 |
| 2506 | Dominion Square | 705 Dominion Square S/C | Culpeper | VA | 22701 | 10/05/17 | 12,000 |
| 2141 | Westchester Commons | 125 Perimeter Dr | Midlothian | VA | 23113 | 02/27/09 | 35,194 |
| 2222 | Merchant's Walk | 7504 West Broad | Richmond | VA | 23294 | 03/09/12 | 18,419 |
| 2185 | Tower Shopping Center | 2043 Colonial Ave | Roanoke | VA | 24015 | 04/15/11 | 22,832 |
| 1094 | DW Center | 14346 Warwick Blvd Ste 480 | Newport News | VA | 23602 | 10/19/90 | 15,300 |
| 1270 | Riverdale Plaza | 1076 W Mercury Blvd | Hampton | VA | 23666 | 05/12/99 | 14,000 |
| 2209 | Newtown Shops on Main | 5103 Main St. | Williamsburg | VA | 23188 | 04/15/11 | 15,334 |
| 2507 | Crossways Shopping Center | 1593 Crossways Blvd | Chesapeake | VA | 23320 | 10/05/17 | 19,867 |
| 2520 | Hilltop Plaza | 551 Hiltop Plaza | Virginia Beach | VA | 23454 | 06/21/18 | 24,140 |
| 102 | Seven Corners Center | 6320 Seven Corners Ctr | Falls Church | VA | 22044 | 10/10/60 | 13,824 |
| 820 | Warrenton Center | 251 W Lee Hwy Ste 659 | Warrenton | VA | 20186 | 11/01/91 | 12,000 |
| 1875 | Fairfax Towne Center | 12124 Fairfax Towne Center | Fairfax | VA | 22033 | 04/27/10 | 23,000 |
| 2158 | Prince William Square | 14350 Smoke Town Rd | Woodbridge | VA | 22192 | 02/06/09 | 23,890 |
| 2159 | Cosner's Corner | 9685 Jefferson Davis Hwy | Fredericksburg | VA | 22407 | 02/06/09 | 25,331 |
| 2550 | Sugarland Crossing | 47100 Community Plaza | Sterling | VA | 20164 | 08/06/21 | 35,000 |
| 511 | Millwood Pike | 1092 Millwood Pike | Winchester | VA | 22602 | 06/01/75 | 13,440 |
| 526 | Commerce Square | 45 Hinesburg Rd | South Burlington | VT | 05403 | 12/07/91 | 19,560 |
| 289 | Green Mountain S/C | 308 Us Route 7 S | Rutland Town | VT | 05701 | 08/04/92 | 16,800 |
| 2340 | Central Vermont Shopping Cente | 1400 Us Route 302, Suite 10 | Barre | VT | 05641 | 02/03/13 | 12,000 |
| 1725 | Sunset Square | 1125 E Sunset Dr Ste 125 | Bellingham | WA | 98226 | 09/05/03 | 28,000 |
| 794 | High Point S/C | 1029 Bethel Ave | Port Orchard | WA | 98366 | 09/01/94 | 12,648 |
| 2007 | Silverdale Plaza | 2886 Nw Bucklin Hill Rd | Silverdale | WA | 98383 | 07/16/01 | 29,903 |
| 2577 | Columbia Center | 1321 N Columbia Center Blvd Suite 456 | Kennewick | WA | 99336 | 07/07/23 | 29,378 |
| 810 | Gateway Square | 470 Bridge St | Clarkston | WA | 99403 | 01/12/93 | 17,089 |
| 1867 | Twin City SC | 700 Ocean Beach Hwy Ste 100 | Longview | WA | 98632 | 05/05/09 | 19,457 |
| 2199 | Mount Vernon Plaza | 510 East College Way | Mount Vernon | WA | 98273 | 05/20/11 | 24,450 |
| 802 | Port Angeles Plaza | 150 Port Angeles Plz | Port Angeles | WA | 98362 | 10/26/70 | 14,300 |
| 1687 | North Wilber Avenue | 481 N Wilbur Ave | Walla Walla | WA | 99362 | 06/01/88 | 15,000 |
| 2443 | Town Center | 1020 Stratford Road | Moses Lake | WA | 98837 | 10/03/14 | 16,600 |
| 2038 | Target Place Plaza | 2725 Harrison Ave Nw Ste 500 | Olympia | WA | 98502 | 11/21/03 | 38,187 |
| 2102 | Orchards Market Center | 11505 Ne Fourth Plain Blvd Ste 86 | Vancouver | WA | 98662 | 05/13/05 | 35,546 |
| 2394 | Totem Pole | 7907 Ne Highway 99 | Vancouver | WA | 98665 | 02/02/14 | 16,998 |
| 354 | Kent Hill Plaza | 25810 104Th Ave Se | Kent | WA | 98030 | 05/01/84 | 18,067 |
| 789 | Cascade Plaza | 7601 Evergreen Way | Everett | WA | 98203 | 03/01/78 | 19,284 |
| 793 | Northeast Sunset Blvd. | 2823 Ne Sunset Blvd | Renton | WA | 98056 | 07/01/81 | 15,804 |
| 805 | Aurora Ave North | 15236 Aurora Ave N | Shoreline | WA | 98133 | 06/29/77 | 22,880 |
| 1711 | Nw 57Th Street | 2217 Nw 57Th St | Seattle | WA | 98107 | 06/01/85 | 14,000 |
| 1944 | Pavilions Centre | 31523 Pacific Hwy S | Federal Way | WA | 98003 | 09/16/99 | 43,506 |
| 1950 | Southcenter Parkway | 17501 Southcenter Pkwy | Tukwila | WA | 98188 | 05/26/00 | 43,056 |
| 2044 | Meridian Town Center | 13410 Meridian East Ste A | Puyallup | WA | 98373 | 08/06/04 | 35,023 |
| 2067 | Cross Roads S/C | 15600 Ne 8Th Street  Ste H1 | Bellevue | WA | 98008 | 08/06/04 | 35,090 |
| 2081 | Lynnwood Center | 5824 196Th Street Sw | Lynnwood | WA | 98036 | 09/17/04 | 42,538 |
| 2093 | Boulevard Centre | 4104 Tacoma Mall Blvd | Tacoma | WA | 98409 | 09/17/04 | 42,584 |
| 2173 | Gateway Shopping Center | 3704 172Nd St Ne Ste F | Arlington | WA | 98223 | 11/05/10 | 22,864 |
| 784 | Five Mile S/C | 1840 W Francis Ave | Spokane | WA | 99205 | 12/01/79 | 28,000 |
| 1701 | East 29Th Avenue | 2801 E 29Th Ave | Spokane | WA | 99223 | 12/18/90 | 21,647 |
| 1872 | Market Pointe I | 15110 E. Indiana Ave | Spokane Valley | WA | 99216 | 02/05/10 | 23,452 |
| 1700 | Valley Mall Parkway | 300 Valley Mall Pkwy | East Wenatchee | WA | 98802 | 02/01/83 | 12,000 |
| 783 | Tieton Village S/C | 3702 Tieton Dr | Yakima | WA | 98902 | 06/23/69 | 22,500 |
| 2149 | Fox River Valley SC | 720 N Casaloma Drive | Appleton | WI | 54913 | 08/15/08 | 24,962 |
| 1866 | Oak Pointe Plaza | 4045 Commonwealth Ave | Eau Claire | WI | 54701 | 03/05/09 | 23,028 |
| 2187 | Forest Plaza | 806 West Johnson Street | Fond Du Lac | WI | 54935 | 02/04/11 | 17,570 |
| 2099 | Bayside Market Place | 2777 S. Oneida Street | Green Bay | WI | 54304 | 03/25/05 | 37,777 |
| 2510 | Marketplace at Janesville | 2700 N. Pontiac Dr Ste 150 | Janesville | WI | 53545 | 03/29/18 | 18,774 |
| 2478 | Crossing Meadows Plaza | 1220 Crossing Meadows | Onalaska | WI | 54650 | 10/13/16 | 17,885 |
| 319 | East Town Plaza | 2021 Zeier Rd | Madison | WI | 53704 | 10/01/99 | 20,000 |
| 2086 | Westland Plaza | 6741 Odana Road | Madison | WI | 53719 | 10/29/04 | 35,000 |
| 2236 | Market Place SC | 121 Commerce Street, Suite 1 | Wisconsin Dells | WI | 53965 | 11/10/11 | 15,000 |
| 324 | Silver Nail S/C | 2020 Silvernail Rd | Pewaukee | WI | 53072 | 11/13/91 | 10,462 |
| 862 | Packard Plaza | 5656 S Packard Ave | Cudahy | WI | 53110 | 01/29/93 | 14,310 |
| 2046 | Greenfield Fashion Center | 4950 South 74Th St | Greenfield | WI | 53220 | 02/06/04 | 37,420 |
| 2079 | Brookfield Fashion Center | 16800 W Bluemound Road | Brookfield | WI | 53005 | 08/06/04 | 31,901 |
| 2347 | North Pointe Centre | N78 W14531 Appleton Ave | Menomonee Falls | WI | 53051 | 05/17/13 | 18,166 |
| 728 | Rivers Edge Mall | 401 Bernard St | Watertown | WI | 53094 | 02/01/92 | 11,300 |
| 2215 | Crossroads Commons | 1150 Meridian Drive | Plover | WI | 54467 | 03/09/12 | 15,000 |
| 2322 | Geneva Commons | 600 N. Edwards Blvd | Lake Geneva | WI | 53147 | 11/08/13 | 15,000 |
| 2327 | Heritage Village | 1645 North Spring St. | Beaver Dam | WI | 53916 | 02/03/13 | 14,900 |
| 2487 | Marshfield Center | 1919 N Central Avenue | Marshfield | WI | 54449 | 09/29/16 | 12,325 |

