**EXHIBIT 1**

EXECUTION VERSION

## Pattern Supply Agreement

PATTERN SUPPLY AGREEMENT dated as of December 15, 2023 between IG Design Group Americas, Inc. ("DGA") and its subsidiaries Simplicity Creative Corp. (successor in interest to Simplicity Pattern Co. Inc.) ("Simplicity") and The McCall Pattern Company, Inc. (successor in interest to The McCall Pattern Company) ("McCall"), on the one hand, and Jo-Ann Stores, LLC ("Customer"), on the other hand. DGA, Simplicity and McCall are referred to herein collectively as the "Supplier".

### Background

Supplier is currently a supplier of sewing pattern products to Customer, which merchandises, offers for sale, and sells such products to consumers at Customer's retail locations. This Agreement supersedes and replaces prior agreements between Customer and Supplier pertaining to the supply of sewing patterns to Customer by Supplier, including without limitation, the McCall's Administrative Agreement dated as of October 30, 2014 between McCall and Customer, and the Simplicity Administrative Agreement dated July 18, 2012 between Simplicity and Customer.

### Agreement

For good and valuable consideration received, and intending to be legally bound, Supplier and Customer hereby agree as follows:

## SECTION 1 – DEFINITIONS

As used in this Agreement, the following terms have the meanings given to them below:

"Base Stock" – Supplier's standardized level of Products, reflecting the number of units of each UPC that are to be merchandised and offered for sale to consumers by Customer in its retail stores on a day-to-day (i.e., everyday) basis. Base Stock does not include Products that are Seasonal Units.

"Cabinets and Fixtures" – cabinets and fixtures used to merchandise and display Products offered for sale at Customer's retail stores.

"Gross Revenue" – the gross revenue received by Customer from the sale of Products to consumers, exclusive of Retail Taxes.

"MSRP" – Manufacturer's Suggested Retail Price.

"Products" – sewing pattern products supplied by Supplier to Customer to be merchandised, offered for sale, and sold to consumers in Customer's retail stores, inclusive of Seasonal Units.

1

"Retail Taxes" – sales taxes and other charges imposed upon consumers on retail transactions and required to be collected, reported and disbursed by retailers to federal, state, or local government agencies.

"Seasonal Units" – Products supplied by Supplier to Customer to be merchandised, offered for sale, and sold to consumers at Customer's retail stores on a seasonal basis. Seasonal Units are not part of the Base Stock.

"UPC" – Uniform Product Code, an identification for each stock keeping unit of Products.

## SECTION 2 – TERM
The term of this Agreement shall be from January 1, 2024 to January 30, 2026. Thereafter, the term of this Agreement shall be extended automatically for a period of one year, and from year-to-year thereafter, unless and until either party elects to prevent such automatic extension by sending written notice of non-extension to the other party by not less than four (4) months prior to the then-current expiration date.

## SECTION 3 – SUPPLY, MERCHADISING AND SALE OF PRODUCTS
During the term of this Agreement, the Products will be merchandised and offered for sale to consumers in all Customer retail stores at the Base Stock level. Additionally, as seasonally appropriate, Seasonal Units will be merchandised and offered for sale to consumers in all Customer retail stores.

### Consignment
The parties acknowledge that Supplier holds legal title to, and sole ownership of, all Products currently in Customer's possession or control in its retail stores and at any Customer warehouses or other locations (if any), such Products having been supplied to Customer on a consignment basis to be offered for sale to consumers at Customer's retail locations. Supplier shall likewise retain legal title to, and sole ownership of, all Products supplied to Customer under this Agreement during the term hereof. Without derogating from Supplier's rights as owner of the Products supplied to Customer under this Agreement, and without affecting the parties' intentions that this Agreement establishes a true consignment of the Products, as security for the payment by Customer of amounts becoming due to Supplier as and when due for Products purchased by Customer hereunder, Customer, solely to the extent of its interest in the Products (if any), hereby grants a purchase money security interest to Supplier in and to all such Products previously or hereinafter supplied to Customer and all proceeds thereof. Supplier has the right to file with the appropriate governmental filing offices "consignee/consignor" UCC-1 financing statements with respect to such Products and proceeds, identifying Customer as consignee and Supplier as consignor. Legal title to all Products so supplied shall remain vested in Supplier until the register scan of such Products at retail at which time the Products shall be deemed sold by Supplier to Customer contemporaneously with the Customer's resale of the Products to the retail consumer. Risk of loss to the Products shall remain with Supplier. Customer shall use

