**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| JOANN INC., *et al.*,[1] | ) | Case No. 25-10068 (CTG) |
| Debtors. | ) | (Jointly Administered) |
| | ) | **Re: Docket No. 448** |

**AFFIDAVIT OF PUBLICATION**
**REGARDING NOTICE OF AUCTION**
**FOR THE SALE OF THE DEBTORS' ASSETS**

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: JOANN Inc. (5540); Needle Holdings LLC (3814); Jo-Ann Stores, LLC (0629); Creative Tech Solutions LLC (6734); Creativebug, LLC (3208); WeaveUp, Inc. (5633); JAS Aviation, LLC (9570); joann.com, LLC (1594); JOANN Ditto Holdings Inc. (9652); Dittopatterns LLC (0452); JOANN Holdings 1, LLC (9030); JOANN Holdings 2, LLC (6408); and Jo-Ann Stores Support Center, Inc. (5027). The Debtors' mailing address is 5555 Darrow Road, Hudson, Ohio 44236.



The New York Times
Company

620 8th Avenue
New York, NY 10018
nytimes.com

# PROOF OF PUBLICATION

February 19, 2025

I, Larnyce Tabron, in my capacity as a Principal Clerk of the Publisher of The New York Times, a daily newspaper of general circulation printed and published in the City, County, and State of New York, hereby certify that the advertisement annexed hereto was published in the editions of The New York Times on the following date or dates, to wit on.

2/19/2025, NY/NATL, pg B3

Larnyce Tabron

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

In re: JOANN INC., *et al.*,[1] Debtors. ) Chapter 11, Case No. 25-10068 (CTG) (Jointly Administered)

**NOTICE OF AUCTION FOR THE SALE OF THE DEBTORS' ASSETS**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

On February 16, 2025, the United States Bankruptcy Court for the District of Delaware (the "Court") entered the *Order (I) Approving Bidding Procedures, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Stalking Horse Agreement, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts and Leases, (VII) Approving the Sale of Assets, and (VIII) Granting Related Relief* [Docket No. 448] (the "Order"),[2] authorizing the above-captioned debtors and debtors in possession (collectively, the "Debtors") to market and conduct an auction (the "Auction") to sell the Assets free and clear of liens, claims, encumbrances, and other interests (except as may be set forth in the Definitive Sale Documents), with all such liens, claims, encumbrances, and other interests attaching with the same validity and priority to the applicable sale proceeds. The Auction (if any) will be governed by the bidding procedures approved pursuant to the Order and attached to the Order as Exhibit 1 thereto (the "Bidding Procedures").

Copies of the Order, the Bidding Procedures, the Stalking Horse Agreement, and other documents related thereto, are available upon visiting the Debtors' restructuring website at https://cases.ra.kroll.com/Joann2025 (the "Case Webpage"). Any changes to the location, date and time of the Auction shall be posted on the Case Webpage.

**Any person or entity who wishes to participate in the Auction must comply with the participation requirements, bid requirements, and other requirements set forth in the Bidding Procedures. The Bid Deadline is February 18, 2025, at 5:00 p.m. (prevailing Eastern Time).**

The Debtors intend to conduct the Auction (if required) at which they will consider Qualified Bids (as defined in the Bidding Procedures) submitted to the Debtors and their advisors, by and pursuant to the Bidding Procedures and as set forth in the Order. The Debtors intend to commence the Auction (if applicable) on **February 21, 2025, at 10:00 a.m. (prevailing Eastern Time)**, either in-person or by video conference or such other form of remote communication established by the Debtors (to be communicated to Qualified Bidders in advance). By the earlier of five (5) hours after the Auction (if any) is completed or 12:00 p.m. (prevailing Eastern Time) the calendar day after the Auction is completed, the Debtors shall file with the Court the Notice of Winning Bidder. All creditors in these chapter 11 cases shall be entitled to attend the Auction.

The Debtors reserve the right to modify the Bidding Procedures in accordance with the Bidding Procedures and the Order.

All requests directed to the Debtors in connection with the foregoing, or for further information regarding the Bidding Procedures and participation therein, or for further information regarding the Assets, must be directed to Centerview Partners, LLC, the Debtors' proposed investment banker, at Ryan Kielty (rkielty@centerview.com), Karn Chopra (kchopra@centerview.com), Daniel Bendetson (dbendetson@centerview.com). All Potential Bidders are instructed to review the Bidding Procedures in consultation with counsel.

