**<u>Exhibit 1</u>**

**Sale Order**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| JOANN INC., *et al.*,[1] | ) | Case No. 25-10068 (CTG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: Docket No. 17** |

## ORDER (A) APPROVING AND AUTHORIZING SALE OF THE DEBTORS' ASSETS, FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (C) GRANTING RELATED RELIEF

Upon the motion[2] of the above-captioned debtors and debtors in possession (collectively,

the "Debtors") for the entry of an order (the "Sale Order"): (a) authorizing and approving

performance under the terms and conditions of the Agency Agreement dated as of

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: JOANN Inc. (5540); Needle Holdings LLC (3814); Jo-Ann Stores, LLC (0629); Creative Tech Solutions LLC (6734); Creativebug, LLC (3208); WeaveUp, Inc. (5633); JAS Aviation, LLC (9570); joann.com, LLC (1594); JOANN Ditto Holdings Inc. (9652); Dittopatterns LLC (0452); JOANN Holdings 1, LLC (9030); JOANN Holdings 2, LLC (6408); and Jo-Ann Stores Support Center, Inc. (5027). The Debtors' mailing address is 5555 Darrow Road, Hudson, Ohio 44236.

[2] Capitalized terms used but not otherwise defined in this Sale Order have the meanings given to such terms in the Agency Agreement, the *Motion of Debtors for Entry of an Order (I) Approving Bidding Procedures, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Stalking Horse Agreement, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts and Leases, (VII) Approving the Sale of Assets, and (VIII) Granting Related Relief* [Docket No. 17] (the "Motion"), the *Order (I) Approving Bidding Procedures, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Stalking Horse Agreement, (V) Establishing Notice and Procedures for the Assumption and Assignment of Assumed Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts and Leases, (VII) Approving the Sale of Assets, and (VIII) Granting Related Relief* [Docket No. 446] (the "Bidding Procedures Order"), the *Order (I) Authorizing and Approving the Conduct of Store Closing Sales, with Such Sales to be Free and Clear of all Liens, Claims, and Encumbrances and (II) Granting Related Relief* [Docket No. 443] (the "Store Closing Order"), or the Cash Collateral Order, as applicable. For the avoidance of doubt, in the event of any conflict or inconsistency between defined terms in this Sale Order, the Motion, the Bidding Procedures Order, the Cash Collateral Order, and those defined in the Agency Agreement, the definitions set forth in the Agency Agreement shall control.

February 26, 2025, by and among the Debtors (the "Sellers") and GA Joann Retail Partnership, LLC and Wilmington Savings Fund Society, FSB, in its capacity as prepetition term loan agent (collectively, the "Agent Purchaser" and, together with any designee of the Agent Purchaser, as applicable, the "Purchaser") attached to this Sale Order as **Exhibit A** (as may be amended, supplemented, restated, or otherwise modified from time to time, the "Agency Agreement"), and all other transaction documents necessary and desirable to consummate the Sale, including the Carve Out Reserves Agreement (as defined below) (collectively, the "Sale Transaction Documents"); (b) authorizing and approving the sale of (i) the exclusive right to designate the purchasers, assignees, sublessees, or other transferees of Sellers' right, title, and interest in and to any or all of the Sellers' Leases and Contracts (the "Lease/Contract Designation Rights")[3] and (ii) the exclusive right to market and sell, and/or otherwise designate the purchasers, transferees, and/or assignees of any or all of the Assets (as defined in the Agency Agreement) free and clear of all liens, claims (as such term is defined by section 101(5) of the Bankruptcy Code), liabilities, rights, remedies, restrictions, interests, and encumbrances of any kind or nature whatsoever whether arising before or after the Petition Date, whether at law or in equity, including all claims or rights based on any successor or transferee liability, all environmental claims, all change in control provisions, all rights to object or consent to the effectiveness of the transfer of the Assets to the Purchaser or to be excused from accepting performance by the Purchaser or performing for the benefit of the Purchaser under any Assigned Contract (as defined in the Bidding Procedures

---

[3]  "Contracts" shall mean the Sellers' right, title, and interest in and to executory contracts (together with all amendments, extensions, modifications, and other material documents related thereto). "Leases" shall mean the Sellers' unexpired leases of non-residential real property (together with all amendments, extensions, modifications, and other material documents related thereto).

Order)[4] and all rights at law or in equity (collectively, "Claims"), except to the extent set forth in the Agency Agreement, including the Permitted Encumbrances (as defined in the Agency Agreement), without further order of the Court (the "Asset Designation Rights" and collectively with the Lease/Contract Designation Rights, the "Designation Rights") (the matters in this proviso (b), collectively, and including all actions taken or required to be taken in connection with the implementation and consummation of the Agency Agreement, the "Sale"), upon the closing of the Sale (the "Closing"), satisfaction of the Debt Payoff (as defined below), the Initial Wind-Down Payment (as defined below), and the Initial Central Services Payment (as defined in the Agency Agreement) (collectively, the "Initial Purchase Price Funding") and until the Designation Rights Termination Date;[5] (c) subject to the exercise of the Lease/Contract Designation Rights as set forth in the Agency Agreement and pursuant to the Designation Rights Procedures (as defined herein), authorizing the assumption by the Sellers and assignment to the Purchaser of Assigned Contracts, if any, pursuant to section 365 of the Bankruptcy Code, upon the Closing and the Initial Purchase Price Funding, subject to the Purchaser's payment or satisfaction of any Cure Costs, and until the Designation Rights Termination Date; (d) authorizing the Debtors to consummate the Sale and all other transactions related to the Agency Agreement, including, but not limited to, the GOB Sale (as defined in the Agency Agreement) and Store Closings under the terms of the Agency Agreement and in accordance with the Store Closing Order; and (e) granting related relief; and this Court having entered the Bidding Procedures Order; and the Debtors having scheduled an

---

[4]  For the avoidance of doubt, "Assigned Contracts," as defined in the Bidding Procedures Order, includes Contracts and Leases that may be assumed and assigned in connection with the Sale and pursuant to the Designation Rights Procedures.

[5]  "Designation Rights Termination Date" shall mean the earlier to occur of (i) the end of the Lease/Contract Designation Rights Period applicable to a particular Lease or Contract and (ii) May 31, 2025, as may be amended by written agreement of the Sellers and Agent Purchaser without further order by the Court.

auction (the "Auction") for the Assets; and the Auction having occurred on February 21 and 22, 2025 in accordance with the Bidding Procedures; and the Debtors having determined in consultation with the Consultation Parties that the Purchaser has submitted the highest or otherwise best bid for the Assets and determined that the Purchaser is a Qualified Bidder and a Winning Bidder, in accordance with the Bidding Procedures; and the Court having held a hearing on February 26, 2025 (the "Sale Hearing"); and the Court having reviewed and considered the Motion, the Agency Agreement, and any and all objections to the Sale, the Agency Agreement, and the other Sale Transaction Documents filed in accordance with the Bidding Procedures Order; and the Court having heard statements of counsel and the evidence presented in support of the relief requested in the Motion at the Sale Hearing; and upon the First Day Declaration, witness testimony, and the Frejka Declaration;[6] and it appearing that due notice of the Motion, the Sale Hearing, and the Sale has been provided; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, and their stakeholders; and it appearing that the Court has jurisdiction over this matter; and it appearing that the legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation, it is hereby

---

[6]  "Frejka Declaration" means the *Declaration of Elise S. Frejka, CIPP/US, in Support of the Motion of Debtors for Entry of an Order (I) Approving Bidding Procedures, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Stalking Horse Agreement, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts and Leases, (VII) Approving the Sale of Assets, and (VIII) Granting Related Relief* [Docket No. 388].

**FOUND, CONCLUDED, AND DETERMINED THAT:**

**Jurisdiction, Venue, and Final Order**

A.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper in this District and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      This Sale Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), any other applicable Bankruptcy Rules or Local Rules, and to any extent necessary under Bankruptcy Rule 9014 and Federal Rule of Civil Procedure 54(b), as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Sale Order, and expressly directs entry of judgment as set forth herein.

C.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

**Notice of the Bidding Procedures Order, Bidding Procedures,
Auction, Sale Hearing, Agency Agreement, Sale, and Cure Costs**

D.      As evidenced by the Notice of Potential Sale Hearing [Docket No. 182], Notice of Auction for the Sale of the Debtors' Assets [Docket No. 448], Proof of Publication [Docket No. 472], the Notice of Winning Bidder for Certain of the Debtors' Assets [Docket No. 480], the Notice of Filing of Winning Bidder Agency Agreement [Docket No. 486], and the affidavits of service previously filed with this Court [Docket Nos. 313, [●], [●]], notice of the Bidding Procedures Order, the Bidding Procedures, the Auction, the Sale Hearing, the Agency Agreement,

and the Sale was proper, timely, adequate, and sufficient under the circumstances, and has been provided in accordance with sections 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007, and 9014, and Local Rule 6004-3.

E.      A reasonable opportunity to object or to be heard regarding the relief requested in the Motion was afforded to all interested persons and entities.

F.      The disclosures made by the Debtors in the Motion and related documents filed with the Court concerning the Sale are sufficient under the circumstances.

**Highest and Best Offer**

G.      The Debtors conducted a sale process in accordance with, and have, along with the Purchaser, complied in all respects with, the Bidding Procedures Order and afforded a full, fair, and reasonable opportunity for any interested party to make a higher or otherwise better offer to purchase the Assets.  The approval and consummation of the Sale is in the best interests of the Debtors, their creditors, and all other parties in interest.

