## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| JOANN INC., *et al.*,[1] | ) | Case No. 25-10068 (CTG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## REPLY OF DEBTORS
## IN SUPPORT OF THE PROPOSED SALE TRANSACTION

The debtors and debtors in possession (collectively, the "Debtors") submit this reply (the "Reply") in support of the *Motion of Debtors for Entry of an Order (I) Approving Bidding Procedures, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Stalking Horse Agreement, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts and Leases, (VII) Approving the Sale of Assets, and (VIII) Granting Related Relief* [Docket No. 17] (the "Bidding Procedures Motion")[2] and in response to the objection filed by the U.S. Trustee [Docket No. 285] (the "U.S. Trustee Objection").[3]  In further support of the Bidding Procedures

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: JOANN Inc. (5540); Needle Holdings LLC (3814); Jo-Ann Stores, LLC (0629); Creative Tech Solutions LLC (6734); Creativebug, LLC (3208); WeaveUp, Inc. (5633); JAS Aviation, LLC (9570); joann.com, LLC (1594); JOANN Ditto Holdings Inc. (9652); Dittopatterns LLC (0452); JOANN Holdings 1, LLC (9030); JOANN Holdings 2, LLC (6408); and Jo-Ann Stores Support Center, Inc. (5027). The Debtors' mailing address is 5555 Darrow Road, Hudson, Ohio 44236.

[2]     Capitalized terms used but not defined herein shall have the meanings given such terms in the Bidding Procedures Motion, the *Declaration of Michael Prendergast, Interim Chief Executive Officer, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 5] (the "First Day Declaration"), the order approving certain relief sought in the Bidding Procedures Motion [Docket No. 446] (the "Bidding Procedures Order"), the Agency Agreement, the Cash Collateral Order, or the Proposed Sale Order, as applicable.

[3]     Although several other parties have filed reservations of rights or objections to the Proposed Sale Order, the Debtors believe they have resolved or will resolve all remaining issues not addressed in this Reply through modifications to the Proposed Sale Order and the Agency Agreement.  To the extent any such objection has not

Motion and this Reply, the Debtors incorporate by reference the testimony of Ryan Kielty at the February 14, 2025, hearing and state as follows:

<u>**Preliminary Statement**</u>

1.     In the weeks leading up to the Petition Date, the Debtors commenced a comprehensive marketing process in pursuit of one or more value maximizing transactions for the sale or sales of all, substantially all, or any portion of the Debtors' business.  The Debtors cast a wide net in an effort to reach all potential bidders and reached out to strategics, private equity firms, family offices, high-net worth individuals, intellectual property buyers, landlords, and liquidators.  The Debtors reached out to fifty-one parties they thought, based on prior discussions, were most likely to be interested in engaging in a transaction with the Debtors (while also being most likely to protect the confidentiality of the process prior to a filing).

2.     The Debtors commenced these chapter 11 cases with a Stalking Horse Bid in the form of an agency agreement for the right to liquidate substantially all of the Debtors' assets. Postpetition, the Debtors continued their strategic marketing process to solicit higher or otherwise better offers than the Stalking Horse Bid, contacting at least seventy-seven additional parties comprising a wide range of potential bidders.  The Debtors provided the potential bidders with an array of confidential evaluation materials to provide information about the sale of the Assets.  In sum, the Debtors' prepetition and postpetition marketing efforts were extensive enough to ensure that any party who may be interested in bidding on the Debtors' assets had sufficient notice and an opportunity to do so.

---

been resolved in advance of the Sale Hearing, the Debtors reserve the right to respond to any such objection raised at the Sale Hearing.  The Debtors believe that substantially all of the objections—other than one—have been addressed, will be resolved prior to the Sale Hearing, or have otherwise been resolved through modifications to the Agency Agreement or the Proposed Sale Order.  Attached hereto as **<u>Exhibit A</u>** is a summary of the filed objections (such objections listed, the "<u>Objections</u>") and the status thereof.

