## Exhibit 1

**Further Revised Sale Order**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| JOANN INC., *et al.*,[1] | ) | Case No. 25-10068 (CTG) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | **Re: Docket No. 17** |

## ORDER (A) APPROVING AND AUTHORIZING SALE OF THE DEBTORS' ASSETS, FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, AND (B) GRANTING RELATED RELIEF

Upon the motion[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for the entry of an order (the "Approval Order"): (a) authorizing and approving entry into and performance under the terms and conditions of the Agency Agreement dated as of February 26, 2025, by and among the Debtors (the "Sellers") and GA Joann Retail Partnership,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: JOANN Inc. (5540); Needle Holdings LLC (3814); Jo-Ann Stores, LLC (0629); Creative Tech Solutions LLC (6734); Creativebug, LLC (3208); WeaveUp, Inc. (5633); JAS Aviation, LLC (9570); joann.com, LLC (1594); JOANN Ditto Holdings Inc. (9652); Dittopatterns LLC (0452); JOANN Holdings 1, LLC (9030); JOANN Holdings 2, LLC (6408); and Jo-Ann Stores Support Center, Inc. (5027). The Debtors' mailing address is 5555 Darrow Road, Hudson, Ohio 44236.

[2] Capitalized terms used but not otherwise defined in this Approval Order have the meanings given to such terms in the Agency Agreement, the *Motion of Debtors for Entry of an Order (I) Approving Bidding Procedures, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Stalking Horse Agreement, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts and Leases, (VII) Approving the Sale of Assets, and (VIII) Granting Related Relief* [Docket No. 17] (the "Motion"), the *Order (I) Approving Bidding Procedures, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Stalking Horse Agreement, (V) Establishing Notice and Procedures for the Assumption and Assignment of Assumed Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts and Leases, (VII) Approving the Sale of Assets, and (VIII) Granting Related Relief* [Docket No. 446] (the "Bidding Procedures Order"), the *Order (I) Authorizing and Approving the Conduct of Store Closing Sales, with Such Sales to be Free and Clear of all Liens, Claims, and Encumbrances and (II) Granting Related Relief* [Docket No. 443] (the "Store Closing Order"), or the Cash Collateral Order, as applicable. For the avoidance of doubt, in the event of any conflict or inconsistency between defined terms in this Approval Order, the Motion, the Bidding Procedures Order, the Cash Collateral Order, and those defined in the Agency Agreement, the definitions set forth in the Agency Agreement shall control.

LLC ("<u>Agent</u>") and Wilmington Savings Fund Society, FSB, in its capacity as prepetition term loan agent (the "<u>Term Agent</u>") and collectively with Agent, the "<u>Purchaser</u>") attached to this Approval Order as **<u>Exhibit A</u>** (as may be amended, supplemented, restated, or otherwise modified from time to time, the "<u>Agency Agreement</u>"), and all other transaction documents necessary and desirable to consummate the Transactions, including the Carve Out Reserves Agreement (as defined below) (collectively, the "<u>Transaction Documents</u>"); (b) authorizing and approving the sale of (i) the exclusive right to designate the purchasers, assignees, sublessees, or other transferees of Sellers' right, title, and interest in and to any or all of the Sellers' Leases and Contracts (the "<u>Lease/Contract Designation Rights</u>")[3] and (ii) the exclusive right to market and sell, and/or otherwise designate the purchasers, transferees, and/or assignees of any or all of the Assets (as defined in the Agency Agreement) free and clear of all liens, claims (as such term is defined by section 101(5) of the Bankruptcy Code), liabilities, rights, remedies, restrictions, interests, and encumbrances of any kind or nature whatsoever whether arising before or after the Petition Date, whether at law or in equity, including all claims or rights based on any successor or transferee liability, all environmental claims, all change in control provisions, all rights to object or consent to the effectiveness of the transfer of the Assets to the Purchaser or to be excused from accepting performance by the Purchaser or performing for the benefit of the Purchaser under any Assigned Contract (as defined in the Bidding Procedures Order)[4] and all rights at law or in equity (collectively, "<u>Claims</u>"), except to the extent set forth in the Agency Agreement, including the

---

[3]    "<u>Contracts</u>" shall mean the Sellers' right, title, and interest in and to executory contracts (together with all amendments, extensions, modifications, and other material documents related thereto). "<u>Leases</u>" shall mean the Sellers' unexpired leases of non-residential real property (together with all amendments, extensions, modifications, and other material documents related thereto).

[4]    For the avoidance of doubt, "Assigned Contracts," as defined in the Bidding Procedures Order, includes Contracts and Leases that may be assumed and assigned in connection with the Sale and pursuant to the Designation Rights Procedures.

Permitted Encumbrances (as defined in the Agency Agreement), without further order of the Court but without prejudice to the rights of Agent to seek a further order of the Court in connection with the sale of any of the Assets (the "Asset Designation Rights" and collectively with the Lease/Contract Designation Rights, the "Designation Rights") (the matters in this proviso (b), collectively, and including all actions taken or required to be taken in connection with the implementation and consummation of the Agency Agreement, the "Transactions"), upon the Closing (as defined in the Agency Agreement) and the satisfaction of the Debt Payoff (as defined below), the Initial Wind-Down Payment (as defined below), and the Initial Central Services Payment (as defined in the Agency Agreement) (collectively, the "Initial Purchase Price Funding") and until the Designation Rights Termination Date;[5] (c) subject to the exercise of the Lease/Contract Designation Rights as set forth in the Agency Agreement and pursuant to the Designation Rights Procedures (as defined herein), authorizing the assumption by the Sellers and assignment to the Purchaser or its designees of Assigned Contracts, if any, pursuant to section 365 of the Bankruptcy Code, upon the Closing and the Initial Purchase Price Funding, subject to the Purchaser's or its designees' payment or satisfaction of any Cure Costs, and until the Designation Rights Termination Date; (d) authorizing the Debtors to consummate the Transactions and all other transactions related to the Agency Agreement, including, but not limited to, the GOB Sale (as defined in the Agency Agreement) and Store Closings under the terms of the Agency Agreement and in accordance with the Store Closing Order; and (e) granting related relief; and this Court having entered the Bidding Procedures Order; and the Debtors having scheduled an auction

---

[5]  "Designation Rights Termination Date" shall mean the earlier to occur of (i) the end of the Lease/Contract Designation Rights Period applicable to a particular Lease or Contract and (ii) May 31, 2025, as may be amended by written agreement of the Sellers and Agent, in consultation with the Committee, without further order by the Court.

(the "Auction") for the Assets; and the Auction having occurred on February 21 and 22, 2025 in accordance with the Bidding Procedures; and the Debtors having determined in consultation with the Consultation Parties that the Purchaser has submitted the highest or otherwise best bid for the Assets and determined that the Purchaser is a Qualified Bidder and a Winning Bidder, in accordance with the Bidding Procedures; and the Court having held a hearing on February 26, 2025 (the "Approval Hearing"); and the Court having reviewed and considered the Motion, the Agency Agreement, the Committee Settlement, and any and all objections to the Transactions, the Agency Agreement, and the other Transaction Documents filed in accordance with the Bidding Procedures Order; and the Court having heard statements of counsel and the evidence presented in support of the relief requested in the Motion at the Approval Hearing; and upon the First Day Declaration, witness testimony, and the Frejka Declaration;[6] and it appearing that due notice of the Motion, the Approval Hearing, and the Transactions was provided; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, and their stakeholders; and it appearing that the Court has jurisdiction over this matter; and it appearing that the legal and factual bases set forth in the Motion and at the Approval Hearing establish just cause for the relief granted herein; and after due deliberation, it is hereby

---

[6]    "Frejka Declaration" means the *Declaration of Elise S. Frejka, CIPP/US, in Support of the Motion of Debtors for Entry of an Order (I) Approving Bidding Procedures, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Stalking Horse Agreement, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts and Leases, (VII) Approving the Sale of Assets, and (VIII) Granting Related Relief* [Docket No. 388].

**FOUND, CONCLUDED, AND DETERMINED THAT:**

**Jurisdiction, Venue, and Final Order**

A.       This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper in this District and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.       This Approval Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), any other applicable Bankruptcy Rules or Local Rules, and to any extent necessary under Bankruptcy Rule 9014 and Federal Rule of Civil Procedure 54(b), as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Approval Order, and expressly directs entry of judgment as set forth herein.

C.       The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

**Notice of the Bidding Procedures Order, Bidding Procedures,
Auction, Approval Hearing, Agency Agreement, Transactions**

D.       As evidenced by the Notice of Potential Approval Hearing [Docket No. 182], Notice of Auction for the Sale of the Debtors' Assets [Docket No. 448], Proof of Publication [Docket No. 472], the Notice of Winning Bidder for Certain of the Debtors' Assets [Docket No. 480], the Notice of Filing of Winning Bidder Agency Agreement [Docket No. 486], and the affidavit of service previously filed with this Court [Docket No. 313], notice of the Bidding Procedures Order, the Bidding Procedures, the Auction, the Approval Hearing, the Agency

Agreement, and the Transactions was proper, timely, adequate, and sufficient under the circumstances, and has been provided in accordance with sections 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007, and 9014, and Local Rule 6004-3.

E.      A reasonable opportunity to object or to be heard regarding the relief requested in the Motion was afforded to all interested persons and entities.

F.      The disclosures made by the Debtors in the Motion and related documents filed with the Court concerning the Transactions are sufficient under the circumstances.

### The Committee Settlement

G.      The Official Committee of Unsecured Creditors (the "Committee"), the Debtors, Purchaser, the ABL Agent, and the FILO Agent have agreed to the terms of a global settlement to resolve (a) the *Omnibus Objection of the Official Committee of Unsecured Creditors to Debtors' Motions (i) for Entry of an Order Approving Bidding Procedures and Stalking Horse Agreement; and (ii) for Entry of a Final Order Authorizing the Use of Cash Collateral* [Docket No. 338], and (b) the Committee's potential objections to the Sale (the "Committee Settlement").    The Committee Settlement provides for: (i) the reserve of $9,000,000 from the Wind-Down Budget for stub rent payments (the "Stub Rent Reserve") which shall be used to pay allowed stub rent claims of landlords within two (2) weeks of Closing, *provided* that any portion of the Stub Rent Reserve remaining after all stub rent has been paid shall be deemed available for satisfaction of other items in the Wind-Down Budget; (ii) a reserve of $30,000,000 for the payment of 503(b)(9) claims (the "503(b)(9) Reserve"), which shall be used to pay allowed 503(b)(9) claims pursuant to an expedited reconciliation and payment process to be agreed to by the Debtors and the Committee in consultation with Purchaser; (iii) contribution of 50% of the 503(b)(9) Savings, if any, for the benefit of unsecured creditors, with a minimum guaranteed contribution from Purchaser of $1,500,000, which dollars shall come first from the 503(b)(9) Reserve, and paid at the earlier of

(x) the Sale Termination Date or (y) the entry of an order confirming a chapter 11 plan of the Debtors (the "GUC Guarantee"); (iv) a $1,000,000 payment for the benefit of general unsecured creditors, which amount shall be funded by the Debtors from the accrued weekly cash collateral consent fees of $37,500 owing to each of the ABL Agent and the FILO Agent through entry of the Cash Collateral Order and the remainder from the FILO paydown at Closing (the "FILO Reserve" and, together with the Stub Rent Reserve, the 503(b)(9) Reserve, and (to the extent a chapter 11 plan of the Debtors is confirmed and becomes effective) the GUC Guarantee, the "Settlement Reserves"); (v) the Purchaser shall purchase and covenant to not pursue all Avoidance Actions; (vi) the establishment of lease designation rights pursuant to a separate order of the Court on terms reasonably satisfactory to the Debtors, Purchaser and the Committee (*provided* that unless and until alternative lease designation rights are approved, the Lease/Contract Procedures Order, as defined below, shall apply to the assumption, assignment, and rejection of executory contracts and unexpired leases); (vii) the agreement of the Term Loan Ad Hoc Group not to oppose a waiver of the Prepetition Term Loan Lenders' right to receive a recovery from the first $5,000,000 of value available for distribution to unsecured creditors; (viii) the payment (from the Carve Out Reserves (as defined in the Cash Collateral Order) or, to the extent the Carve Out Reserves are insufficient, the GUC Guarantee and/or the FILO Reserve) of all fees and expenses incurred by the professionals for the Committee through the Closing that are approved by the Court; (ix) a post-Closing budget for the Committee's professionals in the amount of $1,250,000 (the "Post-Closing UCC Budget"), payable from the Carve Out Reserves (as defined in the Cash Collateral Order); (x) any unused amounts from the Post-Closing UCC Budget shall be contributed to the benefit of unsecured creditors (the "UCC Budget Savings"); and (xi) the creation of a trust, whose trustee shall be selected by the Committee, for the benefit of unsecured creditors in any confirmed plan in

these chapter 11 cases to be funded with the GUC Guarantee, the FILO Reserve, and the UCC Budget Savings. The FILO Reserve shall be segregated and not used for any purpose other than as provided for in this Committee Settlement. For the avoidance of doubt, the Prepetition ABL Agent's and the Prepetition FILO Agent's consent to the Sale, the release of the Prepetition ABL and FILO Liens and to the Committee Settlement (and the funding of, and use of funds contained in, the Settlement Reserves) is conditioned upon, and subject to, the Prepetition ABL/FILO Obligations being Paid in Full on or before the Closing.

## Highest and Best Offer

H.      The Debtors conducted a sale process in accordance with, and have, along with the Purchaser, complied in all respects with, the Bidding Procedures Order and afforded a full, fair, and reasonable opportunity for any interested party to make a higher or otherwise better offer to purchase the Assets. The approval and consummation of the Transactions is in the best interests of the Debtors, their creditors, and all other parties in interest.

I.      (i) The Debtors and their advisors engaged in a robust and extensive marketing and sale process, both prior to the commencement of these chapter 11 cases and through the postpetition sale process in accordance with the Bidding Procedures Order and a sound exercise of the Debtors' business judgment, as more fully detailed in the First Day Declaration, the Frejka Declaration, and witness testimony; (ii) the Bidding Procedures were substantively and procedurally fair to all parties and the Debtors conducted a fair, open, and adequate sale process in full compliance in all respects with the Bidding Procedures Order, with all other applicable orders of the Court, and with the Debtors' fiduciary duties; (iii) the sale process, the Bidding Procedures, and the Auction were non-collusive, duly noticed, and provided a full, fair, reasonable, and adequate opportunity for any entity that either expressed an interest in acquiring the Assets, or who the Debtors believed may have had an interest in acquiring the Assets, to make an offer to

8

purchase the Assets; (iv) the Debtors and the Purchaser have negotiated and undertaken their roles leading to the entry into the Agency Agreement in a diligent, non-collusive, fair, reasonable, and good faith manner; and (v) the sale process conducted by the Debtors pursuant to the Bidding Procedures Order and the Bidding Procedures resulted in the highest or otherwise best value for the Assets for the Debtors and their estates, and was in the best interest of the Debtors, their estates, and their creditors.  There is no legal or equitable reason to delay entry into the Agency Agreement and the transactions contemplated therein.

J.    The consummation of the Transactions outside a plan of reorganization pursuant to the Agency Agreement neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a plan of reorganization or liquidation for the Debtors.  The Transactions does not constitute a sub rosa chapter 11 plan for which approval has been sought without the protections that a disclosure statement would afford.

K.    The Purchaser would not have entered into the Agency Agreement and the Transaction Documents, and would not consummate the transactions contemplated thereby, including, without limitation, the Transactions and the purchase of Designation Rights, if (i) a first priority, senior security interest and lien is not automatically perfected on any Assets, Proceeds,[7] and Additional Agent Merchandise Proceeds determined to constitute property of the Debtors' estates after entry of this Approval Order and occurrence of the Closing or (ii) the Purchaser is not granted a superpriority administrative expense claims pursuant to section 507(b) of the Bankruptcy Code, which is senior to all other administrative expense claims (including any other superpriority administrative expense claims but excluding the Carve Out and the FILO Reserve) against the

---

[7]    "Proceeds" has the meaning given thereto in the Agency Agreement.

Debtors to the extent of any amounts owing from the Debtors to Purchaser in connection with the Agency Agreement.

### Good Faith of Debtors and Purchaser

L.     The sale and marketing process engaged in by the Debtors was non-collusive, in good faith, and substantively and procedurally fair to all parties in interest.  Likewise, the negotiation of the Transactions and the other transactions contemplated by the Agency Agreement, including the consideration to be paid by the Purchaser under the Agency Agreement, were negotiated by the Debtors and the Purchaser at arm's-length, in good faith, and without collusion pursuant to sections 363(m) and 364(c)(1) of the Bankruptcy Code, and such consideration constitutes reasonably equivalent value and fair and adequate consideration for the Assets. Specifically: (i) the Purchaser recognized that the Debtors were free to deal with any other party interested in purchasing the Assets; (ii) the Debtors and the Purchaser complied in all respects with the provisions in the Bidding Procedures Order in negotiating and entering into the Agency Agreement and the other Transaction Documents, and the transactions described therein comply with the Bidding Procedures Order; (iii) the Purchaser agreed to subject any bid to the competitive bid procedures set forth in the Bidding Procedures Order; (iv) all payments made by the Purchaser in connection with the Transactions have been disclosed in the Agency Agreement; (v) no common identity of directors, officers, or controlling stockholders exists among the Purchaser and the Debtors; (vi) the negotiation and execution of the Agency Agreement and the other Transaction Documents were at arm's-length and in good faith, and at all times each of the Purchaser and the Debtors were represented by competent counsel of their choosing; and (vii) the Debtors and the Purchaser have not acted in a collusive manner with any person.  The Purchaser will be acting in good faith within the meaning of sections 363(m) and 364(c)(1) of the Bankruptcy Code in closing the transactions contemplated by the Agency Agreement and the other Transaction Documents.

The terms and conditions set forth in the Agency Agreement are fair and reasonable under the circumstances and were not entered into for the purpose of, nor do they have the effect of, hindering, delaying, or defrauding the Debtors or their creditors under any applicable laws. The Purchaser is a "good faith purchaser" within the meaning of sections 363(m) and 364(c)(1) of the Bankruptcy Code, and, as such, is entitled to all the protections afforded thereby. The Debtors and their respective management, board of directors, board of managers (or comparable governing authority), employees, agents, and representatives, and the Purchaser and its respective employees, agents, advisors, and representatives, each actively participated in the bidding process, and each acted in good faith and without collusion or fraud of any kind. Neither the Purchaser nor any of its affiliates, officers, directors, members, partners, principals, or shareholders (or equivalent) or any of their respective representatives, successors, or assigns is an "insider" (as defined under section 101(31) of the Bankruptcy Code) of any Debtors, and therefore, each such person is fully entitled to the protections of sections 363(m) and 364(c)(1).

M.    For the avoidance of doubt, neither the Purchaser nor any of its affiliates, is, or shall be deemed to be, a "successor" to, continuation of, or alter ego of, any of the Debtors or their estates by reason of any theory of law or equity, including for purposes of any foreign, federal, state or local revenue law, pension law, the Employee Retirement Income Security Act, the Consolidated Omnibus Budget Reconciliation Act, the WARN Act (29 U.S.C. §§ 2101 et seq.), Comprehensive Environmental Response Compensation and Liability Act, the Fair Labor Standard Act, Title VII of the Civil Rights Act of 1964 (as amended), the Age Discrimination and Employment Act of 1967 (as amended), the Federal Rehabilitation Act of 1973 (as amended), or the National Labor Relations Act, 29 U.S.C. § 151, et seq. To the extent allowed by applicable law, except as otherwise set forth in this Approval Order, the Purchaser, as a result of any action

11

taken in connection with the Transactions (i) is not, and shall not be considered, a successor to the Debtors, (ii) has not, *de facto* or otherwise, merged with or into the Debtors, (iii) is not a continuation or substantial continuation of any of the Debtors or their respective estates, businesses, or operations, or any enterprise of the Debtors, and (iv) does not have a common identity of incorporators, directors or controlling shareholders with the Debtors.

### No Fraudulent Transfer

N.     The consideration provided by the Purchaser pursuant to the Agency Agreement for its purchase of the Assets constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act, and under the laws of the United States, any state, territory, possession, or the District of Columbia.

O.     Neither the Purchaser nor its past, present, and future subsidiaries, parents, divisions, affiliates, agents, representatives, insurers, attorneys, successors and assigns, nor any of its nor their respective directors, managers, officers, employees, shareholders, members, agents, representatives, attorneys, contractors, subcontractors, independent contractors, owners, insurance companies, or partners (collectively, the "Purchaser Parties") is a continuation of the Debtors or their respective estates and no Purchaser Party is holding itself out to the public as a continuation of the Debtors or their respective estates and the Transactions does not amount to a consolidation, merger, or de facto merger of the Purchaser (or any other Purchaser Party) and the Debtors.

P.     None of the Debtors, the Purchaser, nor any of their respective affiliates, officers, directors, members, partners, principals, or shareholders (or equivalent) or any of their respective representatives, attorneys, successors, or assigns have engaged in any conduct that would cause or permit the consummation of the Transactions or the other transactions contemplated by the Agency

Agreement to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

## **Validity of Transfer**

Q.     The Debtors are the sole and lawful owners of, and have clear and marketable title to the extent of their right, title and interest in and to the Assets.  The Debtors' right, title, and interest in and to the Assets constitute property of the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code.

R.     The Debtors (i) have full corporate power and authority to execute and deliver the Agency Agreement and all other documents contemplated thereby, as applicable, (ii) have all of the power and authority necessary to consummate the Transactions, and (iii) have taken all action necessary to authorize and approve the Agency Agreement and to consummate the Transactions, and no further consents or approvals, other than those expressly provided for in the Agency Agreement, are required for the Debtors to consummate the transactions contemplated by the Agency Agreement.  The Debtors' right, title and interest in and to the Assets constitute property of the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code and the Debtors' title thereto is presently vested in the Debtors' estates.

S.     The Agency Agreement is a valid and binding contract between the Sellers and the Purchaser and shall be enforceable pursuant to its terms.

## **Section 363(f) Is Satisfied**

T.     The Transactions contemplated by the Agency Agreement meet the applicable provisions of section 363(f) of the Bankruptcy Code, such that, except for the Permitted Encumbrances and as otherwise set forth in this Approval Order, the Transactions and any purchase of Purchaser's Designation Rights will be free and clear of any and all Claims, causes of action, liens (including, without limitation, any statutory lien on real and personal property and

any and all "liens" as that term is defined and used in the Bankruptcy Code, including section 101(37) thereof), liabilities, interests, rights, and encumbrances (including, without limitation, the following: all mortgages, restrictions (including, without limitation, any restriction on the use, voting rights, transfer rights, claims for receipt of income, or other exercise of any attributes of ownership), hypothecations, charges, indentures, loan agreements, instruments, leases, licenses, sublicenses, options, deeds of trust, security interests, equity interests, conditional sale rights or other title retention agreements, pledges, judgments, demands, rights of first refusal, consent rights, offsets, contract rights, rights of setoff not taken prepetition, rights of recovery, reimbursement rights, contribution claims, indemnity rights, exoneration rights, product liability claims, alter-ego claims, environmental rights and claims (including, without limitation, toxic tort claims), labor rights and claims, employment rights and claims, pension rights and claims, tax claims, regulatory violations by any governmental entity, decrees of any court or foreign or domestic governmental entity, charges of any kind or nature, debts arising in any way in connection with any agreements, acts, or failures to act, reclamation claims, obligation claims, demands, guaranties, option rights or claims, rights, contractual or other commitment rights and claims, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of the chapter 11 cases and whether imposed by agreement, understanding, law, equity or otherwise, including claims otherwise arising under any theory, law, or doctrine of successor or transferee liability or theories of liability related to acting in concert or active participation with the Debtors or related theories) against any of the Assets (except to the extent set forth in the Agency

Agreement), and will not subject any Purchaser Party to any liability for any Claims whatsoever (including, without limitation, under any theory of equitable law, antitrust, or successor or transferee liability), except as expressly provided in the Agency Agreement with respect to the Permitted Encumbrances and this Approval Order, because, in each case, one or more of the standards set forth in section 363(f)(1)–(5) of the Bankruptcy Code has been satisfied; *provided* that all liens, claims, encumbrances, and interests of which the Assets are sold free and clear pursuant to the Approval Order (including the Adequate Protection Liens (as defined in the Cash Collateral Order)) shall automatically attach to all proceeds of the Transactions (excluding, for the avoidance of doubt, Assets and Proceeds) in the order of priority of such liens, claims, encumbrances, and interests, with the same validity, force, and effect which they had against the applicable Assets prior to the Transactions (including pursuant to the Cash Collateral Order).  All holders of Claims who did not object, or withdrew their objections to the Transactions, are deemed to have consented to the Transactions pursuant to section 363(f)(2) of the Bankruptcy Code, and all holders of Claims are adequately protected—thus satisfying section 363(e) of the Bankruptcy Code—by having their Claims (including the Adequate Protection Liens), if any, attach to the proceeds of the Transactions ultimately attributable to the property against or in which they assert Claims, or other specifically dedicated funds, in the same order of priority and with the same validity, force, and effect that such holder had prior to the Transactions (including pursuant to the Cash Collateral Order), subject to any rights, claims, and defenses of the Debtors or their estates, as applicable.  Those holders of Claims who did object and that have an interest in the Assets fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code.  All proceeds of the Transactions shall be funded into and held in an account owned and controlled by the Debtors, subject to the Cash Collateral Order and the Committee Settlement; *provided* that the

proceeds of the Transactions to fund the Debt Payoff and the Settlement Reserves shall be distributed in accordance with the terms set forth in this Approval Order.

U.      Each transfer, if any, of any Assets to the Purchaser or its designees under the Asset Designation Rights under the Agency Agreement will be a legal, valid, and effective transfer of all of the Debtors' legal, equitable, and beneficial right, title, and interest in and to the Assets free and clear of all Claims, except as expressly provided in the Agency Agreement with respect to the Permitted Encumbrances and as otherwise set forth in this Approval Order.

V.      The Purchaser would not have entered into the Agency Agreement and the Transaction Documents, and would not consummate the transactions contemplated thereby, including, without limitation, the Transactions and the purchase of the Designation Rights of the Assigned Contracts, if (i) each transfer of any Assets was not free and clear of all Claims of any kind or nature whatsoever, including, without limitation, rights or claims based on any successor, transferee, derivative, or vicarious liability or any similar theory and/or applicable state or federal law or otherwise or (ii) the Purchaser or any of its affiliates, would, or in the future could, be liable for any interests, including, without limitation, rights or claims based on any successor, transferee, derivative, or vicarious liability or any similar theory and/or applicable state or federal law or otherwise, in each case subject only to the Permitted Encumbrances.

### GOB Sale and Store Closings

W.      The Debtors have articulated good and sufficient business reasons for the Court to authorize the Purchaser to conduct the GOB Sale and Store Closings in accordance with the process and procedures pursuant to the Agency Agreement and set forth in the Store Closing Order and as modified in **Exhibit B** hereto (the "Amended Store Closing Procedures").   The Store Closing Order is incorporated and modified as described herein.

X.      The Purchaser's Asset Designation Rights are integral to the Agency Agreement and the GOB Sale, are in the best interests of the Debtors and their respective estates and creditors, and represent a sound exercise of the Debtors' business judgment.   Specifically, the Asset Designation Rights are necessary to sell the Assets to the Purchaser or its designees, as applicable.

Y.      Except as otherwise set forth in this Approval Order, the transfer to the Purchaser of the Asset Designation Rights will not subject the Purchaser to any liability whatsoever (except for the Permitted Encumbrances or as otherwise set forth in this Approval Order) that arise prior to the Closing or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of equitable law, any theory of antitrust, successor, transferee, derivative, or vicarious liability or any similar theory and/or applicable state or federal law or otherwise.

### Lease/Contract Designation Rights of the Assigned Contracts

Z.      The Purchaser's Lease/Contract Designation Rights pursuant to the terms of this Approval Order are integral to the Agency Agreement, are in the best interests of the Debtors and their respective estates, and creditors and represent a sound exercise of the Debtors' business judgment.

AA.      The Sellers and the Purchaser will, to the extent necessary, satisfy the requirements of section 365 of the Bankruptcy Code, prior to the assumption and assignment of the Assigned Contracts pursuant to the designation rights procedures (the "Designation Rights Procedures") set forth in the *Order (I) Authorizing and Approving Procedures To Reject or Assume Executory Contracts and Unexpired Leases and (II) Granting Related Relief* (the "Lease/Contract Procedures Order") [D.I. 429] or that may be set forth in a separate motion and proposed form of order, *provided*, *however*, that all rights of a counterparty to an Assigned Contract to object to the

assumption and assignment of a Contract or Lease in connection with the Designation Rights Procedures on any grounds are expressly reserved.  The Purchaser and the Debtors will identify all Assigned Contracts by filing a notice on the docket following the Closing and pursuant to the Designation Rights Procedures, which may be supplemented.  Unless and until any alternative Designation Rights Procedures are approved by a separate order, Purchaser may direct the Debtors to file one or more Assumption Notices (as defined in the Lease/Contract Procedures Order) with respect to any Assigned Contracts pursuant to the Designation Rights Procedures and the Debtors are hereby authorized and directed to comply with such direction and otherwise follow the procedures set forth in the Lease/Contract Procedures Order.

## **Wind-Down Amount**

BB.      Sound business justifications also exist for (i) the deposit of the Carve Out Reserves (as defined in the Cash Collateral Order), including the Post-Closing UCC Budget, to be funded upon Closing in accordance with this Approval Order and the Cash Collateral Order into a segregated account (the "Carve Out Reserves Account") held in trust for the benefit of the parties entitled to the protections of the Carve Out Reserves as set forth in the Cash Collateral Order and to be governed by a customary agreement governing such segregated account that is otherwise consistent with this Approval Order, the Cash Collateral Order, and the Agency Agreement (the "Carve Out Reserves Agreement"), and (ii) the funding of the Wind-Down Payments (as defined below) pursuant to the Wind-Down Budget (as defined below, and the Wind-Down Payments and the Carve Out Reserves, collectively, the "Wind-Down Amount"), subject in all respects to the terms of the Agency Agreement, including the funding of the FILO Reserve in accordance with this Approval Order, the Committee Settlement, and the Cash Collateral Order into a segregated account held in trust for the benefit of general unsecured creditors and as otherwise provided in this Approval Order.  The Wind-Down Amount will avoid a freefall

shutdown of the Debtors' remaining estates and will provide funding of those professional fees and other wind-down costs necessary to implement an orderly and responsible wind-down of the Debtors' estates.  The Wind-Down Amount is reasonable under the facts and circumstances of these chapter 11 cases.

## **Prompt Consummation**

CC.    Based on the record of the Approval Hearing, and for the reasons stated on the record at the Approval Hearing, the Transactions must be approved and consummated promptly to preserve the value of the Assets.  Time, therefore, is of the essence in effectuating the Agency Agreement.  As such, the Debtors and the Purchaser intend to close the Transactions as soon as reasonably practicable in accordance with the terms of the Agency Agreement.  The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the Agency Agreement in accordance with the terms thereof.  Accordingly, there is sufficient cause to waive the stay provided in the Bankruptcy Rules 6004(h) and any other applicable Bankruptcy Rules or Local Rules.

## **Credit Bid**

DD.    As set forth more fully in the Cash Collateral Order, the Debtors have acknowledged that the Prepetition Term Loan Obligations, including for the avoidance of doubt, the Prepetition Term Loan Obligations (each as defined in the Cash Collateral Order): (i) constitute legal, valid, binding, enforceable, unavoidable obligations of the Debtors; (ii) are secured by valid, binding, enforceable, unavoidable, and properly perfected Prepetition Liens on the Prepetition Collateral (each as defined in the Cash Collateral Order); (iii) constitute allowed secured claims under sections 502(a) and 506 of the Bankruptcy Code; and (iv) are authorized to be credit bid pursuant to section 363(k) of the Bankruptcy Code.  Pursuant to the Cash Collateral Order, the

Challenge Deadline (as defined in the Cash Collateral Order) has lapsed and thus no Debtor or any other party in interest has any valid Challenge, claim, or cause of action against the Prepetition Liens or Prepetition Obligations that would impact the propriety of the Credit Bid.

EE.    Pursuant to applicable law, including section 363(k) of the Bankruptcy Code, the Term Agent has elected to credit bid an amount equal to $105,000,000 of the Prepetition Term Loan Obligations, as contemplated under the Agency Agreement (the "Credit Bid").  Such Credit Bid is valid and proper consideration pursuant to sections 363(b) and 363(k) of the Bankruptcy Code and Prepetition Credit Documents (as defined in the Cash Collateral Order).  No cause exists to limit the amount of the credit bid pursuant to section 363(k) of the Bankruptcy Code or otherwise.

FF.    The Term Agent is authorized under the Prepetition Credit Documents to follow the directions of the Required Lenders (as defined in the Prepetition Term Loan Credit Agreement) in submitting the Credit Bid, including, without limitation, in assigning the right to receive the Assets to the Purchaser subject to the terms and conditions set forth in the Agency Agreement, and the Required Lenders are authorized to direct to the Term Agent to make the Credit Bid contemplated by the Agency Agreement.  The Term Agent acted validly and in good faith and in accordance with the Prepetition Credit Documents in submitting the Credit Bid with respect to the transactions contemplated by the Agency Agreement.  The Required Lenders acted validly, reasonably, and in good faith and in accordance with the Prepetition Credit Documents in directing the Term Agent to submit the Credit Bid with respect to the transactions contemplated by the Agency Agreement.

**NOW, THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED THAT:**

1.    The Motion is GRANTED, as set forth in this Approval Order.

2.      All objections to or reservations of rights with respect to the Motion or the relief requested therein that have not been withdrawn or resolved are overruled with prejudice; provided that the foregoing shall not prejudice the rights of any applicable counterparty to an Assigned Contract with respect to exercise of the Purchaser's Lease/Contract Designation Rights and the Designation Rights Procedures.  All persons and entities who did not object or who objected but have withdrawn their objections to the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.

3.      The Agency Agreement and the other Transaction Documents, and all terms and conditions thereof, are hereby APPROVED in all respects, unless otherwise set forth in this Approval Order.  The failure to specifically include any particular provision of the Agency Agreement or the Transaction Documents in this Approval Order shall not diminish or impair the effectiveness of such provision.

4.      The Committee Settlement is APPROVED in all respects.

5.      Upon entry of this Approval Order, the Challenge Deadline (as defined in the Cash Collateral Order) shall be deemed to have expired as of the date of the Approval Hearing.

6.      The Debtors, their respective officers, employees, and agents, and all other applicable parties are authorized and directed to (a) take any and all actions necessary or appropriate to perform, consummate, implement, and close the Transactions in accordance with the terms and conditions set forth in the Agency Agreement, the Transaction Documents, and this Approval Order, and (b) take all further actions and execute and deliver the Agency Agreement and Transaction Documents and any and all additional instruments and documents that may be necessary or appropriate to implement the Agency Agreement and the other Transaction

Documents and consummate the Transactions in accordance with the terms thereof, all without further order of the Court.

7.      Neither the Purchaser nor any of its affiliates is acquiring any of the Excluded Assets as set forth in <u>Section 16.21(e)</u> of the Agency Agreement.

8.      All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with, or which would be inconsistent with, the ability of the Debtors to transfer any Assets to the Purchaser or its designees in accordance with the Agency Agreement, the other Transaction Documents, and this Approval Order; *provided*, *however*, that nothing herein shall prevent counterparties to Assigned Contracts, if any, from objecting to the proposed assumption and assignment of an Assigned Contract or seeking to enforce contractual rights and obligations under such Contracts or Leases in connection with the Designation Rights Procedures. For the avoidance of doubt, all utilities, landlords, creditors, and other interested parties and all persons acting for or on their behalf shall not interfere with or otherwise impede the conduct of the GOB Sale or Store Closings or institute any action in any forum other than this Court that in any way directly or indirectly interferes with or obstructs or impedes the conduct of the GOB Sale or Sale Closings unless otherwise ordered by the Court, so long as such GOB Sale or Store Closing is conducted in accordance with the Amended Store Closing Procedures and/or any Side Letter (as defined herein).

9.      Following the satisfaction of the Initial Purchase Price Funding and the funding of the Stub Rent Reserve and the FILO Reserve, and in accordance with the Agency Agreement and this Approval Order, and upon the purchase of Purchaser's Designation Rights, if any, all of the Sellers' rights, titles, and interests in and to, and possession of, the Assets shall be vested in the Purchaser or its designees under the Asset Designation Rights, as applicable, pursuant to

sections 105(a), 363(b), 363(f) of the Bankruptcy Code. Such transfer shall constitute a legal, valid, enforceable, and effective transfer of the Assets. In connection with the transfer of the Assets, Purchaser is acquiring Avoidance Actions and Other Causes of Action pursuant to the terms and conditions set forth in the Agency Agreement and this Approval Order, and shall be deemed to release and waive (i) all Other Causes of Action against (x) the Prepetition Secured Creditors (as defined in the Cash Collateral Order), (y) 1903P Loan Agent and all of its affiliates including Gordon Brothers Retail Partners, LLC, and (z) any Related Party (as defined in the Agency Agreement), of the Debtors, including former officers or directors, and (ii) all Avoidance Actions (collectively, the "Released Causes of Action"). Upon the occurrence of the Closing, Purchaser shall be deemed to have waived and released the Released Causes of Action, and neither Purchaser, nor any Entity claiming by, through, or on behalf of Purchaser (including by operation of law, sale, assignment, conveyance, or otherwise) shall pursue, prosecute, litigate, institute, or commence an action based on, assert, sell, use defensively, convey, assign, or file any claim or cause of action that relates to any Released Cause of Action. Purchaser is hereby granted derivative standing and authority to commence, prosecute, and settle any Other Causes of Action acquired pursuant to the Agency Agreement other than the Released Causes of Action. All persons or entities, presently at or after the date of the Initial Purchase Price Funding, in possession of some or all of the Assets, shall surrender possession of any and all portions of the Assets to the Debtors on the date of the Initial Purchase Price Funding to be held strictly in trust for the benefit of Purchaser, *provided* that all Assets are subject to Purchaser's right to designate the transferees thereof, irrespective of who has possession, custody, or control thereof. Upon the Initial Purchase Price Funding, Purchaser shall have the exclusive right to market and sell, or otherwise designate the purchasers, licensees, and/or assignees of, any or all of the Assets free and clear of all liens,

claims, and encumbrances thereon (other than Permitted Encumbrances or as otherwise set forth in this Approval Order) without further order of the Bankruptcy Court; *provided* that the Lease/Contract Designation Rights shall be exercised in accordance with the Designation Rights Procedures.

10.    This Approval Order (a) shall be effective as a determination that, as of the Initial Purchase Price Funding, (i) upon the purchase of Purchaser's Designation Rights, as it relates to the Assigned Contracts, if any, the Assets shall have been transferred to the Purchaser or its designees under the Asset Designation Rights free and clear of all Claims, except as to the Permitted Encumbrances, as applicable, or as otherwise set forth herein, or otherwise held strictly in trust by the Sellers for the benefit of the Purchaser, and (ii) the conveyances described herein have been effected; and (b) to the greatest extent permitted under applicable law, is and shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, registrars of patents, trademarks, or other intellectual property, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments; and each of the foregoing persons and entities is hereby authorized to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agency Agreement and the other Transaction Documents.    All Assets transferred to Purchaser pursuant to this Approval Order are sold free and clear of any reclamation rights.    All Claims on the Assets (including the Adequate Protection Liens) shall automatically attach to the proceeds of the Transactions ultimately attributable to the property against which such Claims applied or other specifically dedicated funds (excluding, for the avoidance of doubt, Assets

and Proceeds), in the same order of priority and with the same validity, force, and effect that such Claims applied prior to the Transactions (including pursuant to the Cash Collateral Order), subject to the Committee Settlement and any rights, claims, and defenses of the Debtors or their estates, as applicable, or as otherwise provided herein.  Purchaser shall also be authorized to sell the Additional Agent Merchandise (as defined in the Agency Agreement) as set forth in the Agency Agreement, subject to the Amended Store Closing Procedures.

11.   At Closing, the Purchaser shall (i) to the Prepetition ABL Agent, for the benefit of the Prepetition ABL Lenders, and certain other persons as directed in the ABL Payoff Letter (as defined in the Agency Agreement), (a) pay the amount in cash necessary to indefeasibly pay in full in cash all Prepetition Revolving Obligations, including, without limitation, all outstanding principal, accrued interest, fees, costs and expenses (including, without limitation, all attorneys' fees, costs and expenses, and any other amounts as provided in the Cash Collateral Order), and (b) provide and/or post cash collateral for (and/or replacement of) any issued and outstanding letters of credit (in form and substance acceptable to the Prepetition ABL Agent), in each case in accordance with and as set forth in the ABL Payoff Letter (which shall be in form and substance acceptable to the Prepetition ABL Agent, and such amounts and other consideration, the "ABL Payoff"); and (ii) pay to the Prepetition FILO Agent, for the benefit of the Prepetition FILO Lenders, and certain other persons as directed in the FILO Payoff Letter (as defined in the Agency Agreement), the amount in cash necessary to pay in full in cash all Prepetition FILO Obligations, including, without limitation, all outstanding principal, accrued interest, fees, costs and expenses, make whole obligations and any other amounts as provided in the Cash Collateral Order, all as set forth in the FILO Payoff Letter (as defined in the Agency Agreement, which shall be in form and substance acceptable to the Prepetition FILO Agent) (such amounts and other consideration,

the "FILO Payoff" and, together with the ABL Payoff, the "Debt Payoff"), *provided* that the amount of the FILO Reserve will be deducted from the FILO Payoff, to be treated in accordance with the Committee Settlement, which deduction will not prevent the FILO Payoff from constituting payment in full of all Prepetition FILO Obligations. Upon receipt by the Prepetition ABL Agent and Prepetition FILO Agent of the Debt Payoff in accordance with the ABL Payoff Letter and the FILO Payoff Letter and expiration of the Challenge Deadline (as defined in the Cash Collateral Order), (i) the Prepetition ABL Agent and the Prepetition FILO Agent are authorized to immediately receive and apply any amounts received pursuant to the ABL Payoff Letter and the FILO Payoff Letter, (ii) all ongoing commitments under the ABL/FILO Credit Agreement shall be canceled and terminated, and (iii) following the funding of the Funded Reserve Account in accordance with this Approval Order, the Prepetition ABL Agent, the Prepetition FILO Agent and the Prepetition ABL and FILO Lenders shall have no further obligation to fund the Carve-Out Reserves (as defined in the Cash Collateral Order) or subordinate their liens and claims on account of any Allowed Professional Fees (as defined in the Cash Collateral Order). For the avoidance of doubt, all of the Prepetition Liens (including the Adequate Protection Liens) shall terminate in their entirety with respect to the Assets, and shall not attach to Proceeds, upon receipt by the Prepetition ABL Agent and Prepetition FILO Agent of the Debt Payoff and the occurrence of the Closing and the Prepetition ABL/FILO Obligations being Paid in Full (subject to the funding of the FILO Reserve).

12.     Notwithstanding anything contained in this Approval Order, these chapter 11 cases, the Agency Agreement, any Transaction Documents, the Bidding Procedures Order, the Store Closing Order, the Cash Collateral Order, or any other order entered or to be entered in these chapter 11 cases to the contrary, as of the Closing, for good and valuable consideration, the

adequacy of which is hereby confirmed, including the contributions of the Released Parties[8] to facilitate and implement the Transactions, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Closing, the Released Parties are deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by and on behalf of each and all of the Debtors, the Debtors' estates, any party acting on behalf of the Debtors or their Estates, the ABL Agent, the ABL Lenders, the FILO Agent, the FILO Lenders, and their affiliates, and the Purchaser, in each case on behalf of themselves and their respective successors and assigns, representatives and any and all other entities or persons that may purport to assert any claim or cause of action directly or derivatively, by or through the foregoing entities or persons, from any and all claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claims or causes of action, asserted or assertable on behalf of any of the Debtors, the Debtors' estates, or their affiliates, whether liquidated or unliquidated, fixed or contingent, mature or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, contract, tort, by statute, violations of federal or state securities laws or otherwise that each of the Debtors, the Debtors' estates, or their affiliates would have been legally entitled to assert in their own right (whether individually or

---

[8] "Released Parties" means, collectively, each of the following in their capacities as such, as former or current directors and/or officers of any of the Debtors, as equity holders of any of the Debtors, and/or as debt holders of any of the Debtors at any time prior to the Closing (each to the extent applicable): (i) the Agent Purchaser, (ii) the Term Agent, (iii) each Prepetition Term Loan Lender, (iv) the ABL Agent, (v) the FILO Agent, (vi) each ABL Lender, (vi) each FILO Lender, (vii) any former director or officer of any of the Debtors prior to the Closing, (viii) Gordon Brothers Retail Partners, LLC, and (ix) with respect to (x) any Entity or Person (as defined in the Bankruptcy Code) in the foregoing (i) through (ix), such Entity's or Person's predecessors, successors and assigns, parents, subsidiaries, affiliates, affiliated investment funds or investment vehicles, managed or advised accounts, funds, or other entities, and investment advisors, sub-advisors, or managers, (y) with respect to each of the foregoing in clause (x), such Entity's or Person's respective current and former officers, directors, principals, equity holders (regardless of whether such interests are held directly or indirectly and any fund managers, fiduciaries, or other agents with any involvement related to any of the Debtors), members, partners, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, actuaries, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and (z) with respect to each of the foregoing in clause (x), such Entity's or Person's respective heirs, executors, estates, servants, and nominees.

collectively) or on behalf of the holder of any claim against or interest in or other person, based on or relating to, or in any manner arising from, in whole or in part, any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Closing, including any claims or causes of action based on or relating to, or in any manner arising from, in whole or in part, the chapter 11 cases, the Debtors, the Transactions, the Bidding Procedures, the Bidding Procedures Order, the Agency Agreement, any Transaction Document, the Store Closing Procedures, the Store Closing Order, the Cash Collateral Order, the bidding process, the sale process, the governance, management, transactions, ownership, or operation of any of the Debtors (including, for the avoidance of doubt, in any capacities as former directors, officers, equity holders, or debt holder), the purchase, sale or rescission of any security of or claim against any of the Debtors, the subject matter of, or the transactions or events giving rise to, any claim or interest that is treated in the Bidding Procedures, the Bidding Procedures Order, the Agency Agreement, any Transaction Document, the Store Closing Procedures, the Store Closing Order, the Cash Collateral Order, the business or contractual agreements between any Debtor and any Released Party, the Debtors' in or out-of-court restructuring efforts, intercompany transactions, the Transactions, the Prepetition Credit Documents or the Prepetition Loan Facilities (each as defined in the Cash Collateral Order), the restructuring or sale of claims and interests before the Closing, the negotiation, formulation, preparation, execution, filing, solicitation, entry into, and/or consummation of the Bidding Procedures, the Bidding Procedures Order, the Agency Agreement, any Transaction Document, the Store Closing Procedures, the Store Closing Order, the Cash Collateral Order, the chapter 11 cases, any restructuring transaction, or related contract, instrument, release, or other agreement or document created or entered into in connection with the foregoing, the pursuit of the Transactions, the sale process, or the bidding process, the administration and implementation of the chapter 11

cases, the Prepetition Credit Documents or the Prepetition Loan Facilities, or the distribution of proceeds from the Transactions, the Transactions, the Bidding Procedures, the Bidding Procedures Order, the Agency Agreement, any Transaction Document, the Store Closing Procedures, the Store Closing Order, the Cash Collateral Order, including the distribution of property under this Approval Order, the Agency Agreement, the Store Closing Order, or any other Transaction Document, or any other agreement, act or omission, transaction, event, or other occurrence taking place on or before the Closing.

13.     Each of the parties granting the releases set forth in the foregoing paragraph (including such parties' successors and assigns and including the Purchaser pursuant to the Agency Agreement) covenants not to, and is hereby forever enjoined from, directly or indirectly bringing the released claims and causes of action.   Such releases (i) represent a sound exercise of the Debtors' business judgment; (ii) were negotiated in good faith and at arm's length as part of the Agency Agreement; and (iii) are (a) in exchange for good and valuable consideration, (b) a good faith settlement and compromise of the claims released thereby, (c) in the best interest of the Debtors and their estates, (d) fair, equitable, and reasonable under the circumstances of the Debtors chapter 11 cases, (e) are within the jurisdiction of the Bankruptcy Court; (f) are integral elements of the transactions incorporated into this Approval Order and inextricably bound with the other provisions of this Approval Order; and (g) consistent with the Bankruptcy Code and are hereby approved in their entirety.   For the avoidance of doubt, the foregoing releases do not release any obligations under the Agency Agreement or any other Transaction Documents documenting the Transactions.

14.     Except as otherwise provided in the Agency Agreement and this Approval Order, including with respect to the Permitted Encumbrances, all persons and entities (and their respective

successors and assigns), including, but not limited to, all debt security holders, equity security holders, affiliates, governmental, tax, and regulatory authorities, lenders, customers, vendors, employees, trade creditors, litigation claimants, and other creditors holding claims arising under or out of, in connection with, or in any way relating to, the Debtors, the Assets, and the ownership, sale, or operation of the Assets prior to the Closing or any transfer of any Assets to the Purchaser or its designees, are hereby forever barred, estopped, and permanently enjoined from asserting such claims against any Purchaser Party and its property (including, without limitation, the Assets), unless otherwise provided by further order of this Court.  Following the Closing, no holder of any Claim shall interfere with the Purchaser's title to or use and enjoyment of the Assets based on or related to any such claim or interest.

15.    Except as otherwise provided in the Agency Agreement or this Approval Order, including with respect to the Permitted Encumbrances, if any person or entity that has filed financing statements, mortgages, mechanic's claims, lis pendens, or other documents or agreements evidencing claims against the Debtors or in the Assets shall not have delivered to the Debtors prior to the Closing of the Transactions, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, and/or releases of all Claims that the person or entity has with respect to the Sellers or the Assets or otherwise, then only with regard to the Assets that are purchased by the Purchaser pursuant to the Agency Agreement and this Approval Order, (a) the Sellers are hereby authorized and directed to execute and file such statements, instruments, releases, and other documents on behalf of the person or entity with respect to the Assets, (b) the Purchaser is hereby authorized to file, register, or otherwise record a certified copy of this Approval Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Claims against the Purchaser Parties and the

Assets, and (c) upon consummation of the Transactions, the Purchaser may seek in this Court or any other court to compel appropriate parties to execute and/or file termination statements, instruments of satisfaction, and releases of all Claims that are extinguished or otherwise released pursuant to this Approval Order under section 363 of the Bankruptcy Code, and any other provisions of the Bankruptcy Code, with respect to the Assets. This Approval Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department, or office. Notwithstanding the foregoing, the provisions of this Approval Order authorizing the Transactions and designation and, if applicable, transfer of the Assets free and clear of Claims shall be self-executing and neither the Debtors nor the Purchaser shall be required to execute or file releases, termination statements, assignments, consents, or other instruments to effectuate, consummate, and implement the provisions of this Approval Order.

16.    Except as otherwise provided in the Agency Agreement and this Approval Order, including with respect to the Permitted Encumbrances, effective upon the Closing, all persons and entities are forever prohibited and enjoined from commencing or continuing in any matter any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral, or other proceeding against the Purchaser, any Purchaser Party or their respective assets (including, without limitation, the Assets), with respect to any (a) claim in these chapter 11 cases or in connection with or related to the Transactions or the Debtors or (b) successor or transferee liability including, without limitation, the following actions with respect to clauses (a) and (b): (i) commencing or continuing any action or other proceeding pending or threatened; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any lien, claim, interest, or encumbrance; (iv) asserting any

setoff (except for setoffs exercised prior to the Petition Date), or right of subrogation, or recoupment of any kind; (v) commencing or continuing any action, in any manner or place, that does not comply with, or is inconsistent with, the provisions of this Approval Order or other orders of this Court, or the agreements or actions contemplated or taken in respect hereof; or (vi) revoking, terminating, failing, or refusing to renew any license, permit, or authorization to operate any business in connection with the Assets or conduct any of the businesses operated with respect to such Assets.  Except as otherwise expressly provided in this Approval Order or the Agency Agreement and in accordance with the Agent Dropout Rights (as defined below), after the Closing, the Debtors shall have no further liability with respect to the Assets, and any claims, whether administrative or otherwise, relating to or arising from such Assets after the closing of the sale asserted against the Debtors shall be deemed disallowed.  Purchaser shall not be liable for any claims against the Debtors except as expressly provided for in the Agency Agreement and this Approval Order, and the Debtors shall not be liable for any claims against Purchaser except as expressly provided for in the Agency Agreement.

17.     Following the satisfaction of the Initial Purchase Price Funding and the funding of the Stub Rent Reserve and the FILO Reserve, any Proceeds, or Additional Agent Merchandise Proceeds received by, or that otherwise come into the possession of, Sellers at any time after the Closing shall be segregated and held strictly in trust for the benefit of Purchaser, shall not be commingled with the Sellers' own assets, and, as such, shall not become property of the Debtors' estates pursuant to and consistent with 11 U.S.C. § 541(b)(1), and shall be paid over to Purchaser promptly, but in any event, not later than in connection with each Weekly Sale Reconciliation (as defined in the Agency Agreement).

18.     To the extent Purchaser has not designated any Assets as of the Asset Designation Rights Termination Date (as defined in the Agency Agreement, and any Assets not designated by the Asset Designation Rights Termination Date, the "Residual Assets"), (i) ownership of all cash (on hand, in the bank, in transit, posted in respect of letters of credit or bonds or otherwise), credit card processing float, accounts receivable, notes receivable, credit card receivables, other receivables, deposits, security deposits, proceeds of retail sales in all of the Sellers' retail store locations, rights to refunds, other rights to payment, Intellectual Property, and, subject to Section 7.1 of the Agency Agreement, ownership of all Remaining Merchandise (as defined in the Agency Agreement), comprising Residual Assets shall vest in Purchaser, and (ii) ownership of all other Residual Assets shall revert to the Debtors' estates, each on the Asset Designation Rights Termination Date.

19.     Nothing set forth herein or in the Agency Agreement shall impact the obligation of any proposed designee to assume obligations under an Assigned Contract *cum onere*, including, without limitation, liabilities for indemnification, year-end adjustments or reconciliations, and liabilities for any defaults under such Assigned Contracts, and all parties' rights are reserved in such regard.

20.     The Vacate Date (as defined in the Agency Agreement) for any Lease shall also be the Lease Designation Rights Termination Date for such Lease.  By written agreement of the Debtors and the Agent, the Agent may extend the Lease Designation Rights Termination Date past the Vacate Date provided that the Agent's obligations to pay all Expenses, including Occupancy Expenses, for each Store or Distribution Center, as applicable, shall continue until the new Lease Designation Rights Termination Date.  Thereafter, the Merchant shall be responsible to pay all such Expenses to the extent, if any, the rejection date for an applicable lease is later than the new

Lease Designation Rights Termination Date for such lease; *provided* that the Merchant reserves all rights to seek further reimbursement from the Agent pursuant to the Agency Agreement. Notwithstanding anything to the contrary in the Agency Agreement or this Approval Order, the Agent may not abandon any property at a Store or Distribution Center that does not belong to Merchant.  A copy of any agreement to extend the Lease Designation Rights Termination Date should be filed and sent to any applicable landlord.

### Good Faith of Debtors and Purchaser

21.    The Transactions contemplated by the Agency Agreement is undertaken by the Debtors and the Purchaser without collusion and in good faith, as that term is defined in sections 363(m) and 364(c)(1) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Transactions shall not affect the validity of the Transactions (including, without limitation, the assumption and assignment of the Assigned Contracts, if any, pursuant to the Designation Rights Procedures), unless such authorization and consummation of such Transactions is duly and properly stayed pending such appeal.

22.    Neither the Debtors nor the Purchaser have engaged in any action or inaction that would cause or permit the Transactions to be avoided or costs or damages to be imposed under section 363(n) of the Bankruptcy Code.  The consideration provided by the Purchaser for the Assets under the Agency Agreement is fair and reasonable and the Transactions may not be avoided, and costs and damages may not be imposed, under section 363(n) of the Bankruptcy Code.

### Asset Designation Rights

23.    In accordance with the terms of this Approval Order and Section 15.2 of the Agency Agreement, the Purchaser is authorized to exercise the Asset Designation Rights.  Subject to

Purchaser's compliance with its payment obligations under the Agency Agreement and this Approval Order, Purchaser is authorized to execute, in the name of and as agent for the Debtors, any and all deeds, bills of sale, and other instruments or documents necessary to effectuate the sale, transfer, or other conveyance of any of the Assets, none of which instruments or documents shall require the Debtors to incur any obligations or other liabilities beyond the terms of the Agency Agreement.

24.     At any time after the Closing but in no event later than the Asset Designation Rights Termination Date, the Purchaser is authorized to provide notice of any sale, license, transfer, or other conveyance of any Assets by the Purchaser (other than the Assets being sold pursuant to the GOB Sale or Store Closings, as to which no further notice shall be required) substantially in the form attached to the Agency Agreement as Exhibit 2(b)(iv) (the "Asset Designation Notice").

25.     Except as otherwise stated in this Approval Order, the sale, license, transfer, or other conveyance of any Assets by the Purchaser reflected in any Asset Designation Notice shall be automatically effective on the date reflected in the applicable Asset Designation Notice and subject to the satisfaction of any closing conditions reflected therein, and the sale or other conveyance of such Assets shall be free and clear of all liens, Claims, and encumbrances (other than Permitted Encumbrances) without further order of the Court; *provided* that nothing in this Approval Order shall inhibit the ability of Purchaser to seek other or further orders of the Court in connection with the sale or other disposition of any Assets.

## GOB Sale and Store Closings

26.     Subject to the provisions of this Approval Order and the Amended Store Closing Procedures, as same may be modified by any Side Letter (as defined below), the Debtors and Purchaser are hereby authorized, pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy

Code, to conduct the GOB Sale and Store Closings in accordance with the Store Closing Procedures, as may be modified by any Side Letter.

27.    Following the satisfaction of the Initial Price Funding, Purchaser shall have the exclusive right to use the Stores (as defined in the Agency Agreement) and all other Assets for the purpose of conducting the GOB Sale and Store Closings, free of any interference from any entity or person, subject to compliance with the Agency Agreement (including payment of Expenses (as defined in the Agency Agreement) and Wind-Down Payments), the Store Closing Procedures and this Approval Order.  The Purchaser and each landlord of a Store are authorized to enter into agreements (each, a "Side Letter") between themselves modifying the Store Closing Procedures and this Approval Order, as applicable, without further order of the Court, and such Side Letters shall be binding as among the Purchaser and any such landlords.  In the event of any conflict between this Approval Order and any Side Letter, the terms of such Side Letter shall control; *provided* that this Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of any Side Letter.

28.    For purposes of conducting the GOB Sale and Store Closings, the Purchaser shall have (a) the right to the unencumbered use and occupancy of, and peaceful and quiet possession of each Store and the assets currently located at such Stores (as defined in the Agency Agreement), and (b) the exclusive right to use the Stores and all related Store services, furniture, fixtures, equipment and other assets of the Debtors or Purchaser, as the context makes applicable, as designated under the Agency Agreement and/or hereunder for the purpose of conducting the GOB Sale and Store Closings, free of any interference from any entity or person, subject to compliance with the Store Closing Procedures as modified by any Side Letter and this Approval Order.

29.     Purchaser, as the exclusive agent for Debtors, is authorized to conduct, advertise, post signs, utilize sign-walkers, and otherwise promote the GOB Sale and Store Closings as a "going out of business," "store closing," "sale on everything," "everything must go," or similarly themed sale, in accordance with the Store Closing Procedures (as the same may be modified any Side Letters), subject to compliance with the Store Closing Procedures, this Approval Order, and all applicable federal, state, and local laws, regulations and ordinances, including, without limitation, all laws and regulations relating to advertising, privacy, consumer protection, occupational health and safety and the environment, together with all applicable statutes, rules, regulations and orders of, and applicable restrictions imposed by, governmental authorities, other than all applicable laws, ordinances, rules, regulations, or licensing requirements in respect of "going out of business", "store closing" or similarly-themed sales (collectively, the "Liquidation Sale Laws"); *provided*, *however*, that as long as the GOB Sales and Store Closings are conducted in accordance with the terms of this Approval Order and the Store Closing Procedures, and in light of the provisions in the laws of many Governmental Units (as defined in the Bankruptcy Code) that exempt court-ordered sales from their provisions, the Sellers and the Purchaser will be presumed to be in compliance with any Liquidation Sale Laws and are authorized to conduct the GOB Sale and Store Closings in accordance with the terms of this Approval Order and the Store Closing Procedures without the necessity of further showing compliance with any such Liquidation Sale Laws.

30.     Purchaser may use all Intellectual Property consistent with the Debtors' ordinary course of business usage and in connection with the conduct of the GOB Sale and Store Closings.

31.     Unless otherwise ordered by the Court, all newspapers and other advertising media in which the GOB Sale or Store Closings are advertised shall be directed to accept this Approval

Order as binding and to allow the Debtors and the Purchaser to consummate the transactions provided for in the Agency Agreement, including, without limitation, conducting and advertising the GOB Sale and Store Closings in the manner contemplated by the Store Closing Order.

32.     The Purchaser is authorized to, or may direct the Debtors to, distribute emails and promotional materials to the Debtors' customers consistent with the Debtors' existing policies on the use of consumer information.

### **Wind-Down Funding**

33.     Nothing in this Approval Order shall impair, modify, or otherwise affect the Carve Out (as defined in the Cash Collateral Order).  At Closing, the Debtors shall fund the Funded Reserve Account in accordance with this Approval Order and the Cash Collateral Order, and the Debtors shall be authorized to apply such amounts in accordance with the Cash Collateral Order. The creation and funding of the Funded Reserve Account is approved pursuant to section 363(b) of the Bankruptcy Code.  Except as expressly set forth in this Approval Order, nothing herein shall otherwise impair, modify, or affect the Cash Collateral Order.

34.     At Closing, Purchaser shall make an initial cash payment to the Debtors equal to sixty-five percent (65%) of the Wind-Down Budget (the "Initial Wind-Down Payment") *provided* that, notwithstanding anything herein to the contrary, the Initial Wind Down Payment shall include the payment of all reasonable and documented fees and expenses of the Term Agent advisors and the Term Loan Ad Hoc Group Advisors in an amount not to exceed $1,660,000.  The remaining thirty-five percent (35%) of the Wind Down Budget shall be funded from Acquired Cash and, to the extent necessary, Proceeds, within thirty (30) days after the Closing (together with the Initial Wind Down Payment, the "Wind-Down Payments").  The Wind-Down Payments shall not exceed the amounts set forth in Exhibit 3.1(b) of the Agency Agreement (the "Wind-Down Budget"); *provided* that if any amounts remain in the 503(b)(9) Reserve following reconciliation and

payment of allowed 503(b)(9) claims, such amounts that have not been expended by the Debtors as of the Designation Rights Termination Date shall be returned to Purchaser upon the earlier of (i) the dismissal or conversion of these chapter 11 cases; or (ii) the effective date of a plan of liquidation of the Debtors, subject to the paragraph (G)(iii). The Debtors shall set aside the funds received on account of the Wind-Down Payments into a segregated account and are authorized to use such funds only to make payments pursuant to the Wind-Down Budget and this Approval Order.

### **Other Provisions**

35.     All payments made by the Debtors on account of the Central Services Expenses (as defined in the Agency Agreement) shall be made pursuant to, and solely in accordance with, the Central Services Budget (as defined in the Agency Agreement) (on a line item basis). The Debtors shall provide weekly reporting to Purchaser of all amounts expended for Expenses and the Central Services Expenses as set forth in the Central Services Budget.

36.     The Debtors shall make its books and records reasonably available to Purchaser upon Closing and until the Designation Rights Termination Date.

37.     Purchaser shall neither have nor incur any obligation to advance or fund any amounts to or for the Debtors except as set forth in the Agency Agreement. Except as provided in the Agency Agreement, upon Closing, neither the Debtors nor any other entities acting on their behalf or as their successors (including but not limited to the any statutory committee appointed and any chapter 7 or chapter 11 trustee) may recover from the Purchaser any costs or expenses of preserving, or disposing of, any of the Assets.

38.     The Final Reconciliation (as defined in the Agency Agreement), once agreed to by the Debtors and Purchaser in consultation with the Committee, (i) shall not conflict with or impact the Committee Settlement or funding of the Settlement Reserves and (ii) shall be automatically

deemed approved pursuant to section 105(a) of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure without further order of the Court or action by any party; *provided* that the Committee reserves the right to request an emergency hearing if the Final Reconciliation conflicts with or has any economic impact on the Committee Settlement.

39.     The automatic stay imposed by section 362 of the Bankruptcy Code is hereby lifted, solely to the extent necessary, without further order of the Court, (a) to allow the Purchaser to give the Debtors any notice provided for in the Agency Agreement, (b) to allow the Purchaser to take any and all actions permitted by the Agency Agreement in accordance with the terms and conditions thereof, including, without limitation, effectuating the Transactions and the other transactions contemplated by the Agency Agreement and other Transaction Documents, and (c) to otherwise implement the terms and provisions of the Agency Agreement, the other Transaction Documents, and this Approval Order.

40.     This Approval Order shall be binding in all respects upon the Debtors, their affiliates, their estates, all creditors of (whether known or unknown) and holders of equity interests in any Debtor, any holders of claims against or on all or any portion of the Assets, all counterparties to the Assigned Contracts, the Purchaser, and all of their respective successors and assigns, including, but not limited to, any subsequent trustee(s), examiner(s), or receiver(s) appointed in any of the Debtors' chapter 11 cases or upon conversion of these chapter 11 cases to cases under chapter 7 under the Bankruptcy Code, as to which trustee(s), examiner(s), or receiver(s) such terms and provisions likewise shall be binding.  Subject to Purchaser's obligation to pay Expenses and fund the Wind-Down Payments, any such successor shall continue to hold all Assets, Proceeds, and Additional Agent Merchandise strictly in trust for the benefit of Purchaser.  The Agency

Agreement shall not be subject to rejection or avoidance by the Debtors, their estates, their creditors, their shareholders, or any trustee(s), examiner(s), or receiver(s).

41.     In connection with the Transactions, the Purchaser and the Debtors may and are hereby authorized but not directed to enter into a transition services agreement pursuant to which, effective as of the Closing, the Purchaser and the Debtors may provide certain services to each other for a transitional period following the Closing (the "Transition Services Agreement").  The Purchaser and the Debtors are hereby authorized to execute and deliver any additional documentation contemplated by the Agency Agreement or in furtherance of the Transactions, and to perform all such other and further acts as may be required in connection with the negotiation, execution, and performance of any Transition Services Agreement.  For the avoidance of doubt, the Transition Services Agreement shall provide that neither the Debtors nor their estates shall incur any liabilities for fees, expenses, costs, or disbursements on account of any transition services and the Purchaser shall promptly reimburse the Debtors for any fees, costs, expenses, or other disbursements incurred by the Debtors (including their advisers) in connection with any transition services provided pursuant to the Transition Services Agreement.  The Debtors shall file a notice and proposed order approving any Transition Services Agreement with the Court and shall cause such notice to be served on any affected parties, who shall have two (2) business days to object to the entry of such order.

42.     Notwithstanding the language in Section 2(b)(viii) of the Agency Agreement stating that after the Closing the Debtors shall hold the Assets in trust for the benefit of Purchaser and, as such, the Assets shall not constitute property of the Debtors' estates, all parties' rights regarding any real property lease to which a Debtor is a tenant shall be governed by the Bankruptcy

Code, including, without limitation, regarding any ongoing obligation to timely perform the Debtors' lease obligations and any rejection, assumption, and/or assignment of the lease.

43.     The terms and provisions of this Approval Order and any actions taken pursuant hereto shall survive entry of an order which may be entered: (a) confirming any chapter 11 plan in any of these chapter 11 cases; (b) converting any of these chapter 11 cases to a case under chapter 7 of the Bankruptcy Code; (c) dismissing any of these chapter 11 cases; (d) appointing any trustee, examiner, or receiver under the Bankruptcy Code; or (e) pursuant to which this Court abstains from hearing any of these chapter 11 cases.  The terms and provisions of this Approval Order, notwithstanding the entry of any such orders described in clauses (a)-(e) above, shall continue in these chapter 11 cases or following dismissal of these chapter 11 cases.

44.     Following the satisfaction of the Initial Purchase Price Funding and the Stub Rent Reserve and the FILO Reserve, upon the occurrence of the Closing, all Proceeds shall be exclusive property of the Agent, subject to and in accordance with Section 3.2 of the Agency Agreement.

45.     Upon satisfaction of the Initial Purchase Price Funding and funding of the Stub Rent Reserve and the FILO Reserve, but subject to Purchaser's obligation to pay Expenses and fund the Wind-Down Payments, Purchaser shall have first priority, senior security interests and liens on all Assets and Proceeds, which liens shall be deemed automatically perfected and (i) the Debtors shall be expressly prohibited from granting any security interests or liens on the Assets and Proceeds and (ii) to the extent that any security interest or lien is granted or otherwise attaches, voluntarily or involuntarily, (other than the security interests and liens in favor of the Purchaser) to any Assets or Proceeds, such security interests and liens shall be *void ab initio* without further order of the Court; *provided* that nothing in the Approval Order shall inhibit Purchaser's ability, and this Approval Order expressly authorizes Purchaser, to take any action Purchaser deems

appropriate to perfect and enforce security interests and liens granted in its favor. The automatic stay is hereby modified to the extent necessary to permit Agent to record a copy of this Approval Order, together with a Form UCC-1 or other similar financing statement, in any jurisdiction where the Assets or Proceeds are located, where the Debtors are incorporated or organized, or that Agent otherwise deems appropriate, *provided, however*, that the liens granted to Agent under the Agency Agreement and this Approval Order are self-executing and are deemed perfected irrespective of whether Agent files a financing statement or a copy of this Approval Order.

46.     Following the satisfaction of the Initial Purchase Price Funding and funding of the applicable Settlement Reserves, and subject to Purchaser's obligation to pay Expenses and fund the Wind-Down Payments, until all Assets have been sold or otherwise disposed of, and solely to the extent that any Assets, Proceeds, or Additional Agent Merchandise Proceeds are, notwithstanding the Approval Order, subsequently determined to constitute property of Debtors' estates and a determination has been made by the Court as to the diminution in value of the Assets, Proceeds, or Additional Agent Merchandise, Purchaser shall have a superpriority administrative expense claim pursuant to, and subject to the requirements of, section 507(b) of the Bankruptcy Code, as applicable, limited to the amount of any diminution of value of the Assets, Proceeds, or Additional Agent Merchandise, as applicable, which is senior to all other administrative expense claims (but subject to the FILO Reserve and the Carve Out and related claims in accordance with the Cash Collateral Order) against the Debtors to the extent of any amounts owing from the Debtors to Purchaser in connection with the Agency Agreement, including as a result of any breach of the Agency Agreement.

47.     The sale of any personally identifiable information contemplated in the Agency Agreement is consistent with the Sellers' privacy policies and satisfies the requirements of

section 363(b)(1)(A) of the Bankruptcy Code.  Purchaser or its designees, if applicable, shall be bound by and meet the material standards established by the Sellers' privacy policies solely with respect to any personally identifiable information transferred to Purchaser or its designees pursuant to the Agency Agreement; *provided* that nothing in this Approval Order shall affect, limit, restrict, prohibit or impair any right to amend or replace the Sellers' privacy policies on a go-forward basis with respect to any personally identifiable information transferred to Purchaser or any designee, in accordance with the terms thereof and applicable law.

48.    Purchaser shall indemnify Debtors (and their respective estates) for up to $10,000,000.00 on account of any administrative expense claim or priority tax claim attributable to the tax consequences associated with the elimination or cancellation of, transfer of, or withdrawal from the Key Man Insurance policy program provided for under certain Pre-1986 Corporate Owned Life Insurance policies issued in 1984 and 1985 by Provident Life and Accident Insurance Company (the "Key Man Insurance Policies" and any associated tax liability, the "Key Man Insurance Tax Liability") upon the tax becoming payable to the relevant taxing authority. Sellers shall use best efforts to, and reasonably cooperate with, Purchaser and its professionals in efforts to, mitigate and/or offset the amount of any Key Man Insurance Tax Liability, including by evaluating the availability of any tax attributes that could reduce or eliminate the Key Man Insurance Tax Liability, considering the appropriate classification of any Key Man Insurance Tax Liability, considering structuring alternatives to monetize the Key Man Insurance Policies, or otherwise preventing any Key Man Insurance Tax Liability from arising.  For the avoidance of doubt, Purchaser shall be entitled to the net proceeds (if any), after payment of any associated tax liability, of the Key Man Insurance Policies, including if such proceeds become due and payable prior to the Sellers' withdrawal.

49.     Each and every federal, state, and local governmental agency, department, or official is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agency Agreement and other Transaction Documents.  For the avoidance of doubt, section 1146(a) of the Bankruptcy Code shall not apply to the Transactions.

50.     The Agency Agreement may, in consultation with the Committee, be modified, amended, or supplemented by the parties thereto in accordance with the terms thereof, without further order of the Court; *provided* (i) that any such modification, amendment, or supplement does not, based on the Debtors' business judgment, have a material adverse effect on the Debtors' estates or their creditors; (ii) the Purchaser expressly consents to such modification, amendment, or supplement in writing; and (iii) the Committee expressly consents in writing to any modification, amendment, or supplement that adversely impacts the Committee Settlement or the rights of unsecured creditors.  Any amendment to the Agency Agreement must be filed with the Court within two (2) business days of the execution of such amendment.  The Debtors shall provide notice to the applicable landlord of any amendment that extends the Lease Designation Rights Termination Date for a Store or Distribution Center.

51.     All time periods set forth in this Approval Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

52.     Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 7062, and 9014 or any other Bankruptcy Rules or Local Rule to the contrary, the terms and conditions of this Approval Order shall be effective immediately upon entry and the Debtors and the Purchaser are authorized to close the Transactions immediately upon entry of this Approval Order.

53.     To the extent there is any conflict between the terms of this Approval Order and the Agency Agreement, the terms of this Approval Order shall control.  Nothing contained in any chapter 11 plan hereinafter confirmed in these chapter 11 cases or any order confirming such chapter 11 plan, or any other order of the Court, shall conflict with or derogate from the provisions of the Agency Agreement or any other Transaction Document or the terms of this Approval Order, unless otherwise agreed in writing by the Debtors and the Purchaser or entered by order of the Court.

54.     Nothing in this Approval Order or the Agency Agreement shall impair or prejudice an applicable landlord's rights with respect to Debtors' available insurance coverage with respect to third-party claims asserted in connection with the Debtors' use and occupancy of premises subject to an unexpired real property lease with regard to events that occurred prior to the Closing or the effective date of assignment.

55.     Notwithstanding <u>Section 5.1(a)</u> of the Agency Agreement, and except as provided otherwise in any prior order of this Court or as parties may otherwise agree, the Debtors shall have no liability with respect to the disposition and/or abandonment of assets that are not owned by the Debtors, including goods held on consignment (except to the extent otherwise agreed by the applicable consignor) and the Additional Agent Merchandise.  At least two weeks prior to applicable Sale Termination Date, the Agent shall provide notice to any parties with goods held on consignment (the "<u>Consignment Parties</u>") in such Store and, following such notice, the Consignment Parties shall be solely responsible for the disposition, removal, and/or abandonment of such goods except as provided otherwise in any prior order of the Court.

56.     Notwithstanding anything to the contrary in the Agency Agreement, Occupancy Expenses under any Lease shall include all charges that first become due after the Closing in the

ordinary course consistent with the terms of the applicable lease; *provided* that all parties' rights are reserved with respect to such charges.

57.     Nothing in this Approval Order, the Bidding Procedures Order, the Stalking Horse Agreement, or any document related to any of the foregoing shall: (a) be construed to authorize or permit (i) the assumption and/or assignment of any existing Surety Bond (including those set forth on Exhibit D to the Insurance Order[9]), (ii) the assumption and/or assignment of the existing Indemnity Agreements (as defined in the Insurance Order), or (iii) obligate the surety to replace any existing Surety Bond and/or issue any new surety bond on behalf of a Purchaser; or (b) be deemed to provide a surety's consent to the involuntary substitution of any principal under any existing Surety Bond and/or any existing Indemnity Agreement (the "Surety Agreements"), including, for the avoidance of doubt, that the Purchaser shall not be a substitute principal under any Surety Agreements absent the surety's consent thereto or further order of the Court. Additionally, nothing in this Approval Order, the Bidding Procedures Order, the Stalking Horse Agreement, or any other document, agreement, or instrument contemplated by any of the foregoing shall be deemed to alter, limit, modify, release, waive, or prejudice any rights, remedies, and/or defenses that the Surety has or may have under the Surety Agreements.

58.     The Credit Bid is a valid, proper, and appropriate credit bid consistent in all respects with section 363(k) of the Bankruptcy Code and in accordance with the Prepetition Credit Documents and is hereby approved in all respects pursuant to the Agency Agreement and the Transactions.

---

[9]     *Debtors' Final Order (I) Authorizing the Debtors to (A) Maintain Insurance, Surety Coverage, and Letters of Credit Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto, (B) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, Surety Bonds, and Letters of Credit, and (C) Continue to Pay Broker Fees, and (II) Granting Related Relief* [Docket No. 343] (the "Insurance Order").

59.    Upon the Closing, the Credit Bid under the Agency Agreement shall be deemed to satisfy $105 million in principal amount of Prepetition Term Loan Obligations and the remaining Prepetition Term Loan Obligations following reduction for the Credit Bid (the "Remaining Prepetition Term Loan Obligations") shall remain outstanding as valid claims against the Debtors secured by the Excluded Assets and the cash proceeds of the Transactions (excluding, for the avoidance of doubt, Proceeds) to the extent set forth in the Prepetition Credit Documents.  Nothing in this Approval Order, the Agency Agreement, any Transaction Document, or any other document or order shall impair, modify, affect, or limit the validity of the Remaining Prepetition Term Loan Obligations upon the Closing of the Transactions and the Remaining Prepetition Term Loan Obligations shall remain in full force and effect against the Debtors and their estates but not, for the avoidance of doubt, the Assets or Proceeds (except to the extent of the rights of the Term Agent or any Term Loan Lenders to receive Proceeds pursuant to any agreement with Agent).

60.    The Court shall retain jurisdiction with respect to all matters arising out of or relating to the interpretation, implementation, or enforcement of this Approval Order, the terms and provisions of the Agency Agreement, and all other Transaction Documents.

61.    The Purchaser, Term Loan Ad Hoc Group, the Agent, and the Term Agent shall not support, directly, or indirectly (including through any other party), any motion or pleading that seeks to convert any of the chapter 11 cases to a chapter 7 or seeks to dismiss the chapter 11 cases.

62.    For the avoidance of doubt, the Amended Store Closing Procedures shall also apply to Distribution Centers (as defined in the Agency Agreement).

63.    Notwithstanding anything to the contrary in the Agency Agreement or this Approval Orer, the Agent may not abandon any property at a Store or Distribution Center that does not belong to the Debtors.

64.     In the event of an inconsistency between this Approval Order and the Transaction Documents, including without limitation, the Agency Agreement, the terms of this Approval Order, including the Committee Settlement set forth in paragraph G of the Approval Order, shall control in all respects.  The Committee shall have the right to seek relief on an emergency basis to address any dispute arising from this paragraph 64.

65.     Notwithstanding anything to the contrary in this Approval Order, nothing in this Approval Order shall discharge, cancel, extinguish, alter, impair, modify, or otherwise prevent Mann Enterprises, Inc. ("Mann") from, to the extent they exist, asserting any or and all of Mann's claims, defenses, arguments, or rights relating to (a) any proposed assumption, assumption and assignment, or rejection by any of the Debtors of the Shopping Center Lease for Store #2568 (the "Laguna Niguel Lease") or (b) in the event of an assumption or an assumption and assignment of the Laguna Niguel Lease, including but not limited to any proposed Cure Amount, adequate assurance of performance and/or use of the premises subject to the Laguna Niguel Lease, on account of such assumption or assumption and assignment, all such claims, defenses, arguments, or rights being expressly preserved and reserved.

66.     In resolution of the Limited Objection of Jones Lang LaSalle Americas, Inc. ("JLL"), the Debtors, the Agent and Purchaser stipulate and agree that all fees and expenses due to JLL under the Master Services Facilities Management Agreement (the "MSA") between Jo-Ann Stores, LLC and JLL for post-petition work, including without limitation those fees and expenses due to Third-Party Vendors retained by JLL pursuant to the MSA, are included in the definition of Expenses required to be paid in the Agency Agreement by the Agent, Purchaser and/or the Debtors as so required with the understanding that all rights are reserved with respect to review and approval of the amounts invoiced by JLL under the MSA.

67.     Neither the Debtors nor the Purchaser are authorized to, and the Debtors and the Purchaser shall not, sell any inventory or other property owned by SVP Sewing Brands, LLC or its affiliates (collectively, "SVP" and, such inventory and property, the "SVP Property").  SVP is authorized to remove the SVP Property from the Stores and is authorized to, and shall within 45 days after the Closing (unless otherwise agreed to by Purchaser and SVP, discontinue operation at the Stores (notwithstanding anything to the contrary in that certain Master Sublease, dated as of July 1, 2019, between Jo-Ann Stores, LLC and SVP Sewing Brands LLC, as may be amended, modified, supplemented, or modified from time to time) subject to the following conditions: (i) prior to the conclusion of the GOB Sale at the applicable Store, SVP shall only (absent further order of the Court or consent of the Debtors) be permitted to remove and/or decommission SVP Property (a) in the ordinary course of business between SVP Sewing Brands, LLC and Jo-Ann Stores, LLC or (b) if outside the ordinary course of such parties' business, outside of normal business hours; provided that the Debtors and the Agent shall provide SVP with reasonable access to such Store outside of normal business hours; (ii) if such retrieval is conducted outside the ordinary course of business between SVP Sewing Brands, LLC and Jo-Ann Stores, LLC, SVP shall provide the Debtors at least five (5) business days' notice prior to retrieving SVP Property from the applicable Store and shall coordinate with the applicable JOANN store managers regarding the same; and (iii) SVP shall otherwise use commercially reasonable efforts to not disrupt the Debtors' operations.  The Debtors and the Agent shall (i) provide SVP with written notice of at least fourteen (14) days (or the period of notice provided to the applicable landlord, whichever is longer) before vacating any Store and (ii) continue to provide SVP with reasonable access to the Stores until such notice period expires.  For the avoidance of doubt, the SVP Property is not subject to the rights of the Purchaser or any of the Debtors' creditors (other than SVP).

Except as set forth in this paragraph, this Sale Order shall not apply to sales of SVP Property. SVP Property shall not be considered "Assets," "Proceeds," or "GOB Sale Proceeds" for purposes of this Sale Order or the Agency Agreement. Nothing in this Sale Order shall impair any rights or remedies of SVP under any lease or contract with the Debtors or applicable law. The automatic stay provisions of section 362 of the Bankruptcy Code, to the extent applicable, are hereby vacated and modified solely to the extent necessary to implement the relief set forth in this paragraph. This paragraph shall govern and control to the extent of any conflict with any other paragraph in this Sale Order.

68.     Notwithstanding anything to the contrary in this Approval Order, nothing in this Approval Order shall modify the provisions of any prior order of this Court regarding the Debtor's obligations with respect to the Consignment Agreement (as defined in the Store Closing Procedures Order) between the Debtors and IG Design Group Americas, Inc. ("DGA"), all of which shall remain in effect during the GOB Sale unless otherwise agreed between Purchaser and DGA in writing. Further, nothing in this Sale Order shall impair any rights or remedies of DGA under any contract with the Debtors or applicable law. For the avoidance of doubt, neither DGA's consigned goods nor the amounts due to DGA from the proceeds from the sale of the DGA's consigned goods shall be considered "Assets," "Proceeds," or "GOB Sale Proceeds" for purposes of this Approval Order or the Agency Agreement. This paragraph shall govern and control to the extent of any conflict with any other paragraph in this Approval Order.

69.     Purchaser agrees to include in the Sale the consigned inventory that is on consignment with the Debtors from West Broadway Distribution Services, LLC (the "WBDS") as of the Sale Commencement Date pursuant to that certain Book Distribution Agreement, dated February 1, 2009, as same has been amended, extended and renewed from time to time

(the "WBDS Distribution Agreement") with respect to which WBDS has a filed UCC-1 financing statement with the Secretary of State for the State of Ohio    (Financing Statement # OH00277551070 (the "On-Hand WBDS Consigned Goods").    WBDS and Purchaser are negotiating a side letter (the "WBDS Side Letter") that will govern the allocation of the proceeds of the On-Hand WBDS Consigned Goods between WBDS and Purchaser, the discount applicable to On-Hand WBDS Consigned Goods in connection with the GOB Sale, and other terms to be agreed upon between WBDS and Purchaser; provided, however, in the event that the WBDS Side Letter is not executed by the parties prior to March 1, 2025, then, absent an agreement between Purchaser and WBDS, the Purchaser shall no longer include the On-Hand WBDS Consigned Goods in the Sale, and such On-Hand WBDS Consigned Goods shall be removed from the selling floor and returned to WBDS and Purchaser shall remit payment to WBDS on account of the Sold WBDS Consigned Goods, in amounts provided for under Section 2 of the WBDS Distribution Agreement.    Nothing contained herein shall be deemed to amend, modify, or limit the Debtors' obligations to remit payment to WBDS for amounts due under the WBDS Distribution Agreement other than with respect to the Sold WBDS Consigned Goods.    During the Sale Term, Purchaser and the Debtors, as and where applicable, shall be bound by the Debtors' obligations under all interim and final orders entered by this Court, as applicable, approving the Debtors' cash management motion, including, but not limited to (i) the full and timely daily reporting of Debtors' Point-of-Sale activity and gross revenue with respect to the sale of Sold WBDS Consigned Goods on the immediately preceding day, in the same manner and to the same extent that Debtors provided WBDS with the information prior to the Petition Date, and (ii) maintaining the identifiable proceeds from the sale of the Sold WBDS Consigned Goods so as to be readily identifiable as the proceeds of the sale of goods under the WBDS Distribution Agreement, and (iii)

remittance of all identifiable proceeds of Sold WBDS Consigned Goods, including, but not limited to, all identifiable proceeds from pre-Closing sales of consigned goods (consistent with the Debtors' prior practice from and after the Petition Date pursuant to previously entered interim and final orders of this Court), to WBDS on a weekly basis on each Friday.  For the avoidance of doubt, neither the WBDS Consigned Goods nor the amounts due to WBDS from the proceeds from the sale of the Sold WBDS Consigned Goods shall be considered "Assets," "Proceeds," or "GOB Sale Proceeds" for purposes of this Approval Order or the Agency Agreement.  Except as noted above with respect to the remittance of payment to WBDS on account of the Sold WBDS Consigned Goods, nothing in this Approval Order shall impair any rights or remedies of WBDS under any contract with the Debtors or applicable law.  The automatic stay provisions of section 362 of the Bankruptcy Code, to the extent applicable, are hereby vacated and modified solely to the extent necessary to implement the relief set forth in this paragraph.  This paragraph shall govern and control to the extent of any conflict with any other paragraph in this Approval Order.  In the event of any conflict between this Sale Order and the WBDS Side Letter, the terms of the WBDS Side Letter shall control; provided that this Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of the WBDS Side Letter.

# Exhibit A

# Agency Agreement

*Execution Version*

## AGENCY AGREEMENT

This Agency Agreement ("Agreement") is made as of February 26, 2025, by and between (a) JOANN Inc. (together with its subsidiaries listed on Annex 1, the "Merchant") and (b) GA Joann Retail Partnership, LLC ("Agent") and Wilmington Savings Fund Society, FSB, in its capacity as prepetition term loan agent (the "Term Agent" and together with Agent, "Purchaser"; Purchaser and Merchant are each a "Party" and collectively the "Parties").

**Section 1.  Recitals**

WHEREAS, on January 15, 2025 (the "Petition Date"), Merchant commenced voluntary chapter 11 bankruptcy cases (the "Bankruptcy Cases") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

WHEREAS, Merchant entered into that certain Second Amended and Restated Credit Agreement (the "ABL Credit Agreement") dated as of April 30, 2024, by and among Jo-Ann Stores, LLC, as borrower, the other Loan Parties thereto, Bank of America, N.A., as administrative agent and collateral agent (the "ABL Agent"), and 1903P Loan Agent, LLC, as FILO Documentation Agent (as defined in the ABL Credit Agreement) (the "FILO Agent"); and

WHEREAS, Merchant entered into that certain Credit Agreement (the "Term Loan Credit Agreement") dated as of April 30, 2024, by and among Needle Holdings, LLC, as borrower, JOANN Holdings 2, LLC, the Term Agent, and the lenders party to the Term Loan Credit Agreement from time to time (the "Term Lenders"); and

WHEREAS, Merchant operates retail stores and desires that Agent act as Merchant's exclusive agent for the purposes of, including with respect to the activities set forth in the order approving Merchant's motion seeking approval to commence store closing sales (the "Store Closing Procedures Order"), and effective only from and after the Closing:

(a)    selling all of the Merchandise (as hereinafter defined) from Merchant's retail store locations identified on Exhibit 1(a)(1) attached hereto (each a "Store" and collectively the "Stores"), distribution centers (including e-commerce facilities such as third-party logistics and e-commerce inventory services) identified on Exhibit 1(a)(2) attached hereto (each a "Distribution Center" and collectively, the "Distribution Centers"), wholesale channels or any other channel by means of a "going out of business," "store closing," "sale on everything," "everything must go," or similar sale as described further below (the "GOB Sale"), with the nature and manner of advertising the GOB Sale being in Agent's sole discretion, subject to the terms and conditions of this Agreement and the Sale Guidelines and Approval Order (each as defined below);

(b)    marketing and selling, or otherwise designating the purchasers of the furniture, furnishings, trade fixtures, machinery, equipment, office supplies, Supplies (as defined below), conveyor systems, racking, rolling stock, and other tangible personal property (collectively, "FF&E") owned by Merchant as of the Closing, wherever located ("Owned FF&E");

(c)     designating the purchasers, assignees, sublessees, or other transferees of any or all of Merchant's unexpired leases of non-residential real property (together with all amendments, extensions, modifications, and other material documents related thereto, each a "Lease" and all such Leases collectively, the "Leases") and executory contracts (together with all amendments, extensions, modifications, and other material documents related thereto, each a "Contract" and all such Contracts collectively, the "Contracts"), in each case excluding any Leases or Contracts that may be rejected as permitted and in accordance with the procedures under the Approval Order (defined below) and subject to the assumption and assignment procedures to be incorporated into the Approval Order;

(d)     marketing and selling, or otherwise designating the purchasers, assignees, and/or licensees of any or all IP Rights owned by Merchant (the "Intellectual Property"); and

(e)     marketing and selling, or otherwise designating the purchasers, licensees, and/or assignees of any or all of Merchant's right, title, and interest in and to other real or tangible property (such right, title and interest, the "Other Assets" and, collectively with Merchant's right, title, and interest in and to the Merchandise, Owned FF&E, Leases, Contracts, and Intellectual Property, the "Assets").  For the avoidance of doubt, the Other Assets include but are not limited to all cash on hand in the Merchant's retail store locations, cash in transit, cash in bank accounts, Merchant's interest in and rights with respect to cash posted as collateral for letters of credit or bonds, receivables (including credit card receivables) (collectively, the foregoing are "Acquired Cash"), refunds of any nature, deposits, security deposits, credit card processing float, payment processor reserves, real property, sublease income, proceeds of retail sales of Merchandise in all of the Debtors' retail store locations from and after the Closing, claims and causes of action arising under chapter 5 of the Bankruptcy Code and similar state law ("Avoidance Actions"), and, except as provided for in Section 16.21(d), all other claims and causes of action, including but not limited to commercial tort claims, based on facts and circumstances existing as of the Closing, whether or not theretofore discovered or asserted ("Other Causes of Action"); provided that, effective upon the occurrence of the Closing, neither Purchaser, nor any Person claiming by, through, or on behalf of Purchaser (including by operation of law, sale, assignment, conveyance, or otherwise) shall pursue, prosecute, litigate, institute, or commence an action based on, assert, sell, use defensively, convey, assign or file any claim or cause of action that relates to (i) any Other Cause of Action against (x) the ABL Agent and Prepetition ABL Lenders, as defined in the Cash Collateral Order, (y) FILO Agent and the Prepetition FILO Lenders, as defined in the Cash Collateral Order, and all of the Prepetition FILO Agent's affiliates including Gordon Brothers Retail Partners, LLC, or (z) any Related Party of Merchant, including former directors and officers, or (ii) any Avoidance Action; provided, further, that Other Assets shall not include any Excluded Assets.  Acquired Cash exclusive of cash posted as collateral for letters of credit or bonds is "Available Closing Cash."

NOW, THEREFORE, in consideration of the Purchase Price (as defined below) and the mutual covenants and agreements set forth in this Agreement, the Parties hereby agree as follows:

**Section 2.    <u>Appointment of Agent/Approval Order</u>**.  As soon as practicable after selection of this Agreement as the Winning Bid (as defined in the order approving the terms of the bidding process, the "<u>Bid Procedures Order</u>"), Merchant shall seek entry in the Bankruptcy Cases of a proposed form of order (the "<u>Approval Order</u>") in form and substance satisfactory to Purchaser. The Approval Order shall, among other things:

(a)    find that:

(i)    this Agreement is in the best interest of Merchant, its estate and creditors, and other parties-in-interest;

(ii)    the Parties entered into this Agreement in good faith pursuant to section 363(m) of the Bankruptcy Code and without collusion as described in section 363(n) of the Bankruptcy Code;

(iii)    time is of the essence in effectuating this Agreement and proceeding with the GOB Sale at the Stores uninterrupted;

(iv)    Merchant's decision to enter into this Agreement and perform its obligations under this Agreement is a reasonable exercise of Merchant's sound business judgment consistent with its fiduciary duties and is in the best interests of Merchant, its estate, its creditors, and other parties-in-interest; and

(v)    this Agreement was negotiated in good faith and at arms' length and Purchaser is entitled to the protections of section 363(m) and 364(e) of the Bankruptcy Code; and

(b)    order, adjudge, and decree that:

(i)    this Agreement and all of the transactions contemplated hereby are approved in their entirety;

(ii)    the Parties are authorized to continue to take any and all actions as may be necessary or desirable to implement this Agreement and each of the transactions contemplated hereby;

(iii)    following the satisfaction of the Debt Payoff, all liens and security interests of the ABL Agent and FILO Agent shall be deemed satisfied in full, released, and discharged, and as such, following the satisfaction of the Debt Payoff, the Initial Wind-Down Payment, and the Initial Central Services Payment (each as defined herein) (together, the "<u>Initial Purchase Price Funding</u>"), and in accordance with this Agreement, and subject to Purchaser's compliance with its other obligations hereunder, Agent shall have the exclusive right to market and sell, or otherwise

3

designate the purchasers, licensees, and/or assignees of, any or all of the Assets free and clear of all liens, claims, and encumbrances thereon (other than Permitted Encumbrances) without further order of the Bankruptcy Court;

(iv)    the sale, license, transfer, or other conveyance of any Assets (other than the Assets being sold pursuant to the GOB Sale, as to which no further notice shall be required) reflected in notices filed in the Bankruptcy Cases from time to time by Agent, substantially in the form annexed hereto as Exhibit 2(b)(iv) (each an "Asset Designation Notice"), shall be automatically effective on the date reflected in the applicable Asset Designation Notice and subject to the satisfaction of any closing conditions reflected therein, and the sale or other conveyance of such Assets shall be free and clear of all liens, claims, and encumbrances (other than Permitted Encumbrances) without further order of the Bankruptcy Court; provided, however, that nothing in the Approval Order shall inhibit the ability of Agent to seek other or further orders of the Court in connection with the sale or other disposition of any Assets;

(v)     the form of Asset Designation Notice is approved;

(vi)    subject to Agent's compliance with its payment obligations under this Agreement and the Approval Order, Agent is authorized to execute, in the name of and as agent for Merchant, any and all deeds, bills of sale, and other instruments or documents necessary to effectuate the sale, transfer, or other conveyance of any of the Assets, none of which instruments or documents shall require Merchant to incur any obligations or other liabilities beyond the terms of this Agreement;

(vii)   following the satisfaction of the Initial Purchase Price Funding, all Proceeds received by, or that otherwise come into the possession of, Merchant or Purchaser at any time after the Closing shall be the sole property of Purchaser;

(viii)  following the occurrence of the Closing, and the satisfaction of the Initial Purchase Price Funding, Merchant and any trustee appointed in the Bankruptcy Cases or any successor cases thereto shall hold the Assets (other than the Assets being sold through the GOB Sale) strictly in trust for the benefit of Purchaser and, as such, the Assets shall not constitute property of Merchant's bankruptcy estate pursuant to and consistent with 11 U.S.C. § 541(b)(1) at any time following the Closing;

(ix)    following the satisfaction of the Initial Purchase Price Funding, any Proceeds received by, or that otherwise come into the possession of, Merchant at any time after the Closing shall be segregated and held strictly in trust for the benefit of Purchaser, shall not be commingled with Merchant's own assets, and, as such, shall not become property of

4

Merchant's bankruptcy estate pursuant to and consistent with 11 U.S.C. §541(b)(1), and shall be paid over to Agent promptly, but in any event, not later than in connection with each Weekly Sale Reconciliation;

(x)     following the satisfaction of the Initial Purchase Price Funding, and solely to the extent that any Assets or Proceeds are, notwithstanding the Approval Order, subsequently determined to constitute property of Merchant's estate, but subject to Agent's obligation to pay Expenses and fund the Wind-Down Payments, Agent shall have first priority, senior security interests and liens on all such Assets and Proceeds, which liens shall be deemed automatically perfected and (x) the Merchant shall be expressly prohibited from granting any security interests or liens on the Assets and Proceeds thereof and (y) to the extent that any security interest or lien is granted or otherwise attaches, voluntarily or involuntarily, (other than the security interests and liens in favor of the Agent) to any Assets or Proceeds, such security interests and liens shall be *void ab initio* without further order of the Court; <u>provided</u> that nothing in the Approval Order shall inhibit Agent's ability, and the Approval Order shall expressly authorize Agent, to take any action Agent deems appropriate to perfect and enforce security interests and liens granted in its favor;

(xi)    following the satisfaction of the Initial Purchase Price Funding and subject to Agent's obligation to pay Expenses and fund the Wind-Down Payments, until all Assets have been sold or otherwise disposed of, and solely to the extent that any Assets or Proceeds are, notwithstanding the Approval Order, subsequently determined to constitute property of Merchant's estate, Agent shall have a superpriority administrative expense claim, which is senior to all other administrative expense claims (including any other superpriority administrative expense claims) against Merchant to the extent of any amounts owing from Merchant to Agent in connection with this Agreement, including as a result of any breach of this Agreement and/or as a result of any Proceeds being in Merchant's possession;

(xii)   the Lease/Contract Designation Rights are approved, and Agent is authorized to designate the assignees of any or all of the Contracts and Leases pursuant thereto;

(xiii)  Agent shall have the exclusive right to use the Stores and all other Assets for the purpose of conducting the GOB Sale, free of any interference from any entity or person, subject to compliance with this Agreement (including payment of Expenses and Wind-Down Payments) the Sale Guidelines (as defined below) and Approval Order;

(xiv)   Agent, as the exclusive agent for Merchant, is authorized to conduct, advertise, post signs, utilize sign-walkers, and otherwise promote the

GOB Sale as a "going out of business", "store closing", "sale on everything", "everything must go", or similarly themed sale, in accordance with the Sale Guidelines (as the same may be modified and approved by the Bankruptcy Court), subject to compliance with the Sale Guidelines, the Approval Order, and all applicable federal, state, and local laws, regulations and ordinances, including, without limitation, all laws and regulations relating to advertising, privacy, consumer protection, occupational health and safety and the environment, together with all applicable statutes, rules, regulations and orders of, and applicable restrictions imposed by, governmental authorities (collectively, the "Applicable General Laws"), other than all applicable laws, ordinances, rules, regulations, or licensing requirements in respect of "going out of business", "store closing" or similarly-themed sales (collectively, the "Liquidation Sale Laws"); provided, however, that notwithstanding any other provision in the Approval Order, no party waives any rights to argue any position with respect to whether the conduct was in compliance with the Approval Order and/or any applicable law, or that the enforcement of such applicable law is preempted by the Bankruptcy Code;

(xv)     provided that the GOB Sale is conducted in accordance with and subject to the Sale Guidelines and the Approval Order, and in light of provisions in the laws of many Governmental Units (as defined in the Bankruptcy Code) that exempt court-ordered sales from their provisions, Agent and Merchant, to the extent applicable, will be presumed to be in compliance with any Liquidation Sale Laws and are authorized to conduct the GOB Sale in accordance with the terms of the Approval Order and the Sale Guidelines without the necessity of further showing compliance with any such Liquidation Sale Laws;

(xvi)    Agent may use all Intellectual Property consistent with Merchant's ordinary course of business usage and in connection with the conduct of the GOB Sale;

(xvii)   unless otherwise ordered by the Bankruptcy Court, all newspapers and other advertising media in which the GOB Sale is advertised shall be directed to accept the Approval Order as binding and to allow the Parties to consummate the transactions provided for in this Agreement, including, without limitation, conducting and advertising the GOB Sale in the manner contemplated by this Agreement;

(xviii)  unless otherwise ordered by the Bankruptcy Court, all utilities, landlords, creditors, and other interested parties and all persons acting for or on their behalf shall not interfere with or otherwise impede the conduct of the GOB Sale, or institute any action in any forum other than the Bankruptcy Court that in any way directly or indirectly interferes with or obstructs or impedes the conduct of the GOB Sale;

(xix)    the Bankruptcy Court retains exclusive jurisdiction over the enforcement and interpretation of, and over all matters arising from, this Agreement;

(xx)    Merchant is directed to provide weekly reporting to Agent of all amounts expended for Expenses and the Central Services Expenses as set forth in the Central Services Budget;

(xxi)    Merchant shall make its books and records reasonably available to Agent;

(xxii)    Agent shall not be liable for any claims against Merchant except as expressly provided for in this Agreement and Merchant shall not be liable for any claims against Agent except as expressly provided for in this Agreement;

(xxiii)    all payments made by Merchant on account of the Central Services Expenses shall be made pursuant to, and solely in accordance with, the Central Services Budget (on a line item basis);

(xxiv)    Agent shall neither have nor incur any obligation to advance or fund any amounts to or for Merchant except as set forth in this Agreement;

(xxv)    any amendment to or other modification of the Central Services Budget shall only be effective upon approval by Agent in its sole discretion;

(xxvi)    Agent is authorized to sell the Additional Agent Merchandise on the terms set forth herein, subject to the Sale Guidelines;

(xxvii)    Except as provided for herein, following the occurrence of the Closing, neither the Merchant nor any other entity acting on its behalf or as its successor (including but not limited to any statutory committee appointed in the Bankruptcy Cases and any chapter 7 or 11 trustee) may recover from the Agent any costs or expenses of preserving, or disposing of, any of the Assets, this Agreement shall be binding on any chapter 7 or 11 trustee, and any subsequently appointed chapter 7 trustee is authorized to and shall conduct the business of the Merchant for the limited purposes of complying with and executing under and in accordance with this Agreement, all of the foregoing without further order of the Court;

(xxviii)    Agent and its designees are granted derivative standing to pursue the Avoidance Actions (subject to Section 11.2(f) below) and Other Causes of Action in the name of and/or on behalf of Merchant;

(xxix)    in the event any of the provisions of the Approval Order are modified, amended or vacated by a subsequent order of the Bankruptcy Court or any other court, Agent shall be entitled to the protections provided in

Bankruptcy Code sections 363(m) and 364(e) and, no such appeal, modification, amendment or vacatur shall affect the validity and enforceability of the GOB Sale or the liens or priority authorized or created under this Agreement or the Approval Order;

(xxx)     neither Agent nor any entity comprising Agent is or shall be a mere continuation of Merchant or otherwise subject to successor liability in connection with any of the Assets;

(xxxi)    upon receipt by the ABL Agent and FILO Agent and certain other persons of the Debt Payoff as directed in the Payoff Letters pursuant to Section 3.1(a) of this Agreement, all ongoing commitments under the ABL Credit Agreement shall be canceled and terminated;

(xxxii)   to the extent Agent has not designated the Agent or other assignee of any Assets (any Assets so not designated by such date, the "Residual Assets") as of May 31, 2025 (as may be amended by written agreement of the Parties, the "Asset Designation Rights Termination Date"), (1) ownership of all cash (on hand, in the bank, in transit, posted in respect of letters of credit or bonds or otherwise), credit card processing float, accounts receivable, notes receivable, credit card receivables, other receivables, deposits, security deposits, proceeds of retail sales in all of the Debtors' retail store locations, rights to refunds, other rights to payment, Intellectual Property, and, subject to Section 7.1, ownership of all Remaining Merchandise, comprising Residual Assets shall vest in Agent or its designee, and (2) ownership of all other Residual Assets shall revert to the Debtors' estates, each on the Asset Designation Rights Termination Date;

(xxxiii)  the Credit Bid is a proper credit bid that is consistent in all respects with section 363(k) of the Bankruptcy Code and is an appropriate credit bid that is in accordance with the Term Loan Credit Agreement and all attendant debt documents, including any intercreditor agreement;

(xxxiv)   the Debtors shall release the Term Agent and all lenders under the Term Loan Credit Agreement with respect to any and all claims or causes of action related to the Credit Bid, this Agreement, the bidding process, and the sale process, which such release provision shall be in form and substance acceptable to the Term Agent and the required lenders under the Term Loan Credit Agreement;

(xxxv)    the Final Reconciliation (as defined below), once agreed to by Merchant and Agent, shall be automatically deemed approved pursuant to Bankruptcy Code section 105(a) and Rule 9019 of the Federal Rules of Bankruptcy Procedure without further order of the Bankruptcy Court or action by any party; and

(xxxvi)   this Agreement, the Approval Order, and all provisions hereof and thereof are binding on any successor to Merchant, including but not limited to any chapter 7 or chapter 11 trustee, and subject to Agent's obligation to pay Expenses and fund the Wind-Down Payments, any such successor shall continue to hold all Assets and Proceeds strictly in trust for the benefit of Purchaser.

## Section 3.  Consideration to Merchant and Purchaser.

3.1          Purchase Price. The aggregate consideration being provided to Merchant in exchange for Purchaser's rights and Merchant's obligations under this Agreement is as follows (collectively, the "Purchase Price"):

(a)   Debt Payoff. On the Closing Date, in accordance with payoff letters by each of the ABL Agent (the "ABL Payoff Letter") and FILO Agent (the "FILO Payoff Letter" and, together with the ABL Payoff Letter, the "Payoff Letters") in form and substance satisfactory to each such party, Purchaser shall:

(i)   to the ABL Agent, for the benefit of the ABL Lenders, and certain other persons as directed in the ABL Payoff Letter, (a) pay the amount in cash necessary to indefeasibly pay in full in cash all Prepetition Revolving Obligations (as defined in the Cash Collateral Order), including, without limitation, all outstanding principal, accrued interest, fees, costs and expenses (including, without limitation, all attorneys' fees, costs and expenses), and (b) provide and/or post cash collateral for (and/or replacement of) any issued and outstanding letters of credit (in form and substance acceptable the Prepetition ABL Agent), in each case in accordance with and as set forth in the ABL Payoff Letter (such amounts and other consideration, the "ABL Payoff"); and

(ii)   pay to the FILO Agent, for the benefit of the FILO Lenders, and certain other persons as directed in the FILO Payoff Letter, the amount in cash necessary to indefeasibly pay in full in cash all Prepetition FILO Obligations (as defined in the Cash Collateral Order), including, without limitation, all outstanding principal, accrued interest, fees, costs and expenses (including, without limitation, all attorneys' fees, costs and expenses) and make whole obligations, all as set forth in the FILO Payoff Letter (such amounts and other consideration, the "FILO Payoff" and, together with the ABL Payoff, the "Debt Payoff").

(b)   Wind-Down Funding. At Closing, Agent shall make an initial cash payment to Merchant equal to sixty-five percent (65%) of the Wind-Down Budget (the "Initial Wind-Down Payment"); provided that, notwithstanding anything herein to the contrary, the Initial Wind-Down Payment shall include the payment of all reasonable and documented fees and expenses of the Term Agent advisors and the Term Loan Ad Hoc Group Advisors in an amount not to exceed $1,660,000. The remaining thirty-five percent (35%) of the Wind-Down Budget shall be funded from Acquired Cash and, to the extent necessary, Proceeds, within thirty (30) days after the Closing (together with the Initial Wind-Down Payment, the "Wind-Down Payments"). The Wind-Down Payments shall not exceed the amounts set forth in Exhibit 3.1(b) in the aggregate (the "Wind-Down Budget"); provided, however, that, solely with respect to the 503(b)(9) Claim subcategory of the Wind-Down Budget, any amounts that have not been expended by Merchant

as of the Asset Designation Rights Termination Date shall be returned to Agent (the amounts so returned, the "503(b)(9) Savings") upon the earlier of (i) the effective date of a plan of liquidation of Merchant, subject to the 503(b)(9) Allocation (defined below), or (ii) the dismissal or conversion of the Bankruptcy Cases. With respect to the 503(b)(9) Claim subcategory, Merchant agrees not to make any payments until the date that is 60 days from the Closing (unless extended upon mutual agreement between Merchant and Agent). Merchant shall keep Agent informed on a timely basis of its efforts to reconcile 503(b)(9) claims and shall use best efforts to negotiate settlements with respect to the 503(b)(9) claims, in consultation with Agent. Agent shall also pay to or for the benefit of the Stalking Horse Bidder (as defined in the Bid Procedures Order), the Expense Reimbursement as defined in, and pursuant to, Section 16.19 below. Stub rent included in the Initial Wind-Down Payment shall be paid from the Initial Wind-Down Payment within two weeks after the Closing.

(i)      503(b)(9) Allocation.    To the extent Merchant consummates a chapter 11 plan, then on the Effective Date of such plan, Agent shall contribute 50% of the 503(b)(9) Savings, if any, for distribution under the plan for the benefit of Merchant's general unsecured creditors (the "GUC 503(b)(9) Share") and shall retain the remainder of the 503(b)(9) Savings as Proceeds; *provided, however,* that Purchaser guarantees that the GUC 503(b)(9) Share contributed in connection with such plan shall not be less than $1,500,000; *provided further, however*, the Term Loan Ad Hoc Group will not oppose a chapter 11 plan of Merchant on the basis that such plan does not provide a distribution to Term Loan lenders from the 503(b)(9) Savings on account of any deficiency claim, or as otherwise may be agreed between Purchaser and the Committee.

(c)      Central Services Funding.    At Closing, Agent shall make an initial cash payment to Merchant equal to the agreed upon estimated amount to be incurred in the two weeks following Closing, in an amount set forth in the Central Services Budget (the "Initial Central Services Payment"). After Closing, from time to time, Agent, upon request by the Merchant, shall make additional payments to Merchant on account of the Central Services Expenses (the "Subsequent Central Services Payments" and, together with the Initial Central Services Payment, the "Central Services Payments"). The Central Services Payments are subject to and to be used solely as set forth in the budget and schedule attached as Exhibit 3.1(c) hereto (as may be amended from time to time by agreement of the Parties, subject to approval by Agent in its sole discretion, the "Central Services Budget"). Merchant shall provide Agent with a register of all payments Merchant intends to issue for Central Services Expenses at least one business day before issuance, which register shall identify the amounts and expense categories of such payments. Any portion of the Subsequent Central Services Payments not expended by Merchant as of the Asset Designation Rights Termination Date shall be returned to Agent upon the earlier of (i) the dismissal or conversion of the Bankruptcy Cases; or (ii) the effective date of a plan of liquidation of Merchant. For the avoidance of doubt, Agent's obligation to fund the Central Services Payments shall not exceed the Central Services Budget; provided, however, that, in accordance with Section 4.1, Agent shall be responsible for the payment of any Central Services Expenses in excess of the Central Services Budget to the extent such expenses are incurred at the direction of the Agent, to facilitate Agent's conduct under this Agreement, or otherwise as agreed to by the Agent in writing.

(d)    Expenses.  Subject to and only upon Closing, Agent shall be responsible for the payment of all Expenses pursuant to Section 4.1 below.

(e)    Credit Bid.  The Term Agent, at the direction of an ad hoc group of the Term Lenders (the "Term Loan Ad Hoc Group"), will credit bid the amount of $105,000,000 (the "Credit Bid") at the Closing.  A true, correct, and complete copy of the direction letter from the Term Loan Ad Hoc Group directing the Term Agent to make the Credit Bid in accordance with the terms of this Agreement is attached hereto as Exhibit 3.1(e) (the "Term Loan Ad Hoc Group Direction Letter"), and such Term Loan Ad Hoc Group Direction Letter has been duly executed and delivered by, and is binding and enforceable upon, the Term Lenders in compliance with all terms and conditions of the Term Loan Credit Agreement.

3.2        Consideration to Purchaser.

(a)    Proceeds.  Upon the occurrence of the Closing, all Proceeds (including proceeds from Additional Agent Merchandise) shall be the exclusive property of Agent, subject to distribution in accordance with the waterfall set forth below:

(i)    First, to Agent in an amount equal to the Purchase Price, which, for the avoidance of doubt, shall include the Debt Payoff, the Wind Down Payments, the Central Services Payments, and all Expenses pursuant to Section 4.1.

(ii)    Thereafter, all Proceeds shall be retained by Purchaser and shall be further allocated between Agent and the Term Agent as may be agreed upon between them.

(b)    Assets and Proceeds Held in Trust.  Merchant shall hold all of the Assets in trust for the benefit of Agent.  Any Proceeds received by, or that otherwise come into the possession of, Merchant at any time after the Closing shall be segregated and held strictly in trust for the benefit of Purchaser, shall not be commingled with Merchant's own assets, shall not become property of Merchant's bankruptcy estate, and shall be paid over to Agent promptly upon receipt by Merchant or upon notice received by Merchant from Agent, but in any event no later than the Weekly Sale Reconciliation.

(c)    Remaining Merchandise.  To the extent that there is Merchandise remaining at the Sale Termination Date (the "Remaining Merchandise"), such Remaining Merchandise shall be deemed automatically transferred to Agent free and clear of all liens, claims, and encumbrances (other than Permitted Encumbrances).  Agent and its affiliates shall be authorized to sell or otherwise dispose of the Remaining Merchandise with all logos, brand names, and other Intellectual Property intact, and shall be authorized to advertise the sale of the Remaining Merchandise using the Intellectual Property.

3.3        Proceeds of GOB Sales.

(a)    Following the satisfaction of the Initial Purchase Price Funding, Agent may (but shall not be required to) establish its own accounts (including without limitation credit card accounts and systems), dedicated solely for the deposit of the Proceeds of the GOB Sales (including Proceeds from Additional Agent Merchandise) (the "GOB Sale Proceeds") and the

disbursement of amounts payable to Agent in connection with the GOB Sales (the "Agency Accounts"); and Merchant shall promptly, upon Agent's reasonable request, execute and deliver all necessary documents to open and maintain the Agency Accounts, at no additional cost to Merchant; provided, however, Agent shall have the right, in its sole and absolute discretion, to continue to use the Merchant Designated Deposit Accounts (as defined below) as the Agency Accounts in which case the Merchant Designated Deposit Accounts shall be deemed to be Agency Accounts.  Agent shall exercise sole signatory authority and control with respect to the Agency Accounts.  The Agency Accounts shall be dedicated solely to the deposit of GOB Sale Proceeds and other amounts contemplated by this Agreement in connection with the GOB Sale and the distribution of amounts payable hereunder in connection with the GOB Sale.  Merchant shall not be responsible for, and Agent shall pay as an Expense hereunder, all bank fees and charges, including wire transfer charges, related to the GOB Sale and the Agency Accounts.  Following Agent's notice to Merchant of Agent's designation of the Agency Accounts (other than the Merchant Designated Deposit Accounts), all GOB Sale Proceeds (including credit card GOB Sale Proceeds) shall be deposited into the Agency Accounts.

(b)    Agent shall have the right to use Merchant's credit card facilities, including Merchant's credit card terminals and processor(s), credit card processor coding, Merchant's identification number(s) and existing bank accounts for credit card transactions relating solely to the GOB Sale; provided, that, Agent's use of any such credit card facilities is in compliance with Applicable General Laws and industry standards, including the Payment Card Industry Data Security Standard ("PCI-DSS").  In the event that Agent elects to use Merchant's credit card facilities, Merchant shall process credit card transactions on behalf of Agent and for Agent's account, applying Merchant's customary practices and procedures.  Without limiting the foregoing, Merchant shall make reasonable efforts to (i) cooperate with Agent to download data from all credit card terminals each day during the Sale Term to effect settlement with Merchant's credit card processor(s), and (ii) take such other actions necessary to process credit card transactions on behalf of Agent under Merchant's identification number(s).  At Agent's request, Merchant shall cooperate with Agent to establish Merchant's identification numbers under Agent's name to enable Agent to process all such credit card GOB Sale Proceeds for Agent's account.  Merchant shall not be responsible for, and Agent shall pay as an Expense hereunder, all credit card fees, charges, and chargebacks related to the GOB Sale, whether received during or after the Sale Term.  Agent shall not be responsible for, as an Expense or otherwise, any credit card fees, charges, or chargebacks relating to periods prior to the Closing.

(c)    Unless and until Agent establishes its own Agency Accounts (other than the Merchant Designated Deposit Accounts), all GOB Sale Proceeds and other amounts contemplated by this Agreement (including credit card GOB Sale Proceeds), shall be collected by Merchant and deposited on a daily basis into depository accounts owned in the name of Merchant and designated solely for the deposit of GOB Sale Proceeds and other amounts contemplated by this Agreement (including credit card GOB Sale Proceeds), and the disbursement of amounts payable to or by Agent hereunder (the "Merchant Designated Deposit Accounts").  All funds in the Merchant Designated Deposit Accounts shall at all times be held in trust for the benefit of Agent.  The Merchant Designated Deposit Accounts shall be cash collateral accounts, with all cash, credit card payments, checks and similar items of payment, deposits and any other amounts in such accounts being GOB Sale Proceeds or other amounts contemplated hereunder, and Merchant hereby grants

12

to Agent a first-priority senior security interest in and lien upon each of the Merchant Designated Deposit Accounts and all funds on deposit in such accounts from and after the Closing.

(d)     Merchant shall take all actions necessary to designate Agent as an authorized signer on all Merchant Designated Deposit Accounts and to grant Agent the ability to initiate wire transfers from such Merchant Designated Deposit Accounts.

(e)     On each business day to the extent practicable, Merchant shall promptly pay to Agent by wire transfer all GOB Sale Proceeds held in any bank account of Merchant, including but not limited to all funds in the Merchant Designated Deposit Accounts (including, without limitation, GOB Sale Proceeds, GOB Sale Proceeds from credit card sales, proceeds from the sale of Owned FF&E, and all other amounts) deposited into the Merchant Designated Deposit Accounts for the prior day(s).

**Section 4.  Expenses.**

4.1             Subject to and only upon Closing, Agent shall be responsible for all "Expenses," which shall be paid by Agent in accordance with <u>Section 4.2</u> below.  As used herein, "<u>Expenses</u>" shall mean the actual operating expenses that arise solely after Closing through the Sale Termination Date, that are incurred at the direction of the Agent, to facilitate Agent's conduct under this Agreement, or otherwise as agreed to by the Agent in writing, which are strictly limited to the following expenses:

(a)     actual hourly or salaried payroll, as applicable, with respect to all Retained Employees and any temporary labor engaged for the GOB Sale that are used in connection with conducting the GOB Sale for actual days/hours worked;

(b)     any amounts related to (i) benefits arising, accruing or attributable to the period between the Closing and the Sale Term:  (w) vacation days or vacation pay, (x) sick days or sick leave or any other form of paid time off, (y) maternity leave or other leaves of absence, and (z) ERISA coverage and similar contributions, and (ii) any amounts payable by Merchant for benefits (including FICA, unemployment taxes, workers' compensation and healthcare insurance, but excluding Excluded Payroll Benefits) for Retained Employees used in the GOB Sale (the "<u>Payroll Benefits</u>");

(c)     subject to <u>Section 6.1</u>, the actual Occupancy Expenses;

(d)     Retention Bonuses, if applicable, for Retained Employees, as provided for in <u>Section 9.4</u> below;

(e)     advertising and direct mailings initiated by Agent relating to the GOB Sale, Store interior and exterior signage and banners procured by Agent, and sign-walkers or drivers procured by Agent, in each case relating to the GOB Sale;

(f)     credit card fees, bank card fees, and chargebacks and credit/bank card discounts with respect to Merchandise sold in the GOB Sale;

13

(g)     bank service charges (for Store, corporate accounts, and Agency Accounts), check guarantee fees, and bad check expenses to the extent directly attributable to the GOB Sale;

(h)     costs for additional Supplies at the Stores necessary to conduct the GOB Sale as solely to the extent requested by Agent;

(i)     all fees and charges required to comply with applicable laws in connection with the GOB Sale solely to the extent agreed to by Agent;

(j)     Store cash theft and other Store cash shortfalls in the registers;

(k)     any Central Services Expenses in excess of the Central Services Budget to the extent such expenses are incurred at the direction of the Agent, to facilitate Agent's conduct under this Agreement, or otherwise as agreed to by the Agent in writing.

(l)     the Distribution Center Expenses;

(m)     postage, courier and overnight mail charges requested by Agent to the extent relating to the GOB Sale;

(n)     third party payroll processing expenses associated with the GOB Sale; and

(o)     costs of transfers initiated by Agent of Merchandise and Additional Agent Merchandise between and among the Stores and Distribution Centers during the Sale Term, including delivery and freight costs, it being understood that Agent shall be responsible for coordinating such transfer of Merchandise.

Notwithstanding anything herein to the contrary, there will be no double counting or double payment of Expenses to the extent that Expenses appear or are contained in more than one Expense category.

As used herein, the following terms have the following respective meanings:

(i)     "Central Services Expenses" means the actual costs and expenses for Merchant's central administrative services necessary for the conduct and support of the GOB Sale, including, but not limited to inventory control systems, payroll systems, MIS and POS services, cash and inventory reconciliation, data processing and reporting, email preparation and distribution, information technology support management and maintenance, accounting, office facilities at Merchant's central office, central administrative services and personnel to process and perform sales audit, banking, and other normal course administrative services customarily provided to or for the benefit of operating the Distribution Centers and/or the Stores, and such other central office services reasonably necessary (in the judgment of Agent) for the Sale (collectively, "Central Services").

(ii)     "Distribution Center Expenses" means the actual costs and expenses, including use and Occupancy Expenses and Distribution Center employee payroll, both hourly and salary, and other obligations, of the operations of the Distribution Centers, and the actual costs and expenses (including outbound freight) related to the processing, transfer, and

consolidation of Merchandise, Additional Agent Merchandise, and supplies in the Distribution Centers and from the Distribution Centers to the Stores, and all actual costs and expenses associated with Agent's on-site supervision of the Stores, corporate offices and Distribution Centers, including (but not limited to) any and all fees, wages, taxes, third party payroll costs and expenses, and deferred compensation of Agent's field personnel, travel to, from or between the Stores, corporate offices, and Distribution Centers, and out-of-pocket and commercially reasonable expenses relating thereto (including reasonable and documented corporate travel to monitor and manage the GOB Sale).

(iii)    "Excluded Payroll Benefits" means (i) the following benefits arising, accruing or attributable to the period prior to, during (except as required by applicable law or otherwise agreed to between Merchant and Agent), or after the Sale Term, if any: (w) vacation days or vacation pay, (x) sick days or sick leave or any other form of paid time off, (y) maternity leave or other leaves of absence, and (z) ERISA coverage and similar contributions and/or (ii) any payments due under WARN Act or similar state laws.

(iv)    "Occupancy Expenses" means base rent, percentage rent, HVAC, utilities, CAM, storage costs, real estate and use taxes, Merchant's association dues and expenses, utilities expenses, cash register maintenance, routine repairs, building maintenance, trash and snow removal, housekeeping and cleaning expenses, local and long-distance telephone and internet/wifi expenses, security (including, without limitation, security systems, courier and guard service, building alarm service and alarm service maintenance), and rental for furniture, fixtures and equipment.

(v)    "Third Party" means, with reference to any Expenses to be paid to a Third Party, a party which is not affiliated with or related to Merchant.

(vi)    Notwithstanding any other provision of this Agreement to the contrary, "Expenses" shall not include any other costs, expenses or liabilities payable by Merchant not provided for herein, all of which shall be paid solely by Merchant.

4.2        Payment of Expenses.

Subject to and only upon Closing, Agent shall be responsible for the payment of all Expenses out of Proceeds (or from Agent's own accounts if and to the extent there are insufficient Proceeds). All Expenses incurred by the Merchant during each week of the GOB Sale (*i.e.* Sunday through Saturday) shall be paid by Agent to or on behalf of Merchant, or paid by Merchant and thereafter reimbursed by Agent as provided for herein; provided, however, in the event that the actual amount of an Expense is unavailable on the date of the reconciliation (such as payroll), Merchant and Agent shall agree to an estimate of such amounts, which amounts will be reconciled once the actual amount of such Expense becomes available. To the extent necessary or appropriate, Agent shall work with Merchant in good faith to fund Expenses in advance as needed to ensure the timely payment thereof. Agent and/or Merchant may review or audit the Expenses at any time. To the extent such Expenses are paid by Merchant, Merchant shall provide Agent with payments that Merchant intends to issue for such Expenses at least one business day before issuance, which register shall identify amounts and expense categories of such payments.

**Section 5.  Merchandise.**

    5.1              Merchandise Subject to This Agreement.

    (a)     "Excluded Goods" means all (1) goods that are not owned by Merchant, including but not limited to goods that belong to sublessees, licensees, department lessees, or concessionaires of Merchant and (2) goods held by Merchant on memo, on consignment (except to the extent otherwise agreed by the applicable consignor), or as bailee.  Merchant shall be solely responsible for the disposition and/or abandonment of all Excluded Goods and all costs, expenses, and obligations associated therewith.  Agent shall incur no cost, expense, or obligation in connection with any Excluded Goods.

    (b)     "Merchandise" means all goods owned by Merchant for resale as of the occurrence of the Closing, wherever located, including, for clarity, all goods that are on-order or in-transit as of the Closing, other than Excluded Goods.

    5.2     Valuation.

    (a)     "Cost Value" shall mean, with respect to each item of Merchandise, the lower of (i) the lower of (x) the actual cost of such item and (y) the lowest cost of such item as reflected in the Merchandise File and (ii) the Retail Price.

    (b)     "Retail Price" shall mean with respect to each item of Merchandise, the lower of the lowest ticketed, marked, shelf, Merchandise File, or other file price as reflected in Merchant's books and records for such item.

    (c)     "Merchandise File" shall mean "7.52 Project Thread_Inventory by Article (FW01).zip" and all subsequent and/or refreshed files received by Agent from and after the date of this Agreement.

    5.3              Inventory Count.

    During the Sale Term, for purposes of counting the Merchandise, Merchant and Agent shall jointly keep (i) a strict count of gross register receipts from the sale of Merchandise, less applicable taxes and excluding any prevailing Sale-related discounts ("Gross Rings"), and (ii) cash reports of sales within each Store.  Register reports shall show for each item sold the Cost Value and Retail Price for such item and the markdown or discount, if any, specifically granted by the Agent.  All such records and reports shall be made available to Merchant and Agent during regular business hours upon reasonable notice.

**Section 6.  Sale Term.**

    6.1           Term.  Subject to satisfaction of the conditions precedent set forth in Section 10 hereof, the GOB Sale shall commence at each Store on a date determined by Agent in its sole discretion after the occurrence of the Closing (the "Sale Commencement Date") and shall end at each Store no later than May 31, 2025 (the "Sale Termination Date", and the period from the Sale Commencement Date to the Sale Termination Date as to each Store being the "Sale

16

Term"). Agent may, in its discretion, earlier terminate the GOB Sale on a Store-by-Store basis or close a Distribution Center, upon written notice to Merchant at least five (5) days prior to the end of a calendar month (a "Vacate Notice") and vacate such Store or Distribution Center, in accordance with Section 6.2, by the end of such calendar month (the "Vacate Date"); provided, however, that Agent's obligations to pay all Expenses, including Occupancy Expenses, for each Store or Distribution Center, as applicable, subject to a Vacate Notice shall continue only until the applicable Vacate Date.

6.2     Vacating the Stores.  At the conclusion of the GOB Sale, Agent agrees to leave each Store in "broom clean" condition, ordinary wear and tear excepted, except for unsold items of Owned FF&E which may be abandoned by Agent in place in a neat and orderly manner pursuant to Section 7 below.  Agent shall vacate each Store or Distribution Center on or before the earlier of (a) the Sale Termination Date or, if applicable, (b) the Vacate Date, as provided for herein, at which time Agent shall surrender and deliver the Store or Distribution Center premises, and, if in Agent's possession, keys, to Merchant unless the applicable Lease is being conveyed pursuant to the Lease/Contract Designation Rights.  Notwithstanding the foregoing, Agent's obligations to pay all Expenses for the Stores and Distribution Centers shall be limited as provided for in Section 6.1.

## Section 7.  FF&E/ Merchandise.

7.1     Abandonment of FF&E/Merchandise.  Agent shall be authorized to abandon any and all FF&E or Remaining Merchandise, whether owned or not by Merchant, in place without any cost or liability to Agent.  For the avoidance of doubt, Agent shall have no responsibility whatsoever with respect to FF&E that is not owned by Merchant; provided that nothing in this Section 7 shall limit Agent's rights with respect to Owned FF&E under the Asset Designation Rights or with respect to leased FF&E under the Lease/Contract Designation Rights.

## Section 8.  Conduct of the GOB Sale.

8.1     Rights of Agent.  Subject to entry of the Approval Order, in addition to any other rights granted to Agent elsewhere in this Agreement, Agent shall be permitted to conduct the GOB Sale as a "going out of business," "store closing," "sale on everything," "everything must go," or similarly themed sale throughout the Sale Term, without compliance with any Liquidation Sale Laws, subject to the Approval Order.  Agent shall conduct the GOB Sale in the name of and on behalf of Merchant in a commercially reasonable manner and in compliance with the terms of this Agreement and Applicable General Laws and subject to the Approval Order.  Agent shall conduct the GOB Sale in accordance with the sale guidelines attached hereto as Exhibit 8.1 (the "Sale Guidelines").  In addition to any other rights granted to Agent hereunder in conducting the GOB Sale, Agent shall have the right:

(a)     to establish GOB Sale prices and discounts and Store hours;

(b)     except as otherwise expressly included as an Expense, to use without charge during the Sale Term all FF&E, IT Systems, existing Supplies, intangible assets (including Merchant's name, logo and tax identification numbers and, other Intellectual Property), Store keys, case keys, security codes and safe and lock combinations required to gain access to and operate

the Stores, and the Distribution Centers, and any other assets of Merchant located at the Stores or Distribution Centers (whether owned, leased, or licensed), solely to the extent such use does not violate any Applicable General Law;

(c)     (i) subject to satisfaction of Agent's payment obligations under this Agreement, to be provided by Merchant with central office facilities, central administrative services and personnel to process and perform Central Services and provide other central office services reasonably necessary for the GOB Sale; (ii) to use reasonably sized offices located at Merchant's central office facility to effect the GOB Sale; and (iii) to use all customer lists, mailing lists, email lists, and web and social networking sites and other Intellectual Property utilized by Merchant in connection with its business (to the extent such items can be segregated to the Stores or Distribution Centers and solely in connection with the GOB Sale and subject to Applicable General Laws and any other restrictions requested by Merchant in order for Merchant and Agent to comply with Merchant's privacy policies, contracts, agreements, or applicable laws governing the use and dissemination of personal or confidential information, including consumer personal data);

(d)     to establish and implement advertising, signage and promotion programs consistent with the "going out of business," "store closing," "sale on everything," "everything must go," or similarly themed sale, including without limitation by means of media advertising, and similar interior and exterior signs and banners, and the use of sign walkers or drivers, each at Agent's sole cost as an Expense;

(e)     to include Additional Agent Merchandise in the GOB Sale in accordance with Section 8.9; and

(f)     to transfer Merchandise between and among the Stores and Distribution Centers.

8.2     Terms of Sales to Customers; Final/As Is Sales.  During the Sale Term, all sales of Merchandise and Additional Agent Merchandise will be "final sales" and "as is," and appropriate signage and sales receipts will reflect the same.  Agent shall not warrant the Merchandise in any manner, but will, to the extent legally permissible, pass on all manufacturers' warranties to customers.  Except as otherwise provided herein, during the Sale Term, all sales will be made only for cash or nationally recognized bank credit or debit cards.  Upon entry of the Approval Order, Agent shall not accept or honor coupons during the Sale Term.  Agent shall clearly mark all receipts for the Merchandise sold at the Stores during the Sale Term so as to distinguish the sale of such Merchandise from the goods sold prior to the Sale Commencement Date.

8.3     Tax Matters.

(a)     During the Sale Term, all sales, use, excise, gross receipts and other taxes attributable to sales of Merchandise and Additional Agent Merchandise, as indicated on Merchant's point of sale equipment (other than taxes on net income) payable to any taxing authority having jurisdiction (collectively, "Sales Taxes") shall be added to the sales price of Merchandise and Additional Agent Merchandise and collected by Agent, on Merchant's behalf, at

the time of sale.  All Sales Taxes shall be deposited into a segregated account designated by Merchant and Agent solely for the deposit of such Sales Taxes (the "Sales Taxes Account").  For the avoidance of doubt, Merchant will have payment authority on the Sales Taxes Account from inception until Merchant no longer has any obligation with respect to the payment of Sales Taxes hereunder.  For any Sales Taxes Account that Agent obtains control or payment authority over, Agent agrees to remit any funds in such Sales Taxes Account to Merchant.  Merchant shall prepare and file all applicable reports and documents required by the applicable taxing authorities with respect to Sales Taxes incurred on transactions processed under Merchant's identification number(s), and Merchant shall promptly pay all such Sales Taxes from the Sales Taxes Account. Merchant will be given access to the computation of gross receipts for verification of all such tax collections.  Provided that Agent performs its responsibilities in accordance with this Agreement, Agent shall have no further obligation to Merchant, any taxing authority, or any other party, and Merchant shall indemnify and hold harmless Agent from and against any and all reasonable out-of-pocket costs, including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties, which Agent sustains or incurs as a result or consequence of the failure by Merchant to promptly pay such taxes to the proper taxing authorities and/or the failure by Merchant to promptly file with such taxing authorities all reports and other documents required by applicable law to be filed with or delivered to such taxing authorities.  If Agent fails to perform its responsibilities in accordance with this Section 8.3, and provided Merchant complies with its obligations hereunder, Agent shall indemnify and hold harmless Merchant from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties which Merchant sustains or incurs as a result or consequence of the failure by Agent to collect Sales Taxes and/or the failure by Agent to promptly deliver any and all reports and other documents required to enable Merchant to file any requisite returns with such taxing authorities.  Agent shall use commercially reasonable efforts to cooperate with Merchant to obtain any tax refunds in respect of Sales Taxes.

(b)    Notwithstanding anything in this Agreement to the contrary, nothing in this Agreement shall be interpreted as establishing the federal, state, or local tax consequences of the transactions contemplated by this Agreement.

(c)    Agent shall, and shall cause each of its respective affiliates to, use commercially reasonable efforts to cooperate and consult with Merchant with respect to applicable Sales Taxes matters and other tax matters reasonably associated with the transactions contemplated by this Agreement, including the preparation and filing of applicable tax reports, returns, and documents (including applicable allocations of purchase price) required by the applicable taxing authorities with respect thereto and any audit, litigation, or other proceeding with respect thereto.

(d)    Agent shall be responsible for all documentary, stamp, transfer (including real property transfer), motor vehicle registration, sales, use, value added, excise, and other similar non-income taxes and all filing and recording fees (and any interest, penalties and additions with respect to such taxes and fees) arising from or relating to the consummation of the transactions contemplated by this Agreement (collectively, "Transfer Taxes"), regardless of the party on whom liability is imposed under the provisions of the applicable laws relating to such Transfer Taxes. Merchant and Agent will consult and cooperate on a reasonable basis in preparing and timely filing all tax returns, declarations, reports, estimates, information returns or other statements (collectively, "Tax Returns") with respect to any Transfer Taxes and will cooperate on a reasonable

19

basis and otherwise take reasonable best efforts to obtain any available exemptions from or reductions in such Transfer Taxes.

(e)     Merchant shall provide to Agent a properly completed and duly executed IRS Form W-9 on behalf of each entity listed on <u>Annex 1</u> on or prior to the Closing Date.

8.4     <u>Supplies</u>.  Agent shall have the right to use, without charge, all existing supplies located at the Stores, Distribution Centers and corporate office(s), including, without limitation, boxes, bags, paper, twine and similar sales materials (collectively, "<u>Supplies</u>"); provided, however, that the term "Supplies" does not include any IT System.  In the event that additional Supplies are required in any of the Stores during the GOB Sale, Merchant agrees to promptly provide the same to Agent, if available, for which Agent shall reimburse Merchant at Merchant's cost therefor as set forth in <u>Section 4</u> hereof.

8.5     <u>Returns of Merchandise</u>.  After the Closing Date, Merchant shall modify its return policy such that all sales are "final" as of the Closing Date.  Agent shall accept returns of goods sold by Merchant for fourteen (14) days following the Closing Date or such other date as may be authorized by the Bankruptcy Court, whichever is earlier.  In the Stores where store-closing sales are already being conducted pursuant to the Store Closing Procedures Order, all sales are final and returns will no longer be accepted as of March 2, 2025.  Following such date, the Agent shall have no obligation to accept returns of goods sold.

8.6     <u>Gift Certificates, Credits</u>.  By the Closing Date, Merchant shall use commercially reasonable best efforts to modify its gift certificate, coupon, and loyalty program policies such that Merchant's gift cards, gift certificates, coupons and credits will only be accepted during the fourteen (14) day period following the Closing or such other date as may be authorized by the Bankruptcy Court, whichever is earlier, and that Merchant's loyalty program will be terminated as of the Closing.  Following such date, Agent shall have no obligation to accept gift cards, gift certificates, coupons and credits or honor any of Merchant's loyalty programs during the Sale Term.  After the Petition Date, Merchant shall discontinue the sale of gift certificates and gift cards and use commercially reasonable best efforts to direct any third-party merchants to stop the sale of such gift certificates and gift cards.

8.7     <u>Right to Monitor</u>.  Merchant shall have the right to monitor the GOB Sale and activities attendant thereto and to be present in the Stores during the hours when the Stores are open for business; <u>provided</u> that Merchant's presence does not unreasonably disrupt the conduct of the Sale.  Merchant shall also have a right of access to the Stores at any time in the event of an emergency situation and shall promptly notify Agent of such emergency.

8.8     <u>Sale Reconciliation</u>.  On each Wednesday during the Sale Term, Agent and Merchant shall cooperate to reconcile the sales of Merchandise and Additional Agent Merchandise, the sale of FF&E, Expenses, make payments/setoffs on account of the GOB Sale Proceeds and reconcile such other GOB Sale-related items as either party shall reasonably request, in each case for the prior week or partial week (i.e. Sunday through Saturday), all pursuant to procedures agreed upon by Merchant and Agent (the "<u>Weekly Sale Reconciliation</u>").  Within thirty (30) days after the end of the Sale Term, or as soon as practicable thereafter, Agent and Merchant shall complete a final reconciliation of the Sale (the "<u>Final Reconciliation</u>"), the written

results of which shall be certified by representatives of each of the Merchant and Agent as a final settlement of accounts between the Merchant and Agent with respect to the GOB Sale. Within five (5) days after the completion of the Final Reconciliation and execution of a settlement letter including an appropriate mutual release for the benefit of Merchant and Agent, Agent shall pay to Merchant, or Merchant shall pay to Agent, as the case may be, any and all amounts due the other pursuant to the Final Reconciliation. The Approval Order shall provide that the Final Reconciliation, once agreed to by Merchant and Agent, shall be automatically deemed approved pursuant to Bankruptcy Code section 105(a) and Rule 9019 of the Federal Rules of Bankruptcy Procedure without further order of the Bankruptcy Court or action by any party. During the Sale Term, and thereafter until all of Merchant's and Agent's obligations under this Agreement have been satisfied, Merchant and Agent shall have reasonable access to each other's records with respect to the GOB Sale (including, but not limited to Merchandise, Additional Agent Merchandise, GOB Sale Proceeds, and Expenses) to review and audit such records.

8.9        Additional Agent Merchandise.

(a)        Agent shall be entitled to include in the Sale supplemental goods procured by Agent which are of like kind, and no lesser quality to the Merchandise located in the Stores ("Additional Agent Merchandise"). Agent shall be responsible for payment of the costs associated with procuring any Additional Agent Merchandise and all direct costs and expenses related to, or incurred in connection with, the marketing and sale of the Additional Agent Merchandise, as a Retail Expense of the Sale. Agent may utilize the Distribution Centers for the receipt, processing, handling and distribution of such Additional Agent Merchandise.

(b)        The Additional Agent Merchandise shall be at all times subject to the control of Agent, and Merchant and Lenders shall cooperate with Agent with respect to all filings (including, without limitation, UCC-1 financing statements) and other actions to the extent reasonably requested by Agent in connection with the Additional Agent Merchandise. If requested by Agent, Merchant shall, at Agent's expense as a Retail Expense, insure the Additional Agent Merchandise and, if required, promptly file any proofs of loss with regard to same with Merchant's insurers.

(c)        Any transactions relating to the Additional Agent Merchandise are, and shall be construed as, a true consignment from Agent to Merchant. Merchant acknowledges, and the Approval Order shall provide, that the Additional Agent Merchandise shall be consigned to Merchant as a true consignment under Article 9 of the Uniform Commercial Code (the "UCC"). Agent is hereby granted a first priority security interest in (i) the Additional Agent Merchandise and (ii) the Additional Agent Merchandise proceeds, which security interest Agent shall be authorized to perfect prior to entry of the Approval Order, but which security interest shall, if not sooner perfected, be deemed perfected pursuant to the Approval Order without the requirement of filing UCC financing statements or providing notifications to any prior secured parties, it being understood that the filing and service by Merchant of a sale approval motion and entry by the Bankruptcy Court of the Approval Order constitute adequate prior notice to all preexisting secured parties, *provided, however*, that Agent is hereby authorized to deliver any notices and file any financing statements and amendments thereof under the UCC identifying Agent's interest in the Additional Agent Merchandise and any proceeds from the sale thereof as consigned goods

thereunder and Merchant as the consignee therefor, and Agent's security interest in such Additional Agent Merchandise and Additional Agent Merchandise proceeds. The Lenders hereby (x) acknowledge and agree that the Additional Agent Merchandise are the subject of a true consignment by Agent to Merchant and, as such, are not collateral of the Lenders or any other secured party of Merchant, and (y) consent to the inclusion of the proceeds of the sale of Additional Agent Merchandise as "Proceeds" hereunder.

(d)     Agent shall provide signage in the Stores notifying customers that the Additional Agent Merchandise has been included in the Sale.

8.10    Force Majeure.  If any casualty, act or threatened act of war or terrorism, act of God, epidemic or pandemic, or governmental rules or regulations in response to any of the foregoing prevents or substantially inhibits the conduct of business in the ordinary course at any Store for a period of five (5) consecutive days (a "Force Majeure Event"), such Store and the Merchandise located at such Store may, in Agent's sole discretion, be eliminated from the Sale and considered to be deleted from this Agreement as of the first date of such event, and Agent and Merchant shall have no further rights or obligations hereunder with respect thereto; provided, however, that the proceeds of any insurance attributable to such Merchandise shall constitute Proceeds hereunder and there shall be no adjustment to Purchase Price.

## Section 9.  Employee Matters.

9.1        Merchant's Employees.    Subject to the Central Services Budget and payment of Expenses, Agent may use Merchant's employees in the conduct of the GOB Sale to the extent Agent deems necessary for the GOB Sale, and Agent may select and schedule the number and type of Merchant's employees required for the GOB Sale.  Agent shall identify any such employees to be used in connection with the GOB Sale (each such employee, a "Retained Employee") prior to the Sale Commencement Date.  Notwithstanding the foregoing, Merchant's employees shall at all times remain employees of Merchant.  Agent's selection and scheduling of Merchant's employees shall at all times comply with all applicable collective bargaining agreements, laws and regulations.  Merchant and Agent agree that, except to the extent that wages and benefits of Retained Employees constitute Expenses hereunder, nothing contained in this Agreement and none of Agent's actions taken in respect of the GOB Sale shall be deemed to constitute an assumption by Agent of any of Merchant's obligations relating to any of Merchant's employees including, without limitation, Worker Adjustment Retraining Notification Act ("WARN Act") claims and other termination type claims and obligations, or any other amounts required to be paid by statute or law; nor shall Agent become liable under any employment agreement, collective bargaining agreement, or be deemed a joint or successor employer with respect to such employees.  For the avoidance of doubt, Merchant shall be responsible for providing any required notice under the WARN Act or state laws with respect to its employees and otherwise comply with the WARN Act or state laws with respect to any "plant closing" or "mass layoff" (as defined in the WARN Act) or group termination or similar event affecting the employees, whether before or after the date of this Agreement.  Merchant shall not, without the prior consent of Agent, raise the salary or wages or increase the benefits for, or pay any bonuses or other extraordinary payments to, any Store or Distribution Center employees prior to the Sale Termination Date.  Merchant shall not transfer any employee in anticipation of the GOB Sale nor any Retained Employee during the Sale Term, in each case without Agent's prior consent, not to

be unreasonably withheld.  To the extent reasonably requested in writing by Agent, and at Agent's expense, Merchant shall use commercially reasonable efforts to hire additional temporary employees to facilitate the GOB Sale, which employees shall constitute Retained Employees for purposes of this Agreement.

9.2    <u>Termination of Employees</u>.  Agent may in its discretion stop using any Retained Employee at any time during the GOB Sale, subject to the conditions provided for herein. In the event that Agent desires to cease using any Retained Employee, Agent shall notify Merchant at least seven (7) days prior thereto in writing; <u>provided</u>, <u>however</u>, that, in the event that Agent determines to cease using an employee "for cause" (such as dishonesty, fraud or breach of employee duties), the seven (7) day notice period shall not apply; <u>provided</u> that Agent shall notify Merchant immediately after such discontinuance.  Contemporaneous with providing such notice, Agent shall provide to Merchant all information and other materials in Agent's knowledge, possession or control concerning supporting Agent's determination to terminate any Retained Employee "for cause."  From and after the date of this Agreement and until the Sale Termination Date, Merchant shall not transfer or dismiss employees of the Stores or Distribution Centers except "for cause" without Agent's prior consent, not to be unreasonably withheld.  Notwithstanding the foregoing, Agent shall not have the right to terminate the actual employment of any employee, but rather may only cease using such employee in the GOB Sale and paying any Expenses with respect to such employee (and all decisions relating to the termination or non-termination of such employees shall at all times rest solely with Merchant).  Notwithstanding any other provision hereof, Agent will indemnify and hold Merchant harmless from and against any and all costs or expenses incurred (including, without limitation, reasonable attorneys' fees) in connection with any claims by Retained Employees arising from Agent's conduct in connection with Retained Employees.

9.3    <u>Payroll Matters</u>.  During the Sale Term, Merchant shall process the payroll for all Retained Employees and any former employees and temporary labor engaged for the GOB Sale.  Each Wednesday of each week during which payroll is being paid by Merchant (or such other date as may be reasonably requested by Merchant to permit the funding of the payroll accounts before such payroll is due and payable) during the Sale Term, Agent shall transfer to Merchant's payroll accounts an amount equal to the payroll for Retained Employees plus related payroll taxes, workers' compensation and benefits for each such week, to the extent such amount constitutes Expenses hereunder.

9.4    <u>Employee Retention Bonuses</u>.  Subject to approval by the Bankruptcy Court, Agent may, in its sole discretion, pay, as an Expense, retention bonuses and/or severance pay ("<u>Retention Bonuses</u>"), which bonuses shall be inclusive of payroll taxes, but as to which no severance benefits shall be payable to such Retained Employees who do not voluntarily leave employment, are not otherwise entitled to receive severance pay, and are not terminated "for cause," as Agent may determine in its reasonable and good faith discretion.  Subject to approval by the Bankruptcy Court, the amount of such Retention Bonuses shall be in an amount to be determined by Agent, in its reasonable and good faith discretion, and shall be payable within thirty (30) days after the Sale Termination Date and shall be processed through Merchant's payroll system.

**Section 10.  <u>Conditions Precedent and Subsequent</u>.**

(a)     Agent shall consummate the transactions contemplated under this Agreement (the "<u>Closing</u>") by February 27, 2025 (the "<u>Closing Date</u>") subject only to the satisfaction of the following conditions, unless specifically waived in writing by Agent in its reasonable discretion:

(i)     The Petition Date shall have occurred no later than January 15, 2025;

(ii)     On the Petition Date, Merchant shall have filed a motion and proposed form of Bid Procedures Order;

(iii)     The Bankruptcy Court shall have entered an order approving the use of cash collateral (the "<u>Cash Collateral Order</u>") on a final basis no later than February 26, 2025;

(iv)     The Bankruptcy Court shall have entered the Bid Procedures Order on a final basis no later than February 17, 2025;

(v)     The bid deadline under the Bid Procedures Order shall be no later than February 18, 2025;

(vi)     The Auction, if any, under the Bid Procedures Order shall be no later than February 21, 2025;

(vii)     The Bankruptcy Court shall have entered the Approval Order no later than February 26, 2025;

(viii)     The Bankruptcy Court shall have entered an order, pursuant to section 365(d)(4) of the Bankruptcy Code, extending the Merchant's time to assume or reject the leases for the Stores to the date that is 210 days after the Petition Date;

(ix)     The Termination Declaration Date, as defined in the Cash Collateral Order, shall not have occurred;

(x)     (A) All representations and warranties of Merchant in <u>Section 11.1</u> (other than the representations and warranties set forth in <u>Sections 11.1(a)</u>, <u>(b)</u>, and <u>(c)</u>)) shall be true and correct, except where the failure to be true and correct has not had and would not reasonably be expected to have a material adverse effect on the Assets taken as a whole, (B) all representations and warranties of Merchant in <u>Sections 11.1(a)</u>, <u>(b)</u>, and <u>(c)</u> shall be true and correct in all material respects as of the Closing, and (C) Merchant shall have in all material respects performed the obligations and complied with the covenants required by this Agreement to be performed or complied with by it prior to the Closing;

(xi)     No chapter 11 trustee has been appointed and the Merchant's bankruptcy cases have not been converted to cases under Chapter 7 of the Bankruptcy Code;

(xii)    There shall not have been a variance greater than five percent (5%) of the expenses set forth in "Total Expenses/Wind Down Costs" line item of the cash collateral budget without the written consent of Agent; and

(xiii)    All of the Parties shall have executed this Agreement.

(b)    The willingness of Merchant to enter into the transactions contemplated under this Agreement, and the occurrence of the Closing, are directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by Merchant, with the prior written consent of the Prepetition ABL Agent and the Prepetition FILO Agent to the extent such waiver would materially affect their interests:

(i)    No judgment enacted, promulgated, issued, entered, amended or enforced by any governmental authority or any applicable law shall be in effect enjoining or otherwise prohibiting consummation of the transactions contemplated hereby;

(ii)    All representations and warranties of Agent hereunder shall be true and correct in all material respects as of the Closing, and Agent shall have in all material respects performed the obligations and complied with the covenants required by this Agreement to be performed or complied with by it prior to the Closing;

(iii)    The ABL Agent, the FILO Agent and any other persons designated by them have received full and indefeasible payment in cash (or other consideration as applicable) of all Debt Payoff specified in the Payoff Letters on the Closing Date; and

(iv)    All of the Parties shall have executed this Agreement.

**Section 11.  <u>Representations, Warranties and Covenants</u>.**

11.1        <u>Merchant's Representations and Warranties</u>.  Merchant hereby represents and warrants in favor of Agent as follows:

(a)    As of the date of this Agreement and at the Closing, Merchant (i) is duly organized, validly existing and in good standing under the laws of the State of its organization; (ii) has all requisite corporate power and authority to own, lease and operate the Assets and to carry on its business as presently conducted; (iii) is duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which the Stores are located, except, in each case, to the extent that the failure to be in good standing or so qualified would not reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder; and (iv) has paid when due all United States Trustee fees.

(b)    Subject only to entry of the Approval Order, Merchant, as of the date of this Agreement and at the Closing, has the right, power and authority to execute and deliver this Agreement and each other document and agreement contemplated hereby (collectively, together with this Agreement, the "<u>Agency Documents</u>") and to perform fully its obligations thereunder.

25

Subject only to entry of the Approval Order, Merchant has taken all necessary actions required to authorize the execution, delivery and performance of the Agency Documents, and no further consent or approval is required for Merchant to enter into and deliver the Agency Documents, to perform its obligations thereunder and to consummate the Sale, except for any such consent the failure of which to be obtained would not reasonably be expected to prevent or materially delay or impair the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder. Subject only to entry of the Approval Order, each of the Agency Documents has been duly executed and delivered by Merchant and, upon the due authorization, counter-execution, and delivery of this Agreement by Agent, constitutes the legal, valid and binding obligation of Merchant enforceable in accordance with its terms.

(c)     Merchant, as of the date of this Agreement and at the Closing, owns good and valid title to all of the Assets, free and clear of all security interests, liens, claims and encumbrances of any nature other than the security interests securing the Prepetition Secured Obligations (as defined in the Cash Collateral Order) and Permitted Encumbrances.

(d)     Since January 1, 2024, Merchant has maintained its pricing files, including but not limited to the Merchandise File, in the ordinary course of business, and prices charged to the public for goods are the same in all material respects as set forth in such pricing files, including but not limited to the Merchandise File, for the periods indicated therein, all pricing files, including but not limited to the Merchandise File, and records are true and accurate in all material respects as to the actual cost to Merchant for purchasing the goods referred to therein and as to the selling price to the public for such goods without consideration of any point of sale discounts, as of the dates and for the periods indicated therein. Merchant represents that (i) the ticketed prices of all items of Merchandise do not and shall not include any Sales Taxes and (ii) all registers located at the Stores are programmed to correctly compute all Sales Taxes required to be paid by the customer under applicable law, as such calculations have been identified to Merchant by its retained service provider.

(e)     Merchant has ticketed or marked all goods and items of inventory received and currently located at the Stores or Distribution Centers in a manner consistent with similar Merchandise located at the Stores or Distribution Centers, and in accordance with Merchant's ordinary course past practices and policies relative to pricing and marking goods and inventory.

(f)     Since January 1, 2025, Merchant has not purchased for or transferred to or from the Stores or Distribution Centers any inventory or goods outside the ordinary course.

(g)     To Merchant's knowledge after reasonable inquiry, all Merchandise is in compliance in all material respects with all applicable federal, state and local product safety laws, rules and standards.

(h)     Since January 1, 2024, Merchant has paid all self-insured or Merchant-funded employee benefit programs for Store employees, including health and medical benefits and insurance and all proper claims made or to be made in accordance with such programs.

(i)     Since January 1, 2025, Merchant has not taken any actions with the intent of increasing the Expenses of the Sale as compared to ordinary course operations prior to the Sale

Commencement Date, including without limitation increasing salaries or other amounts payable to employees; except to the extent an employee was due an annual raise in the ordinary course.

(j)     Other than filing the Bankruptcy Case, no action, arbitration, suit, notice, or legal, administrative or other proceeding before any court or governmental body is pending, by or against Merchant, or has been settled or resolved, or to Merchant's knowledge, is threatened against or affects Merchant, relative to Merchant's business or properties, or which questions the validity of this Agreement, in any case, that would reasonably be expected to adversely affect the conduct of the Sale.

(k)     As of February 27, 2025, (i) Available Closing Cash shall be equal to or greater than $54,000,000 minus the portion, if any, of the Wind-Down Budget in Section 3.1(b) paid with Acquired Cash or (ii) to the extent Available Closing Cash is less than $54,000,000, the Debt Payoff shall be equal to $443,100,000 less the amount by which Available Closing Cash is less than $54,000,000.

11.2    Merchant's Covenants.

(a)     Merchant, during the Sale Term, (i) will continue to be duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which the Stores are located, except, in each case, to the extent that the failure to be in good standing or so qualified would not reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder; and (ii) will continue to pay when due all United States Trustee fees.

(b)     Merchant shall not create, incur, assume or suffer to exist any security interest, lien or other charge or encumbrance (other than Permitted Encumbrances) upon or with respect to any of the Assets. From and after the Closing, subject to the Central Services Budget and Agent's satisfaction of its payment obligations under this Agreement, Merchant shall use commercially reasonable efforts to perform such tasks and services as are reasonably necessary, in the ordinary course to maintain and preserve the Assets in saleable condition and to maintain good and valid title to all of the Assets at all times until all Assets have been sold or otherwise disposed of, and such other tasks and services as Agent may otherwise reasonably request in connection with the GOB Sales, including but not limited to paying all ad valorem taxes and utilities when due, performing all routine maintenance in the ordinary course, and renewing all necessary licenses and registrations.

(c)     Except as necessary to comply with Merchant's obligations under the Store Closing Procedures Order, through the Sale Commencement Date, Merchant shall continue to ticket or mark all goods and items of inventory received at the Stores or Distribution Centers in a manner consistent with similar Merchandise located at the Stores or Distribution Centers, and in accordance with Merchant's ordinary course past practices and policies relative to pricing and marking goods and inventory.

(d)     Except as necessary to comply with Merchant's obligations under the Store Closing Procedures Order, through the Sale Commencement Date Merchant shall transfer

inventory or goods to or from Distribution Centers in the ordinary course and shall not deviate from that schedule.

(e)     Except as necessary to comply with Merchant's obligations under the Store Closing Procedures Order, through the Sale Commencement Date Merchant shall not, purchase for or transfer to or from the Stores or Distribution Centers any inventory or goods outside the ordinary course.

(f)     Merchant shall provide Agent with reasonable access to and/or copies of its historic policies and practices, if any, regarding product recalls, as Agent may reasonably request prior to the Sale Commencement Date.

(g)     Subject to the Agent satisfying its payment obligations under this Agreement, Merchant shall, throughout the Sale Term, maintain in good working order, condition, and repair all cash registers, heating systems, air conditioning systems, elevators, escalators and all other mechanical devices necessary for the conduct of the GOB Sale at the Stores in the ordinary course.  Except as otherwise restricted by the Bankruptcy Code upon filing of the Bankruptcy Case, and absent a bona fide dispute, throughout the Sale Term, Merchant shall remain current on all expenses and payables necessary or appropriate for the conduct of the GOB Sale.

(h)     Subject to payment of Expenses and other obligations under this Agreement by Agent, and approval by the Bankruptcy Court, Merchant will continue to pay all self-insured or Merchant-funded employee benefit programs for Store employees, including health and medical benefits and insurance and all proper claims made or to be made in accordance with such programs.

(i)     Payment of Expenses and other obligations under this Agreement by Agent, and approval by the Bankruptcy Court, Merchant will continue to pay throughout the Sale Term all self-insured or Merchant-funded employee benefit programs for Store employees, including health and medical benefits and insurance and all proper claims made or to be made in accordance with such programs.

(j)     Merchant shall not throughout the Sale Term take any actions with the intent of increasing the Expenses of the Sale as compared to ordinary course operations prior to the Sale Commencement Date, including without limitation increasing salaries or other amounts payable to employees; except to the extent an employee was due an annual raise in the ordinary course.

(k)     Prior to the execution of this Agreement, Merchant has provided Agent reasonable access to all pricing and cost files, including but not limited to the Merchandise File, and data files, inter-Stores transfer logs, markdown schedules, invoices, style runs and all other documents relative to the price, mix and quantities of inventory located at the Stores and the Distribution Centers or on order or in transit.

(l)     Merchant hereby acknowledges that, as of and after the date of this Agreement, Agent intends to begin to make arrangements for the purchase of Additional Agent Merchandise from Agent's suppliers of goods as well as Merchant's existing suppliers of goods. To assist Agent in that regard, from and after the date of this Agreement, Merchant shall use Merchant's best efforts to assist and cause Merchant's employees to assist Agent with Agent's efforts to negotiate orders with Merchant's suppliers for goods that Agent is interested in

28

purchasing as Additional Agent Merchandise and to assist Agent with creating SKUs in and otherwise updating Merchant's systems for and in connection with all such Additional Agent Merchandise.

(m)     Except as necessary to comply with Merchant's obligations under the Store Closing Procedures Order, Merchant (i) shall not, prior to or after the Sale Commencement Date, offer any promotions or discounts at the Stores, through any e-commerce sites, social media sites, any other retail location, or any other promotional or retail sales channel owned or controlled directly by Merchant, except as detailed on Exhibit 11.2(m) (the "Promotional Calendar") and (ii) shall make commercially reasonable efforts to notify third party websites or social media sites of such restrictions.

(n)     Merchant shall discontinue its current return program and shall stop the sale of gift cards as of the execution date of this Agreement.

(o)     Merchant shall operate the Stores in accordance with the terms of the Store Closing Procedures Order, including, but not limited to Agent approving signage package to Stores, discounting cadence and staffing and supervision, in each case, in accordance with such terms.

11.3        Agent's Representations, Warranties and Covenants.    Agent hereby represents, warrants and covenants in favor of Merchant as follows:

(a)     Agent: (i) is duly and validly existing and in good standing under the laws of the State of its organization; (ii) has all requisite power and authority to carry on its business as presently conducted and to consummate the transactions contemplated hereby; (iii) is duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including, in the case of the entities comprising Agent, all jurisdictions in which the Stores are located, except, in each case, to the extent that the failure to be in good standing or so qualified would not reasonably be expected to have a material adverse effect on the ability of Agent to execute and deliver this Agreement and perform fully its obligations hereunder.

(b)     Agent: (i) has the right, power and authority to execute and deliver each of the Agency Documents to which it is a party and to perform fully its obligations thereunder; (ii) has taken all necessary actions required to authorize the execution, delivery and performance of the Agency Documents, and no further consent or approval is required on the part of Agent for Agent to enter into and deliver the Agency Documents, to perform its obligations thereunder and to consummate the transactions contemplated thereby, and (iii) has duly executed and delivered each of the Agency Documents and, assuming the due authorization, execution, and delivery of this Agreement by Merchant, constitutes the legal, valid and binding obligation of Agent enforceable in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, and similar laws affecting the rights of creditors generally and by general principles of equity.  No court order or decree of any federal, state or local governmental authority or regulatory body is in effect that would prevent or impair, or is required for, Agent's consummation of the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor, other than as provided herein.

No contract or other agreement to which Agent is a party or by which Agent is otherwise bound will prevent or impair the consummation of the transactions contemplated by this Agreement.

(c)     No action, arbitration, suit, notice or legal administrative or other proceeding before any court or governmental body has been instituted by or against Agent, or has been settled or resolved or, to Agent's knowledge, has been threatened against or affects Agent, which questions the validity of this Agreement or any action taken or to be taken by Agent in connection with this Agreement or which, if adversely determined, would have a material adverse effect upon Agent's ability to perform its obligations under this Agreement.

(d)     The GOB Sale shall be conducted in compliance with all applicable state and local laws, rules and regulations and Merchant's leases and other agreements, except as otherwise provided for in this Agreement, the Sale Guidelines or the Approval Order.

(e)     Absent prior consent by Merchant, Agent will not cause any non-emergency repairs or maintenance (emergency repairs are repairs necessary to preserve the security of a Store premise or to ensure customer safety) to be conducted at the Stores.

(f)     Agent will have at the Closing and at any time that payments are required to be made by Agent under this Agreement or under the other Agent documents sufficient funds available in cash, including from Acquired Cash and Proceeds, to pay the amounts then required to be paid by Agent in connection with the transactions contemplated by this Agreement.

(g)     Assuming (i) the satisfaction or waiver of the conditions set forth in Section 10, and (ii) the accuracy of the Express Representations (without regard to any knowledge or materiality qualifications contained therein), Agent and its subsidiaries will be Solvent. Agent is not entering into the transactions contemplated by this Agreement with the intent to hinder, delay or defraud either present or future creditors of Agent, Merchant or their respective subsidiaries. For purposes of this Agreement, "Solvent," when used with respect to any Person, means that such Person (i) will not be insolvent as defined in section 101 of the Bankruptcy Code, (ii) has property with fair value greater than the total amount of their debts and liabilities, contingent, subordinated or otherwise (it being understood that the amount of contingent liabilities at any time shall be computed as the amount that, in light of all the facts and circumstances existing at such time, can reasonably be expected to become an actual or matured liability), (iii) has assets with present fair salable value not less than the amount that will be required to pay their liability on their debts as they become absolute and matured, (iv) will be able to pay its debts and liabilities, subordinated, contingent or otherwise, as they become absolute and matured, and (v) are not engaged in business or a transaction, and are not about to engage in business or a transaction, for which they have unreasonably small capital.

(h)     As of the date of this Agreement, there are no contracts, undertakings, commitments, agreements or obligations, whether written or oral, between Agent, on the one hand, and any member of the management of Merchant or its respective board of directors (or applicable governing body of any Affiliate of any Person within Merchant), any holder of equity or debt securities of Merchant, or any lender or creditor of Merchant or any Affiliate of Merchant, on the other hand, (a) relating in any way to the Assets or the transactions contemplated by this Agreement, other than any agreements entered into between Agent, the Term Agent, and/or any

lenders under the Term Loan Credit Agreement related to this Agreement, or (b) that would be reasonably likely to prevent, restrict, impede or affect adversely the ability of Merchant or any of its Affiliates to entertain, negotiate or participate in any such transactions.

(i)    Except for the representations and warranties expressly contained in Section 11.1 (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) (the "Express Representations") (it being understood that Agent and its affiliates and representatives have relied only on such Express Representations), Agent acknowledges and agrees, on its own behalf and on behalf of its affiliates and representatives, that neither Merchant, any of its Affiliates, nor any other Person on behalf of Merchant or any of its Affiliates makes, and neither Agent nor any of its affiliates and representatives has relied on, is relying on, or will rely on the accuracy or completeness of any express or implied representation or warranty with respect to Merchant, the any of the Assets, or any businesses or liabilities of Merchant or its Affiliates, or with respect to any information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person, including in any "dataroom" or elsewhere to Agent or any of its affiliates or representatives on behalf of Merchant or any of its Affiliates or representatives. Without limiting the foregoing, neither Merchant, any of its affiliates nor any or of its or their representatives nor any other Person will have or be subject to any Liability whatsoever to Agent, or any other Person, resulting from the distribution to Agent or any of its Affiliates or representatives, or Agent's or any of its Affiliates' or Representatives' use of or reliance on, any such information, including in any dataroom or otherwise in expectation of the transactions or any discussions with respect to any of the foregoing information or otherwise.

(j)    Agent acknowledges and agrees, on its own behalf and on behalf of its affiliates and representatives, that it will not assert, institute, or maintain, and will cause each of its affiliates and representatives not to assert, institute or maintain, any Action that makes any claim contrary to the agreements and covenants set forth in Section 11.3(f).

## Section 12.   Efforts.

12.1        Subject to the terms and conditions of this Agreement, each of the Agent and Merchant shall cooperate with each other and use (and shall cause its affiliates to use) its reasonable best efforts (unless, with respect to any action, another standard of performance is expressly provided for herein) to promptly (i) take, or cause to be taken, all actions, and do, or cause to be done, and assist and cooperate with each other in doing, all things necessary, proper or advisable to cause the conditions to Closing to be satisfied as promptly as reasonably practicable and to consummate and make effective, in the most expeditious manner reasonably practicable, the transactions contemplated by this Agreement, including preparing and filing promptly and fully all documentation to effect all necessary filings, notices, petitions, statements, registrations, submissions of information, applications and other documents, (ii) obtain all approvals, consents, registrations, waivers, permits, authorizations, orders and other confirmations from any governmental authority or third party necessary, proper or advisable to consummate the transactions contemplated hereby, (iii) execute and deliver any additional instruments necessary to consummate the transactions contemplated hereby and (iv) defend or contest in good faith any action brought by a third party that could otherwise prevent or impede, interfere with, hinder or delay in any material respect the consummation of the transactions contemplated hereby.

## Section 13.  <u>Insurance</u>.

13.1 <u>Merchant's Liability Insurance</u>.  Until the Asset Designation Rights Termination Date or as otherwise earlier directed by Agent or set forth in this Agreement, Merchant shall continue to maintain, subject to the satisfaction by Agent of its payment obligations under this Agreement, in such amounts as it currently has in effect, all of its liability insurance policies, including but not limited to commercial general liability, products liability, comprehensive public liability, auto liability and umbrella liability insurance, covering injuries to persons and property in, or in connection with, the Assets and/or Merchant's operation of its business and the Stores and Distribution Centers; and Merchant shall make commercially reasonable efforts to cause Agent to be named as an additional named insured (as its interest may appear) with respect to all such policies.  Merchant shall make commercially reasonable efforts to deliver to Agent certificates evidencing such insurance setting forth the duration thereof and naming Agent as an additional named insured.  All such policies shall require at least thirty (30) days' prior notice to Agent of cancellation, non-renewal or material change.  In the event of a claim under any such policies, Merchant shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder (which shall be reimbursed as an Expense), unless it is determined that liability arose by reason of the willful misconduct or grossly negligent acts or omissions of Agent, or Agent's employees, independent contractors or agents, in which case Agent shall be solely responsible for any such deductibles, retentions or self-insured amounts.  Merchant shall not make any change in the amount of any deductibles or self-insurance amounts on or after the date of this Agreement without Agent's prior written consent or unless such a change is required by the relevant insurer(s) in connection with a renewal or extension of the policy.

13.2 <u>Merchant's Casualty Insurance</u>.  Until the Asset Designation Rights Termination Date, as otherwise earlier directed by Agent, or, if earlier, until the sale or other disposition of all Assets covered by such policies, Merchant shall continue to maintain, subject to the satisfaction by Agent of its payment obligations under this Agreement, all of its presently existing property casualty coverage related to the Assets (including but not limited to fire, flood, wind, hail, natural disaster, theft, and extended coverage casualty insurance).  From and after the Closing, Merchant will make commercially reasonable efforts to cause all such policies to also name Agent as an additional named insured or loss payee, as applicable (as its interest may appear).  In the event of a loss to the Assets on or after the Closing, all proceeds of such insurance shall constitute Proceeds hereunder after subtraction of any expenses reasonably incurred securing such proceeds.  Merchant shall make commercially reasonable efforts to deliver to Agent certificates evidencing such insurance, setting forth the duration thereof and naming Agent as an additional insured or loss payee, as applicable.  Merchant will make commercially reasonable efforts to provide thirty (30) days' prior notice to Agent of cancellation, non-renewal or material change.  Merchant shall not make any change in the amount of any deductibles or self-insurance amounts on or after the date of this Agreement without Agent's prior written consent or unless such a change is required by the relevant insurer(s) in connection with a renewal or extension of the policy.  Upon the sale, conveyance, or other disposition of any Asset specifically identified in any of Merchant's casualty insurance policies, Merchant may, with the Agent's prior consent (such consent not to be unreasonably withheld or delayed), cancel the casualty coverage specifically applicable to such Asset.

13.3        Agent's Insurance.  Agent shall maintain, at Agent's cost (as an Expense) and in such amounts as Agent currently has in effect, commercial general liability policies covering injuries to persons and property in or in connection with Agent's agency at the Stores and shall cause Merchant to be named as an additional insured with respect to such policies.  Agent shall deliver to Merchant certificates evidencing such insurance policies setting forth the duration thereof and naming Merchant as an additional insured, in form and substance reasonably satisfactory to Merchant.  In the event of a claim under any such policies, Agent shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder, unless it is determined that liability arose by reason of the willful misconduct or grossly negligent acts or omissions of Merchant or Merchant's employees, independent contractors or agents (other than Agent or Agent's employees, agents or independent contractors).  Agent shall not make any change in the amount of any deductibles or self-insurance amounts prior to the Sale Termination Date without Merchant's prior written consent.

13.4        Worker's Compensation Insurance.  Merchant shall, at all times while any employees are in its employ, maintain in full force and effect workers' compensation insurance (including employer liability insurance) in compliance with all statutory requirements.

13.5        Risk of Loss.  Without limiting any other provision of this Agreement, Merchant acknowledges that Agent is conducting the GOB Sale on behalf of Merchant solely in the capacity of an agent, and that in such capacity (a) except for any Additional Agent Merchandise, Agent shall not be deemed to be in possession or control of the Stores, Distribution Centers, or the assets located therein or associated therewith, or of Merchant's employees located at the Stores or Distribution Centers, and (b) except as expressly provided in this Agreement, Agent does not assume any of Merchant's obligations or liabilities with respect to any of the foregoing.  Agent shall not be deemed to be a successor employer.  Merchant and Agent agree that, subject to the terms of this Agreement, Merchant shall bear all responsibility for liability claims of customers, employees, and other persons arising from events occurring at the Stores during and after the Sale Term, except to the extent any such claim arises from the acts or omissions of Agent, or its supervisors, agents, independent contractors, or employees located at the Stores (an "Agent Claim").  In the event of any liability claim that Merchant and Agent agree is not an Agent Claim, Merchant shall administer such claim and shall present such claim to Merchant's liability insurance carrier in accordance with Merchant's policies and procedures existing immediately prior to the Sale Commencement Date, and shall provide a copy of the initial documentation relating to such claim to Agent at the address listed in this Agreement.  To the extent that Merchant and Agent agree that a claim constitutes an Agent Claim, Agent shall administer such claim and shall present such claim to its liability insurance carrier, and shall provide copies of the initial documentation relating to such claim to Merchant.  In the event that Merchant and Agent cannot agree whether a claim constitutes an Agent Claim, each party shall present the claim to its own liability insurance carrier, and a copy of the initial claim documentation shall be delivered to the other party to the address designated for delivery of notices hereunder.

13.6        Merchant Indemnification.  From and after the Closing, Merchant shall indemnify and hold Agent, and its officers, directors, employees, agents, representatives, and independent contractors (collectively, "Agent Indemnified Parties") harmless from and against all claims, causes of action, demands, penalties, losses, liability, damage, or other obligations,

including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from or related to: (a) Merchant's material breach of or failure to comply with any of its agreements or covenants contained in this Agreement, in each case, solely to the extent such covenant or agreement requires performance after the Closing; (b) any consumer warranty or products liability claims relating to Merchandise; (c) any harassment or any other unlawful, tortious, or otherwise legally actionable treatment of any customers, employees or agents of Agent by Merchant or any of their respective representatives (other than Agent); and (d) the willful misconduct of Merchant or its respective officers, directors, employees, agents (other than Agent) or representatives.

13.7       Agent Indemnification.

(a)       From and after the Closing, Agent shall indemnify and hold Merchant and its respective officers, directors, employees, agents and representatives harmless from and against all claims, causes of action, demands, penalties, losses, liability, damage, or other obligations, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to: (a) Agent's material breach of or failure to comply with any of its agreements, or covenants, contained in this Agreement, in each case, solely to the extent such covenant or agreement requires performance after the Closing; (b) any claims by any party engaged by Agent as an employee or independent contractor arising out of such employment; (c) any harassment or any other unlawful, tortious or otherwise legally actionable treatment of any customers, employees or agents of Merchant by Agent or any of its representatives; (d) any consumer warranty or products liability claims relating to Additional Agent Merchandise; (e) as set forth in Section 8.3 above; (f) the willful misconduct of Agent, its officers, directors, employees, agents or representatives.

(b)       Agent shall indemnify Merchant (and their respective estates) for up to $10,000,000.00 in the aggregate on account of any Administrative Expense Claim or Priority Tax Claim attributable to the tax consequences associated with the elimination or cancellation of, transfer of, or withdrawal from the Key Man Insurance Policy Program provided for under certain Pre-1986 Corporate Owned Life Insurance policies issued in 1984 and 1985 by Provident Life and Accident Insurance Company (the "Key Man Insurance Policies" and any associated tax liability, the "Key Man Insurance Tax Liability") upon the tax becoming payable to the relevant taxing authority.  Merchant shall use best efforts to, and reasonably cooperate with, Agent and its professionals in efforts to, mitigate and/or offset the amount of any Key Man Insurance Tax Liability, including by evaluating the availability of any tax attributes that could reduce or eliminate the Key Man Insurance Tax Liability, considering the appropriate classification of any Key Man Insurance Tax Liability, considering structuring alternatives to monetize the Key Man Insurance Policies or otherwise preventing any Key Man Insurance Tax Liability from arising.  For the avoidance of doubt, Agent shall be entitled to the net proceeds (if any), after payment of any associated tax liability, of the Key Man Insurance Policies, including if such proceeds become due and payable prior to the Merchant's withdrawal.  Merchant shall use commercially reasonable efforts to estimate the Key Man Insurance Tax Liability within six months after the Closing.  For the avoidance of doubt, the proceeds of the Key Man Insurance Policies constitute Proceeds.

**Section 14.  Agent's Security Interest.**

(a)  Upon the occurrence of the Closing and satisfaction of the Debt Payoff, Agent is hereby granted first priority, senior security interests in and liens upon all Assets, all Proceeds, and any proceeds thereof, which security interests and liens shall be deemed by the Approval Order to be automatically perfected.  The Approval Order shall grant Agent relief from the automatic stay, and nothing in the Approval Order shall inhibit Agent's ability, to take any action Agent deems appropriate to perfect such security interests and liens.  From and after the Closing, the Merchant shall not grant any other party any security interests in or liens upon the Assets, Proceeds, or proceeds thereof.  Any security interests in or liens upon the Assets prior to the Closing and satisfaction of the Debt Payoff shall attach to the Purchase Price as of the Closing.

(b)  Subject to, and subordinated to, the Carve Out, as defined in the Cash Collateral Order, upon the occurrence of the Closing and until all Assets have been sold or otherwise disposed of and Merchant receives the full amount of the Wind-Down Budget, Agent shall have a superpriority administrative expense claim against Merchant, which is senior to all other administrative expenses (including any other superpriority administrative expense claims, not including amounts subject to the Carve Out) to the extent of any amounts owing from Merchant to Agent in connection with this Agreement, including as a result of any breach of this Agreement.

**Section 15.  Designation Rights.**

15.1  Lease/Contract Designation Rights.

(a)  Upon the occurrence of the Closing and until the earlier to occur of (i) the end of the Lease/Contract Designation Rights Period applicable to a particular Lease or Contract and (ii) May 31, 2025 (as may be amended by written agreement of the Parties, the "Lease Designation Rights Termination Date" and the period through such date, the "Lease/Contract Designation Rights Period"), Agent shall have the exclusive right to designate the purchasers, assignees, sublessees, or other transferees of Merchant's right, title, and interest in and to any or all of the Leases and Contracts (the "Lease/Contract Designation Rights") upon the terms and conditions agreed upon between Agent and such designee.  If the Parties extend the Designation Rights Termination Date, the Asset Designation Rights Termination Date, and/or the Sale Termination Date, Agent shall be responsible for (x) the increased Central Services Expenses arising from such extension and (y) an additional Wind-Down Payment not to exceed $500,000 in respect of the actual allowed fees and expenses of estate professionals arising from such extension.  Purchaser shall cooperate in good faith with the Committee to develop procedures reasonably acceptable to Purchaser and the Committee with respect to the Lease/Contract Designation Rights.

(b)  Merchant shall cooperate reasonably with Agent to arrange for the sale, sublease, assignment, and other transfer, as applicable, of the Leases and Contracts, with such sale and assignment to be on such terms as Agent deems acceptable in its sole and absolute discretion.  Without limiting the generality of the foregoing, Merchant agrees (1) to provide Agent with all due diligence materials and information as Agent shall reasonably request in connection with its efforts to market and attempt to sell or otherwise dispose of the Leases and Contracts (including complete copies thereof and any abstracts prepared with respect thereto, and all communications with the counterparties thereunder, all property surveys, all environmental reports and tax and

utility records), with Agent to bear all reasonable third party out-of-pocket costs and expenses relating thereto, in all cases to the extent reasonably available to Merchant, and (2) to cooperate with Agent, its agents, and any potential purchasers assignees, sublessees, or other transferees of any of the Leases and/or Contracts.

(c)     Solely to the extent requested by Agent, Merchant shall exercise renewal and/or extension options under the Leases and Contracts.

(d)     At any time prior to the end of the Lease/Contract Designation Rights Period applicable to a particular Lease or Contract, Agent shall have the right, which right may be exercised at any time and from time to time, to file a Lease/Contract Assumption Notice in the Bankruptcy Cases designating the purchasers, assignees, sublessees, or other transferees (which may in certain circumstances be Agent, any of the entities comprising Agent, any of their respective affiliates, and/or a new entity created by any of the foregoing) of one or more Leases and/or Contracts (which may occur without further order of the Bankruptcy Court pursuant to the Approval Order) and setting forth the proposed cure amount due pursuant to section 365 of the Bankruptcy Code.  The Approval Order shall provide that (a) the counterparties to the Leases or Contracts identified in any Lease/Contract Assumption Notice shall have fourteen (14) days to object to the proposed assumption and assignment, (b) if no objection to the proposed assumption and assignment of a Lease or Contract is timely received, such Lease or Contract shall, upon payment of the applicable cure payment, if any, to the applicable counterparty, automatically be deemed assumed by Merchant and sold, assigned, or otherwise transferred to the purchasers, assignees, or other transferees identified in the Lease/Contract Assumption Notice pursuant to sections 363 and 365 of the Bankruptcy Code, without further order of the Bankruptcy Court or further action by any person or entity, and (c) if an objection to the proposed assumption and assignment of a Lease or Contract is timely received, such Lease or Contract shall not be assumed or assigned until such objection is resolved by agreement of the applicable counterparty or order of the Bankruptcy Court.

(e)     The designee under any Lease/Contract Assumption Notice shall be required, if requested by the applicable counterparty, to provide adequate assurance of future performance with respect to such Lease or Contract if the applicable counterparty so requests. Merchant shall have no responsibility for any cure amounts with respect to any Lease or Contract assumption and assignment.

15.2    Asset Designation Rights

(a)     Upon the occurrence of the Closing, Agent shall have the exclusive right to market and sell, and/or otherwise designate the purchasers, transferees, and/or assignees of (which may in certain circumstances be Agent, any of the entities comprising Agent, any of their respective affiliates, and/or a new entity created by any of the foregoing), any or all of the Assets free and clear of all liens, claims, and encumbrances thereon (other than Permitted Encumbrances), without further order of the Bankruptcy Court (the "Asset Designation Rights").  Agent is authorized to execute, in the name of and as agent for Merchant, any and all deeds, bills of sale, and other instruments or documents necessary to effectuate the sale, transfer, or other conveyance of any of the Assets, none of which instruments or documents shall require Merchant to incur any obligations or other liabilities beyond the terms of this Agreement.

36

(b)        Pursuant to the Approval Order, the sale or other conveyance of any Assets reflected in Asset Designation Notices filed in the Bankruptcy Cases from time to time by Agent shall be automatically effective on the date reflected in the applicable Asset Designation Notice and subject to the satisfaction of any closing conditions reflected therein, and the sale, transfer, or other conveyance of such Assets shall be free and clear of all liens, claims, and encumbrances (other than Permitted Encumbrances) without further order of the Bankruptcy Court; provided, however, that nothing in the Approval Order shall inhibit the ability of Agent to seek other or further orders of the Court in connection with the sale or other disposition of any Assets.

(c)        The costs of maintaining the Assets available for marketing and sale shall constitute Expenses.  All costs of effectuating assumption and assignment shall be deemed an Expense hereunder.

15.3        Agent Dropout Rights.  At any time prior to the expiration of the Lease Designation Rights Termination Date or the Asset Designation Rights Termination Date (as applicable), Agent shall have the right, upon five (5) days' written notice (the "Dropout Notice Period"), which right may be exercised at any time and from time to time in Agent's sole and absolute discretion, to provide notice to Merchant (each such notice, a "Dropout Notice") of Agent's election to discontinue its efforts to market and attempt to sell, assign, transfer, license, designate the acquirer or purchaser, or otherwise dispose of any Asset (each, a "Dropout Asset" and, collectively, the "Dropout Assets").  Upon the effective date of any Dropout Notice, (i) Agent shall have no further obligation or liability with respect to the subject Dropout Asset, and (ii) Merchant shall thereafter be solely responsible for all such Dropout Asset(s) from and after the effective date of the Dropout Notice.  Upon expiration of the Dropout Notice Period, all rights to the Dropout Assets shall revert to Merchant, and Merchant may dispose of such Dropout Asset in such manner as Merchant may elect, and one hundred percent (100%) of all proceeds realized upon a disposition of such Dropout Asset shall be the exclusive property of Merchant (and shall not constitute Proceeds).  The delivery of a Dropout Notice shall not result in a reduction of the Purchase Price payable hereunder.  Prior to the expiration of the Dropout Notice Period, the Agent, in its sole and absolute discretion, may withdraw any Dropout Notice upon written notice to Merchant.  Effective upon the occurrence of the Asset Designation Rights Termination Date, and without any further act by or on behalf of the Agent (such date, the "Deemed Drop Out Date"), Agent shall be deemed to have provided Merchant with a Dropout Notice (the "Deemed Drop Out Notice") for all remaining Assets (other than Assets that were subject to a prior Asset Designation Notice, which Deemed Drop Out Notice shall be deemed effective as of the Deemed Drop Out Date).

## Section 16.  **Miscellaneous**.

16.1        Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers.  Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to the Closing) of the Parties set forth in this Agreement or in any other Agency Document, will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing.  Each covenant and agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms,

and if no term is specified, then for five years following the Closing, and nothing in this Section 16.1 will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement.

16.2        Expenses.  Except with respect to the expense reimbursement provided for in Section 16.19 herein, whether or not the Closing takes place, except as otherwise provided herein, all fees, costs and expenses (including fees, costs and expenses of representatives) incurred in connection with the negotiation of this Agreement, the performance of this Agreement and the other Agent Documents and the consummation of the transactions contemplated by this Agreement will be paid by the Party incurring such fees, costs and expenses.

16.3        Notices.  All notices and communications provided for pursuant to this Agreement shall be in writing and sent by electronic mail and will be deemed to have been given (a)  when personally delivered, (b) when transmitted by electronic mail (having obtained electronic delivery confirmation thereof), if delivered by 5:00 P.M. local time of the recipient on a business day and otherwise on the following business day, (c) the day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third business day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective Party at the number, electronic mail address or street address, as applicable, set forth below, or at such other number, electronic mail address or street address as such Party may specify by written notice to the other Party:

**If to Merchant:**

JOANN Inc.
5555 Darrow Rd.
Hudson, Ohio 44236
Attn:   Ann Aber
Email: ann.aber@joann.com

*With copies (which shall not constitute notice) to*:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attn:   Joshua A. Sussberg, P.C. and Aparna Yenamandra, P.C.
Email: joshua.sussberg@kirkland.com; aparna.yenamandra@kirkland.com

-and-

Kirkland & Ellis LLP
333 West Wolf Point Plaza
Chicago, Illinois 60654
Attn:   Anup Sathy, P.C; Jeffrey Michalik; and Lindsey Blumenthal
Email: anup.sathy@kirkland.com; jeff.michalik@kirkland.com; and
          lindsey.blumenthal@kirkland.com

38

**If to Agent:**

GA Joann Retail Partnership, LLC
c/o GA Group
30870 Russell Ranch Road, Suite 250
Westlake Village, CA 91362
Attention: Scott K. Carpenter and Tim Shilling
Tel: (818) 746-9309
scarpenter@brileyfin.com; tshilling@brileyfin.com;
legal@brileyfin.com

*With copies (which shall not constitute notice) to:*

Lowenstein Sandler LLP
One Lowenstein Drive
Roseland, NJ 07068
Attention:  Andrew Behlmann
Tel: (973) 597-2332
abehlmann@lowenstein.com

16.4        Governing Law/Exclusive Jurisdiction.

(a)        Jurisdiction and Exclusive Venue.  Each of the Parties irrevocably agrees that any Action of any kind whatsoever, including a counterclaim, cross-claim, or defense, regardless of the legal theory under which any liability or obligation may be sought to be imposed, whether sounding in contract or in tort or under statute, or whether at law or in equity, or otherwise under any legal or equitable theory, that may be based upon, arising out of, or related to this Agreement or the negotiation, execution, or performance of this Agreement or the Transactions and any questions concerning the construction, interpretation, validity and enforceability of this Agreement (each, an "Agreement Dispute") brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the Court of Chancery of the State of Delaware (or if such court lacks jurisdiction, any other state or federal court sitting in the State of Delaware) (the "Chosen Courts"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any Agreement Dispute.  Each of the Parties agrees not to commence any Agreement Dispute except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order, decree or award rendered by any Chosen Courts, and no Party will file a motion to dismiss any Agreement Dispute filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of forum non conveniens.  The Parties irrevocably agree that venue would be proper in any of the Chosen Court, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of any Agreement Dispute.  Each of the Parties further irrevocably and unconditionally consents to service of process in the

manner provided for notices in <u>Section 10.3</u>. Nothing in this Agreement will affect the right of any Party to serve process in any other manner permitted by Law.

(b)     <u>Governing Law; Waiver of Jury Trial</u>.  Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement and any Agreement Dispute will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

(c)     EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY AGREEMENT DISPUTE IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY AGREEMENT DISPUTE. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH AGREEMENT DISPUTE WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY AGREEMENT DISPUTE, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 16.4(c)</u>.

16.5     <u>Amendments</u>.  This Agreement may not be modified except in a written instrument executed by all of the Parties.

16.6     <u>No Waiver</u>.  No consent or waiver by any Party, express or implied, to or of any breach or default by the other in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other Party of the same or any other obligation of such Party.  Failure on the part of any Party to complain of any act or failure to act by the other Party or to declare the other Party in default, irrespective of how long such failure continues, shall not constitute a waiver by such Party of its rights hereunder.

16.7     <u>Currency</u>.  All reference to dollars in this Agreement and all schedules, exhibits, and ancillary documents related to this Agreement shall refer to U.S. dollars.

16.8     <u>Successors and Assigns</u>.  This Agreement shall inure to the benefit of and be binding upon Agent and, subject to entry and the terms of the Approval Order, Merchant and their respective successors and assigns, including, but not limited to, any chapter 11 or chapter 7 trustee; <u>provided</u>, <u>however</u>, that this Agreement may not be assigned by any of the Parties without the prior written consent of the other; <u>provided further</u>, <u>however</u>, that notwithstanding the foregoing, Agent may collaterally assign its interest in this Agreement to its lenders, but no such assignment shall relieve Agent from its obligations or liabilities under this Agreement.

16.9         Third Party Beneficiaries.  Except as otherwise expressly provided herein, nothing expressed or referred to in this Agreement will be construed to give any Person other than (i) for purposes of Section 16.10, the Non-Recourse Persons, and (ii) the Parties hereto and such permitted assigns, any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

16.10         Non-Recourse.  This Agreement may only be enforced against, and any Action based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement.  Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or advisor of any Party (each, a "Non-Recourse Person") will have any liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or liabilities of any of the parties to this Agreement or for any Agreement Dispute and (ii) in no event shall any Party have any shared or vicarious liability, or otherwise be the subject of legal or equitable claims, for the actions or omissions (including through equitable claims (such as unjust enrichment) not requiring proof of wrongdoing committed by the subject of such claims) of any other Person, and each of such Persons are intended third party beneficiaries of this Section 16.10 and shall be entitled to enforce this Section 16.10 as if a party directly hereto.

16.11         Construction.  The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Person.  The headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and will in no way restrict or otherwise modify any of the terms or provisions hereof.

16.12         No Right of Set-Off.  Agent, on its own behalf and on behalf itself and its Affiliates and representatives and its and their respective successors and permitted assigns, hereby waives any rights of set-off, netting, offset, recoupment or similar rights that any of them has or may have with respect to the payment of the Debt Payoff or Wind-Down Payments or any other payments to be made by Agent pursuant to this Agreement or any other document or instrument delivered by Agent in connection herewith.

16.13         Fiduciary Obligations.   Nothing in this Agreement, or any document related to the Transactions, will require Merchant or any of its Affiliates or any of their respective managers, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations or applicable law.

16.14         Execution in Counterparts.  This Agreement may be executed in one or more counterparts.  Each such counterpart shall be deemed an original, but all such counterparts together shall constitute one and the same agreement.  This Agreement, to the extent signed and delivered by means of a facsimile machine, electronic mail, or other electronic transmission in which the actual signature is evident, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of any Party, each other

Party shall re-execute original forms hereof and deliver them to all other Parties. No Party shall raise the use of a facsimile machine, electronic mail, or other electronic transmission in which the actual signature is evident to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine, electronic mail or other electronic transmission in which the actual signature is evident as a defense to the formation of a contract and each Party forever waives such defense. In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the Party against which enforcement is sought.

16.15     Section Headings. The headings of sections of this Agreement are inserted for convenience only and shall not be considered for the purpose of determining the meaning or legal effect of any provisions hereof.

16.16     Wiring of Funds. All amounts required to be paid under any provision of this Agreement shall be made by wire transfer of immediately available funds no later as 2:00 p.m. (Eastern Time) on the date that such payment is due, so long as all information necessary to complete the wire transfer has been received by the payor by 10:00 a.m. (Eastern Time) on the date that such payment is due. In the event that the date on which any such payment is due is not a business day, then such payment shall be made by wire transfer on the next business day.

16.17     Nature of Remedies. No failure to exercise and no delay in exercising, on the part of Agent, any right, remedy, power, privilege or adjustment hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, privilege, or adjustment hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, privilege, or adjustment.

16.18     Entire Agreement. This Agreement contains the entire agreement between the Parties with respect to the transactions contemplated hereby and supersedes and cancels all prior agreements, including, but not limited to, all proposals, letters of intent or representations, written or oral, with respect thereto. In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.

16.19     Bidding and Auction. On the first business day following the entry of the Approval Order and consummation of the transactions contemplated by this Agreement or the date on which Agent has received documentation of all of the Stalking Horse Bidder (as defined in the Bid Procedures Order)'s expenditures described in this Section 16.19, whichever is later, Agent shall pay to or for the benefit of the Stalking Horse Bidder an expense reimbursement of (x) up to $500,000 to cover its reasonable out-of-pocket costs and expenses associated with due diligence and professionals' fees and expenses associated with, among other things, negotiating, drafting, and obtaining approval of the Stalking Horse Agreement (as defined in the Bid Procedures Order),

and (y) up to $1,600,000 for any actual, reasonable costs incurred by the Stalking Horse Bidder to acquire signage for the Sale (together (x) and (y), the "Expense Reimbursement").

16.20     Potential Joint Ventures.  Agent shall have the right, in its sole discretion, to form a contractual joint venture with additional entities to serve as "Agent" hereunder as to this Agreement.  However, GA Joann Retail Partnership, LLC shall remain liable for all liabilities and obligations of Agent hereunder.

16.21     Certain Definitions.

(a)     "Action" means any action, suit, litigation, arbitration, mediation, audit, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding) or prosecution, of any kind whatsoever, whether sounding in contract or tort, or whether at law or in equity, or otherwise under any legal or equitable theory, commenced, brought, conducted or heard by or before any governmental body.

(b)     "Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management, affairs and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

(c)     "Contract" means Merchant's right, title, and interest in and to executory contracts (together with all amendments, extensions, modifications, and other material documents related thereto).

(d)     "Excluded Assets" means:

(i)     all documents prepared or received by Merchant or any of its affiliates or on their behalf in connection with the sale of the Assets, this Agreement or the other Agency Documents, the transactions contemplated by this Agreement, or the Bankruptcy Case, including (a) all records and reports prepared or received by Merchant or any of its Affiliates or representatives in connection with the sale of the Assets or the transactions contemplated by this Agreement, including all analyses relating to the business of Merchant or any of its Affiliates so prepared or received, (b) all bids and expressions of interest received from third parties with respect to the acquisition of any of Merchant's or any of its Affiliates' businesses or assets, (c) all privileged materials, documents and records of Merchant or any of its Affiliates, (d) copies of the documents, materials and data related to liabilities prior to the Closing, (e) confidentiality agreements with prospective purchasers of the Assets, and (f) any other files or records to the extent relating to any Excluded Assets or liabilities or the Bankruptcy Case;

(ii)     all current and prior insurance policies or employee benefit plans of Merchant or any of its Affiliates, including for the avoidance of doubt all director and officer insurance policies, and all rights and benefits of any nature of Merchant or any of its Affiliates with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries;

(iii)    all equity interests;

(iv)    Merchant's claims, causes of action or other rights under this Agreement, including the Purchase Price, or any agreement, certificate, instrument, or other document executed and delivered between Merchant or its Affiliates and Agent or any of its Affiliates or designees in connection with the transactions contemplated by this Agreement, or any other agreement between Merchant or any of its Affiliates and Agent or any of its Affiliates or designees entered into on or after the date hereof;

(v)    the Funded Reserve Account, as defined in the Cash Collateral Order;

(vi)    all liabilities or other amounts owing from Merchant or any of its Affiliates;

(vii)    all IT Systems; and

(viii)    tax attributes of Merchant and its Affiliates other than those transferring to Agent by operation of applicable tax law, and, for the avoidance of doubt, other than the proceeds of any tax refunds or credits of Merchant and its Affiliates realized in cash or by reduction of a cash tax liability in lieu of cash that otherwise could have been received.

(e)    "IP Rights" means all intellectual property rights throughout the world including all U.S. and foreign rights in any of the following: (a) patents, patent applications, patent disclosures and inventions (whether or not protectable under patent law), together with all reissues, continuations, continuations-in-part, revisions, divisionals, extensions, and reexaminations in connection therewith; (b) trademarks, service marks, trade names (in each case, whether registered or unregistered), domain names, logos, design rights, corporate names, and registrations and applications for registration thereof and goodwill associated with any of the foregoing (collectively, "Trademarks"); (c) copyrights and copyrightable works (registered or unregistered) and registrations and applications for registration thereof; (d) computer programs (whether in source code, object code, or other form), computer software, firmware, data, databases, and rights therein, and all documentation, including user manuals and training materials, programmers' annotations, notes, and other work product used to design, plan, organize, maintain, support or develop, or related to any of the foregoing (collectively, "Software"); (e) confidential and proprietary information, trade secrets and know-how, and all other inventions, proprietary processes, formulae, models, and methodologies (collectively, together with Software, "Trade Secrets"); (f) all customer information, customer lists, and related documentation and information; and (g) all rights and remedies (including the right to sue for and recover damages) against past, present, and future infringement, misappropriation, or other violation relating to any of the foregoing.

(f)    "IT Systems" means all (i) Software, computers, computer systems, servers, hardware, telecommunications and network equipment firmware, middleware, websites, databases, networks, servers, workstations, routers, hubs, switches, data communication equipment and lines, telecommunications equipment and lines, co-location facilities and equipment, and all other information technology equipment and related items of automated,

computerized or software systems, including any outsourced systems and processes and the data transmitted thereby or thereon, in each case owned, leased or licensed by Merchant or used in or relied on in connection with the business of Merchant.

(f)     "Permitted Encumbrances" means (i) encumbrances for utilities and taxes not yet due and payable, or that are being contested in good faith, or the nonpayment of which is permitted or required by the Bankruptcy Code, (ii) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments that do not, individually or in the aggregate, adversely affect the operation of the Assets and, in the case of the Leases, that do not, individually or in the aggregate, adversely affect the use or occupancy of the respective leased real property, (iii) applicable zoning laws, building codes, land use restrictions and other similar restrictions imposed by law, (iv) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the ordinary course for amounts not yet due and payable or that are being contested by appropriate proceedings, (v) real estate taxes, assessments and other governmental levies, fees or charges imposed with respect to real property which are not yet due or that are being contested in good faith, (vi) licenses granted on a non-exclusive basis, and (vi) solely prior to Closing, any encumbrances that will be removed or released by operation of the Approval Order.

(g)     "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, organization, estate, governmental body or other entity or group.

(h)     "Proceeds" means all proceeds (cash or otherwise, including payments from insurance on the Assets or Merchandise) of or from any of the Assets or Additional Agent Merchandise except as otherwise set forth in this Agreement and exclusive of amounts to pay Sales Taxes, including but not limited to all Proceeds arising from the sale, lease, licensing, assignment, or other disposition of any of the Assets and all service or other revenue received in the Stores.

(i)     "Related Party" means each of, and in each case in its capacity as such, current: directors, managers, officers, committee members, members of any governing body, equity holders (regardless of whether such interests are held directly or indirectly), subsidiaries, Affiliates, employees, financial advisors, attorneys (including any other attorneys or professionals retained by any current director or manager in his or her capacity as director or manager of an Entity), investment bankers, representatives, and other professionals and advisors.

(j)     "Term Loan Ad Hoc Group Advisors" means Gibson, Dunn & Crutcher LLP, Glenn Agre Bergman & Fuentes LLP, and Morris, Nichols, Arsht & Tunnell LLP.

16.22     Rules of Interpretation.  Unless otherwise expressly provided in this Agreement, the following will apply to this Agreement, the Schedules and any other certificate, instrument, agreement or other document contemplated hereby or delivered hereunder.

(a)     The terms "hereof," "herein" and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement, section, clause, schedule and exhibit references contained in this Agreement are references to sections, clauses, schedules and exhibits in or to this Agreement, unless otherwise specified.  All

45

Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(b)     Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed (even if not actually followed) by the words "without limitation." Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

(c)     The words "to the extent" shall mean "the degree by which" and not simply "if."

(d)     When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a business day, the period in question will end on the next succeeding business day.

(e)     Words denoting any gender will include all genders, including the neutral gender. Where a word is defined herein, references to the singular will include references to the plural and vice versa.

(f)     The word "will" will be construed to have the same meaning and effect as the word "shall". The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

(g)     All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(h)     Any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived.

(i)     Any reference to any particular Bankruptcy Code or Tax Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; provided that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Bankruptcy Code or Tax Code section or Law, the reference to such Bankruptcy Code or Tax Code section or Law means such Bankruptcy Code or Tax Code section or Law as in effect at the time of such violation or noncompliance or alleged violation or non-compliance.

(j)     A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and assigns, but only if such successors and assigns are not prohibited by this Agreement.

(k)     A reference to a Person in a particular capacity excludes such Person in any other capacity or individually.

*[signature pages follow]*

IN WITNESS WHEREOF, each Party hereby executes this Agreement by their respective duly authorized representatives as a sealed instrument as of the day and year first written above.

**Merchant:**

**JOANN INC.**

By: _Jeffrey Dwyer_ _____

Name: Jeff Dwyer

Title: Interim Chief Financial Officer

*[Signature Page to Agency Agreement]*

**Agent:**

GA JOANN RETAIL PARTNERSHIP, LLC

By: _Scott Carpenter_____

Name: Scott K. Carpenter

Title: CEO

*[Signature Page to Agency Agreement]*

**<u>Term Agent</u>:**

WILMINGTON SAVINGS FUND SOCIETY, FSB

By:_____
Name:  Craig Cramer
Title:    Trust Officer

## **List of Exhibits**

Exhibit 1(a)(1)        Stores
Exhibit 1(a)(2)        Distribution Centers
Exhibit 2(b)(iv)       Form of Asset Designation Notice
Exhibit 3.1(b)         Wind-Down Budget
Exhibit 3.1 (c)        Central Services Budget
Exhibit 3.1(e)         Term Loan Ad Hoc Group Direction Letter
Exhibit 8.1            Sale Guidelines
Exhibit 11.2(m)        Promotional Calendar

## Annex 1

JOANN INC.
Creative Tech Solutions LLC
Creativebug, LLC
Dittopatterns LLC
JAS Aviation, LLC
JOANN Ditto Holdings Inc.
JOANN Holdings 1, LLC
JOANN Holdings 2, LLC
Jo-Ann Stores, LLC
Jo-Ann Stores Support Center, Inc.
joann.com, LLC
Needle Holdings, LLC
WeaveUp, Inc.

**Exhibit 1(a)(1)**

**<u>Stores</u>**

# Joann
## Store List
### Exhibit 1 (a) (1)

| Str | Name/Mall | Address | City | ST | Zip | Selling S.F. |
|---|---|---|---|---|---|---|
| 102 | Seven Corners Center | 6320 Seven Corners Ctr | Falls Church | VA | 22044 | 13,824 |
| 106 | Diamond Square S/C | 2A Bureau Dr | Gaithersburg | MD | 20878 | 15,000 |
| 107 | Middleton Market Place | 232A South Main St | Middleton | MA | 01949 | 18,500 |
| 112 | Tamal Vista Blvd. | 245 Tamal Vista Blvd | Corte Madera | CA | 94925 | 12,450 |
| 123 | Beltway Plaza Mall | 6200 Greenbelt Rd | Greenbelt | MD | 20770 | 14,000 |
| 132 | Hooksett Village Shops | 1328 Hooksett Rd | Hooksett | NH | 03106 | 12,500 |
| 135 | Flagler Park Plaza | 8257 W Flagler St | Miami | FL | 33144 | 12,016 |
| 138 | Rivercrest Centre | 4917 Cal Sag Rd | Crestwood | IL | 60445 | 14,000 |
| 140 | Danada Square West S/C | 36 Danada Sq W | Wheaton | IL | 60189 | 12,629 |
| 145 | Macarthur Towne Center | 2570 Macarthur Rd Ste 12 | Whitehall | PA | 18052 | 31,000 |
| 153 | Salisbury Plaza | 580 Old Country Rd | Westbury | NY | 11590 | 15,574 |
| 154 | Industrial Drive | 3620 Industrial Dr | Santa Rosa | CA | 95403 | 15,000 |
| 168 | Creekside Plaza | 1830 E Parks Hwy Ste A122 | Wasilla | AK | 99654 | 12,243 |
| 171 | Darrow Road | 5381 Darrow Rd | Hudson | OH | 44236 | 46,700 |
| 172 | Town & Country S/C | 1015 S Broadway | Minot | ND | 58701 | 11,981 |
| 173 | Merchants Crossing S/C | 15201 N Cleveland Ave Ste 400 | Fort Myers | FL | 33903 | 16,000 |
| 176 | Oak Valley Center | 2897 Oak Valley Dr | Ann Arbor | MI | 48103 | 12,750 |
| 177 | Dartmouth Town Ctr | 454 State Rd | North Dartmouth | MA | 02747 | 12,000 |
| 181 | Parkview Plaza | 838 Plaza Blvd | Lancaster | PA | 17601 | 17,014 |
| 206 | Queensbury Plaza | 756 Upper Glen St Ste 15 | Queensbury | NY | 12804 | 15,260 |
| 221 | Great Southern S/C | 1155 Washington Pike | Bridgeville | PA | 15017 | 22,461 |
| 224 | Pullman Square | 160 Pullman Sq | Butler | PA | 16001 | 16,905 |
| 227 | Lima Center | 2720 Elida Rd | Lima | OH | 45805 | 16,608 |
| 236 | Suburban Plaza | 505 Benner Pike | State College | PA | 16801 | 16,960 |
| 245 | Annapolis Plaza | 150 Jennifer Rd Ste C | Annapolis | MD | 21401 | 10,562 |
| 257 | Great South Bay S/C | 735 W Montauk Hwy | West Babylon | NY | 11704 | 18,469 |
| 266 | Newington Park | 2064 Woodbury Ave Ste 302 | Newington | NH | 03801 | 22,500 |
| 279 | Southland Plaza | 2576 S Main St | Adrian | MI | 49221 | 12,103 |
| 284 | St Clair Plaza | 15765 State Route 170 Ste 1 | East Liverpool | OH | 43920 | 12,000 |
| 289 | Green Mountain S/C | 308 Us Route 7 S | Rutland Town | VT | 05701 | 16,800 |
| 292 | Dalton Ave Plaza | 457 Dalton Ave | Pittsfield | MA | 01201 | 12,000 |
| 294 | Northwest Plaza | 1910 N Saginaw Rd | Midland | MI | 48640 | 15,000 |
| 301 | Chautauqua Mall | 318 E Fairmount Ave Rm 106 | Lakewood | NY | 14750 | 11,612 |
| 305 | Felch Street Plaza | 12635 Felch St Ste 60 | Holland | MI | 49424 | 15,194 |
| 306 | Grosse Pointe Farms | 18850 Mack Ave | Grosse Pointe | MI | 48236 | 17,000 |
| 308 | Springfield Plaza S/C | 1608J Upper Valley Pike Ste C9 | Springfield | OH | 45504 | 12,800 |
| 309 | Potter Village | 1212 Oak Harbor Rd | Fremont | OH | 43420 | 13,120 |
| 312 | North Lakeland Plaza | 4241 Us Highway 98 N | Lakeland | FL | 33809 | 19,100 |
| 319 | East Town Plaza | 2021 Zeier Rd | Madison | WI | 53704 | 20,000 |
| 324 | Silver Nail S/C | 2020 Silvernail Rd | Pewaukee | WI | 53072 | 10,462 |
| 328 | Five Points Mall | 1129 N Baldwin Ave Ste 32 | Marion | IN | 46952 | 11,160 |
| 329 | Topsham Fair Mall | 49 Topsham Fair Mall Rd Ste 17 | Topsham | ME | 04086 | 17,900 |
| 333 | Lakewood Plaza | 4387 Commercial Way | Spring Hill | FL | 34606 | 14,000 |
| 348 | Bear Point Plaza | 2686 Us Highway 23 S | Alpena | MI | 49707 | 13,000 |
| 351 | Twenty-Fourth Avenue | 4405 24Th Ave | Fort Gratiot | MI | 48059 | 20,000 |
| 354 | Kent Hill Plaza | 25810 104Th Ave Se | Kent | WA | 98030 | 18,067 |
| 358 | Riverside Plaza | 162 Clinton St # 2 | Cortland | NY | 13045 | 14,132 |
| 363 | Memorial Bridge Plaza | 2311 Ohio Ave Unit C | Parkersburg | WV | 26101 | 14,000 |
| 372 | South Park Plaza | 18921 Park Avenue Plz | Meadville | PA | 16335 | 18,000 |
| 378 | Hollywood City Center | 282 S Hollywood Blvd | Steubenville | OH | 43952 | 15,800 |
| 379 | Reynolds Plaza | 2559 S Reynolds Rd | Toledo | OH | 43614 | 17,193 |
| 384 | Zane Plaza | 1080 N Bridge St | Chillicothe | OH | 45601 | 10,032 |
| 387 | Dubois Mall | 5456 Shaffer Rd | Du Bois | PA | 15801 | 18,000 |
| 395 | Westminster S/C | 20 Englar Rd | Westminster | MD | 21157 | 14,000 |
| 403 | Hanover Commons | 1302 Washington St | Hanover | MA | 02339 | 13,280 |
| 408 | Worcester Road | 244 Worcester Rd | Natick | MA | 01760 | 20,300 |
| 410 | Jfk Mall | 180 Jfk Plz | Waterville | ME | 04901 | 12,500 |
| 414 | East Bay Plaza | 724 Munson Ave | Traverse City | MI | 49686 | 22,606 |

# Joann
## Store List
### Exhibit 1 (a) (1)

| Str | Name/Mall | Address | City | ST | Zip | Selling S.F. |
|-----|-----------|---------|------|----|----|-------------|
| 417 | Tri-County Plaza | 1500 Canton Rd | Akron | OH | 44312 | 13,600 |
| 418 | Milford Plaza | 91 Medway Rd Ste#3 | Milford | MA | 01757 | 23,250 |
| 429 | Pine Tree S/C | 1064 Brighton Ave | Portland | ME | 04102 | 21,025 |
| 431 | Patuxent Crossing | 22576 Macarthur Blvd Ste 300 | California | MD | 20619 | 14,058 |
| 455 | Niagara Square | 2429 Military Rd | Niagara Falls | NY | 14304 | 13,001 |
| 461 | The Shoppes at Dove Creek | 4908 State Hwy 30  Ste#8 | Amsterdam | NY | 12010 | 14,000 |
| 472 | Westford Valley Mkt | 174 Littleton Rd | Westford | MA | 01886 | 11,620 |
| 473 | Bonaventure Plaza | 1635 Plymouth Rd | Minnetonka | MN | 55305 | 18,000 |
| 477 | Shaw'S Plaza | 300 New State Hwy | Raynham | MA | 02767 | 15,775 |
| 480 | South End S/C | 1109 Maryland Ave | Hagerstown | MD | 21740 | 17,344 |
| 485 | Summit Town Center | 7200 Peach St Unit 150 | Erie | PA | 16509 | 15,000 |
| 492 | Majestic Square | 2950 Center Ave | Essexville | MI | 48732 | 14,672 |
| 495 | Lincoln Way East S/C | 1678 Lincoln Way E # 7 | Chambersburg | PA | 17201 | 12,432 |
| 498 | Toy'S R'Us Plaza | 6151 S Westnedge Ave | Portage | MI | 49002 | 20,016 |
| 503 | Quincy Mall | 425 N 32Nd St | Quincy | IL | 62301 | 15,193 |
| 506 | Lafayette Center | 448 Pike St | Marietta | OH | 45750 | 9,000 |
| 507 | West Side Mall | 150 W Side Mall Ste 150 | Edwardsville | PA | 18704 | 24,000 |
| 511 | Millwood Pike | 1092 Millwood Pike | Winchester | VA | 22602 | 13,440 |
| 516 | Plaza 41 (Former Holz Haus) | 2725 West 41St Street | Sioux Falls | SD | 57105 | 21,110 |
| 518 | Division Street Plaza | 3332 W Division St | Saint Cloud | MN | 56301 | 20,600 |
| 521 | University Plaza S/C | 1332 E Main St | Carbondale | IL | 62901 | 12,004 |
| 523 | Edgewood Plaza | 1216 N Memorial Dr | Lancaster | OH | 43130 | 15,000 |
| 525 | Northwest Plaza | 1625 W Mcgalliard Rd | Muncie | IN | 47304 | 18,000 |
| 526 | Commerce Square | 45 Hinesburg Rd | South Burlington | VT | 05403 | 19,560 |
| 527 | Eagle Center | 1920 N Henderson St | Galesburg | IL | 61401 | 14,040 |
| 539 | New Towne Centre | 44740 Ford Rd | Canton | MI | 48187 | 35,303 |
| 545 | Festival At Hamilton S/C | 3926 Festival At Hamilton | Mays Landing | NJ | 08330 | 11,910 |
| 551 | Mercer On One | 3371 Brunswick Ave | Lawrenceville | NJ | 08648 | 18,115 |
| 557 | Soldotna Plaza | 35535 Kenai Spur Hwy | Soldotna | AK | 99669 | 12,525 |
| 566 | Lake Park S/C | 4333 Franklin St | Michigan City | IN | 46360 | 15,000 |
| 569 | Fletcher Square | 9 Fletcher Sq | Dunbar | WV | 25064 | 17,211 |
| 573 | Wal-Mart Plaza | 3527 E Main St | Richmond | IN | 47374 | 13,600 |
| 583 | JOANN Fabrics Plaza | 10875 Caribbean Blvd | Miami | FL | 33189 | 19,557 |
| 593 | Shrewsbury Plaza | 1026 Broad St | Shrewsbury | NJ | 07702 | 15,000 |
| 603 | Beavercreek Towne Centre | 2850 Centre Dr Ste G | Fairborn | OH | 45324 | 19,800 |
| 605 | Portal Plaza | 19765 Stevens Creek Blvd | Cupertino | CA | 95014 | 17,614 |
| 607 | Whitehall Plaza | 3483 W 3Rd St | Bloomington | IN | 47404 | 28,365 |
| 608 | Shiloh Springs Plaza | 5001 Salem Ave | Dayton | OH | 45426 | 18,172 |
| 615 | Norriton Square S/C | 45 E Germantown Pike | Norristown | PA | 19401 | 12,250 |
| 630 | Centre At Dover | 283 N Dupont Hwy Ste F | Dover | DE | 19901 | 11,602 |
| 631 | Wegmans Plaza | 2157 Penfield Rd | Penfield | NY | 14526 | 15,675 |
| 633 | Mcminnville Town Ctr | 1401 N Highway 99W | Mcminnville | OR | 97128 | 12,000 |
| 640 | Lavala Plaza S/C | 1313 National Hwy | Lavale | MD | 21502 | 9,000 |
| 644 | Cedar Crest Sq S/C | 1860 Quentin Rd | Lebanon | PA | 17042 | 14,000 |
| 645 | Kingston Plaza | 1385 Ulster Ave | Kingston | NY | 12401 | 14,678 |
| 653 | Columbia Junction Mall | 2781 32Nd Ave S | Grand Forks | ND | 58201 | 12,000 |
| 665 | Wilshire Plaza | 5612 Grape Rd | Mishawaka | IN | 46545 | 21,690 |
| 683 | Tri-County Plaza | 360 Tri County Ln | Belle Vernon | PA | 15012 | 10,560 |
| 690 | Madison Place S/C | 32065 John R Rd | Madison Heights | MI | 48071 | 35,861 |
| 692 | Regency Mall | 1570 Oakland Ave | Indiana | PA | 15701 | 14,965 |
| 697 | Irongate Mall | 990 W 41St St Ste 2 | Hibbing | MN | 55746 | 15,750 |
| 701 | Clinton Commons S/C | 274 E Main St | Clinton | CT | 06413 | 10,000 |
| 728 | Rivers Edge Mall | 401 Bernard St | Watertown | WI | 53094 | 11,300 |
| 730 | South El Camino Real | 1948 S El Camino Real | San Mateo | CA | 94403 | 14,008 |
| 733 | Bloomfield Village Sq | 4107 Telegraph Rd | Bloomfield Hills | MI | 48302 | 28,000 |
| 736 | Capitol Plaza | 1802 Thomasville Rd | Tallahassee | FL | 32303 | 18,765 |
| 753 | Lapeer S/C | 1865 W Genesee St | Lapeer | MI | 48446 | 12,650 |
| 772 | Village Market Place | 365 E Burleigh Blvd | Tavares | FL | 32778 | 20,306 |

# Joann
## Store List
### Exhibit 1 (a) (1)

| Str | Name/Mall | Address | City | ST | Zip | Selling S.F. |
|-----|-----------|---------|------|----|----|--------------|
| 777 | Middlesex Commons | 43 Middlesex Tpke | Burlington | MA | 01803 | 15,000 |
| 783 | Tieton Village S/C | 3702 Tieton Dr | Yakima | WA | 98902 | 22,500 |
| 784 | Five Mile S/C | 1840 W Francis Ave | Spokane | WA | 99205 | 28,000 |
| 789 | Cascade Plaza | 7601 Evergreen Way | Everett | WA | 98203 | 19,284 |
| 791 | Holiday Village | 1900 Brooks St | Missoula | MT | 59801 | 24,265 |
| 792 | Bi-Mart Plaza | 2248 Santiam Hwy Se | Albany | OR | 97322 | 13,500 |
| 793 | Northeast Sunset Blvd. | 2823 Ne Sunset Blvd | Renton | WA | 98056 | 15,804 |
| 794 | High Point S/C | 1029 Bethel Ave | Port Orchard | WA | 98366 | 12,648 |
| 796 | Federal Way Plaza | 3275 S Federal Way | Boise | ID | 83705 | 16,000 |
| 800 | Mohawk Market Place | 2122 Marcola Rd | Springfield | OR | 97477 | 14,040 |
| 802 | Port Angeles Plaza | 150 Port Angeles Plz | Port Angeles | WA | 98362 | 14,300 |
| 805 | Aurora Ave North | 15236 Aurora Ave N | Shoreline | WA | 98133 | 22,880 |
| 810 | Gateway Square | 470 Bridge St | Clarkston | WA | 99403 | 17,089 |
| 812 | Harris Street | 510 Harris St | Eureka | CA | 95503 | 15,990 |
| 814 | Christmas Tree Promenade | 665 Iyannough Rd | Hyannis | MA | 02601 | 17,645 |
| 816 | Mariner Plaza | 224B Eglin Pkwy Ne | Fort Walton Bea | FL | 32547 | 15,750 |
| 820 | Warrenton Center | 251 W Lee Hwy Ste 659 | Warrenton | VA | 20186 | 12,000 |
| 822 | K-Mart Plaza | 228 W Main St Ste 12 | Malone | NY | 12953 | 10,408 |
| 824 | Seacoast S/C | 270 Lafayette Rd Unit 8 | Seabrook | NH | 03874 | 12,000 |
| 826 | Big Y Plaza | 433 Center St Ste B | Ludlow | MA | 01056 | 15,228 |
| 830 | Belknap Mall S/C | 12 Old State Rd | Belmont | NH | 03220 | 16,395 |
| 850 | Vacaville Commons | 2051 Harbison Dr | Vacaville | CA | 95687 | 15,052 |
| 856 | Butte Plaza Mall | 3100 Harrison Ave | Butte | MT | 59701 | 9,000 |
| 858 | Treble Cove Plaza | 199 Boston Rd | North Billerica | MA | 01862 | 12,754 |
| 862 | Packard Plaza | 5656 S Packard Ave | Cudahy | WI | 53110 | 14,310 |
| 863 | Hutchinson Mall | 1060 Highway 15 | Hutchinson | MN | 55350 | 13,060 |
| 866 | Park Plaza | 789 Hebron Rd | Heath | OH | 43056 | 15,200 |
| 870 | Miracle Village S/C | 4069 Nw Logan Rd | Lincoln City | OR | 97367 | 18,500 |
| 871 | Peninsula Boardwalk | 308 Walnut St | Redwood City | CA | 94063 | 16,336 |
| 873 | Stillwater Avenue | 710 Stillwater Ave | Bangor | ME | 04401 | 23,400 |
| 875 | Auburn Plaza | 732 Center St | Auburn | ME | 04210 | 12,189 |
| 889 | Pilgrim Place S/C | 1406 Pilgrim Lane | Plymouth | IN | 46563 | 10,048 |
| 898 | Dunning Farms S/C | 88 Dunning Rd Ste 23 | Middletown | NY | 10940 | 16,000 |
| 899 | Vincennes Plaza | 630 Niblack Blvd # 6 | Vincennes | IN | 47591 | 16,750 |
| 902 | Shops At Avenue O | 1522 3Rd St Sw | Winter Haven | FL | 33880 | 12,375 |
| 904 | Capitol S/C | 80 Storrs St Ste 5 | Concord | NH | 03301 | 18,872 |
| 915 | Cascade Square | 1324 W 6Th St | The Dalles | OR | 97058 | 12,000 |
| 920 | Skypark Plaza | 2485 Notre Dame Blvd Ste 310 | Chico | CA | 95928 | 20,664 |
| 944 | Miami Valley Crossing | 1256 E Ash St | Piqua | OH | 45356 | 27,500 |
| 957 | Four Flaggs S/C | 8245 W Golf Rd | Niles | IL | 60714 | 16,985 |
| 968 | The Greenery | 7706 N Kendall Dr | Miami | FL | 33156 | 18,490 |
| 970 | Southland Four Seasons | 513 Clairton Blvd | Pittsburgh | PA | 15236 | 18,960 |
| 975 | Springfield S/C | 594 N Lexington Springmill Rd | Mansfield | OH | 44906 | 35,000 |
| 976 | Hamden Mart S/C | 2300 Dixwell Ave | Hamden | CT | 06514 | 25,494 |
| 995 | Angola Plaza | 2010 N Wayne St Ste G | Angola | IN | 46703 | 7,500 |
| 998 | The Landings | 4934 S Tamiami Trl | Sarasota | FL | 34231 | 20,411 |
| 1001 | Shops At Soncy | 3220 S Soncy Rd | Amarillo | TX | 79124 | 30,000 |
| 1011 | Fletcher Hills Town & Country | 2756 Fletcher Pkwy | El Cajon | CA | 92020 | 27,384 |
| 1014 | Ming Retail Center | 3010 Ming Ave | Bakersfield | CA | 93304 | 20,284 |
| 1021 | Savannah Centre | 7400 Abercorn St | Savannah | GA | 31406 | 15,650 |
| 1023 | Pompano Marketplace | 1131 S Federal Hwy | Pompano Beach | FL | 33062 | 20,200 |
| 1032 | Staples Crossing S/C | 5625 S Padre Island Dr # B | Corpus Christi | TX | 78412 | 26,700 |
| 1044 | Hollywood Blvd | 4700 Hollywood Blvd | Hollywood | FL | 33021 | 19,880 |
| 1046 | Central Mall | 2259 S 9Th St Ste 38 | Salina | KS | 67401 | 16,159 |
| 1073 | Pleasant Valley S/C | 3415 Pleasant Valley Blvd, Ste 78 | Altoona | PA | 16602 | 14,220 |
| 1074 | Centrum At Crossroads | 2420 Walnut St | Cary | NC | 27518 | 24,975 |
| 1078 | Oakcreek Village S/C | 4600 Chapel Hill Blvd Ste 8 | Durham | NC | 27707 | 16,051 |
| 1089 | Tops Plaza | 2503B W State Street | Olean | NY | 14760 | 17,855 |

# Joann
## Store List
### Exhibit 1 (a) (1)

| Str | Name/Mall | Address | City | ST | Zip | Selling S.F. |
|-----|-----------|---------|------|----|----|------|
| 1094 | DW Center | 14346 Warwick Blvd Ste 480 | Newport News | VA | 23602 | 15,300 |
| 1095 | Southwest Commons | 8601 W Cross Dr Unit Sm | Littleton | CO | 80123 | 25,650 |
| 1096 | Nugget Mall | 8745 Glacier Hwy | Juneau | AK | 99801 | 22,176 |
| 1098 | Cross Creek Plaza | 1800 Skibo Rd | Fayetteville | NC | 28303 | 20,905 |
| 1102 | Dowlen Town Center | 4035 N Dowlen Road | Beaumont | TX | 77706 | 22,033 |
| 1103 | South York Crossing | 2136 S Queen St | York | PA | 17403 | 16,316 |
| 1106 | Colonia Plaza | 1272 State Rt 27 | Colonia | NJ | 07067 | 15,700 |
| 1107 | Venice Village | 4143 Tamiami Trl S Bay 20 | Venice | FL | 34293 | 10,080 |
| 1126 | Fountain S/C | 1200 Charleston Hwy | West Columbia | SC | 29169 | 15,000 |
| 1131 | West Shore Plaza | 1200 Market St | Lemoyne | PA | 17043 | 20,125 |
| 1149 | Sagamore @ 26 Shopping C | 311 Sagamore Pkwy N | Lafayette | IN | 47904 | 18,728 |
| 1152 | Los Coyotes Centers | 3588 Palo Verde Ave | Long Beach | CA | 90808 | 12,000 |
| 1185 | Gateway S/C | 153 E Swedesford Rd | Wayne | PA | 19087 | 12,000 |
| 1223 | Conejo Valley Plaza | 1516 N Moorpark Rd | Thousand Oaks | CA | 91360 | 30,000 |
| 1227 | East Mockingbird Lane | 6330 E Mockingbird Ln | Dallas | TX | 75214 | 17,959 |
| 1244 | Shady Oaks Shopping Cente | 2405 Sw 27Th Ave | Ocala | FL | 34471 | 25,304 |
| 1268 | Tejas Center | 725 E Villa Maria Rd  Ste 4100 | Bryan | TX | 77802 | 15,140 |
| 1270 | Riverdale Plaza | 1076 W Mercury Blvd | Hampton | VA | 23666 | 14,000 |
| 1288 | La Verne Plaza | 2086 Foothill Blvd Ste A | La Verne | CA | 91750 | 11,350 |
| 1291 | Village At Collin Creek | 700 Alma Dr | Plano | TX | 75075 | 25,014 |
| 1305 | Buckhorn Plaza | 6136 E Main St | Mesa | AZ | 85205 | 9,967 |
| 1309 | Pan America Plaza | 1711 E University Ave | Las Cruces | NM | 88001 | 9,550 |
| 1333 | Home Depot Plaza | 10057 Us Highway 19 | Port Richey | FL | 34668 | 35,000 |
| 1402 | Copperfield Crossing | 15520 Fm 529 Rd | Houston | TX | 77095 | 14,500 |
| 1404 | Santa Fe Square | 965 S Gilbert Rd | Mesa | AZ | 85204 | 21,638 |
| 1433 | Willowchase Center | 12918 Willow Chase Dr | Houston | TX | 77070 | 20,918 |
| 1440 | Country Side Center | 2250 Griffin Way | Corona | CA | 92879 | 20,540 |
| 1447 | Towne House Plaza | 9901 Adams Ave | Huntington Beac | CA | 92646 | 19,000 |
| 1452 | Riverwalk Shopping Plaza | 1632 S Federal Hwy | Boynton Beach | FL | 33435 | 14,938 |
| 1464 | Camino Town & Country S/C | 2227 S El Camino Real Ste C | Oceanside | CA | 92054 | 17,262 |
| 1471 | University Centre | 352 S College Rd Ste 24 | Wilmington | NC | 28403 | 14,000 |
| 1478 | The Falls Centre | 4412 Falls Of Neuse Rd Ste 101 | Raleigh | NC | 27609 | 18,250 |
| 1488 | Rockridge Plaza | 5217 82Nd St Unit 123 | Lubbock | TX | 79424 | 15,595 |
| 1495 | Hillcrest Plaza | 603 N Belt Hwy | Saint Joseph | MO | 64506 | 14,350 |
| 1511 | The Shoppes On Market | 4644 W Market St | Greensboro | NC | 27407 | 19,175 |
| 1524 | Cottonwood West Shopping ( | 10131 Coors Blvd Nw Ste D3 | Albuquerque | NM | 87114 | 16,000 |
| 1549 | Douglas Corners S/C | 9439 Highway 5 | Douglasville | GA | 30135 | 24,000 |
| 1568 | Arden Square | 3130 Arden Way | Sacramento | CA | 95825 | 19,500 |
| 1577 | Capital Mall | 3600 Country Club Dr Spc 408 | Jefferson City | MO | 65109 | 17,043 |
| 1579 | Norridge Marketplace | 4514 N Harlem Ave | Norridge | IL | 60706 | 14,558 |
| 1583 | Columbus Park Crossing | 5555 Whittlesey Blvd  Ste 2900 | Columbus | GA | 31909 | 21,000 |
| 1585 | Rib Mountain Drive | 3300 Rib Mountain Dr | Wausau | WI | 54401 | 23,000 |
| 1586 | Southland S/C | 6901 Pearl Rd | Middleburg Heig | OH | 44130 | 29,887 |
| 1588 | Quakertown Plaza | 1465 W Broad St  Ste 20 | Quakertown | PA | 18951 | 22,888 |
| 1589 | Countryside Plaza | 20 Countryside Plaza | Countryside | IL | 60525 | 26,653 |
| 1590 | Courtland Center | 4190 E Court St Ste 101 | Burton | MI | 48509 | 26,000 |
| 1591 | Sw 4Th Ave | 2255 Sw 4Th Ave | Ontario | OR | 97914 | 25,600 |
| 1592 | Medina Grande Shoppes | 5005 Grande Blvd | Medina | OH | 44256 | 24,126 |
| 1594 | Bear Creek Plaza | 1608 Anderson Rd | Petoskey | MI | 49770 | 20,026 |
| 1595 | Volusia Plaza | 2400 W International Spdwy Blvd | Daytona Beach | FL | 32114 | 22,352 |
| 1596 | Margate Shopping Center | 3340 Nw 62Nd Ave | Margate | FL | 33063 | 21,441 |
| 1598 | Village Crossroads | 540 N Us Hwy 441 | Lady Lake | FL | 32159 | 21,600 |
| 1602 | Village Square | 19 Clifton Country Rd | Clifton Park | NY | 12065 | 10,500 |
| 1603 | Poughkeepsie Plaza Mall | 2600 South Rd | Poughkeepsie | NY | 12601 | 11,370 |
| 1604 | New Hartford S/C | 120 Genesee St | New Hartford | NY | 13413 | 25,000 |
| 1607 | Ames S/C | 117 Salem Tpke | Norwich | CT | 06360 | 14,006 |
| 1609 | Hampshire Mall | 367 Russell St Ste A06 | Hadley | MA | 01035 | 15,000 |
| 1610 | Village Mall | 436 Broadway | Methuen | MA | 01844 | 14,600 |

# Joann
## Store List
### Exhibit 1 (a) (1)

| Str | Name/Mall | Address | City | ST | Zip | Selling S.F. |
|---|---|---|---|---|---|---|
| 1611 | Old Shrewsbury Village | 1000 Boston Tpke | Shrewsbury | MA | 01545 | 20,000 |
| 1614 | Target Plaza | 200 S Main St Rt 12A | West Lebanon | NH | 03784 | 15,573 |
| 1621 | Village Crossing | 10400 Reading Rd | Evendale | OH | 45241 | 17,138 |
| 1626 | Montgomery Commons S/C | 1200 Welsh Rd | North Wales | PA | 19454 | 9,812 |
| 1637 | Metro S/C | 4700 N University St | Peoria | IL | 61614 | 20,200 |
| 1645 | Village S/C | 902 W Kimberly Rd Ste 41 | Davenport | IA | 52806 | 25,200 |
| 1649 | Primrose Market Place | 3370 S Glenstone Ave | Springfield | MO | 65804 | 16,000 |
| 1650 | Lincoln Center | 632 Lincoln Way | Ames | IA | 50010 | 12,000 |
| 1666 | Paul Bunyan Mall | 1401 Paul Bunyan Dr Nw Ste 60 | Bemidji | MN | 56601 | 14,766 |
| 1668 | Plaza Princessa S/C | 3140 Cerrillos Rd Ste B | Santa Fe | NM | 87507 | 12,000 |
| 1669 | Wyoming Blvd Northeast | 2240 Wyoming Blvd Ne | Albuquerque | NM | 87112 | 24,000 |
| 1672 | Aurora City Square | 13861 E Exposition Ave | Aurora | CO | 80012 | 15,500 |
| 1674 | Arapahoe Village S/C | 2440 Arapahoe Ave | Boulder | CO | 80302 | 17,258 |
| 1683 | Karcher Mall | 1509 Caldwell Blvd | Nampa | ID | 83651 | 21,120 |
| 1687 | North Wilber Avenue | 481 N Wilbur Ave | Walla Walla | WA | 99362 | 15,000 |
| 1692 | American Plaza | 840 Blue Lakes Blvd N | Twin Falls | ID | 83301 | 11,985 |
| 1695 | Gallatin Valley Mall | 2825 W Main St Unit S | Bozeman | MT | 59718 | 20,020 |
| 1696 | Shopko Plaza | 3131 N Montana Ave | Helena | MT | 59602 | 12,000 |
| 1697 | Brookstone Square | 2165 Hwy 2 East Suite E | Kalispell | MT | 59901 | 18,000 |
| 1700 | Valley Mall Parkway | 300 Valley Mall Pkwy | East Wenatchee | WA | 98802 | 12,000 |
| 1701 | East 29Th Avenue | 2801 E 29Th Ave | Spokane | WA | 99223 | 21,647 |
| 1711 | Nw 57Th Street | 2217 Nw 57Th St | Seattle | WA | 98107 | 14,000 |
| 1725 | Sunset Square | 1125 E Sunset Dr Ste 125 | Bellingham | WA | 98226 | 28,000 |
| 1731 | Pony Village Mall | 1611 Virginia Ave | North Bend | OR | 97459 | 17,522 |
| 1739 | Poplar Drive | 2350 Poplar Dr | Medford | OR | 97504 | 19,980 |
| 1742 | Molalla Avenue | 1842 Molalla Ave | Oregon City | OR | 97045 | 20,000 |
| 1752 | South Main Street | 190 S Main St | Logan | UT | 84321 | 20,839 |
| 1756 | The Family Center At Orem | 172 E University Pkwy | Orem | UT | 84058 | 27,873 |
| 1763 | Expressway Mall | 425 Rohnert Park Expy W | Rohnert Park | CA | 94928 | 20,000 |
| 1769 | Carson Mall | 1344 S Stewart St | Carson City | NV | 89701 | 10,240 |
| 1771 | Westgate S/C | 375 W Main St Ste E | Woodland | CA | 95695 | 12,024 |
| 1774 | Peckham Square | 3750 Kietzke Ln | Reno | NV | 89502 | 24,700 |
| 1782 | Standiford Avenue | 200 Standiford Ave | Modesto | CA | 95350 | 19,400 |
| 1787 | Tennant Station S/C | 225 Tennant Sta | Morgan Hill | CA | 95037 | 14,720 |
| 1798 | Costco Plaza | 2115 W Commonwealth Ave | Alhambra | CA | 91803 | 13,472 |
| 1803 | Foothill Blvd. | 2160 Foothill Blvd | La Canada | CA | 91011 | 8,400 |
| 1809 | Shopping At The Rose | 2351 N Rose Ave | Oxnard | CA | 93036 | 15,000 |
| 1818 | Santa Susana Plaza | 2242 Tapo St | Simi Valley | CA | 93063 | 22,869 |
| 1831 | South Riordan Ranch Road | 1514 S Riordan Ranch St | Flagstaff | AZ | 86001 | 17,520 |
| 1843 | Poway Center | 12313 Poway Rd | Poway | CA | 92064 | 20,250 |
| 1845 | Point Loma Plaza | 3633 Midway Dr | San Diego | CA | 92110 | 14,950 |
| 1858 | Marketplace At Northglenn | 341 W 104Th Ave # 3 | Northglenn | CO | 80234 | 21,916 |
| 1859 | Village At The Boulder | 1260 Gail Gardner Way | Prescott | AZ | 86305 | 22,400 |
| 1861 | Market Square at Tampa Pal | 6234 Commerce Palms Blvd | Tampa | FL | 33647 | 21,600 |
| 1862 | Shoppes at Isla Verde | 940 S State Road 7 | Wellington | FL | 33414 | 21,600 |
| 1863 | Kokomo Shopping Center | 2130 E Markland Ave | Kokomo | IN | 46901 | 20,700 |
| 1864 | Kandi Mall | 1605 1St St S | Willmar | MN | 56201 | 17,519 |
| 1865 | TJ Maxx Plaza | 4340 13Th Ave S Ste 101 | Fargo | ND | 58103 | 19,952 |
| 1866 | Oak Pointe Plaza | 4045 Commonwealth Ave | Eau Claire | WI | 54701 | 23,028 |
| 1867 | Twin City S/C | 700 Ocean Beach Hwy Ste 100 | Longview | WA | 98632 | 19,457 |
| 1868 | Southern Tier Crossing | 1530 County Route 64 | Horseheads | NY | 14845 | 20,331 |
| 1869 | Indian Hills Plaza | 4208 E. Bluegrass Rd Ste A | Mount Pleasant | MI | 48858 | 21,060 |
| 1872 | Market Pointe I | 15110 E. Indiana Ave | Spokane Valley | WA | 99216 | 23,452 |
| 1873 | Former Warehouse Music | 5255 Lakewood Blvd | Lakewood | CA | 90712 | 14,850 |
| 1874 | Southaven Town Center | 6535 Towne Center Crossing | Southaven | MS | 38671 | 18,243 |
| 1875 | Fairfax Towne Center | 12124 Fairfax Towne Center | Fairfax | VA | 22033 | 23,000 |
| 1876 | Crossroads of Roseville | 1649 W. County Rd B2 | Roseville | MN | 55113 | 23,023 |
| 1877 | Stadium Center | 2210 Daniels St | Manteca | CA | 95337 | 20,807 |

# Joann
## Store List
### Exhibit 1 (a) (1)

| Str | Name/Mall | Address | City | ST | Zip | Selling S.F. |
|-----|-----------|---------|------|----|----|--------------|
| 1878 | Safeway SC | 4950 Almaden Expy Ste 10 | San Jose | CA | 95118 | 23,563 |
| 1879 | Mall at Whitney Field | 100 Commercial Rd Space H | Leominster | MA | 01453 | 18,304 |
| 1886 | Bay Plaza S/C | 1410 E Plaza Blvd Ste A | National City | CA | 91950 | 13,300 |
| 1891 | Shoppes at River Crossing | 5080 Riverside Dr Ste 1300 | Macon | GA | 31210 | 20,331 |
| 1892 | Westgate Mall | 14136 Baxter Drive Suite 120 | Brainerd | MN | 56401 | 15,945 |
| 1893 | Towne Centre | 1923 Old Fort Pkwy | Murfreesboro | TN | 37129 | 20,010 |
| 1894 | Spring Creek Centre | 3835 North Mall Ave | Fayetteville | AR | 72703 | 19,284 |
| 1900 | Belden Parke Crossing | 5487 Dressler Rd Nw | North Canton | OH | 44720 | 46,042 |
| 1901 | Saginaw Square | 2920 Tittabawassee Rd | Saginaw | MI | 48604 | 31,000 |
| 1902 | Tamarack Village | 8208 Tamarack Vlg | Woodbury | MN | 55125 | 45,215 |
| 1903 | Best In The West S/C | 2160 N Rainbow Blvd | Las Vegas | NV | 89108 | 46,140 |
| 1905 | Cool Springs Market | 2000 Mallory Ln Ste 270 | Franklin | TN | 37067 | 43,000 |
| 1906 | Columbia Crossing | 6161 Columbia Crossing Dr | Columbia | MD | 21045 | 45,218 |
| 1907 | Erie Commons | 8000 Plaza Blvd | Mentor | OH | 44060 | 35,984 |
| 1908 | Colonial Landing | 3562 E Colonial Dr | Orlando | FL | 32803 | 37,308 |
| 1910 | Castle Glen Plaza | 8714 Castle Creek Parkway East Dr | Indianapolis | IN | 46250 | 35,264 |
| 1912 | Tollgate Plaza | 615 Bel Air Rd Ste F | Bel Air | MD | 21014 | 46,000 |
| 1913 | North Valley S/C | 8195 W Bell Rd Ste M-3 | Peoria | AZ | 85382 | 40,734 |
| 1915 | Brantley Square | 924 W State Road 436 Ste 1450 | Altamonte Sprin | FL | 32714 | 50,228 |
| 1917 | Ahwatuckee Foothills Towne | 5021 E Ray Rd | Phoenix | AZ | 85044 | 46,535 |
| 1918 | Bolger Square | 3810 Crackerneck Rd | Independence | MO | 64055 | 46,350 |
| 1919 | Del Amo Fashion Center | 21800 Hawthorne Blvd Ste 100 | Torrance | CA | 90503 | 50,000 |
| 1920 | Commons At Temecula | 40462 Winchester Rd | Temecula | CA | 92591 | 35,150 |
| 1921 | Pleasant Hill Square | 2255 Pleasant Hill Rd Ste 200 | Duluth | GA | 30096 | 26,000 |
| 1922 | South Plaza | 4610 S Cleveland Ave | Fort Myers | FL | 33907 | 45,000 |
| 1923 | Great Northern S/C | 26337 Brookpark Rd | North Olmsted | OH | 44070 | 45,161 |
| 1924 | Plaza At Buckland Hills | 1440 Pleasant Valley Rd | Manchester | CT | 06042 | 45,900 |
| 1925 | Argyle S/C | 6001 Argyle Forest Blvd Ste 11 | Jacksonville | FL | 32244 | 48,945 |
| 1926 | Overland Park S/C | 11401 Metcalf Ave | Overland Park | KS | 66210 | 42,810 |
| 1927 | Shelby Town Center | 14367 Hall Rd | Shelby Township | MI | 48315 | 31,941 |
| 1928 | Polaris Towne Centre | 1265 Polaris Pkwy | Columbus | OH | 43240 | 45,650 |
| 1929 | Northway Mall | 1440 Central Ave Ste 2 | Albany | NY | 12205 | 45,491 |
| 1930 | Burlington Plaza | 1551 Niagara Falls Blvd | Amherst | NY | 14228 | 38,668 |
| 1932 | McKinley Milestrip Plaza | 3540 Mckinley Pkwy | Blasdell | NY | 14219 | 48,592 |
| 1933 | West Oaks II | 43570 W Oaks Dr # B-3 | Novi | MI | 48377 | 49,675 |
| 1935 | Arbor Lakes S/C | 12550 Elm Creek Blvd N | Maple Grove | MN | 55369 | 46,000 |
| 1940 | Freestanding (Former Circuit | 20550 E. 13 Mile Road | Roseville | MI | 48066 | 32,863 |
| 1941 | Riverdale Village | 12779 Riverdale Blvd Nw | Coon Rapids | MN | 55448 | 45,850 |
| 1942 | Berlin Turnpike | 3105 Berlin Tpke | Newington | CT | 06111 | 39,239 |
| 1943 | Southtown Plaza | 3333 W Henrietta Rd Ste 90 | Rochester | NY | 14623 | 45,460 |
| 1944 | Pavilions Centre | 31525 Pacific Hwy S | Federal Way | WA | 98003 | 43,506 |
| 1947 | The Festival At Sawmill | 2747 Festival Ln | Dublin | OH | 43017 | 48,737 |
| 1948 | The Crossings At Taylor | 23877 Eureka Rd | Taylor | MI | 48180 | 45,000 |
| 1949 | JOANN / Petsmart Plaza | 3042 Ridge Rd W | Rochester | NY | 14626 | 25,000 |
| 1950 | Southcenter Parkway | 17501 Southcenter Pkwy | Tukwila | WA | 98188 | 43,056 |
| 1951 | Frederick County S/C | 1003-C West Patrick St. | Frederick | MD | 21702 | 39,063 |
| 1952 | Apple Valley Square | 7614 150Th St W | Apple Valley | MN | 55124 | 45,384 |
| 1954 | Porter Ranch Town Center | 19819 Rinaldi St | Northridge | CA | 91326 | 45,000 |
| 1958 | Plaza At Citrus Park | 12635 Citrus Plaza Dr | Tampa | FL | 33625 | 45,965 |
| 1959 | Lake Brandon Plaza S/C | 11215 Causeway Blvd | Brandon | FL | 33511 | 41,947 |
| 1960 | North Point Commons | 965 N Point Dr | Alpharetta | GA | 30022 | 38,418 |
| 1962 | The Auburn Mile | 600 Brown Rd | Auburn Hills | MI | 48326 | 44,015 |
| 1965 | Desert Ridge Market Place | 21001 N Tatum Blvd | Phoenix | AZ | 85050 | 45,000 |
| 1966 | Avon Town Square | 10401 E Us Highway 36 | Avon | IN | 46123 | 28,000 |
| 2001 | Easton Square | 3880 Morse Rd | Columbus | OH | 43219 | 51,950 |
| 2003 | Brighton Mall | 8449 W Grand River Ave | Brighton | MI | 48116 | 36,280 |
| 2004 | Valley View Center S/C | 3737 Carpenter Rd | Ypsilanti | MI | 48197 | 45,000 |
| 2005 | Presidential Commons | 1630 Scenic Hwy N Ste O | Snellville | GA | 30078 | 37,312 |

# Joann
## Store List
### Exhibit 1 (a) (1)

| Str | Name/Mall | Address | City | ST | Zip | Selling S.F. |
|---|---|---|---|---|---|---|
| 2007 | Silverdale Plaza | 2886 Nw Bucklin Hill Rd | Silverdale | WA | 98383 | 29,903 |
| 2010 | Cox Creek Plaza | 354 Cox Creek Pkwy | Florence | AL | 35630 | 17,542 |
| 2012 | Taylor Square S/C | 2891 Taylor Rd | Reynoldsburg | OH | 43068 | 42,420 |
| 2013 | Pueblo Mall | 3449 Dillon Dr | Pueblo | CO | 81008 | 15,350 |
| 2015 | Sunmark Plaza | 651 Marks St | Henderson | NV | 89014 | 42,000 |
| 2016 | Fayette Pavilion | 250 Pavilion Pkwy | Fayetteville | GA | 30214 | 42,000 |
| 2017 | Genessee Commons S/C | G3603 Miller Rd | Flint | MI | 48507 | 42,901 |
| 2021 | Acme Plaza | 3977 Medina Rd | Akron | OH | 44333 | 29,198 |
| 2022 | Frandor S/C | 533 Mall Ct | Lansing | MI | 48912 | 30,077 |
| 2024 | Naper West Plaza | 526 S State Route 59 | Naperville | IL | 60540 | 36,493 |
| 2025 | Tyrone Corners SC | 2500 66Th St N | Saint Petersburg | FL | 33710 | 34,076 |
| 2026 | Yorktown Mall | 3411 Hazelton Rd | Edina | MN | 55435 | 34,066 |
| 2027 | South Frisco Village | 2930 Preston Rd Ste 800 | Frisco | TX | 75034 | 35,000 |
| 2030 | Greenwood Pavilion | 1260 Us 31 North | Greenwood | IN | 46142 | 35,007 |
| 2031 | Curlew Crossing | 2343 Curlew Road | Dunedin | FL | 34698 | 41,865 |
| 2032 | Waterford Lakes Town Cente | 825 N Alafaya Trail | Orlando | FL | 32828 | 35,000 |
| 2033 | Elk Grove Marketplace | 8509 Bond Road | Elk Grove | CA | 95624 | 35,000 |
| 2035 | William D Tate Ave | 1250 William D Tate Ave | Grapevine | TX | 76051 | 26,185 |
| 2038 | Target Place Plaza | 2725 Harrison Ave Nw Ste 500 | Olympia | WA | 98502 | 38,187 |
| 2039 | St Johns Town Center | 10261 River Marsh Drive Ste 149 | Jacksonville | FL | 32246 | 35,000 |
| 2042 | East Broadway Blvd | 7255 East Broadway Blvd | Tucson | AZ | 85710 | 36,454 |
| 2044 | Meridian Town Center | 13410 Meridian East Ste A | Puyallup | WA | 98373 | 35,023 |
| 2045 | Ross Towne Center | 7375 Mcknight Road | Pittsburgh | PA | 15237 | 38,542 |
| 2046 | Greenfield Fashion Center | 4950 South 74Th St | Greenfield | WI | 53220 | 37,420 |
| 2048 | Bloomingdale Court | 362 W Army Trail Rd  Ste 230 | Bloomingdale | IL | 60108 | 25,802 |
| 2050 | Cranberry Mall | 20111 Rt 19 | Cranberry Twp | PA | 16066 | 36,301 |
| 2051 | William Penn Hwy | 3700 William Penn Highway | Monroeville | PA | 15146 | 36,500 |
| 2053 | Robinson Town Centre | 1800 Park Manor Blvd Unit 5 | Pittsburgh | PA | 15205 | 40,684 |
| 2054 | Lincoln Village Plaza | 4600 W Broad Street | Columbus | OH | 43228 | 30,743 |
| 2055 | Yosemite Park Mall | 9090 East Phillips Place | Centennial | CO | 80112 | 35,350 |
| 2057 | Marketplace at Vernon Hills | 413 N Milwaukee Ave  Unit  500 | Vernon Hills | IL | 60061 | 40,024 |
| 2058 | Target At Kissimmee West | 4801 W Irlo Bronson Memorial Hwy | Kissimmee | FL | 34746 | 35,000 |
| 2059 | Greengate Centre | 1600 Greengate Centre Blvd | Greensburg | PA | 15601 | 35,250 |
| 2061 | Hampton Plaza | 2105 S Rochester Road | Rochester Hills | MI | 48307 | 37,500 |
| 2062 | First & Main Town Center | 3795 Bloomington St | Colorado Spring | CO | 80922 | 35,000 |
| 2063 | Christiana Town Center | 341 W Main St | Newark | DE | 19702 | 36,250 |
| 2064 | Towne Center At Fayetteville | 330 Towne Center Dr | Fayetteville | NY | 13066 | 35,252 |
| 2065 | The Shoppes At Geneva Con | 714 Commons Drive | Geneva | IL | 60134 | 35,350 |
| 2067 | Cross Roads S/C | 15600 Ne 8Th Street   Ste H1 | Bellevue | WA | 98008 | 35,090 |
| 2068 | The Shoppes Of Schererville | 715 Us Highway 41 | Schererville | IN | 46375 | 35,266 |
| 2070 | West 63Rd Street | 11215 West 63Rd Street | Shawnee | KS | 66203 | 35,488 |
| 2071 | Saddle Rock Village | 7360 South Gartrell Road | Aurora | CO | 80016 | 35,000 |
| 2074 | The Crossroads of Taylorsvill | 5790 S Redwood Rd | Taylorsville | UT | 84123 | 40,057 |
| 2075 | Santan Village Marketplace | 2753 S. Market Street | Gilbert | AZ | 85295 | 35,000 |
| 2077 | The Shoppes at Naples Cent | 6424 Naples Blvd Suite 501 | Naples | FL | 34109 | 24,816 |
| 2078 | Ashbridge Square | 931 E Lancaster Ave | Downingtown | PA | 19335 | 28,258 |
| 2079 | Brookfield Fashion Center | 16800 W Bluemound Road | Brookfield | WI | 53005 | 31,901 |
| 2081 | Lynnwood Center | 5824 196Th Street Sw | Lynnwood | WA | 98036 | 42,538 |
| 2082 | Fairway Commons | 5811 Five Star Blvd | Roseville | CA | 95678 | 35,000 |
| 2083 | Market Street Village | 1439 W Pipeline Rd | Hurst | TX | 76053 | 35,384 |
| 2084 | River Park Plaza | 8062 N Blackstone Ave | Fresno | CA | 93720 | 35,000 |
| 2086 | Westland Plaza | 6741 Odana Road | Madison | WI | 53719 | 35,000 |
| 2087 | JOANN Plaza | 4101 Transit Road  Ste 1 | Williamsville | NY | 14221 | 38,903 |
| 2089 | Centerton Square | 66 Centerton  Road | Mount Laurel | NJ | 08054 | 35,350 |
| 2090 | Perring Plaza | 1951 Joppa Road | Parkville | MD | 21234 | 34,421 |
| 2091 | Platte Purchase Plaza | 2201 Nw Barry Road | Kansas City | MO | 64154 | 35,406 |
| 2092 | The Court At Oxford Valley | 320 Commerce Blvd | Fairless Hills | PA | 19030 | 36,525 |
| 2093 | Boulevard Centre | 4104 Tacoma Mall Blvd | Tacoma | WA | 98409 | 42,584 |

# Joann
## Store List
### Exhibit 1 (a) (1)

| Str | Name/Mall | Address | City | ST | Zip | Selling S.F. |
|---|---|---|---|---|---|---|
| 2096 | Orange Tree Marketplace | 1625 W Lugonia Avenue | Redlands | CA | 92374 | 35,350 |
| 2099 | Bayside Market Place | 2777 S. Oneida Street | Green Bay | WI | 54304 | 37,777 |
| 2101 | Crossroads at Orenco Statior | 7270 Ne Butler St | Hillsboro | OR | 97124 | 35,399 |
| 2102 | Orchards Market Center | 11505 Ne Fourth Plain Blvd Ste 86 | Vancouver | WA | 98662 | 35,546 |
| 2103 | Lake View Plaza | 15752  S. La Grange Rd | Orland Park | IL | 60462 | 34,050 |
| 2104 | Independence Market Place | 23125 Outer Drive | Allen Park | MI | 48101 | 35,000 |
| 2106 | Ridgemar Town Square | 1400 Green Oaks Rd | Fort Worth | TX | 76116 | 36,805 |
| 2107 | Family Center at Riverdale | 4978 South 1050 West | Riverdale | UT | 84405 | 35,347 |
| 2108 | JOANN Plaza | 4616 Coldwater Rd | Fort Wayne | IN | 46825 | 35,400 |
| 2109 | Tradewinds S/C | 6601 N. Davis Highway Ste 25 | Pensacola | FL | 32504 | 35,190 |
| 2111 | Marple Crossroads | 400 S. State Rd | Springfield | PA | 19064 | 30,600 |
| 2113 | Town & Country SC | 373 E Palatine Road | Arlington Height | IL | 60004 | 36,400 |
| 2114 | Gavora Mall | 250 3Rd St Ste1 | Fairbanks | AK | 99701 | 35,800 |
| 2116 | Lake Crossings | 5663 Harvey Street | Norton Shores | MI | 49444 | 35,350 |
| 2117 | Riverfront Plaza | 2639 N. Elston Ave | Chicago | IL | 60647 | 43,233 |
| 2118 | Shoppes of West Melbourne | 1537 W New Haven Ave | West Melbourne | FL | 32904 | 35,759 |
| 2119 | Buena Park Promenade | 5885 Lincoln Avenue | Buena Park | CA | 90620 | 35,872 |
| 2120 | Tigard Shopping Plaza | 11945 Sw Pacific Hyw Ste 250 | Tigard | OR | 97223 | 32,108 |
| 2121 | Draper Retail Center | 268 E 12300 S | Draper | UT | 84020 | 35,000 |
| 2122 | Wisner Street Plaza | 1099 N Wisner St | Jackson | MI | 49202 | 37,232 |
| 2123 | Milford Crossing | 1405 Boston Post  Road | Milford | CT | 06460 | 35,000 |
| 2124 | The Marketplace at Centerra | 1601 Fall River Drive | Loveland | CO | 80538 | 35,231 |
| 2125 | Marketplace Center | 1500 Bald Hill Road  Ste A | Warwick | RI | 02886 | 35,000 |
| 2126 | Von Karmen Plaza | 2170 Barranca Pkwy | Irvine | CA | 92606 | 35,700 |
| 2128 | Shoe Carnival Towne Centre | 929 N Green River Rd | Evansville | IN | 47715 | 37,227 |
| 2129 | North Attleboro Marketplace | 1360 South Washington St Unit 3 | North Attleboro | MA | 02760 | 35,000 |
| 2131 | Town Center Plaza | 120 N Entrance Road | Sanford | FL | 32771 | 36,988 |
| 2132 | Alameda Crossing | 1717 N Dysart Road | Avondale | AZ | 85392 | 25,308 |
| 2133 | Park & Shop | 1675 B Willow Pass Road | Concord | CA | 94520 | 38,088 |
| 2134 | Arlington Highlands S/C | 137 Merchants Row Ste 165 | Arlington | TX | 76018 | 35,000 |
| 2135 | Providence Marketplace | 401 S Mount Juliet Rd Ste 640 | Mount Juliet | TN | 37122 | 35,384 |
| 2136 | South Towne Centre | 2270 Miamisburg Centerville Rd | Dayton | OH | 45459 | 36,293 |
| 2137 | The Riverview at Dobson | 825 N Dobson Road | Mesa | AZ | 85201 | 35,000 |
| 2139 | Orlando Market | 3379 Daniels Road | Winter Garden | FL | 34787 | 35,314 |
| 2140 | Shops at Arbor Walk | 10515 N Mo Pac Expy Bldg 1 | Austin | TX | 78759 | 35,000 |
| 2141 | Westchester Commons | 125 Perimeter Dr | Midlothian | VA | 23113 | 35,194 |
| 2142 | Monterey Marketplace II | 72765 Dinah Shore Dr | Rancho Mirage | CA | 92270 | 31,419 |
| 2143 | Richmond Plaza | 3435 Wrightsboro Road | Augusta | GA | 30909 | 36,736 |
| 2144 | 11251 Pines Blvd. | 11251 Pines Blvd | Pembroke Pines | FL | 33026 | 27,109 |
| 2145 | Shelbyville Road Plaza | 4600 Shelbyville Rd Ste 280 | Louisville | KY | 40207 | 30,236 |
| 2147 | Arbor Square | 8125 Arbor Square Drive | Mason | OH | 45040 | 29,768 |
| 2148 | Brandywine Crossing | 15920 Crain Highway Se | Brandywine | MD | 20613 | 25,310 |
| 2149 | Fox River Valley SC | 720 N Casaloma Drive | Appleton | WI | 54913 | 24,962 |
| 2150 | El Cerrito Plaza | 300 El Cerrito Plz | El Cerrito | CA | 94530 | 34,310 |
| 2152 | Baybrook Village | 1529 W Bay Area Blvd | Webster | TX | 77598 | 29,668 |
| 2153 | Central Plaza | 13355 Manchester Rd | Ballwin | MO | 63011 | 30,244 |
| 2155 | University Oaks | 201 University Oaks Blvd | Round Rock | TX | 78665 | 25,000 |
| 2156 | Commerce Plaza | 10865 Lincoln Trl | Fairview Heights | IL | 62208 | 25,546 |
| 2157 | The Pavillions | 25 Ne Loop 410 Ste 114 | San Antonio | TX | 78216 | 33,735 |
| 2158 | Prince William Square | 14350 Smoke Town Rd | Woodbridge | VA | 22192 | 23,890 |
| 2159 | Cosner's Corner | 9685 Jefferson Davis Hwy | Fredericksburg | VA | 22407 | 25,331 |
| 2160 | Colonial Commons | 5084 Jonestown Rd | Harrisburg | PA | 17112 | 25,500 |
| 2161 | Broadway Shopping Center | 1073 Broadway | Saugus | MA | 01906 | 22,500 |
| 2162 | Milwaukee Market Place | 1085 N. Milwaukee St | Boise | ID | 83704 | 37,783 |
| 2163 | The Shoppes At Centerpoint | 3665 28Th St Se | Grand Rapids | MI | 49512 | 38,500 |
| 2164 | Square One Shopping Cente | 3563 Nw Federal Hwy | Jensen Beach | FL | 34957 | 28,004 |
| 2165 | Honey Creek Commons | 5705 Us Hwy 41 | Terre Haute | IN | 47802 | 25,127 |
| 2166 | Viking Plaza Mall | 3015 Highway 29 South | Alexandria | MN | 56308 | 18,336 |

# Joann
## Store List
### Exhibit 1 (a) (1)

| Str | Name/Mall | Address | City | ST | Zip | Selling S.F. |
|-----|-----------|---------|------|----|----|------|
| 2167 | The Fountains | 801 South University Dr Suite 75 | Plantation | FL | 33324 | 20,000 |
| 2168 | Pioneer Crossing | 61284 S Highway 97 | Bend | OR | 97702 | 23,290 |
| 2169 | Riverchase Promenade | 1709 Montgomery Hwy S | Hoover | AL | 35244 | 25,677 |
| 2170 | Governors Crossing | 208 Collier Dr | Sevierville | TN | 37862 | 12,000 |
| 2171 | Hamilton Village | 2020 Gunbarrel Road Suite 198 | Chattanooga | TN | 37421 | 24,200 |
| 2172 | Northpointe Commons | 10050 Two Notch Rd Ste 13 | Columbia | SC | 29223 | 21,500 |
| 2173 | Gateway Shopping Center | 3704 172Nd St Ne Ste F | Arlington | WA | 98223 | 22,864 |
| 2175 | Baker Square | 13415 W Center Rd | Omaha | NE | 68144 | 31,837 |
| 2176 | Chestnut Court | 7511 Lemont Rd Ste 101 | Darien | IL | 60561 | 25,000 |
| 2177 | Eastchase Market SC | 7951 Eastchase Pkwy | Montgomery | AL | 36117 | 30,247 |
| 2178 | Mid Rivers | 5610 Suemandy Rd | St Peters | MO | 63376 | 34,250 |
| 2179 | University Hills | 2580 South Colorado Blvd | Denver | CO | 80222 | 26,300 |
| 2180 | Renaissance Square | 622 South Main Street | Cedar City | UT | 84720 | 19,424 |
| 2181 | Eastgate Crossing | 4530 Eastgate Blvd. | Cincinnati | OH | 45245 | 16,730 |
| 2182 | Shop Rite Plaza | 143 Federal Rd | Brookfield | CT | 06804 | 12,859 |
| 2183 | Pocatello Square | 1790 Hurley Dr. | Pocatello | ID | 83201 | 13,427 |
| 2184 | Huntsville Plaza | 5900 B University Drive | Huntsville | AL | 35806 | 15,459 |
| 2185 | Tower Shopping Center | 2043 Colonial Ave | Roanoke | VA | 24015 | 22,832 |
| 2186 | Riverview Mall | 2303 Miracle Mile Road | Bullhead City | AZ | 86442 | 23,545 |
| 2187 | Forest Plaza | 806 West Johnson Street | Fond Du Lac | WI | 54935 | 17,570 |
| 2189 | Amador Plaza Rd | 7177 Amador Plaza Road | Dublin | CA | 94568 | 25,377 |
| 2191 | Madison East Mall | 1400 Madison Avenue Suite #500 | Mankato | MN | 56001 | 19,080 |
| 2192 | Grand Teton Plaza | 2408 South 25Th East | Idaho Falls | ID | 83404 | 24,000 |
| 2193 | North Rock Road | 3665 North Rock Road | Wichita | KS | 67226 | 26,398 |
| 2194 | The Columns | 1185 Vann Dr | Jackson | TN | 38305 | 15,000 |
| 2195 | Arsenal Plaza | 1283 Arsenal Street | Watertown | NY | 13601 | 18,795 |
| 2197 | The Plaza At Rockwall | 1049 E. I.H. 30 | Rockwall | TX | 75087 | 15,000 |
| 2198 | High Point Centre | 441 E Roosevelt Rd Space #410 | Lombard | IL | 60148 | 17,040 |
| 2199 | Mount Vernon Plaza | 510 East College Way | Mount Vernon | WA | 98273 | 24,450 |
| 2200 | Freestanding (Former Circuit | 1535 South Bradley Road | Santa Maria | CA | 93454 | 19,014 |
| 2201 | Florence Mall | 1945 West Palmetto Street #270 | Florence | SC | 29501 | 14,501 |
| 2202 | Sonora Crossroads | 1151 Sanguinetti Road | Sonora | CA | 95370 | 17,440 |
| 2203 | Folsom Square | 1010 East Bidwell Street | Folsom | CA | 95630 | 17,270 |
| 2204 | Elko Junction | 2759 Mountain City Hwy | Elko | NV | 89801 | 15,000 |
| 2205 | Mooresville Consumer Squar | 221 Norman Station Blvd. Suite 2211 | Mooresville | NC | 28117 | 12,000 |
| 2206 | Colony Square | 16626 Southwest Freeway | Sugar Land | TX | 77479 | 27,134 |
| 2207 | Westgate Crossing | 660 Spartan Blvd. | Spartanburg | SC | 29301 | 25,000 |
| 2208 | Crossroads Commons | 1407 Flammang Drive | Waterloo | IA | 50702 | 18,197 |
| 2209 | Newtown Shops on Main | 5103 Main St. | Williamsburg | VA | 23188 | 15,334 |
| 2210 | Tri Valley Plaza | 1325 E. Florence Blvd | Casa Grande | AZ | 85122 | 15,045 |
| 2211 | Roseland Center | 3225 State Route 364 | Canandaigua | NY | 14424 | 19,389 |
| 2212 | Rayzor Ranch | 2640 West University Dr | Denton | TX | 76201 | 21,890 |
| 2213 | Freestanding (Former Alberts | 852 N Main St | Tooele | UT | 84074 | 15,000 |
| 2215 | Crossroads Commons | 1150 Meridian Drive | Plover | WI | 54467 | 15,000 |
| 2216 | Corvallis Crossing | 932 Nw Circle Blvd | Corvallis | OR | 97330 | 18,656 |
| 2217 | Freestanding (Former Comp | 30 A & S Drive | Paramus | NJ | 07652 | 30,000 |
| 2218 | Lancaster Mall | 783 Lancaster Dr. Ne. Suite #133 | Salem | OR | 97301 | 26,218 |
| 2219 | Former Circuit City | 6910 S. Lindbergh Blvd | Saint Louis | MO | 63125 | 28,575 |
| 2220 | Joliet Commons | 2741 Plainfield Road | Joliet | IL | 60435 | 15,000 |
| 2222 | Merchant's Walk | 7504 West Broad | Richmond | VA | 23294 | 18,419 |
| 2223 | Frontier Mall | 1400 Del Range Blvd | Cheyenne | WY | 82009 | 14,458 |
| 2225 | Big Oaks Crossing | 3875 North Gloster Street | Tupelo | MS | 38804 | 22,000 |
| 2226 | Price Plaza | 1219 North Fry Road | Katy | TX | 77449 | 33,890 |
| 2227 | New Towne Mall | 400 Mill Ave Se Suite 15 | New Philadelphi | OH | 44663 | 26,579 |
| 2228 | Thunderbird Plaza | 2701 S. College Ave. Unit 160 | Fort Collins | CO | 80525 | 22,220 |
| 2229 | Washington Plaza | 10030 East Washington Street | Indianapolis | IN | 46229 | 21,500 |
| 2232 | Un-Named Shopping Center | 180 Se Neptune Drive, Suite A | Warrenton | OR | 97146 | 16,214 |
| 2233 | Owensboro Towne Center | 5241 Frederica St. Space #3 | Owensboro | KY | 42301 | 13,560 |

# Joann
## Store List
### Exhibit 1 (a) (1)

| Str | Name/Mall | Address | City | ST | Zip | Selling S.F. |
|---|---|---|---|---|---|---|
| 2234 | Freestanding, Former Circuit | 10750 W Colfax Ave # 100 | Lakewood | CO | 80215 | 20,970 |
| 2236 | Market Place SC | 121 Commerce Street, Suite 1 | Wisconsin Dells | WI | 53965 | 15,000 |
| 2238 | Mesa Mall | 2424 Highway 6 & 50. Space 0015 | Grand Junction | CO | 81505 | 14,150 |
| 2239 | Lakeshore Marketplace | 834-A Dawsonville Highway | Gainesville | GA | 30501 | 19,800 |
| 2240 | Colerain Towne Center | 10166 Colerain Avenue | Cincinnati | OH | 45251 | 23,500 |
| 2241 | Midway Plaza | 965 Central Park Ave | Scarsdale | NY | 10583 | 31,843 |
| 2242 | Northtowne East | 1001 N. Clinton St. Ste 01 | Defiance | OH | 43512 | 22,527 |
| 2243 | Gateway Mall | 2700 State Street, Suite C | Bismarck | ND | 58503 | 15,975 |
| 2246 | Former Circuit City | 3051 W. Wabash Avenue | Springfield | IL | 62704 | 22,000 |
| 2247 | Golden Isles Plaza | 137 Golden Isles Plaza Parkway | Brunswick | GA | 31520 | 14,663 |
| 2248 | Carolina Pavilions | 9523 South Blvd | Charlotte | NC | 28273 | 23,500 |
| 2249 | Metro North Shopping Center | 1205 Se 16Th Court, Suite 200 | Ankeny | IA | 50021 | 18,250 |
| 2250 | Sterling Lincoln Center | 3201 East Lincolnway | Sterling | IL | 61081 | 15,000 |
| 2251 | Bandera Pointe | 11655 Bandera Road | San Antonio | TX | 78250 | 25,000 |
| 2252 | Berkley Mall | 625 N Berkeley Blvd #H | Goldsboro | NC | 27534 | 15,313 |
| 2253 | Sutters Creek Crossing | 572 Sutter'S Creek Blvd | Rocky Mount | NC | 27804 | 14,355 |
| 2255 | Rio Hill SC | 1774 Rio Hill Center | Charlottesville | VA | 22901 | 21,080 |
| 2256 | Ambassador Row | 3559 Ambassador Caffery Parkway | Lafayette | LA | 70503 | 28,000 |
| 2257 | Belton Marketplace | 1153 E. North Avenue | Belton | MO | 64012 | 21,000 |
| 2259 | Shops At Fox River | 3310 Shoppers Drive | Mchenry | IL | 60050 | 17,172 |
| 2261 | Houston Lakes | 87 Spiral Drive | Florence | KY | 41042 | 23,936 |
| 2262 | North Point Plaza | 1150 Carlisle Street Suite #3 | Hanover | PA | 17331 | 14,335 |
| 2263 | Elk Park Center | 19154 Freeport Street Nw | Elk River | MN | 55330 | 18,009 |
| 2264 | Marketfair North | 4154 State Route 31 | Clay | NY | 13041 | 26,878 |
| 2265 | Hulen Fashion Center | 5212 S Hulen Street | Fort Worth | TX | 76132 | 21,795 |
| 2266 | Freshwater Plaza | 136 Elm Street, Suite A | Enfield | CT | 06082 | 13,865 |
| 2267 | Rockwell Plaza | 8345 N. Rockwell Avenue | Oklahoma City | OK | 73132 | 24,400 |
| 2268 | The Junction | 6361 I-55 North | Jackson | MS | 39213 | 18,036 |
| 2269 | Siegen Lane Marketplace | 10545 South Mall Drive | Baton Rouge | LA | 70809 | 22,000 |
| 2270 | High Desert Gateway | 12779 Main Street | Hesperia | CA | 92340 | 20,004 |
| 2271 | Greenhouse Marketplace | 699 Lewelling Blvd Suite 230 | San Leandro | CA | 94579 | 25,000 |
| 2272 | Golden Gate | 1533 Golden Gate Plaza, Suite #153 | Mayfield Heights | OH | 44124 | 23,528 |
| 2273 | Northpark Mall | 101 N Range Line Road, Suite 354 | Joplin | MO | 64801 | 22,659 |
| 2274 | Former Best Buy | 3900 Alpine Ave. Nw Suite B | Comstock Park | MI | 49321 | 22,500 |
| 2277 | White Lake Market Place | 9052 Highland Road | White Lake | MI | 48386 | 25,660 |
| 2279 | Century Town Center | 5921 20Th St. Unit B | Vero Beach | FL | 32966 | 11,048 |
| 2280 | Deer Trace Shopping Center | 4079 Highway 28 | Sheboygan Falls | WI | 53085 | 20,388 |
| 2281 | Queen Creek Marketplace | 21238 S. Ellsworth Loop Road | Queen Creek | AZ | 85142 | 19,920 |
| 2282 | Shoppes at University Center | 8441 Cooper Creek Blvd | Bradenton | FL | 34201 | 20,303 |
| 2283 | Dean Lakes | 4120 Dean Lakes Boulevard | Shakopee | MN | 55379 | 17,040 |
| 2284 | Overlook Village | 80 South Tunnel Road Suite 30 | Asheville | NC | 28805 | 22,835 |
| 2286 | Former Borders | 1075 Woodland Road | Reading | PA | 19610 | 25,023 |
| 2289 | Rockbridge Shopping Center | 509 East Nifong | Columbia | MO | 65201 | 19,002 |
| 2290 | Champaign Town Center | 722 West Town Center Blvd. | Champaign | IL | 61822 | 17,642 |
| 2291 | Bradford Plaza | 519 N Main St. | Stillwater | OK | 74075 | 15,047 |
| 2292 | Woodlands Home Center | 25415 Interstate 45 Ste D | Spring | TX | 77380 | 34,450 |
| 2294 | Twin City Plaza | 101 Twin City Mall | Crystal City | MO | 63019 | 15,614 |
| 2295 | Centerville Marketplace | 302 North Marketplace Dr | Centerville | UT | 84014 | 23,875 |
| 2296 | Towne Center | 2050 West University Dr Suite 250 | Mc Kinney | TX | 75070 | 20,331 |
| 2297 | Lakewood Village | 2637 Lakewood Village Drive | No Little Rock | AR | 72116 | 18,452 |
| 2298 | 23rd Street Plaza | 413 East 23Rd Street | Panama City | FL | 32405 | 20,579 |
| 2300 | Freestanding (frm Circuit City | 4948 Monroe St | Toledo | OH | 43623 | 31,903 |
| 2301 | Rochester Crossing | 160 Washington St Ste 606 | Rochester | NH | 03839 | 13,037 |
| 2302 | Oracle Wetmore | 4380 N. Oracle Rd. Ste 150 | Tucson | AZ | 85705 | 16,050 |
| 2303 | Concordville Town Center | 600 Town Centre Drive Suite D-108 | Glen Mills | PA | 19342 | 13,199 |
| 2305 | Village Of Rivergate | 2088 Gallatin Pike North | Madison | TN | 37115 | 33,741 |
| 2306 | Lindale Mall | 255 Collins Road Ne | Cedar Rapids | IA | 52402 | 20,600 |
| 2308 | Sherman Commons | 4127 N Hwy 75 | Sherman | TX | 75090 | 20,451 |

# Joann
## Store List
### Exhibit 1 (a) (1)

| Str | Name/Mall | Address | City | ST | Zip | Selling S.F. |
|-----|-----------|---------|------|-----|-----|--------------|
| 2309 | River Ridge Mall | 3405 Candlers Mountain Rd | Lynchburg | VA | 24502 | 14,174 |
| 2310 | Deer Creek Shopping Center | 3200 Laclede Station Rd | Saint Louis | MO | 63143 | 19,710 |
| 2311 | Grants Pass Shopping Cente | 1090 Northeast E Street | Grants Pass | OR | 97526 | 16,500 |
| 2312 | Greenbriar Shopping Center | 1361 86Th Street West | Indianapolis | IN | 46260 | 21,500 |
| 2313 | Harvest Park Shopping Cente | 4627 Greenway Drive | Knoxville | TN | 37918 | 15,000 |
| 2314 | Cross Pointe Plaza | 840 Woods Crossing Road | Greenville | SC | 29607 | 18,000 |
| 2315 | Market Place | 2833 King Avenue West | Billings | MT | 59102 | 20,000 |
| 2317 | Freestanding | 1024 Green Acres Road | Eugene | OR | 97408 | 20,491 |
| 2318 | Morganton Heights | E132 Morganton Heights Blvd | Morganton | NC | 28655 | 12,500 |
| 2321 | Jefferson Square | 2880 South 6Th Street | Klamath Falls | OR | 97603 | 22,839 |
| 2322 | Geneva Commons | 600 N. Edwards Blvd | Lake Geneva | WI | 53147 | 15,000 |
| 2324 | Peru Mall | 3940 Route 251 Suite A1 | Peru | IL | 61354 | 15,000 |
| 2325 | Chimney Rock | 6351 E. Hwy 191 | Odessa | TX | 79762 | 13,160 |
| 2326 | Silver Lake Mall | 200 West Hanley Ave Suite 1101 | Coeur D Alene | ID | 83815 | 18,335 |
| 2327 | Heritage Village | 1645 North Spring St. | Beaver Dam | WI | 53916 | 14,900 |
| 2328 | Ashley Crossing | 2243 Ashley Crossing Dr, Suite C | Charleston | SC | 29414 | 15,074 |
| 2329 | Cotton Mill Shopping Center | 720 W. Telegraph | Washington | UT | 84780 | 23,500 |
| 2330 | Sahuarita Plaza | 18785 S I-19 Frontage Rd, Suite 113 | Green Valley | AZ | 85614 | 13,043 |
| 2331 | American Fork Shopping Cer | 640 East State Road | American Fork | UT | 84003 | 25,436 |
| 2332 | Westland Shopping Center | 3750 West Saginaw Street | Lansing | MI | 48917 | 20,084 |
| 2333 | Muscatine Mall | 1903 Park Avenue | Muscatine | IA | 52761 | 14,719 |
| 2334 | Clinton Towne Center | 1803 West 1800 North Suite G1 | Clinton | UT | 84015 | 23,985 |
| 2335 | Village of Amelia | 463877 State Road 200 | Yulee | FL | 32097 | 14,000 |
| 2338 | University Park S/C | 1425 Scalp Ave, Space 110 | Johnstown | PA | 15904 | 18,614 |
| 2340 | Central Vermont Shopping C | 1400 Us Route 302, Suite 10 | Barre | VT | 05641 | 12,000 |
| 2341 | Roxbury Mall | 281-28 Rt 10E | Succasunna | NJ | 07876 | 30,425 |
| 2343 | Trademart Shopping Center | 14569 N Us Highway 25 E, Unit 26 | Corbin | KY | 40701 | 15,000 |
| 2344 | West Loop Shopping Center | 1000 West Loop Place, Ste 120 | Manhattan | KS | 66502 | 22,000 |
| 2345 | Susquehanna Valley Mall | 1 Susquehanna Valley Mall Dr, D6 | Selinsgrove | PA | 17870 | 12,958 |
| 2347 | North Pointe Centre | N78 W14531 Appleton Ave | Menomonee Fal | WI | 53051 | 18,166 |
| 2348 | Koeller Plaza | 1226 Koeller St | Oshkosh | WI | 54902 | 18,000 |
| 2349 | Shackleford Crossing | 2616 S Shackleford Rd, Ste A | Little Rock | AR | 72205 | 14,000 |
| 2351 | Main St Marketplace | 1215-B North Main Street | Summerville | SC | 29483 | 23,125 |
| 2352 | Blue Ridge Mall | 1800 Four Seasons Blvd, Space D1 | Hendersonville | NC | 28792 | 14,826 |
| 2353 | Freestanding | 1175 Dana Drive | Redding | CA | 96003 | 28,588 |
| 2354 | Creekview Center | 397 Easton Rd | Warrington | PA | 18976 | 24,825 |
| 2355 | Garden State Pavillion | 2234 W Marlton Pike Rd Plot E3 | Cherry Hill | NJ | 08002 | 25,287 |
| 2356 | Fairview Plaza | 160 Fairview Avenue Suite # 83 | Hudson | NY | 12534 | 15,360 |
| 2357 | Boulevard Plaza | 11000 Roosevelt Blvd | Philadelphia | PA | 19116 | 30,330 |
| 2358 | Shawnee Mall | 4901 N. Kickapoo Street | Shawnee | OK | 74804 | 13,863 |
| 2359 | Conyers Plaza | 1380 Dogwood Drive | Conyers | GA | 30013 | 24,920 |
| 2361 | Phoenix Center | 1976 Phoenix Center Drive | Washington | MO | 63090 | 15,000 |
| 2363 | Village at Northshore | 105 Northshore Blvd Suite 135 | Slidell | LA | 70460 | 20,125 |
| 2364 | Newnan Pavilion | 1074 Bullsboro Drive, Unit #6 | Newnan | GA | 30265 | 18,239 |
| 2365 | Gardner Towne Center | 2089 West Hwy 40 | Vernal | UT | 84078 | 15,032 |
| 2366 | White Mountain Mall | 2441 Foothill Blvd, Suite 5 | Rock Springs | WY | 82901 | 15,716 |
| 2367 | Torrington Plaza | 39 South Main St | Torrington | CT | 06790 | 15,848 |
| 2371 | East Park Plaza | 220 N 66Th St Ste 270 | Lincoln | NE | 68505 | 31,650 |
| 2373 | Merrillville Plaza | 1916 E 80Th Ave No 14 | Merrillville | IN | 46410 | 26,008 |
| 2374 | Pride Center | 22914 W Victory Blvd | Woodland Hills | CA | 91367 | 28,434 |
| 2376 | Mobile Festival Centre | 3725 Airport Blvd, Unit 100-C | Mobile | AL | 36608 | 21,364 |
| 2377 | Minges Creek Plaza | 5420 Beckley Road, Suite M | Battle Creek | MI | 49015 | 19,790 |
| 2378 | Century Center | 3323 Century Center St Sw | Grandville | MI | 49418 | 21,177 |
| 2379 | Northgate Shopping Center | 1082 N Main Street | Spanish Fork | UT | 84660 | 21,931 |
| 2380 | Athens Mall | 743 E. State Street, Suite O | Athens | OH | 45701 | 20,152 |
| 2381 | Fox Run Shopping Center | 521 N. Solomon'S Island Rd, Ste 34 | Prince Frederick | MD | 20678 | 12,020 |
| 2382 | Westfield Wheaton Plaza | 11160 Veirs Mill Road, Unit 180 | Wheaton | MD | 20902 | 22,218 |
| 2383 | Riverdale Crossing | 48 Route 23 | Riverdale | NJ | 07457 | 21,807 |

# Joann
## Store List
### Exhibit 1 (a) (1)

| Str | Name/Mall | Address | City | ST | Zip | Selling S.F. |
|---|---|---|---|---|---|---|
| 2386 | Joffco Square | 555 W. Roosevelt Road | Chicago | IL | 60607 | 16,651 |
| 2387 | Interstate Plaza | 1671 Ih-35 South, Suite 208 | New Braunfels | TX | 78130 | 17,979 |
| 2389 | Freestanding (former Alberts | 1000 South Central Avenue | Glendale | CA | 91204 | 33,699 |
| 2390 | Westminster City Center | 9250 Sheridan Blvd #200 | Westminster | CO | 80031 | 23,261 |
| 2391 | The Esplanade At Butler Plaz | 3202 Sw 35Th Blvd | Gainesville | FL | 32608 | 36,185 |
| 2392 | Ashland Towne Center | 500 Winchester Ave, Suite 700 | Ashland | KY | 41101 | 19,190 |
| 2393 | Lawton Towne Center | 449 Nw 2Nd St | Lawton | OK | 73501 | 18,000 |
| 2394 | Totem Pole | 7907 Ne Highway 99 | Vancouver | WA | 98665 | 16,998 |
| 2396 | Canyon Place | 4005 Sw 117Th Street | Beaverton | OR | 97005 | 17,442 |
| 2397 | Freestanding | 732 Sw 6Th Street | Redmond | OR | 97756 | 15,300 |
| 2399 | Willow Creek Crossing | 500 Indianhead Drive | Mason City | IA | 50401 | 18,000 |
| 2402 | Northgate Mall | 1600 Jackson St. Northgate Mall | Tullahoma | TN | 37388 | 15,000 |
| 2403 | Walpole Mall | 96 Providence Highway | East Walpole | MA | 02032 | 24,760 |
| 2404 | Faribo West Mall | 200 Western Ave Nw, Suite C10 | Faribault | MN | 55021 | 14,544 |
| 2405 | Livonia Commons | 13489 Middlebelt Rd | Livonia | MI | 48150 | 24,100 |
| 2406 | La Cienega Square | 1250 S La Cienega Blvd | Los Angeles | CA | 90035 | 20,300 |
| 2407 | Waterside Market Place | 50809 Waterside Drive | Chesterfield | MI | 48051 | 25,000 |
| 2409 | 1379 Hooper Avenue | 1379 Hooper Avenue | Toms River | NJ | 08753 | 20,000 |
| 2410 | Midway Market Square | 380 Market Drive | Elyria | OH | 44035 | 25,594 |
| 2411 | Shop Rite Plaza | 774 Queen St. | Southington | CT | 06489 | 19,693 |
| 2412 | Suburban Plaza | 2655 N. Decatur Road | Decatur | GA | 30033 | 20,035 |
| 2414 | Lakeland Plaza | 540 A Lakeland Plaza | Cumming | GA | 30040 | 17,793 |
| 2415 | Witte Plaza | 9960 Old Katy Rd | Houston | TX | 77055 | 25,000 |
| 2418 | Freeport Shopping Center | 1611 South West Avenue | Freeport | IL | 61032 | 18,018 |
| 2419 | Barren River Plaza | 376 North L Rogers Wells Blvd | Glasgow | KY | 42141 | 17,163 |
| 2420 | Monte Vista Crossing | 2717 Countryside Drive | Turlock | CA | 95380 | 18,000 |
| 2422 | Riverside Plaza | 3635 Riverside Plaza Dr. Ste.240 | Riverside | CA | 92506 | 15,131 |
| 2424 | Broadmoor Plaza | 1131 E. Ireland Road | South Bend | IN | 46614 | 16,527 |
| 2426 | Monroe Mall | 2115 W. Roosevelt Blvd, Suite 111 | Monroe | NC | 28110 | 20,059 |
| 2428 | Clovis Crossing Shopping Ce | 1065 Herndon Ave. | Clovis | CA | 93611 | 18,000 |
| 2434 | Crosswinds Commons | 1133 Sw Wanamaker Rd Ste 200 | Topeka | KS | 66604 | 24,709 |
| 2435 | Northlake Commons | 3942 Northlake Blvd | West Palm Bea | FL | 33403 | 25,345 |
| 2438 | Cross County Mall | 700 Broadway East | Mattoon | IL | 61938 | 13,670 |
| 2439 | Town Fair Center | 1224 James Ave | Bedford | IN | 47421 | 12,175 |
| 2441 | Grocery Outlet SC | 11 N State Highway 49-88 | Jackson | CA | 95642 | 12,564 |
| 2442 | Fullerton Crossroads | 3300 Yorba Linda Boulevard | Fullerton | CA | 92831 | 20,100 |
| 2443 | Town Center | 1020 Stratford Road | Moses Lake | WA | 98837 | 16,600 |
| 2444 | Westridge Center | 1425 N. Davis Road | Salinas | CA | 93907 | 16,355 |
| 2445 | Central Texas Marketplace | 4633 S. Jack Kultgen Expy Unit 104 | Waco | TX | 76706 | 25,000 |
| 2446 | Yarbrough Plaza | 10501 Gateway Blvd W Bld 9 | El Paso | TX | 79925 | 27,515 |
| 2447 | Pittsburgh Mills | 133 Pittsburgh Mills Circle | Tarentum | PA | 15084 | 21,903 |
| 2448 | Former Home Depot | 1991 Tiffin Avenue | Findlay | OH | 45840 | 21,073 |
| 2449 | Covina Town Square | 1460 North Azusa Avenue | Covina | CA | 91722 | 25,196 |
| 2450 | Raleigh Mall | 4293 Robert C. Byrd Drive | Beckley | WV | 25801 | 21,000 |
| 2451 | Crossings at Sandusky | 756 Crossings Road | Sandusky | OH | 44870 | 16,000 |
| 2452 | Centre Point Village | 26583 Carl Boyer Drive | Santa Clarita | CA | 91350 | 24,970 |
| 2453 | Scottsdale Center | 206 S Promenade Blvd | Rogers | AR | 72758 | 18,000 |
| 2454 | Village of Martinsville | 240 Commonwealth Blvd W | Martinsville | VA | 24112 | 14,957 |
| 2455 | Village Mall | 2917 North Vermillion Suite C17 | Danville | IL | 61832 | 16,427 |
| 2456 | Wolf Creek Plaza | 10521 S. 15Th Street | Bellevue | NE | 68123 | 23,865 |
| 2459 | Ohio Valley Mall | 67800 Mall Ring Rd Unit 305 | St. Clairsville | OH | 43950 | 16,398 |
| 2460 | Westgate Market | 6930 W. Kellogg Drive | Wichita | KS | 67209 | 22,182 |
| 2461 | Roseburg Marketplace | 1438 Nw Garden Valley Blvd | Roseburg | OR | 97471 | 18,000 |
| 2462 | Raley's Center | 704 West Onstott Rd | Yuba City | CA | 95991 | 19,794 |
| 2464 | Pharr Town Center | 500 N. Jackson Rd | Pharr | TX | 78577 | 20,157 |
| 2465 | Freestanding | 2391 County Line Road | Algonquin | IL | 60102 | 19,875 |
| 2468 | Regency Mall | 2629 S. Green Bay Road | Racine | WI | 53406 | 23,371 |
| 2469 | Palouse Mall | 1854 W. Pullman Road | Moscow | ID | 83843 | 17,680 |

# Joann
## Store List
### Exhibit 1 (a) (1)

| Str | Name/Mall | Address | City | ST | Zip | Selling S.F. |
|---|---|---|---|---|---|---|
| 2473 | Sequoia Plaza | 3930 S. Mooney Blvd | Visalia | CA | 93277 | 21,282 |
| 2474 | Park West Place | 10916-B Trinity Parkway | Stockton | CA | 95219 | 18,192 |
| 2475 | Haines Station Plaza | 2255 N Haines Avenue | Rapid City | SD | 57701 | 11,622 |
| 2476 | Freestanding Building | 3911 16Th Street | Moline | IL | 61265 | 16,900 |
| 2477 | Burning Tree Plaza | 5115 Burning Tree Plaza | Duluth | MN | 55811 | 17,682 |
| 2478 | Crossing Meadows Plaza | 1220 Crossing Meadows | Onalaska | WI | 54650 | 17,885 |
| 2479 | Governors Square Plaza | 2831 Wilma Rudolph | Clarksville | TN | 37040 | 26,079 |
| 2481 | Park Plaza | 2108 W 27Th Street | Lawrence | KS | 66047 | 14,148 |
| 2482 | Park Central Shopping Cente | 3206 South Clack Drive | Abilene | TX | 79606 | 21,500 |
| 2483 | University Plaza | 2813 E Nettleton Avenue | Jonesboro | AR | 72401 | 11,987 |
| 2485 | City Base Landing | 3142 Se Military Drive Suite 126 | San Antonio | TX | 78235 | 15,200 |
| 2486 | Power Center | 1804 Macarthur Blvd | Alexandria | LA | 71301 | 16,327 |
| 2487 | Marshfield Center | 1919 N Central Avenue | Marshfield | WI | 54449 | 12,325 |
| 2489 | Towne Centre | 219 Towne Drive | Elizabethtown | KY | 42701 | 12,000 |
| 2490 | Willow Lake Crossing | 2951 Watson Blvd | Warner Robins | GA | 31093 | 12,277 |
| 2492 | Market Place Shopping Cent | 123 Marketplace Drive | Anderson | SC | 29621 | 11,250 |
| 2494 | Johnson City Plaza | 108 Johnson City Plaza Dr | Johnson City | TN | 37601 | 8,000 |
| 2497 | Freestanding | 1702 Veterans Memorial Pkwy East | Tuscaloosa | AL | 35404 | 10,098 |
| 2498 | Fort Smith Marketplace | 7609 Rogers Avenue | Fort Smith | AR | 72903 | 11,985 |
| 2499 | The Marketplace | 3271 Marketplace Drive  Suite: C1 | Council Bluffs | IA | 51501 | 20,310 |
| 2500 | Kingsport Shopping Center | 1409 East Stone Drive | Kingsport | TN | 37660 | 14,300 |
| 2501 | Midlothian Towne Crossing | 2000 F.M. 663 St 500 | Midlothian | TX | 76065 | 15,000 |
| 2502 | Boulevard Centre at Eastwoo | 5555 Youngstown Warren Road #14 | Niles | OH | 44446 | 22,341 |
| 2503 | Eastbrook Plaza | 2610 25Th Street | Columbus | IN | 47201 | 14,329 |
| 2504 | Bayou Walk Shopping Cente | 6634 Youree Drive | Shreveport | LA | 71105 | 23,500 |
| 2505 | New River Valley Center | 145 Shoppers Way | Christiansburg | VA | 24073 | 20,525 |
| 2506 | Dominion Square | 705 Dominion Square S/C | Culpeper | VA | 22701 | 12,000 |
| 2507 | Crossways Shopping Center | 1593 Crossways Blvd | Chesapeake | VA | 23320 | 19,867 |
| 2508 | Westside North Shopping Ce | 91 Westbank Expressway Ste 490 | Gretna | LA | 70053 | 17,935 |
| 2509 | Iowa City Marketplace | 1676 Sycamore Street | Iowa City | IA | 52240 | 27,000 |
| 2510 | Marketplace at Janesville | 2700 N. Pontiac Dr Ste 150 | Janesville | WI | 53545 | 18,774 |
| 2511 | University Mall | 930 22Nd Avenue S. | Brookings | SD | 57006 | 12,335 |
| 2512 | The Shops at Coventry | 351 West Schuylkill Rd | Pottstown | PA | 19465 | 14,310 |
| 2513 | Indian Springs Shopping Cen | 3177 Princeton Road | Hamilton | OH | 45011 | 22,400 |
| 2515 | Germantown Center | 3703 N. Newton St | Jasper | IN | 47546 | 14,036 |
| 2517 | Pine Tree Mall | 2402 Roosevelt Road | Marinette | WI | 54143 | 15,164 |
| 2519 | Shops @ Boardman Park | 441 Boardman Poland Road | Youngstown | OH | 44512 | 28,881 |
| 2520 | Hilltop Plaza | 551 Hiltop Plaza | Virginia Beach | VA | 23454 | 24,140 |
| 2521 | Ferris Commons | 1250 W. Perry Avenue | Big Rapids | MI | 49307 | 15,000 |
| 2522 | Arcadia Fiesta SC | 3049 East Indian School Road | Phoenix | AZ | 85016 | 16,000 |
| 2523 | Orange Park Plaza | 1411 N. Tustin Streets | Orange | CA | 92867 | 18,547 |
| 2526 | Foothill Ranch Towne Center | 26742 Portola Parkway | Foothill Ranch | CA | 92610 | 22,500 |
| 2527 | Village West Shopping Cente | 2981 West Florida Avenue (Unit G1) | Hemet | CA | 92545 | 21,398 |
| 2528 | Former Dan's Market | 2330 E. 3000 South (Temp) | Salt Lake City | UT | 84109 | 23,445 |
| 2529 | Chino Town Square | 5545 Philadelphia St | Chino | CA | 91710 | 18,369 |
| 2532 | Market Centre | 4024 Elkhart Road #25 | Goshen | IN | 46526 | 21,494 |
| 2533 | Westlake Shopping Center | 423 Westlake Center (Second Level) | Daly City | CA | 94015 | 22,900 |
| 2534 | Freestanding | 3055 Atlanta Highway | Athens | GA | 30606 | 21,500 |
| 2536 | Shops of Forest Hill | 3150 Village Shops Drive (Temp) | Germantown | TN | 38138 | 24,970 |
| 2537 | Coconut Pointe | 8072 Mediterranean Drive | Estero | FL | 33928 | 18,322 |
| 2538 | Crossroads SC | 125 East Reynolds Road, Suite 110 | Lexington | KY | 40517 | 30,000 |
| 2540 | Plaza 20 | 2600 Dodge Street (Suite A-1)- Temp | Dubuque | IA | 52003 | 18,000 |
| 2542 | Sunrise Village Shopping Cen | 5489 Sunrise Blvd | Citrus Heights | CA | 95610 | 27,150 |
| 2544 | Wilshire Plaza | 725 Veterans Blvd | Metairie | LA | 70005 | 20,250 |
| 2545 | University Center | 3801 Old Seward Highway | Anchorage | AK | 99503 | 30,637 |
| 2546 | Riverside Woodman Plaza | 13730 Riverside Drive | Sherman Oaks | CA | 91423 | 46,563 |
| 2547 | Freestanding | 501 Roberts Ct | Kennesaw | GA | 30144 | 42,059 |
| 2548 | Champtions Centre | 530 Ed Noble Parkway | Norman | OK | 73072 | 30,244 |

# Joann
## Store List
### Exhibit 1 (a) (1)

| Str | Name/Mall | Address | City | ST | Zip | Selling S.F. |
|-----|-----------|---------|------|----|----|-----|
| 2550 | Sugarland Crossing | 47100 Community Plaza | Sterling | VA | 20164 | 35,000 |
| 2552 | Bloomington Commons | 1719 E Empire Street | Bloomington | IL | 61704 | 21,828 |
| 2554 | Former Salvation Army | 10174 SE 82nd Avenue | Clackamas | OR | 97086 | 40,259 |
| 2555 | Scottdale Plaza | 1800 M-139 Unit A | Benton Harbor | MI | 49022 | 25,470 |
| 2556 | Valley Court Shopping Cente | 9999 University Avenue | Clive | IA | 50325 | 33,330 |
| 2557 | Union Plaza | 10007 E 71st St | Tulsa | OK | 74133 | 34,392 |
| 2558 | Deptford Plaza | 1120 Hurffville Road | Deptford | NJ | 8096 | 40,003 |
| 2559 | Grand Plaza | 177 South Las Posas Road | San Marcos | CA | 92078 | 40,000 |
| 2560 | Lakepointe Towne Crossing | 715 Hebron Parkway | Lewisville | TX | 75057 | 33,862 |
| 2561 | Meyerland Plaza | 290 Meyerland Plaza | Houston | TX | 77096 | 33,733 |
| 2562 | Silas Creek Crossing | 3208 Silas Creek Parkway | Winston-Salem | NC | 27103 | 27,410 |
| 2563 | The Centre at Deane Hill | 276 Morrell Road | Knoxville | TN | 37919 | 40,000 |
| 2564 | Nashua Mall Plaza | 31 Gusabel Avenue | Nashua | NH | 3063 | 37,113 |
| 2565 | Ann & Hope Plaza | 85 Highland Avenue | Seekonk | MA | 2771 | 21,700 |
| 2566 | Seaboard Commons | 1120 Seaboard St | Myrtle Beach | SC | 29577 | 32,500 |
| 2567 | Sayville Plaza | 5159 Sunrise Hwy | Bohemia | NY | 11716 | 31,484 |
| 2568 | Former Ralph's Market | 27871 La Paz Rd | Laguna Niguel | CA | 92677 | 31,518 |
| 2569 | Waterford North | 1025 Veterans Pkwy | Clarksville | IN | 47129 | 24,961 |
| 2570 | Deerbrook Marketplace | 20424 US-59 | Humble | TX | 77338 | 39,581 |
| 2571 | Southpark Meadows | 9500 S IH 35 Frontage Rd | Austin | TX | 78748 | 35,000 |
| 2572 | The Village at Cumberland P | 8950 S Broadway Ave | Tyler | TX | 75703 | 28,751 |
| 2573 | Rochester Marketplace | 3839 Marketplace Drive NW | Rochester | MN | 55901 | 23,725 |
| 2574 | Dickson City Crossing | 638 Commerce Blvd | Dickson City | PA | 18519 | 20,000 |
| 2575 | Marketplace at Towne Centre | 19105 Lyndon B Johnson Fwy | Mesquite | TX | 75150 | 23,755 |
| 2576 | Plaza Farmington | 3558 E Main St | Farmington | NM | 87402 | 20,020 |
| 2577 | Columbia Center | 1321 N Columbia Center Blvd Suite 456 | Kennewick | WA | 99336 | 29,378 |
| 2579 | Parkway Plaza | 3120 Vestal Parkway East | Vestal | NY | 13850 | 30,000 |
| 2580 | Shoppes at Paradise Key | 4437 Commons Dr. | Destin | FL | 32541 | 33,875 |
| 2582 | Gresham Town Fair | 604 NW Eastman Pkwy | Gresham | OR | 97030 | 24,948 |
| 2583 | Westridge Plaza | 1310 S Beach Blvd | La Habra | CA | 90631 | 28,021 |
| 2585 | Holiday Village Mall | 1200 10th Ave S | Great Falls | MT | 59405 | 21,062 |
| 2586 | State Street Market | 6360 E. State Street | Rockford | IL | 61108 | 28,500 |
| 2587 | Bradley Commons | 2056 N State Rt. 50 (Unit 15) | Bourbonnais | IL | 60914 | 21,421 |
| 2589 | Hyde Park Plaza | 3872 C Paxton Avenue) | Cincinnati | OH | 45209 | 24,393 |
| 2590 | Town Center Square | 10930 Foothill Blvd | Rancho Cucam | CA | 91730 | 37,355 |
| 2596 | Birch Run Station | 1717 Beam Avenue | Maplewood | MN | 55109 | 27,000 |
| 200 | TJ Maxx Plaza | 1746 E 3Rd St | Williamsport | PA | 17701 | 10,400 |
| 235 | Hermitage Towne Plaza | 2481 E State St | Hermitage | PA | 16148 | 13,960 |
| 677 | Holyoke Plaza | 2267 Northampton St | Holyoke | MA | 01040 | 15,120 |
| 722 | Garrison Forest Plaza | 10377 Reisterstown Rd | Owings Mills | MD | 21117 | 15,296 |
| 1484 | Bayshore Village | 4265 Tamiami Trl Unit I | Port Charlotte | FL | 33980 | 9,500 |
| 2036 | Preston Forest S C | 11700 Preston Rd #810 | Dallas | TX | 75230 | 48,686 |
| 2069 | Destination Eight | 39818 10Th Street W. | Palmdale | CA | 93551 | 35,328 |
| 2342 | Cayuga Mall | 2309 N Triphammer Rd, Unit 1 | Ithaca | NY | 14850 | 18,350 |
| 2400 | Tifton Mall | 612 Virginia Ave North | Tifton | GA | 31794 | 16,233 |
| 2416 | Burlington Commons | 3200 Agency Street, Ste 110 | Burlington | IA | 52601 | 18,000 |
| 2429 | Ridgecrest Town Center | 700 North China Lake Unit C | Ridgecrest | CA | 93555 | 20,000 |
| 2480 | Valley Crossing | 2102 Us Hwy 70 Se | Hickory | NC | 28602 | 7,780 |

| 802 |
|-----|
| 257 |

| 22,946 |
|--------|
| 24,647 |

**Exhibit 1(a)(2)**

**<u>Distribution Centers</u>**

# Joann
## Distribution Center and Ecommerce Platform List
### Exhibit 1 (a) (2)

| GRP | Name/Mall | Address | City | ST | Zip | Square Feet |
|---|---|---|---|---|---|---|
| **Distribution Center** | Visalia DC(1) | 2500 N Plaza Dr | Visalia | CA | 93291 | 635,281 |
| **Distribution Center** | Visalia DC #2(2) | 7530 W. Sunnyview Ave | Visalia | CA | 93291 | 104,870 |
| **Distribution Center** | Opelika DC(1) | 3101 Anderson Rd | Opelika | AL | 36801 | 702,623 |
| **Distribution Center** | West Jefferson eComm FC | 1020 Enterprise Pkwy | West Jefferson | OH | 43162 | 832,600 |
| **Ecommerce Platform** | Hudson SSC, DC(1) | 5555 Darrow Road | Hudson | OH | 44236 | 1,453,419 |

**Exhibit 2(b)(iv)**

**Form of Asset Designation Notice**

**Exhibit 2(b)(iv)**
**Asset Designation Notice**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| JOANN, INC., *et al.*,[1] | Case No. 25-10068 (CTG) |
| Debtors. | (Jointly Administered) |

### NOTICE OF DESIGNATION OF ASSET PURCHASER

**PLEASE TAKE NOTICE** that pursuant to the *Order Approving Debtors' Entry Into Agency Agreement and Consummation of the Transactions Contemplated Thereby* (the "Approval Order") [D.I. __],[2] Purchaser hereby designates the entity identified on Schedule A ("Designee") annexed hereto as the assignee of the Assets identified on Schedule A (the "Designated Assets") pursuant to the agreement between Purchaser, as agent for the Debtors, and Designee, an abstract of which is annexed hereto as Exhibit A (the "Purchase Agreement").

**PLEASE TAKE FURTHER NOTICE** that pursuant to the Approval Order, upon the closing of the transaction pursuant to the Purchase Agreement, the Designated Assets shall be deemed conveyed to Designee by the Debtors free and clear of all liens, claims, encumbrances, and other interests of any kind.

Dated: [_], 2025
Wilmington, Delaware

_____
**[COUNSEL TO PURCHASER]**

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: JOANN Inc. (5540); Needle Holdings LLC (3814); Jo-Ann Stores, LLC (0629); Creative Tech Solutions LLC (6734); Creativebug, LLC (3208); WeaveUp, Inc. (5633); JAS Aviation, LLC (9570); joann.com, LLC (1594); JOANN Ditto Holdings Inc. (9652); Dittopatterns LLC (0452); JOANN Holdings 1, LLC (9030); JOANN Holdings 2, LLC (6408); and Jo-Ann Stores Support Center, Inc. (5027). The Debtors' mailing address is 5555 Darrow Road, Hudson, Ohio 44236.

[2]  Capitalized terms used but not defined in this Notice have the meanings given thereto in the Approval Order.

**Exhibit 2(b)(iv)**
**Asset Designation Notice**

## SCHEDULE A

| Designated Assets | Designee |
|---|---|
|  |  |

**Exhibit 3.1(b)**

**<u>Wind-Down Budget</u>**

Exhibit 3.1 b  Wind Down Budget

| | |
|---|---:|
| Debtor / UCC Professional Fees /Escrow Funding | 22,100,000 |
| ABL/FILO/TL Professional Fees | 4,260,000 |
| 503b9 and Stub Rent | 39,000,000 |
| U.S. Trustee Fee | 500,000 |
| Total | 65,860,000 |

**Exhibit 3.1(c)**

**<u>Central Services Budget</u>**

**Exhibit 3.1 c**

| | Total | 3/8/25 Mar-25 8 | 3/15/25 Mar-25 9 | 3/22/25 Mar-25 10 | 3/29/25 Mar-25 11 | 4/5/25 Apr-25 12 | 4/12/25 Apr-25 13 | 4/19/25 Apr-25 14 | 4/26/25 Apr-25 15 | 5/3/25 May-25 16 | 5/10/25 May-25 17 | 5/17/25 May-25 18 | 5/24/25 May-25 19 | 5/31/25 May-25 20 | 6/7/25 Jun-25 21 | 6/14/25 Jun-25 22 | 6/21/25 Jun-25 23 | 6/28/25 Jun-25 24 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Summary Corporate Costs** | | | | | | | | | | | | | | | | | | |
| Corporate Labor | 3.00 | 0.10 | 0.83 | 0.10 | 0.83 | 0.10 | 0.23 | 0.03 | 0.21 | 0.03 | 0.21 | 0.03 | 0.10 | 0.01 | 0.10 | 0.01 | 0.05 | 0.01 |
| Outside Services | 1.76 | 0.15 | 0.15 | 0.15 | 0.15 | 0.06 | 0.06 | 0.06 | 0.06 | 0.14 | 0.14 | 0.14 | 0.14 | 0.14 | 0.05 | 0.05 | 0.05 | 0.05 |
| Technology | 4.67 | 0.48 | 0.48 | 0.48 | 0.48 | 0.41 | 0.41 | 0.41 | 0.41 | 0.22 | 0.22 | 0.22 | 0.22 | 0.22 | - | - | - | - |
| General & Other Insurance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Travel, Meals & Entertainment | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | - | - | - | - |
| Facilities Management | 0.74 | 0.09 | 0.09 | 0.09 | 0.09 | 0.09 | 0.09 | 0.09 | 0.09 | - | - | - | - | - | - | - | - | - |
| Employee Costs | 0.14 | 0.01 | 0.01 | 0.01 | 0.01 | 0.01 | 0.01 | 0.01 | 0.01 | 0.01 | 0.01 | 0.01 | 0.01 | 0.01 | - | - | - | - |
| Credit Card And Bank Service Fees | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | - | - | - | - |
| Corporate Non-Opex | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Summary Corporate Costs** | **10.35** | **0.84** | **1.57** | **0.84** | **1.57** | **0.69** | **0.81** | **0.61** | **0.79** | **0.40** | **0.59** | **0.40** | **0.48** | **0.39** | **0.15** | **0.06** | **0.10** | **0.05** |

**Exhibit 3.1(e)**

**<u>Term Loan Ad Hoc Group Direction Letter</u>**

**Execution Version**

February 22, 2025

Wilmington Savings Fund Society, FSB
Administrative Agent
500 Delaware Avenue, 11th Floor
Wilmington, DE 19801
Attention: Patrick Healy, Senior Vice President, Global Capital Markets

Re:    <u>Letter of Direction Regarding Credit Bid in Connection with Joint Bid with GA Joann</u>
       <u>Retail Partnership, LLC</u>

Dear Mr. Healy:

The undersigned entities are Lenders under (i) that certain Credit Agreement, dated as of April 30, 2024 (as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**Credit Agreement**"), among Needle Holdings LLC, a Delaware limited liability company (the "**Borrower**"), JOANN Holdings 2, LLC, a Delaware limited liability company ("**Holdings**," and together with the Borrower and each of their affiliates and subsidiaries, the "**Company**"), Wilmington Savings Fund Society, FSB, as Administrative Agent and Collateral Agent (in such capacities, the "**Administrative Agent**"), and the other Lenders party thereto, (ii) that certain Security Agreement, dated as of April 30, 2024 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**Security Agreement**"), among the Borrower, Holdings, the Subsidiary Guarantors party thereto from time to time, and the Administrative Agent, and (iii) the other Loan Documents. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Credit Agreement.

Pursuant to Sections 9.01 and 9.10 of the Credit Agreement, the undersigned Lenders, who as of the date hereof, collectively hold an aggregate amount of $██████████ of the outstanding Loans under the Credit Agreement, constitute "Required Lenders" under the Credit Agreement, hereby request and direct the Administrative Agent to authorize the Authorized Person (as defined below) to, on behalf of the Lenders, make the Credit Bid (as defined below) pursuant to the agency agreement in the form attached hereto as **Exhibit A** (the "**Agency Agreement**") and the joint venture letter agreement in the form attached hereto as **Exhibit B** (the "**JV Letter Agreement**"), and any related and ancillary agreements or documents that the Required Lenders deem necessary, for the purpose of bidding and making settlement or payment of the purchase price under the Agency Agreement and the JV Letter Agreement for certain Collateral pledged pursuant to the Security Agreement (such Collateral, the "**Auctioned Collateral**") to be sold to Purchaser (as defined in the Agency Agreement) (the "**Bidder**"), a direct or indirect subsidiary of Bidder, or another entity, in each case as designated by Purchaser or contemplated by the Agency Agreement and the JV Letter Agreement (the Bidder or any other such entity that acquires the Auctioned Collateral, the "**Buyer**"), upon the consummation of the sale of the Auctioned Collateral to Buyer (such sale being referred to herein as the "**363 Sale**") to be provided in the order approving the 363 Sale, in accordance with bidding procedures approved by the United States Bankruptcy Court for the District of Delaware (the "**Bidding Procedures**"), including, if necessary, at an auction to be conducted in accordance with the Bidding Procedures (the "**Auction**"). In addition to and in

1

connection with the foregoing, the Required Lenders request and direct the Administrative Agent to:

A.      reasonably cooperate with such steps necessary to distribute, issue, assign, and/or cancel interests (as applicable) in Bidder in accordance with the Loan Documents and applicable law;

B.      assign to the relevant director and/or officer of Bidder or such other person authorized by Joann Retail Partnership, LLC (the "**Authorized Person**") all rights of the Administrative Agent under the Credit Agreement, the Security Agreement, and the other Loan Documents to credit bid up to $105,000,000 of the Obligations under the Credit Agreement on behalf of the Required Lenders thereunder as consideration for the 363 Sale involving the Company (the "**Credit Bid**") (it being understood for the avoidance of doubt that any such Obligations shall not be utilized for such Credit Bid, and shall not be transferred to the applicable debtor, until the consummation of the 363 Sale); provided that the Required Lenders reserve the right, at any time, to request and direct the Administrative Agent, through the Lenders' Counsel (as defined below), to increase the amount of the Credit Bid in connection with the sale process or the Auction, if any, and thereby authorize the Authorized Person to Credit Bid such increased amount pursuant to the terms of the Agency Agreement;

C.      assign an amount of the Obligations equal to the amount of the Credit Bid to Buyer at the consummation of the 363 Sale;

D.      reasonably cooperate with the Lenders and the Authorized Person with respect to any actions necessary or required in furtherance of the Credit Bid, the Auction, or any other aspect of the 363 Sale;

E.      execute the Agency Agreement; and

F.      execute the JV Letter Agreement.

Each undersigned Lender represents and warrants and covenants, severally and not jointly, that (i) it is a Lender under the Credit Agreement and that it has the power and authority to enter into this letter of direction (the "**Letter of Direction**") and (ii) such Lender owns the amount of the Loans set forth on its signature page hereto.  The Administrative Agent, in its capacity as Agent, shall have no obligations to comply with any direction pursuant to this Letter of Direction if it reasonably concludes that the Lenders signatory hereto no longer constitute Required Lenders. Each Lender signatory hereto hereby confirms and agrees that this Letter of Direction shall not be revoked except by another written direction issued by or on behalf of the Required Lenders; provided the same is delivered sufficiently in advance to halt the exercise of such remedies. Notwithstanding anything to the contrary contained here, all actions or inactions of the Administrative Agent in connection with this Letter of Direction shall be at the Direction of the Required Lenders; provided that the Administrative Agent shall be entitled to rely upon, and shall

not incur any liability for relying upon, any written direction or instruction from Lenders Counsel (or any other designated Lender Advisor) that is purported to be a Direction of the Required Lenders, and the Administrative Agent shall not have any responsibility to independently determine whether such direction has in fact been authorized by Required Lenders.

Each undersigned Lender acknowledges and agrees that: (i) the Lenders are being represented by Gibson, Dunn & Crutcher LLP, Glenn Agre Bergman & Fuentes LLP, and Morris, Nichols, Arsht & Tunnell LLP (collectively, the "**Lenders Counsel**") in this matter and have relied exclusively upon the legal advice of Lenders Counsel and not upon the legal advice of the Administrative Agent, the Company, or their respective counsel; (ii) the Lenders are not relying upon any information provided to the Lenders by the Administrative Agent or its counsel; and (iii) the Administrative Agent and the Lenders reserve all of their respective rights and remedies under the Loan Documents, at law, and in equity, including the right to object to the form of any proposed order relating to the subject matter of this Letter of Direction.

To the extent that the structure of the 363 Sale requires Buyer to be an entity other than Bidder or any of its direct or indirect subsidiaries, the Administrative Agent acknowledges that the directions and instructions as described above may be modified or amended to reflect such structure; provided that in no event will the Administrative Agent be required to form or own Buyer.

The Administrative Agent shall enjoy all rights and benefits under the Credit Agreement and the other Loan Documents, including, as applicable, (i) the rights and immunities of the Agent set forth in the Credit Agreement and (ii) the exculpatory, expense reimbursement and indemnification provisions in favor of the Agent set forth in the Credit Agreement in connection with any act or omission taken pursuant to this Letter of Direction. Nothing in this Letter of Direction shall alter, limit, or waive any such rights, remedies, limitations of liability, exculpations, reimbursements, indemnities, and other protections of the Indemnitees under, and to the extent set forth in, the Credit Agreement or the other applicable Loan Documents, all of which are hereby reserved. It is expressly understood and agreed that the foregoing rights, remedies, limitations of liability, exculpations, reimbursements, indemnities, and other protections apply to any actions taken by the Administrative Agent in accordance with this Letter of Direction. The Authorized Person shall be an express third party beneficiary of clause (x) of the second paragraph of this Letter of Direction.

The Administrative Agent acknowledges that, by signing this Letter of Direction, the Administrative Agent is authorizing the Authorized Person to Credit Bid pursuant to the terms of the Agency Agreement and the JV Letter Agreement.

The rights and remedies conferred hereunder shall be cumulative and the exercise or waiver of any such right or remedy shall not preclude or inhibit the exercise of additional rights or remedies or the subsequent exercise of such right or remedy.

This Letter of Direction shall be interpreted and enforced under the laws of the State of New York without regard to the conflict of laws principles thereof and shall inure to the benefit of, and the obligations created hereby shall be binding upon, the successors and permitted assigns of the Lenders and the Administrative Agent.

This letter may be executed by the Lenders in separate counterparts and the Administrative Agent is hereby instructed to accept the signature pages of such counterparts. Facsimile or electronically transmitted signature pages shall constitute originals for all purposes.

If any of this Letter of Direction is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Letter of Direction will remain in full force and effect. Any provision of this Letter of Direction held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable. This Letter of Direction is delivered pursuant to and shall be governed in accordance with the Credit Agreement.

[*The remainder of this page is intentionally left blank.*]

IN WITNESS WHEREOF, the undersigned have executed this Letter of Direction effective as of the date first written above.

[*Signature Pages on File*]

## Exhibit A

**Agency Agreement**

[*On File*]

## Exhibit B

**JV Letter Agreement**

[*On file with the Buyer*]

**Exhibit 8.1**

**<u>Sale Guidelines</u>**

**EXHIBIT 8.1**
**SALE GUIDELINES**

A.     The Sale shall be conducted so that the Stores in which sales are to occur will remain open no longer than during the normal hours of operation provided for in the respective leases for the Stores.

B.     The Sale shall be conducted in accordance with applicable state and local "Blue Laws," where applicable, so that no Sale shall be conducted on Sunday unless the Merchant had been operating such Store on a Sunday.

C.     On "shopping center" property, Agent shall not distribute handbills, leaflets or other written materials to customers outside of any Stores' premises, unless permitted by the lease or, if distribution is customary in the "shopping center" in which such Store is located; *provided* that Agent may solicit customers in the Stores themselves. On "shopping center" property, Agent shall not use any flashing lights or amplified sound to advertise the Sale or solicit customers, except as permitted under the applicable lease or agreed to by the landlord.

D.     At the conclusion of the Sale or the Lease/Contract Designation Rights Period, as applicable, Agent shall vacate the Stores in broom clean condition; *provided* that Agent may abandon any FF&E not sold in the Sale at the Stores, the Distribution Centers, or Merchant's corporate offices at the conclusion of the Sale or the Lease/Contract Designation Rights Period, as applicable, without cost or liability of any kind to Agent.  Any abandoned FF&E left in a Store or Distribution Center or Merchant's corporate offices after a lease is rejected shall be deemed abandoned to the landlord having a right to dispose of the same as the landlord chooses without any liability whatsoever on the part of the landlord to any party and without waiver of any damage claims against the Merchant.  For the avoidance of doubt, as of the Sale Termination Date or the conclusion of the Lease/Contract Designation Rights Period, as applicable, Agent may abandon, in place and without further responsibility or liability of any kind, any FF&E located at a Store or Distribution Center  or Merchant's corporate offices.

E.     Following, and subject to, the entry of the Approval Order, Agent may advertise the Sale as a "store closing," "going out of business," "sale on everything," "everything must go," or similar-themed sale, as dictated by the Approval Order.

F.     Agent shall be permitted to utilize display, hanging signs, and interior banners in connection with the Sale; *provided, however*, that such display, hanging signs, and interior banners shall be professionally produced and hung in a professional manner. The Merchant and Agent shall not use neon or day-glo on its display, hanging signs, or interior banners.  Furthermore, with respect to enclosed mall locations, no exterior signs or signs in common areas of a mall shall be used unless otherwise expressly permitted in these Sale Guidelines.  In addition, the Merchant and Agent shall be permitted to utilize exterior banners at (i) non-enclosed mall Stores and (ii) enclosed mall Stores to the extent the entrance to the applicable Store does not require entry into the enclosed mall common area; provided, however, that such banners shall be located or hung so as to make clear that the Sale is being conducted only at the affected Store, shall not be wider than the storefront of the Store, and shall not be larger than 4 feet x 40 feet.  In addition, the Merchant and Agent shall be permitted to utilize sign walkers in a safe and professional manner and in accordance with the terms of the Approval Order. Nothing contained in these Sale Guidelines shall be construed to create or impose upon Agent any additional restrictions not contained in the applicable lease agreement.

1

F.      Conspicuous signs shall be posted in the cash register areas of each of the affected Stores to effect that "all sales are final."

G.      Except with respect to the hanging of exterior banners, Agent shall not make any alterations to the storefront or exterior walls of any Stores.

H.      Agent shall not make any alterations to interior or exterior Store lighting. No property of the landlord of a Store shall be removed or sold during the Sale. The hanging of exterior banners or in-Store signage and banners shall not constitute an alteration to a Store.

I.      Agent shall keep Store premises and surrounding areas clear and orderly consistent with present practices.

J.      Subject to the provisions of the Agreement, Agent shall have the right to sell all Owned FF&E at the Stores and Distribution Centers and Merchant's corporate offices.  Agent may advertise the sale of the Owned FF&E in a manner consistent with these guidelines at the Closing Stores.  The purchasers of any Owned FF&E sold during the sale shall be permitted to remove the Owned FF&E either through the back shipping areas at any time, or through other areas after applicable business hours. For the avoidance of doubt, as of the Sale Termination Date or the termination of the Lease/Contract Designation Rights Period, as applicable, Agent may abandon, in place and without further responsibility, any FF&E at the Stores, the Distribution Centers, and Merchant's corporate offices.

K.      Agent shall be entitled to include Additional Agent Merchandise in the Sale in accordance with the terms of the Approval Order and the Agreement.

L.      At the conclusion of the Sale at each Store, pending assumption or rejection of applicable leases, the landlords of the Stores shall have reasonable access to the Stores' premises as set forth in the applicable leases.  The Merchant, Agent and their agents and representatives shall continue to have access to the Stores as provided for in the Agreement.

M.      Post-petition rents shall be paid by the Merchant as required by the Bankruptcy Code until the rejection or assumption and assignment of each lease.  Agent shall have no responsibility to the landlords therefor.

N.      The rights of landlords against Merchant for any damages to a Store shall be reserved in accordance with the provisions of the applicable lease.

O.      If and to the extent that the landlord of any Store affected hereby contends that Agent or Merchant is in breach of or default under these Sale Guidelines, such landlord shall email or deliver written notice by overnight delivery on Merchant and Agent as follows:

**If to Agent:**

GA Joann Retail Partnership, LLC
c/o GA Group
30870 Russell Ranch Road, Suite 250
Westlake Village, CA 91362
Attention: Scott K. Carpenter and Tim Shilling
scarpenter@brileyfin.com; tshilling@brileyfin.com; legal@brileyfin.com

*With copies (which shall not constitute notice) to:*

Lowenstein Sandler LLP
One Lowenstein Drive
Roseland, NJ 07068
Attention:  Andrew Behlmann
Tel: (973) 597-2332
abehlmann@lowenstein.com

**If to Merchant:**
JOANN Inc.
5555 Darrow Rd.
Hudson, Ohio 44236
Attn:    Ann Aber
Email:  ann.aber@joann.com

*With copies (which shall not constitute notice) to*:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attn:    Joshua A. Sussberg, P.C. and Aparna Yenamandra, P.C.
Email:  joshua.sussberg@kirkland.com; aparna.yenamandra@kirkland.com

-and-

Kirkland & Ellis LLP
333 West Wolf Point Plaza
Chicago, Illinois 60654
Attn:    Anup Sathy, P.C; Jeffrey Michalik; and Lindsey Blumenthal
Email:  anup.sathy@kirkland.com; jeff.michalik@kirkland.com; and lindsey.blumenthal@kirkland.com

**Exhibit 11.2(m)**

**<u>Promotional Calendar</u>**

FY21 Q1 Promotional Calendar

**Exhibit 11.2 (m)**
*-Strictly Confidential / Subject to NDA-*

**Project Thread**
*FY2025 Promotional Calendar*

| MO FW | FY25 | Primary Event Print FY25 | FY24 | Subevent Print and/or Digital FY25 | FY24 | RPI Print FY25 | FY24 | Digital FY25 | FY24 | TP Print FY25 | FY24 | Digital FY25 | FY24 | Online Only / BOPIS FY25 | SHIPPING FY25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DEC 45 FW45 | | | | | | | | | | | | | | | |
| DEC 46 | 12/15/2024 Sun | 12/5 Event (FL+PC) | 12/7 Event (FL+PC) | 4-day Holiday Homestretch DB's (print) Weekend DB's as needed (digital) | 4-day Christmas Countdown DB's (print) +2-day LPOY DB's (digital) | 40% | 40% | 40% | 40% | | | | | 20%TP (B) | $3.99FRS>$20 |
| DEC 46 | 12/16/2024 Mon | 12/5 Event (FL+PC) | 12/7 Event (FL+PC) | Entire Site Sale | 7-day LPOY DB's (digital) | 40% | 40% | 40% | 40% | | | | | 20%TP (B) | $3.99FRS>$20 |
| DEC 46 | 12/17/2024 Tue | 12/5 Event (FL+PC) | 12/7 Event (FL+PC) | Entire Site Sale | 7-day LPOY DB's (digital) | 40% | 40% | 40% | 40% | | | | | 20%TP (B) | $3.99FRS>$20 |
| DEC 46 | 12/18/2024 Wed | 12/5 Event (FL+PC) | 12/7 Event (FL+PC) | 7-day LPOY DB's (digital) Yarnormous Begins | 7-day LPOY DB's (digital) | 40% | 40% | 40% | 40% | | | | | 20%TP (B) | $3.99FRS>$20 |
| DEC 46 | 12/19/2024 Thu | 12/5 Event (FL+PC) | 12/7 Event (FL+PC) | 7-day LPOY DB's (digital) | 7-day LPOY DB's (digital) Yarnormous Begins | 40% | 40% | 40% | 40% | | | | | 20%TP (B) *Suppress from all channels | $3.99FRS>$20 |
| DEC 46 | 12/20/2024 Fri | 12/5 Event (FL+PC) | 12/7 Event (FL+PC) | 7-day LPOY DB's (digital) + Free O/S Ornament w/purchase | 7-day LPOY DB's (digital) | 40% | 40% | 40% | 40% | | | | | 20%TP (B) *Suppress from all channels | $3.99FRS>$20 |
| DEC 46 | 12/21/2024 Sat | 12/5 Event (FL+PC) | 12/7 Event (FL+PC) | 7-day LPOY DB's (digital) + Free O/S Ornament w/purchase | 7-day LPOY DB's (digital) Extended Store Hours 8a-10p | 40% | 40% | 40% | 40% | | | | | 20%TP (B) *Suppress from all channels | $3.99FRS>$20 |
| DEC 46 FW46 | | | | | | | | | | | | | | | |
| DEC 47 | 12/22/2024 Sun | 12/5 Event (FL+PC) | 12/7 Event (FL+PC) | 7-day LPOY DB's (digital) + Free O/S Ornament w/purchase | 7-day LPOY DB's (digital) Stores close 5pm | 40% | 40% | 40% | 40% | | | | | | $3.99FRS>$20 |
| DEC 47 | 12/23/2024 Mon | 12/5 Event (FL+PC) | 12/7 Event (FL+PC) | 7-day LPOY DB's (digital) | Christmas Day +FSNM | 40% | | 40% | 40% | | | | | | $3.99FRS>$20 |
| DEC 47 | 12/24/2024 Tue | 12/5 Event (FL+PC) | 12/26 Event (PC) | 7-day LPOY DB's (digital) | | 40% | 40%, 50% (C.) | 40% | 50% (C.) | | | | | | $3.99FRS>$20 |
| DEC 47 | 12/25/2024 Wed | 12/5 Event (FL+PC) | 12/26 Event (PC) | Christmas Day Online early start of DB's | Online early start of DB's | | 40%, 50% (C.) | 50% (C.) | 50% (C.) | | | | | 20%TP (B) | FS>$20 |
| DEC 47 | 12/26/2024 Thu | 12/26 Event (PC) | 12/26 Event (PC) | 4-day SUB, DB's (dig) | 3-day SUB, DB's (dig) | 40%, 50% (C.) | 40%, 50% (C.) | 50% (C.) | 50% (C.) | | | | | 20%TP (B) | $3.99FRS>$20 |
| DEC 47 | 12/27/2024 Fri | 12/26 Event (PC) | 12/26 Event (PC) | 4-day SUB, DB's (dig) | 3-day SUB, DB's (dig) | 40%, 50% (C.) | 40%, 50% (C.) | 50% (C.) | 50% (C.) | | | | | 20%TP (B) | $3.99FRS>$20 |
| DEC 47 | 12/28/2024 Sat | 12/26 Event (PC) | 12/26 Event (PC) | 4-day SUB, DB's (dig) | 3-day SUB, DB's (dig) | 40%, 50% (C.) | 40%, 50% (C.) | 50% (C.) | 50% (C.) | | | | | 20%TP (B) | $3.99FRS>$20 |
| DEC 47 FW47 | | | | | | | | | | | | | | | |
| DEC 48 | 12/29/2024 Sun | 12/26 Event (PC) | 12/26 Event (PC) | 4-day SUB, DB's (dig) | 3-day SUB, DB's (dig extend) | 40%, 50% (C.) | 40%, 50% (C.) | 50% (C.) | 50% (C.) | | | | | 20%TP (B) | $3.99FRS>$20 |
| DEC 48 | 12/30/2024 Mon | 12/26 Event (PC) | 12/26 Event (PC) | | New Year's Day 3-day SUB, DB's (dig extend) | 40% | 40%, 50% (C.) | 40% | 50% (C.) | | | 30%TPR | | 20%TP (B) | $3.99FRS>$20 |
| DEC 48 | 12/31/2024 Tue | 12/26 Event (PC) | 12/26 Event (PC) | | | 40% | 40% | 40% | 40% | | | 30%TPR | 30%TPR (C.) | 20%TP (B) | $3.99FRS>$20 |
| DEC 48 | 1/1/2025 Wed | 12/26 Event (PC) | 12/26 Event (PC) | New Year's Day | | 40% | 40% | 40% | 40% | | | 30%TPR | 30%TPR (C.) | 20%TP (B) | $3.99FRS>$20 |
| DEC 48 | 1/2/2025 Thu | 12/26 Event (PC) | 12/26 Event (PC) | 4-day SUB#2, SALE (dig) | 3-day SUB, SALE (dig) | 40%, 50% (C.) | 40%, 50% (C.) | 50% (C.) | 50% (C.) | | | | | 20%TP (B) | FRS$49 |
| DEC 48 | 1/3/2025 Fri | 12/26 Event (PC) | 12/26 Event (PC) | 4-day SUB#2, SALE (dig) | 3-day SUB, SALE (dig) | 40%, 50% (C.)+M412 | 40%, 50% (C.) | 50% (C.) | 50% (C.) | | | | | 20%TP (B) | FRS$49 |
| DEC 48 | 1/4/2025 Sat | 12/26 Event (PC) | 12/26 Event (PC) | 4-day SUB#2, SALE (dig) | 3-day SUB, SALE (dig) | 40%, 50% (C.) | 40%, 50% (C.) | 50% (C.) | 50% (C.) | | | | | 20%TP (B) | FRS$49 |
| DEC 48 FW48 | | | | | | | | | | | | | | | |
| JAN 49 | 1/5/2025 Sun | 12/26 Event (PC) | 12/26 Event (PC) | 4-day SUB#2, SALE (dig) | 3-day SUB, SALE (dig extend + 1 day) | 40%, 50% (C.) | 40% | 50% (C.) | 40% | | | | | 20%TP (B) | FRS$49 |
| JAN 49 | 1/6/2025 Mon | 12/26 Event (PC) | 12/26 Event (PC) | Reveal Your Deal | Reveal Your Deal | 40% | 40% | 40% | 40% | | | | | RYD: 15%/20%/25% (O)+$2.99FRS | RYD: 15%/20%/25% (O)+$2.99FRS |
| JAN 49 | 1/7/2025 Tue | 12/26 Event (PC) | 12/26 Event (PC) | Reveal Your Deal | Reveal Your Deal | 40% | 40% | 40% | 40% | | | | | RYD: 15%/20%/25% (O)+$2.99FRS | RYD: 15%/20%/25% (O)+$2.99FRS |

| | | | Primary Event | | Subevent | | RPI | | | | TP | | | | Online Only / | SHIPPING |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Print | | Print and/or Digital | | Print | | Digital | | Print | | Digital | | BOPIS | |
| MO FW | | FY25 | FY25 | FY24 | FY25 | FY24 | FY25 | FY24 | FY25 | FY24 | FY25 | FY24 | FY25 | FY24 | FY25 | FY25 |
| JAN 49 | | 1/8/2025 Wed | 12/26 Event (PC) | 12/26 Event (PC) | Early Start DB's online | Early Start DB's online | 40% | 40% | 40% | 40% | | | | | 20%TP (B) | FRS$49 |
| JAN 49 | | 1/9/2025 Thu | 1/9 Event (FL) | 1/11 Event (FL) | 4-day SUB WWU DB's (print) | 5-day SUB, WWU DB's (print) | 40%, 50% (C.) | 40% | 50% (C.) | | | 20%TP (C.) | | 20% TP (C.) APP(O) | 20%TP (B) | FRS$49 |
| JAN 49 | | 1/10/2025 Fri | 1/9 Event (FL) | 1/11 Event (FL) | 4-day SUB WWU DB's (print) | 5-day SUB, WWU DB's (print) | 40%, 50% (C.) | 40% | 50% (C.) | | | 20%TP (C.) | | 20% TP (C.) APP(O) | 20%TP (B) | FRS$49 |
| JAN 49 | | 1/11/2025 Sat | 1/9 Event (FL) | 1/11 Event (FL) | 4-day SUB WWU DB's (print) | 5-day SUB, WWU DB's (print) | 40%, 50% (C.) | 40% | 50% (C.) | | | 20%TP (C.) | | 20% TP (C.) APP(O) | 20%TP (B) | FRS$49 |
| JAN 49 FW49 | | | | | | | | | | | | | | | | |
| JAN 50 | | 1/12/2025 Sun | 1/9 Event (FL) | 1/11 Event (FL) | 4-day SUB WWU DB's (print) | 5-day SUB, WWU DB's (print) | 40%, 50% (C.) | 40%, 60% (S) 50% Fabric (C.) | 50% (C.) | 60% (S), 50% Fabric (C.) | | | | | 20%TP (B) | FRS$49 |
| JAN 50 | | 1/13/2025 Mon | 1/9 Event (FL) | 1/11 Event (FL) | Entire Site Sale | MLK Day 5-day SUB, WWU DB's (print) | 40% | 40%, 60% (S) 50% Fabric (C.) | 40% | 60% (S), 50% Fabric (C.) | | | | | 20%TP (B) | FRS$49 |
| JAN 50 | | 1/14/2025 Tue | 1/9 Event (FL) | 1/11 Event (FL) | Entire Site Sale | Extend MLK DB's online only | 40% | 40% | 40% | 40% | | | | | 20%TP (B) | FRS$49 |
| JAN 50 | | 1/15/2025 Wed | 1/9 Event (FL) | 1/11 Event (FL) | Early Start DB's online | Online early start of DB's | 40% | 40% | 40% | 40% | | | | | 20%TP (O) | FRS$49 |
| JAN 50 | | 1/16/2025 Thu | 1/9 Event (FL) | 1/11 Event (FL) | 5-day SUB#2,DB (print) | 4-day SUB, WWU DB's (print) | 40% | 40%, 50% (C.) | | 50% (C.) | 20%TP (C.) | | 20%TP (C.) | | | FRS$49 |
| JAN 50 | | 1/17/2025 Fri | 1/9 Event (FL) | 1/11 Event (FL) | 5-day SUB#2,DB (print) | 4-day SUB, WWU DB's (print) | 40% | 40%, 50% (C.) | | 50% (C.) | 20%TP (C.) | | 20%TP (C.) | | | FRS$49 |
| JAN 50 | | 1/18/2025 Sat | 1/9 Event (FL) | 1/11 Event (FL) | 5-day SUB#2,DB (print) | 4-day SUB, WWU DB's (print) | 40% | 40%, 50% (C.) | | 50% (C.) | 20%TP (C.) | | 20%TP (C.) | | | FRS$49 |
| JAN 50 FW50 | | | | | | | | | | | | | | | | |
| JAN 51 | | 1/19/2025 Sun | 1/9 Event (FL) | 1/11 Event (FL) | 5-day SUB#2,DB (print) | 4-day SUB, WWU DB's (print) | 40%, 60% (S,B) | 40% | 60% (S,B) | 40% | | | | | 20%TP (B) | FRS$49 |
| JAN 51 | | 1/20/2025 Mon | 1/9 Event (FL) | 1/11 Event (FL) | MLK Day 5-day SUB#2,DB (print) | Entire Site Sale | 40%, 60% (S,B) | 40% | 60% (S,B) | 40% | | | | | 20%TP (B) | FRS$49 |
| JAN 51 | | 1/21/2025 Tue | 1/9 Event (FL) | 1/11 Event (FL) | | Entire Site Sale | 40% | 40% | 40% | 40% | | | | | 20%TP (B) | FRS$49 |
| JAN 51 | | 1/22/2025 Wed | 1/9 Event (FL) | 1/11 Event (FL) | | Entire Site Sale | 40% | 40% | 40% | 40% | | | | | 20%TP (B) | FRS$49 |
| JAN 51 | | 1/23/2025 Thu | 1/9 Event (FL) | 1/11 Event (FL) | 3-day SUB#3,SALE (digital) | 3-day SUB, SALE (digital) | 40%, 50% (C.) | 40%, 50% (C.) | 50% (C.) | 50% (C.) | | | | | 20%TP (B) | FRS$49 |
| JAN 51 | | 1/24/2025 Fri | 1/9 Event (FL) | 1/11 Event (FL) | 3-day SUB#3,SALE (digital) | 3-day SUB, SALE (digital) | 40%, 50% (C.) | 40%, 50% (C.) | 50% (C.) | 50% (C.) | | | | | 20%TP (B) | FRS$49 |
| JAN 51 | | 1/25/2025 Sat | 1/9 Event (FL) | 1/11 Event (FL) | 3-day SUB#3,SALE (digital) | 3-day SUB, SALE (digital) | 40%, 50% (C.) | 40%, 50% (C.) | 50% (C.) 60%RPI (S, no APP) | 50% (C.) 60%RPI (S, no APP) | | | | | 20%TP (B) | FRS$49 |
| JAN 51 FW51 | | | | | | | | | | | | | | | | |
| JAN 52 | | 1/26/2025 Sun | 1/9 Event (FL) | 1/11 Event (FL) | | Entire Stock Fabric Event (C.) | 40% | 40% | 40% | 40% | | | | | 20%TP (B) | FRS$49 |
| JAN 52 | | 1/27/2025 Mon | 1/9 Event (FL) | 1/11 Event (FL) | | Entire Stock Fabric Event (C.) | 40% | 40% | 40% | 40% | | | | | 20%TP (B) | FRS$49 |
| JAN 52 | | 1/28/2025 Tue | 1/9 Event (FL) | 1/11 Event (FL) | | Entire Stock Fabric Event (C.) | 40% | 40% | 40% (NO HP) | 40% (NO HP) | | | | | 20%TP (B) | FRS$49 |
| JAN 52 | | 1/29/2025 Wed | 1/9 Event (FL) | 1/11 Event (FL) | Early Start online | Entire Stock Fabric Event (C.) | 40% | 40% | 40% | 40% | | | | | 20%TP (B) | FRS$49 |
| JAN 52 | | 1/30/2025 Thu | 1/30 Event (Dig) | 2/1 Event (LOB PC) | 3-day SUB, SALE (print) | 3-day SUB, SALE (print) | | 40%, 50% (C.) | 50% (C.) APP 60% (S) EM/HP | 50% (C.) APP 60% (S) EM/HP | | | | | 20%TP (B) | FRS$49 |
| JAN 52 | | 1/31/2025 Fri | 1/30 Event (Dig) | 2/1 Event (PC) | 3-day SUB, SALE (print) | 3-day SUB, SALE (print) | | 40%, 50% (C.) | 50% (C.) APP 60% (S) EM/HP | 50% (C.) APP 60% (S) EM/HP | | | | | 20%TP (B) | FRS$49 |
| JAN 52 | | 2/1/2025 Sat | 1/30 Event (Dig) | 2/1 Event (PC) | 3-day SUB, SALE (print) | 3-day SUB, SALE (print) | | 40%, 50% (C.) | 50% (C.) APP 60% (S) EM/HP | 50% (C.) APP 60% (S) EM/HP | | | | | 20%TP (B) | FRS$49 |
| JAN 52 FW52 | | | | | | | | | | | | | | | | |

FY21 Q1 Promotional Calendar

Exhibit 11.2.m
*-Strictly Confidential / Subject to NDA-*

**Project Thread**
*FY2026 Promotional Calendar*

| MO | FW | FY26 | Primary Event Print FY26 | FY25 | FY24 | Subevent Print and/or Digital FY26 | FY25 | FY24 | RPI Print FY26 | RPI Print FY25 | RPI Digital FY26 | RPI Digital FY25 | RPI Digital FY24 | FY26 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FEB | 1 | 2/2/2025 Sun | 1/30 Event (Dig) | 2/1 Event (PC) | 2/2 Event (LOB PC) | Fabric Sale 2/1-2/14 | | | | 40% | 40% | 40% | 40% | |
| FEB | 1 | 2/3/2025 Mon | 1/30 Event (Dig) | 2/1 Event (PC) | 2/2 Event (LOB PC) | Reveal Your Deal | Mystery Deal | Reveal Your Deal | | 40% | 40% | 40% | 40% | |
| FEB | 1 | 2/4/2025 Tue | 1/30 Event (Dig) | 2/1 Event (PC) | 2/2 Event (LOB PC) | Reveal Your Deal | Mystery Deal | Reveal Your Deal | | 40% | 40% | 40% | 40% | |
| FEB | 1 | 2/5/2025 Wed | 1/30 Event (Dig) | 2/1 Event (PC) | 2/2 Event (LOB PC) | Early Start Online | Online early start of 3-day SALE | Reveal Your Deal | | 40% | 40% | 40% | 40% | |
| FEB | 1 | 2/6/2025 Thu | **1/30 Event (Dig)+2/6 PC** | 2/1 Event (PC) | 2/2 Event (LOB PC) | 3-day SUB, SALE (print) +PC only Coupon Commotion | 3-day SUB, SALE (print) | 3-day SUB, SALE (print) | 40%, 50% (C.) | 40%, 50% (C.) | 50% (C.) | 50% (C.) | 50% (C.) | Add final decisions from PC |
| FEB | 1 | 2/7/2025 Fri | 1/30 Event (Dig)+2/6 PC | 2/1 Event (PC) | 2/2 Event (LOB PC) | 3-day SUB, SALE (print) +PC only Coupon Commotion | 3-day SUB, SALE (print) | 3-day SUB, SALE (digital) | 40%, 50% (C.) | 40%, 50% (C.) | 50% (C.) | 50% (C.) | 50% (C.) | |
| FEB | 1 | 2/8/2025 Sat | 1/30 Event (Dig)+2/6 PC | 2/1 Event (PC) | 2/2 Event (LOB PC) | 3-day SUB, SALE (print) +PC only Coupon Commotion | 3-day SUB, SALE (print) | 3-day SUB, SALE (digital) | 40%, 50% (C.) | 40%, 50% (C.) | 50% (C.) | 50% (C.) | 50% (C.) | |
| | 1 FW1 | | | | | | | | | | | | | |
| FEB | 2 | 2/9/2025 Sun | 1/30 Event (Dig)+2/6 PC | 2/1 Event (PC) | 2/2 Event (LOB PC) | Superbowl 59 +PC only Coupon Commotion | Superbowl 58 | Superbowl 57 | 40% | 40% | 40% | 40% | 40% | |
| FEB | 2 | 2/10/2025 Mon | 1/30 Event (Dig)+2/6 PC | 2/1 Event (PC) | 2/2 Event (LOB PC) | PC only Coupon Commotion | Fabric Sale 2/1-2/14 Val Day Fab Finds | Online Hot Buys | 40% | 40% | 40% | 40% | 40% | |
| FEB | 2 | 2/11/2025 Tue | 1/30 Event (Dig)+2/6 PC | 2/1 Event (PC) | 2/2 Event (LOB PC) | PC only Coupon Commotion | Fabric Sale 2/1-2/14 Val Day Fab Finds | Valentine's Day Online Hot Buys | 40% | 40% | 40% | 40% | 40% | |
| FEB | 2 | 2/12/2025 Wed | 1/30 Event (Dig)+2/6 PC | 2/1 Event (PC) | 2/2 Event (LOB PC) | Early Start Online +PC only Coupon Commotion | Valentine's Day Start Pres Day Online (all day) | Online Hot Buys | 40% | 40% | 40% | 40% | 40% | |
| FEB | 2 | 2/13/2025 Thu | **2/13 Event (FL)** | **2/15 Event (FL+PC)** | 2/2 Event (LOB PC) | Pres Day 5-Day Doorbusters (print) | Pres Day 5-Day Doorbusters (print) | Start Pres Day Online (all day) | 40% | 40% | | | | 20% TP (C.) |
| FEB | 2 | 2/14/2025 Fri | 2/13 Event (FL) | 2/15 Event (FL+PC) | **2/17 Event (FL+PC)** | Valentine's Day Pres Day 5-Day Doorbusters (print) | Pres Day 5-Day Doorbusters (print) | Pres Day 4-Day Doorbusters (print) | 40% | 40% | | | | 20% TP (C.) |
| FEB | 2 | 2/15/2025 Sat | 2/13 Event (FL) | 2/15 Event (FL+PC) | 2/17 Event (FL+PC) | Pres Day 5-Day Doorbusters (print) | Pres Day 5-Day Doorbusters (print) | Pres Day 4-Day Doorbusters (print) | 40% | 40% | | | | 20% TP (C.) |
| | 2 FW2 | | | | | | | | | | | | | |
| FEB | 3 | 2/16/2025 Sun | 2/13 Event (FL) | 2/15 Event (FL+PC) | 2/17 Event (FL+PC) | Pres Day 5-Day Doorbusters (print) | Pres Day 5-Day Doorbusters (print) | Pres Day 4-Day Doorbusters (print) | 40%, 60% (S) | 40%, 60% (S) | 60% (S) | 60% (S) | 60% (B) | |
| FEB | 3 | 2/17/2025 Mon | 2/13 Event (FL) | 2/15 Event (FL+PC) | 2/17 Event (FL+PC) | President's Day Pres Day 5-Day Doorbusters (print) | President's Day Pres Day 5-Day Doorbusters (print) | President's Day Pres Day 4-Day Doorbusters (print) | 40%, 60% (S) | 40%, 60% (S) | 60% (S) | 60% (S) | 60% (B) | |
| FEB | 3 | 2/18/2025 Tue | 2/13 Event (FL) | 2/15 Event (FL+PC) | 2/17 Event (FL+PC) | | Fab Finds (DM offers) | Entire Site Sale | 40% | 40% | 40% | 40% | 40% | |
| FEB | 3 | 2/19/2025 Wed | 2/13 Event (FL) | 2/15 Event (FL+PC) | 2/17 Event (FL+PC) | | Fab Finds (DM offers) | Entire Site Sale | 40% | 40% | 40% | 40% | 40% | |
| FEB | 3 | 2/20/2025 Thu | 2/13 Event (FL) | 2/15 Event (FL+PC) | 2/17 Event (FL+PC) | 3-day SUB, SALE (print) | 3-day SUB, SALE (print) | Entire Site Sale | 40%, 50% (C.) | 40%, 50% (C.) | 50% (C.) | 50% (C.) | 40% | |
| FEB | 3 | 2/21/2025 Fri | 2/13 Event (FL) | 2/15 Event (FL+PC) | 2/17 Event (FL+PC) | 3-day SUB, SALE (print) | 3-day SUB, SALE (print) | 3-Day SUB, SALE (print) | 40%, 50% (C.) | 40%, 50% (C.) | 50% (C.) | 50% (C.) | 50% (C.) | |
| FEB | 3 | 2/22/2025 Sat | 2/13 Event (FL) | 2/15 Event (FL+PC) | 2/17 Event (FL+PC) | 3-day SUB, SALE (print) | 3-day SUB, SALE (print) | 3-Day SUB, SALE (print) | 40%, 50% (C.) | 40%, 50% (C.) | 50% (C.) | 50% (C.) | 50% (C.) | |
| | 3 FW3 | | | | | | | | | | | | | |
| FEB | 4 | 2/23/2025 Sun | 2/13 Event (FL) | 2/15 Event (FL+PC) | 2/17 Event (FL+PC) | 1-day digital extension | 1-day digital extension | 3-Day SUB, SALE (print) | 40%, 50% Fabric (C.) | 40%, 50% Fabric (C.) | 40%, 50% Fabric (C.) | 40%, 50% Fabric (C.) | 50% (C.) | |
| FEB | 4 | 2/24/2025 Mon | 2/13 Event (FL) | 2/15 Event (FL+PC) | 2/17 Event (FL+PC) | | Entire Site Sale | Online Hot Buys | 40%, 50% Fabric (C.) | 40%, 50% Fabric (C.) | 40%, 50% Fabric (C.) | 40%, 50% Fabric (C.) | 50% Fabric (C.) | |
| FEB | 4 | 2/25/2025 Tue | 2/13 Event (FL) | 2/15 Event (FL+PC) | 2/17 Event (FL+PC) | | Entire Site Sale | Online Hot Buys | 40%, 50% Fabric (C.) | 40%, 50% Fabric (C.) | 40%, 50% Fabric (C.) | 40%, 50% Fabric (C.) | 50% Fabric (C.) | |
| FEB | 4 | 2/26/2025 Wed | 2/13 Event (FL) | 2/15 Event (FL+PC) | 2/17 Event (FL+PC) | | Doorbusters Start Early Online | Online Hot Buys | 40%, 50% Fabric (C.) | 40%, 50% Fabric (C.) | 40%, 50% Fabric (C.) | 40%, 50% Fabric (C.) | 40%, 50% Fabric (C.) | |
| FEB | 4 | 2/27/2025 Thu | **2/27 Event (FL)** | **2/29 Event (FL+PC)** | 2/17 Event (FL+PC) | Friends & Family TP's 3-day Doorbusters (print) | Friends & Family TP's 3-day Doorbusters (print) | Doorbusters Start Early Online | 40% | 40% | | | | (2) 25% TP (C.) |
| FEB | 4 | 2/28/2025 Fri | 2/27 Event (FL) | 2/29 Event (FL+PC) | **3/3 Event (FL+PC)** | Friends & Family TP's 3-day Doorbusters (print) | Friends & Family TP's 3-day Doorbusters (print) | Friends & Family TP's 3-day Doorbusters | 40% | 40% | | | | (2) 25% TP (C.) |
| FEB | 4 | 3/1/2025 Sat | 2/27 Event (FL) | 2/29 Event (FL+PC) | 3/3 Event (FL+PC) | Friends & Family TP's 3-day Doorbusters (print) | Friends & Family TP's 3-day Doorbusters (print) | Friends & Family TP's 3-day Doorbusters | 40% | 40% | | | | (2) 25% TP (C.) |
| | 4 FW4 | | | | | | | | | | | | | |
| MAR | 5 | 3/2/2025 Sun | 2/27 Event (FL) | 2/29 Event (FL+PC) | 3/3 Event (FL+PC) 3-day Doorbusters (dig extend) + new 1-day offers? | Friends & Family TP's 3-day Doorbusters (dig extend) + new 1-day offers | Friends & Family TP's 3-day Doorbusters | 40% | 40% | | | 40% | (2) 25% TP (C.) | |
| MAR | 5 | 3/3/2025 Mon | 2/27 Event (FL) | 2/29 Event (FL+PC) | 3/3 Event (FL+PC) | Reveal Your Deal / Cottoncredible HP | bopis test (remove bopis) Online Doorbusters | Online Doorbusters | 40% | 40% | 40% | 40% | 40% | |
| MAR | 5 | 3/4/2025 Tue | 2/27 Event (FL) | 2/29 Event (FL+PC) | 3/3 Event (FL+PC) | Reveal Your Deal / Cottoncredible HP | bopis test (remove bopis) Online Doorbusters | Online Doorbusters | 40% | 40% | 40% | 40% | 40% | |
| MAR | 5 | 3/5/2025 Wed | 2/27 Event (FL) | 2/29 Event (FL+PC) | 3/3 Event (FL+PC) | Reveal Your Deal / Cottoncredible HP | Online Doorbusters | Online Doorbusters | 40% | 40% | 40% | 40% | 40% | |
| MAR | 5 | 3/6/2025 Thu | 2/27 Event (FL) | 2/29 Event (FL+PC) | 3/3 Event (FL+PC) 3-Day SUB, SALE (print) | 3-day SUB, SALE (print) | Online Doorbusters | 40%, 50% (C.) | 40%, 50% (C.) | 50% (C.) | 50% (C.) | 40% | |
| MAR | 5 | 3/7/2025 Fri | 2/27 Event (FL) | 2/29 Event (FL+PC) | 3/3 Event (FL+PC) | 3-day SUB, SALE (print) | 3-day SUB, SALE (print) | 3-Day SUB, SALE (print) | 40%, 50% (C.) | 40%, 50% (C.) | 50% (C.) | 50% (C.) | 50% (C.) | |
| MAR | 5 | 3/8/2025 Sat | 2/27 Event (FL) | 2/29 Event (FL+PC) | 3/3 Event (FL+PC) | 3-day SUB, SALE (print) | 3-day SUB, SALE (print) | 3-Day SUB, SALE (print) | 40%, 50% (C.) | 40%, 50% (C.) | 50% (C.) | 50% (C.) | 50% (C.) | |
| | 5 FW5 | | | | | | | | | | | | | |
| MAR | 6 | 3/9/2025 Sun | 2/27 Event (FL) | 2/29 Event (FL+PC) | 3/3 Event (FL+PC) | 1-day digital extension | 1-day digital extension | 3-Day SUB, SALE (print) | 40% | 40% | 50% (C.) | 50% (C.) | 50% (C.) | |
| MAR | 6 | 3/10/2025 Mon | 2/27 Event (FL) | 2/29 Event (FL+PC) | 3/3 Event (FL+PC) | | HP: Cottoncredible, Tech, Easter, Spring/FF | Reveal Your Deal | 40% | 40% | 40% | 40% | 40% | |

FY21 Q1 Promotional Calendar

| MO | FW | FY26 | Primary Event Print FY26 | FY25 | FY24 | Subevent Print and/or Digital FY26 | FY25 | FY24 | RPI Print FY26 | FY25 | Digital FY26 | FY25 | FY24 | FY26 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MAR | 6 | 3/11/2025 Tue | 2/27 Event (FL) | 2/29 Event (FL+PC) | 3/3 Event (FL+PC) | | HP: Cottoncredible, Tech, Easter, Spring/FF | Reveal Your Deal | 40% | 40% | 40% | 40% | 40% | |
| MAR | 6 | 3/12/2025 Wed | 2/27 Event (FL) | 2/29 Event (FL+PC) | 3/3 Event (FL+PC) | | HP: Cottoncredible, Tech, Easter, Spring/FF | Reveal Your Deal | 40% | 40% | 40% | 40% | 40% | |
| MAR | 6 | 3/13/2025 Thu | 2/27 Event (FL) | 2/29 Event (FL+PC) | 3/3 Event (FL+PC) | 4-day SUB, DB (digital) | 4-day SUB, DB (digital) | 4-day SUB, SALE (digital) | 40%, 50% (C.) | 40%, 50% (C.) | | | 40% | |
| MAR | 6 | 3/14/2025 Fri | 2/27 Event (FL) | 2/29 Event (FL+PC) | 3/3 Event (FL+PC) | 4-day SUB, DB (digital) | 4-day SUB, DB (digital) MIK's LPOS 3/15-3/24 | 4-day SUB, SALE (digital) St. Patrick's Day MIK's LPOS 3/17-3/26 | 40%, 50% (C.) | 40%, 50% (C.) | | | 50% (C.) | |
| MAR | 6 | 3/15/2025 Sat | 2/27 Event (FL) | 2/29 Event (FL+PC) | 3/3 Event (FL+PC) | 4-day SUB, DB (digital) | 4-day SUB, DB (digital) | 4-day SUB, SALE (digital) | 40%, 50% (C.) | 40%, 50% (C.) | | | 50% (C.) | |
| MAR | 6 | FW6 | | | | | | | | | | | | |

4 of 6

2/17/2025

FY21 Q1 Promotional Calendar

Exhibit 11.2 m
*-Strictly Confidential / Subject to NDA-*

**Project Thread**
*FY2026 Promotional Calendar*

| MO | FW | FY26 | Print | | TP (Digital) | | | Online Only / BOPIS | | | SHIPPING | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | FY25 | FY24 | FY26 | FY25 | FY24 | FY26 | FY25 | FY24 | FY26 | FY25 | FY24 |
| FEB | 1 | 2/2/2025 Sun | 20%TP(B) in PC | | | | | 20%TP (B) | | 25%(B) + $1.99FRS | FS$49(auto) | | 25%(B) + $1.99FRS |
| FEB | 1 | 2/3/2025 Mon | 20%TP(B) in PC | | | | | RYD 15,20,25 (O) | | RYD 15,20,25 (O) + $1.99FRS) | FS$49(auto) | | RYD 15,20,25 (O) + $1.99FRS) |
| FEB | 1 | 2/4/2025 Tue | 20%TP(B) in PC | | | | | RYD 15,20,25 (O) | | RYD 15,20,25 (O) + $1.99FRS) | FS$49(auto) | | RYD 15,20,25 (O) + $1.99FRS) |
| FEB | 1 | 2/5/2025 Wed | 20%TP(B) in PC | | | | | 20%TP (B) | | RYD 15,20,25 (O) + $1.99FRS) | FS$49(auto) | | RYD 15,20,25 (O) + $1.99FRS) |
| FEB | 1 | 2/6/2025 Thu | 20%TP(B) in PC | | | | | 20%TP (B) | | 20%(B) + $2.99FRS | $2.99 FRS<br>FS$49(auto) | | 20%(B) + $2.99FRS |
| FEB | 1 | 2/7/2025 Fri | 20%TP(B) in PC | | | | | 20%TP (B) | | 20%(B) + $2.99FRS | $2.99 FRS<br>FS$49(auto) | | 20%(B) + $2.99FRS |
| FEB | 1 | 2/8/2025 Sat | 20%TP(B) in PC | | | | | 20%TP (B) | | 20%(B) + $2.99FRS | $2.99 FRS<br>FS$49(auto) | | 20%(B) + $2.99FRS |
| FEB | 1 FW1 | | | | | | | | | | | | |
| FEB | 2 | 2/9/2025 Sun | 20%TP(B) in PC | | | 30%TPR (c.) | | 20%TP (B) | | 20%(B) + $1.99FRS | $1.99 FRS<br>FS$49auto | | 20%(B) + $1.99FRS |
| FEB | 2 | 2/10/2025 Mon | 20%TP(B) in PC | | | | | 20%TP (B) | | 20%(B) + $3.99FRS | $3.99 FRS<br>FS$49auto | | 20%(B) + $3.99FRS |
| FEB | 2 | 2/11/2025 Tue | 20%TP(B) in PC | | | | | 20%TP (B) | | 20%(B) + $3.99FRS | $3.99 FRS<br>FS$49auto | | 20%(B) + $3.99FRS |
| FEB | 2 | 2/12/2025 Wed | 20%TP(B) in PC | | | | | 20%TP (O) | | 20%(B) + $3.99FRS, 40TPR(O) | $3.99 FRS | | 20%(B) + $3.99FRS |
| FEB | 2 | 2/13/2025 Thu | 20% TP (C.) | | 20% TP (C.) | 20% TP (C.) | | | | 20%(B) + $1.99FRS | $1.99 FRS | | 20%(B) + $1.99FRS |
| FEB | 2 | 2/14/2025 Fri | 20% TP (C.) | 20% TP (C.) | 20% TP (C.) | 20% TP (C.) | 20%TP (C.) | | | 20%(C.) + $1.99FRS | $1.99 FRS | | 20%(C.) + $1.99FRS |
| FEB | 2 | 2/15/2025 Sat | 20% TP (C.) | 20% TP (C.) | 20% TP (C.) | 20% TP (C.) | 20%TP (C.) | | | 20%(C.) + $1.99FRS | $1.99 FRS | | 20%(C.) + $1.99FRS |
| FEB | 2 FW2 | | | | | | | | | | | | |
| FEB | 3 | 2/16/2025 Sun | | | | | | 20%TP (O) | | 20%(B) + FSNM | FSNM | | 20%(B) + FSNM |
| FEB | 3 | 2/17/2025 Mon | | | | | | 20%TP (O) | | 20%(B) + FSNM | FSNM | | 20%(B) + FSNM |
| FEB | 3 | 2/18/2025 Tue | | | | | | 20%TP (B) | | 20%(B) + $4.99FRS | $1.99 FRS | | 20%(B) + $4.99FRS |
| FEB | 3 | 2/19/2025 Wed | | | | | | 20%TP (B) | | 20%(B) + $4.99FRS | $1.99 FRS | | 20%(B) + $4.99FRS |
| FEB | 3 | 2/20/2025 Thu | | | | | | 20%TP (B) | | 20%(B) + $4.99FRS | $1.99 FRS | | 20%(B) + $4.99FRS |
| FEB | 3 | 2/21/2025 Fri | | | | | | 20%TP (B) | | 20%(B) + $4.99FRS | $1.99 FRS | | 20%(B) + $4.99FRS |
| FEB | 3 | 2/22/2025 Sat | | | | | | 20%TP (B) | | 20%(B) + $4.99FRS | $1.99 FRS | | 20%(B) + $4.99FRS |
| FEB | 3 FW3 | | | | | | | | | | | | |
| FEB | 4 | 2/23/2025 Sun | | | | | | 20%TP (B) | | 20%(B) + $2.99FRS>$35 order | $1.99 FRS | | 20%(B) + $2.99FRS>$35 order |
| FEB | 4 | 2/24/2025 Mon | | | | | | 20%TP (B) | | 20%(B) + $2.99FRS>$35 order | $1.99 FRS | | 20%(B) + $2.99FRS>$35 order |
| FEB | 4 | 2/25/2025 Tue | | | | | | 20%TP (B) | | 20%(B) + $2.99FRS>$35 order | $1.99 FRS | | 20%(B) + $2.99FRS>$35 order |
| FEB | 4 | 2/26/2025 Wed | | | | | | 25%TP (B) | | 20%(B) + $2.99FRS>$35 order | $3.99 FRS | | 20%(B) + $2.99FRS>$35 order |
| FEB | 4 | 2/27/2025 Thu | (2) 25% TP (C.) | | (2) 25% TP (C.) | (2) 25% TP (C.) | | | | 25%(O) + $3.99FRS>$35 order | $3.99 FRS | | 25%(O) + $3.99FRS>$35 order |
| FEB | 4 | 2/28/2025 Fri | (2) 25% TP (C.) | (2) 25% TP (C.) | (2) 25% TP (C.) | (2) 25% TP (C.) | (2) 25% TP (C.) | | | 25%(C.) + $3.99FRS>$35 order | $3.99 FRS | | 25%(C.) + $3.99FRS>$35 order |
| FEB | 4 | 3/1/2025 Sat | (2) 25% TP (C.) | (2) 25% TP (C.) | (2) 25% TP (C.) | (2) 25% TP (C.) | (2) 25% TP (C.) | | | 25%(C.) + $3.99FRS>$35 order | $3.99 FRS | | 25%(C.) + $3.99FRS>$35 order |
| FEB | 4 FW4 | | | | | | | | | | | | |
| MAR | 5 | 3/2/2025 Sun | (2) 25% TP (C.) | 2-25% TP (C.) | (2) 25% TP (C.) | (2) 25% TP (C.) | (2) 25% TP (C.) | | | 25%(C.) + $3.99FRS>$35 order | $3.99 FRS | | 25%(C.) + $3.99FRS>$35 order |
| MAR | 5 | 3/3/2025 Mon | | | | | | 20%(B) + 15/20/25%(O)+$2.99FRS | no Bopis (all channels) | | 20%(B) + 15/20/25%(O)+$2.99FRS | | $2.99FRS>$35 order |
| MAR | 5 | 3/4/2025 Tue | | | | | | 20%(B) + 15/20/25%(O)+$2.99FRS | no Bopis (all channels) | | 20%(B) + 15/20/25%(O)+$2.99FRS | | $2.99FRS>$35 order |
| MAR | 5 | 3/5/2025 Wed | | | | | | 20%(B) + 15/20/25%(O)+$2.99FRS | | 20%(B) + $2.99FRS>$35 order | 20%(B) + 15/20/25%(O)+$2.99FRS | | 20%(B) + $2.99FRS>$35 order |
| MAR | 5 | 3/6/2025 Thu | | | | | | 20%TP (B) | | 20%(B) + $2.99FRS>$35 order | $2.99FRS | | 20%(B) + $2.99FRS>$35 order |
| MAR | 5 | 3/7/2025 Fri | | | | | | 20%TP (B) | | 20%(B) + $2.99FRS>$35 order | $2.99FRS | | 20%(B) + $2.99FRS>$35 order |
| MAR | 5 | 3/8/2025 Sat | | | | | | 20%TP (B) | | 20%(B) + $2.99FRS>$35 order | $2.99FRS | | 20%(B) + $2.99FRS>$35 order |
| MAR | 5 FW5 | | | | | | | | | | | | |
| MAR | 6 | 3/9/2025 Sun | | | | | | 20%TP (B) | | 25%(B)>$35 + $1.99FRS>$35 order | $2.99FRS | | 25%(B)>$35 + $1.99FRS>$35 order |
| MAR | 6 | 3/10/2025 Mon | | | | | | 20%TP (B) | | RYD: 15%(O),20%(O),25%(O) | $2.99FRS | | |

2/17/2025

FY21 Q1 Promotional Calendar

| MO | FW | | FY26 | | TP | | | | | Online Only / BOPIS | | | | SHIPPING | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Print | | | Digital | | | | | | | | | |
| | | FY26 | FY25 | FY24 | FY26 | FY25 | FY24 | FY26 | FY25 | FY24 | FY26 | FY25 | FY24 | | |
| MAR | 6 | 3/11/2025 Tue | | | | | | | 20%TP (B) | RYD: 15%(O),20%(O),25%(O) | | $2.99FRS FSNM/APP | | |
| MAR | 6 | 3/12/2025 Wed | | | | | | | 20%TP (B) | RYD: 15%(O),20%(O),25%(O) | | $2.99FRS FSNM/APP | | |
| MAR | 6 | 3/13/2025 Thu | | | | 20%TP (C.) (APP = O) | | | combo TP+$3.99FRS | 20%(B)>$35 + $1.99FRS>$35 order | | combo TP+$3.99FRS | 20%(B)>$35 + $1.99FRS>$35 order | |
| MAR | 6 | 3/14/2025 Fri | | | | 20%TP (C.) (APP = O) | | | combo TP+$3.99FRS | 20%(B)>$35 + $1.99FRS>$35 order | | combo TP+$3.99FRS | 20%(B)>$35 + $1.99FRS>$35 order | |
| MAR | 6 | 3/15/2025 Sat | | | | 20%TP (C.) (APP = O) | | | combo TP+$3.99FRS | 20%(B)>$35 + $1.99FRS>$35 order | | combo TP+$3.99FRS | 20%(B)>$35 + $1.99FRS>$35 order | |
| MAR | 6 FW6 | | | | | | | | | | | | | | |

**Exhibit B**

**Amended Store Closing Procedures**

## Amended Store Closing Procedures[1]

1.      The GOB Sale shall be conducted so that the Closing Stores in which sales are to occur will remain open no longer than during the normal hours of operation or such hours as otherwise provided for in the respective leases for the Closing Stores.

2.      The GOB Sale shall be conducted in accordance with applicable state and local "Blue Laws," where applicable, so that no Store Closing Sale shall be conducted on Sunday unless the Debtors had been operating such Closing Store on a Sunday prior to the commencement of the GOB Sale.

3.      On "shopping center" property, neither the Debtors nor GA Joann Retail Partnership, LLC (the "Agent")  shall distribute handbills, leaflets or other written materials to customers outside of any Closing Stores' premises, unless permitted by the lease or, if distribution is customary in the "shopping center" in which such Closing Store is located; *provided* that the Debtors or Agent may solicit customers in the Closing Stores themselves.  On "shopping center" property, neither the Debtors nor the Agent shall use any flashing lights or amplified sound to advertise the GOB Sale or solicit customers, except as permitted under the applicable lease or agreed to by the landlord.

4.      The Agent shall have the right to use and sell the Assets.  The Agent may advertise the sale of the Assets in a manner consistent with the Amended Store Closing Procedures.  The purchasers of any of the Assets sold during the GOB Sale shall be permitted to remove the Assets either through the back or alternative shipping areas at any time, or through other areas after store

---

[1]    Capitalized terms used but not defined in the Amended Store Closing Procedures have the meanings given to them in the *Motion of Debtors for Entry of an Order (I) Authorizing and Approving the Conduct of Store Closing Sales, With Such Sales to be Free and Clear of All Liens, Claims, and Encumbrances, and (II) Granting Related Relief* (the "Motion").

business hours; provided, however, that the foregoing shall not apply to the sale of *de minimis* Assets, whereby the item(s) can be carried out of the store in a shopping bag.

5.      At the conclusion of the Store Closing Sale, Agent shall vacate the Stores in broom clean condition; *provided that* the Agent may abandon any furniture, fixtures, and equipment (the "FF&E") not sold in the GOB Sale at the Stores, the Distribution Centers, or Merchant's corporate offices at the conclusion of the Sale or the Lease/Contract Designation Rights Period, as applicable, without cost or liability of any kind to Agent.  For the avoidance of doubt, as of the end date of the GOB Sale, Agent may abandon, in place and without further responsibility or liability of any kind, any FF&E located at a Store or Distribution Center or Merchant's corporate offices.

6.      The Debtors and Agent may advertise the GOB Sale as "store closing," "going out of business," "sale on everything," "everything must go," "everything on sale," or similar-themed sales.  The Debtors and Agent may also have a "countdown to closing" sign prominently displayed in a manner consistent with these Store Closing Procedures.

7.      Agent shall be entitled to include Additional Agent Merchandise in the Store Closing Sale in accordance with the terms of the Approval Order and the Agency Agreement.

8.      The Debtors and Agent shall be permitted to utilize sign-walkers, display, hanging signs, and interior banners in connection with the GOB Sale; *provided* that such sign walkers, display, hanging signs, and interior banners shall be professionally produced and hung in a professional manner.  The Debtors and Agent shall not use neon or day-glo on its sign walkers, display, hanging signs, or interior banners.  Furthermore, with respect to enclosed mall locations, no exterior signs or signs in common areas of a mall shall be used unless otherwise expressly permitted in these Store Closing Procedures.  In addition, the Debtors and Agent shall be permitted

to utilize exterior banners at (i) non-enclosed mall Closing Stores and (ii) enclosed mall Closing Stores to the extent the entrance to the applicable Closing Store does not require entry into the enclosed mall common area; *provided*, however, that such banners shall be located or hung so as to make clear that the GOB Sale are being conducted only at the affected Closing Store, and shall not be wider than the storefront of the Closing Store.  In addition, the Debtors and Agent shall be permitted to utilize sign walkers in a safe and professional manner and in accordance with the terms of the Order.  Nothing contained in these Store Closing Procedures shall be construed to create or impose upon the Debtors or Agent any additional restrictions not contained in the applicable lease agreement.

9.      Conspicuous signs shall be posted in the cash register areas of each of the affected Closing Stores to effect that "all sales are final."

10.     Except with respect to the hanging of exterior banners, neither the Debtors nor the Agent shall make any alterations to the storefront or exterior walls of any Closing Stores, except as authorized by the applicable lease.

11.     The Agent shall not make any alterations to interior or exterior Closing Store lighting, except as authorized by the applicable lease.  No property of the landlord of a Closing Store shall be removed or sold during the GOB Sale.  The hanging of exterior banners or in-Closing Store signage and banners shall not constitute an alteration to a Closing Store.

12.     The Agent shall keep Closing Store premises and surrounding areas clear and orderly consistent with present practices.

13.     The Agent and the landlord of any Store are authorized to enter into Side Letters without further order of the Court, provided that such agreements do not have a material adverse effect on the Debtors or their estates.

14.     The Agent shall have the right to sell all FF&E owned by the Debtors (the "Owned FF&E").  The Agent may advertise the sale of the Owned FF&E in a manner consistent with these guidelines at the Closing Stores.  The purchasers of any Owned FF&E sold during the sale shall be permitted to remove the Owned FF&E either through the back or alternative shipping areas at any time, or through other areas after applicable business hours.

15.     At the conclusion of the GOB Sale at each Closing Store, pending assumption or rejection of applicable leases, the landlords of the Closing Stores shall have reasonable access to the Closing Stores' premises as set forth in the applicable leases.  The Debtors and their agents and representatives shall continue to have access to the Closing Stores.  In the event the Debtors reject the lease associated with a Closing Store, the Debtors will use reasonable efforts to facilitate a smooth transfer of possession, including, if practicable, the return of any key codes and security materials.  The Debtors will use reasonable efforts to provide landlords of any such leases to be rejected with notice prior to the Debtors' surrender of possession, *provided* that nothing in these Amended Store Closing Procedures shall impact the terms of the Lease/Contract Procedures Order.

16.     16.     As and when due, all real estate lease obligations accrued post-petition shall be paid by the Debtors as required by the Bankruptcy Code for the period until the rejection or assumption and assignment of each such lease.  Agent has no direct responsibility to the landlords therefor, but is subject to any responsibility therefor to the Debtors provided in the Agency Agreement.

17.     The rights of landlords against the Debtors for any damages to a Closing Store shall be reserved in accordance with the provisions of the applicable lease; *provided* that to the extent certain leases of Closing Stores require written confirmation of receipt of a key to effectuate surrender, this requirement is waived.

18.     If and to the extent that the landlord of any Closing Store affected hereby contends that the Debtors or Agent are in breach of or default under these Store Closing Procedures, such landlord shall email or deliver written notice by overnight delivery on the Debtors and Agent as follows:

**If to Merchant:**

JOANN Inc.
5555 Darrow Road
Hudson, Ohio 44236
Attention:  Legal Department

*With copies (which shall not constitute notice) to:*

Cole Schotz P.C.
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
(302) 652-3131
Attention:  Patrick J. Reilley, Stacy L. Newman, Michael E. Fitzpatrick, and Jack M. Dougherty
Email:  preilley@coleschotz.com
          snewman@coleschotz.com
          mfitzpatrick@coleschotz.com
          jdougherty@coleschotz.com

- and -

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:  Aparna Yenamandra, P.C.
Email:
          aparna.yenamandra@kirkland.com

- and -

Kirkland & Ellis LLP
333 West Wolf Point Plaza
Chicago, Illinois 60654
Attention:  Jeffrey Michalik, and Lindsey Blumenthal
Email: jeff.michalik@kirkland.com
          lindsey.blumenthal@kirkland.com

**If to Agent:**

GA Joann Retail Partnership, LLC
c/o GA Group
30870 Russell Ranch Road, Suite 250
Westlake Village, CA 91362
Attention:  Scott K. Carpenter and Tim Shilling
Email: scarpenter@brileyfin.com; tshilling@brileyfin.com; legal@brileyfin.com

*With copies (which shall not constitute notice) to:*

Lowenstein Sandler LLP
One Lowenstein Drive
Roseland, NJ 07068
Attention: Andrew Behlmann
Tel: (973) 597-2332
abehlmann@lowenstein.com