## Exhibit 2

**Redline**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| JOANN INC., *et al.*,[1] | ) | Case No. 25-10068 (CTG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: Docket No. 17** |

## ORDER (A) APPROVING AND
## AUTHORIZING SALE OF THE DEBTORS' ASSETS,
## FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES,
## AND OTHER INTERESTS, AND (B) GRANTING RELATED RELIEF

Upon the motion[2] of the above-captioned debtors and debtors in possession (collectively,

the "Debtors") for the entry of an order (the "Approval Order"): (a) authorizing and approving

entry into and performance under the terms and conditions of the Agency Agreement dated as of

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: JOANN Inc. (5540); Needle Holdings LLC (3814); Jo-Ann Stores, LLC (0629); Creative Tech Solutions LLC (6734); Creativebug, LLC (3208); WeaveUp, Inc. (5633); JAS Aviation, LLC (9570); joann.com, LLC (1594); JOANN Ditto Holdings Inc. (9652); Dittopatterns LLC (0452); JOANN Holdings 1, LLC (9030); JOANN Holdings 2, LLC (6408); and Jo-Ann Stores Support Center, Inc. (5027).  The Debtors' mailing address is 5555 Darrow Road, Hudson, Ohio 44236.

[2]    Capitalized terms used but not otherwise defined in this Approval Order have the meanings given to such terms in the Agency Agreement, the *Motion of Debtors for Entry of an Order (I) Approving Bidding Procedures, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Stalking Horse Agreement, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts and Leases, (VII) Approving the Sale of Assets, and (VIII) Granting Related Relief* [Docket No. 17] (the "Motion"), the *Order (I) Approving Bidding Procedures, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Stalking Horse Agreement, (V) Establishing Notice and Procedures for the Assumption and Assignment of Assumed Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts and Leases, (VII) Approving the Sale of Assets, and (VIII) Granting Related Relief* [Docket No. 446] (the "Bidding Procedures Order"), the *Order (I) Authorizing and Approving the Conduct of Store Closing Sales, with Such Sales to be Free and Clear of all Liens, Claims, and Encumbrances and (II) Granting Related Relief* [Docket No. 443] (the "Store Closing Order"), or the Cash Collateral Order, as applicable.  For the avoidance of doubt, in the event of any conflict or inconsistency between defined terms in this Approval Order, the Motion, the Bidding Procedures Order, the Cash Collateral Order, and those defined in the Agency Agreement, the definitions set forth in the Agency Agreement shall control.

February 26, 2025, by and among the Debtors (the "Sellers") and GA Joann Retail Partnership, LLC ("Agent") and Wilmington Savings Fund Society, FSB, in its capacity as prepetition term loan agent (the "Term Agent") and collectively with Agent, the "Purchaser") attached to this Approval Order as **Exhibit A** (as may be amended, supplemented, restated, or otherwise modified from time to time, the "Agency Agreement"), and all other transaction documents necessary and desirable to consummate the Transactions, including the Carve Out Reserves Agreement (as defined below) (collectively, the "Transaction Documents"); (b) authorizing and approving the sale of (i) the exclusive right to designate the purchasers, assignees, sublessees, or other transferees of Sellers' right, title, and interest in and to any or all of the Sellers' Leases and Contracts (the "Lease/Contract Designation Rights")[3] and (ii) the exclusive right to market and sell, and/or otherwise designate the purchasers, transferees, and/or assignees of any or all of the Assets (as defined in the Agency Agreement) free and clear of all liens, claims (as such term is defined by section 101(5) of the Bankruptcy Code), liabilities, rights, remedies, restrictions, interests, and encumbrances of any kind or nature whatsoever whether arising before or after the Petition Date, whether at law or in equity, including all claims or rights based on any successor or transferee liability, all environmental claims, all change in control provisions, all rights to object or consent to the effectiveness of the transfer of the Assets to the Purchaser or to be excused from accepting performance by the Purchaser or performing for the benefit of the Purchaser under any Assigned Contract (as defined in the Bidding Procedures Order)[4] and all

---

[3]    "Contracts" shall mean the Sellers' right, title, and interest in and to executory contracts (together with all amendments, extensions, modifications, and other material documents related thereto). "Leases" shall mean the Sellers' unexpired leases of non-residential real property (together with all amendments, extensions, modifications, and other material documents related thereto).

[4]    For the avoidance of doubt, "Assigned Contracts," as defined in the Bidding Procedures Order, includes Contracts and Leases that may be assumed and assigned in connection with the Sale and pursuant to the Designation Rights Procedures.

rights at law or in equity (collectively, "Claims"), except to the extent set forth in the Agency Agreement, including the Permitted Encumbrances (as defined in the Agency Agreement), without further order of the Court but without prejudice to the rights of Agent to seek a further order of the Court in connection with the sale of any of the Assets (the "Asset Designation Rights" and collectively with the Lease/Contract Designation Rights, the "Designation Rights") (the matters in this proviso (b), collectively, and including all actions taken or required to be taken in connection with the implementation and consummation of the Agency Agreement, the "Transactions"), upon the Closing (as defined in the Agency Agreement) and the satisfaction of the Debt Payoff (as defined below), the Initial Wind-Down Payment (as defined below), and the Initial Central Services Payment (as defined in the Agency Agreement) (collectively, the "Initial Purchase Price Funding") and until the Designation Rights Termination Date;[5] (c) subject to the exercise of the Lease/Contract Designation Rights as set forth in the Agency Agreement and pursuant to the Designation Rights Procedures (as defined herein), authorizing the assumption by the Sellers and assignment to the Purchaser or its designees of Assigned Contracts, if any, pursuant to section 365 of the Bankruptcy Code, upon the Closing and the Initial Purchase Price Funding, subject to the Purchaser's or its designees' payment or satisfaction of any Cure Costs, and until the Designation Rights Termination Date; (d) authorizing the Debtors to consummate the Transactions and all other transactions related to the Agency Agreement, including, but not limited to, the GOB Sale (as defined in the Agency Agreement) and Store Closings under the terms of the Agency Agreement and in accordance

---

[5]   "Designation Rights Termination Date" shall mean the earlier to occur of (i) the end of the Lease/Contract Designation Rights Period applicable to a particular Lease or Contract and (ii) May 31, 2025, as may be amended by written agreement of the Sellers and Agent, in consultation with the Committee, without further order by the Court.

with the Store Closing Order; and (e) granting related relief; and this Court having entered the Bidding Procedures Order; and the Debtors having scheduled an auction (the "Auction") for the Assets; and the Auction having occurred on February 21 and 22, 2025 in accordance with the Bidding Procedures; and the Debtors having determined in consultation with the Consultation Parties that the Purchaser has submitted the highest or otherwise best bid for the Assets and determined that the Purchaser is a Qualified Bidder and a Winning Bidder, in accordance with the Bidding Procedures; and the Court having held a hearing on February 26, 2025 (the "Approval Hearing"); and the Court having reviewed and considered the Motion, the Agency Agreement, the Committee Settlement, and any and all objections to the Transactions, the Agency Agreement, and the other Transaction Documents filed in accordance with Bidding Procedures Order; and the Court having heard statements of counsel and the evidence presented in support of the relief requested in the Motion at the Approval Hearing; and upon the First Day Declaration, witness testimony, and the Frejka Declaration;[6] and it appearing that due notice of the Motion, the Approval Hearing, and the Transactions was provided; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, and their stakeholders; and it appearing that the Court has jurisdiction over this matter; and it appearing that the legal and factual bases set forth in the Motion and at the Approval Hearing establish just cause for the relief granted herein; and after due deliberation, it is hereby

---

[6]  "Frejka Declaration" means the *Declaration of Elise S. Frejka, CIPP/US, in Support of the Motion of Debtors for Entry of an Order (I) Approving Bidding Procedures, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Stalking Horse Agreement, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts and Leases, (VII) Approving the Sale of Assets, and (VIII) Granting Related Relief* [Docket No. 388].

**FOUND, CONCLUDED, AND DETERMINED THAT:**

**<u>Jurisdiction, Venue, and Final Order</u>**

A.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper in this District and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      This Approval Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), any other applicable Bankruptcy Rules or Local Rules, and to any extent necessary under Bankruptcy Rule 9014 and Federal Rule of Civil Procedure 54(b), as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Approval Order, and expressly directs entry of judgment as set forth herein.

C.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

**Notice of the Bidding Procedures Order, Bidding Procedures,
Auction, Approval Hearing, Agency Agreement, Transactions**

D.      As evidenced by the Notice of Potential Approval Hearing [Docket No. 182], Notice of Auction for the Sale of the Debtors' Assets [Docket No. 448], Proof of Publication [Docket No. 472], the Notice of Winning Bidder for Certain of the Debtors' Assets [Docket No. 480], the Notice of Filing of Winning Bidder Agency Agreement [Docket No. 486], and the affidavit of service previously filed with this Court [Docket No. 313], notice of the Bidding Procedures Order, the Bidding Procedures, the Auction, the Approval Hearing, the Agency

Agreement, and the Transactions was proper, timely, adequate, and sufficient under the circumstances, and has been provided in accordance with sections 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007, and 9014, and Local Rule 6004-3.

E.      A reasonable opportunity to object or to be heard regarding the relief requested in the Motion was afforded to all interested persons and entities.

F.      The disclosures made by the Debtors in the Motion and related documents filed with the Court concerning the Transactions are sufficient under the circumstances.

### The Committee Settlement

G.      The Official Committee of Unsecured Creditors (the "Committee"), the Debtors, Purchaser, the ABL Agent, and the FILO Agent have agreed to the terms of a global settlement to resolve (a) the *Omnibus Objection of the Official Committee of Unsecured Creditors to Debtors' Motions (i) for Entry of an Order Approving Bidding Procedures and Stalking Horse Agreement; and (ii) for Entry of a Final Order Authorizing the Use of Cash Collateral* [Docket No. 338], and (b) the Committee's potential objections to the Sale (the "Committee Settlement"). The Committee Settlement provides for: (i) the reserve of $9,000,000 from the Wind-Down Budget for stub rent payments (the "Stub Rent Reserve") which shall be used to pay allowed stub rent claims of landlords within two (2) weeks of Closing, *provided* that any portion of the Stub Rent Reserve remaining after all stub rent has been paid shall be deemed available for satisfaction of other items in the Wind-Down Budget; (ii) a reserve of $30,000,000 for the payment of 503(b)(9) claims (the "503(b)(9) Reserve"), which shall be used to pay allowed 503(b)(9) claims pursuant to an expedited reconciliation and payment process to be agreed to by the Debtors and the Committee in consultation with Purchaser; (iii) contribution of 50% of the 503(b)(9) Savings, if any, for the benefit of unsecured creditors, with a minimum guaranteed

contribution from Purchaser of $1,500,000, which dollars shall come first from the 503(b)(9) Reserve, and paid at the earlier of (x) the Sale Termination Date or (y) the entry of an order confirming a chapter 11 plan of the Debtors (the "GUC Guarantee"); (iv) a $1,000,000 payment for the benefit of general unsecured creditors, which amount shall be funded by the Debtors from the accrued weekly cash collateral consent fees of $37,500 owing to each of the ABL Agent and the FILO Agent through entry of the Cash Collateral Order and the remainder from the FILO paydown at Closing (the "FILO Reserve" and, together with the Stub Rent Reserve, the 503(b)(9) Reserve, and (to the extent a chapter 11 plan of the Debtors is confirmed and becomes effective) the GUC Guarantee, the "Settlement Reserves"); (v) the Purchaser shall purchase and covenant to not pursue all Avoidance Actions; (vi) the establishment of lease designation rights pursuant to a separate order of the Court on terms reasonably satisfactory to the Debtors, Purchaser and the Committee (*provided* that unless and until alternative lease designation rights are approved, the Lease/Contract Procedures Order, as defined below, shall apply to the assumption, assignment, and rejection of executory contracts and unexpired leases); (vii) the agreement of the Term Loan Ad Hoc Group not to oppose a waiver of the Prepetition Term Loan Lenders' right to receive a recovery from the first $5,000,000 of value available for distribution to unsecured creditors; (viii) the payment (from the Carve Out Reserves (as defined in the Cash Collateral Order) or, to the extent the Carve Out Reserves are insufficient, the GUC Guarantee and/or the FILO Reserve) of all fees and expenses incurred by the professionals for the Committee through the Closing that are approved by the Court; (ix) a post-Closing budget for the Committee's professionals in the amount of $1,250,000 (the "Post-Closing UCC Budget"), payable from the Carve Out Reserves (as defined in the Cash Collateral Order); (x) any unused amounts from the Post-Closing UCC Budget shall be contributed to the benefit of unsecured

creditors (the "UCC Budget Savings"); and (xi) the creation of a trust, whose trustee shall be selected by the Committee, for the benefit of unsecured creditors in any confirmed plan in these chapter 11 cases to be funded with the GUC Guarantee, the FILO Reserve, and the UCC Budget Savings.   The FILO Reserve shall be segregated and not used for any purpose other than as provided for in this Committee Settlement.   For the avoidance of doubt, the Prepetition ABL Agent's and the Prepetition FILO Agent's consent to the Sale, the release of the Prepetition ABL and FILO Liens and to the Committee Settlement (and the funding of, and use of funds contained in, the Settlement Reserves) is conditioned upon, and subject to, the Prepetition ABL/FILO Obligations being Paid in Full on or before the Closing.

