# Exhibit A



**112931**

# Tenant Document Profile Sheet

| **Required Profile Fields** | |
| --- | --- |
| Date Submitted: | 7/23/2012 |
| Submitted By: | KRC\MEisenthal |
| Document Title: | Lease Agreement |
| Author (Business Person or Attorney): | Roper, Elaine |
| Document Execution Date: | 8/26/2011 |
| Project ID: | SNCA1685/ (Unit #: 030 ) |
| Site ID: | 1685 |
| Region: | SE |
| DocType - Tenants: | Lease Documents |
| D/B/A: | Jo-Ann Fabrics / LJOANFA00 |
| Notes: | |
| **Imaging Instructions** | |
| Scan to NetDocuments: | Yes |
| Notify Others: | |

**Lease Administration:**

| Deliver to Lease Admin for Abstracting: | LCD: | 1st Mo. Base Rent: | |
| --- | --- | --- | --- |
| | RCD: | Management Fee: | |
| **No** | | CAM Est: | |
| | ACH (Y/W/E): Y | RE Tax Ext: | |
| | | Tax on Rent: | |
| | | Security Deposit: | |
| | 1st Month's Rent | Total: | $0.00 |



**\* K I M C O \***

# LEASE AGREEMENT

Between

## EDENS & AVANT FINANCING II LIMITED PARTNERSHIP
### "Landlord"

and

## JO-ANN STORES, INC.
### "Tenant"

Dated: August 26, 2011

## TABLE OF CONTENTS

| SECTION | HEADING | PAGE |
|---------|---------|------|
| SECTION 1. | EXHIBITS TO LEASE | 1 |
| SECTION 2. | DEFINITIONS | 2 |
| SECTION 3. | PREMISES | 7 |
| SECTION 4. | TERM AND OPTIONS TO EXTEND | 9 |
| SECTION 5. | FIXED MINIMUM RENT | 9 |
| SECTION 6. | PERCENTAGE RENT | 10 |
| SECTION 7. | GROSS SALES | 11 |
| SECTION 8. | TAXES | 13 |
| SECTION 9. | COMMON AREA COSTS | 15 |
| SECTION 10. | CONSTRUCTION OF PREMISES | 18 |
| SECTION 11. | USE | 22 |
| SECTION 12. | COMMON AREAS | 22 |
| SECTION 13. | UTILITIES | 23 |
| SECTION 14. | USE VIOLATION | 24 |
| SECTION 15. | COTENANCY | 25 |
| SECTION 16. | RULES AND REGULATIONS | 26 |
| SECTION 17. | ALTERATIONS, INSTALLATIONS AND IMPROVEMENTS OF TENANT | 27 |
| SECTION 18. | REPAIRS AND MAINTENANCE | 27 |
| SECTION 19. | INDEMNIFICATION | 29 |
| SECTION 20. | WAIVER OF CLAIMS | 29 |
| SECTION 21. | PROPERTY AND LIABILITY INSURANCE | 30 |
| SECTION 22. | SIGNS | 31 |
| SECTION 23. | ASSIGNMENT AND SUBLETTING | 32 |
| SECTION 24. | REPAIR AFTER CASUALTY | 33 |
| SECTION 25. | CONDEMNATION | 35 |
| SECTION 26. | REPRESENTATIONS AND COVENANTS OF LANDLORD | 36 |
| SECTION 27. | TENANT'S DEFAULT | 40 |
| SECTION 28. | RIGHTS OF LANDLORD | 42 |
| SECTION 29. | LANDLORD'S DEFAULT | 42 |
| SECTION 30. | MORTGAGE SUBORDINATION | 43 |
| SECTION 31. | NO WAIVER | 44 |
| SECTION 32. | SURRENDER OF PREMISES | 45 |
| SECTION 33. | SHORT FORM LEASE, COMMENCEMENT DATE AGREEMENT | 45 |
| SECTION 34. | NOTICE | 46 |
| SECTION 35. | HAZARDOUS MATERIALS | 47 |
| SECTION 36. | LIMITATION OF LANDLORD'S LIABILITY | 49 |
| SECTION 37. | DELIVERY OF SITE PLAN | 49 |
| SECTION 38. | SUBSTITUTE RENT – INTENTIONALLY OMITTED | 49 |
| SECTION 39. | ENTIRE AGREEMENT; WRITING REQUIRED | 49 |
| SECTION 40. | OPERATING COVENANT | 50 |

SECTION 41.    APPLICABLE LAW AND CONSTRUCTION ............................................. 50
SECTION 42.    UNAVOIDABLE DELAYS ............................................................................ 51
SECTION 43.    REASONABLE CONSENT ........................................................................... 51
SECTION 44.    NO PARTNERSHIP ...................................................................................... 51
SECTION 45.    ESTOPPEL .................................................................................................... 51
SECTION 46.    QUIET ENJOYMENT ................................................................................... 52
SECTION 47.    HOLDING OVER ........................................................................................... 52
SECTION 48.    BROKERS ...................................................................................................... 52
SECTION 49.    INTENTIONALLY OMITTED ...................................................................... 52
SECTION 50.    CLAIMS LIMITATION ................................................................................. 52
SECTION 51.    CAPTIONS .................................................................................................... 53
SECTION 52.    VARIATION IN PRONOUNS ....................................................................... 53
SECTION 53.    SECTION REFERENCES .............................................................................. 53
SECTION 54.    BINDING EFFECT OF AGREEMENT ......................................................... 53
SECTION 55.    ATTORNEY'S FEES ...................................................................................... 53
SECTION 56.    OFAC WARRANTY ....................................................................................... 53
SECTION 57.    LANDLORD'S SUSTAINABILITY INITIATIVES AND PRACTICES ..... 54
SECTION 58.    EARLY TERMINATION ............................................................................... 55

## LEASE

This Lease is made as of August 26, 2011, between **EDENS & AVANT FINANCING II LIMITED PARTNERSHIP** , a Delaware limited liability Company, ("Landlord"), and **JO-ANN STORES, INC.**, an Ohio corporation ("Tenant").

Landlord and Tenant covenant and agree as follows:

### SECTION 1. EXHIBITS TO LEASE

(a)     The following exhibits are attached to and made a part of this Lease, and are incorporated herein by reference:

Exhibit A. The description of the lands upon which the Shopping Center is located.

Exhibit B. The site plan showing the Shopping Center, the approximate location of the Premises, as hereafter defined, the Shopping Center buildings, Excluded Property, the approximate location of the Protected Area, Prohibited Area, the parking areas, driveways and common areas and containing other general information relative to the development of the Shopping Center Site (the "Site Plan").

Exhibit C. Intentionally Omitted.

Exhibit C-1. Intentionally Omitted.

Exhibit D. The final plans and specifications detailing Tenant's Work, as approved by Landlord and Tenant. [to be incorporated by reference or attached post-execution]

Exhibit D-1. The final plans and specifications detailing Tenant's signs, as approved by Landlord and Tenant. [to be incorporated by reference or attached post-execution]

Exhibit E. Intentionally Omitted.

Exhibit F. The Exclusive and Prohibited Uses of other tenants

Exhibit G. N/A (Parties acknowledge and agree the Shopping Center is not encumbered by a mortgage).

Exhibit H. Form of Estoppel Certificate.

(b) If there is any conflict between the language in this Lease and the content of any of the aforementioned Exhibits, the content of the Exhibit shall control.

**SECTION 2. DEFINITIONS**

The terms listed below have the respective meanings as follows:

(a)     Additional Rent: The Fixed Tax Payment (Section 8), the Fixed Common Area Cost (Section 9), and Fixed Insurance Payment (Section 21).

(b)     On-Going Anchor Tenants: Ross, TJMaxx, and HHGregg.

(c)     Commencement Date: (i) July 27, 2012 (it being agreed and understood that the July 27, 2012 date shall be delayed on a day for day basis for each day beyond March 26, 2012 that the Premises is not delivered to Tenant will all Delivery Requirements satisfied), or (ii) the day that Tenant opens for and conducts business in the Premises, whichever day first occurs. Notwithstanding anything to the contrary in this Lease, unless Tenant otherwise opens for business, the Commencement Date will not occur during any period that: (1) the Delivery Requirements are not satisfied; or (2) Omitted; or (3) the representations and warranties of Landlord in this Lease are not true and complete and such untruth or in accuracy materially adversely affects the Tenant's ability to operate; or (4) Landlord is not in material compliance with its obligations under this Lease; or (5) a Use Violation, as defined in Section 14 below, exists in the Shopping Center. Tenant may elect to open for business during the period(s) identified in the immediately preceding sentence, and in such case, Tenant shall be obligated to pay only Substitute Rent during said period(s).

(d)     Common Areas: the parking areas, driveways, aisles, sidewalks, malls (whether enclosed or unenclosed), truck storage areas, mechanical rooms, landscaped areas, and other common, service and related areas and improvements within the Shopping Center, whether open to the public generally or for the non-exclusive use of one or more tenants, and whether or not shown on Exhibit B, but excluding the roof(s).

(e)     Default Rate: an annual rate of interest equal to three and one-half percentage points over the three-month London Interbank Offered Rate (LIBOR), as published in the Wall Street Journal as of the date of default.

(f)     Delivery Date: the date that Landlord delivers the Premises to Tenant with all of the Delivery Requirements satisfied and Tenant accepts said delivery by written acknowledgment signed by Tenant's Vice President of Real Estate or Store Development, Director of Store Development or Director of Construction and Facilities. Tenant shall not unreasonably delay, condition or refuse its acceptance of the Premises. The Delivery Date shall not occur prior to the Required Delivery Date (regardless of whether Landlord has satisfied the Delivery Requirements prior to that date) unless the Tenant accepts the same in writing as set forth above, or during any period that (1) the representations and warranties of Landlord in this Lease are not true and complete and the untruth or the incomplete nature of the representation or warranty materially adversely affects Tenant's ability to perform its work in the Premises or (2) Landlord is not in material compliance with its obligations under this Lease.

(g)     "Delivery Requirements" means the following:

2

(1)     Intentionally Omitted;

(2)     the Premises are delivered to Tenant free and clear of any Hazardous Material, including asbestos, and Landlord represents and warrants as such;

(3)     Tenant shall have received from Landlord results from a slab moisture test indicating that the slab meets or exceeds the acceptable levels of slab moisture per ASTM F1869-98 (five (5) pounds per one thousand (1,000) square feet per twenty-four (24) hours of moisture);

(4)     To Landlord's knowledge, all Common Areas have been completed in accordance with all applicable Laws, including, without limitation, all paving of the parking lot, service areas and access roads, curbing (including curb cuts), site lighting, striping, sidewalks, loading dock area and landscaping, unless changes are required due to Tenant's use of and/or improvements to the Premises;

(5)     Intentionally Omitted;

(6)     Intentionally Omitted; and,

(7)     Intentionally Omitted.

(h)     Estimated Delivery Date: Landlord's good-faith estimate of the Delivery Date is March 26, 2012; provided, however, Landlord shall be permitted to extend this Estimated Delivery Date to a date up to April 30, 2012 (which shall also be referred to as the "Estimated Delivery Date" and replace March 26, 2012 as the "Estimated Delivery Date"), by delivering written notice of Landlord's election to extend such date to Tenant on or before November 16, 2011 (the "Landlord's Extension Notice").

(i)     Gross Leasable Area: the number of square feet of floor area (excluding non-retail mezzanine, basement and other such areas), measured from the exterior face of exterior walls, the exterior building line for sidewalk or mall frontage, and the center line of party walls, with no deduction for columns, stairs, elevators, or any interior construction or equipment areas used exclusively by Tenant for the Premises.

With respect to the Shopping Center, the Gross Leasable Area is the greater of (i) the total constructed Gross Leasable Area available for the exclusive use and occupancy of tenants within the Shopping Center, whether or not actually rented or open for business, as the same exists from time to time, or (ii) the total Gross Leasable Area of the Shopping Center intended for exclusive use and occupancy as shown on the Site Plan, whether or not actually rented.

With respect to the Premises, the Gross Leasable Area will be the actual completed Gross Leasable Area, as the same exists from time to time.

3

Any change in Gross Leasable Area, whether of the Premises or Shopping Center, will be deemed in effect on the first day of the next succeeding month following such change. Landlord covenants to advise Tenant of any increase or decrease in the Gross Leasable Area of the Shopping Center due to the construction or demolition of any buildings in the Shopping Center together with a current Site Plan reflecting such change, within 30 days after receipt of written request from Tenant.

Landlord represents and warrants that the Gross Leasable Area of the Shopping Center intended for exclusive use and occupancy as shown in the Site Plan is currently 153,829 square feet.

  (j)  Hazardous Materials:  See Section 35.

  (k)  HVAC: heating, ventilating and air conditioning exclusively serving the Premises.

  (l)  Landlord's Work: None, except as otherwise expressly set forth herein.

  (m)  Laws: any and all laws, codes, ordinances or regulations passed into existence by any Public Entity now or hereinafter in existence.

  (n)  Lease Year: a period of 12 consecutive calendar months during the Term. The first Lease Year (or Lease Year One) begins on the first day of February next following the Commencement Date, unless the Commencement Date is the first day of February, in which event the first Lease Year begins on the Commencement Date. The first Lease Year will include the first Partial Lease Year, if any. Rent and any limitations on such Rent for purposes of any Partial Lease Year will be proportionately adjusted based upon the actual number of days of such Partial Lease Year in relation to the number of days in a full Lease Year.

  (o)  Partial Lease Year: the period, if any, of fewer than 12 consecutive calendar months between the Commencement Date and the first day of the first Lease Year and the period, if any, of less than 12 consecutive calendar months between the last day of the last Lease Year and the expiration of the Term.

  (p)  Permitted Use: The sale of fabrics of all kinds; goods sold by the yard; patterns; knitting supplies, needlepoint, macramé; art materials and supplies; finished crafts, craft materials and supplies; yarns; all types of notions; floral products, artificial flowers and accessories; scrapbooks and scrapbooking supplies and materials; framed artwork; picture frames, framing (both ready made and custom made) and framing materials and supplies; fabric care items; foam products; ceramics; wearable art and wearable art supplies; miniatures, dolls, hobby items; sewing machines, sewing machine furniture; irons, ironing boards; seasonal merchandise; custom services and custom products using arts and craft and sewing components including, but not limited to, quilting, bow-making, window treatments, floral design, fashion sewing, instructional classes, materials and services; and the incidental sale of (defined as no more than ten percent (10%) of any individual following item) baskets, wicker items; housewares; linens, curtains, towels, pillows; drapery and upholstery materials; draperies, drapery hardware; blinds, shades, shutters and window treatments; do-it-yourself products and accessories; bridal apparel and accessories, wedding supplies; gift items,

4

cards, party supplies; paper goods, stationery; candles, candlesticks, brass and pottery; indoor and outdoor house decorating products and accessories; furniture; prepackaged and unpackaged food and food products, coffee, tea, and assorted beverages; instructional books and tapes; children's books; toys; vacuum cleaners, lamps, small household appliances; products, accessories related to all of the foregoing, and other items and services customarily offered for sale by a fabric, craft or general merchandise store, and such other related merchandise and services typically offered in the stores operated by Tenant under the name Jo-Ann, Jo-Ann Fabrics and Crafts or such other name under which Tenant may operate. Notwithstanding the foregoing, the Tenant shall not operate in violation of the exclusive use by another tenant in effect in the Shopping Center as of the date of execution hereof, which exclusive and prohibited uses are set forth on Exhibit F.

(q)     Plans and Specifications: the final plans and specifications for the construction or remodeling of the Premises, in the form of Exhibit D, as the same may be modified by written agreement by and between Landlord and Tenant.

(r)     Premises: a portion of the Shopping Center as approximately shown on the Site Plan and located within the Shopping Center, on the Shopping Center Site, consisting of space having approximately 22,835 square feet of Gross Leasable Area, with a minimum frontage of 140  feet (to the center of the side walls), identified by street address as Overlook Village Shopping Center, Unit #30, 136 S. Tunnel Road, Asheville, North Carolina 28805;

(s)     Protected Area: the area shown on the Site Plan.

(t)     Protected Use: the sale of any of the following: fabrics of any kind, goods sold by the yard, upholstery materials, patterns, yarns and knitting supplies, needlepoint, macramé, artificial flowers and accessories, arts and crafts materials and supplies (including jewelry arts and crafts) [provided, however, in  no event shall this restriction prohibit the operation of a finished jewelry store such as, by way of example but not limitation, Zales or Pandora, or the sale of  finished jewelry by other tenants/occupants incidental to their primary use, such as, by way of example but not limitation, Hallmark], framed artwork (except that Landlord may lease to one (1) frame shop not to exceed 1,800 square feet); custom framing, scrapbooks and scrapbooking supplies and materials, yarns and all types of notions, sewing machines, sewing machine furniture, and products, accessories and services related to all of the foregoing and other items and services customarily offered for sale by a fabric and arts and crafts store. For purposes of this Lease, "finished jewelry" shall refer to jewelry that does not require assembly of the jewelry components, such as (for example but not by way of limitation), sale of  unfinished necklace chains (sold by the inch) or unfinished earrings to assemble individually) (it being agreed and understood that a store devoting the lesser of (x) five percent (5%) or more of its Gross Leasable Area to the sale of beads or beaded jewelry, or (y) five hundred (500) square feet or more to the sale of beads or beaded jewelry shall be considered a tenant that does NOT sell finished jewelry and shall not be allowed in the Shopping Center).

(u)     Public Entity: the federal, state, county, municipal or other governmental unit, however denominated, and any agency, division, department or public official thereof, now or hereafter having jurisdiction, in any respect, over the Premises, the Shopping Center or Shopping Center Site.

5

(v)     Rent: Fixed Minimum Rent, Additional Rent and all other monetary obligations of Tenant to Landlord under this Lease.

(w)     Required Delivery Date: The Estimated Delivery Date established pursuant to Section 2(h).

(x)     Shopping Center: the Overlook Village Shopping Center located at 136 S. Tunnel Road, Asheville, North Carolina 28805 consisting of all buildings including the Premises and Common Areas, and other improvements located upon the Shopping Center Site, and as currently shown on Exhibit B (as may be modified from time to time pursuant to the terms of this Lease).

(y)     Shopping Center Site: the legal description set forth on Exhibit A, on which the Shopping Center is located.

(z)     Sign Drawings: the portion of the final plans and specifications for Tenant's exterior sign(s) on or about the Shopping Center which are part of Exhibits C and D-1, as the same may be modified by written agreement by and between Landlord and Tenant.

(aa)    Intentionally Omitted.

(bb)    Substitute Rent: the lesser of (i) five percent (5%) of Gross Sales or (ii) fifty percent (50%) of the Fixed Minimum Rent, in lieu of the Fixed Minimum Rent otherwise required to be paid under this Lease.  Tenant is not obligated to pay any Fixed Minimum Rent, Percentage Rent or Additional Rent at any time when Substitute Rent is payable pursuant to any provision of this Lease.

(cc)    Tenant's Proportionate Share: a fraction, the numerator of which is the Gross Leasable Area of the Premises and the denominator of which is the Gross Leasable Area of the Shopping Center. Notwithstanding the foregoing, if any portion of Common Area Costs, Taxes, or Insurance Costs are furnished or directly payable by an individual tenant or occupant as opposed to Landlord, the cost of the item(s) furnished or payable by such tenant or occupant shall not be included in Common Area Costs, Taxes, or Insurance Costs, as the case may be, and the square footage of the tenant or occupant furnishing or paying for such item(s) shall not be included in the calculation of Tenant's Proportionate Share of such item(s). Tenant's Proportionate Share shall be adjusted in the event of any increase or decrease in the Gross Leasable Area of all buildings within the Shopping Center or the Gross Leasable Area of the Premises.

(dd)    Tenant's Work: the work, if any, to be performed by or at the direction of Tenant in finishing the Premises as provided in the Plans and Specifications and Sign Drawings approved by Landlord.

(ee)    Term: the Initial Term, as hereafter defined, and each Extended Term, as hereafter defined, if any, and any renewals or period of holdover tenancy.

6

(ff)    Termination Date: June 1, 2012, provided this Lease is fully executed by June 1, 2011 (it being agreed and understood that the June 1, 2012 date shall be delayed on a day for day basis for each day beyond June 1, 2011 that this Lease is not fully executed).

(gg)    Threshold Requirement: Intentionally Omitted.

(hh)    Unavoidable Delay: A delay beyond the reasonable control of the delayed party caused by the other party, labor strikes, lock-outs, extraordinary labor troubles, industry-wide inability to procure materials, failure of power, extraordinary restrictive governmental laws or regulations (such as gas rationing), riots, war, military or usurped governmental power, acts of terrorism, sabotage, material fire or other material casualty, or an extraordinary and material act of God (such as a tornado or earthquake), but excluding inadequacy of insurance proceeds, litigation or other disputes, financial inability, lack of suitable financing, delays of the delayed party's contractor and failure to obtain approvals or permits unless otherwise caused by an event of Unavoidable Delay.

## SECTION 3. PREMISES

(a)    For the Rent and upon the terms and conditions contained in this Lease, Landlord leases during the Term, and Tenant leases from Landlord during the Term, the following:

(1) The Premises as described in Section 2(r) hereof, as approximately outlined on the Site Plan and further described herein; and,

(2) The right, in common with Landlord and all other tenants of the Shopping Center granted similar rights by Landlord, to the non-exclusive use of all Common Areas [subject to the grant of exclusive parking or other similar rights which does not materially adversely affect the operation of Tenant's business]. The rights hereby granted with respect to the Common Areas shall constitute easements appurtenant to the Premises and a servitude upon the Shopping Center Site. The benefit and the burden of such easements shall run with and bind the Shopping Center Site.

(3) Subject to local codes and all applicable laws, rules, regulations and restrictions and Landlord's prior written approval (it being understood that it may not be possible to identify an area for the Cart Corrals (as hereinafter defined)) not to be unreasonably withheld or delayed, the right to place (i) omitted, and (ii) shopping cart corrals ("Corral(s)") within the Protected Area immediately adjacent to Tenant's storefront (but not taking more than two (2) total parking spaces). Tenant will maintain the Corral(s) in good condition and repair. If Landlord receives notice that Tenant's Corral(s) violate any local code or ordinance, or other applicable rule, regulation or restriction then after receipt of notice from the governing body or Landlord, as applicable, Tenant will remove the violating Corral(s), or move them to an acceptable location approved by Landlord. Tenant shall repair any damage to the Shopping Center caused by the installation and/or removal of the Corral(s) at Tenant's sole cost and expense. Tenant shall be required to police the location of its shopping carts daily to ensure that the same

7

are not left in the parking areas or other common areas outside of Tenant's permitted Corral location. Landlord shall have the right to request Tenant to temporarily remove and/or relocate said Corral(s) immediately in the event of an emergency or, within thirty (30) days' after receipt of Landlord's written request to effectuate repairs and/or remodeling at the Shopping Center.

