# EXHIBIT A

# LEASE AGREEMENT

Between


**VESTAR QCM, L.L.C.**
**"Landlord"**

**and**


**Jo-Ann Stores, Inc.**
**"Tenant"**


Dated: August __29__ , 2011

# TABLE OF CONTENTS

| SECTION | HEADING | PAGE |
|---|---|---|
| SECTION 1. | EXHIBITS TO LEASE | 1 |
| SECTION 2. | DEFINITIONS | 2 |
| SECTION 3. | PREMISES | 7 |
| SECTION 4. | TERM AND OPTIONS TO EXTEND | 10 |
| SECTION 5. | FIXED MINIMUM RENT | 11 |
| SECTION 6. | PERCENTAGE RENT | 12 |
| SECTION 7. | GROSS SALES | 12 |
| SECTION 8. | TAXES | 14 |
| SECTION 9. | COMMON AREA COSTS | 16 |
| SECTION 10. | CONSTRUCTION OF PREMISES | 18 |
| SECTION 11. | USE | 21 |
| SECTION 12. | COMMON AREAS | 21 |
| SECTION 13. | UTILITIES | 22 |
| SECTION 14. | INTENTIONALLY DELETED | 22 |
| SECTION 15. | CO-TENANCY | 22 |
| SECTION 16. | RULES AND REGULATIONS | 24 |
| SECTION 17. | ALTERATIONS, INSTALLATIONS AND IMPROVEMENTS BY TENANT | 24 |
| SECTION 18. | REPAIRS AND MAINTENANCE | 25 |
| SECTION 19. | INDEMNIFICATION | 27 |
| SECTION 20. | WAIVER OF CLAIMS | 28 |
| SECTION 21. | PROPERTY AND LIABILITY INSURANCE | 29 |
| SECTION 22. | SIGNS | 29 |
| SECTION 23. | ASSIGNMENT AND SUBLETTING | 30 |
| SECTION 24. | REPAIR AFTER CASUALTY | 31 |
| SECTION 25. | CONDEMNATION | 33 |
| SECTION 26. | REPRESENTATIONS AND COVENANTS OF LANDLORD | 33 |
| SECTION 27. | TENANT'S DEFAULT | 35 |
| SECTION 28. | RIGHTS OF LANDLORD | 37 |
| SECTION 29. | LANDLORD'S DEFAULT | 37 |
| SECTION 30. | MORTGAGE SUBORDINATION | 38 |
| SECTION 31. | NO WAIVER | 39 |
| SECTION 32. | SURRENDER OF PREMISES | 39 |
| SECTION 33. | SHORT FORM LEASE, COMMENCEMENT DATE AGREEMENT | 40 |
| SECTION 34. | NOTICE | 40 |
| SECTION 35. | HAZARDOUS MATERIALS | 41 |
| SECTION 36. | LIMITATION OF LANDLORD'S LIABILITY | 43 |
| SECTION 37. | DELIVERY OF SITE PLAN | 44 |
| SECTION 38. | INTENTIONALLY OMITTED | 44 |
| SECTION 39. | ENTIRE AGREEMENT; WRITING REQUIRED | 44 |

i

SECTION 40.   OPERATING COVENANT ........................................................ 44
SECTION 41.   APPLICABLE LAW AND CONSTRUCTION ............................ 45
SECTION 42.   UNAVOIDABLE DELAYS ..................................................... 45
SECTION 43.   REASONABLE CONSENT ..................................................... 46
SECTION 44.   NO PARTNERSHIP ............................................................... 46
SECTION 45.   ESTOPPEL ........................................................................... 46
SECTION 46.   QUIET ENJOYMENT ........................................................... 46
SECTION 47.   HOLDING OVER ................................................................. 47
SECTION 48.   BROKERS ............................................................................ 47
SECTION 49.   DISPUTE RESOLUTION ...................................................... 47
SECTION 50.   CONFLICT OF INTEREST ................................................... 47
SECTION 51.   CAPTIONS ........................................................................... 48
SECTION 52.   VARIATION IN PRONOUNS ................................................ 48
SECTION 53.   SECTION REFERENCES ...................................................... 48
SECTION 54.   BINDING EFFECT OF AGREEMENT .................................... 48
SECTION 55.   ATTORNEY'S FEES ............................................................. 48
SECTION 56.   OFAC WARRANTY .............................................................. 48
SECTION 57.   WAIVER OF RIGHT TO JURY TRIAL ................................... 49
SECTION 58.   DEVELOPMENT AGREEMENT ............................................ 49
SECTION 59.   NO PERSONAL LIABILITY .................................................. 50
SECTION 60.   VENUE ................................................................................ 50
SECTION 61.   SALES TAX SURCHARGE ................................................... 50
SECTION 62.   OVERFLIGHT DISCLOSURE ............................................... 52

ii

# LEASE

This Lease is made as of ᴀᵤᵍᵘˢᵗ 29 , 2011, between VESTAR QCM, L.L.C., an Arizona limited liability company, ("Landlord"), and Jo-Ann Stores, Inc., an Ohio corporation ("Tenant").

Landlord and Tenant covenant and agree as follows:

## SECTION 1. EXHIBITS TO LEASE

(a)     The following Exhibits are attached to and made a part of this Lease, and are incorporated herein by reference:

Exhibit A.  The description of the lands upon which the Shopping Center is located.

Exhibit B.  The site plan showing the Shopping Center, the location of the Premises, as hereafter defined, the Shopping Center buildings, the Protected Area, the parking areas, driveways and common areas and containing other general information relative to the development of the Shopping Center Site (the "Site Plan").

Exhibit C.  The FY13 22K Prototype Plans and scope of work matrix which defines the responsibility for performance of work (and all costs associated therewith) between Landlord and Tenant for a build-out of the Premises.

Exhibit C-1.    Lease Outline Drawing with Minimum Landlord Requirements.

Exhibit D.  Tenant's Plans and Specifications (CDs which means construction documents).  To be attached post Lease execution.

Exhibit D-1.  Tenant's Prototype Signage Plans.

Exhibit D-2.  Landlord's Master Sign Plan.

Exhibit D-3.  Location of Monument Signs and Tenant's Position Thereon.

Exhibit E.  The Project Coordination Guidelines.

Exhibit F.  The Exclusive Uses of other tenants and Occupants as of the date of this Lease.

Exhibit F-1.    Restricted Uses.

Exhibit G.  Form of Subordination, Non-Disturbance and Attornment Agreement.

1

(b) If there is any conflict between the language in this Lease and the content of any of the aforementioned Exhibits, the content of the Exhibit shall control.

## SECTION 2. DEFINITIONS

The terms listed below have the respective meanings as follows:

(a)    <u>Commencement Date</u>:  (i) the 61st day after the Delivery Date, or (ii) the day that Tenant opens for business in the Premises, whichever day first occurs. Notwithstanding anything to the contrary in this Lease, unless Tenant otherwise opens for business, the Commencement Date will not occur during any period that Tenant has not received the fully executed SNDA required under <u>Section 30(a)</u> below. Tenant may elect to open for business during any period identified in the immediately preceding sentence, and in such case, Tenant shall be obligated to pay only Substitute Rent during said period. Also, notwithstanding the foregoing, in no event shall Tenant be required to open or commence the payment of Rent during the period commencing November 15 and ending the next occurring January 31 ("Blackout Period"); and, if the Commencement Date would otherwise occur in the Blackout Period (except for the reason that Tenant opens for business), the Commencement Date shall be deemed to be the first day after the expiration of the Blackout Period. If Tenant opens during the Blackout Period, then Tenant is obligated to pay full Rent during the Blackout Period.

(b)    <u>Common Areas</u>: the parking areas, driveways, aisles, sidewalks, malls (whether enclosed or unenclosed), truck storage areas, common mechanical rooms, and other common, service and related areas and improvements within the Shopping Center, whether open to the public generally or for the non-exclusive use of one or more tenants, and whether or not shown on <u>Exhibit B</u>, but excluding the roof(s).

(c)    <u>Declarations</u>.  Together, that certain (i) Operation and Easement Agreement dated January 30, 2007 executed by Landlord and Target Corporation, a Minnesota corporation, recorded on January 31, 2007 in the Official Records of Maricopa County, Arizona as Instrument No. 2007-0124860, and (ii) all amendments, modifications, extensions and renewals and replacements thereof; all of which shall be superior to this Lease, binding upon the Shopping Center and run with the land. Landlord hereby grants and warrants to Tenant, its successors and assigns, for the Lease Term, the non-exclusive right and easement appurtenant to and for the benefit of the Premises and any occupant thereof and its customers, employees, and invitees, to use, for purposes of access, ingress and egress, and parking all those certain access, ingress and egress, and parking easement areas granted to or established by Landlord under the Declarations. Landlord warrants that: (a) to the best of its knowledge the Declarations are in full force and effect without any existing violation or breach thereunder; and (b) the Declarations do not prevent Tenant's use of the Premises as contemplated hereby. Landlord covenants to enforce the Declarations to the extent necessary to grant Tenant the rights and benefits hereunder.  Landlord shall not amend or terminate the

2

Declarations without the written consent of Tenant to the extent it would have a material adverse affect on Tenant.

(d)     Default Rate: an annual rate of interest equal to twelve percent (12%) per annum.

(e)     Delivery Date: the date that Landlord delivers the Premises to Tenant with all of the Delivery Requirements satisfied and Tenant accepts said delivery by written acknowledgement signed by Tenant's Vice President of Real Estate or Store Development, Director of Store Development or Director of Construction and Facilities (Tenant's Representative). The Delivery Date shall be deemed to have occurred if Tenant opens for business in the Premises. Tenant shall not unreasonably delay, condition or refuse its acceptance of the Premises and Tenant shall be deemed to have accepted the Premises if it does not reject same in writing within five business days after delivery and written notice of delivery to Tenant's Representative. The Delivery Date shall not occur prior to the Required Delivery Date or Estimated Delivery Date (regardless of whether Landlord has satisfied the Delivery Requirements prior to that date), except with Tenant's express written consent, in its sole discretion. The Delivery Date shall not occur prior to the Estimated Delivery Date (regardless of whether Landlord has satisfied the Delivery Requirements prior to that date), except with Tenant's express written consent, in its sole discretion.

(f)     "Delivery Requirements" means the following:

(1)     Landlord's Work is substantially complete (i.e., complete with the exception of minor "punchlist" items which can be completed without unreasonably interfering with the performance of Tenant's Work)

(2)     the Premises are delivered to Tenant free and clear of any Hazardous Material, including asbestos, and Landlord represents and warrants as such;

(3)     Tenant has received from Landlord results from a slab moisture test indicating that the slab meets or exceeds the acceptable levels of slab moisture per ASTM F1869-98 (five pounds per 1,000 square feet per 24 hours of moisture);

(4)     all Common Areas have been completed in accordance with all applicable Laws, including, without limitation, all paving of the parking lot, service areas and access roads, curbing (including curb cuts), site lighting, striping, sidewalks, loading dock area and landscaping (the parties agree that the Common Areas are complete);

(5)     Tenant has received a fully executed copy of the SNDA required under Section 30(a); and

3

(6)     Landlord shall have delivered a copy of the Temporary Certificate of Occupancy (or its equivalent) for the Premises to Tenant.

(g)     <u>Development Agreement</u>.  That certain Development Agreement by and between the Town and Landlord dated June 15, 2005, recorded June 22, 2005 in the Official Records of Maricopa County, Arizona as Instrument No. 2005-0848189 and all amendments, modifications, extensions, renewals and replacements thereof.  Landlord warrants that: (a) to the best of its knowledge the Development Agreement is in full force and effect without any existing violation or breach thereunder; and (b) the Development Agreement does not prevent Tenant's use of the Premises as contemplated hereby.  Landlord shall not amend or terminate the Development Agreement without the written consent of Tenant to the extent it would have a material adverse affect on Tenant.

(h)     <u>Estimated Delivery Date</u>: Landlord's good-faith estimate of the Delivery Date is March 21, 2012.

(i)     <u>Gross Leasable Area</u>: the number of square feet of floor area on all levels (including any mezzanines, basements or balconies that are used for sales but excluding any not used for sales), measured from the exterior face of exterior walls and of service corridor walls, the exterior building line for sidewalk or mall frontage, and the center line of party walls, with no deduction for columns, stairs, elevators, or any interior construction or equipment.

With respect to the Shopping Center, the Gross Leasable Area is the total constructed Gross Leasable Area available for the exclusive use and occupancy of tenants within the Shopping Center, whether or not actually rented or open for business, as the same exists from time to time. With respect to the Premises, the Gross Leasable Area will be the actual completed Gross Leasable Area (including any mezzanines, basements or balconies that are used for sales but excluding any not used for sales), as the same exists from time to time.

Any change in Gross Leasable Area, whether of the Premises or Shopping Center, will be deemed in effect on the first day of the next succeeding month following such change. Landlord covenants to use commercially reasonable efforts to advise Tenant of any increase or decrease in the Gross Leasable Area of the Shopping Center due to the construction or demolition of any buildings in the Shopping Center within sixty (60) days of any such change, together with a current Site Plan reflecting such change.

(j)     <u>Hazardous Materials</u>:  See <u>Section 35</u>.

(k)     <u>HVAC</u>: heating, ventilating and air conditioning exclusively serving the Premises.

(l)     <u>Landlord's Work</u>: the work to be performed by or at the direction of Landlord in constructing and/or remodeling the Premises and related improvements as more particularly specified in <u>Exhibit C</u> and in <u>Section 10</u> below.

4

(m)   <u>Laws</u>: any and all laws, codes, ordinances or regulations passed into existence by any Public Entity now or hereinafter in existence.

(n)   <u>Lease Year</u>: a period of twelve (12) consecutive calendar months during the Term. The first Lease Year (or Lease Year One) begins on the first day of February next following the Commencement Date, unless the Commencement Date is the first day of February, in which event the first Lease Year begins on the Commencement Date. The first Lease Year will include the first Partial Lease Year, if any. Rent and any limitations on such Rent for purposes of any Partial Lease Year will be proportionately adjusted based upon the actual number of days of such Partial Lease Year in relation to the number of days in a full Lease Year.

(o)   <u>Outside Delivery Date</u>: December 16, 2012.

(p)   <u>Partial Lease Year</u>: the period, if any, of fewer than twelve (12) consecutive calendar months between the Commencement Date and the next occurring February 1 and the period, if any, of less than twelve (12) consecutive calendar months between the last day of the last Lease Year and the expiration of the Term.

(q)   <u>Permitted Use</u>:  initially, primarily for the sale of fabrics of all kinds, goods sold by the yard, linens, curtains, drapery and upholstery materials, towels, pillows, draperies, drapery hardware, patterns, knitting supplies, needlepoint, macramé, art materials and supplies, finished crafts, craft materials and supplies, ceramics, wearable art and wearable art supplies, miniatures, dolls, hobby items, picture frames, framing (both readymade and custom made) and framing materials and supplies, bridal apparel and accessories, wedding supplies, floral products, artificial flowers and accessories, gift items, cards, party supplies, paper goods, stationery, candles, candlesticks, brass and pottery, foam products, yarns, all types of notions, indoor and outdoor house decorating products and accessories, furniture, do-it-yourself products and accessories, seasonal merchandise, baskets, wicker items, housewares, prepackaged and unpackaged food and food products, coffee, tea, and assorted beverages, instructional books and tapes, children's books, toys, sewing machines, sewing machine furniture, vacuum cleaners, fabric care items, lamps, small household appliances, irons, ironing boards, custom services and custom products using craft and sewing components, including, but not limited to, quilting, bow-making, window treatments, floral design, alterations, instructional classes, materials and services, products, accessories related to all of the foregoing, and other items and services customarily offered for sale by a fabric, craft or general merchandise store, and such other related merchandise and services typically offered in a majority of the stores operated by Tenant under the name Jo-Ann, Jo-Ann Fabrics and Crafts or such other name under which Tenant may operate. After the Operation Period, as defined in <u>Section 40</u>, Tenant may use the Premises for any lawful retail purpose, subject to <u>Section 11</u> of this Lease. The Permitted Use is subject to other tenant and occupant exclusives existing as of the date hereof, which are attached as <u>Exhibit F</u>.

5

(r)    Plans and Specifications: The final plans and specifications for the construction of the Premises, in the form of Exhibit D, attached hereto.

(s)    Premises: a portion of the Shopping Center as shown on the Site Plan and located within the Shopping Center, on the Shopping Center Site, consisting of space having approximately 20,000 square feet of Gross Leasable Area, with a minimum frontage of approximately 100 feet (to the center of the side walls.)

(t)    Protected Area: the area shown on the Site Plan.

(u)    Prototype Plans:   Turn-Key Plans marked as Prototype drawings, previously provided to Landlord and available on Tenant's portal (to which Landlord has been provided access).

(v)    Public Entity: the federal, state, county, municipal or other governmental unit, however denominated, and any agency, division, department or public official thereof, now or hereafter having jurisdiction, in any respect, over the Premises, the Shopping Center or Shopping Center Site.

(w)    Rent: Fixed Minimum Rent, Additional Rent, and all other monetary obligations of Tenant to Landlord under this Lease.

(x)    Shopping Center: the Queen Creek Marketplace located in Queen Creek, Arizona, consisting of all buildings including the Premises and Common Areas, and other improvements located upon the Shopping Center Site, and outlined on Exhibit B.

(y)    Shopping Center Site: the legal description set forth on Exhibit A, on which the Shopping Center is located.

(z)    Substitute Rent: Fifty percent (50%) of the Fixed Minimum Rent in lieu of the Rent otherwise required to be paid under this Lease.

(aa)    Tenant's Proportionate Share: a fraction, the numerator of which is the Gross Leasable Area of the Premises and the denominator of which is the Gross Leasable Area of the Shopping Center. Notwithstanding the foregoing, if any portion of Common Area Costs, Taxes, or Insurance Costs are furnished or directly payable by an individual tenant or occupant as opposed to Landlord, the cost of the item(s) furnished or payable by such tenant or occupant shall not be included in Common Area Costs, Taxes, or Insurance Costs, as the case may be, and the square footage of the tenant or occupant furnishing or paying for such item(s) shall not be included in the calculation of Tenant's Proportionate Share of such item(s). Tenant's Proportionate Share shall be adjusted in the event of any increase or decrease in the Gross Leasable Area of all buildings within the Shopping Center or the Gross Leasable Area of the Premises.

6

(bb)    Tenant's Work: the store fixturing and merchandising work to be performed by or at the direction of Tenant in preparing to open for business from the Premises.

(cc)    Term: the Initial Term, as hereafter defined, and each Extended Term, as hereafter defined, if any, and any renewals or period of holdover tenancy.

(dd)    Town. The Town of Queen Creek, Arizona, an Arizona municipal corporation.

(ee)    Town Lease. That certain Land and Improvements Lease executed by the Town, as landlord, and Landlord, as tenant, in accordance with the provisions of the Development Agreement and all amendments, modifications, extensions, renewals and replacements thereof.

(ff)    Unavoidable Delay: A material delay beyond the reasonable control of the delayed party caused by labor strikes, lock-outs, labor troubles, industry-wide inability to procure materials, failure of power, extraordinary restrictive governmental laws or regulations (such as gas rationing), riots, war, military or usurped governmental power, acts of terrorism, sabotage, material fire or other material casualty, Severe Weather, or an extraordinary and material act of God (such as a tornado or earthquake), but excluding inadequacy of insurance proceeds, litigation or other disputes, financial inability, lack of suitable financing, delays of the delayed party's contractor and failure to obtain approvals or permits unless otherwise caused by an event of Unavoidable Delay. "Severe Weather" means weather that a reasonable person would find unusual and unanticipated at the time of the scheduling of the activity based on recent weather patterns for the period in question in the vicinity of the Premises.

## SECTION 3. PREMISES

(a)    For the Rent and upon the terms and conditions contained in this Lease, Landlord leases during the Term, and Tenant leases from Landlord during the Term, the following:

(1) The Premises as outlined on the Site Plan and further described herein; and,

(2) The right, in common with Landlord and all other tenants of the Shopping Center granted similar rights by Landlord, to the non-exclusive use of all Common Areas.

(3) Subject to local codes the Declarations and Landlord's written approval, which approval shall not be unreasonably withheld, conditioned or delayed, the right to place (i) two storage containers ("Containers") during seasonal selling seasons in a location at, near, or next to Tenant's loading dock in the Container Area shown on Exhibit B or at any other location mutually agreed upon by Landlord and Tenant, and (ii) shopping cart corrals ("Corrals") in Tenant's Protected Area and at, near or next to the outside of the Premises' entryway and in no more than four

7

parking lot spaces in another part of the Protected Area. Each Container will not exceed 10 feet in width and 40 feet in length. Tenant will maintain the Containers and Corrals in good condition and repair. If Landlord receives notice that Tenant's Containers or Corrals violate any local code or ordinance or the Declarations, then after receipt of notice from the governing body, or party to the Declarations, Tenant will remove the violating Containers or Corrals, or move them to an acceptable location. In addition, subject to local codes and the Declarations, Tenant shall have the right to store up to five bales of cardboard at the exterior of the rear of the Premises (and adjacent to the real wall) for a period not to exceed 72 consecutive hours, and each bale as dimensions of approximately 5' by 5'.

(4) Subject to local codes and Declarations, Tenant may display merchandise on the sidewalk on both sides of the storefront door of the Premises, provided that such display does not extend beyond 30 feet in either direction and is at least 10 feet way from any adjacent tenant's premises and 10 feet away from the curb. Tenant's use of such sidewalk area shall (i) be in good taste, adhering to the standards of a first-class, institutional grade, Shopping Center; and (ii) be of such duration and frequency and numbers so as to not unreasonably interfere with the operation of the Shopping Center. Tenant shall regularly police the Common Areas adjacent to such sidewalks and remove any litter or debris resulting from Tenant's sidewalk sales and the liability insurance to be maintained by Tenant pursuant to this Lease shall expressly extend to the conduct by Tenant of such sidewalk sales.

(b)      Subject to the reasonable consent of Tenant, Landlord expressly reserves the right to maintain, use, repair and replace the pipes, ducts, conduits, utility lines, tunneling and wires leading through the ceiling, plenum areas, columns, partitions, and within or under the floor slabs comprising part of the Premises, but only to the extent that such installations (i) are reasonably necessary to serve the Premises or other parts of the Shopping Center; (ii) are installed in locations that will not interfere with Tenant's use of the Premises or Tenant's permitted signage; (iii) are not exposed within the selling area; and (iv) do not decrease the ceiling height of the Premises. Similarly, subject to the further provisions of this Lease, local codes and the Declarations, Tenant shall have the right to make installations on or within the Premises (e.g., the roof) which are part of Tenant's Leadership in Energy and Environmental Design initiative. In exercising the foregoing rights, neither Landlord or Tenant shall interfere with the use or occupancy of the Premises or commence any such work without first notifying the other party at least ten (10) days in advance, of the commencement of such work.

(c)      If Tenant installs a mezzanine in the Premises for the storage of inventory and/or fixtures, Tenant shall not pay any Rent on that space (provided that if the use of such space is changed to sales space, Rent shall thereupon be due and payable thereon.)

8

(d)     Within sixty (60) days following the Commencement Date, upon request of either Landlord or Tenant, Landlord shall have its architect ("Landlord's Architect") measure the final Premises to determine the number of Gross Leasable Area of the Premises. If the area reflected by such measurement varies from that set forth in this Lease, then all items of Rent shall be appropriately adjusted, provided, however, except to the extent resulting from changes to the scope of Landlord's Work requested in writing by Tenant, in no event shall any item of Rent be increased by more than one percent (1%) because of a variance in area of the Premises.  If neither party requests a measurement within such sixty (60) day period, then the area specified in this Lease shall be deemed to be the Gross Leasable Area of the Premises.  If Tenant disputes the measurement of Landlord's Architect, Tenant shall notify Landlord within five business days after receipt by Tenant of such measurement.  Tenant shall then have fifteen (15) days to have an architect selected by Tenant and licensed to practice in the State of Arizona ("Tenant's Architect") to measure the Premises using the procedures set forth herein.  If Tenant's Architect disputes the findings of Landlord's Architect, both Architects shall meet in good faith for a period not to exceed fifteen (15) days and try to reach agreement on the number of leasable square feet.  If the Architects cannot reach agreement within such period, the Architects shall in good faith select a third, independent architect and licensed to practice in the State of Arizona (the "Resolution Architect") to measure the Premises.  The measurement of the Resolution Architect shall be final and binding on all parties.  All fees and costs payable to Landlord's Architect shall be paid by Landlord.  All fees and costs payable to Tenant's Architect, shall be paid by Tenant.  Tenant and Landlord shall each be responsible for one-half of the fees and costs payable to the Resolution Architect.

(e)     Provided Tenant is not then in default hereunder beyond any applicable notice and cure period and is open and operating at the Premises, if Landlord desires to lease the approximately 2,000 square foot Owner's room adjacent to the Premises and identified on the Site Plan as the "Contiguous Space" (the "Contiguous Space") to any other party, Landlord shall provide written notice to Tenant (a "Lease Notice").  The Lease Notice shall identify the prospective new tenant, and contain a description of all material terms of the lease arrangement with such prospective new tenant.  The date on which Tenant receives the Lease Notice may be referred to herein as the "Notice Date". Tenant shall have the right to lease the Contiguous Space on the terms contained in the Lease Notice by providing written notice of acceptance to Landlord within ten (10) business days after the Notice Date.  In such event, Tenant and Landlord shall execute a new lease for the Contiguous Space and the Premises incorporating the terms contained in the Lease Notice with respect to the Contiguous Space, except that the term for the Contiguous Space and the Premises shall be coterminous and shall equal the remaining term hereunder. If Tenant fails to deliver such written notice of acceptance within such ten (10) day period, Landlord shall be free to lease the Contiguous Space to the tenant identified in the Lease Notice on the terms set forth therein and Tenant's right and obligation to lease the Contiguous Space under this subsection (e) shall thereupon terminate.

Queen Creek Marketplace, Queen Creek, AZ
EXECUTION VERSION: August 5, 2011
UB Document No. 756176 v.10

**SECTION 4.  TERM AND OPTIONS TO EXTEND**

(a)      The "Initial Term" begins on the Commencement Date and ends on the last day of the 10th Lease Year, unless sooner terminated as herein provided.

(b)      Provided Tenant is not in default hereunder beyond any applicable notice and cure period at the time of exercise and is open and operating at the Premises at the time of exercise, Landlord grants Tenant the right and option to extend this Lease for two additional periods of five years each (individually called an "Extended Term" and collectively called "Extended Terms"), commencing upon the expiration of the Initial Term or such prior Extended Term, as the case may be. Each Extended Term shall be upon the same terms, covenants and conditions as the Term except for the option to extend then exercised and except for such changes, if any, in Rent or other Tenant charges as are expressly set forth in this Lease.  Tenant must deliver notice to Landlord of its election to extend this Lease  for an Extended Term no later than one hundred twenty (120) days before the expiration of the Initial Term or the then current Extended Term, as the case may be.

(c)      Notwithstanding anything to the contrary in this Lease, provided Tenant is not in default hereunder beyond any applicable notice and cure period at the time of exercise, if Tenant's annual Gross Sales for the Premises during the twelve (12) month period commencing on the first day of the 37th month of the Term and ending on the last day of the 48th month of the Term ("Threshold Period"), do not exceed $2,000,000.00 (the "Threshold Sales"), then Tenant may terminate this Lease, without further liability of either party to the other, by giving Landlord at least written notice of termination ("Notice to Terminate"), which Notice to Terminate must be accompanied by a statement of Gross Sales for the Threshold Period, certified by Tenant to be true, correct and complete in all material respects and must be given after the Threshold Period, but at least sixty (60) days prior to the Kick Out Date. The Lease shall then terminate effective on the last day of the 60th month of the Term (the "Kick Out Date.") If the Lease terminates pursuant to this subsection, within 30 days after the Kick Out Date Tenant shall reimburse Landlord for 100% of the Unamortized Cost of Landlord's Work Notwithstanding anything in this Lease to the contrary, in the event Tenant has Gross Sales in excess of $2,800,000.00 for any rolling twelve (12) month period, Tenant's right to terminate under this subsection shall thereupon become void. Notwithstanding anything in this Lease to the contrary, in the event the Premises is closed for any reason at any time during the Threshold Period (other than due to Unavoidable Delay, damage and destruction, eminent domain or permissible repairs or renovation to the Premises, which closures are referred to as "Allowed Closure(s)")("Threshold Sales Voiding Condition"), Tenant shall be deemed to have waived its right to terminate this Lease under this Section 4  and the termination right established herein shall be null and void and of no further force and effect. The remedy set forth in the immediately preceding sentence, shall be Landlord's exclusive remedy should a Threshold Sales Voiding Condition occur.  If there is an Allowed Closure through the end of the Threshold Period, then, for purposes of this provision, the Threshold Sales shall be reduced by multiplying same by a fraction, the numerator of which shall be the 365 minus the number of days of Allowed Closure, and the denominator of which shall be 365.  As used herein, "Unamortized

10

Cost of Landlord's Work" means the unamortized portion (as of the date of such termination) of the total sums expended by Landlord as set forth in Landlord's books and records in the performance of Landlord's Work hereunder not to exceed $20.00 per square foot, with amortization to be on a straight-line basis over the initial Term of the Lease. The total sums expended by Landlord in the performance of Landlord's Work shall be reflected in a written itemization provided by Landlord upon written request from Tenant.

## SECTION 5. FIXED MINIMUM RENT

(a)     From and after the Commencement Date, Tenant must pay to Landlord, without demand, at the address herein specified for notices to Landlord, Fixed Minimum Rent for the Premises as follows:

(1)     During Lease Years one through five of the Initial Term at the rate of $262,000.00 per year, based on $13.10 per square foot, payable in equal monthly installments of $21,833.33; and

(2)     During Lease Years six through 10 of the Initial Term at the rate of $282,000.00 per year, based on $14.10 per square foot, payable in equal monthly installments of $23,500.00; and

(3)     During the first five-year Extended Term at the rate of $300,000.00 per year, based on $15.00 per square, payable in equal monthly installments of $25,000.00; and

(4)     During the second five-year Extended Term at the rate of $320,000.00 per year, based on $16.00 per square foot, payable in equal monthly installments of $26,666.67.

Notwithstanding anything contained herein, at and as of the beginning of each Extended Term, Fixed Minimum Rent as set forth above shall be increased by Tenant's Proportionate Share of the amount, if any, that Common Area Costs and Taxes for the immediately preceding Lease Year (the "Reset Year") exceeded the Common Area Costs and Taxes for the first (1st) Lease Year of the five (5) Lease Years immediately preceding the Reset Year, provided in no event shall Common Area Costs (as defined below) and Taxes for the Reset Year be deemed to have increased by more than fifteen percent (15%). The amounts shall include and be in payment of all other charges not specifically set forth in this Lease.

(b)     Tenant must pay monthly installments of Fixed Minimum Rent in advance on or before the first day of each month during the Term, commencing on the first day of the first month next following the Commencement Date (unless the Commencement Date is the first day of the month, in which event the first monthly installment shall be due on the Commencement Date).

11

Notwithstanding the foregoing, Landlord must invoice Tenant, which invoicing will not occur more than thirty (30) days before the Commencement Date, for the first monthly installment of Fixed Minimum Rent. In no event will the first rent installment be due until ten (10) days after Tenant's receipt of this initial invoice. Fixed Minimum Rent for the partial month, if any, after the Commencement Date will be computed on a per diem basis (assuming a 30-day month), and Tenant must pay the Fixed Minimum Rent for such partial month concurrently with the first monthly installment. If Tenant fails to pay Rent on the due date and Landlord notifies Tenant of such failure, then if Tenant fails to pay Rent on the due date thereafter in the same Lease Year, then the Landlord, in addition to the Rent then owed, is entitled a late fee of One Hundred and No/100 Dollars ($100.00) for such subsequent late payment and any such other late payment of Rent thereafter during that Lease Year.

**SECTION 6. PERCENTAGE RENT** -None.

**SECTION 7. GROSS SALES**

(a)    "<u>Gross Sales</u>" means the entire amount of the actual receipts, whether cash or otherwise, from all sales of merchandise and services for all business conducted in, on or from the Premises, including mail or telephone orders received at the Premises and filled from the Premises or elsewhere (but excluding mail, telephone, internet or other orders filled at the Premises but originating elsewhere). Each sale upon installment or credit shall be treated as a sale for the full amount thereof in the month during which such sale shall be made, irrespective of the time when Tenant shall receive payment (whether full or partial) from its customers. Layaway sales, so-called, shall be included in the Gross Sales of the respective computation period only to the extent of payments received during that computation period. Notwithstanding the foregoing, with respect to assignees, sublessees, concessionaires and licensees of Tenant that, together, occupy no more than 1,000 square feet of Gross Leasable Area, Tenant shall not be obligated to report and include with Tenant's Gross Sales, the sales generated by them, although any payments to Tenant by such entity will be included in Gross Sales.

(b)    Notwithstanding anything to the contrary, the following are excluded from Gross Sales:

(1)    sums collected and paid out for any sales tax or excise tax imposed by any duly constituted governmental authority;

(2)    the value or price of merchandise exchanged between the stores of Tenant, or the affiliates of Tenant, if any, where such exchange of merchandise is made solely for the convenient operation of the business of Tenant or the affiliate of Tenant and not for the purpose of consummating a sale which has been made at, in, from or upon the Premises, or for the purpose of depriving Landlord of

12

the benefit of a sale which otherwise would be made at, in, from or upon the Premises;

(3)     the amount of returns to shippers or manufacturers;

(4)     sales to employees made at a discount;

(5)     non-sufficient funds check charges or financing charges to customers whether or not separately stated or billed;

(6)     service charges to customers who buy a budget or deferred payment plan;

(7)     revenue from gift certificates or gift cards until redeemed at the Premises;

(8)     revenue from vending machines used solely for the benefit of employees;

(9)     the amount of any cash or credit refund made upon any sale where the merchandise sold, or some part thereof, is thereafter returned by the purchaser and accepted by Tenant;

(10)    sales of fixtures not in the ordinary course;

(11)    all sums and credits received in settlement of claims for loss or damage to merchandise;

(12)    non-retail bulk sales of merchandise outside of the ordinary course of business on the Premises;

(13)    tax exempt sales or merchandise donated or sold at a discount to charitable or non-profit organizations (not to exceed two percent (2%) of annual Gross Sales);

(14)    fees for classes or demonstrations;

(15)    the value attributed to merchandise taken in trade;

(16)    referrals to affiliates of or other divisions of Tenant;

(17)    fees for gift wrapping, mailing and other customer services provided on a not for profit basis;

13

(18)     sales of lottery tickets, special event tickets and the like (but the commissions paid to Tenant shall be included in Gross Sales);

(19)     the amount of credit sales and credit accounts incurred at the Premises which are written off as bad debts and deducted as an expense (not to exceed two percent (2%) of annual Gross Sales); and

(20)     sale of patterns.

(c)     Tenant will deliver to Landlord within sixty (60) days after the end of each Lease Year a statement showing Gross Sales for such Lease Year. In the event Tenant delivers a Notice to Terminate, Landlord may cause an audit to be made by an agent designated in writing by Landlord of all books and records of account, documents, records, returns, papers and files relating to Gross Sales for the Threshold Period. In such event, Tenant shall, on upon at least fifteen (15) days prior request of Landlord, make all such records available for examination at the address specified in this Lease for notices to Tenant during regular business hours.  If Landlord makes an audit of the Threshold Period and the Gross Sales shown by Tenant's statement for such Threshold Period had been understated such that Tenant's Gross Sales exceed the Threshold Sales, Tenant must pay to Landlord the reasonable costs of Landlord's audit and Tenant's Notice to Terminate shall be deemed null and void.

## SECTION 8.  TAXES

(a)     Landlord covenants and warrants that the tax parcel on which the Premises is located (the "Tax Parcel") does not extend beyond the perimeter of the Shopping Center Site and that the improvements comprising the Shopping Center (including the Premises and Common Areas) as set forth on Exhibit B are the only improvements now located thereon.

(b)     If any Taxes may be paid in installments, subject to the exclusions below, only the installments coming due during the Term will be included within Taxes. Landlord shall use commercially reasonable efforts to minimize the Taxes assessed against the Tax Parcel.   In addition, Tenant is responsible for paying any sales and rent tax imposed on the Rent by the applicable Public Entity.

(c)     Tenant must pay before delinquency all municipal, county and state taxes assessed during the Term against any leasehold interest and personal property of any kind, owned by or placed in, upon or about the Premises by Tenant.

(d)     "Taxes" as used herein, means all real property taxes, possessory interest taxes, government property lease excise taxes, personal property taxes assessed against the Buildings and Improvements within the Shopping Center, excise taxes, assessments (whether arising from any Improvement District or Special Taxing District or otherwise, including the Improvement District or

14

Special Taxing District to be formed by Landlord and/or the Town pursuant to the Development Agreement), excises, levies and all other charges of whatsoever kind in nature and whether the foregoing be general or special, ordinary or extraordinary, foreseen or unforeseen, which at any time during the Lease Term may be imposed upon Tax Parcel, including those imposed or required by governmental authorities having jurisdiction to increase tax increments to such governmental authorities and for services such as fire protection, street, sidewalk and road maintenance, refuse removal or other governmental services formerly provided without charge to property owners or occupants assessed against the Tax Parcel, provided the following are excluded from Taxes:

> (i)      Any portion of the Taxes assessed: (1) against additional buildings or other taxable improvements not now constructed on the Tax Parcel or shown on the Site Plan as being part of the Shopping Center; or (2) otherwise attributable to any increase in the assessed value of the Tax Parcel by reason of such improvements or work;

> (ii)     Any portion of the Taxes attributable to a revaluation of the Tax Parcel arising out of a sale or other change in the ownership thereof or of any interest therein if such sale or change triggers an immediate increase in Taxes (i.e., an increase that is collected in the same tax period during which the sale or change occurs);

> (iii)    Any portion of the Taxes in the nature of fees, charges or assessments for governmental services or improvements related to the initial construction or any alteration, expansion or rehabilitation of the Shopping Center or other improvement of the Tax Parcel;

> (iv)    Any tax or fee that applies generally to all business owners or operators, as opposed to owners of real property;

> (v)     Any impact fee, user fee, exaction fee, environmental fee or other tax paid as a prerequisite to construction of the Shopping Center, or any addition or improvement thereto;

> (vi)    Estate tax, inheritance tax, succession tax, capital levy tax, corporate franchise tax, margin tax, profits tax, net income tax, conveyance fee or transfer tax and the like;

> (vii)   Any assessment, bond, tax, or other finance vehicle that is (A) imposed as a result of Landlord's initial construction of the Shopping Center, or (B) used to fund construction of additions or improvements to the Shopping Center; and

15

(viii)   Any penalty, interest or other charge attributable to Landlord's late or delinquent payment of Taxes.

## SECTION 9. COMMON AREA COSTS

(a)      On or before April 1 of each year during the Lease Term, Landlord must provide Tenant with a reasonably detailed statement assessing and prorating the Common Area Costs, together with copies of all underlying bills.

(b)      Once per Lease Year, Tenant or its agent has the right to audit and inspect Landlord's books and records pertaining to Common Area Costs and Taxes upon not less than fifteen (15) days prior written notice for the current Lease Year or any or all of the prior three (3) Lease Years, but not more than once with respect to any such Lease Year. If any audit or review of Landlord's books and records determines that Landlord has overstated any Common Area Costs or Taxes by more than five percent (5%), then Landlord must pay to Tenant the out of pocket reasonable costs of such audit or review up to a maximum cost of $2,500.00; otherwise the audit or review shall be at Tenant's sole cost and expense. Landlord shall maintain its books and records for all relevant periods required under this Lease.

(c)      As used herein, "Common Area Costs" mean the costs and expenses incurred by Landlord in operating, maintaining, insuring, repairing and replacing, where required, the Common Areas, provided the following are excluded from Common Area Costs:

(1)   the original cost, or depreciation of the original cost, of constructing, erecting and installing the Shopping Center, the Common Areas, common facilities and related services;

(2)   principal and interest payments pursuant to any mortgage that encumbers the Premises or Shopping Center;

(3)   Taxes;

(4)   administrative charges, management fees, fees based upon a percentage calculation, leasing commissions or any other fee or charge regardless of the name (including, without limitation, salaries of all kinds, social security, taxes, insurance, part-time or full-time labor, any fees paid to manage the Shopping Center including those paid to a third party management company, and similar costs and expenses) that is related to the management and operation of the Shopping Center;

(5)   excess premiums for insurance covering the Common Areas occasioned by the extra-hazardous use or activities of occupants other than Tenant;

16

(6)     expenses incurred due to the negligence or willful misconduct of Landlord or any occupant of the Shopping Center or their respective agents or employees;

(7)     costs and expenses incurred for repairs or replacements due to faulty construction, faulty workmanship or structural defects;

(8)     expenses related to an individual occupants of the Shopping Center or to a particular tenant space, or to buildings;

(9)     any cost, fees, fines or penalties, or interest thereon, related to violations by Landlord or any occupant of any Law;

(10)    capital expenditures (a capital expenditure is defined as an item or items costing $5,000 or more and having a useful life of at least one year); other than a "Permitted Capital Expenditure." A Permitted Capital Expenditure is limited to the following:  repaving of the parking lot(s) not more frequently than once every seven years; provided, however, that each Permitted Capital Expenditure must be amortized on a straight-line basis over the useful life of the related improvement based on federal income tax guidelines, but in no event less than seven years, and only the amount of the annual amortization shall be included in Common Area Costs for any Lease Year within the useful life so determined;

(11)    reserves for replacement;

(12)    costs for insuring the Common Areas, but this exclusion does not limit Landlord's rights of reimbursement, if any, under Section 21;

(13)    cost of advertising, marketing, decorating, redecorating, or special cleaning or other services not provided on a regular basis;

(14)    all costs and expenses relative to the solicitation and execution of leases for space in the Shopping Center;

(15)    all costs and expenses related to the operation, maintenance and repair of any garage space in the Shopping Center;

(16)    the cost of any repair or replacement made by Landlord because of the total or partial destruction of the Shopping Center or the condemnation of a portion of the Shopping Center or the Shopping Center Site;

17

(17)    any operating expense paid to a related corporation, entity or person that is in excess of that amount that would have been paid absent such relationship;

(18)    the cost of overtime or other expenses incurred by or on behalf of Landlord to correct any default of Landlord or for work performed by or on behalf of Landlord where such work is expressly provided in this Lease or any other lease the cost of which was/is to be borne at Landlord's expense;

(19)    any cost that is paid or reimbursed by third parties, including warranties and guarantees and including any cost that is paid or reimbursed by insurance (or would have been covered by insurance required to be maintained by Landlord); and

(20)    the amount of any insurance deductible or self-insured retentions.

(d)    Landlord shall use its commercially reasonable efforts to keep Common Area Costs to a minimum subject, however, to the obligation of Landlord to maintain the Shopping Center as a first-class retail project.

## SECTION 10.  CONSTRUCTION OF PREMISES

(a)    Within ninety (90) days after the mutual execution of this Lease, (the "Plans Delivery Date"), Landlord shall prepare and submit to Tenant for Tenant's approval proposed plans and specifications (the "Proposed Plans"), which Proposed Plans will conform to Tenant's then current Prototype Plans, subject to such changes as may be required by law or which are reasonable given the unique conditions of the Premises but which shall in all events comply with the Lease Outline Drawing with Minimum Landlord Requirements attached hereto as Exhibit C-1; provided, however, notwithstanding Tenant's Prototype Plans to the contrary: (1) Tenant shall accept the existing stock room wall, existing rear hallway and existing restrooms and shall reuse existing lighting controls and circuiting for installation of its prototype light fixtures in all areas; and (2) Tenant shall reimburse Landlord for any documented, out-of-pocket costs incurred as a result of conforming to the then current Prototype Plans as opposed to the FY12 Prototype Plans. If Tenant fails to approve or disapprove, in writing, the Proposed Plans within fifteen (15) days after receipt thereof from Landlord, then such approval will be deemed to have been granted. If Tenant furnishes Landlord a written response, Landlord agrees to resubmit revised Proposed Plans within 10 days after having received Tenant's response, and Tenant will then have a ten (10) day period within which to review the same. If Tenant fails to respond within said ten (10) days, then such revision will be deemed approved.  Such review process will continue until the Proposed Plans are acceptable to both Landlord and Tenant, whereupon the same will constitute "Landlord's Approved Plans", from which Landlord shall build out the Premises. If the parties do not reach agreement on the Landlord's Proposed Plans within ninety (90) days after their first submission to Tenant despite good faith efforts by the Landlord and Tenant, then either party may terminate this Lease upon thirty (30) days

18

prior written notice to the other party. If Landlord terminates this Lease under this Section then Tenant within fifteen (15) days after such termination, may void Landlord's termination notice by notifying Landlord that Tenant accepts the most recent Proposed Plans. Within fifteen (15) days of Landlord's receipt of approval of Landlord's Proposed Plans, Landlord shall apply for all required governmental permits and approvals necessary for Landlord's Work, and Landlord shall diligently pursue obtaining such permits and approvals.

(b)    Landlord must perform its work shown on Landlord's Approved Plans in accordance with Landlord's Approved Plans and Exhibit C, and any other items set forth on Exhibit C, at no cost to Tenant, in accordance with the terms of this Lease, the project coordination guidelines (Exhibit E), and in accordance with all Laws ("Landlord's Work"). Landlord will, at Landlord's sole cost and expense, apply for and receive from the appropriate Public Entity the temporary and permanent certificates of occupancy. Landlord or Landlord's agent shall coordinate and be responsible for the installation of access for telephone service, which "installation" shall include (i) conduit installation with pull string from the local telephone company's main point of entrance to the Premises, (ii) installation of a plywood phone board allowing termination of service by the local phone company within the Premises, and (iii) installation of #6 ground rod.. The installation access for telephone service must be complete on the date that is 90 days prior to the Delivery Date and Landlord shall notify Tenant of such completion (it being agreed and understood that, at Tenant's option, the Delivery Date may be delayed on a day-for-day basis for each day the installation of the telephone service remains incomplete after said date.) Subject to Unavoidable Delays and material delays caused by Tenant, Landlord must deliver to Tenant the Premises no later than the Estimated Delivery Date in compliance with all Laws and free of all Hazardous Material.

(c)    Landlord must give Tenant notice of the Delivery Date not less than ninety (90) days prior thereto. At any time between such notice and the Delivery Date Tenant will have access to the Premises for inspection and performance of Tenant's Work. In no event will Tenant be required to accept delivery of the Premises (i) prior to the Estimated Delivery Date, or (ii) unless and until all conditions to the occurrence of the Delivery Date have been satisfied. If Tenant accepts delivery of the Premises prior to the Delivery Date, Landlord must satisfy the conditions to the Delivery Date as soon as possible and, in doing so, must not unreasonably interfere, and must cause its contractors not to unreasonably interfere, with the fixturing, furnishing, equipping, and stocking of the Premises by Tenant and its contractors.

(d)    Landlord's Work must be substantially completed (i.e., complete with the exception of minor "punchlist" items which can be completed without interfering with the performance of Tenant's Work) and possession of the Premises must be delivered to Tenant for the installation of Tenant's fixtures, furnishings, equipment and inventory and the other the Delivery Requirements must be satisfied on or before the Estimated Delivery Date. If any punchlist items (hereinafter defined) remain to be completed on the Delivery Date, Landlord shall complete the same as promptly as possible (and in any event within fifteen (15) days after the Delivery Date) without interfering with the performance of Tenant's Work. If any "punchlist" items remain to be

Queen Creek Marketplace, Queen Creek, AZ
EXECUTION VERSION: August 5, 2011
UB Document No. 756176v.10

completed on the Delivery Date, Landlord shall complete the same as promptly as possible (and in any event within fifteen (15) days after the Delivery Date) without interfering with the performance of Tenant's Work. If any "punchlist" items are not completed within such fifteen (15) day period, then Tenant, after forty eight (48) hours' notice to Landlord, may complete the same, and Landlord must reimburse Tenant for the reasonable and documented cost thereof upon demand. If the Delivery Date has not occurred on or before the Outside Delivery Date, Tenant will have the right, but is not obligated, to accept delivery of the Premises, without relieving Landlord of any obligation to complete Landlord's Work and otherwise to satisfy the conditions to the Delivery Date.

(e)     Subject to Unavoidable Delays and material delays caused by Tenant, if Landlord does not deliver the Premises to Tenant in the condition as herein required by the Estimated Delivery Date, Landlord must pay to Tenant the sum of Twenty Five Thousand and No/100 Dollars ($25,000.00) (the "Lump Sum Payment"). In addition, for each day after the Estimated Delivery Date that the Premises are not delivered to Tenant in the condition as herein required (subject to Unavoidable Delays and material delays caused by Tenant), Landlord must pay to Tenant the sum of Two Hundred and No/100 Dollars ($200.00) (the "Per Diem Payment") for each day between the Estimated Delivery Date and the earlier to occur of (1) the Delivery Date; or (2) the date Tenant terminates this Lease in accordance with Section 10(g), up to a maximum of sixty (60) days.

(f)     If Landlord fails to pay Tenant the Lump Sum Payment and/or the Per Diem Payment, then Tenant will have the right (without limiting any other right or remedy of Tenant to collect such payment) to deduct such amount, together with interest thereon at the Default Rate, from Rent. Landlord and Tenant agree that it will be difficult to determine the precise amount of damages that Tenant will incur as a result of the failure of the Delivery Date to occur by the Estimated Delivery Date. Therefore, Landlord and Tenant agree that the Per Diem Payment and the Lump Sum Payment constitute liquidated damages for such failure.

(g)     If the Delivery Date has not occurred on or before the Outside Delivery Date, then Tenant has the right to terminate this Lease by delivering written notice to Landlord at any time from and after the Outside Delivery Date but before the Delivery Date. After delivery of Tenant's notice of termination, Tenant shall be relieved of all obligations and liability hereunder. If Tenant so terminates this Lease, Landlord shall be liable to Tenant for all payments due Tenant under Section 10(e). This Section 10(g) survives the termination of this Lease.

(h)     As used herein, a "Tenant caused delay" means a failure of Tenant to perform when and as required hereunder which is not a result of matters outside the reasonable control of Tenant and which is not cured by Tenant within two business days after written notice specifically providing that Tenant's failure to cure will be a "Tenant caused delay" hereunder; provided that with respect to the failure by Tenant to timely respond to any submission of plans from Landlord as required hereunder, after Landlord has given one such notice, it shall not be required to give further notice as to any subsequent failure by Tenant to timely respond to any submission of plans from Landlord as required hereunder, and any subsequent failure by Tenant to timely respond to any

20

submission of plans from Landlord as required hereunder shall immediately be a "Tenant caused delay."

(i)    If, as a result of, or as a condition to, Landlord's Work, any Hazardous Material is required by Law to be removed, abated, or otherwise remediated, then Landlord must perform such removal, abatement or remediation. If, as a result of, or as a condition to, Tenant's Work, any Hazardous Material is required by Law to be removed, abated, or otherwise remediated, then Landlord must reimburse Tenant within thirty (30) days for Tenant's cost of such removal, abatement or remediation, and if not so reimbursed, Tenant may deduct the cost from Rent.

## SECTION 11.  USE

The Premises may be used for the Permitted Use and for any other lawful retail use that is not a use that violates the exclusive use restrictions set forth on Exhibit F, or the use restrictions that are set forth on Exhibit F-1. Landlord represents that Exhibit F and Exhibit F-1 accurately reflect exclusives, uses and encumbrances that will encumber the Premises as terms of leases of Shopping Center premises (the uses covered by such restrictions are collectively referred to as the "Restricted Uses" and individually as a "Restricted Use"). When a Restricted Use is no longer applicable for the benefit of another premises, the Premises will not be subject to such Restricted Use and such use will no longer be a Restricted Use.

## SECTION 12.  COMMON AREAS

(a)    At its own cost (except as otherwise specified in Section 9), Landlord must construct, install, operate, manage, equip, light, repair and maintain the Common Areas in a serviceable, neat and clean condition for the benefit of the tenants of the Shopping Center and their customers, employees, licensees and invitees. Landlord's obligations with respect to the Common Areas include, but are not limited to, equipping, lighting, snow and ice removal, cleaning, gardening, landscaping, public liability and property damage insurance, repairs, replacements, striping and line painting, sanitary control, security arrangements including private police and similar services and functions, if necessary. Landlord may close any Common Areas temporarily, at such times as to cause the least possible interruption or interference with Tenant's business, to make repairs or changes, to prevent the acquisition of public rights in such Common Areas or to discourage non-customer parking; but, in no event will the Protected Area be closed (except in the event of an emergency) without the prior reasonable consent of Tenant. In no event shall Landlord designate the Protected Area as an employee parking area or otherwise permit the Protected Area to be used for employee parking.

(b)    Landlord must keep the Common Areas clean and well lighted from dusk until at least one-half hour after the close of Tenant's business (but in no event after 10:30 p.m.) and remove snow from the parking areas, driveways and sidewalks as promptly as possible. Unless required by a Public Entity, Landlord cannot impose any parking charges for the parking of

21

automobiles in the parking areas. Landlord cannot grant any rights in, or permit special or exclusive use of, the sidewalk space or parking areas directly in the front of the Premises or in the exterior area near the rear door of the Premises.

## SECTION 13.   UTILITIES

Landlord, at its sole cost and expense, must cause all utilities furnished to the Premises to be separately metered so that only the service provided to the Premises will be reflected in utility bills rendered to Tenant by the respective supplying public utility companies. Tenant must pay, when due, bills for utilities furnished to the Premises by public utility companies from and after the Delivery Date, including water, gas, electricity and telephone and the like, as are separately metered and charged directly to Tenant.

## SECTION 14.   INTENTIONALLY DELETED

## SECTION 15.   CO-TENANCY

(a)     <u>Possession Co-Tenancy</u>.

(i)     The Possession Co-Tenancy Requirement means that: (A) Target (the "<u>Anchor Tenant</u>") is open for business to the public during normal operating hours from substantially all the premises as shown on the Site Plan (the "<u>Anchor Tenant Premises</u>"); and (B) at least three Key Tenants are open for business to the public during normal operating hours from substantially all of their respective premises as shown on the Site Plan (the "<u>Key Tenant Premises</u>.") Notwithstanding anything to the contrary, Tenant is not required to accept delivery of the Premises, and the Delivery Date herein shall not be deemed to occur, until the Possession Co-Tenancy Requirement is met

(ii)     Tenant may, in its sole discretion, accept delivery of the Premises prior to the date the Possession Co-Tenancy Requirement is met, in which event the Delivery Date hereunder shall, provided all other conditions to the Delivery Date have been satisfied, occur on the date Tenant waives in writing the Possession Co-Tenancy Requirements.

(iii)     If the Possession Co-Tenancy Requirement is not met for twelve (12) months from the date the Delivery Date would otherwise have occurred, then Tenant may, as its sole and exclusive remedy, terminate this Lease by written notice to Landlord at any time within thirty (30) days thereafter and prior to the date the Possession Co-Tenancy Requirement is met. If Tenant does not provide to Landlord written notice that Tenant elects to terminate this Lease on account of the failure of the Possession Co-Tenancy requirements within thirty (30) days following the expiration of the twelve (12) month period described in this clause (iii), then, in such event, the Possession Co-Tenancy Requirement shall be deemed to have been waived as of the expiration of such thirty (30) day period.

22

(iv)    The "Key Tenants" are Kohl's, Stein Mart, Bed Bath & Beyond, Ross, Sports Chalet and Pets Mart.

(b)    Opening Co-Tenancy.

(i)    The Opening Co-Tenancy Requirement means that: (A) the Anchor Tenant is open for business to the public during normal operating hours from substantially all the Anchor Tenant Premises; and (B) at least three Key Tenants are open for business to the public during normal operating hours from substantially all of their respective Key Tenant Premises. Notwithstanding anything to the contrary, Tenant is not required to open for business, nor is Tenant obligated for the payment of Rent, until the Opening Co-Tenancy Requirement is met, except as set forth in clause (ii) below.

(ii)    If Tenant elects to open for business before the date that the Opening Co-Tenancy Requirement is met, then from the date Tenant opens for business until the Opening Co-Tenancy Requirement is met, Tenant shall pay Substitute Rent.

(iii)    If the Opening Co-Tenancy Requirement is not met for one hundred eighty (180) days from the date the Commencement Date would otherwise have occurred, then Tenant has the one time right and option to terminate this Lease by giving one hundred eighty (180) days prior written notice to Landlord delivered within one hundred eighty (180) days thereafter. If Tenant does not terminate the Lease within such time, Tenant shall thereupon be obligate to thereafter pay the full Rent due hereunder.

(c)    Ongoing Co-Tenancy.

(i)    The Ongoing Co-Tenancy Requirement means that: (A) the Anchor Tenant is open for business to the public during normal operating hours from substantially all the Anchor Tenant Premises; and (B) at least four Key Tenants are open for business to the public during normal operating hours from substantially all of their respective Key Tenant Premises..

(ii)    If, at any time after the satisfaction of the Opening Co-Tenancy Requirement, or the period to terminate this Lease under subsection (b) above has expired, the Ongoing Co-Tenancy Requirement is not met, then Tenant shall pay Substitute Rent until the Ongoing Co-Tenancy Requirement is satisfied.

(ii)    If the Ongoing Co-Tenancy Requirement is not met for twenty four (24) months, then Tenant has the one time right and option to terminate this Lease by giving ninety (90) days prior written notice to Landlord delivered within ninety (90) days thereafter. If Tenant does not terminate the Lease within such time, Tenant shall thereupon be obligate to thereafter pay the full Rent due hereunder.

Queen Creek Marketplace, Queen Creek, AZ
EXECUTION VERSION: August 5, 2011
UB Document No. 756176 v.10

(d)  <u>Definitions</u>.

(i)  A national comparable retail tenant or tenants suitable for occupancy in a first-class shopping center and operating under one trade name in 75% of the Anchor Tenant Premises or Key Tenant Premises, as applicable, will be deemed to be an "<u>Anchor Tenant</u>" or Key Tenant, as applicable, after the commencement of such substitute operation.

(ii)  For purposes of this Lease, "<u>national</u>" shall mean a first-class retailer operating at least 25 stores in multiple states.

(iii)  A "<u>retail tenant</u>" is a non-residential, non-office tenant, who sells goods to consumers, provided that any tenant that has office space within its premises incidental to a retail use shall still be considered a retail tenant. For clarification purposes only, restaurants and salons shall be considered retail tenants. Real estate or securities brokerage offices, financial or tax planning services, accounting offices, insurance or legal services, travel agencies, banks, health clubs, cinemas, bowling alleys, comedy clubs, medical offices, and dental offices shall not be considered retail tenants.

## SECTION 16.  RULES AND REGULATIONS

(a)  Landlord may, for the general welfare of the Shopping Center or the avoidance of nuisance, impose reasonable rules and regulations of general application governing the conduct of tenants in the Shopping Center and the use of the Common Areas (it is agreed and understood that such rules and regulations and any subsequent modifications thereto, notwithstanding anything to the contrary in this Lease, shall be subject and subordinate to the terms and conditions of the body of this Lease so that in the event of any conflict or inconsistency between the terms hereof and such rules and regulations, the terms hereof shall supersede and control.) Tenant will comply with and perform any and all such rules and regulations imposed by Landlord so long as such rules and regulations do not limit the rights or expand the obligations of Tenant under this Lease and all occupants of the Shopping Center are subject to and comply with such rules and regulations. Landlord must use commercially reasonable efforts to enforce such rules and regulations.

(b)  Tenant is not required to join or maintain membership in any tenant's business association sponsored by or for the Shopping Center, nor is Tenant required to pay any of the costs of the activities conducted by such association.

## SECTION 17.  ALTERATIONS, INSTALLATIONS AND IMPROVEMENTS BY TENANT

(a)  Tenant, without Landlord's consent, has the right during the continuance of this Lease to make such interior alterations, changes and improvements to the Premises as Tenant may desire for the conduct of Tenant's business and for the full beneficial use of the Premises; except for structural changes, alterations or improvements that affect the exterior, the storefront, structure or

24

roof of the Premises or any mechanical or utility systems serving any other portions of the Shopping Center, which may be made by Tenant only with, Landlord's written consent, which consent must not be unreasonably withheld or delayed.   Tenant will pay all costs and expenses of its improvements, will make such changes, alterations and improvements in a good and workmanlike manner, in accordance with all applicable laws and building regulations, and free and clear of any mechanic's liens or other liens or claims in connection with the making of such changes, alterations and improvements. Tenant shall repair any damage caused by the removal of any personal property from the Premises, which obligation survives the expiration or early termination of this Lease.

(b)      Except as otherwise provided, all signs, furnishings, trade fixtures, inventory, equipment and other removable property installed in the Premises by Tenant will remain the personal property of Tenant, will not be subject to any Landlord's lien or lien or security interest against the property of Landlord, and may be removed from the Premises by Tenant upon the termination of this Lease. If any of the foregoing is affixed to the Premises and require severance, then Tenant may remove such property only if Tenant repairs any damage caused by such removal. Tenant's obligation to repair survives the expiration or earlier termination of this Lease.

## SECTION 18.   REPAIRS AND MAINTENANCE

(a)      Except as otherwise provided, Tenant shall maintain, repair and replace the interior, non-structural portion of the Premises, at its sole cost and expense, in an attractive, clean and sanitary condition and in good working order, repairs and condition.

(b)      Landlord warrants and guarantees that all structural portions of the Premises and the roof, utility cables, mains and conduits, the HVAC, electrical, gas, plumbing, sprinkler, and sewer systems are, and will be upon the Delivery Date, in good working order and repair (it is agreed and understood that the floor slab moisture shall not exceed, per ASTM F1869-98, five pounds per 1,000 square feet per 24 hours of moisture) and shall meet ASTM requirements to allow for the installation of resilient flooring, and that the Premises and Common Areas surrounding the Premises are water-tight (for example, there is no standing water outside or inside of the Premises), and there are not, and will not be on the Delivery Date, any violations of any Laws. Landlord, at no cost to Tenant, must promptly correct any code violations subsequently found to exist in the Premises that relate to either Landlord's Work or the structural components of the Premises, and must promptly replace or repair, in a good and workmanlike manner and using the highest quality materials, any defects in workmanship, material or equipment that may appear in, on or about Landlord's Work during the Term.

(c)      Subject to Section 18(d), and except for damage caused by fire or other casualties or taking by eminent domain or conveyance in lieu thereof: Tenant, at its sole cost and expense, must make all interior nonstructural repairs to the Premises, including doors and windows, and (1) all repairs to the plumbing and gas systems exclusively serving the Premises from their respective meters to and including the plumbing and gas systems in the interior of the Premises, and (2) the

25

electrical system exclusively serving the Premises from Tenant's electrical panel to and including the electrical systems in the remainder of the interior of the Premises. Notwithstanding the foregoing, Tenant is not required to make any: (i) repairs of damage covered by insurance maintained or required to be maintained by Landlord; (ii) repairs necessitated by reason of the negligence, willful misconduct, or default of Landlord, its agents, employees or contractors; (iii) repairs to the plumbing, gas, electrical or other similar units and systems where such repairs would necessitate going through or into the floor slab, structural walls, or roof of the Premises; (iv) replacement of any plumbing, gas, electrical or similar units or systems; or (v) repair or replacement of the sprinkler, life safety or other detection or suppression system. All of the repairs and replacements referred to in the immediately preceding sentence will be performed by Landlord at its sole cost and expense.

(d)    Landlord, at its sole cost and expense, must make all repairs to the Premises other than those that Tenant is required to make. Landlord's obligations include, but are not limited to, repairs to the structural portions of the Premises (both interior and exterior), the roof, floor slab, foundation, exterior walls, any interior damage caused by roof leaks or water/sewage backing up into the Premises no matter where from, and all repairs or replacements to the (x) gas and plumbing systems or any portion thereof up to (but not including) their respective meters, and (y) the electrical system up to (but not including) Tenant's electrical panel (and not including HVAC, except as set forth herein). In making any repairs or replacements, Landlord must not unreasonably interfere with Tenant's normal operations and business. Landlord assigns to Tenant all warranties and guarantees, if any, with respect to any and all construction and equipment on the Premises to be maintained by Tenant and will use commercially reasonable efforts to enforce any such warranties on behalf of Tenant that cannot be assigned to Tenant.

(e)    Landlord will deliver the existing HVAC units and system in good working condition and per Tenant's minimum heating and cooling specifications and in accordance with Tenant's Prototype Plans. Landlord will warrant those HVAC units for the first twenty (12) months commencing with the Rent Commencement Date ("Warranty Period"). Landlord's liability under the foregoing warranty shall be limited to the repair and/or replacement, as the case may be, of defective parts and in no event shall Landlord be liable for special or consequential damages. Landlord shall have no obligation with respect to the foregoing warranty unless Tenant gives Landlord written notice of any operational or mechanical defects prior to the expiration of the Warranty Period. Commencing on the first day after the expiration of the Warranty Period, Tenant will be responsible for all repairs and replacements of the HVAC unit(s) or if the Landlord must replace any of the HVAC unit(s) (replacement must include a five-year extended warranty covering the compressor(s) and a ten-year extended warranty covering the heat exchanger(s)) during the Warranty Period, Landlord will assign the warranties to Tenant on a non-exclusive basis and Tenant will then be responsible for all repairs and replacements to the replaced HVAC unit(s) from the date of such assignment forward, except as specifically set forth herein. In addition, Landlord has provided the Tenant with a survey of the existing conditions of the HVAC units along with pictures, manufacturer's name, plus the serial and model numbers, and tonnage for each HVAC

unit. Notwithstanding anything to the contrary in the Lease, if Tenant should replace the HVAC system or any part thereof during the final two years of the Initial Term or any Lease extension or renewal or prior to a sales kickout, if any, and not remain in possession of the Premises pursuant to a subsequent Lease extension or renewal, then the Landlord shall reimburse Tenant, within thirty (30) days of the deliver back of possession of the Premises to the Landlord, for the un-amortized cost of said replacement based on a straight-line amortization schedule over the useful life of the equipment in accordance with federal income tax guidelines (in no event less than ten (10) years). The provisions of the immediately preceding sentence shall not apply in the event this Lease terminates due to a default by Tenant, damage or destruction of the Premises by casualty event, or as a result of a taking or eminent domain.

(f)     Tenant will maintain the Premises, at its expense, free and clear of all rubbish, garbage and trash and place such rubbish, garbage and trash in the containers provided by Tenant, which containers shall be of sufficient size to satisfy the rubbish, garbage and trash requirements of Tenant. Tenant, at its own cost and expense, will dispose of all rubbish, garbage and trash on a timely basis. Landlord will provide an area for Tenant's trash containers, at Landlord's sole cost and expense, reasonably proximate to the rear of the back door to the Premises.

(g)     Subject to this <u>Section 18</u>, Tenant will keep the Premises in an orderly and sanitary condition, free from vermin, rodents, bugs and other pests, and Landlord must keep the Common Areas in an orderly and sanitary condition, free from vermin, rodents, bugs and other pests. Notwithstanding the foregoing, Landlord is responsible for the extermination of termites, carpenter ants, and other insects capable of causing structural damage in, on or about the Premises, the Common Areas, and all parts of the Shopping Center.

(h)     Notwithstanding anything to the contrary in this Lease, Tenant is responsible for making any interior non-structural alterations of or improvements to the Premises that are required by any Public Entity after the Delivery Date, except to the extent that such responsibility is imposed upon Landlord in the next following sentence or otherwise under this Lease. Landlord is responsible, at its sole cost and expense, for making all alterations of or improvements to the Premises that are required by any Public Entity and that (i) are structural in nature, (ii) relate to the exterior thereof, (iii) relate to the sprinkler, utility or life safety systems therein that are shared with one or more other tenants of the Shopping Center, or (iv) relate to the handicapped or disabled and are not the result of, or related to, Tenant's specific use of the Premises for the Permitted Use.

## SECTION 19.   INDEMNIFICATION

(a)     Except as otherwise provided in this Lease, but subject to <u>Section 21</u> hereof, Landlord and its agents and employees shall not be liable for damage to property sustained by Tenant resulting from any accident or occurrence in the Premises including, but not limited to, claims for damage resulting from:  (i) any equipment or appurtenances becoming out of repair; (ii) injury done or occasioned by wind; (iii) any defect in or failure of plumbing, HVAC equipment,

27

electric wiring, gas, water and steam pipes, stairs or walks; (iv) broken glass; (v) the backing up of any sewer pipe or downspout; (vi) the bursting, leaking or running of any tank, tub, washstand, water closet, waste pipe, drain or any other pipe or tank in, upon or about the Premises; (vii) the escape of steam or hot water; (viii) water, snow or ice being upon or coming through the roof, skylight, trap door, stairs, walks or any other place upon or near the Premises; and (ix) the falling of any fixture, plaster or stucco. Nothing in this Section is intended to relieve Landlord of its maintenance obligations under this Lease.

(b)    Without limiting any liability between Landlord or Tenant imposed under this Lease or under law, Landlord shall be liable to Tenant for damages: (i) if Landlord, after receipt of notice from Tenant or actual knowledge, fails to commence and complete repairs that are the Landlord's obligation, within a reasonable time under the circumstances then existing, or (ii) if such damage is otherwise caused by the act, omission or negligence of Landlord, its agents, employees, or contractors.

(c)    Subject to the mutual waiver of subrogation, Tenant must indemnify, defend and hold Landlord harmless from and against any and all claims, demands, actions, damages, liability and expense in connection with loss, damage or injury to persons or property occurring in, on or about, or arising out of the Premises; or arising out of the acts or omissions of Tenant, Tenant's agents, contractors, or employees. Subject to the mutual waiver of subrogation, Landlord must indemnify, defend and hold Tenant harmless from and against any and all claims, demands, actions, damages, liability and expense in connection with the loss, damage or injury to persons or property, arising out of the acts or omissions of the Landlord, Landlord's agents, contractors or employees, or arising out of the use or operation of the Common Areas.

(d)    If either party, without fault on its part, is made a party to any litigation commenced by or against the other party, then such other party shall protect and hold such first party harmless and shall pay all costs, expenses and reasonable attorney's fees incurred or paid by such first party in connection with the litigation.

This Section 19 survives the expiration or termination of this Lease.

## SECTION 20.  WAIVER OF CLAIMS

Notwithstanding any provision to the contrary, Landlord and Tenant waive any and all right of recovery, claim, action or cause of action against the other, their respective agents and employees, for any loss or damage that may occur to the Premises or the Shopping Center or any additions or improvements thereto, or any contents therein, by reason of fire, the elements or any other cause which could be insured against under the terms of a standard special form insurance policy or policies, or for which Landlord or Tenant may be reimbursed as a result of insurance coverage insuring any loss suffered by either party, regardless of cause or origin, including the negligence of Landlord or Tenant, or their respective agents and employees. This waiver applies regardless of

28

whether either party actually obtains property insurance, and regardless of whether any insurance proceeds are collected. All property insurance policies required under this Lease covering the Premises or the Shopping Center must expressly waive any right on the part of the insurer against the other party for damage to or destruction of the Premises or the Shopping Center resulting from the acts or omissions of the other party.

## SECTION 21.  PROPERTY AND LIABILITY INSURANCE

(a)    Landlord must keep in full force and effect Commercial General Liability Insurance and Umbrella Insurance with respect to the Shopping Center, including the Common Areas, naming Tenant as an additional insured thereunder to the extent its interest may appear, with nationally recognized companies rated no lower than A-VIII by A.M. Best Company with total minimum limits to apply per location of $2 million on account of bodily injuries or death and/or property damage resulting from one occurrence. Landlord must deposit a certificate or other evidence of such insurance with Tenant.

(b)    Tenant must keep in full force and effect Commercial General Liability Insurance and Umbrella Insurance with respect to the Premises, naming Landlord as an additional insured to the extent its interest may appear, with nationally recognized companies rated no lower than A-VIII by A.M. Best Company with total minimum limits to apply per location of $2 million on account of bodily injuries or death and/or property damage resulting from one occurrence. Tenant's evidence of insurance is maintained by Tenant's insurer on the website of Tenant's insurance broker, which can be accessed through Tenant's website, "JoAnn.com."

(c)    Landlord must keep the Premises and the Shopping Center, including Common Areas, insured against loss or damage by fire, lightning, vandalism and malicious mischief, and such other perils as are now or may hereafter be comprehended in the term "All Risk Coverage" or "special form" coverage or "Special Form Cause of Loss" (or other terms that become the insurance industry standard in the future), including, without limitation, earthquake and flood, if in an area that is designated as an earthquake or flood zone, boiler and machinery, plate glass, power failure, mold, windstorm, terrorism, seepage or leakage and loss of rent damage, in amounts equal to at least eighty percent (80%) of the full replacement value thereof, or such greater amounts as may be required to prevent the application of co-insurance provisions. In addition, Landlord also may maintain rent loss insurance. Such insurance must cover improvements in the Premises owned by Landlord to the extent that the same are customarily insurable as part of the realty, but will not include the cost of restoration of Tenant's trade fixtures, furniture, furnishings, inventory, equipment and other personal property. Notwithstanding anything to the contrary, Landlord is solely responsible for any and all deductibles and self-insured retentions.

## SECTION 22.  SIGNS

(a)    Subject to local codes and ordinances, the Declarations, and compliance by Tenant

Queen Creek Marketplace, Queen Creek, AZ
EXECUTION VERSION: August 5, 2011
UB Document No. 756176 v.10

with Landlord's Master Sign Plan, Tenant may install and maintain a sign or individual letters ("Jo-Ann, Fabric and Crafts" or any other name or slogan that Tenant may adopt) or signs on the front, side, rear or any other fascia of the Premises, as well as a sign or signs on the directory(ies), if any, located in or around the Shopping Center or for use by any of the tenants of the Shopping Center, and "framing," "craft" and similar departmental signs on the front fascia in addition to its regular sign, and a panel on the monument sign on Ellsworth Loop and the monument sign On Rittenhouse Road in the same position as Shoe Pavilion on each (as depicted on Exhibit D-3), all in accordance with Exhibit C and Tenant's Signage Plans attached hereto as Exhibit D-1. All signs will comply with all requirements of any Public Entity, the Declarations and Landlord's Master Sign Plan and Tenant will obtain all necessary permits or licenses.

(b)     In addition to the foregoing signs, subject to local codes and ordinances, the Declarations and compliance by Tenant with Landlord's Master Sign Plan, attached hereto as Exhibit D-2, Tenant may install and maintain a professionally prepared banner sign periodically in front of the Premises as shown on Exhibit D-1.

(c)     Tenant must maintain its signs in good condition and repair at all times, and must save the Landlord harmless from injury to person or property arising from the erection and maintenance of the signs. Upon vacating the Premises, Tenant must remove all signs and repair (exclusive of painting) all damage caused by such removal.

(d)     If Landlord renovates all or any portion of the Shopping Center, which renovation requires the removal of any of Tenant's sign(s), Landlord must first notify Tenant at least 45 days before the removal of such sign(s) and Landlord will bear the cost of such removal and reinstallation, together with the cost of any damage to the sign(s) as a result of such removal or reinstallation. Further, Landlord must provide and install on or about the Shopping Center, at Landlord's sole cost and expense, a banner or other type of temporary sign(s) identifying Tenant's trade name, which banner or sign(s) must be equal in size to Tenant's existing sign and approved by Tenant before such installation.

## SECTION 23.  ASSIGNMENT AND SUBLETTING

(a)     Tenant shall not assign this Lease or sublet all or any part of the Premises for any lawful retail use without Landlord's prior written consent not to be unreasonably withheld or delayed.

(b)     If Tenant assigns this Lease and Tenant's assignee or any subsequent assignee has, at the time of the assignment, or attains at any time after the assignment, a tangible net worth of at least $50,000,000.00 and twenty-five (25) stores open and operating under the same tradename, then Tenant shall be released and discharged from any further liability under this Lease. Such net worth shall be determined as of the end of the most recent fiscal year preceding the intended release unless more current figures are available.

Queen Creek Marketplace, Queen Creek, AZ
EXECUTION VERSION: August 5, 2011
UB Document No. 756176 v.10

(c)    Notwithstanding anything contained herein, Tenant may, upon prior written notice to Landlord but without Landlord's prior consent, assign this Lease or sublease all or any portion of the Premises, to a Tenant Affiliate. "Tenant Affiliate" means: (a) any entity controlling, controlled by or under common control with Tenant; (b) any entity resulting from the merger, consolidation or reorganization of Tenant with or into any other entity; or (c) any entity acquiring all or substantially all of the ownership of Tenant or all or substantially all of Tenant's locations in the State of Arizona. Tenant may also license or grant concessions within the Premises at its discretion provided such operations are an integrated part of the business operations at the Premises and do not have a separate entrance.

## SECTION 24.    REPAIR AFTER CASUALTY

(a)    In the event of damage to or destruction of the Shopping Center or any portion thereof (including the Premises) by casualty or any other cause whatsoever, then, except as otherwise provided in this Section, Landlord promptly must begin and diligently pursue to completion the restoration and repair thereof; but Landlord is obligated to repair the Premises only to their condition on the Delivery Date (subject to alterations thereof required by changes in governmental code). Any repair or restoration of the Premises must be completed within 270 days after the event of damage or destruction and the repair and restoration of other portions of the Shopping Center must be completed as quickly as possible. Within thirty (30) days after an event of damage or destruction, Landlord must deliver to Tenant notice of the anticipated period of restoration.

(b)    Except as otherwise provided in this Section, Tenant has no right to terminate this Lease by reason of damage to or destruction of the Shopping Center (including the Premises). In the event of any damage or destruction to the Premises, then all Rent will abate pro-rata using the same ratio that the portion of the Premises rendered unusable (in Tenant's reasonable judgment) bears to the Gross Leasable Area of the Premises, which abatement will continue until the earlier of (i) ninety (90) days after delivery of the restored Premises; or (ii) the date Tenant reopens in the entire Premises. In the event of damage or destruction to any other portion of the Shopping Center (including the Common Area) that interferes with access to the Premises or the conduct of business therein, Tenant will pay only Substitute Rent until the completion of Landlord's repair and restoration.

(c)    Notwithstanding Section 24(a), Landlord may terminate this Lease and has no restoration and repair responsibility in the event of damage to or destruction of the Shopping Center if (i) the cost of repair or restoration exceeds twenty five percent (25%) of the replacement value of the Shopping Center; (ii) the cost of repair or restoration exceeds $25 million; (iii) the event or destruction was not insurable under the insurance coverage required of Landlord hereunder; (iv) the insurance proceeds payable as a result of the damage or destruction have been applied by the Shopping Center mortgagee against the mortgage debt thereon; or (v) the reasonable period for

Queen Creek Marketplace, Queen Creek, AZ
EXECUTION VERSION: August 5, 2011
UB Document No. 756176 v.10

substantial completion of the repair and restoration exceeds one year. As a condition to the termination by Landlord of this Lease under this subsection (c): (1) the leases of all other occupants in the Shopping Center (excluding only the Anchor Tenants with more Gross Leasable Area than the Premises) must also have been terminated by reason of the event of damage and destruction; and (2) Landlord must have no intent and be under no obligation to rebuild the Shopping Center.

(d)    If the Premises are damaged or destroyed and Landlord has not completed the restoration and repair thereof within 270 days as required in Section 24(a), Tenant has the right, prior to completion of Landlord's restoration and/or repair and without waiving any other right or remedy against Landlord, to terminate this Lease. In the event of damage or destruction to any portion of the Shopping Center other than the Premises which is not repaired, or by Landlord's estimate cannot be repaired, within one year from the event thereof, Tenant has the right to terminate this Lease but has no other claim against Landlord for failure to repair except to the extent that Landlord has failed to use reasonable efforts to complete such repairs as required.

(e)    In addition to all rights to terminate this Lease granted to the parties in this Section, if the Premises are destroyed or damaged during the last two years of the Term to the extent that the cost to repair and restore the same is fifty percent (50%) or more of the value of the Premises immediately before such damage or destruction, then each of Landlord and Tenant has the right to terminate this Lease as of the date of such damage or destruction by giving notice thereof within thirty (30) days after the date of the damage or destruction. If Tenant, within thirty (30) days after receipt of Landlord's notice of termination, gives Landlord notice of its intention to extend this Lease for any additional Extended Term then available to Tenant, then the notice of Landlord to terminate this Lease will be of no force and effect. If Tenant elects to extend this Lease for any additional Extended Terms then available to Tenant, Landlord must use its best efforts to restore the Premises to its former condition with all reasonable speed, and all Rent will abate pro-rata using the same ratio that the portion of the Premises rendered unusable (in Tenant's reasonable judgment) bears to the Gross Leasable Area of the Premises, which abatement will continue until the earlier of (i) ninety (90) days after delivery of the restored Premises; or (ii) the date Tenant reopens in the entire Premises If this Lease is terminated pursuant to this subsection, Landlord must refund within thirty (30) days of notice any Rent paid in advance.

(f)    Notwithstanding anything to the contrary, if Landlord terminates the Lease under this section, and if within two years after such termination Landlord rebuilds the Premises or the Shopping Center for retail use, as the case may be, then Tenant has the right, at its option, to lease space in the Shopping Center comparable to the Premises (the "Substitute Premises") upon the same terms and conditions and for the balance of the Term, provided that the costs to rebuild the Premises or the Shopping Center, as the case may be, are not substantially higher than the original cost to build same. If the cost to rebuild is substantially higher, then Landlord must offer the Substitute Premises to Tenant at rental rates then being offered by Landlord to prospective tenants of the rebuilt Shopping Center. Notwithstanding termination of this Lease, Landlord must notify Tenant of its intention to repair or restore the Premises or the Shopping Center, as the case may be, whereupon

32

Tenant has thirty (30) days after receipt to give Landlord notice of Tenant's intention to accept such Substitute Premises on the terms and conditions set forth above. This subsection 24(f) survives termination of this Lease.

## SECTION 25.    CONDEMNATION

(a)    If thirty percent (30%) or more of the Gross Leasable Area of the Premises or fifty percent (50%) or more of the Gross Leasable Area of the Shopping Center is taken by condemnation or right of eminent domain or conveyed in lieu thereof (a "Taking"), this Lease will terminate at the option of either party as of the day possession is taken by or title vests in the taking authority, and both parties will be released from any further liability hereunder.  In the event of a Taking of less than thirty percent (30%,) but more than five percent (5%), of the Gross Leasable Area of the Premises, then Tenant has the right to terminate this Lease. In the event of a Taking of less than fifty percent (50%), but more than ten percent (10%), of the Gross Leasable Area of the Shopping Center (including the Common Areas), then either party has the right to terminate this Lease.  Any such termination is effective as of the day possession is taken by, or title to the portion taken vests in, the taking authority.

(b)    In the event of a Taking of any portion of the Premises or the Shopping Center, upon which this Lease is not terminated, Landlord, to the extent of the amount awarded, must restore the remainder of the Premises or the Shopping Center (including the Common Areas), with reasonable speed to a complete architectural unit as nearly like its condition prior to such partial taking as shall be practicable, and if during or after the work of restoration Tenant is deprived of all or a part of the use of the Premises, the Rent will abate for so long as Tenant is deprived of such use, in the same proportion as that portion of the Premises taken bears to the entire Premises.

(c)    All damages awarded in connection with the taking of the Premises, whether allowed as compensation for diminution in value to the leasehold or to the fee of the Premises, belong to the Landlord; but, if Tenant has made any material leasehold improvements to the Premises, or alterations or structural changes and repairs to the Premises, at its own expense (regardless of when made), Tenant and not Landlord is entitled to claim an award for the unamortized balance of Tenant's cost thereof.  If the condemning authority does not make a separate award therefor, Landlord, subject to the rights of any mortgagee, must assign a portion of its award equal to such unamortized cost to Tenant.  If Landlord in obtaining its award uses Tenant's cost items, then Tenant is entitled, subject to the rights of any first Mortgagee, to a proportionate share of Landlord's award based upon the costs.  Tenant is also entitled to claim an award for loss of business, damage to merchandise and fixtures, removal and reinstallation costs and moving expenses, in a separate action only.

## SECTION 26.    REPRESENTATIONS AND COVENANTS OF LANDLORD

(a)    On the date hereof Landlord represents, warrants and covenants to Tenant as follows:

Queen Creek Marketplace, Queen Creek, AZ
EXECUTION VERSION: August 5, 2011
UB Document No. 756176 v.10

(1)     The Shopping Center Site is zoned to permit the use of the Shopping Center for general retail purposes, and the Premises are zoned to permit their use as a retail store conducting the Permitted Use, as of right (i.e., without any special permit, approval, variance or other waiver);

(2)     The legal description set forth on Exhibit A matches the Shopping Center depicted on the Site Plan (i.e., Exhibit B) and includes no additional property therein;

(3)     The Common Areas, Premises (excluding Tenant's Work or other alterations made by or on behalf of Tenant or by a party other than Landlord or its agents) and all structural portions of the Shopping Center comply with all Laws;

(4)     The Site Plan correctly and completely shows all improvements currently contemplated to be made to the Shopping Center Site

(b)     Landlord covenants to Tenant during the Term that:

(1)     Landlord will provide surface parking spaces in the Common Areas on an unreserved basis and without cost (other than as may be mandated by a Public Entity in the future), with at least four (4) parking spaces being provided for each 1,000 square feet of Gross Leasable Area within the Shopping Center or the amount required by Laws, whichever is greater;

(2)     Except as shown on the Site Plan as of the date hereof and except if mandated by a Public Entity or as a result of eminent domain proceedings, no building, edifice or obstruction will be placed on the Shopping Center Site and no addition or alteration will be made to the Shopping Center (A) that materially adversely affects access to the Premises; (B) that materially adversely affects the visibility of the front of the Premises (including, without limitation, the signage thereon); or (C) that materially increases the monetary obligations of Tenant under this Lease. Without limiting the generality of the foregoing, except if mandated by a Public Entity or as a result of eminent domain proceedings in no event will any improvement or alteration, including, for example, a reduction in the change in the parking layout or configuration be made to the "Protected Area" as shown on the Site Plan;

(3)     Landlord will maintain, operate and manage the Shopping Center as a first-class retail project in compliance with all Laws, and the Shopping Center will be used and occupied only for normal retail uses customarily conducted in

34

first-class shopping centers.

(4)    In no event will the Shopping Center or any portion thereof be used as or for any use in violation of the Declarations or the Restricted Uses.

(c)    The foregoing representations, warranties and covenants are material considerations and inducements to Tenant in executing this Lease, the breach of which will cause irreparable and severe harm to Tenant. If (i) Landlord breaches any representation, warranty or covenant contained in subsections (b) (1),(2), or (4), and such breach continues for 30 days after written notice of such breach is delivered to Landlord (but Landlord will not be deemed to be in breach if Landlord promptly commences to remedy the default within the 30 day period and proceeds to cure with due diligence, and successfully completes such cure within a reasonable time thereafter), Tenant has the right (A) to terminate this Lease at any time during the period of such breach; or (B) to pay Substitute Rent during the period of such breach; and (ii) Landlord breaches any other representation, warranty or covenant contained herein, and such breach continues for 90 days after written notice of such breach is delivered to Landlord (but Landlord will not be deemed to be in breach if Landlord promptly commences to remedy the default within the 90 day period and proceeds to cure with due diligence, and successfully completes such cure within a reasonable time thereafter), then Landlord shall be deemed in default under the terms of the Lease and Tenant shall have the rights and remedies provided under Section 29 of the Lease on account of such default (including the right to sue for actual damages.)

Notwithstanding anything in the foregoing to the contrary, Tenant shall have no remedy for a violation of subsections (b)(1),(2), or (4), including but not limited to the right to pay Substitute Rent, if such violation is caused by another tenant or occupant in the Shopping Center violating a provision of its lease or license agreement regarding its premises, which either does not permit or specifically prohibits the use that violates such subsections, provided Landlord uses good faith efforts to enforce Landlord's rights under such lease or license agreement, including filing an appropriate legal action to obtain a temporary restraining order, preliminary injunction, or order resulting from an arbitration proceeding enjoining the violation within 30 days after written request from Tenant and Landlord diligently pursues cure through completion.

## SECTION 27.  TENANT'S DEFAULT

(a)    Landlord may, by written notice to Tenant, terminate this Lease, or without terminating this Lease re-enter the Premises by summary proceedings, and may dispossess the Tenant if:

(1)    Tenant fails to pay Rent on or before the due date and then fails to pay same within 10 days after receipt of written notice from Landlord;

(2)    Tenant is in material default in the performance of any of the covenants,

35

terms, conditions and provisions of this Lease, and Tenant fails to remedy such default within thirty (30) days after receipt of written notice thereof (but Tenant will not be deemed to be in default if Tenant commences to remedy the default within the thirty (30) day period and proceeds to cure with due diligence);

(3)    Tenant is adjudged bankrupt or makes an assignment for the benefit of creditors, or if a receiver of any property of Tenant in, upon or about the Premises is appointed in any action, suit or proceeding by or against Tenant and is not removed within ninety (90) days (unless such ninety (90) day period is extended by court order, in which event the time period will be as established by court order or established by such person(s) or entity acting under or for the court) after appointment; or

(4)    The interest of Tenant in the Premises is offered for sale or sold under execution or other legal process, and if not rescinded within ninety (90) days after written notice from Landlord to Tenant.

Landlord must mitigate its damages. In the event of re-entry Landlord must use commercially reasonable good faith efforts to relet the Premises and, in the event of a reletting, must apply the rent therefrom first to the payment of Landlord's reasonable expenses incurred and paid by reason of Tenant's default, next to the reasonable expense of reletting, including, but not limited to, reasonably necessary repairs to the Premises, and then to the payment of rent and all other sums due from Tenant, with Tenant remaining liable for any deficiency. Any and all deficiencies shall be payable by Tenant monthly on the date provided for the payment of Fixed Minimum Rent.

(b)    In the event of a default by either party of any of the terms, provisions, covenants or conditions of this Lease, the other party has the right to invoke any remedy provided at law or in equity; except, however, Landlord is not entitled to terminate this Lease or to dispossess Tenant except for a material default and in no event is Landlord entitled to accelerate Rent. Notwithstanding anything contained herein, in no event is Landlord entitled to exercise self help to lock out Tenant or forcibly retake possession of the Premises without due legal process and an appropriate court order except if: (i) Tenant is in monetary default hereunder after applicable notice and cure period; and (ii) Tenant fails to cure such default within 10 days after a second written notice to Tenant (a "Lock Out Notice") which specifically notifies Tenant that it is in monetary default which if not cured within 10 days may subject Tenant to Landlord's right to exercise self help to lock out Tenant or forcibly retake possession of the Premises without due legal process and an appropriate court order. Notwithstanding the foregoing, Landlord shall not exercise self help to lock out Tenant or forcibly retake possession of the Premises without due legal process and an appropriate court order if within 10 days after its receipt of the Lock Out Notice Tenant pays the alleged past due amount to Landlord, provided Tenant may pay such amount "under protest" by

36

noting same when making such payment, in which event if it is later determined that Tenant did not in fact owe Landlord such amount Landlord shall be obligated to reimburse Tenant the amount paid under protest together with interest thereon at the Default Rate herein.

## SECTION 28.  RIGHTS OF LANDLORD

(a)    Landlord reserves the right at all reasonable times during Tenant's business hours and upon prior reasonable notice to Tenant (except in the event of emergency, when notice is not required) by itself or its duly authorized agents, to inspect the Premises and, to make such repairs as Landlord is obligated to make to the Premises.  In exercising the foregoing right, Landlord must not unreasonably interrupt or disrupt Tenant's business or unreasonably disrupt access to the Premises by Tenant, Tenant's employees, agents, invitees and customers.

(b)    If Landlord makes any payments on behalf of Tenant, which are Tenant's obligation, to fulfill Tenant's covenants, then any amount so paid by Landlord are declared to be "Additional Rent" and are due and payable to Landlord from Tenant with the next installment of Fixed Minimum Rent due thereafter, together with interest thereon at the Default Rate from the date of such advance to the repayment thereof in full.

(c)    Landlord has the right during the last two months before the expiration of this Lease, so long as it does not interfere with Tenant's business, to exhibit the Premises and put up the usual notice "for rent" or "for sale", which notice will not be removed or hidden by Tenant.  No more than one sign will be placed upon the Premises and the sign cannot exceed twelve (12) feet square.

## SECTION 29.  LANDLORD'S DEFAULT

(a)    If Landlord fails to keep and perform any covenant or agreement to be kept and performed by Landlord, then Tenant, in addition to all other remedies now or hereafter afforded or provided by this Lease, at law or in equity, has the right to perform such covenant or agreement for or on behalf of Landlord or make good any such default, and any amount or amounts that the Tenant advances on Landlord's behalf must be repaid by Landlord to Tenant on demand, together with interest thereon at the Default Rate from the date of such advance to the repayment thereof in full.

(b)    Except in the event of emergency, before performing any covenant or agreement on behalf of Landlord, Tenant will provide Landlord with written notice of Landlord's default and Tenant's intent to perform such covenant or agreement, and Landlord will have thirty (30) days within which to complete performance of the same (and Landlord will not be deemed to be in default if Landlord commences to remedy the default within the thirty (30) day period and proceeds to cure with due diligence). For purposes hereof, "emergency" means (i) any event which poses immediate threat of injury or damage to persons or property or (ii) any event which, in Tenant's judgment, threatens Tenant's ability to open for business as scheduled or impairs or interferes with Tenant's business operations.

Queen Creek Marketplace, Queen Creek, AZ
EXECUTION VERSION: August 5, 2011
UB Document No. 756176 v.10

(c)     If Landlord fails to pay any sum to Tenant when due, and if such failure continues for ten (10) days after receipt of notice from Tenant, Tenant has the right, without forfeiture of its other rights hereunder, at its election, to setoff and deduct the same, together with interest thereon at the Default Rate, from Rent. Notwithstanding the foregoing, Tenant's rights of offset under Section 10 hereof will be governed by Section 10.

(d)     If either party fails to pay, when due, any sum due hereunder, the same shall accrue interest at the Default Rate until paid in full.

## SECTION 30. MORTGAGE SUBORDINATION

(a)     Prior to the Delivery Date, Landlord must obtain and deliver to Tenant a non-disturbance and attornment agreement, substantially in the form of Exhibit G (the "SNDA"), from any existing ground lessor, mortgagee or lien holder (except with respect to the Town and the Town Lease.)

(b)     Landlord reserves the right to request from Tenant a waiver of priority of Tenant's leasehold estate hereunder for the purpose of subordinating Tenant's leasehold estate in favor of a first mortgage lien or any refinancing or replacement of a first mortgage loan that Landlord may hereafter deem necessary or desirable. Tenant, upon such request by Landlord, will execute and deliver an agreement substantially in the form of Exhibit G. The word "mortgage" means (y) any lease of land only or of land and buildings in a sale-lease-back transaction involving all or any part of the Shopping Center, or (z) any mortgage, deed of trust or other similar security instruments constituting a lien upon all or any part of the Shopping Center, whether the same shall be in existence as of the date hereof or created hereafter, and any modifications, extensions, renewals and replacements thereof. "Mortgagee" means a party having the benefit of a mortgage, whether as lessor, Mortgagee, trustee or note-holder.

(c)     No change in ownership of all or any portion of the Shopping Center, or assignment of this Lease, or the Rent, will bind Tenant until after Tenant has been given evidence, including photostat or certified copy of deed or assignment, showing change in ownership, or assignment.

(d)     If Tenant receives a written notice from any party claiming a collateral interest in this Lease or in the Rent and, by reason thereof, a present entitlement to collect the Rent, Tenant has the right either: (i) to pay Rent to such party, which payment will satisfy any and all liabilities of Tenant to Landlord with respect to such payment, without obligation on Tenant to make further inquiry but subject to such party's providing to Tenant a copy of the instrument pursuant to which such party claims entitlement and to such claim being plausible on the face of such instrument; or (ii) to withhold Rent from Landlord and pay same to an escrow agent or a court pending the determination by a court of competent jurisdiction of the entitlement thereto.

38

(e)     In accordance with the provisions Section 17(d) of the Town Lease, if the Town Lease is terminated as a result of a breach or default by Landlord in its capacity as the tenant under the Town Lease, then so long as Tenant complies with the terms and conditions of this Lease and shall attorn directly to the Town, the Town shall attorn to Tenant in accordance with the terms and provisions of this Lease, the Town shall recognize the Tenant's rights under this Lease so that Tenant's occupancy of the Premises shall not be disturbed, and the Town shall honor this Lease as if the Town were the Landlord under this Lease.

## SECTION 31. NO WAIVER

No waiver by either party of any of the terms, covenants, provisions or conditions in this Lease, and no waiver of any legal or equitable relief or remedy, will be implied by the failure of either party to assert any rights, or to declare any forfeiture, or for any other reason. No waiver of any of the terms, provisions, covenants, rules and regulations herein will be valid unless it is in writing signed by both parties. No waiver by either party, or forgiveness of performance by either party in respect to one or more tenants of the Shopping Center, will constitute a waiver or forgiveness of performance in favor of Tenant, Landlord or any other tenant. The waiver or the forgiveness of performance of any one or more of the terms, provisions, conditions, rules and regulations of this Lease will not be claimed or pleaded by Tenant or Landlord to excuse a subsequent failure of performance of any of the terms, provisions, conditions, covenants, rules and regulations of this Lease.

## SECTION 32.  SURRENDER OF PREMISES

(a)     Tenant must deliver up and surrender to Landlord possession of the Premises, including all Landlord's Work (and replacements thereof) and all improvements permanently attached to the Premises during the Term, upon the expiration of this Lease, or its termination in any way, in as good condition and repair as the same are in on the Commencement Date (excepting damage by fire or other casualty which could be covered by a standard "All-Risk Coverage" or "special form" insurance policy, ordinary wear and tear, authorized alterations and modifications, and decay, neglect, fault or default of Landlord and taking by eminent domain or conveyance in lieu thereof only). Upon the expiration or earlier termination of this Lease, Tenant will deliver the keys at the office of Landlord or Landlord's agent.

(b)     Tenant has the right, while the Lease remains in effect, to place a banner sign at the front of the Premises, in a place visible to Tenant's customers, directing Tenant's customer's to another store of Tenant or providing Tenant's customers with information and a telephone number. If the Lease has terminated or expired, then Landlord must leave the sign at the front of the Premises until the earlier to occur of: (1) ninety (90) days after Tenant vacates the Premises; or (2) a new tenant opens for business in that location.

Queen Creek Marketplace, Queen Creek, AZ
EXECUTION VERSION: August 5, 2011
UB Document No. 756176 v.10

## SECTION 33.  SHORT FORM LEASE, COMMENCEMENT DATE AGREEMENT

(a)    Neither party may record this Lease, but if either party requests that a Short Form Lease or a Memorandum of Lease be recorded, then the other party must execute such Agreement, which Agreement will contain the information set forth below. The Short Form Lease or Memorandum of Lease will describe the Premises and the rights herein demised, the Term, and the extension rights (if any), any exclusive granted to Tenant and other provisions hereof reasonably requested by Tenant. The failure to record the Short Form Lease or Memorandum of Lease will not affect or impair the validity and effectiveness of this Lease, and this Lease will control in the event of any inconsistency between the two.   The party requesting that the Short Form Lease or Memorandum of Lease be recorded must prepare and pay all costs of recording the Short Form Lease or Memorandum of Lease, and the other party must execute at any and all times such Short Form Lease or Memorandum of Lease and any other instruments as may be required for such recording.

(b)    At the time that the Commencement Date is established, the parties will promptly enter into a Commencement Date Agreement, setting forth the actual commencement and expiration of the Initial Term and any extensions thereof and describing the Premises, but containing no further provisions of this Lease, which Commencement Date Agreement may be recorded by either party if there already is a Memorandum of Lease or a Short Form Lease recorded.  If the Commencement Date is established before a Short Form Lease or Memorandum of Lease is executed by the parties, the Short Form Lease or Memorandum of Lease and the Commencement Date Agreement may be consolidated into a single recordable document.

## SECTION 34.  NOTICE

Any notices, statements, acknowledgments and consents required to be given by or on behalf of either party to the other must be in writing and must be given by Certified U.S. Mail, or by private courier service requiring a signed acknowledgment of delivery (such as Federal Express) addressed as follows:

if to the Landlord at:        VESTAR QCM, L.L.C.
                              2425 East Camelback Road
                              Suite 750
                              Phoenix, Arizona 85016
                              Attention:  President

with a copy to:               Mariscal, Weeks, McIntyre & Friedlander, P.A.
                              2901 North Central Avenue, Suite 200
                              Phoenix, AZ  85012
                              Attn: David L. Lansky, Esq.

40

| if to the Tenant at: | Jo-Ann Stores, Inc.<br>5555 Darrow Road<br>Hudson, Ohio 44236<br>Attn: Senior Vice President, Real Estate |
|---|---|
| with a copy to: | Jo-Ann Stores, Inc.<br>5555 Darrow Road<br>Hudson, Ohio 44236<br>Attn: Senior Legal Counsel |

or at such other address of Landlord or, Tenant as may be specified by such a notice. Any notice sent by certified mail is deemed to have been served three days after deposit thereof with the U.S. Postal Service. Any notice sent by courier service is deemed to have been served as of the next business day (excluding Saturdays, Sundays, and any federal government holidays). Notwithstanding the foregoing, the time period in which a response to any such notice must be given, or in which an action must be commenced or be taken, will commence to run on the date of receipt by the addressee thereof as shown on the return receipt or acknowledgment of delivery for such notice. Rejection or other refusal to accept, or the inability to deliver because of changed address of which no notice was given, will be deemed to be receipt of notice as of the date of such rejection, refusal or inability to deliver. Notwithstanding anything to the contrary, Tenant may give facsimile notice of the need of emergency repairs, followed promptly by notice as required above.

## SECTION 35.  HAZARDOUS MATERIALS

(a)    Tenant must not cause or permit the escape, disposal or release of any Hazardous Material (as hereafter defined) in violation of Law. Tenant must not allow the storage or use of Hazardous Material in any manner not sanctioned by Law, nor allow to be brought into the Shopping Center any Hazardous Material except to use in the ordinary course of Tenant's business. Tenant must defend, indemnify and hold Landlord harmless from and against any and all claims, losses, liabilities, damages, penalties, fines and expenses (including, without limitation, consequential damages, cleanup and other remedial and restoration costs, fees for consultants and experts and reasonable attorneys' fees and other costs of litigation arising by reason of any of the aforesaid or any action against Tenant under this indemnity) arising directly or indirectly from, out of or by reason of the release of Hazardous Materials in the Shopping Center occurring during the Term if caused by Tenant or Tenant's contractors, agents or employees or persons acting under Tenant. It is a condition to indemnification that Tenant receive notice of any claim by Landlord promptly after Landlord first has knowledge thereof. This indemnity survives the expiration or earlier termination of the Term.

(b)    Landlord must not cause or permit any Hazardous Material to exist in the Premises. In addition, Landlord must cause or permit any Hazardous Material to be sold, used, stored, brought upon or disposed of (collectively a "Use") in, on, under or about the Shopping Center (including the

41

Premises, before the Delivery Date) without in each case: (i) obtaining all necessary permits required in connection therewith; and (ii) complying with all permit requirements; and (iii) otherwise taking all appropriate steps and making adequate arrangements to assure that such Use is in the ordinary course of business in the operation of the Shopping Center. Such use must be performed safely and without contamination of the Shopping Center and the Shopping Center Site or any portion thereof and fully in compliance with all applicable Laws.

(c)     If either party receives any written notice of Hazardous Discharge or Environmental Complaint that specifically identifies the Premises or the Common Areas or describes a condition that materially impairs or could materially impair the occupancy, use and enjoyment of the Premises, Landlord must give immediate oral and written notice of same to Tenant detailing all relevant facts and circumstances within the knowledge of Landlord.

(d)     Landlord must defend, indemnify and hold Tenant harmless from and against any and all claims, losses, liabilities, damages, penalties, fines and expenses (including, without limitation, consequential damages, cleanup and other remedial and restoration costs, fees for consultants and experts and reasonable attorneys' fees and other costs of litigation arising by reason of any of the aforesaid or any action against Tenant under this indemnity) arising directly or indirectly from, out of or by reason of the release of Hazardous Materials in the Shopping Center occurring during the Term caused by Landlord or Landlord's contractors, agents or employees or persons acting under Landlord. It is a condition of this indemnification that Landlord receive notice of any such claim by Tenant promptly after Tenant first has knowledge thereof. This indemnity survives the expiration or early termination of this Lease.

(e)     If Tenant's use, occupancy and enjoyment ("Occupancy") of the Premises is materially interfered with by reason of this existence or remediation of any Hazardous Material located on, in or under the Shopping Center or on the Shopping Center Site (except for any Hazardous Material used by Tenant), then (i) throughout such period of interference, a fair and just proportion of the Rent and other charges payable (taking into account the nature of the interference to Tenant's Occupancy), will be abated, and (ii) if Tenant's occupancy is substantially impaired for three months or more, then Tenant has the right to terminate this Lease by giving notice to Landlord of its election to do so, whereupon this Lease will automatically terminate and end effective as of the date of such notice and neither party will have any further obligations hereunder. Landlord may nullify Tenant's notice of termination if Landlord diligently corrects the Hazardous Material interference and completes the job in accordance with all applicable governmental laws, codes, regulations and requirements within three months after the date of Tenant's termination notice. The abatement provided in clause (i) of this subsection will continue throughout the period of such correction by Landlord.

(f)     "Hazardous Material" means (i) any waste, pollutant or contaminant which is or becomes regulated by the federal government or any state, local or other governmental entity (or any agency thereof) having jurisdiction over the Shopping Center and the operations conducted thereon

Queen Creek Marketplace, Queen Creek, AZ
EXECUTION VERSION: August 5, 2011
UB Document No. 756176 v.10

(the "government authority"); (ii) any substance or material that is or becomes regulated by any governmental authority by reason of the hazardous or toxic qualities of such substance or material; and (iii) any other toxic or hazardous substance, regardless of whether the same is regulated, including, without limitation, so-called "black mold," any mycotoxin, and any other mold capable of producing a toxic or allergic reaction in humans (including, without limitation, Stachybotrys, S. atra, S. chartarum, Aspergillus, Fusarium, Coccidioides)

(g)     "Hazardous Discharge" means the presence, use, release, dispersal, emission, spill, discharge or cleanup of any Hazardous Material (i) on or about or emanating from the Shopping Center or the Shopping Center Site, or (ii) arising out of the use and occupancy of or operations within the Shopping Center, or (iii) caused by Landlord or other occupant of the Shopping Center or the employees, contractors, invitees or agents thereof.

(h)     "Environmental Complaint" means any complaint, investigation, order, citation, or action with regard to any Hazardous Discharge, air emissions, water discharges, noise emissions or any other environmental, health or safety matter pertaining to or emanating from the Shopping Center from any Public Entity.

(i)     Landlord has provided a Phase I environmental site assessment to Tenant prior to the execution hereof.

## SECTION 36.    LIMITATION OF LANDLORD'S LIABILITY

(a)     If Landlord fails to perform any covenant, term or condition on Landlord's part to be performed, and as a consequence of such default Tenant recovers a money judgment against Landlord, such judgment will be satisfied only out of (i) the proceeds of sale received upon execution of such judgment and levy thereon against the right, title and interest of Landlord in the Shopping Center, (ii) the rents and other income from such property receivable by Landlord, and (iii) the consideration received by Landlord for the sale or other disposition of all or any part of Landlord's right, title and interest in the Shopping Center, which consideration is deemed to include any assets at any time after such sale or disposition held by Landlord having a value not exceeding that of the proceeds of such sale or other disposition, and Landlord shall not be liable for any deficiency.

(b)     Notwithstanding subsection (a), in the event of fraud on the part of Landlord or Landlord's failure to perform any covenant or obligation of Landlord under Sections 10 (solely with respect to the payment of sums to Tenant in the event of termination of the Lease or late delivery of the Premises), 26 or 35 the aforesaid limitation on liability is inapplicable

(c)     This Section will not be deemed to deny to Tenant, or limit its right to obtain, injunctive relief or specific performance of Landlord's covenants under this Lease or to avail itself of any other right or remedy (not involving a personal liability of Landlord in excess of the limits of

43

personal liability fixed by this Section) which may be accorded Tenant by Law or under this Lease by reason of Landlord's failure to perform its obligations thereunder including, but not limited to, the rights and remedies granted Tenant under Section 29.

## SECTION 37.  DELIVERY OF SITE PLAN

Within thirty (30) days after Tenant's written request therefor, but not more than once per Lease Year, Landlord must provide Tenant with a copy of the most current available site plan of the Shopping Center, which must reflect:  (a) the Gross Leasable Area of the Shopping Center as actually constructed; (b) the names and location and the Gross Leasable Area of the premises occupied by the respective tenants thereof; and (c) those premises in the Shopping Center, if any, which are not then currently occupied and open for business. If Landlord fails to provide this information within the period allowed , then Tenant has the right to suspend the payment of monthly installments of Additional Rent, or Rent if there is no Additional Rent, until delivery of the information, which Additional Rent or Rent, as the case may be, shall be paid in full upon Landlord's compliance with this Section 37.

## SECTION 38.  INTENTIONALLY OMITTED

## SECTION 39.  ENTIRE AGREEMENT; WRITING REQUIRED

This Lease contains all of the agreements of the parties with respect to any matter covered or mentioned in this Lease, and no prior agreement, understanding or representation pertaining to any such matter will be effective for any purpose.  No provision of this Lease may be changed, deleted, modified or amended, except by an agreement in writing signed by the parties.

## SECTION 40.  OPERATING COVENANT

(a)    Tenant agrees to open for business, fully stocked and staffed, subject to delays caused by condemnation, casualty, or Section 42, for one day, within sixty (60) days after the Commencement Date, as a Jo-Ann Stores, Inc. (the "Operation Period"). Tenant's failure to open for business within ninety (90) days after the Commencement Date for any reason other than condemnation, casualty or Section 42 shall be an event of default.  After Tenant opens for one (1) day, as provided in the previous sentence, then notwithstanding anything contained in this Lease, expressly or impliedly, to the contrary, and notwithstanding the agreement for the payment by Tenant of Rent (including Substitute Rent or other percentage rent), Tenant is under no duty or obligation, either expressed or implied, to thereafter continuously conduct, its business in the Premises at any time during the Term. Further, Tenant's failure to continuously conduct its business in the Premises will not in any way be an event of default under this Lease, nor will such a failure otherwise entitle Landlord to begin or to maintain any action, suit, or proceeding, whether in law or in equity.

44

(b)    Notwithstanding subsection (a), if Tenant ceases operation of business from the Premises for reasons other than an assignment or subletting (provided the assignee or sublessee opens in the Premises within sixty (60) days after Landlord's recapture rights have been triggered), damage and destruction, remodeling, eminent domain or Unavoidable Delay, for one hundred eighty (180) or more days (provided that such one hundred eighty (180) day period will be extended through the restoration and repair period provided in this Lease in the event of any casualty, damage or destruction, or condemnation), then at any time thereafter Landlord has the right, but not the obligation, to terminate this Lease and recapture the Premises. Until such time as Landlord elects to terminate this Lease, Tenant remains obligated for the payment of Fixed Minimum Rent and additional rent and other charges as due and payable under the Lease.

## SECTION 41.  APPLICABLE LAW AND CONSTRUCTION

The laws of the state within which the Premises are located govern the validity, performance and enforcement of this Lease without regard to its conflicts of law principles. If one or more of the provisions of this Lease is held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability will not affect or impair any other provision of this Lease, and this Lease will be construed as if such invalid, illegal or unenforceable provision had not been contained herein. The submission of this document for examination does not constitute an offer to lease, or a reservation of or option for the Premises, and this Lease becomes effective only upon execution and delivery thereof by both Landlord and Tenant. This Lease has been negotiated by Landlord and Tenant and will not be deemed to have been prepared by either Landlord or Tenant, but by both equally. All prior negotiations, considerations, representations and understandings between the parties are and shall be deemed to be incorporated and merged into this Lease and shall not be construed as having survived the execution hereof so that only the provisions of this Lease shall govern the respective rights and obligations of the parties hereto to the same effect as if all such negotiations, considerations, representations and understandings shall have never been made or given by either party to the other party hereto.

## SECTION 42.  UNAVOIDABLE DELAYS

Except as otherwise expressly provided herein, if either party is delayed or hindered in or prevented from the performance of any obligation required hereunder by Unavoidable Delay, the time for performance of such obligation shall be extended for the period of the delay, provided that Unavoidable Delay will not excuse prompt and timely payments, including Rent, when due under this Lease except when (A) the Commencement Date is delayed by reason of Unavoidable Delay; or (B) such payment is excused pursuant to other provisions of this Lease. However, no delay will be excused by this section unless (1) the delayed party notifies the other party in writing of the delay within seven (7) days of the event giving rise to such delay; (2) the delayed party has exhausted all other resources available at reasonable costs to avoid such delay; and (3) the delayed party diligently pursues completion of the activity that was delayed. Notwithstanding anything to the contrary in this

45

Lease, under no circumstances will Unavoidable Delay extend the time for performance of any obligation by more than ninety (90) days.

## SECTION 43.  REASONABLE CONSENT

Wherever either party's consent or approval is required, such consent or approval must not be unreasonably or arbitrarily withheld or delayed, unless otherwise expressly stated.

## SECTION 44.  NO PARTNERSHIP

Landlord and Tenant acknowledge that neither of them in any way or for any purpose becomes a partner or an associate of the other in the conduct of Tenant's business, the operation of the Shopping Center or otherwise, or a joint venture, or a member of a joint enterprise with the other. Neither party is liable for payment of the debts or performance of any obligation of the other. The relationship is and shall be that of Landlord and Tenant.

## SECTION 45.  ESTOPPEL

Within thirty (30) days after request, Tenant shall, without charge, execute and deliver to Landlord a Tenant Estoppel Certificate substantially in the form of Exhibit H. Within thirty (30) days after request, Landlord shall, and without charge, execute and deliver to Tenant a written instrument certifying that this Lease is unmodified and in full force and effect, or if there has been any modification, that this Lease is in full force and effect as modified and stating all such modifications; specifying the dates to which Rent has been paid; stating whether there exists any default in the performance by either party under any provision of this Lease; and certifying as to such other matters as Tenant reasonably may request. With regard to any estoppel certificates related to this Lease, the Lease will take precedence over the contents of such estoppel certificates, should a conflict arise.

## SECTION 46.  QUIET ENJOYMENT

Landlord represents and warrants to Tenant that subject to the Declarations and the Town Lease Landlord is well seized of fee simple title to the Premises and the portions of the Shopping Center owned by it and has full power and authority to execute and deliver this Lease. Landlord covenants to Tenant that Tenant shall at all times have peaceable and quiet enjoyment and possession of the Premises and of the rights granted hereunder without any manner of hindrance from Landlord or any other person or persons claiming by, through and under Landlord, if Tenant performs all the covenants and agreements to be performed on Tenant's part.

46

## SECTION 47.  HOLDING OVER

If, at the expiration of the Term, Tenant continues to occupy the Premises, such holding over shall not constitute a renewal of this Lease, but Tenant shall be a tenant from month to month, at the same rent and under the same terms and conditions as in effect immediately prior to the commencement of the month to month tenancy, and either party may terminate the Lease during said month to month tenancy upon 90 days prior written notice to the other party; provided, however, Landlord shall not specify a Lease termination date to be during the period commencing September 1 and ending on the immediately following January 31. If Landlord provides written notice to tenant at least 90 days prior to the expiration date that Landlord requires Tenant to vacate the Premises upon expiration and Tenant continues to occupy the Premises after expiration, or if Landlord provides the 90 day notice in accordance with the prior sentence and Tenant fails to vacate by the termination date set forth in the notice, then Tenant shall thereupon be obligated to pay 125% of the rent otherwise due during such holdover.

## SECTION 48.  BROKERS

Each party represents to the other party that it has not dealt with any party with regard to the Premises or this Lease, except that Western Retail Advisors, LLC represents Landlord and Tenant in this transaction.  Landlord will pay such broker pursuant to a separate agreement.  Each party will indemnify and hold the other party harmless from and against any loss, cost, liability and expense, including reasonable attorney's fees, arising out of a breach of its representation in this section.

## SECTION 49.  DISPUTE RESOLUTION

In the event the Town succeeds to the interest of Landlord under this Lease pursuant to the provisions of the Town Lease and there is a dispute hereunder which the Town and Tenant cannot resolve between themselves, Tenant agrees that there shall be a forty-five (45) day moratorium on litigation during which time the Town and Tenant agree to attempt to settle the dispute by non-binding mediation before the commencement of litigation.  The mediation shall be held under the commercial mediation rules of the American Arbitration Association.  The mediator selected shall have at least five (5) years experience in mediating or arbitrating disputes relating to commercial property development.  The cost of any such mediation shall be divided equally between the Town and Tenant or in such other fashion as the mediator may order.  The results of the mediation shall be non-binding on the Town and Tenant and both the Town and Tenant shall be free to initiate litigation upon the conclusion of mediation.  Nothing herein shall limit Tenant's right to pursue any other remedy provided in this Lease.

## SECTION 50.  CONFLICT OF INTEREST.

Pursuant to Arizona law, rules and regulations, no member, official or employee of the Town shall have any personal interest, direct or indirect, in this Lease, nor shall any such member, official

47

or employee participate in any decision relating to this Lease which affects his or her personal interest or the interest of any corporation, partnership or association in which he or she is, directly or indirectly, interested.

## SECTION 51.   CAPTIONS

Any paragraph titles or captions contained in this Lease are for convenience only and do not define, limit or otherwise modify the scope or intent of this Lease.

## SECTION 52.   VARIATION IN PRONOUNS

All the terms and words used in this Lease, regardless of the number and gender in which they are used, will be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context or sense of this Lease or any paragraph or clause herein may require, the same as if such words had been fully and properly written the number and gender.

## SECTION 53.   SECTION REFERENCES

All references to any section number(s) refer to the Section contained in this Lease.

## SECTION 54.   BINDING EFFECT OF AGREEMENT

This Lease and all of the covenants, conditions, provisions and restrictions herein inures to the benefit of and binds the heirs, executors, administrators, devisees, legatees, personal representatives, successors and assigns, respectively, of Landlord and Tenant.

## SECTION 55.   ATTORNEY'S FEES

If Landlord or Tenant is required to enforce this Lease, then the non-prevailing party must pay to the prevailing party the prevailing party's arbitration costs (if any), court costs and reasonable attorney's fees. This provision applies to court costs and attorneys fees incurred in any trial and appellate courts.

## SECTION 56.   OFAC WARRANTY

Each party represents and warrants to the other party that the representing party (a) is not acting, directly or indirectly, for or on behalf of any person, group, entity, or nation named by any Executive Order or the U.S. Treasury Department as a terrorist, "Specially Designated National and Blocked Person," or other banned or blocked person, entity, nation, or transaction pursuant to any law, order, rule, or regulation that is enforced or administered by the Office of Foreign Assets Control, and (b) is not engaged in this lease transaction, directly or indirectly, on behalf of, or

48

instigating or facilitating this lease transaction, directly or indirectly, on behalf of any such person, group, entity or nation. The breaching party must defend, indemnify, and hold harmless the other party from and against all claims, damages, losses, risks, liabilities, and expenses (including reasonable attorney's fees and costs) arising from or related to any breach of the forgoing representation.

## SECTION 57.  WAIVER OF RIGHT TO JURY TRIAL

**IF AND TO THE FULLEST EXTENT PERMITTED BY APPLICABLE GOVERNMENTAL RESTRICTIONS, LANDLORD AND TENANT EACH WAIVE THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY OF ANY CONTRACT OR TORT CLAIM, COUNTERCLAIM, CROSS-COMPLAINT OR CAUSE OF ACTION IN ANY ACTION, PROCEEDING OR HEARING BROUGHT BY EITHER LANDLORD OR TENANT AGAINST THE OTHER ON ANY MATTER ARISING OUT OF OR IN ANY WAY CONNECTED TO THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT OR TENANT'S USE OR OCCUPANCY OF THE PREMISES, INCLUDING ANY CLAIM OF INJURY OR DAMAGE OR THE ENFORCEMENT OF ANY REMEDY UNDER ANY CURRENT OR FUTURE LAW, STATUTE, REGULATION, CODE OR ORDINANCE.**

## SECTION 58.  DEVELOPMENT AGREEMENT

Tenant acknowledges that Landlord has entered into the Development Agreement with the Town and that Landlord may receive certain economic development incentives in exchange for performing certain obligations thereunder.  Tenant further acknowledges and agrees that Tenant is not entitled to any portion of the economic development incentives and that the economic development incentives are the sole property of Landlord.  Landlord warrants that it has not paid or given, and will not pay or give, any third person any money or consideration for obtaining the Development Agreement.  In accordance with the requirements of the Development Agreement, Tenant shall either obtain from the Town a separate transaction privilege tax license for the Premises or shall provide to the Town a certified work sheet setting forth Tenant's name, Tenant's transaction privilege tax license number and the amount of transaction privilege taxes paid with respect to Tenant's business operations at the Premises.  Within thirty (30) days after receipt of written request from Landlord, Tenant shall furnish or cause to be furnished to Landlord an annual statement of Gross Sales  (or quarterly if Landlord requests), together with copies of its state and local sales tax forms.  Any information gained from such statements shall be confidential and shall not be disclosed other than to carry out the purposes of this Lease; provided, however, Landlord shall be permitted to divulge the contents of any such statement to the Town pursuant to the Development Agreement and in connection with any financing arrangements, sales or assignments of Landlord's interest in the Premises or in connection with any administrative or judicial proceedings in which Landlord is involved where Landlord may be required to divulge such information.  In addition, Tenant consents to (a) the Arizona Department of Revenue providing transaction privilege tax revenue information with respect to the Premises to the Town and Landlord, and (b) the Town providing transaction privilege tax revenue information with respect to the Premises to Landlord.

## SECTION 59.  NO PERSONAL LIABILITY

No member, official or employee of the Town shall be personally liable to Tenant or any successor or any permitted assignee (i) in the event of any default or breach by the Town under the Development Agreement, (ii) for any amount which may become due to the Tenant or any successor or permitted assignee, or (iii) pursuant to any obligation of the Town under the terms of the Development Agreement.

## SECTION 60.  VENUE

**LANDLORD AND TENANT HEREBY VOLUNTARILY, KNOWINGLY, IRREVOCABLY AND UNCONDITIONALLY SUBMIT TO THE JURISDICTION OF THE SUPERIOR COURT OF MARICOPA COUNTY, ARIZONA (OR IF THE REQUISITES OF JURISDICTION OBTAIN, THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA SITTING IN MARICOPA COUNTY, ARIZONA) IN CONNECTION WITH ANY DISPUTE (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) BETWEEN OR AMONG LANDLORD AND TENANT ARISING OUT OF OR IN ANY WAY RELATED TO THE PREMISES, THIS DOCUMENT OR ANY OTHER AGREEMENTS, DOCUMENTS OR INSTRUMENTS EXECUTED AND DELIVERED IN CONNECTION WITH OR OTHERWISE RELATING TO THE PREMISES. IN THIS REGARD, THE EXCLUSIVE VENUE OF ANY SUCH DISPUTE SHALL BE IN MARICOPA COUNTY, ARIZONA. LANDLORD AND TENANT HEREBY VOLUNTARILY, KNOWINGLY, IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY DEFENSE OF FORUM NON CONVIENS OR ANY OTHER OBJECTION TO VENUE IN MARICOPA COUNTY, ARIZONA.**

## SECTION 61.  SALES TAX SURCHARGE

In accordance with the provisions of Paragraph 42 of the Development Agreement, set forth below is a verbatim copy of Paragraph 42 of the Development Agreement.

42.    Project Sales Tax Surcharge:

42.1    The Town has adopted a General Plan that includes the goal of preserving and enhancing its "Town Center", as defined in the General Plan and the Town Center Specific Area Plan.  The parties acknowledge that the scale and intensity of the development of the Site will increase the burdens on Town to provide additional infrastructure and maintenance in the Town Center in order to address additional traffic burdens in the Town Center and to encourage pedestrian and small retail uses.  Therefore, a surcharge in the amount of .25% shall be added to each sale subject to a Transaction Privilege Tax generated on the Site (the "Surcharge") and shall be reported and

50

remitted to Town, in addition to and together with payments of Transaction Privilege Tax by the tenants and other occupants of the Site.

42.2    The obligation of each tenant or occupant of the Site to pay the Surcharge is a covenant running with the land and shall be binding on each tenant or occupants operating a business on the Site. Developer hereby waives any objection to the imposition of the Surcharge by the Town. In consideration of the execution of this Agreement by Developer and the Town, each tenant or occupant of the Site shall be deemed to have waived any right to object to the Surcharge and shall be deemed to have covenanted directly with the Town to pay the Surcharge in addition to and together with payments of Transaction Privilege Tax by each such tenant or occupant.

42.3    Notwithstanding the provisions of this Paragraph 42 to the contrary, the Town acknowledges and agrees that the Surcharge is payment only by tenants or occupants of the Site and, in n o event, shall Developer be liable should any tenant or occupant of the Site not pay the Surcharge to the Town as and when due. In addition, the Town acknowledges and agrees that the Surcharge shall, in no event, be applicable commercial rents payable by tenants or occupants of the Site to Developer or its successors and assigns, the Town acknowledging that the Surcharge is not applicable to the so-called "Rent Tax" levied and assessed by the Town.

42.4    A Notice of Surcharge in the form attached hereto as Exhibit A shall be recorded in the offices of the Maricopa County Recorder's Office concurrently with the recordation of this Development Agreement. Developer consents to the recording of the Notice of Surcharge. In addition, Developer shall provide written notice of the Surcharge to its tenants on or before a lease is entered into for any property on the Site.

42.5    Proceeds of the surcharge shall be reported and remitted to the Town at the same time as Transaction Privilege Taxes are reported and remitted to the State. In the event the Town determines that the surcharge will be remitted directly to the State, proceeds of the surcharge shall be reported and remitted directly to the State.

42.6    The Surcharge shall be used only for key infrastructure, operations and maintenance or other programming or projects the Town deems necessary exclusive to and within Town Center. No portion of the

51

proceeds of the surcharge shall be used, directly or indirectly, for improvements outside the Town Center.

42.7   Town shall create a special fund for the deposit of the Surcharge paid by tenants and occupants of the Site and deposit all proceeds of the Surcharge received into such fund. Amounts deposited into the special fund shall be used only for the purposes set forth in Paragraph 42.6. This Paragraph 42 shall survive the expiration of this Agreement.

In accordance with the provisions of Paragraph 42 of the Development Agreement, Tenant waives any right to object to the Surcharge and Tenant shall be deemed to have covenanted directly with the Town to pay the surcharge in addition to and together with the payment by Tenant of its payments of transaction privilege taxes.

## SECTION 62. OVERFLIGHT DISCLOSURE

Landlord hereby discloses to Tenant that the Shopping Center is situated within the "Williams Gateway Overflight Area 3" as defined by the Williams Regional Planning Study (WRPS) and as adopted by the Queen Creek Council Resolution No. 115-96. In addition, Landlord discloses to Tenant the potential noise impact upon the Shopping Center and the Premises as a result of aircraft arriving and departing from Williams Gateway Airport.

*[Remainder of Page Intentionally Left Blank – Signatures Follow on Next Page]*

52

In witness whereof, the parties have signed this Lease as of the date listed above.

**VESTAR QCM, L.L.C.,**
an Arizona limited liability company

By:  VESTAR ARIZONA LX, L.L.C.,
     an Arizona limited liability company
Its:  Managing Member

By: _____

     DAVID LARCHer
     AUTHorized Member

Employer Identification Number: 06-1689390

TENANT:
**JO-ANN STORES, INC.**

By: _____
     James Kerr
     Executive Vice President and Chief
     Financial Officer

And
By: _____
     David Goldston
     Senior Vice President, General Counsel and
     Secretary

53

STATE OF ARIZONA            )
                           ) ss.
COUNTY OF MARICOPA          )

*David Larche authorized Member (KO)*

On ___Aug. 29, 2011___, before me, __Shelly K. Orozco___, a Notary Public in and for said state, personally appeared ~~Lee T. Hanley, President~~ of VESTAR ARIZONA LX, L.L.C., an Arizona limited liability company, the Managing Member of **VESTAR QCM, L.L.C.**, an Arizona limited liability company, personally known to me (or proved to me on the basis of satisfactory evidence) to be the persons whose names are subscribed to the within instrument and acknowledged to me that they executed the same in their authorized capacities, and that by their signatures on the instrument, the persons, or the entity upon behalf of which the persons acted, executed the instrument.

WITNESS my hand and official seal.

_____
Notary Public in and for said State

My Commission Expires:

___4/10/14___

SHELLY K. OROZCO
Notary Public - Arizona
Maricopa County
My Commission Expires
April 10, 2014

STATE OF OHIO              )
                          ) SS
COUNTY OF SUMMIT           )

BEFORE ME, a Notary Public in and for said County and State, personally appeared **JO-ANN STORES, INC.**, an Ohio corporation, by James Kerr, its executive vice president and chief financial officer, and David Goldston, its senior vice president, general counsel and secretary, who acknowledged that they did sign the foregoing instrument on behalf of said corporation and that the same is their free act and deed personally and as such officers.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at Hudson, Ohio, this 23rd day of August, 2011.

NOTARIAL SEAL
STATE OF OHIO

BONITA MARIE CAESAR
Notary Public, State of Ohio
My Commission Expires
August 17, 2012

_____
NOTARY PUBLIC

54

## EXHIBIT A

Shopping Center Legal Description

All of that real property located in the Town of Queen Creek, County of Maricopa, State of Arizona more particularly described as follows:

Lots 1 through 21 and Tracts A and B of Queen Creek MP-Phase 1, shown by Map on file in Book 827, Page 27 of Maps, official records of Maricopa County, Arizona.

Exhibit A – Page 1

Queen Creek Marketplace, Queen Creek, AZ
EXECUTION VERSION: August 5, 2011
UB Document No. 756176 v.10

# EXHIBIT B

Site Plan



Shopping Center Boundary

Premises (approx 20,000 sf)
Anchor Tenant Premises
Key Tenant Premises
Container Area
Protected Area

Contingent Space
(small space next to Premises)

## **EXHIBIT C**

FY13 22K Prototype Plans and Scope of Work Matrix

EXH. C – SITE SPECIFIC MATRIX

# JO-ANN fabrics and crafts

ALL WORK IDENTIFIED WITHIN THE MATRIX TO BE PER CURRENT JO-ANN STORES, INC. PROTOTYPE SET OF PLANS.

LANDLORD SHALL BE REQUIRED TO PURCHASE THROUGH JO-ANN STORES, INC. NATIONAL ACCOUNT VENDORS WHERE REQUIRED PER THE CURRENT PROTOTYPE.

ALL WORK DESCRIBED AND ALL EXISTING CONDITIONS MUST BE COMPLIANT WITH THE LEASE TERMS

QUEEN CREEK MARKETPLACE
QUEEN CREEK, AZ

DIVISION OF WORK MATRIX APPROVED AS SHOWN BELOW

| | |
|---|---|
| [signature] 8/4/11 | [signature] 8-4-11 |
| Name (Jo-Ann Stores, Inc.) Date | Name (Owner Representative) Date |
| Construction Manager | [signature] |
| Title | Title |

COMMENTS

1. LANDLORD SHALL PROVIDE SURVEY OF EXISTING RTU'S FOR JOANN APPROVAL WHICH WILL NOT BE UNREASONABLY WITHHELD. EXISTING UNITS WILL CONSIST OF 6-12.5 AND 1-5 TON CARRIER UNITS. LANDLORD TO FURNISH THE UNITS IN GOOD WORKING ORDER AND WILL WARRANT FOR 3 YEARS. LANDLORD TO INSTALL DUCT DETECTORS AND WIRE INTO EMS PER PROTOTYPE. EXISTING 5 TON UNIT TO SERVE TENANTS RESTROOM, BREAKROOM AND OFFICES. . #1-EXISTING 12.5 TON UNIT TO BE BRANCHED OFF TO SERVE STOCK ROOM. PROVIDE TEST AND BALANCE REPORT TO JAS PRIOR TO TURN-OVER
2. LANDLORD TO PROVIDE (2)-EXISTING 277/480V, 200AMP PANELS TO SERVE HVAC AND LIGHTING. (1)-EXSISTING 120/208V, 200AMP PANEL WITH 75 KVA TRANSFORMER IN LIEU OF PRE MANUFACTURED POWER WALL SYSTEM. LANDLORD TO INSTALL ALL SUPPLEMENTAL ELECTRICAL GEAR INCLUDING INVERTER TO MEET PROTOTYPE.
3. LANDLORD TO PROVIDE MANUFACTURERS GAF DIAMOND PLEDGE ROOF GUARANTEE THRU 2023. CERTIFICATE PREVIOUSLY SENT TO TENANT WARRANTY
4. LANDLORD TO SURVEY ENERGY MANAGEMENT SYSTEM AND TEMPERATURE SYSTEM FOR COMPLIANCE WITH TENANT PROTOTYPE. IF NOT COMPATIBLE, LANDLORD WILL INSTALL NEW EMS SYSTEM PURCHASED FROM JO-ANN VENDOR.
5. LANDLORD TO REUSE EXISTING STOCKROOM WALL.
6. EXISTING TOILET ROOMS TO REMAIN. LANDLORD TO INSTALL NEW PROTOTYPICAL ACCESSORIES AND PAINT WALLS AND CEILING. LANDLORD TO REPLACE FRP PANELS IF DAMAGED DURING CONSTRUCTION.
7. LANDLORD TO REMOVE EXISTING SWING DOORS AND INSTALL PROTOTYPE SLIDING DOORS. NO VESTIBULE.
8. LANDLORD SHALL DEMO ALL EXISTING FLOOR OUTLETS AND J-BOXES TO BELOW SLAB. CAP AND INFILL WITH CONCRETE.
9. LANDLORD WILL REUSE EXISTING RELAY PANEL AND ADD RELAY AS REQUIRED BY PROTOTYPE
10. LANDLORD WILL REUSE CIRCUITS AND CONTROLS IN BACK OF HOUSE
11. LANDLORD WILL REUSE EXISTING CIRCUITS AND RELAYS FOR MAIN SALES FLOOR LIGHITNG AND RE-WIRE AS REQUIRED TO MEET JO-ANNS PROTOTYPICAL CIRCUITING.
12. PERIMETER LIGHTING TO BE SPECIFIED BY JO-ANN'S 120 VOLT PROTOTYPE.
13. LANDLORD TO PROVIDE NECESSARY CIRCUITING FOR INVERTER PANEL FOR EMERGENCY LIGHTING REQUIREMENTS PER JO-ANN PROTOTYPE.
14. LANDLORD TO REPLACE EXISTING 45 KVA TRANSFORMER WITH JO-ANN PROTOTYPICAL 75 KVA TRANSFORMER IF NOT ADEQUATE TO MEET THE ELECTRICAL REQUIREMENTS IN JO-ANN PROTOTYPE AND CLARIFICATIONS/ MODIFICATIONS NOTED ABOVE.
15. JO-ANN WILL PURCHASE AN ELECTRIC UNIT HEATER. LANDLORD WILL INSTALL AND WIRE THE UNIT HEATER IN THE STOCK ROOM.
16. LANDLORD TO INSTALL JO-ANN REQUIRED HARDWARE ON ALL DOORS.
17. LANDLORD TO INSTALL PROTOTYPICAL LIGHT FIXTURES IN SALES AREA. EXISTING LIGHT FIXTURES IN STOCK ROOM AND TOILET ROOMS REMAIN. NEW PROTOTYPICAL LIGHT FIXTURES TO BE INSTALLED IN BREAK ROOM AND OFFICE

| FURNISHED & INSTALLED | EXISTING | NA | JO-ANN | LANDLORD | DIVISION OF WORK: TURNKEY |
|---|---|---|---|---|---|
| 1.0 GENERAL | | | | | |
| 1.1 | | | | ● | OBTAIN ALL APPLICABLE PERMITS, TEMPORARY CERTIFICATE OF OCCUPANCY FOR FIXTURING/MERCHANDISING, FINAL CERTIFICATE OF OCCUPANCY, TURN OVER CODE COMPLIANT BUILDING TO TENANT |
| 1.2 | | | ● | | STORE FIXTURE INSTALLATION PERMIT AND ASSOCIATED FEES |
| 1.3 | | | | ● | PERMIT FEES FOR TENANT IMPROVEMENT CONSTRUCTION |
| 1.4 | | | | ● | FULL SET ARCHITECTURAL/MECHANICAL/ELECTRICAL/PLUMBING AND STRUCTURAL DOCUMENTS FOR TENANT IMPROVEMENT CONSTRUCTION BASED ON TENANT'S CURRENT PROTOTYPE |
| 1.5 | | | ● | | APPROVAL OF CONSTRUCTION DOCUMENTS |
| 1.6 | ● | | | | PERFORM FACILITY TESTING AND INSPECTION (INCLUDING HVAC INSPECTION, MOLD SURVEY): PROVIDE RESULTS TO TENANT. |
| 1.7 | | | | ● | PERFORM MOISTURE SLAB TESTING; PROVIDE RESULTS TO TENANT; MAXIMUM 5 POUNDS PER THOUSAND, AGGREGATE, PER TENANT'S CURRENT PROTOTYPE SPECIFICATION |
| 1.8 | | | | ● | REMEDY IF SLAB MOISTURE IS DETECTED |
| 1.9 | ● | | | | ROOF (WATER-TIGHT) |
| 1.10 | | ● | | | ROOF WARRANTY FOR DURATION OF LEASE TERM |
| 1.11 | ● | | | | TENANT SPACE FREE OF HAZARDOUS MATERIALS |
| 1.12 | ● | | | | COMPLIANCE WITH ALL SEISMIC REQUIREMENTS, IF APPLICABLE |
| 1.13 | ● | | | | TERMITE AND PEST CONTROL PER TENANT'S SPECIFICATIONS |
| 1.14 | | | | ● | LANDLORD'S GENERAL CONTRACTOR SHALL PROVIDE WEEKLY CONSTRUCTION STATUS REPORTS AND 8-10 PROGRESS PHOTOS TO TENANT DURING SHELL CONSTRUCTION |
| 1.15 | | | | ● | CLOSE OUT PACKAGE |
| 2.0 UTILITIES | | | | | |
| 2.1 | ● | | | | UTILITY FEES |
| 2.2 | ● | | | | SEPARATE UTILITIES (ELECTRIC, ~~GAS,~~ WATER, SEWER, SPRINKLER); DEDICATED SERVICES FOR TENANT, DEDICATED METERS FOR TENANT |
| 2.3 | ● | | | | ALL UTILITY SERVICES BROUGHT TO TENANT SPACE (APPROVED LOCATION) |
| 2.3.1 | ● | | | | MINIMUM 400 AMP 277/480V OR 800 AMP 120/208V ELECTRICAL SERVICE WITH METER, CURRENT TRANSFORMER CABINET, DISCONNECT SWITCH(ES): ASSUMES GAS SERVICE IS AVAILABLE |
| 2.3.2 | | ● | | | INCOMING GAS SERVICE AND METER |
| 2.3.3 | ● | | | | 1-1/2" MINIMUM INCOMING WATER SERVICE, METER, BACKFLOW PREVENTER |
| 2.3.4 | ● | | | | 4" SANITARY (ANY EXISTING LINES TO BE SCOPED, RESULTS SENT TO TENANT) |
| 2.3.5 | ● | | | | INCOMING TELEPHONE SERVICE (25 PAIR) BROUGHT TO TENANT DEMARC |
| 2.4 | ● | | | | TELEPHONE CONDUIT WITH PULL STRING AND PHONE BOARD |
| 2.5 | | ● | | | SEPARATE EXTERIOR ACCESS TO SPRINKLER ROOM, WHEN SPRINKLER RISER SERVICES MULTIPLE TENANTS |
| 2.6 | | ● | | | SEPARATE EXTERIOR ACCESS TO ELECTRIC ROOM, WHEN ELECTRICAL EQUIPMENT SERVICES MULTIPLE TENANTS |
| 3.0 EXTERIOR – SITE | | | | | |
| 3.1 | ● | | | | DEMOLITION-SITE |
| 3.2 | ● | | | | SIDEWALK – NEW OR EXISTING REPAIRED TO LIKE-NEW CONDITION LEASE LINE TO LEASE LINE |
| 3.3 | ● | | | | CURBS – NEW OR EXISTING REPAIRED TO LIKE-NEW CONDITION LEASE LINE TO LEASE LINE |
| 3.4 | ● | | | | PARKING LOT PAVING AND STRIPING, IF NEW CONSTRUCTION |
| 3.5 | ● | | | | PARKING RESEALING AND RESTRIPING, IF EXISTING |
| 3.6 | | | | ● | HANDICAP CURB AT ENTRY – NEW OR EXISTING IN LIKE-NEW CONDITION |
| 3.7 | | | | ● | CROSSWALK STRIPING AT ENTRY – NEW PAINT |
| 3.8 | ● | | | | STOP SIGNS AT PEDESTRIAN CROSSWALK AT ENTRY |
| 3.9 | | ● | | | PIPE RAIL CART CORRALS (AT SIDEWALK) NOT PERMITTED AT CENTER |
| 3.10 | | | ● | | PIPE RAIL CART CORRALS (IN PARKING LOT) |
| 3.11 | | | | ● | LANDLORD APPROVAL FOR DEDICATED STORAGE AREA FOR 4-5 BALES OUTSIDE BUILDING; NEAR OVERHEAD COILING DOOR, WITH ENCLOSURE IF REQUIRED |
| 3.12 | | | | ● | STORAGE AREA FOR 4-5 BALES OUTSIDE BUILDING; NEAR DOOR |
| 3.13 | | | | ● | TRASH DUMPSTER PAD (AND ENCLOSURE WHEN REQUIRED) |
| 3.14 | | | ● | | TRASH DUMPSTER/RECYCLE CONTAINER |
| 3.15 | ● | | | | LANDSCAPING – NEW OR EXISTING IN LIKE-NEW CONDITION |
| 3.16 | ● | | | | LANDSCAPE MAINTENANCE – TRIMMING TREES, SHRUBS TO MAINTAIN VISIBILITY OF BUILDING AND ALL SIGNAGE |
| 3.17 | ● | | | | PARKING LOT LIGHTING (3 FOOTCANDLE AVERAGE); PROVIDE PHOTOMETRIC PLAN TO TENANT |
| 3.18 | ● | | | | MONUMENT/PYLON SIGN STRUCTURE |
| 3.19 | ● | | | | MONUMENT/PYLON SIGN ELECTRICAL |
| 3.20 | ● | | | | DIVISION OF MONUMENT/PYLON PANEL, IF APPLICABLE |
| 3.21 | | | ● | | MONUMENT/PYLON SIGN PANELS FOR TENANT |
| 4.0 EXTERIOR – BLDG. | | | | | |
| 4.1 | | | | ● | MAINTAIN STRUCTURAL INTEGRITY OF EXISTING BUILDING |
| 4.2 | | | | ● | EXTERIOR WALLS – MODIFICATIONS AND/OR PENETRATION |
| 4.3 | | ● | | | TENANT'S PROTOTYPE FRONT FACADE/ENTRY ELEMENT |
| 4.4 | | | | ● | EXTERIOR EGRESS DOOR(S): QUANTITY PER CODE, ADA COMPLIANT; WITH TENANT'S REQUIRED HARDWARE PER TENANT LAYOUT |
| 4.5 | ● | | | | AT-GRADE DELIVERY DOCK AREA; 14' X 14' CONCRETE PAD WITH ADJACENT MAN DOOR WITH TENANT'S REQUIRED HARDWARE |
| 4.6 | ● | | | | DELIVERY DOCK EQUIPMENT, OPERATIONAL, LIKE-NEW CONDITION |
| 4.7 | ● | | | | OVERHEAD COILING DELIVERY/BALE ACCESS DOOR (8'X10') WITH TENANT'S REQUIRED HARDWARE |
| 4.8 | ● | | | | STOREFRONT FRAMING AND GLAZING |
| 4.9 | | | | ● | EXTERIOR AUTOMATIC SLIDING ENTRY DOOR UNIT; WITH TENANT'S REQUIRED HARDWARE |
| 4.10 | | | ● | | FACADE SIGNAGE |
| 4.11 | | | ● | | TEMPORARY BANNERS (NOW HIRING, COMING SOON, NOW OPEN) |
| 4.12 | | | ● | | TEMPORARY SITE SIGN |

| FURNISHED & INSTALLED | EXISTING | NA | JO-ANN | LANDLORD | DIVISION OF WOR TURNKEY |
|---|---|---|---|---|---|
| 5.0 INTERIOR – BLDG. | | | | | |
| 5.1 | | | | ● | CONSTRUCTION OF DEMISING WALLS – METAL STUDS, GYPSUM BOARD, FINISHED (FIRE RATED, IF REQUIRED BY CODE) FLOOR TO DECK AND PAINT-READY. |
| 5.2 | | | | ● | +/- 12' HIGH CLEAR ZONE THROUGHOUT SALES AREA (CEILING/WALLS), AS DEFINED IN TENANT'S PROTOTYPE |
| 5.3 | | | | ● | INTERIOR DEMOLITION (PARTITIONS, CEILINGS, LIGHTING, FLOORING, AND ALL REMNANTS OF PREVIOUS TENANT'S IMPROVEMENTS, ETC), IF APPLICABLE |
| 5.4 | | | | ● | INTERIOR CONCRETE FLOOR SLAB – LEVEL/READY AND FULLY PREPPED, PER TENANT'S PROTOTYPE, FOR NEW RESILIENT FLOORING |
| 5.5 | | ● | | | VESTIBULE (INCLUDING INTERIOR AUTOMATIC SLIDING DOORS) |
| 5.6 | | | | ● | GYPSUM BOARD ON PERIMETER SALES WALL, FINISHED FLOOR TO DECK, PAINT-READY |
| 5.7 | | | | ● | INTERIOR PARTITIONS |
| 5.8 | | | | ● | MISC. WOOD BLOCKING |
| 5.9 | | | | ● | PAINTING |
| 5.10 | | | | ● | INTERIOR DOORS AND HARDWARE |
| 5.11 | | | | ● | RESILIENT FLOORING, BASE, AND TRANSITION STRIPS |
| 5.12 | | | | ● | CARPET |
| 5.13 | | ● | | | CERAMIC TILE |
| 5.14 | | | | ● | RESTROOM ACCESSORIES |
| 5.15 | | | | ● | CABINETRY/ CASEWORK IN OFFICES SUPPLIED BY JO-ANN |
| 5.16 | | | | ● | CABINETRY/ CASEWORK IN BREAK ROOM SUPPLIED BY JO-ANN |
| 5.17 | | | | ● | FRP, CORNER GUARDS, COLUMN WRAPS |
| 5.18 | | | | ● | FIRE EXTINGUISHERS PER CODE/SIGNAGE/COMMISSIONING |
| 5.19 | | | ● | | STORE FIXTURES AND MERCHANDISING HARDWARE |
| 5.20 | | | | ● | 2X4 FURRING FOR STORE FIXTURE ANCHORING |
| 5.21 | | | ● | | INSTALLATION OF STORE FIXTURES |
| 5.22 | | | ● | | STOCK ROOM SHELVING |
| 5.23 | | | ● | | CARDBOARD BALER |
| 5.24 | | | ● | | WINDOW GRAPHICS ON STOREFRONT GLASS, WHERE REQUIRED BY TENANT STORE LAYOUT |
| 6.0 MECHANICAL | | | | | |
| 6.1 | | ● | | | DEMOLITION/DISPOSAL OF EXISTING HVAC, CAP EXISTING CURBS WEATHERTIGHT AND DEMO OF ALL INTERIOR DUCTWORK BACK TO SUPPLY AND RETURN DROPS FROM EACH UNIT (SEE NOTE 1) |
| 6.2 | | | | ● | HIGH-EFFICIENCY TRANE HVAC UNITS WITH DUCT SMOKE DETECTORS (SEE NOTE 1) |
| 6.3 | | | | ● | ROOF PENETRATIONS FOR RTU'S, VENTS, FLUES, ETC. (SEE NOTE 1) |
| 6.4 | | | | ● | STRUCTURAL SUPPORT FOR RTU'S, AS REQUIRED (SEE NOTE 1) |
| 6.5 | | | | ● | ROOF CURBS AND/OR CURB ADAPTORS FOR ROOF TOP UNITS NOTE 1 |
| 6.6 | | | | ● | HVAC – INTERIOR DISTRIBUTION DUCTWORK |
| 6.7 | | | | ● | HVAC DISTRIBUTION MATERIAL (DIFFUSERS, DUCT SMOKE DETECTORS, REMOTE TEST STATIONS, SAMPLING TUBES, ANNUNCIATORS, EXHAUST FANS) |
| 6.8 | | | | ● | TEMPORARY THERMOSTATS ON COLUMNS NEAR EACH RTU |
| 6.9 | | | | ● | ENERGY MANAGEMENT SYSTEM AND TEMPERATURE SENSORS |
| 6.10 | | | | ● | STOCK ROOM HEATER (NOTE 15) |
| 6.11 | | ● | | | VESTIBULE HEATER |
| 7.0 PLUMBING | | | | | |
| 7.1 | ● | | | | PLUMBING (BRANCH LINES) |
| 7.2 | | | | ● | PLUMBING FIXTURES (INCLUDING HOT WATER HEATER) |
| 7.3 | ● | | | | ELECTRIC WATER COOLER(S) |
| 7.4 | ● | | | | DEDICATED SPRINKLER MAIN(S) |
| 7.5 | ● | | | | DEDICATED FLOW SWITCH(ES) AND TAMPER VALVE(S) ON SPRINKLER MAIN(S) PER NFPA CODES |
| 7.6 | | | | ● | DEDICATED SPRINKLER BRANCH LINES/MODIFICATION OF HEADS |
| 7.7 | | | | ● | FIRE ALARM SYSTEM/MONITORING – NEW AND/OR MODIFICATIONS |
| 7.8 | | ● | | | SPRINKLER MONITORING WHEN SPRINKLER SYSTEM SERVES MULTIPLE TENANT SPACES |
| 8.0 ELECTRICAL | | | | | |
| 8.1 | | ● | | | PREFABRICATED ELECTRICAL POWER WALL, SEE NOTE 2 |
| 8.2 | | | | ● | SUPPLEMENTAL BATTERY BACK-UP INVERTER CABINET, LIGHTING CONTROL PANEL, MISCELLANEOUS PANELS AND RACKS (NOTE 2) |
| 8.3 | | | | ● | ALL INTERIOR ELECTRICAL DISTRIBUTION, DISTRIBUTION BOXES, ETC. |
| 8.4 | | | | ● | INTERIOR LIGHT FIXTURES (NOTE 17) |
| 8.5 | | | | ● | FACADE SIGNAGE ELECTRICAL/ACCESS PANEL FOR SIGN COMPANY |
| 8.6 | ● | | | | EXTERIOR BUILDING-MOUNTED LIGHT FIXTURES (WALL PACKS, UNDER CANOPY LIGHTING, EMERGENCY LIGHTING) – WIRE TO TENANT PANEL |
| 8.7 | | | | ● | EMERGENCY, EXIT AND MISCELLANEOUS LIGHT FIXTURES |
| 8.8 | | | | ● | POWER POLES (LANDLORD'S GENERAL CONTRACTOR TO INSTALL AFTER TURNOVER DATE) |
| 8.9 | | | | ● | DATA CONDUIT (FOR REGISTER SYSTEM) WITH PULL STRINGS |
| 8.10 | | | ● | | TELEPHONES – COORDINATED BY LANDLORD'S GENERAL CONTRACTOR |
| 8.11 | | | ● | | DATA LINES FOR REGISTER SYSTEM – COORDINATED BY LANDLORD'S GENERAL CONTRACTOR |
| 8.12 | | | ● | | LOSS PREVENTION SYSTEM (BURGLAR) – COORDINATED BY LANDLORD'S GENERAL CONTRACTOR |
| 8.13 | | | | ● | INSTALLATION OF ELECTRICAL REQUIRED FOR SPECIFIC STORE FIXTURES AFTER INSTALLATION OF THE FIXTURE |
| 8.14 | | | | ● | CARDBOARD BALER ELECTRICAL |

*08.03.2011*
ver. 03.01.2011

EX C pg 1






A001







JO-ANN
fabrics and crafts

JO-ANN FABRICS AND CRAFTS

FLOOR PLAN

A201









### GENERAL NOTES

### KEY NOTES

### NOTES TO THE DESIGNER

**ROOF PLAN**

A241

**01 ROOF PLAN**





GENERAL NOTES

NOTES TO THE DESIGNER

JO-ANN
fabrics and crafts

JO-ANN FABRICS AND CRAFTS
FRONT ENTRY
WALL SECTIONS

A401
EXC RG 12

03  WALL SECTION @ TYP. FRONT ELEVATION WALL

02  WALL SECTION AT ENTRY COLUMN

01  WALL SECTION AT ENTRY THROUGH STOREFRONT

2011242.50



NOTES TO THE DESIGNER

08  ENLARGED CART CORRAL PLAN

06  DETAIL AT METAL PARAPET CAP

03  SECTION AT END PILASTER

08  TUBE STEEL CART CORRAL - END ELEVATION

05  DETAIL AT EIFS CROWN

02  DETAIL - AT PILASTER

07  TUBE STEEL CART CORRAL - SIDE ELEVATION

04  DETAIL AT WINDOW SILL

01  DETAIL - AT CANOPY COLUMN

JO-ANN FABRICS AND CRAFTS
FRONT ENTRY
DETAILS

A402



**NOTES TO THE DESIGNER**

**02    PIPE RAIL PROTECTION**

**01    WALL SECTION AT-GRADE OVERHEAD DOOR**

JO-ANN fabrics and crafts

JO-ANN FABRICS AND CRAFTS
23K PROTOTYPE
7/20.1 VERSION

WALL SECTIONS

A403
Ex C
Pg 14



**04 | INTERIOR ELEVATION - LEFT SIDE WALL**

**03 | INTERIOR ELEVATION - RIGHT SIDE WALL**

**02 | INTERIOR ELEVATION - REAR WALL**

**01 | INTERIOR ELEVATION - FRONT WALL**

GENERAL NOTES

KEY NOTES

NOTES TO THE DESIGNER

JO-ANN FABRICS AND CRAFTS

INTERIOR ELEVATIONS

A501



**GENERAL NOTES**

**KEY NOTES**

**NOTES TO THE DESIGNER**

JO-ANN
fabrics and crafts

JO-ANN FABRICS AND CRAFTS
25K PROTOTYPE
FY2015 VERSION

INTERIOR ELEVATIONS

05 — INTERIOR ELEVATIONS - VESTIBULE (REFERENCE SHEET A702 FOR ENLARGED VESTIBULE PLAN)

04 — INTERIOR ELEVATIONS - GENERAL OFFICE (REFERENCE SHEET A701 FOR ENLARGED GENERAL OFFICE PLAN)

03 — INTERIOR ELEVATIONS - BREAK ROOM (REFERENCE SHEET A701 FOR ENLARGED BREAK ROOM PLAN)

02 — INTERIOR ELEVATIONS - WOMEN'S REST ROOM (REFERENCE SHEET A701 FOR ENLARGED RESTROOM PLANS)

01 — REST ROOM ACCESSORIES

A502







NON-VESTIBULE ALTERNATE

NOTES TO THE DESIGNER

GENERAL NOTES

04  ALTERNATE - ENTRY

03  ALTERNATE - SECTION

02  ENLARGED CEILING PLAN - ENTRY

01  ENLARGED FLOOR PLAN - ENTRY

A702



TOILET ROOM GENERAL NOTES

TOILET ROOM MOUNTING HEIGHTS

CHECK STAND NOTES

05  TYPICAL GRAB BAR

04  DOOR CONSTRUCTION

08  LAVATORY CLEARANCE

03  ROOM/STALL LAYOUT

10  CLEARANCE @ DOORS

07  THRESHOLD @ DOORS

02  MOUNTING DETAILS

11  ADA SIGNAGE

09  REACH LIMIT DETAILS

06  WATER COOLER DETAIL

01  STAIR RAILING DETAIL

JOANN FABRICS AND CRAFTS
INTERIOR ACCESSIBILITY DETAILS

ADA1



HANDICAP PARKING GENERAL NOTES

WALK AND SIDEWALK GENERAL NOTES

STAIR HANDRAILS GENERAL NOTES

RAMP GENERAL NOTES

HANDICAP PARKING SPACE REQUIRED

CURB RAMP GENERAL NOTES

08  HANDICAP PARKING STALLS

07  CURB RAMP DETAIL

06  STAIR RAILING

03  RAMP HANDRAIL

05  HC PARKING SIGN

02  SITE ENTRANCE SIGN

04  OBSTRUCTION @SIDEWALK

01  PAVEMENT SYMBOL

JO-ANN
fabrics and crafts

JO-ANN FABRICS AND CRAFTS
EXTERIOR
ACCESSIBILITY DETAILS

ADA2

2011242.50

## LIGHT FIXTURE SCHEDULE

| CALLOUT | SYMBOL | LAMP | DESCRIPTION | BALLAST | MOUNTING | MODEL | INPUT WATTS | VOLTS | NOTES |
|---|---|---|---|---|---|---|---|---|---|
| A | | (1) 28W F28T8/XL/SPX30/ECO | 8 FT. TANDEM FLUORESCENT STRIP LUMINAIRE | GENERAL ELECTRIC GE34I432LU/HA | BOTTOM OF JOIST | LITHONIA ZTC132-MVOLT-1/4-GEOA4 | 56 | 277V, 1P, 2W | PROVIDE PROTECTIVE SLEEVES OR LAMPS IN STOCKROOM. |
| AE | | (1) 28W F28T8/XL/SPX30/ECO | 8 FT. TANDEM FLUORESCENT STRIP LUMINAIRE | GENERAL ELECTRIC GE34I432LU/HA | BOTTOM OF JOIST | LITHONIA ZTC132-MVOLT-1/4-GEOA4 | 56 | 277V, 1P, 2W | PROVIDE PROTECTIVE SLEEVES ON LAMPS IN STOCKROOM. |
| BL | | (1) 28W F28T8/XL/SPX30/ECO | 8 FT. TANDEM FLUORESCENT INDUSTRIAL LUMINAIRE WITH AN UPLIGHT SLOTS | GENERAL ELECTRIC GE34I432LU/HA | 13'-0" AFF. | LITHONIA JFLA232-MVOLT-1/4-GEOA4 | 56 | 277V, 1P, 2W | |
| BL | | (1) 28W F28T8/XL/SPX30/ECO | 8 FT. TANDEM FLUORESCENT INDUSTRIAL LUMINAIRE WITH AN UPLIGHT SLOTS | GENERAL ELECTRIC GE34I432LU/HA | 13'-0" AFF. | LITHONIA JFLA232-MVOLT-1/4-GEOA4 | 56 | 277V, 1P, 2W | |
| NC | | (2) 28W F28T8/XL/SPX30/ECO | | GENERAL ELECTRIC GE34I432LU/HA | 13'-0" AFF. | LITHONIA JFLA232-MVOLT-1/4-GEOA4—CAS4 | 56 | 277V, 1P, 2W | |
| 2B | | (2) 28W F28T8/XL/SPX30/ECO | 4 FT. FLUORESCENT INDUSTRIAL LUMINAIRE WITH AN UPLIGHT SLOTS | GENERAL ELECTRIC GE34I432LU/HA | 13'-0" AFF. | LITHONIA JLA232-MVOLT-GEOA4 | 63 | 277V, 1P, 2W | |
| 2TL | | (2) 28W F28T8/XL/SPX30/ECO | 4 FT. FLUORESCENT INDUSTRIAL LUMINAIRE WITH AN UPLIGHT SLOTS | GENERAL ELECTRIC GE34I432LU/HA | 13'-0" AFF. | LITHONIA JLA232-MVOLT-GEOA4 | 63 | 277V, 1P, 2W | |
| BX | | (2) 28W F28T8/XL/SPX30/ECO | 8 FT. STRIP FLUORESCENT LUMINAIRE WITH ASYMMETRIC REFLECTOR | GENERAL ELECTRIC GE34I432LU/HA | 13'-6" AFF. | LITHONIA ZTC132-MVOLT-1/4-GEOA4 —CJCAB4R | 56 | 277V, 1P, 2W | INSTALL REFLECTOR TO DIRECT LIGHT TOWARD FIXTURES PLACED ALONG THE PERIMETER OF THE SALES FLOOR WALLS. |
| B3L | | (2) 28W F28T8/XL/SPX30/ECO | 8 FT. STRIP FLUORESCENT LUMINAIRE WITH ASYMMETRIC REFLECTOR | GENERAL ELECTRIC GE34I432LU/HA | 13'-6" AFF. | LITHONIA ZTC132-MVOLT-1/4-GEOA4 —CJCAB4R | 56 | 277V, 1P, 2W | SAME AS ABOVE |
| 3B | | (2) 28W F28T8/XL/SPX30/ECO | 4 FT. STRIP FLUORESCENT LUMINAIRE WITH ASYMMETRIC REFLECTOR | GENERAL ELECTRIC GE34I432LU/HA | 13'-6" AFF. | LITHONIA JLA232-MVOLT-GEOA4 | 63 | 277V, 1P, 2W | SAME AS ABOVE |
| B3L | | (2) 28W F28T8/XL/SPX30/ECO | 4 FT. STRIP FLUORESCENT LUMINAIRE WITH ASYMMETRIC REFLECTOR | GENERAL ELECTRIC GE34I432LU/HA | 13'-6" AFF. | LITHONIA JLA232-MVOLT-GEOA4 | 63 | 277V, 1P, 2W | SAME AS ABOVE |
| CE | | (3) 32W F32T8/XL/SPX30/ECO | 2'X4' FLUORESCENT LAY-IN TROFFER WITH ACRYLIC PRISMATIC LENS | GENERAL ELECTRIC GE34I432LU/HA | 8'-0" AFF. | LITHONIA JSPRF232A13-MVOLT-1/3-GEOA4 | 83 | 277V, 1P, 2W | |
| CE | | (3) 32W F32T8/XL/SPX30/ECO | 2'X4' FLUORESCENT RECESSED TROFFER WITH ACRYLIC PRISMATIC LENS | GENERAL ELECTRIC GE34I432LU/HA | 6'-6" AFF, OR 8'-0" AFF. | LITHONIA JSPRF232A13-MVOLT-1/3-GEOA4 | 83 | 277V, 1P, 2W | |
| C1E | | (2) 32W F32T8/XL/SPX30/ECO | 2'X4' FLUORESCENT RECESSED TROFFER WITH ACRYLIC PRISMATIC LENS | GENERAL ELECTRIC GE34I432LU/HA | 6'-6" AFF, OR 8'-0" AFF. | LITHONIA JSPRF232A13-MVOLT-1/3 GEOA4 | 83 | 277V, 1P, 2W | |
| D | O | (1) FLUBB/SPX033/W | COMPACT FLUORESCENT DOWNLIGHT W/LENS | ELECTRONIC | 9'-0" AFF. | LITHONIA GOTHA4 JLGF1-IEDSW4T32-MVOLT | 22 | 277V 1P 2W | |
| E1 | +0/0/0 | (2) 9W LED | EMERGENCY EXIT SIGN —LED LAMPS | | COORDINATE WITH FIXTURE PLAN AND LOCAL CODES | LITHONIA JLQMSW-3-W-ELN | 5 | 120/277V, 1P, 2W | SINGLE OR DOUBLE FACE, WITH ARROWS AS INDICATED ON PLAN |
| EM | | (1) 8W 4W XENON | EXTERIOR EXIT DISCHARGE LIGHTING | 1/4 BALLAST PER BATTERY | WALL, MOUNT 12' ABOVE DOOR | LITHONIA JCELMX-G4V-G4 | 18 | 120V, 1P, 1W | |
| F | | (1) 120W PAR38 | DOOR LIGHT WITH SWITCH ON 45° ANGLE SPOT ARM | | 7'-0" AFF. | PRIZMIX FXL-30-DH1-CXY-90-120 | 120 | 120V, 1P, 1W | |
| G | | (1) 173W 86MTR | METAL HALIDE WALL PACK WITH POLYCARBONATE LENS WEATHER BALLAST | ELECTRONIC | 15'-0" AFF. | LITHONIA JTWP-175M-TB-SF | 210 | 277V 1P 2W | |

A. ALL LIGHT FIXTURES SHALL BE ORDERED THROUGH TODAY'S NATIONAL ACCOUNT VENDOR. NO SUBSTITUTIONS PERMITTED.

B. ALL LAY-IN LIGHT FIXTURES SHALL BE SUPPORTED INDEPENDENT OF GRID CEILING FROM THE STRUCTURE ABOVE FROM ALL FOUR CORNERS. ATTACH WITH GRID CLIPS IN LAY-IN CEILINGS.

C. VOLTAGE OF ALL LIGHT FIXTURES MUST BE SPECIFIED OR VERIFIED. CONTRACTOR IS RESPONSIBLE FOR RECEIVING ALL MATERIAL AND THE CONDITION OF MATERIAL AFTER RECEIPT.

D. CONTRACTOR SHALL VERIFY ALL CEILING TYPES (ONE VS. GYPWALL) FOR EACH ROOM PRIOR TO PLACING FINAL PURCHASE ORDER.

E. EXIT SIGNS SHALL BE FURNISHED WITH NUMBER OF FACES AND DIRECTIONAL ARROWS AS REQUIRED TO SUIT PLAN AND THE LOCAL AUTHORITY HAVING JURISDICTION.

F. ALL CONDUIT SEISMIC LIGHT FIXTURES SHALL BE PAINTED TO MATCH ADJACENT PAINT FINISH.

G. ALL FLUORESCENT LIGHT FIXTURES THAT UTILIZE DOUBLE-ENDED LAMPS SHALL INCLUDE THE DISCONNECTING MEANS AS REQUIRED BY 410.130(G) IN THE 2008 AND 2011 NATIONAL ELECTRICAL CODE OR 410.73(G) IN THE 2005 NATIONAL ELECTRICAL CODE (AS APPLICABLE).

H. VERIFY THE USE/ACCEPTANCE OF NO CORE/LAMP/FACTORED WIRING SYSTEMS WITH LOCAL AUTHORITY HAVING JURISDICTION PRIOR TO ANY WORK OR THE PURCHASE OF ANY MATERIALS INCLUDING BUT NOT LIMITED TO REDUCE STATUS AT STORE FIXTURES SELLFLOOR.

I. ALL FIXTURE TYPES MAY NOT BE UTILIZED.

## GENERAL NOTES

A. WHERE THERE MAY BE A CONFLICT IN THE SPECIFICATIONS AND/OR DRAWINGS, THEN THE MORE EXPENSIVE LABOR, MATERIALS AND EQUIPMENT SHALL BE ASSUMED TO BE REQUIRED AND SHALL BE PROVIDED BY THE CONTRACTOR TO THE SATISFACTION OF THE OWNER.

B. WHEN WORK NOT SPECIFICALLY CALLED OUT IS REQUIRED TO COMPLETE THE PROJECT, IT SHALL BE PROVIDED BY THE CONTRACTOR AT NO EXTRA COST TO THE OWNER.

C. ALL WALL MOUNTED SWITCHES/SENSORS SHALL BE MOUNTED AT 44" A.F.F. TO BOTTOM PROVIDED WITH A THERMOPLASTIC COVER PLATE TO MATCH DEVICE COLOR UNLESS OTHERWISE SPECIFIED.

D. ALL RECEPTACLES SHALL BE FLUSH MOUNTED AT 18" A.F.F. TO BOTTOM AND DATA/TELEPHONE OUTLETS SHALL BE FLUSH MOUNTED AT 18" A.F.F., TO BOTTOM PROVIDED WITH A STAINLESS STEEL COVER PLATE WITH BRUSHED FINISH. BACK PLATE DEVICE COLOR UNLESS OTHERWISE SPECIFIED. BACK-TO-BACK DEVICE SHALL BE OFFSET HORIZONTALLY, 6" MINIMAL.

E. THE EXACT LOCATION OF ALL SWITCHES, OUTLETS, ETC. SHALL BE COORDINATED WITH ARCHITECTURAL ELEVATIONS.

F. ALL DEVICES SHALL BE WHITE AND MANUFACTURED BY LEVITON, P & S OR HUBBELL.

G. ALL BRANCH CIRCUITS SHALL BE MINIMUM #12 AWG WIRE IN CODE SIZE RACEWAY. PROVIDE LARGER WIRE SIZE AS REQUIRED TO MAINTAIN BRANCH VOLTAGE DROP OF 3% FOR BRANCH CIRCUITS & 5% FOR FEEDERS/SERVICE CIRCUIT COMBINED.

H. ALL COLUMN MOUNTED RECEPTACLES, CONDUIT AND JUNCTION BOXES LOCATED IN SALES AREA SHALL BE MOUNTED AT 84" A.F.F. AND LOCATED ON THE SIDE OF THE COLUMN FACING THE PERIMETER WALL. PAINT CONDUIT AND BOX TO MATCH ADJACENT COLUMN PAINT COLOR.

I. SEE ARCHITECTURAL REFLECTED CEILING PLANS FOR EXACT LIGHT FIXTURE LOCATIONS.

J. CONTRACTOR SHALL PROVIDE ALL STEEL SUPPORTS REQUIRED TO HANG LIGHT FIXTURES AS SHOWN. FINAL LIGHT FIXTURE LOCATIONS SHALL BE COORDINATED WITH MECHANICAL, DIFFUSERS AND STRUCTURAL DESIGN, AND LIGHTING HAVING TOP PRIORITY.

## SYMBOL LEGEND

ALL SYMBOLS MAY NOT BE USED AND ARE NOT TO SCALE.

| | | | |
|---|---|---|---|
| ⊟ | DISCONNECT SWITCH | | DUPLEX WALL MOUNTED RECEPTACLE. 20A GRY4, SPEC GRADE. |
| ⊡ | BUZZER PUSH BUTTON | | GFCI—GROUND FAULT INTERRUPTING. |
| ⊞ | BELL PUSH BUTTON | WP = WEATHERPROOF | |
| ▭ | TRANSFORMER | EXC = ELECTRIC WATER COOLER | |
| | MOTORBASE | | DUPLEX WALL MOUNTED RECEPTACLE. 20A GRY, SPEC GRADE, GROUNDED TO ISOLATED GROUND PANEL. PROVIDE ORANGE RECEPTACLE. |
| | POWER POLE | | |
| ▣ | DISTRIBUTION BOX | ⊕ | QUADRUPLE WALL MOUNTED RECEPTACLE |
| ⦶ | PLUGMOLD | | JUNCTION BOX AND CONDUIT FOR COMMUNICATIONS |
| | BUZZER | | JUNCTION BOX AND CONDUIT FOR VOLUME CONTROLS |
| ⊖ | BELL | | |
| | WALL MOUNTED LINE VOLTAGE DUAL TECHNOLOGY OCCUPANCY SENSOR WITH MANUAL ON AUTOMATIC OFF — WATT STOPPER DT-305 OR EQUAL. WITH PILOT, MOUNT TO COUNT PER DETAIL. ON SENS. FOR TOILET ROOM OCCUPANCY SENSORS. | | DISCONNECT SWITCH, 30 AMP—SWITCH SIZE, 30 AMP FUSE SIZE. N/F = NON FUSED. WP = WEATHERPROOF |
| | | | MAGNETIC MOTOR CONTACT |
| | | | FLOAT SWITCH CONTACT |
| | CEILING MOUNTED LINE VOLTAGE DUAL TECHNOLOGY OCCUPANCY SENSOR — WATT STOPPER WT-305 | | MANUAL PULL STATION |
| | | | FIRE ALARM ANNUNCIATOR PAD |
| | CEILING MOUNTED POWER PACK COMPANION TO LOW VOLTAGE OCCUPANCY SENSORS — WATT STOPPER B4Z-100 | | REMOTE DUCT SMOKE INDICATOR TEST STATION |
| | | | TEMPERATURE SENSOR |
| | TELEPHONE OR DATA OUTLET BOX | | |





**01   LIGHTING FLOOR PLAN**

E101



POWER PLAN

01  POWER PLAN

E201





**GENERAL NOTES**

**NOTES TO THE DESIGNER**

02  **LEASE DEPARTMENT OPTION**

01  **FRAMING DEPARTMENT OPTION**

JO-ANN fabrics and crafts

JO-ANN FABRICS AND CRAFTS
OPTIONAL DEPARTMENT
POWER PLANS

E203



**GENERAL NOTES**

**KEY NOTES**

**DESIGNER NOTES**

01 | ELECTRICAL EQUIPMENT PLAN

JOANN
fabrics and crafts

JOANN FABRICS AND CRAFTS
2401 PROTOTYPE
FIXED VERSION

ELECTRICAL
EQUIPMENT PLAN

E301



FOR REFERENCE ONLY

NATIONAL ACCOUNT VENDOR WILL SURVEY THE SPACE AND PROVIDE SITE-SPECIFIC PLANS FOR THE PROJECT.

GENERAL CONTRACTOR WILL HAVE NO WORK ASSOCIATED WITH FIRE ALARM DESIGN, PERMITTING, DEMO, MODIFICATION AND/OR INSTALLATION OF NEW DEVICES.

01  FIRE ALARM SYSTEM SCHEMATIC PLAN

E401



**01  SECURITY ALARM SYSTEM SCHEMATIC PLAN**

SECURITY ALARM LEGEND

GENERAL NOTES

NOTES TO THE DESIGNER

FOR REFERENCE ONLY

NATIONAL ACCOUNT VENDOR WILL
SURVEY THE SPACE AND PROVIDE
SITE-SPECIFIC PLANS FOR THE
PROJECT.

GENERAL CONTRACTOR WILL
DEMOLISH ANY EXISTING DEVICES
COMPLETELY.  NEW DEVICES
PROVIDED AND INSTALLED BY
VENDOR.

SECURITY ZONE LIST

JO-ANN fabrics and crafts

JO-ANN FABRICS AND CRAFTS
SECURITY ALARM SYSTEM
SCHEMATIC PLAN AND LEGEND

E402



ELECTRICAL SERVICE CRITERIA

NOTES TO THE DESIGNER

06  LOAD SUMMARY

04  SUPPLEMENTARY EQUIPMENT TEMPLATE

02  SUPPLEMENTARY EQUIPMENT ELEVATION - LOOSE GEAR OPTION

KEY NOTES

KEY NOTES

KEY NOTES

05  STOCK ROOM OCCUPANCY SENSOR WIRING DIAGRAM

03  TRANSFORMER GROUNDING DETAIL

01  ONE-LINE DIAGRAM AND DETAILS (LOOSE GEAR OPTION)

JO-ANN FABRICS AND CRAFTS
ELECTRICAL DIAGRAMS AND CALCULATIONS

E501
EXG  Pg 36





JOANN
fabrics and crafts

NOTES TO THE DESIGNER

03  POWER WALL PLAN AND ELEVATION

04  PREFERRED SCHEMATIC LAYOUT

02  SUPPLEMENTAL EQUIPMENT (POWER WALL OPTION)

01  ONE-LINE DIAGRAM AND DETAILS (PREFABRICATED POWERWALL OPTION)

JO-ANN FABRICS AND CRAFTS
PREFABRICATED POWER
WALL DETAILS

E701





02  ENLARGED MECHANICAL PLAN

01  MECHANICAL PLAN

JO-ANN FABRICS AND CRAFTS

MECHANICAL PLAN

M101

## NOTES TO THE DESIGNER



1. ALWAYS DEVISE ALL PROTOTYPE VALUES LISTED IN SCHEDULES AND COMPLETELY FILL OUT FOR EACH SITE-SPECIFIC PROJECT.
2. FOR PROJECTS LOCATED WITHIN 5 MILES OF A SALT WATER COAST, PROVIDE ROOF TOP UNITS WITH FACTORY APPLIED EPOXY COATING FOR CONDENSER AND EVAPORATOR COILS.
3. WHERE JANITOR CLOSETS AND RESTROOMS ARE NOT ADJACENT, USE SEPARATE FANS FOR EACH.
4. CONFIRM WITH LOCAL CODES IF VENTILATION REQUIREMENTS, USE ASHRAE 62.1 WHERE NOT.
5. FOR PROJECTS LOCATED IN AREAS THAT REQUIRE COMPLIANCE TO TITLE 24 MUST INCLUDE TITLE 24 COMPLIANCE FORMS IN THIS SET OF DRAWINGS. CREATE AN 11×85 SHEET OF SHEETS FOR FORMS, DOWNLOAD THE MOST CURRENT FORMS FROM WEBSITE BELOW. www.energy.ca.gov/title24/

AVERAGE NEW BUILDING COOLING VALUES (per SALES FLOOR AREA):
ZONE A: 330 SQ. FT/TON
ZONE B: 350 SQ. FT/TON
ZONE C: 375 SQ. FT/TON
ZONE D: 400 SQ. FT/TON
ZONE E: 425 SQ. FT/TON

CABINET HEATER IN VESTIBULE MAY NOT BE REQUIRED IN ZONES A AND B, SUBJECT TO TENANT APPROVAL.

NOTE:  THE ZONE CHART ABOVE SHOULD ONLY BE USED TO DESIGNATE SPECIFIC HVAC CAPACITIES FOR PROJECTS. THE DESIGNER SHALL PERFORM DETAILED HEATING AND COOLING LOAD CALCULATIONS AND MAKE SPECIFIC EQUIPMENT SELECTIONS BASED ON THE RESULTS OF HIS CALCULATIONS. SEE "NOTES TO DESIGNER" ON WOOD FOR LOAD CALCULATION STEPS.

f. IN LOCATIONS WITH A MANAGER OFFICE AND/OR A CASH OFFICE, ONE (1) VAV BOX SHALL BE PROVIDED AND INSTALLED AFTER THE GENERAL DEVICE'S LOCATED IN THE BACK OF HOUSE. VAV BOXES ARE NOT TO BE USED IN THE GENERAL OFFICES, BREAK ROOMS, OR GLASS ROOMS. EQUIPMENT SHALL BE SIZED FOR 12°F MAX. RISE AT 30% OF AIRFLOW. ONE BOX MAY BE USED TO SERVE UP TO TWO ADDITIONAL OFFICES.

### VAV BOX SCHEDULE

| DESIGNATION | |
|---|---|
| MANUFACTURER / MODEL NO. | TRANE VCCF08 |
| SERVICE | BREAK ROOM |
| MINIMUM AIRFLOW | 420 |
| MAXIMUM AIRFLOW | 800 |
| CFM/SF | 25/90 |
| HEATING HEAT KW/MBH | 3 KW/10.2 MBH |
| VOLTAGE | 277/1 (24V/1 277/1 IS NOT AVAILABLE) |
| MCA | 20 |
| MOCP | 20 |

### GAS-FIRED UNIT HEATER SCHEDULE

| DESIGNATION | UH-1 |
|---|---|
| SERVICE | STOCKROOM |
| TYPE | CENTRIFUGAL FAN |
| OUTPUT (MBH) | 103 |
| VOLTAGE / HZ / PHASE | 115 / 60 / 1 |
| MANUFACTURER / MODEL NO. | TRANE GPHD 103 |

NOTES:
1. FURNISH WITH SINGLE STAGE GAS CONTROL (INTERMITTENT PILOT) ALUMINIZED STEEL HEAT EXCHANGER VERTICAL LOUVERED FLUE VENT / FAN OPERATION, CHASE FOR ROOM REQUIREMENTS AND SINGLE STAGE ROOM THERMOSTAT WITH LOCKABLE COVER.
2. PROVIDE ALL RELAYS AND TRANSFORMERS FOR A COMPLETELY OPERATIONAL SYSTEM.

### CABINET HEATER SCHEDULE

| DESIGNATION | CH-1 |
|---|---|
| SERVES | VESTIBULE |
| KW | 3 |
| VOLTAGE | 208/1 ELEMENT AND MOTOR |
| MANUFACTURER / MODEL NO. | TRANE / UHCABT44A |

NOTES:
1. FURNISH WITH RECESS MOUNTED (SERIES 90) UNIT MOUNTED THERMOSTAT, SINGLE POLE) UNIT MOUNTED DISCONNECT SWITCH AND PLASTIC TRIM.

### ENERGY MANAGEMENT SYSTEM (EMS)

JOANN HAS A NATIONAL ACCOUNT VENDOR, WHO PROVIDES AN ENERGY MANAGEMENT SYSTEM (EMS). COORDINATE ALL WORK RELATED TO THE EMS SYSTEM WITH THE EMS CONTRACTOR PRIOR TO INSTALLATION OF MATERIALS.

THE EMS VENDOR WILL SUPPLY AND INSTALL THE FOLLOWING:
1. TEMPERATURE SENSORS (TO REPLACE TEMPORARY THERMOSTATS)
2. CO2 SENSOR(S) AND WIRING
3. GAS PULSE/CT'S FOR ON-SITE INSTALLATION AT EOP PANEL.
4. GAS PANELS
5. CT FOR PROGRAMMING

MECHANICAL CONTRACTOR SHALL SUPPLY THE FOLLOWING:
1. CONDUIT, WIRES (SEE EMC EQUIPMENT PACKAGE ON THE SHEET)
2. TEMPORARY THERMOSTATS
3. STAT, ROOM THERMOSTATS, INCLUDING WIRING
4. VESTIBULE HEATER AND THERMOSTAT, INCLUDING WIRING
5. BOXES, HEAT KIT, TEST, WEARING AND BALANCING (IF APPLICABLE)
6. CLEARANCE OF SYSTEM AFTER EMS INSTALLATION IS COMPLETE.

ELECTRICAL CONTRACTOR SHALL SUPPLY THE FOLLOWING:
1. CONDUIT, PULL WIRE AND MOUNTED FOR GAS SERVICES, SENSOR(S) PROVIDED AND INSTALLED BY GAS VENDOR.
2. CONDUIT, BOXES AND WIRE FOR TEMPORARY THERMOSTATS.
3. INSTALLATION OF GAS PULSE/CT'S NEAR THE EOP PANEL. (MAX) PRE-FABRICATED POWER WALL, IS USED. GAS PULSE/CT'S WILL SHIP WITH THE PREFABRICATED WALL. UNIT MUST FOR ON-SITE INSTALLATION. FINAL ELECTRICAL CONNECTION BY E.C. IF WIRING IS REQUIRED WHERE EXISTING ELECTRICAL ROOM IS BEING MOVED, E.C. WILL NEED TO COORDINATE WITH NATIONAL ACCOUNT VENDOR FOR DISCONNECT/INSTALLATION DETAILS OF GAS PULSE/CT'S.)





### ROOFTOP UNIT SCHEDULE

| SYMBOL | MANUFACTURER MODEL NUMBER | AIR FLOW (CFM) | O.A. FLOW (CFM) | AHU EFF. | EXT. S.P. (IN W.G.) | EAT DB (DF/WB) | CX COOLING COIL LAT DB (DF/WB) | TOTAL CLG (MBH) | SENS. CLG (MBH) | GAS HEAT INPUT (MBH) | OUTPUT (MBH) | STAGES | VOLTS/ø/HZ | MCA | MOCP | UNIT WEIGHT (LBS) | DEVICE NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AC-1 | TRANE YCD150E | 5,000 | L435 | 83 | 1.1 | 80/67 | | 12.5 | 116 | 320 | 263 | 2 | 460/3/60 | 34 | 40 | -/12.0 | 2350 | 1,2,3,4,5 |
| AC-2 | TRANE YCD150E | 5,000 | L435 | 83 | 1.1 | 80/67 | | 12.5 | 116 | 320 | 263 | 2 | 460/3/60 | 34 | 40 | -/12.0 | 2350 | 1,2,3,4,5 |
| AC-3 | TRANE YCD151E | 5,000 | L435 | 83 | 1.1 | 80/67 | | 12.5 | 116 | 320 | 263 | 2 | 460/3/60 | 34 | 40 | -/12.0 | 2350 | 1,2,3,4,5 |
| AC-4 | TRANE YCD151E | 5,000 | L435 | 83 | 1.1 | 80/67 | | 12.5 | 116 | 320 | 263 | 2 | 460/3/60 | 34 | 40 | -/12.0 | 2350 | 1,2,3,4,5 |
| AC-5 | TRANE YHD090E | 1,290 | 190 | 83 | 5.0 | 80/67 | | 3 | 38 | 63 | 54 | 1 | 460/3/60 | 24 | 25 | 15.2/- | 900 | 1,2,3,4,5 |
| AC-6 | TRANE YHD090E | 2,000 | 180 | 65 | 1.0 | 80/67 | | 3 | 47 | 130 | 104 | 1 | 460/3/60 | 18 | 25 | 15.2/- | 1190 | 1,2,3,4,5 |

NOTES:
1. PROVIDE WITH AN INSULATED ROOF CURB.
2. PROVIDE INSULATED ROOF CURB FOR MOUNTING.
3. PIPE CONDENSATE TO DISCHARGE ON SPLASH BLOCK WHERE PERMITTED. IF NOT, PIPE DOWN THRU CURB TO EOP SINK WITH COPPER PIPING.
4. PROVIDE WITH INTERNAL DISCONNECT AND PROVIDED ON OUTLET.
5. UNIT SHALL BE EQUIPPED WITH DEMAND CONTROL VENTILATION, CO2 SENSOR SHALL BE INSTALL IN LOCATIONS AS SHOWN ON THE PLANS AND SHALL BE CONTROLLED THRU THE ENERGY MANAGEMENT SYSTEM.
6. PROVIDE SMOKE DUCT DETECTORS ON UNITS PER LOCAL CODE REQUIREMENTS.

### EXHAUST FAN SCHEDULE

| SYMBOL | MANUFACTURER | MODEL | TYPE | DRIVE TYPE | AIR FLOW (CFM) | EXT. S.P. (IN W.G.) | FAN (RPM) | BHP | SONES | VOLTS/ø/HZ | FAN MOTOR HP | APPROX. WEIGHT (LBS) | NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EF-1 | GREENHECK | CB-081 | ROOF CENTRIFUGAL | BELT | 200 | 0.40 | 808 | .13 | | 115/1/60 | 1/8 | 68 | 1, 2, 3 |

NOTES:
1. PROVIDE INTEGRAL DISCONNECT SWITCH.
2. PROVIDE INSULATED ROOF CURB FOR MOUNTING.
3. CONTROL SHALL BE THROUGH EMS. FANS SHALL TURN ON DURING OCCUPIED HOURS AND OFF DURING UNOCCUPIED HOURS.

### VENTILATION SCHEDULE
BASED ON ASHRAE 62.1-2007

| ROOM NAME | OCCUPANCY CATEGORY | FLOOR AREA Af (SF) | AREA OUTDOOR AIRFLOW Ra (CFM/SF) | OCCUPANT DENSITY (#/1000SF) | PEOPLE (PEOPLE) | EFFECTIVENESS | REQUIRED OUTDOOR AIRFLOW Vbz (CFM) | EXHAUST RATE (CFM/SF) | REQUIRED EXHAUST (CFM) | ACTUAL PROVIDED OUTDOOR AIR (CFM) | ACTUAL PROVIDED EXHAUST (CFM) | MECHANICAL UNIT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SALES | SALES | 18470 | 6.13 | 7.5 | 15 | 282 | 0.6 | 3588 | 0 | 0 | 5730 | 0 | AC-1,2,3,4 |
| STOCK | STOCK (S/R) | 9400 | 0.12 | 0 | 0 | 0.8 | 158 | 0 | 0 | 160 | 0 | AC-5 |
| OFFICE | OFFICE SPACE | 140 | 0.06 | 5 | 3 | 0.8 | 33 | 0 | 0 | 33 | 6 | AC-5 |
| CORRIDOR | CORRIDORS | 93 | 0.06 | 0 | 0 | 0.8 | 8 | 0 | 0 | 17 | 0 | AC-5 |
| VESTIBULE | OTHER | 180 | 0 | 0 | 0 | 0.8 | 0 | 0 | 0 | 0 | 0 | - |
| BREAK ROOM | BREAK ROOMS | 218 | 0.06 | 5 | 25 | 0.6 | 64 | 0 | 0 | 50 | 0 | AC-5 |
| RESTROOM | — | | | | | 0.8 | | | 1.0 | 33 | 0 | 50 | AC-5, EF-1 |
| MENS | PUBLIC TOILET | 68 | 0 | 0 | 0 | 0.8 | 0 | 20 | 4 | 73 | AC-5, EF-1 |
| WOMENS | PUBLIC TOILET | 71 | 0 | 0 | 0 | 0.8 | 0 | 20 | 4 | 73 | AC-5, EF-1 |
| TOTAL | | | | | | | 3883 | | | 123 | 5660 | 280 | |

NOTES:
1. SALES FLOOR AND STOCK AREA UNDER DEMAND CONTROL VENTILATION USING CO2 SENSORS THAT SHALL MAINTAIN THE QUALITY OF AIR INSIDE EACH SPACE.
2. RESTROOM VENTILATION SHALL BE CONNECTED TO EMS SYSTEM TO RUN CONTINUOUSLY DURING OCCUPIED HOURS.

### SUPPLY, RETURN & EXHAUST AIR DEVICE SCHEDULE

| DESIGNATION | DESCRIPTION |
|---|---|
| CD-1 CEILING DIFFUSER | TITUS MODEL TMRA-AA, 24"×24" MODULE, LAY-IN/SURFACE MOUNTED, ALUMINUM, WHITE FINISH WITH OPPOSED BLADE DAMPER. |
| CD-2 CEILING DIFFUSER | TITUS MODEL TMRA-AA, 12"×12" MODULE, LAY-IN SURFACE MOUNTED, ALUMINUM, WHITE FINISH WITH OPPOSED BLADE DAMPER. |
| CD-3 DUCT MOUNTED DIFFUSER | TITUS MODEL TMSA, ROUND, ADJUSTABLE PATTERN DIFFUSER, 12"R DUCT SIZE, DUCT MOUNT, STEEL, WHITE FINISH WITH OPPOSED BLADE DAMPER. |
| G-1 RETURN/EXHAUST GRILLE | TITUS MODEL 50F, LAY-IN/SURFACE MOUNTED, 22"×22", EGGCRATE, 1/2"×1/2" GRID. |
| G-2 RETURN GRILLE | TITUS MODEL 50F, LAY-IN/SURFACE MOUNTED, 24"×12", EGGCRATE, 1/2"×1/2" GRID. |

NOTES:
1. UNLESS OTHERWISE INDICATED, ALL DEVICES ARE SHOWN SHALL NOT EXCEED 30.
2. COORDINATE EXACT LOCATION OF ALL AIR DEVICES WITH ARCHITECTURAL REFLECTED CEILING PLANS.
3. UNLESS OTHERWISE INDICATED, ALL AIR DEVICES SHALL BE OF ALUMINUM CONSTRUCTION, WITH WHITE FINISH.
4. EACH AIR DEVICE SHALL BE EQUIPPED FOR LAY-IN, FLUSH CEILING OR SURFACE MOUNTING AS REQUIRED.
5. UNLESS OTHERWISE INDICATED, DUCT RUNOUTS TO AIR DEVICES SHALL BE FULL SIZE OF NECK. MAXIMUM LENGTH OF FLEXIBLE DUCT IS 5'-0". FLEXIBLE DUCT SHALL NOT BE INSTALLED ALONG INACCESSIBLE CEILINGS.
6. EXHAUST INDUSTRIES, GRILLES AND DIFFUSERS BY DESIGNER, WARRANTY OR SIMILAR INDUSTRIES, ARE ACCEPTABLE.
7. ANY SUBSTITUTIONS FOR LISTED ABOVE MUST BE REVIEWED WITH AND APPROVED BY TENANT.
8. COORDINATE WITH REFLECTED CEILING PLAN FOR DIFFUSER BRANCH TYPE.



### HVAC EQUIPMENT PACKAGE

ROOFTOP UNITS INCLUDE CUSTOM CONTROL FEATURES FOR PROVIDE WITH TENANT'S ENERGY MANAGEMENT SYSTEM. UNITS MUST BE ORDERED FROM JOANN NATIONAL ACCOUNT VENDOR IN ORDER TO GET THESE CUSTOM FEATURES.

THE MECHANICAL CONTRACTOR (OR GENERAL CONTRACTOR) SHALL PURCHASE THE EQUIPMENT FROM THE NATIONAL ACCOUNT VENDOR. THE CONTRACTOR SHALL ALSO BE RESPONSIBLE FOR COORDINATING AND ACCEPTING THE NATIONAL VENDORS PRIMARY QUANTITIES AND MODEL NUMBERS. ALL TEMPORARY STORAGE OF EQUIPMENT AND PROVIDING A (1) YEAR LABOR WARRANTY ON ALL PRODUCTS.

THE EQUIPMENT PACKAGE INCLUDES THE FOLLOWING:
1. ROOFTOP HEATING/COOLING UNITS (6 TOTAL).
2. GAS FIRED UNIT HEATER.
3. SUPPLY GROUP DUCT DIFFUSER (6 TOTAL).
4. ELECTRIC CABINET HEATER (CEILING MOUNTED).
5. VAV BOX(ES) (IF APPLICABLE).

THESE DRAWINGS ARE CONCEPTUAL DOCUMENTS AND ARE NOT TO BE USED FOR CONSTRUCTION. DOCUMENTS ARE NOT AUTHORIZED TO BE RELEASED OR USED FOR REGULATORY, PERMIT, BID OR CONSTRUCTION PURPOSES. THESE DOCUMENTS SHALL NOT BE USED BY ANY PARTY OTHER THAN JO-ANN STORES, INC. FOR ANY PURPOSE. THE INFORMATION CONTAINED ON THE USE OF THESE DOCUMENTS WITHOUT THE WRITTEN PERMISSION FROM GPD GROUP.

GPD GROUP

JOANN fabrics and crafts

JO-ANN FABRICS AND CRAFTS
22M PROTOTYPE
7/27/11 VERSION

MECHANICAL SCHEDULES

JOB NO.
2011242.50

M201



JO-ANN fabrics and crafts

08  EXHAUST FAN DETAIL

03  SUPPLY DROP BOX DETAIL

DIMENSIONAL DATA

EXHAUST VENT THROUGH ROOF DETAIL

02  SUPPLY DROP BOX AT ROOFTOP A/C UNIT

04  SUPPLY DIFFUSER DETAIL

01  SUPPLY / RETURN DUCTS AT ROOFTOP A/C UNIT

JO-ANN FABRICS AND CRAFTS

MECHANICAL DETAILS

M301



GENERAL NOTES

KEY NOTES

NOTES TO THE DESIGNER

JO-ANN
fabrics and crafts

04 | RISER DIAGRAM

03 | STACK DIAGRAM

02 | SANITARY PLUMBING PLAN

01 | WATER PLUMBING PLAN

JO-ANN FABRICS AND CRAFTS

PLUMBING PLAN
AND ISOMETRICS

2011242.50

P101



JO-ANN fabrics and crafts



# GENERAL CONDITIONS - 010000

THE TEXAS GENERAL CONDITIONS, G.C. AND CONTRACTOR SHALL BE INTERCHANGEABLE.

A. CONTRACT RESPONSIBILITIES
B. FIELD CONDITIONS
C. FIELD MEASURES
D. PENETRATIONS, COMPLIANCE
E. G.C. / LANDLORD COORDINATION
F. MATERIAL HANDLING
G. GENERAL CONSTRUCTION

# SUMMARY OF WORK - 011000

A. PROJECT/WORK DESCRIPTION
B. TENANT OCCUPANCY
C. PRE-ORDERED PRODUCTS
D. TENANT-FURNISHED ITEMS
E. SUBSTITUTION

# PROJECT MEETINGS - 012000

A. QUALITY ASSURANCE
B. PROGRESS MEETINGS

# SUBMITTALS - 013000

A. SUBMITTAL PROCEDURES
B. SHOP DRAWINGS
C. QUALITY ASSURANCE SUBMITTALS
D. ARCHITECT'S ACTION

# CONSTRUCTION FACILITIES & TEMPORARY CONTROLS - 015000

A. SUMMARY
B. PROJECT
C. PRODUCTS



GPD GROUP

JO-ANN fabrics and crafts

JO-ANN FABRICS AND CRAFTS

ARCHITECTURAL SPECIFICATIONS

2011242.50

SP101



## SUBSTITUTIONS - 016000

## CONTRACT CLOSE-OUT - 017000

## FINAL CLEANING - 017100

## TERMITE CONTROL - SECTION 023610

## PEST CONTROL - SECTION 023611

## CONCRETE WORK - 033000

## UNIT MASONRY - 042000

## ROUGH CARPENTRY - 061000

JO-ANN FABRICS AND CRAFTS
ARCHITECTURAL
SPECIFICATIONS

201 1242.50

SP102

**CORE PERFORMANCE GUIDE TABLE 2.5.1 - MINIMUM INSULATION REQUIREMENT R-VALUES**

| CLIMATE ZONE | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
|---|---|---|---|---|---|---|---|---|
| **ROOFS** | | | | | | | | |
| INSULATION ENTIRELY ABOVE DECK | R-20 ci | R-20 ci | R-20 ci | R-25 ci | R-25 ci | R-25 ci | R-25 ci | R-35 ci |
| METAL BLDGS (R/R-8) | R-13 + R-13 | R-13 + R-13 | R-13 + R-19 | R-13 + R-13 | R-25 ci | R-30 + R-8 | R-30 + R-8 | R-30 + R-11 |
| (VERTICAL BUILDS) | | | | | | | | |
| **WALLS, ABOVE GRADE** | | | | | | | | |
| MASS, EXTERIOR INSULATION | R-5.7 ci | R-5.7 ci | R-7.6 ci | R-9.5 ci | R-11.4 ci | R-13.3 ci | R-15.2 ci | R-25 ci |
| MASS, INTERIOR INSULATION | R-5.7 ci | R-7.6 ci | R-9.5 ci | R-11.4 ci | R-13.3 ci | R-15.2 ci | R-15.2 ci | R-25 ci |
| METAL BUILDING | R-13 | R-13 + R-5.6 ci | R-13 + R-6.5 ci | R-13 + R-6.5 ci | R-13 + R-6.5 ci | R-13 + R-13 ci | R-13 + R-13 ci | R-13 + R-14.4 ci |
| METAL FRAMED | R-13 + R-5 ci | R-13 + R-5 ci | R-13 + R-7.5 ci | R-13 + R-7.5 ci | R-13 + R-7.5 ci | R-13 + R-7.5 ci | R-13 + R-15.6 ci | R-13 + R-18.8 ci |
| **WALLS, BELOW GRADE** | | | | | | | | |
| BELOW GRADE WALL | NR | NR | NR | R-7.5 ci | R-7.5 ci | R-7.5 ci | R-7.5 ci | R-7.5 ci |
| MASS, EXTERIOR INSULATION | NR | NR | NR | R-7.5 ci | R-7.5 ci | R-7.5 ci | R-10 ci | R-10 ci |
| **FLOORS** | | | | | | | | |
| MASS | R-10 ci | R-10 ci | R-10 ci | R-10.4 ci | R-12.5 ci | R-15 ci | R-15 ci | R-20.7 ci |
| METAL JOIST | R-19 | R-19 | R-30 | R-30 | R-30 | R-38 | R-38 | R-49 |
| **SLAB-ON-GRADE FLOORS** | | | | | | | | |
| UNHEATED SLABS | NR | NR | NR | R-10 FOR 24" | R-10 FOR 24" | R-15 FOR 24" | R-15 FOR 24" BELOW | R-15 FOR 24" BELOW |

NOTE:
R-VALUES ARE PROVIDED FOR REFERENCE ONLY. ACTUAL DESIGN VALUES ARE TO MEET ALL LOCAL CODE REQUIREMENTS.



MAP BASED ON INTERNATIONAL ENERGY CONSERVATION CODE

## BUILDING INSULATION - 07210

## VAPOR RETARDERS - 072600

## EXTERIOR FINISH SYSTEM - 072400

## ROOFING SYSTEM - 075000

## MANUFACTURED ROOF SPECIALTIES - 077100

## ROOF HATCH & LADDER - 077200

## JOINT SEALERS - 079200

## DOORS AND FRAMES - 081113

## OVERHEAD COILING DOORS - 083323

## ALUMINUM STOREFRONT - 084413

## DOOR HARDWARE - 087100

## GLASS AND GLAZING - 088000

## GYPSUM BOARD - 092900



GPD GROUP



JO-ANN
fabrics and crafts

JO-ANN FABRICS AND CRAFTS
ARCHITECTURAL SPECIFICATIONS

20112425.0

SP103

## CERAMIC TILE - 093000

## ACOUSTICAL PANEL CEILING - 095113

## RESILIENT FLOORING - 096500

## TILE CARPETING - 096813

## WALL COVERINGS - 097200

## PAINT - 099100

## FACILITY WASTE - 118226

## NOTES TO THE DESIGNER

## TOILET PARTITIONS - 102113

## TOILET & BATH ACCESSORIES - 102800

## LOADING DOCK EQUIPMENT - 111300

## FACILITY WASTE - 118226



JO-ANN FABRICS AND CRAFTS
ARCHITECTURAL SPECIFICATIONS

2011242.50

SP104

## BASIC MECHANICAL REQUIREMENTS - 150100

A. THE TERM CONTRACTOR IN THIS SPECIFICATION SHALL BE CONSTRUED TO MEAN A "LICENSED CONTRACTOR" IN THE MECHANICAL PLUMBING AND FIRE PROTECTION TRADES. LICENSED SHALL BE CURRENT AND VALIDATED BY THE STATE AND/OR LOCAL JURISDICTION HAVING JURISDICTION IN THE EXECUTION OF THE TRADE ON THIS PROJECT.

B. DEFINITIONS SHALL SUBMIT MANUFACTURER'S CATALOG DATA FOR EACH MANUFACTURED ITEM. SUBMITTAL SHALL INCLUDE INFORMATION TO SHOW COMPLIANCE WITH CONTRACT DOCUMENT REQUIREMENTS, MARK CATALOG DATA TO INDICATE SPECIFIC ITEM WITH APPLICABLE DATA UNDERLINED. PROVIDE CATALOG QUANTITIES OF SHOP DRAWINGS FOR JO-ANN STORES, INC. TO RETAIN TWO COPIES FOR THEIR RECORDS.

C. CONTRACTOR SHALL SUBMIT "AS-BUILT" DRAWINGS AT THE COMPLETION OF PROJECT. DRAWINGS SHALL RECORD DISCREPANCIES BETWEEN MECHANICAL WORK AS INSTALLED AND AS SHOWN IN CONTRACT DOCUMENTS.

D. CONTRACTOR SHALL SUBMIT AN "OPERATING AND MAINTENANCE MANUAL" AT THE COMPLETION OF THE PROJECT. THE MANUAL SHALL CONTAIN COPIES OF ALL WARRANTIES REQUIRED IN SPECIFICATIONS.

E. MAINTENANCE PROCEDURES FOR ROUTINE PREVENTIVE MAINTENANCE AND TROUBLE SHOOTING AND COMPLETE MANUFACTURER'S PUBLICATIONS NAMES OF RESPONSIBLE PARTS.

F. CONTRACTOR SHALL VERIFY FINAL LOCATIONS FOR ROUGH-INS WITH FIELD MEASUREMENTS AND WITH THE REQUIREMENTS OF THE ACTUAL EQUIPMENT TO BE CONNECTED.

G. SEQUENCE, COORDINATE AND INTEGRATE THE VARIOUS ELEMENTS OF MECHANICAL SYSTEMS, MATERIALS AND EQUIPMENT. PERFORM CUTTING AND PATCHING FOR MECHANICAL SYSTEMS AS REQUIRED FOR INSTALLATION, SEAL EXTERIOR OPENINGS WEATHERTIGHT.

H. ENCLOSED, CONTRACTOR SHALL BE USED FOR ALL ROOF, SPANDREL AND FIRE FLOOR WORK.

## BASIC MECHANICAL MATERIALS AND METHODS - 150500

A. REFER TO INDIVIDUAL PIPING SYSTEM SPECIFICATION SECTIONS FOR PIPE, FITTING, MATERIALS AND JOINTS. PIPE SERVICES SHALL COMPLY WITH ASME B31.9.1 FOR FASTENER-THREADED PIPE AND PIPE FITTINGS.

B. FURNISH AND INSTALL MANUFACTURED ESCUTCHEONS FOR EXPOSED WALL AND CEILING PENETRATIONS. INSTALL MAKE-UP IN FINISHED MATERIALS, INSTALL CHROME-PLATED FINISH WHERE EXPOSED IN PUBLIC OR PRIVATE SPACES.

C. HANGERS AND SUPPORTS: FURNISH AND INSTALL HANGERS AND SUPPORTS AS REQUIRED...

[remainder of section illegible]

## MECHANICAL INSULATION - 152500

A. GENERAL:
1. FURNISH AND INSTALL INSULATION FOR ELECTRONIC AND PIPING AS DESCRIBED IN CONTRACT DOCUMENTS. SUBMIT PRODUCT DATA FOR EACH TYPE OF MECHANICAL INSULATION FOR THE DATA FOR EACH TYPE OF MECHANICAL INSULATION FOR THE PROJECT, IDENTIFYING R-VALUE, THICKNESS, AND ACCESSORIES.
2. INSULATION SHALL BE A FIRE SPREAD RATING OF 25 OR LESS AND A SMOKE DEVELOPED RATING OF 50 OR LESS.
3. SCHEDULE INSULATION APPLICATION AFTER HEAT AND PIPING TESTS HAVE BEEN COMPLETED.
B. PRODUCTS:
1. ELASTOMERIC: INORGANIC GLASS FIBERS, BONDED WITH A THERMOSETTING RESIN.
   a. BLANKETS: 1-1/2" THICK MIN ALUMINUM FOIL, SCRIM KRAFT FACING AND 1-1/2 LB. DENSITY, OWENS-CORNING 705.
   b. PREFORMED PIPE INSULATION: 1" THICK WITH REINFORCED ALL SERVICE VAPOR RETARDER JACKETING, OWENS-CORNING 25 ASJ.
   c. DUCT LINER: 1" OR 1" THICK DUCT LINER AS REQUIRED ACCORDING TO LOCAL FIRE ORDINANCE STANDARD.
   d. REPLACE ANY MATERIALS WHICH HAVE GOTTEN WET WITH FRESH MATERIAL.
C. EXECUTION:
1. SELECT ACCESSORIES COMPATIBLE WITH MATERIALS SUITABLE FOR THE SERVICE THAT DO NOT DIMINISH, SETTLE, OR OTHERWISE ADJUST THE INSULATION OR JACKET.
2. INSULATION SHALL FIRMLY OVER INSULATION AND SHALL NOT DETER HEAT TRANSFER OR MOISTURE JOINTS OF ONE TECHNIQUE IS NOT POSSIBLE, BUT ONE JOINT CONVENTIONALLY AND APPLY TO THE PIPE.
3. INSTALL INSULATION MATERIAL TIGHTLY SO FIXTURES ACCESSIBLE TO THE DISABLED PER ADA AND ANSI A117.1.

## PLUMBING PIPING - 154100

A. GENERAL:
1. FURNISH AND INSTALL PLUMBING PIPING AS SHOWN ON DWGS.
2. FURNISH AND INSTALL WATER SEALS OF REQUIRED IN COMPLIANCE WITH THE LOCAL WATER UTILITY COMPANY'S STANDARDS.
B. SUMMARY:
1. THIS SECTION INCLUDES PLUMBING PIPING SYSTEMS AS SHOWN ON DWGS. PROVIDE ALL PIPING, FITTINGS, AND VALVES NEEDED TO PROVIDE THE FOLLOWING:
   a. POTABLE WATER DISTRIBUTION, INCLUDING COLD AND HOT WATER SUPPLY.
   b. DRAINAGE AND VENT SYSTEMS, INCLUDING SANITARY AND STORM.
C. DOMESTIC WATER PIPING SYSTEMS:
1. ALL ABOVE-GROUND PIPING SHALL BE TYPE "L" HARD DRAWN COPPER WITH WROUGHT COPPER FITTINGS.
2. SWEAT JOINTS JOINED WITH 95/5 TIN-ANTIMONY SOLDER FOR ABOVE GROUND PIPING.
D. SOIL, WASTE AND VENT PIPING:
1. ALL PIPE AND FITTINGS:
   a. ABS CAULK GRADE OR PVC CAULK GRADE PLASTIC PIPE & FITTINGS, PROVIDE APPROVED CLEANER & GLUE FOR ABS OR PVC FITTINGS.
   b. HOT PIPING SHALL BE TYPE "L" HARD COPPER WITH WROUGHT COPPER FITTINGS OR STEEL. PIPES WITH NO HUB CONNECTIONS WHERE EXPOSED IN PUBLIC OR PRIVATE SPACES.
E. VALVES:
1. SECTIONS, VALVES INSTALL SECTIONS, VALVES CLOSE TO THE END OF EACH SECTION OR EQUIPMENT CONNECTION AND WHERE INDICATED. SEE ALL VALVES FOR SECTIONS, WHERE 2 INCHES AND SMALLER.
2. SHUTOFF VALVES SHALL SHUTOFF VALVES OR INLET TO EACH PLUMBING FIXTURE. SEE SHUTOFF VALVES SHALL BE USED WHERE PLUMBING FIXTURE HOT HAVING CONNECTION FIXTURE UNITS.
3. BOXES AND SHALLER, LINE BALL VALVES.
F. CONNECTIONS:
1. SUPPLY AIRLINES TO FIXTURES INSTALL HOT AND COLD WATER SUPPLY PIPES POINTS OF SIZES INDICATED, BUT NOT SMALLER THAN REQUIRED BY PLUMBING CODE.
2. DRAINAGE RUNOUTS TO FIXTURES. PROVIDE DRAINAGE AND VENT PIPING OF SIZES AND MINIMUM SLOPES AS PER CODE AS INDICATED, BUT NOT SMALLER THAN REQUIRED BY PLUMBING CODE TO PLUMBING FIXTURES AND DRAINS.
G. FIELD QUALITY CONTROL:
1. TEST ABOVE-GROUND SANITARY FOR CONFORMANCE AS PER CODE:
   a. DO NOT ENCLOSE, COVER, OR PUT INTO OPERATION WATER DISTRIBUTION PIPING SYSTEM UNTIL IT HAS BEEN INSPECTED AND APPROVED BY THE AUTHORITY HAVING JURISDICTION.
2. TEST WATER DISTRIBUTION PIPING AS FOLLOWS:
   a. TEST FOR LEAKS AND DEFECTS IN NEW WATER DISTRIBUTION PIPING SYSTEMS.
   b. CAP AND SUBJECT THE PIPING SYSTEM TO A STATIC WATER PRESSURE TWICE THE OPERATING PRESSURE WITHOUT EXCEEDING PRESSURE RATING OF PIPING SYSTEM MATERIALS. ISOLATE TEST SOURCE AND ALLOW TO STAND FOR 4 HOURS. LEAKS AND LOSS IN TEST PRESSURE CONSTITUTE DEFECTS THAT MUST BE REPAIRED.
   c. REPAIR LEAKS AND DEFECTS WITH NEW MATERIALS AND RETEST SYSTEM UNTIL ACCEPTED OR POISON PROOF.
3. PREPARE REPORTS FOR TESTS AND REQUIRED BY AUTHORITIES HAVING JURISDICTION.
H. CLEANING:
1. CLEAN AND DISINFECT DOMESTIC WATER PIPING ACCORDING TO PROCEDURES OF AUTHORITY HAVING JURISDICTION.

## PLUMBING FIXTURES - 154400

A. GENERAL:
1. PROVIDE PLUMBING FIXTURES AND TRIM, FITTINGS, OTHER COMPONENTS AND TRIM AS SHOWN AND SPECIFIED.
2. SCHEDULE.
3. FAUCETS UNLESS OTHERWISE SPECIFIED, PROVIDE FAUCETS THAT ARE CAST BRASS WITH POLISHED CHROME-PLATED FINISH.
4. FURNISH WALL CHAMBER FOR THE FOLLOWING FIXTURES:
   a. WALL HUNG LAVATORIES AND SINKS.
B. FIELD QUALITY CONTROL:
1. INSPECT EACH INSTALLED FIXTURE FOR DAMAGE, REPLACE DAMAGED FIXTURES AND COMPONENTS.
C. ADJUSTING AND CLEANING:
1. OPERATE AND ADJUST FAUCETS AND CONTROLS. REPLACE DAMAGED AND MALFUNCTIONING FIXTURES, FITTINGS, AND CONTROLS.
2. ADJUST WATER PRESSURE AT FAUCETS, AND FLUSHOMETERS HAVING CONTROLS, TO PROVIDE PROPER FLOW AND SPRAY.
3. REPLACE WASHERS OF LEAKING AND DRIPPING FAUCETS AND STOPS.
4. CLEAN FIXTURES, FITTINGS, AND SPACE AND DRAIN STRAINERS WITH MANUFACTURER'S RECOMMENDED CLEANING METHODS AND MATERIALS.
D. PROTECTION:
1. PROVIDE PROTECTIVE COVERING FOR INSTALLED FIXTURES AND FITTINGS.
2. DO NOT ALLOW USE OF FIXTURES FOR TEMPORARY FACILITIES, EXCEPT WHEN APPROVED IN WRITING BY JO-ANN STORES, INC.

## NATURAL GAS SYSTEMS - 154900

A. GENERAL:
1. FURNISH AND INSTALL PIPING AS SHOWN ON DRAWINGS, AND IN COMPLIANCE WITH NFPA 54.
2. PURCHASE GAS METER OF REQUIRED IN COMPLIANCE WITH GAS COMPANY'S STANDARDS. LOCATE AS SHOWN ON DWGS.
B. PRODUCTS:
1. PIPING SHALL BE NEW ASTL SCHEDULE 40 BLACK STEEL PIPE. PROVIDE THREADED PIPE FOR 2" AND UNDER PIPING. PROVIDE PLAIN END PIPE FOR PIPING LARGER THAN 2".
2. FITTINGS SHALL BE 150# MALLEABLE IRON FOR 2" AND UNDER. FITTINGS SHALL BE WELDED FLANGE BUTT WELD FOR 2-1/2" AND LARGER.
3. USE AN APPROVED PIPE DOPE OR TEFLON TAPE.
4. PROVIDE A DIRT LEG, GAS COCK, AND UNION WITHIN 72 INCHES OF EQUIPMENT CONNECTION.
C. VALVES — SEE SECTION 150500
D. QUALITY ASSURANCE:
1. CONNECT NEW PIPING TO THE TANKMARK, FUEL GAS CODE" FOR GAS PIPING MATERIALS AND COMPONENTS, INSTALLATIONS, AND INSPECTION TESTING AND PURGING.
E. FIELD QUALITY CONTROL:
1. INSPECT, LEAK TEST, AND PURGE NATURAL GAS SYSTEMS ACCORDING TO LOCAL GAS COMPANY STANDARDS.
2. REPAIR LEAKS AND DEFECTS WITH NEW MATERIALS, AND RETEST SYSTEM UNTIL SATISFACTORY RESULTS ARE OBTAINED.
3. REPORT TEST RESULTS PROMPTLY AND IN WRITING TO THE ARCHITECT AND THE AUTHORITY HAVING JURISDICTION.
4. VERIFY CAPACITIES AND PRESSURE RATINGS OF GAS METERS, REGULATORS, VALVES, AND SPECIALTIES.
5. VERIFY CORRECT PRESSURE SETTINGS FOR PRESSURE REGULATORS.
6. VERIFY THAT SPECIFIED PIPING TESTS ARE COMPLETE.
7. INSTALL METER AND VALVE CONNECTIONS FROM GAS METER. OUTSIDE BUILDING OR AS LOCATED OF CODE.

## PLUMBING EQUIPMENT - 154600

A. ELECTRIC DOMESTIC WATER HEATER: PROVIDE COMMERCIAL ELECTRIC WATER HEATERS OF SIZE, CAPACITY AND ELECTRICAL CHARACTERISTICS AS SCHEDULED ON THE DRAWINGS. COMPLY WITH ANSI/ASHRAE/IES 90A FOR ENERGY EFFICIENCY. PROVIDE UNITS WITH THE FOLLOWING:
   1. TANK HEAVY-GAUGE STEEL TANK WORKING PRESSURE OF 150 PSIG; ACCESS PANEL; GLASS LINING FUSED TO THE TANK.
   2. JACKET: INSULATE TANK WITH CFC-FREE POLYURETHANE CLOSED CELL FOAM OR FIBERGLASS INSULATION. PROVIDE OUTER STEEL JACKET WITH BAKED-ENAMEL FINISH OVER INSULATION.
   3. HEAVY-DUTY MEDIUM HEAT DEVICES, WITH INDUSTRY SPECIAL TEMPERATURE SETTING THROUGH RANGES OF TEMPERATURE.
   4. CONTROLS: AUTOMATIC WATER TEMPERATURE CONTROL; ADJUSTABLE IMMERSION CONTROL, GROUP.
   5. SAFETY CONTROLS: DOUBLE POLE, MANUAL RESET, HIGH LIMIT FROM TEMPERATURE AND AUTOMATIC RESET VENTS.
   6. ACCESSORIES PROVIDE FACTORY-INSTALLED SUBBASE TOP OF NON-ASBESTOS PADDING AND TEMPERATURE RELIEF VALVE OF ASME RATED TO DISCHARGE OF 210°F, 125 PSIG RELIEF DRAIN VALVE, TEMPERATURE RELIEF VALVE STEEL LEVEL, MOUNT DRAIN BASIN ALLOWED DRAIN PIPE TO DRAIN.
B. WATER HAMMER ARRESTORS: ALL COLD AND HOT WATER SUPPLY LINE SHALL HAVE A WATER HAMMER ARRESTOR INSTALLED AS CLOSE AS POSSIBLE TO FIXTURES SERVED.
C. CLEAN-OUTS:
   1. PROVIDE THERMAL EXPANSION TANK OF THE SIZE AND CAPACITY AS SCHEDULED ON THE DRAWINGS. UNIT SHALL BE NON-CORROSIVE DIAPHRAGM TYPE. FIELD-CHARGE PRESSURE SHALL BE SET TO THE AMOUNT OF NET POLYPROPYLENE LINER HEAT-LOST RATES, DIAPHRAGM RUBBER. CUSHION NOT THREADED CONNECTION AIR CHARGING VALVE WITH PROTECTIVE CAP UNIT SHALL BE SUITABLE FOR WATER-SIDE 150 PSIG.

## ROOFTOP HEATING AND COOLING UNITS - 155000

A. GENERAL:
   1. INSTALL ROOFTOP HEATING AND COOLING UNITS AS SCHEDULED ON THE DRAWINGS. UNITS SHALL BE RATED BY ARI STANDARD 210 AND CONCEPT AND SHALL BE IN ACCORDANCE WITH ALL REGULATIONS OF THE AUTHORITY HAVING JURISDICTION AND REQUIREMENTS OF THE MANUFACTURER AND TESTED IN ACCORDANCE WITH ISO 9001. COMPRESSORS, A 10-YEAR WARRANTY ON HEAT EXCHANGERS, AND A 1-YEAR WARRANTY ON ALL OTHER PARTS.
B. PRODUCTS:
   1. UNITS SHALL BE COMPLETELY FACTORY ASSEMBLED AND TESTED, UNITS SHALL INCLUDE THE FOLLOWING: FACTORY WIRED ELECTRICAL CONTROLS, EVAPORATOR FAN AND MOTOR, CONDENSER FAN COIL AND MOTOR, INTERCONNECTING PIPING AND REFRIGERANT CHARGE, FILTER SECTION, COMPRESSORS AND COMPLETE REFRIGERATION SYSTEM, CONTROLS, EVAPORATOR FAN AND MOTOR, GAS-FIRED FURNACE SECTION, AND ECONOMIZER AS SCHEDULED ON DWGS.
   2. ROOF CURB: PROVIDE WITH FACTORY-FABRICATED ROOF CURB FOR EACH UNIT. CURB SHALL BE A MINIMUM OF 14-INCHES HIGH AND SHALL BE PROVIDE WITH NAILER STRIPS AND GASKETS.
C. EXECUTION:
   1. INSTALL UNITS ON ROOF CURBS WITH 3/4" x 1-3/4" WIDE GASKETING MATERIAL SUPPLIED BY UNIT MANUFACTURER.

## POWER VENTILATORS - 155000

A. GENERAL:
   1. INSTALL POWER VENTILATORS AS DESCRIBED IN CONTRACT DOCUMENTS.
B. PRODUCTS:
   1. AS SCHEDULED ON DRAWINGS, OTHER APPROVED MANUFACTURERS INCLUDE GREENHECK, COOK, ACME AND PENN.
   2. CEILING MOUNTED EXHAUST FANS SHALL BE ACOUSTICALLY INSULATED WITH A SOUND LEVEL RATING OF 4.0 SONES MAX. FANS SHALL OPERATE ON 120/1/60 ELECTRICAL POWER.
   3. FURNISH BACKDRAFT DAMPER — EITHER GRAVITY OPERATED, OR MOTORIZED AS SHOWN.
C. EXECUTION:
   1. INSTALL FAN LEVEL AND PLUMB, IN ACCORDANCE WITH MANUFACTURER'S WRITTEN INSTRUCTIONS, SECURE UNIT TO STRUCTURE AS SHOWN.
   2. CHECK CLOSELY FANS FOR INSTALLED THAT WILL AFFECT ITS OPERATION AND THE CORRECTIVE ACTION BEFORE START-UP.

## METAL DUCTWORK - 159000

A. GENERAL:
   1. FURNISH AND INSTALL RECTANGULAR AND ROUND METAL DUCTS AND FITTINGS FOR AIR SYSTEMS FOR THE EXHAUST DUCTWORK.
   2. FURNISH AND INSTALL DUCT LINER IN ALL RETURN AIR DUCTWORK, SANITARY AS SMT INSULATION ON DRAWINGS.
   3. METAL DUCTWORK SHALL BE SEAL TRANSPARENT FOR THE INSTALLATION OF AIR CONDITIONING AND VENTILATING SYSTEMS.
B. PRODUCTS:
   1. FABRICATE DUCTS OF LOCK FORMING GALV. ASTM A 653, COATING DESIGNATION G90, IN CONFORMANCE WITH ALL "SMACNA" STANDARDS. PROVIDE ALL FITTINGS, JOINTS AND SEALANT IN SYSTEM. ALL SEAMS SHALL BE MADE WITH JOINTS AND SEAMS MADE WITH UNITED DUCT SEAL, ER EQUAL.
   2. DUCT LINER: 1/2" DUCT LINER AT ALL RETURN AIR DUCTS, SMACNA APPROVED FLEXIBLE DUCT MADE WITH MINIMUM VAPOR BARRIER AND METAL SPIRAL AS COMPILED OR STANDARD LEAKAGE METAL FLEX MINIMUM.
   3. DAMPERS. ALL DUCTS AS SHOWN ON THE DRAWINGS WITH VOLUME DAMPERS AT BRANCH DUCTS SHALL BE FACTORY FABRICATED MULTIPLE DAMPERS BLADE DESIGN WITH STANDARD LEAKAGE PROTECTION AND INDICATED OF CONTROL PRODUCTS TCO-08 OR EQUAL.
   4. FIRE DAMPERS SHALL BE "RUSKIN" BND TYPE B. INSERTED 1-1/2" HOUR FIRE RATING WITH A 165° FUSIBLE LINK. FIRE DAMPERS SHALL BE PROVIDED AT MECHANICAL DUCTS OR SUPPLY AND/OR CONTROL AS REQUIRED.
   5. ONE DAMPER SHALL BE "RUSKIN" BND TYPE B, INSERTED 1-1/2" HOUR FIRE RATING WITH A 165° FUSIBLE LINK, WITH TEST/BREAK TESTED AND MEET STANDARD OR AS MEASURED BY LOCAL CODE, REGULATIONS.
   6. FLEXIBLE DUCTS SHALL COMPLY WITH UL 181, CLASS I, FACTORY-FABRICATED, FLEXIBLE DUCT AND FITTINGS ALLOWED MADE OF POLYESTER LINER VAPOR JACKETED OUTER GALVANIZED REINFORCED LINER SILVER VAPOR JACKET ENCLOSING GALV. STEEL WIRE HELIX. MAXIMUM LENGTH OF FLEXIBLE DUCT SHALL BE 5 FEET WITH INSULATION AROUND A MINIMUM OF 4-INCH THICK, R-6.0 MIN. FIBERGLASS DUCT INSULATION. STEEL-WIRE HELIX ENCAPSULATED IN THE ACOUSTIC DUCTILIZE FILM INNER LINER.
   7. FLEXIBLE DUCTS SHALL COMPLY WITH FLEXIBLE DUCT MAX TO BE 5'-0".
C. EXECUTION:
   1. CONSTRUCT AND INSTALL EACH DUCT FITTING FOR THE SPECIFIC DUCT PRESSURE CLASSIFICATION INDICATED. INSTALL DUCTS CLOSE TO WALLS OVERHEAD CONSTRUCTION, COLUMNS, AND OTHER PERMANENT ELEMENTS OF THE BUILDING.
   2. INSTALL DUCT LINER. CONFORM AS REQUIRED BY THE TESTING AND BALANCING PROCEDURES. HANDLE DUCT SYSTEM PANELS TO PERM. ACCEPTABLE.
   3. PROVIDE ALL SUPPORTS FOR FLEXIBLE DUCT, INSTALL FLANGED 1" WIDE DUCT. SUPPORT SYSTEM. MUST NOT DISTURB DUCT OF CAUSE CUT OFF VISIBLE THE FLEXIBLE DUCT.

## AIR OUTLETS AND INLETS - 159500

A. GENERAL:
   1. INSTALL CEILING AIR DIFFUSERS AND GRILLES AS DESCRIBED IN CONTRACT DOCUMENTS, WITH REGISTERS, DIAGRAMS LOCATION OF CEILING DIFFUSERS AND GRILLES WITH THE REFLECTED CEILING PLAN, ANCHOR SECURELY.
B. PRODUCTS:
   1. INSTALL AIR OUTLETS AND INLETS IN ACCORDANCE WITH MANUFACTURER'S WRITTEN INSTRUCTIONS, SEQUENCE LOCATION OF CEILING DIFFUSERS AND GRILLES WITH THE REFLECTED CEILING PLAN, ANCHOR SECURELY WITH OPENING.

## TEMPERATURE CONTROL SYSTEMS - 159700

A. GENERAL:
   1. THE BUILDING TEMPERATURE CONTROL SYSTEMS SHALL BE FURNISHED AND INSTALLED BY NATIONAL ACCOUNT VENDOR UNDER SEPARATE CONTRACT WITH JO-ANN STORES, INC. THE GENERAL SYSTEM WILL BE PROVIDE MONITORING OF THE SYSTEM FROM THE HOME OFFICE.

CONTROLS SHALL CONTROL SYSTEMS SHALL BE INSTALLED BY THE ANOTHER SYSTEM IN ORDER TO ENSURE OCCUPIED AND UNOCCUPIED FUNCTIONS. WHERE THE BE A UNIT SET OF CONTROLS TO BE A UNIT SET VALUES WILL BE PROVIDED TO OPERATE THE VARIOUS AND/OR HEAT EXCHANGERS, AND A CONDENSER SHALL BE A DUAL SYSTEM UNITS.

B. EXECUTION:
   1. INSTALL CONTROL DEVICES AND COMPONENTS ACCORDING TO MANUFACTURER'S WRITTEN INSTRUCTIONS AND DIAGRAMS. MOUNT THERMOSTATS AS SHOWN AS INDICATED. INSTALL PROVIDED BY JO-ANN STORES, INC.

DRAWING CONTROL VENTILATION TEMPERATURE SHALL BE ADEQUATELY ADJUSTED TO MEET CODE REQ. AS SHOWN IN THE SAME DIAGRAM AS SHOWN. ALL BE MONITORED VIA A CCU SENSOR MOUNTED IN THE SAME FLOOR AREA.

## TESTING, ADJUSTING, AND BALANCING - 159900

A. GENERAL:
   1. FURNISH TESTING, BALANCING, AND ADJUSTING OF HEATING, COOLING AND EXHAUST SYSTEMS. TESTING AGENCY SHALL HAVE FIVE YEARS EXPERIENCE WITH AIR DUCTS, AND BE A MEMBER OF ABS (ASSOCIATED AIR BALANCE COUNCIL).
   2. SUBMIT FOUR COPIES OF COMPLETE TEST AND BALANCE PROCEDURE REPORT FOR APPROVAL PRIOR TO STARTING. ALL THE WORK OF EITHER THE SYSTEM DESIGN AND HEATING SYSTEM DURING THE WINTER.
B. EXECUTION:
   1. PERFORM TESTING AND BALANCING OF COMPLETE ACCORDANCE WITH THE ASSOCIATED AIR BALANCE COUNCIL STANDARDS, FOR FIELD MEASUREMENTS AND ANALYSIS.
   2. INSTRUMENTS USED BY AGENCY SHALL BE ACCURATELY CALIBRATED AND MAINTAINED IN GOOD CONDITION.
   3. AIR TERMINAL BALANCING PROCEDURE:
      a. CHECK FILTERS. DO NOT PROCEED WITHOUT CORRECT, CLEAN.
      b. TEST AND ADJUST BLOWER RPM TO DESIGN REQUIREMENTS.
      c. TEST AND RECORD MOTOR FULL LOAD AMPS AND COMPARE TO NAMEPLATE.
      d. MAKE PITOT-TUBE TRAVERSE OF MAIN SUPPLY DUCTS AND OBTAIN CFM.
      e. TEST AND RECORD SYSTEM AND STATIC PRESSURES, SUCTION AND DISCHARGE.
      f. TEST AND ADJUST EACH DIFFUSER, GRILLE, AND REGISTER TO WITHIN 10% OF DESIGN REQUIREMENTS. IDENTIFY EACH DIFFUSER, GRILLE AND REGISTER BY MANUFACTURER, TYPE, SIZE, AND CONFIRM INTERFACE BETWEEN RELATED CITY AND TESTER.





SP105

Exd Pg 44

SP106

2017124250

ELECTRICAL SPECIFICATIONS

JO-ANN FABRICS AND CRAFTS



JOANN fabrics and crafts

## SWITCHBOARDS - 16413

## WIRING METHODS - 160100

## ELECTRICAL REQUIREMENTS - 160100

SP107

2011242.50

JOANN FABRICS AND CRAFTS
EASTGATE
ELECTRICAL SPECIFICATIONS

JOANN
fabrics and crafts

DATA AND TELEPHONE - 185000

LIGHTING - 165000

PANELBOARDS - 162416

**EXHIBIT C-1**

Lease Outline Drawing with Minimum Landlord Requirements



MAJOR 'I'

SCALE: 1/16" = 1'-0"

sheet A

ref. -
job 08074
date 04.06.11

# EXHIBIT D

Tenant's Plans and Specifications (CDs which means construction documents).  To be attached post Lease execution.

## **EXHIBIT D-1**

Tenant's Prototype Signage Plans

Queen Creek Marketplace, Queen Creek, AZ
EXECUTION VERSION: August 5, 2011
UB Document No. 756176 v.10

Queen Creek AZ

Prototype Signs



**LED ILLUMINATED CHANNEL LETTERS**

JOANN: 156.3 square feet
fabrics and crafts: 64.5 square feet
TOTAL SQUARE FOOTAGE: 220.8

1" Exterior Signage

**LED ILLUMINATED CHANNEL LETTERS**

FACES:      3/16" #2447 White acrylic w/ custom Dual-Color day/night film
            overlay to match PMS 560 Green
JOANN TRIMCAP:  2" White jewelite
FAC TRIMCAP:    1" White jewelite
RETURNS:    5" deep .063 alum. – White
BACKS:      .063 Alum. – pre-painted White
ILLUMINATION:   White Tetra Max LED's as req'd by manufacturer
MOUNTING:   Surface mounted flush as required

31'-3"

9'-0" overall

5'-0"

16-3/4"

1'-2-4-1/2"

27'-2"

**COLOR MATCHING**

DUAL COLOR FILM

PMS 560 GREEN

DN00319
Matte finish

Letters will be green
in daylight hours
& illuminate White at dark

Dept Signage
specs on page 3

Scale: 1/16"=1'

TOP OF PARAPET
26'-0" AFF

25'-0" AFF

**LED CHANNEL - REMOTE, FLUSH**

seasonal    classes

décor    general

NOTICE: PRINTS ARE THE EXCLUSIVE PROPERTY OF "MC SIGN COMPANY" ANY UN-AUTHORIZED USE OR DUPLICATION WILL RESULT IN A 20% CHARGE PER OCCURRENCE PER THE VALUE OF THE DISPLAY © MC SIGN CO. 1996

MC SIGN COMPANY
8959 TYLER BLVD.
MENTOR, OHIO 44060

JO-ANN
fabrics and crafts

VARIOUS

Sign On.™

Partner with the best.

Exhibit ____ D-1 ____ Page ____



**LED ILLUMINATED CHANNEL LETTERS**
Scale: 3/16"=1'-0"

JOANN: 156.3 square feet
fabrics and crafts: 64.5 square feet
TOTAL SQUARE FOOTAGE: 220.8

**LED ILLUMINATED CHANNEL LETTERS**

FACES: 3/16" #2447 White acrylic w/ custom Dual-Color day/night film overlay to match PMS 560 Green
JOANN TRIMCAP: 2" White Jewelite
FAC TRIMCAP: 1" White Jewelite
RETURNS: 5" deep .063 alum. - White
BACKS: .063 Alum. - pre-painted White
ILLUMINATION: White Tetra Max LED's as req'd by manufacturer
MOUNTING: Surface mounted flush as required

COLOR MATCHING
DUAL COLOR FILM
PMS 560 GREEN
DN00319
Matte finish

Letters will be green
in daylight hours
& illuminate White at dark

31'-3"
9'-0" overall
5'-0"
16-3/4"
f=2'-4-1/2"
27'-2"

**Proposed Signage**          Scale: 1/32"=1'

LED CHANNEL - REMOTE, FLUSH

NOTICE: PRINTS ARE THE EXCLUSIVE PROPERTY OF "MC SIGN COMPANY" ANY UN-AUTHORIZED USE OR DUPLICATION WILL RESULT IN A 20% CHARGE PER OCCURRENCE PER THE VALUE OF THE DISPLAY ©MC SIGN CO. 1998

**MC SIGN COMPANY**
8959 TYLER BLVD.
MENTOR, OHIO 44060
PH. 440-269-6200 FAX 440-269-6277

Sign On.
Partner with the best.

Exhibit D-1 Page 2



NON-ILLUMINATED DEPARTMENT SIGNAGE.

FLORAL: 8.6 sq. ft.
SEASONAL: 31.3 sq. ft.

DECOR: 10.2 sq. ft.
CLASSES: 13.2 sq. ft.

**NON-ILLUMINATED REVERSE CHANNELS**

FACES: .090 alum. painted White

RETURNS: .063 alum. 3" deep welded to faces; Painted White

MOUNTING: Stud mounted flush as req'd

61-5/8"  73-1/8"  95"

floral  decor  classes

seasonal

225-1/8"

20"

SECTION VIEW

DRILL MASONRY
FILL HOLE W/ SILICONE
OR SIMILAR ADHESIVE

STUD WELD
BEHIND
LETTER FLUSH
W/ WALL

ALUMINUM
LETTERS

STUDS BONDED
OR WELDED TO
ALUMINUM FACE

Channel letter specs on page 1

Copy to be centered vertically in Green color band

Scale: 1/16"=1'

JO-ANN
fabrics and crafts

seasonal  classes  decor  floral

NOTICE: PRINTS ARE THE EXCLUSIVE PROPERTY OF "MC SIGN COMPANY" ANY UN-AUTHORIZED USE OR DUPLICATION WILL RESULT IN A 20% CHARGE PER OCCURRENCE PER THE VALUE OF THE DISPLAY © MC SIGN CO. 1998

MC SIGN COMPANY
8959 TYLER BLVD.
MENTOR, OHIO 44060

JO-ANN
fabrics and crafts

VARIOUS

Sign On.
Partner with the best.

Exhibit D-1   Page 3



NOTICE: PRINTS ARE THE EXCLUSIVE PROPERTY OF "MC SIGN COMPANY" ANY UN-AUTHORIZED USE OR DUPLICATION WILL RESULT IN A 20% CHARGE PER OCCURRENCE PER THE VALUE OF THE DISPLAY © MC SIGN CO. 1998

Exhibit D-1   Page 4

## EXHIBIT D-2

Landlord's Master Sign Plan



Developed by:

**Vestar**

2425 E. CAMELBACK RD
SUITE 750
PHOENIX, AZ 85016
TEL. 602 866 0900
FAX 602 955 2298



# QUEEN CREEK
## M A R K E T P L A C E

Architect



Butler Design Group Inc.



Signage Consultant



**INDUSTRIES**

---

C O M P R E H E N S I V E    S I G N    P L A N

**Version 6.0 - March, 2006**



## General Requirements
### Signage

These criteria have been established for the purpose of maintaining a continuity of quality and aesthetics throughout Queen Creek Marketplace for the mutual benefit of all tenants, and to comply with the approved Comprehensive Sign Plan for the development, regulations of the Town of Queen Creek Sign Ordinance, building and electrical codes of any governmental authority having jurisdiction. Conformance will be strictly enforced, and any non-compliant sign(s) installed by a Tenant shall be brought into conformance at the sole cost and expense of the Tenant. This criteria is subject to final approval by the Town of Queen Creek as part of a Comprehensive Sign Plan submittal. If a conflict is found to exist between these criteria and the final criteria approved by the Town of Queen Creek, the latter shall prevail.

I.   GENERAL REQUIREMENTS

A.   Tenant shall submit or cause to be submitted to Developer, for approval, prior to fabrication, four (4) copies of detailed drawings indicating the location, size, layout, design color, method of illumination, materials, and method of attachment of Tenant's building mounted signage.

B.   Tenant or Tenant's representative shall obtain all required permits for signs and their installation.

C.   All building mounted signs shall be constructed and installed at Tenant's sole expense. All freestanding site signage will be fabricated and installed by Developer's designated sign contractor. Tenant shall provide electronic artwork suitable for production to Developer's sign contractor who will produce Tenant's signage on the site signage. Tenant shall reimburse Developer for all site signage costs in accordance to the terms of their respective lease agreement.

D.   Tenant shall be responsible for the fulfillment of all requirements and specifications, including those of the local municipality.

E.   All signs shall be reviewed for conformance with these criteria and overall design quality. Approval or disapproval of sign submittals based on aesthetics of design shall remain the sole right of Developer or Developer's authorized representative.

F.   Tenant shall be responsible for the installation and maintenance of Tenant's sign. Should Tenant's sign require maintenance or repair, Developer shall give Tenant thirty (30) days written notice to effect said

maintenance or repair. Should Tenant fail to do the same, Developer may undertake repairs and Tenant shall reimburse Developer within ten (10) days from receipt of Developer's invoice.

G.   Advertising devices such as attraction boards, posters, banners and flags shall not be permitted except for temporary banners that may be permitted to announce a grand opening or seasonal sale. Temporary banners must be approved in writing by the Developer prior to its installation. Permits, if required by the Town of Queen Creek, shall be obtained prior to installation.

II.   SPECIFICATIONS - TENANT BUILDING SIGNAGE

A.   General Specifications

1   No animated, flashing or audible signs shall be permitted.

2   All signs, including temporary signs and their installation shall comply with all Town of Queen Creek building and electrical codes.

3   No exposed raceways, crossovers or conduit shall be permitted unless physical circumstances exist that prohibit the signage to otherwise be installed. All tenant signage shall consist of individual letters and logos installed onto the building's wall surface. Sign cabinets are discouraged, however may be approved if part of the Tenant's nationally recognized corporate identification program. Tenant signage shall not include any background color, material and/or structure used to delineate tenant signage unless part of the Tenant's nationally recognized corporate identification program. The Developer shall have the sole and separate discretion in approving and/or varying any provision of these specifications.

4   All cabinets, conductors, transformers and other equipment shall be concealed whenever possible.

5   Temporary signs and banners and painted lettering shall not be permitted except as approved by the Developer and the Town of Queen Creek.

6   Any damage to a wall surface or roof deck resulting from Tenant's sign installation shall be repaired at Tenant's sole cost. Should Tenant fail to do the same, Developer may undertake repairs and Tenant shall reimburse Developer within ten (10) days from receipt of Developer's invoice.

7   Upon removal of any sign by Tenant, any damage to a wall surface and/or architectural elements shall be repaired at Tenant's cost. Should Tenant fail to do the same, Developer may undertake repairs and Tenant shall reimburse Developer within ten (10) days from receipt of Developer's invoice.

B.   Location of Signs

1.  All signs or devices advertising an individual use, business or building shall be attached to the building at the location directed and authorized by the Developer.

## III.   DESIGN REQUIREMENTS BUILDING SIGNAGE

Individual illuminated letters and logos are recommended and may include pan channel metal letters with acrylic sign faces, reverse pan channel "backlit" illuminated letters, or any combination thereof. The letters are to be mounted onto the building fascia. Electrical connections shall be concealed to remote and/or self-contained transformers. All signage shall be installed in compliance to the Town of Queen Creek electrical code and UL 2161 / UL 48 specifications. Any sign installation found to be non-compliant shall be repaired immediately by the Tenant at Tenant's sole expense.

A.   Sign Area

1.  The maximum aggregate sign area per building elevation for each tenant shall be calculated by multiplying one and one-half (1.50) times the length of the Tenant's storefront(s) and/or elevation(s) occupied by the Tenant without limitation as to maximum sign area and/or number of sign elements. As a minimum allowance, Tenants occupying less than thirty three (33) feet of storefront and/or elevation shall be permitted a minimum of fifty (50) square feet of sign area.

B.   Letter Height and Placement Restrictions

1.  Tenant signage shall be installed in accordance with the approved Comprehensive Sign Plan in location(s) designated by the Developer and/or Developer's agents.

2.  Majors and Pad tenants occupying less than 9999 SF shall be limited to a maximum letter height of thirty six (36") inches. Shop tenants shall be limited to a maximum letter height of twenty four (24") inches. Majors occupying 10000 SF through 49999 SF shall be limited to a maximum letter height of sixty (60") inches. Anchors occupying greater than 50000 SF shall be limited to a maximum letter height of seventy two (72") inches. Logos shall not be subject to maximum letter height restrictions herein established. However, Logos shall be included in sign area computations. Anchors, Majors, Pad, and Shop Tenants shall be permitted to utilize their corporate identification program subject to sign area limitations contained in the approved Comprehensive Sign Plan. All signage shall be reviewed and approved by the developer and shall be appropriate to the surrounding building features, environment, and thematic design of Queen Creek Marketplace. The Developer and the Town of Queen Creek shall have discretion in varying any provision of these specifications.

3.  Sign on Wall Surface: No sign shall exceed eighty (80%) percent of the height and/or width of the building elevation and/or wall surface upon which it is placed. The available surface area of the wall may affect letter height.

4.  Where Shop Tenant signage is installed on a common sign band and/or wall surface, the overall length of the sign shall not exceed a maximum of eighty (80%) percent of the Tenant's leased storefront length. This percentage may be less if warranted by architectural conditions.

C.   Letter Style or Logo Restrictions

1.  Copy and/or logos utilized shall be Tenant's choice, subject to the approval of Developer and/or Developer's agents and the Town of Queen Creek.

D.   Illumination

1.  Tenant building signage may be internally illuminated, backlit to create a silhouette, and/or any combination of lighting methods mentioned herein.

E.   Under Canopy Blade Sign

1.  Each Shop Tenant shall be required to install graphic copy, at Tenant's cost, on the under canopy blade sign furnished by the Developer in accordance to the specifications contained in this Comprehensive Sign Plan. Anchor, Majors and Pad Tenants shall have the option to do so. For cost efficiencies and design/construction uniformity, all under canopy blade signs will be manufactured by the Developer's project sign contractor and purchased in bulk by Developer. Each Tenant that is required to have a blade sign shall reimburse the Developer for the cost of the display and its installation thereof.

2.  All under canopy blade sign copy shall consist of flat cut out graphics and shall be surface applied to both sides of the display. The Developer and/or Developer's Agents shall approve in writing all copy and layout prior to its installation. Each Shop Tenant shall furnish and install the approved copy for said display at Tenant's sole and separate expense. For convenience, Tenant can furnish the copy to Developer's project sign contractor for mounting and/or can provide the project's sign contractor with electronic art suitable for production. Tenant shall pay for all costs associated with the production and mounting of Tenant's blade sign copy.

3.  The blade sign shall be suspended and/or projected using a mechanism consistent with other under canopy blade signs throughout the Queen Creek Marketplace as specified.



## IV.  GENERAL CONSTRUCTION REQUIREMENTS

A.  All exterior signs shall be secured by concealed fasteners, stainless steel, or nickel or cadmium plated.

B.  All illuminated signage shall be fabricated in a manner to conceal light leaks.

C.  All penetrations of the building structure required for sign installation shall be neatly sealed in a watertight condition.

D.  Required labels or other identification shall be permitted on the exposed surface of signs and shall be applied in an inconspicuous location.

E.  Tenant shall be fully responsible for the operations of Tenant's sign contractors and shall indemnify, defend and hold Developer harmless for, from and against damages or liabilities on account thereof. Tenants shall employ licensed contractors and shall furnish to the Developer Certificates of Insurance for both General Liability and Workers Compensation prior to commencement of any sign installation.

Ex D-3 - Pg 4



Ex D 3 - Pg 5

**Freestanding Signage and Wayfinding System**



# QUEEN CREEK MARKETPLACE
RITTENHOUSE ROAD & ELLSWORTH ROAD
QUEEN CREEK, ARIZONA

ST-1  Center ID Sign / Entry Feature

ST-2  16' High Multi-Tenant Monument Sign

ST-3  7' High Pad Monument Sign

ST-4  Vehicular Directional Sign (Typical)

ST-5  Pedestrian Directory Sign (Typical)

PHASE 2

PHASE 1



## Freestanding Sign Matrix

| SIGN | SIGN TYPE | FUNCTION | LOCATION | QUANTITY | HEIGHT | SIZE | ILLUMINATION | MATERIALS |
|------|-----------|----------|----------|----------|--------|------|--------------|-----------|
| SIGN TYPE 1.1 Primary Entry Feature Wall | Wall Feature | Center Identification | Intersection of Ellsworth Road and Rittenhouse Road | 1 | Primary Entry Feature | 100 SF of Center Identification | Internal and/or ground illumination | Masonry, Stucco, Textured Aluminum, Powder Coat and Acrylics |
| SIGN TYPE 1.2, 1.3, 1.4 & 1.5 Entry Feature Wall | Wall Feature | Center Identification | Ellsworth Road Project Entrance and Rittenhouse Road Project Entrance | 4 | Entry Feature | 50 SF of Center Identification | Internal and/or ground illumination | Masonry, Stucco, Textured Aluminum, Powder Coat and Acrylics |
| SIGN TYPE 1.6 & 1.7 Entry Feature Wall | Wall Feature | Center Identification | NWC of Property along Rittenhouse Road and Intersection of Ellsworth Road and Victoria Ln | 2 | Entry Feature | 50 SF of Center Identification | Internal and/or ground illumination | Masonry, Stucco, Textured Aluminum, Powder Coat and Acrylics |
| SIGN TYPE 2 Multi-Tenant Monument Sign | Monument | Multi tenant identification | Placed along Ellsworth Road and Rittenhouse Road | Ellsworth Road (3) Rittenhouse Road (3) | Sixteen (16') feet to top of sign section exclusive of architectural embellishments | 150 SF Tenant Sign Area Exclusive of Architectural Embellishments | Internal and/or ground illumination | Masonry, Stucco, Textured Aluminum, Powder Coat and Acrylics |
| SIGN TYPE 3 Pad Monument Sign | Monument | Pad Tenant identification | Placed along Ellsworth Road and Rittenhouse Road | Ellsworth Road (5) Rittenhouse Road (3) | Seven (7') feet to top of sign section exclusive of architectural embellishments | 40 SF Tenant Sign Area Exclusive of Architectural Embellishments | Internal and/or ground illumination | Masonry, Stucco, Textured Aluminum, Powder Coat and Acrylics |
| SIGN TYPE 4 Vehicular Directional Sign | Monument | Vehicular Directional | Placed Throughout the Project Site | TBD | Six (6') feet to top of sign section exclusive of architectural embellishments | 6 SF Directional Sign Area Exclusive of Architectural Embellishments | Non-Illuminated | Textured Aluminum, Powder Coat and Reflective Vinyl |
| SIGN TYPE 5 Pedestrian Directory | Kiosk | Pedestrian Directory / Site Map / Promotional | Placed Throughout the Project Site at Pedestrian Locations | TBD | Eight (8') feet to top of the architectural embellishment. | 24 SF / Face (3 faces) of Sign Area Exclusive of Architectural Embellishments | Internal and ground illumination | Textured Aluminum, Powder Coat and Acrylics |



**ST-1.1**
Primary Center ID Sign / Entry Feature  - Scale: NTS

    



## ST-1.2, 1.3, 1.4 & 1.5
Secondary Center ID Sign / Entry Feature  - Scale: 3/8"=1'-0"







## ST-1.6 & ST-1.7
Tertiary Center ID Sign / Entry Feature  - Scale: 1/4" = 1'-0"







Internally illuminated Tenant Panels with Routed Copy .
Tenant Copy will be 3/8" push-thru clear acrylic
with first surface applied vinyl.

15'-0"

**TENANT**
3'-1 1/4" x 15'-0"

**TENANT**
3'-1 1/4" x 15'-0"

**TENANT**
3'-1 1/4" x 7'-4"

**TENANT**
3'-1 1/4" x 7'-4"

3'-1 1/4"

3'-1 1/4"

3'-1 1/4"

10'-0"

18'-0"

Side Elevation

Front Elevation

22'-6"









RAISED ALUMINUM SIGN PANEL
W/ ROUTED TENANT GRAPHICS.
3/8" ACRYLIC PUSH-THRU W/ FIRST
SURFACE APPLIED VINYL

Side Elevation    Front Elevation






Ex D-3 - Pag 12



ALUMINUM CABINET / POLE COVER TEXTURED AND PAINTED

ALUMINUM PANEL PAINTED

WHITE REFLECTIVE VINYL LETTERING

◄ TENANT
◄ TENANT
◄ TENANT
► TENANT
▲ TENANT

SIDE ELEVATION                    ELEVATION: VEHICULAR DIRECTIONAL   3/4"=1'-0"






# 3 SIDED - 3 POST - PEDESTRIAN DIRECTORY

**ISOMETRIC VIEW**



## SPECIFICATIONS

**ELECTRICAL**
BALLAST - 1190-12R ( 250 watts ) OR 71A5793
LAMPS - (1) 250 watts INDOOR / OUTDOOR
VOLTS - 110-120
AMPS - NORMAL DRAW OF 2.3 AMPS

**LIGHT BOX SECTION INCL. DOOR / FRAMES**
DOOR/FRAMES - EXTRUDED ALUMINUM WELDED AND PAINTED
LIGHT BOX STRUCTURE FABRICATED STEEL (INDOOR),
STAINLESS STEEL (OUTDOOR) AND PAINTED.

**UPRIGHT TUBING**
3" OUTSIDE DIAMETER STEEL TUBING / INDOOR.
3" OUTSIDE DIAMETER STAINLESS TUBING / OUTDOOR.

**ATTACHMENT OF TUBES TO LIGHT BOX**
SCREW FROM INSIDE LIGHT BOX INTO STEEL TUBES.
(3) THREE SCREWS PER TUBE

**ELECTRICAL FEED**
FROM LOWER CORNER OF LIGHT BOX DOWN INSIDE
ONE TUBE THRU FLOOR PLATE AND CONNECTED
BY INSTALLERS TO FLOOR PLUG.
3 - PRONG PLUG SUPPLIED
WITH LINE CORD / INDOOR.
HARD WIRED / OUTDOOR.

**GRAPHIC SIZE**
48" X 70"

**VISUAL OPENING**
46.50 X 67.50

**NOTICE:**
COLORS TBD



## FOOT PRINT - 3 SIDED - 3 POST - DIRECTORY SIZE
SCALE: 1/2" = 1'-0"

## DIRECTORY UNIT FURNISHED BY VIACOM



QUEEN CREEK
M A R K E T P L A C E

Ex D-3 - Pg 15

**Building Signage and Thematic Image Graphics**



## Building Sign Matrix
## Major Tenants

| SIGN | SIGN TYPE | FUNCTION | LOCATION | HEIGHT | SIZE | ILLUMINATION | MATERIALS |
|---|---|---|---|---|---|---|---|
| Major Tenant with occupancy of 50,000 SF or greater | Wall Mounted Signs | Tenant Identification | All elevations that offer readability | 72" Maximum Letter Height Exclusive of Logos | 1.50 SF / Linear Foot of Building Street Frontage or Elevation Upon Which Signage is Placed (Typical) | Interior, Backlit or a combination thereof. | Aluminum, Acrylic, Painted Metal, Flexface Materal |
| Major Tenant with occupancy greater than 10,000 SF through 49,999 SF | Wall Mounted Signs | Tenant Identification | All elevations that offer readability | 60" Maximum Letter Height Exclusive of Logos | 1.50 SF / Linear Foot of Building Street Frontage or Elevation Upon Which Signage is Placed (Typical) | Interior, Backlit or a combination thereof | Aluminum, Acrylic, Painted Metal, Flexface Materal |
| Major Tenant with occupancy 9,999 SF or less | Wall Mounted Signs | Tenant Identification | All elevations that offer readability | 36" Maximum Letter Height Exclusive of Logos | 1.50 SF / Linear Foot of Building Street Frontage or Elevation Upon Which Signage is Placed (Typical) | Interior, Backlit or a combination thereof | Aluminum, Acrylic, Painted Matl, Flexface Material |
| All Major Tenants | Under Canopy Blade Sign (Optional) | Tenant Identification | In front of tenant's leased space | Below architectural canopy. Maintain 8' Clearance AFF | 8 SF | Non-Illuminated | Aluminum, Acrylic, Painted Metal, Vinyl Graphics |

*Comprehensive Sign Plan subject to Town of Queen Creek approval as part of a PAD*

Majors and shop tenants occupying less than 9999 SF shall be limited to a maximum letter height of thirty-six (36") inches exclusive of logos.

Majors occupying 10000 SF through 49999 SF shall be limited to a maximum letter height of sixty (60") inches exclusive of logos.

Majors occupying greater than 50000 SF shall be limited to a maximum letter height of seventy two (72") inches exclusive of logos.

All national retailers shall be permitted to utilize their standard corporate identification program subject to sign area limitations contained in the approved Comprehensive Sign Plan.

All signage shall be reviewed and approved by the developer and shall be appropriate to the surrounding building features, environment, and thematic design of Queen Creek Marketplace.

Developer shall have sole and separate discretion in varying any provision of these specifications.

Signage is illustrated to depict typical placements. Actual sizes and locations will be determined by tenant's corporate identification standards
In accordance to criteria established as part of the csp submittal.



**TYPICAL BUILDING SIGNAGE - MAJOR TENANT**



**TYPICAL MAJOR TENANT ELEVATIONS**













## Building Sign Matrix
## Shop Tanants

| SIGN | SIGN TYPE | FUNCTION | LOCATION | HEIGHT | SIZE | ILLUMINATION | MATERIALS |
|---|---|---|---|---|---|---|---|
| Shop Tenants | Wall Signs | Tenant ID | Wall surfaces and architectural features designed to accommodate signage. | Within Building Silhouette | 1.5 SF / Linear Foot of Building Street Frontage (Typical)<br><br>50 SF Minimum (Typical) Per Building Elevation Upon Which Signage is Placed<br><br>36" Maximum Letter Height Exclusive of Logos | Interior, Backlit or a Combination thereof. | Aluminum, Acrylic, Painted Metal, Flexface Material |
| Shop Tenants | Under Canopy Blade Sign (Mandatory) | Tenant ID | In front of tenant's leased space | Below architectural canopy, Maintain 8' Clearance AFF | 8 SF | Non-illuminated | Aluminum, Acrylic, Painted Metal, Vinyl Graphics |

*Comprehensive Sign Plan subject to Town of Queen Creek approval as part of a PAD*

Shop tenants occupying less than 9999 SF shall be limited to a maximum letter height of thirty-six (36") inches exclusive of logos.

All national retailers shall be permitted to utilize their standard corporate identification program subject to sign area limitations contained in the approved Comprehensive Sign Plan.

All signage shall be reviewed and approved by the developer and shall be appropriate to the surrounding building features, environment, and thematic design of Queen Creek Marketplace.

Developer shall have sole and separate discretion in varying any provision of these specifications.

Signage is illustrated to depict typical placements. Actual sizes and locations will be determined by tenant's corporate identification standards In accordance to criteria established as part of the csp submittal.



TYPICAL BUILDING SIGNAGE - SHOP TENANTS



SHOPS TENANT ELEVATION CHARACTER











## Sign Matrix
## Pad Tenants

| SIGN | SIGN TYPE | FUNCTION | LOCATION | HEIGHT | SIZE | ILLUMINATION | MATERIALS |
|---|---|---|---|---|---|---|---|
| Pad Tenant | Wall Signs | Tenant ID | Wall surfaces and architectural features designed to accommodate signage. | Within Building Silhouette | 1.5 SF / Linear Foot of Building Street Frontage (Typical)<br>50 SF Minimum (Typical)<br>36" Maximum Letter Height Exclusive of Logos | Interior, Backlit, or a combination thereof. | Aluminum, Acrylic, Painted Metal, Flexface Material |
| Pad Tenant | Under Canopy Blade Sign (Optional) | Tenant ID | In front of tenant's leased space | Below architectural canopy. Maintain 8' Clearance AFF | 8 SF | Non-Illuminated | Aluminum, Acrylic, Painted Metal, Vinyl Graphics |
| Pad Tenant | Menu Signs | Menu Display and Pricing | Drive Thru | Per Town of Queen Creek Sign Ordinance | Per Town of Queen Creek Sign Ordinance | Interior and Ground Illumination | Aluminum, Acrylic, Painted Metal, Flexface Material |
| Pad Tenant | Traffic Directionals | Vehicular | Driveways and Drive Thru as Required | Per Town of Queen Creek Sign Ordinance | Per Town of Queen Creek Sign Ordinance | Interior and Ground Illumination | Aluminum, Acrylic, Painted Metal, Flexface Material |
| Pad Tenant | ATM | ATM | Wall or Freestanding | Per Town of Queen Creek Sign Ordinance | Per Town of Queen Creek Sign Ordinance | Interior and Ground Illumination | Aluminum, Acrylic, Painted Metal, Flexface Material |

*Comprehensive Sign Plan subject to **Town of Queen Creek** approval as part of a **PAD***

All national retailers shall be permitted to utilize their
standard corporate identification program subject to
sign area limitations contained in the approved Compre-
hensive Sign Plan.

All signage shall be reviewed and approved by the
developer and shall be appropriate to the surrounding
building features, environment, and thematic design of
Queen Creek Marketplace.

Developer shall have sole and separate discretion in
varying any provision of these specifications.

Signage is illustrated to depict typical placements. Actual
sizes and locations will be determined by tenant's corpo-
rate identification standards In accordance to criteria
established as part of the csp submittal.



**TYPICAL BUILDING SIGNAGE - PAD TENANTS**

 

**PAD TENANT ELEVATION CHARACTER**

    



3'-0" SIGN PANEL

2'-9" COPY AREA

TENANT

1'-8"

1'-4" SIGN PANEL

1'-1" COPY AREA

4'-0"

**D/F BLADE SIGN - ELEVATION**
SCALE: 1-1/2"=1'-0"

**END VIEW**
SCALE: 1-1/2"=1'-0"

Tenant copy to be FCO 1/4" thick sintra™ or aluminum.
Tenant copy to be painted per tenant's corporate colors and flush mounted to background.
Developer approval required for all layouts.






Vestar
3425 East Camelback Road • Suite 750 • Phoenix, Arizona 85018
Phone (602) 866-0900

Builder Group Inc.
8065 S. Van Buren St.
Suite 375
Phoenix, Arizona 85042
Phone (602) 437-9500
Fax (602) 437-7762

blaier INDUSTRIES
7000 WEST DESERT COVE AVE. • PHOENIX, ARIZONA 85029 • PHONE (602) 547-8410 • FAX (602) 789-8789 • www.blairindustries.com

| | | |
|---|---|---|
| Queen Creek Marketplace Ellsworth & Rittenhouse Rd. Queen Creek, AZ | 2001-5-004 | 03/27/08 |
| | 1 1/2" = 1'-0" | |
| TENANT BLADE SIGN | | |
| Dan Larsen | Paul Blaier | BS-1 |

**EXHIBIT D-3**

Location of Monument Signs and Tenant's Position Thereon

Queen Creek Marketplace, Queen Creek, AZ
EXECUTION VERSION: August 5, 2011
UB Document No. 756176 v.11



SW7011
"NATURAL CHOICE"
SHERWIN WILLIAMS

**TO STREET** ➡

15'-0"

7'-5"     7'-5"

3'-1"

| TENANT SIGN | | |
| TENANT SIGN | TENANT SIGN | |
| TENANT SIGN | JO·ANN | |

3'-1"

3'-1"

16'-0"

10'-0"

5'-..."

22'-6"

Front Elevation
ST-2.02    16' High Multi-Tenant Monument Sign 1/4" = 1'-0"

BY BLEIER INDUSTRIES

* DEVELOPER APPROVAL REQUIRED.

---

7'-5" TENANT PANEL SIZE

7'-1"
TENANT COPY ENVELOPE SIZE

3'-1"

**JO·ANN** — ① ②

2'-8" 1'-2" @ "J"
VO.

**TENANT PANEL (Qty=2 Faces)**
SCALE: 1/2"=1'-0"

ST-2.02

SPECIFICATIONS:

① TENANT PANEL
800ma FLOURESCENT INTERNALLY ILLUMINATED,
2" DEEP PAN-FORMED INDIVIDUAL ALUMINUM TENANT PANELS,
TEXTURED AND PAINTED SW 7011 "NATURAL CHOICE".

② TENANT COPY/GRAPHICS
TENANT SIGNAGE WILL BE ROUTED WITH WHITE ACRYLIC BACK-UP,
1" FCO CLEAR ACRYLIC PUSH-THRU WITH FIRST SURFACE
APPLIED 3M™ TRANSLUCENT COLORED VINYL UTILIZING TENANT'S CORPORATE COLORS.

③ DOTTED LINE INDICATES TENANT MAXIMUM VISIBLE OPENING.

---



Vestar

34354 and Camelback Road • Suite 700 • Phoenix, Arizona 85016
PHONE: 602 840-0800



bleier
INDUSTRIES

9850 WEST ROOSEVELT STREET
TOLLESON, ARIZONA 85353
602-944-3117
FAX 602-385-0753
SALES@BLEIERINDUSTRIES.COM

| Queen Creek Marketplace Ellsworth & Rittenhouse Rd. Queen Creek, AZ | 02/02/11 |
| | ST-2.02 |
| Monument Sign - JoAnn Fabrics | |
| FMB | Paul Bleier |
| 2011-6-004 | AS NOTED |

© 2011, BLEIER INDUSTRIES, LLC.
This drawing and the ideas, design and details herein are the exclusive property of Bleier Industries, LLC. This drawing and the ideas contained in it are not to be reproduced, copied or disclosed in any other person or entity without the express written consent of Bleier Industries, LLC.



SW7011
"NATURAL CHOICE"
SHERWIN WILLIAMS

**TO STREET**

Front Elevation
ST-2.04   16' High Multi-Tenant Monument Sign   1/4" = 1'-0"

BY BLEIER INDUSTRIES

* DEVELOPER APPROVAL REQUIRED.

7'-5" TENANT PANEL SIZE

7'-1"
TENANT COPY ENVELOPE SIZE

# JO·ANN

TENANT PANEL (Qty=2 Faces)
SCALE: 1/2"-1'-0"

ST-2.04

SPECIFICATIONS:

TENANT PANEL

1. 800ma FLOURESCENT INTERNALLY ILLUMINATED,
   2" DEEP PAN-FORMED INDIVIDUAL ALUMINUM TENANT PANELS,
   TEXTURED AND PAINTED SW 7011 "NATURAL CHOICE".

2. TENANT COPY/GRAPHICS
   TENANT SIGNAGE WILL BE ROUTED WITH WHITE ACRYLIC BACK-UP,
   1" FCO CLEAR ACRYLIC PUSH-THRU WITH FIRST SURFACE
   APPLIED 3M™ TRANSLUCENT COLORED VINYL UTILIZING TENANT'S CORPORATE COLORS.

3. DOTTED LINE INDICATES TENANT MAXIMUM VISIBLE OPENING.





Developer

**V** Vestar

9650 WEST ROOSEVELT STREET
TOLLESON, ARIZONA 85353
602-944-3117
FAX 602-395-0783
SALES@BLEIERINDUSTRIES.COM

| PROJECT: Queen Creek Marketplace Ellsworth & Rittenhouse Rd. Queen Creek, AZ | | DATE 02/02/11 | REVISIONS |
| --- | --- | --- | --- |
| TITLE: Monument Sign - JoAnn Fabrics | | SHEET NO. ST-2.04 | |
| DESIGN BY: FMB | SALES BY: Paul Bleier | SCALE: AS NOTED | |
| 2011-B-005 | | | |



ST-2.1  16' High Multi-Tenant Monument Sign

<u>**EXHIBIT E**</u>

The Project Coordination Guidelines



## Exhibit E

### Real Estate Process

Jo-Ann Stores, Inc., an Ohio corporation ("JAS" ) is a party to that certain lease agreement by and between VESTAR QCM, L.L.C., an Arizona limited liability company ("Landlord"), dated _____, 2011 (the "Lease). Capitalized and defined terms used in this Exhibit E shall have the same meanings as those ascribed to them in the Lease, unless the context clearly dictates otherwise.

Administrative Requirements – Addressed in Sections 010000, 011000, 012000, and 013300 on SP101 of FY13 Construction Documents. Forms attached to this document.

Document Review/Delivery Requirements – Addressed in Sections 10 and 2(f) of the Lease. This includes requirements for the Notice of Delivery.

Availability of Inspections – Buildings must be available for inspection by JAS prior to the execution of the Lease and at any point during Landlord's construction or turnover process.

Closeout procedures – Addressed in Section 4 of General Project Guidelines on cover sheet of Prototype and/or Construction Documents. These procedures are also addressed on Section 017000 on SP102 of FY13 Construction Documents.

Approved Vendors – All Turnkey Projects are required to follow this list for fixtures and equipment. Shell Projects to the extent of the scope listed on Exhibit C are required to follow this list. National Account Venders are listed in Required Vender List on cover sheet of FY13 Prototype and/or Construction Documents and on Attachment E – 3.

Submittals – Addressed in Section  013300 on SP101 of FY13 Construction Documents.

Milestones – Addressed in Section 2 of General Project Guidelines on cover sheet of Prototype and/or Construction Documents.

Turnover Criteria - Addressed in Section 3 of General Project Guidelines on cover sheet of Prototype and/or Construction Documents.

Changes to Project Scope – All changes to the responsibilities set forth in Exhibit C (project scope attached to the Lease) must be presented in writing and approved by JAS in advance. Any changes made outside of JAS approval will become the responsibility of the Landlord.

Definitions – See Section 2 of the Lease.

Site work – Addressed in Section 3 of General Project Guidelines on cover sheet of Prototype and/or Construction Documents.

Architectural – Addressed in Protoype Block Plans, Prototype Construction Documents and Prototype Elevations available on JAS WorkRoom Sites and attached to the Lease.

Plumbing – Addressed in Section 102800 on SP104 and 150100, 150500, 152500, 154100, 154400, 154600 and 154900 on SP105 of FY13 Prototype Construction Documents.

Fire Sprinkler – Addressed in Note 'c' on P101 of FY13 Prototype Construction Documents. Fire sprinkler requirements are coordinated with the local fire marshal or the authority having jurisdiction.

HVAC – Addressed in Sections 156000, 158000, 159000, 159500, 159700, and 159900 on SP105 of FY13 Prototype and/or Construction Documents.

Electrical Systems
- Fire Alarm System – Addressed in E401 Prototype Construction Documents available on JAS WorkRoom and attached to the Lease.
- Burglar Alarm System – Addressed in E402 Prototype Construction Documents available on JAS WorkRoom and attached to the Lease.
- Electrical System – Addressed in E100 – E700 Prototype Construction Documents available on JAS WorkRoom and attached to the Lease.

Roof – Addressed in Section  075000, 077100,  and 077200 on SP103 of FY13 Prototype Construction Documents.

Slab – Addressed in Section 033000 on SP102 and 096500 on SP104 of FY13 Prototype Construction Documents and also addressed in Sections 2 and 18 of the Lease.

Utilities – Addressed in Section  169000 on SP107 of FY13 Prototype and/or Construction Documents.  In addition, timing for broadband, telephone service and other communication utilities are set forth in section 10 (b) of the Lease.

Temporary Construction and Utilities – Addressed in Section  015000 on SP101 of FY13 Prototype Construction Documents.

## Required Attachments

E – 1    Project Information Sheet

E – 2    Construction Status Report

E – 3    National Account Vendor List

E – 4    (Intentionally Omitted)

E – 5    JAS Construction Department Contacts

# Jo-Ann Stores Construction Contacts

## Property Information (Landlord/Developer)

**Landlord**

| | |
|---|---|
| Name | |
| Address | |
| | |
| | |
| Phone | |

**LLD Construction Contact**

| | |
|---|---|
| Name | |
| Office | |
| Fax | |
| Mobile | |
| Email | |

**JAS Construction Manager**

| | |
|---|---|
| Name | Jim Piar |
| Office | (330) 463-6701 |
| Fax | |
| Mobile | |
| Email | james.piar@joann.com |

**Property Manager**

| | |
|---|---|
| Name | |
| Office | |
| Fax | |
| Mobile | |
| Email | |

**Legal Notice Address**

| | |
|---|---|
| Name | |
| | |
| Office | |
| | |
| | |
| | |

## Site Construction Information:    construction type: choose below

**General Contractor:**

| | |
|---|---|
| Name | |
| Address | |
| | |
| | |
| Office | |

**Project Manager:**

| | |
|---|---|
| Name | |
| Office | |
| Fax | |
| Mobile | |
| Email | |

**Site Superintendent:**

| | |
|---|---|
| Name | |
| Site # | |
| Fax | |
| Mobile | |
| Email | |

**Architect:** *(of record)*

| | |
|---|---|
| Name | |
| Office | |
| Fax | |
| Mobile | |
| Email | |

# Jo-Ann Stores Construction Contacts

| Site Construction Information: | | construction type: choose below |
|---|---|---|

**General Contractor:**

| Name | |
|---|---|
| Address | |
| | |
| | |
| Office | |

**Project Manager:**

| Name | |
|---|---|
| Office | |
| Fax | |
| Mobile | |
| Email | |

# Jo-Ann Stores Construction Contacts

**Site Superintendent:**

| | |
|---|---|
| Name | |
| Site # | |
| Fax | |
| Mobile | |
| Email | |

**Architect:** *(of record)*

| | |
|---|---|
| Name | |
| Office | |
| Fax | |
| Mobile | |
| Email | |



# CONSTRUCTION STATUS REPORT

## PROJECT INFORMATION:

| STORE #: | | DATE: | |
|---|---|---|---|

### STORE LOCATION:

| Shopping Center Name: | |
|---|---|
| Address: | |
| Address: | |
| City / State / Zip: | |

### GENERAL CONTRACTOR:

| Company Name: | |
|---|---|
| Address: | |
| City / State / Zip: | |
| Superintendent Contact: | |
| Phone: | |
| Fax: | |
| Email: | |

## SCHEDULE COMPLIANCE:

| SITE WORK : | Comments: |
|---|---|

| UTILITIES - ROUGH<br>GAS, WATER, ELECTRIC SEWER, TELEPHONE | Comments: |
|---|---|

### UTILITIES - METERS

| | Meter #'s | Utility Company |
|---|---|---|
| ELECTRIC | | |
| WATER | | |
| GAS | | |

| BUILDING SHELL: | Comments: |
|---|---|

### TENANT IMPROVEMENT:

| | | | | | |
|---|---|---|---|---|---|
| Demolition- | 0% | Rough Electrical- | 0% | Floor Prep- | 0% |
| Deck Painting- | 0% | RTU's | 0% | Flooring Install- | 0% |
| Framing - | 0% | Lighting- | 0% | Facade / EIFS Work | 0% |
| Storefront Construction- | 0% | HVAC Ductwork- | 0% | Finish Plumbing- | 0% |
| Sheet Rock- | 0% | Millwork- | 0% | Finish Electric- | 0% |
| Rough Plumbing- | 0% | Wall Paint- | 0% | Finish Carpentry- | 0% |

| Comments: | Overall Construction Completion | 0% |
|---|---|---|

**FIELD OF ISSUES**

**SITE WORK**                  Comments:

**BUILDING EXTERIOR**          Comments:

**BUILDING INTERIOR**          Comments:

**PURCHASE ORDERS**            Comments:

**DELIVERY**                   Comments:

**INSTALLATION**               Comments:

**VALIDATION**                 Comments:

**TCO STATUS**                 Comments:
DO WE NEED TCO TO FIXTURE & PLANNOGRAM?
DO WE NEED TCO TO MERCHANDISE?

**C.O/O. STATUS**              Comments:
LIST ALL REQUIREMENTS FOR OBTAINING CO

**ISSUES LOG**                 Comments:

**GC REQUIRED TO SUBMIT REPORT TO JO ANN STORES EVERY MONDAY BY 12:00 PM EST VIA E-MAIL TO Brett.Blankenship@joann.com, Brent.Schrock@joann.com, James.Piar@joann.com, Cara.Desko@joann.com**

| Approved/Preferred Architects | | | | |
|---|---|---|---|---|
| GPD Associates | Architect | 520 South Main St. Suite 2531 Akron, OH 44311-1010 | 330-572-2227 330-572-2161 | Becky Mc Adams Lisa Weaver |
| Herschman Architects | Architect | 25001 Emery Road, Suite 400 Cleveland, OH 44128 | 216-223-3200 216-223-3226 | Mike Crislip Stacey O'Guinn |
| Interbrand Design Forum | Architect | 7575 Paragon Rd Dayton ,OH 45459 | 937-312-8853 937-312-8868 | Mike Twiss Beverly Davidson |
| MCG Architecture | Architect | 7100 E. Pleasant Valley Rd., #120 Cleveland, OH 44131 | 216-520-1551 216-520-1551 | Kevin Mousty Jim Clarke |
| Menemsha Construction Solutions | Architect | 4950 W. 145th Street Hawthorne, CA 90250 | 310-263-3532 310-263-3512 | Reza Hadaegh Vasilis Papadatos |
| Omega Design Architecture, PC | Architect | 2000 Regency Parkway,Suite 475 Cary, NC 27518 | 919-651-9730 919-651-9730 | Richard Roberts, AIA, Mike Marsich |
| Required National Account Vendors | | | | |
| Accel | Millwork - Office & Breakroom | 325 Quadral Drive Wadsworth, OH 44281 | 330-336-0317 x2123 | Gwen Pattee |
| Armstrong - *starts grp 5 FY12* | Carpet, VCT | 2500 Columbia Ave Lancaster PA 17604-3001 | 800-442-4212 800-442-4212 | Lisa Cavataio Trina Siegrist |
| Bailiwick | Low Voltage Wiring | 7630 Commerce Way Eden Prairie, MN 55344 | 952-556-3847 | Tony Pascuzzi |
| Besam Entrance Solutions | Automatic Doors | National Account Center 300 Horizon Center Suite 309 Hamilton, NJ 08691 | 609-528-2580 x122 | Pam Homyak |
| Commerical Dock and Door | Dock Equipment/ Overhead Door | 7653 St. Clair Ave. Mentor, OH 44060-5235 | 440-951-4541 x14 | Eric Liebhardt |
| Digital Reliance, Inc. | Close Out Electronic Package | 386 Charmel Place Columbus, OH 43235 | 614-430-5950 | Jerry Galbreath |
| D.H. Pace Door Services | Doors, Frames & Hardware, Rest room accessories (Rev 4/2010) | 2146 E. Pythian Springfield, MO 65802 | 816-480-2634 816-480-2658 | Joel Ilten - VP National Accounts Dana Haley |
| F.E. Moran | Fire Alarm, Burglar Alarm | 33341 Kelly Road Fraser, MI 48026 | 586-228-5788 586-296-4366 | John Maiuri Laura Kirchinger |
| Grand Entrance | Vestibule Walk-off Mat/Carpet | 4640 Wedgewood Blvd. Frederick, MD 21703 | 888-424-6287 | Ashley Oberholzer |
| Leff Electric Co. | Light Fixtures and Elec. Equipment | 4700 Spring Road. Cleveland, OH 44131 | 800-686-5333 216-325-1572 | Shannon Skoda Steve Lias |
| Marathon Equipment | Cardboard Baler | PO Box 1798 Vernon, AL 35592 | 800-633-8974 X1220 800-633-8974 X1227 | Jim Squier Renee Bowman |
| Mannington Commercial - until grp 5 FY12 | Carpet, VCT | 17155 S. Franklin ST Chagrin Falls, OH 44023 | 440-666-3892 | Nancy Kinnett |
| MC Sign Company | Exterior Building Signs | 8959 Tyler Blvd.      Mentor, OH 44060 | 800-627-4460 | Elizabeth Merritt Tammy Ward |
| National Fire Services | Fire Extinguishers | 1860 Boy Scout Drive Fort Myers, FL 33907 | 888-464-0134 | Bill Chindamo |
| Quality Solutions | Slab Moisture Tests | 455 N. Maize Ct. Wichita, KS 67212- | 316-721-3656 Ext.130 | James Christenson |
| PCX | Power room, Electrical Distribution | 33 Pony Farm Rd. Clayton, NC 27520 | 919-247-8547 | Martin Klammer |
| PTNE | Telephone, Video & Data Systems | 1112 N. Meridian Rd Youngstown, OH 44509 | 800-678-4638 | Steve Sava |
| Roth Bros. | Energy Mgmt. System | 3847 Crum Rd. Youngstown, OH 44515 | 800- 872-7684 | Ben Rivera |

| Required National Account Vendors | | | | |
|---|---|---|---|---|
| SP Industries | System Specialists | 2982 Jefferson Rd Hopkins, MI 49328 | 800-592-5959 | Brad Duemler |
| Trane Corp | HVAC | 31200 Bainbridge Rd. Solon, OH 44139 | 440-248-3400 | Harry Hakenson |
| Vomela | Window Graphics | 274 Fillmore Avenue East St. Paul, MN 55107 | 651-523-9507 | Michael S. Beran National Sales Account Manager |

Initials_____ / Date_____

# Jo-Ann Stores's Construction Team is comprised of the following individuals:

Rich Ault
Director, Construction and Special Projects
Email: rich.ault@joann.com
Phone: 330.463.3291

Jim Piar
Manager, Store Construction
Email: james.piar@joann.com
Phone: 330.463.6701

Gail McKinney
Supervisor, Store Construction
Email: gail.mckinney@joann.com
Phone: 330.463.8705

Brent Schrock
Construction Analyst
Email: brent.schrock@joann.com
Phone: 330.463.8644

Cara Desko
Construction Planner
Email: cara.desko@joann.com
Phone: 330.463.6892

Brett Blankenship
Construction Specialist
Email: brett.blankenship@joann.com
Phone: 330.463.5965

Valerie Metzger
Construction Specialist
Email: valerie.metzer@joann.com
Phone: 330.463.8446

Justin Smith
Construction Specialist
Email: justin.smith@joann.com
Phone: 330.463.6895

Exhibit E – Attachment E

## EXHIBIT F

Exclusive Uses of other tenants and Occupants

SCHEDULE OF EXCLUSIVES
FOR
QUEEN CREEK TOWNE CENTER
(as of January 26, 2010)
10381-221

| TENANT | EXCLUSIVE |
|---|---|
| OfficeMax  (1) | None |
| Target (2) | None |
| Kohl's (3) | None |
| PetsMart (4) | None |
| Sports Chalet (7) | None |
| Ross (8) | None |
| Bev Mo (11) | None |
| Famous Footwear (12) | None |
| Chase Bank (13) | So long as the originally named Lessee (or a Transferee pursuant to a Permitted Transfer) is continuously and without interruption conducting business operations within the Demised Premises for the Permitted Use (except for temporary closures resulting from damage, destruction, remodeling of the Demised Premises or Force Majeure) and provided that there is not then in existence an Event of Default, subject to the further provisions of this §12.09,  Lessor shall not sell, lease or rent more than one (1) other free standing pad in the Shopping Center for the operation of (a) a branch bank, savings bank, savings and loan association or credit union, or (b) a mortgage lending operation (collectively, the "Exclusive Use").  Lessor and Lessee acknowledge and agree that the Exclusive Use does not include stock brokerages, insurance companies, or high risk and pay day loan services and the exclusive rights granted to Lessee in this §12.09 apply only to the Restricted Bank Pads (identified as such on the Site Plan) do not apply to the portion of the Shopping Center identified on the Site Plan as "Major". In |

Exhibit F - Page 1

| TENANT | EXCLUSIVE |
|---|---|
| | furtherance of this provision, Lessor shall not authorize any other tenants to use space in Shopping Center for the Exclusive Use and shall include a restriction in all future leases for the Shopping Center prohibiting other tenants from using their respective premises for the Exclusive Use; provided, however, this sentence shall not preclude Lessor from selling, leasing or renting not more than one (1) other freestanding pad in the Shopping Center for use as a branch bank, savings bank, savings and loan association, credit union or mortgage lending operation, provided, however, such other freestanding pad used as a branch bank, savings bank, savings and loan association, credit union or mortgage lending operation must be located adjacent to Rittenhouse Road and cannot be a Restricted Pad (as the same is identified as such on the Site Plan). |
| Tips 'N Toes (14) | None |
| Tilly's (15) | None |
| Paradise Bakery (17) | None |
| Verizon (18) | None |
| Chipotle (21) | None |
| Great Clips (22) | So long as the originally named Tenant or an assignee or sublessee pursuant to a Permitted Transfer is continuously and without interruption conducting business operations within the entire Premises for the Permitted Use of the Premises and provided that there has not occurred an Event of Default, except for premises having a Floor Area of five thousand (5,000) square feet or more, Landlord shall not, during the initial Lease Term, lease or rent any other premises within the portions of the Shopping Center presently owned by Landlord to a tenant or occupant who will use such premises primarily for (i.e., more than fifty percent (50%) of the Floor Area is devoted to or more than fifty percent (50%) of Gross Sales are derived from) the operation of a no appointment, value oriented, family hair salon such as Fantastic Sam's, Super Cuts, Cost Cutters or Sport Clips. The provisions of this **Article 16D** shall not, however, restrict Landlord from selling or leasing premises within the Shopping Center to full service, boutique style or theme oriented hair salons. |

Queen Creek Marketplace, Queen Creek, AZ
EXECUTION VERSION: August 5, 2011
UB Document No. 756176 v.10

| __TENANT__ | __EXCLUSIVE__ |
|---|---|
| | |
| Cost Plus (23) | None. |
| Chick-Fil-A (24) | None |
| Peach Tree Dental (25) | None |
| Bed, Bath & Beyond (26) | None |
| Red Brick Pizza (28) | None |
| Steinmart (30) | None |
| Mattress Firm (31) | None |
| Alltel (32) | None |
| JC Penney (34) | None |
| Ulta (35) | None |
| Massage Envy (39) | So long as the originally named Tenant (or another bona fide Massage Envy franchisee) is continuously and without interruption conducting business operations within the entire Premises for the Permitted Use of the Premises and provided that there has not occurred an Event of Default, except for the premises identified in the Site Plan as "__Major Tenant__" and any lease, license or concession agreement executed prior to the Date of this Lease and any amendment, modification, expansion, renewal or replacement thereof, Landlord shall not, during the Lease Term, lease or rent any other premises within the portions of the Shopping Center presently owned by Landlord to a tenant or occupant who will use such Premises primarily for (i.e., more than fifteen percent (15%) of the Floor Area is devoted to or more than fifteen percent (15%) of Gross Sales are derived from) massage therapy and/or muscle therapy. |

Exhibit F - Page 3

| TENANT | EXCLUSIVE |
|--------|-----------|
|        |           |
| Bikes Direct (43) | None |
| Frazee Paints (44) | None |
| Justice Stores (45) | None |
| Bath & Body Works (48) | So long as the originally named Tenant or an assignee or sublessee pursuant to the provisions of Section 15.2.1 above is continuously and without interruption conducting business operations within the entire Demised Premises for the Permitted Uses and provided that there is not then in existence an Event of Default, except for Ulta Cosmetics, premises having a gross leaseable floor area of ten thousand (10,000) square feet or more and any lease, license or concession agreement executed prior to the date of this Lease, Landlord shall not, during the Lease Term, lease or rent any other premises within the Shopping Center to a tenant or occupant who will use such premises primarily for (i.e., more than thirty percent (30%) of the gross leaseable floor area is devoted to or more than thirty percent (30%) of Gross Sales are derived from) the sale or display of body and facial care products, bath items, beauty aids, soaps, creams, lotions, cosmetics or toiletries. Landlord shall not amend an existing lease, license or concession agreement for premises within the Shopping Center (other than with respect to premises having a gross leaseable floor area of ten thousand (10,000) square feet or more) so as to permit a use in violation of the provisions of this Section 34.1. In addition, Landlord shall not consent to a change in use by an existing tenant or other occupant of the Shopping Center (other than tenants or occupants of premises having a gross leaseable floor area of ten thousand (10,000) square feet or more) to a use which would violate the rights granted to Tenant in this Section 34.1, provided that Landlord has the right, pursuant to the applicable lease, occupancy agreement or other document describing such tenant's or occupant's permitted use to (a) consent to a change in use, and (b) condition its consent to such a change in use on the proposed use not violating the rights granted to Tenant in this Section 34.1, and (c) withholding consent based on such criteria not constituting a breach of the applicable lease or occupancy agreement by Landlord. |

Exhibit F - Page 4

| TENANT | EXCLUSIVE |
|--------|-----------|
| Gamestop (52) | So long as the originally named Tenant or an assignee or sublessee pursuant to a Permitted Transfer is continuously and without interruption conducting business operations within the entire Premises for the Permitted Use of the Premises and provided that there has not occurred an Event of Default, except for premises identified on the Site Plan as "**Major Tenant**", the freestanding pads and premises within the Shopping Center containing a Floor Area of four thousand (4,000) square feet or more and any lease, license or concession agreement executed prior to the Date of this Lease (and any amendment, modification, extension, expansion, renewal or replacement thereof), Landlord shall not, during the Lease Term, lease or rent any other premises within the portions of the Shopping Center presently owned by Landlord to a tenant or occupant who will use such premises primarily for (i.e., more than twenty percent (20%) of the Floor Area will be devoted to) the sale of new and used video game platform hardware, software and accessories, electronic board games, hand-held entertainment software and hardware and the sale, resale, trading in and renting of video game and personal computer games. |
| Macayos (53) | None |
| 2B Wireless (54) | So long as the originally named Tenant is continuously and without interruption conducting business operations within the Premises for the Permitted Use of the Premises then except for any lease executed prior to the Date of this Lease and any amendment, extension, expansion, renewal or replacement thereof, Landlord shall not, during the initial Lease Term, (i) lease or rent any other premises within the building identified on the Site Plan as "**Shops F**" to a tenant or occupant whose primary business is the sale of mobile wireless telecommunication devices, or (ii) lease or rent any other Premises within the Shopping Center having a floor area of less than ten thousand (10,000) square feet to a tenant or occupant whose primary business is the sale of T-Mobile products and services. In the event of a breach by Landlord of its obligations contained in this **Article 16D**, which breach is not cured by Landlord pursuant to **Article 22** below, Tenant shall have the right, as its sole and exclusive remedy, to bring an action for specific performance and/or obtaining a temporary or permanent injunction against Landlord with respect to such uncured breach. |
| In-n-Out (56) | None |
| Saba's (58) | None |

Exhibit F - Page 5

| <u>TENANT</u> | <u>EXCLUSIVE</u> |
|---|---|
| Yogurt Jungle (61) | So long as the originally named Tenant is continuously and without interruption conducting business operations within the entire Premises for the Permitted Use of the Premises and provided that there has not occurred an Event of Default, except for the premises having a Floor Area of ten thousand (10,000) square feet or more and any lease, license or concession agreement executed prior to the Date of this Lease, and any amendment, modification, extension, expansion, renewal or replacement thereof, Landlord shall not, during the initial Lease Term, lease or rent any other premises within (i) the Shopping Center to a tenant or occupant who will use such premises primarily for (i.e., more than fifty percent (50%) of the Floor Area is devoted to or more than fifty percent (50%) of Gross Sales are derived from) frozen yogurt, and (ii) "<u>Shops F</u>" (identified as such on the Site Plan to a tenant or occupant who will use such premises primarily for the sale of frozen yogurt, ice cream, gelato, sorbet or frozen desert treats. |

Exhibit F - Page 6

Queen Creek Marketplace, Queen Creek, AZ
EXECUTION VERSION: August 5, 2011
UB Document No. 756176 v.10

# **EXHIBIT F-1**

Restricted Uses

## SCHEDULE OF PROHIBITED USES
### FOR
### QUEEN CREEK TOWNE CENTER
(as of August 14, 2008)
10381-221

| TENANT | PROHIBITED USE |
|---|---|
| OfficeMax (1) | Without Tenant's prior written approval, which approval may be withheld in Tenant's sole discretion, Landlord shall not make any changes in the Tenant Protected Area as shown on EXHIBIT "B", including without limitation changing the entrances to or access routes within such Tenant Protected Area, constructing or installing any structures or other improvements within such Tenant Protected Area (including kiosks, signs, or automated teller machines)<br><br>During the Initial Term of this lease and during any renewal period hereunder:<br><br>(a) No portion of the Shopping Center located within two hundred linear feet (200') of the demising walls of the Demised Premises shall be used as a restaurant, or for office purposes (such as medical or office uses, except that administrative offices incidental to a retail store operation or a veterinary clinic located within a pet supply store such as PetsMart shall be permitted), or for any use that requires parking in excess of five (5) spaces for each one thousand (1,000) square feet of leasable floor area, or for any use prohibited under subparagraphs (c) or (d) immediately below;<br><br>(b) No portion of the Shopping Center shall be occupied or used in violation of the OEA;<br><br>(c) No portion of the Shopping Center (excluding the portion owned by Target Corporation and the portion ground leased to Kohl's Department Stores, Inc.) shall be occupied or used, directly or indirectly, for a nightclub or other entertainment facility, bowling alley, arcade (but the foregoing does not preclude the use of up to ten (10) pinball or video games in connection with an otherwise permitted use which is located at least one hundred (100) linear feet from the demising walls of the Demised Premises); amusement center (as determined by prevailing community standards and provided that the use of up to ten (10) pinball or video games in connection with an otherwise permitted use which is located at least one hundred (100) linear feet from the |

Exhibit F-1 - Page 1

| TENANT | PROHIBITED USE |
| --- | --- |
|  | demising walls of the Demised Premises shall not be considered an amusement center), theater; movie theater (but the foregoing does not preclude a movie theater which is located at least three hundred (300) linear feet from the demising walls of the Demised Premises); fitness center, health club or spa (except that an exercise studio or Jazzercise facility consisting of four thousand (4,000) square feet or less may be permitted so long as such space is located at least one hundred (100) linear feet from the demising walls of the Demised Premises and a fitness center, health club or spa may be permitted so long as such space is located at least three hundred (300) linear feet from the demising walls of the Demised Premises); game room (but the foregoing does not preclude the use of up to ten (10) pinball or video games in connection with an otherwise permitted use which is located at least one hundred (100) linear feet from the demising walls of the Demised Premises); skating rink; billiard room (but the foregoing does not preclude up to two tables in connection with an otherwise permitted use which is located at least one hundred (100) linear feet from the demising walls of the Demised Premises); massage parlor (except for massage services offered by a health spa, a beauty salon, a medical doctor or chiropractor which massage services are incidental to a use otherwise permitted under this lease); adult book store or any other purpose which includes the display or sale of pornographic or obscene materials (as determined by prevailing community standards); off-track betting facility (but the foregoing shall not preclude off-track betting in connection with an otherwise permitted restaurant which is located at least one hundred (100) linear feet from the demising walls of the Demised Premises); flea market; second hand store; pawn shop; blood bank; goodwill store; bar; liquor store or store selling alcoholic beverages for off premises consumption (except that (i) a full service grocery store, drugstore, or Cost Plus may sell alcoholic beverages in prepackaged containers, (ii) a gourmet grocer such as Trader Joe's, or (iii) a gourmet or specialty liquor store, such as The Sportsman or Total Wine or Beverage & More may be permitted); tavern or pub (but the foregoing does not preclude a restaurant from selling alcoholic beverages so long as at least fifty percent (50%) of the restaurant's gross sales are from the sale of food); discotheque, ballroom or dance hall (but the foregoing does not preclude incidental patron dancing in an otherwise permitted restaurant which is located at least one hundred (100) linear feet from the demising walls of the Demised Premises); day care center (except that a day care center located on a freestanding pad located at least three hundred (300) linear feet from the demising walls of the Demised |

Queen Creek Marketplace, Queen Creek, AZ
EXECUTION VERSION: August 5, 2011
UB Document No. 756176 v.10

| TENANT | PROHIBITED USE |
|--------|----------------|
| | Premises may be permitted); beauty school; barber college; offices (other than a full service bank office, savings and loan association office, credit union, medical or dental office customarily located in shopping centers, administrative offices incidental to a retail store operation, or a veterinary clinic located within a pet supply store such as PetsMart) (provided, however, that up to ten percent (10%) of the floor area of the Shopping Center may be used as office space so long as such office space is located at least three hundred (300) linear feet from the demising walls of the Demised Premises); place of instruction; reading room (except for a reading room maintained by Barnes & Noble within its premises); or any operation catering primarily to students or trainees rather than to customers or for any use prohibited under subparagraph (d) immediately below; provided, however, notwithstanding the foregoing in this subsection (c), the following uses are permitted in the Lifestyle Center depicted as such on EXHIBIT "B": a nightclub or other entertainment facility, bowling alley, arcade, amusement center, tavern, pub, discotheque, ballroom, or dance hall; <br><br> (d) No portion of the Shopping Center shall be occupied or used in violation of any prohibitions or restrictions on use contained in any document or instrument listed on EXHIBIT "D" <br><br> (e) No portion of the Shopping Center (other than the Demised Premises) shall be leased, occupied or sold by Landlord to a direct competitor of Tenant, such as Staples, Office Depot, Mardel Christian Office and Education Supply Store, Mail Boxes, etc., FedEx/Kinko's or Workplace. |
| Target (2) OEA | Kiosks and remote merchandising units on the Developer Tract are limited to those areas identified as "Permitted Kiosk Areas" on the Site Plan, no more than ten (10) such kiosks or remote merchandising units shall be permitted in each Permitted Kiosk Area and no such kiosk or remote merchandising unit shall be of a size greater than one hundred (100) square feet <br><br> No more than ten percent (10%) of the total Floor Area on the Developer Tract may be used for Retail Office and/or Business Office purposes and no more than ten percent (10%) of the total Floor Area on the Target Tract may be used for a retail office and/or business office purposes; provided, however, that office space used by an Occupant for administrative purposes, and which is not open to the general public, shall not be considered Retail Office or Business Office for the purpose of |

Exhibit F-1 - Page 3

| TENANT | PROHIBITED USE |
|---|---|
| | this limitation.<br><br>No use shall be permitted in the Shopping Center which is inconsistent with the operation of a first-class retail shopping center or which violates Governmental Requirements. Without limiting the generality of the foregoing, without the prior written consent of the Approving Parties, which consent each Approving Party may withhold in its sole and absolute discretion, the following uses shall not be permitted:<br><br>(A) Any use which emits an obnoxious odor, noise or sound which can be heard or smelled outside of any Building in the Shopping Center or any other activity which may constitute a public or private nuisance.<br><br>(B) An operation primarily used as a storage warehouse operation (but this prohibition shall not be applicable to the following <u>wholesale or rackstyle retailers</u>: Home Depot USA, Inc., Lowe's HIW, Inc., Sam's Club (but only if located more than five hundred (500) feet from the Target Building), Costco, BJ's or any successor to the foregoing by merger, consolidation or acquisition of all or substantially all assets) and any assembling, manufacturing, distilling, refining, smelting, agricultural or mining operation (but this prohibition shall not prohibit assembly or manufacture of products incidental to the retail sale thereof, nor shall this prohibit the operation of a so-called "<u>brew pub</u>" provided that any such "<u>brew pub</u>" (i) constitutes a Restaurant, and (ii) does not derive more than forty five percent (45%) of its Gross Sales from the sale of alcoholic beverages) and is located more than five hundred (500) from the Building on the Target Tract.<br><br>(C) Any "<u>second hand</u>" store, "<u>surplus</u>" store, or pawn shop; provided, however, this prohibition shall not be applicable to the following retail facilities as may be found in a reasonable number of good quality shopping centers in the Phoenix, Arizona metropolitan area which sell used equipment or goods: "<u>Game Stop</u>," "<u>Play It Again Sports</u>", "<u>EB Games</u>," "<u>Blockbuster</u>," "<u>Hollywood Video</u>," "<u>Game Crazy</u>," "<u>Computer Renaissance</u>," "<u>My Sister's Attic</u>," "<u>Funco Land</u>", "<u>FYE For Your Entertainment</u>" or a successor to any of the foregoing by merger, consolidation or acquisition of all or substantially all assets.<br><br>(D) Any mobile home park, trailer court, labor camp, junkyard, or stockyard; provided, however, this prohibition shall not be applicable to the temporary use |

Exhibit F-1 - Page 4

| TENANT | PROHIBITED USE |
|--------|----------------|
| | of construction trailers during periods of construction, reconstruction or maintenance.<br><br>(E) Any dumping, disposing, incineration or reduction of garbage; provided, however, this prohibition shall not be applicable to garbage compactors located near the rear of any Building and provided further this restriction shall not be applicable to governmentally required or encouraged recycling centers in locations identified on the Site Plan or otherwise approved by the Approving Parties.<br><br>(F) Any fire sale, bankruptcy sale (unless pursuant to a court order) or auction house operation.<br><br>(G) Any central laundry, dry cleaning plant or laundromat; provided, however, this prohibition shall not be applicable to nominal supportive facilities for on-site service oriented to pickup and delivery by the ultimate consumer as the same may be found in retail shopping centers in the metropolitan area where the Shopping Center is located such as, by way of example only, pressing, alterations, shoe shine and shoe repair.<br><br>(H) Any automobile, truck, trailer or recreational vehicle sales, leasing, display or body shop repair operation, but this shall not prohibit, on not more than three (3) occasions during each calendar year (each of which shall not exceed seven (7) days) the promotional display of automobiles or light trucks in the portion of the Common Areas of the Shopping Center not located on the Target Tract and identified on the Site Plan as the "Permitted Promotion Area".<br><br>(I) Any bowling alley or skating rink; provided, however, this prohibition shall not be applicable to one (1) bowling alley having a Floor Area of forty thousand (40,000) square feet or less located north of the "Bowling Alley Line" set forth on the Site Plan.<br><br>(J) Any movie theater or live performance theater.<br><br>(K) Any residential use, including but not limited to: single family dwellings, townhouses, condominiums, other multi-family units, and other forms of living quarters, sleeping apartments or lodging rooms, but this shall not be applicable to a hotel or motel located on a freestanding pad and located within three hundred |

Exhibit F-1 - Page 5

| TENANT | PROHIBITED USE |
|--------|----------------|

(300) feet of the south right of way line for Rittenhouse Road.

(L) Any veterinary hospital or animal raising or boarding facility; provided, however, this prohibition shall not be applicable to pet shops or pet supply stores. Notwithstanding the forgoing exception, except in connection with a national pet supply store such as PetsMart, (i) any veterinary or boarding services provided in connection with the operation of a pet shop shall only be incidental to such operation; (ii) the boarding of pets as a separate customer service shall be prohibited; (iii) all kennels, runs and pens shall be located inside the Building; and (iv) the combined incidental veterinary and boarding facilities shall occupy no more than fifteen percent (15%) of the Floor Area of the pet shop.

(M)    Any mortuary or funeral home.

(N) Any establishment selling or exhibiting "obscene" material, but this shall not be construed as prohibiting the sale of normally stocked merchandise in a full line bookstore having at least fifty (50) locations such as Border's or Barnes & Noble, a full line video store having at least fifty (50) locations such as Hollywood Entertainment or Blockbuster Video, a full line consumer electronics store having at least fifty (50) locations such as Best Buy, Circuit City or Fry's Electronics or to the sale of adult magazines by a convenience store having at least fifty (50) locations such as Circle K or 7 Eleven.

(O) Any establishment selling or exhibiting drug-related paraphernalia or which exhibits either live or by other means to any degree, nude or partially clothed dancers or wait staff, provided, however, this prohibition shall not be applicable to national restaurant operations as may be found in a number of reasonable good quality shopping centers in the Phoenix, Arizona metropolitan area whose wait staff are attired similar to the current attire of wait staff such as TGI Fridays, Hard Rock Café, Kona Grill, Yardhouse or Chili's.

(P) Any bar or tavern, except a bar or tavern shall be permitted as a component of a Restaurant so long as the following two (2) conditions are satisfied: (i) such Restaurant's reasonably projected annual gross revenues from the sale of alcoholic beverages for on-premises consumption does not exceed forty five percent (45%) of the gross revenues of such business, and (ii) such Restaurant is located more than five hundred (500) feet from the Building on the Target Tract. In addition, the prohibition set forth in this paragraph shall not be applicable to a

Queen Creek Marketplace, Queen Creek, AZ
EXECUTION VERSION: August 5, 2011
UB Document No. 756176 v.10

| TENANT | PROHIBITED USE |
|---|---|
| | wine store or liquor store located north of the "Bowling Alley Line" as set forth on the Site Plan that may offer on-premises sampling of products so long as such sampling complies with the codes and ordinances of Governmental Authorities.<br><br>(Q) Any health spa, fitness center or workout facility having a Floor Area in excess of four thousand (4,000) square feet and located within five hundred (500) feet of the Building on the Target Tract; any massage parlors or similar establishments, but this shall not prohibit massage services offered by a permitted health club, a permitted fitness center, a day spa (but not more than two (2) day spas shall be permitted, a beauty salon, a barber shop, a doctor, a nurse, a chiropractor, a physical therapist or by licensed massage therapists from reputable businesses such as, by way of example, Massage Envy, provided that all such massage services are rendered within premises located within at least five hundred (500) feet from the Building on the Target Tract.<br><br>(R) Any flea market, amusement or video arcade (but this shall not be applicable to pinball, electronic or other game machines incidental to a Restaurant located on a freestanding pad and provided such arcade amusement or video arcade encompasses not more than five percent (5%) of the Floor Area of such Restaurant or two hundred (200) square feet, whichever is less, provided, however, this prohibition shall not be applicable to the portions of the Shopping Center located more than five hundred (500) feet from the Building on the Target Tract), pool or billiard hall (but this shall not prohibit a Restaurant having a Floor Area of at least four thousand (4,000) square feet on a freestanding pad from having three (3) or fewer pool tables; car wash (but this prohibition shall not be applicable to not more than one (1) fully automatic so-called "tube" or "tunnel" car wash operated in connection with a gas station or a mini mart, but only if located on one of "Pads G, H, I, J, K, L or M") or dance hall (but this shall not prohibit a Restaurant on a freestanding pad from permitting incidental patron dancing, provided that (a) such Restaurant does not derive more than forty five (45%) of its gross revenues from the sale of alcoholic beverages, and (ii) such Restaurant is located at least five hundred (500) feet from the Building on the Target Tract).<br><br>(S) Any training or educational facility, including but not limited to: beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers; provided, however, this prohibition shall not be applicable to on-site employee training by an Occupant |

Queen Creek Marketplace, Queen Creek, AZ
EXECUTION VERSION: August 5, 2011
UB Document No. 756176 v.10

| TENANT | PROHIBITED USE |
|--------|----------------|
| | incidental to the conduct of its business at the Shopping Center.<br><br>(T) Any gambling facility or operation, including but not limited to: off-track or sports betting parlor; table games such as blackjack or poker; slot machines, video poker/blackjack/keno machines or similar devices; or bingo hall. Notwithstanding the foregoing, this prohibition shall not be applicable to government sponsored gambling activities or charitable gambling activities, so long as such activities are incidental to the business operation being conducted by the Occupant. In addition, this prohibition shall not be applicable to the operation of arcade games, video games, pinball games or games of amusement by the Occupant of Premises located more than five hundred (500) feet from the Building on the Target Tract as long as in no event shall there be conducted, operated or permitted to be conducted or operated a bingo hall or similar bingo operation from or within such Premises.<br><br>(U) Any church, temple or other house of religious worship.<br><br>(V) Any check cashing services (unless operated by a bank or other financial institution or if ancillary to an otherwise permitted use).<br><br>(W)    The storage, display or sale of explosives or fireworks.<br><br>(X) Any trailer court or mobile home park.<br><br>(Y) The operation on the Developer Parcel of (a) a general merchandise discount retail store containing Floor Area in excess of ninety thousand (90,000) square feet of Floor Area,  (b) a supermarket, grocery store or other store primarily selling fresh produce, fresh meats, groceries, fresh fruit, dairy products, fresh vegetables, bakery products or delicatessen products   for off premises consumption, and (c) the operation of (i) a store in excess of ten thousand (10,000) square feet of Floor Area or (ii) a store on a free standing pad having one or more drive thru lanes, in either case selling prescription pharmacy merchandise (i.e. any product which, by law, may be dispensed only by or under the supervision of a qualified pharmacist or a person licensed to dispense medicinal drugs); PROVIDED, HOWEVER, (x) the prohibition in clause (a) shall not apply (i) subject to Exempted Closures (as defined below), at any time that Target is not operating in at least ninety thousand (90,000) square feet of Floor Area within the Building on the Target Parcel a general merchandise |

Queen Creek Marketplace, Queen Creek, AZ
EXECUTION VERSION: August 5, 2011
UB Document No. 756176 v.10

| TENANT | PROHIBITED USE |
|---|---|
| | discount retail store and has not been doing so for eighteen (18) months, and (ii) to the following retailers: Lowe's HIW, Inc., Home Depot USA, Inc., Sam's Club (but only if located more than five hundred (500) feet from the Target Building), Costco, BJ's or any successor to the foregoing by merger, consolidation or acquisition of all or substantially all assets; (y) the prohibition in clause (b) shall not apply (i) subject to Exempted Closures, at any time that Target is not utilizing a portion of the Building on the Target Parcel for the operation of a full service supermarket or full service grocery store and has not been doing so for eighteen (18) months, (ii) individual stores in separately demised spaces on the Developer Parcel may use up to ten percent (10%) of the total Floor Area of such space for the sale of food for off premises consumption, (iii) Restaurants may sell food prepared on premises for off premises consumption, subject to the locational restrictions set forth in Section 5.1.4, (iv) to the following retailers: Sam's Club (but only if located more than five hundred (500) feet from the Target Building), Costco, BJ's or any successor to the foregoing by merger, consolidation or acquisition of all or substantially all assets, and (v) to the following specialty retailers: Cost Plus, Trader Joes, Dean & Deluca or any successor by merger, consolidation or acquisition of all or substantially all assets; and (z) the prohibition in clause (c) shall not apply (i) subject to Exempted Closures, at any time that Target is not utilizing a portion of the Building on the Target Parcel for the sale of prescription pharmacy merchandise and has not been doing so for eighteen (18) months, and (ii) doctors, dentists, chiropractors, osteopaths, naturopaths, veterinarians and other licensed health care providers (other than pharmacists) who may dispense prescription drugs to their patients during office visits on a non retail basis. For the purposes of this Section 5.1.2(Z), an "Exempted Closure" shall mean any period of time that the Building on the Target Parcel is closed due to (i) casualty, repair, reconstruction, remodeling or refixturing if the Occupant is proceeding with reasonable diligence to complete the work and reopen for business, not to exceed, however, seven hundred thirty (730) days; or (ii) unavoidable events outside the reasonable control of the Occupant of the Building on the Target Parcel including, but not limited to, acts of God, condemnation, other governmental rules, orders, acts or requirements, insurrection, riot and labor disputes (but excluding financial inability or economic conditions); or (iii) substitution of a new Occupant resulting from the sale, assignment or sublease of any portion of the Target Parcel.<br><br>(Z) No Restaurant shall be located within three hundred (300) feet of the Building on |

Queen Creek Marketplace, Queen Creek, AZ
EXECUTION VERSION: August 5, 2011
UB Document No. 756176 v.10

| TENANT | PROHIBITED USE |
|--------|----------------|
| | the Target Tract, but this shall not prohibit a tenant such as Barnes & Noble, Borders, Bed Bath & Beyond, Cost Plus or Kohl's from having incidental food service within its premises.<br><br>(AA)  Any gas station, except if located on one of "Pads G, H, I, J, K, L or M."<br><br>(BB)  No pet shops or pet supplies store shall be located within three hundred (300) feet of the Building on the Target Tract.<br><br>No merchandise, equipment or services, including but not limited to vending machines, promotional devices and similar items, shall be displayed, offered for sale or lease, or stored within the Common Area; provided, however, the foregoing prohibition shall not be applicable to:<br><br>(A) Temporary collection and the storage of shopping carts in cart corrals located in the parking areas of the Shopping Center, including the storage of shopping carts on the Target Tract and the Developer Tract, as long as such shopping carts are stored within a building or behind a screen wall or landscaping specifically designed to screen such shopping carts from view;<br><br>(B) the installation of an "ATM" banking facility within an exterior wall of any Building or within a kiosk;<br><br>(C) the seasonal display and sale of bedding plants on the sidewalk in front of any Building located on the Target Tract on the Developer Tract;<br><br>(D) the placement of bicycle racks and landscaping planters on the sidewalk in front of any Building;<br><br>(E) the placement of spherical bollards (Target's brand) on the sidewalk in front of any Building on the Target Tract or the placement of other types of bollards on the Developer Tract, provided that bollards on the Developer Tract are approved in connection with the approval of the Plans by the Approving Parties;<br><br>(F) temporary Shopping Center promotions, except that no promotional activities will be allowed in the Common Area without the prior written approval of the Approving Parties unless such promotional activities are located within the parking areas of the Shopping Center identified as the "Permitted Promotion |

Exhibit F-1 - Page 10

| TENANT | PROHIBITED USE |
|---|---|
| | Area" on the Site Plan;<br><br>(G) any recycling center required or encouraged by law, the location of which (if not shown on the Site Plan) shall be subject to the approval of the Approving Parties;<br><br>(H) Outside Dining Areas adjacent to a Building, except that Outside Dining Areas will only be allowed in the portions of the Common Areas identified on the Site Plan as "Permitted Outside Dining" without the prior written approval of the Approving Parties (but the location of the Outside Dining Areas on the freestanding pads shall not be restricted); provided, however, (i) any Outside Dining Area shall be considered a portion of the Building Area for the purposes of determining compliance with the parking ratio requirements set forth in this OEA, (ii) any Outside Dining Area shall be fenced in or otherwise enclosed, and (iii) to the extent an Outside Dining Area is exclusively available to any Occupant or group of Occupants of the Shopping Center, such Occupant shall, as its sole cost and expense, ensure, clean and maintain such Outside Dining Area.<br><br>(I) Any designated Outside Sales Area; provided, however, with respect to any Outside Sales Area which is not included within a Building Area, such space may be used not more than three (3) times per calendar year, and the duration of such use shall be subject to the following limitations: during the period commencing on October 15th and ending on December 27th – no limitation on the number of days of consecutive use; during the period commencing February 15th and ending on July 10th – not more than one hundred twenty-five (125) consecutive days of use; and, during any other period – not more than thirty (30) consecutive days of use. |
| Kohl's (3) | **PROHIBITED USES**<br>(a)   Warehouse, storage or for any manufacturing (except in connection with and incidental to retail sales on premises), distillation, refining, smelting, agriculture (except in connection with a retail nursery or garden center), or mining operation; provided, however, the restriction against distillation shall not apply to a "brew pub" if the "brew pub" is permitted in clauses (h) or (v) below;<br><br>(b)   "Second-hand" store whose principal business is selling used merchandise, thrift shops, salvation army type stores, "goodwill" type stores, and similar businesses; provided, however, the foregoing restriction shall not apply to a |

| TENANT | | PROHIBITED USE |
|---|---|---|
| | | store selling reconditioned merchandise together with new merchandise in a first class manner (e.g., EB Games, Game Stop, Wherehouse Records, Hollywood Video, Game Crazy, Blockbuster, Computer Renaissance and Play-It-Again Sports) |
| | (c) | Mobile home park, trailer court, labor camp, junk yard, or stock yard (except that this provision shall not prohibit the temporary use of construction trailers during any periods of construction, reconstruction or maintenance); provided, however, the foregoing restriction shall not apply to recycling centers required for any retail operation by governmental restrictions; |
| | (d) | Dumping, disposing, incinerating, or reducing of garbage (exclusive of dumpsters for the temporary storage of garbage and any garbage compactors, in each case which are regularly emptied so as to minimize offensive odors); provided, however, the foregoing restriction shall not apply to recycling centers required for any retail operation by governmental restrictions; |
| | (e) | Fire, going out of business, relocation, bankruptcy or similar sales (unless pursuant to court order); |
| | (f) | Central laundry or dry cleaning plant (provided, however, any central laundry or dry cleaning plant shall be required to be equipped with a "closed-loop" system and Landlord shall be responsible for any contamination resulting from such central laundry or dry cleaning plant as if Landlord caused such contamination directly) or laundromat anywhere within the Shopping Center; |
| | (g) | Selling or leasing new or used automobiles, trucks, trailers, or recreational vehicles; provided, however, Landlord may display no more than five cars within the Common Area, from time to time, as part of temporary Shopping Center promotions, provided further that no such cars are displayed upon any part of Tenant's Tract; |
| | (h) | Any bowling alley, skating rink or bar (unless part of a sit down restaurant), dance hall, discotheque, or night club (provided, however, the foregoing restriction upon a dance hall or night club shall not prohibit a family oriented, first-class restaurant operation from having a dance floor that does not exceed 500 square feet of Floor Area for use by lunch or dinner patrons |

Queen Creek Marketplace, Queen Creek, AZ
EXECUTION VERSION: August 5, 2011
UB Document No. 756176 v.10

| TENANT | PROHIBITED USE |
|---|---|
|  | and the foregoing restriction upon a bar shall not prohibit the operation of a first class microbrewery or "brew pub" upon any freestanding pad except Pad H; |
|  | (i)    Veterinary hospital or animal raising or boarding facilities (except that this restriction shall not be deemed to preclude the operation of a pet shop or pet supply store); |
|  | (j)    Funeral home or mortuary; |
|  | (k)    Any establishment which stocks, displays, sells, rents or offers for sale or rent any (i) pornographic material; provided, however, the foregoing restriction shall not prohibit the operation of a full-line video store by a regional or national retailer in accordance with its customary store operations and in compliance with law (e.g., Blockbuster Video, Hollywood Video or Video Update) or a full-line bookstore by a regional or national retailer in accordance with its customary store operations and in compliance with law (e.g., Borders, Barnes & Noble or Walden Books) or (ii) any merchandise or material commonly used or intended for use with or in consumption of any narcotic, dangerous drug or other controlled substance, including without limitation, any hashish pipe, waterpipe, bong, cilium, pipe screens, rolling papers, rolling devices, coke spoons or roach clips; provided, however, the foregoing restriction shall not prohibit the operation of a full-line drug store or pharmacy by a regional or national retailer in accordance with its customary store operations and in compliance with law. |
|  | (l)    Flea market; provided, however, this restriction shall not be deemed to prohibit Landlord from having farmers' markets, art shows or other similar first class promotional events (collectively, "Promotional Events") within the Common Area on a temporary basis (not to exceed three consecutive days), from time to time, provided that no such Promotional Events are held within 1,000 feet of the Building and the area used to hold such Promotional Events does not exceed five percent of the available parking spaces in the Common Area where such Promotional Events are permitted; |
|  | (m)    Car wash (except on Pads G, I, J, K, L or M); |
|  | (n)    Massage parlor; provided, however the foregoing restriction shall not apply |

Exhibit F-1 - Page 13

| TENANT | PROHIBITED USE |
|---|---|
| | to doctors, chiropractors, or licensed nurse practitioners or prohibit massage services by a first class massage studio such as Massage Envy or massage services provided as an incidental use of the operation of a beauty salon, health club, or athletic facility otherwise permitted in the Shopping Center |
| | (o)    Living quarters, sleeping apartments or lodging rooms; |
| | (p)    Tattoo parlor; |
| | (q)    Church, school, day care center (provided, however, the foregoing restriction shall not apply to a day care center located upon Pad H or more than 500 feet from the Kohl's Building) or related religious or educational facility or religious reading room; |
| | (r)    Automotive service and repair (provided, however, the foregoing restriction shall not apply to (i) the retail gasoline service station identified as "Car Wash" or (ii) to one other retail gasoline service station located upon Pads G, I, J, K, L or M, or (iii) to one specialty automotive service/repair facility located upon Pads G, I , J, K, L or M, provided such specialty automotive/repair facility is operated by a regional or national chain such as a "Jiffy Lube" or "Midas" and does not provide general automotive repair or body work services or (iv) to one traditional "tire, battery and accessories" or similar facility ("TBA"), provided such TBA is operated by a regional or national chain and does not provide general automotive repair or body work services; |
| | (s)    Office, except for a bank or financial institution, travel agency, insurance agency, medical or dental clinic (provided that any such clinic does not admit patients for overnight stays), real estate sales office, stock brokerage office, title insurance office,  loan company office, optometrist office, optical, post office, packing store or other "retail office" or "service office" typically found in first class shopping centers or for Landlord's on-site management office or office space used by any other tenant or occupant of the Shopping Center so long as any such office is incidental to such tenant's or occupant's primary use; |
| | (t)    Cinema or movie theater; |

Queen Creek Marketplace, Queen Creek, AZ
EXECUTION VERSION: August 5, 2011
UB Document No. 756176 v.10

| TENANT | PROHIBITED USE |
|--------|----------------|
| | (u)   Amusement arcade, amusement center, amusement gallery or video game room (collectively, "Amusement Center") (provided, however, the foregoing shall not prohibit an occupant of the Shopping Center from having five or fewer games as an ancillary part of its business), gymnasium or off-track betting parlor; provided however, the foregoing restriction shall not apply to such uses on Pad F or Pad G or more than 300 feet from Tenant's Tract, provided further that any gymnasium located in the Shopping Center shall be parked at a ratio of one parking space for each 150 square feet of Floor Area and any off-track gambling parlor shall be located within a restaurant as an ancillary use thereof. |
| PetsMart (4) | Any use in violation of the OEA is prohibited during the Term of the Lease in any portion of the Shopping Center.  In addition, the following uses are prohibited during the Term of the Lease within the Shopping Center (including the Premises):  nuisance; any use causing loud noises or offensive odors (including any business using exterior loud speakers); manufacturing facility (but this restriction shall not apply to in-store assembly in the normal course); dry cleaner (except facilities for drop off and pick up of clothing cleaned at another location); any facility for the sale, lease or rental of automobiles, trucks, motorcycles, recreational vehicles, boats or other vehicles; automobile repair shop or service station or any facility storing or selling gasoline or diesel fuel in or from tanks, but this shall not prohibit a carwash such as Danny's Carousel or an operation such as Discount Tires, Brakes Plus, Minute Lube, or Fletcher Tire and the like on Pads D, F, G, H and M, as designated on Exhibit A; used clothing or thrift store or liquidation outlet (but this restriction shall not apply to retailers who sell used or reconditioned goods together with new products such as "Play it Again Sports", "Computer Renaissance", "Warehouse Records", "EB Games", or "Gamestop", nor to a first-class retailer such as "Terri's Consignment", nor shall this restriction prohibit the operation of a so-called "99-Cents" or "Dollar Store" or a "MacFrugals"); massage parlor (except that massage therapy offered by a doctor, chiropractor, or nurse under the supervision of a doctor or chiropractor, or massage offered by a licensed massage therapist in connection with the operation of a salon, health club or day spa otherwise permitted by this Lease shall be permitted); adult book shop (meaning a store primarily engaged in the sale of sexually oriented materials and not a general interest bookstore such as "Barnes & Noble" or "B. Dalton") or adult movie house (except that this restriction shall not apply to a full-line video store such as "Blockbuster Video", "Video Update" or "Hollywood Video"); mortuary or funeral parlor; coin operated laundry; cocktail |

Exhibit F-1 - Page 15

| TENANT | PROHIBITED USE |
|--------|----------------|
| | lounge, bar or tavern or sale of alcoholic beverages, whether or not packaged, except (i) full service grocery store, drugstore, or "Cost Plus" may sell alcoholic beverages in prepackaged containers, (ii) a gourmet grocer such as "Trader Joe's", (iii) if operated in excess of one hundred ten feet (110') from the Premises a gourmet or specialty liquor store, such as "The Sportsman", "Beverages and More" and "Total Wine", may be permitted, or (iv) in a restaurant, wherever located; night club; cinema or theater; game arcade (which shall not be interpreted to mean the use of five (5) or fewer video or pinball machines ancillary to an otherwise permitted use and shall not prohibit a family oriented restaurant with video games, pinball games or arcade games as a component of its business [such as Chuck E Cheese or Peter Piper Pizza] in a location otherwise permitted hereunder) or other place of recreation; bowling alley, skating rink or carnival; health spa (provided, however, that a health spa or jazzersize studio may be located more than five hundred (500) feet from the Premises); church (except incidental use of theatre auditoriums for religious services by the theatre tenant); restaurants, except if located more than three hundred (300) feet from the Premises or on pads; children's recreational, educational or day-care facility, but this shall not prohibit a daycare center such as Tutor Time on a free standing pad; offices or professional uses in excess of 10% of the Gross Floor Area in the aggregate, all of which, except banks, shall be located more than three hundred (300) feet from the Premises; schools of any nature; or any other use inconsistent with the operation of a high quality retail shopping center.  As used herein, "school" includes, but is not limited to, a beauty school, barber college, reading room, place of instruction or any other operation serving primarily students or trainees rather than retail customers.  It is the intent of this Paragraph that the Shopping Center shall be devoted to high quality retail uses and that the parking and the other common facilities shall not be burdened by either excessive or protracted use. None of the restrictions set forth in this section shall be applicable to the portion of the Shopping Center owned and/or ground leased by Target, Kohl's or Lowe's except to the extent such restrictions may be included within the OEA. |
| Sport Chalet (7) | Landlord covenants and agrees that the Shopping Center shall be constructed, leased, operated, maintained and managed as a first class shopping center and that no premises (and no portion of any premises) in the Shopping Center shall be used or occupied for any of the following:  any unlawful use; funeral establishment; automobile sale, leasing, repair or display establishment or used car lot, including body repair facilities, but this shall not prohibit the occasional display of motor |

| TENANT | PROHIBITED USE |
|---|---|
|  | vehicles in the Common Areas of the Shopping Center for promotional purposes, nor shall this prohibit the operation of lube and oil services in connection with the operation of a first class car wash; auction or bankruptcy sale, except pursuant to a court order; pawn shop; outdoor circus, outdoor carnival or outdoor amusement park, or other outdoor entertainment facility, primarily pool or billiard establishment; shooting gallery; refinery, but this shall not prohibit a brew pub; adult bookstore or facility selling, renting or displaying pornographic or adult books, literature, or videotapes (materials shall be considered "<u>adult</u>" or "<u>pornographic</u>" for such purpose if the same are not available for sale or rental to children under 18 years old because they explicitly deal with or depict human sexuality), provided that sale, rental or display of such items as an incidental part of a permitted business shall be permitted and customary operation by a first-class book seller, such as "<u>Barnes & Noble</u>" or "<u>Borders Books and Music</u>" or a first class video rental operation such as "<u>Blockbuster Video</u>," "<u>Hollywood Video</u>," "<u>Circuit City</u>" or "<u>Best Buy</u>" shall not be deemed to violate the provisions of this clause; massage parlor, but this shall not prohibit massage services by a doctor, chiropractor, nurse or physical therapist or the provision of massage services by a licensed massage therapist in connection with the operation of a hair salon, nail salon, day spa or barber shop; any residential use, including but not limited to living quarters, sleeping apartments or lodging rooms; theater; auditorium, meeting hall, ballroom, school or other place of public assembly, but this shall not prohibit employee training or the operation of a children's day care center; unemployment agency; dance studio, but this shall not permit a small dance studio having a Floor Area of less than four thousand (4,000) square feet such as "<u>Jazzercise</u>" or "<u>Waist Basket</u>" and located more than three hundred (300) feet from the Premises, dance hall, but this shall not prohibit incidental patron dancing by an otherwise permitted restaurant; cocktail lounge or bar (except as an incident to a permitted restaurant), disco or night club; bingo or similar games of chance, but lottery tickets and other items commonly sold in retail establishments may be sold as an incidental part of business and off-track betting shall be permitted in connection with the operation of a restaurant; video game or amusement arcade, except as an incidental part of another primary business, but this shall not prohibit a family entertainment restaurant such as "<u>Peter Piper Pizza</u>" or "<u>Chuck E Cheese</u>" from having video, pinball or arcade games so long as such family entertainment restaurant is located on a free standing pad; skating or roller rink; car wash, car repair or car rental agency, but this shall not prohibit the operation of a first class car wash, service station and lube and oil facility located on a freestanding pad; second hand store, auction house, or flea market, but this shall not prohibit the sale of reconditioned merchandise in connection with the sale of new merchandise by |

| TENANT | PROHIBITED USE |
|--------|----------------|
| | retailers such as "Computer Renaissance," "EB Games," "Gamestop," "Hollywood Video" and "Blockbuster Video"; sit-down restaurant, health club or work-out facility or other parking intensive use located within three hundred feet (300') of the Premises; or non-retail use (which shall not prohibit in the Shopping Center office use incident to a permitted retail operation or such uses commonly referred to as "quasi-retail" or "service retail" such as by way of example and without limitation, a bank, a credit union, doctors, dentists, a travel agency, real estate office, insurance agency or accounting service, so long as same do not exceed ten percent (10%) of the Floor Area of the Shopping Center) Tenant shall not use the Premises for any of the foregoing prohibited uses. The provisions of this Section shall not be applicable to the portions of the Shopping Center identified on the Site Plan as "Target (Major F)", "Kohl's (Major M)" and "Lowe's (Major N)" or to any other premises within the Shopping Center having a Floor Area of eighty thousand (80,000) square feet or more. |
| Ross (8) | No part of Landlord's Parcel shall be used for office or residential purposes or as a theater, auditorium, meeting hall, school, church or other place of public assembly, "flea market," gymnasium, veterinary services, overnight stay pet facilities, health club, dance hall, billiard or pool hall, massage parlor, video game arcade, bowling alley, skating rink, car wash, facility for the sale, display, leasing or repair of motor vehicles, night club, adult products, adult books or adult audio/video products (which are defined as stores in which at least ten percent (10%) of the inventory is not available for sale or rental to children under the age of majority in the state in which the Store is located because such inventory explicitly deals with or depicts human sexuality). No ATM or similar machine shall be permitted in the Shopping Center within one hundred (100) feet of the front and side perimeter walls of the Store. Further, no restaurant or other "High Intensity Parking User" (as hereinafter defined) shall be permitted in Landlord's Parcel within three hundred (300) feet of the front and side perimeter walls of the Store. A "High Intensity Parking User" is a tenant or occupant whose use requires more than five (5) parking spaces per one thousand (1,000) square feet of Leasable Floor Area in accordance with either customary shopping center practices or governmental regulations, whichever has a higher parking requirement. The foregoing use restrictions are referred to herein as the Ross Prohibited Uses. The prohibitions contained in this Section 3.2.1(a) shall not be applicable to the Target Tract, the Major N Tract, or to the Kohl's Tract unless and until Landlord regains legal control of the Kohl's Tract. |

Exhibit F-1 - Page 18

| TENANT | PROHIBITED USE |
|--------|----------------|
| | Exceptions to Retail Use. Notwithstanding the restrictions on use set forth in Section 3.2.1(a) above, the following uses shall be permitted in the Shopping Center: |
| | Video Game Arcade. Five (5) or less video games and pinball machines in the aggregate shall be permitted in any premises which has a primary restaurant use and a video game arcade that is at least three hundred (300) feet from the Store, provided it is family oriented and is a first class operator, such as Funcoland, Game Works or Sega City or is incidental to the operation of a permitted restaurant such as Peter Piper Pizza or Chuck E. Cheese; |
| | Automotive Uses. Up to an aggregate of three (3) automotive uses which may include national or regional car wash/gas station, lube facility, brake repair shop, or tire shops provided that each automotive use is located at least three hundred (300) feet from any of the perimeter walls of the Store; |
| | Workout Club /Spa. One (1) small "workout" club or first class day spa or salon, provided that such "workout" club or first class day spa or salon shall not be greater than four thousand (4,000) square feet and shall not be located within five hundred (500) feet from any perimeter wall of the Store; |
| | Veterinary Services. A pet store, with veterinary services and temporary overnight stay pet facilities, including a pet hotel, shall be permitted by a national pet supply store, provided that the nearest perimeter wall of the pet store shall not be any closer than three hundred fifty (300) feet to the nearest perimeter wall of the Store; |
| | Gymnasium or Health Club. One (1) gymnasium or health club not to exceed sixty-five thousand (65,000) square feet of Leasable Floor Area located in "Major N", "Pad M", "Pad K " or "Pad L" as designated on the Site Plan; |
| | Coffee or Espresso Bar. The incidental operation of a "coffee or espresso bar" or "coffee shop" or similar operation incidental to a primary use of a book store by a retailer such as Barnes and Noble, or other similar retailer, providing its customers with coffee, tea, and other beverages, pastries, sandwiches, snacks and other pre-prepared or packaged food or beverage items, as well as related merchandise, either for sale or complimentary and for either on-site or take-out consumption; |

| TENANT | PROHIBITED USE |
|---|---|
| | Shopping Center Management Office and Retail Service Offices.  One (1) shopping center management office and office use typically found in shopping centers, such as travel agencies, real estate brokers, insurance brokers, optometrists' office, and the like shall be permitted provided that no such single office use, excepting those located within "Shops E" as designated on the Site Plan,  shall exceed three thousand (3,000) square feet, and all office uses shall  not exceed, in the aggregate, fifteen thousand (15,000) square feet in Landlord's Parcel;<br><br>Billiards and Pool Tables   Billiards/pool tables are permitted provided that they are incidental to an otherwise permitted use;<br><br>Massage Services    Massage services offered as an incidental service of a medical office, chiropractic office, permitted health club, first class day spa or salon shall be permitted;<br><br>General Interest Book Store/ Film Store.   One (1) general interest bookstore such as Barnes & Noble or B. Dalton and one (1) full-line video store such as Blockbuster Video, Video Update or Hollywood Video each of which may carry films with adult content that are released for general commercial distribution to national theater chains;<br><br>Preschool or Daycare.  · One (1) preschool or daycare center shall be permitted  provided that it is not located closer than five hundred (500) feet to the nearest exterior wall of the Store;<br><br>Dancing.   Patron dancing shall be permitted if it is  incidental to the operation of a permitted restaurant located not closer than five hundred (500) feet to the Store; and<br><br>Outparcels.    Restaurant uses shall be permitted on the Outparcels. |
| Circuit City (10) | No portion of the Shopping Center north of the Main Drive Aisle shall be used for any non-retail use other than retail service uses customary to first-class shopping centers, such as banks, insurance offices, title companies, doctor, dentist and chiropractor offices, and travel agencies, so long as such service office use is limited to not more than ten percent (10%) of the total gross leasable area of all of the buildings in the Shopping Center located north of the Main Drive Aisle and in any event are located in the areas designated on the Site Plan as "Permissible Service Office Area".  Notwithstanding the foregoing, Landlord reserves the right to develop a hotel ("Hotel") on a freestanding pad along Rittenhouse Road in the |

<p style="text-align:center">Exhibit F-1 - Page 20</p>

| TENANT | PROHIBITED USE |
|---|---|
| | area designated on the Site Plan as "Permissible Hotel Area" so long as the parking area for the Hotel contains sufficient ground level parking spaces within the Permissible Hotel Area, without reliance on parking spaces that may be available outside of the Permissible Hotel Area, to comply with the greater of any applicable governmental requirements or the minimum parking ratio requirements set forth in Section 5 above.  Moreover, Landlord shall not lease to or permit any portion of the Shopping Center and Tenant shall not lease or permit any portion of the Premises to be used for any of the following purposes:<br><br>(A)    bookstore or establishment engaged in the business of selling, exhibiting or delivering pornographic or obscene materials (but this prohibition shall not apply to any full line bookstore, or nationally-recognized video store, all of the type commonly existing in other first class shopping centers);<br><br>(B)    a so-called "head shop";<br><br>(C)    video or other type of game room or arcade (but this restriction shall not prohibit an otherwise acceptable tenant from operating not more than five (5) arcade games incidental to its primary use), unless located south of the "Main Drive Aisle" (identified as such on the Site Plan); provided, however, that such restriction shall not apply to Peter Piper Pizza or Chuck E. Cheese (so long as such user is located on a freestanding pad or "Major R" shown on the Site Plan [*to be discussed in connection with request for other restaurants*] and operates its retail business in its premises under its customary tradename (as set forth herein) and in a manner substantially similar to the majority of its other restaurants in the state of Arizona as of the date of this Lease);<br><br>(D)    off-track betting parlor (unless incidental to a permitted restaurant use);<br><br>(E)    pawn shop or business selling so-called "second-hand goods" (but excluding regional or national operators with more than twenty (20) locations specializing in the sale of new and used or reconditioned goods, such as Computer Renaissance, Terrie's Consignment, EB Games, Gamestop or Play It Again Sports);<br><br>(F)    junk yard or flea market;<br><br>(G)    recycling facility or stockyard (excluding governmentally-required |

Queen Creek Marketplace, Queen Creek, AZ
EXECUTION VERSION: August 5, 2011
UB Document No. 756176 v.10

| TENANT | PROHIBITED USE |
|--------|----------------|
| | recycling); |

    (H)    motor vehicle or boat dealership, vehicle repair shop (including lubrication and/or service center, but this shall not prohibit a nationally or regionally-recognized tire, battery and accessories store on the Outparcels identified on the Site Plan); body and fender shop; car wash facility (except on an Outparcel; motor vehicle or boat storage facility (but this shall not preclude the temporary and periodic display of cars and/or boats in the Common Areas of the Shopping Center, but not on the Preferred Area);

    (I)    theater, auditorium, bar (not part of an otherwise permitted restaurant), sports or other entertainment viewing facility, whether live, film, audio/visual or video (unless such user is located south of the Main Drive Aisle);

    (J)    discotheque, dance hall, or night club, but this shall not prohibit live music, disc jockey music, dancing, outdoor music, dining and dancing, and/or full alcohol consumption without limitation as a component of the operation of a multi-theme entertainment venue, provided that such is located south of the Main Drive Aisle;

    (K)    bowling alley; skating rink; billiard parlor (provided that three (3) or fewer billiard or pool tables in connection with a permitted restaurant use shall be acceptable, but this shall not prohibit a bowling alley, skating rink or billiard parlor with or without full alcohol consumption without limitation as a component of the operation of a multi-themed entertainment venue, provided that such is located south of the Main Drive Aisle);

    (L)    health spa or exercise facility (unless located in the area designated as the "Health Club Area" in the Site Plan);

    (M)    [intentionally deleted];

    (N)    office usage other than incidental in connection with non-prohibited uses and except for retail service usage (such as a real estate office, travel agency, and similar office uses as described in the first sentence hereof), unless located south of the Main Drive Aisle;

    (O)    dry cleaning or laundry plant (except as to an establishment which receives

Queen Creek Marketplace, Queen Creek, AZ
EXECUTION VERSION: August 5, 2011
UB Document No. 756176 v.10

| TENANT | PROHIBITED USE |
|---|---|
| | and dispenses items for laundering and/or dry cleaning but the processing of which items is done elsewhere or is entirely self-contained); |

<div style="margin-left: 2em;">

(P)    Laundromat;

(Q)    industrial or manufacturing uses (other than such manufacturing use as is conducted in conjunction with a tenant's home center business or in conjunction with another tenant's primary retail use);

(R)    training or educational facility (other than on-site employment training that is incidental to a primary retail use), including, without limitation a beauty school, barber college, reading room, place of instruction or any other activity catering primarily to students or trainees as opposed to customers;

(S)    house of worship (other than temporary and periodic use of a theater auditorium for a religious service) or religious bookstore or reading room;

(T)    discount, closeout or dollar stores, including, without limitation the following: 98 cents Clearance Center, 98 Cents Only Store, Dollar Tree, Family Dollar Store,  Liquidation World, MacFrugals, McCrory, Dollar General, Odd Lots, Dollar Bills, Bill's Dollar Store, Big Lots, All For One, Just a Buck, Tuesday Morning, Dollar Express, Wow-Mart, Army/Navy Store (unless such user is located south of the Main Drive Aisle);

(U)    automotive parts or accessories store such as Auto Zone or Napa Auto Parts, unless located more than four hundred (400) feet from the Premises;

(V)    check cashing service, except as incidental to a retail use or an established federal or state bank, credit union or savings and loan.

</div>

In addition to the foregoing, Landlord shall not operate, lease or permit to be operated or leased any restaurant within any building on Landlord's Premises which abuts "Tenant's Preferred Area" (as shown on the Site Plan) or which is located within three hundred (300) feet of the front entrance to the Building; provided, however that [*restaurant usage, including Peter Piper Pizza and Chuck E. Cheese, to be discussed*].  In addition, no auction, fire or going-out-of-business sale shall be conducted in the Shopping Center.
Notwithstanding the foregoing, Tenant hereby agrees that the foregoing

<div style="text-align: center;">Exhibit F-1 - Page 23</div>

| TENANT | PROHIBITED USE |
|---|---|
| | restrictions shall not apply to the premises identified on the Site Plan as "Target," "Lowe's" and "Kohl's" (so long as the foregoing list of retailers operate their retail business in their premises under their customary tradenames (as set forth herein) and in a manner substantially similar to the majority of their stores in the state of Arizona as of the date of this Lease).<br><br>Prohibited Uses in Common Area:  Landlord covenants that it shall not, without Tenant's express written consent, permit the following uses or activities to occur in the Common Areas within the Tenant's Preferred Area: (1) advertisements or signs except for the monument signs described in paragraph 8 and traffic control signs; (2) display or sale of merchandise (except for "sidewalk sales" permitted herein as shown on the Site Plan); (3) operation of loudspeakers or other sound electronically amplified so as to be heard in the Common Areas (other than as may be typical in comparable shopping centers); (4) imposition of a charge for parking, except to the extent required by governmental authorities having jurisdiction; or (5) operation of cellular telephone or other telecommunication tower for use by any other party not an occupant of the Shopping Center; provided however that the foregoing restriction shall not apply to a stealth-type antenna disguised to look like a normal shopping center element (e.g., light pole) so long as same is not located within the parking area of Tenant's Preferred Area.  Notwithstanding the foregoing, Tenant hereby agrees that the foregoing restrictions shall not apply to the premises identified on the Site Plan as "Target," "Lowe's" and "Kohl's" (so long as the foregoing list of retailers operate their retail business in their premises under their customary tradenames (as set forth herein) and in a manner substantially similar to the majority of their stores in the state of Arizona as of the date of this Lease). |
| Bev Mo (11) | None |
| Famous Footwear (12) | None |
| Chase Bank (13) | None |
| Nails of the World (14) | None |
| Tilly's (15) | None |

Queen Creek Marketplace, Queen Creek, AZ
EXECUTION VERSION: August 5, 2011
UB Document No. 756176 v.10

| TENANT | PROHIBITED USE |
|---|---|
| | |
| Juice It Up (16) | None |
| Paradise Bakery (17) | None |
| Verizon (18) | None |
| Longhorn Steaks (19) | None |
| Subway (20) | None |
| Chipotle (21) | None |
| Great Clips (22) | None |
| Cost Plus (23) | Tenant has entered into this Lease in reliance upon representations by Landlord that the Shopping Center is and will remain retail in character, and, further, no part of which shall be used for any Prohibited Use or any use which violates the Project Documents. In addition, except for the rights of tenants under leases in effect as of the date of this Lease, and except with the express prior written consent of Tenant, the following uses shall be prohibited within two hundred (200) feet of the front door of the Store (it being understood that such radius restriction shall apply in the front and sides of the Store, and not to the rear of the Store): (i) any full service, sit-down restaurant (provided, however the foregoing restaurant restriction shall not preclude another tenant from operating a café as an incidental part of its business, provided that the floor area devoted to the operation of such café does not exceed five percent (5%) of the total Leasable Floor Area occupied by such other tenant); and (ii) any health club, health spa, gymnasium, fitness center or similar business. Landlord shall uniformly enforce as against all tenants and other occupants of the Shopping Center the restrictions referred to herein as Prohibited Uses.<br><br>Landlord shall not place permanent or temporary kiosks, displays, carts and stands in the Common Areas located within Tenant's Control Area. |
| Chick-Fil-A | None |

<div align="center">Exhibit F-1 - Page 25</div>

Queen Creek Marketplace, Queen Creek, AZ
EXECUTION VERSION: August 5, 2011
UB Document No. 756176 v.10

| TENANT | PROHIBITED USE |
|--------|----------------|
| (24) | |
| Pacific Dental (25) | None |
| Bed Bath & Beyond (26) | Landlord shall not lease, rent or, occupy or permit any portion of the Shopping Center to be occupied (except to the extent otherwise permitted under any lease for space in the Shopping Center existing as of the Effective Date) for any of the *"Prohibited Uses"* (defined in Exhibit M hereto annexed). The provisions of this Section 13.1.2 shall not be applicable to the portions of the Shopping Center owned and/or leased by Target Corporation, Kohl's, Major N Occupant and their respective successors and assigns.<br><br>Prohibited Uses<br>As used in this Lease, the term *"Prohibited Uses"* shall mean any of the following uses:<br>A.          As to the Shopping Center, any of the following uses:<br>(1)          Any use which emits or results in strong, unusual or offensive odors, fumes, dust or vapors (other than the ordinary odors emitted from coffee shops, restaurants or nail salons), is a public or private nuisance, emits noise or sounds which are objectionable due to intermittence, beat, frequency, shrillness or loudness, creates a hazardous condition, or is used, in whole or in part, as or for warehousing or the dumping or disposing of garbage or refuse (other than governmentally required recycling centers).<br>(2)          Any operation primarily used as a storage facility and any assembling, manufacturing, distilling, refining, smelting, agricultural, or mining operation (except that this provision shall not prohibit incidental assembly, manufacturing or refining which is strictly incidental to a retail use typically located in first class shopping centers, such as, by way of example, assembly of products or operation of a brew pub);<br>(3)          Any "second hand" store, "surplus" store (except that this provision shall not prohibit a store that sells blemished or reconditioned goods, such as EB Games, Game Stop, Hollywood Video, Blockbuster Video, Play It Again Sports or Computer Renaissance or a first class retailer such as Terry's Consignment, as such stores are presently operated);<br>(4)          Any mobile home park, trailer court, labor camp, junkyard, or stockyard (except that this provision shall not prohibit the temporary use of construction trailers during periods of construction, reconstruction, or |

| TENANT | PROHIBITED USE |
|---|---|
| | maintenance); |

maintenance);

    (5)    Any dumping, disposing, incineration, or reduction of garbage (exclusive of trash compactors or trash containers located near the rear of any building);

    (6)    Any fire sale, bankruptcy sale (unless pursuant to a court order), auction house operation, fictitious going-out-of-business sale, lost-our-lease sale or similarly advertised event;

    (7)    Any central laundry, dry cleaning plant, or laundromat located within 250 feet of the Premises or which is greater than five thousand (5,000) square feet;

    (8)    Any automobile, truck, trailer, boat, or recreational vehicle sales, leasing, display or body shop repair operation;

    (9)    Any bowling alley or skating rink;

    (10)    Any live performance theater, auditorium, meeting hall or sporting event;

    (11)    Any living quarters, sleeping apartments, or lodging rooms;

    (12)    Any veterinary hospital or animal raising or boarding facilities (except to the extent permitted below), but this shall not be applicable to a national pet supply store such as Petco and PetsMart and shall not be deemed to prohibit a national pet supply store such as Petco or PetsMart from providing overnight boarding for animals;

    (13)    Any mortuary or funeral home;

    (14)    Any "Pornographic Use", which shall include, without limitation, a store displaying for sale or exhibition books, magazines or other publications containing any combination of photographs, drawings or sketches of a sexual nature, which are not primarily scientific or educational, or a store offering for exhibition, sale or rental video cassettes or other medium capable of projecting, transmitting or reproducing, independently or in conjunction with another device, machine or equipment, an image or series of images, the content of which has been rated or advertised generally as NC-17 or "X" or unrated by the Motion Picture Rating Association, or any successor thereto; the parties hereto acknowledge and agree (i) the sale of books, magazines and other publications by a national bookstore of the type normally located in first-class shopping centers in the State in which the Shopping Center is located (such as, for example, Borders and Barnes & Noble, as said stores currently operate), (ii) the sale and/or rental of videos by a full line video store or consumer electronics store (such as, for example, Blockbuster Video, Hollywood Entertainment, Circuit City or Best Buy as such stores are presently operated), or (iii) the

Queen Creek Marketplace, Queen Creek, AZ
EXECUTION VERSION: August 5, 2011
UB Document No. 756176 v.10

| TENANT | PROHIBITED USE |
|---|---|
|  | exhibition of general release or release of general release movies of the type typically shown in movie theaters located in first-class shopping centers, or (iv) the sale of magazines and other publications by a convenience store (such as, for example, 7-11 and Circle K), shall not be deemed a "pornographic use" hereunder; or massage parlor (except that the foregoing prohibition shall not apply to massage services offered by a doctor, chiropractor, physical therapist or nurse in an office permitted hereunder, or to incidental massage services offered at a health club, day spa or beauty salon permitted hereunder) or to a first class massage studio such as Massage Envy; <br><br>(15)   Any so-called "head shop", or other establishment primarily selling or exhibiting drug-related paraphernalia; <br><br>(16)   Any bar, tavern, or other establishment selling alcoholic beverages for on- or off-premises consumption, except as incidental to a restaurant use permitted pursuant to (35) below, provided that the reasonably projected annual gross revenues from the sale of alcoholic beverages for on-premises consumption in such restaurant shall not exceed forty percent (40%) of the gross revenues of such restaurant, and further provided, that said 40% restriction shall not apply to any national or regional family-oriented, sit-down restaurant such as TGI Fridays, Red Lobster, Olive Garden and Bennigans.  In addition, nothing in this paragraph (16) shall restrict the sale of alcoholic beverages for off premises consumption by a grocery store or a liquor store such as Total Wine or Beverages and More; <br><br>(17)   Any catering or banquet hall; <br><br>(18)   Any flea market, amusement or video arcade, pool or billiard hall, night club, discotheque, or dance hall, provided, however, that this restriction shall not prohibit (a) any tenant or occupant of a Pad (as defined in clause (24) below) from having five (5) or fewer amusement or video arcade games incidental to an otherwise permitted use, or (b) any restaurant permitted by clause (35) below from having, as an incidental use, up to three (3) pool/billiard tables; or (c) a freestanding pad from being used as a Chuck E. Cheese or Peter Piper Pizza; <br><br>(19)   Any training or education facility, including but not limited to: beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers; provided, however, this prohibition shall not be applicable to on-site employee training by an Occupant incidental to the conduct of its business at the Shopping Center; <br><br>(20)   Any gambling facility or operation, including but not limited to: |

Queen Creek Marketplace, Queen Creek, AZ
EXECUTION VERSION: August 5, 2011
UB Document No. 756176 v.10

| TENANT | PROHIBITED USE |
|---|---|
| | off-track or sports betting parlor; table games such as black-jack or poker; slot machines; video poker/black-jack/keno machines or similar devices; or bingo hall.  Notwithstanding the foregoing, this prohibition shall not apply to governmental sponsored gambling activities, or charitable gambling activities, so long as such governmental and/or charitable activities are incidental to the business operation being conducted by the Occupant; <br><br>(21)    Any unlawful use; <br><br>(22)    Any pawn shop, gun shop, or tattoo and/or body piercing parlor; provided, however, that this prohibition shall not be applicable to the sale of guns as part of a national or regional full line sporting goods store; <br><br>(23)    Any church or other place of religious worship; <br><br>(24)    Any car wash, automobile repair shop, or any business servicing motor vehicles in any respect, including, without limitation, any quick lube oil change service, tire center or gasoline or service station or facility unless located on a building site designated as a "Pad" on Exhibit B (a "Pad"); <br><br>(25)    Any carnival, amusement park or circus; <br><br>(26)    Any medical clinics or medical offices except that no more than three medical offices (and not clinics) totaling in the aggregate not more than 15,000 square feet of Floor Area may be located in the Shopping Center no less than 250 feet from the Premises provided that they are first class medical offices of the type typically found in first–class shopping centers and, in addition, additional first class offices medical offices may be located on Shops E, Pad I, Pad J, Pad K, Pad L, Pad M, Shops A and Pad A with no limit on the aggregate Floor Area in those areas; <br><br>(27)    Intentionally Omitted. <br><br>(28)    Any office use, other than: (x) office space used in connection with and ancillary to a permitted retail use hereunder; and (y) retail offices providing services commonly found in similar first-class shopping centers in the Phoenix, AZ metropolitan area (for example, financial services, real estate brokerage, insurance agency, banking, travel agency), provided that such uses are located at least 150 feet away from the Premises, and not more than ten percent (10%) of Floor Area in the Shopping Center, in the aggregate, shall be devoted to such uses; <br><br>(29)    Any hotel/motel except on Pad I, Pad J, Pad K, Pad L and Pad M; <br><br>(30)    Any day care center, except that same may be located on any Pad; <br><br>(31)    Any store selling live animals of any kind or veterinary office, except as may be incidental to a full-line pet and pet supply store operating in at least 10,000 square feet of Floor Area and located at least 150 feet from the |

<div align="center">Exhibit F-1 - Page 29</div>

| TENANT | PROHIBITED USE |
|---|---|
| | Premises or on any Pad; any such occupant shall use reasonable efforts to prevent its customers from allowing their pets to urinate or defecate in the Common Areas and will promptly remove any "dog dirt" from the Common Areas;<br><br>(32)  Any children's entertainment or activity facility (such as "Discovery Zone", or "Chuck E. Cheese's") unless located more than 250 feet from the Premises or located on a Pad;<br><br>(33)  Any karate center;<br><br>(34)  Any movie theater;<br><br>(35)  Any restaurant serving meals for on- or off-premises consumption unless located 250 feet from the Premises, except that restaurants may be located on any Pad at the Shopping Center and provided that this restriction shall not apply to a café operated by a major tenant incidental to its primary use;<br><br>(36)  Any beauty parlor or nail salon (except that beauty parlors and/or nail salons shall be permitted, provided that such uses are located at least 250 feet away from the perimeter of the Premises;<br><br>(37)  Any health spa, exercise facility or similar type business located less than 250 feet from the Premises. |
| Red Brick Pizza (28) | None |
| Riviera Pools (29) | None |
| Steinmart (30) | None |
| Mattress Firm (31) | None |
| Alltel (32) | None |
| Ulta (35) | None |
| Kirkland's (37) | None |
| Del Taco (38) | None |

Exhibit F-1 - Page 30

| TENANT | PROHIBITED USE |
|---|---|
| Massage Envy (39) | None |
| Red Robin (41) | None |
| Bikes Direct (43) | None |
| Frazee Paints (44) | None |
| Justice Stores (45) | None |
| Claire's (46) | None |
| Bath & Body Works (48) | None |
| Kay Jewelers (50) | None |
| Payless (51) | None |
| Gamestop (52) | None |
| Macayo's (53) | None |
| 2B Wireless (54) | None |
| Wendy's (55) | None |
| In N Out (56) | None |
| Saba's (58) | None |
| Red Robin (59) | None |

Queen Creek Marketplace, Queen Creek, AZ
EXECUTION VERSION: August 5, 2011
UB Document No. 756176 v.10

| TENANT | PROHIBITED USE |
|---|---|
| (41) | |
| Yogurt Jungle (61) | None |
| Jo-Ann | In addition to the Prohibited Uses set forth otherwise in this Exhibit, all of which are incorporated herein:<br>(1)    Tattoo parlor;<br>(2)    Marijuana dispensary;<br>(3)    Church, synagogue, mosque or other pace of worship;<br>(4)    Any centers for medical procedures, counseling or activities related to abortion, birth control or euthanasia; and<br>(5)    Drug or alcohol recovery or treatment center (paragraphs 4 and 5 do not however prevent an urgent care center or other medical use typically found in first class shopping centers.) |

Queen Creek Marketplace, Queen Creek, AZ
EXECUTION VERSION: August 5, 2011
UB Document No. 756176 v.10

# EXHIBIT G

Form of Subordination, Non-Disturbance and Attornment Agreement

**When recorded, return to:**
Jo-Ann Stores, Inc.
Attn: Lisa Drew, Paralegal
5555 Darrow Road
Hudson, OH 44236

**This instrument was prepared by:**

Scott Kadish, Esq.
Ulmer & Berne LLP
600 Vine Street, Suite 2800
Cincinnati, OH 45202

---

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

This Subordination, Non-Disturbance and Attornment Agreement (the "Agreement") is made as of the ____ day of _____, 2011, by and among _____ ("Lender"), _____ ("Landlord"), and **JO-ANN STORES, INC.**, an Ohio corporation ("Tenant").

Reference is made to a loan (the "Mortgage") from Lender to Landlord, dated _____, and recorded on _____, as instrument number _____, in _____, _____ County, _____.

Reference is made to a lease dated _____, 2011 by and between Tenant and Landlord (the "Lease") of certain premises situated within the property as legally described on Exhibit A attached hereto and incorporated by reference herein and covered by said Mortgage.

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and in consideration of the mutual promises contained herein, the parties agree as follows:

1.      Lender consents to the Lease and the provisions thereof.

2.      Subject to the terms hereof, the Lease is and will be subject and subordinate at all

Exhibit G – Page 1

Queen Creek Marketplace, Queen Creek, AZ
EXECUTION VERSION: August 5, 2011
UB Document No. 756176 v.10

times to the lien of the Mortgage and to all renewals and extensions of the Mortgage to the full extent of all amounts secured thereby and interest thereon, but any and all such renewals and extensions, nevertheless shall be subject to and entitled to the benefits of the terms of this Agreement.

3.      If the holder of the Mortgage, or any person claiming under the holder (whether by a foreclosure, deed in lieu of foreclosure or otherwise), succeeds to the interest of Landlord in the Lease, then Tenant will recognize and attorn to the holder, or such other person, as its landlord under the Lease.

4.      In the event of foreclosure or other right asserted under the Mortgage by the holder thereof, the Lease and all of the rights of Tenant thereunder will continue in full force and effect and will not be terminated or disturbed (whether by a foreclosure, deed in lieu of foreclosure or otherwise), except in the case of a material default by Tenant under the terms of the Lease continuing after notice to Tenant and beyond any applicable notice and grace period and otherwise in accordance with the Lease. Tenant shall not be subject to any pre-foreclosure remedies asserted under the Mortgage or related loan documents. Lender shall not name or join Tenant as a defendant in any exercise of Lender's rights and remedies arising upon a default under the Mortgage unless applicable law requires Tenant to be made a party thereto as a condition to proceeding against Landlord or prosecuting such rights and remedies. In the latter case, Lender may join Tenant as a defendant in such action only for such purpose and not to terminate the Lease or otherwise adversely affect Tenant's rights under the Lease or this Agreement in such action.

5.      If Lender succeeds to the interest of Landlord under the Lease, Tenant will have the same rights and remedies against Lender for any default under the Lease, but Lender will not be, except for those defaults of a continuing nature which, as of the date of Lender's succession to title, had already been commenced or notice of their commencement had already been given to Landlord:

(a)      liable for any act or omission of any prior landlord (including Landlord) under the Lease, except for non-monetary defaults of a continuing nature of which Lender has received notice and latent or patent defects in construction to the same extent that any prior landlord would be liable;

(b)      subject to any off-sets or abatements against rent that Tenant may have against any prior landlord (including Landlord) due to a default under the Lease, except (i) for those which, as of the date of foreclosure, were already commenced or notice of their commencement was sent, (ii) for the exercise of rights expressly set forth in the Lease, and (iii) for those relating to continuing defaults identified in subsection (a) above;

Exhibit G – Page 2

(c)     bound by any Fixed Minimum Rent that Tenant might have paid for more than the current month to any prior landlord (including Landlord), except as expressly required under the Lease or actually received by Lender;

(d)     bound by any payment of rents, additional rents or other sums which Tenant may have paid more than one (1) month in advance to Landlord or any prior landlord unless (i) such sums are actually received by Lender or (ii) such prepayment shall have been expressly approved by Lender; and

(e)     bound by any amendment or modification to the Lease that shortens the term of the Lease or reduces the rent owed thereunder without the prior consent of Lender (it being understood that in the event Lender does not respond to such request within ten (10) Business Days consent shall be deemed given by Lender); Landlord is responsible for securing any and all consents required by Lender.

For purposes of subsection (e), "Business Day" shall mean any day other than Saturday, Sunday, any other day on which banks are required or authorized to close in Ohio, or the place of business of any servicer servicing the Loan.

6.     In the event of any casualty or condemnation (eminent domain), Lender must permit the insurance proceeds or the condemnation award, as the case may be, to be used for any restoration and repair as required by the Lease.

7.     Except as expressly provided herein, this Agreement does not constitute a waiver by Lender of any of its rights under the Mortgage or related documents, and the Mortgage and any related documents remain in full force and effect and will be complied with in all respects by Landlord.

8.     No modification, amendment, waiver or release of any provision of this Agreement or of any right, obligation, claim or cause of action arising hereunder will be valid or effective unless in writing and signed by the parties hereto.

9.     Nothing herein will amend, waive or rescind any term or condition of the Lease or relieve the Landlord from any of its obligations under the Lease.

10.     Tenant will provide a courtesy copy concurrently to Lender of any notice of default (or breach) from Tenant to Landlord that would allow Tenant to terminate the Lease. Lender will have the same time allowed the Landlord, pursuant to the Lease, after Landlord's receipt of notice to

Exhibit G – Page 3

cure the default giving rise to the termination (it being understood that the opportunity to cure granted to Lender herein shall be available to Lender only to the extent such opportunity to cure is available to Landlord pursuant to the terms of the Lease and such cure period afforded Lender shall run concurrently with the cure period available to Landlord). Notwithstanding the foregoing, Lender shall have no obligation to cure any default by Landlord except in the event Lender shall succeed to title of the property.

Co-Tenancy violations are not considered defaults under the Lease and Tenant shall have the right to exercise all remedies related thereto without notice to or consent from Lender.

11.     Any notices from one party to the other must be in writing and sent via next business day courier service (e.g., Federal Express) or by certified U.S. mail to the following addresses:

|  |  |
|---|---|
| if to Tenant: | Jo-Ann Stores, Inc.<br>Attn: Senior Vice President, Real Estate<br>5555 Darrow Road<br>Hudson, OH 44236 |
| With a copy to: | Jo-Ann Stores, Inc.<br>Attn: Senior Legal Counsel<br>5555 Darrow Road<br>Hudson, OH 44236 |
| if to Lender: | _____ |
| with a copy: | _____ |

12.     Landlord represents and warrants to Tenant that all prior mortgages and deeds of trust encumbering the Premises demised under the Lease have been satisfied or will be satisfied with the proceeds of the Mortgage.

13.     This Agreement inures to and binds the successors and assigns of the respective parties.

14.     This Agreement shall not be effective against Tenant unless and until Tenant has received a fully executed original of this Agreement signed by all parties.

15.     This Agreement shall be deemed to be a contract entered into pursuant to the laws of the state within which the Premises is located and shall in all respects be governed, construed, applied and enforced in accordance with the laws of the state within which the Premises is

Exhibit G – Page 4

located.

*[Remainder of Page Intentionally Left Blank]*

Exhibit G – Page 5

Each party has caused this Agreement to be signed by its duly authorized representative as of the date written above.

**LENDER:**

By:_____

Name:_____

Its:_____

**LANDLORD:**

By:_____

Name:_____

Its:_____

**TENANT:**
**JO-ANN STORES, INC.**

By:_____
   David Goldston, Senior Vice President,
   General Counsel and Secretary

*[Notary Signatures Follow on Next Page]*

Exhibit G – Page 6

STATE OF _____)
                                         ) SS
COUNTY OF _____)

       BEFORE ME, a Notary Public in and for said County and State, personally appeared _____, a[n] _____, by _____, its _____, who acknowledged that he/she did sign the foregoing instrument on behalf of said corporation and that the same is his/her free act and deed personally and as such officer.

       IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at _____, _____, this _____ day of _____, 2011.

                          _____
                                 NOTARY PUBLIC


STATE OF _____)
                                         ) SS
COUNTY OF _____)

       BEFORE ME, a Notary Public in and for said County and State, personally appeared _____, by _____, its _____, who acknowledged that he/she did sign the foregoing instrument on behalf of said corporation and that the same is his/her free act and deed personally and as such officer.

       IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at _____, _____, this _____ day of _____, 2011.

                          _____
                                 NOTARY PUBLIC

Exhibit G – Page 7

STATE OF OHIO                    )
                                 ) SS
COUNTY OF SUMMIT                 )

       BEFORE ME, a Notary Public in and for said County and State, personally appeared **Jo-Ann Stores, Inc.,** an Ohio corporation, by David Goldston, its senior vice president, general counsel and secretary, who acknowledged that he did sign the foregoing instrument on behalf of said corporation and that the same is his free act and deed personally and as such officers.

       IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at Hudson, Ohio, this _____ day of _____, 2011.


                                  _____
                                      NOTARY PUBLIC


                 *[Notary Page to SNDA dated _____, 2011]*


Exhibit G – Page 8

# EXHIBIT A

## Legal Description of Shopping Center

All of that real property located in the Town of Queen Creek, County of Maricopa, State of Arizona more particularly described as follows:

Lots 1 through 21 and Tracts A and B of Queen Creek MP-Phase 1, shown by Map on file in Book 827, Page 27 of Maps, official records of Maricopa County, Arizona.

Exhibit G – Page 9

# EXHIBIT H

Form of Estoppel Certificate

Estoppel Certificate

To:

Shopping Center:

Landlord:

Tenant:               JO-ANN STORES, INC.

Lease:

Tenant represents that, as of the date hereof:

1.   The Lease constitutes the entire written agreement between Tenant and Landlord and has not been modified or amended, except as indicated herein.

2.   The Lease is in full force and effect.  The term commenced on _____ and expires on _____.  [Tenant has no further options to renew the term of the Lease.] or [Tenant has _____ ___-year options to renew the term of the Lease.]

3.   Tenant has taken possession of approximately _____ square feet in the Shopping Center under the Lease (the "Premises") and is occupying the Premises.

4.   To the undersigned's actual knowledge, without inquiry or investigation, the Landlord is not currently in default under the Lease except as follows:

5.   The monthly Fixed Minimum Rent payable under the Lease is $_____ and has not been prepaid by more than one month.

6.   The address for notices to be sent to Tenant is as follows:

> Jo-Ann Stores, Inc.
> Attn:  Senior Vice President, Real Estate
> 5555 Darrow Road
> Hudson, OH 44236

> with a copy to:

> Jo-Ann Stores, Inc.
> Attn:  Senior Legal Counsel
> 5555 Darrow Road
> Hudson, OH 44236

Exhibit H - Page 1

Queen Creek Marketplace, Queen Creek, AZ
EXECUTION VERSION: August 5, 2011
UB Document No. 756176 v.10

7.  Nothing contained herein will: (a) amend, modify, waive or rescind any of the terms, conditions, covenants or obligations of the Lease; (b) waive or estop Tenant's right to declare a default based on facts of which the undersigned does not have actual knowledge, without inquiry or investigation; (c) waive or estop Tenant's right to claim any offset, claim or counterclaim resulting from an audit of Landlord's business records or public records; (d) waive or estop any claims, defenses, rights or remedies of Tenant; or (e) relieve the Landlord from any of its obligations under the Lease.

8.  Tenant's statements exclude certification as to any matter that may be disclosed by audit, inspection, or examination of Landlord's records or public records relating to charges and monetary items under the Lease.

9.  If there is any conflict between this certificate and the Lease, the Lease shall control.

10. Tenant acknowledges that you are relying upon this Estoppel Certificate and the accuracy of the information contained herein. Nevertheless, Tenant will not be liable to any party for damages of any kind whatsoever (whether direct, indirect, special, consequential or any other type) resulting from any statement in this certificate.


Dated:


**JO-ANN STORES, INC.**


By: _____
     David B. Goldston
     Senior Vice President, General Counsel,
     and Secretary

Exhibit H – Page 2