# EXHIBIT B

LAWYERS TITLE OF ARIZONA, INC.

When Recorded, Return to:
David L. Lansky
Mariscal, Weeks, McIntyre & Friedlander, P.A.
2901 North Central Avenue
Suite 200
Phoenix, Arizona 85012

*15289 3? Tidy Screensen*
*14 of 20*
*/524953*

OFFICIAL RECORDS OF
MARICOPA COUNTY RECORDER
HELEN PURCELL
2007-0124860 01/31/07 11:15 AM
5 OF 11

COSTELLUMP

OPERATION AND EASEMENT AGREEMENT

BETWEEN

TARGET CORPORATION

AND

VESTAR QCM, L.L.C.

For
QUEEN CREEK MARKETPLACE
QUEEN CREEK, ARIZONA

# OPERATION AND EASEMENT AGREEMENT
## TABLE OF CONTENTS

ARTICLE I - DEFINITIONS ................................................................................1
1.1    Approving Party.........................................................................................1
1.2    Building .....................................................................................................2
1.3    Building Area..............................................................................................2
1.4    Common Area.............................................................................................2
1.5    Constant Dollars ........................................................................................2
1.6    Development Agreement ............................................................................3
1.7    First Mortgage ...........................................................................................3
1.8    First Mortgagee ..........................................................................................3
1.9    Floor Area...................................................................................................3
1.10   Governmental Authorities ..........................................................................4
1.11   Governmental Requirements ......................................................................4
1.12   Improvements .............................................................................................4
1.13   Occupant.....................................................................................................4
1.14   Operator......................................................................................................4
1.15   Outside Sales Area......................................................................................4
1.16   Party............................................................................................................5
1.17   Permittee.....................................................................................................5
1.18   Person .........................................................................................................6
1.19   Primary Building Area................................................................................6
1.20   Restaurant ...................................................................................................6
1.21   Taxes...........................................................................................................6
1.22   Town............................................................................................................7
1.23   Tract............................................................................................................7
1.24   Utility Lines ...............................................................................................7


ARTICLE II - EASEMENTS ...............................................................................7
2.1    Ingress, Egress and Parking ......................................................................7
2.2    Utilities ......................................................................................................9
2.3    Construction, Maintenance and Reconstruction ......................................12
2.4    Sign Easement ..........................................................................................13
2.5    Restriction ................................................................................................16


ARTICLE III - CONSTRUCTION.......................................................................16
3.1    General Requirements ..............................................................................16
3.2    Common Area............................................................................................18
3.3    Building Improvements ............................................................................20
3.4    Liens .........................................................................................................24

ARTICLE IV - MAINTENANCE AND REPAIR ..................................................................................24
4.1   Utility Lines ..............................................................................................................................24
4.2   Common Area ............................................................................................................................24
4.3   Building and Outside Sales Area ...............................................................................................34


ARTICLE V - OPERATION OF THE SHOPPING CENTER ...........................................................35
5.1   Uses ...........................................................................................................................................35
5.2   Lighting ......................................................................................................................................43
5.5   Taxes ..........................................................................................................................................50


ARTICLE VI - MISCELLANEOUS ...................................................................................................51
6.1   Default .......................................................................................................................................51
6.2   Interest .......................................................................................................................................53
6.3   Estoppel Certificate ...................................................................................................................54
6.4   Notices .......................................................................................................................................54
6.5   Approval Rights .........................................................................................................................56
6.6   Condemnation ............................................................................................................................56
6.7   Binding Effect ............................................................................................................................57
6.8   Construction and Interpretation .................................................................................................57
6.9   Negation of Partnership .............................................................................................................58
6.10  Not a Public Dedication .............................................................................................................58
6.11  Excusable Delays .......................................................................................................................58
6.12  Mitigation of Damages ..............................................................................................................59
6.13  OEA Shall Continue Notwithstanding Breach ..........................................................................59
6.14  Time ...........................................................................................................................................59
6.15  No Waiver ..................................................................................................................................59


ARTICLE VII - TERM .......................................................................................................................59
7.1   Term of this OEA .......................................................................................................................59


8     EXCULPATION .......................................................................................................................60
8.1   Certain Limitations on Remedies ..............................................................................................60


ARTICLE IX - MISCELLANEOUS ..................................................................................................61
9.1   Subdivision of Tracts .................................................................................................................61
9.2   Priority of Agreement. ...............................................................................................................61
9.3   Dispute Resolution. ...................................................................................................................61
9.4   Conflict of Interest. ...................................................................................................................62
9.5   Development Agreement. ...........................................................................................................62

EXHIBITS

Exhibit A  Legal Description of Target Tract
Exhibit B  Legal Description of Developer Tract
Exhibit C  Intentionally Omitted
Exhibit D  Architectural Theme
Exhibit E  Submission Guidelines
Exhibit F  Comprehensive Sign Program
Exhibit G  Intentionally Omitted
Exhibit X  Site Plan

## OPERATION AND EASEMENT AGREEMENT

THIS OPERATION AND EASEMENT AGREEMENT ("OEA") is made and entered into as of the _30_ day of _JANUARY_ , 2007, between TARGET CORPORATION, a Minnesota corporation qualified to do business in Arizona as Target Stores, Inc. ("Target") and VESTAR QCM, L.L.C., an Arizona limited liability company ("Developer").

### WITNESSETH

WHEREAS, Target is the owner of a certain tract of land legally described in Exhibit A attached hereto and identified as the "Target Tract" on Exhibit X (the "Site Plan") attached hereto; and

WHEREAS, Developer is the owner of a certain tract of land legally described in Exhibit B attached hereto and identified as the "Developer Tract" on the Site Plan; and

WHEREAS, the Target Tract and the Developer Tract (collectively, the "Shopping Center") are contiguous and adjacent to each other as shown on the Site Plan; and

WHEREAS, the signatories hereto intend to develop and operate their respective Tracts in conjunction with each other as integral parts of a retail shopping complex, but not a planned or common interest development/community, and in order to effectuate the common use and operation of their respective Tracts they desire to enter into certain covenants and agreements, and to grant to each other certain reciprocal easements, in, to, over, and across their respective Tracts.

NOW, THEREFORE, in consideration of the premises, the covenants and agreements hereinafter set forth and in furtherance of the parties' understanding, it is agreed as follows:

### ARTICLE I - DEFINITIONS

1.1    Approving Party

"Approving Party" shall mean the Party designated from time to time to make certain decisions and/or give certain approvals pursuant to the terms of this OEA. There shall be one (1) Approving Party representing the Developer Tract and one (1) Approving Party representing the Target Tract. Each Approving Party shall have absolute discretion to make the decisions and/or give the approvals expressly designated to be made and/or given on behalf of the real estate represented by such position regardless of whether the Approving Party then owns all or less than all of the Developer Tract or the Target Tract, as the case may be. The Party designated as Approving Party for the Developer Tract shall have the right to assign such status to any other Party owning a Tract within the Developer Tract; provided, however, if such assignment is not made in writing, then the status of Approving Party for the Developer Tract shall automatically be deemed assigned to the Party acquiring the last portion of the Developer Tract owned by the

Party then holding the status of Approving Party for the Developer Tract. The Party designated as Approving Party for the Target Tract shall have the right to assign such status to any other Party owning a Tract within the Target Tract; provided, however, if such assignment is not made in writing, then the status of Approving Party for the Target Tract shall automatically be deemed assigned to the Party acquiring the last portion of the Target Tract owned by the Party then holding the status of Approving Party for the Target Tract. Developer shall be the initial Approving Party for the Developer Tract; Target shall be the initial Approving Party for the Target Tract.

### 1.2    Building

"Building" shall mean any permanently enclosed structure placed, constructed or located on a Tract, which for the purpose of this OEA shall include any building appurtenances such as stairs leading to or from a door, transformers, trash containers or compactors, canopies, supports, loading docks, truck ramps, and other outward extensions of such structure.

### 1.3    Building Area

"Building Area" shall mean the limited areas of the Shopping Center within which Buildings may be constructed, placed or located. Building Areas are designated on the Site Plan. One or more Buildings may be located within a Building Area.

### 1.4    Common Area

"Common Area" shall mean all areas within the exterior boundaries of the Shopping Center, exclusive of (i) any Building and (ii) any Outside Sales Area during the period such area is used for sales, display and/or storage purposes intended for the non-exclusive common use by Owners and Occupants, including parking areas, streets, onsite retention areas, driveways, curb cuts, access roads, aisles, sidewalks, malls, landscape areas and other common and service areas within the Shopping Center, whether or not shown on the Site Plan.

### 1.5    Constant Dollars

"Constant Dollars" shall mean the value of the U.S. dollar to which such phrase refers, as adjusted from time to time. An adjustment shall occur on the 1st day of June of the sixth (6th) full calendar year following the date of this OEA, and thereafter at five (5) year intervals. Constant Dollars shall be determined by multiplying the dollar amount to be adjusted by a fraction, the numerator of which is the Current Index Number and the denominator of which is the Base Index Number. The "Base Index Number" shall be the level of the Index for the month during the calendar year this OEA is dated; the "Current Index Number" shall be the level of the Index for the month during the calendar year preceding the adjustment year; the "Index" shall be the Consumer Price Index for All Urban Consumers, published by the Bureau of Labor Statistics of the United States Department of Labor for U.S. City Average, All Items (1982-84=100), or any successor index thereto as hereinafter provided. If publication of the Index is discontinued, or if the basis of calculating the Index is materially changed, then the Approving Parties shall substitute for the Index comparable statistics as computed by an agency of the United States

Government or, if none, by a substantial and responsible periodical or publication of recognized authority most closely approximating the result which would have been achieved by the Index.

### 1.6     Development Agreement

"Development Agreement" shall mean that certain Development Agreement dated June 15, 2005 by and between the Town and Developer recorded June 22, 2005 in the official records of Maricopa County, Arizona as Instrument No. 2005-08408189, as amended.

### 1.7     First Mortgage

"First Mortgage" shall mean any mortgage, deed of trust or other security instrument which creates a first lien against a Parcel or any Improvements constructed thereon.

### 1.8     First Mortgagee

"First Mortgagee" shall mean the beneficiary or secured party under a first mortgage.

### 1.9     Floor Area

"Floor Area" shall mean the aggregate of the actual number of square feet of space (i) contained on each floor within a Building, including any mezzanine or basement space, as measured from the exterior faces of the exterior walls or store front and/or the center line of any common walls; provided, however, that the following areas shall not be included in such calculation: space attributable to any multi-deck, platform, rack or other multi-level system used solely for the storage of merchandise which is located above ground floor; any space used solely for Building utilities or mechanical equipment; and (ii) exceeding fifteen thousand (15,000) square feet within an Outside Sales Area. Within thirty (30) days after receipt of a request therefor, a Party shall certify to the requesting Party the amount of Floor Area applicable to such Party's Tract. If any Party causes an as-built survey to be prepared with respect to any portion of the Shopping Center, such Party shall furnish a copy of such survey to the other Parties for informational purposes only.

During any period of rebuilding, repairing, replacement or reconstruction of a Building, the Floor Area previously attributable to that Tract shall be deemed to be the same as existed immediately prior to such period. Upon completion of such rebuilding, repairing, replacement or reconstruction, the Party owning such Tract shall cause a new determination of Floor Area for such Tract to be made in the manner described above, and such determination shall be sent to any other Party requesting the same.

3

### 1.10   Governmental Authorities

"Governmental Authorities" shall mean any federal, state, county, city or local governmental or quasi-governmental authority, entity or body (or any departmental agency thereof) exercising jurisdiction over a particular subject matter, including the Town.

### 1.11   Governmental Requirements

"Governmental Requirements" shall mean all applicable laws, statutes, ordinances, codes, rules, regulations, orders, and applicable judicial decisions or decrees, as presently existing and hereafter amended, of any Governmental Authorities.

### 1.12   Improvements

"Improvements" means the Buildings, Common Areas and other improvements from time to time existing on a Parcel

### 1.13   Occupant

"Occupant" shall mean any Person from time to time entitled to the use and occupancy of any portion of a Building in the Shopping Center under an ownership right or under any lease, sublease, license, concession, or other similar agreement.

### 1.14   Operator

"Operator" shall mean the Person, if any, designated from time to time by the Approving Parties to maintain and operate the Common Area of the Shopping Center.   The Person designated as Operator shall serve in such capacity until he resigns upon sixty (60) days prior written notice, or is removed by the Approving Parties.  The Approving Parties hereby designate Developer as the initial Operator, and Developer hereby accepts such appointment.  During any period an Operator is not designated, each Party shall maintain and operate its own Tract pursuant to Article IV hereof.

### 1.15   Outside Sales Area

"Outside Sales Area" shall mean those areas, if any, designated on the Site Plan which from time to time may be used for sales, display and/or storage purposes; provided, however, with respect to any Outside Sales Area located outside of a Building Area, the Parties acknowledge and agree that the actual location of such Outside Sales Area may vary from time to time, subject to the approval of the Approving Parties.  During the period an Outside Sales Area is: (i) used for sales, display and/or storage purposes, such area shall not be considered part of the Common Area, and (ii) not used for sales, display and/or storage purposes, such area shall be considered part of the Common Area. During the period and Outside Sales Area is (a) used, such space shall be enclosed by a fence or other security barrier, but shall not be heated or air conditioned, and (b) not used, the surrounding barrier, if any, shall removed by the Occupant and the surface of such area shall be used for Common Area purposes; provided, however, if the

Outside Sales Area is located within a Building Area, such area may be used for the location of Buildings.

### 1.16   Party

"Party" shall mean each signatory hereto and its respective successors and assigns during the period of such Person's fee ownership of any portion of the Shopping Center. A Party transferring all or any portion of its fee interest in the Shopping Center shall give notice to all other Parties and the Operator, if any, of such transfer and shall include in such notice at least the following information:

  (A) The name and address of the new Party;

  (B) A copy of the legal description of the portion of the Tract transferred by such Party; and

  (C) If the new Party is the designated Approving Party.

Each Party shall be liable for the performance of all covenants, obligations and undertakings applicable to the Tract or portion thereof owned by it that accrue during the period of such ownership, and such liability shall continue with respect to any portion of the Tract transferred by such Party until the notice of transfer set forth above is given. Until such notice of transfer is given, the transferring Party shall (for the purpose of this OEA only) be the transferee's agent. Once the notice of transfer is given, the transferring Party shall be released from all obligations pertaining to the portion of the Tract transferred arising subsequent to the notice of transfer. For the purpose of this Section only, if the notice of transfer is given pursuant to the provisions of Section 6.4, the effective date of such notice shall be the date such notice is sent. Notwithstanding anything to the contrary, if a notice of transfer is given, any payment made by a Party to the transferor within thirty (30) days of such notice shall be deemed properly paid, and the transferor and transferee shall resolve any necessary adjustments and/or prorations regarding such payment between themselves.

If a Tract is owned by more than one (1) Party, the Party or Parties holding at least fifty-one percent (51%) of the ownership interest in such Tract shall designate in writing one (1) Person to represent all owners of the Tract and such designated Person shall be deemed the Person authorized to give consents and/or approvals pursuant to this OEA for such Tract.

Nothing contained herein to the contrary shall affect the existence, priority, validity or enforceability of any lien permitted hereunder which is recorded against the transferred portion of the Shopping Center prior to receipt of such notice of transfer by the Party filing such lien.

### 1.17   Permittee

"Permittee" shall mean all Occupants and the officers, partners, members, directors, employees, agents, contractors, customers, vendors, suppliers, visitors, invitees, licensees,

5

subtenants, and concessionaires of Occupants insofar as their activities relate to the intended development, use and occupancy of the Shopping Center. Persons engaged in civic, public, charitable or political activities within the Shopping Center, including but not limited to the activities set forth below, shall not be considered Permittees:

  (A) Exhibiting any placard, sign or notice.

  (B) Distributing any circular, handbill, placard or booklet.

  (C) Soliciting memberships or contributions for private, civic, public charitable or political purposes.

  (D) Parading, picketing or demonstrating.

  (E) Failing to follow regulations established by the Approving Parties relating to the use and operation of the Shopping Center.

1.18 <u>Person</u>

"<u>Person</u>" shall mean any individual, partnership, firm, association, corporation, limited liability company, trust, or any other form of business or Governmental Authority.

1.19 <u>Primary Building Area</u>

"<u>Primary Building Area</u>" shall mean those specifically designated Building Areas on the Site Plan that collectively provide protection for the type of "<u>unlimited area</u>" Building referred to in <u>Section 3.3.4</u> hereof.

1.20 <u>Restaurant</u>

"<u>Restaurant</u>" shall mean any operation or business which requires a governmental permit, license and/or authorization to prepare and/or serve food for either on or off-site consumption; provided, however, notwithstanding anything contained herein to the contrary, a supermarket, grocery store or similar operation shall not be deemed a Restaurant.

1.21 <u>Taxes</u>

"<u>Taxes</u>" means all real property taxes, possessory interest taxes, government property lease excise taxes, payments in lieu of taxes, personal property taxes and excise taxes assessed against the buildings and improvements within the Shopping Center, assessments (whether arising from any improvement or special taxing district, or otherwise), excluding, however, any improvement or special taxing district formed for the purpose of installing or paying for the installation of offsite improvements installed by or for the benefit of the Approving Parties in connection with the initial construction of the Shopping Center (other than the Improvement District described in <u>Section 9</u> of the Development Agreement which is specifically included as a component of Taxes for the Developer Tract, but not for the Target Tract)) (provided, however,

all such assessments shall be converted to installments payable over the longest period available), excises, levies, license and permit fees, and all other charges of whatsoever kind and nature and whether any of the foregoing be general or special, ordinary or extraordinary, foreseen or unforeseen, which at any time may be imposed upon the Shopping Center, including those imposed or required by governmental authorities having jurisdiction to increase tax increments to such governmental authorities and for services such as fire protection, street, sidewalk and road maintenance, refuse removal or other governmental services formerly provided without charge to property owners or occupants.

1.22    Town

"Town" shall mean the Town of Queen Creek, an Arizona municipal corporation, having an address of 22350 South Ellsworth Road, Queen Creek, Arizona 85242.

1.23    Tract

"Tract" shall mean that portion of the Shopping Center owned by a Party.

1.24    Utility Lines

"Utility Lines" shall mean those facilities and systems for the transmission of utility services, including the drainage and storage of surface water. "Common Utility Lines" shall mean those Utility Lines which are installed to provide the applicable service to both the Developer Tract and the Target Tract. "Separate Utility Lines" shall mean those Utility Lines which are installed to provide the applicable service to either the Developer Tract or the Target Tract. For the purpose of this OEA, the portion of a Utility Line extending between a Common Utility Line and a Building shall be considered a Separate Utility Line. Utility Lines installed pursuant to this OEA shall only provide service necessary for the development and/or operation of the Shopping Center.


ARTICLE II - EASEMENTS

2.1    Ingress, Egress and Parking

2.1.1    During the term of this OEA, each Party hereby grants and conveys to each other Party for its use and for the use of its Permittees, in common with others entitled to use the same, a non-exclusive easement for the passage and parking of vehicles over and across the parking and driveway areas of the grantor's Tract, as the same may from time to time be constructed and maintained for such use, and for the passage and accommodation of pedestrians over and across the parking, driveways and sidewalk areas of the grantor's Tract, as the same may from time to time be constructed and maintained for such use. The easement herein established shall be appurtenant to and for the benefit of each grantee's Tract, and shall be binding on, enforceable against and burden each grantor's Tract. Such easement rights shall be subject to the following reservations as well as the other applicable provisions contained in this OEA:

7

(A)    Each Party reserves the right to close-off any portion of its Tract for such reasonable period of time as may be legally necessary, in the opinion of such Party's counsel, to prevent the acquisition of prescriptive rights by anyone; provided, however, that prior to closing-off any portion of its Tract, such Party shall give written notice to each other Party of its intention to do so, and shall attempt to coordinate such closing-off with each other Party so that no unreasonable interference with the passage of pedestrians or vehicles shall occur.

(B)    Each Party reserves the right at any time and from time to time to exclude and restrain any Person who is not a Permittee from using its Tract.

(C)    Each Party reserves the right to temporarily erect or place barriers in and around areas on its Tract which are being constructed and/or repaired in order to insure either safety of Persons or protection of property.

2.1.2  In addition to the general easement specified in <u>Section 2.1.1</u>, the Parties hereby grant and convey to each other Party for its use and for the use of its Permittees, in common with others entitled to use the same, and subject to the reservations set forth in <u>Section 2.1.1(A) and (B)</u>, a non-exclusive, perpetual easement for the passage and accommodation of pedestrians and vehicles (but not for parking purposes) upon, over and across that portion of each grantor's Tract designated on the Site Plan as the Access Drive; such Drive to be approximately thirty 30 feet wide (curb to curb), and to contain two (2) lanes, one in each direction. The easement herein established shall be appurtenant to and for the benefit of each grantee's Tract, and shall be binding on, enforceable against and burden each grantor's Tract. During the term of this OEA, each portion of the Access Drive shall be maintained in accordance with the provisions governing the maintenance of the parking and driveways on each grantor's Tract, and such Access Drive shall not be relocated without the approval of all grantees. After the termination of this OEA, any grantor may, at its expense, relocate the portion of the Access Drive located upon its Tract so long as the relocated portion remains reasonably direct and ties into/connects with the other portions of the Access Drive on the immediately adjacent Tracts. Notice of such relocation shall be provided to each grantee at least thirty (30) days prior to relocation of such Access Drive.

After the termination of this OEA, that portion of the grantor's Tract on which the Access Drive is located shall be maintained in a safe, clean and good state of repair and condition by the grantor, at its sole cost and expense. In the event the grantor shall fail to perform the required maintenance, any grantee, after at least thirty (30) days prior notice to the grantor, shall have the right, but not the obligation, to cause such maintenance to be performed. If such curative measures are taken the grantor shall, within thirty (30) days after written demand, which demand shall be accompanied by work orders, invoices and other reasonably satisfactory documentation of the costs incurred, pay to the grantee curing such default, all costs and expenses incurred with respect to such curative action. In addition, such grantee shall have the right to create a lien upon

8

the grantor's Tract in order to secure payment of the amount expended by such grantee to perform such maintenance, plus Interest at the rate set forth in <u>Section 6.2</u> hereof.

