# EXHIBIT C

Store No. 286
Queen Creek, AZ

LEASE

Between

TRADER JOE'S COMPANY

a California corporation,

as Tenant

and

QCM Partners LLC,

a Delaware limited liability company,

as Landlord

dated February 13, 2020

**QUEEN CREEK MARKETPLACE SHOPPING CENTER**

TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| 1. | PREMISES | 1 |
| 2. | TERM | 1 |
| 3. | RENT | 6 |
| 4. | CONSTRUCTION | 8 |
| 5. | FIXTURES | 13 |
| 6. | USE OF PREMISES | 13 |
| 7. | PAYMENT OF TAXES | 17 |
| 8. | DAMAGE AND DESTRUCTION | 19 |
| 9. | INSURANCE AND INDEMNIFICATION | 22 |
| 10. | EXERCISE OF EMINENT DOMAIN | 25 |
| 11. | UTILITIES | 27 |
| 12. | LIENS | 28 |
| 13. | ASSIGNMENT AND SUBLETTING | 28 |
| 14. | NOTICES | 29 |
| 15. | RIGHT TO GO UPON PREMISES | 29 |
| 16. | MAINTENANCE | 30 |
| 17. | DEFAULT | 31 |
| 18. | SIGNS AND COMMUNICATIONS EQUIPMENT | 33 |
| 19. | REPRESENTATIONS AND WARRANTIES | 35 |
| 20. | COMMON AREA | 36 |
| 21. | ATTORNEYS' FEES | 45 |
| 22. | SUBORDINATION, NONDISTURBANCE & ATTORNMENT AGREEMENTS; ESTOPPEL CERTIFICATES | 45 |
| 23. | HOLDING OVER; END OF TERM | 46 |
| 24. | DISPUTE RESOLUTION | 46 |
| 25. | SUCCESSORS IN INTEREST | 47 |
| 26. | MEMORANDUM OF LEASE | 47 |
| 27. | REMEDIES ARE CUMULATIVE | 47 |
| 28. | QUIET POSSESSION | 47 |
| 29. | ALTERATION | 47 |
| 30. | EFFECTIVENESS | 48 |

ii

31.   MERCHANT'S ASSOCIATION; MARKETING FUND ............................................... 48
32.   HAZARDOUS SUBSTANCES .................................................................................. 48
33.   GENERAL PROVISIONS ......................................................................................... 49

325821301.2

# EXHIBITS

| EXHIBIT "A" | LEGAL DESCRIPTION OF SHOPPING CENTER |
|---|---|
| EXHIBIT "B" | SITE PLAN |
| EXHIBIT "B-1" | PADS P, Q & R FOR PROHIBITED USES EXCEPTION |
| EXHIBIT "C" | CONSTRUCTION |
| EXHIBIT "D" | MEMORANDUM OF LEASE |
| EXHIBIT "E" | SUBORDINATION, NONDISTURBANCE & ATTORNMENT AGREEMENT |
| EXHIBIT "F" | SHOPPING CENTER SIGN CRITERIA |
| EXHIBIT "F-1" | TENANT'S SIGN PLANS |
| EXHIBIT "F-2" | PYLON/MONUMENT SIGNS |
| EXHIBIT "G" | ESTOPPEL |
| EXHIBIT "H" | SHOPPING CENTER RULES AND REGULATIONS |
| EXHIBIT "I" | EXISTING EXCLUSIVE AND PROHIBITED USES |
| EXHIBIT "J" | USE RESTRICTION WAIVER LETTER |
| EXHIBIT "K" | EXISTING TENANTS |
| EXHIBIT "L" | EXISTING TENANTS WITH GENERAL USE OR ASSIGN/SUBLEASE WITHOUT LL CONSENT RIGHTS |
| EXHIBIT "M" | RULES AND REGULATIONS FOR EXPRESSIVE ACTIVITIES |

325821301.2

<u>L E A S E</u>

THIS LEASE is made on February 13, 2020 (the "**Effective Date**"), by and between QCM PARTNERS LLC, a Delaware limited liability company , whose address is set forth in <u>Paragraph Q</u> of the Basic Lease Terms ("**Landlord**") and TRADER JOE'S COMPANY, a California corporation, whose address is set forth in <u>Paragraph Q</u> of the Basic Lease Terms ("**Tenant**").

W I T N E S E T H :

**BASIC LEASE TERMS**

| A. | **Premises:** | The area depicted on **Exhibit "B"** attached hereto, containing approximately 12,578 square feet of Floor Area. The building containing the Premises is referred to herein as the "**Building**". The final size and configuration of the Building shall be mutually agreed upon by the parties. | <u>Section 1(a)</u> |
|---|---|---|---|
| B. | **Shopping Center:** | The real property legally described on **Exhibit "A"** attached hereto, located in the Town of Queen Creek ("**Town**"), County of Maricopa, State of Arizona together with all buildings and other improvements constructed or to be constructed thereon, and commonly known as the Queen Creek Marketplace Shopping Center. The Shopping Center contains, or shall contain, approximately eight hundred fifty-nine thousand five hundred seventy-five (859,575) square feet of Floor Area. | <u>Section 1(a)</u> |
| C. | **Parking:** | Required parking ratio is four (4) spaces per thousand square feet (1,000) square feet of Floor Area.<br><br>Minimum number of parking spaces in the Shopping Center is three thousand nine hundred fifty-five (3,955) spaces. | <u>Section 20(a)(i)</u> |
| D. | **Primary Term:** | Approximately 10 years commencing on _____, and expiring on _____ (subject to the right to extend per Section 2(e)).[1] | <u>Section 2(d)</u> |

---

[1] This information to be added to Lease per amendment once determined.

i

| E. | **Rent Commencement Date:** | [to be inserted when determined][2] | Section 2(f) |
|----|----|----|----|
| F. | **Extension Options:** | 4 options to extend the Term of 5 years each, to be exercised 180 days before expiration of then current term.  The first option must be exercised by _____.[3] | Section 2(e) |
| G. | **Initial Fixed Minimum and Rent Tax:** | **Initial Fixed Minimum Rent**: $26.00 per square foot of Floor Area in the Premises per annum, or $327,028 per annum, payable in equal monthly installments of $27,252.33, based on a Floor Area of 12,578 square feet, subject to adjustment upon final measurement pursuant to Section 4(m).<br><br>**Rent Tax**: Rent tax of 2.75% of Fixed Minimum Rent, equal to $8,993 per annum, payable monthly (along with Fixed Minimum Rent) in the amount of $749.44. | Sections 3(a)(i) and 3(e) |
| H. | **Adjustments to Fixed Minimum Rent:** | On the first (1st) day of the month following every fifth (5th) anniversary of the Rent Commencement Date, Fixed Minimum Rent is increased by the percentage change in the Index subject to a maximum increase of 10%. If, however, the Rent Commencement Date is the first (1st) day of a calendar month, then the adjustment described in this Paragraph H shall occur on the fifth (5th) anniversary of the Rent Commencement Date and on the same day each five (5) years thereafter. | Section 3(a)(ii) |
| I. | **TI Allowance:** | None. | Section 4(o) |
| J. | **Landlord Covenant:** | Excluding Target, Dollar Tree, Bed Bath & Beyond, Total Wine and Bev Mo, so long as there is not in existence and continuing an Event of Default and so long as Tenant is conducting business operations within the Premises for the Grocery Use (subject to Permitted Closures), Landlord and its affiliates shall not sell or lease or enter into other | Section 6(c) |

---

[2] This information to be added to Lease per amendment once determined.

[3] This information to be added to Lease per amendment once determined.

| | | | |
|---|---|---|---|
| | | occupancy agreements (including, without limitation, licenses) premises within the Shopping Center to (i) a direct competitor of Tenant such as Sprouts, Whole Foods, Dean and Deluca or Natural Grocers and/or (ii) a tenant whose primary use is the sale of groceries (without regard to whether such tenant also sells alcoholic beverages). | |
| K. | **Delivery Hours:** | 24 hours a day, 7 days a week. | Section 20(d) |
| L. | **Pro Rata Share:** | 1.54% for Common Area Charges*<br>68.32% for Real Property Taxes<br>2.13% for Insurance Charges**<br><br>* Landlord allocates Common Area Charges amongst the tenants and occupants of the Shopping Center on a line item by line item basis. As such, the percentage set forth above is subject to adjustment to take into account tenants and occupants who have self-maintained or self-provided with respect to a particular component of Common Area Charges and therefore do not participate in such line item, provided Landlord consistently applies such allocation across all tenants and occupants in the Shopping Center and provides Tenant reasonable backup documentation showing the allocation calculations are equitable.<br><br>**Landlord allocates Insurance Charges amongst the tenants and occupants of the Shopping Center on a line item by line item basis. As such, the percentage set forth above is subject to adjustment to account for those tenants who self-insure or provide their own policies of insurance with respect to a particular component of Insurance Charges, provided Landlord consistently applies such allocation across all tenants and occupants in the Shopping Center and provides Tenant reasonable backup documentation showing the allocation calculations are equitable. | Sections 7(b) and 20(f) |

| M. | **First Year Cap and Rent Tax:** | $6.15 per square foot of Floor Area of the Premises, plus Rent Tax of 2.75% - $0.17 as follows:<br><br>Common Area Maintenance Charges: $1.77 psf<br><br>Real Property Taxes : $4.22 psf<br><br>Insurance Charges: $0.16 psf<br><br>If the First Year (as defined in Section 2(h)) contains more than three hundred sixty-five (365) days, each of the figures set forth above shall be multiplied by a fraction, the numerator of which is the number of days in the First Year and the denominator of which is three hundred sixty-five (365). | Section 20(f)(vi) |
| N. | **Ongoing Cap on Controllable Common Area Maintenance Charges:** | The lesser of (i) the change in the Index (as defined in Section 3(a)(ii)) during the preceding calendar year or (ii) three percent (3%) over the Controllable Common Area Maintenance Charges paid by Tenant during the preceding calendar year. | Section 20(f)(vi) |
| O. | **CC&Rs/REAs:** | The following shall collectively be referred to herein as the "**Target OEA**": Together, that certain (i) Operation and Easement Agreement dated January 30, 2007 executed by Landlord and Target Corporation, a Minnesota corporation, recorded on January 31, 2007 in the Official Records of Maricopa County, Arizona as Instrument No. 2007-0124860, (ii) First Amendment to Operation and Easement Agreement recorded on December 11, 2007 in the Official Records of Maricopa County, Arizona as Instrument No. 2007-1299325, (iii) Supplemental Declaration of Covenants and Restrictions recorded on January 14, 2010 in the Official Records of Maricopa County, Arizona as Instrument No. 2010-032385, (iv) First Amendment to Supplemental Declaration of Covenants and Restrictions recorded on July 11, 2012 in the Official Records of Maricopa County, Arizona as Instrument No. 2012-0606129, (v) Supplemental Declaration | Sections 1(b) and 20(g) |

iv

|  |  | of Covenants and Restrictions recorded on July 9, 2010 in the Official Records of Maricopa County, Arizona as Instrument No. 2010-0583082, (vi) Second Amendment to Operation and Easement Agreement recorded on December 3, 2013 in the Official Records of Maricopa County, Arizona as Instrument No. 2013-1030866, (vii) Supplemental Declaration of Covenants and Restrictions recorded on October 10, 2014 in the Official Records of Maricopa County, Arizona as Instrument No. 2014-0673292, and (viii) all amendments, modifications, extensions, replacements, supplements and renewals thereof, so long as such changes do not impair, in any material respect, Tenant's rights under this Lease; all of which shall be superior to this Lease, binding upon the Shopping Center and run with the land. |  |
| P. | **Broker(s):** | CBRE and IDS Real Estate Group for Tenant; Western Retail Advisors and Vestar Properties, Inc. for Landlord | Section 33(c) |

| Q. | **Addresses for Notices and Payments:** | | Section 14 |
|---|---|---|---|
| | LANDLORD<br><br>**Notices To:**<br>QCM PARTNERS, LLC<br>c/o Vestar<br>2425 East Camelback Road, Suite 750<br>Phoenix, AZ 85016<br>Attention: President – Management Services<br><br>and<br><br>The Northwestern Mutual Life Insurance Company<br>720 East Wisconsin Avenue<br>Milwaukee, WI 53202<br>Attention: Real Estate Investment Department<br><br>Address for Payments of Rent<br>QCM PARTNERS, LLC<br>c/o Vestar<br>P.O. Box 60051<br>City of Industry, CA 91716 | | TENANT<br><br>**Notices To:**<br><br>Trader Joe's Company<br>800 South Shamrock Avenue<br>Monrovia, CA 91016<br>Attn: Real Estate Department<br><br>**With a copy to (which shall not constitute notice):**<br><br>realestateteam@traderjoes.com |
| R. | **Security Deposit** | | None |
| S. | **Rights of First Refusal** | | None |
| T. | **Guarantor** | | None |

vi

The foregoing Basic Lease Terms are intended to supplement and/or summarize the provisions set forth in the balance of this Lease. If there is any conflict between any provisions contained in the Basic Lease Terms and the balance of this Lease, the balance of this Lease shall control.

After commencement of the Primary Term, the parties shall revise the Basic Lease Terms by amendment to this Lease to insert the applicable dates and to make any required adjustments based on the actual size of the Premises.

**Landlord**

**QCM PARTNERS, LLC,**
a Delaware limited liability company

By:   Vestar NM Retail Acquisitions, LLC,
        a Delaware limited liability company,
        its sole member

    By:   The Northwestern Mutual Life
        Insurance Company, a Wisconsin
        corporation, a member

        By:   Northwestern Mutual
            Investment Management
            Company, LLC, a Delaware
            limited liability company, its
            wholly-owned affiliate

            By:   _____

                JESSICA SCUDEN
                Managing Director

By:   Vestar Retail Acquisitions Manager,
        LLC, a Delaware limited liability
        company, a member

    By: _____
    Name: _____
    Title: _____

**Tenant**

TRADER JOE'S COMPANY,
a California corporation

By:_____
    Bryan Palbaum
    President

vii

The foregoing Basic Lease Terms are intended to supplement and/or summarize the provisions set forth in the balance of this Lease.  If there is any conflict between any provisions contained in the Basic Lease Terms and the balance of this Lease, the balance of this Lease shall control.

After commencement of the Primary Term, the parties shall revise the Basic Lease Terms by amendment to this Lease to insert the applicable dates and to make any required adjustments based on the actual size of the Premises.

| Landlord | Tenant |
|---|---|
| **QCM PARTNERS, LLC,**<br>a Delaware limited liability company | TRADER JOE'S COMPANY,<br>a California corporation |

By:   Vestar NM Retail Acquisitions, LLC,
      a Delaware limited liability company,
      its sole member

      By:   The Northwestern Mutual Life
            Insurance Company, a Wisconsin
            corporation, a member

            By:   Northwestern Mutual
                  Investment Management
                  Company, LLC, a Delaware
                  limited liability company, its
                  wholly-owned affiliate

                By:   _____

                      _____
                      Managing Director

By:   Vestar Retail Acquisitions Manager,
      LLC, a Delaware limited liability
      company, a member

By: _____
Name: _____   J. Paul Rhodes
Title: _____   Manager

Tenant

TRADER JOE'S COMPANY,
a California corporation

By:_____
      Bryan Palbaum
      President

56837\390699\222465005.v14
325797155.2

The foregoing Basic Lease Terms are intended to supplement and/or summarize the provisions set forth in the balance of this Lease.  If there is any conflict between any provisions contained in the Basic Lease Terms and the balance of this Lease, the balance of this Lease shall control.

After commencement of the Primary Term, the parties shall revise the Basic Lease Terms by amendment to this Lease to insert the applicable dates and to make any required adjustments based on the actual size of the Premises.

**Landlord**

**QCM PARTNERS, LLC,**
a Delaware limited liability company

By:    Vestar NM Retail Acquisitions, LLC,
      a Delaware limited liability company,
      its sole member

      By:   The Northwestern Mutual Life
            Insurance Company, a Wisconsin
            corporation, a member

            By:   Northwestern Mutual
                 Investment Management
                 Company, LLC, a Delaware
                 limited liability company, its
                 wholly-owned affiliate

            By:   _____
                _____
                Managing Director

By:    Vestar Retail Acquisitions Manager,
      LLC, a Delaware limited liability
      company, a member

      By: _____
      Name: _____
      Title: _____

**Tenant**

**TRADER JOE'S COMPANY,**
a California corporation

By: _____
    Bryan Palbaum
    President

S-1

1.          PREMISES

(a)      Demise.

Landlord leases to Tenant, and Tenant leases from Landlord, on the terms and conditions contained in this Lease, the Premises as described in Paragraph A of the Basic Lease Terms, which is located in the Shopping Center as described in Paragraph B of the Basic Lease Terms.

Tenant shall have the right, at no cost, to exclusively use, but subject to the terms of this Lease (which may include rights expressly reserved by Landlord): (i) the Cart Corral Areas (as defined in Section 20(g)(i)) for storage of its shopping carts; (ii) the Outdoor Display Area (as defined in Section 20(g)(ii)) for displaying merchandise; (iii) the Loading Area (as defined in Section 20(g)(iii)) for loading and unloading; (iv) the Trash Enclosure Area (as defined in Section 20(g)(iv)) for storage of trash containers; (v) the Empty Pallet Enclosure Area (as defined in Section 20(g)(v)) for storage of empty pallets and warehouse returns; and (vi) the Recycling Room (as defined in Section 20(g)(vi)) for a recycling room.

(b)      Rights to Use Common Area.  Landlord hereby grants to Tenant, its customers and invitees: (i) the non-exclusive right to use, in common with other tenants and occupants of the Shopping Center, their subtenants, licensees and invitees, subject to the REA/CC&Rs, all portions of the Shopping Center intended for common use (the "**Common Area**"), including but not limited to parking areas, roads, streets, drives, cart corrals, truck and delivery passages and areas, customer loading zones, landscaped and planted areas, service areas, shared trash enclosures and facilities, parking lot lighting, exterior ramps, entrances to and exits from the Shopping Center, sidewalks, pylon or monument sign structures, and shared utility facilities now or hereafter made available or maintained by Landlord in the Shopping Center and (ii) all easements or other rights under any instrument creating covenants, conditions, easements, restrictions or other rights with respect to any portion of the Shopping Center including under any REA or CC&Rs (each as defined below).  "**REA**" shall mean any reciprocal easement agreement or similar documents covering the Shopping Center, including the Target OEA described in Paragraph O of the Basic Lease Terms.  "**CC&Rs**" shall mean covenants, conditions and restrictions or other similar documents covering the Shopping Center.

2.      TERM

(a)      Contingent Term. The "**Contingent Term**" of this Lease shall commence upon the Effective Date.  Tenant and Landlord, as applicable, shall diligently and expeditiously pursue the satisfaction of the conditions listed below (the "**Conditions**").  The Contingent Term shall continue until the date that Tenant delivers notice to Landlord that all Conditions have been satisfied or waived by Tenant (the "**Contingency Notice**") but not later than May 25, 2020 provided that if Tenant's Liquor License (defined below) is appealed or protested, such date shall be extended by thirty (30) days (the "**Outside Contingency Date**").  If any of the Conditions remain unsatisfied (and are not waived by Tenant) as of the Outside Contingency Date, Tenant shall have the right to terminate this Lease at any time thereafter by delivery of notice to Landlord (the "**Termination Notice**"), whereupon this Lease shall terminate on the date specified in the Termination Notice and thereafter neither Landlord nor Tenant shall have any further liability

1

hereunder. If Tenant does not either elect to terminate this Lease on or before the Outside Contingency Date by delivering a Termination Notice or waive in writing the contingencies described in this Section 2 by delivering a Contingency Notice on or before the Outside Contingency Date, then Landlord may transmit to Tenant a written notice in **BOLD, ALL CAP, 14 POINT FONT**, such notice to state the following: **"TENANT'S FAILURE TO DELIVERY A TERMINATION NOTICE OR A CONTINGENCY NOTICE WITHIN 10 BUSINESS DAYS FOLLOWING RECEIPT OF THIS NOTICE SHALL BE DEEMED TENANT'S DELIVERY OF A CONTINGENCY NOTICE WAIVING ALL OUTSTANDING LEASE CONDITIONS"**. If Tenant thereafter does not deliver a Termination Notice within ten (10) business days following receipt of Landlord's notice, Tenant shall be deemed to have delivered a Contingency Notice as of the expiration of such ten (10) business day period.

The following are conditions precedent to the commencement of the Construction Terms, and each Condition shall be, in Tenant's reasonable opinion, fully satisfied or waived by Tenant, before the Construction Terms shall commence:

> (i)       Landlord shall obtain all zoning changes, use permits, building permits and other entitlements required by any governmental agencies (subject to no conditions unacceptable to Tenant) to: (A) perform "**Landlord's Work**" (as defined in Section 4(b) below), (B) fulfill any of Landlord's obligations to Tenant hereunder and (C) operate a specialty grocery store selling alcoholic beverages for off-premises consumption but excluding (i) Tenant's liquor license, and (ii) a use permit to operate as a grocery store which can only be issued to Tenant for its operations (collectively, the "**Entitlements**"). Landlord shall promptly submit for, and diligently pursue, the Entitlements at Landlord's sole cost and expense. Landlord shall deliver notice to Tenant as to the date all Entitlements are received, which date shall be deemed the "**Entitlement Receipt Date**". Provided Landlord uses commercially reasonable, diligent efforts to obtain the Entitlements, it shall not be deemed in default for its failure to obtain the Entitlements, and Tenant shall not be entitled to any remedies for such failure other than the right to terminate this Lease as provided above. Landlord hereby represents to Tenant that it has obtained all Entitlements as of the Effective Date.

> (ii)      The Town Council of the Town of Queen Creek shall have recommended the issuance to Tenant of an off-sale Series 10 liquor license, which license shall permit Tenant to sell and offer for sale from the Premises all beer and wine (but no liquor) for off-premises consumption (the "**Liquor License**"), and such recommendation shall not be subject to appeal or protest or the period for appeal or protest shall have expired or if a protest has been filed, the recommendation of the Town Council is not withdrawn and such recommendation has become final and non-appealable. Tenant shall timely file and diligently pursue obtaining the recommendation of the Town Council to the issuance of the Liquor License.

> (iii)     Tenant shall obtain in final form and in form and content satisfactory to Tenant, in Tenant's reasonable opinion, all permits (including use permits), licenses and authorizations, and all other approvals from the government bodies having jurisdiction (federal, state and local), necessary for Tenant to perform the "**Tenant's Work**" (as defined in Section 4(a) below) and to use the Premises for the "**Grocery Use**" (as defined in Section 6(a)(i) below), subject to no conditions, requirements, costs, or continuing regulations unacceptable to Tenant, which

2

permits, authorizations and approvals shall include, but shall not be limited to, building permits, plumbing permits, health and safety permits, sign permits, and conditional or special use permits (except those required under Section 2(a)(i) above)(collectively, "**Tenant's Permits**").

(iv)    Landlord shall deliver to Tenant an existing ALTA survey of the Shopping Center February 25, 2019 and a current Preliminary Report on the condition of title of the Shopping Center issued by First American Title Insurance Company (the "**Report**") together with a link to legible copies of all documents listed as exceptions in the Report, within ten (10) days after the commencement of the Contingent Term and Tenant shall review and approve the condition of title of the Shopping Center (or deliver objections thereto) prior to the expiration of the Contingent Term.  The parties acknowledge that Tenant has approved the Report and the foregoing Condition has been satisfied.

(v)    Landlord has delivered to Tenant a list of existing exclusive and prohibited uses in the Shopping Center and copies of the actual lease provisions containing such restrictions, which are attached to this Lease as **Exhibit "I"**.  In the event any of such restrictions prohibit or restrict the sale of an item sold by Tenant, Landlord shall use commercially reasonable efforts to deliver to Tenant, prior to the expiration of the Contingent Term, a letter in substantially the form of **Exhibit "J"** attached hereto, executed by the applicable tenant.  The parties acknowledge and agree that Landlord has fully satisfied this Condition based on Landlord's disclosures in **Exhibit "I"**.  To the extent the **Exhibit "I"** disclosures are inaccurate or incomplete, this Condition shall not be deemed satisfied and Landlord shall be responsible to cause its satisfaction.

(vi)    Landlord shall deliver to Tenant an existing Phase 1 Environmental Assessment of the Shopping Center, dated January 2019.  Tenant shall review and approve the environmental condition of the Shopping Center (or deliver objections thereto) prior to expiration of the Contingent Term.  Said approval shall not relieve Landlord of its obligations concerning Hazardous Substances (as defined in Section 32(c) below) under Landlord's Work or under Section 32(b)(i).  The parties acknowledge that Tenant has approved the Environmental Report and this Condition has been satisfied.

(vii)    Landlord shall deliver to Tenant a Subordination, Nondisturbance and Attornment Agreement in the form of **Exhibit "E"** attached hereto executed by Landlord and the holders of any deeds of trust or mortgages upon or affecting the Shopping Center, or any part thereof, which is prior or superior to the rights of Tenant herein (the "**SNDA**").  If there are any other liens or encumbrances upon or affecting the Shopping Center, or any part thereof, which are prior or superior to the rights of Tenant herein (excluding current real property taxes not delinquent and the REA/CC&Rs), Landlord shall either (A) deliver evidence to Tenant that such lien or encumbrance has been removed as an exception to title or (B) in the event of a mechanics lien, cause a Mechanic's Lien Release Bond to be posted.  The SNDA shall be recorded by Landlord at Landlord's sole cost and expense, provided, however, that it shall not be recorded until the Contingency Notice has been delivered by Tenant and only if Tenant does not elect to terminate this Lease pursuant to this Section 2(a).  In the event Landlord records the SNDA prior to the delivery of the Contingency Notice, such unauthorized recordation shall be deemed a material

3

breach of Confidential Information (defined below) entitling Tenant to the remedies set forth in Section 33(j)(v).

(viii)    Landlord shall deliver to Tenant a shell drawing in CAD format of the Premises suitable for Tenant to prepare its construction drawings within thirty (30) days after the Effective Date.  Landlord shall, within thirty (30) days of the Effective Date, deliver to Tenant for its review and approval a design and construction schedule in MS Projects format (or other acceptable format).  The parties acknowledge and agree that Landlord has fully satisfied this Condition.

(ix)    Tenant shall have reviewed and approved "**Landlord's Plans**" (as defined in Section 2(b) of **Exhibit "C"** attached hereto) in accordance with **Exhibit "C"**.  The parties acknowledge and agree that Tenant has approved Landlord's Plans.

(x)    Within thirty (30) days after the Entitlement Receipt Date, Tenant shall review and approve the plans for Landlord's Work and elevations approved by all governmental agencies having jurisdiction over the Shopping Center and all conditions of such approval.  The parties acknowledge that Tenant has approved the matters described in this clause (x).

(xi)    Landlord and Tenant each acknowledge and agree that time is of the essence in and agree to assist and cooperate in obtaining the satisfaction of said Conditions, including (without limitation) the execution of such documents as may be necessary to obtain the satisfaction of said Conditions; provided, however, that the foregoing shall not be construed as creating any obligation to obtain the satisfaction of the Conditions set forth in this Section 2(a) unless otherwise set forth herein.

(b)    Construction Terms. Provided this Lease has not been terminated pursuant to Section 2(a) above, the "**Landlord's Construction Term**" shall commence on the date which is one (1) day after the end of the Contingent Term.  Landlord's Construction Term shall end on the "**Delivery Date**" (as defined in Section 4(b) below).  The "**Tenant's Construction Term**" shall commence on the day following the Delivery Date.  Tenant's Construction Term shall end on the earlier of: (i) the date which is one hundred fifty (150) days after the commencement of Tenant's Construction Term, or (ii) the date immediately preceding the date that Tenant opens for business to the public in the Premises. In the event Landlord elects to deliver the Premises to Tenant prior to the end of the Contingent Term, the Delivery Date shall not be deemed to have occurred until the end of the Contingent Term.  The Landlord's Construction Term and the Tenant's Construction Term are sometimes collectively referred to herein as the "**Construction Terms**".

(c)    Blackout Period. Notwithstanding anything to the contrary contained in this Lease, Tenant shall not be required to accept possession of or commence doing business from the Premises during the period starting October 15th of the first year and ending January 31st of the following year (the "**Blackout Period**"). If the Delivery Date occurs during the Blackout Period, and if Tenant elects to delay acceptance of possession of the Premises, then, during the Blackout Period, the Primary Term shall not commence and the Tenant's Construction Term shall toll and

4

be extended on a day for day basis (applied after the Blackout Period ends) by the number of days occurring during the Blackout Period unless and until Tenant in fact accepts possession of the Premises. If any portion of Tenant's Construction Term occurs during the Blackout Period, unless Tenant chooses to perform Tenant's Work or commence business operations during the Blackout Period, then Tenant's Construction Term shall be extended on a day-for-day basis (applied after the Blackout Period ends) by the number of days occurring during the Blackout Period.

(d)    Primary Term. The "**Primary Term**" shall commence on the day after the end of the Tenant's Construction Term. The Primary Term shall continue for a period of approximately ten (10) years, ending at 11:59 p.m. on the last day of the month in which the tenth (10th) anniversary of the "**Rent Commencement Date**" (as defined in Section 2(f) below) occurs (the "**Expiration Date**") (for example, if the 10th anniversary falls on March 10th, the Primary Term will expire on March 31st). Notwithstanding the foregoing, in the event the Primary Term would expire during the period starting November 1st and ending January 15th, and Tenant shall have not otherwise exercised an Extension Option as provided in Section 2(e), the Expiration Date may be, at Tenant's election, extended to January 31st following such tenth (10th) anniversary.

(e)    Options to Extend. Tenant may extend the Term of this Lease (individually, an "**Extension Option**" and collectively, "**Extension Options**"), at its option, for the number of successive five (5) year periods specified in Paragraph F of the Basic Lease Terms ("**Extended Terms**"), upon the same terms, covenants and conditions as herein provided, except that Fixed Minimum Rent shall be as specified in Section 3(a) below. Each such Extension Option shall be exercised by Tenant delivering to Landlord written notice of such election (each, an "**Extension Option Exercise Notice**"), not less than the number of days set forth in Paragraph F of the Basic Lease Terms prior to the commencement of the five (5) year period to which Tenant's notice relates (each, an "**Extension Notice Deadline**") and upon the delivery of such notice, this Lease and the Term thereof shall be automatically renewed and extended for the five (5) year period to which the Extension Option Exercise Notice relates. The exercise by Tenant of any one Extension Option shall not be deemed to impose upon Tenant any duty or obligation to renew for any further period of time, and the exercise of any Extension Option shall be effective only upon the giving of an Extension Option Exercise Notice in accordance with the foregoing provisions. Notwithstanding the foregoing, Tenant may exercise an Extension Option only if at the time Tenant delivers an Extension Option Exercise Notice, there is not in existence an Event of Default with respect to the payment of Fixed Minimum Rent ("**Fixed Rent Event of Default**") provided that if Tenant attempts to exercise an Extension Option during such time, Landlord shall so notify Tenant and Tenant shall have until the later of fourteen (14) days from receipt of such notice and the applicable Extension Notice Deadline to cure such Fixed Rent Event of Default and re-exercise the Extension Option. Such Landlord notice to Tenant shall be in **BOLD, ALL CAP, 14 POINT FONT** and state the following: "**A FIXED RENT EVENT OF DEFAULT CURRENTLY EXISTS, THEREFORE TENANT'S EXERCISE OF ITS EXTENSION OPTION IS NOT VALID. TENANT'S FAILURE TO TIMELY CURE THE FIXED RENT EVENT OF DEFAULT AND RE-EXERCISE THE EXTENSION OPTION SHALL RESULT IN TENANT'S EXERCISE OF ITS EXTENSION OPTION BEING VOID.**" .

(f)    Rent Commencement Date. Tenant's obligation to pay Fixed Minimum Rent (defined below) pursuant to the terms of this Lease shall commence on the first (1st) day of

5

the Primary Term as set forth in Section 2(d) above (the "**Rent Commencement Date**"). Tenant shall not be required to pay Fixed Minimum Rent during the Contingent Term or the Construction Terms.

Notwithstanding the preceding paragraph to the contrary, unless Tenant shall have opened for business from the Premises, Landlord and Tenant hereby agree that in no event shall the Rent Commencement Date commence prior to Landlord's substantial completion of all "**Landlord's Work**" and completion of all Common Area and site work for the Shopping Center, including line painting of the parking areas and landscaping, unless the parties shall agree otherwise in writing.

(g)    Payment of Additional Rent. Tenant's obligation to pay Tenant's Pro Rata Share of Real Property Taxes (as defined and set forth in Section 7), Insurance Charges (as set forth in Section 9) and Common Area Maintenance Charges (collectively referred to herein as "**Additional Rent**") shall commence on the Rent Commencement Date. Tenant shall have no obligation to pay Additional Rent during the Contingent Term or the Construction Terms.

(h)    Term. As used in this Lease, "**Term**," "**Lease Term**," and "**Term of this Lease,**" include the Contingent Term, the Construction Terms, the Primary Term, and the Extended Terms (if the applicable Extension Option is exercised by Tenant).

3.    RENT

(a)    Fixed Minimum Rent.

(i)    Initial Fixed Minimum Rent.    Commencing on the Rent Commencement Date, through the last day of the month during which the fifth (5th) anniversary of the Rent Commencement Date occurs, Tenant shall pay to Landlord the Fixed Minimum Rent set forth in Paragraph G of the Basic Lease Terms, which amount is subject to adjustment upon final measurement of the Premises pursuant to Section 4(m).

(ii)    Adjustments. The Fixed Minimum Rent shall be adjusted on the first (1st) day of the month following the fifth (5th) anniversary of the Rent Commencement Date and every succeeding fifth (5th) anniversary during the Term (each such 5-year term that triggers an adjustment, a "**5-Year Period**") hereof by the percentage change, if any, in the Consumer Price Index during the prior 5-Year Period, but in no event shall the adjustment for any 5-Year Period exceed ten percent (10%). The adjustment, if any, shall be calculated using the revised Unadjusted Consumer Price Index for All Items (1982-84=100) for All Urban Consumers published by the Bureau of Labor Statistics of the United States Department of Labor (the "**Index**"). The Index for the month which is two (2) months prior to the month in which the applicable 5-Year Period commences shall be considered the "**base.**" Such adjustments shall be made as soon as specific Bureau of Labor Statistics figures become available, and shall be adjusted retroactive to the beginning of the respective 5-Year Period. When the adjustment is determined, Landlord shall give Tenant written notice showing how the new Fixed Minimum Rent was computed. In no event shall the annual Fixed Minimum Rent decrease below the amount payable during the immediately preceding 5-Year Period as a result of a decrease in the Index. In the event that the Index contemplated herein is not reported for the months required for the calculation set forth above, the

parties agree to utilize the Index reported for the month(s) nearest preceding the month(s) for such calculation.

(iii)   Index Changes. If the Index shall be converted to a different standard reference base or otherwise revised, the determination of subsequent increases in the annual Fixed Minimum Rent shall be made with the use of such conversion factor formula or table for converting the Index as may be published by the Bureau of Labor Statistics or any successor agency, or, if the Bureau of Labor Statistics or any successor agency does not publish the same, then with the use of such conversion factor, formula, or table, as may be published by Prentice Hall, Inc., or, failing such publication, that published by any other nationally recognized publisher of similar statistical information. In the event the Index shall cease to be published, the index designated by the Bureau of Labor Statistics or the Department of Labor as replacing the Index shall be used thereafter. In the event the Bureau of Labor Statistics or the Department of Labor fails to designate a replacement, then the calculation shall be determined on the basis of an index chosen by Tenant as a comparable and recognized index of the purchasing power of the United States consumer dollar published by the Department of Labor or other governmental agency.

(b)   Time and Place of Payment; Partial Months.

(i)   Time and Place of Payment. Fixed Minimum Rent shall be payable in advance without prior notice or demand and, except as set forth in this Lease, without set off, deduction or abatement, on or before the first (1st) day of each calendar month during the Term hereof to the address given for Landlord in Paragraph Q of the Basic Lease Terms, unless Landlord shall give Tenant written notice of a change of address or of the party to whom such Fixed Minimum Rent shall be mailed along with written documentation reasonably satisfactory to Tenant of such party's right to receive payment hereunder.

(ii)   Partial Months. If the Primary Term commences on a day other than the first (1st) day of the month, the Fixed Minimum Rent for the initial fractional month of the Primary Term shall be prorated and paid with the Fixed Minimum Rent paid for the first full calendar month of the Primary Term. If the Term ends on a day other than the last day of a month, the Fixed Minimum Rent for that month shall be prorated. The proration of Fixed Minimum Rent for any fractional months and any other proration of payments due hereunder shall be based on the actual number of days in such calendar month.

(c)   Interest Rate. If any sums payable under this Lease due from one party to the other shall not be received within five (5) days following the date that such payment is due, the late paying party shall pay to the other interest on such overdue amount from the date the overdue amount is payable until paid. Acceptance of such interest shall in no event constitute a waiver of a party's default with respect to such overdue amount, nor prevent the exercise of any of the other rights and remedies granted hereunder. The amount of interest payable under this Section 3(c) shall be the lesser of ten percent (10%) per annum or the maximum legal rate of interest allowed by law (the "**Interest Rate**").

(d)   Late Charge. In the event that on more than one occasion during any calendar year any payment of monthly Fixed Minimum Rent or Additional Rent payable by Tenant

7

325821301.2

hereunder is not paid to Landlord on the date it is due and such failure constitutes an Event of Default, then on the second occasion during such calendar year, Tenant agrees to pay to Landlord a late charge in the amount of Five Hundred Dollars ($500) and on the third occasion during such calendar year and each subsequent occasion thereafter during such calendar year, Tenant agrees to pay to Landlord a late charge in the amount of One Thousand Dollars ($1000), in each case to compensate Landlord for its administrative and other overhead expenses. Any late charge shall be payable as Additional Rent under this Lease, provided that additional late charges shall not be payable in connection with the late payment of late charges. Payment by Tenant of the foregoing late charge shall not be deemed a waiver of the applicable Event of Default in such payment, and such late charge shall be in addition to, and not in lieu of, any other remedy to which Landlord is entitled under this Lease.

(e)    <u>Rent Tax.</u>  Notwithstanding anything to the contrary, Tenant, and not Landlord, shall pay, when due and payable, any state, county or city sales tax, transaction privilege tax, and any other sales, excise, use, rental or occupancy tax now or hereafter levied or assessed upon or payable by virtue of the Fixed Minimum Rent, or any item of Additional Rent reserved hereunder or any other payment made or other consideration given by Tenant under this Lease and classified as rental by taxing authority other than any tax excluded from Real Property Taxes (as defined in <u>Section 7(a)</u>).  Such tax shall be paid by Tenant to Landlord, in addition to and together with the payment of Fixed Minimum Rent and/or Additional Rent to which such tax relates.  As of the Effective Date, the rent tax described in this <u>Section 3(e)</u> is Two and 75/100 Percent (2.75%) of the Fixed Minimum Rent and items of Additional Rent.  Landlord shall provide to Tenant prompt written notice of any change in the rate of such rent tax.

4.    <u>CONSTRUCTION</u>

(a)    <u>Landlord's Work; Tenant's Work.</u>  Landlord covenants and agrees that it shall, in accordance with the "**Approved Plans**" (as defined in <u>Section 2.b</u> of **Exhibit "C"**), perform the work which is referred to as "**Landlord's Work**" in **Exhibit "C"** attached hereto, at Landlord's sole cost and expense.  Landlord acknowledges and agrees that the scope of Landlord's Work as of the Effective Date may be modified during the plan approval process described below. In addition to the work designated as "**Landlord's Work**" on **Exhibit "C"** attached hereto, Landlord's Work shall include, and Landlord shall perform at its sole cost and expense, all work necessary to bring the Premises and the Common Area into compliance with applicable federal, state and local building codes and regulations, and governing laws (without regard to any variances or grandfathered rights) so that Tenant may open for business in the Premises; provided that Landlord's Work shall not include compliance with laws that are specific to Tenant's specific use of the Premises as a retail grocery market.  Landlord shall comply with all requirements (including <u>Sections 5, 6.a and 6.b, and 8</u>) of **Exhibit "C"**.  If Tenant shall perform any portion of Landlord's Work at Tenant's written request, Tenant shall receive a credit against Rent for any Landlord's Work performed by Tenant, which credit shall be finalized and paid in accordance with <u>Section 7</u> of **Exhibit "C"**.  All improvements to the Premises which are not included in the definition of "**Landlord's Work**" set forth in **Exhibit "C"** hereto and are necessary for Tenant to open and operate in the Premises for the "**Grocery Use**" (as defined in <u>Section 6(a)(i)</u> below) shall be "**Tenant's Work**".  Tenant shall perform Tenant's Work at Tenant's sole cost and expense in accordance with the "**Approved Tenant's Plans**" (as defined in <u>Section 2.c</u> of **Exhibit "C"**).

8

(b)     Delivery. Landlord's target date for delivery of the Premises is August 14, 2020 (the "**Target Delivery Date**"). The date on which Landlord delivers the Premises to Tenant with Landlord's Work "**Substantially Complete**" (as defined below) shall be deemed the "**Delivery Date**". Landlord shall notify Tenant of the intended Delivery Date at least thirty (30) days prior to the Delivery Date. On or before the Delivery Date (or as otherwise agreed by the parties), Tenant or Tenant's representative shall walk the Premises with Landlord or Landlord's representative and create a list of punch list items (as defined in Section 4(h)) and of those other items which have not been completed in accordance with the Approved Plans. If the Delivery Date does not occur on or before the date which is thirty (30) days after the Target Delivery Date (and such date shall be extended by the number of days occurring during a Force Majeure event and as a result of Tenant Delays), in addition to all other remedies provided in this Lease, Tenant shall be granted and receive one (1) day's free Fixed Minimum Rent for each day of delay beyond such period. If the Delivery Date does not occur on or before the date which is sixty (60) days after the Target Delivery Date (and such date shall be extended by the number of days occurring during any Force Majeure event and as a result of Tenant Delays), Tenant shall have the option, in lieu of the free Fixed Minimum Rent provided above, at any time prior to the Delivery Date, to terminate this Lease by delivering written notice to Landlord of such termination. If, however, Tenant exercises the option of terminating this Lease in accordance with the provisions of this Section 4(b), such termination along with recovery of the liquidated damages specified below shall be Tenant's sole remedy. Notwithstanding anything to the contrary contained herein (and notwithstanding Force Majeure), if the Delivery Date does not occur on or before the date which is one hundred eighty (180) days after the Target Delivery Date (notwithstanding any Force Majeure event, but such one hundred eighty (180) day time period shall be subject to extension for Tenant caused delays), Tenant shall have the option, in lieu of the free Fixed Minimum Rent provided above, at any time prior to the Delivery Date, to terminate this Lease by delivering written notice to Landlord. If, however, Tenant exercises the option of terminating this Lease in accordance with the provisions of this Section 4(b), such termination along with recovery of the liquidated damages specified below shall be Tenant's sole remedy. In the event this Lease is terminated pursuant to this Section 4(b), neither Tenant nor Landlord shall have any duties or obligations to each other hereunder, except Landlord shall pay to Tenant within thirty (30) days after Landlord's receipt of Tenant's termination notice One Hundred Fifty Thousand Dollars ($150,000) as liquidated damages to compensate Tenant for its damages incurred in connection with completing due diligence on the Premises, designing the Premises, and expenses incurred in entering into this Lease. Both parties acknowledge and agree that the actual damages resulting in such event would be extremely difficult or impracticable to ascertain, and that under the circumstances existing as of the date hereof, One Hundred Fifty Thousand Dollars ($150,000) represents the parties' reasonable estimate of such damages, and such payment is not intended to be a forfeiture penalty. Landlord's obligation to pay for Tenant's damages in such event shall expressly survive the termination of this Lease. As used herein, "**Substantially Complete**" means that all of Landlord's Work has been completed in accordance with the Approved Plans therefor, subject only to punch list items as defined in Section 4(h) below. As used herein, "**Tenant Delay**" shall mean a delay in Landlord's completion of Landlord's Work solely caused by (i) Landlord's implementation of Tenant requested modifications to Landlord's Work made after the parties agreed on the Approved Plans (as defined in Exhibit "C"), which modifications are not otherwise specifically required pursuant to Landlord's Work, required by governmental agencies or as a

9

result of Tenant's approval of the Conditions; (ii) the presence or work of Tenant's contractors or employees in the Premises prior to delivery of the Premises by Landlord demonstrated and documented (by written notice from Landlord to Tenant) to have caused a delay in Landlord's Work (provided the mere presence or performance of work by Tenant's contractors or employees under Section 4(i) shall not constitute a Tenant Delay); or (iii) Tenant's failure to comply with the terms and provisions of this Lease. In order for Landlord to claim the occurrence of Tenant Delay, Landlord must have notified Tenant in writing of the act or omission within ten (10) business days after the initial occurrence.

(c)     Plans and Specifications.  The plan approval process is set forth in Section 2 of **Exhibit "C"** attached hereto.

(d)     Changes to Approved Plans.  See Section 2.d of **Exhibit "C"**.

(e)     Permits and Construction Commencement.     See Section 2.e of **Exhibit "C"**.

(f)     Tenant Finish.  Promptly after the Delivery Date, Tenant shall have full access to the Premises for the purpose of (i) finishing the Premises, and (ii) equipping the Premises for the operation of Tenant's business, subject to delays resulting from Force Majeure.

(g)     Utilities.  Landlord covenants to Tenant that utility service connections for all utilities shall be complete and available for hook-up on the interior of the Premises upon completion of the Landlord's Work as shown on **Exhibit "C"** with capacities shown on the Approved Plans.  Tenant shall, however, sign such applications and deliver such deposits as may be necessary to establish utility service in Tenant's name.

(h)     Acceptance of the Premises by Tenant.    Notwithstanding Tenant's acceptance of delivery of the Premises as of the Delivery Date, Landlord shall have the obligation to repair or correct "**punch-list items**" at its sole cost and expense upon notification thereof from Tenant.  Tenant shall notify Landlord in writing of punch-list items within thirty (30) days after the Delivery Date. If the punch-list items are not completed within ten (10) days after Landlord receives notification from Tenant, Tenant may complete the items on the punch list and deduct the actual third party out of pocket costs and expenses incurred by Tenant from the Fixed Minimum Rent due or to become due under this Lease.  As used herein, the term "**punch-list items**" shall mean details of construction, decoration and mechanical adjustment which, in the aggregate, are minor in character and do not materially interfere with Tenant's ability to perform Tenant's Work or obtain a certificate of occupancy (or local equivalent) permitting Tenant open in the Premises for the use permitted hereunder.

(i)     Coordination of Work.  If Landlord and Tenant determine that it is possible for Tenant to commence Tenant's Work prior to the Delivery Date and actual completion of Landlord's Work by Landlord, Landlord shall notify Tenant in writing and Tenant may, at its option, commence Tenant's Work prior to Landlord's actual completion of Landlord's Work. Notwithstanding the provisions of the immediately preceding sentence, from and after July 7, 2020 or such earlier date agreed to by the parties, Tenant may enter the Premises in order to

10

perform underground plumbing and electrical work and in order to pour its floor slab. Landlord consents to Tenant performing additional work prior to the Delivery Date, so long as Tenant doing so does not unreasonably interfere with the performance by Landlord of Landlord's Work and, in this regard, Landlord and Tenant shall mutually cooperate with each other in order for Landlord to complete Landlord's Work and Tenant to complete Tenant's Work; provided, however, the foregoing shall not be deemed to obligate Landlord to execute any document or consent whereby Landlord would incur any obligation or liability in connection with the Tenant's Work. If Landlord consents to early entry by Tenant in the Premises for the performance of Tenant's Work, such entry shall not unreasonably interfere with the performance by Landlord of Landlord's Work (provided the mere presence of Tenant and its agents and contractors shall not constitute unreasonable interference). Any early entry by Tenant in the Premises for the performance of Tenant's Work prior to the Delivery Date shall be subject to the terms and provisions of this Lease, except for the obligation to pay Fixed Minimum Rent or any item of Additional Rent and Tenant's maintenance obligations under Section 16(a).

        (j)    <u>Landlord Construction Indemnification</u>. Landlord agrees to indemnify, defend and hold Tenant and Tenant's shareholders, officers, directors, employees and agents harmless from and against any costs, claims, expenses (including, without limitation, reasonable attorneys' fees) or liabilities resulting from any injury or death of any person or persons or any damage to property that arises from or relates to any work performed by Landlord or its agents or employees.

        (k)    <u>Tenant Construction Indemnification</u>. Tenant agrees to indemnify, defend and hold Landlord and Landlord's shareholders, officers, directors, employees and agents harmless from and against any costs, claims, expenses (including, without limitation, reasonable attorneys' fees) or liabilities resulting from any injury or death of any person or persons or any damage to property that arises from or relates to any work performed by Tenant or its agents or employees.

        (l)    <u>Concealed Conditions and Defects</u>. In the event that prior to the Rent Commencement Date Tenant or its agents or contractors encounter concealed or unknown conditions or defects during the design or performance of Tenant's Work either (i) below the surface of the ground (including, without limitation, variable fill, asphalt, organic material, abandoned utility lines, utility lines not within an easement or in the location shown on the Approved Plans, garbage or debris or abandoned underground storage tanks and piping related thereto), or (ii) in the building shell, Landlord shall remove or correct (and to the extent applicable, dispose of in accordance with Environmental Law (as defined in <u>Section 32(c)</u>) such concealed or unknown conditions or defects, at its sole cost and expense, and in accordance with applicable laws. Landlord shall perform such removal or correction within ten (10) days of receipt of notice from Tenant of the existence of such conditions or defects and Landlord shall further, within such period, restore the affected area(s) of the Premises or the Common Area to the condition which such area(s) should have been in, so as to render the area(s) useable for Tenant's Work. If concealed or unknown conditions or defects are encountered and must be removed or corrected, the Tenant's Construction Term shall be deemed extended by one day for each day of delay caused by the removal or correction of such conditions or defects.

11

(m)     <u>Measurement</u>.  Tenant may at any time following the Delivery Date and prior to the Rent Commencement Date have its architect measure the Floor Area of the Premises, at Tenant's sole cost and expense. "**<u>Floor Area</u>**" means the floor area in square feet at each level or story of buildings of the applicable area (e.g., Premises, Building, Shopping Center, etc.), including mezzanines (if same are used as retail sales area), measured from the centerline of any common walls and from the outside of any exterior walls (but not including therein any decorative facade, fascia or architectural treatment, or any overhang such as canopies or non-occupiable extensions of the building and an equitable adjustment shall be made for exterior walls that are greater than standard thickness) and shall include the area of permanent outside sales areas for which Landlord receives base or fixed rent (which area shall be measured from the outside of the exterior wall of any adjacent building to the actual exterior perimeters of such permanent outside sales area, including any aisles, fences or walls included therein).  Floor Area shall not include any of the following areas for which Landlord does not collect rent or other consideration:  loading docks; loading zones or delivery areas; temporary outdoor display areas (including Tenant's Outdoor Display Area); outdoor cart storage areas; outdoor sales areas; recycling rooms (unless located within the premises of a particular tenant or occupant); pallet storage areas; electrical, mechanical, or equipment rooms or areas (unless located within the premises of a particular tenant or occupant); exterior trash enclosures or exterior compactor areas. In addition, with respect to the movie theatre located in the Shopping Center, the term "**<u>Floor Area</u>**" expressly excludes mezzanines, stadium seating areas, projector rooms, box offices and exterior stairways.  In the event the number of square feet of Floor Area in the Premises as determined by such measurement differs from the number specified in <u>Paragraph A</u> of the Basic Lease Terms, Tenant may deliver written notice thereof to Landlord.  If Landlord agrees with the determination of the Floor Area of the Premises as calculated by Tenant's architect, Tenant and Landlord shall revise the Basic Lease Terms in order to insert the new Floor Area in <u>Paragraph A</u>, to recalculate the Fixed Minimum Rent using the dollar per square foot rate in <u>Paragraph G</u>, and to recalculate Tenant's Pro Rata Share specified in <u>Paragraph L</u>.

If Landlord disagrees with the determination of the Floor Area of the Premises as calculated by Tenant's architect, Landlord shall provide Tenant with written notice thereof ("**<u>Landlord's Notice of Disapproval</u>**") within thirty (30) days after Landlord receives the calculation by Tenant's architect.  Landlord's failure to provide Tenant with Landlord's Notice of Disapproval shall be deemed Landlord's agreement with and acceptance of the Floor Area determination.  If Landlord timely provides a Landlord's Notice of Disapproval, the parties shall diligently attempt in good faith to resolve the disagreement over the Floor Area of the Premises within thirty (30) days after Tenant receives Landlord's Notice of Disapproval.  If the parties are unable to resolve the disagreement within such thirty (30) day period, the dispute shall be resolved by binding arbitration as set forth in <u>Section 24(b)</u> below.

(n)     <u>Certificate of Occupancy</u>.  Prior to the date Tenant opens the Premises for business to the general public, Landlord shall, if required and applicable, be responsible for obtaining an updated certificate of occupancy for the Building and the Shopping Center and Tenant, provided Landlord has satisfied all of Landlord's obligations hereunder necessary in order for Tenant to obtain its certificate of occupancy, shall be responsible for obtaining a certificate of occupancy with respect to the Premises. Notwithstanding any contrary provision contained in this Lease, if, upon the completion of Tenant's Work, a certificate of occupancy is not issued due solely

12

to: (i) incomplete or incorrect items of Landlord's Work or which are not Tenant's obligation under the terms of this Lease, or (ii) related to any violations or open permits at the Shopping Center which are unrelated to Tenant's Work or Tenant's Permits, then, in such event, Landlord shall correct the same and the Rent Commencement Date shall toll and be extended on a day for day basis (applied after Landlord corrects the same) by the number of days that Tenant is delayed from opening for business by reason thereof (provided Tenant shall deliver written notice to Landlord of such delay upon the occurrence thereof). A "**certificate of occupancy**" shall mean a temporary or permanent certificate of occupancy or any equivalent documentation which confirms that Landlord's Work and Tenant's Work, as applicable, has been completed and that the Premises are available for Tenant to take possession, fixture, merchandise and open for business.

(o)    Tenant Improvement Allowance. There is no tenant improvement allowance payable by Landlord in connection with this Lease.

5.    FIXTURES

All trade fixtures and equipment installed by Tenant in or on the Premises (including, but not limited to, furniture, communication equipment, wall coverings and decorations, registers, refrigeration equipment, walk-in coolers or freezers, shelving and signs) shall remain the property of Tenant ("**Tenant's Property**") and Tenant may, in its sole discretion, remove the same or any part thereof at any time prior to or at the expiration or earlier termination of this Lease. In addition, Tenant may remove from the Premises all items installed by Tenant that are indicative of Tenant's business and may otherwise "**de-identify**" the Premises, as Tenant reasonably believes necessary or appropriate for the protection of Tenant's interest in Tenant's trademarks, trade names or copyrights ("**Tenant's Trade Dress**"). Tenant shall repair any damage to the Premises and/or the Shopping Center resulting from the removal of Tenant's Property and/or Tenant's Trade Dress. In addition, if the removal of Tenant's Trade Dress would result in a modification to the exterior of the Premises, the removal of Tenant's Trade Dress and the resulting appearance of the exterior of the Premises shall be subject to Landlord's prior written approval, which approval shall not be unreasonably withheld, conditioned or delayed.

6.    USE OF PREMISES

(a)    Use.

(i)    Initial Use. Tenant shall initially open for business in the Premises as a fully stocked, staffed and fixtured Trader Joe's grocery store, and may thereafter use the Premises for the purpose of conducting thereon, a retail grocery market selling items compatible with the items offered for sale (or rental) in other retail outlets operated by Tenant now or in the future, including, but not limited to, all types of alcoholic beverages, including beer, wine and liquor for off-premises consumption (if allowed by law and subject to Tenant obtaining all required licenses and approvals); nonalcoholic beverages, including, but not limited to, fresh juices, hot packed juices, sodas, waters, coffee and tea; groceries, including specialty foods, spices, sauces, dried fruit, nuts, fish, bakery products, meat and produce; delicatessen; fresh cut flowers and plants, vitamins and supplements, homeopathy products, health and beauty aids, prepared take home meals, housewares, kitchen gadgets and supplies, gift baskets, greeting cards, pet food and

13

supplies, and other items compatible with the items offered for sale (or rental) in other retail outlets operated by Tenant now or in the future (the "**Grocery Use**"). Tenant may also install terminals at its cash registers to process credit and debit card transactions. Subject to applicable governmental regulation, Tenant shall be allowed to do incidental cooking for the purpose of sampling its products to its customers. Service animals shall be permitted on the Premises to the extent permitted by applicable law. Tenant shall have the right to terminate this Lease upon thirty (30) days written notice to Landlord if any newer change in any Town law, rule or regulation precludes, prohibits or materially and adversely impairs Tenant's ability to use the Premises for the sale of alcoholic beverages, whereupon neither Landlord nor Tenant shall have any further liability hereunder, excluding those provisions which are expressly intended to survive the termination of this Lease. Landlord shall not grant any other tenant or occupant of the Shopping Center an exclusive right or use restriction that would interfere with Tenant's use of the Premises for the Grocery Use.

(ii)     Change of Use. After Tenant initially opens for business in the Premises, Tenant may thereafter use the Premises for any lawful retail purpose, excluding (x) any "**Prohibited Uses**" or "**Noxious Uses**" (both as defined in Sections 6(b)(i) and 6(b)(ii), respectively), (y) in the event of a change from the Grocery Use any use which would violate any then-existing exclusive use restriction granted to any tenant in the Shopping Center pursuant to a lease in existence as of the date of such change of use, provided such then-existing exclusive use restriction has not been granted in violation of the terms of this Lease, or (z) any prohibited use set forth on **Exhibit "I"**.

(iii)    No Continuous Operation. Nothing contained in this Lease shall be construed to require Tenant to operate the Premises continuously either for the Grocery Use or for any other use. Nothing contained in this Lease shall be construed to require Tenant to open and operate within the Premises continuously either for the Grocery Use or for any other use provided, however, Tenant shall be required to open a fully stocked and fixturized store for business in the Premises for at least one (1) business day for the Grocery Use under the trade name "Trader Joes", subject to Landlord caused delays and Permitted Closures (defined below). At any time thereafter, in the event Tenant ceases to operate its business on the Premises at any time excluding Permitted Closures or due to Landlord's actions for one hundred eighty (180) consecutive days, Landlord shall have the right as Landlord's sole remedy to terminate this Lease by giving Tenant ninety (90) days prior written notice of termination (the "**Go Dark Recapture Notice**") within three hundred sixty-five (365) days after the expiration of such one hundred eighty (180) day period (the "**Recapture Window**") (and provided that Tenant has not recommenced business operations at the Premises prior to the termination date specified in the Go Dark Recapture Notice), whereupon neither Landlord nor Tenant shall have any further liability hereunder, excluding those provisions which are expressly intended to survive the termination of this Lease. Notwithstanding Landlord's election to recapture the Premises, Tenant may, at its election, void the Go Dark Recapture Notice by delivering written notice to Landlord stating Tenant's good faith intent to recommence business operations at the Premises, which notice shall be delivered within sixty (60) business days after Tenant receives the Go Dark Recapture Notice, and, in such event, this Lease shall remain in full force and effect and Landlord's right to recapture the Premises shall be deemed void, provided that Tenant in fact so recommences business within thirty (30) days thereafter. Notwithstanding the provisions of this Section 6(a)(iii) to the contrary, if Landlord declines to deliver a Go Dark Recapture Notice during

the Recapture Window, but Tenant has not yet resumed business operations within the Premises at the time Tenant intends to assign the Lease or sublease the Premises, then prior to Tenant effectuating such assignment or sublease, Tenant shall provide Landlord notice thereof and Landlord shall have another Recapture Window within which to deliver a Go Dark Recapture Notice, and the terms above shall apply thereto. As used herein, "**Permitted Closures**" means periods of closure due to remodeling, renovation, Force Majeure (as defined in Section 33(a) below), Landlord's actions or inactions in violation of this Lease or a cause or event pursuant to Sections 8 or 10.

      (b)    Prohibited and Noxious Uses.

          (i)    Prohibited Uses. Landlord agrees that none of the space located in the "**Tenant Control Area**" depicted on **Exhibit "B"** shall be occupied by any of the following uses without Tenant's prior written consent: offices (except as an incidental use to a permitted retail or commercial business); entertainment or recreational facility, including, but not limited to, a restaurant, bar, pub, nightclub, music hall, disco, banquet hall, auditorium, bowling alley, skating rink, theater, billiard room, health or beauty spa, gymnasium (including, but not limited to, exercise, dance, martial arts, Pilates, yoga, spin or similar fitness studio), massage parlor or tanning parlor, amusement arcade, children's play gym facility (including those similar to "**My Gym**" or "**Gymboree**"), establishment catering to birthday parties (such as a "**Chuck E. Cheese**" or "**Sandy Deck's**") or other place of public amusement; training facility or educational facility, including, but not limited to, a beauty school, barber college, reading room, place of instruction, or any other operation catering primarily to students or trainees rather than to customers; self-storage facility; place of worship, or a community gathering place (collectively, "**Prohibited Uses**"). Notwithstanding the foregoing, uses existing for other tenants or occupants of the Shopping Center as of the Effective Date, which tenants are listed on **Exhibit "K"** hereto (the "**Existing Tenants**"), as well as Pads P, Q and R (as shown on **Exhibit "B-1"**) can continue to be utilized by such Existing Tenants and replacement tenants to Existing Tenants (and their successors and assigns) occupying the same location and no more Floor Area as the replaced Existing Tenant without constituting a violation of the Prohibited Uses. It is the intent of this provision that the parking and other Common Area within the Tenant Control Area should not be burdened by either large scale or protracted use. The term "**restaurant**" shall not apply to a fast or quick food operation, bagel shop, juice shop, yogurt store, sandwich shop, coffee shop (such as, a Starbucks or a Peet's) or other similar specialty type of food or beverage store, occupying less than or equal to Two Thousand Five Hundred (2,500) square feet of Floor Area individually for any single use or Seven Thousand Five Hundred (7,500) square feet of Floor Area in the aggregate.

          (ii)    Noxious Uses. In addition, unless Tenant has ceased to operate its business on the Premises for one hundred eighty (180) consecutive days or more (excluding Permitted Closures or due to Landlord's actions), Landlord shall not sell, operate or lease (or permit to be sold, operated or leased) any portion of the Shopping Center for use as: (A) a flea market, check cashing operation (other than as part of bank operations), thrift shop, pawn shop, dollar-type store (other than one (1) Five Below store), second-hand store or store selling used merchandise, consignment store, or clearance center (except for upscale or high-end resale shops such as Game Stop and My Sister's Closet); (B) a funeral home; (C) a facility for the sale of paraphernalia for use with illicit drugs; (D) a facility for the sale or display of pornographic

15

material (as determined by community standards for the area in which the Premises are located), but this shall not extend to a full line first-class book store such as Barnes & Noble or to a first-class movie theatre; (E) an off-track betting parlor; (F) a carnival, amusement park, circus, tent sale, pumpkin patch, Christmas tree lot except within the "**Permitted Xmas Lot Zone**" depicted on **Exhibit "B"** or "**farmer's market**"; (G) a facility for the sale or storage of new or used motor vehicles, trailers or mobile homes; (H) a facility for any use which is illegal or dangerous or constitutes a nuisance; (I) a cigarette, cigar or smoke shop or any other store with a primary business of selling tobacco products and/or accessories; (J) a marijuana dispensary or store; (K) an addiction treatment clinic or a space in which meetings are conducted in connection with addictions or recovery therefrom; (L) a homeless shelter, soup kitchen, not-for-profit restaurant (such as Panera Cares), or such other use catering to the needs of the homeless or indigent population; (M) a gas or fuel station; or (N) a self-service parcel delivery pick-up location (such as Amazon Lockers, The Hub or Buffer Box) (collectively, "**Noxious Uses**"). Notwithstanding the foregoing, uses existing for Existing Tenants (but not their replacements) can continue to be utilized by such Existing Tenants (and their successors and assigns) without constituting a violation of the Noxious Uses. Except to the extent prohibited under the Target OEA, the Noxious Uses described in this Section 6(b)(ii) shall not be applicable to the premises identified on the site plan as "**Target**" (the "**Target Parcel**").

          (iii)     Violation. All of the foregoing Prohibited Uses and Noxious Uses collectively shall be defined as "**Restrictions On Use**". From the Effective Date through the Term, Landlord shall include in all new leases or occupancy agreements for space within the Shopping Center an express provision prohibiting any use in violation of the Restrictions On Use. Landlord agrees that the Restrictions On Uses shall apply to any future expansion of the Shopping Center. In the event of a violation of any of the Restrictions On Use, which is the result of Landlord or its agents or representatives engaging in a Prohibited Use or Noxious Use or Landlord entering into a lease, license or other agreement (or an amendment or modification to an existing lease, license or other agreement) that permits a Prohibited Use or Noxious Use, or if in the case of any other Prohibited Use or Noxious Use that is not a Non-Willful Restriction On Use Breach (defined below) (in any such event, a "**Willful Restriction On Use Breach**"), then Landlord shall have a period of thirty (30) days following written notice from Tenant of the breach to cure such Willful Restriction On Use Breach (the "**Willful Restriction On Use Breach Cure Period**"). In the event of a violation of any of the Restrictions On Use that is the result of a tenant, licensee or other occupant in the Shopping Center violating its lease, license or other agreement (a "**Non-Willful Restriction On Use Breach**"), Landlord shall have a period of two hundred forty (240) days following written notice from Tenant of the breach to cure such Non-Willful Restriction On Use Breach (the "**Non-Willful Restriction On Use Cure Period**"). If Landlord fails to cure such breach within the Willful Restriction On Use Breach Cure Period or within the Non-Willful Restriction On Use Breach Cure Period, as applicable, then Tenant may elect to reduce Fixed Minimum Rent to a level of fifty percent (50%) of the Fixed Minimum Rent commencing at the end of the applicable cure period. Tenant shall also have the right to terminate this Lease if a Willful Restriction On Use Breach is not cured by the Willful Restriction On Use Breach Cure Period or a Non-Willful Restriction On Use Breach is not cured within four hundred fifty five (455) days of delivery to Landlord of notice of such breach, in each case, following written notice from Tenant of such violation, and while any such violation is continuing, by delivery of written notice to Landlord, and this Lease shall cease and terminate on the date specified in such notice,

325821301.2

whereupon neither Landlord nor Tenant shall have any further liability hereunder, excluding those provisions which are expressly intended to survive the termination or expiration of this Lease.

(c)     Landlord Leasing Covenant.  Excluding Target, Dollar Tree, Bed Bath & Beyond, Total Wine and Bev Mo, so long as there is not in existence and continuing any uncured Event of Default and so long as Tenant is conducting business operations with the Premises for the Grocery Use (subject to Permitted Closures), Landlord and its affiliates shall not sell or lease or enter into other occupancy agreements (including, without limitation, licenses) premises within the Shopping Center to (i) a direct competitor of Tenant's, such as Sprouts, Whole Foods, Dean and Deluca, or Natural Grocer's, and/or (ii) a tenant whose primary use is the sale of groceries (without regard to whether such tenant also sells alcoholic beverages) (the "**Landlord Covenant**").  Tenant acknowledges that the Landlord Covenant expressly excludes Target, Dollar Tree, Bed Bath & Beyond, Total Wine and Bev Mo.  Tenant acknowledges further that Tenant has not been granted an exclusive right to conduct the Grocery Use in the Shopping Center.  The foregoing covenant is not binding upon any other tenant or occupant of the Shopping Center and such tenants may change use even if such use is for use described in clause (i) and/or (ii) of the Landlord Covenant.  In the event of any violation by Landlord (or its affiliates) of the Landlord Covenant, Tenant, at any time thereafter, may reduce Fixed Minimum Rent to a level of fifty percent (50%) of the Fixed Minimum Rent herein at such time until such violation is rectified.  In addition, if such violation is not cured within sixty (60) days following written notice thereof by Tenant to Landlord, Tenant shall also have the right to terminate this Lease at any time while such violation is continuing by delivery of written notice to Landlord and this Lease shall cease and terminate on the date specified in such notice, whereupon neither Landlord nor Tenant shall have any further liability hereunder, excluding those provisions which are expressly intended to survive the termination of this Lease.  Landlord agrees that the Landlord Covenant shall apply to any future expansion of the Shopping Center.  Landlord warrants and represents that Landlord has granted no exclusive to tenant or occupants of the Shopping Center whose premises contain ten thousand (10,000) square feet or more of Floor Area and Landlord expressly covenants and agrees that at no time during the Term shall Landlord grant any exclusive use in favor of any other tenant or occupant of the Shopping Center whose premises contain ten thousand (10,000) square feet or more of Floor Area.  Landlord agrees that except as set forth in this Lease and/or the Target OEA, Tenant is not and shall not be subject to any limitations whatsoever on its use of the Premises or its operations for the Grocery Use, and any exclusive granted to other tenants or occupants of the Shopping Center shall not be binding or effective against or in any way affect the Grocery Use or the Premises.

7.     PAYMENT OF TAXES

(a)     Definition.   Landlord shall pay to the local tax authorities or other governmental agencies before delinquency any Real Property Taxes levied or assessed against the Shopping Center and the improvements thereon during the Term.  The term "**Real Property Taxes**" shall mean and include all taxes, assessments and governmental or quasi-governmental charges of any kind and nature whatsoever levied or assessed against the Shopping Center (whether arising from any improvement or special taxing district, or otherwise) and any other charges, taxes and/or impositions now in existence or hereafter imposed by any governmental authority and any tax, fee, levy, assessment or charge which is imposed or added to a tax or charge

17

hereinbefore included within the definition of real property tax assessed against the buildings and improvements within the Shopping Center, excise taxes, assessments, including any special taxing district assessment which is imposed in order to fund public facilities or transportation services for the area in which the Shopping Center is located, including Assessment No. 13.02.2.1.1.1.1 issued by the Town of Queen Creek, Arizona Improvement District No. 001 (the "**ID Payment**").

(b)     Payment.  At such intervals as Landlord is required to pay Real Property Taxes (or on any delayed or installment basis as is permitted without imposition of a penalty), Tenant shall pay Landlord for Tenant's Pro Rata Share of Real Property Taxes levied against the tax parcel or parcels of which the Premises is a part.  Tenant's payment of Real Property Taxes to Landlord shall be net of any early-payment discounts available at the time Tenant's payment is due.  Tenant shall pay Landlord for Real Property Taxes either (i) within thirty (30) days after Tenant's receipt of Landlord's statement therefor, accompanied by the tax bill on the basis of which such statement is rendered, provided that Tenant shall in no event be required to pay said Real Property Taxes earlier than thirty (30) days prior to the applicable delinquency date or (ii) on a monthly estimated basis at the same time and in the same manner as Common Area Maintenance Charges in Section 20(f). Landlord shall pay, or cause the payment of, all Real Property Taxes before any fine, penalty, interest or cost may be added thereto, become due or be imposed by operation of law for the nonpayment or late payment thereof.  In no event shall Tenant be liable for any discount forfeited or penalty incurred as a result of late payment by Landlord. All notices to Tenant requesting Tenant's payment of Real Property Taxes shall be accompanied by complete copies of tax bills.

(c)     Exclusions.  Tenant's obligation to reimburse or pay Landlord for Tenant's Pro Rata Share of Real Property Taxes levied against the Shopping Center during any fiscal tax year during the Term hereof shall not include (i) any local, county, municipal, state or federal income, franchise, corporate, estate, inheritance or succession tax of Landlord; (ii) any tax, fee or increase which may be levied to the extent as a result of a voluntary or involuntary assignment, transfer or change of ownership of all or any portion of Landlord's interest in the Premises, the Shopping Center or in the composition of Landlord (except the first such increase during each five (5) year period of the Lease Term); and (iii) any business license tax or tax or increase which may be levied on Landlord's income, gross receipts, sales, rents or profits, under a margin tax, or any other tax levied on Landlord other than a tax based on the value of the real property of the Premises and/or the Shopping Center (other than the rent tax described in Section 3(c)).  In addition, other than the ID Payment, Tenant shall not be obligated to pay any on-site or off-site assessments or improvements required by city or governmental authorities having jurisdiction over the Shopping Center, any portion of any assessment whatsoever or fees for improvements such as road widening, the installation or hookup to and maintenance of sewer and sewer lines, sanitary and storm drainage systems and other utility lines and installations (whether public or private) or installation of traffic control devices or traffic or impact fees or system development charges, or similar charge related to the development or redevelopment of the Shopping Center.

(d)     Prorations.  At the beginning and end of the Term, Real Property Taxes to be paid by Tenant shall be prorated based on the portion of the fiscal tax year in which this Lease is in effect.

325821301.2

(e)     Installments.  In the event any Real Property Taxes may be legally paid in installments (whether by subjecting the Premises to bond or otherwise), Landlord shall pay such Real Property Taxes in installments.  In the event that said Real Property Taxes are paid in installments, Tenant shall be obligated to pay Tenant's Pro Rata Share of the installment of Real Property Taxes paid by Landlord which become due and payable during the Term of this Lease which shall be prorated at the beginning of the Term or end of the Term as herein above provided. Tenant agrees to execute or join with Landlord in the execution of any application or other instrument that may be necessary to permit the payment of such Real Property Taxes in installments.

(f)     Personal Property Taxes.  Tenant shall pay before delinquency any and all taxes levied or assessed, and becoming payable during the Term, against Tenant's personal property located upon the Premises.

(g)     Tax Contests.  At the reasonable request of Tenant, unless Landlord has a reasonable basis to conclude that doing so could adversely affect Real Property Taxes, Landlord shall contest the existence, amount or validity of any Real Property Taxes affecting the tax parcel of which the Premises is a part.  As a result of any successful appeal, Tenant shall be entitled to a refund of any overpayment of Tenant's Pro Rata Share of Real Property Taxes.

8.     DAMAGE AND DESTRUCTION

(a)     Casualty.  If during the Term the Premises (and/or the improvements therein or any portion of the "**Required Rebuild Area**" depicted on **Exhibit "B"**) is damaged or destroyed by fire, or by any other cause required to be covered by the insurance required to be carried by Landlord pursuant to Section 9(a) hereof, Landlord shall forthwith proceed to repair and/or rebuild the same, excluding any additions or improvements made by Tenant but including those made by Landlord, to substantially the same plans and design as existed immediately before such damage or destruction occurred but only to the extent of Landlord's Work, but in any event complying with all applicable building codes ("**Landlord's Restoration Work**").  To the extent it pertains to the Premises, Landlord's Restoration Work shall be performed in accordance with plans and specifications ("**Restoration Plans**") approved in writing by Tenant, prepared by a licensed architect selected and employed by Landlord and approved in writing by Tenant, which approval shall not be unreasonably withheld, conditioned or delayed and performed by a licensed general contractor selected and employed by Landlord and approved in writing by Tenant, which approval shall not be unreasonably withheld, conditioned or delayed.  Subject to building code requirements, materials used in Landlord's Restoration Work shall be as nearly like original materials as may then be reasonably procured in regular channels of supply.  Landlord shall provide the Restoration Plans to Tenant within ninety (90) days of such damage or destruction. Landlord's Restoration Work shall be commenced within sixty (60) days after the approval by Tenant of the Restoration Plans and the identity of the licensed general contractor selected by Landlord and shall be completed within two hundred ten (210) days after the date of commencement of Landlord's Reconstruction Work. In the event Landlord's Restoration Work is not commenced or completed within the time period above, then Tenant shall have the option to terminate this Lease by giving Landlord written notice, which termination shall be effective thirty (30) days after receipt by Landlord of Tenant's notice of termination, unless prior to the expiration

19

of such thirty (30) day period, Landlord commences and/or completes, as the case may be, Landlord's Restoration Work, and thereafter neither Landlord nor Tenant shall have any further liability hereunder, except for those obligations or liabilities which by the terms of this Lease survive termination. If Tenant exercises the option of terminating this Lease in accordance with the provisions of this Section 8(a), such termination shall be Tenant's sole remedy. If Landlord anticipates that it will not be able to commence or complete Landlord's Restoration Work within the time periods set forth in this Section, Landlord shall so notify Tenant and set forth the date of anticipated delay. In such event, Tenant shall have the right to exercise its right to terminate within thirty (30) days of receipt of such anticipated delay notice, whereupon neither Landlord nor Tenant shall have any further liability hereunder, excluding those provisions which are expressly intended to survive the termination of this Lease. If Tenant exercises the option of terminating this Lease in accordance with the provisions of this Section 8(a), such termination shall be Tenant's sole remedy. Such obligation shall survive the termination of this Lease. In the event of damage to or destruction of portions of the Shopping Center outside the Required Rebuild Area, Landlord shall either remove the damage or destroyed improvements and restore the property occupied thereby to level grade within ninety (90) days of such damage or destruction, or elect, to repair and/or rebuild the same, in which event, Landlord shall promptly commence such repair work and complete the same with reasonable diligence (and in all instances, within one (1) year from commencement).

       (b)     <u>Uninsured Casualty</u>.

       (i)     If during the Term the Premises is damaged by a cause or casualty not covered by the insurance required to be carried by Landlord pursuant to Section 9(a) hereof, Landlord may elect to terminate this Lease or perform the Landlord's Restoration Work at its sole cost and expense (without charge back to Tenant as part of the Common Area Maintenance Charges). Within ninety (90) days after the date of the casualty, Landlord shall give Tenant written notice of its intention to terminate this Lease or to perform the Landlord's Restoration Work pursuant to the preceding sentence. In the event that Landlord fails to give such notice within the period provided, such failure shall be deemed to constitute Landlord's election to terminate this Lease to the extent not restored as part of Landlord's Restoration Work.

       (ii)     In the event that Landlord elects, or is so deemed to have elected, to terminate this Lease pursuant to Section 8(b)(i) ("**Landlord Termination Election**"), and as a condition to the effectiveness of Landlord's Termination Election, Landlord shall have concurrently terminated all the leases or other occupancy agreements with other tenants and occupants in the Shopping Center whose premises were damaged and for which Landlord has a contractual right to terminate and Tenant shall have a right of first offer to lease retail space in the Shopping Center for a period of sixty (60) months after the effective date of termination ("**ROFO Period**") for the same term and extension option terms remaining and economic terms as this Lease as of the date of the termination ("**ROFO**"), subject to the ROFO terms below. Tenant's ROFO shall be exercised at any time during the ROFO Period, if Landlord elects to restore, rebuild or redevelop all or a portion of the Shopping Center for retail purposes (indicia of such election shall include, without limitation, applying for permits or entitlements, engaging architects, engineers, brokers or consultants in connection with the same, developing marketing materials, engaging in discussions with potential tenants or occupants). Landlord shall notify Tenant

("**ROFO Notice**") of the applicable future retail space (which must be at least 90% of the Floor Area of the Premises). Tenant may lease such future retail space under the same term and extension option terms remaining and economic terms as this Lease as of the effective date of termination and pursuant to a new lease based on this Lease, provided appropriate changes shall be made to address any change in circumstances applicable to such future retail space and the Shopping Center, by delivering written notice of exercise to Landlord ("**ROFO Notice of Exercise**") within thirty (30) days after the date of the ROFO Notice. Failure of Tenant to properly and timely exercise its right to lease such future retail space within such thirty (30) day period shall waive Tenant's ROFO and Landlord shall thereafter have the right to lease such future retail space to any third-party. The foregoing obligations related to the ROFO shall survive the termination of this Lease.

(iii)    In the event of the Landlord Termination Election, Tenant shall have an additional thirty (30) days thereafter to negate Landlord Termination Election and require that Landlord perform the Landlord's Restoration Work necessitated by such damage or destruction ("**Tenant Negation**"). In such event, Tenant shall advance to Landlord the sums as and when necessary to perform such uninsured Landlord's Restoration Work and this Lease shall continue in full force and effect. Subject to receipt of all necessary permits, Landlord thereafter shall perform Landlord's Restoration Work in accordance with the timelines required under Section 8(a), and Tenant shall be entitled to exercise the termination rights under Section 8(a) in the event Landlord fails to do so. In the event Tenant does not exercise a Tenant Negation, this Lease shall terminate effective as of the date of Landlord Termination Election, whereupon neither Landlord nor Tenant shall have any further liability hereunder, excluding those provisions which are expressly intended to survive the termination of this Lease. In the event of a Tenant Negation, Landlord shall have no obligation to reimburse Tenant the sums advanced by it to Landlord in connection with Landlord's Restoration Work.

(c)    Tenant's Repairs. In the event that this Lease is not terminated pursuant to Section 8(a) or 8(b) hereof, Tenant shall, at its own expense or using the proceeds from Tenant's insurance, replace and repair the damaged portions of the Premises that are not part of Landlord's Restoration Work (including Tenant's Work and other improvements made by Tenant to the Premises), Tenant's Property and Tenant's Trade Dress, as may, in the opinion of Tenant, be necessary for the resumption by Tenant of its business in the Premises. Such replacement or repair shall take place as soon after the damage or destruction as may be reasonably possible, subject to Force Majeure and any Landlord caused delays. Subject to Force Majeure and delays caused by Landlord, Tenant shall reopen for business, for at least one day, not later than one hundred eighty (180) days following completion by Landlord of Landlord's Restoration Work.

(d)    Rent Abatement. Subject to the provisions of Section 8(b) hereof, in the event of a partial damage or destruction, Tenant shall continue to utilize the Premises to the extent that it may be practicable to do so from the standpoint of good business, in Tenant's reasonable opinion. All annual Fixed Minimum Rent and other charges payable by Tenant under this Lease shall abate from the time any damage or destruction occurs until the Premises is wholly restored, unless Tenant shall continue or resume using the Premises, in which event the annual Fixed Minimum Rent and other charges payable by Tenant under this Lease shall be equitably abated in the proportion that the unusable part of the Premises bears to the whole thereof. In the case of

21

damage to the Building (excluding the Premises) or Common Area, Fixed Minimum Rent and other charges payable by Tenant under this Lease shall be equitably abated in the proportion that the use of the Premises are frustrated or impaired until such frustration or impairment ceases. In all events, any rent abatement pursuant to this Section 8(d) shall terminate not later than one hundred eighty (180) days following completion by Landlord of Landlord's Restoration Work.

(e)    End of Term.  Either party hereto shall have the right to terminate this Lease if, during the last two (2) years of the then existing Term, the Premises is damaged by a cause or casualty required to be insured by Landlord under Section 9(a) and, in the case the Landlord is the terminating party, the estimated repair costs of the Building (exclusive of Tenant's Property and Tenant's Trade Dress and other tenants' personal property, furniture, fixtures and equipment) exceeds fifty percent (50%) of the full replacement cost of the Building, provided that in each case, written notice of termination is given within ninety (90) days of the casualty event, whereupon neither Landlord nor Tenant shall have any further liability hereunder, excluding those provisions which are expressly intended to survive the termination of this Lease.

(i)    Notwithstanding anything to the contrary in this Section 8(e), in the event that Tenant has any remaining Extension Options, and the time within which said option may be exercised has not yet expired, Tenant shall exercise such Extension Option, if it is to be exercised at all, no later than twenty (20) days after the occurrence of any such partial destruction or damage occurring within the last two (2) years of the Lease Term.  If Tenant duly exercises such Extension Option during said twenty (20) day period, then the other provisions of this Section 8 shall apply as if the Lease Term at the time of the damage had more than two (2) years remaining.

(f)    Waiver of Statutes; Force Majeure.  Landlord and Tenant agree that the foregoing provisions shall govern the respective rights of the parties in the event of damage or destruction of the Premises, or any part thereof, and hereby expressly waive the provisions of any statutes to the contrary. Notwithstanding anything herein to the contrary, the maximum number of days that a party may claim as delays under this Section 8 caused by Force Majeure events is sixty (60) days.

9.    INSURANCE AND INDEMNIFICATION

(a)    Landlord's Insurance.  Landlord shall keep (or cause to be kept, subject, however, to commercially reasonable rights of self-insurance) in full force and effect during the Term upon the buildings (including the Building and all improvements thereto) and Common Area in the Shopping Center, property insurance with "**All Risk**" coverage with an ordinance or law coverage endorsement and shall include flood coverage.

(i)    Said insurance shall be written by a company or companies licensed to do business in the state in which the Premises is located and rated Class A- VIII or better in the most recent A.M. Best Key Rating Guide of Property-Casualty Insurance Companies.

(ii)     Said insurance shall be in an amount of the full replacement cost, containing no co-insurance, with a commercially reasonable deductible for which Tenant shall not be responsible.

(iii)     Except to a mortgagee who has entered into an SNDA with Tenant, Landlord agrees that it shall not assign, transfer or convey to any party its right in, or right to receive, all or any portion of the proceeds of said insurance pertaining to the Premises without the prior written consent of Tenant.

(iv)     Tenant shall pay Landlord its Pro Rata Share of the costs of such insurance at the same time as Tenant makes its payments of Common Area Maintenance Charges.

(v)     With respect to any insurance effective for a period commencing prior to the commencement of the Primary Term of this Lease, Tenant's obligation to pay Landlord for Tenant's Pro Rata Share of the premiums thereof shall be limited to paying Landlord for that portion of Tenant's Pro Rata Share of the premium for such insurance as the portion of the term of the policy lapsing following commencement of the Primary Term hereof bears to the entire term of the policy.  With respect to any insurance effective for a term extending beyond the Term of this Lease, Tenant's obligation to pay Landlord for Tenant's Pro Rata Share of the premiums thereof pursuant to this <u>Section 9</u> shall be limited to paying Landlord for that portion of Tenant's Pro Rata Share of the premium for such insurance as that portion of the term of the policy commencing prior to the expiration of the Term of this Lease and ending at the expiration of the Term of this Lease bears to the entire term of the policy.

(b)     <u>Indemnity</u>.  Tenant hereby agrees to indemnify, defend and hold Landlord harmless from all claims, costs, liability, damage or expense, including reasonable attorneys' fees, for any death, damage or injury to persons or property occurring on the Premises, and from the gross negligence or willful misconduct of Tenant, its agents, servants, contractors or employees elsewhere in the Shopping Center, in each case, except to the extent caused by Landlord's gross negligence or willful misconduct.  Landlord hereby agrees to indemnify, defend and hold Tenant harmless from any and all claims, costs, liability, damage or expense, including reasonable attorneys' fees, for any death, damage or injury to persons or property (i) occurring within the Common Areas of the Shopping Center (excluding the Premises), or (ii) within the Premises as a result of Landlord or its agents', employees' or contractors' gross negligence or willful misconduct, and (iii) from any gross negligence or willful misconduct by Landlord or its agents, servants, contractors or employees, in each case, except to the extent caused by Tenant's gross negligence or willful misconduct. The indemnifications contained herein shall apply only as to claims arising out of events that occur prior to expiration or earlier termination of this Lease and shall survive the expiration or termination of this Lease.

(c)     <u>Liability Insurance</u>.  Tenant and Landlord each agrees that it shall maintain in force a policy or policies of commercial general liability insurance (on an occurrence based form) written by one or more insurance carriers (with minimum rating of Class A-VIII as determined in the most recent A.M. Best Key Rating Guide of Property-Casualty Insurance Companies) licensed to do business in the state in which the Premises is located that shall insure against liability, with policy limits of not less than $5,000,000 combined single limit per

occurrence and in the aggregate, which shall include coverage for products/completed operations, bodily injury (including mental anguish and death), broad form property damage, premises liability, contractual liability (including the assumption of liability assumed by Landlord or Tenant, as applicable, in Section 9(b) above, cross liability, and personal and advertising injury, with no absolute pollution exclusion. Said policy or policies shall provide, among other things, blanket contractual liability insurance recognizing and insuring the assumption of liability assumed by the purchaser thereof in Section 9(b), as applicable. Tenant's policy shall cover the Premises and the business operated by Tenant, including Tenant's activities in the Common Areas, and shall name Landlord as an additional insured. Landlord's policy shall cover the Common Area and Landlord's activities in the Premises, shall name Tenant as an additional insured. The Five Million Dollar ($5,000,000) combined single limit described in this Section 9(c) may consist of a combination of primary and umbrella or excess liability policies. Tenant's policy of liability insurance shall be primary as to the Premises and non-contributory, and Landlord's policy of liability insurance shall be primary as to the Common Areas and non-contributory. Tenant shall pay its Pro Rata Share of the premiums for such insurance carried by Landlord at the same time as Common Area Maintenance Charges.

(d)     Workers Compensation.  Tenant and Landlord (to the extent Landlord has employees) each agrees to maintain and keep in force, during the Term hereof, all Workers' Compensation and Employers' Liability Insurance required under applicable Workers' Compensation Acts of the state in which the Premises are located. Such policies shall have no exclusions for sole proprietors, executive officers, partners or members.  Both of such policies shall include waivers of subrogation in favor of Landlord.

(e)     Tenant's Property Insurance.  Tenant shall keep in full force and effect during the Term a policy of property insurance with all risk coverage with an ordinance or law coverage endorsement and otherwise satisfying the requirements of Section 9(a) above but pertaining to Tenant's Work and to any alterations or improvements made by Tenant to the Premises subsequent to the Rent Commencement Date. Such policy may, if Tenant so elects, also cover items of Tenant's personal property, fixtures and equipment. Landlord shall have no interest in the proceeds of such policy.

(f)     Evidence of Insurance.  Within thirty (30) days after written request, each of the parties hereto agrees to deliver to the other evidence that the policies of insurance required by this Section 9 have been issued and are in effect.  In any event, Tenant shall provide to Landlord evidence of the required insurance not later than the Delivery Date and thereafter upon request as described in this Section.

(g)     Self-Insurance.  Tenant, due to the number of locations which it and its related companies occupy and the resultant spreading of risks, may desire to self-insure and/or assume the risk of loss and liabilities on many risks.  Landlord agrees that provided that Tenant maintains a net worth of not less than Two Hundred Million Dollars ($200,000,000), Tenant may be a self-insurer so long as the matters self-insured hereunder are so self-insured in a manner customary for similar locations in Tenant's program of insurance.  Tenant agrees to pay the amount of any such deductibles or self-insurance to the party or parties entitled to the proceeds of insurance pursuant to the provisions hereof.  If Tenant elects to self-insure, Tenant shall provide to Landlord

24

(and any mortgagee who provided to Tenant an SNDA) a letter indicating that Tenant is self-insuring and that Landlord and, if applicable, such mortgagee, is an additional insured on any such commercial general liability self-insurance program of self-insurance.

(h)     Blanket Policies.  Notwithstanding anything to the contrary contained within this Section 9, Landlord's or Tenant's obligations to carry the insurance provided for herein may be brought within the coverage of a so-called blanket policy or policies of insurance carried and maintained by the insuring party, provided, however, the non-insuring party shall be named as an additional insured thereunder and the procuring party shall take steps (such as, the procurement of excess insurance in a commercially reasonable amount) to ensure that the coverage afforded the other party shall not be reduced or diminished by reason of the use of such blanket policy of insurance, and provided further that the requirements set forth herein are otherwise satisfied. With regard to the insurance maintained pursuant to this paragraph, each party agrees to provide to the other party, upon written request, the certificate(s) of insurance evidencing the insurance coverage carried pursuant to this paragraph.

(i)     Waiver of Subrogation.  Neither Landlord nor Tenant shall be liable to the other or to any property insurance company (by way of subrogation or otherwise) insuring the other party for any loss or damage to any building, structure or other tangible property, or any resulting loss of income, even though such loss or damage might have been occasioned by the acts or omissions of such party, its agents, contractors or employees; provided the provisions of this subparagraph shall apply only to the extent of the property insurance coverage maintained or required to be maintained with respect to such loss or damage or (y) liability imposed upon Landlord solely in its capacity as the fee owner of the Premises and without regard to (1) any conduct by Landlord or its employees, agents, representatives, contractors, subcontractors or consultants, and (2) Landlord's express obligations under this Lease.

10.     EXERCISE OF EMINENT DOMAIN

(a)     Taking.  An appropriation or taking under the power of eminent domain of all, or a portion, of the Shopping Center, are sometimes hereinafter called a "**taking.**"

(b)     Total Taking of the Premises.  If there is a taking of all of the Premises then this Lease shall terminate and expire as of the date of taking of actual physical possession of the Premises by the condemnor, whereupon neither Landlord nor Tenant shall have any further liability hereunder, excluding those provisions which are expressly intended to survive the termination of this Lease. In such event, Tenant shall be entitled to participate in any condemnation award so as to be compensated for the cost of relocation, removal and decrease in value, as a result of such taking of Tenant's fixtures, equipment and stock-in-trade located in the Premises, goodwill and any other items to which Tenant is entitled under applicable law, excludes, however, the bonus value of the leasehold of which Tenant is being deprived for the remainder of the Term hereof (calculated as the difference between the Fixed Minimum Rent hereunder and the market rental being charged at other shopping centers in the vicinity of the Shopping Center for similar space, if any). Nothing in this Section 10 shall be construed as a waiver by Landlord of any rights vested in it by law to recover damages from a condemnor for the taking of its right, title, or interest in the Shopping Center.

25

(c)     <u>Partial Taking</u>. In the event of the taking of:

(i)     any portion of the Premises, or any portion of the Shopping Center, so that the remainder thereof is not reasonably adapted to the continued use of the Premises by Tenant; or

(ii)     any portion of the Common Area located in Tenant's Control Area so that a portion of said Common Area is so separated from the remainder thereof that in Tenant's reasonable opinion the Common Area located in Tenant's Control Area available to customers of Tenant is so limited that the continued leasing of the Premises by Tenant is impracticable or unprofitable; or if such change would reduce the available number of parking spaces to less than ninety percent (90%) of the parking spaces within 200 feet of Tenant's entrance, as such parking spaces are shown on **Exhibit "B"** hereto; or

(iii)     access, whether by a taking or otherwise, to the Premises or Loading Area of the Shopping Center or a portion thereof to adjoining thoroughfares, so that accessibility is so limited and reduced that in Tenant's reasonable opinion the continued leasing of the Premises by Tenant shall become impracticable or unprofitable;

then Tenant shall have the right to cancel and terminate this Lease as hereinafter provided. Within ninety (90) days after receipt by Tenant from Landlord of written notice that a condemnation action has been commenced, Tenant may, by written notice to Landlord, notify Landlord of its election to terminate this Lease, whereupon neither Landlord nor Tenant shall have any further liability hereunder, excluding those provisions which are expressly intended to survive the termination of this Lease, and Tenant shall share in any award or sale price as provided in <u>Section 10(b)</u> hereof.

(d)     <u>Repair</u>. Unless terminated pursuant to <u>Sections 10(b) or 10(c)</u> above, this Lease shall remain in full force and effect. Landlord shall promptly, at its sole expense to the extent of the proceeds of the taking, make all repairs and alterations to the Shopping Center and the improvements thereon (including, without limitation, the Premises, but only to the extent of Landlord's Restoration Work) necessitated by such taking so that the portions of the Shopping Center not taken constitute a complete architectural unit. Tenant shall repair, alter, remove or replace Tenant's Work and its equipment and trade fixtures in the Premises as necessitated by such taking.

(i)     Tenant shall continue to utilize the Premises for the operation of its business to the extent that it may be practicable to do so from the standpoint of good business. Prior to the completion of repair and restoration work by Landlord, Fixed Minimum Rent and other charges payable by Tenant hereunder shall be equitably abated in the proportion that the unusable part of the Premises bears to the whole thereof effective as the date of taking, and such abatement shall, in all events, terminate not later than one hundred eighty (180) days following completion by Landlord of Landlord's Restoration Work. When Tenant completely resumes business in the Premises, Fixed Minimum Rent and other charges shall be reduced in the proportion which the area taken or sold bears to the total area of the Premises.

(ii)    If it is impracticable for Tenant to continue to utilize the Premises, all Fixed Minimum Rent and other charges shall equitably abate from the time of the actual taking or any disturbance of Tenant's possession of the Premises and/or the enjoyment by Tenant of its rights in the Shopping Center hereto pursuant to this Lease, until completion of such repair and restoration work by Landlord, and the expiration of such further reasonable time as shall be necessary to enable Tenant to resume doing business in the Premises, and such abatement shall, in all events, terminate not later than one hundred eighty (180) days following completion by Landlord of Landlord's Restoration Work.

(e)    <u>Notice of Proceedings</u>. Upon service on either party hereto of any legal process in connection with any condemnation proceedings, the party so served shall give immediate notice thereof to the other party hereto.

(f)    <u>Temporary Taking</u>. In the event of a taking of the Premises, or the No Tenant Employee Parking Area (as defined in <u>Section 20(a)</u>) or any portion thereof, for temporary use (specifically one not exceeding sixty (60) days in duration), without the taking of the fee simple title thereto, this Lease shall remain in full force and effect. All awards, damages, compensation and proceeds payable by the condemnor by reason of such taking for periods prior to the expiration of this Lease shall be payable to Tenant. All such awards, damages, compensation and proceeds for periods after the expiration of this Lease shall be payable to Landlord. Anything contained herein to the contrary notwithstanding, a temporary taking for any period in excess of sixty (60) days may, at Tenant's option, be deemed a permanent taking and shall be governed by <u>Sections 10(a) or 10(b)</u>, as applicable. As the entire award for a temporary taking of the Premises is payable to Tenant, there shall be no abatement of Fixed Minimum Rent or other charges during a period of a temporary taking.

(g)    <u>Taking of Sign</u>. In the event of the taking of any pylon or monument sign on which Tenant has installed or has the right to install identification panels Landlord shall provide a substitute site reasonably acceptable to Tenant for such sign with adequate electrical power, located so as to be visible to vehicular traffic or roadways adjacent to the Shopping Center (and Landlord shall replace and/or rebuild any of such signage so taken at its sole cost).

(h)    <u>Lease Prevails</u>. In the event of any taking, the rights and obligations of the parties shall be determined by this Lease and Landlord and Tenant waive any rights at law to the contrary.

11.    UTILITIES

(a)    <u>Utility Service</u>. Tenant shall pay during the Term hereof directly to the appropriate utility company or governmental agency all electric, water, gas, telephone and other public utility charges in connection with its occupancy and use of the Premises as shown on specific meters or submeters recording such usage, including all costs of operating and maintaining all equipment therein, all business licenses and similar permit fees but excluding any installation costs, development fees, traffic fees and other mitigation fees, tap fees, hook-up fees and/or connection fees or charges, all of which shall be paid by Landlord; provided, however, as described in <u>Section 4(g)</u> above, Tenant shall execute such applications and deliver such deposits as may be

27

necessary to establish utility service in Tenant's name.  All utilities shall be separately metered to Tenant throughout the Term of this Lease.

(b)  Interruptions in Service.  Landlord shall give Tenant at least forty-eight (48) hours advance notice of any interruption of utility service to the Premises to be caused by a third-party of which Landlord has actual knowledge (a "**Third Party Utility Interruption**") or which will be caused by a repair or other work being performed or requested by Landlord (a "**Landlord Utility Interruption**", together with a Third Party Utility Interruption, a "**Foreseeable Utility Interruption**").  Landlord shall use commercially reasonable efforts to minimize the impact on Tenant's business conducted in the Premises during such Foreseeable Utility Interruption.  Such efforts shall include, but not be limited to, scheduling the Foreseeable Utility Interruption outside of Tenant's business hours, or, at a minimum, during off-peak business hours and arranging for generators or other backup power sources to be delivered to the Premises and installed (at Landlord's cost in the case of a Landlord Utility Interruption).  If Tenant makes its own arrangements for generators or other backup power sources, then Landlord shall reimburse Tenant for the actual, reasonable costs thereof in the case of a Landlord Utility Interruption. Notwithstanding anything to the contrary contained in this Lease, if a Foreseeable Utility Interruption continues for twenty four (24) hours or more, as Tenant's sole and exclusive remedy for the interruption of its business in connection therewith, all Fixed Minimum Rent and other charges payable by Tenant hereunder shall abate on a day for day basis until the Foreseeable Utility Interruption ceases.

12.   LIENS

Each party shall pay all costs for work performed by or on its behalf and shall keep the Premises and the Shopping Center free and clear of mechanics' liens and any other liens filed in connection with labor, materials or services (including professional services) furnished or claimed to have been furnished to such party.  In the event that any such lien does so attach, the party performing the work or on whose behalf the work or service was performed shall, within thirty (30) days after notice from the other party, cause any lien to be discharged or removed of record by either paying the amount of the lien or recording a statutory lien release bond.  Each party shall indemnify, protect, defend and hold harmless the other from and against any and all costs, losses, liabilities claims, demands and expenses (including reasonable attorneys' fees and costs) arising as a result of any mechanics', materialman's, or other lien filed against the Premises or the Shopping Center in connection with any labor, materials or services furnished or claimed to have been furnished on behalf of the indemnifying party.

13.   ASSIGNMENT AND SUBLETTING

Subject to the provisions of Section 6 hereof, Tenant shall have the right to assign this Lease, sublet the Premises, and/or transfer and grant concessions or licenses ("**Transfer**") in all or any part of the Premises without the consent of Landlord, provided that Tenant remains jointly and severally primarily liable under this Lease for all monetary and nonmonetary obligations arising subsequent to the date of the Transfer. No Transfer shall relieve the originally named Tenant from any of its obligations as Tenant hereunder except that the initially named Tenant shall not be liable for any extensions of the Term beyond the Primary Term and Extension Terms set forth in Paragraph F of

28

the Basic Lease Terms, or any increase in Fixed Minimum Rent or Additional Rent or any increased liability to Tenant negotiated by Landlord and the assignee, unless the originally named Tenant approves in writing. In the event that the originally named Tenant fails to respond to a request for such approval within thirty (30) days of request from Landlord, Landlord may send a second notice to Tenant in **BOLD, ALL CAP, 14 POINT FONT**, such notice to state the following: "**FAILURE TO DISAPPROVE OF THE REQUEST TO APPROVE AN AMENDMENT TO THE QUEEN CREEK, AZ LEASE IN 5 DAYS SHALL BE DEEMED TRADER JOE'S APPROVAL THEREOF**". If Tenant continues to fail to respond within five (5) days of receipt of such second notice, such failure shall be deemed to constitute Tenant's approval of such change, modification or amendment requested.

14.    NOTICES

Any notices required to be given hereunder, or which either party hereto may desire to give to the other, shall be in writing. Such notice may be given by reputable overnight national delivery service (with proof of receipt or delivery provided to the sender), personal delivery or mailing the same by United States mail, registered or certified, return receipt requested, postage prepaid, at the address set forth in Paragraph Q of the Basic Lease Terms, or to such other single address as the respective parties may from time to time designate by notice given in the manner provided in this Section. In no event may a post office box be specified as a notice address.

A notice shall be deemed received upon actual receipt or refusal of acceptance of delivery, as evidenced by the courier, and shall not be deemed received by virtue of electronic transmission, whether by facsimile, email, text or other electronic transmission.

In no event shall notices be delivered to or posted at the Premises. Landlord's breach of the foregoing shall constitute a material breach of this Lease and an unauthorized release of Confidential Information (as defined in Section 33(j)(ii)) entitling Tenant to the remedies set forth in Section 33(j)(v). Notwithstanding the foregoing, Landlord may deliver, in addition to the Notice Address, a duplicate notice to the Store Manager at the Premises only to the extent such notice relates to repairs at the Shopping Center or Premises to be performed by Landlord or other similar notices related to day to day operations at the Shopping Center.

15.    RIGHT TO GO UPON PREMISES

Landlord hereby reserves the right for itself or its duly authorized agents and representatives outside of the business hours of Tenant upon at least forty-eight (48) hours prior notice to Tenant and accompanied by a representative of Tenant to enter upon the Premises for the purpose of showing the same to any prospective purchaser or lender or tenant (provided that all showings to prospective tenants shall occur during the last six (6) months of the Term), inspecting the same or making any repairs which Landlord is required hereunder to make on the Premises or to adjoining buildings, but any such repairs shall be made with all due dispatch outside of the business hours of Tenant and in such manner as to cause the least possible inconvenience to Tenant in the conduct of its business, it being agreed that in the event of an imminent emergency to life or property necessitating emergency repairs to be made by Landlord, Landlord may enter upon the Premises forthwith to effect such repairs. To the extent Landlord incurs incremental additional costs or

expense in order to perform a repair outside of the business hours of Tenant, Tenant shall, within thirty (30) days after Landlord's request for reimbursement, pay to Landlord the amount of such incremental additional costs. Tenant shall make a representative of Tenant available during the performance of any such repairs.

16.    MAINTENANCE

(a)    Tenant's Obligations.  Subject to Landlord providing its consent when required under the provisions of Section 29, Tenant shall, at its own expense, maintain the Premises in good condition and repair and to a standard consistent with the balance of the Shopping Center, excluding those portions of the Premises that Landlord is to maintain pursuant to Section 16(b) hereof. Tenant shall not be responsible for matters which arise out of the use or occupancy of the Premises prior to the Term hereof or any maintenance or repairs resulting from the gross negligence or intentional misconduct of Landlord, its agents, employees or contractors. During the one (1) year period following the Rent Commencement Date, Landlord agrees to make all repairs to or alterations of the Premises which may become necessary by reason of any defects in any construction thereof by Landlord (Landlord's liability being limited to the repair or replacement, as the case may be, of defective materials and/or workmanship and in no event shall Landlord be liable for consequential or special damages). Tenant shall be permitted to go upon the roof to perform repairs or maintenance to any equipment that Tenant has installed thereon, but such Tenant roof access shall not void or adversely impact any roof warranty maintained by Landlord and Tenant shall be responsible for any roof repairs necessitated by or resulting from such Tenant roof access.  For the avoidance of doubt, Tenant, and not Landlord, is solely responsible for the maintenance and repair and replacement of the HVAC system serving the Premises.  If any warranties exist for the heating, ventilating and air conditioning system, Landlord shall assign the warranties to Tenant, and deliver the warranties to Tenant.

(i)    Emergency Repairs.  In the event of an emergency and a failure by Landlord to immediately (which shall be measured in relation to the particular emergency circumstances) commence and thereafter diligently pursue such repairs, Tenant may (A) repair the roof covering and (B) perform any other of Landlord's obligations set forth in Section 16(b), subject to reimbursement from Landlord for the costs of such repairs.  Tenant shall engage a roofing contractor designated by Landlord to undertake any emergency roof repairs; provided, however, in the event that Landlord fails to designate a roofing contractor upon Tenant's request to Landlord therefor (which request for reimbursement shall be accompanied by work orders, invoices and other evidence of the costs and expenses so incurred), Tenant shall have the right to select any roofing contractor to undertake such repairs. In the event Landlord does not reimburse Tenant for the cost of such emergency repairs within fifteen (15) days of Tenant's billing of Landlord therefor, Tenant may deduct such amounts from the next installment(s) of Additional Rent and up to fifty percent (50%) of Fixed Minimum Rent coming due with interest at the Interest Rate. Such right of offset shall commence with the calendar month following any payment by Tenant to the contractor performing such work, and shall continue until Tenant has been fully reimbursed for such repairs.  In the event that this Lease shall expire or otherwise terminate prior to such time as Tenant shall have been fully reimbursed for the cost of such maintenance, Landlord shall pay the balance thereof to Tenant within ten (10) days of the end of the Term hereof. Such reimbursement obligation shall survive the expiration or earlier termination of this Lease.  In

30

exercising the rights granted to Tenant pursuant to this Section 16(a)(i), Tenant (a) shall use commercially reasonable efforts to not disturb the quiet enjoyment of other tenants or occupants of the Shopping Center, and (b) shall repair any damage caused to any portion of the Shopping Center as a result of the exercise by Tenant of such rights, and (c) shall perform all repairs in good, workmanlike manner, in conformance with all applicable laws, and (d) shall have all such repairs performed by licensed and bonded contractors under contracts with industry standard warranties.

(ii)     Guaranties or Warranties.  In the event that any expense incurred by Tenant in complying with the provisions of this Section 16(a) proximately results from a cause for which Landlord would be entitled to proceed against Landlord's contractor under any guaranty or warranty made by such contractor, Landlord hereby assigns to Tenant, on a non-exclusive basis, the right to proceed against such contractor under such guaranty or warranty.

(b)     Landlord's Obligations.   Landlord at its sole expense shall maintain (including replacements if necessary) and repair the exterior and structural elements of the Premises (excluding doors, glass and windows) and Building, the roof membrane, the roof structure, the roof covering, the outside walls (excluding the sign fascia attached to the front of the Premises), ceiling slab, floor slab (but not the floor covering), all utilities to the point of connection to the Premises (including wiring, pipes, conduits and equipment) serving the Premises up to their points of connection to the Premises, the systems within and serving the Building (including, without limitation, water mains, sprinkler mains, sewer mains, and main electrical feeders, but excluding any systems exclusively serving the Premises) and the foundations of the Premises and the Building in good condition and repair throughout the Term of this Lease.  In addition, subject to Tenant's obligation to maintain the HVAC system in accordance with the provisions of Section 16(a), Landlord at its sole cost shall replace all heating and air conditioning systems and equipment that serve the Premises.  Landlord represents to Tenant that the Premises is not served by any shared systems (including mechanical, electrical, HVAC or other systems).

17.    DEFAULT

(a)     Tenant Default. Each of the following events shall be deemed to be an event of default by Tenant under this Lease ("**Event of Default**"): (i) the failure by Tenant to pay any rent or other sum required to be paid hereunder if such failure continues for ten (10) days after receipt by Tenant of notice from Landlord specifying such default; or (ii) the failure by Tenant to perform or observe any of Tenant's non-monetary obligations contained in this Lease within thirty (30) days after receipt by Tenant of notice from Landlord specifying the failure (or such additional period, if any, but not to exceed one hundred eighty (180) days, as may be reasonably required to cure the failure if the failure reasonably cannot be cured within a thirty (30) day period, provided Tenant commences to cure within thirty (30) days after receipt of notice and thereafter diligently pursues such cure to completion).  On the occurrence of any Event of Default, Landlord shall have the right to pursue one or all of the following remedies, each of which shall be cumulative and nonexclusive: (i) terminate this Lease, (ii) terminate Tenant's right to possession without terminating this Lease, (iii) exercise Landlord's remedies under A.R.S. § 33-361 (excluding any Landlord right thereunder to damages, attorney fees or court or other costs beyond what Landlord would be entitled to under other provisions of this Lease), (iv) commence an action to recover its legal damages (excluding any Landlord right thereunder to damages, attorney fees or court or other

costs beyond what Landlord would be entitled to under other provisions of this Lease), (v) commence an action to specifically enforce Tenant's obligations under this Lease and/or enjoin a violation by Tenant of the provisions of this Lease, or (vi) cure the Event of Default on behalf of Tenant; provided, however, Tenant has not already cured such Event of Default at the time of such Landlord election. If Landlord cures an Event of Default on behalf of Tenant, Tenant shall, on demand and as Additional Rent, reimburse Landlord for Landlord's expenses incurred thereby, plus interest from the date incurred until paid by Tenant at the Interest Rate. If Landlord terminates either this Lease or Tenant's right to possession of the Premises, Tenant shall immediately surrender the Premises to Landlord, but subject to Landlord's obligation to use commercially reasonable efforts to mitigate its damages. If Tenant fails to surrender the Premises, Landlord may enter upon and take possession of the Premises and expel or remove Tenant and any other person who may be occupying the Premises or any part thereof. Any termination only of Tenant's right to possession of the Premises shall not relieve Tenant of Tenant's obligation to pay Fixed Minimum Rent or other charges under this Lease on the days originally set forth in this Lease for payment, without acceleration. Landlord shall use reasonable efforts to mitigate any damages incurred by Landlord and to relet the Premises. In determining the amount of loss which Landlord suffers by reason of termination of this Lease, allowance shall be made for the expense of repossession and any necessary repairs, but not for any remodeling undertaken by Landlord following repossession.

        (b)    <u>Landlord Default</u>. Should Landlord default in the performance of any covenant, provision, warranty, condition or agreement herein, and such default in the case of any failure by Landlord to pay any sum required to be paid to Tenant hereunder or to any third party, continues for ten (10) business days after notice thereof from Tenant, or in case of any non-monetary default, continues for thirty (30) days after receipt by Landlord of written notice thereof from Tenant (except as otherwise provided herein), or if the default of Landlord is of a type which is not reasonably possible to cure within thirty (30) days, if Landlord has not commenced to cure said default within said thirty (30) day period and does not thereafter diligently prosecute the curing of said default to completion (except as otherwise provided herein) within one hundred eighty (180) days, Tenant may, in addition to any and all other remedies which it may have under this Lease, at law and/or in equity (i) provided such default has a material adverse effect on Tenant's operations, use of the Premises or rights under this Lease and relates to areas within Tenant's Control Area, subject to the provisions of <u>Section 20(k)</u> pay or perform any obligations of Landlord hereunder (including payment of all or any part of a broker's commission) and if Landlord does not pay to Tenant the actual out-of-pocket costs and expenses so incurred by Tenant, Tenant may deduct the cost thereof from up to fifty percent (50%) of each installment of annual Fixed Minimum Rent and one hundred percent (100%) of all other charges payable pursuant to the terms of this Lease, with interest at the Interest Rate, from the date of Tenant's payment to the date of Tenant's reimbursement or (ii) Tenant may withhold Fixed Minimum Rent and other charges payable pursuant to the terms of this Lease until Landlord's default is cured. In the case Tenant makes deductions as permitted under clause (i) above, Tenant shall be entitled to make sure deductions until it has been fully reimbursed for such costs plus interest as above provided, or until the expiration or earlier termination of this Lease, whichever occurs first. In the event that this Lease shall expire or otherwise terminate prior to such time as Tenant shall have been fully reimbursed for such costs, Landlord shall pay the balance thereof to Tenant within thirty (30) days of the end of the Term hereof. Such reimbursement obligation shall survive the expiration or

earlier termination of this Lease. The rights and remedies reserved to Tenant herein are cumulative, and Tenant may pursue any and all rights and remedies, whether at the same time or otherwise, except as expressly set forth otherwise in this Lease.

(c)    <u>Liquidated Damages</u>.  Wherever in this Lease a specific monetary remedy is specified, both parties acknowledge that in the event of a violation of the applicable section or failure to meet an applicable deadline, damages will be difficult, if not impossible, to ascertain and the amount of liquidated damages set forth is a reasonable estimate of the damages which would be suffered by the party entitled thereto.

(d)    <u>Waiver of Consequential Damages</u>. Notwithstanding anything in this Lease to the contrary, neither party shall be liable to the other for consequential, incidental, punitive, exemplary, special or indirect damages, whether arising in tort, contract, under any statute, under any indemnity provision or otherwise, and each party hereby waives any claims against the other related thereto. The parties intend that the limitations under this Section imposed on remedies and the measure of damages be without regard to the cause(s) related thereto, including, without limitation, the negligence or strict liability of any party, whether such negligence be sole, joint or concurrent, or active or passive. Each party acknowledges that amounts recoverable by the other pursuant to <u>Sections 17(a) and 17(b)</u> of this Lease do not constitute consequential, incidental, punitive, exemplary, special or indirect damages.  The terms of this Section shall survive the expiration or earlier termination of this Lease.

18.    <u>SIGNS AND COMMUNICATIONS EQUIPMENT</u>

(a)    <u>Tenant's Building Signs; Other Tenant Signs</u>.  Subject to Tenant obtaining all necessary municipal approvals, Tenant shall have the right, at Tenant's sole cost and expense, to install, erect, maintain and replace from time to time upon the front, sides, and rear of the exterior of the Premises building signs, which building signs shall be subject to Landlord's prior approval, (minimum 42" internally lit channel letters using Tenant's corporate logo and colors) and all other signs necessary or appropriate to the conduct of its business.  Tenant shall not install, erect or maintain any sign in violation of (i) any applicable law, ordinance or use permit of any governmental authority or  (ii) the Shopping Center Sign Criteria attached hereto as **Exhibit "F"** (unless expressly authorized herein).  Landlord approves Tenant's sign plans attached hereto as **Exhibit "F-1"**.  Notwithstanding anything to the contrary in the Shopping Center Sign Criteria but subject to applicable laws and code, Tenant shall be able to utilize such professionally prepared window signs so long as no more than thirty percent (30%) of the window area is covered by such signage, professionally prepared banners  (including, without limitation, depicting Tenant's **"Fearless Flyer"** motto or any other featured products or mottos, which may be periodically displayed on the exterior of the Premises, subject to applicable laws and code, so long as the manner by which such banners are affixed to the Premises is approved by Landlord, such approval cannot be unreasonably withheld, conditioned or delayed; **provided, however**, so long as the occupant of the Premises is Trader Joe's or its affiliate, the requirement that any such signage (i) be professionally prepared, or (ii) not cover more than thirty percent (30%) of the window area, or (iii) that Landlord have the right to approve the manner by which banners are affixed to the Premises shall not be applicable and in lieu thereof, Tenant shall be responsible for any damage resulting from Tenant affixing banners to the exterior of the Premises.  Notwithstanding anything

33

to the contrary in the Shopping Center Sign Criteria, Tenant may remove any of its signs at any time during the Term and may remove the same upon the expiration or termination of this Lease, and Tenant at its own expense shall repair any damage caused by the removal thereof.

(b)     Pylon, Monument and Directional Signage.  Tenant shall be allotted panels in the positions depicted on **Exhibit "F-2"** attached hereto on both sides of the specific monument and pylon signs located on Rittenhouse Road and Ellsworth Loop Road as depicted on **Exhibit "F-2"**.  Landlord agrees to meet and confer with Tenant upon its request if Tenant desires directional signage, with the goal of coming up with a solution to satisfy that need.  If subsequent to the Effective Date, Landlord receives approvals from the Town of Queen Creek to install additional monument or pylon signs along Rittenhouse Road and/or Ellsworth Loop Road and after Landlord has made available sign panels on the future signage on each of Rittenhouse Road and Ellsworth Loop Road to Target, Kohl's, the then occupant of the Steinmart box, the then occupant of the Bed Bath & Beyond box and Dave & Buster's, subject to existing rights in effect in writing as of the date of this Lease, before Landlord permits any tenant or occupant of the Shopping Center (who is not doing so as of the date of this Lease) to maintain signage on more than one monument or pylon sign along Rittenhouse Road or on more than one monument or pylon sign along Ellsworth Loop Road, as the case may be, Landlord shall extend to Tenant the opportunity to install sign panels on such future signage along Rittenhouse Road and/or Ellsworth Loop Road, as the case may be, but in no event shall Landlord be required to make available more than one (1) additional location along Rittenhouse Road and one (1) additional location along Ellsworth Loop Road.  The provisions of this paragraph do not extend to sign panels on existing pylon or monument signs that are vacated when an existing tenant or occupant of the Shopping Center vacates and such panels shall remain available for the replacement occupant of such space.

(c)     Prohibited Signs.  Landlord shall not install, erect or maintain any signs upon the Premises during the Term, except that, unless this Lease shall have previously been extended or renewed, Landlord may erect a "**To Rent**" sign during the last one hundred twenty (120) days of the Primary Term and the Extended Term, if any; provided, however, that such sign shall not obstruct any sign of Tenant or interfere unreasonably with the conduct of Tenant's business.  Landlord shall use commercially reasonable efforts to enforce the Sign Criteria for the Shopping Center on a uniform and nondiscriminatory basis.  The provisions of this Section 18(c) shall not, however, be applicable to signage required by governmental authorities having jurisdiction.

(d)     Communications Equipment.  Tenant may, at any time during this Lease Term, install, maintain, replace and/or remove any communications dishes, links or antennas and related equipment on the roof of the Premises as Tenant deems reasonably necessary or desirable, provided same shall (i) not adversely and materially affect the roof or the structural elements of the Premises, (ii) not void any applicable roof warranty, (iii) comply with all governmental regulations and requirements, (iv) be performed at Tenant's sole cost and expense, (v) be in a mutually agreeable location, (vi) be screened from view, (vii) all such communication equipment shall be used only by Tenant in connection with its use of the Premises (i.e., Tenant may not permit third parties to place communication equipment upon the roof of the Premises for use by or for the benefit of any such third party), and (viii) Tenant shall not offer communication services to third parties. Tenant shall submit specifications for any communication equipment to Landlord for

34

approval prior to installation. Tenant shall be solely responsible for any repairs to the roof resulting from the installation, maintenance, and/or repair of such rooftop communication devices.

(i)    If Tenant shall install such equipment, Tenant shall be responsible for the maintenance and repair thereof, at Tenant's sole cost. At the expiration or earlier termination of this Lease, such equipment shall remain the property of Tenant, and may be removed by Tenant. Upon the removal by Tenant of any communication dishes, links or antennas, Tenant shall repair any damage done in connection with such removal.

(ii)    Landlord shall not install or permit to be installed any radio or other transmitting equipment which would cause any interference with Tenant's communications transmissions in or from the Premises.

19.    REPRESENTATIONS AND WARRANTIES

(a)    Landlord's Representations and Warranties. As of the Effective Date or such other date specified below, Landlord represents, warrants and covenants to Tenant: (i) that all of the Shopping Center is zoned for commercial purposes, and that the Premises and Shopping Center are presently properly subdivided in conformity with all applicable laws; (ii) that Landlord is the fee simple owner of the portion of the Shopping Center identified on Exhibit A to the Memorandum of Lease; (iii) that the Shopping Center is subject to no restrictions or continuing regulations of any kind or nature whatsoever incompatible with Tenant's use as contemplated by Section 6(a) above and that there are no restrictions or restrictions in any agreement by which Landlord is bound which would adversely affect the uses described in Section 6(a) during the Term, in each case, except for such restrictions or regulations listed on **Exhibit "I"** subject to the terms of this Lease; (iv) that as of the Delivery Date, the Premises shall be in good working order and condition, the roof shall be watertight and all utility systems shall be functional; (v) that to the best of Landlord's knowledge, there are no exceptions to title with respect to and/or encumbrances on the Shopping Center other than those shown in the Report; (vi) that Landlord has no notice of any Real Property Taxes other than as reflected on the current tax bill, including the improvement district assessment described in the definition of the term "**Real Property Taxes**"; (vii) that Landlord has not used, discharged, dumped, spilled or stored any Hazardous Substances on or about the Shopping Center, in violation of applicable laws or in amounts which require remedial action or which has resulted in a recognized environmental condition, and has received no notice of such occurrence and has no knowledge that any such condition exists at the Shopping Center in each case, except as may be disclosed in the environmental report provided by Landlord to Tenant; (viii) that Landlord has no knowledge of any condition that would preclude Tenant from obtaining all permits and licenses necessary for it to carry on its business on the Premises; (ix) that if Landlord is a corporation, limited liability company, partnership or trust, Landlord covenants that it is duly constituted under the laws of the state of its organization, and that its officer, member, manager, partner or trustee who is acting as its signatory in this Lease is duly authorized and empowered to act for and on behalf of the entity or trust and that Landlord is duly qualified and in good standing to transact business in the state in which the Premises is located; (x) that there are no judicial, quasi-judicial, administrative or other orders, injunctions, moratoria or pending proceedings against Landlord or the Shopping Center which preclude or interfere with, or would preclude or interfere with, the construction contemplated herein or the occupancy and use of the

35

Premises by Tenant for the purposes herein contemplated; (xi) that, except as may be expressly set forth in this Lease, no third party has the legal right to object to Tenant's tenancy hereunder, prohibit the selling of any products sold by Tenant or the uses allowed herein or the right to consent to any feature of the Premises or Tenant's signage or cart corrals; (xii) there are no exclusive or prohibited use rights applicable to the Shopping Center other than those listed on **Exhibit "I"**, and none of the existing exclusive or prohibited use rights for the benefit of such Existing Tenants prohibit or limit Tenant from using the Premises for the Grocery Use as contemplated by Section 6(a) above; (xiii) there are no Existing Tenants with the right to use its premises for any general or legal use, or the right to assign or sublease its premises without Landlord's consent other than those listed on **Exhibit "L"**; and (xiv) that none of the terms or provisions of this Lease conflict with any of the terms or provisions contained in any document or agreement, written or oral, affecting the Shopping Center and that the terms and provisions of any document or agreement, written or oral, affecting the Shopping Center do not conflict with any of the terms or provisions of this Lease. If any of the matters described above are not as represented or warranted, and if the breach of such representation or warranty adversely and materially impacts Tenant's rights, obligations and liabilities under this Lease or likely will adversely and materially impact Tenant's ability to operate its business from the Premises as contemplated by this Lease, Tenant shall have the right to terminate this Lease at any time prior to the Delivery Date if discovered prior to the Delivery Date, and if discovered from or after Delivery Date, Tenant shall have the right to terminate this Lease if Landlord fails to cure such failed representation or warranty within thirty (30) days' written notice from Tenant and such failure adversely and materially impact Tenant's rights, obligations, and liabilities under this Lease or its ability to operate its business from the Premises as contemplated under this Lease. In the event of such termination neither Landlord nor Tenant shall have any further liability hereunder, excluding those provisions which are expressly intended to survive the termination of this Lease.

(b)     Specially Designated National and Blocked Persons List.  Landlord and Tenant each represent and warrant to the other that: (i) they are not acting, directly or indirectly, for or on behalf of any person, group, entity or nation listed by the United States Treasury Department as a Specially Designated National and Blocked Person, or for or on behalf of any person, group, entity or nation designated in Executive Order No. 13224 as a person who commits, threatens to commit, or supports terrorism; and (ii) they are not engaged in this transaction directly or indirectly on behalf of, or facilitating this transaction directly or indirectly on behalf of, any such person, group, entity or nation.

(c)     Survival.  All representations and warranties contained in this Lease shall survive the expiration or earlier termination of this Lease.

20.    COMMON AREA

(a)     Definition.  Subject to the requirements of governmental authorities having jurisdiction over the Shopping Center, Landlord agrees to provide and maintain during the Term of this Lease the Common Area as shown on the Site Plan attached as **Exhibit "B"** hereto. Landlord shall maintain and repair the Common Area in a first-class manner including, but not limited to, sweeping, striping, cleaning and repairing the parking area, maintaining any Shopping Center monument or pylon sign structure, removal of Common Area trash and garbage, lighting

the Common Area to a minimum lighting level required by applicable law throughout the parking areas, maintaining landscaping (including such pruning and landscape maintenance as necessary in order to ensure that all pylon, monument and directional signs and all of Tenant's building signs are visible at all times of the year), and providing security as needed (collectively, "**Common Area Maintenance**").

         (i)    Primary Parking Field; Parking Ratio. The "**Primary Parking Field**" is outlined on **Exhibit "B"** hereto. Except as may result from the acts of governmental authorities having jurisdiction, the number of parking spaces and the parking ratio for the Shopping Center shall not be reduced below the numbers specified in Paragraph C of the Basic Lease Terms at any time during the Term except with Tenant's prior written approval, which Tenant may withhold in its sole discretion. In the event of a condemnation under the provisions of Section 10 of this Lease that reduces the parking spaces in the Primary Parking Field, the parties shall, prior to the effectiveness of such condemnation, expand the scope of the Primary Parking Field by mutual agreement to replace the lost parking spaces with comparable parking spaces. In the event Tenant determines in its reasonable judgment at any time during the Term hereof that parking is not readily available for its customers, Landlord and Tenant shall meet and confer in good faith in an effort to alleviate the parking situation at Landlord's sole cost and expense, but as part of Common Area Maintenance Charges (such as, time limited parking spaces, parking lot monitors, or valet parking). No valet, ride share, carpool, charging station or other long-term parking shall be allowed in the Primary Parking Field.

         (ii)    Security. Landlord shall implement such security measures as it deems necessary and appropriate in its sole but good faith discretion for the Common Area; provided, however: any security personnel shall be employed by a first-class, reputable security company. The foregoing shall not preclude Tenant from implementing its own security measures (including but not limited to security personnel) for the Premises at Tenant's sole cost and expense. Any security service provided by Landlord may be at such intervals and with such manpower as Landlord determines. Such security services are intended to be deterrent in nature and Landlord does not undertake to insure that damage to persons or property will thereby be prevented. This Lease does not impose upon Landlord, any owner of a portion of the Shopping Center or any other tenant or occupant of the Shopping Center (including Tenant) a duty to guard against the criminal acts of a third party.

         (b)    Changes to Shopping Center. Landlord shall not construct more than Six Thousand (6,000) square feet of additional retail space adjacent to the Premises in the "**Limited Retail Area**" depicted on **Exhibit "B"**. Except for governmentally required changes where no reasonable alternative exists, no changes to the Tenant Control Area may be made from that shown on **Exhibit "B"** during the Term without Tenant's prior written approval, which approval may be withheld in Tenant's sole and absolute discretion. Prohibited changes include, but are not limited to, changes in the number or configuration of the parking spaces in the Primary Parking Field, changes to the size and/or placement of buildings in the Tenant Control Area, changes to Tenant's Loading Area, changes to ingress to and egress in the Tenant Control Area and the driveways in the Tenant Control Area. In addition, no changes shall be made to the Shopping Center which would impact the Primary Parking Field by placing additional parking demand on the Primary Parking Field without Tenant's prior written approval, which Tenant may withhold in its sole

37

discretion. There shall in no event be located within the area extending from the storefront of the Premises into the Common Area directly in front of the Premises any kiosk, cart, outdoor seating, bench, fountain or water feature, cell tower or site, ATM or any other improvement (except Tenant's cart storage areas and Outdoor Display Area) unless shown on **Exhibit "B"** or specifically consented to by Tenant in writing, which consent shall be in Tenant's sole discretion, and excluding initial construction of the building or reconstruction of buildings after a casualty in areas that do not fall within the Common Area within the areas depicted as Pads P, Q, R, Chase, Wild Wings and Village Inn on **Exhibit "B-1"**. Landlord shall not construct any building or other improvements in the Tenant Control Area that violates the maximum building area and maximum height restrictions under the REA/CC&Rs. Notwithstanding anything in this Section 20(b) to the contrary, Landlord shall in all instances be subject to the requirements of Section 20(h).

(c)     Employee Parking.  Tenant's employees shall be provided with free parking (at no additional cost to Tenant other than Common Area Maintenance Charges) while working, in areas designated by Landlord (the "**Employee Parking Areas**"). The Employee Parking Area is approximately indicated on **Exhibit "B"** hereto. Landlord shall not designate any area within the "**No Tenant Employee Parking Field**" depicted on **Exhibit "B"** for use as employee parking by any tenants, licensees or other occupants of the Shopping Center.

(d)     Deliveries. Tenant shall have the right to accept deliveries and load and unload merchandise at the Premises throughout the Term hereof at the times set forth in Paragraph K of the Basic Lease Terms.  Landlord shall not enter into any separate agreements with any governing municipality which limits Tenant's loading or unloading times at the Premises.

(e)     Compliance With Laws.  Landlord shall comply with all governmental laws and regulations now in force or which may hereafter be in force, affecting the Common Area.

(f)     Common Area Maintenance Charges.  Tenant shall pay to Landlord, during the Primary and any Extended Term of this Lease, Tenant's Pro Rata Share of Landlord's costs incurred in Common Area Maintenance ("**Common Area Maintenance Charges**"), insurance charges incurred by Landlord pursuant to Sections 9(a) and 9(c) (collectively, "**Insurance Charges**") and Real Property Taxes pursuant to Section 7.  "**Tenant's Pro Rata Share**" shall mean the percentage set forth in Paragraph L of the Basic Lease Terms, which is calculated by dividing the number of square feet of Floor Area in the Premises by the number of square feet of leasable Floor Area in the Shopping Center.  Tenant's Pro Rata Share shall be adjusted by any change in total leasable Floor Area in the Shopping Center.

(i)     Non Capital Expenditures.  Landlord shall not make or authorize any one-time non-capital expenditure for which Tenant's Pro Rata Share is expected to exceed Ten Thousand Dollars ($10,000.00) (hereinafter the "**Consent Amount**") without first obtaining the written consent of Tenant to such expenditure, which consent shall not be unreasonably withheld, conditioned or delayed.  As a condition to such consent, Tenant may require that Tenant's Pro Rata Share of such expenditure be paid annually in installments, according to the following calculation: Tenant's total Pro Rata Share of such expenditure shall be divided by the number of years then remaining in the term of this Lease (including any previously exercised Extension Options) or such other reasonable time period, and the resulting amount shall be paid

38

by Tenant annually, within thirty (30) days after receipt of an invoice therefor from Landlord.  In no event shall Tenant be obligated to pay any portion of such expenditure after the expiration or earlier termination of this Lease.

(ii)    <u>Management and Administrative Fees and Expenses</u>.    All management and administrative fees and expenses shall not exceed in the aggregate ten percent (10%) of Common Area Maintenance Charges payable by Tenant.  In no event shall Tenant pay management or administrative fees or expenses on Real Property Taxes or Insurance Charges.

(iii)    <u>Payment</u>.    Tenant shall pay to Landlord its Pro Rata Share of estimated monthly Common Area Maintenance Charges, Insurance Charges and Real Property Taxes (collectively, "**<u>Operating Costs</u>**") on the first (1st) day of each month. Prior to the Effective Date, Landlord has furnished to Tenant an estimate of the Operating Costs reasonably anticipated by Landlord during the first (1st) year of the Primary Term, and Tenant's monthly Pro Rata Share thereof.  Within ninety (90) days after the end of each calendar year or as soon thereafter as is reasonably possible (but in all events within one hundred twenty (120) days after the end of each calendar year), Landlord shall furnish to Tenant a reconciliation statement (the "**<u>Reconciliation</u>**") showing in detail the actual Operating Costs for such calendar year, Tenant's Pro Rata Share thereof and the sum of the actual payments made by Tenant during such calendar year. The Reconciliation shall be certified to be correct by Landlord or its duly authorized agent. If Tenant's Pro Rata Share of the actual Operating Costs during such calendar year exceeds the estimated payments made by Tenant, then Tenant shall pay any deficiency to Landlord within thirty (30) days after Tenant's receipt of the Reconciliation. If the estimated payments made by Tenant during such calendar year exceed Tenant's Pro Rata Share of Operating Costs, such excess shall be carried forward and credited against the next payments of Operating Costs due, or, if the last year of Term, Tenant shall receive a refund from Landlord of such excess payments made within thirty (30) days after the expiration or earlier termination of this Lease, which obligation shall survive the expiration or termination of this Lease. Any demand by Landlord to Tenant for payment of Tenant's Pro Rata Share of the above Operating Costs shall be accompanied by (A) a statement showing in reasonable detail the expenditures made by Landlord in connection with the Common Area and (B) reasonable written data supporting the billing and showing the basis for the determination of Tenant's Pro Rata Share. Landlord shall also provide such other substantiating documentation as Tenant may reasonably request.  The failure of Landlord to include any expenditure in a statement to Tenant within eighteen (18) months following the close of the calendar year of such expenditure shall be deemed a waiver by Landlord of its right to demand payment by Tenant of Tenant's Pro Rata Share thereof.

(iv)    <u>Tenant's Inspection and Audit Rights.</u>    Tenant shall have the right upon not less than ten (10) business days prior notice, throughout the Term hereof to audit and examine, at Landlord's main business office, the books and records of Landlord with respect to any billing to Tenant.  Such audit shall be made at the sole cost and expense of Tenant and shall be completed with all reasonable diligence. Any such audit must be conducted, if at all, within eighteen (18) months following receipt by Tenant of the reconciliation for the calendar year in question. Tenant shall provide to Landlord a copy of any such audit within thirty (30) days after completion thereof.  If such audit or examination discloses any overcharge by Landlord, and the Landlord does not provide written notice that it disputes the results of the audit which notice sets

forth the basis of its dispute within thirty (30) days Landlord shall promptly reimburse Tenant for any such overpayment and if such overpayment by Tenant is in excess of three percent (3%) of Tenant's Pro Rata Share of Operating Costs, Landlord shall reimburse Tenant for the out of pocket cost of such audit or examination, not to exceed Four Thousand Dollars ($4,000). If Landlord and Tenant are unable to agree on the results of Tenant's audit, such dispute shall be resolved in accordance with the provisions of <u>Section 24(b)</u> below.

   (v) <u>Exclusions</u>. The following shall not be included in Common Area Maintenance Charges or Insurance Charges, as applicable: (A) any dues, charges or promotional or advertising expenses for a merchants' or other association of the tenants in the Shopping Center; (B) maintenance, repairs, replacements or additions (1) necessitated by the grossly negligent or wrongful act of Landlord or any other tenant, made to correct any construction defect, or to correct damage caused by subsidence or adverse or substandard soil conditions, or (2) of utility systems not part of the Common Area; (C) amounts paid to entities related to Landlord in excess of the cost of such services from any competitive source; (D) amounts reimbursed from insurance proceeds, repairs or replacements of any item under warranty or reimbursed by any other tenant in the Shopping Center (excluding tenant reimbursement of Common Area Maintenance Charges and/or Insurance Charges); (E) premiums for commercial general liability insurance on the Common Area for coverage in excess of the limits established by this Lease; (F) reserves for anticipated future expenses; (G) interest, late charges or penalties incurred as a result of Landlord's failure to pay bills in a timely manner; (H) any amounts expended by Landlord as environmental response costs for removal, encapsulation, enclosure, clean-up, remediation or other activities regarding Landlord's compliance with federal, state, municipal or local hazardous waste and environmental laws, regulations and ordinances (but this does not extend to steam cleaning the Common Areas or the removal of trash or debris from the Common Areas); (I) capital expenditures and/or capital replacements of any type, and any amounts in excess of the Consent Amount to which Tenant has not given its consent; (J) expenditures made more than eighteen (18) months prior to submission of demand; (K) expenses related to parking operations associated with the Shopping Center such as valet and shuttle services (as distinguished from maintenance and repair costs); (L) the costs of any changes required by existing law pursuant to <u>Section 29(a)</u> below; (M) any costs incurred for maintenance, taxes, or insurance on any undeveloped portions or expansions of, or additions to, the Shopping Center and costs incurred for any insurance deductibles in excess of Ten Thousand Dollars ($10,000); (N) costs incurred in connection with Landlord entering into new leases or amendments to existing leases, including without limitation, broker fees or remodeling or reconfiguring premises or signage; (O) any costs listed as exclusions from Real Property Taxes under <u>Section 7(c)</u>.

   (vi) <u>Limitation on Charges</u>. Commencing on the Rent Commencement Date, through the last day of the first full calendar year of the Primary Term, Real Property Taxes, Insurance Charges and Common Area Maintenance Charges shall not exceed the First Year Cap set forth in <u>Paragraph M</u> of the Basic Lease Terms. After the period in which the First Year Cap applies, in no event shall Tenant's Pro Rata Share of Controllable Common Area Maintenance Charges (including Management and Administrative Fees and Expenses provided in <u>Section 20(f)(ii)</u> above) for any calendar year increase by more than the Ongoing Cap set forth in <u>Paragraph N</u> of the Basic Lease Terms. As used herein, "**Controllable Common Area Maintenance Charges**" shall mean all Common Area Maintenance Charges (including Management and

40

Administrative Fees and Expenses provided in subsection (ii) above), excluding costs of trash removal, security costs, Common Area utilities and governmentally imposed charges.

(g)     Use of Common Area. The Common Area in Tenant's Control Area shall not be used for any purpose other than (1) the parking of private motor vehicles of customers, agents, contractors, invitees, licensees, subtenants and employees of Tenant and other tenants or occupants of the Shopping Center while such persons are present at the Shopping Center and the ingress and egress of such vehicles, (2) the ingress and egress of pedestrians, (3) typical Common Area improvements such as lighting standards, trimmed trees, bumper guards, curbs, ramps and directional signs, outdoor dining, sidewalk sales (excluding areas around the Premises contiguous with the shops) and drive-thru lanes. Landlord shall take any appropriate action, including, without limitation, but only if Landlord, in its sole discretion, determines the same to be appropriate, necessary legal action, to ensure that the Common Area in Tenant's Control Area are used for the purposes set forth herein and for no other purpose whatsoever. Landlord shall use commercially reasonable efforts to enforce the provisions of the CC&Rs and REAs for the benefit of Tenant against any party who is subject to, and is in violation of, the CC&Rs and REAs. Landlord agrees that throughout the Term, Tenant's customers shall have the non-exclusive right to use all parking in the Shopping Center and that there shall be no charge for parking in the Common Area for Tenant, its customers or invitees other than Tenant's Pro Rata Share of Common Area Maintenance Charges. No portion of the Common Area in Tenant's Control Area shall be used for commercial truck parking, inventory, storage, do-it-yourself or demonstration areas, park and ride or carpooling arrangements.

(i)     Cart Corrals. Notwithstanding anything to the contrary contained herein, Tenant shall be permitted to use "**cart corrals**" in the Common Area, one (1) on each side of the entrance to the Premises, with a minimum capacity of at least 150 carts, and at least two (2) in the parking lot, in the locations approximately indicated on **Exhibit "B"** ("**Cart Corral Areas**"). The Cart Corral Areas shall not be included in the calculation of the Floor Area of the Premises. Tenant shall keep the Empty Pallet Enclosure Area in clean and neat order and Tenant's liability insurance shall extend to its operations in the Cart Corral Areas.

(ii)     Outdoor Displays. Notwithstanding anything to the contrary contained herein, Tenant may use the area depicted on **Exhibit "B"** attached hereto for displaying merchandise (the "**Outdoor Display Area**"). The Outdoor Display Area shall not be included in the calculation of the Floor Area of the Premises. Tenant shall keep the Outdoor Display Area in a clean and neat order, shall operate the Outdoor Display Area in a manner so as to not unreasonably interfere with pedestrian or vehicular access to the premises of other tenants and Tenant's liability insurance shall extend to its operations in the Outdoor Display Area.

(iii)     Loading Area. Notwithstanding anything to the contrary contained herein, Tenant may use the covered and screened area depicted on **Exhibit "B"** as the "**Loading Area**" for loading and unloading ("**Loading Area**"). The Loading Area shall not be included in the calculation of the Floor Area of the Premises. Tenant shall keep the Loading Area in a clean and neat order and Tenant's liability insurance shall extend to its operations in the Loading Areas.

41

(iv)  <u>Trash Enclosure</u>.  Notwithstanding anything to the contrary contained herein, Tenant shall be permitted to use an area near Tenant's loading door to be agreed upon by the parties as a trash enclosure (the "**Trash Enclosure Area**"). The Trash Enclosure Area shall be sufficient in size to hold the trash bins described in <u>Section 3.d</u> of **Exhibit "C"**. The Trash Enclosure Area shall not be included in the calculation of Floor Area of the Premises. Tenant shall keep the Trash Enclosure Area in a clean and neat order and Tenant's liability insurance shall extend to its operations in the Trash Enclosure Areas.

(v)  <u>Empty Pallet Enclosure</u>.  Notwithstanding anything to the contrary contained herein, Tenant shall be permitted to use an area to be agreed upon by the parties for the storage of empty pallets and warehouse returns (the "**Empty Pallet Enclosure Area**"). The Empty Pallet Enclosure Area shall be a minimum of 10 feet by 20 feet and shall not be included in the calculation of Floor Area of the Premises.  Tenant shall keep the Cart Corral Area in a clean and neat order and Tenant's liability insurance shall extend to its operations in the Empty Pallet Enclosure Areas.

(vi)  <u>Recycling Room</u>.  Notwithstanding anything to the contrary contained herein, if required by applicable law for a food establishment, Tenant shall be permitted to use an area to be agreed upon by the parties for a recycling room (the "**Recycling Room**"). The Recycling Room shall be sufficient in size to comply with applicable law for a food establishment and shall not be included in the calculation of Floor Area of the Premises. Tenant shall keep the Recycling Room in a clean and neat order and Tenant's liability insurance shall extend to its operations in the Cart Corral Areas.

(vii)  <u>Entryway Music</u>.  Notwithstanding anything to the contrary contained herein, Tenant shall be permitted to install, in accordance with Tenant's Work, and at its sole cost and expense, entryway audio speakers, immediately outside of the entryway of the Premises. Tenant may play music from such speakers from its Premises audio system in accordance with all applicable laws and at low audible volume levels during the periods that the Premises shall be open for business.

(h)  <u>Construction Activities</u>.  Except as expressly set forth in this Lease (including, without limitation, under <u>Sections 20(a)(i)</u>, <u>20(b)</u>, <u>20(g)</u>, and this <u>20(h)</u>), Tenant agrees that Landlord shall have the right at all times, in its sole discretion, to change the size, location, elevation, nature and/or use of any portion or all of the Common Areas, the Shopping Center or any part thereof as Landlord may from time to time determine, including the right to sell or lease part or parts thereof, to change the location and size of the landscaping.  Except as expressly set forth in this Lease (including, without limitation, under <u>Sections 20(a)(i)</u>, <u>20(b)</u>, <u>20(g)</u>, and this <u>20(h)</u>), Landlord shall, at all times, have the right and privilege of determining the name of the Shopping Center, the nature and extent of the Common Areas, whether the same shall be surface, underground or multiple deck, and of making such changes to the Common Areas from time to time which in Landlord's opinion are desirable, including the location and relocation of driveways, entrances, exits, automobile parking spaces, the direction and flow of traffic, installation of improvements, designation of prohibited areas, landscaped areas, decorations, kiosks, and any other facilities.  Except as expressly set forth in this lease, (including, without limitation, under <u>Sections 20(a)(i)</u>, <u>20(b)</u>, <u>20(g)</u>, and this <u>20(h)</u>), Landlord's rights with respect to the Shopping

Center shall include, but not be limited to, the right to (i) utilize from time to time any portion of the Common Area for promotional, entertainment and related purposes (subject to the Restrictions on Uses), (ii) place permanent or temporary kiosks, displays, carts and stands in the Common Areas and to lease or license the same to Persons, (iii) renovate, upgrade or change the shape and size of the Common Areas, and (iv) construct buildings on the Common Areas. Landlord may perform such demolition, remodeling, reconstruction, renovations or changes (collectively, "**Construction Activities**") in the Shopping Center, other than the Premises, as Landlord may reasonably determine to be appropriate, but subject to the Tenant Control Area being "**frozen**" as provided in Section 20(b) and Tenant's consent rights as provided thereunder. Prior to commencing any Construction Activities in the Tenant Control Area and notwithstanding anything in this Lease to the contrary, Landlord shall submit to Tenant, for Tenant's review and approval (except with respect to the initial construction of the building or reconstruction of buildings after a casualty in areas that do not fall within the Common Area within the areas depicted as Pads P, Q, R, Chase, Wild Wings and Village Inn on **Exhibit "B-1"**): Landlord agrees that any Construction Activities occurring in the "**Tenant Control Area**" (i) shall be undertaken and completed in a manner that shall create compatibility of appearance and architectural harmony with the balance of the Shopping Center subject to requirements under the Target OEA, (ii) shall not interfere with or impede at any time full-sized truck access to the Premises (including the loading docks), (iii) shall not materially or adversely affect (A) pedestrian or vehicular access to or from the Premises or Tenant's cart corrals, or the internal circulation of vehicular traffic within the Shopping Center, (B) visibility of the Premises or any permitted Tenant signage (other than any permanent obstructions that would ordinarily occur as a result of construction of buildings in the areas shown on the Site Plan), (C) the business conducted by Tenant in the Premises, or (D) the parking serving the Premises and (iv) shall not include any barricades or fencing that would impede or obstruct direct access to or from the Premises or Tenant's cart corrals. Landlord agrees that it shall use commercially reasonable efforts to minimize the impact of all Construction Activities occurring in the Shopping Center on Tenant's business or the operation of the Shopping Center. There shall be no Construction Activities in the Tenant Control Area between November 1st and the following January 15th, except for work required by or to comply with applicable law that cannot be deferred until after January 15th and Permitted Tenant Work (defined below). Landlord, during the performance of any Construction Activities, shall keep the areas subject to such activities in an orderly condition, store all construction materials and equipment from within or from an enclosed staging area approved by Tenant. "**Permitted Tenant Work**" means the preparation of existing or new Floor Area within the Shopping Center for new tenants so long as any work performed by Landlord in connection with retenanting fully is contained within the interior of such retenanting space, other than installation of exterior building signage for such new tenant that is completed in 24 hours or less and if for new Floor Area, all contractor, materialmen and consultant parking shall be outside the Tenant Control Area and all staging shall be screened and outside Tenant's Primary Parking Field.

(i)     Rules and Regulations; CC&Rs; Easements.     Attached hereto as **Exhibit "H"** are the "**Shopping Center Rules and Regulations**". The rules and regulations provided shall be enforced on a uniform, nondiscriminatory basis, and shall not be amended without the consent of Tenant. Except as set forth on **Exhibit "H"**, Tenant shall not be bound by any rules or regulations or any modifications, expansions and/or alterations thereto which materially increase Tenant's obligations under this Lease, diminish Tenant's rights under this

43

Lease, increase Tenant's financial obligations under this Lease or conflict with this Lease. In the event the Shopping Center Rules and Regulations conflict or are inconsistent with this Lease, the provisions of this Lease shall control. In no event shall any (i) CC&Rs or REAs, (ii) amendments to any existing CC&Rs or REAs, or (iii) easements that would affect the Premises, be recorded against the Shopping Center that would be binding on Tenant without first obtaining the approval of Tenant, thereto.

(j)    Expressive Activities. Landlord agrees that it shall not authorize or consent to speech and activities by non-tenants of the Shopping Center, including, but not limited to, making speeches, petitioning, signature gathering, handbilling, soliciting, distributing written materials, or displaying signs, placards, posters or items for sale or purchase (collectively, "**Expressive Activities**") in the Shopping Center, including the Primary Parking Field, on the sidewalk surrounding the Premises, including, but not limited to, the walkway in front of the Premises, or within one hundred (100) feet of any entrances to and exits from the Premises (collectively, the "**Prohibited Areas**"), and Landlord shall take commercially reasonable steps to promptly enforce the foregoing, including, without limitation, but only if Landlord, in its sole discretion, determines the same to be appropriate, causing the lawful removal of such parties conducting Expressive Activities within such Prohibited Areas. The actions required by Landlord pursuant to this Section shall be a Common Area Maintenance Charge. Landlord has adopted and shall use commercially reasonably efforts to cause the enforcement of the Rules and Regulations for Expressive Activities set forth on **Exhibit "M"** attached hereto by this reference. The area designated by Landlord pursuant **Exhibit "M"** for "**Expressive Activities**" (as defined in **Exhibit "M"**) shall in no event be in Prohibited Areas.

(k)    Violation. In the event Landlord violates the provisions of Section 20(a)(i), 20(b), 20(g) or 20(h), and such violation continues for ten (10) days after Landlord's receipt of notice of the same (or five (5) days in the case of Section 20(h) violations) (i) and such violation has a material adverse effect on Tenant, Tenant shall have the right to terminate this Lease upon sixty (60) days advance written notice to Landlord for up to one (1) year after Landlord's receipt of notice of such violation, whereupon this Lease shall cease and terminate and neither Landlord nor Tenant shall have any further liability hereunder, excluding those provisions which are expressly intended to survive the termination of this Lease, unless (and only if cure is possible) Landlord has commenced and is diligently in pursuit of curing the violation, or (ii) reduce Fixed Minimum Rent to a level of fifty percent (50%) of the Fixed Minimum Rent specified herein at such time (with a minimum reduction of one month's Fixed Minimum Rent) until such time as such violation is rectified. In addition, if Landlord or Landlord's independent contractor fail to maintain the Common Area or any portion thereof within the Tenant Control Area in accordance with the requirements of this Lease, Tenant may give Landlord thirty (30) days written notice thereof, setting forth with particularity its objections or claimed deficiencies, and if such objections and/or deficiencies are not corrected to Tenant's reasonable satisfaction within said thirty (30) day period, or in the event that such correction requires more than thirty (30) days and is not commenced promptly and performed diligently or continues beyond the time reasonably needed to correct the objection or deficiency, then Tenant, in addition to any other right or remedy, shall have the right thereafter to correct any or all such objections or deficiencies, or cause such deficiencies to be corrected by an independent contractor. Within thirty (30) days following Tenant's request, Landlord shall pay Tenant an amount equal to all actual third party costs, fees

and expenses paid or incurred by Tenant for such operation, maintenance and repairs (the "**CAM Correction Costs**") plus ten percent (10%) thereof as an administrative fee ("**Tenant's Administrative Fee**") together with accrued interest on the unpaid balance thereof at the Interest Rate from the date paid or incurred by Tenant until recovered in full. If Landlord fails to pay to Tenant such total amount within ten (10) days after receiving a written demand therefor and reasonable evidence of the amount thereof, Tenant may elect to deduct such amount from the next payments due to Landlord hereunder until recovered in full; provided, however, Tenant may not deduct more than fifty percent (50%) from any single monthly installment of Fixed Minimum Rent, but may deduct one hundred percent (100%) of any monthly amounts then being billed and payable to Landlord for Common Area Maintenance Charges, and such monthly deductions from successive monthly installments of Fixed Minimum Rent and Common Area Maintenance Charges may continue until all amounts due to Tenant hereunder are fully recovered provided, however, that Tenant shall be entitled to offset against larger percentages of successive installments of Fixed Minimum Rent if the fifty percent (50%) offset is insufficient to reimburse Tenant in full within six (6) months after the due date, taking into account the then remaining number of installments of Fixed Minimum Rent. In the event that this Lease shall expire or otherwise terminate prior to such time as Tenant shall have been fully reimbursed for such amounts, Landlord shall pay the balance thereof to Tenant within thirty (30) days of the end of the Term hereof. Such reimbursement obligation shall survive the expiration or earlier termination of this Lease. After Tenant has been reimbursed in full as provided herein, Landlord may include the CAM Correction Costs in the Common Area Maintenance Charges to be shared by all tenants in the Shopping Center, but in no event shall Tenant's Administrative Fee be included in Common Area Maintenance Charges.

21.    ATTORNEYS' FEES

In the event either party shall commence or be required to defend any action or proceeding against any other party by reason of any breach or claimed breach of any provision of this Lease, to commence or defend any action or proceeding in any way connected with this Lease or to seek a judicial declaration of rights under this Lease, including seeking equitable relief, the party prevailing in such action or proceeding shall be entitled to recover from or to be reimbursed by the other party for the prevailing party's reasonable attorneys' fees and costs through all levels of proceedings. The obligations under this Section shall survive the expiration or earlier termination of this Lease.

22.    SUBORDINATION,    NONDISTURBANCE    &    ATTORNMENT AGREEMENTS; ESTOPPEL CERTIFICATES

(a)    No Liens. Landlord shall not create or permit any lien or encumbrance upon or affecting the Shopping Center or any portion thereof which shall be prior or superior to this Lease or to the interest of Tenant hereunder, except taxes and other liens created by operation of law upon the property of Landlord and except those in favor of lenders who have executed SNDAs with Tenant.

(b)    Future Mortgages. If this Lease is to be subordinate to a future deed of trust or mortgage, Landlord shall deliver to Tenant a Subordination, Nondisturbance and Attornment

45

Agreement for recordation in the form of **Exhibit "E"** attached hereto executed by Landlord's lender with regard to all future deeds of trust or mortgages affecting the Premises and all renewals, modifications, replacements and extensions of such deeds of trust or mortgages.

(c)    <u>Estoppel Certificates</u>.  Within twenty (20) days after receipt of written request by either party (or forty-five (45) days if received in November or December) and not more than twice per calendar year, the other party shall, without charge, certify, by written and duly executed instrument in substantially the form attached hereto as **Exhibit "G"** to any other entity specified in such request.

23.    <u>HOLDING OVER; END OF TERM</u>

(a)    <u>Holding Over</u>.  Tenant shall vacate and surrender the Premises to Landlord upon the expiration or earlier termination of this Lease in accordance with the provisions of <u>Section 23(b)</u> below.  If Tenant fails to so surrender the Premises, Tenant shall being occupying the Premises on the same terms and conditions as those herein specified on a month-to-month basis except the Fixed Minimum Rent shall be increased to one hundred twenty-five percent (125%) of that payable in the month immediately preceding the end of the Term.

(b)    <u>End of Term</u>.  Upon the expiration or sooner termination of this Lease, Tenant shall surrender the Premises to Landlord broom clean, in condition required to be maintained under <u>Section 16(a)</u>, reasonable wear and tear, casualty and condemnation accepted, provided, however, Tenant shall be entitled to remove any of Tenant's Property or Tenant's Trade Dress as set forth in <u>Section 5</u> above.

24.    <u>DISPUTE RESOLUTION</u>

(a)    <u>Negotiation</u>.  The parties shall attempt to resolve through negotiation any controversy, dispute or claim arising out of or relating to this Lease, or the breach thereof (collectively, a "**Dispute**"), except for: (1) any action for unlawful detainer under any applicable state statutes, (2) any action seeking injunctive relief to restrain violation of use restrictions, waste, nuisance or unlawful conduct, (3) any dispute where there is an indispensable third party who is under no obligation to submit to arbitration and does not agree to do so, (4) any insolvency or bankruptcy proceedings, and (5) the exercise by a party of a right of self-help provided in this Lease. Either party may initiate negotiations by delivering written notice to the other party specifying the subject of the dispute (the "**Dispute Notice**").  The parties shall negotiate in good faith for a period of thirty (30) days after delivery of the Dispute Notice (the "**Negotiation Period**"), including meeting at a mutually agreeable time, manner and/or place.

(b)    <u>Arbitration</u>.  If the Dispute is not resolved by the expiration of the Negotiation Period, then it shall be submitted to arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules. Judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. The matters listed as items (1), (2), (3), (4) and (5) in <u>Section 24(a)</u> above may be litigated immediately and shall not be subject to the above procedures for negotiation or arbitration.

46

25.   SUCCESSORS IN INTEREST

Each and all of the covenants, agreements, obligations, conditions and provisions of this Lease shall inure to the benefit of and shall bind the successors and permitted assigns of the respective parties hereto.

26.   MEMORANDUM OF LEASE

A memorandum of this Lease, in substantially the form of **Exhibit "D"** attached hereto (the "**Memorandum of Lease**"), shall be executed and acknowledged by the parties for the purpose of recording. Tenant shall be responsible for timely causing the recordation of the Memorandum of Lease. Tenant shall pay all recording fees and Landlord shall pay any applicable transfer tax or other taxes or fees. Upon expiration of the Term and at Landlord's request, Tenant shall execute and deliver a Termination of the Memorandum of Lease in a form suitable for recording by Landlord at its sole cost and expense. No other memorandum or short form of this Lease, nor the Lease, may be recorded without both parties' consent, in each of their sole and absolute discretion.

27.   REMEDIES ARE CUMULATIVE

Except to the extent a remedy is expressly set forth in this Lease for a particular breach, default or violation, remedies conferred by this Lease upon the respective parties are not intended to be exclusive, but are cumulative and in addition to remedies otherwise afforded by the law.

28.   QUIET POSSESSION

Subject to Landlord's rights under Section 17(a) after an Event of Default, Tenant shall have quiet and peaceful use, enjoyment and possession of the Premises throughout the Term and without hindrance or interruption by Landlord or any other person or persons lawfully or equitably claiming by, through or under Landlord.

29.   ALTERATION

(a)   Changes Required by Law. Any changes, alterations or additions in or to the Premises or the Common Area which may be necessary or required by reason of any law, rule, regulation or order promulgated by competent governmental authority shall be made at the sole cost and expense of Landlord, including but not limited to the remediation, removal and disposal of any Hazardous Substances and interior and exterior compliance with the Americans with Disabilities Act (ADA). Notwithstanding the foregoing, if, after the Rent Commencement Date, any changes, alterations or additions to the Premises or the Common Areas are required solely due to Tenant's use of the Premises or solely as a result of work performed on the Premises by Tenant, such changes, alterations or additions shall be made at the sole cost and expense of Tenant. Tenant may contest the validity of any such law, rule, regulation or order, but shall indemnify and save Landlord harmless against the consequences of continued violation thereof by Tenant pending such contest. Landlord may contest the validity of any such law, rule, regulation or order, but shall indemnify, defend and save Tenant harmless against the consequences of continued violation thereof by Landlord pending such contest.

47

(b)    <u>Alterations During Term</u>.    Tenant shall be permitted to perform nonstructural interior alterations to the Premises and to revise the interior layout of the Premises without Landlord's prior written consent.  Tenant shall obtain Landlord's written consent to any alterations or construction which affect the exterior or the structural nature of the Premises.  All alterations shall be performed in a good, workmanlike and lien free manner and in conformance with the codes and ordinances of governmental authorities having jurisdiction and, required by Landlord in connection with granting its consent if required under this <u>Section 29(b)</u>, in accordance with plans approved by Landlord.

30.    <u>EFFECTIVENESS</u>

This Lease shall only be effective when executed by the parties hereto.

31.    <u>MERCHANT'S ASSOCIATION; MARKETING FUND</u>

Tenant shall not be obligated to join or make any contribution to any merchants association or marketing fund.

32.    <u>HAZARDOUS SUBSTANCES</u>

(a)    <u>Use of Hazardous Substances</u>.  Tenant agrees that, except as herein set forth, it shall not generate, use, store, handle or dispose of on or transport over the Premises any Hazardous Substances in violation of any Environmental Laws.  Tenant may sell and/or use household and automotive cleaning supplies, office supplies and other chemicals in standard retail containers as are commonly sold by grocery stores, supermarkets, discount stores and/or drugstores in accordance with all applicable Environmental Laws.

(b)    <u>Hazardous Substances on the Premises or the Shopping Center</u>.  If, at any time during the Term, Hazardous Substances are found in the Premises or in the Shopping Center, then, in such event:

(i)    with regard to any Hazardous Substances in violation of any Environmental Law that Tenant (or any assignee or sublessee of Tenant and/or their respective agents, servants, contractors or employees) shall not have caused, Landlord shall remove, remediate, and dispose of the same, in compliance with applicable Environmental Laws, at Landlord's sole cost and expense.  Landlord shall defend, indemnify, and hold Tenant harmless from and against any and all costs, damages, expenses and/or liabilities (including reasonable attorneys' fees) which Tenant may suffer as a result of any claim, suit or action regarding any Hazardous Substances (whether alleged or real) and/or regarding the removal and clean-up of same or resulting from the presence of such Hazardous Substances attributable to the acts or omissions of Landlord. The representation, warranty and indemnity of Landlord described in this Section shall survive the termination or expiration of this Lease.

(ii)    with regard to any Hazardous Substances in violation of any Environmental Law caused by Tenant (or any assignee or sublessee of Tenant and/or their respective agents, servants, contractors or employees), Tenant shall remove, remediate and dispose of the same, in compliance with applicable Environmental Laws, at Tenant's sole cost and expense.

48

Tenant shall defend, indemnify, and hold Landlord harmless from and against any and all costs, damages, expenses and/or liabilities (including reasonable attorneys' fees) which Landlord may suffer as a result of any claim, suit or action regarding any such Hazardous Substances (whether alleged or real) present due to Tenant (or any assignee or sublessee of Tenant and/or their respective agents, servants, contractors or employees) and/or regarding the removal and clean-up of same or resulting from the presence of such Hazardous Substances. The representation, warranty and indemnity of Tenant described in this Section shall survive the termination or expiration of this Lease.

(c)    Definitions. The term "**Hazardous Substance**" includes, without limitation, any material or substance which is (i) defined or listed as a "**hazardous waste**", "**extremely hazardous waste**", "**restrictive hazardous waste**" or "**hazardous substance**" or considered a waste, condition of pollution or nuisance under any Environmental Law (as defined below); (ii) petroleum or a petroleum product or fraction thereof; (iii) asbestos; (iv) mold and/or (v) substances known to cause cancer and/or reproductive toxicity. The term "**Environmental Law**" shall mean any federal, state or local law, statute, ordinance, rule, regulation, order, consent, decree, judgment or common-law doctrine, interpretation thereof, and provisions and conditions of permits, licenses, plans, approvals and other operating authorizations whether currently in force or hereafter enacted relating to health, industrial hygiene or the environmental conditions on, under or about the Premises or the Shopping Center, as such laws are amended and the regulations and administrative codes applicable thereto. It is the intent of the parties hereto to construe the terms "**Hazardous Substance**" and "**Environmental Law**" in their broadest sense.

33.    GENERAL PROVISIONS

(a)    Force Majeure. Any deadlines or requirements to perform obligations in this Lease (other than financial or delays due to holdovers by prior tenants) which cannot be met because of delays caused by governmental regulations, inability to procure labor or materials, strikes, acts of God, or the occurrence of other events beyond the control of Landlord or Tenant ("**Force Majeure**") shall be extended by the amount of time caused by such delays. Notwithstanding anything herein to the contrary, the failure by Landlord to perform Landlord's Work or construct, rebuild or repair the Premises according to building code existing as of the date of the Approved Plans are submitted, schedule or receive timely inspections (other than due to atypical city processing or inspection timing) or permits by the necessary authorities, and/or timely perform Landlord's Work or construct, rebuild or repair the Premises due to concealed conditions not reasonably anticipated, or preventions or stoppage due to the negligence, misconduct or financial inability of Landlord or Landlord's contractors, employees or representatives shall not constitute Force Majeure. In order for either party to claim the occurrence of Force Majeure, such party must have notified the other in writing of such occurrence within ten (10) business days after the initial occurrence. The provisions of this Section 33(a) shall not, however, be applicable to the financial obligations of either Landlord or Tenant, including the obligation to pay Fixed Minimum Rent and Additional Rent.

(b)    No Waiver. No waiver of any breach of the covenants, agreements, obligations and conditions of this Lease to be kept or performed by either party hereto shall be

49

construed to be a waiver of any succeeding breach of the same or any other covenant, agreement, obligation, condition or provision hereof.

(c)    Brokers.  Except as set forth in this Section 33(c), Tenant shall not be responsible for the payment of any commissions in relation to the leasing transaction represented by this Lease. Landlord and Tenant each covenant that they have not dealt with any real estate broker or finder with respect to this Lease, except for the Brokers identified in Paragraph P of the Basic Lease Terms.  Landlord shall pay the Brokers a commission in connection with this Lease pursuant to a separate agreement between Landlord and Brokers.  Each party shall hold the other party harmless from all damages, claims, liabilities or expenses, including reasonable and actual attorneys' fees (through all levels of proceedings), resulting from any claims that may be asserted against the other party by any real estate broker or finder with whom the indemnifying party either has or is purported to have dealt, except for the Brokers. In connection with the Brokers, Landlord shall hold Tenant harmless from all damages, claims, liabilities or expenses, including reasonable and actual attorneys' fees (through all levels of proceedings), resulting from any claims that may be asserted against Tenant by the Brokers.

(d)    Headings; Captions.  The use herein of any gender or number shall not be deemed to make inapplicable the provision should the gender or number be inappropriate to the party referenced.   All section headings, titles or captions contained in this Lease are for convenience only and shall not be deemed part of this Lease and shall not in any way limit or amplify the terms and provisions of this Lease.

(e)    Preparation of Lease.  Landlord and Tenant have negotiated this Lease, have had the opportunity to be advised respecting the provisions contained herein and have had the right to approve each and every provision hereof;  therefore, this Lease shall not be construed against either Landlord or Tenant as a result of the preparation of this Lease by or on behalf of either party.

(f)    Severability; Governing Law.  If any clause, sentence or other portion of this Lease shall become illegal, null or void for any reason, or shall be held by any court of competent jurisdiction to be so, the remaining portions thereof shall remain in full force and effect. This Lease shall be governed by and construed in accordance with the laws of the State of Arizona, excluding principles of conflicts of law.

(g)    Consent.  Whenever under this Lease provision is made for Tenant to secure the consent or approval of Landlord or for Landlord to secure the consent or approval of Tenant, unless otherwise expressly provided to the contrary in connection with such provision, such consent or approval shall be in writing and shall not be unreasonably withheld, conditioned or delayed and any disapproval (including grounds therefor) must be in writing. Except as otherwise expressly set forth in this Lease, party being asked to approve a matter shall provide written notice of its approval or disapproval within twenty (20) days after receipt of a request therefore ("**First Approval Request**"). If no such approval/disapproval has been delivered within such twenty (20) days period, then the requesting party shall have the right to deliver a second request for approval ("**Second Approval Request**"), and the party being asked for approval shall have ten (10) days after receipt of the Second Approval Request in which to approve or disapprove such request. If such Second Approval Request states that a failure by the party being asked to approve to respond

50

within ten (10) days shall constitute an approval of the matter so requested, the proposed action shall be deemed approved by the party being asked to approve the action if the party being requested to approve does not timely respond to the Second Approval Request.

(h)    Entire Agreement; Amendments. This Lease, including all exhibits hereto, is intended to be a final expression of the agreement between Landlord and Tenant regarding the letting of the Premises; its terms may not be contradicted by evidence of any prior or contemporaneous agreements. This Lease supersedes all prior proposals, offers, counteroffers, correspondence or negotiations. Landlord and Tenant further intend this Lease to be a complete and exclusive statement of the terms of their agreement regarding the letting of the Premises; no extrinsic evidence may be used to interpret, explain, or supplement this Lease. No provision of this Lease may be amended except by an agreement in writing signed by Landlord and Tenant. **LANDLORD AND TENANT ACKNOWLEDGE AND AGREE THAT EACH OF LANDLORD AND TENANT IS SOPHISTICATED AND EXPERIENCED IN COMMERCIAL REAL ESTATE TRANSACTIONS AND HAS BEEN REPRESENTED BY COMPETENT LEGAL COUNSEL IN CONNECTION WITH THE PREPARATION, NEGOTIATION AND EXECUTION OF THIS LEASE. AS REFERENCED ABOVE, LANDLORD AND TENANT INTEND THAT THIS LEASE CONSTITUTE THE ENTIRE AGREEMENT OF THE PARTIES AND THAT THIS LEASE NOT BE DEEMED TO INCLUDE, BY IMPLICATION OR OTHERWISE, ANY TERM, COVENANT OR PROVISION NOT EXPRESSLY SET FORTH IN THIS LEASE. IN THIS REGARD, THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING SHALL NOT BE USED TO CONTRADICT THE EXPRESS PROVISIONS OF THIS LEASE.**

(i)    Timing. Time is declared to be of the essence of this Lease and each and every provision of this Lease. If the time for performance of any obligation or taking any action under this Lease expires on a Saturday, Sunday or legal holiday, the time for such performance or taking such action shall be extended to the next succeeding day which is not a Saturday, Sunday or legal holiday. If the day on which rent or any other payment due hereunder is payable falls on a Saturday, Sunday or on a legal holiday, it shall be payable on the next succeeding day which is not a Saturday, Sunday or legal holiday.

(j)    Financial Information; Confidentiality; Press Releases; Promotional Materials

(i)    Financial Information. Tenant shall have no obligation to report its sales to Landlord or to provide Landlord with any financial information whatsoever ("**Financial Information**").

(ii)    Confidentiality. From and after the date lease negotiations were entered into and throughout the Term of this Lease, Landlord and Tenant shall not disclose any of the terms, covenants, conditions or agreements set forth in the letters of intent or in this Lease or any amendments hereto, nor provide such correspondence, this Lease, any amendments hereto or any copies of the same, nor any other information (oral, written or electronic) which is communicated by or on behalf of Tenant or by or on behalf of Landlord relating or pertaining to Tenant, Tenant's proposed occupancy of the Premises (including, without limitation, architectural

51

plans, specifications, site plans and drawings), any Financial Information, or Tenant's business (collectively, "**Confidential Information**"), to any person or entity including, without limitation, any brokers, any other tenants in the Shopping Center or any affiliates, agents or employees of such tenants or brokers except as set forth herein, or the press or any news media, without Tenant's and Landlord's written consent or except as ordered by a court with appropriate authority provided Landlord seeks available protective orders.

(A)    Notwithstanding the foregoing, Landlord may disclose the terms of this Lease to those of its partners, employees, representatives, property managers, vendors, brokers, consultants, attorneys, accountants, current or potential mortgagees, lenders or purchasers of the Shopping Center who have a reasonable need for such Confidential Information and who agree to be bound by the terms of this Section, and Tenant may disclose the terms of this Lease to those of its partners, employees, consultants, attorneys, accountants and current or potential lenders, assignees or subtenants who agree to be so bound.

(B)    Notwithstanding the foregoing, Landlord and Tenant may disclose architectural plans, specifications, site plans and drawings and such other information as is required to consultants, contractors and subcontractors who have agreed to be bound by the confidentiality provisions under this <u>Section 33(j)</u> (which may occur via email) in applications to the government bodies having jurisdiction (federal, state and local) over the Entitlements and any other necessary permits and approvals and in construction contracts.

(C)    Notwithstanding the foregoing, Landlord may disclose the name of Tenant for purposes of obtaining waivers required pursuant to <u>Section 2(a)(v)</u> of this Lease provided that Landlord shall first obtain a Confidentiality Agreement signed by the applicable Existing Tenant based on Tenant's form, with such charges are reasonably agreed to by the parties thereto, and instruct such Existing Tenant not to disclose the identity of Tenant or its proposed tenancy in the Shopping Center until Tenant publicly announces the same..

(iii)    <u>Press Releases</u>. Landlord hereby represents, covenants, and agrees that, prior to the earlier of the Rent Commencement Date or the date that Tenant announces to the public its tenancy or prospective tenancy in the Shopping Center, Landlord shall not publicize, disclose or release any material whatsoever regarding Tenant's prospective tenancy in the Shopping Center to any news media ("**news media**" includes but is not limited to, newspapers, magazines, television, radio, internet sites, social media, or any other media used for the dissemination of news or topics of interest) or any third party, without Tenant's prior written consent, which it may withhold or condition in its sole discretion. Following the earlier of the Rent Commencement Date or the date that Tenant announces to the public its tenancy or prospective tenancy in the Shopping Center, Landlord shall not issue any news media releases focused primarily on Tenant or Tenant's occupancy in the Shopping Center without Tenant's prior written consent.

(iv)    <u>Promotional Materials</u>. Landlord shall not have the right to use Tenant's trade name, trademarks, or logo ("**Tenant's Trademarks**"), nor shall the Tenant's Trademarks be used by Landlord in advertising or in photographs of the storefront of the Premises nor in any other manner. Notwithstanding the foregoing, following the earlier of the Rent

Commencement Date or the date that Tenant announces to the public its tenancy or prospective tenancy in the Shopping Center, Landlord shall be granted a limited license to use, display, or show Tenant's name, trade logo and photographs or renderings of the exterior of the Premises (including pictures of Tenant's signs) or on Shopping Center site or leasing plans, brochures marketing space for lease in the Shopping Center, so long as Tenant is not given undue prominence in such materials (the "**Promotional License**"). In the event Tenant objects to Landlord's use of the Promotional License, Landlord shall immediately cease and desist such use and shall destroy all materials containing information objectionable to Tenant; thereafter, the Promotional License shall be revoked. If Landlord fails to immediately cease and desist such use and immediately destroy all such materials or thereafter uses Tenant's Trademarks without Tenant's consent, in its sole and absolute discretion, Landlord shall be deemed to be in breach of the Promotional License.

(v)    Remedies. Landlord hereby acknowledges that the unauthorized disclosure by Landlord of Confidential Information to any third party or a breach by Landlord of the Promotional License may cause material damage to Tenant, thereby entitling Tenant to injunctive relief restraining such unauthorized use or disclosure by Landlord, together may seek with damages, costs, and attorneys' fees. In addition to the foregoing, in the event of a violation by Landlord, Tenant shall be entitled to recover as liquidated damages an amount equal to One Hundred Thousand Dollars ($100,000). The parties acknowledge and agree that it would be impracticable or extremely difficult to the determine Tenant's actual damages from a breach by Landlord of this Section 33(j) and that such amount is reasonable under the circumstances. Tenant shall have the burden of proof to establish any such unauthorized disclosure by Landlord or breach by Landlord as required by the law of the state in which the Premises is located. Notwithstanding the provisions of this Section 33(j)(v) to the contrary, the liquidated damages set forth in this Section shall not be applicable to a breach of the provisions of Section 33(j)(iii) occurring subsequent to the earlier of the Rent Commencement Date or date Tenant announces to the public its tenancy or prospective tenancy in the Shopping Center, provided that Landlord shall still be bound by the provisions thereunder. Tenant shall have the burden of proof in establishing a violation or breach under this Section 33(j).

(vi)    Landlord. For purposes of this Section 33(j), "Landlord" shall include but not be limited to any broker, agent, property manager, vendor, or representative of Landlord.

(k)    **Venue**. LANDLORD AND TENANT HEREBY VOLUNTARILY, KNOWINGLY, IRREVOCABLY AND UNCONDITIONALLY SUBMIT TO THE JURISDICTION OF THE SUPERIOR COURT OF MARICOPA COUNTY, ARIZONA (OR IF THE REQUISITES OF JURISDICTION OBTAIN, THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA SITTING IN MARICOPA COUNTY, ARIZONA) IN CONNECTION WITH ANY DISPUTE (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) BETWEEN OR AMONG LANDLORD AND TENANT ARISING OUT OF OR IN ANY WAY RELATED TO THE PREMISES, THIS DOCUMENT OR ANY OTHER AGREEMENTS, DOCUMENTS OR INSTRUMENTS EXECUTED AND DELIVERED IN CONNECTION WITH OR OTHERWISE RELATING TO THE PREMISES. IN THIS REGARD, THE EXCLUSIVE VENUE OF ANY SUCH DISPUTE SHALL BE IN MARICOPA COUNTY, ARIZONA.

325821301.2

**LANDLORD AND TENANT HEREBY VOLUNTARILY, KNOWINGLY, IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY DEFENSE OF FORUM NON CONVENIENS OR ANY OTHER OBJECTION TO VENUE IN MARICOPA COUNTY, ARIZONA.**

(l)    <u>Waiver of Right to Jury Trial</u>. **IF AND TO THE FULLEST EXTENT PERMITTED BY APPLICABLE GOVERNMENTAL RESTRICTIONS, LANDLORD AND TENANT EACH WAIVE THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY OF ANY CONTRACT OR TORT CLAIM, COUNTERCLAIM, CROSS COMPLAINT OR CAUSE OF ACTION IN ANY ACTION, PROCEEDING OR HEARING BROUGHT BY EITHER LANDLORD OR TENANT AGAINST THE OTHER ON ANY MATTER ARISING OUT OF OR IN ANY WAY CONNECTED TO THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT OR TENANT'S USE OR OCCUPANCY OF THE PREMISES, INCLUDING ANY CLAIM OF INJURY OR DAMAGE OR THE ENFORCEMENT OF ANY REMEDY UNDER ANY CURRENT OR FUTURE LAW, STATUTE, REGULATION, CODE OR ORDINANCE.**

(m)    <u>Name of Shopping Center</u>. Landlord reserves the right at any time to change the name by which the Shopping Center is designated.

(n)    <u>Tenant's Authority</u>. If Tenant is a corporation or partnership, the officers or partners of Tenant (as the case may be) executing this Lease on Tenant's behalf hereby make the following covenants, warranties and representations upon which Landlord is relying in agreeing to lease the Premises to Tenant in accordance with the terms of this Lease:

(i)    that Tenant has been duly organized, is validly existing and is in good standing in the State of California and is authorized to do business in the State of Arizona.

(ii)    that Tenant has been duly qualified and is, as of the Effective Date, in good standing to transact business in the state in which the Premises is located and shall continue to be so until the end of the Term;

(iii)    that the officers or partners executing this Lease on Tenant's behalf have been duly authorized by all necessary corporate action to execute the same, and that upon the execution hereof this Lease shall be the valid and binding obligation of Tenant.

(o)    <u>Waiver of Right of Redemption and Relief from Forfeiture</u>. Without in any way affecting or limiting Tenant's express rights under this Lease, to the fullest extent permitted by law, Tenant expressly waives any and all rights of redemption and all rights to relief from forfeiture granted by or under any present or future laws, in the event of Tenant being evicted or dispossessed for any cause, or in the event Landlord obtains possession of the Premises by reason of the violation by Tenant of any of the covenants and conditions of this Lease, or otherwise. Additionally, to the fullest extent permitted by law, Tenant waives all homestead rights and exemptions which Tenant may have under any law as against any obligations occurring under this Lease.

54

(p)     Brokerage Disclosure. Landlord and Tenant acknowledge and agree that Landlord has disclosed to Tenant that Landlord and/or Landlord's affiliates or constituent partners or members are licensed real estate brokers in the States of Arizona and California and that employees, affiliates and constituent partners or members of Landlord, Landlord's affiliates and/or Landlord's constituent partners or members are licensed real estate salespersons in the States of Arizona and California. In accordance with Applicable Laws, Landlord (and/or Landlord's affiliates or constituent partners or members), if and to the extent any of the foregoing is/are acting as a broker with respect to this Lease, represents that it represents only Landlord's interest with respect to this Lease. Tenant acknowledges that Landlord (and/or Landlord's affiliates or constituent partners or members) does not represent Tenant or its interests with respect to this Lease.

(q)     Overflight Disclosure. Landlord hereby discloses to Tenant that the Shopping Center is situated within the "**Williams Gateway Overflight Area 3**" as defined by the Williams Regional Planning Study (WRPS) and as adopted by the Queen Creek Council Resolution No. 115-96. In addition, Landlord discloses to Tenant the potential noise impact upon the Shopping Center and the Premises as a result of aircraft arriving and departing from Williams Gateway Airport.

(r)     Sales Tax Surcharge. Landlord discloses to Tenant that the Town has adopted a sales tax surcharge applicable to the Shopping Center as follows:

(i)     The Town has adopted a General Plan that includes the goal of preserving and enhancing its "**Town Center**", as defined in the General Plan and the Town Center Specific Area Plan. Landlord discloses to Tenant that the Town requires that a surcharge in the amount of .25% be added to each sale subject to a Transaction Privilege Tax generated at the Shopping Center (the "**Surcharge**") and shall be reported and remitted to Town, in addition to and together with payments of Transaction Privilege Tax by the tenants and other occupants of the Shopping Center.

(ii)     The obligation of each tenant or occupant of the Shopping Center to pay the Surcharge is a covenant running with the land and shall be binding on each tenant or occupants operating a business on the Shopping Center. Landlord hereby waives any objection to the imposition of the Surcharge by the Town.

(s)     Counterparts. This Lease may be executed simultaneously, with or without notary acknowledgement, in one or more counterparts, each of which shall be deemed an original, but all of which when taken together shall constitute one and the same instrument and it shall not be necessary that any single counterpart bear the signature of all parties.

(t)     No Merger. There shall be no merger of this Lease, nor of the leasehold estate created by this Lease, with the fee estate in the Premises by reason of the fact that this Lease or the leasehold estate created by the Lease or any interest in this Lease may be held, directly or indirectly, by or for the account of any person who shall own the fee estate in the Premises or any interest in such fee estate, and no such merger shall occur unless and until all Persons (including

55

any leasehold mortgagee) having an interest in this Lease or in the leasehold estate created by this Lease shall join in a written instrument effecting such merger and shall duly record the same.

(u)    No Partnership. Nothing contained in this Lease shall be deemed or construed as creating an agency, partnership or joint venture relationship between Landlord and Tenant or between Landlord and any other person or cause Landlord to be responsible in any way for the debts or obligations of Tenant or any other person. Except to the extent a person is expressly identified in this Lease as an intended third party beneficiary, there are no third party beneficiaries of any of the terms, covenants and provisions of this Lease.

(v)    Sale of Premises by Landlord. In the event of any transfer of the Premises by Landlord or assignment by Landlord of this Lease, the transferor shall be and is hereby entirely freed and relieved of all liability under any and all covenants and obligations contained in or derived from this Lease arising out of any act, occurrence or omission relating to the Premises or this Lease occurring after the consummation of such transfer or assignment provided such transferee or assignee assumes all of Landlord's covenants and obligations under this Lease arising from and after the consummation date.

(w)    Non-recourse to Landlord. Notwithstanding anything to the contrary contained in this Lease, it is expressly understood and agreed that any money judgment against Landlord resulting from any default or other claim arising under this Lease (whether in contract, tort or for breach of any express or implied covenant contained in this Lease) shall be satisfied only out of the rents, issues, profits and other income (collectively "**income**") actually received from the operation of the Shopping Center and from Landlord's equity interest in the Shopping Center (together with income, the "**Sources**"), and no other real, personal or mixed property of Landlord (the term "**Landlord**" for purposes of this Section (w) only shall mean any and all members and any and all partners, both general and/or limited, if any, which comprise Landlord), wherever situated, shall be subject to levy on any judgment obtained against Landlord and if such income is insufficient for the payment of such judgment, Tenant shall not institute any further action, suit, claim or demand, in law or in equity, against Landlord (other than with respect to the Sources) for or on the account of such deficiency. Tenant hereby waives, to the fullest extent permitted by law, any right to satisfy a money judgment against Landlord, Landlord's Representatives and/or Landlord's lender except from the Sources.

**[signatures on next page]**

56

325821301.2

IN WITNESS WHEREOF, upon the day and year first herein above written, the respective parties hereto have executed this Lease, inclusive of all exhibits hereto, personally or by officers or agents thereunto duly authorized.

**Landlord**

**QCM PARTNERS, LLC,**
a Delaware limited liability company

By:   Vestar NM Retail Acquisitions, LLC,
        a Delaware limited liability company, its sole member

      By:   The Northwestern Mutual Life Insurance
            Company, a Wisconsin corporation, a member

            By:   Northwestern Mutual Investment Management
            Company, LLC, a Delaware limited liability company,
            its wholly-owned affiliate

            By: _____
                        JESSICA SCHOEN
            ~~Managing~~ Director

By:   Vestar Retail Acquisitions Manager, LLC,
        a Delaware limited liability company, a member

      By: _____
      Name: _____
      Title: _____

**Tenant**

TRADER JOE'S COMPANY,
a California corporation

By_____
    Bryan Palbaum
    President

S-1

IN WITNESS WHEREOF, upon the day and year first herein above written, the respective parties hereto have executed this Lease, inclusive of all exhibits hereto, personally or by officers or agents thereunto duly authorized.

**Landlord**

**QCM PARTNERS, LLC,**
a Delaware limited liability company

By:   Vestar NM Retail Acquisitions, LLC,
      a Delaware limited liability company, its sole member

    By:   The Northwestern Mutual Life Insurance
        Company, a Wisconsin corporation, a member

        By:   Northwestern Mutual Investment Management
            Company, LLC, a Delaware limited liability company,
            its wholly-owned affiliate

            By:   _____

                _____
                Managing Director

By:   Vestar Retail Acquisitions Manager, LLC,
      a Delaware limited liability company, a member

    By:   _X. Paul Rhodes_____
    Name:   **J. Paul Rhodes**_____
    Title:   **Manager**_____

**Tenant**

TRADER JOE'S COMPANY,
a California corporation

By_____
    Bryan Palbaum
    President

S-1

IN WITNESS WHEREOF, upon the day and year first herein above written, the respective parties hereto have executed this Lease, inclusive of all exhibits hereto, personally or by officers or agents thereunto duly authorized.

**Landlord**

**QCM PARTNERS, LLC,**
a Delaware limited liability company

By:   Vestar NM Retail Acquisitions, LLC,
       a Delaware limited liability company, its sole member

      By:   The Northwestern Mutual Life Insurance
            Company, a Wisconsin corporation, a member

            By:   Northwestern Mutual Investment Management
                 Company, LLC, a Delaware limited liability company,
                 its wholly-owned affiliate

                By:   _____

                      _____
                      Managing Director

By:   Vestar Retail Acquisitions Manager, LLC,
       a Delaware limited liability company, a member

      By: _____
      Name: _____
      Title: _____

**Tenant**

TRADER JOE'S COMPANY,
a California corporation

By _____
     Bryan Palbaum
     President

**EXHIBIT "A"**

**LEGAL DESCRIPTION OF SHOPPING CENTER**

All of that real property located in the Town of Queen Creek, County of Maricopa, State of Arizona more particularly described as follows:

Lots 1 through 21 and Tracts A and B of Queen Creek MP-Phase 1, shown by Map on file in Book 827, Page 27 of Maps, official records of Maricopa County, Arizona

A-1

**EXHIBIT "B"**

**SITE PLAN**

(See Attached)

B-1



EXHIBIT 3
SCALE: 1"=100'-0"

QUEEN CREEK
MARKETPLACE



= TRASH ENCLOSURE AREA

= CART CORRAL AREAS

= EMPTY PALLET ENCLOSURE AREA

= OUTDOOR DISPLAY AREA

= LOADING DOCK AND LOADING AREA

= LIMITED RETAIL AREA

6,000 SF

21112 S. ELLSWORTH
LOOP ROAD

PREMISES
12,561 SF

21186 S. ELLSWORTH
LOOP ROAD

SITE EXHIBIT
SCALE: 1" = 20'-0"

N

QUEEN CREEK
MARKETPLACE
PREMISE - #286 - QUEEN CREEK
02.04.25
PROJECT NO: 19086.00

Vestar

VERTICAL



EXHIBIT 4 - CONTROL AREA & NO PARKING
SCALE: 1"=100'-0"

QUEEN CREEK MARKETPLACE

Vestar



EXHIBIT 4 - PROTECTED PARKING AREA
SCALE: 1"=100'-0"

QUEEN CREEK
M A R K E T P L A C E

Vestar

VERTICAL



**Queen Creek**

M A R K E T P L A C E

**Queen Creek, Arizona**

Site Area
90.23 Acres

Building Area
859,575 Square Feet

Parking
4.99 / 1,000 Square Feet

Vestar

NEC of Ellsworth &
Rittenhouse Roads

brr
ARCHITECTURE



EXHIBIT 5 - REQUIRED REBUILD AREA
SCALE: 1"=100'-0"

QUEEN CREEK
MARKETPLACE

Vestar

VERTICAL

**EXHIBIT "B-1"**

**PADS P, Q & R FOR PROHIBITED USES EXCEPTION**

**(See Attached)**

325821301.2



**Vestar**

Site Area
90.23 Acres

Building Area
859,575 Square Feet

Parking
4.99 / 1,000 Square Feet

# QUEEN CREEK
### M A R K E T P L A C E

## Queen Creek, Arizona

NEC of Ellsworth &
Rittenhouse Roads

**brr**
ARCHITECTURE

## EXHIBIT "C"

## CONSTRUCTION

### Trader Joe's Shell Specifications

Landlord covenants that:

I.   Immediately upon execution of the Lease, it will proceed with all diligence and dispatch to, design, demolish, construct or remodel upon the real property demised hereunder a store building of the dimensions set forth in Exhibit A (Site Plan) attached hereto or alter, remodel and reconstruct the Premises, all in conformance with this Exhibit C.

II.  It will diligently execute the construction or remodeling of said building and Premises until the same is completed in all details.

III. It will provide labor and materials to perform the items listed below per Tenant Direction. It will use Tenant required vendors and will not use substitute materials.

IV.  "**Tenant Direction**" is defined as site specific plans, specifications, or written directions provided by the Tenant.

## 1. LANDLORD'S WORK

The term "**Landlord's Work**" shall be defined as specifically provided in the Lease and shall include as the performance by Landlord of all work necessary to deliver the Premises to Tenant with all of the features and in the condition described in this Exhibit C, including all design, any and all permits, special use permits, materials, labor, and equipment necessary to perform such work and payment of all traffic mitigation, impact, and other development fees. Landlord's Work shall be at Landlord's sole cost and expense and shall be performed in accordance with the Approved Plans, the provisions hereinafter set forth, and specifically in accordance with the timetable set forth in this Exhibit C, time being of the essence.

## 2. PLANS AND SPECIFICATIONS

a.   Within thirty (30) days following the later of the Effective Date or delivery by Landlord to Tenant of the shell drawings in CAD format for the Premises, Tenant's store layout and fixture plan shall be furnished to Landlord. All architectural plans, diagrams, specifications and other data relating to Landlord's Work shall be produced by Landlord based on said store layout and fixture plan.

b.   **LANDLORD'S PLANS:** Within forty-five (45) days following delivery of Tenant's store layout and fixture plan to Landlord, Landlord shall furnish a full set of construction drawings for the Building ("**Landlord's Plans**") for Landlord's

C-1

Work to Tenant for approval. Landlord's Plans shall include, but not be limited to, facades of the buildings in the Shopping Center, grades, sign location and design, sidewalks, base building plans, loading areas, utility rooms, fire alarm, fire sprinkler system and device locations, dimensions of buildings and the Premises, demising walls, column and other structural support locations, lighting, location for trash enclosure, location for go-backs enclosure, location for HVAC equipment, location for refrigeration equipment, chases and shafts related to Tenant's refrigeration and HVAC equipment, landscaping, curbing, fencing, engineered delivery truck routing plans, and parking layout. Landlord to contact the electrical utility company and obtain in writing, and furnish to Tenant, the maximum available fault current at the utility service point, to ensure that all electrical equipment has a fault current interrupting rating greater than the available fault current. Within fifteen (15) days following receipt of Landlord's Plans, Tenant shall provide Landlord with written objections to the plans ("**Tenant's Comments**"). Within fifteen (15) days following receipt of Tenant's Comments, Landlord shall either revise Landlord's Plans and deliver final plans to Tenant or furnish Tenant with written notice setting forth the reasons for Landlord's reasonable refusal to consent to Tenant's changes, whereupon Tenant and Landlord shall negotiate in good faith to finalize Landlord's Plans. The final plans for Landlord's Work are referred to herein as the "Approved Plans". If Landlord fails to either furnish Tenant with written notice setting forth the reasons for Landlord's refusal to consent to Tenant's changes or provide Tenant the revised final plans with changes requested by Tenant within fifteen (15) days following Tenant's revision letter, the changes requested by Tenant shall be deemed approved and Landlord's Plans, as revised by Tenant's changes, shall be deemed the "Approved Plans." If the parties are unable to agree on the Approved Plans in accordance with this Section, then either party may terminate this Lease by delivering written notice to other whereupon any prepaid charges or deposits paid by Tenant to Landlord shall be immediately refunded to Tenant and thereafter neither party shall have any further rights or obligations hereunder. Following approval or deemed approval of the Approved Plans, Tenant shall prepare architectural plans, diagrams, specifications, and other data relating to Tenant's Work based on the Approved Plans.

c. **TENANT'S PLANS:** Within forty-five (45) days following the approval or deemed approval of the Approved Plans, Tenant shall prepare architectural plans, diagrams, specifications, and other data relating to Tenant's Work based on the Approved Plans ("**Tenant's Plans**"). Landlord shall approve or disapprove Tenant's Plans within thirty (30) days following Landlord's receipt thereof. In the event Landlord disapproves Tenant's Plans, Landlord shall provide Tenant with the reasons for disapproval in reasonable detail and Tenant shall cause Tenant's Plans to be revised accordingly and shall resubmit the revised Tenant's Plans to Landlord for approval. Landlord shall have ten (10) days to disapprove the revised Tenant's Plans but shall not be permitted to raise any new objections to any portion of Tenant's Plans previously approved by Landlord. The foregoing process shall

C-2

continue until Tenant's Plans are approved by Landlord (the "**Approved Tenant's Plans**").  Landlord's failure to approve or disapprove of Tenant's Plans within said thirty (30) day or ten (10) day period, as applicable, shall be deemed to constitute Landlord's approval thereof.

d.  **CHANGES TO APPROVED PLANS**:  No changes, modifications or alterations in the Approved Plans or Approved Tenant Plans (except those of an incidental nature requested by Tenant which do not materially change the Approved Plans, Approved Tenant Plans or Landlord's Work) shall be made without the written consent of Landlord and Tenant, which consent shall not be unreasonably withheld, conditioned or delayed.  If any changes shall be made, the cost of such changes shall be borne by the party, either Landlord or Tenant, requesting such change, and, if the changes impact the construction schedule of the non-requesting party, the non-requesting party shall be entitled to an extension of time for completion of its work.

e.  **PERMITS AND CONSTRUCTION COMMENCEMENT**:

i.  Within thirty (30) days after the Approved Plans are approved (or deemed approved), Landlord, at its sole cost and expense, shall promptly submit the Approved Plans to the local governing authority asserting jurisdiction over the performance of Landlord's Work to the Premises for the purpose of obtaining all necessary building and related permits for the performance of Landlord's Work.

ii.  Within thirty (30) days following receipt of the foregoing permits, Landlord shall commence performance of Landlord's Work and shall give written notice to Tenant that construction has commenced.  If Landlord fails to commence construction within the thirty (30) day period, Tenant may terminate this Lease with written notice to Landlord, whereupon any prepaid charges or deposits shall be immediately refunded to Tenant and thereafter neither party hereto shall have any further rights or obligations hereunder.

3.  **SITE AND PARKING**

a.  Landlord shall deliver a graded, blacktopped, illuminated and appropriately striped and landscaped parking lot and other common areas. Parking lot illumination shall be the maximum foot candle level permitted by local jurisdiction throughout and shall be designed or modified to provide uniform lighting free of dark patches and pockets. At a minimum, Landlord shall protect the Premises with bollards or comparable devices or features that will deny access of vehicles less than 4,500 pounds at traffic speeds of 30 miles per hour or less ("**Impact Resistant Bollards**") or comparable devices, per Tenant Direction.

C-3

b. In order to provide for disabled, shopping cart and material handling access to the Premises, Landlord shall provide concrete ramps (curb cuts) in the sidewalk poured and in alignment with all entrance and exit doors, receiving doors, and fire doors to the Premises. The ramps at entrance and exit doors shall be a minimum of eight feet (8') wide will have a finish designed for shopping cart and material handling equipment operation. All ramps and sidewalks shall meet all Building Code and ADA requirements. The main entry ramps shall lead to a minimum eight foot (8') wide pedestrian walkway from the ramp to the parking field. Landlord shall create safe pathways from the parking lot to the Premises, including such measures as striping, speed bumps, cross walks, bollards, and stop signs, in accordance with the parking lot plan approved by Tenant, but shall not include textured-type paving stones or materials with would cause hazard to shopping cart use. Wheel stops shall not be used.

c. If Tenant determines during design, construction or within one year of store opening that additional striping, speed bumps, cross walks, bollards, stop signs, or any other safety measures are required, upon Tenant's request, Landlord shall provide requested measures.

d. No less than thirty (30) days prior to Tenant's opening, the common area will be maintained in a first class condition.

e. The walkway directly adjacent to the Premises main entries and exits shall be designed to accommodate a covered cart corral (with 100-cart capacity) in locations approved by Tenant. Landlord shall install at least two cart corrals built into the landscaping for cart return (certain geographic regions require a fully enclosed cart corrals). Size, number, and locations of cart corrals are to be per Tenant Direction. Landlord shall supply and install in the above-mentioned cart corrals features to protect the building and the site from cart damage. Landlord shall provide and install an awning, canopy or other extended continuous covering, attached to and integrated with the building structure over the full length and depth of the cart corral and over the front entrance and exit doors to protect those areas from weather. Certain geographic regions require a fully enclosed cart corral.

f. The Landlord shall install an awning or covering over all other egress doors, ramps and stairs if required by code.

g. Landlord shall install a structurally designed and engineered canopy over the loading dock door, minimum 15 feet high by 15 feet wide by 10 feet deep. Landlord shall be responsible for installation of protective bollards around all canopy supports. Plans for canopy design and layout to be reviewed and approved by Tenant to ensure compatibility with trucking/delivery route.

h. The Landlord shall design the site to accommodate a 15' truck height and maneuvering requirements of a seventy-five (75') tractor trailer (WB-67) with truck

C-4

turning software that indicates ingress, egress and loading abilities. Access driveways, dock openings and or enclosures must be designed and engineered to allow maneuvering requirements of a seventy-five (75') tractor trailer (WB-67). Truck travel paths must be constructed of heavy duty paving except where heavy duty concrete is called out in this document.

i. Loading area shall provide the right for Tenant to be allowed to accept deliveries at any time, seven (7) days a week, 24 hours a day.

Landlord shall provide all common on-site and off-site development in good and complete repair and condition (including, without limitation, the ingress and egress roads to and from the Shopping Center). Landlord shall be responsible for any exterior or site improvements required by any city or government agency including ADA/Accessibility codes. No less than thirty (30) days prior to Tenant's opening, any adjacent building areas that are not improved or are under construction at the time Tenant opens for business in the Premises shall be screened from view with appropriate fencing or other barricades until the completion of construction in that area. Any adjacent building pads, or exposed soil areas shall be paved, or planted, and maintained with grass or other suitable ground cover, until the building is constructed or the work is complete on said areas. All landscaping shall be kept as low as governmental authorities will permit so as not to obscure visibility of the Premises or all signage and other stores in the Shopping Center.

j. During Tenant's construction of its Tenant improvements, Landlord shall provide Tenant and its contractors with parking (minimum 12 stalls) immediately adjacent to the Premises, a construction staging area. Power will be provided per Paragraph L of "**Demised Premises**" which can be used during construction by tenant.

k. Landlord shall provide all permanent utilities and connections servicing the site and the Premises with separate meters including but not limited to separate domestic water lines (Tenant acknowledging that the fire sprinkler line shall be a portion of a shared fire riser), irrigation systems, telephone, storm drainage, gas, electrical power, sanitary sewer (minimum depth of 48" below finished grade) and grease trap or interceptor as required by local jurisdiction (Tenant acknowledges that the grease trap will be located within the Premises and installed by Tenant). All meters and associated fees, shall be installed by and the responsibility of the Landlord. Meters shall be transferred to Tenant upon delivery of the Premises. Within 30 days after the Effective Date of the Lease, Landlord shall contact Tenants utilities department to review the utilities procurement process. Landlord shall not enter into long term contracts binding Tenant at specific rates for utilities. All utilities must be brought to the locations specified by Tenant within the Premises, separately metered, and must meet current codes.

l. Landlord shall provide a means for Tenant to unload and move product from tractor-trailers to its Stockroom, either with a raised loading dock at 48" high with

C-5

dock leveler and dock truck protection, or freight elevator approved by Tenant, and/or a minimum of a 20-foot by 30-foot 6 inch think reinforced, 4000 PSI concrete pad at designated loading are at the same elevation as the interior finish slab. Pad to be sloped away from building at a maximum of 2%, minimum of 1.0%, slope. Landlord shall provide an 8' x 8' insulated roll-up door immediately adjacent to the loading area previously described.

m. Landlord shall provide a fully enclosed (including roof), rodent-proof, secure trash enclosure in a mutually-agreed location near Tenant's loading door. The enclosures must hold, at a minimum, two 4-yard trash bins with two (2) 10' (w) x 8' (h) minimum openings. The trash enclosure is to be located on a minimum 4" thick reinforced concrete pad at 4,000 PSI. Design must meet needs of Tenant and the local trash services company. Landlord shall provide fire suppression systems, floor drains, utilities and wash down area, and all other code required modifications to meet local jurisdictional agency requirements for a food sales establishment. An 8' wide by 4" thick reinforced concrete path way is to be installed by Landlord leading from the loading door to the trash enclosure. Trash enclosure is to be at the same elevation as the interior finish slab. Landlord shall install lighting within the trash enclosure, wired to Tenant's panels, per Tenant Direction.

n. Landlord shall provide a fully enclosed Empty Pallet Enclosure (including roof), in a mutually-agreed location. The enclosures must hold Tenant's empty pallets and warehouse returns. Empty Pallet Enclosure is to be a minimum of 10' x 20' with an 8' (w) x 8' (h) minimum opening. The Empty Pallet Enclosure is to be located on a minimum 4" thick reinforced concrete pad at 4,000 PSI. An 8' wide by 4" thick reinforced concrete path way is to be installed by Landlord leading from the loading door to the Empty Pallet Enclosure. Empty Pallet Enclosure is to be at the same elevation as the interior finish slab. Landlord shall install lighting within the Empty Pallet Enclosure, wired to Tenant's panels, per Tenant Direction. Landlord shall provide fire suppression systems, utilities and wash down area if required by local jurisdictional agency.

o. When required by code for a food establishment, Landlord shall provide a fully enclosed Recycling Room (including roof), in a mutually-agreed location. The Recycling Room shall not be part of the premises. The Recycling Room is to be sized to meet all required local code requirements for a food establishment. The Recycling Room is to be located on a minimum 4" thick reinforced concrete pad at 4,000 PSI. An 8' wide by 4" thick reinforced concrete path way is to be installed by Landlord leading from the loading door to the Recycling Room. Recycling Room is to be at the same elevation as the interior finish slab. Landlord shall install code required lighting and ventilation within the Recycling Room, wired to Tenant's panels, per Tenant Direction. Landlord shall provide fire suppression systems, utilities, wash down area, and grease interceptors if required by local jurisdictional agency.

C-6

p.  Refrigeration and HVAC equipment if on a concrete pad must be located on a minimum 4" thick reinforced concrete pad at 4,000 PSI attached to the Premises or on the roof. The pad must be screened from view, within a secure, lockable enclosure, and must have proper air flow per Tenant Direction and service space required by code and manufacturers specification.

q.  Landlord and Tenant acknowledge that the Shopping Center is existing construction and that the parking lot and Common Areas have previously been constructed. As such, Tenant accepts the Common Areas and the parking lot in their current existing as-is, where-is condition and Landlord has no obligation to modify, alter or upgrade the Common Areas or parking lots from their present existing condition.

## 4.  DEMISED PREMISES:

a.  **SHELL:**  Landlord shall demolish the existing improvements in the Premises to deliver clean shell, including but not limited to the demolition, removal, and disposal of existing demising walls, perimeter interior walls, previous floor finishes, interior concrete floor slabs within ½" of existing demising and perimeter walls, grease traps, utilities, ceilings, plumbing, electrical, HVAC ductwork, and the prior Tenant's furniture, fixtures, and equipment.

b.  **FLOOR:**  Tenant's prototype finished floor is an integrally colored concrete, polished slab (which shall be poured as part of Tenant's Work). Therefore, regardless of existing condition, Landlord shall demolish and remove the existing floor and be responsible for delivering a certified pad compacted to 95% density and per landlord provided geo technical report and slab design. Final grade of pad shall be graded to 5 inches below finished floor level +/- 1/10".

c.  **ROOFING:**

i.  When Premises are part of new construction, Landlord shall supply and install a new roof which will provide a weather tight and secure roof for the term of the Lease.

ii.  When premises are part of existing construction, Landlord shall repair and replace roof as required to provide a weather tight and secure roof for the term of the Lease.

iii.  Roofing type shall be TPO single ply or as approved by Tenant. All roof penetrations per Tenant Direction.

iv.  Landlord to provide roof access through an interior steel ladder or stair from within the Premises (or from within an owner's room) or within a mutually agreed upon common area with 24 hour 7 days a week access to a roof hatch or service door provided by Landlord and located per Tenant Direction.

C-7

     v. Landlord to provide two drain line vent penetrations, one exhaust fan, roof jack or curb, and two low voltage 2" conduits with weather heads and penetrations per Tenant Direction. Landlord to provide frost free anti siphon hose bid on the roof per Tenant Direction set and flash all roof mounted curbs, Conn-Fab rails, refrigeration support posts and Mega Vaults.

     vi. Landlord shall set and flash all roof mounted curbs and/or refrigeration support posts required to raise equipment a minimum of 18" above roof, and Mega Vaults per Tenant Direction and current code.

     vii. Landlord to provide and install structure and screening around all equipment if required by code.

d. **SHAFTS & CHASES:** Per Tenant Direction, Landlord to provide continuous fire-rated vertical, horizontal chases, shafts for installation of all tenant directed refrigeration and HVAC piping, conduits, ductwork, and utilities with rated access panels, large enough to accommodate the service of equipment within, provided at each floor level or wall penetrations. Landlord shall protect chases, shafts so that Tenant's refrigeration and HVAC piping, conduits, ductwork, and utilities are protected from damage by others. Locations of continuous fire-rated vertical, horizontal chases, shafts are from Tenant's equipment located outside of the Premises to the Premises.

e. **STOREFRONT SYSTEMS:** Landlord shall provide a storefront, including automatic entry and exit doors, vestibule, and a continuous awning or covering over the doors and cart corral which harmonizes with the architecture of the Shopping Center and consists of approximately eighty percent windows and doors. Location, extent and quantity of windows shall be approved by Tenant. Location of automatic entry and exit doors to be determined per Tenant Direction. One-inch insulated security glass shall be used on the storefront. Glass type shall be solar bronze or per to match color of store front minimum, as specified by Tenant and as required by code. Where required by code hurricane glass or concealed hurricane shutters will be supplied and installed by Landlord per Tenant Direction. Landlord shall install a 48 inch high wall below storefront and glazing. Shop drawings for the storefront system including mullion placement shall be submitted to tenant for approval. Landlord shall install all storefront outlets and exterior sign circuits per Tenant Direction.

f. **DOORS:**

     i. AUTOMATIC DOORS: Landlord shall furnish and install all automatic vestibule entry and exit doors per Tenant's specification and supplier. Storefront frames and automatic doors shall be anodized or factory powder coated to match existing storefront materials and finish. Vestibule doors

C-8

shall be constructed from the same materials and supplier as the storefront. Landlord shall supply and install hardware, power and energize all automatic doors. No surface mounted conduit or wiring is permitted.

ii. EMERGENCY EXITS: Landlord shall provide emergency exits meeting Building Code and other legal requirements. Landlord shall provide Steel doors equipped with alarmed 4 point locking panic hardware per Tenant Direction

iii. ALL OTHER DOORS: Landlord shall provide and install all other perimeter and exterior doors, frames, and hardware in a location per Tenant's plans, specifications and supplier.

g. **WALLS AND PARTITIONS:** Landlord shall provide all demising walls and perimeter walls. All perimeter walls shall be drywall construction on minimum 2 ½" metal studs (no hat channels) with insulation between the studs, R value to meet local jurisdiction and Energy Code requirements and covered by five-eighths inch (5/8") type "x" gypsum wallboard from floor to the underside of the roof. All demising walls shall be drywall construction on minimum 6" metal studs (no hat channels) with sound attenuation blankets (R/19) between the studs and covered by five-eighths inch (5/8") type "x" gypsum wallboard from floor to underside of the roof and shall have a minimum fire rating as required by code. All exterior and demised exposed CMU walls are to be furred, with insulation between the studs, R value to meet local jurisdiction and Energy Code requirements and covered by five-eighths inch (5/8") type "x" gypsum wallboard from floor to the underside of the roof All wall penetrations shall be fire caulked per code. When required by code, Landlord shall be responsible for fireproofing of existing structure, including but not limited to walls, structural steel, ceilings, etc. Exterior walls, demising partitions and walls provided by Landlord may be used by Tenant for refrigeration piping, plumbing, electrical and utilities. Walls are to be in a single flat plane without pipes, columns or other protrusions. All surfaces (new or existing) shall be stripped of previous occupant's wall coverings, taped, sanded, smooth to a level 5 finish and ready for paint.

h. **BUILDING SIGNAGE:** Tenant shall be allowed to install its own sign (Red internally lit, minimum 42 inch individually mounted letters) on all sides of the Premises, unless otherwise provided in the Lease. Landlord shall provide Tenant a coordinated (size, materials and colors) sign band areas that are coordinated with Tenant's sign plan and free of visible scoring, joints, and heavy textures. Landlord shall provide ¾" plywood backing behind exterior finishes at entire sign band for Tenant's sign mounting. Landlord shall provide electrical circuit per Tenant's plans at each sign location for sign power. Circuit to terminate at a junction box centered on the sign band and mounted within 36" of the perimeter wall.

i.  **FIRE PROTECTION:** Landlord shall provide a complete, inspected, and tested "**base**" sprinkler system sized and designed to accommodate Tenant's fit-out in compliance with all current codes and connected to the fire alarm panels as required for "**Core and Shell**" approval from all local jurisdictions prior to Tenant fit-out. Work includes, but is not limited to, all permits, main water supply, main riser, main and branch lines, all controls, all control valves, all post and/or wall indicator valves (if required by local authorities), all heads for up and down coverage, all escutcheons, low voltage wiring, flow and tamper devices, any required backflow preventers and monitoring required for Landlord to receive Core and Shell, Temporary Certificate of Occupancy, or other pre-occupancy approval as required by local jurisdiction. The height of the main and distribution sprinkler lines after installation shall be as high as possible to the underside of the structure above. Where permitted by code, sprinkler riser shall be located outside the Premises. The system shall be designed and installed in such a manner that the system can be shut down for modifications/repairs without impacting other tenants in the building. When required by code to be installed within the Premises, riser shall be located in a vertical manner, in a mutually agreed upon location that minimizes the space occupied by the riser. Landlord shall be responsible for satisfaction of any testing and approval by the local fire department or municipality and obtaining a test (pressure) certificate for Landlord's work. Tenant shall be responsible for any testing if and after the system is modified.

j.  **FIRE ALARM SYSTEM:** Landlord shall provide a monitored "**base**" Fire Alarm System, sized and designed to accommodate Tenant's fit-out in compliance with all current codes and connected to Fire Sprinkler system as required for "**Core and Shell**" approval from all local jurisdictions prior to Tenant fit-out. A Fire Alarm System contains but is not limited to: FACP, FAAP, DGP, HVAC duct smoke detectors, all pull stations at exterior doors, all FA devices on perimeter/demising walls and columns required for Landlord to receive its Core and Shell, Temporary Certificate of Occupancy, or other pre-occupancy approval as required by local jurisdiction. No surface mounted conduit or wiring is permitted. Final connection to Fire Alarm Panel for Tenant-installed devices shall be the responsibility of the tenant and coordinated with Tenant's GC. Should Tenant be required to monitor the fire alarms, Landlord shall install system per Tenant Direction.

k.  **HEATING, AIR CONDITIONING, & REFRIGERATION:**

    i.  EQUIPMENT LOCATION: Landlord shall provide structural support and an area/location for Tenant's heating, ventilation, air conditioning, and refrigeration (HVAC/R) equipment (examples of equipment include but are not limited to compressors, compressor racks, condensers, fluid coolers, expansion tanks, air handlers, fan coil units, and pump stations). Landlord shall supply this area either on the roof, behind a secure, fence enclosed concrete pad with thickened slab edge adjacent to the Premises, or in the building, not a part of the Premises. All equipment locations must have

proper air flow and service space required by code, equipment manufacturer requirements, and Tenant Direction.  Tenant must have access to all equipment areas at all times.  Requirements for equipment dimensions, weights and platforms will be provided by Tenant.  Landlord shall provide factory startup and commissioning of Landlord provided HVAC units only.

ii.  EQUIPMENT

1.  Landlord shall provide new commercial grade packaged rooftop units with electric DX with gas heat units per Tenant Direction.  The System shall include all related curbs, power, gas, drains, and structural support required.  The System design shall maintain maximum 74 degrees Fahrenheit dry bulb and must include humidity control to keep tenants space at 50 % relative humidity within the premises at all times.  The system shall be designed for an estimated (1) ton of cooling per (350) square feet minimum. Landlord shall provide at a minimum, 0.8 CFM per square foot supply air and 0.15 CFM per square foot outside air to the premises. The System's typical configuration consists but is not limited to 3-4 HVAC "**package**" units and 1 stand-alone Munters dehumidification unit all per Tenant Plans and Specifications. Tenant's HVAC system shall be independent of any other zones in the building and fully functional 24 hours 365 days per year without any setback.

2.  Landlord shall provide and install temporary manual thermostat for each unit for startup and tenant use.

3.  Landlord shall provide all HVAC wiring (power and control wiring to temporary thermostat), gas piping, and condensate piping per Tenant Direction.

4.  Landlord shall furnish and install internally insulated (lined) supply and return sheet metal from unit through roof curb and down into interior space with all elbows having turning vanes, a minimum of 16 inches below the bottom of roof joist for each packaged rooftop unit.

5.  Tenant shall furnish and install flex ductwork, diffusers, and grilles within the space.

6.  Landlord shall provide one rooftop exhaust fan with curb and one roof jack or curb per Tenant plans, specifications, and direction.

l.  **ELECTRICAL:**  In a location determined by Tenant, Landlord shall provide and install a 1200 ampere, two-hundred-eight volt (208V) three–phase, four-wire

C-11

325821301.2

separate (one meter for Tenant's use only) electrical service to the Power Wall per Tenant Direction, or a 600 ampere, four-hundred-eighty volt (480V) three-phase, four-wire separate (one meter for Tenant's use only) electrical service to the Power Wall per Tenant Direction. Landlord shall wire, energize, test, inspect and make ready for Tenant's use all Power Wall, and equipment (including roof top equipment) provided by Landlord. Tenant shall provide site specific Power Wall design to landlord for Landlord to supply and install. Landlord shall provide additional amperage as required should pumps, electric resistant heat, elevators or escalators be necessary. Landlord's electrical work shall include separate metering for the Premises. Landlord to contact the electrical utility company and obtain in writing, and furnish to Tenant, the maximum available fault current at the utility service point, to ensure that all electrical equipment has a fault current interrupting rating greater than the available fault current. Power Wall and any related components to be installed in a location per Tenant Direction. Landlord shall provide and install per Tenant Direction all exterior lighting including but not limited to emergency lighting over all egress doors. Landlord shall provide and install loading dock lights. Exterior lighting with the exception of the loading dock and egress door lighting shall be powered from Landlord's House Electric panel. Dock lights and egress door lights will be wired to power wall. Landlord shall install all storefront outlets and exterior sign circuits wired to power wall. Landlord and Tenant acknowledge and agree that Tenant and not Landlord shall furnish and install the power wall and that Landlord shall provide a credit to Tenant, which credit shall be in an amount agreed upon by Landlord and Tenant.

m. **PHONE/VOICE:** Landlord shall provide data and voice facilities to the Primary MPOE of the property. Landlord shall be responsible for providing the local phone company a reasonable pathway to the property.

   i. PRIMARY MPOE: If Primary MPOE is within the Premises, the MPOE location shall be determined by Tenant. When the Primary MPOE is not located within the Premises, Landlord shall provide 2 (Two), 2 (two)-inch conduits from the property's Primary MPOE to the Tenant's DMARC location. Tenant to coordinate with desired telecommunications provider to pull wire from the Landlord MPOE to the Tenant's DMARC.

n. **PLUMBING:** The Premises will be serviced from the street to the premises by a minimum new 2-inch water line and a minimum new 4" sanitary sewer (minimum 48" invert below finish floor). Freeze proof wall hydrants will be installed in a recessed box at the front and rear of the building adjacent to the overhead loading door and adjacent to the entry door. An additional roof mounted freeze proof hydrant shall be installed adjacent to Tenant's condensing units. If required by local jurisdictional agency, Landlord will install wall hydrants, drains, and grease interceptors at trash and pallet enclosures. Landlord shall seal, make water tight and provide drip pans at all penetrations from levels above the Premises and shall flood test the levels above to confirm space is water tight.

C-12

    i.   COOLING CONDENSATE: Landlord to provide and install condensate piping with p-traps and cleanouts for each HVAC rooftop unit, sized and plumbed per local mechanical codes. Condensate piping shall be supported as best recommended by pipe manufacturer or mechanical code and discharged as required by local jurisdiction.

    ii.   NATURAL GAS: Landlord to supply natural gas meter and connection to local utility. Minimum capacity of 4,000 CFH national gas sized for 350 developed lineal feet, shut off valve, and 11" water column. Landlord shall provide and install gas piping from meter to all gas-fired equipment, designed and sized per local mechanical codes, connect to gas-fired equipment with a gas shutoff valve, dirt trap, and union. All equipment provided by Landlord to be piped, connected, energized, tested, inspected and made ready for Tenant's use.

    iii.   WATER: Stubbed into the premises per Tenant Direction providing minimum 2" diameter line (terminated with a flanged fitting, pressure of at least 55psi, backflow preventers (RPZ) with funnel on discharge line, pressure regulators, and meter, with floor drain located under the RPZ.

  o.  **SANITARY SEWER:** New 4" line stubbed into the premises per Tenant Direction with adequate depth (minimum 48" below finished floor) to meet sewer invert elevation

  p.  **CEILING HEIGHT:** Landlord shall provide a clear height from floor to lowest obstruction in Premises adequate enough to allow for the installation of all Tenant's mechanical equipment, ducts, conduit, piping, and other appurtenant equipment and the installation of a drop ceiling at twelve (12') clear. If Landlord is to supply less than 18' clear height from floor to lowest obstruction in the Premises, then Landlord shall notify Tenant prior to Lease execution.

## 5. GENERAL REQUIREMENTS

  a.  **COMPLIANCE:** The specifications will be strictly followed unless prior approval of variation is obtained from Tenant in writing.  . Landlord's Work shall be performed by licensed contractors and shall comply with all local, state and national building codes and laws applicable to new construction disregarding variances and grandfathered rights. Landlord shall be responsible for all exterior ADA compliance, including but not limited to primary and secondary entry and access to the Premises, parking, cross-walks and sidewalks.

  b.  **WORKMANSHIP:** All materials furnished and all work done shall be of the quality and character specified herein or in the Tenant approved core/shell construction documents. In the event of a conflict between this Landlord work

<div align="center">C-13</div>

325821301.2

exhibit and the Plans, this Landlord work exhibit will control.  Where no standard is specified for such work or materials, they shall be of first class quality.

c.  **INSPECTION:**  Tenant has the right to inspect and approve all work performed by Landlord prior to acceptance of the Premises.  The Premises shall be delivered in broom-clean condition free of all rubbish and debris.

d.  **WARRANTIES:**  Except as otherwise provided herein, Landlord shall warrant all items for one (1) year, except for the roof which Landlord warrants for the duration of the Term of the Lease, or as otherwise specified in the Lease, and the HVAC system which Landlord warrants for a period of 1 year from Tenant's opening for business.  In addition, Landlord agrees to assign to Tenant any warranties it may receive from the manufacturer or installer of said items.

e.  **SIGNAGE:**  Upon commencement of Landlord's Work and until Tenant opens for business in the Premises, Tenant may post a sign in a prominent and visible location near the Premises that announces "**Coming Soon. TRADER JOE'S.**"  Tenant shall also be permitted to hang a "**Now Hiring**" banner.  The design of such sign, including the size of the letters, shall be such that it will be easily legible up to one hundred (100) feet away.

f.  **HIRING LOCATION:**  If available within the Shopping Center, Landlord shall provide an empty space, free of charge, for the use of Tenant's interviewing and hiring.  If no space is available within the Shopping Center, Landlord shall permit Tenant to install a temporary hiring facility (i.e. tent, trailer or prefabricated facility) directly in front of the Premises.

g.  **COMPLETION DOCUMENTS:**   Upon completion of Landlord's Work, Landlord shall provide to the Tenant:

  i.  A list containing the contact names, address and telephone number of all contractors performing Landlord's Work;

  ii.  One reproducible set of "**as-built**" drawings and;

  iii.  One set of "**as-built**" drawings in AutoCAD format

6.  **SCHEDULE:**

a.  **PROJECT TEAM MEETING:**  Within 5 days of execution of the Lease, Landlord and Tenant will schedule a project team meeting with Landlord, Landlord's Architectural, Engineering team  and (if selected) General Contractor to review this exhibit, overall project and Schedule.

C-14

b. **PROJECT UPDATES:** Landlord and Tenant will schedule regular project team meeting with Landlord, Landlord's Architectural and Engineering team and when selected General Contractor to review project and Schedule.

    i. Landlord shall submit biweekly construction progress photos showing overall site, roadwork improvements, interior and exterior building.

    ii. Landlord shall submit biweekly construction schedule updates specific to the delivery of the premises and progress of construction in and around the premises and site.

c. **NOTIFICATION OF DELIVERY:** Landlord shall notify Tenant, in writing, of the intended Delivery Date at least thirty days prior to the Delivery Date.

    i. **PUNCH LIST:** On or before the Delivery Date (or as otherwise agreed by the parties), Tenant or Tenant's representative shall walk the Premises with Landlord or Landlord's representative and create a punch list of those minor items which have not been completed in a satisfactory manner. A copy of this punch list will be provided to the Landlord. Landlord shall complete all outstanding items listed on the punch list within ten (10) business days of the Delivery Date. If after ten (10) days, Landlord has not completed the punch list items to Tenant's satisfaction, Tenant shall notify Landlord in writing, that Tenant shall complete the items on the punch list and deduct the costs and expenses incurred by Tenant from the Fixed Minimum Rent due under this Lease.

7. **CREDIT:** Work provided by Tenant and credited by Landlord (work/credit) to be finalized and paid within sixty (60) days of Certificate of Occupancy

8. **TRADER JOE'S VENDOR CONTACTS: No Substitutions Permitted**

| Item | Supplier | Contact | email | Phone |
|---|---|---|---|---|
| Roof Rails | Conn-Fab | Patricia Frates | pfrates@connfab.com | |
| Auto Doors | Storefront Door | Sam Travato | sam@sdoorinc.com | (714) 842-1337 |
| Roll Up Door | Dynamic | Bret Leveillee | bret@dynamic-dock-door.com | (800) 573-3625 |
| Door Hardware | Dynamic | Bret Leveillee | bret@dynamic-dock-door.com | (800) 573-3625 |
| Scissors Lift | Dynamic | Bret Leveillee | bret@dynamic-dock-door.com | (800) 573-3625 |
| Power Wall | CD Controls | John Stryker | johnstryker@cdcontrols.com | (706) 356 0325 |
| Power Wall (Western US) | Hill Phoenix | Tony Stockler | anthony.stockler@hillphoenix.com | (562) 577-1742 |
| HVAC Units | Lennox | Sarah Orwig | sarah.orwig@lennoxind.com | (972) 497-6717 |
| HVAC Units | Lennox | Eric Thordarson | eric.thordarson@lennoxind.com | (972) 571-4871 |
| HVAC Units | Munters | John Bardenhagen | John.Bardenhagen@munters.com | (210) 216-7882 |
| Electrical Power Transfer Switch | TAW | Buck Buckalew | buck.buckalew@tawinc.com | (954) 977-0202 x1727 |
| Energy Management System | R3 | Rick Ferguson | rickf@r3retailsolutions.com | (503) 419-6435 |
| Parking Lot Cart Corrals | Peggs | Amy Black | amy@thepeggscompany.com | (800) 242-8416 x202 |
| Mega Vaults (roof house) | Fiskio | Joe Trapani | jtrapani@fiskio.com | (800) 288-6816 |
| Utilities Contact | Trader Joe's | Astrid Anaya | aanaya@traderjoes.com | (857) 400-3372 |
| Vertical Transportation Consulting | VDA | M. Wade Smith | msmith@vdassoc.com | (973) 994-9220 |
| HVAC/Refrigeration Condensers | Trader Joe's | If heat rejection equipment for refrigeration and/or HVAC equipment will be other than rooftop air cooled, contact Trader Joe's | | |

C-15

32582I301.2

C-16

EXHIBIT "D"

## FORM OF MEMORANDUM OF LEASE

RECORDING REQUESTED BY,
AND WHEN RECORDED RETURN TO:

Trader Joe's Company
800 South Shamrock Avenue
Monrovia, CA 91016
Attn: Real Estate Department

MEMORANDUM OF LEASE

THIS MEMORANDUM OF LEASE is made and given this ___ day of _____, 2020, by QCM PARTNERS LLC, a Delaware limited liability company, hereinafter called "**Landlord**," and TRADER JOE'S COMPANY, a California corporation, hereinafter called "**Tenant**".

WITNESSETH:

1.      Landlord leases to Tenant and Tenant leases from Landlord certain retail space (the "**Premises**"), pursuant to that certain Lease dated of even date herewith (the "**Lease**") which Premises are approximately illustrated on the Site Plan attached as Exhibit "**B**" to the Lease. Capitalized terms used in this Memorandum but not defined shall have the meaning given in the Lease.

2.      The Premises is part of the Shopping Center, the portion of which that is owned by Landlord being legally described on Exhibit "**A**" attached hereto and by this reference incorporated herein (the "**Shopping Center**").

3.      The Lease provides for a Primary Term of ten (10) years, commencing at the time specified in the Lease, with options to extend the Primary Term for four (4) additional periods of five (5) years each.

4.      Landlord has granted to Tenant certain rights over the "**Common Area**" of the Shopping Center (as such term is defined in the Lease).

5.      Landlord has agreed that none of the space located in the "**Tenant Control Area**" depicted on Exhibit "**B**" to the Lease shall be occupied by any of the following uses without Tenant's prior written consent: offices (except as an incidental use to a permitted retail or commercial business); entertainment or recreational facility, including, but not limited to, a restaurant, bar, pub, nightclub, music hall, disco, banquet hall, auditorium, bowling alley, skating rink, theater, billiard room, health or beauty spa, gymnasium (including, but not limited to, exercise, dance, martial arts, Pilates, yoga, spin or similar fitness studio), massage parlor or tanning

D-1

parlor, amusement arcade, children's play gym facility (including those similar to "**My Gym**" or "**Gymboree**"), establishment catering to birthday parties (such as a "**Chuck E. Cheese**" or "**Sandy Deck's**") or other place of public amusement; training facility or educational facility, including, but not limited to, a beauty school, barber college, reading room, place of instruction, or any other operation catering primarily to students or trainees rather than to customers; self-storage facility; place of worship, or a community gathering place (collectively, "**Prohibited Uses**"). Notwithstanding the foregoing, uses existing for other tenants or occupants of the Shopping Center as of the Effective Date, which tenants are listed on **Exhibit "K"** of the Lease (the "**Existing Tenants**"), as well as Pads P, Q and R (as shown on **Exhibit "B-1"** to the Lease) can continue to be utilized by such Existing Tenants and replacement tenants to Existing Tenants (and their successors and assigns) occupying the same location and no more Floor Area as the replaced Existing Tenant without constituting a violation of the Prohibited Uses. It is the intent of this provision that the parking and other Common Area within the Tenant Control Area should not be burdened by either large scale or protracted use. The term "**restaurant**" shall not apply to a fast or quick food operation, bagel shop, juice shop, yogurt store, sandwich shop, coffee shop (such as, a Starbucks or a Peet's) or other similar specialty type of food or beverage store, occupying less than or equal to Two Thousand Five Hundred (2,500) square feet of Floor Area individually for any single use or Seven Thousand Five Hundred (7,500) square feet of Floor Area in the aggregate.

6.      Landlord has agreed that unless Tenant has ceased to operate its business on the Premises for one hundred eighty (180) consecutive days or more (excluding Permitted Closures or due to Landlord's actions), Landlord shall not sell, operate or lease (or permit to be sold, operated or leased) any portion of the Shopping Center for use as: (A) a flea market, check cashing operation (other than as part of bank operations), thrift shop, pawn shop, dollar-type store (other than one (1) Five Below store), second-hand store or store selling used merchandise, consignment store, or clearance center (except for upscale or high-end resale shops such as Game Stop and My Sister's Closet); (B) a funeral home; (C) a facility for the sale of paraphernalia for use with illicit drugs; (D) a facility for the sale or display of pornographic material (as determined by community standards for the area in which the Premises are located), but this shall not extend to a full line first-class book store such as Barnes & Noble or to a first-class movie theatre; (E) an off-track betting parlor; (F) a carnival, amusement park, circus, tent sale, pumpkin patch, Christmas tree lot except within the "**Permitted Xmas Lot Zone**" depicted on **Exhibit "B"** to the Lease or "**farmer's market**"; (G) a facility for the sale or storage of new or used motor vehicles, trailers or mobile homes; (H) a facility for any use which is illegal or dangerous or constitutes a nuisance; (I) a cigarette, cigar or smoke shop or any other store with a primary business of selling tobacco products and/or accessories; (J) a marijuana dispensary or store; (K) an addiction treatment clinic or a space in which meetings are conducted in connection with addictions or recovery therefrom; (L) a homeless shelter, soup kitchen, not-for-profit restaurant (such as Panera Cares), or such other use catering to the needs of the homeless or indigent population; (M) a gas or fuel station; or (N) a self-service parcel delivery pick-up location (such as Amazon Lockers, The Hub or Buffer Box) (collectively, "**Noxious Uses**"). Notwithstanding the foregoing, uses existing for Existing Tenants (but not their replacements) can continue to be utilized by such Existing Tenants (and their successors and assigns) without constituting a violation of the Noxious Uses. Except to the extent prohibited under the Target OEA, the Noxious Uses described in Section 6(b)(ii) to the Lease shall

D-2

not be applicable to the premises identified on **Exhibit "B"** to the Lease as "**Target**" (the "**Target Parcel**").

(x)     Landlord has agreed that excluding Target, Dollar Tree, Bed Bath & Beyond, Total Wine and Bev Mo, so long as there is not in existence and continuing any uncured Event of Default and so long as Tenant is conducting business operations with the Premises for the Grocery Use (subject to Permitted Closures), Landlord and its affiliates shall not sell or lease or enter into other occupancy agreements (including, without limitation, licenses) premises within the Shopping Center to (i) a direct competitor of Tenant's, such as Sprouts, Whole Foods, Dean and Deluca, or Natural Grocer's, and/or (ii) a tenant whose primary use is the sale of groceries (without regard to whether such tenant also sells alcoholic beverages) (the "**Landlord Covenant**"). Tenant acknowledges that the Landlord Covenant expressly excludes Target, Dollar Tree, Bed Bath & Beyond, Total Wine and Bev Mo. Tenant acknowledges further that Tenant has not been granted an exclusive right to conduct the Grocery Use in the Shopping Center. The foregoing covenant is not binding upon any other tenant or occupant of the Shopping Center and such tenants may change use even if such use is for use described in clause (i) and/or (ii) of the Landlord Covenant. Landlord has agreed that the Landlord Covenant shall apply to any future expansion of the Shopping Center. Landlord has warranted and represented that Landlord has granted no exclusive to tenant or occupants of the Shopping Center whose premises contain ten thousand (10,000) square feet or more of Floor Area and Landlord has expressly covenanted and agreed that at no time during the Term shall Landlord grant any exclusive use in favor of any other tenant or occupant of the Shopping Center whose premises contain ten thousand (10,000) square feet or more of Floor Area. Landlord has agreed that except as set forth in this Lease and/or the Target OEA, Tenant is not and shall not be subject to any limitations whatsoever on its use of the Premises or its operations for the Grocery Use, and any exclusive granted to other tenants or occupants of the Shopping Center shall not be binding or effective against or in any way affect the Grocery Use or the Premises.

7.     Other terms and conditions pertaining to the Lease are set forth in the Lease, which is incorporated herein by this reference.

8.     This Memorandum may be executed in any number of counterparts, each of which shall be deemed as original, but all of which together shall constitute one in the same agreement.

9.     This Memorandum is a short form for recording purposes only, and is not a complete summary of the Lease. In the event of any inconsistency between the terms of this Memorandum and terms of the Lease, the terms of the Lease shall prevail.

[SIGNATURES ON NEXT PAGE]

D-3

IN WITNESS WHEREOF, the undersigned have executed this Memorandum as of the day and year first above written.

Landlord

**QCM PARTNERS, LLC,**
a Delaware limited liability company

By:   Vestar NM Retail Acquisitions, LLC,
a Delaware limited liability company, its sole member

      By:   The Northwestern Mutual Life Insurance
Company, a Wisconsin corporation, a member

          By:   Northwestern Mutual Investment Management
Company, LLC, a Delaware limited liability company,
its wholly-owned affiliate

              By:  _____

                  _____
                  Managing Director

By:   Vestar Retail Acquisitions Manager, LLC,
a Delaware limited liability company, a member

      By: _____
      Name: _____
      Title: _____

Tenant

TRADER JOE'S COMPANY,
a California corporation

By_____
      Bryan Palbaum
      President

D-4

State                     )
                          ) ss.
County of                 )


On _____, 2020, before me, _____ Notary Public, personally appeared _____, known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.


WITNESS, my hand and official seal.


Signature _____

                                                    (Seal)

---

### ACKNOWLEDGMENT

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.


State of California          )
                             ) ss.
County of Los Angeles        )


On _____, 2020, before me, _____, Notary Public, personally appeared Bryan Palbaum, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.


WITNESS my hand and official seal.


Signature _____

                                                    (Seal)

D-5

EXHIBIT A TO MEMORANDUM OF LEASE

Legal Description of the Portion of the Shopping Center Owned by Landlord

Lots 3, 7, 8, 10, 11, 12, 14, 15, 16, 18, 20, 22 and Tracts A and B of Queen Creek MP-Phase 1, shown by Map on file in Book 827, Page 27 of Maps, official records of Maricopa County, Arizona.

D-6

EXHIBIT "E"

**FORM OF SNDA**

RECORDING REQUESTED BY
AND WHEN RECORDED RETURN TO:

Trader Joe's Company
800 South Shamrock Avenue
Monrovia, CA 91016
Attn: Real Estate Department

SUBORDINATION, NONDISTURBANCE AND ATTORNMENT AGREEMENT

THIS SUBORDINATION, NONDISTURBANCE AND ATTORNMENT AGREEMENT (the "**Agreement**"), dated the _____ day of _____, by and between _____, a _____ (hereinafter called "**Lender**"), _____, a _____ (hereinafter called "**Landlord**") and TRADER JOE'S COMPANY, a California corporation (hereinafter called "**Tenant**").

WITNESSETH:

WHEREAS, Tenant and Landlord have entered into that certain lease (the "**Lease**") dated _____ pertaining to certain premises within the real property described on Exhibit "A" attached hereto and by this reference incorporated herein (the "**Shopping Center**"); and

WHEREAS, Lender has made [or has agreed to make] a loan, which loan is secured by, among other things, that certain Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing, recorded as Document Number _____, in the office of the _____ County Recorder (the "**Deed of Trust**"); and

WHEREAS, Tenant wishes to be assured of its continued use and occupancy of the Shopping Center including the Common Area (as defined in the Lease) under the terms of the Lease, notwithstanding any breach or default by Landlord or the exercise of any remedies under the Deed of Trust.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is hereby agreed as follows:

1.    SUBORDINATION. The Lease is and shall be subject and subordinate to the lien of the Deed of Trust referenced above, and to all renewals, modifications, consolidations,

E-1

325821301.2

replacements and extensions thereof (collectively, the "**Deed of Trust**"). Notwithstanding the foregoing subordination or the terms and provisions contained in the Deed of Trust to the contrary, Lender agrees that all condemnation awards and proceeds of insurance affecting the Shopping Center or any of Tenant's interests under the Lease shall be used, distributed and applied in the manner provided in the Lease. In no event shall any of Tenant's trade fixtures, inventory, equipment, furniture and furnishings, accounts, books or records or other assets be or become subject or subordinate to the lien in favor of Lender.

2.      NONDISTURBANCE. Tenant's possession, use and enjoyment of the Premises and the Shopping Center shall not be interfered with, disturbed or diminished, or otherwise affected in any manner as a result of any act or omission of Landlord, or any exercise of any remedies under the Deed of Trust, including a Foreclosure (as defined below) and all rights and privileges of Tenant under the Lease, and any renewals, modifications, or extensions thereof, shall be recognized by Lender and any Successor Landlord (as defined in Paragraph 3 below). As used in this Agreement, "**Foreclosure**" means any non-judicial or judicial foreclosure or other enforcement of the remedies of the Deed of Trust, or any deed or other transfer in lieu thereof. Lender shall not join Tenant as a party in any Foreclosure unless such joinder shall be required by law and Tenant shall not thereby be subjected or exposed to any liability, cost or expense, and such joinder shall not result in the termination of the Lease or disturb Tenant's possession or use and enjoyment of the Premises.

3.      ATTORNMENT. In the event of Foreclosure or other conveyance under the Deed of Trust, the Shopping Center shall be conveyed subject to the Lease and this Agreement, and Tenant agrees that it shall attorn to and recognize any purchaser at a foreclosure sale under the Deed of Trust, and any transferee who acquires the Shopping Center by deed in lieu of foreclosure or any other realization proceeding (a "**Successor Landlord**"), as its landlord under the Lease upon the same terms and conditions set forth in the Lease, and, in such event, Successor Landlord shall be bound as landlord under the Lease to Tenant under all the terms, covenants and conditions under the Lease.

4.      PERFORMANCE BY TENANT. In the event that Tenant receives any notice from Lender or any Successor Landlord to pay rent or other sums or render any other performance under the Lease to such Lender or Successor Landlord, Tenant may render performance in accordance with such notice without any duty of inquiry and despite any knowledge or notice to the contrary with the same force and effect as if such payment or performance were rendered to Landlord, and Landlord hereby releases and discharges Tenant of and from any liability to Landlord resulting from Tenant's payment of such rent to Lender or any Successor Landlord in accordance with this Agreement or Lender's or any Successor Landlord's notice or instructions from Lender or any Successor Landlord.

5.      SUCCESSOR LANDLORD LIABILITY.  In the event of Foreclosure or other conveyance under the Deed of Trust, Tenant shall have the same remedies against Successor Landlord for the breach of any agreement contained in the Lease that Tenant might have had under the Lease against Landlord, provided, however, Lender as a Successor Landlord shall not be:

E-2

(a)    liable for any act or omission of any prior landlord (including Landlord), except to the extent such act or omission is continuing at the time Lender acquires title to the Shopping Center or unless Tenant shall have given notice of such act or omission to Lender (whether or not Lender elected to cure or remedy such act or omission);

(b)    subject to any offsets or defenses which Tenant might have against any prior landlord (including Landlord) except to the extent the condition under which such offset or defense arose is continuing at the time Lender acquires title to the Shopping Center or unless Tenant shall have given notice of the state of facts or circumstances under which such offset or defense arose to Lender (whether or not Lender elected to cure or remedy such act or omission), provided, however, Lender shall be subject to offsets that are expressly permitted in the Lease;

(c)    bound by any rent or additional rent which Tenant might have paid for more than the current month to any prior landlord (including Landlord) except to the extent such advance rent or additional rent is expressly required under the Lease;

(d)    bound by any security deposit which Tenant may have paid to any prior landlord (including Landlord), unless such deposit is received by or available to Lender or party who was the holder of the Deed of Trust at the time of a Foreclosure or other conveyance under the Deed of Trust; or

(e)    bound by any amendment or modification of the Lease made without Lender's consent, unless such amendment or modification was subsequently affirmed by Lender (amendments or modifications that are expressly provided for in the Lease shall be excluded from this Paragraph 5(e)).  Lender's failure to approve or disapprove any proposed amendment or modification within fifteen (15) days after request shall be deemed approval of such amendment or modification by Lender.

6.    GOVERNING LAW. The laws of the state in which the Shopping Center is located shall govern the validity, performance and enforcement of this Agreement.

7.    SUCCESSORS AND ASSIGNS.  The covenants, terms and conditions of this Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective heirs, executors, administrators, personal representatives, successors, and assigns.

8.    NOTICES. Any notice required or permitted to be given hereunder shall be in writing and may be served personally, or by certified mail, return receipt requested, or by reputable overnight delivery service (with proof of receipt available) addressed to the parties at the following addresses:

TENANT:                Trader Joe's Company
                       800 S. Shamrock Avenue
                       Monrovia, CA  91016
                       Attn:  Real Estate Department

E-3

With A Copy to (which shall not constitute notice):

realestateteam@traderjoes.com

LENDER:
_____
_____
_____
_____

Each party may designate a different address for the receipt of notices by providing written notice thereof to the other party.

9.    ATTORNEYS' FEES.  If there is any litigation between either of the parties to this Agreement to enforce or interpret any provisions hereof or rights arising hereunder, the losing party in such litigation, as determined by the court, shall pay to the prevailing party, as determined by the court, all costs and expenses, including, without limitation, reasonable attorneys' fees, incurred by the prevailing party in connection with such litigation, with such attorneys' fees to be determined by the court sitting without a jury.

10.    NOTICE OF DISCHARGE.   Lender shall give notice to Tenant of the reconveyance or other release of the Deed of Trust within thirty (30) days of the date the reconveyance or other release is recorded. Upon such reconveyance or other release, this Agreement shall be of no further force or effect.

11.    MODIFICATION.  This Agreement shall not be modified, altered, changed or amended in any manner other than by a written agreement signed by the parties hereto or their respective successors in interest.

12.    AUTHORITY; CAPACITY.  Each party to this Agreement covenants, warrants and represents that it has full right, power and authority to enter into this Agreement and each person signing this Agreement covenants, warrants and represents that such person has the power and due authority to execute this Agreement in the capacity stated and to bind the entity for which such person is signing.

*[Signature Page Follows]*

E-4

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on this \_\_\_\_ day of _____, 2020.


<u>LENDER</u>

_____

By:_____
Its:_____


<u>TENANT</u>

TRADER JOE'S COMPANY,
a California corporation

By_____
        Mitchell Nadler
        SVP/Chief Financial Officer


<u>LANDLORD</u>

_____
a_____

By: _____
Name:_____
Its:_____

E-5

State                         )
                              ) ss.
County of                     )

On _____ ____, 2020, before me, _____ Notary Public, personally appeared _____, known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS, my hand and official seal.

Signature _____

                                                    (Seal)

---

## ACKNOWLEDGMENT

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California           )
                              ) ss.
County of Los Angeles         )

On _____, 2020, before me, _____, Notary Public, personally appeared Mitchell Nadler, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____

                                                    (Seal)

E-6

State                          )
                               ) ss.
County of                      )


On _____ ____, 2020, before me, _____ Notary Public, personally appeared _____, known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.


WITNESS, my hand and official seal.


Signature _____

                                                          (Seal)

E-7

EXHIBIT "A"

## LEGAL DESCRIPTION OF THE SHOPPING CENTER
### ENCUMBERED BY THE DEED OF TRUST

Lots 3, 7, 8, 10, 11, 12, 14, 15, 16, 18, 20, 22 and Tracts A and B of Queen Creek MP-Phase 1, shown by Map on file in Book 827, Page 27 of Maps, official records of Maricopa County, Arizona.

325821301.2

325821301.2

F-1

EXHIBIT "F"

SHOPPING CENTER SIGN CRITERIA









**C O M P R E H E N S I V E   S I G N   P L A N**

Version 6.0   March, 2006

3258213012



## General Requirements
## Signage

These criteria have been established for the purpose of maintaining a continuity of quality and aesthetics throughout Queen Creek Marketplace for the mutual benefit of all tenants, and to comply with the approved Comprehensive Sign Plan for the development, operations of the Town of Queen Creek Sign Ordinance, building and zoning codes of any governmental authority having jurisdiction over the sign, and any required panel signs installed by a tenant shall conform to the provisions of the Comprehensive Sign criteria. In addition to the above criteria, any required signs installed by the Tenant shall conform to the provisions of the Comprehensive Sign Plan as well as be subject to the standards and the criteria outlined below.

### I. GENERAL REQUIREMENTS

A. Tenant shall submit or cause its installation to Developer for approval, prior to fabrication, two sets of detailed drawings indicating the location, size, layout, design, color, outline or illumination, materials and method of attachment of Tenant's building mounted signage.

B. Tenant or Tenant's representative shall obtain all required permits for sign and its installation.

C. All lettering, logos and signage attachment shall be manufactured and installed by Developer's designated sign contractor. Tenant shall provide electronic artwork suitable for production to Developer's sign contractor who will produce Tenant's signage on their behalf. Tenant shall reimburse Developer for all sign approved costs incurred prior to the term of their lease agreement.

D. Tenant shall be responsible for the installation of all its elements and locations including those of the local municipality.

E. All signs shall be reviewed for conformance with these criteria and overall design quality. Approval or disapproval of sign submittals based on aesthetics of design, shall remain the sole right of Developer or Developer's authorized representative.

F. Tenant shall be responsible for the installation and maintenance of Tenant's sign. Should Tenant fail to properly maintain or repair, restore or keep such sign or sign tenant thereafter shall repair under written cost.

right corner of each. Should a sign fail to include the name, Developer may add the proper cost to tenant staff work. See "such parts of the obligations of assignment's service.

C. Adequate devices such as attachment blocks, panels, mountain and flags shall not be permitted except as temporary items and may be permitted to service a required space, or secured site. Temporary or removal or boxing of such in a required by the Developer prior to installation of Tenant. If required by the Tenant to service, discoloration damages prior to installation.

### II. SPECIFICATIONS: TENANT BUILDING SIGNAGE

A. General Specifications

1. Reasonable, having a maximum signs shall be provided.

2. All signs including their body signs and other functions shall comply as will remain in Queen Creek's building and electrical codes.

3. No exposed raceways, crossovers or conduit shall be permitted unless a special circumstance exist that justifies the exposure to otherwise be installed will hem the use/color shall remain of prohibition. All such logo-related text, the building's wall elements. Any external sign discouraged; however, may be approved in part to the Tenant is not overly recognized or remain in maximum size or agent. Sign signage shall not remain registration and text, unless all text or text was used to distance a tenant's or store unless part of the Tenant's nationally recognized corporate identification program. The Moreover shall have the use are separate secured or approved by and/or varying any provision of those specifications.

4. All anchors, electrical, transformers and other equipment shall be concealed wherever possible.

5. Company's signs and banners and painted etching shall not be permitted across an approach by the Developer and/or the Team of its own cost.

6. Any damage to a wall surface or roof deck resulting from Tenant's sign installation shall be resolved at Tenant's sole cost. Should Tenant fail to do the same, Developer may undertake repairs and leave at its behalf Developer and its costs from the date of the payment notice.

7. Signs or issues that may apply to Tenant only damage that all service and architectural elements shall be resolved at Tenant's cost. Should Tenant fail to do the same, Developer may undertake repairs and Tenant shall reimburse Developer within ten (10) days from receipt of Developer's notice.

B. Location of Signs

3258213012

F-3

IV.   GENERAL CONSTRUCTION REQUIREMENTS

A.   [illegible text]

B.   [illegible text]

C.   [illegible text]

D.   [illegible text]

E.   [illegible text]

F-4

325821301.2

F-5



**Freestanding Signage and Wayfinding System**



F-7



## Freestanding Sign Matrix

| SIGN | SIGN TYPE | FUNCTION | LOCATION | QUANTITY | HEIGHT | SIZE | ILLUMINATION | MATERIALS |
|---|---|---|---|---|---|---|---|---|
| SIGN TYPE 1.1 Primary Entry Feature Wall | Wall Feature | Center Identification | Intersection of Ellsworth Road and Rittenhouse Road | 1 | Primary Entry Feature | 100 SF of Center Identification | Internal and/or ground Illumination | Masonry, Stucco, Textured Aluminum, Powder Coat and Acrylics |
| SIGN TYPE 1.2, 1.3, 1.4 & 1.5 Entry Feature Wall | Wall Feature | Center Identification | Cluster - Rural Project Entrance and Rittenhouse Road Project Entrance | 4 | Entry Feature | 50 SF of Center Identification | Internal and/or ground Illumination | Masonry, Stucco, Textured Aluminum, Powder Coat and Acrylics |
| SIGN TYPE 1.6 & 1.7 Entry Feature Wall | Wall Feature | Center Identification | Two of Property along Ellsworth Road and Intersection of Ellsworth Road and Victoria Lane | 2 | Entry Feature | 25 SF of Center Illumination | Internal and/or ground Illumination | Masonry, Stucco, Textured Aluminum, Powder Coat and Acrylics |
| SIGN TYPE 2 Multi-Tenant Monument Sign | Monument | Multi-tenant identification | Phase along Ellsworth Road and Rittenhouse Road | Ellsworth Road (3) Rittenhouse Road (3) | Between (10) feet in top of the wall to each side of architectural embellishments | 150 SF Tenant Sign Area exclusive of Architectural Embellishments | Internal and/or ground Illumination | Masonry, Stucco, Textured Aluminum, Powder Coat and Acrylics |
| SIGN TYPE 3 Pad Monument Sign | Monument | Pad tenant identification | Phase along Ellsworth Road and Rittenhouse Road | Ellsworth Road (3) Rittenhouse Road (3) | Seven (7) feet to top of the wall to each side of architectural embellishments | 50 SF Tenant Sign Area exclusive of Architectural Embellishments | Internal and/or ground Illumination | Masonry, Stucco, Textured Aluminum, Powder Coat and Acrylics |
| SIGN TYPE 4 Vehicular Directional Sign | Monument | Vehicular Direction | Phase throughout the Project Site | tbd | Six (6) feet from a height exclusive of architectural embellishments | 5 SF Directional Sign Area exclusive of Architectural Embellishments | Non Illuminated | Tool and Aluminum, Powder Coat and Industrial Vinyl |
| SIGN TYPE 5 Pedestrian Directory | Kiosk | Pedestrian Direction - Site Visit Reinforcement | Phase throughout the Project Street Pedestrian Locations | tbd | Nine (9) feet height to the top of the architectural embellishment | 25 SF of Sign Area of each Sign Area exclusive of Architectural Embellishments | Internal and ground Illumination | Tool and Aluminum, Powder Coat and Acrylics |

325821301.2

F-8



ST-1.1
Primary Center ID Sign / Entry Feature – Scale: NTS






325821301.2

F-9



**ST-1.2, 1.3, 1.4 & 1.5**
Secondary Center ID Sign / Entry Feature - Scale: 3/8"=1'-0"





325821301.2

F-10



## ST-1.6 & ST-1.7
Tertiary Center ID Sign / Entry Feature  · Scale: 1/4" = 1'-0"





325821301.2

F-11



Side Elevation                    Front Elevation



325621301.2

F-12



7'-5"

7'-0"

5'-0"

PAD
TENANT
5'-0" x 7'-0"

- 2'-6' -
Side Elevation

1'-4"
Front Elevation



325821301.2

F-13



ALUMINUM CABINET / POLE COVER TEXTURED AND PAINTED

ALUMINUM PANEL PAINTED

WHITE REFLECTIVE VINYL LETTERING






325821301.2

F-14

## 3 SIDED - 3 POST - PEDESTRIAN DIRECTORY

ISOMETRIC VIEW



### SPECIFICATIONS

**MATERIAL**

**LIGHT BOX SECTION / AL. DOOR / FRAMES**

**UPRIGHT TUBING**

**ATTACHMENT OF TUBES TO LIGHT BOX**

**ELECTRICAL FEED**

**GRAPHICS SIZE**

**VISUAL OPENING**

**HARDWARE**

**COLORS**



## FOOT PRINT - 3 SIDED - 3 POST - DIRECTORY SIZE
SCALE: 1/2" = 1'-0"

## DIRECTORY UNIT FURNISHED BY VIACOM



bleter
INDUSTRIES

51-5

325821301.2

F-15



**Building Signage and Thematic Image Graphics**

325821301.2

F-16



## Building Sign Matrix
## Major Tenants

| SIGN | SIGN TYPE | FUNCTION | LOCATION | HEIGHT | SIZE | ILLUMINATION | MATERIALS |
|---|---|---|---|---|---|---|---|
| Major Tenant with occupancy of 50,000 SF or greater | Wall Mounted Sign | Tenant identification | Storefront Interior Elevation | Maximum Letter Height, Per Sign Criteria | 1.50 SF / Linear Foot of Building; Store Frontage or Length in Line With Frontage Facade (Typical) | Internally Illuminated or Halo Illuminated | Aluminum, Plastic, Painted Metal, Return Style, etc. |
| Major Tenant with occupancy greater than 10,000 SF through 49,999 SF | Wall Mounted Sign | Tenant identification | Storefront Interior Elevation | Maximum Letter Height, Per Sign Criteria | 1.50 SF / Linear Feet of Building; Store Frontage or Length in Line With Frontage Facade (Typical) | Internally Illuminated or Halo Illuminated | Aluminum, Plastic, Painted Metal, Return Style, etc. |
| Major Tenant with occupancy 9,999 SF or less | Wall Mounted Sign | Tenant identification | Storefront Interior Elevation | Maximum Letter Height, Per Sign Criteria | 1.50 SF / Linear Feet of Building; Store Frontage or Length in Line With Frontage Facade (Typical) | Internally Illuminated or Halo Illuminated | Aluminum, Plastic, Painted Metal, Return Style, etc. |
| All Major Tenants | Under Canopy/Blade Sign (Optional) | Tenant identification | Interior Elevation Canopy Area | Below and Parallel to Canopy; Minimum 8' Clearance Area | 16+ | Not Illuminated | Aluminum, Plastic, Painted Metal, Wood, etc. |

*Comprehensive Sign Plan subject to Town of Queen Creek approval as part of a PAD*

32582130.2

**F-17**

Majors and sub-tenants occupying less than 9999 SF shall be limited to a maximum letter height of thirty-six (36") inches exclusive of logos

Majors occupying 10000 SF through 29999 SF shall be limited to a maximum letter height of sixty (60") inches exclusive of logos.

Majors occupying greater than 30000 SF shall be limited to a maximum letter height of seventy-two (72") inches exclusive of logos.

A national retailer shall be permitted to use their standard corporate identification program subject to any small limitations contained in the approved Comprehensive Sign Plan

All signage shall be reviewed and approved by the developer and shall be appropriate to the surrounding building features, environment and overall design of Queen Creek Marketplace

Developer shall have sole and separate discretion in approving any provision of these specifications

Signage as illustrated to depict typical placement. Actual sizes and locations will be determined by tenant's corporate identification standards
In accordance with criteria established as part of the approved



TYPICAL BUILDING SIGNAGE - MAJOR TENANT



TYPICAL MAJOR TENANT ELEVATIONS







325821301.2

F-18



## Building Sign Matrix
## Shop Tenants

| SIGN | SIGN TYPE | FUNCTION | LOCATION | HEIGHT | SIZE | ILLUMINATION | MATERIALS |
|---|---|---|---|---|---|---|---|
| Shop Tenants | Wall Sign | Tenant ID | Wall surface and architectural features (height / proportionally align) | Wall building elevation | 1.5 x tenant unit of building front frontage (typical). 50 SF Maximum (Signage Per tenant). Elevation Over 50 with 3 tenants / floor. 30' Maximum sign height per tenant, floor. | Halo, Backlit and Channel letters | Aluminum, Acrylic, Painted Metal, Exposed Neon |
| Shop Tenants | Under Canopy, Blade Sign, Pedestrian | Tenant ID | Below entrance canopy | Below entrance canopy, minimum 8' clearance | ± 8' | Not illuminated | Aluminum, Acrylic, Painted Metal, Vinyl Graphics |

*Comprehensive Sign Plan subject to Town of Queen Creek approval as part of a PAD*

325823301.2

F-19

Shop tenants occupying less than 9999 SF shall use minor combination letter height of thirty-six (36") inches exclusive of logos.

A national retailers shall be permitted to utilize their standard corporate identification program subject to sign area limitations outlined in the approved Comprehensive Sign Plan.

All signage shall be reviewed and approved by the developer and shall be appropriate to the surrounding building features, environment, and thematic design of Queen Creek Marketplace.

Developers shall have sole and separate discretion in any sign approval per all of these specifications.

Signage is illustrated to depict typical placements. Actual sizes and locations will be determined by tenants corporate identification standards in accordance to criteria established as part of the resubmittal.



TYPICAL BUILDING SIGNAGE  SHOP TENANTS



SHOPS TENANT ELEVATION CHARACTER











325821301.2

F-20



## Sign Matrix
## Pad Tenants

| SIGN | SIGN TYPE | FUNCTION | LOCATION | HEIGHT | SIZE | ILLUMINATION | MATERIALS |
|------|-----------|----------|----------|--------|------|--------------|-----------|
| Pad Tenant | Bic Sign | Identify | Calcolase and of all compatible or desired to a use model, signage | Calculated per tenant | 1 ½ S.F. total area of leading direct frontage (lineal). At Minimum square. 55' Maximum Letter Heart bank for all logos | Internal, Back lit, or A combination thereof | Aluminum & metal face fabric, Plexel, Metal |
| Pad Tenant | Under Canopy/blade type (optional) | Identify | At bend of areas behind tenant | Below entrance canopy, Maximum 8' clearance at 7' | 6 SF | Non-illuminated | Aluminum acrylic. Plexel Vinyl graphics |
| Pad Tenant | Storefront | Identify business and name | Front End | At Front of Canopy Storefront Overhang | At Front of Canopy Storefront Overhang | Internal, Ground Illumination | Aluminum acrylic. Plexel, Metal Wood |
| Pad Tenant | Directional | Direct | Driveways and Drive Isles at Required | At Front of Store Signs Right of Entrance | At Front of Store Signs General | Internal, Ground Illumination | Aluminum, acrylic, Fabric Metal Plexel, Wood |
| Pad Tenant | ADA | ADA | Seating Transition | At Front of Store/Overhang or back | At Front of Store/Overhang or back | Internal Ground Illumination | Aluminum acrylic. Plexel, Metal Plexel, Wood/li |

Comprehensive Sign Plan subject to Town of Queen Creek approval as part of a PAD

325821301.2

F-21

All national retailers shall be permitted to utilize the standard corporate identification program subject to sign area limitations contained in the approved Comprehensive Sign Plan.

All signage shall be reviewed and approved by the developer and shall be appropriate to the surrounding building features, environment, and thematic design of Queen Creek Marketplace.

Developer shall have sole and separate discretion in verifying and provision of these prescriptions.

Signage listed above indicates typical placement, but the sizes and locations will be determined by tenant's corporate identification standards in accordance to criteria established as part of the associated submittal.



TYPICAL BUILDING SIGNAGE - PAD TENANTS




PAD TENANT ELEVATION CHARACTER







3258213012

F-22



5' 0" B GUINNE1

2-0" COPY AREA

TENANT

1' 8"

1' 4" SIGN PANT

1'-1" COPY AREA

4' 0"

D'N BLADE SIGN - ELEVATION
SCALE 1-1/2"-1'-0"

END VIEW
SCALE 1/1 Pa 0"

Insert copy to be FCO 1/4" thick acrivic™ or aluminum
Tenant copy to be centered per tenant's corporate colors and flush mounted to background
Developer approval required for all updates


Vestar


Bd
INDUSTRIES


bleler
INDUSTRIES


BS-1

325821301.2

EXHIBIT "F-1"

TENANT'S SIGN PLANS

# TRADER JOE'S

## Exterior Signing Package

Store #286
21398 S. Ellsworth Loop
Queen Creek, AZ 85142

October 17, 2019
January 20,2020

Approval subject to conformance of all requirements on sign criteria that are not specified on the drawing unless otherwise noted.
☒ Approved
☐ Approved As Noted
☐ Please Revise and Resubmit
1/22/20
Signature Date
VESTAR

F-1-1

CONTINENTAL SIGNS 7541 Santa Rita Circle, Unit D, Stanton, CA 90680 • Tel: (714) 894-2011 • Fax: (714) 897-0660 • www.continentalsigns.com
© 2019



SITE PLAN

3258213O1.2

F-1-3

17'-4"
5"
A
3'-0"
3'-0"
TRADER
JOE'S
SIGNS A B & C

INDIVIDUAL CHANNEL LETTERS, INTERIOR ILLUMINATION, THREE (3) SETS REQUIRED

66.5 Sq Ft. EACH

Scale: 1/4"=1'-0"

"TRADER JOE'S:
BACKING OF LETTERS TO BE .063 ALUMINUM W/ RETURNS .040 ALUMINUM.
FACES TO BE RED #2793 PLEX & 1" BRONZE TRIMCAP EDGES.
RETURNS TO BE DK. BRONZE ACRYLIC POLYURETHANE ENAMEL FINISH.
FACE ILLUMINATION TO BE RED LOW VOLTAGE LED SYSTEM.

*NOTE: 120V ELECTRICAL SERVICE TO SIGNS SHALL BE SUPPLIED
BY GENERAL CONTRACTOR

5" DP
ALUMINUM RETURNS
W/ U.L. LABEL ATTACHED
CONCRETE BLOCK
BUILDING WALL
WATERPROOF FLEXIBLE
CONDUIT
LOW VOLTAGE CABLE
ALUMINUM RACEWAY
OR TRANSFORMER BOX
12 VOLT LED SYSTEM
(UL APPROVED)
DISCONNECT SWITCH
ACRYLIC SIGN FACE
12 VOLT LED
TRANSFORMER
(UL APPROVED)
DRAIN HOLES (TYP) W/LIGHT
DEFLECTORS
UNINTERRUPTED TO
HOUSE GROUND
1/4" X 1 1/2" NYLON ANCHOR
MIN. OF 5 TO 6 PER LTR EACH.

SECTION DETAIL NOT TO SCALE (A)

CONTINENTAL SIGNS

7541 Santa Rita Circle, Unit D
Stanton, CA 90680
Tel: (714) 894-2011
Fax: (714) 897-0860
www.continentalsigns.com

State Lic #: 664525

PROJECT NAME:
Trader Joe's #288

LOCATION:
21398 S. Ellsworth Loop
Queen Creek, AZ 85142

DATE: 17Oct19

DESIGN NUMBER:

SCALE:

REVISIONS:

CUSTOMER APPROVAL DATE

LANDLORD APPROVAL DATE

CONCEPTUAL DRAWING ONLY:
All dimensions are approximate & may change due to construction factors or exact field conditions. Colors shown are as close to printing will allow, always follow written specifications.

V# 1.0

©2019 THIS DESIGN / DRAWING IS THE EXCLUSIVE PROPERTY OF CONTINENTAL SIGNS INC. AND CANNOT BE REPRODUCED EITHER IN PART OR WHOLE WITHOUT WRITTEN CONSENT FROM CONTINENTAL SIGNS INC.



SOUTH ELEVATION

Scale 3/32"=1'-0"



WEST ELEVATION

SIGN Ⓑ

Scale: 3/32"=1'-0"

325821301.2

F-1-6



NORTH ELEVATION

SIGN C

Scale: 3/32"=1'-0"

132'-0" FRONTAGE

EQ.    17'-4"    EQ.

TRADER JOE'S

**Continental Signs**

7541 Santa Rita Circle, Unit D
Stanton, CA 90680
Tel: (714) 894-2011
Fax: (714) 897-0860
www.continentalsigns.com

PROJECT NAME
Trader Joe's #288

LOCATION
21398 S. Ellsworth Loop
Queen Creek, AZ 85142

DATE

DESIGN NUMBER

SCALE

REVISIONS

CUSTOMER APPROVAL                DATE

LANDLORD APPROVAL                DATE

CONCEPTUAL DRAWING ONLY

4.0

325821301.2

F-1-7



**EXISTING D/F MONUMENT SIGN PANELS**

SIGN ST 2.02
SIGN ST 2.04

SCALE 1/2"=1'-0"

EXISTING ALUMINUM BACKGROUND PANELS.
ROUT OUT COPY AND PUSH THRU 3/8" CLEAR FLEX
OVERLAID WITH #73 RED TRANS. VINYL.

2 EXISTING D/F SIGNS, 4 PANELS REQUIRED

CONTINENTAL SIGNS

7541 Santa Rita Circle, Unit D
Stanton, CA 90680
Tel: (714) 894-2011
Fax: (714) 897-0860
www.continentalsigns.com

State Lic #: 664525

PROJECT NAME:
Trader Joe's #288

LOCATION:
21398 S. Ellsworth Loop
Queen Creek, AZ 85142

DATE 17Oct19

DESIGN NUMBER:

SCALE

REVISIONS:

CUSTOMER APPROVAL          DATE

LANDLORD APPROVAL          DATE

CONCEPTUAL DRAWING ONLY
All dimensions are approximate & may
change due to certification factors or
actual field conditions. Colors shown
are as close to printing will allow,
always follow written specifications.

5.0

325821301.2

F-1-8



325821301 2

F-2-1



**EXHIBIT "F-2"**

**PYLON/MONUMENT SIGN PLANS**

# EXHIBIT "G"

## ESTOPPEL CERTIFICATE

_____

_____

_____

RE:    Lease dated , between _____, a _____
("**Landlord**"), and TRADER JOE'S COMPANY, a California corporation
("**Tenant**"), covering premises commonly known as
_____("**Lease**")

TO WHOM IT MAY CONCERN:

The undersigned, as [Tenant] [Landlord] under the Lease identified above, hereby confirms to you as of the date hereof and to its knowledge that:

1.    Except as follows: _____ (if none, write "**None**" or leave blank, in which case the response will be deemed to be "**None**"), (a) Tenant has accepted possession of the leased premises, (b) all improvements required to be completed and space required to be furnished by Landlord have been so completed and furnished in all material respects, and (c) Landlord has paid or otherwise made available to Tenant all sums of money required to be so paid or made available in connection with the completion of such improvements.

2.    The term of the Lease commenced on _____ and expires on _____ and the Lease contains the following renewal options: _____ [insert "**None**" if none].

3.    The full monthly rental of $_____ provided in the Lease is being paid on a current basis, and no rentals have been prepaid except as provided by the terms of the Lease. Tenant acknowledges that all additional rent (charges for taxes, insurance, maintenance, common areas, etc.) are payable pursuant to the terms of the Lease.  The Lease does not provide for any security deposit.

4.    The Lease in the form attached hereto is in full force and effect and has not been modified, altered or amended.

5.    There are no other written agreements relating to the Premises between Tenant and Landlord except _____ (if none, write "**None**" or leave blank, in which case the response will be deemed to be "**None**").

6.    To the undersigned officer of [Tenant's] [Landlord's] actual knowledge, [Landlord] [Tenant] is not in default, nor has it failed to perform any of its material obligations, under the Lease.

G-1

7.     Tenant has no offsets or credits against rentals due or to become due under the Lease, except as a result of Landlord's failure, if any, described in Paragraph 5 above, or as may be otherwise provided in the Lease.

8.     Tenant has not transferred, assigned or sublet, or agreed to transfer, assign or sublet, its interest in the Lease or any part thereof, except _____ (if none, write "**None**" or leave blank, in which case the response will be deemed to be "**None**").

9.     This estoppel certificate is for the sole benefit of the addressee and may not be relied upon by any other person or entity.

**[signature contained on the following page]**

G-2

TENANT

TRADER JOE'S COMPANY,
a California corporation

By:_____
        Mitchell Nadler
        SVP/Chief Financial Officer


Dated: _____, 20____


OR

LANDLORD

**QCM PARTNERS, LLC,**
a Delaware limited liability company

By:  Vestar NM Retail Acquisitions, LLC,
     a Delaware limited liability company, its sole member

      By:  The Northwestern Mutual Life Insurance
          Company, a Wisconsin corporation, a member

          By:  Northwestern Mutual Investment Management
              Company, LLC, a Delaware limited liability company,
              its wholly-owned affiliate

             By:  _____
                  _____
                  Managing Director

By:  Vestar Retail Acquisitions Manager, LLC,
     a Delaware limited liability company, a member

     By: _____
     Name: _____
     Title: _____

325821301.2

## EXHIBIT "H"

## SHOPPING CENTER RULES AND REGULATIONS

1.      Tenant, its employees and/or agents, shall not solicit business in the parking or other Common Areas, nor shall Tenant, its employees or its agents, distribute any handbills or other advertising matter in or on the parking or other Common Areas, or in or on any automobiles parked therein.

2.      If there is or shall be installed a supervised fire sprinkler alarm system for the protection of Premises and of the Shopping Center, Tenant agrees to pay Tenant's Pro Rata Share of the service charges in connection with such system in accordance with Section 20(f) of the Lease.

3.      Tenant shall not carry on any trade or occupation, or operate any instrument or apparatus or equipment which emits any odor or causes any noise or sound discernible outside the Premises except as permitted under the Lease.

4.      Tenant shall not place or maintain any display of merchandise, or otherwise conduct any business (including the storage of any merchandise or other property of Tenant), in any areas of the Shopping Center outside of the Premises, except as permitted under the Lease.

5.      Tenant shall store or stock in the Premises such and only such goods, wares, merchandise or other property as shall be reasonably required for the conduct of Tenant's business in the Premises.

6.      Tenant shall not use, permit or suffer the use of the Premises, or any part thereof, as living, sleeping or lodging quarters, or other residential purpose.

7.      Tenant shall not use the plumbing facilities for any purpose other than that for which they are constructed, and no grease or foreign substance of any kind shall be disposed of therein, and the expense of any breakage, stoppage or damage (whether on or off the Premises) resulting from any breach thereof shall be borne by Tenant.

8.      Tenant shall not install or instruct to be installed in, on or about the Premises any audio, video or radio transmitting equipment, diathermy equipment, x-ray equipment or any other material or equipment which would cause any interference with, or interruption of, radio or television reception or transmission anywhere in the Shopping Center.

9.      No loudspeakers, televisions, phonographs, radios, flashing lights or other devices shall be used in a manner so as to be heard or seen outside of the Premises, except as permitted under the Lease.

325821301.2

10.    Tenant shall not obstruct the passageways, driveways, approachways, walks, roadways, exits and entries in, to and from and through the Common Area and all other parts of the Shopping Center used in common with other tenants, except as permitted under the Lease.

11.    Intentionally omitted.

12.    Intentionally omitted.

13.    Neither Tenant, nor its agents, employees or contractors, shall enter upon or have access to any roof at the Shopping Center without Landlord's express prior consent in each instance, except as permitted under the Lease.

14.    All trash, refuse and waste materials shall be regularly moved from the Premises to trash receptacles provided for the Shopping Center, and until removal shall be stored (i) in adequate containers, which such containers shall be located so as not to be visible to the general public shopping in the Shopping Center, and (ii) so as not to constitute any health or fire hazard.  No burning of trash, refuse or waste materials shall occur.

15.    Intentionally omitted.

16.    Intentionally omitted.

17.    Tenant shall not throw, discard or deposit any paper, glass or extraneous matter of any kind, except in designated receptacles, or create litter or hazards of any kind; nor deface, damage or demolish any part of the Premises or any sign, light standard or fixture, landscaping materials or other improvements within the Shopping Center, or the property of any customers, business invitees or employees situated within the Shopping Center.

18.    All of Tenant's window displays and other displays in or on the Premises shall be in good taste and in keeping with the best standards of the retail trade.

19.    Tenant shall keep the Premises (including, without limitation, exterior and interior portions of all windows, doors and all other glass) in a neat and clean condition and shall maintain the Premises and Tenant's personal property therein as an attractive shopping area in accordance with the general character of the Shopping Center.

20.    Intentionally omitted.

21.    If the Premises become infested with vermin, Tenant shall at Tenant's expense cause the same to be exterminated from time to time.

22.    Tenant shall not operate in or on the Premises or in any part of the Shopping Center any coin or token operated vending machine or similar device for the sale of merchandise other than one pay telephone in the suite (including, without limitation, pay lockers, pay toilets, scales, amusement devices, and, except for vending machines located within employee-only areas and

H-2

serving only employees, machines for the sale of beverages, foods, candy, cigarettes or other commodities).

23.    Intentionally omitted.

24.    Any freight handling equipment (including, without limitation, fork-lift trucks, tow trucks or similar machines) used by or on behalf of Tenant in the Shopping Center shall be equipped with pneumatic rubber tires, and any such equipment which is powered shall be electrically powered.

25.    Tenant shall not place a load on any floor in the Premises or the Shopping Center which shall exceed the floor load per square foot which such floor was designed to carry, and Tenant shall install any heavy items of equipment which shall be installed or maintained in the Premises in such a manner so as to achieve a proper distribution of weight.

26.    Tenant shall not install, operate or maintain in the Premises or the Shopping Center any electrical equipment which will overload the electrical system therein, or any part thereof, beyond its reasonable capacity for proper and safe operation as determined by Landlord in relation to the overall system and requirements therefor in the Shopping Center, or which does not bear the approval of Underwriters' Laboratories.

# EXHIBIT "I"

## EXISTING EXCLUSIVE AND PROHIBITED USES

### PART 1 – EXCLUSIVE USES:

| TENANT | EXCLUSIVE |
|---|---|
| 2B Wireless (T-Mobile) | **Article 16.D.** So long as the originally named Tenant is continuously and without interruption conducting business operations within the Premises for the Permitted Use of the Premises then except for any lease executed prior to the Date of this Lease and any amendment, extension, expansion, renewal or replacement thereof, Landlord shall not, during the initial Lease Term, (i) lease or rent any other premises within the building identified on the Site Plan as "**Shops G**" to a tenant or occupant whose primary business is the sale of mobile wireless telecommunication devices, or (ii) lease or rent any other Premises within the Shopping Center having a floor area of less than ten thousand (10,000) square feet to a tenant or occupant whose primary business is the sale of T-Mobile products and services. In the event of a breach by Landlord of its obligations contained in this **Article 16D**, which breach is not cured by Landlord pursuant to **Article 22** below, Tenant shall have the right, as its sole and exclusive remedy, to bring an action for specific performance and/or obtaining a temporary or permanent injunction against Landlord with respect to such uncured breach. |
| Ahi Poke | **Article 16D.** Except for the premises identified on the Site Plan as "**Major Tenant**" and any lease, license or concession agreement executed prior to the Date of this Lease, and any amendment, modification, extension, expansion, renewal or replacement thereof. Landlord shall not, during the initial Lease Term, lease or rent any other premises within the portions of the Shopping Center owned by Landlord to a tenant or occupant who will use such premises (including a kiosk) primarily for (i.e., more than fifteen percent (15%) of the Floor Area is devoted to or more than fifteen percent (15%) of Gross Sales are derived from) the sale of poke bowls. Notwithstanding anything to the contrary, Landlord shall not consent to any assignment or subletting or change of use by an existing tenant (other than Major Tenants) to any transferee permitting a use in violation of Tenant's exclusive use in this Article 16D, but only so long as Landlord has the discretion and legal right to withhold such consent or not agree to such change in use. The restrictions set forth in this Article 16D shall not be applicable with respect to sit-down restaurants containing five thousand square feet (5,000') or more of Floor Area. |
| Alliance Urgent Care (*d/b/a* One Health) | **Article 16.D.:** So long as the originally named Tenant is continuously and without interruption conducting business operations within the entire Premises for the Permitted Use of the Premises and provided that there has not occurred an Event of Default, except for the premises identified on the Site Plan as "**Major Tenant**" and any lease, license or concession agreement executed prior to the Date of this Lease, and any amendment, modification, extension, expansion, renewal or replacement thereof, Landlord shall not, lease or rent any other premises within the portions of the Shopping Center presently owned by Landlord to a tenant or occupant who will use |

| TENANT | EXCLUSIVE |
|---|---|
| | such premises primarily for (i.e., more than fifty percent (50%) of the Floor Area is devoted to or more than fifty percent (50%) of Gross Sales are derived from) an urgent care medical office, a "**family practice**" medical office or a "**walk-in**" medical clinic. |
| America's Best Contacts | **Article 16D.**  So long as the originally named Tenant, or an assignee or sublessee pursuant to a Permitted Transfer, or an approved assignee or sublessee pursuant to Landlord's prior written consent, is continuously and without interruption conducting business operations within the entire Premises for the Permitted Use of the Premises (except for Temporary Closures) and provided that there has not occurred an Event of Default (any required notice having been given and any applicable cure period having expired), Landlord shall not, from and after the Date of this Lease, lease or rent premises within the Shopping Center to a tenant or occupant who will use such premises primarily for (i.e., twenty percent (20%) or more of Gross sales are derived from or twenty percent (20%) or more of Floor area is devoted to) the retail sale of prescription eyeglasses, prescription sunglasses, prescription contact lenses, vision accessories and supplies, or optometric/ophthalmological services. The provisions of this <u>Article 16D</u> shall be applicable only to Landlord and shall not be binding upon any other tenant or occupant of the Shopping Center and such tenants or occupants may change use and/or assign or sublet without regard to the provisions of this <u>Article 16D</u>. The provisions of this <u>Article 16D</u> shall not, however, be applicable to a tenant or occupant whose primary business is the retail sale of non-prescription sunglasses or non-prescription eyewear. Tenant hereby acknowledges and agrees that the leasing restriction set forth in this <u>Article 16D</u> are restrictions against Landlord's acts or omissions and as a personal covenant from Landlord to Tenant and that the provisions of this <u>Article 16D</u> are in no way meant to act as an exclusive use provision in favor of Tenant, nor to grant Tenant the exclusive right to (i) sell any product or product type, or (ii) conduct business for any particular use, in the Shopping Center, and that nothing contained in this Lease shall prohibit any existing tenant in the Shopping Center as of the Date of this Lease from displaying and/or selling prescription eyeglasses, prescription sunglasses, prescription contact lenses, vision accessories and supplies, or optometric/ophthalmological services unless such tenant's lease requires Landlord to grant consent to any of the foregoing uses in which case Landlord shall withheld its consent.  Tenant further agrees that, to the extent any provision of this <u>Article 16D</u> could be interpreted (whether by Tenant or any third party) to be an exclusive use provision in favor of Tenant, that the parties hereby agree that such provision is not an exclusive use provision but rather a personal covenants granted by Landlord to Tenant and shall not and should not be interpreted as such now, or in the future.  In addition, Tenant acknowledges and agrees that any such leasing restriction or similar concept set forth in the lease of any other tenant in the Shopping Center is not, nor shall it at any time be interpreted to be, an exclusive use clause in favor of such tenant. |
| Applebee's (*dark*) | None. |
| Barrio Queen | None. |

| TENANT | EXCLUSIVE |
|---|---|
| Barro's | **Supplemental Declaration of Covenants and Restrictions, Recital C.** So long as Owner is conducting business operations on the Owner Parcel for the Initial Use, except for temporary closures due to damage, destruction or remodeling of the improvements constructed by Owner on the Owner Parcel, then Developer shall not sell, lease or rent any other premises within the portions of the Shopping Center (i) presently owned by Developer, and (ii) located within the Exclusive Zone identified on Exhibit "E", and (iii) having a leaseable floor area of less than ten thousand (10,000) square feet to a tenant or occupant who will use such premises primarily for the operation of a full service, sit-down restaurant serving pizzas as its main menu item. This exclusivity provision shall not be applicable to the extent that any of the above prohibited uses are permitted under existing permitted use language, without further consent from Developer, under an existing lease or occupancy agreement for another tenant or occupant of the Shopping Center as of the Record Date. |
| Bath & Body Works | None |
| Beall's *(Sublease from Office Max)* | None |
| Bed, Bath & Beyond | None |
| Bev Mo | None |
| Bikes Direct | None |
| Buffalo Wild Wings | **Supplemental Declaration of Covenants and Restrictions, Recital C, Paragraph 1.** So long as Owner (or Owner's tenant or occupant) is conducting business operations on the Owner Parcel for the Initial Use, except for temporary closures due to damage, destruction or remodeling of the improvements constructed by Owner on the Owner Parcel, then Developer shall not sell, lease or rent any other premises within the portions of the Shopping Center (i) presently owned by Developer, and (ii) located within the Exclusive Zone identified on Exhibit "E", and (iii) having a leaseable floor area of less than ten thousand (10,000) square feet to a tenant or occupant who will use such premises for either (i) a restaurant and/or bar with a sports theme or concept meeting the definition of a "**Sports Bar**" (defined below), or (ii) a restaurant and/or bar which serves bone-in or boneless chicken wings with four (4) or more type of sauces (for purposes of this Paragraph C, hot, medium, and mild varieties, for example, of Buffalo-flavored sauce shall be construed as a total of one (1) such sauce) as a menu item on more than an Incidental Basis (for purposes of this Paragraph C, Incidental Basis shall mean either (i) the sale of chicken fingers, or (ii) the sale of bone-in or boneless chicken wings, or in the aggregate, the sale of chicken fingers and/or bone-in or boneless chicken wings, that account for less than seven percent (7%) of such tenant's or occupant's revenue from food sales).    For the purposes of this Paragraph C, a "**Sports Bar**" is defined as a restaurant and/or bar which (i) publicly advertises (in any medium other than (x) posters and other promotional material posted solely within the interior walls of said restaurant or bar, |

| TENANT | EXCLUSIVE |
|--------|-----------|
|        | (y) an occupant's social media outlet such as Facebook or Twitter or its website, or (z) marketing or promotional activities conducted by the Shopping Center) itself as a place to view sporting events for more than six (6) separate sporting events or tournament series (one (1) tournament series would include, for example and not as an exhaustive list, the entire baseball World Series, the entire NCAA basketball tournament, including the Final Four) in any calendar year, and (ii) has (a) any television screens 50" or larger, or (b) any projection programming or broadcasting other than programming or broadcasting brought in by the patron (e.g., pharmaceutical sales presentations) or (c) more than a total of nine (9) television screens, excluding television screens in restrooms.  It is understood that the Sports Bar provision relates to a restaurant and/or bar's advertisement of the viewing of sporting events, not the display of sporting events itself (i.e., a restaurant and/or bar which has televisions with sporting events on display is not in and of itself a violation of this provision, unless accompanied by the advertising described in (i) above). It is understood and agreed that competing businesses prohibited by the foregoing exclusive shall include, without limitation, Fox and Hound, Baileys, Champps, Hooters, Wing Stop, Buffalo Wings & Rings, Paradocks East Cost Grille, Raising Cane's, Quaker Steak and Lube, The Green Turtle, Brick House Tavern & Tap, Show Me's, East Coast Wings & Grill, Boston Pizza and Sports, , Duffy's Sports Gills, Ker's WingHouse, Bru's Room Sports Grill, Native New Yorker and Hurricane Grill & Wings. It is understood and agreed, however, that notwithstanding the foregoing, this restriction provided above shall not restrict Landlord's ability to lease space in the Shopping Center to (i) Applebee's, BJ Restaurant and Brewhouse, Toby Keith's Bar & Grill, O'Charleys, Raffertys, Tumbleweed, Chuy's, TGI Fridays, Lonestar Steakhouse, Longhorn Steakhouse, Tilted Kilt Pub & Eatery, Cheddar's Casual Café, Carolina Ale, Miller's Ale House, Macayo's Mexican Restaurant, The Keg, California Pizza Kitchen, Chili's, Red Robin, Johnny Rockets, Margaritaville, Yard House, Martini Ranch, Famous Dave's, Hell's Half Acre, Z'Tejas, Gordon Biersch, Saddle Ranch Chop House and, as such restaurants are operated as of the Record Date as to menu, marketing, décor or televisions; (ii) any and all fast food/drive-thru restaurants concepts, including those that sell bone in or boneless chicken wings on more than an Incidental Basis, but which do not sell alcohol; (iii) restaurants and/or bars with  an average menu entrée price of at least $14.00 (which amount shall be increased (but not decreased) annually on the anniversary of the Revised Date by the percentage increase, if any, in the CPI for the month in which the Record Date occurs to the next anniversary of such date.  As used herein, CPI shall mean the Consumer Price Index for All Urban Consumers, U.S. City Average, All Items (1982-84 = 100) as published by the U.S. Department of Labor, Bureau of Labor Statistics, or if the publication of such index is discontinued, such other materially equivalent index or indices mutually selected by Developer and Owner); (iv) any tenants or occupants which have live music as a significant element of their operation (i.e., at least eighteen (18) live music performances per year) and/or (v) any tenants or occupants which have gaming or entertainment as a significant component of its operations including, without limitation, bowling, laser tag, electronic gaming and related similar activities (such that gaming represents at least ten percent (10%) of such tenants or occupants revenue). |

| TENANT | EXCLUSIVE |
|---|---|
| Chase Bank | **Section 12.09.**  So long as the originally named Lessee (or a Transferee pursuant to a Permitted Transfer) is continuously and without interruption conducting business operations within the Demised Premises for the Permitted Use (except for temporary closures resulting from damage, destruction, remodeling of the Demised Premises or Force Majeure) and provided that there is not then in existence an Event of Default, subject to the further provisions of this **§12.09**, Lessor shall not sell, lease or rent more than one (1) other free standing pad in the Shopping Center for the operation of (a) a branch bank, savings bank, savings and loan association or credit union, or (b) a mortgage lending operation (collectively, the "**Exclusive Use**").  Lessor and Lessee acknowledge and agree that the Exclusive Use does not include stock brokerages, insurance companies, or high risk and pay day loan services and the exclusive rights granted to Lessee in this **§12.09** apply only to the Restricted Bank Pads (identified as such on the Site Plan) do not apply to the portion of the Shopping Center identified on the Site Plan as "**Major**".  In furtherance of this provision, Lessor shall not authorize any other tenants to use space in Shopping Center for the Exclusive Use and shall include a restriction in all future leases for the Shopping Center prohibiting other tenants from using their respective premises for the Exclusive Use; provided, however, this sentence shall not preclude Lessor from selling, leasing or renting not more than one (1) other freestanding pad in the Shopping Center for use as a branch bank, savings bank, savings and loan association, credit union or mortgage lending operation, provided, however, such other freestanding pad used as a branch bank, savings bank, savings and loan association, credit union or mortgage lending operation must be located adjacent to Rittenhouse Road and cannot be a Restricted Pad (as the same is identified as such on the Site Plan). |
| Chick-Fil-A | None |
| Chipotle | None |
| Crumbl Cookies | None. |
| Data Doctors | **Exhibit 16D.**  Except for the premises identified on the Site Plan as "**Major Tenant**" and any lease, license or concession agreement executed prior to the Date of this Lease, and any amendment, modification, extension, expansion, renewal or replacement thereof, Landlord shall not, during the initial Lease Term, lease or rent any other premises within the portions of the Shopping Center identified on the Site Plan "**Shops F**" and "**Shops G**" to a tenant or occupant who will use such premises primarily for (i.e., more than fifty percent (50%) of the Floor Area is devoted to or more than fifty percent (50%) of Gross Sales are derived from) computer sales and service of custom built/non-custom built computers, troubleshooting, service and repair, data recovery, home and small business networking. |
| Del Taco | **Recital C, Supplemental Declaration of Covenants and Restrictions.**  So long as Owner is conducting business operations on the Owner Parcel for the Initial Use, except for temporary closures due to damage, destruction or remodeling of the improvements constructed by Owner of the Owner Parcel, then except for any lease or occupancy agreement executed prior to the Record Date, and any amendment, |

| TENANT | EXCLUSIVE |
|---|---|
|  | modification, extension, expansion or renewal thereof, Developer shall not sell, lease or rent Parcels 8 or 12 in the Shopping Center for use primarily as the operation of a quick service Mexican restaurant with a drive-thru including, but not limited to, Taco Bell, Green Burrito and El Pollo Loco. In no event, however, shall the provisions of this Paragraph "C" preclude Developer from selling or renting Parcels 8 or 12 in the Shopping Center to (i) a full service Mexican food restaurant, or (ii) a quick service restaurant which sells Mexican food as an ancillary part of its menu offerings. |
| Dollar Tree | None |
| DownEast Outfitters | None |
| Famous Footwear | **Article 16D.**  Landlord shall not, lease or rent premises within the Shopping Center to Shoe Carnival, Rack Room Shoes, Shoe Department or a similar direct competitor of Tenant. The provisions of this Article 16D shall be applicable only to Landlord and shall not be binding upon any other tenant or occupant of the Shopping Center and such tenants or occupants may change use and/or assign or sublet without regard to the provisions of this Article 16D. |
| Frazee Paints | None |
| Geno's Pizza | **Article 16.D.:**  So long as the originally named Tenant is continuously and without interruption conducting business operations within the entire Premises for the Permitted Use of the Premises and provided that there has not occurred an Event of Default, except for the premises identified on the Site Plan as "**Major Tenant**" and any lease, license or concession agreement executed prior to the Date of this Lease, and any amendment, modification, extension, expansion, renewal or replacement thereof, Landlord shall not, during the initial Lease Term, lease or rent any other premises within the portions of the Shopping Center identified on the Site Plan as "**Shops A**", "**Shops C**", "**Shops D**", "**Shops E**", "**Shops F**" and "**Shops G**" to a tenant or occupant where the permitted use of such premises is the operation of a quick serve restaurant whose primary menu item is (i.e., more than fifty percent (50%) of Gross Sales are derived from) the sale of pizza.  The provisions of this **Article 16D** shall not be deemed to restrict full service sit down restaurants. |
| GNC | **Article 16.D:**  So long as the originally named Tenant or a Permitted Transferee is continuously and without interruption conducting business operations within the Premises for the Permitted Use of the Premises and provided that there has not occurred an Event of Default, and except for premises identified on the Site Plan as "**Major Tenant**" or the freestanding pads, and except for any lease executed prior to the Date of this Lease and any amendment, extension, expansion, renewal or replacement thereof, Landlord shall not lease or rent any other premises within the Shopping Center primarily for (i.e., more than the lesser of (i) five hundred (500) square feet of Floor Area, or (ii) twenty-five percent (25%) of Floor Area is devoted to) the sale of health foods, vitamins, mineral and herbal supplements or sports nutrition supplements. |

I-6

| TENANT | EXCLUSIVE |
|---|---|
| Great Clips | **Article 16D:** So long as the originally named Tenant or an assignee or sublessee pursuant to a Permitted Transfer is continuously and without interruption conducting business operations within the entire Premises for the Permitted Use of the Premises and provided that there has not occurred an Event of Default, except for premises having a Floor Area of five thousand (5,000) square feet or more, Landlord shall not, during the initial Lease Term, lease or rent any other premises within the portions of the Shopping Center presently owned by Landlord to a tenant or occupant who will use such premises primarily for (i.e., more than fifty percent (50%) of the Floor Area is devoted to or more than fifty percent (50%) of Gross Sales are derived from) the operation of a no appointment, value oriented, family hair salon such as Fantastic Sam's, Super Cuts, Cost Cutters or Sport Clips. The provisions of this **Article 16D** shall not, however, restrict Landlord from selling or leasing premises within the Shopping Center to full service, boutique style or theme oriented hair salons. |
| Harkins | **Section 8.4** (a) Landlord, as an Approving Party under the CC&Rs, shall not consent to any amendment, waiver or variance under the CC&Rs to permit the operation of a motion picture theatre (including, without limitation, a first run theatre, a discount or "dollar" theatre, or an IMAX or other specialty theatre) in any location in the Shopping Center other than the Premises, and Landlord shall at all times remain an Approving Party under the CC&Rs. Further, Landlord shall not permit any tenant or occupant of any property owned by Landlord or an affiliate of Landlord outside the Shopping Center and within a competitive exhibitor **"clearance"** radius surrounding the Shopping Center (as established by motion picture distributors and which presently is on the order of 5.0 miles) other than Tenant (or an affiliate of Tenant) to operate a motion picture theatre (including, without limitation, a first run theatre, a discount or **"dollar"** theatre, or an IMAX or other specialty theatre); provided, however, that for this purpose Landlord's capital partner and lenders shall not be deemed **"affiliates";** and provided, further, Landlord or an affiliate may purchase an existing, operating motion picture theatre or a shopping center containing such a theatre without thereby breaching this restriction.

(b) So long as the Premises are being operated as a motion picture theatre, neither Tenant nor an affiliate of Tenant shall operate a motion picture theatre within the applicable clearance radius. In addition, Landlord agrees that all sales and leases of space in the portions of the Shopping Center located within 600 feet of any entrance to the Premises shall include prohibitions on the retail sale of (a) popped popcorn, or (b) boxed or packaged candy, or (c) Dippin' Dots products.

(c) Retail service and commercial offices in the Shopping Center shall not exceed 10% of the GLA of the Shopping Center (excluding the Premises) in the aggregate.

(d) Landlord shall not permit any tenant or occupant to use any part of the Shopping Center for a bowling alley, video or other game parlor, billiard parlor, amusement center, children's recreational facility or party center; provided, however, high quality entertainment or combined restaurant/entertainment operations such as Jillian's, Dave & Busters, Gameworks, Chuck E. Cheese, and Peter Piper Pizza containing any of the foregoing uses may be permitted outside of the Use Restricted Area, and up to |

I-7

| TENANT | EXCLUSIVE |
|--------|-----------|
| | three pool tables in a restaurant shall be permitted and up to five video or pinball games shall be permitted in an otherwise permitted use.<br><br>(e) Any health club or spa shall not occupy more than 50,000 square feet of GLA and shall be located outside of the Use Restricted Area. Any bar, disco or night club in the Shopping Center shall not occupy more than 20,000 square feet of GLA in the aggregate, and shall be operated in a high-class manner. Not more than two bars, night clubs, or discos shall be permitted, and all bars shall be located outside of the Use Restricted Area. For purposes of this subsection, high quality entertainment or combined restaurant/entertainment operations such as Jillian's and Dave & Busters, are not deemed bars, nightclubs, or discos. Any off-track betting facility may be part of a sports bar or sports-theme restaurant that is located outside of the Use Restricted Area. Any store for the sale of motor vehicles shall occupy less than 20,000 square feet of GLA, and shall keep all of its inventory indoors at all times, with none parked in the Common Area; provided, however, that the occasional promotional display of motor vehicles in the Common Area shall be permitted south of the Main Drive Aisle.<br><br>**Section 8.5 Exemptions**:   The provisions shall not , however, be applicable to the premises identified on the Site Plan attached to the Lease as "**Kohl's**" and "**Target**," which premises shall be subject only to the restrictions set forth in the CC&Rs. |
| In-N-Out | None |
| Jo-Ann Stores | None |
| Joint, The | **Article 16D**.  So long as the originally named Tenant or an assignee or sublessee pursuant to a Permitted Transfer is continuously and without interruption conducting business operations within the entire Premises for the Permitted Use of the Premises (subject to Temporary Closures) and provided that there has not occurred an Event of Default, except for the premises identified on the Site Plan as "**Major Tenant**", any premises containing ten thousand (10,000) square feet of Floor Area or more, and any lease, license or concession agreement executed prior to the Date of this Lease, and any amendment, modification, extension, expansion, renewal or replacement thereof, Landlord shall not, during the initial Lease Term, lease or rent any other premises within the portions of the Shopping Center presently owned by Landlord to a tenant or occupant who will use such premises primarily for (i.e., more than fifty percent (50%) of the Floor Area is devoted to or more than fifty percent (50%) of Gross Sales are derived from) chiropractic services. |
| Justice Stores | None |
| Kirkland's | **Article 1, definition of "Exclusive Use**".  So long as Tenant is conducting business operations within the Premises for the Permitted Use of the Premises (to the extent required by Section 9.1) and provided that the Lease is free from default (any required notice having been given and any applicable cure period having expired), Landlord agrees not to lease, let, use or authorize to be used, any portion of the Center containing less than ten thousand (10,000) square feet of Rentable Area now or at any |

| TENANT | EXCLUSIVE |
|---|---|
| | time during the Lease Term or any extension thereof to any entity or other party that operates or makes use of its premises for the retail sale of framed art, decorative household mirrors, and lamps ("Tenant's Exclusive Use").  Other tenants and occupants of the Center whose premises contain less than ten thousand (10,000) square feet of Rentable Area may sell such items if the sale of such items does not constitute a primary use (i.e., such items are sold in the lesser of (i) twenty-five percent (25%) of a tenant's or occupant's premises or (ii) five hundred (500) square feet or less of Rentable Area, including an allocation of one-half (½) of the area of the adjacent aisleways).  Tenant's Exclusive Use right shall be a covenant that binds Landlord and shall be a restriction upon the Center that runs with the land.  Tenant's Exclusive Use shall not apply to any lease, license or concession agreement executed prior to the date of the Lease (and any amendment, modification, extension, expansion, renewal or replacement thereof) or to any premises containing ten thousand (10,000) square feet or more of Rentable Area.  In connection with the foregoing, to the extent any existing tenant or other occupant of the Center or assignee or sublessee thereof desires to change its use to any portion of Tenant's Exclusive Use and Landlord has the right under such lease or other agreement to deny such change of use request without being in breach of such lease for doing so, Landlord shall deny such request. |
| Kohl's | None |
| Massage Envy | **Article 16.D.**:  So long as the originally named Tenant (or another bona fide Massage Envy franchisee) is continuously and without interruption conducting business operations within the entire Premises for the Permitted Use of the Premises and provided that there has not occurred an Event of Default, except for the premises identified in the Site Plan as "**Major Tenant**" and any lease, license or concession agreement executed prior to the Date of this Lease and any amendment, modification, expansion, renewal or replacement thereof, Landlord shall not, during the Lease Term, lease or rent any other premises within the portions of the Shopping Center presently owned by Landlord to a tenant or occupant who will use such Premises primarily for (i.e., more than fifteen percent (15%) of the Floor Area is devoted to or more than fifteen percent (15%) of Gross Sales are derived from) massage therapy and/or muscle therapy. |
| Maurice's | None. |
| Mountainside Fitness | None. |
| Old Navy | None. |
| Olive Garden | **Article C of Supplemental Declaration of Covenants and Restrictions ("SDCR")**.  So long as Owner is conducting business operations on the Owner Parcel for the Initial Use, except for temporary closures due to damage, destruction, or remodeling of the improvements constructed by Owner on the Owner Parcel, then except for any lease or occupancy agreement executed by Developer prior to the Record Date, and any amendment, modification, extension, expansion or renewal thereof, Developer shall not sell, lease or rent any other parcel in the Shopping Center designated as the |

I-9

| TENANT | EXCLUSIVE |
|---|---|
| | "**Restricted Property**" on <u>Exhibit E</u> attached to this Supplemental Declaration for the operation of a full service sit down Italian restaurant. |
| Panera Bread | None |
| Peach Tree Dental | **Article 16D.**  So long as the originally named Tenant or an assignee or sublessee pursuant to a Permitted Transfer is continuously and without interruption conducting business operations within the entire Premises for the Permitted Use of the Premises and provided that there has not occurred an Event of Default, except for any premises within the Shopping Center having a Floor Area of ten thousand (10,000) square feet or more and any lease, license or concession agreement executed prior to the Date of this Lease, and any amendment, modification, extension, expansion, renewal or replacement thereof, Landlord shall not, during the initial Lease Term, lease or rent any other premises within the portions of the Shopping Center presently owned by Landlord to a tenant or occupant who will use such premises primarily for (i.e., more than fifty percent (50%) of the Floor Area is devoted to or more than fifty percent (50%) of Gross Sales are derived from) the operation of a general dentistry practice. Landlord and Tenant acknowledge that the foregoing restriction shall not be applicable to a specialty dentistry practice (including, without limitation, orthodontics, pediatric dentistry, oral surgery, periodontics, endodontics and cosmetic surgery). |
| PetSmart | None |
| Pita Jungle | None |
| Pressed for Time | None |
| PT 360 | **Article 16D.** Except for the premises identified on the Site Plan as "**Major Tenant**" and any lease, license or concession agreement executed prior to the Date of this Lease, and any amendment, modification, extension, expansion, renewal or replacement thereof, Landlord shall not, during the initial Lease Term, lease or rent any other premises within the portions of the Shopping Center presently owned by Landlord to a tenant or occupant who will use such premises primarily for (i.e., more than fifty percent (50%) of the Floor Area is devoted to or more than fifty percent (50%) of Gross Sales are derived from) the operation of a physical therapy practice (but this shall not restrict massage services (such as, by way of example Massage Envy), spa services, chiropractic services, medical doctors, or health spas or studios). |
| Ross | None |
| Sally Beauty | **Article 16.D. :** So long as the originally named Tenant or a Transferee pursuant to a Permitted Transfer is continuously and without interruption conducting business operations within the Premises for the Permitted Use of the Premises and provided that there has not occurred an event of default, and except for premises having a Floor Area of ten thousand (10,000) square feet or more and any lease executed prior to the Date of this Lease and any amendment, extension, renewal or |

I-10

| TENANT | EXCLUSIVE |
|---|---|
|  | replacement thereof, Landlord shall not lease or rent any other premises within the portions of the Shopping Center owned by Landlord primarily for (a) the sale of beauty supplies to the general public or to licensed cosmetologists and/or (b) the sale of human or synthetic hair, wigs, and/or hair extensions. The provisions of this **Article 16D** shall not, however, be applicable to a retail operation similar to an Ulta Salon, Cosmetics & Fragrance, Inc. or Bath and Body Works. |
| Sauce | **Article 16D.** In the event that "**Pita Jungle**" ceases conducting business within the Shopping Center, Landlord shall not, during the initial Lease Term, lease or rent either (a) the "**Future Pad**" (identified as such on the Site Plan), or (b) the premises within "**Shops H**" currently leased to "**Pita Jungle**" (depicted on the Site Plan), in either case to a tenant or occupant who will use such premises primarily for (i.e., more than twenty percent (20%) of the Floor Area is devoted to or more than twenty percent (20%) of Gross Sales are derived from) the sale of pizza or pasta. |
| Smashburger | **Article 16.D.** :So long as the originally name Tenant or an assignee or sublessee pursuant to a Permitted Transfer is continuously and without interruption conducting business operations within the Premises for the Permitted Use of the Premises and provided that there has not occurred an Event of Default which has continued beyond any applicable cure period, except for the premises consisting of freestanding pads, premises having a Floor Area of ten thousand (10,000) square feet or more and any lease, license, or concession agreement executed prior to the Date of this Lease, and any amendment, modification, extension, expansion, renewal or replacement thereof, unless said amendment, modification, expansion, renewal or replacement materially changes the use of the premises to which it relates, Landlord shall not, during the initial Lease Term, lease or rent any other premises within the Shopping Center to a tenant or occupant who will use such premises for the operation of a quick service restaurant selling primarily (i.e. more than thirty percent (30%) of Gross Sales are derived from) hamburgers and cheeseburgers.  The foregoing restriction shall not restrict Landlord in leasing space in the Shopping Center to a full service restaurant that has waiter or waitress service. |
| Sprint | None |
| Subway | **Article 16.D.** :So long as the originally name Tenant or an assignee or sublessee pursuant to a Permitted Transfer is continuously and without interruption conducting business operations within the Premises for the Permitted Use of the Premises and is not currently in default, except for the premises identified on the Site Plan as "**Major Tenant**", any lease, license or concession agreement executed prior to the Date of this Lease and any amendment, modification, extension, renewal or replacement thereof, Landlord shall not, during the Lease Term, lease or rent any other premises within the portions of the Shopping Center identified on the Site Plan as "**Shops F**" and "**Shops G**" to a tenant or occupant who specializes in the sale of submarine style sandwiches including, without limitation, Quizno Subs, Cousin Subs, Blimpie's, or Submarina. |
| Target | None |

I-11

| TENANT | EXCLUSIVE |
|--------|-----------|
| Thai Chili | **Article 16D.** Except for tenants occupying more than five thousand (5,000) square feet of Floor Area and any lease, rental agreement or amendments thereto executed prior to the Date of this Lease, Landlord shall not, during the initial Lease Term, lease or rent any other premises within the portions of the Shopping Center identified on the Site Plan as Shops "**F**" and Shops "**G**" to a tenant or occupant who will use such premises primarily for the sale of Thai food (i.e., Thai House, Pink Pepper Thai Cuisine, Thai Rama or Thai Basil shall be prohibited). Other types of Asian cuisine (e.g. Chinese, Japanese or Korean restaurants) shall not be subject to the aforementioned restriction. |
| Tilly's | None |
| Tips 'N Toes | None |
| TJ Maxx | None |
| Torrid | None |
| ULTA Beauty | None |
| V's Barbershop | **Article 16D.** Except for the premises identified on the Site Plan as "**Major Tenant**" and any lease, license or concession agreement executed prior to the Date of this Lease, and any amendment, modification, extension, expansion, renewal or replacement thereof, Landlord shall not, during the initial Lease Term, lease or rent any other premises within the portions of the Shopping Center presently owned by Landlord to a tenant or occupant who will use such premises primarily for (i.e., more than forty percent (40%) of the floor Area is devoted to or more than twenty-five percent (25%) of Gross Sales are derived from) the operation of a men's and boy's barber shop or men's salon. In no event, however, shall the restriction described in the preceding sentence act to prohibit a full-service hair-cutting studio, full-service salon or a gender-neutral discount hair cutter such as Great Clips or Supercuts. |
| Verizon | None |
| Village Inn | **Section 12.07.** Except for Temporary Closures, and provided that there has not occurred an Event of Default, and except for any lease, license, or concession agreement executed prior to the Effective Date of this Lease for which such lessee's use at the time of such lease would otherwise be in breach of this §12.07, Lessor shall not, during the Initial Lease Term, lease or rent any other premises within the portion of the Shopping Center identified on the Site Plan as the "Exclusive Zone" to a lessee or occupant where the permitted use of such premises is primarily for (i.e., more than fifty percent (50%) of the Floor Area is devoted to or more than fifty percent (50%) of Gross Sales are derived from) a family dining full service restaurant in the Shopping Center having menu items which are comparable to Lessee's restaurant. The following shall be considered examples, but not an exhaustive list, of a family dining full service restaurant having menu items comparable to Lessee: Waffle |

I-12

| TENANT | EXCLUSIVE |
|---|---|
|  | House, International House of Pancakes, Huddle House, Perkins, Denny's, Yolk, The Egg and I, and First Watch. |
| Yogurt Jungle | **Article 16.D.**: So long as the originally named Tenant is continuously and without interruption conducting business operations within the entire Premises for the Permitted Use of the Premises and provided that there has not occurred an Event of Default, except for the premises having a Floor Area of ten thousand (10,000) square feet or more and any lease, license or concession agreement executed prior to the Date of this Lease, and any amendment, modification, extension, expansion, renewal or replacement thereof, Landlord shall not, during the initial Lease Term, lease or rent any other premises within (i) the Shopping Center to a tenant or occupant who will use such premises primarily for (i.e., more than fifty percent (50%) of the Floor Area is devoted to or more than fifty percent (50%) of Gross Sales are derived from) frozen yogurt, and (ii) "**Shops F**" (identified as such on the Site Plan to a tenant or occupant who will use such premises primarily for the sale of frozen yogurt, ice cream, gelato, sorbet or frozen desert treats. |

I-13

## PART 2: PROHIBITED USES

(See Attached)

<u>BED BATH & BEYOND INC.</u>

ARTICLE 13
USES AND RESTRICTIONS

13.1    <u>Permitted and Prohibited Uses.</u>

13.1.2 <u>Prohibited Uses</u>.  Landlord shall construct, lease, operate, maintain and manage the Shopping Center as a first-class shopping center comparable to other first-class shopping centers in the state in which the Shopping Center is located.  Landlord shall not lease, rent or occupy or permit any portion of the Shopping Center to be occupied (except to the extent otherwise permitted under any lease for space in the Shopping Center existing as of the Effective Date) for any of the **"Prohibited Uses"** (defined in <u>Exhibit M</u> hereto annexed).  The provisions of this Section 13.1.2 shall not be applicable to the portions of the Shopping Center owned or occupied by Target, Kohl's or the Major Occupant T.



I-15

BED BATH & BEYOND INC.

Exhibit M

Prohibited Uses

As used in this Lease, the term *Prohibited Uses* shall mean any of the following uses:

(1) Any use which emits or results in strong, unusual or offensive odors, fumes, dust or vapors (other than the ordinary odors emitted from coffee shops, restaurants or nail salons), is a public or private nuisance, emits noise or sounds which are objectionable due to intermittence, beat, frequency, shrillness or loudness, creates a hazardous condition, or is used, in whole or in part, as or for warehousing or the dumping or disposing of garbage or refuse (other than governmentally required recycling centers).

(2) Any operation primarily used as a storage facility and any assembling, manufacturing, distilling, refining, smelting, agricultural, or mining operation (except that this provision shall not prohibit incidental assembly, manufacturing or refining which is strictly incidental to a retail use typically located in first class shopping centers, such as, by way of example, assembly of products or operation of a brew pub);

(3) Any "second hand" store, "surplus" store (except that this provision shall not prohibit a store that sells blemished or reconditioned goods, such as EB Games, Game Stop, Hollywood Video, Blockbuster Video, Play It Again Sports or Computer Renaissance or a first class retailer such as Terry's Consignment, as such stores are presently operated);

(4) Any mobile home park, trailer court, labor camp, junkyard, or stockyard (except that this provision shall not prohibit the temporary use of construction trailers during periods of construction, reconstruction, or maintenance);

(5) Any dumping, disposing, incineration, or reduction of garbage (exclusive of trash compactors or trash containers located near the rear of any building);

(6) Any fire sale, bankruptcy sale (unless pursuant to a court order), auction house operation, fictitious going-out-of-business sale, lost-our-lease sale or similarly advertised event;

(7) Any central laundry, dry cleaning plant, or laundromat (except that a dry cleaner that performs all dry cleaning outside the Shopping Center shall be permitted, so long as its on-site premises are located more than 150 feet away from the Premises);

(8) Any automobile, truck, trailer, boat, or recreational vehicle sales, leasing, display or body shop repair operation;

(9) Any bowling alley or skating rink;

(10) Any live performance theater, auditorium, meeting hall or sporting event;

(11) Any living quarters, sleeping apartments, or lodging rooms;

(12) Any veterinary hospital or animal raising or boarding facilities (except to the extent permitted below);

(13) Any mortuary or funeral home;

(14) Any "Pornographic Use", which shall include, without limitation, a store displaying for sale or exhibition books, magazines or other publications containing any combination of photographs, drawings or sketches of a sexual nature, which are not primarily scientific or educational, or a store offering for exhibition, sale or rental video cassettes or other medium capable of projecting, transmitting or reproducing, independently or in conjunction with another device, machine or equipment, an image or

I-16

series of images, the content of which has been rated or advertised generally as NC-17 or "X" or unrated by the Motion Picture Rating Association, or any successor hereto; the parties hereto acknowledge and agree (i) the sale of books, magazines and other publications by a national bookstore of the type normally located in first-class shopping centers in the State in which the Shopping Center is located (such as, for example, Borders and Barnes & Noble, as said stores currently operate), (ii) the sale and/or rental of videos by a full line video store or consumer electronics store (such as, for example, Blockbuster Video, Hollywood Entertainment, Circuit City or Best Buy as such stores are presently operated), or (iii) the exhibition of general release or release of general release movies of the type typically shown in movie theaters located in first-class shopping centers, or (iv) the sale of magazines and other publications by a convenience store (such as, for example, 7-11 and Circle K), shall not be deemed a "pornographic use" hereunder; or massage parlor (except that the foregoing prohibition shall not apply to massage services offered by a doctor, chiropractor, physical therapist or nurse in an office permitted hereunder, or to incidental massage services offered at a health club, day spa or beauty salon permitted hereunder) or to a first class massage studio such as Massage Envy;

(15)   Any so-called "head shop", or other establishment primarily selling or exhibiting drug-related paraphernalia;

(16)   Any bar, tavern, or other establishment selling alcoholic beverages for on- or off-premises consumption, except to the extent the same is incidental to a family-oriented, sit-down restaurant [such as TGI Fridays, Red Lobster and Bennigans (as such restaurants are currently operated)] otherwise permitted under Item 35, below;

(17)   Any catering or banquet hall;

(18)   Any flea market, amusement or video arcade, pool or billiard hall, night club, discotheque, or dance hall provided, however, that this restriction shall not prohibit (a) any tenant or Occupant of any building site designated as a "Pad" on Exhibit B hereto from having five (5) or fewer amusement or video arcade game machines incidental to an otherwise permitted use, or (b) any restaurant permitted by Item 35 below from having, as an incidental use, up to three (3) pool/billiard tables and (c) any use otherwise permitted under Item 32 of this Exhibit M;

(19)   Any training or education facility, including but not limited to:  beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers; provided, however, this prohibition shall not be applicable to on-site employee training by an Occupant incidental to the conduct of its business at the Shopping Center;

(20)   Any gambling facility or operation, including but not limited to: off-track or sports betting parlor; table games such as black-jack or poker; slot machines; video poker/black-jack/keno machines or similar devices; or bingo hall.  Notwithstanding the foregoing, this prohibition shall not apply to governmental sponsored gambling activities, or charitable gambling activities, so long as such governmental and/or charitable activities are incidental to the business operation being conducted by the Occupant;

(21)   Any unlawful use;

(22)   Any pawn shop, gun shop, or tattoo and/or body piercing parlor; provided, however, that this prohibition shall not be applicable to the sale of guns as part of a national or regional full-line sporting goods store nor to incidental ear piercing by a jewelry store or other retailer;

(23)   Any church or other place of religious worship;

(24)   Any car wash, automobile repair shop, or any business servicing motor vehicles in any respect, including, without limitation, any quick lube oil change service, tire center or gasoline or service station or facility unless located on Permitted Pad.  As

I-17

used herein, the term *Permitted Pad* shall mean all building sites designated as "Pad" on Exhibit B hereto except for Shops B, Pad G and Pad H;

(25)    Any carnival, amusement park or circus;

(26)    Any medical clinics or medical offices except that (i) no more than three (3) first class medical offices (but not clinics) of the type typically found in first–class shopping centers, of no more than 5,000 square feet of Floor Area each, may be located in the Shopping Center provided such offices are at least 350 feet from the Premises and (ii) no more than three (3) additional first class medical offices (and not clinics) of the type typically found in first–class shopping centers, of no more than 4,000 square feet of Floor Area each, may be located in the Shopping Center provided such offices are located on the building site designated as Shops A, Shops E, Pad I, Pad J, Pad K or Pad M on Exhibit B hereto;

(27)    Any supermarket, except that an upscale, boutique-type food store of the type normally operated in the Phoenix, Arizona metropolitan area (such as, by way of example, Zagara's, Whole Foods, Fresh Fields, or Wild Oats), provided, that such store shall not occupy more than 27,000 square feet of Floor Area, and shall be located at least 200 feet away from the Premises (except that, subject to the OEA, an upscale, boutique-type food store shall be permitted to be located within the Premises);

(28)    Any office use, other than: (x) office space used in connection with and ancillary to a permitted retail use hereunder; and (y) retail offices providing services commonly found in similar first-class shopping centers in the Phoenix, Arizona metropolitan area (for example, financial services, real estate brokerage, insurance agency, banking (including credit unions and savings and loan institutions), and travel agency), provided that such uses are located at least 200 feet away from the Premises;

(29)    Any hotel/motel except one (1) such hotel or motel may be located on Pad I, Pad J, Pad L or Pad M as shown on Exhibit B hereto;

(30)    Any daycare center(s), except such day care center(s) may be located in any area of the Shopping Center other than "Pad G," and/or "Pad H" as shown on Exhibit B hereto;

(31)    Any veterinary office or overnight boarding of animals, except as may be incidental to a permitted full-line pet and pet supply store operating in at least 15,000 square feet of Floor Area and located at least 100 feet away from the Premises (except that a full-line pet and pet supply store shall be permitted to be located within the Premises); such occupant shall use reasonable efforts to prevent its customers from allowing their pets to urinate or defecate in the Common Areas and will promptly remove any "dog dirt" from in front of the Premises; no pet or pet supply store shall be located within 100 feet of the Premises;

(32)    Any children's entertainment or activity facility (such as "Discovery Zone", or "Chuck E. Cheese's") except that one (1) such business may be permitted provided it is located at least 250' away from the Premises or on a Permitted Pad (as defined in Item 24 hereof);

(33)    Any karate center;

(34)    Any movie theater;

(35)    Any restaurant serving meals for on- or off-premises consumption unless located 250 feet from the Premises or on any building site designated as a "Pad" on Exhibit B and provided that this restriction shall not apply to a café that is incidental to a primary use by an occupant consisting of 12,000 square feet or more of Floor Area;

(36)    Any beauty parlor or nail salon unless such businesses are located at least 250 feet away from the Premises;

M-3

I-18

(37)    Any health spa, exercise facility or similar type business, except that one (1) such health spa, exercise facility or similar type business containing less than 10,000 square feet of Floor Area may be permitted provided it is located at least 250' away from the Premises (if such business contains more than 10,000 square feet of Floor Area, then it may be permitted provided such business is located more than 500' away from the Premises); or

(38)    Subject to Item (3) above, any store primarily selling merchandise which is classed as "odd lot," "close out," "clearance," "discontinued," "cancellation," "second," "factory reject," "sample," "floor model," "demonstrator," "obsolescent," "over stock," "distressed," "bankruptcy," "fire sale" or "damaged", such as, for example, "Grossman's Bargain Outlet", "Contractor's Warehouse", "Big Lots", "Liquidation World", or "Odd Job"; provided that the retailer commonly known as "Christmas Tree Shops" shall be deemed not to violate the foregoing restriction.

I-19

**HARKINS QUEEN CREEK, L.L.C.**

8.3    **Prohibited Uses.** Except as otherwise provided in Section 8.1, Tenant shall not use the Premises, and Landlord shall not permit any part of the Shopping Center to be used, for any of the following purposes: sale of fireworks, bingo parlor, skating rink, amusement park, carnival, circus, sporting facility (except that this shall not restrict promotional events in the Common Areas of the Shopping Center located outside of Tenant's Protected Area as permitted by the CC&R's), flea-market or thrift store (but this restriction shall not apply to retailers who sell used or reconditioned goods together with new products such as **"Play it Again Sports"**, **"Computer Renaissance"**, **"EB Games"**, **"GameStop"**, **"Warehouse Records"**, and **"Blockbuster Video"**, nor to a first-class retailer such as **"Terri's Consignment"**, nor shall this restriction prohibit the operation of a so-called **"99-Cents"** or **"Dollar Store"** or a **"MacFrugals"**), church, meeting hall or auditorium (except the Premises and except combined restaurant/entertainment facilities as described in Section 8.4(d) may include meeting facilities), banquet facility except as part of a restaurant, call center, funeral parlor, massage parlor (except that massage therapy offered by a doctor, chiropractor, or nurse under the supervision of a doctor or chiropractor, or massage offered by a licensed massage therapist in connection with the operation of a salon, health club, national or regional massage studio (such as Massage Envy) or day spa otherwise permitted by this Lease shall be permitted), a medical marijuana facility or a so-called **"head shop"** or facility for the sale, rental, distribution or

display of drug paraphernalia such as roach clips, bongs, water pipes, coke spoons, cigarette wrapping papers, pipes and/or syringes, any use including adult-oriented sales or themes of a violent or sexual nature, including sale or display of pornographic materials (but this restriction shall not apply to a general interest bookstore such as "**Barnes & Noble**" or "**B. Dalton**" nor to a video store or kiosk such as Blockbuster Video or Redbox), lumber yard (except a full-line home improvement store such as Home Depot or Lowe's), manufacturing (but this restriction shall not apply to in-store assembly in the normal course or the production of beer by a brew pub), or other non-retail, non-restaurant, non-entertainment business, except retail service and commercial offices as provided below. Landlord shall not permit any portion of the Tenant Protected Area except as designated on the Site Plan to be used for outdoor sales or events of any kind by any other tenant or occupant of the Shopping Center.

8.4     **Restricted Uses.**

In addition, Landlord agrees that all sales and leases of space in the portions of the Shopping Center located within 600 feet of any entrance to the Premises shall include prohibitions on the retail sale of (a) popped popcorn, or (b) boxed or packaged candy, or (c) Dippin' Dots products.

(c)     Retail service and commercial offices in the Shopping Center shall not exceed 10% of the GLA of the Shopping Center (excluding the Premises) in the aggregate.

(d)     Landlord shall not permit any tenant or occupant to use any part of the Shopping Center for a bowling alley, video or other game parlor, billiard parlor, amusement center, children's recreational facility or party center; provided, however, high quality entertainment or combined restaurant/entertainment operations such as Jillian's, Dave & Busters, Gameworks, Chuck E. Cheese, and Peter Piper Pizza containing any of the foregoing uses may be permitted outside of the Use Restricted Area, and up to three pool tables in a restaurant shall be permitted and up to five video or pinball games shall be permitted in an otherwise permitted use.

(e)    Any health club or spa shall not occupy more than 50,000 square feet of GLA and shall be located outside of the Use Restricted Area. Any bar, disco or night club in the Shopping Center shall not occupy more than 20,000 square feet of GLA in the aggregate, and shall be operated in a high-class manner.  Not more than two bars, night clubs, or discos shall be permitted, and all bars shall be located outside of the Use Restricted Area.  For purposes of this subsection, high quality entertainment or combined restaurant/entertainment operations such as Jillian's and Dave & Busters, are not deemed bars, nightclubs, or discos.  Any off-track betting facility may be part of a sports bar or sports-theme restaurant that is located outside of the Use Restricted Area..  Any store for the sale of motor vehicles shall occupy less than 20,000 square feet of GLA, and shall keep all of its inventory indoors at all times, with none parked in the Common Area; provided, however, that the occasional promotional display of motor vehicles in the Common Area shall be permitted south of the Main Drive Aisle.

8.5    **Exemptions**.  The provisions of this <u>ARTICLE 8</u> shall not, however, be applicable to the premises identified on the Site Plan as **"Kohl's"** and **"Target,"** which premises shall be subject only to the restrictions set forth in the **"CC&Rs."**

I-22

KOHL'S PENNSYLVANIA, INC.

### Section 7.2

(a)    Landlord shall not, without the prior written consent of Tenant, at any time permit any occupant of space in the Shopping Center to (i) conduct or permit any bankruptcy sale unless directed by order of a court of bankruptcy or other court of competent jurisdiction or any fire or "going out of business" sale; (ii) use, or permit to be used, any sound broadcasting system or amplifying device which can be heard outside of such space, except systems or devices located within such spaces which are intended for hearing within such spaces and are not audible more than 25 feet outside of such spaces; (iii) use or permit the use of any portion of such space for any of the uses set forth in EXHIBIT I attached hereto; or (iv) use, operate, or maintain such space in such manner that any of the rates for any insurance carried by Tenant shall thereby be increased, unless Landlord shall pay to Tenant an amount equal to any such increase in rates on demand as each premium which shall include such increase shall become due and payable.  In the event of a violation of this Section by an occupant of space in the Shopping Center, Landlord shall promptly use its commercially reasonable efforts, including the diligent prosecution of litigation, to prevent the continuance of such violation.

(b)    Landlord shall not, without the prior written consent of Tenant, at any time permit any occupant of space within 300' of the Kohl's Building, other than the portion of the Land identified as "Lowe's Tract" on EXHIBIT B, to use, or permit to be used, the sidewalks adjacent to such occupant's space or any other portion of the Common Areas for the sale or display of any merchandise or for any other business, occupation, or undertaking.

23

I-23

KOHL'S PENNSYLVANIA, INC.

### ARTICLE XX
### TENANT'S USE OF PREMISES

Section 20.1   Tenant may use the Premises for any lawful use permitted under the OEA and applicable zoning ordinances; provided, however, Tenant shall not use the Premises for any use that is prohibited under EXHIBIT I (Prohibited Uses), or for any other purpose that is not consistent with a good, clean, first-class institutional-grade shopping center operation. Neither the foregoing language nor any other language contained in this Lease shall be construed to obligate Tenant to operate a store within the Premises.

39

I-24

KOHL'S PENNSYLVANIA, INC.

## EXHIBIT I

## PROHIBITED USES

(a)    Warehouse, storage or for any manufacturing (except in connection with and incidental to retail sales on premises), distillation, refining, smelting, agriculture (except in connection with a retail nursery or garden center), or mining operation; provided, however, the restriction against distillation shall not apply to a "brew pub" if the "brew pub" is permitted in clauses (h) or (v) below;

(b)    "Second-hand" store whose principal business is selling used merchandise, thrift shops, salvation army type stores, "goodwill" type stores, and similar businesses; provided, however, the foregoing restriction shall not apply to a store selling reconditioned merchandise together with new merchandise in a first class manner (e.g., EB Games, Game Stop, Wherehouse Records, Hollywood Video, Game Crazy, Blockbuster, Computer Renaissance and Play-It-Again Sports)

(c)    Mobile home park, trailer court, labor camp, junk yard, or stock yard (except that this provision shall not prohibit the temporary use of construction trailers during any periods of construction, reconstruction or maintenance); provided, however, the foregoing restriction shall not apply to recycling centers required for any retail operation by governmental restrictions;

(d)    Dumping, disposing, incinerating, or reducing of garbage (exclusive of dumpsters for the temporary storage of garbage and any garbage compactors, in each case which are regularly emptied so as to minimize offensive odors); provided, however, the foregoing restriction shall not apply to recycling centers required for any retail operation by governmental restrictions;

(e)    Fire, going out of business, relocation, bankruptcy or similar sales (unless pursuant to court order);

(f)    Central laundry or dry cleaning plant (provided, however, any central laundry or dry cleaning plant shall be required to be equipped with a "closed-loop" system and Landlord shall be responsible for any contamination resulting from such central laundry or dry cleaning plant as if Landlord caused such contamination directly) or laundromat anywhere within the Shopping Center;

(g)    Selling or leasing new or used automobiles, trucks, trailers, or recreational vehicles; provided, however, Landlord may display no more than five cars within the Common Area, from time to time, as part of temporary Shopping Center promotions, provided further that no such cars are displayed upon any part of Tenant's Tract;

(h)    Any bowling alley, skating rink or bar (unless part of a sit down restaurant), dance hall, discotheque, or night club (provided, however, the foregoing restriction upon a dance hall or night club shall not prohibit a family oriented, first-class restaurant operation from having a dance floor that does not exceed 500 square feet of Floor Area for use by lunch or dinner patrons and the foregoing restriction upon a bar shall not prohibit the operation of a first class microbrewery or "brew pub" upon any freestanding pad except Pad H;

(i)    Veterinary hospital or animal raising or boarding facilities (except that this restriction shall not be deemed to preclude the operation of a pet shop or pet supply store);

(j)    Funeral home or mortuary;

(k)    Any establishment which stocks, displays, sells, rents or offers for sale or rent any (i) pornographic material; provided, however, the foregoing restriction shall not prohibit the operation of a full-line video store by a regional or national retailer in accordance with its customary store operations and in compliance with law (e.g., Blockbuster Video, Hollywood Video or Video Update) or a full-line bookstore by a regional or national retailer in accordance with its customary store operations and in compliance with law (e.g., Borders, Barnes & Noble or Walden Books) or (ii) any merchandise or material commonly used or intended for use with or in consumption of any narcotic, dangerous drug or other controlled substance, including without limitation, any hashish pipe, waterpipe, bong, cilium, pipe screens, rolling papers, rolling

devices, coke spoons or roach clips; provided, however, the foregoing restriction shall not prohibit the operation of a full-line drug store or pharmacy by a regional or national retailer in accordance with its customary store operations and in compliance with law .

(l)     Flea market; provided, however, this restriction shall not be deemed to prohibit Landlord from having farmers' markets, art shows or other similar first class promotional events (collectively, "Promotional Events") within the Common Area on a temporary basis (not to exceed three consecutive days), from time to time, provided that no such Promotional Events are held within 1,000 feet of the Building and the area used to hold such Promotional Events does not exceed five percent of the available parking spaces in the Common Area where such Promotional Events are permitted;

(m)     Car wash (except on Pads G, I, J, K, L or M);

(n)     Massage parlor; provided, however the foregoing restriction shall not apply to doctors, chiropractors, or licensed nurse practitioners or prohibit massage services by a first class massage studio such as Massage Envy or massage services provided as an incidental use of the operation of a beauty salon, health club, or athletic facility otherwise permitted in the Shopping Center

(o)     Living quarters, sleeping apartments or lodging rooms;

(p)     Tattoo parlor;

(q)     Church, school, day care center (provided, however, the foregoing restriction shall not apply to a day care center located upon Pad H or more than 500 feet from the Kohl's Building) or related religious or educational facility or religious reading room;

(r)     Automotive service and repair (provided, however, the foregoing restriction shall not apply to (i) the retail gasoline service station identified as "Car Wash" or (ii) to one other retail gasoline service station located upon Pads G, I, J, K, L or M, or (iii) to one specialty automotive service/repair facility located upon Pads G, I , J, K, L or M, provided such specialty automotive/repair facility is operated by a regional or national chain such as a "Jiffy Lube" or "Midas" and does not provide general automotive repair or body work services or (iv) to one traditional "tire, battery and accessories" or similar facility ("TBA"), provided such TBA is operated by a regional or national chain and does not provide general automotive repair or body work services;

(s)     Office, except for a bank or financial institution, travel agency, insurance agency, medical or dental clinic (provided that any such clinic does not admit patients for overnight stays), real estate sales office, stock brokerage office, title insurance office, loan company office, optometrist office, optical, post office, packing store or other "retail office" or "service office" typically found in first class shopping centers or for Landlord's on-site management office or office space used by any other tenant or occupant of the Shopping Center so long as any such office is incidental to such tenant's or occupant's primary use;

(t)     Cinema or movie theater;

(u)     Amusement arcade, amusement center, amusement gallery or video game room (collectively, "Amusement Center") (provided, however, the foregoing shall not prohibit an occupant of the Shopping Center from having five or fewer games as an ancillary part of its business), gymnasium or off-track betting parlor; provided, however, the foregoing restriction shall not apply to such uses on Pad F or Pad G or more than 300 feet from Tenant's Tract, provided further that any gymnasium located in the Shopping Center shall be parked at a ratio of one parking space for each 150 square feet of Floor Area and any off-track gambling parlor shall be located within a restaurant as an ancillary use thereof.

I-2

I-26

**OLD NAVY, LLC**

13.3    **Prohibited Uses**

(A)    Landlord covenants that no portion of the Shopping Center and Tenant covenants that no portion of the Premises shall be used for any of the following purposes: a bowling alley; a video or amusement arcade (other than as an incidental use); the sale of alcoholic beverages within five hundred (500) feet of the Premises, except in connection with a business whose primary use is a restaurant; a movie theatre within one thousand (1,000) feet of the Premises; a fitness center, gymnasium, aerobics studio or weightlifting center within two hundred and fifty (250) feet of the Premises (provided that Tenant shall be permitted to conduct yoga and fitness classes at the Premises on a non-primary basis); the sale of automotive parts including tires (other than as an incidental use) or automotive services including repair services; the sale, rental or display of materials that are pornographic in nature; any unusual fire, explosive or dangerous hazards (including the storage, display or sale of explosives or fireworks other than "sparklers"); a carnival or amusement park; the sale of Christmas trees or pumpkins within the parking lot or other Common Areas; an assembling (other than assembly of merchandise purchased at retail, such as the assembly of bicycles by a bicycle retailer), manufacturing, distilling (other than in connection with the operation of a brew pub or microbrewery), refining, smelting, industrial, agricultural, drilling or mining operation (other than typical environmental and/or geotechnical testing); storage (other than as an incidental use); a commercial laundry or dry cleaning plant; a laundromat; any establishment (including a pet supply store) that allows animals (other than guide dogs) to be brought into such space; a veterinarian or veterinary hospital (other than as an incidental use); a mortuary or funeral establishment; the sale of coffins or caskets; a pawn shop; a flea market; a shooting gallery; any use that permits a pest infestation without prompt action to eliminate the infestation; any use that permits noxious odors to be smelled outside of the premises; and any use that permits vibrations to be felt outside of the premises. Landlord shall promptly take all prudent actions to ensure that such uses are prohibited, including, without limitation, listing such prohibitions in the leases and occupancy agreements with all tenants of the Shopping Center and taking all commercially reasonable efforts as necessary or prudent to enforce such prohibitions. If Landlord fails to take such actions within one (1) month after notice from Tenant, Tenant shall have the right to take such actions on behalf of, and at the cost and expense of, Landlord.

(B)    In addition, Landlord covenants that, during the Term, no portion of the Shopping Center shall be used for any of the prohibited uses contained in a lease or operating agreement for another tenant or occupant of the Shopping Center, which prohibited uses are set forth verbatim on **Exhibit G**. Tenant covenants that Tenant shall be bound by each prohibited use set forth on **Exhibit G** to the extent it applies to the Premises until the earlier to occur of (1) the date on which the lease or operating agreement containing the prohibited use expires, is terminated or modified to remove such prohibited use, or (2) the date on which another party at the Shopping Center uses or is permitted to use its premises for such prohibited use.

292493.3
291670.1

ON #6621 Queen Creek
Queen Creek, AZ
2195511137.2 56837/329439

23

4.30.2018

I-27

325821301.2

OLD NAVY, LLC                    **EXHIBIT G**

**SCHEDULE OF PROHIBITED USES**
**FOR**
**QUEEN CREEK MARKETPLACE**
(as of February 27, 2017)

CH File No. 56837.311522

| TENANT | PROHIBITED USE |
|---|---|
| 2B Wireless (T-Mobile) | None |
| Alliance Urgent Care (*d/b/a* One Health) | None |
| America's Best Contacts | None |
| Applebee's (*dark*) | None. |
| Barro's | None. |
| Beall's (*sublease* from OfficeMax) | **Section 10.** Without Tenant's prior written approval, which approval may be withheld in Tenant's sole discretion, Landlord shall not make any changes in the Tenant Protected Area as shown on **Exhibit "B"**, including without limitation changing the entrances to or access routes within such Tenant Protected Area, constructing or installing any structures or other improvements within such Tenant Protected Area (including kiosks, signs, or automated teller machines)<br><br>**Section 21.** During the Initial Term of this lease and during any renewal period hereunder:<br><br>(a)    No portion of the Shopping Center located within two hundred linear feet (200') of the demising walls of the Demised Premises shall be used as a restaurant, or for office purposes (such as medical or office uses, except that administrative offices incidental to a retail store operation or a veterinary clinic located within a pet supply store such as PetsMart shall be permitted), or for any use that requires parking in excess of five (5) spaces for each one thousand (1,000) square feet of leasable floor area, or for any use prohibited under **subparagraphs (c) or (d)** immediately below;<br><br>(b)    No portion of the Shopping Center shall be occupied or used in violation of the OEA;<br><br>(c)    No portion of the Shopping Center (excluding the portion owned by Target Corporation and the portion ground leased to Kohl's Department Stores, Inc.) shall be occupied or used, directly or indirectly, for a nightclub or other entertainment facility, bowling alley, arcade (but the foregoing does not preclude the use of up to ten (10) pinball or video games in connection with an otherwise permitted use which is located at least one hundred (100) linear feet from the demising walls of the Demised Premises); amusement center (as determined by prevailing community standards and provided that the use of up to ten (10) pinball or video games in connection with an otherwise permitted use which is located at least one hundred (100) linear feet from the demising walls of the Demised Premises shall not be considered an amusement center), theater; movie theater (but the foregoing does not preclude a movie theater which is located at least three hundred (300) linear feet from the demising walls of the Demised Premises); fitness center, health club or spa (except that an exercise studio or Jazzercise facility consisting of four thousand (4,000) square feet or less may be permitted so long as such space is located at least one hundred (100) linear feet from the demising walls of the Demised Premises and a fitness center, health club or spa may be permitted so long as such space is located at least three hundred (300) linear feet from the demising walls of the Demised |

1

205510090.1 56837/311522

325821301.2

| TENANT | PROHIBITED USE |
|---|---|
| | Premises); game room (but the foregoing does not preclude the use of up to ten (10) pinball or video games in connection with an otherwise permitted use which is located at least one hundred (100) linear feet from the demising walls of the Demised Premises); skating rink; billiard room (but the foregoing does not preclude up to two tables in connection with an otherwise permitted use which is located at least one hundred (100) linear feet from the demising walls of the Demised Premises); massage parlor (except for massage services offered by a health spa, a beauty salon, a medical doctor or chiropractor which massage services are incidental to a use otherwise permitted under this lease); adult book store or any other purpose which includes the display or sale of pornographic or obscene materials (as determined by prevailing community standards); off-track betting facility (but the foregoing shall not preclude off-track betting in connection with an otherwise permitted restaurant which is located at least one hundred (100) linear feet from the demising walls of the Demised Premises); flea market; second hand store; pawn shop; blood bank; goodwill store; bar; liquor store or store selling alcoholic beverages for off premises consumption (except that (i) a full service grocery store, drugstore, or Cost Plus may sell alcoholic beverages in prepackaged containers, (ii) a gourmet grocer such as Trader Joe's, or (iii) a gourmet or specialty liquor store, such as The Sportsman or Total Wine or Beverage & More may be permitted); tavern or pub (but the foregoing does not preclude a restaurant from selling alcoholic beverages so long as at least fifty percent (50%) of the restaurant's gross sales are from the sale of food); discotheque, ballroom or dance hall (but the foregoing does not preclude incidental patron dancing in an otherwise permitted restaurant which is located at least one hundred (100) linear feet from the demising walls of the Demised Premises); day care center (except that a day care center located on a freestanding pad located at least three hundred (300) linear feet from the demising walls of the Demised Premises may be permitted); beauty school; barber college; offices (other than a full service bank office, savings and loan association office, credit union, medical or dental office customarily located in shopping centers, administrative offices incidental to a retail store operation, or a veterinary clinic located within a pet supply store such as PetsMart) (provided, however, that up to ten percent (10%) of the floor area of the Shopping Center may be used as office space so long as such office space is located at least three hundred (300) linear feet from the demising walls of the Demised Premises); place of instruction; reading room (except for a reading room maintained by Barnes & Noble within its premises); or any operation catering primarily to students or trainees rather than to customers or for any use prohibited under subparagraph (d) immediately below; provided, however, notwithstanding the foregoing in this subsection (c), the following uses are permitted in the Lifestyle Center depicted as such on **Exhibit "B"**: a nightclub or other entertainment facility, bowling alley, arcade, amusement center, tavern, pub, discotheque, ballroom, or dance hall; |
| | (d)   No portion of the Shopping Center shall be occupied or used in violation of any prohibitions or restrictions on use contained in any document or instrument listed on **Exhibit "D"** |
| | (e)   No portion of the Shopping Center (other than the Demised Premises) shall be leased, occupied or sold by Landlord to a direct competitor of Tenant, such as Staples, Office Depot, Mardel Christian Office and Education Supply Store, Mail Boxes, etc., FedEx/Kinko's or Workplace. |
| Bed Bath & Beyond | **Section 13.1.2:**  Landlord shall not lease, rent or, occupy or permit any portion of the Shopping Center to be occupied (except to the extent otherwise permitted under any lease for space in the Shopping Center existing as of the Effective Date) for any of the "**Prohibited Uses**" (defined in Exhibit M hereto annexed). The provisions of this section shall not be applicable to the portions of the Shopping Center owned and/or leased by Target Corporation, Kohl's, Major N Occupant and their respective successors and assigns.

**Exhibit M:  Prohibited Uses** |

| TENANT | PROHIBITED USE |
|---|---|
|  | As used in this Lease, the term "**Prohibited Uses**" shall mean any of the following uses:<br><br>A.    As to the Shopping Center, any of the following uses:<br><br>(1)    Any use which emits or results in strong, unusual or offensive odors, fumes, dust or vapors (other than the ordinary odors emitted from coffee shops, restaurants or nail salons), is a public or private nuisance, emits noise or sounds which are objectionable due to intermittence, beat, frequency, shrillness or loudness, creates a hazardous condition, or is used, in whole or in part, as or for warehousing or the dumping or disposing of garbage or refuse (other than governmentally required recycling centers).<br><br>(2)    Any operation primarily used as a storage facility and any assembling, manufacturing, distilling, refining, smelting, agricultural, or mining operation (except that this provision shall not prohibit incidental assembly, manufacturing or refining which is strictly incidental to a retail use typically located in first class shopping centers, such as, by way of example, assembly of products or operation of a brew pub);<br><br>(3)    Any "**second hand**" store, "**surplus**" store (except that this provision shall not prohibit a store that sells blemished or reconditioned goods, such as EB Games, Game Stop, Hollywood Video, Blockbuster Video, Play It Again Sports or Computer Renaissance or a first class retailer such as Terry's Consignment, as such stores are presently operated);<br><br>(4)    Any mobile home park, trailer court, labor camp, junkyard, or stockyard (except that this provision shall not prohibit the temporary use of construction trailers during periods of construction, reconstruction, or maintenance);<br><br>(5)    Any dumping, disposing, incineration, or reduction of garbage (exclusive of trash compactors or trash containers located near the rear of any building);<br><br>(6)    Any fire sale, bankruptcy sale (unless pursuant to a court order), auction house operation, fictitious going-out-of-business sale, lost-our-lease sale or similarly advertised event;<br><br>(7)    Any central laundry, dry cleaning plant, or laundromat located within 250 feet of the Premises or which is greater than five thousand (5,000) square feet;<br><br>(8)    Any automobile, truck, trailer, boat, or recreational vehicle sales, leasing, display or body shop repair operation;<br><br>(9)    Any bowling alley or skating rink;<br><br>(10)    Any live performance theater, auditorium, meeting hall or sporting event;<br><br>(11)    Any living quarters, sleeping apartments, or lodging rooms;<br><br>(12)    Any veterinary hospital or animal raising or boarding facilities (except to the extent permitted below), but this shall not be applicable to a national pet supply store such as Petco and PetsMart and shall not be deemed to prohibit a national pet supply store such as Petco or PetsMart from providing overnight boarding for animals;<br><br>(13)    Any mortuary or funeral home;<br><br>(14)    Any "**Pornographic Use**", which shall include, without limitation, a store displaying for sale or exhibition books, magazines or other publications containing any combination of photographs, drawings or sketches of a sexual nature, which are not primarily scientific or educational, or a store offering for exhibition, sale or rental video cassettes or other medium capable of projecting, transmitting or reproducing, independently or in conjunction |

| TENANT | PROHIBITED USE |
|---|---|
|  | with another device, machine or equipment, an image or series of images, the content of which has been rated or advertised generally as NC-17 or "**X**" or unrated by the Motion Picture Rating Association, or any successor thereto; the parties hereto acknowledge and agree (i) the sale of books, magazines and other publications by a national bookstore of the type normally located in first-class shopping centers in the State in which the Shopping Center is located (such as, for example, Borders and Barnes & Noble, as said stores currently operate), (ii) the sale and/or rental of videos by a full line video store or consumer electronics store (such as, for example, Blockbuster Video, Hollywood Entertainment, Circuit City or Best Buy as such stores are presently operated), or (iii) the exhibition of general release or release of general release movies of the type typically shown in movie theaters located in first-class shopping centers, or (iv) the sale of magazines and other publications by a convenience store (such as, for example, 7-11 and Circle K), shall not be deemed a "**pornographic use**" hereunder; or massage parlor (except that the foregoing prohibition shall not apply to massage services offered by a doctor, chiropractor, physical therapist or nurse in an office permitted hereunder, or to incidental massage services offered at a health club, day spa or beauty salon permitted hereunder) or to a first class massage studio such as Massage Envy; |
|  | (15)    Any so-called "**head shop**", or other establishment primarily selling or exhibiting drug-related paraphernalia; |
|  | (16)    Any bar, tavern, or other establishment selling alcoholic beverages for on- or off-premises consumption, except as incidental to a restaurant use permitted pursuant to **clause (35)** below, provided that the reasonably projected annual gross revenues from the sale of alcoholic beverages for on-premises consumption in such restaurant shall not exceed forty percent (40%) of the gross revenues of such restaurant, and further provided, that said forty percent (40%) restriction shall not apply to any national or regional family-oriented, sit-down restaurant such as TGI Fridays, Red Lobster, Olive Garden and Bennigans. In addition, nothing in this **paragraph (16)** shall restrict the sale of alcoholic beverages for off premises consumption by a grocery store or a liquor store such as Total Wine or Beverages and More; |
|  | (17)    Any catering or banquet hall; |
|  | (18)    Any flea market, amusement or video arcade, pool or billiard hall, night club, discotheque, or dance hall, provided, however, that this restriction shall not prohibit (a) any tenant or occupant of a Pad (as defined in **clause (24)** below) from having five (5) or fewer amusement or video arcade games incidental to an otherwise permitted use, or (b) any restaurant permitted by **clause (35)** below from having, as an incidental use, up to three (3) pool/billiard tables; or (c) a freestanding pad from being used as a Chuck E. Cheese or Peter Piper Pizza; |
|  | (19)    Any training or education facility, including but not limited to: beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers; provided, however, this prohibition shall not be applicable to on-site employee training by an Occupant incidental to the conduct of its business at the Shopping Center; |
|  | (20)    Any gambling facility or operation, including but not limited to: off-track or sports betting parlor; table games such as black-jack or poker; slot machines; video poker/black-jack/keno machines or similar devices; or bingo hall. Notwithstanding the foregoing, this prohibition shall not apply to governmental sponsored gambling activities, or charitable gambling activities, so long as such governmental and/or charitable activities are incidental to the business operation being conducted by the Occupant; |
|  | (21)    Any unlawful use; |
|  | (22)    Any pawn shop, gun shop, or tattoo and/or body piercing parlor; provided, however, that this prohibition shall not be applicable to the sale of guns as part of a national or regional full line sporting goods store; |

| TENANT | PROHIBITED USE |
|---|---|
|  | (23)   Any church or other place of religious worship; |
|  | (24)   Any car wash, automobile repair shop, or any business servicing motor vehicles in any respect, including, without limitation, any quick lube oil change service, tire center or gasoline or service station or facility unless located on a building site designated as a "**Pad**" on **Exhibit B** (a "**Pad**"); |
|  | (25)   Any carnival, amusement park or circus; |
|  | (26)   Any medical clinics or medical offices except that no more than three medical offices (and not clinics) totaling in the aggregate not more than fifteen thousand (15,000) square feet of Floor Area may be located in the Shopping Center no less than two hundred fifty feet (250') from the Premises and that they are first class medical offices of the type typically found in first-class shopping centers and, in addition, additional first class offices medical offices may be located on Shops E, Pad I, Pad J, Pad K, Pad L, Pad M, Shops A and Pad A with no limit on the aggregate Floor Area in those areas; |
|  | (27)   Intentionally Omitted. |
|  | (28)   Any office use, other than: (x) office space used in connection with and ancillary to a permitted retail use hereunder; and (y) retail offices providing services commonly found in similar first-class shopping centers in the Phoenix, Arizona metropolitan area (for example, financial services, real estate brokerage, insurance agency, banking, travel agency), provided that such uses are located at least one hundred fifty feet (150') away from the Premises, and not more than ten percent (10%) of Floor Area in the Shopping Center, in the aggregate, shall be devoted to such uses; |
|  | (29)   Any hotel/motel except on Pad I, Pad J, Pad K, Pad L and Pad M; |
|  | (30)   Any day care center, except that same may be located on any Pad; |
|  | (31)   Any store selling live animals of any kind or veterinary office, except as may be incidental to a full-line pet and pet supply store operating in at least 10,000 square feet of Floor Area and located at least one hundred fifty feet (150') from the Premises or on any Pad; any such occupant shall use reasonable efforts to prevent its customers from allowing their pets to urinate or defecate in the Common Areas and will promptly remove any "**dog dirt**" from the Common Areas; |
|  | (32)   Any children's entertainment or activity facility (such as "**Discovery Zone**", or "**Chuck E. Cheese's**") unless located more than two hundred fifty feet (250') from the Premises or on a Pad; |
|  | (33)   Any karate center; |
|  | (34)   Any movie theater; |
|  | (35)   Any restaurant serving meals for on- or off-premises consumption unless located two hundred fifty feet (250') from the Premises, except that restaurants may be located on any Pad at the Shopping Center and provided that this restriction shall not apply to a café operated by a major tenant incidental to its primary use; |
|  | (36)   Any beauty parlor or nail salon (except that beauty parlors and/or nail salons shall be permitted, provided that such uses are located at least two hundred fifty feet (250') away from the perimeter of the Premises; |
|  | (37)   Any health spa, exercise facility or similar type business located less than two hundred fifty feet (250') from the Premises. |
| Bev Mo | None |

5

| TENANT | PROHIBITED USE |
|---|---|
| Bikes Direct | None |
| Buffalo Wild Wings | **Supplemental Declaration of Covenants and Restrictions, Recital C, Paragraph 2.** So long as Owner (or Owner's tenant or occupant) is conducting business operations on the Owner Parcel for the Initial Use, except for temporary closures due to damage, destruction or remodeling of the improvements constructed on the Owner Parcel, then Developer shall not sell, lease or rent any other premises within the portions of the Shopping Center presently owned by Developer for use as a Fox and Hound or Baileys restaurant. The provisions of this Paragraph C(2) shall be applicable only to Developer and shall not be binding upon any other tenant or occupant of the Shopping Center and such tenants or occupants may change use and/or assign or sublet without regard to the provisions of this Paragraph C(2). Owner acknowledges that the sale/leasing restrictions set forth in this Paragraph C(2) are restrictions against Developer's acts only and that the provisions of this Paragraph C(2) are in no way meant to act as an exclusive use provision in favor of Owner nor grant to Owner the exclusive right to (a) sell any product or product type, or (b) conduct business for any particular use, in the Shopping Center and that nothing contained in this Paragraph C(2) shall prohibit any tenant or occupant of the Shopping Center from conducting any particular use. Owner further agrees that, to the extent any provision of this Paragraph C(2) could be interpreted (whether by Owner or any third party) to be an exclusive use provision in favor of Owner, that Developer and Owner hereby agree that the provisions of this Paragraph C(2) are not an exclusive use provision shall not and should not be interpreted as such, now or in the future. |
| Chase Bank | None |
| Chick-Fil-A | None |
| Chipotle | None |
| Cost Plus | **Section 9.1(b):** Tenant has entered into this Lease in reliance upon representations by Landlord that the Shopping Center is and will remain retail in character, and, further, no part of which shall be used for any Prohibited Use or any use which violates the Project Documents. In addition, except for the rights of tenants under leases in effect as of the date of this Lease, and except with the express prior written consent of Tenant, the following uses shall be prohibited within two hundred two hundred feet (200') of the front door of the Store (it being understood that such radius restriction shall apply in the front and sides of the Store, and not to the rear of the Store): (i) any full service, sit-down restaurant (provided, however the foregoing restaurant restriction shall not preclude another tenant from operating a café as an incidental part of its business, provided that the floor area devoted to the operation of such café does not exceed five percent (5%) of the total Leasable Floor Area occupied by such other tenant); and (ii) any health club, health spa, gymnasium, fitness center or similar business. Landlord shall uniformly enforce as against all tenants and other occupants of the Shopping Center the restrictions referred to herein as Prohibited Uses.<br><br>**Section 18.5:** Landlord shall not place permanent or temporary kiosks, displays, carts and stands in the Common Areas located within Tenant's Control Area. |
| Dollar Tree | None |
| Downeast Outfitters | None |
| Famous Footwear | None |
| Frazee Paints | None |
| Geno's Pizza | None |
| GNC | None |
| Great Clips | None |

6

| TENANT | PROHIBITED USE |
|---|---|
| Harkins | **Section 8.3:** Except as otherwise provided in <u>Section 8.1</u>, Tenant shall not use the Premises, and Landlord shall not permit any part of the Shopping Center to be used, for any of the following purposes: sale of fireworks, bingo parlor, skating rink, amusement park, carnival, circus, sporting facility (except that this shall not restrict promotional events in the Common Area of the Shopping Center located outside of Tenant's Protected Area as permitted by the CC&R's), flea market or thrift store (but this restriction shall not apply to retailers who sell used or reconditioned goods together with new products such as "<u>Play It Again Sports</u>", "<u>Computer Renaissance</u>", "<u>EB Games</u>", "<u>GameStop</u>", "<u>Warehouse Records</u>", and "<u>Blockbuster Video</u>", nor to a first-class retailer such as "<u>Terri's Consignment</u>", nor shall this restriction prohibit the operation of a so-called "<u>99-Cents</u>" or "<u>Dollar Store</u>" or a "<u>MacFrugals</u>"), church, meeting hall or auditorium (except the Premises and except combined restaurant/entertainment facilities as described in Section 8.4(d) may include meeting facilities), banquet facility except as part of a restaurant, call center, funeral parlor, massage parlor (except that massage therapy offered by a doctor, chiropractor, or nurse under the supervision of a doctor or chiropractor, or massage offered by a licensed massage therapist in connection with the operation of a salon, health club, national or regional massage studio (such as Massage Envy) or day spa otherwise permitted by this Lease shall be permitted, a medical marijuana facility or a so-called "<u>head shop</u>" or facility for the sale, rental, distribution or display of drug paraphernalia such as roach clips, bongs, water pipes, coke spoons, cigarette wrapping papers, pipes and/or syringes, any use including adult-oriented sales or themes of a violent or sexual nature, including sale or display of pornographic materials (but this restriction shall not apply to a general interest bookstore such as "<u>Barnes & Noble</u>" or "<u>B. Dalton</u>" nor to a video store or kiosk such as Blockbuster Video or Redbox), lumber yard (except a full-line home improvement store such as Home Depot or Lowe's), manufacturing (but this restriction shall not apply to in-store assembly in the normal course or the production of beer by a brew pub), or other non-retail, non-restaurant, non-entertainment business, except retail service and commercial offices as provided below. Landlord shall not permit any portion of the Tenant Protected Area except as designated on the Site Plan to be used for outdoor sales or events of any kind by any other tenant or occupant of the Shopping Center. |
| In-N-Out | See Target OEA. |
| Jo-Ann Stores | None |
| Joint, The | |
| Justice Stores | None |
| ▓▓▓▓▓▓ | None. |
| Kohl's | **Exhibit I:  PROHIBITED USES**<br><br>(a)    Warehouse, storage or for any manufacturing (except in connection with and incidental to retail sales on premises), distillation, refining, smelting, agriculture (except in connection with a retail nursery or garden center), or mining operation; provided, however, the restriction against distillation shall not apply to a "<u>brew pub</u>" if the "<u>brew pub</u>" is permitted in <u>clauses (b) or (v)</u> below;<br><br>(b)    "<u>Second-hand</u>" store whose principal business is selling used merchandise, thrift shops, salvation army type stores, "<u>goodwill</u>" type stores, and similar businesses; provided, however, the foregoing restriction shall not apply to a store selling reconditioned merchandise together with new merchandise in a first class manner (e.g., EB Games, Game Stop, Wherehouse Records, Hollywood Video, Game Crazy, Blockbuster, Computer Renaissance and Play-It-Again Sports)<br><br>(c)    Mobile home park, trailer court, labor camp, junk yard, or stock yard (except that this provision shall not prohibit the temporary use of construction trailers during any periods of construction, reconstruction |

7

| TENANT | | PROHIBITED USE |
|---|---|---|
| | | or maintenance); provided, however, the foregoing restriction shall not apply to recycling centers required for any retail operation by governmental restrictions; |
| | (d) | Dumping, disposing, incinerating, or reducing of garbage (exclusive of dumpsters for the temporary storage of garbage and any garbage compactors, in each case which are regularly emptied so as to minimize offensive odors); provided, however, the foregoing restriction shall not apply to recycling centers required for any retail operation by governmental restrictions; |
| | (e) | Fire, going out of business, relocation, bankruptcy or similar sales (unless pursuant to court order); |
| | (f) | Central laundry or dry cleaning plant (provided, however, any central laundry or dry cleaning plant shall be required to be equipped with a "closed-loop" system and Landlord shall be responsible for any contamination resulting from such central laundry or dry cleaning plant as if Landlord caused such contamination directly) or laundromat anywhere within the Shopping Center; |
| | (g) | Selling or leasing new or used automobiles, trucks, trailers, or recreational vehicles; provided, however, Landlord may display no more than five cars within the Common Area, from time to time, as part of temporary Shopping Center promotions, provided further that no such cars are displayed upon any part of Tenant's Tract; |
| | (h) | Any bowling alley, skating rink or bar (unless part of a sit down restaurant), dance hall, discotheque, or night club (provided, however, the foregoing restriction upon a dance hall or night club shall not prohibit a family oriented, first-class restaurant operation from having a dance floor that does not exceed five hundred (500) square feet of Floor Area for use by lunch or dinner patrons and the foregoing restriction upon a bar shall not prohibit the operation of a first class microbrewery or "brew pub" upon any freestanding pad except Pad H; |
| | (i) | Veterinary hospital or animal raising or boarding facilities (except that this restriction shall not be deemed to preclude the operation of a pet shop or pet supply store); |
| | (j) | Funeral home or mortuary; |
| | (k) | Any establishment which stocks, displays, sells, rents or offers for sale or rent any (i) pornographic material; provided, however, the foregoing restriction shall not prohibit the operation of a full-line video store by a regional or national retailer in accordance with its customary store operations and in compliance with law (e.g., Blockbuster Video, Hollywood Video or Video Update) or a full-line bookstore by a regional or national retailer in accordance with its customary store operations and in compliance with law (e.g., Borders, Barnes & Noble or Walden Books) or (ii) any merchandise or material commonly used or intended for use with or in consumption of any narcotic, dangerous drug or other controlled substance, including without limitation, any hashish pipe, waterpipe, bong, cilium, pipe screens, rolling papers, rolling devices, coke spoons or roach clips; provided, however, the foregoing restriction shall not prohibit the operation of a full-line drug store or pharmacy by a regional or national retailer in accordance with its customary store operations and in compliance with law. |
| | (l) | Flea market; provided, however, this restriction shall not be deemed to prohibit Landlord from having farmers' markets, art shows or other similar first class promotional events (collectively, "Promotional Events") within the Common Area on a temporary basis (not to exceed three consecutive days), from time to time, provided that no such Promotional Events are held within one thousand (1,000) feet of the Building and the area used to hold such Promotional Events does not exceed five percent of the available parking spaces in the Common Area where such Promotional Events are permitted; |

205510090.1 56837/311522

8

| TENANT | PROHIBITED USE |
|---|---|
| | (m)  Car wash (except on Pads G, I, J, K, L or M); |
| | (n)  Massage parlor; provided, however the foregoing restriction shall not apply to doctors, chiropractors, or licensed nurse practitioners or prohibit massage services by a first class massage studio such as Massage Envy or massage services provided as an incidental use of the operation of a beauty salon, health club, or athletic facility otherwise permitted in the Shopping Center |
| | (o)  Living quarters, sleeping apartments or lodging rooms; |
| | (p)  Tattoo parlor; |
| | (q)  Church, school, day care center (provided, however, the foregoing restriction shall not apply to a day care center located upon Pad H or more than five hundred feet (500') from the Kohl's Building) or related religious or educational facility or religious reading room; |
| | (r)  Automotive service and repair (provided, however, the foregoing restriction shall not apply to (i) the retail gasoline service station identified as "Car Wash" or (ii) to one other retail gasoline service station located upon Pads G, I, J, K, L or M, or (iii) to one specialty automotive service/repair facility located upon Pads G, I, J, K, L or M, provided such specialty automotive/repair facility is operated by a regional or national chain such as a "Jiffy Lube" or "Midas" and does not provide general automotive repair or body work services or (iv) to one traditional "tire, battery and accessories" or similar facility ("TBA"), provided such TBA is operated by a regional or national chain and does not provide general automotive repair or body work services; |
| | (s)  Office, except for a bank or financial institution, travel agency, insurance agency, medical or dental clinic (provided that any such clinic does not admit patients for overnight stays), real estate sales office, stock brokerage office, title insurance office, loan company office, optometrist office, optical, post office, packing store or other "retail office" or "service office" typically found in first class shopping centers or for Landlord's on-site management office or office space used by any other tenant or occupant of the Shopping Center so long as any such office is incidental to such tenant's or occupant's primary use; |
| | (t)  Cinema or movie theater; |
| | (u)  Amusement arcade, amusement center, amusement gallery or video game room (collectively, "Amusement Center") (provided, however, the foregoing shall not prohibit an occupant of the Shopping Center from having five or fewer games as an ancillary part of its business), gymnasium or off-track betting parlor; provided however, the foregoing restriction shall not apply to such uses on Pad F or Pad G or more than three hundred feet (300') from Tenant's Tract, provided further that any gymnasium located in the Shopping Center shall be parked at a ratio of one parking space for each one hundred fifty (150) square feet of Floor Area and any off-track gambling parlor shall be located within a restaurant as an ancillary use thereof. |
| Love/Sick | None. |
| Macayos (dark) | None. |
| Massage Envy | None |
| Mattress Firm | None |
| Maurice's | None. |
| Mountainside Fitness | None. |

9

205510090.1 56837/311522

I-36

| TENANT | PROHIBITED USE |
|---|---|
| Olive Garden | None. |
| Paradise Bakery | None. |
| Peach Tree Dental | None |
| PetsMart | **Exhibit G:** Any use in violation of the OEA is prohibited during the Term of the Lease in any portion of the Shopping Center. In addition, the following uses are prohibited during the Term of the Lease within the Shopping Center (including the Premises): nuisance; any use causing loud noises or offensive odors (including any business using exterior loud speakers); manufacturing facility (but this restriction shall not apply to in-store assembly in the normal course); dry cleaner (except facilities for drop off and pick up of clothing cleaned at another location); any facility for the sale, lease or rental of automobiles, trucks, motorcycles, recreational vehicles, boats or other vehicles; automobile repair shop or service station or any facility storing or selling gasoline or diesel fuel in or from tanks, but this shall not prohibit a carwash such as Danny's Carousel or an operation such as Discount Tires, Brakes Plus, Minute Lube, or Fletcher Tire and the like on Pads D, F, G, H and M, as designated on **Exhibit A**; used clothing or thrift store or liquidation outlet (but this restriction shall not apply to retailers who sell used or reconditioned goods together with new products such as **"Play it Again Sports"**, **"Computer Renaissance"**, **"Warehouse Records"**, **"EB Games"**, or **"GameStop"**, nor to a first-class retailer such as **"Terri's Consignment"**, nor shall this restriction prohibit the operation of a so-called **"99-Cents"** or **"Dollar Store"** or a **"MacFrugals"**); massage parlor (except that massage therapy offered by a doctor, chiropractor, or nurse under the supervision of a doctor or chiropractor, or massage offered by a licensed massage therapist in connection with the operation of a salon, health club or day spa otherwise permitted by this Lease shall be permitted); adult book shop (meaning a store primarily engaged in the sale of sexually oriented materials and not a general interest bookstore such as **"Barnes & Noble"** or **"B. Dalton"**) or adult movie house (except that this restriction shall not apply to a full-line video store such as **"Blockbuster Video"**, **"Video Update"** or **"Hollywood Video"**); mortuary or funeral parlor; coin operated laundry; cocktail lounge, bar or tavern or sale of alcoholic beverages, whether or not packaged, except (i) full service grocery store, drugstore, or **"Cost Plus"** may sell alcoholic beverages in prepackaged containers, (ii) a gourmet grocer such as **"Trader Joe's"**, (iii) if operated in excess of one hundred ten feet (110') from the Premises a gourmet or specialty liquor store, such as **"The Sportsman"**, **"Beverages and More"** and **"Total Wine"**, may be permitted, or (iv) in a restaurant, wherever located; night club; cinema or theater; game arcade (which shall not be interpreted to mean the use of five (5) or fewer video or pinball machines ancillary to an otherwise permitted use and shall not prohibit a family oriented restaurant with video games, pinball games or arcade games as a component of its business [such as Chuck E Cheese or Peter Piper Pizza] in a location otherwise permitted hereunder) or other place of recreation; bowling alley, skating rink or carnival; health spa (provided, however, that a health spa or jazzersize studio may be located more than five hundred feet (500') from the Premises); church (except incidental use of theatre auditoriums for religious services by the theatre tenant); restaurants, except if located more than three hundred feet (300') from the Premises or on pads; children's recreational, educational or day-care facility, but this shall not prohibit a daycare center such as a Tutor Time on a free standing pad; offices or professional uses in excess of ten percent (10%) of the Gross Floor Area in the aggregate, all of which, except banks, shall be located more than three hundred feet (300') from the Premises; schools of any nature; or any other use inconsistent with the operation of a high quality retail shopping center. As used herein, **"school"** includes, but is not limited to, a beauty school, barber college, reading room, place of instruction or any other operation serving primarily students or trainees rather than retail customers. It is the intent of this Paragraph that the Shopping Center shall be devoted to high quality retail uses and that the parking and the other common facilities shall not be burdened by either excessive or protracted use. None of the restrictions set forth in this section shall be applicable to the portion of the Shopping Center owned and/or ground leased by Target, Kohl's or Lowe's except to the extent such restrictions may be included within the OEA. |

10

I-37

| TENANT | PROHIBITED USE |
|---|---|
| Pita Pit | None. |
| Ross | **Section 3.2.1:** (a) No part of Landlord's Parcel shall be used for office or residential purposes or as a theater, auditorium, meeting hall, school, church or other place of public assembly, "flea market," gymnasium, veterinary services, overnight stay pet facilities, health club, dance hall, billiard or pool hall, massage parlor, video game arcade, bowling alley, skating rink, car wash, facility for the sale, display, leasing or repair of motor vehicles, night club, adult products, adult books or adult audio/video products (which are defined as stores in which at least ten percent (10%) of the inventory is not available for sale or rental to children under the age of majority in the state in which the Store is located because such inventory explicitly deals with or depicts human sexuality). No ATM or similar machine shall be permitted in the Shopping Center within one hundred feet (100') of the front and side perimeter walls of the Store. Further, no restaurant or other "**High Intensity Parking User**" (as hereinafter defined) shall be permitted in Landlord's Parcel within three hundred feet (300') of the front and side perimeter walls of the Store. A "**High Intensity Parking User**" is a tenant or occupant whose use requires more than five (5) parking spaces per one thousand (1,000) square feet of Leasable Floor Area in accordance with either customary shopping center practices or governmental regulations, whichever has a higher parking requirement. The foregoing use restrictions are referred to herein as the Ross Prohibited Uses. The prohibitions contained in this **Section 3.2.1(a)** shall not be applicable to the Target Tract, the Major N Tract, or to the Kohl's Tract unless and until Landlord regains legal control of the Kohl's Tract. <br><br> (b) **Exceptions to Retail Use.** Notwithstanding the restrictions on use set forth in **Section 3.2.1(a)** above, the following uses shall be permitted in the Shopping Center: <br><br> (1)    **Video Game Arcade.** Five (5) or less video games and pinball machines in the aggregate shall be permitted in any premises which has a primary restaurant use and a video game arcade that is at least three hundred feet (300') from the Store, provided it is family oriented and is a first class operator, such as Funcoland, Game Works or Sega City or is incidental to the operation of a permitted restaurant such as Peter Piper Pizza or Chuck E. Cheese; <br><br> (2)    **Automotive Uses.** Up to an aggregate of three (3) automotive uses which may include national or regional car wash/gas station, lube facility, brake repair shop, or tire shops provided that each automotive use is located at least three hundred feet (300') from any of the perimeter walls of the Store; <br><br> (3)    **Workout Club /Spa.** One (1) small "**workout**" club or first class day spa or salon, provided that such "**workout**" club or first class day spa or salon shall not be greater than four thousand (4,000) square feet and shall not be located within five hundred feet (500') feet from any perimeter wall of the Store; <br><br> (4)    **Veterinary Services.** A pet store, with veterinary services and temporary overnight stay pet facilities, including a pet hotel, shall be permitted by a national pet supply store, provided that the nearest perimeter wall of the pet store shall not be any closer than three hundred fifty feet (350') to the nearest perimeter wall of the Store; <br><br> (5)    **Gymnasium or Health Club.** One (1) gymnasium or health club not to exceed sixty-five thousand (65,000) square feet of Leasable Floor Area located in "**Major N**", "**Pad M**", "**Pad K** " or "**Pad L**" as designated on the Site Plan; <br><br> (6)    **Coffee or Espresso Bar.** The incidental operation of a "**coffee or espresso bar**" or "**coffee shop**" or similar operation incidental to a primary use of a book store by a retailer such as Barnes and Noble, or other similar retailer, providing its customers with coffee, tea, and other beverages, pastries, sandwiches, snacks and other pre-prepared or packaged food or beverage items, as well as related merchandise, either for sale or complimentary and for either on-site or take-out consumption; |

11

I-38

| TENANT | PROHIBITED USE |
|---|---|
| . | (7)  **Shopping Center Management Office and Retail Service Offices**. One (1) shopping center management office and office use typically found in shopping centers, such as travel agencies, real estate brokers, insurance brokers, optometrists' office, and the like shall be permitted provided that no such single office use, excepting those located within "**Shops E**" as designated on the Site Plan, shall exceed three thousand (3,000) square feet, and all office uses shall not exceed, in the aggregate, fifteen thousand (15,000) square feet in Landlord's Parcel;<br><br>(8)  **Billiards and Pool Tables**.  Billiards/pool tables are permitted provided that they are incidental to an otherwise permitted use;<br><br>(9)  **Massage Services**.  Massage services offered as an incidental service of a medical office, chiropractic office, permitted health club, first class day spa or salon shall be permitted;<br><br>(10)  **General Interest Book Store/ Film Store**. One (1) general interest bookstore such as Barnes & Noble or B. Dalton and one (1) full-line video store such as Blockbuster Video, Video Update or Hollywood Video each of which may carry films with adult content that are released for general commercial distribution to national theater chains;<br><br>(11)  **Preschool or Daycare**.  One (1) preschool or daycare center shall be permitted  provided that its is not located closer than five hundred feet (500') to the nearest exterior wall of the Store;<br><br>(12)  **Dancing**.  Patron dancing shall be permitted if it is  incidental to the operation of a permitted restaurant located not closer than five hundred feet (500') to the Store; and<br><br>(13)  **Outparcels**.  Restaurant uses shall be permitted on the Outparcels.<br><br>**Additional Prohibited Uses:** See Target OEA |
| Rue 21 | None |
| Saba's | None |
| Sally Beauty | None |
| Sandex<br>(*d/b/a* Data Doctors) | None. |
| Smashburger | None |
| Sprint | None |
| Steinmart | None |
| Subway | None |
| Target<br>(OEA) | **Operation and Easement Agreement, Section 3.2.6.**<br>Kiosks and remote merchandising units on the Developer Tract are limited to those areas identified as "**Permitted Kiosk Areas**" on the Site Plan, no more than ten (10) such kiosks or remote merchandising units shall be permitted in each Permitted Kiosk Area and no such kiosk or remote merchandising unit shall be of a size greater than one hundred (100) square feet.<br><br>**Section 5.1.1**<br>No more than ten percent (10%) of the total Floor Area on the Developer Tract may be used for Retail Office and/or Business Office purposes and no more than ten percent (10%) of the total Floor Area on the Target Tract may be used for a retail office and/or business office purposes; provided, however, that office space used by an Occupant for administrative purposes, and which is not open to the general public, shall not be considered Retail Office or Business Office for the purpose of this limitation. |

12

| TENANT | PROHIBITED USE |
|---|---|
| | **Section 5.1.2**<br>No use shall be permitted in the Shopping Center which is inconsistent with the operation of a first-class retail shopping center or which violates Governmental Requirements. Without limiting the generality of the foregoing, without the prior written consent of the Approving Parties, which consent each Approving Party may withhold in its sole and absolute discretion, the following uses shall not be permitted:<br><br>(A)  Any use which emits an obnoxious odor, noise or sound which can be heard or smelled outside of any Building in the Shopping Center or any other activity which may constitute a public or private nuisance.<br><br>(B)  An operation primarily used as a storage warehouse operation (but this prohibition shall not be applicable to the following wholesale or rack style retailers: Home Depot USA, Inc., Lowe's HIW, Inc., Sam's Club (but only if located more than five hundred feet (500') from the Target Building), Costco, BJ's or any successor to the foregoing by merger, consolidation or acquisition of all or substantially all assets) and any assembling, manufacturing, distilling, refining, smelting, agricultural or mining operation (but this prohibition shall not prohibit assembly or manufacture of products incidental to the retail sale thereof, nor shall this prohibit the operation of a so-called "brew pub" provided that any such "brew pub" (i) constitutes a Restaurant, and (ii) does not derive more than forty five percent (45%) of its Gross Sales from the sale of alcoholic beverages) and is located more than five hundred feet (500') from the Building on the Target Tract.<br><br>(C)  Any "second hand" store, "surplus" store, or pawn shop; provided, however, this prohibition shall not be applicable to the following retail facilities as may be found in a reasonable number of good quality shopping centers in the Phoenix, Arizona metropolitan area which sell used equipment or goods: "GameStop," "Play It Again Sports", "EB Games," "Blockbuster," "Hollywood Video," "Game Crazy," "Computer Renaissance," "My Sister's Attic", "Fanco Land", "FYE For Your Entertainment" or a successor to any of the foregoing by merger, consolidation or acquisition of all or substantially all assets.<br><br>(D)  Any mobile home park, trailer court, labor camp, junkyard, or stockyard; provided, however, this prohibition shall not be applicable to the temporary use of construction trailers during periods of construction, reconstruction or maintenance.<br><br>(E)  Any dumping, disposing, incineration or reduction of garbage; provided, however, this prohibition shall not be applicable to garbage compactors located near the rear of any Building and provided further this restriction shall not be applicable to governmentally required or encouraged recycling centers in locations identified on the Site Plan or otherwise approved by the Approving Parties.<br><br>(F)  Any fire sale, bankruptcy sale (unless pursuant to a court order) or auction house operation.<br><br>(G)  Any central laundry, dry cleaning plant or laundromat; provided, however, this prohibition shall not be applicable to nominal supportive facilities for on-site service oriented to pickup and delivery by the ultimate consumer as the same may be found in retail shopping centers in the metropolitan area where the Shopping Center is located such as, by way of example only, pressing, alterations, shoe shine and shoe repair.<br><br>(H)  Any automobile, truck, trailer or recreational vehicle sales, leasing, display or body shop repair operation, but this shall not prohibit, on not more than three (3) occasions during each calendar year (each of which shall not exceed seven (7) days) the promotional display of automobiles or light trucks in the portion of the Common Areas of the Shopping Center not located on the Target Tract and identified on the Site Plan as the "Permitted Promotion Area". |

| TENANT | | PROHIBITED USE |
|---|---|---|
| | (I) | Any bowling alley or skating rink; provided, however, this prohibition shall not be applicable to one (1) bowling alley having a Floor Area of forty thousand (40,000) square feet or less located north of the "Bowling Alley Line" set forth on the Site Plan. |
| | (J) | Any movie theater or live performance theater. |
| | (K) | Any residential use, including but not limited to: single family dwellings, townhouses, condominiums, other multi-family units, and other forms of living quarters, sleeping apartments or lodging rooms, but this shall not be applicable to a hotel or motel located on a freestanding pad and located within three hundred feet (300') of the south right of way line for Rittenhouse Road. |
| | (L) | Any veterinary hospital or animal raising or boarding facility; provided, however, this prohibition shall not be applicable to pet shops or pet supply stores. Notwithstanding the forgoing exception, except in connection with a national pet supply store such as PetsMart, (i) any veterinary or boarding services provided in connection with the operation of a pet shop shall only be incidental to such operation; (ii) the boarding of pets as a separate customer service shall be prohibited; (iii) all kennels, runs and pens shall be located inside the Building; and (iv) the combined incidental veterinary and boarding facilities shall occupy no more than fifteen percent (15%) of the Floor Area of the pet shop. |
| | (M) | Any mortuary or funeral home. |
| | (N) | Any establishment selling or exhibiting "obscene" material, but this shall not be construed as prohibiting the sale of normally stocked merchandise in a full line bookstore having at least fifty (50) locations such as Border's or Barnes & Noble, a full line video store having at least fifty (50) locations such as Hollywood Entertainment or Blockbuster Video, a full line consumer electronics store having at least fifty (50) locations such as Best Buy, Circuit City or Fry's Electronics or to the sale of adult magazines by a convenience store having at least fifty (50) locations such as Circle K or 7 Eleven. |
| | (O) | Any establishment selling or exhibiting drug-related paraphernalia or which exhibits either live or by other means to any degree, nude or partially clothed dancers or wait staff, provided, however, this prohibition shall not be applicable to national restaurant operations as may be found in a number of reasonable good quality shopping centers in the Phoenix, Arizona metropolitan area whose wait staff are attired similar to the current attire of wait staff such as TGI Fridays, Hard Rock Café, Kona Grill, Yardhouse or Chili's. |
| | (P) | Any bar or tavern, except a bar or tavern shall be permitted as a component of a Restaurant so long as the following two (2) conditions are satisfied: (i) such Restaurant's reasonably projected annual gross revenues from the sale of alcoholic beverages for on-premises consumption does not exceed forty-five percent (45%) of the gross revenues of such business, and (ii) such Restaurant is located more than five hundred feet (500') from the Building on the Target Tract. In addition, the prohibition set forth in this paragraph shall not be applicable to a wine store or liquor store located north of the "Bowling Alley Line" as set forth on the Site Plan that may offer on-premises sampling of products so long as such sampling complies with the codes and ordinances of Governmental Authorities. |
| | (Q) | Any health spa, fitness center or workout facility having a Floor Area in excess of four thousand (4,000) square feet and located within five hundred feet (500') of the Building on the Target Tract; any massage parlors or similar establishments, but this shall not prohibit massage services offered by a permitted health club, a permitted fitness center, a day spa (but not more than two (2) day spas shall be permitted, a beauty salon, a barber shop, a doctor, a nurse, a chiropractor, a physical |

| TENANT | PROHIBITED USE |
|---|---|
| | therapist or by licensed massage therapists from reputable businesses such as, by way of example, Massage Envy, provided that all such massage services are rendered within premises located within at least five hundred feet (500') from the Building on the Target Tract. |
| (R) | Any flea market, amusement or video arcade (but this shall not be applicable to pinball, electronic or other game machines incidental to a Restaurant located on a freestanding pad and provided such arcade amusement or video arcade encompasses not more than five percent (5%) of the Floor Area of such Restaurant or two hundred (200) square feet, whichever is less, provided, however, this prohibition shall not be applicable to the portions of the Shopping Center located more than five hundred feet (500') from the Building on the Target Tract), pool or billiard hall (but this shall not prohibit a Restaurant having a Floor Area of at least four thousand (4,000) square feet on a freestanding pad from having three (3) or fewer pool tables; car wash (but this prohibition shall not be applicable to not more than one (1) fully automatic so-called "**tube**" or "**tunnel**" car wash operated in connection with a gas station or a mini mart, but only if located in one of "**Pads G, H, I, J, K, L or M**") or dance hall (but this shall not prohibit a Restaurant on a freestanding pad from permitting incidental patron dancing, provided that (a) such Restaurant does not derive more than forty-five (45%) of its gross revenues from the sale of alcoholic beverages, and (ii) such Restaurant is located at least five hundred feet (500') from the Building on the Target Tract). |
| (S) | Any training or educational facility, including but not limited to: beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers; provided, however, this prohibition shall not be applicable to on-site employee training by an Occupant incidental to the conduct of its business at the Shopping Center. |
| (T) | Any gambling facility or operation, including but not limited to: off-track or sports betting parlor; table games such as blackjack or poker; slot machines, video poker/blackjack/keno machines or similar devices; or bingo hall. Notwithstanding the foregoing, this prohibition shall not be applicable to government sponsored gambling activities or charitable gambling activities, so long as such activities are incidental to the business operation being conducted by the Occupant. In addition, this prohibition shall not be applicable to the operation of arcade games, video games, pinball games or games of amusement by the Occupant of Premises located more than five hundred feet (500') from the Building on the Target Tract as long as in no event shall there be conducted, operated or permitted to be conducted or operated a bingo hall or similar bingo operation from or within such Premises. |
| (U) | Any church, temple or other house of religious worship. |
| (V) | Any check cashing services (unless operated by a bank or other financial institution or if ancillary to an otherwise permitted use). |
| (W) | The storage, display or sale of explosives or fireworks. |
| (X) | Any trailer court or mobile home park. |
| (Y) | The operation on the Developer Parcel of (a) a general merchandise discount retail store containing Floor Area in excess of ninety thousand (90,000) square feet of Floor Area, (b) a supermarket, grocery store or other store primarily selling fresh produce, fresh meats, groceries, fresh fruit, dairy products, fresh vegetables, bakery products or delicatessen products for off premises consumption, and (c) the operation of (i) a store in excess of ten thousand (10,000) square feet of Floor Area or (ii) a store on a free standing pad having one or more drive thru lanes, in either case selling prescription pharmacy merchandise (i.e., any product which, by law, may be dispensed only by or under the supervision of a qualified pharmacist or a person licensed to dispense medicinal drugs); provided, however, (x) the prohibition in clause (a) shall not apply (i) |

| TENANT | PROHIBITED USE |
|---|---|
| | subject to Exempted Closures (as defined below), at any time that Target is not operating in at least ninety thousand (90,000) square feet of Floor Area within the Building on the Target Parcel a general merchandise discount retail store and has not been doing so for eighteen (18) months, and (ii) to the following retailers: Lowe's HIW, Inc., Home Depot USA, Inc., Sam's Club (but only if located more than five hundred feet (500') from the Target Building), Costco, BJ's or any successor to the foregoing by merger, consolidation or acquisition of all or substantially all assets; (y) the prohibition in clause (b) shall not apply (i) subject to Exempted Closures, at any time that Target is not utilizing a portion of the Building on the Target Parcel for the operation of a full service supermarket or full service grocery store and has not been doing so for eighteen (18) months, (ii) individual stores in separately demised spaces on the Developer Parcel may use up to ten percent (10%) of the total Floor Area of such space for the sale of food for off premises consumption, (iii) Restaurants may sell food prepared on premises for off premises consumption, subject to the locational restrictions set forth in **Section 5.1.4**, (iv) to the following retailers: Sam's Club (but only if located more than five hundred feet (500') from the Target Building), Costco, BJ's or any successor to the foregoing by merger, consolidation or acquisition of all or substantially all assets, and (v) to the following specialty retailers: Cost Plus, Trader Joes, Dean & Deluca or any successor by merger, consolidation or acquisition of all or substantially all assets; and (z) the prohibition in clause (c) shall not apply (i) subject to Exempted Closures, at any time that Target is not utilizing a portion of the Building on the Target Parcel for the sale of prescription pharmacy merchandise and has not been doing so for eighteen (18) months, and (ii) doctors, dentists, chiropractors, osteopaths, naturopaths, veterinarians and other licensed health care providers (other than pharmacists) who may dispense prescription drugs to their patients during office visits on a non retail basis. For the purposes of this **Section 5.1.2(Z)**, an "**Exempted Closure**" shall mean any period of time that the Building on the Target Parcel is closed due to (i) casualty, repair, reconstruction, remodeling or refixturing if the Occupant is proceeding with reasonable diligence to complete the work and reopen for business, not to exceed, however, seven hundred thirty (730) days; or (ii) unavoidable events outside the reasonable control of the Occupant of the Building on the Target Parcel including, but not limited to, acts of God, condemnation, other governmental rules, orders, acts or requirements, insurrection, riot and labor disputes (but excluding financial inability or economic conditions); or (iii) substitution of a new Occupant resulting from the sale, assignment or sublease of any portion of the Target Parcel. |
| | (Z)  No Restaurant shall be located within three hundred feet (300') of the Building on the Target Tract, but this shall not prohibit a tenant such as Barnes & Noble, Borders, Bed Bath & Beyond, Cost Plus or Kohl's from having incidental food service within its premises. |
| | (AA)  Any gas station, except if located on one of "**Pads G, H, I, J, K, L or M.**" |
| | (BB)  No pet shops or pet supplies store shall be located within three hundred feet (300') of the Building on the Target Tract. |
| | **Section 5.1.4**<br>No merchandise, equipment or services, including but not limited to vending machines, promotional devices and similar items, shall be displayed, offered for sale or lease, or stored within the Common Area; provided, however, the foregoing prohibition shall not be applicable to: |
| | (A)  Temporary collection and the storage of shopping carts in cart corrals located in the parking areas of the Shopping Center, including the storage of shopping carts on the Target Tract and the Developer Tract, as long as such shopping carts are stored within a building or behind a screen wall or landscaping specifically designed to screen such shopping carts from view; |

16

| TENANT | PROHIBITED USE |
|---|---|
| | (B) the installation of an "**ATM**" banking facility within an exterior wall of any Building or within a kiosk; |
| | (C) the seasonal display and sale of bedding plants on the sidewalk in front of any Building located on the Target Tract on the Developer Tract; |
| | (D) the placement of bicycle racks and landscaping planters on the sidewalk in front of any Building; |
| | (E) the placement of spherical bollards (Target's brand) on the sidewalk in front of any Building on the Target Tract or the placement of other types of bollards on the Developer Tract, provided that bollards on the Developer Tract are approved in connection with the approval of the Plans by the Approving Parties; |
| | (F) temporary Shopping Center promotions, except that no promotional activities will be allowed in the Common Area without the prior written approval of the Approving Parties unless such promotional activities are located within the parking areas of the Shopping Center identified as the "**Permitted Promotion Area**" on the Site Plan; |
| | (G) any recycling center required or encouraged by law, the location of which (if not shown on the Site Plan) shall be subject to the approval of the Approving Parties; |
| | (H) Outside Dining Areas adjacent to a Building, except that Outside Dining Areas will only be allowed in the portions of the Common Areas identified on the Site Plan as "**Permitted Outside Dining**" without the prior written approval of the Approving Parties (but the location of the Outside Dining Areas on the freestanding pads shall not be restricted); provided, however, (i) any Outside Dining Area shall be considered a portion of the Building Area for the purposes of determining compliance with the parking ratio requirements set forth in this OEA, (ii) any Outside Dining Area shall be fenced in or otherwise enclosed, and (iii) to the extent an Outside Dining Area is exclusively available to any Occupant or group of Occupants of the Shopping Center, such Occupant shall, as its sole cost and expense, ensure, clean and maintain such Outside Dining Area. |
| | (I) Any designated Outside Sales Area; provided, however, with respect to any Outside Sales Area which is not included within a Building Area, such space may be used not more than three (3) times per calendar year, and the duration of such use shall be subject to the following limitations: during the period commencing on October 15th and ending on December 27th - no limitation on the number of days of consecutive use; during the period commencing February 15th and ending on July 10th - not more than one hundred twenty-five (125) consecutive days of use; and, during any other period - not more than thirty (30) consecutive days of use. |
| Thai Chili | None. |
| Tilly's | None |
| Tips 'N Toes | None |
| TJ Maxx | **Schedule B to Lease, Paragraph 4(A).** Subject to the rights of tenants/occupants under Existing Leases (as defined in Paragraph (D) below), Landlord agrees that, except if Tenant is operating a non-retail use in the Demised Premises, the Shopping Center shall not be used (a) for any non-retail purposes (repairs, alterations and offices incidental to retailing, and banks and small loan offices, not being deemed non-retail), or (b) for any entertainment purposes such as a bowling alley, skating rink, cinema, bar, nightclub, discotheque, amusement gallery, poolroom, health club, massage parlor, sporting event, sports or game facility, off-track betting club (but the provisions of this clause (b) shall not be applicable to that portion of the Shopping Center identified on the Lease Plan as the "Theatre Area"), nor shall the provisions of this clause (b) prohibit or restrict any of the following restaurants: (i) the |

17

| TENANT | PROHIBITED USE |
|---|---|
| | incidental sale of alcoholic beverages by a restaurant, (ii) incidental patron dancing by an otherwise permitted restaurant, (iii) up to three (3) billiards tables at an otherwise permitted restaurant (up to five (5) billiards tables, however, in a sports bar such as Buffalo Wild Wings or Zips Operate on the date hereof), (iv) up to five (5) video, pinball or other electronic amusement devices incidental to an otherwise permitted use, (v) the operation of a family entertainment restaurant such as Chuck E. Cheese or Peter Piper Pizza, or (vi) off-track betting activities incidental to the operation of an otherwise permitted restaurant, or (c) for any establishment which sells or displays pornographic materials (provided, however, that this restriction against pornographic materials shall not extend to (1) a full line bookstore typically found in first class shopping centers such as Barnes & Noble, or (2) a full line video store typically found in a first class shopping center such as Blockbuster Videos (provided that in the case of such a book store or full-line video store that such chains do not change their focus to a use which is primarily adult-only oriented) or (3) the movie theater located in the portion of the Shopping Center identified on the Lease Plan as the "Theatre Area" so long as such theater is operated as a first class theater), or (d) for any establishment which sells or displays used merchandise or second hand goods (provided, however, that this restriction shall not apply to not more than three (3) stores typically found in a first class shopping center that sells reconditioned merchandise together with new merchandise such as Computer Renaissance, Play It Again Sports, My Sister's Closet, My Sister's Attic, Well Suited, Terry's Consignment, EB Games, Gamestop or Game Crazy, nor shall it prevent a video/record store from engaging in a CD or video exchange program). Except for existing tenants/occupants of the Shopping Center under Existing Leases (and similar replacements thereof for substantially the same use), no restaurants or establishments selling food prepared on premises for consumption on or off premises shall be located in the portions of the Shopping Center labeled "Prohibited Restaurant Area" on the Lease Plan (other than cafés incidental to an otherwise primary use).  Anything in this Paragraph 4(A) to the contrary notwithstanding, Landlord and Tenant hereby agree as follows:

(i) One (1) health club may be located at least five hundred feet (500') from the Demised Premises, one (1) health club may be located in the area marked "Theatre Area" on the Lease Plan and up to two (2) health clubs containing not more than four thousand (4,000) square feet each may be located anywhere in the Shopping Center;

(ii) A cinema or theater may be located in the area marked "Theatre Area" on the Lease Plan;

(iii) Service oriented uses which are normally found in first-class shopping centers such as travel agencies, insurance agencies, weight loss clinics (such as Weight Watchers, Jenny Craig) and financial institutions ("Service Oriented Offices") shall be permitted provided that such Service Oriented Offices shall be limited to an aggregate of ten percent (10%) of floor area within the Shopping Center; and
(iv) Commercial office and business office uses shall be permitted provided that such business office uses are located more than five hundred feet (500') from the building of which the Demised Premises is a part and provided that such business office uses, together with the service office uses described in clause (iii) above shall be limited to an aggregate of ten percent (10%) of the floor area of the Shopping Center.

**Schedule B to Lease, Paragraph 4(D).** The provisions of this Paragraph 4 shall not apply (1) to the Kohl's Parcel or the Target Parcel (except to the extent the REA provides otherwise), (2) the portions of the Development not owned by Landlord (except to the extent the REA provides otherwise), and/or (3) with respect to rights previously granted to tenants or occupants under leases or agreements existing as of the date hereof (collectively "Existing Leases") for only so long as such Existing Leases continue in full force and effect and only to the extent such Existing Leases permit such Prohibited Uses or the Competing Uses.  Landlord agrees not to amend any Existing Leases to permit the Prohibited Uses or the Competing Uses. Landlord warrants and represents that all of the Existing Leases are listed on Schedule N attached hereto.

**Schedule B to Lease, Paragraph 5(A).** So long as Landlord shall not be in |

18

| TENANT | PROHIBITED USE |
|---|---|
|  | default under Paragraph 4 hereof, the Demised Premises shall not be used for any non-retail purposes (including a food service operation) or entertainment purposes except incidental amusement devices. In no event may Tenant use the Demised Premises for any use identified as a "Prohibited Use" on Schedule F attached hereto. |
| ULTA | Section 4.5.   In addition, no restaurant or other food service operation or children's recreational facility will be located within one hundred feet ( 1 00') of the Premises, but this shall not be applicable to a food service operation incidental to a primary use such as that operated, by way of example only, by Barnes & Noble or Old Navy. |
| Verizon | None |
| Village Inn | N/A. |
| Yogurt Jungle | None |

19

I-46

**TARGET CORPORATION**

3.2.6   No Party shall make changes to the improved Common Area on its Tract, except that each Party hereby reserves the right, from time to time without obtaining the consent or approval of any other Party, to make at its own expense any insignificant change, modification or alteration in the portion of the Common Area on its Tract, including the installation of convenience facilities such as mailboxes, public telephones, kiosks, remote merchandising units

(provided, however, kiosks and remote merchandising units on the Developer Tract are limited to those areas identified as "Permitted Kiosk Areas" on the Site Plan, no more than ten (10) such kiosks or remote merchandising units shall be permitted in each Permitted Kiosk Area and no such kiosk or remote merchandising unit shall be of a size greater than one hundred (100) square feet, cart corrals, benches, bike racks, directional and/or parking information signs, provided that:

(A)    The accessibility of such Common Area for pedestrian and vehicular traffic (as it relates to the remainder of the Shopping Center) is not unreasonably restricted or hindered, and all parking stalls and rows and vehicular traffic lanes shall remain generally as shown on the Site Plan.

(B)    There shall be maintained at all times within such Common Area a sufficient number of vehicular parking spaces to meet the parking requirements set forth in Section 3.2.5; provided, however, that no more than two percent (2%) of the parking spaces depicted on the Site Plan for such Tract shall be eliminated.

(C)    No Governmental Requirements shall be violated as a result of such action; any and all Governmental Requirements applicable to such modifications shall be satisfied by the Party performing the same; and such action shall not result in any other Party being in violation of any Governmental Requirements.

(D)    No change shall be made in the access points between the Common Area and the adjacent public streets; provided, however, that additional access points may be created with the approval of the Approving Parties.

(E)    At least thirty (30) days prior to making any such change, modification or alteration, the Party desiring to do such work shall deliver to each Approving Party copies of the plans therefor, and provided further that such work shall not occur during the months of October, November, December or January.

**TARGET CORPORATION**

ARTICLE V - OPERATION OF THE SHOPPING CENTER

5.1  Uses

5.1.1  The Shopping Center shall be used only for entertainment businesses, retail sales, offices, Restaurants or other permitted commercial purposes. "Business Office" shall mean an office which does not provide services directly to consumers; "Retail Office" shall mean an office which provides services directly to consumers, including but not limited to financial institutions, real estate, stock brokerage and title companies, travel and insurance agencies, and medical, dental and legal clinics. No more than ten percent (10%) of the total Floor Area on the Developer Tract may be used for Retail Office and/or Business Office purposes and no more than ten percent (10%) of the total Floor Area on the Target Tract may be used for a retail office and/or business office purposes; provided, however, that office space used by an Occupant for administrative purposes, and which is not open to the general public, shall not be considered Retail Office or Business Office for the purpose of this limitation.

5.1.2  No use shall be permitted in the Shopping Center which is inconsistent with the operation of a first-class retail shopping center or which violates Governmental Requirements. Without limiting the generality of the foregoing, without the prior written consent of the Approving Parties, which consent each Approving Party may withhold in its sole and absolute discretion, the following uses shall not be permitted:

(A)  Any use which emits an obnoxious odor, noise or sound which can be heard or smelled outside of any Building in the Shopping Center or any other activity which may constitute a public or private nuisance.

(B)  An operation primarily used as a storage warehouse operation (but this prohibition shall not be applicable to the following wholesale or rackstyle retailers: Home Depot USA, Inc., Lowe's HIW, Inc., Sam's Club (but only if located more than five hundred (500) feet from the Target Building), Costco, BJ's or any successor to the foregoing by merger, consolidation or acquisition of all or substantially all assets) and any assembling, manufacturing, distilling, refining, smelting, agricultural or mining operation (but this prohibition shall not prohibit assembly or manufacture of products incidental to the retail sale thereof, nor shall this prohibit the operation of a so-called "brew pub" provided that any such "brew pub" (i) constitutes a Restaurant, and (ii) does not derive more than forty five percent (45%) of its Gross Sales from the sale of alcoholic beverages) and is located more than five hundred (500) from the Building on the Target Tract.

(C)  Any "second hand" store, "surplus" store, or pawn shop; provided, however, this prohibition shall not be applicable to the following retail facilities as may be found in a reasonable number of good quality shopping centers in the Phoenix, Arizona metropolitan area which sell used

35

equipment or goods: "Game Stop," "Play It Again Sports", "EB Games," "Blockbuster," "Hollywood Video," "Game Crazy," "Computer Renaissance," "My Sister's Attic", "Funco Land", "FYE For Your Entertainment" or a successor to any of the foregoing by merger, consolidation or acquisition of all or substantially all assets.

(D)  Any mobile home park, trailer court, labor camp, junkyard, or stockyard; provided, however, this prohibition shall not be applicable to the temporary use of construction trailers during periods of construction, reconstruction or maintenance.

(E)  Any dumping, disposing, incineration or reduction of garbage; provided, however, this prohibition shall not be applicable to garbage compactors located near the rear of any Building and provided further this restriction shall not be applicable to governmentally required or encouraged recycling centers in locations identified on the Site Plan or otherwise approved by the Approving Parties.

(F)  Any fire sale, bankruptcy sale (unless pursuant to a court order) or auction house operation.

(G)  Any central laundry, dry cleaning plant or laundromat; provided, however, this prohibition shall not be applicable to nominal supportive facilities for on-site service oriented to pickup and delivery by the ultimate consumer as the same may be found in retail shopping centers in the metropolitan area where the Shopping Center is located such as, by way of example only, pressing, alterations, shoe shine and shoe repair.

(H)  Any automobile, truck, trailer or recreational vehicle sales, leasing, display or body shop repair operation, but this shall not prohibit, on not more than three (3) occasions during each calendar year (each of which shall not exceed seven (7) days) the promotional display of automobiles or light trucks in the portion of the Common Areas of the Shopping Center not located on the Target Tract and identified on the Site Plan as the "Permitted Promotion Area".

(I)  Any bowling alley or skating rink; provided, however, this prohibition shall not be applicable to one (1) bowling alley having a Floor Area of forty thousand (40,000) square feet or less located north of the "Bowling Alley Line" set forth on the Site Plan.

(J)  Any movie theater or live performance theater.

<div align="center">36</div>

<div align="center">I-50</div>

(K)   Any residential use, including but not limited to: single family dwellings, townhouses, condominiums, other multi-family units, and other forms of living quarters, sleeping apartments or lodging rooms, but this shall not be applicable to a hotel or motel located on a freestanding pad and located within three hundred (300) feet of the south right of way line for Rittenhouse Road.

(L)   Any veterinary hospital or animal raising or boarding facility; provided, however, this prohibition shall not be applicable to pet shops or pet supply stores. Notwithstanding the forgoing exception, except in connection with a national pet supply store such as PetsMart, (i) any veterinary or boarding services provided in connection with the operation of a pet shop shall only be incidental to such operation; (ii) the boarding of pets as a separate customer service shall be prohibited; (iii) all kennels, runs and pens shall be located inside the Building; and (iv) the combined incidental veterinary and boarding facilities shall occupy no more than fifteen percent (15%) of the Floor Area of the pet shop.

(M)   Any mortuary or funeral home.

(N)   Any establishment selling or exhibiting "obscene" material, but this shall not be construed as prohibiting the sale of normally stocked merchandise in a full line bookstore having at least fifty (50) locations such as Border's or Barnes & Noble, a full line video store having at least fifty (50) locations such as Hollywood Entertainment or Blockbuster Video, a full line consumer electronics store having at least fifty (50) locations such as Best Buy, Circuit City or Fry's Electronics or to the sale of adult magazines by a convenience store having at least fifty (50) locations such as Circle K or 7 Eleven.

(O)   Any establishment selling or exhibiting drug-related paraphernalia or which exhibits either live or by other means to any degree, nude or partially clothed dancers or wait staff, provided, however, this prohibition shall not be applicable to national restaurant operations as may be found in a number of reasonable good quality shopping centers in the Phoenix, Arizona metropolitan area whose wait staff are attired similar to the current attire of wait staff such as TGI Fridays, Hard Rock Café, Kona Grill, Yardhouse or Chili's.

(P)   Any bar or tavern, except a bar or tavern shall be permitted as a component of a Restaurant so long as the following two (2) conditions are satisfied: (i) such Restaurant's reasonably projected annual gross revenues from the sale of alcoholic beverages for on-premises consumption does not exceed forty five percent (45%) of the gross revenues of such business,

U:\ATTORNEYS\DLL\2\VESTAR\Queen Creek Towne Center\Target\OEA V8 (1-24-07).doc

325821301.2

and (ii) such Restaurant is located more than five hundred (500) feet from the Building on the Target Tract. In addition, the prohibition set forth in this paragraph shall not be applicable to a wine store or liquor store located north of the "Bowling Alley Line" as set forth on the Site Plan that may offer on-premises sampling of products so long as such sampling complies with the codes and ordinances of Governmental Authorities.

(Q)  Any health spa, fitness center or workout facility having a Floor Area in excess of four thousand (4,000) square feet and located within five hundred (500) feet of the Building on the Target Tract; any massage parlors or similar establishments, but this shall not prohibit massage services offered by a permitted health club, a permitted fitness center, a day spa (but not more than two (2) day spas shall be permitted, a beauty salon, a barber shop, a doctor, a nurse, a chiropractor, a physical therapist or by licensed massage therapists from reputable businesses such as, by way of example, Massage Envy, provided that all such massage services are rendered within premises located within at least five hundred (500) feet from the Building on the Target Tract.

(R)  Any flea market, amusement or video arcade (but this shall not be applicable to pinball, electronic or other game machines incidental to a Restaurant located on a freestanding pad and provided such arcade amusement or video arcade encompasses not more than five percent (5%) of the Floor Area of such Restaurant or two hundred (200) square feet, whichever is less, provided, however, this prohibition shall not be applicable to the portions of the Shopping Center located more than five hundred (500) feet from the Building on the Target Tract), pool or billiard hall (but this shall not prohibit a Restaurant having a Floor Area of at least four thousand (4,000) square feet on a freestanding pad from having three (3) or fewer pool tables; car wash (but this prohibition shall not be applicable to not more than one (1) fully automatic so-called "tube" or "tunnel" car wash operated in connection with a gas station or a mini mart, but only if located on one of "Pads G, H, I, J, K, L or M") or dance hall (but this shall not prohibit a Restaurant on a freestanding pad from permitting incidental patron dancing, provided that (a) such Restaurant does not derive more than forty five (45%) of its gross revenues from the sale of alcoholic beverages, and (ii) such Restaurant is located at least five hundred (500) feet from the Building on the Target Tract).

(S)  Any training or educational facility, including but not limited to:  beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers; provided, however, this prohibition shall not be applicable to

38

U:\ATTORNEYS\DLL#2\VESTAR\Queen Creek Towne Center\Target\OEA V8 (1-24-07).doc

I-52

on-site employee training by an Occupant incidental to the conduct of its business at the Shopping Center.

(T)   Any gambling facility or operation, including but not limited to: off-track or sports betting parlor; table games such as blackjack or poker; slot machines, video poker/blackjack/keno machines or similar devices; or bingo hall. Notwithstanding the foregoing, this prohibition shall not be applicable to government sponsored gambling activities or charitable gambling activities, so long as such activities are incidental to the business operation being conducted by the Occupant. In addition, this prohibition shall not be applicable to the operation of arcade games, video games, pinball games or games of amusement by the Occupant of Premises located more than five hundred (500) feet from the Building on the Target Tract as long as in no event shall there be conducted, operated or permitted to be conducted or operated a bingo hall or similar bingo operation from or within such Premises.

(U)   Any church, temple or other house of religious worship.

(V)   Any check cashing services (unless operated by a bank or other financial institution or if ancillary to an otherwise permitted use).

(W)   The storage, display or sale of explosives or fireworks.

(X)   Any trailer court or mobile home park.

(Y)   The operation on the Developer Parcel of (a) a general merchandise discount retail store containing Floor Area in excess of ninety thousand (90,000) square feet of Floor Area, (b) a supermarket, grocery store or other store primarily selling fresh produce, fresh meats, groceries, fresh fruit, dairy products, fresh vegetables, bakery products or delicatessen products for off premises consumption, and (c) the operation of (i) a store in excess of ten thousand (10,000) square feet of Floor Area or (ii) a store on a free standing pad having one or more drive thru lanes, in either case selling prescription pharmacy merchandise (i.e. any product which, by law, may be dispensed only by or under the supervision of a qualified pharmacist or a person licensed to dispense medicinal drugs); PROVIDED, HOWEVER, (x) the prohibition in clause (a) shall not apply (i) subject to Exempted Closures (as defined below), at any time that Target is not operating in at least ninety thousand (90,000) square feet of Floor Area within the Building on the Target Parcel a general merchandise discount retail store and has not been doing so for eighteen (18) months, and (ii) to the following retailers: Lowe's HIW, Inc., Home Depot USA, Inc., Sam's Club (but only if located more than five hundred (500) feet

39
U:\ATTORNEYS\DLL#2\VESTAR\Queen Creek Towne Center\Target\OEA V8 (1-24-07).doc

from the Target Building), Costco, BJ's or any successor to the foregoing by merger, consolidation or acquisition of all or substantially all assets; (y) the prohibition in clause (b) shall not apply (i) subject to Exempted Closures, at any time that Target is not utilizing a portion of the Building on the Target Parcel for the operation of a full service supermarket or full service grocery store and has not been doing so for eighteen (18) months, (ii) individual stores in separately demised spaces on the Developer Parcel may use up to ten percent (10%) of the total Floor Area of such space for the sale of food for off premises consumption, (iii) Restaurants may sell food prepared on premises for off premises consumption, subject to the locational restrictions set forth in Section 5.1.4, (iv) to the following retailers: Sam's Club (but only if located more than five hundred (500) feet from the Target Building), Costco, BJ's or any successor to the foregoing by merger, consolidation or acquisition of all or substantially all assets, and (v) to the following specialty retailers: Cost Plus, Trader Joes, Dean & Deluca or any successor by merger, consolidation or acquisition of all or substantially all assets; and (z) the prohibition in clause (c) shall not apply (i) subject to Exempted Closures, at any time that Target is not utilizing a portion of the Building on the Target Parcel for the sale of prescription pharmacy merchandise and has not been doing so for eighteen (18) months, and (ii) doctors, dentists, chiropractors, osteopaths, naturopaths, veterinarians and other licensed health care providers (other than pharmacists) who may dispense prescription drugs to their patients during office visits on a non retail basis. For the purposes of this Section 5.1.2(Z), an "Exempted Closure" shall mean any period of time that the Building on the Target Parcel is closed due to (i) casualty, repair, reconstruction, remodeling or refixturing if the Occupant is proceeding with reasonable diligence to complete the work and reopen for business, not to exceed, however, seven hundred thirty (730) days; or (ii) unavoidable events outside the reasonable control of the Occupant of the Building on the Target Parcel including, but not limited to, acts of God, condemnation, other governmental rules, orders, acts or requirements, insurrection, riot and labor disputes (but excluding financial inability or economic conditions); or (iii) substitution of a new Occupant resulting from the sale, assignment or sublease of any portion of the Target Parcel.

(Z)    No Restaurant shall be located within three hundred (300) feet of the Building on the Target Tract, but this shall not prohibit a tenant such as Barnes & Noble, Borders, Bed Bath & Beyond, Cost Plus or Kohl's from having incidental food service within its premises.

(AA)    Any gas station, except if located on one of "Pads G, H, I, J, K, L or M."

U:\ATTORNEYS\DLL#2\VESTAR\Queen Creek Towne Center\Target\OEA V8 (1-24-07).doc

(BB)  No pet shops or pet supplies store shall be located within three hundred (300) feet of the Building on the Target Tract.

5.1.4  No merchandise, equipment or services, including but not limited to vending machines, promotional devices and similar items, shall be displayed, offered for sale or lease, or stored within the Common Area; provided, however, the foregoing prohibition shall not be applicable to:

(A)  Temporary collection and the storage of shopping carts in cart corrals located in the parking areas of the Shopping Center, including the storage of shopping carts on the Target Tract and the Developer Tract, as long as such shopping carts are stored within a building or behind a screen wall or landscaping specifically designed to screen such shopping carts from view;

(B)  the installation of an "ATM" banking facility within an exterior wall of any Building or within a kiosk;

(C)  the seasonal display and sale of bedding plants on the sidewalk in front of any Building located on the Target Tract on the Developer Tract;

(D)  the placement of bicycle racks and landscaping planters on the sidewalk in front of any Building;

41

(E)    the placement of spherical bollards (Target's brand) on the sidewalk in front of any Building on the Target Tract or the placement of other types of bollards on the Developer Tract, provided that bollards on the Developer Tract are approved in connection with the approval of the Plans by the Approving Parties;

(F)    temporary Shopping Center promotions, except that no promotional activities will be allowed in the Common Area without the prior written approval of the Approving Parties unless such promotional activities are located within the parking areas of the Shopping Center identified as the "Permitted Promotion Area" on the Site Plan;

(G)    any recycling center required or encouraged by law, the location of which (if not shown on the Site Plan) shall be subject to the approval of the Approving Parties;

(H)    Outside Dining Areas adjacent to a Building, except that Outside Dining Areas will only be allowed in the portions of the Common Areas identified on the Site Plan as "Permitted Outside Dining" without the prior written approval of the Approving Parties (but the location of the Outside Dining Areas on the freestanding pads shall not be restricted); provided, however, (i) any Outside Dining Area shall be considered a portion of the Building Area for the purposes of determining compliance with the parking ratio requirements set forth in this OEA, (ii) any Outside Dining Area shall be fenced in or otherwise enclosed, and (iii) to the extent an Outside Dining Area is exclusively available to any Occupant or group of Occupants of the Shopping Center, such Occupant shall, as its sole cost and expense, ensure, clean and maintain such Outside Dining Area.

(I)    Any designated Outside Sales Area; provided, however, with respect to any Outside Sales Area which is not included within a Building Area, such space may be used not more than three (3) times per calendar year, and the duration of such use shall be subject to the following limitations: during the period commencing on October 15th and ending on December 27th -- no limitation on the number of days of consecutive use; during the period commencing February 15th and ending on July 10th -- not more than one hundred twenty-five (125) consecutive days of use; and, during any other period -- not more than thirty (30) consecutive days of use.

42

U:\ATTORNEYS\DLL#2\VESTAR\Queen Creek Towne Center\Target\OEA V8 (1-24-07).doc

PETSMART, INC.

**21.      PROHIBITED USES AND EXCLUSIVE RIGHTS.**

Certain provisions pertaining to prohibited uses within the Shopping Center are set forth in Exhibit G.  Landlord hereby represents and warrants that Exhibit G sets forth any and all prohibited uses which currently affect any portion of the Shopping Center, including without limitation under any existing lease, declaration of covenants or restrictions or other agreement or document of any kind affecting any portion of the Shopping Center, whether or not listed in Exhibit E, identified in the Title Insurance Policy, of record or otherwise disclosed to Tenant.

Draft No. 6  – 02/23/2007– RHM
Knockoff of 1267 – Lake Pleasant, AZ

38

#1809 – Queen Creek, AZ
Control No. AZPHX3401

I-57

325821301.2

PETSMART,INC.

## EXHIBIT G

## PROHIBITED USES

1.  **Prohibited Uses.** Any use in violation of the OEA is prohibited during the Term of the Lease in any portion of the Shopping Center. In addition, the following uses are prohibited during the Term of the Lease within the Shopping Center (including the Premises): nuisance; any use causing loud noises or offensive odors (including any business using exterior loud speakers); manufacturing facility (but this restriction shall not apply to in-store assembly in the normal course); dry cleaner (except facilities for drop off and pick up of clothing cleaned at another location); any facility for the sale, lease or rental of automobiles, trucks, motorcycles, recreational vehicles, boats or other vehicles; automobile repair shop or service station or any facility storing or selling gasoline or diesel fuel in or from tanks, but this shall not prohibit a carwash such as Danny's Carousel or an operation such as Discount Tires, Brakes Plus, Minute Lube, or Fletcher Tire and the like on Pads D, F, G, H and M, as designated on Exhibit A; used clothing or thrift store or liquidation outlet (but this restriction shall not apply to retailers who sell used or reconditioned goods together with new products such as "Play it Again Sports", "Computer Renaissance", "Warehouse Records", "EB Games", or "Gamestop", nor to a first-class retailer such as "Terri's Consignment", nor shall this restriction prohibit the operation of a so-called "99-Cents" or "Dollar Store" or a "MacFrugals"); massage parlor (except that massage therapy offered by a doctor, chiropractor, or nurse under the supervision of a doctor or chiropractor, or massage offered by a licensed massage therapist in connection with the operation of a salon, health club or day spa otherwise permitted by this Lease shall be permitted); adult book shop (meaning a store primarily engaged in the sale of sexually oriented materials and not a general interest bookstore such as "Barnes & Noble" or "B. Dalton") or adult movie house (except that this restriction shall not apply to a full-line video store such as "Blockbuster Video", "Video Update" or "Hollywood Video"); mortuary or funeral parlor; coin operated laundry; cocktail lounge, bar or tavern or sale of alcoholic beverages, whether or not packaged, except (i) full service grocery store, drugstore, or "Cost Plus" may sell alcoholic beverages in prepackaged containers, (ii) a gourmet grocer such as "Trader Joe's", (iii) if operated in excess of one hundred ten feet (110') from the Premises a gourmet or specialty liquor store, such as "The Sportsman", "Beverages and More" and "Total Wine", may be permitted, or (iv) in a restaurant, wherever located; night club; cinema or theater; game arcade (which shall not be interpreted to mean the use of five (5) or fewer video or pinball machines ancillary to an otherwise permitted use and shall not prohibit a family oriented restaurant with video games, pinball games or arcade games as a component of its business [such as Chuck E Cheese or Peter Piper Pizza] in a location otherwise permitted hereunder) or other place of recreation; bowling alley, skating rink or carnival; health spa (provided, however, that a health spa or jazzersize studio may be located more than five hundred (500) feet from the Premises); church (except incidental use of theatre auditoriums for religious services by the theatre tenant); restaurants, except if located more than three hundred (300) feet from the Premises or on pads; children's recreational, educational or day-care facility, but this shall not prohibit a daycare center such as Tutor Time on a free standing pad; offices or professional uses in excess of 10% of the Gross Floor Area in the aggregate, all of which, except banks, shall be located more than three hundred (300) feet from the Premises; schools of any nature; or any other use inconsistent with the operation of a high quality retail shopping center. As used herein, "school" includes, but is not limited to, a beauty

Draft No. 6  – 02/23/2007– RHM
Knockoff of 1267 – Lake Pleasant, AZ                         Exhibit G
                                                            Page 1                         #1809 – Queen Creek, AZ
                                                                                           Control No. AZPHX3401

I-58

325821301.2

school, barber college, reading room, place of instruction or any other operation serving primarily students or trainees rather than retail customers. It is the intent of this Paragraph that the Shopping Center shall be devoted to high quality retail uses and that the parking and the other common facilities shall not be burdened by either excessive or protracted use. None of the restrictions set forth in this section shall be applicable to the portion of the Shopping Center owned and/or ground leased by Target, Kohl's or Lowe's except to the extent such restrictions may be included within the OEA.

Draft No. 6  – 02/23/2007– RHM
Knockoff of I 267 – Lake Pleasant, AZ

Exhibit G
Page 2

#1809 – Queen Creek, AZ
Control No. AZPHX3401

I-59

325821301.2

ROSS DRESS FOR LESS, INC.

8   **3.2.    Nature of the Shopping Center.**

9       **3.2.1.**

10      (a)   _Retail Use._   Tenant has entered into this Lease in reliance upon
11   representations by Landlord that Landlord's Parcel is and shall remain retail in character, and, further,
12   no part of Landlord's Parcel shall be used for office or residential purposes or as a theater, auditorium,
13   meeting hall, school, church or other place of public assembly, "flea market," gymnasium, veterinary
14   services, overnight stay pet facilities, health club, dance hall, billiard or pool hall, massage parlor, video
15   game arcade, bowling alley, skating rink, car wash, facility for the sale, display, leasing or repair of
16   motor vehicles, night club, adult products, adult books or adult audio/video products (which are
17   defined as stores in which at least ten percent (10%) of the inventory is not available for sale or rental
18   to children under the age of majority in the state in which the Store is located because such inventory
19   explicitly deals with or depicts human sexuality). No ATM or similar machine shall be permitted in the
20   Shopping Center within one hundred (100) feet of the front and side perimeter walls of the Store.
21   Further, no restaurant or other "High Intensity Parking User" (as hereinafter defined) shall be
22   permitted in Landlord's Parcel within three hundred (300) feet of the front and side perimeter walls of
23   the Store. A "High Intensity Parking User" is a tenant or occupant whose use requires more than five
24   (5) parking spaces per one thousand (1,000) square feet of Leasable Floor Area in accordance with
25   either customary shopping center practices or governmental regulations, whichever has a higher
26   parking requirement. The foregoing use restrictions are referred to herein as the Ross Prohibited Uses.
27   The prohibitions contained in this Section 3.2.1(a) shall not be applicable to the Target Tract, the
28   Major N Tract, or to the Kohl's Tract unless and until Landlord regains legal control of the Kohl's
29   Tract.

30      (b)   _Exceptions to Retail Use._   Notwithstanding the restrictions on use set forth
31   in Section 3.2.1(a) above, the following uses shall be permitted in the Shopping Center:

32

33      (i)   _Video Game Arcade._   Five (5) or less video games and pinball
34   machines in the aggregate shall be permitted in any premises which has a primary restaurant use and a
35   video game arcade, provided that it is located at least three hundred (300) feet from the Store, provided
36   it is family oriented and is a first class operator, such as Funcoland, Game Works or Sega City or is
37   incidental to the operation of a permitted restaurant such as Peter Piper Pizza or Chuck E. Cheese;

38      (ii)   _Automotive Uses._   Up to an aggregate of three (3) automotive
39   uses which may include  national or regional car wash/gas station, lube facility, brake repair shop, or
40   tire shops provided that each automotive use is located at least three hundred (300) feet from any of
41   the perimeter walls of the Store;

"QueenCreek"
Queen Creek Marketplace
Queen Creek, AZ
Store No. 1190
ARK.123.11

- 14 -

04/26/07
FINAL

I-60

1    (iii)    <u>Workout Club /Spa</u>.  One (1) small "workout" club or first class
2  day spa or salon, provided that such "workout" club or first class day spa or salon shall not be greater
3  than four thousand (4,000) square feet and shall not be located within five hundred (500) feet from any
4  perimeter wall of the Store;

5    (iv)    <u>Veterinary Services</u>.  A pet store, with veterinary services and
6  temporary overnight stay pet facilities, including a pet hotel, shall be permitted by a national pet
7  supply store, provided that the nearest perimeter wall of the pet store shall not be any closer than
8  three hundred fifty (350) feet to the nearest perimeter wall of the Store;

9    (v)    <u>Gymnasium or Health Club</u>.  One (1) gymnasium or health club
10  not to exceed sixty-five thousand (65,000) square feet of Leasable Floor Area located in "Major N",
11  "Pad M", "Pad K " or "Pad L" as designated on the Site Plan;

12    (vi)    <u>Coffee or Espresso Bar</u>.    The incidental operation of a "coffee
13  or espresso bar" or "coffee shop" or similar operation incidental to a primary use of a book store by a
14  retailer such as Barnes and Noble, or other similar retailer, providing its customers with coffee, tea, and
15  other beverages, pastries, sandwiches, snacks and other pre-prepared or packaged food or beverage
16  items, as well as related merchandise, either for sale or complimentary and for either on-site or take-out
17  consumption;

18    (vii)    <u>Shopping Center Management Office and Retail Service Offices</u>.
19  One (1) shopping center management office and office use typically found in shopping centers, such as
20  travel agencies, real estate brokers, insurance brokers, optometrists' office, and the like shall be
21  permitted provided that no such single office use, excepting those located within "Shops E" as
22  designated on the Site Plan, shall exceed three thousand (3,000) square feet, and all office uses shall
23  not exceed, in the aggregate, fifteen thousand (15,000) square feet in Landlord's Parcel;

24    (viii)    <u>Billiards and Pool Tables</u>    Billiards/pool tables are permitted
25  provided that they are incidental to an otherwise permitted use;

26    (ix)    <u>Massage Services</u>    Massage services offered as an incidental
27  service of a medical office, chiropractic office, permitted health club, first class day spa or salon shall be
28  permitted;

29    (x)    <u>General Interest Book Store/ Film Store</u>.  One (1) general interest
30  bookstore such as Barnes & Noble or B. Dalton and  one (1) full-line video store such as Blockbuster
31  Video, Video Update or Hollywood Video each of which may carry films with adult content that are
32  released for general commercial distribution to national theater chains;

33    (xi)    <u>Preschool or Daycare</u>.  One (1) preschool or daycare center shall
34  be permitted  provided that its is not located closer than five hundred (500) feet to the nearest exterior
35  wall of the Store;

36    (xii)    <u>Dancing</u>.  Patron dancing shall be permitted if it is  incidental to
37  the operation of a permitted restaurant located not closer than five hundred (500) feet to the Store; and

38    (xiii)    <u>Outparcels</u>.  Restaurant uses shall be permitted on the Outparcels.

"Queen Creek"
Queen Creek Marketplace
Queen Creek, AZ                                    - 15 -                                    04/26/07
Store No. 1190                                                                              FINAL
ARK.123.11

3.2.2.    <u>Further Prohibited Uses</u>.  Landlord agrees that, without the consent of Tenant, the Ross Prohibited Uses set forth in Section 3.2.1 and the "Landlord's Prohibited Uses" which are listed in **Exhibit D** (collectively, the "Prohibited Uses") shall not be permitted in the Shopping Center.  Tenant agrees that it will not violate the Prohibited Uses.  Landlord shall hold Tenant harmless from any claims or damages suffered or claimed to be suffered by Tenant as a result of any breach or alleged breach of Landlord's representation and warranty set forth in this Section 3.2.2.

"Queen Creek"
Queen Creek Marketplace
Queen Creek, AZ
Store No. 1190
ARK.123.11

- 16 -

04/26/07
FINAL

I-62

325821301.2

**ROSS DRESS FOR LESS, INC.**

### EXHIBIT D
### PROHIBITED USES

1.    The Prohibited Uses as set forth in Section 3.2.1 of the Lease.

2.    The Prohibited Uses as set forth in the OEA and reproduced below:

5.1.1   The Shopping Center shall be used only for entertainment businesses, retail sales, offices, Restaurants or other permitted commercial purposes. "Business Office" shall mean an office which does not provide services directly to consumers; "Retail Office" shall mean an office which provides services directly to consumers, including but not limited to financial institutions, real estate, stock brokerage and title companies, travel and insurance agencies, and medical, dental and legal clinics. No more than ten percent (10%) of the total Floor Area on the Developer Tract may be used for Retail Office and/or Business Office purposes and no more than ten percent (10%) of the total Floor Area on the Target Tract may be used for a retail office and/or business office purposes; provided, however, that office space used by an Occupant for administrative purposes, and which is not open to the general public, shall not be considered Retail Office or Business Office for the purpose of this limitation.

5.1.2   No use shall be permitted in the Shopping Center which is inconsistent with the operation of a first-class retail shopping center or which violates Governmental Requirements. Without limiting the generality of the foregoing, without the prior written consent of the Approving Parties, which consent each Approving Party may withhold in its sole and absolute discretion, the following uses shall not be permitted:

(A)    Any use which emits an obnoxious odor, noise or sound which can be heard or smelled outside of any Building in the Shopping Center or any other activity which may constitute a public or private nuisance.

(B)    An operation primarily used as a storage warehouse operation (but this prohibition shall not be applicable to a "rackstyle retailer") and any assembling, manufacturing, distilling, refining, smelting, agricultural or mining operation (but this prohibition shall not prohibit assembly or manufacture of products incidental to the retail sale thereof, nor shall this prohibit the operation of a so-called "brew pub" provided that any such "brew pub" (i) constitutes a Restaurant, and (ii) does not derive more than forty five percent (45%) of its Gross Sales from the sale of alcoholic beverages) and is located more than five hundred (500) from the Building on the Target Tract.

"Queen Creek"
Queen Creek Marketplace                    EXHIBIT D                                    FINAL
Queen Creek, AZ                             Page 1 of 5
Store No. 1190
ARK.123.1

I-63

(C)     Any "second hand" store, "surplus" store, or pawn shop; provided, however, this prohibition shall not be applicable to retail facilities as may be found in a reasonable number of good quality shopping centers in the Phoenix, Arizona metropolitan area which sell used equipment or goods (by way of example and not limitation, retail stores such as "Game Stop," "Play It Again Sports", "EB Games," "Blockbuster," "Hollywood Video," "Game Crazy," "Computer Renaissance," "My Sister's Attic," and "Terrie's Consignment").

(D)     Any mobile home park, trailer court, labor camp, junkyard, or stockyard; provided, however, this prohibition shall not be applicable to the

temporary use of construction trailers during periods of construction, reconstruction or maintenance.

(E)     Any dumping, disposing, incineration or reduction of garbage; provided, however, this prohibition shall not be applicable to garbage compactors located near the rear of any Building and provided further this restriction shall not be applicable to governmentally required or encouraged recycling centers in locations identified on the Site Plan or otherwise approved by the Approving Parties.

(F)     Any fire sale, bankruptcy sale (unless pursuant to a court order) or auction house operation.

(G)     Any central laundry, dry cleaning plant or laundromat; provided, however, this prohibition shall not be applicable to nominal supportive facilities for on-site service oriented to pickup and delivery by the ultimate consumer as the same may be found in retail shopping centers in the metropolitan area where the Shopping Center is located such as, by way of example only, pressing, alterations, shoe shine and shoe repair.

(H)     Any automobile, truck, trailer or recreational vehicle sales, leasing, display or body shop repair operation, but this shall not prohibit, on not more than three (3) occasions during each calendar year (each of which shall not exceed seven (7) days) the promotional display of automobiles or light trucks in the portion of the Common Areas of the Shopping Center not located on the Target Tract and identified on the Site Plan as the "Permitted Promotion Area".

"Queen Creek"
Queen Creek Marketplace
Queen Creek, AZ
Store No. 1190
ARK.123.1

EXHIBIT D
Page 2 of 5

FINAL

I-64

325821301.2

(I)     Any bowling alley or skating rink; provided, however, this prohibition shall not be applicable to one (1) bowling alley having a Floor Area of forty thousand (40,000) square feet or less located north of the "Bowling Alley Line" set forth on the Site Plan.

(J)     Any movie theater or live performance theater.

(K)     Any residential use, including but not limited to: single family dwellings, townhouses, condominiums, other multi-family units, and other forms of living quarters, sleeping apartments or lodging rooms, but this shall not be applicable to a hotel or motel located on a freestanding pad and located within three hundred (300) feet of the south right of way line for Rittenhouse Road.

(L)     Any veterinary hospital or animal raising or boarding facility; provided, however, this prohibition shall not be applicable to pet shops or pet supply stores. Notwithstanding the forgoing exception, except in connection with a national pet supply store such as PetsMart, (i) any veterinary or boarding services provided in connection with the operation of a pet shop shall only be incidental to such operation; (ii) the boarding of pets as a separate customer service shall be prohibited; (iii) all kennels, runs and pens shall be located inside the Building; and (iv) the combined incidental veterinary and boarding facilities shall occupy no more than fifteen percent (15%) of the Floor Area of the pet shop.

(M)     Any mortuary or funeral home.

(N)     Any establishment selling or exhibiting "obscene" material, but this shall not be applicable to a national full line bookstore such as Border's or Barnes & Noble, a national full line video store such Hollywood Entertainment or Blockbuster Video, a national full line consumer electronic store such as Best Buy or Circuit City or to the sale of adult magazines by a national convenience store such as Circle K or 7 Eleven.

(O)     Any establishment selling or exhibiting drug-related paraphernalia or which exhibits either live or by other means to any degree, nude or partially clothed dancers or wait staff, provided, however, this prohibition shall not be applicable to national restaurant operations as may be found in a number of reasonable good quality shopping centers in the Phoenix, Arizona metropolitan area whose wait staff may be clothed in other than long sleeve shirts and long pants.

"Queen Creek"                           FINAL
Queen Creek Marketplace
Queen Creek, AZ              EXHIBIT D
Store No. 1190               Page 3 of 5
ARK.123.1

I-65

(P)    Any bar or tavern, except in connection with a Restaurant so long as (i) such Restaurant's reasonably projected annual gross revenues from the sale of alcoholic beverages for on-premises consumption does not exceed forty five percent (45%) of the gross revenues of such business, and (ii) such Restaurant is located more than five hundred (500) feet from the Building on the Target Tract.  This prohibition shall not, however, be applicable to a wine store or liquor store that may offer on-premises sampling of products so long as such sampling complies with the codes and ordinances of Governmental Authorities.

(Q)    Any health spa, fitness center or workout facility having a Floor Area in excess of four thousand (4,000) square feet and located within five hundred (500) feet of the Building on the Target Tract; any massage parlors or similar establishments, but this shall not prohibit massage services offered by a permitted health club, a permitted fitness center, a day spa (but not more than two (2) day spas shall be permitted, a beauty

salon, a barber shop, a doctor, a nurse, a chiropractor, a physical therapist or by licensed massage therapists from reputable businesses such as, by way of example, Massage Envy, provided that all such massage services are rendered within premises located within at least five hundred (500) feet from the Building on the Target Tract.

(R)    Any flea market, amusement or video arcade (but this shall not be applicable to pinball, electronic or other game machines incidental to a Restaurant located on a freestanding pad and provided such arcade amusement or video arcade encompasses not more than five percent (5%) of the Floor Area of such Restaurant or two hundred (200) square feet, whichever is less, provided, however, this prohibition shall not be applicable to the portions of the Shopping Center located more than five hundred (500) feet from the Building on the Target Tract), pool or billiard hall (but this shall not prohibit a Restaurant having a Floor Area of at least four thousand (4,000) square feet on a freestanding pad from having three (3) or fewer pool tables; car wash (but this prohibition shall not be applicable to not more than one (1) fully automatic so-called "tube" or "tunnel" car wash operated in connection with a gas station or a mini mart) or dance hall (but this shall not prohibit a Restaurant on a freestanding pad from permitting incidental patron dancing, provided that (a) such Restaurant does not derive more than forty five (45%) of its gross revenues from the sale of alcoholic beverages, and (ii) such Restaurant is located at least five hundred (500) feet from the Building on the Target Tract).

"Queen Creek"
Queen Creek Marketplace
Queen Creek, AZ
Store No. 1190
ARK.123.1

EXHIBIT D
Page 4 of 5

FINAL

I-66

(S)     Any training or educational facility, including but not limited to:  beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers; provided, however, this prohibition shall not be applicable to on-site employee training by an Occupant incidental to the conduct of its business at the Shopping Center.

(T)     Any gambling facility or operation, including but not limited to:  off-track or sports betting parlor;  table games such as blackjack or poker; slot machines, video poker/blackjack/keno machines or similar devices;  or bingo hall.  Notwithstanding the foregoing, this prohibition shall not be applicable to government sponsored gambling activities or charitable gambling activities, so long as such activities are incidental to the business operation being conducted by the Occupant.  In addition, this prohibition shall not be applicable to the operation of arcade games, video games, pinball games or games of skill by the Occupant of Premises located more than five hundred (500) feet from the Building on the Target Tract as long as in no event shall there be conducted, operated or permitted to be conducted or operated a bingo hall or similar bingo operation from or within such Premises.

(U)     Any church, temple or other house of religious worship.

(V)     Any check cashing services (unless operated by a bank or other financial institution or if ancillary to an otherwise permitted use).

(W)     The storage, display or sale of explosives or fireworks.

(X)     Any trailer court or mobile home park.

"Queen Creek"
Queen Creek Marketplace
Queen Creek, AZ
Store No. 1190
ARK.123.1

EXHIBIT D
Page 5 of 5

FINAL

I-67

325821301.2

**THE TJX COMPANIES, INC.**

4. (A)  Subject to the rights of tenants/occupants under Existing Leases (as defined in Paragraph (D) below), Landlord agrees that, except if Tenant is operating a non-retail use in the Demised Premises, the Shopping Center shall not be used (a) for any non-retail purposes (repairs, alterations and offices incidental to retailing, and banks and small loan offices, not being deemed non-retail), or (b) for any entertainment purposes such as a bowling alley, skating rink, cinema, bar, nightclub, discotheque, amusement gallery, poolroom, health club, massage parlor, sporting event, sports or game facility, off-track betting club (but the provisions of this clause (b) shall not be applicable to that portion of the Shopping Center identified on the Lease Plan as the "Theatre Area", nor shall the provisions of this clause (b) prohibit or restrict any of the following restaurants: (i) the incidental sale of alcoholic beverages by a restaurant, (ii) incidental patron dancing by an otherwise permitted restaurant, (iii) up to three (3) billiards tables at an otherwise permitted restaurant (up to five (5) billiards tables, however, in a sports bar such as Buffalo Wild Wings or Zips operate on the date hereof), (iv) up to five (5) video, pinball or other electronic amusement devices incidental to an otherwise permitted use, (v) the operation of a family entertainment restaurant such as Chuck E. Cheese or Peter Piper Pizza, or (vi) off-track betting activities incidental to the operation of an otherwise permitted restaurant, or (c) for any establishment which sells or displays pornographic materials (provided, however, that this restriction against pornographic materials shall not extend to (1) a full line bookstore typically found in first class shopping centers such as Barnes & Noble, or (2) a full line video store typically found in a first class shopping center such as Blockbuster Videos (provided that in the case of such a book store or full-line video store that such chains do not change their focus to a use which is primarily adult-only oriented) or (3) the movie theater located in the portion of the Shopping Center identified on the Lease Plan as the "Theatre Area" so long as such theater is operated as a first class theater), or (d) for any establishment which sells or displays used merchandise

SCHEDULE B                                                                                    B-2
G:\Legal\C.Ahola\TJ Maxx\AZ\Queen Creek\Lease Docs\lease final.docx

I-68

or second hand goods (provided, however, that this restriction shall not apply to not more than three (3) stores typically found in a first class shopping center that sells reconditioned merchandise together with new merchandise such as Computer Renaissance, Play It Again Sports, My Sister's Closet, My Sister's Attic, Well Suited, Terry's Consignment, EB Games, Gamestop or Game Crazy, nor shall it prevent a video/record store from engaging in a CD or video exchange program).    Except for existing tenants/occupants of the Shopping Center under Existing Leases (and similar replacements thereof for substantially the same use), no restaurants or establishments selling food prepared on premises for consumption on or off premises shall be located in the portions of the Shopping Center labeled "Prohibited Restaurant Area" on the Lease Plan (other than cafés incidental to an otherwise primary use).

Anything in this Paragraph 4(A) to the contrary notwithstanding, Landlord and Tenant hereby agree as follows:

(i)    One (1) health club may be located at least five hundred feet (500') from the Demised Premises, one (1) health club may be located in the area marked "Theatre Area" on the Lease Plan and up to two (2) health clubs containing not more than four thousand (4,000) square feet each may be located anywhere in the Shopping Center;

(ii)    A cinema or theater may be located in the area marked "Theatre Area" on the Lease Plan;

(iii)    Service oriented uses which are normally found in first-class shopping centers such as travel agencies, insurance agencies, weight loss clinics (such as Weight Watchers, Jenny Craig) and financial institutions ("Service Oriented Offices") shall be permitted provided that such Service Oriented Offices shall be limited to an aggregate of ten percent (10%) of floor area within the Shopping Center; and

(iv)    Commercial office and business office uses shall be permitted provided that such business office uses are located more than five hundred feet (500') from the building of which the Demised Premises is a part and provided that such business office uses, together with the service office uses described in clause (iii) above shall be limited to an aggregate of ten percent (10%) of the floor area of the Shopping Center.

THE TJX COMPANIES, INC.

(D)  The provisions of this Paragraph 4 shall not apply (1) to the Kohl's Parcel or the Target Parcel (except to the extent the REA provides otherwise), (2) the portions of the Development not owned by Landlord (except to the extent the REA provides otherwise), and/or (3) with respect to rights previously granted to tenants or occupants under leases or agreements existing as of the date hereof (collectively "Existing Leases") for only so long as such Existing Leases continue in full force and effect and only to the extent such Existing Leases permit such Prohibited Uses or the Competing Uses. Landlord agrees not to amend any Existing Leases to permit the Prohibited Uses or the Competing Uses. Landlord warrants and represents that all of the Existing Leases are listed on Schedule N attached hereto.

5.  (A)  So long as Landlord shall not be in default under Paragraph 4 hereof, the Demised Premises shall not be used for any non-retail purposes (including a food service operation) or entertainment purposes except incidental amusement devices.  In no event may Tenant use the Demised Premises for any use identified as a "Prohibited Use" on Schedule F attached hereto.

<u>ULTA SALON, COSMETICS & FRAGRANCE, INC.</u>

**4.5    Restricted Uses.**  The Prohibited Uses set forth in Exhibit G hereto shall be prohibited throughout the Shopping Center.  In addition, no restaurant or other food service operation or children's recreational facility will be located within one hundred feet (100') of the Premises, but this shall not be applicable to a food service operation incidental to a primary use such as that operated, by way of example only, by Barnes & Noble or Old Navy.

<u>ULTA SALON, COSMETICS & FRAGRANCE, INC.</u>

**EXHIBIT G**

**SCHEDULE OF PROHIBITED USES**

FOR
QUEEN CREEK MARKETPLACE
(as of June 5, 2007)
10381-221

| TENANT | PROHIBITED USE |
|---|---|
| OfficeMax  (1) | Without Tenant's prior written approval, which approval may be withheld in Tenant's sole discretion, Landlord shall not make any changes in the Tenant Protected Area as shown on <u>EXHIBIT "B"</u>, including without limitation changing the entrances to or access routes within such Tenant Protected Area, constructing or installing any structures or other improvements within such Tenant Protected Area (including kiosks, signs, or automated teller machines)  During the Initial Term of this lease and during any renewal period hereunder:  (a) No portion of the Shopping Center located within two hundred linear feet (200') of the demising walls of the Demised Premises shall be used as a restaurant, or for office purposes (such as medical or office uses, except that administrative offices incidental to a retail store operation or a veterinary clinic located within a pet supply store such as PetsMart shall be permitted), or for any use that requires parking in excess of five (5) spaces for each one thousand (1,000) square feet of leasable floor area, or for any use prohibited under subparagraphs (c) or (d) immediately below;  (b) No portion of the Shopping Center shall be occupied or used in violation of the OEA;  (c) No portion of the Shopping Center (excluding the portion owned by Target Corporation and the portion ground leased to Kohl's Department Stores, Inc.) shall be occupied or used, directly or indirectly, for a nightclub or other entertainment facility, bowling alley, arcade (but the foregoing does not preclude the use of up to ten (10) pinball or video games in connection with an otherwise permitted use which is located at least one hundred (100) linear feet from the demising walls of the Demised Premises); amusement center (as determined by prevailing community standards and provided that the use of up to ten (10) pinball or video games in connection with an otherwise permitted use which is located at least one hundred (100) linear feet from the demising walls of the Demised Premises shall not be considered an amusement center), theater; movie theater (but the foregoing does not preclude a movie theater which is located at least three hundred (300) linear feet from the |

LEKv5
882865-6 10961.0154000

Exhibit G
Page 2

Ulta [Form v15-05/07] [Queen Creek Marketplace/Queen Creek, AZ]
Store No: 356

I-72

325821301.2

| **TENANT** | PROHIBITED USE |
|---|---|
|  | demising walls of the Demised Premises); fitness center, health club or spa (except that an exercise studio or Jazzercise facility consisting of four thousand (4,000) square feet or less may be permitted so long as such space is located at least one hundred (100) linear feet from the demising walls of the Demised Premises and a fitness center, health club or spa may be permitted so long as such space is located at least three hundred (300) linear feet from the demising walls of the Demised Premises); game room (but the foregoing does not preclude the use of up to ten (10) pinball or video games in connection with an otherwise permitted use which is located at least one hundred (100) linear feet from the demising walls of the Demised Premises); skating rink; billiard room (but the foregoing does not preclude up to two tables in connection with an otherwise permitted use which is located at least one hundred (100) linear feet from the demising walls of the Demised Premises); massage parlor (except for massage services offered by a health spa, a beauty salon, a medical doctor or chiropractor which massage services are incidental to a use otherwise permitted under this lease); adult book store or any other purpose which includes the display or sale of pornographic or obscene materials (as determined by prevailing community standards); off-track betting facility (but the foregoing shall not preclude off-track betting in connection with an otherwise permitted restaurant which is located at least one hundred (100) linear feet from the demising walls of the Demised Premises); flea market; second hand store; pawn shop; blood bank; goodwill store; bar; liquor store or store selling alcoholic beverages for off premises consumption (except that (i) a full service grocery store, drugstore, or Cost Plus may sell alcoholic beverages in prepackaged containers, (ii) a gourmet grocer such as Trader Joe's, or (iii) a gourmet or specialty liquor store, such as The Sportsman or Total Wine or Beverage & More may be permitted); tavern or pub (but the foregoing does not preclude a restaurant from selling alcoholic beverages so long as at least fifty percent (50%) of the restaurant's gross sales are from the sale of food); discotheque, ballroom or dance hall (but the foregoing does not preclude incidental patron dancing in an otherwise permitted restaurant which is located at least one hundred (100) linear feet from the demising walls of the Demised Premises); day care center (except that a day care center located on a freestanding pad located at least three hundred (300) linear feet from the demising walls of the Demised Premises may be permitted); beauty school; barber college; offices (other than a full service bank office, savings and loan association office, credit union, medical or dental office customarily located in shopping centers, administrative offices incidental to a retail store operation, or a veterinary clinic located within a pet supply store such as PetsMart) (provided, however, that up to ten percent (10%) of the floor area of the Shopping Center may be used as office space so |

LEK:s
882865-6 10961.0154000

Exhibit G
Page 3

Ulta [Form v15-05/07] [Queen Creek Marketplace/Queen Creek, AZ]
Store No: 356

I-73

325821301.2

| TENANT | PROHIBITED USE |
|---|---|
| | long as such office space is located at least three hundred (300) linear feet from the demising walls of the Demised Premises); place of instruction; reading room (except for a reading room maintained by Barnes & Noble within its premises); or any operation catering primarily to students or trainees rather than to customers or for any use prohibited under subparagraph (d) immediately below; provided, however, notwithstanding the foregoing in this subsection (c), the following uses are permitted in the Lifestyle Center depicted as such on **EXHIBIT "B"**:  a nightclub or other entertainment facility, bowling alley, arcade, amusement center, tavern, pub, discotheque, ballroom, or dance hall;<br><br>  **(d)** No portion of the Shopping Center shall be occupied or used in violation of any prohibitions or restrictions on use contained in any document or instrument listed on **EXHIBIT "D"** |
| Target (2) OEA | Kiosks and remote merchandising units on the Developer Tract are limited to those areas identified as "Permitted Kiosk Areas" on the Site Plan, no more than ten (10) such kiosks or remote merchandising units shall be permitted in each Permitted Kiosk Area and no such kiosk or remote merchandising unit shall be of a size greater than one hundred (100) square feet<br><br>No more than ten percent (10%) of the total Floor Area on the Developer Tract may be used for Retail Office and/or Business Office purposes and no more than ten percent (10%) of the total Floor Area on the Target Tract may be used for a retail office and/or business office purposes; provided, however, that office space used by an Occupant for administrative purposes, and which is not open to the general public, shall not be considered Retail Office or Business Office for the purpose of this limitation.<br><br>No use shall be permitted in the Shopping Center which is inconsistent with the operation of a first-class retail shopping center or which violates Governmental Requirements.   Without limiting the generality of the foregoing, without the prior written consent of the Approving Parties, which consent each Approving Party may withhold in its sole and absolute discretion, the following uses shall not be permitted:<br><br>(A) Any use which emits an obnoxious odor, noise or sound which can be heard or smelled outside of any Building in the Shopping Center or any other activity which may constitute a public or private nuisance. |

LEKv5
B22865-6 10961.0154000

Exhibit G
Page 4

Ulta [Form v15-05/07] [Queen Creek Marketplace/Queen Creek, AZ]
Store No: 356

325821301.2

I-74

| TENANT | PROHIBITED USE |
|--------|----------------|
|        |                |

(B) An operation primarily used as a storage warehouse operation (but this prohibition shall not be applicable to the following wholesale or rackstyle retailers: Home Depot USA, Inc., Lowe's HIW, Inc., Sam's Club (but only if located more than five hundred (500) feet from the Target Building), Costco, BJ's or any successor to the foregoing by merger, consolidation or acquisition of all or substantially all assets) and any assembling, manufacturing, distilling, refining, smelting, agricultural or mining operation (but this prohibition shall not prohibit assembly or manufacture of products incidental to the retail sale thereof, nor shall this prohibit the operation of a so-called "brew pub" provided that any such "brew pub" (i) constitutes a Restaurant, and (ii) does not derive more than forty five percent (45%) of its Gross Sales from the sale of alcoholic beverages) and is located more than five hundred (500) from the Building on the Target Tract.

(C) Any "second hand" store, "surplus" store, or pawn shop; provided, however, this prohibition shall not be applicable to the following retail facilities as may be found in a reasonable number of good quality shopping centers in the Phoenix, Arizona metropolitan area which sell used equipment or goods: "Game Stop," "Play It Again Sports", "EB Games," "Blockbuster," "Hollywood Video," "Game Crazy," "Computer Renaissance," "My Sister's Attic", "Funco Land", "FYE For Your Entertainment" or a successor to any of the foregoing by merger, consolidation or acquisition of all or substantially all assets.

(D) Any mobile home park, trailer court, labor camp, junkyard, or stockyard; provided, however, this prohibition shall not be applicable to the temporary use of construction trailers during periods of construction, reconstruction or maintenance.

(E) Any dumping, disposing, incineration or reduction of garbage; provided, however, this prohibition shall not be applicable to garbage compactors located near the rear of any Building and provided further this restriction shall not be applicable to governmentally required or encouraged recycling centers in locations identified on the Site Plan or otherwise approved by the Approving Parties.

(F) Any fire sale, bankruptcy sale (unless pursuant to a court order) or auction house operation.

(G) Any central laundry, dry cleaning plant or laundromat; provided, however,

LEKv5
882865-6 10961.0154000

Exhibit G
Page 5

Ulta [Form v15-05/07] [Queen Creek Marketplace/Queen Creek, AZ]
Store No: 356

I-75

325821301.2

| TENANT | PROHIBITED USE |
|--------|----------------|
|        | this prohibition shall not be applicable to nominal supportive facilities for on-site service oriented to pickup and delivery by the ultimate consumer as the same may be found in retail shopping centers in the metropolitan area where the Shopping Center is located such as, by way of example only, pressing, alterations, shoe shine and shoe repair.<br><br>(H) Any automobile, truck, trailer or recreational vehicle sales, leasing, display or body shop repair operation, but this shall not prohibit, on not more than three (3) occasions during each calendar year (each of which shall not exceed seven (7) days) the promotional display of automobiles or light trucks in the portion of the Common Areas of the Shopping Center not located on the Target Tract and identified on the Site Plan as the "Permitted Promotion Area".<br><br>(I) Any bowling alley or skating rink; provided, however, this prohibition shall not be applicable to one (1) bowling alley having a Floor Area of forty thousand (40,000) square feet or less located north of the "Bowling Alley Line" set forth on the Site Plan.<br><br>(J) Any movie theater or live performance theater.<br><br>(K) Any residential use, including but not limited to: single family dwellings, townhouses, condominiums, other multi-family units, and other forms of living quarters, sleeping apartments or lodging rooms, but this shall not be applicable to a hotel or motel located on a freestanding pad and located within three hundred (300) feet of the south right of way line for Rittenhouse Road.<br><br>(L) Any veterinary hospital or animal raising or boarding facility; provided, however, this prohibition shall not be applicable to pet shops or pet supply stores. Notwithstanding the forgoing exception, except in connection with a national pet supply store such as PetsMart, (i) any veterinary or boarding services provided in connection with the operation of a pet shop shall only be incidental to such operation; (ii) the boarding of pets as a separate customer service shall be prohibited; (iii) all kennels, runs and pens shall be located inside the Building; and (iv) the combined incidental veterinary and boarding facilities shall occupy no more than fifteen percent (15%) of the Floor Area of the pet shop.<br><br>(M) Any mortuary or funeral home.<br><br>(N) Any establishment selling or exhibiting "obscene" material, but this shall not |

LEKv5
882865-6 10961.0154000

Exhibit G
Page 6

Ulta [Form v 15-05/07] [Queen Creek Marketplace/Queen Creek, AZ]
Store No: 356

I-76

325821301.2

| TENANT | PROHIBITED USE |
|--------|----------------|
|        | be construed as prohibiting the sale of normally stocked merchandise in a full line bookstore having at least fifty (50) locations such as Border's or Barnes & Noble, a full line video store having at least fifty (50) locations such as Hollywood Entertainment or Blockbuster Video, a full line consumer electronics store having at least fifty (50) locations such as Best Buy, Circuit City or Fry's Electronics or to the sale of adult magazines by a convenience store having at least fifty (50) locations such as Circle K or 7 Eleven.<br><br>(O) Any establishment selling or exhibiting drug-related paraphernalia or which exhibits either live or by other means to any degree, nude or partially clothed dancers or wait staff, provided, however, this prohibition shall not be applicable to national restaurant operations as may be found in a number of reasonable good quality shopping centers in the Phoenix, Arizona metropolitan area whose wait staff are attired similar to the current attire of wait staff such as TGI Fridays, Hard Rock Café, Kona Grill, Yardhouse or Chili's.<br><br>(P) Any bar or tavern, except a bar or tavern shall be permitted as a component of a Restaurant so long as the following two (2) conditions are satisfied: (i) such Restaurant's reasonably projected annual gross revenues from the sale of alcoholic beverages for on-premises consumption does not exceed forty five percent (45%) of the gross revenues of such business, and (ii) such Restaurant is located more than five hundred (500) feet from the Building on the Target Tract. In addition, the prohibition set forth in this paragraph shall not be applicable to a wine store or liquor store located north of the "Bowling Alley Line" as set forth on the Site Plan that may offer on-premises sampling of products so long as such sampling complies with the codes and ordinances of Governmental Authorities.<br><br>(Q) Any health spa, fitness center or workout facility having a Floor Area in excess of four thousand (4,000) square feet and located within five hundred (500) feet of the Building on the Target Tract; any massage parlors or similar establishments, but this shall not prohibit massage services offered by a permitted health club, a permitted fitness center, a day spa (but not more than two (2) day spas shall be permitted, a beauty salon, a barber shop, a doctor, a nurse, a chiropractor, a physical therapist or by licensed massage therapists from reputable businesses such as, by way of example, Massage Envy, provided that all such massage services are rendered within premises located within at least five hundred (500) feet from the Building on the Target Tract.<br><br>(R) Any flea market, amusement or video arcade (but this shall not be applicable to pinball, electronic or other game machines incidental to a Restaurant |

| TENANT | PROHIBITED USE |
|--------|----------------|

located on a freestanding pad and provided such arcade amusement or video arcade encompasses not more than five percent (5%) of the Floor Area of such Restaurant or two hundred (200) square feet, whichever is less, provided, however, this prohibition shall not be applicable to the portions of the Shopping Center located more than five hundred (500) feet from the Building on the Target Tract), pool or billiard hall (but this shall not prohibit a Restaurant having a Floor Area of at least four thousand (4,000) square feet on a freestanding pad from having three (3) or fewer pool tables; car wash (but this prohibition shall not be applicable to not more than one (1) fully automatic so-called "tube" or "tunnel" car wash operated in connection with a gas station or a mini mart, but only if located on one of "Pads G, H, I, J, K, L or M") or dance hall (but this shall not prohibit a Restaurant on a freestanding pad from permitting incidental patron dancing, provided that (a) such Restaurant does not derive more than forty five (45%) of its gross revenues from the sale of alcoholic beverages, and (ii) such Restaurant is located at least five hundred (500) feet from the Building on the Target Tract).

(S) Any training or educational facility, including but not limited to: beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers; provided, however, this prohibition shall not be applicable to on-site employee training by an Occupant incidental to the conduct of its business at the Shopping Center.

(T) Any gambling facility or operation, including but not limited to: off-track or sports betting parlor; table games such as blackjack or poker; slot machines, video poker/blackjack/keno machines or similar devices; or bingo hall. Notwithstanding the foregoing, this prohibition shall not be applicable to government sponsored gambling activities or charitable gambling activities, so long as such activities are incidental to the business operation being conducted by the Occupant. In addition, this prohibition shall not be applicable to the operation of arcade games, video games, pinball games or games of amusement by the Occupant of Premises located more than five hundred (500) feet from the Building on the Target Tract as long as in no event shall there be conducted, operated or permitted to be conducted or operated a bingo hall or similar bingo operation from or within such Premises.

(U) Any church, temple or other house of religious worship.

(V) Any check cashing services (unless operated by a bank or other financial institution or if ancillary to an otherwise permitted use).

LEKv5
882865-6 10961.0154000

Exhibit G
Page 8

Ulta [Form v15-05/07] [Queen Creek Marketplace/Queen Creek, AZ]
Store No: 356

| **TENANT** | PROHIBITED USE |
|---|---|
| | (W) The storage, display or sale of explosives or fireworks.<br><br>(X) Any trailer court or mobile home park.<br><br>(Y) The operation on the Developer Parcel of (a) a general merchandise discount retail store containing Floor Area in excess of ninety thousand (90,000) square feet of Floor Area, (b) a supermarket, grocery store or other store primarily selling fresh produce, fresh meats, groceries, fresh fruit, dairy products, fresh vegetables, bakery products or delicatessen products for off premises consumption, and (c) the operation of (i) a store in excess of ten thousand (10,000) square feet of Floor Area or (ii) a store on a free standing pad having one or more drive thru lanes, in either case selling prescription pharmacy merchandise (i.e. any product which, by law, may be dispensed only by or under the supervision of a qualified pharmacist or a person licensed to dispense medicinal drugs); PROVIDED, HOWEVER, (x) the prohibition in clause (a) shall not apply (i) subject to Exempted Closures (as defined below), at any time that Target is not operating in at least ninety thousand (90,000) square feet of Floor Area within the Building on the Target Parcel a general merchandise discount retail store and has not been doing so for eighteen (18) months, and (ii) to the following retailers: Lowe's HIW, Inc., Home Depot USA, Inc., Sam's Club (but only if located more than five hundred (500) feet from the Target Building), Costco, BJ's or any successor to the foregoing by merger, consolidation or acquisition of all or substantially all assets; (y) the prohibition in clause (b) shall not apply (i) subject to Exempted Closures, at any time that Target is not utilizing a portion of the Building on the Target Parcel for the operation of a full service supermarket or full service grocery store and has not been doing so for eighteen (18) months, (ii) individual stores in separately demised spaces on the Developer Parcel may use up to ten percent (10%) of the total Floor Area of such space for the sale of food for off premises consumption, (iii) Restaurants may sell food prepared on premises for off premises consumption, subject to the locational restrictions set forth in <u>Section 5.1.4</u>, (iv) to the following retailers: Sam's Club (but only if located more than five hundred (500) feet from the Target Building), Costco, BJ's or any successor to the foregoing by merger, consolidation or acquisition of all or substantially all assets, and (v) to the following specialty retailers: Cost Plus, Trader Joes, Dean & Deluca or any successor by merger, consolidation or acquisition of all or substantially all assets; and (z) the prohibition in clause (c) shall not apply (i) subject to Exempted Closures, at any time that Target is not utilizing a portion of the Building on the Target Parcel for the sale of prescription pharmacy merchandise and has not been doing so for eighteen (18) months, and (ii) |

Exhibit G
Page 9

Ulta [Form v15-05/07] [Queen Creek Marketplace/Queen Creek, AZ]
Store No: 356

| TENANT | PROHIBITED USE |
|---|---|
| | doctors, dentists, chiropractors, osteopaths, naturopaths, veterinarians and other licensed health care providers (other than pharmacists) who may dispense prescription drugs to their patients during office visits on a non retail basis. For the purposes of this Section 5.1.2(Z), an "Exempted Closure" shall mean any period of time that the Building on the Target Parcel is closed due to (i) casualty, repair, reconstruction, remodeling or refixturing if the Occupant is proceeding with reasonable diligence to complete the work and reopen for business, not to exceed, however, seven hundred thirty (730) days; or (ii) unavoidable events outside the reasonable control of the Occupant of the Building on the Target Parcel including, but not limited to, acts of God, condemnation, other governmental rules, orders, acts or requirements, insurrection, riot and labor disputes (but excluding financial inability or economic conditions); or (iii) substitution of a new Occupant resulting from the sale, assignment or sublease of any portion of the Target Parcel. <br><br> (Z) No Restaurant shall be located within three hundred (300) feet of the Building on the Target Tract, but this shall not prohibit a tenant such as Barnes & Noble, Borders, Bed Bath & Beyond, Cost Plus or Kohl's from having incidental food service within its premises. <br><br> (AA) Any gas station, except if located on one of "Pads G, H, I, J, K, L or M." <br><br> (BB) No pet shops or pet supplies store shall be located within three hundred (300) feet of the Building on the Target Tract. <br><br> No merchandise, equipment or services, including but not limited to vending machines, promotional devices and similar items, shall be displayed, offered for sale or lease, or stored within the Common Area; provided, however, the foregoing prohibition shall not be applicable to: <br><br> (A) Temporary collection and the storage of shopping carts in cart corrals located in the parking areas of the Shopping Center, including the storage of shopping carts on the Target Tract and the Developer Tract, as long as such shopping carts are stored within a building or behind a screen wall or landscaping specifically designed to screen such shopping carts from view; <br><br> (B) the installation of an "ATM" banking facility within an exterior wall of any Building or within a kiosk; <br><br> (C) the seasonal display and sale of bedding plants on the sidewalk in front of any |

LEKvS
882865-6 109 6I.0154000

Exhibit G
Page 10

Ulta [Form v15-05/07] [Queen Creek Marketplace/Queen Creek, AZ]
Store No: 356

I-80

325821301.2

| TENANT | PROHIBITED USE |
|--------|----------------|
|        | Building located on the Target Tract on the Developer Tract; <br><br> (D) the placement of bicycle racks and landscaping planters on the sidewalk in front of any Building; <br><br> (E) the placement of spherical bollards (Target's brand) on the sidewalk in front of any Building on the Target Tract or the placement of other types of bollards on the Developer Tract, provided that bollards on the Developer Tract are approved in connection with the approval of the Plans by the Approving Parties; <br><br> (F) temporary Shopping Center promotions, except that no promotional activities will be allowed in the Common Area without the prior written approval of the Approving Parties unless such promotional activities are located within the parking areas of the Shopping Center identified as the "Permitted Promotion Area" on the Site Plan; <br><br> (G) any recycling center required or encouraged by law, the location of which (if not shown on the Site Plan) shall be subject to the approval of the Approving Parties; <br><br> (H) Outside Dining Areas adjacent to a Building, except that Outside Dining Areas will only be allowed in the portions of the Common Areas identified on the Site Plan as "Permitted Outside Dining" without the prior written approval of the Approving Parties (but the location of the Outside Dining Areas on the freestanding pads shall not be restricted); provided, however, (i) any Outside Dining Area shall be considered a portion of the Building Area for the purposes of determining compliance with the parking ratio requirements set forth in this OEA, (ii) any Outside Dining Area shall be fenced in or otherwise enclosed, and (iii) to the extent an Outside Dining Area is exclusively available to any Occupant or group of Occupants of the Shopping Center, such Occupant shall, as its sole cost and expense, ensure, clean and maintain such Outside Dining Area. <br><br> (I) Any designated Outside Sales Area; provided, however, with respect to any Outside Sales Area which is not included within a Building Area, such space may be used not more than three (3) times per calendar year, and the duration of such use shall be subject to the following limitations: during the period commencing on October 15th and ending on December 27th -- no limitation on the number of days of consecutive use; during the period commencing February 15th and ending on July 10th -- not more than one hundred twenty- |

| **TENANT** | PROHIBITED USE |
|---|---|
| | five (125) consecutive days of use; and, during any other period -- not more than thirty (30) consecutive days of use. |
| Kohl's (3) | **PROHIBITED USES** |

(a)  Warehouse, storage or for any manufacturing (except in connection with and incidental to retail sales on premises), distillation, refining, smelting, agriculture (except in connection with a retail nursery or garden center), or mining operation; provided, however, the restriction against distillation shall not apply to a "brew pub" if the "brew pub" is permitted in clauses (h) or (v) below;

(b)  "Second-hand" store whose principal business is selling used merchandise, thrift shops, salvation army type stores, "goodwill" type stores, and similar businesses; provided, however, the foregoing restriction shall not apply to a store selling reconditioned merchandise together with new merchandise in a first class manner (e.g., EB Games, Game Stop, Wherehouse Records, Hollywood Video, Game Crazy, Blockbuster, Computer Renaissance and Play-It-Again Sports)

(c)  Mobile home park, trailer court, labor camp, junk yard, or stock yard (except that this provision shall not prohibit the temporary use of construction trailers during any periods of construction, reconstruction or maintenance); provided, however, the foregoing restriction shall not apply to recycling centers required for any retail operation by governmental restrictions;

(d)  Dumping, disposing, incinerating, or reducing of garbage (exclusive of dumpsters for the temporary storage of garbage and any garbage compactors, in each case which are regularly emptied so as to minimize offensive odors); provided, however, the foregoing restriction shall not apply to recycling centers required for any retail operation by governmental restrictions;

(e)  Fire, going out of business, relocation, bankruptcy or similar sales (unless pursuant to court order);

(f)  Central laundry or dry cleaning plant (provided, however, any central laundry or dry cleaning plant shall be required to be equipped with a "closed-loop" system and Landlord shall be responsible for any contamination resulting from such central laundry or dry cleaning plant as if Landlord caused such contamination directly) or laundromat anywhere within the Shopping Center;

LEKv5
882865-6 10961.0154000

Exhibit G
Page 12

Ulta [Form v15-05/07] [Queen Creek Marketplace/Queen Creek, AZ]
Store No: 356

I-82

325821301.2

| TENANT | PROHIBITED USE |
|---|---|

(g)    Selling or leasing new or used automobiles, trucks, trailers, or recreational vehicles; provided, however, Landlord may display no more than five cars within the Common Area, from time to time, as part of temporary Shopping Center promotions, provided further that no such cars are displayed upon any part of Tenant's Tract;

(h)    Any bowling alley, skating rink or bar (unless part of a sit down restaurant), dance hall, discotheque, or night club (provided, however, the foregoing restriction upon a dance hall or night club shall not prohibit a family oriented, first-class restaurant operation from having a dance floor that does not exceed 500 square feet of Floor Area for use by lunch or dinner patrons and the foregoing restriction upon a bar shall not prohibit the operation of a first class microbrewery or "brew pub" upon any freestanding pad except Pad H;

(i)    Veterinary hospital or animal raising or boarding facilities (except that this restriction shall not be deemed to preclude the operation of a pet shop or pet supply store);

(j)    Funeral home or mortuary;

(k)    Any establishment which stocks, displays, sells, rents or offers for sale or rent any (i) pornographic material; provided, however, the foregoing restriction shall not prohibit the operation of a full-line video store by a regional or national retailer in accordance with its customary store operations and in compliance with law (e.g., Blockbuster Video, Hollywood Video or Video Update) or a full-line bookstore by a regional or national retailer in accordance with its customary store operations and in compliance with law (e.g., Borders, Barnes & Noble or Walden Books) or (ii) any merchandise or material commonly used or intended for use with or in consumption of any narcotic, dangerous drug or other controlled substance, including without limitation, any hashish pipe, waterpipe, bong, cilium, pipe screens, rolling papers, rolling devices, coke spoons or roach clips; provided, however, the foregoing restriction shall not prohibit the operation of a full-line drug store or pharmacy by a regional or national retailer in accordance with its customary store operations and in compliance with law.

(l)    Flea market; provided, however, this restriction shall not be deemed to prohibit Landlord from having farmers' markets, art shows or other similar first class promotional events (collectively, "Promotional Events") within the Common Area on a temporary basis (not to exceed

LEKvS
882865-6 10961.0154000

Exhibit G
Page 13

Ulta [Form v15-05/07] [Queen Creek Marketplace/Queen Creek, AZ]
Store No: 356

I-83

325821301.2

| TENANT | PROHIBITED USE |
|---|---|
| | three consecutive days), from time to time, provided that no such Promotional Events are held within 1,000 feet of the Building and the area used to hold such Promotional Events does not exceed five percent of the available parking spaces in the Common Area where such Promotional Events are permitted; |
| | (m)  Car wash (except on Pads G, I, J, K, L or M); |
| | (n)  Massage parlor; provided, however the foregoing restriction shall not apply to doctors, chiropractors, or licensed nurse practitioners or prohibit massage services by a first class massage studio such as Massage Envy or massage services provided as an incidental use of the operation of a beauty salon, health club, or athletic facility otherwise permitted in the Shopping Center |
| | (o)  Living quarters, sleeping apartments or lodging rooms; |
| | (p)  Tattoo parlor; |
| | (q)  Church, school, day care center (provided, however, the foregoing restriction shall not apply to a day care center located upon Pad H or more than 500 feet from the Kohl's Building) or related religious or educational facility or religious reading room; |
| | (r)  Automotive service and repair (provided, however, the foregoing restriction shall not apply to (i) the retail gasoline service station identified as "Car Wash" or (ii) to one other retail gasoline service station located upon Pads G, I, J, K, L or M, or (iii) to one specialty automotive service/repair facility located upon Pads G, I , J, K, L or M, provided such specialty automotive/repair facility is operated by a regional or national chain such as a "Jiffy Lube" or "Midas" and does not provide general automotive repair or body work services or (iv) to one traditional "tire, battery and accessories" or similar facility ("TBA"), provided such TBA is operated by a regional or national chain and does not provide general automotive repair or body work services; |
| | (s)  Office, except for a bank or financial institution, travel agency, insurance agency, medical or dental clinic (provided that any such clinic does not admit patients for overnight stays), real estate sales office, stock brokerage office, title insurance office, loan company office, optometrist office, optical, post office, packing store or other "retail office" or "service office" typically found in first class shopping centers or for Landlord's on-site management office or office space used by any other |

LEKv5
832865-6 10961.0154000

Exhibit G
Page 14

Ulta [Form v15-05/07] [Queen Creek Marketplace/Queen Creek, AZ]
Store No: 356

I-84

325821301.2

| **TENANT** | PROHIBITED USE |
|---|---|
| | tenant or occupant of the Shopping Center so long as any such office is incidental to such tenant's or occupant's primary use; |
| | (t)   Cinema or movie theater; |
| | (u)   Amusement arcade, amusement center, amusement gallery or video game room (collectively, "Amusement Center") (provided, however, the foregoing shall not prohibit an occupant of the Shopping Center from having five or fewer games as an ancillary part of its business), gymnasium or off-track betting parlor; provided however, the foregoing restriction shall not apply to such uses on Pad F or Pad G or more than 300 feet from Tenant's Tract, provided further that any gymnasium located in the Shopping Center shall be parked at a ratio of one parking space for each 150 square feet of Floor Area and any off-track gambling parlor shall be located within a restaurant as an ancillary use thereof. |
| PetsMart (4) | Any use in violation of the OEA is prohibited during the Term of the Lease in any portion of the Shopping Center.  In addition, the following uses are prohibited during the Term of the Lease within the Shopping Center (including the Premises): nuisance; any use causing loud noises or offensive odors (including any business using exterior loud speakers); manufacturing facility (but this restriction shall not apply to in-store assembly in the normal course); dry cleaner (except facilities for drop off and pick up of clothing cleaned at another location); any facility for the sale, lease or rental of automobiles, trucks, motorcycles, recreational vehicles, boats or other vehicles; automobile repair shop or service station or any facility storing or selling gasoline or diesel fuel in or from tanks, but this shall not prohibit a carwash such as Danny's Carousel or an operation such as Discount Tires, Brakes Plus, Minute Lube, or Fletcher Tire and the like on Pads D, F, G, H and M, as designated on Exhibit A; used clothing or thrift store or liquidation outlet (but this restriction shall not apply to retailers who sell used or reconditioned goods together with new products such as "Play it Again Sports", "Computer Renaissance", "Warehouse Records", "EB Games", or "Gamestop", nor to a first-class retailer such as "Terri's Consignment", nor shall this restriction prohibit the operation of a so-called "99-Cents" or "Dollar Store" or a "MacFrugals"); massage parlor (except that massage therapy offered by a doctor, chiropractor, or nurse under the supervision of a doctor or chiropractor, or massage offered by a licensed massage therapist in connection with the operation of a salon, health club or day spa otherwise permitted by this Lease shall be permitted); adult book shop (meaning a store primarily engaged in the sale of sexually oriented materials and not a general interest bookstore such as "Barnes & Noble" or "B. Dalton") or adult movie house (except that this restriction shall not apply to a full-line video store such as "Blockbuster Video", "Video Update" or "Hollywood Video"); mortuary or funeral parlor; coin operated laundry; |

LEKv5
882865-6 10961.0154000

Exhibit G
Page 15

Ulta [Form v15-05/07] [Queen Creek Marketplace/Queen Creek, AZ]
Store No: 356

I-85

325821301.2

| TENANT | PROHIBITED USE |
|--------|----------------|
|        | cocktail lounge, bar or tavern or sale of alcoholic beverages, whether or not packaged, except (i) full service grocery store, drugstore, or "Cost Plus" may sell alcoholic beverages in prepackaged containers, (ii) a gourmet grocer such as "Trader Joe's", (iii) if operated in excess of one hundred ten feet (110') from the Premises a gourmet or specialty liquor store, such as "The Sportsman", "Beverages and More" and "Total Wine", may be permitted, or (iv) in a restaurant, wherever located; night club; cinema or theater; game arcade (which shall not be interpreted to mean the use of five (5) or fewer video or pinball machines ancillary to an otherwise permitted use and shall not prohibit a family oriented restaurant with video games, pinball games or arcade games as a component of its business [such as Chuck E Cheese or Peter Piper Pizza] in a location otherwise permitted hereunder) or other place of recreation; bowling alley, skating rink or carnival; health spa (provided, however, that a health spa or jazzersize studio may be located more than five hundred (500) feet from the Premises); church (except incidental use of theatre auditoriums for religious services by the theatre tenant); restaurants, except if located more than three hundred (300) feet from the Premises or on pads; children's recreational, educational or day-care facility, but this shall not prohibit a daycare center such as Tutor Time on a free standing pad; offices or professional uses in excess of 10% of the Gross Floor Area in the aggregate, all of which, except banks, shall be located more than three hundred (300) feet from the Premises; schools of any nature; or any other use inconsistent with the operation of a high quality retail shopping center.  As used herein, "school" includes, but is not limited to, a beauty school, barber college, reading room, place of instruction or any other operation serving primarily students or trainees rather than retail customers.  It is the intent of this Paragraph that the Shopping Center shall be devoted to high quality retail uses and that the parking and the other common facilities shall not be burdened by either excessive or protracted use. None of the restrictions set forth in this section shall be applicable to the portion of the Shopping Center owned and/or ground leased by Target, Kohl's or Lowe's except to the extent such restrictions may be included within the OEA. |
| Shoe Pavilion (6) | None |
| Sport Chalet (7) | Landlord covenants and agrees that the Shopping Center shall be constructed, leased, operated, maintained and managed as a first class shopping center and that no premises (and no portion of any premises) in the Shopping Center shall be used or occupied for any of the following:  any unlawful use; funeral establishment; automobile sale, leasing, repair or display establishment or used car lot, including body repair facilities, but this shall not prohibit the occasional display of motor vehicles in the Common Areas of the Shopping Center for promotional purposes, nor shall this prohibit the operation of lube and oil services |

LBKv5
882865-6 10961.0154000

Exhibit G
Page 16

Ulta [Form v15-05/07] [Queen Creek Marketplace/Queen Creek, AZ]
Store No: 356

I-86

325821301.2

| TENANT | PROHIBITED USE |
|--------|----------------|
|        | in connection with the operation of a first class car wash; auction or bankruptcy sale, except pursuant to a court order; pawn shop; outdoor circus, outdoor carnival or outdoor amusement park, or other outdoor entertainment facility, primarily pool or billiard establishment; shooting gallery; refinery, but this shall not prohibit a brew pub; adult bookstore or facility selling, renting or displaying pornographic or adult books, literature, or videotapes (materials shall be considered "<u>adult</u>" or "<u>pornographic</u>" for such purpose if the same are not available for sale or rental to children under 18 years old because they explicitly deal with or depict human sexuality), provided that sale, rental or display of such items as an incidental part of a permitted business shall be permitted and customary operation by a first-class book seller, such as "<u>Barnes & Noble</u>" or "<u>Borders Books and Music</u>" or a first class video rental operation such as "<u>Blockbuster Video</u>," "<u>Hollywood Video</u>," "<u>Circuit City</u>" or "<u>Best Buy</u>" shall not be deemed to violate the provisions of this clause; massage parlor, but this shall not prohibit massage services by a doctor, chiropractor, nurse or physical therapist or the provision of massage services by a licensed massage therapist in connection with the operation of a hair salon, nail salon, day spa or barber shop; any residential use, including but not limited to living quarters, sleeping apartments or lodging rooms; theater; auditorium, meeting hall, ballroom, school or other place of public assembly, but this shall not prohibit employee training or the operation of a children's day care center; unemployment agency; dance studio, but this shall not permit a small dance studio having a Floor Area of less than four thousand (4,000) square feet such as "<u>Jazzercise</u>" or "<u>Waist Basket</u>" and located more than three hundred (300) feet from the Premises, dance hall, but this shall not prohibit incidental patron dancing by an otherwise permitted restaurant; cocktail lounge or bar (except as an incident to a permitted restaurant), disco or night club; bingo or similar games of chance, but lottery tickets and other items commonly sold in retail establishments may be sold as an incidental part of business and off-track betting shall be permitted in connection with the operation of a restaurant; video game or amusement arcade, except as an incidental part of another primary business, but this shall not prohibit a family entertainment restaurant such as "<u>Peter Piper Pizza</u>" or "<u>Chuck E Cheese</u>" from having video, pinball or arcade games so long as such family entertainment restaurant is located on a free standing pad; skating or roller rink; car wash, car repair or car rental agency, but this shall not prohibit the operation of a first class car wash, service station and lube and oil facility located on a freestanding pad; second hand store, auction house, or flea market, but this shall not prohibit the sale of reconditioned merchandise in connection with the sale of new merchandise by retailers such as "<u>Computer Renaissance</u>," "<u>EB Games</u>," "<u>Gamestop</u>," "<u>Hollywood Video</u>" and "<u>Blockbuster Video</u>"; sit-down restaurant, health club or work-out facility or other parking intensive use located within three hundred feet (300') of the Premises; or non-retail use (which shall not prohibit in the Shopping Center office use incident to a permitted retail operation or such uses commonly referred |

Exhibit G
Page 17

Ulta [Form v15-05/07] [Queen Creek Marketplace/Queen Creek, AZ]
Store No: 356

| TENANT | PROHIBITED USE |
|--------|----------------|
|  | to as "quasi-retail" or "service retail" such as by way of example and without limitation, a bank, a credit union, doctors, dentists, a travel agency, real estate office, insurance agency or accounting service, so long as same do not exceed ten percent (10%) of the Floor Area of the Shopping Center) Tenant shall not use the Premises for any of the foregoing prohibited uses. The provisions of this Section shall not be applicable to the portions of the Shopping Center identified on the Site Plan as "Target (Major F)", "Kohl's (Major M)" and "Lowe's (Major N)" or to any other premises within the Shopping Center having a Floor Area of eighty thousand (80,000) square feet or more. |
| Ross (8) | No part of Landlord's Parcel shall be used for office or residential purposes or as a theater, auditorium, meeting hall, school, church or other place of public assembly, "flea market," gymnasium, veterinary services, overnight stay pet facilities, health club, dance hall, billiard or pool hall, massage parlor, video game arcade, bowling alley, skating rink, car wash, facility for the sale, display, leasing or repair of motor vehicles, night club, adult products, adult books or adult audio/video products (which are defined as stores in which at least ten percent (10%) of the inventory is not available for sale or rental to children under the age of majority in the state in which the Store is located because such inventory explicitly deals with or depicts human sexuality). No ATM or similar machine shall be permitted in the Shopping Center within one hundred (100) feet of the front and side perimeter walls of the Store. Further, no restaurant or other "High Intensity Parking User" (as hereinafter defined) shall be permitted in Landlord's Parcel within three hundred (300) feet of the front and side perimeter walls of the Store. A "High Intensity Parking User" is a tenant or occupant whose use requires more than five (5) parking spaces per one thousand (1,000) square feet of Leasable Floor Area in accordance with either customary shopping center practices or governmental regulations, whichever has a higher parking requirement. The foregoing use restrictions are referred to herein as the Ross Prohibited Uses. The prohibitions contained in this Section 3.2.1(a) shall not be applicable to the Target Tract, the Major N Tract, or to the Kohl's Tract unless and until Landlord regains legal control of the Kohl's Tract.<br><br>Exceptions to Retail Use. Notwithstanding the restrictions on use set forth in Section 3.2.1(a) above, the following uses shall be permitted in the Shopping Center:<br><br>Video Game Arcade. Five (5).or less video games and pinball machines in the aggregate shall be permitted in any premises which has a primary restaurant use and a video game arcade that is at least three hundred (300) feet from the Store, provided it is family oriented and is a first class operator, such as Funcoland, Game Works or Sega City or is incidental to |

LEKv5
882865-6 10961.0154000

Exhibit G
Page 18

Ulta [Form v15-05/07] [Queen Creek Marketplace/Queen Creek, AZ]
Store No: 356

I-88

325821301.2

| **TENANT** | PROHIBITED USE |
|---|---|
|  | the operation of a permitted restaurant such as Peter Piper Pizza or Chuck E. Cheese;<br><br>Automotive Uses.  Up to an aggregate of three (3) automotive uses which may include  national or regional car wash/gas station, lube facility, brake repair shop, or tire shops provided that each automotive use is located at least three hundred (300) feet from any of the perimeter walls of the Store;<br><br>Workout Club /Spa.  One (1) small "workout" club or first class day spa or salon, provided that such "workout" club or first class day spa or salon shall not be greater than four thousand (4,000) square feet and shall not be located within five hundred (500) feet from any perimeter wall of the Store;<br><br>Veterinary Services.  A pet store, with veterinary services and temporary overnight stay pet facilities, including a pet hotel, shall be permitted by a national pet supply store, provided that the nearest perimeter wall of the pet store shall not be any closer than three hundred fifty (300) feet to the nearest perimeter wall of the Store;<br><br>Gymnasium or Health Club.  One (1) gymnasium or health club not to exceed sixty-five thousand (65,000) square feet of Leasable Floor Area located in "Major N", "Pad M", "Pad K " or "Pad L" as designated on the Site Plan;<br><br>Coffee or Espresso Bar.    The incidental operation of a "coffee or espresso bar" or "coffee shop" or similar operation incidental to a primary use of a book store by a retailer such as Barnes and Noble, or other similar retailer, providing its customers with coffee, tea, and other beverages, pastries, sandwiches, snacks and other pre-prepared or packaged food or beverage items, as well as related merchandise, either for sale or complimentary and for either on-site or take-out consumption;<br><br>Shopping Center Management Office and Retail Service Offices.  One (1) shopping center management office and office use typically found in shopping centers, such as travel agencies, real estate brokers, insurance brokers, optometrists' office, and the like shall be permitted provided that no such single office use, excepting those located within "Shops E" as designated on the Site Plan,  shall exceed three thousand (3,000) square feet, and all office uses shall   not exceed, in the aggregate, fifteen thousand (15,000) square feet in Landlord's Parcel;<br><br>Billiards and Pool Tables  Billiards/pool tables are permitted provided |

| **TENANT** | PROHIBITED USE |
|---|---|
| | that they are incidental to an otherwise permitted use;<br><br>Massage Services   Massage services offered as an incidental service of a medical office, chiropractic office, permitted health club, first class day spa or salon shall be permitted;<br><br>General Interest Book Store/ Film Store.   One (1) general interest bookstore such as Barnes & Noble or B. Dalton and one (1) full-line video store such as Blockbuster Video, Video Update or Hollywood Video each of which may carry films with adult content that are released for general commercial distribution to national theater chains;<br><br>Preschool or Daycare.   One (1) preschool or daycare center shall be permitted provided that its is not located closer than five hundred (500) feet to the nearest exterior wall of the Store;<br><br>Dancing.   Patron dancing shall be permitted if it is incidental to the operation of a permitted restaurant located not closer than five hundred (500) feet to the Store; and<br><br>Outparcels.   Restaurant uses shall be permitted on the Outparcels. |
| Circuit City (10) | No portion of the Shopping Center north of the Main Drive Aisle shall be used for any non-retail use other than retail service uses customary to first-class shopping centers, such as banks, insurance offices, title companies, doctor, dentist and chiropractor offices, and travel agencies, so long as such service office use is limited to not more than ten percent (10%) of the total gross leasable area of all of the buildings in the Shopping Center located north of the Main Drive Aisle and in any event are located in the areas designated on the Site Plan as "Permissible Service Office Area". Notwithstanding the foregoing, Landlord reserves the right to develop a hotel ("Hotel") on a freestanding pad along Rittenhouse Road in the area designated on the Site Plan as "Permissible Hotel Area" so long as the parking area for the Hotel contains sufficient ground level parking spaces within the Permissible Hotel Area, without reliance on parking spaces that may be available outside of the Permissible Hotel Area, to comply with the greater of any applicable governmental requirements or the |

| TENANT | PROHIBITED USE |
|--------|----------------|
| | minimum parking ratio requirements set forth in Section 5 above. Moreover, Landlord shall not lease to or permit any portion of the Shopping Center and Tenant shall not lease or permit any portion of the Premises to be used for any of the following purposes:<br><br>(A) bookstore or establishment engaged in the business of selling, exhibiting or delivering pornographic or obscene materials (but this prohibition shall not apply to any full line bookstore, or nationally-recognized video store, all of the type commonly existing in other first class shopping centers);<br><br>(B) a so-called "head shop";<br><br>(C) video or other type of game room or arcade (but this restriction shall not prohibit an otherwise acceptable tenant from operating not more than five (5) arcade games incidental to its primary use), unless located south of the "Main Drive Aisle" (identified as such on the Site Plan); provided, however, that such restriction shall not apply to Peter Piper Pizza or Chuck E. Cheese (so long as such user is located on a freestanding pad or "Major R" shown on the Site Plan [*to be discussed in connection with request for other restaurants*] and operates its retail business in its premises under its customary tradename (as set forth herein) and in a manner substantially similar to the majority of its other restaurants in the state of Arizona as of the date of this Lease);<br><br>(D) off-track betting parlor (unless incidental to a permitted restaurant use);<br><br>(E) pawn shop or business selling so-called "second-hand goods" (but excluding regional or national operators with more than twenty (20) locations specializing in the sale of new and used or reconditioned goods, such as Computer Renaissance, Terrie's Consignment, EB Games, Gamestop or Play It Again Sports);<br><br>(F) junk yard or flea market;<br><br>(G) recycling facility or stockyard (excluding governmentally-required recycling); |

LBK v5
882865-6 10961.0154000

Exhibit G
Page 21

Ulta [Form v15-05/07] [Queen Creek Marketplace/Queen Creek, AZ]
Store No: 356

| **TENANT** | PROHIBITED USE |
|---|---|
| | (H) motor vehicle or boat dealership, vehicle repair shop (including lubrication and/or service center, but this shall not prohibit a nationally or regionally-recognized tire, battery and accessories store on the Outparcels identified on the Site Plan); body and fender shop; car wash facility (except on an Outparcel; motor vehicle or boat storage facility (but this shall not preclude the temporary and periodic display of cars and/or boats in the Common Areas of the Shopping Center, but not on the Preferred Area); <br><br> (I) theater, auditorium, bar (not part of an otherwise permitted restaurant), sports or other entertainment viewing facility, whether live, film, audio/visual or video (unless such user is located south of the Main Drive Aisle); <br><br> (J) discotheque, dance hall, or night club, but this shall not prohibit live music, disc jockey music, dancing, outdoor music, dining and dancing, and/or full alcohol consumption without limitation as a component of the operation of a multi-theme entertainment venue, provided that such is located south of the Main Drive Aisle; <br><br> (K) bowling alley; skating rink; billiard parlor (provided that three (3) or fewer billiard or pool tables in connection with a permitted restaurant use shall be acceptable, but this shall not prohibit a bowling alley, skating rink or billiard parlor with or without full alcohol consumption without limitation as a component of the operation of a multi-themed entertainment venue, provided that such is located south of the Main Drive Aisle); <br><br> (L) health spa or exercise facility (unless located in the area designated as the "Health Club Area" in the Site Plan); <br><br> (M) [intentionally deleted]; <br><br> (N) office usage other than incidental in connection with non-prohibited uses and except for retail service usage (such as a real estate office, travel agency, and similar office uses as described in the first sentence hereof), unless located south of the Main Drive Aisle; <br><br> (O) dry cleaning or laundry plant (except as to an establishment which receives and dispenses items for laundering and/or dry cleaning but the processing of which items is done elsewhere or is entirely self-contained); <br><br> (P) Laundromat; |

LEKv5
882865-5 | 0961.0154000

Exhibit G
Page Z2

Ulta [Form v1 5-05/07] [Queen Creek Marketplace/Queen Creek, AZ]
Store No: 356

I-92

325821301.2

| **TENANT** | PROHIBITED USE |
|---|---|
|  | (Q) industrial or manufacturing uses (other than such manufacturing use as is conducted in conjunction with a tenant's home center business or in conjunction with another tenant's primary retail use); <br><br> (R) training or educational facility (other than on-site employment training that is incidental to a primary retail use), including, without limitation a beauty school, barber college, reading room, place of instruction or any other activity catering primarily to students or trainees as opposed to customers; <br><br> (S) house of worship (other than temporary and periodic use of a theater auditorium for a religious service) or religious bookstore or reading room; <br><br> (T) discount, closeout or dollar stores, including, without limitation the following: 98 cents Clearance Center, 98 Cents Only Store, Dollar Tree, Family Dollar Store, Liquidation World, MacFrugals, McCrory, Dollar General, Odd Lots, Dollar Bills, Bill's Dollar Store, Big Lots, All For One, Just a Buck, Tuesday Morning, Dollar Express, Wow-Mart, Army/Navy Store (unless such user is located south of the Main Drive Aisle); <br><br> (U) automotive parts or accessories store such as Auto Zone or Napa Auto Parts, unless located more than four hundred (400) feet from the Premises; <br><br> (V) check cashing service, except as incidental to a retail use or an established federal or state bank, credit union or savings and loan. <br><br> In addition to the foregoing, Landlord shall not operate, lease or permit to be operated or leased any restaurant within any building on Landlord's Premises which abuts "Tenant's Preferred Area" (as shown on the Site Plan) or which is located within three hundred (300) feet of the front entrance to the Building; provided, however that [*restaurant usage, including Peter Piper Pizza and Chuck E. Cheese, to be discussed*]. In addition, no auction, fire or going-out-of-business sale shall be conducted in the Shopping Center. <br><br> Notwithstanding the foregoing, Tenant hereby agrees that the foregoing restrictions shall not apply to the premises identified on the Site Plan as "Target," "Lowe's" and "Kohl's" (so long as the foregoing list of retailers operate their retail business in their premises under their customary tradenames (as set forth herein) and in a manner substantially similar to the majority of their stores in the state of Arizona as of the date of this Lease). |

LEKv5
882865-6 10961.0154000

Exhibit G
Page 23

Ulta [Form v15-05/07] [Queen Creek Marketplace/Queen Creek, AZ]
Store No: 356

I-93

325821301.2

| TENANT | PROHIBITED USE |
|--------|----------------|
| | **Prohibited Uses in Common Area:** Landlord covenants that it shall not, without Tenant's express written consent, permit the following uses or activities to occur in the Common Areas within the Tenant's Preferred Area: (1) advertisements or signs except for the monument signs described in paragraph 8 and traffic control signs; (2) display or sale of merchandise (except for "sidewalk sales" permitted herein as shown on the Site Plan); (3) operation of loudspeakers or other sound electronically amplified so as to be heard in the Common Areas (other than as may be typical in comparable shopping centers); (4) imposition of a charge for parking, except to the extent required by governmental authorities having jurisdiction; or (5) operation of cellular telephone or other telecommunication tower for use by any other party not an occupant of the Shopping Center; provided however that the foregoing restriction shall not apply to a stealth-type antenna disguised to look like a normal shopping center element (e.g., light pole) so long as same is not located within the parking area of Tenant's Preferred Area. Notwithstanding the foregoing, Tenant hereby agrees that the foregoing restrictions shall not apply to the premises identified on the Site Plan as "Target," "Lowe's" and "Kohl's" (so long as the foregoing list of retailers operate their retail business in their premises under their customary tradenames (as set forth herein) and in a manner substantially similar to the majority of their stores in the state of Arizona as of the date of this Lease). |
| Bev Mo (11) | None |
| Famous Footwear (12) | None |
| Chase Bank (13) | None |
| Nails of the World (14) | None |
| Tilly's (15) | None |
| Juice It Up (16) | None |
| Paradise Bakery (17) | None |
| Verizon (18) | None |

LEKv5
882865-6 10961.0154000

Exhibit G
Page 24

Ulta [Form v15-05/07] [Queen Creek Marketplace/Queen Creek, AZ]
Store No: 356

I-94

325821301.2

| TENANT | PROHIBITED USE |
|---|---|
| Longhorn Steaks (19) | None |
| Subway (20) | None |
| Chipotle (21) | None |
| Great Clips (22) | None |
| Cost Plus (23) | Tenant has entered into this Lease in reliance upon representations by Landlord that the Shopping Center is and will remain retail in character, and, further, no part of which shall be used for any Prohibited Use or any use which violates the Project Documents.  In addition, except for the rights of tenants under leases in effect as of the date of this Lease, and except with the express prior written consent of Tenant, the following uses shall be prohibited within two hundred (200) feet of the front door of the Store (it being understood that such radius restriction shall apply in the front and sides of the Store, and not to the rear of the Store):  (i) any full service, sit-down restaurant (provided, however the foregoing restaurant restriction shall not preclude another tenant from operating a café as an incidental part of its business, provided that the floor area devoted to the operation of such café does not exceed five percent (5%) of the total Leasable Floor Area occupied by such other tenant); and (ii) any health club, health spa, gymnasium, fitness center or similar business.  Landlord shall uniformly enforce as against all tenants and other occupants of the Shopping Center the restrictions referred to herein as Prohibited Uses.<br><br>**27.1    Landlord shall not place permanent or temporary kiosks, displays, carts and stands in the Common Areas located within Tenant's Control Area.** |
| Chick-Fil-A (24) | None |
| Pacific Dental (25) | None |
| Bed Bath & Beyond (26) | Landlord shall not lease, rent or, occupy or permit any portion of the Shopping Center to be occupied (except to the extent otherwise permitted under any lease for space in the Shopping Center existing as of the Effective Date) for any of the *"Prohibited Uses"* (defined in <u>Exhibit M</u> hereto annexed). The provisions of this |

Exhibit G<br>Page 25

Ulta [Form v15-05/07] [Queen Creek Marketplace/Queen Creek, AZ]<br>Store No.: 356

I-95

| **TENANT** | PROHIBITED USE |
|---|---|
| | Section 13.1.2 shall not be applicable to the portions of the Shopping Center owned and/or leased by Target Corporation, Kohl's, Major N Occupant and their respective successors and assigns.<br><br>Prohibited Uses<br><br>As used in this Lease, the term *"Prohibited Uses"* shall mean any of the following uses:<br><br>A.    As to the Shopping Center, any of the following uses:<br><br>    (1)    Any use which emits or results in strong, unusual or offensive odors, fumes, dust or vapors (other than the ordinary odors emitted from coffee shops, restaurants or nail salons), is a public or private nuisance, emits noise or sounds which are objectionable due to intermittence, beat, frequency, shrillness or loudness, creates a hazardous condition, or is used, in whole or in part, as or for warehousing or the dumping or disposing of garbage or refuse (other than governmentally required recycling centers).<br>    (2)    Any operation primarily used as a storage facility and any assembling, manufacturing, distilling, refining, smelting, agricultural, or mining operation (except that this provision shall not prohibit incidental assembly, manufacturing or refining which is strictly incidental to a retail use typically located in first class shopping centers, such as, by way of example, assembly of products or operation of a brew pub);<br>    (3)    Any "second hand" store, "surplus" store (except that this provision shall not prohibit a store that sells blemished or reconditioned goods, such as EB Games, Game Stop, Hollywood Video, Blockbuster Video, Play It Again Sports or Computer Renaissance or a first class retailer such as Terry's Consignment, as such stores are presently operated);<br>    (4)    Any mobile home park, trailer court, labor camp, junkyard, or stockyard (except that this provision shall not prohibit the temporary use of construction trailers during periods of construction, reconstruction, or maintenance);<br>    (5)    Any dumping, disposing, incineration, or reduction of garbage (exclusive of trash compactors or trash containers located near the rear of any building);<br>    (6)    Any fire sale, bankruptcy sale (unless pursuant to a court order), auction house operation, fictitious going-out-of-business sale, lost-our-lease sale or similarly advertised event;<br>    (7)    Any central laundry, dry cleaning plant, or laundromat located within 250 feet of the Premises or which is greater than five thousand (5,000) square feet;<br>    (8)    Any automobile, truck, trailer, boat, or recreational vehicle sales, leasing, display or body shop repair operation; |

LEKv5
882865-6 10961.0154000

Exhibit G
Page 26

Ulta [Form v15-05/07] [Queen Creek Marketplace/Queen Creek, AZ]
Store No: 356

I-96

325821301.2

| **TENANT** | PROHIBITED USE |
| --- | --- |
|  | (9)    Any bowling alley or skating rink;<br>(10)   Any live performance theater, auditorium, meeting hall or sporting event;<br>(11)   Any living quarters, sleeping apartments, or lodging rooms;<br>(12)   Any veterinary hospital or animal raising or boarding facilities (except to the extent permitted below), but this shall not be applicable to a national pet supply store such as Petco and PetsMart and shall not be deemed to prohibit a national pet supply store such as Petco or PetsMart from providing overnight boarding for animals;<br>(13)   Any mortuary or funeral home;<br>(14)   Any "Pornographic Use", which shall include, without limitation, a store displaying for sale or exhibition books, magazines or other publications containing any combination of photographs, drawings or sketches of a sexual nature, which are not primarily scientific or educational, or a store offering for exhibition, sale or rental video cassettes or other medium capable of projecting, transmitting or reproducing, independently or in conjunction with another device, machine or equipment, an image or series of images, the content of which has been rated or advertised generally as NC-17 or "X" or unrated by the Motion Picture Rating Association, or any successor thereto; the parties hereto acknowledge and agree (i) the sale of books, magazines and other publications by a national bookstore of the type normally located in first-class shopping centers in the State in which the Shopping Center is located (such as, for example, Borders and Barnes & Noble, as said stores currently operate), (ii) the sale and/or rental of videos by a full line video store or consumer electronics store (such as, for example, Blockbuster Video, Hollywood Entertainment, Circuit City or Best Buy as such stores are presently operated), or (iii) the exhibition of general release or release of general release movies of the type typically shown in movie theaters located in first-class shopping centers, or (iv) the sale of magazines and other publications by a convenience store (such as, for example, 7-11 and Circle K), shall not be deemed a "pornographic use" hereunder; or massage parlor (except that the foregoing prohibition shall not apply to massage services offered by a doctor, chiropractor, physical therapist or nurse in an office permitted hereunder, or to incidental massage services offered at a health club, day spa or beauty salon permitted hereunder) or to a first class massage studio such as Massage Envy;<br>(15)   Any so-called "head shop", or other establishment primarily selling or exhibiting drug-related paraphernalia;<br>(16)   Any bar, tavern, or other establishment selling alcoholic beverages for on- or off-premises consumption, except as incidental to a restaurant use permitted pursuant to (35) below, <u>provided</u> that the reasonably projected annual gross revenues from the sale of alcoholic beverages for on-premises consumption in such restaurant shall not exceed forty percent (40%) of the gross revenues of such restaurant, and <u>further provided</u>, that said 40% restriction shall |

| TENANT | PROHIBITED USE |
|---|---|
|  | not apply to any national or regional family-oriented, sit-down restaurant such as TGI Fridays, Red Lobster, Olive Garden and Bennigans. In addition, nothing in this paragraph (16) shall restrict the sale of alcoholic beverages for off premises consumption by a grocery store or a liquor store such as Total Wine or Beverages and More;<br>(17)   Any catering or banquet hall;<br>(18)   Any flea market, amusement or video arcade, pool or billiard hall, night club, discotheque, or dance hall, provided, however, that this restriction shall not prohibit (a) any tenant or occupant of a Pad (as defined in clause (24) below) from having five (5) or fewer amusement or video arcade games incidental to an otherwise permitted use, or (b) any restaurant permitted by clause (35) below from having, as an incidental use, up to three (3) pool/billiard tables; or (c) a freestanding pad from being used as a Chuck E. Cheese or Peter Piper Pizza;<br>(19)   Any training or education facility, including but not limited to: beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers; provided, however, this prohibition shall not be applicable to on-site employee training by an Occupant incidental to the conduct of its business at the Shopping Center;<br>(20)   Any gambling facility or operation, including but not limited to: off-track or sports betting parlor; table games such as black-jack or poker; slot machines; video poker/black-jack/keno machines or similar devices; or bingo hall.  Notwithstanding the foregoing, this prohibition shall not apply to governmental sponsored gambling activities, or charitable gambling activities, so long as such governmental and/or charitable activities are incidental to the business operation being conducted by the Occupant;<br>(21)   Any unlawful use;<br>(22)   Any pawn shop, gun shop, or tattoo and/or body piercing parlor; provided, however, that this prohibition shall not be applicable to the sale of guns as part of a national or regional full line sporting goods store;<br>(23)   Any church or other place of religious worship;<br>(24)   Any car wash, automobile repair shop, or any business servicing motor vehicles in any respect, including, without limitation, any quick lube oil change service, tire center or gasoline or service station or facility unless located on a building site designated as a "Pad" on Exhibit B (a "Pad");<br>(25) ·  Any carnival, amusement park or circus;<br>(26)   Any medical clinics or medical offices except that no more than three medical offices (and not clinics) totaling in the aggregate not more than 15,000 square feet of Floor Area may be located in the Shopping Center no less than 250 feet from the Premises provided that they are first class medical offices of the type typically found in first–class shopping centers and, in addition, additional first class offices medical offices may be located on Shops E, Pad I, |

| TENANT | PROHIBITED USE |
|---|---|
|  | Pad J, Pad K, Pad L, Pad M, Shops A and Pad A with no limit on the aggregate Floor Area in those areas;<br>(27)  Intentionally Omitted.<br>(28)  Any office use, other than: (x) office space used in connection with and ancillary to a permitted retail use hereunder; and (y) retail offices providing services commonly found in similar first-class shopping centers in the Phoenix, AZ metropolitan area (for example, financial services, real estate brokerage, insurance agency, banking, travel agency), provided that such uses are located at least 150 feet away from the Premises, and not more than ten percent (10%) of Floor Area in the Shopping Center, in the aggregate, shall be devoted to such uses;<br>(29)  Any hotel/motel except on Pad I, Pad J, Pad K, Pad L and Pad M;<br>(30)  Any day care center, except that same may be located on any Pad;<br>(31)  Any store selling live animals of any kind or veterinary office, except as may be incidental to a full-line pet and pet supply store operating in at least 10,000 square feet of Floor Area and located at least 150 feet from the Premises or on any Pad; any such occupant shall use reasonable efforts to prevent its customers from allowing their pets to urinate or defecate in the Common Areas and will promptly remove any "dog dirt" from the Common Areas;<br>(32)  Any children's entertainment or activity facility (such as "Discovery Zone", or "Chuck E. Cheese's") unless located more than 250 feet from the Premises or located on a Pad;<br>(33)  Any karate center;<br>(34)  Any movie theater;<br>(35)  Any restaurant serving meals for on- or off-premises consumption unless located 250 feet from the Premises, except that restaurants may be located on any Pad at the Shopping Center and provided that this restriction shall not apply to a café operated by a major tenant incidental to its primary use;<br>(36)  Any beauty parlor or nail salon (except that beauty parlors and/or nail salons shall be permitted, provided that such uses are located at least 250 feet away from the perimeter of the Premises;<br>(37)  Any health spa, exercise facility or similar type business located less than 250 feet from the Premises. |
| Red Brick Pizza (28) | None |
| Riviera Pools (29) | None |
| Steinmart (30) | 27.2    None |

Exhibit G
Page 29

Ulta [Form v15-05/07] [Queen Creek Marketplace/Queen Creek, AZ]
Store No: 356

I-99

| TENANT | PROHIBITED USE | |
|---|---|---|
| Mattress Firm (31) | 27.3 | None |
| Alltel (32) | 27.4 | None |
| Ulta (35) | 27.5 | None |
| Kirkland's (37) | 27.6 | None |
| Del Taco (38) | 27.7 | None |

L&K v5
882865-6 10961.0154000

Exhibit G
Page 30

Ulta [Form v15-05/07] [Queen Creek Marketplace/Queen Creek, AZ]
Store No: 356

I-100

**EXHIBIT "J"**

**USE RESTRICTION WAIVER LETTER**

Trader Joe's Company
800 South Shamrock Avenue
Monrovia, CA 91016

      Re:    Queen Creek Marketplace Shopping Center
              Queen Creek, Arizona

TRADER JOE'S COMPANY, a California corporation ("**Trader Joe's**") is or may be a tenant of the above-referenced shopping center in which the undersigned is also a tenant pursuant to that certain Lease dated _____ (the "**Lease**") between **[INSERT NAME OF TENANT]** and **[INSERT NAME OF LANDLORD]**. The undersigned acknowledges that Trader Joe's operates a specialty grocery store carrying a complete assortment of items, which includes or may include the sale of items restricted by the Lease. The undersigned agrees that the provisions of Section _____ of the Lease shall not apply to Trader Joe's. The undersigned agrees that it shall take no action challenging or interfering with the right of Trader Joe's and its successors and assigns to operate a specialty grocery store, including the sale of items prohibited by Section _____ of the Lease.

The undersigned represents that it has the full right and lawful authority to execute this document. This agreement shall be binding upon the undersigned, its successors and assigns and inure to the benefit of TRADER JOE'S COMPANY, a California corporation its successors and assigns.

_____,
a _____

By:_____
Its:_____

J-1

## EXHIBIT "K"

## EXISTING TENANTS

Sketchers
Total Wine
360 PT
Ahi Poke Bowl
Alliance Urgent Care
America's Best Contacts & Eyeglasses
Applebee's
Barrio Queen
Barro's Pizza
Bath & Body works
Bed Bath & Beyond
Bev Mo
Bike Masters / Bikes Direct
Buffalo Wild Wings
Chick-Fil-A
Chipotle
Crumbl Cookies
Data Doctor's
Del Taco
Dollar Tree
Down East Basics
Famous Footwear
Geno's Giant Slice
GNC
Great Clips
Halloween City
Harkin's
In-N-Out Burgers
Jo-Ann Stores
JP Morgan Chase Bank
Justice
Kirkland's
Kohl's
Massage Envy
Maurice's
Mountainside Fitness
Old Navy
Olive Garden
Pacific Dental d/b/a Peachtree Dental
Panera Bread
PetSmart
Pita Jungle

K-1

Pressed for Time
Ross
Sally Beauty
Sauce Pizza and Wine
Sherwin Williams Paints
Smash Burger
Sprint
Subway
Super Target
Thai Chili
The Joint
Tilly's
Tips & Toes Nail Spa
TJ Maxx
T-Mobile
Torrid
Ulta Beauty
Verizon Wireless
Village Inn
V's Barbershop
Yogurt Jungle

K-2

## EXHIBIT "L"

## EXISTING TENANTS WITH GENERAL USE OR ASSIGN/SUBLEASE WITHOUT LL CONSENT RIGHTS

| TENANT | RIGHT TO OPERATE FOR ANY PERMITTED USE | RIGHT TO ASSIGN/SUBLET WITHOUT LANDLORD'S CONSENT |
|---|---|---|
| Bed Bath and Beyond | Yes | Yes |
| Dollar Tree | Yes, subject to Landlord's consent. | Yes, but only certain permitted transactions. |
| Harkins | Yes | Yes, but only certain permitted transactions. |
| Jo-Ann Stores | Yes | Yes, but only certain permitted transactions. |
| Kohl's | Yes | Yes, but only certain permitted transactions. |
| Mountainside Fitness | No | Yes, but only certain permitted transactions. |
| Old Navy | No | Yes, but only certain permitted transactions. |
| PetSmart | Yes | Yes, but only certain permitted transactions. |
| Ross | Yes | Yes, but only certain permitted transactions. |
| Target | Yes | N/A. |

L-1

| TJMaxx | Yes | Yes |
|---|---|---|
| ULTA Salon | Yes | Yes,<br>but only certain permitted transactions. |

L-2

EXHIBIT "M"

## RULES AND REGULATIONS FOR EXPRESSIVE ACTIVITIES AT
## QUEEN CREEK MARKETPLACE SHOPPING CENTER

### Preamble

Queen Creek Marketplace (the "**Shopping Center**") is owned by QCM Partners, LLC (the "**Owner**") and is not open to public access except for commercial activity or as set forth herein. It is the owner's intent to have these Rules set forth reasonable regulations governing access to the Shopping Center which is required by law and to not create any right of access beyond that which is strictly required by law. These Rules are promulgated by the management of the Shopping Center for the purpose of reasonably regulating as to time, place, and manner the activities of all individuals, groups and organizations (hereinafter referred to as "**petitioners**") engaged in "**expressive activity**" at the Shopping Center and should not be construed as a waiver by the Owner of its property rights. "**Expressive activity**" includes (a) "**political petitioning**" which is defined as any conduct by which an individual obtains signatures for any petition directed to any governmental or political body, (b) the distribution or dissemination of written political material, and (c) other expressive activity or speech sanctioned by law. These Rules shall not be deemed or construed to permit any other activity other than expressive activity (as defined), and the Owner of the Shopping Center expressly reserves the right, in its sole and absolute discretion, to consent to or to prohibit any other organized solicitation activity other than the expressive activity described in these Rules and sanctioned by law, including, but not limited to any form of commercial solicitation or entertainment. The Shopping Center has the right to take steps to avoid a breach of the peace that is substantively likely to result from the planned expressive activity.

1. **Acknowledgement**. Each individual petitioner must read, acknowledge, and agree to abide by these rules before commencing expressive activities.

2. **Designated Area**. Expressive activity shall only take place in the Designated Area specified in the approved Application Permit (attached as **Exhibit A**) which shall be determined giving consideration to the Designated Area(s) selected by the petitioner and the criteria described in **Item 14**. The Designated Area(s) available for expressive activities and the maximum number of petitioners allowed in each Designed Area are identified on **Exhibit B** to these Rules. No activity shall be allowed at any other location, including driveways and parking lots. The Shopping Center reserves the right to change the Designated Area(s), from time to time, as it deems necessary for the commercial operation of the Shopping Center.

3. **Number of Participants**. All petitioners must be listed on the application. No more than two (2) individuals engaged in the expressive activity may occupy the Designated Area at one time.

4. **Blackout Periods**. Because of the extreme volume of mall patrons and tenant traffic during certain shopping seasons, no expressive activity may occur during the period beginning the weekend before Thanksgiving and ending January 2 of each year without the consent of Owner, which consent Owner may grant or withhold in its sole discretion. The Shopping Center reserves

M-1

the right to add to or modify the Blackout Days at least ten (10) days in advance of the next such date.

**5. Limitation on Days**. Each petitioner group is limited to three (3) consecutive days use of Shopping Center property for expressive activity. The Shopping Center is justified in this restriction in the interest of providing potential access to all groups who may want to use the Designated Areas for expressive activities. Upon written application, the Shopping Center may, in its sole discretion, provide an additional two (2) consecutive days use if the Designated Area is not being used by other petitioning groups.

**6. Security Deposit**. If leaflets or other materials are to be handed out on the Shopping Center property, or Shopping Center management reasonably determines that the proposed expressive activity poses a risk of damage or increased cost to the Shopping Center property, Petitioner must post a Five Hundred and No/100 Dollars ($500.00) security deposit to cover the cost of cleaning up litter or repairing damage which results from such expressive activity. The deposit, less any expense incurred by the Shopping Center for cleaning up litter or repairing damage, shall be refunded within fifteen (15) days after the expressive activity has ended.

**7. Furniture**. There will be no furniture supplied by the Shopping Center. There is a maximum of one (1) table and two (2) chairs that may be brought by the petitioners.

**8. Posters, Signs. and Displays**. Signage shall not exceed more than two (2) signs each not greater than 22" by 28" in dimension. Signage, signs and posters shall be affixed to the table permitted in the designated area and in no other location. In no event shall any petitioner place signage so that it blocks the view of any store or display within the Shopping Center. Further, signage shall not include any commercial statement or speech, or in any fashion suggest that the owner of the Shopping Center supports the views of any petitioner. All such signs must be strictly temporary and easily removed at the end of each day and they shall not be affixed to any portion of the Shopping Center other than the table in the Designated Area. Signs shall not contain words which are of an inflammatory nature, obscene, or are fighting words or that contain gruesome pictures or displays. Placement of fliers and/or handbills of any sort on automobiles located in the Shopping Center parking lot is strictly prohibited. All posters, signs, and displays must be submitted to the Shopping Center management office three (3) days before the first date petitioner intends on petitioning. Any poster, sign, or display used by petitioners must comply with the general scheme, color, and design of the Shopping Center and be compatible with the general aesthetics of the Shopping Center, i.e., neat in appearance, and shall not interfere with, or directly compete with, the business displays or logos of tenants within the Shopping Center.

**9. Prohibited Communication**. The use of "**fighting words,**" obscenities, grisly or gruesome displays, or highly inflammatory slogans is strictly prohibited.

**10. Electrical. Mechanical, and Sound Equipment**. No electrical or mechanical equipment that Shopping Center tenants are prohibited to use, such as loudspeakers, flashing lights or amplified music or other sounds, may be used by petitioners.

**11.    Prohibited Representations**. Petitioners shall make no express or implied representation to any person within the Shopping Center or on Shopping Center property that the Owner or manager of the Shopping Center sponsors or supports any view, belief, or request

M-2

contained in any petition, statement, or literature being disseminated or exhibited on Shopping Center property. The Shopping Center reserves the right to disavow, in any manner it sees fit, the views and activities of petitioners.

**12.  Solicitation of Contributions and Commercial Activities**. Petitioners shall not solicit contributions or donations from anyone on Shopping Center property, nor shall they engage in the sale of any items or any services or any other commercial activity whatsoever on Shopping Center property, unless petitioners have obtained the express written consent of Owner, which consent Owner may grant or withhold in its sole discretion.

**13.  Interference with Shopping Center Tenants and Patrons**. Petitioners shall not impede or interfere with the business of any Shopping Center tenants, employees or personnel, nor shall they detain or in any way impede or interfere with smooth flow and free passage of patrons, customers or personnel through the access ways of the Shopping Center. Any Petitioner engaging in expressive activity who defaces or otherwise abuses Shopping Center property or persons shall be subject to immediate removal and legal action.

**14.  Application**. Before engaging in expressive activity, a Petitioner must submit their written application not less than five (5) nor more than twenty (20) business days to the Shopping Center management office and provide the following information:

- The nature of the petition and the governmental body that such petition is directed;

- Name, address, telephone number, and signature of responsible adult;

- Listing of all persons who will participate in the expressive activity; and

- Any previous injury(ies) to persons or property while such participating person was engaged in similar expressive activity and the other locations, whether publicly or privately owned, at which such person engaged in a similar expressive activity within the last twelve (12) months.

**15.  Insurance**. If, in Owner's reasonable business judgment, the nature or timing of the expressive activity creates a foreseeable risk of injury or damage to persons or property, and that risk, in the discretion of management, warrants special insurance protection, each petitioning group must purchase and carry the necessary insurance coverage as determined by Shopping Center management. The following criteria will be used by Shopping Center management to determine whether insurance is required: (a) whether there is a prior history of injury to persons or property when this group engages in expressive activity; (b) whether there is a prior history of injury to persons or property when similar groups engage in expressive activity; (c) the historical scope of the risk and whether it exceeds the minimal or inconsequential; (d) whether the risk can be lessened or eliminated by adjusting the time, date, place or planned manner of activity; and (e) if so, whether the petitioner is willing to make such adjustments. If Shopping Center management reasonably and in good faith determines that an insurance policy is required, said insurance policy shall name as additional insureds Owner, Owner's property manager and the Shopping Center Merchants' Association and petitioner shall provide the Shopping Center manager, prior to commencement of political petitioning, with a valid certificate of insurance evidencing such insurance.

M-3

**Acknowledged by:**

Petitioning Group_____

Print name_____

Signature_____

Date_____

**EXHIBIT A**

**Permit Application for Expressive Activities at the Shopping Center**

1) Name of petitioning group_____

2) Address of petitioning group_____

3) Name of responsible sponsoring party_____

4) Address of responsible sponsoring party_____

*5)* Telephone number of responsible sponsoring party_____

6) Dates requested (maximum of three (3) consecutive days)_____

7) Times requested_____

8) Name and address of each petitioner (this information may be attached)

_____

_____

_____

9) For each of the above listed participants, list any previous injuries to persons or property while such person was engaged in similar expressive activity, and the other locations, at which such person engaged in a similar expressive activity within the last twelve (12) months (this information may be attached)

_____

_____

10)   Maximum number of petitioners (day 1)_____

(day 2)_____

(day 3)_____

11)   Designated Area(s) requested _____ (there is no guarantee you will receive the requested Designated Area)

12)   Purpose of petitioning activity (this information may be attached)_____

13)   Governmental body to which such activity is directed _____

14)   Will leaflets or other written political material be distributed? Yes ( )   No ( )

15)   If the answer to Question 14 is "**yes**", you must attach a copy of the material that will be distributed.

16)   Will Shopping Center patrons or tenants be approached?   Yes ( )   No ( )

17)    Has this petitioning group engaged in similar activities within the last twelve (12) months?

<div align="center">Yes( )  No( )</div>

18)    If the answer to Question 17 is "<u>yes</u>", list the locations such activity occurred and any damage to property or persons as well as any arrests, citations or civil suits resulting therefrom (this information may be attached)

_____

_____

**To the best of my knowledge and belief, the above information is true, complete, and correct.**

Print name _____

Signature _____

Date_____

M-A-2

**Official Shopping Center Use Only**

Approved political expressive activity      Yes ( )  No ( )

Rejected nonpolitical prohibited activity    Yes ( )   No ( )

Insurance policy required      Yes ( )  No ( )

If "<u>yes</u>", has proof of Insurance policy been provided?   Yes ( )   No ( )

Security deposit required      Yes ( )  No ( )

Amount of security deposit    $_____

Security deposit received   Yes ( )  No ( )

Designated Area(s) _____

Expressive activity times _____

Furniture provided  Yes ( )  No ( )

Number of tables provided  _____

Number of chairs provided  _____

Other information _____

_____

By: _____

Name: _____

Its: _____

Date: _____

M-A-3

325821301.2

**EXHIBIT B**

## <u>Designated Areas for Expressive Activity at the Shopping Center</u>



M-B-1



**QUEEN CREEK**
MARKETPLACE

Queen Creek, Arizona

Site Area
90.23 Acres

Building Area
859,575 Square Feet

Parking
4.99 / 1,000 Square Feet

NEC of Ellsworth &
Rittenhouse Roads