# **EXHIBIT 2**

# LEASE

between

**KIMCO OCALA 665, INC.,**
as Landlord,

and

**STAPLES THE OFFICE SUPERSTORE EAST, INC.,**
as Tenant

Dated *September 6*, 2006

for premises located at

**Shade Oaks Shopping Center**
**Ocala, FL**

*The preparation, revision or delivery of this Lease for examination and discussion shall in no event be deemed to be an offer to lease the Premises but shall be merely a part of the negotiations between Landlord and Tenant. Neither party hereto shall have any obligation or liability to the other whatsoever at law or in equity (including any claims for detrimental reliance or promissory estoppel) unless and until such time as both parties shall have executed and delivered this Lease.*

Ocala, FL (RKH) 8-14-06

Facilities, any costs associated with the buildings located within the Center (except as expressly provided in clause (iii) above), or any costs for environmental testing or compliance. The Common Facilities Costs shall be allocated to each calendar year in accordance with generally accepted accounting principles.

*Section 4.4.3. Payment of Common Facilities Costs.* Landlord shall provide Tenant with a reasonable estimate of Common Facilities Costs (with a detailed breakdown of items) and Tenant's Share thereof prior to each calendar year (or at Landlord's option, the Center's fiscal year). Tenant shall pay one twelfth of such estimate on the first day of each month. Within 180 days after the end of such calendar (or fiscal) year Landlord shall reconcile actual costs and Tenant's estimated payments by providing Tenant a statement containing (a) a detailed breakdown of the actual Common Facilities Costs, (b) a computation of Tenant's Share of such Common Facilities Costs, (c) the manner in which Tenant's Share was calculated (including a statement setting forth the amount of leaseable square footage in the Center), (d) the amount of Tenant's payments made, and (e) the increase in Common Facilities Costs over the immediately prior year as described in Section 4.4.1 hereof. Within 30 days after receipt of such statement, Landlord shall reimburse Tenant any amounts which Tenant has overpaid or Tenant shall pay to Landlord any amounts Tenant has underpaid. Landlord's failure to deliver a statement to Tenant within three years after the end of the applicable calendar (or fiscal) year shall relieve Tenant of its obligation to pay Tenant's Share of the Common Facilities Cost for that year.

*Section 4.4.4. Records; Audit Right.* Landlord shall provide Tenant, upon request, backup for any item included in Common Facilities Costs. In addition, upon reasonable prior notice to Landlord and at reasonable times, Tenant may, no more often than once per year and within 3 years after Tenant's receipt of Landlord's reconciliation statement, audit Landlord's records relating to the Common Facilities Costs contained in said statement and Tenant's Share thereof. Such audit to be held at Landlord's Address. If any such audit reveals an overcharge of Tenant with respect to Tenant's Share of Common Facilities Costs, such amounts shall be immediately repaid to Tenant by Landlord with Interest from the date such overcharge was paid by Tenant. If Landlord fails to repay such overcharge within 30 days after notice of the overcharge discovered by the audit, Tenant may offset such amount against any amounts owing Landlord under this Lease. If the audit reveals an overcharge in the aggregate of more than 5% of Tenant's Share of such audited Common Facilities Costs, Landlord shall pay the reasonable cost of such audit.

*Section 4.5. Payments.* Payments shall be made to Landlord at Landlord's Address until Tenant is otherwise notified in writing by Landlord. Tenant shall be fully protected in acting upon any notice changing the payee and purporting to be signed by or on behalf of Landlord and believed by Tenant in good faith to be genuine. After three years from the issuance by Landlord of any bill or statement of charges to be paid by Tenant, whether for Base Rent, additional charge or otherwise, Landlord shall not increase the amount covered by such bill or statement.

### *Article V. Use*

*Section 5.1. Permitted Use.* The Premises shall only be used for the following purposes: the sale and leasing of equipment (including computers and telecommunications equipment),

-12-

Ocala, FL (RKH) 8-14-06

furniture or supplies for business or office (including home office) use; the provision of business or office services (including copying, printing, telecommunications, packing, shipping and business equipment repair services); for uses ancillary thereto; and for any other legal retail purpose (i) not in violation of any of the exclusive use rights or prohibited uses existing as of the date hereof and listed in **Exhibit F** and then existing and enforceable, and (ii) not in violation of Section 5.2.2. Except where expressly made Landlord's obligation hereunder, Tenant agrees to comply with all applicable law in connection with Tenant's use of the Premises.

