# EXHIBIT A

# LEASE AGREEMENT

Between

**SCI Price Plaza Fund, LLC, together with SCI ENTITIES**
**"Landlord"**

**and**

**Jo-Ann Stores, Inc.**
**"Tenant"**

Dated: February _24_, 2011

Price Plaza, Katy, TX
EXECUTION VERSION: February 8, 2011

## TABLE OF CONTENTS

| SECTION | HEADING | PAGE |
|---|---|---|

| SECTION 1. | EXHIBITS TO LEASE | 1 |
| SECTION 2. | DEFINITIONS | 2 |
| SECTION 3. | PREMISES | 7 |
| SECTION 4. | TERM AND OPTIONS TO EXTEND | 9 |
| SECTION 5. | FIXED MINIMUM RENT | 11 |
| SECTION 6. | PERCENTAGE RENT | 12 |
| SECTION 7. | GROSS SALES | 12 |
| SECTION 8. | TAXES | 14 |
| SECTION 9. | COMMON AREA COSTS | 16 |
| SECTION 10. | CONSTRUCTION OF PREMISES | 20 |
| SECTION 11. | USE | 22 |
| SECTION 12. | COMMON AREAS | 22 |
| SECTION 13. | UTILITIES | 23 |
| SECTION 14. | USE VIOLATION | 24 |
| SECTION 15. | CO-TENANCY | 25 |
| SECTION 16. | RULES AND REGULATIONS | 26 |
| SECTION 17. | ALTERATIONS, INSTALLATIONS AND IMPROVEMENTS BY TENANT | 27 |
| SECTION 18. | REPAIRS AND MAINTENANCE | 27 |
| SECTION 19. | INDEMNIFICATION | 29 |
| SECTION 20. | WAIVER OF CLAIMS | 30 |
| SECTION 21. | PROPERTY AND LIABILITY INSURANCE | 30 |
| SECTION 22. | SIGNS | 32 |
| SECTION 23. | ASSIGNMENT AND SUBLETTING | 33 |
| SECTION 24. | REPAIR AFTER CASUALTY | 34 |
| SECTION 25. | CONDEMNATION | 35 |
| SECTION 26. | REPRESENTATIONS AND COVENANTS OF LANDLORD | 36 |
| SECTION 27. | TENANT'S DEFAULT | 38 |
| SECTION 28. | RIGHTS OF LANDLORD | 40 |
| SECTION 29. | LANDLORD'S DEFAULT | 41 |
| SECTION 30. | MORTGAGE SUBORDINATION | 41 |
| SECTION 31. | NO WAIVER | 42 |
| SECTION 32. | SURRENDER OF PREMISES | 42 |
| SECTION 33. | SHORT FORM LEASE, COMMENCEMENT DATE AGREEMENT | 43 |
| SECTION 34. | NOTICE | 43 |
| SECTION 35. | HAZARDOUS MATERIALS | 45 |
| SECTION 36. | LIMITATION OF LANDLORD'S LIABILITY | 46 |
| SECTION 37. | DELIVERY OF SITE PLAN | 47 |
| SECTION 38. | INTENTIONALLY OMITTED | 47 |
| SECTION 39. | ENTIRE AGREEMENT; WRITING REQUIRED | 47 |
| SECTION 40. | OPERATING COVENANT | 47 |
| SECTION 41. | APPLICABLE LAW AND CONSTRUCTION | 48 |
| SECTION 42. | UNAVOIDABLE DELAYS | 48 |
| SECTION 43. | REASONABLE CONSENT | 49 |
| SECTION 44. | NO PARTNERSHIP | 49 |
| SECTION 45. | ESTOPPEL | 49 |

Price Plaza, Katy, TX
EXECUTION VERSION: February 8, 2011

SECTION 46.    QUIET ENJOYMENT ..................................................................... 49
SECTION 47.    HOLDING OVER ......................................................................... 49
SECTION 48.    BROKERS .................................................................................... 50
SECTION 49.    INTENTIONALLY DELETED ...................................................... 50
SECTION 50.    CLAIMS LIMITATION ................................................................ 50
SECTION 51.    CAPTIONS .................................................................................. 50
SECTION 52.    VARIATION IN PRONOUNS ....................................................... 51
SECTION 53.    SECTION REFERENCES .............................................................. 51
SECTION 54.    BINDING EFFECT OF AGREEMENT .......................................... 51
SECTION 55.    ATTORNEY'S FEES ..................................................................... 51
SECTION 56.    OFAC WARRANTY ...................................................................... 51

# LEASE

This Lease is made as of *FEBRUARY 24* , 2011, between SCI PRICE PLAZA FUND, LLC, a Delaware limited liability company, its successor and assigns, together with SCI ENTITIES identified in Addendum 1 attached hereto ("Landlord"), and Jo-Ann Stores, Inc., an Ohio corporation ("Tenant").

Landlord and Tenant covenant and agree as follows:

## SECTION 1. EXHIBITS TO LEASE

(a)    The following addenda and exhibits are attached to and made a part of this Lease, and are incorporated herein by reference:

Addendum 1. List of SCI Entities.

Exhibit A.  The description of the lands upon which the Shopping Center is located.

Exhibit B.  The site plan showing the Shopping Center, the location of the Premises, as hereafter defined, the Shopping Center buildings, the Protected Area, the parking areas, driveways and common areas and containing other general information relative to the development of the Shopping Center Site (the "Site Plan").

Exhibit B-1. Acknowledgement of Delivery Date.

Exhibit C. Intentionally Deleted.

Exhibit D. Tenant's plans and specs (CDs which means construction documents). To be attached post Lease execution.

Exhibit D-1. Tenant's Prototype signage.

Exhibit E. Intentionally Deleted.

Exhibit F. The Prohibited Uses and Exclusive Uses of other tenants

Exhibit G. Intentionally Deleted

Exhibit H. Form of Estoppel Certificate.

(b)    If there is any conflict between the language in this Lease and the content of any of the aforementioned Exhibits, the content of the Exhibit shall control.

## SECTION 2. DEFINITIONS

The terms listed below have the respective meanings as follows:

(a)    Additional Rent: Tenant's Proportionate Share of Taxes (Section 8), Tenant's Proportionate Share of Common Area Costs (Section 9), Tenant's Proportionate Share of Insurance (Section 21), and any other payment that Tenant is required to make to Landlord pursuant to the terms and conditions of this Lease.

(b)    Commencement Date: The earlier of: (i) six months after the Delivery Date, or (ii) the day that Tenant opens for business in the Premises. Notwithstanding anything to the contrary in this Lease, unless Tenant otherwise opens for business, the Commencement Date will not occur during any period that: (1) Tenant has not received all required governmental permits and approvals necessary for Tenant's occupancy of the Premises for the Permitted Use (as herein after defined), provided Tenant applies for such permits and approvals within 60 days after the full execution of this Lease by both Landlord and Tenant and approval of Tenant's plans and specifications by Landlord (provided Tenant delivers such plans and specifications to Landlord within 30 days after the full execution of this Lease by both Landlord and Tenant); or (2) Tenant has not received the SNDA required under Section 30(a) below executed by Landlord's lender. Although the Commencement Date will not be deemed to have occurred, Tenant may elect to open for business during any period identified in the immediately preceding sentence, and in such case, Tenant shall be obligated to pay only Substitute Rent and all Additional Rent during said period until the foregoing conditions have been satisfied and the Commencement Date has occurred. Also, notwithstanding the foregoing, in no event shall Tenant be required to open for business during the period commencing November 15 of any calendar year and ending the next occurring January 31 ("Blackout Period"); and, if the Commencement Date would otherwise occur in the Blackout Period (except for the reason that Tenant opens for business), the Commencement Date shall be deemed to be the first day after the expiration of the Blackout Period. If Tenant opens during the Blackout Period, then Tenant shall pay full Rent during the Blackout Period.

(c)    Common Areas: the parking areas, access roads, driveways, aisles, retaining walls, sidewalks, malls (whether enclosed or unenclosed), loading docks, delivery and pick-up areas, truck storage areas, mechanical rooms, landscaped areas, exterior lighting facilities, comfort stations and public washrooms (if any), detention basin, and other common, service and related areas, facilities and improvements within the Shopping Center, whether open to the public generally or for the non-exclusive use of one or more tenants, their respective agents, employees, and invitees, and whether or not shown on Exhibit B, but excluding the roof(s).

(d)    Default Rate: an annual rate of interest equal to 6% per annum or the highest legal rate, whichever is lower as of the date of such default.

(e)    Delivery Date: the date that Landlord delivers the Premises to Tenant with all of the Delivery Requirements satisfied and Tenant accepts said delivery by written acknowledgment in the form attached hereto as Exhibit B-1 signed by Tenant's Senior Vice

President of Real Estate or Store Development, Director of Store Development or Director of Construction and Facilities; provided Tenant will be deemed to have accepted delivery of the Premises if Landlord delivers a written request for acceptance of delivery to Tenant's Senior Vice President of Real Estate or Store Development, Director of Store Development or Director of Construction and Facilities (at the Tenant's notice address as set forth in Section 34 of this Lease) and Tenant fails to have its Senior Vice President of Real Estate or Store Development, Director of Store Development or Director of Construction and Facilities sign a written rejection within two (2) business days after Landlord delivers the Premises to Tenant with all of the Delivery Requirements satisfied. Tenant shall not unreasonably delay, condition or refuse its acceptance of the Premises if Landlord has satisfied the Delivery Requirements. Landlord and Tenant agree to execute a written acknowledgement (in a form reasonably acceptable to both Landlord and Tenant), which will be signed by Tenant's Senior Vice President of Real Estate or Store Development, Director of Store Development or Director of Construction and Facilities documenting the actual date of Tenant's acceptance of the Premises.

(f)     "Delivery Requirements" means the following:

(1)     the Premises are delivered to Tenant free and clear of any Hazardous Material, including asbestos, and Landlord represents as such to its actual knowledge; and

(2)     all Common Areas shall be in its current existing condition as of the execution date of this Lease

(g)     Estimated Delivery Date: Upon the mutual execution of this Lease.

(h)     Gross Leasable Area: the number of square feet of floor area (excluding non-retail mezzanine, basement and other such areas), measured from the exterior face of exterior walls and the center line of demising or party walls, in the Premises that is leased exclusively by Tenant. With respect to the Premises, the Gross Leasable Area will be the actual completed Gross Leasable Area, as the same exists from time to time.

With respect to the Shopping Center, the Gross Leasable Area is the greater of (i) the total constructed Gross Leasable Area available for the exclusive use and occupancy of tenants within the Shopping Center, whether or not actually rented or open for business, as the same exists from time to time, or (ii) the total Gross Leasable Area of the Shopping Center intended for exclusive use and occupancy as shown on the Site Plan, whether or not actually constructed or rented. Subject to the terms and conditions of this Lease, Landlord reserves the right to modify the Gross Leasable Area of the Shopping Center from time to time during the Lease Term (as defined hereinafter) as a result of expansion of the Shopping Center, construction of new improvements, the demolition of existing improvements, or inclusion of improvements not currently within the boundaries of the Shopping Center.

Any change in Gross Leasable Area, whether of the Premises or Shopping Center, will be deemed in effect on the first day of the next succeeding month following such

change. Landlord will endeavor to advise Tenant of any increase or decrease in the Gross Leasable Area of the Shopping Center due to the construction or demolition of any buildings in the Shopping Center within 60 days of any such change, together with a current Site Plan reflecting such change; provided, however, Tenant's inadvertent failure to provide such notice to Tenant will not affect Landlord's ability to change the Gross Leasable Area.

As of the execution date of this Lease, Landlord represents that the Gross Leasable Area of the Shopping Center intended for exclusive use and occupancy as shown in the Site Plan is 205,818 square feet (which is subject to change from time to time as permitted in this Lease).

(i)    Hazardous Materials: See Section 35.

(j)    HVAC: heating, ventilating and air conditioning exclusively serving the Premises.

(k)    Laws: any and all laws, codes, ordinances, rules or regulations passed into existence by any Public Entity now or hereinafter in existence.

(l)    Lease Year: a period of 12 consecutive calendar months during the Term. The first Lease Year (or Lease Year One) begins on the first day of February next following the Commencement Date, unless the Commencement Date is the first day of February, in which event the first Lease Year begins on the Commencement Date. The first Lease Year will include the first Partial Lease Year, if any. Rent and any limitations on such Rent for purposes of any Partial Lease Year will be proportionately adjusted based upon the actual number of days of such Partial Lease Year in relation to the number of days in a full Lease Year.

(m)    Partial Lease Year: the period, if any, of fewer than 12 consecutive calendar months between the Commencement Date and the next occurring February 1 and the period, if any, of less than 12 consecutive calendar months between the last day of the last Lease Year and the expiration of the Term.

(n)    Permitted Use: the sale of fabrics of all kinds; goods sold by the yard; patterns; knitting supplies; needlepoint; macramé; art materials and supplies; finished crafts, craft materials and supplies; yarns; all types of fabric and sewing notions; floral products; artificial flowers and accessories; scrapbooks and scrapbooking supplies and materials; framed artwork; picture frames, framing (ready made) and framing materials and supplies (except for custom picture framing services); fabric care items; foam products; ceramics; wearable art and wearable art supplies; miniatures, dolls, and hobby items; sewing machines and sewing machine furniture; irons; ironing boards; seasonal merchandise; custom services and custom products using arts and craft and sewing components including, but not limited to, quilting, bow-making, window treatments, floral design, fashion sewing, instructional classes, materials and services; and the incidental sale of (defined as no more than 10% of any individual following item): baskets; wicker items; house wares; linens; curtains; towels; pillows; drapery and upholstery materials; draperies and drapery hardware; blinds, shades, shutters and window treatments; do-

it-yourself products and accessories; bridal apparel and accessories, wedding supplies; gift items, cards, and party supplies; paper goods and stationery; candles and candlesticks; brass and pottery; indoor and outdoor house decorating products and accessories; furniture; prepackaged and unpackaged food and food products, coffee, tea, and assorted beverages; instructional books and tapes; vacuum cleaners; lamps, small household appliances; products and accessories related to all of the foregoing, and other items and services customarily offered for sale by a fabric or craft store, and such other related merchandise and services typically offered in the stores operated by Tenant under the name Jo-Ann, Jo-Ann Fabrics and Crafts or such other name under which Tenant may operate as permitted under this Lease. Notwithstanding anything in this Paragraph or the Lease to the contrary, in no event shall Tenant operate any use from the Premises that would violate any exclusive use by another tenant or executed lease in effect in the Shopping Center or the Shopping Center Site as of the date hereof, which exclusive uses are set forth on Exhibit F.

(o)    Plans and Specifications: the final plans and specifications for the construction or remodeling of the Premises, in the form of Exhibit D, as the same may be modified by written agreement by and between Landlord and Tenant.

(p)    Premises: a portion of the Shopping Center as shown on the Site Plan and located within the Shopping Center, on the Shopping Center Site, consisting of space having approximately 33,890 square feet of Gross Leasable Area, with a minimum frontage of 140 feet (to the center of the side walls) (+/- 5%).

(q)    Protected Area: the area shown on the Site Plan.

(r)    Protected Use: sale of fabrics of all kinds, fabric and sewing goods sold by the yard, upholstery materials, scrapbooks and scrapbooking materials and supplies, patterns, yarns and knitting supplies, needlepoint, macramé, artificial flowers and accessories related to artificial flower, arts and crafts materials and supplies, all types of fabric and sewing notions, sewing machines, sewing machine furniture, products, accessories and services related to all of the foregoing and other items and services customarily offered for sale by a fabric and/or arts and crafts store.

(s)    Prototype Plans: Plans marked as Prototype drawings dated March, 2010, previously provided to Landlord and available on Tenant's portal (to which Landlord has been provided access).

(t)    Public Entity: the federal, state, county, municipal or other governmental unit, however denominated, and any authority, agency, division, department or public official thereof, now or hereafter having jurisdiction, in any respect, over the Premises, the Shopping Center or Shopping Center Site.

(u)    Rent: Fixed Minimum Rent, Additional Rent, and all other monetary obligations of Tenant to Landlord under this Lease. Tenant's obligation to pay Rent under this Lease is completely separate and independent from any of Landlord's obligations under this Lease.

(v)     Shopping Center: the Price Plaza located in Katy, Texas, consisting of all buildings including the Premises and Common Areas, and other improvements located upon the Shopping Center Site, and outlined on Exhibit B.

(w)     Shopping Center Site: the legal description set forth on Exhibit A, on which the Shopping Center is located.

(x)     Sign Drawings: the portion of the final plans and specifications for Tenant's pylon signs and exterior sign(s) on or about the Shopping Center which are part of Exhibits D and D-1, as the same may be modified by written agreement by and between Landlord and Tenant.

(y)     Substantially Complete: complete with the exception of minor "punchlist" items that can be completed within 14 days without interfering with the performance of Tenant's Work.

(z)     Substitute Rent: 50% of the Fixed Minimum Rent otherwise required to be paid under this Lease. Tenant remains obligated to pay Additional Rent at any time when Substitute Rent is payable pursuant to any provision of this Lease.

(aa)     Tenant's Proportionate Share: a fraction, the numerator of which is the Gross Leasable Area of the Premises and the denominator of which is the Gross Leasable Area of the Shopping Center. Notwithstanding the foregoing, if any portion of Common Area Costs, Taxes, or Insurance Costs are furnished or directly payable by an individual tenant or occupant as opposed to Landlord, the cost of the item(s) furnished or payable by such tenant or occupant shall not be included in Common Area Costs, Taxes, or Insurance Costs, as the case may be, and the square footage of the tenant or occupant furnishing or paying for such item(s) shall not be included in the calculation of Tenant's Proportionate Share of such item(s). Tenant's Proportionate Share shall be adjusted in the event of any increase or decrease in the Gross Leasable Area of all buildings within the Shopping Center or the Gross Leasable Area of the Premises.

(bb)     Tenant's Work: the store fixturing and merchandising work to be performed by or at the direction of Tenant in preparing to open for business from the Premises in accordance with Tenant's Plans approved by Landlord.

(cc)     Term: the Initial Term, as hereafter defined, and each Extended Term, as hereafter defined, if any, and any renewals or period of holdover tenancy.

(dd)     The term "REA" as used herein shall mean that certain Reciprocal Easement Operation Agreement dated June 27, 1997, between Price/Fry Limited Liability Company and Home Depot U.S.A., Inc., as Amended by the Amendment dated January 31, 2000, between Price/Fry L.P. and Home Depot U.S.A., Inc., a true and complete copy of which has heretofore been delivered to Tenant. The Shopping Center is subject to the REA and notwithstanding

anything contained herein Tenant shall not violate the REA. Tenant, its successors and permitted assigns, and its customers, employees, and invitees, shall have the non-exclusive right for the Lease Term to use, for purposes of access, ingress and egress, and parking all those certain access, ingress and egress, and parking easement areas granted to or established by Landlord under the REA. Landlord certifies that, to the best of its knowledge the REA is in full force and effect without any existing violation or breach thereunder. Landlord shall not amend or terminate the REA without the written consent of Tenant (which consent will not be unreasonably withheld, delayed or conditioned) to the extent it would have a material adverse affect on Tenant's rights under this Lease.

(ee)    Unavoidable Delay: A material delay beyond the reasonable control of the delayed party caused by labor strikes, lock-outs, extraordinary labor troubles, industry-wide inability to procure materials, failure of power, extraordinary restrictive governmental laws or regulations (such as gas rationing), riots, war, military or usurped governmental power, acts of terrorism, sabotage, material fire or other material casualty, or an extraordinary and material act of God (such as a tornado or earthquake), but excluding inadequacy of insurance proceeds, litigation or other disputes, financial inability, lack of suitable financing, delays of the delayed party's contractor and failure to obtain approvals or permits unless otherwise caused by an event of Unavoidable Delay.

## SECTION 3. PREMISES

(a)    For the Rent and upon the terms and conditions contained in this Lease, Landlord leases to Tenant during the Term, and Tenant leases from Landlord during the Term, the following:

   (1) The Premises as described in Section 2(p) hereof, outlined on the Site Plan and further described herein; and,

   (2) The right, in common with Landlord and all other tenants of the Shopping Center granted similar rights by Landlord, to the non-exclusive use of all Common Areas. The rights hereby granted with respect to the Common Areas shall constitute easements appurtenant to the Premises and a servitude upon the Shopping Center Site. The benefit and the burden of such easements shall run with and bind the Shopping Center Site.

   (3) Subject to compliance with local codes and all applicable laws, and subject to any REA and any other prohibited uses, restrictions or covenants in existing leases affecting the Shopping Center, the right to place (i) two storage containers ("Containers") during seasonal selling seasons in a location at, near, or next to Tenant's loading dock in the Container Area shown on Exhibit B, (ii) shopping cart corrals ("Corrals") in Tenant's Protected Area at, near or next to the outside of the Premises' entryway and in no more than four parking lot spaces in another part of the Protected Area, and (iii) five bales ("Bales") of cardboard at the rear exterior of the Premises for a period not to

exceed 72 hours. Each Container will not exceed 10 feet in width and 40 feet in length. Tenant will maintain the Containers, Corrals and Bales in good condition and repair and in accordance with the first-class nature and operation of the Shopping Center. If Landlord receives notice that Tenant's Containers, Corrals or Bales violate any local code or ordinance, then after receipt of notice from the governing body, Tenant will remove the violating Containers, Corrals or Bales, or move them to an acceptable location mutually agreed upon by Landlord and Tenant. Tenant's Containers, Corrals and Bales shall not be used in a manner that, in Landlord's sole reasonable opinion, unreasonably impedes pedestrian and vehicular use of the Common Areas. All Containers, Corrals and Bales within the Container Area and Protected Area shall be and remain at the sole risk of Tenant. Landlord will not be liable for any damage to, theft of or loss of any such property. Tenant shall be solely responsible for providing adequate security with respect to such property. Further, Tenant shall be solely liable for the cost and expense of repairing any damage to any portion of the Shopping Center caused by Tenant's use of the Containers, Corrals and Bales as provided in this Paragraph. Tenant hereby agrees to indemnify and hold Landlord harmless from and against any and all liability, claims, costs and expenses including reasonable attorneys' fees, arising from Tenant's use of the Container Area or Protected Area. If Tenant is not permitted to use the Container Area or Protected Area as a result of the failure of any government authority to permit Tenant's use thereof or the revocation by any government authority of Tenant's right to such use, Tenant shall have no recourse against Landlord under any provision of this Lease as a result thereof, and this Lease shall remain in full force and effect in accordance with its terms.

