**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| JOANN INC., *et al.*,[1] | ) | Case No. 25-10068 (CTG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**AMENDED DISCLOSURE STATEMENT FOR THE SECOND AMENDED JOINT CHAPTER 11 PLAN
OF JOANN INC. AND ITS DEBTOR AFFILIATES**

THIS IS A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN IN ACCORDANCE WITH
BANKRUPTCY CODE SECTION 1125 AND WITHIN THE MEANING OF BANKRUPTCY CODE
SECTION 1126. 11 U.S.C. §§ 1125, 1126. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS
SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY
SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

**COLE SCHOTZ P.C.**
Patrick J. Reilley (No. 4451)
Stacy L. Newman (No. 5044)
Michael E. Fitzpatrick (No. 6797)
Jack M. Dougherty (No. 6784)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone:     (302) 652-3131
Facsimile:      (302) 652-3117
Email:           preilley@coleschotz.com
                     snewman@coleschotz.com
                     mfitzpatrick@coleschotz.com
                     jdougherty@coleschotz.com

**KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Aparna Yenamandra, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900
Email:           joshua.sussberg@kirkland.com
                     aparna.yenamandra@kirkland.com

- and -

Anup Sathy, P.C. (admitted *pro hac vice*)
Jeffrey Michalik (admitted *pro hac vice*)
Lindsey Blumenthal (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200
Email:           anup.sathy@kirkland.com
                     jeff.michalik@kirkland.com
                     lindsey.blumenthal@kirkland.com

*Co-Counsel to the Debtors
and Debtors in Possession*

*Co-Counsel to the Debtors
and Debtors in Possession*

---

1    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:
JOANN Inc. (5540); Needle Holdings LLC (3814); Jo-Ann Stores, LLC (0629); Creative Tech Solutions LLC (6734);
Creativebug, LLC (3208); WeaveUp, Inc. (5633); JAS Aviation, LLC (9570); joann.com, LLC (1594); JOANN Ditto
Holdings Inc. (9652); Dittopatterns LLC (0452); JOANN Holdings 1, LLC (9030); JOANN Holdings 2, LLC (6408); and Jo-
Ann Stores Support Center, Inc. (5027). The Debtors' mailing address is 5555 Darrow Road, Hudson, Ohio 44236.

---

**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**

---

**THE DEADLINE TO VOTE ON THE PLAN IS**
**June 30, 2025, at 4:00 p.m. (prevailing Eastern Time)**

**FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE <u>ACTUALLY RECEIVED</u> BY KROLL RESTRUCTURING ADMINISTRATION LLC ON OR BEFORE THE VOTING DEADLINE AS DESCRIBED HEREIN.**

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO CERTAIN HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE *SECOND AMENDED JOINT CHAPTER 11 PLAN OF JOANN INC. AND ITS DEBTOR AFFILIATES.* NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. PRIOR TO DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE VII HEREIN.

THE DEBTORS URGE HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO VOTE TO <u>ACCEPT</u> THE PLAN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE TRANSACTIONS CONTEMPLATED THEREBY. FURTHER, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN ANTICIPATED EVENTS IN THE CHAPTER 11 CASES, AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE INCORPORATED BY REFERENCE HEREIN. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THEIR BOOKS AND RECORDS OR THAT WAS OTHERWISE MADE AVAILABLE TO THEM AT THE TIME OF SUCH PREPARATION AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS, THE WIND-DOWN DEBTORS, THE PLAN ADMINISTRATOR, OR THE GUC TRUST, AS APPLICABLE, MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION DATE OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE

SPECIFICALLY NOTED, AND THERE IS NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN. THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING ARTICLE VII OF THIS DISCLOSURE STATEMENT, ENTITLED "RISK FACTORS," BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

<u>SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS AND
ANY FINANCIAL INFORMATION CONTAINED HEREIN</u>

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THIS DISCLOSURE STATEMENT HAS NOT BEEN FILED WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "<u>SEC</u>"). THE PLAN OR DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC, ANY OTHER STATE SECURITIES COMMISSION OR OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT OR THE PLAN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY, IN ALL MATERIAL RESPECTS, OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE.

<u>FORWARD-LOOKING STATEMENTS</u>

THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT ARE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER FEDERAL SECURITIES LAWS. THE DEBTORS CONSIDER ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS TO BE FORWARD-LOOKING

STATEMENTS. READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS IN THIS DISCLOSURE STATEMENT ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE BUT ARE SUBJECT TO A WIDE RANGE OF RISKS. FORWARD-LOOKING STATEMENTS MAY INCLUDE STATEMENTS ABOUT THE DEBTORS':

- BUSINESS STRATEGY;

- FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES;

- LEVELS OF INDEBTEDNESS, LIQUIDITY, AND COMPLIANCE WITH DEBT COVENANTS;

- FINANCIAL STRATEGY, BUDGET, PROJECTIONS, AND OPERATING RESULTS;

- SUCCESSFUL RESULTS FROM THE DEBTORS' OPERATIONS;

- GENERAL ECONOMIC AND BUSINESS CONDITIONS;

- ADVERSE TAX CHANGES OR CONSEQUENCES;

- THE AMOUNT, NATURE, AND TIMING OF THE DEBTORS' CAPITAL EXPENDITURES;

- LIMITED ACCESS TO CAPITAL RESOURCES;

- THE ADEQUACY OF THE DEBTORS' CAPITAL RESOURCES AND LIQUIDITY TO SATISFY LIQUIDITY NEEDS;

- COUNTERPARTY CREDIT RISK;

- THE OUTCOME OF PENDING AND FUTURE LITIGATION; AND

- PLANS, OBJECTIVES, AND EXPECTATIONS, INCLUDING THE CONSUMMATION OF ANY SALE TRANSACTIONS.

STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE DEBTORS', THE WIND-DOWN DEBTORS', AND THE GUC TRUST'S FUTURE PERFORMANCE. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE DEBTORS', THE WIND-DOWN DEBTORS', OR THE GUC TRUST'S ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN. THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING: THE DEBTORS' ABILITY TO CONFIRM AND CONSUMMATE THE PLAN; THE POTENTIAL THAT THE DEBTORS MAY NEED TO PURSUE AN ALTERNATIVE TRANSACTION IF THE PLAN IS NOT CONFIRMED OR IF ANY SALE TRANSACTIONS ARE NOT CONSUMMATED; THE DEBTORS' ABILITY TO REDUCE OR ELIMINATE ANY DEBT OR OTHER OBLIGATIONS; THE POTENTIAL ADVERSE IMPACT OF THE CHAPTER 11 CASES ON THE DEBTORS' OPERATIONS, MANAGEMENT, AND EMPLOYEES; THE RISKS ASSOCIATED WITH OPERATING THE DEBTORS' BUSINESS DURING THE CHAPTER 11 CASES; CUSTOMER RESPONSES TO THE CHAPTER 11 CASES; THE DEBTORS' INABILITY TO DISCHARGE OR SETTLE CLAIMS DURING THE CHAPTER 11 CASES; GENERAL ECONOMIC, BUSINESS, AND MARKET CONDITIONS; EXPOSURE TO LITIGATION; THE DEBTORS' ABILITY TO DIVEST EXISTING BUSINESSES OR OTHERWISE MONETIZE ASSETS, INCLUDING THROUGH ANY SALE TRANSACTIONS; AND ADVERSE TAX CHANGES OR CONSEQUENCES.

THIS DISCLOSURE STATEMENT IS SUBJECT TO FURTHER REVISION AND MAY BE AMENDED TO, AMONG OTHER THINGS, TAKE INTO ACCOUNT FURTHER SPECIFICS OF ANY TRANSACTION TO BE CONSUMMATED PURSUANT TO THE PLAN, AND TO ACCOMMODATE ADDITIONAL REQUESTS FOR DISCLOSURE.

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ........................................................................................................1

II.     QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND
        THE PLAN ...............................................................................................................3

        A.      What is chapter 11? ........................................................................................3
        B.      Why are the Debtors sending me this Disclosure Statement? ...........................3
        C.      What is the GA Transaction? ...........................................................................3
        D.      Am I entitled to vote on the Plan? ....................................................................4
        E.      What will I receive from the Debtors if the Plan is consummated? ...................4
        F.      What happens to my recovery if the Plan is not confirmed or does not go effective? ...................7
        G.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the
                Plan goes effective, and what is meant by "Confirmation," "Effective Date," and
                "Consummation?" ...........................................................................................7
        H.      What are the sources of Cash and other consideration required to fund the Plan? ...........................7
        I.      What is the Wind-Down under the Plan? ..........................................................7
        J.      Is there potential litigation related to the Plan? ...............................................7
        K.      Will the final amount of Allowed General Unsecured Claims affect the recovery of
                Holders of Allowed General Unsecured Claims under the Plan? .......................8
        L.      Will there be releases and exculpation granted to parties in interest as part of the Plan? ................8
        M.      What is the deadline to vote on the Plan? .........................................................9
        N.      How do I vote for or against the Plan? ..............................................................9
        O.      Why is the Bankruptcy Court holding a Combined Hearing? ...........................9
        P.      When is the Combined Hearing set to occur? ....................................................9
        Q.      What is the purpose of the Combined Hearing? ...............................................10
        R.      What is the effect of the Plan on the Debtors' ongoing business? ....................10
        S.      Whom do I contact if I have additional questions with respect to this Disclosure
                Statement or the Plan? ...................................................................................10
        T.      Could subsequent events potentially affect recoveries under the Plan? ...........11
        U.      Do the Debtors recommend voting in favor of the Plan? ..................................11

III.    THE DEBTORS' PLAN .........................................................................................11

        A.      The Plan. .......................................................................................................11
        B.      Means for Implementation of the Plan. ..........................................................16

IV.     THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW ..........28

        A.      JOANN's Corporate History and Business Operations. ...................................28
        B.      The Debtors' Prepetition Capital Structure. ...................................................30

V.      EVENTS LEADING TO THE CHAPTER 11 FILINGS ..........................................33

VI.     MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11
        CASES .....................................................................................................................34

        A.      First Day Relief. ............................................................................................34
        B.      Appointment of Official Committee of Unsecured Creditors. ..........................34
        C.      Other Procedural and Administrative Motions. ..............................................35
        D.      Retention of Debtor Professionals. .................................................................35
        E.      Approval of Debtors' Use of Cash Collateral. .................................................36
        F.      Bidding Procedures, Marketing Process, and GA Transaction. ........................36
        G.      Assumption and Rejection of Executory Contracts and Unexpired Leases. ......37
        H.      Claims Based on Rejection of Executory Contracts or Unexpired Leases. .......39

I.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. ...................................39
J.      Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases. ..........40
K.      Insurance Policies. ..................................................................................................................41
L.      Modifications, Amendments, Supplements, Restatements, or Other Agreements. ........................42
M.      Filing of Statements of Financial Affairs and Schedules of Assets and Liabilities. .......................42
N.      The Investigation .....................................................................................................................42

**VII.    RISK FACTORS** .........................................................................................................................**42**

A.      Certain Bankruptcy Law Considerations. ..................................................................................42
B.      Other Risks. .............................................................................................................................46
C.      Disclosure Statement Disclaimer. .............................................................................................46

**VIII.   SOLICITATION AND VOTING PROCEDURES** ........................................................................**48**

A.      Holders of Claims Entitled to Vote on the Plan. ........................................................................48
B.      Voting Record Date. .................................................................................................................49
C.      Voting on the Plan. ...................................................................................................................49
D.      Ballots Not Counted. ................................................................................................................50

**IX.     CONFIRMATION OF THE PLAN** ...............................................................................................**50**

A.      Requirements for Confirmation of the Plan. ..............................................................................50
B.      Best Interests of Creditors. .......................................................................................................51
C.      Feasibility. ...............................................................................................................................52
D.      Acceptance by Impaired Classes. ..............................................................................................52
E.      Confirmation without Acceptance by All Impaired Classes. .......................................................53

**X.      CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE
        PLAN** ..........................................................................................................................................**54**

A.      Introduction. ............................................................................................................................54
B.      Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and Wind-
        Down Debtors. .........................................................................................................................55
C.      Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed
        Claims Entitled to Vote. ...........................................................................................................56
D.      Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of
        Allowed Claims. .......................................................................................................................58
E.      FATCA. ...................................................................................................................................59

**XI.     RECOMMENDATION** ................................................................................................................**60**

## EXHIBITS

**EXHIBIT A**    Chapter 11 Plan

**EXHIBIT B**    Corporate Organization Chart

## I.    INTRODUCTION

On May 5, 2025, JOANN Inc. and the other above-captioned debtors and debtors in possession (collectively, the "Debtors," and together with their non-Debtor affiliates, "JOANN" or the "Company") filed the *Disclosure Statement for the Amended Joint Chapter 11 Plan of JOANN Inc. and Its Debtor Affiliates* [Docket No. 810] and the *Amended Joint Chapter 11 Plan of JOANN Inc. and its Debtor Affiliates* [Docket No. 809].

The Debtors hereby submit this disclosure statement (this "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims against and Interests in the Debtors in connection with the solicitation of votes for acceptance of the *Second Amended Joint Chapter 11 Plan of JOANN Inc. and its Debtor Affiliates*, Filed on May 24, 2025 [Docket No. 986] (as may be amended, restated, supplemented, or modified from time to time, the "Plan").[1]  A copy of the Plan is attached hereto as **Exhibit A** and is incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the other Debtors.  The rules of interpretation set forth in Article I.B of the Plan govern the interpretation of this Disclosure Statement.

**THE DEBTORS SUPPORT THE PLAN AND BELIEVE THAT THE COMPROMISES AND SETTLEMENTS CONTEMPLATED BY THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS.  AT THIS TIME, THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

JOANN has been an American institution over the last 80 years, steadily growing into the nation's category leader in sewing and fabrics with one of the largest assortments of arts and crafts products. JOANN provides a comprehensive creative outlet for its customers, selling a variety of fabrics for a wide range of uses such as home improvement, décor, and fashion projects, sewing machines, other sewing supplies, crafting materials, technology and organizers, seasonal décor, and cake decorating materials. Through both its online and brick-and-mortar stores, JOANN has long been a staple in the crafting community.

More recently, however, JOANN faced a severe liquidity constraint caused by an outsized capital structure and operational cost center, subsequently impairing JOANN's ability to service its funded debt. As a result, JOANN filed for chapter 11 in early 2024 to implement a prepackaged plan of reorganization (the "Prior Cases") and emerged from the Prior Cases in April 2024.  Upon emergence, JOANN immediately turned to implementing its post-emergence business plan, but post-emergence challenges, including the prolonged impact of a sluggish retail economy, put JOANN back into an untenable debt position.  Accordingly, JOANN commenced a marketing process to attract bids for the sale of some or all of the Debtors' business as a going-concern or of some or all of the Debtors' assets.

On January 15, 2025 (the "Petition Date"), the Debtors commenced the Chapter 11 Cases in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), with the goal of continuing its comprehensive, strategic marketing process (the "Marketing Process").   Shortly before commencing these Chapter 11 Cases, the Company successfully negotiated a stalking horse agreement with Gordon Brothers Retail Partners, LLC (the "Stalking Horse") for the right to liquidate substantially all of the Debtors' assets (such agency agreement setting forth the terms of the GA Transaction, the "Stalking

---

[1]    Capitalized terms used but not otherwise defined in this Disclosure Statement have the meaning given to them in the Plan.

Horse Agreement," and such corresponding bid, the "Stalking Horse Bid")[2] in exchange for (i) the Debt Payoff, (ii) the Wind-Down Payments, (iii) Central Service Payments, and (iv) Expenses (all as defined in the Stalking Horse Agreement), setting the floor for other potential bids in the Debtors' Chapter 11 Cases.

On the Petition Date, the Debtors Filed a motion seeking Bankruptcy Court approval of bidding procedures for one or more sales of the Debtors' assets pursuant to section 363 of the Bankruptcy Code (collectively, the "363 Sales"), as well as certain sale process dates and deadlines [Docket No. 17] (the "Bidding Procedures Motion").  The Bidding Procedures Motion also sought Bankruptcy Court approval of the Debtors' entry into the Stalking Horse Agreement.  The Bankruptcy Court entered an order granting the Bidding Procedures Motion on February 16, 2025 [Docket No. 446] (the "Bidding Procedures Order").

Following the Marketing Process, which involved regular consultation with the requisite parties described in the Bidding Procedures, including the Official Committee of Unsecured Creditors (the "Committee"), and competition between two bidders at an auction held February 21–22, 2025 (the "Auction"), the Debtors entered into an agreement (the "Agency Agreement") with GA Joann Retail Partnership, LLC and the Prepetition Term Loan Agent (together, the "Purchaser") for the right to liquidate substantially all of the Debtors' assets (the "GA Transaction").  On February 26, 2025, the Bankruptcy Court entered an order approving the GA Transaction [Docket No. 520] (the "Approval Order").  Since then, the Debtors have operated their businesses in coordination with the Purchaser and commenced the liquidation of the assets obtained under the Agency Agreement.

Having completed the GA Transaction, the Plan's primary objective is to maximize value for all stakeholders and to distribute property of the Estates that is or becomes available for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that the Plan accomplishes this objective and is in the best interest of the Estates.

Generally, the Plan:

- designates a Plan Administrator to wind-down the Debtors' affairs, pay and reconcile certain Claims, and administer the Plan in an efficient manner;

- contemplates distributions being made pursuant to a waterfall priority scheme in accordance with the Bankruptcy Code;

- contemplates recoveries to Holders of Administrative Claims and Other Priority Claims as is necessary to satisfy section 1129 of the Bankruptcy Code; and

- provides for the creation of the GUC Trust for the benefit of Holders of General Unsecured Claims and Prepetition Term Loan Deficiency Claims pursuant to the Committee Settlement.

The Debtors believe that Confirmation of the Plan will avoid the lengthy delay and significant cost of liquidation under chapter 7 of the Bankruptcy Code.

The Debtors believe that the Plan maximizes stakeholder recoveries in these Chapter 11 Cases through the Marketing Process that was targeted to obtain the highest and best bids for the Debtors' assets. Accordingly, the Debtors urge all Holders of Claims entitled to vote to accept the Plan by returning their

---

[2]    The Stalking Horse Agreement can be found at Exhibit 2 to Docket No. 17.

ballots so that Kroll Restructuring Administration LLC,[3] the Debtors' claims and noticing agent (the "Claims and Noticing Agent"), actually receives such ballots by June 30, 2025, at 4:00 p.m. prevailing Eastern Time (the "Voting Deadline").  Assuming the Plan receives the requisite acceptances, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Combined Hearing (as defined below).

## II.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

### A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly-situated creditors and similarly-situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a chapter 11 plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor (whether or not such creditor or equity interest holder voted to accept the plan), and any other entity as may be ordered by the bankruptcy court.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B.    Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims or interests whose votes on the Plan are being solicited.  The Debtors will seek approval of this Disclosure Statement on a conditional basis, and this Disclosure Statement is being submitted in accordance with these requirements.  The Bankruptcy Court will consider final approval of this Disclosure Statement and the Plan at the Combined Hearing, which is scheduled for July 10, 2025, at 10:00 a.m., prevailing Eastern Time (the "Combined Hearing").

