**<u>EXHIBIT A</u>**

The Lease

# LEASE AGREEMENT

### Between

### IRC Rochester Marketplace, L.L.C
### "Landlord"

### and

### Jo-Ann Stores, LLC
### "Tenant"

# LEASE

This Lease is made as of _4/18_, 20 22 ("Effective Date"), between **IRC Rochester Marketplace, L.L.C.**, a Delaware limited liability company ("Landlord"), and **Jo-Ann Stores, LLC**, an Ohio limited liability company ("Tenant").

Landlord and Tenant covenant and agree as follows:

## SECTION 1.  EXHIBITS TO LEASE

(a)    The following Exhibits are attached to and made a part of this Lease, and are incorporated herein by reference:

Exhibit A.  The description of the lands upon which the Shopping Center is located.

Exhibit B.  The site plan showing the Shopping Center, the location of the Premises, as hereafter defined, the Shopping Center building, the Protected Area, the parking areas, driveways and common areas and containing other general information relative to the development of the Shopping Center Site (the "Site Plan").

Exhibit C.  Intentionally deleted.

Exhibit D.  Sign Criteria For Shopping Center

Exhibit D-1.  Tenant's Signage Plans.

Exhibit E.  Intentionally deleted.

Exhibit F.  Restricted Uses of Other Tenants.

Exhibit F-1.  Prohibited Uses

Exhibit G.  Form of Subordination, Non-Disturbance and Attornment Agreement.

Exhibit H.  Form of Estoppel Certificate.

Exhibit I.  Shopping Center Rules and Regulations.

Exhibit J.  Form of Commencement Date Agreement

(b)    If there is any conflict or ambiguity between the Approved Plans (as defined below), the language in this Lease or any Exhibit attached hereto, the order of precedence shall be the Approved Plans, then this Lease and finally the Exhibits unless expressly stated otherwise.

4

#2573 ROCHESTER, MN

## SECTION 2.  DEFINITIONS

The terms listed below have the respective meanings as follows:

(a)     Additional Rent: Tenant's Proportionate Share of Taxes (Section 8), Tenant's Proportionate Share of Common Area Costs (Section 9), and Tenant's Proportionate Share of Insurance (Section 21).

(b)     Commencement Date: (1) the 150th day after the Delivery Date; or (2) the day that Tenant opens for business in the Premises, whichever day first occurs. Notwithstanding anything to the contrary in this Lease, unless Tenant otherwise opens for business, the Commencement Date shall not occur during any period that: (i) Tenant has not received all required governmental permits and approvals necessary for Tenant's occupancy, provided Tenant promptly applies for such permits and approvals and diligently pursues the same until issuance, or (ii) Tenant has not received the fully executed SNDA required under Section 30(a) below. Tenant may elect to open for business during any period identified in the immediately preceding sentence, and in such case, Tenant shall be obligated to pay Substitute Rent and 100% of Additional Rent during said period. Also, notwithstanding the foregoing, in no event shall Tenant be required to open or commence the payment of Rent during the period commencing November 15th and ending the next occurring January 31st ("Blackout Period"); and, if the Commencement Date would otherwise occur in the Blackout Period (except for the reason that Tenant opens for business), the Commencement Date shall be deemed to be the first day after the expiration of the Blackout Period.  If Tenant opens during the Blackout Period, then Tenant is obligated to pay Substitute Rent and 100% of Additional Rent during the Blackout Period.

(c)     Common Areas: the parking areas, driveways, aisles, sidewalks, , truck storage areas, landscaped areas, storm water improvements, and other common, service and related areas and improvements within the Shopping Center and the exterior of the buildings within the Shopping Center, whether open to the public generally or for the non-exclusive use of one or more tenants, and whether or not shown on Exhibit B, but excluding the roof(s).

(d)     Default Rate: an annual rate of interest equal to twelve percent (12%).

(e)     Delivery Date: the date that Landlord delivers the Premises to Tenant with all of the Delivery Requirements (as defined below) satisfied and Tenant accepts said delivery by written acknowledgement signed by Tenant's Vice President or National Director of Real Estate or Director of Construction (Tenant's Representative).   Tenant shall not unreasonably delay, condition or refuse its acceptance of the Premises. Said acceptance by Tenant shall be effective as of the date of delivery of the Premises to Tenant with all of the Delivery Requirements satisfied, even if Tenant's acceptance occurs thereafter. The Delivery Date shall not occur prior to the Estimated Delivery Date (regardless of whether Landlord has satisfied the Delivery Requirements prior to that date), except with Tenant's express written consent, in its sole discretion.

(f)     "Delivery Requirements" means the following:

5

(1)    The Premises are delivered to Tenant free and clear of any Hazardous Material, including asbestos, and Landlord represents and warrants as such; and

(2)    All Common Areas shall be substantially completed and will be in accordance with all applicable Laws, including, without limitation, delivery areas, landscaping and paving, sidewalks, and striping of parking areas.

(g)    Estimated Delivery Date: Subject to Unavoidable Delay and delays caused by Tenant, Landlord's good faith estimate of the Delivery Date is August 28, 2022.

(h)    Gross Leasable Area or GLA: the number of square feet of floor area (excluding non-retail mezzanine and basement areas), measured from the exterior face of exterior walls, and the center line of interior party walls, with no deduction for columns, stairs, elevators, or any interior construction or equipment areas used exclusively by Tenant for the Premises.

With respect to the Shopping Center, the Gross Leasable Area is the total constructed Gross Leasable Area available for the exclusive use and occupancy of tenants within the Shopping Center.  With respect to the Premises, the Gross Leasable Area shall be the actual completed Gross Leasable Area, as the same exists from time to time.

Any change in Gross Leasable Area, whether of the Premises or Shopping Center, shall be deemed in effect on the first day of the next succeeding month following such change. Landlord covenants to advise Tenant of any increase or decrease in the Gross Leasable Area of the Shopping Center due to the construction or demolition of any buildings in the Shopping Center within sixty (60) days of any such change, together with a current Site Plan reflecting such change. The Gross Leasable Area for the Shopping Center intended for exclusive use and occupancy as shown in the Site Plan is estimated to be 64,353 square feet of Gross Leasable Area.

(i)    Hazardous Materials:  See Section 35.

(j)    HVAC: heating, ventilating and air conditioning exclusively serving the Premises.

(k)    Landlord's Work: the work to be performed by or at the direction of Landlord in constructing and/or remodeling the Premises and related improvements as more particularly specified in Sections 10 and 18 below.

(l)    Laws: any and all laws, codes, ordinances or regulations passed into existence by any Public Entity (as defined below) now or hereinafter in existence.

(m)    Lease Year: a period of twelve (12) consecutive calendar months during the Term. The first Lease Year (or Lease Year One) begins on the first day of February following the Commencement Date, unless the Commencement Date is the first day of February, in which event the first Lease Year begins on the Commencement Date.  The first Lease Year shall include the first Partial Lease Year, if any. Rent and any limitations on such Rent for purposes of any Partial

6

Lease Year shall be proportionately adjusted based upon the actual number of days of such Partial Lease Year in relation to the number of days in a full Lease Year.

     (n)    Outside Delivery Date: October 1, 2022 (subject to extension due to Tenant delays, but not subject to Unavoidable Delay).

     (o)    Partial Lease Year: the period, if any, of fewer than twelve (12) consecutive calendar months between the Commencement Date and the next occurring February 1 and the period, if any, of less than twelve (12) consecutive calendar months between the last day of the last Lease Year and the expiration of the Term.

     (p)    Permitted Use: the retail sale of fabrics of all kinds; goods sold by the yard; patterns; knitting supplies, needlepoint, macramé; art materials and supplies; finished crafts, craft materials and supplies; educational aids, materials and supplies; yarns; all types of notions; floral products, artificial flowers and accessories; scrapbooks and scrapbooking supplies and materials; framed artwork; picture frames, framing (both readymade and custom made) and framing materials and supplies; fabric care items; foam products; ceramics; wearable art and wearable art supplies; miniatures, dolls, hobby items; sewing machines, sewing machine furniture; irons, ironing boards; seasonal merchandise; custom services and custom products using arts and craft and sewing components including, but not limited to, quilting, bow-making, window treatments, floral design, fashion sewing, instructional classes, materials and services; and the incidental sale of (defined as no more than ten percent (10%) of any individual following item) baskets, wicker items; housewares; linens, curtains, towels, pillows; drapery and upholstery materials; draperies, drapery hardware; blinds, shades, shutters and window treatments; do-it-yourself products and accessories; bridal apparel and accessories, wedding supplies; gift items, cards, party supplies; paper goods, stationery; candles, candlesticks, brass and pottery; indoor and outdoor house decorating products and accessories; furniture; prepackaged and unpackaged food and food products, coffee, tea, and assorted beverages; instructional books and tapes; children's books; toys; vacuum cleaners, lamps, small household appliances; products, accessories related to all of the foregoing, and other items and services customarily offered for sale by a fabric, craft or general merchandise store, and such other related merchandise and services typically offered in the stores operated by Tenant under the name Jo-Ann, Jo-Ann Fabrics and Crafts, JOANN or such other name under which Tenant may operate in the state of Minnesota. Notwithstanding the foregoing or any other provision in this Lease to the contrary, in no event shall the Premises be used in violation of any exclusive, restricted and/or prohibited uses and/or restrictions of record applicable to the Shopping Center as referenced on Exhibit F and/or Exhibit F-1 attached hereto.

     (q)    Premises: a portion of the Shopping Center as shown on the Site Plan and located within the Shopping Center, on the Shopping Center Site, consisting of space having approximately 23,942 square feet of Gross Leasable Area, with a minimum frontage of 125 feet (to the center of the side walls).

     (r)    Protected Area: the area shown on the Exhibit B Site Plan.

     (s)    Protected Use: as defined in Section 14 of this Lease.

#2573 ROCHESTER, MN

(t)    Public Entity: the federal, state, county, municipal or other governmental unit, however denominated, and any agency, division, department or public official thereof, now or hereafter having jurisdiction, in any respect, over the Premises, the Shopping Center or Shopping Center Site.

(u)    Rent: Fixed Minimum Rent, Additional Rent, and all other monetary obligations of Tenant to Landlord under this Lease.

(v)    Shopping Center: the Rochester Marketplace located in Rochester, Minnesota, consisting of all land and buildings including the Premises and Common Areas, and other improvements located upon the Shopping Center Site, and outlined on Exhibit B.

(w)    Shopping Center Site: the legal description set forth on Exhibit A, on which the Shopping Center is located.

(x)    Substantially Complete: complete with the exception of minor Punchlist Items (as defined below) that can be completed within fourteen (14) days without interfering with the performance of Tenant's Work.

