## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | ) |
| JOANN, INC., *et al.*,[1] | ) Chapter 11 |
| | ) |
| Debtor. | ) Case No. 25-10068 (CTG) |
| | ) |
| | ) (Jointly Administered) |
| | ) |
| | ) Re: Docket Nos. 760, 863 |

## REPLY OF BOOT BARN, INC. TO CAVENDER STORES, L.P.'S OBJECTION TO FIRST NOTICE OF ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACT AND/OR UNEXPIRED LEASES

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: JOANN Inc. (5540); Needle Holdings LLC (3814); Jo-Ann Stores, LLC (0629); Creative Tech Solutions LLC (6734); Creativebug, LLC (3208); WeaveUp, Inc. (5633); JAS Aviation, LLC (9570); joann.com, LLC (1594); JOANN Ditto Holdings Inc. (9652); Dittopatterns LLC (0452); JOANN Holdings 1, LLC (9030); JOANN Holdings 2, LLC (6408); and Jo-Ann Stores Support Center, Inc. (5027). The Debtors' mailing address is 5555 Darrow Road, Hudson, Ohio 44236.

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ...........................................................................................1

BACKGROUND ...............................................................................................................3

      A.     Assumption and Assignment Procedures for Debtors' Leases ................................3

      B.     Joann's Murfreesboro Lease and Auction ................................................5

      C.     The Party City Lease and Cavender's Objection .......................................7

REPLY ............................................................................................................................11

I.     Cavender's Entry into Fourth Amendment Violated the Automatic Stay as an Act
to Obtain Possession of or Exercise Control over Property of the Debtors' Estates .........11

      A.     Automatic Stay Protects Against Any Act Interfering with Debtors'
Property..................................................................................11

      B.     Cavender's Actions Depressed the Value of the Debtors' Property and
Violated the Automatic Stay .............................................................13

II.    The Assumption and Assignment of the Joann Murfreesboro Lease to Boot Barn
Complies with Sections 365(b)(3)(C) and (D) of the Bankruptcy Code .........................15

      A.     The Joann Murfreesboro Lease Contains No Applicable Use Restrictions...........15

      B.     The Joann Murfreesboro Lease Contains No Planned Tenant Mix ......................17

III.   Bad Faith Precludes Cavender from Objecting to Assignment of the Joann
Murfreesboro Lease ...................................................................................19

      A.     Cavender's Acted in Bad Faith by Colluding to Control the Sale Price of
the Joanne Murfreesboro Lease .........................................................19

      B.     Cavender's Acted in Bad Faith by Concealing Its Deal with the Landlord..........20

CONCLUSION.................................................................................................................21

# TABLE OF AUTHORITIES

**Page**

### Cases

*In re 48th Street Steakhouse, Inc.*,
  835 F.2d 427 (2d Cir. 1987), *cert. denied,* 485 U.S. 1035 (1988)...............................12, 13, 14

*In re Abbotts Dairies of Pennsylvania, Inc.*,
  788 F.2d 143 (3d Cir. 1986)..................................................................................................18, 20

*Acands, Inc. v. Travelers Cas. & Sur. Co.*,
  435 F.3d 252 ...........................................................................................................................11, 12, 13

*In re Achaogen, Inc.*,
  649 B.R. 238 (Bankr. D. Del. 2023) ......................................................................................21

*In re Allentown Ambassadors, Inc.*,
  361 B.R. 422 ..........................................................................................................................13

*In re Ames Dep't Stores, Inc.*,
  121 B.R. 160 (Bankr. S.D.N.Y. 1990) ..................................................................................17

*In re Ames Dep't Stores, Inc.*,
  127 B.R. 744 (Bankr. S.D.N.Y. 1991) ..................................................................................16

*In re Ames Dept. Stores, Inc.*,
  316 B.R. 772 (Bankr. S.D.N.Y. 2004) ..................................................................................12

*Butner v. United States*,
  440 U.S. 48, 99 S. Ct. 914, 59 L. Ed. 2d 136 (1979)............................................................16

*In re Edwards*,
  228 B.R. 552 (Bankr. E.D. Pa. 1998) ...................................................................................21

*In re Gucci*,
  126 F.3d 380 (2d Cir. 1997)...................................................................................................12, 19

*In re Joshua Slocum Ltd.*,
  922 F.2d 1081 (3d Cir. 1990).................................................................................................16

*In re Martin Paint Stores*,
  199 B.R. 258 (Bankr. S.D.N.Y. 1996)...................................................................................14, 15, 18

*Musso v. Ostashko*,
  468 F.3d 99 (2d Cir. 2006).....................................................................................................12

*In re Party City Holdco Inc., et al.,*
   Case No. 24-90621 (Bankr. S.D. Tex.)...................................................................7

*Picard v. Fairfield Greenwich Ltd.,*
   762 F.3d 199 (2d Cir. 2014).............................................................................12

*In re Pursuit Cap. Mgmt., LLC,*
   874 F.3d 124 (3d Cir. 2017).............................................................................20

*Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV)* ..........................3

*In re Rickel Home Centers, Inc.,*
   209 F.3d 291 (3d Cir.), *cert. denied,* 531 U.S. 873 (2000).....................................12

*In re Serv. Merch. Co., Inc.,*
   297 B.R. 675 (Bankr. M.D. Tenn. 2002) .........................................................16

*In re Sunnyside Timber, LLC,*
   413 B.R. 352 (Bankr. W.D. La. 2009)...............................................................19

*In re Tempo Tech. Corp.,*
   202 B.R. 363 (D. Del. 1996).......................................................................18, 19, 20

*In re Theokary,*
   444 B.R. 306 (Bankr. E.D. Pa. 2011) ..............................................................12

*In re Toys R Us,*
   587 B.R. 304 (Bankr. E.D. Va. 2018)..........................................................15, 18

*In re Toys "R" Us Prop. Co. I, LLC,*
   598 B.R. 233 (Bankr. E.D. Va. 2019).........................................................17, 18

*In re Trak Auto Corp.,*
   367 F.3d 237 (4th Cir. 2004) .........................................................................16

*Matter of U. L. Radio Corp.,*
   19 B.R. 537 (Bankr. S.D.N.Y. 1982)...............................................................15

