# EXHIBIT A

# LEASE AGREEMENT

**Between**

**Suburban Plaza LLC**
**"Landlord"**

**and**

**Jo-Ann Stores, LLC**
**"Tenant"**

Dated: ~~November~~ _December_ 8th, 2014

Store No. 2412, Suburban Plaza, Decatur, GA
EXECUTION VERSION: November 19, 2014
UB Document No. 1126865 v.1

# TABLE OF CONTENTS

| SECTION | HEADING | PAGE |
|---|---|---|
| SECTION 1. | EXHIBITS TO LEASE | 1 |
| SECTION 2. | DEFINITIONS | 2 |
| SECTION 3. | PREMISES | 7 |
| SECTION 4. | TERM AND OPTIONS TO EXTEND | 9 |
| SECTION 5. | FIXED MINIMUM RENT | 11 |
| SECTION 6. | INTENTIONALLY DELETED. | 11 |
| SECTION 7. | GROSS SALES. | 12 |
| SECTION 8. | TAXES | 14 |
| SECTION 9. | COMMON AREA COSTS | 17 |
| SECTION 10. | CONSTRUCTION OF PREMISES | 21 |
| SECTION 11. | USE | 26 |
| SECTION 12. | COMMON AREAS | 26 |
| SECTION 13. | UTILITIES | 27 |
| SECTION 14. | USE VIOLATION | 27 |
| SECTION 15. | CO-TENANCY | 28 |
| SECTION 16. | RULES AND REGULATIONS | 30 |
| SECTION 17. | ALTERATIONS, INSTALLATIONS AND IMPROVEMENTS BY TENANT | 30 |
| SECTION 18. | REPAIRS AND MAINTENANCE | 31 |
| SECTION 19. | INDEMNIFICATION | 33 |
| SECTION 20. | WAIVER OF CLAIMS | 33 |
| SECTION 21. | PROPERTY AND LIABILITY INSURANCE | 34 |
| SECTION 22. | SIGNS | 35 |
| SECTION 23. | ASSIGNMENT AND SUBLETTING | 36 |
| SECTION 24. | REPAIR AFTER CASUALTY | 37 |
| SECTION 25. | CONDEMNATION | 39 |
| SECTION 26. | REPRESENTATIONS AND COVENANTS OF LANDLORD | 40 |
| SECTION 27. | TENANT'S DEFAULT | 45 |
| SECTION 28. | RIGHTS OF LANDLORD | 47 |
| SECTION 29. | LANDLORD'S DEFAULT | 48 |
| SECTION 30. | MORTGAGE SUBORDINATION | 49 |
| SECTION 31. | NO WAIVER | 49 |
| SECTION 32. | SURRENDER OF PREMISES | 50 |
| SECTION 33. | SHORT FORM LEASE, COMMENCEMENT DATE AGREEMENT | 50 |
| SECTION 34. | NOTICE | 51 |
| SECTION 35. | HAZARDOUS MATERIALS | 51 |
| SECTION 36. | LIMITATION OF LANDLORD'S LIABILITY | 53 |
| SECTION 37. | DELIVERY OF SITE PLAN | 54 |
| SECTION 38. | INTENTIONALLY OMITTED | 54 |
| SECTION 39. | ENTIRE AGREEMENT; WRITING REQUIRED | 54 |
| SECTION 40. | OPERATING COVENANT | 55 |

Store No. 2412, Suburban Plaza, Decatur, GA
EXECUTION VERSION: November 19, 2014
UB Document No. 1126865 v.1

SECTION 41.    APPLICABLE LAW AND CONSTRUCTION............................................56
SECTION 42.    UNAVOIDABLE DELAYS................................................................56
SECTION 43.    REASONABLE CONSENT.............................................................56
SECTION 44.    NO PARTNERSHIP........................................................................57
SECTION 45.    ESTOPPEL....................................................................................57
SECTION 46.    QUIET ENJOYMENT....................................................................57
SECTION 47.    HOLDING OVER ..........................................................................57
SECTION 48.    BROKERS .....................................................................................58
SECTION 49.    INTENTIONALLY DELETED \f C \l ............................................58
SECTION 50.    CLAIMS LIMITATION..................................................................58
SECTION 51.    CAPTIONS.....................................................................................58
SECTION 52.    VARIATION IN PRONOUNS........................................................58
SECTION 53.    SECTION REFERENCES ..............................................................58
SECTION 54.    BINDING EFFECT OF AGREEMENT ..........................................59
SECTION 55.    ATTORNEY'S FEES .....................................................................59
SECTION 56.    OFAC WARRANTY.......................................................................59
SECTION 57.    PDF/COUNTERPART SIGNATURE ............................................59

Store No. 2412, Suburban Plaza, Decatur, GA
EXECUTION VERSION: November 19, 2014
UB Document No. 1126865 v.1

## LEASE

This Lease is made as of ~~November~~ *December 5th* 2014, between **Suburban Plaza LLC**, a Georgia limited liability company organized under the laws of Georgia ("Landlord"), and **Jo-Ann Stores, LLC**, an Ohio limited liability company ("Tenant").

Landlord and Tenant covenant and agree as follows:

## SECTION 1. EXHIBITS TO LEASE

(a)     The following Exhibits are attached to and made a part of this Lease, and are incorporated herein by reference:

Exhibit A.   The description of the lands upon which the Shopping Center is located.

Exhibit B.   The site plan showing the Shopping Center, the location of the Premises, as hereafter defined, the Shopping Center buildings, the Protected Area, the parking areas, driveways and common areas and containing other general information relative to the development of the Shopping Center Site (the "Site Plan").

Exhibit C.  The Scope of Work Matrix.

Exhibit D.  The FY16 22K Prototype Plans.

Exhibit D-1.  Tenant's Prototype Signage Plans.

Exhibit D-2.  Pylon Sign Rendering.

Exhibit E.  The Project Coordination Guidelines.

Exhibit F.  The Exclusive Uses and Prohibited Uses.

Exhibit G.  Form of Subordination, Non-Disturbance and Attornment Agreement.

Exhibit H.  Form of Estoppel Certificate.

Exhibit I.   Rules and Regulations.


(b)     If there is any conflict between the language in this Lease and the content of any of the aforementioned Exhibits, the content of the Exhibit shall control.


Store No. 2412, Suburban Plaza, Decatur, GA
EXECUTION VERSION: November 19, 2014
UB Document No. 1126865 v.1

**SECTION 2. DEFINITIONS**

The terms listed below have the respective meanings as follows:

(a)    "Additional Rent": Tenant's Proportionate Share of Taxes (Section 8), Tenant's Proportionate Share of Common Area Costs (Section 9), and Tenant's Proportionate Share of Insurance (Section 21).

(b)    "Commencement Date": (i) the 181st day after the Delivery Date, or (ii) the day that Tenant opens for business in the Premises, whichever day first occurs. Notwithstanding anything to the contrary in this Lease, unless Tenant otherwise opens for business, the Commencement Date will not occur until Tenant has received all required governmental permits, approvals, certificates of occupancy or equivalents thereto (collectively, the "Permits"); provided Tenant promptly applies for and diligently pursues obtaining the Permits. Notwithstanding the foregoing, in no event shall Tenant be required to open or commence the payment of Rent during the period commencing November 15 and ending the next occurring January 31 ("Blackout Period"); and, if the Commencement Date would otherwise occur in the Blackout Period (except for the reason that Tenant opens for business), the Commencement Date shall be deemed to be the first day after the expiration of the Blackout Period.  If Tenant opens during the Blackout Period, then the Commencement Date shall be the date of Tenant's Opening.

(c)    "Common Areas": the parking areas, driveways, aisles, sidewalks, landscaped areas, truck storage areas, mechanical rooms, service and related areas and improvements within the Shopping Center, whether open to the public generally or for the non-exclusive use of one or more tenants, and whether or not shown on Exhibit B attached hereto, but excluding the roof(s) and other common areas of the Shopping Center as they are or may be from time to time constituted.

(d)    "Default Rate": an annual rate of interest equal to three and one-half percentage points over the three-month London Interbank Offered Rate (LIBOR), as published in the Wall Street Journal as of the date of default.

(e)    "Delivery Date": the date that Landlord delivers the Premises to Tenant with all of the Delivery Requirements satisfied and Tenant accepts said delivery by written acknowledgment signed by Tenant's Senior Vice President of Real Estate or Store Development, Director of Store Development or Director of Construction and Facilities. Tenant shall not unreasonably delay, condition or refuse its acceptance of the Premises. The Delivery Date shall not occur prior to the Estimated Delivery Date (regardless of whether Landlord has satisfied the Delivery Requirements prior to that date), except with Tenant's express written consent, in its sole discretion.

(f)    "Delivery Requirements" means the following:

(1)    Landlord's Work is Substantially Complete (hereinafter defined);

(2)    the Premises are delivered to Tenant free and clear of any asbestos, and any Hazardous Material not in compliance with all environmental laws and Landlord represents and warrants as such;

(3)    Tenant has received from Landlord results from a slab moisture test indicating that the slab meets or exceeds the acceptable levels of slab moisture per ASTM 2170-2 (Rh 90% or below) (it is also understood and agreed between the parties that floor covering installation shall not occur until this subsection 2(f)(3) has been satisfied), said test must be performed by a certified testing company and shall include a floor plan indicating where the test locations are within the Premises;

(4)    all Common Areas have been substantially completed in accordance with all applicable Laws, including, without limitation, all paving of the parking lot, service areas and access roads, curbing (including curb cuts), site lighting, striping, sidewalks, loading dock area and landscaping; provided, however substantial completion of certain portions of the Common Area necessary to·complete renovations to the Shopping Center as shown on the Site Plan shall not be a Delivery Requirement; and

(5)    Landlord has provided Tenant with 90 days prior written notice of delivery.

(g)    "Estimated Delivery Date": Landlord's good-faith estimate of the Delivery Date is November 27, 2015.

(h)    "Gross Leasable Area": the number of square feet of floor area (excluding non-retail mezzanine, outdoor patio areas and basement), measured from the exterior face of exterior walls, the exterior building line for sidewalk or mall frontage, and the center line of party walls, with no deduction for columns, stairs, elevators, or any interior construction or equipment areas used exclusively by Tenant for the Premises.

With respect to the Shopping Center, the Gross Leasable Area is the total constructed Gross Leasable Area, from time to time, available for the exclusive use and occupancy of tenants within the Shopping Center. With respect to the Premises, the Gross Leasable Area will be the actual completed Gross Leasable Area, as the same exists from time to time. In addition, the space identified on Exhibit B as Suite 2619 (currently operating as a bowling alley) shall not be considered Gross Leasable Area of the Shopping Center except during such times as the space is open and operating for business to the general public.

Any change in Gross Leasable Area, whether of the Premises or Shopping Center, will be deemed in effect on the first day of the next succeeding month following such change. Landlord covenants to advise Tenant of any increase or decrease in the Gross Leasable

Area of the Shopping Center due to the construction or demolition or renovation of any buildings in the Shopping Center within 60 days of any such change, together with a current Site Plan reflecting such change.

Landlord represents that the buildings located on the Shopping Center, as shown on the Site Plan, after completion of renovations, are anticipated to contain approximately 325,000 gross leasable square feet.

(i)    "Hazardous Materials":  See Section 35.

(j)    "HVAC": heating, ventilating and air conditioning systems exclusively serving the Premises.

(k)    "Laws": any and all laws, codes, ordinances or regulations passed into existence by any Public Entity now or hereinafter in existence.

(l)    "Lease Year": a period of 12 consecutive calendar months during the Term. The first Lease Year (or Lease Year One) begins on the first day of February next following the Commencement Date, unless the Commencement Date is the first day of February, in which event the first Lease Year begins on the Commencement Date.   The first Lease Year will include the first Partial Lease Year, as defined below, if any. Rent and any limitations on such Rent for purposes of any Partial Lease Year will be proportionately adjusted based upon the actual number of days of such Partial Lease Year in relation to the number of days in a full Lease Year.

(m)    "Outside Delivery Date":  June 29, 2016.

(n)    "Partial Lease Year": the period, if any, of fewer than 12 consecutive calendar months between the Commencement Date and the next occurring  February 1and the period, if any, of less than 12 consecutive calendar months between the last day of the last Lease Year and the expiration of the Term.

(o)    "Permitted Use": any lawful retail purpose only, provided any lawful retail purpose shall not be in violation of (i) any exclusive uses, restricted uses or prohibited uses in the Shopping Center, as set forth on Exhibit F attached hereto, so long as such exclusive uses, restricted uses or prohibited uses of the existing tenants are in effect as of the effective date of Tenant's change in use and remain in effect; or (ii) exclusive uses, restricted uses or prohibited uses of any other lease then in effect with any other tenant in the Shopping Center of which the exclusive uses Landlord has given written notice of to Tenant prior to Tenant providing Landlord notice of Tenant's change in use; or (iii) the ECR.  Upon 10 days' written request from Tenant, Landlord will advise Tenant which exclusive uses, restricted uses and prohibited uses still encumber the Premises and will furnish to Tenant the documentary support therefor.

(p)    "Premises": a portion of the Shopping Center as shown on the Site Plan and

located within the Shopping Center, consisting of space having approximately 20,035 square feet of Gross Leasable Area, with approximately 135 feet of frontage as cross-hatched/outlined on the Site Plan.

(q)     "Protected Area": the area shown on the Site Plan as "Protected Area".

(r)     "Protected Use": the sale of any of the following: fabrics of all kinds, goods sold by the yard, upholstery materials (excluding furniture store), scrapbooks and scrapbooking materials and supplies, patterns, yarns and knitting supplies, needlepoint, macramé, artificial flowers and accessories, arts and craft materials and supplies, all types of notions related to sewing and fabrics, custom framing, sewing machines, sewing machine furniture, products, accessories and services related to all of the foregoing ("Exclusive Use Items").

(s)     "Public Entity": the federal, state, county, municipal or other governmental, public, quasi-governmental unit, however denominated, and any bodies, boards, agencies, divisions, departments, bureaus or public officials thereof, now or hereafter having jurisdiction, in any respect, over the Premises, the Shopping Center or Shopping Center Site.

(t)     "Rent": Fixed Minimum Rent, Additional Rent, Substitute Rent, Alternate Substitute Rent, Use Violation Rent, Co-Tenancy Rent, and all other monetary obligations of Tenant to Landlord under this Lease.

(u)     "Shopping Center": Suburban Plaza located in Decatur, GA, consisting of all buildings including the Premises and Common Areas, and other improvements located upon the Shopping Center Site, and outlined on Exhibit B attached hereto. A portion of the Shopping Center is leased to Wal-Mart Stores East, LP (such lessee, and its successors and assigns referred to as "Wal-Mart") such portion being depicted on the Site Plan as "Wal-Mart Tract" (the "Wal-Mart Tract"). The Shopping Center is further subject to the terms and conditions of that certain Easement with Covenants and Restrictions Affecting Land by and between Landlord and Wal-Mart recorded in the public records of DeKalb County, Georgia at Deed Book 24435, Page 127 (the "ECR"). This Lease and the terms hereof are subject and subordinate to the terms of the ECR. Furthermore, Tenant acknowledges that with respect to any obligations imposed in the Lease on Landlord related to the Shopping Center (including any obligations related to the Common Areas), Landlord shall not be required to perform such obligations on the Wal-Mart Tract provided that Landlord enforces the terms of the ECR requiring Wal-Mart to perform such obligations pursuant to the ECR, and for such purposes the term "Shopping Center" shall exclude the Wal-Mart Tract. Landlord hereby grants and warrants to Tenant, its successors and assigns, for the Lease Term, the non-exclusive right and easement appurtenant to and for the benefit of the Premises and any occupant thereof and its customers, employees, and invitees, to use, for purposes of access, ingress and egress, and parking all those certain access, ingress and egress, and parking easement areas granted to or established by Landlord under the ECR. Landlord warrants that: (a) to the best of its knowledge the ECR is in full force and effect without any existing violation or breach thereunder; and (b) the ECR does not prevent Tenant's use of the Premises as contemplated hereby. Landlord covenants to enforce the ECR to the



extent necessary to grant Tenant the rights and benefits hereunder. Landlord shall not amend or terminate the ECR without the written consent of Tenant to the extent it would have a material adverse affect on Tenant.

(v)    "Shopping Center Site": the legal description set forth on Exhibit A attached hereto, on which the Shopping Center is located.

(w)    "Substantially Complete": complete with the exception of minor "punch list" items that can be completed without significant interference with the performance of Tenant's Work in the Premises.

(x)    "Substitute Rent":  50% (or 75% during times that Tenant is required to pay Increased Substitute Rent) of the Fixed Minimum Rent in lieu of the Fixed Minimum Rent only otherwise required to be paid under this Lease.  Tenant is not obligated to pay any Fixed Minimum Rent at any time when Substitute Rent is payable pursuant to any provision of this Lease.  In addition, Tenant shall not be obligated to be open or operating the Premises during any period it is entitled to pay Substitute Rent.  Landlord acknowledges that certain violations of this Lease or specified events hereunder will cause Tenant significant damage, but that actual damages will be impossible to determine.  Landlord agrees that the violations and other events specified in the Lease where Tenant is entitled to pay Substitute Rent are in fact cases where Tenant will suffer significant damage, but that actual damages will be impossible to determine. Landlord has agreed to Substitute Rent as liquidated damages because actual damages are impossible to determine and so liquidated damages represent a fair compromise and is not a penalty.  Landlord has agreed to these provisions (and the entire Lease) voluntarily and after consultation with legal counsel.

(y)    "Tenant's Proportionate Share": a fraction, the numerator of which is the Gross Leasable Area of the Premises and the denominator of which is the Gross Leasable Area of the Shopping Center. Notwithstanding the foregoing, if any portion of Common Area Costs, Taxes, or Insurance Costs are furnished or directly payable by an individual tenant or occupant as opposed to Landlord, the cost of the item(s) furnished or payable by such tenant or occupant shall not be included in Common Area Costs, Taxes, or Insurance Costs, as the case may be, and the square footage of the tenant or occupant furnishing or paying for such item(s) shall not be included in the calculation of Tenant's Proportionate Share of such item(s). Tenant's Proportionate Share shall be adjusted in the event of any increase or decrease in the Gross Leasable Area of all buildings within the Shopping Center or the Gross Leasable Area of the Premises.

(z)    "Tenant's Work": the work, if any, to be performed by or at the direction of Tenant in finishing the Premises as provided in Tenant's Approved Plans, as hereafter defined.

(aa)    "Term": the Initial Term, as hereafter defined, and each Extended Term, as hereafter defined, if any, and any renewals or period of holdover tenancy.

(bb)    "Unavoidable Delay": A material delay beyond the reasonable control of the delayed party caused by labor strikes, lock-outs, extraordinary labor troubles, industry-wide inability to procure materials, failure of power, extraordinary restrictive Laws (such as gas rationing), riots, war, military or usurped governmental power, acts of terrorism, sabotage, material fire or other material casualty, severe weather (i.e., weather that is unusual and unanticipated at the time and date of scheduling of the activity based on historical weather patterns for the period in question for the vicinity of the Shopping Center), or an extraordinary and material act of God (such as a tornado or earthquake), but excluding inadequacy of insurance proceeds, litigation or other disputes, financial inability, lack of suitable financing, delays of the delayed party's contractor and failure to obtain approvals or permits unless otherwise caused by an event of Unavoidable Delay.

## SECTION 3.  PREMISES

(a)    For the Rent and upon the terms and conditions contained in this Lease, Landlord leases to Tenant during the Term, and Tenant leases from Landlord during the Term, the following:

(1)    The Premises as described in Section 2(p) hereof, outlined on the Site Plan and further described herein.

(2)    The right, subject to the ECR, in common with Landlord and all other tenants of the Shopping Center granted similar rights by Landlord, to the non-exclusive use of all Common Areas with the exception of short term parking spaces which Landlord may designate for use by particular occupants such as, for example, restaurant "to go" parking and dry cleaner pick-up.  The rights hereby granted with respect to the Common Areas shall constitute easements appurtenant to the Premises and a servitude upon the Shopping Center Site. The benefit and the burden of such easements shall run with and bind the Shopping Center Site.

(3)    Subject to all Laws and the ECR, the right to place shopping cart corrals ("Corrals") in Tenant's Protected Area in the parking lot and at, near or next to the outside of the Premises' entryway on the sidewalk. Tenant's Corrals shall take up no more than four parking lot spaces in the aggregate and the approximate location of the Corrals is shown on Exhibit B. Tenant will maintain the Corrals in good condition and repair. If Landlord receives notice that Tenant's Corrals violate any Laws or the ECR, then after receipt of notice from the governing body (or Wal-Mart, as applicable), Tenant will remove the violating Corrals.

(4)    Notwithstanding anything contained herein, but subject to the ECR, Tenant has the right to display merchandise on the sidewalk on both sides of the storefront door of the Premises, provided that by such display does

not extend beyond 30 feet in either direction and is at least 10 feet away from any adjacent tenant's premises, and further provided such sales shall (i) be conducted in a manner consistent with sidewalk sales in first-class shopping centers in the state in which the Shopping Center is located, (ii) not materially interfere with normal pedestrian access over the sidewalks, (iii) not materially interfere with the normal business operation of any other tenant in the Shopping Center or visibility of any other premises in the Shopping Center, and (iv) not be in violation of the ECR.

(b)    Subject to the reasonable consent of Tenant, Landlord expressly reserves the right to maintain, use, repair and replace the pipes, ducts, conduits, utility lines, tunneling and wires leading through the ceiling, plenum areas, columns, partitions, and within or under the floor slabs comprising part of the Premises, but only to the extent that such installations (i) are reasonably necessary to serve the Premises or other parts of the Shopping Center, (ii) are installed in locations that will not substantially interfere with Tenant's use of the Premises or Tenant's permitted signage, (iii) are not exposed within the selling area, excluding the sprinkler system, and (iv) do not decrease the ceiling height of the Premises.

Similarly, notwithstanding anything to the contrary in this Lease, Tenant shall have the right to make installations around the Premises (e.g., the roof) which are consistent with Tenant's Approved Plans for other similar stores operated by Tenant or which are part of Tenant's Leadership in Energy and Environmental Design initiative or other Tenant initiatives. So long as such installations conform to all warranties, if any, applicable to the roof of the Premises, and all Laws and the ECR with regard to Tenant's use, installation and maintenance of any roof installation including the use of (or supervised by) Landlord's roofing contractor in order not to void or impair the roof warranty. In exercising the foregoing rights, neither Landlord nor Tenant shall interfere with the use or occupancy of the Premises or other tenant premises or commence any such work without first notifying the other party, at least 10 days in advance, of the commencement of such work. In no event may Landlord construct any improvements above the Premises or place signs on the exterior walls of the Premises.

(c)    The "Premises" excludes the exterior walls, roof, and the floor slab (excluding floor covering installed by Tenant) and areas beneath the floor slab, and if Tenant installs a mezzanine in the Premises for the storage of inventory and/or fixtures, Tenant shall not pay any Rent on that space.

(d)    Within 60 days following the Commencement Date, upon request of either Landlord or Tenant, Landlord shall have its architect ("Landlord's Architect") measure the final Premises to determine the number of Gross Leasable Area of the Premises. If the area reflected by such measurement varies from that set forth in this Lease, then all items of Rent shall be appropriately adjusted, provided, however, that in no event shall any item of Rent be increased by more than 1% because of a variance in area of the Premises and in no event shall the Improvement Allowance be reduced from the amount set forth herein. If neither party requests a measurement within such 60 day period, then the area specified in this Lease shall be deemed

to be the Gross Leasable Area of the Premises. If Tenant disputes the measurement of Landlord's Architect, Tenant shall notify Landlord within five business days after receipt by Tenant of such measurement. Tenant shall then have 15 days to have an architect selected by Tenant ("Tenant's Architect") to measure the Premises using the procedures set forth herein. If Tenant's Architect disputes the findings of Landlord's Architect, both Architects shall meet in good faith for a period not to exceed 15 days and try to reach agreement on the number of leasable square feet. If the Architects can not reach agreement within such period, the Architects shall in good faith select a third, independent architect (the "Resolution Architect") to measure the Premises. The measurement of the Resolution Architect shall be final and binding on all parties. All fees and costs payable to Landlord's Architect shall be paid by Landlord. All fees and costs payable to Tenant's Architect, shall be paid by Tenant. Tenant and Landlord shall each be responsible for one-half of the fees and costs payable to the Resolution Architect.

## SECTION 4.  TERM AND OPTIONS TO EXTEND

(a)     The "Initial Term" begins on the Commencement Date and ends on the last day of the 10th Lease Year, unless sooner terminated as herein provided.

(b)     Landlord grants Tenant the right and option to extend this Lease for four additional periods of five years each (individually called an "Extended Term" and collectively called "Extended Terms"), commencing upon the expiration of the Initial Term or such prior Extended Term, as the case may be. Each Extended Term shall be upon the same terms, covenants and conditions as the Initial Term except for the option to extend then exercised and except for such changes, if any, in Rent as are expressly set forth in this Lease and except that Tenant will not receive any Improvement Allowance for any Extended Term.

(c)     Tenant must deliver written notice to Landlord of its election to extend this Lease for an Extended Term on or before the later to occur of the following: (1) the date that is 180 days before the expiration of the Term or the Extended Term, as the case may be; or (2) the date that is 30 days after Tenant's receipt of written notice from Landlord indicating that the time period in which Tenant has to exercise its option has expired. If the Term expires before such notice from Landlord, and Tenant continues in possession of the Premises after such expiration, the Term will be extended automatically on a month to month basis as provided in Section 47 hereof, or Tenant surrenders the Premises to Landlord, or Tenant exercises its option, in which case the Extended Term will be deemed to have commenced upon the expiration of the Initial Term (or prior Extended Term, as the case may be). Concurrently with the exercise of the option by Tenant, Tenant will pay Landlord any unpaid balance of the Rent due during the Extended Term that has accrued as of the date of such notice of extension.

(d)     Notwithstanding anything to the contrary in this Lease, if Tenant's annual Gross Sales for the Premises during the 12-month period commencing on the first day of the 37th month of the Term and ending on the last day of the 48th month of the Term ("Threshold Period"), do not exceed $110.00 per square foot of the Premises (the "Threshold Sales"), then Tenant may terminate this Lease, without further liability of either party to the other (except as

Store No. 2412, Suburban Plaza, Decatur, GA
EXECUTION VERSION: November 19, 2014
UB Document No. 1126865 v.1

set forth in this Lease to the contrary), by giving Landlord 12 months written notice of termination ("Notice to Terminate"), which notice must be given within 12 months after the expiration of the Threshold Period, and the Lease shall terminate on the date which is 12 months following the date of such Notice to Terminate. If the Lease terminates pursuant to this subsection, on or before the termination date, then Tenant agrees to reimburse Landlord for 80% of the unamortized Improvement Allowance and 80% of the unamortized Tenant's real estate broker commission paid by Landlord for the tenancy established under this Lease.

Notwithstanding anything in this Lease to the contrary, in the event Tenant has Gross Sales in excess of $135.00 per square foot of the Premises for any rolling 12 month period, Tenant's right to terminate under this subsection shall thereupon become void.

Notwithstanding anything in this Lease to the contrary, in the event the Tenant opens a new store within three miles of the Premises or the Premises is closed for any reason at any time during the Threshold Period (other than due to Unavoidable Delay, damage and destruction, eminent domain or permissible repairs or renovation to the Premises, which closures are referred to as "Allowed Closure(s)") ("Threshold Sales Voiding Condition"), Tenant shall be deemed to have waived its right to terminate this Lease under this Section 4 and the termination right established herein shall be null and void and of no further force and effect. The remedy set forth in the immediately preceding sentence, shall be Landlord's exclusive remedy should a Threshold Sales Voiding Condition occur. If there is an Allowed Closure through the end of the Threshold Period, then, for purposes of this provision, Tenant's Gross Sales for each day of Allowed Closure shall be Tenant's Gross Sales in the same day in the prior calendar year (or, if Tenant was not open for business in the prior calendar year, then from the same day two years prior to the day in question).

Landlord shall have the right to audit Tenant's statements of Gross Sales for the Threshold Period within 30 days of Landlord's receipt of the Notice to Terminate under this subsection, and Landlord shall provide Tenant with the results of such audit (the "Audit Results"). If the Audit Results reveal that Tenant's Gross Sales are in excess of the amount required for the exercise of the termination right, then Tenant shall have the right to dispute the Audit Results by sending Landlord, within 10 days after Tenant's receipt of the Audit Results, written notice specifying the reason(s) Tenant is disputing the Audit Results (the "Notice"). If Tenant fails to send the Notice within said 10-day period, then the Audit Results shall be deemed to have been approved and accepted by Tenant as correct, and Tenant's Notice to Terminate shall be withdrawn and this Lease shall continue in full force.

If Landlord and Tenant each dispute the other's findings, then Landlord and Tenant jointly shall elect an independent auditor to determine the actual Gross Sales for the relevant period. The costs of the third-party audit shall be borne by the non-prevailing party. In the event the independent auditor determines that Tenant's Gross Sales were understated to the extent that Tenant is not entitled to exercise the termination right, then the Notice to Terminate shall be withdrawn and this Lease shall continue in full force and effect.

## SECTION 5.  FIXED MINIMUM RENT

(a)     From and after the Commencement Date, Tenant must pay to Landlord, without demand or offset, unless specifically set forth elsewhere herein, at the address herein specified for notices to Landlord, Fixed Minimum Rent for the Premises as follows (which is calculated based on Gross Leasable Area of the Premises of 20,035 square feet):

(1)     During Lease Years one through 10 of the Initial Term at the rate of $12.00 per square foot per year ($240,420 per year; $20,035 per month); and

(2)     During the first five-year Extended Term at the rate of $15.00 per square foot per year ($300,525 per year; $25,043.75 per month); and

(3)     During the second five-year Extended Term at the rate of $16.00 per square foot per year ($320,560 per year; $26,713.33 per month); and

(4)     During the third five-year Extended Term at the rate of $17.00 per square foot per year ($340,595 per year; $28,382.92 per month); and

(5)     During the fourth five-year Extended Term at the rate of $18.00 per square foot per year ($360,630 per year; $30,052.52 per month).

(b)     Tenant must pay monthly installments of Fixed Minimum Rent in advance on or before the first day of each month during the Term, commencing on the first day of the first month next following the Commencement Date (unless the Commencement Date is the first day of the month, in which event the first monthly installment shall be due on the Commencement Date). Notwithstanding the foregoing, Landlord must invoice Tenant, which invoicing will not occur before the Commencement Date, for the first monthly installment of Fixed Minimum Rent. In no event will the first Rent installment be due until ten days after Tenant's receipt of this initial invoice. Fixed Minimum Rent for the partial month, if any, after the Commencement Date will be computed on a per diem basis (assuming a 30-day month), and Tenant must pay the Fixed Minimum Rent for such partial month concurrently with the first monthly installment. If Tenant fails to pay Rent on the due date and Landlord notifies Tenant in writing of such failure twice in any Lease Year, then if Tenant fails to pay Rent on the due date thereafter in the same Lease Year, then the Landlord, in addition to the Rent then owed, is entitled to a late fee of $100 plus interest at the Default Rate for such third late payment and any such other late payment of Rent thereafter during that Lease Year.

## SECTION 6.  INTENTIONALLY DELETED.

## SECTION 7.  GROSS SALES

(a)    "Gross Sales" means the entire amount of the actual receipts, whether cash or otherwise, from all sales of merchandise and services for all business conducted in, on or from the Premises, including mail or telephone orders received at the Premises and filled from the Premises or elsewhere (but excluding mail, telephone, internet or other orders filled at the Premises but originating elsewhere).  Each sale upon installment or credit shall be treated as a sale for the full amount thereof in the month during which such sale shall be made, irrespective of the time when Tenant shall receive payment (whether full or partial) from its customers.  Layaway sales, so-called, shall be included in the Gross Sales of the respective computation period only to the extent of payments received during that computation period.  Notwithstanding the foregoing, with respect to assignees, sublessees, concessionaires and licensees of Tenant that, together, occupy no more than 500 square feet of Gross Leasable Area, Tenant shall not be obligated to report and include with Tenant's Gross Sales, the sales generated by them, although any payments to Tenant by such entity will be included in Gross Sales.

(b)    Notwithstanding anything to the contrary, the following are excluded from Gross Sales:

(1)    sums collected and paid out for any sales tax or excise tax imposed by any duly constituted governmental authority;

(2)    the value or price of merchandise exchanged between the stores of Tenant, or the affiliates of Tenant, if any, where such exchange of merchandise is made solely for the convenient operation of the business of Tenant or the affiliate of Tenant and not for the purpose of consummating a sale which has been made at, in, from or upon the Premises, or for the purpose of depriving Landlord of the benefit of a sale which otherwise would be made at, in, from or upon the Premises;

(3)    the amount of returns to shippers or manufacturers;

(4)    sales to employees made at a discount, not to exceed 2% of Gross Sales per Lease Year;

(5)    non-sufficient funds check charges or financing charges to customers whether or not separately stated or billed;

(6)    service charges to customers who buy a budget or deferred payment plan;

(7)    revenue from gift certificates or gift cards until redeemed at the Premises;

(8)    revenue from vending machines used solely for the benefit of employees, provided such machines are located in an "employee only" area;

(9)     the amount of any cash or credit refund made upon any sale where the merchandise sold, or some part thereof, is thereafter returned by the purchaser and accepted by Tenant;

(10)    sales of fixtures not in the ordinary course of Tenant's business;

(11)    all sums and credits received in settlement of claims for loss or damage to merchandise;

(12)    non-retail bulk sales of merchandise outside of the ordinary course of business on the Premises;

(13)    tax exempt sales or merchandise donated or sold at a discount to charitable or non-profit organizations, not to exceed 2% of Gross Sales per Lease Year;

(14)    fees for classes or demonstrations to the extent not retained by Tenant;

(15)    the value attributed to merchandise taken in trade;

(16)    referrals to affiliates of or other divisions of Tenant;

(17)    fees for gift wrapping, mailing and other customer services provided on a not for profit basis (not to exceed 2% of Gross Sales in any Lease Year);

(18)    sales of lottery tickets, special event tickets and the like (but the commissions paid to Tenant shall be included in Gross Sales);

(19)    receivables that are reported as bad debts by Tenant for federal and state income tax purposes, provided that: (x) Tenant has taken reasonable steps to collect such receivables; (y) in any Lease Year, Tenant's exclusions for bad debts shall not exceed 1% of Gross Sales for such Lease Year; and (z) any amount that is excluded from Gross Sales pursuant to this clause but is later collected by Tenant shall be included in Gross Sales for the Lease Year in which the amount is received by Tenant; and

(20)    sale of patterns (not to exceed 1% of Gross Sales in any Lease Year).

(c)    Tenant will deliver to Landlord within 75 days after the end of each Lease Year a statement showing Gross Sales for such Lease Year.

(d)    If Tenant exercises its right to terminate this Lease under Section 4(d) above,

Landlord may cause an audit to be made of all of the books of account, documents, records, returns, papers and files of Tenant relating to Gross Sales made at, in, on or from the Premises during the Threshold Period. Tenant, upon at least 30 days' prior request by Landlord, shall make all such records available for such examination at the address specified in this Lease for notices to Tenant during regular business hours. Landlord must hold in strict confidence any information obtained from all such records and reports examined by it or by its designated agent.

## SECTION 8. TAXES

(a)     Landlord covenants and warrants that the entire Shopping Center Site is currently located on tax parcel identification number 18 049 04 028 (the "Tax Parcel"), that the Tax Parcel does not extend beyond the perimeter of the Shopping Center Site.

(b)     "Taxes" shall be defined as all real estate taxes, ad valorem taxes, assessments, assessed or imposed at any time by any Public Entity upon or against the Shopping Center or any portion thereof and all reasonable tax protest charges and fees.

(c)     Landlord shall bill to Tenant and Tenant must pay to Landlord during the Term, as the Term may be extended or renewed, Tenant's Proportionate Share of Taxes within 30 days after receipt of Landlord's statement, together with copies of receipted tax bills for which payment is sought and a reasonable assessment and verification for the computation of Tenant's Proportionate Share of Taxes for the Tax Year. "Tax Year" shall mean a 12 month period established by Landlord as the year for purposes of computing Tenant's Proportionate Share of Taxes. For the first Tax Year, Tenant shall pay no more than $2.30 per square foot of Gross Leasable Area of the Premises for Taxes; and, Landlord represents that $2.00 per square foot is its good faith estimate of the actual Taxes that would be due if Tenant were paying Tenant's full Proportionate Share of Taxes for said Tax Year.

(d)     In no event will Tenant pay for Taxes for a time period longer than the Term. For example, if the Term is 10 years, then notwithstanding if the Taxes are paid in advance contemporaneously, or in arrears to the taxing authority, Tenant will reimburse Landlord for Taxes paid during the 10 years of the Term, regardless of the period to which such payment relates.

(e)     Notwithstanding the foregoing, if the Premises, or a portion of the Shopping Center including the Premises, is separately assessed, then Tenant will pay, as Tenant's allocable share of Taxes, Tenant's fraction of Taxes, with Tenant's fraction being a fraction whose numerator is the Gross Leasable Area of the Premises and whose denominator is the Gross Leasable Area of all buildings within such separately assessed parcel.

(f)     A pro rata installment of Tenant's Proportionate Share of Taxes shall be due for the last Tax Year of the Term, if the Term, as same may be extended or renewed, for any reason terminates on a day other than December 31. The obligation of Tenant with respect to this Section 8 shall survive the termination date, unless extended or renewed, the recovery of

Tenant's Proportionate Share hereunder being a recovery for the Tax Year in which payable hereunder.

(g)    If any Taxes may be paid in installments, subject to the exclusions below, only the installments coming due during the Term will be included within Taxes. Landlord must use commercially reasonably efforts to minimize the Taxes assessed against the Tax Parcel.

(h)    Tenant must pay before delinquency all municipal, county and state taxes assessed during the Term against any leasehold interest and personal property of any kind, owned by or placed in, upon or about the Premises by Tenant.