# Jo-Ann Stores

## Exhibit 1(a)(1)
## Store List

| Store No. | Store | Address | City | State | Zip Code | Open Date | Square Ft |
|---|---|---|---|---|---|---|---|
| 2517 | Pine Tree Mall | 2402 Roosevelt Road | Marinette | WI | 54143 | 08/02/18 | 15,166 |
| 2348 | Koeller Plaza | 1226 Koeller St | Oshkosh | WI | 54902 | 04/12/13 | 18,000 |
| 2468 | Regency Mall | 2629 S. Green Bay Road | Racine | WI | 53406 | 09/01/16 | 23,371 |
| 2280 | Deer Trace Shopping Center | 4079 Highway 28 | Sheboygan Falls | WI | 53085 | 07/26/12 | 20,388 |
| 1585 | Rib Mountain Drive | 3300 Rib Mountain Dr | Wausau | WI | 54401 | 07/18/03 | 23,000 |
| 569 | Fletcher Square | 9 Fletcher Sq | Dunbar | WV | 25064 | 10/07/95 | 17,211 |
| 2450 | Raleigh Mall | 4293 Robert C. Byrd Drive | Beckley | WV | 25801 | 03/10/16 | 21,000 |
| 363 | Memorial Bridge Plaza | 2311 Ohio Ave Unit C | Parkersburg | WV | 26101 | 06/08/96 | 14,000 |
| 2223 | Frontier Mall | 1400 Del Range Blvd | Cheyenne | WY | 82009 | 09/02/11 | 14,458 |
| 2366 | White Mountain Mall | 2441 Foothill Blvd, Suite 5 | Rock Springs | WY | 82901 | 05/17/13 | 15,716 |