2

commercially reasonable efforts (at least equal to such efforts utilized by Customer with respect to other merchandise inventory offered for sale at Customer's retail stores) to maintain the Products in merchantable condition and to safeguard the Products from theft and shrink.

Replenishment & Inventories

1.
2.
3.
4.



New Product
Upon four weeks' notice of providing UPC information to Customer's Data Integrity Department, Supplier will periodically ship to all approved Customer stores Product with newly issued designs (including Seasonal Units) and revised counter catalogs (at no charge to Customer), to ensure that all Products offer consumers fresh new fashion, costume, craft and home decorating ideas.

Store Openings
Customer from time to time opens new stores in the ordinary course of business. Customer will notify Supplier of new store openings, and Supplier will ship to Customer an initial Base Stock of Products for each new store opening and Seasonal Units as appropriate.

Existing Cabinets and Fixtures

3

[REDACTED]

### New Pattern Cabinets and Fixtures

During the term of this Agreement, excluding however the last twelve (12) months of the term, provided that Customer is in compliance with its obligations hereunder, Supplier will provide to Customer all Cabinets and Fixtures needed for Customer's new store openings, except that if an existing store is closing in the same market where a new store is opening, Customer shall relocate the Cabinets and Fixtures from the closing store to the new store.

### Store Closings

If Customer determines to close a store, Customer shall notify Supplier, and Supplier may elect to: (i) have the Products on hand at such store returned to Supplier or (ii) have Customer liquidate such Products under the normal store liquidation process and discard any remaining Products upon the store close date. If Supplier instructs Customer to return Products on hand at a store that is closing, Supplier will pay the freight costs and will be responsible to reimburse Customer for store labor costs.

### Store Operations

Customer will determine the location of all Cabinets and Fixtures in Customer's stores, and Customer will be responsible for maintaining Cabinets and Fixtures in good working order.  Customer will be responsible for properly maintaining and prominently merchandising Products in its stores, including the display of newly issued catalogs, placing all Products received into the Cabinets and Fixtures, removing discarded Products, properly labeling cabinet drawers and generally keeping the Products in a neat and orderly fashion.

### Inspection

Customer will allow Supplier's employees or representatives to inspect any of the Products in Customer stores during normal store hours after notifying the store manager upon arrival, except that no inspections shall occur during the period October 1 through December.  Five (5) days prior notice will be given to the store manager and to Customer's legal department (legal@joann.com) before an inspection.

## SECTION 4 – RETAIL PRICING AND PROMOTIONAL DISCOUNTS

[REDACTED]

4


second-rate, low quality, low value or counterfeit so as to disparage Supplier or the Products.

## SECTION 5 – REVENUE SHARE AND PAYMENT TERMS

On a daily basis, Customer shall report to Supplier the Gross Revenue collected by Customer from the sale of Products on the immediately preceding day. As set forth below, a portion of the Gross Revenue will be remitted to Supplier as Customer's purchase price for the Products sold, and the remaining portion of the Gross Revenue will be retained by Customer:



a. [REDACTED]

b. [REDACTED]

c. [REDACTED]

d. [REDACTED]

e. [REDACTED]

Supplier's share of Gross Revenue shall be remitted to Supplier by Customer on a weekly basis by ACH payment each Friday, for the immediately preceding week ending on Saturday. As and when required by applicable law, Customer shall collect Retail Taxes from consumers on and in connection with the sale of Products and report and remit such Retail Taxes to the appropriate governmental bodies.