Objections to the proposed order approving any Winning Bid(s) (and/or designation of a Back-Up Bid(s), as applicable) (the "Sale Order," and such objections, "Sale Objections") must be made on or before: **February 20, 2025, at 5:00 p.m. (prevailing Eastern Time)** to the Stalking Horse Bid if there is no Auction, or **February 25, 2025, at 5:00 p.m. (prevailing Eastern Time)** (the "Sale Objection Deadline") if there is an Auction. All Sale Objections must: (a) be in writing; (b) conform to the applicable provisions of the Bankruptcy Rules and the Local Rules; (c) state with particularity the legal and factual basis for the Sale Objection and the specific grounds therefor; and (d) be filed with the Court and served so as to be **actually received** by the following parties (the "Notice Parties") no later than the Sale Objection Deadline: (a) the Debtors, JOANN Inc., 5555 Darrow Road, Hudson, Ohio 44236, Attn.: Ann Aber, EVP, Chief Legal and Human Resources Officer; (b) proposed co-counsel to the Debtors, (i) Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn.: Aparna Yenamandra, P.C. (aparna.yenamandra@kirkland.com) and 333 West Wolf Point Plaza, Chicago Illinois 60654, Attn.: Jeffrey Michalik (jeff.michalik@kirkland.com), and Lindsey Blumenthal (lindsey.blumenthal@kirkland.com) and (ii) Cole Schotz P.C., 500 Delaware Avenue, Suite 1410, Wilmington, Delaware 19801, Attn.: Patrick J. Reilley (preilley@coleschotz.com), Stacy L. Newman (snewman@coleschotz.com), Michael E. Fitzpatrick (mfitzpatrick@coleschotz.com), and Jack M. Dougherty (jdougherty@coleschotz.com); (c) the United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn.: Malcolm M. Bates (malcolm.m.bates@usdoj.gov); (d) counsel to the Prepetition ABL Agent, Morgan, Lewis & Bockius LLP, One Federal Street, Boston, Massachusetts 02110, Attn.: Christopher Carter (christopher.carter@morganlewis.com) and Marjorie Crider (marjorie.crider@morganlewis.com); (e) counsel to the Prepetition FILO Agent, Choate Hall & Stewart LLP, 2 International Place, Boston, Massachusetts 02110, Attn.: John Ventola (jventola@choate.com) and Jonathan Marshall (jmarshall@choate.com); (f) counsel to the Prepetition Term Loan Lender Ad Hoc Group, (i) Gibson, Dunn & Crutcher LLP, 200 Park Avenue New York, New York 10166, Attn.: Scott Greenberg (SGreenberg@gibsondunn.com), Josh Brody (JBrody@gibsondunn.com), and Kevin Liang (KLiang@gibsondunn.com), (ii) Glenn Agre Bergman & Fuentes LLP, 1185 Avenue of the Americas, 22nd Floor, New York, New York 10036, Attn: Andrew Glenn (aglenn@glennagre.com), Kurt Mayr (kmayr@glennagre.com), Agustina Berro (aberro@glennagre.com), Malak Doss (mdoss@glennagre.com), and Esther Hong (ehong@glennagre.com), and (iii) Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, 16th Floor, Wilmington, Delaware 19801, Attn.: Donna Culver (dculver@morrisnichols.com), Robert Dehney (rdehney@morrisnichols.com), Matthew Harvey (mharvey@morrisnichols.com), and Brenna Dolphin (bdolphin@morrisnichols.com); (g) counsel to the Prepetition Term Loan Agent, ArentFox Schiff LLP, 1301 Avenue of the Americas, 42nd Floor, New York, New York 10019, Attn.: Jeffrey Gleit (jeffrey.gleit@afslaw.com) and 1717 K Street NW, Washington, D.C. 20006, Attn.: Jonathan Bagg (jonathan.bagg@afslaw.com), and 233 South Wacker Drive, Suite 7100, Chicago, Illinois 60606, Attn.: Matthew Bentley (matthew.bentley@afslaw.com); (h) counsel to Centerbridge, Proskauer Rose LLP, 1 International Place, Boston, Massachusetts 02110, Attn: Charles A. Dale (cdale@proskauer.com) and Adam Nowicki (anowicki@proskauer.com); and (i) proposed counsel to the Official Committee of Unsecured Creditors, (A) Kelley Drye & Warren LLP, 3 World Trade Center, New York, New York 10007, Attn: Jason R. Adams (jadams@kelleydrye.com), Eric R. Wilson (ewilson@kelleydrye.com), and Maeghan J. McLoughlin (mmcloughlin@kelleydrye.com); and (B) Pachulski Stang Ziehl & Jones LLP, 919 N. Market Street, Suite 1700, Wilmington, Delaware 19801, Attn: Brad Sandler (bsandler@pszjlaw.com) and James O'Neill (joneill@pszjlaw.com).