H.      (i) The Debtors and their advisors engaged in a robust and extensive marketing and sale process, both prior to the commencement of these chapter 11 cases and through the postpetition sale process in accordance with the Bidding Procedures Order and the sound exercise of the Debtors' business judgment, as more fully detailed in the First Day Declaration, the Frejka Declaration, and witness testimony; (ii) the Bidding Procedures were substantively and procedurally fair to all parties and the Debtors conducted a fair, open, and adequate sale process in full compliance in all respects with the Bidding Procedures Order, with all other applicable orders of the Court, and with the Debtors' fiduciary duties; (iii) the sale process, the Bidding Procedures, and the Auction were non-collusive, duly noticed, and provided a full, fair, reasonable, and adequate opportunity for any entity that either expressed an interest in acquiring the Assets, or who the Debtors believed may have had an interest in acquiring the Assets, to make an offer to

purchase the Assets; (iv) the Debtors and the Purchaser have negotiated and undertaken their roles leading to the entry into the Agency Agreement in a diligent, non-collusive, fair, reasonable, and good faith manner; and (v) the sale process conducted by the Debtors pursuant to the Bidding Procedures Order and the Bidding Procedures resulted in the highest or otherwise best value for the Assets for the Debtors and their estates, and was in the best interest of the Debtors, their estates, and their creditors.  There is no legal or equitable reason to delay entry into the Agency Agreement and the transactions contemplated therein.

I.      The consummation of the Sale outside a plan of reorganization pursuant to the Agency Agreement neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a plan of reorganization or liquidation for the Debtors.  The Sale does not constitute a sub rosa chapter 11 plan for which approval has been sought without the protections that a disclosure statement would afford.

J.      The Purchaser would not have entered into the Agency Agreement and the Sale Transaction Documents, and would not consummate the transactions contemplated thereby, including, without limitation, the Sale and the exercise of Designation Rights of the Assigned Contracts, if any,  pursuant to the Designation Rights Procedures, if (i) a first priority, senior security interest and lien is not automatically perfected on any Assets, Proceeds,[7] and Additional Agent Merchandise Proceeds determined to constitute property of the Debtors' estates after entering this Sale Order and upon Closing or (ii) the Purchaser is not granted a superpriority administrative expense claims pursuant to section 507(b) of the Bankruptcy Code, which is senior to all other administrative expense claims (including any other superpriority administrative

---

[7]    "Proceeds" shall mean all proceeds (cash or otherwise or payments from insurance on the Assets or Merchandise) from the sale of any Assets, other than the sale of any Additional Agent Merchandise, net of Sales Taxes.

expense claims) against the Debtors to the extent of any amounts owing from the Debtors to Purchaser in connection with the Agency Agreement.

**Good Faith of Debtors and Purchaser**

K.     The sale and marketing process engaged in by the Debtors was non-collusive, in good faith, and substantively and procedurally fair to all parties in interest.  Likewise, the negotiation of the Sale and the other transactions contemplated by the Agency Agreement, including the consideration to be paid by the Purchaser under the Agency Agreement, were negotiated by the Debtors and the Purchaser at arm's-length, in good faith, and without collusion pursuant to sections 363(m) and 364(e) of the Bankruptcy Code, and such consideration constitutes reasonably equivalent value and fair and adequate consideration for the Assets.  Specifically: (i) the Purchaser recognized that the Debtors were free to deal with any other party interested in purchasing the Assets; (ii) the Debtors and the Purchaser complied in all respects with the provisions in the Bidding Procedures Order in negotiating and entering into the Agency Agreement and the other Sale Transaction Documents, and the transactions described therein comply with the Bidding Procedures Order; (iii) the Purchaser agreed to subject any bid to the competitive bid procedures set forth in the Bidding Procedures Order; (iv) all payments made by the Purchaser in connection with the Sale have been disclosed in the Agency Agreement; (v) no common identity of directors, officers, or controlling stockholders exists among the Purchaser and the Debtors; (vi) the negotiation and execution of the Agency Agreement and the other Sale Transaction Documents were at arm's-length and in good faith, and at all times each of the Purchaser and the Debtors were represented by competent counsel of their choosing; and (vii) the Debtors and the Purchaser have not acted in a collusive manner with any person.  The Purchaser will be acting in good faith within the meaning of sections 363(m) and 364(e) of the Bankruptcy Code in closing the transactions contemplated by the Agency Agreement and the other Sale Transaction

Documents.  The terms and conditions set forth in the Agency Agreement are fair and reasonable under the circumstances and were not entered into for the purpose of, nor do they have the effect of, hindering, delaying, or defrauding the Debtors or their creditors under any applicable laws. The Purchaser is a "good faith purchaser" within the meaning of sections 363(m) and 364(e) of the Bankruptcy Code, and, as such, is entitled to all the protections afforded thereby.  The Debtors and their respective management, board of directors, board of managers (or comparable governing authority), employees, agents, and representatives, and the Purchaser and its respective employees, agents, advisors, and representatives, each actively participated in the bidding process, and each acted in good faith and without collusion or fraud of any kind.  Neither the Purchaser nor any of its affiliates, officers, directors, members, partners, principals, or shareholders (or equivalent) or any of their respective representatives, successors, or assigns is an "insider" (as defined under section 101(31) of the Bankruptcy Code) of any Debtors, and therefore, each such person is fully entitled to the protections of sections 363(m) and 364(e).

L.      For the avoidance of doubt, neither the Purchaser nor any of its affiliates, is, or shall be deemed to be, a "successor" to, continuation of, or alter ego of, any of the Debtors or their estates by reason of any theory of law or equity, including for purposes of any foreign, federal, state or local revenue law, pension law, the Employee Retirement Income Security Act, the Consolidated Omnibus Budget Reconciliation Act, the WARN Act (29 U.S.C. §§ 2101 et seq.), Comprehensive Environmental Response Compensation and Liability Act, the Fair Labor Standard Act, Title VII of the Civil Rights Act of 1964 (as amended), the Age Discrimination and Employment Act of 1967 (as amended), the Federal Rehabilitation Act of 1973 (as amended), or the National Labor Relations Act, 29 U.S.C. § 151, et seq.  To the extent allowed by applicable law, except as otherwise set forth in this Sale Order, the Purchaser, as a result of any action taken

in connection with the Sale (i) is not, and shall not be considered, a successor to the Debtors, (ii) has not, *de facto* or otherwise, merged with or into the Debtors, (iii) is not a continuation or substantial continuation of any of the Debtors or their respective estates, businesses, or operations, or any enterprise of the Debtors, and (iv) does not have a common identity of incorporators, directors or controlling shareholders with the Debtors.

### No Fraudulent Transfer

M.      The consideration provided by the Purchaser pursuant to the Agency Agreement for its purchase of the Assets constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act, and under the laws of the United States, any state, territory, possession, or the District of Columbia.

N.      Neither the Purchaser nor its past, present, and future subsidiaries, parents, divisions, affiliates, agents, representatives, insurers, attorneys, successors and assigns, nor any of its nor their respective directors, managers, officers, employees, shareholders, members, agents, representatives, attorneys, contractors, subcontractors, independent contractors, owners, insurance companies, or partners (collectively, the "Purchaser Parties") is a continuation of the Debtors or their respective estates and no Purchaser Party is holding itself out to the public as a continuation of the Debtors or their respective estates and the Sale does not amount to a consolidation, merger, or de facto merger of the Purchaser (or any other Purchaser Party) and the Debtors.

O.      None of the Debtors, the Purchaser, nor any of their respective affiliates, officers, directors, members, partners, principals, or shareholders (or equivalent) or any of their respective representatives, attorneys, successors, or assigns have engaged in any conduct that would cause or permit the consummation of the Sale or the other transactions contemplated by the Agency

Agreement to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

## Validity of Transfer

P.     The Debtors are the sole and lawful owners of, and have clear and marketable title to the extent of their right, title and interest in and to the Assets to be sold to the Purchaser pursuant to the Agency Agreement.  The Debtors' right, title, and interest in and to the Assets constitute property of the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code.

Q.     The Debtors (i) have full corporate power and authority to execute and deliver the Agency Agreement and all other documents contemplated thereby, as applicable, (ii) have all of the power and authority necessary to consummate the Sale, and (iii) have taken all action necessary to authorize and approve the Agency Agreement and to consummate the Sale, and no further consents or approvals, other than those expressly provided for in the Agency Agreement, are required for the Debtors to consummate the transactions contemplated by the Agency Agreement. The Debtors' right, title and interest in and to the Assets constitute property of the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code and the Debtors' title thereto is presently vested in the Debtors' estates.

R.     The Agency Agreement is a valid and binding contract between the Sellers and the Purchaser and shall be enforceable pursuant to its terms.