3.      In parallel, the Debtors received approval of the Bidding Procedures, which capitalized on the prepetition marketing process and established an efficient, orderly pathway to consummating a sale transaction and maximizing value for the benefit of all stakeholders.  The Bidding Procedures balanced the dual needs of driving a competitive process and minimizing the time and administrative burden that the Debtors would spend in prolonged chapter 11 cases, which can often prove catastrophic for retailers in similar circumstances.  The Bidding Procedures were designed to encourage bidding and facilitate a competitive process to hopefully result in one or more value maximizing sale transaction(s)—and that is exactly what the Bidding Procedures did.

4.      On February 18, 2025, the Debtors received a joint bid from GA Joann Retail Partnership, LLC, a subsidiary of GA Group, and Wilmington Savings Fund Society, FBS, in its capacity as Prepetition Term Loan Agent (the "GA Bid").  The GA Bid—which preserved the key benefits of the Stalking Horse Bid, such as the payoff of the Prepetition ABL Obligations, the payoff of the Prepetition FILO Obligations, and a fully funded Wind-Down Budget—also included a $75 million credit bid from the Prepetition Term Loan Lenders.  Accordingly, the GA Bid served as an improvement on the Stalking Horse Bid and set the stage for a competitive auction.

5.      The Debtors commenced an auction for substantially all of the Assets (the "Auction") on February 21, 2025.  The Auction lasted two days and resulted in multiple rounds of competitive bids.  After careful and thorough evaluation of each bid, the Debtors announced the GA Bid as the Winning Bidder.  The winning GA Bid improved over the course of the Auction to include a $105 million Term Loan credit bid and provided materially better terms for the Term Loan Lenders and general unsecured creditors (including, but not limited to, a preference action waiver and cash commitments).  The GA Bid was further refined after the Auction to fold in settlements with additional stakeholders and resulted in the terms set forth in

the Agency Agreement filed at Docket No. 486 (as may be further amended, the "<u>Agency Agreement</u>"), and the *Order (A) Approving and Authorizing Sale of the Debtors' Assets, Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* filed at Docket No. 493 (as may be further amended, the "<u>Proposed Sale Order</u>" and the transactions contemplated thereby and by the Agency Agreement, collectively, the <u>Proposed Sale Transaction</u>").  The Proposed Sale Transaction is the result of good-faith, arms-length negotiations and incorporates terms forged in the crucible of a competitive Auction.  Accordingly, the Proposed Sale Transaction represents the highest and best alternative available to the Debtors, and the Court should enter the Proposed Sale Order approving the Proposed Sale Transaction.

6.  Today, the Prepetition ABL Agent, the Prepetition FILO Agent, the Prepetition Term Loan Agent, the Ad Hoc Term Loan Group, and the Committee support the Proposed Sale Transaction, subject to finalization of the language of the Proposed Sale Order, the Cash Collateral Order, and the Agency Agreement.  For the reasons set forth below, the U.S. Trustee Objection should be overruled.

<u>**Reply**</u>

**I.   The Terms of the Proposed Sale Transaction Are Appropriate Exercises of the Debtors' Reasonable Business Judgment.**

7.  The Debtors agreed to the provisions of the Agency Agreement and the Proposed Sale Order in a sound exercise of their business judgment.  Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  To approve a sale pursuant to section 363(b) of the Bankruptcy Code, courts require a debtor to demonstrate that a sound business purpose exists for the proposed transaction.  *See, e.g., In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996)

("Under Section 363, the debtor in possession can sell property of the estate . . . if [the debtor] has an 'articulated business justification' . . . ."). The business judgment rule shields a debtor's decision-making from judicial second-guessing. Once a debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that, in making the business decision, the directors of a corporation acted on an informed basis, in good faith,' and in the honest belief that the action was in the best interests of the company." *In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill. 1995) (citation omitted); *see also In re Filene's Basement, LLC*, 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014).