### Highest and Best Offer

H.      The Debtors conducted a sale process in accordance with, and have, along with the Purchaser, complied in all respects with, the Bidding Procedures Order and afforded a full, fair, and reasonable opportunity for any interested party to make a higher or otherwise better offer to purchase the Assets.   The approval and consummation of the Transactions is in the best interests of the Debtors, their creditors, and all other parties in interest.

I.      (i) The Debtors and their advisors engaged in a robust and extensive marketing and sale process, both prior to the commencement of these chapter 11 cases and through the postpetition sale process in accordance with the Bidding Procedures Order and a sound exercise of the Debtors' business judgment, as more fully detailed in the First Day Declaration, the Frejka Declaration, and witness testimony;   (ii) the Bidding Procedures were substantively and procedurally fair to all parties and the Debtors conducted a fair, open, and adequate sale process in full compliance in all respects with the Bidding Procedures Order, with all other applicable orders of the Court, and with the Debtors' fiduciary duties; (iii) the sale process, the Bidding

8

Procedures, and the Auction were non-collusive, duly noticed, and provided a full, fair, reasonable, and adequate opportunity for any entity that either expressed an interest in acquiring the Assets, or who the Debtors believed may have had an interest in acquiring the Assets, to make an offer to purchase the Assets; (iv) the Debtors and the Purchaser have negotiated and undertaken their roles leading to the entry into the Agency Agreement in a diligent, non-collusive, fair, reasonable, and good faith manner; and (v) the sale process conducted by the Debtors pursuant to the Bidding Procedures Order and the Bidding Procedures resulted in the highest or otherwise best value for the Assets for the Debtors and their estates, and was in the best interest of the Debtors, their estates, and their creditors.  There is no legal or equitable reason to delay entry into the Agency Agreement and the transactions contemplated therein.

J.        The consummation of the Transactions outside a plan of reorganization pursuant to the Agency Agreement neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a plan of reorganization or liquidation for the Debtors. The Transactions does not constitute a sub rosa chapter 11 plan for which approval has been sought without the protections that a disclosure statement would afford.

K.        The Purchaser would not have entered into the Agency Agreement and the Transaction Documents, and would not consummate the transactions contemplated thereby, including, without limitation, the Transactions and the purchase of Designation Rights, if (i) a first priority, senior security interest and lien is not automatically perfected on any Assets, Proceeds,[7] and Additional Agent Merchandise Proceeds determined to constitute property of the Debtors' estates after entry of this Approval Order and occurrence of the Closing or (ii) the

---

[7]    "Proceeds" has the meaning given thereto in the Agency Agreement.

Purchaser is not granted a superpriority administrative expense claims pursuant to section 507(b) of the Bankruptcy Code, which is senior to all other administrative expense claims (including any other superpriority administrative expense claims but excluding the Carve Out and the FILO Reserve) against the Debtors to the extent of any amounts owing from the Debtors to Purchaser in connection with the Agency Agreement.

### Good Faith of Debtors and Purchaser

L.      The sale and marketing process engaged in by the Debtors was non-collusive, in good faith, and substantively and procedurally fair to all parties in interest.  Likewise, the negotiation of the Transactions and the other transactions contemplated by the Agency Agreement, including the consideration to be paid by the Purchaser under the Agency Agreement, were negotiated by the Debtors and the Purchaser at arm's-length, in good faith, and without collusion pursuant to sections 363(m) and 364(c)(1) of the Bankruptcy Code, and such consideration constitutes reasonably equivalent value and fair and adequate consideration for the Assets.  Specifically: (i) the Purchaser recognized that the Debtors were free to deal with any other party interested in purchasing the Assets; (ii) the Debtors and the Purchaser complied in all respects with the provisions in the Bidding Procedures Order in negotiating and entering into the Agency Agreement and the other Transaction Documents, and the transactions described therein comply with the Bidding Procedures Order; (iii) the Purchaser agreed to subject any bid to the competitive bid procedures set forth in the Bidding Procedures Order; (iv) all payments made by the Purchaser in connection with the Transactions have been disclosed in the Agency Agreement; (v) no common identity of directors, officers, or controlling stockholders exists among the Purchaser and the Debtors; (vi) the negotiation and execution of the Agency Agreement and the other Transaction Documents were at arm's-length and in good faith, and at

all times each of the Purchaser and the Debtors were represented by competent counsel of their choosing; and (vii) the Debtors and the Purchaser have not acted in a collusive manner with any person. The Purchaser will be acting in good faith within the meaning of sections 363(m) and 364(c)(1) of the Bankruptcy Code in closing the transactions contemplated by the Agency Agreement and the other Transaction Documents. The terms and conditions set forth in the Agency Agreement are fair and reasonable under the circumstances and were not entered into for the purpose of, nor do they have the effect of, hindering, delaying, or defrauding the Debtors or their creditors under any applicable laws. The Purchaser is a "good faith purchaser" within the meaning of sections 363(m) and 364(c)(1) of the Bankruptcy Code, and, as such, is entitled to all the protections afforded thereby. The Debtors and their respective management, board of directors, board of managers (or comparable governing authority), employees, agents, and representatives, and the Purchaser and its respective employees, agents, advisors, and representatives, each actively participated in the bidding process, and each acted in good faith and without collusion or fraud of any kind. Neither the Purchaser nor any of its affiliates, officers, directors, members, partners, principals, or shareholders (or equivalent) or any of their respective representatives, successors, or assigns is an "insider" (as defined under section 101(31) of the Bankruptcy Code) of any Debtors, and therefore, each such person is fully entitled to the protections of sections 363(m) and 364(c)(1).

M.    For the avoidance of doubt, neither the Purchaser nor any of its affiliates, is, or shall be deemed to be, a "successor" to, continuation of, or alter ego of, any of the Debtors or their estates by reason of any theory of law or equity, including for purposes of any foreign, federal, state or local revenue law, pension law, the Employee Retirement Income Security Act, the Consolidated Omnibus Budget Reconciliation Act, the WARN Act (29 U.S.C. §§ 2101

et seq.), Comprehensive Environmental Response Compensation and Liability Act, the Fair Labor Standard Act, Title VII of the Civil Rights Act of 1964 (as amended), the Age Discrimination and Employment Act of 1967 (as amended), the Federal Rehabilitation Act of 1973 (as amended), or the National Labor Relations Act, 29 U.S.C. § 151, et seq. To the extent allowed by applicable law, except as otherwise set forth in this Approval Order, the Purchaser, as a result of any action taken in connection with the Transactions (i) is not, and shall not be considered, a successor to the Debtors, (ii) has not, *de facto* or otherwise, merged with or into the Debtors, (iii) is not a continuation or substantial continuation of any of the Debtors or their respective estates, businesses, or operations, or any enterprise of the Debtors, and (iv) does not have a common identity of incorporators, directors or controlling shareholders with the Debtors.

### No Fraudulent Transfer

N.      The consideration provided by the Purchaser pursuant to the Agency Agreement for its purchase of the Assets constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act, and under the laws of the United States, any state, territory, possession, or the District of Columbia.

O.      Neither the Purchaser nor its past, present, and future subsidiaries, parents, divisions, affiliates, agents, representatives, insurers, attorneys, successors and assigns, nor any of its nor their respective directors, managers, officers, employees, shareholders, members, agents, representatives, attorneys, contractors, subcontractors, independent contractors, owners, insurance companies, or partners (collectively, the "Purchaser Parties") is a continuation of the Debtors or their respective estates and no Purchaser Party is holding itself out to the public as a continuation of the Debtors or their respective estates and the Transactions does not amount to a

consolidation, merger, or de facto merger of the Purchaser (or any other Purchaser Party) and the Debtors.

P.        None of the Debtors, the Purchaser, nor any of their respective affiliates, officers, directors, members, partners, principals, or shareholders (or equivalent) or any of their respective representatives, attorneys, successors, or assigns have engaged in any conduct that would cause or permit the consummation of the Transactions or the other transactions contemplated by the Agency Agreement to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

## Validity of Transfer

Q.        The Debtors are the sole and lawful owners of, and have clear and marketable title to the extent of their right, title and interest in and to the Assets.  The Debtors' right, title, and interest in and to the Assets constitute property of the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code.

R.        The Debtors (i) have full corporate power and authority to execute and deliver the Agency Agreement and all other documents contemplated thereby, as applicable, (ii) have all of the power and authority necessary to consummate the Transactions, and (iii) have taken all action necessary to authorize and approve the Agency Agreement and to consummate the Transactions, and no further consents or approvals, other than those expressly provided for in the Agency Agreement, are required for the Debtors to consummate the transactions contemplated by the Agency Agreement.  The Debtors' right, title and interest in and to the Assets constitute property of the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code and the Debtors' title thereto is presently vested in the Debtors' estates.

S.      The Agency Agreement is a valid and binding contract between the Sellers and the Purchaser and shall be enforceable pursuant to its terms.

### Section 363(f) Is Satisfied

T.      The Transactions contemplated by the Agency Agreement meet the applicable provisions of section 363(f) of the Bankruptcy Code, such that, except for the Permitted Encumbrances and as otherwise set forth in this Approval Order, the Transactions and any purchase of Purchaser's Designation Rights will be free and clear of any and all Claims, causes of action, liens (including, without limitation, any statutory lien on real and personal property and any and all "liens" as that term is defined and used in the Bankruptcy Code, including section 101(37) thereof), liabilities, interests, rights, and encumbrances (including, without limitation, the following:   all mortgages, restrictions (including, without limitation, any restriction on the use, voting rights, transfer rights, claims for receipt of income, or other exercise of any attributes of ownership), hypothecations, charges, indentures, loan agreements, instruments, leases, licenses, sublicenses, options, deeds of trust, security interests, equity interests, conditional sale rights or other title retention agreements, pledges, judgments, demands, rights of first refusal, consent rights, offsets, contract rights, rights of setoff not taken prepetition, rights of recovery, reimbursement rights, contribution claims, indemnity rights, exoneration rights, product liability claims, alter-ego claims, environmental rights and claims (including, without limitation, toxic tort claims), labor rights and claims, employment rights and claims, pension rights and claims, tax claims, regulatory violations by any governmental entity, decrees of any court or foreign or domestic governmental entity, charges of any kind or nature, debts arising in any way in connection with any agreements, acts, or failures to act, reclamation claims, obligation claims, demands, guaranties, option rights or claims, rights, contractual or

other commitment rights and claims, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of the chapter 11 cases and whether imposed by agreement, understanding, law, equity or otherwise, including claims otherwise arising under any theory, law, or doctrine of successor or transferee liability or theories of liability related to acting in concert or active participation with the Debtors or related theories) against any of the Assets (except to the extent set forth in the Agency Agreement), and will not subject any Purchaser Party to any liability for any Claims whatsoever (including, without limitation, under any theory of equitable law, antitrust, or successor or transferee liability), except as expressly provided in the Agency Agreement with respect to the Permitted Encumbrances and this Approval Order, because, in each case, one or more of the standards set forth in section 363(f)(1)–(5) of the Bankruptcy Code has been satisfied; *provided* that all liens, claims, encumbrances, and interests of which the Assets are sold free and clear pursuant to the Approval Order (including the Adequate Protection Liens (as defined in the Cash Collateral Order)) shall automatically attach to all proceeds of the Transactions (excluding, for the avoidance of doubt, Assets and Proceeds) in the order of priority of such liens, claims, encumbrances, and interests, with the same validity, force, and effect which they had against the applicable Assets prior to the Transactions (including pursuant to the Cash Collateral Order). All holders of Claims who did not object, or withdrew their objections to the Transactions, are deemed to have consented to the Transactions pursuant to section 363(f)(2) of the Bankruptcy Code, and all holders of Claims are adequately protected—thus satisfying section 363(e) of the Bankruptcy Code—by having their Claims

(including the Adequate Protection Liens), if any, attach to the proceeds of the Transactions ultimately attributable to the property against or in which they assert Claims, or other specifically dedicated funds, in the same order of priority and with the same validity, force, and effect that such holder had prior to the Transactions (including pursuant to the Cash Collateral Order), subject to any rights, claims, and defenses of the Debtors or their estates, as applicable. Those holders of Claims who did object and that have an interest in the Assets fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code. All proceeds of the Transactions shall be funded into and held in an account owned and controlled by the Debtors, subject to the Cash Collateral Order and the Committee Settlement; *provided* that the proceeds of the Transactions to fund the Debt Payoff and the Settlement Reserves shall be distributed in accordance with the terms set forth in this Approval Order.