(b)    Subject to the reasonable consent of Tenant, Landlord expressly reserves the right to maintain, use, repair and replace the pipes, ducts, conduits, utility lines, tunneling and wires leading through the ceiling, plenum areas, columns, partitions, and within or under the floor slabs comprising part of the Premises, but (subject to those existing on the date hereof and their comparable replacements) only to the extent that such installations (i) are reasonably necessary to serve the Premises or other parts of the Shopping Center, (ii) are installed in locations that will not interfere with Tenant's use of the Premises or Tenant's permitted signage, (iii) are not exposed within the selling area, and (iv) do not decrease the ceiling height of the Premises; provided, however, the Tenant approves any existing items within the Premises. Similarly, notwithstanding anything to the contrary in this Lease, Tenant shall have the right to make installations around the Premises (except the roof) which are consistent with Tenant's prototype plans for other similar stores operated by Tenant or which are part of Tenant's Leadership in Energy and Environmental Design initiative or other Tenant initiatives and which are approved by Landlord, not to be unreasonably withheld or delayed. In exercising the foregoing rights, neither Landlord or Tenant shall interfere with the use or occupancy of the Premises or other tenant premises or the Common Areas or commence any such work without first notifying the other party, at least thirty (30) days in advance (except in the event of an emergency), of the commencement of such work. Except as may be existing on the date hereof (or their comparable replacements), in no event may Landlord construct any improvements above the Premises or place signs on the exterior walls of the Premises.

(c)    The "Premises" excludes the exterior of exterior walls, roof, and the floor slab (excluding floor covering installed by Tenant) and areas beneath the floor slab.

(d)    Within 60 days after the Commencement Date, either party has the right to measure the Premises in accordance with Section 2(i). If the parties cannot agree to the measurement, then representatives of Landlord and Tenant will jointly measure the Premises. If such representatives cannot agree, then the Premises will be measured by an architect jointly selected by Landlord and Tenant, whose fee will be paid equally by Landlord and Tenant, and the measurement of the floor area by such architect will bind Landlord and Tenant. If actual field measurements indicate a Gross Leasable Area smaller or larger than that set forth above in Section 2(r), then Rent and the construction allowance will be reduced or increased, as the case may be, on the basis of the actual field measurements, except that there shall be no adjustment in Rent or the construction allowance beyond that which would arise from a variance of the Gross Leasable Area of the Premises set forth in Section 2(r) by one (1)%, regardless of a square footage set forth in Block Plans, construction drawings or elsewhere that is less than or greater than that set forth in Section 2(r) (it being understood that in such case and for all purposes under this Lease, the Premises Gross Leasable Area shall be deemed to be to the Gross Leasable Area of the Premises set forth in Section 2(r) hereof minus or plus one (1)%, as the case may be).

(e)

8

## SECTION 4.  TERM AND OPTIONS TO EXTEND

(a)      The Initial Term begins on the Commencement Date and ends on the last day of the 10th Lease Year, unless sooner terminated as herein provided.

(b)      So long as Tenant is not then in default of a material and/or monetary condition of this Lease beyond the expiration of applicable notice and cure periods, Landlord grants Tenant the right and option to extend this Lease for two (2) additional periods of five (5) years each (individually called an "Extended Term" and collectively called "Extended Terms"), commencing upon the expiration of the Initial Term or such prior Extended Term, as the case may be. Each Extended Term shall be upon the same terms, covenants and conditions as the Term except for the option to extend then exercised and except for such changes, if any, in Rent or other Tenant charges as are expressly set forth in this Lease.

(c)      Tenant must deliver written notice to Landlord of its election to extend this Lease for an Extended Term on or before the later to occur of the following: (1) the date that is one hundred eighty(180) days before the expiration of the Term or the Extended Term, as the case may be; or (2) the date that is 30 days after Tenant's receipt of written notice from Landlord indicating that the time period in which Tenant has to exercise its option has expired ("Landlord's Notice"). If the Term expires before Landlord's Notice, and Tenant continues in possession of the Premises after such expiration, the Term will be extended automatically on a month to month basis until the earlier of (i) 30 days after the date Tenant receives Landlord's Notice, or (ii) the date Tenant exercises its option, in which case the Extended Term will be deemed to have commenced upon the expiration of the Initial Term (or prior Extended Term, as the case may be). Concurrently with the exercise of the option by Tenant, Tenant will pay Landlord any unpaid balance of the Rent due during the Extended Term that has accrued as of the date of such notice of extension.

## SECTION 5.  FIXED MINIMUM RENT

(a)      From and after the Commencement Date, Tenant must pay to Landlord, without demand, at the address herein specified for Notices to Landlord set forth in Section 34, Fixed Minimum Rent for the Premises as follows:

(1)      During Lease Years One through Five of the Initial Term at the rate of ▮▮▮▮ per year (▮▮▮ per square foot) in equal monthly installments of ▮▮▮▮; and

(2)      During Lease Years Six through Ten of the Initial Term at the rate of ▮▮▮▮ per year (▮▮▮ per square foot) in equal monthly installments of ▮▮▮▮; and

(3)      During the first five-year Extended Term at the rate ▮▮▮▮ per year (▮▮▮ per square foot) in equal monthly installments of ▮▮▮▮; and

9

(4)    During the second five-year Extended Term at the rate ▮▮▮▮▮▮ per year (▮▮▮▮ per square foot) in equal monthly installments ▮▮▮▮▮▮.

(b)    Tenant must pay monthly installments of Fixed Minimum Rent in advance on or before the first day of each month during the Term (without demand, deduction or set-off except as specifically set forth in this Lease), commencing on the first day of the first month next following the Commencement Date (unless the Commencement Date is the first day of the month, in which event the first monthly installment shall be due on the Commencement Date). Notwithstanding the foregoing, Landlord must invoice Tenant, which invoicing will not occur before the Commencement Date, for the first monthly installment of Fixed Minimum Rent. Landlord must include with the initial invoice a written certification that the requirements of the Opening Cotenancy (if any) are satisfied. In no event will the first rent installment be due until ten (10) days after Tenant's receipt of this initial invoice and certification of the Opening Cotenancy. Fixed Minimum Rent and Additional Rent for the partial month, if any, after the Commencement Date will be computed on a per diem basis (assuming a 30-day month), and Tenant must pay the Fixed Minimum Rent and Additional Rent for such partial month concurrently with the first monthly installment. If Tenant fails to pay Rent on the due date, interest shall accrue at the Default Rate. Landlord shall notify Tenant in writing of such failure but not more than twice in any Lease Year. If Tenant fails to pay Rent on the due date thereafter in the same Lease Year, then the Landlord, in addition to the Rent then owed, is entitled to a late fee of $100 for such third late payment and any such other late payment of Rent thereafter during that Lease Year.

## SECTION 6. PERCENTAGE RENT

(a) In addition to Fixed Minimum Rent, Tenant must pay to Landlord Percentage Rent for each Lease Year and Partial Lease Year, if any, in the amount by which ▮▮▮▮▮▮▮ of Tenant's annual Gross Sales (hereinafter defined) of all goods and services for such Lease Year or Partial Lease Year, if any, exceeds the Fixed Minimum Rent payable during each such Lease Year or Partial Lease Year.

(b) A Partial Lease Year shall be the time period from the Commencement Date until the next occurring January 31, and/or the time period from the end of the last Lease Year to the end of the Term. Percentage Rent for the any Partial Lease Year, if any, shall be based upon Gross Sales for such Partial Lease Year and the Breakpoint shall be calculated based on the Fixed Minimum Rent during such Partial Lease Year.

(c) Percentage Rent for each Lease Year and Partial Lease Year is payable on an annual basis within seventy-five (75) days after the last day of such Lease Year or Special Computation Period, as the case may be.

(d) Notwithstanding anything to the contrary, if any time Tenant pays Substitute Rent, Tenant shall not be required to pay Percentage Rent pursuant to this Section, during the time Substitute Rent is paid.

10

## SECTION 7.  GROSS SALES

(a) "Gross Sales" means the entire amount of the actual receipts whether cash or otherwise, from all sales of merchandise and services for all business conducted in, on or from the Premises, including mail or telephone orders received at the Premises and filled from the Premises or elsewhere (but excluding mail, telephone, internet or other orders filled at the Premises but originating elsewhere).  Each sale upon installment or credit shall be treated as a sale for the full amount thereof in the month during which such sale shall be made, irrespective of the time when Tenant shall receive payment (whether full or partial) from its customers.  Layaway sales, so-called, shall be included in the Gross Sales of the respective computation period only to the extent of payments received during that computation period.  Notwithstanding the foregoing, with respect to assignees, sublessees, concessionaires and licensees of Tenant that, together, occupy no more than one thousand (1,000) square feet of Gross Leasable Area, Tenant shall not be obligated to report and include with Tenant's Gross Sales, the sales generated by them, although any payments to Tenant by such entity will be included in Gross Sales;

(b) Notwithstanding anything to the contrary, the following are excluded from Gross Sales:

(1) sums collected and paid out for any sales, tax or excise tax imposed by any duly constituted governmental authority;

(2) value or price of merchandise exchanged between the stores of Tenant, or the affiliates of Tenant, if any, where such exchange of merchandise is made solely for the convenient operation of the business of Tenant or the affiliate of Tenant and not for the purpose of consummating a sale which has been made at, in, from or upon the Premises or for the purpose of depriving Landlord of the merchandise sold, or some part thereof, is thereafter returned by Tenant's customer and accepted by Tenant; or (v) sales of Tenant's fixtures not in the ordinary course of Tenant's business.

(3) sales to employees made at a discount (not to exceed one percent (1%) of total Gross Sales);

(4) non-sufficient funds check charges or financing charges to customers whether or not separately stated or billed;

(5) service charges to customers who buy a budget or deferred payment plan;

(6) revenue from gift certificates or gift cards until redeemed at the Premises;

(7) revenue from vending machines used solely for the benefit of employees;

(8) the amount of any cash or credit refund made upon any sale where the merchandise sold, or some part thereof, is thereafter returned by the purchaser and accepted by Tenant and was previously included in Gross Sales;

(9) sale of fixtures;

11

(10) all sums and credits received in settlement of claims for loss or damaged to merchandise; non-retail bulk sales of merchandise outside of the ordinary course of business on the Premises;

(11) non-retail bulk sales of merchandise outside of the ordinary course of business on the Prem

(12) tax exempt sales or merchandise donated or sold at a discount to charitable or non-profit organizations;

(13) fees for classes or demonstrations (not to exceed more than three percent (3%) of Gross Sales);

(14) the value attributed to merchandise taken in trade;

(15) referrals to affiliates of or other divisions of Tenant;

(16) fees for gift wrapping, mailing and other customer services provided on a not for profit basis;

(17) sales of lottery tickets, special event tickets and the like (but the commissions paid to Tenant shall be included in Gross Sales);

(18) the amount of credit sales and credit accounts incurred at the Premises which are written off as bad debts and deducted as an expense and was previously included in Gross Sales;

(19) sales by any sublessee, concessionaire or licensee in the Premises whose Gross Leasable Area, together, occupy less than one thousand (1,000) cumulative square feet of Gross Leasable Area, except that any payments to Tenant by such entity will be included in Gross Sales; and

(20) sale of patterns (not more than three percent (3%) of Gross Sales).

(c) At any time within three (3) years after the close of each Lease Year and Partial Lease Year, but not more often than once with respect to any Lease Year and Partial Lease Year, Landlord may cause an audit to be made by any accountant designated in writing by Landlord of all of the books of account, documents, records, returns, papers and files of Tenant relating to Gross Sales for such Lease Year made at, in, on or from the Premises. Tenant, upon at least twenty (20) days prior request of Landlord, shall make all such records available for such examination at the address specified in this Lease for notices to Tenant during regular business hours. Landlord must hold in strict confidence any information obtained from all such records and reports examined by it or by its designated accountant. If Landlord makes an audit for any Lease Year or Partial Lease Year, and the Gross Sales shown by Tenant's statement for such Lease Year or Partial Lease Year have been understated by more than three percent (3%) and if such understatement resulted in an underpayment of Percentage Rent by at least One Thousand and 00/100 Dollars ($1,000.00), then

12

Tenant, in addition to immediately paying to Landlord the full amount of the understated Percentage Rent as determined by such audit, must pay to Landlord the reasonable cost of such audit, not to exceed Five Hundred and 00/100 Dollars ($500.00); otherwise the audit will be at Landlord's sole cost and expense. Tenant makes no representation or warranty as to the sales that it expects to make in the Premises.

(d) The Gross Sales of any Lease Year or Partial Lease Year, as the case may be, and the Percentage Rent due thereon, if any, have no bearing on or connection with the Gross Sales or any other Lease Year or Partial Lease Year.

(e) Tenant will deliver to Landlord (i) within thirty (30) days after the end of each month, a statement showing Gross Sales for the preceding month, and (ii) within seventy-five (75) days after the end of each Lease Year or Special Computation Period, as the case may be, a statement Showing Gross Sales for such Lease Year or Special Computation Period, as the case may be.

## SECTION 8. TAXES

(a) Landlord covenants and warrants that the entire Shopping Center is located on tax parcel identification number(s) 57-1066367 (the "Tax Parcel"), that the Tax Parcel does not extend beyond the perimeter of the Shopping Center Site and that the improvements comprising the Shopping Center (including the Premises and Common Areas) as set forth on Exhibit B are, currently, the only improvements now located which are considered for the tax value for which Tenant shall be responsible for its Proportionate Share thereof. Once or twice per Lease Year, depending on when tax bills are issued by the government authority, Tenant must pay to Landlord the Fixed Tax Payment (hereinafter defined) plus a three percent (3%) annual increase as Tenant's share of real estate taxes ("Taxes") levied upon the Tax Parcel and paid by Landlord during each year of the Term. Notwithstanding the foregoing, if the Premises, or a portion of the Shopping Center including the Premises, is separately assessed, then Tenant will pay, as Tenant's allocable share of Taxes, the lower of: (1) the Fixed Tax Payment, or (2) Tenant's Fraction of Taxes, with Tenant's Fraction being a fraction whose numerator is the Gross Leasable Area of the Premises and whose denominator is the Gross Leasable Area of all buildings within such separately assessed parcel. Tenant will pay the Fixed Tax Payment on a monthly basis and each payment shall be due in advance on the first (1st) day of each month. For the first (1st) Lease Year the Tenant's Proportionate Share of Taxes shall not exceed $▮ per year (i.e. per twelve (12) month period) per square foot of Gross Leasable Area of the Premises (the "Fixed Tax Payment"); and, Landlord represents that said amount is a good faith estimate of the actual Taxes that would be due if Tenant were paying its full Proportionate Share of Taxes for said Lease Year. Commencing on the first (1st) day of the second (2nd) Lease Year, the Fixed Tax Payment shall increase by three percent (3%) per year twelve (12) month period thereafter during the Initial Term, commencing on the first day of each such twelve (12) month period. The Fixed Tax Payment shall be "reset" for first Lease Year of each Extended Term (the first day of each such Lease Year referred to as a "Reset Date") to be the average of the actual Proportionate Share of Taxes for each of the

13

two (2) years immediately prior to the applicable Reset Date. The reset Fixed Tax Payment shall increase three percent (3%) per year for the second (2nd) through fifth (5th) Lease Year of each Extended Term, commencing on the first day of each such Lease Year.

(b)     Intentionally Omitted.

(c)     In no event will Tenant pay for Taxes for a time period longer than the Term.

(d)     If any Taxes or assessed valuation(s) are contested or negotiated by Landlord, then Tenant's Proportionate Share of Taxes shall also include Tenant's Proportionate Share of the cost and expense of consultation services incurred in evaluating, negotiating and contesting such Taxes or assessed valuation(s). Landlord agrees to contest and/or negotiate Taxes as part of Landlord's management of the Shopping Center in accordance with the generally accepted shopping center management practices in the geographic region within which the Shopping Center is located.

(e)     If any Taxes may be paid in installments, Landlord will cause such taxes to be paid over the longest installment period allowed, and, subject to the exclusions below, and with regard to the reset of the Fixed Tax Payment, only the installments coming due during the Term will be included within Taxes. Landlord must use best efforts to minimize the Taxes assessed against the Tax Parcel.

(f)     Tenant must pay before delinquency all municipal, county and state taxes assessed during the Term against any leasehold interest and personal property of any kind, owned by or placed in, upon or about the Premises by Tenant.

(g)     Notwithstanding anything to the contrary, the following are excluded from Taxes for purpose of the reset of the Fixed Tax Payment:

(1) Any portion of the Taxes assessed: (A) against tenant improvements and tenant space completion work, whether constructed by Landlord or by any other party; or (B) against additional buildings or other taxable improvements not now constructed on the Tax Parcel; or (C) otherwise attributable to any increase in the assessed value of the Tax Parcel by reason of such improvements or work;

(2) Any portion of the Taxes attributable to a revaluation of the Tax Parcel arising out of a sale or other change in the ownership thereof or of any interest therein;

(3) Any portion of the Taxes in the nature of fees, charges or assessments for governmental services or improvements related to the initial construction or any alteration, expansion or rehabilitation of the Shopping Center or other improvement of the Tax Parcel (beyond the upkeep and repair of the Shopping Center that is necessary to keep the same in first-class condition);

14

(4) Any tax or fee that applies generally to all business owners or operators, as opposed to owners of real property;

(5) Any impact fee, user fee, exaction fee, environmental fee or other tax paid as a prerequisite to construction of the Shopping Center, or any addition or improvement thereto;

(6) Estate tax, inheritance tax, succession tax, capital levy tax, corporate franchise tax, margin tax, profits tax, income tax, conveyance fee or transfer tax and the like that is or may be imposed upon Landlord (provided, however, that if at any time during the term hereof the method or methods of taxation prevailing at the execution of this Lease shall be altered so that in lieu of or as a substitute to the whole or any part of the real estate taxes levied, assessed or imposed; (i) a tax on rents is received from the Shopping Center, or (ii) a license fee measured by the rents receivable by Landlord from the Shopping Center, or (iii) a tax or license fee imposed upon Landlord which is otherwise measured by or based in whole or in part upon the Shopping Center or any part thereof, then the same shall be included in the computation of real estate taxes hereunder, computed as if the amount of such tax or fee so payable were that due if the Shopping Center were the only property of Landlord subject thereto, levied on the Shopping Center;

(7) Any assessment, bond, tax, or other finance vehicle that is (A) imposed as a result of Landlord's initial construction of the Shopping Center, or (B) used to fund construction of additions or improvements to the Shopping Center (beyond the upkeep and repair of the Shopping Center that is necessary to keep the same in first-class condition); and

(8) Any penalty, interest or other charge attributable to Landlord's late or delinquent payment of Taxes.

## SECTION 9. COMMON AREA COSTS

(a)     In addition to payment of the Fixed Minimum Rent, Tenant must pay to Landlord for the First Lease Year an amount equal to $ ▮ per square foot per year (i.e. per twelve (12) month period) multiplied by the Gross Leasable Area of the Premises (which fixed dollar amount shall be referred to as "Fixed Common Area Cost") for the cost of operation, repair, management and maintenance of the Common Areas . For subsequent Lease Years, Tenant must pay to Landlord the Fixed Common Area Cost and any increase as set forth below. The Fixed Common Area Cost shall be paid on a monthly basis and shall be due in advance on the first (1st) day of each calendar month. The Fixed Common Area Cost shall increase by three percent (3%) per year for Lease Years two (2) through ten (10) of the Initial Term, commencing on the first day of each such Lease Year. The Fixed Common Area Cost shall be "reset" for first Lease Year of each Extended Term (the first day of each such Lease Year referred to as a "Reset Date") to be the average of the actual Proportionate Share of Common Area Costs for each of the two years immediately prior to the applicable Reset

15

Date. The reset Fixed Common Area Cost shall increase three percent (3%) per year for the second (2nd) through fifth (5th) Lease Year of each Extended Term, commencing on the first day of each such Lease Year.

    (b)    Intentionally omitted.

    (c)    Subject to Unavoidable Delays, on or before April 1 of each year, Landlord must provide Tenant with a statement assessing and prorating the Pro-Rata Common Area Costs, together with a statement of the Gross Leasable Area of the Shopping Center and copies of all bills for which payment is sought. If Landlord fails to provide the annual reconciliation statement, then Tenant has the right to suspend payment of Pro-Rata Common Area Costs until such statement is received. Tenant must pay to Landlord, within 30 days of such receipt, any deficiency owed to Landlord. If Tenant's estimated payments are in excess of Tenant's Proportionate Share in any Lease Year, then such excess will be applied to the following Lease Year unless such Lease Year is the final Lease Year of Tenant's occupancy, in which case Landlord must refund such overpayment to Tenant within 30 days after delivery of the annual statement.

    (d)    Subject to Unavoidable Delays, on or before April 1 of the first Lease Year of each Extended Term, Landlord must provide Tenant with a statement assessing and prorating the actual Common Area Costs applicable for the first Lease Year of the applicable Extended Term, together with a statement of the Gross Leasable Area of the Shopping Center and copies of all bills used to support the reset Fixed Common Area Cost figure. If Landlord fails to provide the aforementioned information, then Tenant has the right to continue paying the Fixed Common Area Cost paid in the previous Lease Year until such information is received.

    (e)    The payment of such Common Area Costs is in consideration of Landlord's maintenance, repair, management and operation of the Common Areas and Landlord must use such payment for that purpose.

    (f)    Notwithstanding anything to the contrary, in determining the reset Fixed Common Area Cost figure, the following are excluded from Common Area Costs:

    (1)    the original cost, or depreciation of the original cost, of constructing, erecting and installing the Shopping Center, the Common Areas, common facilities and related services;

    (2)    principal and interest payments pursuant to any mortgage that encumbers the Premises or Shopping Center;

    (3)    Taxes;

    (4)    administrative charges (except an administrative fee equal to five percent (5%) of all Fixed Common Area Costs and Pro Rata Common Area Costs), management fees, fees based upon a percentage calculation, leasing commissions or any other fee or charge regardless of the name (including, without limitation, salaries of all kinds, social security, taxes, insurance, part-

16

time or full-time labor, any fees paid to manage the Shopping Center including those paid to a third party management company, and similar costs and expenses) that is related to the management and operation of the Shopping Center;

(5)     expenses incurred due to the negligence or willful misconduct of Landlord or any occupant of the Shopping Center or their respective agents or employees;

(6)     costs and expenses incurred for repairs or replacements due to faulty construction, faulty workmanship or structural defects;

(7)     expenses related to an individual occupants of the Shopping Center or to a particular tenant space, or to buildings;

(8)     any cost, fees, fines or penalties, or interest thereon, related to violations by Landlord or any occupant of any Law; and the cost of compliance with Laws enacted after the date hereof;

(9)     capital expenditures (a capital expenditure is defined as an item costing $5,000 or more and having a useful life of at least seven years), other than Permitted Capital Expenditure. A "Permitted Capital Expenditure" is limited to (i) the costs for repaving of the parking lot(s) not more frequently than once every seven years; (ii) the costs for roof replacement (after the first ten (10) years of the Term); (iii) the costs for repairing/replacing the private well system; provided, however, that the Permitted Capital Expenditure must be amortized on a straight-line basis over the useful life of the related improvement based generally accepted accounting principles, but in no event less than seven years, and only the amount of the annual amortization shall be included in the Fixed Common Area Cost (after reset) for any Lease Year within the useful life so determined;

(10)    reserves for replacement;

(11)    costs for insuring the Common Areas, but this exclusion does not limit Landlord's rights of reimbursement, if any, under Section 21;

(12)    cost of advertising or marketing services;

(13)    all costs and expenses relative to the solicitation and execution of leases for space in the Shopping Center;

(14)    all costs and expenses related to the operation, maintenance and repair of any garage space in the Shopping Center;

Ashville, NC
Execution Version: August 16, 2011

(15)    the cost of any repair or replacement made by Landlord because of the total or partial destruction of the Shopping Center or the condemnation of a portion of the Shopping Center or the Shopping Center Site;

(16)    any operating expense paid to a related corporation, entity or person that is in excess of that amount that would have been paid absent such relationship;

(17)    the cost of overtime or other expenses incurred by or on behalf of Landlord to correct any default of Landlord or for work performed by or on behalf of Landlord where such work is expressly provided in this Lease or any other lease the cost of which was/is to be borne at Landlord's expense;

(18)    any cost that is paid or reimbursed by third parties, including warranties and guarantees and including any cost that is paid or reimbursed by insurance (or would have been covered by insurance required to be maintained by Landlord);

(19)    intentionally omitted; and

(20)    payments made under any easement, operating agreement, license, restrictive covenant, or any instrument relating to the payment or sharing of costs among property owners;

(21)    costs disproportionately incurred by or on behalf of one or more tenants, including, without limitation, all costs relating to a food court area; and

(22)    costs and expenses incurred with respect to the correction, disposal, investigation, removal, transportation, or treatment of Hazardous Material.