2.2   <u>Utilities</u>

2.2.1   Each Party hereby grants and conveys to each other Party non-exclusive, perpetual easements in, to, over, under, along and across those portions of the grantor's Tract (exclusive of any portion located within Building Areas) necessary for the installation, operation, flow, passage, use, maintenance, connection, repair, relocation, and removal of Utility Lines serving the grantee's Tract. The initial location (and in the event of relocation, the new location) of any Utility Line shall be subject to the prior written approval of the Party whose Tract is to be burdened thereby. Such easement area shall be no wider than necessary to reasonably satisfy the requirements of a private or public utility company, or five (5) feet on each side of the centerline if the easement is granted to a Party. The grantee shall provide to the grantor a copy of an as-built survey showing the location of such Utility Line. All Utility Lines shall be underground except:

     (A)    Ground mounted electrical transformers;

     (B)    As may be necessary during periods of construction, reconstruction, repair or temporary service;

     (C)    As may be required by Governmental Authorities;

     (D)    As may be required by the provider of such utility service; and

     (E)    Fire hydrants.

At least thirty (30) days prior to utilizing the easement granted herein, the grantee shall provide the grantor with a written statement describing the need for such easement, shall identify the proposed location of the Utility Line, the nature of the service to be provided, the anticipated commencement and completion dates for the work. Prior to commencing any work on a grantor's Tract, including any emergency work, the grantee shall provide to the grantor evidence of insurance coverage as required by <u>Section 5.4.2</u>.

2.2.2   Any Party electing to install a Separate Utility Line shall obtain all permits and approvals and shall pay all costs and expenses with respect to the initial construction and all subsequent maintenance, relocation or abandonment of the Separate Utility Line. The Separate Utility Line shall be maintained in a safe, clean and good state of repair and condition. The grantee shall perform such work in compliance with all Governmental Requirements, as quickly as possible and after normal business hours whenever possible. Except in the case of a maintenance emergency where such work may be initiated after reasonable notice, the grantee shall provide the grantor with at least fifteen (15) days prior notice before commencement of any work. The grantee of any Separate Utility Line agrees to defend, protect, indemnify and hold

harmless the grantor for, from and against all claims or demands, including any action or proceeding brought thereon, and all costs, liens, losses, expenses and liabilities of any kind relating thereto, including reasonable attorneys' fees and cost of suit, arising out of or resulting from the exercise of the right to install, maintain and operate the Separate Utility Line; provided, however, the foregoing obligation shall not apply to claims or demands based on the negligence or the willful act or omission of the grantor.

2.2.3    Except as may otherwise be agreed, the Parties (the "Cooperating Parties") electing to install a Common Utility Line shall obtain all permits and approvals and shall pay all costs and expenses with respect to the initial construction thereof. Once constructed, Operator shall maintain, replace and/or relocate the Common Utility Line in a safe, clean and good state of repair and condition, and in compliance with all Governmental Requirements, as quickly as possible and after normal business hours whenever possible. If there is no Operator, then any Cooperating Party shall have the right to maintain, repair or replace the Common Utility Line without submission of a Budget or estimate of expenditures, except as hereinafter provided. If a Cooperating Party, in performing maintenance, repair or replacement of a Common Utility Line, is likely to incur costs of more than Twenty Thousand Dollars ($20,000) in Constant Dollars for such work in any one instance (or series of related or repeated circumstances), such Cooperating Party shall first notify the other Cooperating Parties required to pay a portion of such costs, in which case the Cooperating Parties shall prepare a list of qualified bidders, shall seek competitive bids from the list of qualified bidders before performing the work and shall select the lowest, responsive qualified bidder to perform the work. If a list of bidders is not jointly prepared within fifteen (15) days of the request for bidders, the Cooperating Party desiring to perform the work may prepare the list (containing not less than three bidders) for such other Cooperating Parties' approval, which approval shall not be unreasonably withheld, from which bids will be solicited. After a Cooperating Party has incurred any costs for maintaining, repairing or replacing a Common Utility Line, it may send a statement of such costs, increased by an amount equal to the Administration Fee (defined in Section 4.2.2), together with a copy of any invoice reflecting a charge exceeding Five Hundred Dollars ($500.00) in Constant Dollars to each Cooperating Party benefiting from such Common Utility Line. Each Cooperating Party shall pay within thirty (30) days after receipt of the statement of costs either its allocable share of such costs as agreed upon when the Common Utility Line was installed, or if no separate cost sharing agreement was made, then in accordance with the sharing of Common Area Maintenance Costs. Except in the case of a maintenance emergency where such work may be initiated after reasonable notice, the grantor shall be provided with at least fifteen (15) days prior notice before commencement of any work.

2.2.4    Each Party hereby grants and conveys to each other Party owning an adjacent Tract the perpetual right and easement to discharge surface storm water drainage and/or runoff from the grantee's Tract over, upon and across the Common Area of the grantor's Tract, upon the following conditions and terms:

10

(A)    The grades and the surface water drainage/retention system for the Shopping Center shall be initially constructed in strict conformance with the plans and specifications approved by the Approving Parties; and

(B)    No Party shall alter or permit to be altered the surface of the Common Area or the drainage/retention system constructed on its Tract if such alteration would materially increase the flow of surface water onto an adjacent Tract either within the aggregate or by directing the flow of surface water to a limited area. All surface water collection, retention and distribution facilities shall be deemed a Common Utility Line.

2.2.5    Each Party hereby grants and conveys to each other Party owning an adjacent tract the perpetual right and easement for lateral and subjacent support by the grantor's Tract for the support of the grantee's Tract and all buildings and other Improvements existing thereon from time to time; provided, however, the provisions of this Section 2.2.5 shall not benefit or burden the Target Tract.

2.2.6    Each Party hereby grants and conveys to each other Party owning an adjacent Tract a temporary easement to go upon the Common Areas of the grantor's Tract to the extent necessary from time to time to affect construction, maintenance, repair or replacement as permitted or required by this OEA.

2.2.7    Each Party hereby grants and conveys to each other Party owning an adjacent Tract an easement upon and under the Common Areas on the grantor's Tract for inadvertent encroachments of not more than six (6) inches of walls, footings, foundations, overhangs, shadow boxes attached to or forming an integral part of a Building, plasters and other Building ornamentation, canopies, canopy support columns, marquees, eaves of roofs, sidewalks, retaining walls, fire hose connections, hose bibs and pipes, down spouts, yard and flood lights and signs.

2.2.8    In the event a Party fails to perform its obligations under this Section 2.2, any grantor shall have the right to claim a default pursuant to Section 6.1 and avail itself of all the provisions therein contained, including, subject to compliance with the provisions of Section 6.1, the right to lien a Defaulting Party's Tract, and receive Interest on all sums expended to cure such default.

2.2.9    The grantor shall have the right to relocate a Utility Line on its Tract upon thirty (30) days prior written notice to the grantee(s), provided that such relocation:

(A)    Shall not be commenced during the months of November, December or January;

(B)    Shall not interfere with or diminish the utility service to the grantee during the grantee's business hours; and if an electrical line/computer line is

11

being relocated, then the grantor and grantee shall coordinate such interruption to eliminate any detrimental effects;

(C)    Shall not reduce or unreasonably impair the usefulness or function of such Utility Line;

(D)    Shall be performed without cost or expense to the grantee;

(E)    Shall be completed using materials and design standards which equal or exceed those originally used; and

(F)    Shall have been approved by the provider of such utility service and the appropriate Governmental Authorities.

Documentation of the relocated easement area, including the furnishing of an "as-built" survey to all grantees, shall be at the grantor's expense and shall be accomplished as soon as possible following completion of such relocation. If the grantor shall so request, following the relocation of a Utility Line, the grantee shall release the previous easement.

2.3    Construction, Maintenance and Reconstruction

2.3.1    In order to accommodate any Building improvements which may inadvertently be constructed beyond a Tract's boundary line, each Party grants to each other Party owning an adjacent Tract, an easement, not to exceed a maximum lateral distance of six (6) inches, in, to, over, under, and across that portion of the grantor's Tract adjacent to such common boundary line for the maintenance and replacement of such encroaching Building improvements.

2.3.2    In the event a constructing Party (the "Constructing Party") determines that it is necessary to place underground piers, footings and/or foundations ("Subsurface Construction Elements") across the boundary line of its Tract, the Constructing Party shall advise the Party owning the adjacent Tract (the "Adjacent Party") of the Constructing Party's construction requirements and shall provide plans and specifications relating thereto to the Adjacent Party, including proposed construction techniques for the Subsurface Construction Elements. Each Adjacent Party hereby grants and conveys to each Constructing Party for the benefit of its Tract an easement, not to exceed a maximum lateral distance of five (5) feet, in, to, under, and across that portion of the Adjacent Party's Tract not theretofore occupied by any then existing structure, for the installation, maintenance and replacement of such Subsurface Construction Elements; provided, however, that the Constructing Party shall have no right to use such easement if (a) the Adjacent Party is able to provide the Constructing Party a reasonable alternative construction method for the placement of the Subsurface Construction Elements entirely on the Constructing Party's Tract, or (b) the installation, maintenance and replacement of such subsurface construction elements would materially and adversely impact the construction of Buildings by the Adjacent Party on its Tract.

The Adjacent Party reserves the right to require the Constructing Party to modify the design specifications for the Subsurface Construction Elements in order to permit the Adjacent Party the opportunity to utilize the same in connection with the construction of its Building so that each Party shall be able to place its Building immediately adjacent to the common boundary line. If a common Subsurface Construction Element is used by the Constructing Party and the Adjacent Party, each shall assume and pay its reasonable share of the cost and expense of the design and construction thereof. In the event any Building utilizing a common Subsurface Construction Element is destroyed and not replaced or is removed, the common Subsurface Construction Element shall remain in place for the benefit of the other Building utilizing the same.

2.3.3   The easements established under <u>Sections 2.3.1 and 2.3.2</u> shall be appurtenant to and for the benefit of each grantee's Tract, and shall be binding on, enforceable against and burden each grantor's Tract. Notwithstanding such easement grant, nothing herein shall diminish or waive the right of a grantor to recover damages resulting from a grantee's failure to construct its Building within its Tract in the case of <u>Section 2.3.1</u>, or within the easement area limits in the case of <u>Section 2.3.2</u>. Such easements in each instance shall:

(A)   Continue in effect for the term of this OEA and thereafter for so long as the Building utilizing the easement area exists (including a reasonable period to permit reconstruction or replacement of such Building if the same shall be destroyed, damaged or demolished).

(B)   Include the reasonable right of access necessary to exercise and enjoy such grant upon terms and with the limitations described in <u>Section 3.1.5</u>.

2.3.4   With respect to Buildings constructed along the common boundary line between Tracts, nothing herein shall be deemed to create or establish:

(A)   A "<u>common</u>" or "<u>party</u>" wall to be shared with the adjacent Building.

(B)   The right for a Building to receive support from or apply pressure to the adjacent Building.

2.4   <u>Sign Easement</u>

2.4.1   Target hereby grants and conveys to Developer, its successors and assigns as the owner of the Developer Tract, a perpetual easement for the construction, reconstruction, replacement, operation, maintenance and repair of two (2) pedestrian directory sign structures and one (1) vehicular directory sign structure, including the right and privilege to place thereon or affix thereto identification panels, over, under, upon and across that portion of the Target Tract identified on the Site Plan as the Developer Directory Signs, together with reasonable access over, under, upon, through and across the Target Tract to install, replace, maintain, repair and operate a Separate Utility Line pursuant to the terms and conditions set forth in <u>Section 2.2</u> above

13

in order to provide such sign structure and panels with power. The foregoing easement, together with the rights included therewith, shall be for the benefit of and appurtenant to the Developer Tract and shall be binding on, enforceable against and burden the Target Tract. Developer shall have the right to release the easement, and upon such release Developer shall remove its panels and thereafter have no further rights, duties or responsibilities with respect to the Developer Directory Signs and/or the sign structures.

During the term of this OEA, the use and the maintenance of the sign structures, including any panels attached thereto and the relocation of the sign structure shall be governed by the provisions of Section 5.3.1 below. Developer shall be entitled to receive any condemnation award paid relating to the sign structure and/or panels taken, including any relocation benefits, and at its sole election, Developer may cause a new sign structure to be constructed on an adjacent portion of the Target Tract.

Following the termination of this OEA, Developer shall cause the sign structure, including any panels attached thereto, to be maintained. In the event the Developer Directory Signs are taken by condemnation, the owner of the Tract upon which the sign structure was located shall designate a replacement area with comparable visibility as close to the original location as reasonably possible. Developer shall be entitled to receive any condemnation award paid relating to the sign structures and any panels attached thereto, including any relocation benefits, and at its election, Developer may cause a new sign structure to be constructed on the replacement sign area.

2.4.2    Developer hereby grants and conveys to Target, its successors and assigns as the owner of the Target Tract, a perpetual, non-delegable easement for the right and privilege to place or affix identification panel(s) in the position (both sides) specified in Exhibit F to the sign structures to be located on that portion of the Developer Tract identified on the Site Plan as Target Rittenhouse Road Monument Sign and Target Ellsworth Road Monument Sign; the easement grant shall include reasonable access over, across and upon the Developer Tract to permit such panel(s) to be installed, replaced, maintained and operated. Developer reserves the right to grant additional panel easements, subject to the restrictions set forth in Section 5.3.1, for the remaining panel areas specified on Exhibit F, and each such additional grant shall recognize the easement right and privileges granted herein to Target, and shall specify which panel space on the sign structure is the subject of the easement grant. A copy of the recorded easement shall be delivered to Target and each other Person holding a prior panel easement with respect to such sign structure. In the event Target Rittenhouse Road Monument Sign and/or the Target Ellsworth Road Monument Sign is not in place during the term of the OEA, or at any time thereafter, then the aforesaid easement grant shall also include the right for Target to construct, reconstruct, replace, repair, maintain and operate Target Rittenhouse Road Monument Sign and Target Ellsworth Road Monument Sign, together with reasonable access over, under, upon, through and across the Developer Tract to install, replace, maintain, repair and operate a Separate Utility Line pursuant to the terms and provisions set forth in Section 2.2 above in order to provide such sign structure and panels with power. If Target elects to construct the sign structure, the design thereof shall be as specified on Exhibit F, or another design approved either during the term of

14

the OEA by the Approving Parties and the Parties entitled to place panels on the sign structure pursuant to Section 5.3.1, or following the expiration of the OEA, by the Persons entitled to place panels on the sign structure pursuant to easement grants. The foregoing easement, together with all rights and privileges specified, shall be for the benefit of the Target Tract and shall be binding on, enforceable against and burden the Developer Tract. Target shall have the right to release the easement, and upon such release Target shall remove its panel(s) and thereafter have no further rights, duties or responsibilities with respect to the sign structure.

During the term of this OEA, the right of other Occupants to place panels on the sign structures, the maintenance and/or replacement of the sign structures, and any relocation of the sign structures shall be governed by the provisions of Section 5.3.1 hereof. Developer (or Target if it has constructed the sign structures) shall be entitled to receive the portion of any condemnation award relating to the sign structures, including any relocation benefits, and the Person receiving the award shall cause a new sign structures to be constructed in accordance with Exhibit F in a replacement location acceptable to the Approving Parties. If the award received for the sign structures is less than the cost to replace the sign structures, the Parties entitled to place panels on the sign structures shall pay the deficiency based on the panel area allocated to each pursuant to Exhibit F, or the then approved design, even if such panel area is not used. The award (whether paid separately or as part of a lump sum) attributable to each panel taken shall belong to the owner thereof.

Following the termination of this OEA, the maintenance and/or replacement of each sign structures shall be performed by a Person designated by the majority of the grantees entitled to place panels on the sign structures, and all maintenance (including cost of providing power) and/or replacement costs shall be separately billed to the grantees based on the panel area allocated to each, even if such panel area is not used. Each Person attaching a panel to the sign structures shall cause such panel (including any backlit lighting) to be maintained at its sole cost and expense in a safe condition and in a good state of repair and pursuant to Governmental Regulations. In the event an area upon which the sign structures are located is taken by condemnation, the owner of the land upon which the sign structures are located shall designate a replacement area with comparable visibility as close to the original location as is reasonably possible. The Person then maintaining the sign structures shall be entitled to receive the portion of the condemnation award relating to the sign structures taken, including any relocation benefits, and such Person shall cause a new sign structures to be constructed in the replacement location in accordance with the design criteria set forth in Exhibit F, or any other design criteria approved by the grantees entitled to place panels on the sign structures pursuant to the easement grant. If the award received for the sign structures is less than the cost to replace the sign structures, the grantees entitled to place panels on the sign structures shall pay the deficiency based on the panel area allocated to each pursuant to the easement grants, even if such panel area is not used. The award (whether paid separately or as part of a lump sum) attributable to each panel taken shall belong to the owner thereof.

15

2.5    Restriction

No Party shall grant any easement for the benefit of any property not within the Shopping Center; provided, however, that the foregoing shall not prohibit the granting or dedicating of easements by a Party on its Tract to Governmental Authorities or to public utility companies.

## ARTICLE III - CONSTRUCTION

3.1    General Requirements

3.1.1    Each Party agrees that all construction activities performed or authorized by it within the Shopping Center shall be performed in compliance with all Governmental Requirements. All construction shall utilize new materials and shall be performed in a good, safe, workman-like manner using first class materials, in conformity with generally accepted construction practices and once commenced, shall be pursued diligently and continuously to completion.

3.1.2    Each Party further agrees that any construction activities performed or authorized by it shall not:

> (A)    Cause any unreasonable increase in the cost of constructing improvements upon another Party's Tract.

> (B)    Unreasonably interfere with construction work being performed on any other part of the Shopping Center.

> (C)    Unreasonably interfere with the use, occupancy or enjoyment of any part of the remainder of the Shopping Center by any other Party or its Permittees.

> (D)    Cause any Building located on another Tract to be in violation of any Governmental Requirements.

3.1.3    Each Party agrees to defend, protect, indemnify and hold harmless each other Party for, from and against all claims and demands, including any action or proceeding brought thereon, and all costs, liens, losses, expenses and liabilities of any kind relating thereto, including reasonable attorneys fees and cost of suit, relating to personal injury, bodily injury, property damage and/or mechanics', materialmen's and/or other professional service liens arising out of or resulting from any construction activities performed or authorized by or materials or services provided to such indemnifying Party; provided, however, that the foregoing shall not be applicable to either events or circumstances caused by the negligence or willful act or omission of such indemnified Party, its licensees, concessionaires, agents, servants, employees, or anyone claiming by, through, or under any of them, or claims covered by the release set forth in Section 5.4.3.

3.1.4   In connection with any construction, reconstruction, repair or maintenance on its Tract, each Party reserves the right, at its expense, to create a temporary staging and/or storage area on its Tract at such location as will not unreasonably interfere with access between such Tract and the other areas of the Shopping Center. Prior to the commencement of any work which requires the establishment of a staging and/or storage area on its Tract, a Party shall give at least thirty (30) days prior notice to the Approving Parties, for their approval, of the proposed location of such staging and/or storage area. If substantial work is to be performed, the constructing Party shall, at the request of any Approving Party, fence such staging and/or storage area. Notwithstanding the foregoing, if a business is operating on the Target Tract then no other Party's staging and/or storage area shall be located within one hundred (100) feet of the Target Tract, unless such area is located within a Building Area. If the Approving Parties do not approve the proposed location of the staging and/or storage area, the requesting Party shall modify the proposed location of the staging and/or storage area to satisfy the reasonable requirements of the Approving Parties. All storage of materials and the parking of construction vehicles, including vehicles of workers, shall occur only on the constructing Party's Tract, and all laborers, suppliers, contractors and others connected with such construction activities shall use only the access points located upon the constructing Party's Tract. Upon completion of such work, the constructing Party shall, at its expense, restore any damaged Common Area to a condition equal to or better than that existing prior to commencement of such work.

3.1.5   Each Party hereby grants and conveys to each other Party and to such Party's contractors, materialmen and laborers a temporary license for access and/or use over and across the Common Area of the grantor's Tract as shall be reasonably necessary for the grantee to construct and/or maintain improvements upon the grantee's Tract; provided, however, that such license shall be in effect only during such periods of time when actual construction and/or maintenance is being performed and provided further that the use of such license shall not unreasonably interfere with the use and operation of the Common Area by the other Parties or their Permittees. Prior to exercising the rights granted herein, the grantee shall first provide the grantor with a written statement describing the need for such license and shall identify the area of use. Each grantee physically using a portion of the grantor's Tract in connection with the construction and/or maintenance of the grantee's Tract shall furnish a certificate of insurance showing that its contractor has obtained the minimum insurance coverage required by Section 5.4.2, shall promptly pay all costs and expenses associated with such work, shall diligently complete such work as quickly as possible, and shall promptly clean the area, and restore and/or repair the affected portion of the grantor's Tract to a condition which is equal to or better than the condition which existed prior to the commencement of such work. Notwithstanding the foregoing, in the event a dispute exists between the contractors, laborers, suppliers and/or others connected with such construction activities, each Party shall have the right to prohibit the contractors, laborers, suppliers and/or others working for another Party from using the Common Area on its Tract; provided, however, the provisions of this sentence shall be inapplicable to the work being performed by Developer in connection with the initial development of the Common Areas of the Shopping Center in accordance with the provisions of the Site Development Agreement of even date herewith between Developer and Target, as any dispute between the contractors of the Parties in connection with the initial development of the Common Areas of the

17

Shopping Center is to be resolved in accordance with the applicable provisions of such Site Development Agreement.

3.2    Common Area

The Parties have agreed that the Common Area shall be constructed as shown on the Site Plan; provided, however, no fence or other barrier which would prevent or unreasonably obstruct the passage of pedestrian or vehicular travel shall be erected or permitted within or across the Common Area, exclusive of the limited curbing and other forms of traffic control depicted on the Site Plan, permitted staging and/or storage areas and Outside Sales Areas. Contemporaneously with the construction of a Building upon its Tract, the constructing Party shall cause the Common Area on its Tract to be substantially completed no later than the day the first Occupant of such Tract opens for business with the public. Such work shall be done in accordance with Governmental Requirements, in a good and workmanlike manner and in accordance with good engineering standards; provided, however, the following minimum general design standards shall be·complied with throughout the term of this OEA:

3.2.1    The lighting system shall use a lamp source of metal halide, and shall be designed to produce a minimum maintained lighting intensity measured at grade at all points of at least:

(A)    five (5) footcandles at curb in front of the entrance to any Building.

(B)    two (2) footcandles at entry drives to the Shopping Center.