*Section 5.2. Exclusive, Prohibited and Restricted Uses.* Landlord covenants that, other than the Premises:

*Section 5.2.1. Exclusive Use.* No part of the Center shall be used for the sale or leasing of equipment (including computers), furniture or supplies for business or office (including home office) use, or the provision of business or office services (including copying, printing, packing, shipping and business equipment repair services) (collectively, the "Exclusive Goods and Services"). Landlord shall not advertise any other office supply superstore (as such retailing concept is generally defined and acknowledged within the retail industry) within the Center or on any Center-specific internet web site or page; and

*Section 5.2.2. Prohibited Uses.* No part of the Center shall be used for any of the following: (i) bowling alley, skating rink, or miniature golf; (ii) schools (however schools including but not limited to Sylvan Learning, Kaplan or Huntington shall be allowed); (iii) auditorium, meeting hall, hotel or motor inn, or any residential use; (iv), adult bookstore, adult entertainment facility, a so-called "head" shop; (v) amusement park, carnival, banquet facility, dance hall (but a dance studio such as Arthur Murray shall not be prohibited), disco, nightclub, pool hall (but a family oriented billiards parlor shall be allowed); (vi) any manufacturing, or warehouse use (except incidental to a retail operation however typical storefront office uses (such as travel, medical offices, insurance agencies or real estate agencies) shall be permitted so long as no such user occupies in excess of 5,000 square feet within the Center and as all such users in the aggregate do not occupy in excess of 24,000 square feet within the Center; however this restriction shall not apply to the building currently occupied by Kmart; if the Kmart building becomes available and Landlord regains control of said building, Landlord may lease up to 20,000 square feet within such building in the aggregate for such non-retail permitted uses); (vii) funeral parlor, animal raising or storage (except as part of a full-line retail pet supply operation), pawn shop, flea market or swap meet, junk yard; (viii) drilling for and/or removal of subsurface substances, dumping, disposal, incineration or reduction of garbage or refuse, other than in enclosed receptacles intended for such purposes; (ix) frozen food locker or sales facility, milk distribution center, nursing home; or (x) any use which constitutes a public or private nuisance or produces objectionable noise.

Notwithstanding the foregoing, this Section 5.2 shall not prohibit or restrict: (a) any tenant or its successors, replacements or assigns under an existing lease in effect prior to the date of this Lease from using space occupied by it for its present permitted use (as any such lease may be renewed and/or extended); (b) the replacement of a tenant under an existing lease in effect prior to the date of this Lease from operating for the same use as operated as of the date hereof; or (c)

any existing or future tenant from selling, leasing or providing Exclusive Goods and Services as an Incidental Part of such future tenant's primary business. Incidental Part is defined as the lesser of: (I) 10% of such tenant's retail floor area; or (II) 3,000 square feet of retail floor area.

*Section 5.3. Covenants in General.* The covenants set forth in Section 5.2 shall run with the land comprising the Project. In the event of a breach of any such covenants, Tenant shall be entitled to injunctive relief and any other appropriate remedy. Further, Section 5.2.1 shall not preclude the operation of (i) a so-called consumer electronics store; or (ii) a computer store which sells computers and computer related products as long as Exclusive Good and Services are an Incidental Part of the computer stores business; or (iii) a furniture store which sells office furniture as an Incidental Part of their business; or (iv) the operation of a cellular telephone store.

*Section 5.4. Recapture.* If Tenant does not open for business within the Premises within 6 months after the Commencement Date or, after initially opening, ceases to operate a business on the Premises for more than 6 consecutive months (excluding in either event any period the Premises are not being operated due to casualty, alterations, renovation or repairs), Landlord shall have the right to terminate this Lease and recapture the Premises. Within 60 days after the expiration of either of such 6 month periods, Landlord may exercise its right of termination by giving Tenant written notice thereof at least 90 days, but not more than 180 days, prior to the effective date of termination as specified in such notice. If Landlord does not exercise its right to terminate as aforesaid, and such cessation of business on the Premises continues for an additional 12 consecutive months, Landlord shall again have the right (and shall continue to have such right after each successive twelve month period during which such cessation of business continues) to terminate this Lease and recapture the Premises by sending notice thereof to Tenant, within 60 days after the expiration for such additional 12 month period, at least 90 days, but not more than 180 days, prior to the effective date of termination as specified in such notice. Upon such termination, all further obligations of the parties shall cease, except for those accrued as of the termination date and except that Landlord (or any entity under common control with Landlord) shall not, for 10 months after termination of this Lease pursuant to this Section 5.4 and so long as Tenant is then operating an "office supply superstore" (as such retailing concept is generally acknowledged and defined within the retail industry) within 5 miles of the Premises, lease any space within the Center for the purposes of the operation of a another "office supply superstore". Notwithstanding the foregoing, if Tenant gives Landlord notice within 30 days that Tenant, or its assignee or subtenant, intends to commence operation of business in the Premises prior to the effective date of termination specified in Landlord's notice or within a reasonable time thereafter, such notice by Landlord, and Landlord's election to terminate, shall be null and void and this Lease shall continue.

*Section 5.4.1. Termination Payment.* If this Lease is terminated pursuant to this Section 5.4, Landlord shall pay to Tenant the unamortized cost to Tenant of leasehold improvements paid for by Tenant and installed in, or made to, the Premises from time to time. Such payment shall be made by Landlord no later than 30 days before the effective date of termination and in no event shall the effective date of termination of this Lease be deemed to