(b)    Landlord expressly reserves the right to maintain, use, repair and replace the pipes, ducts, conduits, utility lines, tunneling and wires leading through the ceiling, plenum areas, columns, partitions, and within or under the floor slabs comprising part of the Premises, but only to the extent that such installations (i) are reasonably necessary to serve the Premises or other parts of the Shopping Center, (ii) are installed in locations that will not unreasonably interfere with Tenant's use of the Premises or Tenant's permitted signage, (iii) are not exposed within the selling area, and (iv) do not decrease the ceiling height of the Premises. Similarly, notwithstanding anything to the contrary in this Lease, Tenant shall have the right to make installations around the Premises (e.g., the roof) which are consistent with Tenant's prototype plans for other similar stores operated by Tenant or which are part of Tenant's Leadership in Energy and Environmental Design initiative or other Tenant initiatives. In exercising the foregoing rights, neither Landlord or Tenant shall unreasonably interfere with the use or occupancy of the Premises or other tenant premises or commence any such work without first notifying the other party in writing, at least 10 days in advance, of the commencement of such work. In no event may Landlord construct any improvements above the Premises or place signs on the exterior walls of the Premises without the reasonable consent of Tenant. If, and to the extent that any of Tenant's installations as noted above, involve the roof of the Premises, Tenant shall not perform such installations without first notifying Landlord and Landlord's roofing

contractor (including proof of the applicable insurance required hereunder), allowing such roofing contractor to perform any installations involving the roof (provided the charges therefor are reasonable and competitive in the market where the Shopping Center is located) so as not to void or disturb any roof warranties in place, and indemnifying and holding Landlord harmless in connection with any such activities.

(c)    The "Premises" excludes the exterior walls, roof, and the floor slab (excluding floor covering installed by Tenant) and areas beneath the floor slab, and if Tenant installs a mezzanine in the Premises for the storage of inventory and/or fixtures, Tenant shall not pay any Rent on that space provided such mezzanine space is not used as selling space.

(d)    Within 60 days following the Commencement Date, upon request of either Landlord or Tenant, Landlord shall have its architect ("Landlord's Architect") measure the final Premises to determine the number of Gross Leasable Area of the Premises. If the area reflected by such measurement varies from that set forth in this Lease, then all items of Rent shall be appropriately adjusted, provided, however, that in no event shall any item of Rent be increased by more than 5% because of a variance in area of the Premises. If neither party requests a measurement within such 60 day period, then the area specified in this Lease shall be deemed to be the Gross Leasable Area of the Premises. If Tenant disputes the measurement of Landlord's Architect, Tenant shall notify Landlord within five business days after receipt by Tenant of such measurement. Tenant shall then have 15 days to have an architect selected by Tenant that is properly licensed an insured in the State of Texas ("Tenant's Architect") to measure the Premises using the procedures set forth herein. If Tenant's Architect disputes the findings of Landlord's Architect, both Architects shall meet in good faith for a period not to exceed 15 days and try to reach agreement on the Gross Leasable Area of the Premises. If the Architects cannot reach agreement within such period, the Architects shall in good faith select a third, independent architect (the "Resolution Architect") to measure the Premises. The measurement of the Resolution Architect shall be final and binding on all parties. All fees and costs payable to Landlord's Architect shall be paid by Landlord.  All fees and costs payable to Tenant's Architect, shall be paid by Tenant. Tenant and Landlord shall each be responsible for one-half of the fees and costs payable to the Resolution Architect.

## SECTION 4.  TERM AND OPTIONS TO EXTEND

(a)    The "Initial Term" begins on the Commencement Date and ends on the last day of the 10th Lease Year, including any Partial Lease Year, unless sooner terminated, extended or renewed as herein provided.

(b)    Provided that on the date of exercise (i) this Lease shall be in full force and effect, (ii) Tenant shall be in possession of the Premises, is open and operating in the Premises in accordance with its Permitted Use [subject to casualty, eminent domain, Unavoidable Delay, or reasonable periods of closure for remodeling (which period for remodeling shall not to exceed 60 days) or repairs after casualty or condemnation as permitted under this Lease], and (iii) that Tenant shall not be in default under any of the terms, provisions, covenants or conditions of this Lease beyond any applicable notice and cure period, then, and only in such

event, Landlord grants Tenant the right and option to extend this Lease for three additional periods of five years each (individually called an "Extended Term" and collectively called "Extended Terms"), commencing upon the expiration of the Initial Term or such prior Extended Term, as the case may be. Each Extended Term shall be upon the same terms, covenants and conditions as the Term except for the option to extend then exercised and except for such changes, if any, in Rent or other Tenant charges as are expressly set forth in this Lease.

(c)    Tenant must deliver written notice to Landlord of its election to extend this Lease for an Extended Term on or before the later to occur of the following: (1) the date that is 180 days before the expiration of the Term or the Extended Term, as the case may be; or (2) the date that is 30 days after written notice from Landlord indicating that the time period in which Tenant has to exercise its option has expired. If the Term expires before such notice from Landlord, and Tenant continues in possession of the Premises after such expiration, the Term will be extended automatically on a month to month basis until the earlier of: (1) 30 days after the date Landlord has given such notice, or (2) Tenant surrenders the Premises to Landlord in accordance with the terms and conditions of the Lease, or (3) Tenant exercises its option, in which case the Extended Term will be deemed to have commenced upon the expiration of the Initial Term (or prior Extended Term, as the case may be.) Concurrently with the exercise of the option by Tenant, Tenant will pay Landlord any unpaid balance of the Rent due during the Extended Term that has accrued as of the date of such notice of extension.

(d)    Notwithstanding anything to the contrary in this Lease, but subject to the last sentence of this subsection, if Tenant's annual Gross Sales for the Premises have not exceeded $110.00 per square foot of the Premises during any rolling 12-month period (the "Threshold Sales") between the first day of the 19th month of the Term and the last day of the 48th month of the Term ("Threshold Period"), then Tenant shall have the one-time right to terminate this Lease within 6 months after the expiration of the Threshold Period, without further liability of either party to the other, by giving Landlord 12 months prior written notice of termination ("Notice to Terminate"); and the Lease shall terminate on the date which is 12 months following the date of such Notice to Terminate. If the Lease terminates pursuant to this subsection, upon Tenant's surrender of the Premises to Landlord, Tenant agrees to pay Landlord for 50% of the unamortized Tenant Allowance and 50% of the unamortized real estate broker commissions paid by Landlord for the tenancy established under this Lease.

Notwithstanding anything in this Lease to the contrary, in the event Tenant has Gross Sales in excess of $125.00 per square foot of the Premises for any rolling 12 month period, Tenant's right to terminate under this subsection shall thereupon become void.

Notwithstanding anything in this Lease to the contrary, in the event the Tenant opens a new store within five miles of the Premises or the Premises is closed for any reason at any time during the Threshold Period (other than due to Unavoidable Delay, damage and destruction or eminent domain ( "Threshold Sales Voiding Condition"), Tenant shall be deemed to have waived its right to terminate this Lease under this Section 4  and the termination right established herein shall be null and void and of no further force and effect. The remedy set forth in the immediately preceding sentence, shall be Landlord's exclusive remedy should a

Threshold Sales Voiding Condition occur.

## SECTION 5.  FIXED MINIMUM RENT

(a)     From and after the Commencement Date, Tenant must pay to Landlord, without demand, offset or deduction (except as may otherwise be expressly provided in this Lease) at the address herein specified for notices to Landlord, Fixed Minimum Rent for the Premises as follows:

(1)     During Lease Years one through five of the Initial Term (including any Partial Lease Year) at the rate of $271,120.00 per year, based on $8.00 per square foot of Gross Leasable Area of the Premises, payable in monthly installments of $22,593.33; and

(2)     During Lease Years six through 10 of the Initial Term at the rate of $305,010.00 per year, based on $9.00 per square foot of Gross Leasable Area of the Premises, payable in monthly installments of $25,417.50; and

(3)     During the first five-year Extended Term at the rate of $338,900.00 per year, based on $10.00 per square foot of Gross Leasable Area of the Premises, payable in monthly installments of $28,241.67; and

(4)     During the second five-year Extended Term at the rate of $372,790.00 per year, based on $11.00 per square foot of Gross Leasable Area of the Premises, payable in monthly installments of $31,065.83; and

(5)     During the third five-year Extended Term at the rate of $406,680.00 per year, based on $12.00 per square foot of Gross Leasable Area of the Premises, payable in monthly installments of $33,890.00.

The amounts shall include and be in payment of all other charges not specifically set forth in this Lease.

(b)     Tenant must pay monthly installments of Fixed Minimum Rent in advance on or before the first day of each month during the Term, commencing on the first day of the first month next following the Commencement Date (unless the Commencement Date is the first day of the month, in which event the first monthly installment shall be due on the Commencement Date). Notwithstanding the foregoing, Landlord must invoice Tenant, which invoice will not occur before the Commencement Date, for the first monthly installment of Fixed Minimum Rent; and Tenant will pay the amount set forth in such invoice to Landlord within ten (10) days after receipt thereof or be considered a late payment of Rent hereunder. Landlord must include

with the initial invoice a written certification that the requirements of the Opening Co-Tenancy are satisfied. In no event will the first rent installment be due until ten days after Tenant's receipt of this initial invoice. Fixed Minimum Rent for the partial month, if any, after the Commencement Date will be computed on a per diem basis (assuming a 30-day month), and Tenant must pay the Fixed Minimum Rent for such partial month concurrently with the first monthly installment. If Tenant fails to pay Rent on the due date, then the Landlord, in addition to the Rent then owed, is entitled to a late fee of $100 for such late payment; provided, Landlord agrees to waive such late fee for the first late payment during any Lease Year.

## SECTION 6. PERCENTAGE RENT -None.

## SECTION 7. GROSS SALES

(a)     "Gross Sales" means the entire amount of the actual receipts, whether cash or otherwise, from all sales of merchandise and services for all business conducted in, on or from the Premises, including mail or telephone orders received at the Premises and filled from the Premises or elsewhere (but excluding mail, telephone, internet or other orders filled at the Premises but originating elsewhere). Each sale upon installment or credit shall be treated as a sale for the full amount thereof in the month during which such sale shall be made, irrespective of the time when Tenant shall receive payment (whether full or partial) from its customers. Layaway sales, so-called, shall be included in the Gross Sales of the respective computation period only to the extent of payments received during that computation period. Notwithstanding the foregoing, Tenant shall be obligated to report and include with Tenant's Gross Sales, the sales generated by any assignee, sublessee, concessionaire or licensee of Tenant. Notwithstanding the foregoing, with respect to assignees, sublessees, concessionaires and licensees of Tenant that, together, occupy no more than 1,000 square feet of Gross Leasable Area, Tenant shall not be obligated to report and include with Tenant's Gross Sales, the sales generated by them, although any payments to Tenant by such entity will be included in Gross Sales. Within 15 days after the expiration of each month during the Term including any part of the Threshold Period, Tenant shall certify and submit to Landlord a statement of Tenant's Gross Sales for the preceding month of the Term.

(b)     Notwithstanding anything to the contrary, the following are excluded from Gross Sales:

(1)     sums collected and paid out for any sales tax or excise tax imposed by any duly constituted governmental authority;

(2)     the value or price of merchandise exchanged between the stores of Tenant, or the affiliates of Tenant, if any, where such exchange of merchandise is made solely for the convenient operation of the business of Tenant or the affiliate of Tenant and not for the purpose of consummating a sale which has been made at, in, from or upon the Premises, or for the purpose of depriving Landlord of the benefit of a sale which otherwise would be made at, in, from or upon the Premises;

(3)     the amount of returns to shippers or manufacturers;

(4)     sales to employees made at a discount;

(5)     non-sufficient funds check charges or financing charges to customers whether or not separately stated or billed;

(6)     service charges to customers who buy a budget or deferred payment plan;

(7)     revenue from gift certificates or gift cards until redeemed at the Premises;

(8)     revenue from vending machines used solely for the benefit of employees;

(9)     the amount of any cash or credit refund made upon any sale where the merchandise sold, or some part thereof, is thereafter returned by the purchaser and accepted by Tenant;

(10)    sales of fixtures;

(11)    all sums and credits received in settlement of claims for loss or damage to merchandise;

(12)    non-retail bulk sales of merchandise outside of the ordinary course of business on the Premises;

(13)    tax exempt sales or merchandise donated or sold at a discount to charitable or non-profit organizations;

(14)    fees for classes or demonstrations;

(15)    the value attributed to merchandise taken in trade;

(16)    referrals to affiliates of or other divisions of Tenant;

(17)    fees for gift wrapping, mailing and other customer services provided on a not for profit basis;

(18)    sales of lottery tickets, special event tickets and the like (but the commissions paid to Tenant shall be included in Gross Sales);

(19)    the amount of credit sales and credit accounts incurred at the Premises which are written off as bad debts and deducted as an expense;

(20)    sales by any sublessee, concessionaire or licensee in the Premises whose

Gross Leasable Area, together, occupy less than 1,000 square feet of Gross Leasable Area, except that any payments to Tenant by such entity will be included in Gross Sales; and

(21)   sale of patterns.

## SECTION 8.  TAXES

(a)   Landlord covenants and warrants that the entire Shopping Center is located on tax parcel identification number #1206720010003 (the "Tax Parcel"), that the Tax Parcel does not extend beyond the perimeter of the Shopping Center Site and that the improvements comprising the Shopping Center (including the Premises and Common Areas) as set forth on Exhibit B are the only improvements now located or to be located thereon which will be considered for the tax value for which Tenant shall be responsible for its Proportionate Share thereof (notwithstanding Landlord's reserved rights for the Common Areas under this Lease). On a monthly basis based upon the estimates provided by Landlord, Tenant must pay to Landlord the Tenant's Proportionate Share of real estate taxes ("Taxes") levied upon the Tax Parcel and payable by Landlord during each year of the Term, after reducing Taxes (i) by the amount of any contributions for Taxes paid by any party having the right to use the Common Areas but not a tenant of the Shopping Center, and (ii) by any rollback, discount for timely or early payment, credit or reduction that has been granted or issued by any taxing authority or governmental group or agency and utilized by Landlord. Notwithstanding the foregoing, if the Premises, or a portion of the Shopping Center including the Premises, is separately assessed, then Tenant will pay, as Tenant's allocable share of Taxes, the lower of: (1) Tenant's Proportionate Share of Taxes, or (2) Tenant's Fraction of Taxes, with Tenant's Fraction being a fraction whose numerator is the Gross Leasable Area of the Premises and whose denominator is the Gross Leasable Area of all buildings within such separately assessed parcel. Tenant will pay Tenant's Proportionate Share of Taxes within 30 days after receipt of Landlord's annual reconciliation statement assessing and prorating the Taxes, together with copies of receipted tax bills for which payment is sought and reasonable verification for the computation of Tenant's Proportionate Share. For the first Lease Year, Tenant shall pay no more than $3.20 per square foot of Gross Leasable Area of the Premises for Taxes; and, Landlord represents that said amount is a good faith estimate of the actual Taxes that would be due if Tenant were paying its full Proportionate Share of Taxes for said Lease Year. Notwithstanding anything to the contrary, in no event shall Tenants total contribution for Taxes exceed  $3.20 per square foot of Gross Leasable Area of the Premises per year for the first Lease Year, which is Landlord's good faith estimate thereof.

(b)   In no event will Tenant pay for Taxes for a time period longer than the Term.

(c)   Every five years during the Term of this Lease, Landlord shall have the duty to timely compare the then current value of the Shopping Center (utilizing the income approach, using a market capitalization rate) to the assessed value of the Shopping Center determined by the taxing authority. (For the purpose of this subsection, "market capitalization rate" shall mean the average rate used for sales of first class shopping centers of similar size to the Shopping

Center located in the county (and the next closest counties, as needed, until at least five comparable sales have been located) within which the Shopping Center is located during the 12 month period immediately preceding the date of appraisal by the taxing authority.) If the value determined by Landlord is 5% or more less than the value determined by the taxing authority, then Landlord shall be required to timely pursue, and prosecute to completion, a reduction in the assessed value determined by the taxing authority to an amount that is acceptable to Tenant through whatever means as are customary in the jurisdiction where the Shopping Center is located, including the filing of an appeal of the assessed value, if necessary (for example, it may be customary in a given jurisdiction to commence a dialog with the assessor in order to reduce the assesses value of the Shopping Center, prior to filing a formal application or appeal with the board of review or other body have jurisdiction over such matters). The cost for pursuing the reduction in assessed value as outlined in the immediately preceding sentences of this subsection shall be included in Taxes, and Tenant shall be responsible for Tenant's Proportionate Share thereof. Throughout the process of determining the value of the Shopping Center and seeking a reduction, Landlord shall communicate with Tenant and provide Tenant the opportunity to provide input in the process. If Landlord successfully contests the assessed value of the Shopping Center and a resulting refund or credit in Taxes occurs, such refund or credit shall be paid or applied to the party(ies) that actually paid or will pay such Taxes (it being understood that if Taxes are paid by Landlord and Landlord is reimbursed by Tenant, Tenant shall be the party that has "paid" or "will pay" such Taxes for purposes of this subsection).

(d)      If any special assessment imposed on the Shopping Center and qualifying as "Taxes" hereunder may lawfully be paid in installments, only the installments coming due during the Term will be included within Taxes. Landlord must use best efforts to minimize the Taxes assessed against the Tax Parcel.

(e)      Tenant must pay before delinquency all municipal, county and state taxes assessed during the Term against any leasehold interest and personal property of any kind, owned by or placed in, upon or about the Premises by Tenant.

(f)      Notwithstanding anything to the contrary, the following are excluded from Taxes:

> (1) Any portion of the Taxes assessed: (A) against tenant improvements and tenant space completion work, whether constructed by Landlord or by any other party; or (B) against additional buildings or other taxable improvements not now constructed on the Tax Parcel; or (C) otherwise attributable to any increase in the assessed value of the Tax Parcel by reason of such improvements or work;

> (2) Any portion of the Taxes attributable to a revaluation of the Tax Parcel arising out of a sale or other change in the ownership thereof or of any interest therein, except for one time during any five year period during the Initial Term of the Lease and once during each Extended Term;

(3) Any portion of the Taxes in the nature of fees, charges or assessments for governmental services or improvements related to the initial construction or any alteration, expansion or rehabilitation of the Shopping Center or other improvement of the Tax Parcel (beyond the upkeep and repair of the Shopping Center that is necessary to keep the same in first-class condition);

(4) Any tax or fee that applies generally to all business owners or operators, as opposed to owners of real property;

(5) Any impact fee, user fee, exaction fee, environmental fee or other tax paid as a prerequisite to construction of the Shopping Center, or any addition or improvement thereto;

(6) Estate tax, inheritance tax, succession tax, capital levy tax, corporate franchise tax, margin tax, rent tax, profits tax, gross receipts tax, income tax, conveyance fee or transfer tax and the like;

(7) Any assessment, bond, tax, or other finance vehicle that is (A) imposed as a result of Landlord's initial construction of the Shopping Center, or (B) used to fund construction of additions or improvements to the Shopping Center; and

(8) Any penalty, interest or other charge attributable to Landlord's late or delinquent payment of Taxes.

**SECTION 9. COMMON AREA COSTS**

(a)    In addition to payment of the Fixed Minimum Rent, Tenant must pay to Landlord Tenant's Proportionate Share of Landlord's reasonable and actual costs applicable to the Shopping Center for the operation and maintenance of the Common Areas ("Common Area Costs"), after reducing such Common Area Costs by (i) the amount of any contributions toward Common Area Costs paid by tenants paying such costs directly to a third-party provider or any party not a tenant of the Shopping Center; and (ii) all fees and revenue collected or paid to Landlord for parking in, at, on, near or around the Shopping Center. Subject to the cap in subsection (c) below, Tenant must pay to Landlord in 12 equal installments, each in advance on the first day of every calendar month, an estimated sum toward Tenant's Proportionate Share of Common Area Costs. During the first Lease Year, the monthly installment will not exceed the rate of $1.42 per square foot per year multiplied by the Gross Leasable Area of the Premises. For Lease Years after the first Lease Year, the monthly sum may be adjusted annually by Landlord to reflect actual changes in the Common Area Costs, subject to the cap in subsection (c) below.

(b)    On or before April 1 of each year, Landlord must provide Tenant with a statement assessing and prorating the Common Area Costs, together with a certified statement

of the Gross Leasable Area of the Shopping Center and copies of all bills for which payment is sought. Tenant must pay to Landlord, within 30 days of such receipt, any deficiency owed to Landlord. If Tenant's estimated payments are in excess of Tenant's Proportionate Share in any Lease Year, then such excess will be applied to the following Lease Year unless such Lease Year is the final Lease Year of Tenant's occupancy, in which case Landlord must refund such overpayment to Tenant within 30 days after delivery of the annual statement.

(c)     Notwithstanding the anything to the contrary, in no event will Tenant's Proportionate Share of Common Area Costs (excluding utilities, refuse disposal, water, ice/snow removal, insurance, or any unforeseen expenses caused by a casualty or an event of force majeure) increase by more than 5% per year (non-cumulative basis) above that amount actually paid by Tenant for the previous Lease Year.