### C.    What is the GA Transaction?

Under the Plan, the Debtors shall distribute the proceeds from the GA Transaction.  Following the entry of the Approval Order, the Debtors and the GUC Trust will distribute proceeds to Holders of Allowed Claims in accordance with the Plan.  If the Debtors sell any assets remaining in the Debtors' possession following the completion of the GA Transaction, proceeds therefrom will also be distributed in accordance with the Plan.

---

[3]    The Bankruptcy Court approved the Debtors' retention of Kroll Restructuring Administration LLC as the Claims and Noticing Agent on January 17, 2025 [Docket No. 108].

The Debtors are satisfied that the GA Transaction represents the highest or otherwise best offer for the respective assets.

**D.      Am I entitled to vote on the Plan?**

Your ability to vote on, and your distribution (if any) under, the Plan depends on what type of Claim or Interest you hold and whether you held that Claim or Interest as of the Voting Record Date.  Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class."  Each Class's respective voting status is set forth below:

| Class | Claim/Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | Prepetition Term Loan Claims | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 6 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 7 | Interests in JOANN | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 8 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

**E.      What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to Holders of Claims or Interests under the Plan.  Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive Plan Distributions depends on the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan, except to the extent that such Holder agrees to less favorable treatment, the treatment described below in full and final satisfaction, compromise, settlement, and release of, and in exchange for, such Holder's Allowed Claim or Allowed Interest.  Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.**

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Principal Amount of Claims (in millions) | Projected Plan Recovery[4] |
| 1 | Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in exchange for such Allowed Other Secured Claim, on or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Other Secured Claim shall receive, at the option of the Debtors or Wind-Down Debtors, as applicable:  (i) payment in full in Cash of such Holder's Allowed Other Secured Claim; (ii) the collateral securing such Holder's Allowed Other Secured Claim; (iii) Reinstatement of such Holder's Allowed Other Secured Claim; or (iv) such other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired. | $.1[5] | 100% |
| 2 | Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, in exchange for such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later to occur of (i) the Effective Date and (ii) the date such Claim becomes Allowed (or as otherwise set forth in the Plan), each Holder of an Allowed Other Priority Claim will either be satisfied in full, in Cash, or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | $6.3 | 100% |
| 3 | Prepetition Term Loan Claims | Except to the extent that a Holder of an Allowed Prepetition Term Loan Claim agrees to less favorable treatment, pursuant to the Plan, and subject to the terms of the Committee Settlement set forth in the Plan, each Holder of Prepetition Term Loan Claims shall be entitled to their Pro Rata share of the Wind-Down Proceeds, if any, up to the Allowed amount of such Prepetition Term Loan Claims less the Credit Bid Amount. | $48.4 | 0-7% |

---

[4]   The Plan contemplates distributions on account of Allowed Claims being made pursuant to a waterfall priority scheme pursuant to the Bankruptcy Code.  Therefore, the projected recoveries for each class (other than Class 4 given Holders of Allowed Claims in such class shall receive distributions from the GUC Trust) listed in this chart depend entirely on the extent to which classes senior to them are satisfied.

[5]   This figure does not include any contingent Claims secured by letters of credit.

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Principal Amount of Claims (in millions) | Projected Plan Recovery[4] |
| 4 | General Unsecured Claims | Except to the extent that a Holder of a General Unsecured Claim or Prepetition Term Loan Deficiency Claim agrees to less favorable treatment, each Holder of an Allowed General Unsecured Claim and Allowed Prepetition Term Loan Deficiency Claim shall receive the following:  (i) Holders of Allowed General Unsecured Claims, excluding Holders of Allowed Prepetition Term Loan Deficiency Claims, shall receive their Pro Rata share of the Class A GUC Trust Interests; and (ii) Holders of Allowed Prepetition Term Loan Deficiency Claims shall receive their Pro Rata share of the Class B GUC Trust Interests. | $559.5 | 0-1%[6] |
| 5 | Intercompany Claims | Allowed Intercompany Claims, to the extent not assumed pursuant to the terms of the Approval Order, shall, at the election of the applicable Debtors or Wind-Down Debtors, be (a) Reinstated, (b) converted to equity, (c) otherwise set off, settled, distributed, contributed, cancelled, or released without any distribution on account of such Intercompany Claims, or (d) otherwise addressed at the option of the Debtors or Wind-Down Debtors, in each case, in accordance with the Wind-Down Transactions Memorandum. | $420.0 | 0% |
| 6 | Intercompany Interests | Allowed Intercompany Interests shall, at the election of the Debtors or Wind-Down Debtors, be (a) Reinstated,  (b) set off, settled, addressed, distributed, contributed, merged, cancelled, or released without any distribution on account of such Intercompany Interests, or (c) otherwise addressed at the option of the Debtors or Wind-Down Debtors, in each case, in accordance with the Wind-Down Transactions Memorandum. | N/A | N/A |
| 7 | Interests in JOANN | Interests in JOANN shall be cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Interests in JOANN will not receive any distribution on account of such Interests. | N/A | N/A |
| 8 | Section 510(b) Claims | Allowed Section 510(b) Claims, if any, shall be cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Allowed Section 510(b) Claims will not receive any distribution on account of such Allowed Section 510(b) Claims. | N/A | N/A |

---

6    Recovery subject to contract rejection damage claims.

**F.**     **What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code.  Conversion to chapter 7 would require the Debtors to incur expenses related to the chapter 7 trustee and additional retained professionals, and such expenses may decrease recoveries for Holders of Allowed Claims in the Voting Classes (as defined herein). *See, e.g.*, 11 U.S.C. §§ 326(a); 503(b)(2).  The conversion to chapter 7 would require entry of a new bar date, which may increase the amount of Allowed Claims and thereby reduce Pro Rata recoveries.  *See* Fed. R. Bankr. P. 1019(2), 3002(c).

**G.**     **If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases approving the Plan.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can "go effective." Distributions to Holders of Allowed Claims will only be made on the date the Plan becomes effective— the "Effective Date"—as soon as reasonably practicable thereafter, or as otherwise specified in the Plan. *See* Article IX of this Disclosure Statement, entitled "Confirmation of the Plan," for a discussion of the conditions precedent to consummation of the Plan.  "Consummation" means the occurrence of the Effective Date.

**H.**     **What are the sources of Cash and other consideration required to fund the Plan?**

The Debtors, Wind-Down Debtors, and the GUC Trust, as applicable, shall make the distributions and perform their respective obligations under the Plan with the Wind-Down Debtors' Assets (excluding any amounts to be included in the Professional Fee Escrow Account) and the GUC Trust Assets, as applicable, on and after the Effective Date.

**I.**     **What is the Wind-Down under the Plan?**

After the Effective Date, the Debtors will initiate a Wind-Down process.  The Wind-Down is the wind-down, liquidation, and dissolution of each of the Wind-Down Debtors, which will include, among other things, the disposition of some or all of the Wind-Down Debtors' remaining assets, potentially through one or more GA Transactions, together with a waterfall distribution of the net cash proceeds (if any) and wind-down of each of the Debtors' post-sale Estates, all as provided in the Plan.  A Plan Administrator will be appointed to facilitate the Wind-Down.

**J.**     **Is there potential litigation related to the Plan?**

Parties in interest may object to Confirmation of the Plan, which objections potentially could give rise to litigation.

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting Classes.  The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it

determines that the Plan satisfies section 1129(b) of the Bankruptcy Code.  *See* Article VII.A.5 of this Disclosure Statement, entitled "Nonconsensual Confirmation."

**K.    Will the final amount of Allowed General Unsecured Claims affect the recovery of Holders of Allowed General Unsecured Claims under the Plan?**

The Debtors' current estimate of aggregate Allowed General Unsecured Claims ranges from approximately $0 to $559,500,000.

Although the Debtors' estimate of Allowed General Unsecured Claims is generally the result of the Debtors' and their advisors' analysis of reasonably available information, the projected amount of Allowed General Unsecured Claims set forth herein is subject to material change (either higher or lower), which difference could materially affect Class 4 recoveries, and reflects the Debtors' current view on potential rejection damages.  The Debtors may also reject Executory Contracts and Unexpired Leases, which may result in parties asserting General Unsecured Claims for rejection damages.  Any change in the number, identity, or timing of actual rejected Executory Contracts and Unexpired Leases could have a material impact on the amount of Allowed General Unsecured Claims.  To the extent that the actual amount of rejection damages Claims changes, the value of recoveries to Holders of Allowed General Unsecured Claims could change as well, and such changes could be material.

Finally, the Debtors and the GUC Trust may also object to certain Proofs of Claim, and any such objections ultimately could cause the total amount of General Unsecured Claims to change.  These changes could affect recoveries to Holders of Allowed General Unsecured Claims, and such changes could be material.

**L.    Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes.  The Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The Debtors' releases, third-party releases (which are solely applicable to parties that opt in to granting such release), and exculpation provisions included in the Plan are an integral part of the Debtors' chapter 11 efforts.

The Released Parties and the Exculpated Parties have made or are expected to make substantial and valuable contributions to the Debtors' chapter 11 process through efforts to negotiate and implement the Plan, which will maximize the value of the Debtors' estates for the benefit of all parties in interest. Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.  Importantly, each of the Releasing Parties will be deemed to have expressly, unconditionally, generally, individually, and collectively released all Claims and Causes of Action against the Debtors and the Released Parties.

The Releasing Parties are each of, and in each case in its capacity as such:  (a) the Debtors; (b) each of the Wind-Down Debtors; (c) the Plan Administrator; (d) the Prepetition ABL Lenders; (e) the Prepetition FILO Lenders; (f) the Prepetition Term Loan Lenders; (g) the Prepetition ABL Agent; (h) the Prepetition FILO Agent; (i) the Prepetition Term Loan Agent; (j) all Holders of Claims against the Debtors who vote to accept the Plan and who affirmatively opt in to the releases provided by the Plan; (k) all Holders of Claims against the Debtors who vote to reject the Plan and who affirmatively opt in to the releases provided by the Plan; (l) all Holders of Claims against the Debtors who are deemed to reject the Plan and who affirmatively opt in to the releases provided by the Plan; (m) all Holders of Claims against the Debtors who are deemed to accept the Plan and who affirmatively opt in to the releases provided by the Plan; (n) all Holders of Interests in the Debtors who affirmatively opt in to the releases provided by the Plan; (o) the Committee and its members (solely in their capacity as Committee members and not as Holders of Claims);

8

(p) each current and former Affiliate of each Entity in clause (a) through the following clause (q) for which such Entity is legally entitled to bind such Affiliate to the releases contained in the Plan under applicable non-bankruptcy law; and (q) each Related Party of each Entity in clause (a) through this clause (q) for which such Affiliate or Entity is legally entitled to bind such Related Party to the releases contained in the Plan under applicable non-bankruptcy law; *provided* that each such Entity that elects not to opt into the releases contained in the Plan, such that it is not a Releasing Party in its capacity as a Holder of a Claim or Interest shall nevertheless be a Releasing Party in each other capacity applicable to such Entity.

The Released Parties are each of, and in each case in its capacity as such: (a) the Debtors; (b) each of the Wind-Down Debtors; (c) the Plan Administrator; (d) the Prepetition ABL Lenders; (e) the Prepetition FILO Lenders; (f) the Prepetition Term Loan Lenders; (g) the Prepetition ABL Agent; (h) the Prepetition FILO Agent; (i) the Prepetition Term Loan Agent; (j) the Releasing Parties; (k) the Committee and its members (in their capacity as Committee members); (l) the GUC Trust and the GUC Trustee; (m) the Purchaser; (n) each current and former Affiliate of each Entity in clause (a) through the following clause (o); and (o) each Related Party of each Entity in clause (a) through this clause (o); *provided however*, that none of the Excluded Parties shall be Released Parties.

The Exculpated Parties are:  collectively, (a) each of the Debtors; (b) the Committee and each of its respective members in their capacity as such; and (c) with respect to the Entities in clauses (a) through (b), each of their respective current and former directors, managers, officers, attorneys, financial advisors, consultants, or other professionals or advisors that served in such capacity between the Petition Date and Effective Date.

The Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Third Circuit.  Moreover, the Debtors will present evidence at the Combined Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.  The release, exculpation, and injunction provisions that are contained in the Plan are copied in Article III.A.4 of this Disclosure Statement, entitled "Releases."

**M.      What is the deadline to vote on the Plan?**

The Voting Deadline is June 30, 2025, at 4:00 p.m. (prevailing Eastern Time).

**N.      How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan.  For your vote to be counted, your ballot must be properly completed, executed, and delivered as directed, so that your ballot including your vote is **actually received** by the Debtors' Claims and Noticing Agent **on or before the Voting Deadline, which is June 30, 2025, at 4:00 p.m. (prevailing Eastern Time)**.  *See* Article VIII of this Disclosure Statement, entitled "Solicitation and Voting Procedures."

**O.      Why is the Bankruptcy Court holding a Combined Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

**P.      When is the Combined Hearing set to occur?**

The Combined Hearing is scheduled for July 10, 2025 at 10:00 a.m., prevailing Eastern Time.  The Combined Hearing may be adjourned from time to time without further notice.  Objections to the Plan and

to final approval of this Disclosure Statement must be Filed and served on the Debtors, and certain other parties, by no later than June 27, 2025, at 4:00 p.m. (prevailing Eastern Time) in accordance with the notice of the Combined Hearing that accompanies this Disclosure Statement and the Interim Disclosure Statement Order (as defined below) incorporated herein by reference.

**Q.    What is the purpose of the Combined Hearing?**

The confirmation of a chapter 11 plan by a bankruptcy court binds the debtor, any person acquiring property under a chapter 11 plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a chapter 11 plan discharges a debtor from any debt that arose before the confirmation of such chapter 11 plan and provides for the treatment of such debt in accordance with the terms of the confirmed chapter 11 plan. One of those exceptions, applicable here, provides that the confirmation of a plan does not discharge a debtor if (i) the plan provides for the liquidation of all or substantially all of the property of the estate, (ii) the debtor does not engage in business after consummation of the plan, and (iii) the debtor would be denied a discharge in a case under chapter 7 of the Bankruptcy Code. Because the Debtors and the Plan satisfy each of the foregoing requirements, they will not receive discharges in these Chapter 11 Case.

**R.    What is the effect of the Plan on the Debtors' ongoing business?**

The Debtors are liquidating under chapter 11 of the Bankruptcy Code.  Following Confirmation, the Plan will be consummated on the Effective Date, which is the date that is the first Business Day after the Confirmation Date on which (i) no stay of the Confirmation Order is in effect and (ii) all conditions precedent to the occurrence of the Effective Date set forth in Article IX of the Plan have been satisfied or waived.  On or after the Effective Date, and unless otherwise provided in the Plan, the Plan Administrator will commence the wind-down of the Wind-Down Debtors in accordance with the terms of the Plan and the Wind-Down Budget.  Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved, including the creation of the GUC Trust.

**S.    Whom do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Claims and Noticing Agent, Kroll Restructuring Administration LLC, via one of the following methods:

> *By regular mail, hand delivery, or overnight mail at:*
> JOANN Inc.
> Ballot Processing Center
> c/o Kroll Restructuring Administration LLC
> 850 Third Avenue, Suite 412
> Brooklyn, NY 11232
>
> *By electronic mail at:*
> JoannInfo@ra.kroll.com (with "Joann Inc. Solicitation Inquiry" in the subject line)
>
> *By telephone (toll free) at:*
> (844) 712-2239 (U.S./Canada, toll-free) or +1 (646) 863-7121 (International, toll)

Copies of the Plan, this Disclosure Statement, and any other publicly Filed documents in the Chapter 11 Cases are available upon written request to the Claims and Noticing Agent at the addresses and

telephone numbers above or by downloading the exhibits and documents from the website of the Claims and Noticing Agent at https://cases.ra.kroll.com/Joann2025 (free of charge) or the Bankruptcy Court's website at http://www.deb.uscourts.gov (for a fee).

**T.      Could subsequent events potentially affect recoveries under the Plan?**

Potentially, yes.  Recoveries under the Plan are only guaranteed after the Plan is Confirmed and the Effective Date is reached.  Any number of subsequent events may interfere with Plan recoveries.

**U.      Do the Debtors recommend voting in favor of the Plan?**

Yes.  The Debtors believe that the Plan provides for a larger distribution to Holders of Claims than would otherwise result from any other available alternative.  The Debtors believe that the Plan is in the best interest of all Holders of Claims or Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

## III.    THE DEBTORS' PLAN

**A.      The Plan.**

As discussed in this Article III, the Plan contemplates liquidating the Debtors' remaining business and assets following the consummation of the GA Transaction under chapter 11 of the Bankruptcy Code. The Plan contemplates the following key terms, among others described herein and therein:

**1.   General Settlement of Claims and Interests.**

Pursuant to the Bankruptcy Code and Bankruptcy Rules, and in consideration of the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies resolved pursuant to the Plan.  Pursuant to the Bankruptcy Code and Bankruptcy Rules, the Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies, and entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests.  Subject to Article VI of the Plan, all Plan Distributions made to Holders of Allowed Claims that are settlement parties are intended to be and shall be final.

**2.   GA Transaction.**

The GA Transaction is the sale of certain of the Debtors' assets pursuant to the Agency Agreement. Following the competitive Marketing Process, Auction, and entry of the Approval Order, the Debtors consummated the GA Transaction.  The GA Transaction provided value to the Debtors' estates, including through the Committee Settlement.

The Debtors may enter into additional sale transactions for their remaining assets following consummation of the GA Transaction.  If any such transactions occur, proceeds therefrom will be distributed in accordance with the Plan.

### 3. Recoveries to Certain Holders of Claims against and Interests in the Debtors.

The recoveries to Holders of Claims against and Interests in the Debtors are described in Article II.E of this Disclosure Statement, entitled "What will I receive from the Debtors if the Plan is consummated?"

### 4. Releases.

The Plan contains certain releases, as described in Article II.L of this Disclosure Statement, entitled "Will there be releases and exculpation granted to parties in interest as part of the Plan?" The release, exculpation, and injunction provisions that are contained in the Plan are copied in pertinent part below.