(y)    Substitute Rent:  fifty percent (50%) of the Fixed Minimum Rent in lieu of the Fixed Minimum Rent otherwise required to be paid under this Lease during any time when Substitute Rent is payable pursuant to any provision of this Lease.  Landlord acknowledges that certain violations of this Lease or specified events hereunder shall cause Tenant significant damage, but that actual damages shall be impossible to determine.  Landlord agrees that the violations and other events specified in the Lease where Tenant is entitled to pay Substitute Rent are in fact cases where Tenant shall suffer significant damage, but that actual damages shall be impossible to determine.  Landlord has agreed to Substitute Rent as liquidated damages because actual damages are impossible to determine and so liquidated damages represent a fair compromise and is not a penalty. Landlord has agreed to these provisions (and the entire Lease) voluntarily and after consultation with legal counsel. Notwithstanding any provisions in this Lease to the contrary, Tenant shall continue to pay 100% of all Additional Rent during any period that Substitute Rent is payable under this Lease.

(z)    Tenant's Proportionate Share: a fraction, the numerator of which is the Gross Leasable Area of the Premises and the denominator of which is the Gross Leasable Area of the Shopping Center. Notwithstanding the foregoing, if any portion of Common Area Costs, Taxes, or Insurance Costs are furnished or directly payable by an individual tenant or occupant as opposed to Landlord, the cost of the item(s) furnished or payable by such tenant or occupant shall not be included in Common Area Costs, Taxes, or Insurance Costs, as the case may be, and the square footage of the tenant or occupant furnishing or paying for such item(s) shall not be included in the calculation of Tenant's Proportionate Share of such item(s). Tenant's Proportionate Share shall be adjusted in the event of any increase or decrease in the Gross Leasable Area of all buildings within the Shopping Center or the Gross Leasable Area of the Premises.

(aa)    Tenant's Work: the work, if any, to be performed by or at the direction of Tenant in finishing the Premises as provided in Tenant's Approved Plans (as defined below).

8

#2573 ROCHESTER, MN

(bb)    Term: the Initial Term, as hereafter defined, and each Extended Term, as hereafter defined, if any, and any renewals or period of holdover tenancy.

(cc)    Unavoidable Delay: A material delay beyond the reasonable control of the delayed party caused by labor strikes, lock-outs, extraordinary labor troubles, industry-wide inability to procure materials, or other national, state or local health emergency, extraordinary restrictive governmental laws or regulations (such as gas rationing), riots, war, martial law, military or usurped governmental power, acts of domestic terrorism, sabotage, material fire or other material casualty, natural disaster or an act of God (such as tornado, flood or earthquake), but excluding inadequacy of insurance proceeds, litigation or other disputes, financial inability, lack of suitable financing, delays of the delayed party's contractor and failure to obtain approvals or permits unless otherwise caused by an event of Unavoidable Delay.

## SECTION 3.  PREMISES

(a)    For the Rent and upon the terms and conditions contained in this Lease, Landlord leases during the Term, and Tenant leases from Landlord during the Term, the following:

(1)    The Premises as described in Section 2(q) and outlined on the Site Plan and further described herein;

(2)    The right, in common with Landlord and all other tenants of the Shopping Center and all others granted similar rights by Landlord, to the non-exclusive use of all Common Areas;

(3)    Subject to Reciprocal Easement Agreements and Covenants, Conditions & Restrictions and OEA and local codes, the right, at no additional charge by Landlord, to place one (1) storage container during seasonal selling seasons and, upon the prior written consent of Landlord, such consent not to be unreasonably withheld, conditioned, or delayed, and subject to there being sufficient area available for same, up to ten (10) storage containers during interior alterations, changes, improvements or remodel to the Premises ("Containers") in a location at, near, or next to Tenant's loading dock in the Protected Area behind the Premises or at any other location mutually agreed upon by Landlord and Tenant; up to four (4) curbside pickup parking lot signs in front of the Premises in the location indicated on the Site Plan to indicate that the parking space is for the exclusive use of Tenant's curbside pickup customers only (provided Landlord shall not have any requirement, nor Tenant shall have any right to enforce any exclusive parking in such stalls and Tenant shall remove such signs if any other occupant alleges that such signs is a violation of their lease with Landlord); and shopping cart corrals ("Corrals") in Tenant's Protected Area in the parking lot and at, near or next to the outside of the Premises' entryway on the sidewalk, but not in front of any other tenant's premises. Tenant's Corrals shall take up no more than two (2) parking lot spaces.

9

#2573 ROCHESTER, MN

Each Container shall not exceed 10 feet in width and 40 feet in length. Tenant shall maintain the Containers and Corrals in good condition and repair, and repair any damage to the parking lot caused by same. If Landlord receives notice that Tenant's Containers or Corrals violate any local code or ordinance, or restrictions of record, then after receipt of notice from the governing body, Tenant shall remove the violating Containers or Corrals, or move them to an acceptable location reasonably acceptable to Landlord. In addition, Tenant shall have the right to store up to five (5) bales of cardboard at the exterior rear of the Premises and each bale has dimensions of approximately 5' x 5'. Landlord may grant similar rights to other occupants of the Shopping Center; and

(4)     Notwithstanding anything contained herein, subject to Reciprocal Easement Agreements and Covenants, Conditions & Restrictions and OEA and local codes and any existing restrictions of record, Tenant has the right to display merchandise on the sidewalk on both sides of the storefront door of the Premises no more often than four (4) weeks in each calendar quarter (unless part of a chainwide event), provided that such display does not extend beyond 30 feet in either direction and is at least 10 feet away from any adjacent tenant's premises and allows reasonable area for pedestrian traffic flow on the sidewalks. Landlord may grant similar rights other occupants in the Shopping Center.

(b)     Subject to the reasonable consent of Tenant, Landlord expressly reserves the right to maintain, use, repair and replace the pipes, ducts, conduits, utility lines, tunneling and wires leading through the ceiling, plenum areas, columns, partitions, and within or under the floor slabs comprising part of the Premises, but only to the extent that such installations (1) are reasonably necessary to serve the Premises or other parts of the Shopping Center; (2) are installed in locations that shall not interfere with Tenant's use of the Premises or Tenant's permitted signage; (3) are not exposed within the selling area; and (4) do not decrease the ceiling height of the Premises. In exercising the foregoing rights, neither Landlord nor Tenant shall materially interfere with the use or occupancy of the Premises or other tenant premises or commence any such work without first notifying the other party, at least ten (10) days in advance, of the commencement of such work (except in the event of an emergency). In no event may Landlord construct any improvements above the Premises (other than pipes, conduits or utility lines) or place signs on the exterior walls of the Premises.

(c)     The "Premises" excludes the exterior walls, roof, and the floor slab (excluding floor covering installed by Tenant) and areas beneath the floor slab, and if Tenant installs a mezzanine in the Premises for the storage of inventory and/or fixtures, Tenant shall not pay any Rent on that space nor will that square footage be included as part of the Shopping Center GLA. Notwithstanding the foregoing, for purposes of measuring the GLA of the Premises only, the Premises shall include all exterior walls.

(d) At any time up to the Commencement Date, either party's architect may measure the Premises. If the Gross Leasable Area in such measurement varies from the GLA in this Lease,

10

#2573 ROCHESTER, MN

then all items of Rent shall be appropriately adjusted; provided, however, that in no event shall any item of Rent be increased or decreased by more than two percent (2%) because of a variance in area of the Premises, and in no event shall the Construction Allowance be reduced or increased from the amount set forth herein. If neither party performs such measurement, then the area specified in this Lease shall be deemed to be the Gross Leasable Area of the Premises. If a party disputes the measurement, the disputing party shall notify the measuring party within fifteen (15) days after receipt of such measurement; if neither party timely objects to the measurement, then the measurement shall be deemed approved by both parties. If a party timely objects, the disputing party shall then have thirty (30) days for its architect to measure the Premises. If the disputing party's architect disputes the findings of the measuring party's architect, both architects shall meet in good faith to agree on the number of leasable square feet. If the architects cannot agree within thirty (30) days, they shall in good faith select a third, independent architect (the "Resolution Architect") to measure the Premises, whose measurement shall be final and binding. All fees and costs payable to Landlord's architect shall be paid by Landlord. All fees and costs payable to Tenant's architect shall be paid by Tenant. Tenant and Landlord shall each pay one-half of the fees and costs payable to the Resolution Architect.

## SECTION 4.  TERM AND OPTIONS TO EXTEND

(a)    The "Initial Term" begins on the Commencement Date and ends on the last day of the 10th Lease Year, unless sooner terminated as herein provided.

(b)    Landlord grants Tenant the right and option to extend this Lease for three (3) additional periods of five (5) Lease Years each (individually called an "Extended Term" and collectively called "Extended Terms"), commencing upon the expiration of the Initial Term or such prior Extended Term, as the case may be. Each Extended Term shall be upon the same terms, covenants and conditions as the Initial Term except for the option to extend then exercised and except for such changes, if any, in Rent or other Tenant charges as are expressly set forth in this Lease.

(c)    Tenant must deliver written notice to Landlord of its election to extend this Lease for an Extended Term on or before the later to occur of the following: (1) the date that is two hundred seventy (270) days before the expiration of the Initial Term or the applicable Extended Term, as the case may be; or (2) the date that is thirty (30) days after Tenant's receipt of written notice from Landlord indicating that the time period in which Tenant has to exercise its option has expired. If the Term expires before such notice from Landlord, and Tenant continues in possession of the Premises after such expiration, the Term shall be extended automatically on a month to month basis (at 125% of the Rent last in effect) until the earlier of thirty (30) days after the date Landlord has given such notice, or Tenant surrenders the Premises to Landlord, or Tenant exercises its option, in which case the Extended Term shall be deemed to have commenced upon the expiration of the Initial Term (or prior Extended Term, as the case may be). Concurrently with the exercise of the option by Tenant, Tenant shall pay Landlord any unpaid balance of the Rent due during the Extended Term that has accrued as of the date of such notice of extension.

(d)    Intentionally deleted.

11

#2573 ROCHESTER, MN

## SECTION 5.  FIXED MINIMUM RENT

(a)    From and after the Commencement Date, Tenant must pay to Landlord, without demand, deduction, offset (except as expressly provided in this Lease) at the address herein specified for notices to Landlord, Fixed Minimum Rent for the Premises as follows:

(1)    During Lease Years one through five of the Initial Term at the rate of $287,304.00 per Lease Year ($12.00 per square foot of Gross Leasable Area of the Premises per Lease Year); and

(2)    During Lease Years six through ten of the Initial Term at the rate of $316,034.40 per Lease Year ($13.20 per square foot of Gross Leasable Area of the Premises per Lease Year); and

(3)    During the first five-year Extended Term at the rate of $347,637.84 per Lease Year ($14.52 per square foot of Gross Leasable Area of the Premises per Lease Year); and

(4)    During the second five-year Extended Term at the rate of $382,353.74 ($15.97 per square foot of Gross Leasable Area of the Premises per Lease Year; and

(5)    During the third five-year Extended Term at the rate of $420,660.94 ($17.57 per square foot of Gross Leasable Area of the Premises per Lease Year); and

The amounts shall include and be in payment of all other charges not specifically set forth in this Lease.