*United States v. Whiting Pools, Inc.,*
   462 U.S. 198 (1983)........................................................................................11

## Statutes

11 U.S.C. § 362.......................................................................................................11

11 U.S.C. § 362(a)(3)...............................................................1, 11, 12, 13, 14

11 U.S.C. § 363(n) .................................................................................................19

11 U.S.C. § 365 ...............................................................................................................4, 5

11 U.S.C. § 365(b)(3)(C) ..............................................................................1, 10, 15, 16, 17

11 U.S.C. § 365(b)(3)(D) ..............................................................................1, 10, 15, 17, 18

11 U.S.C. § 365(f) .............................................................................................................12

11 U.S.C. § 541(a)(1) ........................................................................................................11

11 U.S.C. §§ 101-1531 ........................................................................................................1

## Other Authorities

First Amendment .................................................................................................................5

Fourth Amendment .............................................................................9, 10, 11, 14, 15, 19, 20

*Establishing Notice and Procedures for the Assumption and Assignment of
    Assumed Contracts and Leases, (VI) Authorizing the Assumption and
    Assignment of Assumed Contracts and Leases, (VII) Approving the Sale of
    Assets, and (VIII) Granting Related Relief* ................................................................3

*Establishing Notice and Procedures for the Assumption and Assignment of
    Contracts and Leases, (VI) Authorizing the Assumption and Assignment of
    Assumed Contracts and Leases, (VII) Approving the Sale of Assets, and (VIII)
    Granting Related Relief* ................................................................................................3

5 Collier on Bankruptcy ¶ 541.01 (16th ed. 2024) ........................................................11

Boot Barn, Inc. ("**Boot Barn**"), by and through undersigned counsel, files this reply (the "**Reply**") to Cavender Stores, L.P.'s ("**Cavender's**") objection (the "**Objection**") to the Debtors' proposed assumption and assignment of the Murfreesboro Lease (defined below) to Boot Barn [Docket No. 863] as contemplated in the *First Notice of Assumption and Assignment of Certain Executory Contract and/or Unexpired Leases* [Docket No. 760] (the "**First Assumption Notice**"). In support of its Reply, Boot Barn states as follows:

## PRELIMINARY STATEMENT

1.      Boot Barn was the successful bidder for one of the Debtors' leases in Murfreesboro, Tennessee.  Cavender's, the objector here, bid actively at the auction and was declared the backup bidder.  Cavender's is not only a disgruntled bidder, but also a tenant of another store located in the same shopping center in Murfreesboro.  Not satisfied with the outcome of the auction, Cavender's and the Landlord (as defined below) purported to enter into an amendment to the lease for the Cavender's store that would supposedly restrict Boot Barn from being the assignee of the Debtor's lease.  According to Cavender's, its newly-minted amended lease with its exclusivity provision would prevent Boot Barn from meeting the requirements of providing adequate assurance of future performance under Section 365(b)(3)(C) and (D) of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1531 (the "**Bankruptcy Code**").  This argument lacks merit and should be rejected for the following reasons.

2.      First, Cavender's duplicitous behavior was designed to reduce the market for the Debtors' lease and its value.  This bid-chilling act to depress the value of the Debtors' property violates the automatic stay of Section 362(a)(3) as an act to obtain possession of or exercise control over property of the Debtors' estate.  Consequently, the purported amendment, as it affects the Debtors' interest in property, is void *ab initio*.

3.      Second, the proposed assignment of the Debtors' lease to Boot Barn is permissible under the Bankruptcy Code's shopping center provisions.  As courts have repeatedly held, these provisions were added to the Bankruptcy Code for the benefit of landlords, not other tenants of the shopping center.  Accordingly, to determine whether any exclusivity or use restriction would prevent the proposed assignee from providing adequate assurance, it is the provisions of the lease that debtors seek to assign that are examined, not leases for other tenants.   Here, the lease that the Debtors seek to assign to Boot Barn contains no restrictions on use or exclusivity that would impair Boot Barn's ability to furnish adequate assurance of future performance.  Cavender's alternative contention that the assignment to Boot Barn would disrupt the tenant mix or balance in the shopping center is similarly misplaced.  The lease that Boot Barn seeks to assume does not contain any reference to tenant mix or balance nor has Landlord, the intended beneficiary of Section 365(b)(3)(4), appeared and made that argument.

4.      Finally, Cavender's actions constitute bad faith.  Although Cavender's contends that the amendment to its lease pre-dates the auction, Cavender's appears to have executed the amendment the day after it lost the auction to Boot Barn.  Moreover, while both Cavender's and the Landlord were qualified bidders present at the auction, neither party informed the auctioneer or anyone else at the auction that its lease would prevent an assignment to Boot Barn.  Rather than disclose the amendment, the Landlord elected not to bid and Cavender's took a lying-in wait approach—either it would be the successful bidder, or it would contend that its lease prohibited an assignment to Boot Barn.

5.      In connection with this Reply, Boot Barn has served discovery on Cavender's to determine whether their conduct, including an attempt to chill bidding, warrant the imposition of

sanctions.  Boot Barn reserves all rights to seek appropriate relief following discovery in this matter.

## BACKGROUND

**A.      Assumption and Assignment Procedures for Debtors' Leases**

6.      The Debtors commenced these chapter 11 cases (the "**Bankruptcy Cases**") on January 15, 2025 for the purpose of, among other things, consummating one or more value-maximizing transactions for potential sales of all, substantially all, or any portion of the Debtors' business or assets.[2]  Towards that end, the Court has entered certain orders to facilitate such outcome, including the Assumption Procedures Order,[3] Bidding Procedures Order[4] and the Sale Approval Order.[5]

7.      Pursuant to the Assumption Procedures Order, the Court approved certain procedures with respect to the Debtors assuming and assigning to third parties their non-residential

---

[2]   *See Motion of Debtors for Entry of* an *Order (I) Approving Bidding Procedures, (II) Scheduling Certain Dates and* Deadlines *with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Stalking Horse Agreement, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts and Leases, (VII) Approving the Sale of Assets, and (VIII) Granting Related Relief* [Docket No. 17], at ¶¶ 1-2.