(i)    Notwithstanding anything to the contrary, the following are excluded from Taxes:

(1)    The amount of any contributions for Taxes paid by any party having the right to use the Common Areas but not a tenant of the Shopping Center;

(2)    Any rollback, discount for timely or early payment, credit or reduction that has been granted or issued by any taxing authority or governmental group or agency;

(3)    Intentionally Deleted.

(4)    Any portion of the Taxes attributable to a revaluation of the Tax Parcel arising out of a sale or other change in the ownership thereof or of any interest therein more than once in any five year period;

(5)    Any portion of the Taxes in the nature of fees, charges or assessments for governmental services related to the initial construction or any alteration, expansion or rehabilitation of the Shopping Center or other improvement of the Tax Parcel (beyond the upkeep and repair of the Shopping Center that is necessary to keep the same in a good condition);

(6)    Any tax or fee that applies generally to all business owners or operators, as opposed to owners of real property;

(7)    Any impact fee, user fee, exaction fee, environmental fee or other tax paid as a prerequisite to construction of the Shopping Center, or any addition or improvement thereto;

(8)    Estate tax, inheritance tax, succession tax, capital levy tax, corporate franchise tax, margin tax, rent tax (unless in substitution of ad valorem tax or otherwise mandated by Laws), profits tax, gross receipts tax, income tax, conveyance fee or transfer tax;

(9)     Any assessment, bond, tax, or other finance vehicle that is (A) imposed as a result of Landlord's initial construction of the Shopping Center, or (B) used to fund construction of additions or improvements to the Shopping Center; and

(10)    Any penalty, interest or other charge attributable to Landlord's late or delinquent payment of Taxes that is not caused by Tenant's failure to timely pay Tenant's Proportionate Share of Taxes.

(j)     For each new determination by the taxing authority of the assessed value of the Shopping Center, Landlord shall have the duty to timely compare the then current value of the Shopping Center (utilizing the income approach, using a market capitalization rate) to the assessed value of the Shopping Center determined by the taxing authority. (For the purpose of this subsection, "market capitalization rate" shall mean the average rate used for sales of first class shopping centers of similar size to the Shopping Center located in the county (and the next closest counties, as needed, until at least five comparable sales have been located) within which the Shopping Center is located during the 12 month period immediately preceding the date of appraisal by the taxing authority). If the value determined by Landlord is 5% or more less than the value determined by the taxing authority, then Landlord shall be required to timely pursue, a reduction in the assessed value determined by the taxing authority through whatever means as are customary in the jurisdiction where the Shopping Center is located, including the filing of an appeal of the assessed value, if necessary (for example, it may be customary in a given jurisdiction to commence a dialog with the assessor in order to reduce the assesses value of the Shopping Center, prior to filing a formal application or appeal with the board of review or other body have jurisdiction over such matters). The cost for pursuing the reduction in assessed value as outlined in the immediately preceding sentences of this subsection shall be included in Taxes, and Tenant shall be responsible for Tenant's Proportionate Share thereof. Throughout the process of determining the value of the Shopping Center and seeking a reduction, Landlord shall communicate with Tenant and provide Tenant the opportunity to participate, at Tenant's discretion. If Landlord successfully contests the assessed value of the Shopping Center and a resulting refund or credit in Taxes occurs, such refund or credit shall be paid or applied to the party(ies) that actually paid or will pay such Taxes (it being understood that if Taxes are paid by Landlord and Landlord is reimbursed by Tenant, Tenant shall be the party that has "paid" or "will pay" such Taxes for purposes of this subsection). If Landlord fails to comply with the terms of this subsection (for example, fails to timely file an application for reassessment of value of the Shopping Center), then commencing in the year that said failure occurred and continuing during the remainder of the Term until Landlord complies with the terms of this subsection, and notwithstanding anything to the contrary in this Lease, Tenant's Proportionate Share of Taxes shall not increase by more than 5% per Tax Year (non-cumulative basis) above that amount actually paid by Tenant for the previous Tax Year.

Store No. 2412, Suburban Plaza, Decatur, GA
EXECUTION VERSION: November 19, 2014
UB Document No. 1126865 v.1

## SECTION 9.  COMMON AREA COSTS

(a)     Landlord shall bill to Tenant and Tenant must pay to Landlord during the Term, as the Term may be extended or renewed, concurrently with monthly Fixed Minimum Rent, without demand or offset, unless specifically set forth elsewhere herein, Tenant's Proportionate Share of the estimated Common Area Costs.

(b)     "Common Area Costs" shall be defined as Landlord's reasonable and actual costs applicable to all expenses and costs arising out of or related to the operating, managing, policing, advertising, equipping, lighting, painting, cleaning, repairing, replacing, resurfacing, paving, repaving, administering and maintaining the Shopping Center and all portions and components thereof, including, without limitation, the roof of the Shopping Center (including all roof repairs but excluding roof replacement), and the Common Areas, including, without limitation, landscaping (including, without limitation, irrigating, fertilizing, mulching, strawing, planting, replanting and replacing flowers, trees, shrubs and grass), repairing or maintaining utilities, and lighting, traffic control, sanitary assessments and services, removal of snow, trash, rubbish, garbage and other refuse, security services, pest control, such marketing and promotional efforts for the benefit of the Shopping Center as are selected by Landlord and rental fees for machinery or other equipment with respect to such maintenance, all costs for or associated with supplies, material and personnel to implement any of the foregoing, and all occupational taxes and similar taxes, and all business license fees and expenses, all as determined by Landlord, and 5% of all the foregoing costs to be applied against administrative expenses with respect to such Common Area Costs.

(c)     Within 120 days following each annual period from January 1 through December 31 ("Calendar Year") during the Term or any extension thereof, Landlord shall deliver to Tenant, together with supporting documentation of Common Area Costs, a written estimate (on a line item basis) of Tenant's Proportionate Share of Common Area Costs for the ensuing Calendar Year showing in reasonable detail the Common Area Costs incurred by Landlord for the operation and maintenance of the Common Areas during such Calendar Year. Such estimate shall not differ materially from the prior year's estimate without a reasonable written explanation from Landlord. At any time, and from time to time, before, on or after the expiration of the first Calendar Year or any subsequent Calendar Year during the Term, as the Term may be extended or renewed, Landlord may estimate or revise the estimate of the costs and expenditures for Common Area Costs for the remainder of the Calendar Year or the ensuing Calendar Year, which determination may be based in whole or in part upon the expenses for the preceding or ensuing Calendar Year as increased by any known or anticipated increases in the cost of Common Area Costs, or by any combination thereof, together with Landlord's determination of Tenant's Proportionate Share thereof, and Landlord shall be entitled to notify Tenant of the monthly sum to be paid by Tenant to Landlord during the remaining months of such Calendar Year or the next ensuing Calendar Year. Upon each such determination of Tenant's Proportionate Share of Common Area Costs, as provided herein, Tenant shall make such payments in such amounts as are provided herein until receipt of notice from Landlord of any change in such amounts. Any deficiencies in the payments made by Tenant shall be paid by

Tenant to Landlord within 30 days of receipt of demand therefor. Any surplus paid by Tenant during the preceding Lease Year shall be applied against the next sums due from Tenant or, if at the end of the Term, shall be refunded to Tenant. For Calendar Years after the first Calendar Year, the monthly sum may be adjusted annually by Landlord to reflect actual changes in the Common Area Costs, subject to the cap in subsection (d) below.

(d)     Tenant shall be responsible for Tenant's Proportionate Share of Common Area Costs. The Common Area Costs for the first Calendar Year (or the portion thereof falling within the first Calendar Year) are estimated to be $1.25 per square foot, and shall not exceed $1.44. Tenant's Proportionate Share of Common Area Costs for each Calendar Year after the initial Calendar Year (or portion thereof) shall be equal to Tenant's Proportionate Share of the Common Area Costs for the previous Calendar Year on an annualized basis in the event the initial Calendar Year of the Term is less than twelve months, increased by no more than 5% (the "Common Area Costs Cap"). In no event shall the Common Area Costs reimbursable by Tenant with respect to any Calendar Year during the initial Term or any extension thereof exceed the Common Area Costs Cap for such Calendar Year, excluding increases attributable to utilities, Insurance Costs, security and snow removal costs.

(e)     The payment of such Common Area Costs is in consideration of Landlord's maintenance and operation of the Common Areas, and Landlord must use such payment for that purpose.

(f)     Notwithstanding anything to the contrary, the following are excluded from Common Area Costs:

(1)     the original cost, or depreciation of the original cost, of constructing, erecting and installing the Shopping Center, the Common Areas, common facilities and related services;

(2)     principal and interest payments pursuant to any mortgage that encumbers the Premises or Shopping Center;

(3)     Taxes, but this exclusion does not limit Landlord's rights of reimbursement, if any, under Section 8;

(4)     administrative charges in excess of the 5% administrative fee as set forth in Section 9(b) herein, management fees, fees based upon a percentage calculation, leasing commissions or any other fee or charge regardless of the name (including, without limitation, salaries of all kinds, social security, taxes, insurance, part-time or full-time labor, any fees paid to manage the Shopping Center including those paid to a third party management company, and similar costs and expenses) that is related to the management and operation of the Shopping Center;

(5)     expenses incurred due to the gross negligence or willful misconduct of Landlord or any occupant of the Shopping Center or their respective agents or employees;

(6)     costs and expenses incurred for repairs or replacements due to faulty construction, faulty workmanship or structural defects;

(7)     expenses related to an individual occupants of the Shopping Center or to a particular tenant space, or to buildings;

(8)     any cost, fees, fines or penalties, or interest thereon, related to violations by Landlord or any occupant of any Laws; and the cost of compliance with Laws enacted after the date hereof;

(9)     capital expenditures (a capital expenditure is defined as an item or items costing $1,000 or more and having a useful life of at least one year); other than a "Permitted Capital Expenditure." A Permitted Capital Expenditure is limited to the following:  repaving of the parking lot(s) not more frequently than once every seven years; provided, however, that each Permitted Capital Expenditure must be amortized on a straight-line basis over the useful life of the related improvement based on Generally Accepted Accounting Principles (GAAP), but in no event less than seven years, and only the amount of the annual amortization shall be included in Common Area Costs for any Lease Year within the useful life so determined;

(10)    reserves for replacement;

(11)    costs for insuring the Common Areas, but this exclusion does not limit Landlord's rights of reimbursement, if any, under Section 21;

(12)    cost of advertising, marketing, decorating, redecorating, or special cleaning or other services not provided on a regular basis;

(13)    all costs and expenses relative to the solicitation and execution of leases for space in the Shopping Center;

(14)    all costs and expenses related to the operation, maintenance and repair of any garage space in the Shopping Center;

(15)    the cost of any repair or replacement made by Landlord because of the total or partial destruction of the Shopping Center or the condemnation of a portion of the Shopping Center or the Shopping Center Site;



(16)     any operating expense paid to a related corporation, entity or person that is in excess of that amount that would have been paid absent such relationship;

(17)     the cost of overtime or other expenses incurred by or on behalf of Landlord to correct any default of Landlord or for work performed by or on behalf of Landlord where such work is expressly provided in this Lease or any other lease the cost of which was/is to be borne at Landlord's expense;

(18)     any cost that is paid or reimbursed by third parties, including warranties and guarantees and including any cost that is paid or reimbursed by insurance (or would have been covered by insurance required to be maintained by Landlord);

(19)     the amount of any insurance deductible or self-insured retentions;

(20)     payments made under any easement, operating agreement, license, restrictive covenant, or any instrument relating to the payment or sharing of costs among property owners;

(21)     costs disproportionately incurred by or on behalf of one or more tenants; and

(22)     costs and expenses incurred with respect to the correction, disposal, investigation, removal, transportation, or treatment of Hazardous Materials, unless such costs are due to Tenant; and

(23)     the amount of any contributions toward Common Area Costs paid by tenants paying such costs directly to a third-party provider or any party not a tenant of the Shopping Center.

(g)     Provided Tenant is not in default hereunder beyond any applicable notice and cure period, Tenant shall have the right to audit the Common Area Costs, Taxes and Insurance Costs for which Landlord has billed Tenant, subject to the following conditions:

(1)     Tenant gives Landlord 10 business days' prior written notice of Tenant's intent to audit;

(2)     The audit occurs during Landlord's normal business hours and in Landlord's principal offices;

(3)     Tenant may only audit the applicable records and books once during each Tax Year, Calendar Year or Insurance Fiscal Year (collectively, the

"Audit Period");

(4)     The audit must be conducted and completed within 12 months after Tenant receives the reconciliation report for the applicable Audit Period;

(5)     Tenant provides Landlord a copy of the auditor's report; and

(6)     Tenant shall keep the results of such audit and Landlord's books and records strictly confidential (except Tenant may share with its attorneys, accountants and other agents and employees on a need-to-know basis).

Notwithstanding anything to the contrary in this Lease, if Tenant's audit determines that Tenant overpaid Landlord, Landlord shall refund to Tenant the amount overpaid within 30 days after receipt of Tenant's written request therefor. If Tenant overpaid Landlord by more than 5%, Landlord also shall pay to Tenant, upon written demand, the reasonable and actual cost of the audit or examination, said cost not to exceed $3,500.00.

(h)     Landlord must use commercially reasonable efforts to keep Common Area Costs to a minimum subject, however, to the obligation of Landlord to maintain the Shopping Center as a first-class retail project.

(i)     Landlord covenants that there will be no duplication of costs between those payable by Tenant within this section and under this section and any other section of this Lease.

## SECTION 10.   CONSTRUCTION OF PREMISES

(a)     On or before the date that is 90 days before the Estimated Delivery Date (the "Plans Delivery Date"), Landlord must prepare and submit to Tenant for Tenant's approval proposed plans and specifications (the "Landlord's Proposed Plans"), which Landlord's Proposed Plans will conform in all material respects to Tenant's Prototype Plans, subject to such changes as may be required by Laws or which are reasonable given the unique conditions of the Premises. If Tenant fails to approve or disapprove, in writing, the Landlord's Proposed Plans within 15 days after receipt thereof from Landlord, then such approval will be deemed to have been granted. If Tenant furnishes Landlord a written response, Landlord agrees to resubmit revised Landlord's Proposed Plans within 30 days after having received Tenant's response and Tenant will then have a 10-day period within which to review the same. If Tenant fails to respond within said 10 days, then such revision will be deemed approved. Such review process will continue, with each party exercising good faith, until the Landlord's Proposed Plans are acceptable to both Landlord and Tenant (said approved Landlord's Proposed Plans shall be referred to as the "Landlord's Approved Plans"). If the parties do not reach agreement on Approved Plans within 180 days after their first submission to Landlord, despite good faith efforts by Landlord and Tenant, either party may terminate this Lease upon written notice to the other within 15 days after expiration of such 180-day period.

(b)     Landlord must perform its work shown on Landlord's Approved Plans in accordance with Landlord's Approved Plans and Exhibit C, and any other items set forth on Exhibit C, at no cost to Tenant, in accordance with the terms of this Lease, the project coordination guidelines (Exhibit E), and in accordance with all Laws ("Landlord's Work"). In the event of a conflict between Landlord's Approved Plans and either Exhibit C or Exhibit E, Landlord's Approved Plans shall govern. Landlord will, at Landlord's sole cost and expense, apply for and receive from the appropriate Public Entity a temporary certificate of occupancy (or equivalent) if required in order for Tenant to be able to complete Tenant's Work. So long as shown on Landlord's Approved Plans, Landlord or Landlord's agent shall coordinate and be responsible for the installation of access for telephone service, which "installation" shall include (i) conduit installation with pull string from the local telephone company's main point of entrance to the Premises, (ii) installation of a plywood board allowing termination of service by the local phone company within the Premises, and (iii) installation of #6 ground rod. The installation access for telephone service must be complete 60 days prior to the Delivery Date and Landlord shall notify Tenant of such completion (it being agreed and understood that, at Tenant's option, the Delivery Date may be delayed on a day-for-day basis for each day the installation of the telephone service remains incomplete after said date). Subject to Unavoidable Delays and delays caused by Tenant. Landlord must deliver to Tenant the Premises no later than the Estimated Delivery Date in compliance with all Laws and free of all Hazardous Material.

(c)     Within 30 days after approval of Landlord's Approved Plans, Tenant, at its sole cost and expense, must deliver to Landlord for Landlord's approval, a copy of Tenant's proposed plans and specifications and Sign Drawings (the "Tenant's Proposed Plans"), which can be completed only after completion of Landlord's Approved Plans. Landlord shall not unreasonably withhold its approval of Tenant's Proposed Plans. If Landlord fails to approve or disapprove, in writing, the Tenant's Proposed Plans within 15 days after receipt thereof from Tenant, then such approval will be deemed to have been given. If Landlord furnishes Tenant a written response, Tenant will resubmit revised Tenant's Proposed Plans within 10 days after having received Landlord's response, and Landlord will then have a 10-day period within which to review the same. If Landlord fails to respond within 10 days, then such revision will be deemed approved. Such review process will continue until the Tenant's Proposed Plans are acceptable to both Landlord and Tenant (said approved Tenant's Proposed Plans shall be referred to as the "Tenant's Approved Plans"), whereupon the same will constitute the Tenant's Approved Plans. In no event shall Landlord object to any part of Tenant's Proposed Plans to the extent it is consistent with Tenant's Prototype Plans. Within 15 days of Tenant's receipt of Tenant's Approved Plans, Tenant shall apply for all required governmental permits and approvals necessary for Tenant's Work, and Tenant shall diligently pursue obtaining such permits and approvals. If Tenant is unable to secure the required governmental permits and approvals within 60 days of Tenant's application therefore ("Permit Period") despite good faith efforts, then Landlord shall have the right to pursue such permits and approvals on behalf of Tenant for an additional 60 days (said 120 day period is hereinafter referred to as the "Permit Period"). If the required governmental permits and approvals have not been obtained during the Permit Period, despite good faith efforts by Tenant, Tenant shall have the right to terminate this

Lease by delivering written notice to Landlord of its intent to terminate the Lease to the Landlord within 30 days after the end of the Permit Period. If Tenant fails to exercise its right to terminate this Lease during said 30 day period, the right to terminate established under this section shall be null and void. After delivery of the termination notice to Landlord, Tenant shall be relieved of all obligations under this Lease and shall not be liable to Landlord for damages or otherwise.

(d)    Landlord represents, warrants and covenants to Tenant that on the Delivery Date all vestiges of prior tenant signage, including holes, mountings and coloration, shall be removed ("Prior Signage") and the Premises will comply with all Laws, including, without limitation, all Laws with respect to Hazardous Material, and: (i) if any Prior Signage is present, then Landlord must perform such removal or Tenant may, at its option, remove the Prior Signage and Landlord must reimburse Tenant within 30 days for Tenant's cost of such removal, abatement or remediation, and if not so reimbursed, Tenant may deduct the cost from Rent; (ii) if any Hazardous Material present on the Delivery Date, not caused by Tenant, is required by Law to be removed, abated, or otherwise remediated, then Landlord must perform such removal, abatement or remediation; or (iii) with respect to Hazardous Material if, as a result of, or as a condition to, Tenant's Work, any Hazardous Material is required by Law to be removed, abated, or otherwise remediated, then Tenant may, at its option, but upon 10 days prior notice to Landlord and approval by Landlord of the party Tenant engages to perform such work, remove, abate or otherwise remediate such Hazardous Material and Landlord must reimburse Tenant within 30 days for Tenant's reasonable and actual cost of such removal, abatement or remediation, and if not so reimbursed, Tenant may deduct the cost from Fixed Minimum Rent, but no such deduction shall exceed 50% of Fixed Minimum Rent in any month. Notwithstanding anything to the contrary in this Lease, if removal, abatement or remediation is required under Subsection 10(d)(ii) or (iii) hereof ("Remediation Period"), then the Commencement Date shall be delayed on a day for day basis for each day of the Remediation Period.  Tenant may hereafter perform a slab moisture test to determine if the slab meets or exceeds the acceptable levels of slab moisture per ASTM 2170-2 (Rh 90% or below).  If the test establishes that the slab moisture does not meet or exceed such level, Landlord will reimburse Tenant within 10 days after the Delivery Date Tenant's reasonable and actual costs to remediate same, not to exceed $2.00 per square foot of floor slab.

(e)    Tenant shall hereafter, upon at least 24 hours notice, have access to the Premises for inspection, taking measurements and, making plans as may be appropriate or desirable by Tenant without being deemed thereby to have taken possession or accepted delivery of the Premises; provided, however, that Tenant shall not, during the course of such entry, materially interfere with the performance of Landlord's Work and shall indemnify, defend and hold Landlord harmless from and against any and all claims or losses arising from Tenant's entry upon the Premises, except to the extent caused by Landlord, its agents, employees or contractors. In no event will Tenant be required to accept delivery of the Premises unless and until all the Delivery Requirements have been satisfied.

(f)    The Delivery Requirements must be satisfied on or before the Estimated Delivery

Date. If any punch list items (hereinafter defined) remain to be completed on the Delivery Date, the Delivery Date will be deemed to have occurred, but Landlord shall complete the same as promptly as possible (and in any event within 30 days after the Delivery Date or such longer period as may be reasonably required not to exceed 90 days in any event as long as Landlord commences such work within such 30-day period and thereafter diligently completes same without unreasonably interfering with the performance of Tenant's Work or Tenant's opening for business in the Premises) without unreasonably interfering with the performance of Tenant's Work. If any punch list items are not completed within such time, Tenant, after at least 48 hours notice to Landlord, may complete the punch list items, and Landlord shall reimburse Tenant for the reasonable cost thereof upon demand. "Punch list items" shall mean such minor items of fit or finish which do not affect either the performance of Tenant's Work or Tenant's ability to conduct its normal business operations in the Premises, as determined in Tenant's sole discretion.

(g)     Subject to Unavoidable Delays and Tenant caused delay, if the Delivery Date does not occur by the Estimated Delivery Date, Landlord must pay Tenant $25,000.00 (the "Lump Sum Payment"). In addition, Landlord must pay Tenant $1,500.00 for each day of delay (the "Per Diem Payment") between the Estimated Delivery Date and the earlier to occur of (i) the Delivery Date, or (ii) the date Tenant terminates this Lease in accordance with Section 10(h). If Landlord fails to pay Tenant the Lump Sum Payment and/or the Per Diem Payment, then Tenant will have the right (without limiting any other right or remedy of Tenant to collect such payment) to deduct such amount, together with interest thereon at the Default Rate, from Fixed Minimum Rent, but no such deduction shall exceed 50% of Fixed Minimum Rent due in any month. Landlord and Tenant agree that it will be difficult to determine the precise amount of damages that Tenant will incur as a result of the failure of the Delivery Date to occur by the Estimated Delivery Date. Therefore, Landlord and Tenant agree that the Per Diem Payment and the Lump Sum Payment constitute liquidated damages for such failure. If the Delivery Date does not occur by the Estimated Delivery Date, said liquidated damages shall be payable to Tenant irrespective of the date Tenant actually opens for and conducts business in the Premises and shall be payable to Tenant irrespective of whether Tenant enters or accepts the Premises before the completion of Landlord's Work. As used herein, a "Tenant caused delay" means a failure of Tenant to perform when and as required hereunder which is not a result of Unavoidable Delay and which is not cured by Tenant within two business days after written notice specifically providing that Tenant's failure to cure will be a "Tenant caused delay" hereunder.

(h)     If the Delivery Date has not occurred on or before the Outside Delivery Date, and such failure is not caused by Tenant caused delay or Unavoidable Delay, then Tenant has the right to terminate this Lease by delivering written notice to Landlord at any time from and after the Outside Delivery Date but before the occurrence of the Delivery Date. After delivery of Tenant's notice of termination, Tenant shall be relieved of all obligations and liability hereunder. If Tenant so terminates this Lease, Landlord shall be liable to Tenant for all payments due Tenant under Section 10. In addition, Landlord within 30 days must reimburse Tenant for all legal fees incurred by Tenant in connection with this Lease not to exceed

$10,000.00. This Section 10(h) survives the termination of this Lease.

(i)     Landlord shall pay to Tenant as a construction allowance an amount equal to $601,050.00, based on $30.00 per square foot (the "Improvement Allowance"). The foregoing Improvement Allowance represents a portion of Landlord's contribution toward Work required by Tenant to initially open for business in the Premises and shall be paid to Tenant in accordance with the following terms and conditions:

(1)     Within 30 days after Landlord receives from Tenant (i) written certification that 25% of the leasehold improvements have been fully completed in compliance with all Laws, (ii) valid partial lien waivers, and (iii) AIA Application and Certification of Payment, Landlord shall reimburse Tenant 25%, or $150,262.50, of the Improvement Allowance.

(2)     Within 30 days after Landlord receives from Tenant (i) written certification that 50% of the leasehold improvements have been fully completed in compliance with all Laws, (ii) valid partial lien waivers, and (iii) AIA Application and Certification of Payment, Landlord shall reimburse Tenant 25%, or $150,262.50, of the Improvement Allowance.

(3)     Within 30 days after Landlord receives from Tenant (i) written certification that 75% of the leasehold improvements have been fully completed in compliance with all Laws, (ii) valid partial lien waivers, and (iii) AIA Application and Certification of Payment, Landlord shall reimburse Tenant 25%, or $150,262.50, of the Improvement Allowance.

(4)     Within 30 days after Landlord receives from Tenant (i) a copy of the Certificate of Occupancy, or its equivalent, (ii) written certification that such improvements have been fully completed in compliance with all Laws, (iii) AIA Application and Certification of Payment, (v) Tenant's "as built" drawings, and (vi) an executed "Final Affidavit and Lien Waiver" on Landlord's form, Landlord shall reimburse Tenant the final 25%, or $150,262.50, of the Improvement Allowance.

(5)     If Landlord fails to pay Tenant any portion of the Improvement Allowance in accordance with this Lease, then Tenant will have the right (without limiting any other right or remedy of Tenant) to deduct such amount from Rent (as a setoff or as recoupment in the case of bankruptcy), together with interest thereon at the Default Rate. Landlord will wire-transfer the Improvement Allowance to Tenant's bank as follows: Bank of America, 100 West 33rd Street, New York, NY 10001, ABA : 026009593 (in the event Landlord elects to submit an ACH transmission, the number is: 111000012); Jo-Ann Account No.: 4427216208; Account Name: Jo-Ann Stores, LLC Store #2412.

(6)     If (x) a portion of valid lien waivers and valid releases are delivered to Landlord, then Landlord shall release funds to Tenant to the extent said lien waivers and releases are provided, or (y) the valid lien waiver and valid release is not provided, in no event shall the balance of the Improvement Allowance due Tenant be withheld beyond the statutorily defined period in which liens may be filed, if no liens have been filed during said period, and no other legal grounds exist for the filing and maintenance of valid liens and Tenant shall furnish, at Tenant's expense, an endorsement to Landlord's title insurance policy affirmatively insuring over the validity of such lien or release of lien; and Tenant shall fully indemnify Landlord against the filing or maintenance of any such lien. If Landlord fails to pay Tenant any portion of the Improvement Allowance in accordance with this section of this Lease, then Tenant will have the right (without limiting any other right or remedy of Tenant) to deduct such amount from Rent (as a setoff or as recoupment in the case of bankruptcy), together with interest thereon at the Default Rate.

## SECTION 11.  USE

The Premises shall be only used for the Permitted Use set forth in Section 2(o).

## SECTION 12.  COMMON AREAS

(a)     Landlord, at its own cost and expense (except as Landlord is reimbursed by Tenant under Section 9 or Section 21) must construct, install, operate, manage, repair and maintain the Common Areas in a neat and clean condition for the benefit of Tenant and Tenant's customers, employees, licensees and invitees. Landlord's obligations with respect to the Common Areas include, but are not limited to:

(1)     Equipping and lighting the Common Areas;

(2)     Maintaining the surfaces of all sidewalks, restriping and maintenance of paved and parking areas in a level, smooth and evenly covered condition with the type of surfacing material originally installed or such substitute as shall in all respects be equal in quality to the original;

(3)     Removing all ice and snow, papers, mud and sand, debris, filth and refuse and thoroughly sweeping the Common Areas to keep them in a clean and orderly condition;

(4)     Placing, keeping in good condition and repair and replacing all utility lines, any necessary appropriate directional signs, markers and curbs;

Store No. 2412, Suburban Plaza, Decatur, GA
EXECUTION VERSION: November 19, 2014
UB Document No. 1126865 v.1

- 26 -

(5)     Maintaining, trimming and watering, mowing and weeding all landscaped areas and making such replacements of shrubs and other landscaping as is necessary.

(b)     Landlord may close any Common Areas temporarily, at such times as to cause the least possible interruption or interference with Tenant's business, to make repairs or changes, to prevent the acquisition of public rights in such Common Areas or to discourage non-customer parking; but, in no event will the Protected Area be closed (except in the event of an emergency or due to Laws) without the prior reasonable consent of Tenant. In no event shall Landlord designate the Protected Area as an employee parking area.

(c)     Landlord must keep the Common Areas clean and well lighted from dusk until at least one-half hour after the close of Tenant's business and remove snow from the parking areas, driveways and sidewalks as promptly as possible. Landlord cannot impose any parking charges for the parking of automobiles in the parking areas. Landlord cannot grant any rights in, or permit special or exclusive use of, the sidewalk space or parking areas immediately in front of the Premises or in the exterior area near the rear door of the Premises.

## SECTION 13.  UTILITIES

Landlord, at its sole cost and expense, must cause all utilities furnished to the Premises to be separately metered (or sub-metered as related to water only) so that only the service provided to the Premises will be reflected in utility bills rendered to Tenant by the respective supplying public utility companies. Tenant must pay, when due, bills for utilities furnished to the Premises by public utility companies from and after the Delivery Date, including water, gas, electricity and telephone and the like, as are separately metered and charged directly to Tenant. Tenant shall be responsible for only those utilities that are separately metered (or sub-metered as related to water only) as provided herein.

## SECTION 14.  USE VIOLATION

So long as Tenant is (A) not in material uncured monetary default under the Lease, (B) open for business to the general public in all of the Premises as a fully-staffed, fully-stocked and fully-fixtured store, and is being primarily used full-time for the Protected Use: Landlord shall not, after the date of this Lease (it being acknowledged that tenants operating under leases executed prior to this date or this Lease shall not be subject to the this covenant), knowingly and intentionally sell or lease to any party other than Tenant for use in any premises in the Shopping Center other than the Premises (the "Other Premises") to a party other than Tenant (the "Other Tenant") whose primary use is the Protected Use, nor shall Landlord give an approval where Landlord has the sole right to object, to any Other Tenant to utilize any Other Premises for the primary use as the Protected Use (the "Leasing Covenant"). The Leasing Covenant is not an "exclusive" right granting Tenant the right to be the only premises in the Shopping Center utilizing the Protected Use, but is rather only a "personal" leasing covenant, which does not run with the land, between Landlord and Tenant, and shall not in any way prohibit Landlord from entering into a retail lease containing an "open" use clause or other use clause which does not

restrict any Other Tenant's use (i.e., a provision permitting any lawful retail use or words of similar import). Moreover, the Leasing Covenant shall not restrict Landlord from leasing any Other Premises to any Other Tenant for the Protected Use, provided that to Landlord's knowledge the primary business of such Other Tenant is not going to be for the Protected Use. In the event that Landlord knowingly and intentionally violates this provision, Tenant shall have all rights afforded to Tenant at law and in equity and shall only be required to pay 50% of Fixed Minimum Rent during such time as the Other Tenant operates in the Shopping Center primarily for the Protected Use. For purposes of this clause, such Other Tenants whose current uses constitute a violation of the Leasing Covenant and are accordingly specifically excluded include, without limitation, those businesses such as and similar to Cost Plus, Kirkland's, home accessory stores and gift stores. (By way of example: Landlord will not lease to a competitor such as Michael's, Hobby Lobby, Hancock Fabrics, nor will Landlord permit any Other Tenant to sublease Other Premises to one of these competitors if Landlord has the right to withhold such consent. However Ross Dress for Less, Inc., or its affiliates, Home Goods and Wal-Mart shall specifically be excluded from such Leasing Covenant.)

## SECTION 15. CO-TENANCY

     (a)    <u>Intentionally Deleted</u>.

     (b)    <u>Opening Co-Tenancy</u>.

     (i)    The Opening Co-Tenancy Requirement means that Wal-Mart or at least two Anchor Tenants are either open for business to the public during normal operating hours from substantially all of their respective Anchor Tenant Premises or have accepted possession of their premises and are actively engaged in merchandising, tenant improvements and other activities consistent with store opening. Notwithstanding anything to the contrary, Tenant is not required to open for business, nor is Tenant obligated for the payment of Rent except as provided herein to the contrary, until the Opening Co-Tenancy Requirement is met.

     (ii)    If Tenant elects to open for business before the date that the Opening Co-Tenancy Requirement is met, then from the date Tenant opens for business until the Opening Co-Tenancy Requirement is met, Tenant shall pay Substitute Rent.

     (iii)    If the Opening Co-Tenancy Requirement is not met for 360 days from the date the Commencement Date would otherwise have occurred, then Tenant has the right and option (1) to continue its tenancy upon the terms and conditions of this Lease subject to its right to pay Substitute Rent (which shall be increased to Increased Substitute Rent) until the satisfaction of the Opening Co-Tenancy Requirement; or (2) to terminate this Lease by giving 90 days prior written notice to Landlord; provided, however, if Tenant does not elect to open for business, Tenant shall be deemed to elect option (2). Failure to exercise the termination option will not waive Tenant's continuing right to do so as long as said Opening Co-Tenancy Requirement is not satisfied. If Tenant elects to terminate this Lease, all further obligations hereunder will terminate effective 90 days after the date of Tenant's notice, and in such event

any Rent paid in advance will be immediately refunded to Tenant.

(c)     Ongoing Co-Tenancy.

(i)     The Ongoing Co-Tenancy Requirement means that: either (I)(A) Wal-Mart or its Qualified Replacement is open for business during normal operating hours on the Wal-Mart Tract as shown on the Site Plan; and (B) at least two other Anchor Tenants are open for business to the public in the Shopping Center during normal operating hours; or (II) at least five Anchor Tenants are open for business to the public in the Shopping Center during normal operating hours; provided, however, for satisfaction of this clause (II) only, one of the tenants may occupy only 10,000 or more.

(ii)     If, at any time after the satisfaction of the Opening Co-Tenancy Requirement, the Ongoing Co-Tenancy Requirement is not met, then Tenant may pay Substitute Rent until the Ongoing Co-Tenancy Requirement is satisfied; provided, however, in the event the Ongoing Co-Tenancy Requirement remains unsatisfied for 24 months after Tenant commenced payment of Substitute Rent, Tenant shall pay Increased Substitute Rent until cure of the Opening Co-Tenancy Requirement. If the Ongoing Co-Tenancy requirement is not met within twelve months, then without limiting Tenant's right to pay Substitute Rent (or Increased Substitute Rent, as applicable), Tenant may terminate this Lease upon 90 days written notice to Landlord delivered at any time thereafter prior to the date the Ongoing Co-Tenancy Requirement is satisfied.

(d)     Definitions.

(i)     An "Anchor Tenant" is a national or regional comparable retail tenant suitable for occupancy in a first-class shopping center occupying at least 18,000 contiguous square feet under a single trade name. L.A. Fitness qualifies as an Anchor Tenant.

(ii)     A "Qualified Replacement" means up to three national comparable retail tenants, each occupying a minimum of 18,000 contiguous square feet under a single trade name within their Anchor Tenant Premises located on the Wal-Mart Tract, suitable for occupancy in a first-class shopping center will, on a collective basis, be deemed to be a "Qualified Replacement" after the commencement of such substitute operation by such tenants.

(ii)     For purposes of this Lease, "national" shall mean a first-class retailer operating at least 75 stores in multiple states, and "regional" shall mean a first-class retailer operating at least 25 stores in Georgia and the states contiguous to Georgia.

(iii)     A "comparable retail tenant" is a tenant selling products normally found in a comparable quality shopping center, such as, for example (but not by limitation) a general merchandiser such as Target, a home goods store such as Home Goods, an electronics store such as Best Buy, a sporting goods store such as Dick's Sporting Goods or Sports Authority, a fashion oriented retailer that is not a "deep discount" retailer (Marshall's, TJ Maxx, Ross are

permissible comparable retail tenants), a non-discount grocery store, a high quality health club such as L.A. Fitness, a pet store such as Petsmart, a cosmetics store such as ULTA, or a book store such as Barnes & Noble, and attracting a comparable quantity and type of high frequency shopper.

## SECTION 16. RULES AND REGULATIONS

(a)    The rules and regulations annexed hereto as <u>Exhibit I</u>, and all reasonable, non-discriminatory rules and regulations which Landlord may hereafter from time to time adopt and promulgate for the government and management of the Shopping Center, are hereby made a part of this Lease and shall, during the Term, as same may be extended or renewed, be fully observed and performed by Tenant as if such rules and regulations were contained herein as covenants on the part of Tenant to be performed. Tenant will comply with and perform any and all such rules and regulations imposed by Landlord so long as such rules and regulations do not limit the rights or expand the obligations of Tenant under this Lease and all occupants of the Shopping Center are subject to and comply with such rules and regulations. In the event of any conflict between any rules and regulations and the Terms of this Lease, the Terms of this Lease shall supersede and control. Landlord must use commercially reasonable efforts to enforce such rules and regulations. Notwithstanding the foregoing, Tenant has the right to display merchandise on the sidewalk on both sides of the storefront door of the Premises at such times as to cause the least possible interruption or interference with other tenants' businesses in the Shopping Center.

(b)    Tenant is not required to join or maintain membership in any tenant's business association sponsored by or for the Shopping Center, nor is Tenant required to pay any of the costs of the activities conducted by such association.