**802**    **Total Stores**

**Exhibit 1(a)(2)**

## **Distribution Centers**

# Jo-Ann Stores

## Exhibit 1(a)(2)
## Distribution Center

| Distribution Center | Address | City | State | Zip Code | Open Date | Square Ft |
|---|---|---|---|---|---|---|
| Visalia DC | 2500 N Plaza Dr | Visalia | CA | 93291 | 10/19/2006 | 635,281 |
| Visalia DC #2 | 7530 W. Sunnyview Ave | Visalia | CA | 93291 | 6/1/2021 | 104,870 |
| Opelika DC | 3101 Anderson Rd | Opelika | AL | 36801 | 6/7/2021 | 702,623 |
| West Jefferson | 1020 Enterprise Pkwy | West Jefferson | OH | 43162 | 2/1/2021 | 832,600 |
| Hudson | 5555 Darrow Road | Hudson | OH | 44236 | 9/20/2023 | 1,453,419 |

**Exhibit 2(b)(iv)**

**<u>Form of Asset Designation Notice</u>**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| JOANN INC., *et al.*,[1] | ) | Case No. 25-[_____] (___) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## NOTICE OF DESIGNATION OF DESIGNATED ASSET

**PLEASE TAKE NOTICE** that, Gordon Brothers Retail Partners, LLC ("Agent"),[2] and JOANN INC. and its debtors affiliates (collectively, the "Debtors"), are parties to that certain Agency Agreement dated as January 15, 2025 (the "Agency Agreement"), pursuant to which Agent agreed to act as the Debtors' Agent as set forth in the Agency Agreement.

**PLEASE TAKE FURTHER NOTICE** that, on February [●], 2025, the Bankruptcy Court entered an order (the "Approval Order") [Docket No. ●], approving the Agency Agreement, including with respect to Agent's designation rights thereunder.

**PLEASE TAKE FURTHER NOTICE** that, on February [●], 2025, the Closing under the Agency Agreement occurred.

**PLEASE TAKE FURTHER NOTICE** that, in accordance with Section 15 of the Agency Agreement, Agent desires to (a) designate the assets identified in **Exhibit A** hereto and incorporated herein (collectively, the "Designated Assets") as a "Designated Asset", and (b) designate [●] as the Designee with respect to the sale, license, transfer, or other conveyance of such Designated Assets.

## DESIGNATION OF DESIGNATED ASSETS

1.      In accordance with Section 15 of the Agency Agreement, Agent hereby (a) designates the Designated Assets as a "Designated Asset", and (b) designates [●] as the Designee with respect to the sale, license, transfer, or other conveyance of such Designated Assets, effective as of February [●], 2025.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: JOANN Inc. (5540); Needle Holdings LLC (3814); Jo-Ann Stores, LLC (0629); Creative Tech Solutions LLC (6734); Creativebug, LLC (3208); WeaveUp, Inc. (5633); JAS Aviation, LLC (9570); joann.com, LLC (1594); JOANN Ditto Holdings Inc. (9652); Dittopatterns LLC (0452); JOANN Holdings 1, LLC (9030); JOANN Holdings 2, LLC (6408); and Jo-Ann Stores Support Center, Inc. (5027). The Debtors' mailing address is 5555 Darrow Road, Hudson, Ohio 44236.

[2] All capitalized undefined terms used in this Notice shall have the same meaning as in the Agency Agreement.

IN WITNESS WHEREOF, this Notice of Designation has been signed by as of the date hereof.

Dated: February [●], 2025
      New York, New York

Respectfully submitted,

**KATTEN MUCHIN ROSENMAN LLP**

By: */s/*_____
    Steven J. Reisman
    Cindi M. Giglio
    50 Rockefeller Plaza
    New York, NY 10020-1605
    Tel: (212) 940-3828
    Email: sreisman@katten.com
        cgiglio@katten.com

*Attorneys for Gordon Brothers Retail Partners, LLC*

**EXHIBIT A**

**DESIGNATED ASSETS**

**Exhibit 3.1(b)**

**<u>Wind-Down Budget</u>**

# Jo-Ann Stores
## Exhibit 3.1(b)
## Wind-Down Budget

| | | |
|---|---|---:|
| Debtor/UCC Professional Fees Escrow Funding | $ | 24,707,111 |
| ABL/FILO/TL Professional Fees | $ | 3,111,000 |
| Stub Rent | $ | 9,010,687 |
| 503(b)(9) Claims | $ | 30,000,000 |
| U.S. Trustee Fee | $ | 500,000 |
| **Total** | **$** | **67,328,798** |

**Exhibit 3.1(c)**

**<u>Central Services Budget</u>**

**Jo Ann Stores**
**Exhibit 3.1(c)**
**Central Service Budget**

| | 2/22/25 | 3/1/25 | 3/8/25 | 3/15/25 | 3/22/25 | 3/29/25 | 4/5/25 | 4/12/25 | 4/19/25 | 4/26/25 | 5/3/25 | 5/10/25 | 5/17/25 | 5/24/25 | 5/31/25 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Corporate Labor | - | 1.61 | - | 1.61 | - | 1.61 | - | 0.12 | - | 0.12 | - | 0.12 | - | 0.12 | - | 5.29 |
| Corporate Opex | 0.91 | 0.74 | 0.74 | 0.74 | 0.74 | 0.74 | 0.58 | 0.58 | 0.58 | 0.58 | 0.38 | 0.38 | 0.38 | 0.38 | 0.38 | 8.81 |
| Corporate Non-Opex | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Operating Expenses - Corporate** | **0.91** | **2.35** | **0.74** | **2.35** | **0.74** | **2.35** | **0.58** | **0.70** | **0.58** | **0.70** | **0.38** | **0.49** | **0.38** | **0.49** | **0.38** | **14.10** |

Corporate Labor includes:
Store Operations
Field Leadership
Finance
Merchandising
Inventory Management
Supply Chain
Legal
IT
Marketing
CEO Group
Asset Protection & Security
Human Resources
Product Development & Sourcing

**Exhibit 8.1**

**<u>Sale Guidelines</u>**

## **Exhibit 8.1**

### **Sale Guidelines**

1.      The GOB Sales will be conducted during normal business hours or such hours as otherwise permitted by the applicable Lease for each Store.