5

## SECTION 6 – INFORMATION SYSTEMS/RECORD KEEPING/AUDIT
Both parties agree that information will be exchanged between the parties generally via Electronic Data Interface (EDI) transmissions. Each party further agrees to allow the other party to audit its relevant information systems programs and any other records maintained to ensure that the proper recording and payment of Gross Revenue collected and Products sold has been made.

## SECTION 7 – BREACH; DEFAULT; TERMINATION
If either party shall be in breach of any of its representations, warranties or obligations contained herein or in any other agreement between the parties hereto or their respective affiliates, and such breach is not cured within thirty (30) days (except for any breach of party's obligations to remit payments to the other party, in which case the cure period shall be five (5) business days) after receipt of written notice thereof from the non-breaching party, then the non-breaching party shall have the right to terminate this Agreement upon written notice to the breaching party. Additionally, a party to the Agreement shall be in default of this Agreement upon: (i) the filing by or against such party of a petition in bankruptcy or the initiation by or against such party of insolvency proceedings under the laws of any jurisdiction, or (ii) the making by such party of an assignment for the benefit of creditors, or (iii) the discontinuance by such party of its business operations. Upon occurrence of a default, the non-defaulting party shall have the right to terminate this Agreement upon written notice to the defaulting party. Any termination of this Agreement under this paragraph shall not be deemed an election of remedies, and the non-breaching party shall be entitled to exercise such other rights and remedies as may be available to such party under applicable law. Either party may terminate this Agreement without cause upon four months' prior written notice to the other party. The parties agree to cooperate with each other in good faith during such notice period and Supplier will continue to provide Products during such period, provided that Customer remains in compliance with its obligations hereunder.

## SECTION 8 – CREDIT REVIEW
Supplier's obligations to supply Products to Customer on a consignment basis and to supply Cabinets and Fixtures shall at all times be subject to Supplier's satisfaction with Customer's creditworthiness as determined in Supplier's sole discretion. From time to time, as requested by Supplier, Customer shall provide Supplier with such information as Supplier may reasonably request for purposes of performing a credit review of Customer, which information, to the extent not otherwise publicly revealed by Customer, shall be confidential and subject to Section 12 (Publicity; Confidentiality). Notwithstanding the forgoing, if Customer is a publicly traded corporation, then before requesting the Confidential Information of Customer, Supplier will obtain information from Customer's public reports and filings with the applicable stock exchange or from the Securities Exchange Commission.

## SECTION 9 – OBLIGATIONS UPON EXPIRATION OR TERMINATION
Upon expiration or termination of this Agreement, Supplier may elect to: (i) have the Products on hand at Customer's stores and/or warehouses returned to Supplier or (ii) have Customer liquidate such Products for a period of up to twelve (12) months after

6

expiration or termination under the normal store liquidation process and discard or return to Supplier any Products remaining after the liquidation process concludes. If Supplier instructs Customer to return Products, Supplier will pay the freight costs and, if termination is not due to the default or breach by Supplier, Customer will be responsible for store labor costs. The Gross Revenue resulting from any sales of Products following the expiration or termination hereof shall be allocated between the parties in accordance with Section 5 of this Agreement, and Customer shall remit Supplier's share thereof to Supplier, as though such sales had taken place during the term hereof.

### SECTION 10 – INDEMNIFICATION

Customer agrees to defend, indemnify and hold Supplier and its employees harmless from and against any and all third party liability claims, causes of action, suits, damages, losses, costs and expenses (including reasonable attorney's fees and expenses) to the extent arising out of, or resulting from any breach by Customer of its representations, warranties or obligations under this Agreement, or any negligent or willful act or omission of Customer, or any violation by Customer of applicable laws and regulations. Supplier agrees to defend, indemnify and hold Customer and its employees harmless from and against any and all third party liability claims, causes of action, suits, damages, losses, costs and expenses (including reasonable attorney's fees and expenses) to the extent arising out of, or resulting from any breach by Supplier of its representations, warranties or obligations under this Agreement, or any negligent or willful act or omission of Supplier, or any violation by Supplier of applicable laws and regulations.