Dated: February 16, 2025, Wilmington, Delaware. /s/ Patrick J. Reilley
**COLE SCHOTZ P.C.**, Patrick J. Reilley (No. 4451), Stacy L. Newman (No. 5044), Michael E. Fitzpatrick (No. 6797), Jack M. Dougherty (No. 6784), 500 Delaware Avenue, Suite 1410, Wilmington, Delaware 19801, Telephone: (302) 652-3131, Facsimile: (302) 652-3117, Email: preilley@coleschotz.com, snewman@coleschotz.com, mfitzpatrick@coleschotz.com, jdougherty@coleschotz.com -and- **KIRKLAND & ELLIS LLP, KIRKLAND & ELLIS INTERNATIONAL LLP**, Joshua A. Sussberg, P.C. (admitted *pro hac vice*), Aparna Yenamandra, P.C. (admitted *pro hac vice*), 601 Lexington Avenue, New York, New York 10022, Telephone: (212) 446-4800, Facsimile: (212) 446-4900, Email: joshua.sussberg@kirkland.com, Email: aparna.yenamandra@kirkland.com -and- Anup Sathy, P.C. (admitted *pro hac vice*), Jeffrey Michalik (admitted *pro hac vice*), Lindsey Blumenthal (admitted *pro hac vice*), 333 West Wolf Point Plaza, Chicago, Illinois 60654, Telephone: (312) 862-2000, Facsimile: (312) 862-2200, Email: anup.sathy@kirkland.com, jeff.michalik@kirkland.com, lindsey.blumenthal@kirkland.com

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: JOANN Inc. (5540); Needle Holdings LLC (3814); Jo-Ann Stores, LLC (0629); Creative Tech Solutions LLC (6734); Creativebug, LLC (3208); WeaveUp, Inc. (5633); JAS Aviation, LLC (9570); joann.com, LLC (1594); JOANN Ditto Holdings Inc. (9652); Dittopatterns LLC (0452); JOANN Holdings 1, LLC (9030); JOANN Holdings 2, LLC (6408); and Jo-Ann Stores Support Center, Inc. (5027). The Debtors' mailing address is 5555 Darrow Road, Hudson, Ohio 44236.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Order or the Bidding Procedures, as applicable.

Sworn to me this 20th day of February, 2025

Shannon Schmidt
Online Notary Public
State of New York
Nassau County
Commission #: 01SC0033223
Commission Expires: 01/28/2029

**LITIGATION | AUTOMOTIVE**

KENT NISHIMURA FOR THE NEW YORK TIMES

A memorial to the victims of a plane crash last month near Washington.

# Victim's Family Files Claims Against U.S. for D.C. Crash

By NIRAJ CHOKSHI

The family of one of the 67 victims of a plane crash last month near Washington filed two legal claims against the federal government on Tuesday, seeking compensation and signifying the beginning of what is expected to be a long and complex legal fight.

The claims, which appear to be the first against the U.S. government over the collision, were filed by the family of Casey Crafton, an airline passenger who died in the crash, according to Robert A. Clifford, the lawyer representing the family. Mr. Clifford said he had also asked several companies associated with the crash to preserve evidence.

"I don't know who caused this crash, but I know the passengers sure didn't, and the families are entitled to answers," Mr. Clifford said in an interview. "This was preventable."

The crash occurred on the night of Jan. 29 when an Army Black Hawk helicopter collided with American Airlines Flight 5342 near Ronald Reagan National Airport, plunging the plane and the helicopter into the icy Potomac River and killing everyone on both aircraft. It was the worst plane crash in the United States in nearly a quarter-century.

*The actions appear to signal the start of a long legal battle.*

The cause has not yet been identified, but the National Transportation Safety Board, which is leading a federal investigation, said last week that it was looking into what appeared to be missed instructions sent from an air traffic controller to the helicopter pilots. Aviation experts say the investigation will probably identify multiple safety failures, as is often the case with plane crashes.

The claims by Mr. Crafton's wife, Rachel, and their three sons on Tuesday were filed under the Federal Tort Claims Act, which enables individuals to take the federal government to court for property damage, personal injury or death. One was filed against the Federal Aviation Administration, which oversees air traffic control, and the other against the Army. Each seeks $250 million in compensation, a figure that Mr. Clifford described as a ceiling for the claim.

The claims are filed with the F.A.A. and Army. If they reject the claims or fail to respond within six months, the family can file a lawsuit in federal court.

The F.A.A. and the Army did not respond to requests for comment.

Mr. Clifford said he expected to defer a decision on suing any companies connected to the crash until the N.T.S.B. issued a preliminary report. The agency has said that it plans to do so in the next weeks but that it will not identify a probable cause of the crash until it publishes a final report in a year or two.

Mr. Clifford said he was weighing legal action on behalf of other victims' families.

Mr. Clifford, who is also representing families of the crash of a 2019 Boeing 737 Max in Ethiopia, said he had asked several companies to preserve evidence related to last month's episode. That includes American Airlines and its subsidiary, PSA Airlines, which was operating the plane, as well as Sikorsky Aircraft, the Lockheed Martin subsidiary that makes the Black Hawk helicopter, and Collins Aerospace, which makes components for military and commercial aircraft.

The airlines were ultimately responsible for the passengers' safety, Mr. Clifford said, particularly considering mounting safety concerns at Reagan National, including congestion and previous close calls.