## Section 363(f) Is Satisfied

S.     The Sale of the Assets to the Purchaser under the terms of the Agency Agreement meets the applicable provisions of section 363(f) of the Bankruptcy Code, such that, except for the Permitted Encumbrances and as otherwise set forth in this Sale Order, the Sale of the Assets and any exercise of Purchaser's Designation Rights will be free and clear of any and all Claims, causes of action, liens (including, without limitation, any statutory lien on real and personal property and

any and all "liens" as that term is defined and used in the Bankruptcy Code, including section 101(37) thereof), liabilities, interests, rights, and encumbrances (including, without limitation, the following:  all mortgages, restrictions (including, without limitation, any restriction on the use, voting rights, transfer rights, claims for receipt of income, or other exercise of any attributes of ownership), hypothecations, charges, indentures, loan agreements, instruments, leases, licenses, sublicenses, options, deeds of trust, security interests, equity interests, conditional sale rights or other title retention agreements, pledges, judgments, demands, rights of first refusal, consent rights, offsets, contract rights, rights of setoff not taken prepetition, rights of recovery, reimbursement rights, contribution claims, indemnity rights, exoneration rights, product liability claims, alter-ego claims, environmental rights and claims (including, without limitation, toxic tort claims), labor rights and claims, employment rights and claims, pension rights and claims, tax claims, regulatory violations by any governmental entity, decrees of any court or foreign or domestic governmental entity, charges of any kind or nature, debts arising in any way in connection with any agreements, acts, or failures to act, reclamation claims, obligation claims, demands, guaranties, option rights or claims, rights, contractual or other commitment rights and claims, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of the chapter 11 cases and whether imposed by agreement, understanding, law, equity or otherwise, including claims otherwise arising under any theory, law, or doctrine of successor or transferee liability or theories of liability related to acting in concert or active participation with the Debtors or related theories) against any of the Assets (except to the extent set forth in the Agency

Agreement), and will not subject any Purchaser Party to any liability for any Claims whatsoever (including, without limitation, under any theory of equitable law, antitrust, or successor or transferee liability), except as expressly provided in the Agency Agreement with respect to the Permitted Encumbrances and this Sale Order, because, in each case, one or more of the standards set forth in section 363(f)(1)–(5) of the Bankruptcy Code has been satisfied; *provided* that all liens, claims, encumbrances, and interests of which the Assets are sold free and clear pursuant to the Sale Order (including the Adequate Protection Liens (as defined in the Cash Collateral Order)) shall automatically attach to all proceeds of the Sale in the order of priority of such liens, claims, encumbrances, and interests, with the same validity, force, and effect which they had against the applicable Assets prior to the sale (including pursuant to the Cash Collateral Order).  All holders of Claims who did not object, or withdrew their objections to the Sale, are deemed to have consented to the Sale pursuant to section 363(f)(2) of the Bankruptcy Code, and all holders of Claims are adequately protected—thus satisfying section 363(e) of the Bankruptcy Code—by having their Claims (including the Adequate Protection Liens), if any, attach to the proceeds of the Sale ultimately attributable to the property against or in which they assert Claims, or other specifically dedicated funds, in the same order of priority and with the same validity, force, and effect that such holder had prior to the Sale (including pursuant to the Cash Collateral Order), subject to any rights, claims, and defenses of the Debtors or their estates, as applicable. Those holders of Claims who did object and that have an interest in the Assets fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code.  All proceeds of the Sale shall be funded into and held in an account owned and controlled by the Debtors, subject to the Cash Collateral Order; *provided* that the proceeds of the Sale to fund the Debt Payoff shall be distributed in accordance with the terms set forth in the Agency Agreement.

T.      The transfer of the Assets to the Purchaser under the Agency Agreement will be a legal, valid, and effective transfer of all of the Debtors' legal, equitable, and beneficial right, title, and interest in and to the Assets free and clear of all Claims, except as expressly provided in the Agency Agreement with respect to the Permitted Encumbrances and as otherwise set forth in this Sale Order.

U.      The Purchaser would not have entered into the Agency Agreement and the Sale Transaction Documents, and would not consummate the transactions contemplated thereby, including, without limitation, the Sale and the exercise of the Designation Rights of the Assigned Contracts, if (i) the transfer of the Assets was not free and clear of all Claims of any kind or nature whatsoever, including, without limitation, rights or claims based on any successor, transferee, derivative, or vicarious liability or any similar theory and/or applicable state or federal law or otherwise or (ii) the Purchaser or any of its affiliates, would, or in the future could, be liable for any interests, including, without limitation, rights or claims based on any successor, transferee, derivative, or vicarious liability or any similar theory and/or applicable state or federal law or otherwise, in each case subject only to the Permitted Encumbrances.

**GOB Sale and Store Closings**

V.      The Debtors have articulated good and sufficient business reasons for the Court to authorize the Purchaser to conduct the GOB Sale and Store Closings in accordance with the process and procedures pursuant to the Agency Agreement and set forth in the Store Closing Order and as modified in **Exhibit B** hereto (the "Amended Store Closing Procedures").  The Store Closing Order is incorporated and modified as described herein.

W.      The Purchaser's Asset Designation Rights are integral to the Agency Agreement and the GOB Sale, are in the best interests of the Debtors and their respective estates and creditors,

and represents the sound exercise the Debtors' business judgment.  Specifically, the Asset Designation Rights are necessary to sell the Assets to the Purchaser.

X.     Except as otherwise set forth in this Sale Order, the designation to the Purchaser of the Asset Designation Rights will not subject the Purchaser to any liability whatsoever (except for the Permitted Encumbrances or as otherwise set forth in this Sale Order) that arise prior to the Closing or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of equitable law, any theory of antitrust, successor, transferee, derivative, or vicarious liability or any similar theory and/or applicable state or federal law or otherwise.

## Lease/Contract Designation Rights of the Assigned Contracts

Y.     The Purchaser's Lease/Contract Designation Rights pursuant to the terms of this Sale Order are integral to the Agency Agreement, are in the best interests of the Debtors and their respective estates, and creditors and represents the sound exercise the Debtors' business judgment.

Z.     The Sellers and the Purchaser will, to the extent necessary, satisfy the requirements of section 365 of the Bankruptcy Code, prior to the assumption and assignment of the Assigned Contracts pursuant to the designation rights procedures that will be set forth in a separate motion and proposed form of order (the "Designation Rights Procedures"),[8] *provided*, *however*, that all rights of a counterparty to an Assigned Contract to object to the assumption and assignment of a Contract or Lease in connection with the Designation Rights Procedures on any grounds are expressly reserved.  The Purchaser and the Debtors will identify all Assigned Contracts by filing

---

[8]    For the avoidance of doubt, no Assigned Contracts are being assumed or assumed and assigned pursuant to this Sale Order.  Instead, there will be a separate motion for entry of Designation Rights Procedures, in a form acceptable to the Purchaser and consistent with the terms of the Agency Agreement.

a notice on the docket following the Closing and pursuant to the Designation Rights Procedures, which may be supplemented.

## **Wind-Down Amount**

AA.    Sound business justifications also exist for (i) the deposit of the Carve Out Reserves (as defined in the Cash Collateral Order) to be funded upon Closing in accordance with this Sale Order and the Cash Collateral Order into a segregated account (the "Carve Out Reserves Account") held in trust for the benefit of the parties entitled to the protections of the Carve Out Reserves as set forth in the Cash Collateral Order and to be governed by a customary agreement governing such segregated account that is otherwise consistent with this Sale Order, the Cash Collateral Order, and the Agency Agreement (the "Carve Out Reserves Agreement"), and (ii) the funding of the Wind-Down Payments (as defined below) pursuant to the Wind-Down Budget (as defined below, and the Wind-Down Payments and the Carve Out Reserves, collectively, the "Wind-Down Amount").  The Wind-Down Amount will avoid a freefall shutdown of the Debtors' remaining estates and will provide funding of those professional fees and other wind-down costs necessary to implement an orderly and responsible wind-down of the Debtors' estates.  The Wind-Down Amount is reasonable under the facts and circumstances of these chapter 11 cases.

## **Prompt Consummation**

BB.    Based on the record of the Sale Hearing, and for the reasons stated on the record at the Sale Hearing, the Sale of the Assets must be approved and consummated promptly to preserve the value of the Assets.  Time, therefore, is of the essence in effectuating the Agency Agreement. As such, the Debtors and the Purchaser intend to close the Sale of the Assets as soon as reasonably practicable in accordance with the terms of the Agency Agreement.  The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and

justification for the immediate approval and consummation of the Agency Agreement in accordance with the terms thereof.  Accordingly, there is sufficient cause to waive the stay provided in the Bankruptcy Rules 6004(h) and 6006(d) and any other applicable Bankruptcy Rules or Local Rules.

**NOW, THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED THAT:**

1.      The Motion is GRANTED, as set forth in this Sale Order.

2.      All objections to or reservation of rights with respect to the Motion or the relief requested therein that have not been withdrawn or resolved are overruled with prejudice; provided that the foregoing shall not prejudice the rights of any applicable counterparty to an Assigned Contract with respect to Purchaser's Lease/Contract Designation Rights and the Designation Rights Procedures.  All persons and entities who did not object or withdraw their objections to the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.

3.      The Agency Agreement and the other Sale Transaction Documents, and all terms and conditions thereof, are hereby APPROVED in all respects, unless otherwise set forth in this Sale Order.  The failure to specifically include any particular provision of the Agency Agreement or the Sale Transaction Documents in this Sale Order shall not diminish or impair the effectiveness of such provision.

4.      Upon entry of this Sale Order, the Challenge Deadline (as defined in the Cash Collateral Order) shall be deemed to have expired as of the date of the Sale Hearing.

**Designation Rights of the Assets as Set Forth in the Agency Agreement**

5.      The Debtors, their respective officers, employees, and agents, and all other applicable parties are authorized and directed to (a) take any and all actions necessary or appropriate to perform, consummate, implement, and close the Sale in accordance with the terms and conditions set forth in the Agency Agreement, the Sale Transaction Documents, and this Sale

Order, and (b) take all further actions and execute and deliver the Agency Agreement and Sale Transaction Documents and any and all additional instruments and documents that may be necessary or appropriate to implement the Agency Agreement and the other Sale Transaction Documents and consummate the Sale in accordance with the terms thereof, all without further order of the Court.