8.      The Debtors consistently maintained a robust marketing process prepetition and throughout these chapter 11 cases. The record is clear that the Debtors and their advisors left no stone unturned throughout the marketing process. Upon the Bid Deadline, the Debtors and their advisors worked around the clock to evaluate and develop bids and potential bids and commence an open and fair auction process. The Debtors engaged meaningfully with each and every prospective purchaser. Ultimately, the marketing process resulted in two Qualified Bids for substantially all of the Debtors' Assets. Despite receiving only two all-Asset Qualified Bids, the Debtors and their advisors spent most of the next thirty-six hours engaging in extensive, good-faith negotiation and development of multiple rounds of bids received.

9.      The marketing process and the Auction maximized the value of the estate through a transparent, organized, and fair process. Indeed, the processes worked as intended—both qualified bidders engaged in robust, competitive bidding for assets they both desired. *In re Pursuit Cap. Mgmt., LLC*, 874 F.3d 124, 136 (3d Cir. 2017) ("As to value, we have said that, '[g]enerally speaking, an auction may be sufficient to establish that one has paid 'value' for the assets of a bankrupt' . . . a competitive auction strongly indicates that a purchaser has paid appropriate value

for estate assets." (citation omitted)).  Ultimately, the competitive nature of the process ensured that the provisions of the Proposed Sale Transaction, including the Purchaser's superpriority administrative expense claim and the Final Reconciliation (each discussed in more detail below), are on the most favorable terms available to the Debtors.

## II.    The Superpriority Expense Claim Is Reasonable and Consistent with the Bankruptcy Code.

10.    The Purchaser is entitled to a superpriority administrative expense claim in accordance with section 507(b) of the Bankruptcy Code.  Section 507(b) of the Bankruptcy Code contains two requirements for superpriority administrative expense status: (i) the Debtor must have "provide[d] adequate protection of the interest of a holder of a claim serviced by a lien on property of the debtor" and (ii) "such creditor [must have] a claim allowable under [section 507(a)(2) of the Bankruptcy Code] arising from the . . . use, sale, or lease of such property under section 363 [of the Bankruptcy Code]."  The Proposed Sale Transaction contemplated in the Proposed Sale Order satisfies both of these requirements.

11.    In accordance with the terms of the Agency Agreement, the Proposed Sale Order provides that:

> [f]ollowing the satisfaction of the Initial Purchase Price Funding and subject to Purchaser's obligation to pay Expenses and fund the Wind-Down Payments, until all Assets have been sold or otherwise disposed of, and solely to the extent that any Assets, Proceeds, or Additional Agent Merchandise Proceeds are, notwithstanding the Sale Order, subsequently determined to constitute property of Debtors' estates, Purchaser shall have a superpriority administrative expense claim  . . .  which is senior to all other administrative expense claims (including any other superpriority administrative expense claims but excluding the Carve Out and related claims in accordance with the Cash Collateral Order) against the Debtors to the extent of any amounts owing from the Debtors to Purchaser in connection with the Agency Agreement, including as a result of any breach of the Agency Agreement.

Proposed Sale Order. ¶ 42.

12.     First, the Purchaser has liens eligible for 507(b) superpriority claim protection.  The Purchaser is a joint venture between GA Joann Retail Partnership, LLC, a subsidiary of GA Group, and the Ad Hoc Term Loan Group, and the Proposed Sale Transaction incorporates a $105 million credit bid of the Prepetition Term Loan Obligations.  Pursuant to the Cash Collateral Order, the Prepetition Term Loan Lenders have received Adequate Protection Liens (as defined in the Cash Collateral Order).  Additionally, in accordance with the terms of the Agency Agreement, the Proposed Sale Order seeks to grant liens over assets of the estate (to the extent such assets constitute property of the Debtors' estate).