U. Each transfer, if any, of any Assets to the Purchaser or ~~any of~~ its designees under the Asset Designation Rights under the Agency Agreement will be a legal, valid, and effective transfer of all of the Debtors' legal, equitable, and beneficial right, title, and interest in and to the Assets free and clear of all Claims, except as expressly provided in the Agency Agreement with respect to the Permitted Encumbrances and as otherwise set forth in this Approval Order.

V. The Purchaser would not have entered into the Agency Agreement and the Transaction Documents, and would not consummate the transactions contemplated thereby, including, without limitation, the Transactions and the purchase of the Designation Rights of the Assigned Contracts, if (i) each transfer of any Assets was not free and clear of all Claims of any kind or nature whatsoever, including, without limitation, rights or claims based on any successor, transferee, derivative, or vicarious liability or any similar theory and/or applicable state or federal law or otherwise or (ii) the Purchaser or any of its affiliates, would, or in the future could, be

liable for any interests, including, without limitation, rights or claims based on any successor, transferee, derivative, or vicarious liability or any similar theory and/or applicable state or federal law or otherwise, in each case subject only to the Permitted Encumbrances.

### GOB Sale and Store Closings

W.      The Debtors have articulated good and sufficient business reasons for the Court to authorize the Purchaser to conduct the GOB Sale and Store Closings in accordance with the process and procedures pursuant to the Agency Agreement and set forth in the Store Closing Order and as modified in **Exhibit B** hereto (the "Amended Store Closing Procedures").  The Store Closing Order is incorporated and modified as described herein.

X.      The Purchaser's Asset Designation Rights are integral to the Agency Agreement and the GOB Sale, are in the best interests of the Debtors and their respective estates and creditors, and represent a sound exercise of the Debtors' business judgment.  Specifically, the Asset Designation Rights are necessary to sell the Assets to the Purchaser or its designees, as applicable.

Y.      Except as otherwise set forth in this Approval Order, the transfer to the Purchaser of the Asset Designation Rights will not subject the Purchaser to any liability whatsoever (except for the Permitted Encumbrances or as otherwise set forth in this Approval Order) that arise prior to the Closing or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of equitable law, any theory of antitrust, successor, transferee, derivative, or vicarious liability or any similar theory and/or applicable state or federal law or otherwise.

## Lease/Contract Designation Rights of the Assigned Contracts

Z.     The Purchaser's Lease/Contract Designation Rights pursuant to the terms of this Approval Order are integral to the Agency Agreement, are in the best interests of the Debtors and their respective estates, and creditors and represent a sound exercise of the Debtors' business judgment.

AA.     The Sellers and the Purchaser will, to the extent necessary, satisfy the requirements of section 365 of the Bankruptcy Code, prior to the assumption and assignment of the Assigned Contracts pursuant to the designation rights procedures (the "Designation Rights Procedures") set forth in the *Order (I) Authorizing and Approving Procedures To Reject or Assume Executory Contracts and Unexpired Leases and (II) Granting Related Relief* (the "Lease/Contract Procedures Order") [D.I. 429] or that may be set forth in a separate motion and proposed form of order, *provided*, *however*, that all rights of a counterparty to an Assigned Contract to object to the assumption and assignment of a Contract or Lease in connection with the Designation Rights Procedures on any grounds are expressly reserved.  The Purchaser and the Debtors will identify all Assigned Contracts by filing a notice on the docket following the Closing and pursuant to the Designation Rights Procedures, which may be supplemented. Unless and until any alternative Designation Rights Procedures are approved by a separate order, Purchaser may direct the Debtors to file one or more Assumption Notices (as defined in the Lease/Contract Procedures Order) with respect to any Assigned Contracts pursuant to the Designation Rights Procedures and the Debtors are hereby authorized and directed to comply with such direction and otherwise follow the procedures set forth in the Lease/Contract Procedures Order.

**Wind-Down Amount**

BB.      Sound business justifications also exist for (i) the deposit of the Carve Out Reserves (as defined in the Cash Collateral Order), including the Post-Closing UCC Budget, to be funded upon Closing in accordance with this Approval Order and the Cash Collateral Order into a segregated account (the "Carve Out Reserves Account") held in trust for the benefit of the parties entitled to the protections of the Carve Out Reserves as set forth in the Cash Collateral Order and to be governed by a customary agreement governing such segregated account that is otherwise consistent with this Approval Order, the Cash Collateral Order, and the Agency Agreement (the "Carve Out Reserves Agreement"), and (ii) the funding of the Wind-Down Payments (as defined below) pursuant to the Wind-Down Budget (as defined below, and the Wind-Down Payments and the Carve Out Reserves, collectively, the "Wind-Down Amount"), subject in all respects to the terms of the Agency Agreement, including the funding of the FILO Reserve in accordance with this Approval Order, the Committee Settlement, and the Cash Collateral Order into a segregated account held in trust for the benefit of general unsecured creditors and as otherwise provided in this Approval Order.  The Wind-Down Amount will avoid a freefall shutdown of the Debtors' remaining estates and will provide funding of those professional fees and other wind-down costs necessary to implement an orderly and responsible wind-down of the Debtors' estates.  The Wind-Down Amount is reasonable under the facts and circumstances of these chapter 11 cases.

**Prompt Consummation**

CC.      Based on the record of the Approval Hearing, and for the reasons stated on the record at the Approval Hearing, the Transactions must be approved and consummated promptly to preserve the value of the Assets.  Time, therefore, is of the essence in effectuating the Agency

Agreement.  As such, the Debtors and the Purchaser intend to close the Transactions as soon as reasonably practicable in accordance with the terms of the Agency Agreement.  The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the Agency Agreement in accordance with the terms thereof.  Accordingly, there is sufficient cause to waive the stay provided in the Bankruptcy Rules 6004(h) and any other applicable Bankruptcy Rules or Local Rules.

### Credit Bid

DD.    As set forth more fully in the Cash Collateral Order, the Debtors have acknowledged that the Prepetition Term Loan Obligations, including for the avoidance of doubt, the Prepetition Term Loan Obligations (each as defined in the Cash Collateral Order): (i) constitute legal, valid, binding, enforceable, unavoidable obligations of the Debtors; (ii) are secured by valid, binding, enforceable, unavoidable, and properly perfected Prepetition Liens on the Prepetition Collateral (each as defined in the Cash Collateral Order); (iii) constitute allowed secured claims under sections 502(a) and 506 of the Bankruptcy Code; and (iv) are authorized to be credit bid pursuant to section 363(k) of the Bankruptcy Code.  Pursuant to the Cash Collateral Order, the Challenge Deadline (as defined in the Cash Collateral Order) has lapsed and thus no Debtor or any other party in interest has any valid Challenge, claim, or cause of action against the Prepetition Liens or Prepetition Obligations that would impact the propriety of the Credit Bid.

EE.    Pursuant to applicable law, including section 363(k) of the Bankruptcy Code, the Term Agent has elected to credit bid an amount equal to $105,000,000 of the Prepetition Term Loan Obligations, as contemplated under the Agency Agreement (the "Credit Bid").  Such Credit

Bid is valid and proper consideration pursuant to sections 363(b) and 363(k) of the Bankruptcy Code and Prepetition Credit Documents (as defined in the Cash Collateral Order).  No cause exists to limit the amount of the credit bid pursuant to section 363(k) of the Bankruptcy Code or otherwise.

FF.    The Term Agent is authorized under the Prepetition Credit Documents to follow the directions of the Required Lenders (as defined in the Prepetition Term Loan Credit Agreement) in submitting the Credit Bid, including, without limitation, in assigning the right to receive the Assets to the Purchaser subject to the terms and conditions set forth in the Agency Agreement, and the Required Lenders are authorized to direct to the Term Agent to make the Credit Bid contemplated by the Agency Agreement.  The Term Agent acted validly and in good faith and in accordance with the Prepetition Credit Documents in submitting the Credit Bid with respect to the transactions contemplated by the Agency Agreement.  The Required Lenders acted validly, reasonably, and in good faith and in accordance with the Prepetition Credit Documents in directing the Term Agent to submit the Credit Bid with respect to the transactions contemplated by the Agency Agreement.

**NOW, THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED THAT:**

1.    The Motion is GRANTED, as set forth in this Approval Order.

2.    All objections to or reservations of rights with respect to the Motion or the relief requested therein that have not been withdrawn or resolved are overruled with prejudice; provided that the foregoing shall not prejudice the rights of any applicable counterparty to an Assigned Contract with respect to exercise of the Purchaser's Lease/Contract Designation Rights and the Designation Rights Procedures.  All persons and entities who did not object or who

objected but have withdrawn their objections to the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.

3.      The Agency Agreement and the other Transaction Documents, and all terms and conditions thereof, are hereby APPROVED in all respects, unless otherwise set forth in this Approval Order.  The failure to specifically include any particular provision of the Agency Agreement or the Transaction Documents in this Approval Order shall not diminish or impair the effectiveness of such provision.

4.      The Committee Settlement is APPROVED in all respects.

5.      Upon entry of this Approval Order, the Challenge Deadline (as defined in the Cash Collateral Order) shall be deemed to have expired as of the date of the Approval Hearing.

6.      The Debtors, their respective officers, employees, and agents, and all other applicable parties are authorized and directed to (a) take any and all actions necessary or appropriate to perform, consummate, implement, and close the Transactions in accordance with the terms and conditions set forth in the Agency Agreement, the Transaction Documents, and this Approval Order, and (b) take all further actions and execute and deliver the Agency Agreement and Transaction Documents and any and all additional instruments and documents that may be necessary or appropriate to implement the Agency Agreement and the other Transaction Documents and consummate the Transactions in accordance with the terms thereof, all without further order of the Court.

7.      Neither the Purchaser nor any of its affiliates is acquiring any of the Excluded Assets as set forth in Sections 16.21(e) of the Agency Agreement.

8.      All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with, or which would be inconsistent with, the ability of the Debtors

to transfer any Assets to the Purchaser or its designees in accordance with the Agency Agreement, the other Transaction Documents, and this Approval Order; *provided*, *however*, that nothing herein shall prevent counterparties to Assigned Contracts, if any, from objecting to the proposed assumption and assignment of an Assigned Contract or seeking to enforce contractual rights and obligations under such Contracts or Leases in connection with the Designation Rights Procedures.  For the avoidance of doubt, all utilities, landlords, creditors, and other interested parties and all persons acting for or on their behalf shall not interfere with or otherwise impede the conduct of the GOB Sale or Store Closings or institute any action in any forum other than this Court that in any way directly or indirectly interferes with or obstructs or impedes the conduct of the GOB Sale or Sale Closings unless otherwise ordered by the Court, so long as such GOB Sale or Store Closing is conducted in accordance with the Amended Store Closing Procedures and/or any Side Letter (as defined herein).

9.       Following the satisfaction of the Initial Purchase Price Funding and the funding of the Stub Rent Reserve and the FILO Reserve, and in accordance with the Agency Agreement and this Approval Order, and upon the purchase of Purchaser's Designation Rights, if any, all of the Sellers' rights, titles, and interests in and to, and possession of, the Assets shall be vested in the Purchaser or its designees under the Asset Designation Rights, as applicable, pursuant to sections 105(a), 363(b), 363(f), and 365 of the Bankruptcy Code.  Such transfer in accordance with the Designation Rights shall constitute a legal, valid, enforceable, and effective transfer of the Assets.  In connection with the transfer of the Assets, Purchaser is acquiring Avoidance Actions and Other Causes of Action pursuant to the terms and conditions set forth in the Agency Agreement and this Approval Order, and shall be deemed to release and waive (i) all Other Causes of Action against (x) the Prepetition Secured Creditors (as defined in the Cash Collateral

Order), (y) 1903P Loan Agent and all of its affiliates including Gordon Brothers Retail Partners, LLC, and (z) any Related Party (as defined in the Agency Agreement), of the Debtors, including former officers or directors, and (ii) all Avoidance Actions (collectively, the "<u>Released Causes of Action</u>").  Upon the occurrence of the Closing, Purchaser shall be deemed to have waived and released the Released Causes of Action, and neither Purchaser, nor any Entity claiming by, through, or on behalf of Purchaser (including by operation of law, sale, assignment, conveyance, or otherwise) shall pursue, prosecute, litigate, institute, or commence an action based on, assert, sell, use defensively, convey, assign, or file any claim or cause of action that relates to any Released Cause of Action.  Purchaser is hereby granted derivative standing and authority to commence, prosecute, and settle any Other Causes of Action acquired pursuant to the Agency Agreement other than the Released Causes of Action.  All persons or entities, presently at or after the date of the Initial Purchase Price Funding, in possession of some or all of the Assets, shall surrender possession of any and all portions of the Assets to the Debtors on the date of the Initial Purchase Price Funding to be held strictly in trust for the benefit of Purchaser, *provided* that all Assets are subject to Purchaser's right to designate the transferees thereof, irrespective of who has possession, custody, or control thereof.  Upon the Initial Purchase Price Funding, Purchaser shall have the exclusive right to market and sell, or otherwise designate the purchasers, licensees, and/or assignees of, any or all of the Assets free and clear of all liens, claims, and encumbrances thereon (other than Permitted Encumbrances or as otherwise set forth in this Approval Order) without further order of the Bankruptcy Court; *provided* that the Lease/Contract Designation Rights shall be exercised in accordance with the Designation Rights Procedures.