(g)    Landlord must use commercially reasonable efforts to keep Common Area Costs to a minimum in accordance with generally accepted practices to maintain the Shopping Center as a first-class retail project.

(h)    Landlord covenants that there will be no duplication of costs between those payable by Tenant within this section and under this section and any other section of this Lease.

## SECTION 10.  CONSTRUCTION OF PREMISES

(a)    Tenant shall deliver to Landlord for Landlord's approval, a copy of Tenant's proposed Plans and Specifications for the Premises and the Sign Drawings as soon as possible after Lease execution, provided, however, in no event shall such delivery be required earlier than January 15, 2012 (collectively, the "Proposed Plans"), and the parties agree that the date the Proposed Plans are delivered to Landlord shall be considered the date of receipt by Landlord of the Proposed Plans. If Landlord fails to approve or disapprove (including providing comments to the Proposed Plans), in writing, the Proposed Plans within fifteen (15) days after receipt thereof from Tenant, then such approval will be deemed to have been given if the Tenant provides the Landlord with notice of the

18

same ("Deemed Approval Notice") and the Landlord fails to approve or disapprove (or provide comments to the Proposed Plans) within ten (10) business days following the date of Landlord's receipt of Tenant's notice which notice, to be effective, must note that pursuant to this Section 10 of the Lease the Landlord's consent to the Proposed Plans will be deemed given if the Landlord does not approve, disapprove, or provide comments to the Proposed Plans within ten (10) business days following the Landlord's receipt of such notice. If Landlord furnishes Tenant a written response, Tenant will resubmit revised Proposed Plans within 10 days after having received Landlord's response, and Landlord will then have a ten (10)-day period within which to review the same. If Landlord fails to respond within such ten (10) days and Tenant previously issued a Deemed Approval Notice during the review process, then such revision will be deemed approved. If Landlord fails to respond within ten (10) days and Tenant did not previously issue a Deemed Approval Notice during the review process, then if Tenant should issue a Deemed Approval Notice and Landlord fails to approve or disapprove (including providing comments to the Proposed Plans), in writing, to the Proposed Plans within ten (10) days after receipt of said Deemed Approval Notice, then such approval will be deemed to have been given. Such review process will continue until the Proposed Plans are acceptable to both Landlord and Tenant, whereupon the same will constitute the Plans and Specifications and Sign Drawings as Exhibits D and D-1. In the event the Tenant fails to provide the revised Proposed Plans as and when set forth above the Landlord's Delivery Date shall be extended a day for each day of delay. The parties agree to act reasonably and in good faith. If the parties do not reach agreement on the Tenant's Proposed Plans within ninety (90) days after their first (1st) submission to Landlord, Tenant may terminate this Lease upon written notice to the Landlord within fifteen (15) days after such ninety (90) day period provided Tenant complied with the timing requirements set forth above and negotiated the Plans in good faith. Within fifteen (15) days of Tenant's receipt of the approved Plans and Specifications, Tenant shall apply for all required governmental permits and approvals necessary for Tenant's Work and Tenant shall diligently pursue obtaining such permits and approvals. If Tenant is unable to secure the required governmental permits and approvals within sixty (60) days of Tenant's application therefore (subject to the right of Tenant to extend such sixty (60) day period for a period of thirty (30) days by providing Landlord notice within such sixty (60) day period ("Tenant's Permit Period") despite good faith, diligent efforts, Tenant shall promptly notify Landlord in writing, and then Landlord shall have the right with written notice to Tenant made within thirty (30) days after the date Tenant notifies Landlord that it has not obtained such permits and approvals ("Landlord's Election Notice") to pursue such permits and approvals on behalf of Tenant, at Tenant's reasonable expense (which expenses must be approved in advance by Tenant, which it shall not unreasonably withheld, condition or delay). Landlord shall have ninety (90) days from the date of Landlord's Election Notice to pursue said permits and approvals. If Landlord elects to pursue such permits and approvals, said ninety (90) day period shall hereinafter referred to as the "Landlord's Permit Period". If the required governmental permits and approvals have not been obtained (i) by Tenant during the Tenant's Permit Period, despite good faith efforts by Tenant, and Landlord has not provided Tenant with Landlord's Election Notice as foresaid, the parties shall have the right to terminate this Lease by delivering written notice to the other of its intent to terminate this Lease within thirty (30) days after the end of the Tenant's Permit Period, or (ii) by either Landlord or Tenant during the Landlord's Permit Period the parties shall have the right to terminate this Lease by delivering written notice to the other of its intent to terminate within thirty (30) days after the end of Landlord's Permit Period. If either party fails to exercise its right to terminate this Lease during said thirty (30) days period as aforesaid, the right to terminate established under this section shall be null and void. After delivery of the

19

termination notice in accordance with the foregoing terms of this paragraph (a), the parties shall be relieved if all obligations under this Lease and shall not be liable to the other for damages or otherwise.

(b) Landlord represents, warrants and covenants to Tenant that on the Delivery Date all vestiges of prior tenant signage, including holes, mountings and coloration, shall be removed ("Prior Signage") and the Premises will, to the Landlord's actual knowledge as of the date hereof, comply with all Laws, including, without limitation, all Laws with respect to Hazardous Material, and: (i) if any Prior Signage is present, then Landlord must perform such removal or Tenant may, at its option, remove the Prior Signage and Landlord must reimburse Tenant within thirty (30) days after receipt of written demand for Tenant's cost of such Prior Signage removal, plus fifteen percent (15%) administrative fee (said demand shall include a copy of paid invoices for said Prior Signage removal work, if said work is performed by a third party), and if not so reimbursed, Tenant may after giving Landlord a written notice specifying Landlord's failure to so reimburse Tenant and an additional ten (10) days' to cure, deduct such amount from Fixed Minimum Rent; (ii) if any Hazardous Material, not caused by Tenant, is required by Law to be removed, abated, or otherwise remediated, then Landlord must perform such removal, abatement or remediation pursuant to the terms of Section 35; or (iii) with respect to Hazardous Material if, as a result of, or as a condition to, Tenant's Work, any Hazardous Material existing on the Delivery Date is required by Law to be removed, abated, or otherwise remediated, then Tenant shall notify Landlord and Landlord shall remove, abate or otherwise remediate such Hazardous Material in accordance with the terms of Section 35, at Landlord's expense. Subject to: (1) the immediately prior sentence, (2) the repair obligations of Landlord, and (3) the provisions of this Lease, Tenant will take possession of the Premises on the Delivery Date on an "as is" basis. Notwithstanding anything to the contrary in this Lease, if removal, abatement or remediation is required under Subsection 10(b)(ii) or (iii) hereof ("Remediation Period"), then the Commencement Date shall be delayed on a day for day basis for each day of the Remediation Period.

(c) In no event shall the Required Delivery Date be earlier than the Estimated Delivery Date. At any time after the later of the date Landlord has exclusive possession of the Premises or full execution and delivery of this Lease to Tenant (and so long as Tenant has supplied Landlord with evidence of insurance coverage pursuant to Section 21), Tenant shall have access to the Premises for inspection, taking measurements, making plans, erecting temporary or permanent signs and the performance of Tenant's Work as may be appropriate or desirable by Tenant without being deemed thereby to have taken possession or accepted delivery of the Premises; provided, however, Tenant shall pay for all utilities consumed by Tenant in the Premises and shall be required to comply with all other terms and conditions of this Lease except for the payment of Rent (until the Commencement Date) and Tenant shall not interfere with the performance of Landlord's Work. In no event will Tenant be required to accept delivery of the Premises unless and until the Delivery Requirements have been satisfied. No agent or non-employee representative of Tenant has the authority to accept delivery of the Premises. Only direct employees of Tenant with a title of Director or above can accept delivery, which acceptance must be in writing. Any purported acceptance by a non-authorized person or that is not in writing is not binding upon Tenant.

(d) Unless the Premises are delivered to Tenant on the date this Lease is fully executed and delivered to Tenant, Landlord covenants that the Delivery Date will occur no later than the

Required Delivery Date. If the Delivery Date has not occurred on or before the Termination Date (defined in Section 2(ff)), Tenant will have the right, but will not be obligated, to accept delivery of the Premises, without relieving Landlord of any obligation to fully complete Landlord's Work and otherwise to satisfy the Delivery Requirements.

(e)    Subject to Unavoidable Delays, if the Delivery Date does not occur within five (5) days of the Required Delivery Date (the "Penalty Date"), Landlord must pay to Tenant the sum of ▇▇▇▇ (the "Lump Sum Payment"). In addition, subject to Unavoidable Delays, Landlord must pay to Tenant the sum of $▇▇▇▇ for each day (the "Per Diem Payment") between the Penalty Date and the earlier to occur of (i) the Delivery Date or (ii) the date Tenant terminates this Lease in accordance with Section 10(f). If Landlord fails to pay Tenant the Lump Sum Payment and/or the Per Diem Payment then, after providing Landlord with written notice specifying such failure and ten (10) days' after Landlord's receipt thereof to cure, Tenant will have the right (without limiting any other right or remedy of Tenant to collect such payment) to deduct such amount, together with interest thereon at the Default Rate, from Fixed Minimum Rent and other payments due Landlord. Landlord and Tenant agree that it will be difficult to determine the precise amount of damages that Tenant will incur as a result of the failure of the Delivery Date to occur by the Required Delivery Date. Therefore, Landlord and Tenant agree that the Per Diem Payment and the Lump Sum Payment constitute liquidated damages for such failure. Subject to Unavoidable Delays, if the Delivery Date does not occur by the Required Delivery Date, said liquidated damages shall be payable irrespective of the date Tenant actually opens for and conducts business in the Premises.

(f)    If the Delivery Date has not occurred on or before the Termination Date, then so long as Tenant has executed this Lease by July 1, 2011, Tenant has the right to terminate this Lease by delivering written notice to Landlord at any time from and after the Termination Date but before the Delivery Date. After delivery of Tenant's notice of termination, the parties shall be relieved of all obligations hereunder and shall not be liable to the other in damages or otherwise except, Landlord shall be liable to Tenant for all payments due Tenant under Section 10(e). This Section 10(f) survives the termination of this Lease.

(g)    Landlord must pay Tenant a "construction allowance" in the amount of $548,040.00.00 ($24.00 per square foot [subject to Section 3(d)]) to be used by Tenant for leasehold improvements to the Premises, as follows: (i) fifty percent (50%) to be paid to Tenant within thirty (30) days of possession, (ii) twenty-five percent (25%) to be paid within thirty (30) days' after the later of (1) the date Tenant opens the Premises for business to the public, (2) Landlord's receipt of Tenant's general contractor's lien waiver and release for services/deliverables in excess of Ten Thousand Dollars ($10,000.00); provided, however, if the lien waiver and release is not provided, in no event shall the balance of the construction allowance due Tenant be withheld beyond the date that is thirty (30) days after Landlord has received written notice from Tenant that the statutorily defined period in which liens must be filed has expired and no liens have been filed during said period (provided, however, Tenant shall defend, indemnify and hold Landlord harmless from any and all claims made by any contractor performing work for, and/or supplying materials to, or on behalf, of Tenant), (3) a copy of Tenant's certificate of occupancy an (4) Landlord's receipt of first month's rent, and (5) a reasonably detailed statement evidencing that the construction allowance was utilized on Tenant's leasehold improvements to the Premises, and (iii) twenty-five (25%) to be paid within thirty (30) days of the end of the forty eighth (48th) month provided Tenant is not in

21

default of this Lease, this Lease is in full force and effect, and the Tenant has not exercised the kick out right as set forth in Section 58. If Tenant has provided all the information/documentation required as set forth above and Landlord fails to pay Tenant any portion of the construction allowance in accordance with this Lease, then after providing Landlord written notice specifying such failure and thirty (30) days' after Landlord's receipt of said notice to cure, Tenant will have the right (without limiting any other right or remedy of Tenant) to deduct such amount from Fixed Minimum Rent (as a setoff or as recoupment in the case of bankruptcy), together with interest thereon at the Default Rate. Landlord will wire-transfer the construction allowance to Tenant's bank as follows: Key Bank, 127 Public Square, Cleveland, OH 44114, ABA: 041001039, Account #1061502834.

## SECTION 11.   USE

(a)        The Premises shall be used for the Permitted Use, except as provided otherwise in this Section 11.

(b)        Subject always to the right to use the Premises for the Permitted Use, the Premises will not be used in violation of the exclusive or prohibited uses as are set forth on Exhibit F, the exclusive or prohibited uses of any future tenant open and occupying a minimum of 20,000 square feet of Gross Leasable Area in the Shopping Center ("Major Tenant") and/or the Restricted Uses as set forth in Section 26(a)(10). Landlord represents that the use restrictions set forth on Exhibit F accurately reflect existing exclusive and/or prohibited uses that encumber the Premises as of the date of Lease execution as terms of existing leases of the Shopping Center (the uses covered by such restrictions are collectively referred to as the "Prohibited Uses" and individually as a "Prohibited Use"). Upon the expiration (unless the term is extended) or earlier termination of the lease or other written instrument containing a Prohibited Use, the Premises will not be subject to such Prohibited Use under this Lease and such use will no longer be a Prohibited Use. Within thirty (30) days after receipt of written request of Tenant, Landlord will advise Tenant which Prohibited Uses still encumber the Premises and will furnish to Tenant reasonable documentary support therefor.

## SECTION 12.   COMMON AREAS

(a)        Landlord, at its own cost and expense (except as otherwise specified in Section 9, Section 18 or Section 21) must construct, install, operate, manage, repair and maintain the Common Areas in a first-class, neat and clean condition in accordance with generally accepted shopping center maintenance and management practices in the geographic region within which the Shopping Center is located, for the non-exclusive benefit of Tenant and Tenant's customers, employees, licensees and invitees. Landlord's obligations with respect to the Common Areas include, but are not limited to:

(1) Equipping and lighting the Common Areas;

(2) Maintaining the surfaces of all sidewalks, restriping and maintenance of paved and parking areas in a level, smooth and evenly covered condition with the type of surfacing material originally installed or such substitute as shall in all respects be equal in quality to the original;

22

Ashville, NC
Execution Version: August 16, 2011

(3) Removing all ice and snow, papers, mud and sand, debris, filth and refuse and thoroughly sweeping the Common Areas to keep them in a clean and orderly condition;

(4) Placing, keeping in good condition and repair and replacing all utility lines, any necessary appropriate directional signs, markers and curbs;

(5) Maintaining, trimming and watering, mowing and weeding all landscaped areas and making such replacements of shrubs and other landscaping as is necessary; and

(6) If necessary in Landlord's sole, commercially reasonable judgment, security arrangements including private police and similar services and functions.

(b)       Landlord may close any Common Areas temporarily, at such times as to cause the least possible interruption or interference with Tenant's business, to make repairs or changes, to prevent the acquisition of public rights in such Common Areas or to discourage non-customer parking; but, in no event will the Protected Area be closed (except in the event of an emergency) without the prior consent of Tenant not to be unreasonably withheld, conditioned or delayed. In no event shall Landlord designate the Protected Area as an employee parking area or otherwise permit the Protected Area to be used for employee parking.

(c)       Landlord must keep the Common Areas clean and well lighted from dusk until at least one-half hour after the close of Tenant's business and remove snow from the parking areas, driveways and sidewalks as promptly as possible. Landlord cannot impose any parking charges for the parking of automobiles in the parking areas. Except for the rights of tenants (existing as of the date of execution of this Lease) and subject to the other provisions of this Lease, Landlord cannot grant any rights in, or permit special or exclusive use of, the sidewalk space or parking areas in the Protected Area or in the exterior area immediately adjacent to the rear door of the Premises that will unreasonably interfere with Tenant's use and/or visibility of the Premises and/or access to or from the Premises to the Common Areas (except temporarily to effectuate repairs to and/or remodeling of the Shopping Center).

**SECTION 13.  UTILITIES**

Landlord, at its sole cost and expense, must cause upon delivery of the Premises to Tenant all gas, water, sewer and electricity utilities furnished to the Premises subject to Tenant contracting with individual providers for such utility service and making any necessary deposits for the initial installation of the same, but not deposits in connection with the usage of the same. The utilities are separately metered and usage is reflected in utility bills rendered to Tenant by the respective supplying public utility companies. Tenant must pay, when due, bills for utilities furnished to the Premises by the Landlord or the public utility companies, as applicable, from and after the date Tenant takes possession of the Premises, including water, gas, electricity and telephone and the like.

23

Ashville, NC
Execution Version: August 16, 2011

## SECTION 14.  USE VIOLATION

(a)     If Tenant is open and operating and not in default, beyond the expiration of applicable notice and cure periods, of a material and/or monetary provision of this Lease, subject to Section 14(b), if any portion of any Restricted Property (defined below) is used or occupied for the Protected Use, or if any sales area therein is designated for the Protected Use (either event being referred to as a "Use Violation"), then, as Tenant's remedy (except the right to terminate as set forth below) Tenant is obligated to pay only Substitute Rent commencing on the date that is thirty (30) days after the date Tenant notifies Landlord, in writing, of the Use Violation ("Cure Period") (so long as said Use Violation then exists) until such Use Violation ceases (provided, however, if Tenant is already paying Substitute Rent pursuant to its rights hereunder or elsewhere in this Lease, then, in addition to the right to pay Substitute Rent, Tenant shall be permitted to pursue all remedies available to it at law and in equity).  In addition, if the Use Violation exists one hundred eighty (180) days after the Cure Period, Tenant has the right to terminate this Lease by giving sixty (60) days written notice to Landlord, in which event all further obligations hereunder shall terminate on the date specified in Tenant's notice, and any Rent (including Substitute Rent) paid in advance by Tenant must be refunded to Tenant within 30 days after the later of (i) the effective date of termination of the Lease or (ii) the date Tenant vacates and surrenders the Premises to Landlord in the condition required under the Lease.

(b)     The foregoing restriction in subsection (a) will not apply to: (1) any tenant of the Restricted Property devoting the lesser of (x) ten percent (10%) of its Gross Leasable Area to the sale of items comprising the Protected Use, or (y) 500 square feet to the sale of items comprising the Protected Use (or 1,500 square feet if the tenant is a Major Tenant); (2) a frame shop not to exceed 1,800 square feet, and (3) any tenant in the Restricted Property as of the date of this Lease to the extent such tenant's lease (as the same exists on the date hereof) permits it to sell items that are included in the Protected Use without Landlord's consent (which shall include a permitted use in such lease defined as "any lawful use"), but this clause (3) shall not apply if Landlord permits an assignment of the lease or expansion or sublease of such tenant's premises for a use that would violate this Section 14 if Landlord reasonably and legally may refuse to grant such permission, and further Landlord covenants with Tenant not to modify or amend any such tenant's lease in any manner that would permit such tenant to sell any items comprising the Protected Use to an extent greater than such tenant is permitted to sell such items under its existing lease.

(c)     In the event that Tenant's Protected Use is violated, the computation of Substitute Rent shall commence on the first (1st) day after the expiration of the Cure Period and shall be paid in monthly installments.

(d)     "Restricted Property" means the Shopping Center, any additions thereto or outparcels thereof, and any property owned by Landlord or an affiliate of Landlord that is adjacent to the Shopping Center Site; provided, however, the property

24

designated on the Site Plan as "Excluded Property" shall not be deemed part of the Restricted Property.

(e)     Landlord covenants and agrees to use diligent, good faith, commercially reasonable efforts to cure any breach or violation of this Section, including, without limitation, seeking and diligently prosecuting all available legal and equitable remedies to compel or otherwise cause cessation of the Use Violation.

(f)     Notwithstanding anything to the contrary, in the event of a Use Violation by any tenant or occupant who conducts or operates in violation of the Protected Use without Landlord consenting to or granting such tenant or occupant the right to do so (a "rogue tenant"), then Tenant's right to pay Substitute Rent, to pursue other remedies at law and in equity, and to terminate this Lease will be deferred, provided that Landlord commences court action to cure or eliminate the Use Violation by the rogue tenant within 30 days after receipt of written notice from Tenant and diligently pursues same to completion (which diligence by Landlord must include appeals to the highest state court, if lower court rulings are adverse to Landlord and allow the Use Violation to continue). If Landlord does not take such action against the rogue tenant as described in the immediately preceding sentence, then Tenant may exercise its termination right and right to pay Substitute Rent at any time thereafter until the Use Violation ceases.

## SECTION 15.  COTENANCY.

(a)     Intentionally Omitted

1)     Intentionally Omitted.

2)     Intentionally Omitted.

3)     Intentionally Omitted.