(C)    two (2) footcandles on average in the general parking areas.

(D)    one-half (1/2) footcandle at the perimeter of the parking areas.

Each Party may elect to control the lighting system located on its Tract. The type and design of the Common Area light standards shall be approved by the Approving Parties.

3.2.2    The slope in the parking area shall not exceed a maximum of three percent (3%) nor be less than a minimum of one and one-half percent (1 1/2%), and the slope at all entrances to the Shopping Center shall not exceed a maximum of five percent (5%), unless Approving Parties agree to a different standard.

3.2.3    All sidewalks and pedestrian aisles shall be concrete or other materials approved by the Approving Parties; the automobile parking areas, driveways, and access roads shall be designed in conformity with the recommendations of a licensed soils engineer approved by the Approving Parties, which design shall require the installation of a suitable base and surfacing with an asphaltic concrete or concrete-wearing material.

18

3.2.4   Utility Lines that are placed underground shall be at depths designated by consultants approved by the Approving Parties. If surface water retention and/or detention areas are located outside of the general parking or landscape buffer areas, such retention and/or detention areas shall be fenced or otherwise secured to impede public access thereto.

3.2.5   The parking area on the Target Tract shall contain sufficient ground level parking spaces, without reliance on parking spaces that may be available on another portion of the Shopping Center in order to comply with the greater of Governmental Requirements or the following minimum requirements: four and five tenths (4.5) parking spaces for each one thousand (1,000) square feet. The parking area within any Parking Zone on the Developer Tract (which Parking Zones are identified as such on the Site Plan) shall, in the aggregate, contain sufficient ground level parking spaces, without reliance on parking spaces that may be available in another portion of the Shopping Center, in order to comply with the greater of (a) Governmental Requirements, or (b) the sum of (i) four and five tenths (4.5) parking spaces for each one thousand (1,000) square feet of Floor Area for any use other than a "restaurant use", and (ii) ten (10) parking spaces for each one thousand (1,000) square feet of Floor Area of restaurant use within such Parking Zone. For the purposes of this provision, the term "restaurant use" shall mean premises used for the operation of a Restaurant, but shall specifically exclude (i) premises providing seating for less than twenty five (25) patrons, and (ii) premises having a Floor Area of less than two thousand three hundred (2,300) square feet; provided, however, if any single building within a Parking Zone has more than three (3) restaurant uses in such building with premises of less than two thousand three hundred (2,300) square feet, the Floor Area of all of such premises shall be aggregated and that portion of the Floor Area in excess of two thousand three hundred (2,300) square feet shall park at a ratio of ten (10) parking spaces for each one thousand (1,000) square feet of Floor Area.

In the event of a condemnation of part of a Tract or a sale or transfer in lieu thereof that reduces the number of usable parking spaces on such Tract below that which is required herein, the Party whose Tract is so affected shall use its commercially reasonable efforts (including using proceeds from the condemnation award or settlement) to restore and/or substitute ground-level parking spaces in order to comply with the parking requirements set forth in this OEA. If such compliance is not reasonably possible, such Party shall not be deemed in default hereunder, but such Party shall not be permitted to expand the amount of Floor Area located on its Tract. If such Floor Area is thereafter reduced other than by casualty, then the Floor Area on such Tract may not subsequently be increased unless the parking requirements set forth above are satisfied.

Temporary unavailability of parking spaces caused by uses or promotions permitted under this OEA shall not result in or be deemed a violation of this Section 3.2.5.

3.2.6   No Party shall make changes to the improved Common Area on its Tract, except that each Party hereby reserves the right, from time to time without obtaining the consent or approval of any other Party, to make at its own expense any insignificant change, modification or alteration in the portion of the Common Area on its Tract, including the installation of convenience facilities such as mailboxes, public telephones, kiosks, remote merchandising units

(provided, however, kiosks and remote merchandising units on the Developer Tract are limited to those areas identified as "Permitted Kiosk Areas" on the Site Plan, no more than ten (10) such kiosks or remote merchandising units shall be permitted in each Permitted Kiosk Area and no such kiosk or remote merchandising unit shall be of a size greater than one hundred (100) square feet, cart corrals, benches, bike racks, directional and/or parking information signs, provided that:

(A)     The accessibility of such Common Area for pedestrian and vehicular traffic (as it relates to the remainder of the Shopping Center) is not unreasonably restricted or hindered, and all parking stalls and rows and vehicular traffic lanes shall remain generally as shown on the Site Plan.

(B)     There shall be maintained at all times within such Common Area a sufficient number of vehicular parking spaces to meet the parking requirements set forth in Section 3.2.5; provided, however, that no more than two percent (2%) of the parking spaces depicted on the Site Plan for such Tract shall be eliminated.

(C)     No Governmental Requirements shall be violated as a result of such action; any and all Governmental Requirements applicable to such modifications shall be satisfied by the Party performing the same; and such action shall not result in any other Party being in violation of any Governmental Requirements.

(D)     No change shall be made in the access points between the Common Area and the adjacent public streets; provided, however, that additional access points may be created with the approval of the Approving Parties.

(E)     At least thirty (30) days prior to making any such change, modification or alteration, the Party desiring to do such work shall deliver to each Approving Party copies of the plans therefor, and provided further that such work shall not occur during the months of October, November, December or January.

The provisions of this Section 3.2.6 do not apply to any changes, modifications or alterations of Common Area located within Building Areas which result from or arise out of the construction, expansion or maintenance of Buildings or Outside Sales Areas.

3.3    Building Improvements

3.3.1    Building(s) shall only be located within the Building Areas designated on the Site Plan. While it is acknowledged and agreed that no Party shall have an obligation to commence construction of any Building on its Tract, each Party agrees that once it has commenced construction of a Building, such Building shall be completed within a reasonable time. If the number of "square feet" of building space within the Shopping Center is restricted by

20

Governmental Requirements, the Parties hereby allocate the permitted square footage as follows: (i) to the Target Tract, the number of square feet necessary to accommodate 178,000 square feet of Floor Area plus a 11,000 square foot Outdoor Sales Area; (ii) to the Developer Tract, the balance of such permitted square footage. The Parties understand that the calculation of Building sizes is based on the definition of "Floor Area" set forth in this OEA, and further that such term is unique to this OEA and is not intended to mirror the definition of "square feet" set forth in codes/regulations established by the local Governmental Authorities.

       3.3.2   The Approving Parties have agreed upon an architecturally compatible theme for the exterior of all Buildings to be constructed, placed or located within the Shopping Center, as represented by the Building elevations (the "Theme") attached hereto as Exhibit D. Each Party agrees that any Building located on its Tract (and the signage thereon) shall comply with such Theme, and shall comply with the other requirements of the OEA.  In order to insure compliance with such Theme, each Party shall, at least thirty (30) days prior to the commencement of any work on its Tract, submit to the Approving Parties for approval detailed plans ("Plans") as required by Exhibit E attached hereto covering the initial construction of each Building and any additions, remodeling, reconstruction or other alteration thereto which changes the exterior thereof; provided, however, the Approving Parties waive the requirement for the submission of Plans for the initial Buildings to be constructed on the Target Tract and on the Developer Tract (except for the freestanding pads on the Developer Tract) as the Approving Parties hereby acknowledge receipt and approval of the Plans for the initial Buildings to be developed on the Target Tract and the Developer Tract.  If an Approving Party should reject the Plans for not complying with the Theme, the submitting Party and the Approving Parties shall mutually consult to establish approved Plans for the proposed work.  The Approving Parties shall not withhold approval of, or recommend changes in the Plans if the plans conform to the Theme and other requirements of the OEA.  In no event shall an Approving Party require any other Party to utilize design standards superior to those utilized by the Approving Party in the construction of any Buildings on its Tract.  Approval of Plans by the Approving Parties shall not constitute assumption of responsibility for the accuracy, sufficiency or propriety thereof, nor shall such approval constitute a representation or warranty that the Plans comply with Governmental Requirements.  No material deviation shall be made from the approved Plans.  The failure by an Approving Party to approve or disapprove the plans within thirty (30) days after submission, which failure continues for ten (10) days after delivery of a second (2nd) notice, shall be deemed an approval by such Approving Party of the Plans.

       3.3.3   The Parties hereby specifically consent to the placement of Buildings along their respective common boundary lines, and each Party agrees to support any request by another Party for a side-yard or setback variance if the same is required in order to accommodate such construction.  The front wall of any Building to be constructed immediately adjacent to the Building on the Target Tract shall be set back at least two (2) feet from the front wall of the Building on the Target Tract.  The second Party to construct a Building along a common boundary line shall:

(A)    Cause such construction to be completed in such a manner that the improvements on the adjoining Tract are not damaged, and so that the wall, roof, foundation or other structure portion of one Building does not receive support from, nor apply pressure to the other Building.

(B)    Undertake and assume the obligation of completing and maintaining the nominal attachment (flashing and seal) of its Building to that of the existing Building on the adjoining Tract, it being the intent of the Parties to establish and maintain the appearance of one (1) continuous Building complex.

Along the common boundary line between the Developer Tract and the Target Tract, the separation of Building walls shall be no less than nine (9) inches. Target agrees to use reasonable efforts to locate its Building wall at least eight (8) inches from the common boundary line, but in no event more than nine (9) inches therefrom.   Developer agrees to use reasonable efforts to locate its Building wall at least one (1) inch from the common boundary line, but in no event more than two (2) inches therefrom.

3.3.4   The Parties acknowledge that Target initially proposes to construct on the Target Tract a Building which is classified as an "unlimited area building" under certain building codes; the term "unlimited area building", as used in this document, refers to a building that is allowed to exceed area limitations stipulated in the applicable building code, not by virtue of its construction type, but as a condition of its isolation on the property and by its inclusion of a sprinkler system. The Parties agree that all Buildings constructed within the Primary Building Area shall comply with the following requirements:

(A)    No Building shall be constructed within sixty (60) feet of the Building Area on an adjoining Tract unless such Building, hereinafter referred to as the "Adjacent Building," shall be located immediately adjacent to the common boundary line and is attached to the Building, if any, on the adjacent Tract in accordance with Section 3.3.3.

(B)    If an Adjacent Building exists, then no Building shall be located within sixty (60) feet of the Adjacent Building unless such Building is attached to the Adjacent Building in accordance with Section 3.3.3; the Adjacent Building and all other Buildings on the Tract that are attached to the Adjacent Building and to each other are hereinafter referred to as the "Building Group".

(C)    Any Building that is not part of the Building Group shall be located at least sixty (60) feet distant from the Building Group.

(D)     The Adjacent Building or the Building Group, as the case may be, shall comply with the building code requirements applicable to an "unlimited area building", including without limitation the installation of an approved sprinkler system for fire protection.

In addition to the requirements set forth above, the Parties agree that no Building shall initially be placed or constructed on their respective Tracts in a manner which will, based on then existing Governmental Requirements, either preclude the construction on the Primary Building Areas of an "unlimited area building", or cause an existing "unlimited area building" thereon to no longer be in conformance with applicable building code requirements, it being understood and agreed, however, that subsequent changes in Governmental Requirements shall not obligate a Party to modify or alter its existing Building.

If required by any Governmental Authorities, each Party agrees to join in a recordable declaration which confirms the existence of a sixty (60) foot clear area around the Primary Building Areas.

3.3.5    Except to the extent set forth otherwise on the Theme attached to this OEA as Exhibit D, no Building shall exceed one (1) story, nor the following height restrictions:

(A)     On the Target Tract          - 38 feet

(B)     On the Developer Tract      - 38 feet; provided, however, the thirty eight (38) foot height restriction for the Developer Tract shall be decreased to (i) twenty six (26) feet (exclusive of towers and other architectural treatments) and thirty (30) feet (inclusive of towers and other architectural features) for the freestanding pads, excluding the freestanding Pads identified on the Site Plan as "Pad A, Pad B, Pad C, Pad D, Pad E, Pad F" and the Buildings identified on the Site Plan as "Shops F" and "Shops G", and (ii) for the freestanding Pads identified on the Site Plan as "Pad A, Pad B, Pad C, Pad D, Pad E, Pad F" and the Buildings identified on the Site Plan as "Shops F" and "Shops G", twenty four (24) feet in height (exclusive of towers and other architectural treatments) and thirty (30) feet in height inclusive of towers and architectural treatments, which towers and architectural treatments shall not exceed thirty percent (30%) of the frontage of any Building.

The height restriction set forth in this Section 3.5 shall not be exceeded without the consent of the Approving Parties which consent each Approving Party may withhold in its sole discretion. The height of any Building shall be measured perpendicular from the finished floor elevation to the top of the roof structure, including any screening, parapet, penthouse, mechanical equipment or similar appurtenance located on the roof of such Building. Any Party shall have the right to install, maintain, repair, replace and remove Communications Equipment (defined

below) on the top of the Building on its Tract which may extend above the height limits established above; provided, however, such Communication Equipment shall be set back from the front of the Building to reduce visibility thereof by customers. As used herein, the phrase "Communications Equipment" means such things as satellite and microwave dishes, antennas and laser heads, together with associated equipment and cable.

        3.3.6   Each Party shall cause all refuse collection areas, outdoor storage areas and service areas to be screened in a neat and attractive manner as may comply with Governmental Requirements.

3.4   Liens

No party by whom or for whom any construction, installation, maintenance, repair or replacement work is performed or any materials, services or supplies are furnished shall permit any mechanics', materialmen's or professional service liens to be filed against another Party's Tract by reason thereof. In the event any mechanic's, materialmen's or professional service lien is recorded against the Tract of one Party as a result of work or services performed or materials furnished for the use of another Party, the Party permitting or causing such lien to be so recorded agrees to cause such lien to be discharged within fifteen (15) days after the entry of a final judgment (after all appeals) for the foreclosure of such lien. Notwithstanding the foregoing, upon request of the Party whose Tract is subject to such lien, the Party permitting or causing such lien to be recorded agrees to promptly cause such lien to be released and discharged of record, either by paying the indebtedness which gave rise to such lien or by posting bond or other security as shall be required by law to obtain such release and discharge. Nothing herein shall prevent the Party permitting or causing such lien to be recorded from contesting the validity thereof in any manner such Party chooses so long as such contest is pursued with reasonable diligence and so long as such contesting Party causes such lien to be released and discharged of record by posting a bond or other security. In the event such contest is determined adversely (allowing for appeal to the highest appellate court), such Party shall promptly pay in full the required amount, together with any interest, penalties, costs, or other charges necessary to release such lien of record. The Party permitting or causing such lien to be recorded agrees to defend, protect, indemnify and hold harmless the other Party and its Tract from and against all claims and demands, including any action or proceeding brought thereon, and all costs, losses, expenses and liabilities of any kind relating thereto, including reasonable attorneys' fees and cost of suit, arising out of or resulting from such lien.

ARTICLE IV - MAINTENANCE AND REPAIR

4.1   Utility Lines

Utility Lines shall be maintained as provided in Section 2.2.

4.2   Common Area

        4.2.1   Subject to the joint maintenance provision set forth in Section 4.2.2, each Party shall cause to be operated and maintained, including any replacement due to ordinary wear

24

and tear, at its sole cost and expense, the Common Area on its Tract in a sightly, safe condition and first class state of repair. The unimproved Common Area shall be mowed and kept litter-free. The minimum standard of maintenance for the improved Common Area shall be comparable to the standard of maintenance followed in other first class retail developments of comparable size in the Phoenix, Arizona metropolitan area; notwithstanding the foregoing, however, the Common Area shall be operated and maintained in compliance with all applicable Governmental Requirements and the provisions of this OEA. All Common Area improvements shall be repaired or replaced with materials at least equal to the quality of the materials being repaired or replaced so as to maintain the architectural and aesthetic harmony of the Shopping Center as a whole. Such operation, maintenance and repair obligation shall include but not be limited to the following:

(A)     Drive and Parking Areas. Maintaining all paved surfaces and curbs in a smooth and evenly covered condition, including, without limitation, replacement of base, skin patch, resurfacing and resealing. (For the purpose of this Section, an overlay of the drives and parking areas shall be considered a maintenance item.)

(B)     Debris and Refuse. Periodically removing papers, debris, filth, refuse, ice and snow (2" on surface), including vacuuming and broom-sweeping at least five (5) times per week, but in any event to the extent necessary to keep the Common Area in a first-class, clean and orderly condition; provided, however, that trash and/or garbage removal from a Party's Building shall not be considered a Common Area Maintenance Cost (defined below) since such removal obligation is covered by Section 4.3.1. All sweeping shall be at appropriate intervals during such times as shall not interfere with the conduct of business or use of the Common Area by Permittees.

(C)     Directional Signs and Markers. Maintaining, cleaning and replacing any appropriate directional, stop or handicapped parking signs or markers; restriping parking lots and drive lanes at least every twenty four (24) months, but in any event as necessary to maintain parking space designation and traffic direction; and keeping clearly marked fire lanes, loading zones, no parking areas and pedestrian cross-walks.

(D)     Lighting. Maintaining, cleaning and replacing Common Area lighting facilities, including light standards, wires, conduits, lamps, ballasts and lenses, time clocks and circuit breakers, illuminating the Common Area pursuant to Section 5.2.1; provided however, exterior Building lighting fixtures, including any lighting fixtures associated with a canopy or other architectural feature forming a part of such Building, shall be considered a part of such Building, and the maintenance and replacement of such

25

fixtures, and the cost of illumination, shall be the obligation of the Party upon whose Tract such fixtures are located.

(E)    <u>Landscaping</u>. Maintaining and replacing all landscape plantings, trees and shrubs in an attractive and thriving condition, trimmed and weed-free; maintaining and replacing landscape planters, including those adjacent to exterior walls of Buildings (but except for Shop Buildings F and G (identified on the Site Plan), not Buildings located on the freestanding pads); providing water for landscape irrigation through a properly maintained system, including performing any seasonal (start up and/or winterization) maintenance thereto, and any modifications to such system to satisfy governmental water allocation or emergency requirements. If any Party or Occupant requires "<u>special</u>" landscaping (i.e. flowers, shrubs, trees, etc.) beyond the standard landscaping requirements for the remainder of the Shopping Center, or if landscaping additions/modifications are required as a result of a Building addition, expansion or remodel, the cost of installation, replacement and maintenance of such special or required landscaping shall be borne solely by such Party or Occupant, as the case may be, and shall not be included in Common Area Maintenance Costs.

(F)    <u>Common Utility Lines</u>. Maintaining, cleaning, replacing and repairing any and all Common Utility Lines in accordance with the provisions of <u>Section 2.2</u>.

(G)    <u>Obstructions</u>. Keeping the Common Area free from any obstructions, including those caused by the sale or display of merchandise, unless such obstruction is permitted under the provisions of this OEA.

(H)    <u>Sidewalks</u>. Maintaining, cleaning and replacing sidewalks, including those adjacent and contiguous to Buildings. Sidewalks shall be steam-cleaned at least monthly and pressure washed periodically in the interim, shall be swept at appropriate intervals during such time as shall not interfere with the conduct of business or use of the Common Area, and shall be cleared of ice or snow (after each snow fall of 2" or more).

(I)    <u>Supervisory Personnel</u>. Providing of professional supervision or security personnel for the Common Area, if reasonably required.

(J)    <u>Traffic</u>. Supervising traffic at entrances and exits to the Shopping Center and within the Shopping Center as conditions reasonably require in order to maintain an orderly and proper traffic flow.

Notwithstanding anything contained herein to the contrary, each Party shall have the obligation to operate, maintain, and repair, at its sole cost and expense, in a clean, sightly and safe condition, the following items (if any) located on its Tract: any exterior shipping/receiving dock area; any truck ramp or truck parking area; any recycling center or similarly designated area for the collection of items intended for recycling; and any refuse, compactor or dumpster area.

    4.2.2   Prior to Operator commencing any operation and/or maintenance duties, Operator shall obtain, and thereafter maintain during the period of such operation and/or maintenance performance, the insurance required by <u>Section 5.4.4</u>. Commencing on the earlier of the date the Occupant of the Target Tract open for business with the general public, or the date upon which the Common Areas are substantially completed, Operator shall operate and maintain (or cause to be operated and maintained) the Common Area of the Shopping Center in accordance with the requirements of <u>Section 4.2.1</u>. If, however, substantial completion of the Common Areas does not occur on or before the date set for substantial completion of the Common Areas in accordance with the provisions of the Site Development Agreement between Developer and Target of even date herewith, then, in such event, maintenance of the Common Areas by Operator shall not commence until thirty (30) days prior to the date specified by the occupant of the Target Tract that it intends to open for business with the general public, unless the Approving Parties otherwise agree to a different date. At least thirty (30) days prior to any major work in the parking lots or drive areas, Operator shall advise the Approving Parties of the scope thereof, and the proposed commencement and completion dates; except in an emergency, such major work shall not be performed between October and the following January. Operator shall expend only such funds as are reasonably necessary for the operation and maintenance of the Common Area, including the performance of other obligations imposed on Operator pursuant to <u>Section 4.2.1</u> hereof, and shall promptly pay such costs ("<u>Common Area Maintenance Costs</u>") when incurred. Within thirty (30) days following the commencement of such maintenance and operation, Operator shall provide the Approving Parties an estimated budget for the balance of the current calendar year containing the information required by <u>Section 4.2.3</u>, and each Party agrees to pay its share of Common Area Maintenance Costs actually incurred during the balance of such year, plus the Administration Fee (defined below), in accordance with <u>Section 4.2.4</u>. Operator may hire companies affiliated with it to perform the maintenance and operation of the Common Area, but only if the rates charged by such affiliates are competitive with those of other companies furnishing similar services in the metropolitan area in which the Shopping Center is located, it being agreed that this provision shall be construed strictly against Operator. Each Party hereby grants to Operator, its agents, contractors and employees, a license to enter upon such Party's Tract to discharge Operator's duties to operate, maintain and repair the Common Area. For the purpose of this OEA, Common Area Maintenance Costs shall not include:

    (A)    Any late charges or fees or any cost, fee, fine, penalty or similar charge arising out of or resulting from any violation by Operator or anyone else relating to the Shopping Center; provided, however, any of the foregoing incurred as a result of a Party's delinquent payment of Common Area Maintenance Costs shall be paid solely by such Party.

(B)    Any charge for electricity for Building accent lighting or Building security lighting. Also, any charge for electricity to a Party that separately pays the cost of power to illuminate the Common Area on its Tract.