(d)     Tenant shall have the right to audit and inspect Landlord's books and records pertaining to Common Area Costs, Taxes and Insurance Costs by giving written notice to Landlord within 12 months after receipt of the annual reconciliation statement, (i) disputing the accuracy of such statement, (ii) designating the auditor to review the accuracy of the statement with Landlord and/or Landlord's designated representatives, and (iii) agreeing to be bound by all of the following requirements: (x) Tenant's auditor will not be paid on a contingency basis (unless pursuant to a multi-store contract entered into by Tenant on such basis), and (y) all information obtained through Tenant's audit shall be held in strict confidence and shall not be revealed to anyone except in connection with litigation between Landlord and Tenant regarding Common Area Costs or as required by applicable laws. Such audit by Tenant must be completed within 120 days after Tenant delivers such written notice to Landlord. Landlord shall have all rights allowed by law or equity if Tenant or any of its officers, agents or employees and/or its auditor violate the confidentiality terms of this subsection. The obligations in this subsection shall survive termination of this Lease. Such books and records shall be made available at Landlord's address provided herein. If any audit or review of Landlord's books and records determines that Tenant has overpaid any Common Area Costs, Taxes or Insurance Costs, then Tenant has the right to offset any overpayment against Rent, but if Tenant is in the last Lease Year of the Term, then Landlord must refund the overpayment to Tenant within 30 days after notice from Tenant. If any such audit or review determines that Tenant has overpaid any Common Area Costs, Taxes or Insurance Costs by more than 5%, then Landlord must pay to Tenant the reasonable cost of such audit or review not to exceed $2,500.00; otherwise the audit or review shall be at Tenant's sole cost and expense. Landlord shall be responsible for providing Tenant with books and records for Tenant's additional rent contribution for the preceding calendar year only. Notwithstanding anything to the contrary in this Lease, in no event shall Tenant be entitled to withhold payment of the Common Area Costs, Taxes and Insurance Costs during any audit period, or any period during which Tenant disputes Landlord's charges pursuant to this Paragraph.

(e)     The payment of such Common Area Costs is in consideration of Landlord's maintenance and operation of the Common Areas, and Landlord must use such payment for that purpose.

(f)    Notwithstanding anything to the contrary, the following are excluded from Common Area Costs:

(1)    the original cost, or depreciation of the original cost, of constructing, erecting and installing the Shopping Center, the Common Areas, common facilities and related services;

(2)    principal and interest payments pursuant to any mortgage that encumbers the Premises or Shopping Center;

(3)    Taxes;

(4)    administrative charges, management fees, fees based upon a percentage calculation, leasing commissions or any other fee or charge regardless of the name (including, without limitation, salaries of all kinds, social security, taxes, insurance, part-time or full-time labor, any fees paid to manage the Shopping Center including those paid to a third party management company, and similar costs and expenses) that is related to the management and operation of the Shopping Center, in excess of 7% of Common Area Costs (excluding insurance);

(5)    expenses incurred due to the negligence or willful misconduct of Landlord or any occupant of the Shopping Center or their respective agents or employees;

(6)    costs and expenses incurred for repairs or replacements due to faulty construction, faulty workmanship or structural defects;

(7)    expenses related to an individual occupants of the Shopping Center or to a particular tenant space, or to buildings;

(8)    any cost, fees, fines or penalties, or interest thereon, related to violations by Landlord or any occupant of any Law; and the cost of compliance with Laws enacted prior to the date hereof;

(9)    capital expenditures (a capital expenditure is defined as an item or items costing $10,000 or more and having a useful life of at least one year); other than a "Permitted Capital Expenditure." A Permitted Capital Expenditure is limited to the following: repaving of the parking lot(s) not more frequently than once every five years; provided, however, that each Permitted Capital Expenditure must be amortized on a straight-line basis over the useful life of the related improvement based on federal income tax guidelines, but in no event less than seven years, and only the amount of the annual amortization shall be included in Common Area Costs for any Lease Year within the useful life so determined;

(10)    reserves for replacement;

(11)    costs for insuring the Common Areas, but this exclusion does not limit Landlord's rights of reimbursement, if any, under Section 21;

(12)    cost of advertising, marketing, decorating, redecorating, or special cleaning or other services not provided on a regular basis;

(13)    all costs and expenses relative to the solicitation and execution of leases for space in the Shopping Center;

(14)    all costs and expenses related to the operation, maintenance and repair of any garage space in the Shopping Center;

(15)    the cost of any repair or replacement made by Landlord because of the total or partial destruction of the Shopping Center or the condemnation of a portion of the Shopping Center or the Shopping Center Site;

(16)    any operating expense paid to a related corporation, entity or person that is in excess of that amount that would have been paid absent such relationship;

(17)    the cost of overtime or other expenses incurred by or on behalf of Landlord to correct any default of Landlord or for work performed by or on behalf of Landlord where such work is expressly provided in this Lease or any other lease the cost of which was/is to be borne at Landlord's expense;

(18)    any cost that is paid or reimbursed by third parties, including warranties and guarantees and including any cost that is paid or reimbursed by insurance (or would have been covered by insurance required to be maintained by Landlord);

(19)    the amount of any self-insured retentions; and

(20)    payments made under any easement, operating agreement, license, restrictive covenant, or any instrument relating to the payment or sharing of costs among property owners;

(21)    costs disproportionately incurred by or on behalf of one or more tenants, including, without limitation, all costs relating to a food court area; and

(22)    costs and expenses incurred with respect to the correction, disposal, investigation, removal, transportation, or treatment of Hazardous Material.

(g)    Landlord must use best efforts to keep Common Area Costs to a minimum subject, however, to the obligation of Landlord to maintain the Shopping Center as a first-class retail project.

(h)    Landlord covenants that there will be no duplication of costs between those payable by Tenant within this section and under this section and any other section of this Lease.

## SECTION 10.  CONSTRUCTION OF PREMISES

(a)    Tenant, at its sole cost and expense, must deliver to Landlord for Landlord's approval, a copy of Tenant's proposed plans and specifications and sign drawings (the "Proposed Plans"). Landlord shall approve or disapprove, in writing, of the Proposed Plans within 30 days after receipt thereof from Tenant. If Landlord furnishes Tenant a written response, Tenant will resubmit revised Proposed Plans within 10 days after having received Landlord's response, and Landlord will then have a 10-day period within which to review the same. Such review process will continue until the Proposed Plans are acceptable to both Landlord and Tenant. Notwithstanding anything contained herein, if Tenant's Proposed Plans are not approved by Landlord within 45 days after the date Tenant first submits same to Landlord hereunder, the Commencement Date herein shall be extended on a day for day basis for each day thereafter until such Proposed Plans are approved by Landlord.  If the parties do not reach agreement on the Tenant's Proposed Plans within 90 days after their first submission to Landlord, the latest revision of the Proposed Plans submitted by Tenant to Landlord will be deemed approved by Landlord; provided Tenant has timely submitted its prior revisions (time being of the essence). Within 15 days of Tenant's receipt of the Landlord-approved Plans and Specifications, Tenant shall apply for all required governmental permits and approvals necessary for Tenant's Work, and Tenant shall diligently pursue obtaining such permits and approvals. If Tenant is unable to secure the required governmental permits and approvals for a prototypical "Jo-Ann" or "Jo-Ann Fabrics and Crafts" store (subject to changes thereto as may be reasonable and appropriate given the site specific conditions) within 60 days of Tenant's application therefor ("Permit Period") despite diligent, good faith efforts, then Landlord shall have the right to pursue such permits and approvals on behalf of Tenant for an additional 60 days (if Landlord elects to pursue such permits and approvals, said 120 day period shall hereinafter referred to as the "Permit Period"). If Landlord obtains such permits and approvals, Tenant shall reimburse Landlord for its reasonable out-of-costs and expenses in connection with pursuing issuance of the building permit. If the required governmental permits and approvals have not been obtained during the Permit Period, despite diligent, good faith efforts by Landlord and Tenant, Landlord shall have the right to terminate this Lease by delivering written notice to Tenant of its intent to terminate the Lease to the other within 30 days after the end of the Permit Period. After delivery of the termination notice, Tenant shall be relieved of all obligations under this Lease and shall not be liable to Landlord for damages or otherwise. For purposes of this Paragraph, Tenant's "diligent, good faith efforts" include (i) complying with any lawful requests or requirements imposed by the applicable governmental authority and (ii) responding to any denial or request for information by applicable governmental authority within three (3) business days after issuance of same.

Price Plaza, Katy, TX
EXECUTION VERSION: February 8, 2011

(b)     Subject to: (1) the repair obligations of Landlord under the Lease, and (2) any other applicable provisions of this Lease, Tenant will take possession of the Premises on the Delivery Date on an "as is", "where is" basis. Notwithstanding anything to the contrary in this Lease, if any Hazardous Material are existing at the Premises as of the Delivery Date, not caused by Tenant, is required by Law to be removed, abated, or otherwise remediated from the Premises, then Landlord must perform such removal, abatement or remediation.

(c)     After the effective date of this Lease, pursuant to the terms and conditions of this Lease, Tenant shall have access to the Premises for inspection, taking measurements, making plans, erecting temporary or permanent signs and the performance of Tenant's Work as may be appropriate or desirable by Tenant without the Commencement Date being deemed to have occurred; provided, however, that Tenant shall indemnify, defend and hold Landlord harmless from and against any and all claims or losses arising from Tenant's entry upon the Premises, except to the extent caused by Landlord, its agents, employees or contractors. In no event will Tenant be required to accept delivery of the Premises unless and until the Delivery Requirements have been satisfied. No agent or non-employee representative of Tenant has the authority to accept delivery of the Premises. Only direct employees of Tenant with a title of Director or above can accept delivery, which acceptance must be in writing. Any purported acceptance by a non-authorized person or that is not in writing is not binding upon Tenant.

(d)     Tenant shall not permit to be created or to remain undischarged any lien, encumbrance or charge (arising out of any work done or materials or supplies furnished, or claimed to have been done or furnished, by any contractor, mechanic, laborer or materialman or any mortgage, conditional sale, security agreement or chattel mortgage, or otherwise by or for Tenant) which might be or become a lien or encumbrance or charge upon the Shopping Center or any part thereof or the income therefrom. Tenant will not suffer any other matter or thing whereby the estate, rights and interests of Landlord in the Shopping Center, or any part thereof might be impaired. If any lien, or notice of lien on account of an alleged debt of Tenant or any notice of contract by a party engaged by Tenant or Tenant's contractor to work on the Premises shall be filed against the Shopping Center or any part thereof, Tenant, within 15 days after notice of the filing thereof, will cause the same to be discharged of record by payment, deposit, bond, order of a court of competent jurisdiction or otherwise. If Tenant shall fail to cause such lien or notice of lien to be discharged within the period aforesaid, then, in addition to any other right or remedy, Landlord may, but shall not be obligated to, discharge the same either by paying the amounts claimed to be due or by procuring the discharge of such lien by deposit or by bonding proceedings and in any such event Landlord shall be entitled, if Landlord so elects, to compel the prosecution of an action for the foreclosure of such lien by the lienor and to pay the amount of the judgment in favor of the lienor with interest, costs and allowances. Any amount so paid by Landlord and all costs and expenses, including attorney's fees, incurred by Landlord in connection therewith, shall constitute Additional Rent payable by Tenant under this Lease and shall be paid by Tenant to Landlord on demand. Nothing herein contained shall obligate Tenant to pay or discharge any lien created by Landlord. Tenant has no authority to and shall not create any liens for labor or material on or against the Shopping Center or any interest therein, and no such liens shall extend to the interest of Landlord in the Shopping Center or the

Premises under any circumstances. Tenant agrees to notify all materialmen, suppliers, contractors, mechanics, or laborers involved with work or improvements on the Premises at Tenant's request, in connection with any improvements, alterations or otherwise, that such party must look only to Tenant or Tenant's other property interests for payment. All materialmen, suppliers, contractors, mechanics and laborers may be put on notice of this Section by the recordation, at Landlord's option, in the Public Records of the County where the Premises is located.

(e)     Landlord must pay Tenant a "construction allowance" in the amount of $20.00 per square foot of Gross Leasable Area of the Premises (which equals $677,800.00) toward Tenant's out-of-pocket costs of constructing its permanent leasehold improvements in the Premises, in progress payments as follows: (i) 33% to be paid to Tenant within 30 days after the Delivery Date; (ii) 33% to be paid to Tenant within 90 days after the Delivery Date; and (iii) 34% to be paid to Tenant within 30 days after Tenant's Work has been completed substantially in accordance with the Landlord-approved Plans and Specifications, Tenant has opened for business at the Premises and delivered to Landlord duly and properly executed lien waivers and release for services/deliverables from Tenant's general contractor or construction manager (and all subcontractors, materialmen and other persons furnishing labor or materials to the Premises in excess of $5,000.00) and a copy of the final certificate of occupancy for the Premises (or its equivalent); provided, however, if (x) a portion of lien waivers and releases are delivered to Landlord, then Landlord shall release funds to Tenant to the extent said lien waivers and releases are provided, or (y) the lien waiver and release is not provided, in no event shall the balance of the construction allowance due Tenant be withheld beyond the statutorily defined period in which liens may be filed, if no liens have been filed during said period. If Landlord fails to pay Tenant any portion of the construction allowance within 30 days after the due date thereof, then Tenant will have the right after provided prior written notice to Landlord thereof to deduct such amount from Rent. Landlord will wire-transfer the construction allowance to Tenant's bank as follows: Key Bank, 127 Public Square, Cleveland, OH 44114, ABA: 041001039, Account #1061502834, Account Name: Jo-Ann Stores, Inc.

## SECTION 11.  USE

The Premises may be used for the Permitted Use, provided the Premises shall not be used in violation of the exclusive uses as are set forth on Exhibit F. Landlord represents that the use restrictions accurately reflect exclusives, uses and encumbrances that presently encumber the Premises as terms of existing leases of Shopping Center premises (the uses covered by such restrictions are collectively referred to as the "Restricted Uses" and individually as a "Restricted Use").

## SECTION 12.  COMMON AREAS

(a)     Landlord, at its own cost and expense (except as otherwise specified in Section 9 or Section 21) shall operate, manage, repair and maintain the Common Areas in a first-class, neat and clean condition for the benefit of Tenant and Tenant's customers, employees, licensees and invitees. Landlord's obligations with respect to the Common Areas include, but are not

Price Plaza, Katy, TX
EXECUTION VERSION: February 8, 2011

limited to:

(1) Equipping and lighting the Common Areas;

(2) Maintaining the surfaces of all sidewalks, restriping and maintenance of paved and parking areas in a level, smooth and evenly covered condition with the type of surfacing material originally installed or such substitute as shall in all respects be equal in quality to the original;

(3) Removing all ice and snow, papers, mud and sand, debris, filth and refuse and thoroughly sweeping the Common Areas to keep them in a clean and orderly condition;

(4) Placing, keeping in good condition and repair and replacing all utility lines, any necessary appropriate directional signs, markers and curbs;

(5) Maintaining, trimming and watering, mowing and weeding all landscaped areas and making such replacements of shrubs and other landscaping as is necessary;

(6) Security arrangements including private police and similar services and functions to the extent necessary in Landlord's reasonable commercial judgment.

(b)     Landlord may close any Common Areas temporarily, at such times as to cause the least possible interruption or interference with Tenant's business, to make repairs or changes, to prevent the acquisition of public rights in such Common Areas or to discourage non-customer parking; but, in no event will the Protected Area be closed (except in the event of an emergency) without the prior reasonable consent of Tenant. In no event shall Landlord designate the Protected Area as an employee parking area or otherwise permit the Protected Area to be used for employee parking.

(c)     Landlord must keep the Common Areas clean and well lighted from dusk until at least one-half hour after the close of Tenant's business and remove snow from the parking areas, driveways and sidewalks as promptly as possible. Landlord cannot impose any parking charges for the parking of automobiles in the parking areas. Landlord cannot grant any rights in, or permit special or exclusive use of, the sidewalk space or parking areas near the front of the Premises or in the exterior area near the rear door of the Premises.

## SECTION 13.  UTILITIES

Landlord, at its sole cost and expense, must cause all utilities furnished to the Premises to be separately metered so that only the service provided to the Premises will be reflected in utility bills rendered to Tenant by the respective supplying public utility companies. Tenant must pay, when due, bills for utilities furnished to the Premises by public utility companies from and after the Delivery Date, including water, gas, electricity and telephone and the like, as are separately metered and charged directly to Tenant.

## SECTION 14.  USE VIOLATION

(a)     If any portion of any Restricted Property (defined below) is used or occupied for the Protected Use, or if any sales area therein is designated for the Protected Use (either event being referred to as a "Use Violation"), then Tenant is obligated to pay only Substitute Rent (plus Additional Rent) until such Use Violation ceases.  In addition, if any Use Violation lasts for more than 12 consecutive months, Tenant has the right to terminate this Lease by giving 60 days written notice to Landlord, in which event all further obligations hereunder shall terminate on the date specified in Tenant's notice, and any Rent (including Substitute Rent) paid in advance by Tenant must be refunded to Tenant within 30 days after termination of the Lease.

(b)     The foregoing restriction in subsection (a) will not apply to: (1) any tenant of the Restricted Property devoting 10% or less of its Gross Leasable Area to the sale of items comprising the Protected Use; or (2) any tenant open and operating in the Restricted Property as of the date of this Lease to the extent such tenant's lease (as the same exists on the date hereof) permits it to sell items that are included in the Protected Use without Landlord's consent, but this clause shall not apply if Landlord permits an expansion of such tenant's premises for a use that would violate this Section 14 if Landlord reasonably and legally may refuse to grant such permission, and further Landlord covenants with Tenant not to modify or amend any such tenant's lease in any manner that would permit such tenant to sell any items comprising the Protected Use to an extent greater than such tenant is permitted to sell such items under its existing lease.)

(c)     In the event that Tenant's Protected Use is violated, the computation of Substitute Rent shall commence on the first day of the violation of the Use Violation, and shall be paid in monthly installments.

(d)     Notwithstanding anything to the contrary, in the event of a Use Violation by any tenant or occupant who conducts or operates in violation of the Protected Use without Landlord consenting to or granting such tenant or occupant the right to do so (a "rogue tenant"), then Tenant's right to pay Substitute Rent and terminate this Lease will be deferred and Tenant shall continue to pay the Fixed Minimum Rent due hereunder, so long as that Landlord commences court action to cure or eliminate the Use Violation by the rogue tenant within 30 days of after Landlord becomes aware of such rogue tenant by Tenant and diligently pursues same to completion (which diligence by Landlord must include appeals to the highest state court, if lower court rulings are adverse to Landlord and allow the Use Violation to continue). If Landlord does not take such action against the rogue tenant as described in the immediately preceding sentence, then Tenant may exercise its right to pay Substitute Rent (plus Additional Rent) and terminate this Lease as provided in subsection (a) above.

(e)     Without limiting Tenant's rights and remedies under this Section 14, Tenant has the right to equitable relief (including injunction) in the event of a Use Violation.

(f)     "Restricted Property" means the Shopping Center, any additions thereto or outparcels thereof.

(g)     Landlord covenants and agrees to use diligent, good faith, commercially reasonable efforts to cure any breach or violation of this Section by a rogue tenant, including, without limitation, seeking and diligently prosecuting all available legal and equitable remedies to compel or otherwise cause cessation of the Use Violation.

(h)     Notwithstanding anything to the contrary contained herein, if at any time during which a Use Violation exists and Tenant is entitled to pay Substitute Rent pursuant to another provision under this Lease ("Prior Substitute Rent Reason"), then, in lieu of paying Substitute Rent, Tenant shall be entitled to pay Alternate Substitute Rent until such time as the Use Violation is satisfied or until such time as the Prior Substitute Rent Reason is satisfied, in which case Tenant shall be obligated to pay Substitute Rent (plus Additional Rent) in accordance with the terms of this Section 14. As used in this Lease, "Alternate Substitute Rent" shall mean 50% of the Substitute Rent. Tenant remains obligated to pay Additional Rent at any time when Alternate Substitute Rent is payable pursuant to any provision of this Lease.

**SECTION 15.  CO-TENANCY**

(a)     <u>Opening Co-Tenancy</u>.

(i)     The Opening Co-Tenancy Requirement means that at least two Anchor Tenants (as defined herein below) are open for business to the public during its normal operating hours from substantially all of its premises as shown on the Site Plan (the "Anchor Tenant Premises"). Notwithstanding anything to the contrary, Tenant is not required to open for business, nor is Tenant obligated for the payment of Rent, until the Opening Co-Tenancy Requirement is met.

(ii)     If Tenant elects to open for business before the date that the Opening Co-Tenancy Requirement is met, then from the date Tenant opens for business until the Opening Co-Tenancy Requirement is met, Tenant may pay Substitute Rent plus Additional Rent.

(b)     <u>Ongoing Co-Tenancy</u>.

(i)     The Ongoing Co-Tenancy Requirement means that at least two Anchor Tenants are open for business to the public during normal operating hours from substantially all its Anchor Tenant Premises.

(ii)     If, at any time after Tenant opens for business (except if Tenant opens for business before the date that the Opening Co-Tenant Requirement is met), the Ongoing Co-Tenancy Requirement is not met, then Tenant may pay Substitute Rent (plus Additional Rent) until the Ongoing Co-Tenancy Requirement is satisfied. If the Ongoing Co-Tenancy Requirement is not met for a period 12 consecutive months, then for a period of 30 days after the expiration of such 12-month period, Tenant shall have the one-time right to terminate this

Lease upon 90 days written notice to Landlord delivered at any time thereafter prior to the date the Ongoing Co-Tenancy Requirement is satisfied. If Tenant does not exercise the foregoing termination right within such 30-day period, Tenant shall pay (together with Additional Rent) the greater of Substitute Rent or 6% of Gross Sales, not to exceed Fixed Minimum Rent.

    (c)    <u>Definitions</u>.

        (i)    The "Anchor Tenants" are Best Buy, Babies R Us and Ross, or their respective Qualified Replacements;

        (ii)    "Qualified Replacement" means a single national or regional retail tenant operating under one trade name in 90% of the Anchor Tenant Premises.

        (iii)    For purposes of this Lease, "national" shall mean a first-class retailer operating at least 25 stores, and "regional" shall mean a first-class retailer operating at least 10 stores in Texas and the states contiguous to Texas.