#### (a) Release of Liens.

**Except as otherwise provided in the Plan, the Plan Supplement, Confirmation Order, or any contract, instrument, release, or other agreement or document created pursuant to the Plan or Confirmation Order, immediately following the making of all distributions to be made to an applicable Holder pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to reinstate in accordance with Article III.B.1 of the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be automatically, unconditionally, and fully released, settled, and compromised, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert automatically and unconditionally to the applicable Debtor and its successors and assigns. Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to promptly take such actions as may be reasonably requested by the Wind-Down Debtors to evidence the release of such Lien and/or security interest, including the execution, delivery, and Filing or recording of such releases. The presentation or Filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

**If any Holder of a Secured Claim that has been satisfied or released in full pursuant to the Plan or the Confirmation Order, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as reasonably practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors or the Wind-Down Debtors that are necessary or desirable to record or effectuate the cancelation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Wind-Down Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.**

#### (b) Releases by the Debtors.

**Notwithstanding anything contained in the Plan or the Confirmation Order to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, upon entry of the Confirmation Order and effective as of the Effective Date, to the fullest extent permitted by applicable law, each Released Party is, and is deemed hereby to be, fully, conclusively, absolutely, unconditionally, irrevocably, and forever released by each and all of the Debtors, the Wind-Down Debtors, and their Estates, in each case on behalf of**

12

themselves and their respective successors, assigns, and representatives, including any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Wind-Down Debtors, or their Estates, that any such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against or Interest in a Debtor, the Wind-Down Debtors, or other Entity, or that any Holder of any Claim against or Interest in a Debtor, the Wind-Down Debtors, or other Entity could have asserted on behalf of the Debtors or the Wind-Down Debtors (but excluding any and all direct claims any such Holder of a Claim or Interest may have), to the extent such Claim or Cause of Action (x) has not been sold pursuant to the GA Transaction Documents and Approval Order(s) and (y) is based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Wind-Down Debtors  (including the Debtors' and the Wind-Down Debtors' capital structure, management, ownership, or operation thereof or otherwise), the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor or Wind-Down Debtor and any Released Party, the Debtors' in or out of court restructuring efforts (including the marketing, bidding, auction, and sale related processes leading to the GA Transaction), the purchase, sale, or rescission of any security of the Debtors or the Wind-Down Debtors, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors or the Wind-Down Debtors or any GUC Trust Causes of Action that constitute Avoidance Actions), intercompany transactions between or among a Debtor, the Wind-Down Debtors, or an Affiliate of a Debtor and another Debtor, the Wind-Down Debtors, or Affiliate of a Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Disclosure Statement, the Plan, the Plan Supplement, the GA Transaction, any other Definitive Document or any Wind-Down Transaction, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan, the Plan Supplement, the GA Transaction, any other Definitive Document, any of the Wind-Down Transactions, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of the GA Transaction, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for any claims arising from or related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release: (1) any obligations arising on or after the Effective Date (solely to the extent such obligation does not arise from any acts or omissions prior to the Effective Date) of any party or Entity under the Plan, the Confirmation Order, or any post-Effective Date transaction contemplated by the Plan or the Wind-Down Transactions, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the Wind-Down Transactions; or (2) any matters retained by the Wind-Down Debtors pursuant to the Schedule of Retained Causes of Action.

(c)      Releases by the Releasing Parties.

Except as otherwise expressly set forth in the Plan or the Confirmation Order, effective as of the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed hereby to be, fully, conclusively, absolutely, unconditionally, irrevocably, and forever released by each Releasing Party from any and all claims

and Causes of Action, whether known or unknown, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Wind-Down Debtors, or their Estates, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to or in any manner arising from, in whole or in part, the Debtors or the Wind-Down Debtors (including the Debtors' and the Wind-Down Debtors' capital structure, management, ownership, or operation thereof or otherwise), the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor or Wind-Down Debtor and any Released Party, the Debtors' in or out of court restructuring efforts (including the marketing, bidding, auction, and sale related processes leading to the GA Transaction), the purchase, sale, or rescission of any security of the Debtors or the Wind-Down Debtors, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted by the Debtors or the Wind-Down Debtors or any GUC Trust Causes of Action that constitute Avoidance Actions), intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Disclosure Statement, the Plan, the Plan Supplement, the GA Transaction, any other Definitive Document, or any Wind-Down Transaction, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan, the Plan Supplement, the GA Transaction, any other Definitive Document, any of the Wind-Down Transactions, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of the GA Transaction, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for any claims arising from or related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence.

Notwithstanding anything to the contrary in the foregoing, the Third-Party Release does not release (1) any obligations arising on or after the Effective Date (solely to the extent such obligation does not arise from any acts or omissions prior to the Effective Date) of any party or Entity under the Plan, the Confirmation Order, or any post-Effective Date transaction contemplated by the Plan or the Wind-Down Transactions, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the Wind-Down Transactions or (2) the rights of any Holder of Allowed Claims to receive distributions under the Plan.

(d)    Exculpation.

Except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur any liability for, and each such party shall be exculpated from any Cause of Action for any claim related to any act or omission occurring between the Petition Date and the Effective Date in connection with, relating to or arising out of the Chapter 11 Cases prior to the Effective Date, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the GA Transaction, the Plan, the Plan Supplement, any other Definitive Document, or any Wind-Down Transaction, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan, the Plan Supplement, the GA Transaction, any other Definitive Document, any of the Wind-Down Transactions, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of the GA Transaction, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted gross negligence, willful misconduct, or actual fraud. Notwithstanding anything to the contrary in the foregoing, the exculpation set forth above does not

14

exculpate any obligations arising on or after the Effective Date of any Person or Entity under the Plan, any post-Effective Date transaction contemplated by the Wind-Down Transactions, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

(e)    Injunction.

In accordance with Bankruptcy Code section 1141(d)(3), the Plan does not discharge the Debtors. Section 1141(c) of the Bankruptcy Code nevertheless provides, among other things, that the property dealt with by the Plan is free and clear of all Claims and Interests against the Debtors. Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Persons or Entities who have held, hold, or may hold Claims, Interests, or Causes of Action in the Debtors and the Wind-Down Debtors, shall be precluded and permanently enjoined on and after the Effective Date, from taking any of the following actions against the Debtors, the Wind-Down Debtors (but solely to the extent such action is brought against the Debtors or the Wind-Down Debtors to directly or indirectly recover upon any property of the Estates dealt with by the Plan, upon the Effective Date) the Exculpated Parties, the Released Parties, and any successors, assigns, or representatives of such Persons or Entities, solely with respect to any Claims, Interests, or Causes of Action that will be or are treated by the Plan: (a) commencing or continuing in any manner any Claim, action, or other proceeding of any kind; (b) enforcing, attaching, collecting, or recovering by any manner or means of any judgment, award, decree, or order; (c) creating, perfecting, or enforcing any encumbrance of any kind; (d) asserting any right of setoff or subrogation of any kind against any obligation due from such Entities or against the property of such Entities unless such holder exercised such setoff prior to the Petition Date or such setoff is otherwise permissible under applicable law, and notwithstanding an indication of a Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released or settled pursuant to the Plan. All Persons or Entities who directly or indirectly have held, hold, may hold, or seek to assert Claims or Causes of Action that (x) have been released in the Plan (the "Released Claims") or (y) that are subject to exculpation (the "Exculpated Claims"), shall be enjoined from (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to the Released Claims and Exculpated Claims; (ii) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree, or order on account of or in connection with or with respect to the Released Claims and Exculpated Claims; (iii) creating, perfecting, or enforcing any encumbrance of any kind on account of or in connection with or with respect to the Released Claims and Exculpated Claims; (iv) asserting any right of subrogation on account of or in connection with or with respect to the Released Claims and Exculpated Claims, except to the extent that a permissible right of subrogation is asserted with respect to a timely filed Proof of Claim; or (v) or commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to the Released Claims and Exculpated Claims; *provided, however*, that the foregoing injunction shall have no effect on the liability of any person or Entity that results from any act or omission based on or arising out of gross negligence, fraud, or willful misconduct. Notwithstanding anything to the contrary in the Plan, the Plan Supplement, or the Confirmation Order, the automatic stay pursuant to section 362 of the Bankruptcy Code shall remain in full force and effect with respect to the Debtors and any property dealt with by the Plan until the closing of these Chapter 11 Cases. Notwithstanding anything to the contrary in the foregoing, the injunction set forth above does not enjoin (1) a Holder of a Claim or Interest that is not a Releasing Party from taking any actions described in Article VIII.E of the Plan solely with respect to any direct claim of such Holder that is not an Exculpated Claim or (2) the enforcement of any obligations arising on or after the Effective

**Date of any Person or Entity under the Plan, any post-Effective Date transaction contemplated by the Wind-Down Transactions, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.**

**Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, managers, principals, and direct and indirect Affiliates, in their capacities as such, shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Each Holder of an Allowed Claim, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in Article VIII.E of the Plan.**

For more detail, *see* Article VIII of the Plan, entitled "Settlement, Release, Injunction, and Related Provisions," which is incorporated herein by reference.

### B.    Means for Implementation of the Plan.

#### 1.    Sources of Consideration for Plan Distributions and Waterfall Recovery.

On or after the Effective Date, the Debtors, Wind-Down Debtors or the Plan Administrator, as applicable, shall make Plan Distributions on account of Allowed Claims (other than Allowed General Unsecured Claims) or Prepetition Term Loan Deficiency Claims in accordance with Article III.B of the Plan using the Wind-Down Proceeds from liquidating the Wind-Down Debtors' Assets (excluding any amounts to be included in the Professional Fee Escrow Account or any amounts that constitute GUC Trust Assets), as follows: (a) *first*, on account of Allowed Administrative Claims and Priority Tax Claims; (b) *second*, on account of Allowed Other Secured Claims (solely to the extent such proceeds are on account of collateral for such Allowed Other Secured Claim), if any; (c) *third*, on account of Allowed Other Priority Claims, if any; and (d) *fourth*, on account of Allowed Prepetition Term Loan Claims (less the Credit Bid Amount) (collectively, the "Waterfall Recovery").

On or after the Effective Date, the GUC Trust shall be responsible for making Plan Distributions on account of Prepetition Term Loan Deficiency Claims and Allowed General Unsecured Claims in Class 4 in accordance with Article III.B.4 of the Plan from the GUC Trust Assets.

#### 2.    Wind-Down Debtors.

##### (a)    Purpose.

The Debtors shall continue in existence after the Effective Date as the Wind-Down Debtors for the purposes of (1) winding down the Debtors' businesses and affairs as expeditiously as reasonably possible and liquidating any Wind-Down Debtors' Assets held by the Wind-Down Debtors, if any, (2) resolving any Disputed Claims (other than Disputed General Unsecured Claims), (3) paying or otherwise satisfying Allowed Claims (other than Allowed General Unsecured Claims) in accordance with the Waterfall Recovery, (4) filing appropriate tax returns (and, for the avoidance of doubt, may pursue any refunds, credits, or other tax benefits to which the Debtors and/or the Wind-Down Debtors are entitled and file any tax returns or other filings as are required in connection therewith), (5) winding down and dissolving any direct or indirect subsidiaries of the Wind-Down Debtors, and (6) administering the Plan in an efficacious manner.  Except as otherwise set forth in the Plan with respect to the GUC Trust, the Wind-Down Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (x) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court and (y) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each

case without the need or requirement for the Plan Administrator to File motions or substitutions of parties or counsel in each such matter.

(b)    **Vesting of Assets.**

On the Effective Date, the Wind-Down Debtors' Assets shall vest in the Wind-Down Debtors for the primary purpose of liquidating the Wind-Down Debtors' Assets and winding down the Debtors' Estates, with no objective to continue or engage in the conduct of a trade or business. The Wind-Down Debtors will, in an expeditious but orderly manner, liquidate and convert to Cash the Wind-Down Debtors' Assets, make timely Plan Distributions, and not unduly prolong its duration. Such assets shall be held free and clear of all Liens, Claims, and interests of Holders of Claims and Interests, except as otherwise provided in the Plan or in any other order of the Bankruptcy Court. The Wind-Down Debtors shall be deemed to be fully bound by the terms of the Plan and the Confirmation Order.

(c)    **Plan Administrator.**

On the Effective Date, the authority, power, and incumbency of the persons acting as directors and officers of each of the Debtors shall be deemed to have been terminated and such persons shall be deemed to have resigned, solely in their capacities as such, and the Plan Administrator shall have the power and authority to implement the Plan and take any actions reasonably necessary to further such implementation, subject to the Committee Settlement.

The Plan Administrator shall have the power and authority to implement the Wind-Down Transactions, including administering Allowed Administrative Claims from the Wind-Down Budget and administering and distributing the amounts set forth in the 503(b)(9) Reserve in accordance with the Plan. The Plan Administrator shall be entitled to retain the services of attorneys, accountants, and other professionals that, in the discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties. The reasonable and documented fees and expenses of such professionals shall be paid by solely in accordance with the Plan Administrator Budget. The payment of the reasonable and documented fees and expenses of the Plan Administrator's retained professionals shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court.

(d)    **Exculpation, Indemnification, Insurance, and Liability Limitation.**

The Plan Administrator and all professionals retained by the Plan Administrator, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by each of the Wind-Down Debtors. The Plan Administrator may obtain, at the expense of the Wind-Down Debtors, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Wind-Down Debtors. The Plan Administrator may rely upon written information previously generated by the Debtors.

(e)    **Tax Returns.**

After the Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state, local and non-U.S. tax returns for each of the Debtors and the Wind-Down Debtors (and, for the avoidance of doubt, the Plan Administrator may pursue any refunds, credits, or other tax benefits to which the Debtors and the Wind-Down Debtor are entitled and file any tax returns or other filings as are required in connection therewith), and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

**(f)    Dissolution of the Wind-Down Debtors.**

Upon a certification to be Filed with the Bankruptcy Court by the Plan Administrator of all Plan Distributions having been made and completion of all its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, each of the Wind-Down Debtors shall be deemed to be dissolved without any further action by such Wind-Down Debtor, including the filing of any documents with the secretary of state for the state in which each such Wind-Down Debtor is formed or any other jurisdiction. The Plan Administrator, however, shall have authority to take all necessary actions to dissolve the Wind-Down Debtors in and withdraw the Wind-Down Debtors from applicable states.

### 3.    Committee Settlement.

On February 26, 2025, the Debtors, the Committee, the Prepetition ABL Agent, the Prepetition FILO Agent, the Prepetition Term Loan Agent, the Prepetition Term Loan Ad Hoc Group, and GA Joann Retail Partnership, LLC agreed to the terms of the Committee Settlement in connection with the GA Transaction, which were approved by the Bankruptcy Court in the Approval Order. The Committee Settlement provides for the following:

(a)    a reserve of $9,000,000 in the Wind-Down Budget for Allowed Stub Rent payments (the "Stub Rent Reserve") which was used to pay Allowed Stub Rent Claims of landlords, provided that any portion of the Stub Rent Reserve remaining after all Allowed Stub Rent Claims have been paid shall be available for satisfaction of other items in the Wind-Down Budget;

(b)    a reserve of $30,000,000 for the payment of Allowed 503(b)(9) Claims (the "503(b)(9) Reserve") pursuant to the 503(b)(9) Reconciliation Procedures;

(c)    a reserve of $1,500,000 (the "GUC Guarantee"), which shall be paid by the Debtors or the Wind-Down Debtors from the 503(b)(9) Reserve (with the current amount of such reserve totaling $30,000,000) on the Effective Date to the GUC Trust. Within ten (10) business days of the conclusion of the reconciliation of Allowed 503(b)(9) Claims (in accordance with the 503(b)(9) Reconciliation Procedures), to the extent the sum of Allowed 503(b)(9) Claims exceeds $28,500,000 (the remainder of the 503(b)(9) Reserve), Purchaser shall pay to the 503(b)(9) Reserve the equivalent value of Allowed 503(b)(9) Claims that exceeds $28,500,000, up to a maximum of $1,500,000; provided that, for the avoidance of doubt, the Purchaser shall not be obligated to pay any amounts to the GUC Trust pursuant to this section prior to the conclusion of the reconciliation process for Allowed 503(b)(9) Claims in accordance with the 503(b)(9) Reconciliation Procedures. For the avoidance of doubt, if the sum of Allowed 503(b)(9) Claims is less than $28,500,000, then such resulting 503(b)(9) Savings shall be split 50% to the GUC Trust and 50% to the Purchaser;

(d)    a $1,000,000 payment to the GUC Trust from (i) the accrued weekly cash collateral consent fees of $37,500 owing to each of the Prepetition ABL Agent and the Prepetition FILO Agent through entry of the Cash Collateral

Order; and (ii) the remainder from the FILO paydown at the closing of the GA Transaction (the "FILO Reserve");

(e)    the Purchaser's acquisition and covenant not to pursue any and all Avoidance Actions;

(f)    the agreement of the Prepetition Term Loan Ad Hoc Group not to oppose the waiver of the Prepetition Term Loan Lenders' right to receive a recovery from the first $5,000,000 of value available for distribution to Holders of Allowed General Unsecured Claims;

(g)    the payment (from the Carve Out Reserves (as defined in the Cash Collateral Order) or, to the extent the Carve Out Reserves are insufficient, the GUC Guarantee and/or the FILO Reserve) of all Allowed fees and expenses incurred by the Committee's Professionals through the closing of the GA Transaction that are approved by the Bankruptcy Court;

(h)    the Post-Closing UCC Budget for the Committee's professionals with any unused amounts from the Post-Closing UCC Budget, after payment of the Allowed Professional Fee Claims of the Committee's Professionals, contributed to the GUC Trust (the "Committee Budget Savings"); and

(i)    the creation of the GUC Trust, with the Committee to select the GUC Trustee.

**4.    GUC Trust.**

**(a)    Creation, Vesting of Assets, and Governance of the GUC Trust.**

On the Effective Date, the Debtors and the GUC Trustee shall execute the GUC Trust Agreement and shall take all steps necessary to establish the GUC Trust in accordance with the Plan and the beneficial interests therein, which shall be for the benefit of the GUC Trust Beneficiaries. Additionally, on the Effective Date, to the extent applicable, the Debtors shall irrevocably transfer and shall be deemed to have irrevocably transferred to the GUC Trust all of the Debtors' rights, title, and interest in and to all of the GUC Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, and to the extent applicable, the GUC Trust Assets shall automatically vest in the GUC Trust without further action by any person, free and clear of all Claims, Liens, encumbrances, or interests subject only to the GUC Trust Interests and the GUC Trust Expenses, as provided for in the GUC Trust Agreement, and such transfer shall be exempt from any stamp, real estate transfer, other transfer, mortgage reporting, sales, use, or other similar tax. To the extent that the Debtors or the Wind-Down Debtors come into possession of GUC Trust Assets after the Effective Date, the Debtors or the Wind-Down Debtors, as applicable, shall immediately and irrevocably transfer such assets to the GUC Trust and such GUC Trust Assets shall automatically vest in the GUC Trust consistent with Article IV.F.1 of the Plan.

The GUC Trust shall be the exclusive trustee of the GUC Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estates appointed pursuant to Bankruptcy Code section 1123(b)(3) regarding all GUC Trust Assets. The GUC Trust shall be governed by the GUC Trust Agreement and administered by the GUC Trustee. The powers, rights, and responsibilities of the GUC Trust and GUC Trustee shall be specified in the GUC Trust Agreement. The GUC Trust shall hold and distribute the GUC Trust Assets in accordance with the provisions of the Plan and the GUC Trust Agreement. Other rights and duties of the GUC Trust and the GUC Trust Beneficiaries

shall be as set forth in the GUC Trust Agreement. After the Effective Date, the Debtors, Wind-Down Debtors, and Plan Administrator shall have no interest in the GUC Trust Assets.

### (b)    Purpose of the GUC Trust.

The GUC Trust shall be a liquidating trust established for the purpose of pursuing or liquidating the GUC Trust Assets, reconciling and objecting to General Unsecured Claims, and making Plan Distributions to GUC Trust Beneficiaries in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the purpose of the GUC Trust, and is otherwise intended to comply with the ruling guidelines set forth in Revenue Procedure 94-45, 1994-2 C.B. 684.

### (c)    Powers of the GUC Trust.

The GUC Trust shall be deemed to be a judicial substitute for each of the Debtors as the party-in-interest in these Bankruptcy Cases solely with respect to the purposes of the GUC Trust set forth in Section IV.F. of the Plan, under the Plan or in any judicial proceeding or appeal to which the Debtors are a party, consistent with section 1123(b)(3)(B) of the Bankruptcy Code and section 303 of the Delaware General Corporation Law, and is appointed as the representative of the Estates solely for the purposes set forth in Section IV.F. of the Plan. Solely with respect to the purposes of the GUC Trust set forth in Section IV.F. of the Plan, the GUC Trust may exercise all power and authority that may be exercised by any officer, director or holder of an Interest in the Debtors with like effect as if authorized, exercised and taken by unanimous consent of such officers, directors or holders of Interests. For the avoidance of doubt, any consultation or consent rights of the Committee with respect to the 503(b)(9) Reconciliation Procedures pursuant to the Approval Order shall be transferred to the GUC Trustee on the Effective Date; *provided* that, any other consultation or consent rights of any other party set forth in the Plan with respect to the 503(b)(9) Reconciliation Procedures shall not be altered on or after the Effective Date.