(b)    Tenant must pay monthly installments of Fixed Minimum Rent in advance on or before the first day of each month during the Term, commencing on the first day of the first month next following the Commencement Date (unless the Commencement Date is the first day of the month, in which event the first monthly installment shall be due on the Commencement Date). Notwithstanding the foregoing, Landlord must invoice Tenant, which invoicing shall not occur before the Commencement Date, for the first monthly installment of Fixed Minimum Rent. In no event shall the first rent installment be due until ten (10) days after Tenant's receipt of this initial invoice. Fixed Minimum Rent for the partial month, if any, after the Commencement Date shall be computed on a per diem basis (assuming a thirty (30) day month), and Tenant must pay the Fixed Minimum Rent for such partial month concurrently with the first monthly installment. If Tenant fails to pay Rent on the due date and Landlord notifies Tenant in writing of such failure twice in any Lease Year, then if Tenant fails to pay Rent on the due date thereafter in the same Lease Year, then the Landlord, in addition to the Rent then owed, is entitled to a late fee of Five Hundred Dollars ($500.00) for such third late payment and any such other late payment of Rent thereafter during that Lease Year and interest at the Default Rate from the day due until paid.

12

#2573 ROCHESTER, MN

## SECTION 6.   INTENTIONALLY DELETED

## SECTION 7.   GROSS SALES

(a)    "Gross Sales" means the entire amount of the actual receipts, whether cash or otherwise, from all sales of merchandise and services for all business conducted in, on or from the Premises, including mail or telephone orders received at the Premises and filled from the Premises or elsewhere (but excluding mail, telephone, internet or other orders filled at the Premises but originating elsewhere).  Each sale upon installment or credit shall be treated as a sale for the full amount thereof in the month during which such sale shall be made, irrespective of the time when Tenant shall receive payment (whether full or partial) from its customers. Layaway sales, so-called, shall be included in the Gross Sales of the respective computation period only to the extent of payments received during that computation period.  Notwithstanding the foregoing, with respect to assignees, sublessees, concessionaires and licensees of Tenant that, together, occupy no more than 1,000 square feet of Gross Leasable Area, Tenant shall not be obligated to report and include with Tenant's Gross Sales, the sales generated by them, although any payments to Tenant by such entity shall be included in Gross Sales.

(b)    Notwithstanding anything to the contrary, the following are excluded from Gross Sales:

(1)    sums collected and paid out for any sales tax or excise tax imposed by any duly constituted governmental authority;

(2)    the value or price of merchandise exchanged between the stores of Tenant, or the affiliates of Tenant, if any, where such exchange of merchandise is made solely for the convenient operation of the business of Tenant or the affiliate of Tenant and not for the purpose of consummating a sale which has been made at, in, from or upon the Premises, or for the purpose of depriving Landlord of the benefit of a sale which otherwise would be made at, in, from or upon the Premises;

(3)    the amount of returns to shippers or manufacturers;

(4)    sales to employees made at a discount;

(5)    non-sufficient funds check charges or financing charges to customers whether or not separately stated or billed;

(6)    service charges to customers who buy a budget or deferred payment plan;

(7)    revenue from gift certificates or gift cards until redeemed at the Premises;

(8)    revenue from vending machines used solely for the benefit of employees;

13

(9)     the amount of any cash or credit refund made upon any sale where the merchandise sold, or some part thereof, is thereafter returned by the purchaser and accepted by Tenant;

(10)    sales of fixtures;

(11)    all sums and credits received in settlement of claims for loss or damage to merchandise;

(12)    non-retail bulk sales of merchandise outside of the ordinary course of business on the Premises;

(13)    tax exempt sales or merchandise donated or sold at a discount to charitable or non-profit organizations;

(14)    fees for classes or demonstrations;

(15)    the value attributed to merchandise taken in trade;

(16)    referrals to affiliates of or other divisions of Tenant;

(17)    fees for gift wrapping, mailing and other customer services provided on a not for profit basis;

(18)    sales of lottery tickets, special event tickets and the like (but the commissions paid to Tenant shall be included in Gross Sales);

(19)    the amount of credit sales and credit accounts incurred at the Premises which are written off as bad debts and deducted as an expense; and

(20)    sale of patterns.

(c)     The Gross Sales of any Lease Year or Partial Lease Year, as the case may be, if any, have no bearing on or connection with the Gross Sales of any other Lease Year or Partial Lease Year.

(d)     Tenant shall deliver to Landlord within seventy-five (75) days after the end of each Lease Year a statement showing Gross Sales for such Lease Year.

## SECTION 8.  TAXES

(a)     Landlord covenants and warrants that the entire Shopping Center is located on tax parcel identification number 742112060097 (the "Tax Parcel"), that he Tax Parcel does not currently extend beyond the perimeter of the Shopping Center Site. Landlord reserves the right to add to, or subtract from, the buildings in the Shopping Center, in which case Tenant's Proportionate Share shall be recalculated in accordance with Section 2(z).  Once or twice per

14

#2573 ROCHESTER, MN

calendar year, depending on when tax bills are issued by the government authority, Tenant must pay to Landlord the Tenant's Proportionate Share of real estate taxes ("Taxes") levied, imposed or assessed upon the Tax Parcel and paid by Landlord during each calendar year occurring partially or wholly within the Term, after reducing Taxes (1) by the amount of any contributions for Taxes paid by any party having the right to use the Common Areas but not a tenant of the Shopping Center; and (2) by any rollback, discount for timely or early payment, credit or reduction that has been granted or issued by any taxing authority or governmental group or agency. Subject to Section 8(g) of this Lease, Taxes shall include all taxes, assessments, and other governmental charges, general and special, ordinary and extraordinary, of any kind and nature whatsoever, including, but not limited to, assessments for public improvements and benefits, which shall during the Term hereof be paid, assessed, levied, imposed upon or become due and payable with respect to the Shopping Center. and Landlord's reasonable expenses in obtaining any refund or reduction of Taxes. If at any time during the Term of this Lease and notwithstanding any provision in this Lease to the contrary, a tax or excise on rents or other tax, however described, is levied or assessed against Landlord on account of the rents expressly reserved hereunder, such tax or excise on rents or other tax shall be included within the definition of Taxes, but only to the extent of the amount thereof which is lawfully assessed or imposed as a direct result of Landlord's ownership of this Lease or of the Rent accruing under this Lease.

Notwithstanding the foregoing, if the Premises, or a portion of the Shopping Center including the Premises, is separately assessed, then Tenant shall pay, as Tenant's allocable share of Taxes, the lower of: (i) Tenant's Proportionate Share of Taxes; or (ii) Tenant's Fraction of Taxes (related to such separately assessed parcel), with Tenant's Fraction being a fraction whose numerator is the Gross Leasable Area of the Premises and whose denominator is the Gross Leasable Area of all buildings within such separately assessed parcel.

Tenant shall pay Tenant's Proportionate Share of Taxes within thirty (30) days after receipt of Landlord's statement assessing and prorating the Taxes, together with copies of tax bills and reasonable evidence of payment for which payment is sought and reasonable verification for the computation of Tenant's Proportionate Share. For the first calendar year of the Term, Tenant shall pay an estimated $4.15 per square foot of Gross Leasable Area of the Premises for Taxes on an annualized basis; and, Landlord represents that said amount is a good faith estimate of the actual Taxes that would be due if Tenant were paying Tenant's Proportionate Share of Taxes directly for said calendar year.

(b)     Intentionally deleted.

(c)     In no event shall Tenant pay for Taxes for a time period longer than the Term.

(d)     The parties acknowledge that only Landlord has the right to dispute the assessed value of the Shopping Center (which is the only way to attempt to control the real estate taxes). If Landlord does not dispute the assessed valuation of the Shopping Center after Tenant's request therefor for any year during the Term, Tenant shall have the right to dispute the assessed value of the Shopping Center for the year in question..

15

#2573 ROCHESTER, MN

Thousand Five Hundred Dollars ($7,500.00) incurred by Tenant in connection with this Lease. This Section 10(e) survives the termination of this Lease.

(f)    If, as a result of, or as a condition to, Landlord's Work, any Hazardous Material is required by Law to be removed, abated, or otherwise remediated, then Landlord must perform such removal, abatement or remediation. If, as a result of, or as a condition to, Tenant's Work, any Hazardous Material that existed in the Premises as of the Effective Date is required by Law to be removed, abated, or otherwise remediated, then Landlord must reimburse Tenant within thirty (30) days for Tenant's cost of such removal, abatement or remediation, and if not so reimbursed, Tenant may deduct the cost from Rent.

(g)    Landlord shall pay Tenant a "Construction Allowance" in the amount of One Million Five Thousand Five Hundred Sixty-Four Dollars ($1,005,564.00) ($42.00 per square foot of Gross Leasable Area of the Premises), irrespective of costs, as follows: (1) twenty-five percent (25%) to be paid to Tenant within forty-five (45) days of the Delivery Date, provided that Tenant has commenced construction (the "Initial Payment"); (2) twenty-five percent (25%) to be paid to Tenant no later than sixty (60) days after the Initial Payment (the "Second Payment"); and (3) the remaining fifty percent (50%) to be paid to Tenant within thirty (30) days of Tenant's opening in the Premises and delivery to Landlord of the following: (i) unconditional final lien waivers from Tenant's general contractor and any sub-contractors and material suppliers with invoices of Ten Thousand Dollars ($10,000.00) or greater; (ii) an AIA schedule of values; and (iii) a copy of the Certificate of Occupancy; provided, however, if a lien waiver is not provided, in no event shall the balance of the Construction Allowance due to Tenant be withheld beyond the statutorily defined period in which liens may be filed, if no liens have been filed during said period. If Landlord fails to pay Tenant any portion of the Construction Allowance in accordance with this Lease, then Tenant shall have the right (without limiting any other right or remedy of Tenant) to deduct such amount from Fixed Minimum Rent (as a setoff or as recoupment in the case of bankruptcy), together with interest thereon at the Default Rate. Landlord shall wire-transfer the Construction Allowance to Tenant's bank as follows: Bank of America, 100 West 33rd Street, New York, NY 10001, ABA: 026009593 (in the event Landlord elects to submit an ACH transmission, the number is: 111000012); JOANN Account No.: 4427216208;  Account Name: Jo-Ann Stores, LLC; Store #2573.

Within ten days prior to Landlord's obligation to pay the Initial Payment and the Second Payment, Tenant shall deliver to Landlord partial lien waivers from Tenant's general contractor and any subcontractors and material suppliers with invoices of $10,000 or greater for which Tenant has received as of such date. The delivery of such lien waivers shall be a condition precedent to Landlord's obligation to make such payments to Tenant.