[3]   *See Order (I) Authorizing and Approving Procedures to Reject or Assume Executory Contracts and Unexpired Leases and (II) Granting Related Relie*f [Docket No. 429] (the "**Assumption Procedures Order**").  Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Assumption Procedures Order.

[4]   *See Order (I) Approving Bidding Procedures, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Stalking Horse Agreement, (V) Establishing Notice and Procedures for the Assumption and Assignment of Assumed Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts and Leases, (VII) Approving the Sale of Assets, and (VIII) Granting Related Relief* [Docket No. 446] (together with exhibits thereto, the "**Bidding Procedures Order**").

[5]   *See Order* (*A) Approving and Authorizing Sale of the Debtors' Assets, Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, and (B) Granting Related Relief* [Docket No. 520] (the "**Sale Approval Order**").

real estate property leases (the "**Assumption Procedures**").[6]    Generally, the Assumption

Procedures: (a) require the Debtors to file an Assumption Notice indicating the Debtors intent to

assume a contract or contracts pursuant to section 365 of the Bankruptcy Code, which sets forth,

among other things: (i) the contract or lease proposed to be assumed, including the store number

and address; (ii) the Assumption Counterparty; (iii) the identity of the proposed Assignee to such

contract, if applicable; (iv) the proposed Assumption Date; (v) proposed cure amount, if any, for

each such contract; (vi) with respect to any Lease which the Debtors seek to assume and assign (if

any), any known third party having an interest in any consigned goods subject to such assignment;

and (vii) the deadline and procedures for filing objections to the Assumption Notice, and (b)

require the Debtors to serve, by first class mail, the Assumption Notice on, among others, the

Assumption Counterparty affected by such Assumption Notice and, to the extent the Debtors seek

to assume and assign a lease of non-residential real property, the Debtors will cause evidence of

adequate assurance of future performance to be served with the Assumption Notice by overnight

delivery upon the Assumption Counterparties affected by the Assumption Notice.[7]

8.      Pursuant to the Sale Approval Order, the Court, among other things, (i) approved

the Debtors' entry into and performance under the terms and conditions of that certain Agency

Agreement dated as of February 26, 2025 (the "**Agency Agreement**"), by and among the Debtors

and GA Joann Retail Partnership (the "**Agent**"), and Wilmington Savings Fund Society, FSB, in

its capacity as prepetition term loan agent (the "**Term Agent**" and collectively with Agent, the

"**Purchaser**"), and (ii) authorized and approved the sale to the Purchaser of the exclusive right to

designate the purchasers, assignees, sublessees, or other transferees of Debtors' right, title, and

---

[6]   Assumption Procedures Order, at ¶ 3.

[7]   *See id.*

interest in and to any or all of the Debtors' Leases and Contracts (as defined in the Agency Agreement) (the "**Lease/Contract Designation Rights**").[8]    Prior to the assumption and assignment of any of the Assigned Contracts (as defined in the Bidding Procedures Order), the Purchaser and the Debtors will satisfy the requirements of Section 365 of the Bankruptcy Code pursuant to the procedures established in the Assumption Procedures Order with the Purchaser directing the Debtors to file one or more Assumption Notices (as defined in the Assumption Procedures Order) with respect to any Assigned Contracts.

9.      In connection with its rights obtained under the Sale Approval Order, the Agent and its real estate consultant, A&G Real Estate Partners, engaged in a months-long marketing and bidding process to obtain the highest and best offer for the leases for which the Agent had exercised its designation rights.[9]  Pursuant to such process, leases were sold in private sales or through public auctions noticed to potential parties-in-interest, including the landlords under the particular lease or leases.[10]

### B.      Joann's Murfreesboro Lease and Auction

10.      Among the leases that the Agent designated for assumption and assignment is that certain Lease Agreement between Jo-Ann Stores, LLC and Integris Ventures-TC, LLC (the "**Landlord**"), dated January 18, 2010, of property located at 1923 Old Fort Parkway, Murfreesboro, TN 37129 (as amended, the "**Joann Murfreesboro Lease**").[11]  The property,

---

[8]   *See* Sale Approval Order, at ¶¶ 3.  The Agency Agreement provides the Agent with the exclusive right to designate the purchasers, assignees, subleases or other transferees of the Debtors' right, title, and interest to any or all of the Debtors' leases and contracts upon the terms agreed to between the Agent and such designee.  *See* Agency Agreement, § 15.1.

[9]   *See* Transcript of Joann, Inc. Status Call/Auction Proceedings, dated April 22, 2025 (the "**Auction Transcript**" or "**Auction Tr.**"), attached to the Kirpalani Declaration as **Exhibit A**, at 3:20-4:9.

[10]   *Id.*

[11]   DDR MDT Murfreesboro Towne Center, LLC was the original landlord under the Lease.  The current Landlord is the successor-in-interest pursuant to that First Amendment to Lease, dated July 9, 2020.  A

identified as store number 193, is part of an open air shopping center known as Towne Center (the "**Shopping Center**").  Exhibit F and H to the Joann Murfreesboro Lease contain lists of exclusive, restricted, and prohibited uses and exclusive use covenants (the "**Exclusive Use Covenants**").[12]

11.    On April 22, 2025, the Agent conducted a public auction for the Joann Murfreesboro Lease (the "**Auction**").  Three entities submitted bids by the applicable bid deadline prior to the auction: Boot Barn[13] at $50,000, Cavender's[14] at $50,000, and the Landlord at $40,000.[15]  Boot Barn and Cavender's actively bid at the Auction; the Landlord, while present during the Auction, did not bid beyond its initial $40,000 bid.[16]  After multiple rounds of bidding, Cavender's submitted a bid of $325,000, which Boot Barn then topped with a bid of $350,000.[17] At that point, Cavender's representatives informed the auctioneer that "we're out, Cavender's stands down."[18]  Prior to closing the bidding, the auctioneer asked the Landlord if they wanted to bid and the Landlord responded "no, I'm good."[19]  Consequently, the auctioneer declared Boot Barn the successful bidder for the Joann Murfreesboro Lease with a bid of $350,000 and declared

---

copy of the Murfreesboro Lease and the First Amendment to Lease are attached to the Kirpalani Declaration as **Exhibits B and C**, respectively.