## SECTION 17. ALTERATIONS, INSTALLATIONS AND IMPROVEMENTS BY TENANT

(a)    Tenant, without Landlord's consent, has the right to make such interior alterations, changes and improvements to the Premises as Tenant may desire for the conduct of Tenant's business and for the full beneficial use of the Premises; except for structural changes, alterations or improvements, or changes, alterations or improvements which affect the exterior, the store front or roof of the Premises or any mechanical or utility systems serving any portion of the Shopping Center, which changes, alterations or improvements may be made by Tenant only with Landlord's written consent, which consent must not be unreasonably withheld or delayed. Tenant will pay all costs and expenses of its improvements (including Tenant's Work, if any), will make such changes, alterations and improvements in a good and workmanlike manner, in accordance with all Laws and <u>Exhibit J</u> attached hereto, and free and clear of any mechanic's liens or other liens or claims in connection with the making of such changes, alterations and improvements.

(b)    Except as otherwise provided, all signs, furnishings, trade fixtures, inventory,

equipment and other removable property installed in the Premises by Tenant will remain the personal property of Tenant, will not be subject to any Landlord's lien or lien or security interest against the property of Landlord, and shall be removed from the Premises by Tenant upon the termination of this Lease. Tenant will repair any damage caused by removal of its property from the Premises. Tenant's obligation to repair survives the expiration or earlier termination of this Lease.

## SECTION 18.  REPAIRS AND MAINTENANCE

(a)    Except as otherwise provided, Tenant will maintain, repair and replace the interior, non-structural portion of the Premises, at its sole cost and expense, in an attractive, clean and sanitary condition and in good working order.

(b)    Landlord represents, to the best of Landlord's actual knowledge and belief, that all structural portions of the Premises and the roof, utility cables, mains and conduits, the HVAC, electrical, gas, plumbing, sprinkler, and sewer systems are, and will be upon the Delivery Date, in good working order and repair and shall meet ASTM requirements to allow for the installation of resilient flooring, and that the Premises are water-tight (for example, there is no standing water inside of the Premises), and there are not, and will not be on the Delivery Date, any violation of any Laws.

(c)    Subject to Section 18(d), and except for damage caused by fire or other casualties or taking by eminent domain or conveyance in lieu thereof: Tenant, at its sole cost and expense, must make all interior nonstructural repairs to the Premises, including doors and windows, and (1) all repairs to the plumbing and gas systems exclusively serving the Premises from their respective meters to and including the plumbing and gas systems in the interior of the Premises, and (2) the electrical system exclusively serving the Premises from Tenant's electrical panel to and including the electrical systems in the remainder of the interior of the Premises. Notwithstanding the foregoing, Tenant is not required to make any: (i) repairs of damage covered by insurance maintained or required to be maintained by Landlord; (ii) repairs necessitated by reason of the negligence, willful misconduct, or default of Landlord, its agents, employees or contractors; (iii) repairs to the plumbing, gas, electrical or other similar units and systems where such repairs would necessitate going through or into the floor slab, structural walls, or roof of the Premises; (iv) replacement of any plumbing, gas, electrical or similar units or systems; or (v) repair or replacement of the sprinkler, life safety or other detection or suppression system. All of the repairs and replacements referred to in the immediately preceding sentence will be performed by Landlord at its sole cost and expense unless due to the negligence, willful misconduct or default of Tenant, its agents, employees or contractors (in which case Tenant shall make all such repairs and replacements at its sole cost and expense).

(d)    Landlord, at its sole cost and expense, must make all repairs to the Premises other than those that Tenant is required to make.  Landlord's obligations include, but are not limited to, repairs to the structural portions of the Premises (both interior and exterior), the roof, floor slab, foundation, exterior walls, any interior damage caused by roof leaks or water/sewage

backing up into the Premises no matter where from, provided not exclusively serving the Premises, and all repairs or replacements to the (x) gas and plumbing systems or any portion thereof up to (but not including) their respective meters, and (y) the electrical system up to (but not including) Tenant's electrical panel (and not including HVAC, except as set forth herein). In making any repairs or replacements, Landlord must not unreasonably interfere with Tenant's normal operations and business. Landlord assigns to Tenant all warranties and guarantees, if any, with respect to any and all construction and equipment on the Premises to be maintained by Tenant to the extent assignable.

(e)     Notwithstanding anything to the contrary, Tenant must provide a new HVAC system for the Premises. Tenant will assume all responsibility for the repair and replacement of the HVAC system servicing the Premises. Tenant shall be responsible for all routine maintenance of the HVAC from the Delivery Date throughout the Term. Notwithstanding anything to the contrary in the Lease, if Tenant should replace or repair the HVAC system or any part thereof during the final two years of the Initial Term or any Lease extension or renewal and not remain in possession of the Premises pursuant to a subsequent Lease extension or renewal, then the Landlord shall reimburse Tenant, within 30 days of the delivery back of possession of the Premises to the Landlord, for (i) the un-amortized cost of said replacement based on a straight-line amortization schedule over the useful life of the equipment in accordance with federal income tax guidelines (in no event less than 15 years), or (ii) the actual cost of the repair in excess of $5,000 (it being understood that Tenant shall be responsible for the first $5,000 of the cost of any repair), as the case may be.

(f)     Tenant will maintain the Premises, at its expense, free and clear of all rubbish, garbage and trash and place such rubbish, garbage and trash in the containers provided by Tenant. Tenant, at its own cost and expense, will dispose of all rubbish, garbage and trash on a timely basis. Tenant's trash compactor or containers shall be located in the proposed areas shown on Exhibit B attached hereto.

(g)     Subject to this Section 18, Tenant will keep the Premises in an orderly and sanitary condition, free from vermin, rodents, bugs and other pests, and Landlord shall use commercially reasonable efforts to keep the Common Areas in an orderly and sanitary condition, free from vermin and rodents.

(h)     Notwithstanding anything to the contrary, Tenant is responsible for making any interior non-structural alterations of or improvements to the Premises that are required by any Public Entity after the Delivery Date, except to the extent that such responsibility is imposed upon Landlord in the next following sentence or otherwise under this Lease. Landlord is responsible, at its sole cost and expense, for making all alterations of or improvements to the Premises that are required by any Public Entity and that are not the result of, or related to, Tenant's specific use of the Premises or alterations and improvements to the Premises made by or on behalf of Tenant, and that (i) are structural in nature, (ii) relate to the exterior thereof, including the Common Areas, (iii) relate to the sprinkler, utility or life safety systems therein, or (iv) relate to the handicapped or disabled, but this clause (iv) does not require Landlord to make



any "path of travel" alterations or improvements or those otherwise relating to Tenant's fixtures and placement thereof.

## SECTION 19.  MUTUAL INDEMNIFICATION

(a)    Subject to Section 20, Landlord must indemnify, defend and hold Tenant harmless from and against any and all claims, demands, actions, damages, liability and expense in connection with the loss, damage or injury to persons or property, arising out of or related to the acts or omissions of the Landlord, Landlord's agents, contractors or employees, or arising out of the use or operation of the Common Areas and all other space in the Shopping Center not designated for the exclusive use of one tenant, except as caused by the negligence or willful misconduct of Tenant, its agents, employees, contractors or representatives.

(b)    Subject to Section 20, Tenant must indemnify, defend and hold Landlord harmless from and against any and all claims, demands, actions, damages, liability and expense in connection with loss, damage or injury to persons or property (1) occurring in, on or about, or arising out of the Premises, except as caused by the negligence or willful misconduct of Landlord, its agents, employees, contractors or representatives; or (2) arising out of the negligence or willful misconduct of Tenant, Tenant's agents, contractors, or employees.

(c)    If either party, without fault on its part, is made a party to any litigation commenced by or against the other party, then such other party shall protect and hold such first party harmless and shall pay all costs, expenses and reasonable attorney's fees incurred or paid by such first party in connection with the litigation.

This Section 19 survives the expiration or termination of this Lease.

## SECTION 20.  WAIVER OF CLAIMS

Notwithstanding any provision to the contrary, Landlord and Tenant waive any and all right of recovery, claim, action or cause of action against the other, their respective agents and employees, for any loss or damage that may occur to the Premises or the Shopping Center or any additions or improvements thereto, or any contents therein, by reason of fire, the elements or any other cause which could be insured against under the terms of a standard special form insurance policy or policies, or for which Landlord or Tenant may be reimbursed as a result of insurance coverage insuring any loss suffered by either party, regardless of cause or origin, including the negligence of Landlord or Tenant, or their respective agents and employees.  This waiver applies regardless of whether either party actually obtains property insurance, and regardless of whether any insurance proceeds are collected.  Notwithstanding the above, Landlord and Tenant agree and acknowledge that the waiver of claims herein contained shall expressly exclude any loss paid by the insured in the form of a deductible or self-insured retention. All property insurance policies required under this Lease covering the Premises or the Shopping Center must expressly waive any right on the part of the insurer against the other party for damage to or destruction of the Premises or the Shopping Center resulting from the

acts or omissions of the other party.

## SECTION 21.  PROPERTY AND LIABILITY INSURANCE

(a)    Landlord must keep in full force and effect Commercial General Liability Insurance and Umbrella Insurance with respect to the Shopping Center, including the Common Areas, naming Tenant as an additional insured thereunder to the extent its interest may appear, with nationally recognized companies rated no lower than A-, IX by A.M. Best Company with total minimum limits to apply per location of $1 million on account of bodily injuries or death and/or property damage resulting from one occurrence and $2 million aggregate. Landlord must deposit a certificate or other evidence of such insurance with Tenant.

(b)    Tenant must keep in full force and effect Commercial General Liability Insurance and Umbrella Insurance with respect to the Premises, naming Landlord as an additional insured to the extent its interest may appear, with nationally recognized companies rated no lower than A-, IX by A.M. Best Company with total minimum limits to apply per location of $2 million on account of bodily injuries or death and/or property damage resulting from one occurrence.  Tenant's evidence of insurance is maintained by Tenant's insurer on the website of Tenant's insurance broker, which can be accessed through Tenant's website, "JoAnn.com."

(c)    Landlord must keep the Premises and the Shopping Center, including Common Areas, insured against loss or damage by fire, lightning, vandalism and malicious mischief, and such other perils as are now or may hereafter be comprehended in the term "All Risk Coverage" or "special form" coverage or "Special Form Cause of Loss" (or other terms that become the insurance industry standard in the future), including, without limitation, earthquake and flood, if in an area that is designated as an earthquake or flood zone, boiler and machinery, plate glass, power failure, mold, windstorm, terrorism, seepage or leakage and loss of rent damage, in amounts equal to at least 80% of the full replacement value thereof, or such greater amounts as may be required to prevent the application of co-insurance provisions.  Such insurance must cover improvements in the Premises owned by Landlord to the extent that the same are customarily insurable as part of the realty, but will not include the cost of restoration of Tenant's trade fixtures, furniture, furnishings, inventory, equipment and other personal property. Notwithstanding anything to the contrary, Landlord is solely responsible for any and all deductibles and self-insured retentions.

(d)    Landlord shall bill to Tenant and Tenant must pay to Landlord during the Term, as the Term may be extended or renewed, without demand or offset, unless specifically set forth elsewhere herein, Tenant's Proportionate Share of the estimated Insurance Costs for the Insurance Fiscal Year within 30 days after receipt of Landlord's statement, together with a copy of a receipted bill for which payment is sought and a reasonable assessment of for the computation of Tenant's Proportionate Share of Insurance Costs. "Insurance Costs" shall mean liability, environmental, pollution and remediation legal liability, umbrella, rents, flood, and fire and extended coverage insurance premiums for the Shopping Center and Common Areas

reimbursable to Landlord under Common Area Costs. During the first Insurance Fiscal Year, the Insurance Costs paid by Tenant are estimated to be at the rate of $0.20 per square foot, which amount is Landlord's good faith estimate of the full amount of Tenant's Proportionate Share of Insurance Costs for the first Insurance Fiscal Year if Tenant were to pay Tenant's actual Proportionate Share of Insurance Costs for said period, provided, however, that in no event shall the rate for such first year exceed $0.25 per square foot.

(e)    Within 120 days following the expiration of the first Insurance Fiscal Year or any subsequent Insurance Fiscal Year during the Term, as the Term may be extended or renewed, Landlord may reasonably estimate or revise the estimate of the costs and expenditures for Insurance Costs for the remainder of the Insurance Fiscal Year or the ensuing Insurance Fiscal Year, which determination may be based in whole or in part upon the expenses for the preceding or ensuing Insurance Fiscal Year as increased by any known or anticipated increases in the cost of insurance, or by any combination thereof, together with Landlord's determination of Tenant's Proportionate Share thereof, and Landlord shall be entitled to notify Tenant in writing of the monthly sum to be paid by Tenant to Landlord during the remaining months of such Insurance Fiscal Year or the next ensuing Insurance Fiscal Year. Such estimate shall not differ materially from the prior year's estimate without a reasonable written explanation from Landlord. "Insurance Fiscal Year" shall mean any 12 month period determined by Landlord, the first such Insurance Fiscal Year which shall, until otherwise determined by Landlord, be the fiscal year from June 1 through May 31 which contains the Commencement Date. Upon each such determination of Tenant's Proportionate Share of Insurance Costs, as provided herein, Tenant shall make such payments in such amounts as are provided for herein until receipt of notice from Landlord of any change in such amounts. In the event that the amounts so paid by Tenant for Insurance Costs for the first or any subsequent Insurance Fiscal Year under this section shall be (i) less than Tenant's Proportionate Share thereof, the deficiency shall be paid by Tenant to Landlord within 30 days after notice to Tenant of such determination, or (ii) more than Tenant's Proportionate Share thereof, the excess shall be retained by Landlord and credited against the next sums due from Tenant under this Section 21, or, if at the end of the Term, shall be refunded to Tenant.

(f)    Notwithstanding anything to the contrary contained herein, if the Insurance Costs increase by more than 5% in any Insurance Fiscal Year due to Landlord's purchase of new or additional insurance (including terrorism insurance), regardless of whether Landlord's lender or mortgagee requires such new insurance, then Landlord shall be solely responsible at Landlord's cost for the portion of the increase exceeding 5%.

## SECTION 22.  SIGNS

(a)    Subject to all Laws, Tenant has the right to install and maintain a sign or individual letters ("Jo-Ann, Fabric and Crafts" or any other name or slogan that Tenant may adopt) or signs on the front, side, rear or any other fascia of the Premises, as well as a sign on the pylon located in or around the Shopping Center at the location depicted on Exhibit B, with such panel located as depicted on Exhibit D-2 and "framing," "craft" and similar departmental

signs on the front fascia in addition to its regular sign, all in accordance with Exhibit C and Tenant's Prototype Signage Plans attached hereto as Exhibit D-1. All signs will comply with all requirements of any Public Entity, and Tenant will obtain all necessary permits or licenses. Notwithstanding the foregoing, Tenant is entitled to seek and receive a variance from any Public Entity so as to allow Tenant to have the size, color, number, etc., of signs that Tenant desires, including storefront signs, pylon signs, banner signs and monument signs so long as such variance will not impact signage available to other tenants in the Shopping Center. Landlord will cooperate and assist Tenant with any such variance at no cost to Landlord. Tenant's sole cost for the pylon and/or monument sign(s) shall be the cost to fabricate and install Tenant's panels.

(b)    Tenant's sign package shall be approved in accordance with the same process for approval of the plans for Premises build-out as outlined in Section 10 hereof.

(c)    In addition to the foregoing signs, subject to the ECR Tenant has the right to install and maintain a professionally prepared banner sign periodically in front of the Premises as shown on Exhibit D-1.

(d)    Tenant must maintain its signs in good condition and repair at all times, and must save the Landlord harmless from injury to person or property arising from the erection and maintenance of the signs. Upon vacating the Premises, Tenant must remove all signs and repair (exclusive of painting) all damage caused by such removal.

(e)    If Landlord renovates all or any portion of the Shopping Center, which renovation requires a change to the facade and/or the removal of any of Tenant's sign(s), Landlord shall not materially change the appearance of the façade without Tenant's consent and shall notify Tenant at least 45 days before the removal of sign(s). Landlord will bear the cost of such removal and reinstallation, together with the cost of any damage to the sign(s) as a result of such removal or reinstallation. Further, Landlord must provide and install on or about the Shopping Center, at Landlord's sole cost and expense, a banner or other type of temporary sign(s) identifying Tenant's trade name, which banner or sign(s) must be equal in size to Tenant's existing sign and approved by Tenant before such installation.

**SECTION 23.  ASSIGNMENT AND SUBLETTING**

(a)    Tenant has the right to assign this Lease or sublet all or any part of the Premises for any lawful retail use without Landlord's prior written consent, provided that such assignee's or subtenant's use does not violate any exclusive use rights granted to other tenants in the Shopping Center that exist on the date of the assignment or sublease or any prohibited use then affecting the Shopping Center (subject, however, to Landlord's advising Tenant of such rights). Within 15 days after the receipt of a written request from Tenant, Landlord must deliver to Tenant notice of any restrictions on the use of the Premises enforceable by any other tenants of the Shopping Center. Failure to deliver to Tenant a list of any restrictions will constitute Landlord's covenant that there are not restrictions on the use of the Premises for any use and



Landlord must indemnify, defend and hold Tenant harmless if there actually is a restriction. A change in effective voting control of the Tenant does not constitute an assignment of the Lease.

(b)    Tenant shall, in all events, remain fully liable to Landlord for all obligations of Tenant under this Lease, unless expressly released in writing by Landlord.

(c)    Except for transactions permitted pursuant to Section 23(d), in the event Tenant proposes to assign this Lease or sublet any portion of the Premises, it shall first give notice thereof (hereinafter called the "Assignment/Subletting Notice") to Landlord, which notice shall (i) specify the name and address of the proposed assignee or sublessee and the entire business terms of the assignment or subletting; (ii) summarize the business or operating history of the proposed assignee or sublessee; (iii) describe in reasonable detail the proposed use of the Premises by the proposed assignee or sublessee; and (iv) include such other information or documentation as may be reasonably necessary or appropriate to enable Landlord to determine the qualifications of the proposed assignee or sublessee to the extent such information is available. Within thirty (30) days after receipt of an Assignment/Subletting Notice from Tenant, Landlord may elect to terminate this Lease and recapture the Premises by giving notice of termination to Tenant (the "Termination Notice"). In the event Landlord terminates this Lease by giving the Termination Notice to Tenant as aforesaid, this Lease shall automatically terminate on the ninetieth (90th) day (hereinafter called the "Termination Date") following Tenant's receipt of the Termination Notice with the same force and effect as if said Termination Date had been designated as the expiration date of this Lease and Landlord and Tenant shall upon such Termination Date be released from any and all liabilities thereafter accruing hereunder. All Fixed Minimum Rent and Additional Rent payable by Tenant hereunder shall be apportioned as of the Termination Date and Tenant shall promptly pay to Landlord any amounts so determined to be due and owing by Tenant to Landlord, and conversely Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods subsequent to the Termination Date.

(d)    Notwithstanding the foregoing, Tenant may assign or sublet all or any part of the Premises, in each case without the prior consent of Landlord, to: (1) a parent, subsidiary, affiliated corporation, or successor to Tenant; (2) the parent of Tenant by way of merger, reorganization, consolidation, corporate restructuring, purchase of stock or assets, or the like; or (3) any entity that acquires a substantial number of Tenant's stores either generally or in the metropolitan area where the Premises are located.  Tenant may also sublet, without the consent of Landlord, not more than 10% of the Gross Leasable Area of the Premises for the operation of one or more departments with the business operation of Tenant.

## SECTION 24.   REPAIR AFTER CASUALTY

(a)    In the event of damage to or destruction of the Shopping Center or any portion thereof (including the Premises) by casualty or any other cause whatsoever, then, except as otherwise provided in this Section, Landlord must begin and diligently pursue to completion the restoration and repair within 30 days of the event of damage or destruction (or as soon as Landlord is reasonably able to do so). Landlord is obligated to repair the Premises only to their

condition on the Delivery Date (subject to alterations thereof required by changes in governmental code). Any repair or restoration of the Premises must be completed within 365 days after the event of damage or destruction. Any repair and restoration of the Shopping Center (other than the Premises) must be completed as quickly as possible. Within 60 days after an event of damage or destruction, Landlord must deliver to Tenant notice of the anticipated period of restoration.

(b)    In the event of any damage or destruction to the Premises, then all Rent will abate pro-rata using the same ratio that the portion of the Premises rendered unusable (in Tenant's reasonable judgment) bears to the Gross Leasable Area of the Premises.

    (1)    In the event of damage or destruction to any other portion of the Protected Area that materially interferes with access to the Premises or the conduct of business therein, then Tenant will pay only Substitute Rent until the completion of Landlord's repair and restoration to the Protected Area.

    (2)    In the event that, due to damage or destruction a Co-Tenancy Violation occurs, then until such time as the Co-Tenancy Violation is cured, as the case may be, Tenant has the right to the remedies set forth in this Lease for such Co-Tenancy Violation.

(c)    Notwithstanding Section 24(a), Landlord may terminate this Lease and has no restoration and repair responsibility in the event of damage to or destruction of the Shopping Center if (i) the cost of repair or restoration exceeds 75% of the replacement value of the Shopping Center and the event or destruction was not insurable under the insurance coverage required of Landlord hereunder; or (ii) the reasonable period for substantial completion of the repair and restoration exceeds eighteen months. As a condition to Landlord's termination of this Lease under this subsection: (1) the leases of all other similarly affected occupants in the Shopping Center must also have been terminated by reason of the event of damage and destruction; and (2) Landlord must have no intent and be under no obligation to rebuild the Shopping Center.

(d)    If the Premises are damaged or destroyed and Landlord has not substantially completed the restoration and repair thereof within 270 days as required in Section 24(a), then Tenant has the right, prior to completion of Landlord's restoration and/or repair, without waiving any other right or remedy against Landlord, to terminate this Lease upon 10 days written notice. If over 50% of the Shopping Center other than the Premises is not repaired, or by Landlord's estimate cannot be repaired, within one year from the event of damage or destruction, then Tenant has the right to terminate this Lease but has no other claim against Landlord for failure to repair except to the extent that Landlord has failed to use reasonable efforts to complete such repairs.

(e)    In addition to all rights to terminate this Lease granted to the parties in this Section, if 40% or more of the Premises are destroyed or damaged during the last two years of

the Term, then each of Landlord and Tenant has the right to terminate this Lease as of the date of such damage or destruction by giving written notice thereof within 30 days after the date of the damage or destruction. If Tenant, within 30 days after receipt of Landlord's written notice of termination, gives Landlord written notice of its intention to extend this Lease for any additional Extended Term then available to Tenant, then the notice of Landlord to terminate this Lease will be of no force and effect. If Tenant elects to extend this Lease for any additional Extended Terms then available to Tenant, Landlord must use its diligent good faith efforts to restore the Premises to its former condition with all reasonable speed, and all Rent will abate pro-rata as set forth in subsection (b) until the date of delivery of the restored or repaired Premises.

(f)     If this Lease is terminated pursuant to this section, Landlord must refund within 15 days of notice any unearned Rent paid in advance.

(g)     Notwithstanding anything to the contrary, if Landlord terminates the Lease under this section, and if within two years after such termination Landlord rebuilds the Premises or the Shopping Center for retail use, as the case may be, then Tenant has the right, at its option, to lease space in the Shopping Center comparable to the Premises (the "Substitute Premises") upon the same terms and conditions and for the balance of the Term provided that the costs to rebuild the Premises or the Shopping Center, as the case may be, are not substantially higher than the original cost to build same. If the cost to rebuild is substantially higher, then Landlord must offer the Substitute Premises to Tenant at rental rates then being offered by Landlord to prospective tenants of the rebuilt Shopping Center. Notwithstanding termination of this Lease, Landlord must notify Tenant of its intention to repair or restore the Premises or the Shopping Center, as the case may be, whereupon Tenant has 30 days after receipt to give Landlord notice of Tenant's intention to accept such Substitute Premises on the terms and conditions of this Lease and setting forth the period within which such repair or restoration must be completed as a condition of Tenant's acceptance of the Substituted Premises. This subsection 24(g) survives termination of this Lease.

(h)     If Landlord elects, or is required by this Section 24, to repair the Premises or the Shopping Center, then Landlord must notify Tenant in writing when the repairs are completed. The repairs will be not be deemed completed unless and until the repairs are actually completed in accordance with the terms of this Lease and Tenant has thereafter received written notice of such completion.

(i)     If the Lease is not terminated under the terms of this Section 24, then Rent will cease abating and become due and payable on the earlier of the date (i) 180 days after the date that Landlord completes its restoration of the Premises as required hereunder, and (ii) Tenant has rebuilt, refixtured and restocked the Premises.

## SECTION 25.  CONDEMNATION

(a)     If 50% or more of the Gross Leasable Area of the Premises or 50% or more of the Gross Leasable Area of the Shopping Center is taken by condemnation or right of eminent

domain or conveyed in lieu thereof or taken in any similar condemnation-related manner for a period of three (3) months or longer (a "Taking"), this Lease will terminate at the option of either party as of the day possession is taken by or title vests in the taking authority, and both parties will be released from any further liability hereunder.

(b)     In the event of a Taking of less than 50%, but more than 15%, of the Gross Leasable Area of the Premises, or a Taking of any portion of the Protected Area, then Tenant has the right to terminate this Lease and any further liability hereunder if, in the commercially reasonable objective determination of Tenant, the Premises cannot be economically operated for, or are unsuitable, for the intended purposes of this Lease. Any such termination is effective as of the day possession is taken by, or title to the portion taken vests in, the taking authority.

(c)     In the event of a Taking of less than 50%, but more than 15%, of the Gross Leasable Area of the Shopping Center (including the Common Areas), then (i) Tenant has the right to terminate this Lease and any further liability hereunder if, in Tenant's reasonable determination, the Premises cannot be economically operated for, or are unsuitable for, their intended purposes; and (ii) Landlord has the right to terminate this Lease and any further liability hereunder if, in Landlord's commercially reasonable objective determination, the Shopping Center cannot be economically operated for, or are unsuitable for, their intended purposes. Any such termination is effective as of the day possession is taken by, or title to the portion taken vests in, the taking authority

(d)     In the event of a Taking of any portion of the Premises or the Shopping Center, upon which this Lease is not terminated, Landlord to the extent of the amount awarded, must restore the remainder of the Premises or the Shopping Center (including the Common Areas), with reasonable speed to a complete architectural unit as nearly like its condition prior to such partial Taking as shall be practicable, and if during or after the work of restoration Tenant is deprived of all or a part of the use of the Premises, the Rent will abate for so long as Tenant is deprived of such use and until Tenant has rebuilt, refixtured and restocked the Premises, as necessary, in the same proportion as that portion of the Premises taken bears to the entire Premises.

(e)     All damages awarded in connection with the Taking of the Premises, whether allowed as compensation for diminution in value to the leasehold or to the fee of the Premises, belong to the Landlord; but, if Tenant has made any material leasehold improvements to the Premises, or alterations or structural changes and repairs to the Premises, at its own expense (regardless of when made), Tenant and not Landlord is entitled to claim an award for the unamortized balance of Tenant's cost thereof. If the condemning authority does not make a separate award therefor, Landlord, subject to the rights of any mortgagee, must assign an equitable portion of its award for such unamortized cost to Tenant. Tenant is also entitled to claim an award for loss of business, damage to merchandise and fixtures, removal and reinstallation costs and moving expenses, in a separate action only.

**SECTION 26.   REPRESENTATIONS AND COVENANTS OF LANDLORD**

Store No. 2412, Suburban Plaza, Decatur, GA
EXECUTION VERSION: November 19, 2014
UB Document No. 1126865 v.1

(a)     On the date hereof, Landlord represents, warrants and covenants to Tenant as follows:

(1)     The Shopping Center Site is zoned to permit the use of the Shopping Center for general retail purposes, and the Premises are zoned to permit their use as a retail store conducting the Permitted Use, as of right (i.e., without any special permit, approval, variance or other waiver);

(2)     The legal description set forth on <u>Exhibit A</u> attached hereto matches the Shopping Center depicted on the Site Plan (i.e., <u>Exhibit B</u>) and includes no additional property therein;

(3)     To the best of Landlord's knowledge, the Common Areas, Premises (excluding Tenant's Work or other alterations made by or on behalf of Tenant, but not excluding Landlord's Work or work directed by Landlord on or behalf of Tenant) and all structural portions of the Shopping Center comply with all Laws;

(4)     Subject to eminent domain or as otherwise required by all Laws, Landlord will during the Term of the Lease, provide surface or deck parking spaces in the Common Areas on an unreserved basis and without cost, with at least the number of spaces required by Laws (including any applicable variance);

(5)     No building, edifice or obstruction will be placed on the Shopping Center Site (including the "Protected Area" as shown on the Site Plan) and no addition or alteration will be made to the Shopping Center (A) that materially diminishes the accessibility of the Premises to and from the parking areas within the Common Areas and the other stores in the Shopping Center; (B) that materially diminishes the visibility of the front of the Premises (including, without limitation, the signage thereon) from public highways, parking areas or other stores in the Shopping Center; (C) that diminishes the access to or the utility of the service areas serving the Premises; (D) that has the effect of increasing the monetary obligations of Tenant under this Lease; or (E) that otherwise materially and adversely affects the conduct of business from the Premises or the rights of Tenant under this Lease. The foregoing subsections (A) – (E) shall not apply in instances where access and/or visibility are dimished due to (i) Laws, (ii) condemnation, (iii) casualty, (iv) temporary instances due to repairs, remodeling, renovation or other construction to the Shopping Center, or (v) rights of other tenants in the Shopping Center. Without limiting the generality of the foregoing, in no event will any improvement or alteration (including a reduction in size of the Protected Area through any means

(except through an eminent domain proceeding), including, for example, a reduction in the Shopping Center or Shopping Center Site, or a change in the parking layout or configuration or traffic patterns of vehicles or pedestrians) be made to the "Protected Area" as shown on the Site Plan without Tenant's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed. However, Landlord may make changes in the Protected Area as necessary to comply with Laws without requiring consent by the Tenant;

(6)    The Site Plan correctly and completely shows all contemplated improvements on the Shopping Center Site;

(7)    Intentionally Deleted;

(8)    During the Term of the Lease, Landlord will maintain, operate and manage the Shopping Center primarily as a retail project in compliance with all Laws, and the Shopping Center will be used and occupied only for normal retail, service and other ancillary uses customarily conducted in shopping centers.

(9)    Subject to the rights of tenants or occupants under existing leases and agreements as of the date hereof, in no event will the Shopping Center (excluding the Wal-Mart Tract) be used as or for any of the following during the Term of the Lease:

(i)     A movie theater; auditorium; meeting or banquet hall (except that the foregoing restrictions shall not apply to the portion of the Shopping Center identified on the Site Plan as "Lower Level Space");

(ii)    church; bingo hall (except that the foregoing restrictions shall not apply to the Lower Level Space) or a place of public assembly (except in the Lower Level Space);

(iii)   library or school (includes, but not limited to, a beauty school, barber college, reading room, place of instruction or any other operation serving primarily students or trainees rather than retail customers, provided that the foregoing restrictions shall not apply to Lower Level Space and further provided that tutoring of any grade/level of school/university for subjects/testing such as Score, Mathnasium and Sylvan Learning Center shall be permitted);

(iv)    for the sale or service of automobiles or other vehicles; provided, however, auto parts retail locations shall be permitted, and further provided, one quick lube/tire and battery station such as Kaufman Tire, Jiffy Lube or NTB shall be permitted;

(v)     night club or bar serving alcoholic beverages except as incidental

to a restaurant ("incidental" shall be defined as deriving less than 40% of gross sales from the sale of alcoholic beverages) provided, however, the operation of an upscale wine bar or similar operation shall not be prohibited; or liquor or package store, except the following shall be permitted (a) a liquor or package store anywhere in the Lower Level Space; (b) a Total Wine or similar retailer; (c) the sale of alcoholic beverages in connection with a permitted retail use (such as the sale of wine, beer or spirits by Bed, Bath & Beyond, Cost Plus, or a grocery store);

(vi)     funeral parlor; massage parlor (except for (i) therapeutic massages given in connection with the operation of a day spa and therapeutic massage providers such as Massage Envy and Spa Sydell; (ii) hair salons which provides massage services as an incidental part of its business; (iii) the provision of massage services in connection with medical or chiropractic facilities, such as medical rehabilitations clinics; and (iv) massages given as incidental to a health club);

(vii)    animal clinic or animal boarding (kennel) except as incidental to a national pet supply store such as *Petsmart* or *Petco*;

(viii)   discotheque; dance hall or otherwise for musical/dance reviews or topless/nude shows;

(ix)     karate studio; gymnasium; bowling alley; or skating rink, except the foregoing shall be permitted anywhere on the Lower Level Space or on the Upper Level Space so long as same which located on the Upper Level Space is not located within 200 feet of the front door of the Premises;

(x)      car wash;

(xi)     off-track betting establishment;

(xii)    except in the Lower Level Space, pool room, (provided the same shall be allowed in the Lower Level Space only if it is a "high end" pool room operation) game room or amusement arcade (defined as any establishment containing more than a combination of three electronic, pinball or other games, gallery or store or pinball arcade) except as to all of the above incidental to a permitted restaurant use;

(xiii)   so-called "flea market"; or second hand, used goods or consignment store; provided, however, the foregoing restriction shall not prohibit antique shops or stores selling high quality used merchandise such as *Play It Again Sports*, *Plato's Closet*, and *Game Stop* or stores that sell "Vintage" clothing;

(xiv)    store selling primarily distressed or damaged merchandise (except to the extent falling within the uses permitted by clause (xiii) above;

(xv)     health club (except for the premises depicted as "Permitted Health Club" on the Site Plan, and successors, assigns and replacements

thereof);

(xvi)   so-called "head shop" or night club;

(xvii)  gun range or gun shop, except the sale of guns as incidental to a national or regional sporting goods store such as Dick's Sporting Goods shall be permitted;

(xviii) for warehousing, except as incidental to a retail business;

(xix)   adult book store or store selling or exhibiting sexually explicit materials (materials shall be considered "adult" or "pornographic" for such purpose if the same are not available for sale or rental to children under 18 years old because they explicitly deal with or depict human sexuality), provided that sale, rental or display of such items as an incidental part of a permitted business (as used above, the term "incidental" means, with respect to any national or regional video store chain or national or regional book store, any sale or rental of such materials and with respect to other tenants, the sale of such materials from not more than ten percent (10%) of the sales area of such business and so as to constitute less than ten percent (10%) of the gross sales of such business) shall be permitted;

(xx)    Intentionally Deleted;

(xxi)   abortion clinic, aids clinic, drug treatment facility or bodily fluid collection facility; homeless shelter or halfway house;

(xxii)  Laundromat; provided, however, this prohibition shall not be applicable to (i) nominal supportive facilities for on-site service oriented to pickup and delivery by the ultimate consumer as the same may be found in retail shopping centers in the metropolitan area where the Shopping Center is located; or (ii) a store with dry cleaning processes, using dry cleaning solvents that are biodegradable, non-chlorinated and are not hydrocarbons, and are not Hazardous Materials; and

(xxiii) marijuana dispensary.

(10)   Landlord owns fee simple title to the Shopping Center free and clear of all mortgages. There are no claims of other parties, restrictions, reservations, or defects in Landlord's title which could interfere with or impair Tenant's rights under this Lease or Tenant's use, occupancy, or enjoyment of the Premises; and,

(11)   At the time of the Delivery Date, there are no planned or contemplate taxes and assessments, either general and specific, whether ad valore specific or otherwise, with respect to the Shopping Center.

(b)   The foregoing representations, warranties and covenants are mate considerations and inducements to Tenant in executing this Lease, the breach of which

cause irreparable and severe harm to Tenant.    If (i) Landlord breaches any representation, warranty or covenant contained in subsections (4),(5), or (9), and such breach continues for 30 days after written notice of such breach is delivered to Landlord (but Landlord will not be deemed to be in breach if Landlord promptly commences to remedy the default within the 30 day period and proceeds to cure with due diligence, and successfully completes such cure within a reasonable time thereafter), Tenant has the right (A) to terminate this Lease at any time after such cure period (unless Landlord is diligently prosecuting such cure), but only if such breach is of such a nature to have a material and adverse impact on Tenant's ability to operate in the Shopping Center and Tenant has no adequate remedy at law or in equity; or (B) to pay Substitute Rent during the period of such breach; and if (ii) Landlord breaches any other representation, warranty or covenant contained herein, and such breach continues for 90 days after written notice of such breach is delivered to Landlord (but Landlord will not be deemed to be in breach if Landlord promptly commences to remedy the default within the 90 day period and proceeds to cure with due diligence, and successfully completes such cure within a reasonable time thereafter), then Landlord shall be deemed in default under the terms of the Lease and Tenant shall have the rights and remedies provided under Section 29 of the Lease on account of such default (including the right to sue for actual damages).

Notwithstanding anything in the foregoing to the contrary, Tenant shall have no remedy for a violation of subsection (9), if such violation is caused by another tenant or occupant in the Shopping Center violating a provision of its lease or license agreement regarding its premises, which either does not permit or which specifically prohibits the use that violates such subsection, provided Landlord uses good faith efforts to diligently enforce Landlord's rights under such lease or license agreement.

## SECTION 27.  TENANT'S DEFAULT

(a)    Landlord may, by written notice to Tenant, terminate this Lease, or without terminating this Lease re-enter the Premises by summary proceedings, and may dispossess the Tenant if:

(1)    Tenant fails to pay Rent on or before the due date and then fails to pay same within 10 days after receipt of written notice from Landlord; provided that Landlord shall not be required to deliver more than two such notices in any Lease Year and Tenant shall be in default on the 3rd such occasion in a Lease Year, without necessity of further notice;

(2)    Tenant is in material default in the performance of any of the covenants, terms, conditions and provisions of this Lease, and Tenant fails to remedy such default within 30 days after receipt of written notice thereof (but Tenant will not be deemed to be in default if Tenant commences to remedy the default within the 30-day period and proceeds to cure with due diligence);

(3)     Tenant is adjudged bankrupt or makes an assignment for the benefit of creditors, or if a receiver of any property of Tenant in, upon or about the Premises is appointed in any action, suit or proceeding by or against Tenant and is not removed within 90 days (unless such 90-day period is extended by court order, in which event the time period will be as established by court order or established by such person(s) or entity acting under or for the court) after appointment; or

(4)     The interest of Tenant in the Premises is offered for sale or sold under execution or other legal process, and if not rescinded within 90 days after written notice from Landlord to Tenant.