2.      The GOB Sales will be conducted in accordance with applicable state and local "Blue Laws," and thus, where such a law is applicable, no GOB Sale will be conducted on Sunday unless Merchant was operating such stores on Sundays before the Sale Commencement Date.

3.      On "shopping center" property, neither Merchant nor Agent shall distribute handbills, leaflets, or other written materials to customers outside of any Stores' premises, unless permitted by the applicable lease or if distribution is customary in the "shopping center" in which such Store is located; *provided* that Merchant and Agent may solicit customers in the Stores themselves.  On "shopping center" property, neither Merchant nor Agent shall use any flashing lights or amplified sound to advertise the GOB Sale or solicit customers, except as permitted under the applicable Lease or agreed in writing by the landlord.

4.      At the conclusion of the GOB Sale, Agent shall vacate the Stores in broom clean condition; *provided* that the Agent may leave in place and without further responsibility or liability of any kind any furniture, fixtures, and equipment (including, but not limited to, machinery, rolling stock, office equipment and personal property, and conveyor systems and racking) (collectively, "FF&E") not sold in the GOB Sale at the conclusion of the GOB Sale, without cost or liability of any kind to Agent.  For the avoidance of doubt, as of the conclusion of the GOB Sale or the Vacate Date, as applicable, the Agent may leave in place and without further responsibility or liability of any kind, any FF&E.

5.      Merchant and Agent shall have the right to use and sell the FF&E.  Merchant and Agent may advertise the sale of the FF&E in a manner consistent with these Sale Guidelines. The purchasers of any FF&E sold during the GOB Sale shall be permitted to remove the FF&E either through the back or alternative shipping areas at any time, or through other areas after Store business hours; *provided*, *however*, that the foregoing shall not apply to *de minimis* FF&E sales made whereby the item can be carried out of the Store in a shopping bag.

6.      Merchant and Agent may, but are not required to, advertise all of the GOB Sales as "going out of business," "store closing," "sale on everything," "everything must go," or similarly themed sales.  Merchant and Agent may also have a "countdown to closing" sign prominently displayed in a manner consistent with these Sale Guidelines.

7.      Agent shall be entitled to include Additional Agent Merchandise (as defined in the Agency Agreement) in the GOB Sale in accordance with the terms of the Agency Agreement.

8.      Merchant and Agent shall be permitted to utilize sign walkers, display, hanging signs, and interior banners in connection with the GOB Sale; *provided* that such sign walkers, display, hanging signs, and interior banners shall be professionally produced and hung in a professional manner.   Neither Merchant nor Agent shall use neon or "day-glo" on its sign walkers, display, hanging signs, or interior banners if prohibited by the applicable lease or applicable law.  Furthermore, with respect to enclosed mall locations, no exterior signs or signs in common areas of a mall shall be used unless otherwise expressly permitted in these Sale Guidelines.  In addition, Merchant and Agent shall be permitted to utilize exterior banners at (a) non-enclosed mall Stores and (b) enclosed mall Stores to the extent the entrance to the applicable Store does not require entry into the enclosed mall common area; *provided*, *however*, that such banners shall be located or hung so as to make clear that the GOB Sale is being conducted only at the affected Store, and shall not be wider than the storefront of the Store.   In addition, Merchant and Agent shall be permitted to utilize sign walkers in a safe and professional manner.  Merchant and Agent shall also be permitted to use 4'x40' exterior banners, A-frames, feather flags, and banners listing "building for sale" with contact information.  Nothing contained in these Sale Guidelines shall be construed to create or impose upon Merchant or Agent any additional restrictions not contained in the applicable lease agreement.

9.      Neither Merchant nor Agent shall make any alterations to the storefront, roof, or exterior walls of any Stores or shopping centers, or to interior or exterior store lighting, except with respect to the hanging of exterior banners or as authorized by the applicable Lease.  The hanging of exterior banners or in-store signage shall not constitute an alteration to a Store.

10.     Affected landlords will have the ability to negotiate with Agent, any particular modifications to the Sale Guidelines pursuant to side letter agreements.  Agent and the landlord of any Store are authorized to enter into side letters without further order of the Court; *provided* that such agreements do not have a material adverse effect on Merchant or its estate.

11.     Conspicuous signs will be posted in each of the affected stores to the effect that all sales are "final."

12.     Merchant will keep store premises and surrounding areas clear and orderly, consistent with past practices.

13.     An unexpired non-residential real property lease will not be deemed rejected by reason of a GOB Sale or the adoption of these Sale Guidelines.

14.     The rights of landlords against Merchant for any damages to a Store shall be reserved in accordance with the provisions of the applicable Lease; *provided* that (a) closed Stores shall be surrendered in as-is condition and (b) to the extent certain Leases of closed Stores require written confirmation of receipt of a key to effectuate surrender, this requirement is waived.

15. If and to the extent that the landlord of any Store contends that Merchant or Agent is in breach of or default under these Sale Guidelines, such landlord shall provide at least five days' written notice, served by email or overnight delivery, on:

**If to Merchant:**

JOANN Inc.
5555 Darrow Rd.
Hudson, Ohio 44236
Attn:   Ann Aber
Email: ann.aber@joann.com

*With copies (which shall not constitute notice) to*:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attn:   Joshua A. Sussberg, P.C. and Aparna Yenamandra, P.C.
Email: joshua.sussberg@kirkland.com;
aparna.yenamandra@kirkland.com

-and-

Kirkland & Ellis LLP
333 West Wolf Point Plaza
Chicago, Illinois 60654
Attn:   Anup Sathy, P.C.; Jeffrey Michalik; and Lindsey Blumenthal
Email: anup.sathy@kirkland.com; jeff.michalik@kirkland.com; and
lindsey.blumenthal@kirkland.com

**If to Agent:**

GORDON BROTHERS RETAIL PARTNERS, LLC
101 Huntington Street, 11th Floor
Boston, Massachusetts 02199
Attn: Rick Edwards; Joseph Malfitano; and David Braun
Email: redwards@gordonbrothers.com;
jmalfitano@gordonbrothers.com; and dbraun@gordonbrothers.com

*With copies (which shall not constitute notice) to:*

Katten Muchin Rosenman LLP
50 Rockefeller Plaza
New York, New York 10020
Attn: Steven J. Reisman and Cindi M. Giglio

Email: sreisman@katten.com; cgiglio@katten.com

16.     If the parties are unable to resolve the dispute, either the landlord or Merchant shall have the right to schedule an emergency hearing before the Bankruptcy Court on no less than three business days' notice, unless the parties agree to a hearing on shorter notice, subject to the Bankruptcy Court's availability.