### SECTION 11 - LIMITATION OF LIABILITY

**Except with regard to indemnification obligations and violations of law, in no event will either party be liable to the other party (or to its agents or representatives) for any special, incidental, consequential or other indirect damages (including loss of revenues, profits or opportunities), whether arising out of, or as a result of, breach of contract, warranty, tort (including negligence), strict liability or otherwise, whether or not a party was advised of the possibility of such loss, and regardless of whether such remedy fails of its essential purpose. In no event will either party be responsible or liable for any loss, claim, expense or damage to the extent caused by, contributed to, or arising out of, the acts or omissions of the other party, whether negligent or otherwise.**

### SECTION 12 – PUBLICITY; CONFIDENTIALITY

No press releases or other disclosure, either written or oral, of (a) the transactions contemplated by this Agreement, or (b) any Confidential Information (as defined herein) exchanged under this Agreement, will be made by either party without the consent of the other party, except as otherwise provided herein. The parties shall maintain the terms of this Agreement as Confidential Information. Each party may disclose Confidential Information to its officers, directors, employees (and those of its affiliates), auditors, attorneys, insurers and accountants, provided, in each case, that such parties have a need to know and have agreed to maintain the confidentiality

7

thereof on terms no less restrictive than those set forth herein. Further, Confidential Information may be disclosed by a party as necessary to enforce the provisions hereof or to defend a claim made against such party (or an affiliate thereof) by the other party (or an affiliate thereof), or as may be required to comply with applicable law, court order or legal process. In advance of disclosing Confidential Information pursuant to the immediately preceding sentence, the disclosing party shall, if permissible under applicable law, provide prior written notice to the other party so that the other party may seek an appropriate protective order or other appropriate remedy to preserve the confidentiality thereof to the extent possible. It is permissible for Supplier to disclose the existence of this Agreement through the filing of a UCC-1 financing statement. Confidential Information means information pertaining to the business of a party that such party maintains as confidential; provided, however, that Confidential Information does not include information that, (a) is publicly available at the time of disclosure, (b) becomes publicly available other than on account of the receiving party's breach of its obligations hereunder; (c) is already lawfully possessed or known by the receiving party at the time of disclosure; (d) is lawfully obtained by the receiving party on a non-confidential basis from a third party; or (e) is independently developed by the receiving party.

## SECTION 13 – NOTICES

All notices must be in writing, and sent by certified mail, postage prepaid, return receipt requested, or delivered by hand or commercial courier service (e.g., UPS, FedEx, DHL). If mailed by US Postal Service, notice will be deemed given seven business days after it was mailed, as evidenced by the postmark. If delivered by hand or commercial courier service, notice will be deemed given when received by the party to whom addressed.

| | |
|---|---|
| If to Supplier: | IG Design Group Americas, Inc.<br>5555 Glenridge Connector, Suite 300<br>Atlanta, GA 30342<br>Attn: Abbie Small (abbie.small@dgamericas.com) |
| cc to: | mike.santivasci@dgamericas.com |
| | |
| If to Customer: | Jo-Ann Stores, LLC<br>5555 Darrow Road<br>Hudson, OH 44236<br>Attn: General Counsel |
| cc to: | legal@joann.com |

## SECTION 14 – ASSIGNMENT

Except for an assignment by McCall and/or Simplicity to DGA, neither party may assign its rights or obligations under this Agreement to a third party without the express written consent of the other party, not to be unreasonably withheld or delayed. This Agreement shall inure to the benefit of the parties, and to the extent permitted by this Agreement, their successors, and assigns.

8

## SECTION 15. - MISCELLANEOUS.

(a) <u>Remedies</u>. All rights and remedies granted to either party are cumulative, not exclusive, and additional to any other rights or remedies provided by law or equity except where otherwise stated in this Agreement. In the event of any legal or equitable action between the parties, the prevailing party is entitled to recover its reasonable attorneys' fees and costs from the non-prevailing party, as determined by the court in its discretion.