"We think that the airlines knew of all these near misses, that they knew that there were these potential dangers, and under the law as the common carrier, American and PSA had the highest duty of care," he said.

American did not respond to a request for comment.

On the night of the crash, the helicopter crew had asked an air traffic controller for permission to use visual separation with the plane, in which pilots maintain distance from a nearby aircraft by keeping it in their line of sight. The request was granted, but questions remain about whether the controller had left too much room for confusion in communications with the helicopter crew or whether that crew had been focused on the wrong plane.

At a news conference last week, the N.T.S.B. shared two instances in which it appeared that the helicopter crew might not have fully received messages from the air traffic controller. The episode also shed light on concerns that the air traffic control system has come under increasing strain in recent years, partly because of chronic understaffing.

Mr. Crafton, 40, lived in Connecticut and studied aviation management at Bob Jones University, where he met his wife. On the night of the crash, he was returning from a business trip to Wichita, Kan.

# A Setback for Electric Trucks Under Trump

FROM FIRST BUSINESS PAGE

to clean up their fleets. It was a big setback for the state, which has long been allowed to have tailpipe emission rules that are stricter than federal standards because of California's infamous smog.

MARK ABRAMSON FOR THE NEW YORK TIMES

**California officials insist their push for electric semis is not doomed. Jessica Cordero, a vice president at the logistics firm NFI Cal Cartage, is happy with its electric fleet.**

DANIELLE VILLASANA FOR THE NEW YORK TIMES

Some transportation experts said that even before Mr. Trump's election, California's effort had problems. The batteries that power electric trucks are too expensive. They take too long to charge. And there aren't enough places to plug the trucks in.

"It was excessively ambitious," said Daniel Sperling, a professor at the University of California, Davis, who specializes in sustainable transportation, referring to the program that made truckers buy green rigs.

California officials insist that their effort is not doomed and say they will keep it alive with other rules and by providing truckers incentives to go electric.

"We know we have a lot of work to do, but we also have tools to accomplish this," said Liane M. Randolph, chair of the California Air Resources Board, the state body that sets clean air standards, at the ceremonial opening of a truck charging station near the Port of Long Beach in January.

California requires truck manufacturers to sell an increasing number of zero-emissions heavy trucks in the state. This rule is more protected from any challenge by the Trump administration. In an agreement struck after the rule was introduced, the manufacturers committed to comply with its requirements regardless of the outcome of any future litigation, and California agreed to soften the rule.

In theory, California's plans to first electrify port trucks had a lot going for it. Fumes from such vehicles contribute to well-documented health problems like childhood asthma in neighborhoods near the ports and warehouses. Heavy-duty transportation in California is estimated to emit as much carbon dioxide, the main cause of climate change, annually as New Zealand.

Also, these trucks travel distances that battery-powered semis can handle on one charge, roughly 200 miles. The hope was that — with the right regulatory sticks and carrots — carriers, truck manufacturers, charging companies and utilities would create an electric trucking network that would serve as a springboard for a broader effort to remove diesel rigs from the state by 2045.

It was not that simple in practice.

Port truckers are overwhelmingly small operators that earn only slim profits. They typically prefer used diesel rigs that sell for as little as $40,000 and are reluctant to take on the risk of acquiring electric tractor-trailers, which can cost around $150,000 after government incentives. Without that aid, the trucks cost $500,000.

Truckers make money by wringing as many hours as possible out of trucks. But electric rigs can take up to two hours to charge.

"The reality is we don't really expect to make much money with these trucks right now," said Erick Gordon, vice president of Redefined Transportation, whose fleet of 25 diesel rigs moves containers from the Ports of Long Beach and Los Angeles to warehouses in the area. He is weighing whether to lease five electric trucks.

The state had hoped to require newly registered port trucks to be zero-emissions vehicles — most such trucks today run on batteries. Since port truckers must retire diesel vehicles after a certain number of years, the rule would have gradually removed all diesel trucks from ports. California had sought a waiver for the rule from the Environmental Protection Agency because the regulation is stricter than federal standards. But the Biden administration did not approve the request in its final weeks.

Still, some trucking executives said they intended to keep deploying electric trucks.

"It doesn't really have any impact on where we're going," said Jessica Cordero, a vice president at NFI Cal Cartage, a large logistics company. "We have our own initiatives and goals."

NFI has 70 electric and 50 diesel trucks operating in California, and used grants to cover the cost of the vehicles. The electric fleet is turning a profit, Ms. Cordero said, in part because it costs less to fuel and maintain the vehicles.

Rudy Diaz, chief executive of Hight Logistics, a port trucking company in Long Beach with 20 electric semis and chargers in its yard, said he, too, had achieved significant cost savings. But now that port truckers aren't required to buy green vehicles, he fears that competitors deploying much cheaper diesel vehicles will have an advantage.

"It makes me nervous — we invested in this infrastructure and these new trucks hoping that the waiver will pass," he said, referring to the E.P.A. waiver.