6.      Neither the Purchaser nor any of its affiliates is acquiring any of the Excluded Assets as set forth in Sections 16.21(e) of the Agency Agreement.

7.      All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with, or which would be inconsistent with, the ability of the Debtors to transfer the Assets to the Purchaser in accordance with the Agency Agreement, the other Sale Transaction Documents, and this Sale Order; *provided*, *however*, that nothing herein shall prevent counterparties to Assigned Contracts, if any, from objecting to the proposed assumption and assignment of an Assigned Contract or seeking to enforce contractual rights and obligations under such Contracts or Leases in connection with the Designation Rights Procedures.  For the avoidance of doubt, all utilities, landlords, creditors, and other interested parties and all persons acting for or on their behalf shall not interfere with or otherwise impede the conduct of the GOB Sale or Store Closings or institute any action in any forum other than this Court that in any way directly or indirectly interferes with or obstructs or impedes the conduct of the GOB Sale or Sale Closings unless otherwise ordered by the Court, so long as such GOB Sale or Store Closing is conducted in accordance with the Amended Store Closing Procedures and/or any Side Letter (as defined herein).

8.      Following the satisfaction of the Initial Purchase Price Funding, and in accordance with the Agency Agreement and this Sale Order, and upon the exercise of Purchaser's Designation Rights, pursuant to the Designation Rights Procedures as it relates to the Assigned Contracts, if

any, all of the Sellers' rights, titles, and interests in and to, and possession of, the Assets shall be vested in the Purchaser, pursuant to sections 105(a), 363(b), 363(f), and 365 of the Bankruptcy Code. Such transfer in accordance with the Designation Rights shall constitute a legal, valid, enforceable, and effective transfer of the Assets. In connection with the transfer of the Assets, Purchaser is granted derivative standing to pursue the Avoidance Actions (subject to Section 11.2(f) of the Agency Agreement) and Other Causes of Action in the name of and/or on behalf of the Sellers. All persons or entities, presently at or after the date of the Initial Purchase Price Funding, in possession of some or all of the Assets, shall surrender possession of any and all portions of the Assets to the Purchaser on the date of the Initial Purchase Price Funding or at such time thereafter as the Purchaser may request. Upon the Initial Purchase Price Funding, Purchaser shall have the exclusive right to market and sell, or otherwise designate the purchasers, licensees, and/or assignees of, any or all of the Assets free and clear of all liens, claims, and encumbrances thereon (other than Permitted Encumbrances or as otherwise set forth in this Sale Order) without further order of the Bankruptcy Court; *provided* that the Lease/Contract Designation Rights shall be exercised in accordance with the Designation Rights Procedures.

9.     This Sale Order (a) shall be effective as a determination that, as of the Initial Purchase Price Funding, (i) upon the exercise of Purchaser's Designation Rights, pursuant to the Designation Rights Procedures as it relates to the Assigned Contracts, if any, the Assets shall have been transferred to the Purchaser free and clear of all Claims, except as to the Permitted Encumbrances, as applicable, or as otherwise set forth herein, or otherwise held in trust by the Sellers for the benefit of the Purchaser, and (ii) the conveyances described herein have been effected; and (b) to the greatest extent of applicable law, is and shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, registrars of

patents, trademarks, or other intellectual property, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments; and each of the foregoing persons and entities is hereby authorized to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agency Agreement and the other Sale Transaction Documents. The Assets are sold free and clear of any reclamation rights. All Claims on the Assets (including the Adequate Protection Liens) shall automatically attach to the proceeds of the Sale ultimately attributable to the property against which such Claims applied or other specifically dedicated funds, in the same order of priority and with the same validity, force, and effect that such Claims applied prior to the Sale (including pursuant to the Cash Collateral Order), subject to any rights, claims, and defenses of the Debtors or their estates, as applicable, or as otherwise provided herein. Purchaser shall also be authorized to sell the Additional Agent Merchandise (as defined in the Agency Agreement) as set forth in the Agency Agreement, subject to the Amended Store Closing Procedures.

10.    At Closing, the Purchaser shall (i) to the Prepetition ABL Agent, for the benefit of the Prepetition ABL Lenders, and certain other persons as directed in the ABL Payoff Letter (as defined in the Agency Agreement), (a) pay the amount in cash necessary to indefeasibly pay in full in cash all Prepetition Revolving Obligations, including, without limitation, all outstanding principal, accrued interest, fees, costs and expenses (including, without limitation, all attorneys' fees, costs and expenses, and any other amounts as provided in the Cash Collateral Order and the ABL Payoff Letter), and (b) provide and/or post cash collateral for (and/or replacement of) any issued and outstanding letters of credit (in form and substance acceptable to the Prepetition ABL

Agent), in each case in accordance with and as set forth in the ABL Payoff Letter (which shall be in form and substance acceptable to the Prepetition ABL Agent, and such amounts and other consideration, the "ABL Payoff"); and (ii) pay to the Prepetition FILO Agent, for the benefit of the Prepetition FILO Lenders, and certain other persons as directed in the FILO Payoff Letter (as defined in the Agency Agreement), the amount in cash necessary to indefeasibly pay in full in cash all Prepetition FILO Obligations, including, without limitation, all outstanding principal, accrued interest, fees, costs and expenses, and any other amounts as provided in the Cash Collateral Order and the ABL Payoff Letter and make whole obligations, all as set forth in the FILO Payoff Letter (as defined in the Agency Agreement, which shall be in form and substance acceptable to the Prepetition FILO Agent) (such amounts and other consideration, the "FILO Payoff" and, together with the ABL Payoff, the "Debt Payoff").  Upon receipt by the Prepetition ABL Agent and Prepetition FILO Agent of the Debt Payoff in accordance with the ABL Payoff Letter and the FILO Payoff Letter and expiration of the Challenge Deadline (as defined in the Cash Collateral Order), (i) the Prepetition ABL Agent and the Prepetition FILO Agent are authorized to immediately receive and apply any amounts received pursuant to the ABL Payoff Letter and the FILO Payoff Letter, (ii) all ongoing commitments under the ABL/FILO Credit Agreement shall be canceled and terminated, and (iii) following the funding of the Funded Reserve Account in accordance with this Sale Order, the Prepetition ABL Agent, the Prepetition FILO Agent and the Prepetition ABL and FILO Lenders shall have no further obligation to fund the Carve-Out Reserves (as defined in the Cash Collateral Order) or subordinate their liens and claims on account of any Allowed Professional Fees (as defined in the Cash Collateral Order).  For the avoidance of doubt, the Prepetition ABL and FILO Liens (and the Adequate Protection Liens for Prepetition ABL and FILO Lenders) shall continue in full force and effect until such time as the Prepetition

ABL and FILO Obligations are Paid in Full and nothing herein shall modify in any way the Cash Collateral Order.

11.     On the Closing, each of the Prepetition Secured Creditors (as defined in the Cash Collateral Order) and their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees shall be deemed released and discharged by each and all of the Debtors, the Debtors' estates, any party acting on behalf of the Debtors or their Estates, and the Purchaser, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any cause of action, directly or derivatively, by, through, or for the foregoing entities, from any and all claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, the Debtors' estates and the Purchaser, as applicable, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Debtors' estates, the Purchaser or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any claim against, or interest in, the Debtors or the Purchaser, based on or relating to, or in any manner arising from, in whole or in part, the transactions or events giving rise to, the business or contractual agreements between any Debtors, the Prepetition Secured Creditors, the Debtors' in- or -out-of-court restructuring efforts, intercompany transactions, the Sale, the Prepetition Credit Documents or the Prepetition Loan Facilities (each as defined in the Cash Collateral Order), the Chapter 11 Cases, or any restructuring transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Sale, the Prepetition Credit Documents or the Prepetition Loan Facilities, the Chapter 11 Cases, this Sale Order or the distribution of proceeds from the Sale or any other related agreement, or

upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the closing.

12.     Except as otherwise provided in the Agency Agreement and this Sale Order, including with respect to the Permitted Encumbrances, all persons and entities (and their respective successors and assigns), including, but not limited to, all debt security holders, equity security holders, affiliates, governmental, tax, and regulatory authorities, lenders, customers, vendors, employees, trade creditors, litigation claimants, and other creditors holding claims arising under or out of, in connection with, or in any way relating to, the Debtors, the Assets, and the ownership, sale, or operation of the Assets prior to the Closing or the transfer of the Assets to the Purchaser, are hereby forever barred, estopped, and permanently enjoined from asserting such claims against any Purchaser Party and its property (including, without limitation, the Assets).  Following the Closing, no holder of any Claim shall interfere with the Purchaser's title to or use and enjoyment of the Assets based on or related to any such claim or interest.