13.     Second, the liquidation process contemplates the sale and use of the Debtors' assets, which are subject to the Prepetition Term Loan Lenders' Adequate Protection Liens and, upon entry of the Proposed Sale Order, the new Purchaser's liens (together, the "Purchaser's Liens"). This sale and use under section 363 of the Bankruptcy Code will reduce the Debtors' assets to cash proceeds, which appropriately should remain subject to the Purchaser's Liens so that the Purchaser can receive the proceeds of the liquidation sales in accordance with the Agency Agreement.

14.     Next, the Purchaser is entitled to an administrative expense claim pursuant to section 503(b)(1)(A) of the Bankruptcy Code.  "An administrative expense claim is entitled to priority under section 503(b)(1)(A) if: (1) there was a post-petition transaction between the claimant and the estate, and (2) those expenses yielded a benefit to the estate." *In re Energy Future Holdings Corp.*, 990 F.3d 728, 741 (3d Cir. 2021) (citing *In re Women First Healthcare, Inc.*, 332 B.R. 115, 121 (Bankr. D. Del. 2005) (internal quotations omitted)); *see also In re O'Brien Env't Energy, Inc.*, 181 F.3d 527, 532 (3d Cir. 1999).  Here, the Proposed Sale Transaction satisfies the first requirement because it is a postpetition transaction with the Debtors.  With respect to the second requirement, the Proposed Sale Transaction not only provides significant benefits to the

Debtors' estates but also represents the highest and best alternative available to the Debtors.  If approved, the Proposed Sale Transaction will repay the Debtors' Prepetition ABL and FILO Facilities in full, create a framework for the Prepetition Term Loan Lenders to reap substantial benefits of the liquidation of their collateral, maintain the Debtors' administrative solvency, and deliver value to out-of-the-money unsecured creditors.

15.     As part of the consideration to the Purchaser for participation in the Proposed Sale Transaction, the Proposed Sale Order seeks to provide administrative priority for any amounts owing from the Debtors to the Purchaser in connection with amounts owed under the Agency Agreement, including as a result of any breach of the Agency Agreement and/or as a result of any Proceeds or Additional Agent Merchandise Proceeds being in the Debtors' possession (the "Priority Costs").  Agency Agreement § 14(a).  The Priority Costs are payable by the Debtors only to the limited extent necessary to ensure that (A) the Debtors comply with the terms of the Agency Agreement and (B) the Purchaser receives the benefit of its bargain.  This "cost," even as a priority administrative expense, does not outweigh the considerable benefit to the Debtors' estate—a sale of the Debtors' Assets at the highest and best price.  *See Energy Future*, 990 F.3d at 742 ("[A]n analysis as to whether a particular action benefitted an estate must weigh the costs to the estate against the alleged benefits").  As such, the Purchaser is entitled to an administrative expense claim pursuant to section 503(b)(1)(A) of the Bankruptcy Code, and the second requirement of section 507(b) of the Bankruptcy Code is met.

16.     Section 507(b) of the Bankruptcy Code authorizes superpriority administrative expense status of the Priority Costs because (i) the Purchaser is receiving or is entitled to adequate protection of the Purchaser's Liens, and, notwithstanding such protection, (ii) the Purchaser has a claim allowable under section 507(a)(2) of the Bankruptcy Code.  Granting superpriority

administrative expense status does not adversely affect other parties in interest, as evidenced by the fact no parties with an economic stake in these chapter 11 cases are objecting to or will be harmed by these provisions of the Agency Agreement.  Indeed, the Proposed Sale Transaction preserves the administrative solvency of the Debtors and, in recognition of that bargain—and only in the limited circumstances where a superpriority administrative expense claim would become payable on account of the Priority Costs—the Purchaser should be entitled to repayment first before other administrative claimants.  For those reasons, this Court should overrule the U.S. Trustee Objection and authorize the Purchaser's Liens and corresponding superpriority administrative expense claim.