10.     This Approval Order (a) shall be effective as a determination that, as of the Initial Purchase Price Funding, (i) upon the purchase of Purchaser's Designation Rights, ~~pursuant to the Designation Rights Procedures~~ as it relates to the Assigned Contracts, if any, the Assets shall have been transferred to the Purchaser or its designees under the Asset Designation Rights free and clear of all Claims, except as to the Permitted Encumbrances, as applicable, or as otherwise set forth herein, or otherwise held strictly in trust by the Sellers for the benefit of the Purchaser, and (ii) the conveyances described herein have been effected; and (b) to the greatest extent permitted under applicable law, is and shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, registrars of patents, trademarks, or other intellectual property, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments; and each of the foregoing persons and entities is hereby authorized to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agency Agreement and the other Transaction Documents.  All Assets transferred to Purchaser pursuant to this Approval Order are sold free and clear of any reclamation rights.  All Claims on the Assets (including the Adequate Protection Liens) shall automatically attach to the proceeds of the Transactions ultimately attributable to the property against which such Claims applied or other specifically dedicated funds (excluding, for the avoidance of doubt, Assets and Proceeds), in the same order of priority and with the same validity, force, and effect that such Claims applied prior to the Transactions (including pursuant to the Cash Collateral Order), subject to the Committee Settlement and any rights, claims, and defenses of the Debtors or their estates, as applicable, or

as otherwise provided herein.  Purchaser shall also be authorized to sell the Additional Agent Merchandise (as defined in the Agency Agreement) as set forth in the Agency Agreement, subject to the Amended Store Closing Procedures.

11.     At Closing, the Purchaser shall (i) to the Prepetition ABL Agent, for the benefit of the Prepetition ABL Lenders, and certain other persons as directed in the ABL Payoff Letter (as defined in the Agency Agreement), (a) pay the amount in cash necessary to indefeasibly pay in full in cash all Prepetition Revolving Obligations, including, without limitation, all outstanding principal, accrued interest, fees, costs and expenses (including, without limitation, all attorneys' fees, costs and expenses, and any other amounts as provided in the Cash Collateral Order), and (b) provide and/or post cash collateral for (and/or replacement of) any issued and outstanding letters of credit (in form and substance acceptable to the Prepetition ABL Agent), in each case in accordance with and as set forth in the ABL Payoff Letter (which shall be in form and substance acceptable to the Prepetition ABL Agent, and such amounts and other consideration, the "ABL Payoff"); and (ii) pay to the Prepetition FILO Agent, for the benefit of the Prepetition FILO Lenders, and certain other persons as directed in the FILO Payoff Letter (as defined in the Agency Agreement), the amount in cash necessary to pay in full in cash all Prepetition FILO Obligations, including, without limitation, all outstanding principal, accrued interest, fees, costs and expenses, make whole obligations and any other amounts as provided in the Cash Collateral Order, all as set forth in the FILO Payoff Letter (as defined in the Agency Agreement, which shall be in form and substance acceptable to the Prepetition FILO Agent) (such amounts and other consideration, the "FILO Payoff" and, together with the ABL Payoff, the "Debt Payoff"), *provided* that the amount of the FILO Reserve will be deducted from the FILO Payoff, to be treated in accordance with the Committee Settlement, which deduction will not prevent the FILO

26

Payoff from constituting payment in full of all Prepetition FILO Obligations. Upon receipt by the Prepetition ABL Agent and Prepetition FILO Agent of the Debt Payoff in accordance with the ABL Payoff Letter and the FILO Payoff Letter and expiration of the Challenge Deadline (as defined in the Cash Collateral Order), (i) the Prepetition ABL Agent and the Prepetition FILO Agent are authorized to immediately receive and apply any amounts received pursuant to the ABL Payoff Letter and the FILO Payoff Letter, (ii) all ongoing commitments under the ABL/FILO Credit Agreement shall be canceled and terminated, and (iii) following the funding of the Funded Reserve Account in accordance with this Approval Order, the Prepetition ABL Agent, the Prepetition FILO Agent and the Prepetition ABL and FILO Lenders shall have no further obligation to fund the Carve-Out Reserves (as defined in the Cash Collateral Order) or subordinate their liens and claims on account of any Allowed Professional Fees (as defined in the Cash Collateral Order). For the avoidance of doubt, all of the Prepetition Liens (including the Adequate Protection Liens) shall terminate in their entirety with respect to the Assets, and shall not attach to Proceeds, upon receipt by the Prepetition ABL Agent and Prepetition FILO Agent of the Debt Payoff and the occurrence of the Closing and the Prepetition ABL/FILO Obligations being Paid in Full (subject to the funding of the FILO Reserve).

12.    Notwithstanding anything contained in this Approval Order, these chapter 11 cases, the Agency Agreement, any Transaction Documents, the Bidding Procedures Order, the Store Closing Order, the Cash Collateral Order, or any other order entered or to be entered in these chapter 11 cases to the contrary, as of the Closing, for good and valuable consideration, the adequacy of which is hereby confirmed, including the contributions of the Released Parties[8] to

---

[8] "Released Parties" means, collectively, each of the following in their capacities as such, as former or current directors and/or officers of any of the Debtors, as equity holders of any of the Debtors, and/or as debt holders of any of the Debtors at any time prior to the Closing (each to the extent applicable): (i) the Agent Purchaser, (ii) the Term Agent, (iii) each Prepetition Term Loan Lender, (iv) the ABL Agent, (v) the FILO Agent, (vi) each ABL

facilitate and implement the Transactions, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Closing, the Released Parties are deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by and on behalf of each and all of the Debtors, the Debtors' estates, any party acting on behalf of the Debtors or their Estates, the ABL Agent, the ABL Lenders, the FILO Agent, the FILO Lenders, and their affiliates, and the Purchaser, in each case on behalf of themselves and their respective successors and assigns, representatives and any and all other entities or persons that may purport to assert any claim or cause of action directly or derivatively, by or through the foregoing entities or persons, from any and all claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claims or causes of action, asserted or assertable on behalf of any of the Debtors, the Debtors' estates, or their affiliates, whether liquidated or unliquidated, fixed or contingent, mature or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, contract, tort, by statute, violations of federal or state securities laws or otherwise that each of the Debtors, the Debtors' estates, or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any claim against or interest in or other person, based on or relating to, or in any manner arising from, in whole or in part, any

---

Lender, (vi) each FILO Lender, (vii) any former director or officer of any of the Debtors prior to the Closing, (viii) Gordon Brothers Retail Partners, LLC, and (ix) with respect to (x) any Entity or Person (as defined in the Bankruptcy Code) in the foregoing (i) through (ix), such Entity's or Person's predecessors, successors and assigns, parents, subsidiaries, affiliates, affiliated investment funds or investment vehicles, managed or advised accounts, funds, or other entities, and investment advisors, sub-advisors, or managers, (y) with respect to each of the foregoing in clause (x), such Entity's or Person's respective current and former officers, directors, principals, equity holders (regardless of whether such interests are held directly or indirectly and any fund managers, fiduciaries, or other agents with any involvement related to any of the Debtors), members, partners, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, actuaries, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and (z) with respect to each of the foregoing in clause (x), such Entity's or Person's respective heirs, executors, estates, servants, and nominees.

act or omission, transaction, agreement, event, or other occurrence taking place on or before the Closing, including any claims or causes of action based on or relating to, or in any manner arising from, in whole or in part, the chapter 11 cases, the Debtors, the Transactions, the Bidding Procedures, the Bidding Procedures Order, the Agency Agreement, any Transaction Document, the Store Closing Procedures, the Store Closing Order, the Cash Collateral Order, the bidding process, the sale process, the governance, management, transactions, ownership, or operation of any of the Debtors (including, for the avoidance of doubt, in any capacities as former directors, officers, equity holders, or debt holder), the purchase, sale or rescission of any security of or claim against any of the Debtors, the subject matter of, or the transactions or events giving rise to, any claim or interest that is treated in the Bidding Procedures, the Bidding Procedures Order, the Agency Agreement, any Transaction Document, the Store Closing Procedures, the Store Closing Order, the Cash Collateral Order, the business or contractual agreements between any Debtor and any Released Party, the Debtors' in or out-of-court restructuring efforts, intercompany transactions, the Transactions, the Prepetition Credit Documents or the Prepetition Loan Facilities (each as defined in the Cash Collateral Order), the restructuring or sale of claims and interests before the Closing, the negotiation, formulation, preparation, execution, filing, solicitation, entry into, and/or consummation of the Bidding Procedures, the Bidding Procedures Order, the Agency Agreement, any Transaction Document, the Store Closing Procedures, the Store Closing Order, the Cash Collateral Order, the chapter 11 cases, any restructuring transaction, or related contract, instrument, release, or other agreement or document created or entered into in connection with the foregoing, the pursuit of the Transactions, the sale process, or the bidding process, the administration and implementation of the chapter 11 cases, the Prepetition Credit Documents or the Prepetition Loan Facilities, or the distribution of proceeds

from the Transactions, the Transactions, the Bidding Procedures, the Bidding Procedures Order, the Agency Agreement, any Transaction Document, the Store Closing Procedures, the Store Closing Order, the Cash Collateral Order, including the distribution of property under this Approval Order, the Agency Agreement, the Store Closing Order, or any other Transaction Document, or any other agreement, act or omission, transaction, event, or other occurrence taking place on or before the Closing.

13.     Each of the parties granting the releases set forth in the foregoing paragraph (including such parties' successors and assigns and including the Purchaser pursuant to the Agency Agreement) covenants not to, and is hereby forever enjoined from, directly or indirectly bringing the released claims and causes of action.  Such releases (i) represent a sound exercise of the Debtors' business judgment; (ii) were negotiated in good faith and at arm's length as part of the Agency Agreement; and (iii) are (a) in exchange for good and valuable consideration, (b) a good faith settlement and compromise of the claims released thereby, (c) in the best interest of the Debtors and their estates, (d) fair, equitable, and reasonable under the circumstances of the Debtors chapter 11 cases, (e) are within the jurisdiction of the Bankruptcy Court; (f) are integral elements of the transactions incorporated into this Approval Order and inextricably bound with the other provisions of this Approval Order; and (g) consistent with the Bankruptcy Code and are hereby approved in their entirety.  For the avoidance of doubt, the foregoing releases do not release any obligations under the Agency Agreement or any other Transaction Documents documenting the Transactions.

14.     Except as otherwise provided in the Agency Agreement and this Approval Order, including with respect to the Permitted Encumbrances, all persons and entities (and their respective successors and assigns), including, but not limited to, all debt security holders, equity

security holders, affiliates, governmental, tax, and regulatory authorities, lenders, customers, vendors, employees, trade creditors, litigation claimants, and other creditors holding claims arising under or out of, in connection with, or in any way relating to, the Debtors, the Assets, and the ownership, sale, or operation of the Assets prior to the Closing or any transfer of any Assets to the Purchaser or its designees, are hereby forever barred, estopped, and permanently enjoined from asserting such claims against any Purchaser Party and its property (including, without limitation, the Assets), unless otherwise provided by further order of this Court. Following the Closing, no holder of any Claim shall interfere with the Purchaser's title to or use and enjoyment of the Assets based on or related to any such claim or interest.