(b)     ON-GOING COTENANCY

1)     To induce Tenant to enter into this Lease and to fulfill its obligations hereunder, Landlord represents and warrants that it has entered into a binding lease (or similar agreement) for the use and occupancy of the following tenants in the Shopping Center (the "On-Going Anchor Tenant's"): Ross, TJ Maxx, and HH Gregg in the premises shown on the Site Plan (the "On-Going Anchor Tenant Premises"). If Tenant is open and operating and not in default, beyond the expiration of applicable notice and cure periods, of a material and/or monetary provision of this Lease and, at any time, two (2) of the Ongoing Anchor Tenants are not open for business with retail customers during regular Shopping Center hours ("Anchor Tenant Violation") (unless such closure is due to casualty, condemnation, repairs, remodeling or, for a period not to exceed 120 days, to effectuate an assignment or subletting), then, Tenant is obligated to pay only Substitute Rent for so long as such Anchor Tenant Violation continues (provided, however, if Tenant is already paying Substitute Rent pursuant to its rights hereunder or elsewhere in this Lease, then, in addition to the

25

right to pay Substitute Rent, Tenant shall be permitted to pursue all remedies available to it at law and in equity). Notwithstanding the foregoing, if the Anchor Tenant Violation exists as a result of TJ Maxx not being open for business the Landlord shall have a period of twelve (12) full calendar months within which to replace TJ Maxx (as set forth in the following paragraph) before such closure shall result in an Anchor Tenant Violation. If the Anchor Tenant Violation continues for one (1) full year and is not satisfied as set forth in this subsection "(b) 1)", then Tenant shall have the right to terminate this Lease by giving 90 days prior written notice to Landlord, and any Rent (including Substitute Rent) paid in advance by Tenant must be refunded to Tenant within 30 days after the later of (x) the effective date of termination of the Lease or (y) the date Tenant vacates and surrenders the Premises to Landlord in the condition required under this Lease. Tenant's failure to exercise the termination option will not be a waiver of Tenant's continuing right to do so as long as the Anchor Tenant Violation continues.

With regard to all the On-Going Anchor Tenants, up to two (2) regional or national retail tenants suitable for occupancy in a first-class shopping center and each operating under its single trade name in collectively 80% (in the aggregate) of the On-Going Anchor Tenant Premises of the On-Going Anchor Tenant being replaced will be deemed to be an "On-Going Anchor Tenant" after the commencement of such substitute operation (it being agreed and understood that if any replacement On-Going Anchor Tenant, or combination of replacement tenants as set forth hereinabove of the original On-Going Anchor Tenant, should cease operating thereby causing a subsequent Co-Tenancy Violation, then, in order to cure such subsequent Co-Tenancy Violation, the subsequent replacement On-Going Anchor Tenants (or tenants, as the case may be) must occupy at least 80% of the original On-Going Anchor Tenant Premises). For purposes of this Lease, "national" shall mean a first-class retailer operating at least forty-five (45) stores, and "regional" shall mean a first-class retailer operating at least 15 stores in the South East and the states contiguous to the State of North Carolina.

2)    Intentionally Omitted.

**SECTION 16.  RULES AND REGULATIONS**

(a)    Landlord may, for the general welfare of the Shopping Center or the avoidance of nuisance, impose reasonable rules and regulations of general application governing the conduct of tenants in the Shopping Center and the use of the Common Areas (it is agreed and understood that such rules and regulations and any subsequent modifications thereto, notwithstanding anything to the contrary in this Lease, shall be subject and subordinate to the terms and conditions of the body of this Lease). Tenant will comply with and perform any and all such rules and regulations imposed by Landlord so long as such rules and regulations do not unreasonably limit the rights or expand the obligations of Tenant under this Lease and all occupants of the Shopping Center are subject to and comply with such rules and regulations. Landlord must use best efforts to enforce such rules and regulations. Notwithstanding the foregoing, Tenant has the right to display merchandise on the sidewalk on both sides of the storefront door of the Premises.

(b)    Tenant is not required to join or maintain membership in any tenant's business association sponsored by or for the Shopping Center, nor is Tenant required to pay any of the costs of the activities conducted by such association.

26

**SECTION 17.  ALTERATIONS, INSTALLATIONS AND IMPROVEMENTS BY TENANT**

(a)     After Tenant's initial improvements to the Premises, Tenant, without Landlord's consent, has the right to make such interior alterations, changes and improvements to the Premises as Tenant may desire for the conduct of Tenant's business and for the full beneficial use of the Premises; provided, however, Tenant shall obtain Landlord's consent for all alterations exceeding $125,000.00 and those affecting the structure of the Premises and the roof, and/or exterior of the Premises (or interior storefront visible from the parking areas), and/or the mechanical, electrical, heating, ventilation, air conditioning and/or plumbing systems of the building within which the Premises is a part, which shall all require Landlord's consent, not to be unreasonably withheld or delayed.  Tenant will pay all costs and expenses of its improvements, will make such changes, alterations and improvements in a good and workmanlike manner, in accordance with all applicable laws and building regulations, and free and clear of any mechanic's liens or other liens or claims in connection with the making of such changes, alterations and improvements.

(b)     Except as otherwise provided, all signs, furnishings, trade fixtures, inventory, equipment and other removable property installed in the Premises by Tenant will remain the personal property of Tenant, will not be subject to any Landlord's lien or lien or security interest against the property of Landlord, and may be removed from the Premises by Tenant upon the termination of this Lease. If any of the foregoing is affixed to the Premises, Tenant will repair any damage caused by removal.

**SECTION 18.  REPAIRS AND MAINTENANCE**

(a)     Except as otherwise provided, Tenant will maintain the interior, non-structural portion of the Premises, at its sole cost and expense, in an attractive, clean and sanitary condition.

(b)     To Landlord's knowledge as of the date hereof, Landlord warrants and guarantees that all structural portions of the Premises and the roof, utility cables, mains and conduits, electrical, gas, plumbing, sprinkler, and sewer systems will be upon the Delivery Date, in good working order and repair, and, to Landlord's knowledge as of the date hereof, there are not, and will not be on the Delivery Date, any violations of any Laws.  Should Landlord perform any work in, on or about the Premises and/or the Common Areas, Landlord, at no cost to Tenant, must correct any code violations or any defects in workmanship, material or equipment during the Term.

(c)     Subject to Section 18(d), and except for damage caused by fire or other casualties or taking by eminent domain or conveyance in lieu thereof (whereupon the terms of Sections 24 and 25 shall control): Tenant, at its sole cost and expense, must make all interior nonstructural repairs to the Premises, including doors and windows, and (1) all repairs to the plumbing and gas systems exclusively serving the Premises from their respective meters to and including the plumbing and gas systems in the interior of the Premises, and (2) the electrical system exclusively serving the Premises from Tenant's electrical panel to and including the electrical systems in the remainder of the interior of the Premises. Notwithstanding the foregoing, Tenant is not required to make any: (i) repairs of damage covered by insurance maintained or required to be maintained by Landlord; (ii) repairs necessitated by reason of the negligence, willful misconduct, or default of Landlord, its

27

agents, employees or contractors; (iii) repairs to the plumbing, gas, electrical or other similar units and systems where such repairs would necessitate going through or into the floor slab, structural walls, or roof of the Premises; (iv) replacement of any plumbing, gas, electrical or similar units or systems; or (v) repair or replacement of the sprinkler, life safety or other detection or suppression system. All of the repairs and replacements referred to in the immediately preceding sentence will be performed by Landlord at its sole cost and expense (unless necessitated by the acts or omissions of Tenant).

(d)    Landlord, at its sole cost and expense, must make all repairs to the Premises other than those that Tenant is required to make. Landlord's obligations include, but are not limited to, repairs to the structural portions of the Premises (both interior and exterior), the roof, floor slab, foundation, exterior of exterior walls, and all repairs or replacements to the (x) gas and plumbing systems or any portion thereof up to (but not including) their respective meters, and (y) the electrical system up to (but not including) Tenant's electrical panel. In making any repairs or replacements, Landlord shall use commercially reasonable efforts not to unreasonably interfere with Tenant's normal operations and business. Landlord assigns to Tenant all warranties and guarantees, if any, with respect to any and all construction and equipment on the Premises to be maintained by Tenant.

(e)    Tenant will assume all responsibility for the maintenance, repair and replacement of the portion of the HVAC system serving the Premises. Notwithstanding anything to the contrary in the Lease, if Tenant should replace the HVAC system or any part thereof during the final two years of the Initial Term or any Lease extension or renewal and has maintained a contract on said HVAC system providing for, at a minimum, semi-annual maintenance, and not remain in possession of the Premises pursuant to a subsequent Lease extension or renewal, then the Landlord shall reimburse Tenant, within 30 days after the date Tenant delivers back possession of the Premises to the Landlord in the condition required under this Lease, for either (i) the un-amortized cost of said replacement based on a straight-line amortization schedule over the useful life of the equipment in accordance with federal income tax guidelines, or (ii) the repair cost paid by Tenant in excess of $1,500.00 (it being agreed and understood that Tenant shall be responsible for the first $1,500.00 of repair cost), as the case may be.

(f)    Tenant will maintain the Premises, at its expense, free and clear of all rubbish, garbage and trash and place such rubbish, garbage and trash in the containers provided by Tenant. Tenant, at its own cost and expense, will dispose of all rubbish, garbage and trash on a timely basis. In the event the Landlord provides trash removal services the Tenant shall reimburse the Landlord for the cost of the same based on the pro-rata share of the occupants using such service or on such other method as the Landlord shall reasonable determine based on the use of the service. In the event the Landlord provides an area for Tenant's exclusive container the Tenant shall contract for such trash removal services and pay for the same directly.

(g)    Subject to this Section 18, Tenant will keep the Premises in an orderly and sanitary condition, free from vermin, rodents, bugs and other pests, and Landlord must keep the Common Areas in an orderly and sanitary condition in accordance with the terms of Section 12.

(h)    Notwithstanding anything to the contrary, Tenant is responsible for making any interior non-structural alterations of or improvements to the Premises that are required by any Public

28

Entity after the Delivery Date, except to the extent that such responsibility is imposed upon Landlord in the next following sentence or otherwise under this Lease. Landlord is responsible, at its sole cost and expense, for making all alterations of or improvements to the Premises that are required by any Public Entity and that (i) are structural in nature, (ii) relate to the exterior thereof, (iii) relate to the sprinkler, utility or life safety systems therein or (iv) relate to the handicapped or disabled and do not relate to the interior of the Premises.

## SECTION 19.  INDEMNIFICATION

(a)      Subject to Section 20, Landlord must indemnify, defend and hold Tenant harmless from and against any and all claims, demands, actions, damages, liability and expense in connection with the loss, damage or injury to persons or property, arising out of or related to the wrongful or negligent acts or omissions of the Landlord, Landlord's agents, contractors or employees, or arising out of the use or operation of the Common Areas and all other space in the Shopping Center not designated for the exclusive use of one tenant, except as caused by the negligence or willful misconduct of Tenant, its agents, employees, contractors or representatives.

(b)      Subject to Section 20, Tenant must indemnify, defend and hold Landlord harmless from and against any and all claims, demands, actions, damages, liability and expense in connection any loss, damage or injury to persons or property (1) occurring in, on or about, or arising out of the Premises, except as caused by the negligence or willful misconduct of Landlord, its agents, employees, contractors or representatives; or (2) arising out of or related to the wrongful or negligent acts or omissions of Tenant, Tenant's agents, contractors, or employees.

(c)      If either party, without fault on its part, is made a party to any litigation commenced by or against the other party, then such other party shall defend, protect and hold such first party harmless and shall pay all costs, expenses and reasonable attorney's fees incurred or paid by such first party in connection with the litigation.

This Section 19 survives the expiration or termination of this Lease.

## SECTION 20.  WAIVER OF CLAIMS.

Notwithstanding any provision to the contrary, Landlord and Tenant waive any and all right of recovery, claim, action or cause of action against the other, their respective agents and employees, for any loss or damage that may occur to the Premises or the Shopping Center or any additions or improvements thereto, or any contents therein, by reason of fire, the elements or any other cause which could be insured against under the terms of a standard special form insurance policy or policies, or for which Landlord or Tenant may be reimbursed as a result of insurance coverage insuring any loss suffered by either party, regardless of cause or origin, including the negligence of Landlord or Tenant, or their respective agents and employees. This waiver applies regardless of whether either party actually obtains property insurance, and regardless of whether any insurance proceeds are collected. Notwithstanding the above, Landlord and Tenant agree and acknowledge that the waiver of claims herein contained shall expressly exclude any loss paid by the insured in the form of a deductible or self-insured retention. All property insurance policies required under this Lease covering the Premises or the Shopping Center must expressly waive any right on the part of

29

the insurer against the other party for damage to or destruction of the Premises or the Shopping Center resulting from the acts or omissions of the other party.

## SECTION 21.  PROPERTY AND LIABILITY INSURANCE

(a)     Landlord must keep in full force and effect Commercial General Liability Insurance and Umbrella Insurance with respect to the Shopping Center, including the Common Areas, naming Tenant as an additional insured hereunder to the extent its interest may appear, with nationally recognized companies rated no lower than A-, IX by A.M. Best Company with total minimum limits to apply per location of $2 million on account of bodily injuries or death and/or property damage resulting from one occurrence. Landlord must deposit a certificate or other evidence of such insurance with Tenant within thirty (30) days after receipt of written request from Tenant.

(b)     Tenant must keep in full force and effect Commercial General Liability Insurance and Umbrella Insurance with respect to the Premises, naming Landlord, Edens & Avant Investments, LP, Edens & Avant Realty, Inc., Landlord's lenders, employees, officers, directors and agents of such companies and other designees of Landlord, it's successors and/or assigns, as an additional insured to the extent its interest may appear, with nationally recognized companies rated no lower than A-, IX by A.M. Best Company with total minimum limits to apply per location of $2 million on account of bodily injuries or death and/or property damage resulting from one occurrence. Tenant's evidence of insurance is maintained by Tenant's insurer on the website of Tenant's insurance broker, which can be accessed through Tenant's website, "JoAnn.com." Notwithstanding the foregoing, Tenant shall, upon written request from Landlord, supply Landlord with evidence of its insurance prior to accessing the Premises.

(c)     Landlord must keep the Premises and the Shopping Center, including Common Areas, insured against loss or damage by fire, lightning, vandalism and malicious mischief, and such other perils as are now or may hereafter be comprehended in the term "All Risk Coverage" or "special form" coverage or "Special Form Cause of Loss" (or other terms that become the insurance industry standard in the future), including, without limitation, earthquake and flood, if in an area that is designated as an earthquake or flood zone, boiler and machinery, plate glass, power failure, mold, windstorm, terrorism, seepage or leakage and loss of rent damage, in amounts equal to at least 80% of the full replacement value thereof, or such greater amounts as may be required to prevent the application of co-insurance provisions. Such insurance must cover improvements in the Premises owned by Landlord to the extent that the same are customarily insurable as part of the realty, but will not include the cost of restoration of Tenant's trade fixtures, furniture, furnishings, inventory, equipment and other personal property.

(d)     In addition to the payment of Fixed Minimum Rent, Tenant must pay a Fixed Insurance Payment as Tenant's share of the premium paid by Landlord for maintaining the insurance for the Shopping Center required under subsections 21(a) and 21(c). Tenant must pay to Landlord in twelve (12) equal monthly installments, each in advance on the first day of each and every calendar month, an amount equal to $■ per year multiplied by the Gross Leasable Area of the Premises for the First Lease Year of the Term (the "Fixed Insurance Payment"), which amount is Landlord's good faith estimate of the full amount of Tenant's Proportionate Share of Insurance Costs for the first Lease Year.  The Fixed Insurance Payment shall increase by three percent (3%)

30

per year twelve (12) month period thereafter during the Initial Term, commencing on the first day of each such twelve (12) month period. The Fixed Insurance Payment shall be "reset" for first Lease Year of each Extended Term (the first day of each such Lease Year referred to as a "Reset Date") to be the average of the actual Proportionate Share of Insurance for each of the two (2) years immediately prior to the applicable Reset Date. The reset Fixed Insurance Payment shall increase three percent (3%) per year for the second (2nd) through fifth (5th) Lease Year of each Extended Term, commencing on the first day of each such Lease Year.

## SECTION 22. SIGNS

(a)    Tenant has the right to install and maintain a sign or individual letters ("Jo-Ann, Fabric and Crafts" or any other name or slogan that Tenant may adopt) or signs on the front or side of the Premises, and "framing," "craft" and similar departmental signs on the front fascia in addition to its regular sign, all in accordance with Exhibit D-1. All signs will be subject to Landlord's prior written approval not to be unreasonably withheld or delayed and shall comply with all requirements of any Public Entity, and Tenant will obtain all necessary permits or licenses. Further, Tenant has the right to install two 2-sided panels on the two pylons serving the Shopping Center in the locations previously occupied by Books-A-Million, if any, provided such panels are reasonably approved by Landlord and installed at Tenant's sole cost and expense. Notwithstanding the foregoing, so long as the same does not diminish Landlord's signage rights at the Shopping Center, Tenant is entitled to seek and receive a variance from any Public Entity so as to allow Tenant to have the size, color, number, etc., of signs that Tenant desires, and which are approved by Landlord. Landlord must reasonably cooperate and assist Tenant with any such variance, at Tenant's sole cost and expense.

(b)    Tenant's complete sign package as described in this Section 22, shall proceed through the process outlined in Section 10(a) for approval, and except as otherwise set forth herein, is subject to governmental approval. Tenant understands that Landlord's approval of its sign package is primarily for conceptual purposes and such approval shall not constitute a representation or warranty of any kind with respect to compliance with governmental requirements.

(c)    In addition to the foregoing signs, subject to governmental approval, Tenant has the right to install and maintain a professionally prepared banner sign periodically in front of the Premises in the location and manner to be identified on Exhibit D and/or D-1.

(d)    Tenant must maintain its signs in good condition and repair at all times, and must defend, indemnify and save the Landlord harmless from injury to person or property arising from the erection, removal and maintenance of the signs. Upon vacating the Premises, Tenant must remove all signs and repair (exclusive of painting) all damage caused by such removal.

(e)    If Landlord repairs or renovates all or any portion of the Shopping Center, which repair and/or renovation requires the removal of any of Tenant's sign(s), Landlord must first notify Tenant at least 45 days before the removal of such sign(s) (or immediately, without prior notice to Tenant, if in an emergency) and Landlord will bear the cost of such removal and reinstallation, together with the cost of any damage to the sign(s) as a result of such removal or reinstallation. Further, pursuant to this paragraph (e), Landlord must provide and install on or about the Shopping Center, at Landlord's sole cost and expense, a banner or other type of temporary sign(s) identifying

31

Tenant's trade name, which banner or sign(s) must be equal in size to Tenant's existing sign and approved by Tenant before such installation.

## SECTION 23.  ASSIGNMENT AND SUBLETTING

(a)    So long as Tenant is not in default, beyond the expiration of applicable notice and cure periods, of any material and/or monetary provision of this Lease, Tenant has the right to assign this Lease or sublet all or any part of the Premises for any lawful retail purpose provided (i) that such assignee or sublessee uses the Premises for a use that does not violate any exclusive and/or restricted use rights granted to other tenants in the Shopping Center that exist on the date of the assignment or sublease (subject, however, to Landlord's advising Tenant of such rights as set forth herein) or the Restricted Uses and (ii) Landlord reasonably approves of the assignee in writing as well as the use; provided, however, in deciding whether to approve the assignee the Landlord shall consider the Tenant's continuing liability under the Lease. Within 30 days after the receipt of a written request from Tenant, Landlord must deliver to Tenant notice of any restrictions on the use of the Premises enforceable by any other tenants of the Shopping Center that is in addition to the Restricted Uses and those set forth on Exhibit F.  Subject to Unavoidable Delays, failure to deliver to Tenant a list of any restrictions will constitute Landlord's covenant that, except the Restricted Uses and those set forth on Exhibit F, there are no restrictions on the use of the Premises for any use and Landlord must indemnify, defend and hold Tenant harmless if there actually is a restriction.

A change in effective voting control of the Tenant does not constitute an assignment of the Lease. Landlord agrees to enter into a commercially reasonable recognition agreement with such subtenant or assignee.

Tenant shall provide Landlord with written notice of an assignment of the Lease or a sublease of the Premises which shall include the proposed assignee's/sublessee's contact information and effective date of transfer.

(b)    Except as specifically set forth below, Tenant shall not be relieved of any liability under the Lease in the event of an assignment or sublease. If Tenant assigns this Lease and Tenant's assignee or any subsequent assignee has assumed this Lease in writing and, at the time of the assignment, or attains at any time after the assignment, a tangible net worth of at least $100 Million, then Tenant shall be released and discharged from any further liability under this Lease. Such net worth shall be determined as of the end of the most recent fiscal year preceding the intended release unless more current figures are available.

(c)    The Landlord and Tenant agree that, in the case of a sublease or assignment under this Lease that is not a Related Entity Transfer (hereinafter defined), Landlord shall be entitled to receive fifty percent (50%) of the actual amount received by Tenant (within 30 days of receipt by Tenant) from any such sublessee or assignee which is in excess of the Rent set forth in this Lease for the balance of the term of the sublease or assignment less the reasonable and customary transaction costs of Tenant in effectuating the assignment or sublease or collecting amounts due from the sublessee or assignee ("Profit"). It is agreed and understood that the right to such Profit established herein shall in no way create any obligation on the part of Tenant to enter into a sublease or assignment or continue with a sublease or assignment it may have entered into with a sublessee or

32

assignee (i.e., Tenant shall have the unfettered right to terminate any such sublease or assignment for any or no reason whatsoever and any obligation to pay Landlord Profit for such sublease or assignment shall terminate). "Related Entity Transfer" is defined as any transfer, sublease or assignment to: (i) a parent; subsidiary; or a subsidiary of a parent corporation; or (ii) the parent of Tenant by way of merger, consolidation, corporate restructuring, or purchase of all or substantially all of stock or assets; or (iii) any entity that acquires substantially all of Tenant's stores either generally or in the State where the Premises are located; or (iv) any sublet of not more than 20% of the Gross Leasable Area of the Premises for the operation of one or more departments within the business operation of Tenant and in accordance with the uses permitted herein.

## SECTION 24.  REPAIR AFTER CASUALTY

(a)     In the event of damage to or destruction of the Shopping Center or any portion thereof (including the Premises) by casualty or any other cause whatsoever, then, except as otherwise provided in this Section but subject to Landlord's mortgagee, if any, agreeing to release or actually releasing some or all of the insurance proceeds for the purpose of repair or restoration, Landlord must begin and diligently pursue to completion the restoration and repair within 30 days after the event of damage or destruction and receipt of applicable permits and approvals. Landlord is obligated to repair the Premises only to their condition on the Delivery Date (subject to alterations thereof required by changes in governmental code). Any repair or restoration of the Premises must be completed within 180 days after the event of damage or destruction and receipt of applicable permits and approvals and insurance proceeds. Any repair and restoration of the Shopping Center (other than the Premises) must be completed as quickly as possible. Landlord agrees to timely apply for and diligently pursue the issuance of all required permits and approvals for Landlord's repair/restoration work.  Within 30 days after an event of damage or destruction, Landlord must deliver to Tenant notice of the anticipated period of restoration.

(b)     In the event of any damage or destruction to the Premises, then all Rent will abate pro-rata using the same ratio that the portion of the Premises rendered unusable (in Tenant's reasonable judgment) bears to the Gross Leasable Area of the Premises.