(C)    Any charge for water to a Party that separately pays the cost of water for irrigating the landscaping upon its Tract.

(D)    Any costs for promotional, marketing, seasonal or holiday events of any type (including, without limitation, costs of promotional equipment, banners, decorations and/or lighting, or the cost of set up, take down or storing any of the foregoing).

(E)    Any costs to clean up or repair the Common Area resulting from any promotional, marketing, seasonal or holiday activities, or from construction, maintenance or replacement of a Party's Buildings; any cost to remove trash and/or garbage from a Building, such removal obligation being the responsibility of the Party owning the Building.

(F)    Any costs resulting from or arising out of the repair or replacement of items to the extent covered by warranties or guaranties including, but not limited to, such as site improvements, signs, trees, plants or other landscaping.

(G)    Real property taxes and assessments on the Common Area.

(H)    Operator's profit, administrative and overhead costs including, but not limited to: office space, equipment and utilities; legal, insurance, accounting and administrative service; Operator's personnel who are not permanently located at the Shopping Center; premiums relating to bonding over mechanic's liens; and costs relating to hiring, training, screening, drug testing and/or background checks of personnel.

(I)    Any fee or charge relating to the management and/or supervision of the operation of the Common Area, or any part thereof, paid to a third party, commercial management company or similar provider.

(J)    Entertainment, transportation, meals and lodging of anyone.

(K)    Any fee, assessment or charge to a Party that separately pays such kind of imposition for fire hydrants located on its Tract.

In lieu of Operator's profit, administrative, indirect and overhead costs, Operator shall be permitted to charge an amount ("Administration Fee") computed by multiplying the Common

Area Maintenance Costs (exclusive of utility charges, and the portion of single purpose expenditures that exceed Twenty Five Thousand Dollars ($25,000.00)) by ten percent (10%). Operator may charge a greater amount (e.g., fifteen percent (15%) of all Common Area Maintenance Costs) to Occupants of the Developer Tract. If any of Operator's personnel at the Shopping Center perform services, functions or tasks in addition to Common Area duties, then the cost of such personnel shall be equitably allocated according to time spent performing such duties.

4.2.3   Operator shall, at least ninety (90) days prior to the beginning of each calendar year during the term of this OEA, submit to the Approving Parties an estimated budget ("Budget") for the Common Area Maintenance Costs and the Administration Fee for operating and maintaining the Common Area for the ensuing calendar year. An Approving Party shall approve or disapprove the Proposed Budget within thirty (30) days after receipt. In the event an Approving Party believes a charge for a particular component of Common Area Maintenance Costs is excessive, such approving Party shall notify Operator of such belief within such thirty (30) day period and thereupon Operator shall obtain no fewer than two (2) competitive bids for such component of Common Area Maintenance Costs. Unless the existing provider's cost is lower, the lowest acceptable bidder shall be utilized as soon as the contract with the existing provider can be terminated without penalty.   The Budget shall be in a form and content reasonably acceptable to the Approving Parties and shall identify separate cost estimates for at least the categories specified under Section 4.2.1, plus:

      (A)    The Administration Fee.

      (B)    Rental or purchase of equipment and supplies used in maintaining or repairing the Common Area.

      (C)    Depreciation or trade-in allowance applicable to items purchased for Common Area purposes.

      (D)    Maintenance of sign structure(s) pursuant to Section 5.3.1.

      (E)    Maintenance of Common Utility Line(s) pursuant to Section 2.2.3.

      (F)    Capital improvements to the Common Area.

If an item of maintenance or replacement is to be accomplished in phases over a period of calendar years during the term of this OEA, such as resurfacing of the drive and/or parking areas, then the Budget shall separately identify the cost attributable to the applicable calendar year (including the portion of the Common Area affected) and shall note the anticipated cost and timing (indicating the portion of the Common Area affected) of such phased work during succeeding calendar years. The cost of approved "phased" work shall be paid by the Parties approving the same, or their successors or assigns, as the case may be, notwithstanding that when

such work is performed a Party may not then be participating in the joint maintenance of the Common Area.

If an Approving Party disapproves the proposed Budget or fails to approve a proposed Budget within thirty (30) days after receipt, it shall consult with the other Approving Party and Operator to establish a final approved Budget. If disapproval involves the estimate of cost for any category of expense and an Approving Party obtains a bid from a reasonably competent and experienced Person that is at least ten percent (10%) less than the budgeted amount, then Operator shall accept the bid obtained by such Approving Party and award the work or service covered thereby to such bidder, or in calculating such Approving Party's share of Common Area Maintenance Costs, only the amounts set forth in the bid for the work or service covered thereby shall be included. In addition, if a Budget is not approved by December 1st of any calendar year, Operator shall have the right to terminate its maintenance obligation with respect to the Common Area located on the Tract of the disapproving Approving Party by written notice given prior to December 10th of such calendar year.  If such notice is given, commencing on the following January 1st, such Approving Party shall (i) maintain and operate the Common Area on its Tract at its expense; and (ii) contribute towards the costs of the specified maintenance and operation functions performed by Operator set forth in <u>Section 4.2.7</u> as though it was a withdrawing Party. If such notice is not given, then Operator shall continue to maintain and operate all of the Common Area for the next calendar year.  Approval of the Budget, or any of the line items comprising a part thereof, shall not be considered a waiver of a Party's right to audit and/or contest, challenge or dispute the Reconciliation (defined in <u>Section 4.2.4</u>).

Operator shall use its diligent, good faith efforts to operate and maintain the Common Area in accordance with the Budget. Notwithstanding the foregoing, Operator shall have the right to make emergency repairs to the Common Area to prevent injury or damage to Persons or property, it being understood that Operator shall nevertheless advise each Party of such emergency condition as soon as reasonably possible, including the corrective measures taken and the cost thereof.  If the cost of the emergency action exceeds Ten Thousand Dollars ($10,000.00) in Constant Dollars, then Operator shall submit a supplemental billing to each Party, together with evidence supporting such cost, and each Party shall pay its share thereof within thirty (30) days after receipt of such billing.  If the cost limitation set forth above is not exceeded then such costs shall be included as part of the Common Area Maintenance Costs for that year.

4.2.4   Common Area Maintenance Costs and the Administration Fee shall be allocated based on as follows:

| | | |
|---|---|---|
| (A) | To the Developer Tract | 83.37% (75.18 acres) |
| (B) | To the Target Tract | 16.63% (15.00 acres); |

provided, however, Developer's share of Common Area Maintenance Costs may be allocated by Developer amongst the Tracts comprising the Developer Tract based upon the relative Floor Area of the Buildings developed or to be developed on such Tracts.

U:\ATTORNEYS\DLL#2\VESTAR\Queen Creek Towne Center\Target\OEA V8 (1-24-07).doc

In the event an existing Tract is divided (excluding, however, the subdivision of the Developer Tract described above), the Party causing such division shall, at its expense, prorate the allocation of Common Area Maintenance Costs and the Administration Fee attributable to the original Tract between the newly created Tracts, file a recorded declaration confirming such allocation and deliver a copy of such declaration to Operator and each other Party. Each Party shall pay to the Operator in equal monthly payments, in advance, the share of the Common Area Maintenance Costs and the Administration Fee attributable to such Party's Tract based either upon the amount set forth in the approved Budget or, if a Budget is not approved, then the lesser of the amount set forth in the unapproved Budget or the monthly payment established for such Party for the prior year. Notwithstanding the provision for determining the amount of payment set forth in the immediately preceding sentence, in the event a Budget is not approved because Operator elected not to submit a Budget for consideration, and such election continues so that no Budget is submitted at least sixty (60) days prior to the beginning of the calendar year, then each Approving Party not receiving a Budget shall have the right to use its reasonable judgment to determine the amount of the Budget for the next calendar year, and each Party represented by such Approving Party shall pay to Operator monthly payments attributable to such Party's Tract, based on the amount of the Budget established by that Approving Party.

Within sixty (60) days after the end of each calendar year, Operator shall provide each Party with a statement certified by an authorized Person, together with supporting invoices and other materials setting forth the actual Common Area Maintenance Costs paid by Operator for the operation and maintenance of the Common Area (such statement and supporting data are collectively called the "Reconciliation"), the Administration Fee, and the share of the aggregate thereof that is attributable to each Party's Tract. The Reconciliation shall separately identify cost categories specified in Sections 4.2.1 and 4.2.3, and shall be in a form reasonably acceptable to the Approving Parties. If the amount paid with respect to a Tract for such calendar year shall have exceeded the share allocable to such Tract, Operator shall refund by check the excess to the Party owning such Tract at the time the Reconciliation is delivered, or if the amount paid with respect to a Tract for such calendar year shall be less than the share allocable to such Tract, the Party owning such Tract at the time such Reconciliation is delivered shall pay the balance of such Party's share to Operator within thirty (30) days after receipt of such Reconciliation, less any amounts disputed in writing, it being understood and agreed that the thirty (30)-day period only establishes the period for payment, and is not to be construed as an acceptance of the Reconciliation. If Operator does not timely submit the Reconciliation, then such Party's payment period shall be extended to sixty (60) days after delivery of the Reconciliation. If Operator does not refund amounts shown by the Reconciliation to be owed a Party, then such Party may offset the refund owed, plus Interest, against payments for Common Area Maintenance Costs and Administration Fee due for any future period. Notwithstanding anything contained herein to the contrary, if during a calendar year the Operator resigns or is replaced, the replacement Operator shall be responsible for the Reconciliation adjustments, including any reimbursement due to a Party for such calendar year; in addition, for a period of thirty (30) days after a substitution of Operator is made, any payment made by a Party to the prior Operator shall be deemed properly paid, and the old and new Operators shall resolve any necessary adjustments and/or prorations regarding such payments between themselves.

Within two (2) years after the date of receipt of a Reconciliation, each Approving Party shall have the right to audit Operator's books and records pertaining to the operation and maintenance of the Common Area for the calendar year covered by such Reconciliation. A Party shall notify Operator of such Party's intent to audit at least fifteen (15) days prior to the designated audit date. If such audit shall disclose any error in the determination of the Common Area Maintenance Costs, the Administration Fee or any allocation thereof to a particular Tract, the auditing Party shall provide Operator with a copy of the audit, and an appropriate adjustment shall be made forthwith. Notwithstanding anything to the contrary, the approval of a prior Reconciliation, or any line item comprising a part thereof, shall not be a waiver of a Party's right to challenge subsequent Reconciliations regarding such line item. The cost of any audit shall be assumed by the auditing Party unless such Party shall be entitled to a refund in excess of three percent (3%) of the amount calculated by Operator as such Party's share for the applicable calendar year, in which case Operator shall pay the cost of such audit. If Operator does not respond to the results of such audit within ninety (90) days after receipt of the audit, then the auditing Party shall have the right to offset the refund claimed, plus Interest, from the date Operator receives the audit, plus costs of the audit if appropriate, against subsequent payments due Operator; provided, however, Operator shall retain the right to dispute the results of such audit for a period of six (6) months following receipt of such audit, and Operator's election not to contest the results of such audit during the 6-month period shall be deemed acceptance of such audit. After the expiration of a two (2) year period following the delivery of a Reconciliation, during which two (2) year period no audit is made by an Approving Party, such Reconciliation shall constitute an account stated as to Common Area Maintenance Costs for the period covered by such Reconciliation.

4.2.5    Operator agrees to defend, indemnify and hold each Party harmless from and against any mechanic's, materialmen's and/or laborer's liens, and all costs, expenses and liabilities in connection therewith, including reasonable attorney's fees and court costs, arising out of the maintenance and operation by Operator of the Common Area, and if any Tract shall become subject to any such lien, Operator shall promptly cause such lien to be released and discharged of record, either by paying the indebtedness which gave rise to such lien or by posting such bond or other security as shall be required by law to obtain such release and discharge. If a Party (as opposed to Operator) is maintaining any portion of the Common Area, it shall undertake the indemnity obligations expressed above with respect to the portion of the Common Area it is maintaining.

4.2.6    Subject to the provisions of Section 2.2.3 regarding Common Utility Lines and Section 2.4 regarding sign structures, if any portion of the Common Area is damaged or destroyed by any cause whatsoever, whether insured or uninsured, during the term of this OEA, other than damage caused by ordinary use or wear and tear, the Party upon whose Tract such Common Area is located shall repair or restore such Common Area at its sole cost and expense with all due diligence; provided, however, that no Party shall be required to expend more than Two Hundred Fifty Thousand Dollars ($250,000.00) in Constant Dollars in excess of insurance proceeds which may be available (or which would have been available except for such Party's election of deductibles or self-insurance, which amount such Party shall be responsible to contribute) for such repair or restoration. Notwithstanding the limitation set forth in the

preceding sentence, a Party may require the Party upon whose Tract such Common Area is located to do such restoration work if the requiring Party has agreed in writing to pay the costs in excess of Two Hundred Fifty Thousand Dollars ($250,000.00). Except to the extent limited by Section 5.4.3, if such damage or destruction of Common Area on a Tract is caused in whole or in part by another Party or a third Person, the Party obligated to make such repair or restoration reserves and retains the right to proceed against such other Party or third Person for indemnity, contribution and/or damages.

        4.2.7  As a right personal to Target or any affiliates of Target, and notwithstanding the provisions of Section 4.2.8 below, in the event that in Target's reasonable business judgment, Operator has failed to operate and maintain the Common Area of the Shopping Center, or any portion thereof as required by this OEA, then Target shall have the right to notify Operator of such fact. If Operator shall not have rectified such situation within fifteen (15) days from receipt of Target's notice, then Target shall have the right to issue a second notice regarding such failure. If Operator shall not have rectified such situation within fifteen (15) days from receipt of Target's second notice, then Target shall have the right to cure such failure and deduct the costs of such action from its share of the Common Area Maintenance Costs, including a corresponding reduction in the Administration Fee. In the event Target shall have issued three (3) separate second notices to Operator during any twelve (12) month period, then Target shall have the right, upon not less than sixty (60) days written notice given to Operator, to take over and assume the maintenance of the Target Tract, provided that such notice shall be effective only as of the last day of a calendar quarter. Following the effective date of such assumption, Target shall maintain the Common Area on the Target Tract, and shall pay all costs and expenses incurred in connection therewith; provided, however, Operator shall continue to maintain the Common Utility Lines of the Shopping Center, the Developer Directory Signs, the Target Rittenhouse Monument Sign and the Target Ellsworth Road Monument Sign regardless of location, but shall no longer be obligated to continue to insure the Common Area on or provide security service for the Target Tract (unless Target so requests in writing). Upon such assumption Target shall be released from the obligation to contribute towards Operator's maintenance and operation of the balance of the Common Area, except with respect to those functions identified above for which continued participation is mandatory; Target's share of such costs shall be paid in accordance with the allocation set forth in Section 4.2.4 above. Operator shall continue to maintain the balance of the Common Area in accordance with the standards set forth herein. Target shall have the right to cause the Operator to resume the operation and maintenance of the Common Area on the Target Tract upon the satisfaction of the following condition: Target shall give the Operator at least sixty (60) days prior notice of its intention to have the Operator reassume the operation and maintenance of the Common Area on the Target Tract; provided however, such date for re-assumption shall always be the first day of a calendar quarter. Provided the above condition is satisfied, concurrently with the designated date, Operator shall resume full operation and maintenance of the Common Area on the Target Tract and Target shall be responsible for its share of the costs and expenses of Operator's performance as set forth in Section 4.2.4 above.

        4.2.8  In addition to the rights set forth in Section 4.2.7 above, in the event Target believes, in its reasonable judgment, that Operator is not operating and maintaining the

33

Common Area within the Shopping Center in the manner designated by this OEA and provided that Target shall have delivered three (3) or more second notices as described in Section 4.2.7, then Target shall have the right, upon giving not less than sixty (60) days written notice to Operator, to take over and assume the maintenance of the Common Area within the Shopping Center. Following the effective date of such assumption, Target shall perform all of the obligations of Operator hereunder and maintain the Common Area in the Shopping Center, and shall pay all costs and expenses incurred in connection therewith and shall have the rights of Operator set forth in this Section 4.2. In the event Target takes over performance of the obligations of Operator, thereafter Target shall have the right to cause Operator to resume the operation and maintenance of the Common Area within the Shopping Center upon the satisfaction of the following condition: Target shall give the Operator at least sixty (60) days prior notice of its intention to have the Operator reassume the operation and maintenance of the Common Area of the Shopping Center; provided however, such date for re-assumption shall always be the first day of a calendar quarter. Provided the above condition is satisfied, concurrently with the designated date, Operator shall resume full operation and maintenance of the Common Area of the Shopping Center and Target shall be responsible for its share of the costs and expenses of Operator's performance as set forth in Section 4.2.4 above.

### 4.3    Building and Outside Sales Area

4.3.1    After completion of construction, each Party covenants and agrees to maintain and keep the exterior portion of the Buildings and Outside Sales Area, if any, located on its Tract in first-class condition and state of repair, in compliance with all Governmental Requirements, and in compliance with the provisions of this OEA, including either the Theme or the exterior architectural concept approved for such Building by the Approving Parties. Each Party further agrees to store all trash and garbage on its Tract in adequate containers, to locate such containers so that they are not readily visible from the parking area, and to arrange for regular removal of such trash or garbage.

4.3.2    In the event any of the Buildings in the Shopping Center are damaged by fire or other casualty (whether insured or not), the Party upon whose Tract such Building is located shall, subject to Governmental Requirements and/or insurance adjustment delays, immediately remove the debris resulting from such casualty and provide a sightly barrier, and within a reasonable time thereafter shall either (i) repair or restore the Building so damaged to a complete unit, such repair or restoration to be performed in accordance with all provisions of this OEA, or (ii) erect another Building in such location, such construction to be performed in accordance with all provisions of this OEA, or (iii) demolish the damaged portion and/or the balance of such Building and restore the cleared area to either a hard surface condition or a landscaped condition in which event the area shall be Common Area until a replacement Building is erected.   Such Party shall have the option to choose which of the foregoing alternatives to perform, but such Party shall be obligated to perform one (1) of such alternatives. Such Party shall give notice to each other Party within one hundred eighty (180) days from the date of such casualty of which alternative such Party elects.

ARTICLE V - OPERATION OF THE SHOPPING CENTER

5.1    Uses

5.1.1    The Shopping Center shall be used only for entertainment businesses, retail sales, offices, Restaurants or other permitted commercial purposes. "Business Office" shall mean an office which does not provide services directly to consumers; "Retail Office" shall mean an office which provides services directly to consumers, including but not limited to financial institutions, real estate, stock brokerage and title companies, travel and insurance agencies, and medical, dental and legal clinics. No more than ten percent (10%) of the total Floor Area on the Developer Tract may be used for Retail Office and/or Business Office purposes and no more than ten percent (10%) of the total Floor Area on the Target Tract may be used for a retail office and/or business office purposes; provided, however, that office space used by an Occupant for administrative purposes, and which is not open to the general public, shall not be considered Retail Office or Business Office for the purpose of this limitation.

5.1.2    No use shall be permitted in the Shopping Center which is inconsistent with the operation of a first-class retail shopping center or which violates Governmental Requirements. Without limiting the generality of the foregoing, without the prior written consent of the Approving Parties, which consent each Approving Party may withhold in its sole and absolute discretion, the following uses shall not be permitted:

(A)    Any use which emits an obnoxious odor, noise or sound which can be heard or smelled outside of any Building in the Shopping Center or any other activity which may constitute a public or private nuisance.

(B)    An operation primarily used as a storage warehouse operation (but this prohibition shall not be applicable to the following wholesale or rackstyle retailers: Home Depot USA, Inc., Lowe's HIW, Inc., Sam's Club (but only if located more than five hundred (500) feet from the Target Building), Costco, BJ's or any successor to the foregoing by merger, consolidation or acquisition of all or substantially all assets) and any assembling, manufacturing, distilling, refining, smelting, agricultural or mining operation (but this prohibition shall not prohibit assembly or manufacture of products incidental to the retail sale thereof, nor shall this prohibit the operation of a so-called "brew pub" provided that any such "brew pub" (i) constitutes a Restaurant, and (ii) does not derive more than forty five percent (45%) of its Gross Sales from the sale of alcoholic beverages) and is located more than five hundred (500) from the Building on the Target Tract.

(C)    Any "second hand" store, "surplus" store, or pawn shop; provided, however, this prohibition shall not be applicable to the following retail facilities as may be found in a reasonable number of good quality shopping centers in the Phoenix, Arizona metropolitan area which sell used

35

equipment or goods: "<u>Game Stop</u>," "<u>Play It Again Sports</u>", "<u>EB Games</u>," "<u>Blockbuster</u>," "<u>Hollywood Video</u>," "<u>Game Crazy</u>," "<u>Computer Renaissance</u>," "<u>My Sister's Attic</u>", "<u>Funco Land</u>", "<u>FYE For Your Entertainment</u>" or a successor to any of the foregoing by merger, consolidation or acquisition of all or substantially all assets.

(D)     Any mobile home park, trailer court, labor camp, junkyard, or stockyard; provided, however, this prohibition shall not be applicable to the temporary use of construction trailers during periods of construction, reconstruction or maintenance.

(E)     Any dumping, disposing, incineration or reduction of garbage; provided, however, this prohibition shall not be applicable to garbage compactors located near the rear of any Building and provided further this restriction shall not be applicable to governmentally required or encouraged recycling centers in locations identified on the Site Plan or otherwise approved by the Approving Parties.

(F)     Any fire sale, bankruptcy sale (unless pursuant to a court order) or auction house operation.

(G)     Any central laundry, dry cleaning plant or laundromat; provided, however, this prohibition shall not be applicable to nominal supportive facilities for on-site service oriented to pickup and delivery by the ultimate consumer as the same may be found in retail shopping centers in the metropolitan area where the Shopping Center is located such as, by way of example only, pressing, alterations, shoe shine and shoe repair.

(H)     Any automobile, truck, trailer or recreational vehicle sales, leasing, display or body shop repair operation, but this shall not prohibit, on not more than three (3) occasions during each calendar year (each of which shall not exceed seven (7) days) the promotional display of automobiles or light trucks in the portion of the Common Areas of the Shopping Center not located on the Target Tract and identified on the Site Plan as the "<u>Permitted Promotion Area</u>".

(I)     Any bowling alley or skating rink; provided, however, this prohibition shall not be applicable to one (1) bowling alley having a Floor Area of forty thousand (40,000) square feet or less located north of the "<u>Bowling Alley Line</u>" set forth on the Site Plan.