    (d)    Notwithstanding anything to the contrary contained herein, if at any time during which the Opening Co-Tenancy Requirement or the Ongoing Co-Tenancy Requirement has not been met or exists (collectively referred to as "Co-Tenancy Violation"), as the case may be, and Tenant is entitled to pay Substitute Rent pursuant to another provision under this Lease ("Prior Substitute Rent Reason"), then, in lieu of paying Substitute Rent for such Co-Tenancy Violation, Tenant shall be entitled to pay Alternate Substitute Rent (plus Additional Rent) until such time as the Co-Tenancy Violation is satisfied or until such time as the Prior Substitute Rent Reason is satisfied, in which case Tenant shall be obligated to pay Substitute Rent, as applicable, in accordance with the terms of this Section 15, plus Additional Rent.

**SECTION 16.  RULES AND REGULATIONS**

    (a)    Landlord may, for the general welfare of the Shopping Center or the avoidance of nuisance, impose reasonable rules and regulations of general application governing the conduct of tenants in the Shopping Center and the use of the Common Areas (it is agreed and understood that such rules and regulations and any subsequent modifications thereto, notwithstanding anything to the contrary in this Lease, shall be subject and subordinate to the terms and conditions of the body of this Lease so that in the event of any conflict or inconsistency between the terms hereof and such rules and regulations, the terms hereof shall supersede and control.)  Tenant will comply with and perform any and all such rules and regulations imposed by Landlord so long as such rules and regulations do not limit the rights or expand the obligations of Tenant under this Lease and all occupants of the Shopping Center are subject to and comply with such rules and regulations.  Landlord must use commercially reasonable efforts to enforce such rules and regulations.  Notwithstanding the foregoing, Tenant has the right to display merchandise on the sidewalk on both sides of the storefront door of the Premises, provided such outdoor sales and storage area is kept in a clean, neat and orderly condition, is operated in accordance with the REA and applicable laws and does not obstruct or impede pedestrian and vehicular access in the Shopping Center.

(b)     Tenant is not required to join or maintain membership in any tenant's business association sponsored by or for the Shopping Center, nor is Tenant required to pay any of the costs of the activities conducted by such association.

## SECTION 17.  ALTERATIONS, INSTALLATIONS AND IMPROVEMENTS BY TENANT

(a)     Tenant, without Landlord's consent, has the right to make such interior alterations, changes and improvements to the Premises as Tenant may desire for the conduct of Tenant's business and for the full beneficial use of the Premises; except for alterations, changes and improvements that: (i) exceed $75,000.00 in any 12-month period, (ii) structural changes, alterations or improvements, or (iii) changes that affect the storefront or Shopping Center systems, all of which require Landlord's consent, which consent must not be unreasonably withheld or delayed.  Tenant will pay all costs and expenses of its improvements, will make such changes, alterations and improvements in a good and workmanlike manner, in accordance with all applicable laws and building regulations, and free and clear of any mechanic's liens or other liens or claims in connection with the making of such changes, alterations and improvements.

(b)     Except as otherwise provided, all signs, furnishings, trade fixtures, inventory, equipment and other removable property installed in the Premises by Tenant will remain the personal property of Tenant, and may be removed from the Premises by Tenant upon the termination of this Lease. If any of the foregoing is affixed to the Premises, Tenant will repair any damage caused by removal.

## SECTION 18.  REPAIRS AND MAINTENANCE

(a)     Except as otherwise provided, Tenant will maintain the interior, non-structural portion of the Premises (including the doors, windows, screens, floors, walls, ceilings, pipes, wires, conduits and other equipment and fixtures located in or traversing the Premises), at its sole cost and expense, in an attractive, clean and sanitary condition.

(b)     Intentionally Deleted.

(c)     Subject to Section 18(d), and except for damage caused by fire or other casualties or taking by eminent domain or conveyance in lieu thereof: Tenant, at its sole cost and expense, must make all interior nonstructural repairs to the Premises, including doors and windows, and (1) all repairs to the plumbing and gas systems exclusively serving the Premises from their respective meters to and including the plumbing and gas systems in the interior of the Premises, and (2) the electrical system exclusively serving the Premises from Tenant's electrical panel to and including the electrical systems in the remainder of the interior of the Premises. Notwithstanding the foregoing, except for any repairs or replacements caused by Tenant's negligence or willful misconduct for which Tenant would be responsible, Tenant is not required to make any: (i) repairs of damage covered by insurance maintained or required to be

maintained by Landlord; (ii) repairs necessitated by reason of the negligence, willful misconduct, or default of Landlord, its agents, employees or contractors; (iii) repairs to the plumbing, gas, electrical or other similar units and systems where such repairs would necessitate going through or into the floor slab, structural walls, or roof of the Premises; (iv) replacement of any plumbing, gas, electrical or similar units or systems; or (v) repair or replacement of the sprinkler, life safety or other detection or suppression system. Except as otherwise expressly set forth herein, all of the repairs and replacements referred to in the immediately preceding sentence will be performed by Landlord at its sole cost and expense (and included as a part of Common Area Costs).

(d)     Landlord, at its sole cost and expense, must make all repairs to the Premises other than those that Tenant is required to make. Landlord's obligations include, but are not limited to, repairs to the structural portions of the Premises (both interior and exterior), the roof, floor slab, foundation, exterior walls, any interior damage caused by roof leaks or water/sewage backing up into the Premises no matter where from, and all repairs or replacements to the (x) gas and plumbing systems or any portion thereof up to (but not including) their respective meters, and (y) the electrical system up to (but not including) Tenant's electrical panel (and not including HVAC, except as set forth herein). In making any repairs or replacements, Landlord must not unreasonably interfere with Tenant's normal operations and business. Landlord assigns to Tenant all warranties and guarantees, if any, with respect to any and all construction and equipment on the Premises to be maintained by Tenant.

(e)     Tenant will be responsible for all repairs and replacements of the HVAC unit(s). Landlord will assign all applicable HVAC warranties to Tenant. In addition, Landlord has provided the Tenant with a survey of the existing conditions of the HVAC units along with pictures, manufacturer's name, plus the serial and model numbers, and tonnage for each HVAC unit. Notwithstanding anything to the contrary in the Lease, if Tenant should replace the HVAC units during the final two years of the Initial Term or any Lease extension or renewal (which replacement is not caused by Tenant's misuse, negligence or willful misconduct), and not remain in possession of the Premises pursuant to a subsequent Lease extension or renewal, then the Landlord shall reimburse Tenant, within 30 days of the deliver back of possession of the Premises to the Landlord, for the un-amortized cost of said replacement based on a straight-line amortization schedule over the useful life of the equipment in accordance with federal income tax guidelines (in no event less than 15 years); provided Landlord has the right to inspect and approve the HVAC units (and the associated cost thereof) prior to installation in the last two years of the Term.

(f)     Tenant will maintain the Premises, at its expense, free and clear of all rubbish, garbage and trash and place such rubbish, garbage and trash in the containers provided by Tenant. Tenant, at its own cost and expense, will dispose of all rubbish, garbage and trash on a timely basis. Landlord will provide an area for Tenant's trash compactor or containers, at Landlord's sole cost and expense, in a location mutually acceptable to Landlord and Tenant.

(g)     Subject to this Section 18, Tenant will keep the Premises in an orderly and sanitary condition, free from vermin, rodents, bugs and other pests, and Landlord must keep the

Common Areas in an orderly and sanitary condition, free from vermin, rodents, bugs and other pests. Notwithstanding the foregoing, Landlord is responsible for the extermination of insects causing structural damage in, on or about the Premises, the Common Areas, and all parts of the Shopping Center.

(h)     Notwithstanding anything to the contrary, Tenant is responsible for making any interior non-structural alterations of or improvements to the Premises that are required by any Public Entity after the Delivery Date, except to the extent that such responsibility is imposed upon Landlord in the next following sentence or otherwise under this Lease. Landlord is responsible, at its sole cost and expense (except if such requirement arises as a result of Tenant seeking approval from a Public Entity for alterations and improvements to the Premises, which shall be done by Landlord at Tenant's sole cost and expense), for making all alterations of or improvements to the Premises that are required by any Public Entity and that (i) are structural in nature, (ii) relate to the exterior thereof, including the Common Areas, (iii) relate to the sprinkler, utility or life safety systems therein or (iv) relate to the handicapped or disabled, but this clause does not require Landlord to make any "path of travel" alterations or improvements or those otherwise relating to Tenant's fixtures and placement thereof.

## SECTION 19.   INDEMNIFICATION

(a)     Subject to Section 20, Landlord shall indemnify, defend and hold Tenant harmless from and against any and all claims, demands, actions, damages, liability and expense in connection with the loss, damage or injury to persons or property, arising out of or related to the negligent or intentional acts or omissions of the Landlord, Landlord's agents, contractors or employees, or arising out of the use or operation of the Common Areas and all other space in the Shopping Center not designated for the exclusive use of one tenant, except as caused by the negligence or willful misconduct of Tenant, its agents, employees, contractors or representatives.

(b)     Subject to Section 20, Tenant shall indemnify, defend and hold Landlord harmless from and against any and all claims, demands, actions, damages, liability and expense in connection with loss, damage or injury to persons or property (1) occurring in, on or about, or arising out of the Premises, except as caused by the negligence or willful misconduct of Landlord, its agents, employees, contractors or representatives; or (2) arising out of the negligent or intentional acts or omissions of Tenant, Tenant's agents, contractors, or employees.

(c)     If either party, without fault on its part, is made a party to any litigation commenced by or against the other party, then such other party shall protect and hold such first party harmless and shall pay all costs, expenses and reasonable attorney's fees incurred or paid by such first party in connection with the litigation.

This Section 19 survives the expiration or termination of this Lease.

## SECTION 20.  WAIVER OF CLAIMS

Notwithstanding any provision to the contrary, Landlord and Tenant waive any and all right of recovery, claim, action or cause of action against the other, their respective agents and employees, for any loss or damage that may occur to the Premises or the Shopping Center or any additions or improvements thereto, or any contents therein, by reason of fire, the elements or any other cause which could be insured against under the terms of a standard special form insurance policy or policies, or for which Landlord or Tenant may be reimbursed as a result of insurance coverage insuring any loss suffered by either party, regardless of cause or origin, including the negligence of Landlord or Tenant, or their respective agents and employees.  This waiver applies regardless of whether either party actually obtains property insurance, and regardless of whether any insurance proceeds are collected.  Notwithstanding the above, Landlord and Tenant agree and acknowledge that the waiver of claims herein contained shall expressly exclude any loss paid by the insured in the form of a deductible or self-insured retention. All property insurance policies required under this Lease covering the Premises or the Shopping Center must expressly waive any right on the part of the insurer against the other party for damage to or destruction of the Premises or the Shopping Center resulting from the acts or omissions of the other party.

Notwithstanding anything in this Lease to the contrary, Landlord and Tenant each hereby waives trial by jury in any action, proceeding or counterclaim brought by either party with respect to any matter arising out of or in way connected with this Lease or the use and occupancy of the Premises. Tenant also agrees to waive any and all counterclaims Tenant may have in any suit for possession by Landlord (other than mandatory counterclaims which would be waived if not asserted at that time) it being understood that the subject of any such counterclaim may be asserted by Tenant but only in a separate action brought by Tenant against Landlord.

## SECTION 21.  PROPERTY AND LIABILITY INSURANCE

(a)    Landlord must keep in full force and effect Commercial General Liability Insurance and Umbrella Insurance with respect to the Shopping Center, including the Common Areas, naming Tenant as an additional insured thereunder to the extent its interest may appear, with nationally recognized companies rated no lower than A-, X by A.M. Best Company with total minimum limits to apply per location of $2 million on account of bodily injuries or death and/or property damage resulting from one occurrence. Landlord must deposit a certificate or other evidence of such insurance with Tenant within 30 days after receipt of Tenant's written request therefor.

(b)    Tenant must keep in full force and effect Commercial General Liability Insurance and Umbrella Insurance with respect to the Premises, naming Landlord and Landlord's property manager as additional insureds to the extent its interest may appear, with nationally recognized companies rated no lower than A-, X by A.M. Best Company with total minimum limits to apply per location of $2 million on account of bodily injuries or death and/or property damage resulting from one occurrence. Tenant shall also maintain: (i) all-risk property

insurance, written at replacement cost value and with replacement cost endorsement, covering all of Tenant's personal property in the Premises (including, without limitation, inventory, trade fixtures, floor coverings, furniture and other property removable by Tenant under the provisions of this Lease) and all leasehold improvements in the Premises; (ii) if and to the extent required by law, worker's compensation or similar insurance in form and amounts required by law; and (iii) insurance for plate glass (for which Tenant may self-insure). Tenant must deposit a certificate or other evidence of such insurance with Landlord prior to Landlord's delivery of the Premises and at least 15 days prior to any renewal date of such insurance policies; provided, however, so long as Tenant's evidence of insurance is maintained by Tenant's insurer on the website of Tenant's insurance broker, which can be accessed through Tenant's website, "JoAnn.com," Tenant will not be required to deposit a certificate or other evidence of insurance with Landlord.

(c)   Landlord must keep the Shopping Center, including Common Areas, insured against loss or damage by fire, lightning, vandalism and malicious mischief, and such other perils as are now or may hereafter be comprehended in the term "All Risk Coverage" or "special form" coverage or "Special Form Cause of Loss" (or other terms that become the insurance industry standard in the future), including, without limitation, earthquake and flood, if in an area that is designated as an earthquake or flood zone, boiler and machinery, plate glass, power failure, mold, windstorm, terrorism, seepage or leakage and loss of rent damage. Such insurance must cover improvements in the Premises owned by Landlord to the extent that the same are customarily insurable as part of the realty, but will not include the cost of restoration of Tenant's trade fixtures, furniture, furnishings, inventory, equipment and other personal property. Notwithstanding anything to the contrary, Common Areas costs shall include reimbursements for any and all deductibles and self insured retentions paid by Landlord.

(d)   In addition to the payment of Fixed Minimum Rent, Tenant must pay its Proportionate Share of the premium paid by Landlord for maintaining the insurance for the Shopping Center required under subsections 21(a) and 21(c), including any commercially reasonable insurance deductibles therefor (the "Insurance Costs"). Tenant must pay to Landlord in 12 equal installments, each in advance on the first day of each and every calendar month, an estimated sum towards Tenant's Proportionate Share of the Insurance Costs. During the first Lease Year, the insurance paid by Tenant will not exceed the rate of $0.97 per square foot per year multiplied by the Gross Leasable Area of the Premises, which amount is Landlord's good faith estimate of the full amount of Tenant's Proportionate Share of Insurance Costs for the first Lease Year if Tenant were to pay Tenant's actual Proportionate Share of Insurance Costs for said period. This sum is subject to annual adjustments by Landlord to reflect actual changes in the Insurance Costs. Upon receipt of its annual statement of Insurance Costs from its insurer, Landlord must provide Tenant with a statement assessing and prorating the Insurance Costs together with copies of all bills for which payment is sought. Tenant must pay to Landlord within 30 days of such receipt any deficiency owed to Landlord. If Tenant's estimated payments are in excess of Tenant's Proportionate Share in any Lease Year, then such excess will be applied to the following Lease Year unless such Lease Year is the final Lease Year of Tenant's occupancy, in which case Landlord must refund such overpayment to Tenant within 30 days after the end of such Lease Year. Landlord covenants that there will be no duplication of costs

Price Plaza, Katy, TX
EXECUTION VERSION: February 8, 2011
- 31 -

between this Section and any other Section of this Lease.

## SECTION 22. SIGNS

(a)     Subject to compliance with all applicable laws and the REA, and Landlord's prior written approval not to be unreasonably withheld, Tenant has the right to install and maintain a sign or individual letters ("Jo-Ann, Fabric and Crafts" or any other name or slogan that Tenant may adopt) or signs on the front, side, rear or any other fascia of the Premises, as well as a sign or signs on the pylon, if any, located in the Shopping Center for use by the tenants of the Shopping Center, and "framing," "craft" and similar departmental signs on the front fascia in addition to its regular sign, all in accordance with Exhibits D and D-1, with Tenant's approved exterior and pylon signage. Tenant's pylon signage will be in the  position formerly occupied by Linens N Things. All signs will comply with all requirements of any Public Entity, and Tenant will obtain all necessary permits or licenses. Notwithstanding the foregoing, Tenant is entitled to seek and receive a variance from any Public Entity so as to allow Tenant to have the size, color, design, and number of signs that Tenant desires, including storefront signs, pylon signs, banner signs and monument signs. Landlord agrees to cooperate (using commercially reasonable efforts) with Tenant, at no cost to Landlord, to obtain any such variance; provided, Landlord will not be required to take a position that will materially adversely affect Landlord's current operation of the Shopping Center for the benefit of all tenants and occupants thereof (including, but not limited to, reducing the overall signage allocation for the Shopping Center). Tenant's sole cost for the exterior, fascia and pylon signs shall be the cost to fabricate and install Tenant's signage, as well as the cost to obtain any variances.

(b)     Within 45 days after the mutual execution of this Lease, Tenant will prepare and submit to Landlord for Landlord's approval proposed sign drawings, which proposed sign drawings will be based upon Exhibit D-1. If Landlord fails to approve or disapprove, in writing, the proposed sign drawings within 15 days after receipt thereof from Tenant, then such approval will be deemed to have been granted. If Landlord furnishes Tenant a written response, Tenant agrees to resubmit revised sign drawings within 10 days after having received Landlord's response and Landlord will then have a 10-day period within which to review the same. If Landlord fails to respond within said 10 days, then such revision will be deemed approved. Such review process shall continue until the proposed sign drawings are acceptable to both Tenant and Landlord, whereupon the same will constitute the Sign Drawings and will be affixed to this Lease as an additional part of Exhibit D.

(c)     In addition to the foregoing signs pursuant to this Section 22, subject to compliance with all applicable laws and the REA, Tenant has the right to install and maintain a professionally prepared banner sign periodically in front of the Premises in the location and manner identified on Exhibit D; provided such banners are: (i) do not exceed in the aggregate more than 10% of the glass portion of the storefront; (ii) are not taped or otherwise affixed to the glass of the storefront window; and (iii) are of a type and quality substantially similar to that used in the Tenant's other locations with the State of Texas.

(d)     Tenant must maintain its signs in good condition and repair at all times, and must save the Landlord harmless from injury to person or property arising from the erection and maintenance of the signs. Upon vacating the Premises, Tenant must remove all signs and repair (exclusive of painting) all damage caused by such removal.

(e)     If Landlord renovates all or any portion of the Shopping Center, which renovation requires the removal of any of Tenant's sign(s), Landlord must first notify Tenant at least 45 days before the removal of such sign(s) and Landlord will bear the cost of such removal and reinstallation, together with the cost of any damage to the sign(s) as a result of such removal or reinstallation. Further, Landlord must provide and install on or about the Shopping Center, at Landlord's sole cost and expense, a banner or other type of temporary sign(s) identifying Tenant's trade name, which banner or sign(s) must be equal in size to Tenant's existing sign and approved by Tenant before such installation.

## SECTION 23.  ASSIGNMENT AND SUBLETTING

(a)     Tenant has the right to assign this Lease or sublet all or any part of the Premises for any lawful retail purpose, which use shall be subject to the prior written consent of Landlord not to be unreasonably withheld, provided (i) that such assignee or sublessee uses the Premises for a primary use that does not violate any exclusive use rights granted to other tenants in the Shopping Center or any restricted/prohibited uses that exist on the date of the assignment or sublease (subject, however, to Landlord's advising Tenant of such rights), (ii) Tenant is not in default under any terms or provisions of this Lease beyond any applicable notice and cure period; (iii) Tenant remains jointly and severally liable in connection with the obligations on Tenant under this Lease, and (iv) Tenant shall not subdivide the Premises into more than two separate subdivided units. Within 15 days after the receipt of a written request from Tenant, Landlord must deliver to Tenant notice of any prohibitions or restrictions on the use of the Premises enforceable by any other tenants of the Shopping Center.  Failure to deliver to Tenant a list of any prohibitions or restrictions will constitute Landlord's covenant that there are not prohibitions or restrictions on the use of the Premises for any use and Landlord must indemnify, defend and hold Tenant harmless if there actually is a prohibition or restriction.

(b)     In the event Tenant desires to assign this Lease or sublease the entire Premises, Tenant shall provide to Landlord reasonable information on the proposed assignee or sublessee sufficient to ensure that the conditions in Section 23(a) above have been satisfied, as well as a full copy of the agreement by which Tenant proposes to assign or sublease the Premises. Landlord shall be entitled to fifty percent (50%) of any and all consideration received by Tenant in the aggregate from any assignment of this Lease and/or any subletting of the Premises over and above the Rent and charges due to Landlord from Tenant under the terms of this Lease; providing, however, any such consideration paid to Tenant for goodwill, leasehold improvements, inventory, personal property or other payments related solely to the value of Tenant's business in connection with such assignment and/or subletting or in finding and leasing to such assignment and/or sublessee shall belong to Tenant.  If Tenant assigns this Lease or sublets the Premises and Tenant's assignee or subtenant or any subsequent assignee or subtenant has, at the time of the assignment or subletting, or attains at any time after the assignment or

subletting, a net worth of at least $80 Million, then Tenant shall be released and discharged from any further liability under this Lease at the time such assignee or subtenant reaches the net worth of at least $80 Million. Such net worth shall be determined as of the end of the most recent fiscal year preceding the intended release unless more current figures are available.

## SECTION 24.  REPAIR AFTER CASUALTY

(a)     In the event of damage to or destruction of the Shopping Center or any portion thereof (including the Premises) by casualty or any other cause whatsoever, then, except as otherwise provided in this Section, Landlord will diligently pursue to completion the restoration and repair promptly after the event of damage or destruction. Landlord is obligated to repair the Premises only to their condition on the Delivery Date (subject to alterations thereof required by changes in governmental code). Any repair and restoration of the Premises by Landlord must be completed as quickly as possible using commercially reasonable efforts. As soon as reasonably possible after an event of damage or destruction, Landlord must deliver to Tenant notice of the anticipated period of restoration.