### (d)    Employment, Indemnification and Other Agreements.

The GUC Trust may enter into employment, indemnification and other agreements with individuals who may be required to assist the GUC Trust after the Effective Date. Such agreements shall remain in place after the Effective Date until such time as the GUC Trust shall determine to either terminate or amend such agreements. All costs and expenses associated with entering into such agreements shall be GUC Trust Expenses.

### (e)    GUC Trust Agreement.

The GUC Trust Agreement generally will provide for, among other things:

    i.    the payment of GUC Trust Expenses;

    ii.    the retention of counsel, accountants, financial advisors, or other professionals and the payment of their reasonable and documented compensation, all without Bankruptcy Court approval or further order;

    iii.    the investment of Cash within certain limitations, including those specified in Article IV.F. of the Plan;

    iv.    the orderly collection, pursuit, and liquidation of the GUC Trust Assets;

    v.    the making of Plan Distributions under the Plan and under the GUC Trust Agreement to GUC Trust Beneficiaries;

<div style="padding-left:3em">

vi.      the pursuit, settlement, or resolution of GUC Trust Causes of Action;

vii.     the pursuit of objections to, and estimations and settlements of, General Unsecured Claims;

viii.    the abandonment, in any commercially reasonable manner, of any GUC Trust Asset that, in the GUC Trust's reasonable business judgment, cannot be sold in a commercially reasonable manner or that the GUC Trust believes in good faith and with reasonable business judgment has inconsequential value to the GUC Trust; and

ix.      reasonable and customary indemnification provisions subject to customary carveouts.

</div>

### (f)      GUC Trust Assets.

From and after the Effective Date, the GUC Trust, in accordance with Bankruptcy Code section 1123(b)(3), shall serve as a representative of the Estates with respect to any and all GUC Trust Assets.

### (g)      GUC Trust Expenses.

From and after the Effective Date, the GUC Trust shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the GUC Trust Expenses. The GUC Trust Expenses shall be payable solely from the GUC Trust Assets in accordance with the Plan and GUC Trust Agreement, and the GUC Trustee shall have no responsibility whatsoever to pay GUC Trust Expenses in his, her or its corporate or individual capacity. The GUC Trust may, but shall not be obligated to, physically segregate and maintain separate accounts or sub-accounts for GUC Trust Expenses. Reserves may be merely bookkeeping entries or accounting methodologies, which may be revised from time to time, to enable the GUC Trust to determine reserves and amounts to be paid to Holders of Allowed General Unsecured Claims.

### (h)      GUC Trust Professionals.

The GUC Trust may employ, without further order of the Bankruptcy Court, professionals (including those previously retained by the Committee) to assist in carrying out its duties hereunder and under the GUC Trust Agreement, and may compensate and reimburse the reasonable and documented expenses of these professionals as GUC Trust Expenses without further order of the Bankruptcy Court from the GUC Trust Assets in accordance with the Plan and the GUC Trust Agreement.

### (i)      Claims Reconciliation and Administration.

The GUC Trust may review, allow, object to, prosecute, negotiate, estimate, settle or otherwise compromise any General Unsecured Claims in its sole discretion.

### (j)      Distributions to GUC Trust Beneficiaries.

The GUC Trust, in its sole discretion, may make Plan Distributions to GUC Trust Beneficiaries at any time following the Effective Date or use the GUC Trust Assets or proceeds thereof, provided that such Plan Distributions or use are otherwise permitted under, and not inconsistent with, the terms of the Plan (including, for the avoidance of doubt, the treatment of Claims in Class 4), the GUC Trust Agreement, and applicable law.

**(k)    Disbursing Agent.**

The GUC Trust shall serve as or may select an alternative Disbursing Agent for GUC Trust Beneficiaries under the Plan.

**(l)    Limitation of Liability.**

Neither the GUC Trust, GUC Trustee, nor their respective firms, companies, affiliates, partners, officers, directors, members, employees, independent contractors, designees, professionals, advisors, attorneys, representatives, disbursing agents or agents, and any of such Person's successors and assigns, shall incur any responsibility or liability by reason of any error of law or fact or of any matter or thing done or suffered or omitted to be done under or in connection with the Plan or GUC Trust Agreement, other than for specific actions or omissions resulting from its willful misconduct, gross negligence or fraud found by a Final Order (not subject to further appeal or review) of a court of competent jurisdiction to be the direct and primary cause of loss, liability, damage, or expense suffered by the GUC Trust.  The GUC Trust may, in connection with the performance of its functions, in its sole and absolute discretion, consult with its attorneys, accountants, advisors, and agents, and shall not be liable for any act taken, or omitted to be taken, or suggested to be done in accordance with advice or opinions rendered by such persons, regardless of whether such advice or opinions are in writing.  Notwithstanding such authority, neither the GUC Trust nor the GUC Trustee shall be under any obligation to consult with any such attorneys, accountants, advisors, or agents, and any determination not to do so shall not result in the imposition of liability on the GUC Trust or the GUC Trustee unless such determination is based on willful misconduct, gross negligence, or fraud.  Persons dealing with the GUC Trust or GUC Trustee shall look only to the GUC Trust Assets to satisfy any liability incurred by the GUC Trust or GUC Trustee to such person in carrying out the terms of the Plan or the GUC Trust Agreement, and neither the GUC Trust nor the GUC Trustee shall have any personal obligation to satisfy such liability.

**(m)    Indemnification.**

The GUC Trust shall indemnify the GUC Trust Indemnified Parties for, and shall hold them harmless against, any loss, liability, damage, judgment, fine, penalty, claim, demand, settlement, cost, or expense (including the reasonable fees and expenses of their respective professionals) incurred without fraud, gross negligence or willful misconduct on the part of the GUC Trust Indemnified Parties (which fraud, gross negligence or willful misconduct, if any, must be determined by a Final Order of a court of competent jurisdiction) for any action taken, suffered, or omitted to be taken by the GUC Trust Indemnified Parties in connection with the acceptance, administration, exercise, and performance of their duties under the Plan or the GUC Trust Agreement, as applicable.  An act or omission taken in connection with any order of the Bankruptcy Court, and not inconsistent therewith, will be conclusively deemed not to constitute fraud, gross negligence or willful misconduct.  In addition, the GUC Trust shall, to the fullest extent permitted by law, indemnify and hold harmless the GUC Trust Indemnified Parties from and against and with respect to any and all liabilities, losses, damages, claims, costs, and expenses, including attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the GUC Trust or the implementation or administration of the Plan if the GUC Trust Indemnified Party acted in good faith and in a manner reasonably believed to be in, or not opposed to, the best interest of the GUC Trust.  To the extent the GUC Trust indemnifies and holds harmless any GUC Trust Indemnified Parties as provided above, the reasonable and documented legal fees and related costs incurred by counsel to the GUC Trust in monitoring or participating in the defense of such claims giving rise to the right of indemnification shall be paid as GUC Trust Expenses.  The costs and expenses incurred in enforcing the right of indemnification in Section IV.F.13 of the Plan shall be paid by the GUC Trust.  This provision shall survive the termination of the GUC Trust Agreement and the death, dissolution, liquidation, resignation, replacement, or removal of the GUC Trustee.

      **(n)**      **Insurance.**

The GUC Trust shall be authorized, but not required, to obtain any reasonably necessary insurance coverage, at the GUC Trust's sole expense, for itself and its respective agents, including coverage with respect to the liabilities, duties, and obligations of the GUC Trust, which insurance coverage may, at the sole option of the GUC Trust, be extended for a reasonable period after the termination of the GUC Trust Agreement.

      **(o)**      **United States Federal Income Tax Treatment of the GUC Trust.**

The GUC Trust shall be structured to qualify as a "liquidating trust" within the meaning of Treasury Regulation Section 301.7701-4(d) and a grantor trust within the meaning of Sections 671 through 679 of the Tax Code. For all United States federal income tax purposes, all parties shall treat the transfer of the GUC Trust Assets to the GUC Trust as: (a) a first-step transfer of the GUC Trust Assets directly to the applicable GUC Trust Beneficiaries, followed by (b) a second-step transfer by such GUC Trust Beneficiaries to the GUC Trust of such GUC Trust Assets in exchange for the GUC Trust Interests; provided that the GUC Trust Assets will be subject to any GUC Trust Expenses. Accordingly, the applicable GUC Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the GUC Trust Assets. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

No request for a ruling from the IRS will be sought on the classification of the GUC Trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the GUC Trust. If the IRS were to successfully challenge the classification of the GUC Trust as a grantor trust, the federal income tax consequences to the GUC Trust and the GUC Trust Beneficiaries could vary from those discussed in the Plan (including the potential for an entity-level tax). For example, the IRS could characterize the GUC Trust as a so-called "complex trust" subject to a separate entity-level tax on its earnings, except to the extent that such earnings are distributed during the taxable year.

As soon as possible after the transfer of the GUC Trust Assets to the GUC Trust, the GUC Trustee of the GUC Trust shall make a good faith valuation of the GUC Trust Assets. This valuation will be made available from time to time, as relevant for tax reporting purposes. Each of the Debtors, the GUC Trustee of the GUC Trust, and the holders of Claims receiving interests in the GUC Trust shall take consistent positions with respect to the valuation of the GUC Trust Assets, and such valuations shall be utilized for all U.S. federal income tax purposes.

Allocations of taxable income of the GUC Trust among the GUC Trust Beneficiaries shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the GUC Trust had distributed all its assets (valued at their tax book value) to the GUC Trust Beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the GUC Trust. Similarly, taxable loss of the GUC Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining GUC Trust Assets. The tax book value of the GUC Trust Assets shall equal their fair market value on the date of the transfer of the GUC Trust Assets to the GUC Trust, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

      **(p)**      **Tax Reporting.**

      i.      The GUC Trust shall file any and all tax returns for the GUC Trust, as applicable; provided that neither the GUC Trust nor the GUC Trustee shall

have any personal liability for the signing or accuracy of the GUC Trust's tax returns that are due to be filed after the Effective Date or for any tax liability related thereto.  Neither the GUC Trust nor the GUC Trustee shall have any responsibility for the filing of tax returns for any of the Debtors or the Wind-Down Debtors.

ii. The GUC Trust shall be responsible for payment, out of the GUC Trust Assets, of any taxes imposed on the GUC Trust or GUC Trust Assets to the extent such payment is consistent with the Bankruptcy Code, the Plan and any applicable order of the Bankruptcy Court including, but not limited to, any order establishing a Bar Date.

iii. The GUC Trust shall file annual information tax returns for the GUC Trust treating the GUC Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) that will include information concerning certain items relating to the holding or disposition (or deemed disposition of the GUC Trust Assets (*e.g.*, income, gain, loss, deduction, and credit)).

iv. The GUC Trust shall distribute such tax-related notices to the applicable GUC Trust Beneficiaries as the GUC Trustee determines are necessary or desirable.

**(q)** **Cash Investments.**

The GUC Trust may, but shall not be required to, invest Cash (including any earnings thereon or proceeds therefrom); provided that such investments must be investments that are permitted to be made by a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings or other controlling authorities.

**(r)** **Dissolution of the GUC Trust.**

The GUC Trustee and the GUC Trust shall be discharged or dissolved, as the case may be, at such time as: (a) all objections to Disputed General Unsecured Claims are fully resolved, (b) the GUC Trust determines that pursuit of any GUC Trust Causes of Action is not likely to yield sufficient additional benefits or proceeds to justify further pursuit, and (c) all Plan Distributions required to be made by the GUC Trust to the GUC Trust Beneficiaries under the Plan and the GUC Trust Agreement have been made; *provided, however*, that in no event shall the GUC Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion made within the six (6) month period before such fifth anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made at least six (6) months before the end of the preceding extension), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the GUC Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the GUC Trust Assets.  Upon dissolution of the GUC Trust or at such earlier time as determined by the GUC Trust in its sole discretion, any remaining GUC Trust Assets that exceed the amounts required to be paid under the Plan may be transferred by the GUC Trust to a charitable organization selected by the GUC Trustee in his, her, or its sole discretion; *provided*, that such charitable organization shall be unrelated to the GUC Trustee, the Debtors' lenders and the Holders of Interests in the Debtors.

(s)     **Control Provisions.**

To the extent there is any inconsistency between the Plan as it relates to the GUC Trust and the GUC Trust Agreement, the Plan shall control.

(t)     **Cooperation and Access to Books and Records.**

The GUC Trust shall be provided with originals or copies of or access to all documents and business records of the Debtors reasonably available to the Debtors, the Wind-Down Debtors, or Plan Administrator and reasonably necessary for the disposition of the GUC Trust Assets, addressing any GUC Trust Causes of Actions, and pursuing objection to General Unsecured Claims.  The Debtors, the Wind-Down Debtors, and the Plan Administrator, as applicable, shall use reasonable efforts to cooperate with the GUC Trust in connection with the GUC Trust's reconciliation of and objections to General Unsecured Claims, including with respect to providing evidence and information as reasonably requested by the GUC Trust.

(u)     **Disputed Ownership Fund Treatment.**

With respect to any of the assets of the GUC Trust that are subject to potential disputed claims of ownership or uncertain distributions, or to the extent "liquidating trust" treatment is otherwise unavailable or not elected to be applied with respect to the GUC Trust, such GUC Trust may be subject to disputed ownership fund treatment under section 1.468B-9 of the Treasury Regulations, and if this is the case, the Debtors intend that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes.  Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account.  Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

**5.    Statutory Committee and Cessation of Fee and Expense Payment.**

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases, including the Committee, shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases, except in connection with applications for compensation, objections thereto, and any responses to any appeal of the Confirmation Order.  The Wind-Down Debtors shall no longer be responsible for paying any fees or expenses incurred by any statutory committee, including the Committee, after the Effective Date, except in connection with (i) any fees or expenses for services rendered prior to the Effective Date, or fees and expenses incurred in connection with final fee applications of Professionals, in each case that are Allowed by the Bankruptcy Court; and (ii) fees incurred in connection with any appeal of the Confirmation Order.

**6.    Cancellation of Securities and Agreements.**

Except for the purpose of enabling Holders of Allowed Claims to receive a Plan Distribution as provided in the Plan, and except as otherwise set forth therein, the Plan Supplement, or the Confirmation Order, on the Effective Date, and with respect to any Prepetition Loan Facilities that have not been Paid in Full (as defined in the Cash Collateral Order) prior to the Effective Date:  (1) the obligations of the Debtors under the Prepetition Loan Documents and any other certificate, Security (including any preferred stock, common stock or other capital stock), share, note, bond, indenture, purchase right, option, warrant, restricted stock, restricted stock units (or any other incentive equity interest) or other instrument or document (including any indenture or credit agreement) directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except, and only to the extent, such certificates, notes, or other instruments or documents evidencing

indebtedness or obligation of or ownership interest in the Debtors that are Reinstated pursuant to the Plan) shall be cancelled as to the Debtors and their affiliates, and the Wind-Down Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors and their affiliates pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing any Securities (including any preferred stock, common stock or other capital stock), shares, certificates, notes, bonds (but not including any surety bonds issued on behalf of any of the Debtors), indentures, credit agreement, purchase rights, options, warrants, restricted stock, restricted stock units (or any other incentive equity interest) or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except, and only to the extent, such agreements, certificates, notes, or other instruments evidencing indebtedness or obligation of or ownership interest in the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and cancelled and of no force or effect and the rights of the Holders thereof and obligations of the Debtors thereunder shall be deemed satisfied in full, canceled, and of no force or effect.  Holders of (including any beneficial owners) or parties to any of the foregoing cancelled instruments, Securities, and other documentation will have no rights arising from or relating to such instruments, securities and other documentation, or the cancellation thereof, except the rights, distributions, and treatment provided for pursuant to the Plan or the Confirmation Order, as applicable.  Notwithstanding the foregoing, no executory contract or unexpired lease that (i) has been, or will be, assumed or assumed and assigned pursuant to section 365 of the Bankruptcy Code, or (ii) relating to a Claim that was paid in full prior to the Effective Date, shall be terminated or cancelled on the Effective Date.

### 7.  Corporate Action.

Upon the Effective Date, all actions contemplated under the Plan, regardless of whether taken before, on, or after the Effective Date, shall be deemed authorized and approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, the Debtors, the Plan Administrator, the GUC Trust, or any other Entity or Person in all respects. All matters provided for in the Plan or deemed necessary or desirable by the Debtors before, on, or after the Effective Date involving the corporate structure of the Debtors or the Wind-Down Debtors, and any corporate action required by the Debtors or the Wind-Down Debtors in connection with the Plan or corporate structure of the Debtors or Wind-Down Debtors shall be deemed to have occurred and shall be in effect on the Effective Date, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Wind-Down Debtors.  Before, on, or after the Effective Date, the appropriate directors, managers, officers, Governing Bodies or other similarly authorized Persons of the Debtors or the Wind-Down Debtors, as applicable, shall be authorized to issue, execute, file (including File), record and/ deliver any agreements and documents, securities, and instruments contemplated under the Plan (or necessary, appropriate or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Wind-Down Debtors.  These authorizations and approvals shall be effective notwithstanding any requirements under non bankruptcy law (including any non-U.S. law to the fullest extent available).

### 8.  Effectuating Documents; Further Transactions.

On and after the Effective Date, the Plan Administrator or GUC Trust, as applicable, may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Confirmation Order, and the Wind-Down Transactions, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan or the Confirmation Order.

9.    **Section 1146 Exemption.**

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to the Wind-Down Debtors or to any other Person or from the Wind-Down Debtors to any other Person) of property under the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity security, property, or other interest in the Debtors or the Wind-Down Debtors; (2) the Wind-Down Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate or bulk transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

10.   **D&O Liability Insurance Policies; Other Insurance Matters.**

After the Effective Date, the Wind-Down Debtors shall not terminate or otherwise reduce the coverage under any of the D&O Liability Insurance Policies in effect on or after the Petition Date, with respect to conduct or events occurring prior to the Effective Date, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such D&O Liability Insurance Policy for the full term of such D&O Liability Insurance Policy, to the extent set forth therein and in accordance with and subject in all respects to the terms and conditions of such D&O Liability Insurance Policy, which shall not be altered, regardless of whether such directors and officers remain in such positions after the Effective Date.

On the Effective Date, to the extent the D&O Liability Insurance Policies are executory, any and all D&O Liability Insurance Policies shall be deemed assumed by the Wind-Down Debtors pursuant to sections 105 and 365 of the Bankruptcy Code, and nothing shall alter, modify, amend, expand or otherwise affect any coverage for defense and indemnity under any applicable D&O Liability Insurance Policy available to any individuals and/or entities under such D&O Liability Insurance Policy in accordance with and subject in all respects to the terms and conditions of such D&O Liability Insurance Policy, which shall not be altered.