## SECTION 11.  USE

The Premises may be used for the Permitted Use and no other use, provided notwithstanding the foregoing or any other provision in this Lease to the contrary, the Premises shall not be used in violation of any of the exclusive, restricted and/or prohibited uses as are set forth on Exhibit F or  Exhibit F-1 attached hereto or any of the uses set forth in Section 26(a)(9) of this Lease. Landlord represents that the use restrictions on Exhibit F accurately reflect

23

exclusives, uses and encumbrances that presently encumber the Premises as terms of existing leases of Shopping Center premises (the uses covered by such restrictions, the prohibited uses on Exhibit F-1 and the restricted uses in Section 26(a)(9) are collectively referred to as the "Restricted Uses" and individually as a "Restricted Use". Upon the expiration or earlier termination of the lease or other written instrument containing a Restricted Use (as may be extended, renewed, amended and/or replaced from time to time), the Premises shall not be subject to such Restricted Use under this Lease and such use shall no longer be a Restricted Use. Upon the request of Tenant, Landlord promptly shall advise Tenant which Restricted Uses still encumber the Premises and shall furnish to Tenant the documentary support therefor.

## SECTION 12.   COMMON AREAS

(a)    Landlord, at its own cost and expense (except as otherwise specified in Section 9 or Section 21) must construct, install, operate, manage, repair and maintain the Common Areas in a neat and clean condition in accordance with the prevailing commercially reasonable standards for shopping centers of similar age, size and character in the metropolitan areas in which the Shopping Center is located for the nonexclusive benefit of Tenant and Tenant's customers, employees, licensees and invitees and all others entitled to use the same. Landlord's obligations with respect to the Common Areas include, but are not limited to:

(1)   Equipping and lighting the Common Areas;

(2)   Maintaining the surfaces of all sidewalks, restriping and maintenance of paved and parking areas in a level, smooth and evenly covered condition with the type of surfacing material originally installed or such substitute as shall in all respects be equal in quality to the original;

(3)   Removing all ice and snow, papers, mud and sand, debris, filth and refuse and thoroughly sweeping the Common Areas to keep them in a clean and orderly condition;

(4)   Placing, keeping in good condition and repair and replacing all utility lines, any necessary appropriate directional signs, markers and curbs;

(5)   Maintaining, trimming and watering, mowing and weeding all landscaped areas and making such replacements of shrubs and other landscaping as is necessary; and

(6)   Security arrangements including private police and similar services and functions, provided Landlord reasonably determines that such services are necessary.

(b)    Landlord may close any Common Areas temporarily, at such times as to cause the least possible interruption or interference with Tenant's business, to make repairs or changes, to prevent the acquisition of public rights in such Common Areas or to discourage non-customer parking; but, in no event shall the Protected Area be closed (except in the event of an emergency)

24

#2573 ROCHESTER, MN

during normal business hours without the prior reasonable consent of Tenant. In no event shall Landlord designate the Protected Area as an employee parking area or otherwise permit the Protected Area to be used for employee parking.

Landlord must keep the Common Areas clean and well lighted from dusk until at least one-half hour after the close of Tenant's business and remove snow from the parking areas, driveways and sidewalks as promptly as possible. Landlord cannot impose any parking charges for the parking of automobiles in the parking areas. Landlord cannot grant any exclusive rights in, or permit special or exclusive use of, the sidewalk space or parking areas near the front of the Premises or in the exterior area near the rear door of the Premises. Notwithstanding the foregoing, Landlord may from time to time designate certain portions of the Common Areas for the exclusive use of Landlord or one or more occupants of the Shopping Center for carryout or "to go" parking, customer pick-up or parking, loading of items purchased in the Shopping Center, employee parking, valet parking and/or for similar short term parking use.

## SECTION 13.  UTILITIES

Landlord, at its sole cost and expense, shall cause all utilities furnished to the Premises (including Common Area lighting) to be separately metered so that only the service provided to the Premises shall be reflected in utility bills rendered to Tenant by the respective supplying public utility companies, except that water and sewer may be sub-metered and paid directly to Landlord. Tenant must pay, when due, bills for all utilities furnished to the Premises by public utility companies from and after the Delivery Date, including water, gas, electricity, telephone and the like, as are separately metered and charged directly to Tenant. Tenant shall have the right, in its sole discretion, to choose its provider for telephone, internet, cable, and the like. If required, Landlord shall provide consent, not to be unreasonably withheld or delayed, to access the Premises for installation or repair of any such utilities. Landlord shall not be liable to Tenant for damages or otherwise if any utilities shall become unavailable or for any interruption or any in any utility service, and the same shall not constitute a default, termination or an eviction; provided, however, if any disruption in such services occurs as a result of the negligence or willful misconduct of Landlord, its agents, employees or contractors, and as a result thereof the Premises are rendered untenantable, Tenant shall have the right to abate Rent and other charges during the continuance of such disruption until such disruption ceases to the extent that the Premises are again tenantable.

## SECTION 14.  USE VIOLATION

(a)    After the Effective Date, Landlord shall not lease, license or sell any space in the Restricted Property to a direct category competitor of Tenant which is a fabric store, arts and crafts store or sewing machine store ("Protected Use"), such as by way of example and not limited to Michaels Arts & Crafts, Sierra Pacific Crafts, Ben Franklin Arts & Crafts, Beverly's, Calico Corners, Hobby Lobby, Aaron Brothers custom framing, Singer, Bernina, Viking White, Husqvarna and Pfaff. Home Depot and Target are not bound by Tenant's exclusive since they are not a fabric store, arts and craft store or sewing machine store and because they are not located within the Restricted Property. For the avoidance of doubt, by way of example and not limited to, Five Below, HomeGoods, OfficeMax, Hallmark, Dollar Tree, Menards, Lowe's, Ace Hardware, Sears, Bed Bath and Beyond, Walgreen's, Walmart, Sam's Club, and Costco are not a violation

25

of the Protected Use because such uses are not a fabric store, arts and crafts store or sewing machine store.

(b)    Provided Tenant is not in default beyond any applicable cure period, if any portion of any Restricted Property (as defined below) is used or occupied for the Protected Use, (a "Use Violation"), then, in addition to all remedies available at law and in equity (other than lease termination), Tenant is obligated to pay only Substitute Rent in lieu of Fixed Minimum Rent until such Use Violation ceases. In addition, if any Use Violation exists for more than 120 consecutive days, Tenant has the right to terminate this Lease by giving sixty (60) days' written notice to Landlord prior to cessation of such Use Violation, in which event all further obligations hereunder shall terminate on the date specified in Tenant's notice (which date shall be not more than sixty (60) days from the date of such notice), and any Rent (including Substitute Rent) paid in advance by Tenant must be refunded to Tenant within thirty (30) days after termination of the Lease. Notwithstanding any provision in this Lease to the contrary, the provisions of this Section 14 shall not apply to any leases in effect prior to the Effective Date (and all occupants claiming by, through or under such leases) as may be extended, renewed and amended from time to time. Notwithstanding the foregoing to the contrary, in the event Tenant is not open and operating (except temporary closures for casualty, condemnation, remodeling, holidays or Unavoidable Delays) for more than three hundred sixty-five (365) consecutive days ("Tenant Closure"), then Landlord may lease, license or sell (and/or amend any existing leases for) space in the Restricted Property for the Protected Use, beginning on the three hundred sixty-sixth consecutive day of such closure and continuing until such time as Tenant re-opens for business in the Premises (the "Suspension Period").  Upon Tenant's re-opening for business in the Premises, the Suspension Period shall cease and the Protected Use shall again be effective until there is another Tenant Closure, and Landlord shall not thereafter lease, license or sell (and/or amend any existing leases for) any space in the Restricted Property for the Protected Use unless there is another Tenant Closure; provided, however, the Protected Use shall not apply to any lease, license or sale (and/or any amendment to any existing leases (and the leases to which such amendments relate)) of space in the Restricted Property which is entered into by Landlord during any Suspension Period.

(c)    Intentionally deleted.

(d)    In the event that Tenant's Protected Use is violated, the computation of Substitute Rent shall commence on the first day of the violation of the Use Violation and shall be paid in monthly installments.

(e)    Notwithstanding anything to the contrary, in the event of a Use Violation by any tenant or occupant of the Restricted Property who conducts or operates in violation of the Protected Use without Landlord consenting to or granting such tenant or occupant the right to do so (a "rogue tenant"), then Tenant's right to pay Substitute Rent and terminate this Lease shall be deferred and Landlord shall not be in default during such period of deferral, provided that Landlord commences court action to cure or eliminate the Use Violation by the rogue tenant within ninety (90) days after notice from Tenant and diligently pursues same to completion (which diligence by Landlord must include appeals to the highest state court, if lower court rulings are adverse to Landlord and allow the Use Violation to continue). If Landlord does not take such action against the rogue tenant as described in the immediately preceding sentence, then Tenant

26

#2573 ROCHESTER, MN

may exercise its termination right and right to pay Substitute Rent at any time prior to the cessation of such Use Violation.

(f)      Tenant's failure to exercise the termination option is not a waiver of Tenant's continuing right to do so as long as such Use Violation continues, except as otherwise provided herein.  Without limiting Tenant's rights and remedies under this Section 14, Tenant has the right to equitable relief (including injunction) in the event of a Use Violation.

(g)      "Restricted Property" means the Shopping Center. The Target Parcel and Home Depot Parcel are not part of the Shopping Center or Restricted Property.

(h)      Landlord covenants and agrees to use diligent, good faith, commercially reasonable efforts to cure any breach or violation of this Section, including, without limitation, seeking and diligently prosecuting all available legal and equitable remedies to compel or otherwise cause cessation of the Use Violation.

(i)      Notwithstanding anything to the contrary contained herein, if at any time during which a Use Violation exists and Tenant is entitled to pay Substitute Rent pursuant to Section 14(b) and Section 15(c) of the Lease ("Prior Substitute Rent Reason"), then, in lieu of paying Substitute Rent, and in addition to all remedies available at law and in equity Tenant shall be entitled to pay Alternate Substitute Rent until such time as the Use Violation is satisfied or waived or until such time as the Prior Substitute Rent Reason is satisfied or waived, in which case Tenant shall be obligated to pay Substitute Rent in accordance with the terms of this Section 14. As used in this Lease, "Alternate Substitute Rent" shall mean fifty percent (50%) of the Substitute Rent.

## SECTION 15.   CO-TENANCY

(a)      Intentionally deleted.