[12]    *See* Exhibit F to the Joann Murfreesboro Lease (Exhibit "F" – List of Exclusive, Restricted and Prohibited Uses and Exclusive Use Covenants) and (Exhibit "H" Additional Prohibited Uses).

[13]    Founded in 1978, Boot Barn is the largest and fastest-growing lifestyle retail chain devoted to western and work-related footwear, apparel and accessories in the U.S., with more than 420 stores in 46 states and an e-commerce channel.

[14]    Cavender's has described itself as operating more than 100 "Cavender's Boot City" locations in more than 15 states and, together with its other operating brands, it engages in the retail sale of western-related and work-related footwear, apparel, and accessories.  *See* Objection at ¶ 6.

[15]    *See* Auction Tr. at 33:6-8.

[16]    *Id.* at 34:14-22.

[17]    *Id*. at 33:19-36:3.

[18]    *Id*. 36:4-5.

[19]    *Id*. 36:6-11.

Cavender the back-up bidder at $325,000.[20]  Beyond bidding or indicating it was not bidding, Cavender's and the Landlord, respectively, made no statements regarding the Joann Murfreesboro Lease or any other lease or property in the Shopping Center.

### C.    The Party City Lease and Cavender's Objection

12.    Prior to actively bidding for the Joann Murfreesboro Lease, Cavender's engaged in a similar bankruptcy sale process for the Lease Agreement between JDN Realty Corporation ("**JDN**") and Party City Corporation ("**Party City**"), dated July 21, 1998, for another property located in the Shopping Center ("**the Party City Lease**)."  Like the Debtors here, Party City commenced its own chapter 11 cases in 2024 in the Southern District of Texas (the "**Texas Bankruptcy Court**") seeking to sell substantially all of its assets, including the assumption and assignment of its non-residential real property leases.[21]  On March 5, 2025, the Texas Bankruptcy Court entered the Party City Sale Order,[22] which, among other things, approved the assumption and assignment of the Party City Lease to Cavender's pursuant to the Assumption and Assignment Agreement.[23]

13.    Among other things, the Assumption and Assignment Agreement provides for the following with respect to Cavender's rights acquired under the Party City Lease:

---

[20]  *Id*. 36:12-17.

[21]  *See In re Party City Holdco Inc., et al.*, Case No. 24-90621 (Bankr. S.D. Tex.) (the "**Party City Cases**").

[22]  *See Order (A) Approving and Authorizing Sale of Certain of the Debtors' Assets, Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief* [Docket No. 858 in the Party City Cases] (the "**Party City Sale Order**").  A true and correct copy of the Party City Sale Order is attached to the Kirpalani Declaration as **Exhibit D**.

[23]  *See* Assumption and Assignment Agreement, dated as of March 5, 2025, by and between Party City Corporation, as assignor, and Cavender Stores, L.P., as assignee (the "**Assumption and Assignment Agreement**") [Docket No. 858-1 in Party City Cases].  A true and correct copy of the Assumption and Assignment Agreement is attached to the Kirpalani Declaration as **Exhibit E**.

> **Assignee hereby acknowledges and agrees that Assignor makes no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Lease(s).** Without limiting the foregoing, Assignor hereby disclaims any warranty (express or implied) of merchantability or fitness for any premises subject to the Lease(s). Assignee further acknowledges that the Assignee has conducted an independent inspection and investigation of the physical condition of premises subject to the Lease(s) and all such other matters relating to or affecting the Lease(s) as Assignee deemed necessary or appropriate and that in proceeding with its acquisition of the Lease(s), Assignee is doing so based upon such independent inspections and investigations. **Accordingly, Assignee will accept the Lease(s) "AS IS" and "WHERE IS."**

Assumption and Assignment Agreement, ¶ 6 (emphasis added).

14.    The Assumption and Assignment Agreement did not require or contemplate any amendments to the Party City Lease in order for it to be effective and binding on Cavender's or the Landlord.  And the Texas Bankruptcy Court did not approve any amendments or modifications to the Party City Lease in either the Assumption and Assignment Agreement or the Party City Sale Order.   In fact, the Party City Sale Order required that any material modifications to the Assumption and Assignment Agreement or any related agreements would require approval of the Texas Bankruptcy Court.[24]

15.    The Party City Sale Order provided that the assumption and assignment of the Party City Lease would be effective as of the Closing Date.[25]   Upon information and belief, the

---

[24]    *See* Party City Sale Order, at ¶ 30 ("The Assumption and Assignment Agreement, and any related agreements, documents or other instruments, may be modified, amended or supplemented by the parties thereto, in a writing signed each party, and in accordance with the terms thereof, without further order of the Court; **provided that any such modification, amendment or supplement does not materially change the terms of the Assumption and Assignment Agreement or any related agreements, documents or other instruments.**").  (emphasis added).

[25]    Party City Sale Order, at ¶ 4 (Closing Date occurs "when the following conditions have been met: (i) the Debtor counterparty and Buyer have both executed the Assumption and Assignment Agreement, (ii) entry off this Sale Order, (iii) Buyer has paid the full amount due under the Assumption and Assignment Agreement, and (iv) the effective date of assignment has occurred in accordance with the terms of the Assumption and Assignment Agreement."

Assumption and Assignment Agreement became effective no later than March 31, 2025.[26]  Upon the Closing Date, the Party City Sale Order provided that it "shall be considered and constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Acquired Lease acquired under and pursuant to the Assumption and Assignment Agreement."[27]

16.     At the time that Cavender's entered into the Assumption and Assignment Agreement, the Party City Lease did not contain any exclusivity provision or other restriction that would have prevented any western and work-related footwear, apparel and accessories retailer from being an occupant of any of the stores in the Shopping Center.  In April 2025, Cavender's and the Landlord purported to amend the Party City Lease through the Fourth Amendment.[28]  As relevant, the Fourth Amendment purported to add an exclusivity provision to restrict other potential tenants of the Shopping Center.  According to one of the "Whereas" clauses in the Fourth Amendment, "as a condition to Assignee assuming the Lease, Assignee requires Landlord to (i) agree to certain amendments to the Lease, (ii) consent to the assignment of Tenant's interest in the Lease to Assignor [sic], and (iii) enter into certain other agreements with Assignee as set forth in this Agreement."[29]  This purported condition to Cavender's and the Landlord performing under the Party City Lease is not required in either the Party City Sale Order nor the Assumption and Assignment Agreement.