Notwithstanding anything to the contrary contained herein, upon an event of Tenant default and a subsequent eviction by Landlord, Landlord agrees to use reasonable efforts to relet the Premises for a term or terms which may, at Landlord's option, be less than or exceed the balance of the Term. Landlord does not necessarily agree to lease the Premises at its then fair market value in the event it enters into a new lease agreement. The foregoing, however, shall in no way obligate Landlord to lease the Premises in any manner which is not in keeping with the type and caliber of tenants at the Shopping Center, nor shall the same obligate Landlord to relet the Premises in preference to other vacant space therein. Any and all deficiencies shall be payable by Tenant monthly on the date provided for the payment of Fixed Minimum Rent. Notwithstanding anything to the contrary in this Lease, if Tenant has in good faith disputed an alleged monetary default for an amount which is less than two months of Rent, and if Landlord obtains a final judgment adverse to Tenant with regard to said amount, wholly or in part, Tenant may within 30 days of the date of the journalized final judgment pay the amount set forth in the final judgment to Landlord and retain the right to possession of the Premises and all of its rights under the Lease, notwithstanding any termination of the Lease pursuant to the Lease or at law or in equity, which may have occurred as a result of said monetary default.

(b)     In the event of a default by either party of any of the terms, provisions, covenants or conditions of this Lease, the other party has the right to invoke any remedy provided at law or in equity; except, however, Landlord is not entitled to terminate this Lease or to dispossess Tenant except for a material default and in no event is Landlord entitled to accelerate Rent. Notwithstanding anything contained herein, in no event is Landlord entitled to exercise self help to lock out Tenant or forcibly retake possession of the Premises without due legal process and an appropriate court order. However, Landlord may declare to be due and payable immediately, the then present value (calculated with a discount factor of eight percent [8%] per annum) of the difference between (x) the entire amount of Fixed Minimum Rent, and other charges and assessments which in Landlord's reasonable determination would become due and payable during the remainder of the Lease Term (in the absence of the termination of this Lease), and (y) the then fair market rental value of the Premises for the remainder of the Lease Term. Upon the acceleration of such amounts, Tenant agrees to pay the same at once, in addition to all Fixed Minimum Rent, costs, charges, assessments, and reimbursements theretofore due; provided, however, that such payment shall not constitute a penalty or forfeiture, but shall constitute

liquidated damages for Tenant's failure to comply with the terms and provisions of this Lease (Landlord and Tenant agreeing that Landlord's actual damages in such event are impossible to ascertain and that the amount set forth above is a reasonable estimate thereof). All remedies are cumulative and concurrent.

(c)     Notwithstanding anything to the contrary, with respect to any alleged default of Tenant other than a default in the payment of Rent, or other sums of money, if Tenant notifies the Landlord, within 30 days after Landlord's notice of such default, that Tenant disputes such alleged default and Tenant files within the 30-day period an action in a court of competent jurisdiction contesting such alleged default, then Tenant will not be deemed to be in default with respect to such matter. If a final judgment is adverse to Tenant, wholly or in part, Tenant must immediately begin to correct the matters complained of by Landlord, or that portion thereof as to which such judgment shall have been adverse to Tenant, and complete the correction within 30 days after such judgment, or if more than 30 days are reasonably required to complete such correction, correct the same within 30 days and prosecute the same to completion with reasonable diligence.

(d)     In addition to the remedies provided above, it Tenant is in default of the Lease as provided in Section 27 (a) above, Landlord may make any alterations or repairs to the Premises which it may deem reasonably necessary or proper to return the Premises to a so called "Vanilla Box" condition; and Tenant shall pay all costs of such reletting including, but not limited to, the reasonable cost of any such alterations and repairs made to the Premises, reasonable attorneys' fees, reasonable brokerage commissions; and if this Lease will not have been terminated, Tenant shall continue to pay all Fixed Minimum Rent, Additional Rent and all other charges due under this Lease up to and including, without limitation, the date of beginning of payment of rent by any subsequent tenant of part or all of the Premises, and thereafter (unless Landlord has exercised its right under Subsection (b) above) Tenant shall pay monthly during the remainder of the Lease Term the difference, if any, between the rent and other charges collected from any such subsequent tenant or tenants and the Fixed Minimum Rent, Additional Rent and other charges reserved in this Lease, but Tenant shall not be entitled to receive any excess of any such rents collected over the Fixed Minimum Rent and Additional Rent reserved herein.

## SECTION 28. RIGHTS OF LANDLORD

(a)     Landlord reserves the right at all reasonable times during Tenant's business hours and upon prior reasonable notice to Tenant (except in the event of emergency, when notice is not required) by itself or its duly authorized agents, to  inspect the Premises and, to make such repairs as Landlord is obligated to make to the Premises.  In exercising the foregoing right, Landlord must not unreasonably interrupt or disrupt Tenant's business or unreasonably disrupt access to the Premises by Tenant, Tenant's employees, agents, invitees and customers.

(b)     If Landlord makes any payments on behalf of Tenant, which are Tenant's obligation, to fulfill Tenant's covenants, then any amount so paid by Landlord are declared to be "Additional Rent" and are due and payable to Landlord from Tenant with the next installment of



Fixed Minimum Rent due thereafter, together with interest thereon at the Default Rate from the date of such advance to the repayment thereof in full.

(c)     Landlord has the right during the last two months before the expiration of this Lease, so long as it does not unreasonably interfere with Tenant's business, to exhibit the Premises and put up the usual notice "for rent" or "for sale", which notice will not be removed or hidden by Tenant. No more than one sign will be placed upon the Premises and the sign cannot exceed 12 feet square.

## SECTION 29. LANDLORD'S DEFAULT

(a)     If Landlord fails to keep and perform any covenant or agreement to be kept and performed by Landlord, then Tenant, in addition to all other remedies now or hereafter afforded or provided by this Lease, at law or in equity, has the right to: (i) perform such covenant or agreement for or on behalf of Landlord or make good any such default, if such covenant or agreement is limited to the Premises, and any reasonable amount or amounts that the Tenant advances on Landlord's behalf must be repaid by Landlord to Tenant within 30 days after demand, and if not paid within 30 days, Landlord shall also pay interest thereon at the Default Rate from the date of such advance to the repayment thereof in full or (ii) deposit the installments of Rent and other cash payments accruing under this Lease into an escrow account with any third party with instructions to pay such sums to Landlord when Landlord has performed the covenants and agreements to be performed by Landlord or, if Tenant performs such covenants and agreements for or on behalf of Landlord, when any amounts advanced by Tenant for the performance of such covenants and agreements, together with all accrued interest thereon, have been repaid in full, and, if any such amounts have not been repaid in full on or before the 60th day after such funds are deposited into escrow, to return such funds to Tenant for offset against the amounts advanced; or (iii) any combination of (i) and (ii).

(b)     Except in the event of emergency, before performing any covenant or agreement on behalf of Landlord, Tenant will provide Landlord with written notice of Landlord's default and Tenant's intent to perform such covenant or agreement, and Landlord will have 30 days within which to complete performance of the same (and Landlord will not be deemed to be in default if Landlord commences to remedy the default within the 30-day period and proceeds to cure with due diligence). For purposes hereof, "emergency" means (i) any event which poses immediate threat of injury or damage to persons or property or (ii) any event which, in Tenant's reasonable judgment, threatens Tenant's ability to open for business as scheduled or impairs or interferes with Tenant's business operations.

(c)     If Landlord fails to pay any sum to Tenant when due, and if such failure continues for 30 days after receipt of notice from Tenant, Tenant has the right, without forfeiture of its other rights hereunder, at its election, to setoff and deduct the same, together with interest thereon at the Default Rate, from Fixed Minimum Rent but in no event shall any offset exceed 50% of Fixed Minimum Rent in any month. Notwithstanding the foregoing, Tenant's rights of offset under Section 10 hereof will be governed by Section 10.

Store No. 2412, Suburban Plaza, Decatur, GA
EXECUTION VERSION: November 19, 2014
UB Document No. 1126865 v.1

## SECTION 30. MORTGAGE SUBORDINATION

(a)    Intentionally Deleted.

(b)    Landlord reserves the right to request from Tenant a waiver of priority of Tenant's leasehold estate hereunder for the purpose of subordinating Tenant's leasehold estate in favor of a first mortgage lien or any refinancing or replacement of a first mortgage loan that Landlord may hereafter deem necessary or desirable. Within 30 days of a written request by Landlord, Tenant will execute and deliver an agreement substantially in the form of Exhibit G attached hereto or such other form reasonable acceptable to Tenant. The word "mortgage" means (y) any lease of land only or of land and buildings in a sale-lease-back transaction involving all or any part of the Shopping Center, or (z) any mortgage, deed of trust or other similar security instruments constituting a lien upon all or any part of the Shopping Center, whether the same shall be in existence as of the date hereof or created hereafter, and any modifications, extensions, renewals and replacements thereof. "Mortgagee" means a party having the benefit of a mortgage, whether as lessor, Mortgagee, trustee or note-holder.

(c)    After a change in ownership of all or any portion of the Shopping Center that requires a change in the Rent payee, or assignment of this Lease by Landlord that requires a change in the Rent payee, Tenant shall have no obligation to pay Rent to the new payee until Tenant receives written notice from Landlord confirming the name and address of the new payee.

(d)    If Tenant receives a written notice from any party claiming a collateral interest in this Lease or in the Rent and, by reason thereof, a present entitlement to collect the Rent, Tenant has the right either (i) to pay Rent to such party, which payment will satisfy any and all liabilities of Tenant to Landlord with respect to such payment, without obligation on Tenant to make further inquiry but subject to such party's providing to Tenant a copy of the instrument pursuant to which such party claims entitlement and to such claim being plausible on the face of such instrument; or (ii) to withhold Rent from Landlord and pay same to an escrow agent or a court pending the determination by a court of competent jurisdiction of the entitlement thereto.

## SECTION 31. NO WAIVER

No waiver by either party of any of the terms, covenants, provisions or conditions in this Lease, and no waiver of any legal or equitable relief or remedy, will be implied by the failure of either party to assert any rights, or to declare any forfeiture, or for any other reason. No waiver of any of the terms, provisions, covenants, rules and regulations herein will be valid unless it is in writing signed by both parties. No waiver by either party, or forgiveness of performance by either party in respect to one or more tenants of the Shopping Center, will constitute a waiver or forgiveness of performance in favor of Tenant, Landlord or any other tenant. The waiver or the forgiveness of performance of any one or more of the terms, provisions, conditions, rules and regulations of this Lease will not be claimed or pleaded by Tenant or Landlord to excuse a



subsequent failure of performance of any of the terms, provisions, conditions, covenants, rules and regulations of this Lease.

## SECTION 32.  SURRENDER OF PREMISES

(a)     Tenant must deliver up and surrender to Landlord possession of the Premises, including all Landlord's Work (and replacements thereof) and all improvements permanently attached to the Premises during the Term, upon the expiration of this Lease, or its termination in any way, in as good condition and repair as the same are in on the Commencement Date (excepting damage by fire or other casualty which could be covered by a standard "All-Risk Coverage" or "special form" insurance policy, ordinary wear and tear, authorized alterations and modifications, and decay, neglect, fault or default of Landlord and taking by eminent domain or conveyance in lieu thereof). Upon the expiration or earlier termination of this Lease, Tenant will deliver the keys at the office of Landlord or Landlord's agent. Tenant will have an additional ten-day Rent-free period after expiration or termination of the Lease to remove its signs, trade fixtures, furnishings, inventory, equipment, furniture and other personal property from the Premises and any such property which remains for 10 days after the expiration or termination of the Lease shall be deemed abandoned and title to such property shall pass to Landlord without requirement of further documentation.

(b)     Provided Tenant is not in default under this Lease beyond any applicable notice and cure period, Tenant has the right, while the Lease remains in effect, to place a banner sign on the interior front window of the Premises, in a place visible to Tenant's customers, directing Tenant's customer's to another store of Tenant or providing Tenant's customers with information and a telephone number. If the Lease has terminated or expired, then Landlord must leave the sign at the front of the Premises until the earlier to occur of: (1) 90 days after Tenant vacates the Premises, or (2) Landlord signs a lease with a new tenant.

## SECTION 33.  SHORT FORM LEASE, COMMENCEMENT DATE AGREEMENT

(a)     Neither party may record this Lease, but if either party requests that a Short Form Lease or a Memorandum of Lease be recorded, then the other party must execute such Agreement, which Agreement will contain the information set forth below. The Short Form Lease or Memorandum of Lease will describe the Premises and the rights herein demised, the Term, and the extension rights (if any), any exclusive granted to Tenant and other provisions hereof reasonably requested by Tenant.  The failure to record the Short Form Lease or Memorandum of Lease will not affect or impair the validity and effectiveness of this Lease, and this Lease will control in the event of any inconsistency between the two.  The party requesting that the Short Form Lease or Memorandum of Lease be recorded must prepare and pay all costs of recording the Short Form Lease or Memorandum of Lease, and the other party must execute at any and all times such Short Form Lease or Memorandum of Lease and any other instruments as may be required for such recording.  The party requesting that the Short Form Lease or Memorandum of Lease be recorded, at its sole cost and expense, shall record a release of the Short Form Lease or Memorandum of Lease upon the expiration or earlier termination of this

Lease. This provision shall survive the termination of this Lease.

(b)     At the time that the Commencement Date is established, the parties will promptly enter into a Commencement Date Agreement, setting forth the actual commencement and expiration of the Initial Term and any extensions thereof, any applicable kickout dates, the then current Gross Leasable Area of the Premises and the corresponding Rent, which Commencement Date Agreement may be recorded by either party if both parties agree to said recordation in advance.

## SECTION 34.  NOTICE

Any notices, statements, acknowledgments and consents required to be given by or on behalf of either party to the other must be in writing and must be given by Certified U.S. Mail, or by private courier service requiring a signed acknowledgment of delivery (such as Federal Express) addressed as follows:

| | |
|---|---|
| if to the Landlord at: | Suburban Plaza, LLC<br>c/o Selig Enterprises, Inc.<br>1100 Spring Street N.W.<br>Suite 550<br>Atlanta, Georgia 30309-2848<br>Attn: Kenneth J. Clayman, Esq. |
| if to the Tenant at: | Jo-Ann Stores, LLC<br>5555 Darrow Road<br>Hudson, Ohio 44236<br>Attn:  Vice President, Real Estate |
| with a copy to: | Jo-Ann Stores, LLC<br>5555 Darrow Road<br>Hudson, Ohio 44236<br>Attn:  Senior Legal Counsel |

or at such other address of Landlord or, Tenant as may be specified by such a notice.  Notice shall be deemed served upon receipt by the addressee thereof as shown on the return receipt or acknowledgment of delivery for such notice.  Rejection or other refusal to accept, or the inability to deliver because of changed address of which no notice was given, will be deemed to be receipt of notice as of the date of such rejection, refusal or inability to deliver.  Notwithstanding anything to the contrary, Tenant may give facsimile notice of the need of emergency repairs, followed promptly by notice as required above.

## SECTION 35.  HAZARDOUS MATERIALS

(a)     Tenant must not cause or permit the escape, disposal or release of any Hazardous

Materials (as hereafter defined) in violation of Laws. Tenant must not allow the storage or use of Hazardous Materials in any manner not sanctioned by Laws, nor allow to be brought into the Shopping Center any Hazardous Materials except to use in the ordinary course of Tenant's business and in such case, such use shall comply with all Laws. Tenant must defend, indemnify and hold Landlord harmless from and against any and all claims, losses, liabilities, damages, penalties, fines and expenses (including, without limitation, cleanup and other remedial and restoration costs, fees for consultants and experts and reasonable attorneys' fees and other costs of litigation arising by reason of any of the aforesaid or any action against Landlord under this indemnity) arising directly or indirectly from, out of or by reason of the release of Hazardous Materials in the Shopping Center occurring during the Term caused by Tenant or Tenant's contractors, agents or employees or persons acting under Tenant. It is a condition to indemnification that Tenant receives notice of any claim by Landlord promptly after Landlord first has knowledge thereof. This indemnity survives the expiration or earlier termination of the Term.

(b)      Landlord must not cause or permit any Hazardous Materials to exist in the Premises. In addition, Landlord must not knowingly cause or permit any Hazardous Materials to be sold, used, stored, brought upon or disposed of (collectively a "Use") in, on, under or about the Shopping Center (including the Premises, before the Delivery Date) without in each case: (i) obtaining all necessary permits required in connection therewith; and (ii) complying with all permit requirements; and (iii) otherwise taking all appropriate steps and making adequate arrangements to assure that such Use is in the ordinary course of business in the operation of the Shopping Center.   Such Use must be performed safely and without contamination of the Shopping Center and the Shopping Center Site or any portion thereof and fully in compliance with all applicable Laws. Landlord must defend, indemnify and hold Tenant harmless from and against any and all claims, losses, liabilities, damages, penalties, fines and expenses (including, without limitation, cleanup and other remedial and restoration costs, fees for consultants and experts and reasonable attorneys' fees and other costs of litigation arising by reason of any of the aforesaid or any action against Tenant under this indemnity) arising directly or indirectly from, out of or by reason of the release of Hazardous Materials in the Shopping Center occurring during the Term caused by Landlord or Landlord's contractors, agents or employees or persons acting under Landlord. It is a condition of this indemnification that Landlord receives notice of any such claim by Tenant promptly after Tenant first has knowledge thereof.  This indemnity survives the expiration or early termination of this Lease.

(c)      If either party receives any written notice of Hazardous Discharge or Environmental Complaint that specifically identifies the Premises or the Common Areas or describes a condition that materially impairs or could materially impair the occupancy, use and enjoyment of the Premises, then the receiving party must give immediate oral and written notice of same to the other party detailing all relevant facts and circumstances within the knowledge of the receiving party.

(d)      If Tenant's use, occupancy and enjoyment ("Occupancy") of the Premises is materially interfered with by reason of the existence or remediation of any Hazardous Materials

located on, in or under the Shopping Center or on the Shopping Center Site and is caused by Landlord or Landlord's agents, employees or contractors, then (i) throughout such period of interference, a fair and just proportion of the Rent and other charges payable (taking into account the nature of the interference to Tenant's Occupancy), will be abated, and (ii) if Tenant's occupancy is substantially impaired for three months or more, then Tenant has the right to terminate this Lease by giving written notice to the other of its election to do so, whereupon this Lease will automatically terminate and end effective as of the date of such notice and neither party will have any further obligations hereunder other than obligations which survive termination. Landlord may nullify Tenant's notice of termination if Landlord diligently corrects the Hazardous Materials interference and completes the job in accordance with Laws within three months after the date of Tenant's termination notice. The abatement provided in clause (i) of this subsection will continue throughout the period of such correction by Landlord.

(e)    "Hazardous Materials" means (i) any waste, pollutant, material, substance or contaminant which is or becomes listed, defined, or classified as having properties harmful to health, safety, or indoor or outdoor environment; and (ii) any substance or material that is or becomes regulated by any Public Entity by reason of the hazardous or toxic qualities of such substance or material; and (iii) any other toxic or hazardous substance, regardless of whether the same is regulated, including, without limitation, so-called "black mold," any mycotoxin, and any other mold capable of producing a toxic or allergic reaction in humans (including, without limitation, Stachybotrys, S. atra, S. chartarum, Aspergillus, Fusarium, Coccidioides). Without limiting the generality of the forgoing, Hazardous Materials include oil, petroleum, petroleum-fraction or petroleum-derived substance; urea formaldehyde foam insulation; asbestos and asbestos-containing materials; and any electrical equipment that contains any oil or dye-electric fluid containing polychlorinated biphenyls.

(f)    "Hazardous Discharge" means the presence, use, release, dispersal, emission, spill, discharge or cleanup of any Hazardous Materials (i) on or about or emanating from the Shopping Center or the Shopping Center Site, or (ii) arising out of the use and occupancy of or operations within the Shopping Center, or (iii) caused by Landlord or other occupant of the Shopping Center or the employees, contractors, invitees or agents thereof.

(g)    "Environmental Complaint" means any complaint, investigation, order, citation, or action with regard to any Hazardous Discharge, air emissions, water discharges, noise emissions or any other environmental, health or safety matter pertaining to or emanating from the Shopping Center from any Public Entity.

## SECTION 36.  LIMITATION OF LANDLORD'S LIABILITY

(a)    If Landlord fails to perform any covenant, term or condition on Landlord's part to be performed, and as a consequence of such default Tenant recovers a money judgment against Landlord, such judgment will be satisfied only out of (i) the proceeds of sale received upon execution of such judgment and levy thereon against the right, title and interest of Landlord in the Shopping Center, (ii) the rents and other income from such property receivable

by Landlord, and (iii) the consideration received by Landlord for the sale or other disposition of all or any part of Landlord's right, title and interest in the Shopping Center, which consideration is deemed to include any assets at any time after such sale or disposition held by Landlord having a value not exceeding that of the proceeds of such sale or other disposition, and Landlord shall not be liable for any deficiency.

(b)     Notwithstanding subsection (a), in the event of fraud on the part of Landlord the aforesaid limitation on liability is inapplicable.  This Section will not be deemed to deny to Tenant, or limit its right to obtain, injunctive relief or specific performance of Landlord's covenants under this Lease or to avail itself of any other right or remedy (not involving a personal liability of Landlord in excess of the limits of personal liability fixed by this Section) which may be accorded Tenant by Laws or under this Lease by reason of Landlord's failure to perform its obligations thereunder including, but not limited to, the rights and remedies granted Tenant under Section 29.

## SECTION 37.   DELIVERY OF SITE PLAN

Within 30 days after Tenant's written request therefor but not more than once per Lease Year, Landlord must provide Tenant with a copy of the most current available site plan of the Shopping Center, which must reflect:  (a) the then current Gross Leasable Area of the Shopping Center; (b) the names and location and the Gross Leasable Area of the premises occupied by the respective tenants thereof; and (c) those premises in the Shopping Center, if any, which are not then currently occupied and open for business. If Landlord fails to provide this information within the period allowed, then Tenant has the right to suspend the payment of monthly installments of Additional Rent, until delivery of the information, which Additional Rent shall be paid in full upon Landlord's compliance with this Section 37.

## SECTION 38.   INTENTIONALLY OMITTED

## SECTION 39.   ENTIRE AGREEMENT; WRITING REQUIRED

This Lease contains all of the agreements of the parties with respect to any matter covered or mentioned in this Lease, and no prior agreement, understanding or representation pertaining to any such matter will be effective for any purpose.  No provision of this Lease may be changed, deleted, modified or amended, except by an agreement in writing signed by the parties.

Store No. 2412, Suburban Plaza, Decatur, GA
EXECUTION VERSION: November 19, 2014
UB Document No. 1126865 v.1

## SECTION 40.  OPERATING COVENANT

(a)      Tenant will open from the Premises, fully stocked and staffed as a typical "Jo Ann Fabric" retail store within 90 days after the Commencement Date and continue to operate from the Premises during Tenant's normal business hours for a period of at least one full day (the "Operation Period"), but for reasons other than damage and destruction, eminent domain, Unavoidable Delays, or such other right as provided for under this Lease.  After the Operation Period, notwithstanding anything contained in this Lease, expressly or impliedly, to the contrary, and notwithstanding the agreement for the payment by Tenant of Rent (including Substitute Rent or other percentage rent), Tenant is under no duty or obligation, either express or implied, to open, or thereafter to continuously conduct, its business in the Premises at any time during the Term.  After the Operation Period, Tenant's failure to open for business in the Premises will not in any way be deemed an event of default under this Lease, nor will such a failure otherwise entitle Landlord to begin or to maintain any action, suit, or proceeding, whether in law or in equity, relating in any way to Tenant's failure to open or thereafter to continuously conduct its business in the Premises.

(b)      If Tenant elects to discontinue its operation of business from the Premises ("Go Dark") and the cessation continues for 180 consecutive days, for reasons other than an assignment or subletting (not to exceed 90 days), damage and destruction, remodeling (not to exceed 90 days), eminent domain, Unavoidable Delays, or such other right as provided for under this Lease or under Laws, Tenant shall remain liable for the payment of Rent and all other terms and conditions under the Lease.  Landlord shall have the right to recapture the Premises with 90 days' prior written notice to Tenant if Tenant elects to Go Dark.  Tenant will have the one-time right, within 30 days of receipt of Landlord's recapture termination notice, to advise Landlord that Tenant will reopen for business from the Premises. If Tenant elects to reopen for business, then it must do so within 30 days of its notice to Landlord or such greater time as is reasonably necessary under the circumstances; otherwise, Tenant's notice will be null and void.  If, after Tenant's re-opening, Tenant elects to Go Dark again in the future, Tenant shall not have the right to re-open upon Landlord's written notice to Tenant terminating this Lease.    If Landlord terminates this Lease as provided above, Landlord shall pay to Tenant an amount equal to the unamortized costs of Tenant's Work in excess of the Tenant Improvement Allowance and all other reasonable and actual fees, costs, and charges incurred by Tenant in preparation for opening the Premises for business.    Tenant's obligations under this Lease will terminate as of the date of such notice and payment, except for (i) claims of personal injury or property damage arising on or prior to the termination date for which and against which Tenant was obligated under the terms of this Lease to indemnify and hold harmless Landlord, and (ii) all Rent and other charges which have accrued (but as yet have not been billed) under this Lease, up to and including the termination date.  For the purpose of this Lease, the unamortized costs shall be an amount equal to the initial costs amortized on a straight line basis over the term of this Lease (including any option periods).  The initial costs shall consist of the cost of improvements that Tenant made to the Premises prior to opening for business therein, as well as any the cost of any permanent improvements to the Premises that Tenant has made, less the amount of the Improvement Allowance, if any, paid the Tenant, provided Tenant submits to Landlord an

itemized schedule of initial Tenant's Work and the initial costs thereof within 90 days after written request.

## SECTION 41.  APPLICABLE LAW AND CONSTRUCTION

The laws of the state within which the Premises are located govern the validity, performance and enforcement of this Lease without regard to its conflicts of law principles.  If one or more of the provisions of this Lease is held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability will not affect or impair any other provision of this Lease, and this Lease will be construed as if such invalid, illegal or unenforceable provision had not been contained herein.  The submission of this document for examination does not constitute an offer to lease, or a reservation of or option for the Premises, and this Lease becomes effective only upon execution and delivery thereof by both Landlord and Tenant. This Lease has been negotiated by Landlord and Tenant and will not be deemed to have been prepared by either Landlord or Tenant, but by both equally. All prior negotiations, considerations, representations and understandings between the parties are and shall be deemed to be incorporated and merged into this Lease and shall not be construed as having survived the execution hereof so that only the provisions of this Lease shall govern the respective rights and obligations of the parties hereto to the same effect as if all such negotiations, considerations, representations and understandings shall have never been made or given by either party to the other party hereto.

## SECTION 42.  UNAVOIDABLE DELAYS

Except as otherwise expressly provided herein, if either party is delayed or hindered in or prevented from the performance of any obligation required hereunder by Unavoidable Delay, the time for performance of such obligation shall be extended for the period of the delay, provided that Unavoidable Delay will not excuse prompt and timely payments, including Rent, when due under this Lease except when (A) the Commencement Date is delayed by reason of Unavoidable Delay; or (B) such payment is excused pursuant to other provisions of this Lease. However, no delay will be excused by this section unless (1) the delayed party notifies the other party in writing of the delay within 21 days of the event giving rise to such delay; (2) the delayed party has exhausted all other resources available at reasonable costs to avoid such delay; and (3) the delayed party diligently pursues completion of the activity that was delayed. Notwithstanding anything to the contrary in this Lease, under no circumstances will Unavoidable Delay extend the time for performance of any obligation by more than 90 days.

## SECTION 43.  REASONABLE CONSENT

Wherever either party's consent or approval is required, such consent or approval must not be unreasonably or arbitrarily withheld or delayed, unless otherwise expressly stated.

## SECTION 44.  NO PARTNERSHIP

Landlord and Tenant acknowledge that neither of them in any way or for any purpose becomes a partner or an associate of the other in the conduct of Tenant's business, the operation of the Shopping Center or otherwise, or a limited liability company, or a member of a joint enterprise with the other.  Neither party is liable for payment of the debts or performance of any obligation of the other. The relationship is and shall be that of Landlord and Tenant.

## SECTION 45.  ESTOPPEL

Within 15 business days after written request, Tenant will execute and deliver to Landlord a Tenant Estoppel Certificate substantially in the form of <u>Exhibit H</u> attached hereto. Within 30 days after request, Landlord will execute and deliver to Tenant a written instrument certifying that this Lease is unmodified and in full force and effect, or if there has been any modification, that this Lease is in full force and effect as modified and stating all such modifications; specifying the dates to which Rent has been paid; stating whether to Landlord's knowledge there exists any default in the performance by either party under any provision of this Lease; and certifying as to such other matters as Tenant reasonably may request. With regard to any estoppel certificates related to this Lease, the Lease will take precedence over the contents of such estoppel certificates, should a conflict arise. The requesting party shall be required to pay the other party under this Lease a non-refundable fee in the amount of $1,000.00 for each new Estoppel Certificate and each new SNDA requested from and provided by the other to cover administrative, legal and other costs and expenses incurred in processing, negotiating and drafting said documents.

## SECTION 46.  QUIET ENJOYMENT

Landlord represents and warrants to Tenant that Landlord is well seized of fee simple title to the Premises and the Shopping Center and has full power and authority to execute and deliver this Lease. Landlord covenants to Tenant that Tenant shall at all times have peaceable and quiet enjoyment and possession of the Premises and of the rights granted hereunder without any manner of hindrance from Landlord or any other person or persons claiming by, through or under Landlord, if Tenant performs all the covenants and agreements to be performed on Tenant's part.

## SECTION 47.  HOLDING OVER

Notwithstanding anything to the contrary in the Lease, upon the expiration of the Initial Term, Options or any extensions, the Lease shall automatically convert to a month-to-month tenancy upon the same terms and conditions (except rental shall be at 125% of the rental for the prior month) which exist at the time of Lease expiration, and either party may terminate the Lease during said month-to-month tenancy upon 90 days prior written notice to the other party; provided, however, Landlord shall not specify a Lease termination date during the period commencing November 15 and ending January 31, unless Tenant is in default under the terms



of the lease beyond applicable notice and cure periods.

## SECTION 48.  BROKERS

Each party represents to the other party that it has not dealt with any party with regard to the Premises or this Lease, except that Ruth Coan of The Shopping Center Group represent Tenant in this transaction.  Landlord will pay Tenant's brokers pursuant to a separate agreement between Landlord and Tenant's brokers and it is agreed that if Landlord does not pay Tenant's brokers, Tenant shall have the right to pay Tenant's brokers for fees due and offset said amounts against the Fixed Minimum Rent due Landlord. Each party will indemnify and hold the other party harmless from and against any loss, cost, liability and expense, including reasonable attorney's fees, arising out of a breach of its representation in this section.

## SECTION 49.  INTENTIONALLY DELETED

## SECTION 50.  CLAIMS LIMITATION

All actions or claims by Landlord for Rent shall be barred three years after the end of each Lease Year or Partial Lease Year. All actions or claims by Tenant for recovery of excess payments of Rent shall be barred three years after the end of each Lease Year or Partial Lease Year, except that in the case of any component of Additional Rent, the same will not be barred until three years after Tenant's receipt of Landlord's annual reconciliation statement furnished with respect to that Lease Year or Partial Lease Year. The forgoing limitations shall not apply in the event of fraud or willful mis-statement of the amounts so stated.

## SECTION 51.  CAPTIONS

Any paragraph titles or captions contained in this Lease are for convenience only and do not define, limit or otherwise modify the scope or intent of this Lease.

## SECTION 52.  VARIATION IN PRONOUNS

All the terms and words used in this Lease, regardless of the number and gender in which they are used, will be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context or sense of this Lease or any paragraph or clause herein may require, the same as if such words had been fully and properly written the number and gender.

## SECTION 53.  SECTION REFERENCES

All references to any section number(s) refer to the Section contained in this Lease.

Store No. 2412, Suburban Plaza, Decatur, GA
EXECUTION VERSION: November 19, 2014
UB Document No. 1126865 v.1

## SECTION 54.  BINDING EFFECT OF AGREEMENT

This Lease and all of the covenants, conditions, provisions and restrictions herein inures to the benefit of and binds the heirs, executors, administrators, devisees, legatees, personal representatives, successors and assigns, respectively, of Landlord and Tenant.

## SECTION 55.  ATTORNEY'S FEES

If Landlord or Tenant is required to enforce this Lease, then the non-prevailing party must pay to the prevailing party the prevailing party's arbitration costs (if any), court costs and reasonable attorney's fees. This provision applies to court costs and attorneys fees incurred in any trial and appellate courts.

## SECTION 56.  OFAC WARRANTY

Each party represents and warrants to the other party that the representing party (a) is not acting, directly or indirectly, for or on behalf of any person, group, entity, or nation named by any Executive Order or the U.S. Treasury Department as a terrorist, "Specially Designated National and Blocked Person," or other banned or blocked person, entity, nation, or transaction pursuant to any law, order, rule, or regulation that is enforced or administered by the Office of Foreign Assets Control, and (b) is not engaged in this lease transaction, directly or indirectly, on behalf of, or instigating or facilitating this lease transaction, directly or indirectly, on behalf of any such person, group, entity or nation. The breaching party must defend, indemnify, and hold harmless the other party from and against all claims, damages, losses, risks, liabilities, and expenses (including reasonable attorney's fees and costs) arising from or related to any breach of the forgoing representation.

## SECTION 57.       PDF/COUNTERPART SIGNATURE

This Lease may be executed in multiple counterparts, each of which shall constitute an original and all of which taken together shall constitute one and same agreement binding upon the parties, notwithstanding that all the parties are not signatories to the same counterpart. In order to facilitate the finalization of this Lease, the parties agree that signatures transmitted by facsimile machine or signatures transmitted via e-mail in a "PDF" format may be used in place of original signatures on this Lease. Each party intends to be bound by such party's facsimile or "PDF" format signature on this Lease, is aware that the other parties are relying on such party's facsimile or "PDF" format signature, and hereby waives any defenses to the enforcement of this Lease based upon the form of signature. Promptly following any facsimile transmittal or e-mail transmittal of "PDF" format signatures, the parties shall deliver to the other parties the original executed Lease by reputable overnight courier to the notice addresses listed herein (it being agreed and understood that the delivery of such original shall not be a condition to the binding nature of the facsimile or electronic copy of the document provided such document is received by the parties).



In witness whereof, the parties have signed this Lease as of the date listed above.

**Signed in the Presence of:**

LANDLORD:
**SUBURBAN PLAZA, LLC,** a limited liability company organized under the laws of the State of Georgia

By: Selig Enterprises, Inc., a Georgia corporation, as manager

By:_____
S. Stephen Selig, III, Its President

Employer Identification Number:_____

**Signed in the Presence of:**

TENANT:
**JO-ANN STORES, LLC,** an Ohio limited liability company

By:_____
James Kerr, Interim Chief Executive Officer and Interim President

And

By:_____
David B. Goldston, Senior Vice President, General Counsel and Secretary

Store No. 2412, Suburban Plaza, Decatur, GA
EXECUTION VERSION: November 19, 2014
UB Document No. 1126865 v.1

- 60 -

STATE OF GEORGIA )
        ) SS
COUNTY OF *Fulton* )

  BEFORE ME, a Notary Public in and for said County and State, personally appeared **SUBURBAN PLAZA, LLC,** by Selig Enterprises, Inc., its manager, by S. Stephen Selig, III, its President, who did sign the foregoing instrument on behalf of the said companies in their respective capacities and that the same is his free act and deed personally and as such authorized representative.

  IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at Decatur, Georgia, this ___ day of ~~November,~~ *December* 2014.



              NOTARY PUBLIC

STATE OF OHIO )
       ) SS
COUNTY OF SUMMIT )

  BEFORE ME, a Notary Public in and for said County and State, personally appeared **JO-ANN STORES, LLC,** an Ohio limited liability company, by James Kerr, its interim chief executive officer and interim president, and David B. Goldston, its senior vice president, general counsel and secretary, who acknowledged that they did sign the foregoing instrument on behalf of said corporation and that the same is their free act and deed personally and as such officers.

  IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at Hudson, Ohio, this _____ day of November, 2014.