**Exhibit 11.2(m)**

**<u>Promotional Calendar</u>**


TO COME

## Exhibit 3

**Sale Notice**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| JOANN INC., *et al.*,[1] | ) | Case No. 25-10068 (CTG) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## NOTICE OF AUCTION FOR THE SALE OF THE DEBTORS' ASSETS

**PLEASE TAKE NOTICE OF THE FOLLOWING**:

On [●], 2025, the United States Bankruptcy Court for the District of Delaware (the "Court") entered the *Order (I) Approving Bidding Procedures, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Stalking Horse Agreement, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts and Leases, (VII) Approving the Sale of Assets, and (VIII) Granting Related Relief* [Docket No. [●]] (the "Order"),[2] authorizing the above-captioned debtors and debtors in possession (collectively, the "Debtors") to market and conduct an auction (the "Auction") to sell the Assets free and clear of liens, claims, encumbrances, and other interests (except as may be set forth in the Definitive Sale Documents), with all such liens, claims, encumbrances, and other interests attaching with the same validity and priority to the applicable sale proceeds. The Auction (if any) will be governed by the bidding procedures approved pursuant to the Order and attached to the Order as Exhibit 1 thereto (the "Bidding Procedures").

Copies of the Order, the Bidding Procedures, the Stalking Horse Agreement, and other documents related thereto, are available upon visiting the Debtors' restructuring website at https://cases.ra.kroll.com/Joann2025 (the "Case Webpage"). Any changes to the location, date and time of the Auction shall be posted on the Case Webpage.

**Any person or entity who wishes to participate in the Auction must comply with the participation requirements, bid requirements, and other requirements set forth in the Bidding Procedures. The Bid Deadline is February 18, 2025, at 5:00 p.m. (prevailing Eastern Time).**

The Debtors intend to conduct the Auction (if required) at which they will consider Qualified Bids (as defined in the Bidding Procedures) submitted to the Debtors and their advisors, by and pursuant to the Bidding Procedures and as set forth in the Order. The Debtors intend to commence the Auction (if applicable) on **February 21, 2025, at 10:00 a.m. (prevailing Eastern Time)**, either in-person or by

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: JOANN Inc. (5540); Needle Holdings LLC (3814); Jo-Ann Stores, LLC (0629); Creative Tech Solutions LLC (6734); Creativebug, LLC (3208); WeaveUp, Inc. (5633); JAS Aviation, LLC (9570); joann.com, LLC (1594); JOANN Ditto Holdings Inc. (9652); Dittopatterns LLC (0452); JOANN Holdings 1, LLC (9030); JOANN Holdings 2, LLC (6408); and Jo-Ann Stores Support Center, Inc. (5027). The Debtors' mailing address is 5555 Darrow Road, Hudson, Ohio 44236.

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Order or the Bidding Procedures, as applicable.

videoconference or such other form of remote communication established by the Debtors (to be communicated to Qualified Bidders in advance). By the earlier of five (5) hours after the Auction (if any) is completed or 12:00 p.m. (prevailing Eastern Time) the calendar day after the Auction is completed, the Debtors shall file with the Court the Notice of Winning Bidder. All creditors in these chapter 11 cases shall be entitled to attend the Auction.

The Debtors reserve the right to modify the Bidding Procedures in accordance with the Bidding Procedures and the Order.

All requests directed to the Debtors in connection with the foregoing, or for further information regarding the Bidding Procedures and participation therein, or for further information regarding the Assets, must be directed to: Centerview Partners, LLC, the Debtors' proposed investment banker, at Ryan Kielty (rkielty@centerview.com), Karn Chopra (kchopra@centerview.com), Daniel Bendetson (dbendetson@centerview.com). All Potential Bidders are instructed to review the Bidding Procedures in consultation with counsel.