(b) <u>Partial Invalidity or Unenforceability</u>. If a court or other authority with appropriate jurisdiction declares any provision of this Agreement invalid or unenforceable, that decision will not affect the validity of any remaining provisions, which will remain in effect; further, any provision declared invalid or unenforceable shall be deemed reformed and replaced with a similar provision that is valid and enforceable and which is as near as possible in scope and application to the provision declared invalid or unenforceable.

(c) <u>Waivers</u>. No delay or failure by either party to exercise or enforce any right or provision in this Agreement will be considered a waiver thereof, or a waiver of such party's right thereafter to exercise or enforce every right and provision herein. Waivers must be in writing. No single waiver will constitute a continuing or subsequent waiver.

(d) <u>Entire Agreement; Amendments; Counterparts</u>. This Agreement constitutes the entire agreement between the parties relating to the subject matter hereof and supersedes all prior and contemporaneous oral and written negotiations and understandings. All amendments, changes, or modifications to this Agreement must be written. This Agreement may be signed in counterparts or in duplicate originals. Each counterpart or each duplicate will be deemed an original Agreement signed by each party, for all purposes. An electronic signature (such as DocuSign) or a signature in .PDF will have the same force and effect as an original signature.

(e) <u>Section headings; Interpretation.</u> (1) The headings are inserted for convenience only and do not control or affect the meaning or construction of any of the sections, (2) If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties and no presumption or burden of proof will arise favoring or disfavoring any party because of the authorship of any provision of this Agreement, (3) References to the plural include the singular, the singular the plural, and the part the whole, (4) "including" has the inclusive meaning frequently identified with the phrase "including but not limited to" and "including, without limitation," (5) References to "hereunder," "herein" and "hereof" relate to this Agreement as a whole and not any particular section, paragraph or provision, (6) "must", "shall", "will" or "agrees" are mandatory, and "may" is permissive, (7) words of any gender include the other gender, (8) references to persons will include corporations and entities, and (9) Any reference in this Agreement to any statute, rule, regulation or agreement, including this Agreement, will be deemed to include such statute,

9

rule, regulation or agreement as it may be modified, varied, amended or supplemented.

(f) <u>Survival</u>. The provisions in this Agreement that by their sense and context are intended to survive the completion of the performance, cancellation or termination of this Agreement will so survive. All indemnity obligations survive termination or expiration of this Agreement.

(g) <u>Unavoidable Delay</u>. Neither party will be liable to the other party for any delay in performance or failure to perform due to circumstances or causes beyond its reasonable control, including natural disasters such as flood, earthquake, hurricane, tornado or other acts of nature; explosion; war; riot; embargo; labor dispute (but excluding labor disputes with the party's own employees); declaration of martial law; acts of God; acts of terrorism (domestic or foreign); or any similar event with respect to all of the forgoing. The party not subject to the delay may terminate this Agreement if the delayed party is unable to perform for 30 days or more.

(h) <u>Choice of Law; Jurisdiction</u>. This Agreement, and all claims or causes of action (whether in contract, tort or statute) that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement (including any claim or cause of action based upon, arising out of, or related to any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement), is governed by, and enforced in accordance with, the internal laws of Delaware, including its statutes of limitations, and excluding its conflict of law provisions. The parties consent to the exclusive jurisdiction of the state or federal courts sitting in the State of Delaware.

[signature page follows]

In witness whereof, the parties have executed this Agreement as of:

JO-ANN STORES, LLC

BY _____ (DocuSigned by: 61D54C7C7B8445C...)

TITLE    CMO

DATE    12/18/2023

IG DESIGN GROUP AMERICAS, INC.

BY _Abbie Small_

TITLE    EVP and Category GM

DATE    12-15-23

THE MCCALL PATTERN COMPANY, INC.

BY _Abbie Small_

TITLE    EVP and Category GM

DATE    12-15-23

SIMPLICITY CREATIVE CORP.

BY _Abbie Small_

TITLE    EVP and Category GM

DATE    12-15-23

11