Because regulators can no longer force truckers to go green, the financial carrots are even more important.

Climate United, a group of environmental nonprofits specializing in green investments, plans to spend $250 million it received from the Biden administration on 500 electric trucks that it intends to lease to small trucking firms through Forum Mobility, a company that also provides charging.

The Ports of Los Angeles and Long Beach impose fees on diesel trucks. Some of those funds have been used to subsidize electric trucks and chargers. And last year, the California Air Resources Board decided that some of the money that electric utilities get from selling clean energy credits would also be used to subsidize zero-emission trucks.

Some people involved in the push think technological advances will help increase the use of electric trucks.

Salim Youssefzadeh, co-founder and chief executive of WattEV, a truck charging company, said new, higher capacity chargers could allow trucks to charge in just 30 minutes, allowing truckers to get back on the road quickly. In some of its locations, WattEV is building solar and battery storage, which reduces its cost of electricity.

Lower prices for electric trucks will also help. Wen Han started an electric truck company, Windrose Technology, in 2022 in China. He aims to start selling his vehicles in the United States this year for around $250,000 — well below the cost of those sold by more established manufacturers. He said he could make money at that price, even with U.S. tariffs, which are 40 percent for the truck Windrose makes, because of his low manufacturing costs.

"Our job is to make diesel trucks obsolete," he said, "and that happens with or without any sort of subsidies."

Bianca Calanche, whose company, Jaspem Truckline, operates at ports in the Los Angeles area, said it would be hard to deploy electric trucks because she didn't have chargers in her truck depot. But she is still considering them, because she is worried that subsidies for electric trucks will run out and that the state will try to force companies like hers to electrify once Mr. Trump has left office.

"This will still come back to us," she said. "It's California."

BROWN BROTHERS HARRIMAN

We are pleased to announce the appointment of two new General Partners of the firm, effective January 1, 2025:

**Lewis Hart**
Resident in New York

**Christopher McCabe**
Resident in Boston

Capital Partners • Investor Services

New York • Beijing • Boston • Charlotte • Chicago
Dublin • Grand Cayman • Hong Kong • Houston
Jersey City • Kraków • London • Luxembourg • Nashville
Philadelphia • Tokyo • Wilmington • Zürich

**www.bbh.com**

**IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE**

In re: JOANN INC., *et al.*,[1] Debtors. ) Chapter 11, Case No. 25-10068 (CTG) ) (Jointly Administered)

**NOTICE OF AUCTION FOR THE SALE OF THE DEBTORS' ASSETS**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

On February 16, 2025, the United States Bankruptcy Court for the District of Delaware (the "Court") entered the *Order (I) Approving Bidding Procedures, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Stalking Horse Agreement, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts and Leases, (VII) Approving the Sale of Assets, and (VIII) Granting Related Relief* [Docket No. 446] (the "Order"),[2] authorizing the above-captioned debtors and debtors in possession (collectively, the "Debtors") to market and conduct an auction (the "Auction") to sell the Assets free and clear of liens, claims, encumbrances, and other interests (except as may be set forth in the Definitive Sale Documents), with all such liens, claims, encumbrances, and other interests attaching with the same validity and priority to the applicable sale proceeds. The Auction (if any) will be governed by the bidding procedures approved pursuant to the Order and attached to the Order as Exhibit 1 thereto (the "Bidding Procedures").

Copies of the Order, the Bidding Procedures, the Stalking Horse Agreement, and other documents related thereto, are available upon visiting the Debtors' restructuring website at https://cases.ra.kroll.com/Joann2025 (the "Case Webpage"). Any changes to the location, date and time of the Auction shall be posted on the Case Webpage.

**Any person or entity who wishes to participate in the Auction must comply with the participation requirements, bid requirements, and other requirements set forth in the Bidding Procedures. The Bid Deadline is February 18, 2025, at 5:00 p.m. (prevailing Eastern Time).**

The Debtors intend to conduct the Auction (if required) at which they will consider Qualified Bids (as defined in the Bidding Procedures) submitted to the Debtors and their advisors, by and pursuant to the Bidding Procedures and as set forth in the Order. The Debtors intend to commence the Auction (if applicable) on **February 21, 2025, at 10:00 a.m. (prevailing Eastern Time)**, either in-person or by videoconference or such other form of remote communication established by the Debtors (to be communicated to Qualified Bidders in advance). By the earlier of five (5) hours after the Auction (if any) is completed or 12:00 p.m. (prevailing Eastern Time) the calendar day after the Auction is completed, the Debtors shall file with the Court the Notice of Winning Bidder. All creditors in these chapter 11 cases shall be entitled to attend the Auction.

The Debtors reserve the right to modify the Bidding Procedures in accordance with the Bidding Procedures and the Order.