13.     Except as otherwise provided in the Agency Agreement or this Sale Order, including with respect to the Permitted Encumbrances, if any person or entity that has filed financing statements, mortgages, mechanic's claims, lis pendens, or other documents or agreements evidencing claims against the Debtors or in the Assets shall not have delivered to the Debtors prior to the Closing of the Sale, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, and/or releases of all Claims that the person or entity has with respect to the Sellers or the Assets or otherwise, then only with regard to the Assets that are purchased by the Purchaser pursuant to the Agency Agreement and this Sale Order, (a) the Sellers are hereby authorized and directed to execute and file such statements, instruments, releases, and other documents on behalf of the person or entity with respect to the

Assets, (b) the Purchaser is hereby authorized to file, register, or otherwise record a certified copy of this Sale Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Claims against the Purchaser Parties and the Assets, and (c) upon consummation of the Sale, the Purchaser may seek in this Court or any other court to compel appropriate parties to execute and/or file termination statements, instruments of satisfaction, and releases of all Claims that are extinguished or otherwise released pursuant to this Sale Order under section 363 of the Bankruptcy Code, and any other provisions of the Bankruptcy Code, with respect to the Assets. This Sale Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department, or office. Notwithstanding the foregoing, the provisions of this Sale Order authorizing the Sale and designation of the Assets free and clear of Claims shall be self-executing and neither the Debtors nor the Purchaser shall be required to execute or file releases, termination statements, assignments, consents, or other instruments to effectuate, consummate, and implement the provisions of this Sale Order.

14.     Except as otherwise provided in the Agency Agreement and this Sale Order, including with respect to the Permitted Encumbrances, effective upon the Closing, all persons and entities are forever prohibited and enjoined from commencing or continuing in any matter any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral, or other proceeding against the Purchaser, any Purchaser Party or their respective assets (including, without limitation, the Assets), with respect to any (a) claim in these chapter 11 cases or in connection with or related to the Sale or the Debtors or (b) successor or transferee liability including, without limitation, the following actions with respect to clauses (a) and (b): (i) commencing or continuing any action or other proceeding pending or threatened; (ii) enforcing,

attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any lien, claim, interest, or encumbrance; (iv) asserting any setoff (except for setoffs exercised prior to the Petition Date), or right of subrogation, or recoupment of any kind; (v) commencing or continuing any action, in any manner or place, that does not comply with, or is inconsistent with, the provisions of this Sale Order or other orders of this Court, or the agreements or actions contemplated or taken in respect hereof; or (vi) revoking, terminating, failing, or refusing to renew any license, permit, or authorization to operate any business in connection with the Assets or conduct any of the businesses operated with respect to such Assets.  Except as otherwise expressly provided in this Sale Order or the Agency Agreement and in accordance with the Agent Dropout Rights (as defined below), after the Closing, the Debtors shall have no further liability with respect to the Assets, and any claims, whether administrative or otherwise, relating to or arising from such Assets after the closing of the sale asserted against the Debtors shall be deemed disallowed.  Purchaser shall not be liable for any claims against the Debtors except as expressly provided for in the Agency Agreement and this Sale Order, and the Debtors shall not be liable for any claims against Purchaser except as expressly provided for in the Agency Agreement.

15.    Following the satisfaction of the Initial Purchase Price Funding, any Proceeds, or Additional Agent Merchandise Proceeds received by, or that otherwise come into the possession of, Sellers at any time after the Closing shall be segregated and held strictly in trust for the benefit of Purchaser, shall not be commingled with the Sellers' own assets, and, as such, shall not become property of the Debtors' estates pursuant to and consistent with 11 U.S.C. § 541(b)(1), and shall be paid over to Purchaser promptly, but in any event, not later than in connection with each Weekly Sale Reconciliation (as defined in the Agency Agreement).

16.     To the extent Purchaser has not designated any Assets as of May 31, 2025 (as may be amended by written agreement of the Sellers and Agent Purchaser, the "Asset Designation Rights Termination Date" and any Assets so not designated by the Asset Designation Rights Termination Date, the "Residual Assets"), (i) ownership of all cash (on hand, in the bank, in transit, posted in respect of letters of credit or bonds or otherwise), credit card processing float, accounts receivable, notes receivable, credit card receivables, other receivables, deposits, security deposits, proceeds of retail sales in all of the Sellers' retail store locations, rights to refunds, other rights to payment, Intellectual Property, and, subject to Section 7.1 of the Agency Agreement, ownership of all Remaining Merchandise (as defined in the Agency Agreement), comprising Residual Assets shall vest in Purchaser, and (ii) ownership of all other Residual Assets shall revert to the Debtors' estates, each on the Asset Designation Rights Termination Date.

### Good Faith of Debtors and Purchaser

17.     The Sale contemplated by the Agency Agreement is undertaken by the Debtor and the Purchaser without collusion and in good faith, as that term is defined in sections 363(m) and 364(e) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale (including, without limitation, the assumption and assignment of the Assigned Contracts, if any, pursuant to the Designation Rights Procedures), unless such authorization and consummation of such Sale is duly and properly stayed pending such appeal.

18.     Neither the Debtors nor the Purchaser have engaged in any action or inaction that would cause or permit the Sale to be avoided or costs or damages to be imposed under section 363(n) of the Bankruptcy Code.  The consideration provided by the Purchaser for the Assets under the Agency Agreement is fair and reasonable and the Sale may not be avoided, and costs and damages may not be imposed, under section 363(n) of the Bankruptcy Code.

## **Asset Designation Rights**

19.     In accordance with the terms of this Sale Order and <u>Section 15.2</u> of the Agency Agreement, the Purchaser is authorized to exercise the Asset Designation Rights.  Subject to Purchaser's compliance with its payment obligations under the Agency Agreement and this Sale Order, Purchaser is authorized to execute, in the name of and as agent for the Debtors, any and all deeds, bills of sale, and other instruments or documents necessary to effectuate the sale, transfer, or other conveyance of any of the Assets, none of which instruments or documents shall require the Debtors to incur any obligations or other liabilities beyond the terms of the Agency Agreement.

20.     At any time after the Closing but in no event later than the Designation Rights Termination Date, the Purchaser is authorized to provide notice of any sale, license, transfer, or other conveyance of any Assets by the Purchaser (other than the Assets being sold pursuant to the GOB Sale or Store Closings, as to which no further notice shall be required) substantially in the form attached hereto as **Exhibit C** (the "<u>Asset Designation Notice</u>").

21.     Except as otherwise stated in this Sale Order, including as it relates to the assumption and assignment of Assigned Contracts, if any, upon exercise of the Lease/Contract Designation Rights by the Purchaser, which shall be pursuant to the Designation Rights Procedures, the sale, license, transfer, or other conveyance of any Assets by the Purchaser reflected in any Asset Designation Notice shall be automatically effective on the date reflected in the applicable Asset Designation Notice and subject to the satisfaction of any closing conditions reflected therein, and the sale or other conveyance of such Assets shall be free and clear of all liens, Claims, and encumbrances (other than Permitted Encumbrances) without further order of the Court; *provided* that nothing in this Sale Order shall inhibit the ability of Purchaser to seek other or further orders of the Court in connection with the sale or other disposition of any Assets.

**GOB Sale and Store Closings**

22.     Subject to the provisions of this Sale Order and the Amended Store Closing Procedures, as same may be modified by any Side Letter (as defined below), the Debtors and Purchaser are hereby authorized, pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code, to conduct the GOB Sale and Store Closings in accordance with the Store Closing Procedures, as may be modified by any Side Letter.

23.     Following the satisfaction of the Initial Price Funding, Purchaser shall have the exclusive right to use the Stores (as defined in the Agency Agreement) and all other Assets for the purpose of conducting the GOB Sale and Store Closings, free of any interference from any entity or person, subject to compliance with the Agency Agreement (including payment of Expenses (as defined in the Agency Agreement) and Wind-Down Payments), the Store Closing Procedures and this Sale Order.  The Purchaser and each landlord of a Store are authorized to enter into agreements (each, a "Side Letter") between themselves modifying the Store Closing Procedures and this Sale Order, as applicable, without further order of the Court, and such Side Letters shall be binding as among the Purchaser and any such landlords.  In the event of any conflict between this Sale Order and any Side Letter, the terms of such Side Letter shall control; *provided* that this Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of any Side Letter.

24.     For purposes of conducting the GOB Sale and Store Closings, the Purchaser shall have (a) the right to the unencumbered use and occupancy of, and peaceful and quiet possession of each Store and the assets currently located at such Stores (as defined in the Agency Agreement), and (b) the exclusive right to use the Stores and all related Store services, furniture, fixtures, equipment and other assets of the Debtors or Purchaser, as the context makes applicable, as designated under the Agency Agreement and/or hereunder for the purpose of conducting the GOB

Sale and Store Closings, free of any interference from any entity or person, subject to compliance with the Store Closing Procedures as modified by any Side Letter and this Sale Order.

25.     Purchaser, as the exclusive agent for Debtors, is authorized to conduct, advertise, post signs, utilize sign-walkers, and otherwise promote the GOB Sale and Store Closings as a "going out of business," "store closing," "sale on everything," "everything must go," or similarly themed sale, in accordance with the Store Closing Procedures (as the same may be modified and approved by the Court or any Side Letters), subject to compliance with the Store Closing Procedures, this Sale Order, and all applicable federal, state, and local laws, regulations and ordinances, including, without limitation, all laws and regulations relating to advertising, privacy, consumer protection, occupational health and safety and the environment, together with all applicable statutes, rules, regulations and orders of, and applicable restrictions imposed by, governmental authorities, other than all applicable laws, ordinances, rules, regulations, or licensing requirements in respect of "going out of business", "store closing" or similarly-themed sales (collectively, the "Liquidation Sale Laws"); *provided*, *however*, that as long as the GOB Sales and Store Closings are conducted in accordance with the terms of this Sale Order and the Store Closing Procedures, and in light of the provisions in the laws of many Governmental Units (as defined in the Bankruptcy Code) that exempt court-ordered sales from their provisions, the Sellers and the Purchaser will be presumed to be in compliance with any Liquidation Sale Laws and are authorized to conduct the GOB Sale and Store Closings in accordance with the terms of this Sale Order and the Store Closing Procedures without the necessity of further showing compliance with any such Liquidation Sale Laws.