### III.    The Court Should Approve the Final Reconciliation Without a Further Hearing.

17.    The Agency Agreement provides for a weekly reconciliation of payments, sales, and accounts among the Debtors and the Purchaser.  Agency Agreement § 8.8.  These reconciliations are routine exercises that are necessary because, as a key term of the Proposed Sale Transaction, the Purchaser has committed to reimbursing the Debtors on a dollar-for-dollar basis for operating expenses incurred post-Closing during the Sale Term.  Indeed, the reconciliations ensure that each party in the Proposed Sale Transaction is receiving the benefit for which it bargained.

18.    The Agency Agreement also provides for a "Final Reconciliation," which is an extension of the weekly reconciliations.  *See Id.*  The Final Reconciliation constitutes the last weekly reconciliation at the end of the Sale Term and is intended to reconcile any final accounting and process discrepancies.  This process is fair to the Debtors, the Purchaser, and any remaining creditors.  Costs incurred during the Sale Term are subject to reimbursement under the Agency Agreement, and the Final Reconciliation ensures that the Debtors have an avenue to receiving appropriate amounts to do so.  Assuming that the Wind-Down Budget and Expense

Reimbursement are sufficient to cover the Debtors' administrative expense liability, which is a core assumption underlying the terms of the Proposed Sale Transaction, no parties will be harmed by the Final Reconciliation.  To the extent of any dispute around the Final Reconciliation among the parties, this Court will retain jurisdiction over the matter.  Accordingly, requiring the Debtors to approve of the Final Reconciliation after notice and a hearing would be an unnecessary waste of precious estate resources, which have been carefully budgeted.  This Court should overrule the U.S. Trustee Objection.

<u>**Reservation of Rights**</u>

19.    The Debtors are continuing their review of the Objections and are actively engaged in discussions with most of the parties thereto.  The Debtors reserve their rights to present additional evidence and legal argument at the Sale Hearing in response to any of the matters raised in the Objections.

WHEREFORE, the Debtors respectfully request that the Court overrule the Objections, approve the Proposed Sale Transaction, enter the Proposed Sale Order, waive the stay provided for by each of Bankruptcy Rules 6004(h) and 6006(d), and grant the Debtors such other and further relief as this Court deems just and proper.

*[Remainder of page intentionally left blank]*

Dated: February 26, 2025
Wilmington, Delaware

*/s/ Patrick J. Reilley*

| | |
|---|---|
| **COLE SCHOTZ P.C.** | **KIRKLAND & ELLIS LLP** |
| Patrick J. Reilley (No. 4451) | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| Stacy L. Newman (No. 5044) | Joshua A. Sussberg, P.C. (admitted *pro hac vice*) |
| Michael E. Fitzpatrick (No. 6797) | Aparna Yenamandra, P.C. (admitted *pro hac vice*) |
| Jack M. Dougherty (No. 6784) | 601 Lexington Avenue |
| 500 Delaware Avenue, Suite 1410 | New York, New York 10022 |
| Wilmington, Delaware 19801 | Telephone:     (212) 446-4800 |
| Telephone:     (302) 652-3131 | Facsimile:     (212) 446-4900 |
| Facsimile:     (302) 652-3117 | Email:          joshua.sussberg@kirkland.com |
| Email:          preilley@coleschotz.com |                  aparna.yenamandra@kirkland.com |
|                  snewman@coleschotz.com | |
|                  mfitzpatrick@coleschotz.com | - and - |
|                  jdougherty@coleschotz.com | |
| | Anup Sathy, P.C. (admitted *pro hac vice*) |
| | Jeffrey Michalik (admitted *pro hac vice*) |
| | Lindsey Blumenthal (admitted *pro hac vice*) |
| | 333 West Wolf Point Plaza |
| | Chicago, Illinois 60654 |
| | Telephone:     (312) 862-2000 |
| | Facsimile:     (312) 862-2200 |
| | Email:          anup.sathy@kirkland.com |
| |                  jeff.michalik@kirkland.com |
| |                  lindsey.blumenthal@kirkland.com |
| | |
| *Proposed Co-Counsel to the Debtors* | *Proposed Co-Counsel to the Debtors* |
| *and Debtors in Possession* | *and Debtors in Possession* |