15.    Except as otherwise provided in the Agency Agreement or this Approval Order, including with respect to the Permitted Encumbrances, if any person or entity that has filed financing statements, mortgages, mechanic's claims, lis pendens, or other documents or agreements evidencing claims against the Debtors or in the Assets shall not have delivered to the Debtors prior to the Closing of the Transactions, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, and/or releases of all Claims that the person or entity has with respect to the Sellers or the Assets or otherwise, then only with regard to the Assets that are purchased by the Purchaser pursuant to the Agency Agreement and this Approval Order, (a) the Sellers are hereby authorized and directed to execute and file such statements, instruments, releases, and other documents on behalf of the person or entity with respect to the Assets, (b) the Purchaser is hereby authorized to file, register, or otherwise record a certified copy of this Approval Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Claims against the Purchaser Parties and the Assets, and (c) upon consummation of the Transactions, the Purchaser

may seek in this Court or any other court to compel appropriate parties to execute and/or file termination statements, instruments of satisfaction, and releases of all Claims that are extinguished or otherwise released pursuant to this Approval Order under section 363 of the Bankruptcy Code, and any other provisions of the Bankruptcy Code, with respect to the Assets. This Approval Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department, or office. Notwithstanding the foregoing, the provisions of this Approval Order authorizing the Transactions and designation and, if applicable, transfer of the Assets free and clear of Claims shall be self-executing and neither the Debtors nor the Purchaser shall be required to execute or file releases, termination statements, assignments, consents, or other instruments to effectuate, consummate, and implement the provisions of this Approval Order.

16.     Except as otherwise provided in the Agency Agreement and this Approval Order, including with respect to the Permitted Encumbrances, effective upon the Closing, all persons and entities are forever prohibited and enjoined from commencing or continuing in any matter any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral, or other proceeding against the Purchaser, any Purchaser Party or their respective assets (including, without limitation, the Assets), with respect to any (a) claim in these chapter 11 cases or in connection with or related to the Transactions or the Debtors or (b) successor or transferee liability including, without limitation, the following actions with respect to clauses (a) and (b): (i) commencing or continuing any action or other proceeding pending or threatened; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any lien, claim, interest, or encumbrance; (iv) asserting any setoff (except for setoffs exercised prior to the Petition Date), or right of

subrogation, or recoupment of any kind; (v) commencing or continuing any action, in any manner or place, that does not comply with, or is inconsistent with, the provisions of this Approval Order or other orders of this Court, or the agreements or actions contemplated or taken in respect hereof; or (vi) revoking, terminating, failing, or refusing to renew any license, permit, or authorization to operate any business in connection with the Assets or conduct any of the businesses operated with respect to such Assets.  Except as otherwise expressly provided in this Approval Order or the Agency Agreement and in accordance with the Agent Dropout Rights (as defined below), after the Closing, the Debtors shall have no further liability with respect to the Assets, and any claims, whether administrative or otherwise, relating to or arising from such Assets after the closing of the sale asserted against the Debtors shall be deemed disallowed. Purchaser shall not be liable for any claims against the Debtors except as expressly provided for in the Agency Agreement and this Approval Order, and the Debtors shall not be liable for any claims against Purchaser except as expressly provided for in the Agency Agreement.

17.     Following the satisfaction of the Initial Purchase Price Funding and the funding of the Stub Rent Reserve and the FILO Reserve, any Proceeds, or Additional Agent Merchandise Proceeds received by, or that otherwise come into the possession of, Sellers at any time after the Closing shall be segregated and held strictly in trust for the benefit of Purchaser, shall not be commingled with the Sellers' own assets, and, as such, shall not become property of the Debtors' estates pursuant to and consistent with 11 U.S.C. § 541(b)(1), and shall be paid over to Purchaser promptly, but in any event, not later than in connection with each Weekly Sale Reconciliation (as defined in the Agency Agreement).

18.     To the extent Purchaser has not designated any Assets as of the Asset Designation Rights Termination Date (as defined in the Agency Agreement, and any Assets not designated by

the Asset Designation Rights Termination Date, the "Residual Assets"), (i) ownership of all cash (on hand, in the bank, in transit, posted in respect of letters of credit or bonds or otherwise), credit card processing float, accounts receivable, notes receivable, credit card receivables, other receivables, deposits, security deposits, proceeds of retail sales in all of the Sellers' retail store locations, rights to refunds, other rights to payment, Intellectual Property, and, subject to Section 7.1 of the Agency Agreement, ownership of all Remaining Merchandise (as defined in the Agency Agreement), comprising Residual Assets shall vest in Purchaser, and (ii) ownership of all other Residual Assets shall revert to the Debtors' estates, each on the Asset Designation Rights Termination Date.

19.     Nothing set forth herein or in the Agency Agreement shall impact the obligation of any proposed designee to assume obligations under an Assigned Contract *cum onere*, including, without limitation, liabilities for indemnification, year-end adjustments or reconciliations, and liabilities for any defaults under such Assigned Contracts, and all parties' rights are reserved in such regard.

20.     The Vacate Date (as defined in the Agency Agreement) for any Lease shall also be the Lease Designation Rights Termination Date for such Lease.  By written agreement of the Debtors and the Agent, the Agent may extend the Lease Designation Rights Termination Date past the Vacate Date provided that the Agent's obligations to pay all Expenses, including Occupancy Expenses, for each Store or Distribution Center, as applicable, shall continue until the new Lease Designation Rights Termination Date.  Thereafter, the Merchant shall be responsible to pay all such Expenses to the extent, if any, the rejection date for an applicable lease is later than the new Lease Designation Rights Termination Date for such lease; *provided* that the Merchant reserves all rights to seek further reimbursement from the Agent pursuant to

the Agency Agreement.  Notwithstanding anything to the contrary in the Agency Agreement or this Approval Order, the Agent may not abandon any property at a Store or Distribution Center that does not belong to Merchant.  A copy of any agreement to extend the Lease Designation Rights Termination Date should be filed and sent to any applicable landlord.

### Good Faith of Debtors and Purchaser

21.    The Transactions contemplated by the Agency Agreement is undertaken by the Debtors and the Purchaser without collusion and in good faith, as that term is defined in sections 363(m) and 364(c)(1) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Transactions shall not affect the validity of the Transactions (including, without limitation, the assumption and assignment of the Assigned Contracts, if any, pursuant to the Designation Rights Procedures), unless such authorization and consummation of such Transactions is duly and properly stayed pending such appeal.

22.    Neither the Debtors nor the Purchaser have engaged in any action or inaction that would cause or permit the Transactions to be avoided or costs or damages to be imposed under section 363(n) of the Bankruptcy Code.  The consideration provided by the Purchaser for the Assets under the Agency Agreement is fair and reasonable and the Transactions may not be avoided, and costs and damages may not be imposed, under section 363(n) of the Bankruptcy Code.

### Asset Designation Rights

23.    In accordance with the terms of this Approval Order and Section 15.2 of the Agency Agreement, the Purchaser is authorized to exercise the Asset Designation Rights. Subject to Purchaser's compliance with its payment obligations under the Agency Agreement

and this Approval Order, Purchaser is authorized to execute, in the name of and as agent for the Debtors, any and all deeds, bills of sale, and other instruments or documents necessary to effectuate the sale, transfer, or other conveyance of any of the Assets, none of which instruments or documents shall require the Debtors to incur any obligations or other liabilities beyond the terms of the Agency Agreement.

24.     At any time after the Closing but in no event later than the Asset Designation Rights Termination Date, the Purchaser is authorized to provide notice of any sale, license, transfer, or other conveyance of any Assets by the Purchaser (other than the Assets being sold pursuant to the GOB Sale or Store Closings, as to which no further notice shall be required) substantially in the form attached to the Agency Agreement as <u>Exhibit 2(b)(iv)</u> (the "<u>Asset Designation Notice</u>").

25.     Except as otherwise stated in this Approval Order, the sale, license, transfer, or other conveyance of any Assets by the Purchaser reflected in any Asset Designation Notice shall be automatically effective on the date reflected in the applicable Asset Designation Notice and subject to the satisfaction of any closing conditions reflected therein, and the sale or other conveyance of such Assets shall be free and clear of all liens, Claims, and encumbrances (other than Permitted Encumbrances) without further order of the Court; *provided* that nothing in this Approval Order shall inhibit the ability of Purchaser to seek other or further orders of the Court in connection with the sale or other disposition of any Assets.

### GOB Sale and Store Closings

26.     Subject to the provisions of this Approval Order and the Amended Store Closing Procedures, as same may be modified by any Side Letter (as defined below), the Debtors and Purchaser are hereby authorized, pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy

Code, to conduct the GOB Sale and Store Closings in accordance with the Store Closing Procedures, as may be modified by any Side Letter.

27.     Following the satisfaction of the Initial Price Funding, Purchaser shall have the exclusive right to use the Stores (as defined in the Agency Agreement) and all other Assets for the purpose of conducting the GOB Sale and Store Closings, free of any interference from any entity or person, subject to compliance with the Agency Agreement (including payment of Expenses (as defined in the Agency Agreement) and Wind-Down Payments), the Store Closing Procedures and this Approval Order.  The Purchaser and each landlord of a Store are authorized to enter into agreements (each, a "Side Letter") between themselves modifying the Store Closing Procedures and this Approval Order, as applicable, without further order of the Court, and such Side Letters shall be binding as among the Purchaser and any such landlords.  In the event of any conflict between this Approval Order and any Side Letter, the terms of such Side Letter shall control; *provided* that this Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of any Side Letter.

28.     For purposes of conducting the GOB Sale and Store Closings, the Purchaser shall have (a) the right to the unencumbered use and occupancy of, and peaceful and quiet possession of each Store and the assets currently located at such Stores (as defined in the Agency Agreement), and (b) the exclusive right to use the Stores and all related Store services, furniture, fixtures, equipment and other assets of the Debtors or Purchaser, as the context makes applicable, as designated under the Agency Agreement and/or hereunder for the purpose of conducting the GOB Sale and Store Closings, free of any interference from any entity or person, subject to compliance with the Store Closing Procedures as modified by any Side Letter and this Approval Order.

29.     Purchaser, as the exclusive agent for Debtors, is authorized to conduct, advertise, post signs, utilize sign-walkers, and otherwise promote the GOB Sale and Store Closings as a "going out of business," "store closing," "sale on everything," "everything must go," or similarly themed sale, in accordance with the Store Closing Procedures (as the same may be modified any Side Letters), subject to compliance with the Store Closing Procedures, this Approval Order, and all applicable federal, state, and local laws, regulations and ordinances, including, without limitation, all laws and regulations relating to advertising, privacy, consumer protection, occupational health and safety and the environment, together with all applicable statutes, rules, regulations and orders of, and applicable restrictions imposed by, governmental authorities, other than all applicable laws, ordinances, rules, regulations, or licensing requirements in respect of "going out of business", "store closing" or similarly-themed sales (collectively, the "Liquidation Sale Laws"); *provided*, *however*, that as long as the GOB Sales and Store Closings are conducted in accordance with the terms of this Approval Order and the Store Closing Procedures, and in light of the provisions in the laws of many Governmental Units (as defined in the Bankruptcy Code) that exempt court-ordered sales from their provisions, the Sellers and the Purchaser will be presumed to be in compliance with any Liquidation Sale Laws and are authorized to conduct the GOB Sale and Store Closings in accordance with the terms of this Approval Order and the Store Closing Procedures without the necessity of further showing compliance with any such Liquidation Sale Laws.

30.     Purchaser may use all Intellectual Property consistent with the Debtors' ordinary course of business usage and in connection with the conduct of the GOB Sale and Store Closings.

31.     Unless otherwise ordered by the Court, all newspapers and other advertising media in which the GOB Sale or Store Closings are advertised shall be directed to accept this Approval Order as binding and to allow the Debtors and the Purchaser to consummate the transactions provided for in the Agency Agreement, including, without limitation, conducting and advertising the GOB Sale and Store Closings in the manner contemplated by the Store Closing Order.

32.     The Purchaser is authorized to, or may direct the Debtors to, distribute emails and promotional materials to the Debtors' customers consistent with the Debtors' existing policies on the use of consumer information.

**Wind-Down Funding**

33.     Nothing in this Approval Order shall impair, modify, or otherwise affect the Carve Out (as defined in the Cash Collateral Order).  At Closing, the Debtors shall fund the Funded Reserve Account in accordance with this Approval Order and the Cash Collateral Order, and the Debtors shall be authorized to apply such amounts in accordance with the Cash Collateral Order.  The creation and funding of the Funded Reserve Account is approved pursuant to section 363(b) of the Bankruptcy Code.  Except as expressly set forth in this Approval Order, nothing herein shall otherwise impair, modify, or affect the Cash Collateral Order.