> (1)     In the event of damage or destruction to any other portion of the Shopping Center (including the Common Area) that materially interferes with access to the Premises or the conduct of business therein, then Tenant will pay only Substitute Rent until the completion of Landlord's repair and restoration.
>
> (2)     In the event that, due to damage or destruction: (i) any Anchor Tenant Violation occurs; or (ii) any Anchor Tenant Violation isn't cured within two hundred seventy (270) days after Landlord's receipt of insurance proceeds and applicable permits, then, at any time thereafter, until such time as the Anchor Tenant Violation is cured, as the case may be, Tenant has the right to the remedies set forth in this Lease for such Anchor Tenant Violation.

(c)     Notwithstanding Section 24(a), Landlord may terminate this Lease and has no restoration and repair responsibility in the event of damage to or destruction of the Shopping Center

33

if (i) the cost of repair or restoration exceeds 40% of the replacement value of the Shopping Center and the event or destruction was not insurable under the insurance coverage required of Landlord hereunder or, if applicable, the insurance proceeds payable as a result of the damage or destruction have been applied by the Landlord's mortgagee against the mortgage debt thereon; or (ii) the reasonable period for substantial completion of the repair and restoration exceeds twelve months. As a condition to Landlord's termination of this Lease under this subsection: (1) the leases of all other similarly situated occupants in the Shopping Center must also have been terminated by reason of the event of damage and destruction; and (2) Landlord must have no intent and be under no obligation to rebuild the Shopping Center.

(d)     If the Premises are damaged or destroyed and Landlord has not completed the restoration and repair thereof within 180 days as required in Section 24(a), then Tenant has the right, without waiving any other right or remedy against Landlord, to terminate this Lease. If any portion of the Shopping Center other than the Premises is not repaired, or by Landlord's estimate cannot be repaired, within one year from the event of damage or destruction, then Tenant has the right to terminate this Lease but has no other claim against Landlord for failure to repair except to the extent that Landlord has failed to use reasonable efforts to complete such repairs.

(e)     In addition to all rights to terminate this Lease granted to the parties in this Section, if 40% or more of the Premises are destroyed or damaged during the last two years of the Term, then each of Landlord and Tenant has the right to terminate this Lease as of the date of such damage or destruction by giving written notice thereof within 30 days after the date of the damage or destruction. If Tenant, within 30 days after receipt of Landlord's written notice of termination, gives Landlord written notice of its intention to extend this Lease for any additional Extended Term then available to Tenant, then the notice of Landlord to terminate this Lease will be of no force and effect.  If Tenant elects to extend this Lease for any additional Extended Terms then available to Tenant, Landlord must use its best efforts to restore the Premises to its former condition (subject to alterations required by code) with all reasonable speed, and all Rent will abate pro-rata as set forth in subsection (b).

(f)     If this Lease is terminated pursuant to this section, Landlord must refund within 30 days after receipt of written notice from Tenant any Rent paid in advance after the effective date of termination.

(g)     Notwithstanding anything to the contrary, if Landlord terminates the Lease under this section, and if after such termination Landlord rebuilds the Premises or the Shopping Center, as the case may be, at any time within the Term (including extensions thereof), then Tenant has the right, at its option, to lease space in the Shopping Center comparable to the Premises (the "Substitute Premises") upon the same terms and conditions and for the balance of the Term.  Notwithstanding termination of this Lease, Landlord must notify Tenant of its intention to repair or restore the Premises or the Shopping Center, as the case may be, whereupon Tenant has 30 days after receipt to give Landlord notice of Tenant's intention to accept such Substitute Premises on the terms and conditions of this Lease and setting forth the period within which such repair or restoration must be completed as a condition of Tenant's acceptance of the Substituted Premises. This subsection 24(g) survives termination of this Lease.

34

(h)     If Landlord elects, or is required by this Section 24, to repair the Premises or the Shopping Center, then Landlord must notify Tenant in writing when the repairs are completed. The repairs will be not be deemed completed unless and until the repairs are actually completed in accordance with the terms of this Lease and Tenant has thereafter received written notice of such completion.

(i)     If the Lease is not terminated under the terms of this Section 24, then Rent will cease abating and become due and payable on the earlier of the date (i) that is 180 days after the date that Landlord completes its restoration of the Premises as required hereunder, or (ii) Tenant has rebuilt, refixtured and restocked the Premises and has opened for business from the Premises.

## SECTION 25.  CONDEMNATION

(a)     If 50% or more of the Gross Leasable Area of the Premises or 50% or more of the Gross Leasable Area of the Shopping Center is taken by condemnation or right of eminent domain or conveyed in lieu thereof or taken in any other manner for a period of six (6) months or longer (a "Taking"), this Lease will terminate at the option of either party as of the day possession is taken by or title vests in the taking authority, and both parties will be released from any further liability hereunder.

(b)     In the event of a Taking of less than 50%, but more than 10%, of the Gross Leasable Area of the Premises, or a Taking of more than 10% of the Protected Area, then Tenant has the right to terminate this Lease and any further liability hereunder if, in the reasonable determination of Tenant, the Premises cannot be economically operated for, or are unsuitable, for the intended purposes of this Lease. Any such termination is effective as of the later of (i) the day possession is taken by, or title to the portion taken vests in, the taking authority or (ii) the day Tenant surrenders the Premises to Landlord per the terms of this Lease (subject to said condemnation).

(c)     In the event of a Taking of less than 50%, but more than 15%, of the Gross Leasable Area of the Shopping Center (including the Common Areas), then (i) Tenant has the right to terminate this Lease and any further liability hereunder if, in Tenant's reasonable determination, the Premises cannot be economically operated for, or are unsuitable for, their intended purposes; and (ii) Landlord has the right to terminate this Lease and any further liability hereunder if, in Landlord's reasonable determination, the Shopping Center cannot be economically operated for, or are unsuitable for, their intended purposes. Any such termination is effective as of the later of (i) the day possession is taken by, or title to the portion taken vests in, the taking authority or (ii) the day Tenant surrenders the Premises to Landlord per the terms of this Lease (subject to said condemnation).

(d)     In the event of a Taking of any portion of the Premises or the Shopping Center, upon which this Lease is not terminated, Landlord must, subject to Landlord's mortgagee, if applicable, agreeing to release or actually releasing some or all of the condemnation proceeds for the purpose of repair or restoration and receipt of applicable permits and approvals, restore the remainder of the Premises or the Shopping Center (including the Common Areas), with reasonable speed to a complete architectural unit as nearly like its condition prior to such partial Taking as shall be practicable, and if during or after the work of restoration Tenant is deprived of all or a part of the

35

use of the Premises, the Rent will abate for so long as Tenant is deprived of such use and until Tenant has rebuilt, refixtured and restocked the Premises, as necessary, in the same proportion as that portion of the Premises taken bears to the entire Premises. Tenant shall use best efforts to restore the Premises as soon as reasonably possible after Landlord completes its restoration.

(e)     All damages awarded in connection with the Taking of the Premises, whether allowed as compensation for diminution in value to the leasehold or to the fee of the Premises, belong to the Landlord; but, if Tenant has made any material leasehold improvements to the Premises, or alterations or structural changes and repairs to the Premises, at its own expense (and not reimbursed by Landlord through any tenant improvement allowance) (regardless of when made), Tenant and not Landlord is entitled to claim an award for the unamortized balance of Tenant's cost thereof. If the condemning authority does not make a separate award therefor, Landlord, subject to the rights of any mortgagee, must assign a portion of its award equal to such unamortized cost to Tenant. If Landlord in obtaining its award uses Tenant's cost items, then Tenant is entitled, subject to the rights of any first Mortgagee, to a proportionate share of Landlord's award based upon the costs. Tenant is also entitled to claim an award for loss of business, damage to merchandise and fixtures, removal and reinstallation costs and moving expenses, in a separate action only.

## SECTION 26.  REPRESENTATIONS AND COVENANTS OF LANDLORD

(a)     On the date hereof and hereafter during the Term, Landlord represents, warrants and covenants to Tenant as follows:

(1)     The Shopping Center Site is zoned to permit the use of the Shopping Center for general retail purposes including the Protected Use;

(2)     To Landlord's knowledge, the legal description set forth on Exhibit A matches the Shopping Center depicted on the Site Plan (i.e., Exhibit B) and includes no additional property therein;

(3)     To the Landlord's knowledge as of the date hereof, the Common Areas and Premises (excluding Tenant's Work or other alterations made by or on behalf of Tenant, but not excluding Landlord's Work or work directed by Landlord on or behalf of Tenant) comply with all Laws;

(4)     Landlord will provide surface parking spaces in the Common Areas on an unreserved basis (subject to minor reserved parking which does not materially adversely affect Tenant's operations) and without cost, with parking spaces being provided pursuant to applicable Laws;

(5)     Except as may be existing on the date hereof and their comparable replacements, no building, edifice or obstruction will be placed in the Protected Area and no addition or alteration will be made to the Protected Area (A) that diminishes the accessibility of the Premises to and from the parking areas within the Common Areas and the other stores in the Shopping

36

Center; (B) that diminishes the visibility of the front of the Premises (including, without limitation, the signage thereon) from public highways, parking areas or other stores in the Shopping Center; (C) that diminishes the access to or the utility of the service areas serving the Premises; (D) that has the effect of increasing the monetary obligations of Tenant under this Lease; or (E) that otherwise adversely affects the conduct of business from the Premises or the rights of Tenant under this Lease. Without limiting the generality of the foregoing, in no event will any improvement or alteration within the Protected Area (including a reduction in size of the Protected Area through any means (except through an eminent domain proceeding and except temporarily in order to effectuate repairs, maintenance and/or remodeling), including, for example, a reduction in, or a change to, the parking layout or configuration or traffic patterns of vehicles or pedestrians) be made to the "Protected Area" as shown on the Site Plan which would adversely affect Tenant's operations;

(6)     The Site Plan currently and, to the Landlord's knowledge, correctly and completely shows all improvements on the Shopping Center Site;

(7)     Intentionally Omitted;

(8)     Intentionally Omitted;

(9)     Intentionally Omitted.

(10)    Except as existing on the date hereof and their replacements, in no event will the Shopping Center or any portion thereof, including the Premises, be used as or for any of the following ("Restricted Uses"):

        (i)     Any entertainment purposes including, without limitation, a auditorium or circus or a movie theater or cinema in the area identified on the Site Plan as the "Prohibited Use Area";

        (ii)    church; bingo hall or a place of public assembly;

        (iii)   library or school (includes, but not limited to, a beauty school, barber college, reading room, place of instruction or any other operation serving primarily students or trainees rather than retail customers, except for operations like Huntington Learning Center (by way of example only) which operate in less than 4,000 square feet) or other schools found in mixed use development; provided that the restriction in this Section (iii) only apply to the Prohibited Use Area;

        (iv)    for the sale, storage or service of automobiles or other vehicles; or fueling, washing or repair operations (except all of the foregoing are permitted on outparcels not directly in front of the Premises);

        (v)     night club; or bar;

37

(vi)    funeral parlor; massage parlor;

(vii)   animal clinic or animal boarding (kennel) (except those in a regional or national prototypical pet store such as Petsmart, Petco, or Pet Supplies Plus by way of example only);

(viii)  discotheque; dance hall or otherwise for musical/dance reviews or topless/nude shows; provided, however, the foregoing shall not prevent operations such as a dance studio, karate studio, jazzercise studio, ballet studio, gymnastics studio, a music store or similar uses in the Shopping Center that are not part of the Prohibited Use Area;

(ix)    sporting activities (not including karate, dance, gymnastics, or the like); gymnasium; bowling alley; or skating rink to the extent they are within the Prohibited Use Area;

(x)     car wash except on outparcels;

(xi)    off-track or other betting establishment (except for the incidental sale of state lottery);

(xii)   pool room, game room or amusement arcade (defined as any establishment containing more than a combination of three electronic, pinball or other games) except in connection with a restaurant operation, gallery or store or pinball arcade; facilities for indoor laser war games (except as found in a "Chuck E Cheese" or "Discovery Zone" by way of example only);

(xiii)  so-called "flea market"; or second hand, used goods or consignment store (except for a regional or national retail operation similar to a "Tuesday Morning" by way of example only or a consignment operation or second hand store typically found in first class shopping centers);

(xiv)  store selling primarily distressed or damaged merchandise;

(xv)   health clubs such as Gold's Gym (this restriction shall not apply to other first-class national or regional operations occupying no more than 5,000 square feet, such as Curves and Weight-Watchers by way of example only) or spa (except for first-class salons or day spas occupying or nail salons or massage operations operating in less than 4,000 square feet); provided, however, the restriction in this Section (xv) only apply to the Prohibited Use Area;

(xvi)  so-called "head shop";

(xvii) gun range or gun shop;

(xviii) for warehousing, except as incidental to a retail business;

(xix)  adult book store or store selling or exhibiting sexually explicit materials (except for books stores and/or video stores which sell such items incidental to its primary business similar to "Barnes & Noble" or "Blockbuster Video" by way of example only);

38

(xx)    any business or use that emits offensive odors, fumes, dust or vapors or is a public or private nuisance or emits loud noise or objectionable sounds or creates fire, explosive or other hazard (e.g., motorized vehicle repair or body shop); provided, however, tire, battery or auto parts retail locations shall not be precluded under these Restricted Uses;

(xxi)    abortion clinic, aids clinic, drug treatment facility or bodily fluid collection facility (not including lab facilities) (except in connection with a normal hospital or health clinic operating on one of the outparcels); homeless shelter or halfway house;

(xxii)    intentionally omitted;

(xxiii)    animal kennel (except as noted in vii);

(xxiv)    laundromat (except a dry-cleaning operation for drop-off services only); and,

(xxv)    any non-retail use in the Prohibited Use Area and in the Shopping Center (except with regard to areas of the Shopping Center that are not in the Prohibited Use Area, uses that are incidental to the retail use or any other office use ("Offices"), for example (but not by way of limitation) bank, tax preparation services, medical offices, etc., provided that such Offices, in the aggregate, do not exceed 40,000 square feet).

(11)    Landlord owns fee simple title to the Shopping Center free and clear of all liens and encumbrances except for those of public record on the date hereof which would materially affect the operation of Tenant's business or the rights of Tenant herein. To the best of Landlord's knowledge as of the date hereof, there are no claims of other parties, restrictions, reservations, or defects in Landlord's title which could interfere with or impair Tenant's rights under this Lease or Tenant's use, occupancy, or enjoyment of the Premises;

(12)    At the time of the execution of this Lease, the First Lease Year Tax estimate set forth in Section 8 of this Lease, is Landlord's good faith, researched and reasonably accurate estimate of the Tenant's Proportionate Share of Taxes for the First Lease Year based on a tax valuation of a fully leased Shopping Center;

(13)    To the actual Landlord's knowledge as of the date hereof, at the time of the Delivery Date, there are no planned or contemplated taxes and assessments, either general and specific, whether ad valorem, specific or otherwise, with respect to the Shopping Center; and,

(14)    To the actual Landlord's knowledge, at the time of the Delivery Date, the Premises are (are will be) free of Hazardous Material in violation of applicable Laws.

39

(b)     The representations, warranties and covenants above are material considerations and inducements to Tenant in executing this Lease, the breach of which will cause irreparable and severe harm to Tenant. Without limiting any other right or remedy of Tenant, in the event of a breach of the representations, warranties, and covenants contained in this Section 26 (unless the Lease provides for specific remedies in the event of the breach), Tenant has the right after providing Landlord with thirty (30) days' prior written notice and opportunity to cure (with such additional time as is reasonably necessary if Landlord has commenced the cure within said 30-day period and is diligently pursuing the cure to completion) (i) to terminate this Lease at any time during the period of such breach if the breach materially adversely affects the operation of Tenant's business such that Tenant can not reasonably operate from the Leased Premises; (ii) to pay Substitute Rent during the period of such breach. Notwithstanding anything to the contrary, in the event of a violation of this subsection "(b)" by any tenant or occupant without Landlord consenting to or granting such tenant or occupant the right to do so (a "rogue tenant"), then Tenant's right to pay Substitute Rent and to terminate this Lease will be deferred, provided that Landlord commences court action to cure or eliminate the violation by the rogue tenant within 30 days after receipt of written notice from Tenant and diligently pursues same to completion (which diligence by Landlord must include appeals to the highest state court, if lower court rulings are adverse to Landlord and allow the violation to continue). If Landlord does not take such action against the rogue tenant as described in the immediately preceding sentence, then Tenant may exercise its termination right and right to pay Substitute Rent at any time thereafter until the violation ceases.

## SECTION 27.  TENANT'S DEFAULT

(a)     Landlord may, by written notice to Tenant, terminate this Lease, or without terminating this Lease re-enter the Premises by summary proceedings, and may dispossess the Tenant if:

(1)     Tenant fails to pay Rent on or before the due date and then fails to pay same within 10 days after receipt of written notice from Landlord;

(2)     Tenant is in material default in the performance of any non-monetary covenants, terms, conditions and provisions of this Lease, and Tenant fails to remedy such default within 30 days after receipt of written notice thereof (but Tenant will not be deemed to be in default if Tenant commences to remedy the default within the 30-day period and proceeds to cure with due diligence);

(3)     Tenant is adjudged bankrupt or makes an assignment for the benefit of creditors, or if a receiver of any property of Tenant in, upon or about the Premises is appointed in any action, suit or proceeding by or against Tenant and is not removed within 90 days (unless such 90-day period is extended by court order, in which event the time period will be as established by court order or established by such person(s) or entity acting under or for the court) after appointment; or

40

(4)     The interest of Tenant in the Premises is offered for sale or sold under execution or other legal process, and if not rescinded within 90 days after written notice from Landlord to Tenant.

Landlord must mitigate its damages. In the event of re-entry Landlord must use best efforts to relet the Premises and, in the event of a reletting, must apply the rent therefrom first to the payment of Landlord's reasonable expenses incurred and paid by reason of Tenant's default, next to the reasonable expense of reletting, including, but not limited to, reasonably necessary repairs to the Premises, and then to the payment of rent and all other sums due from Tenant, with Tenant remaining liable for any deficiency. Any and all deficiencies shall be payable by Tenant monthly on the date provided for the payment of Fixed Minimum Rent. Notwithstanding anything to the contrary in this Lease, if Tenant has in good faith disputed an alleged monetary default for an amount which is less than two (2) months of Rent, and if Landlord obtains a final judgment adverse to Tenant with regard to said amount, wholly or in part, Tenant may within 30 days of the date of the journalized final judgment pay the amount set forth in the final judgment to Landlord and retain the right to possession of the Premises and all of its rights under the Lease, notwithstanding any termination of the Lease pursuant to the Lease or at law or in equity, which may have occurred as a result of said monetary default.

(b)     In the event of a default by either party of any of the terms, provisions, covenants or conditions of this Lease, the other party has the right to invoke any remedy provided at law or in equity; except, however, Landlord is not entitled to terminate this Lease or to dispossess Tenant except for a material default and in no event is Landlord entitled to accelerate Rent. Notwithstanding anything contained herein, in no event is Landlord entitled to exercise self help to lock out Tenant or forcibly retake possession of the Premises without due legal process and an appropriate court order. All remedies are cumulative and concurrent.

(c)     If Tenant fails to keep and perform any non-monetary covenant or agreement to be kept and performed by Tenant, then Landlord, in addition to all other remedies now or hereafter afforded or provided by this Lease, at law or in equity, has the right to: (i) perform such covenant or agreement for or on behalf of Tenant or make good any such default, and any amount or amounts that the Landlord advances on Tenant's behalf must be repaid by Tenant to Landlord within ten (10) days after receipt of written demand, together with interest thereon at the Default Rate from the date of such advance to the repayment thereof in full. Except in the event of emergency, before performing any non-monetary covenant or agreement on behalf of Tenant as set forth above, Landlord will provide Tenant with written notice of Tenant's default and Landlord's intent to perform such covenant or agreement, and Tenant will have 30 days within which to complete performance of the same (and Tenant will not be deemed to be in default if Tenant commences to remedy the default within the 30-day period and proceeds to cure with due diligence). For purposes hereof, "emergency" means (i) any event which poses immediate threat of injury or damage to persons or property or (ii) any event which, in Landlord's judgment, threatens another tenant's ability to open for business as scheduled or impairs or interferes with Landlord's or another tenant's business operations.

41

(d)     Notwithstanding anything to the contrary, with respect to any alleged default of Tenant other than a default in the payment of Rent, or other sums of money, if Tenant notifies the Landlord, within 30 days after Landlord's notice of such default, that Tenant disputes such alleged default and Tenant files within the 30-day period an action in a court of competent jurisdiction contesting such alleged default, then Tenant will not be deemed to be in default with respect to such matter. If a final judgment is adverse to Tenant, wholly or in part, Tenant must immediately begin to correct the matters complained of by Landlord, or that portion thereof as to which such judgment shall have been adverse to Tenant, and complete the correction within 30 days after such judgment, or if more than 30 days are reasonably required to complete such correction, correct the same within 30 days and prosecute the same to completion with reasonable diligence.

## SECTION 28. RIGHTS OF LANDLORD

(a)     Landlord reserves the right at all reasonable times during Tenant's business hours (except in the event of an emergency) and upon prior reasonable notice to Tenant (except in the event of emergency, when notice is not required) by itself or its duly authorized agents, to inspect the Premises and, to make such repairs as Landlord is obligated to make to the Premises. In exercising the foregoing right, Landlord must not unreasonably interrupt or disrupt Tenant's business or unreasonably disrupt access to the Premises by Tenant, Tenant's employees, agents, invitees and customers.

(b)     If Landlord makes any payments on behalf of Tenant, which are Tenant's obligation, to fulfill Tenant's covenants, then any amount so paid by Landlord are declared to be "Additional Rent" and are due and payable to Landlord from Tenant with the next installment of Fixed Minimum Rent due thereafter, together with interest thereon at the Default Rate from the date of such advance to the repayment thereof in full.

(c)     Landlord has the right during the last three months before the expiration of this Lease, so long as it does not unreasonably interfere with Tenant's business, to exhibit the Premises and put up the usual notice "for rent" or "for sale", which notice will not be removed or hidden by Tenant. No more than one sign will be placed upon the Premises and the sign cannot exceed 12 feet square.

## SECTION 29. LANDLORD'S DEFAULT

(a)     If Landlord fails to keep and perform any covenant or agreement to be kept and performed by Landlord, then Tenant, in addition to all other remedies now or hereafter afforded or provided by this Lease, at law or in equity (unless the Lease provides for specific remedies in the event of the breach), has the right to: (i) perform such covenant or agreement for or on behalf of Landlord or make good any such default, and any amount or amounts that the Tenant advances on Landlord's behalf must be repaid by Landlord to Tenant on demand, together with interest thereon at the Default Rate from the date of such advance to the repayment thereof in full or (ii) deposit the installments of Rent and other cash payments accruing under this Lease into an escrow account with any third party with instructions to pay such sums to Landlord when Landlord has performed the covenants and agreements to be performed by Landlord or, if Tenant performs such covenants and agreements for or on behalf of Landlord, when any amounts advanced by Tenant for the performance

42

of such covenants and agreements, together with all accrued interest thereon, have been repaid in full, and, if any such amounts have not been repaid in full on or before the 60th day after such funds are deposited into escrow, to return such funds to Tenant for set-off against the amounts advanced; or (iii) any combination of (i) and (ii). Notwithstanding the foregoing to the contrary, Tenant shall not have the right to cure a default of Landlord unless the default materially adversely affects Tenant's use and occupancy of the Premises or materially interferes with the Protected Area.