(J)     Any movie theater or live performance theater.

36

(K)     Any residential use, including but not limited to: single family dwellings, townhouses, condominiums, other multi-family units, and other forms of living quarters, sleeping apartments or lodging rooms, but this shall not be applicable to a hotel or motel located on a freestanding pad and located within three hundred (300) feet of the south right of way line for Rittenhouse Road.

(L)     Any veterinary hospital or animal raising or boarding facility; provided, however, this prohibition shall not be applicable to pet shops or pet supply stores. Notwithstanding the forgoing exception, except in connection with a national pet supply store such as PetsMart, (i) any veterinary or boarding services provided in connection with the operation of a pet shop shall only be incidental to such operation; (ii) the boarding of pets as a separate customer service shall be prohibited; (iii) all kennels, runs and pens shall be located inside the Building; and (iv) the combined incidental veterinary and boarding facilities shall occupy no more than fifteen percent (15%) of the Floor Area of the pet shop.

(M)     Any mortuary or funeral home.

(N)     Any establishment selling or exhibiting "obscene" material, but this shall not be construed as prohibiting the sale of normally stocked merchandise in a full line bookstore having at least fifty (50) locations such as Border's or Barnes & Noble, a full line video store having at least fifty (50) locations such as Hollywood Entertainment or Blockbuster Video, a full line consumer electronics store having at least fifty (50) locations such as Best Buy, Circuit City or Fry's Electronics or to the sale of adult magazines by a convenience store having at least fifty (50) locations such as Circle K or 7 Eleven.

(O)     Any establishment selling or exhibiting drug-related paraphernalia or which exhibits either live or by other means to any degree, nude or partially clothed dancers or wait staff, provided, however, this prohibition shall not be applicable to national restaurant operations as may be found in a number of reasonable good quality shopping centers in the Phoenix, Arizona metropolitan area whose wait staff are attired similar to the current attire of wait staff such as TGI Fridays, Hard Rock Café, Kona Grill, Yardhouse or Chili's.

(P)     Any bar or tavern, except a bar or tavern shall be permitted as a component of a Restaurant so long as the following two (2) conditions are satisfied: (i) such Restaurant's reasonably projected annual gross revenues from the sale of alcoholic beverages for on-premises consumption does not exceed forty five percent (45%) of the gross revenues of such business,

and (ii) such Restaurant is located more than five hundred (500) feet from the Building on the Target Tract. In addition, the prohibition set forth in this paragraph shall not be applicable to a wine store or liquor store located north of the "Bowling Alley Line" as set forth on the Site Plan that may offer on-premises sampling of products so long as such sampling complies with the codes and ordinances of Governmental Authorities.

(Q)     Any health spa, fitness center or workout facility having a Floor Area in excess of four thousand (4,000) square feet and located within five hundred (500) feet of the Building on the Target Tract; any massage parlors or similar establishments, but this shall not prohibit massage services offered by a permitted health club, a permitted fitness center, a day spa (but not more than two (2) day spas shall be permitted, a beauty salon, a barber shop, a doctor, a nurse, a chiropractor, a physical therapist or by licensed massage therapists from reputable businesses such as, by way of example, Massage Envy, provided that all such massage services are rendered within premises located within at least five hundred (500) feet from the Building on the Target Tract.

(R)     Any flea market, amusement or video arcade (but this shall not be applicable to pinball, electronic or other game machines incidental to a Restaurant located on a freestanding pad and provided such arcade amusement or video arcade encompasses not more than five percent (5%) of the Floor Area of such Restaurant or two hundred (200) square feet, whichever is less, provided, however, this prohibition shall not be applicable to the portions of the Shopping Center located more than five hundred (500) feet from the Building on the Target Tract), pool or billiard hall (but this shall not prohibit a Restaurant having a Floor Area of at least four thousand (4,000) square feet on a freestanding pad from having three (3) or fewer pool tables; car wash (but this prohibition shall not be applicable to not more than one (1) fully automatic so-called "tube" or "tunnel" car wash operated in connection with a gas station or a mini mart, but only if located on one of "Pads G, H, I, J, K, L or M") or dance hall (but this shall not prohibit a Restaurant on a freestanding pad from permitting incidental patron dancing, provided that (a) such Restaurant does not derive more than forty five (45%) of its gross revenues from the sale of alcoholic beverages, and (ii) such Restaurant is located at least five hundred (500) feet from the Building on the Target Tract).

(S)     Any training or educational facility, including but not limited to: beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers; provided, however, this prohibition shall not be applicable to

on-site employee training by an Occupant incidental to the conduct of its business at the Shopping Center.

(T)    Any gambling facility or operation, including but not limited to:  off-track or sports betting parlor;  table games such as blackjack or poker; slot machines, video poker/blackjack/keno machines or similar devices; or bingo hall.  Notwithstanding the foregoing, this prohibition shall not be applicable to government sponsored gambling activities or charitable gambling activities, so long as such activities are incidental to the business operation being conducted by the Occupant. In addition, this prohibition shall not be applicable to the operation of arcade games, video games, pinball games or games of amusement by the Occupant of Premises located more than five hundred (500) feet from the Building on the Target Tract as long as in no event shall there be conducted, operated or permitted to be conducted or operated a bingo hall or similar bingo operation from or within such Premises.

(U)    Any church, temple or other house of religious worship.

(V)    Any check cashing services (unless operated by a bank or other financial institution or if ancillary to an otherwise permitted use).

(W)    The storage, display or sale of explosives or fireworks.

(X)    Any trailer court or mobile home park.

(Y)    The operation on the Developer Parcel of (a) a general merchandise discount retail store containing Floor Area in excess of ninety thousand (90,000) square feet of Floor Area, (b) a supermarket, grocery store or other store primarily selling fresh produce, fresh meats, groceries, fresh fruit, dairy products, fresh vegetables, bakery products or delicatessen products for off premises consumption, and (c) the operation of (i) a store in excess of ten thousand (10,000) square feet of Floor Area or (ii) a store on a free standing pad having one or more drive thru lanes, in either case selling prescription pharmacy merchandise (i.e. any product which, by law, may be dispensed only by or under the supervision of a qualified pharmacist or a person licensed to dispense medicinal drugs); PROVIDED, HOWEVER, (x) the prohibition in clause (a) shall not apply (i) subject to Exempted Closures (as defined below), at any time that Target is not operating in at least ninety thousand (90,000) square feet of Floor Area within the Building on the Target Parcel a general merchandise discount retail store and has not been doing so for eighteen (18) months, and (ii) to the following retailers: Lowe's HIW, Inc., Home Depot USA, Inc., Sam's Club (but only if located more than five hundred (500) feet

39

from the Target Building), Costco, BJ's or any successor to the foregoing by merger, consolidation or acquisition of all or substantially all assets; (y) the prohibition in clause (b) shall not apply (i) subject to Exempted Closures, at any time that Target is not utilizing a portion of the Building on the Target Parcel for the operation of a full service supermarket or full service grocery store and has not been doing so for eighteen (18) months, (ii) individual stores in separately demised spaces on the Developer Parcel may use up to ten percent (10%) of the total Floor Area of such space for the sale of food for off premises consumption, (iii) Restaurants may sell food prepared on premises for off premises consumption, subject to the locational restrictions set forth in Section 5.1.4, (iv) to the following retailers: Sam's Club (but only if located more than five hundred (500) feet from the Target Building), Costco, BJ's or any successor to the foregoing by merger, consolidation or acquisition of all or substantially all assets, and (v) to the following specialty retailers: Cost Plus, Trader Joes, Dean & Deluca or any successor by merger, consolidation or acquisition of all or substantially all assets; and (z) the prohibition in clause (c) shall not apply (i) subject to Exempted Closures, at any time that Target is not utilizing a portion of the Building on the Target Parcel for the sale of prescription pharmacy merchandise and has not been doing so for eighteen (18) months, and (ii) doctors, dentists, chiropractors, osteopaths, naturopaths, veterinarians and other licensed health care providers (other than pharmacists) who may dispense prescription drugs to their patients during office visits on a non retail basis. For the purposes of this Section 5.1.2(Z), an "Exempted Closure" shall mean any period of time that the Building on the Target Parcel is closed due to (i) casualty, repair, reconstruction, remodeling or refixturing if the Occupant is proceeding with reasonable diligence to complete the work and reopen for business, not to exceed, however, seven hundred thirty (730) days; or (ii) unavoidable events outside the reasonable control of the Occupant of the Building on the Target Parcel including, but not limited to, acts of God, condemnation, other governmental rules, orders, acts or requirements, insurrection, riot and labor disputes (but excluding financial inability or economic conditions); or (iii) substitution of a new Occupant resulting from the sale, assignment or sublease of any portion of the Target Parcel.

(Z)     No Restaurant shall be located within three hundred (300) feet of the Building on the Target Tract, but this shall not prohibit a tenant such as Barnes & Noble, Borders, Bed Bath & Beyond, Cost Plus or Kohl's from having incidental food service within its premises.

(AA)    Any gas station, except if located on one of "Pads G, H, I, J, K, L or M."

(BB)   No pet shops or pet supplies store shall be located within three hundred (300) feet of the Building on the Target Tract.

5.1.3   No Party shall use, or permit the use of, Hazardous Materials on, about, under or in its Tract, or the balance of the Shopping Center, except in the ordinary course of its usual business operations conducted thereon, and any such use shall at all times be in compliance with all Environmental Laws. Each Party agrees to defend, protect, indemnify and hold harmless each other Party for, from and against all claims or demands, including any action or proceeding brought thereon, and all costs, liens, losses, expenses and liabilities of any kind relating thereto, including but not limited to costs of investigation, remedial or removal response, and reasonable attorneys' fees and cost of suit, arising out of or resulting from any Hazardous Material used or permitted to be used by such Party, whether or not in the ordinary course of business.

For the purpose of this Section 5.1.3, the term (i) "Hazardous Materials" shall mean and refer to the following:  petroleum products and fractions thereof, asbestos, asbestos containing materials, urea formaldehyde, polychlorinated biphenyls, radioactive materials and all other dangerous, toxic or hazardous pollutants, contaminants, chemicals, materials, substances and wastes listed or identified in, or regulated by, any Environmental Law, and (ii) "Environmental Laws" shall mean and refer to the following:  all federal, state, county, municipal, local and other statutes, laws, ordinances and regulations which relate to or deal with human health or the environment, all as may be amended from time to time.

5.1.4   No merchandise, equipment or services, including but not limited to vending machines, promotional devices and similar items, shall be displayed, offered for sale or lease, or stored within the Common Area; provided, however, the foregoing prohibition shall not be applicable to:

(A)   Temporary collection and the storage of shopping carts in cart corrals located in the parking areas of the Shopping Center, including the storage of shopping carts on the Target Tract and the Developer Tract, as long as such shopping carts are stored within a building or behind a screen wall or landscaping specifically designed to screen such shopping carts from view;

(B)   the installation of an "ATM" banking facility within an exterior wall of any Building or within a kiosk;

(C)   the seasonal display and sale of bedding plants on the sidewalk in front of any Building located on the Target Tract on the Developer Tract;

(D)   the placement of bicycle racks and landscaping planters on the sidewalk in front of any Building;

41

(E)     the placement of spherical bollards (Target's brand) on the sidewalk in front of any Building on the Target Tract or the placement of other types of bollards on the Developer Tract, provided that bollards on the Developer Tract are approved in connection with the approval of the Plans by the Approving Parties;

(F)     temporary Shopping Center promotions, except that no promotional activities will be allowed in the Common Area without the prior written approval of the Approving Parties unless such promotional activities are located within the parking areas of the Shopping Center identified as the "Permitted Promotion Area" on the Site Plan;

(G)     any recycling center required or encouraged by law, the location of which (if not shown on the Site Plan) shall be subject to the approval of the Approving Parties;

(H)     Outside Dining Areas adjacent to a Building, except that Outside Dining Areas will only be allowed in the portions of the Common Areas identified on the Site Plan as "Permitted Outside Dining" without the prior written approval of the Approving Parties (but the location of the Outside Dining Areas on the freestanding pads shall not be restricted); provided, however, (i) any Outside Dining Area shall be considered a portion of the Building Area for the purposes of determining compliance with the parking ratio requirements set forth in this OEA, (ii) any Outside Dining Area shall be fenced in or otherwise enclosed, and (iii) to the extent an Outside Dining Area is exclusively available to any Occupant or group of Occupants of the Shopping Center, such Occupant shall, as its sole cost and expense, ensure, clean and maintain such Outside Dining Area.

(I)     Any designated Outside Sales Area; provided, however, with respect to any Outside Sales Area which is not included within a Building Area, such space may be used not more than three (3) times per calendar year, and the duration of such use shall be subject to the following limitations: during the period commencing on October 15th and ending on December 27th -- no limitation on the number of days of consecutive use; during the period commencing February 15th and ending on July 10th -- not more than one hundred twenty-five (125) consecutive days of use; and, during any other period -- not more than thirty (30) consecutive days of use.

        5.1.5   Outside storage areas located in the rear and immediately adjacent to a building on the Target Tract or the Developer Tract, provided that such storage areas are screened from view (to the extent required by governmental requirements) does not interfere with the free flow of pedestrian vehicular traffic in the Common Areas.

5.1.6   The names "Target", "Greatland", "SuperTarget" or any variation using the name "Target" shall not be used to identify the Shopping Center or any business or trade conducted on the Developer Tract.  Until the Approving Parties agree upon a name change, the Shopping Center shall be called "Queen Creek Marketplace."

5.1.7   Except to the extent required by law, no Permittee shall be charged for the right to use the Common Area; provided, however, for the purpose of this provision, a tax assessment or other form of charge applicable to parking spaces or parking lots shall be deemed by the Approving Parties an imposition required by law.  In addition, the provisions of this Section 5.1.7 shall not be applicable to the operation by Developer of valet parking service for businesses conducted on the Developer Tract.

5.1.8   Each Party shall use its reasonable efforts to cause the employees of the Occupants of its Tract to park their vehicles only on such Tract.

5.1.9   This OEA is not intended to, and does not, create or impose any obligation on a Party to operate, continuously operate, or cause to be operated a business or any particular business at the Shopping Center or on any Tract.

5.2   Lighting

5.2.1   After completion of the Common Area lighting system on its Tract, each Party hereby covenants and agrees to keep its Tract fully illuminated from dusk to at least 10:30 p.m., Monday to Saturday and from dusk to 9:30 p.m. on Sundays, unless the Approving Parties agree upon a different time.  Each Party further agrees to keep any exterior Building security lights, plus each of the lights located on the light standards located adjacent to any main access drive or entry into the Shopping Center on from dusk until dawn.  During the term of this OEA, each Party grants an irrevocable license to each other Party for the purpose of permitting the lighting from one Tract to incidentally shine on the adjoining Tract.

5.2.2   It is recognized that Occupants within the Shopping Center may be open for business at different hours, and that a Party may wish to have the Common Area lights on another Tract be illuminated before or after the required time period.  Accordingly, a Party ("Requesting Party") shall have the right, at any time, to require the Party that controls the lighting on such Tract ("Requested Party") to keep the Common Area lights it controls operating as stipulated by the Requesting Party, provided that the Requesting Party notifies the Requested Party of such request not less than ten (10) business days in advance.  The Requesting Party shall state the period during which it wishes such Common Area lights to be kept operating and shall pay to the Requested Party a prepayment as follows:

(A)   If the period is less than thirty (30) days, then the prepayment shall be one hundred percent (100%) of the reasonable cost for such additional operation (including electrical power, bulbs and manpower), as reasonably estimated by the Requested Party; and

43

(B)     If the period is thirty (30) days or longer, then the prepayment shall be one hundred percent (100%) of the reasonable cost for such additional operation (including electrical power, bulbs and manpower) for thirty (30) days, as reasonably estimated by the Requested Party, and the Requesting Party shall renew such prepayment at the end of each thirty (30) day period.

If the Requesting Party is of the opinion that the estimated prepayment established by the Requested Party is greater than one hundred percent (100%) of such additional operation, the Parties shall attempt to agree upon the cost of such additional operation but if they cannot do so, then the amount the Requesting Party is obligated to pay shall be estimated by the electrical utility company furnishing such power, or if the electrical utility company elects not to do so, by a reputable electrical engineer. Upon the failure of a Requesting Party to pay the estimated amount or renew a prepayment as required hereby, the Requested Party shall have the right to discontinue such additional lighting and to exercise any other remedies herein provided. Any such request for additional lighting may be withdrawn or terminated at any time by written notice from the Requesting Party, and a new request or requests for changed hours of additional operation may be made from time to time.

5.3.1   No freestanding signs shall be permitted within the Shopping Center unless constructed in one of the specific areas designated on Exhibit F and/or the Site Plan for signage and only one sign structure may be located in each sign area. All signage within the Shopping Center shall comply with Governmental Requirements, shall be in conformance with the applicable provisions of this OEA and shall conform to the Comprehensive Sign Program for the Shopping Center, a copy of which is attached to this OEA as Exhibit F.

5.3.2   Except to the extent such signs comply with the comprehensive sign program for the Shopping Center, a copy of which is attached to this OEA as Exhibit F, neither exterior identification signs attached to Buildings nor freestanding signs shall be of the type set forth below:

(a)     flashing, moving or audible (other than in a drive-thru lane) sign;

(b)     made of paper or cardboard, or be temporary in nature or be a sticker or decal; provided, however, the foregoing shall not prohibit the placement at the entrance of each Occupant's space of a small sticker or decal indicating hours of business, acceptance of credit cards, emergency phone numbers and other similar items or information;

(c)     placed on canopy roofs extending above the Building roof, placed on penthouse walls or placed to project two (2) feet above the canopy or top of the wall upon which it is mounted;

44

(d)     placed at any angle to the Building; provided, however, the foregoing shall not apply to any sign under a sidewalk canopy if sign is at least eight feet (8') above the sidewalk;

(e)     painted on the surface of any Building; or

(f)     made utilizing (i) exposed neon tubes, (ii) exposed ballot boxes, (iii) exposed transformers, or (iv) exposes raceways unless such exposed raceways comply with all of the following requirements: (1) the raceways shall not exceed two inches (2") in depth and/or twelve inches (12") in height; (2) the color of the raceways are the same color materials upon which raceways are located; (3) all transformers are remote-mounted behind the Building facia; and (4) the letters to be installed on the raceways do not exceed a height of thirty six inches (36').

5.3.3   In addition to the signage permitted pursuant to Sections 5.3.1 and 5.3.2 above, each Party shall be permitted to place within the Common Area located on its Tract time restricted parking signs (but any time-restricted signs on the Developer Tract shall be located at least three hundred feet (300') from the Target Tract), directional signs (including tenant directional signs) or informational signs such as "Handicapped Parking", temporary for lease, temporary for sale and temporary property management signs, and the temporary erection of a sign identifying each contractor working on a construction job and a temporary sign identifying each lender providing financing for portions of the Shopping Center. Each Party shall have the obligation to operate, maintain and repair, in a clean, sightly and safe condition all tenant identification signs, including components thereof located upon its Tract. In addition, the Developer may, subject to Governmental Requirements, erect and maintain "Coming Soon", "Now Hiring" and/or Grand Opening" banners on the Developer Tract during the initial construction of the Buildings on the Developer Tract. Further, Target may, subject to Governmental Requirements, erect and maintain "Coming Soon", "Now Hiring" and/or "Grand Opening" banners on the Target Tract during the initial construction of the Building on the Target Tract.

5.4     Insurance

5.4.1   Each Party (as to its Tract only) shall maintain or cause to be maintained in full force and effect at least the minimum insurance coverages in Constant Dollars set forth below:

(A)     Commercial General Liability Insurance with a combined single limit of liability of Five Million Dollars ($5,000,000.00) in Constant Dollars for bodily injury, personal injury and property damage, arising out of any one occurrence. The other Parties and Operator shall be "additional insureds" under such policy as it applies to the insuring Party's Tract.

(B)     Workers' compensation and employer's liability insurance:

45

> (i)   Worker's compensation insurance as required by any applicable law or regulation.
>
> (ii)  Employer's liability insurance in the amount of $1,000,000 each accident for bodily injury, $1,000,000 policy limit for bodily injury by disease and $1,000,000 each employee for bodily injury by disease.

(C)   Automobile Liability Insurance for owned, hired and non-owned automobiles. The limits of liability shall not be less than $1,000,000 combined single limit each accident for bodily injury and property damage.

Each Party agrees to defend, protect, indemnify and hold harmless each other Party and Operator from and against all claims or demands, including any action or proceedings brought thereon, and all costs, liens, losses, expenses and liability of any kind relating thereto, including reasonable attorneys' fees and cost of suit, arising out of or resulting from the injury to or death of any Person, or damage to the property of any Person located on the Tract owned by each indemnifying Party; provided, however, the foregoing obligation shall not apply to claims or demands based on the negligence or willful act or omission of such other Party or Operator, its licensees, concessionaires, agents, servants, or employees, or the agents, servants, or employees of any licensee or concessionaire thereof. In the event it is determined that such other Party or Operator was not at fault, then the indemnifying Party shall reimburse such other Party for all reasonable costs and/or expenses incurred by it defending against such claim or demand.

5.4.2   Prior to commencing any construction activities within the Shopping Center, each Party and Operator, as the case may be, shall obtain or require its contractor to obtain and thereafter maintain so long as such construction activity is occurring, at least the minimum insurance coverages in Constant Dollars set forth below:

(A)   Workers' compensation and employer's liability insurance:

> (i)   Worker's compensation insurance as required by any applicable law or regulation.
>
> (ii)  Employer's liability insurance in the amount of $1,000,000 each accident for bodily injury, $1,000,000 policy limit for bodily injury by disease and $1,000,000 each employee for bodily injury by disease.

(B)   Commercial General Liability insurance covering all operations by or on behalf of the contractor, which shall include the following minimum limits of liability and coverages:

      (i)     Required coverages:

          (1)    Premises and Operations.

          (2)    Products and Completed Operations.

          (3)    Contractual Liability, insuring the indemnity obligations assumed by contractor under the contract documents.

          (4)    Broad Form Property Damage (including Completed Operations).

          (5)    Explosion, Collapse and Underground Hazards.

          (6)    Personal Injury Liability.

      (ii)    Minimum limits of liability:

          (1)    $1,000,000 each occurrence (for bodily injury and property damage).

          (2)    $1,000,000 for Personal Injury Liability.