(b)     In the event of any damage or destruction to the Premises, then all Rent will abate pro-rata using the same ratio that the portion of the Premises rendered unusable (in Landlord's and Tenant's reasonable judgment) bears to the Gross Leasable Area of the Premises.

(c)     Notwithstanding Section 24(a), Landlord may terminate this Lease and has no restoration and repair responsibility in the event of damage to or destruction of the Shopping Center if (i) the cost of repair or restoration exceeds 50% of the replacement value of the Shopping Center, so that the Shopping Center cannot in the reasonable judgment of Landlord be operated as an integral unit or if Landlord elects not to restore the Shopping Center; or (ii) the Shopping Center is damaged as a result of a risk which is not insurable under the insurance coverage required of Landlord hereunder; or (iii) the reasonable period for substantial completion of the repair and restoration exceeds twelve months; or (iv) the holder of any mortgage, deed of trust or other lien requires the use of all or any part of Landlord's insurance proceeds in satisfaction of all or a part of this indebtedness secured by any such mortgage, deed of trust or other lien. As a condition to Landlord's termination of this Lease under this subsection that the leases of all other occupants in the building containing the Premises at the Shopping Center must also have been terminated by reason of the event of damage and destruction.

(d)     If the Premises are damaged or destroyed and Landlord has not completed the restoration and repair thereof within 270 days, then Tenant has the right, without waiving any other right or remedy against Landlord, to terminate this Lease by giving written of such termination to Landlord no later than 30 days after the end of such 270-day restoration period.

(e)     In addition to all rights to terminate this Lease granted to the parties in this Section, if 25% or more of the Premises are destroyed or damaged during the last year of the Term, then each of Landlord and Tenant has the right to terminate this Lease as of the date of such damage or destruction by giving written notice thereof within 30 days after the date of the

damage or destruction. If Tenant, within 30 days after receipt of Landlord's written notice of termination, gives Landlord written notice of its intention to extend this Lease for any additional Extended Term then available to Tenant, then the notice of Landlord to terminate this Lease will be of no force and effect. If Tenant elects to extend this Lease for any additional Extended Terms then available to Tenant by notice to Landlord within 30 days after the date of the damage or destruction, Landlord must use commercially reasonable efforts to restore the Premises to its former condition with all reasonable speed, and all Rent will abate pro-rata as set forth in subsection (b).

(f)     If this Lease is terminated pursuant to this section, Landlord must refund within 30 days of notice any Rent paid in advance.

(g)     Intentionally Deleted.

(h)     If Landlord elects, or is required by this Section 24, to repair the Premises or the Shopping Center, then Landlord must notify Tenant in writing when the repairs are completed. The repairs will be not be deemed completed unless and until the repairs are actually completed in accordance with the terms of this Lease and Tenant has thereafter received written notice of such completion. Once Landlord's restoration work is completed, Tenant agrees to pursue to completion of Tenant's restoration obligations in the Premises.

(i)     If the Lease is not terminated under the terms of this Section 24, then Rent will cease abating and become due and payable on the earlier to occur of the date (i) 90 days after the date that Landlord completes its restoration of the Premises as required hereunder, and (ii) Tenant has rebuilt, refixtured and restocked the Premises.

## SECTION 25.  CONDEMNATION

(a)     If 50% or more of the Gross Leasable Area of the Premises or 50% or more of the Tenant's Protected Area is taken by condemnation or right of eminent domain or conveyed in lieu thereof or taken in any other manner for a period of three (3) months or longer (a "Taking"), this Lease will terminate at the option of either party as of the day possession is taken by or title vests in the taking authority, and both parties will be released from any further liability hereunder.

(b)     In the event of a Taking of less than 50%, but more than 15%, of the Gross Leasable Area of the Premises, then Tenant has the right to terminate this Lease and any further liability hereunder if, in the reasonable determination of both Tenant and Landlord, the Premises cannot be economically operated for the intended purposes of this Lease. Any such termination will be effective as of the day possession is taken by, or title to the portion taken vests in, the taking authority.

(c)     In the event of a Taking of less than 50%, but more than 15%, of the Gross Leasable Area of the Shopping Center (including the Common Areas), then Landlord has the right to terminate this Lease and any further liability hereunder if, in Landlord's reasonable

determination, the Shopping Center cannot be economically operated for, or are unsuitable for, their intended purposes. Any such termination is effective as of the day possession is taken by, or title to the portion taken vests in, the taking authority.

(d)     In the event of a Taking of any portion of the Premises or the Shopping Center, upon which this Lease is not terminated, Landlord and Tenant must restore the remainder of the Premises or the Shopping Center (including the Common Areas), as applicable, with reasonable speed to a complete architectural unit as nearly like its condition prior to such partial Taking as shall be practicable and, if during or after the work of restoration by Landlord, Tenant is deprived of all or a part of the use of the Premises, the Rent will abate for so long as Tenant is deprived of such use and until Tenant has rebuilt, refixtured and restocked the Premises, as necessary, in the same proportion as that portion of the Premises taken bears to the entire Premises.

(e)     All damages awarded in connection with the Taking of the Premises, whether allowed as compensation for diminution in value to the leasehold or to the fee of the Premises, belong to the Landlord; but, Tenant shall be entitled to claim, prove and receive in the condemnation proceeding such award or compensation as may be allowed for its trade fixtures and for loss of business, good will, depreciation or injury to and cost of removal of stock in trade, but only in a separate action.

## SECTION 26.  REPRESENTATIONS AND COVENANTS OF LANDLORD

(a)     On the date hereof and hereafter during the Term (as applicable), Landlord represents, warrants and covenants to Tenant as follows:

(1)     The Shopping Center Site is zoned to permit the use of the Shopping Center for general retail purposes and, to Landlord's actual knowledge, the Premises are zoned to permit their use as a retail store conducting the Permitted Use, as of right (i.e., without any special permit, approval, variance or other waiver);

(2)     The legal description set forth on Exhibit A matches the Shopping Center depicted on the Site Plan (i.e., Exhibit B) and includes no additional property therein;

(3)     To Landlord's actual knowledge, the Common Areas and all structural portions of the Shopping Center comply with all Laws;

(4)     Landlord will provide surface parking spaces in the Common Areas on an unreserved basis and without cost, in the amount required by Laws;

(5)     No building, edifice or obstruction will be placed on the Shopping Center Site and no addition or alteration will be made to the Shopping Center (A) that materially and adversely diminishes the accessibility of the Premises

Price Plaza, Katy, TX
EXECUTION VERSION: February 8, 2011

to and from the parking areas within the Common Areas and the other stores in the Shopping Center; (B) that materially and adversely diminishes the visibility of the front of the Premises (including, without limitation, the signage thereon) from public highways and parking areas; (C) that materially and adversely diminishes the access to or the utility of the service areas serving the Premises; (D) that has the effect of increasing the monetary obligations of Tenant under this Lease; or (E) that otherwise materially and adversely affects the conduct of business from the Premises or the rights of Tenant under this Lease. Without limiting the generality of the foregoing, in no event will any improvement or alteration (including a reduction in size of the Protected Area through any means (except through an eminent domain proceeding), including, for example, a reduction in the Shopping Center or Shopping Center Site, or a change in the parking layout or configuration or traffic patterns of vehicles or pedestrians) be made to the "Protected Area" as shown on the Site Plan without Tenant's prior written consent (which consent will not be unreasonably withheld, delayed or conditioned);

(6)     The Site Plan correctly and completely shows all improvements on the Shopping Center Site;

(7)     Intentionally Deleted;

(8)     Landlord will maintain, operate and manage the Shopping Center as a first-class retail project in compliance with all Laws, and the Shopping Center will be used and occupied only for normal retail uses and other uses customarily conducted in first-class shopping centers.

(9)     In no event will the Shopping Center or any portion thereof be used as or for any of the Prohibited Uses listed on Exhibit F.

(10)    Landlord owns fee simple title to the Shopping Center and, to the best of its knowledge, it is free and clear of all liens and encumbrances except for the lien of the existing mortgage in favor of Wachovia (a Wells Fargo company). To Landlord's actual knowledge, there is no encumbrance that would prohibit or materially adversely affect Tenant's proposed use of the Property as contemplated by this Lease;

(11)    To Landlord's actual knowledge, at the time of the Delivery Date, there are no planned or contemplated increases in taxes and assessments, either general and specific, whether ad valorem, specific or otherwise, with respect to the Shopping Center; and,

(12)   To Landlord's actual knowledge based on its most recent environmental report for the Shopping Center Site, the Premises are free of Hazardous Material.

(b)   The foregoing representations, warranties and covenants in Section 26(a) of this Lease are material considerations and inducements to Tenant in executing this Lease, the breach of which will cause irreparable and severe harm to Tenant. And, (i) if Landlord breaches any representation, warranty or covenant contained in subsections (4),(5), or (9), and such breach continues for 30 days after written notice of such breach is received by Landlord (but Landlord will not be deemed to be in breach if Landlord promptly commences to remedy the default within said 30 day period and proceeds to cure with due diligence thereafter), Tenant has the right (A) to terminate this Lease upon written notice to Landlord delivered at any time thereafter but prior to cure; or (B) to pay Substitute Rent during the period of such breach; and (ii) if Landlord breaches any other representation, warranty or covenant contained in Section 26(a) of this Lease, and such breach continues for 90 days after written notice of such breach is delivered to Landlord (but Landlord will not be deemed to be in breach if Landlord promptly commences to remedy the default within such 90 day period and proceeds to cure with due diligence thereafter), then Landlord shall be deemed in default under the terms of the Lease and Tenant shall have the rights and remedies provided under Section 29 of the Lease on account of such default (including the right to sue for actual damages).

## SECTION 27.   TENANT'S DEFAULT

(a)   Landlord may, by written notice to Tenant, terminate this Lease, or without terminating this Lease re-enter the Premises by summary proceedings, and may dispossess the Tenant if:

(1)   Tenant fails to pay Rent on or before the due date and then fails to pay same within 10 days after receipt of written notice from Landlord;

(2)   Tenant is in material default in the performance of any of the covenants, terms, conditions and provisions of this Lease, and Tenant fails to remedy such default within 30 days after receipt of written notice thereof (but Tenant will not be deemed to be in default if Tenant commences to remedy the default within the 30-day period and proceeds to cure with due diligence, which extended cure period shall not exceed 120 days);

(3)   Tenant is adjudged bankrupt or makes an assignment for the benefit of creditors, or if a receiver of any property of Tenant in, upon or about the Premises is appointed in any action, suit or proceeding by or against Tenant and is not removed within 90 days (unless such 90-day period is extended by court order, in which event the time period will be as established by court order or established by such person(s) or entity acting under or for the court) after appointment; or

(4)    The interest of Tenant in the Premises is offered for sale or sold under execution or other legal process, and if not rescinded within 90 days after written notice from Landlord to Tenant.

Landlord agrees to use commercially reasonable efforts to mitigate its damages. As used herein, Landlord's obligation to "mitigate" shall be deemed satisfied if Landlord does such things as it would typically do to lease vacant space; provided, however:

1.    Landlord shall have no obligation to solicit or entertain negotiations with any other prospective tenants for the Premises until Landlord obtains full and complete possession of the Premises including, without limitation, the final and unappealable legal right to re-let the Premises free of any claim of Tenant.

2.    Landlord shall not be obligated to offer the Premises to any prospective tenant when other premises in the Shopping Center suitable for that prospective tenant's use are currently available, or will be available within the next six months.

3.    Landlord shall not be obligated to lease the Premises to a substitute tenant for a rental less than the current fair market rental then prevailing for similar retail space in comparable shopping centers in the same market area as the Shopping Center.

4.    Landlord shall not be obligated to enter into a new lease under terms and conditions that are unacceptable to Landlord under Landlord's then current leasing policies for comparable space in the Shopping Center.

5.    Landlord shall not be obligated to enter into a lease with any proposed substitute tenant that does not have, in Landlord's reasonable opinion, sufficient financial resources or operating experience to operate the Premises in a first-class manner.

6.    Landlord shall not be required to expend any amount of money to alter, remodel, or otherwise make the Premises suitable for use by a substitute tenant unless:

(A)    Tenant pays any such sum to Landlord in advance of Landlord's execution of a lease with such substitute tenant (which payment shall not be in lieu of any damages or other sums to which Landlord may be entitled to as a result of Tenant's default under this Lease); or

(B)    Landlord, in Landlord's sole discretion, determines that any such expenditure is financially justified.

7.    Landlord shall not be obligated to enter into a lease with any substitute tenant whose use would:

(A)    Disrupt the tenant mix or balance of the Shopping Center in Landlord's reasonable determination;

(B)     Violate any restriction, covenant, or requirement contained in the lease of another tenant of the Shopping Center;

(C)     Adversely affect the reputation of the Shopping Center in Landlord's reasonable opinion; or

(D)     Be incompatible with the operation of the Shopping Center as a first-class shopping center.

Upon compliance with the above criteria regarding the re-letting of the Premises after a default by Tenant, Landlord shall be deemed to have fully satisfied Landlord's obligation to mitigate damages under this Lease and under any law or judicial ruling in effect on the date of this Lease or at the time of Tenant's default; and Tenant waives, to the fullest extent legally permissible, any right to assert in any action by Landlord to enforce the terms of this Lease, any defense, counterclaim, or rights of setoff or recoupment respecting the mitigation of damages by Landlord, unless and to the extent Landlord maliciously or in bad faith fails to act in accordance with the requirements of this clause.

In the event of re-entry Landlord must use commercially reasonable efforts to relet the Premises and, in the event of a reletting, must apply the rent therefrom first to the payment of Landlord's reasonable expenses incurred and paid by reason of Tenant's default, next to the reasonable expense of reletting, including, but not limited to, reasonably necessary repairs to the Premises, and then to the payment of rent and all other sums due from Tenant, with Tenant remaining liable for any deficiency. Any and all deficiencies shall be payable by Tenant monthly on the date provided for the payment of Fixed Minimum Rent.

(b)     In the event of a default by either party of any of the terms, provisions, covenants or conditions of this Lease, the other party has the right to invoke any remedy provided at law or in equity. Notwithstanding anything contained herein, in no event is Landlord entitled to exercise self help to lock out Tenant or forcibly retake possession of the Premises without due legal process and an appropriate court order. All remedies are cumulative and concurrent.

## SECTION 28. RIGHTS OF LANDLORD

(a)     Landlord reserves the right at all reasonable times during Tenant's business hours and upon prior reasonable notice to Tenant (except in the event of emergency, when notice is not required) by itself or its duly authorized agents, to  inspect the Premises and, to make such repairs as Landlord is obligated to make to the Premises.  In exercising the foregoing right, Landlord must not interrupt or disrupt Tenant's business or unreasonably disrupt access to the Premises by Tenant, Tenant's employees, agents, invitees and customers.

(b)     If Landlord makes any payments on behalf of Tenant, which are Tenant's obligation, to fulfill Tenant's covenants, then any amount so paid by Landlord are declared to be "Additional Rent" and are due and payable to Landlord from Tenant with the next installment of Fixed Minimum Rent due thereafter, together with interest thereon at the Default Rate from the

date of such advance to the repayment thereof in full.

(c)     Landlord has the right during the last six months before the expiration of this Lease, so long as it does not unreasonably interfere with Tenant's business, to exhibit the Premises and during the last two months of the Term to put up the usual notice "for rent" or "for sale", which notice will not be removed or hidden by Tenant.  No more than one sign will be placed upon the Premises and the sign cannot exceed 12 feet square.

## SECTION 29.  LANDLORD'S DEFAULT

(a)     If Landlord fails to keep and perform any covenant or agreement to be kept and performed by Landlord, then Tenant, in addition to all other remedies now or hereafter afforded or provided by this Lease, at law or in equity, has the right to perform such covenant or agreement for or on behalf of Landlord or make good any such default (except for any alteration or repair to the structural elements of the Shopping Center, including the roof(s)), and any amount or amounts that the Tenant advances on Landlord's behalf must be repaid by Landlord to Tenant on demand, together with interest thereon at the Default Rate from the date of such advance to the repayment thereof in full.

(b)     Except in the event of emergency, before performing any covenant or agreement on behalf of Landlord, Tenant will provide Landlord with written notice of Landlord's default and Tenant's intent to perform such covenant or agreement, and Landlord will have 30 days within which to complete performance of the same (and Landlord will not be deemed to be in default if Landlord commences to remedy the default within the 30-day period and proceeds to cure with due diligence). For purposes hereof, "emergency" means (i) any event which poses immediate threat of injury or damage to persons or property or (ii) any event which, in Tenant's judgment, threatens Tenant's ability to open for business as scheduled or unreasonably impairs or interferes with Tenant's business operations.

(c)     If Landlord fails to pay any sum to Tenant when due, and if such failure continues for 30 days after receipt of notice from Tenant, Tenant has the right, without forfeiture of its other rights hereunder, at its election, to setoff and deduct the same, together with interest thereon at the Default Rate, from Fixed Minimum Rent at a rate not to exceed 50% of the monthly installation of Fixed Minimum Rent due per month until Tenant is reimbursed in full. Notwithstanding the foregoing, Tenant's rights of offset under Section 10 hereof will be governed by Section 10.

## SECTION 30. MORTGAGE SUBORDINATION

(a)     Landlord must obtain and deliver to Tenant a non-disturbance and attornment agreement, substantially in a form reasonably acceptable to Tenant and the holder of any existing mortgage or lien or ground lessor (the "SNDA"), signed only by any existing ground lessor, mortgagee or lien holder (and Landlord if a party thereto) on or prior to the Rent Commencement Date.

(b)     Landlord reserves the right to request from Tenant a waiver of priority of Tenant's leasehold estate hereunder for the purpose of subordinating Tenant's leasehold estate in favor of a first mortgage lien or any refinancing or replacement of a first mortgage loan that Landlord may hereafter deem necessary or desirable.  Tenant, upon such request by Landlord, will execute and deliver an agreement in a form reasonably acceptable to Tenant and the holder of such mortgage lien. The word "mortgage" means (y) any lease of land only or of land and buildings in a sale-lease-back transaction involving all or any part of the Shopping Center, or (z) any mortgage, deed of trust or other similar security instruments constituting a lien upon all or any part of the Shopping Center, whether the same shall be in existence as of the date hereof or created hereafter, and any modifications, extensions, renewals and replacements thereof. "Mortgagee" means a party having the benefit of a mortgage, whether as lessor, Mortgagee, trustee or note-holder.

(c)     After a change in ownership of all or any portion of the Shopping Center that requires a change in the Rent payee, or assignment of this Lease by Landlord that requires a change in the Rent payee, Tenant shall have no obligation to pay Rent to the new payee until Tenant receives written notice from Landlord confirming the name and address of the new payee.

(d)     If Tenant receives a written notice from any party claiming a collateral interest in this Lease or in the Rent and, by reason thereof, a present entitlement to collect the Rent, Tenant has the right to pay Rent to such party, which payment will satisfy any and all liabilities of Tenant to Landlord with respect to such payment, without obligation on Tenant to make further inquiry but subject to such party's providing to Tenant a copy of the instrument pursuant to which such party claims entitlement and to such claim being plausible on the face of such instrument.

## SECTION 31. NO WAIVER

No waiver by either party of any of the terms, covenants, provisions or conditions in this Lease, and no waiver of any legal or equitable relief or remedy, will be implied by the failure of either party to assert any rights, or to declare any forfeiture, or for any other reason.  No waiver of any of the terms, provisions, covenants, rules and regulations herein will be valid unless it is in writing signed by both parties. No waiver by either party, or forgiveness of performance by either party in respect to one or more tenants of the Shopping Center, will constitute a waiver or forgiveness of performance in favor of Tenant, Landlord or any other tenant.  The waiver or the forgiveness of performance of any one or more of the terms, provisions, conditions, rules and regulations of this Lease will not be claimed or pleaded by Tenant or Landlord to excuse a subsequent failure of performance of any of the terms, provisions, conditions, covenants, rules and regulations of this Lease.

## SECTION 32.  SURRENDER OF PREMISES

(a)     Tenant must deliver up and surrender to Landlord possession of the Premises, including all improvements permanently attached to the Premises during the Term, upon the

expiration of this Lease, or its termination in any way, in as good condition and repair as the same are in on the Commencement Date (excepting damage by fire or other casualty which could be covered by a standard "All-Risk Coverage" or "special form" insurance policy, ordinary wear and tear, and decay, neglect, fault or default of Landlord and taking by eminent domain or conveyance in lieu thereof). Upon the expiration or earlier termination of this Lease, Tenant will deliver the keys at the office of Landlord or Landlord's agent.

(b)      Tenant has the right, while the Lease remains in effect, to place a banner sign at the front of the Premises, in a place visible to Tenant's customers, directing Tenant's customer's to another store of Tenant or providing Tenant's customers with information and a telephone number. If the Lease has terminated or expired, then Landlord must leave the sign at the front of the Premises until the earlier to occur of (1) 30 days after Tenant vacates the Premises; or (2) a new tenant opens for business in that location.

## SECTION 33.    SHORT FORM LEASE, COMMENCEMENT DATE AGREEMENT

(a)      Neither party may record this Lease, but if either party requests that a Short Form Lease or a Memorandum of Lease be recorded, then the other party must execute such Agreement, which Agreement will contain the information set forth below and contain a self executing release clause, and be in a form reasonably acceptable to both Landlord and Tenant. The Short Form Lease or Memorandum of Lease will describe the Premises and the rights herein demised, the Term, and the extension rights (if any), any exclusive granted to Tenant and other provisions hereof reasonably requested by Tenant. The failure to record the Short Form Lease or Memorandum of Lease will not affect or impair the validity and effectiveness of this Lease, and this Lease will control in the event of any inconsistency between the two. The party requesting that the Short Form Lease or Memorandum of Lease be recorded must prepare and pay all costs of recording the Short Form Lease or Memorandum of Lease, and the other party must execute at any and all times such Short Form Lease or Memorandum of Lease and any other instruments as may be required for such recording.