11.   **Preservation of Causes of Action.**

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII of the Plan, all Causes of Action that a Debtor or an Estate may hold against any Person or Entity as of the Effective Date, whether arising before or after the Petition Date, and whether or not specifically enumerated in the Schedule of Retained Causes of Action, shall vest in the Wind-Down Debtors, other than Claims and Causes of Action acquired pursuant to the GA Transaction, Claims and Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, and the GUC Trust Causes of Action.  The Plan Administrator shall have the exclusive right, authority, and discretion to initiate, file, prosecute,

enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment such Causes of Action, other than GUC Trust Causes of Action, as appropriate, in accordance with the best interests of the Wind-Down Debtors, and no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

**No Person or Entity (other than the Released Parties) may rely on the absence of a specific reference in the Schedule of Retained Causes of Action, the Plan, the Plan Supplement, or this Disclosure Statement to any Cause of Action against it as any indication that the Debtors, the Wind-Down Debtors, the Plan Administrator, or the GUC Trust will not pursue any and all available Causes of Action against it. The Debtors, the Wind-Down Debtors, the Plan Administrator, and the GUC Trust expressly reserve all rights to prosecute any and all Causes of Action against any Person or Entity, except as otherwise expressly provided in the Plan, including Article VIII of the Plan. For the avoidance of doubt, the Purchaser acquired all Avoidance Actions and Other Causes of Action (as defined in the GA Transaction Documents) and released and waived its right to pursue (i) all Avoidance Actions, and (ii) Other Causes of Action against the Prepetition ABL Lenders, the Prepetition FILO Lenders, the Prepetition Term Loan Lenders, the ABL Agent, FILO Agent, the Prepetition Term Loan Agent, Gordon Brothers Retail Partners, LLC, and any Related Party of the Debtors.**

### 12. Section 1145 Exemption.

To the extent any Securities are issued in connection with the Plan, pursuant to section 1145 of the Bankruptcy Code and, to the extent that section 1145 of the Bankruptcy Code is inapplicable, section 4(a)(2) of the Securities Act, the issuance of any Securities pursuant to the Plan shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable federal, state, or local law requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security. As long as the exemption to registration under section 1145 of the Bankruptcy Code is applicable, Securities issued pursuant to the Plan should not be considered "restricted securities" (as defined in rule 144(a)(3) under the Securities Act) and would be freely tradable and transferable under the federal securities laws by any initial recipient thereof that (x) is not an "affiliate" of the Wind-Down Debtors (as defined in rule 144(a)(1) under the Securities Act), (y) has not been such an "affiliate" within ninety days of such transfer, and (z) is not an entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code.

No Securities are expected to be issued pursuant to the Plan with respect to any Claims or Interests.

### 13. Abandonment of Non-Debtor Equity Interests.

On or after the Effective Date, the Debtors and the Wind-Down Debtors may abandon any Non-Debtor Equity Interests pursuant to section 554 of the Bankruptcy Code without further order of the Bankruptcy Court or further notice to any Entity.

## IV.    THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

### A.    JOANN's Corporate History and Business Operations.

As of the Petition Date, JOANN was the nation's category leader in sewing and fabrics, offering one of the largest assortments of arts-and-crafts products. The Company's story began in 1943 when German immigrants founded the "Cleveland Fabric Shop" in Cleveland, Ohio. By 1963, the Company had grown to 18 stores, and the founders decided to rename the store "Jo-Ann Fabrics"—a combination of the names of the two families' daughters, Joan and Jacqueline Ann.

Over the subsequent years, Jo-Ann Fabrics experienced unparalleled growth. By 1969, the Company was publicly listed on the American Stock Exchange, and in 1976 the Company joined the New York Stock Exchange. JOANN opened its 500th store in 1980 and by 1998, following the acquisition of two fabric companies, had become the largest fabric and crafts retailer in the United States. The same year, the business was renamed Jo-Ann Stores Inc. and rebranded all stores operating under other names to "Jo-Ann Fabrics." In 2011, JOANN was purchased by Leonard Green & Partners and taken private.

While COVID-19 caused irreparable disruption and harm to many retailers, the global pandemic led to a surge in demand for JOANN's products. Shelter in place and mask mandates drove customers to JOANN stores to purchase supplies for not only DIY projects but also masks and other personal protective equipment. JOANN experienced a 23.5% increase in sales from fiscal year 2020 to fiscal year 2021.[7] The Company went public again in March 2021, with its shares of common stock listed on the NASDAQ, trading under the ticker symbol "JOAN."

Despite an increase in business during the pandemic, the Company nevertheless faced the same challenges faced by nearly all retailers at the time: competition from online retailers and increased merchandise costs. On March 18, 2024, JOANN Inc. and certain then-debtor affiliates filed for chapter 11 bankruptcy in the District of Delaware to implement a prepackaged plan of reorganization focused solely on reducing the Company's funded debt load. The Debtors entered the Prior Cases with a transaction support agreement with a majority of its financial stakeholders and received commitments for approximately $132 million in new financing and related financial accommodations. The Company emerged from the Prior Cases on April 30, 2024 as a private company and its shares of common stock were no longer listed on the NASDAQ.

As discussed above, JOANN provides a wide spectrum of crafting supplies. The products offered generally fall into three categories:

> ***Sewing***. JOANN offers several subcategories within the Sewing product segment, including (a) seasonally themed fabrics, (b) a variety of fabrics for a wide range of uses such as home improvement, décor, and fashion projects, (c) sewing machines, and (d) other sewing supplies.

> ***Arts and Crafts and Home Décor***. The Arts and Crafts and Home Décor segment includes, among other things, (a) yarn and yarn accessories, (b) crafting materials, technology and organizers, (c) seasonal décor, and (d) cake decorating materials.

> ***Additional Non-Merchandise Services***. The Additional Non-Merchandise Services include shared freight revenue, revenue from subletting store space, and non-merchandise services such as revenue from subscriptions to Debtor Creativebug, LLC's online content.

As of the Petition Date, JOANN had multiple domestic and international supply sources for each of its product categories. In the 2024 fiscal year, JOANN sourced approximately 65% of its purchases from domestic suppliers, and the remaining purchases were sourced from foreign suppliers located in Pakistan, India, Vietnam, and China, among other countries. More than one-third of the Company's foreign-sourced products come from China and are purchased by non-Debtor Jo-Ann Trading (Shanghai) Co., Ltd., a wholly-owned foreign subsidiary of Debtor Jo-Ann Stores, LLC.

---

[7]    The Company's fiscal year ends on the Saturday closest to January 31 of the named year. For example, the 2020 fiscal year ended on February 1, 2020, the 2021 fiscal year ended on January 30, 2021, and the 2022 fiscal year ended on January 29, 2022.

Purchasing for the Debtors' stores was performed centrally through JOANN's store support center rather than by individual stores. Once purchased, merchandise was directed to either one of the Debtors' three distribution centers in Hudson, Ohio; Visalia, California; or Opelika, Alabama (each a "<u>Distribution Center</u>") or its e-commerce fulfillment center in West Jefferson, Ohio. Each Distribution Center was responsible for supplying merchandise to stores in a specific geographical region, typically on a weekly basis, with each Distribution Center supplying a roughly equal portion of the Company's outbound merchandise. Additionally, the Distribution Centers shipped select products ordered by customers through joann.com directly to the customers' homes, with the balance of e-commerce orders fulfilled directly from stores, through JOANN's e-commerce fulfillment center, or directly from vendors.

JOANN's products are available to customers online or in one of the Company's brick-and-mortar stores. In 2024, approximately 86% of sales revenue was generated in-store. As of the Petition Date, JOANN had approximately 800 stores in 49 states, all of which are operated from leased premises. In 2024, approximately 14% of JOANN's annual sales revenue was generated through the Company's e-commerce offerings such as through joann.com and the Company's mobile app. As of the Petition Date, JOANN's e-commerce sales were primarily fulfilled through JOANN's brick-and-mortar stores and the Company's e-commerce fulfillment center, and a small portion of orders were fulfilled from the Company's Distribution Centers or directly by vendors.

Debtor JOANN INC. is the ultimate parent company of the twelve other Debtors in these Chapter 11 Cases, along with one non-Debtor affiliate, Jo-Ann Trading (Shanghai) Co., Ltd., which is wholly owned by Debtor Jo-Ann Stores, LLC.

**B.    The Debtors' Prepetition Capital Structure.**

As of the Petition Date, the Debtors had approximately $615.7 million in total funded debt obligations.

| Funded Debt | Approximate Principal Amount Outstanding |
|---|---|
| ABL Facility (Revolving Loans and issued Letters of Credit) | $352.4 million |
| FILO Term Loan Facility | $109.9 million |
| Term Loan Facility | $153.4 million |
| **Total Funded Debt Obligations** | **$615.7 million** |

**1.    The ABL Facility and FILO Facility.**

Debtor Jo-Ann Stores, LLC, as borrower, JOANN Holdings 2, LLC, as parent, Needle Holdings LLC, as holdings, Bank of America, N.A., as administrative agent and as collateral agent (the "<u>Prepetition ABL Agent</u>"), 1903P Loan Agent, LLC, as documentation agent (the "<u>Prepetition FILO Agent</u>"), and the lenders party thereto from time to time (the "<u>Prepetition ABL Lenders</u>") entered into that certain Second Amended and Restated Credit Agreement, dated as of April 30, 2024 (as amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time and in effect immediately prior to the Petition Date, the "<u>ABL/FILO Credit Agreement</u>"). The ABL/FILO Credit Agreement was entered into to provide exit financing to the Debtors in connection with the Debtors' emergence from the Prior Cases.

The ABL/FILO Credit Agreement provided the Debtors with access to a maximum aggregate amount of $500 million in revolving credit commitments (the "<u>ABL Facility</u>"), with the availability of such commitments being subject to a monthly determination of the Borrowing Base (as defined therein) and

reduced by the amount, if any, of Letters of Credit (as defined therein) issued thereunder. In addition, the ABL/FILO Credit Agreement provided for $100 million of term loans under a first in, last out term loan facility (the "FILO Term Loan Facility," such lenders under the FILO facility, the "Prepetition FILO Lenders," and the FILO facility together with the ABL Facility, the "Prepetition ABL and FILO Facilities"). The Prepetition ABL and FILO Facilities contained a maturity date of June 22, 2027. As of the Petition Date, an aggregate balance of approximately $352.4 million remained outstanding under the ABL Facility, consisting of $331.6 million outstanding in Revolving Loans (as defined in the ABL/FILO Credit Agreement), and $20.8 million in existing Letters of Credit, and an aggregate balance of approximately $109.9 million remained outstanding under the FILO Term Loan Facility. The Prepetition ABL and FILO Facilities were secured by substantially all of the assets of the borrower and the guarantors under the ABL/FILO Credit Agreement, subject to certain limitations and exceptions, including first priority security interests in: (a) all credit card receivables and bank accounts, other than bank accounts which constitute identifiable proceeds of Term Loan Priority Collateral (as defined below); (b) cash, money, and cash equivalents (other than identifiable proceeds of Term Loan Priority Collateral); (c) all deposit accounts, securities accounts, and commodities accounts, in each case except for any such accounts which constitute Term Loan Priority Collateral; (d) all inventory; and (e) documents, general intangibles, instruments, chattel paper, commercial tort claims, supporting obligations, letter-of-credit rights, books and records, and collateral security and guarantees evidencing, governing, or relating to any of the items referred to in foregoing (as more fully described in the ABL/FILO Credit Agreement, the "ABL Priority Collateral"). The respective rights of the Prepetition ABL Lenders as between themselves with respect to, among other things, their security interests in the ABL Priority Collateral, the treatment of proceeds thereof, as well as certain rights of first refusal and consent rights were governed by the ABL/FILO Credit Agreement.

## 2. The Term Loan Facility.

Debtor Needle Holdings, LLC, as borrower, JOANN Holdings 2, LLC, as holdings, Wilmington Savings Fund Society, FSB, as administrative agent (the "Prepetition Term Loan Agent"), and the lenders party thereto from time to time (the "Prepetition Term Loan Lenders") entered into that certain Credit Agreement, dated as of April 30, 2024 (as amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time and in effect immediately prior to the Petition Date, the "Prepetition Term Loan Credit Agreement"), pursuant to which the Prepetition Term Loan Lenders provided the Debtors a senior secured term loan facility in an aggregate principal amount of approximately $153.8 million (the "Prepetition Term Loan Facility"). The Prepetition Term Loan Facility matures on April 30, 2028. As of the Petition Date, a balance of approximately $153.4 million remained outstanding under the Prepetition Term Loan Facility, which was secured by a security interest in substantially all of the assets of the borrower and the guarantors under the Prepetition Term Loan Credit Agreement, subject to certain limitations and exclusions, including first priority security interests in: (a) equipment, fixtures, real property, intercompany indebtedness between or among the Debtors or their affiliates, intellectual property, and all equity interests held by the Debtors and their affiliates (subject to certain customary exceptions); (b) except to the extent constituting ABL Priority Collateral, all instruments, commercial tort claims, documents, and general intangibles; (c) except to the extent constituting ABL Priority Collateral, any deposit accounts, securities accounts, or commodity accounts that are intended to solely contain Term Loan Priority Collateral, and the contents thereof; (d) all other collateral other than ABL Priority Collateral (including proceeds thereof); and (e) all collateral security and guarantees with respect to the foregoing and all cash, money, insurance proceeds, instruments, securities, and financial assets received as proceeds of the foregoing (as more fully described in the Prepetition Term Loan Credit Agreement, the "Term Loan Priority Collateral").

### 3. The ABL and Term Loan Intercreditor Agreement.

The respective contractual rights of the Prepetition ABL Lenders and the Prepetition Term Loan Lenders with respect to their shared collateral was governed by that certain Second Amended and Restated Intercreditor Agreement, dated as of April 30, 2024 (as amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time, the "ABL and Term Loan Intercreditor Agreement"), by and between the Prepetition ABL Agent and the Prepetition Term Loan Agent. The ABL and Term Loan Intercreditor Agreement governed, among other things, the division of collateral into ABL Priority Collateral and Term Loan Priority Collateral, the priority of liens and application of proceeds with respect thereto, as well as the respective rights of the Prepetition ABL Lenders and the Prepetition Term Loan Lenders in connection with certain bankruptcy matters.

### 4. The Prepetition Agreement Among FILO Lenders.

Pursuant to that certain Amended and Restated Agreement Among Lenders, dated as of April 30, 2024, by and among the Prepetition FILO Lenders and the Prepetition FILO Agent (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Prepetition Agreement Among FILO Lenders"), the Prepetition FILO Lenders and the Prepetition FILO Agent agreed, among other things, to the respective rights, obligations, and priorities of each class of the Prepetition FILO Lenders with respect to matters set forth therein.

### 5. Unsecured Debt.

In addition to their funded debt, the Debtors have customary unsecured debt, including amounts owed to trade vendors and landlords. Prior to the Petition Date, JOANN routinely incurred fixed, liquidated, and undisputed payment obligations in the ordinary course of business to various third-party providers of goods and services. These included obligations owed to JOANN's extensive network of vendors, on whom JOANN has long relied to supply merchandise. A majority of these vendors conducted business with JOANN on a purchase order-by-purchase order basis and were paid on prearranged terms. As of the Petition Date, the Debtors estimate that approximately $133 million of merchandise trade debt is due and outstanding, of which approximately $30 million is on account of goods provided to the Debtors within the twenty days leading up to the Petition Date. Certain of those claims may be entitled to statutory priority, including under section 503(b)(9) of the Bankruptcy Code, or may give rise to liens in favor of shippers or warehousemen in the event they go unpaid.

In addition to trade debt, JOANN's stores are operated exclusively from leased premises. As of the Petition Date, the Debtors accrued approximately $26 million in lease and occupancy-related expenses each month, a substantial portion of which is reflected on the Debtors' books as a liability at any given time. In addition, counterparties to unexpired leases may file substantial rejection damages claims in connection with the ultimate rejection of some or all of the Debtors' 800 store locations, which could significantly increase the amount of general unsecured claims asserted against the Debtors' estates.

### 6. JOANN Inc.'s Equity.

The Debtors transitioned from a publicly traded to a privately held company upon emergence from the Prior Cases. JOANN Inc. issued new equity interests to holders of its prepetition secured debt and debtor in possession financing facility on account of their claims. As of the Petition Date, JOANN Inc. has 200,000,000 shares of common stock authorized, of which 100,000,003 shares of common stock are issued and outstanding. As of the Petition Date, JOANN Inc. also has 1,000,000 shares of preferred stock authorized. However, JOANN Inc. currently has no shares of preferred stock issued and outstanding.

## V.    EVENTS LEADING TO THE CHAPTER 11 FILINGS

JOANN emerged from the Prior Cases with a de-levered capital structure and a plan to reduce overhead expenses, right-size its workforce, establish competitive pricing strategies, and capitalize on JOANN's loyal customer base and steady revenue streams.  However, a variety of factors, including external market headwinds across the retail industry and inventory and liquidity challenges, made it impossible for JOANN to service its post-emergence funded debt, revitalize its business, and continue to operate as a going concern, necessitating these Chapter 11 Cases.

Over the last year, the retail industry has faced a stagnant retail economy, marred by persistent inflation and high interest rates.  JOANN was not immune to these macroeconomic forces, and it attempted to implement its post-emergence plan in the face of these significant headwinds.  As a result, nearly twice as many U.S. retailers filed for bankruptcy in 2024 than 2023, and thousands of retail stores closed over the last twelve months.  While consumer spending generally appeared to improve in the latter half of 2024, inflation-fatigued consumers tended to spend their dollars on essentials and low-cost goods, as opposed to craft, décor, and similar products offered by JOANN.

Inflation continued to increase throughout 2024, and consumers continued to limit discretionary spending, forcing retailers to choose between increased prices or lower profit margins.  The struggles in the retail industry forced many retailers to cut prices at the same time JOANN was attempting to implement its post-emergence business plan.  Indeed, after JOANN emerged from bankruptcy in April 2024, one of its key competitors announced lower prices on over 5,000 items in their arts, crafts, DIY, and home décor product categories.  Further, JOANN's loyal customer base had become accustomed to competitive pricing in the relatively consolidated arts-and-crafts and home goods industries, making it more difficult for JOANN to react to macroeconomic pressures across the retail sector that were applying downward pressure on margins.

JOANN typically sought to maintain, and historically had maintained, in-stock levels at or above 90% to accommodate its loyal base.  Such inventory levels declined leading up to and during the Prior Cases.

JOANN's in-stock performance had significant knock-on effects across its product lines because many of JOANN's customers are "project customers."  A project customer comes into the store intending to buy all the materials needed to complete a project.  On average, JOANN customers purchase between five and six products per trip.  But when the store is missing items necessary to complete the "project," customers will put their basket down, abandon the purchase altogether, and plan to return when all project items become available.  This means that if JOANN has a stock shortage on a specific product, the associated revenue impact can be exponential and impact a number of related products that would fall into the same 'basket' as the out-of-stock product.  This impact is generally margin-agnostic.  Thus, higher margin items—*i.e.*, sewing machines—suffer when the store lacks the customer's desired inputs, such as sewing thread.  The behavior of JOANN's consumers made maintaining in-stock levels a critical aspect of JOANN's operational success.