(b)      Opening Co-Tenancy

(1)      The Opening Co-Tenancy Requirement means that: Target and Home Depot (the "Anchor Tenants"), or their Replacement Anchor, are open for business to the public during normal operating hours from its premises as shown on the Site Plan (the "Anchor Tenant Premises"). Notwithstanding anything to the contrary, Tenant is not required to open for business, nor is Tenant obligated for the payment of Rent, until the Opening Co-Tenancy Requirement is met.

(2)      If Tenant elects to open for business before the date that the Opening Co-Tenancy Requirement is met, then from the date Tenant opens for business until the Opening Co-Tenancy Requirement is met, Tenant may pay Substitute Rent in lieu of Fixed Minimum Rent. Tenant shall also pay all Additional Rent.

27

#2573 ROCHESTER, MN

### Exhibit F

### Restricted Uses of Other Tenants

| Building | Name | (I)    Property Exclusives and Restrictions |
|---|---|---|
| 10321 | Rochester Marketplace | **Operation and Easement Agreement by and between Ryan Companies US, Inc. ("Developer"), Target Corporation ("Target") and Credit Suisse Leasing 92A, L.P. ("CSL") dated April 28, 2000 ("OEA") recorded as Document No. A-840878 in the Office of the Olmstead County Recorder**<br><br>**[CSL is Home Depot Tract]**<br><br>Section 2.1(d)(iii):  No fence or other barrier which would unreasonably prevent or obstruct the passage of pedestrian or vehicular travel for the purposes herein permitted shall be erected or permitted within or across the Common Area; provided, however, that the foregoing provision shall not prohibit the installation of limited curbing and other forms of traffic controls or limit the rights of Parties for Block 2 …<br><br>Section 3.2(E) [as modified by First Amendment to OEA]:  The parking area on the Target Tract, the Home Depot Tract and on each Individual Lot within Block 1 of the Developer Tract shall each (without reliance on parking spaces that may be available on another Tract and/or another Individual Lot on Block 1) contain sufficient ground level parking spaces in order to comply with the following minimum requirements:<br><br>(i)  Five (5.0) parking spaces for each one thousand (1,000) square feet of Floor Area, exclusive of Restaurant parking requirements set forth below; provided, however, that compact car parking spaces in Block I may not exceed twenty (20%) percent of total parking spaces and shall be located only in the areas, if any, designated on the Site Plan;<br><br>(ii)  If a business use contains a drive-up unit (such as remote banking teller or food ordering dispensing facility), then there shall also be created space for stacking not less than five (5) automobiles for each drive-up unit;<br><br>(iii)  For each single Restaurant which has more than sixteen hundred (1,600) square feet of Floor Area, but less than five thousand (5,000) square feet of Floor Area, then ten (10) parking spaces for each one thousand (1,000) square feet of Floor Area devoted to such use (including without |

limitation, the initial 1,500 square feet of Floor Area of such use);

(iv) For each single Restaurant which has at least five thousand (5,000) square feet of Floor Area, but less than seven thousand (7,000) square feet of Floor Area, then fifteen (15) parking spaces for each one thousand (1,000) square feet of Floor Area devoted to such use; and

(v) For each single Restaurant which has seven thousand (7,000) square feet or more of Floor Area, then twenty (20) parking spaces for each one thousand (1,000) square feet of Floor Area devoted to such use. For purposes of this Section 3.2(E) only, up to ten thousand (10,000) square feet of Floor Area within the "garden center" located in the Building to be constructed on Lot 1, Block 1, shall not be included for purposes of calculating the foregoing parking requirements so long as such area is used solely for a "garden center" and not for any other purpose. If an Occupant operates a Restaurant incidental to its primary business purpose, then so long as such incidental operation continues, the portion of the Floor Area occupied by such Restaurant shall be excluded from the application of (ii), (iii), (iv) and (v) above. For the purpose of this clause only, a Restaurant shall be an "incidental operation" if it occupies less than seven percent (7%) of the Occupant's Floor Area and does not have a separate customer entry/exit door to the outside of the Building. In the event an Occupant utilizes Floor Area for Restaurant and other purposes, only the portion of Floor Area allocated for Restaurant purposes shall be subject to the increased parking requirements set forth above.

Section 3.2(F): No Party shall make changes to the Improved Block 1 Common Area, without the approval of the Approving Parties and no Party shall make changes to the Improved Block 2 Common Area or the Block 3 Common Area without the approval of the Approving Party for the Developer Tract (provided that in no event shall Building Areas be expanded within Block 2 or Block 3 without also obtaining the approval of all of the Approving Parties … except that as to all Common Area each Party hereby reserves the right, from time to time without obtaining the consent or approval of any other Party, to make at its own expense any insignificant change, modification or alteration in its portion of the Common Area, including the installation of convenience facilities such as ,mailboxes, public telephones, benches, bike racks, directional and/or parking informational signs

Exhibit F

Section 5.1:

(A)  The Shopping Center shall be used only for retail sales, offices, hotel (on Block 3 only), Restaurants or other permitted commercial purposes. "Business Office" shall mean an office which does not provide services directly to consumers; "Retail Office" shall mean an office which provides services directly to consumers, including but not limited to financial institutions, real estate, stock brokerages, title company and escrow offices, travel and insurance agencies, and medical, dental and legal clinics. No more than ten percent (109/x) of the total Floor Area in Block I may be used for Retail Office and/or Business Office purposes; provided, however, that office space used by an Occupant for administrative purposes, and which is not open to the general public, shall not be considered Retail Office or Business Office for the purpose of this limitation.

(B)  No use shall be permitted in the Shopping Center which is inconsistent with the operation of a first-class retail shopping center. Without limiting the generality of the foregoing, the following uses shall not be permitted without consent of the Approving Parties:

(i)  Any use which emits an obnoxious odor, noise, or sound which can be heard or smelled outside of any Building in the Shopping Center; provided that the foregoing shall not prohibit the reasonable use of loud speakers in the Outside Sales Area located immediately adjacent to the Building located on the Home Depot Tract;

(ii)  Any operation primarily used as a storage warehouse operation and any assembling, manufacturing, distilling, refining, smelting, agricultural, or mining operation;

(iii)  Any "second hand" store, "surplus" store, pawn shop or flea market, except for high class new and used merchandise stores such as Once Upon A Child, Funco Land and Play It Again Sports shall be allowed;

(iv)  Any mobile-home park, trailer court, labor camp, junkyard, or stockyard (except that this provision shall not prohibit the temporary use of construction trailers during periods of construction, reconstruction, or maintenance),

(v)  Any dumping, disposing, incineration, or reduction of garbage (provided, however, this prohibition shall not be applicable to located near the rear of any Building);

Exhibit F

(vi)  (Any fire sale, bankruptcy sale (unless pursuant to court order) or any auction house operation;

(vii)  Any central laundry, dry cleaning plant, or laundromat; provided, however, this prohibition shall not be applicable to nominal supportive facilities for on-site service oriented to pickup and delivery by the ultimate consumer as the same may be found in retail shopping centers in the metropolitan area where the Shopping Center is located;

(viii)  Any automobile, truck, trailer or recreational vehicle sales, leasing, display or body shop repair operation; provided that the foregoing shall not prohibit the daily rental of one ton pick up trucks with a cab chassis and attached aluminum covered flat bed (or other similar vehicles not exceeding such dimensions) to customers solely for the purpose of transporting materials purchased from HD by such customer so long as (a) such activity is limited to that portion of the Home Depot tract lying within one hundred fifty (150) feet the building located thereon, (b) such activity does not involve the use of more than four (4) vehicles, and (c) the parking spaces used for such vehicles shall not be applicable towards the parking requirements set forth in Section 3.2 (E);

(ix)  Any car wash, except in conjunction with any Occupant operating a fuel facility on Lot 3, Block 1, Block 2 or Block 3, and in any event, only so long as such fuel facility is permitted by clause (x) below;

(x)  Any fuel facility, except on Lots 1, 3 and 7, Block 1, Block 2 and/or Block 3

(xi)  Any bowling alley or skating rink;

(xii)  Any movie theater or liver performance theater;

(xiii)  Any hotel, motel or residential use, including, but not limited to:  single-family dwellings; townhouses, condominiums, other multi-family units, and other forms of living quarters, sleeping apartments or lodging rooms, except that a hotel shall be a permitted use on Lot 2, Block 3;

(xiv)  Any veterinary hospital or animal raising or boarding facility; provided, however, that the foregoing restrictions shall not apply to any Occupant whose primary business is the retail sale of pets (including, but not limited to, fish, birds, reptiles, dogs, cats and other small mammals), pet grooming, veterinary or other pet services, pet food, pet

Exhibit F

accessories and other pet products provided such operations are otherwise in compliance with all other provisions of this OEA and provided, further, that (a) overnight boarding (indoor only) of pets is limited to that which is incidental to the operations of such Occupant and not offered to customers as a separate service and (b) the combined veterinary and overnight boarding facilities occupy no more than fifteen percent (15%) of the gross Floor Area of such Occupant. In no event shall outdoor boarding or exercising of pets be permitted under any circumstances. Such Occupant shall use reasonable efforts not to permit its customers to allow their pets to urinate or defecate in the Common Areas and will promptly act, at its sole cost and expense, to prevent the accumulation of any pet stains, pet odors or pet droppings within that portion of the Common Area located within one hundred fifty (150) feet from any entrance to such Occupant's premises;

(xv)  Any mortuary or funeral home;

(xvi)  Any establishment selling or exhibiting obscene materials, except that this provision shall not prohibit (A) videotape rental stores which rent primarily non- "x-rated" videotapes (that is, "G" to "R"-rated videotapes) but which also rent "X-rated or non-rated videotapes" for off-premises viewing only, provided such "X-rated" or "non-rated" videotapes, and the place and procedure for selection thereof (which shall not exceed in the aggregate fifty (50) square feet of Floor Area), precludes viewing or selection by minors and without any promotional, advertising or other depiction or description in respect of any "X-rated" or "non-rated" videotapes displayed or utilized within or outside the store or (B) book stores, which are not perceived to be, nor hold themselves out as "adult book" stores, and general merchandise stores such as drug stores which sell primarily :general audience books, but which incidentally sell books magazines and other periodicals which may contain pornographic materials so long as such sale is not from any special or segregated section in the store;

(xvii)  (Any establishment which exhibits either live or by other means to any degree nude or partially clothed dances or wait staff and/or any massage parlors or similar establishments or selling or exhibiting drug-related paraphernalia;

(xviii)  Any bar, tavern, Restaurant, night club or other establishment whose reasonably projected annual gross

Exhibit F

revenues from the sale of alcoholic beverages for on-premises consumption exceeds forty per cent (40%) of the gross revenues of such business;

(xix)    (In Block 1, any health spa, fitness center or workout facility;

(xx)    In Block 2 and Block 3, any health spa, fitness center or workout facility exceeding 5,000 square feet in size;

(xxi)    Any amusement or video arcade in Block 1;