---

[26]   Under the Assumption and Assignment Agreement, if the closing did not occur by March 31, 2025, the parties acknowledged that the Party City Lease could be rejected in the Party City Cases.  Assumption and Assignment Agreement, at § 2

[27]   Party City Sale Order, at ¶ 18.

[28]   *See* Fourth Amendment to Lease, Estoppel, and Consent to Assignment, between Cavender's and Landlord (the "**Fourth Amendment**").  A true and correct copy of the Fourth Amendment is attached to the Kirpalani Declaration as **Exhibit F.**

[29]   Assumption and Assignment Agreement, at 1.

17.    Substantively, the Fourth Amendment purported to provide Cavender's with the exclusive right to carry and sell any western-related and work-related footwear, apparel, and accessories in the Shopping Center, and specifically prohibited the Landlord from leasing property to a number of Cavender's competitors, including Boot Barn.[30]  Although the Fourth Amendment has a date of April 2, 2025, Cavender's did not actually execute it until April 23, 2025, the day after it lost the auction for the Joann Murfreesboro Lease to Boot Barn.[31]  Based upon this "exclusivity right," Cavender's filed the Objection contending that the assumption and assignment of the Joann Murfreesboro Lease to Boot Barn would violate the shopping center specific provisions of Section 365(b)(3)(C) and (D).[32]

18.    The Objection raises two arguments.  First, Cavender's contends the assumption and assignment to Boot Barn should not be permitted because Boot Barn cannot demonstrate adequate assurance of future performance and its assumption and assignment would place the Landlord "in immediate breach of the Fourth Amendment to the Party City Lease with Cavender's, which predates the proposed assumption by Boot Barn."[33]  Alternatively, Cavender's argues that Boot Barn's assumption and assignment of the Party City Lease "would substantially disrupt the tenant mix and balance at the Shopping Center by competing western and work-related footwear

---

[30]  Fourth Amendment, at § 5.

[31]  Objection at ¶ 8.

[32]  *Id.* at ¶ 14 ("Cavender objects to the assumption and assignment of the Lease to Boot Barn as contemplated in the First Assumption Notice as it would violate section 365(b)(3)(C) and (D) of the Bankruptcy Code.  Approval of the proposed assumption and assignment would allow one of Cavender's primary competitors to move into the Shopping Center mere feet from a premises that Cavender's has already occupied and begun refurbishing, disrupting the mix and balance of the Shopping Center and violating Cavender's contractual rights.").

[33]  *Id.* at ¶ 17.

and apparel stores within feet of each other, thereby harming not only Cavender's but also other tenants in the Shopping Center through reduced foot and other traffic."[34]

19.    For the reasons set forth below, both arguments lack merit and should be rejected.

## **REPLY**

## I.    **Cavender's Entry into Fourth Amendment Violated the Automatic Stay as an Act to Obtain Possession of or Exercise Control over Property of the Debtors' Estates**

20.    Prior to addressing the merits of Cavender's Section 365(b)(3) arguments, Boot Barn notes that Cavender's and the Landlord's actions in entering into the Fourth Amendment, and seeking to depress the value of the Joann Murfreesboro Lease, violated the automatic stay in the Debtors' bankruptcy cases as it constituted an act to obtain possession of or exercise control over property of the Debtors' estates.

### A.    **Automatic Stay Protects Against Any Act Interfering with Debtors' Property**

21.    The filing of a bankruptcy case "creates an estate" comprising, among other things, "all legal or equitable interests of the debtor in property as of the commencement of the case."  11 U.S.C. § 541(a)(1); *see also United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 n.9 (1983) (defining property of the estate to include "all kinds of property, including tangible or intangible property"); 5 Collier on Bankruptcy ¶ 541.01 (16th ed. 2024) (Bankruptcy Code defines estate property to be "as inclusive as possible" so as to maximize the estate from which creditors will be paid).

22.    In recognition of the overarching principle of protecting and maximizing estate property, upon the filing of a bankruptcy petition, Section 362 of the Bankruptcy Code automatically stays "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. 362(a)(3).  The automatic stay

---

[34]    *Id.* at ¶ 18.

is broad in scope and prohibits actions that might be taken to control or interfere with property of the estate, including actions against third parties, not only actions against the debtor. *Acands, Inc. v. Travelers Cas. & Sur. Co.*, 435 F.3d 252, 259 (3d Cir. 2006). The stay protects "bankruptcy estates by restraining any formal or informal action or legal proceeding that might dissipate estate assets or interfere with the trustee's orderly administration of the estate." *Picard v. Fairfield Greenwich Ltd.*, 762 F.3d 199, 207 (2d Cir. 2014); *Musso v. Ostashko*, 468 F.3d 99, 104 (2d Cir. 2006) (the automatic stay encompasses "all actions and proceedings that may affect the debtor's property"); *In re Gucci*, 126 F.3d 380, 392 (2d Cir. 1997) (Section 362(a)(3) encompasses actions that would "inevitably have an adverse impact upon the property of the estate.").

23.    A debtor's interest in an unexpired lease is property of the bankruptcy estate. *See, e.g., In re Rickel Home Centers, Inc.*, 209 F.3d 291, 300 (3d Cir. 2000), *cert. denied,* 531 U.S. 873 (2000); *In re 48th Street Steakhouse, Inc.,* 835 F.2d 427, 430 (2d Cir. 1987), *cert. denied,* 485 U.S. 1035 (1988); *see also In re Theokary*, 444 B.R. 306, 316 (Bankr. E.D. Pa. 2011) (noting that "[w]hile the § 362(a)(3) concepts of 'obtaining possession of' and 'exercising control over' are not easily applied to intangible assets such as executory contracts and unexpired leases, it is generally accepted that § 362(a)(3) applies to such assets.") (citing *Acands, Inc. v. Travelers Casualty and Surety Co.,* 435 F.3d at 260). As such, that leasehold interest is a protectable interest under Section 362(a)(3) of the Bankruptcy Code. *In re Theokary*, 444 B.R. at 316.