              NOTARY PUBLIC

Ashley Pugh
Resident Summit County
Notary Public, State of Ohio
My Commission Expires: 02/23/2019

Store No. 2412, Suburban Plaza, Decatur, GA
EXECUTION VERSION: November 19, 2014
UB Document No. 1126865 v.1

Exhibit A

**Shopping Center Legal Description**

**SUBURBAN PLAZA**

All that tract or parcel of land lying and being in Lot 49 of the 18th District, DeKalb County, Georgia, and being more particularly described as follows:

**BEGINNING** at an iron pin found  (rebar with cap) which forms the northeasterly end of a miter forming the intersection of the southwesterly right of way line of North Decatur Road (variable r/w) the southeasterly right of way line of Scott Boulevard, also known as U. S. Highway 29 / U. S. Highway 78 / State Route 8, (variable r/w) and the northeasterly right of way line of Medlock Road (variable r/w) and proceed in a southeasterly direction along the southwesterly right of way line of North Decatur Road (variable r/w) the following courses and distances: 1) South 65°57'01" East, 354.90 feet to a nail placed; 2) South 19°28'34" West, 15.00 feet to a nail placed; 3) South 65°58'16" East for a distance of 179.26 feet to a point; 4) thence 363.20 feet along the arc of a curve to the left, said curve having a radius of 2963.63 feet and being subtended by a chord of South 69°28'55" East, 362.98 feet to a point; 5) thence South 72°04'44" East for a distance of 52.86 feet to a point; 6) thence 111.81 feet along the arc of a curve to the left, said curve having a radius of 1481.52 feet and being subtended by a chord of South 74°14'28" East, 111.79 feet to an iron pin placed (1/2" rebar); 7) thence South 68°02'34" East for a distance of 18.93 feet to an iron pin placed (1/2" rebar); 8) thence 5.94 feet along the arc of a curve to the left, said curve having a radius of 1484.39 feet and being subtended by a chord of South 77°14'26" East, 5.94 feet to a point; 9) thence 183.79 feet along the arc of a curve to the left, said curve having a radius of 1484.39 feet and being subtended by a chord of South 80°54'08" East, 183.67 feet to a point; 10) thence South 84°26'58" East for a distance of 8.33 feet to an iron pin placed (1/2" rebar) at the northwesterly end of a radius forming the intersection of the southeasterly right of way line of North Decatur Road (variable r/w) with the northwesterly right of way line of Church Street (variable r/w); thence, along said radius 128.72 feet along the arc of a curve to the right, said curve having a radius of 100.00 feet and being subtended by a chord of South 33°03'19" East, 120.02 feet to a concrete right-of-way monument found on the northwesterly right of way line of Church Street (variable r/w); thence in a southwesterly direction along the northwesterly right of way line of Church Street (variable r/w) the following courses and distances: 1) South 22°45'46" West, a distance of 24.26 feet to a concrete right-of-way monument found; 2) thence 235.10 feet along the arc of a curve to the right, said curve having a radius of 1481.89 feet and being subtended by a chord of South 28°01'21" West, 234.85 feet to a concrete right-of-way monument found; 3) thence South 32°42'26" West for a distance of 114.25 feet to a point; 4) thence 65.34 feet along the arc of a curve to the right, said curve having a radius of 573.00 feet and being subtended by a chord of South 35°40'26" West, 65.30 feet to a concrete right-of-way monument found; 5) thence 79.83 feet along the arc of a curve to the right, said curve having a radius of 1487.89 feet and being subtended by a chord of South 41°10'37" West, 79.82 feet to a concrete right-of-way monument found; 6) thence South 42°18'15" West for a distance of 288.27 feet to an iron pin found (1/2" rebar; thence departing said northwesterly right of way line of Church Street (variable r/w) and proceed North 73°50'43" West for a distance of 158.76 feet to an iron pin found (1/2" rebar); thence North 72°03'50" West for a distance of 386.80 feet to an iron pin found (1/2" rebar); thence North 05°28'34" East for a distance of 97.15 feet to an iron pin placed (1/2" rebar); thence North 05°56'34" East for a distance of 100.04 feet to an iron pin placed (1/2" rebar); thence North 05°54'34" East for a distance of 95.77 feet to an iron pin found (3/8" rebar); thence North 71°37'16" West for a distance of 179.92 feet to an iron pin found (1/2" rebar); thence North 20°06'57" East for a distance of 145.27 feet to an iron pin found (1/2" rebar); thence North 66°20'46" West for a distance of 126.68 feet to an iron pin found (1" rebar); thence North 66°20'46" West for a distance of 145.96 feet to an iron pin found (1" open top pipe) on the easterly right of way line of Medlock Road (variable r/w);

Exhibit A, Page 1

thence in a northerly direction along the easterly and northeasterly right of way line of Medlock Road (variable r/w) the following courses and distances: 1) North 00°57'33" East for a distance of 289.69 feet to an iron pin found (rebar with cap); 2) thence North 24°17'44" East for a distance of 30.68 feet to an iron pin found (rebar with cap); 3) thence North 00°51'16" East for a distance of 85.80 feet to an iron pin placed (1/2" rebar with cap) at the southwesterly end of the aforementioned miter forming the intersection of the southwesterly right of way line of North Decatur Road (variable r/w), the southeasterly right of way line of Scott Boulevard, also known as U.S. Highway 29 / U.S. Highway 78 / State Route 8 (variable r/w), and the northeasterly right of way line of Medlock Road (variable r/w); thence along said miter North 54°11'35" East for a distance of 61.40 feet to the **Point of Beginning**.

Said tract or parcel containing 19.58062 acres, or 852,932 square feet.

Exhibit A, Page 2

<u>Exhibit B</u>

**Site Plan**

Exhibit B

Store No. 2412, Suburban Plaza, Decatur, GA
EXECUTION VERSION: November 19, 2014
UB Document No. 1126865 v.1



LEGEND

PROTECTED AREA

SHOPPING CENTER SITE

COMMON AREAS NOT TO BE COMPLETED AT TIME OF DELIVERY

WALMART TRACT - COMMON AREA NOT TO BE COMPLETED AT TIME OF DELIVERY

PYLON SIGN #2

SUITE 2641

PERMITTED TENANT CLUB TENANT "A"

COMMON AREA NOT TO BE COMPLETED AT TIME OF DELIVERY

PROTECTED AREA

PYLON SIGN #1

NORTH DECATUR ROAD

MEDLOCK ROAD

SCOTT BOULEVARD

LOWER LEVEL PARKING BELOW ANCHOR TENANT

TENANT 'C'

TENANT 'D'

TENANT 'E'

JO-ANN FABRICS TENANT E

LOWER LEVEL PARKING BELOW TENANT 'C'

BOWLING ALLEY

LOWER LEVEL

UPPER LEVEL

PROPOSED TRASH CONTAINER LOCATION

APPROXIMATE LOCATION OF CART CORRALS

## SUBURBAN PLAZA REDEVELOPMENT: LEASING PLAN

NORTH DECATUR ROAD
DECATUR, DEKALB COUNTY, GA. 30030

DRAWN BY: CO
DATE: 10/02/2014

SCALE: 1"=160'

0    80'    160'    320'

**SELIG** ENTERPRISES, INC.

1100 SPRING STREET NW SUITE 550
ATLANTA, GEORGIA 30309-2848
TEL (404) 876-5511 FAX (404) 875-2629

Exhibit _B_ Page _1_ of _1_

Exhibit C

**Scope of Work Matrix**

Exhibit C



**JO-ANN fabric and craft stores®**

* ALL WORK IDENTIFIED WITHIN THIS MATRIX TO AS PER CURRENT JO-ANN STORES, INC. PROTOTYPE SET OF PLANS. NOT ALL PROTOTYPE ITEMS ARE ADDRESSED IN THIS MATRIX. IT IS THE LANDLORD'S RESPONSIBILITY TO COMPLY WITH ALL CURRENT PROTOTYPE REQUIREMENTS AND CURRENT SPECS.
* LANDLORD SHALL BE REQUIRED TO PURCHASE THROUGH JO-ANN STORES, INC. NATIONAL ACCOUNT VENDORS WHERE REQUIRED PER THE CURRENT PROTOTYPE.
* JO-ANN RELEASE JO-ANN STORES NATIONAL ACCOUNT VENDOR OR JO-ANN STORES GENERAL CONTRACTOR.
* IF THERE IS A DISCREPANCY BETWEEN JO-ANN'S PROTOTYPICAL DOCUMENTS AND THIS MATRIX THE MATRIX WILL GOVERN AND CONTROL.
* ITEMS CHECKED "AS-IS" ARE DELIVERED IN AS IS CONDITION WITHOUT WARRANTY OR REPRESENTATION EXCEPT AS MAY OTHERWISE BE PROVIDED IN THE LEASE, THE EXOSIT OR ANY OTHER EXHIBIT TO THE LEASE.
* ITEMS CHECKED "EXISTING" ARE A WARRANTY AND REPRESENTATION BY LANDLORD THAT THE EXISTING PREMISES MEET THE SPECIFICATIONS AND CONDITIONS DESCRIBED IN THE LINE ITEM AND THAT THE PREMISES WILL BE DELIVERED TO TENANT IN ACCORDANCE THEREWITH.
* ANY AS-IS OR EXISTING CONDITION REQUIRING WORK MUST INCLUDE A CLARIFICATION NOTE.

## SHELL PROJECT

## SHELL PROJECT

*(The remainder of this page consists of an extremely dense two-column Division of Work matrix with columns: DIVISION OF WORK, AS-IS, EXISTING, NOT APPLICABLE, JO-ANN, LANDLORD, and a description field. The individual line items are not legibly reproducible at this resolution.)*

**DIVISION OF WORK MATRIX APPROVED AS SHOWN:**

Coust manager          10/7/14

Manager Construction   10/7/14

Construction Department Representative

**STORE NAME:**          Decatur, GA

**STORE ADDRESS:**       Suburban Plaza

**DATE:** 09.10.14

**REVISED DATE:** 09.15.14, 09.24.14, 10.03.14

Exhibit C  Page 1 of 1



Exhibit D-2

**Pylon Sign Rendering**

Exhibit D-2

**PYLON SIGN #1**

Legend
New tenant cabinet section for existing monument. Base, stee poles! & Main ID cabinet to
remain as existing. All tenant sections to be 1'-9" x 14'- 0 1/2" with 2" tall
reveals between. internally illuminated w/ H.O. lamps, to UL standards.

Color and Material Finish

14'- 8"

3'- 2 1/2"
(existing)

## SUBURBAN PLAZA

2"

3'- 8"

**Walmart** ✺
Save money. Live better.

1'- 9"

*LA FITNESS*

15'- 4"
(new construction)

*TENANT*    (PROPOSED HOMEGOODS)

*TENANT*    (PROPOSED ROSS)

*TENANT*    (PROPOSED JOANN FABRIC)

SUBURBAN LANES
AUTOMATIC SCORING

*TENANT*

2'- 8"

25'- 8"

6'- 5 3/4"
(existing)

3'- 6"          3'- 6"

2'- 0"

14'- 0 1/2"




| DESIGNED FOR: selig | SALES AGENT: tom tyson | REVISION BY:      DATE: | SCALE: 3/16" = 1' | Signal Signs Corp. 440 Six Flags Parkway Mableton, GA 30126 | DESIGNED FOR: SELIG ENTERPRISES, INC. | NOTICE This original engineering and design is the property of Signal Signs and in not to reproduced, copied, loaned, exhibited or used in any fashion in whole or in part without written permission from Signal Signs Corp. Please be advised, there are initally two free hours of design time available per job request, in the event that the said two hour lapse, you will then be billed our design rate of $75 per hour. |
|---|---|---|---|---|---|---|
| LOCATION suburban plaza | DRAWN BY: bmp | DATE: 02.04.13 | DRAWING VLRSION. v2-a | FILE PATH: :\c\selig\sub. plaza\sm. pylon | | |

Ph 770-941-9900
Fax 770-941-2307

**PYLON SIGN #2**

Legend

New tenant cabinet section for existing monument. Base, stee poles! & Main ID cabinet to
remain as existing. All tenant sections to be 2'-9 3/8" x 16'-0 1/2" with 4" tall
reveals between. internally illuminated w/ H.O. lamps, to UL standards. Vinyl as required.

Color and Material Finish



17'- 0"

4'- 7 1/4"
(existing)

**SUBURBAN PLAZA**

4"

6'- 11 1/4"

**Walmart** ✦
Save money. Live better.

2'- 9 3/8"

**LA FITNESS**

25'- 1"
(new construction)

**TENANT**   (PROPOSED HOMEGOODS)

**TENANT**   (PROPOSED ROSS)

**TENANT**   (PROPOSED JOANN FABRIC)

**SUBURBAN LANES**
AUTOMATIC SCORING

**TENANT**

2'- 6"

5'- 6"   (existing)

4'- 0"        4'- 0"

16'- 0 1/2"

3'- 1"

38'- 4 1/4"

2'- 1"



SIGNAL
SIGNS

RISING ABOVE THE REST

| | | | | |
|---|---|---|---|---|
| DESIGNED FOR: selig | SALES AGENT: tom tyson | REVISION BY:    DATE: | SCALE: 1/8" = 1' | |
| LOCATION: suburban plaza | DRAWN BY: bmp   DATE: 02.04.13 | DRAWING VERSION v2-a | FILE PATH: /c\selig\sub. plaza\tg. pylon | |

**Signal Signs Corp.**
440 Six Flags Parkway
Mableton, GA 30126

Ph 770-941-9900
Fax 770-941-2307

DESIGNED FOR



SELIG
ENTERPRISES, INC.

UL LISTED

NOTICE
This original engineering and design is the property of Signal Signs Corp. and is not to
be reproduced, copied, loaned, exhibited or used in any fashion in whole or in part
without written permission from Signal Signs Corp. Please be advised, there are
initially two free hours of design time available per job request, in the event that
the said two hour lapse, you will then be billed our design rate of $75 per hour.

Exhibit E

**The Project Coordination Guidelines**

Exhibit E

# JO-ANN
## fabric and craft stores™

## Exhibit E

Project Coordination Guidelines

**Real Estate Process**

Jo-Ann Stores, LLC, an Ohio limited liability company ("JAS" ) is a party to that certain lease agreement by and between Suburban Plaza LLC, a Georgia limited liability company ("Landlord"), dated _____, 2014 (the "Lease). Capitalized and defined terms used in this Exhibit E shall have the same meanings as those ascribed to them in the Lease, unless the context clearly dictates otherwise.

Administrative Requirements – Addressed in Sections 010000, 011000, 012000, and 013300 on SP101 of FY16 Construction Documents. Forms attached to this document.

Document Review/Delivery Requirements – Addressed in Sections 10 and 2(f) of the Lease. This includes requirements for the Notice of Delivery.

Availability of Inspections – Buildings must be available for inspection by JAS prior to the execution of the Lease and at any point during Landlord's construction or turnover process.

Closeout procedures – Addressed in Section 4 of General Project Guidelines on cover sheet of Prototype and/or Construction Documents. These procedures are also addressed on Section 017000 on SP102 of FY16 Construction Documents.

Approved Vendors – All Turnkey Projects are required to follow this list for fixtures and equipment. Shell Projects to the extent of the scope listed on Exhibit C are required to follow this list. National Account Venders are listed in Required Vender List on cover sheet of FY16 Prototype and/or Construction Documents and on Attachment E – 3.

Submittals – Addressed in Section  013300 on SP101 of FY16 Construction Documents.

Milestones – Addressed in Section 2 of General Project Guidelines on cover sheet of Prototype and/or Construction Documents.

Turnover Criteria - Addressed in Section 3 of General Project Guidelines on cover sheet of Prototype and/or Construction Documents.



Changes to Project Scope – All changes to the responsibilities set forth in Exhibit C (project scope attached to the Lease) must be presented in writing and approved by JAS in advance. Any changes made outside of JAS approval will become the responsibility of the Landlord.

Definitions – See Section 2 of the Lease.

Site work – Addressed in Section 3 of General Project Guidelines on cover sheet of Prototype and/or Construction Documents.

Architectural – Addressed in Prototype Block Plans, Prototype Construction Documents and Prototype Elevations available on JAS WorkRoom Sites and attached to the Lease.

Plumbing – Addressed in Section 102800 on SP105 and 150100, 150500, 152500, 154100, 154400, 154600 and 154900 on SP105 of FY16 Prototype Construction Documents.

Fire Sprinkler – Addressed in Note 'c' on P101 of FY16 Prototype Construction Documents. Fire sprinkler requirements are coordinated with the local fire marshal or the authority having jurisdiction.

HVAC – Addressed in Sections 156000, 158000, 159000, 159500, 159700, and 159900 on SP105 of FY16 Prototype and/or Construction Documents.

Electrical Systems
- Fire Alarm System – Addressed in E401 Prototype Construction Documents available on JAS WorkRoom and attached to the Lease.
- Burglar Alarm System – Addressed in E402 Prototype Construction Documents available on JAS WorkRoom and attached to the Lease.
- Electrical System – Addressed in E100 – E701 Prototype Construction Documents available on JAS WorkRoom and attached to the Lease.

Roof – Addressed in Section  075000, 077100,  and 077200 on SP103 of FY16 Prototype Construction Documents.

Slab – Addressed in Section 033000 on SP102,  096500 on SP104 and 033000 on SP108 of FY16 Prototype Construction Documents and also addressed in Sections 2 and 18 of the Lease.

Utilities – Addressed in Section  169000 on SP107 of FY16 Prototype and/or Construction Documents.  In addition, timing for broadband, telephone service and other communication utilities are set forth in section 10 (b) of the Lease.

Temporary Construction and Utilities – Addressed in Section  015000 on SP101 of FY16 Prototype Construction Documents.

**<u>Required Attachments</u>**

E – 1    Project Information Sheet

E – 2    Construction Status Report

E – 3    National Account Vendor List

E – 4    (Intentionally Omitted)

E – 5    JAS Construction Department Contacts

# Jo-Ann Stores Construction Contacts

## Property Information (Landlord/Developer)

**Landlord**

| | |
|---|---|
| Name | |
| Address | |
| | |
| | |
| Phone | |

**LLD Construction Contact**

| | |
|---|---|
| Name | |
| Office | |
| Fax | |
| Mobile | |
| Email | |

**JAS Construction Manager**

| | |
|---|---|
| Name | Jim Piar |
| Office | (330) 463-6701 |
| Fax | |
| Mobile | |
| Email | james.piar@joann.com |

**Property Manager**

| | |
|---|---|
| Name | |
| Office | |
| Fax | |
| Mobile | |
| Email | |

**Legal Notice Address**

| | |
|---|---|
| Name | |
| Office | |
| | |
| | |
| | |

## Site Construction Information:      construction type: choose below

**General Contractor:**

| | |
|---|---|
| Name | |
| Address | |
| | |
| | |
| Office | |

**Project Manager:**

| | |
|---|---|
| Name | |
| Office | |
| Fax | |
| Mobile | |
| Email | |

**Site Superintendent:**

| | |
|---|---|
| Name | |
| Site # | |
| Fax | |
| Mobile | |
| Email | |

**Architect:** *(of record)*

| | |
|---|---|
| Name | |
| Office | |
| Fax | |
| Mobile | |
| Email | |

# Jo-Ann Stores Construction Contacts

**Site Superintendent:**

| | |
|---|---|
| Name | |
| Site # | |
| Fax | |
| Mobile | |
| Email | |

**Architect:** *(of record)*

| | |
|---|---|
| Name | |
| Office | |
| Fax | |
| Mobile | |
| Email | |

# JO-ANN

# CONSTRUCTION STATUS REPORT

## PROJECT INFORMATION:

| STORE #: | | DATE: | |
|---|---|---|---|

**STORE LOCATION:**

| Shopping Center Name: | |
|---|---|
| Address: | |
| Address: | |
| City / State / Zip: | |

**GENERAL CONTRACTOR:**

| Company Name: | |
|---|---|
| Address: | |
| City / State / Zip: | |
| Superintendent Contact: | |
| Phone: | |
| Fax: | |
| Email: | |

## SCHEDULE COMPLIANCE:

**SITE WORK :** — Comments:

**UTILITIES - ROUGH**
GAS, WATER, ELECTRIC, SEWER, TELEPHONE — Comments:

**UTILITIES - METERS**

| | Meter #'s | Utility Company |
|---|---|---|
| ELECTRIC | | |
| WATER | | |
| GAS | | |

**BUILDING SHELL:** — Comments:

**TENANT IMPROVEMENT:**

| | | | | | |
|---|---|---|---|---|---|
| Demolition- | 0% | Rough Electrical- | 0% | Floor Prep- | 0% |
| Deck Painting- | 0% | RTU's | 0% | Flooring Install- | 0% |
| Framing - | 0% | Lighting- | 0% | Façade / EIFS Work | 0% |
| Storefront Construction- | 0% | HVAC Ductwork- | 0% | Finish Plumbing- | 0% |
| Sheet Rock- | 0% | Millwork- | 0% | Finish Electric- | 0% |
| Rough Plumbing- | 0% | Wall Paint- | 0% | Finish Carpentry- | 0% |

Comments:                                    **Overall Construction Completion** 0%

**LANDLORD ISSUES:**

**SITE WORK :**

Comments:

**BUILDING EXTERIOR:**

Comments:

**BUILDING INTERIOR:**

Comments:

**NATIONAL ACCOUNT VENDOR ISSUES:**

**PURCHASE ORDERS:**

Comments:

**DELIVERY:**

Comments:

**INSTALLATION:**

Comments:

**VALIDATION:**

Comments:

**INSPECTIONS/ CO REQUIREMENTS:**

**TCO STATUS:**
DO WE NEED TCO TO FIXTURE & PLANNOGRAM?
DO WE NEED TCO TO MERCHANDISE?

Comments:

**C. of O. STATUS:**
LIST ALL REQUIREMENTS FOR OBTAINING CO

Comments:

**ISSUE LOG STATUS:**

**ISSUES LOG:**

Comments:

**GC REQUIRED TO SUBMIT REPORT TO JO ANN STORES EVERY MONDAY BY 12:00 PM EST** via posting report and progress photos to the JoAnn Workroom (expesite) and notifying the Construction Specialist assigned to your project.

# Jo-Ann Stores Construction Contacts

| Site Construction Information: | construction type: choose below |
|---|---|

**General Contractor:**

| | |
|---|---|
| Name | |
| Address | |
| | |
| | |
| Office | |

**Project Manager:**

| | |
|---|---|
| Name | |
| Office | |
| Fax | |
| Mobile | |
| Email | |

## Approved/Preferred Architects

| | | | | | |
|---|---|---|---|---|---|
| Architectural Group International | Architect | 15 West 7th Street Covington, KY 41011 | 859-261-5400 | twilhelm@agi-us.com | Tim Wilhelm |
| | | | | joann@agi-us.com | Quin Wichmann |
| GPD Associates | Architect | 520 South Main St.  Suite 2531 Akron, OH  44311-1010 | 330-572-2131 | royster@gpdgroup.com | Ryan Oyster |
| | | | 330-572-2241 | mparks@gpdgroup.com | Matt Parks |
| Interbrand Design Forum | Architect | 7575 Paragon Rd Dayton ,OH 45459 | 937-312-8863 | brady.harding@interbrand.com | Brady Harding |
| | | | 937-312-8967 | david.dameron@interbrand.com | David Dameron |
| MJM Architects | Architect | 105 Broadway # 4 Nashville, TN 37201 | 615-244-8170 | s.maher@mjmarch.com | Steve Maher |
| | | | | n.daman@mjmarch.com | Nicole Daman |

## Required National Account Vendors

| | | | | | |
|---|---|---|---|---|---|
| Accel | Millwork | 325 Quadral Drive Wadsworth, OH 44281 | 330-336-0317 x2123 | GwenP@accelgrp.com | Gwen Pattee |
| Armstrong | Flooring Materials | 2500 Columbia Ave Lancaster, PA 17604 | 281-376-7669 | TeamJoAnn@armstrong.com | Raymond Wheeler |
| | | | 800-442-4212 | TLSiegrist@armstrong.com | Trina Siegrist |
| Bailiwick | Low Voltage Wiring | 7630 Commerce Way Eden Prairie, MN 55344 | 952-556-3847 | apascuzzi@bailiwick.com | Tony Pascuzzi |
| | | | 952-556-3852 | athompson@bailiwick.com | Annette Thompson |
| Besam Entrance Solutions | Automatic Doors | National Account Center 300 Horizon Center Suite 300 Hamilton, NJ 08691 | 609-249-9502 | Pam.Homyak@assaabloy.com | Pam Homyak |
| Commercial Fire, Inc. | Fire Extinguishers | 2465 St. Johns Bluff Rd. S. Jacksonville, FL 32246 | 800-241-1277 x 129 | joann@commercialfire.com | Kerri Lovett |
| Digital Reliance, Inc. | Close Out Electronic Package | 386 Charmel Place Columbus, OH  43235 | 614-430-5950 | jg@digital-reliance.com | Jerry Galbreath |
| D.H. Pace | Doors, Frames & Hardware, Restroom | 2146 E. Pythian Springfield, MO  65802 | 417-831-5565 | joel.ilten@dhpace.com | Adam West |
| | | | 417-831-5585 x5102 | Paul.Senne@dhpace.com | Paul Senne |
| DH Pace | Dock Equipment  / Overhead Door | 1120 Clay Drive North Kansas City, MO 64116 | 888-643-3667 | Laurie.Pazienza@dhpace.com | Laurie Pazienza |
| F.E. Moran | Fire and Burglar Alarms | 33341 Kelly Road Fraser, MI  48026 | 217-373-2768 | Mnieding@femoransecurity.com | Mark Nieding |
| | | | 217-373-2768 | NationalAccounts@femoranalarm.com | Mark Nieding |
| Grand Entrance | Vestibule Carpet / Acrovyn | 4005 Royal Drive Suite 300 Kennesaw, GA 30144 | 770-970-1979 | csholes@c-sgroup.com | Courtney Sholes |
| Leff Electric Co. | Light Fixtures & Loose Gear | 4700 Spring Road. Cleveland, OH 44131 | 216-325-1572 | slias@leffelectric.com | Steve Lias |
| | | | 216-325-1597 | sskoda@leffelectric.com | Shannon Skoda |
| Marathon Equipment | Cardboard Balers | PO Box 1798 Vernon, AL  35592 | 800-633-8974 x1220 | jim.squier@marathonequipment.com | Jim Squier |
| MC Sign Company | Exterior Building Signs | 8959 Tyler Blvd. Mentor, OH  44060 | 440-209-6200 x212 | tammy.ward@mcsign.com | Tammy Ward |
| | | | 440-209-6200 x214 | shawna.clark@mcsign.com | Shawna Clark |
| IFTI | Slab Moisture Tests | 2300 Clayton Road, Suite 1240 Concord, CA 94520 | 925-305-2917 | jennifer.armstron@IFTI.com | Jennifer Armstrong |
| Leff Electric Co. | Power Wall, Electrical Distribution | 4700 Spring Road. Cleveland, OH 44131 | 216-325-1597 | sskoda@leffelectric.com | Shannon Skoda |
| PTNE | Telephone, & Data Systems | 1112 N. Meridian Rd Youngstown, OH 44509 | 800-678-4638 | ssava@ptneinc.com | Steve Sava |
| | | | 330-270-4400 | mmineo@ptneinc.com | Matt Mineo |
| Roth Bros. | Energy Mgmt. System | 3847 Crum Rd. Youngstown, OH 44515 | 330-270-2557 | brivera@rothbros.com | Ben Rivera |
| SP Industries | System Specialists | 2982 Jefferson Rd Hopkins, MI  49328 | 800-592-5959 | bduemler@sp-industries.com | Brad Duemler |
| Trane Corp | HVAC | 31200 Bainbridge Rd. Solon, OH 44139 | 440-248-3400 | hhakenson2@trane.com | Harry Hakenson/ Lisa Deboe |
| Trans Alarm | Alarm Monitoring | 500 East Travelers Trail Burnsville, MN 55337 | 440-725-6872 | Mpavlicek@transalarm.com | Mike Pavlicek |

## Exhibit E–5

## Jo-Ann Stores' Construction Team is comprised of the following Individuals:

Steve Scalise
Director of Construction & Store Projects
Email: steve.scalise@joann.com
Phone: 330.463.3291

Jim Piar
Manager Store Construction
Email: james.piar@joann.com
Phone: 330.463.6701

Rich Harkins
Supervisor Store Construction
Email: rich.harkins@joann.com
Phone: 330.463.8536

Brent Schrock
Supervisor Construction Services
Email: brent.schrock@joann.com
Phone: 330.463.8644

Cara Desko
Construction Services Planner
Email: cara.desko@joann.com
Phone: 330.463.6892

Exhibit F

**Exclusive Uses and Prohibited Uses.**

**EXCLUSIVES**

**MAIL PLUS MORE**

Provided (i) Tenant is not in Tenant Default of this lease beyond any applicable cure period, and (ii) Tenant is operating and has continuously operated a business in the Premises in accordance with the Use of Premises, Landlord hereby agrees not to lease any portion of the Shopping Center as an "Unpermitted Competing Business." An "Unpermitted Competing Business" is hereby defined as any "local/mom and pop" tenant containing less than one thousand five hundred (1,500) square feet operating a mail services (including, without limitation, faxing and copying) business operation. Notwithstanding anything to the contrary in the foregoing sentence, this provision shall not be applicable to (i) any tenants in the Shopping Center, their successors and assigns, who currently have leases which permit such tenants to operate an "Unpermitted Competing Business", or (ii) a "Permitted Competing Business," defined as (i) any "national tenant", such as UPS, Kinkos, Staples, Office Depot or any other national or regional copy, printing, office supply, shipping or sign business, and (ii) any "local/mom and pop" tenant containing one thousand five hundred (1,500) square feet or more operating a mail services (including, without limitation, faxing and copying) business operation.

**MOE'S SOUTHWEST GRILL**

Provided (i) Tenant is not in Default of this lease beyond any applicable cure period and (ii) Tenant is operating a business in the Premises in accordance with the Use of Premises, Landlord hereby agrees not to lease any portion of the Shopping Center as a "Competing Business". A "Competing Business" is hereby defined as (i) any operation similar in concept as a "Willie's Mexicana", "Chipotle", "Burrito Art", or "Baja Fresh" or (ii) more than one (1) restaurant (other than Tenant) in excess of 1,500 square feet with dine-in capabilities. Notwithstanding anything to the contrary in the foregoing sentence, this provision shall not be applicable to any tenants in the Shopping Center, their successors and assigns, who currently have leases which permit such tenants to operate a "Competing Business".

**PIZZA HUT**

Provided (i) Tenant is not in Default of this lease beyond any applicable cure period and (ii) Tenant is operating a business in the Premises in accordance with Paragraph 1.1 (P), Landlord hereby agrees not to lease any portion of the Shopping Center, as it may be expanded or modified from time to time, as a "Competing Business." A "Competing Business" is hereby defined as any business whose primary use is the retail sale of pizza and chicken wings. Notwithstanding anything to the contrary in the foregoing, this provision shall not be applicable

Store No. 2412, Suburban Plaza, Decatur, GA
EXECUTION VERSION: November 19, 2014
UB Document No. 1126865 v.1

to: (i) any tenants in the Shopping Center, their successors and assigns, who have leases prior to the date of this lease, which permit such tenants to operate a "Competing Business", (ii) any leases prior to the date of this lease which permit such tenants to operate as "any lawful, retail purpose", or (iii) any family-style full-service Italian restaurant; provided such restaurant does not derive fifteen (15%) percent or more of its retail sales from the sale of pizza, or chicken wings. Further, this exclusive shall not survive a lease assignment, except for any such assignment as may be permitted or approved under Article X of this lease.

## WAL-MART

Except as provided in Section 3 below, the Shopping Center may be used for any lawful purpose, provided that no restaurant may be located within the "Restaurant Restricted Area" shown on Exhibit "A." The Wal-Mart Tract may be used for any lawful principally retail purpose. Nothing contained in this ECR shall be construed to contain a covenant, either express or implied, for Wal-Mart to either commence the operation of a business or thereafter continuously operate a business on the Wal-Mart Tract. Wal-Mart may, at Wal-Mart's sole discretion and at any time, cease the operation of Wal-Mart's business on the Wal-Mart Tract; and Owner hereby waives any legal action for damages or for equitable relief which might be available to Owner because of such cessation of business activity by Wal-Mart. In no event shall any of the Tracts nor any portion thereof be used at any time in any of the manners or purposes expressly prohibited in Exhibit "D" or Exhibit "E" attached hereto.

Competing Business. As long as Wal-Mart or an affiliate is the lessee or owner of the Wal-Mart Tract, no space in the Shopping Center, shall be used, leased or occupied by or conveyed to any other party for primary use as or in support of (a) a Grocery Store or Supermarket, as defined in this Paragraph 3, (b) a Discount Department Store or other Discount Store, as defined in this Paragraph 3, (c) a pharmacy, (d) a variety, general or "dollar store" (with the exception of the operation of a Family Dollar store during the term of the existing lease with such tenant), (e) a membership warehouse club, (f) a Gas Station/Convenience Store, as defined in this Paragraph 3, or (g) as any combination of the foregoing uses (the "Competing Uses"). In the event of material breach of this covenant, Wal-Mart shall have the right to seek any remedies afforded by either law or equity, including, without limitation, the rights to injunctive relief.

- "Grocery Store" or "Supermarket," as those terms are used herein, shall mean a food store or food department containing more than 3,000 square feet each of gross leasable area in the Shopping Center, for the purpose of selling food for consumption off the premises, which shall include, without limitation, the sale of dry, refrigerated or frozen groceries, meat, seafood, poultry, produce, delicatessen or bakery products, refrigerated or frozen dairy products, or any grocery products normally sold in such stores or departments.

- "Discount Department Store" or "Discount Store," as those terms are used herein, shall mean a discount department store or discount store in the Shopping Center, for the purpose of selling a full line of both hard goods and soft goods (e.g., clothing, cards, gifts, electronics, garden

Exhibit F, Page 2

supplies, furniture, pharmacy, lawnmowers, toys, health and beauty aids, hardware items, bath accessories and auto accessories) at a discount in a retail operation similar to that of Wal-Mart.

"Gas Station/Convenience Store" as used herein shall mean a retail store or operation of any size dispensing motor fuels or fuel additives by pump, container, or any future method of dispensing and introducing fuel into automobiles, trucks, or other transportation devices whether or not such activities are primary to such store or operation.

## ROSS

Without the prior written consent of Tenant, which consent may be withheld in the absolute and sole discretion of Tenant during the Term, no tenant or occupant of the Shopping Center (excluding the Wal-Mart Tract so long as the lease therefor between Landlord and Wal-Mart remains in effect), other than Tenant, may use, and Landlord, if it has the capacity to do so, shall not permit any other tenant or occupant of the Shopping Center to use (a) its premises for the Off Price Sale (as hereinafter defined) of merchandise, provided however, one (1) Off Price Sale retailer shall be permitted up to a maximum of twenty-five thousand (25,000) square feet of Leasable Floor Area in the Shopping Center, or (b) intentionally deleted, (c) more than ten thousand (10,000) square feet of Leasable Floor Area of its premises for the sale of apparel (except for discount department stores in excess of eighty-five thousand (85,000) square feet of Leasable Floor Area). For purposes of this Section 15.3, "Off Price Sale" shall mean the retail sale of merchandise on an everyday basis at prices reduced from those charged by full price retailers, such as full price department stores; provided, however, this definition shall not prohibit sales events by a retailer at a price discounted from that retailer's every day price; and provided further, retailers such as Target, Wal-Mart, J.C. Penney, Old Navy, Rack Room Shoes/DSW/Off Broadway/Shoe Carnival, Five Below and Kohl's shall not be deemed Off Price Sale retailers. (As of the Effective Date, examples of Off Price Sale retailers include such retailers as T.J. Maxx, Marshalls, A.J. Wright, Fallas Paredes, Nordstrom Rack, Goody's, Factory 2U, Burlington Coat, Steinmart, Filene's Basement and Beall's Outlet.) Notwithstanding the provisions of this Section 15.3, the use restrictions set forth in this Section 15.3 shall not apply to or restrict any use, business or operation of (i) Wal-Mart or The TJX Companies, Inc. (or its affiliates) or HomeGoods, Inc. (or its affiliates) (each, an "Excluded Tenant"), or (ii) any successor, assign or subtenant of an Excluded Tenant (each, an "Excluded Transferee"). Landlord covenants and agrees that if Landlord has the right to withhold its consent to a change in use of the premises occupied by any such Existing Tenant, Landlord shall withhold such consent to a change in use of the premises which violates the provisions set forth in this Section 15.3. This Section 15.3 shall not apply to Toys 'R Us, Babies 'R Us, Buy Buy Baby, and sporting goods stores such as The Sports Authority, Academy Sports or Dick's Sporting Goods.

Landlord shall not lease space nor allow space to be occupied in the Shopping Center by any occupant, other than Tenant, whose use of the space shall be (a) for David's Bridal; (b) for a store primarily selling merchandise at one price or set prices such as a 99 Cents store, as they are operated as of the Effective Date, and other such types of operations (excluding one (1) Five

Below store and one (1) Dollar Tree store); or (c) for a discount department store under twenty thousand (20,000) square feet of Leasable Floor Area, such as a Family Dollar store, as they are operated as of the Effective Date.


## LA FITNESS

PRIMARY USES. The "Primary Uses" of the Premises shall be for the operation of a health club and fitness facility which may include, without limitation, weight and aerobic training, exercise dancing, yoga, Pilates, Zumba, racquetball/squash, personal training, aerobics, health and fitness related programs, free weights, spinning/cycling, circuit training, boxing, basketball, swimming pool, swim lessons, racquetball/squash lessons, sauna and whirlpool facilities. As part of the health club and fitness facility operated within the Building, Tenant may use portions of the Building for uses ancillary to a health club and fitness facility (hereinafter, the "Ancillary Uses"), including, but not limited to, a health club and fitness facility related pro shop selling apparel and other fitness related items, physical therapy center, spa services, sports medicine, weight loss and nutritional advising, therapeutic massage, chiropractic care, tanning salon, juice bar, vitamin and nutritional supplement sales, ATM machines located inside the Building, vending machines located inside the Building, child care facility for members, and food and beverage service (including the sale of healthy and/or natural foods), as well as the sale of exercise and/or health related videos and/or DVDs and other related electronic media items. In addition, Tenant shall be permitted to use portions of the Premises for storage and office uses incidental to the Primary Uses. Subject to Exhibit J-1 attached hereto, Landlord hereby represents, warrants and covenants to Tenant that Tenant's operation of business from the Premises for the Primary Uses does not and will not violate any agreements respecting exclusive use rights or restrictions on use within the Project or any portion thereof. Provided that Tenant is not in default of this lease beyond any applicable notice and cure period, Tenant (or its successor or assigns) shall have the right throughout the Term and all Option Terms to operate for uses permitted under this lease and, subject to the rights of existing Project tenants under leases in effect as of the Effective Date ("Existing Tenants") identified in Exhibit J-2 attached hereto (and extensions or renewals thereof), so long as Tenant (or its successor or assigns) is operating as a health club and fitness facility in at least sixty percent (60%) of the Premises, Landlord will not allow any other non-retail fitness related operation (including, without limitation, health club, aerobics, yoga, Pilates, dance studio offering fitness-oriented classes such as Zumba, spinning/cycling, circuit training, personal training, basketball, boxing, cardiovascular or jazzercise operations) to operate in the Project (and Landlord will not amend the ECR to permit such uses in the Project). Only for purposes of the immediately preceding sentence, in order for Tenant to be deemed to be operating a "health club and fitness facility", such facility must include court sports, swimming area and men's/women's locker rooms. Tenant shall not be deemed to have ceased operating its business if it closes or ceases operations on account of remodeling, repairs or condemnation provided, with respect to remodeling, Tenant is diligently pursuing completion of same or for not more than two hundred seventy (270) days in connection with an assignment or sublease of the Premises. In the event of a breach of the foregoing, Tenant shall be entitled to injunctive relief and any other available remedy. The foregoing shall not,

Exhibit F, Page 4

however, preclude Landlord from permitting another Project tenant to engage in the retail sale of fitness equipment for off-premises use or the operation of any of the Ancillary Uses, and any of the following uses shall expressly be permitted: (a) tanning salon, (b) weight loss clinic, (c) retail store specializing in sale of athletic apparel and equipment, such as without limitation, Dick's Sporting Goods or The Sports Authority, (d) subject to Section 8.4, physician or chiropractic or other medical office, including without limitation, occupational and physical therapy or a day spa such as Spa Sydell or therapeutic massage provider, such as Massage Envy, provided that none of the uses described in this sentence shall offer exercise or personal training components and that further provided that any day spa or therapeutic massage providers shall not exceed 10,000 square feet of Floor Area in the Project, (e) retail store or pharmacy offering the sale of nutritional supplements, such as without limitation, CVS or GNC, or (f) any children's gymnasium catering to children under the age of 18 or offering activities such as gymnastics and dance.  If any governmental license(s) or permit(s) shall be required for the proper and lawful conduct of Tenant's business or other activity carried on in the Premises, or if a failure to procure such a license or permit might or would in any way adversely affect Landlord or the Premises, then Tenant, at Tenant's expense, shall duly procure and thereafter maintain such license(s) or permit(s) and submit the same for inspection by Landlord upon request.  Tenant, at Tenant's expense, shall at all times materially comply with the requirements of such license(s) or permit(s).