Objections to the proposed order approving any Winning Bid(s) (and/or designation of a Back-Up Bid(s), as applicable) (the "Sale Order," and such objections, "Sale Objections") must be made on or before: **February 20, 2025, at 5:00 p.m. (prevailing Eastern Time)** to the Stalking Horse Bid if there is no Auction, or **February 25, 2025, at 5:00 p.m. (prevailing Eastern Time)** (the "Sale Objection Deadline") if there is an Auction. All Sale Objections must: (a) be in writing; (b) conform to the applicable provisions of the Bankruptcy Rules and the Local Rules; (c) state with particularity the legal and factual basis for the Sale Objection and the specific grounds therefor; and (d) be filed with the Court and served so as to be ***actually received*** by the following parties (the "Notice Parties") no later than the Sale Objection Deadline: (a) the Debtors, JOANN Inc., 5555 Darrow Road, Hudson, Ohio 44236, Attn.: Ann Aber, EVP, Chief Legal and Human Resources Officer; (b) proposed co-counsel to the Debtors, (i) Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn.: Aparna Yenamandra, P.C. (aparna.yenamandra@kirkland.com) and 333 West Wolf Point Plaza, Chicago Illinois 60654, Attn.: Jeffrey Michalik (jeff.michalik@kirkland.com), and Lindsey Blumenthal (lindsey.blumenthal@kirkland.com) and (ii) Cole Schotz P.C., 500 Delaware Avenue, Suite 1410, Wilmington, Delaware 19801, Attn.: Patrick J. Reilley (preilley@coleschotz.com), Stacy L. Newman (snewman@coleschotz.com), Michael E. Fitzpatrick (mfitzpatrick@coleschotz.com), and Jack M. Dougherty (jdougherty@coleschotz.com); (c) the United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn.: Malcolm M. Bates (malcolm.m.bates@usdoj.gov); (d) counsel to the Prepetition ABL Agent, Morgan, Lewis & Bockius LLP, One Federal Street, Boston, Massachusetts 02110, Attn.: Christopher Carter (christopher.carter@morganlewis.com) and Marjorie Crider (marjorie.crider@morganlewis.com); (e) counsel to the Prepetition FILO Agent, Choate Hall & Stewart LLP, 2 International Place, Boston, Massachusetts 02110, Attn.: John Ventola (jventola@choate.com) and Jonathan Marshall (jmarshall@choate.com); (f) counsel to the Prepetition Term Loan Lender Ad Hoc Group, (i) Gibson, Dunn & Crutcher LLP, 200 Park Avenue New York, New York 10166, Attn.: Scott Greenberg (SGreenberg@gibsondunn.com), Josh Brody (JBrody@gibsondunn.com), and Kevin Liang (KLiang@gibsondunn.com), (ii) Glenn Agre Bergman & Fuentes LLP, 1185 Avenue of the Americas, 22nd Floor, New York, New York 10035, Attn: Andrew Glenn (aglenn@glennagre.com), Kurt Mayr (kmayr@glennagre.com), Agustina Berro (aberro@glennagre.com), Malak Doss (mdoss@glennagre.com), and Esther Hong (ehong@glennagre.com), and (iii) Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, 16th Floor, Wilmington, Delaware 19801, Attn: Donna Culver (dculver@morrisnichols.com), Robert Dehney (rdehney@morrisnichols.com), Matthew Harvey (mharvey@morrisnichols.com), and Brenna Dolphin (bdolphin@morrisnichols.com); (g) counsel to the Prepetition Term Loan Agent, ArentFox Schiff LLP, 1301 Avenue of the Americas, 42nd Floor, New York, New York 10019, Attn.: Jeffrey Gleit (jeffrey.gleit@afslaw.com) and 1717 K Street NW, Washington, D.C. 20006, Attn.: Jonathan Bagg (jonathan.bagg@afslaw.com), and 233 South Wacker Drive, Suite 7100, Chicago, Illinois 60606, Attn.: Matthew Bentley (matthew.bentley@afslaw.com); and (h) proposed counsel to the Official Committee of Unsecured Creditors, (i) Kelley Drye & Warren LLP, 3 World Trade Center, New York, New York 10007, Attn: Jason R. Adams (jadams@kelleydrye.com); Eric R. Wilson (ewilson@kelleydrye.com); and Maeghan J. McLoughlin (mmcloughlin@kelleydrye.com); and (ii) Pachulski Stang Ziehl & Jones LLP, 919 N. Market Street, Suite 1700, Wilmington, Delaware 19801, Attn: Brad Sandler (bsanlder@pszjlaw.com) and James O'Neill (joneill@pszjlaw.com).

**<u>Exhibit 4(A)</u>**

**Notice of Winning Bidder (if no Auction)**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| JOANN INC., *et al.*,[1] | ) | Case No. 25-10068 (CTG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## NOTICE OF WINNING BIDDER FOR CERTAIN OF THE DEBTORS' ASSETS

**PLEASE TAKE NOTICE OF THE FOLLOWING**:

On [●], 2025, the United States Bankruptcy Court for the District of Delaware (the "Court") entered the *Order (I) Approving Bidding Procedures, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Stalking Horse Agreement, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts and Leases, (VII) Approving the Sale of Assets, and (VIII) Granting Related Relief*] [Docket No. [●]] (the "Order"),[2] by which the Court approved procedures setting forth the process by which the Debtors are authorized to conduct a marketing and auction process for the sale or sales (the "Sale Transactions") of the Debtors' assets (the "Assets").

The Debtors select the following Winning Bidder:

| Assets | Winning Bidder | Back-Up Bidder | Key Terms of Proposed Sale |
|---|---|---|---|
| [●] | | | |

The Sale Hearing to consider approval of the sale of the Assets to the Winning Bidder(s) will be held before the Honorable Craig T. Goldblatt, at the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 3rd Floor, Courtroom #7, Wilmington, Delaware 19801, on **February 21, 2025, at 9:30 a.m. (prevailing Eastern Time)**.

At the Sale Hearing, the Debtors will seek the Court's approval of the Winning Bid(s) for the applicable Assets. Unless the Court orders otherwise, the Sale Hearing shall be an evidentiary hearing on

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: JOANN Inc. (5540); Needle Holdings LLC (3814); Jo-Ann Stores, LLC (0629); Creative Tech Solutions LLC (6734); Creativebug, LLC (3208); WeaveUp, Inc. (5633); JAS Aviation, LLC (9570); joann.com, LLC (1594); JOANN Ditto Holdings Inc. (9652); Dittopatterns LLC (0452); JOANN Holdings 1, LLC (9030); JOANN Holdings 2, LLC (6408); and Jo-Ann Stores Support Center, Inc. (5027). The Debtors' mailing address is 5555 Darrow Road, Hudson, Ohio 44236.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Order, the Motion, or the Bidding Procedures, as applicable.

matters relating to the sale(s) for the applicable Assets, and there will be no further bidding at the Sale Hearing.

This notice is subject to the terms and conditions of the Motion and the Order, with such Order controlling in the event of any conflict, and the Debtors encourage parties in interest to review such documents, including the Bidding Procedures, in their entirety.  Parties interested in receiving additional or other information regarding the proposed Sale Transaction or other disposition of the applicable Assets may make a written request to Kroll Restructuring Administration LLC ("Kroll") (the notice and claims agent retained in these chapter 11 cases) or by calling (844) 712-2239 (US/Canada Toll Free) or +1 (646) 863-7121 (International) for calls originating outside of the U.S.