All requests directed to the Debtors in connection with the foregoing, or for further information regarding the Bidding Procedures and participation therein, or for further information regarding the Assets, must be directed to: Centerview Partners, LLC, the Debtors' proposed investment banker, at Ryan Kielty (rkielty@centerview.com), Karn Chopra (kchopra@centerview.com), Daniel Bendetson (dbendetson@centerview.com). All Potential Bidders are instructed to review the Bidding Procedures in consultation with counsel.

Objections to the proposed order approving any Winning Bid(s) (and/or designation of a Back-Up Bid(s), as applicable) (the "Sale Order," and such objections, "Sale Objections") must be made on or before: **February 20, 2025, at 5:00 p.m. (prevailing Eastern Time)** to the Stalking Horse Bid if there is no Auction, or **February 25, 2025, at 5:00 p.m. (prevailing Eastern Time)** (the "Sale Objection Deadline") if there is an Auction. All Sale Objections must: (a) be in writing; (b) conform to the applicable provisions of the Bankruptcy Rules and the Local Rules; (c) state with particularity the legal and factual basis for the Sale Objection and the specific grounds therefor; and (d) be filed with the Court and served so as to be ***actually received*** by the following parties (the "Notice Parties") no later than the Sale Objection Deadline: (a) the Debtors, JOANN Inc., 5555 Darrow Road, Hudson, Ohio 44236, Attn.: Ann Aber, EVP, Chief Legal and Human Resources Officer; (b) proposed co-counsel to the Debtors, (i) Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn.: Aparna Yenamandra, P.C. (aparna.yenamandra@kirkland.com) and 333 West Wolf Point Plaza, Chicago Illinois 60654, Attn.: Jeffrey Michalik (jeff.michalik@kirkland.com), and Lindsey Blumenthal (lindsey.blumenthal@kirkland.com) and (ii) Cole Schotz P.C., 500 Delaware Avenue, Suite 1410, Wilmington, Delaware 19801, Attn.: Patrick J. Reilley (preilley@coleschotz.com), Stacy L. Newman (snewman@coleschotz.com), Michael E. Fitzpatrick (mfitzpatrick@coleschotz.com), and Jack M. Dougherty (jdougherty@coleschotz.com); (c) the United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn.: Malcolm M. Bates (malcolm.m.bates@usdoj.gov); (d) counsel to the Prepetition ABL Agent, Morgan, Lewis & Bockius LLP, One Federal Street, Boston, Massachusetts 02110, Attn.: Christopher Carter (christopher.carter@morganlewis.com) and Marjorie Crider (marjorie.crider@morganlewis.com); (e) counsel to the Prepetition FILO Agent, Choate Hall & Stewart LLP, 2 International Place, Boston, Massachusetts 02110, Attn.: John Ventola (jventola@choate.com) and Jonathan Marshall (jmarshall@choate.com); (f) counsel to the Prepetition Term Loan Lender Ad Hoc Group, (i) Gibson, Dunn & Crutcher LLP, 200 Park Avenue New York, New York 10166, Attn.: Scott Greenberg (SGreenberg@gibsondunn.com), Josh Brody (JBrody@gibsondunn.com), and Kevin Liang (KLiang@gibsondunn.com), (ii) Glenn Agre Bergman & Fuentes LLP, 1185 Avenue of the Americas, 22nd Floor, New York, New York 10035, Attn: Andrew Glenn (aglenn@glennagre.com), Kurt Mayr (kmayr@glennagre.com), Agustina Berro (aberro@glennagre.com), Malak Doss (mdoss@glennagre.com), and Esther Hong (ehong@glennagre.com), and (iii) Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, 16th Floor, Wilmington, Delaware 19801, Attn: Donna Culver (dculver@morrisnichols.com), Robert Dehney (rdehney@morrisnichols.com), Matthew Harvey (mharvey@morrisnichols.com), and Brenna Dolphin (bdolphin@morrisnichols.com); (g) counsel to the Prepetition Term Loan Agent, ArentFox Schiff LLP, 1301 Avenue of the Americas, 42nd Floor, New York, New York 10019, Attn.: Jeffrey Gleit (jeffrey.gleit@afslaw.com) and 1717 K Street NW, Washington, D.C. 20006, Attn.: Jonathan Bagg (jonathan.bagg@afslaw.com), and 233 South Wacker Drive, Suite 7100, Chicago, Illinois 60606, Attn.: Matthew Bentley (matthew.bentley@afslaw.com); (h) counsel to Centerbridge, Proskauer Rose LLP, 1 International Place, Boston, Massachusetts 02110, Attn: Charles A. Dale (cdale@proskauer.com) and Adam Nowicki (anowicki@proskauer.com); and (i) proposed counsel to the Official Committee of Unsecured Creditors, (A) Kelley Drye & Warren LLP, 3 World Trade Center, New York, New York 10007, Attn: Jason R. Adams (jadams@kelleydrye.com); Eric R. Wilson (ewilson@kelleydrye.com); and Maeghan J. McLoughlin (mmcloughlin@kelleydrye.com); and (B) Pachulski Stang Ziehl & Jones LLP, 919 N. Market Street, Suite 1700, Wilmington, Delaware 19801, Attn: Brad Sandler (bsanlder@pszjlaw.com) and James O'Neill (joneill@pszjlaw.com).