26.     Purchaser may use all Intellectual Property consistent with the Debtors' ordinary course of business usage and in connection with the conduct of the GOB Sale and Store Closings.

27.     Unless otherwise ordered by the Court, all newspapers and other advertising media in which the GOB Sale or Store Closings are advertised shall be directed to accept this Sale Order as binding and to allow the Debtors and the Purchaser to consummate the transactions provided for in the Agency Agreement, including, without limitation, conducting and advertising the GOB Sale and Store Closings in the manner contemplated by the Store Closing Order.

28.     The Purchaser is authorized to distribute emails and promotional materials to the Debtors' customers consistent with the Debtors' existing policies on the use of consumer information.

29.     Neither the Debtors nor the Purchaser are authorized to, and the Debtors and the Purchaser shall not, sell any inventory or other property owned by SVP Sewing Brands, LLC or its affiliates (collectively, "SVP" and, such inventory and property, the "SVP Property").  SVP is authorized to remove the SVP Property from the Stores and discontinue operation at the Stores (notwithstanding anything to the contrary in that certain Master Sublease, dated as of July 1, 2019, between Jo-Ann Stores, LLC and SVP Sewing Brands LLC, as may be amended, modified, supplemented, or modified from time to time) subject to the following conditions:  (i) prior to the conclusion of the GOB Sale at the applicable Store, SVP shall only (absent further order of the Court or consent of the Debtors) be permitted to remove and/or decommission SVP Property (a) in the ordinary course of business between SVP Sewing Brands, LLC and Jo-Ann Stores, LLC or (b) if outside the ordinary course of such parties' business, outside of normal business hours; provided that the Debtors and the Agent shall provide SVP with reasonable access to such Store outside of normal business hours; (ii) if such retrieval is conducted outside the ordinary course of business between SVP Sewing Brands, LLC and Jo-Ann Stores, LLC, SVP shall provide the Debtors at least five (5) business days' notice prior to retrieving SVP Property from the applicable

Store and shall coordinate with the applicable JOANN store managers regarding the same; and (iii) SVP shall otherwise use commercially reasonable efforts to not disrupt the Debtors' operations. The Debtors and the Agent shall (i) provide SVP with written notice of at least fourteen (14) days (or the period of notice provided to the applicable landlord, whichever is longer) before vacating any Store and (ii) continue to provide SVP with reasonable access to the Stores until such notice period expires. For the avoidance of doubt, the SVP Property is not subject to the rights of the Purchaser or any of the Debtors' creditors (other than SVP). This Order shall not apply to sales of SVP Property and the SVP Property shall not be considered "Assets," "Proceeds," or "GOB Sale Proceeds" for purposes of this Order or the Agency Agreement. Nothing in this Order shall impair any rights or remedies of SVP under any lease or contract with the Debtors or applicable law. The automatic stay provisions of section 362 of the Bankruptcy Code, to the extent applicable, are hereby vacated and modified solely to the extent necessary to implement the relief set forth in this paragraph. This paragraph shall govern and control to the extent of any conflict with any other paragraph in this Order.

### Wind-Down Funding

30.    Nothing in this Order shall impair, modify, or otherwise affect the Carve Out (as defined in the Cash Collateral Order). At Closing, the Debtors shall fund the Funded Reserve Account in accordance with this Sale Order and the Cash Collateral Order, and the Debtors shall be authorized to apply such amounts in accordance with the Cash Collateral Order. The creation and funding of the Funded Reserves Account is approved pursuant to section 363(b) of the Bankruptcy Code. Except as expressly set forth in this Order, nothing herein shall otherwise impair, modify, or affect the Cash Collateral Order.

31.    At Closing, Purchaser shall make an initial cash payment to the Debtors equal to sixty-five percent (65%) of the Wind-Down Budget (the "Initial Wind-Down Payment") *provided*

that, notwithstanding anything herein to the contrary, the Initial Wind Down Payment shall include the payment of all reasonable and documented fees and expenses of the Term Agent advisors and the Term Loan Ad Hoc Group Advisors in an amount not to exceed $1,660,000. The remaining thirty-five percent (35%) of the Wind Down Budget shall be funded from Acquired Cash and, to the extent necessary, Proceeds, within thirty (30) days after the Closing (together with the Initial Wind Down Payment, the "Wind-Down Payments"). The Wind-Down Payments shall not exceed the amounts set forth in Exhibit 3.1(b) of the Agency Agreement (the "Wind-Down Budget"); *provided* that, solely with respect to the "503(b)(9) Claim" subcategory of the Wind-Down Budget, any amounts that have not been expended by the Debtors as of the Designation Rights Termination Date shall be returned to Purchaser upon the earlier of (i) the dismissal or conversion of these chapter 11 cases; or (ii) the effective date of a plan of liquidation of the Debtors. The Debtors shall set aside the funds received on account of the Wind-Down Payments into a segregated account, and are hereby authorized and directed to use such funds to pay applicable Claims upon reconciliation of such Claim and in accordance with the Wind-Down Budget.

## Other Provisions

32.     All payments made by the Debtors on account of the Central Services Expenses (as defined in the Agency Agreement) shall be made pursuant to, and solely in accordance with, the Central Services Budget (as defined in the Agency Agreement) (on a line item basis). The Debtors shall provide weekly reporting to Purchaser of all amounts expended for Expenses and the Central Services Expenses as set forth in the Central Services Budget.

33.     The Debtors shall make its books and records reasonably available to Purchaser upon Closing and until the Designation Rights Termination Date.

34.     Purchaser shall neither have nor incur any obligation to advance or fund any amounts to or for the Debtors except as set forth in the Agency Agreement. Except as provided in

the Agency Agreement, upon Closing, neither the Debtors nor any other entity acting on its behalf or as its successor (including but not limited to the any statutory committee appointed and any chapter 7 or chapter 11 trustee) may recover from the Purchaser any costs or expenses of preserving, or disposing of, any of the Assets.

35.     The Final Reconciliation (as defined in the Agency Agreement), once agreed to by the Debtors and Purchaser, shall be automatically deemed approved pursuant to section 105(a) of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure without further order of the Court or action by any party.

36.     The automatic stay imposed by section 362 of the Bankruptcy Code is hereby lifted, solely to the extent necessary, without further order of the Court, (a) to allow the Purchaser to give the Debtors any notice provided for in the Agency Agreement, (b) to allow the Purchaser to take any and all actions permitted by the Agency Agreement in accordance with the terms and conditions thereof, including, without limitation, effectuating the Sale and the other transactions contemplated by the Agency Agreement and other Sale Transaction Documents, and (c) to otherwise implement the terms and provisions of the Agency Agreement, the other Sale Transaction Documents, and this Sale Order.

37.     The terms and provisions of the Agency Agreement, the other Sale Transaction Documents, and this Sale Order shall be binding in all respects upon the Debtors, their affiliates, their estates, all creditors of (whether known or unknown) and holders of equity interests in any Debtor, any holders of claims against or on all or any portion of the Assets, all counterparties to the Assigned Contracts, the Purchaser, and all of their respective successors and assigns, including, but not limited to, any subsequent trustee(s), examiner(s), or receiver(s) appointed in any of the Debtors' chapter 11 cases or upon conversion of these chapter 11 cases to cases under chapter 7

under the Bankruptcy Code, as to which trustee(s), examiner(s), or receiver(s) such terms and provisions likewise shall be binding. Subject to Purchaser's obligation to pay Expenses and fund the Wind-Down Payments, any such successor shall continue to hold all Assets, Proceeds, and Additional Agent Merchandise strictly in trust for the benefit of Purchaser. The Agency Agreement shall not be subject to rejection or avoidance by the Debtors, their estates, their creditors, their shareholders, or any trustee(s), examiner(s), or receiver(s).

38.    In connection with the Sale, the Purchaser and the Debtors may and are hereby authorized but not directed to enter into a transition services agreement pursuant to which, effective as of the Closing, the Purchaser and the Debtors may provide certain services to each other for a transitional period following the Closing (the "Transition Services Agreement"). The Purchaser and the Debtors are hereby authorized to execute and deliver any additional documentation contemplated by the Agency Agreement or in furtherance of the Sale, and to perform all such other and further acts as may be required in connection with the negotiation, execution, and performance of the Transaction Services Agreement. For the avoidance of doubt, the Transition Services Agreement shall provide that neither the Debtors nor their estates shall incur any liabilities for fees, expenses, costs, or disbursements on account of any transition services and the Purchaser shall promptly reimburse the Debtors for any fees, costs, expenses, or other disbursements incurred by the Debtors (including their advisers) in connection with any transition services provided pursuant to the Transition Services Agreement.

39.    The terms and provisions of this Sale Order and any actions taken pursuant hereto shall survive entry of an order which may be entered: (a) confirming any chapter 11 plan in any of these chapter 11 cases; (b) converting any of these chapter 11 cases to a case under chapter 7 of the Bankruptcy Code; (c) dismissing any of these chapter 11 cases; (d) appointing any trustee,

examiner, or receiver under the Bankruptcy Code; or (e) pursuant to which this Court abstains from hearing any of these chapter 11 cases. The terms and provisions of this Sale Order, notwithstanding the entry of any such orders described in clauses (a)-(e) above, shall continue in these chapter 11 cases or following dismissal of these chapter 11 cases.