34.     At Closing, Purchaser shall make an initial cash payment to the Debtors equal to sixty-five percent (65%) of the Wind-Down Budget (the "Initial Wind-Down Payment") *provided* that, notwithstanding anything herein to the contrary, the Initial Wind Down Payment shall include the payment of all reasonable and documented fees and expenses of the Term Agent advisors and the Term Loan Ad Hoc Group Advisors in an amount not to exceed $1,660,000.  The remaining thirty-five percent (35%) of the Wind Down Budget shall be funded

from Acquired Cash and, to the extent necessary, Proceeds, within thirty (30) days after the Closing (together with the Initial Wind Down Payment, the "Wind-Down Payments").  The Wind-Down Payments shall not exceed the amounts set forth in Exhibit 3.1(b) of the Agency Agreement (the "Wind-Down Budget"); *provided* that if any amounts remain in the 503(b)(9) Reserve following reconciliation and payment of allowed 503(b)(9) claims, such amounts that have not been expended by the Debtors as of the Designation Rights Termination Date shall be returned to Purchaser upon the earlier of (i) the dismissal or conversion of these chapter 11 cases; or (ii) the effective date of a plan of liquidation of the Debtors, subject to the paragraph (G)(iii).  The Debtors shall set aside the funds received on account of the Wind-Down Payments into a segregated account and are authorized to use such funds only to make payments pursuant to the Wind-Down Budget and this Approval Order.

### Other Provisions

35.    All payments made by the Debtors on account of the Central Services Expenses (as defined in the Agency Agreement) shall be made pursuant to, and solely in accordance with, the Central Services Budget (as defined in the Agency Agreement) (on a line item basis).  The Debtors shall provide weekly reporting to Purchaser of all amounts expended for Expenses and the Central Services Expenses as set forth in the Central Services Budget.

36.    The Debtors shall make its books and records reasonably available to Purchaser upon Closing and until the Designation Rights Termination Date.

37.    Purchaser shall neither have nor incur any obligation to advance or fund any amounts to or for the Debtors except as set forth in the Agency Agreement.  Except as provided in the Agency Agreement, upon Closing, neither the Debtors nor any other entities acting on their behalf or as their successors (including but not limited to the any statutory committee

appointed and any chapter 7 or chapter 11 trustee) may recover from the Purchaser any costs or expenses of preserving, or disposing of, any of the Assets.

38.     The Final Reconciliation (as defined in the Agency Agreement), once agreed to by the Debtors and Purchaser in consultation with the Committee, (i) shall not conflict with or impact the Committee Settlement or funding of the Settlement Reserves and (ii) shall be automatically deemed approved pursuant to section 105(a) of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure without further order of the Court or action by any party; *provided* that the Committee reserves the right to request an emergency hearing if the Final Reconciliation conflicts with or has any economic impact on the Committee Settlement.

39.     The automatic stay imposed by section 362 of the Bankruptcy Code is hereby lifted, solely to the extent necessary, without further order of the Court, (a) to allow the Purchaser to give the Debtors any notice provided for in the Agency Agreement, (b) to allow the Purchaser to take any and all actions permitted by the Agency Agreement in accordance with the terms and conditions thereof, including, without limitation, effectuating the Transactions and the other transactions contemplated by the Agency Agreement and other Transaction Documents, and (c) to otherwise implement the terms and provisions of the Agency Agreement, the other Transaction Documents, and this Approval Order.

40.     This Approval Order shall be binding in all respects upon the Debtors, their affiliates, their estates, all creditors of (whether known or unknown) and holders of equity interests in any Debtor, any holders of claims against or on all or any portion of the Assets, all counterparties to the Assigned Contracts, the Purchaser, and all of their respective successors and assigns, including, but not limited to, any subsequent trustee(s), examiner(s), or receiver(s)

appointed in any of the Debtors' chapter 11 cases or upon conversion of these chapter 11 cases to cases under chapter 7 under the Bankruptcy Code, as to which trustee(s), examiner(s), or receiver(s) such terms and provisions likewise shall be binding.  Subject to Purchaser's obligation to pay Expenses and fund the Wind-Down Payments, any such successor shall continue to hold all Assets, Proceeds, and Additional Agent Merchandise strictly in trust for the benefit of Purchaser.  The Agency Agreement shall not be subject to rejection or avoidance by the Debtors, their estates, their creditors, their shareholders, or any trustee(s), examiner(s), or receiver(s).

41.    In connection with the Transactions, the Purchaser and the Debtors may and are hereby authorized but not directed to enter into a transition services agreement pursuant to which, effective as of the Closing, the Purchaser and the Debtors may provide certain services to each other for a transitional period following the Closing (the "Transition Services Agreement"). The Purchaser and the Debtors are hereby authorized to execute and deliver any additional documentation contemplated by the Agency Agreement or in furtherance of the Transactions, and to perform all such other and further acts as may be required in connection with the negotiation, execution, and performance of any Transition Services Agreement.  For the avoidance of doubt, the Transition Services Agreement shall provide that neither the Debtors nor their estates shall incur any liabilities for fees, expenses, costs, or disbursements on account of any transition services and the Purchaser shall promptly reimburse the Debtors for any fees, costs, expenses, or other disbursements incurred by the Debtors (including their advisers) in connection with any transition services provided pursuant to the Transition Services Agreement. The Debtors shall file a notice and proposed order approving any Transition Services Agreement

with the Court within and shall cause such notice to be served on any affected parties, who shall have two (2) business days of execution to object to the entry of such order.

42.     Notwithstanding the language in Section 2(b)(viii) of the Agency Agreement stating that after the Closing the Debtors shall hold the Assets in trust for the benefit of Purchaser and, as such, the Assets shall not constitute property of the Debtors' estates, all parties' rights regarding any real property lease to which a Debtor is a tenant shall be governed by the Bankruptcy Code, including, without limitation, regarding any ongoing obligation to timely perform the Debtors' lease obligations and any rejection, assumption, and/or assignment of the lease.

43.     The terms and provisions of this Approval Order and any actions taken pursuant hereto shall survive entry of an order which may be entered: (a) confirming any chapter 11 plan in any of these chapter 11 cases; (b) converting any of these chapter 11 cases to a case under chapter 7 of the Bankruptcy Code; (c) dismissing any of these chapter 11 cases; (d) appointing any trustee, examiner, or receiver under the Bankruptcy Code; or (e) pursuant to which this Court abstains from hearing any of these chapter 11 cases.  The terms and provisions of this Approval Order, notwithstanding the entry of any such orders described in clauses (a)-(e) above, shall continue in these chapter 11 cases or following dismissal of these chapter 11 cases.

44.     Following the satisfaction of the Initial Purchase Price Funding and the Stub Rent Reserve and the FILO Reserve, upon the occurrence of the Closing, all Proceeds shall be exclusive property of the Agent, subject to and in accordance with Section 3.2 of the Agency Agreement.

45.     Upon satisfaction of the Initial Purchase Price Funding and funding of the Stub Rent Reserve and the FILO Reserve, but subject to Purchaser's obligation to pay Expenses and

fund the Wind-Down Payments, Purchaser shall have first priority, senior security interests and liens on all Assets and Proceeds, which liens shall be deemed automatically perfected and (i) the Debtors shall be expressly prohibited from granting any security interests or liens on the Assets and Proceeds and (ii) to the extent that any security interest or lien is granted or otherwise attaches, voluntarily or involuntarily, (other than the security interests and liens in favor of the Purchaser) to any Assets or Proceeds, such security interests and liens shall be *void ab initio* without further order of the Court; *provided* that nothing in the Approval Order shall inhibit Purchaser's ability, and this Approval Order expressly authorizes Purchaser, to take any action Purchaser deems appropriate to perfect and enforce security interests and liens granted in its favor.  The automatic stay is hereby modified to the extent necessary to permit Agent to record a copy of this Approval Order, together with a Form UCC-1 or other similar financing statement, in any jurisdiction where the Assets or Proceeds are located, where the Debtors are incorporated or organized, or that Agent otherwise deems appropriate, *provided, however*, that the liens granted to Agent under the Agency Agreement and this Approval Order are self-executing and are deemed perfected irrespective of whether Agent files a financing statement or a copy of this Approval Order.

46.     Following the satisfaction of the Initial Purchase Price Funding and funding of the applicable Settlement Reserves, and subject to Purchaser's obligation to pay Expenses and fund the Wind-Down Payments, until all Assets have been sold or otherwise disposed of, and solely to the extent that any Assets, Proceeds, or Additional Agent Merchandise Proceeds are, notwithstanding the Approval Order, subsequently determined to constitute property of Debtors' estates and a determination has been made by the Court as to the diminution in value of the Assets, Proceeds, or Additional Agent Merchandise, Purchaser shall have a superpriority

administrative expense claim pursuant to, and subject to the requirements of, section 507(b) and 364(c)(1) of the Bankruptcy Code, as applicable, limited to the amount of any diminution of value of the Assets, Proceeds, or Additional Agent Merchandise, as applicable, which is senior to all other administrative expense claims (including any other superpriority administrative expense claims but excludingbut subject to the FILO Reserve and the Carve Out and related claims in accordance with the Cash Collateral Order) against the Debtors to the extent of any amounts owing from the Debtors to Purchaser in connection with the Agency Agreement, including as a result of any breach of the Agency Agreement.

47.    The sale of any personally identifiable information contemplated in the Agency Agreement is consistent with the Sellers' privacy policies and satisfies the requirements of section 363(b)(1)(A) of the Bankruptcy Code.  Purchaser or its designees, if applicable, shall be bound by and meet the material standards established by the Sellers' privacy policies solely with respect to any personally identifiable information transferred to Purchaser or its designees pursuant to the Agency Agreement; *provided* that nothing in this Approval Order shall affect, limit, restrict, prohibit or impair any right to amend or replace the Sellers' privacy policies on a go-forward basis with respect to any personally identifiable information transferred to Purchaser or any designee, in accordance with the terms thereof and applicable law.

48.    Purchaser shall indemnify Debtors (and their respective estates) for up to $10,000,000.00 on account of any administrative expense claim or priority tax claim attributable to the tax consequences associated with the elimination or cancellation of, transfer of, or withdrawal from the Key Man Insurance policy program provided for under certain Pre-1986 Corporate Owned Life Insurance policies issued in 1984 and 1985 by Provident Life and Accident Insurance Company (the "Key Man Insurance Policies" and any associated tax liability,

45

the "Key Man Insurance Tax Liability") upon the tax becoming payable to the relevant taxing authority. Sellers shall use best efforts to, and reasonably cooperate with, Purchaser and its professionals in efforts to, mitigate and/or offset the amount of any Key Man Insurance Tax Liability, including by evaluating the availability of any tax attributes that could reduce or eliminate the Key Man Insurance Tax Liability, considering the appropriate classification of any Key Man Insurance Tax Liability, considering structuring alternatives to monetize the Key Man Insurance Policies, or otherwise preventing any Key Man Insurance Tax Liability from arising. For the avoidance of doubt, Purchaser shall be entitled to the net proceeds (if any), after payment of any associated tax liability, of the Key Man Insurance Policies, including if such proceeds become due and payable prior to the Sellers' withdrawal.

49.    Each and every federal, state, and local governmental agency, department, or official is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agency Agreement and other Transaction Documents. For the avoidance of doubt, section 1146(a) of the Bankruptcy Code shall not apply to the Transactions.

50.    The Agency Agreement may, in consultation with the Committee, be modified, amended, or supplemented by the parties thereto in accordance with the terms thereof, without further order of the Court; *provided* (i) that any such modification, amendment, or supplement does not, based on the Debtors' business judgment, have a material adverse effect on the Debtors' estates or their creditors; (ii) the Purchaser expressly consents to such modification, amendment, or supplement in writing; and (iii) the Committee expressly consents in writing to any modification, amendment, or supplement that adversely impacts the Committee Settlement or the rights of unsecured creditors. Any amendment to the Agency Agreement must be filed

with the Court within two (2) business days of the execution of such amendment. The Debtors shall provide notice to the applicable landlord of any amendment that extends the Lease Designation Rights Termination Date for a Store or Distribution Center.

51.     All time periods set forth in this Approval Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

52.     Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 7062, and 9014 or any other Bankruptcy Rules or Local Rule to the contrary, the terms and conditions of this Approval Order shall be effective immediately upon entry and the Debtors and the Purchaser are authorized to close the Transactions immediately upon entry of this Approval Order.

53.     To the extent there is any conflict between the terms of this Approval Order and the Agency Agreement, the terms of this Approval Order shall control. Nothing contained in any chapter 11 plan hereinafter confirmed in these chapter 11 cases or any order confirming such chapter 11 plan, or any other order of the Court, shall conflict with or derogate from the provisions of the Agency Agreement or any other Transaction Document or the terms of this Approval Order, unless otherwise agreed in writing by the Debtors and the Purchaser or entered by order of the Court.

54.     Nothing in this Approval Order or the Agency Agreement shall impair or prejudice an applicable landlord's rights with respect to Debtors' available insurance coverage with respect to third-party claims asserted in connection with the Debtors' use and occupancy of premises subject to an unexpired real property lease with regard to events that occurred prior to the Closing or the effective date of assignment.