(b)    Except in the event of emergency, before performing any covenant or agreement on behalf of Landlord as set forth above, Tenant will provide Landlord with written notice of Landlord's default and Tenant's intent to perform such covenant or agreement, and Landlord will have 30 days within which to complete performance of the same (and Landlord will not be deemed to be in default if Landlord commences to remedy the default within the 30-day period and proceeds to cure with due diligence). For purposes hereof, "emergency" means (i) any event which poses immediate threat of injury or damage to persons or property or (ii) any event which, in Tenant's judgment, threatens Tenant's ability to open for business as scheduled or impairs or interferes with Tenant's business operations.

(c)    If Landlord fails to pay any sum to Tenant when due, and if such failure continues for 10 days after receipt of written notice from Tenant, Tenant has the right, after providing Landlord with an additional 10 days written notice, without forfeiture of its other rights hereunder, at its election, to setoff and deduct the same, together with interest thereon at the Default Rate, from Fixed Minimum Rent; provided, however, in no event shall Tenant be permitted to offset an amount equal to more than 80% of Fixed Minimum Rent per month. Notwithstanding the foregoing, Tenant's rights of offset under Section 10 hereof will be governed by Section 10.

(d)    Notwithstanding anything to the contrary, with respect to any alleged default of Landlord other than a default in the payment sums of money, if Landlord notifies the Tenant, within 30 days after Tenant's notice of such default, that Landlord disputes such alleged default and Landlord files within the 30-day period an action in a court of competent jurisdiction contesting such alleged default, then Landlord will not be deemed to be in default with respect to such matter. If a final judgment is adverse to Landlord, wholly or in part, Landlord must immediately begin to correct the matters complained of by Tenant, or that portion thereof as to which such judgment shall have been adverse to Landlord, and complete the correction within 30 days after such judgment, or if more than 30 days are reasonably required to complete such correction, correct the same within 30 days and prosecute the same to completion with reasonable diligence.

## SECTION 30. MORTGAGE SUBORDINATION

(a)    N/A.

(b)    Landlord reserves the right to request from Tenant a waiver of priority of Tenant's leasehold estate hereunder for the purpose of subordinating Tenant's leasehold estate in favor of a first mortgage lien or any refinancing or replacement of a first mortgage loan that Landlord may hereafter deem necessary or desirable. Tenant, upon such request by Landlord, will execute and deliver an agreement substantially in the form of Exhibit G or such other form as is reasonably required by Landlord's Mortgagee. The word "mortgage" means (y) any lease of land only or of land

43

Ashville, NC
Execution Version: August 16, 2011

and buildings in a sale-lease-back transaction involving all or any part of the Shopping Center, or (z) any mortgage, deed of trust or other similar security instruments constituting a lien upon all or any part of the Shopping Center, whether the same shall be in existence as of the date hereof or created hereafter, and any modifications, extensions, renewals and replacements thereof. "Mortgagee" means a party having the benefit of a mortgage, whether as lessor, Mortgagee, trustee or note-holder.

(c)    After a change in ownership of all or any portion of the Shopping Center that requires a change in the Rent payee, or assignment of this Lease by Landlord that requires a change in the Rent payee, Tenant shall have no obligation to pay Rent to the new payee until Tenant receives written notice from Landlord confirming the name and address of the new payee.

(d)    If Tenant receives a written notice from any party claiming a collateral interest in this Lease or in the Rent and, by reason thereof, a present entitlement to collect the Rent, Tenant has the right either (i) to pay Rent to such party, which payment will satisfy any and all liabilities of Tenant to Landlord with respect to such payment, without obligation on Tenant to make further inquiry but subject to such party's providing to Tenant a copy of the instrument pursuant to which such party claims entitlement and to such claim being plausible on the face of such instrument; or (ii) to withhold Rent from Landlord and pay same to an escrow agent or a court pending the determination by a court of competent jurisdiction of the entitlement thereto.

(e)    Tenant agrees to use reasonable efforts to simultaneously give the Landlord's Mortgagee, a copy of any notice of default served upon the Landlord, provided that prior to such notice Tenant has been notified in writing of the address of such Mortgagee. Tenant further agrees that the Mortgagee shall have the same right to cure said default during the same time period as Landlord is granted under the Lease. Failure to give such notice to such Mortgagee shall not constitute a default under this Lease or create any liability upon Tenant for such failure.

(f)    With reference to any assignment by Landlord of the Rents payable hereunder, which assignment is made to the holder of a mortgage or ground lease on property which includes the Premises, Tenant agrees:

(i) that the execution thereof by Landlord, and the acceptance thereof by Landlord, and the acceptance thereof by the holder of such mortgage shall not be treated as an assumption by such holder or ground lessor of any of the obligations of Landlord hereunder, unless such holder shall succeed to Landlord's interest under the Lease; and

(ii) that, except as aforesaid, such holder shall be treated as having assumed Landlord's obligations hereunder upon foreclosure of such holder's mortgage and the taking of possession of the Premises.

## SECTION 31. NO WAIVER

No waiver by either party of any of the terms, covenants, provisions or conditions in this Lease, and no waiver of any legal or equitable relief or remedy, will be implied by the failure of either party to assert any rights, or to declare any forfeiture, or for any other reason. No waiver of

44

any of the terms, provisions, covenants, rules and regulations herein will be valid unless it is in writing signed by both parties. No waiver by either party, or forgiveness of performance by either party in respect to one or more tenants of the Shopping Center, will constitute a waiver or forgiveness of performance in favor of Tenant, Landlord or any other tenant. The waiver or the forgiveness of performance of any one or more of the terms, provisions, conditions, rules and regulations of this Lease will not be claimed or pleaded by Tenant or Landlord to excuse a subsequent failure of performance of any of the terms, provisions, conditions, covenants, rules and regulations of this Lease.

## SECTION 32.  SURRENDER OF PREMISES

(a)     Tenant must deliver up and surrender to Landlord possession of the Premises, including all Landlord's Work (and replacements thereof) and all improvements permanently attached to the Premises during the Term, upon the expiration of this Lease, or its termination in any way, in as good condition and repair as the same are in on the Commencement Date (excepting damage by fire or other casualty which could be covered by a standard "All-Risk Coverage" or "special form" insurance policy, ordinary wear and tear, and decay, neglect, fault or default of Landlord and taking by eminent domain or conveyance in lieu thereof). Upon the expiration or earlier termination of this Lease, Tenant will deliver the keys at the office of Landlord or Landlord's agent.

(b)     Tenant has the right, while the Lease remains in effect, with Landlord's written consent not to be unreasonably withheld or delayed and subject to compliance with applicable Laws, to place a banner sign at the front of the Premises, in a place visible to Tenant's customers, directing Tenant's customer's to another store of Tenant or providing Tenant's customers with information and a telephone number. If the Lease has terminated (through no fault of Tenant) or expired, then Landlord must leave the sign at the front of the Premises until the earlier to occur of (1) 90 days after Tenant vacates the Premises; or (2) a new tenant (or Landlord in anticipation of a new tenant) commences improvements to the Premises.

## SECTION 33.  SHORT FORM LEASE, COMMENCEMENT DATE AGREEMENT

(a)     Neither party may record this Lease, but if either party requests that a Short Form Lease or a Memorandum of Lease be recorded, then the other party must execute such Agreement, which Agreement will contain the information set forth below. The Short Form Lease or Memorandum of Lease will describe the Premises and the rights herein demised, the Term, and the extension rights (if any), any exclusive granted to Tenant and other provisions hereof reasonably requested by Tenant. The failure to record the Short Form Lease or Memorandum of Lease will not affect or impair the validity and effectiveness of this Lease, and this Lease will control in the event of any inconsistency between the two.  The party requesting that the Short Form Lease or Memorandum of Lease be recorded must prepare and pay all costs of recording the Short Form Lease or Memorandum of Lease, and the other party must execute at any and all times such Short Form Lease or Memorandum of Lease and any other instruments as may be reasonably required for such recording within thirty (30) days' after receipt of said documents.

45

(b)     At the time that the Commencement Date is established, the parties will promptly enter into a Commencement Date Agreement, setting forth the actual commencement and expiration of the Initial Term and any extensions thereof, the then current Gross Leasable Area of the Premises and the corresponding Rent.

**SECTION 34.  NOTICE**

Any notices, statements, acknowledgments and consents required to be given by or on behalf of either party to the other must be in writing and must be given by Certified U.S. Mail, or by private courier service requiring a signed acknowledgment of delivery (such as Federal Express) addressed as follows:

| | |
|---|---|
| if to the Landlord at: | EDENS & AVANT FINANCING II LIMITED PARTNERSHIP<br>c/o E & A Investments LP<br>Post Office Box 528<br>Columbia, South Carolina  29202<br>Attn: Legal Department |
| Express Delivery: | EDENS & AVANT FINANCING II LIMITED PARTNERSHIP<br>c/o E & A Investments LP<br>Attn:  Legal Department<br>1221 Main Street, Suite 1000<br>Columbia, South Carolina  29201 |
| RENT PAYMENTS TO: | EDENS & AVANT FINANCING II LIMITED PARTNERSHIP<br>Department #2079<br>PO Box 536856<br>Atlanta, Georgia 30353-6856 |
| if to the Tenant at: | Jo-Ann Stores, Inc.<br>5555 Darrow Road<br>Hudson, Ohio 44236<br>Attn:  Senior Vice President, Real Estate |
| with a copy to: | Jo-Ann Stores, Inc.<br>5555 Darrow Road<br>Hudson, Ohio 44236<br>Attn:  Senior Legal Counsel |

or at such other address of Landlord or of Tenant as may be specified by written notice.  Any notice sent by certified mail is deemed to have been served three (3) days after deposit thereof with the U.S. Postal Service. Any notice sent by courier service is deemed to have been served as of the next business day (excluding Saturdays, Sundays, and any federal government holidays) if sent via

46

overnight delivery. Notwithstanding the foregoing, the time period in which a response to any such notice must be given, or in which an action must be commenced or be taken, will commence to run on the date of receipt by the addressee thereof as shown on the return receipt or acknowledgment of delivery for such notice. Rejection or other refusal to accept, or the inability to deliver because of changed address of which no notice was given, will be deemed to be receipt of notice as of the date of such rejection, refusal or inability to deliver. Notwithstanding anything to the contrary, the parties may give facsimile notice of the need of emergency repairs, followed promptly by notice as required above.

## SECTION 35.  HAZARDOUS MATERIALS

(a)      Tenant must not cause or permit the escape, disposal or release of any Hazardous Material (as hereafter defined) in violation of Law. Tenant must not allow the storage or use of Hazardous Material in any manner not sanctioned by Law, nor allow to be brought into the Shopping Center any Hazardous Material except to use in the ordinary course of Tenant's business. Tenant must defend, indemnify and hold Landlord harmless from and against any and all claims, losses, liabilities, damages, penalties, fines and expenses (including, without limitation, consequential damages, cleanup and other remedial and restoration costs, fees for consultants and experts and reasonable attorneys' fees and other costs of litigation arising by reason of any of the aforesaid or any action against Tenant under this indemnity) arising directly or indirectly from, out of or by reason of the release of Hazardous Materials in the Shopping Center occurring during the Term caused by Tenant or Tenant's contractors, agents or employees or persons acting under Tenant. It is a condition to indemnification that Tenant receives notice of any claim by Landlord promptly after Landlord first has knowledge thereof. This indemnity survives the expiration or earlier termination of the Term.

(b)      Landlord must not cause or permit any Hazardous Material in violation of Laws to exist in the Premises. In addition, Landlord must not cause or permit any Hazardous Material to be sold, used, stored, brought upon or disposed of (collectively a "Use") in, on, under or about the Shopping Center (including the Premises, before the Delivery Date) without in each case: (i) obtaining all necessary permits required in connection therewith; and (ii) complying with all permit requirements; and (iii) otherwise taking all appropriate steps and making adequate arrangements to assure that such Use is in the ordinary course of business in the operation of the Shopping Center. Such Use must be performed safely and without contamination of the Shopping Center and the Shopping Center Site or any portion thereof and fully in compliance with all applicable Laws. Landlord must defend, indemnify and hold Tenant harmless from and against any and all claims, losses, liabilities, damages, penalties, fines and expenses (including, without limitation, consequential damages, cleanup and other remedial and restoration costs, fees for consultants and experts and reasonable attorneys' fees and other costs of litigation arising by reason of any of the aforesaid or any action against Landlord under this indemnity) arising directly or indirectly from, out of or by reason of the release of Hazardous Materials in the Shopping Center occurring during the Term caused by Landlord or Landlord's contractors, agents or employees or persons acting under Landlord. It is a condition of this indemnification that Landlord receive notice of any such claim by Tenant promptly after Tenant first has knowledge thereof. This indemnity survives the expiration or early termination of this Lease.

47

(c)     If either party receives any written notice of Hazardous Discharge or Environmental Complaint that specifically identifies the Premises or the Common Areas or describes a condition that materially impairs or could materially impair the occupancy, use and enjoyment of the Premises, then the receiving party must give immediate oral and written notice of same to the other party detailing all relevant facts and circumstances within the knowledge of the receiving party (provided, however, Landlord shall only be required to give Tenant such notice if the Hazardous Discharge or Environmental Complaint that specifically identifies the Common Areas describes a condition that is a health hazard under any Laws or materially impairs or could materially impair the occupancy, use and enjoyment of the Premises or the Protected Area).

(d)     If Tenant's use, occupancy and enjoyment ("Occupancy") of the Premises is materially interfered with by reason of this existence or remediation of any Hazardous Material located on, in or under the Shopping Center or on the Shopping Center Site (except for any Hazardous Material used, or release caused, by Tenant), then (i) throughout such period of interference, a fair and just proportion of the Rent and other charges payable (taking into account the nature of the interference to Tenant's Occupancy), will be abated, and (ii) if Tenant's Occupancy is substantially impaired for three (3) months or more, then Tenant has the right to terminate this Lease by giving written notice to the other of its election to do so, whereupon this Lease will automatically terminate and end effective as of the date of such notice and neither party will have any further obligations hereunder accruing after the date Tenant surrenders the Premises to Landlord in the condition required under this Lease. Landlord may nullify Tenant's notice of termination if Landlord is diligently correcting the Hazardous Material interference and completes the job in accordance with all applicable governmental laws, codes, regulations and requirements within three months after the date of Tenant's termination notice. The abatement provided in clause (i) of this subsection will continue throughout the period of such correction by Landlord.

(e)     "Hazardous Material" means (i) any waste, pollutant, material, substance or contaminant which is or becomes listed, defined, or classified as having properties harmful to health, safety, or indoor or outdoor environment; and (ii) any substance or material that is or becomes regulated by any Public Entity by reason of the hazardous or toxic qualities of such substance or material; and (iii) any other toxic or hazardous substance, regardless of whether the same is regulated, including, without limitation, so-called "black mold," any mycotoxin, and any other mold capable of producing a toxic or allergic reaction in humans (including, without limitation, Stachybotrys, S. atra, S. chartarum, Aspergillus, Fusarium, Coccidioides). Without limiting the generality of the forgoing, Hazardous Material includes oil, petroleum, petroleum-fraction or petroleum-derived substance; urea formaldehyde foam insulation; asbestos and asbestos-containing materials; and any electrical equipment that contains any oil or dye-electric fluid containing polychlorinated biphenyls.

(f)     "Hazardous Discharge" means the presence, use, release, dispersal, emission, spill, discharge or cleanup of any Hazardous Material (i) on or about or emanating from the Shopping Center or the Shopping Center Site, or (ii) arising out of the use and occupancy of or operations within the Shopping Center, or (iii) caused by Landlord or Tenant or other occupant of the Shopping Center or the employees, contractors, invitees or agents thereof.

48

(g)    "Environmental Complaint" means any complaint, investigation, order, citation, or action with regard to any Hazardous Discharge, air emissions, water discharges, noise emissions or any other environmental, health or safety matter pertaining to or emanating from the Shopping Center from any Public Entity.

This Section 35 survives the expiration or termination of this Lease.

## SECTION 36.  LIMITATION OF LANDLORD'S LIABILITY

(a)    If Landlord fails to perform any covenant, term or condition on Landlord's part to be performed, and as a consequence of such default Tenant recovers a money judgment against Landlord, such judgment will be satisfied only out of (i) the proceeds of sale received upon execution of such judgment and levy thereon against the right, title and interest of Landlord in the Shopping Center, (ii) the rents and other income from such property receivable by Landlord, and (iii) the consideration received by Landlord for the sale or other disposition of all or any part of Landlord's right, title and interest in the Shopping Center, which consideration is deemed to include any assets at any time after such sale or disposition held by Landlord having a value not exceeding that of the proceeds of such sale or other disposition, and Landlord shall not be liable for any deficiency.

(b)    Notwithstanding subsection (a), in the event of fraud on the part of Landlord the aforesaid limitation on liability is inapplicable.  This Section will not be deemed to deny to Tenant, or limit its right to obtain, injunctive relief or specific performance of Landlord's covenants under this Lease or to avail itself of any other right or remedy (not involving a personal liability of Landlord in excess of the limits of personal liability fixed by this Section) which may be accorded Tenant by Law or under this Lease by reason of Landlord's failure to perform its obligations thereunder including, but not limited to, the rights and remedies granted Tenant under Section 29.

## SECTION 37.  DELIVERY OF SITE PLAN

Within 30 days after receipt of Tenant's written request therefor, Landlord must provide Tenant with a copy of the most current available site plan of the Shopping Center available to Landlord, which must reflect:  (a) the Gross Leasable Area of the Shopping Center as actually constructed; (b) the names and location and the Gross Leasable Area of the premises occupied by the respective tenants thereof; and (c) those premises in the Shopping Center, if any, which are not then currently occupied and open for business.

## SECTION 38.  INTENTIONALLY OMITTED

## SECTION 39.  ENTIRE AGREEMENT; WRITING REQUIRED

This Lease contains all of the agreements of the parties with respect to any matter covered or mentioned in this Lease, and no prior agreement, understanding or representation pertaining to any such matter will be effective for any purpose. No provision of this Lease may be changed, deleted, modified or amended, except by an agreement in writing signed by the parties.

49

## SECTION 40.  OPERATING COVENANT

Tenant will open for business from the Premises as a prototypical Jo-Ann Fabrics store as operated in the majority of Tenant's other locations within 90 days after the Commencement Date and will continue to operate from the Premises during Tenant's normal business hours as are operated by the majority of Tenant's other locations for a period of one day (the "Operation Period"), but for reasons other than an assignment or subletting (in no event longer than 90 days), damage and destruction, remodeling (in no event longer than 90 days), eminent domain, Unavoidable Delays, or such other right as provided for under this Lease or under law or equity. After the Operation Period, Tenant is under no duty or obligation, either expressed or implied, to open, reopen, remain open, operate, or thereafter to continually conduct business from the Premises at any time during the Term. After the Operation Period, Tenant's failure to open, reopen, remain open, operate, or thereafter to continually conduct business from the Premises will not in any way be deemed an event of default under this Lease, nor will such failure otherwise entitle Landlord to begin or to maintain any action, suit or proceeding, whether in law or in equity, relating in any way to Tenant's failure to open, reopen, remain open, operate, or thereafter to continually conduct business from the Premises.

If Tenant ceases to operate its business from the Premises for 30 consecutive days, for reasons other than an assignment or subletting (but in no event more than 60 days), damage and destruction, remodeling (but in no event more than 60 days), eminent domain, Unavoidable Delays, or such other right as provided for under this Lease or under law or equity, then Landlord has the right to terminate the Lease upon 30 days prior written notice. If Landlord terminates the Lease, it must do so by written notice to Tenant. Tenant will have the right, within 30 days of receipt of Landlord's termination notice, to advise Landlord that Tenant will reopen for business from the Premises. If Tenant elects to reopen for business, then it must do so within 60 days of its notice to Landlord; otherwise, Tenant's notice will be null and void.  Notwithstanding anything contained herein to the contrary, Tenant shall continue to be obligated to pay all Rent as and when due until the earlier of (i) the effective date of termination and Tenant's vacation and delivery of the Premises to Landlord in accordance with the terms of this Lease or (ii) the expiration of the Term.

## SECTION 41.  APPLICABLE LAW AND CONSTRUCTION

The laws of the state within which the Premises are located govern the validity, performance and enforcement of this Lease without regard to its conflicts of law principles.  If one or more of the provisions of this Lease is held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability will not affect or impair any other provision of this Lease, and this Lease will be construed as if such invalid, illegal or unenforceable provision had not been contained herein.  The submission of this document for examination does not constitute an offer to lease, or a reservation of or option for the Premises, and this Lease becomes effective only upon execution and delivery thereof by both Landlord and Tenant. This Lease has been negotiated by Landlord and Tenant and will not be deemed to have been prepared by either Landlord or Tenant, but by both equally. All prior negotiations, considerations, representations and understandings between the parties are and shall be deemed to be incorporated and merged into this Lease and shall not be construed as having survived the execution hereof so that only the provisions of this Lease shall govern the respective rights and obligations of the parties hereto to the same effect as if all such

50

negotiations, considerations, representations and understandings shall have never been made or given by either party to the other party hereto.

## SECTION 42.  UNAVOIDABLE DELAYS

Except as otherwise expressly provided herein, if either party is delayed or hindered in or prevented from the performance of any obligation required hereunder by Unavoidable Delay, the time for performance of such obligation shall be extended for the period of the delay, provided that Unavoidable Delay will not excuse prompt and timely payments, including Rent, when due under this Lease except when (A) the Commencement Date is delayed by reason of Unavoidable Delay; or (B) such payment is excused pursuant to other provisions of this Lease.  However, no delay will be excused by this section unless (1) the delayed party notifies the other party in writing of the delay within 21 days of the event giving rise to such delay; (2) the delayed party has exhausted all other resources available at reasonable costs to avoid such delay; and (3) the delayed party diligently pursues completion of the activity that was delayed. Notwithstanding anything to the contrary in this Lease, under no circumstances will Unavoidable Delay extend the time for performance of any obligation by more than 90 days.

## SECTION 43.  REASONABLE CONSENT

Wherever either party's consent or approval is required, such consent or approval must not be unreasonably or arbitrarily withheld or delayed, unless otherwise expressly stated.

## SECTION 44.  NO PARTNERSHIP

Landlord and Tenant acknowledge that neither of them in any way or for any purpose becomes a partner or an associate of the other in the conduct of Tenant's business, the operation of the Shopping Center or otherwise, or a joint venture, or a member of a joint enterprise with the other.  Neither party is liable for payment of the debts or performance of any obligation of the other. The relationship is and shall be that of Landlord and Tenant.