          (3)    $2,000,000 aggregate for Products and Completed Operations.

          (4)    $2,000,000 general aggregate applying separately to this project.

(C)    Automobile liability insurance including coverage for owned, hired and non-owned automobiles. The limits of liability shall not be less than $1,000,000 combined single limit each accident for bodily injury and property damage. The contractor shall require each of his subcontractors to include in their liability insurance policies coverage for automobile contractual liability.

(D)    The contractor shall also carry umbrella/excess liability insurance in the amount of $5,000,000. If there is no per project aggregate under the Commercial General Liability policy, the limit shall be $10,000,000.

47

If the construction activities involve the use of another Tract, then the constructing Person shall cause (x) the owner of such Tract to be an additional insured on each policy (for the Commercial General Liability policy pursuant to a CG 2010 11-85 version Form B endorsement, or equivalent), (y) with respect to the work on such other Tract, the coverage set forth in (B) (ii) (3) above to be extended for a three (3) year period following final completion of work, and (z) each such policy to provide that the same shall not be cancelled, allowed to expire, nor reduced in amount or coverage below the requirements set forth above without at least thirty (30) days prior written notice to each insured.  If any of the insurance policies are cancelled, expire or the amount or coverage thereof is reduced below the level required, then the constructing Person shall immediately stop all work on and use of the other Tract until either the required insurance is reinstated, or replacement insurance is obtained, and evidence thereof is given to the owner of such other Tract.

5.4.3   Effective upon the commencement of construction of any Building on its Tract and so long as such Building exists, a Party shall carry, or cause to be carried, property insurance with "Special Form" coverage, in the amount of one hundred percent (100%) of full replacement cost thereof (excluding footings, foundations and excavations).

Each Party (the "Releasing Party") hereby releases and waives for itself, and each Person claiming by, through or under it, each other Party and Operator (the "Released Party") from any liability for any loss or damage to all property of such Releasing Party located upon any portion of the Shopping Center, which loss or damage is of the type covered by the insurance required to be maintained under Section 5.4.3, irrespective of the amount of such insurance required or actually carried, including any deductible or self insurance reserve.  Each Releasing Party agrees to use its reasonable efforts to obtain, if needed, appropriate endorsements to its policies of insurance, and to the policies of insurance carried by its Occupants, with respect to the foregoing release; provided, however, that failure to obtain such endorsements shall not affect the release and waiver hereinabove given.

Each Party agrees to defend, protect, indemnify and hold harmless each other Party for, from and against all claims or demands, including any action or proceeding brought thereon, and all costs, liens, losses, expenses and liabilities of any kind relating thereto, including reasonable attorneys' fees and cost of suit asserted by or through any Occupant of the indemnifying Party's Tract for any loss or damage to the property of such Occupant located upon the indemnifying Party's Tract, which loss or damage would have been covered by the insurance required to be maintained under Section 5.4.3.

5.4.4   During the period, if any, Operator is maintaining the Common Area, Operator shall maintain or cause to be maintained in full force and effect at least the minimum insurance coverages in Constant Dollars set forth below:

(A)     Commercial General Liability Insurance with a combined single limit of liability of Two Million Dollars ($2,000,000.00) for bodily injury, personal injury and property damage, arising out of any one occurrence.

Each Party shall be an "additional insured" under such policy applied as to Operator's operation and maintenance obligations under this OEA. Such policy shall be strictly excess, secondary coverage to the policies of insurance to be maintained by the Parties pursuant to the provisions of Section 5.4.1 above.

(B)    Workers' Compensation and Employer's Liability Insurance:

    (i)    Worker's compensation insurance as required by any applicable law or regulation.

    (ii)    Employer's liability insurance in the amount of $1,000,000 for each accident for bodily injury, $1,000,000 policy limit for bodily injury by disease and $1,000,000 each employee for bodily injury by disease.

(C)    Automobile Liability Insurance for owned, hired and non-owned automobiles. The limits of liability shall not be less than $1,000,000 combined single limit each accident for bodily injury and property damage.

Operator agrees to defend, protect, indemnify and hold harmless each Party for, from and against all claims or demands, including any action or proceeding brought thereon, and all costs, liens, losses, expenses and liabilities of any kind, including reasonable attorneys' fees and cost of suit, asserted or incurred for personal injury, bodily injury or property damage in connection with or arising out of the performance, or failure to perform, by Operator of its duties or obligations under this OEA with respect to the maintenance and operation of the Common Area; provided, however, the foregoing obligation shall not apply to claims or demands based on the negligence or the willful act or omission of the Party to be indemnified. In the event it is determined that such Party was not at fault, then the Operator shall reimburse such other Party for all reasonable expenses and/or costs incurred by such Party defending against such claim or demand.

5.4.5    All insurance required by a Person pursuant to Section 5.4 shall be written on an occurrence basis and procured from companies rated by Best's Rating Guide not less than A-/X, and which are authorized to do business in the state where the Shopping Center is located. All insurance may be provided under (i) an individual policy covering the Shopping Center, (ii) a blanket policy or policies which includes other liabilities, properties and locations of such Party; provided, however, that if such blanket commercial general liability insurance policy or policies contain a general policy aggregate of less than Twenty Million Dollars ($20,000,000.00) in Constant Dollars, then such insuring Party shall also maintain excess liability coverage necessary to establish a total liability insurance limit of Twenty Million Dollars ($20,000,000.00) in Constant Dollars, (iii) a plan of self-insurance, provided that any Party so self-insuring notifies the other Parties of its intent to self-insure and agrees that upon request it shall deliver to such other Parties each calendar year a copy of its annual report that is audited by an independent

49

certified public accountant which discloses that such Party has Two Hundred Fifty Million Dollars ($250,000,000.00) in Constant Dollars of both net worth and net current assets, or (iv) a combination of any of the foregoing insurance programs. To the extent any deductible is permitted or allowed as a part of any insurance policy carried by a Party in compliance with Section 5.4, such Party shall be deemed to be covering the amount thereof under an informal plan of self-insurance; provided, however, that in no event shall any deductible exceed Fifty Thousand Dollars ($50,000.00) in Constant Dollars unless such Party complies with the requirements regarding self-insurance pursuant to (iii) above. Each Party and Operator, if any, agree to furnish to any Person requesting the same, a certificate(s) of insurance, or statement of self-insurance, as the case may be, or the Web address where such insurance information is contained, evidencing that the insurance required to be carried by such Party or Operator, as the case may be, is in full force and effect.

Any insurance provision that requires another Person to be added as an "additional insured" shall include the following provisions:

    (A)    Shall provide that the policy shall not be canceled or reduced in amount or coverage below the requirements of this OEA, nor shall such policy be allowed to expire without at least thirty (30) days prior written notice by the insurer to each insured and to each additional insured.

    (B)    Shall provide for severability of interests.

    (C)    Shall provide that an act or omission of one (1) of the insureds or additional insureds which would void or otherwise reduce coverage, shall not reduce or void the coverage as to the other insureds.

    (D)    Shall provide for contractual liability coverage with respect to any indemnity obligation set forth therein.

5.5   Taxes

Each Party shall pay, or cause to be paid prior to delinquency, all Taxes with respect to its Tract, the Building, and other improvements located thereon, and any personal property owned or leased by such Party in the Shopping Center, provided that if such Taxes or any part thereof may be paid in installments, each Party may pay each such installment as and when the same becomes due and payable. Each Party shall use reasonable efforts to cause the Tracts to be separately assessed as one or more separate Parcels by all local taxing authorities for the purposes of Taxes. If a Party fails to make a payment of such Taxes and such failure could result in a lien on any other land or Improvements in the Shopping Center or adversely affect any right of a Party under this OEA, any non-defaulting party or First Mortgagee may make such payment on behalf of the defaulting party and recover from the defaulting party the amounts so paid together with Interest thereon. Nothing contained herein shall prevent any Party from contesting at its cost and expense any Taxes with respect to its Tract in any manner such Party elects, so long as such contest is

maintained with reasonable diligence and in good faith, but any such contested Taxes shall be paid prior to the time when the Tract subject thereto can be subjected to sale under Governmental Requirements pursuant to a proceeding which may result in impairment of the rights created under this OEA or terminate any provision of this OEA as applied to any Tract. At the time such contest is concluded (allowing for appeal to the highest appellate court), the contesting Party shall promptly pay all Taxes determined to be owing, together with all interest, penalties and costs thereon. The Party conducting such contest shall indemnify the other Parties for, from and against any loss, lien, cost, damage, injury or expense (including reasonable attorneys' fees), arising out of or relating to the conduct of such contest, but no Party shall be liable to any other Party or Occupant for any increased Taxes allegedly resulting from such contest. Notwithstanding the provisions of this Section 5.5 to the contrary, no Owner or Occupant may contest the formation of the Improvement District described in Section 9 of the Development Agreement, nor may any Owner or Occupant contest the surcharge described in Section 42 of the Development Agreement.

## ARTICLE VI - MISCELLANEOUS

6.1    Default

      6.1.1    The occurrence of any one or more of the following events shall constitute a material default and breach of this OEA by the non-performing Party (the "Defaulting Party"):

      (A)    The failure to make any payment required to be made hereunder within ten (10) days after the due date.

      (B)    The failure to observe or perform any of the covenants, conditions or obligations of this OEA, other than as described in clause (A) above, within thirty (30) days after the issuance of a notice by another Party or Operator, as the case may be (the "Non-Defaulting Party") specifying the nature of the default claimed; provided, however, if such default is of a nature that it cannot be reasonably cured within thirty (30) days, the non-performing Party shall have a reasonable period of time to cure such breach or default so long as such non-performing Party diligently prosecutes its cure to completion.

      6.1.2    With respect to any default under Section 6.1.1(B), any Non-Defaulting Party shall have the right following the expiration of any applicable cure period, if any, but not the obligation, to cure such default by the payment of money or the performance of some other action for the account of and at the expense of the Defaulting Party; provided, however, that in the event such default shall constitute an emergency condition, the Non-Defaulting Party, acting in good faith, shall have the right to cure such default upon such advance notice as is reasonably possible under the circumstances or, if necessary, without advance notice, so long as notice is given as soon as possible thereafter. To effectuate any such cure, the Non-Defaulting Party shall have the right to enter upon the Tract of the Defaulting Party (but not into

51

any Building) to perform any necessary work or furnish any necessary materials or services to cure the default of the Defaulting Party. Each Party shall be responsible for the default of its Occupants. In the event any Non-Defaulting Party shall cure a default, the Defaulting Party shall reimburse the Non-Defaulting Party for all costs and expenses incurred in connection with such curative action, plus Interest as provided herein, within ten (10) days after receipt of demand therefor, together with reasonable documentation supporting the expenditures made. In the event the Defaulting Party does not reimburse the Non-Defaulting Party as set forth above, in addition to any other remedy available, the Non-Defaulting Party shall have the right to offset such amount owed against any current or future sum of money due the Defaulting Party until the full amount owed is recovered.

The right to cure the default of another Party shall not be deemed to:

       (A)     Impose any obligation on a Non-Defaulting Party to do so.

       (B)     Render the Non-Defaulting Party liable to the Defaulting Party or any third party for an election not to do so.

       (C)     Relieve the Defaulting Party from any performance obligation hereunder.

       (D)     Relieve the Defaulting Party from any indemnity obligation as provided in this OEA.

       6.1.3   Costs, expenses and Interest accruing and/or assessed pursuant to Section 6.1.1(A) and/or Section 6.1.2 above shall constitute a lien against the Defaulting Party's Tract. Such lien shall attach and take effect only upon (a) delivery of a copy thereof to the defaulting Party, and (b) recordation of a claim of lien in the office of the Recorder of the County of the State in which the Shopping Center is located by the Party making such claim. The claim of lien shall include the following:

       (A)     The name of the lien claimant.

       (B)     A statement concerning the basis for the claim of lien and identifying the lien claimant as a Non-Defaulting Party.

       (C)     An identification of the owner or reputed owner of the Tract or interest therein against which the lien is claimed.

       (D)     A description of the Tract against which the lien is claimed.

       (E)     A description of the work performed which has given rise to the claim of lien and a statement itemizing the amount thereof.

52

(F)     A statement that the lien is claimed pursuant to the provisions of this OEA, reciting the date and document number of recordation hereof. The notice shall be duly verified, acknowledged and contain a certificate that a copy thereof has been served upon the Party against whom the lien is claimed, by personal service or by mailing pursuant to <u>Section 6.4</u> below. The lien so claimed shall attach from the date of recordation solely in the amount claimed thereby and may be enforced in any judicial proceedings allowed by law, including without limitation, a suit in the nature of a suit to foreclose a mortgage/deed of trust or mechanic's lien under the applicable provisions of the law of the State in which the Shopping Center is located.

6.1.4   Each Non-Defaulting Party, Operator and First Mortgagee shall have the right to prosecute any proceedings at law or in equity against any Defaulting Party hereto, or any other Person, violating or attempting to violate or defaulting upon any of the provisions contained in this OEA, and to recover its actual damages (but not special, consequential or punitive damages) for any such violation or default. Such proceeding shall include the right to restrain by injunction any violation or threatened violation by another Party or Person of any of the terms, covenants or conditions of this OEA, or to obtain a decree to compel performance of any such terms, covenants or conditions, it being agreed that the remedy at law for a breach of any such term, covenant or condition (except those, if any, requiring the payment of a liquidated sum) is not adequate. All of the remedies permitted or available to a Party under this OEA or at law or in equity shall be cumulative and not alternative, and the invocation of any such right or remedy shall not constitute a waiver or election of remedies with respect to any other permitted or available right or remedy. If a Party brings an action of law or in equity to enforce the terms and provisions of this OEA, the prevailing Party as determined by the Court in such action shall be entitled to recover reasonable attorneys' fees and court costs for all stages of litigation, including but not limited to, appellate proceedings, in addition any remedy granted. No breach of this OEA or default by any Party shall entitle any other Party to terminate or cancel this OEA. Except as expressly set forth in this OEA, all of the remedies available to a non-defaulting Party under this OEA or otherwise shall be cumulative and non-exclusive.

6.1.5   This OEA may be enforced only by the Parties, Operator and First Mortgagees and not by any other Occupant or User of the Shopping Center or any part thereof.

6.2     <u>Interest</u>

Any time a Party or Operator, if any, shall not pay any sum payable hereunder to another Party or to Operator within five (5) days of the due date, such delinquent Party or Operator shall pay interest on such amount from the due date to and including the date such payment is received by the Party entitled thereto, at the lesser of:

(A)     The highest rate permitted by law to be either paid on such type of obligation by the Party obligated to make such payment or charged by the Party to whom such payment is due, whichever is less.

(B)     The prime rate, plus three percent (3%). As used herein, "prime rate" shall mean the rate of interest published from time to time as the "Prime Rate" in the Wall Street Journal under the heading "Money Rates"; provided, however, that (i) if more than one such rate is published therein the prime rate shall be the highest such rate and (ii) if such rate is no longer published in the Wall Street Journal or is otherwise unavailable, the prime rate shall be a substantially comparable index of short term loan interest rates charged by U.S. banks to corporate borrowers selected by the Approving Parties.

### 6.3   Estoppel Certificate

Each Party and Operator, if any, agree that upon written request (which shall not be more frequent than three (3) times during any calendar year) of any other Party or Operator, it will issue, without charge, within thirty (30) days after receipt of such request to such Party, or its prospective First Mortgagee or successor, an estoppel certificate stating to the best of the issuer's knowledge as of such date:

(A)     Whether it knows of any default under this OEA by the requesting Party or any other Party, and if there are known defaults, specifying the nature thereof in reasonable detail.

(B)     Whether this OEA has been assigned, modified or amended in any way by it and if so, then stating the nature thereof in reasonable detail.

(C)     Whether this OEA is in full force and effect.

Such estoppel certificate shall act to estop the issuer from asserting a claim or defense against a bona fide encumbrancer or purchaser for value to the extent that such claim or defense is based upon facts known to the issuer as of the date of the estoppel certificate which are contrary to the facts contained therein, and such bona fide purchaser or encumbrancer has acted in reasonable reliance upon such estoppel certificate without knowledge of facts to the contrary. The issuance of an estoppel certificate shall in no event subject the issuer to any liability for the negligent or inadvertent failure of the issuer to disclose correct and/or relevant information, nor shall such issuance be construed to waive any rights of the issuer to perform an audit or obtain an adjustment with respect to Common Area Maintenance Costs for any year it is entitled to do so, or to challenge acts committed by other Parties for which approval by the Approving Parties was required but not sought or obtained.

### 6.4        Notices

All notices, consents, demands and requests (collectively, the "notice") required or permitted to be given under this OEA must be in writing and shall be deemed to have been given as of the date such notice is (i) delivered to the Party intended, (ii) delivered to the then designated address of the Party intended, (iii) rejected at the then designated address of the Party

54

intended, provided such notice was sent prepaid, or (iv) sent by nationally recognized overnight courier with delivery instructions for "next business day" service, or by United States certified mail, return receipt requested, postage prepaid and addressed to the then designated address of the Party intended.  The initial addresses of the Parties shall be:

Target:    Target Corporation
           Property Development
           Attn:  Real Estate – Existing Stores
           1000 Nicollet Mall
           Minneapolis, MN 55403

Developer:
           Vestar QCM, L.L.C.
           c/o Vestar Development Co.
           2425 East Camelback Road
           Suite 750
           Phoenix, Arizona 85016
           Attention: David J. Larcher

           With a copy to:
           David L. Lansky
           Mariscal, Weeks, McIntyre & Friedlander, P.A.
           2901 North Central Avenue
           Suite 200
           Phoenix, Arizona 85012

With respect to any "notice" to Operator:

           Vestar QCM, L.L.C.
           c/o Vestar Development Co.
           2425 East Camelback Road
           Suite 750
           Phoenix, Arizona 85016
           Attention: David J. Larcher

           With a copy to:
           David L. Lansky
           Mariscal, Weeks, McIntyre & Friedlander, P.A.
           2901 North Central Avenue
           Suite 200
           Phoenix, Arizona 85012

Upon at least ten (10) days prior written notice, each Party shall have the right to change its address to any other address within the United States of America.

6.5    Approval Rights

6.5.1    Except as otherwise provided herein, with respect to any matter as to which a Party has specifically been granted an approval right under this OEA, nothing contained in this OEA shall limit the right of a Party to exercise its business judgment, in its sole discretion, whether or not "objectively" reasonable under the circumstances, and any such decision shall not be deemed inconsistent with any covenant of good faith and fair dealing which may be implied by law or be part of this OEA. Notwithstanding the provisions of this Section 6.5.1 to the contrary, so long as the Developer is Vestar Arizona XXXIX, L.L.C. or a person controlling, controlled by or under common control with Vestar Arizona XXXIX, L.L.C., any consent or approval to be granted by Target and Developer shall not be unreasonably withheld, conditioned or delayed. The Parties intend by this OEA to set forth their entire understanding with respect to the terms, covenants, conditions and standards pursuant to which their obligations are to be judged and their performance measured.

6.5.2    Unless provision is made for a specific time period, each response to a request for an approval or consent required to be considered pursuant to this OEA shall be given by the Party to whom directed within thirty (30) days after receipt thereof. Each disapproval shall be in writing and, subject to Section 6.5.1, the reasons therefor shall be clearly stated. If a response is not given within the required time period, which failure continues for fifteen (15) days after delivery of a second notice, which second notice contains the following statement: **YOUR FAILURE TO RESPOND TO THIS REQUEST WITHIN FIFTEEN (15) DAYS SHALL RESULT AND DEEMED APPROVAL UNDER THE OEA,"** The requested party shall be deemed to have been given its approval. Notwithstanding anything contained herein to the contrary, the provisions of this Section 6.5.2 do not apply in any manner or fashion to any request which requires an amendment to this OEA, such requests being governed solely by the provisions of Section 6.8.5.

6.5.3    If the Approving Parties' approval is requested, unanimous approval must be given.

6.6    Condemnation

In the event any portion of the Shopping Center shall be condemned, or conveyed under threat of condemnation, the award shall be paid to the Party owning the Tract or the improvements taken, and the other Parties hereby waive and release any right to recover any value attributable to the property interest so taken, except that (i) if the taking includes improvements belonging to more than one (1) Party, such as Utility Lines or Signs, the portion of the award allocable thereto shall be used to relocate, replace or restore such jointly owned improvements to a useful condition, and (ii) if the taking includes easement rights which are intended to extend beyond the term of this OEA, the portion of the award allocable to each such easement right shall be paid to the respective grantees thereof. In addition to the foregoing, if a separate claim can be filed for the taking of any other property interest existing pursuant to this OEA which does not reduce or diminish the amount paid to the Party owning the Tract or the improvement taken, then the owner of such other property interest shall have the right to seek an

award for the taking thereof. Except to the extent they burden the land taken, no easement or license set forth in this OEA shall expire or terminate based solely upon such taking.

6.7    Binding Effect

The terms of this OEA and all easements granted hereunder shall constitute covenants running with the land and shall bind the Tracts described herein and inure to the benefit of and be binding upon each Party, their successors and assigns. This OEA is not intended to supersede, modify, amend or otherwise change the provisions of any prior instrument affecting the land burdened hereby.

6.8    Construction and Interpretation

6.8.1    This OEA and the Exhibits hereto contain all the representations and the entire agreement between the Parties with respect to the subject matter hereof. Any prior negotiations, correspondence, memoranda or agreements are superseded in total by this OEA and the Exhibits attached hereto. This OEA has been fully negotiated at arms length between the signatories hereto, and after advice by counsel and other representatives chosen by such Parties, and such Parties are fully informed with respect thereto; no such Party shall be deemed the scrivener of this OEA; and, based on the foregoing, the provisions of this OEA and the Exhibits hereto shall be construed as a whole according to their common meaning and not strictly for or against any Party.

6.8.2    Whenever required by the context of this OEA, (i) the singular shall include the plural, and vice versa, and the masculine shall include the feminine and neuter genders, and vice versa, and (ii) use of the words "including", "such as", or words of similar import, when following any general term, statement or matter shall not be construed to limit such statement, term or matter to specific items, whether or not language of non-limitation, such as "without limitation", or "but not limited to", are used with reference thereto, but rather shall be deemed to refer to all other items or matters that could reasonably fall within the broadest scope of such statement, term or matter.

6.8.3    The captions preceding the text of each article and section of this OEA are included only for convenience of reference. Captions shall be disregarded in the construction and interpretation of this OEA. Capitalized terms are also selected only for convenience of reference and do not necessarily have any connection to the meaning that might otherwise be attached to such term in a context outside of this OEA.