(b)      At the time that the Commencement Date is established, the parties will promptly enter into a Commencement Date Agreement, setting forth the actual commencement and expiration of the Initial Term and any extensions thereof, any applicable kickout dates, the then current Gross Leasable Area of the Premises and the corresponding Rent, which Commencement Date Agreement shall not be recorded by either party.

## SECTION 34.    NOTICE

Any notices, statements, acknowledgments and consents required to be given by or on behalf of either party to the other must be in writing and must be given by Certified U.S. Mail, or by private courier service requiring a signed acknowledgment of delivery (such as Federal Express) addressed as follows:

Price Plaza, Katy, TX
EXECUTION VERSION: February 8, 2011

if to the Landlord at:           SCI Price Plaza Fund, LLC
c/o Fameco Management Services
633 West Germantown Pike, Suite 200
Plymouth Meeting, PA 19462
Attn: Lawrence R. Zipf, President

with required copies to:
SCI Price Plaza Fund, LLC
c/o CB Richard Ellis | Asset Services
2800 Post Oak Blvd., Suite 2300
Houston, TX  77056
Attn: Property Manger

And to:
Holland & Knight LLP
515 East Las Olas Boulevard, Suite 1200
Ft. Lauderdale, Florida 33301
Attn:  Irwin J. Fayne, Esq.

if to the Tenant at:           Jo-Ann Stores, Inc.
5555 Darrow Road
Hudson, Ohio 44236
Attn:  Senior Vice President, Real Estate

with a copy to:

Jo-Ann Stores, Inc.
5555 Darrow Road
Hudson, Ohio 44236
Attn:  Senior Legal Counsel

or at such other address of Landlord or, Tenant as may be specified by such a notice.  Any notice sent by certified mail is deemed to have been served three days after deposit thereof with the U.S. Postal Service. Any notice sent by courier service is deemed to have been served as of the next business day (excluding Saturdays, Sundays, and any federal government holidays). Notwithstanding the foregoing, the time period in which a response to any such notice must be given, or in which an action must be commenced or be taken, will commence to run on the date of receipt by the addressee thereof as shown on the return receipt or acknowledgment of delivery for such notice.  Rejection or other refusal to accept, or the inability to deliver because of changed address of which no notice was given, will be deemed to be receipt of notice as of the date of such rejection, refusal or inability to deliver.  Notwithstanding anything to the contrary, Tenant may give facsimile notice of the need of emergency repairs, followed promptly by notice as required above.

Price Plaza, Katy, TX
EXECUTION VERSION: February 8, 2011

## SECTION 35.  HAZARDOUS MATERIALS

(a)     Tenant must not cause or permit the escape, disposal or release of any Hazardous Material (as hereafter defined) in violation of Law.  Tenant must not allow the storage or use of Hazardous Material in any manner not sanctioned by Law, nor allow to be brought into the Shopping Center any Hazardous Material except to use in the ordinary course of Tenant's business. Tenant must defend, indemnify and hold Landlord harmless from and against any and all claims, losses, liabilities, damages, penalties, fines and expenses (including, without limitation, cleanup and other remedial and restoration costs, fees for consultants and experts and reasonable attorneys' fees and other costs of litigation arising by reason of any of the aforesaid or any action against Tenant under this indemnity) arising directly or indirectly from, out of or by reason of the release of Hazardous Materials in the Shopping Center occurring during the Term caused by Tenant or Tenant's contractors, agents or employees or persons acting under Tenant. It is a condition to indemnification that Tenant receive notice of any claim by Landlord promptly after Landlord first has knowledge thereof. This indemnity survives the expiration or earlier termination of the Term.

(b)     Landlord must not cause or permit any Hazardous Material to exist in the Premises. In addition, Landlord must not cause or permit any Hazardous Material to be sold, used, stored, brought upon or disposed of (collectively a "Use") in, on, under or about the Shopping Center (including the Premises, before the Delivery Date) without in each case: (i) obtaining all necessary permits required in connection therewith; and (ii) complying with all permit requirements; and (iii) otherwise taking all appropriate steps and making adequate arrangements to assure that such Use is in the ordinary course of business in the operation of the Shopping Center. Such Use must be performed safely and without contamination of the Shopping Center and the Shopping Center Site or any portion thereof and fully in compliance with all applicable Laws. Landlord must defend, indemnify and hold Tenant harmless from and against any and all claims, losses, liabilities, damages, penalties, fines and expenses (including, without limitation, cleanup and other remedial and restoration costs, fees for consultants and experts and reasonable attorneys' fees and other costs of litigation arising by reason of any of the aforesaid or any action against Landlord under this indemnity) arising directly or indirectly from, out of or by reason of the release of Hazardous Materials in the Shopping Center occurring during the Term caused by Landlord or Landlord's contractors, agents or employees or persons acting under Landlord. It is a condition of this indemnification that Landlord receive notice of any such claim by Tenant promptly after Tenant first has knowledge thereof.  This indemnity survives the expiration or early termination of this Lease.

(c)     If either party receives any written notice of Hazardous Discharge or Environmental Complaint that specifically identifies the Premises or the Common Areas or describes a condition that materially impairs or could materially impair the occupancy, use and enjoyment of the Premises, then the receiving party must give immediate oral and written notice of same to the other party detailing all relevant facts and circumstances within the knowledge of the receiving party.

(d)     If Tenant's use, occupancy and enjoyment ("Occupancy") of the Premises is materially and adversely interfered with by reason of this existence or remediation of any Hazardous Material located on, in or under the Shopping Center or on the Shopping Center Site (except for any Hazardous Material used by Tenant), then (i) throughout such period of interference, a fair and just proportion of the Rent and other charges payable (taking into account the nature of the interference to Tenant's Occupancy), will be abated, and (ii) if Tenant's occupancy is substantially impaired for three months or more, then Tenant has the right to terminate this Lease by giving written notice to the other of its election to do so, given (if at all) within 10 days after the end of such 3-month period, whereupon this Lease will automatically terminate and end effective as of the date of such notice and neither party will have any further obligations hereunder. Landlord may nullify Tenant's notice of termination if Landlord is diligently corrects the Hazardous Material interference and completes the job in accordance with all applicable governmental laws, codes, regulations and requirements within three months after the date of Tenant's termination notice. The abatement provided in clause (i) of this subsection will continue throughout the period of such correction by Landlord.

(e)     "Hazardous Material" means (i) any waste, pollutant, material, substance or contaminant which is or becomes listed, defined, or classified as having properties harmful to health, safety, or indoor or outdoor environment; and (ii) any substance or material that is or becomes regulated by any Public Entity by reason of the hazardous or toxic qualities of such substance or material; and (iii) any other toxic or hazardous substance, regardless of whether the same is regulated, including, without limitation, so-called "black mold," any mycotoxin, and any other mold capable of producing a toxic or allergic reaction in humans (including, without limitation, Stachybotrys, S. atra, S. chartarum, Aspergillus, Fusarium, Coccidioides). Without limiting the generality of the forgoing, Hazardous Material includes oil, petroleum, petroleum-fraction or petroleum-derived substance; urea formaldehyde foam insulation; asbestos and asbestos-containing materials; and any electrical equipment that contains any oil or dye-electric fluid containing polychlorinated biphenyls.

(f)     "Hazardous Discharge" means the presence, use, release, dispersal, emission, spill, discharge or cleanup of any Hazardous Material (i) on or about or emanating from the Shopping Center or the Shopping Center Site, or (ii) arising out of the use and occupancy of or operations within the Shopping Center, or (iii) caused by Landlord or other occupant of the Shopping Center or the employees, contractors, invitees or agents thereof.

(g)     "Environmental Complaint" means any complaint, investigation, order, citation, or action with regard to any Hazardous Discharge, air emissions, water discharges, noise emissions or any other environmental, health or safety matter pertaining to or emanating from the Shopping Center from any Public Entity.

## SECTION 36.  LIMITATION OF LANDLORD'S LIABILITY

(a)     If Landlord fails to perform any covenant, term or condition on Landlord's part to be performed, and as a consequence of such default Tenant recovers a money judgment against Landlord, such judgment will be satisfied only out of (i) the proceeds of sale received

upon execution of such judgment and levy thereon against the right, title and interest of Landlord in the Shopping Center, (ii) the rents and other income from such property receivable by Landlord, and (iii) the consideration received by Landlord for the sale or other disposition of all or any part of Landlord's right, title and interest in the Shopping Center, which consideration is deemed to include any assets at any time after such sale or disposition held by Landlord having a value not exceeding that of the proceeds of such sale or other disposition, and Landlord shall not be liable for any deficiency.

(b)    This Section will not be deemed to deny to Tenant, or limit its right to obtain, injunctive relief or specific performance of Landlord's covenants under this Lease or to avail itself of any other right or remedy (not involving a personal liability of Landlord in excess of the limits of personal liability fixed by this Section) which may be accorded Tenant by Law or under this Lease by reason of Landlord's failure to perform its obligations thereunder including, but not limited to, the rights and remedies granted Tenant under Section 29.

## SECTION 37.  DELIVERY OF SITE PLAN

Within 30 days after Tenant's written request therefor, Landlord must provide Tenant with a copy of the most current available site plan of the Shopping Center, which must reflect: (a) the Gross Leasable Area of the Shopping Center as actually then-existing; (b) the names and location and the Gross Leasable Area of the premises occupied by the respective tenants thereof; and (c) those premises in the Shopping Center, if any, which are not then currently occupied and open for business.

## SECTION 38.  INTENTIONALLY OMITTED

## SECTION 39.  ENTIRE AGREEMENT; WRITING REQUIRED

This Lease contains all of the agreements of the parties with respect to any matter covered or mentioned in this Lease, and no prior agreement, understanding or representation pertaining to any such matter will be effective for any purpose. No provision of this Lease may be changed, deleted, modified or amended, except by an agreement in writing signed by the parties.

## SECTION 40.  OPERATING COVENANT

(a)    Notwithstanding anything contained in this Lease, expressly or impliedly, to the contrary, and notwithstanding the agreement for the payment by Tenant of Rent (including Substitute Rent or other percentage rent), Tenant is under no duty or obligation, either express or implied, to open, or thereafter to continuously conduct, its business in the Premises at any time during the Term. Further, Tenant's failure to open for business in the Premises will not in any way be deemed an event of default under this Lease, nor will such a failure otherwise entitle Landlord to begin or to maintain any action, suit, or proceeding, whether in law or in equity, relating in any way to Tenant's failure to open or thereafter to continuously conduct its business in the Premises. Notwithstanding the foregoing, when Tenant is open for business in the

Premises its minimum hours of operation shall be 10:00 A.M. to 6:00 PM, Monday - Saturday.

(b)     Notwithstanding the foregoing, if Tenant ceases to operate its business from the Premises for 90 consecutive days, while continuing to pay Rent due hereunder, for reasons other than an assignment or subletting, damage and destruction, remodeling (with any such remodeling not to exceed a period of 60 days), eminent domain, Unavoidable Delays, or such other right as provided for under this Lease, then Landlord has the right to terminate the Lease upon 90 days prior written notice. If Landlord terminates the Lease, it must do so by written notice to Tenant. Tenant will have the right, within 30 days of receipt of Landlord's termination notice, to advise Landlord that Tenant will reopen for business from the Premises. If Tenant elects to reopen for business by such notice to Landlord, then it must continue to pay Rent due hereunder and open within 60 days of its notice to Landlord; otherwise, Tenant's notice will be null and void.

## SECTION 41.  APPLICABLE LAW AND CONSTRUCTION

The laws of the state within which the Premises are located govern the validity, performance and enforcement of this Lease without regard to its conflicts of law principles. If one or more of the provisions of this Lease is held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability will not affect or impair any other provision of this Lease, and this Lease will be construed as if such invalid, illegal or unenforceable provision had not been contained herein. The submission of this document for examination does not constitute an offer to lease, or a reservation of or option for the Premises, and this Lease becomes effective only upon execution and delivery thereof by both Landlord and Tenant. This Lease has been negotiated by Landlord and Tenant and will not be deemed to have been prepared by either Landlord or Tenant, but by both equally. All prior negotiations, considerations, representations and understandings between the parties are and shall be deemed to be incorporated and merged into this Lease and shall not be construed as having survived the execution hereof so that only the provisions of this Lease shall govern the respective rights and obligations of the parties hereto to the same effect as if all such negotiations, considerations, representations and understandings shall have never been made or given by either party to the other party hereto.

## SECTION 42.  UNAVOIDABLE DELAYS

Except as otherwise expressly provided herein, if either party is delayed or hindered in or prevented from the performance of any obligation required hereunder by Unavoidable Delay, the time for performance of such obligation shall be extended for the period of the delay, provided that Unavoidable Delay will not excuse prompt and timely payments, including Rent, when due under this Lease except when (A) the Commencement Date is delayed by reason of Unavoidable Delay; or (B) such payment is excused pursuant to other provisions of this Lease. However, no delay will be excused by this section unless (1) the delayed party notifies the other party in writing of the delay within 21 days of the event giving rise to such delay; (2) the delayed party has exhausted all other resources available at reasonable costs to avoid such delay; and (3) the delayed party diligently pursues completion of the activity that was delayed. Notwithstanding anything to the contrary in this Lease, under no circumstances will

Unavoidable Delay extend the time for performance of any obligation by more than 90 days.

## SECTION 43.  REASONABLE CONSENT

Wherever either party's consent or approval is required, such consent or approval must not be unreasonably or arbitrarily withheld or delayed, unless otherwise expressly stated.

## SECTION 44.  NO PARTNERSHIP

Landlord and Tenant acknowledge that neither of them in any way or for any purpose becomes a partner or an associate of the other in the conduct of Tenant's business, the operation of the Shopping Center or otherwise, or a joint venture, or a member of a joint enterprise with the other.  Neither party is liable for payment of the debts or performance of any obligation of the other. The relationship is and shall be that of Landlord and Tenant.

## SECTION 45.  ESTOPPEL

Within 30 days after request, Tenant will execute and deliver to Landlord a Tenant Estoppel Certificate substantially in the form of Exhibit H. Within 30 days after request, Landlord will execute and deliver to Tenant a written instrument certifying that this Lease is unmodified and in full force and effect, or if there has been any modification, that this Lease is in full force and effect as modified and stating all such modifications; specifying the dates to which Rent has been paid; stating whether there exists any default in the performance by either party under any provision of this Lease; and certifying as to such other matters regarding the status of the Lease as Tenant reasonably may request. With regard to any estoppel certificates related to this Lease, the Lease will take precedence over the contents of such estoppel certificates, should a conflict arise.

## SECTION 46.  QUIET ENJOYMENT

Landlord represents and warrants to Tenant that Landlord is well seized of fee simple title to the Premises and the Shopping Center and has full power and authority to execute and deliver this Lease. Landlord covenants to Tenant that Tenant shall at all times have peaceable and quiet enjoyment and possession of the Premises and of the rights granted hereunder without any manner of hindrance from Landlord or any other person or persons claiming by or through Landlord, if Tenant performs all the covenants and agreements to be performed on Tenant's part. If a violation of this the section occurs, in addition to any other remedies available to Tenant, Tenant shall have the right to pay Substitute Rent commencing on the first date of the violation and continuing until such violation is cured.

## SECTION 47.  HOLDING OVER

If, at the expiration of the Term, Tenant continues to occupy the Premises, such holding over shall not constitute a renewal of this Lease, but Tenant shall be a tenant from month to month, at the same rent and under the same terms and conditions as in effect immediately prior

to the commencement of the month to month tenancy for the first six months and 150% of such rent thereafter, and either party may terminate the Lease during said month to month tenancy upon 90 days prior written notice to the other party; provided, however, Landlord shall not specify a Lease termination date to be during the period commencing September 1 and ending on the immediately following January 31. Landlord shall be entitled to exercise all available remedies at law and in equity in connection with Tenant's continuing holdover in the Premises beyond such termination date.

## SECTION 48.   BROKERS

Each party represents to the other party that it has not dealt with any party with regard to the Premises or this Lease, except that The Retail Connection represents Tenant in this transaction and CB Richard Ellis represents Landlord in this transaction. CB Richard Ellis will pay Tenant's broker pursuant to a separate agreement; and it is agreed that if Tenant's broker is not timely paid as set forth in that separate agreement, Tenant shall have the right to pay Tenant's broker for fees due and set-off said amounts against Rent due Landlord at a rate not to exceed 50% of the monthly installation of Fixed Minimum Rent due per month until Tenant is reimbursed in full. Each party will indemnify and hold the other party harmless from and against any loss, cost, liability and expense, including reasonable attorney's fees, arising out of a breach of its representation in this section.

## SECTION 49.   INTENTIONALLY DELETED

## SECTION 50.   CLAIMS LIMITATION

All actions or claims by Landlord for Rent shall be barred three years after the end of each Lease Year or Partial Lease Year. All actions or claims by Tenant for recovery of excess payments of Rent shall be barred three years after the end of each Lease Year or Partial Lease Year, except that in the case of any component of Additional Rent, the same will not be barred until three years after Tenant's receipt of Landlord's annual reconciliation statement furnished with respect to that Lease Year or Partial Lease Year. The forgoing limitations shall not apply in the event of fraud or willful mis-statement of the amounts so stated.

Notwithstanding anything herein to the contrary, Landlord and Tenant each waive the right to pursue an action against the other for consequential damages and/or lost profits relating to any matter or claim arising under, or in connection with this Lease (except in connection with Tenant holding over in the Premises pursuant to Section 47 if Landlord notifies Tenant that a new tenant will be leasing the Premises at the expiration of the term of this Lease).

## SECTION 51.   CAPTIONS

Any paragraph titles or captions contained in this Lease are for convenience only and do not define, limit or otherwise modify the scope or intent of this Lease.

## SECTION 52.  VARIATION IN PRONOUNS

All the terms and words used in this Lease, regardless of the number and gender in which they are used, will be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context or sense of this Lease or any paragraph or clause herein may require, the same as if such words had been fully and properly written the number and gender.

## SECTION 53.  SECTION REFERENCES

All references to any section number(s) refer to the Section contained in this Lease.

## SECTION 54.  BINDING EFFECT OF AGREEMENT

This Lease and all of the covenants, conditions, provisions and restrictions herein inures to the benefit of and binds the heirs, executors, administrators, devisees, legatees, personal representatives, successors and assigns, respectively, of Landlord and Tenant.

## SECTION 55.  ATTORNEY'S FEES

If Landlord or Tenant is required to enforce this Lease, then the non-prevailing party must pay to the prevailing party the prevailing party's arbitration costs (if any), court costs and reasonable attorney's fees. This provision applies to court costs and attorneys fees incurred in any trial and appellate courts.

## SECTION 56.    OFAC WARRANTY

Each party represents and warrants to the other party that the representing party (a) is not knowingly acting, directly or indirectly, for or on behalf of any person, group, entity, or nation named by any Executive Order or the U.S. Treasury Department as a terrorist, "Specially Designated National and Blocked Person," or other banned or blocked person, entity, nation, or transaction pursuant to any law, order, rule, or regulation that is enforced or administered by the Office of Foreign Assets Control, and (b) is not knowingly engaged in this lease transaction, directly or indirectly, on behalf of, or instigating or facilitating this lease transaction, directly or indirectly, on behalf of any such person, group, entity or nation. The breaching party must defend, indemnify, and hold harmless the other party from and against all claims, damages, losses, risks, liabilities, and expenses (including reasonable attorney's fees and costs) arising from or related to any breach of the forgoing representation.

[Remainder of Page Intentionally Left Blank – Signatures Continue on Next Page]

In witness whereof, the parties have signed this Lease as of the date listed above.

LANDLORD:
**SCI PRICE PLAZA FUND, LLC**

By: _____

Name: _____LAWRENCE R. ZIPF_____

Title: _____ASSET MANAGER_____

And

**SCI ENTITIES**

By: _____

Name: _____LAWRENCE R. ZIPF_____

Title:  Its Authorized Representative

Employer Identification Number: #20-3363903

TENANT:
**JO-ANN STORES, INC.**

By: _____
James Kerr, Executive Vice President and
Chief Financial Officer

And

By: _____
David B. Goldston, Senior Vice
President, General Counsel and
Secretary

STATE OF _Pennsylvania_ )
                                                    ) SS
COUNTY OF _Montgomery_ )

BEFORE ME, a Notary Public in and for said County and State, personally appeared on SCI Price Plaza Fund, LLC, by _Lawrence N. Lipf_, its _Asset Manager_ who did sign the foregoing instrument on behalf of the limited liability company and that the same is his/her free act and deed of the limited liability company and personally and as such authorized representative.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at _Plymouth_, _PA_ _Meeting_, this _16th_ day of _March_, 2011.

_Suzanne Palmer_
NOTARY PUBLIC

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Suzanne Palmer, Notary Public
Plymouth Twp., Montgomery County
My Commission Expires June 2, 2012
Member, Pennsylvania Association of Notaries

STATE OF _Pennsylvania_ )
                                                    ) SS
COUNTY OF _Montgomery_ )

BEFORE ME, a Notary Public in and for said County and State, personally appeared on SCI ENTITIES, by _Lawrence N. Lipf_, its _Asset Manager_ who did sign the foregoing instrument on behalf of the limited liability company and that the same is his/her free act and deed of the limited liability company and personally and as such authorized representative.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at _Plymouth_, _PA_ _Meeting_, this _16th_ day of _March_, 2011.

_Suzanne Palmer_
NOTARY PUBLIC

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Suzanne Palmer, Notary Public
Plymouth Twp., Montgomery County
My Commission Expires June 2, 2012
Member, Pennsylvania Association of Notaries

Price Plaza, Katy, TX
EXECUTION VERSION: February 8, 2011

STATE OF OHIO           )
                              ) SS
COUNTY OF SUMMIT    )

      BEFORE ME, a Notary Public in and for said County and State, personally appeared **JO-ANN STORES, INC.**, an Ohio corporation, by James Kerr, its executive vice president and chief financial officer, and David B. Goldston, its senior vice president, general counsel and secretary, who acknowledged that they did sign the foregoing instrument on behalf of said corporation and that the same is their free act and deed personally and as such officers.

      IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at Hudson, Ohio, this _21st_ day of February, 2011.

                                   _Bonita Marie Caesar_    NOTARY PUBLIC

BONITA **MARIE** CAESAR
Notary **Public**, State of Ohio
**My Commission** Expires
August 17, 2012

      **[Notary Page to Lease Agreement dated _February 24_ , 2011 Katy, TX]**

Price Plaza, Katy, TX
EXECUTION VERSION: February 8, 2011

## Addendum 1

## SCI ENTITIES

1.  SCULLIN REVOCABLE FAMILY TRUST dated 3/4/88, Robert F. Scullin and Cathy B. Scullin, Trustees, as sole member of SMLLC named SCI Price Plaza Fund 1 LLC, a Delaware limited liability company

2.  LIVESAY, John W., a single man, as sole member of SMLLC named SCI Price Plaza Fund 2 LLC, a Delaware limited liability company

3.  CISTONE, Dominick F. and Joan F., husband and wife as joint tenants, as sole member of SMLLC named SCI Price Plaza Fund 3 LLC, a Delaware limited liability company

4.  ROWLAND, William L. & Ruby H., husband and wife as joint tenants, as sole member of SMLLC named SCI Price Plaza Fund 4 LLC, a Delaware limited liability company

5.  MESSINA, Robert R., as sole member of SMLLC named SCI Price Plaza Fund 5 LLC, a Delaware limited liability company

6.  MESSINA, Helene P., as sole member of SMLLC named SCI Price Plaza Fund 6 LLC, a Delaware limited liability company

7.  GOMES, Robert D. and Kathleen Emma, husband and wife as community property, as sole member of SMLLC named SCI Price Plaza Fund 7 LLC, a Delaware limited liability company

8.  WOODLAND, Michael F., as sole member of SMLLC named SCI Price Plaza Fund 8 LLC, a Delaware limited liability company

9.  WEE CARE LEARNING CENTER, INC., a California Corporation, as sole member of SMLLC named SCI Price Plaza Fund 9 LLC, a Delaware limited liability company

10. FERADOROUS, Phillip & Eleni, husband and wife as joint tenants, as sole member of SMLLC named SCI Price Plaza Fund 10, LLC, a Delaware limited liability company

11. LEHMAN, Robert Wesley and Ann Elaine, husband and wife as community property, as sole member of SMLLC named SCI Price Plaza Fund 11, LLC, a Delaware limited liability company

12. KB SHENANDOAH, LLC, a Texas limited liability company, by THE BOCHNER REVOCABLE TRUST made November 29, 1984 (Restated January 2005), Kurt Bochner, Trustee, as sole member of SMLLC named SCI Price Plaza Fund 12, LLC, a Delaware limited liability company

13. JONAS GIVE AWAY TRUST dated 7/16/86 (as amended), Frank Jonas and Ingrid W. Jonas, Trustees, as sole member of SMLLC named SCI Price Plaza Fund 13 LLC, a Delaware limited liability company

14. CLARK, Jeff P., a single man, as sole member of SMLLC named SCI Price Plaza Fund 14, LLC, a Delaware limited liability company

15. WEN, William K., a married man as his sole and separate property, as sole member of SMLLC named SCI Price Plaza Fund 15 LLC, a Delaware limited liability company

16. SCI COMMERCIAL CENTER, LLC, a Nevada limited liability company, as sole member of SMLLC named SCI Price Plaza Fund 16 LLC, a Delaware limited liability company

17. TAPPER PROPERTIES (THOMAS) LLC, a California limited liability company, as sole member of SMLLC named SCI Price Plaza Fund 17 LLC, a Delaware limited liability company

18. TAPPER PROPERTIES (WACHTER), LLC, a California limited liability company, as sole member of SMLLC named SCI Price Plaza Fund 18 LLC, a Delaware limited liability company

19. MCHUGH TRUST dated 12-3-86, Robert E. McHugh and Edith C. McHugh, Trustees, as sole member of SMLLC named SCI Price Plaza Fund 19 LLC, a Delaware limited liability company

Addendum 1 - Page 1

20. CARRILLO, Steven T. and Elizabeth M., husband and wife as community property, as sole member of SMLLC named SCI Price Plaza Fund 20 LLC, a Delaware limited liability company

21. HANNA, Nassim, a married man as his sole and separate property, as sole member of SMLLC named SCI Price Plaza Fund 21 LLC, a Delaware limited liability company

22. FITZGERALD, Rolland L., a married man as his sole and separate property, as sole member of SMLLC named SCI Price Plaza Fund 22 LLC, a Delaware limited liability company

23. SUTTON, Roy A. a single man, as sole member of SMLLC named SCI Price Plaza Fund 23, LLC, a Delaware limited liability company

24. MARSON, Stuart and Laurie, husband and wife as community property, as sole member of SMLLC named SCI Price Plaza Fund 24, LLC, a Delaware limited liability company

25. BOUTET, Reginald B., an unmarried man, as sole member of SMLLC named SCI Price Plaza Fund 25, LLC, a Delaware limited liability company

26. WETZEL, Judith B., an unmarried woman, as sole member of SMLLC named SCI Price Plaza Fund 26 LLC, a Delaware limited liability company

27. DAVID CLIFFORD SMITH and VICKI LYNN SMITH, Trustees, or their successors in trust, under the David Clifford Smith Revocable Living Trust dated the 8th day of May, 1998, and any amendments thereto, as sole member of SMLLC named SCI Price Plaza Fund 27, LLC, a Delaware limited liability company

28. VICKI LYNN SMITH and DAVID CLIFFORD SMITH, Trustees, or their successors in trust, under the Vicki Lynn Smith Revocable Living Trust dated the 8th day of May, 1998 and any amendments thereto, as sole member of SMLLC named SCI Price Plaza Fund 28, LLC, a Delaware limited liability company

29. WESTCOTT, Donald E. and Janette M., husband and wife as community property, as sole member of SMLLC named SCI Price Plaza Fund 29, LLC, a Delaware limited liability company

30. HICKEY, Niall, an unmarried man, as sole member of SMLLC named SCI Price Plaza Fund 30, LLC, a Delaware limited liability company

31. COMFORT, Frank &Victoria, husband and wife as community property, as sole member of SMLLC named SCI Price Plaza Fund 31, LLC, a Delaware limited liability company

32. LESSLER, Craig S., unmarried man, as sole member of SMLLC named SCI Price Plaza Fund 32 LLC, a Delaware limited liability company

33. CERASANI, Janis Sue, an unmarried woman, as sole member of SMLLC named SCI Price Plaza Fund 33 LLC, a Delaware limited liability company

34. PARRA, Guillermina, a married woman as her sole and separate property, as sole member of SMLLC named SCI Price Plaza Fund 34 LLC, a Delaware limited liability company

35. DURAZO, Lydia S., a married woman as her sole and separate property, as sole member of SMLLC named SCI Price Plaza Fund 35 LLC, a Delaware limited liability company

Addendum 1 - Page 2

<u>Exhibit A</u>

**Shopping Center Legal Description**

TRACT ONE:

BEING ALL THAT CERTAIN TRACT OR PARCEL OF LAND CONTAINING 26.2893 ACRES OR 1,145,163 SQUARE FEET SITUATED IN THE W. C. R. R. CO. SURVEY, BLOCK 3, SECTION 5, ABSTRACT NO. 900. AND IN THE W. C. R. R. CO. SURVEY, BLOCK 3, SECTION 10, ABSTRACT NO. 1359, HARRIS COUNTY, TEXAS; BEING OUT OF AND A PART OF THAT CERTAIN 27.0044 ACRE TRACT OF RECORD UNDER HARRIS COUNTY CLERK'S FILE NO. R-462457, HARRIS COUNTY DEED RECORDS. SAID 26.2893 ACRES OR 1,145,163 SQUARE FEET TRACT BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING AT A POINT FOR THE INTERSECTION OF THE NORTH RIGHT-OF-WAY LINE OF THAT CERTAIN MISSOURI KANSAS & TEXAS RAILROAD (100 FEET WIDE) OF RECORD UNDER HARRIS COUNTY CLERK'S FILE NO. D-545895 AND THE WEST RIGHT-OF-WAY LINE OF FRY ROAD (WIDTH VARIES) FROM WHICH A BRASS DISK IN CONCRETE BEARS SOUTH 42 DEGREES 03 MINUTES WEST, 0.34 FEET, SAID POINT BEING THE SOUTHEAST CORNER OF SAID 27.0044 ACRE TRACT AND THE SOUTHEAST CORNER OF THE HEREIN DESCRIBED TRACT.

THENCE SOUTH 88 DEGREES 42 MINUTES 50 SECONDS WEST, 1265.28 FEET, ALONG THE NORTH RIGHT-OF-WAY LINE OF SAID MISSOURI KANSAS & TEXAS RAILROAD, TO A 5/8-INCH IRON ROD FOUND MARKING THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED TRACT AND THE SOUTHEAST CORNER OF THAT CERTAIN 40.0956 ACRE TRACT OF RECORD UNDER HARRIS COUNTY CLERK'S FILE NO. R-663629;

THENCE NORTH 01 DEGREES 17 MINUTES 10 SECONDS WEST, ALONG THE COMMON LINE BETWEEN SAID 27.0044 AND 40.0956 ACRE TRACTS, 865.47 FEET TO A 1/2-INCH IRON ROD FOUND IN THE NORTH LINE OF THAT CERTAIN TEXAS AND NEW MEXICO PIPELINE CO. (30 FEET WIDE) OF RECORD IN VOLUME 772, PAGE 381, VOLUME 1063, PAGE 339 AND HARRIS COUNTY CLERK'S FILE NO. E-089704, HARRIS COUNTY DEED RECORDS MARKING THE NORTHWEST CORNER OF THE HEREIN DESCRIBED TRACT, SAME BEING THE SOUTHWEST CORNER OF RESERVE "A", WAL-MART KATY, OF RECORD IN FILM CODE NO. 355112 OF THE HARRIS COUNTY MAP RECORDS;

THENCE NORTH 88 DEGREES 24 MINUTES 48 SECONDS EAST, ALONG THE COMMON LINE BETWEEN SAID 30 FEET WIDE PIPELINE EASEMENT AND SAID RESERVE "A", WAL-MART KATY, 743.86 FEET TO A 5/8-INCH IRON ROD FOUND MARKING A POINT OF INTERSECTION;

THENCE NORTH 88 DEGREES 43 MINUTES 25 SECONDS EAST, CONTINUING ALONG SAID COMMON LINE, A DISTANCE OF 628.74 FEET TO A 5/8-INCH IRON ROD FOUND IN THE WEST RIGHT-OF-WAY LINE OF SAID FRY ROAD MARKING THE NORTHEAST CORNER OF THE HEREIN DESCRIBED TRACT AND THE SOUTHEAST CORNER OF SAID RESERVE "A", WAL-MART KATY;

THENCE SOUTH 05 DEGREES 45 MINUTES 04 SECONDS WEST, ALONG SAID WEST RIGHT-OF-WAY LINE, A DISTANCE OF 875.86 FEET TO THE POINT OF BEGINNING AND CONTAINING 26.2893 ACRES OR 1,145,163 SQUARE FEET OF LAND.

SAVE AND EXCEPT FROM THE ABOVE DESCRIBED TRACT THE FOLLOWING DESCRIBED TRACT OR PARCEL OF LAND:
(SEE ATTACHED CONTINUATION SHEET)

TRACT ONE CONTINUATION
(DESCRIPTION OF SAVE AND EXCEPTED PARCEL)

Being a tract or parcel containing 9.365 acres (407,939 square feet) of land
situated in the W.C. R.R. Company Survey, Abstract Number 900, and W.C. R.R.
Company Survey, Abstract Number 1359, Harris County, Texas: being out of and
a part of a called 27.0044 acre tract, conveyed to I-10/Fry Road 27, Ltd., as
recorded under Harris County Clerk's File (H.C.C.F.) Number R462457; said 9.365
acre tract being more particularly described as follows (bearings are based on said
deed recorded under H.C.C.F. R462457):

COMMENCING for reference at a brass disk in concrete found marking the
intersection of the north right-of-way (R.O.W.) line of the Texas Department of
Transportation (formerly Missouri Pacific Railroad Company) R.O.W. (100 feet
wide) and the west R.O.W. line of Fry Road (width varies), marking the southeast
corner of said 27.0044 acre tract;

THENCE, South 88°42'50" West, along said north R.O.W. line, a distance of
15.00 feet to a 5/8-inch iron rod with cap stamped "Terra Surveying" set marking
the south end of a cut-back line, the POINT OF BEGINNING, and the most
southerly southeast corner of the herein described tract;

THENCE, South 88°42'50" West, continuing along said north R.O.W. line, a
distance of 604.35 feet to a 5/8-inch iron rod with cap stamped "Terra Surveying"
set marking the southwest corner of the herein described tract;

THENCE, North 01°17'10" West, departing said north R.O.W. line, a distance of
325.00 feet to a 5/8-inch iron rod with cap stamped "Terra Surveying" set
marking an angle point of the herein described tract;

THENCE, North 10°18'22" East, a distance of 79.62 feet to a 5/8-inch iron rod
with cap stamped "Terra Surveying" set marking an angle point of the herein
described tract;

THENCE, North 01°17'10" West, a distance of 223.50 feet to a 5/8-inch iron rod
with cap stamped "Terra Surveying" set marking the northwest corner of the
herein described tract;

THENCE, North 88°42'50" East, a distance of 680.69 feet to a 5/8-inch iron rod
with cap stamped "Terra Surveying" set in the aforementioned west R.O.W. line of
Fry Road, marking the northeast corner of the herein described tract;

THENCE, South 05°45'04" West, along said west R.O.W. line, a distance of
616.26 feet to a 5/8-inch iron rod with cap stamped "Terra Surveying" set
marking the north end of the aforementioned cut-back line and the most easterly
southeast corner of the herein described tract;

THENCE, South 47°13'57" West, along said cut-back line, a distance of 22.48
feet to the POINT OF BEGINNING and containing 9.365 acres (407,939 square
feet) of land.

Exhibit A - Page 2

TRACT TWO:

BEING ALL THAT CERTAIN TRACT OR PARCEL OF LAND CONTAINING 20.0000 OR 871,198 SQUARE FEET SITUATED IN THE W. C. R. R. CO. SURVEY, BLOCK 3, SECTION 5, ABSTRACT NO. 900, AND THE W. C. R. R. CO. SURVEY, BLOCK 3, SECTION 10, ABSTRACT NO. 1359, HARRIS COUNTY, TEXAS; BEING OUT OF AND A PART OF THAT CERTAIN 40.0956 ACRE TRACT OF RECORD UNDER HARRIS COUNTY CLERK'S FILE NO. R-663629, HARRIS COUNTY DEED RECORDS, SAID 20.0000 ACRES OR 871,198 SQUARE FEET BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT FOR THE INTERSECTION OF THE NORTH RIGHT-OF-WAY LINE OF THAT CERTAIN MISSOURI KANSAS & TEXAS RAILROAD (100 FEET WIDE) OF RECORD UNDER HARRIS COUNTY CLERK'S FILE NO. D-545895 AND THE WEST RIGHT-OF-WAY LINE OF FRY ROAD (WIDTH VARIES) FROM WHICH A BRASS DISK IN CONCRETE BEARS SOUTH 42 DEGREES 03 MINUTES WEST, 0.34 FEET, SAID POINT BEING THE SOUTHEAST CORNER OF THAT CERTAIN 27.0044 ACRE TRACT OF RECORD UNDER HARRIS COUNTY CLERK'S FILE NO. R-462576;

THENCE SOUTH 88 DEGREES 42 MINUTES 50 SECONDS WEST, 1265.28 FEET ALONG THE NORTH RIGHT-OF-WAY LINE OF SAID MISSOURI KANSAS & TEXAS RAILROAD TO A 5/8-INCH IRON ROD FOUND MARKING THE SOUTHEAST CORNER AND POINT OF BEGINNING OF THE HEREIN DESCRIBED TRACT, SAME BEING THE SOUTHWEST CORNER OF SAID 27.0044 ACRE TRACT;

THENCE SOUTH 88 DEGREES 42 MINUTES 50 SECONDS WEST, CONTINUING ALONG SAID NORTH RIGHT-OF-WAY LINE, 1142.92 FEET TO A POINT MARKING THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED TRACT FROM WHICH A 1/2-INCH IRON ROD FOUND BEARS NORTH 88 DEGREES 38 MINUTES EAST, 0.30 FEET, SAME BEING THE SOUTHEAST CORNER OF THAT CERTAIN 47.3724 ACRE TRACT OF RECORD UNDER HARRIS COUNTY CLERK'S FILE NO. G-149343;

THENCE NORTH 01 DEGREES 59 MINUTES 00 SECONDS WEST, 759.25 FEET, ALONG THE EAST LINE OF SAID 47.3724 ACRE TRACT, TO A 5/8-INCH IRON ROD SET MARKING THE NORTHWEST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE NORTH 88 DEGREES 42 MINUTES 50 SECONDS EAST, 1152.15 FEET TO A 5/8-INCH IRON ROD SET MARKING THE NORTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE SOUTH 01 DEGREES 17 MINUTES 10 SECONDS WEST, ALONG THE COMMON LINE BETWEEN SAID 40.0956 AND 27.0044 ACRE TRACTS, 759.19 FEET TO THE POINT OF BEGINNING AND CONTAINING 20.0000 ACRES OR 871,198 SQUARE FEET OF LAND.

Exhibit A - Page 3

Price Plaza, Katy, TX
EXECUTION VERSION: February 8, 2011

<u>Exhibit B</u>

**Site Plan**

Exhibit B

Price Plaza, Katy, TX
EXECUTION VERSION: February 8, 2011



Exhibit B-1
**Acknowledgement of Delivery Date**

THIS ACKNOWLEDGEMENT OF DELIVERY DATE ("Acknowledgement") is made this _____ day of _____, 2011, by and between SCI Price Plaza Fund, LLC, a Delaware limited liability company, together with SCI Entities (collectively, "Landlord"), and Jo-Ann Stores, Inc., an Ohio corporation ("Tenant").

WHEREAS, Landlord and Tenant have entered into a Lease dated _____, 2011 (the "Lease");

WHEREAS, the Delivery Date is dependent upon the occurrence of certain events; and

WHEREAS, those certain events have occurred and Landlord and Tenant now desire to specify the Delivery Date of the Lease.

NOW, THEREFORE, in consideration of the premises, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Landlord and Tenant warrant and represent each to the other as follows:

1.      The Delivery Date is _____, 20___.

2.      The Estimated Commencement Date is _____, 20___.

IN WITNESS WHEREOF, Landlord and Tenant do hereby execute this Acknowledgement under seal on the day and year first above written.

**WITNESSES:**

_____

_____
Name Printed

_____

_____
Name Printed

**TENANT:**
**JO-ANN STORES, INC.**

By:_____

Name:_____

Title:_____

**WITNESSES:**

_____

_____
Name Printed

_____

_____
Name Printed

**LANDLORD:**
SCI Price Plaza Fund, LLC, and SCI Entities

By:_____

Name:_____

Title:_____

Exhibit B-1

Exhibit C

**Intentionally Deleted.**

Exhibit C

<u>Exhibit D</u>

**Tenant's Plans and Specs and Sign Drawings**

To be attached post-execution.

Exhibit D

<u>Exhibit D-1</u>

**Tenant's Prototype Signage**

Exhibit D-1



## LED ILLUMINATED CHANNEL LETTERS
### scale: 3/16"=1'-0"

JOANN:  156.3 square feet
fabrics and crafts: 64.5 square feet
TOTAL SQUARE FOOTAGE: 220.8

## 5'-0" Exterior Signage

31'-3"
5'-0"
9'-0" overall
16-3/4"
f=2'-4-1/2"
27'-2"

# JO·ANN
## fabrics and crafts

Dept Signage specs on page 3

TOP OF PARAPET 28'-0" AFF
Scale: 1/16"=1'

28'-0" AFF

JOANN
fabrics and crafts

seasonal    classes          decor  floral

32'

## LED ILLUMINATED CHANNEL LETTERS

**FACES:** 3/16" #2447 White acrylic w/ custom Dual-Color day/night film overlay to match PMS 560 Green
**JOANN TRIMCAP:** 2" White jewelite
**FAC TRIMCAP:** 1" White jewelite
**RETURNS:** 5" deep .063 alum. – White
**BACKS:** .063 Alum. - pre-painted White
**ILLUMINATION:** White Tetra Max LED's  as req'd by manufacturer
**MOUNTING:** Surface mounted flush as required

### COLOR MATCHING

DUAL COLOR FILM
PMS 560 GREEN
DN00319 Matte finish

### nighttime simulation

Letters will be green in daylight hours & illuminate White at dark

### LED CHANNEL - REMOTE, FLUSH

Blocking as needed
Power supply housing
Electric power supply
Flexible conduit ½" minimum
Listed disconnect switch
Primary electrical source

Mounting as required
Aluminum returns
Trim cap
Acrylic face
Aluminum backs
12 volt jacketed cable
LED
Weep holes 1/4" dia.