As discussed above, the business plan following the Prior Cases was premised, in part, on vendors shipping on terms largely commensurate with pre-bankruptcy levels in the post-emergence, particularly because such vendors were not impaired under the Prior Cases.  However, many suppliers began halting production of key JOANN retail items and ramping down entire production lines following the Prior Cases for products that were critical to JOANN's post-emergence business plan.  This created a snowball effect with respect to those vendors who were continuing to provide product, resulting in tighter credit limits, shortened payment terms, partial shipments, and increased prices.  The Debtors were unable to execute their business plan following the Prior Cases due to inventory and restocking challenges, which continued to deepen as time went on.  The Company saw in-stock levels dip well below 90% in the summer of 2024—

33

the lowest levels the Company has experienced in over a decade, as the ramp up to restoring inventory levels took longer than the Company anticipated. Revenue and profitability fell linearly with the record-low in-stock levels, making it difficult to service even the restructured debt load resulting from the Prior Cases.

The Company audited its supply chain in fall 2024 and placed additional emphasis on restoring in-stock percentages to historical levels. The Company, however, needed many additional months to return to normal in-stock levels, which recovered slowly. As they did, top-line revenue and profitability also improved—as had been expected. However, by the time the Company turned around in-stock levels, liquidity constraints did not allow the Company to service its debt load while responsibly operating the business, ultimately necessitating these Chapter 11 Cases.

## VI.    MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES

### A.    First Day Relief.

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors Filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and customers following the commencement of the Chapter 11 Cases. On January 16, 2025 and January 17, 2025, the Bankruptcy Court entered orders approving the First Day Motions on either an interim or final basis. On February 10, 2025, the Bankruptcy Court entered orders approving certain of the First Day Motions on a final basis.

A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the *Declaration of Michael Prendergast, Interim Chief Executive Officer, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 5] (the "First Day Declaration"), Filed on January 15, 2025. The First Day Motions, the First Day Declaration, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at https://cases.ra.kroll.com/Joann2025.

### B.    Appointment of Official Committee of Unsecured Creditors.

On January 18, 2025, the U.S. Trustee Filed the *Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 198], notifying parties in interest that the U.S. Trustee had appointed the Committee in these Chapter 11 Cases. The Committee is currently comprised of: (a) Low Tech Toy Club LLC; (b) SunYin (HK) Holding Limited; (c) Gwen Studios LLC; (d) Brother International Corp.; (e) Ormo Ithalat Ihracat A.S.; (f) Advantus, Corp.; (g) Kimco Realty Corporation; (h) Simon Property Group, Inc.; and (i) Regency Centers, L.P.

On January 31, 2025, the Committee Filed the *Notice of Appearance and Request for Notice of the Official Committee of Unsecured Creditors* [Docket No. 239], identifying its proposed counsel as Pachulski Stang Ziehl & Jones LLP ("Pachulski") and Kelley Drye & Warren LLP ("Kelley Drye"). The Committee subsequently retained Province, LLC ("Province") as its financial advisor. The Committee Filed retention applications for Pachulski, Kelley Drye, and Province on February 28, 2025 [Docket Nos. 530, 531, 532], which were approved by the Bankruptcy Court on March 18, 2025 and March 24, 2025 [Docket Nos. 594, 595, 634]. The Debtors held an initial meeting of creditors pursuant to section 341 of the Bankruptcy Code on February 19, 2025.

### C.    Other Procedural and Administrative Motions.

During these Chapter 11 Cases, the Debtors also Filed several other motions to further facilitate the smooth and efficient administration of the Chapter 11 Cases and reduce the administrative burdens associated therewith, including:

- Bidding Procedures Motion.  Please see Article I of this Disclosure Statement for discussions of the Bidding Procedures Motion.

- Ordinary Course Professionals Motion.  The *Motion of Debtors for Entry of an Order (I) Authorizing the Debtors to Retain and Compensate Professionals Utilized in the Ordinary Course of Business and (II) Granting Related Relief* [Docket No. 427] (the "OCP Motion"), Filed on February 13, 2025, sought authorization for the Debtors to retain and compensate certain professionals utilized in the ordinary course of business.  On March 4, 2025, the Debtors Filed a certification of counsel stating that no objections to the OCP Motion had been Filed and asking the Bankruptcy Court to enter an order granting the OCP Motion [Docket No. 548].  Subsequently, on March 4, 2025, the Bankruptcy Court entered an order approving the OCP Motion on a final basis [Docket No. 553].

- Interim Compensation Procedures Motion.  The *Motion of Debtors for Entry of an Order (I) Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals and (II) Granting Related Relief* [Docket No. 426] (the "Interim Compensation Procedures Motion"), Filed on February 13, 2025, sought approval of procedures for the interim compensation and reimbursement of expenses of retained Professionals in the Chapter 11 Cases.  On March 4, 2025, the Debtors Filed a certification of counsel stating that no objections to the Interim Compensation Procedures Motion had been Filed and asking the Bankruptcy Court to enter an order granting the Interim Compensation Procedures Motion [Docket No. 547].  Subsequently, on March 4, 2025, the Bankruptcy Court entered an order approving the Interim Compensation Procedures Motion on a final basis [Docket No. 552].

- Claims Bar Date Motion.  The *Motion of Debtors Seeking Entry of an Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Under Section 503(B)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(B)(9) Requests, and (IV) Approving Form and Manner of Notice Thereof* [Docket No. 475] (the "Claims Bar Date Motion"), Filed on February 20, 2025, sought to establish bar dates for filing proofs of claims, amended schedules, and rejection damages, and approving the form and manner for filing proofs of claims.  On March 5, 2025, the Debtors Filed a certification of counsel stating that no objections to the Claims Bar Date Motion had been Filed and asking the Bankruptcy Court to enter an order granting the Claims Bar Date Motion [Docket No. 560].  On March 5 2025, the Bankruptcy Court entered an order approving the Claims Bar Date Motion on a final basis [Docket No. 561].

### D.    Retention of Debtor Professionals.

The Debtors Filed applications for the retention of various professionals to assist the Debtors in carrying out their duties as debtors in possession and to represent their interests in the Chapter 11 Cases:

- Kirkland & Ellis LLP ("<u>Kirkland</u>"), as primary restructuring counsel [Docket Nos. 424, 456];

- Cole Schotz P.C., as co-counsel [Docket Nos. 425, 457];

- Centerview Partners LLC, as investment banker [Docket Nos. 421, 454];

- Deloitte Tax LLP, as tax advisory services provider [Docket Nos. 468, 469];

- Alvarez & Marsal North America, LLC, as financial advisor [Docket Nos. 420, 453]; and

- Kroll Restructuring Administration LLC, as claims and noticing agent and administrative advisor [Docket Nos. 422, 455].

In conjunction with the Retention Applications, the Debtors also Filed the *Motion of Debtors for Entry of an Order Authorizing the Debtors to File Under Seal the Names of Certain Confidential Parties in Interest Related to the Debtors' Professional Retention Applications* [Docket No. 452] (the "<u>Motion to Seal</u>"), seeking authority for the Debtors' professionals to redact and File under seal the names of certain confidential parties that were potential bidders in the Marketing Process. On March 4 2025, the Bankruptcy Court entered an order approving the Motion to Seal [Docket No. 543].

The foregoing professionals are, in part, responsible for the administration of the Chapter 11 Cases. The postpetition compensation of all of the Debtors' professionals retained pursuant to sections 327 and 328 of the Bankruptcy Code is subject to the approval of the Bankruptcy Court.

### E.    Approval of Debtors' Use of Cash Collateral.

On January 15, 2025, the debtors Filed the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Creditors; (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 6] (the "<u>Cash Collateral Motion</u>"), requesting that the Bankruptcy Court authorize the Debtors to continue using the Prepetition ABL Lenders' and Prepetition FILO Lenders' Cash Collateral to provide sufficient liquidity for their operations during these Chapter 11 Cases. On January 16, 2025, the Bankruptcy Court entered an order approving the Cash Collateral Motion on an interim basis [Docket No. 106]. On February 26, 2025, the Bankruptcy Court entered an order approving the Cash Collateral Motion on a final basis [Docket No. 516].

### F.    Bidding Procedures, Marketing Process, and GA Transaction.

As described above, the Debtors, led by Centerview Partners LLC ("<u>Centerview</u>"), engaged in a thorough marketing process with the goal of obtaining higher and better bids than the Stalking Horse Bid and achieving one or more sale transactions in accordance with the Bidding Procedures. Prior to the Petition Date, Centerview contacted 83 potential strategic and financial investors, which led to the execution of 30 non-disclosure agreements for access to virtual data rooms, financial models, and other financial, operational, and legal diligence materials. The Debtors also entered into the Stalking Horse Agreement prior to the Petition Date, which contemplated the right to liquidate substantially all of the Debtors' assets and set the floor for a competitive bidding process where topping bids could yield additional value to stakeholders.

On February 26, 2025, following the Auction, the Debtors executed the Agency Agreement with the Purchaser. The Agency Agreement provided for a credit bid of $105 million in addition to payment for

the sale of inventory and sale of FF&E in accordance with the Agency Agreement. Additionally, the Agency Agreement allowed the Debtors to pay the Prepetition ABL Lenders and Prepetition FILO Lenders in full.

The Debtors are satisfied that the GA Transaction, resulting from the Bidding Procedures and Marketing Process, represents the highest or otherwise best offer for the respective assets.

### G.    Assumption and Rejection of Executory Contracts and Unexpired Leases.

The Debtors are party to a substantial number of executory contracts. The Debtors, with the assistance of their advisors, have reviewed and will continue to review the Executory Contracts and Unexpired Leases to identify contracts and leases to either assume or reject pursuant to sections 365 or 1123 of the Bankruptcy Code. To facilitate this process, the Debtors Filed the *Motion of Debtors for Entry of an Order (I) Authorizing and Approving Procedures to Reject or Assume Executory Contracts and Unexpired Leases, and (II) Granting Related Relief* [Docket No. 16] (the "Assumption/Rejection Procedures Motion") on January 15, 2025, seeking approval of procedures for rejecting executory contracts and unexpired leases. On February 13, 2025, the Debtors Filed a certificate of no objection stating that no objections to the Assumption/Rejection Procedures Motion had been Filed and asking the Bankruptcy Court to enter an order granting the Assumption/Rejection Procedures Motion [Docket No. 401]. On February 14, 2025, the Bankruptcy Court entered an order approving the Rejection Procedures Motion on a final basis [Docket No. 429] (the "Assumption/Rejection Procedures Order").

On the Effective Date, except as otherwise provided in the Plan, each Executory Contract or Unexpired Lease not previously assumed, assumed and assigned, or rejected shall be deemed automatically rejected by the applicable Debtor, unless otherwise agreed by the applicable counterparty, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that: (1) are specifically described in the Plan as to be assumed in connection with Confirmation of the Plan, are identified on a Cure Notice, are identified on the Schedule of Assumed Executory Contracts and Unexpired Leases, or were assumed as part of the GA Transaction; (2) have been previously assumed or rejected by the Debtors pursuant to any other Bankruptcy Court order; (3) are the subject of a Filed motion to assume, assume and assign, or reject such Executory Contract or Unexpired Lease (or of a Filed objection with respect thereto) that is pending on the Confirmation Date; (4) are a contract, release, or other agreement or document entered into in connection with the Plan; or (5) are an Insurance Policy.

For the avoidance of doubt and notwithstanding anything to the contrary in the Plan, the Debtors shall make all assumption and rejection determinations for their Executory Contracts and Unexpired Leases either through the Filing of a motion or identification in the Plan Supplement, in each case prior to the applicable deadlines set forth in sections 365(d)(2) and 365(d)(4) of the Bankruptcy Code, and as further set forth in the 365(d)(4) extension order entered at Docket No. 432 (the "365(d)(4) Extension Order"). To the extent any provision of the Bankruptcy Code or the Bankruptcy Rules requires the Debtors to assume or reject an Executory Contract or Unexpired Lease by a deadline, including section 365(d) of the Bankruptcy Code, such requirement shall be satisfied if the Debtors make an election, either through the Filing of a motion or identification in the Plan Supplement or similar schedule in connection with the Approval Order, to assume or reject such Executory Contract or Unexpired Lease prior to the applicable deadline, regardless of whether or not the Bankruptcy Court has actually ruled on such proposed assumption or rejection prior to such deadline.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving, subject to and upon the occurrence of the Effective Date, the assumptions, assumptions and assignments, or rejections of the Executory Contracts and Unexpired Leases as set forth in the Plan or the Schedule of Assumed Executory Contracts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Except as otherwise specifically set forth in the Plan or in the Confirmation Order or

any GA Transaction Documents approved pursuant to the Approval Order, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Notwithstanding anything in the Plan to the contrary, with respect to any Unexpired Lease that is not assumed on the Effective Date pursuant to Article V.A. of the Plan, the effective date of rejection of such Unexpired Leases shall be the later of:  (A) the Effective Date, except (1) in connection with a Court-Ordered Cure Cost pursuant to Article V.C. of the Plan; or (2) if agreed by the applicable counterparty, and (B) the date upon which the Debtors notify the landlord in writing (e-mail being sufficient) that they have surrendered the premises to the landlord and returned the keys, key codes, or security codes, as applicable; *provided* that on the date the Debtors surrender the premises as set forth in subsection (B) above, any property remaining on the premises subject to a rejected Unexpired Lease shall be deemed abandoned by the Debtors or the Wind-Down Debtors, as applicable, as of the effective date of the rejection, and the counterparty to such Unexpired Lease shall be authorized to use or dispose of any property left on the premises in its sole and absolute discretion without notice or liability to the Debtors or the Wind-Down Debtors, as applicable, or any third party.  If the effective date of any rejection of an Unexpired Lease is after the Confirmation Date pursuant to the terms of the Plan, the Debtors or the Wind-Down Debtors, as applicable, shall provide notice of such rejection to the applicable landlord no later than the applicable deadlines set forth in the 365(d)(4) Extension Order, setting forth the deadline for Filing any Claims arising from such rejection which notice shall also be served upon the GUC Trust.

Notwithstanding anything to the contrary in the Plan or the Confirmation Order, the rights of counterparties to Unexpired Leases of nonresidential real property to object to the continued possession of such leased property, including the ability to conduct sales on the properties, or failure to comply with any other lease terms or obligations, including payment of rents and charges and insurance obligations, in each case related to such Unexpired Lease following entry of the Confirmation Order are expressly preserved, and the rights of such counterparties to request such objection be heard on shortened notice are preserved.

Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall revest in, and be fully enforceable by, the applicable Debtor or Wind-Down Debtor, as applicable, in accordance with its terms, except as such terms may have been modified by agreement of the parties thereto, subject to Article V.A of the Plan. Notwithstanding anything to the contrary in the Plan, the Confirmation Order, or any other Final Order, the Debtors may amend or otherwise modify the Schedule of Assumed Executory Contracts and Unexpired Leases prior to the Effective Date to designate an Executory Contract previously included on the Schedule of Assumed Executory Contracts and Unexpired Leases for assumption and assignment.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Confirmation Date shall be subject to a Final Order on or after the Confirmation Date but may be withdrawn, settled, or otherwise prosecuted by the applicable Debtor or Wind-Down Debtor, as applicable, and consistent with the 365(d)(4) Extension Order.

Subject to the Approval Order, to the maximum extent permitted by law, the transactions contemplated by the Plan shall not constitute a "change of control" or "assignment" (or terms with similar effect) under any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan, or any other transaction, event, or matter that would (A) result in a violation, breach, or default under such Executory Contract or Unexpired Lease, (B) increase, accelerate, or otherwise alter any obligations, rights, or liabilities of the Debtors or the Wind-Down Debtors under such Executory Contract or Unexpired Lease, or (C) result in the creation or imposition of a Lien upon any property or asset of the Debtors or the Wind-Down Debtors pursuant to the applicable Executory Contract or Unexpired Lease, and to the extent any provision in any such Executory Contract or Unexpired Lease restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the transactions contemplated by the Plan, the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect

thereto, and any consent or advance notice required under such Executory Contract or Unexpired Lease in connection with assumption thereof (subject to the other provisions of Article V.A of the Plan) shall be deemed satisfied by Confirmation.

Notwithstanding anything to the contrary in the Plan, after the Confirmation Date, an Unexpired Lease on a Cure Notice or the Schedule of Assumed Executory Contracts and Unexpired Leases as of the Confirmation Date may not be rejected by the applicable Debtor(s), other than as provided for in the Plan, unless the applicable lessor has (x) consented to such rejection, (y) objected to the assumption of such Unexpired Lease and such objection remains outstanding, or (z) consented to an extension of the time period in which the applicable Debtor(s) must assume or reject such Unexpired Lease pursuant to section 365(d)(4) of the Bankruptcy Code (as extended with the applicable lessor's consent, the "Deferred Deadline"), in which case for purposes of clause (z) the applicable Debtor(s) shall have until the Deferred Deadline to assume or reject such Unexpired Lease, subject to the applicable lessor's right to object to such assumption or rejection. For any Unexpired Lease assumed pursuant to Article V.A. of the Plan, all costs required to cure such Unexpired Lease shall be paid on the Effective Date or as soon as reasonably practicable thereafter, unless subject to a dispute with respect to Cure Claims with such dispute addressed in accordance with Article V.C of the Plan. Any guaranty of an Unexpired Lease that is assumed pursuant to the Plan, the Confirmation Order, or any other order of the Bankruptcy Court shall be reaffirmed by the applicable Debtor or Wind-Down Debtor and remain in full force and effect as of the Effective Date, unless otherwise agreed in writing by the Debtor or Wind-Down Debtor, as applicable, and the applicable counterparty.

### H.    Claims Based on Rejection of Executory Contracts or Unexpired Leases.

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Claims Agent within thirty days after the later of (1) the date of service of notice of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date. All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan or such other treatment as agreed to by the GUC Trust and the Holder of such Claim. For the avoidance of doubt, unless otherwise agreed, any property remaining on the premises subject to a rejected Unexpired Lease shall be deemed abandoned by the Debtors or the Wind-Down Debtors, as applicable, as of the effective date of the rejection, and the counterparty to such Unexpired Lease shall be authorized to (i) use or dispose of any property left on the premises in its sole and absolute discretion without notice or liability to the Debtors, or the Wind-Down Debtors, as applicable, or any third party, and (ii) shall be authorized to assert a Claim for any and all damages arising from the abandonment of such property by filing a Proof of Claim in accordance with Article V.B of the Plan.

### I.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.

Any monetary defaults under an assumed Executory Contract or Unexpired Lease, as reflected on the Cure Notice, shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim in Cash on the Effective Date, subject to the limitations described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

Unless otherwise agreed to in writing by the parties to the applicable Executory Contract or Unexpired Lease, any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount must be filed, served, and actually received by counsel to the Debtors no later than fourteen (14) days after service of Cure Notice on affected counterparties. Any counterparty to an Executory Contract or Unexpired Leases that fails to timely object to the proposed assumption or assumption and assignment, as applicable, of any Executory Contract or Unexpired Lease

will be deemed to have consented to such assumption or assumption and assignment and, unless otherwise ordered by the Court, any untimely request for an additional or different cure amount shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any of the Debtors, the Wind-Down Debtors, or the GUC Trust.

In the event of a dispute regarding any Cure Claims, the ability of the Wind-Down Debtors or any assignee, as applicable, to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) or any other matter pertaining to assumption, then payment of any Cure Claims shall be made: (a) five (5) days after entry of a Bankruptcy Court order resolving such dispute, approving such assumption (and if applicable, assignment) or (b) as may be agreed upon the Debtors or the Wind-Down Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease. Any such disputes shall be scheduled for hearing upon request of the affected counterparty or the Debtors or the Wind-Down Debtors, as applicable, at the earliest convenience of the Bankruptcy Court; provided that no hearing will be scheduled on less than ten (10) days' notice to the affected counterparty, and the Debtors or the Wind-Down Debtors, as applicable. The Debtors and the Wind-Down Debtors, as applicable, may reconcile and settle in the ordinary course of the Debtors' business any dispute (following a timely Filed objection) regarding any Cure Claim or any other matter pertaining to assumption without any further notice to or action, order, or approval of the Bankruptcy Court.