(xxii)    Pool or billiard hall or dance hall;

(xxiii)    In Block 1 any training or educational facility, including but not limited to: beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers; provided however, this prohibition shall not be applicable to on-site employee training by an Occupant incidental to the conduct of its business at the Shopping Center;

(xxiv)    In Block 2 and Block 3, any facility prohibited by the terms of Section (xxiii) above which exceeds 5,000 square feet in size;

(xxv)    Any gambling facility or operation including, but not limited to: off-track or sports betting parlor; table games as black-jack or poker; slot machines, video poker/black-jack/keno machines or similar devices; or bingo hall. Notwithstanding the foregoing, this prohibition shall not apply to governmental sponsored gambling activities, or charitable gambling activities, so long as such governmental and/or charitable activities are incidental to the business operation being conducted by the Occupant. The term "incidental" as used in this subsection (xxiv) [sic] is defined as any use which occupies less than 10% of the Occupant's Floor Area;

(xxvi)    Any house of worship;

(xxvii)    No portion of the Developer Tract may be used for a home improvement center or for the sale of lumber, hardware items, plumbing supplies, electrical supplies, paint, wallpaper, carpeting, floor coverings, cabinets, siding, ceiling fans, gardening supplies, nursery products, furniture and pool supplies and other related items customarily carried by a home improvement center except for the incidental sale of such items; provided however, that the sale or use of the lesser of (a) two thousand (2,000) square

feet or (b) five percent (5%) of Floor Area for the sale of paint, wallpaper or ceiling fans in the aggregate or shall not be deemed to constitute a violation hereof. In addition, the foregoing restriction shall not prohibit the sale of furniture in connection with the operation of an office supply superstore which is part of such a national chain of such stores so long as such business operates in the same manner and with the same merchandise mix as a majority of the stores within such chain;

(xxviii) No portion of the Developer Tract shall be used as a grocery store, supermarket, convenience store, or department within a store, for the sale of food, groceries, fruit, produce, dairy products, vegetables, bakery products, meats or delicatessen products; provided however, that (a) each Occupant of the Developer Tract may display and sell such products from an area not to exceed the lesser of eight percent (8%) of such Occupant's Floor Area or 2,000 square feet of Floor Area and (b) the Occupant of Lot 3, Block 1, Block 2, or Block 3, in conjunction with the operation of a so-called "fuel and convenience store" only, display and sell such products from an area not to exceed four thousand five hundred (4,500) square feet of Floor Area. One-half of the aisle space adjacent to any shelving or display case used for the retail display of such products shall be included in calculating Floor Area for purposes of this Subsection. Restaurants shall not be prohibited on the basis of this Subsection;

(xxix)  No portion of the HD Tract shall be used for the conduct of a business selling food, groceries, fruit, produce, dairy products, vegetables, bakery products, meats or delicatessen products (collectively, "Grocery Items"); provided, however, that the foregoing limitation shall not (i) apply during the period that Home Depot U.S.A, Inc. (including its corporate successors following merger or other reorganization) or any other corporation which controls, is controlled by, or under common control with Home Depot U.S.A. Inc., is the owner or lessee of the HD Tract and is conducting the primary business then being operated on the HD Tract, (ii) apply after such time as Target Corporation (including its corporate successors following merger or other reorganization) or any other corporation which controls, is controlled by, or under common control with Target Corporation) ceases to operate a business engaged in selling Grocery Items from the Target Tract sunless such entity has only temporarily [not to exceed one year] ceased operating a store for the sale of Grocery Items by reason of expansion, remodeling,

or casualty) or (iii) limit or prohibit the incidental sale of Grocery Items; and

(xxx)   No portion of the Target Tract shall be used for the conduct of a business of selling lumber, hardware items, plumbing supplies, electrical supplies, floor and wall coverings or other related items customarily carried by a home improvement center (collectively, "Home Improvement Supplies"); provided, however, that the foregoing limitation shall not (i) apply during the period that Target Corporation (including its corporate successors following merger or other reorganization) or any other corporation which controls, is controlled by, or under common control with Target Corporation, is the owner or lessee of the Target Tract and is conducting the primary business then being operated on the Target Tract, (ii) apply after such time as Home Depot U.S.A., Inc. (including its corporate successors following merger or other reorganization) or any other corporation which controls, is controlled by, or under common control with Home Depot U.S.A., Inc., ceases to operate a business primarily engaged in selling Home Improvement Supplies from the HD Tract (unless such entity has only temporarily [not to exceed one year] ceased operating a store for the sale of Home Improvement Supplies by reason of expansion, remodeling, or casualty), or (iii) limit or prohibit the incidental sale of Home Improvement Supplies.

Section 5.1(D):  On Block 1, no merchandise, equipment or services, including but not limited to vending machines, promotional devices and similar items, shall be displayed, offered for sale or lease, or stored within the Common Area; provided however, that the foregoing prohibition shall not be applicable to (i) the storage of shopping carts or the installation of an "ATM" banking facility on the Target Tract, Home Depot Tract or Developer Tract; (ii) the seasonal display and sale of bedding plants and other merchandise on the sidewalk in front of any Building on the Developer Tract, but in no event on Lots 5 or 8, Block 1, (iii) the sale or display of any merchandise on the sidewalk in front of any Building on the Home Depot Tract or Target Tract, (iv) outdoor Restaurant seating, but in no event on Lots 5 or 8, Block 1, (iv) sales from the Permanent Outdoor Sales Areas shown on the Site Plan, (v) sales from the Non-Permanent Outdoor Sales Areas shown on the Site Plan, or (vi) temporary Shopping Center promotions, except that no promotional activities will be allowed in the Block 1 Common Area without the prior written approval of the Approving Parties which may be withheld in their reasonable discretion. In addition, if a recycling center or equipment is required by law to be located in the Shopping Center, the location thereof shall be subject to the approval of the Approving Parties.

Exhibit F

Section 5.1(E): The following use and occupancy restrictions shall be applicable to the Developer Tract:

(i)     No Restaurant shall be located on Lots 5 or 8, Block 1;

(ii)    No toy store exceeding five thousand (5,000) square feet of the Floor Area shall be permitted;

(iii)   No junior department store and/or apparel store exceeding in the aggregate twenty-six thousand (26,400) square feet of Floor Area shall be permitted;

(iv)    No drug store exceeding sixteen thousand (16,000) square feet of Floor Area shall be permitted; and

(v)     No pet shop shall be located within either of the Buildings located on Lots 5 or 8, Block 1, which are immediately adjacent to the Target Tract.

DECLARATION OF EXCUSIVES AND PROHIBITED by Ryan Companies US, Inc., a Minnesota corporation dated September 13, 2000 ("Original Declaration"), and recorded as Document No. A-852277;
As amended by that certain Amendment to Declaration of Exclusives and Prohibited Uses dated October 6, 2000 ("First Amendment"), and recorded as Document No. A-855062,
As amended by that certain Second Amendment to Declaration of Exclusives and Prohibited Uses dated August 29, 2001 ("Second Amendment"), and as Document No. A-888166,
[The Original Declaration, the First Amendment and the Second Amendment are hereinafter collectively referred to as the "Declaration"]

2. This exclusive ("Applebee's Exclusive") shall benefit only Lot 1, Block 3, Rochester Marketplace, and the owners of all other Burdened Parcels are prohibited from engaging in the following:

Occupancy for the operation of a casual dining restaurant substantially similar to an Applebee's Neighborhood Grill & Bar (the "Restricted Use"), specifically including, but not limited to, such similar concepts as "Houlihan's", "Bennigans", ."Fuddrucker's", "TGI Fridays", "Houstons", "Chili's", "Ruby Tuesday's", "O'Charley's", "Red Robin", "Pizzeria Uno", "99", and "Hope"; HOWEVER, the foregoing shall not prohibit the operation of any restaurant which serves primarily a single type of food, such as barbeque, pizza, seafood, chicken wings, Mexican, Oriental or other ethnic foods, or other single food, specifically including, but not limited to, Red Lobster, Outback Steakhouse, and Olive Garden.

...the owners of all Burdened Parcels are prohibited from engaging in any business that includes the following:

3. Off-sale Liquor Store, except for Lot 3, Block 1, Rochester Marketplace;

4. Fast-Food Restaurant with Drive-through Facility featuring Mexican food or primarily chicken products, except for Lot 1, Block 2, Rochester Marketplace which prohibition shall end on the date 20 years from the date hereof [as amended by the First Amendment]

5. Auditorium;

6. Meeting Hall;

7. Check cashing facility (unless incidental to a bank);

8. reality laser tag room or facility; '

9. Indoor recreational facility.

[Per the Second Amendment]

The Burdened Parcel shall not be used for the following:

B. Sale of gourmet coffee, espresso drinks, gourmet coffee products, whole bean coffee, and/or coffee ground on-site, to the extent that such sales are greater than 20% of the tenant's gross revenues, except for Suite 101 of Lot 2, Block 2, Rochester Marketplace, which Suite 101 has no limitation regarding the sale of such items, until no part of Lot 2, Block 2 is leased to Caribou Coffee Company, Inc., or its successors or assigns. '

C. Sale of noodles and pasta and noodle and pasta related dishes, for on-premises and off-premises consumption, except for Suite 102 of Lot 2, Block 2, Rochester Marketplace; provided, however, that other tenants of the Shopping Center shall have the right to sell noodles and pasta, dishes if (i) the sale of noodle and pasta dishes by such tenant is incidental to another primary business of such tenant, and (ii) such tenant' s sale of noodle and pasta dishes from that tenant's leased space in the Shopping Center does not exceed 10% of such tenant's annual gross revenue derived from its business operations at the Shopping Center, until no part of Lot 2, Block 2 is leased by The Noodle Shop Co-Minnesota; Inc., or its successors or assigns.