24.    In retailer bankruptcies, debtors often seek to monetize the value of their interest in below market leases by assuming and assigning them to third parties. Section 365(f) of the Bankruptcy Code is designed to allow a debtor to maximize the value of its interest in unexpired leases by overriding provisions in leases that would restrict a debtor's ability to freely assign its leases. *In re Ames Dept. Stores, Inc.*, 316 B.R. 772, 794 (Bankr. S.D.N.Y. 2004) (Section 365(f)

of the Bankruptcy Code "protects the body of creditors as a whole from provisions, typically in leases, that frustrate the estate's ability to convert the economic value in leases into cash that can increase creditor recoveries").

**B.    Cavender's Actions Depressed the Value of the Debtors' Property and Violated the Automatic Stay**

25.    As noted above, Cavender's was an active bidder for the Joann Murfreesboro Lease.  The Landlord also submitted an initial bid for the lease.  Both parties were aware of Boot Barn's interest in the lease and the prospect of active bidding.  In order to thwart the ability to obtain maximum value for the Joann Murfreesboro Lease, Cavender's and the Landlord clandestinely engaged in a scheme to create a "head's I win, tails you lose" situation for Cavender's.  Cavender's sought to ensure that it would be the successful bidder even if it did not submit the highest and best bid for the lease.  *See In re Allentown Ambassadors, Inc.*, 361 B.R. 422, 457-58 (Bankr. E.D. Pa. 2007) (denying defendants' motion for summary judgment in action brought by debtor contending that defendants actions violated the automatic stay and concluding that debtor had stated a viable claim that defendants' actions adversely affecting the debtor's economic rights violated the stay under Section 362(a)(3)).  The fact that an action does not target the debtors directly is irrelevant to whether the action seeks to obtain possession of or exercise control over the Debtors' property.  *See Acands, Inc. v. Travelers Cas. & Sur. Co.*, 435 F.3d, at 259 (actions directed at third parties, not the debtor, can violate the stay if the action was seeking to exercise control over estate property).

26.    One of the most prominent cases discussing a violation of Section 362(a)(3) in the context of an action directed at a third party but nonetheless finding that the action was an act to obtain possession or exercise control over estate property was in *In re 48th St. Steakhouse, Inc.*, 835 F.2d 427 (2d Cir. 1987).  In that case, the debtor operated a restaurant pursuant to a sublease

with the primary tenant.  The debtor fell into arrears on its sublease and filed for bankruptcy.  The landlord subsequently served a notice of termination of the primary lease on the primary tenant based upon the nonpayment of rent.  The debtor filed an adversary proceeding contending that the landlord's attempt to terminate lease violated the automatic stay because its sublease was coterminous with the primary lease.  The bankruptcy court and district court agreed with the debtor and the landlord appealed to the Second Circuit Court of Appeals.  *Id.*

27.     Before the Second Circuit, the landlord continued to argue that its action directed at the non-debtor primary tenant was not an act to obtain possession over the debtor's property and therefore did not violate the stay.  *Id.* at 430.  As did the courts below, the Second Circuit rejected the argument, concluding that landlord's termination of the primary lease would result in the destruction of the debtor's sublease.  *Id.* at 431.  In its decision, the Second Circuit rejected the landlord's argument that automatic stay was not violated because its action was not directly targeted at the debtor, noting that "[i]f action taken against the non-bankrupt party would inevitably have an adverse impact on property of the bankrupt estate, then such action should be barred by the automatic stay."  *Id.*

28.     The same is true here.  Prior to the Fourth Amendment, the Debtors had a lease that could be assigned to any western shoe and apparel store, including Boot Barn.  Now, Cavender's contends that the Debtors possess a lease that is not assignable to the specific competitors listed in the lease or to western apparel and shoe stores.  While Cavender's and the Landlord's actions in executing the Fourth Amendment may not have been targeted directly at the Debtors, the action taken would inevitably have an adverse impact on the Joann Murfreesboro Lease by seeking to eliminate a whole category of potential bidders and not allowing the lease to be assigned to the highest bidder.  *See In re Martin Paint Stores*, 199 B.R. 258, 261 n.3 (Bankr. S.D.N.Y. 1996)

(holding that an action that interfered with the debtor's ability to assume and assign its lease violated Bankruptcy Code Section 362(a)(3)).  Cavender's action is an act to obtain possession of or exercise control over the Debtors' property, and it is barred by the automatic stay.

## II.     The Assumption and Assignment of the Joann Murfreesboro Lease to Boot Barn Complies with Sections 365(b)(3)(C) and (D) of the Bankruptcy Code

### A.     The Joann Murfreesboro Lease Contains No Applicable Use Restrictions

29.     The Objection first argues that a contract entered into between Cavender's and the Landlord, to which no Debtor was a party, should govern assignment of the Joann Murfreesboro Lease under Section 365(b)(3)(C) of the Bankruptcy Code.  As an initial matter, Cavender's itself acknowledges the questionable validity of the Fourth Amendment in support of its Argument.[35] Assuming, *arguendo*, effectiveness, this argument nonetheless finds no support in the statute, case law, or legislative history.  "[T]he purpose of § 365(b)(3)(C) is to preserve the landlord's bargained-for protections with respect to premises use and other matters that are spelled out ***in the lease with the debtor-tenant.***"  *In re Toys R Us*, 587 B.R. 304, 309-10 (Bankr. E.D. Va. 2018) (emphasis added); *Matter of U. L. Radio Corp.*, 19 B.R. 537, 543 (Bankr. S.D.N.Y. 1982) ("the Court will generally consider the provisions of the lease to be assigned.").  The provision is intended to protect the landlord's economic expectations, not those of other tenants.  *In re Martin Paint Stores*, 199 B.R. at 262.