## Home Goods

Landlord agrees that, from the date hereof until expiration of the term of this lease, no other premises in the Shopping Center (excluding Wal-Mart) shall at any time contain more than fifteen thousand (15,000) square feet of leasable floor area therein which are primarily used or occupied for, or devoted to, the sale or display of the following categories of items: linens and domestics, window treatments, floor · coverings, bathroom items, bedding, wall décor, housewares, table top goods, glassware, flatware, cookware, kitchen utensils, closet, shelving and storage items and home accessories (all of the foregoing hereinafter referred to as a "Competing Use" and the merchandise referred to therein as the "Protected Merchandise").  The computation of such leasable floor area used, occupied or dedicated to the sale or display of Protected Merchandise shall include one half (1/2) of all floor area in any aisles, corridors or similar spaces adjacent to or abutting any racks, gondolas, shelves, cabinets, counters or other fixtures or equipment containing or used for the sale or display of the Protected Merchandise.

Notwithstanding anything in this lease to the contrary, the following tenants and the tenants listed in Schedule F shall not be deemed a Competing Use or Prohibited Use and shall be permitted to operate within the Shopping Center without regard to such use restrictions: T.J. Maxx, T.J. Maxx 'N More, Marshalls, Mega Marshalls, Ross, Dress For Less, Inc. (or its affiliates), A.J. Wright, Nordstrom Rack, Jo Ann's, Kirkland's, Pier One.  Furthermore, this Paragraph 4 shall not apply with respect to rights previously granted to tenants or occupants with respect to Prohibited Use or Competing Use under leases or agreements existing as of the date hereof.

Exhibit F, Page 5

PROHIBITED USES

## LA FITNESS

Landlord covenants and agrees that the Project shall be constructed, leased, operated, maintained and managed in a first rate manner consistent with similar shopping centers in the Atlanta, Georgia area. Subject to the rights of Existing Tenants and any renewals or extensions of their leases thereof (but only to the extent any such existing lease does not currently prohibit the subject premises to be used in violation of the foregoing restrictions and if Landlord has sufficient consent rights over a change in use under any such existing lease, Landlord shall not consent to a change in use that will violate the following restrictions), Landlord covenants and agrees that no premises (and no portion of any premises) in the Project (excluding the Wal-Mart Tract) shall be used or occupied for any of the following: any unlawful use; funeral establishment; used car lot; auction or bankruptcy sale (except those which are lawful and bona fide); pawn shop; shooting gallery; refinery; adult bookstore or facility selling, renting or displaying pornographic or adult books, magazines, literature, films, pictures, videotapes, video discs or other adult paraphernalia or merchandise of any kind (materials shall be considered "adult" or "pornographic" for such purpose if the same are not available for sale or rental to children under 18 years old because they explicitly deal with or depict human sexuality), provided that sale, rental or display of such items as an incidental part of a permitted business (as used above, the term "incidental" means, with respect to any national or regional video store chain or national or regional book store, any sale or rental of such materials and with respect to other tenants, the sale of such materials from not more than ten percent (10%) of the sales area of such business and so as to constitute less than ten percent (10%) of the gross sales of such business) shall be permitted); massage parlor (except for (i) therapeutic massages given in connection with the operation of a day spa and therapeutic massage providers such as Massage Envy and Spa Sydell, (ii) hair salons which provides massage services as an incidental part of its business; and (iii) the provision of massage services in connection with medical or chiropractic facilities, such as medical rehabilitations clinics to the extent not otherwise prohibited by this Section); tattoo parlor/shop; unemployment agency; government office (except this restriction shall not apply to the portion of the Project identified on the Site Plan as the "Lower Level Space"); food stamp center; check cashing/pay day loan business; call center/phone bank (except a call center shall be permitted in the Lower Level Space); any school (however this shall not apply to the existing school and any additional school that is located in the Lower Level Space), training, educational or day care facility, including but not limited to: beauty schools, barber colleges, nursing schools, diet centers, real estate school including a real estate office that includes a school, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers provided that the foregoing restrictions on schools shall not apply to the Lower Level Space and further provided that tutoring of any grade/level of school/university for subjects/testing such as *Score, Mathnasium, Sylvan Learning* shall be permitted; office (provided banks, small loan offices, and other quasi-retail uses often found in first class shopping centers [such as a travel agency; real estate brokerage office medical office/clinic (except that medical office/clinic shall be permitted only in the Lower Level Space, and dental and optometrist offices shall be permitted); urgent care (except that urgent care shall be permitted only in the Lower Level Space); "park and ride"; amusement park; restaurant in

Exhibit F, Page 6



Shops "F" (however, (i) two (2) restaurants with sit-down service that does not exceed 5,000 square feet in the aggregate and is not otherwise considered a social encounter, lounge or sports bar establishment shall be permitted in Shops "F" shown on the Site Plan provided the entrance to such restaurant faces away from the Premises and towards Wal-Mart as shown on the Site Plan, and (ii) frozen yogurt shops and cookie shops shall not be considered restaurants); sports bar (except in the Lower Level Shops); dance hall; cocktail lounge or bar, disco or night club (although the operation of a bar in connection with a permitted restaurant and the operation of an upscale wine bar or similar operation shall not be prohibited); bingo (except in the Lower Level Shops) or similar games of chance, but lottery tickets and other items commonly sold in retail establishments may be sold as an incidental part of business; second-hand store and thrift store (provided, however, the foregoing restriction shall not prohibit antique shops or stores selling high quality used merchandise such as *Play It Again Sports*, *Plato's Closet*, and *Game Stop* or stores that sells "Vintage" clothing); or auction house or flea market.

## Wal-Mart

**NOTWITHSTANDING ANYTHING CONTAINED** in the Lease to the contrary, Wal-Mart and the Owner shall not use, nor permit all or any portion of the **Shopping Center** or **Common Areas** to be used, in any of the following manners, nor for any of the following purposes or uses (unless otherwise noted herein):

Any sale, display, exhibition, distribution or delivery of pornographic or obscene books, newspapers, magazines or other periodicals, films, videotapes, DVDs, or other materials, operation of a pornographic business, or any form of assignation or lewdness, or any business employing partially or totally nude entertainers, employees, waiters or waitresses, or any usage as an adult entertainment facility, or any facility or entertainment which caters to or intends to arouse normal sexual desires or prurient interests of patrons, including, without limitation, the depiction of "X-Rated," pornographic or sexually explicit materials, conduct or nudity by movies, pictures, films, peep shows, videos, live entertainment or sex-centered objects, including, without limitation, sex toys, depiction of genitalia or of an anus, or anal, oral or vaginal intercourse, whether actual or simulated as a homosexual or heterosexual act, or masturbation, whether homosexual, heterosexual or autoerotic, or any business or facility used in growing, delivering, transferring, supplying, dispensing, dispersing, distributing or selling marijuana, whether by prescription, medical recommendation or otherwise, and whether consisting of live plants, seeds, seedlings or processed or harvested portions of the marijuana plant.

## Home Goods

Landlord agrees that the Shopping Center (excluding the Wal-Mart Tract) shall not be used (a) for any non-retail purposes (repairs, alterations and offices incidental to retailing, and banks and small loan offices, not being deemed non-retail) or office usage (*except that* offices are permissible *provided* they are service uses, or are incidental, complementary to, compatible with, or ancillary to retail use, including, without limitation, banks or other financial institutions, travel agencies, insurance or similar offices, real estate, brokers and title companies, dental or

Exhibit F, Page 7

medical offices, none of which individual ancillary office uses on the "Upper Level" of the Shopping Center as depicted on the Lease Plan shall be greater than three thousand five hundred (3,500) square feet of leasable floor area each, nor exceed (i) eight thousand (8,000) square feet of leasable floor area in the aggregate on the "Upper Level", nor (ii) fifteen thousand (15,000) square feet of leasable floor area in the aggregate as depicted on the "Lower Level" (provided, however, if the current lease encumbering the Wal-Mart Tract is terminated so that the restrictions in this Paragraph 4(A) become applicable to the Wal-Mart Tract, the square footage limitation for an individual ancillary office use on the Wal-Mart Tract shall be not to exceed five thousand (5,000) square feet of leasable floor area and the restriction on the aggregate amount of square footage permitted on the "Upper Level", including the Wal-Mart Tract, shall be increased to fifteen thousand (15,000) square feet) or (b) for any entertainment purposes such as a bowling alley (except that a bowling alley is permissible in the space specifically so depicted on the "Lower Level"), skating rink, cinema, bar (although the operation of a bar in connection with a permitted restaurant and the operation of an upscale wine bar or similar operation shall not be prohibited), nightclub, discotheque, amusement gallery, poolroom, health club (except that LA Fitness or other replacement health club or clubs are permissible in the space specifically so depicted on the Upper Level, or their respective substitute or substitutes) massage parlor (*except that* in addition to L.A. Fitness, one (1) first-class massage therapy or day spa of the type typically found in first-class shopping centers, such as Massage Envy or Spa Sydell, shall be permitted, provided that such massage therapy provider or day spa occupies no more than four thousand (4,000) square feet of leasable floor area) and further, hair salons which provide massage services as an incidental part of its business and the provision of massage services in connection with medical or chiropractic facilities, such as medical rehabilitations clinics shall not be prohibited by this Section), sporting event, sporting or game facility, off-track betting club (provided that the incidental sale of lottery tickets shall be permitted), (c) for any establishment which sells or displays pornographic materials; provided that sale, rental or display of such items as an incidental part of a permitted business shall be permitted (as used above, the term "incidental" means, with respect to any national or regional video store chain or national or regional book store, any sale or rental of such materials and with respect to other tenants, the sale of such materials from not more than ten percent (10%) of the sales area of such business and so as to constitute less than ten percent (10%) of the gross sales of such business), (d) for any establishment which sells or displays used merchandise or second hand goods, (provided, however, the foregoing restriction shall not prohibit antique shops or stores selling high quality used merchandise such as *Play It Again Sports*, *Plato's Closet*, and *Game Stop* or stores that sell "Vintage" clothing) and (e) for restaurants except in the area labeled "Permitted Restaurant Area" on the Lease Plan, provided that in no event may there be an individual restaurant of over five thousand (5,000) square feet of leasable floor area, nor restaurants in the aggregate total of more than fifteen thousand (15,000) square feet of leasable floor area; provided, however, restaurants and cafes operating within a permitted retail use shall not be considered restaurants for purposes of this restriction. provided, however, if the current lease encumbering the Wal-Mart Tract is terminated so that the restrictions in this Paragraph 4(A) become applicable to the Wal-Mart Tract, the entire Wal-Mart Tract shall be considered "Permitted Restaurant Area" and the limitation on restaurants in the aggregate shall increase to thirty thousand (30,000) square feet, with no more than fifteen thousand (15,000) square feet being permitted in the portion of the Shopping Center that is not part of the Wal-Mart Tract.

Exhibit F, Page 8

(Collectively the prohibited uses listed in this Paragraph 4(A) are referred to as the "Prohibited Uses".)

## ROSS

Tenant has entered into this Lease in reliance upon representations by Landlord that the Shopping Center (which, for purposes of this Section 3.2.1 shall exclude the Wal-Mart Tract) is and shall remain retail in character, and, further, no part of the Shopping Center shall be used for: office (except as incidental to a retail tenant's use) or residential purposes or as a theater, auditorium, meeting hall, school, church or other place of public assembly; "flea market;" mortuary; gymnasium; veterinary services or pet vaccination clinic or overnight stay pet facilities (except as an incidental use in conjunction with the operation of a national or regional pet store retailer, provided such pet store retailer is not located within one hundred fifty (150) feet from the front and side perimeter walls of the Store); health club; dance hall; billiard or pool hall; massage parlor; video game arcade (except as incidental to a non-prohibited use); bowling alley (except for the bowling alley existing on the Effective Date and a replacement bowling alley in the same location); skating rink; car wash; facility for the sale, display, leasing or repair of motor vehicles; night club; on-premises consumption of alcoholic beverages (except as incidental to a primarily restaurant use or other use that is not primarily focused on consumption of alcohol); any facility offering gambling to the public (including any so-called Internet café that offers gambling to the public, off-track betting facility, casino or gaming facility), provided that the incidental sale of lottery tickets shall be permitted; or for the sale of adult products or adult bookstores or adult audio/video products stores (which are defined as stores in which at least ten percent (10%) of the inventory is not available for sale or rental to children under the age of majority in the state in which the Store is located because such inventory explicitly deals with or depicts human sexuality). No ATM or similar machine shall be permitted in the Shopping Center within one hundred (100) feet of the front and side perimeter walls of the Store, except if located wholly within the interior of another tenant's or occupant's premises.

Further, no restaurant or other "High Intensity Parking User" (as hereinafter defined) shall be permitted in the Shopping Center within three hundred (300) feet of the front and side perimeter walls of the Store, except within the building designated as "Shops F" on **Exhibit B**; provided, however, that quick service restaurants (i.e., no wait-staff takes orders at tables and food that is primarily ordered at a counter such as Subway, Jimmy Johns, or Panda Express) shall be permitted in the Lower Level Space; and no night club, bar, sports bar, or any restaurant where the on-premises consumption of alcohol exceeds forty percent (40%) of gross sales (and which shall include Buffalo Wild Wings, Elephant Bar and BJ's Brewhouse, regardless of the percentage sale of alcohol, and other similar establishments) shall be permitted within the Shopping Center. A "High Intensity Parking User" is a tenant or occupant whose use, by Requirements, requires more than five (5) parking spaces per one thousand (1,000) square feet of Leasable Floor Area. The foregoing use restrictions are referred to herein as the Ross Prohibited Uses.

Exceptions.

Exhibit F, Page 9

Store No. 2412, Suburban Plaza, Decatur, GA
EXECUTION VERSION: November 19, 2014
UB Document No. 1126865 v.1



Notwithstanding the prohibition on offices set forth above, retail service offices such as full service banks, medical offices, dental offices, travel agencies, real estate brokers and title companies, shall be permitted, provided that such retail service office use (A) does not exceed three thousand five hundred (3,500) square feet of Leasable Floor Area for any individual retail service office use; (B) does not exceed ten percent (10%) of the Leasable Floor Area of the Shopping Center in the aggregate (excluding the Lower Level Space, provided any retail service office space located in the Lower Level Space has parking which is proximate to the Lower Level Space as shown in Exhibit B. In the event Landlord elects not to build the parking under Tenant's Store, the ten percent (10%) aggregate restriction shall then apply to the Lower Level Space); and (C) is not located within one hundred (100) feet of the front, side or rear perimeter walls of the Store (except in the Lower Level Space). Furthermore, one (1) stand-alone (i.e. not incidental to a pet store) veterinary office shall be permitted in Lower Level Space.

Notwithstanding the prohibition on schools set forth above, schools such as Sylvan Learning, Kumon or a similar type of school use shall be permitted, provided that such use (A) does not exceed in the aggregate one thousand five hundred (1,500) square feet of Leasable Floor Area; and (B) is not located within three hundred (300) feet of the front, side or rear perimeter walls of the Store. The foregoing distance restriction shall not apply to the Lower Level Space. In Lower Level Space Landlord may lease to one (1) such use not to exceed five thousand (5,000) square feet of Leasable Floor Area.

Notwithstanding the prohibition on massage parlors set forth above, one (1) massage therapy provider or a first-class day spa of the type typically found in first-class shopping centers, such as Massage Envy or Spa Sydell, shall be permitted, provided that such massage therapy provider or day spa (A) occupies no more than four thousand (4,000) square feet of Leasable Floor Area; and (B) is not located within two hundred (200) feet of the front, side or rear perimeter walls of the Store. Furthermore, the following massage services shall permitted notwithstanding the prohibition on massage parlors: massage services provided by an otherwise permitted hair salon as an incidental part of its business; massage services provided by an otherwise permitted medical or chiropractic facilities, such as medical rehabilitations clinics; and massages provided as an incidental part of an otherwise permitted health club's business.

Notwithstanding the prohibition on health clubs set forth above, one (1) health club such as LA Fitness shall be permitted in the location designated as "LA Fitness" on **Exhibit B**, provided that its main entrance fronts on Church Street.

Notwithstanding the prohibition on the sale, display, leasing or repair of motor vehicles, the display and/or sale of boats and ATV shall be permitted by sporting goods/outdoor stores (such as Dick's Sporting Goods) so long as the display of such items is located entirely within its premises.

Notwithstanding the prohibition on on-premises consumption of alcoholic beverages, an upscale wine bar occupying no more than two thousand (2,000) square feet of Leasable Floor Area shall be permitted in Shops F, Shops G and the Lower Level Space.

The Ross Prohibited Uses shall not apply to those tenants or occupants of the Shopping Center who, in accordance with the terms of existing leases or occupancy agreements in effect on the Effective

Store No. 2412, Suburban Plaza, Decatur, GA
EXECUTION VERSION: November 19, 2014
UB Document No. 1126865 v.1

Date ("Existing Tenants"), cannot be prohibited from so operating, but only for the balance of the term(s) of such existing lease(s) or occupancy agreement(s), including any extensions thereof. Landlord covenants and agrees that if Landlord has the right to consent to a change in use of the premises occupied by any such Existing Tenant, Landlord shall not consent to a change in use of the premises which violates the Ross Prohibited Uses.

Exhibit F, Page 11

Exhibit G

**Form of Subordination, Non-Disturbance and Attornment Agreement**

**When recorded, return to:**

**This instrument was prepared by:**

Jo-Ann Stores, LLC
Matt Senra, Esq.
5555 Darrow Road
Hudson, OH 44236

_____ SPACE ABOVE THIS LINE FOR RECORDER'S USE
**SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT**

This Subordination, Non-Disturbance and Attornment Agreement (the "Agreement") is made as of the
____ day of _____, 20__, by and among _____,
an_____, with an address for purposes of notice at _____
("Lender"), **Suburban Plaza LLC**, a Georgia limited liability company ("Landlord"), and **Jo-Ann Stores, LLC**, an Ohio limited liability company ("Tenant").

Reference is made to a loan (the "Mortgage") from Lender to Landlord, dated _____,
and recorded on _____, as instrument number _____, in Decatur,
_____ County, Georgia.

Reference is made to a lease dated _____, 20___ by and between Tenant and Landlord
(the "Lease") of certain premises situated within the property as legally described on Exhibit A attached
hereto and incorporated by reference herein and covered by said Mortgage.

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and in
consideration of the mutual promises contained herein, the parties agree as follows:

      Lender consents to the Lease and the provisions thereof.

      Subject to the terms hereof, the Lease is and will be subject and subordinate at all times to the lien
of the Mortgage and to all renewals and extensions of the Mortgage ("Amendments") to the full extent of
all amounts secured thereby and interest thereon, provided, however, such Amendments do not expand
Tenant's obligations or limit Tenant's rights under the Lease (except as agreed to in this Agreement).

      If the holder of the Mortgage, or any person claiming under the holder (whether by a foreclosure,
deed in lieu of foreclosure or otherwise), succeeds to the interest of Landlord in the Lease, then Tenant
will recognize and attorn to the holder, or such other person, as its landlord under the Lease.

Exhibit G, Page 1

Store No. 2412, Suburban Plaza, Decatur, GA
EXECUTION VERSION: November 19, 2014
UB Document No. 1126865 v.1

In the event of foreclosure or other right asserted under the Mortgage by the holder thereof, the Lease and all of the rights of Tenant thereunder will continue in full force and effect and will not be terminated or disturbed (whether by a foreclosure, deed in lieu of foreclosure or otherwise), except in the case of a material default by Tenant under the terms of the Lease continuing after notice to Tenant and beyond any applicable notice and grace period and otherwise in accordance with the Lease. Tenant shall not be subject to any pre-foreclosure remedies asserted under the Mortgage or related loan documents. Lender shall not name or join Tenant as a defendant in any exercise of Lender's rights and remedies arising upon a default under the Mortgage unless applicable law requires Tenant to be made a party thereto as a condition to proceeding against Landlord or prosecuting such rights and remedies. In the latter case, Lender may join Tenant as a defendant in such action only for such purpose and not to terminate the Lease or otherwise adversely affect Tenant's rights under the Lease or this Agreement in such action.

If Lender succeeds to the interest of Landlord under the Lease, Tenant will have the same rights and remedies against Lender for any default under the Lease, but Lender will not be:

(a)     liable for any act or omission of any prior landlord (including Landlord) under the Lease, except for non-monetary defaults of a continuing nature of which Lender has received notice, and latent or patent defects in construction to the same extent that any prior landlord would be liable [but nothing herein will be construed to limit Lender's maintenance and repair obligations in its capacity as landlord under the Lease];

(b)     subject to any off-sets or abatements against rent that Tenant may have against any prior landlord (including Landlord) due to a default under the Lease, except (i) for those which, as of the date of foreclosure, were already commenced or notice of their commencement was sent, (ii) for the exercise of rights expressly set forth in the Lease, and (iii) for those relating to continuing defaults identified in subsection (a) above [it being understood that nothing in this clause is deemed to exclude Lender from responsibility for (A) any "self-help" and "set-off" remedies in the Lease, including, but not limited to, remedies for repairs and maintenance required of the Landlord under the Lease from and after the date Lender takes title to the Premises, whether or not the need for such repairs or maintenance accrued before or after such date and (B) any "set-off" remedies related to the "exclusive use", "co-tenancy" or "prohibited use" provisions in the Lease];

(c)     bound by any Fixed Minimum Rent that Tenant might have paid for more than the current month to any prior landlord (including Landlord), except as expressly required under the Lease or actually received by Lender;

(d)     bound by any payment of rents, additional rents or other sums which Tenant may have paid more than one month in advance to Landlord or any prior landlord unless (i) such sums are actually received by Lender or (ii) such prepayment was expressly approved by Lender; and

(e)     bound by any amendment or modification to the Lease that shortens the term of the Lease or reduces the rent owed thereunder without the prior consent of

Exhibit G, Page 2

Lender, and if Lender does not respond to such request within 15 days, then consent will be deemed given by Lender; Landlord is responsible for securing all consents required by Lender.

In the event of any casualty or condemnation (eminent domain), Lender must permit the insurance proceeds or the condemnation award, as the case may be, to be used for any restoration and repair as required by the Lease.

Except as expressly provided herein, this Agreement does not constitute a waiver by Lender of any of its rights under the Mortgage or related documents, and the Mortgage and any related documents remain in full force and effect and will be complied with in all respects by Landlord.

No modification, amendment, waiver or release of any provision of this Agreement or of any right, obligation, claim or cause of action arising hereunder will be valid or effective unless in writing and signed by the parties.

Nothing herein will amend, waive or rescind any provision or condition of the Lease or relieve the Landlord from any of its obligations under the Lease.

Tenant will provide a courtesy copy concurrently to Lender of any notice of default (or breach) from Tenant to Landlord that would allow Tenant to terminate the Lease. Lender will have the same time allowed to the Landlord, after Landlord's receipt of notice, to cure the default giving rise to the termination. The opportunity to cure granted to Lender will be available to Lender only to the extent such opportunity to cure is available to Landlord under the Lease, and such cure period afforded to Lender will run concurrently with the cure period available to Landlord. Notwithstanding the foregoing, Lender will have no obligation to cure any default by Landlord except if Lender succeeds to title of the property.

Co-Tenancy and use violations are not considered defaults under the Lease, and Tenant has the right to exercise all remedies related thereto without notice to Lender.

Any notices from one party to the other must be in writing and sent via courier (e.g., UPS, Federal Express) or by certified U.S. mail to the following addresses:

| | |
|---|---|
| if to Tenant: | Jo-Ann Stores, LLC<br>Attn: Senior Vice President of Real Estate<br>5555 Darrow Road<br>Hudson, OH 44236 |
| With a copy to: | Jo-Ann Stores, LLC<br>Attn: Senior Legal Counsel<br>5555 Darrow Road<br>Hudson, OH 44236 |
| if to Lender: | Principal Life Insurance Company<br>c/o Principal Real Estate Investors, LLC<br>801 Grand Avenue<br>Des Moines, IA 50392-1450 |
| with a copy: | _____ |

Exhibit G, Page 3

Store No. 2412, Suburban Plaza, Decatur, GA
EXECUTION VERSION: November 19, 2014
UB Document No. 1126865 v.1

Landlord represents and warrants to Tenant that all prior mortgages and deeds of trust encumbering the Premises demised under the Lease have been satisfied or will be satisfied with the proceeds of the Mortgage.

This Agreement inures to and binds the successors and assigns of the respective parties.

This Agreement shall not be effective against Tenant unless and until Tenant has received an original of this Agreement signed by all parties.

This Agreement shall be deemed to be a contract entered into under the laws of Georgia and shall in all respects be governed, construed, applied and enforced in accordance with the laws of Georgia.

Each party's duly authorized representative has signed this Agreement as of the date written above.

LENDER:

By:_____

Name:_____

Its:_____

LANDLORD:
**Suburban Plaza, LLC**

By Selig Enterprises, Inc., its Manager

By:_____
    S. Stephen, Selig, III, its President

TENANT:
**Jo-Ann Stores, LLC**

By:_____
David B. Goldston
Senior Vice President, General Counsel,
and Secretary

*[Notary Signatures Follow on Next Page]*

Exhibit G, Page 4

STATE OF _____ )
                                 ) SS
COUNTY OF _____ )

        BEFORE ME, a Notary Public in and for said County and State, personally appeared Principal Life Insurance Company, an Iowa corporation, by _____, its _____, who acknowledged that he/she did sign the foregoing instrument on behalf of said corporation and that the same is his/her free act and deed personally and as such officer.

        IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at _____, _____, this _____ day of _____, 20__.

                                       _____
                                           NOTARY PUBLIC

STATE OF _____ )
                                 ) SS
COUNTY OF _____ )

        BEFORE ME, a Notary Public in and for said County and State, personally appeared Suburban Plaza, LLC by Selig Enterprises, Inc., its manager by Stephen Selig, III, its President, who acknowledged that he/she did sign the foregoing instrument on behalf of said corporation and that the same is his/her free act and deed personally and as such officer.

        IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at _____, _____, this _____ day of _____, 20___.

                                       _____
                                           NOTARY PUBLIC

Exhibit G, Page 5

STATE OF OHIO          )
                                    ) SS

COUNTY OF SUMMIT     )

BEFORE ME, a Notary Public in and for said County and State, personally appeared **Jo-Ann Stores, LLC**, an Ohio limited liability company, by David Goldston, its senior vice president, general counsel and secretary, who acknowledged before me that he did sign the foregoing instrument on behalf of said corporation and that the same is his free act and deed personally and as such officers.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at Hudson, Ohio, this _____ day of _____, 20__.

_____
                                  NOTARY PUBLIC

*[Notary Page to SNDA dated _____, 20__]*

Exhibit G, Page 6

**EXHIBIT A**

**Legal Description of Shopping Center**

Store No. 2412, Suburban Plaza, Decatur, GA
EXECUTION VERSION: November 19, 2014
UB Document No. 1126865 v.1

<u>Exhibit H</u>
**Form of Estoppel Certificate**

To:

| | |
|---|---|
| Shopping Center: | Suburban Plaza |
| Landlord: | Suburban Plaza LLC |
| Tenant: | Jo-Ann Stores, LLC, an Ohio limited liability company |
| Lease: | Lease by and between Landlord and Tenant dated _____, 2014, as modified by  (the "Lease") (together, the "Lease")[two] (collectively, the "Lease") [three or more] |

Tenant represents that, as of the date hereof:

1. The Lease constitutes the entire written agreement between Tenant and Landlord and has not been modified or amended, except as indicated herein.

2. The Lease is in full force and effect.  The term commenced on _____ and expires on _____.  [Tenant has _____( ) 5-year options to renew the term thereof.] [Tenant has one 5-year option to renew remaining] [Tenant has no options to renew the term of the Lease.]

3. Tenant has taken possession of the premises demised under the Lease (the "Premises") and is occupying the Premises.

4. To the undersigned's actual knowledge, without inquiry or investigation, the Landlord is not currently in default under the Lease, except as follows: _____, and Tenant reserves all rights and remedies with regard to the aforementioned issues [.]   [; provided, however, that common area, tax and insurance reconciliation(s) have not been received from Landlord for the following years: [Insert Years]].  With regard to any and all common area, tax and insurance expenses, but subject to the limitations under the lease, Tenant specifically reserves all rights and remedies with respect to any overpayments which may be discovered subsequent to the date of this Estoppel Certificate regardless of the year in which the overpayment occurred, including but not limited to the right to seek reimbursement for any overpayments.  [In addition, Tenant specifically advises that it is auditing Landlord's common area, tax and insurance expenses; to date, there have been no findings, but the audit is still open, and Tenant reserves any and all rights and remedies with respect thereto.]

    Furthermore, Tenant has not inspected the Shopping Center, including the common areas, to verify that Landlord is in compliance with its obligations with respect thereto, and Tenant hereby reserves all rights provided in the Lease regarding the same.

5. The monthly Fixed Minimum Rent payable under the Lease is $[_____] and has not been prepaid by more than one month. [Tenant is not paying fixed monthly rent.  Rather, Tenant is paying Substitute Rent, as defined in the Lease.  The monthly Substitute Rent varies each month according to store sales.  Substitute Rent has not been prepaid.]

Exhibit H, Page 1

6. No security deposit has been made in connection with the Lease.

7. Tenant does not have any option or preferential right to purchase all or any part of the Shopping Center.

8. The address for notices to be sent to Tenant is as follows:

> Jo-Ann Stores, LLC
> Attn:  Senior Vice President, Real Estate
> 5555 Darrow Road
> Hudson, OH 44236

with a copy to:

> Jo-Ann Stores, LLC
> Attn:  Senior Legal Counsel
> 5555 Darrow Road
> Hudson, OH 44236

9. Nothing contained herein will: (a) amend, modify, waive or rescind any of the terms, conditions, covenants or obligations of the Lease; (b) waive or estop Tenant's right to declare a default based on facts of which the Tenant does not have actual or constructive knowledge, without inquiry or investigation; (c) waive or estop Tenant's right to claim any offset, claim or counterclaim resulting from an audit of Landlord's business records or public records; (d) waive or estop any claims, defenses, rights or remedies of Tenant, except as relates to matters specified herein; or (e) relieve the Landlord from any of its obligations under the Lease.

10. Tenant's statements exclude certification as to any matter that may be disclosed by audit, inspection, or examination of Landlord's records or public records relating to charges and monetary items under the Lease.

11. If there is any conflict between this certificate and the Lease, the Lease shall control.

12. Tenant acknowledges that you are relying upon this Estoppel Certificate and the accuracy of the information contained herein. Nevertheless, Tenant will not be liable to any party for damages of any kind whatsoever (whether direct, indirect, special, consequential or any other type) resulting from any statement in this certificate.

13. The undersigned representative of Tenant is duly authorized to execute this instrument on behalf of Tenant.

Dated: _____, 2014

**JO-ANN STORES, LLC**

By: _____
    David B. Goldston, Senior Vice President,
    General Counsel and Secretary

Exhibit H, Page 2

Store No. 2412, Suburban Plaza, Decatur, GA
EXECUTION VERSION: November 19, 2014
UB Document No. 1126865 v.1

Exhibit I

**Rules and Regulations**

Subject to the terms of the Lease, Tenant shall not use, nor permit all or any portion of the Premises or Common Areas to be used, in any of the following manners, nor for any of the following purposes or uses:

- Any illegal usage.

- Any manner which violates any Laws or certificate of occupancy.

- Any use which creates fire, explosive or environmental hazards.

- Any manner which generates, stores, treats, disposes of, installs or otherwise causes or permits any Hazardous Materials to be brought upon or kept or used in or on the Premises.

- Any manner which creates or permits a nuisance or trespass.

- Any manner which causes the overburdening of any system or systems of any utilities.

- Any manner which exceeds the floor load for which such floor was designed or is permitted by Laws to carry.

- Any hazardous or wasteful manner.

- Any manner which vitiates or increases the rate of any Insurance premiums.

- Any manner which produces, reproduces or transmits any sounds or vibrations which may be heard, seen or experienced, or are audible or detectable, outside the Premises.

- Any manner which utilizes any device or advertising medium which may be heard, seen or experienced outside the Premises, including, without limitation, flashing lights, searchlights, loudspeakers, phonographs, radio broadcasts or public address systems.

- Any manner which produces, emanates or transmits odors, fumes, dust or vapors which are detectable outside the Premises, or which are strong, unusual, offensive or otherwise objectionable.

- Any usage of the front entrance of the Premises for truck delivery, shipping, pick-up or drop-off of merchandise or supplies, or any delivery, shipping, drop-off or pick-up in which steel plates are not utilized at all times under all dolly wheels so as to prevent floor damage.

- Any delivery of merchandise or other items between 9:00 A.M. and 11:30 A.M., Mondays

Exhibit I, Page 1

through Fridays, or during any hours which are not first approved by Landlord in writing.

- Any parking of delivery or other vehicles so as to interfere with the use of any driveway, sidewalk or parking area or any other Common Areas, or any storage of any truck, trailer or other vehicles in any of the Common Areas.

- Any manner which involves the solicitation, sale, storage, display or demonstration of merchandise or other items or services in any of the Common Areas, or the placement or usage of any cash registers in any Common Areas, or any usage which in any manner obstructs or encumbers the driveways, sidewalks or other Common Areas, including, without limitation, utilization of automatic teller machines, coin or token operated machines, telephones, lockers, toilets, stalls, scales, amusement devices or machines for the sale or dispensing of beverages, foods, candy, cigarettes, newspapers, periodicals or other items.

- Any placement of handbills, bumper stickers, flyers or advertising materials on any vehicles parked in the Common Areas.

- Any placement of banners or portable signs of any type upon or in the Premises or Shopping Center.

- Any burning of any garbage, rubbish or other materials or rubbish upon or in the Premises or Shopping Center.

- Any dumping, disposing, incineration or reduction of garbage exclusive of dumpsters located at the rear of the Premises.

- Any manner which, in the reasonable judgment of Landlord, impairs or adversely affects the character, reputation or appearance of the Shopping Center as a first-class shopping center, or which is not in accordance with the highest standards of good shopping center operations for similar shopping centers in the metropolitan area in which the Shopping Center is located, or which is inconsistent with the use and operation of the Shopping Center as an integrated, community-oriented retail development.

- Any parking by any employees of Tenant in any areas in the Shopping Center other than those areas designated "Employee Parking Area" on the Site Plan or otherwise designated by Landlord.

Exhibit I, Page 2

<u>Exhibit D-1</u>

**Tenant's Prototype Signage Plans**

Tenant's Prototype Signage is included on the attached compact disc identified as "Jo-Ann Stores 5' Sign Prototypes and Temporary Banners December 2013". The parties acknowledge receipt by placing their initials thereon.



Exhibit D-1

**5 FT. PROTOTYPE
SIGN PACKAGE FOR REFERENCE**

# JO-ANN
## fabrics and crafts

**MC SIGN COMPANY**

8959 TYLER BLVD.
MENTOR, OHIO 44060

PH. 440-209-6200  FAX 440-209-6277
www.mcsign.com



Sign On.™

Partner with the best.



LED ILLUMINATED CHANNEL LETTERS
scale:1/4"=1'-0"
JOANN: 156.3 square feet
fabrics and crafts: 64.5 square feet
TOTAL SQUARE FOOTAGE: 220.8

**5'-0" Exterior Stacked Signage**

# LED ILLUMINATED CHANNEL LETTERS

**FACES:** 3/16" #2447 White acrylic w/ custom Dual-Color day/night film overlay to match PMS 560 Green

**JOANN TRIMCAP:** 2" White jewelite

**FAC TRIMCAP:** 1" White jewelite

**RETURNS:** 5" deep .063 alum. - White

**BACKS:** .063 Alum. - pre-painted White

**ILLUMINATION:** White GE Tetra Max Wide Angle as req'd by manufacturer

**MOUNTING:** Surface mounted flush





COLOR MATCHING — Pantone 560 Green Dual color film: DN00319 Matte finish




**LED CHANNEL - REMOTE, FLUSH**










MC SIGN COMPANY
8959 TYLER BLVD.
MENTOR, OHIO 44060
PH. 440-209-6200
FAX 440-209-6277
www.mcsign.com

CLIENT: JOANN fabrics and crafts
ADDRESS: Fy2015 5 FT PROTOTYPE SET

PAGE NUMBER: 2  TICKET NO.: N/A  DATE: 9/12/13
PROJECT MANAGER: TAMMY WARD  DESIGNER: CA
ELECTRONIC FILE NAME: J/JOANN/PROTOTYPE/FY2015 PROTO/FY2015 - 5 FT PROTOTYPE

Sign On.™ Partner with the best.