Copies of the Motion, the Order, the Bidding Procedures, this notice, and any other related documents are available:  (a) upon request to Kroll by calling  (844) 712-2239 (US/Canada Toll Free) or +1 (646) 863-7121 (International) for calls originating outside of the U.S.; (b) by visiting the Debtors' restructuring website at https://cases.ra.kroll.com/Joann2025; or (c) for a fee via PACER by visiting https://pacer.uscourts.gov.

**Exhibit 4(B)**

**Notice of Winning Bidder (if there is an Auction)**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| JOANN INC., *et al.*,[1] | ) | Case No. 25-10068 (CTG) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## NOTICE OF WINNING BIDDER AND
## BACK-UP BIDDER FOR CERTAIN OF THE DEBTORS' ASSETS

**PLEASE TAKE NOTICE OF THE FOLLOWING**:

On [●], 2025, the United States Bankruptcy Court for the District of Delaware (the "Court") entered the *Order (I) Approving Bidding Procedures, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Stalking Horse Agreement, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts and Leases, (VII) Approving the Sale of Assets, and (VIII) Granting Related Relief* [Docket No. [●]] (the "Order"),[2] by which the Court approved procedures setting forth the process by which the Debtors are authorized to conduct a marketing and auction process for the sale or sales (the "Sale Transactions") of the Debtors' assets (the "Assets").

On **February 21, 2025, at 10:00 a.m. (prevailing Eastern Time)**, pursuant to the Order, the Debtors commenced the Auction either in-person or by videoconference or such other form of remote communication established by the Debtors.

At the conclusion of the Auction, the Debtors selected the following Winning Bidder and Back-Up Bidder:

| Assets | Winning Bidder | Back-Up Bidder | Key Terms of Proposed Sale |
|---|---|---|---|
| [●] |  |  |  |

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: JOANN Inc. (5540); Needle Holdings LLC (3814); Jo-Ann Stores, LLC (0629); Creative Tech Solutions LLC (6734); Creativebug, LLC (3208); WeaveUp, Inc. (5633); JAS Aviation, LLC (9570); joann.com, LLC (1594); JOANN Ditto Holdings Inc. (9652); Dittopatterns LLC (0452); JOANN Holdings 1, LLC (9030); JOANN Holdings 2, LLC (6408); and Jo-Ann Stores Support Center, Inc. (5027). The Debtors' mailing address is 5555 Darrow Road, Hudson, Ohio 44236.

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Order, the Motion, or the Bidding Procedures, as applicable.

The Sale Hearing to consider approval of the sale of the Assets to the Winning Bidder(s) at the Auction will be held before the Honorable Craig T. Goldblatt, at the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 3rd Floor, Courtroom #7, Wilmington, Delaware 19801, on **February 26, 2025, at 2:00 p.m. (prevailing Eastern Time)**.

At the Sale Hearing, the Debtors will seek the Court's approval of the Winning Bid(s) and the designation of the Back-Up Bid(s) (if any) for the applicable Assets.  Unless the Court orders otherwise, the Sale Hearing shall be an evidentiary hearing on matters relating to the sale(s) for the applicable Assets, and there will be no further bidding at the Sale Hearing.

If a Winning Bidder cannot or refuses to consummate the Sale Transaction following entry of the Sale Order because of the breach or failure on the part of the Winning Bidder, the Back-Up Bidder (if any) shall be deemed the new Winning Bidder and the Debtors, (1) shall provide written notice to the Back-Up Bidder and file and serve a notice of intent to proceed with the Back-Up Bidder and (2) schedule a telephonic status conference, which may be expedited, upon reasonable notice under the circumstances (which shall be no less than three (3) business days), at which time a briefing and hearing schedule will be established for those landlords and counterparties to executory contracts that do not consent to a proposed assumption and assignment to the Back-Up Bidder.

This notice is subject to the terms and conditions of the Motion and the Order, with such Order controlling in the event of any conflict, and the Debtors encourage parties in interest to review such documents, including the Bidding Procedures, in their entirety.  Parties interested in receiving additional or other information regarding the proposed Sale Transaction or other disposition of the applicable Assets may make a written request to Kroll Restructuring Administration LLC ("Kroll") (the notice and claims agent retained in these chapter 11 cases) or by calling (844) 712-2239 (US/Canada Toll Free) or +1 (646) 863-7121 (International) for calls originating outside of the U.S.

Copies of the Motion, the Order, the Bidding Procedures, this notice, and any other related documents are available:  (a) upon request to Kroll by calling  (844) 712-2239 (US/Canada Toll Free) or +1 (646) 863-7121 (International) for calls originating outside of the U.S.; (b) by visiting the Debtors' restructuring website at https://cases.ra.kroll.com/Joann2025; or (c) for a fee via PACER by visiting https://pacer.uscourts.gov.

## Exhibit 5

**Cure Notice**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| JOANN INC., *et al.*,[1] | ) | Case No. 25-10068 (CTG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

### NOTICE OF POTENTIAL ASSUMPTION OR
### ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS OR LEASES

**PLEASE TAKE NOTICE OF THE FOLLOWING**:

On [●], 2025, the United States Bankruptcy Court for the District of Delaware (the "Court") entered the *Order (I) Approving Bidding Procedures, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Stalking Horse Agreement, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts and Leases, (VII) Approving the Sale of Assets, and (VIII) Granting Related Relief* [Docket No. [●]] (the "Order"),[2] by which the Court approved procedures for the assumption or assumption and assignment of executory contracts and unexpired leases and granted related relief, as set forth in the Order.

Pursuant to the Order and by this notice (this "Cure Notice"), the Debtors hereby notify you that they have determined, in the exercise of their reasonable business judgment, that each executory contract or unexpired lease set forth on **Schedule 1** attached hereto (the "Potential Assumption List") may be assumed (and, if applicable, assigned) effective as of the date (the "Assumption Date") set forth in **Schedule 1** or such other date as the Debtors and the counterparty or counterparties to such executory contracts or unexpired leases may agree.