Dated: February 16, 2025, Wilmington, Delaware, /s/ Patrick J. Reilley, **COLE SCHOTZ P.C.,** Patrick J. Reilley (No. 4451), Stacy L. Newman (No. 5044), Michael E. Fitzpatrick (No. 6797), Jack M. Dougherty (No. 6784), 500 Delaware Avenue, Suite 1410, Wilmington, Delaware 19801, Telephone: (302) 652-3131, Facsimile: (302) 652-3117, Email: preilley@coleschotz.com, snewman@coleschotz.com, mfitzpatrick@coleschotz.com, jdougherty@coleschotz.com -and- **KIRKLAND & ELLIS LLP, KIRKLAND & ELLIS INTERNATIONAL LLP,** Joshua A. Sussberg, P.C. (admitted *pro hac vice*), Aparna Yenamandra, P.C. (admitted *pro hac vice*), 601 Lexington Avenue, New York, New York 10022, Telephone: (212) 446-4800, Facsimile: (212) 446-4900, Email: joshua.sussberg@kirkland.com, Email: aparna.yenamandra@kirkland.com -and- Anup Sathy, P.C. (admitted *pro hac vice*), Jeffrey Michalik (admitted *pro hac vice*), Lindsey Blumenthal (admitted *pro hac vice*), 333 West Wolf Point Plaza, Chicago, Illinois 60654, Telephone: (312) 862-2000, Facsimile: (312) 862-2200, Email: anup.sathy@kirkland.com, jeff.michalik@kirkland.com, lindsey.blumenthal@kirkland.com

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: JOANN Inc. (5540); Needle Holdings LLC (3814); Jo-Ann Stores, LLC (0629); Creative Tech Solutions LLC (6734); Creativebug, LLC (3208); WeaveUp, Inc. (5633); JAS Aviation, LLC (9570); joann.com, LLC (1594); JOANN Ditto Holdings Inc. (9652); Dittopatterns LLC (0452); JOANN Holdings 1, LLC (9030); JOANN Holdings 2, LLC (6408); and Jo-Ann Stores Support Center, Inc. (5027). The Debtors' mailing address is 5555 Darrow Road, Hudson, Ohio 44236.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Order or the Bidding Procedures, as applicable.

**UCC PUBLIC SALE NOTICE**

PLEASE TAKE NOTICE THAT Jones Lang LaSalle Americas, Inc. ("**JLL**"), on behalf of Orlando MF Holder, LLC ("**Secured Party**"), will offer for sale at public auction the following assets:

(1) 100% of the limited liability company membership interests in 1880 Destiny Owner LLC, a Delaware limited liability company (the "**1880 Destiny Pledged Entity**") (such membership interests, the "**1880 Destiny Membership Interests**"), together with certain rights and property representing, relating to, or arising from the 1880 Destiny Membership Interests (collectively, the "**1880 Destiny Collateral**"); and

(2) 100% of the limited liability company membership interests in 500 Jordan Stuart Owner LLC, a Delaware limited liability company (the "**500 Jordan Stuart Pledged Entity**" and, together with the 1880 Destiny Pledged Entity, collectively, the "**Pledged Entities**") (such membership interests, the "**500 Jordan Stuart Membership Interests**" and, together with the 1880 Destiny Membership Interests, collectively, the "**Membership Interests**"), together with certain rights and property representing, relating to, or arising from the 500 Jordan Stuart Membership Interests (collectively, the "**500 Jordan Stuart Collateral**" and, together with the 1880 Destiny Collateral, collectively, the "**Collateral**", and individually, the "**Individual Collateral**").

Based upon information provided by 1880 Destiny JV LLC, a Delaware limited liability company (the "**1880 Destiny Debtor**"), and 500 Jordan Stuart JV LLC, a Delaware limited liability company (the "**500 Jordan Stuart Debtor**" and, together with the 1880 Destiny Debtor, collectively, the "**Debtors**"), and their affiliates, it is the understanding of Secured Party (but without any recourse to, or representation or warranty of any kind by, Secured Party as to the accuracy or completeness of the following information) that: (1) the Membership Interests constitute the principal asset of Debtors; (2) the Membership Interests and related Collateral secure payment of a loan in the original maximum principal amount of $128,412,000.00 (the "**Loan**"), for which events of default have occurred and are continuing and all indebtedness due thereunder has been accelerated; (3) the 1880 Destiny Pledged Entity is the fee owner of the real property and improvements commonly known as 1880 Destiny Boulevard, Kissimmee, Florida (the "**1880 Destiny Property**"); and (4) the 500 Jordan Stuart Pledged Entity is the fee owner of the real property and improvements commonly known as 500 Jordan Stuart Circle, Apopka, Florida (the "**500 Jordan Stuart Property**" and, together with the 1880 Destiny Property, collectively, the "**Properties**").