40.     Upon the occurrence of closing, all Proceeds shall be exclusive property of the Agent, subject to and in accordance with Section 3.2 of the Agency Agreement.

41.     Upon satisfaction of the Initial Purchase Price Funding, and solely to the extent that any Assets or Proceeds are, notwithstanding the Sale Order, subsequently determined to constitute property of the Debtors' estates, but subject to Purchaser's obligation to pay Expenses and fund the Wind-Down Payments, Purchaser shall have first priority, senior security interests and liens on all such Assets and Proceeds, which liens shall be deemed automatically perfected and (i) the Debtors shall be expressly prohibited from granting any security interests or liens on the Assets and Proceeds thereof and (ii) to the extent that any security interest or lien is granted or otherwise attaches, voluntarily or involuntarily, (other than the security interests and liens in favor of the Purchaser) to any Assets or Proceeds, such security interests and liens shall be *void ab initio* without further order of the Court; *provided* that nothing in the Sale Order shall inhibit Purchaser's ability, and this Sale Order expressly authorizes Purchaser, to take any action Purchaser deems appropriate to perfect and enforce security interests and liens granted in its favor.

42.     Following the satisfaction of the Initial Purchase Price Funding and subject to Purchaser's obligation to pay Expenses and fund the Wind-Down Payments, until all Assets have been sold or otherwise disposed of, and solely to the extent that any Assets, Proceeds, or Additional Agent Merchandise Proceeds are, notwithstanding the Sale Order, subsequently determined to constitute property of Debtors' estates, Purchaser shall have a superpriority administrative expense

claim pursuant to section 507(b) and 364(e) of the Bankruptcy Code, which is senior to all other administrative expense claims (including any other superpriority administrative expense claims but excluding the Carve Out and related claims in accordance with the Cash Collateral Order) against the Debtors to the extent of any amounts owing from the Debtors to Purchaser in connection with the Agency Agreement, including as a result of any breach of the Agency Agreement.

43.      The sale of personally identifiable information contemplated in the Agency Agreement is consistent with the Sellers' privacy policies and satisfies the requirements of section 363(b)(1)(A) of the Bankruptcy Code. The Purchasers shall be bound by and meet the material standards established by the Sellers' privacy policies solely with respect to the personally identifiable information transferred to the Purchaser pursuant to the Agency Agreement; *provided* that nothing in this Order shall affect, limit, restrict, prohibit or impair any right to amend or replace the Sellers' privacy policies on a going forward basis with respect to the personally identifiable information transferred to the Purchaser, in accordance with the terms thereof and applicable law.

44.      Purchaser shall indemnify Debtors (and their respective estates) for up to $10,000,000.00 on account of any administrative expense claim or priority tax claim attributable to the tax consequences associated with the elimination or cancellation of, transfer of, or withdrawal from the Key Man Insurance policy program provided for under certain Pre-1986 Corporate Owned Life Insurance policies issued in 1984 and 1985 by Provident Life and Accident Insurance Company (the "Key Man Insurance Policies" and any associated tax liability, the "Key Man Insurance Tax Liability") upon the tax becoming payable to the relevant taxing authority. Sellers shall use best efforts to, and reasonably cooperate with, Purchaser and its professionals in efforts to, mitigate and/or offset the amount of any Key Man Insurance Tax Liability, including by

evaluating the availability of any tax attributes that could reduce or eliminate the Key Man Insurance Tax Liability, considering the appropriate classification of any Key Man Insurance Tax Liability, considering structuring alternatives to monetize the Key Man Insurance Policies, or otherwise preventing any Key Man Insurance Tax Liability from arising. For the avoidance of doubt, Purchaser shall be entitled to the net proceeds (if any), after payment of any associated tax liability, of the Key Man Insurance Policies, including if such proceeds become due and payable prior to the Sellers' withdrawal.

45.    Each and every federal, state, and local governmental agency, department, or official is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agency Agreement and other Sale Transaction Documents. For the avoidance of doubt, Bankruptcy Code section 1146(a) shall not apply to the Sale.

46.    The Agency Agreement may be modified, amended, or supplemented by the parties thereto in accordance with the terms thereof, without further order of the Court; *provided* (i) that any such modification, amendment, or supplement does not, based on the Debtors' business judgment, have a material adverse effect on the Debtors' estates or their creditors; and (ii) the Purchaser expressly consents to such modification, amendment, or supplement in writing. The Debtors shall provide the Consultation Parties (as defined in the Bidding Procedures) with prior notice of any such modification, amendment, or supplement of the Agency Agreement.

47.    All time periods set forth in this Sale Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

48.    Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6006(d), 7062, and 9014 or any other Bankruptcy Rules or Local Rule to the contrary, the terms and

conditions of this Sale Order shall be effective immediately upon entry and the Debtors and the Purchaser are authorized to close the Sale immediately upon entry of this Sale Order.

49.    To the extent there is any conflict between the terms of this Sale Order and the Agency Agreement, the terms of this Sale Order shall control.  Nothing contained in any chapter 11 plan hereinafter confirmed in these chapter 11 cases or any order confirming such chapter 11 plan, or any other order of the Court, shall conflict with or derogate from the provisions of the Agency Agreement or any other Sale Transaction Document or the terms of this Sale Order, unless otherwise agreed in writing by the Debtors and the Purchaser or entered by order of the Court.

50.    Nothing in this Sale Order or the Agency Agreement shall impair or prejudice an applicable landlord's rights with respect to Debtors' available insurance coverage with respect to third-party claims asserted in connection with the Debtors' use and occupancy of premises subject to an unexpired real property lease that is one of the Assigned Contracts with regard to events that occurred prior to the Closing or the effective date of assignment.

51.    Nothing in this Sale Order, the Bidding Procedures Order, the Stalking Horse Agreement, or any document related to any of the foregoing shall: (a) be construed to authorize or permit (i) the assumption and/or assignment of any Existing Surety Bond, (ii) the assumption and/or assignment of the Existing Indemnity Agreements, or (iii) obligate the Surety to replace any Existing Surety Bond and/or issue any new surety bond on behalf of a Purchaser; or (b) be deemed to provide a Surety's consent to the involuntary substitution of any principal under any Existing Surety Bond and/or any Existing Indemnity Agreement, including, for the avoidance of doubt, that the Purchaser shall not be a substitute principal under any Surety Agreements absent the Surety's consent thereto or further order of the Court.  Additionally, nothing in this Sale Order, the Bidding Procedures Order, the Stalking Horse Agreement, or any other document, agreement,

or instrument contemplated by any of the foregoing shall be deemed to alter, limit, modify, release, waive, or prejudice any rights, remedies, and/or defenses that the Surety has or may have under the Surety Agreements.

52.     The Purchaser agrees to and shall comply with the terms of that certain Pattern Supply Agreement dated as of December 15, 2023 ("Consignment Agreement") by and between Debtors and IG Design Group Americas, Inc. ("DGA") and its affiliates with respect to all Store Closing Sales, Store Closings, and Closing Stores (as those terms are defined in the Sale Closing Order) including but not limited to, the "Store Closings" provisions set forth in Section 3 of the Consignment Agreement.  Notwithstanding the preceding sentence, DGA agrees to and shall permit the Purchaser to continue to liquidate the consigned goods under the normal store liquidation process contemplated by the Consignment Agreement, or as otherwise agreed by the parties, until the conclusion of each Store Closing Sale; provided, however, that (i) DGA shall determine the pricing, including any discounting, of the consigned goods in reasonable consultation with Purchaser, and (ii) DGA reserves all rights to seek the immediate return or discard of consigned goods under the brand names of Vogue and Burda to the extent that DGA is not able to obtain permission, after good faith efforts, to include such brands in the Store Closing Sales.  In addition to the foregoing, Purchaser further agrees (a) to use reasonable efforts to provide at least 14 days' advance notice prior to the conclusion of a Store Closing, (b) to the extent that any Assets are being relocated to other Store(s) in connection with the completion of a Store Closing, unless otherwise determined by DGA, Purchaser will relocate any remaining consigned goods from the Closing Store to such Store(s), (c) to extent that Purchaser intends to conclude a Store Closing, Purchaser will grant DGA, and its agents and assigns, reasonable access (including before, during, and after store business hours) to immediately remove the consigned goods from

such Closing Store after issuance of such 14 days' notice; and (d) to consult with DGA to dispose of any remaining consigned goods in a manner reasonably acceptable to DGA.  For the duration of the Store Closing Sales, Purchaser shall also be bound by the obligations that the Debtors owe to DGA under all interim and final orders entered by this Court, as applicable, approving the Debtors' cash management motion, including, but not limited to (i) the full and timely daily reporting of Debtors' Point-of-Sale activity and gross revenue with respect to the sale of consigned goods from DGA on the immediately preceding day, in the same manner and to the same extent that Debtors provided DGA with the information prior to the Petition Date, and (ii) maintaining the identifiable proceeds from the sale of such consigned goods so as to be readily identifiable as the proceeds of the sale of goods from the Consignment Agreement with DGA, and (iii) payment of all identifiable proceeds of such consigned goods, including, but not limited to, all identifiable proceeds from pre-Closing sales of consigned goods, to DGA on a weekly basis on each Friday. For the avoidance of doubt, the consigned goods shall not be considered "Assets," "Proceeds," or "GOB Sale Proceeds" for purposes of this Order or the Agency Agreement.  Nothing in this Order shall impair any rights or remedies of DGA under any contract with the Debtors or applicable law. The automatic stay provisions of section 362 of the Bankruptcy Code, to the extent applicable, are hereby vacated and modified solely to the extent necessary to implement the relief set forth in this paragraph.  This paragraph shall govern and control to the extent of any conflict with any other paragraph in this Order.