55.     Notwithstanding Section 5.1(a) of the Agency Agreement, and except as provided otherwise in any prior order of this Court or as parties may otherwise agree, the Debtors shall have no liability with respect to the disposition and/or abandonment of assets that are not owned by the Debtors, including goods held on consignment (except to the extent otherwise agreed by the applicable consignor) and the Additional Agent Merchandise.  At least two weeks prior to applicable Sale Termination Date, the Agent shall provide notice to any parties with goods held on consignment (the "Consignment Parties") in such Store and, following such notice, the Consignment Parties shall be solely responsible for the disposition, removal, and/or abandonment of such goods except as provided otherwise in any prior order of the Court.

56.     Notwithstanding anything to the contrary in the Agency Agreement, Occupancy Expenses under any Lease shall include all charges that first become due after the Closing in the ordinary course consistent with the terms of the applicable lease; *provided* that all parties' rights are reserved with respect to such charges.

57.     Nothing in this Approval Order, the Bidding Procedures Order, the Stalking Horse Agreement, or any document related to any of the foregoing shall: (a) be construed to authorize or permit (i) the assumption and/or assignment of any existing Surety Bond (including those set forth on Exhibit D to the Insurance Order[9]), (ii) the assumption and/or assignment of the existing Indemnity Agreements (as defined in the Insurance Order), or (iii) obligate the surety to replace any existing Surety Bond and/or issue any new surety bond on behalf of a Purchaser; or (b) be deemed to provide a surety's consent to the involuntary substitution of any principal

---

[9]     *Debtors' Final Order (I) Authorizing the Debtors to (A) Maintain Insurance, Surety Coverage, and Letters of Credit Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto, (B) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, Surety Bonds, and Letters of Credit, and (C) Continue to Pay Broker Fees, and (II) Granting Related Relief* [Docket No. 343] (the "Insurance Order").

under any existing Surety Bond and/or any existing Indemnity Agreement (the "Surety Agreements"), including, for the avoidance of doubt, that the Purchaser shall not be a substitute principal under any Surety Agreements absent the surety's consent thereto or further order of the Court. Additionally, nothing in this Approval Order, the Bidding Procedures Order, the Stalking Horse Agreement, or any other document, agreement, or instrument contemplated by any of the foregoing shall be deemed to alter, limit, modify, release, waive, or prejudice any rights, remedies, and/or defenses that the Surety has or may have under the Surety Agreements.

58.     The Credit Bid is a valid, proper, and appropriate credit bid consistent in all respects with section 363(k) of the Bankruptcy Code and in accordance with the Prepetition Credit Documents and is hereby approved in all respects pursuant to the Agency Agreement and the Transactions.

59.     Upon the Closing, the Credit Bid under the Agency Agreement shall be deemed to satisfy $105 million in principal amount of Prepetition Term Loan Obligations and the remaining Prepetition Term Loan Obligations following reduction for the Credit Bid (the "Remaining Prepetition Term Loan Obligations") shall remain outstanding as valid claims against the Debtors secured by the Excluded Assets and the cash proceeds of the Transactions (excluding, for the avoidance of doubt, Proceeds) to the extent set forth in the Prepetition Credit Documents. Nothing in this Approval Order, the Agency Agreement, any Transaction Document, or any other document or order shall impair, modify, affect, or limit the validity of the Remaining Prepetition Term Loan Obligations upon the Closing of the Transactions and the Remaining Prepetition Term Loan Obligations shall remain in full force and effect against the Debtors and their estates but not, for the avoidance of doubt, the Assets or Proceeds (except to the extent of the rights of

the Term Agent or any Term Loan Lenders to receive Proceeds pursuant to any agreement with Agent).

60.     The Court shall retain jurisdiction with respect to all matters arising out of or relating to the interpretation, implementation, or enforcement of this Approval Order, the terms and provisions of the Agency Agreement, and all other Transaction Documents.

61.     The Purchaser, Term Loan Ad Hoc Group, the Agent, and the Term Agent shall not support, directly, or indirectly (including through any other party), any motion or pleading that seeks to convert any of the chapter 11 cases to a chapter 7 or seeks to dismiss the chapter 11 cases.

62.     For the avoidance of doubt, the Amended Store Closing Procedures shall also apply to Distribution Centers (as defined in the Agency Agreement).

63.     Notwithstanding anything to the contrary in the Agency Agreement or this Approval Orer, the Agent may not abandon any property at a Store or Distribution Center that does not belong to the Debtors.

64.     In the event of an inconsistency between this Approval Order and the Transaction Documents, including without limitation, the Agency Agreement, the terms of this Approval Order, including the Committee Settlement set forth in paragraph G of the Approval Order, shall control in all respects.  The Committee shall have the right to seek relief on an emergency basis to address any dispute arising from this paragraph 64.

65.     Notwithstanding anything to the contrary in this Approval Order, nothing in this Approval Order shall discharge, cancel, extinguish, alter, impair, modify, or otherwise prevent Mann Enterprises, Inc. ("Mann") from, to the extent they exist, asserting any or and all of Mann's claims, defenses, arguments, or rights relating to (a) any proposed assumption,

assumption and assignment, or rejection by any of the Debtors of the Shopping Center Lease for Store #2568 (the "Laguna Niguel Lease") or (b) in the event of an assumption or an assumption and assignment of the Laguna Niguel Lease, including but not limited to any proposed Cure Amount, adequate assurance of performance and/or use of the premises subject to the Laguna Niguel Lease, on account of such assumption or assumption and assignment, all such claims, defenses, arguments, or rights being expressly preserved and reserved.

66.    In resolution of the Limited Objection of Jones Lang LaSalle Americas, Inc. ("JLL"), the Debtors, the Agent and Purchaser stipulate and agree that all fees and expenses due to JLL under the Master Services Facilities Management Agreement (the "MSA") between Jo-Ann Stores, LLC and JLL for post-petition work, including without limitation those fees and expenses due to Third-Party Vendors retained by JLL pursuant to the MSA, are included in the definition of Expenses required to be paid in the Agency Agreement by the Agent, Purchaser and/or the Debtors as so required with the understanding that all rights are reserved with respect to review and approval of the amounts invoiced by JLL under the MSA.

67.    Unless otherwise provided for by this Approval Order, any sale of goods (by designation, through the GOB Sale, or otherwise) that are consigned to the Debtors pursuant to a valid, perfected, enforceable consignment ("Consigned Goods") shall be made on terms separately agreed to by side letter agreement between Agent and the applicable consignor (each a "Consignment Side Letter"), *provided* that, prior to entry into a Consignment Side Letter with any consignor, Agent may sell such consignor's Consigned Goods through the GOB Sale and reserve the proceeds thereof for allocation pursuant to a Consignment Side Letter to be entered into with the applicable consignor. Nothing in this Approval Order constitutes an admission or

stipulation by any party as to the validity, perfection, or enforceability of any alleged consignment arrangement.

67.   68. Neither the Debtors nor the Purchaser are authorized to, and the Debtors and the Purchaser shall not, sell any inventory or other property owned by SVP Sewing Brands, LLC or its affiliates (collectively, "SVP" and, such inventory and property, the "SVP Property").  SVP is authorized to remove the SVP Property from the Stores and is authorized to, and shall within 45 days after the Closing (unless otherwise agreed to by Purchaser and SVP, discontinue operation at the Stores (notwithstanding anything to the contrary in that certain Master Sublease, dated as of July 1, 2019, between Jo-Ann Stores, LLC and SVP Sewing Brands LLC, as may be amended, modified, supplemented, or modified from time to time) subject to the following conditions:  (i) prior to the conclusion of the GOB Sale at the applicable Store, SVP shall only (absent further order of the Court or consent of the Debtors) be permitted to remove and/or decommission SVP Property (a) in the ordinary course of business between SVP Sewing Brands, LLC and Jo-Ann Stores, LLC or (b) if outside the ordinary course of such parties' business, outside of normal business hours; provided that the Debtors and the Agent shall provide SVP with reasonable access to such Store outside of normal business hours; (ii) if such retrieval is conducted outside the ordinary course of business between SVP Sewing Brands, LLC and Jo-Ann Stores, LLC, SVP shall provide the Debtors at least five (5) business days' notice prior to retrieving SVP Property from the applicable Store and shall coordinate with the applicable JOANN store managers regarding the same; and (iii) SVP shall otherwise use commercially reasonable efforts to not disrupt the Debtors' operations.  The Debtors and the Agent shall (i) provide SVP with written notice of at least fourteen (14) days (or the period of notice provided to the applicable landlord, whichever is longer) before vacating any Store and

(ii) continue to provide SVP with reasonable access to the Stores until such notice period expires. For the avoidance of doubt, the SVP Property is not subject to the rights of the Purchaser or any of the Debtors' creditors (other than SVP). Except as set forth in this paragraph, this Sale Order shall not apply to sales of SVP Property. SVP Property shall not be considered "Assets," "Proceeds," or "GOB Sale Proceeds" for purposes of this Sale Order or the Agency Agreement. Nothing in this Sale Order shall impair any rights or remedies of SVP under any lease or contract with the Debtors or applicable law. The automatic stay provisions of section 362 of the Bankruptcy Code, to the extent applicable, are hereby vacated and modified solely to the extent necessary to implement the relief set forth in this paragraph. This paragraph shall govern and control to the extent of any conflict with any other paragraph in this Sale Order.

69. The Purchaser agrees to and shall comply with the terms of that certain Pattern Supply Agreement dated as of December 15, 2023 ("Consignment Agreement") by and between Debtors and IG Design Group Americas, Inc. ("DGA") and its affiliates with respect to all Store Closing Sales, Store Closings, and Closing Stores (as those terms are defined in the Sale Closing Order) including but not limited to, the "Store Closings" provisions set forth in Section 3 of the Consignment Agreement without regard to satisfaction of the Initial Purchase Price Funding or rejection of the Consignment Agreement. Notwithstanding the preceding sentence, DGA agrees to and shall permit the Purchaser to continue to liquidate the consigned goods under the normal store liquidation process contemplated by the Consignment Agreement, or as otherwise agreed by the parties, until the conclusion of each Store Closing Sale; provided, however, that (i) DGA shall determine the pricing, including any discounting, of the consigned goods in reasonable consultation with Purchaser, and (ii) DGA reserves all rights to seek the immediate return or discard of consigned goods under the brand names of Vogue and Burda to the extent that DGA is

53

not able to obtain permission, after good faith efforts, to include such brands in the Store Closing Sales. All sales shall be "final sales" on an "as is" basis. In addition to the foregoing, Purchaser further agrees (a) to use reasonable efforts to provide at least 14 days' advance notice prior to the conclusion of a Store Closing, (b) to the extent that any Assets are being relocated to other Store(s) in connection with the completion of a Store Closing, unless otherwise determined by DGA, Purchaser will relocate any remaining consigned goods from the Closing Store to such Store(s), (c) to extent that Purchaser intends to conclude a Store Closing, Purchaser will grant DGA, and its agents and assigns, reasonable access (including before, during, and after store business hours) to immediately remove the consigned goods from such Closing Store after issuance of such fourteen (14) days' notice; and (d) to consult with DGA to dispose of any remaining consigned goods in a manner reasonably acceptable to DGA. For the duration of the Store Closing Sales, Purchaser shall also be bound by the obligations that the Debtors owe to DGA under all interim and final orders entered by this Court, as applicable, approving the Debtors' cash management motion and cash collateral motion, including, but not limited to (i) the full and timely daily reporting of Debtors' Point-of-Sale activity and gross revenue with respect to the sale of consigned goods from DGA on the immediately preceding day, in the same manner and to the same extent that Debtors provided DGA with the information prior to the Petition Date, (ii) maintaining the identifiable proceeds from the sale of such consigned goods so as to be readily identifiable as the proceeds of the sale of goods from the Consignment Agreement with DGA, and (iii) payment of all identifiable proceeds of such consigned goods, including, but not limited to, all identifiable proceeds from pre-Closing sales of consigned goods, to DGA on a weekly basis on each Friday. For the avoidance of doubt, the consigned goods shall not be considered "Assets," "Merchandise," "Proceeds," or "GOB Sale Proceeds" for

purposes of this Sale Order or the Agency Agreement. Nothing in this Sale Order shall impair any rights or remedies of DGA under any contract with the Debtors or applicable law. The automatic stay provisions of section 362 of the Bankruptcy Code, to the extent applicable, are hereby vacated and modified solely to the extent necessary to implement the relief set forth in this paragraph. This paragraph shall govern and control to the extent of any conflict with any other paragraph in this Sale Order.