## SECTION 45.  ESTOPPEL

Within 30 days after request, Tenant will execute and deliver to Landlord a Tenant Estoppel Certificate substantially in the form of Exhibit H. Within 30 days after request, Landlord will execute and deliver to Tenant a written instrument certifying that this Lease is unmodified and in full force and effect, or if there has been any modification, that this Lease is in full force and effect as modified and stating all such modifications; specifying the dates to which Rent has been paid; stating whether there exists any default in the performance by either party under any provision of this Lease; and certifying as to such other matters as Tenant reasonably may request. With regard to any estoppel certificates related to this Lease, the Lease will take precedence over the contents of such estoppel certificates, should a conflict arise. Landlord shall be required to pay Tenant under this Lease a non-refundable fee in the amount of $1,500.00 for each new Estoppel Certificate and each new SNDA requested from and provided by Tenant to cover Tenant's administrative, legal and other costs and expenses incurred in processing, negotiating and drafting said documents and Tenant is hereby authorized to deduct said amount from Fixed Minimum Rent next due.

51

## SECTION 46.  QUIET ENJOYMENT

Landlord represents and warrants to Tenant that Landlord is well seized of fee simple title to the Premises and the Shopping Center and has full power and authority to execute and deliver this Lease. Landlord covenants to Tenant that Tenant shall at all times have peaceable and quiet enjoyment and possession of the Premises and of the rights granted hereunder without any manner of hindrance from Landlord or any other person or persons, if Tenant performs all the covenants and agreements to be performed on Tenant's part.

## SECTION 47.  HOLDING OVER

If, at the expiration of the Term, Tenant continues to occupy the Premises, such holding over shall not constitute a renewal of this Lease, but Tenant shall be a tenant from month to month, at the Rent and otherwise under the same terms and conditions as in effect immediately prior to the commencement of the month to month tenancy, and either party may terminate the Lease during said month to month tenancy upon ninety (90) days prior written notice to the other party; provided, however, Landlord shall not specify a Lease termination date to be during the period commencing September 1 and ending on the immediately following January 31.

## SECTION 48.  BROKERS

Each party represents to the other party that it has not dealt with any party with regard to the Premises or this Lease, except that The Shopping Center Group LLC represents Tenant in this transaction. Landlord will pay Tenant's broker pursuant to a separate agreement between Landlord and Tenant's broker and it is agreed that if Landlord does not pay Tenant's broker or dispute that payment is due within thirty (30) days of notice of the same, Tenant shall have the right to pay Tenant's broker for fees due and set-off said amounts against Fixed Minimum Rent due Landlord. Each party will defend, indemnify and hold the other party harmless from and against any loss, cost, liability and expense, including reasonable attorney's fees, arising out of a breach of its representation in this section.

## SECTION 49.  INTENTIONALLY OMITTED.

## SECTION 50.  CLAIMS LIMITATION

All actions or claims by Landlord for Rent shall be barred three years after the end of each Lease Year or Partial Lease Year. All actions or claims by Tenant for recovery of excess payments of Rent shall be barred three years after the end of each Lease Year or Partial Lease Year, except that in the case of any component of Additional Rent, the same will not be barred until three years after Tenant's receipt of Landlord's annual reconciliation statement furnished with respect to that Lease Year or Partial Lease Year. The forgoing limitations shall not apply in the event of fraud or willful mis-statement of the amounts so stated or in the event of any sum due a party in the event of a breach of Section 35.

Ashville, NC
Execution Version: August 16, 2011

## SECTION 51.  CAPTIONS

Any paragraph titles or captions contained in this Lease are for convenience only and do not define, limit or otherwise modify the scope or intent of this Lease.

## SECTION 52.  VARIATION IN PRONOUNS

All the terms and words used in this Lease, regardless of the number and gender in which they are used, will be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context or sense of this Lease or any paragraph or clause herein may require, the same as if such words had been fully and properly written the number and gender.

## SECTION 53.  SECTION REFERENCES

All references to any section number(s) refer to the Section contained in this Lease.

## SECTION 54.  BINDING EFFECT OF AGREEMENT

This Lease and all of the covenants, conditions, provisions and restrictions herein inures to the benefit of and binds the heirs, executors, administrators, devisees, legatees, personal representatives, successors and assigns, respectively, of Landlord and Tenant.

## SECTION 55.  ATTORNEY'S FEES

If Landlord or Tenant is required to enforce this Lease, then the non-prevailing party must pay to the prevailing party the prevailing party's arbitration costs (if any), court costs and reasonable attorney's fees. This provision applies to court costs and attorneys fees incurred in any trial and appellate courts.

## SECTION 56.  OFAC WARRANTY

Each party represents and warrants to the other party that the representing party (a) is not acting, directly or indirectly, for or on behalf of any person, group, entity, or nation named by any Executive Order or the U.S. Treasury Department as a terrorist, "Specially Designated National and Blocked Person," or other banned or blocked person, entity, nation, or transaction pursuant to any law, order, rule, or regulation that is enforced or administered by the Office of Foreign Assets Control, and (b) is not engaged in this lease transaction, directly or indirectly, on behalf of, or instigating or facilitating this lease transaction, directly or indirectly, on behalf of any such person, group, entity or nation. The breaching party must defend, indemnify, and hold harmless the other party from and against all claims, damages, losses, risks, liabilities, and expenses (including reasonable attorney's fees and costs) arising from or related to any breach of the forgoing representation.

**SECTION 57.  LANDLORD'S SUSTAINABILITY INITIATIVES AND PRACTICES**

Tenant shall adhere at all times during the Lease Term to reasonable rules, regulations, specifications, and related programs from time to time implemented by Landlord to assure the sustainability of the Shopping Center operation in accordance with the terms of this Lease (collectively, the "Shopping Center Sustainability Practices") provided said Shopping Center Sustainability Practices do not limit Tenant's rights under this Lease or expand its obligations hereunder.

The Shopping Center Sustainability Practices may from time to time be implemented by the promulgation of uniformly-applied rules and regulations, tenant handbook, construction specifications and materials manual, and lists of recommended vendors in order to assist Tenant's compliance herewith, or any combination thereof.

In furtherance of the foregoing, notwithstanding anything contained in the Lease to the contrary:

(a)     Landlord reserves the right to designate, from time to time, a third-party trash collection/recycling vendor for the Shopping Center or portions thereof, in which event Tenant shall, as Landlord shall so designate, either (i) reimburse Landlord, as additional rent, based on Tenant's pro rata share as it relates to the square footage of gross leasable areas of all tenants utilizing the dumpster or container service (not the gross leasable area of the entire Shopping Center) or on such other basis as Landlord shall reasonably determine, or (ii) Tenant shall contract directly with such designated vendor for such services and pay such vendor directly, in lieu of Landlord reimbursement (it is agreed and understood, that this subsection "(a)" is optional, at Tenant's discretion, notwithstanding anything to the contrary in this Lease);

(b)     Fixed Common Area Cost shall include those costs related to any Shopping Center Sustainability Practices;

(c)     Landlord's insurance shall include endorsements in order to repair, replace and re-commission the Shopping Center in order to promote the Shopping Center Sustainability Practices;

(d)     In the event tax abatements, credits, reductions or the like (the "Tax Credit") are received as a result of the Shopping Center Sustainability Practices, and Tenant has not reimbursed Landlord for the expenses incurred with regard to the same (it is agreed and understood that provided Tenant has paid its Fixed Common Area Costs, Tenant shall be considered to have "reimbursed Landlord for the expenses incurred with regard to the same"), Tenant's share of Taxes shall be calculated as if no such Tax Credit was received; and

(e)     Any work performed by Tenant at the Shopping Center shall be performed in good and workmanlike manner, in accordance with all applicable laws and regulations and the Shopping Center Sustainability Practices.  Any and all subcontractors must

54

expressly provide that any such subcontract shall be performed in compliance with any and all applicable Shopping Center Sustainability Practices (it is agreed and understood, that this subsection "(e)" is optional, at Tenant's discretion, notwithstanding anything to the contrary in this Lease).

## SECTION 58. EARLY TERMINATION OPTION:

Notwithstanding anything to the contrary in this Lease, if Tenant's annual Gross Sales for the Premises during the twelve (12) month period commencing on the first (1st) day of the thirty-seventh (37th) month of the Term and ending on the last day of the forty-eight (48th) month of the Term ("Threshold Period"), do not exceed $▮▮▮ per square foot of the Gross Leasable Area of the Premises (the "Threshold Sales"), then Tenant may terminate this Lease by giving Landlord twelve (12) months written notice of termination ("Notice to Terminate"), which notice must be given within twelve (12) months after the expiration of the Threshold Period , and the Lease shall terminate on the date which is twelve (12) months following the date of such Notice to Terminate. If the Lease terminates pursuant to this Section 58, within thirty (30) days of the termination date, then Tenant agrees to reimburse Landlord for one hundred percent (100%) of the unamortized Tenant Allowance and one hundred percent (100%) of the unamortized Tenant's real estate broker commission paid by Landlord for the tenancy established under this Lease.

Notwithstanding anything in this Lease to the contrary, in the event the Premises is closed for any reason at any time during the Threshold Period (other than due to Unavoidable Delay, damage and destruction, eminent domain or permissible repairs or renovation to the Premises, which closures are referred to as "Allowed Closures(s)") ("Threshold Sales Voiding Condition"), Tenant shall be deemed to have waived its right to terminate this Lease under this Section 58 and the termination right established herein shall be null and void and of no further force and effect. The remedy set forth in the immediately preceding sentence shall be Landlord's exclusive remedy should a Threshold Sales Voiding Condition occur. If there is an Allowed Closure through the end of the Threshold Period, then, for purposes of this provision, Tenant's Gross Sales for each day of Allowed Closure shall be Tenant's Gross Sales in the same day in the prior calendar year (or, if Tenant was not open for business in the prior calendar year, then from the same day two (2) years prior to the day in question.

Notwithstanding anything in this Lease to the contrary, if Tenant's annual Gross Sales for the Premises, during any consecutive twelve (12) month period prior to the forty-eighth (48th) month of the Term exceed $130.00 per square foot of the Gross Leasable Area of the Premises, then Tenant's right to terminate this Lease established in this Section 58 shall be null and void as of the date said amount is exceeded and, notwithstanding anything to the contrary in this Lease, the balance of the construction allowance shall be due and payable to Tenant within thirty (30) days of such date provided all other conditions to the payment of the construction allowance has been satisfied.

*[Signatures Follow on Next Page]*

55

In witness whereof, the parties have signed this Lease as of the date listed above.

LANDLORD:

**EDENS & AVANT FINANCING II LIMITED PARTNERSHIP,** a Delaware limited partnership

By:  E & A Financing II, LLC a Delaware limited liability company, General Partner

By: Edens & Avant Investments Limited Partnership, a Delaware limited partnership, its sole member

By:  Edens & Avant Administrative LLC, a Delaware limited liability company, its sole general partner

By: _____
Jodie W. McLean
President & Chief Investment Officer

Employer Identification
Number: _57-1066367_

TENANT:
**JO-ANN STORES, INC.**

By: _____
James Kerr
Executive Vice President and
Chief Financial Officer

And,
By: _____
David Goldston
Senior Vice President, General Counsel and
Secretary

56

Ashville, NC
Execution Version: August 16, 2011

STATE OF SOUTH CAROLINA)

                            ) SS

COUNTY OF BUNCOMBE)

     BEFORE ME, a Notary Public in and for said County and State, personally appeared Jodie W. McLean, who did sign the foregoing instrument on behalf of EDENS & AVANT FINANCING II LIMITED PARTNERSHIP and that the same is her free act and deed of the limited liability company and personally and as such authorized representative.

     IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at Columbia , SC , this 26 day of August , 2011.

_Margaret a Goodfell_
NOTARY PUBLIC

STATE OF OHIO         )

                            ) SS

COUNTY OF SUMMIT    )

     BEFORE ME, a Notary Public in and for said County and State, personally appeared **JO-ANN STORES, INC.,** an Ohio corporation, by James Kerr, its executive vice president and chief financial officer, and David Goldston, its senior vice president, general counsel and secretary, who acknowledged before me that they did sign the foregoing instrument on behalf of said corporation and that the same is their free act and deed personally and as such officers.

     IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at Hudson, Ohio, this 19ᵗʰ day of August, 2011.

_Bonita Marie Caesar_
NOTARY PUBLIC

**BONITA MARIE CAESAR**
Notary Public, State of Ohio
My Commission Expires
August 17, 2012

57

Ashville, NC
Execution Version: August 16, 2011

EXHIBIT A
LEGAL DESCRIPTION

BK 1895  PG  477

## EXHIBIT A

### Overlook

A fee simple interest in and to the following-described Tract I less and except the following-described Tract II; a leasehold interest in and to the following-described Tract II; and an easement described below as Tract III:

#### Tract I:

BEGINNING at a stake which stands in the northeastern margin of the 100 foot right-of-way of U.S. Highway 74 where the same is intersected by the southern line of that certain tract or parcel of land conveyed to Asheville Federal Savings and Loan Association by deed recorded in Deed Book 1180, Page 434, Buncombe County, North Carolina Registry (the same being the beginning corner of the tract described in Deed Book 1714, Page 393, Buncombe County Registry), and run thence from said beginning corner thus established with the southeastern boundary line of the Asheville Federal Savings and Loan Association property, North 58 deg. 32' 42" East 184.70 feet to a point; thence, North 33 deg. 21' 58" West 156.00 feet to a pk nail; thence, North 43 deg. 13' 57" East 21.72 feet to an iron pipe; thence North 57 deg. 12' 28" East 17.54 feet to an iron pipe; thence, North 59 deg. 28' 35" East 316.28 feet to an iron pipe; thence, South 72 deg. 39' 00" East 58.74 feet to an iron pipe located in the new western right-of-way boundary of Interstate 240; thence, along the said western right-of-way boundary of Interstate 240, the following eight courses and distances, to wit:

1) South 72 deg. 25' 18" East 186.37 feet to a concrete right-of-way monument;
2) South 21 deg. 11' 05" East 134.13 feet to a concrete right-of-way monument;
3) South 18 deg. 40' 26" East 205.94 feet to a concrete right-of-way monument;
4) South 16 deg. 30' 36" East 180.33 feet to a concrete right-of-way monument;
5) South 15 deg. 40' 45" East 522.40 feet to a concrete right-of-way monument;
6) South 76 deg. 54' 38" West 24.40 feet to a concrete right-of-way monument;
7) South 18 deg. 36' 05" East 64.88 feet to a concrete right-of-way monument; and
8) South 18 deg. 45' 33" East 93.89 feet to an iron pipe, said iron pipe being located North 58 deg. 00' 53" West 249.43 feet from a N.C.G.S. monument "EMORY" having NAD 27 coordinates of N. = 684,041.74 and E. = 953,678.74 and said point also being the Northeast corner of that tract described in Deed Book 1722 Page 58 of the Buncombe County Registry; thence along the northern lines of said tract described in Deed Book 1722, page 58, North 45 deg. 25' 47" West 51.65 feet to an iron pipe; South 63 deg. 06' 17" West 65.00 feet to an iron pipe; South 64 deg. 30' 46" West 90.86 feet to an iron pipe; and South 70 deg. 25' 05" West 95.75 feet to an iron pipe in the Northeastern margin of the 100 foot right-of-way of U.S. Highway 74 (South Tunnel Road); thence along said right-of-way, North 36 deg. 44' 43" West 168.97 feet to a point and North 37 deg. 41' 45" West 659.04 feet to a point, said point being the Southwestern corner of Deed Book 1752 Page 556 of the Buncombe County Registry, thence along and with the southern, eastern and northern boundaries of said tract described in Deed Book 1752, at Page 556, along an arc of a curve to the left an arc distance of 19.45 feet to a point (said arc having a radius of 50.00 feet and being subtended by a chord bearing North 69 deg. 52' 30" East a chord distance of 19.33 feet); along an arc of a curve to the right an arc distance of

BK 189( )PG  479

## (ATTACHMENT)

57.06 feet to a point (said arc having a radius of 175.00 feet and being subtended by a chord bearing North 68 deg. 04' 30" East a chord distance of 56.81 feet); along an arc of a curve to the left an arc distance of 36.74 feet to a point (said arc having a radius of 20.00 feet and being subtended by a chord bearing North 24 deg. 47' 30" East a chord distance of 31.79 feet); North 27 deg. 50' 00" West 232.58 feet to a point; thence along an arc of a curve to the left an arc distance of 32.84 feet to a point (said arc having a radius of 20.00 feet and being subtended by a chord bearing North 74 deg. 52' 30" West a chord distance of 29.27 feet); and South 58 deg. 05' 00" West 106.44 feet to a point; thence along an arc of a curve to the left an arc distance of 17.82 feet to a point (said arc having a radius of 40.00 feet and being subtended by a chord bearing South 45 deg. 19' 30" West a chord distance of 17.68 feet), said point being in the Northeastern margin of the 100 foot right-of-way of U.S. Highway 74; thence along said right-of-way, North 37 deg. 41' 45" West 24.33 feet to the point of BEGINNING, and containing 13.78 acres or 600,522.68 square feet as surveyed for Edens & Avant Properties Limited Partnership by Ray E. Anders & Associates, Inc., dated January 19, 1994, last revised January 12, 1998. File # 6560.

### Tract II:

The following-described parcel is a portion of the above-described 13.78 acre tract, and is held by Edward I. Greene and wife, Joyce C. Greene pursuant to the terms of that long term lease agreement by and between Centennial American Properties, Ltd. as tenant, and Edward I. Greene and wife, Joyce C. Greene, as landlord, dated October 1, 1988 and recorded in Deed Book 1550, Page 197, Buncombe County Registry, which lease has been assigned to Overlook Associates Limited Partnership, which lease has been amended by Amendment of Lease Agreement and Agreement, dated June 13, 1989, and recorded in Deed Book 1565, Page 676, Buncombe County Registry, all of which has been transferred to Asheville Retail Partners, A.S.C. General Partnership by Deed recorded in Deed Book 1714 at Page 393, Buncombe County Registry, and as further amended by First Amended and Restated Ground Lease by and between Edens & Avant Properties Limited Partnership and Edward I. Greene dated as of January 16, 1998.

BEGINNING at a point, said point being the easternmost corner of the Asheville Federal Savings and Loan Association tract as described in Deed Book 1180, Page 434, Buncombe County Registry, and going thence from said beginning point thus established, North 58 de. 32' 42" East 371.88 feet to a point; thence, North 55 deg. 34' 46" West 55.38 feet to an existing pk nail; thence, North 31 deg. 21' 46" West 34.08 feet to a former right-of-way concrete monument (now a pk nail); thence, North 22 deg. 42' 51" East 47.99 feet to an iron pipe located in the new western right-of-way boundary of Interstate 240; thence, North 72 deg. 39' 00" West 58.74 feet to an iron pipe; thence, South 59 deg. 28' 35" West 316.28 feet to an iron pipe; thence, South 57 deg. 12' 28" West 17.54 feet to an iron pipe; thence South 43 deg. 13' 57" West 21.72 feet to an existing pk nail in the line of the property conveyed by Greene to Asheville Federal Savings and Loan Association by deed recorded in Deed Book 1180, Page 434; thence with the line of said Asheville Federal property, South 33 deg. 21' 58" East 156 feet to the point of BEGINNING, containing 1.33 acres and being the same property described in the lease recorded in Deed Book 1550, Page 197, Buncombe County Registry, as surveyed for Edens & Avant Properties Limited

-2-

Exhibit ___A___ Page __2__

BK 1895 PG 479

## (ATTACHMENT)

Partnership by Ray E. Anders & Associates, Inc. dated January 19, 1994, last revised January 12, 1998, File # 6560.

### Tract III

A nonexclusive driveway easement approximately 24 feet in width extending from the above described 13.78 acre tract in a northerly direction across the property of Asheville Federal Savings and Loan Association and the property of Edward I. Greene to the existing driveway of the K Mart Shopping Center owned by Edward I. Greene and then continuing with said existing driveway (as expanded in width to include an additional entrance lane) in a westerly direction across the aforesaid K Mart Shopping Center property of Edward I. Greene and the northernmost portion of property of Asheville Federal Savings and Loan Association to U.S. Highway 74, as shown on Exhibit A-1 of that certain Tri-Party Agreement dated August 30, 1988 by and among Centennial American Properties, Ltd. Asheville Federal Savings and Loan Association and Edward I. Greene, recorded in the Office of the Register of Deeds for Buncombe County, North Carolina, in Book 1550 at Page 159; said driveway easement being for the uses and purposes described in said Tri-Party Agreement as amended by subsequent amendment agreement recorded in Book 1550 at Page 176, Buncombe County Registry and as further amended by Amendment of Lease and Agreement dated June 13, 1989 and recorded in Book 1565 at Page 676, Buncombe County Registry, and Agreement dated June 13, 1989 and recorded in Book 1565 at Page 685, Buncombe County Registry, including without limitation access for the above described 13.78 acre tract to and from U.S. Highway 74.

-3-

Exhibit ___A___ Page 3

EXHIBIT B
SITE PLAN

# EXHIBIT B



EXHIBIT C

Intentionally omitted.

EXHIBIT C-1

Intentionally omitted.

Ashville, NC
Execution Version: August 16, 2011

## EXHIBIT D
## TENANT'S PLANS AND SPECIFICATIONS

To be delivered post execution

EXHIBIT D-1
TENANT'S SIGN PLANS

To be delivered post execution

EXHIBIT E
PROJECT COORDINATION GUIDELINES

Intentionally omitted

EXHIBIT F

The Exclusive and Prohibited Uses of other tenants

Ashville, NC
Execution Version: August 16, 2011

EXHIBIT F

OVERLOOK VILLAGE EXCLUSIVES AND USE RESTRICTIONS

- No other occupant shall be permitted to sell pizza for on or off premise provided, however, the foregoing shall not be applicable to any occupant whose sale of prepared pizza constitutes less than ten percent (10%) of its gross sales.

- In no event shall the Shopping Center or any portion thereof be used as of or for a movie theater (except as shown on the Site Plan); auditorium; meeting hall, bingo hall or a place of public assembly; library; sale or service of automobiles or other vehicles; bar serving alcoholic beverages except as incidental to a restaurant; funeral parlor; massage parlor; discotheque; dance hall (or otherwise for musical/dance reviews or topless/nude shows); karate; gymnasium; skating rink; car wash; off-track betting establishment; game room; amusement arcade, gallery or store; pinball arcade; so-called "flea market"; store selling primarily distressed or damaged merchandise; pool room; bowling alley; health club or spa; so-called "head shop"; night club; school; gun range; or any business or use which emits nuisance, emits loud noise or sounds which are objectionable; creates fire, explosive or other hazard; warehousing, except as incidental to retail business; adult book store or store selling or exhibiting sexually explicit materials (all of the foregoing collectively referred to as the "Prohibited Uses").