6.8.4    Invalidation of any of the provisions contained in this OEA, or of the application thereof to any Person by judgment or court order, shall in no way affect any of the other provisions hereof or the application thereof to any other Person and the same shall remain in full force and effect.

6.8.5    This OEA may be amended by, and only by, a written agreement signed by all of the then current Approving Parties and shall be effective only when recorded in

57

the county and state where the Shopping Center is located; provided, however, that no such amendment shall impose any materially greater obligation on, or materially impair any right of, a Party or its Tract without the consent of such Party. No agreement to any amendment of this OEA shall ever be required of any Occupant or Person other than the Parties, Operator and First Mortgagees, nor shall any Occupant or Person other than the Parties, Operator and First Mortgagees have any right to enforce any of the provisions hereof. Since the submission of a proposed amendment to the Parties is not an item of "consent" or "approval", each Party may consider any proposed amendment to this OEA in its sole and absolute discretion without regard to reasonableness or timeliness.

6.8.6     This OEA may be executed in several counterparts, each of which shall be deemed an original. The signatures to this OEA may be executed and notarized on separate pages, and when attached to this OEA shall constitute one (1) complete document.

6.9     Negation of Partnership

None of the terms or provisions of this OEA shall be deemed to create a partnership between or among the Parties in their respective businesses or otherwise, nor shall it cause them to be considered joint venturers or members of any joint enterprise. Each Party shall be considered a separate owner, and no Party shall have the right to act as an agent for another Party, unless expressly authorized to do so herein or by separate written instrument signed by the Party to be charged.

6.10     Not a Public Dedication

Nothing herein contained shall be deemed to be a gift or dedication of any portion of the Shopping Center or of any Tract or portion thereof to the general public, or for any public use or purpose whatsoever. Except as herein specifically provided, no right, privileges or immunities of any Party hereto shall inure to the benefit of any third-party Person, nor shall any third-party Person be deemed to be a beneficiary of any of the provisions contained herein.

6.11     Excusable Delays

Whenever performance is required of any Party hereunder, such Party shall use all due diligence to perform and take all necessary measures in good faith to perform; provided, however, that if completion of performance shall be delayed at any time by reason of acts of God, war, acts of the public enemy (including terrorist acts), civil commotion, riots, strikes, picketing or other labor disputes, unavailability of labor or materials, damage to work in progress by reason of fire or other casualty, utility disruptions, including rolling blackouts or any cause beyond the reasonable control of such Party, then the time for performance as herein specified shall be appropriately extended by the amount of the delay actually so caused. The provisions of this Section shall not operate to excuse any Party from the prompt payment of any monies required by this OEA.

6.12    Mitigation of Damages

In all situations arising out of this OEA, each Party and Operator, if any, shall attempt to avoid and mitigate the damages resulting from the conduct of any other Party. Each Party shall take all reasonable measures to effectuate the provisions of this OEA.

6.13    OEA Shall Continue Notwithstanding Breach

It is expressly agreed that no breach of this OEA shall (i) entitle any Party to cancel, rescind, or otherwise terminate this OEA, or (ii) defeat or render invalid the lien of any mortgage or trust deed made in good faith and for value as to any part of the Shopping Center, or (iii) defeat or render invalid or terminate the leasehold and/or possessory rights of any Occupant of the Shopping Center pursuant to a bona fide lease made in good faith and for value as to any part of the Shopping Center. However, such limitation shall not affect in any manner any other rights or remedies which a Party may have hereunder by reason of any such breach.

6.14    Time

Time is of the essence of this OEA.

6.15    No Waiver

The failure of any Party to insist upon strict performance of any of the terms, covenants or conditions hereof shall not be deemed a waiver of any rights or remedies which that Party may have hereunder, at law or in equity, and shall not be deemed a waiver of any subsequent breach or default in any of such terms, covenants or conditions. No waiver by any Party of any default under this OEA shall be effective or binding on such Party unless made in writing by such Party and no such waiver shall be implied from any omission by a Party to take action in respect to such default. No express written waiver of any default shall affect any other default or cover any other period of time other than any default and/or period of time specified in such express waiver. One (1) or more written waivers of any default under any provision of this OEA shall not be deemed to be a waiver of any subsequent default in the performance of the same provision or any other term or provision contained in this OEA. The failure of a Party to provide a Reconciliation or statement for amounts owed within a specified time shall not act as a waiver of such Party's right to collect such amount upon the later issuance of the required Reconciliation or statement.

ARTICLE VII - TERM

7.1 Term of this OEA

This OEA shall be effective as of the date first above written and shall continue in full force and effect until (a) 11:59 p.m. on April 30, 2107, or (b) terminated by a written instrument signed and acknowledged by or on behalf of all Parties and recorded in the official records of Maricopa County, Arizona; provided, however, if not previously terminated pursuant to clause (b) above, this Agreement may be continued beyond April 30, 2107 by a written Agreement signed and acknowledged by or on behalf of all Parties. Notwithstanding the termination of this

OEA, (i) the easements referred to in <u>Article II</u> hereof which are specified as being perpetual or as continuing beyond the term of this OEA shall continue in full force and effect as provided herein, and (ii) the building covenants and restrictions set forth in <u>Section 3.3.4 (D)</u> hereof shall continue in full force and effect so long as an "<u>unlimited area</u>" Building exists within the Primary Building Area. Upon the termination of this OEA, all rights and privileges derived from and all duties and obligations created and imposed by the provisions of this OEA, except as relates to the easements mentioned above, shall terminate and have no further force or effect; provided, however, that the termination of this OEA shall not limit or affect any remedy at law or in equity that a Party may have against any other Party with respect to any liability or obligation arising or to be performed under this OEA prior to the date of such termination.

## 8  EXCULPATION

### 8.1    Certain Limitations on Remedies

None of the Persons comprising a Party (whether partners, shareholders, officers, directors, members, trustees, employees, beneficiaries or otherwise) shall ever be personally liable for any judgment obtained against a Party. Each Party agrees to look solely to the equity interest in the Shopping Center of a defaulting Party for recovery of damages for any breach of this OEA and/or for the collection of any judgment (or other judicial process) requiring the payment of money by such defaulting party, subject, however, to the prior rights of a First Mortgagee; and no other assets of such Party shall be subject to levy, execution or other judicial process for the satisfaction of any claim hereunder and such defaulting Party shall not be liable for any such default or breach, except to the extent of its interest in its Tract; provided, however, the foregoing shall not in any way impair, limit or prejudice the right of a Party:

    (A)    <u>Casualty Insurance and Condemnation Proceeds</u>. To recover from another Party all damages and costs on account of, or in connection with, casualty insurance or condemnation proceeds which are not applied or used in accordance with the terms of this OEA.

    (B)    <u>Hazardous Substances</u>. To recover from another Party all damages and costs arising out of or in connection with, or on account of, a breach by such Party of its obligations under <u>Section 5.1.3</u>.

    (C)    <u>Liability Insurance</u>. To recover from another Party all damages and costs arising out of or in connection with, or on account of, a breach by such Party of its obligations under <u>Section 5.4</u>.

    (D)    <u>Taxes</u>. To recover from a Party all damages and costs arising out of or in connection with, or on account of, the failure by such Party to pay when due any Tax, as specified in <u>Section 5.5</u> and <u>Section 6.1</u>.

(E)     Fraud or Misrepresentation.  To recover from another Party all damages and costs as a result of any fraud or misrepresentation by such Party in connection with any term, covenant or condition in this OEA.

(F)     Equitable Relief; Costs.  To pursue equitable relief in connection with any term, covenant or condition of this OEA, including a proceeding for temporary restraining order, preliminary injunction, permanent injunction or specific performance, and recover all costs, including Interest thereon, relating to such enforcement action.

## ARTICLE IX - MISCELLANEOUS

### 9.1   Subdivision of Tracts.

Developer and Target may subdivide their respective Tracts into two or more Tracts, provided that (a) such subdivision shall be accomplished in compliance with all applicable Laws; (b) each new Tract shall be separately assessed from all other Tracts by all local taxing authorities for real estate tax purposes; (c) each new Tract shall be subject to all of the terms and provisions of this Agreement which are applicable to the original Tract, including any specific restrictions on the original Tract; and (d) the creation of any new Tract shall not result in the creation of any Building Area not depicted on the Site Plan.

### 9.2   Priority of Agreement.

Except as specifically provided in Section 6.13, this Agreement and the rights granted and created hereby, including the easements granted and created hereunder, shall be superior to all leases, conveyances, transfers, assignments, contracts, mortgages, deeds of trust and other encumbrances and documents in any way affecting any part of the Shopping Center; provided, however, this Agreement is subject and subordinate to the Development Agreement. Any party foreclosing any such mortgage, deed of trust, lien or encumbrance, and any party acquiring title to or any interest in any part of the Shopping Center as a result thereof shall acquire and hold such title or interest expressly subject to the provisions of this Agreement. Any transferee of a Tract in the Shopping Center shall automatically be deemed, by acceptance of such Tract, to have agreed to be bound by all of the provisions of this Agreement, and to have agreed to perform and do any and all things thereafter required to be done and performed hereunder by the Party of the Tract so transferred.

### 9.3   Dispute Resolution.

In the event that there is a dispute involving the Town which any Party and/or Occupant and the Town cannot resolve between themselves, each Party and Occupant agrees that there shall be a forty-five (45) day moratorium on litigation during which time each Party and Occupant and the Town agree to attempt to settle the dispute by non-biding mediation before the commencement of litigation. The mediation shall be held under the commercial mediation rules of the American Arbitration Association. The mediator selected shall have at least five (5) years experience in mediating or arbitrating disputes relating to commercial property development.

The cost of any such mediation shall be divided equally between such Party or Occupant and the Town, or in such other fashion as the mediator may order. The results of the mediation shall be non-binding on such Party or Occupant and the Town and such Party or Occupant and/or the Town shall be free to initiate litigation upon the conclusion of mediation.

9.4     Conflict of Interest.

Pursuant to Arizona law, rules and regulations, no member, official or employee of the Town shall have any personal interest, direct or indirect, in this Agreement, nor shall any such member, official or employee participate in any decision relating to this Agreement which affects his or her personal interest or the interest of any corporation, partnership or association in which he or she is, directly or indirectly, interested.

9.5     Development Agreement.

Developer has entered into the Development Agreement with the Town and, as a result, Developer may receive certain economic development incentives in exchange for performing certain obligations pursuant to the Development Agreement. Except as may be set forth in a separate agreement between Developer, the Town and any Party, no Party (or Occupant of any Party) shall be entitled to any portion of the economic development incentives that may be available to Developer and all such economic development incentives are the sole property of Developer. Developer warrants that it has not paid or given and will not pay or give any Person any money or consideration in connection with the execution of the Development Agreement. Upon the request of Developer, each Party shall furnish to Developer (or shall cause its Occupant(s) to furnish) a statement of gross sales derived by such Party (or Occupant) from the Shopping Center. Alternatively, each Party may elect to provide the statement of gross sales derived by such Party (or Occupant) for the Shopping Center directly to the Town and, in such event, such Party shall provide to Developer written notice that it has done so. Any information gained by Developer from such statement shall be confidential; provided, however, Developer shall be permitted to divulge the contents of any such statement to the Town pursuant to the Development Agreement. Each Party shall obtain (or shall cause its Occupants to obtain) a separate transaction privilege tax license for the business conducted at the Shopping Center or, in the alternative, each Party (or Occupant of such Party) shall provide to the Town a certified worksheet setting forth such Party's (or Occupant's) name, such Party's (or Occupant's) transaction privilege license number and the amount of transaction privilege taxes paid with respect to such Party's (or Occupant's) business operations at the Shopping Center. In addition, each Party (and the Occupant of each Party) consents to (a) the Arizona Department of Revenue providing transaction privilege tax revenue information with respect to the Shopping Center to the Town, and (b) the Town providing transaction privilege tax revenue information with respect to such Party's (or Occupant's) business operations at the Shopping Center.

*[Rest of page intentionally left blank]*

SIGNATURE PAGE
FOR
OPERATION AND EASEMENT AGREEMENT
BETWEEN
TARGET CORPORATION
AND
VESTAR QCM, L.L.C.

IN WITNESS WHEREOF, the Parties have caused this OEA to be executed effective as of the day and year first above written.

VESTAR QCM, L.L.C.,
an Arizona limited liability company

By: VESTAR ARIZONA XL, L.L.C.,
    an Arizona limited liability company
Its: Managing Member

("Developer")

By:_____

Name:_____**David Larcher**_____

Title:_____**Manager**_____

STATE OF ARIZONA     )
                      ) ss.
County of Maricopa     )

On Jun. 29, 200 7 before me, Shelly K. Orozco, a Notary Public in and for said state, personally appeared ( David Larcher, personally known to me (or proved to me on the basis of satisfactory evidence) to be the persons whose names are subscribed to the within instrument and acknowledged to me that they executed the same in their authorized capacities, and that by their signatures on the instrument, the persons, or the entity upon behalf of which the persons acted, executed the instrument.

WITNESS my hand and official seal.



SHELLY K. OROZCO
Notary Public - Arizona
Maricopa County
My Commission Expires
April 20, 2010

Notary Public in and for said State
My Commission Expires: 7/20/10

U:\ATTORNEYS\DLL#2\VESTAR\Queen Creek Towne Center\Target\OEA V8 (1-24-07).doc

SIGNATURE PAGE
FOR
OPERATION AND EASEMENT AGREEMENT
BETWEEN
TARGET CORPORATION
AND
VESTAR QCM, L.L.C.

IN WITNESS WHEREOF, the Parties have caused this OEA to be executed effective as of the day and year first above written.

TARGET CORPORATION,
a Minnesota corporation qualified to do
business in Arizona as Target Stores, Inc.

("Target")

By: _____
Name:_____**Brad Syverson**_____
Title:_____*Director Real Estate*_____
             *Target Corporation*

STATE OF MINNESOTA          )
                            ) ss.
COUNTY OF HENNEPIN          )

On this 2₆ day of January , 200 7, before me, a Notary Public within and for said County, personally appeared Brad Syverson to me personally known, being first by me duly sworn, did say that he is the Director Real Estate of Target Corporation and that said instrument was signed on behalf of said corporation by authority of its Board of Directors and Brad Syverson acknowledged said instrument to be the free act and deed of said corporation.

_____
Notary Public

My commission expires: 1/31/2009

ELIZABETH A. MANKEY
NOTARY PUBLIC- MINNESOTA
My Commission Expires Jan. 31, 2009

64

## EXHIBIT A
## LEGAL DESCRIPTION OF TARGET TRACT

All of that real property located in the Town of Queen Creek, County of Maricopa, State of Arizona more particularly described as follows:

Lot 19 of Queen Creek MP-Phase 1, shown by Map on file in Book _____, Pages _____ to _____, inclusive, of Maps, official records of Maricopa County, Arizona.

## EXHIBIT B

## LEGAL DESCRIPTION OF DEVELOPER TRACT

All of that real property located in the Town of Queen Creek, County of Maricopa, State of Arizona more particularly described as follow:

Lots 1 through 18 inclusive and 20 and 21 and Tracts A and B, QUEEN CREEK M P – Phase 1, shown by Map on file in Book _____, Pages _____ to _____, inclusive, of Maps, official records of Maricopa County, Arizona

# EXHIBIT C
## INTENTIONALLY OMITTED

**EXHIBIT D**
**ARCHITECTURAL THEME**







**EXHIBIT D ARCHITECTURAL THEME**

N.T.S







**EXHIBIT D ARCHITECTURAL THEME**

N.T.S

QUEEN CREEK MARKETPLACE

D2

Vestar



**EXHIBIT D ARCHITECTURAL THEME**

**N.T.S**

QUEEN CREEK
M A R K E T P L A C E

Vestar

**D3**



SHOPS A

SHOPS A-SIDE ELEVATION

SHOPS A-SIDE ELEVATION

EXHIBIT D ARCHITECTURAL THEME

N.T.S

QUEEN CREEK
MARKETPLACE

Vestar

D4



SHOPS F

SHOPS F-SIDE ELEVATION

SHOPS F-SIDE ELEVATION

N.T.S

D5

QUEEN CREEK
MARKETPLACE

Vestar

EXHIBIT D ARCHITECTURAL THEME



SHOPS G

SHOPS G-SIDE ELEVATION

SHOPS G-SIDE ELEVATION

EXHIBIT D ARCHITECTURAL THEME

N.T.S

QUEEN CREEK
MARKETPLACE

D6

Vestar

## EXHIBIT E
## SUBMISSION GUIDELINES

1.  During the conceptual design phase, the constructing Party shall submit to the Approving Parties the following:

    A.  Site Design Documents to Indicate the Following:
        o   Parking configurations and car parking count
        o   Typical bay width and stall dimensions
        o   Drive widths
        o   Setbacks
        o   Curb cuts
        o   Spot elevations or rough contours
        o   Rough landscape scope
        o   Lighting pole locations
        o   Preliminary utility strategies

    B.  Building Design Single Line Plans to Indicate the Following:
        o   Exterior wall configuration
        o   Doors and store front extent
        o   Canopies and overhangs
        o   Probable column locations at exterior and abutting our building on interior

    C.  Exterior Elevation Drawings to Indicate the Following:
        o   Opaque wall areas with doors and store fronts

2.  After approval has been granted of conceptual design phase submitted in accordance with the guidelines specified in <u>Section 1</u> above, the constructing party shall submit final design phase plans to the Approving Parties as follows:

    A.  Site Design Documents Delineating Information Outlined in the Concept Phase with the Following Added Detail:
        o   Refined grading plans
        o   Selected lighting fixtures and resultant lighting levels in foot candles
        o   Landscaping showing generic planting materials and locations
        o   Proposed paving section designs and location
        o   Utility layouts including hydrants and sizes proposed
        o   Proposed details for curbs, site structures, manholes, etc.
        o   Proposed site signage designs and locations

    B.  Building Design Plans Delineating Information Outlined in the Concept Phase with the Following Added Detail:
        o   Exterior wall thicknesses
        o   Structural columns or bearing walls at building exterior and proposed foundation design at adjoining wall between abutting buildings

      o    Where common footings are to be shared provide wall or column load information for design of that footing

      o    Proposed roof plan showing slopes and location of penthouses or other major mechanical equipment

      o    References of key flashing details of roof to adjoining building

C.    Exterior Elevation Drawings Delineating Information Outlined in the Concept Phase with the Following Added Detail:

      o    Proposed building sign standards

      o    Paint color chips and samples of other materials such as brick or concrete aggregates (glass or aluminum finishes may be annotated on the elevations)

      o    Proposed large scale details of key section conditions to show exterior design intent

      o    Major penthouses or rooftop equipment profiles

      o    Features such as special masonry patterns, bands or special materials and textures

      o    Rain leaders or scuppers

      o    Wall sections at various exterior locations including at the demising wall to the adjoining building with key vertical dimensioning

3.    If a building is to have a through-the-wall pedestrian access connection to an adjoining building, then the final design phase submission shall also include (to the owner of such adjoining building) the following:

      o    Plans of the pedestrian mall circulation showing any variations in floor elevations

      o    Elevations/sections of the proposed mall space showing store front sign bulkheads and key dimensions

      o    Proposed ceiling design including special features such as variations in height or skylights

      o    Floor material patterns

      o    Landscaping and mall seating areas

      o    Proposed interior sign guidelines

      o    Paint color chips and samples of other materials such as brick or concrete aggregates (glass or aluminum finishes may be annotated on the plans or elevations)

      o    Proposed large scale details of key section conditions to show interior design intent

4.    The constructing party shall provide the Approving Parties with a complete set of bid documents for the building and/or improvements to be located upon its Tract.

2

# EXHIBIT F
## COMPREHENSIVE SIGN PROGRAM



**ST-1** Center ID Sign / Entry Feature    **ST-2** 16' High Multi-Tenant Monument Sign    **ST-3** 7' High Pad Monument Sign

# QUEEN CREEK
## Freestanding

| SIGN | SIGN TYPE | FUNCTION | LOCATION | QUANTITY |
|---|---|---|---|---|
| SIGN TYPE 1.1 Primary Entry Feature Wall | Wall Feature | Center Identification | Intersection of Ellsworth Road and Rittenhouse Road | 1 |
| SIGN TYPE 1.2, 1.3, 1.4 & 1.5 Entry Feature Wall | Wall Feature | Center Identification | Ellsworth Road Project Entrance and Rittenhouse Road Project Entrance | 4 |
| SIGN TYPE 1.6 & 1.7 Entry Feature Wall | Wall Feature | Center Identification | NWC of Property along Rittenhouse Road and Intersection of Ellsworth Road and Victoria Ln | 2 |
| SIGN TYPE 2 Multi-Tenant Monument Sign | Monument | Multi tenant identification | Placed along Ellsworth Road and Rittenhouse Road | Ellsworth Road (3) Rittenhouse Road (3) |
| SIGN TYPE 3 Pad Monument Sign | Monument | Pad Tenant Identification | Placed along Ellsworth Road and Rittenhouse Road | Ellsworth Road (5) Rittenhouse Road (3) |
| SIGN TYPE 4 Vehicular Directional Sign | Monument | Vehicular Directional | Placed Throughout the Project Site | TBD |
| SIGN TYPE 5 Pedestrian Directory | Kiosk | Pedestrian Directory / Site Map / Promotional | Placed Throughout the Project Site at Pedestrian Locations | TBD |

MATCH A

# MARKETPLACE
## Sign Matrix

MATCH A

| HEIGHT | SIZE | ILLUMINATION | MATERIALS |
|---|---|---|---|
| Primary Entry Feature | 100 SF of Center Identification | Internal and/or ground Illumination | Masonry, Stucco, Textured Aluminum, Powder Coat and Acrylics |
| Entry Feature | 50 SF of Center Identification | Internal and/or ground Illumination | Masonry, Stucco, Textured Aluminum, Powder Coat and Acrylics |
| Entry Feature | 50 SF of Center Identification | Internal and/or ground Illumination | Masonry, Stucco, Textured Aluminum, Powder Coat and Acrylics |
| Sixteen (16') feet to top of sign section exclusive of architectural embellishments | 150 SF Tenant Sign Area Exclusive of Architectural Embellishments | Internal and/or ground Illumination | Masonry, Stucco, Textured Aluminum, Powder Coat and Acrylics |
| Seven (7') feet to top of sign section exclusive of architectural embellishments | 40 SF Tenant Sign Area Exclusive of Architectural Embellishments | Internal and/or ground Illumination | Masonry, Stucco, Textured Aluminum, Powder Coat and Acrylics |
| Six (6') feet to top of sign section exclusive of architectural embellishments | 6 SF Directional Sign Area Exclusive of Architectural Embellishments | Non-Illuminated | Textured Aluminum, Powder Coat and Reflective Vinyl |
| Eight (8') feet to top of the architectural embellishment. | 24 SF / Face (3 faces) of Sign Area Exclusive of Architectural Embellishments | Internal and ground Illumination | Textured Aluminum, Powder Coat and Acrylics |



# ST-1.1

Queen Creek Marketplace

Primary Center ID Sign / Entry Feature  - Scale: NTS



## ST-1.2, 1.3, 1.4 & 1.5
*Secondary Center ID Sign / Entry Feature  - Scale: 1/4"=1'-0"*

**Queen Creek Marketplace**



## ST-1.6 & ST-1.7

**Queen Creek Marketplace**

Tertiary Center ID Sign / Entry Feature  - Scale: 1/4" = 1'-0"



TO STREET

15'-0"

7'-4"

SIGN

SIGN

SIGN

SUPER TARGET

3'-1"

10'-0"

3'-1"

3'-1"

10'-0"

16'-0"

22'-6"

**Queen Creek Marketplace**

Tenant Panels will be 2" Pan-formed aluminum textured and painted. Tenant copy will be routed with white acrylic back-up, 1" FCO clear push-thru with first surface applied colored vinyl per tenant's color requirements.
Illumination will be internal 800ma flourescent.