## MC SIGN COMPANY
8959 TYLER BLVD.
MENTOR, OHIO 44060
PH. 440-209-6200  FAX 440-209-6277

**CLIENT:** JO·ANN fabrics and crafts
**ADDRESS:** VARIOUS

**TICKET #:** N/A
**DRAWING #:** 100608-1
**DATE:** 8/8/10
**PROJECT MANAGER:** TAMMY WARD
**DESIGNER:** Viv
**ELECTRONIC FILE LOCATION & NAME:** J\JOANN\PROTOTYPE\ F42012 PROTOTYPES
**REVIEWED BY:** **DATE:**

**REVISION HISTORY**
**DATE:** **CHANGES MADE:**

## Sign On.™
Partner with the best.

**CLIENT SIGNATURE & APPROVAL DATE:**

NOTICE: PRINTS ARE THE EXCLUSIVE PROPERTY OF "MC SIGN COMPANY" ANY UN-AUTHORIZED USE OR DUPLICATION WILL RESULT IN A 20% CHARGE PER OCCURRENCE PER THE VALUE OF THE DISPLAY©MC SIGN CO. 1998

Exhibit _D1_  Page _1_

# LED ILLUMINATED CHANNEL LETTERS
### scale: 3/16"= 1'-0"

*JOANN: 156.3 square feet*
*fabrics and crafts: 64.5 square feet*
*TOTAL SQUARE FOOTAGE: 220.8*

## LED ILLUMINATED CHANNEL LETTERS

| | |
|---|---|
| **FACES:** | 3/16" #2447 White acrylic w/ custom Dual-Color day/night film overlay to match PMS 560 Green |
| **JOANN TRIMCAP:** | 2" White jewelite |
| **FAC TRIMCAP:** | 1" White jewelite |
| **RETURNS:** | 5" deep .063 alum. - White |
| **BACKS:** | .063 Alum. - pre-painted White |
| **ILLUMINATION:** | White Tetra Max LED's as req'd by manufacturer |
| **MOUNTING:** | Surface mounted flush as required |

**31'-3"**

# JO·ANN
## fabrics and crafts

**9'-0" overall**

**5'-0"**

**16-3/4"**

**2'-4-1/2"**

**27'-2"**



COLOR MATCHING

| | |
|---|---|
| PMS 560 GREEN | DUAL COLOR FILM |
| | DN00319 Matte finish |

*nighttime simulation*

*Letters will be green in daylight hours & illuminate White at dark*



**Proposed Signage**                              *Scale: 1/32"=1'*





LED CHANNEL - REMOTE, FLUSH

---



**MC SIGN COMPANY**

8959 TYLER BLVD.
MENTOR, OHIO 44060
PH. 440-209-6200  FAX 440-209-6277

| CLIENT: | | |
|---|---|---|
| **JO·ANN** fabrics and crafts | | |
| ADDRESS: | | |
| VARIOUS | | |

| TICKET #: | DRAWING #: | DATE: |
|---|---|---|
| N/A | 100608-2 | 6/8/10 |
| PROJECT MANAGER: | | DESIGNER: |
| TAMMY WARD | | Viv |
| ELECTRONIC FILE LOCATION & NAME: | | |
| J/JOANN/PROTOTYPE/ F42012 PROTOTYPES | | |
| REVIEWED BY: | | DATE: |

| REVISION HISTORY | | |
|---|---|---|
| DATE: | CHANGES MADE: | |

# Sign On.™
### Partner with the best.

CLIENT SIGNATURE & APPROVAL DATE:

NOTICE: PRINTS ARE THE EXCLUSIVE PROPERTY OF "MC SIGN COMPANY" ANY UN-AUTHORIZED USE OR DUPLICATION WILL RESULT IN A 20% CHARGE PER OCCURRENCE PER THE VALUE OF THE DISPLAY© MC SIGN CO. 1998

Exhibit P-1 Page 2



**NON-ILLUMINATED, DEPARTMENT SIGNAGE**
scale: 3/8"=1'-0"

FLORAL: 8.6 sq. ft.
SEASONAL: 31.3 sq. ft.

DECOR: 10.2 sq. ft.
CLASSES: 13.2 sq. ft.

61-5/8"   73-1/8"   95"

20" floral   20" decor   20" classes

225- 1/8"

20" seasonal

**NON-ILLUMINATED REVERSE CHANNELS**

FACES: .090 alum. painted White

RETURNS: .063 alum. 3" deep welded
to faces; Painted White

MOUNTING: Stud mounted flush as req'd

**SECTION VIEW**

Channel letter
specs on page 1

Copy to be centered
vertically in Green color band

DRILL MASONRY
FILL HOLE W/ SILICONE
OR SIMILAR ADHESIVE

STUD WELD
BEHIND
LETTER FLUSH
W/ WALL

ALUMINUM
LETTERS

STUDS BONDED
OR WELDED TO
ALUMINUM FACE

WALL

TOP OF PARAPET
28'-0" AFF   Scale: 1/16"=1'

JO-ANN
fabrics and crafts

seasonal   classes

decor   floral

28'-0" AFF

32'

13'-4"



**MC SIGN COMPANY**

8959 TYLER BLVD.
MENTOR, OHIO 44060
PH. 440-209-6200  FAX 440-209-6277



| CLIENT: JO-ANN fabrics and crafts | TICKET #: N/A | DRAWING #: 100808-3 | DATE: 9/8/10 | REVISION HISTORY | | |
|---|---|---|---|---|---|---|
| | PROJECT MANAGER: TAMMY WARD | | DESIGNER: VJV | DATE: | CHANGES MADE: | |
| ADDRESS: VARIOUS | ELECTRONIC FILE LOCATION & NAME: J:/JOANN/PROTOTYPE/ F42012 PROTOTYPES | | | | | |
| | REVIEWED BY: | | DATE: | | | |

**Sign On.™**
Partner with the best.

CLIENT SIGNATURE & APPROVAL DATE:

NOTICE: PRINTS ARE THE EXCLUSIVE PROPERTY OF "MC SIGN COMPANY" ANY UN-AUTHORIZED USE OR DUPLICATION WILL RESULT IN A 20% CHARGE PER OCCURRENCE PER THE VALUE OF THE DISPLAY© MC SIGN CO. 1998

Exhibit D/1   Page 3



**PYLON SIGN LAYOUT**

**SITE SIGN LAYOUTS**

SITE SIGN LOCATION TO BE VERIFIED WITH LANDLORD PRIOR TO INSTALLATION

**COMING SOON PACKAGE**

**NOW OPEN/GRAND OPENING PACKAGE**

**RECEIVING DOOR SIGNAGE**

MC SIGN COMPANY
8959 TYLER BLVD.
MENTOR, OHIO 44060
PH. 440-209-6200 FAX 440-209-6277

| CLIENT: | TICKET #: | DRAWING #: | DATE: |
|---|---|---|---|
| JO-ANN fabrics and crafts | N/A | 100608-4 | 6/8/10 |
| | PROJECT MANAGER: TAMMY WARD | | DESIGNER: Viv |
| ADDRESS: VARIOUS | ELECTRONIC FILE LOCATION & NAME: J/JOANN/PROTOTYPE/ F42012 PROTOTYPES | | |
| | REVIEWED BY: | | DATE: |

REVISION HISTORY

| DATE: | CHANGES MADE: |
|---|---|

Sign On.™ Partner with the best.

CLIENT SIGNATURE & APPROVAL DATE:

NOTICE: PRINTS ARE THE EXCLUSIVE PROPERTY OF "MC SIGN COMPANY" ANY UN-AUTHORIZED USE OR DUPLICATION WILL RESULT IN A 20% CHARGE PER OCCURRENCE PER THE VALUE OF THE DISPLAY© MC SIGN CO. 1998

Exhibit D-1 Page 4

<u>Exhibit E</u>

**Intentionally Deleted**

Exhibit E

Exhibit F

**Prohibited Uses and Exclusive Uses**

Prohibited Uses:

adult book store
alcoholic beverage sales
amusement arcade
amusement center
animal raising
automobile body shop
automobile dealership
automotive parts, supplies,
    accessories or related products
automotive repairs and service
bank, savings and loan or
    consumer finance business
bar
billiard parlor
bingo parlor
boat sale or display
bowling alley
brothel
car rental
car wash
carnival
catering hall
convenience store
cult meeting place
dance hall
dental office
discotheque
drug store or pharmacy department
dry cleaner
exercise club
extermination or similar service
factory use
firing range
flea market
food store
funeral parlor
game arcade
game room
gas station
grocery store
gun store
head shop
health club
health spa
hospital
house of worship
industrial use
insurance company or agency
judo school
karate school
labor camp
Laundromat
manufacturing use
massage parlor
medical or therapeutic office
meeting hall

mobile home park
mobile home sales
monument sales
mortuary
movie theater
nightclub
non-retail use
off-track betting parlor
office use
palm reader
pawn shop
pet store selling live pets or offering pet services
    such as grooming and boarding
place of public assembly
plant nursery.
prescription drug sales
psychic
religious organization
restaurant
sale of drugs
sale of food items for off premises
    consumption
sale, rental, repair, storage or service
    of trucks and/or trailers and
    recreational vehicles
school, classes or other educational
    facility
skating rink
sporting facility
stockyard
supermarket
swimming pool sales
target range
taxidermist
theater
trailer court
trailer sales
veterinary hospital
warehouse use
weight loss center

Exhibit F - Page 1

<u>Prohibited Uses</u>: **Babies 'R Us**

- Any use which emits or results in strong, unusual at offensive odors, fumes, dust or vapors;
- Any use which emits objectionable noise or sound;
- Any use which is a public or private nuisance:
- Theater of any kind;
- Sports or other entertainment viewing facility;
- Automobile body and fender shop;
- Automobile repairs shop or any business servicing motor vehicles, except pursuant to Pep Boys Lease or otherwise by a national or regional retailer selling similar products and services;
- Any business storing or selling gasoline or diesel fuel at retail or wholesale;
- Catering or banquet hall;
- Fast-food restaurant incorporating a coin or token-operated amusement room, except Chuck E. Cheese;
- So-called 'head shop;"
- Bowling alley;
- Billiard parlor or bingo parlor or any establishment conducting games of chance;
- Sales office;
- Showroom or storage facility tor boats, automobiles or other vehicles;
- Establishment serving alcoholic beverages for on-premises consumption;
- Pawnshop;
- Dry cleaning or laundry plant
- Funeral parlor;
- Massage parlor;
- Discotheque or dance hall;
- Recycling facility or stockyard;
- Health spa, exercise facility or similar-type business;
- Recreation and fitness facility;
- Skating rink;
- Car wash;
- So-called "health clinic", "medical clinic", "urgent care factory", "walk-in care facility" or rehabilitative facility;
- Arcade or game room;
- Carnival, fair, circus or amusement park;
- Photo kiosk;
- Business setting so-called "second hand goods";

Exhibit F - Page 2

- "Outlet Store" selling merchandise that is used, damaged or discontinued (except stores such as land's End", "Spiegel's", or "J.C. Penney Surplus");
- Junkyard;
- So-caned "flea market" or "swap shop";
- Offices (excluding office space used in connection with and ancillary to a permitted retail use hereunder);
- Industrial, factory, manufacturing, warehouse;
- Residential purposes;
- Training or educational facility;
- Sale of fireworks;
- Beauty shop (except that ULTA[3] may operate a hair cutting salon as incidental to its primary use);
- Adult bookstore or store selling or exhibiting pornographic materials, including, without limitation, a store displaying for sale or exhibition books, magazines or other publications containing any combination of photographs, drawings or sketches of a sexual nature, which are not primarily scientific or educational. Notwithstanding the provisions above, in the event that Landlord enter into a lease or other occupancy agreement with a "full-line" national or regional retail bookstore (including, without limitation, "Borders" Books) operating in at least 20,000 square feet of Gross Leasable floor Area (the "Major Bookstore") for space in the Shopping Center, the Major Bookstore shall be permitted to sell the types and numbers of sex publications as are commonly sold in a majority of stores of the Major Bookstore, in the manner in which such publications are commonly displayed and sold in such stores, all as of the date hereof.
- Sale or rental of video cassettes or other medium capable of projecting, transmitting or reproducing, independent or in conjunction with another devise, machine or equipment, an image or series of images, the content of which has been rated NC-17 or unrated by the Motion Picture Rating Association, or any successor thereto (excluding those items produced prior to the use of the Motion Picture Rating Association system and those items produced for general "over-the-air" television), or which is advertised or otherwise designated as being "X" rated or having "X" rated content (collectively "X-rated Videos"). Notwithstanding the foregoing, in the event that Landlord enters into a lease(s) or other occupancy agreements with Blockbuster Video (or a similar national or regional general videotape retailer), such tenants or occupants shall be permitted to rent or sell the types and numbers of X-rated videos as are commonly sold in a majority of the stores in their respective retail chains, in the manner in which such videos are commonly displayed, rented and sold in such stores, all as of the date hereof.

Exclusive Uses:

**59 Diner**

Landlord agrees that during the term of this Lease, but only for so long as Tenant is open for business, using the Leased Premises for the Exclusive Use (as hereinafter defined) and is not otherwise in default of any of the provisions of this Lease beyond any applicable notice and cure periods, Landlord will not hereafter enter into a new lease in the Shopping Center with a tenant whose principal permitted use is a family style restaurant in the "casual dining segment"

(defined above) (the "Exclusive Use") (e.g. Chili's, TGI Friday's, Applebee's, Houlihan's, O'Charley's, Ruby Tuesday's, etc.).

**Aaron Brothers**
Landlord agrees that during the term of the Lease (commencing upon the full execution thereof), but only for so long as Tenant is open for business (excluding closures as a result of force majeure, casualty, renovations or alterations), using the Leased Premises for the "Exclusive Use" (as such term is defined in the Lease) and is not otherwise in default of any of the provisions of the Lease, beyond applicable notice and cure periods, and except where Landlord and Tenant are diligently proceeding with each other in good faith to resolve a dispute (e.g., CAM or tax disputes). Landlord will not hereafter enter into a new lease in the Shopping Center with a tenant who sells or provides custom picture framing services (the "Exclusive Use").

**Babies 'R Us**
Landlord shall not operate, lease or permit any other store located in the Shopping Center, or any other property owned or leased by Landlord or any affiliate of Landlord which is within one (1) mile of the perimeter of Shopping Center, including, without limitation, the Outparcels, but excluding the Anchor Parcel, to be used for the sale, rental or distribution of items, individually or in the aggregate, customarily carried by a modern toy store (for so long as Tenant originally named herein or its Affiliates or Successors are operating in the Demised Premises) or a babies'/children's specialty store, including, without limitation, infant, juvenile and children's: toys, and indoor and/or outdoor play and recreational equipment; prenatal items and equipment; maternity wear; infant, juvenile and children's: clothing, apparel, footwear, furnishings, shoes, accessories, furniture, bedding, books, records, audio and video cassettes, wheel goods; layettes, infant, juvenile and children's: food, health and beauty aids; cribs, car seats, carriages, strollers, playpens, and other equipment and accessories.

**Best Buy**
Tenant shall use the Premises for sales, rental, service and warehousing of retail products to be sold at retail at the Premises (and if applicable, installation in motor vehicles) of electronics and appliances, other products typically sold in the majority of Tenant's stores, and thereafter for any lawful retail use (not in violation of the REA or Exclusives), and Landlord shall not permit any person or entity other than Tenant in space leased directly or indirectly from Landlord within the Shopping Center to sell, rent, service and/or warehouse (and, if applicable, install in motor vehicles) the following product categories as its primary use: electronic equipment or appliances (including, without limitation, televisions, stereos, video recorders); major household appliances (including, without limitation, refrigerators, freezers, stoves, microwave ovens, dishwashers, washers and dryers); car radios, stereos, tape decks or phones; entertainment software including compact discs, music videos and prerecorded tapes ("Tenant's Primary Exclusives").

**Eyeland Vision**
Except for incidental sales by existing tenants, and tenants over 10,000 square feet, Landlord shall not lease space to another tenant who will be in competition with tenant.

**Mattress Firm**
Tenant agrees that the Leased Premises will be used and occupied by Tenant and/or any assignees, sublessees or other occupants (which reference to assignees, sublessees and other occupants shall not be deemed to give Tenant any rights to assign or sublet not specifically set

Exhibit F - Page 4

forth in this Lease), or permitted to be used and occupied by Tenant or any other such parties only for the Permitted Use, and for no other use or purpose. Without limitation of the foregoing, no sale or dispensing of lottery tickets, other gaming tickets, liquor, wine or beer shall be permitted. Tenant's use shall be exclusive to the Shopping Center excepting only premises exceeding 20,000 square feet. On premises exceeding 20,000 square feet, the sale of mattresses shall not be its primary use and will not account for over 25% of their sales floor area.

**Party City**
Landlord agrees that during the term of this Lease, but only for so long as Tenant is open for business, using the Leased Premises for the Exclusive Use (as hereinafter defined) and is not otherwise in default of any of the provisions of this Lease, Landlord will not hereafter enter into a new lease in the Shopping Center with a tenant whose principal permitted use is the retail sale of party supplies (the "Exclusive Use"). The aforementioned restriction shall not apply to: (i) any existing tenants at the Shopping Center or their successors, assigns or replacements; or (ii) any existing leases at the Shopping Center as same may be renewed, extended, modified or amended (except that no such modification shall grant a tenant the right to engage in the Exclusive Use where such tenant did not previously have that right); (iii) any store measuring 20,000 square feet or more.

**Ross**
Without the prior written consent of Tenant, no tenant or occupant of Landlord's Parcel (other than Tenant) may use, and Landlord shall not permit any other tenant or occupant to use, ten thousand (10,000) square feet of LFA or more of its premises for the display and/or sale of apparel on an off-price basis ("Off-Price Use"). "Off-Price Use," for the purpose hereof, shall mean the retail sale (currently identified with such retailers as Tenant, T.J. Maxx, Marshall's, Stein Mart and Burlington Coat Factory) of first quality, name brand apparel for men, women, and children on an every day basis at prices significantly reduced from those charged by full price retail apparel retailers, provided, however, that this definition shall not prohibit apparel sales events by a typical apparel retailer at prices discounted from that retailer's every day price. The current business operation of the following businesses are not within the definition of "Off-Price Use": Target, Fashion Bug, WalMart, K-Mart, Kohl's, Bob's Stores, Old Navy, Dress Barn, Sears, J.C. Penney and Mervyn's. The foregoing Off-Price Use protection shall only continue so long as Tenant continues its Off-Price business operations in the Store.

**Souper Salad**
Landlord agrees that during the term of this Lease, but only for so long as Tenant is open for business, using the Leased Premises for the Exclusive Use (as hereinafter defined) and is not otherwise in default of any of the provisions, of this Lease, Landlord will not hereafter enter into a new lease in the Shopping Center with a tenant whose principal permitted use is a salad bar (the "Exclusive Use").

**Sprint**
Landlord agrees that during the term of this Lease, but only for so long as Tenant is open for business, using the Leased Premises for the Exclusive Use (as hereinafter defined) and is not otherwise in default of any of the provisions of this Lease, Landlord will not hereafter enter into a new lease in the Shopping Center with a tenant whose principal permitted use is the retail sale of wireless and wireline communication services and devices (the "Exclusive Use").

Exhibit F - Page 5

**United Retail (The Avenue)**

Landlord agrees that during the term of this Lease, but only for so long as Tenant is open for business, except for closures as a result of force majeure, casualty, condemnation, or temporary closures for inventory or remodeling, using the Leased Premises for the Exclusive Use (as hereinafter defined) and is not otherwise in default of any of the provisions of this Lease, Landlord will not hereafter enter into a new lease in the Shopping Center with a tenant whose principal primary use is the retail sale of large size women's ready-to-wear apparel (sizes 16 and up) (the "Exclusive Use").

Exhibit F - Page 6

Exhibit G

**Intentionally Deleted**

Exhibit G

<u>Exhibit H</u>

**Form of Estoppel Certificate**

To:

Shopping Center:

Landlord:

Tenant:                   JO-ANN STORES, INC.

Lease:

Tenant represents that, as of the date hereof:

1.  The Lease constitutes the entire written agreement between Tenant and Landlord and has not been modified or amended, except as indicated herein.

2.  The Lease is in full force and effect. The term commenced on _____ and expires on _____. [Tenant has no further options to renew the term of the Lease.] or [Tenant has _____-year options to renew the term of the Lease.]

3.  Tenant has taken possession of approximately _____ square feet in the Shopping Center under the Lease (the "Premises") and is occupying the Premises.

4.  To the undersigned's actual knowledge, without inquiry or investigation, the Landlord and Tenant are not currently in default under the Lease except as follows:

5.  The monthly Fixed Minimum Rent payable under the Lease is $_____ and has not been prepaid by more than one month.

6.  To the best of Tenant's knowledge, Tenant is not owed any monies from Landlord; and Tenant is not entitled to any abatement, rent concessions or tenant improvement/construction allowance except

7.  The address for notices to be sent to Tenant is as follows:

> Jo-Ann Stores, Inc.
> Attn: Vice President, Real Estate
> 5555 Darrow Road
> Hudson, OH 44236

with a copy to:

> Jo-Ann Stores, Inc.
> Attn: Senior Legal Counsel
> 5555 Darrow Road
> Hudson, OH 44236

Exhibit H -- Page 1

Price Plaza, Katy, TX
EXECUTION VERSION: February 8, 2011

8. Nothing contained herein will: (a) amend, modify, waive or rescind any of the terms, conditions, covenants or obligations of the Lease; (b) waive or estop Tenant's right to declare a default based on facts of which the undersigned does not have actual knowledge, without inquiry or investigation; (c) waive or estop Tenant's right to claim any offset, claim or counterclaim resulting from an audit of Landlord's business records or public records; (d) waive or estop any claims, defenses, rights or remedies of Tenant; or (e) relieve the Landlord from any of its obligations under the Lease.

9. Tenant's statements exclude certification as to any matter that may be disclosed by audit, inspection, or examination of Landlord's records or public records relating to charges and monetary items under the Lease.

10. If there is any conflict between this certificate and the Lease, the Lease shall control.

11. Tenant acknowledges that you are relying upon this Estoppel Certificate and the accuracy of the information contained herein. Nevertheless, Tenant will not be liable to any party for damages of any kind whatsoever (whether direct, indirect, special, consequential or any other type) resulting from any statement in this certificate.


Dated:

                                   JO-ANN STORES, INC.


                                   By: _____
                                        David B. Goldston
                                        Senior Vice President, General Counsel,
                                        and Secretary


Exhibit H – Page 2

Price Plaza, Katy, TX
EXECUTION VERSION: February 8, 2011