If the Bankruptcy Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice (such greater amount, the "Court-Ordered Cure Cost"), the Debtors or Wind-Down Debtors, as applicable, shall have the right to (a) satisfy the Court-Ordered Cure Cost within five (5) days of the Bankruptcy Court Order determining the Court-Ordered Cure Costs and assume such Executory Contract or Unexpired Lease in accordance with the terms herein, or (b) remove such Executory Contract or Unexpired Lease from the Schedule of Assumed Executory Contracts and Unexpired Leases, in which case such Executory Contract or Unexpired Lease will be deemed rejected on the later of five (5) business days after the Court-Ordered Cure Cost and the Effective Date.

The assumption of any Executory Contract or Unexpired Lease pursuant to the Plan, in connection with the GA Transaction, or pursuant to the Assumption and Rejection Procedures Order and the cure of defaults associated therewith in accordance with section 365(b) of the Bankruptcy Code, including the payment of any Cure Claims, shall result in the full release and satisfaction of any Cure Claims or defaults, whether monetary or nonmonetary (solely to the extent agreed between the Debtors and the counterparty to an applicable Executory Contract or Unexpired Lease), including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease, in each case at any time prior to the effective date of assumption of such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed in the Chapter 11 Cases shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

**J.      Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.**

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Wind-Down Debtors, as applicable, under such Executory Contracts or Unexpired Leases to the extent of applicable law. In particular, and solely to the extent afforded by applicable law, the Wind-Down Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to rejected Executory Contracts or Unexpired Leases.

### K.  Insurance Policies.

Notwithstanding anything to the contrary in the Plan, the Confirmation Order, any other Definitive Document, the Plan Supplement, any Bar Date Order or bar date notice, any Claim Objection, any other document related to any of the foregoing, or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening, grants an injunction, discharge, or release, confers Bankruptcy Court jurisdiction, or requires a party to opt out of any releases): (a) on the Effective Date, solely to the extent the Insurance Policies are executory, the Wind-Down Debtors shall be deemed to have assumed all Assumed Insurance Policies, unaltered and in their entireties, pursuant to sections 105 and 365 of the Bankruptcy Code and, after such assumption, all Assumed Insurance Policies shall vest, unaltered and in their entireties, in the Wind-Down Debtors; (b) on and after the Effective Date, the Wind-Down Debtors shall become and remain liable in full for all of their and the Debtors' obligations under the Assumed Insurance Policies regardless of whether such obligations arise before, on, or after the Effective Date, *provided*, *however*, that in no event shall the GUC Trust be liable for any of the Debtors' obligations under the Assumed Insurance Policies; (c) nothing alters, amends, modifies, waives, releases, diminishes, prejudices, or impairs (i) any of the rights and obligations of the Debtors and their Estates (or, after the Effective Date, the Wind-Down Debtors), or of any Insurers, or of any other individuals or entities under any Insurance Policies; (ii) any coverage or benefits provided under any Insurance Policies; (iii) the terms and conditions of any Insurance Policies; or (iv) the enforceability of any Insurance Policies; (d) nothing in the Plan, the Confirmation Order, or any documents related thereto shall permit or effectuate a sale, assignment, or other transfer of any Insurance Policy, and any and all rights of the Insurers to object to or otherwise oppose any sale, assignment, or other transfer of any Insurance Policy are preserved and, after the Effective Date, nothing shall permit or otherwise effectuate a sale, assignment, or other transfer of any Insurance Policy and/or any rights, benefits, claims, proceeds, rights to payment, or recoveries under and/or relating to any Insurance Policy without the prior express written consent of the applicable Insurer; and (e) on the Effective Date, the automatic stay of section 362(a) of the Bankruptcy Code and the injunctions set forth in Article VIII.E of the Plan, if and to the extent applicable, shall be deemed lifted without further order of the Bankruptcy Court solely to permit:  (i) claimants with valid workers' compensation claims or direct action claims against an Insurer under applicable non-bankruptcy law to proceed with their claims; and (ii) Insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of the Bankruptcy Court, (A) workers' compensation claims, (B) claims where a claimant asserts a direct claim against any Insurer under applicable non bankruptcy law, or an order has been entered by the Bankruptcy Court granting a claimant relief from the automatic stay or the injunctions set forth in Article VIII.E of the Plan to proceed with its claim, and (C) all costs in relation to each of the foregoing.

If an Insured Litigation Claim may be covered by an Insurance Policy that has a self-insured retention ("SIR"), the Allowed amount of such Insured Litigation Claim that is within the applicable SIR shall constitute an Allowed General Unsecured Claim against the applicable Debtor's Estate.  Such SIR shall be considered satisfied pursuant to the Plan through allowance of such General Unsecured Claim solely in the amount of the applicable SIR; *provided, however*, that nothing in the Plan obligates the Plan Administrator or GUC Trust to otherwise satisfy or pay in cash any SIR under any Insurance Policy.  Any recovery on account of the Insured Litigation Claim in excess of the SIR established upon the liquidation of the Insured Litigation Claim shall be recovered solely from the Debtors' insurance coverage, if any, and only to the extent of available insurance coverage and any proceeds thereof.  Nothing in the Plan shall be (i) construed to limit, extinguish, or diminish the insurance coverage that may exist or shall be construed as a finding that liquidated any Claim payable pursuant to an insurance policy, or (ii) a determination that any Insurance Policy is an executory contract or is capable of assumption or rejection.  In no event shall the Plan Administrator or the GUC Trust be required to pay any amounts within a self-insured retention, including defense costs, other than through the allowance of a General Unsecured Claim up to the amount of the applicable SIR.

L.    **Modifications, Amendments, Supplements, Restatements, or Other Agreements.**

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, reciprocal easement agreements, construction operating and reciprocal easement agreements, operating or redevelopment agreements, covenants, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

M.    **Filing of Statements of Financial Affairs and Schedules of Assets and Liabilities.**

On February 11, 2025, the Debtors Filed their respective statements of financial affairs and schedules of assets and liabilities (collectively, the "Schedules and Statements") with the Bankruptcy Court. Copies of the Schedules and Statements can be viewed free of charge at https://cases.ra.kroll.com/Joann2025.

N.    **The Investigation.**

Prior to the Petition Date, the special committee of independent directors of JOANN's board of directors (the "Special Committee") commenced an investigation into and analysis of potential claims and causes of action that may be available to the Company or against the Company (the "Investigation"). The Investigation primarily involved the Company and its related parties, including the activities of the Company's directors and officers.

To date, the Special Committee, with the assistance of Kirkland, has reviewed over 24,000 documents in connection with the Investigation. The Special Committee, with the assistance of Kirkland, has also conducted numerous interviews with current officers and business leaders. In the exercise of its fiduciary duty, the Special Committee did not identify any actionable claims or causes of action that would have precluded the Debtors from entering into the GA Transaction or seeking approval of the Plan.

# VII.    RISK FACTORS

Holders of Claims should read and carefully consider the risk factors set forth, as well as the other information set forth in this Disclosure Statement and the documents delivered together with this Disclosure Statement, referred to or incorporated by reference in this Disclosure Statement, below before voting to accept or reject the Plan. Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' business or the Plan and its implementation.

A.    **Certain Bankruptcy Law Considerations.**

The occurrence or nonoccurrence of any or all of the following contingencies, and any others, may affect distributions available to Holders of Allowed Claims and Allowed Interests under the Plan but will not necessarily affect the validity of the vote of any Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

1. **Parties in Interest May Object to the Plan's Classification of Claims and Interests.**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

2. **The Conditions Precedent to the Effective Date of the Plan May Not Occur.**

As more fully set forth in Article IX.A of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent.  If such conditions precedent are not waived, or not met, the Effective Date will not take place.

3. **The Debtors May Fail to Satisfy Vote Requirements.**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to pursue another strategy to wind-down the Estates, such as confirm an alternative chapter 11 plan, a dismissal of the Chapter 11 Cases and an out-of-court dissolution, an assignment for the benefit of creditors, a conversion to a chapter 7 case, or other strategies.  There can be no assurance that the terms of any such alternative strategies would be similar or as favorable to the Holders of Interests and Allowed Claims as those proposed in the Plan.

4. **The Debtors May Not Be Able to Secure Confirmation of the Plan.**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that:  (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and the voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If the Plan is not confirmed by the Bankruptcy Court, it is unclear what distributions, if any, Holders of Allowed Claims and Allowed Interests will receive with respect to their Allowed Claims and Allowed Interests.  The Bankruptcy Court, as a court of equity, may exercise substantial discretion.

The Debtors reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications may result in a less favorable treatment of any Class, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan.  Such a less

favorable treatment may include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

### 5.    Nonconsensual Confirmation.

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 6.    Plan Exclusivity Period.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors will have retained the exclusive right to propose the Plan upon filing their Petitions. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

### 7.    The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code.

If a bankruptcy court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the bankruptcy court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of the additional expenses the Debtors would necessarily incur related to the chapter 7 trustee and additional retained professionals. Such expenses may decrease recoveries for Holders of Allowed Claims in the Voting Classes. *See, e.g.*, 11 U.S.C. §§ 326(a) and 503(b)(2). The conversion to chapter 7 would require entry of a new bar date, which may increase the amount of Allowed Claims and thereby reduce Pro Rata recoveries. *See* Fed. R. Bankr. P. 1019(2), 3002(c).

### 8.    The Debtors and the GUC Trust May Object to the Amount or Classification of a Claim.

Except as otherwise provided in the Plan, the Debtors and the GUC Trust reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

9.    **Risk of Non-Occurrence of the Effective Date.**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

10.    **Contingencies May Affect Votes of Impaired Classes to Accept or Reject the Plan.**

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which may affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

11.    **Releases, Injunctions, and Exculpations Provisions May Not Be Approved.**

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Wind-Down Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.

12.    **The Total Amount of General Unsecured Claims May Be Higher Than Anticipated by the Debtors.**

With respect to Holders of General Unsecured Claims, the Claims Filed against the Debtors' Estates may be materially higher than the Debtors have estimated. As of the date of the Disclosure Statement, the Debtors have yet to determine whether they will be assuming or rejecting the overwhelming majority of the leases for their 800 prior store locations. The ultimate rejection of any such leases may result in additional General Unsecured Claims being filed by landlords for rejection damages.

13.    **The GUC Trust Expenses are Currently Unknown.**

As more fully discussed in the Plan, the GUC Trust will incur certain GUC Trust Expenses in connection with fulfilling its obligations under the Plan and the GUC Trust Agreement, including in connection with the reconciliation of General Unsecured Claims. The amount of GUC Trust Expenses that will be incurred in connection with General Unsecured Claim reconciliation process is unknown and ultimately will reduce the aggregate proceeds available for distributions to holders of Allowed General Unsecured Claims.

14.    **Certain Tax Implications of the Plan.**

Holders of Allowed Claims should carefully review Article X of this Disclosure Statement, entitled "CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN," to

determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Wind-Down Debtors and Holders of Claims against and Interests in the Debtors.

### B.    Other Risks.

#### 1.    The Wind-Down Debtors May be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases.

The Debtors are currently subject to or interested in certain legal proceedings, which may adversely affect the Debtors. In the future, the Wind-Down Debtors may become party to litigation. In general, litigation can be expensive and time-consuming to bring or defend against. Such litigation could result in settlements or judgments that could significantly affect the Wind-Down Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Wind-Down Debtors may become party to, nor the final resolution of any such litigation. The impact of any such litigation on the Wind-Down Debtors' businesses and financial stability, however, could be material.

#### 2.    Even if Wind-Down Transactions are Implemented, the Debtors Will Continue to Face Risks.

Even if the Wind-Down Transactions are implemented, the Debtors will continue to face a number of risks, including certain risks that are beyond the Debtors' control, such as changes in economic conditions, bank instability, and changes in the Debtors' industry. As a result of these risks and others, there is no guarantee that the Wind-Down Transactions will achieve the Debtors' stated goals.

### C.    Disclosure Statement Disclaimer.

#### 1.    The Financial Information Contained in this Disclosure Statement Has Not Been Audited.

In preparing this Disclosure Statement, the Debtors and their advisors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information, and any conclusions or estimates drawn from such financial information, provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant that the financial information contained herein, or any such conclusions or estimates drawn therefrom, is without inaccuracies.

#### 2.    Information Contained in this Disclosure Statement Is for Soliciting Votes.

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

#### 3.    This Disclosure Statement Was Not Reviewed or Approved by the United States Securities and Exchange Commission.

This Disclosure Statement was not filed with the SEC under the Securities Act or applicable state securities laws. Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibit or the statements contained in this Disclosure Statement.

### 4.    This Disclosure Statement May Contain Forward Looking Statements.

This Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward-looking terminology such as "may," "will," "might," "expect," "believe," "anticipate," "could," "would," "estimate," "continue," "pursue," or the negative thereof or comparable terminology. All forward-looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The information contained herein is an estimate only, based upon information currently available to the Debtors.

### 5.    No Legal or Tax Advice Is Provided to You by this Disclosure Statement.

***This Disclosure Statement does not constitute legal advice to you.*** The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each Holder of a Claim or an Interest should consult his or her own legal counsel, accountant, or other applicable advisor with regard to any legal, tax, and other matters concerning his or her Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

### 6.    No Admissions Made.

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including, without limitation, the Debtors) nor (b) deemed evidence of the tax or other legal effects of the Plan on the Debtors, Holders of Allowed Claims or Allowed Interests, or any other parties in interest.

### 7.    Failure to Identify Litigation Claims or Projected Objections.

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. After the Confirmation or Effective Date of the Plan, (i) the Debtors or the Plan Administrator may seek to investigate, File, and prosecute Claims and Interests and (ii) the Debtors, the Plan Administrator or the GUC Trust, as applicable, may object to Claims or Interests, irrespective of whether this Disclosure Statement identifies such Claims or Interests or objections to such Claims or Interests.

### 8.    No Waiver of Right to Object to Claim or Interest.

The vote by a Holder of a Claim or Interest for or against the Plan does not constitute a waiver or release of any claims, causes of action, or rights of the Debtors (or any entity, as the case may be) to object to that Holder's Claim or Interest, regardless of whether any claims or causes of action of the Debtors or their respective Estates are specifically or generally identified in this Disclosure Statement.

### 9.    Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors.

The Debtors' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement.

### 10. Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update.

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement, unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

### 11. No Representations Outside this Disclosure Statement Are Authorized.

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Debtors and the U.S. Trustee.

## VIII.    SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a ballot or ballots to be used for voting on the Plan, is being distributed to the Holders of Claims or Interests in the Class that is entitled to vote to accept or reject the Plan. The procedures and instructions for voting and related deadlines are set forth in the *Order (I) Conditionally Approving the Adequacy of the Disclosure Statement, (II) Scheduling a Plan Confirmation and Final Disclosure Statement Approval Hearing and Setting Dates and Deadlines, (III) Approving the Solicitation Package and Notice Procedures, (IV) Approving the Forms of Ballots and Notices in Connection Therewith, and (V) Granting Related Relief* (the "Interim Disclosure Statement Order") and the exhibits annexed thereto [Docket No. [●]].

*The Interim Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement in formulating a decision to vote to accept or reject the Plan.*

---

**THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**.

PLEASE REFER TO THE INTERIM DISCLOSURE STATEMENT ORDER FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

---

### A.    Holders of Claims Entitled to Vote on the Plan.

### B.    Under the provisions of the Bankruptcy Code, not all Holders of Claims against or Interests in a debtor are entitled to vote on a chapter 11 plan. What is the GA Transaction?

Under the Plan, the Debtors shall distribute the proceeds from the GA Transaction. Following the entry of the Approval Order, the Debtors and the GUC Trust will distribute proceeds to Holders of Allowed Claims in accordance with the Plan. If the Debtors sell any assets remaining in the Debtors' possession

following the completion of the GA Transaction, proceeds therefrom will also be distributed in accordance with the Plan.

The Debtors are satisfied that the GA Transaction represents the highest or otherwise best offer for the respective assets.

Am I entitled to vote on the Plan?Under the Plan, the Debtors shall distribute the proceeds from the GA Transaction.  Following the entry of the Confirmation Order, the Debtors and the GUC Trust will distribute proceeds to Holders of Allowed Claims in accordance with the Plan.

The Debtors are satisfied that the GA Transaction represents the highest or otherwise best offer for the respective assets.

Section II.D of this Disclosure Statement, entitled "Am I entitled to vote on the Plan?", provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim or Interest) under the Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from Holders of Claims in Class 3 and Class 4 (the "Voting Classes").  The Holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a Plan Distribution.  Accordingly, Holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are *not* soliciting votes from Holders of Claims or Interests in Classes 1 through 2 and 5 through 8.  Additionally, the Interim Disclosure Statement Order provides that certain Holders of Claims in the Voting Classes, such as those Holders whose Claims have been disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Plan.

**C.      Voting Record Date.**

**The Voting Record Date is May 23, 2025**.  The Voting Record Date is the date on which it was determined which Holders of Claims or Interests in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims or Interests have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim or Interest.

**D.      Voting on the Plan.**

**The Voting Deadline is June 30, 2025, at 4:00 p.m. (prevailing Eastern Time)**.  To be counted as votes to accept or reject the Plan, all ballots must be properly executed, completed, and delivered as directed, so that your ballot containing your vote is **actually received** by the Claims and Noticing Agent on or before the Voting Deadline.

To vote, complete, sign, and date your ballot and return it (with a signature) *promptly* to one of the below addresses.

| **If by First Class Mail, Hand Delivery, or Overnight Mail:** |
| --- |
| JOANN Inc. (2025) Ballot Processing Center<br>c/o Kroll Restructuring Administration LLC<br>850 Third Avenue, Suite 412<br>Brooklyn, NY 11232<br><br>To arrange hand delivery of your Ballot, please email the Claims and Noticing Agent at JoannBallots@ra.kroll.com (with "Joann Inc. Ballot Delivery" in the subject line) at least 24 hours prior to your arrival at the Kroll address above and provide the anticipated date and time of delivery. |

**OR**

**SUBMIT VIA AN ELECTRONIC BALLOT THROUGH THE CLAIMS AND NOTICING AGENT'S ONLINE ELECTRONIC BALLOT SUBMISSION PORTAL AT HTTPS://CASES.RA.KROLL.COM/JOANN2025.**

**PLEASE SELECT JUST ONE OPTION TO VOTE.**

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE CLAIMS AND NOTICING AGENT TOLL FREE AT (844) 712-2239 (DOMESTIC) or +1 (646) 863-7121 (INTERNATIONAL) OR VIA ELECTRONIC MAIL TO JOANNINFO@RA.KROLL.COM (WITH "JOANN INC. SOLICITATION INQUIRY" IN THE SUBJECT LINE).**

      E.      **Ballots Not Counted.**

      **No ballot will be counted toward Confirmation if, among other things**:  (1) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim or Interest; (2) it was transmitted by means other than as specifically set forth in the ballots; (3) it was cast by an entity that is not entitled to vote on the Plan; (4) it was cast for a Claim listed in the Debtors' schedules as contingent, unliquidated, or disputed for which the applicable bar date has passed and no proof of claim was Filed; (5) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Interim Disclosure Statement Order); (6) it was sent to the Debtors, the Debtors' agents/representatives (other than the Claims and Noticing Agent), or the Debtors' financial or legal advisors instead of the Claims and Noticing Agent; (7) it is unsigned; or (8) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan.  **Please refer to the Interim Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

      **ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR THAT IS OTHERWISE NOT IN COMPLIANCE WITH THE INTERIM DISCLOSURE STATEMENT ORDER WILL <u>NOT</u> BE COUNTED.**

IX.      **CONFIRMATION OF THE PLAN**

      A.      **Requirements for Confirmation of the Plan.**

      Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are:  (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting

Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of Holders of Claims or Interests.