D. The business of preparing tax returns, except for Suite 106 of Lot 6, Block 1, Rochester Marketplace, until no part of Lot 6, Block 1 is leased by H & R Block Tax Services, Inc., or its successors or assigns... ·

E. The sale of shoes or other footwear, to the extent any tenant devotes more than 25% of the gross leasable area of its leased premises to the sale of shoes or other footwear, except for the leased Premises ·of Brown Group Retail, Inc. and/or its assigns, and except for the leased premises of Payless Shoe Source, Inc. and/or its assigns, as long as the leased premises of Payless ShoeSource, Inc. and/or its assigns does not exceed 3,000 square feet, until no part of Lot 8, Block 1 is leased by Brown Group Retail, Inc., or its successors or assigns. ·

F. Except for Space 105 of Lot 6, Block 1, a unisex, discount hair care shop in the Shopping Center; provided, however, that Landlord shall not be prevented from leasing space in the Shopping Center to any full service beauty salon (such as, by way of example and without limitation, Aveda, Rocco Altobelli, Hair Performers, First Barber Stylists, and Beauty Mart) which may provide services such as permanents,

Exhibit F

| | | hair coloring, tanning, and manicures, or to any other business in which less than 25% of its gross sales are derived from hair care or hair cutting services, until no part of Lot 6, Block 1 is leased by Roch-N-Roll, Inc., its successors or assigns. |
|---|---|---|

| Unit | Trade Name | Exclusives |
|---|---|---|
| 001 | Lane Bryant | Section 12.17:  Upon the commencement of operation in the Shopping Center ... excluding that retail outlot building shown and labeled on Exhibit A hereto as "Excluded Retail Outlot Building" [Landlord shall not allow operation in the Shopping Center] of any [other] retail store selling large size (14 and up) women's clothing and/or apparel....The foregoing rights shall also apply to the remerchandising of any existing store in the Shopping Center . . . .<br><br>In addition to the Excluded Retail Outlot Building, this Section 12.17 shall not be applicable to (i) any current tenant at the Shopping Center that is operating a store under a lease which exists on the date this Lease and which, pursuant to the terms of such existing lease (as such terms exist on the date this Lease), has the right to sell such large women's clothing and/or apparel without Landlord's consent, all of which such current tenants are set forth in Exhibit "E" attached hereto and made a part hereof and (ii) any Future Tenant or Occupant (as such term is hereinafter defined) in the Shopping Center containing in excess of twenty thousand (20,000) square feet. The term "Future Tenant or Occupant" shall mean any tenant or other occupant of the Shopping Center that enters into a lease or other occupancy agreement or otherwise operates at the Shopping Center after the date hereof. |

| Unit | Trade Name | Restrictions Landlord |
|---|---|---|
| 001 | Lane Bryant | 8.2  Landlord warrants and agrees that during the Lease Term, (i) the entire Shopping Center and improvements shown on Exhibit "A" shall always be operated as a single, single level, integrated first-class retail complex, undivided by ramps or obstructions to the flow of traffic, with direct and unencumbered access between all of the buildings in the Shopping Center and all of the common and parking areas shown on said Exhibit "A";<br>...(iii) there shall be no buildings, structures, barriers or the like constructed on the commons areas of the Shopping Center, except as shown on Exhibit "A" as future building area, without Tenant's prior written approval, which approval shall not be unreasonably withheld.<br><br>Landlord further warrants and agrees that Landlord shall not permit any portion of the Shopping Center to be used or occupied by any (a) pawn shop, flea market or junk yard, (b) gun sales or rental shop, (c) gambling, off-track betting, electronic gaming or bingo parlor, (d) psychic, tarot card reading or similar services, (e) bailbondsman (f) sale or distribution of illicit drug supplies or paraphernalia including, but not limited to, roach clips, water pipes, bongs, coke spoons or hypodermic syringes, (g) tattoo parlor, massage parlors, or exotic or erotic dance clubs, or (h) sale or distribution of any pornographic or "adult" materials including, but not limited to, "adult" books, videos, or recordings of any kind (unless sold as an incidental part of a bookstore selling general merchandise (e.g. Barnes & Noble, Border's)). In addition, Landlord shall not permit any leasable |

Exhibit F

| | | space immediately adjacent to the Leased Premises to be occupied by (w) a nail salon, (x) a dry cleaning processing plant, (y) a pet store or (z) a restaurant or other establishment engaged primarily in the preparation of food for consumption on or off premises unless the walls between such premises and the Leased Premises are constructed in such a manner as to prevent odors and vermin from entering the Leased Premises from such common walls.<br><br>12.16  Landlord covenants and agrees that it will not locate any kiosks, gazebo, building structure or other obstruction in front of the Leased Premises or in a position which effectively diverts or obstructs the flow of traffic to the Leased Premises or materially limits the visibility of Tenant's store front or sign. . |
|---|---|---|
| **Unit** | **Trade Name** | **Restrictions All** |
| 001 | Lane Bryant | None |
| **Unit** | **Trade Name** | **Exclusives** |
| 002 | Famous Footwear | Section 11:  <u>EXCLUSIVE</u> Except for existing tenants (or potential tenants) within the Shopping Center on the date hereof (as set forth on Exhibit G attached hereto and made a part hereof), except for portions of the Shopping Center not owned by Landlord, and except for Target, Home Depot and Payless Shoe Source, Inc. (so long as the gross leasable area of Payless Shoe Source does not exceed 3,000 square feet), Landlord covenants, warrants, and agrees that it shall not, throughout the term hereof, lease space in the Shopping Center to another tenant that devotes more than twenty five percent (25%) of its gross leasable area to the sale of shoes or other footwear, nor shall Landlord permit any tenant or occupant of the Shopping Center to use more than twenty five percent (25%) of its gross leasable area for the sale of shoes or other footwear |
| **Unit** | **Trade Name** | **Restrictions Landlord** |
| 002 | Famous Footwear | Section 2:  ... In no event will Landlord construct any building or other structure in the "No-Build Area", as shown on Exhibit A, and, to the extent that Landlord has the right to reasonably withhold consent to any request to build in the No-Build Area, Landlord will not consent to the construction of any building or other structure in the No-Build Area . . .<br><br>In no event shall Landlord reduce the total number of parking spaces for the Shopping Center below local code requirements...the general layout of portions of the Shopping Center owned by Landlord, as well as Tenant's location in relation to the parking area and the Anchor Tenant(s), and access points to the Shopping Center and the Premises, all to the extent owned by Landlord, shall not be altered so as to adversely affect Tenant without Tenant's consent. In addition, in no event shall Landlord permit any building or other structure to be erected within the "No Build Area'" as shown on Exhibit A<br><br>In no event shall the sign of another tenant or occupant of the Shopping Center be placed within the lease-lines of the Premises, which area shall include the entire storefront, fascia and rear wall of the Premises.<br><br>Section 26:  Landlord shall neither place nor construct any kiosks, carts, or other structure (temporary or permanent) on the sidewalk or in the parking lot in front of the Premises and ... Landlord shall not place or |

Exhibit F

|  |  | construct any building or any decorative or aesthetic object on the sidewalk or in the parking lot in front of the Premises which will interfere with the view of the show windows of the Premises, Tenant's sign, or the access to the Premises other than as specifically provided in Exhibit "X" to the OEA as "Non-Permanent Outdoor Sales Area'".<br><br>Landlord shall not construct any building or other structure in the no-build area as designated on exhibit A. Landlord shall not consent to the construction of buildings or other structures in the no build area in the event Landlord has the right to reasonably withhold such consent. note that lots 2,3 & 4 block 1 Rochester marketplace: lots 1 & 2 block 3 Rochester marketplace: and the building labeled Home Depot and the building labeled Target on exhibit A and the land on which they are located are not owned by Landlord.. |
| **Unit** | **Trade Name** | **Restrictions All** |
| 002 | Famous Footwear | None |
| **Unit** | **Trade Name** | **Exclusives** |
| 004 | PetSmart | Exhibit G,<br><br>Section 2:  From and after the date hereof and continuing throughout the Term of the Lease, Tenant shall have the exclusive right in the Shopping Center to conduct any portion of Tenant's Primary Business described in clauses (i), (ii) and (iii) of this Section 2. All other tenants or other occupants of any portion of the Shopping Center shall be prohibited from engaging in any portion of such Primary Business described in clauses (i), (ii) and (iii) of this Section 2, except on a basis which is incidental to an otherwise permitted use. For purposes of this Section 2, the term "incidental" shall mean that the use occupies the lesser of (a) five hundred (500) square feet of Gross Floor Area, or (b) five percent (5%) of the sales area in the subject premises.<br><br>As used in the Lease, the term "Tenant's Primary Business" shall mean the retail sale of (i) pets (including but not limited to fish, birds, reptiles, dogs, cats and other small animals), (ii) food, accessories and other products relating to pets and animals, including equestrian products and apparel related thereto, (iii) services related to pets and animals, such as grooming, boarding, pet day care, animal training and obedience classes, pet adoption and veterinary services, (iv) products relating to nature and the environment, and (v) educational products and services related to any of the foregoing, and office and storage uses incidental to the foregoing. |
| **Unit** | **Trade Name** | **Restrictions Landlord** |
| 004 | PetSmart | 5.1  Buildings, kiosks and other improvements and permanent barriers shall be constructed only within "permitted building areas" shown on Exhibit A.<br><br>Section 5.2:  ... the layout, striping and location of all parking areas and pedestrian and vehicular access ways and other improvements and landscaping within that portion of the Common Area identified on Exhibit A as "Tenant's Protected Area" shall not be changed, and no additional buildings and/or other improvements shall be constructed within Tenant's |

Exhibit F

Protected Area without Tenant's consent ... Landlord shall not make any changes to the access to the rear of Tenant's Building that will obstruct or restrict Tenant's current access for trucks and semi-trailers to the rear of Tenant's Building.... The Common Area shall at all times contain no less than the sum of five (5) parking spaces per one thousand (1,000) square feet of Gross Floor Area for the entire Shopping Center. Further, any use located on the out-parcels identified as "OL1" and "OL2" on Exhibit A (whether leased to or owned by the occupant thereof) must be "self parked" completely and separately on such out-parcel (i.e., all parking required for such use, either pursuant to local governmental requirements or pursuant to this Lease, whichever amount is greater, must be located on and within the out-parcel containing such use, without the benefit of variances or cross-easements). Also, any children's recreational, entertainment or day-care facility shall maintain at least as much parking as would be required for a restaurant of the same size.

Section 6.2: ... the parking spaces in the Common Area shall be used only for the parking of private automobiles or similar vehicles of customers, agents, contractors, invitees, licensees, subtenants and employees of Tenant or any other tenants or occupants of the Shopping Center while such persons are present at the Shopping Center, and for no other purpose, and none of such parking spaces shall be reserved. In addition, the access, perimeter and through roads, streets, drives and walkways, including areas for truck access, maneuvering and loading, shall be used only for pedestrian and vehicular traffic and no other purpose, ... except as otherwise expressly provided herein and/or under the OEA and the existing leases held by existing tenants in the Shopping Center, no portion of the Common Area may be used for special promotions, sidewalk sales, merchandise displays, seasonal sales, delivery, commercial truck parking, inventory storage, do-it-yourself or demonstration areas, park and ride or car pooling arrangements or for any other purposes, except the common purposes for which such portion of the Common Area was designed. Notwithstanding the foregoing, sidewalk sales shall be permitted within the Shopping Center, subject to compliance with all of the following requirements: (a) merchants must display goods for sale only on the portion of the sidewalk directly in front of their own storefronts, (b) merchandise must be displayed in a manner that does not interfere with pedestrian or vehicular traffic, (c) merchandise must be displayed in a neat, clean, orderly and professional manner and must be moved indoors during all non-business hours, and (d) any such sidewalk sale by a tenant must not exceed four (4) consecutive days in duration and must not occur more frequently than two (2) times in any twelve (12) month period. If Tenant has no dedicated cart storage areas, Tenant may also use the sidewalk in front of the Premises for such use as long as such cart storage areas do not interfere with pedestrian or vehicular traffic.