30.     The assumption and assignment of the Joann Murfreesboro Lease to Boot Barn complies with Section 365(b)(3)(C) because the Joann Murfreesboro Lease contains no applicable restrictions or exclusivity provisions.  All use restrictions are explicitly outlined in exhibits F and H to the lease.  Those restrictions forbid the space from being used as, among other things, a

---

[35]  *See* Objection ¶ 17 ("Cavender's understands that a dispute may exist as to the effectiveness of the Fourth Amendment.").

bookstore, party supply store, furniture store, and sporting goods store. The Joann Murfreesboro Lease also forbids using the space for a variety of nonretail activities. Nowhere does the lease prohibit using the space to sell western shoes and apparel.

31.     The additional restrictions that Cavender's seeks to impose would rob the Debtors of the benefit of their bargain, and transform Section 365(b)(3) from a shield protecting a landlord's pre-bankruptcy rights into a sword allowing shopping center landlords to unilaterally alter any debtors' contractual agreement and obtain a commercially competitive advantage that actually allows them to improve their position to the detriment of the debtors' estate. This kind of disregard for property interests in bankruptcy has been condemned by the Supreme Court, *see Butner v. United States,* 440 U.S. 48, 55 (1979) ("Uniform treatment of property…serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving 'a windfall merely by reason of the happenstance of bankruptcy'"), and it flies in the face of Congress' clear intent to *protect* bargained for property interests. *See In re Joshua Slocum Ltd.*, 922 F.2d 1081, 1091 (3d Cir. 1990) ("Congress has suggested that the modification of a contracting party's rights is not to be taken lightly"); *In re Ames Dep't Stores, Inc.*, 127 B.R. 744, 753 (Bankr. S.D.N.Y. 1991) ("[T]here is no indication of any intention by Congress to do anything other than hold a shopping center debtor tenant to its bargain with a landlord and to leave intact the property interests of debtor and landlord as set forth in that bargain…"); *In re Trak Auto Corp.*, 367 F.3d, at 244 ("[W]hen a shopping center lease is assigned in bankruptcy, Congress's purpose in § 365(b)(3)(C) is to preserve the landlord's bargained-for protections with respect to premises use and other matters that are spelled out in the lease with the debtor-tenant."). The Objection offers no support

for this extreme and inequitable outcome, identifying no case in which a provision in another tenant's contract bars assignment of a lease that contains no applicable restrictions.[36]

### B.    The Joann Murfreesboro Lease Contains No Planned Tenant Mix

32.    Cavender's alternatively argues that Section 365(b)(3)(D) prohibits assignment of the Joann Murfreesboro Lease to a competitor of any existing Shopping Center tenant because it would disrupt the tenant mix.  This reading applies the statute without reference to the terms of the Joann Murfreesboro Lease nor to evidence of the Landlord's intent to preserve a specific tenant mix in the Shopping Center.  Courts have repeatedly rejected this misinterpretation of Section 365(b)(3)(D).  *See, e.g., In re Ames Dep't Stores, Inc.*, 121 B.R. 160, 165 (Bankr. S.D.N.Y. 1990) ("It is, nevertheless, clear that section 365(b)(3)(D) must be interpreted to refer to contractual protections and not undefined notions of tenant mix."); *In re Toys "R" Us Prop. Co. I, LLC*, 598 B.R. 233, 242 (Bankr. E.D. Va. 2019) ("there is no operating agreement, no master lease, and no joint advertising that would evidence any master plan for development of the stores or to maintain any particular tenant mix. In addition, there is nothing in the Toys Lease that would evidence such an intention.").

33.    Correct application of Section 365(b)(3)(D) reveals that the Debtors and the Landlord never intended the Joann Murfreesboro Lease to preserve any tenant mix, and Cavender's presents no evidence that tenant mix was considered by anyone until Cavender's failed to secure the Joann Murfreesboro Lease at the Auction.  With this argument, Cavender's once again seeks to rob the Debtors of their bargained for property interests.  Worse, rather than binding the Debtors

---

[36]    The Objection contains only one case that discusses Section 365(b)(3)(C), *In re Serv. Merch. Co., Inc.*, 297 B.R. 675, 688 (Bankr. M.D. Tenn. 2002), in which the court reviewed the use restriction contained in another tenant's lease to inform its analysis, but concluded that because the restriction applied only to property "owned or where the particular use thereof is controlled by Landlord," it did not apply because the landlord did not own or control the use of the space that the debtors sought to assign.  To the extent it is relevant to the analysis under Section 365(b)(3)(C), similar language is not in the Party City Lease.

to specific terms outlined in a contract between two non-debtor parties, this reading of Section 365(b)(3)(D) would give shopping center landlords (and, apparently, all shopping center tenants) the power to unilaterally impose *any* restriction to assignment, so long it is couched as concern for a vague and undefined tenant mix. *See In re Toys "R" Us Prop. Co. I, LLC*, 598 B.R. at 242 ("For the Court to hold that a landlord's stated concern as to tenant mix, without more, is sufficient to prevent a debtor's assignment of a lease would be to give absolute veto power to any landlord whose lease a debtor seeks to assume and assign."). As Cavender's admits, "Section 365(b)(3)(D) of the Bankruptcy Code favors minimizing disruption to **carefully planned** tenant mixes in shopping centers."[37] The Joann Murfreesboro Lease contains no such plan, and Cavender's cannot now levy restrictions based on one it self-servingly created out of thin air (and only after it was the unsuccessful bidder for the Joann Murfreesboro Lease).

34.    In addition to lacking evidence of an intended tenant mix, the Objection provides no support for Cavender's assertion that assignment to Boot Barn will somehow harm the Shopping Center. *See In re Toys "R" Us, Inc.*, 587 B.R., at 311 ("Brea I has not demonstrated that a third 'off-price' retailer will disrupt the tenant mix and balance."). If anything, the addition of Boot Barn will increase foot traffic in the Shopping Center, as it will attract customers who benefit from the wider selection available from two footwear stores in close proximity. *See In re Martin Paints Stores*, 199 B.R. at 265 ("it is equally likely that the addition of Pretty Girl will bring new customers to the neighborhood and the Premises, resulting in an increase in business for [the objecting party]").

---

[37] Objection ¶ 20 (emphasis added).