**LED ILLUMINATED CHANNEL LETTERS**
scale:1/4"=1'-0"

JOANN: 156.3 square feet
fabrics and crafts: 64.5 square feet

**TOTAL SQUARE FOOTAGE: 220.8**

**5'-0" Exterior Stacked Signage**

31'-3"

9'-0" overall

5'-0"

16-1/2"

f=2'-4-1/2"

27'-2"

# LED ILLUMINATED CHANNEL LETTERS

**FACES:** 3/16" #2447 White acrylic w/ custom Dual-Color day/night film overlay to match PMS 560 Green

**JOANN TRIMCAP:** 2" White jewelite

**FAC TRIMCAP:** 1" White jewelite

**RETURNS:** 5" deep .063 alum. - White

**BACKS:** .063 Alum. - pre-painted White

**ILLUMINATION:** White GE Tetra Max Wide Angle as req'd by manufacturer

**MOUNTING:** Surface mounted flush



**COLOR MATCHING**


Pantone 560 Green
Dual color film:
DN00319 Matte finish


nighttime simulation

Letters will be green in daylight hours & illuminate White at dark

scale: 1/16"=1'-0"



TOP OF PARAPET
28'-0" A.F.F.

TOP OF PARAPET
26'-0" A.F.F.

TOP OF PARAPET
27'-0" A.F.F.

**LED CHANNEL - REMOTE, FLUSH**





**MC SIGN COMPANY**

8959 TYLER BLVD.
MENTOR, OHIO 44060

PH. 440-209-6200
FAX 440-209-6277

www.mcsign.com



**CLIENT:**
JOANN
fabrics and crafts

**ADDRESS:**
Fy2015
5 FT PROTOTYPE SET

| PAGE NUMBER | TICKET NO.: | DATE: | DATE: | REVISIONS: |
|---|---|---|---|---|
| 3 | N/A | 9/12/13 | | |

**PROJECT MANAGER:**
TAMMY WARD

**DESIGNER:**
CA

**ELECTRONIC FILE NAME:**
J:/JOANN/PROTOTYPE/FY2015 PROTO/FY2015 - 5 FT PROTOTYPE

NOTE: PRINTS ARE THE EXCLUSIVE PROPERTY OF 'MCSIGN COMPANY'. ANY UNAUTHORIZED USE OR DUPLICATION WILL RESULT IN A 20% CHARGE PER OCCURANCE PER THE VALUE OF THE DISPLAY. © MC SIGN CO 1998


**Sign On.™**
Partner with the best.




CLIENT SIGNATURE & APPROVAL DATE:

**NON-ILLUMINATED, REVERSE CHANNEL LETTERS**
scale: 3/8" = 1'-0"

Category Signage - White

15.6 sq. ft.    225- 1/8"
20"    seasonal

13.2 sq. ft.    95"
20"    classes

8.6 sq. ft.    61-5/8"
20"    floral

10.2 sq. ft.    73-1/8"
20"    decor

**NON-ILLUMINATED - REVERSE CHANNEL LETTERS**

**FACES:** .090 aluminum painted White

**RETURNS:** 3" deep .063 aluminum welded to faces; Painted White

**MOUNTING:** Stud mounted, flush as required

**COLOR MATCHING**

White



TOP OF PARAPET
26'-0" A FF

scale: 3/32" = 1'-0"

28'-0" A FF

Copy to be centered vertically in Green color band

**JO·ANN**
fabrics and crafts

seasonal    classes    decor    floral

8'-0"

32"

13'-4"

**NON-ILLUMINATED REVERSE CHANNEL**

Studs bonded or welded to aluminum face

Drill masonry, fill hole w/ silicone or similar adhesive

wall

Reverse channel letter

---

MC SIGN COMPANY
8959 TYLER BLVD.
MENTOR, OHIO 44060
PH. 440-209-6200
FAX 440-209-6277
www.mcsign.com

CLIENT: JO·ANN fabrics and crafts
ADDRESS:
Fy2015
5 FT PROTOTYPE SET

| PAGE NUMBER | TICKET NO. | DATE: |
|---|---|---|
| 4 | N/A | 9/12/13 |

PROJECT MANAGER:
TAMMY WARD

DESIGNER:
CA

ELECTRONIC FILE NAME:
J:/JOANN/PROTOTYPE/FY2015 PROTO/ FY2015 - 5 FT PROTOTYPE

DATE:    REVISIONS:

**Sign On.™**
Partner with the best.

CLIENT SIGNATURE & APPROVAL DATE:

NOTE:  PRINTS ARE THE EXCLUSIVE PROPERTY OF 'MCSIGN COMPANY'.  ANY UNAUTHORIZED USE OR DUPLICATION WILL RESULT IN A 20% CHARGE PER OCCURANCE PER THE VALUE OF THE DISPLAY.   © MC SIGN CO 1998

## PROTOTYPICAL REFERENCE

### PYLON SIGN LAYOUT



### SITE SIGN LAYOUTS

SITE SIGN LOCATION TO BE VERIFIED WITH LANDLORD PRIOR TO INSTALLATION





### COMING SOON PACKAGE



### NOW OPEN/GRAND OPENING PACKAGE



### RECEIVING DOOR & EMERGENCY EXIT SIGNAGE







MC SIGN COMPANY
8959 TYLER BLVD.
MENTOR, OHIO 44060
PH. 440-209-6200
FAX 440-209-6277
www.mcsign.com

CLIENT: JO-ANN fabrics and crafts
ADDRESS: Fy2015 5 FT PROTOTYPE SET

| PAGE NUMBER | TICKET NO. | DATE: |
| 5 | N/A | 9/12/13 |
PROJECT MANAGER: TAMMY WARD
DESIGNER: CA
ELECTRONIC FILE NAME: J:\JOANN\PROTOTYPE\FY2015 PROTO\FY2015 - 5 FT PROTOTYPE

DATE: 11/18/13 CA    REVISIONS: ADDED COMING SOON & EMER. EXT. CHANGED SIZE OF COMING SOON BANNER & NOW OPEN.

Sign On. Partner with the best.

CLIENT SIGNATURE & APPROVAL DATE:

NOTE: PRINTS ARE THE EXCLUSIVE PROPERTY OF "MCSIGN COMPANY". ANY UNAUTHORIZED USE OR DUPLICATION WILL RESULT IN A 20% CHARGE PER OCCURANCE PER THE VALUE OF THE DISPLAY. © MC SIGN CO 1998

## YEARLY CHANGES

| | |
|---|---|
| Site Sign: FY13 | Added Shop Joann.com oval |
| Site Sign: FY14 | Added Joann.com/URL |
| Coming Soon: FY13 | Changed to (3) 8'x22'. Added Shop Joann.com oval to window banners. |
| Coming Soon: FY14 | Changed to (1) 5'x14'. Added Joann.com/URL |



**8959 TYLER BLVD.**
**MENTOR, OHIO 44060**
PH. 440-209-6200
FAX 440-209-6277
www.mcsign.com

| CLIENT: | | PAGE NUMBER | TICKET NO.: | DATE: | DATE: | REVISIONS: |
|---|---|---|---|---|---|---|
| JO-ANN fabrics and crafts | | 6 | N/A | 9/12/13 | | |
| | | PROJECT MANAGER: | | DESIGNER: | | |
| ADDRESS: | | TAMMY WARD | | CA | | |
| Fy2015 5 FT PROTOTYPE SET | | ELECTRONIC FILE NAME: | | | | |
| | | J:/JOANN/PROTOTYPE/FY2015 PROTO/FY2015 - 5 FT PROTOTYPE | | | | |



**Sign On.** ™
Partner with the best.

CLIENT SIGNATURE & APPROVAL DATE:

NOTE: PRINTS ARE THE EXCLUSIVE PROPERTY OF 'MCSIGN COMPANY'. ANY UNAUTHORIZED USE OR DUPLICATION WILL RESULT IN A 20% CHARGE PER OCCURANCE PER THE VALUE OF THE DISPLAY. © MC SIGN CO 1998

<u>Exhibit D</u>

**The FY16 22K Prototype Plans**

Tenant's Prototype Plans are included on the attached compact disc identified as "Prototype 22K - FY16 Real Estate Distribution Set – May 2014". The parties acknowledge receipt by placing their initials thereon.



Exhibit D

**SCAN SHEET CHECKLIST**

12/5/2014 10:47

TENANT NUMBER: 32595-006328

Property Name: Suburban Plaza

Property Type: _____

| # of pages | name of file | initials | date |
|---|---|---|---|
| 101 | Lease 120814 | JM | 12-10-14 |
| 2 | Commission 120414 Worksheet | JM | 12-10-14 |
| | Exhibit C | | 1-15-15 |
| | Estoppel | | 2-6-15 |
| | SNDA | | 3-10-15 |
| | Notice of Delivery | | 3-11-16 |
| | CMC | | 4-29-16 |



## ESTOPPEL CERTIFICATE

To:                          Principal Life Insurance Company, its successors and assigns ("Lender")
                             c/o Principal Real Estate Investors, LLC
                             801 Grand Avenue
                             Des Moines, Iowa  50392-1360
                             Attn:  Commercial Real Estate

Shopping Center:             Suburban Plaza located in Decatur, Georgia

Landlord:                    Suburban Plaza LLC, a Georgia limited liability company

Tenant:                      Jo-Ann Stores, LLC, an Ohio limited liability company

Lease:                       Lease between Landlord and Tenant dated December 8, 2014 (the "Lease")

Tenant represents that, as of the date hereof:

1.  The Lease constitutes the entire written agreement between Tenant and Landlord and has not been modified or amended, except as indicated herein.

2.  The Lease is in full force and effect.  The term commenced on April 28, 2016 and expires on January 31, 2027.  Tenant has four 5-year options to renew the term thereof.

3.  Tenant has taken possession of the premises demised under the Lease (the "Premises") and is occupying the Premises.

4.  To the undersigned's actual knowledge, without inquiry or investigation, the Landlord is not in default under the Lease.  With regard to any and all common area, tax and insurance expenses, Tenant reserves all rights and remedies with respect to any overpayments which may be discovered after the date of this Estoppel Certificate regardless of the year in which the overpayment occurred, including but not limited to, the right to seek reimbursement or offset for any overpayments.

    Furthermore, Tenant has not inspected the Shopping Center, including the common areas, to verify that Landlord is in compliance with its obligations with respect thereto, and Tenant hereby reserves all rights regarding the same.

5.  The monthly Fixed Minimum Rent under the Lease is $20,035.00 and has not been prepaid by more than one month.

6.  No security deposit has been made in connection with the Lease.

7.  Tenant does not have any option or preferential right to purchase all or any part of the Shopping Center.

Page 1 of 2

#2412 Decatur, GA



8.  The address for notices to be sent to Tenant is as follows:

> Jo-Ann Stores, LLC
> Attn: Vice President, Real Estate
> 5555 Darrow Road
> Hudson, OH 44236
>
> with a copy to:
>
> Jo-Ann Stores, LLC
> Attn: Senior Legal Counsel
> 5555 Darrow Road
> Hudson, OH 44236

9.  Nothing contained herein will: (a) amend, modify, waive or rescind any of the terms, conditions, covenants or obligations of the Lease; (b) waive or estop Tenant's right to declare a default based on facts of which Tenant does not have actual knowledge, without inquiry or investigation; (c) waive or estop Tenant's right to claim any offset, claim or counterclaim resulting from an audit of Landlord's business records or public records; (d) waive or estop any claims, defenses, rights or remedies of Tenant; or (e) relieve the Landlord from any of its obligations under the Lease.

10. Tenant's statements exclude certification as to any matter that may be disclosed by audit, inspection, or examination of Landlord's records or public records relating to charges and monetary items under the Lease.

11. If there is any conflict between this certificate and the Lease, the Lease controls.

12. Tenant acknowledges that you are relying upon this Estoppel Certificate and the accuracy of the information contained herein. Nevertheless, Tenant will not be liable to any party for damages of any kind whatsoever (whether direct, indirect, special, consequential or any other type) resulting from any statement in this certificate.

13. The undersigned representative of Tenant is duly authorized to execute this instrument on behalf of Tenant.

Dated: September 9, 2016

**JO-ANN STORES, LLC**

By: David B Goldst

David B. Goldston
Senior Vice President,
General Counsel and Secretary

Page 2 of 2

#2412 Decatur, GA



**JO-ANN**
fabric and craft stores

Via FedEx
Via Email: bstogner@seligenterprises.com

April 19th, 2016

Suburban Plaza, LLC
c/o Selig Enterprises, Inc.
Attn: Kenneth J. Clayman, Esq.
1100 Spring Street NW, Suite 550
Atlanta, GA 30309

RE:     **Confirmation of Commencement** – Lease dated December 8, 2014 by and between Suburban Plaza, LLC and Jo-Ann Stores, LLC for the Premises located in Suburban Plaza, Decatur, GA, Jo-Ann store 2412.

Dear Landlord:

This letter serves to establish the Term and other key dates of the Lease dated 12/08/2014, as follows:

| | |
|---|---|
| The Commencement Date of the Initial Term is: | 4/28/2016 |
| The Expiration Date of the Initial Term is: | 01/31/2027 |

- The last date by which the Option Term 1 may be exercised is:       8/4/2026
- The last date by which the Option Term 2 may be exercised is:       8/4/2031
- The last date by which the Option Term 3 may be exercised is:       8/4/2036
- The last date by which the Option Term 4 may be exercised is:       8/4/2041

Please indicate your approval of the foregoing by signing both copies of this letter and returning one copy to my attention.

Sincerely,

*Jayne George*

Jayne (Fenton) George
Lease Coordinator

The foregoing is accepted and agreed to this _28_ day of _April_, 2016.

**Suburban Plaza, LLC ("Landlord")**

By: _____

Its: _____

_____

**Corporate Office and Distribution Center**
**5555 Darrow Road, Hudson, Ohio 44236, Phone 330-656-2600, www.joann.com**



**JO-ANN**
**fabric and craft stores**

Via Fed-Ex Delivery
Via email: amcdowell@seligenterprises.com

March 08, 2016

Suburban Plaza, LLC
c/o Selig Enterprises, Inc.
Attn: Kenneth J. Clayman, Esq.
1100 Spring Street NW, Suite 550
Atlanta, GA 30309-2848

Re:    Lease Agreement dated December 08, 2014, by and between **Suburban Plaza, LLC**
("Landlord"), and **Jo-Ann Stores, LLC** ("Tenant") – <u>Store #2412 – Suburban Plaza,</u>
<u>Decatur, GA</u>

Dear Landlord:

Please be advised that no agent or non-employee representative of Tenant has the authority to accept
delivery of the Premises (as defined in the Lease). Only direct employees of Tenant (or its corporate
affiliate) with a title of Director or above can accept delivery, which acceptance must be in writing.
Any purported acceptance by a non-authorized person or that is not in writing prior to this letter is
hereby disavowed.

Notwithstanding anything to the contrary in the Lease, the Estimated Delivery Date was **11/27/2015**.
Tenant hereby accepts delivery of the Premises on that date. Landlord's work is substantially
complete and Jo-Ann is in receipt of the SNDA.

Nothing in this letter shall waive any of Tenant's rights under the Lease, at law or in equity. Tenant
shall continue to occupy the Premises and perform Tenant's Work pursuant to its right to do so under
the Lease.

Sincerely,

Craig Edge
Director, Store Development

cc:    Scott Roubic        Craig Edge        Kevin Beegle
       Brent Schrock       Dave Geibel



**Corporate Office and Distribution Center**
**5555 Darrow Road, Hudson, Ohio 44236, Phone 330-656-2600, www.joann.com**

2015033835    DEED BOOK **24804** Pg **436**

Filed and Recorded:
3/2/2015 3:52:01 PM
Debra DeBerry
Clerk of Superior Court
DeKalb County, Georgia

**When recorded, return to:**

Bob Bailey
Principal Life Insurance Company
801 Grand Avenue
Des Moines, IA 50392-1360

**This instrument was prepared by:**

Jo-Ann Stores, LLC
Matt Senra, Esq.
5555 Darrow Road
Hudson, OH 44236

After recording return to:
Calloway Title & Escrow, LLC
**David W. Dudley** 2.2771
4170 Ashford Dunwoody Rd. Ste. 285
Atlanta, Georgia 30319

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

This Subordination, Non Disturbance and Attornment Agreement (the "Agreement") is made as of the 27th day of **February**, 2015, by and among PRINCIPAL LIFE INSURANCE COMPANY, an Iowa corporation, with an address for purposes of notice at c/o Principal Real Estate Investors, LLC, 801 Grand Avenue, Des Moines, Iowa 50392-1360 ("Lender"), Suburban Plaza LLC, a Georgia limited liability company ("Landlord"), and JO-ANN STORES, LLC, an Ohio limited liability company ("Tenant").

Reference is made to a loan (the "Mortgage") from Lender to Landlord, dated 2/27/15, and recorded on 24804 352.410 as ~~INSTRUMENT NUMBER~~ DEED BOOK, in Decatur, Dekalb County, Georgia.

Reference is made to a lease dated December 8, 2014 by and between Tenant and Landlord (the "Lease") of certain premises situated within the property known as Suburban Plaza located in Decatur, GA as legally described on Exhibit A attached hereto and incorporated by reference herein and covered by said Mortgage.

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and in consideration of the mutual promises contained herein, the parties agree as follows:

ED BOOK  24804 Pg 437

Lender consents to the Lease and the provisions thereof.

Subject to the terms hereof, the Lease is and will be subject and subordinate at all times to the lien of the Mortgage and to all renewals and extensions of the Mortgage ("Amendments") to the full extent of all amounts secured thereby and interest thereon, provided, however, such Amendments do not expand Tenant's obligations or limit Tenant's rights under the Lease (except as agreed to in this Agreement).

If the holder of the Mortgage, or any person claiming under the holder (whether by a foreclosure, deed in lieu of foreclosure or otherwise), succeeds to the interest of Landlord in the Lease, then Tenant will recognize and attorn to the holder, or such other person, as its landlord under the Lease.

In the event of foreclosure or other right asserted under the Mortgage by the holder thereof, the Lease and all of the rights of Tenant thereunder will continue in full force and effect and will not be terminated or disturbed (whether by a foreclosure, deed in lieu of foreclosure or otherwise), except in the case of a material default by Tenant under the terms of the Lease continuing after notice to Tenant and beyond any applicable notice and grace period and otherwise in accordance with the Lease. Tenant shall not be subject to any pre-foreclosure remedies asserted under the Mortgage or related loan documents. Lender shall not name or join Tenant as a defendant in any exercise of Lender's rights and remedies arising upon a default under the Mortgage unless applicable law requires Tenant to be made a party thereto as a condition to proceeding against Landlord or prosecuting such rights and remedies. In the latter case, Lender may join Tenant as a defendant in such action only for such purpose and not to terminate the Lease or otherwise adversely affect Tenant's rights under the Lease or this Agreement in such action.

If Lender succeeds to the interest of Landlord under the Lease, Tenant will have the same rights and remedies against Lender for any default under the Lease, but Lender will not be:

(a)    liable for any act or omission of any prior landlord (including Landlord) under the Lease, except for non-monetary defaults of a continuing nature of which Lender has received notice, and latent or patent defects in construction to the same extent that any prior landlord would be liable but nothing herein will be construed to limit Lender's maintenance and repair obligations in its capacity as landlord under the Lease;

(b)    subject to any off-sets or abatements against rent that Tenant may have against any prior landlord (including Landlord) due to a default under the Lease, except (i) for those which, as of the date of foreclosure, were already commenced or notice of their commencement was sent, (ii) for the exercise of rights expressly set forth in the Lease, and (iii) for those relating to continuing defaults identified in subsection (a) above it being understood that nothing in this clause is deemed to exclude Lender from responsibility for (A) any "self-help" and "set-off" remedies in the Lease, including, but not limited to, remedies for repairs and maintenance required of the Landlord under the Lease from and after the date Lender takes title to the Premises, whether or not the need for such repairs or maintenance

DEED BOOK 24804 Pg 438

accrued before or after such date and (B) any "set-off" remedies related to the "exclusive use", "co-tenancy" or "prohibited use" provisions in the Lease;

    (c)    bound by any Fixed Minimum Rent that Tenant might have paid for more than the current month to any prior landlord (including Landlord), except as expressly required under the Lease or actually received by Lender;

    (d)    bound by any payment of rents, additional rents or other sums which Tenant may have paid more than one month in advance to Landlord or any prior landlord unless (i) such sums are actually received by Lender or (ii) such prepayment was expressly approved by Lender; and

    (e)    bound by any amendment or modification to the Lease that shortens the term of the Lease or reduces the rent owed thereunder without the prior consent of Lender, and if Lender does not respond to such request within 15 days, then consent will be deemed given by Lender; Landlord is responsible for securing all consents required by Lender.

    In the event of any casualty or condemnation (eminent domain), Lender must permit the insurance proceeds or the condemnation award, as the case may be, to be used for any restoration and repair as required by the Lease.

    Except as expressly provided herein, this Agreement does not constitute a waiver by Lender of any of its rights under the Mortgage or related documents, and the Mortgage and any related documents remain in full force and effect and will be complied with in all respects by Landlord.

    No modification, amendment, waiver or release of any provision of this Agreement or of any right, obligation, claim or cause of action arising hereunder will be valid or effective unless in writing and signed by the parties.

    Nothing herein will amend, waive or rescind any provision or condition of the Lease or relieve the Landlord from any of its obligations under the Lease.

    Tenant will provide a courtesy copy concurrently to Lender of any notice of default (or breach) from Tenant to Landlord that would allow Tenant to terminate the Lease. Lender will have the same time allowed to the Landlord, after Landlord's receipt of notice, to cure the default giving rise to the termination. The opportunity to cure granted to Lender will be available to Lender only to the extent such opportunity to cure is available to Landlord under the Lease, and such cure period afforded to Lender will run concurrently with the cure period available to Landlord. Notwithstanding the foregoing, Lender will have no obligation to cure any default by Landlord except if Lender succeeds to title of the property.

    Co-Tenancy and use violations are not considered defaults under the Lease, and Tenant has the right to exercise all remedies related thereto without notice to Lender.

    Any notices from one party to the other must be in writing and sent via courier (e.g.,

DEED BOOK 24804 Pg 439

UPS, Federal Express) or by certified U.S. mail to the following addresses:

if to Tenant:   Jo-Ann Stores, LLC
       Attn: Vice President of Real Estate
       5555 Darrow Road
       Hudson, OH 44236

with a copy to:   Jo-Ann Stores, LLC
       Attn: Senior Legal Counsel
       5555 Darrow Road
       Hudson, OH 44236

if to Lender:    Principal Life Insurance Company
       c/o Principal Real Estate Investors, LLC
       801 Grand Avenue
       Des Moines, IA 50392-1450

Landlord represents and warrants to Tenant that all prior mortgages and deeds of trust encumbering the Premises demised under the Lease have been satisfied or will be satisfied with the proceeds of the Mortgage.

This Agreement inures to and binds the successors and assigns of the respective. parties.

This Agreement shall not be effective against Tenant unless and until Tenant has received an original of this Agreement signed by all parties.

This Agreement shall be deemed to be a contract entered into under the laws of Georgia and shall in all respects be governed, construed, applied and enforced in accordance with the laws of Georgia.

[SIGNATURES ON THE FOLLOWING PAGES]

Each party's duly authorized representative has signed this Agreement as of the date written above.

LENDER:

Signed, sealed and delivered in the presence of:    PRINCIPAL LIFE INSURANCE COMPANY, an Iowa corporation

Unofficial Witness  _____

By: PRINCIPAL REAL ESTATE
INVESTORS, LLC, a Delaware limited
liability company, its authorized signatory

Notary Public  _____

By _____
Name:    Robert R. Bailey
Title:    Senior Financing Consultant

My Commission Expires: _____

COTTY McFADDEN
Commission Number 187359
My Commission Expires
November 4, 2017

By _____
Name:    Patrice K. Davis
Title:    Assistant Managing Director
Commercial Finance Consulting

(NOTARIAL SEAL)

STATE OF IOWA          )
                       ) SS
COUNTY OF POLK         )

BEFORE ME, a Notary Public in and for said County and State, personally appeared Principal Life Insurance Company, an Iowa corporation, by _____, its _____, who acknowledged that he/she did sign the foregoing instrument on behalf of said corporation and that the same is his/her free act and deed personally and as such officer.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at Des Moines, Iowa this _____ day of _____, 2015.

_____
NOTARY PUBLIC

[SIGNATURES CONTINUED ON THE FOLLOWING PAGE]

DEED BOOK 24804 Pg 441

LANDLORD:

Signed, sealed and delivered in the presence of:

Unofficial Witness

Notary Public

My Commission Expires:

(NOTARY SEAL)

SUBURBAN PLAZA, LLC, a Georgia limited
liability Company

By: SELIG ENTERPRISES, INC., a Georgia
corporation, its Manager

By _____
S. Stephen Selig, III, its President

STATE OF GEORGIA          )
                          ) SS
COUNTY OF FULTON          )

BEFORE ME, a Notary Public in and for said County and State, personally appeared Suburban Plaza, LLC, by Selig Enterprises, Inc., a Georgia corporation, its manager, by _S Stephen Selig III_____, its _President_____, who acknowledged that (he)she did sign the foregoing instrument on behalf of said corporation and that the same is his/her free act and deed personally and as such officer.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at Atlanta, Georgia this _9th_ day of _February_____, 2015.

_____
NOTARY PUBLIC

[SIGNATURES CONTINUED ON THE FOLLOWING PAGE]

TENANT:

Signed, sealed and delivered in the presence of:    JO-ANN STORES, LLC, an Ohio limited
liability company

_____
Unofficial Witness

By _____
    David B. Goldston
    Senior Vice President,
_____    General Counsel and Secretary
Notary Public

My Commission Expires:

(NOTARIAL SEAL)

STATE OF OHIO         )
                        ) SS
COUNTY OF SUMMIT    )

      BEFORE ME, a Notary Public in and for said County and State, personally appeared Jo-
Ann Stores, LLC, an Ohio limited liability company, by David Goldston, its senior vice
president, general counsel and secretary, who acknowledged before me that he did sign the
foregoing instrument on behalf of said corporation and that the same is his free act and deed
personally and as such officers.

      IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at Hudson,
Ohio, this 5th day of February , 2015.

_____
NOTARY PUBLIC

Ashley Pugh
Resident Summit County
Notary Public, State of Ohio
My Commission Expires: 02/23/2018

DEED BOOK 24804 Pg 443

EXHIBIT A

LEGAL DESCRIPTION OF SHOPPING CENTER

All that tract or parcel of land lying and being in Lot 49 of the 18th District, DeKalb County, Georgia, and being more particularly described as follows:

**BEGINNING** at an iron pin found (rebar with cap) which forms the northeasterly end of a miter forming the intersection of the southwesterly right of way line of North Decatur Road (variable r/w) the southeasterly right of way line of Scott Boulevard, also known as U. S. Highway 29 / U. S. Highway 78 / State Route 8, (variable r/w) and the northeasterly right of way line of Medlock Road (variable r/w) and proceed in a southeasterly direction along the southwesterly right of way line of North Decatur Road (variable r/w) the following courses and distances: 1) South 65°57'01" East, 354.90 feet to a nail placed; 2) South 19°28'34" West, 15.00 feet to a nail placed; 3) South 65°58'16" East for a distance of 179.26 feet to a point; 4) thence 363.20 feet along the arc of a curve to the left, said curve having a radius of 2963.63 feet and being subtended by a chord of South 69°28'55" East, 362.98 feet to a point; 5) thence South 72°04'44" East for a distance of 52.86 feet to a point; 6) thence 111.81 feet along the arc of a curve to the left, said curve having a radius of 1481.52 feet and being subtended by a chord of South 74°14'28" East, 111.79 feet to an iron pin placed (1/2" rebar); 7) thence South 68°02'34" East for a distance of 18.93 feet to an iron pin placed (1/2" rebar); 8) thence 5.94 feet along the arc of a curve to the left, said curve having a radius of 1484.39 feet and being subtended by a chord of South 77°14'26" East, 5.94 feet to a point; 9) thence 183.79 feet along the arc of a curve to the left, said curve having a radius of 1484.39 feet and being subtended by a chord of South 80°54'08" East, 183.67 feet to a point; 10) thence South 84°26'58" East for a distance of 8.33 feet to an iron pin placed (1/2" rebar) at the northwesterly end of a radius forming the intersection of the southeasterly right of way line of North Decatur Road (variable r/w) with the northwesterly right of way line of Church Street (variable r/w); thence, along said radius 128.72 feet along the arc of a curve to the right, said curve having a radius of 100.00 feet and being subtended by a chord of South 33°03'19" East, 120.02 feet to a concrete right-of-way monument found on the northwesterly right of way line of Church Street (variable r/w); thence in a southwesterly direction along the northwesterly right of way line of Church Street (variable r/w) the following courses and distances: 1) South 22°45'46" West, a distance of 24.26 feet to a concrete right-of-way monument found; 2) thence 235.10 feet along the arc of a curve to the right, said curve having a radius of 1481.89 feet and being subtended by a chord of South 28°01'21" West, 234.85 feet to a concrete right-of-way monument found; 3) thence South 32°42'26" West for a distance of 114.25 feet to a point; 4) thence 65.34 feet along the arc of a curve to the right, said curve having a radius of 573.00 feet and being subtended by a chord of South 35°40'26" West, 65.30 feet to a concrete right-of-way monument found; 5) thence 79.83 feet along the arc of a curve to the right, said curve having a radius of 1487.89 feet and being subtended by a chord of South 41°10'37" West, 79.82 feet to a concrete right-of-way monument found; 6) thence South 42°18'15" West for a distance of 288.27 feet to an iron pin found (1/2" re-bar); thence departing said northwesterly right of way line of Church Street (variable r/w) and proceed North 73°50'43" West for a distance of 158.76 feet to an iron pin found (1/2" rebar); thence North 72°03'50" West for a distance of 386.80 feet to an iron pin found (1/2" rebar); thence North 05°28'34" East for a distance of 97.15 feet to an iron pin placed (1/2" rebar); thence North 05°56'34" East for a

DEED BOOK 24804 Pg 444
Debra DeBerry
Clerk of Superior Court
DeKalb County, Georgia

distance of 100.04 feet to an iron pin placed (1/2" rebar); thence North 05°54'34" East for a distance of 95.77 feet to an iron pin found (3/8" rebar); thence North 71°37'16" West for a distance of 179.92 feet to an iron pin found (1/2" rebar); thence North 20°06'57" East for a distance of 145.27 feet to an iron pin found (1/2" rebar); thence North 66°20'46" West for a distance of 126.68 feet to an iron pin found (1" rebar); thence North 66°20'46" West for a distance of 145.96 feet to an iron pin found (1" open top pipe) on the easterly right of way line of Medlock Road (variable r/w); thence in a northerly direction along the easterly and northeasterly right of way line of Medlock Road (variable r/w) the following courses and distances: 1) North 00°57'33" East for a distance of 289.69 feet to an iron pin found (rebar with cap); 2) thence North 24°17'44" East for a distance of 30.68 feet to an iron pin found (rebar with cap); 3) thence North 00°51'16" East for a distance of 85.80 feet to an iron pin placed (1/2" rebar with cap) at the southwesterly end of the aforementioned miter forming the intersection of the southwesterly right of way line of North Decatur Road (variable r/w), the southeasterly right of way line of Scott Boulevard, also known as U.S. Highway 29 / U.S. Highway 78 / State Route 8 (variable r/w), and the northeasterly right of way line of Medlock Road (variable r/w); thence along said miter North 54°11'35" East for a distance of 61.40 feet to the **Point of Beginning**.

Said tract or parcel containing 19.58062 acres, or 852,932 square feet.

## ESTOPPEL CERTIFICATE

To:                    Principal Life Insurance Company, its successors and assigns ("Lender")
                       c/o Principal Real Estate Investors, LLC
                       801 Grand Avenue
                       Des Moines, Iowa 50392-1360
                       Attn: Commercial Real Estate

                       Suburban Plaza, LLC
                       c/o Selig Enterprises, Inc.
                       1100 Spring Street N.W., Suite 550
                       Atlanta, Georgia 30309
                       Attn: Kenneth J. Clayman, Esq.

Shopping Center:       Suburban Plaza located in Decatur, GA

Landlord:              Suburban Plaza LLC, a Georgia limited liability company

Tenant:                Jo-Ann Stores, LLC, an Ohio limited liability company

Lease:                 Lease Agreement by and between Landlord and Tenant dated December 8, 2014
                       (the "Lease")

Tenant represents that, as of the date hereof:

1.  The Lease constitutes the entire written agreement between Tenant and Landlord and has not been modified or amended, except as indicated herein.

2.  The Lease is in full force and effect. The term will commence on the Commencement Date (as defined in the Lease) and end on the last day of the 10th Lease Year (as defined in the Lease). Tenant has four (4) 5-year options to renew the term thereof.

3.  Tenant is not yet in possession of the premises demised under the Lease (the "Premises") and reserves all rights and remedies with respect thereto.

4.  To the undersigned's actual knowledge, without inquiry or investigation, the Landlord is not currently in default under the Lease. Landlord will owe Tenant an Improvement Allowance in the amount of $601,050.00 in accordance with the Lease and must meet all other Delivery Requirements under the Lease. Tenant is awaiting delivery of the Memorandum of Lease from Landlord in accordance with the Lease.

    Furthermore, Tenant has not inspected the Shopping Center, including the common areas, to verify that Landlord is in compliance with its obligations with respect thereto, and Tenant hereby reserves all rights regarding the same.

5.  The monthly Fixed Minimum Rent is to be paid in accordance with the Lease and has not been prepaid by more than one month.

6.  No security deposit has been made in connection with the Lease.

Page 1 of 2

#2412 Decatur, GA

7. Tenant does not have any option or preferential right to purchase all or any part of the Shopping Center.

8. The address for notices to be sent to Tenant is as follows:

> Jo-Ann Stores, LLC
> Attn: Vice President, Real Estate
> 5555 Darrow Road
> Hudson, OH 44236

> with a copy to:

> Jo-Ann Stores, LLC
> Attn: Senior Legal Counsel
> 5555 Darrow Road
> Hudson, OH 44236

9. Nothing contained herein will: (a) amend, modify, waive or rescind any of the terms, conditions, covenants or obligations of the Lease; (b) waive or estop Tenant's right to declare a default based on facts of which the undersigned does not have actual knowledge, without inquiry or investigation; (c) waive or estop Tenant's right to claim any offset, claim or counterclaim resulting from an audit of Landlord's business records or public records; (d) waive or estop any claims, defenses, rights or remedies of Tenant; or (e) relieve the Landlord from any of its obligations under the Lease.

10. Tenant's statements exclude certification as to any matter that may be disclosed by audit, inspection, or examination of Landlord's records or public records relating to charges and monetary items under the Lease.

11. If there is any conflict between this certificate and the Lease, the Lease shall control.

12. Tenant acknowledges that you are relying upon this Estoppel Certificate and the accuracy of the information contained herein. Nevertheless, Tenant will not be liable to any party for damages of any kind whatsoever (whether direct, indirect, special, consequential or any other type) resulting from any statement in this certificate.

13. The undersigned representative of Tenant is duly authorized to execute this instrument on behalf of Tenant.

Dated: February 5, 2015

**JO-ANN STORES, LLC**

By: _David B Goldston_

David B. Goldston
Senior Vice President,
General Counsel and Secretary

Page 2 of 2

#2412 Decatur, GA

**When recorded, return to:**

Bob Bailey
Principal Life Insurance Company
801 Grand Avenue
Des Moines, IA 50392-1360

**This instrument was prepared by:**

Jo-Ann Stores, LLC
Matt Senra, Esq.
5555 Darrow Road
Hudson, OH 44236

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

This Subordination, Non Disturbance and Attornment Agreement (the "Agreement") is made as of the _27ᵗʰ_ day of _February_ , 2015, by and among PRINCIPAL LIFE INSURANCE COMPANY, an Iowa corporation, with an address for purposes of notice at c/o Principal Real Estate Investors, LLC, 801 Grand Avenue, Des Moines, Iowa 50392-1360 ("Lender"), Suburban Plaza LLC, a Georgia limited liability company ("Landlord"), and JO-ANN STORES, LLC, an Ohio limited liability company ("Tenant").

Reference is made to a loan (the "Mortgage") from Lender to Landlord, dated _____, and recorded on _____, as instrument number _____, in Decatur, Dekalb County, Georgia.

Reference is made to a lease dated December 8, 2014 by and between Tenant and Landlord (the "Lease") of certain premises situated within the property known as Suburban Plaza located in Decatur, GA as legally described on Exhibit A attached hereto and incorporated by reference herein and covered by said Mortgage.

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and in consideration of the mutual promises contained herein, the parties agree as follows:

Lender consents to the Lease and the provisions thereof.

Subject to the terms hereof, the Lease is and will be subject and subordinate at all times to the lien of the Mortgage and to all renewals and extensions of the Mortgage ("Amendments") to the full extent of all amounts secured thereby and interest thereon, provided, however, such Amendments do not expand Tenant's obligations or limit Tenant's rights under the Lease (except as agreed to in this Agreement).

If the holder of the Mortgage, or any person claiming under the holder (whether by a foreclosure, deed in lieu of foreclosure or otherwise), succeeds to the interest of Landlord in the Lease, then Tenant will recognize and attorn to the holder, or such other person, as its landlord under the Lease.

In the event of foreclosure or other right asserted under the Mortgage by the holder thereof, the Lease and all of the rights of Tenant thereunder will continue in full force and effect and will not be terminated or disturbed (whether by a foreclosure, deed in lieu of foreclosure or otherwise), except in the case of a material default by Tenant under the terms of the Lease continuing after notice to Tenant and beyond any applicable notice and grace period and otherwise in accordance with the Lease. Tenant shall not be subject to any pre-foreclosure remedies asserted under the Mortgage or related loan documents. Lender shall not name or join Tenant as a defendant in any exercise of Lender's rights and remedies arising upon a default under the Mortgage unless applicable law requires Tenant to be made a party thereto as a condition to proceeding against Landlord or prosecuting such rights and remedies. In the latter case, Lender may join Tenant as a defendant in such action only for such purpose and not to terminate the Lease or otherwise adversely affect Tenant's rights under the Lease or this Agreement in such action.