The Debtors believe that the party to which each applicable executory contract or unexpired lease may be assigned has the financial wherewithal to meet all future obligations under such contract or lease and the Debtors will use commercially reasonable efforts to provide evidence thereof to such applicable counterparty (and their counsel, if known) thereby demonstrating that the assignee of the contract or lease has the ability to comply with the requirements of adequate assurance of future performance.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: JOANN Inc. (5540); Needle Holdings LLC (3814); Jo-Ann Stores, LLC (0629); Creative Tech Solutions LLC (6734); Creativebug, LLC (3208); WeaveUp, Inc. (5633); JAS Aviation, LLC (9570); joann.com, LLC (1594); JOANN Ditto Holdings Inc. (9652); Dittopatterns LLC (0452); JOANN Holdings 1, LLC (9030); JOANN Holdings 2, LLC (6408); and Jo-Ann Stores Support Center, Inc. (5027). The Debtors' mailing address is 5555 Darrow Road, Hudson, Ohio 44236.

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Order, the Motion, or the Bidding Procedures, as applicable.

Parties objecting to the proposed assumption and assignment (including a Winning Bidder's proposed form of adequate assurance of future performance) must file and serve a written objection (each, a "Cure Objection") so that such objection is filed with the Court and **actually received by the following parties no later than [●], 2025, at 5:00 p.m. (prevailing Eastern Time)** (the "Cure Objection Deadline"): (a) the Debtors, JOANN Inc., 5555 Darrow Road, Hudson, Ohio 44236, Attn.: Ann Aber, EVP, Chief Legal and Human Resources Officer; (b) proposed co-counsel to the Debtors, (i) Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn.: Aparna Yenamandra, P.C. (aparna.yenamandra@kirkland.com) and 333 West Wolf Point Plaza, Chicago Illinois 60654, Attn.: Jeffrey Michalik (jeff.michalik@kirkland.com), and Lindsey Blumenthal (lindsey.blumenthal@kirkland.com) and (ii) Cole Schotz P.C., 500 Delaware Avenue, Suite 1410, Wilmington, Delaware 19801, Attn.: Patrick J. Reilley (preilley@coleschotz.com), Stacy L. Newman (snewman@coleschotz.com), Michael E. Fitzpatrick (mfitzpatrick@coleschotz.com), and Jack M. Dougherty (jdougherty@coleschotz.com); (c) the United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn.: Malcolm M. Bates (malcolm.m.bates@usdoj.gov);

(d) counsel to the Prepetition ABL Agent, Morgan, Lewis & Bockius LLP, One Federal Street, Boston, Massachusetts 02110, Attn.: Christopher L. Carter (christopher.carter@morganlewis.com) and Marjorie Crider (marjorie.crider@morganlewis.com); (e) counsel to the Prepetition FILO Agent, Choate Hall & Stewart LLP, 2 International Place, Boston, Massachusetts 02110, Attn.: John Ventola (jventola@choate.com) and Jonathan Marshall (jmarshall@choate.com); (f) counsel to the Prepetition Term Loan Lender Ad Hoc Group, (i) Gibson, Dunn & Crutcher LLP, 200 Park Avenue New York, New York 10166, Attn.: Scott Greenberg (SGreenberg@gibsondunn.com), Josh Brody (JBrody@gibsondunn.com), and Kevin Liang (KLiang@gibsondunn.com), (ii) Glenn Agre Bergman & Fuentes LLP, 1185 Avenue of the Americas, 22nd Floor, New York, New York 10035, Attn: Andrew Glenn (aglenn@glennagre.com), Kurt Mayr (kmayr@glennagre.com), Agustina Berro (aberro@glennagre.com), Malak Doss (mdoss@glennagre.com), and Esther Hong (ehong@glennagre.com), and (iii) Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, 16th Floor, Wilmington, Delaware 19801, Attn: Donna Culver (dculver@morrisnichols.com), Robert Dehney (rdehney@morrisnichols.com), Matthew Harvey (mharvey@morrisnichols.com), and Brenna Dolphin (bdolphin@morrisnichols.com); (g) counsel to the Prepetition Term Loan Agent, ArentFox Schiff LLP, 1301 Avenue of the Americas, 42nd Floor, New York, New York 10019, Attn.: Jeffrey Gleit (jeffrey.gleit@afslaw.com) and 1717 K Street NW, Washington, D.C. 20006, Attn.: Jonathan Bagg (jonathan.bagg@afslaw.com), and 233 South Wacker Drive, Suite 7100, Chicago, Illinois 60606, Attn.: Matthew Bentley (matthew.bentley@afslaw.com); (g) counsel to the Winning Bidder, [●]; and (h) proposed counsel to the Official Committee of Unsecured Creditors, (i) Kelley Drye & Warren LLP, 3 World Trade Center, New York, New York 10007, Attn: Jason R. Adams (jadams@kelleydrye.com); Eric R. Wilson (ewilson@kelleydrye.com); and Maeghan J. McLoughlin (mmcloughlin@kelleydrye.com); and (ii) Pachulski Stang Ziehl & Jones LLP, 919 N. Market Street, Suite 1700, Wilmington, Delaware 19801, Attn: Brad Sandler (bsanlder@pszjlaw.com) and James O'Neill (joneill@pszjlaw.com).

Absent a Cure Objection being timely filed, the assumption of each executory contract or unexpired lease may become effective on the Assumption Date set forth in **Schedule 1**, or such other date as the Debtors and the counterparty or counterparties to such executory contract or unexpired lease may agree.

If an objection is timely filed and not withdrawn or resolved, such objection will be heard at the Sale Hearing or on such other date and time as agreed to by the Debtors and the objecting party or ordered by the Court. If such objection is overruled or withdrawn, the applicable executory contract or unexpired lease shall be assumed as of the Assumption Date set forth in **Schedule 1** or such other date as the Debtors and the counterparty or counterparties to such executory contract unexpired lease may agree.

## <u>Schedule 1</u>

**Potential Assumption List**