The sale is scheduled to take place on **April 22, 2025 at 11:00 AM Eastern Prevailing Time** (the "**Sale**"), pursuant to section 9-610 of the Uniform Commercial Code as enacted in the State of New York (the "**UCC**"). The Sale will be conducted in person at the offices of Mayer Brown LLP, located at 1221 Avenue of the Americas, New York, NY 10020, and also by broadcast for remote participation via a virtual videoconference. The URL address and password for the virtual videoconference will be provided to all confirmed participants that have properly registered pursuant to the Terms of Sale (as defined below).

The Collateral will be offered both as a collective whole and on an Individual Collateral basis, with the ultimate method of sale being determined by which method will result in the best bid for the Collateral, as Secured Party, in the exercise of its commercially reasonable discretion, determines, and as addressed in the Terms of Sale. The Collateral will be offered **AS IS, WHERE IS, WITH ALL FAULTS**. Except solely as provided in the succeeding sentence, Secured Party makes no guarantee, representation or warranty, express or implied, as to any matter, including as to any matter pertaining to the Collateral or either of the Properties, and the sale of the Collateral will be made without recourse to, and without representation or warranty by, Secured Party. In order to further facilitate the sale of the Collateral, Secured Party will cause the Sale to be free and clear of the Loan and any mortgages or other liens held by the Secured Party in and to the Properties and any other assets of the Pledged Entities that secure the Loan.

The Collateral includes unregistered securities under the Securities Act of 1933, as amended (the "**Securities Act**"), and, accordingly, while the Sale will be conducted as a public sale under the UCC, it will be a private sale for purposes of the Securities Act and other applicable securities laws, including, without limitation, that participation in the Sale shall be restricted to qualified prospective bidders that represent that the Collateral (or any Individual Collateral, as applicable) will not be sold, assigned, pledged, disposed of, hypothecated or otherwise transferred without the prior registration in accordance with the Securities Act and the securities laws of all other applicable jurisdictions, unless an exemption from such registration is available.

PLEASE TAKE NOTICE that there are specific requirements for any potential bidder in connection with obtaining information, being qualified to attend the Sale, bidding on any of the Collateral and closing on a purchase of any of the Collateral (collectively, the "**Requirements**"), including without limitation: complying with: (1) each of the Pledged Entities' governing documents (including its operating documents); (2) the other qualifications and requirements in connection with the Sale (including but not limited to the Terms of Sale relating to the sale of the Collateral (the "**Terms of Sale**")); and (3) the Securities Act and any other laws or regulations applicable to any of the Collateral or the Sale.

An online datasite for the Sale (the "**Datasite**"), which can be accessed by visiting the following website created by JLL for this Sale (www.TheLaurelandCamilaMFUCCSale.com), includes certain information that Secured Party possesses concerning the Pledged Entities, the Loan, the Collateral, the Debtors, and the Properties (collectively, the "**Disclosed Materials**"), as well as a complete set of the Terms of Sale and all exhibits thereto. Access to the Datasite and any of Disclosed Materials is conditioned, at a minimum, upon execution and delivery of a confidentiality agreement, the form of which agreement can be found by visiting the referenced website. To be permitted to attend and participate at the Sale auction, prospective bidders must confirm their ability to satisfy the Requirements in the manner described in the Terms of Sale and, following such confirmation, each such qualified participant will be provided with a URL and password enabling virtual access to the video conference for the Sale and/or registered for admittance to the Sale. No information provided, whether in the Datasite or otherwise, shall constitute a representation or warranty of any kind or nature whatsoever with respect to such information, the Collateral, the Sale, or the Properties by either JLL or the Secured Party, or any of their respective agents, attorneys, or other authorized representatives. Participants are encouraged to review all Disclosed Materials and perform such due diligence as they deem necessary in advance of the Sale.

Secured Party reserves the right to amend the Terms of Sale, credit bid, make a cash bid in excess of any credit bid, set a minimum reserve price for the Collateral or each Individual Collateral (if applicable), reject all bids, and terminate or adjourn the Sale to another time. All bids (other than credit bids of Secured Party) must be for cash with no financing conditions and the successful bidder must deliver immediately available good funds: (1) for the Required Deposit (as defined in the Terms of Sale) on the date of the Sale; and (2) for the balance of the purchase price for the Collateral (or any Individual Collateral, as applicable) on the closing date prescribed by the Terms of Sale. The winning bidder must pay all transfer taxes, stamp duties and similar taxes incurred in connection with the purchase of the Collateral (or any Individual Collateral, as applicable).

Questions may be directed to Brett Rosenberg at brett.rosenberg@jll.com.