53.    The Court shall retain jurisdiction with respect to all matters arising out of or relating to the interpretation, implementation, or enforcement of this Sale Order, the terms and provisions of the Agency Agreement, and all other Sale Transaction Documents.

## **Exhibit 1**

### **Agency Agreement**

*Filed at Docket No. [●]*

## **Exhibit 2**

## **Asset Designation Notice**

**<u>Exhibit 3</u>**

**<u>Amended Store Closing Procedures</u>**

**Amended Store Closing Procedures**[1]

1.      The Store Closing Sales shall be conducted so that the Closing Stores in which sales are to occur will remain open no longer than during the normal hours of operation or such hours as otherwise provided for in the respective leases for the Closing Stores.

2.      The Store Closing Sales shall be conducted in accordance with applicable state and local "Blue Laws," where applicable, so that no Store Closing Sale shall be conducted on Sunday unless the Debtors had been operating such Closing Store on a Sunday prior to the commencement of the Store Closing Sales.

3.      On "shopping center" property, neither the Debtors nor GA Joann Retail Partnership, LLC (the "Agent")  shall distribute handbills, leaflets or other written materials to customers outside of any Closing Stores' premises, unless permitted by the lease or, if distribution is customary in the "shopping center" in which such Closing Store is located; *provided* that the Debtors or Agent may solicit customers in the Closing Stores themselves.  On "shopping center" property, neither the Debtors nor the Agent shall use any flashing lights or amplified sound to advertise the Store Closing Sales or solicit customers, except as permitted under the applicable lease or agreed to by the landlord.

4.      The Agent shall have the right to use and sell the Store Closing Assets.  The Agent may advertise the sale of the Store Closing Assets in a manner consistent with the Amended Store Closing Procedures.  The purchasers of any of the Store Closing Assets sold during the Store Closing Sales shall be permitted to remove the Store Closing Assets either through the back or alternative shipping areas at any time, or through other areas after store business hours; provided,

---

[1]     Capitalized terms used but not defined in the Amended Store Closing Procedures have the meanings given to them in the *Motion of Debtors for Entry of an Order (I) Authorizing and Approving the Conduct of Store Closing Sales, With Such Sales to be Free and Clear of All Liens, Claims, and Encumbrances, and (II) Granting Related Relief* (the "Motion").

however, that the foregoing shall not apply to the sale of *de minimis* Store Closing Assets, whereby the item(s) can be carried out of the store in a shopping bag.

5.      At the conclusion of the Store Closing Sale, Agent shall vacate the Stores in broom clean condition; *provided that* the Agent may abandon any furniture, fixtures, and equipment (the "FF&E") not sold in the Sale at the Stores, the Distribution Centers, or Merchant's corporate offices at the conclusion of the Sale or the Lease/Contract Designation Rights Period, as applicable, without cost or liability of any kind to Agent. Any abandoned FF&E left in a Store or Distribution Center or Merchant's corporate offices after a lease is rejected shall be deemed abandoned to the landlord having a right to dispose of the same as the landlord chooses without any liability whatsoever on the part of the landlord to any party and without waiver of any damages claims against the Merchant. For the avoidance of doubt, as of the end date of the Store Closing Sales, Agent may abandon, in place and without further responsibility or liability of any kind, any FF&E located at a Store or Distribution Center or Merchant's corporate offices.

6.      The Debtors and Agent may advertise the Store Closing Sales as "store closing," "sale on everything," "everything must go," "everything on sale," or similar-themed sales. The Debtors and Agent may also have a "countdown to closing" sign prominently displayed in a manner consistent with these Store Closing Procedures.

7.      Agent shall be entitled to include Additional Agent Merchandise in the Store Closing Sale in accordance with the terms of the Approval Order and the Agency Agreement.

8.      The Debtors and Agent shall be permitted to utilize sign-walkers, display, hanging signs, and interior banners in connection with the Store Closing Sales; *provided* that such sign walkers, display, hanging signs, and interior banners shall be professionally produced and hung in a professional manner. The Debtors and Agent shall not use neon or day-glo on its sign walkers,

display, hanging signs, or interior banners.  Furthermore, with respect to enclosed mall locations, no exterior signs or signs in common areas of a mall shall be used unless otherwise expressly permitted in these Store Closing Procedures.  In addition, the Debtors and Agent shall be permitted to utilize exterior banners at (i) non-enclosed mall Closing Stores and (ii) enclosed mall Closing Stores to the extent the entrance to the applicable Closing Store does not require entry into the enclosed mall common area; *provided*, however, that such banners shall be located or hung so as to make clear that the Store Closing Sales are being conducted only at the affected Closing Store, and shall not be wider than the storefront of the Closing Store.  In addition, the Debtors and Agent shall be permitted to utilize sign walkers in a safe and professional manner and in accordance with the terms of the Order.  Nothing contained in these Store Closing Procedures shall be construed to create or impose upon the Debtors or Agent any additional restrictions not contained in the applicable lease agreement.

9.      Conspicuous signs shall be posted in the cash register areas of each of the affected Closing Stores to effect that "all sales are final."

10.     Except with respect to the hanging of exterior banners, neither the Debtors nor the Agent shall make any alterations to the storefront or exterior walls of any Closing Stores, except as authorized by the applicable lease.

11.     The Agent shall not make any alterations to interior or exterior Closing Store lighting, except as authorized by the applicable lease.  No property of the landlord of a Closing Store shall be removed or sold during the Store Closing Sales.  The hanging of exterior banners or in-Closing Store signage and banners shall not constitute an alteration to a Closing Store.

12.     The Agent shall keep Closing Store premises and surrounding areas clear and orderly consistent with present practices.

3

13.    The Agent and the landlord of any Store are authorized to enter into Side Letters without further order of the Court, provided that such agreements do not have a material adverse effect on the Debtors or their estates.

14.    Subject to paragraph 17 of the Order, the Agent shall have the right to sell all FF&E owned by the Debtors (the "Owned FF&E"). The Agent may advertise the sale of the Owned FF&E in a manner consistent with these guidelines at the Closing Stores. The purchasers of any Owned FF&E sold during the sale shall be permitted to remove the Owned FF&E either through the back or alternative shipping areas at any time, or through other areas after applicable business hours. For the avoidance of doubt, as of the end date of the Store Closing Sales, the Agent may abandon, in place and without further responsibility, any FF&E at the Stores, the Distribution Centers, and Merchant's corporate offices.

15.    At the conclusion of the Store Closing Sales at each Closing Store, pending assumption or rejection of applicable leases, the landlords of the Closing Stores shall have reasonable access to the Closing Stores' premises as set forth in the applicable leases. The Debtors and their agents and representatives shall continue to have access to the Closing Stores. In the event the Debtors reject the lease associated with a Closing Store, the Debtors will use reasonable efforts to facilitate a smooth transfer of possession, including, if practicable, the return of any key codes and security materials. The Debtors will use reasonable efforts to provide landlords of any such leases to be rejected with at least fourteen (14) days' advance notice prior to the Debtors' surrender of possession.

16.    Post-petition rents shall be paid by the Debtors as required by the Bankruptcy Code until the rejection or assumption and assignment of each lease. Agent shall no responsibility to the landlords therefor.

17.    The rights of landlords against the Debtors for any damages to a Closing Store shall be reserved in accordance with the provisions of the applicable lease; *provided* that to the extent certain leases of Closing Stores require written confirmation of receipt of a key to effectuate surrender, this requirement is waived.

18.    If and to the extent that the landlord of any Closing Store affected hereby contends that the Debtors or Agent are in breach of or default under these Store Closing Procedures, such landlord shall email or deliver written notice by overnight delivery on the Debtors and Agent as follows:

> **If to Merchant:**
>
> JOANN Inc.
> 5555 Darrow Road
> Hudson, Ohio 44236
> Attention:  Legal Department
>
> *With copies (which shall not constitute notice) to:*
>
> Cole Schotz P.C.
> 500 Delaware Avenue, Suite 1410
> Wilmington, Delaware 19801
> (302) 652-3131
> Attention:  Patrick J. Reilley, Stacy L. Newman, Michael E. Fitzpatrick, and Jack M. Dougherty
> Email:  preilley@coleschotz.com
>           snewman@coleschotz.com
>           mfitzpatrick@coleschotz.com
>           jdougherty@coleschotz.com
>
> - and -
>
> Kirkland & Ellis LLP
> 601 Lexington Avenue
> New York, New York 10022
> Attention:  Aparna Yenamandra, P.C.
> Email:
>           aparna.yenamandra@kirkland.com
>
> - and -

Kirkland & Ellis LLP
333 West Wolf Point Plaza
Chicago, Illinois 60654
Attention:  Jeffrey Michalik, and Lindsey Blumenthal
Email: jeff.michalik@kirkland.com
   lindsey.blumenthal@kirkland.com


**If to Agent:**

GA Joann Retail Partnership, LLC
c/o GA Group
30870 Russell Ranch Road, Suite 250
Westlake Village, CA 91362
Attention:  Scott K. Carpenter and Time Shilling
Email: scarpenter@brileyfin.com; tshilling@brileyfin.com; legal@brileyfin.com

*With copies (which shall not constitute notice) to:*

Lowenstein Sandler LLP
One Lowenstein Drive
Roseland, NJ 07068
Attention: Andrew Behlmann
Tel: (973) 597-2332
abehlmann@lowenstein.com