68.    Notwithstanding anything to the contrary in this Approval Order, nothing in this Approval Order shall modify the provisions of any prior order of this Court regarding the Debtor's obligations with respect to the Consignment Agreement (as defined in the Store Closing Procedures Order) between the Debtors and IG Design Group Americas, Inc. ("DGA"), all of which shall remain in effect during the GOB Sale unless otherwise agreed between Purchaser and DGA in writing. Further, nothing in this Sale Order shall impair any rights or remedies of DGA under any contract with the Debtors or applicable law. For the avoidance of doubt, neither DGA's consigned goods nor the amounts due to DGA from the proceeds from the sale of the DGA's consigned goods shall be considered "Assets," "Proceeds," or "GOB Sale Proceeds" for purposes of this Approval Order or the Agency Agreement. This paragraph shall govern and control to the extent of any conflict with any other paragraph in this Approval Order.

69.    70. Purchaser agrees to include in the Sale the consigned inventory that is on consignment with the Debtors from West Broadway Distribution Services, LLC (the "WBDS") as of the Sale Commencement Date pursuant to that certain Book Distribution Agreement, dated February 1, 2009, as same has been amended, extended and renewed from time to time (the "WBDS Distribution Agreement") with respect to which WBDS has a filed UCC-1 financing statement with the Secretary of State for the State of Ohio  (Financing Statement #

OH00277551070) (the "On-Hand WBDS Consigned Goods"). ~~With regard to each item of On-Hand WBDS Consigned Goods that is sold during the Sale Term (the "Sold WBDS Consigned Goods"), in lieu of receiving payment of amounts provided for under the Section 2 of the WBDS Distribution Agreement on account of such Sold WBDS Consigned Goods, WBDS shall be entitled to receive payment as provided for in the~~ WBDS and Purchaser are negotiating a side letter ~~currently being negotiated by Purchaser and WBDS~~ (the "WBDS Side Letter") that will govern the allocation of the proceeds of the On-Hand WBDS Consigned Goods between WBDS and Purchaser, the discount applicable to On-Hand WBDS Consigned Goods in connection with the GOB Sale, and other terms to be agreed upon between WBDS and Purchaser; provided, however, in the event that the WBDS Side Letter is not executed by the parties prior to March 1, 2025, then, absent an agreement between Purchaser and WBDS, the Purchaser shall no longer include the On-Hand WBDS Consigned Goods in the Sale, and such On-Hand WBDS Consigned Goods shall be removed from the selling floor and returned to WBDS and Purchaser shall remit payment to WBDS on account of the Sold WBDS Consigned Goods, in amounts provided for under Section 2 of the WBDS Distribution Agreement.  Nothing contained herein shall be deemed to amend, modify, or limit the Debtors' obligations to remit payment to WBDS for amounts due under the WBDS Distribution Agreement other than with respect to the Sold WBDS Consigned Goods.  During the Sale Term, Purchaser and the Debtors, as and where applicable, shall be bound by the Debtors' obligations under all interim and final orders entered by this Court, as applicable, approving the Debtors' cash management motion, including, but not limited to (i) the full and timely daily reporting of Debtors' Point-of-Sale activity and gross revenue with respect to the sale of Sold WBDS Consigned Goods on the immediately preceding day, in the same manner and to the same extent that Debtors provided

WBDS with the information prior to the Petition Date, and (ii) maintaining the identifiable proceeds from the sale of the Sold WBDS Consigned Goods so as to be readily identifiable as the proceeds of the sale of goods under the WBDS Distribution Agreement, and (iii) remittance of all identifiable proceeds of Sold WBDS cConsigned gGoods, including, but not limited to, all identifiable proceeds from pre-Closing sales of consigned goods (consistent with the Debtors' prior practice from and after the Petition Date pursuant to previously entered interim and final orders of this Court), to WBDS on a weekly basis on each Friday.  For the avoidance of doubt, neither the WBDS Consigned Goods nor the amounts due to WBDS from the proceeds from the sale of the Sold WBDS Consigned Goods shall be considered "Assets," "Proceeds," or "GOB Sale Proceeds" for purposes of this SaleApproval Order or the Agency Agreement.  Except as noted above with respect to the remittance of payment to WBDS on account of the Sold WBDS Consigned Goods, nothing in this SaleApproval Order shall impair any rights or remedies of WBDS under any contract with the Debtors or applicable law.  The automatic stay provisions of section 362 of the Bankruptcy Code, to the extent applicable, are hereby vacated and modified solely to the extent necessary to implement the relief set forth in this paragraph.  This paragraph shall govern and control to the extent of any conflict with any other paragraph in this SaleApproval Order.  In the event of any conflict between this Sale Order and the WBDS Side Letter, the terms of the WBDS Side Letter shall control; provided that this Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of the WBDS Side Letter.

## **Exhibit A**

### **Agency Agreement**

*Filed at Docket No. 486*

**Exhibit B**

**Amended Store Closing Procedures**

## Amended Store Closing Procedures[1]

1.      The GOB Sale shall be conducted so that the Closing Stores in which sales are to occur will remain open no longer than during the normal hours of operation or such hours as otherwise provided for in the respective leases for the Closing Stores.

2.      The GOB Sale shall be conducted in accordance with applicable state and local "Blue Laws," where applicable, so that no Store Closing Sale shall be conducted on Sunday unless the Debtors had been operating such Closing Store on a Sunday prior to the commencement of the GOB Sale.

3.      On "shopping center" property, neither the Debtors nor GA Joann Retail Partnership, LLC (the "Agent")  shall distribute handbills, leaflets or other written materials to customers outside of any Closing Stores' premises, unless permitted by the lease or, if distribution is customary in the "shopping center" in which such Closing Store is located; *provided* that the Debtors or Agent may solicit customers in the Closing Stores themselves.  On "shopping center" property, neither the Debtors nor the Agent shall use any flashing lights or amplified sound to advertise the GOB Sale or solicit customers, except as permitted under the applicable lease or agreed to by the landlord.

4.      The Agent shall have the right to use and sell the Assets.  The Agent may advertise the sale of the Assets in a manner consistent with the Amended Store Closing Procedures.  The purchasers of any of the Assets sold during the GOB Sale shall be permitted to remove the Assets either through the back or alternative shipping areas at any time, or through

---

[1]    Capitalized terms used but not defined in the Amended Store Closing Procedures have the meanings given to them in the *Motion of Debtors for Entry of an Order (I) Authorizing and Approving the Conduct of Store Closing Sales, With Such Sales to be Free and Clear of All Liens, Claims, and Encumbrances, and (II) Granting Related Relief* (the "Motion").

other areas after store business hours; provided, however, that the foregoing shall not apply to the sale of *de minimis* Assets, whereby the item(s) can be carried out of the store in a shopping bag.

5.      At the conclusion of the Store Closing Sale, Agent shall vacate the Stores in broom clean condition; *provided that* the Agent may abandon any furniture, fixtures, and equipment (the "FF&E") not sold in the GOB Sale at the Stores, the Distribution Centers, or Merchant's corporate offices at the conclusion of the Sale or the Lease/Contract Designation Rights Period, as applicable, without cost or liability of any kind to Agent.  For the avoidance of doubt, as of the end date of the GOB Sale, Agent may abandon, in place and without further responsibility or liability of any kind, any FF&E located at a Store or Distribution Center or Merchant's corporate offices.

6.      The Debtors and Agent may advertise the GOB Sale as "store closing," "going out of business," "sale on everything," "everything must go," "everything on sale," or similar-themed sales.  The Debtors and Agent may also have a "countdown to closing" sign prominently displayed in a manner consistent with these Store Closing Procedures.

7.      Agent shall be entitled to include Additional Agent Merchandise in the Store Closing Sale in accordance with the terms of the Approval Order and the Agency Agreement.

8.      The Debtors and Agent shall be permitted to utilize sign-walkers, display, hanging signs, and interior banners in connection with the GOB Sale; *provided* that such sign walkers, display, hanging signs, and interior banners shall be professionally produced and hung in a professional manner.  The Debtors and Agent shall not use neon or day-glo on its sign walkers, display, hanging signs, or interior banners.  Furthermore, with respect to enclosed mall locations, no exterior signs or signs in common areas of a mall shall be used unless otherwise

expressly permitted in these Store Closing Procedures.  In addition, the Debtors and Agent shall be permitted to utilize exterior banners at (i) non-enclosed mall Closing Stores and (ii) enclosed mall Closing Stores to the extent the entrance to the applicable Closing Store does not require entry into the enclosed mall common area; *provided*, however, that such banners shall be located or hung so as to make clear that the GOB Sale are being conducted only at the affected Closing Store, and shall not be wider than the storefront of the Closing Store.  In addition, the Debtors and Agent shall be permitted to utilize sign walkers in a safe and professional manner and in accordance with the terms of the Order.  Nothing contained in these Store Closing Procedures shall be construed to create or impose upon the Debtors or Agent any additional restrictions not contained in the applicable lease agreement.

9.      Conspicuous signs shall be posted in the cash register areas of each of the affected Closing Stores to effect that "all sales are final."

10.     Except with respect to the hanging of exterior banners, neither the Debtors nor the Agent shall make any alterations to the storefront or exterior walls of any Closing Stores, except as authorized by the applicable lease.

11.     The Agent shall not make any alterations to interior or exterior Closing Store lighting, except as authorized by the applicable lease.  No property of the landlord of a Closing Store shall be removed or sold during the GOB Sale.  The hanging of exterior banners or in-Closing Store signage and banners shall not constitute an alteration to a Closing Store.

12.     The Agent shall keep Closing Store premises and surrounding areas clear and orderly consistent with present practices.

13.     The Agent and the landlord of any Store are authorized to enter into Side Letters without further order of the Court, provided that such agreements do not have a material adverse effect on the Debtors or their estates.

14.     The Agent shall have the right to sell all FF&E owned by the Debtors (the "Owned FF&E").  The Agent may advertise the sale of the Owned FF&E in a manner consistent with these guidelines at the Closing Stores.  The purchasers of any Owned FF&E sold during the sale shall be permitted to remove the Owned FF&E either through the back or alternative shipping areas at any time, or through other areas after applicable business hours.

15.     At the conclusion of the GOB Sale at each Closing Store, pending assumption or rejection of applicable leases, the landlords of the Closing Stores shall have reasonable access to the Closing Stores' premises as set forth in the applicable leases.  The Debtors and their agents and representatives shall continue to have access to the Closing Stores.  In the event the Debtors reject the lease associated with a Closing Store, the Debtors will use reasonable efforts to facilitate a smooth transfer of possession, including, if practicable, the return of any key codes and security materials.  The Debtors will use reasonable efforts to provide landlords of any such leases to be rejected with notice prior to the Debtors' surrender of possession, *provided* that nothing in these Amended Store Closing Procedures shall impact the terms of the Lease/Contract Procedures Order.

16.    16.    As and when due, all real estate lease obligations accrued post-petition shall be paid by the Debtors as required by the Bankruptcy Code for the period until the rejection or assumption and assignment of each such lease.  Agent has no direct responsibility to the landlords therefor, but is subject to any responsibility therefor to the Debtors provided in the Agency Agreement.

17.     The rights of landlords against the Debtors for any damages to a Closing Store shall be reserved in accordance with the provisions of the applicable lease; *provided* that to the extent certain leases of Closing Stores require written confirmation of receipt of a key to effectuate surrender, this requirement is waived.

18.     If and to the extent that the landlord of any Closing Store affected hereby contends that the Debtors or Agent are in breach of or default under these Store Closing Procedures, such landlord shall email or deliver written notice by overnight delivery on the Debtors and Agent as follows:

**If to Merchant:**

JOANN Inc.
5555 Darrow Road
Hudson, Ohio 44236
Attention:  Legal Department

*With copies (which shall not constitute notice) to:*

Cole Schotz P.C.
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
(302) 652-3131
Attention:  Patrick J. Reilley, Stacy L. Newman, Michael E. Fitzpatrick, and Jack M. Dougherty
Email:  preilley@coleschotz.com
         snewman@coleschotz.com
         mfitzpatrick@coleschotz.com
         jdougherty@coleschotz.com

- and -

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:  Aparna Yenamandra, P.C.
Email:
         aparna.yenamandra@kirkland.com

- and -

Kirkland & Ellis LLP
333 West Wolf Point Plaza
Chicago, Illinois 60654
Attention:  Jeffrey Michalik, and Lindsey Blumenthal
Email: jeff.michalik@kirkland.com
        lindsey.blumenthal@kirkland.com


**If to Agent:**

GA Joann Retail Partnership, LLC
c/o GA Group
30870 Russell Ranch Road, Suite 250
Westlake Village, CA 91362
Attention:  Scott K. Carpenter and Tim Shilling
Email: scarpenter@brileyfin.com; tshilling@brileyfin.com;
legal@brileyfin.com

*With copies (which shall not constitute notice) to:*

Lowenstein Sandler LLP
One Lowenstein Drive
Roseland, NJ 07068
Attention: Andrew Behlmann
Tel: (973) 597-2332
abehlmann@lowenstein.com