- The Shopping Center is and shall remain retail in character, and further, except, as otherwise below, no part of the Shopping Center shall be used for office (except as provided in Subsections 3.2.1(b) below) or residential purposes or as a theater, auditorium, meeting hall, school, church or other place of public assembly, "flea-market", gymnasium, veterinary services, overnight pet stay facilities, health club, dance hall, billiard or pool hall, massage parlor, video game arcade, bowling alley, skating rink, car wash, facility for sale, display, leasing or repair of motor vehicles, night club, adult products, adult books, or adult audio/video products (which are defined as stores in which at least ten percent (10%) of the inventory is not available for sale or rental to children under eighteen (18) years old because such inventory explicitly deals with or depicts human sexuality).

- No tenant or occupant of the Shopping Center (other than Tenant) may use, and Landlord shall not permit any other tenant or occupant of the Shopping Center to use in excess of fifteen thousand (15,000) square feet of Leasable Floor Area of its premises for the Off Price Sale of apparel and/or soft goods. For purposes of this restriction "Off-Price Sale" shall mean the retail sale or display of apparel and/or soft goods on an every day basis at prices reduced from those charged by full price retailers, such as full price department stores (i.e. J.C. Penny, Kohl's); provided, however, this definition shall not prohibit sales events by a retailer at a price discounted from the retailer's every day price. (As of the Effective Date, examples of Off Price Sale retailers include such retailers as T.J. Maxx, Marshall's Nordstrom Rack, Factory 2U, Burlington Coat, Steinmart, and Filene's Basement.)

- The Shopping Center shall not be used for any non-retail purposes (repairs, alterations and offices incidental to retailing, and banks and small loan offices, not being deemed non-retail), or for any entertainment purposes such as a bowling alley, skating rink, cinema, bar, nightclub, discotheque, amusement gallery, poolroom, health club, massage parlor or off-track betting club.



Exhibit ___F___ Page ___1___

# ROSS

3.2.1.

(a)    Prohibited Use.    Tenant has entered into this Lease in reliance upon representations by Landlord that the Shopping Center is and shall remain retail in character, and, further, except as otherwise provided in Subsections 3.2.1(b) below, no part of the Shopping Center shall be used for office (except as provided in Subsection 3.2.1(b) below) or residential purposes or as a theater, auditorium, meeting hall, school, church or other place of public assembly, "flea market," gymnasium, veterinary services, overnight stay pet facilities,  health club, dance hall, billiard or pool hall, massage parlor, video game arcade, bowling alley, skating rink, car wash, facility for the sale, display, leasing or repair of motor vehicles, night club, adult products, adult books or adult audio/video products (which are defined as stores in which at least ten percent (10%) of the inventory is not available for sale or rental to children under eighteen (18) years old because such inventory explicitly deals with or depicts human sexuality).  No ATM or similar machine shall be permitted in the Shopping Center within one hundred (100) feet of the front and side perimeter walls of the Store. Further, no restaurant or other "High Intensity Parking User" (as hereinafter defined) shall be permitted in the Shopping Center within one hundred fifty (150) feet of the front and side perimeter walls of the Store. A "High Intensity Parking User" is a tenant or occupant which requires more than five (5) parking spaces per one thousand (1,000) square feet of Leasable Floor Area in accordance with governmental regulations. The foregoing use restrictions are referred to herein as the Ross Prohibited Uses.

Overlook Village
Asheville, NC
Store 768
ARK0024.7

07/18/03

Exhibit ___F___ Page __2__

1  (b)  Notwithstanding the provisions of Section 3.2.1(a) above, the following
2 uses shall be permitted:

3  (i)  Uses permitted under tenant leases in the Shopping Center which
4 are in existence as of the Effective Date of this Lease; however, upon expiration of such tenant leases,
5 any use of a space vacated by an existing tenant shall be subject to all the provisions of this Section
6 3.2.1; and.

7  (ii)  Up to five percent (5%) of the remaining space in the Shopping
8 Center may be used by those "retail office" tenants commonly found in a first-class retail shopping
9 center, such as real estate brokers, stockbrokers and optometrists in all areas of the Shopping Center
10 except the tenant spaces in the Building of which the Store is a part. Medical and dental offices and
11 medical clinics are not "retail offices".

12  3.2.2.  Further Prohibited Uses. Landlord further agrees that those prohibited uses
13 which are set forth in Section 3.2.1(a) above and are listed in Exhibit D (collectively, the
14 "Prohibited Uses") shall not be permitted in the Shopping Center. If Landlord sells any portion of
15 the Shopping Center, Landlord shall attach and incorporate into every deed or other instruments of
16 conveyance the Prohibited Uses and the provisions of Section 15.3. Any property contiguous to any
17 portion of the Shopping Center which may be purchased, leased or otherwise controlled by
18 Landlord or any affiliate of Landlord shall be subject to all the restrictions of the Prohibited Uses
19 and Section 15.3 hereof.

20  3.3.  Grant of Common Area Use.

21  Tenant, as well as its agents, employees, customers and invitees, shall have and is granted
22 nonexclusive and undisturbed access to, and use of all Common Areas (hereinafter "easement"),
23 which easement shall be appurtenant to the Store during the entire Term of this Lease. Landlord
24 shall use commercially reasonable efforts to prevent Common Area use by other than the Shopping
25 Center's occupants and their Invitees. In no event shall Tenant or Tenant's Invitees' use of
26 Common Areas be conditioned upon payment of parking or other charges by Tenant. However,
27 notwithstanding the above, Landlord may (a) permit tenants in the Shopping Center to use the
28 sidewalk areas in front of each tenant's premises for the periodic sale of merchandise and;
29 (b) permit the periodic use of portions of the Common Areas (other than the Control Area) in the
30 Shopping Center for periodic sales or activities by civic organizations or organizations such as the
31 Girl Scouts; provided the location of any such sales or activities areas shall not be adjacent to the
32 Store and shall not interfere with ingress or egress to the Store, the operation of the Store or
33 materially interfere with the use of the Common Areas.

34  3.4.  Grant of Utility Easements.

35  Landlord hereby grants to Tenant the nonexclusive right by easement to use Utility conduits
36 serving the Store within the Shopping Center.

Overlook Village  07/18/03
Asheville, NC
Store 768
ARK0024.7



Exhibit ___E___ Page __3__

## EXHIBIT D
### Prohibited Uses

1. The Prohibited Uses as set forth in Section 3.2.1 of the Lease. — *see page 13 "prohibited use"*

Overlook Village
Asheville, NC
Store No. 768
ARK 0024.1

06/10/03

Exhibit __E__ Page __4__

# CICI PIZZA

(1)    Tenant's Exclusive. Tenant shall have the exclusive right to sell pizza for on and off premises consumption (the "Exclusive Right") within the shopping center, buildings, common areas and any land area shown or described on Exhibit "A" to the Lease (collectively, the "Shopping Center"). During the term of the Lease and any extension or renewal hereof, no portion of the Shopping Center may be leased, sold, used or occupied for the Exclusive Right other than (a) the premises leased to Tenant pursuant to the Lease (the "Leased Premises"); or (b) any portion of the Shopping Center that was, prior to the date of the final execution of the Lease by both Landlord and Tenant (the "Lease Execution Date"), leased to and occupied by another tenant of Landlord (or its predecessors(s)-in-interest) whose lease expressly permitted such use. Notwithstanding anything contained in this paragraph to the contrary, however, the Exclusive Right shall not be applicable to any tenant of or outparcel purchaser from Landlord at the Shopping Center whose sale of prepared pizza constitutes less than ten percent (10%) of its gross sales.

# SHOE CARNIVAL

## ARTICLE V

### COMPETITION AND TERMINATION

5.01. Competition. During the term of this Lease and in order to induce the Tenant to enter into this Lease, neither Landlord nor its successors and assigns, officers, directors, shareholders (holding more than 10 percent of its stock), parent, affiliated and subsidiary corporations, or affiliated parties or partners shall, directly or indirectly, use, suffer, permit, or consent to the use or occupancy of any part of the Shopping Center of which the Leased Premises are a part, as a retail shoe store selling primarily men's, women's, or children's shoes and related accessories having a floor area in excess of 3,000 sq. ft. This paragraph shall not apply to any tenants open for business on the date hereof.

This provision shall not be binding upon the Landlord unless at the time of the execution of a lease with a cotenant. Tenant is not open and operating and using at least 60% of the Leased Premises for uses permitted in Article IV. Provided, however, that the Tenant is aware that Pic N Pay Shoes are presently operating in the *Shopping Center* and that operation by Pic N Pay does not violate the terms of this paragraph.

Exhibit ___F___ Page __6__

**15.13.    Restrictions.**    The  Shopping  Center  shall  be
maintained, operated and managed as a first-class retail project in
compliance with all laws, regulations and orders and shall be used
and occupied only for normal retail uses customarily conducted in

Exhibit ___F___ Page ___1___

7/12/93

first-class shopping centers; and in no event shall the Shopping
Center or any portion thereof be used as of for a movie theater
(except as shown on the Site Plan); auditorium; meeting hall; bingo
hall or a place of public assembly; library; sale or service of
automobiles or other vehicles; bar serving alcoholic beverages
except as incidental to a restaurant; funeral parlor; massage
parlor; discotheque; dance hall (or otherwise for musical/dance
reviews or topless/nude shows); karate, gymnasium, skating rink;
car wash; off-track betting establishment; game room; amusement
arcade, gallery or store; pinball arcade; so-called "flea market";
store selling primarily distressed or damaged merchandise; pool
room; bowling alley; health club or spa; so-called "head shop";
night club; school; gun range; or any business or use which emits
offensive odors, fumes, dust or vapors; is a public or private
nuisance; emits loud noise of sounds which are objectionable;
creates fire, explosive or other hazard; warehousing, except as
incidental to a retail business; adult book store or store selling
or exhibiting sexually explicit materials (all of the foregoing
collectively referred to as the "Prohibited Uses").

# TJ MAXX

## SCHEDULE B

1. No buildings or structures other than canopies attached to store buildings, lighting equipment and directional and other signs permitted by the provisions of this lease may be built in any area of the Shopping Center other than in the areas shown on the Lease Plan as building areas. The aggregate building floor area in the area labelled OUT PARCEL B upon the Lease Plan ("Out Parcel") shall not be more than one-fourth (1/4) of the ground area of such Out Parcel, and the remainder of such Out Parcel shall be constructed and maintained only as paved parking areas, and driveways, footways and landscaping incidental thereto and no building or sign thereon shall be more than twenty (20) feet in height above the ground.

2. The areas of the Shopping Center shown on the Lease Plan as parking areas shall at all times be maintained as Parking Areas. The expression "Parking Areas" means parking spaces and driveways and footways and includes the areas shown as parking areas on the Lease Plan plus such other areas as Landlord shall from time to time designate as Parking Areas. The areas in the Shopping Center currently used for service or labelled SERVICE DRIVE upon the Lease Plan shall be maintained during the term hereof as service roads and areas (the "Service Areas"). The Parking Areas, the Service Areas, the entrances and exits of the Shopping Center and any landscaped areas within the Shopping Center are called the "Common Areas". All areas upon the Lease Plan shown as building area and each Out Parcel each shall prior to commencement of construction of buildings therein, be either maintained neatly as landscaped areas consistent with sound retail shopping center practice or maintained and operated as parking areas, and driveways and footways incidental thereto, in the same manner as Landlord is obligated under this Paragraph 2 and Paragraph 7 hereof to maintain and operate the Parking Areas. After completion of building construction upon said OUT PARCEL (as permitted under Paragraph 1 hereof) the balance thereof shall be maintained and operated as parking areas, and driveways and footways incidental thereto, in the same manner as Landlord is obligated under this Paragraph 2 and Paragraph 7 hereof to maintain and operate the Parking Areas.  Subject to Section 11.3, Landlord agrees that at all times there will be free and uninterrupted access as shown on the Lease Plan (A) for motor vehicles between the Main Street and the Parking Areas and the service doors of the Demised Premises as shown upon the Lease Plan and (11) for pedestrians between the Parking Areas and the main customer entrance of the Demised Premises.  The entrances and exits between all adjacent streets and the Parking Areas shall be maintained as shown on the Lease Plan. If any highway median strip cross-over now existing near the Shopping Center shall be relocated, or if the installation of a highway median strip hereafter shall include a cross-over near the Shopping Center, then Landlord shall make such relocation of the entrances, exits and driveways of the Shopping Center and such changes in the traffic flow pattern of the Shopping Center as shall be reasonably necessary to conform the same to the new median strip cross-over. Landlord agrees that the Parking Areas within the Shopping Center will always contain at least four and 37/100 (4.37) parking spaces for so-called standard size American automobiles, and driveways and footways incidental thereto, for each one thousand (1,000) square foot of floor area in the Shopping Center and, in any event, not less than five hundred ninety (590) such spaces.

3. "Landlord's Construction Work" (as defined in Section 3.1) shall also include installation of a Shopping Center identification pylon sign, including without limitation, the pylon, the Shopping Center identification panel, the base, utilities service therefor and all other appurtenances thereto, all herein collectively referred to as the "Pylon Sign". The location of the Pylon Sign shall be as shown thereafter upon the Lease Plan.

Exhibit ___F___ Page ___9___

No panels, identification or ornamentation shall be upon the Pylon Sign. Notwithstanding the foregoing, if any lessee panels shall be allowed by law upon either such sign then only Tenant and the Indecement Store shall be permitted to have identification panels thereon in addition to the Shopping Center identification thereon. No other occupant of space within the Shopping Center shall have any greater rights than Tenant with respect to identification signs or use of the Common Areas, except that the right of Tenant or any other occupant with respect to the size of signs shall be proportional to the floor areas of its premises in the Shopping Center, but nothing in this Paragraph 3 shall modify Section 3.1 of this lease.

4. Landlord agrees that as long as any retail sales activity shall be conducted in the Demised Premises the Shopping Center shall not be used for any non-retail purposes (repairs, alterations and offices incidental to retailing, and banks and small loan offices, not being deemed non-retail), or for any entertainment purposes such as a bowling alley, skating rink, cinema, bar, nightclub, discotheque, amusement gallery, poolroom, health club, massage parlor or off-track betting club.

5. (A) Until a prescription pharmacy shall first have not been operated in the Shopping Center for a period of one (1) year, the Demised Premises shall not be used for the operation of a prescription pharmacy without the consent of the operator of such prescription pharmacy in the Shopping Center.

(B) So long as Landlord shall not be in default under Paragraph 4 hereof, the Demised Premises shall not be used for any non-retail purposes or entertainment purposes (as therein defined) except incidental amusement devices.

6. Tenant and all persons having business with Tenant shall have the right to use, in common with all other occupants of the Shopping Center and all persons having business with such other occupants, and no other persons, all Common Areas of the Shopping Center, for parking and access in connection with business in the Shopping Center, and for no other purpose.

7. Landlord, at all times, shall keep in good repair and condition the Pylon Sign and all Common Areas of the Shopping Center and all directional signs therein, keep the Common Areas suitably paved and marked for parking and traffic flow, keep all Common Areas free of refuse and obstruction and free of snow and ice to the extent required by the business operations of the stores within the Shopping Center, keep the Common Areas properly drained, and keep the Pylon Sign and the Common Areas adequately lighted, and shall provide electricity to Tenant's, and any other lessees', panels permitted thereon pursuant to Paragraph 3, during all times when the Demised Premises shall be open for business and for a reasonable period of time thereafter.

8. Landlord shall, within fifteen (15) days after the execution and delivery of this lease, request, for delivery to Tenant, a recognition agreement, in duplicate, from any mortgagee whose mortgage shall be prior in lien to the lien of this lease and, if Landlord shall hold a leasehold estate in all or part of the Shopping Center rather than a fee interest, a recognition agreement from the fee owner. Each such recognition agreement shall be in recordable form and shall provide that this lease and all rights of tenants hereunder shall not be disturbed except for a cause which would permit Landlord to disturb the same hereunder. Each such recognition agreement from a mortgagee shall also be in the form of Schedule D. Each such recognition agreement from a fee owner shall also be in the form of Schedule E. In the event that Landlord shall not have delivered all such instruments to Tenant, in the form herein described, on or before the sixtieth (60th) day after the date of this lease, then Tenant shall have the right to terminate this lease at any time thereafter but before the delivery to Tenant of all such agreements.

Exhibit ___F___ Page ___10___

9.  The Demised Premises are demised to Tenant with the bene-
fit of all of the rights contained in this lease and all of the
rights appurtenant to this lease and to the Demised Premises by
operation of law, and are demised subject to, and with the bene-
fit of, the following:

    (A)  Taxes not yet due and payable.

    (B)  Easements for utilities serving the Shopping Center
       and not for general transmission lines serving
       other premises.

    (C)  The Mortgage, if any, referred to in Schedule D.

10.  As partial reimbursement to Landlord of the cost to
Landlord of performing the obligations of Landlord set forth in
Paragraph 7 of this Schedule B, Tenant shall pay Landlord for
each year included in the term of this lease, an amount equal to
the product of "Tenant's CAM Fraction" (hereinafter defined) and
the cost to Landlord of performing said obligations during said
year, including without limitation, wages paid to employees of
Landlord employed exclusively at the Shopping Center in perform-
ing said obligation.  The amounts payable by Tenant under this
Paragraph 10 shall be payable monthly, on account, at the times
minimum rent is payable hereunder, in equal monthly installments
of one-twelfth of one hundred five percent (105%) of the annual
amount actually payable by Tenant under this Paragraph 10 for the
immediately preceding calendar year with the amount of any excess
payment on account by Tenant hereunder being adjusted within
thirty (30) days after the close of each year by Tenant withhold-
ing any such excess from the next succeeding monthly payments
thereafter becoming due on account hereunder, and the amount of
any deficiency in monthly payments on account hereunder by Tenant
being paid by Tenant within thirty (30) days after receipt by
Tenant of the evidence required of Landlord under the immediately
following sentence.  Landlord shall submit to Tenant evidence of
such cost to Landlord in such detail as Tenant may require.  For
the first year included in the term, the monthly payment on
account by Tenant hereunder shall be Seven Hundred Ten Dollars
($710).  Tenant's CAM Fraction is that fraction the numerator of
which shall be the number of square feet of floor area in the
Demised Premises and the denominator of which shall be the number
of square feet of floor area in all the buildings in the Shopping
Center, counting floor area pursuant to Section 6.1.  As the num-
ber of square feet of floor area may change during any year,
Tenant's CAM Fraction may change during said year and the amount
payable by Tenant for said year pursuant to the provisions of
this Paragraph 10 shall reflect such changes in square footage.
The amount payable hereunder shall not include any amounts reim-
bursable to Landlord by insurance companies, or expended for
repairs or replacements of the Common Areas required prior to the
first anniversary of the Commencement Date or as the result of
settling or attributable to any so-called capital expenditures as
determined by generally accepted accounting principles consis-
tently applied except to the extent of the annual depreciation
thereof or allowable to any so-called management or administra-
tive fees or overhead or allocable to any so-called capital
expenditures except to the extent of the annual depreciation
thereof.

11.  Landlord shall maintain with respect to the Common Areas
throughout the term of this lease a policy or policies of public
liability insurance in amounts of not less than Two Million
Dollars ($2,000,000) with respect to injuries to any one person
and not less than Five Million Dollars ($5,000,000) with respect
to injuries suffered in any one accident and not less than Five
Hundred Thousand Dollars ($500,000) with respect to damage to
property, such policies of insurance to name Tenant as an addi-
tional insured thereunder and be issued for periods of not less
than one (1) year by responsible insurance companies well rated

by national rating organizations and authorized to do business in
the state in which the Demised Premises are located. Landlord
shall deliver such policies to Tenant at least fifteen (15) days
prior to the Commencement Date, and each renewal policy at least
ten (10) days prior to the expiration of the policy it renews.
In lieu of delivering any policy of insurance to Tenant, Landlord
may deliver to Tenant a certificate of the company issuing such
policy. All such insurance policies shall provide that such pol-
icies shall not be cancelled without at least ten (10) days prior
written notice to Tenant.

12. Tenant shall instruct its employees to park their auto-
mobiles only in areas in the Shopping Center reasonably desig-
nated by Landlord therefor. Tenant shall request that its
employees furnish Landlord with their respective automobile
license numbers. If furnished by Landlord, Tenant will deliver
to its employees parking stickers with the request that the same
be affixed as requested by Landlord. Tenant shall not be deemed
in default under this lease if any such employees shall violate
such request or instructions.

## EXHIBIT G
## FORM OF SUBORDINATION, NON-DISTURBANCE AND ATTORNEMENT
## AGREEMENT

N/A (Parties acknowledge and agree the Shopping Center is not encumbered by a mortgage)

Ashville, NC
Execution Version: August 16, 2011

EXHIBIT H
FORM OF ESTOPPEL CERTIFICATE

## Exhibit H

### Form of Estoppel Certificate

To:

Shopping Center:

Landlord:

Tenant:               JO-ANN STORES, INC.

Lease:

Tenant represents that, as of the date hereof:

1.  The Lease constitutes the entire written agreement between Tenant and Landlord and has not been modified or amended, except as indicated herein.

2.  The Lease is in full force and effect. The term commenced on _____ and expires on _____. [Tenant has no further options to renew the term of the Lease.] or [Tenant has _____-year options to renew the term of the Lease.]

3.  Tenant has taken possession of approximately _____ square feet in the Shopping Center under the Lease (the "Premises") and is occupying the Premises.

4.  To the undersigned's actual knowledge, without inquiry or investigation, the Landlord is not currently in default under the Lease except as follows:

5.  The monthly Fixed Minimum Rent payable under the Lease is $_____ and has not been prepaid by more than one month.

6.  The address for notices to be sent to Tenant is as follows:

> Jo-Ann Stores, Inc.
> Attn: Senior Vice President, Real Estate
> 5555 Darrow Road
> Hudson, OH 44236

> with a copy to:

> Jo-Ann Stores, Inc.
> Attn: Senior Legal Counsel
> 5555 Darrow Road
> Hudson, OH 44236

Exhibit H – Page 1

Ashville, NC
Execution Version: August 16, 2011

7. Nothing contained herein will: (a) amend, modify, waive or rescind any of the terms, conditions, covenants or obligations of the Lease; (b) waive or estop Tenant's right to declare a default based on facts of which the undersigned does not have actual knowledge, without inquiry or investigation; (c) waive or estop Tenant's right to claim any offset, claim or counterclaim resulting from an audit of Landlord's business records or public records; (d) waive or estop any claims, defenses, rights or remedies of Tenant; or (e) relieve the Landlord from any of its obligations under the Lease.

8. Tenant's statements exclude certification as to any matter that may be disclosed by audit, inspection, or examination of Landlord's records or public records relating to charges and monetary items under the Lease.

9. If there is any conflict between this certificate and the Lease, the Lease shall control.

10. Tenant acknowledges that you are relying upon this Estoppel Certificate and the accuracy of the information contained herein. Nevertheless, Tenant will not be liable to any party for damages of any kind whatsoever (whether direct, indirect, special, consequential or any other type) resulting from any statement in this certificate.


Dated:


                              **JO-ANN STORES, INC.**


                        By: _____

                              David B. Goldston
                              Senior Vice President,
                              General Counsel and Secretary


Exhibit H – Page 2

Ashville, NC
Execution Version: August 16, 2011