**ST-2.01   16' High Multi-Tenant Monument Sign (Typical)  Scale: 3/16"=1'-0"**



TO STREET

15'-0"

7'-4"

SIGN

SIGN          SIGN

SIGN          SIGN

3'-1"

10'-0"

3'-1"

3'-1"

10'-0"

16'-0"

10'-0"

22'-6"

**Queen Creek Marketplace**

Tenant Panels will be 2" Pan-formed aluminum textured and painted. Tenant copy will be routed with white acrylic back-up, 1" FCO clear push-thru with first surface applied colored vinyl per tenant's color requirements.
Illumination will be internal 800ma flourescent.

**ST-2.02   16' High Multi-Tenant Monument Sign (Typical)  Scale: 3/16"=1'-0"**



ST-2.03   16' High Multi-Tenant Monument Sign (Typical) Scale: 3/16"=1'-0"

**Queen Creek Marketplace**

Tenant Panels will be 2" Pan-formed aluminum textured and painted. Tenant copy will be routed with white acrylic back-up, 1" FCO clear push-thru with first surface applied colored vinyl per tenant's color requirements.
Illumination will be internal 800ma flourescent.



**ST-2.04   16' High Multi-Tenant Monument Sign (Typical)  Scale: 3/16"=1'-0"**

**Queen Creek Marketplace**

Tenant Panels will be 2" Pan-formed aluminum textured and painted. Tenant copy will be routed with white acrylic back-up, 1" FCO clear push-thru with first surface applied colored vinyl per tenant's color requirements.
Illumination will be internal 800ma flourescent.



TO STREET

15'-0"

7'-4"

SIGN

SUPER
**TARGET**

SIGN

SIGN

3'-1"

10'-0"

3'-1"

3'-1"

10'-0"

16'-0"

22'-6"

**ST-2.05   16' High Multi-Tenant Monument Sign (Typical)  Scale: 3/16"=1'-0"**

**Queen Creek Marketplace**

Tenant Panels will be 2" Pan-formed
aluminum textured and painted.
Tenant copy will be routed with white
acrylic back-up, 1" FCO clear
push-thru with first surface applied
colored vinyl per tenant's color
requirements.
Illumination will be internal
800ma flourescent.



TO STREET

15'-0"

7'-4"

SIGN

SIGN        SIGN

SIGN        SIGN

10'-0"

3'-1"

10'-0"

3'-1"

3'-1"

16'-0"

22'-6"

**ST-2.06   16' High Multi-Tenant Monument Sign (Typical)  Scale: 3/16"=1'-0"**

**Queen Creek Marketplace**

Tenant Panels will be 2" Pan-formed
aluminum textured and painted.
Tenant copy will be routed with white
acrylic back-up, 1" FCO clear
push-thru with first surface applied
colored vinyl per tenant's color
requirements.
Illumination will be internal
800ma flourescent.



7'-0"

7'-0"

5'-8"

PAD
TENANT

11'-4"

**ST-3   7' High Pad Monument Sign (Typical)     Scale: 1/4"=1'-0"**

**Queen Creek Marketplace**

Tenant Panels will be 2" Pan-formed
aluminum textured and painted.
Tenant copy will be routed with white
acrylic back-up, 1" FCO clear
push-thru with first surface applied
colored vinyl per tenant's color
requirements.
Illumination will be internal
800ma flourescent.

# QUEEN CREEK MARKETPLACE

## General Requirements
## Signage

These criteria have been established for the purpose of maintaining a continuity of quality and aesthetics throughout Queen Creek Marketplace for the mutual benefit of all tenants, and to comply with the approved Comprehensive Sign Plan for the development, regulations of the Town of Queen Creek Sign Ordinance, building and electrical codes of any governmental authority having jurisdiction. Conformance will be strictly enforced, and any non-compliant sign(s) installed by a Tenant shall be brought into conformance at the sole cost and expense of the Tenant. This criteria is subject to final approval by the Town of Queen Creek as part of a Comprehensive Sign Plan submittal. If a conflict is found to exist between these criteria and the final criteria approved by the Town of Queen Creek, the latter shall prevail.

I.    GENERAL REQUIREMENTS

      A.    Tenant shall submit or cause to be submitted to Developer, for approval, prior to fabrication, four (4) copies of detailed drawings indicating the location, size, layout, design color, method of illumination, materials, and method of attachment of Tenant's building mounted signage.

      B.    Tenant or Tenant's representative shall obtain all required permits for signs and their installation.

      C.    All building mounted signs shall be constructed and installed at Tenant's sole expense. All freestanding site signage will be fabricated and installed by Developer's designated sign contractor. Tenant shall provide electronic artwork suitable for production to Developer's sign contractor who will produce Tenant's signage on the site signage. Tenant shall reimburse Developer for all site signage costs in accordance to the terms of their respective lease agreement.

      D.    Tenant shall be responsible for the fulfillment of all requirements and specifications, including those of the local municipality.

      E.    All signs shall be reviewed for conformance with these criteria and overall design quality. Approval or disapproval of sign submittals based on aesthetics of design shall remain the sole right of Developer or Developer's authorized representative.

F.   Tenant shall be responsible for the installation and maintenance of Tenant's sign.  Should Tenant's sign require maintenance or repair, Developer shall give Tenant thirty (30) days written notice to effect said maintenance or repair.  Should Tenant fail to do the same, Developer may undertake repairs and Tenant shall reimburse Developer within ten (10) days from receipt of Developer's invoice.

G.   Advertising devices such as attraction boards, posters, banners and flags shall not be permitted except for temporary banners that may be permitted to announce a grand opening or seasonal sale.  Temporary banners must be approved in writing by the Developer prior to its installation.  Permits, if required by the Town of Queen Creek, shall be obtained prior to installation.

## II.   SPECIFICATIONS - TENANT BUILDING SIGNAGE

A.   General Specifications

1.   No animated, flashing or audible signs shall be permitted.

2.   All signs, including temporary signs and their installation shall comply with all Town of Queen Creek building and electrical codes.

3.   No exposed raceways, crossovers or conduit shall be permitted unless physical circumstances exist that prohibit the signage to otherwise be installed. All tenant signage shall consist of individual letters and logos installed onto the building's wall surface. Sign cabinets are discouraged, however, may be approved if part of the Tenant's nationally recognized corporate identification program.  Tenant signage shall not include any background color, material and/or structure used to delineate tenant's signage unless part of the Tenant's nationally recognized corporate identification program. The Developer shall have the sole and separate discretion in approving and/or varying any provision of these specifications.

4.   All cabinets, conductors, transformers and other equipment shall be concealed wherever possible.

5.   Temporary signs and banners and painted lettering shall not be permitted except as approved by the Developer and the Town of Queen Creek.

6.   Any damage to a wall surface or roof deck resulting from Tenant's sign installation shall be repaired at Tenant's sole cost. Should Tenant fail to do the same, Developer may undertake repairs and Tenant shall reimburse Developer within ten (10) days from receipt of Developer's invoice.

7.  Upon removal of any sign by Tenant, any damage to a wall surface and/or architectural element shall be repaired at Tenant's cost. Should Tenant fail to do the same, Developer may undertake repairs and Tenant shall reimburse Developer within ten (10) days from receipt of Developer's invoice.

B.  Location of Signs

1.  All signs or devices advertising an individual use, business or building shall be attached to the building at the location directed and authorized by the Developer.

## III.    DESIGN REQUIREMENTS BUILDING SIGNAGE

Individual illuminated letters and logos are recommended and may include pan channel metal letters with acrylic sign faces, reverse pan channel "backlit" illuminated letters, or any combination thereof. The letters are to be mounted onto the building fascia. Electrical connections shall be concealed to remote and/or self-contained transformers. All signage shall be installed in compliance to the Town of Queen Creek electrical code and UL 2161 / UL 48 specifications. Any sign installation found to be non-compliant shall be repaired immediately by the Tenant at Tenant's sole expense.

A.  Sign Area

1.  The maximum aggregate sign area per building elevation for each tenant shall be calculated by multiplying one and one-half (1.50) times the length of the Tenant's storefront(s) and/or elevation(s) occupied by the Tenant without limitation as to maximum sign area and/or number of sign elements.  As a minimum allowance, Tenants occupying less than thirty three (33) feet of storefront and/or elevation shall be permitted a minimum of fifty (50) square feet of sign area.

B.  Letter Height and Placement Restrictions

1.  Tenant signage shall be installed in accordance with the approved Comprehensive Sign Plan in location(s) designated by the Developer and/or Developer's agents.

2.  Majors and Pad tenants occupying less than 9999 SF shall be limited to a maximum letter height of thirty six (36") inches. Shop tenants shall be limited to a maximum letter height of twenty four (24") inches. Majors occupying 10000 SF through 49999 SF shall be limited to a maximum letter height of sixty (60") inches. Anchors occupying greater than 50000 SF shall be limited to a maximum letter height of seventy two (72") inches.  Logos shall not be subject to maximum letter height

restrictions herein established. However, Logos shall be included in sign area computations. Anchors, Majors, Pad, and Shop Tenants shall be permitted to utilize their corporate identification program subject to sign area limitations contained in the approved Comprehensive Sign Plan. All signage shall be reviewed and approved by the developer and shall be appropriate to the surrounding building features, environment, and thematic design of Queen Creek Marketplace. The Developer and the Town of Queen Creek shall have discretion in varying any provision of these specifications.

3.  Sign on Wall Surface: No sign shall exceed eighty (80%) percent of the height and/or width of the building elevation and/or wall surface upon which it is placed. The available surface area of the wall may affect letter height.

4.  Where Shop Tenant signage is installed on a common sign band and/or wall surface, the overall length of the sign shall not exceed a maximum of eighty (80%) percent of the Tenant's leased storefront length. This percentage may be less if warranted by architectural conditions.

C.  Letter Style or Logo Restrictions

1.  Copy and/or logos utilized shall be Tenant's choice, subject to the approval of Developer and/or Developer's agents and the Town of Queen Creek.

D.  Illumination

1.  Tenant building signage may be internally illuminated, backlit to create a silhouette, exposed neon and/or any combination of lighting methods mentioned herein.

E.  Under Canopy Blade Sign

1.  Each Shop Tenant shall be required to install graphic copy, at Tenant's cost, on the under canopy blade sign furnished by the Developer in accordance to the specifications contained in this Comprehensive Sign Plan. Anchor, Majors and Pad Tenants shall have the option to do so. For cost efficiencies and design/construction uniformity, all under canopy blade signs will be manufactured by the Developer's project sign contractor and purchased in bulk by Developer. Each Tenant that is required to have a blade sign shall reimburse the Developer for the cost of the display and its installation thereof.

2.  All under canopy blade sign copy shall consist of flat cut out graphics and shall be surface applied to both sides of the display. The Developer and/or

Developer's Agents shall approve in writing all copy and layout prior to its installation. Each Shop Tenant shall furnish and install the approved copy for said display at Tenant's sole and separate expense. For convenience, Tenant can furnish the copy to Developer's project sign contractor for mounting and/or can provide the project's sign contractor with electronic art suitable for production. Tenant shall pay for all costs associated with the production and mounting of Tenant's blade sign copy.

3.    The blade sign shall be suspended and/or projected using a mechanism consistent with other under canopy blade signs throughout the Queen Creek Marketplace as specified.

## IV.    GENERAL CONSTRUCTION REQUIREMENTS

A.    All exterior signs shall be secured by concealed fasteners, stainless steel, or nickel or cadmium plated.

B.    All illuminated signage shall be fabricated in a manner to conceal light leaks.

C.    All penetrations of the building structure required for sign installation shall be neatly sealed in a watertight condition.

D.    Required labels or other identification shall be permitted on the exposed surface of signs and shall be applied in an inconspicuous location.

E.    Tenant shall be fully responsible for the operations of Tenant's sign contractors and shall indemnify, defend and hold Developer harmless for, from and against damages or liabilities on account thereof.  Tenants shall employ licensed contractors and shall furnish to the Developer Certificates of Insurance for both General Liability and Workers Compensation prior to commencement of any sign installation.

# QUEEN CREEK M ▶

## Building Sign
## Major Ten

MATCH B ▶

| SIGN | SIGN TYPE | FUNCTION | LOCATION | HEIGHT |
|---|---|---|---|---|
| Major Tenant with occupancy of 50,000 SF or greater | Wall Mounted Signs | Tenant Identification | All elevations that offer readability | 72" Maximum Letter Height Exclusive of Logos |
| Major Tenant with occupancy greater than 10,000 SF through 49,999 SF | Wall Mounted Signs | Tenant Identification | All elevations that offer readability | 60" Maximum Letter Height Exclusive of Logos |
| Major Tenant with occupancy 9,999 SF or less | Wall Mounted Signs | Tenant Identification | All elevations that offer readability | 36" Maximum Letter Height Exclusive of Logos |
| All Major Tenants | Under Canopy Blade Sign (Optional) | Tenant Identification | In front of tenant's leased space | Below architectural canopy. Maintain 8' Clearance AFF |

*Comprehensive Sign Plan subject to Town of Queen Creek approval as part of a PAD*

# ARKETPLACE

MATCH B

## Matrix
ants

| SIZE | ILLUMINATION | MATERIALS |
|---|---|---|
| 1.50 SF / Linear Foot of Building Street Frontage or Elevation Upon Which Signage is Placed (Typical) | Interior, Backlit or a combination thereof. | Aluminum, Acrylic, Painted Metal, Flexface Material |
| 1.50 SF / Linear Foot of Building Street Frontage or Elevation Upon Which Signage is Placed (Typical) | Interior, Backlit or a combination thereof | Aluminum, Acrylic, Painted Metal, Flexface Material |
| 1.50 SF / Linear Foot of Building Street Frontage or Elevation Upon Which Signage is Placed (Typical) | Interior, Backlit or a combination thereof | Aluminum, Acrylic, Painted Metal, Flexface Material |
| 8 SF | Non-illuminated | Aluminum, Acrylic, Painted Metal, Vinyl Graphics |

# QUEEN CREEK

## Building Shop

MATCH C

| SIGN | SIGN TYPE | FUNCTION | LOCATION |
|------|-----------|----------|----------|
| Shop Tenants | Wall Signs | Tenant ID | Wall surfaces and architectural features designed to accommodate signage. |
| Shop Tenants | Under Canopy Blade Sign (Mandatory) | Tenant ID | In front of tenant's leased space |

*Comprehensive Sign Plan subject to Town of Queen Creek approval as part of a PAD*

# MARKETPLACE

## Sign Matrix
## Tenants

MATCH C

| HEIGHT | SIZE | ILLUMINATION | MATERIALS |
|--------|------|--------------|-----------|
| Within Building Silhouette | 1.5 SF / Linear Foot of Building Street Frontage (Typical)<br><br>50 SF Minimum (Typical) Per Building Elevation Upon Which Signage is Placed<br><br>36" Maximum Letter Height | Interior, Backlit or a Combination thereof. | Aluminum, Acrylic, Painted Metal, Flexface Material |
| Below architectural canopy. Maintain 8' Clearance AFF | 8 SF | Non-illuminated | Aluminum, Acrylic, Painted Metal, Vinyl Graphics |

# QUEEN CREEK MAR

## Sign Matrix
## Pad Tenants

MATCH D

| SIGN | SIGN TYPE | FUNCTION | LOCATION | HEIGHT |
|------|-----------|----------|----------|--------|
| Pad Tenant | Wall Signs | Tenant ID | Wall surfaces and architectural features designed to accommodate signage. | Within Building Silhouette |
| Pad Tenant | Under Canopy Blade Sign (Optional) | Tenant ID | In front of tenant's leased space | Below architectural canopy.  Maintain 8' Clearance AFF |
| Pad Tenant | Menu Signs | Menu Display and Pricing | Drive Thru | Per Town of Queen Creek Sign Ordinance |
| Pad Tenant | Traffic Directionals | Vehicular | Driveways and Drive Thru as Required | Per Town of Queen Creek Sign Ordinance |
| Pad Tenant | ATM | ATM | Wall or Freestanding | Per Town of Queen Creek Sign Ordinance |

*Comprehensive Sign Plan subject to Town of Queen Creek approval as part of a PAD*

# KETPLACE

MATCH D

| SIZE | ILLUMINATION | MATERIALS |
|---|---|---|
| 1.5 SF / Linear Foot of Building Street Frontage (Typical)<br><br>50 SF Minimum (Typical)<br><br>36" Maximum Letter Height Exclusive of Logos | Interior, Backlit, or a combination thereof. | Aluminum, Acrylic, Painted Metal, Flexface Material |
| 8 SF | Non-Illuminated | Aluminum, Acrylic, Painted Metal, Vinyl Graphics |
| Per Town of Queen Creek Sign Ordinance | Interior and Ground Illumination | Aluminum, Acrylic, Painted Metal, Flexface Material |
| Per Town of Queen Creek Sign Ordinance | Interior and Ground Illumination | Aluminum, Acrylic, Painted Metal, Flexface Material |
| Per Town of Queen Creek Sign Ordinance | Interior and Ground Illumination | Aluminum, Acrylic, Painted Metal, Flexface Material |

**EXHIBIT G**
**INTENTIONALLY OMITTED**

**EXHIBIT X**
**SITE PLAN**



## Target Exhibit X

N.T.S.



X-1



Target Exhibit X

BUILDING
AREA
PROPERTY
LINE

SEE SHEET X5 FOR CONTINUATION

SEE SHEET X3 FOR CONTINUATION

N.T.S.

QUEEN CREEK
MARKETPLACE

X-2

Vestar



BOWLING
ALLEY
LIMIT

SEE SHEET X2 FOR CONTINUATION

PROPERTY
LINE

BUILDING
AREA

OUTDOOR
SEATING
AREA

PERMITTED KIOSK AREA
AND OUTDOOR SEATING
AREA
TARGET
MONUMENT SIGN

SEE SHEET X4 FOR CONTINUATION

SHOPS G

SHOPS F

MAJOR O    MAJOR P    MAJOR Q    MAJOR
           IN-LINE                S
           SPACE

SEE SHEET X6 FOR CONTINUATION

ACCESS DRIVE

**Target Exhibit X**



N.T.S.

X-3



**AGGREGATE PARKING ZONE**

**PROPERTY LINE**

**ACCESS DRIVE**

**BUILDING AREA**

**OUTDOOR SEATING AREA**

SEE SHEET X3 FOR CONTINUATION

SEE SHEET X7 FOR CONTINUATION

PAD B

PAD C

PAD A

SHOPS A

IN-LINE SPACE

MAJOR A

**Target Exhibit X**

N.T.S.



X-4



SEE SHEET X2 FOR CONTINUATION

PROPERTY LINE

OUTDOOR SEATING AREA

BUILDING AREA

AGGREGATE PARKING ZONE

PERMITTED PROMOTIONAL ACTIVITIES

TARGET MONUMENT SIGN

SHOPS E

PAD

PAD J

SEE SHEET X8 FOR CONTINUATION

SEE SHEET X6 FOR CONTINUATION

ACCESS DRIVE

**Target Exhibit X**



N.T.S.
QUEEN CREEK
MARKETPLACE

X-5

Vestar

**OUTDOOR SEATING AREA**

**SEE SHEET X3 FOR CONTINUATION**

**SEE SHEET X5 FOR CONTINUATION**

**SEE SHEET X7 FOR CONTINUATION**

**SEE SHEET X9 FOR CONTINUATION**

**TARGET TRACT**

**BUILDING AREA**

PAD E

PAD F

PAD G

PAD H

**ACCESS DRIVE**

**BOWLING ALLEY LIMIT**

**AGGREGATE PARKING ZONE**

**DIRECTIONAL SIGN**

**Target Exhibit X**

N.T.S.

QUEEN CREEK MARKETPLACE

Vestar

X-6



**AGGREGATED PARKING AREA**

**ACCESS DRIVE**

**OUTDOOR SEATING AREA**

**OUTSIDE SALES AREA**

SEE SHEET X4 FOR CONTINUATION

SEE SHEET X6 FOR CONTINUATION

SEE SHEET X10 FOR CONTINUATION

MAJOR A

IN-LINE SPACES

MAJOR B

MAJOR C

SHOPS C

MAJOR F

**BUILDING AREA**

**PERMITTED KIOSK AREA**

**PROPERTY LINE**

**DIRECTIONAL SIGNS**

**PRIMARY BUILDING AREA**

**TARGET TRACT**

**Target Exhibit X**

N.T.S.



X-7



**Target Exhibit X**



**Target Exhibit X**



Target Exhibit X

PROPERTY LINE

BUILDING AREA

PRIMARY BUILDING AREA

SEE SHEET X9 FOR CONTINUATION

SEE SHEET X7 FOR CONTINUATION

ACCESS DRIVE

N.T.S.

QUEEN CREEK MARKETPLACE

Vestar

X-10