At the Combined Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

## B.    Best Interests of Creditors.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

The Debtors believe that liquidation of the Debtors' business under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Allowed Claims or Interests as compared to distributions contemplated under the Plan. While the Debtors do not anticipate, as of the date of filing this Disclosure Statement, that any Holders of Claims against the Debtors in Class 4 (General Unsecured Claims) will receive a distribution or recovery greater than 1% on account of their Claim(s), the Debtors believe that proceeding under the Plan avoids the incremental costs, delays, and uncertainties associated with a chapter 7 liquidation. Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Allowed Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets and to make distributions to creditors in accordance with the priorities established in the Bankruptcy Code. Generally, secured creditors are paid first from the proceeds of sales of their collateral. If any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to be paid. Unsecured creditors are paid from any remaining sale proceeds, according to their respective priorities. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority. Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

All or substantially all of the assets of the Debtors' business will have been liquidated through the GA Transaction, and the Plan effects a wind-down of the Debtors' remaining assets not otherwise acquired in the GA Transaction. Although a chapter 7 liquidation would achieve the same goal, the Debtors believe that the Plan provides a greater recovery to Holders of Allowed Claims than would a chapter 7 liquidation.

Liquidating the Debtors' Estates under the Plan likely provides Holders of Allowed Claims with a larger, more timely recovery in part because of the increased expenses that would be incurred in a chapter 7 liquidation, with the appointment of the chapter 7 trustee. The delay of the chapter 7 trustee becoming familiar with the assets could easily cause bids already obtained to be lost, and the chapter 7 trustee will not have the technical expertise and knowledge of the Debtors' business that the Debtors had when they proposed to sell their assets pursuant to the Plan. Moreover, the distributable proceeds under a chapter 7 liquidation will be lower because of the chapter 7 trustee's fees and expenses. Therefore, the appointment of a chapter 7 trustee would potentially delay distributions to creditors and reduce the present value of any recover for Holders. *See, e.g.*, 11 U.S.C. § 326(a) (providing for compensation of a chapter 7 trustee);

11 U.S.C. § 503(b)(2) (providing administrative expense status for compensation and expenses of a chapter 7 trustee and such trustee's professionals). Additionally, the Debtors' Estates would continue to be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for Professionals), which may constitute Allowed Claims in any chapter 11 case.

The conversion to chapter 7 would also require entry of a new bar date. *See* Fed. R. Bankr. P. 1019(2); 3002(c). Thus, the amount of Claims ultimately Filed and Allowed against the Debtors could materially increase, thereby further reducing creditor recoveries versus those available under the Plan.

In light of the foregoing, the Debtors submit that a chapter 7 liquidation would result in reduced sale proceeds and recoveries, increased expenses, delayed distributions, and the prospect of additional claims that were not asserted in the Chapter 11 Cases. Accordingly, the Debtors believe that the Plan provides an opportunity to bring the highest return for creditors.

**THE DEBTORS DO NOT CURRENTLY EXPECT DISTRIBUTABLE PROCEEDS TO RESULT IN ANY MATERIAL VALUE OR DISTRIBUTIONS TO HOLDERS OF TERM LOAN DEFICIENCY CLAIMS OR GENRAL UNSECURED CLAIMS. THE DEBTORS ANTICIPATE THAT HOLDERS OF CLAIMS IN CLASS 3 WILL RECOVER BETWEEN 0-7% OF THEIR CLAIMS AND HOLDERS OF CLAIMS IN CLASS 4 WILL RECOVER BETWEEN 0-1% OF THEIR CLAIMS.**

C.    **Feasibility.**

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a chapter 11 plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

The Debtors' marketing and sale process was a comprehensive and arm's length process with the goal of identifying counterparties for one or more potential value-maximizing sale transactions, including an extensive prepetition process beginning in December 2024. The Debtors believe that this process demonstrated that recoveries under the Plan are commensurate with parties' Claims and Interests based on the value of the Debtors' assets. The Plan provides for the liquidation and distribution of the Debtors' assets. Accordingly, the Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors.

In light of this, the Debtors do not anticipate filing a valuation analysis. *See* 11 U.S.C. § 1125(b) ("The court may approve a disclosure statement without a valuation of the debtor or an appraisal of the debtor's assets."); *In re LBI Media, Inc.*, No. 18-12655 (CSS) (Bankr. D. Del. Jan. 22, 2019) (ECF No. 360) (order approving disclosure statement without a valuation analysis and approving the filing of a valuation analysis at a later date, if necessary); *In re Gastar Exploration Inc.*, No. 18-36057 (MI) (Bankr. S.D. Tex. Dec. 21, 2018) (ECF No. 282) (order approving disclosure statement that conducted valuation analysis through a comprehensive marketing process).

D.    **Acceptance by Impaired Classes.**

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan. Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan. Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Pursuant to Article III.F of the Plan, if a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

**E.       Confirmation without Acceptance by All Impaired Classes.**

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided* that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

**1.       No Unfair Discrimination.**

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

**2.       Fair and Equitable Test.**

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class. The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

## X.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    Introduction.

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors, the Wind-Down Debtors, and certain beneficial owners of Claims (each such beneficial owner, a "Holder"). The following summary does not address the U.S. federal income tax consequences to Holders not entitled to vote to accept or reject the Plan. This summary is based on the U.S. Internal Revenue Code of 1986, as amended ("IRC"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities (collectively, "Applicable Tax Law"), all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. Changes in these rules or new interpretations of the rules with retroactive effect could significantly affect the U.S. federal income tax consequences described herein. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Debtors have not requested, and do not intend to seek, a ruling or determination from the IRS as to any of the tax consequences of the Plan discussed below. The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to certain Holders in light of their individual circumstances. This discussion also does not address tax issues with respect to such Holders that are subject to special treatment under the U.S. federal income tax laws (including, for example, accrual-method U.S. Holders (as defined below) that prepare an "applicable financial statement" (as defined in Section 451 of the IRC), banks, mutual funds, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, Persons whose functional currency is not the U.S. dollar, U.S. expatriates, broker-dealers, small business investment companies, Persons who are related to the Debtors within the meaning of the IRC, Persons liable for alternative minimum tax, Persons using a mark-to-market method of accounting, Persons who are themselves in bankruptcy, real estate investment companies and regulated investment companies and those holding, or who will hold, consideration received pursuant to the Plan as part of a hedge, straddle, conversion, or other integrated transaction). No aspect of state, local, non-income, or non-U.S. taxation is addressed. Furthermore, this summary assumes that a Holder holds only Claims in a single Class and holds such Claims only as "capital assets" (within the meaning of section 1221 of the IRC). This summary also assumes that the Holder has not taken a bad debt deduction with respect to a Claim (or any portion thereof) in the current or any prior year and such Claim did not become completely or partially worthless in a prior taxable year, and that various debt and other arrangements to which the Debtors and Wind-Down Debtors are or will be a party will be respected for U.S. federal income tax purposes in accordance with their form,

and, to the extent relevant, that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the IRC. This summary does not discuss differences in tax consequences to Holders that act or receive consideration in a capacity other than any other Holder of a Claim of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below.  The U.S. federal income tax consequences of the implementation of the Plan to the Debtors, Wind-Down Debtors, and Holders of Claims against and Interests in the Debtors described below also may vary depending on the nature of any Wind-Down Transactions that the Debtors and/or Wind-Down Debtors engage in.  This summary does not address the U.S. federal income tax consequences to Holders (a) whose Claims are Unimpaired or otherwise entitled to payment in full under the Plan, (b) that are deemed to reject the Plan or (c) that are otherwise not entitled to vote to accept or reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim that for U.S. federal income tax purposes is:  (1) an individual who is a citizen or resident of the United States; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the IRC) has authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person (within the meaning of section 7701(a)(30) of the IRC). For purposes of this discussion, a "Non-U.S. Holder" is any Holder that is neither a U.S. Holder nor a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity.  Partnerships (or other pass-through entities) and partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders are urged to consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER.  ALL HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS FOR THE U.S. FEDERAL, STATE, LOCAL, AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

### B.    Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and Wind-Down Debtors.

The Plan is being structured as one or more taxable sales of the assets and/or equity interests of the Debtors, Wind-Down Debtors, and their subsidiaries together with the wind-down, dissolution, and liquidation of the Debtors' Estates after the Effective Date.  The Debtors and/or their subsidiaries, as applicable, will realize gain or loss in an amount equal to the difference between the value of the consideration received (including, for this purpose, assumption of liabilities) and the adjusted tax basis in the sold assets. Realized gains, if any, may be offset by current-year losses and other available tax attributes. While the Debtors continue to study the issue, it is not yet possible to determine whether such transactions are in the aggregate expected to result in a cash tax liability of the Debtors and/or Wind-Down Debtors. Any of the Debtors and Wind-Down Debtors' tax attributes that are not utilized to offset such realized gains (if any) will not survive the implementation of the Plan.  Accordingly, the rules regarding cancellation of

indebtedness income and the rules regarding section 382 of the IRC generally are not expected to be applicable and, in each case, not discussed herein.

### C.    Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims Entitled to Vote.

The following discussion assumes that the Debtors and the Wind-Down Debtors will undertake the Wind-Down Transactions currently contemplated by the Plan.  U.S. Holders are urged to consult their tax advisors regarding the tax consequences of the Wind-Down Transactions.

### 1.    Consequences to Class 3 Holders of Prepetition Term Loan Claims.

Except to the extent that a Holder of an Allowed Prepetition Term Loan Claim agrees to less favorable treatment, each Holder of Prepetition Term Loan Claims shall be entitled to their Pro Rata share of the distributable proceeds, if any, up to the Allowed amount of such Prepetition Term Loan Claims in accordance with the Waterfall Recovery until such Claims are paid in full.

Each such Holder will be treated as exchanging their Claim in a taxable exchange under section 1001 of the IRC for their Pro Rata share of the distributable proceeds.  Accordingly, subject to the rules regarding accrued but untaxed interest, each Holder of such Claim should recognize gain or loss equal to the difference between (a) the amount of distributable proceeds received in exchange for such Claim, and (b) such Holder's adjusted tax basis in such Claim.  The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among others, the tax status of the Holder, the nature of the Claim in such Holder's hands and how long it has been held, whether the Claim was purchased at a market discount (discussed below), the nature and tax treatment of any fees, costs or expense reimbursements to which consideration is allocated and whether and to what extent the Holder previously has claimed a bad debt deduction with respect to its Claim.  If recognized gain is capital gain, it generally would be long-term capital gain if the Holder held its Claim for more than one year at the time of the exchange.  The deductibility of capital losses is subject to certain limitations as discussed below.  Each Holder of an Allowed Prepetition Term Loan Claim is urged to consult its tax advisor to determine the character of any gain or loss recognized with respect to the satisfaction of its such Claim.

### 2.    Accrued Interest.

To the extent that any amount received by a U.S. Holder of a Claim under the Plan is attributable to accrued but untaxed interest or original issue discount ("OID") during its holding period on the debt instruments constituting the surrendered Claim, the receipt of such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already taken into income by the U.S. Holder). Conversely, a U.S. Holder of a Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest on the debt instruments constituting such Claim was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors.  Such loss may be ordinary, but the tax law is unclear on this point.

If the fair market value of the consideration received by a U.S. Holder is not sufficient to fully satisfy all principal and interest on Claims, the extent to which such consideration will be attributable to accrued but untaxed interest is unclear.  Under the Plan, the aggregate consideration to be distributed to Holders of Claims in each Class will be allocated first to the principal amount of such Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any.  Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, and certain case law generally indicates that

a final payment on a distressed debt instrument that is insufficient to repay outstanding principal and interest will be allocated to principal, rather than interest. Certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest. There can be no assurance that the IRS will not take the position that the consideration received by the U.S. Holder should be allocated in a manner that differs from the allocation as provided in the Plan. U.S. Holders of Claims should consult their tax advisors regarding the proper allocation of the consideration received by them under the Plan and the U.S. federal income tax treatment of accrued but untaxed interest.

### 3. Market Discount.

Under the "market discount" provisions of sections 1276 through 1278 of the IRC, some or all of any gain realized by a Holder exchanging the debt instruments constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the surrendered Allowed Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if its Holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or, (ii) in the case of a debt instrument issued with OID, its adjusted issue price, by at least a de minimis amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a Holder on the exchange of debt constituting its Allowed Claim that was acquired with market discount is expected to be treated as ordinary income to the extent of the market discount that accrued thereon while such debts were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued).

### 4. Limitation on Use of Capital Losses.

A U.S. Holder of a Claim who recognizes capital losses as a result of the transactions undertaken pursuant to the Plan will be subject to limits on their use of such capital losses. For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods) and ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains. A non-corporate U.S. Holder may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. A corporate U.S. Holder who has more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in succeeding tax years. Corporate U.S. Holders may only carry over unused capital losses for the five years following the capital loss year but are allowed to carry back unused capital losses to the three years preceding the capital loss year.

### 5. Medicare Tax.

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, interest, dividends and gains from the sale or other disposition of capital assets. U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be Received under the Plan.

D.    **Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Claims.**

The following discussion assumes that the Debtors and the Wind-Down Debtors, will undertake the Wind-Down Transactions currently contemplated by the Plan and includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders.  This discussion does not include any non-U.S. tax considerations.  The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex.  Each Non-U.S. Holder is urged to consult its tax advisor regarding the U.S. federal, state, local, non-U.S., and non-income tax consequences of the consummation of the Plan and the Wind-Down Transactions to such Non-U.S. Holder.

1.    **Gain Recognition.**

Subject to the discussion of backup withholding and FATCA (as defined below) gain, if any, recognized by a Non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Wind-Down Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States ("ECI") (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).  If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is ECI in the same manner as a U.S. Holder (except that the Medicare tax generally would not apply).  In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates).  In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

2.    **U.S. Federal Income Tax Consequences to Non-U.S. Holders of Payments of Interest (Including OID and Interest Attributable to Accrued but Untaxed Interest) under the Plan.**

Subject to the discussion of backup withholding and FATCA (as defined below), interest income (which, for purposes of this discussion of Non-U.S. Holders, includes OID and accrued but untaxed interest under the Plan) of a Non-U.S. Holder that is not ECI will qualify for the portfolio interest exemption and, therefore, will not be subject to U.S. federal income tax or withholding, provided that:

- the Non-U.S. Holder does not own, actually or constructively, 10 percent or more of interest in the Debtors on a Claim within the meaning of Section 871(h)(3) of the IRC and Treasury Regulations thereunder;

- the Non-U.S. Holder is not a controlled foreign corporation related to the Debtors, actually or constructively through the ownership rules under Section 864(d)(4) of the IRC;

- the Non-U.S. Holder is not a bank that is receiving the interest on an extension of credit made pursuant to a loan agreement entered into in the ordinary course of its trade or business; and

- the beneficial owner gives the Debtors or the Debtors' paying agent or other withholding agent an appropriate IRS Form W-8 (or suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed establishing its status as a Non-U.S. Holder.

If not all of these conditions are met, interest paid to a Non-U.S. Holder pursuant to the Plan that is not ECI generally will be subject to U.S. federal income tax and withholding at a 30 percent rate, unless an applicable income tax treaty reduces or eliminates such withholding and the Non-U.S. Holder claims the benefit of that treaty by providing an appropriate IRS Form W-8 (or a suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed.

If interest paid to a Non-U.S. Holder pursuant to the Plan is ECI, the Non-U.S. Holder will be required to pay U.S. federal income tax on that interest on a net income basis generally in the same manner as a U.S. Holder (and the 30 percent withholding tax described above will not apply, provided the appropriate statement (generally a properly executed IRS Form W-8ECI or suitable substitute or successor form or such other form as the IRS may prescribe) is provided to the issuer or the issuer's paying agent or other withholding agent) unless an applicable income tax treaty provides otherwise. If a Non-U.S. Holder is eligible for the benefits of any income tax treaty between the United States and its country of residence, any interest income that is ECI will be subject to U.S. federal income tax in the manner specified by the treaty if the Non-U.S. Holder claims the benefit of the treaty by providing an appropriate IRS Form W-8 (or a suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed. In addition, a corporate Non-U.S. Holder may, under certain circumstances, be subject to an additional "branch profits tax" at a 30 percent rate, or, if applicable, a lower treaty rate, on its effectively connected earnings and profits attributable to such interest (subject to adjustments).

The certifications described above must be provided to the applicable withholding agent prior to the payment of interest and, as applicable, must be updated periodically. Non-U.S. Holders that do not timely provide the applicable withholding agent with the required certification, but that qualify for a reduced rate under an applicable income tax treaty, may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS. Non-U.S. Holders should consult their tax advisors regarding their entitlement to benefits under any applicable income tax treaty.

E.    FATCA.

Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments." For this purpose, "withholdable payments" generally are U.S. source payments of fixed or determinable, annual or periodical income, and, subject to information reporting and backup withholding (discussed below), also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends. FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal withholding. FATCA withholding rules that would have applied to payments of gross proceeds from the sale or other disposition of property of a type that can produce U.S. source interest or dividends were previously scheduled to take effect on January 1, 2019. However, such withholding has effectively been suspended under proposed Treasury Regulations that may be relied on until final regulations become effective. Nonetheless, there can be no assurance that a similar rule will not go into effect in the future. Each Non-U.S. Holder should consult its tax advisor regarding the possible impact of FATCA withholding rules on such Non-U.S. Holder.

**BOTH U.S. HOLDERS AND NON-U.S. HOLDERS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE POSSIBLE IMPACT OF THESE RULES ON SUCH HOLDERS' EXCHANGE OF ANY OF ITS CLAIMS PURSUANT TO THE PLAN.**

### 1. Information Reporting and Backup Withholding.

The Debtors, Wind-Down Debtors, and applicable withholding agents will withhold all amounts required by law to be withheld from payments of interest and dividends, whether in connection with Plan Distributions or in connection with payments made on account of consideration received pursuant to the Plan and will comply with all applicable information reporting requirements. The IRS may make the information returns reporting such interest and dividends and withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident. In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, under the backup withholding rules, a Holder may be subject to backup withholding (currently at a rate of 24 percent) with respect to distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption)). Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax, provided that the required information is timely provided to the IRS. In addition, with respect to information reporting, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders subject to the Plan are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## XI.    RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated: May 24, 2025

JOANN Inc.
on behalf of itself and its debtor affiliates

By: */s/ Jeffrey Dwyer*
Name: Jeffrey Dwyer
Title: Interim Chief Executive Officer
JOANN Inc.

**<u>EXHIBIT A</u>**

**Chapter 11 Plan**

[Filed Separately]

## **EXHIBIT B**

**Corporate Organization Chart**