6.4 ...Landlord and any other tenant or occupant in the Shopping Center and their or Landlord's contractors, agents, employees and suppliers may use such portions of the Common Area as are not directly in front of, behind or adjacent to the Premises for the parking of trucks and delivery vehicles, storage of materials, and other matters incidental to such work, provided that such use shall not unreasonably or materially interfere with access to the front or rear of Tenant's Building or the operation of any

Exhibit F

portion of the Shopping Center or of the business of Tenant or any subtenant or licensee of Tenant.

Section 3.4:  No tenant or other occupant less than fifteen thousand (15,000) square feet of Gross Floor Area in the Shopping Center shall be permitted to display exterior signage other than normal directional signage and store front signage consistent with Landlord's uniform sign criteria and all applicable legal requirements.

Exhibit G.

Section 1:  The following uses (collectively referred to as "Prohibited Uses" and individually as a "Prohibited Use") are prohibited during the Term of the Lease in any portion of the Shopping Center (except to the extent permitted under leases which are in effect as of the date hereof (and any renewals or replacements thereof) in the same premises, without increase in size or change of location): nuisance; any use causing loud noises or offensive odors (including any business using exterior loud speakers); manufacturing facility; dry cleaner with cleaning facilities on site (unless Landlord separately agrees in writing to indemnify and hold harmless Tenant from and against any liability, claims, costs and expenses arising from the presence of any hazardous material and/or environmental condition in or on the Shopping Center caused by or resulting from the operation of such dry cleaning facility, the presence of which violates any applicable law and/or the removal or remediation of which is mandated by any lawful authority); any facility for the sale, lease or rental of automobiles, trucks, motorcycles, recreational vehicles, boats or other vehicles; automobile repair shop or service station or any facility storing or selling gasoline or diesel fuel in or from tanks; used clothing or thrift store or liquidation outlet (provided, however, the foregoing does not prohibit the operation of high-end re-sellers such as "Play It Again Sports", "Computer Renaissance", or "Once Upon a Child"); massage parlor; adult book shop or adult movie house; mortuary or funeral parlor; coin operated laundry; cocktail lounge, bar or tavern or sale of alcoholic beverages, whether or not packaged, except in conjunction with a restaurant permitted hereunder and except existing tenants that as of the date of this Lease sell alcoholic beverages as a permitted part of their business; night club; cinema or theater; place of recreation (including but not limited to bowling alley, skating rink, carnival, game arcade or health spa); church; or any other use inconsistent with the operation of a high quality retail shopping center. In addition, no restaurant shall be located within one hundred (100) feet of the Premises. Further, the following uses must first be approved in writing by Tenant: drive-throughs; children's recreational, educational or day-care facility; restaurants occupying more than twenty-five hundred (2,500) square feet of Gross Floor Area; offices or professional uses, other than travel agencies, real estate sales offices, insurance agencies, banks or other office uses of a type customarily located in high quality retail shopping centers in the metropolitan area where the Premises are located and which in any event do not exceed an aggregate of five thousand (5,000) square feet of Gross Floor Area for all such office uses in the Shopping Center; and schools of any nature except in conjunction with animal training or obedience training classes associated with Tenant's Primary Business. As used herein, "school" includes, but is not limited to, a beauty school, barber college, reading room, place of instruction or any other operation serving primarily

| | | students or trainees rather than retail customers. It is the intent of this Section that the Shopping Center shall be devoted to high quality retail uses and that the parking and the other common facilities shall not be burdened by either excessive or protracted use. |
|---|---|---|
| Unit | Trade Name | Restrictions All |
| 004 | PetSmart | None |
| Unit | Trade Name | Exclusives |
| 005 | Clothes Mentor | R-3.  EXCLUSIVE USE: Provided that Tenant has not committed an event of default beyond any applicable cure period, Landlord covenants and agrees that during the Term, as such Terms may be extended pursuant to the provisions of the Lease, Tenant has the exclusive right ("Tenant's Exclusive Right") in the Shopping Center to the use of the Premises for the following purposes: the operation of a high end seller and reseller of gently used women' s ready to wear clothing, apparel, shoes and accessories.<br><br>Tenant's Exclusive Right is subject to the following express limitations:<br><br>A.      Tenant's Exclusive Right shall not apply to any existing tenants of the Shopping Center under their existing leases for premises in the Shopping Center (which leases may be renewed, extended or replaced) and which permit such existing tenant to engage in any use which would otherwise be prohibited hereunder;<br><br>B.      Tenant's Exclusive Right shall only limit competing uses that are the primary business of competing tenants and shall not be construed as prohibiting ancillary uses of such competing tenants; and |
| Unit | Trade Name | Restrictions Landlord |
| 005 | Clothes Mentor | 2.1. Landlord ... shall use commercially reasonable efforts to avoid materially and adversely affecting (a) the visibility of the Premises and Tenant' s signage, (b) access to the Premises, (c) the availability for use by Tenant' s customers of parking spaces in the immediate vicinity of the Premises, and (d) Tenant' s ability to operate the Premises, other than on a temporary basis as reasonably necessary for construction, repair and/or maintenance of the Shopping Center |
| Unit | Trade Name | Restrictions All |
| 005 | Clothes Mentor | None |
| Unit | Trade Name | Exclusives |
| 009 | Target | None |
| Unit | Trade Name | Restrictions Landlord |
| 009 | Target | Per the OEA |
| Unit | Trade Name | Restrictions All |
| 009 | Target | None |
| Unit | Trade Name | Exclusives |
| 010 | Home Depot | None |

Exhibit F

| Unit | Trade Name | Restrictions Landlord |
|------|------------|------------------------|
| 010 | Home Depot | Per the OEA |
| Unit | Trade Name | Restrictions All |
| 010 | Home Depot | None |
| Unit | Trade Name | Exclusives |
| 011 | Cedar's Auto Services | None |
| Unit | Trade Name | Restrictions Landlord |
| 011 | Cedar's Auto Services | None |
| Unit | Trade Name | Restrictions All |
| 011 | Cedar's Auto Services | None |
| Unit | Trade Name | Exclusives |
| 012 | Andy's Liquor | None |
| Unit | Trade Name | Restrictions Landlord |
| 012 | Andy's Liquor | None |
| Unit | Trade Name | Restrictions All |
| 012 | Andy's Liquor | None |
| Unit | Trade Name | Exclusives |
| 015 | Taco Bell | Per the Declaration |
| Unit | Trade Name | Restrictions Landlord |
| 015 | Taco Bell | None |
| Unit | Trade Name | Restrictions All |
| 015 | Taco Bell | None |
| Unit | Trade Name | Exclusives |
| 203 | Great Clips | Per the Declaration |
| Unit | Trade Name | Restrictions Landlord |
| 203 | Great Clips | None |
| Unit | Trade Name | Restrictions All |
| 203 | Great Clips | None |
| Unit | Trade Name | Exclusives |
| 204 | H & R Block | Per the Declaration |
| Unit | Trade Name | Restrictions Landlord |
| 204 | H & R Block | None |

Exhibit F

| Unit | Trade Name | Restrictions All |
|------|------------|------------------|
| 204 | H & R Block | None |
| **Unit** | **Trade Name** | **Exclusives** |
| 210 | Noodles & Company | Per the Declaration |
| Unit | Trade Name | **Restrictions Landlord** |
| 210 | Noodles & Company | None |
| **Unit** | **Trade Name** | **Restrictions All** |
| 210 | Noodles & Company | None |
| **Unit** | **Trade Name** | **Exclusives** |
| 211 | Caribou Coffee | Per the Declaration |
| **Unit** | **Trade Name** | **Restrictions Landlord** |
| 211 | Caribou Coffee | None |
| Unit | Trade Name | **Restrictions All** |
| 211 | Caribou Coffee | None |
| **Unit** | **Trade Name** | **Exclusives** |
| 212 | Applebee's | Per The Declaration |
| **Unit** | **Trade Name** | Restrictions Landlord |
| 212 | Applebee's | None |
| **Unit** | **Trade Name** | Restrictions All |
| 212 | Applebee's | None |

Exhibit F

## Exhibit F-1

## Prohibited Uses

1.  Funeral establishment;

2.  Automobile sale, leasing, repair or display establishment or used car lot, including body repair facilities;

3.  Auction or bankruptcy sale;

4.  Pawn shop;

5.  Catalogue, Internet, mail order or an "800-type" phone-order facility, or a wholesale, discount, outlet, "warehouse," "dollar-type" or unit price store;

6.  Outdoor circus, carnival or amusement park, or other entertainment facility;

7.  Outdoor meetings;

8.  Bowling alley;

9.  Primarily pool or billiard establishment;

10. Shooting gallery;

11. Off-track betting (provided that state sponsored lottery tickets shall not be prohibited);

12. Refinery;

13. Adult bookstore or facility selling or displaying or selling access to pornographic books, literature, websites or videotapes (materials shall be considered "adult" or "pornographic" for such purpose if the same are not available for sale or rental to children under 18 years old because they explicitly deal with or depict human sexuality), massage parlor, steam bath, nude modeling, establishment with nude or semi-nude waiters, waitresses or entertainers;

14. Any residential use, including, but not limited to living quarters, sleeping apartments or lodging rooms;

15. Theater including, but not limited to, an x-rated theater;

16. Auditorium, meeting hall, ballroom, school, educational facilities (including, but not limited to, beauty schools, barber colleges, reading rooms or libraries, or other place of public assembly;

17. Unemployment agency, service or commission;

18. Gymnasium, health club, exercise or dance studio;

19. Dance hall;

20. Cocktail lounge, bar, disco or night club;

21. Bingo or similar games of chance, but lottery tickets and other items commonly sold in retail establishments may be sold as an incidental part of business;

22. Video game or amusement arcade, except as an incidental part of another primary business;

23. So called "head shop" which sells drug paraphernalia;

24. Skating or roller rink;

25. Car wash, car repair or car rental agency;

26. Second hand store, auction house, or flea market, Army/Navy-type store or governmental surplus;

27. Restaurant including, but not limited to, drive-in or drive-through restaurants;

28. Non-retail use (which shall not prohibit in the Shopping Center such uses commonly referred to as "quasi-retail" or "service retail" such as a travel agency, real estate office, insurance agency, accounting service, etc., so long as same do not exceed ten percent (10%) of the Leasable Square Feet of the Shopping Center); or

29. Any uses which conflict with the uses of existing tenants.

30. Tenant may not install an Automatic Teller Machine in or on the Premises without the express written consent of Landlord which consent Landlord may deny in its sole discretion.

Exhibit F-1