18

III.   **Bad Faith Precludes Cavender from Objecting to Assignment of the Joann Murfreesboro Lease**

    A.   **Cavender's Acted in Bad Faith by Colluding to Control the Sale Price of the Joanne Murfreesboro Lease**

35.   "[W]hen a bankruptcy court authorizes a sale of assets pursuant to section 363(b)(1), it is required to make a finding with respect to the 'good faith' of the purchaser." *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 149–50 (3d Cir. 1986).  The Bankruptcy Code and the Bankruptcy Rules do not define "good faith." *In re Tempo Tech. Corp.*, 202 B.R. 363, 367 (D. Del. 1996).  Therefore, courts have construed the term in accordance with equitable principles, holding that a finding of good faith rests on integrity of a party's conduct in the course of the bankruptcy sale proceedings. *Id.*

36.   Section 363(n) of the Bankruptcy Code prescribes avoidance of a sale "if the sale price was controlled by an agreement among potential bidders at such sale."  However, a finding of impermissible control of a sale through collusion can also inform a finding of bad faith between potential bidders, *In re Gucci*, 126 F.3d 380, 390-91 (2d Cir. 1997) ("[T]he good-faith requirement prohibits fraudulent, collusive actions specifically intended to affect the sale price or control the outcome of the sale.") (citing *In re Abbotts Dairies*, 788 F.2d at 148-49).  Evidence of collusion need not be explicit; an agreement to collude can also be "inferred from the behavior of the parties or the circumstances*." In re Sunnyside Timber, LLC*, 413 B.R. 352, 363 (Bankr. W.D. La. 2009).

37.   Here, Cavender's and the Landlord were potential bidders to the Joann Murfreesboro Lease, and by executing the Fourth Amendment, they conspired to control the outcome of the Auction.  The Objection states that the Fourth Amendment's use restrictions predate the Auction.[38]  By the time the Auction began, both the Landlord and Cavender's believed

---

[38]   Objection ¶ 18.

that assignment to Cavender was guaranteed, either through Cavender's successful bid or through enforcement of the Fourth Amendment's exclusivity provision.

38.     As backup bidder, if the Objection proves successful, Cavender's will be awarded the Joann Murfreesboro Lease despite submitting a less competitive bid.  Further, by executing the Fourth Amendment, Cavender's guaranteed that it would secure the lease because even if Boot Barn won, assignment would be barred by the Fourth Amendment (according to Cavender's).  Because of this guarantee, Cavender's had no incentive to continue bidding, and with the knowledge that Cavender's signature to the Fourth Amendment would increase rent under the Party City Lease, the Landlord had no incentive to bid at all.  Cavender's and the Landlord's collusion before the auction chilled bidding on the Joanne Murfreesboro Lease and ensured that it sold at an artificially low price controlled by Cavender's.  These actions alone warrant a finding of bad faith.  *In re Abbotts Dairies.*, 788 F.2d, at 148 (stating that an agreement "designed to preclude any truly competitive bidding" would, "as a matter of law, constitute collusion…or an attempt to take grossly unfair advantage of other bidders," sufficient to "destroy [bidder's] good faith status.").

### B.     Cavender's Acted in Bad Faith by Concealing Its Deal with the Landlord

39.     Bad faith should also be found when a purchasers' misconduct involves "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *In re Tempo Tech. Corp.*, 202 B.R., at 367; *In re Abbotts Dairies*, 788 F.2d, at 147

40.     Cavender's deception at the Auction further cements that Cavender's and the Landlord's actions evidence bad faith.  The transcript of the Auction confirms that neither party gave any indication that assignment to Boot Barn could violate Cavender's alleged rights under its own lease.  Knowing that Boot Barn was also an active bidder, Cavender's and the Landlord

deliberately concealed their deal from the Agent, Boot Barn, and the remaining auction participants.  The Court cannot find good faith on these facts.  *C.f. In re Pursuit Cap. Mgmt., LLC*, 874 F.3d 124, 137 (3d Cir. 2017) (finding good faith where bidder participated competitively in the auction); *In re Edwards*, 228 B.R. 552, 564–65 (Bankr. E.D. Pa. 1998) (finding good faith when bidders disclosed to the bankruptcy court the terms of an agreement between the parties). Cavender's prejudiced Boot Barn's participation in the Auction,[39] and its interference directly violated the Court's Order.[40]  The Court should not reward Cavender's underhanded conduct, especially when doing so would depress the value of the Debtors' property.

<u>**CONCLUSION**</u>

**WHEREFORE**, Boot Barn respectfully requests that the Court (i) overrule Cavender's Objection, (ii) enter an order authorizing and approving the Debtors' assignment of the Joann Murfreesboro Lease free and clear of any purported "tenant mix" restrictions set forth in the purported Fourth Amendment, and (iii) grant such other and further relief as the Court deems just and proper.

---

[39]   Boot Barn reserves all rights to recover consequential and punitive damages stemming from Cavender's brazen interference with Boot Barn's business dealings and prospective economic advantage.  *See In re Achaogen, Inc.,* 649 B.R. 238, 248 (Bankr. D. Del. 2023) (finding that back-up bidder's bad faith interference with consummation of sale to winning bidder supported claims of tortious interference with business relations, tortious interference with a prospective economic advantage, breach of implied covenant of good faith, and contempt resulting from willful violation of a court order).

[40]   *See* Sale Approval Order, at 22 ("all utilities, landlords, creditors, and other interested parties and all persons acting for or on their behalf shall not interfere with or otherwise impede the conduct of the GOB Sale or Store Closings.").

Dated: Wilmington, Delaware
        May 27, 2025

**YOUNG CONAWAY
STARGATT & TAYLOR, LLP**

*/s/ Robert S. Brady*
Robert S. Brady (No. 2847)
Kenneth J. Enos (No. 4544)
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
rbrady@ycst.com
kenos@ycst.com

**QUINN EMANUEL
URQUHART & SULLIVAN, LLP**
Susheel Kirpalani (*pro hac vice* pending)
Eric Kay (*pro hac vice* pending)
Rachel Harrington (*pro hac vice* pending)
295 Fifth Avenue
New York, New York 10016
Telephone: (212) 849 7000
susheelkirpalani@quinnemanuel.com
erickay@quinnemanuel.com
rachelharrington@quinnemanuel.com

*Counsel for Boot Barn, Inc.*