If Lender succeeds to the interest of Landlord under the Lease, Tenant will have the same rights and remedies against Lender for any default under the Lease, but Lender will not be:

(a)      liable for any act or omission of any prior landlord (including Landlord) under the Lease, except for non-monetary defaults of a continuing nature of which Lender has received notice, and latent or patent defects in construction to the same extent that any prior landlord would be liable but nothing herein will be construed to limit Lender's maintenance and repair obligations in its capacity as landlord under the Lease;

(b)      subject to any off-sets or abatements against rent that Tenant may have against any prior landlord (including Landlord) due to a default under the Lease, except (i) for those which, as of the date of foreclosure, were already commenced or notice of their commencement was sent, (ii) for the exercise of rights expressly set forth in the Lease, and (iii) for those relating to continuing defaults identified in subsection (a) above it being understood that nothing in this clause is deemed to exclude Lender from responsibility for (A) any "self-help" and "set-off" remedies in the Lease, including, but not limited to, remedies for repairs and maintenance required of the Landlord under the Lease from and after the date Lender takes title to the Premises, whether or not the need for such repairs or maintenance

accrued before or after such date and (B) any "set-off" remedies related to the "exclusive use", "co-tenancy" or "prohibited use" provisions in the Lease;

(c)    bound by any Fixed Minimum Rent that Tenant might have paid for more than the current month to any prior landlord (including Landlord), except as expressly required under the Lease or actually received by Lender;

(d)    bound by any payment of rents, additional rents or other sums which Tenant may have paid more than one month in advance to Landlord or any prior landlord unless (i) such sums are actually received by Lender or (ii) such prepayment was expressly approved by Lender; and

(e)    bound by any amendment or modification to the Lease that shortens the term of the Lease or reduces the rent owed thereunder without the prior consent of Lender, and if Lender does not respond to such request within 15 days, then consent will be deemed given by Lender; Landlord is responsible for securing all consents required by Lender.

In the event of any casualty or condemnation (eminent domain), Lender must permit the insurance proceeds or the condemnation award, as the case may be, to be used for any restoration and repair as required by the Lease.

Except as expressly provided herein, this Agreement does not constitute a waiver by Lender of any of its rights under the Mortgage or related documents, and the Mortgage and any related documents remain in full force and effect and will be complied with in all respects by Landlord.

No modification, amendment, waiver or release of any provision of this Agreement or of any right, obligation, claim or cause of action arising hereunder will be valid or effective unless in writing and signed by the parties.

Nothing herein will amend, waive or rescind any provision or condition of the Lease or relieve the Landlord from any of its obligations under the Lease.

Tenant will provide a courtesy copy concurrently to Lender of any notice of default (or breach) from Tenant to Landlord that would allow Tenant to terminate the Lease. Lender will have the same time allowed to the Landlord, after Landlord's receipt of notice, to cure the default giving rise to the termination. The opportunity to cure granted to Lender will be available to Lender only to the extent such opportunity to cure is available to Landlord under the Lease, and such cure period afforded to Lender will run concurrently with the cure period available to Landlord. Notwithstanding the foregoing, Lender will have no obligation to cure any default by Landlord except if Lender succeeds to title of the property.

Co-Tenancy and use violations are not considered defaults under the Lease, and Tenant has the right to exercise all remedies related thereto without notice to Lender.

Any notices from one party to the other must be in writing and sent via courier (e.g.,

UPS, Federal Express) or by certified U.S. mail to the following addresses:

if to Tenant:   Jo-Ann Stores, LLC
       Attn:  Vice President of Real Estate
       5555 Darrow Road
       Hudson, OH 44236

with a copy to:  Jo-Ann Stores, LLC
       Attn: Senior Legal Counsel
       5555 Darrow Road
       Hudson, OH 44236

if to Lender:   Principal Life Insurance Company
       c/o Principal Real Estate Investors, LLC
       801 Grand Avenue
       Des Moines, IA 50392-1450

Landlord represents and warrants to Tenant that all prior mortgages and deeds of trust encumbering the Premises demised under the Lease have been satisfied or will be satisfied with the proceeds of the Mortgage.

This Agreement inures to and binds the successors and assigns of the respective. parties.

This Agreement shall not be effective against Tenant unless and until Tenant has received an original of this Agreement signed by all parties.

This Agreement shall be deemed to be a contract entered into under the laws of Georgia and shall in all respects be governed, construed, applied and enforced in accordance with the laws of Georgia.

[SIGNATURES ON THE FOLLOWING PAGES]

Each party's duly authorized representative has signed this Agreement as of the date written above.

LENDER:

Signed, sealed and delivered in the presence of:

_____
Unofficial Witness  GERALD AMADEO

_____
Notary Public

My Commission Expires:

(NOTARIAL SEAL)

PRINCIPAL LIFE INSURANCE COMPANY, an Iowa corporation

By: PRINCIPAL REAL ESTATE INVESTORS, LLC, a Delaware limited liability company, its authorized signatory

By _____
Name:  Robert R. Bailey
Title:    Senior Financing Consultant

By _____
Name:  Patrice K. Davis
Title:    Assistant Managing Director
         Commercial Finance Consulting

STATE OF IOWA           )
                        ) SS
COUNTY OF POLK          )

BEFORE ME, a Notary Public in and for said County and State, personally appeared Principal Life Insurance Company, an Iowa corporation, by _____, its _____, who acknowledged that he/she did sign the foregoing instrument on behalf of said corporation and that the same is his/her free act and deed personally and as such officer.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at Des Moines, Iowa this _____ day of _____, 2015.

_____
                                          NOTARY PUBLIC

[SIGNATURES CONTINUED ON THE FOLLOWING PAGE]

LANDLORD:

Signed, sealed and delivered in the presence of:

_____
Unofficial Witness

_____
Notary Public

My Commission Expires:

(NOTARIAL SEAL)

SUBURBAN PLAZA, LLC, a Georgia limited liability Company

By: SELIG ENTERPRISES, INC., a Georgia corporation, its Manager

By _____
S. Stephen Selig, III, its President

STATE OF GEORGIA       )
                        ) SS
COUNTY OF FULTON       )

     BEFORE ME, a Notary Public in and for said County and State, personally appeared Suburban Plaza, LLC, by Selig Enterprises, Inc., a Georgia corporation, its manager, by _S Stephen Selig III_____, its _President_____, who acknowledged that he/she did sign the foregoing instrument on behalf of said corporation and that the same is his/her free act and deed personally and as such officer.

    IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at Atlanta, Georgia this 9th day of _February_____, 2015.

_____
NOTARY PUBLIC

[SIGNATURES CONTINUED ON THE FOLLOWING PAGE]

TENANT:

Signed, sealed and delivered in the presence of:

JO-ANN STORES, LLC, an Ohio limited liability company

_____
Unofficial Witness

By _____
David B. Goldston
Senior Vice President,
General Counsel and Secretary

_____
Notary Public

My Commission Expires:

(NOTARIAL SEAL)

STATE OF OHIO            )
                                         ) SS
COUNTY OF SUMMIT    )

BEFORE ME, a Notary Public in and for said County and State, personally appeared Jo-Ann Stores, LLC, an Ohio limited liability company, by David Goldston, its senior vice president, general counsel and secretary, who acknowledged before me that he did sign the foregoing instrument on behalf of said corporation and that the same is his free act and deed personally and as such officers.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at Hudson, Ohio, this 5th day of February, 2015.

_____
NOTARY PUBLIC

Ashley Pugh
Resident Summit County
Notary Public, State of Ohio
My Commission Expires: 02/23/2019

EXHIBIT A

LEGAL DESCRIPTION OF SHOPPING CENTER

All that tract or parcel of land lying and being in Lot 49 of the 18th District, DeKalb County, Georgia, and being more particularly described as follows:

**BEGINNING** at an iron pin found (rebar with cap) which forms the northeasterly end of a miter forming the intersection of the southwesterly right of way line of North Decatur Road (variable r/w) the southeasterly right of way line of Scott Boulevard, also known as U. S. Highway 29 / U. S. Highway 78 / State Route 8, (variable r/w) and the northeasterly right of way line of Medlock Road (variable r/w) and proceed in a southeasterly direction along the southwesterly right of way line of North Decatur Road (variable r/w) the following courses and distances: 1) South 65°57'01" East, 354.90 feet to a nail placed; 2) South 19°28'34" West, 15.00 feet to a nail placed; 3) South 65°58'16" East for a distance of 179.26 feet to a point; 4) thence 363.20 feet along the arc of a curve to the left, said curve having a radius of 2963.63 feet and being subtended by a chord of South 69°28'55" East, 362.98 feet to a point; 5) thence South 72°04'44" East for a distance of 52.86 feet to a point; 6) thence 111.81 feet along the arc of a curve to the left, said curve having a radius of 1481.52 feet and being subtended by a chord of South 74°14'28" East, 111.79 feet to an iron pin placed (1/2" rebar); 7) thence South 68°02'34" East for a distance of 18.93 feet to an iron pin placed (1/2" rebar); 8) thence 5.94 feet along the arc of a curve to the left, said curve having a radius of 1484.39 feet and being subtended by a chord of South 77°14'26" East, 5.94 feet to a point; 9) thence 183.79 feet along the arc of a curve to the left, said curve having a radius of 1484.39 feet and being subtended by a chord of South 80°54'08" East, 183.67 feet to a point; 10) thence South 84°26'58" East for a distance of 8.33 feet to an iron pin placed (1/2" rebar) at the northwesterly end of a radius forming the intersection of the southeasterly right of way line of North Decatur Road (variable r/w) with the northwesterly right of way line of Church Street (variable r/w); thence, along said radius 128.72 feet along the arc of a curve to the right, said curve having a radius of 100.00 feet and being subtended by a chord of South 33°03'19" East, 120.02 feet to a concrete right-of-way monument found on the northwesterly right of way line of Church Street (variable r/w); thence in a southwesterly direction along the northwesterly right of way line of Church Street (variable r/w) the following courses and distances: 1) South 22°45'46" West, a distance of 24.26 feet to a concrete right-of-way monument found; 2) thence 235.10 feet along the arc of a curve to the right, said curve having a radius of 1481.89 feet and being subtended by a chord of South 28°01'21" West, 234.85 feet to a concrete right-of-way monument found; 3) thence South 32°42'26" West for a distance of 114.25 feet to a point; 4) thence 65.34 feet along the arc of a curve to the right, said curve having a radius of 573.00 feet and being subtended by a chord of South 35°40'26" West, 65.30 feet to a concrete right-of-way monument found; 5) thence 79.83 feet along the arc of a curve to the right, said curve having a radius of 1487.89 feet and being subtended by a chord of South 41°10'37" West, 79.82 feet to a concrete right-of-way monument found; 6) thence South 42°18'15" West for a distance of 288.27 feet to an iron pin found (1/2" re-bar); thence departing said northwesterly right of way line of Church Street (variable r/w) and proceed North 73°50'43" West for a distance of 158.76 feet to an iron pin found (1/2" rebar); thence North 72°03'50" West for a distance of 386.80 feet to an iron pin found (1/2" rebar); thence North 05°28'34" East for a distance of 97.15 feet to an iron pin placed (1/2" rebar); thence North 05°56'34" East for a

distance of 100.04 feet to an iron pin placed (1/2" rebar); thence North 05°54'34" East for a distance of 95.77 feet to an iron pin found (3/8" rebar); thence North 71°37'16" West for a distance of 179.92 feet to an iron pin found (1/2" rebar); thence North 20°06'57" East for a distance of 145.27 feet to an iron pin found (1/2" rebar); thence North 66°20'46" West for a distance of 126.68 feet to an iron pin found (1" rebar); thence North 66°20'46" West for a distance of 145.96 feet to an iron pin found (1" open top pipe) on the easterly right of way line of Medlock Road (variable r/w); thence in a northerly direction along the easterly and northeasterly right of way line of Medlock Road (variable r/w) the following courses and distances: 1) North 00°57'33" East for a distance of 289.69 feet to an iron pin found (rebar with cap); 2) thence North 24°17'44" East for a distance of 30.68 feet to an iron pin found (rebar with cap); 3) thence North 00°51'16" East for a distance of 85.80 feet to an iron pin placed (1/2" rebar with cap) at the southwesterly end of the aforementioned miter forming the intersection of the southwesterly right of way line of North Decatur Road (variable r/w), the southeasterly right of way line of Scott Boulevard, also known as U.S. Highway 29 / U.S. Highway 78 / State Route 8 (variable r/w), and the northeasterly right of way line of Medlock Road (variable r/w); thence along said miter North 54°11'35" East for a distance of 61.40 feet to the **Point of Beginning**.

Said tract or parcel containing 19.58062 acres, or 852,932 square feet.

*file*
*Joanns-*
*Suburban*

## DISCLOSURE STATEMENT - LEASE

The Shopping Center Group, LLC    "Broker"

Tenant: Jo-Ann Stores, LLC

Landlord: Suburban Plaza, LLC

For a lease transaction between Jo-Ann Stores, LLC ("Tenant") and Suburban Plaza, LLC ("Landlord") involving property located at: 2655 North Decatur Rd, Decatur, Georgia (hereinafter "Property"), Broker makes the following disclosures:

1.  In the above transaction:

    _____X_____ (a) Broker represents the Tenant only (if checked, "Client");

    _____ (b) Broker represents the Landlord only (if checked, "Client");

    _____ (c) Broker represents the Tenant and Landlord jointly (if checked, each is the "Client") and such dual agency is expressly consented to by their execution of a Dual Agency Disclosure and Consent Agreement;

    _____ (d) Broker has assigned Broker's affiliated licensee, _____, to represent solely Landlord as its designated agent and has assigned Broker's affiliated licensee, _____, to represent solely Tenant as its designated agent , and thus no dual agency exists in this transaction; but if checked,  each is a "Client"; or

    _____ (e) Broker represent neither Tenant, nor Landlord, but rather Broker is acting as a transactional broker for both parties as defined by applicable law.

2.  In the above transaction, Broker shall receive its compensation from:

    _____ (a) the Tenant only;

    ___X_____ (b) the Landlord only; or

    _____ (c) both the Tenant and Landlord and such payment is expressly consented to by the parties by their signing below.

The parties signing below agree to the representations and source of Broker's compensation disclosed above. The parties acknowledge receipt of the Broker's Brokerage Relationship Policies which is attached to this Statement and is incorporated herein by reference, and which has been reviewed by the parties signing below prior to the execution of this Statement. The defined terms in the attached are the same as are used here.

Landlord

SELIG Enterprise, Inc

By: Will M Stoje

Title: Sr. Vic President

Date: 1/27/15

Tenant

Jo-Ann Stores, LLP

By: _____

Title: Vice President of Real Estate

Date: 1/26/15

## BROKER RELATIONSHIP POLICIES

Georgia law requires each licensed broker to develop and enforce a brokerage relationship policy, to provide a copy of that policy to all prospective clients and to make certain disclosures to each prospective client before entering into a brokerage engagement relationship. That is the purpose of this section. Here are the defined terms that will be used in the policies below: A client is defined as a person being represented by a real estate broker in an agency capacity pursuant to a brokerage engagement. A customer is defined as a person who is not being represented by a real estate broker in an agency capacity pursuant to a brokerage engagement, but for whom such broker may perform ministerial acts in a real estate transaction. A brokerage engagement means a written contract wherein the seller, buyer, landlord or tenant becomes the client of the broker and promises to pay the real estate broker valuable consideration or agrees that a real estate broker may receive valuable consideration from another in consideration of the broker producing a seller, buyer, tenant, or landlord ready, willing and able to sell, buy or rent real property or an interest in the property or performing other brokerage services.

### Brokerage Policies

Broker and its affiliated licensees represent (1) sellers, landlords, buyers and tenants and (2) both sellers and buyers and landlords and tenants under disclosed dual agency for intra-company real estate transactions (for purposes of this Policy, reference to landlord or tenants includes sublandlord and subtenant, if applicable).    In addition, in an agency specific disclosed transaction, Broker and its affiliated licensees may act as a transactional broker and perform ministerial acts (i.e. acts which do not involve the exercise of its discretion or judgment for both seller/landlord and buyer/tenant, without creating an agency relationship with either party.

Broker is a full service brokerage firm and in some instances, Broker may represent both the seller and the buyer or the landlord and tenant in a specific transaction. That may be handled as a dual agency or as designated agent, as determined by Broker as described in this paragraph. A dual agency is permitted under Georgia law if both clients consent. If Broker determines to handle the matter as a dual agency, Broker shall provide to each prospective client a dual agency disclosure and consent agreement in order to obtain each client's written consent to the transaction in which it is acting as a dual agent and make such other disclosures as are required by law. Alternatively, Broker has the right to decide to assign one of its affiliated licensees to represent one client exclusively as a designated agent and assign another of its affiliated licensees to represent the other client exclusively as a designated agent. In such a situation, neither Broker nor the brokerage firm nor the designated agents would be a dual agent. Broker has delegated to its officers and others the right to assign such affiliated licensees in order to have a designated agency situation rather than a dual agency situation.

### Other Brokerage Relationships

Broker is a full service brokerage firm and it represents other clients under existing or subsequent brokerage relationships with respect to the sale, purchase or lease of their real property or acquisition or lease of specific real property. At times, a client and a prospective client of Broker may wish to purchase or lease property that a client of Broker offers for sale or lease. Alternatively, a client and a prospective client of Broker may wish to purchase or lease property that another broker's client offers for sale or lease. At times, a client of Broker may offer for sale or lease property similar to (and competitive with) the property that a prospective client of Broker offers for sale or lease.   Brokers shall not disclose the confidential information of any of its clients to any other of its clients or to its customers, except to the extent required by applicable law.

When a seller or landlord is a client, Broker and its salespersons may still show alternative properties not owned by the client to prospective buyers or prospective tenants, whether or not the alternative properties



are owned by existing or prospective clients of Broker and whether or not the prospective buyers or tenants are existing or prospective clients of Broker.    In addition, when a buyer or tenant is a client, Brokers and its salespersons may still show properties in which the buyer or tenant is interested to other prospective buyers or prospective tenants, whether such prospective buyers or tenants are existing or prospective clients.

## Commission Arrangements

Broker's compensation in representing a seller or landlord or when acting as a dual agent is a particular transaction will generally be paid by such sellers or landlords, pursuant to an agency listing agreement or commission agreement.  In those instances in which Broker represents buyers or tenants, Broker's compensation for services rendered to such buyers or tenants will be paid by seller or landlord or its agent (as applicable to the transaction), unless specifically agreed to the contrary in writing between Broker and the buyer or tenant (as applicable to the transaction).  Broker will advise its clients of its compensation payable in connection with a specific transaction.  Broker will not receive any undisclosed real estate brokerage commission in any real estate transaction and further will advise and obtain the consent of all parties in the event that more than one party to a specific transaction pays it compensation.

Generally, Broker will cooperate with other licensed brokers who are properly authorized in writing to represent another party in a transaction; however, Broker will not recognize such cooperating brokers as subagents of Broker's clients, unless specifically agreed to in writing by Broker's clients and such cooperating brokers.  Broker's compensation to and sharing of commission with cooperating brokers will be set forth in the applicable agency listing agreement or other commission agreement with Broker's clients, who are responsible for compensating Broker.

## Disclosure Statement and Other Information and Notices

Broker, through one or more of its salespersons or licensees, shall provide a Disclosure Statement to all parties to specific transaction prior to the execution of a purchase and sale contract, a lease/sublease or other agreements regarding a transaction involving real property.  The Disclosure Statement will provide disclosures as to whom Broker represents and from whom Broker shall receive compensation in any specific transaction.  In addition, Broker provides to each party to any specific transaction, whether client or customer, additional information and notices which appear on the attached Disclosure Statement.

When recorded, return to:
Jo-Ann Stores, LLC
5555 Darrow Road
Hudson, OH 44236
Attn: Wendy Blasick – Legal Dept.

**This instrument was prepared by:**
Matthew Senra, Esq.
Jo-Ann Stores, LLC
5555 Darrow Road
Hudson, OH 44236

_____

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## MEMORANDUM OF LEASE

This Memorandum of Lease is made as of December 8, 2014, between **Jo-Ann Stores, LLC**, an Ohio limited liability company ("Tenant"), located at 5555 Darrow Road, Hudson, Ohio 44236 and **Suburban Plaza LLC**, a Georgia limited liability company ("Landlord"), located at Suburban Plaza, LLC, c/o Selig Enterprises, Inc., 1100 Spring Street N.W., Suite 550, Atlanta, Georgia 30309-2848.

Reference is made to a Lease dated December 8, 2014, between Landlord and Tenant (the "Lease"). Pursuant to Section 33 of the Lease, the parties desire to create this instrument. The parties acknowledge the following:

1.     The Premises consists of approximately 20,035 square feet in a part of the shopping center known as Suburban Plaza (the "Shopping Center"), located in Decatur, Georgia, owned by Landlord and legally described on Exhibit A attached hereto and incorporated by reference herein ("Shopping Center").

2.     Subject to the terms of the Lease, the initial term of the Lease commences on the Commencement Date (as defined in the Lease) and ends on the last day of the 10th Lease Year (as defined in the Lease). Tenant has options to extend the initial term for four (4) additional periods of five (5) years each.

3.     The Lease provided for the following definition of "Protected Use": the sale of any of the following: fabrics of all kinds, goods sold by the yard, upholstery materials (excluding furniture store), scrapbooks and scrapbooking materials and supplies, patterns, yarns and knitting supplies, needlepoint, macramé, artificial flowers and accessories, arts and craft materials and supplies, all types of notions related to sewing and fabrics, custom framing, sewing machines, sewing machine furniture, products, accessories and services related to all of the foregoing ("Exclusive Use Items").

4.      Subject to the rights of tenants or occupants under existing leases and agreements as of the date hereof, in no event will the Shopping Center (excluding the Wal-Mart Tract) be used as or for any of the following during the Term of the Lease:

(a)      A movie theater; auditorium; meeting or banquet hall (except that the foregoing restrictions shall not apply to the portion of the Shopping Center identified on the Site Plan as "Lower Level Space");

(b)      church; bingo hall (except that the foregoing restrictions shall not apply to the Lower Level Space) or a place of public assembly (except in the Lower Level Space);

(c)      library or school (includes, but not limited to, a beauty school, barber college, reading room, place of instruction or any other operation serving primarily students or trainees rather than retail customers, provided that the foregoing restrictions shall not apply to Lower Level Space and further provided that tutoring of any grade/level of school/university for subjects/testing such as Score, Mathnasium and Sylvan Learning Center shall be permitted);

(d)      for the sale or service of automobiles or other vehicles; provided, however, auto parts retail locations shall be permitted, and further provided, one quick lube/tire and battery station such as Kaufman Tire, Jiffy Lube or NTB shall be permitted;

(e)      night club or bar serving alcoholic beverages except as incidental to a restaurant ("incidental" shall be defined as deriving less than 40% of gross sales from the sale of alcoholic beverages) provided, however, the operation of an upscale wine bar or similar operation shall not be prohibited; or liquor or package store, except the following shall be permitted (a) a liquor or package store anywhere in the Lower Level Space; (b) a Total Wine or similar retailer; (c) the sale of alcoholic beverages in connection with a permitted retail use (such as the sale of wine, beer or spirits by Bed, Bath & Beyond, Cost Plus, or a grocery store);

(f)      funeral parlor; massage parlor (except for (i) therapeutic massages given in connection with the operation of a day spa and therapeutic massage providers such as Massage Envy and Spa Sydell; (ii) hair salons which provides massage services as an incidental part of its business; (iii) the provision of massage services in connection with medical or chiropractic facilities, such as medical rehabilitations clinics; and (iv) massages given as incidental to a health club);

(g)      animal clinic or animal boarding (kennel) except as incidental to a national pet supply store such as *Petsmart* or *Petco*;

(h)      discotheque; dance hall or otherwise for musical/dance reviews or topless/nude shows;

(i)      karate studio; gymnasium; bowling alley; or skating rink, except the foregoing shall be permitted anywhere on the Lower Level Space or on the Upper Level Space so long as same which located on the Upper Level Space is not located within 200 feet of the front door of the Premises;

Store No. 2412, Suburban Plaza, Decatur, GA
Memorandum of Lease

(j)    car wash;

(k)    off-track betting establishment;

(l)    except in the Lower Level Space, pool room, (provided the same shall be allowed in the Lower Level Space only if it is a "high end" pool room operation) game room or amusement arcade (defined as any establishment containing more than a combination of three electronic, pinball or other games, gallery or store or pinball arcade) except as to all of the above incidental to a permitted restaurant use;

(m)    so-called "flea market"; or second hand, used goods or consignment store; provided, however, the foregoing restriction shall not prohibit antique shops or stores selling high quality used merchandise such as *Play It Again Sports*, *Plato's Closet*, and *Game Stop* or stores that sell "Vintage" clothing;

(n)    store selling primarily distressed or damaged merchandise (except to the extent falling within the uses permitted by clause (xiii) above;

(o)    health club (except for the premises depicted as L.A. Fitness on the Site Plan, and successors, assigns and replacements thereof);

(p)    so-called "head shop" or night club;

(q)    gun range or gun shop, except the sale of guns as incidental to a national or regional sporting goods store such as Dick's Sporting Goods shall be permitted;

(r)    for warehousing, except as incidental to a retail business;

(s)    adult book store or store selling or exhibiting sexually explicit materials (materials shall be considered "adult" or "pornographic" for such purpose if the same are not available for sale or rental to children under 18 years old because they explicitly deal with or depict human sexuality), provided that sale, rental or display of such items as an incidental part of a permitted business (as used above, the term "incidental" means, with respect to any national or regional video store chain or national or regional book store, any sale or rental of such materials and with respect to other tenants, the sale of such materials from not more than ten percent (10%) of the sales area of such business and so as to constitute less than ten percent (10%) of the gross sales of such business) shall be permitted;

(t)    Intentionally Deleted;

(u)    abortion clinic, aids clinic, drug treatment facility or bodily fluid collection facility; homeless shelter or halfway house;

(v)    Laundromat; provided, however, this prohibition shall not be applicable to (i) nominal supportive facilities for on-site service oriented to pickup and delivery by the ultimate consumer as the same may be found in retail shopping centers in the metropolitan area where the Shopping Center is located; or (ii) a store with dry cleaning processes, using dry cleaning solvents that are biodegradable, non-chlorinated and are not hydrocarbons, and are not Hazardous Materials; and

Store No. 2412, Suburban Plaza, Decatur, GA
Memorandum of Lease

- 3 -



(w)   marijuana dispensary.

5.   This Memorandum of Lease is intended solely to establish the Lease and the rights of Tenant in respect of the Premises as matters of public record. Reference is hereby made to the Lease for a complete description of all of the rights, duties, and obligations of the parties in respect of the Premises and the use and the occupancy thereof. In the event of any inconsistency between the Lease and this Memorandum of Lease, the Lease shall control.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

In witness whereof, each party has caused this instrument to be signed by its duly authorized representative.

WITNESS

WITNESS

LANDLORD:
**SUBURBAN PLAZA, LLC,** a limited liability company organized under the laws of the State of Georgia

By: Selig Enterprises, Inc., a Georgia corporation, as manager

By: _____
S. Stephen Selig, III, its President

TENANT
**JO-ANN STORES, LLC**

By: _____
James Kerr, Interim Chief Executive Officer and Interim President

*[Signature Page to Memorandum of Lease–Store No. 2412, Suburban Plaza, Decatur, GA]*

Store No. 2412, Suburban Plaza, Decatur, GA
Memorandum of Lease

STATE OF GEORGIA         )
                                  ) SS

COUNTY OF _Fulton_    )

       BEFORE ME, a Notary Public in and for said County and State, personally appeared **SUBURBAN PLAZA, LLC**, by Selig Enterprises, Inc., its manager, by S. Stephen Selig, III, its President, who did sign the foregoing instrument on behalf of the said companies in their respective capacities and that the same is his free act and deed personally and as such authorized representative.

       IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at Decatur, Georgia, this _9th_ day of ~~November~~, 201~~4~~5. February

                                        _____
                                           NOTARY PUBLIC

*[Seal: TIFFANY NEUHOFF, NOTARY PUBLIC, GEORGIA, EXPIRES JAN. 23, 2018, COBB COUNTY]*

STATE OF OHIO         )
                       ) SS

COUNTY OF SUMMIT   )

       BEFORE ME, a Notary Public in and for said County and State, personally appeared Jo-Ann Stores, LLC, an Ohio limited liability company, by James Kerr, its interim chief executive officer and interim president, who acknowledged that he did sign the foregoing instrument on behalf of the limited liability company, and that the same is the free act and deed of the limited liability company and his free act and deed personally and as such officer.

       IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at Hudson, Ohio, this _____ day of November, 2014.

                                        _____
                                           NOTARY PUBLIC

*[Notary Page to Memorandum of Lease –Store No. 2412, Suburban Plaza, Decatur, GA]*



Exhibit A

**Shopping Center Legal Description**

## SUBURBAN PLAZA

All that tract or parcel of land lying and being in Lot 49 of the 18th District, DeKalb County, Georgia, and being more particularly described as follows:

**BEGINNING** at an iron pin found  (rebar with cap) which forms the northeasterly end of a miter forming the intersection of the southwesterly right of way line of North Decatur Road (variable r/w) the southeasterly right of way line of Scott Boulevard, also known as U. S. Highway 29 / U. S. Highway 78 / State Route 8, (variable r/w) and the northeasterly right of way line of Medlock Road (variable r/w) and proceed in a southeasterly direction along the southwesterly right of way line of North Decatur Road (variable r/w) the following courses and distances: 1) South 65°57'01" East, 354.90 feet to a nail placed; 2) South 19°28'34" West, 15.00 feet to a nail placed; 3) South 65°58'16" East for a distance of 179.26 feet to a point; 4) thence 363.20 feet along the arc of a curve to the left, said curve having a radius of 2963.63 feet and being subtended by a chord of South 69°28'55" East, 362.98 feet to a point; 5) thence South 72°04'44" East for a distance of 52.86 feet to a point; 6) thence 111.81 feet along the arc of a curve to the left, said curve having a radius of 1481.52 feet and being subtended by a chord of South 74°14'28" East, 111.79 feet to an iron pin placed (1/2" rebar); 7) thence South 68°02'34" East for a distance of 18.93 feet to an iron pin placed (1/2" rebar); 8) thence 5.94 feet along the arc of a curve to the left, said curve having a radius of 1484.39 feet and being subtended by a chord of South 77°14'26" East, 5.94 feet to a point; 9) thence 183.79 feet along the arc of a curve to the left, said curve having a radius of 1484.39 feet and being subtended by a chord of South 80°54'08" East, 183.67 feet to a point; 10) thence South 84°26'58" East for a distance of 8.33 feet to an iron pin placed (1/2" rebar) at the northwesterly end of a radius forming the intersection of the southeasterly right of way line of North Decatur Road (variable r/w) with the northwesterly right of way line of Church Street (variable r/w); thence, along said radius 128.72 feet along the arc of a curve to the right, said curve having a radius of 100.00 feet and being subtended by a chord of South 33°03'19" East, 120.02 feet to a concrete right-of-way monument found on the northwesterly right of way line of Church Street (variable r/w); thence in a southwesterly direction along the northwesterly right of way line of Church Street (variable r/w) the following courses and distances: 1) South 22°45'46" West, a distance of 24.26 feet to a concrete right-of-way monument found; 2) thence 235.10 feet along the arc of a curve to the right, said curve having a radius of 1481.89 feet and being subtended by a chord of South 28°01'21" West, 234.85 feet to a concrete right-of-way monument found; 3) thence South 32°42'26" West for a distance of 114.25 feet to a point; 4) thence 65.34 feet along the arc of a curve to the right, said curve having a radius of 573.00 feet and being subtended by a chord of South 35°40'26" West, 65.30 feet to a concrete right-of-way monument found; 5) thence 79.83 feet along the arc of a curve to the right, said curve having a radius of 1487.89 feet and being subtended by a chord of South 41°10'37" West, 79.82 feet to a concrete right-of-way monument found; 6) thence South 42°18'15" West for a distance of 288.27 feet to an iron pin found (1/2" re-bar); thence departing said northwesterly right of way line of Church Street (variable r/w) and proceed North 73°50'43" West for a distance of 158.76 feet to an iron pin found (1/2" rebar); thence North 72°03'50" West for a distance of 386.80 feet to an iron pin found (1/2" rebar); thence North 05°28'34" East for a distance of 97.15 feet to an iron pin placed (1/2" rebar); thence North 05°56'34" East for a distance of 100.04 feet to an iron pin placed (1/2" rebar); thence North 05°54'34" East for a distance of 95.77 feet to an iron pin found (3/8" rebar); thence North 71°37'16" West for a distance of 179.92 feet to an iron pin found (1/2" rebar); thence North 20°06'57" East for a distance of 145.27 feet to an iron pin found (1/2" rebar); thence North 66°20'46" West for a distance of 126.68 feet to an iron pin found (1" rebar); thence North 66°20'46" West for a distance of 145.96 feet to an iron pin found (1" open top pipe) on the easterly right of way line of Medlock Road (variable r/w); thence in a northerly direction along the easterly and northeasterly right of way line of Medlock Road (variable



r/w) the following courses and distances: 1) North 00°57'33" East for a distance of 289.69 feet to an iron pin found (rebar with cap); 2) thence North 24°17'44" East for a distance of 30.68 feet to an iron pin found (rebar with cap); 3) thence North 00°51'16" East for a distance of 85.80 feet to an iron pin placed (1/2" rebar with cap) at the southwesterly end of the aforementioned miter forming the intersection of the southwesterly right of way line of North Decatur Road (variable r/w), the southeasterly right of way line of Scott Boulevard, also known as U.S. Highway 29 / U.S. Highway 78 / State Route 8 (variable r/w), and the northeasterly right of way line of Medlock Road (variable r/w); thence along said miter North 54°11'35" East for a distance of 61.40 feet to the **Point of Beginning**.

Said tract or parcel containing 19.58062 acres, or 852,932 square feet.



## ESTOPPEL CERTIFICATE

To:                Principal Life Insurance Company, its successors and assigns ("Lender")
c/o Principal Real Estate Investors, LLC
801 Grand Avenue
Des Moines, Iowa 50392-1360
Attn:  Commercial Real Estate

Suburban Plaza, LLC
c/o Selig Enterprises, Inc.
1100 Spring Street N.W., Suite 550
Atlanta, Georgia  30309
Attn:  Kenneth J. Clayman, Esq.

Shopping Center:    Suburban Plaza located in Decatur, GA

Landlord:        Suburban Plaza LLC, a Georgia limited liability company

Tenant:            Jo-Ann Stores, LLC, an Ohio limited liability company

Lease:              Lease Agreement by and between Landlord and Tenant dated December 8, 2014
(the "Lease")

Tenant represents that, as of the date hereof:

1.  The Lease constitutes the entire written agreement between Tenant and Landlord and has not been modified or amended, except as indicated herein.

2.  The Lease is in full force and effect.  The term will commence on the Commencement Date (as defined in the Lease) and end on the last day of the 10th Lease Year (as defined in the Lease).  Tenant has four (4) 5-year options to renew the term thereof.

3.  Tenant is not yet in possession of the premises demised under the Lease (the "Premises") and reserves all rights and remedies with respect thereto.

4.  To the undersigned's actual knowledge, without inquiry or investigation, the Landlord is not currently in default under the Lease.  Landlord will owe Tenant an Improvement Allowance in the amount of $601,050.00 in accordance with the Lease and must meet all other Delivery Requirements under the Lease.  Tenant is awaiting delivery of the Memorandum of Lease from Landlord in accordance with the Lease.

    Furthermore, Tenant has not inspected the Shopping Center, including the common areas, to verify that Landlord is in compliance with its obligations with respect thereto, and Tenant hereby reserves all rights regarding the same.

5.  The monthly Fixed Minimum Rent is to be paid in accordance with the Lease and has not been prepaid by more than one month.

6.  No security deposit has been made in connection with the Lease.

Page 1 of 2

#2412 Decatur, GA



7. Tenant does not have any option or preferential right to purchase all or any part of the Shopping Center.

8. The address for notices to be sent to Tenant is as follows:

> Jo-Ann Stores, LLC
> Attn: Vice President, Real Estate
> 5555 Darrow Road
> Hudson, OH 44236
>
> with a copy to:
>
> Jo-Ann Stores, LLC
> Attn: Senior Legal Counsel
> 5555 Darrow Road
> Hudson, OH 44236

9. Nothing contained herein will: (a) amend, modify, waive or rescind any of the terms, conditions, covenants or obligations of the Lease; (b) waive or estop Tenant's right to declare a default based on facts of which the undersigned does not have actual knowledge, without inquiry or investigation; (c) waive or estop Tenant's right to claim any offset, claim or counterclaim resulting from an audit of Landlord's business records or public records; (d) waive or estop any claims, defenses, rights or remedies of Tenant; or (e) relieve the Landlord from any of its obligations under the Lease.

10. Tenant's statements exclude certification as to any matter that may be disclosed by audit, inspection, or examination of Landlord's records or public records relating to charges and monetary items under the Lease.

11. If there is any conflict between this certificate and the Lease, the Lease shall control.

12. Tenant acknowledges that you are relying upon this Estoppel Certificate and the accuracy of the information contained herein. Nevertheless, Tenant will not be liable to any party for damages of any kind whatsoever (whether direct, indirect, special, consequential or any other type) resulting from any statement in this certificate.

13. The undersigned representative of Tenant is duly authorized to execute this instrument on behalf of Tenant.

Dated: February 5, 2015

**JO-ANN STORES, LLC**

By: _David B Goldston_____

     David B. Goldston
     Senior Vice President,
     General Counsel and Secretary

Page 2 of 2

#2412 Decatur, GA