# EXHIBIT C

LEASE

**ROSS DRESS FOR LESS, INC.**
**SUBURBAN PLAZA**
**DECATUR, GEORGIA**

_____

**TABLE OF CONTENTS**

| | | |
|---|---|---:|
| **1.** | **SALIENT LEASE TERMS** | **1** |
| | 1.1. Effective Date | 1 |
| | 1.2. Parties/Addresses | 1 |
| | 1.3. Location Information | 2 |
| | 1.4. Critical Dates | 3 |
| | 1.5. Lease Term | 3 |
| | 1.6. Minimum Rent | 4 |
| | 1.7. Required Co-Tenancy | 4 |
| | 1.8. Common Area Charge Administrative Fee | 5 |
| | 1.9. Title Report | 5 |
| | 1.10. Contents of Lease | 5 |
| **2.** | **DEFINITIONS OF GENERAL APPLICATION** | **6** |
| **3.** | **GRANTS OF LEASE, COMMON AREA USE, EASEMENTS AND ACCESS** | **14** |
| | 3.1. Lease | 14 |
| | 3.2. Nature of the Shopping Center | 14 |
| | 3.3. Grant of Common Area Use | 17 |
| | 3.4. Grant of Utility Easements | 17 |
| | 3.5. Utility Rooms | 17 |
| | 3.6. Site Plan or Shopping Center Alterations | 18 |
| | 3.7. Dimensions | 19 |
| | 3.8. Effect of REA | 20 |
| **4.** | **LEASE TERM** | **21** |
| | 4.1. Term | 21 |
| | 4.2. Commencement Date | 21 |
| | 4.3. Acknowledgment of Commencement | 21 |
| | 4.4. Option Periods | 21 |
| **5.** | **CONSTRUCTION AND ACCEPTANCE** | **22** |
| | 5.1. Landlord's Construction Obligations | 22 |
| | 5.2. Construction Commencement | 23 |
| | 5.3. Completion of Construction | 23 |
| | 5.4. Construction Completion Notice | 24 |
| | 5.5. Rollover | 25 |
| | 5.6. Remedies Cumulative | 26 |
| | 5.7. Construction Completion Cancel Date | 26 |

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/632873.6

- i -

02/06/15
FINAL

| | 5.8. | Automatic Termination. | 26 |
| | 5.9. | Entry Prior to Delivery Date. | 26 |
| | 5.10. | Walk-Through Inspection and Punchlist. | 26 |
| | 5.11. | Intentionally Deleted. | 27 |
| | 5.12. | Additional Delivery Requirements. | 27 |
| 6. | RENT | | 28 |
| | 6.1. | Minimum Rent. | 28 |
| | 6.2. | Reimbursements. | 31 |
| | 6.3. | Other Payment Provisions. | 31 |
| | 6.4. | Gross Sales Statement for Purposes of Calculating Substitute Rent. | 32 |
| 7. | COMMON AREA MAINTENANCE | | 32 |
| | 7.1. | Landlord's Obligation to Maintain Common Areas. | 32 |
| | 7.2. | Tenant's Pro Rata Share. | 33 |
| | 7.3. | Definition of Common Area Charges | 33 |
| | 7.4. | Payment of Tenant's Pro Rata Share | 36 |
| 8. | REAL ESTATE TAXES AND ASSESSMENTS | | 41 |
| | 8.1. | Obligation to Pay. | 41 |
| | 8.2. | Tenant's Pro Rata Share. | 41 |
| | 8.3. | Exclusions. | 42 |
| | 8.4. | Rebates. | 43 |
| | 8.5. | Contest. | 43 |
| | 8.6. | Intentionally Deleted. | 43 |
| 9. | INSURANCE | | 43 |
| | 9.1. | Property Insurance. | 43 |
| | 9.2. | Liability Insurance. | 45 |
| | 9.3. | Evidence of Insurance. | 45 |
| | 9.4. | Waiver of Subrogation. | 46 |
| | 9.5. | Tenant's Right to Self-Insure. | 46 |
| 10. | UTILITIES SERVICES | | 47 |
| 11. | MAINTENANCE/REPAIR/ENVIRONMENTAL COMPLIANCE | | 48 |
| | 11.1. | Maintenance and Repair by Tenant. | 48 |
| | 11.2. | Maintenance and Repair by Landlord. | 48 |
| | 11.3. | Repairs Required by Governmental Authorities. | 49 |
| | 11.4. | Hazardous Material. | 50 |
| 12. | ALTERATIONS | | 54 |
| | 12.1. | Permitted Alterations. | 54 |
| | 12.2. | Communication Equipment. | 54 |
| 13. | NON-DISTURBANCE AND SUBORDINATION/ ESTOPPEL CERTIFICATES | | 55 |
| | 13.1. | Non-Disturbance and Subordination. | 55 |

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/632873.6

- ii -

02/06/15
FINAL

13.2.   Estoppel Certificates. ................................................................. 55
13.3.   Processing Fees for Non-Disturbance Agreements and Estoppel Certificates. ......... 56

**14. INDEMNIFICATION** ........................................................................ **56**
14.1.   Tenant Indemnity. .................................................................... 56
14.2.   Landlord Indemnity. .................................................................. 56

**15. USE** .......................................................................................... **56**
15.1.   Tenant's Business. ................................................................... 56
15.2.   Operation. ........................................................................... 57
15.3.   Protection. .......................................................................... 57
15.4.   Exclusive Uses. ...................................................................... 58
15.5.   Other Exclusives Not Binding on Tenant. .............................................. 58
15.6.   Go Dark. ............................................................................. 59

**16. SURRENDER** ................................................................................. **60**
16.1.   Condition of Store. .................................................................. 60
16.2.   Continuance of Possession. ........................................................... 60

**17. LANDLORD'S COVENANTS** ................................................................. **60**
17.1.   Landlord's Warranty. ................................................................. 60
17.2.   Landlord's Title. .................................................................... 60
17.3.   Remedies. ............................................................................ 61

**18. QUIET ENJOYMENT** ........................................................................ **61**

**19. ASSIGNMENT/SUBLETTING** .............................................................. **61**
19.1.   General. ............................................................................. 61
19.2.   Related Entity. ...................................................................... 62
19.3.   Stock. ............................................................................... 62
19.4.   Release of Liability. ................................................................ 62
19.5.   Landlord Notice to Assignee. ......................................................... 62
19.6.   Restriction on Landlord's Right to Assign. ........................................... 62

**20. DEFAULTS/DISPUTE RESOLUTION/ATTORNEYS' FEES** ............................... **63**
20.1.   Defaults. ............................................................................ 63
20.2.   Alternative Dispute Resolution Process. .............................................. 66
20.3.   Unlawful Detainer. ................................................................... 68
20.4.   Attorneys' Fees. ..................................................................... 68

**21. CASUALTY** ................................................................................... **68**
21.1.   Definitions. ......................................................................... 68
21.2.   Insured Casualty. .................................................................... 69
21.3.   Uninsured Casualty. .................................................................. 69
21.4.   End of Term Casualty. ................................................................ 70
21.5.   Shopping Center Casualty. ............................................................ 70
21.6.   Insurance Proceeds. .................................................................. 70

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/632873.6

- iii -

02/06/15
FINAL

21.7.   Tenant Restoration. ........................................................................ 71
21.8.   Waiver of Statute. ........................................................................... 71
21.9.   Laws. ............................................................................................. 71
21.10.  Tolling of Term. ............................................................................. 72
21.11.  Effect of Termination ..................................................................... 72
21.12.  Tenant's Right of First Offer .......................................................... 72

22. **CONDEMNATION** ............................................................................. **73**
22.1.   Taking. .......................................................................................... 73
22.2.   Right to Terminate. ....................................................................... 73
22.3.   Claims ........................................................................................... 74
22.4.   Waiver. .......................................................................................... 74

23. **MECHANIC'S LIENS** ......................................................................... **74**

24. **SIGNS** ................................................................................................. **74**
24.1.   Governmental Approval and Compliance. ..................................... 74
24.2.   Building Signs. ............................................................................... 75
24.3.   Pylon or Monument Signs. ............................................................ 75
24.4.   Temporary Signs. ........................................................................... 75
24.5.   Visibility of Tenant's Store and Signs ............................................ 76

25. **NOTICE** ............................................................................................. **76**

26. **GENERAL CONDITIONS** ................................................................... **77**
26.1.   Partial Invalidity. ........................................................................... 77
26.2.   Relationship of Parties. ................................................................. 77
26.3.   Time. ............................................................................................. 77
26.4.   Waiver. .......................................................................................... 77
26.5.   Partial Months. .............................................................................. 77
26.6.   Consent. ........................................................................................ 77
26.7.   Intentionally Deleted. .................................................................... 77
26.8.   Governing Law. ............................................................................. 77
26.9.   Due Authority. ............................................................................... 78
26.10.  No Prior Agreements. .................................................................... 78
26.11.  Entry by Landlord. ........................................................................ 78
26.12.  Neutral Interpretation. .................................................................. 78
26.13.  Force Majeure. .............................................................................. 78
26.14.  Successors in Interest. .................................................................... 79
26.15.  Memorandum of Lease. ................................................................. 79
26.16.  Real Estate Brokers. ...................................................................... 79
26.17.  Limitation of Landlord's Liability. ................................................. 79
26.18.  Confidentiality Agreement ............................................................. 80
26.19.  No Offer. ....................................................................................... 81

1    **THIS LEASE** (the "Lease") is made as of the Effective Date by and between Landlord and
2    Tenant who are designated in Section 1.2 hereof.  Landlord and Tenant hereby agree as follows:

3    ## 1.    SALIENT LEASE TERMS

4    **1.1.    Effective Date.**

5    *February 10*                    , 2015.

6    **1.2.    Parties/Addresses.**

7    **1.2.1.    Landlord:    SUBURBAN PLAZA, LLC,**

8    a Georgia limited liability company
9
10   Address:            c/o Selig Enterprises, Inc.

11                       1100 Spring Street, Suite 550

12   City/State/Zip:     Atlanta, GA  30309

13   Facsimile #:        (404) 875-2629

14   Phone #:            (404) 898-9034

15   Initial Contact Name:     Bill Stogner

16   Landlord's Taxpayer I.D. #:  46-0818034

17   <u>With copy to:</u>

18   Name:              Kenneth J. Clayman, Esquire

19   Address:           c/o Selig Enterprises, Inc.

20                      1100 Spring Street, Suite 550

21   City/State/Zip:    Atlanta, GA  30309

22   Facsimile #:       (404) 875-2629

23   Phone #:           (404) 898-9045

24

25   **1.2.2.    Tenant:    ROSS DRESS FOR LESS, INC.,**
26   a Virginia corporation

27   (a)    **Address for all invoices for Rent and Reimbursements due under this**
28   **Lease, and change of Landlord or Payee, or change of Landlord's or**
29   **Payee's address:**

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/632873.6

- 1 -

02/06/15
FINAL

| 1 | | Address: | 5130 Hacienda Drive |
| 2 | | City/State/Zip: | Dublin, CA  94568 7579 |
| 3 | | Attention: | **Property Management Department** |
| 4 | | | |
| 5 | | Facsimile #: | (925) 965 4865 |
| 6 | | Phone #: | (925) 965 4400 |

7

8   (b)   **Address for all notices (other than invoices), including notices of**
9   **default and notices pertaining to disputed invoices:**

| 10 | | Address: | 5130 Hacienda Drive |
| 11 | | City/State/Zip: | Dublin, CA  94568 7579 |
| 12 | | Attention: | **Real Estate Law Department** |

| 13 | | Facsimile #: | (925) 965 4174 |
| 14 | | Phone #: | (925) 965 4400 |

15   (c)   Initial Contact Name: **Jac Gee**

16   (d)   Tenant's Taxpayer I.D. #:  20-0594333

17   **1.3.   Location Information.**

18   **1.3.1.**   Shopping Center Name:   Suburban Plaza

19   Location:   N. Decatur Rd. & Scott Blvd.

20   Decatur, DeKalb County, Georgia

21   **1.3.2.**   Minimum  Leasable  Floor  Area  for  Pro  Rata  Share  Denominator  and
22   Co-Tenancy Denominator:

| 23 | (a) | Common Area Charges: | 140,000 square feet. | |
| 24 | | | | (Section 7.2.1) |
| 25 | (b) | Taxes: | 140,000 square feet. | |
| 26 | | | | (Section 8.2.3) |
| 27 | (c) | Property Insurance: | 140,000 square feet. | |
| 28 | | | | (Section 9.1.4) |
| 29 | (d) | Co-Tenancy: | 114,672 square feet. | |
| 30 | | | | (Section 6.1.3) |

31   The total Leasable Floor Area in the Shopping Center (as defined in Article 2 below) shall be
32   approximately three hundred twenty-five thousand sixty-nine (325,069) square feet.  Of that total,
33   the Wal-Mart Tract shall contain approximately one hundred forty-nine thousand eight hundred
34   seventy-six (149,876) square feet of Leasable Floor Area.  The amount of square feet of Leasable
35   Floor Area in Section 1.3.2(a)-(c) above roughly reflects the Leasable Floor Area of the Shopping

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/632873.6

- 2 -

02/06/15
FINAL

Center, excluding the Wal-Mart Tract and the Bowling Alley (as such terms are defined in Article 2 below), depicted on the Site Plan attached hereto as **Exhibit B**. The amount of square feet of Leasable Floor Area in Section 1.3.2(d) above reflects the Leasable Floor Area of the Shopping Center, excluding the Wal-Mart Tract, the Store Agreed Size, and the Bowling Alley, as required by Section 6.1.3(a) below. In the event any portion of the Bowling Alley is occupied, such portion shall be included in the Minimum Leasable Floor Area set forth above.

**1.3.3.** Store Agreed Size: The Store Agreed Size is twenty-five thousand three hundred twenty-eight (25,328) square feet of Leasable Floor Area, including a minimum of one hundred forty-three (143) feet of frontage on that portion of the Common Areas that contain the principal parking area for Tenant's customers, subject to adjustment of the Leasable Floor Area pursuant to the provisions of Section 3.7. The Store Agreed Size shall also be adjusted if the Final Plans (as amended by any change order) provided for a Leasable Floor Area that differs from the Leasable Floor Area set forth herein. Tenant's Store frontage shall be linear, shall not include any indentations, and shall not be set back from the storefront of adjacent tenants (except as otherwise shown on the Site Plan). The Store Agreed Size includes the Building only unless the loading dock is both enclosed and exclusive to Tenant. The Store Agreed Size does not include the pad area for Tenant's trash compactor or Tenant's trash bin enclosure area.

**1.4.** **Critical Dates.**

**1.4.1.** Tenant's obligation for Minimum Rent and Reimbursements shall commence on the earlier of (a) one hundred twenty (120) days after the Delivery Date, or (b) the date that Tenant opens the Store for business to the public (the "Commencement Date").

(Section 4.2)

**1.4.2.** Intended Delivery Date: February 8, 2016.

(Article 2)

**1.4.3.** Date of Tenant's Right to Cancel for Landlord's failure to commence construction ("Construction Commencement Cancel Date"): November 15, 2015.

(Section 5.2)

**1.4.4.** Date of Tenant's Right to Cancel for Landlord's failure to complete construction ("Construction Completion Cancel Date"): August 29, 2016.

(Section 5.7)

**1.4.5.** Automatic Termination Date: August 30, 2016.

(Section 5.8)

**1.5.** **Lease Term.**

**1.5.1.** Initial Term: From the Commencement Date through the January 31 next following the expiration of one hundred twenty (120) months after the Commencement Date. As a hypothetical example and for illustration purposes only, if the Commencement Date is September 15, 2016, then the expiration of the Initial Term shall be January 31, 2027.

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/632873.6

02/06/15
FINAL

1    **1.5.2.**    Option Periods:  Total number of five (5) year Option Periods:  Four (4).
2                                                                              (Section 4.4)

3  **1.6.    Minimum Rent.**

|     |                                                                       | Per Sq. Ft. Per Year | Monthly | Annually |
|-----|-----------------------------------------------------------------------|----------|----------|----------|
| (a) | Initial Term Commencement Date through 10th Full Lease Year           | $13.75   | $29,021.67 | $348,260.00 |
| (b) | Option Periods                                                        |          |          |          |
|     | First:                                                                | $14.25   | $30,077.00 | $360,924.00 |
|     | Second:                                                               | $14.75   | $31,132.33 | $373,588.00 |
|     | Third:                                                                | $15.25   | $32,187.67 | $386,252.00 |
|     | Fourth:                                                               | $15.75   | $33,243.00 | $398,916.00 |

4    The Minimum Rent amounts listed above may be adjusted to reflect the actual Leasable
5  Floor Area of the Store calculated in accordance with the provisions of Section 3.7.

6  **1.7.    Required Co-Tenancy.**

7    **1.7.1.**    Wal-Mart and either HomeGoods or Jo-Ann Fabrics and Crafts ("Required
8  Co-Tenants") operating in no less than the Required Leasable Floor Area, in the location for such
9  Required Co-Tenant designated on **Exhibit B**, indicated as follows:

| Co-Tenant's Name | Required Leasable Floor Area (minimum sq. ft.) |
|------------------|------------------------------------------------|
| (a)   Wal-Mart | 130,000 |
| AND one (1) of the following: | |
| (b)   HomeGoods | 23,000 |
| OR | |
| (c)   Jo-Ann Fabrics and Crafts | 18,000 |

10                                                                            (Section 6.1.3)

11    Provided that the Required Co-Tenancy set forth in Sections 1.7.1 and 1.7.2 is satisfied on
12  the Commencement Date, during the remainder of the Term, any of the Required Co-Tenants may
13  each be replaced by one (1) nationally or regionally recognized Anchor Tenant (as herein defined),
14  operating in no less than ninety percent (90%) of the Required Leasable Floor Area of the Required
15  Co-Tenant being replaced, in the same location as the Required Co-Tenant being replaced, under a
16  bona fide lease of a minimum of three (3) years' duration.  In addition, Wal-Mart may be replaced by

1   up to three (3) Anchor Tenants, aggregately occupying a minimum of sixty-five percent (65%) of the
2   Required Leasable Floor Area set forth above. Notwithstanding the foregoing, Landlord does not
3   have the right to replace a Required Co-Tenant with an Anchor Tenant if that Anchor Tenant is
4   already operating in the Shopping Center. An "Anchor Tenant" is a retailer with at least fifty (50)
5   stores. For purposes of this Section 1.7 and Section 6.1.3, a retailer and/or a retail tenant shall mean
6   a business open to the public whose principal use of its premises is the retail sale of merchandise to
7   customers within its premises, which for purposes hereof may include restaurants and retail service
8   offices as described in Section 3.2.1(b)(i), but shall specifically exclude any use which constitutes a
9   Ross Prohibited Use, as that term is hereinafter defined in this Lease.

10      **1.7.2.**      Required percentage of Leasable Floor Area of the Shopping Center to be
11   occupied by operating retailers (as defined in Section 1.7.1): Sixty-five percent (65%), excluding the
12   Leasable Floor Area of the Store, the Wal-Mart Tract and the Bowling Alley from the numerator
13   and denominator of such calculation.
14                                                                                      (Section 6.1.3)

15   **1.8.   Common Area Charge Administrative Fee.**

16      Six percent (6%).
17                                                                                      (Section 7.3)

18   **1.9.   Title Report.**

19      That certain Commitment for Title Insurance on the state of Landlord's title to the
20   Shopping Center issued by Old Republic National Title Insurance Company, dated January 7, 2015,
21   numbered 2-27711(M)(1).
22                                                                                      (Section 17.2)

23   **1.10.   Contents of Lease.**

24      **1.10.1.**   Pages:  1 – 82

25      **1.10.2.**   Sections:  1.1 – 26.19

26      **1.10.3.**   Exhibits:

27         **A.**   Legal Description of the Shopping Center and that portion of the
28                 Shopping Center referred to herein as the Wal-Mart Tract, which is leased
29                 by Landlord to Wal-Mart

30                 **Part I** – Wal-Mart Tract

31                 **Part II** – Entire Shopping Center

32         **B**   Site Plan

33         **C**   Construction Obligations of Landlord

34         **D**   Landlord's Prohibited Uses

35         **E**   Acknowledgment of Commencement

| 1 | **F** | Non-Disturbance Agreement |
| 2 | **F-1** | Sublease Non-Disturbance Agreement |
| 3 | **G** | Construction Completion Notice |
| 4 | **H** | Exclusive Uses |
| 5 | **I** | Permitted Title Exceptions |
| 6 | **J** | Tenant's Signs |
| 7 | **K** | Approved Elevations |

8

## 2. DEFINITIONS OF GENERAL APPLICATION

9  **Abatement Work.** See Section 11.4.3.

10  **Audit.** See Section 7.4.7.

11  **Annual Statement.** See Section 7.4.5.

12  **Bowling Alley.** The space depicted on the Site Plan as "Bowling Alley – Suite 2619." The
13  Bowling Alley is occupied for use as a bowling alley as of the Effective Date, but Landlord
14  anticipates that it will be vacant in early 2015 and perhaps remodeled for the same or other leasable
15  use during the Term of this Lease. The Bowling Alley shall not be considered Leasable Floor Area
16  unless it is occupied.

17  **Building.** The structure in which the Store is located.

18  **Building Envelope.** Those certain areas designated on **Exhibit B** within the boundaries of
19  which buildings may be constructed.

20  **Business Days.** Business Days shall mean Mondays through Fridays excluding the
21  following holidays: New Year's Day, Martin Luther King, Jr. Day, President's Day, Memorial Day,
22  July 4th, Labor Day, Thanksgiving Day, the Friday following Thanksgiving Day, and Christmas. If
23  any of the foregoing holidays falls on a Saturday, then the Friday before shall constitute the holiday
24  and if any of the foregoing holidays falls on a Sunday, then the Monday following shall constitute
25  the holiday.

26  **Casualty.** See Section 21.1.1.

27  **Commencement Date.** See Sections 1.4.1 and 4.2.

28  **Common Area(s).** Those portions of, and facilities within the Shopping Center which are
29  intended solely for the common use of the occupants, their customers, agents, employees and
30  suppliers, such as the parking areas, driveways, walkways, loading zones and loading areas (whether
31  or not such loading zones or loading areas are available for common use), and landscaping, but
32  specifically excluding the whole or any portion of any building located within the Shopping Center.
33  Enclosed malls are not includable for purposes of Common Area Charges hereof unless the Store

has a direct customer door opening onto such mall intended for access of customers rather than emergency egress and Landlord keeps the mall open to customer access during all of Tenant's operating hours. Any area which is not enclosed by demising walls, but which is substantially used for the benefit of one tenant or group of tenants such as, for example, those areas sometimes referred to in the shopping center industry as "food courts," shall not be considered Common Areas. A "food court" is an open area of the Shopping Center which accommodates a common seating, serving or service area for the patrons of two or more retailers of prepared food whose premises are proximate to such seating, serving or service area.

**Common Area Charges.** See Section 7.3.

**Communication Equipment.** See Section 12.2.1.

**Control Area.** The area so designated on **Exhibit B** which may not be altered except as expressly set forth in this Lease. If no Control Area is indicated on **Exhibit B**, the Control Area shall be the same as the Common Areas.

**Co-Tenancy Report.** See Section 6.1.3(f).

**Co-Tenants.** See Sections 1.7.1 and 6.1.3.

**Delivery Date.** The Delivery Date is the first Permitted Delivery Day after the last of the following conditions is satisfied (hereinafter "deliver" or "delivery"). Each of the conditions set forth in clauses (a) through (m) below are conditions of delivery and in the aggregate are the "Delivery Conditions." All documents and other written evidence required below to be submitted to satisfy the Delivery Conditions (the "Delivery Evidence") shall be delivered to Tenant at the address specified in Section 1.2.2(b).

(a)    Landlord has completed the Store in compliance with the terms of this Lease, except for the Punchlist as specified in Section 5.10; however, the Punchlist items must be completed and/or corrected to the extent required in Section 5.10, and Tenant is otherwise able legally to conduct its normal retail operations without impediment arising from incomplete or defective performance of Landlord's Construction Obligations;

(b)    Landlord has completed (or caused to be completed) all of the Common Areas and Off-Site Improvements, and Landlord has completed the buildings depicted on **Exhibit B** consisting of at least one hundred forty thousand (140,000) square feet of Leasable Floor Area (the "Minimum Building LFA"), and Landlord has fulfilled all construction obligations imposed by this Lease (including **Exhibit C**) and applicable governmental authorities, including obtaining any requisite governmental authorizations and approvals to permit Tenant to open for business, subject to Tenant's completion of Tenant's Work;

(c)    Receipt by Tenant of written evidence that Landlord's Construction Obligations have passed final inspection by the authority by whom the building permit for Landlord's Construction Obligations was issued and Tenant receives a temporary or permanent certificate of occupancy (or equivalent), which permits Tenant to occupy and fixture the Store;

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/632873.6

- 7 -

02/06/15
FINAL

(d)     Landlord's delivery to Tenant of a report and certificate from a licensed environmental consultant reasonably acceptable to Tenant, certifying to Tenant that such consultant conducted a comprehensive survey of the Store, dated not more than thirty (30) days prior to the Delivery Date, and that the Store, including, without limitation, the walls, ceilings, structural steel, flooring, pipes and boilers, and roof and roof coverings are free of Hazardous Materials (including asbestos-containing materials) ("Environmental Report");

(e)     Landlord shall have either (i) replaced the roof of the Store, or (ii) installed an overlay over the roof of the Store; in either event achieving a watertight roof with an R-factor of at least R-38, and delivered to Tenant written evidence thereof, which shall be reasonably satisfactory to Tenant, along with a copy of the roofing contractor's warranty with respect to said roof work (which shall provide for a minimum roof warranty of fifteen (15) years);

(f)     Receipt by Tenant, provided that Tenant signs first, of at least one (1) fully executed original of this Lease and a Memorandum of Lease signed by Landlord and Tenant and notarized so that such Memorandum of Lease may be recorded;

(g)     Delivery to Tenant of exclusive possession of the Store with Landlord's and its contractors' agents and employees' tools, equipment and materials removed from the Store;

(h)     Landlord shall assist Tenant by signing any local governmental documents required for Tenant to obtain its signage permits and Landlord shall have received approval by governmental authorities for the pylon structures depicted on **Exhibit J**, and Landlord shall have constructed the pylon sign structures in the Shopping Center as shown on **Exhibit B** so that Tenant may at any time install its sign panels thereon as depicted on **Exhibit J**;

(i)     Landlord has installed permanent power to the Store;

(j)     The Store has been secured by Landlord from unauthorized entry by persons without a key (an adjacent premises without a store front or store rear or which has any unlocked opening in its exterior walls shall be deemed to render the Store insecure);

(k)     Landlord has delivered to Tenant all certificates of insurance required to be maintained by Landlord pursuant to this Lease;

(l)     If not previously delivered in accordance with the provisions of Section 13.1.1, Landlord has delivered the Non-Disturbance Agreement and/or the Sublease Non-Disturbance Agreement if required pursuant to Section 13.1.1; and

(m)     Landlord has completed the Refurbishment.

Notwithstanding anything to the contrary contained in this Lease, and notwithstanding any delays in completion of Landlord's Construction Obligations due to Force Majeure, unless Tenant in its sole discretion elects to take delivery on a day other than a Permitted Delivery Day, the Delivery Date will not be on a day other than a Permitted Delivery Day. If a Force Majeure event occurs and Landlord complies with the notice provisions of Section 26.13, the Delivery Date will be, at Tenant's option, either (a) the date Landlord tenders delivery of the Store to Tenant with all

Delivery Conditions satisfied, or (b) if Tenant does not take delivery pursuant to the foregoing clause (a), the next Permitted Delivery Day which occurs after the date Landlord tenders delivery of the Store to Tenant with all Delivery Conditions satisfied, and the Commencement Date shall be determined in accordance with Section 1.4.1.

**Environmental Regulations.** See Section 11.4.1.

**Exempted Discontinuances.** See Section 6.1.3(e).

**Final Plans.** See **Exhibit C.**

**Force Majeure.** See Section 26.13.

**Gross Sales.** This definition applies to the calculation of Substitute Rent only. Gross Sales are revenue received by Tenant from the selling price of all merchandise or services contracted to be sold in or from the Store by Tenant, its subtenants, licensees and concessionaires, whether for cash or for credit, excluding, however, the following: (a) the sales price of all merchandise returned and accepted for full credit or the amount of the cash refund or allowance made thereon; (b) the sums and credits received in settlement of claims for loss or damage to merchandise; (c) the consideration received in connection with a sale of inventory which occurs other than in the ordinary course of Tenant's business, including, but not limited to, a sale in bulk or to a jobber, liquidator or assignee; (d) sales taxes, so-called luxury taxes, excise taxes, gross receipt taxes, and other taxes now or hereafter imposed upon the sale or value of merchandise or services, whether added separately to the selling price of the merchandise or services and collected from customers or included in the retail selling price; (e) receipts from public telephones, vending machines, sales of money orders, and the collection of public Utility bills; (f) bank card discounts or fees (e.g., Visa, MasterCard, etc.), interest, carrying charges, or other finance charges in respect of sales made on credit; (g) sales of fixtures, trade fixtures, or personal property that are not merchandise held for sale at retail; (h) sales to employees and senior citizens at discount, in the aggregate not to exceed four percent (4%) of Gross Sales; (i) revenue received from mailing, alterations, delivery or other services performed on a non-profit basis for the benefit of customers; (j) Tenant's accounts receivable, not to exceed two percent (2%) of Gross Sales, which have been determined to be uncollectible for federal income tax purposes during the Lease Year; provided, however, that if such accounts are actually collected in a later Lease Year, the amount shall be included in the Gross Sales for such later Lease Year; (k) rents, subrents or other consideration received in connection with an assignment, sublease, license, concession or other transfer of any portion of the Store; (l) amounts received for merchandise transferred to any other place of business of Tenant (or its subtenants, concessionaires and/or licensees) or to any business organization affiliated with Tenant wherever located; provided such merchandise is not used to complete a sale originated in the Store; and (m) any Internet or other sale contracted on a telecommunications network unless the sale item is delivered to the customer at the Store.

**Hazardous Materials.** See Section 11.4.1.

**HVAC.** See Section 11.1.

**Inline Building.** The Building in the Shopping Center in which the Store is situated.

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/632873.6

- 9 -

02/06/15
FINAL

1    **Insurance Bill.** See Section 9.1.4.

2    **Intended Delivery Date.** The date specified in Section 1.4.2.

3    **Invitee(s).** An Invitee shall mean any agent, employee, customer or other entity or
4    individual who comes upon the Shopping Center property for business or retail consumption
5    purposes, or to perform services for the occupants of the Shopping Center, by the invitation of any
6    party who is entitled to grant access to the Shopping Center such as Landlord, Tenant or any other
7    occupant of the Shopping Center.

8    **Landlord's Construction Obligations.** The construction obligations imposed on
9    Landlord by Section 5.1 and described in **Exhibit C**, any roof replacement or roof repairs required
10   by clause (e) of the Article 2 – Delivery Date definition, and the Refurbishment, also collectively
11   referred to herein as "Landlord's Work."

12   **Leasable Floor Area.** All areas constructed and available, or held for the exclusive use and
13   occupancy of occupants or future occupants of the Shopping Center, measured from the exterior
14   surface of exterior walls and from the center of interior demising partitions excepting that:

15        (a)    Any mezzanines not intended to be used for distribution, sale or display of
16   merchandise to retail customers shall be excluded in the computation of Leasable Floor Area.

17        (b)    Any areas ("Outdoor Areas") which are located wholly or partially outside of
18   a building, or which, although located substantially inside of a building, are not bounded on all sides
19   by exterior walls or a roof, such as outdoor sales, seating, garden or storage areas, or enclosed truck
20   docks, shall be included in Leasable Floor Area if and to the extent that such Outdoor Areas are
21   available or held for the exclusive use and occupancy of occupants or future occupants of the
22   Shopping Center, whether or not such Outdoor Areas are clearly delineated and whether or not any
23   rental or other charges are paid by tenants with respect to such Outdoor Areas. Outdoor Areas
24   shall, to the extent that they are bounded by walls, be measured in the same manner as provided
25   above; otherwise, they shall be measured along lines which reasonably delineate the boundaries of
26   such Outdoor Areas; provided, however, Landlord may exclude from Leasable Floor Area up to two
27   thousand (2,000) square feet of Outdoor Areas which are used as restaurant patio area so long as
28   Landlord does not collect rent on such Outdoor Areas and the tenant fully maintains such Outdoor
29   Areas.

30        (c)    Kiosks shall be includable in Leasable Floor Area. A "kiosk" is a structure of
31   no more than one hundred (100) square feet, set within the Common Areas and completely
32   surrounded by pedestrian walkways or driveways.

33        (d)    The Bowling Alley shall not be considered Leasable Floor Area unless it is
34   occupied.

35   **Lease Year.** The first Lease Year shall extend from the Commencement Date to the first
36   January 31 thereafter. Each subsequent Lease Year shall consist of twelve (12) complete calendar
37   months commencing on February 1 and terminating on the ensuing January 31 and may be referred
38   to herein as a "Full Lease Year."

1    **Legal Rate.**  In the event any rental or other payment due from one party to the other is
2    not paid when due, or in the event interest is required to be paid under the terms of this Lease, such
3    rental or payment amount shall bear interest at the rate of the lesser of (a) ten percent (10%) per
4    annum, or (b) the prime rate per annum quoted by Bank of America (or its successor) for short
5    term, unsecured commercial loans to its most creditworthy corporate borrowers, plus one percent
6    (1%) per annum, but not in any event exceeding the highest rate permissible by law which is not
7    usurious.

8    **LFA Minimums.**  Solely for purposes of calculating Co-Tenancy and Tenant's Pro Rata
9    Share of Reimbursements, the minimum amount of Leasable Floor Area in the Shopping Center
10   agreed by the parties and set forth in Section 1.3.2.

11   **Lower Level Space.**  The portion of the Shopping Center designated as "Lower Level
12   Space" on the Site Plan.

13   **Minimum Rent.**  See Section 6.1.

14   **Monthly Offset Limit.**  See Section 20.1.2(c).

15   **Off-Site Improvements.**  Public improvements not located within the Shopping Center,
16   without which the Shopping Center could not reasonably be used for its intended purpose, such as,
17   without limitation, roadways, offramps, Utility lines and turning lanes.

18   **Option.**  See Section 4.4.

19   **Option Periods.**  See Section 4.4.

20   **Permitted Delivery Day(s).**  Permitted Delivery Days are the second Monday of February,
21   the third Monday of June, and the last Monday of August only, which next follows the actual date
22   Landlord tenders possession of the Store to Tenant with all Delivery Conditions satisfied, provided
23   that it is no earlier than the Intended Delivery Date.

24   **Prohibited Uses.**  See Section 3.2.2.

25   **Property Insurance.**  See Section 9.1.1.

26   **Punchlist.**  See Section 5.10.

27   **REA.**  That certain Easement with Covenants and Restrictions Affecting Land made as of
28   June 19, 2014, by and between Landlord and Wal-Mart Stores East, L.P. ("Wal-Mart"), recorded
29   June 20, 2014 in Deed Book 24435, Pages 127-148, as Document No. 2014089721, in the records of
30   the Superior Court Clerk of DeKalb County, Georgia.

31   **Recommencement Date.**  See Section 21.2.

32   **Redelivery Date.**  The last of the following to occur after a Casualty or Taking:  (a) the date
33   on which Landlord's architect, or contractor having charge of the Restoration, certifies by written

1   notice to the parties that the Restoration has been completed; and (b) Tenant receives from all
2   applicable governmental agencies all necessary written approvals to reopen the Store for business.

3   **Reduced Occupancy Period.** See Section 6.1.3.

4   **Refurbishment.** The general upgrading of the buildings and Common Areas of the
5   Shopping Center, including, without limitation, the "Small Shop" space designated on **Exhibit B**,
6   and resealing and restriping the parking lot, repairing any pot holes, and installing lighting in the
7   Common Areas with fixtures producing an average of not less than five (5) foot candle illumination,
8   in order that the Shopping Center, in its entirety, conforms to the construction quality of the Store
9   as specified in Tenant's plans and specifications.

10  **Reimbursements.** Tenant's obligation to reimburse Landlord for Tenant's Pro Rata Share
11  under the provisions of Sections 7.4.1, 8.2.1 and 9.1.4.

12  **Rent.** The terms "Rent" or "Rental" shall mean all Minimum Rent and Substitute Rent
13  (when applicable) and Reimbursements which may be due from Tenant to Landlord and any other
14  sum due to Landlord from Tenant, pursuant to this Lease.

15  **Requirements.** See Section 11.3.2.

16  **Restoration.** See Section 21.1.4.

17  **Roof Repairs.** See Section 12.2.2.

18  **Section Numbers.** In this Lease, all references to "Section" shall mean the section
19  numbers of this Lease, unless otherwise indicated.

20  **Shopping Center.** That certain real property development with all appurtenances generally
21  described in Section 1.3 above (including the Wal-Mart Tract), which is constructed or is to be
22  constructed on the property described in **Exhibit A**. Tenant acknowledges that Wal-Mart is leasing
23  the Wal-Mart Tract from Landlord, and that Wal-Mart has certain obligations with regard to the
24  Wal-Mart Tract that are set forth in the REA. Therefore, but subject to the provisions of Section
25  3.8 below, Landlord shall not be required to perform any obligations imposed in this Lease on
26  Landlord relating to the portion of the Shopping Center consisting of the Wal-Mart Tract that are
27  Wal-Mart's obligations under the REA.

28  **Site Plan.** The Site Plan is the plan attached hereto as **Exhibit B**. Landlord represents and
29  warrants that the Site Plan depicts the Shopping Center described on **Exhibit A** and that the
30  boundaries thereof are delineated thereon with substantial accuracy. The Inline Building depicted
31  thereon contains or shall contain no more than two (2) stories (but mezzanines having Leasable
32  Floor Area not in excess of one-third (1/3) of the occupant's ground floor Leasable Floor Area,
33  when not used for selling purposes, shall be permitted). Further, the height (including any
34  architectural features and rooftop equipment) of any portion of the Inline Building within the
35  Shopping Center shall not exceed the height of the exterior elevation of the Store on the Final Plans
36  described in **Exhibit C**, except to the extent depicted on the Approved Elevations attached hereto
37  as **Exhibit K**.

**Special Form Policy.** See Section 9.1.1.

**Store.** The Store is that portion of the Shopping Center designated on **Exhibit B**, having the dimensions and containing the Leasable Floor Area specified in Section 1.3, including the use of the roof for the purposes specified in, and in accordance with, Section 12.2.

**Substitute Rent.** Substitute Rent shall mean the lesser of (a) Minimum Rent, or (b) two percent (2%) of Tenant's Gross Sales during the preceding month. Substitute Rent, where applicable in this Lease, shall be paid in lieu of Minimum Rent <u>and</u> Reimbursements, except as otherwise expressly provided in this Lease.

**Support Systems.** See Section 11.4.2.

**Taking.** See Section 22.1.

**Tax or Taxes.** See Section 8.1.

**Tax Bill.** See Section 8.1.

**Tax Year.** The twelve (12) month period used by the taxing authority as the period to which the Tax Bill applies.

**Tenant Delay.** A delay in the performance by Landlord of any obligation it is to perform under **Exhibit C** to this Lease as a result of: (a) Tenant's failure to approve, consent, comment upon or otherwise respond to a request for plan approval within the express time provisions of **Exhibit C**; or (b) Tenant's request for a change order to Landlord's Construction Obligations which directly results in a delay in Landlord's ability to perform its obligations under this Lease; or (c) the interference by Tenant or Tenant's agents, employees or contractors in the performance by Landlord or Landlord's contractors of Landlord's Construction Obligations; provided, <u>however</u>, in order for there to be a valid "Tenant Delay" Landlord must first have given Tenant written notice within five (5) Business Days of the event forming the basis for the claim of the Tenant Delay and provided Tenant with at least three (3) Business Days to rectify the problem causing the delay, but if Tenant fails to rectify the problem within such three (3) Business Days, the number of days that expired since the event that caused the Tenant Delay occurred shall all be included in the determination of the number of days of Tenant Delay.

**Tenant's Pro Rata Share.** Tenant's share of Reimbursements calculated as set forth in Section 7.2 (Common Area Charges), Section 8.2 (Tax Bill) and Section 9.1.4 (Special Form Policy premium).

**Tenant's Work.** The work to the Store by Tenant necessary for Tenant to open the Store for business to the general public; or performed at any time during the Term for the purpose of improving the Store.

**Term.** References to the Term of this Lease shall include the initial term described in Section 1.5.1 ("Initial Term") and any extension of such Term ("Option Period").

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/632873.6

- 13 -

02/06/15
FINAL

**Termination Notice.** A notice provided by Tenant to Landlord in which Tenant notifies Landlord of its election to terminate this Lease if permitted to do so under any provision of this Lease.

**Unamortized Cost.** The remaining balance of any amount expended by Tenant for leasehold improvements to the Store (not including any allowance paid by Landlord to Tenant for Tenant's leasehold improvements as specified in **Exhibit C**) up to a maximum of Two Hundred Fifty Thousand Dollars ($250,000) (the "Unamortized Cost Cap"), as amortized according to generally accepted accounting principles in the books and records of Tenant for public reporting purposes, with an interest rate of ten percent (10%) per annum. Notwithstanding the foregoing, the Unamortized Cost Cap shall not apply to Landlord's obligation to reimburse Tenant for its Unamortized Cost under the provisions of Section 15.6 below.

**Utilities.** Utilities are electricity, gas, power, steam, sanitary sewer, storm sewer, telecommunications (audio, video or data bit streams, whether terrestrial, over the air or satellite), and water supplied by public or private entities.

**Utility Room.** See Section 3.5.

**Wal-Mart Tract.** That portion of the Shopping Center that has been leased from Landlord to Wal-Mart, as designated on **Exhibit B**.

## 3. GRANTS OF LEASE, COMMON AREA USE, EASEMENTS AND ACCESS

### 3.1.   Lease.

Landlord hereby leases to Tenant and Tenant hereby leases from Landlord the Store depicted on the Site Plan, together with all easements, rights and privileges appurtenant thereto, on the terms and conditions set forth herein.

### 3.2.   Nature of the Shopping Center.

#### 3.2.1.   Retail Use.

(a)   General.   Tenant has entered into this Lease in reliance upon representations by Landlord that the Shopping Center (which, for purposes of this Section 3.2.1 shall exclude the Wal-Mart Tract) is and shall remain retail in character, and, further, no part of the Shopping Center shall be used for: office (except as incidental to a retail tenant's use) or residential purposes or as a theater, auditorium, meeting hall, school, church or other place of public assembly; "flea market;" mortuary; gymnasium; veterinary services or pet vaccination clinic or overnight stay pet facilities (except as an incidental use in conjunction with the operation of a national or regional pet store retailer, provided such pet store retailer is not located within one hundred fifty (150) feet of the front and side perimeter walls of the Store, and except for one (1) stand-alone veterinary office, not incidental to a pet store, located in the Lower Level Space); health club; dance hall; billiard or pool hall; massage parlor; video game arcade (except as incidental to a non-prohibited use); bowling alley (except for the bowling alley existing on the Effective Date and a replacement bowling alley in the same location); skating rink; car wash; facility for the sale, display, leasing or repair of motor vehicles; night

club; on-premises consumption of alcoholic beverages (except as incidental to a primarily restaurant use or other use that is not primarily focused on consumption of alcohol); any facility offering gambling to the public (including any so-called Internet café that offers gambling to the public, off-track betting facility, casino or gaming facility), provided that the incidental sale of lottery tickets shall be permitted; or for the sale of adult products or adult bookstores or adult audio/video products stores (which are defined as stores in which at least ten percent (10%) of the inventory is not available for sale or rental to children under the age of majority in the state in which the Store is located because such inventory explicitly deals with or depicts human sexuality). No ATM or similar machine shall be permitted in the Shopping Center within one hundred (100) feet of the front and side perimeter walls of the Store, except if located wholly within the interior of another tenant's or occupant's premises. Landlord shall not lease space nor allow space to be occupied in the Shopping Center by any occupant, other than Tenant, whose use of the space shall be (i) for a David's Bridal store; (ii) for a store primarily selling merchandise at one price or set prices such as a 99 Cents store, as they are operated as of the Effective Date, and other such types of operations (excluding one (1) Five Below store and one (1) Dollar Tree store); or (iii) for a discount department store under twenty thousand (20,000) square feet of Leasable Floor Area, such as a Family Dollar store, as they are operated as of the Effective Date. Further, no restaurant or other "High Intensity Parking User" (as hereinafter defined) shall be permitted in the Shopping Center within three hundred (300) feet of the front and side perimeter walls of the Store, except within the building designated as "Shops F" on **Exhibit B**; provided, however, that quick service restaurants (i.e., no wait-staff takes orders at tables and food is primarily ordered at a counter, such as Subway, Jimmy John's, or Panda Express) shall be permitted in the Lower Level Space; and no night club, bar, sports bar, or any restaurant where the on-premises consumption of alcohol exceeds forty percent (40%) of gross sales (and which shall include Buffalo Wild Wings, Elephant Bar and BJ's Brewhouse, regardless of the percentage sale of alcohol, and other similar establishments) shall be permitted within the Shopping Center. A "High Intensity Parking User" is a tenant or occupant whose use requires more than three and eight-tenths (3.8) parking spaces per one thousand (1,000) square feet of Leasable Floor Area in accordance with applicable governmental regulations. The foregoing use restrictions are referred to herein as the Ross Prohibited Uses.

       (b)    Exceptions.

       (i)    Notwithstanding the prohibition on offices set forth in Section 3.2.1(a) above, retail service offices such as full service banks, medical offices, dental offices, travel agencies, real estate brokers and title companies, shall be permitted, provided that such retail service office use (A) does not exceed three thousand five hundred (3,500) square feet of Leasable Floor Area for any individual retail service office use; (B) does not exceed ten percent (10%) of the Leasable Floor Area of the Shopping Center in the aggregate, and (C) is not located within one hundred (100) feet of the front, side or rear perimeter walls of the Store. The foregoing restrictions in clauses (A) and (B) above shall not apply to the Lower Level Space, provided that any retail service office space located in the Lower Level Space has dedicated parking underneath the Store and the leases with tenants for premises in the Lower Level Space require the employees of such tenants to park on such lower level. If Landlord elects not to build additional parking under the Store, then the foregoing clauses (A) and (B) shall also apply to the Lower Level Space.

       (ii)    Notwithstanding the prohibition on schools set forth in Section 3.2.1(a) above, one (1) school such as Sylvan Learning, Kumon or a similar type of school use shall be permitted, provided that such use (A) does not exceed in the aggregate one thousand five

"North Decatur"          - 15 -          02/06/15
Suburban Plaza                                FINAL
Decatur, GA
Store No. 1741
6061.1165/632873.6

hundred (1,500) square feet of Leasable Floor Area; and (B) is not located within three hundred (300) feet of the Store, which distance restriction shall not apply to the Lower Level Space. Notwithstanding the foregoing, if the school is located in the Lower Level Space, and parking for such school is also provided in the Lower Level Space, then the school may occupy up to five thousand (5,000) square feet of Leasable Floor Area in the Lower Level Space.

(iii)    Notwithstanding the prohibition on massage parlors set forth in Section 3.2.1(a) above, one (1) massage therapy provider or a first-class day spa of the type typically found in first-class shopping centers, such as Massage Envy or Spa Sydell, shall be permitted, provided that such massage therapy provider or day spa (A) occupies no more than four thousand (4,000) square feet of Leasable Floor Area; and (B) is not located within two hundred (200) feet of the front, side or rear perimeter walls of the Store. Furthermore, the following massage services shall permitted notwithstanding the prohibition on massage parlors: massage services provided by an otherwise permitted hair salon as an incidental part of its business; massage services provided by an otherwise permitted medical or chiropractic facilities, such as medical rehabilitations clinics; and massages provided as an incidental part of an otherwise permitted health club's business.

(iv)    Notwithstanding the prohibition on health clubs set forth in Section 3.2.1(a) above, one (1) health club such as LA Fitness shall be permitted in the location designated as "LA Fitness" on **Exhibit B**, provided that its main entrance fronts on Church Street.

(v)    Notwithstanding the prohibition on the sale, display, leasing or repair of motor vehicles set forth in Section 3.2.1(a) above, the display and/or sale of boats and all-terrain vehicles shall be permitted by sporting goods/outdoor stores (such as Dick's Sporting Goods), so long as the display of such items is located entirely within its interior building premises.

(vi)    Notwithstanding the prohibition on on-premises consumption of alcoholic beverages set forth in Section 3.2.1(a) above, an upscale wine bar occupying no more than two thousand (2,000) square feet of Leasable Floor Area shall be permitted in Shops F, Shops G, or the Lower Level Space, as designated on **Exhibit B**.

(vii)    The Ross Prohibited Uses set forth in Section 3.2.1(a) shall not apply to those tenants or occupants of the Shopping Center who, in accordance with the terms of existing leases or occupancy agreements in effect on the Effective Date ("Existing Tenants"), cannot be prohibited from so operating, but only for the balance of the term(s) of such existing lease(s) or occupancy agreement(s), including any extensions thereof. Landlord covenants and agrees that if Landlord has the right to consent to a change in use of the premises occupied by any such Existing Tenant, Landlord shall not consent to a change in use of the premises which violates the Ross Prohibited Uses.

**3.2.2.**    Further Prohibited Uses. Landlord agrees that the Ross Prohibited Uses set forth in Section 3.2.1 shall not be permitted in the Shopping Center (excluding the Wal-Mart Tract). If Landlord sells any portion of the Shopping Center, Landlord shall attach and incorporate into every deed or other instruments of conveyance the Ross Prohibited Uses and the provisions of Section 15.3. Tenant agrees that it will not violate the Ross Prohibited Uses or the "Landlord's Prohibited Uses" which are listed in **Exhibit D**. Landlord further agrees that it will not violate the Landlord's Prohibited Uses; provided, however, that Landlord may modify or terminate any of the

Landlord's Prohibited Uses with the consent of the tenant(s) for whose benefit the applicable Landlord's Prohibited Uses are set forth on **Exhibit D** so long as such modification does not violate the Ross Prohibited Uses. The Ross Prohibited Uses and the Landlord's Prohibited Uses may be collectively referred to herein as the "Prohibited Uses."

### 3.3. Grant of Common Area Use.

(a)     Tenant, as well as its agents, employees, customers and Invitees, shall have and is granted nonexclusive and undisturbed access to, and use of all Common Areas (hereinafter "easement"), which easement shall be appurtenant to the Store until the expiration or earlier termination of this Lease. Landlord shall use commercially reasonable efforts to prevent (a) Common Area use by other than the Shopping Center's occupants and their Invitees, and (b) other Shopping Center's occupants and their employees and officers from parking within two hundred fifty (250) feet of the Store's front doors. In no event shall Tenant or Tenant's Invitees' use of Common Areas be conditioned upon payment of parking or other charges by Tenant.

(b)     Landlord acknowledges that Tenant is concerned with the overflow of parking from the employees, members, and Invitees of health club users, such as LA Fitness (the "Fitness Space Users") in the portion of the Control Area designated on **Exhibit B** as the "Restricted Area." Based on Landlord's representation, Tenant acknowledges that Landlord's lease with LA Fitness is executed and in full force and effect and does not contain restrictions on the use of parking spaces by members and Invitees of LA Fitness, and that parking by such members and Invitees within the Restricted Area is not prohibited. However, as an accommodation to Tenant, within thirty (30) days after Tenant notifies Landlord in writing that automobiles belonging to Fitness Space Users are parked in the Restricted Area, Landlord shall employ a parking attendant (at Landlord's sole cost and expense and not as a Common Area Charge) to monitor the use of the Restricted Area by members and Invitees of Fitness Space Users during Tenant's business hours, which parking attendant shall suggest that such members and Invitees relocate their automobiles outside of the Restricted Area.

### 3.4. Grant of Utility Easements.

(a)     Subject to the reasonable approval of Landlord as to location, Landlord hereby grants to Tenant and its employees, agents, contractors and vendors, the nonexclusive right by easement to install, replace, maintain and use Utilities of Tenant's choice serving the Store within the Shopping Center, and in connection therewith, to use existing Utility conduits and to tie into existing Utility lines.

(b)     Intentionally Deleted.

### 3.5. Utility Rooms.

In the event any meters, controls or conduits for any Utility system serving the Store are at any time situated outside the Store (the "Utility Room"), Tenant shall at all times have access to the Utility Room and to controls and other conduits therein in common with Landlord and other tenants affected by such Utility systems. No other parties (other than Landlord and the other tenants affected by such Utility systems) shall have access to the Utility Room at any time without the consent of Tenant. Landlord shall provide adequate heat and security for the Utility Room and

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/632873.6

- 17 -

02/06/15
FINAL

shall cause the Utility Room to be kept locked at all times. Access to the Utility Room shall be restricted to an exterior entrance situated in the rear wall of the building in which it is located.

### 3.6.    Site Plan or Shopping Center Alterations.

**3.6.1.**    Control Area and Inline Building. The Site Plan is a material consideration for Tenant entering into this Lease. No change, alteration, deletion, or addition (including, but not limited to, landscaping, benches, seating, trash cans, light poles, directional signage or other structures or obstructions) that materially and adversely affect parking or visibility of the Store or Tenant's Signs (collectively, "Obstructions") shall be made to the Control Area on the Site Plan nor shall any change in the location of a front wall of any premises in the Inline Building be made without the prior written consent of Tenant, which consent may be granted or denied in Tenant's sole and absolute discretion. Nothing contained in this Section 3.6.1 shall prevent Landlord from complying with Requirements; provided, however, if the manner in which Landlord may comply with Requirements that affect any of the items referred to in herein is discretionary, then Landlord shall obtain Tenant's consent to the manner of implementation, which consent shall not be unreasonably withheld.

**3.6.2.**    Common Areas. No change or alteration or addition (including, but not limited to, the addition of any Obstructions) shall be made in the Common Areas of the Shopping Center outside of the Control Area (to the extent Landlord has the legal ability to control such changes or alterations) which materially and adversely affects any one or more of the following, without the prior written consent of Tenant (which consent shall not be unreasonably withheld by Tenant if the change is not materially adverse to Tenant): (a) the configuration of the Common Areas; (b) methods of ingress and egress, direction of traffic, lighting, parking, or curbing in the Common Areas; or (c) visibility of the Store or of any of Tenant's Signs. Nothing contained in this Section 3.6.2 shall prevent Landlord from complying with Requirements; provided, however, if the manner in which Landlord may comply with Requirements that affect any of the items referred to in clauses (a), (b), and (c) is discretionary, then Landlord shall obtain Tenant's consent to the manner of implementation which consent shall not be unreasonably withheld.

**3.6.3.**    Building Envelopes. No construction of any building, or remodeling of any building in the Shopping Center located between the Store and the roads which the Store faces or has side visibility may occur except within the Building Envelopes as designated on **Exhibit B**.

**3.6.4.**    Store Exterior; Building Exteriors. The use of the exterior walls of the Store shall be subject to the exclusive control of Tenant, provided any changes to Tenant's exterior storefront appearance are consistent with the color, design and architectural theme of the Shopping Center. Further, Landlord may not alter the exterior of the Store, including, but not limited to, the color of the exterior of the Store, without the prior written consent of Tenant, which consent may be granted or denied in Tenant's sole and absolute discretion. No alteration or change in the color or design of any exterior wall of any building may be made without the prior written consent of Tenant, which consent shall not be unreasonably withheld, delayed or conditioned. Notwithstanding the preceding sentence, Tenant's consent shall not be required with respect to changes to the storefront of other tenants, provided (a) any such changes are harmonious with the color, design and architectural theme of the Shopping Center, (b) the other express height and building limitations set forth in this Lease are not violated, and (c) except for the storefront of

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/632873.6

- 18 -

02/06/15
FINAL

1  "Tenant E" as the same exists on the Effective Date and which is depicted on **Exhibit B**, no
2  storefront of any other tenant may protrude past the front wall of the Store without Tenant's prior
3  written consent, which may be withheld in Tenant's sole discretion.

4    **3.6.5.**  <u>Intentionally Deleted</u>.

5    **3.6.6.**  <u>Tenant's Loading Dock and Loading Area</u>.  Landlord covenants and agrees that
6  Tenant shall have undisturbed access to and use of its loading dock and loading area.  If access to
7  and/or use of Tenant's loading dock and/or loading area is disturbed or interfered with in any
8  material respect for any reason (other than if caused by Tenant), and such disturbance or
9  interference is not cured by Landlord within one (1) Business Day following Landlord's receipt of
10  written notice from Tenant, then, in addition to availing itself of any other remedies available at law
11  or in equity or under this Lease, Tenant may, upon written notice to Landlord, elect to pay
12  Substitute Rent until the disturbance or interference is cured; provided, however, so long as
13  Landlord is using diligent good faith efforts to cure the disturbance or interference, Tenant shall
14  continue to pay Minimum Rent and Reimbursements, rather than Substitute Rent.

15  **3.7.  Dimensions.**

16    Immediately following the completion of Landlord's Construction Obligations, Landlord
17  shall cause the Store to be measured and shall deliver to Tenant an architect's certificate stating the
18  Leasable Floor Area thereof (the "Store Size Certificate").  In the event that the Leasable Floor Area
19  of the Store is less than the size specified in Section 1.3.3 (the "Store Agreed Size"), Minimum Rent
20  and all other charges shall be proportionately reduced and the parties shall set forth the actual
21  Leasable Floor Area of the Store, the adjusted Minimum Rent and other corrections necessitated by
22  the adjustment in Store size in the Acknowledgment of Commencement in **Exhibit E** hereto.  In
23  the event that the Leasable Floor Area of the Store is more than the Store Agreed Size, Minimum
24  Rent and all other charges shall be based upon the Store Agreed Size.  Nothing herein shall be
25  construed as permitting a material variance in dimensions or area.  For purposes of this Section 3.7,
26  a material variance is any decrease in the amount of Store frontage set forth in Section 1.3.3 or any
27  decrease in the Store Agreed Size by more than one-half (½) of one percent (1%) of the amount of
28  square feet of Leasable Floor Area.  Landlord shall simultaneously provide to Tenant a certificate
29  from the project architect as to the total Leasable Floor Area in the Shopping Center depicted on
30  **Exhibit B**.  Tenant shall have the right to dispute through its own licensed architect the amounts so
31  represented and, if so, any unresolved dispute shall be resolved as provided in Section 20.2.  If
32  Tenant fails to dispute, in writing, the Store Size Certificate within six (6) months of receipt thereof
33  (which notice of dispute shall include Tenant's architect's calculation of the Leasable Floor Area
34  within the Store), Tenant shall be deemed to have accepted the Store Size Certificate provided by
35  Landlord.  Until the amounts of Leasable Floor Area in the Store and in the Shopping Center have
36  been finally determined, or deemed accepted in accordance with the previous sentence, Tenant may
37  defer payment of Minimum Rent (to the extent of the disputed amount; i.e., Tenant may defer the
38  difference in Minimum Rent between the two (2) calculations) and the disputed portion of Tenant's
39  Pro Rata Share of any charges which require the use of Leasable Floor Area for computational
40  purposes under the terms of this Lease (e.g., Taxes, insurance and Common Area Charges).

## 3.8.    Effect of REA.

(a)    Landlord agrees that the use of all portions of the Shopping Center, and restrictions upon such use, are material to this Lease and absent rights of usage (and restrictions upon usage), Tenant would not have entered into this Lease.   Therefore, Landlord grants to Tenant non-exclusive easements, rights, licenses, privileges and servitudes reserved in, or granted by, the REA for the benefit of the Shopping Center, including, but not limited to:

(i)    Ingress/egress, cross traffic, pedestrian and vehicular traffic, and parking in the Common Areas of the Shopping Center;

(ii)    If and as applicable, the use of Utility lines, drainage, and sanitary sewer system in the Shopping Center;

(iii)    If and as applicable, the use of the building and pylon signs granted under the REA for the benefit of any portion of the Shopping Center;

(iv)    If and as applicable, maintenance and repair; and

(v)    If and as applicable, use restrictions.

(b)    Landlord agrees that all rights under the REA of approval or consent or election exercisable by the owner of the Shopping Center which would have a material and adverse effect upon Tenant's use and enjoyment of the Store, or would have a material and adverse effect on Tenant's rights or obligations under this Lease, shall not be granted or exercised by Landlord without the prior written consent of Tenant.  Landlord further agrees that Landlord shall not, as owner of the Shopping Center, execute any documents terminating or modifying the REA without the prior written consent of Tenant if such termination or modification would have a material adverse effect upon Tenant's use and enjoyment of the Store, or would have a material and adverse effect on Tenant's rights or obligations under this Lease.

(c)    Provided Tenant obtains Landlord's prior written consent, which consent shall not be unreasonably withheld, Tenant may from time to time contact the "Co-parties," as herein defined, (i) to obtain consent in instances in which the REA provides that Landlord may perform an act (or refrain from performing an act) which Tenant may perform under the terms of this Lease with the consent of the Co-parties, and (ii) with respect to obtaining modifications and amendments to the REA.  Landlord shall not unreasonably withhold its consent to any proposed modifications or amendments agreed to by the Co-parties and Tenant.  "Co-parties" is defined as signatories to the REA other than Landlord.

(d)    Landlord agrees that performance by the Co-parties, in accordance with the terms of the REA, is material to this Lease; therefore Landlord agrees to use commercially reasonable efforts to cause the Co-parties to so perform, or alternatively (if permitted by the terms of the REA), to perform on behalf of the Co-parties and if Landlord does not do so, it shall be a default by Landlord under this Lease.  If following notice from Tenant, Landlord does not commence such effort in time sufficient so that prosecution of such efforts is not prejudiced by delay (and in any event, commence prosecution thereof within thirty (30) days of notice from Tenant), Tenant may prosecute

such efforts in its own name or Landlord's, but in either event, with Landlord's full cooperation, and Landlord shall reimburse Tenant for all costs in good faith incurred. Nothing herein shall preclude Tenant from exercising any rights or remedies available at law or in equity or under this Lease in the event of a breach of the REA.

(e)    Although the Store and the rights of Tenant under this Lease are necessarily subject to the REA the parties agree that, as between the parties hereto, all provisions of this Lease shall be superior and paramount to the REA. In the event of any inconsistency between the REA and this Lease (i) as between the parties hereto, the provisions of this Lease shall prevail, and (ii) if any right(s) of Tenant under this Lease are disturbed and/or interfered with by any person claiming through or under the REA, Tenant shall have all rights and remedies with respect thereto as are available under this Lease.

(f)    Tenant agrees that it shall not violate the terms, covenants, conditions and agreements set forth in the REA which are of a prohibitory nature; the obligations imposed by the REA which are of an affirmative nature in respect of the Store shall be performed by Landlord unless Tenant is obligated to perform such under a provision of this Lease.

(g)    In the event Landlord grants approval to Tenant under any of the terms of this Lease, it shall be deemed that Landlord has obtained all necessary approvals under the REA.

## 4.  LEASE TERM

### 4.1.  Term.

The Term of this Lease shall commence on the Commencement Date and shall expire as specified in Section 1.5.

### 4.2.  Commencement Date.

The Commencement Date shall be the date as set forth in Section 1.4.1.

### 4.3.  Acknowledgment of Commencement.

Within ninety (90) days after the Commencement Date, Landlord and Tenant shall execute a written acknowledgment in the form attached hereto as **Exhibit E**, and by this reference it is hereby incorporated herein.

### 4.4.  Option Periods.

Tenant shall have the right to extend the Term of this Lease (an "Option") for the number of separate, consecutive additional periods ("Option Periods") which are specified in Section 1.5.2, on the terms and conditions set forth herein, except that the number of Option Periods remaining to be exercised shall, in each case, be reduced by one. If Tenant elects to exercise an Option, Tenant shall notify Landlord in writing at least one hundred eighty (180) days prior to the expiration of the Term, or the then current Option Period, as the case may be. If Tenant neglects to timely exercise any Option, Tenant's right to exercise such Option shall not expire or lapse unless Tenant

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/632873.6

- 21 -

02/06/15
FINAL

1 fails to exercise such Option within fifteen (15) days after notice from Landlord of Tenant's failure
2 to timely exercise the Option. If Landlord does so notify Tenant, Tenant shall have the right at any
3 time within fifteen (15) days after such notice to notify Landlord in writing of either Tenant's
4 unqualified and irrevocable exercise of its Option, or Tenant's unqualified and irrevocable waiver of
5 its Option. If Tenant fails to respond within such fifteen (15) day period, Tenant shall conclusively
6 be deemed to have waived its Option and this Lease shall terminate on the then expiration date of
7 the Term.

8 ## 5. CONSTRUCTION AND ACCEPTANCE

9 **5.1. Landlord's Construction Obligations.**

10 **5.1.1.** <u>Current.</u>

11 (a) Landlord shall provide to Tenant, for Tenant's review and approval, the
12 exterior elevations of the Inline Building in order for Tenant to prepare and/or review and approve the
13 exterior elevations for the Store. Landlord shall construct the Inline Building in conformity with the
14 exterior elevations as so approved by Tenant. Landlord acknowledges that Tenant's approval of the
15 exterior Store elevations is contingent upon Landlord constructing (or causing to be constructed) the
16 Inline Building substantially in conformity with the building elevations approved by Tenant. If, prior
17 to the Delivery Date, such elevations are modified, Landlord shall promptly notify Tenant and shall
18 provide Tenant with the modified elevations. If Tenant reasonably determines that the modified
19 elevations require a modification to the exterior Store elevations, Tenant shall notify Landlord of
20 Tenant's requested modifications to the exterior Store elevations and Landlord shall make such
21 modifications to the exterior Store elevations, at Landlord's sole cost and expense. Notwithstanding
22 the foregoing, Tenant will not require Landlord to modify Tenant's exterior Store elevations if
23 Landlord modifies the building elevations to accommodate the storefronts of national and regional
24 retailers which are consistent with such retailers' prototypical storefront designs, provided Tenant
25 maintains its storefront presence comparable to that shown on the approved building elevations.
26 Landlord acknowledges and agrees that any modifications to the approved building elevations shall be
27 subject to the other express provisions of this Lease, including the provisions of the Article 2 – Site
28 Plan definition and the provisions of Section 3.6.

29 (b) Landlord, at its own cost and expense, shall (i) construct the Store in
30 accordance with the terms and conditions of **Exhibit C**, and including, without limitation, installation
31 of permanent power to the Store and installation of a floor slab which maintains moisture vapor
32 emissions at or below five (5) pounds per one thousand (1,000) square feet per twenty-four (24) hours
33 using the calcium chloride method (and no alkalinity test result may exceed a pH of nine (9), and no
34 failure shall be permitted on any seventy-two (72) hour bond test), (ii) construct the buildings and
35 Common Areas of the Shopping Center in conformity with the Site Plan and the Approved Elevations
36 and the Minimum Building LFA, (iii) construct the Off-Site Improvements, and (iv) perform the
37 Refurbishment. In addition, Landlord shall (A) remove all Utility lines that run through the Store that
38 serve any other premises so that all Utility lines that run through the Store shall exclusively serve the
39 Store; and (B) if it is necessary for Landlord to install a chase through the Store to provide ventilation
40 for the parking deck that Landlord may construct underneath the Store (the "Parking Vent"), Landlord
41 shall install such Parking Vent in a location mutually acceptable to Landlord and Tenant, and the

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/632873.6

- 22 -

02/06/15
FINAL

1   square footage of the Parking Vent shall be deducted from the Leasable Floor Area of the Store (and
2   the Store Agreed Size and Minimum Rent shall be adjusted accordingly).  Landlord shall indemnify,
3   defend, protect and hold Tenant harmless from all claims, demands and liabilities, including attorneys'
4   fees and expenses, arising out of Landlord's Construction Obligations, including, but not limited to,
5   claims for defective work arising prior to the expiration of the applicable statute of limitations.  The
6   obligations of this Section 5.1 are a material consideration to Tenant without which Tenant would not
7   have entered into this Lease.

8                    (c)      Landlord shall perform, at Landlord's sole cost and expense, any work
9   required by Requirements as well as any work imposed by any local governmental authority as part of
10  the governmental approval process with respect to Landlord's Work or Tenant's Work, to the extent
11  such work involves the Common Areas of the Shopping Center or any part of the Shopping Center
12  buildings other than the Store.

13      **5.1.2.**    <u>Future</u>.  If Landlord undertakes the upgrading of the exterior of buildings in the
14  Shopping Center other than the Store, then Landlord shall be obligated to similarly upgrade the
15  exterior of the Building so that the Shopping Center presents a uniform appearance of quality,
16  design and age.  Landlord's failure to perform its obligations under this Section 5.1.2 within sixty
17  (60) days following the completion of the general upgrading of other buildings in the Shopping
18  Center, and Landlord's continued failure to commence same within thirty (30) days of Tenant's
19  notice (and complete same within sixty (60) days thereafter), shall constitute a material default under
20  the provisions of this Lease entitling Tenant to all remedies at law, in equity and/or under the terms
21  hereof.

22  **5.2.    Construction Commencement.**

23      If Landlord fails to commence to perform Landlord's Construction Obligations, including
24  the construction of the Store prior to the Construction Commencement Cancel Date specified in
25  Section 1.4.3 of this Lease (subject to extension of such date on a day-for-day basis for delays caused
26  by events of Force Majeure or Tenant Delay), then at any time thereafter, but prior to Landlord's
27  commencement of construction of the Store, Tenant shall have the right to terminate this Lease by
28  notifying Landlord in writing.  If the Store is a new Building to be constructed, "Commencement of
29  Construction" means to commence pouring the foundation for the Store.

30  **5.3.    Completion of Construction.**

31      Landlord shall use commercially reasonable efforts to complete Landlord's Construction
32  Obligations and deliver possession of the Store to Tenant on the Intended Delivery Date.  In the
33  event that Landlord has previously delivered to Tenant a Construction Completion Notice and is
34  thereafter delayed by Force Majeure or Tenant Delay in delivering the Store, or for any other reason
35  is unable to deliver the Store by the Delivery Date as specified in the Construction Completion
36  Notice, Landlord shall continue to diligently complete and deliver Landlord's Work in compliance
37  with this Lease.

## 5.4.    Construction Completion Notice.

(a)    The parties acknowledge the necessity for Landlord to provide Tenant with the Construction Completion Notice specified in this Section 5.4 in order that (i) Tenant shall have adequate time to, among other things, order fixtures and equipment, order and stock in season merchandise, move and hire employees and arrange for advertising, computer and distribution support, perform Tenant's improvements and fixturization of the Store and enter into other commitments required to timely occupy and conduct business within the Store, and (ii) the Shopping Center shall be perceived by the public as a completed, fully functional and operating retail center. Not less than one hundred twenty (120) calendar days prior to the Delivery Date, Landlord must notify Tenant in writing as to when the Delivery Date will occur (the "Construction Completion Notice") in the form set forth in **Exhibit G** (a Delivery Date must be on a Permitted Delivery Day). Landlord shall undertake all due diligence and necessary efforts to complete Landlord's Construction Obligations, and satisfy the Delivery Conditions, and deliver the Store on the Delivery Date specified in the Construction Completion Notice. In the event Landlord does not timely satisfy all the Delivery Conditions by the Delivery Date stated in the Construction Completion Notice (subject to extension of such date on a day-for-day basis for delays caused by events of Force Majeure or Tenant Delay), Tenant will suffer damages arising from Tenant's need for adequate and proper advance notice of delivery. It would be impractical or extremely difficult to fix actual damages in the event of Landlord's breach under this Section 5.4. Therefore, in the event of a breach by Landlord of its obligations under this Section 5.4, the parties acknowledge that the damages to be suffered by Tenant in such event are difficult to ascertain. Landlord acknowledges that such damages include, but are not limited to, the loss of, or need to, relocate employees hired for the Store, costs to reallocate and/or to discount seasonal merchandise ordered for the Store, and costs to reschedule Tenant's improvements and fixturization of the Store. However, after negotiation the parties have made their best reasonable estimate of such damage and have agreed that Landlord shall pay to Tenant, as liquidated damages (the "Liquidated Damages"), the sum of One Hundred Fifty Thousand Dollars ($150,000) which sum shall be paid to Tenant in a lump sum by Landlord to Tenant upon demand at any time following a breach by Landlord of its obligations under this Section 5.4. Nothing herein shall prohibit Tenant, in addition to claiming the Liquidated Damages, from postponing occupancy and the commencement of payment of Rent as specified in Section 5.5 hereof or from enforcing its remedies pursuant to Section 5.4(b). In the event Landlord fails to pay to Tenant the Liquidated Damages as required by this Section 5.4(a), Tenant may, at its option, deduct the full amount of the Liquidated Damages from the Rent or other charges coming due until Tenant has fully recovered the full amount of Liquidated Damages. In addition to Landlord's obligation to pay the Liquidated Damages, Landlord shall remain obligated to diligently complete Landlord's Construction Obligations and to satisfy the Delivery Conditions. If Landlord fails to deliver the Store on the date stated in the Construction Completion Notice due to a delay caused by an event of Force Majeure or Tenant Delay, Landlord's obligation to pay the Liquidated Damages shall be excused for the period of the Force Majeure delay (subject to the provisions of Section 26.13) or Tenant Delay, provided Landlord gives Tenant the notice required by Section 26.13 with respect to a Force Majeure delay, and provided Landlord uses diligent efforts to complete Landlord's Construction Obligations and satisfy the Delivery Conditions. If Landlord does not deliver a Construction Completion Notice, there shall be no Liquidated Damages, but Tenant shall have the remedies specified in Sections 5.5 and 5.6. In the event that after the Delivery Date, Tenant is materially delayed or disrupted in performing Tenant's Work as a direct result of Landlord performing any of its maintenance or repair obligations under this Lease, then the Delivery Date shall, at Tenant's

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/632873.6

- 24 -

02/06/15
FINAL

option, be deemed the next Permitted Delivery Day which follows the completion of such Landlord's repair and/or maintenance obligations.

(b)     On or before the Delivery Date specified in the Construction Completion Notice, Tenant shall have the right, but not the obligation, to notify Landlord of the earliest date (the "Opening Date") that Tenant may commence to operate in the Store for retail business to the general public (the "Opening Date Notice"). For purposes of the remedies set forth in this Section 5.4(b), such Opening Date shall not be earlier than eight (8) days after the Delivery Date specified in the Construction Completion Notice; however, notwithstanding anything contained herein to the contrary, Tenant may open the Store for business prior to the Opening Date. In addition to the provisions of Section 5.4(a) above, if Tenant delivers an Opening Date Notice to Landlord, and thereafter, Landlord fails to timely deliver the Store at least eight (8) days before the Opening Date, in addition to all of Tenant's other rights and remedies due to a missed Delivery Date, Tenant shall also have the right to occupy and conduct business in the Store without any obligation to pay Landlord Rent on and after the Commencement Date (notwithstanding the provisions of Section 6.1.1 of this Lease) for a period equal to the number of days between the missed Delivery Date as specified in the Construction Completion Notice and the one hundred twentieth (120th) day following the next Permitted Delivery Day which occurs after Landlord satisfies all Delivery Conditions. Landlord shall remain obligated to diligently complete Landlord's Construction Obligations and to satisfy the Delivery Conditions.

(c)     If Landlord tenders possession of the Store to Tenant prior to Landlord's satisfaction of the Delivery Conditions, Tenant may take possession of the Store and Tenant may occupy and conduct business in the Store. In such event, the parties' respective insurance obligations set forth in Article 9 shall commence on the date Tenant occupies the Store pursuant to this Section 5.4(c). Tenant's occupancy and use of the Store shall not constitute delivery of the Store or waive Landlord's obligations to satisfy the Delivery Conditions nor shall it constitute acceptance of Landlord's Work or relieve Landlord of responsibility for any warranty or maintenance obligations of Landlord under this Lease. Tenant's obligation to pay Rent shall not commence until Landlord satisfies all Delivery Conditions and the Commencement Date occurs, as determined in accordance with Section 1.4.1, subject to the other express provisions of this Lease.

**5.5.    Rollover.**

Notwithstanding any other provisions of this Lease, Tenant shall not be obligated to accept delivery of the Store at any time other than on a Permitted Delivery Day. If (a) Landlord offers to deliver the Store to Tenant on a date other than a Permitted Delivery Day and Tenant does not accept delivery of the Store on such date, or (b) Landlord fails to deliver a timely Construction Completion Notice to Tenant, then, in either event, the Delivery Date shall, at Tenant's option, be deferred until the next Permitted Delivery Day which occurs after the one hundred twentieth (120th) day following the actual date Landlord satisfies all Delivery Conditions and tenders possession of the Store to Tenant. If Landlord delivers a Construction Completion Notice to Tenant and thereafter Landlord fails to timely deliver the Store to Tenant on the date specified in the Construction Completion Notice, then, unless Tenant agrees in writing to accept delivery of the Store on an earlier date, the Delivery Date shall be deferred until the next Permitted Delivery Day which occurs after the actual date Landlord satisfies all Delivery Conditions and tenders possession of the Store to Tenant. Tenant's rights to defer the Delivery Date pursuant to this Section 5.5 are referred to herein as the "Rollover"

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/632873.6

- 25 -

02/06/15
FINAL

remedy and are in addition to Tenant's rights to recover Liquidated Damages pursuant to Section 5.4 above, if applicable.

### 5.6. Remedies Cumulative.

The Rollover remedy described in Section 5.5 above shall apply in addition to all other remedies at law, or in equity, or under the terms of this Lease.

### 5.7. Construction Completion Cancel Date.

Subject to extension on a day-for-day basis for delays caused by Tenant Delay and/or events of Force Majeure, if for any reason Landlord has not completed Landlord's Construction Obligations, or the Store is not delivered to Tenant prior to the Construction Completion Cancel Date specified in Section 1.4.4 of this Lease, Tenant may, at its sole option, cancel this Lease by written notice to Landlord.

### 5.8. Automatic Termination.

This Lease shall be automatically terminated if the Delivery Date does not occur on or before the Automatic Termination Date specified in Section 1.4.5 of this Lease notwithstanding any Force Majeure events. Notwithstanding the foregoing, this Lease shall not terminate if Tenant is occupying the Store as of the Automatic Termination Date.

### 5.9. Entry Prior to Delivery Date.

Tenant shall have the right, without any obligation to pay Rent, to enter the Store to perform work of preparation, but not operation of its business prior to the Delivery Date; however, such exception regarding operation shall not apply subsequent to the Delivery Date specified in any Construction Completion Notice. Tenant agrees that it shall reasonably coordinate such entry with Landlord's contractor so as not to impede the progress of Landlord's Work by such entry and shall indemnify Landlord from any damage or liability caused by Tenant's entry. No such entry by Tenant shall be deemed an acceptance of delivery of the Store, nor shall it constitute acceptance of Landlord's Work. Tenant may use such Utilities as are available during the course of such period at no charge or cost to Tenant so long as such use is consistent with Tenant's Work.

### 5.10. Walk-Through Inspection and Punchlist.

Within fifteen (15) Business Days after Landlord notifies Tenant of the completion of Landlord's Construction Obligations, Landlord's construction representative and Tenant's construction representative shall meet at and do a complete walk through inspection ("Walk-Through Inspection") of the Store to (a) identify any uncompleted Landlord's Work as required herein, and (b) identify any incomplete or noncomplying items of Landlord's Work. Within five (5) Business Days after the Walk-Through Inspection, Tenant may deliver to Landlord a list ("Punchlist") containing all items described in clauses (a) and (b) above which were identified during the Walk-Through Inspection as not having been completed (i) to the extent necessary to permit Tenant to commence and complete Tenant's Work without delay or interference from the incomplete nature of Landlord's Work and/or from Landlord's contractor performing Landlord's

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/632873.6

- 26 -

02/06/15
FINAL

Work, and (ii) to sufficiently allow Tenant's retail operations to commence in the Store without impediment to the conduct thereof by the incomplete nature of Landlord's Work, and (iii) including completion of the Common Areas to the extent required in this Lease. If Tenant does submit such a list, and the items set forth on the list are, in fact, part of Landlord's Work under this Lease, Landlord shall promptly and diligently complete or correct such items within thirty (30) days thereafter. In any event, the Delivery Date shall not be deemed to have occurred until the listed items are completed and/or corrected to the extent necessary to (x) permit Tenant to commence and complete Tenant's Work without delay or interference from Landlord's contractor performing Landlord's Work and/or caused by the incomplete nature of Landlord's Work, and (y) to permit Tenant's retail operations to commence in the Store without impediment to the conduct thereof. A sum equal to the amount of Minimum Rent for one (1) full month may be deferred by Tenant pending completion by Landlord of the Punchlist.

**5.11.    Intentionally Deleted.**

**5.12.    Additional Delivery Requirements.**

**5.12.1.**    On the Delivery Date. Tenant's occupancy of the Store on or after the Delivery Date shall not constitute an acceptance of Landlord's Work, or relieve Landlord of responsibility for any warranty or maintenance obligations under this Lease.

**5.12.2.**    Thirty Days After the Delivery Date. Within thirty (30) days after the Delivery Date, Landlord shall deliver all of the following to Tenant:

(a)    All fully executed and dated warranties and guarantees applying to the Store from the date of completion of Landlord's Construction Obligations. If such warranties or guarantees are given after the date of completion, they shall be dated as of the actual date that the equipment and/or item was placed in service, but in no event shall execution of any warranty and guaranty occur prior to the date of completion unless authorized in writing by Tenant;

(b)    A list of all contractors, subcontractors and suppliers, each of which provided labor, services or materials in excess of Fifteen Thousand Dollars ($15,000) ("Major Contractors") for the construction of the Store. Said list shall contain the following information about each contractor, subcontractor or supplier: name, business address, phone number (including area code), facsimile number (if available) and e-mail address, contact person for the project, and state license number if required for the execution of work on the Store;

(c)    Equipment operation manuals, catalogue data sheets and material safety data sheets on all major equipment and/or fixtures used in the Store;

(d)    For maintenance use, one percent (1%) of the floor and wall covering material installed of each color and pattern required for the Store; a one (1) gallon container of paint for each color and surface texture used; and each container, box or roll shall be labeled with color, texture and room location in addition to manufacturer's label;

(e)    Completed Punchlist properly signed and dated by Landlord or its general contractor indicating that all items have been completed;

(f) A letter from Landlord's architect or sign contractor stating that site signage structures (i.e., pylon, monument, etc.) have been completed in accordance with the approved drawings and this Lease;

(g) One (1) copy of final project record documents for the Store including, without limitation, record specifications noted to indicate actual as-built conditions and as-built Autocad record drawings developed from red-lined project stick sets indicating actual as-built conditions; and

(h) Copies of unconditional lien waivers and releases from all Major Contractors.

**5.12.3.** Until the foregoing items specified in Section 5.12.2 have been furnished to Tenant, Tenant may defer payment of all Rent due under this Lease.

# 6.  RENT

## 6.1.   Minimum Rent.

**6.1.1.** <u>Payment and Amount</u>. Commencing on the Commencement Date and continuing through the Term of this Lease (except as otherwise expressly set forth in this Lease), without demand or set off except as otherwise specified in this Lease, Tenant shall pay Minimum Rent to Landlord in equal monthly installments at the rates specified in Section 1.6 (the "Minimum Rent"). Minimum Rent shall be payable in advance on or before the first (1st) day of each calendar month. If this Lease commences other than on the first day of a calendar month, the first month's Minimum Rent shall be prorated accordingly and paid with the Minimum Rent for the first full month.

**6.1.2.** <u>Place of Payment</u>. All Minimum Rent and other payments to be made by Tenant to Landlord shall be sent to the place to which Landlord's notices are required to be sent, unless otherwise directed by Landlord in writing.

**6.1.3.** <u>Required Co-Tenancy</u>.

(a) <u>Co-Tenancy Requirements</u>. A "Reduced Occupancy Period" shall occur unless all of the following requirements are satisfied on the Commencement Date and thereafter throughout the Term: (i) the Required Co-Tenants specified in Section 1.7.1, shall be open in the Shopping Center for retail business during the corporate-wide customary operating hours for such Required Co-Tenants; (ii) the Required Co-Tenants are operating in at least the Required Leasable Floor Area for each Required Co-Tenant specified in Section 1.7.1 under bona fide leases of a minimum of three (3) years' duration; and (iii) retail tenants (as defined in Section 1.7.1) of the Shopping Center, including the Required Co-Tenants, are open and operating under bona fide leases of a minimum of three (3) years' duration in at least the percentage of the Leasable Floor Area of the Shopping Center indicated in Section 1.7.2 (which percentage shall be calculated as set forth in Section 1.7.2). For purposes of calculating the percentages in this paragraph, the denominator of the fraction may not be less than the LFA Minimum described in Section 1.3.2(d). Notwithstanding any provision hereof to the contrary, if a Reduced Occupancy Period is due solely to a violation of the

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/632873.6

- 28 -

02/06/15
FINAL

operating hours set forth in clause (i) above (as opposed to a store closure), Tenant shall not be entitled to pay Substitute Rent instead of Minimum Rent until such violation has continued for a period of two (2) months.

(b)   Commencement Date Reduced Occupancy Period.   If a Reduced Occupancy Period exists on the Commencement Date ("Commencement Date Reduced Occupancy Period"), Tenant shall not be required to open the Store for business (notwithstanding any contrary provision in this Lease) and, if Tenant does not open the Store for business, no Rent shall be due or payable whatsoever until and unless the Commencement Date Reduced Occupancy Period is cured. However, if Tenant elects to open for business, Tenant's total obligation for Rent shall be replaced with Substitute Rent, which shall be payable within fifteen (15) days after the close of each calendar month during the Commencement Date Reduced Occupancy Period and continuing until the expiration of the Commencement Date Reduced Occupancy Period (or earlier if Tenant elects to terminate this Lease as herein provided). If the Commencement Date Reduced Occupancy Period continues for a period of eighteen (18) consecutive calendar months, Tenant shall have the ongoing right to terminate this Lease upon thirty (30) days' notice to Landlord (the "Reduced Occupancy Termination Notice"), provided the Reduced Occupancy Termination Notice is given prior to the expiration of the Commencement Date Reduced Occupancy Period. If a Commencement Date Reduced Occupancy Period continues for a period of twenty-four (24) consecutive calendar months, Tenant shall, at its option, by written notice to Landlord given within ninety (90) days after the expiration of such twenty-four (24) month period ("Commencement Date ROP Election Notice"), elect either to (i) terminate this Lease effective ninety (90) days after the date of the Commencement Date ROP Election Notice; or (ii) waive such termination right and commence payments of Minimum Rent and Reimbursements in accordance with this Lease. In the event Tenant does not make either election within the ninety (90) day period, Tenant shall be deemed to have elected option (ii).

(c)   Secondary Reduced Occupancy Period.   If a Reduced Occupancy Period occurs at any time after the Commencement Date and after the satisfaction of the Required Co-Tenancy set forth in Section 1.7.1 and Section 1.7.2, and such Reduced Occupancy Period is not the result of an Exempted Discontinuance as hereinafter defined ("Secondary Reduced Occupancy Period"), Tenant's total obligation for Rent shall be replaced by Substitute Rent or, if Tenant is not operating in the Store during the Secondary Reduced Occupancy Period, fifty percent (50%) of Minimum Rent plus one hundred percent (100%) of Reimbursements, which in either case shall be payable within fifteen (15) days after the close of each calendar month during the Secondary Reduced Occupancy Period and continuing until the expiration of the Secondary Reduced Occupancy Period (or earlier if Tenant terminates this Lease as hereinafter provided in this Section 6.1.3(c)). If the Secondary Reduced Occupancy Period continues for a period of eighteen (18) consecutive calendar months (except in the event of an Exempted Discontinuance), Tenant shall have the ongoing right to terminate this Lease upon thirty (30) days' notice to Landlord (the "Secondary ROP Termination Notice"), provided the Secondary ROP Termination Notice is given prior to the expiration of the Secondary Reduced Occupancy Period. If the Secondary Reduced Occupancy Period continues for a period of twenty-four (24) consecutive calendar months (except in the event of an Exempted Discontinuance), Tenant shall, at its option, by written notice to Landlord given within ninety (90) days after the expiration of such twenty-four (24) month period ("Secondary ROP Election Notice"), elect either to (i) terminate this Lease effective ninety (90) days after the date of the Secondary ROP Election Notice; or (ii) waive such termination right as to that Secondary Reduced Occupancy Period

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/632873.6

- 29 -

02/06/15
FINAL

and resume payments of Minimum Rent and Reimbursements in accordance with this Lease. In the event Tenant does not make either election within the ninety (90) day period, Tenant shall be deemed to have elected option (ii). The provisions of this Section 6.1.3(c) shall apply to any subsequent Secondary Reduced Occupancy Period.

(d)    Unamortized Cost of Leasehold Improvements. In the event Tenant terminates this Lease pursuant to Sections 6.1.3(b) or (c) above, Landlord shall pay to Tenant an amount equal to the Unamortized Cost of Tenant's leasehold improvements, which sum shall be due and payable to Tenant within thirty (30) Business Days following the date of the Reduced Occupancy Termination Notice. If the Unamortized Cost of Tenant's leasehold improvements is not timely paid, Tenant may deduct the amount due from any payments due to Landlord, if any hereunder, in addition to and cumulative with any other remedies available to Tenant at law, in equity, or under the terms of this Lease. As provided in Article 2 – Unamortized Cost definition, the Unamortized Cost of Tenant's leasehold improvements is subject to the Unamortized Cost Cap.

(e)    Exempted Discontinuance. An Exempted Discontinuance shall mean the closure of a retail tenant's store because of Casualty, condemnation, repairs or remodeling for a period not to exceed ninety (90) days. Notwithstanding the preceding sentence, an Exempted Discontinuance shall not include repairs or remodeling or construction of leasehold improvements performed by or on behalf of (i) an Anchor Tenant replacing a Required Co-Tenant (if and to the extent permitted by Section 1.7.1) prior to the date said replacement Anchor Tenant initially opens for business in the premises previously occupied by the Required Co-Tenant being replaced, or (ii) any retail tenant replacing another retail tenant for purposes of satisfying the required percentage of the Shopping Center to be occupied by operating retailers as required by Section 1.7.2, prior to the date said replacement retail tenant initially opens for business. A retail tenant's store which is closed due to an Exempted Discontinuance shall not be considered closed for purposes of determining whether a Secondary Reduced Occupancy Period is in effect (and the Leasable Floor Area of such retail tenant's store shall not be calculated in the numerator or the denominator of the fraction specified in Section 1.7.2) from the commencement of the Exempted Discontinuance until the earlier of: (i) the expiration of such ninety (90) day period; or (ii) the expiration of the Exempted Discontinuance.

(f)    Landlord Reporting Requirements. Within thirty (30) days following the Commencement Date, Landlord shall deliver to Tenant, at Tenant's notice address as set forth in Section 1.2.2(a), (i) Landlord's certification to Tenant certifying either (A) that the Co-Tenancy Requirements applicable as of the Commencement Date are satisfied or (B) that a Reduced Occupancy Period is in effect and specifying the nature of the Reduced Occupancy Period ("Landlord's Co-Tenancy Certification"), and (ii) a Shopping Center tenant roster and occupancy/vacancy report for the Shopping Center which shall include the Leasable Floor Area occupied by each tenant and the percentage of Leasable Floor Area of the Shopping Center occupied by all operating retailers in the Shopping Center ("Co-Tenancy Report"). Tenant may defer the commencement of Rent until Landlord has delivered Landlord's Co-Tenancy Certification and the Co-Tenancy Report as required by the preceding sentence. In addition, within thirty (30) days after request by Tenant (which shall occur no more than two (2) times per calendar year), Landlord shall provide Tenant a Co-Tenancy Report certified as current as of the date of the report plus a Landlord's Co-Tenancy Certification certified as current as of the date of the certificate. In the event Landlord fails to provide the Landlord's Co-Tenancy Certification and/or the Co-Tenancy Report within the time period specified in the preceding sentence, Tenant may defer any payments relating to Rent until such time as the

Landlord's Co-Tenancy Certification and/or Co-Tenancy Report is received by Tenant. If Tenant defers any payments relating to Rent pursuant to this Section 6.1.3(f), Tenant shall pay the amount due within thirty (30) days following Tenant's receipt of the Co-Tenancy Report and the Landlord's Co-Tenancy Certification, subject to the other terms of this Lease, including Section 6.1.3. Tenant shall have the right to audit Landlord's records pertaining to the Co-Tenancy Requirements, including, but not limited to, Landlord's records pertaining to Landlord's Co-Tenancy Certification and the Co-Tenancy Report, in accordance with the provisions of Section 7.4.7. In addition to the foregoing, in the event of a bona fide dispute as to the occurrence, existence or continuation of a Reduced Occupancy Period ("Co-Tenancy Dispute"), Tenant's non-payment of Rent, or Tenant's payment of Substitute Rent, or Tenant's withholding or offsetting of Rent which was overpaid by Tenant during the occurrence of a Reduced Occupancy Period, shall not be deemed a default by Tenant under the terms of this Lease. Upon resolution of the Co-Tenancy Dispute, the obligated party shall pay to the other the remaining sum liquidated as due (if any) with interest thereupon at the Legal Rate.

## 6.2.    Reimbursements.

In addition to the Minimum Rent described in Section 6.1, Tenant shall be responsible to pay Tenant's Pro Rata Share of Common Area Charges as described in Section 7.4.1, the Tax Bill as described in Section 8.2.1, and the Special Form Policy premium as described in Section 9.1.4.

## 6.3.    Other Payment Provisions.

**6.3.1.**    Late Payment. Any sum including Rent accruing to Landlord or Tenant under the provisions of this Lease which is not paid within ten (10) Business Days following written notice that such sum is past due ("Payment Notice Period"), shall bear interest at the Legal Rate from the expiration of the Payment Notice Period to the date paid unless the past due sum is disputed pursuant to Section 6.3.3.

**6.3.2.**    Timely Billing of Charges. All charges due from Tenant to Landlord for which Tenant must be billed by Landlord shall be billed within twelve (12) months after the close of the calendar year in which the charge is incurred by Landlord, or Landlord will have waived its right to reimbursement as otherwise provided in this Lease.

**6.3.3.**    Disputed Sums. In the event that at any time during the Term a bona fide dispute arises with respect to the amount due for any Reimbursements or other charges claimed by a party to be due, or with respect to Tenant's payment of Substitute Rent or Tenant's non-payment of Rent pursuant to Tenant's right to pay Substitute Rent or to defer, withhold, deduct or offset Rent in accordance with this Lease, including, but not limited to, pursuant to Section 6.1.3(f), Section 11.2 and Section 20.1.2(b), the party claiming a dispute shall notify the other party in writing of the basis for the dispute. Pending the resolution of the dispute between the parties by litigation or otherwise, any undisputed portion of any Reimbursements or other charges, Substitute Rent, or Rent, as applicable, shall be paid by Tenant or Landlord, as the case may be, and the disputed portion of any Reimbursements or other charges, Substitute Rent, or Rent, as the case may be, may be withheld pending resolution of the dispute. Either party's withholding of the disputed amount, or Tenant's offsetting of an amount previously paid in the event of a bona fide dispute shall not be deemed a default by such party under the terms of this Lease. Upon resolution of any dispute, the obligated

1  party shall pay to the other the remaining sum liquidated as due (if any) with interest thereupon at
2  the Legal Rate.

3  **6.4.    Gross Sales Statement for Purposes of Calculating Substitute Rent.**

4      **6.4.1.**    Gross Sales Statement.  In the event Tenant pays Substitute Rent pursuant to
5  clause (b) of the Substitute Rent definition in Article 2, within fifteen (15) days after the close of
6  each calendar month, Tenant shall submit to Landlord a statement indicating the amount of its
7  Gross Sales for the previous month.  Landlord covenants to keep such information confidential in
8  accordance with Section 26.18 below.

9      **6.4.2.**    Maintenance of Records.  In the event Tenant pays Substitute Rent during any
10  Lease Year, Tenant shall maintain adequate records for a period of one (1) year after the close of
11  each such Lease Year for the purpose of allowing Landlord to verify the reported Gross Sales for
12  such Lease Year.  At any time within said one (1) year period, Landlord or its agents may inspect
13  such records at Tenant's main office specified in Section 1.2.2 hereinabove during Tenant's normal
14  business hours.  In the event an adjustment is required because of an understatement of Gross Sales
15  in excess of five percent (5%), Tenant shall reimburse Landlord for Landlord's reasonable expenses
16  incurred in conducting such inspection or audit, not to exceed Five Thousand Dollars ($5,000).

17      **6.4.3.**    No Representation.  Landlord acknowledges that Tenant has made no
18  representation as to the Gross Sales which may be generated from the Store.

19                            **7.  COMMON AREA MAINTENANCE**

20  **7.1.    Landlord's Obligation to Maintain Common Areas.**

21      **7.1.1.**    Maintain Common Areas.  Landlord shall maintain (and to the extent it has the
22  legal ability to effect same under the REA, to cause to be maintained) all Common Areas in first
23  class condition, repair and cleanliness, including ice and snow removal, and sidewalk steam cleaning
24  and shall keep the Common Areas free of any impediments and open for easy and safe movement
25  within the Common Areas.  Landlord shall keep the Common Areas well lighted until 11:00 p.m.
26  each night and thereafter shall maintain security lighting in the Common Areas as required by
27  applicable Requirements or, if there are no applicable Requirements, then in accordance with
28  customary shopping center management practices for comparable shopping centers in the vicinity of
29  the Shopping Center, and Landlord shall otherwise keep such Common Areas safe and secure.  Any
30  costs incurred for lighting the Common Areas after 11:00 p.m. other than the security lighting as
31  specified in the preceding sentence (referred to herein as "Additional Lighting") shall be borne solely
32  by Landlord or by those tenants requesting the Additional Lighting (including Tenant, if applicable),
33  and costs incurred in respect to such Additional Lighting shall not be includable as Common Area
34  Charges.  Notwithstanding the foregoing sentence, if full illumination is required in the Common
35  Areas after 11:00 p.m. for general security reasons, rather than at the request of a particular tenant or
36  occupant for reasons related to that tenant's or occupant's particular operations only, then such
37  additional lighting costs may be included in Common Area Charges.  After the Delivery Date, no
38  construction or construction-related activity shall be permitted in the Common Areas, except for
39  emergency repairs diligently pursued, during the period from October 1 of any year to January 2 of
40  the ensuing year, without the prior written consent of Tenant, which consent may include conditions

1    designed to eliminate interference with the operation of the Shopping Center or the effect of such
2    activity upon Tenant's business.

3        **7.1.2.**    <u>Common Area Metering</u>.  The Common Areas shall be served by meters which
4    do not serve any other areas of the Shopping Center.  Landlord shall cause all Utilities for the
5    Common Areas to be separately metered from those of Tenant and/or the Store.  Landlord shall
6    obtain from the local Utility companies and shall provide to Tenant, upon Tenant's request therefor
7    from time to time, written verification (a) that such meters service only the Common Areas, and
8    (b) that no sewer service charges are included in the Common Area water billings.

9    **7.2.    Tenant's Pro Rata Share.**

10       **7.2.1.**    <u>Shopping Center</u>.  Subject to the provisions of Section 7.2.2, Tenant's Pro Rata
11   Share of Common Area Charges is defined as that fraction of Common Area Charges the numerator
12   of which is the Leasable Floor Area in the Store and the denominator of which is the Leasable Floor
13   Area in the Shopping Center (excluding the Wal-Mart Tract, so long as Wal-Mart is separately
14   maintaining that parcel under the REA); provided, however, in no event shall the denominator of
15   such fraction be less than the Minimum Leasable Floor Area set forth in Section 1.3.2(a).

16       **7.2.2.**    <u>Separate Parties</u>.  In the event any parcel within the Shopping Center, other than
17   the Wal-Mart Tract, is separately owned or leased ("Separate Parcel") by the owner or occupant
18   thereof ("Separate Party") and such Separate Party maintains the Common Areas located on its
19   Separate Parcel, then in such event, the Common Area Charges to which Tenant is required to
20   contribute shall exclude the Common Area Charges attributable to the Separate Parcel.  In addition,
21   in calculating Tenant's Pro Rata Share of Common Area Charges to which Tenant contributes under
22   this Lease, Landlord shall exclude the Leasable Floor Area of such Separate Parcel (as well as the
23   Leasable Floor Area of the Wal-Mart Tract) from the total Leasable Floor Area of the Shopping
24   Center.  Notwithstanding the foregoing, in no event shall Tenant's Pro Rata Share of Common Area
25   Charges calculated in the manner set forth above exceed the amount that Tenant would have paid
26   had the Leasable Floor Area of such Separate Parcel not been excluded from the Leasable Floor
27   Area of the Shopping Center.

28   **7.3.    Definition of Common Area Charges.**

29       **7.3.1.**    <u>Included Charges</u>.  The following costs reasonably incurred during the Term for
30   maintenance and repair of the exterior Common Areas shall be included as Common Area Charges:
31   maintaining and repairing the parking area of the Common Areas (including slurry-sealing, restriping
32   parking spaces and filling potholes), sidewalks and loading zones (whether or not such sidewalks and
33   loading zones are Common Areas); Shopping Center security (if Landlord elects to so provide at
34   Landlord's discretion); cleaning, sweeping and other janitorial services; sanitation; maintenance of
35   Common Area refuse receptacles; irrigation and maintenance of existing landscaping; maintenance
36   of directional signs and other markers; electricity to light the Common Areas during the hours
37   required by Section 7.1 (excluding any Additional Lighting as defined in Section 7.1.1); maintenance
38   and repair of and electricity to light pylon and monument signs identifying the Shopping Center on
39   which Tenant's signage appears (but not other pylon or monument signs on which Tenant's signage
40   does not appear) as well as Tenant's signs on such pylon or monument signs; repair and
41   maintenance of lighting fixtures; replacement of lighting elements; any maintenance of other Utility

systems to serve the Common Areas; premiums of Landlord's liability insurance for the Common Areas; trash removal for the Common Areas of the Shopping Center (Landlord shall arrange for separate, segregated dumpsters for Common Area trash, the allocated cost of which shall be includable in Common Area Charges); and the administrative fee described in Section 1.8 which may be included only to the extent assessed against the remainder of Common Area Charges after excluding therefrom liability insurance premiums, Utility costs, security costs, management fees paid to third parties and capital expenditures, if any are expressly authorized by this Section 7.3.1. Taxes as defined in Article 8, and Property Insurance pursuant to Section 9.1 are not included as Common Area Charges, and, accordingly, are not included in the computation of the administrative fee specified in Section 1.8. In addition, Landlord may include in Common Area Charges (a) the cost of repaving the parking lot, provided (i) such repaving does not occur during the Initial Term and not more than once every ten (10) years thereafter, and (ii) the cost of the repaving is amortized over ten (10) years; and (b) replacement of dead landscaping consisting of flowers, plants, trees, bushes and shrubs.

   **7.3.2.**   Excluded Charges.  In no event shall Common Area Charges include any of the following:  (1) costs of original construction (as distinguished from maintenance and repair) of the Shopping Center or any expansion, remodeling or renovation thereof; (2) principal and/or interest payments on any financing for the Shopping Center or any portion thereof or rental under any ground lease or other underlying lease; (3) except as expressly provided in the last sentence of Section 7.3.1 above and any expenditures which are expressively authorized by Section 7.3.1 which are classified as capital expenditures by generally accepted accounting principles, capital expenditures (i.e., expenditures which, in the customary course of maintenance practice for shopping centers similar in type and location to that of the Shopping Center, do not recur annually) including, but not limited to, petromatting or resurfacing of the parking area of the Common Areas; (4) the costs of correcting defects in the design or construction of the Shopping Center, or repair and/or replacement of any materials or equipment required as a result of such defects; (5) any expense resulting from deferred maintenance or the negligence of Landlord, its agents, servants or employees, or any additional expense incurred as a direct result of Landlord's failure to use competitive bidding (to the extent competitive bidding is required under Section 7.4.3) to minimize expenses to the extent possible without detracting from the standards of a first class shopping center; (6) the cost of any repair to remedy damage caused by or resulting from the negligence of any other tenant(s) in the Shopping Center, including their agents, servants or employees; (7) reserves for anticipated future expenses; (8) legal and other fees, leasing commissions, advertising expenses and other costs incurred in connection with development, leasing or operation of the Shopping Center, or in connection with negotiations or disputes with tenants, occupants or prospective tenants or occupants, or legal fees incurred in connection with this Lease; (9) cost of repairs or other work occasioned by fire, Casualty or other insurable risk or the exercise of the right of eminent domain; (10) expenses incurred in the build out, renovation, maintenance, repair, alteration, improvement, decoration, painting or redecoration of any portion of any building in the Shopping Center (except for graffiti removal and associated spot repainting); (11) any items for which Landlord is entitled to be reimbursed or compensated, including, without limitation, contractors' warranty or right of reimbursement from any tenant or occupant of the Shopping Center, including reimbursement for charges incurred solely for such tenant or occupant (i.e., tenant specific charges); (12) any bad debt loss, rent loss or reserves for bad debts or rent loss (including debt consisting of unpaid contributions to Common Area Charges due from another tenant or

1    occupant of the Shopping Center); (13) cleaning, sweeping, and removal of debris within the
2    primary parking area and adjacent walkways and seating area (if any) of any restaurant; (14) expenses
3    in connection with services or other benefits of a type which are not provided Tenant but which are
4    provided only to or for another tenant or occupant of the Shopping Center and costs of Additional
5    Lighting, if applicable; (15) any interest, late charges, or penalties incurred as a result of Landlord's
6    failure to pay any bill as the same shall become due; (16) any and all other costs associated with the
7    operation of the business of Landlord, intending by this exclusion to distinguish the same from the
8    costs of maintenance of the Common Areas (excluded items shall specifically include, but shall not
9    be limited to, formation of the Landlord entity, internal accounting and legal matters, including, but
10   not limited to, preparation of tax returns and financial statements and gathering of data therefor,
11   costs of selling, syndication, financing, mortgaging or hypothecating any of Landlord's interest in the
12   Shopping Center, and costs of any disputes between Landlord and its employees); (17) salaries and
13   bonuses of officers and executives of Landlord and compensation paid to clerks, attendants or other
14   persons in commercial concessions operated by Landlord; (18) advertising and promotional
15   expenditures or customer services or music services such as Muzak or misting services; (19) costs,
16   fines, or fees incurred by Landlord due to violations of any federal, state or local law, statute or
17   ordinance, or any rule, regulation, judgment or decree of any governmental rule or authority;
18   (20) any costs or expenses associated with the investigation, monitoring, removal, cleanup or
19   remediation of any Hazardous Materials (as hereinafter defined) from the Shopping Center, any
20   restoration in connection therewith or compliance with any Environmental Regulations (as
21   hereinafter defined); (21) the cost of compliance with any other Requirements (as hereinafter
22   defined) (including, without limitation, the Americans With Disabilities Act); (22) the cost of any
23   work or services performed for any facility other than the Shopping Center; (23) any costs
24   representing an amount paid to a person, firm, corporation or other entity related to Landlord which
25   is in excess of the amount which would have been paid in the absence of such relationship;
26   (24) management, supervision, administrative and overhead costs (including, but not limited to,
27   office space, equipment, Utilities, and personnel) other than the fee described in Section 1.8; (25) the
28   cost of acquiring sculptures or other art objects and costs of decorative monuments; (26) costs of
29   tools and equipment for operation, repair and maintenance of the Common Area which are not
30   customarily expensed in the year placed in operation pursuant to generally accepted accounting
31   principles; (27) costs incurred in the construction, maintenance, repair or replacement of any
32   buildings in the Shopping Center (whether relating to structural or nonstructural, exterior or interior
33   portions of such buildings), specifically excluding from Common Area Charges any costs incurred
34   for maintenance, repair, Utilities or any other costs with respect to restrooms or restroom facilities,
35   or signs which identify the Shopping Center; (28) any costs to clean up or repair the Common Area
36   as a result of promotional activities or because of construction, maintenance, or reconstruction of
37   buildings in the Shopping Center; (29) premiums for liability insurance of any kind except as
38   specified in Section 7.3.1 above; (30) costs incurred by Landlord as a result of any claim covered by
39   the insurance which Landlord is required to maintain under this Lease, including deductible
40   amounts; (31) any expense associated with "food courts" as that term is described in Article 2 -
41   "Common Areas", such as maintenance, repair, purchase of personal property or any other cost
42   related thereto; (32) Common Area sewer charges, unless such sewer charges are assessed solely as a
43   surcharge on water used for Common Area landscaping; (33) should there be commercial offices
44   within the Shopping Center which occupy, in the aggregate more than five thousand (5,000) square
45   feet of Leasable Floor Area, the charges incurred in respect of such office facilities such as, by way
46   of example, elevator charges, common hallways, electricity, water and janitorial expenses; (34) any

unreimbursed Common Area Charges arising from a reimbursement to Landlord from an occupant of the Shopping Center of less than its mathematical pro rata share thereof calculated based upon Leasable Floor Area occupied by such occupant relative to the Leasable Floor Area of all occupants of the Shopping Center; (35) the cost of promotional and seasonal decorations, including the purchase, leasing, storage, installation and/or removal and clean-up of same; (36) costs of replacing, repairing, or restoring the Shopping Center, or any portion thereof, in the event of a Casualty of any type, regardless of whether insurable or uninsurable, insured or uninsured; (37) rent or other costs for security offices or a police station in the Shopping Center; (38) premiums for earthquake or flood or terrorism insurance of any kind; (39) costs for the construction and maintenance of any pylon or monument signs for the Shopping Center, except for any sign maintenance costs expressly permitted under Section 7.3.1; and (40) any costs or expenses incurred by Landlord in sponsoring events in or upon the Shopping Center or in creating a "brand" or name recognition for the Shopping Center. Additionally, Tenant shall have no obligation to contribute to a marketing fund or merchants' association for the Shopping Center. Notwithstanding anything to the contrary contained in this Article 7, any income received by Landlord from the use of portions of the Common Areas for which Tenant reimburses Landlord for Tenant's Pro Rata Share of Common Area Charges, such as, for example, income (net of related costs) received by Landlord for use of the Common Areas for advertising or for special events, shall be deducted from the Common Area Charges to which Tenant contributes.

**7.4.    Payment of Tenant's Pro Rata Share.**

**7.4.1.**    Payment.  Tenant shall pay Tenant's Pro Rata Share of the Common Area Charges in the manner set forth herein.

**7.4.2.**    Estimated Payments.  Landlord shall, once a year, estimate Common Area Charges for the ensuing calendar year, and Tenant's share thereof, based on the previous year's actual expenditures and Landlord's reasonable projections for the following calendar year, which projections shall be set forth in a detailed budget for Common Area Charges. Landlord shall deliver to Tenant the projections and budget in writing along with the Annual Statement delivered pursuant to Section 7.4.5. If the Shopping Center has not been operated for one (1) year or more as of the Commencement Date of the Term, Common Area Charges shall be based on Landlord's reasonable estimate thereof based on typical charges for similar shopping centers within five (5) miles of the Shopping Center and Landlord shall provide Tenant with a detailed budget for Common Area Charges based upon Landlord's estimates within thirty (30) days following the Delivery Date. Notwithstanding the foregoing, in the event Landlord fails to retain its records of Common Area Charges as required by Section 7.4.7 and records of Common Area Charges for the immediately preceding calendar year are not available to Tenant, then, in addition to all other remedies available to Tenant at law or in equity or under this Lease, including the provisions of Section 7.4.7, Landlord shall not be permitted to increase its estimate of Common Area Charges for the following calendar year and Tenant shall be under no obligation with respect to such calendar year to pay more than the amount payable by Tenant for the last calendar year for which Landlord's records of Common Area Charges were reviewed and approved by Tenant. Beginning with the first (1st) day of the first calendar month of the Term following Tenant's receipt of Landlord's written estimate of its annual obligation in respect of Common Area Charges (but not in any event before thirty (30) days after receipt thereof), Tenant shall include one-twelfth (1/12th) of its annual obligations set forth in such estimate with each payment of Minimum Rent for the ensuing twelve (12) month period. After the

first calendar year, any proposed increase in total Common Area Charges in excess of three percent (3%) over the previous year's expenditures must be justified by itemization of each element of charge, together with (a) a written explanation of the reason (i.e., increased scope of work, deferred work, etc.) for the increase in excess of three percent (3%), and (b) copies of the competitive bids described in Section 7.4.3 below. The requirement for bids shall also apply at any time an element of the Common Area Charge is proposed to increase more than ten percent (10%) in any year, in relation to the cost for such element for the previous twelve (12) month period, whether the resulting proposed Common Area Charges for the subject year will be in excess of three percent (3%) over the amount paid by Tenant for the previous twelve (12) month period. In the event Landlord fails to provide such justification of the proposed increase in Common Area Charges in excess of three percent (3%), Tenant may thereupon defer Tenant's Pro Rata Share of the Common Area Charges in excess of the amount payable by Tenant for the previous twelve (12) months plus three percent (3%) until sixty (60) days following its receipt of the required justification.

**7.4.3.** _Landlord's Contracts._ All Landlord's contracts with third parties for work, service or materials, the cost of which may be included in the Common Area Charges, shall include a detailed description of the work, service, or material to be provided by the contractor. No such contracts shall involve a duplication of the work or service provided by other contractors, their employees or agents or the employees of Landlord. Landlord shall maintain detailed job descriptions for all employees employed by Landlord for the purpose of performing Common Area maintenance activities whose salaries, wages and/or benefits may be included in Common Area Charges. Landlord's employees shall not provide duplicate services to those provided by Landlord's third party contractors. Any individual third party contract in excess of Fifteen Thousand Dollars ($15,000) shall be awarded by competitive bidding from at least two (2) bona fide third party contractors, if the cost related to such work may be included in Common Area Charges.

**7.4.4.** _Intentionally Deleted._

**7.4.5.** _Annual Statement._ Within one hundred twenty (120) days following the close of each calendar year, Landlord shall submit to Tenant a statement ("Annual Statement"), in which Landlord shall set forth in reasonable detail the actual expenditures for Common Area Charges for such calendar year and Tenant's Pro Rata Share of Common Area Charges thereof and Landlord shall also provide Tenant with copies of all invoices and other written evidence of Common Area Charges paid by Landlord ("CAM Evidence"). In addition, within one hundred twenty (120) days following the close of the first calendar year of the Term, Landlord shall provide Tenant with a copy of the Annual Statement for the prior calendar year. The Annual Statement shall be certified by an authorized agent of Landlord to be correct. In the event Landlord fails to provide such Annual Statement or CAM Evidence within the time periods required hereby, Tenant may thereupon defer any payments relating to Common Area Charges until sixty (60) days following its receipt of the last to occur of (a) the Annual Statement, or (b) the CAM Evidence.

**7.4.6.** _Reconciliation of Annual Statement._ If the Annual Statement indicates that Tenant's payments of estimated Common Area Charges exceeded Tenant's total obligation relating to such calendar year ("Overpayment"), Landlord shall accompany said Annual Statement with a refund to Tenant in the amount of such Overpayment ("Overpayment Refund"), and Landlord shall concurrently adjust its accounting records to reflect such refund of Tenant's Overpayment. If the Annual Statement shows that Tenant's payments of estimated Common Area Charges were less

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/632873.6

- 37 -

02/06/15
FINAL

than its total obligation relating to such calendar year, Tenant shall pay the difference to Landlord within sixty (60) days of Tenant's receipt of the Annual Statement. In the event an Overpayment Refund is due Tenant, but Landlord does not deliver the Overpayment Refund to Tenant concurrently with the Annual Statement, as provided above, then Tenant shall have the right to defer any payments relating to Common Area Charges until Tenant receives such Overpayment Refund from Landlord. Tenant shall pay to Landlord any such deferred Common Area Charges within thirty (30) days after Tenant's receipt of the Overpayment Refund. In addition, if Tenant does not receive the Overpayment Refund within thirty (30) days after the date of Tenant's receipt of the Annual Statement indicating an Overpayment by Tenant, then Tenant shall have the right to deduct the amount of the Overpayment Refund due Tenant from the Rent due under this Lease. In such event, Landlord and Tenant shall each adjust their accounting records to reflect the refund of the Overpayment. In addition to the foregoing, if after the Annual Statement is delivered to Tenant, it is subsequently determined that there was an Overpayment by Tenant, Landlord shall deliver the Overpayment Refund to Tenant within thirty (30) days following receipt of Tenant's written notice indicating such Overpayment by Tenant. If Tenant does not receive the Overpayment Refund within the thirty (30) day period set forth in the preceding sentence, Tenant shall have the right to deduct the amount of the Overpayment Refund due Tenant from the Rent due under this Lease. In such event, Landlord and Tenant shall each adjust their accounting records to reflect the refund of the Overpayment. Notwithstanding the foregoing, if at the time Landlord delivers such Annual Statement to Tenant, Tenant is auditing Landlord's records of Common Area Charges, or, if Landlord has not provided the CAM Evidence previously requested by Tenant, any payment which may be determined to be due from Tenant shall be made by Tenant within sixty (60) days following conclusion of such audit, or within sixty (60) days following Tenant's receipt of the CAM Evidence previously requested by Tenant, as applicable.

   7.4.7.    Audit. Tenant shall have the right to audit (the "Audit") all of Landlord's or Landlord's agent's records pertaining to the Reimbursements payable by Tenant pursuant to Sections 7.4.1, 8.2.1 and 9.1.4, including Common Area Charges, Taxes, and the Special Form Policy with a representative of Tenant's choice. Tenant shall also have the right to Audit all of Landlord's or Landlord's agent's records pertaining to the Co-Tenancy Requirements, Landlord's Co-Tenancy Certification, the Co-Tenancy Report and any Reduced Occupancy Period (collectively "Co-Tenancy Records") with a representative of Tenant's choice ("Co-Tenancy Audit"). Tenant may conduct a separate Audit for each category of Reimbursements but no separate Audit may occur more frequently than once in any calendar year. Landlord shall retain its records of Reimbursements for a period of at least three (3) years following the final billing for each calendar year during the Term and Landlord shall retain its Co-Tenancy Records for a period of at least three (3) years following the end of each calendar year during the Term. Landlord covenants and agrees that in the event Landlord assigns this Lease in connection with a transfer of the Shopping Center, Landlord shall deliver to the assignee all of the records of Reimbursements and all Co-Tenancy Records required to be retained by Landlord pursuant to this Lease. In the event Landlord fails to retain its records as required by this Section 7.4.7, Landlord's failure shall constitute a default by Landlord under this Lease and Tenant shall have the following remedies, in addition to all other remedies available to Tenant at law or in equity:

         (a)    Landlord acknowledges and agrees that Tenant's obligation to reimburse Landlord for Tenant's Pro Rata Share of Reimbursements is contingent upon Landlord maintaining

records of Reimbursements as required by this Section 7.4.7 so that Tenant can verify that the Reimbursements billed to Tenant and Tenant's Pro Rata Share thereof are in accordance with the terms of this Lease. Accordingly, if Landlord fails to maintain records of any Reimbursements as required by the terms of this Lease, and Tenant is not able to verify that such Reimbursements and Tenant's Pro Rata Share thereof are billed and calculated in accordance with the terms of this Lease ("Unsubstantiated Reimbursement"), Tenant shall have no obligation to pay to Landlord, Tenant's Pro Rata Share of any such Unsubstantiated Reimbursement. In such event, if Tenant previously made estimated payments with respect to any Unsubstantiated Reimbursement, Landlord shall reimburse Tenant for the amount of such estimated payments within thirty (30) days following receipt of Tenant's written demand therefor, and if Landlord fails to do so, Tenant shall have the right to deduct the amount of such estimated payments made by Tenant with respect to any Unsubstantiated Reimbursement from the Rent due under this Lease until Tenant is fully reimbursed.

(b)     If Landlord fails to maintain Co-Tenancy Records as required by the terms of this Lease, Landlord acknowledges and agrees that it will be deemed that a Reduced Occupancy Period was (or is) in effect for the entire period that the Co-Tenancy Records were not maintained and made available to Tenant, and Tenant will have the remedies set forth in Section 6.1.3 with respect to a Commencement Date Reduced Occupancy Period or a Secondary Reduced Occupancy Period, as applicable, including, but not limited to, Tenant's right to pay no Rent and/or Substitute Rent, as applicable. If Tenant previously paid Rent during any period that a Commencement Date Reduced Occupancy Period or a Secondary Reduced Occupancy Period was in effect (or was deemed to have been in effect) and as a result thereof, Tenant overpaid any Rent, Landlord shall reimburse Tenant for such overpaid Rent within thirty (30) days following receipt of Tenant's written demand therefor, and if Landlord fails to do so, Tenant shall have the right to deduct the amount of such overpaid Rent from the Rent due under this Lease until Tenant is fully reimbursed.

At any time during the three (3) year period following the final billing for each calendar year during the Term, upon at least thirty (30) days' advance notice to Landlord, Tenant may conduct an Audit of any or all Reimbursements. At any time during the three (3) year period following the end of each calendar year during the Term, upon at least thirty (30) days' advance notice to Landlord, Tenant may conduct a Co-Tenancy Audit. The Audit or Co-Tenancy Audit, as applicable, shall commence on a date (the "Audit Date") of which Tenant has notified Landlord not less than thirty (30) days in advance. In the event of cancellation of the Audit by Landlord and failure to provide Tenant with a new Audit Date which is a date within sixty (60) days of the original Audit Date, Tenant shall be relieved of its obligation to make monthly payments of the estimated Common Area Charges and any other Reimbursements which Landlord estimates under the express provisions of this Lease, until the first to occur of twelve (12) months thereafter, or until the Audit is performed and completed; provided, however, relief of such obligation to make monthly payments shall in no event relieve Tenant of its obligation to pay Tenant's Pro Rata Share of the Reimbursements upon such completion of the Audit. In the event of a cancellation of a Co-Tenancy Audit by Landlord and failure to provide Tenant with a new Audit Date which is a date within sixty (60) days of the original Audit Date, Tenant may defer payment of all Rent until the Co-Tenancy Audit is performed and completed. In addition, in the event of cancellation of an Audit or a Co-Tenancy Audit by Landlord, the three (3) year period set forth above shall be extended until the Audit or the Co-Tenancy Audit, as applicable, is performed and completed. Landlord shall reimburse Tenant for the reasonable costs incurred by Tenant, such as, for example, the cost of nonrefundable airfares,

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/632873.6

- 39 -

02/06/15
FINAL

resulting from Landlord's cancellation of the Audit or the Co-Tenancy Audit, as applicable, within ten (10) days following receipt of Tenant's invoice therefor and if Landlord fails to do so, Tenant may deduct the full amount of such costs from any subsequent Rents coming due under this Lease.

Any overbilling discovered in the course of the Audit or any overpayment of Rent discovered in the course of a Co-Tenancy Audit ("Overbilled Amount") shall be refunded to Tenant (together with interest at the Legal Rate) within thirty (30) days following the date that Landlord is provided with a copy of Tenant's Audit or the Co-Tenancy Audit, as applicable (the "Refund Date"). In the event the Overbilled Amount with respect to an Audit of Reimbursements exceeds four percent (4%) of the sum previously billed to Tenant by Landlord, or in the event a Co-Tenancy Audit discloses the occurrence or existence of a Reduced Occupancy Period, then in either event, Landlord shall also reimburse Tenant for all reasonable expenses of the Audit or the Co-Tenancy Audit, as applicable, not to exceed Five Thousand Dollars ($5,000), by the Refund Date. On or before the Refund Date, Landlord shall: (a) refund any Overbilled Amount (together with interest at the Legal Rate) and the Audit or the Co-Tenancy Audit expenses, if applicable; or (b) provide Tenant with (i) the reasons for any disagreement by Landlord with the findings of Tenant's Audit or Tenant's Co-Tenancy Audit, as applicable, (ii) together with any supporting documentation, and (iii) accompanied by cash payment in the amount of any undisputed Overbilled Amount. In the event Landlord fails to respond by either of the foregoing methods, the Audit or the Co-Tenancy Audit, as applicable, shall be deemed conclusive. In such event, Landlord shall refund to Tenant the Overbilled Amount within thirty (30) days following the Refund Date and Landlord and Tenant shall each adjust their accounting records to reflect such refund to Tenant of the Overbilled Amount. In the event the Overbilled Amount relates to an Audit of Reimbursements (and not a Co-Tenancy Audit) and Landlord does not refund Tenant the Overbilled Amount within thirty (30) days following the Refund Date, then Tenant may, in addition to its other remedies, defer any payments relating to Reimbursements until thirty (30) days following Tenant's receipt from Landlord of (a) the Overbilled Amount, and (b) evidence that Landlord has adjusted its accounting records to reflect the refund of the Overbilled Amount. In addition, if Landlord does not refund to Tenant the Overbilled Amount (with respect to either an Audit or a Co-Tenancy Audit) within such thirty (30) day period, then Tenant may, in addition to its other remedies, deduct the Overbilled Amount from the Rent due under this Lease. In such event, Landlord and Tenant shall each adjust their accounting records to reflect the refund of the Overbilled Amount. In the event Landlord disputes Tenant's Audit or the Co-Tenancy Audit, as applicable, and provides the reasons and documentation supporting such claim, the parties shall diligently, within ten (10) Business Days thereafter, attempt to resolve their differences, and, in failing to do so, the matter may be submitted by either party for Arbitration under the provisions of Section 20.2.3 hereof. In the event Landlord fails to pay Tenant the Overbilled Amount (together with interest at the Legal Rate) as well as Audit expenses or Co-Tenancy Audit expenses, if applicable, within thirty (30) days of a final Arbitration award/court order if Landlord disputes the Audit or the Co-Tenancy Audit, as applicable, Tenant shall have the right to deduct all unpaid amounts from the Rent due under this Lease until Tenant is fully paid.

**7.4.8.**    Intentionally Deleted.

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/632873.6

02/06/15
FINAL

## 8.  REAL ESTATE TAXES AND ASSESSMENTS

### 8.1.  Obligation to Pay.

Landlord shall pay all real property taxes and assessments ("Tax" or "Taxes") levied by a government agency against the Shopping Center or smaller Tax parcel which includes the Store (the "Tax Bill") on or before the last day that such Taxes may be paid without penalty, commission, interest or other charge, or such earlier date as will secure the maximum discount, rebate or other reduction of Taxes as may be available.  A "Tax parcel" is a single parcel of land for which the relevant taxing authority renders a separate billing.

### 8.2.  Tenant's Pro Rata Share.

**8.2.1.**    Payment of Tenant's Pro Rata Share.  In addition to the Minimum Rent herein reserved, Tenant shall reimburse Landlord for Tenant's Pro Rata Share (calculated in accordance with Section 8.2.3 hereafter) of the Tax Bill, applicable to each Tax Year or part thereof which falls within the Term.  Tenant's payment shall be made within thirty (30) days after receipt by Tenant of (a) a true and complete copy of Landlord's Tax Bill, and (b) a statement in writing from Landlord setting forth the amount of Tenant's Pro Rata Share of the Tax Bill and the method of calculation thereof.  Tenant's schedule of payments shall be concurrent with Landlord's obligations for payment to the taxing authority; however, Tenant shall have no obligation to pay Tenant's Pro Rata Share of the Tax Bill until Landlord has supplied Tenant the written evidence of payment as specified in clauses (a) and (b) above in this Section 8.2.1.  In the event Landlord fails to pay the Taxes and provide Tenant with evidence of payment, Tenant may deduct from Rent coming due under this Lease an amount equal to the sum of delinquent Taxes for the Building or at Tenant's option, the entire Shopping Center, and at Tenant's option, pay such amount of delinquent Taxes for the Building or at Tenant's option, the entire Shopping Center to the applicable taxing authority; provided, however, that Tenant first gives Landlord written notice and thirty (30) days from the date of the notice to pay the delinquent Taxes.  Should Tenant elect to make the payment of delinquent Taxes, and thereafter Landlord makes such payment to the taxing authority as well, Tenant shall nonetheless be deemed to have fulfilled its payment obligation and the responsibility for obtaining a refund from the taxing authority shall be that of Landlord.

**8.2.2.**    Installments.  In the event of Tax assessments which may be paid in installments by reason of bonding or otherwise, Landlord shall elect to make payment based upon the longest period of installment payments permitted by the appropriate taxing authority.  Tenant shall bear no liability as to installments due following the expiration or earlier termination of this Lease except for prorated amounts due prior to the expiration or earlier termination of this Lease.  Tenant shall not be responsible for any interest, late charge or other penalty resulting from Landlord's late payment or non-payment of Taxes, nor any administrative or other charge which may be claimed by Landlord, unless such late payment or non-payment of Taxes is due to Tenant's failure to pay Tenant's Pro Rata Share of Taxes in a timely manner.

**8.2.3.**    Calculation of Tenant's Pro Rata Share.  Tenant's Pro Rata Share of the Tax Bill is defined as that fraction of Taxes the numerator of which is the Leasable Floor Area in the Store and the denominator of which is the Leasable Floor Area in the Tax parcel of which the Store is a part; provided, however, in no event shall the denominator of said fraction be less than the

Minimum Leasable Floor Area as set forth in Section 1.3.2(b).  Notwithstanding the foregoing, in no event shall Tenant's Pro Rata Share of the Tax Bill calculated in the manner set forth above exceed the amount that Tenant would have paid had the Tax Bill been for the entire Shopping Center and Tenant's Pro Rata Share of such Tax Bill been calculated based upon that fraction of Taxes, the numerator of which is the Leasable Floor Area in the Store and the denominator of which is the Leasable Floor Area of the Shopping Center.  Such computation shall be made separately for each Tax Year and shall be set forth in reasonable detail as a part of Landlord's Annual Statement to Tenant pursuant to Section 7.4.5.  The Tax parcel in which the Store is located shall not contain more Common Areas than is consistent with the overall Common Area square footage to building area ratio of the Shopping Center.

8.2.4.   <u>Partial Year</u>.  Should Tenant be in occupancy during only a portion of the first or final Tax Years, Tenant shall be responsible to pay Landlord only for a ratable portion of its Tax obligation, based on the portion of such Tax Year included in the Term of this Lease.

8.2.5.   <u>Tenant Audit</u>.  Tenant shall have the right to Audit Landlord's or Landlord's agent's records pertaining to Taxes, the Tax Bill and Tenant's Pro Rata Share thereof pursuant to the provisions of Section 7.4.7.

**8.3.   Exclusions.**

There shall be excluded from the Taxes to which Tenant contributes any of the following: (a) any increase in Taxes caused by construction in the Shopping Center commenced subsequent to the Effective Date of this Lease until such time as such newly constructed space constitutes Leasable Floor Area; (b) any second and subsequent increase in Taxes following the Effective Date which is caused by a Change of Ownership Assessment as hereinafter defined (as opposed to routine annual reassessments as performed by the applicable taxing authority); (c) income, excess profits, gross profits, estate, single business, inheritance, succession, transfer, franchise, capital, occupancy, margin, or other tax or assessment upon Landlord or the Rent payable under this Lease; (d) bonds and/or assessments which have been or, subsequent to the date hereof are, levied for the purpose of funding the costs of construction for Landlord's development or redevelopment of, all or any portion of the Shopping Center or capital improvements constructed therein or with respect thereto, or any Off-Site Improvements; (e) any taxes or assessments related to the usage of any Utilities for the Shopping Center (as contrasted with the construction or installation); (f) any special (non-general) assessments which are assessed for the benefit of improvements to the Shopping Center rather than for the general community at large such as, for example, special assessments for schools and fire and police services for the community at large; (g) tax increment financing fees, taxes or assessments; and (h) any Taxes assessed against land in the Shopping Center that has not been fully developed as buildings or Common Areas. A "Change of Ownership Assessment" is any increase in the Tax assessment of the Shopping Center or Tax parcel (as herein defined) resulting from a change in the ownership or title holding of any property within the Tax parcel under the provisions of any real property tax statute for the state in which the property is located, such as, by way of example, California Revenue and Taxation Code section 60 et. seq.

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/632873.6

02/06/15
FINAL

**8.4.    Rebates.**

Any rebates, refunds, or abatements of Taxes received by Landlord subsequent to Tenant's payment of its Pro Rata Share of the Tax Bill, including, but not limited to, tax increment financing rebates or subsidies received by Landlord from the applicable taxing authority, provided Tenant has previously made a contributory payment in respect thereof, shall be refunded to Tenant on a ratable basis within thirty (30) days of receipt by Landlord. Any such rebate, refund or abatement realized by Landlord prior to payment by Tenant shall result in an immediate reduction in Tenant's Pro Rata Share of the Tax Bill then due to Landlord.

**8.5.    Contest.**

If Tenant requests that Landlord contest the validity or amount of Taxes in the Tax Bill and Landlord refuses to make such contest within twenty (20) days of such request, Tenant shall have such rights to contest the validity or amount of Taxes in the Tax Bill in its own name or in the name of Landlord, in either case with Landlord's full cooperation. In conjunction with any such contest, Landlord shall make available to Tenant all information as Tenant may reasonably request related to a Tax contest, including information required by the Assessor for the taxing authority. Recognizing that other tenants in the Shopping Center may have rights to contest the same Tax Bill, Tenant shall reasonably cooperate with any efforts by Landlord to coordinate the Tax contest efforts with such other tenants. Landlord shall provide Tenant with government notices of assessment (or reassessment) within ten (10) Business Days after Landlord's receipt of such notices. If Tenant declines to contest Taxes, and if Landlord chooses to do so, Landlord shall notify Tenant immediately upon Landlord's filing of any contest. The term "contest" as used in this Section 8.5 means contest, appeal, abatement or other proceeding prescribed by applicable law to obtain a tax reduction or tax refund, howsoever denominated. The net benefit of any contest, after the payment of expenses thereof, shall inure to the benefit of Tenant and all other occupants of the parcel(s) included in the Tax Bill in the same proportions as their respective obligations for Taxes to which the contest relates.

**8.6.    Intentionally Deleted.**

## 9.    INSURANCE

**9.1.    Property Insurance.**

**9.1.1.**    Special Form Policy. A policy of fire and Property Insurance in the form of the Insurance Services Offices' ISO Property form 1030 - Causes of Loss Special Form or equivalent ("Special Form Policy"). The term "Property Insurance" means insurance covering damage to tangible real and personal property.

**9.1.2.**    Landlord Insurance. Commencing on the Delivery Date, as defined in Article 2 hereof, and at all times during the Term, Landlord shall maintain a Special Form Policy insuring against damage to the Shopping Center, including Tenant's leasehold improvements and alterations in the Store, but excluding Tenant's trade fixtures, trade equipment and other personal property in the Store. Further, upon completion of construction of the Shopping Center (exclusive of pads and any phase of development to be completed at a later date) the Special Form Policy shall be obtained

1    with an owner's rating for the Shopping Center based upon a completed project as opposed to a
2    property under development.  All Special Form Policy(ies) shall be in the amount of the full
3    replacement cost of the insured improvements, including demolition cost less a deductible of not
4    less than Ten Thousand Dollars ($10,000).  Landlord shall, on the Delivery Date and thereafter
5    upon request of Tenant, provide Tenant with a certificate of such insurance coverage from an
6    insurer authorized to do business within the state in which the Store is located, and which insurer is
7    rated at least A- and X in Best's Insurance Reports, or equivalent.

8          **9.1.3.**    <u>Intentionally Deleted</u>.

9          **9.1.4.**    <u>Tenant's Pro Rata Share</u>.

10               (a)    Tenant shall be responsible to reimburse Landlord for Tenant's Pro Rata
11    Share of the premium for the Special Form Policy described in Section 9.1.1 above, excluding (i) any
12    management or administrative fees, and (ii) earthquake or flood or terrorism insurance, unless such
13    coverage is included in Landlord's Special Form Policy without a rider and without additional cost.
14    Tenant shall pay Tenant's Pro Rata Share within thirty (30) days after Tenant's receipt of the following:
15    (A) written evidence of Landlord's payment of the insurance premium; and (B) a statement, certified by
16    an authorized agent of Landlord, indicating the total cost of the premium applicable to the Shopping
17    Center, accompanied by a copy of the premium billing ("Insurance Bill") and the declaration page
18    from Landlord's policy, together with such further information as Tenant may reasonably require to
19    substantiate the amount of such premium and the manner in which the premium and Tenant's Pro
20    Rata Share thereof have been calculated ("Landlord Special Form Information").  If Landlord covers
21    the Store with a Special Form Policy which includes property other than the Shopping Center,
22    Landlord shall provide a breakdown indicating the premium portion allocable to the Shopping Center.
23    Tenant's Pro Rata Share of the Special Form Policy premium shall be that fraction of the total
24    premium the numerator of which is the Leasable Floor Area of the Store and the denominator of
25    which is the Leasable Floor Area of the Shopping Center for which the Insurance Bill was issued by
26    the insurer.  In no event, however, shall the denominator of the fraction stated in the preceding
27    sentence be less than the Minimum Leasable Floor Area as set forth in Section 1.3.2(c).  In no event
28    shall Tenant's payment to Landlord of Tenant's Pro Rata Share of the Special Form Policy premium
29    exceed that amount which Tenant would have paid had Tenant obtained a Special Form Policy on the
30    Store, in the amount of the full replacement cost of the Store, including demolition cost less a
31    deductible of not less than Ten Thousand Dollars ($10,000), from its own carrier rated at least A- and
32    X in Best's Insurance Reports, or equivalent.  Tenant shall not be responsible for any interest, late
33    charge or other penalty resulting from Landlord's late payment or nonpayment of the Special Form
34    Policy premium.

35               (b)    In the event Landlord fails to provide the Landlord Special Form
36    Information as required in Section 9.1.4(a) above within thirty (30) days of request from Tenant,
37    Tenant may obtain the same or comparable insurance coverage (including naming Landlord as an
38    additional insured) and deduct from Rent coming due under this Lease an amount equal to the amount
39    of Tenant's Pro Rata Share of the Special Form Policy premium, which sum shall be repaid to
40    Landlord (less the cost of any insurance Tenant carried before Landlord provided the evidence of
41    coverage) upon Landlord's delivery to Tenant of the Landlord Special Form Information.  Further, if
42    Tenant receives a notice of cancellation of the Special Form Policy or other evidence indicating that

"North Decatur"               - 44 -               02/06/15
Suburban Plaza                                           FINAL
Decatur, GA
Store No. 1741
6061.1165/632873.6

Landlord has failed to maintain the Special Form Policy on the Store, Tenant shall not be responsible for reimbursement under Section 9.1.4(a).

(c)     Tenant shall have the right to Audit Landlord's or Landlord's agent's records pertaining to the Special Form Policy, the Insurance Bill and Tenant's Pro Rata Share thereof pursuant to the provisions of Section 7.4.7.

**9.2.    Liability Insurance.**

**9.2.1.    Tenant.** Tenant shall, at its sole cost and expense, commencing on the Delivery Date, and at all times during the Term, keep in force a policy or policies of commercial general liability insurance, or an endorsement on a blanket commercial general liability insurance policy or policies, naming Landlord as an additional insured, as their interests may appear, protecting against (except to the extent caused by the negligence or willful act of Landlord or its agents, contractors, employees or representatives and not waived per Section 9.4 hereof) any and all claims and liabilities arising out of injuries to or the death of any persons in the Store, or for property damage in the Store, in the minimum amount of One Million Dollars ($1,000,000) per occurrence so long as Tenant also carries an excess liability policy in an amount of at least Five Million Dollars ($5,000,000), the coverage of which includes the Store. Tenant's policy or policies shall include contractual liability insurance recognizing the liability assumed by Tenant in Section 14.1, and shall be with an insurer which is rated at least A- and X in Best's Insurance Reports, or equivalent.

**9.2.2.    Landlord.** Commencing on the Delivery Date, and at all times during the Term, Landlord shall (as a Common Area Charge payable by Tenant for any period during the Term that follows the Commencement Date) at all times keep (or cause to be kept) in force a policy or policies of commercial general liability insurance for the Common Areas, or an endorsement on a blanket commercial general liability insurance policy or policies, naming Tenant as an additional insured, protecting against (except to the extent caused by the negligence or willful act of Tenant or its agents, contractors, employees or representatives and not waived per Section 9.4 hereof) any and all claims and liabilities arising out of injuries to or the death of any persons in the Common Area or for property damage in the Common Area, in the minimum amount of Five Million Dollars ($5,000,000) per occurrence (provided that a portion of such Five Million Dollar ($5,000,000) coverage may be provided under an excess or umbrella liability policy carried by Landlord) with a deductible not less than Ten Thousand Dollars ($10,000). Said policy or policies shall include contractual liability insurance recognizing the liability assumed by Landlord in Section 14.2, and shall be with an insurer which is rated at least A- and X in Best's Insurance Reports, or equivalent. Tenant's Pro Rata Share of Landlord's commercial general liability insurance for the Common Areas shall not exceed the commercially reasonable cost for such insurance for similar shopping centers in the same geographic area as the Shopping Center.

**9.3.    Evidence of Insurance.**

Landlord and Tenant agree to deliver to the other certificates of insurance evidencing the existence in force of the policies of insurance described in Sections 9.1.1, 9.1.2, 9.2.1 and 9.2.2, together with endorsements showing that the parties have been named as additional insureds. Landlord's and Tenant's insurers shall each use reasonable efforts to provide the party designated on the certificate of insurance as the holder thereof, with at least twenty (20) days' prior written notice

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/632873.6

- 45 -

02/06/15
FINAL

1    of cancellation or of a material change to the insurance policy. Landlord's certificate related to
2    Section 9.2.2 shall provide a breakdown of the premium cost related to the Common Area only as
3    distinguished from the buildings and the remainder of the Shopping Center, or Landlord's
4    good-faith estimate if Landlord's insurer is not able to provide such breakdown on the certificate.

5    **9.4.   Waiver of Subrogation.**

6    On and after the Delivery Date and throughout the Term, Landlord and Tenant hereby
7    waive and release any and all right to maintain a direct action to recover against the other, including
8    the employees, officers, directors and agents of Landlord and Tenant, for damages and any and all
9    loss (including loss of Rent) to any property located within the Store or the Shopping Center, which
10   damage or loss occurs during a period which is covered or could be covered by a Special Form
11   Policy and which arises out of the other party's negligence or otherwise tortious acts or omissions,
12   but only to the extent that the cost of repairing such damage or loss is covered by insurance, or
13   would have been covered by insurance proceeds payable under any policy required to be maintained
14   under this Lease, but not so maintained. Each policy of such insurance shall either, (a) contain a
15   waiver of subrogation by the insurer against Tenant and Landlord, as the case may be, or (b) include
16   the name of Landlord or Tenant, as the case may be, as an additional insured, but not as a party to
17   whom any loss shall be made payable. In the event a party is unable to obtain such a waiver, it shall
18   immediately notify the other of this inability. In the absence of such notification, each party shall be
19   deemed to have obtained such waiver of subrogation. Further, Tenant's agreement to indemnify
20   Landlord, and Landlord's agreement to indemnify Tenant under this Lease, are not intended and
21   shall not relieve any insurance carrier of its obligations under policies required to be carried by
22   Tenant or Landlord pursuant to the provisions of this Lease, to the extent such policies cover, or if
23   carried would have covered the matters subject to the parties' respective indemnification obligations;
24   nor shall they supersede any inconsistent agreement of the parties set forth in any other provision of
25   this Lease. This mutual waiver is in addition to any other waiver or release contained in this Lease.
26   The provisions of this Section 9.4 shall not apply to Landlord's obligation to repair and replace any
27   portion of the Store and Tenant's merchandise damaged by roof leaks as specified in Section 11.2.1.

28   **9.5.   Tenant's Right to Self-Insure.**

29   Notwithstanding anything to the contrary herein contained, provided the Tenant described
30   in Section 1.2.2 (the "Signatory Tenant") maintains a net worth of at least Fifty Million Dollars
31   ($50,000,000), then the Signatory Tenant shall have the option, either alone or in conjunction with
32   any parent, subsidiaries or affiliates of Signatory Tenant, to maintain self-insurance and/or provide
33   or maintain any insurance required by Signatory Tenant under this Lease under blanket and/or
34   broad form insurance policies maintained by Signatory Tenant or by any such parent, subsidiaries or
35   affiliates of Signatory Tenant, provided the same does not thereby decrease the insurance coverage
36   or limits set forth in this Lease. Any self-insurance shall be deemed to contain all of the terms and
37   conditions applicable to such insurance as required in this Lease, including, without limitation, a full
38   waiver of subrogation. If Signatory Tenant elects to so self-insure, then with respect to any claims
39   which may result from incidents occurring during the Lease Term, such self-insurance obligation
40   shall survive the expiration or earlier termination of this Lease to the same extent as the insurance
41   required would survive. For purposes of this Section 9.5, net worth shall mean the book net worth
42   of Signatory Tenant determined from the audited statement of the most recent fiscal year balance

"North Decatur"                - 46 -                02/06/15
Suburban Plaza                                            FINAL
Decatur, GA
Store No. 1741
6061.1165/632873.6

1  sheet immediately preceding the date that Signatory Tenant elects to self-insure, prepared in
2  accordance with generally accepted accounting principles.

3  ## 10. UTILITIES SERVICES

4  Landlord agrees to make available for Tenant's use at the Store all necessary Utilities and
5  other necessary Utility lines and a separate sprinkler riser, as well as refuse collection service and
6  sewerage lines all sufficient to service Tenant's operations, and having no less capacity than specified
7  in the Final Plans (as defined in **Exhibit C**). The Utilities shall be registered by Tenant in Tenant's
8  name. Tenant agrees to pay all use charges for all such Utilities provided to the Store commencing
9  on the Delivery Date and throughout the Term. If Landlord or an affiliated company of Landlord
10  provides some or all of such Utility services, Tenant's obligation to pay for such services shall not
11  exceed the rate that Tenant would have paid had Tenant obtained such Utility service from a Utility
12  provider selected by Tenant. At all times during the Term, Tenant shall have the right to contract
13  with any third party of Tenant's choice to provide some or all of the Utility services for the Store.
14  Landlord shall, at Landlord's sole cost and expense, pay for all Utility hookup, connection or impact
15  fees and permits. Any deposits required to be made in order to establish service to the Store shall be
16  the sole responsibility of Tenant. Landlord shall separate out all Utilities and install separate meters
17  for the Store. In the event that Landlord is prohibited by Requirements to install separate meters
18  for any specific Utility including water, Landlord shall promptly notify Tenant in writing and provide
19  evidence of the Requirement. If Tenant agrees that installation of a separate meter for a specific
20  Utility is prohibited by such Requirement and so notifies Landlord, Landlord shall install a submeter
21  for such Utility and shall cause such submeter to be read on a monthly basis, billing Tenant for its
22  proper share. Each such bill shall be accompanied by such supporting information as Tenant may
23  reasonably request and shall be payable within thirty (30) days after Tenant's receipt of the bill (with
24  Tenant to have the right to check the submeters at any time). However, Landlord shall permit
25  Tenant to read each submeter and be reimbursed for an amount equal to the charges not
26  attributable to Tenant, if Tenant previously paid such charges, which sum shall be paid by Landlord
27  to Tenant within thirty (30) days after Landlord's receipt of Tenant's reading. No administrative or
28  management charge or fee shall be payable by Tenant related to any Utility charges emanating from
29  a meter used in common by Tenant with any other party. Further, in the event of a meter-sharing
30  arrangement, Tenant may require that the charges emanating from any common meter be allocated,
31  by a reputable Utility engineer reasonably approved by Tenant, among the common users thereof in
32  accordance with usage. Neither party shall have the right to charge the other party any
33  administrative, service or other fee in connection with the reading of the submeters. If
34  Requirements prohibit the installation in the Store of a separate water meter or submeter, Landlord
35  shall provide to Tenant the calculation of Tenant's water usage as prepared by or compiled by the
36  Utility agency which provides water service so as to calculate Tenant's share of the sewer service
37  charges without consideration of the use of water by any other tenant in the Shopping Center. In
38  no event shall Tenant's share of any submetered Utility calculated or allocated as provided above,
39  exceed the rate that Tenant would have paid had Tenant obtained such Utility service from a Utility
40  provider selected by Tenant. Tenant shall be entitled to collect, and Landlord shall cooperate with
41  Tenant in collecting, any rebate which is made available by a Utility company for the installation of
42  energy efficient lighting. All Utilities serving the Common Areas shall be separately metered and all
43  Utility lines running through the Store shall exclusively serve the Store.

# 11. MAINTENANCE/REPAIR/ENVIRONMENTAL COMPLIANCE

## 11.1.    Maintenance and Repair by Tenant.

Except for Landlord's interior maintenance obligations under Section 11.2, and subject to the terms of Articles 21 and 22, Tenant shall maintain the interior of the Store, exterior doors including the front doors, and plate glass, in good repair and condition, reasonable wear and tear excepted. Tenant shall, at its expense, perform or cause to be performed all routine maintenance and servicing of the heating, ventilating, and air conditioning system serving the Store (the "HVAC") in accordance with the terms of a customary air conditioning service contract as performed by reputable service companies in the state in which the Shopping Center is located. However, neither Tenant nor Landlord shall be responsible for any repairs to the HVAC beyond routine maintenance and servicing, including, without limitation, any replacements thereof (other than replacements of noncapital components, such as air filters). A "replacement" as that term is used in this Section 11.1 shall mean that the compressor, condenser, motors, the chiller, duct work or heating/cooling coils must be removed and replaced by new equipment, in the reasonable judgment of Tenant's HVAC consultant. Prior to the Commencement Date, Landlord shall assign, in a form satisfactory to Tenant's counsel, all warranties which are available from subcontractors, suppliers, manufacturers, and materialmen for construction of that portion of the Store which is Landlord's responsibility under **Exhibit C,** but which will be Tenant's maintenance responsibility under this Section 11.1.

## 11.2.    Maintenance and Repair by Landlord.

**11.2.1.**    (a)    Landlord's Obligations. Landlord shall, at its sole cost and expense (not passed through to Tenant as a Common Area Charge), be responsible for correcting all defects in Landlord's (or Landlord's contractor's) construction of the Store, provided that Tenant notifies Landlord of any such defects (excluding latent defects) within one (1) year following the Delivery Date. Further, Landlord, at Landlord's sole cost and expense (not passed through to Tenant as a Common Area Charge) shall maintain, repair and replace, in good and sightly condition consistent with first class shopping centers in the county in which the Store is located, the foundation, floor slab [including maintaining moisture vapor emissions at or below five (5) pounds per one thousand (1,000) square feet per twenty-four (24) hours using the calcium chloride method], flooring (including flooring damaged by moisture vapor emissions or subterranean water infiltration but excluding maintenance, repair and replacement required due to Tenant's ordinary wear and tear), roof (including all structural elements and waterproofing membrane), roofing (including the interior ceiling, walls, floors and merchandise damaged from leaking), roof drainage system, including gutters and downspouts, exterior walls, storefronts (including canopy), the Parking Vent, all structural portions of the Store, sprinkler system (including the fire detection monitoring panel and the annual testing and inspection thereof and Landlord shall provide Tenant with copies of all testing and inspection reports), all concealed wiring and plumbing, pipes, conduits (except to the extent installed by Tenant or concealed by virtue of any alterations constructed by Tenant in accordance with Article 12 below), and Landlord shall maintain and repair all such wiring, plumbing, pipes, conduits and Utility systems and lines outside the Store, whether exclusively serving the Store or not, as well as all portions of the Store which are not specifically Tenant's obligation under Section 11.1 above. Subject to the Waiver of Subrogation provisions of Section 9.4, Landlord shall maintain and repair

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/632873.6

- 48 -

02/06/15
FINAL

any damage or defects in any part of the Store caused by the acts or omissions of Landlord, its agents or contractors regardless of which party has the maintenance obligation under this Article 11.

(b)    Notice for Repair.  Tenant may give Landlord notice of the need for those repairs as may be required under the terms of Section 11.2.1(a) above, and Landlord shall proceed forthwith to effect the necessary repairs with reasonable diligence, but in no event later than thirty (30) days after having received Tenant's notice.  If Landlord fails to repair or maintain the Store within the thirty (30) day period, Tenant may, in addition to Tenant's other remedies available at law, in equity or under the terms of this Lease, perform the repairs, maintenance or replacements and, after giving Landlord written demand for reimbursement of the repair costs (including reasonable documentation of such costs) within thirty (30) days and Landlord's failure to so reimburse Tenant, deduct such repair costs from the subsequent Rent payment(s) thereafter coming due.  In the event of an emergency, Tenant may undertake immediate repairs (without the need for advance notice) which are Landlord's responsibility.  If Landlord shall fail to reimburse Tenant for the emergency repair costs incurred by Tenant within thirty (30) days after receipt of Tenant's billing (including reasonable documentation of such costs), Tenant may deduct the costs from the subsequent installments of Rent payment(s) thereafter coming due.

**11.2.2.**    Earth Movement.  Landlord shall perform, at its sole cost and expense, without reimbursement from Tenant, whether directly or through Reimbursements, any maintenance, repairs, alterations or replacements that shall be required by governmental authority, or insurance requirements, or by the ordinary exercise of due care at any time during the Term as a result of movement or threatened movement or settlement affecting the land under (a) the Store, or (b) any buildings within the Shopping Center, or (c) any portion of the Common Areas in the Shopping Center.

**11.2.3.**    First Year Repairs.  Notwithstanding the foregoing provisions of Sections 11.1 and 11.2.1 above, Landlord shall make all repairs, alterations and replacements (other than those required as the result of repairs, alterations, replacements, other improvements or installations by Tenant or any subtenant or concessionaire of Tenant or the agents of any of them) to the Store which may become necessary for any cause except for Tenant's (or its agents', employees' or contractors') negligence or willful acts or omissions on or after the Delivery Date and during the first twelve (12) months of the Term.

**11.2.4.**    Shopping Center Maintenance.  Landlord shall, at no cost or expense to Tenant, maintain and repair (or cause to be maintained and repaired) all buildings within the Shopping Center in good condition, consistent with the standards for first class shopping centers in the county in which the Shopping Center is located, including the painting of exterior walls of the buildings on a periodic basis.

**11.3.    Repairs Required by Governmental Authorities.**

**11.3.1.**    Store.  After completion of Landlord's Construction Obligations, any repairs, alterations or other improvements to the Store required by governmental authority or insurance rating bureau having jurisdiction because of the particular type of retail use of the Store by Tenant or any Tenant's Work to the Store, shall be performed by Tenant at its sole cost and expense.  Any

1  such work, however, which is required to the Shopping Center in general, or to all similar buildings
2  or uses in the area of the Shopping Center, shall be done at the sole cost and expense of Landlord.

3      **11.3.2.**    <u>Shopping Center</u>. Landlord warrants that the construction and the proposed use
4  of the Shopping Center's Common Areas and buildings, including the Store, for retail purposes shall
5  comply with all laws, ordinances, regulations and standards of governmental authorities and
6  insurance rating bureaus having jurisdiction, including, without limitation, Environmental
7  Regulations, as hereinafter defined, and zoning and building codes (all of the foregoing being
8  hereinafter collectively referred to as the "Requirements").

9      **11.3.3.**    <u>Non-Compliance</u>. Landlord agrees that if, at any time on or after the Delivery
10  Date, any governmental authorities or insurance rating bureau having jurisdiction shall determine
11  that the Store or the Shopping Center was constructed, or is being operated, in violation of, any
12  Requirement and shall request compliance, with any Requirement or, absent such a request from the
13  governmental authority, if the Store or the Shopping Center is otherwise not in compliance with or
14  is in violation of any Requirement, and if failure to comply shall in any way adversely affect the use
15  of the Store by Tenant or adversely affect any other rights of Tenant under this Lease or impose any
16  obligation upon Tenant not contained in this Lease or shall increase the obligation of Tenant (such
17  as, by way of example, increased insurance costs), and if such work necessary to bring about
18  compliance with the Requirement is not Tenant's responsibility pursuant to Section 11.3.1, Landlord
19  shall, upon receipt of notice thereof, at Landlord's sole cost and expense, cause such repairs,
20  alterations or other work to be done or action to be taken so as to bring about the compliance, or to
21  effect the Requirement requested. If by reason of such failure of compliance or by reason of such
22  repairs, alterations or other work done by Landlord, Tenant shall be deprived of the use or
23  enjoyment of the whole or any part of the Store or the Common Areas, Rent shall abate and in lieu
24  thereof Tenant shall pay Substitute Rent on a per diem basis until compliance with the Requirement
25  is completed.

26      **11.3.4.**    <u>Zoning</u>. If at any time the applicable zoning shall not permit the retail sale in the
27  Store of the categories of merchandise customarily sold in Tenant's other similarly merchandised full
28  line retail department stores, Tenant may terminate this Lease by giving Landlord one hundred
29  twenty (120) days' prior written notice thereof and this Lease shall terminate at the expiration of
30  such one hundred twenty (120) day period, unless, prior to the expiration of such one hundred
31  twenty (120) day period, Landlord obtains a zoning variance, amendment, or special use permit
32  which permits Tenant to sell such merchandise. If Landlord timely obtains such a zoning variance,
33  amendment or special use permit which permits Tenant to sell such merchandise, then Tenant's
34  Termination Notice shall be void.

35  **11.4.    Hazardous Material.**

36      **11.4.1.**    <u>Definition</u>. As used herein, the term "Hazardous Material" or "Hazardous
37  Materials" shall mean (a) any waste, material or substance (whether in the form of a liquid, a solid, or
38  a gas and whether or not air-borne), which is or is deemed by governmental authority to be a
39  pollutant or a contaminant, or which is or is deemed by governmental authority to be hazardous,
40  toxic, ignitable, reactive, corrosive, dangerous, harmful or injurious, or which presents a risk, to
41  public health or to the environment, or which is or may become regulated by or under the authority
42  of any applicable local, state or federal laws, judgments, ordinances, orders, rules, regulations, codes

1    or other governmental restrictions, guidelines or requirements, any amendments or successor(s)
2    thereto, replacements thereof or publications promulgated pursuant thereto ("Environmental
3    Regulations"); (b) petroleum, including crude oil or any fraction thereof; (c) any asbestos or asbestos
4    containing material ("ACM"); (d) any polychlorinated biphenyl; (e) any radioactive material;
5    (f) radon gas; (g) urea formaldehyde; and (h) mold; provided, however, Hazardous Materials shall
6    not include the foregoing materials to the extent such materials are in compliance with
7    Environmental Regulations and do not require monitoring by applicable governmental authorities.
8    Notwithstanding the preceding sentence, ACM and mold shall constitute Hazardous Materials
9    regardless of the condition and regardless of whether such ACM and/or mold is/are at levels in
10   compliance with Environmental Regulations; provided, however, Landlord's representations,
11   covenants and obligations in this Section 11.4 with respect to mold shall only apply to mold caused
12   by Landlord or Landlord's agents or by any third party or from sources exterior to the Store and not
13   caused by Tenant or Tenant's agents, such as mold arising from water leakage from the exterior of
14   the Store into the Store, as opposed to mold that is naturally occurring in the environment. Tenant
15   shall be responsible to remediate or remove mold caused by Tenant or Tenant's agents or from
16   sources inside the Store (unless caused by Landlord, by Landlord's agents, contractors or employees,
17   or by third parties).

18   **11.4.2.    Landlord's Warranties and Representations.**  Landlord expressly represents and
19   warrants that:

20              (a)    To the best of Landlord's actual knowledge, based on that certain Phase I
21   Environmental Site Assessment report issued March 13, 2012 and prepared by Contour Engineering,
22   LLC, no escape, seepage, leakage, spillage, discharge, emission, release or disposal of Hazardous
23   Material has occurred within the Store or the Shopping Center to date, and the Store and the Shopping
24   Center, as well as the soil, groundwater and soil vapor within or under the Store and the Shopping
25   Center, are free of Hazardous Material as of the Effective Date, and will be free of Hazardous Material
26   as of the Delivery Date and throughout the Lease Term.

27              (b)    Landlord shall not use or knowingly permit any Hazardous Materials to be
28   used in the construction of the Store or in connection with the installation of any Utility system or
29   other facility which serves the Store (whether located in the Store or in other portions of the Shopping
30   Center) including by way of example, but not by limitation, the interior of any partition or demising
31   walls, whether structural or otherwise, columns or beams, and all Utility lines, shafts and ducts, HVAC
32   or other equipment. Such Utility systems and other facilities as hereinabove described, whether located
33   in the Store or other portions of the Building or the Shopping Center, shall be collectively referred to
34   as "Support Systems."

35   **11.4.3.    Landlord's Responsibilities Prior to the Delivery Date to Tenant.**  On or prior to
36   the Delivery Date, Landlord shall have delivered to Tenant the Environmental Report as required by
37   clause (d) of the Article 2 - Delivery Date definition. If, prior to the Delivery Date, Hazardous
38   Materials are found to be present in the Store, the Support Systems or the Shopping Center, then
39   Landlord, at its sole cost and expense, shall cause such Hazardous Materials to be removed from the
40   Store or such other property of Landlord (hereinafter referred to as the "Abatement Work"), and
41   Landlord shall complete such removal prior to the Delivery Date. Upon completion of the
42   Abatement Work, Landlord shall furnish Tenant evidence of removal of the Hazardous Material,
43   including copies of the final inspection report together with a clearance certificate or other

1    document of release or approval from a licensed environmental consultant, and if applicable from
2    other applicable governmental authority such as health department or Environmental Protection
3    Agency (a "Clearance Certificate") certifying that the Store, all Support Systems and other portions
4    of the Shopping Center are free of Hazardous Materials.

5         **11.4.4.**    Landlord's Responsibilities After the Delivery Date.  If Hazardous Materials are
6    found to be present in the Store, Support Systems or the Shopping Center at any time after delivery
7    of possession of the Store to Tenant, then Tenant shall have the right to vacate the Store, at which
8    time all Rent shall abate, unless the presence of such Hazardous Materials was a result of the acts of
9    Tenant or its agents, employees or contractors.  Landlord shall, at its sole cost and expense,
10   complete such Abatement Work as soon as practicable after the discovery of such Hazardous
11   Materials. Upon completion of the Abatement Work, Landlord shall furnish Tenant with a copy of
12   the Clearance Certificate. During such Abatement Work, Tenant's fixturization or construction
13   period, if applicable (as provided for elsewhere in this Lease), shall be tolled until the Abatement
14   Work is complete and a Clearance Certificate is issued.   In the event Landlord is required to
15   undertake Abatement Work, it is understood and agreed that Landlord shall be responsible for the
16   cost of the replacement of all of Tenant's improvements and alterations damaged or destroyed as a
17   result of such Abatement Work.

18        **11.4.5.**    Tenant's Rights.

19              (a)    Tenant's Awareness of Hazardous Materials.   If, at any time, Tenant
20   becomes aware of the presence of Hazardous Materials in the Store, Support Systems and/or the
21   Shopping Center, Tenant may give Landlord written notice to remove and/or abate same and to
22   restore the Store, Support Systems and/or the Shopping Center to a condition which is free of
23   Hazardous Materials, unless the presence of such Hazardous Materials was a result of the acts of
24   Tenant. If within thirty (30) days of receipt of such notice Landlord has not completed the Abatement
25   Work, Tenant may either (i) terminate this Lease upon thirty (30) days' written notice to Landlord, or
26   (ii) undertake all necessary Abatement Work, including the hiring of any contractors and experts
27   Tenant reasonably deems necessary to effect and supervise the Abatement Work.

28              (b)    Claim Against Landlord.  Tenant shall be entitled to claim from Landlord
29   all actual damages (excluding consequential damages and lost profits) arising out of Landlord's breach
30   of any of the provisions of this Section 11.4. Furthermore, if Tenant effects Abatement Work, Tenant
31   shall be entitled to claim from Landlord all costs and expenses associated therewith, including, but not
32   limited to, (i) the Abatement Work, (ii) disposal of Hazardous Materials, (iii) air quality and materials
33   testing, (iv) related consultants' and experts' fees, and (v) fines, fees or costs of any nature whatsoever
34   charged or assessed by any governmental authority or agency regulating and/or supervising such
35   Abatement Work and/or disposal of Hazardous Materials.

36              (c)    Reimbursement of Tenant.  Landlord shall promptly reimburse Tenant for
37   Tenant's costs and expenses incurred pursuant to Section 11.4.5(b) above within thirty (30) days after
38   Landlord's receipt of copies of Tenant's paid invoices or documentation. In addition to any other
39   remedy which Tenant may have under this Lease, at law or in equity, in the event of Landlord's breach
40   of any of the provisions of this Section 11.4, Tenant shall be entitled (i) to claim from Landlord and to
41   deduct from Rent payable to Landlord hereunder all actual damages (excluding consequential damages
42   and lost profits), expenses, costs, fees and fines incurred by it as a result of such breach, and (ii) to

extend the Term hereof by a period equal to the time elapsed from the date of Tenant's initial notice to Landlord to the date that the Abatement Work is completed, and during such period, all Rent and other charges payable hereunder shall abate.

**11.4.6.**     Landlord's Indemnity.  Excepting Hazardous Materials existing solely as a result of the acts of Tenant or Tenant's agents, employees or contractors, Landlord hereby indemnifies Tenant and its successors and assigns, and agrees to hold Tenant and its successors and assigns harmless from and against any and all losses, liabilities, damages (excluding consequential damages and lost profits), injuries, penalties, fines, costs, expenses and claims of any and every kind whatsoever, including, without limitation, reasonable attorneys' and consultants' fees and costs, and the costs of cleanup, remediation, Abatement Work, paid, incurred or suffered by, or asserted against, Tenant and/or its successors and/or assigns as a result of any claim, demand or judicial or administrative action by any person or entity (including governmental or private entities) for, with respect to, or as a direct or indirect result of, the presence on or under, or the escape, seepage, leakage, spillage, discharge, emission, release or disposal on, under or from the Shopping Center or the improvements thereon of any Hazardous Material, or the breach of any Environmental Regulations to which Landlord or any portion of the Shopping Center is subject.  Notwithstanding the foregoing, Landlord shall not be required to indemnify Tenant or Tenant's successors and assigns against claims filed against Tenant arising directly from the actions of third parties unrelated to Landlord (e.g., release of Hazardous Materials by a midnight dumper).  Landlord shall be solely responsible for and shall comply with all laws, rules, ordinances or regulations of any governmental authority having jurisdiction over the Store and the Shopping Center with respect to the presence or removal of Hazardous Materials, unless the presence of such Hazardous Materials is the result of the acts of Tenant or Tenant's agents, employees or contractors.

**11.4.7.**     Tenant's Indemnity.  Tenant hereby indemnifies Landlord and its successors and assigns, and agrees to hold Landlord and its successors and assigns harmless from and against any and all losses, liabilities, damages (excluding consequential damages and lost profits), injuries, penalties, fines, costs, expenses and claims of any and every kind whatsoever, including, without limitation, reasonable attorneys' and consultants' fees and costs, and the costs of cleanup, remediation, Abatement Work, paid, incurred or suffered by, or asserted against, Landlord and/or its successors and/or assigns as a result of any claim, demand or judicial or administrative action by any person or entity (including governmental or private entities) for, with respect to, or as a direct or indirect result of, the presence on or under, or the escape, seepage, leakage, spillage, discharge, emission, release or disposal on, under or from the Store of any Hazardous Material in violation of Environmental Regulations, or the breach of any Environmental Regulations to which Tenant or any portion of the Store is subject which are solely the result of the acts of Tenant or Tenant's agents, employees or contractors.  Tenant shall not cause any Hazardous Materials to be released or discharged on, under or from the Store in violation of Environmental Regulations.

**11.4.8.**     Survival.  The representations, warranties and indemnities contained in this Article 11 shall survive the termination of this Lease.

# 12. ALTERATIONS

## 12.1.   Permitted Alterations.

**12.1.1.**      Tenant may make non-structural alterations or improvements to the interior of the Store (including interior roll down security grills), and signage on the exterior of the Store and its signage on the Shopping Center pylon and monument signs, provided Tenant shall make all such alterations or improvements in a good and workmanlike manner, and in conformity with all laws, ordinances and regulations of public authorities having jurisdiction.  Tenant shall not make any alterations to the exterior, foundation, roof, or any structural portions of the Store without first obtaining the written approval of Landlord, except as specified in Section 12.2.  Such approval by Landlord may not be unreasonably withheld, conditioned or delayed and shall be deemed granted if Tenant is not notified in writing of a reasonable basis for withholding such approval within thirty (30) days of Tenant's request for approval.  Any disapproval shall be supported by a written statement of reasons and suggested revisions to the proposed work that, if incorporated by Tenant, shall constitute the plans as approved without further review by Landlord.  Subject to Section 12.1.2 following, all alterations and improvements made to the Store by Landlord or Tenant (other than Store furniture, trade fixtures, equipment and personal property installed by Tenant), shall, at the end of the Term, become Landlord's property, and, at the end of the Term, shall remain in the Store without compensation to Tenant, unless otherwise stated in this Lease to the contrary.

**12.1.2.**      It is further agreed that upon termination of this Lease, Tenant shall remove its furniture, fixtures, equipment and personal property, and Landlord will accept the Store, with all alterations made by Tenant, without any obligation upon Tenant to restore the Store to its former condition.

## 12.2.   Communication Equipment.

**12.2.1.**      At any time subsequent to the Delivery Date (or such earlier date that Tenant occupies the Store pursuant to Section 5.4(c)), Tenant shall have the right to place upon the Store one or more so-called "satellite dish(es)" or other similar device(s) and/or one or more mounted cameras and to replace, remove, and repair any such device(s), such as antenna, for the purpose of receiving and sending radio, television, computer, telephone, or other communication signals (collectively, the "Communication Equipment").  Any such installation shall be in accordance with plans and specifications previously approved by Landlord.  Such equipment shall be installed in a location or locations substantially shielded from visibility from the principal frontages of the Shopping Center.  Tenant shall be responsible for any damage to the Store caused by installing, removing, replacing, or repairing any such device(s).  Tenant shall install, replace, remove and repair all Communication Equipment in such a manner that will not void any warranties applicable to the roof and/or exterior walls of the Store, including, if necessary, using Landlord's roofing contractor to perform or supervise such work.  Tenant shall obtain all necessary permits and approvals for the installation and operation of the Communication Equipment.

**12.2.2.**      In the event Landlord desires to perform roof repairs and/or roof replacements to the Store and/or the Building or its rooftop equipment in which the Store is located (the "Roof Repairs"), Landlord shall give Tenant at least twenty (20) days' prior written notice of the date Landlord intends to commence such Roof Repairs.  Tenant shall, within twenty (20) days following

1  receipt of such notice, undertake such measures as it deems suitable to protect its Communication
2  Equipment from interference by Landlord, its agents, contractors or employees, in the course of any
3  Roof Repairs. Nothing herein shall relieve Landlord of its obligation not to cause any interference
4  with, or damage to, the Communication Equipment, and Landlord shall remain fully responsible for
5  any loss, cost, or claim resulting from any damage to any part of the Communication Equipment
6  arising as a result of the Roof Repairs.

## 13. NON-DISTURBANCE AND SUBORDINATION/ ESTOPPEL CERTIFICATES

### 13.1. Non-Disturbance and Subordination.

**13.1.1.** <u>Existing Loans/Master Lease(s)</u>. Landlord covenants to obtain from each lender whose loan is secured by the Store or the Shopping Center, if any, an executed agreement ("Non-Disturbance Agreement"), substantially in the form set forth in **Exhibit F**, subject to reasonable revisions mutually acceptable to Tenant and Landlord's lender. Landlord further covenants to obtain from each lessor whose interest in the Shopping Center is paramount to Landlord's ("Overlessor"), if any, an executed agreement ("Sublease Non-Disturbance Agreement") in the form set forth in **Exhibit F-1**. Any such Non-Disturbance Agreement or Sublease Non-Disturbance Agreement shall be fully executed by Landlord and Landlord's lender, or by Landlord and the Overlessor, as applicable, and shall be delivered to Tenant concurrently with Landlord's execution and delivery of this Lease to Tenant. If Landlord breaches its obligation(s) hereunder, Tenant may terminate this Lease by written notice to Landlord at any time prior to Tenant's receipt of all required Non-Disturbance Agreements, or if Tenant has not terminated this Lease, Rent shall abate pending delivery of said Agreements.

**13.1.2.** <u>Future Loans</u>. Tenant shall, within twenty (20) Business Days after Tenant's receipt of Landlord's request, subordinate this Lease in the future to any first mortgage or deed of trust placed by Landlord upon the Store, the Shopping Center or the Building, with an insurance company, bank or any other lender which customarily provides financing for shopping centers, provided that such lender executes a Non-Disturbance Agreement substantially in the form set forth in **Exhibit F**, subject to reasonable revisions mutually acceptable to Tenant and Landlord's lender.

### 13.2. Estoppel Certificates.

Within twenty (20) Business Days after the last to occur of (a) receipt of request therefor, and (b) receipt of the fee described in Section 13.3 below, either party shall deliver to the other a written statement acknowledging (i) the Commencement Date and termination date of this Lease, (ii) that this Lease is in full force and effect (if true), (iii) that this Lease has not been modified (or if it has, stating the dates of such modifications), and (iv) any such other pertinent information which is customary to supply to such a requesting party for purposes of financing or sale (in the case of Landlord's request) or financing, assignment or sublease, or sale (in the case of Tenant's request). In no event shall Tenant be estopped, as a result of Tenant's execution of such certificate, as between Tenant and Landlord or Landlord's affiliates. In no event shall Landlord be estopped, as a result of Landlord's execution of such certificate, as between Landlord and Tenant or Tenant's affiliates.

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/632873.6

- 55 -

02/06/15
FINAL

1  **13.3.    Processing Fees for Non-Disturbance Agreements and Estoppel Certificates.**

2       At the time of each request for a Non-Disturbance Agreement under Section 13.1.2 or an
3  Estoppel Certificate under Section 13.2, the requesting party shall pay to the other, to defray the
4  expenses of processing, the sum of One Thousand Dollars ($1,000) for each such Non-Disturbance
5  Agreement or Estoppel Certificate, which sum shall be increased from time to time in direct
6  proportion to increases in Minimum Rent over the amount of Minimum Rent as of the
7  Commencement Date.  Notwithstanding anything to the contrary contained in this Section 13.3,
8  each party shall be entitled to one (1) Estoppel Certificate and one (1) Non-Disturbance Agreement
9  every five (5) Full Lease Years of the Term, including Option Periods, free of charge.

10                                    **14. INDEMNIFICATION**

11  **14.1.    Tenant Indemnity.**

12       Tenant agrees to hold Landlord harmless from and indemnify and defend Landlord against
13  any and all injury, loss, damage, liability (or any claims related to the foregoing), costs or expenses
14  (including, without limitation, attorneys' fees, reasonable investigation and discovery costs), of
15  whatever nature, to any person or property caused or claimed to be caused by or resulting from any
16  occurrence (a) within the Store, or (b) within the Common Areas if caused by the negligence or
17  willful act or omission of Tenant or its agents, contractors or employees, on and after the Delivery
18  Date and during the Term, provided nothing contained herein shall require Tenant to indemnify
19  Landlord against matters resulting from the negligence or willful acts or omissions of Landlord or
20  Landlord's employees, agents, or contractors, except to the extent Tenant has waived a claim against
21  Landlord pursuant to Section 9.4 hereof.

22  **14.2.    Landlord Indemnity.**

23       Landlord agrees to hold Tenant harmless from and indemnify and defend Tenant against any
24  and all injury, loss, damage, liability (or any claims related to the foregoing), costs or expenses
25  (including, without limitation, attorneys' fees, reasonable investigation and discovery costs), of
26  whatever nature, to any person or property caused or claimed to be caused by or resulting from any
27  occurrence (a) within the Common Area, or any portion of the Shopping Center (other than the
28  Store), or (b) within the Store if caused by the negligence or willful act or omission of Landlord or
29  its agents, contractors and employees, on and after the Effective Date of this Lease, provided
30  nothing contained herein shall require Landlord to indemnify Tenant against matters resulting from
31  the negligence or willful acts or omissions of Tenant or Tenant's employees, agents or contractors,
32  except to the extent Landlord has waived a claim against Tenant pursuant to Section 9.4 hereof.

33                                         **15. USE**

34  **15.1.    Tenant's Business.**

35       Subject to the Prohibited Uses and Section 15.4 below, Tenant's intended use of the Store
36  shall be as a full line department store including, at its option, the sale of soft goods merchandise,
37  including men's, women's and children's apparel, shoes, accessories, such as jewelry and cosmetics,

1  health and beauty aids and related sundries, domestics and linens, housewares, art, pictures, posters,
2  frames, artificial flora, office supplies, sporting goods, furniture and lamps, window and floor
3  coverings, electronics, prerecorded audio and video merchandise and electronic games software and
4  technological evolutions thereof, books, toys, party goods, pet supplies, luggage, packaged foods,
5  including whole bean and ground coffee and packaged teas and tea leaves, and such other items as
6  are sold in Tenant's similarly merchandised stores.

7  **15.2.  Operation.**

8    (a)    Except as provided in Section 15.2(b), it is expressly acknowledged by Landlord that
9  this Lease contains no express or implied covenant for Tenant to conduct business in the Store,
10  continuously or otherwise, or (when conducting business in the Store) to operate during any
11  particular hours or to conduct its business in any particular manner.  Tenant has the sole right in its
12  unrestricted discretion to decide whether or not to operate in the Store and in what manner to
13  conduct operations, if any, and if the Store has more than one (1) customer door ("Excess Customer
14  Doors"), Tenant may, at its option, close any such Excess Customer Doors and operate with only
15  one (1) customer door so long as such customer door is at the front of the Store.

16    (b)    Provided that a Reduced Occupancy Period is not in effect on the Commencement
17  Date, or on any date thereafter that Tenant is otherwise required to open pursuant to this
18  Section 15.2(b), Tenant shall open for business in the Store for at least one (1) day as a fully fixtured,
19  stocked and staffed typical Tenant store, consistent with other typical Tenant stores, within one
20  hundred twenty (120) days after the Commencement Date, subject to delays caused by events of
21  Force Majeure.  In the event a Reduced Occupancy Period is in effect when Tenant is otherwise
22  required to open for business pursuant to the provisions of this Section 15.2(b), and provided
23  Tenant (i) has elected to not open, and/or (ii) has not terminated this Lease pursuant to
24  Section 6.1.3 if such right has arisen, Tenant shall open for business for one (1) day within sixty (60)
25  days after the next Permitted Delivery Day which occurs after the one hundred twentieth (120th)
26  day following the expiration of the Reduced Occupancy Period.

27  **15.3.  Protection.**

28    Without the prior written consent of Tenant, which consent may be withheld in the absolute
29  and sole discretion of Tenant, during the Term, no tenant or occupant of the Shopping Center
30  (excluding the Wal-Mart Tract so long as the lease therefor between Landlord and Wal-Mart remains
31  in effect), other than Tenant, may use, and Landlord, if it has the capacity to do so, shall not permit
32  any other tenant or occupant of the Shopping Center to use (a) its premises for the Off Price Sale
33  (as hereinafter defined) of merchandise; provided, however, one (1) Off Price Sale retailer shall be
34  permitted to occupy up to a maximum of twenty-five thousand (25,000) square feet of Leasable
35  Floor Area in the Shopping Center, or (b) intentionally deleted, or (c) more than ten thousand
36  (10,000) square feet of Leasable Floor Area of its premises for the sale of apparel (except for
37  discount department stores in excess of eighty-five thousand (85,000) square feet of Leasable Floor
38  Area, and retailers whose apparel merchandise consists of athletic apparel such as golf, running and
39  other sporting apparel, as opposed to general men's, women's and children's apparel such as pants,
40  dresses, blouses and the like).  For purposes of this Section 15.3, "Off Price Sale" shall mean the
41  retail sale of merchandise on an everyday basis at prices reduced from those charged by full price
42  retailers, such as full price department stores; provided, however, this definition shall not prohibit

1    sales events by a retailer at a price discounted from that retailer's everyday price; and provided
2    further, retailers such as Target, Wal-Mart, J.C. Penney, Old Navy, Rack Room Shoes, DSW, Off
3    Broadway, Shoe Carnival, Five Below, Half Price Books, and Kohl's shall not be deemed Off Price
4    Sale retailers. (As of the Effective Date, examples of Off Price Sale retailers include such retailers as
5    T.J. Maxx, Marshalls, A.J. Wright, Fallas Paredes, Nordstrom Rack, Goody's, Factory 2U, Burlington
6    Coat, Steinmart, Filene's Basement, and Beall's Outlet.)  If any of the foregoing provisions is
7    violated ("Protection Violation"), commencing on the first day of the Protection Violation and
8    continuing throughout the period of the Protection Violation, Tenant, in addition to all other
9    remedies available at law or in equity, including injunctive relief, shall have the ongoing right,
10   exercisable by written notice to Landlord, either to terminate this Lease or to pay Substitute Rent
11   within fifteen (15) days after the close of each calendar month.  The parties agree that the monetary
12   damages to be suffered by Tenant as a result of a breach by Landlord (or Landlord's tenant(s)) of the
13   provisions of this Section 15.3 are difficult to ascertain and that the payment of Substitute Rent,
14   after negotiation, constitutes the best estimate by the parties of the amount of such damage.  If
15   Tenant elects to terminate this Lease as provided in this Section 15.3, this Lease shall terminate on a
16   date indicated by Tenant in its notice of termination, which in no event shall be sooner than thirty
17   (30) nor later than ninety (90) days after the date of Tenant's notice of termination.  In the event of
18   termination, Landlord shall be obligated to pay Tenant for the Unamortized Cost of Tenant's
19   leasehold improvements in the Store, which costs Tenant agrees to specify in its notice of
20   termination.  If Tenant elects to pay Substitute Rent, (a) such payment of Substitute Rent shall be
21   retroactive to the date any such Protection Violation commenced, and Tenant shall deduct any
22   overpayments of Rent from Rent coming due under this Lease, and (b) at such time as all such
23   Protection Violations cease (the "Cure Date"), Rent shall resume at the rate which would have
24   pertained at the Cure Date had the Protection Violation not occurred.  The provisions of this
25   Section 15.3 shall apply to any subsequent Protection Violation.  Notwithstanding the provisions of
26   this Section 15.3, the use restrictions set forth in this Section 15.3 shall not apply to or restrict any
27   use, business or operation of (i) Wal-Mart, or TJX Companies, Inc. (or its affiliates) or HomeGoods
28   (or its affiliates) (each, an "Excluded Tenant"), or (ii) any successor, assign or subtenant of an
29   Excluded Tenant (each, an "Excluded Transferee").  Landlord covenants and agrees that if Landlord
30   has the right to withhold its consent to a change in use of the premises occupied by any such
31   Excluded Tenant or Excluded Transferee, Landlord shall withhold such consent to a change in use
32   of the premises which violates the provisions set forth in this Section 15.3.

33   **15.4.    Exclusive Uses.**

34       Tenant shall not use the Store for any use which is listed on **Exhibit H** (each, an "Exclusive
35   Use" and, collectively, "Exclusive Uses"), so long as the lease containing the Exclusive Use remains
36   in effect.  Any exclusive granted by Landlord which is not listed on **Exhibit H** (the "Unauthorized
37   Exclusive") shall be null and void as against Tenant and any assignee or sublessee of Tenant.
38   Landlord shall indemnify, defend and hold harmless Tenant and any assignee or sublessee against
39   any and all claims by any other occupant of the Shopping Center that Tenant and/or an assignee or
40   sublessee has violated an Unauthorized Exclusive.

41   **15.5.    Other Exclusives Not Binding on Tenant.**

42       Except for those Exclusive Uses specifically as set forth in **Exhibit H**, neither Tenant nor
43   any Related Entity nor any of its subtenants, licensees, assignees, or other Transferees, or the use of

"North Decatur"                   - 58 -                  02/06/15
Suburban Plaza                                             FINAL
Decatur, GA
Store No. 1741
6061.1165/632873.6

1  the Store shall be subject to any exclusives or restrictions granted to or for the benefit of any other
2  tenants or occupants in the Shopping Center.  Except for those Exclusive Uses specifically set forth
3  in **Exhibit H**, Landlord agrees that it has not entered into a lease or other occupancy agreement
4  with nor shall it lease to or permit occupancy in the Shopping Center by any tenant, subtenant,
5  assignee or other occupant, which has imposed or proposes to impose a restriction on Tenant or
6  Tenant's business.  Landlord shall hold Tenant harmless from any claims or damages suffered or
7  claimed to be suffered by Tenant as a result of any breach or alleged breach of Landlord's
8  representation and warranty set forth in this Section 15.5.

9  **15.6.    Go Dark.**

10  (a)    Except as specified in Section 15.2(b), Tenant is not required to operate its Store or
11  otherwise conduct retail operations within the Store.  However, if Tenant discontinues retail operations
12  in the Store (other than an Exempted Discontinuance of Retail Operations as hereinafter defined) for a
13  period in excess of two hundred seventy (270) consecutive calendar days (the "Go Dark Period"),
14  Landlord may request a statement of the Unamortized Cost of Tenant's leasehold improvements to the
15  Store, which Tenant shall provide within fifteen (15) days of receipt of Landlord's written request.
16  Landlord, within ninety (90) days following the expiration of the Go Dark Period, may elect to
17  terminate this Lease by notifying Tenant thereof (the "Go Dark Termination Notice"), in which event
18  this Lease shall terminate as to all obligations thereafter accruing thirty (30) days after receipt by Tenant
19  of the Go Dark Termination Notice ("Termination Date").  In the event of Lease termination
20  pursuant to this Section 15.6, Landlord shall reimburse Tenant for the Unamortized Cost of Tenant's
21  leasehold improvements within thirty (30) days after Landlord's issuance of the Go Dark Termination
22  Notice.  Landlord may have access to Tenant's relevant books and records for a period of thirty (30)
23  days after receipt of Tenant's statement of Unamortized Cost to verify the amount thereof.  Landlord's
24  obligation for reimbursement shall survive the termination of this Lease.  For purposes of this
25  Section 15.6, Landlord's obligation to reimburse Tenant for the Unamortized Cost shall not be subject
26  to the Unamortized Cost Cap.

27  (b)    The following shall constitute Exempted Discontinuances of Retail Operations: (i) any
28  discontinuance occasioned by an event of Force Majeure (as defined in this Lease); (ii) the temporary
29  cessation of retail operations in connection with an assignment or sublet (provided that the assignee or
30  subtenant commences retail operations within one (1) year after Tenant discontinues such operations);
31  (iii) a temporary discontinuance in connection with remodeling; or (iv) any other temporary
32  discontinuance, provided that such other temporary discontinuance does not exceed sixty (60) days in
33  length.

34  (c)    Notwithstanding the foregoing, Tenant may notify Landlord at any time within fifteen
35  (15) days after receipt of Landlord's Go Dark Termination Notice that (i) Tenant intends to resume
36  retail operations, or (ii) Tenant is in negotiation with another retailer for an assignment of this Lease or
37  a sublease of the Store (the "Go Dark Withdrawal Notice"). If Tenant so notifies Landlord, and if
38  within one hundred twenty (120) days thereafter Tenant either resumes retail operations or enters into
39  such assignment or sublease, then Landlord's Go Dark Termination Notice shall automatically become
40  void and of no force or effect (a "Go Dark Withdrawal Event"). If a Go Dark Withdrawal Event does
41  not timely occur, this Lease shall terminate on the later of (A) the Termination Date, or (B) the one
42  hundred twenty-first (121st) day after Tenant's Go Dark Withdrawal Notice.

1          **16. SURRENDER**

2     **16.1.    Condition of Store.**

3          Upon the expiration or earlier termination of this Lease, Tenant shall surrender possession
4     of the Store to Landlord in broom clean condition, and in good order and repair, reasonable wear
5     and tear and damage by Casualty or condemnation excepted, and with all of Tenant's alterations and
6     leasehold improvements in place.  Tenant shall remove from the Store Tenant's furniture, fixtures,
7     equipment and personal property.  However, Tenant shall have no obligation to remove from the
8     Store or to demolish any alterations or leasehold improvements made to the Store nor to restore the
9     Store to its condition prior to Tenant's use and occupancy thereof.

10    **16.2.    Continuance of Possession.**

11         If Tenant shall remain in possession of the Store or any portion thereof after the expiration
12    of the Term, then in the absence of an agreement in writing between the parties, Tenant shall be
13    deemed a tenant at sufferance until acceptance of Rent by Landlord, at which time, Tenant shall
14    become a tenant from month-to-month under the same terms and conditions as existed immediately
15    prior to the expiration of this Lease, except that, thirty (30) days after expiration of the Term,
16    Minimum Rent shall increase to one hundred twenty percent (120%) of the Minimum Rent in effect
17    immediately preceding the expiration of the Term.

18         **17. LANDLORD'S COVENANTS**

19    **17.1.    Landlord's Warranty.**

20         Landlord warrants to Tenant that (a) Tenant, while operating in the Store for the use stated
21    in Section 15.1 will not be in violation of any exclusives, restrictions or other agreements which
22    Landlord may have with other lessees, lenders, governmental authorities or any other parties, and
23    (b) the use stated in Section 15.1 is not a violation of any restrictions imposed by any governmental
24    body or authority.  Landlord shall hold Tenant harmless from any claims or damages suffered or
25    claimed to be suffered by Tenant as a result of any breach or alleged breach of Landlord's
26    warranties.

27    **17.2.    Landlord's Title.**

28         Landlord has provided Tenant with the Title Report.  Landlord represents and warrants that:
29    (a) Landlord has lawful title to the Shopping Center and full right to make and execute this Lease;
30    (b) at the time of recording of the Memorandum of Lease, the Shopping Center will be free from all
31    other liens, title exceptions and other encumbrances of any kind whatsoever, except those set forth
32    in **Exhibit I** attached hereto and incorporated by this reference ("Permitted Title Exceptions");
33    (c) none of the Permitted Title Exceptions, including, but not limited to, any easements (i) adversely
34    affect Tenant's access to, or use of the Store, or (ii) alter the boundaries or the configuration of the
35    Common Areas, including, but not limited to, the methods of ingress and egress, from that depicted
36    on the Site Plan; and (d) no other party is required to consent to this Lease as a condition to the
37    effectiveness of this Lease or any of the provisions hereof, including, but not limited to, the consent
38    of any lender or ground lessor relating to the Shopping Center.  Tenant will not unreasonably

1  withhold its consent to any future title encumbrance that is necessary for the development of the
2  Shopping Center (such as the granting of Utility easements), provided that Tenant's access to and
3  use of the Store will not be adversely affected, and the boundaries, configuration and use of the
4  Common Areas will not be altered.

5  **17.3.  Remedies.**

6      In the event of any violation of any of the covenants made by Landlord in this Article 17,
7  Tenant may give Landlord notice of the violation.  If Landlord fails to cure the violation within
8  ninety (90) days of such notice, and if such violation has a material and adverse effect upon Tenant's
9  business operations in the Store or Tenant's interest in this Lease, Tenant may exercise its remedies
10 available at law and in equity, including the right to terminate this Lease by written notice to
11 Landlord.

12                        **18. QUIET ENJOYMENT**

13     Landlord represents and warrants that it has full authority to execute and perform this Lease
14 and to grant the subject leasehold estate to Tenant, and that Tenant shall peaceably and quietly have,
15 hold and enjoy the Store with all appurtenances without any manner of hindrance or interference
16 with its quiet enjoyment, possession and use.

17                     **19. ASSIGNMENT/SUBLETTING**

18 **19.1.  General.**

19     **19.1.1.**    Tenant shall have the right to assign this Lease, or sublet the Store or any portion
20 thereof (a "Transfer" and the assignee or sublessee thereof is herein a "Transferee") with the prior
21 written consent of Landlord which consent shall not be unreasonably withheld or delayed.
22 Landlord's failure to respond within thirty (30) days of Tenant's written request for consent to a
23 proposed Transfer shall be deemed Landlord's consent.  If Landlord denies consent to any proposed
24 Transfer, Landlord shall specify in writing the reasons for Landlord's denial of consent.  Tenant shall
25 have the right to operate departments within the Store by means of subleases, licenses or concession
26 agreements without Landlord's consent.  Notwithstanding the foregoing, Tenant agrees that it will
27 not sublet the Store into more than two (2) additional sublease premises.

28     **19.1.2.**    Except as provided in Section 19.2, in the event that Tenant should intend to
29 seek a Transferee for the entire Store, then prior to making the Store available for any such Transfer,
30 Tenant shall first give Landlord written notice of its intention to do so ("Transfer Notice"), which
31 notice shall include (a) a statement of the Unamortized Cost of Tenant's leasehold improvements to
32 the Store, and (b) a proposed Lease termination date which date shall not be sooner than ninety (90)
33 days nor later than four hundred thirty-five (435) days following the date of the Transfer Notice.  If
34 Tenant issues a Transfer Notice to Landlord, Landlord may terminate this Lease, provided, however,
35 it must do so by written notice ("Recapture Notice") given to Tenant within thirty (30) days after the
36 date of the Transfer Notice ("Recapture Election Period").  Landlord's Recapture Notice shall be
37 accompanied by Landlord's payment to Tenant of the Unamortized Costs as set forth in the
38 Transfer Notice.  In the event Landlord gives Tenant a Recapture Notice within the Recapture

Election Period, this Lease shall terminate as to all obligations accruing on and after the date of termination designated by Tenant in the Transfer Notice, unless Tenant rescinds the Transfer Notice by written notice to Landlord given within twenty (20) days following receipt of the Recapture Notice. If Landlord does not give a Recapture Notice within the Recapture Election Period as provided for by this Section 19.1.2, then at any time thereafter Tenant may Transfer the entire Store, subject to the provisions of Section 19.1.1. The provisions of this Section 19.1.2 shall not apply to a transfer to a Related Entity as defined in Section 19.2.

## 19.2.  Related Entity.

An assignment or other transfer of this Lease or any sublease of all or any portion of the Store to a "Related Entity" shall not constitute a Transfer under the terms of this Lease. The term "Related Entity" means: a corporation or other entity with which Tenant may merge or consolidate; or to which Tenant sells at least ten (10) stores in the Southeastern United States; or any parent, affiliate or subsidiary of Tenant; or an affiliate or subsidiary of Tenant's parent.

## 19.3.  Stock.

The sale of stock by Tenant or by any shareholder of Tenant shall not constitute a Transfer under the terms of this Lease.

## 19.4.  Release of Liability.

In the event of a Transfer of this Lease, Tenant shall remain liable.

## 19.5.  Landlord Notice to Assignee.

Landlord, when giving notice to any Transferee of this Lease related to any default hereunder, shall simultaneously give notice thereof to Tenant, who may cure said default at any time during the notice period; and in the event that Tenant shall cure the default, Tenant shall be subrogated to all rights and remedies of Landlord as against the Transferee related to the default and shall have the right at its election to recover possession of the Store from the defaulting Transferee, to cancel and revoke the Transfer, and to be restored by Landlord to its leasehold estate hereunder.

## 19.6.  Restriction on Landlord's Right to Assign.

Landlord shall not assign this Lease prior to the Delivery Date and the date that Landlord performs all of its obligations and duties under this Lease which are conditions precedent to this Lease becoming effective; provided, however, Landlord may assign this Lease at any time to an assignee entity in which all limited liability company members of Landlord hold at least a fifty-one percent (51%) aggregate interest.

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/632873.6

- 62 -

02/06/15
FINAL

# 20. DEFAULTS/DISPUTE RESOLUTION/ATTORNEYS' FEES

## 20.1. Defaults.

### 20.1.1. Tenant's Default.

(a) <u>Breach</u>. The occurrence of either of the following shall constitute a default by Tenant pursuant to this Lease: (i) a failure by Tenant to pay Rent within ten (10) Business Days after Tenant's receipt of written notice from Landlord specifying such failure; or (ii) a failure by Tenant to perform obligations pursuant to this Lease, other than as specified in (i) above, within thirty (30) days after Tenant's receipt of written notice from Landlord specifying such failure; however, such thirty (30) day period may be extended for such period of time as may be reasonably required to perform the obligation provided: (A) such obligation cannot be reasonably performed within thirty (30) days after such notice; (B) Tenant commences efforts to cure the default within thirty (30) days after receipt of Landlord's notice of default; and (C) Tenant diligently pursues completion of the obligation. Tenant's withholding, deducting or offsetting of, or failure to pay Rent pursuant to a bona fide dispute between Landlord and Tenant shall not be deemed a default by Tenant under the provisions of this Lease.

(b) <u>Insolvency</u>. If Tenant makes an assignment for the benefit of creditors, or if any proceedings are commenced under the provisions of the Bankruptcy Act whereby Tenant seeks to be, or would be, discharged of its debts, or the payment of its debts are sought to be delayed, this Lease shall be governed by the provisions of the Federal Bankruptcy Act.

(c) <u>Prohibition Against Landlord Accelerating Rent</u>.

(i) Except as provided in Section 20.1.1(c)(ii) below, and whether or not Landlord terminates this Lease, Tenant shall have no obligation to pay Rent until the date it would otherwise be due in the absence of Tenant's default. Landlord shall have no right to accelerate Rent which would become due except as provided hereafter.

(ii) In the event Landlord terminates this Lease due to a default by Tenant, Landlord may recover from Tenant the balance of the Rent payable by Tenant for the remainder of the Term, minus the fair market rental value of the Store for such period, each discounted to present value using a discount rate of eight percent (8%) per annum.

(d) <u>Personal Property Waiver</u>. Landlord waives such liens, if any, to which it may have a right with respect to the merchandise, furniture, trade fixtures and other personal property of Tenant located on or about the Store, and Landlord shall from time to time execute such documents as Tenant may reasonably request to acknowledge such waiver.

(e) <u>Landlord's Remedy for Improper Offset</u>. Certain provisions of this Lease grant to Tenant the right to offset specified amounts against, or to deduct such amounts from, Rent or other charges payable under this Lease. The exercise by Tenant of any such right or Tenant's withholding of any disputed amount of Rent or other sum shall not constitute a default under this Lease by Tenant unless and until (i) an arbitrator per Section 20.2.3 or a court, if the matter is litigated, shall determine by means of a final award that such right to offset, deduct, or refusal to pay has been exercised improperly by Tenant, and (ii) following the entry of such award, and within thirty (30) days

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/632873.6

02/06/15
FINAL

after receipt by Tenant from Landlord of a bill in the amount determined by such award to have been improperly offset, deducted, or withheld by Tenant, Tenant shall fail to pay such amount to Landlord, together with interest thereon at the Legal Rate retroactive to the date that the offset or deduction was taken by Tenant.

(f)    Inaccurate Default Notices.  If during the Term, Landlord sends Tenant two (2) default notices which are determined to be false or inaccurate, then the following procedures shall apply.  If Landlord sends Tenant a subsequent default notice which Tenant contends is false or inaccurate, Tenant may send written notice to Landlord, objecting to Landlord's default notice and setting forth the basis for Tenant's objection ("Tenant's Objection Notice").  If Landlord does not rescind its default notice by written notice to Tenant within five (5) Business Days following receipt of Tenant's Objection Notice, then, if Landlord's subsequent default notice is determined to be false or inaccurate, then Landlord shall be obligated to pay Tenant a One Thousand Dollar ($1,000) processing fee to defray Tenant's costs incurred in processing and responding to Landlord's default notice, whether or not litigation or an Alternative Dispute Resolution proceeding is commenced in connection with Landlord's default notice.  Landlord shall reimburse Tenant such processing fee within ten (10) days following receipt of Tenant's invoice therefor.  If Landlord fails to reimburse Tenant within such ten (10) day period, Tenant may deduct the processing fee from the Rent due under this Lease.  In such event, Landlord and Tenant shall each adjust their accounting records to reflect the payment of the processing fee to Tenant.  Nothing in this Section 20.1.1(f) shall limit Tenant's right to recover its attorneys' fees and costs under any other provision of this Lease, including, but not limited to, the provisions of Section 20.4.

(g)    Landlord's Remedies for Tenant's Breach of this Lease.  In the event of Tenant's breach of this Lease, Landlord may elect one or more of the following remedies:

(i)    Terminate Tenant's right to possession of the Store, but not this Lease, re-enter the Store and lease all or a portion thereof on behalf of Tenant.  Any amounts obtained by Landlord from re-leasing the Store shall be applied first to the reasonable cost of retaking and re-leasing the Store, including, without limitation, reasonable attorneys' fees, leasing commission and tenant improvement allowance that are the obligation of Landlord ("Landlord Reletting Costs"), then to the past due Rent due from Tenant in such order as Landlord may elect to apply, and the balance, if any, shall be retained by Landlord and applied to future Rent coming due under this Lease.  After Landlord re-takes possession of the Store, Tenant shall remain and continue to be obligated to pay all past due Rent and all future Rent due Landlord under this Lease, when and as such future Rent becomes due, for the remaining Term of this Lease, and Landlord Reletting Costs less any amounts actually collected by Landlord upon re-leasing the Store from time to time.

(ii)    Terminate this Lease and recover from Tenant as damages, in one or more separate actions, any of the following:

(A)    Landlord Reletting Costs.

(B)    An amount equal to all Rent past-due as of the date of termination.

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/632873.6

- 64 -

02/06/15
FINAL

(C)     Unless Landlord elects to recover accelerated Rents pursuant to Section 20.1.1(c)(ii) above, with respect to the same period, Landlord shall be entitled from time to time to bring one or more separate actions to recover from Tenant an amount equal to all Rent that would have otherwise become due under this Lease, but for the termination, through the date of entry of the judgment in any action to recover same less any amounts that Landlord was able to reasonably mitigate by re-leasing the Store, or portion thereof, to others.

(D)     Landlord may elect under Section 20.1.1(c)(ii) to recover as damages accelerated Rent in accordance with Section 20.1.1(c)(ii).

(E)     Landlord may elect such other remedies as are specifically permitted under the terms and provisions of this Lease or available at law or in equity. Landlord shall not be required to elect remedies, and the exercise of any particular remedy shall not exclude Landlord for subsequently or concurrently exercising any other remedy. However, Landlord shall not be entitled to accelerate Rent except as provided in Section 20.1.1(c)(ii) and shall not assert any statutory lien or other lien claim against the personal property of Tenant that is otherwise waived by Landlord under the terms of this Lease.

(iii)     With respect to Landlord's obligation to mitigate damages, Landlord shall only be required to exercise commercially reasonable efforts to re-lease Tenant's Store as Landlord would exert to lease other vacant space in the Shopping Center. Landlord shall not be required to give preference to Tenant's Store over other vacant space in the Shopping Center in re-leasing space in the Shopping Center after Tenant's default.

**20.1.2.**    Landlord's Default.

(a)     Breach. Except for a violation by Landlord of express provisions of this Lease which require specific notice provisions which are shorter or longer than thirty (30) days (which notice provisions shall control over the provisions of this Section 20.1.2(a)), the occurrence of the following shall constitute a default by Landlord pursuant to this Lease: Landlord's failure to perform any of its obligations under this Lease, which default continues for a period of more than thirty (30) days after receipt of written notice from Tenant specifying such default; however, such thirty (30) day period may be extended for such period of time as may be reasonably required to perform the obligation (not to exceed ninety (90) days after Landlord's receipt of such notice) provided: (i) such obligation cannot be reasonably performed within thirty (30) days after such notice; (ii) Landlord commences efforts to cure the default within thirty (30) days after receipt of Tenant's notice of default; and (iii) Landlord diligently pursues completion of the obligation.

(b)     Remedies.

(i)     General. In the event of a material Landlord default, in addition to availing itself of any other remedies available at law and in equity, Tenant may, at its election, upon written notice to Landlord, and upon an additional notice and thirty (30) day cure period, as same may be extended as permitted under Section 20.1.2(a), terminate this Lease, or may incur any expense necessary to perform the obligation of Landlord specified in such notice and deduct such expense from the Rent or other charges coming due.

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/632873.6

- 65 -

02/06/15
FINAL

(ii)    Interruption of Utility Service.    In addition to the remedies described above, in the event Tenant is prevented from using the Store, or any material portion thereof, to conduct its normal retail operations for a period exceeding three (3) consecutive Business Days as a result of the interruption of any Utility service ("Utility Interruption") to the Store which is required to be provided by the terms of this Lease, then the provisions of this Section 20.1.2(b)(ii) shall apply.  Tenant shall promptly deliver to Landlord notice of the interruption (the "Interruption Notice") of such condition.  If the Utility Interruption was caused by Landlord, Landlord shall have five (5) days after receipt of the Interruption Notice to cure the Utility Interruption caused by Landlord.  If Landlord fails to cure the Utility Interruption caused by Landlord within five (5) days after delivery to it of the Interruption Notice, then Rent applicable to the Store shall be abated from the date of the Interruption Notice until the date when such failure is cured.  If the Utility Interruption was not caused by Landlord, Landlord shall have thirty (30) days after receipt of the Interruption Notice to cure the Utility Interruption and if Landlord fails to cure the Utility Interruption within thirty (30) days after the Interruption Notice, regardless of whether Landlord did or did not cause the Utility Interruption, then Rent shall be abated from the date of the Interruption Notice until the date such failure is cured.  If the Utility Interruption shall not be cured within one hundred twenty (120) days after Landlord's receipt of the Interruption Notice, then Tenant, regardless of whether Landlord did or did not cause the Utility Interruption, upon notice to Landlord after expiration of such period, may terminate this Lease, which termination shall be deemed effective upon Tenant's vacation of the Store.  In the event Tenant terminates this Lease because of a Utility Interruption caused by Landlord, Landlord shall pay Tenant the Unamortized Cost of Tenant's leasehold improvements within thirty (30) days of Tenant's Termination Notice.  Notwithstanding the foregoing, if the Utility Interruption is caused by a Casualty, the provisions of Article 21 shall apply.

(c)    Monthly Offset Limit.

(i)    Except as provided in Section 20.1.2(c)(ii) below, whenever a provision in this Lease expressly gives Tenant a right to deduct or offset from Rent, notwithstanding that multiple offset rights may be concurrently triggered, the monthly aggregate deduction(s) or offset(s) shall be limited to fifty percent (50%) of each successive monthly installment of Rent (the "Monthly Offset Limit") payable by Tenant hereunder except:  (A) where authorized by a court of competent jurisdiction; or (B) where authorized by Arbitration; or (C) where Tenant obtains a judgment in any legal proceeding (including Arbitration) in any of which events Tenant shall have the unrestricted right to deduct from the Rent or Rental next coming due.  In addition, if such Monthly Offset Limit is insufficient to reimburse Tenant in full during the remainder of the Term, the Monthly Offset Limit will be ratably increased, taking into account the then remaining number of installments of Rent due and payable by Tenant hereunder during the remainder of the Term such that Tenant is reimbursed in full the amount owing to Tenant by the end of the then applicable Term.

(ii)    The Monthly Offset Limit does not apply to Tenant's right to abate Rent or pay Substitute Rent when authorized by this Lease, or to deduct, offset or withhold Rent pursuant to Sections 11.2.1(b) and 11.4.5(c) of this Lease.

## 20.2.    Alternative Dispute Resolution Process.

20.2.1.    Means of Resolution.  In the event that any controversy or dispute ("Dispute") shall arise under this Lease and in the event that the parties have been unable to resolve such

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/632873.6

- 66 -

02/06/15
FINAL

1   Dispute within thirty (30) days, the Dispute shall be resolved as provided in this Section 20.2. All
2   Disputes, the monetary value of which exceeds Fifty Thousand Dollars ($50,000), or which involve
3   an equitable remedy, shall first require the utilization of Mediation as provided in Section 20.2.2
4   below. All Disputes, the monetary value of which is Fifty Thousand Dollars ($50,000) or less shall
5   be settled by Arbitration as provided in Section 20.2.3 below.

6      **20.2.2.**    <u>Mediation</u>. The parties shall first try in good faith to settle the Dispute by
7   Mediation pursuant to the provisions as set forth below. Either party may initiate Mediation. The
8   party commencing the Mediation shall first give a written notice (a "Mediation Notice") to the other
9   party setting forth the nature of the Dispute. The Mediation shall be administered by the American
10  Arbitration Association under its Commercial Mediation Rules, except to the extent that this
11  Section 20.2.2 is inconsistent therewith, in which event this Section 20.2.2 shall govern and prevail.
12  If the parties cannot agree on the selection of a Mediator within twenty (20) days after receipt of the
13  Mediation Notice, the Mediator shall be selected in accordance with the American Arbitration
14  Association procedure. If the Dispute or any part thereof has not been resolved by Mediation as
15  provided above within sixty (60) days after receipt of the Mediation Notice, or if a party fails to
16  participate in Mediation, then at the election of either party by written notice, the Dispute shall be
17  determined by suit or action in court, unless it is a matter for Arbitration as described in
18  Section 20.2.1 above. The costs of the Mediator and the Mediation service shall be shared equally
19  by the parties; each party shall otherwise bear its own costs incurred in connection with the
20  Mediation, including its own attorneys' fees.

21     **20.2.3.**    <u>Arbitration</u>. Either or both parties may initiate the Arbitration process. The
22  party initiating the Arbitration process shall first give a written notice (an "Arbitration Notice") to
23  the other party setting forth the nature of the Dispute and proposing three (3) neutral Arbitrators
24  associated with the American Arbitration Association ("AAA"). The responding party may then
25  select one (1) of the proposed neutral Arbitrators within five (5) Business Days of receipt of the
26  Arbitration Notice. If the responding party fails to timely select a proposed Arbitrator, the initiating
27  party may submit the matter to AAA or to the court of general jurisdiction to select the Arbitrator.
28  The Arbitration shall be administered by AAA in the state in which the Store is located in
29  accordance with its procedures for streamlined Arbitration, except to the extent that this
30  Section 20.2.3 is inconsistent therewith, in which event this Section 20.2.3 shall govern and prevail.
31  Judgment upon the award rendered by the Arbitrator may be entered in any court of competent
32  jurisdiction. Unless otherwise agreed to by the parties, the matter shall be submitted to one (1)
33  Arbitrator (selected as provided above) and shall be heard in the state in which the Store is located.
34  The parties shall use diligent good faith efforts to conclude the Arbitration within sixty (60) days
35  following delivery of the Arbitration Notice. The Arbitrator shall resolve the controversy in
36  accordance with applicable law and the terms and conditions of this Lease. There shall be no right
37  of appeal from the Arbitration award. The Arbitrator shall allow the parties reasonable
38  opportunities for pre-hearing document exchange but no other discovery shall be permitted.

39     **20.2.4.**    <u>Confidentiality</u>. Except as otherwise required by law, the parties, Mediator
40  and/or Arbitrator agree to keep confidential and not disclose to third parties any information or
41  documents obtained in connection with the Mediation and/or Arbitration process, including the
42  resolution of the Dispute.

20.3.   **Unlawful Detainer.**

Landlord agrees not to initiate (including the service of any notice to pay rent or quit or comparable notice), file, prosecute, or maintain any proceeding for eviction, unlawful detainer, or termination of this Lease against Tenant (and any such proceeding shall be null and void) during the Alternative Dispute Resolution process as set forth in Section 20.2 and/or in the event of a bona fide dispute between the parties with respect to any alleged default by Tenant of any provision of this Lease, including, without limitation, Tenant's non-payment of Rent pursuant to Tenant's right to withhold, deduct or offset Rent in accordance with this Lease.

20.4.   **Attorneys' Fees.**

20.4.1.    Third Party Litigation.  If either party becomes a party to any litigation (including Arbitration) concerning this Lease, the Store or the Shopping Center by reason of any act or omission of the other party or its authorized representatives, and not by its own act or omission or that of its authorized representatives, the other party shall be liable to that party for reasonable attorneys' fees, court costs, investigation expenses, discovery costs and costs of appeal incurred by it in the litigation.

20.4.2.    Actions Between the Parties.  If either party commences an action against the other party arising out of or in connection with this Lease, or in the event of an Arbitration proceeding between the parties relating to this Lease, the prevailing party shall be entitled to have and recover from the losing party reasonable attorneys' fees, costs of suit, investigation costs, discovery costs, and expert witness fees and costs, including costs of appeal.  When this Lease imposes upon a party an obligation to indemnify the other, the indemnification obligation shall include the obligation to pay the indemnitee's reasonable attorneys' fees, costs and disbursements, whether the indemnitee be the plaintiff or defendant.

## 21. CASUALTY

21.1.   **Definitions.**

21.1.1.    Casualty.  An event, or act of God, such as fire, windstorm, flood or earthquake, riot, civil commotion, perils or other matters which are unforeseen and unpredictable, whether insured or uninsured, which causes damage or destruction to the Store or the Shopping Center.

21.1.2.    Casualty Date.  The date of the occurrence of a Casualty.

21.1.3.    Permitted Repair Period.  A period of two hundred seventy (270) days following the Casualty Date.

21.1.4.    Restoration (sometimes referred to herein as "Restore").  Restoration, rebuilding or repairs due to a Casualty under Section 21.2 of this Lease or due to a Taking under Section 22.1 of this Lease.

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/632873.6

- 68 -

02/06/15
FINAL

**21.2.  Insured Casualty.**

If the Store is damaged or destroyed by a Casualty insured against or that Landlord is obligated to insure against under this Lease, to the extent that Restoration cannot reasonably be completed within the Permitted Repair Period, as reasonably determined by Landlord (and Landlord shall deliver notice to Tenant of such determination within thirty (30) days of the Casualty Date), Tenant may, at its election, terminate this Lease as of the Casualty Date by notice to Landlord within forty-five (45) days after the Casualty Date.  If Tenant does not so terminate this Lease, or if Restoration to the Store may be completed within the Permitted Repair Period, then this Lease shall not terminate, and Landlord shall diligently proceed to Restore the Store to substantially the condition as existed immediately prior to the Casualty, and Landlord shall diligently pursue such Restoration to completion.  If the Restoration is not completed within the Permitted Repair Period, Tenant may terminate this Lease by written notice to Landlord at any time prior to the Redelivery Date.  All Rent payable hereunder shall abate from the Casualty Date to the earlier of (a) sixty (60) days following the Redelivery Date (but only if the Redelivery Date falls on a Permitted Delivery Day, and if the Redelivery Date does not fall on a Permitted Delivery Day, the sixtieth (60th) day following the next Permitted Delivery Day); or (b) the date on which Tenant again opens for business in the Store (in either case the "Recommencement Date"); provided that if Tenant continues to do business in the Store during the period of Restoration, Tenant's total obligation for Rent shall be equitably abated in an amount reasonably determined with reference to the nature, extent and duration of the deprivation of Tenant's use of the Store and the interference with Tenant's business ("Equitably Abated").

**21.3.  Uninsured Casualty.**

If the Store is damaged or destroyed by a peril not covered by the standard form of Special Form Policy or not covered by any other insurance maintained by Landlord (hereinafter collectively referred to as an "Uninsured Casualty") and the cost of the Restoration of the Store as reasonably determined by Landlord exceeds by more than Two Hundred Fifty Thousand Dollars ($250,000) ("Threshold Amount") the amount of insurance proceeds available (i.e., net of any applicable deductible) to Landlord, Landlord may elect not to Restore the Store and to terminate this Lease on at least ninety (90) days' prior written notice to Tenant.  If only the Store and no other part of the Building is damaged, Tenant may elect to pay the difference between the cost of Restoration (less available insurance proceeds) and the Threshold Amount (which amount Landlord shall be required to contribute for purposes of Restoration) (the "Difference") by delivering written notice of such election, together with payment of such Difference to a Stakeholder as defined in Section 21.6 hereof, if any, to Landlord within sixty (60) days after delivery of Landlord's notice of election to terminate this Lease.  Upon receipt of such notice and confirmation of payment by Tenant of the Difference to the Stakeholder, if any, the Landlord termination shall be deemed rescinded and Landlord shall pay the Threshold Amount to the Stakeholder and shall proceed with the Restoration of the Store.  If Landlord elects to terminate this Lease under this Section 21.3 and Tenant does not elect to pay the Difference, this Lease shall terminate as of the date set forth in Landlord's notice of election to terminate this Lease.  If this Lease is not terminated under this Section 21.3, all Rent payable hereunder shall abate from the Casualty Date to the Recommencement Date; provided that if Tenant continues to do business in the Store during the period of Restoration, Tenant's total obligation for Rent shall be Equitably Abated.

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/632873.6

- 69 -

02/06/15
FINAL

### 21.4.    End of Term Casualty.

Notwithstanding any provision in this Article 21 to the contrary, Landlord shall not be required to Restore any Casualty to the Store occurring during the final eighteen (18) months of the Term if the cost of such Restoration is greater than One Hundred Fifty Thousand Dollars ($150,000) unless, within thirty (30) days after receipt of Landlord's notice to Tenant that it intends not to effect Restoration, Tenant exercises in writing any next immediately succeeding Option to extend the Term given Tenant hereunder. If Tenant does not elect to exercise the next immediately succeeding Option so as to extend the Term, Tenant shall so notify Landlord within thirty (30) days of Landlord's notice of election not to Restore, and, thereupon, this Lease shall terminate effective as of the Casualty Date.

### 21.5.    Shopping Center Casualty.

In the event that the Store is not damaged or destroyed by a Casualty, but the Inline Building or any of the Common Areas are damaged or destroyed by a Casualty, whether or not insured against (collectively a "Shopping Center Casualty"), Landlord shall promptly remove all rubble and debris resulting from such damage or destruction, and Landlord shall promptly Restore the damaged Inline Building in the Shopping Center as well as the Common Areas as nearly as possible to the condition the same were in immediately prior to such damage or destruction. Notwithstanding anything to the contrary contained herein, and regardless of the extent of damage, Landlord shall promptly remove all rubble and debris so that the Common Areas are usable. Except as otherwise expressly stated in this Section 21.5, the provisions of Sections 21.1 through 21.4 shall apply to a Shopping Center Casualty. If the damage to the Common Areas shall render the whole or any part of the Store unsuitable for Tenant's use, all Rent payable hereunder shall abate from the Casualty Date to the Recommencement Date; provided that if Tenant continues to do business in the Store during the period of Restoration, Tenant's total obligation for Rent shall be to pay Substitute Rent within fifteen (15) days after the close of each calendar month.

### 21.6.    Insurance Proceeds.

Insurance proceeds for damage or destruction to the Store ("Proceeds"), if under One Hundred Thousand Dollars ($100,000), shall be paid directly to Landlord, subject to the terms of any applicable Non-Disturbance Agreement. If in excess of such amount, all of the Proceeds shall be deposited with Lender (as hereinafter defined), provided Lender agrees to apply the Proceeds in the manner described herein. As used in this Section 21.6, the term "Lender" means the holder of indebtedness secured by a first lien upon the Shopping Center, whether the interest creating such lien be denominated as a mortgage, deed of trust, security agreement, vendor's lien or otherwise, but only if Lender is a financial institution, such as a bank, savings and loan, insurance company, or other entity regularly engaged in making loans secured by shopping center real property. If Lender does not so agree, or there is no Lender, then the Proceeds shall be deposited with a bank, trust company, or title insurance company designated by Tenant and approved by Landlord, for the use of the Proceeds as provided in this Section 21.6. The Lender, if it agrees, or such other qualified party so designated to hold and disburse the proceeds is herein referred to as the "Stakeholder." Stakeholder shall disburse the Proceeds to the party performing Restoration upon certification by the architect in charge of Restoration that the amounts requested have been paid in connection with such Restoration or shall be due to contractor, subcontractors, materialmen, architects, suppliers or

other persons who have rendered services or have furnished materials for such Restoration, and upon completion of such Restoration, the remaining balance of any Proceeds shall be paid to Landlord upon demand.

**21.7.   Tenant Restoration.**

If Landlord is obligated to Restore the Store under the terms of this Article 21 but does not commence Restoration as soon as practicable after the Casualty, or does not continue the Restoration of the Store thereafter with reasonable dispatch, Tenant, upon thirty (30) days' prior notice to Landlord, subject to the terms of any applicable Non-Disturbance Agreement, shall have the right to Restore the Store at Landlord's sole cost and expense. If Tenant elects to Restore, subject to the terms of any applicable Non-Disturbance Agreement, Landlord shall promptly pay to Tenant any insurance proceeds relating to the Casualty and shall assign to Tenant all Proceeds held by Stakeholder as provided in Section 21.6 and shall so instruct the Stakeholder in writing. In addition, all Rent shall abate as described in Section 21.2 above; provided that if Tenant continues to do business in the Store during the period of Restoration, Tenant's total obligation for Rent shall be Equitably Abated. Further, Landlord shall reimburse Tenant upon demand for any cost or expense reasonably incurred by Tenant for such Restoration (not including any amount by which the cost and expense of Restoration is increased by any change or changes made by Tenant) in excess of Proceeds received by Tenant plus interest at the Legal Rate. Until Tenant has been fully reimbursed for such costs and expenses, Tenant may deduct the same from any payments of Rent or other charges due hereunder to Landlord. If at the expiration of the Term, Tenant has not been fully reimbursed, Tenant shall have the right to extend the Term for any period of time (but not in excess of twenty-one (21) years) selected by Tenant which is less than or equal to the period which shall enable Tenant to recover such cost and expense plus interest at the Legal Rate from Rent due hereunder. During such extension, Rent shall be imputed as being that in effect in the month immediately preceding such extension. The remedy stated hereinabove shall be cumulative with any other remedy available to Tenant at law or in equity or under the terms of this Lease, including the right to collect the full amount of any such advance from Landlord immediately.

**21.8.   Waiver of Statute.**

The parties waive such rights of Lease termination as are granted to them under the laws of the state wherein the Store is located, it being their agreement that the rights of termination in the event of Casualty, as set forth herein, shall be exclusive.

**21.9.   Laws.**

If applicable governmental laws and regulations prohibit the Restoration of the Store or Common Areas to substantially the condition as existed immediately prior to the Casualty, either party may elect to terminate this Lease effective thirty (30) days after the delivery to the other party of written notice of the election to terminate. Notwithstanding the foregoing, if Landlord elects to terminate this Lease pursuant to this Section 21.9, Tenant may void Landlord's termination by notifying Landlord in writing, within thirty (30) days following receipt of Landlord's Termination Notice, that Tenant will accept Landlord's Restoration of the Store and/or the Common Areas, as applicable, to the extent permitted by applicable governmental laws and regulations, even if such

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/632873.6

- 71 -

02/06/15
FINAL

Restoration of the Store and/or the Common Areas, as applicable, will not be to substantially the condition as existed immediately prior to the Casualty.

## 21.10.  Tolling of Term.

During the period between Landlord's completion of Landlord's Restoration obligations and the Recommencement Date, Tenant and Tenant's employees, agents and contractors shall have the right to enter upon the Store for the purpose of erecting, constructing, or installing such improvements, alterations, fixtures, equipment and furniture as Tenant deems necessary for resuming business in the Store. In the event Rent shall completely abate for any period pursuant to the provisions of this Article 21, the Term shall toll for the period of such abatement, in which event, the monthly installments of Rent following the end of the period of such abatement shall recommence and thereafter continue at the same Rent rate that was in effect at the time of such abatement; the remaining scheduled increases of Minimum Rent shall be postponed for the period of such abatement to reflect such tolling, the expiration date of the then applicable Term (whether the Initial Term or any Option Period) and the commencement and expiration dates of any subsequent Option Periods shall be extended for the period of such abatement, as shall be the deadline dates for notices exercising Option Periods. Any period of tolling shall be added to the calculation of the Initial Term (or any then current Option Period, as the case may be) for purposes of the calculation of the Expiration Date. For example, if the Term of this Lease is tolled under the provisions of this Section 21.10 for a period of four (4) months, and the tolling occurs during the Initial Term, then the definition of Initial Term in Section 1.5.1 shall be:  "From the Commencement Date through the January 31 next following the expiration of one hundred twenty-four (124) months thereafter."

## 21.11.  Effect of Termination.

Upon termination of this Lease pursuant to this Article 21, (a) each of the parties shall be thereby released from all further obligations and duties to the other party as of the Casualty Date, except for items and liabilities which have theretofore accrued and be then unpaid, and (b) Landlord shall promptly refund to Tenant all unearned Rent and other amounts prepaid by Tenant under this Lease.

## 21.12.  Tenant's Right of First Offer.

The provisions of this Article 21 to the contrary notwithstanding, if this Lease is terminated in accordance with this Article 21, and Landlord elects to rebuild the Store or a substantially similar building in the Shopping Center within three (3) years after the Casualty Date, Landlord shall, before marketing space in such building to any person or entity, first offer space in such building to Tenant on terms no less favorable than those for which Landlord will market such space on the open market.

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/632873.6

- 72 -

02/06/15
FINAL

# 22. CONDEMNATION

## 22.1. Taking.

A "Taking" means any governmental act, condemnation proceeding, moratorium, initiative, or referendum whereby Landlord or Tenant is divested of ownership or any of the incidents thereof, or any transfer in lieu thereof, and physical possession is taken by the governmental or condemning authority. In the event Tenant does not terminate this Lease as provided in Section 22.2 following, Landlord shall promptly and diligently Restore the Store, Common Areas, or other space, as the case may be, to as near their condition as existed prior to such Taking as is reasonably possible. During the course of such Restoration, if Tenant is not operating in the Store, all Rent shall abate from the date of the Taking to the Recommencement Date. If Tenant continues to do business in the Store during the period of Restoration, Tenant's total obligation for Rent shall be Equitably Abated. When Restoration is complete, Tenant's total obligation for Minimum Rent shall be adjusted as provided in Section 3.7 in the event the size of the Store is reduced. When Restoration is complete, if the size of the Store is not reduced, but the size of the Common Areas is reduced, Minimum Rent shall thereafter be reduced to an amount calculated by multiplying the Minimum Rent stated in this Lease by a fraction the numerator of which is the fair market rental value of the Store immediately following the Taking and the denominator of which is the fair market rental value of the Store immediately prior to the Taking.

## 22.2. Right to Terminate.

Tenant may terminate this Lease upon written notice to Landlord in the event of any one or more of the following Takings:

22.2.1.    A Taking of any portion of or interest in the Store;

22.2.2.    Any Taking of the Common Areas if the number of parking spaces is reduced below that required by applicable Requirements (and Landlord has not brought the number of parking spaces into compliance with applicable Requirements within thirty (30) days of the date of the Taking by providing additional or alternative parking spaces in a location reasonably acceptable to Tenant), or access to the Store is materially impaired, or access to the Shopping Center is materially impaired;

22.2.3.    Any Taking of any portion of the Shopping Center which materially impairs the operation of Tenant's business; or

22.2.4.    Any Taking of twenty percent (20%) or more of the Leasable Floor Area of the Shopping Center (not including the Store in either the numerator or denominator of such calculation).

22.2.5.    Landlord shall promptly notify Tenant of any Taking. Tenant's termination must be exercised by written notice to Landlord given within sixty (60) days following the date of Tenant's receipt of Landlord's notice of the occurrence of such Taking (as defined in Section 22.1).

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/632873.6

- 73 -

02/06/15
FINAL

**22.3.  Claims.**

Nothing herein contained shall prevent Landlord and Tenant from prosecuting claims in any condemnation proceedings or otherwise for the value of their respective interests, as well as any damages.  Notwithstanding anything to the contrary contained herein, if this Lease is terminated, Landlord shall pay to Tenant from any Landlord award an amount equal to the Unamortized Cost of any leasehold improvements to the Store and Tenant's moving expenses (less any amount recovered by Tenant with respect to same).  If this Lease is not terminated pursuant to a Taking, Landlord shall pay to Tenant the amount of the Unamortized Cost of any leasehold improvements made to the Store by Tenant which shall have been taken or rendered unusable, and not restored (less any amount recovered by Tenant with respect to same).

**22.4.  Waiver.**

The parties waive such rights of Lease termination as may be granted them in the event of condemnation by the laws of the state wherein the Store is located, it being their agreement that the rights of termination set forth in this Lease shall be exclusive.

## 23. MECHANIC'S LIENS

Landlord and Tenant shall prevent any mechanic's, materialman's or other liens against the Store or the Shopping Center in connection with any labor, materials or services furnished or claimed to have been furnished.  If any such lien shall be filed against the Store or the Shopping Center, the party through whom the lien arose will cause the same to be discharged within thirty (30) days of the filing of the lien, provided, however, that either party may contest any such lien, so long as the enforcement thereof is stayed by bonding or otherwise expunging the lien from the official property records in the jurisdiction.

## 24. SIGNS

**24.1.  Governmental Approval and Compliance.**

All exterior signs shall be subject to approval by local governmental authority and shall conform to any applicable requirements of the REA.  Landlord shall cooperate fully with Tenant and assist Tenant in Tenant's efforts to obtain approval for Tenant's signs, as shown on **Exhibit J** ("Tenant's Signs") and made a part hereof, from the local governmental authority.  Landlord's approval for a change to Tenant's signage on the exterior of the Store or Tenant's sign panels on the Shopping Center's pylon or monument signs, as applicable, shall not be required if such change is in connection with a corporate-wide and/or multi-store signage change program by Tenant; however, such change shall be subject to the approval of the local governmental authority and parties under the REA, if required.  Tenant shall have the right to install Tenant's signage within the Store without Landlord's approval.  Landlord approves of all Tenant's Signs shown on **Exhibit J**.  Landlord represents that Tenant's Signs do not violate the requirements of the REA.

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/632873.6

- 74 -

02/06/15
FINAL

24.2. **Building Signs.**

Tenant may erect and maintain Tenant's Signs upon the exterior walls of all sides of the Store, as specified on **Exhibit J**. Tenant's Signs shall be included by Landlord in the sign criteria for the Shopping Center. Tenant's Signs, including Tenant's signage on any sign structure(s) provided by Landlord, shall be fabricated, installed and maintained by Tenant at its sole cost and expense and, at Tenant's election, shall be of no less sign area than the largest sign of any other tenant or occupant in the Shopping Center unless otherwise limited by applicable governmental code. Tenant's Signs for its storefront may be configured with the maximum size permitted under applicable building and/or zoning codes, including any variance obtained by Landlord or Tenant. Subject to Requirements, Tenant's storefront Signs shall not be configured with less than a seventy-two (72) inch "Ross" and a forty-two (42) inch "Dress for Less." Tenant shall have the right, but not the obligation, to install under-canopy signs if permitted by local governmental authority. In the event the sign criteria for the Shopping Center require only a specific type or style of under-canopy sign, then Tenant shall have the right to approve any such under-canopy sign prior to such under-canopy sign's installation. Tenant shall have the right to seek a variance in the event current zoning does not permit Tenant's prototype signage as set forth in **Exhibit J**, and Landlord shall cooperate with Tenant to obtain such variance in order to permit Tenant's prototype signage.

24.3. **Pylon or Monument Signs.**

Landlord shall, at its sole cost and expense, construct, maintain and repair the pylon sign structures specified in the Site Plan and **Exhibit J** upon which Tenant may install and maintain Tenant's sign panels. Landlord shall cooperate fully with Tenant and assist Tenant in obtaining all permits to install Tenant's sign panels on both of Landlord's pylon sign structures in the size and location as specified on **Exhibit J**. If Landlord constructs any additional pylon or monument sign structure, and any other tenant in the Shopping Center (other than the occupant of the Wal-Mart Tract) has more than one (1) panel on more than one (1) pylon or monument sign structure(s), then Tenant shall have the right to install its sign panels on all pylon or monument sign structure(s) at the Shopping Center. In any event, Tenant's permitted signage areas, whether on the Store or on any pylon or monument sign, shall be of no less sign area than the sign area of the largest sign of any tenant in the Shopping Center (excluding the occupant of the Wal-Mart Tract). Landlord shall provide, at Landlord's sole cost and expense, blank panels for Tenant's pylon and monument signage, with panel faces made of the material Landlord requires on all pylon and monument signs at the Shopping Center (e.g., acrylic, aluminum or other material reasonably specified by Landlord for such sign panels). Tenant shall have the right to decorate such blank panels with Tenant's logo and/or trade name in format and color typically used or adopted by Tenant. Tenant shall pay for the expense of fabricating, installing and maintaining its sign panels on the pylon/monument/directional sign structure(s). Utility charges for the pylon sign(s) on which Tenant places its sign panels shall be a Common Area Charge.

24.4. **Temporary Signs.**

Subject to receipt of any required approval by local governmental authority, during the period of construction described in Section 5.1, Tenant shall have the right to construct temporary signage adjacent to and/or on the Store and at the perimeter of the Shopping Center indicating the anticipated opening of the Store for business. Additionally, Tenant may, through the thirtieth (30th)

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/632873.6

- 75 -

02/06/15
FINAL

1  day following the opening of the Store for business, advertise such new business by means of
2  banners, flags and other signage attached to the Store.

3  **24.5.   Visibility of Tenant's Store and Signs.**

4  Landlord covenants and agrees that no landscaping, structures or other improvements shall
5  be installed or permitted in the Shopping Center which materially interfere with or materially
6  obstruct the visibility of the Store or any of Tenant's Signs (a "Material Interference").  Landlord
7  further covenants and agrees that it shall regularly prune landscaping in the Shopping Center so that
8  such landscaping does not result in a Material Interference.  If any landscaping, structures or other
9  improvements result in a Material Interference, Tenant may give Landlord written notice thereof
10 and Landlord shall have thirty (30) days from the date of Tenant's notice to remove or alter the
11 structures or other improvements or to remove or prune the landscaping to eliminate the Material
12 Interference ("Corrective Measures").  If Landlord fails to complete the Corrective Measures prior
13 to the expiration of the thirty (30) day period, then Tenant shall have the right, at its election, to take
14 such Corrective Measures as Tenant deems reasonably necessary to eliminate the interference or
15 obstruction, and Tenant may deduct the cost of such Corrective Measures from Rent due under this
16 Lease.

17                                    **25. NOTICE**

18 Any notice to be given in connection with this Lease shall be in writing and shall reference
19 (a) this Lease, (b) the store number which has been assigned to the Store by Tenant (if known to
20 Landlord), and (c) the location of the Store.  The notice shall be served (i) personally, or (ii) by
21 certified mail, return receipt requested, or (iii) by reputable courier service which provides written
22 evidence of delivery, addressed to Landlord as specified in Section 1.2.1 and addressed to Tenant as
23 specified in Section 1.2.2 (or to such other address as requested by either party in writing), or (iv) by
24 telephone facsimile upon which the date and time of transmission is machine imprinted to the
25 number specified in Section 1.2.1 as to Landlord and as specified in Section 1.2.2 as to Tenant,
26 provided that a copy of the notice is concurrently sent by reputable courier service in accordance
27 with clause (iii) above.  Copies of any notices sent to Tenant (addressed to Tenant as specified in
28 Section 1.2.2) shall also be sent to Bartko, Zankel, Bunzel & Miller, One Embarcadero Center, Suite
29 800, San Francisco, CA 94111, Attention: Ross Notices.  Copies of any notices sent to Landlord
30 shall also be sent to Selig Enterprises, 1100 Spring Street, Suite 550, Atlanta, GA 30339, Attention:
31 Kenneth J. Clayman, Esq.  All notices given in the manner specified herein shall be effective upon
32 actual receipt or upon refusal to accept delivery.

33 Either party, by written notice to the other, may designate two (2) additional parties to
34 receive copies of notices.  Any notice party to this Lease may change its address or location for
35 service of notices, for themselves or any of their respective designees by written notice.

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/632873.6

\- 76 -

02/06/15
FINAL

# 26. GENERAL CONDITIONS

## 26.1. Partial Invalidity.

If any term, covenant, condition, provision or restriction of this Lease is held by a Court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions hereof shall remain in full force and effect and shall in no way be affected, impaired, or invalidated thereby.

## 26.2. Relationship of Parties.

Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third person to create the relationship of principal and agent, or of partnership, or of joint venture, or of any other association between the parties other than Landlord and Tenant, or to prevent Landlord or Tenant from entering into ventures in direct competition with the Shopping Center, or the Store.

## 26.3. Time.

Time is of the essence in the performance of each provision of this Lease.

## 26.4. Waiver.

The waiver of the performance of any term, covenant, condition, provision or restriction of this Lease by Landlord or Tenant shall not be construed as a waiver of any subsequent breach of the same term, covenant, condition, provision or restriction. The various rights, options, elections, powers and remedies of the parties contained in this Lease shall be construed as cumulative and no one of them exclusive of any other or of any legal or equitable remedy which either party might otherwise have in the event of a breach by the other, and the exercise of one right or remedy by a party shall not in any way impair its right to any other right or remedy.

## 26.5. Partial Months.

For purposes of computing dates for expirations, Option Periods, Rent adjustments or cancellations (except for those dates specifically designated herein), any partial month at the commencement of the Term shall be disregarded.

## 26.6. Consent.

Unless a different standard is otherwise specifically stated, wherever in this Lease Landlord or Tenant is required to give its consent or approval to any action on the part of the other, such consent or approval shall not be unreasonably withheld, conditioned or delayed.

## 26.7. Intentionally Deleted.

## 26.8. Governing Law.

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/632873.6

02/06/15
FINAL

This Lease shall be construed in accordance with and governed by the laws of the state wherein the Store is located, except as otherwise required by mandatory provisions of law.

### 26.9.   Due Authority.

If Tenant or Landlord is a corporation, partnership, limited liability company, trustee or other entity, each individual executing this Lease on behalf of said entity (in his/her representative capacity only) represents and warrants that he or she is duly authorized to execute and deliver this Lease on behalf of the entity and that this Lease is binding upon the entity.

### 26.10.   No Prior Agreements.

It is understood that there are no oral agreements or representations between the parties hereto affecting this Lease, and this Lease supersedes and cancels any and all previous negotiations, arrangements, brochures, agreements or representations and understandings, if any, between the parties hereto or displayed by Landlord to Tenant with respect to the subject matter thereof, and none thereof shall be used to interpret or construe this Lease. There are no other representations or warranties between the parties, and all reliance with respect to representations is solely upon the representations and agreements contained in this Lease. This Lease may be modified or amended only by an agreement in writing signed by the parties hereto.

### 26.11.   Entry by Landlord.

Upon reasonable prior notice, in no event to be less than ten (10) Business Days (except in the case of a bona fide emergency, in which event, no prior written notice shall be required, but prior verbal notice shall be required and promptly confirmed in writing thereafter), Landlord may enter the Store during Tenant's business hours for purposes of inspection, to show the Store to prospective purchasers and lenders, or to perform maintenance and repair obligations imposed upon Landlord by this Lease. All maintenance, repairs or replacements by Landlord to the interior of the Store or using the interior of the Store or maintenance, repairs or replacements to any portion of the Shopping Center that will create dust, noise, vibration or other disturbance of Tenant's use of the Store shall be performed only during hours that the Store is not open to the public. Should Landlord unreasonably interfere with Tenant's business by such entry, Rent shall equitably abate in an amount reasonably determined with reference to the nature, extent and duration of the deprivation of Tenant's business in connection with Landlord's entry into the Store.

### 26.12.   Neutral Interpretation.

Landlord and Tenant agree that this Lease has been freely negotiated and that in the event a dispute arises with respect to the meaning or interpretation of any provision of this Lease, no presumption, inference or conclusion shall be drawn against the party that drafted the provision in question.

### 26.13.   Force Majeure.

As used in this Lease, the term "Force Majeure" means delay resulting from the following causes beyond a party's reasonable control:   acts of God such as fire, windstorm, flood or

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/632873.6

- 78 -

02/06/15
FINAL

1   earthquake; industry wide inability to obtain materials or merchandise; war; riot or civil commotion;
2   governmental laws or regulations, including a building moratorium (hereinafter "governmental
3   matters"), provided that "governmental matters" shall exclude planning and building permits,
4   governmental inspections, permanent or temporary certificates of occupancy (or their equivalent in
5   the applicable local jurisdiction) and similar governmental approvals. The party obliged to perform
6   shall give notice to the other as soon as reasonably possible after the onset of such delay stating the
7   cause and an estimate of the duration thereof. If, as a result of an event of Force Majeure, either
8   party shall be delayed or hindered or prevented from the performance of any act required hereunder
9   (other than the making of payments) within the time period set forth herein, the performance of
10  such act shall be excused for the period of delay not to exceed ninety (90) days, and the period of
11  performance of such act shall be extended for a period equivalent to the period of such delay, not to
12  exceed ninety (90) days, unless a provision of this Lease expressly states that Force Majeure is not
13  applicable. Financial inability to perform shall not constitute an event of Force Majeure.

14  **26.14. Successors in Interest.**

15      The terms, conditions and covenants herein contained shall inure to the benefit of and be
16  binding upon the heirs, assigns and other successors in interest to the parties hereto, except as
17  otherwise provided in this Lease.

18  **26.15. Memorandum of Lease.**

19      This Lease shall not be recorded. However, a Memorandum of Lease shall be executed, in
20  recordable form, by both parties concurrently herewith. Either party may record the same at its own
21  cost and expense.

22  **26.16. Real Estate Brokers.**

23      Landlord and Tenant each represents and warrants to the other party that it has not
24  authorized or employed, or acted by implication to authorize or employ, any real estate broker or
25  salesman to act for it in connection with this Lease, other than The Shopping Center Group, LLC
26  ("Brokers"), who shall be paid by Landlord a leasing commission based on the total useable square
27  feet in the Store (excluding non-usable area), as reasonably determined by Tenant, multiplied by
28  Three Dollars ($3); fifty percent (50%) upon the execution of this Lease by Landlord and Tenant
29  and waiver of all Tenant contingencies to the effectiveness of this Lease, and fifty percent (50%)
30  upon the earlier of (a) Tenant opening the Store for business, or (b) the Commencement Date.
31  Landlord and Tenant shall each indemnify, defend and hold the other party harmless from and
32  against any and all claims by any other real estate broker or salesman whom the indemnifying party
33  authorized or employed, or acted by implication to authorize or employ, to act for the indemnifying
34  party in connection with this Lease. Further, in the event Landlord fails to pay the Brokers within
35  ten (10) days of the date that such commission is due to be paid, Tenant, at its option, may pay the
36  Brokers' fees and deduct the same from Rent as it comes due.

37  **26.17. Limitation of Landlord's Liability.**

38      (a)      Except as provided in Section 26.17(b), Landlord's liability hereunder shall be limited
39  to Landlord's interest in the Shopping Center, including the rents, profits and proceeds (including,

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/632873.6

- 79 -

02/06/15
FINAL

without limitation, insurance and condemnation proceeds) therefrom, and no other assets of Landlord shall be subject to any action or proceeding for the enforcement of any right or remedy of Tenant hereunder, provided that Tenant shall not be precluded from enforcing any other rights and remedies of Tenant under this Lease (including, without limitation, Tenant's rights to self-help and to offset amounts due hereunder), for the satisfaction of Landlord's obligations under this Lease. The limitation of liability contained in this Section 26.17 shall apply equally and inure to the benefit of Landlord, its successors and assigns, and their respective present and future partners, beneficiaries, officers, directors, trustees, shareholders, agents, and employees, and their respective heirs, successors, and assigns.

(b)    The provisions of Section 26.17(a) above shall not apply in the following circumstances nor shall the provisions of Section 26.17(a) impair, limit or prejudice the right of Tenant to exercise any legal or equitable remedy available with respect to the following:

(i)    <u>Hazardous Material</u>.  Recover from Landlord all damages and costs arising out of or in connection with, or on account of, the knowing and intentional breach by Landlord of its obligations under Sections 11.4 of this Lease.

(ii)    <u>Fraud or Misrepresentation</u>.  Recover from Landlord damages and costs as a direct result of any knowing and intentional fraud or misrepresentation by Landlord in connection with any material term, covenant, or condition in this Lease.

(iii)    <u>Equitable Relief; Costs</u>.  Pursue equitable relief in connection with any material term, covenant or condition of this Lease, including a proceeding for temporary restraining order, preliminary injunction, permanent injunction or specific performance.

If Landlord shall sell or assign its interest in the Shopping Center, or any portion thereof containing the Store, to a third party that succeeds to Landlord's interest as owner herein during the Term of this Lease, Landlord shall be released and discharged from all obligations accruing after the date of such conveyance or transfer with respect to this Lease, provided that:  (i) all obligations of Landlord to or for the benefit of Tenant accruing prior to the date of such conveyance or transfer are either (A) brought current by payment or performance, or (B) such payment or performance is assumed by the grantee or transferee; and (ii) the grantee or transferee assumes in writing all of Landlord's obligations under this Lease accruing after the date of such conveyance or transfer.

**26.18.  Confidentiality Agreement.**

Landlord agrees to keep the terms of this Lease confidential and not to disclose any information with regard to this Lease, including, but not limited to, any information regarding Rent, Store opening dates, Tenant's sales figures or estimated sales figures, except that Landlord may release such information to:  (a) its accountants, professional advisors, attorneys, investors, lenders and prospective purchasers of the Shopping Center to the extent reasonably necessary for Landlord's business purposes, (b) as required by a subpoena, court order, in connection with litigation between the parties, or as otherwise required by law, rule or regulation, (c) as required for any SEC filing by Landlord, and (d) in order to enforce the terms of this Lease.  Under no circumstances shall Landlord issue press releases or make public disclosure to the media or other third parties (including via postings on the Internet) regarding Tenant's anticipated occupancy, Store opening, and any provisions of this Lease, nor shall Landlord post the terms of this Lease without

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/632873.6

- 80 -

02/06/15
FINAL

the prior written consent of Tenant, which consent shall be at Tenant's sole discretion. Notwithstanding the foregoing, (i) upon full execution of this Lease, Landlord may disclose Tenant's proposed occupancy to Landlord's leasing broker and prospective tenants for leasing purposes, provided that, until Tenant's opening for business at the Store, Tenant's occupancy of the Store is clearly noted as "Proposed" in any site plan or other disclosure made for such purposes, and (ii) the recording of the Memorandum of Lease disclosing the Ross Prohibited Uses set forth in Section 3.2.1 and the Protection clause set forth in Section 15.3, approved and executed by Tenant and recorded pursuant to Section 26.15, shall not be deemed to violate the provisions of this Section 26.18. In the event of a violation of this Section 26.18 by Landlord and/or its employees or agents, Tenant shall have all of its rights and remedies under this Lease, at law or in equity.

**26.19. No Offer.**

The submission of this Lease for examination and negotiation does not constitute an offer to lease, or a reservation of, or option for, the Store, and this Lease shall not become effective or binding until this Lease has been fully executed by both Landlord and Tenant and an executed original of this Lease has been delivered to each party.

| | |
|---|---|
| **LANDLORD:** | **TENANT:** |
| **SUBURBAN PLAZA, LLC,** | **ROSS DRESS FOR LESS, INC.,** |
| **a Georgia limited liability company** | **a Virginia corporation** |

| | |
|---|---|
| By: Selig Enterprises, Inc., | By: _____ |
|     a Georgia corporation | James Fassio |
| Its: Manager | Its: President and Chief Development Officer |

By: _____
Name: _____
Its: _____

Witness: _____
Printed Name: _____
Witness: _____
Printed Name: Elizabeth A. Wolfe
*Notary must be one of the witnesses

Witness: _____
Printed Name: Sandra Powers
Witness: _____
Printed Name: Michelle Owing
*Notary must be one of the witnesses

By: _____
Name: William N. Stoner
Its: Senior Vice President

By: _____
    Gregg McGillis
Its: Senior Vice President, Property Development

Witness: _____
Printed Name: Jennifer Margiotis
Witness: _____
Printed Name: Elizabeth A. Wolfe
*Notary must be one of the witnesses

Witness: _____
Printed Name: Sandra Powers
Witness: _____
Printed Name: Michelle Owing
*Notary must be one of the witnesses

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/632873.6

- 81 -

02/06/15
FINAL

1

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

2

State of California                    )
                                         )

County of Alameda                  )

3
4
5   On *February 10, 2015* before me, *Sandra Powers*_____, a
6 Notary Public, personally appeared James Fassio and Gregg McGillis, who proved to me on the basis
7 of satisfactory evidence to be the persons whose names are subscribed to the within instrument and
8 acknowledged to me that they executed the same in their authorized capacities, and that by their
9 signatures on the instrument the persons, or the entity upon behalf of which the persons acted,
10 executed the instrument.

11
12 I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
13 paragraph is true and correct.

14
15 WITNESS my hand and official seal.
16

> SANDRA POWERS
> Commission # 2048841
> Notary Public - California
> Alameda County
> My Comm. Expires Dec 11, 2017

                                       Notary Public

17
18
19
State of *Georgia* _____ )
                                  )

County of *Fulton* _____ )

20
21
22 On *February 12, 2015* before me, *Jennifer Marglous*_____, a Notary Public,
23 personally appeared Stephen Sel; II and William M. Stern personally known to me, or who
24 proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed
25 to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
26 authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the
27 entity upon behalf of which the person(s) acted, executed the instrument.

28
29 WITNESS my hand and official seal.
30

> JENNIFER MARGLOUS
> NOTARY
> EXPIRES
> GEORGIA
> JAN. 23, 2018
> PUBLIC
> FULTON COUNTY

                                       Notary Public

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/632873.6

             - 82 -

02/06/15
FINAL

## EXHIBIT A

## LEGAL DESCRIPTION OF THE SHOPPING CENTER

### PART I – WAL-MART TRACT

All that tract or parcel of land lying and being in Land Lot 49 of the 18th Land District, DeKalb County, Georgia, and being more particularly described as follows:

BEGINNING at an iron pin found being a 1/2 inch rebar with a plastic cap (said 1/2 inch rebar noted as disturbed, nail set at base) which forms the northeastern end of a miter forming the intersection of the southwestern right of way of North Decatur Road, said right of way varies in width, the southeastern right of way of Scott Boulevard, also known as U.S Highway 29 / U.S. Highway 78 / State Route 8, said right of way varies in width, and the northeastern right of way of Medlock Road, said right of way varies in width; thence, along the aforementioned right of way of North Decatur Road, South 65 degrees 58 minutes 11 seconds East a distance of 354.82 feet to a nail set; South 19 degrees 27 minutes 37 seconds West a distance of 15.05 feet to a nail found; thence South 64 degrees 37 minutes 58 seconds East a distance of 78.71 feet to a point; thence along a curve to the left having a radius of 2958.85 feet and an arc length of 348.12 feet being subtended by a chord of South 68 degrees 00 minutes 11 seconds East for a distance of 347.92 to a point; thence, leaving said right of way, South 60 degrees 26 minutes 25 seconds East a distance of 55.41 feet to a point; thence along a curve to the right having a radius of 28.00 feet and an arc length of 38.25 feet being subtended by a chord of South 21 degrees 18 minutes 23 seconds East for a distance of 35.34 to a point; thence South 17 degrees 49 minutes 40 seconds West a distance of 10.76 feet to a point; thence along a curve to the right having a radius of 37.50 feet and an arc length of 24.74 feet being subtended by a chord of South 36 degrees 43 minutes 42 seconds West for a distance of 24.29 to a point; thence South 55 degrees 37 minutes 43 seconds West a distance of 57.00 feet to a point; thence South 45 degrees 40 minutes 13 seconds West a distance of 72.28 feet to a point; thence South 55 degrees 15 minutes 08 seconds West a distance of 432.22 feet to an iron pin found being a 3/8 inch rebar; thence, along lots 11 & 12 of Medlock Place subdivision, North 71 degrees 36 minutes 26 seconds West a distance of 179.92 feet to an iron pin found being a 1/2 inch rebar; thence, along the property of Mahikari of America, North 20 degrees 06 minutes 14 seconds East a distance of 145.20 feet to an iron pin found being a 1/2 inch rebar; thence North 66 degrees 19 minutes 03 seconds West a distance of 126.71 feet to an iron pin found being a 1 inch rebar; thence North 66 degrees 24 minutes 10 seconds West a distance of 145.98 feet to an iron pin found being a 1" open top pipe on the aforementioned northeastern right of way of Medlock Road; thence, along said right of way, North 00 degrees 56 minutes 51 seconds East a distance of 289.67 feet to an iron pin found being a 1/2 inch rebar with a cap stamped "CDI Prop Cor; thence North 24 degrees 22 minutes 48 seconds East a distance of 30.73 feet to an iron pin found being a 1/2 inch rebar with a cap stamped "CDI Prop Cor"; thence North 00 degrees 49 minutes 48 seconds East a distance of 85.81 feet to an iron pin found being a 1/2 inch rebar with a cap stamped "WB RLS2554" at the southwestern end of the aforementioned miter; thence North 54 degrees 15 minutes 43 seconds East a distance of 61.38 feet to the POINT OF BEGINNING.

Said parcel contains 7.838 acres or 341,402 square feet.

## EXHIBIT A

## PART II – ENTIRE SHOPPING CENTER

All that tract or parcel of land lying and being in Lot 49 of the 18th District, DeKalb County, Georgia, and being more particularly described as follows:

**BEGINNING** at an iron pin found (rebar with cap) which forms the northeasterly end of a miter forming the intersection of the southwesterly right of way line of North Decatur Road (variable r/w) the southeasterly right of way line of Scott Boulevard, also known as U. S. Highway 29 / U. S. Highway 78 / State Route 8, (variable r/w) and the northeasterly right of way line of Medlock Road (variable r/w) and proceed in a southeasterly direction along the southwesterly right of way line of North Decatur Road (variable r/w) the following courses and distances: 1) South 65°57'01" East, 354.90 feet to a nail placed; 2) South 19°28'34" West, 15.00 feet to a nail placed; 3) South 65°58'16" East for a distance of 179.26 feet to a point; 4) thence 363.20 feet along the arc of a curve to the left, said curve having a radius of 2963.63 feet and being subtended by a chord of South 69°28'55" East, 362.98 feet to a point; 5) thence South 72°04'44" East for a distance of 52.86 feet to a point; 6) thence 111.81 feet along the arc of a curve to the left, said curve having a radius of 1481.52 feet and being subtended by a chord of South 74°14'28" East, 111.79 feet to an iron pin placed (1/2" rebar); 7) thence South 68°02'34" East for a distance of 18.93 feet to an iron pin placed (1/2" rebar); 8) thence 5.94 feet along the arc of a curve to the left, said curve having a radius of 1484.39 feet and being subtended by a chord of South 77°14'26" East, 5.94 feet to a point; 9) thence 183.79 feet along the arc of a curve to the left, said curve having a radius of 1484.39 feet and being subtended by a chord of South 80°54'08" East, 183.67 feet to a point; 10) thence South 84°26'58" East for a distance of 8.33 feet to an iron pin placed (1/2" rebar) at the northwesterly end of a radius forming the intersection of the southeasterly right of way line of North Decatur Road (variable r/w) with the northwesterly right of way line of Church Street (variable r/w); thence, along said radius 128.72 feet along the arc of a curve to the right, said curve having a radius of 100.00 feet and being subtended by a chord of South 33°03'19" East, 120.02 feet to a concrete right-of-way monument found on the northwesterly right of way line of Church Street (variable r/w); thence in a southwesterly direction along the northwesterly right of way line of Church Street (variable r/w) the following courses and distances: 1) South 22°45'46" West, a distance of 24.26 feet to a concrete right-of-way monument found; 2) thence 235.10 feet along the arc of a curve to the right, said curve having a radius of 1481.89 feet and being subtended by a chord of South 28°01'21" West, 234.85 feet to a concrete right-of-way monument found; 3) thence South 32°42'26" West for a distance of 114.25 feet to a point; 4) thence 65.34 feet along the arc of a curve to the right, said curve having a radius of 573.00 feet and being subtended by a chord of South 35°40'26" West, 65.30 feet to a concrete right-of-way monument found; 5) thence 79.83 feet along the arc of a curve to the right, said curve having a radius of 1487.89 feet and being subtended by a chord of South 41°10'37" West, 79.82 feet to a concrete right-of-way monument found; 6) thence South 42°18'15" West for a distance of 288.27 feet to an iron pin found (1/2" re-bar); thence departing said northwesterly right of way line of Church Street (variable r/w) and proceed North 73°50'43" West for a distance of 158.76 feet to an iron pin found (1/2" rebar); thence North 72°03'50" West for a distance of 386.80 feet to an iron pin found (1/2" rebar); thence North 05°28'34" East for a distance of 97.15 feet to an iron pin placed (1/2" rebar); thence North 05°56'34" East for a distance of 100.04 feet to an iron pin placed (1/2" rebar); thence North 05°54'34" East for a distance of 95.77 feet to an iron pin found (3/8"

rebar); thence North 71°37'16" West for a distance of 179.92 feet to an iron pin found (1/2" rebar); thence North 20°06'57" East for a distance of 145.27 feet to an iron pin found (1/2" rebar); thence North 66°20'46" West for a distance of 126.68 feet to an iron pin found (1" rebar); thence North 66°20'46" West for a distance of 145.96 feet to an iron pin found (1" open top pipe) on the easterly right of way line of Medlock Road (variable r/w); thence in a northerly direction along the easterly and northeasterly right of way line of Medlock Road (variable r/w) the following courses and distances: 1) North 00°57'33" East for a distance of 289.69 feet to an iron pin found (rebar with cap); 2) thence North 24°17'44" East for a distance of 30.68 feet to an iron pin found (rebar with cap); 3) thence North 00°51'16" East for a distance of 85.80 feet to an iron pin placed (1/2" rebar with cap) at the southwesterly end of the aforementioned miter forming the intersection of the southwesterly right of way line of North Decatur Road (variable r/w), the southeasterly right of way line of Scott Boulevard, also known as U.S. Highway 29 / U.S. Highway 78 / State Route 8 (variable r/w), and the northeasterly right of way line of Medlock Road (variable r/w); thence along said miter North 54°11'35" East for a distance of 61.40 feet to the **Point of Beginning**.

Said tract or parcel containing 19.58062 acres, or 852,932 square feet.

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/678026.1

EXHIBIT A – PART II
2

02/06/15
FINAL



EXHIBIT 'B'
SUBURBAN PLAZA REDEVELOPMENT

NORTH DECATUR ROAD
DECATUR, DEKALB COUNTY, GA. 30030

MEDLOCK ROAD

LEGEND

CONTROL AREA
RESTRICTED AREA

OVERALL SITE ANALYSIS

| | APPROX. PROPOSED |
|---|---|
| WALMART | 149,976 SF |
| EXISTING SHOPS | 178,738 SF |
| TOTAL | 328,514 SF |
| TOTAL PARKING | 1,284 SPACES |
| RATIO | 3,901,000 SF |
| SITE AREA | 19.59 AC. |

SCALE 1"=160'
0    80    160    320

SELIG
ENTERPRISES, INC.
1100 SPRING STREET NW SUITE 550
ATLANTA, GEORGIA 30309-2848
TEL (404) 876-6431 FAX (404) 876-2849

# EXHIBIT C
## CONSTRUCTION OBLIGATIONS OF LANDLORD (TURNKEY)

1.    **Description of Work.** Landlord shall, at Landlord's sole cost and expense, furnish all labor and materials to construct and complete in a good, expeditious and workmanlike manner, to the satisfaction of Tenant, in a Turnkey condition (as described in Paragraph 13 hereof) ready for fixturing, the work described in the Final Plans (the "Work" or the "Improvements") for the Store. Landlord shall supervise and direct all Work, using its best skill and attention. Landlord shall be solely responsible for all construction means and methods, techniques, sequences and procedures, and for coordinating all portions of the Work. All Work shall be performed in accordance with the terms and conditions of the Lease to which this Exhibit is attached (the "Lease").

2.    **Prototype Plans.** Landlord acknowledges having previously received Tenant's revised prototype plans and specifications (which were sent to Landlord on November 3, 2014) and Tenant's Design Guidelines for a typical Ross store (collectively, "Prototype Plans").

3.    **Shell Plans.**

   **3.1.**   Definition and Requirements. "Shell" is defined as a fully enclosed building structure that shall include all structural members to be constructed and installed; and all exterior materials to be installed so that the building is wind and watertight. "Construction" means the type of building material (block, tilt wall, etc.). Included in the plans for the Shell ("Shell Plan") are surveyed dimensions, building lines, column lines, shear walls, openings and clearances, clear heights, exterior elevations, as well as all interior obstructions to use (such as piping, conduits, drains, equipment, devices, mezzanines), utility entrances and assemblies for the sprinkler system, communications lines, water, gas, electricity, and sewer, foundation walls and footings extending above the surface of the floor, and retained building systems, if any, such as mechanical, plumbing, docks and compactor pads as well as adjacent grades and docks. The type of Construction shall also be set forth.

   **3.2.**   When Due. Prior to execution of the Lease, Landlord shall provide Tenant with the Shell Plan for Tenant's Store, elevations of all other buildings in the Shopping Center and a Site Plan of the Shopping Center, all of which shall be in an AutoCad v.2004 ".dwg" format (or such other format as may be required by Tenant by written notice to Landlord), and shall include notation of colors and materials.

   **3.3.**   Tenant Review. Tenant shall review the Shell Plans and provide Landlord with any comments it wishes to make within thirty (30) business days after the later to occur of: (1) Tenant's receipt of the Shell Plans or (2) Tenant's receipt of a fully executed original of the Lease from Landlord.

   **3.4.**   Ratification. Within ten (10) business days after receipt of Tenant's comments to the Shell Plans, Landlord shall ratify the Shell Plans that incorporate Tenant's requested modifications.

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/635979.4

EXHIBIT C
Page 1

02/06/15
FINAL

**4.    Tenant Plans.**  Based on the approved Shell Plans, Tenant shall deliver to Landlord a floor plan for the Store ("Tenant's Floor Plan") on or before the later to occur of forty-five (45) days from (1) the date of execution of the Lease, or (2) Landlord's ratification of the Shell Plans with Tenant's requested modifications, if any, incorporated therein.

**5.    Completed Plans.**

**5.1.**    <u>Production of Landlord's Completed Plans</u>.  Within thirty (30) business days after Landlord's receipt of Tenant's Floor Plan, Landlord's architect(s) (hereinafter "Architect") shall provide Tenant with a copy of complete plans of the Work to be performed in fulfillment of Landlord's construction obligations for the shell of Tenant's Store and interior improvement and related site work, for Tenant's review and comment ("Completed Plans").  The Completed Plans shall be based upon and shall incorporate the Prototype Plans, Shell Plans and Tenant's Floor Plan.

**5.2.**    <u>Tenant Review of Completed Plans</u>.  Within fifteen (15) business days after receipt of the Completed Plans, Tenant shall approve or disapprove the Completed Plans and provide the Architect with Tenant's requested modifications, if any.

**5.3.**    <u>Revision of Completed Plans</u>.  Within fifteen (15) business days following receipt of any comments by Tenant to the Completed Plans, Landlord's architect shall prepare and submit revised Completed Plans to Tenant for approval.  Landlord and Tenant shall each have ten (10) business days thereafter to either approve or disapprove the revised plans.  Any disapproval by either Landlord or Tenant must be accompanied by a specific description of the revisions that the disapproving party would require in order to approve the revised Completed Plans.  Architect shall incorporate any suggested revisions received from Landlord or Tenant into the revised Completed Plans and resubmit the revised Completed Plans to both Landlord and Tenant for approval within five (5) business days following receipt of a notice of disapproval.  If the parties cannot reach agreement within twenty (20) business days after receipt of the revised Completed Plans, the Lease may be terminated by either party on written notice to the other at any time thereafter.

**6.    Final Plans.**

**6.1.**    The Landlord's Final Plans ("Final Plans") shall consist of the revised Completed Plans with all requested and mutually approved modifications incorporated therein.  A site plan shall be included in the Final Plans and shall substantially conform to the Site Plan (Exhibit "B") of the Lease.  In the event of any conflict between such site plan and Exhibit "B", Exhibit "B" shall control.  The Final Plans shall include, without limitation, grading, driveways, parking areas, exterior elevations, and landscaping, as well as the Store building.  The Store building shall contain approximately the number of square feet as set forth in this Lease.  The Final Plans shall set forth the construction to be performed by each party, it being understood that trade fixtures, except as otherwise provided in the Final Plans, shall be the responsibility of Tenant, and all other construction shall be the responsibility of Landlord.  Slot walls shall not be considered trade fixtures. Landlord shall obtain Tenant's written approval of the Final Plans prior to the commencement by Landlord of the Work and the construction of exterior elevations.

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/635979.4

EXHIBIT C
Page 2

02/06/15
FINAL

**6.2.** <u>Final Plans - Record Set</u>. A Record Set, identified as such, of the Permitted Work embodied in the Final Plans to be performed pursuant to the Landlord's construction obligations under the Lease shall be submitted to Tenant within ten (10) business days of issuance of the Building Permit described in Paragraph 9.1 hereof. The Record Set shall include AutoCad v.2004 files of the building shell, floor plan, reflected ceiling, and exterior elevations of the Tenant's Store and Site Plan.

**7.** **Approvals.** Any disapproval or proposed revisions hereunder shall be on reasonable grounds and supported by a detailed written statement thereof. An untimely, unreasonable or unsupported disapproval or a failure to respond within the time allowed shall be deemed an approval for all purposes hereof.

**8.** **Plan Format.** All plans of any type required by Tenant under the terms of this Exhibit must be submitted by Landlord in an AutoCad v.2004 ".dwg" format (or such other format as may be required by Tenant by written notice to Landlord) as well as in printed form in order to constitute a valid submission.

**9.** **Permits.**

**9.1.** <u>Application.</u> Upon approval of the Final Plans by both parties, Landlord at its own cost and expense, shall forthwith make application to all relevant governmental agencies for necessary building permits, licenses and other grants of authority, which may be required in connection with the construction of the Improvements (hereinafter collectively the "Building Permit"). Upon issuance of the Building Permit, a final initialed and dated set of plans reflecting all governmentally required changes shall be delivered to Tenant to review and approve. Tenant's review and Landlord's revision of the Final Plans shall occur on the same time schedule as set forth in 5.1 and 5.2 above. If Tenant objects to any material governmentally required changes and the parties cannot reach agreement within twenty (20) business days after receipt of the revised Final Plans, Tenant may terminate this Lease by written notice to Landlord at any time thereafter. No changes, including those required by local building authority plan check, shall be made in the Final Plans without Tenant's prior written approval.

**9.2.** <u>Failure to Obtain</u>. Landlord shall have ninety (90) business days from the date the Final Plans are approved by both parties in which to obtain the Building Permit, and Tenant shall have ninety (90) business days from the date the Final Plans are approved by both parties in which to obtain all necessary permits for Tenant's building and pylon signage as depicted on Exhibit J of the Lease (collectively, "Signage Permit"), which Signage Permit Tenant shall diligently pursue. If either the Building Permit or the Signage Permit is not obtained (including the inability to obtain any required variance from such governmental authority) within one hundred twenty (120) business days from the date the Final Plans are approved by both parties, Tenant, at its sole option, may terminate this Lease upon written notice to Landlord. If either the Building Permit or the Signage Permit is not obtained, despite Landlord's or Tenant's, as applicable, diligent, good faith, and commercially reasonable efforts, within two hundred seventy (270) business days from the date the Final Plans are approved by both parties hereto, either party may terminate this Lease thereafter by written notice to the other.

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/635979.4

EXHIBIT C
Page 3

02/06/15
FINAL

**9.3.**    Landlord shall timely keep Tenant fully informed of the status of the application for the Building Permit and any negotiations relating to its issuance.  Further, at the election of Tenant, Tenant may take part in any such negotiations.

**10.    Land Entitlement Permits.**  Should it be necessary for Landlord to obtain a Land Entitlement Permit (as defined hereinbelow) of any sort, the time for preparation of Tenant's Floor Plan, Completed or Final Plans shall be extended by the time reasonably required to obtain such Land Entitlement Permit.    Landlord shall prepare such plans and specifications as may be reasonably required for the processing of such Land Entitlement Permit for the Store only.  The term "Land Entitlement Permit" as used herein shall include without limitation an environmental impact report or statement or its equivalent, a zoning change or variance, an architectural or design review approval, general plan change, planned unit development approval or its equivalent, subdivision approval or its equivalent, or any other approval pertaining to the use or general design of the Shopping Center, Store or Improvements other than a Building Permit.

**11.    Access to Premises.**  Tenant's construction representatives at all times shall have access to the premises during construction for purposes of inspection.

**12.    Landlord to Pay for Plans.**  Within ten (10) days after receipt of Tenant's invoice, Landlord shall pay Tenant an allowance ("Architectural Allowance") of Ten Thousand Dollars ($10,000) on account of the costs incurred by Tenant in the preparation, revision and review of the Completed and Final Plans as well as the preparation of the Tenant's Floor Plan, site specific plans, specifications and requirements. Notwithstanding any other provision of the Lease, the obligation imposed herein upon Landlord shall exist even if the Lease to which this Exhibit is attached is terminated by reason of Landlord's inability to obtain Building Permits, Land Entitlement Permits or financing or failure of Landlord and Tenant to agree upon a set of Final Plans; provided, however, if this Lease is so terminated, the right to use the plans shall vest in Landlord; otherwise, title to the plans shall vest in Tenant.  If Landlord fails to pay Tenant the entire Architectural Allowance within thirty (30) days after Tenant's written notice, in addition to any legal or equitable remedy available to Tenant, Tenant shall have the right to deduct all amounts of the unpaid Architectural Allowance from Rent as it becomes due under the Lease.

**13.    Landlord Improvements Allowance; Trash Compactor.**  "Turnkey" condition means completion of all of the Work as set forth in the Final Plans and includes Landlord furnishing, at Landlord's expense, a trash compactor and a pad on which to place it pursuant to the Final Plans.    Landlord shall also pay to Tenant a Leasehold Improvements Allowance of Thirty-Eight Thousand Dollars ($38,000).    The Leasehold Improvement Allowance is for the purpose of constructing or improving qualified long-term real property for use in Tenant's trade or business at the Store, in accordance with Section 110(a) of the Internal Revenue Code.  Landlord shall pay the Leasehold Improvements Allowance within thirty (30) business days of Landlord's receipt of Tenant's invoice therefor.  If Landlord fails to pay Tenant the entire Leasehold Improvement Allowance within thirty (30) days after Tenant's written notice, in addition to any legal or equitable remedy available to Tenant, Tenant shall have the right to deduct all amounts of the unpaid Leasehold Improvement Allowance from Rent as it becomes due under the Lease.

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/635979.4

EXHIBIT C
Page 4

02/06/15
FINAL

14.    **Change Orders.**  Any changes to the Final Plans desired by Tenant subsequent to the approval of such plans by both parties shall be requested in writing.  Landlord agrees to use its reasonable, good faith efforts to incorporate plan changes requested in writing by Tenant and to notify Tenant immediately of any cost increase or potential delay which shall result if such changes are incorporated into the Work, based on the information provided by Architect and Landlord's general contractor.  Landlord shall not be required to incorporate any plan changes requested by Tenant unless Tenant: (a) approves in writing and agrees to pay to Landlord the actual cost increase (including any associated architectural, engineering and general conditions costs and expenses) caused by such changes, and (b) approves in writing and agrees to extensions of all construction deadlines in the Lease (including, without limitation, those set forth in Section 1.4 and Article 5) equal to the delays caused by such changes.

15.    **Change Order Payment or Refund.**  Within thirty (30) days after the Delivery Date and upon notice from Landlord of the amount due, Tenant shall reimburse Landlord in cash for the net cost increase, if any caused by plan changes requested in writing by Tenant.  If the net effect of Tenant's changes is a cost savings, Landlord shall timely remit such savings in cash to Tenant within thirty (30) days after the Delivery Date.

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/635979.4

EXHIBIT C
Page 5

02/06/15
FINAL

## EXHIBIT D

### LANDLORD'S PROHIBITED USES

*From the Easement with Covenants and Restrictions Affecting Land ("ECR"), made as of June 14, 2014, by and between Wal-Mart Stores East, LP, a Delaware limited partnership ("Wal-Mart") and Suburban Plaza, LLC, a Georgia limited liability company ("Owner"), recorded June 20, 2014 as Document No. 2014089721 in Deed Book 24435, Page 122, DeKalb County, Georgia:*

2.    <u>Use</u>.  Except as provided in Section 3 below, the Remainder of the Shopping Center may be used for any lawful purpose, provided that no restaurant may be located within the "**Restaurant Restricted Area**" shown on <u>**Exhibit "A."**</u> The **Wal-Mart Tract** may be used for any lawful principally retail purpose. Nothing contained in this ECR shall be construed to contain a covenant, either express or implied, for Wal-Mart to either commence the operation of a business or thereafter continuously operate a business on the **Wal-Mart Tract**. Wal-Mart may, at Wal-Mart's sole discretion and at any time, cease the operation of Wal-Mart's business on the **Wal-Mart Tract**; and Owner hereby waives any legal action for damages or for equitable relief which might be available to Owner because of such cessation of business activity by Wal-Mart. In no event shall any of the Tracts nor any portion thereof be used at any time in any of the manners or purposes expressly prohibited in <u>**Exhibit "D"**</u> or <u>**Exhibit "E"**</u> attached hereto.

## <u>EXHIBIT "A" TO ECR</u>

## (See attached site plan.)

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/646690.3

EXHIBIT D
1

02/06/15
FINAL



2

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/646690.3

02/06/15
FINAL

## EXHIBIT "E" TO ECR

### PROHIBITED USES

**NOTWITHSTANDING ANYTHING CONTAINED** in the Lease to the contrary, Wal-Mart and the Owner shall not use, nor permit all or any portion of the **Shopping Center** or **Common Areas** to be used, in any of the following manners, nor for any of the following purposes or uses (unless otherwise noted herein):

Any sale, display, exhibition, distribution or delivery of pornographic or obscene books, newspapers, magazines or other periodicals, films, videotapes, DVDs, or other materials, operation of a pornographic business, or any form of assignation or lewdness, or any business employing partially or totally nude entertainers, employees, waiters or waitresses, or any usage as an adult entertainment facility, or any facility or entertainment which caters to or intends to arouse normal sexual desires or prurient interests of patrons, including, without limitation, the depiction of "X-Rated," pornographic or sexually explicit materials, conduct or nudity by movies, pictures, films, peep shows, videos, live entertainment or sex-centered objects, including, without limitation, sex toys, depiction of genitalia or of an anus, or anal, oral or vaginal intercourse, whether actual or simulated as a homosexual or heterosexual act, or masturbation, whether homosexual, heterosexual or autoerotic, or any business or facility used in growing, delivering, transferring, supplying, dispensing, dispersing, distributing or selling marijuana, whether by prescription, medical recommendation or otherwise, and whether consisting of live plants, seeds, seedlings or processed or harvested portions of the marijuana plant.

Notwithstanding anything contained in the Lease to the contrary, Owner shall not use, nor permit that portion of the Remainder of the Shopping Center labeled "Restaurant Restricted Area" on Exhibit "A" to be used for any restaurant.

**LA Fitness**

Landlord covenants and agrees that the Project shall be constructed, leased, operated, maintained and managed in a first rate manner consistent with similar shopping centers in the Atlanta, Georgia area. Subject to the rights of Existing Tenants and any renewals or extensions of their leases thereof (but only to the extent any such existing lease does not currently prohibit the subject premises to be used in violation of the foregoing restrictions and if Landlord has sufficient consent rights over a change in use under any such existing lease, Landlord shall not consent to a change in use that will violate the following restrictions), Landlord covenants and agrees that no premises (and no portion of any premises) in the Project (excluding the Wal-Mart Tract) shall be used or occupied for any of the following: any unlawful use; funeral establishment; used car lot; auction or bankruptcy sale (except those which are lawful and bona fide); pawn shop; shooting gallery; refinery; adult bookstore or facility selling, renting or displaying pornographic or adult books, magazines, literature, films, pictures, videotapes, video discs or other adult paraphernalia or merchandise of any kind (materials

shall be considered "adult" or "pornographic" for such purpose if the same are not available for sale or rental to children under 18 years old because they explicitly deal with or depict human sexuality), provided that sale, rental or display of such items as an incidental part of a permitted business (as used above, the term "incidental" means, with respect to any national or regional video store chain or national or regional book store, any sale or rental of such materials and with respect to other tenants, the sale of such materials from not more than ten percent (10%) of the sales area of such business and so as to constitute less than ten percent (10%) of the gross sales of such business) shall be permitted); massage parlor (except for (i) therapeutic massages given in connection with the operation of a day spa and therapeutic massage providers such as Massage Envy and Spa Sydell, (ii) hair salons which provides massage services as an incidental part of its business; and (iii) the provision of massage services in connection with medical or chiropractic facilities, such as medical rehabilitations clinics to the extent not otherwise prohibited by this Section); tattoo parlor/shop; unemployment agency; government office (except this restriction shall not apply to the portion of the Project identified on the Site Plan as the "Lower Level Space"); food stamp center; check cashing/pay day loan business; call center/phone bank (except a call center shall be permitted in the Lower Level Space); any school (however this shall not apply to the existing school and any additional school that is located in the Lower Level Space), training, educational or day care facility, including but not limited to: beauty schools, barber colleges, nursing schools, diet centers, real estate school including a real estate office that includes a school, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers provided that the foregoing restrictions on schools shall not apply to the Lower Level Space and further provided that tutoring of any grade/level of school/university for subjects/testing such as *Score, Mathnasium, Sylvan Learning* shall be permitted; office (provided banks, small loan offices, and other quasi-retail uses often found in first class shopping centers [such as a travel agency; real estate brokerage office medical office/clinic (except that medical office/clinic shall be permitted only in the Lower Level Space, and dental and optometrist offices shall be permitted); urgent care (except that urgent care shall be permitted only in the Lower Level Space); "park and ride"; amusement park; restaurant in Shops "F" (however, (i) two (2) restaurants with sit-down service that does not exceed 5,000 square feet in the aggregate and is not otherwise considered a social encounter, lounge or sports bar establishment shall be permitted in Shops "F" shown on the Site Plan provided the entrance to such restaurant faces away from the Premises and towards Wal-Mart as shown on the Site Plan, and (ii) frozen yogurt shops and cookie shops shall not be considered restaurants); sports bar (except in the Lower Level Shops); dance hall; cocktail lounge or bar, disco or night club (although the operation of a bar in connection with a permitted restaurant and the operation of an upscale wine bar or similar operation shall not be prohibited); bingo (except in the Lower Level Shops) or similar games of chance, but lottery tickets and other items commonly sold in retail establishments may be sold as an incidental part of business; second-hand store and thrift store (provided, however, the foregoing restriction shall not prohibit antique shops or stores selling high quality used merchandise such as *Play It Again Sports, Plato's Closet,* and *Game Stop* or stores that sells "Vintage" clothing); or auction house or flea market.

## HomeGoods

Landlord agrees that the Shopping Center (excluding the Wal-Mart Tract) shall not be used (a) for any non-retail purposes (repairs, alterations and offices incidental to retailing, and banks and small loan offices, not being deemed non-retail) or office usage (*except that* offices are permissible *provided* they are service uses, or are incidental, complementary to, compatible with, or ancillary to retail use,

including, without limitation, banks or other financial institutions, travel agencies, insurance or similar offices, real estate, brokers and title companies, dental or medical offices, none of which individual ancillary office uses on the "Upper Level" of the Shopping Center as depicted on the Lease Plan shall be greater than three thousand five hundred (3,500) square feet of leasable floor area each, nor exceed (i) eight thousand (8,000) square feet of leasable floor area in the aggregate on the "Upper Level", nor (ii) fifteen thousand (15,000) square feet of leasable floor area in the aggregate as depicted on the "Lower Level" or (b) for any entertainment purposes such as a bowling alley (except that a bowling alley is permissible in the space specifically so depicted on the "Lower Level"), skating rink, cinema, bar (although the operation of a bar in connection with a permitted restaurant and the operation of an upscale wine bar or similar operation shall not be prohibited), nightclub, discotheque, amusement gallery, poolroom, health club (except that LA Fitness or other replacement health club or clubs are permissible in the space specifically so depicted on the Upper Level, or their respective substitute or substitutes) massage parlor (*except that* in addition to L.A. Fitness, one (1) first-class massage therapy or day spa of the type typically found in first-class shopping centers, such as Massage Envy or Spa Sydell, shall be permitted, provided that such massage therapy provider or day spa occupies no more than four thousand (4,000) square feet of leasable floor area) and further, hair salons which provide massage services as an incidental part of its business and the provision of massage services in connection with medical or chiropractic facilities, such as medical rehabilitations clinics shall not be prohibited by this Section), sporting event, sporting or game facility, off-track betting club (provided that the incidental sale of lottery tickets shall be permitted), (c) for any establishment which sells or displays pornographic materials; provided that sale, rental or display of such items as an incidental part of a permitted business shall be permitted (as used above, the term "incidental" means, with respect to any national or regional video store chain or national or regional book store, any sale or rental of such materials and with respect to other tenants, the sale of such materials from not more than ten percent (10%) of the sales area of such business and so as to constitute less than ten percent (10%) of the gross sales of such business), (d) for any establishment which sells or displays used merchandise or second hand goods (provided, however, the foregoing restriction shall not prohibit antique shops or stores selling high quality used merchandise such as *Play It Again Sports*, *Plato's Closet*, and *Game Stop* or stores that sell "Vintage" clothing), and (e) for restaurants except in the area labeled "Permitted Restaurant Area" on the Lease Plan, provided that in no event may there be an individual restaurant of over five thousand (5,000) square feet of leasable floor area, nor restaurants in the aggregate total of more than fifteen thousand (15,000) square feet of leasable floor area; provided, however, restaurants and cafes operating within a permitted retail use shall not be considered restaurants for purposes of this restriction. (Collectively the prohibited uses listed in this Paragraph 4(A) are referred to as the "Prohibited Uses").

## Jo-Ann's

(1)   Subject to the rights of tenants or occupants under existing leases and agreements as of the date hereof, in no event will the Shopping Center (excluding the Wal-Mart Tract) be used as or for any of the following during the Term of the Lease:

(i)   A movie theater; auditorium; meeting or banquet hall (except that the foregoing restrictions shall not apply to the portion of the Shopping Center identified on the Site Plan as "Lower Level Space");

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/646690.3

EXHIBIT D
5

02/06/15
FINAL

(ii)    church; bingo hall (except that the foregoing restrictions shall not apply to the Lower Level Space) or a place of public assembly (except in the Lower Level Space);

(iii)    library or school (includes, but not limited to, a beauty school, barber college, reading room, place of instruction or any other operation serving primarily students or trainees rather than retail customers, provided that the foregoing restrictions shall not apply to Lower Level Space and further provided that tutoring of any grade/level of school/university for subjects/testing such as Score, Mathnasium and Sylvan Learning Center shall be permitted);

(iv)    for the sale or service of automobiles or other vehicles; provided, however, auto parts retail locations shall be permitted, and further provided, one quick lube/tire and battery station such as Kaufman Tire, Jiffy Lube or NTB shall be permitted;

(v)    night club or bar serving alcoholic beverages except as incidental to a restaurant ("incidental" shall be defined as deriving less than 40% of gross sales from the sale of alcoholic beverages) provided, however, the operation of an upscale wine bar or similar operation shall not be prohibited; or liquor or package store, except the following shall be permitted (a) a liquor or package store anywhere in the Lower Level Space; (b) a Total Wine or similar retailer; (c) the sale of alcoholic beverages in connection with a permitted retail use (such as the sale of wine, beer or spirits by Bed, Bath & Beyond, Cost Plus, or a grocery store);

(vi)    funeral parlor; massage parlor (except for (i) therapeutic massages given in connection with the operation of a day spa and therapeutic massage providers such as Massage Envy and Spa Sydell; (ii) hair salons which provides massage services as an incidental part of its business; (iii) the provision of massage services in connection with medical or chiropractic facilities, such as medical rehabilitations clinics; and (iv) massages given as incidental to a health club);

(vii)    animal clinic or animal boarding (kennel) except as incidental to a national pet supply store such as *Petsmart* or *Petco*;

(viii)    discotheque; dance hall or otherwise for musical/dance reviews or topless/nude shows;

(ix)    karate studio; gymnasium; bowling alley; or skating rink, except the foregoing shall be permitted anywhere on the Lower Level Space or on the Upper Level Space so long as same which located on the Upper Level Space is not located within 200 feet of the front door of the Premises;

(x)    car wash;

(xi)    off-track betting establishment;

(xii)    except in the Lower Level Space, pool room, (provided the same shall be allowed in the Lower Level Space only if it is a "high end" pool room operation) game room or amusement arcade (defined as any establishment containing more than a combination of three

"North Decatur"            EXHIBIT D            02/06/15
Suburban Plaza             6               FINAL
Decatur, GA
Store No. 1741
6061.1165/646690.3

electronic, pinball or other games, gallery or store or pinball arcade) except as to all of the above incidental to a permitted restaurant use;

(xiii)   so-called "flea market"; or second hand, used goods or consignment store; provided, however, the foregoing restriction shall not prohibit antique shops or stores selling high quality used merchandise such as *Play It Again Sports*, *Plato's Closet*, and *Game Stop* or stores that sell "Vintage" clothing;

(xiv)   store selling primarily distressed or damaged merchandise (except to the extent falling within the uses permitted by clause (xiii) above;

(xv)    health club (except for the premises depicted as L.A. Fitness on the Site Plan, and successors, assigns and replacements thereof);

(xvi)   so-called "head shop" or night club;

(xvii)  gun range or gun shop, except the sale of guns as incidental to a national or regional sporting goods store such as Dick's Sporting Goods shall be permitted;

(xviii) for warehousing, except as incidental to a retail business;

(xix)   adult book store or store selling or exhibiting sexually explicit materials (materials shall be considered "adult" or "pornographic" for such purpose if the same are not available for sale or rental to children under 18 years old because they explicitly deal with or depict human sexuality), provided that sale, rental or display of such items as an incidental part of a permitted business (as used above, the term "incidental" means, with respect to any national or regional video store chain or national or regional book store, any sale or rental of such materials and with respect to other tenants, the sale of such materials from not more than ten percent (10%) of the sales area of such business and so as to constitute less than ten percent (10%) of the gross sales of such business) shall be permitted;

(xx)    Intentionally Deleted;

(xxi)   abortion clinic, aids clinic, drug treatment facility or bodily fluid collection facility; homeless shelter or halfway house;

(xxii)  Laundromat; provided, however, this prohibition shall not be applicable to (i) nominal supportive facilities for on-site service oriented to pickup and delivery by the ultimate consumer as the same may be found in retail shopping centers in the metropolitan area where the Shopping Center is located; or (ii) a store with dry cleaning processes, using dry cleaning solvents that are biodegradable, non-chlorinated and are not hydrocarbons, and are not Hazardous Materials; and

(xxiii) marijuana dispensary.

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/646690.3

EXHIBIT D
7

02/06/15
FINAL

# EXHIBIT E

## ACKNOWLEDGMENT OF COMMENCEMENT

This Acknowledgment is made as of _____, 20___ with reference to that certain lease (hereinafter referred to as the "Lease") dated _____, 20___, between **SUBURBAN PLAZA, LLC**, as "Landlord" therein, and **ROSS DRESS FOR LESS, INC.**, as "Tenant."

The undersigned hereby confirms the following:

1.  The Delivery Date (as described in said Lease) occurred on _____.

2.  In accordance with the provisions of said Lease the commencement date of the term is _____, and that, unless sooner terminated, the original term thereof expires on _____.

3.  The Agreed Size is _____ square feet.

4.  The notice date for the exercise of the first option is on or before _____, 20___.

**LANDLORD:**
**SUBURBAN PLAZA, LLC,**
**a Georgia limited liability company**

By: Selig Enterprises, Inc.,
    a Georgia corporation
Its: Manager


By:_____
Name:_____
Its:_____

Witness: _____
Printed Name: _____
Witness: _____
Printed Name: _____

**TENANT:**
**ROSS DRESS FOR LESS, INC.,**
**a Virginia corporation**


By:_____
    Gregg McGillis
Its: Senior Vice President, Property Development

Witness:_____
Printed Name:_____
Witness:_____
Printed Name:_____

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/636041.1

EXHIBIT E

02/06/15
FINAL

# EXHIBIT F

RECORDING REQUESTED BY

Ross Dress For Less, Inc.

PREPARED BY AND WHEN RECORDED MAIL TO:

Bartko, Zankel, Bunzel & Miller
One Embarcadero Center, Suite 800
San Francisco, CA 94111
Attn.: Theani C. Louskos, Esq.

SPACE ABOVE THIS LINE RESERVED FOR RECORDER'S USE

## SUBORDINATION, NONDISTURBANCE AND ATTORNMENT AGREEMENT

## LOCATION: DECATUR, GA

1  APN:_____.
2
3        This Subordination, Nondisturbance and Attornment Agreement (the "Agreement") is
4  effective as of this ___ day of _____, 20__, by and between _____ (the "Lender"),
5  ROSS DRESS FOR LESS, INC., a Virginia corporation (the "Tenant") and SUBURBAN PLAZA, LLC, a
6  Georgia limited liability company (the "Landlord").
7
8                                    **RECITALS**
9
10        A.    Lender is the holder of indebtedness secured by a lien or liens upon, the real property
11  described in Exhibit "A" attached hereto and by this reference incorporated herein. The Exhibit "A"
12  property and improvements thereon is hereinafter referred to as the "Shopping Center." The instruments
13  creating such lien or liens whether they be denominated as being "mortgage," "deed of trust," "deed to
14  secure debt," "security agreement," "vendor's lien," "ground lease," or otherwise, and any instruments
15  modifying or amending the same, or entered into in substitution or replacement thereof, are hereinafter
16  collectively referred to as being the "Mortgage," recorded in the Official Records of _____
17  County as Document No. _____.
18
19        B.    Tenant has executed, or will execute, a certain lease with Landlord, dated for reference
20  purposes on _____, for all or a portion of the Shopping Center, which portion (the
21  "Premises") is more particularly set forth in said lease. Said lease and all amendments and modifications
22  thereto are herein collectively referred to as the "Lease."
23

"North Decatur"                    EXHIBIT F                    02/06/15
Suburban Plaza                      Page 1                       FINAL
Decatur, GA
Store No. 1741
6061.1165/636044.1

C.    Tenant has requested that Lender agree not to disturb Tenant's possessory rights under the Lease in the event that Lender should foreclose on the Mortgage, provided that Tenant is not in default of the Lease.

D.    The parties desire to establish certain rights and obligations with respect to their respective interests by means of this Agreement.

## AGREEMENTS

NOW, THEREFORE, the parties hereto in consideration of the mutual covenants herein contained, and intending to be legally bound by hereby agree as follows:

1.    Subject to the terms and conditions of this Agreement, and for so long as this Agreement remains binding upon Lender, the Lease shall be, in accordance with the terms and conditions hereof, subordinate to the lien of the Mortgage and all voluntary and involuntary advances made thereunder.

2.    Lender approves of the Lease.

3.    Provided that Tenant is not in default so as to permit the Landlord to terminate the Lease or Tenant's right to possession of the Premises, Lender or the purchaser at a foreclosure sale pursuant to any action or proceeding to foreclose the Mortgage, whether judicial or non-judicial, or Lender pursuant to acceptance of a deed in lieu of foreclosure or any assignment of Landlord's interest under the Lease, in the exercise of any of the rights arising, or which may arise, out of the Mortgage or in any other manner: (i) shall not disturb or deprive Tenant in or of its use, quiet enjoyment and possession (or its right to use, quiet enjoyment and possession) of the Premises, or of any part thereof, or any right, benefit or privilege granted to or inuring to the benefit of Tenant under the Lease (including any right of renewal or extension thereof); (ii) shall not terminate or affect the Lease; (iii) shall recognize Tenant's rights, benefits and privileges under the Lease; and, (iv) shall recognize the leasehold estate of Tenant under all of the terms, covenants, and conditions of the Lease for the remaining balance of the term of the Lease with the same force and effect as if Lender were the Landlord under the Lease. Lender hereby covenants that any sale by it of the Shopping Center pursuant to the exercise of any rights and remedies under the Mortgage or otherwise, shall be made subject to the Lease and the rights of Tenant thereunder. However, in no event shall Lender be:

(a)    Liable for any act or omission of Landlord arising prior to the date Lender takes possession of Landlord's interest in the Lease or becomes a mortgagee in possession, except to the extent such act or omission is of a continuing nature, such as, for example, a repair obligation;

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/636044.1

EXHIBIT F
Page 2

02/06/15
FINAL

(b)    Liable for any offsets or deficiencies which the Tenant might be entitled to assert against the Landlord arising prior to the date Lender takes possession of Landlord's interest in the Lease or becomes a mortgagee in possession, except to the extent that Lender has received the benefit of the act of the Tenant giving rise to the right of deduction, such as, for example, relief of an obligation that would otherwise have been paid by Lender as Landlord;

(c)    Bound by any payment of rent or additional rent made by Tenant to Landlord for more than one month in advance, which payment was not required under the terms of the Lease;

(d)    Bound by any amendment or modification of the Lease executed after the date of this Agreement which: (i) increases Landlord's obligations or reduces Tenant's obligations under the Lease; and, (ii) is made without Lender's prior written consent (except to the extent that the Lease may specifically contemplate any amendment or modification thereof).

4.    In the event of the termination of the Mortgage by foreclosure, summary proceedings or otherwise, and if Tenant is not in default under the terms and conditions of the Lease so as to permit the Landlord thereunder to terminate the Lease, then, and in any such event, Tenant shall not be made a party in the action or proceeding to terminate the Mortgage unless not to do so would be disadvantageous procedurally to Lender, in which case, such joinder of Tenant as a party shall not extinguish or interfere with any rights of Tenant under the Lease, nor shall Tenant be evicted or moved or its possession or right to possession under the terms of the Lease be disturbed or in any way interfered with, and, subject to the provisions of this Agreement, Tenant will attorn to Lender or any other party which obtains title to the Shopping Center pursuant to any remedy provided for by the Mortgage or otherwise, such attornment to be effective and self-operative without the execution of any other instruments on the part of any party, and the Lease shall continue in full force and effect as a direct Lease from Lender or such party to Tenant under all the terms and provisions of the Lease (including any rights to renew or extend the term thereof). In the event of such attornment, Lender shall be deemed to have assumed and shall assume the performance of all of the affirmative covenants of Landlord occurring under the Lease from and after the time Lender becomes Landlord and until such time as such obligations are assumed by a bona fide purchaser.

5.    Tenant hereby confirms that the Lease is in full force and effect.

6.    Nothing contained in this Agreement shall be deemed to reduce or abrogate any rights of Tenant to cure any default of the Landlord under the Lease in accordance with and subject to the provisions of the Lease and/or to deduct from rental such amounts which Tenant may be entitled to so deduct under the provisions of the Lease.

7.    Unless and until Lender or any subsequent purchaser succeeds to the interest of Landlord under the Lease, Landlord shall continue to perform Landlord's obligations and duties under the Lease.

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/636044.1

EXHIBIT F
Page 3

02/06/15
FINAL

8.     If Landlord executes and delivers to Lender an Assignment of Leases and Rents conveying the rent under the Lease upon an event of default by Landlord under the Mortgage, after receipt of notice from Lender to Tenant (at the address set forth below) that rents under the Lease should be paid to Lender, Tenant shall thereafter pay to Lender all monies thereafter due to Landlord under the Lease.  In such event, Tenant shall be entitled to rely solely upon such notice, and Landlord and Lender hereby indemnify and agree to defend and hold Tenant harmless from and against any and all expenses, losses, claims, damages or liabilities arising out of Tenant's compliance with such notice or performance of the obligations under the Lease by Tenant made in good faith in reliance on and pursuant to such notice.  Tenant shall be entitled to full credit under the Lease for any rents paid to Lender in accordance with the provisions hereof.  Any dispute between Lender (or any other purchaser) and Landlord as to the existence of a default by Landlord under the provisions of the Mortgage, shall be dealt with and adjusted solely between Lender (or any other purchaser) and Landlord, and Tenant shall not be made a party thereto.

9.     Lender shall use the proceeds of any insurance recovery or condemnation award for the purposes stated in the Lease.

10.     No modification, amendment, waiver or release of any provision of this Agreement or of any right, obligation, claim or cause of action arising thereunder shall be valid or binding for any purpose whatsoever unless in writing and duly executed by the party against which the same is brought to be asserted.

11.     This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns, including without limitation, the covenants of Lender herein shall be specifically binding upon any purchaser of the Shopping Center at foreclosure or at a sale under power of sale.

12.     In the event any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, said provision(s) shall be void and of no further force or effect.

13.     This Agreement shall be governed and construed according to the laws of the state where the Shopping Center is located.

14.     Provided that Tenant is not in default under the Lease, Lender shall not institute any litigation naming Tenant as a defendant for the purpose of foreclosing or otherwise terminating Tenant's leasehold interest in the Shopping Center or the Premises unless Tenant is required to be named in such litigation by law, and then only for the purpose of complying with the applicable foreclosure statute and so long as Tenant's failure to defend against any such action shall not result in a waiver of its rights to continued possession under the Lease as set forth in this Agreement.  The term "Lender" as used herein shall include any successor-in-interest to the Lender (including a purchaser at foreclosure or sale in lieu thereof).

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/636044.1

EXHIBIT F
Page 4

02/06/15
FINAL

15.  To be effective, any notice or other communication given pursuant to this Agreement must be in writing and sent postage paid by United States registered or certified mail with return receipt requested.  Rejection or other refusal to accept, or inability to deliver because of changed address of which no notice has been given, will constitute receipt of the notice or other communication.  For purposes hereof, Lender's address is:

_____

_____

_____

Attn.:_____

and Tenant's address is:

Ross Dress For Less, Inc.
5130 Hacienda Drive
Dublin, CA  94568-7579
Attn:  Real Estate Legal Notice Department

and Landlord's address is:

Suburban Plaza, LLC
c/o Selig Enterprises, Inc.
1100 Spring Street, Suite 550
Atlanta, GA  30309
Attn.:  Bill Stogner

With a copy to:

Selig Enterprises, Inc.
1100 Spring Street, Suite 550
Atlanta, GA  30309
Attn.:  Kenneth J. Clayman, Esq.

At any time(s), each party may change its address for the purposes hereof by giving the other party a change of address notice in the manner stated above.

16.  This Agreement (a) contains the entire understanding of Lender and Tenant regarding matters dealt with herein (any prior written or oral agreements between them as to such matters being superseded hereby), (b) can be modified or waived in whole or in part only by a written instrument signed on behalf of the party against whom enforcement of the modification or waiver is sought, and (c) will bind and inure to the benefit of the parties hereto and their respective successors and assigns.

17.  In the event of any litigation arising out of the enforcement or interpretation of any of the provisions of this Agreement, the unsuccessful party shall pay to the prevailing party its reasonable attorneys' fees, including costs of suit, discovery and appeal.  The "prevailing party" shall be that party who obtains substantially the relief sought in the action.

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/636044.1

EXHIBIT F
Page 5

02/06/15
FINAL

1        18.    In the event the Lease is terminated as a result of Landlord's bankruptcy or reorganization,
2  whereby Lender obtains fee title to the Shopping Center (or in the case Lender is the ground lessor, retains
3  fee title without the encumbrance of the ground lease), Lender agrees that the Lease shall remain in effect as
4  between Lender (as Landlord) and Tenant, subject to the terms of this Agreement, and, upon Tenant's
5  written request, Lender and Tenant agree to execute a reinstatement agreement documenting that the Lease
6  has been reinstated as between Lender (as Landlord) and Tenant and that the terms and conditions thereof
7  shall be as stated in the Lease, subject to the provisions of this Agreement.

8          IN WITNESS WHEREOF, the parties have caused this instrument to be executed as of the
9  day and year first written above.

**TENANT:**                                  **LENDER:**
**ROSS DRESS FOR LESS, INC.,**            _____,
**a Virginia corporation**                  a_____

By:_____    By:_____
     Gregg McGillis                    Name:_____
Its:   Senior Vice President, Property Development    Its:_____

Witness: _____    Witness: _____
Printed Name: _____    Printed Name: _____
Witness: _____    Witness: _____
Printed Name: _____    Printed Name: _____
*Notary must be one of the witnesses    *Notary must be one of the witnesses

**LANDLORD:**
**SUBURBAN PLAZA, LLC,**
**a Georgia limited liability company**

By:  Selig Enterprises, Inc.,
     a Georgia corporation
Its:  Manager

By:_____
Name:_____
Its:_____

Witness: _____
Printed Name: _____
Witness: _____
Printed Name: _____
*Notary must be one of the witnesses

10

11    "North Decatur"                         EXHIBIT F                    02/06/15
     Suburban Plaza                         Page 6                      FINAL
     Decatur, GA
     Store No. 1741
     6061.1165/636044.1

1

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

2

State of California  )
  )
County of Alameda  )

3
4
5   On _____ before me, _____,
6   a Notary Public, personally appeared Gregg McGillis, who proved to me on the basis of satisfactory
7   evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to
8   me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their
9   signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted,
10  executed the instrument.
11
12  I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
13  paragraph is true and correct.
14
15  WITNESS my hand and official seal.
16

_____
Notary Public

17
18
19
20  State of_____)
  )
County of_____)

21
22
23  On _____ before me, _____, a Notary Public,
24  personally appeared _____, personally known to me or who proved
25  to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the
26  within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized
27  capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon
28  behalf of which the person(s) acted, executed the instrument.
29
30
31  WITNESS my hand and official seal.
32

_____
Notary Public

33

State of_____)
                               )
County of_____)

1
2
3  On _____ before me, _____, a Notary Public,
4  personally appeared _____, personally known to me or who proved
5  to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the
6  within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized
7  capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon
8  behalf of which the person(s) acted, executed the instrument.
9
10
11  WITNESS my hand and official seal.
12

                                    _____
                                            Notary Public

13

## EXHIBIT F-1

RECORDING REQUESTED BY

Ross Dress For Less, Inc.

AND WHEN RECORDED MAIL TO:

Bartko, Zankel, Bunzel & Miller
One Embarcadero Center, Suite 800
San Francisco, CA 94111
Attn.: Theani C. Louskos, Esq.

SPACE ABOVE THIS LINE RESERVED FOR RECORDER'S USE

## SUBORDINATION, NONDISTURBANCE AND ATTORNMENT AGREEMENT
## [MASTER LESSOR]
## LOCATION: DECATUR, GA

This Subordination, Nondisturbance and Attornment Agreement (the "Agreement") is effective this ____ day of _____, 20____, by and between _____, a _____ _____ (the "Master Lessor"), ROSS DRESS FOR LESS, INC., a Virginia corporation ("Tenant") and SUBURBAN PLAZA, LLC, a Georgia limited liability company ("Landlord").

### RECITALS

A. Under that certain Lease Agreement, dated _____ (the "Master Lease"), Master Lessor is the lessor and Landlord is the lessee with respect to the real property described in Exhibit "A" attached hereto and by this reference incorporated herein. The Exhibit "A" property and improvements thereon are hereinafter collectively referred to as the "Shopping Center."

B. Tenant has executed, or will execute, a certain lease with Landlord, dated for reference purposes on _____, for all or a portion of the Shopping Center, which portion (the "Premises") is more particularly set forth in said lease. Said lease and all amendments and modifications thereto are herein collectively referred to as the "Lease." Capitalized terms used herein without definition shall have the meaning ascribed to them in the Lease.

C. Tenant has requested that Master Lessor agree not to disturb Tenant's possessory rights under the Lease in the event that Landlord defaults under the Master Lease and Master Lessor becomes the landlord under the Lease, provided that Tenant is not in default under the Lease.

D. The parties desire to establish certain rights and obligations with respect to their respective interests by means of this Agreement.

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/636060.1

EXHIBIT F-1
Page 1

02/06/15
FINAL

**AGREEMENTS**

NOW, THEREFORE, the parties hereto in consideration of the mutual covenants herein contained, hereby agree as follows:

1.      Subject to the terms and conditions of this Agreement, the Lease shall be, in accordance with the terms and conditions hereof, subordinate to the Master Lease.

2.      Master Lessor represents and warrants to Tenant that:   (i) Master Lessor is the "Landlord" or "Lessor" under the Master Lease; (ii) Master Lessor is the sole holder of fee simple title to the Shopping Center; (iii) Master Lessor has the full right and authority to enter into this Agreement; (iv) the Master Lease is in full force and effect and represents a valid lease of the entire Shopping Center; (v) a copy of the fully executed Master Lease and each of the amendments thereto referred to above in the Recitals hereto are true and correct, and there are no other amendments, modifications or additions to the Master Lease, written or oral; (vi) neither Master Lessor nor Landlord are in default under any terms or conditions of the Master Lease; (vii) the current term of the Master Lease expires by its own terms on **[TBD]**; and (viii) Landlord currently has **[TBD]** options of **[TBD]** years each to extend the term of the Master Lease.

3.      Master Lessor consents to the Lease and the leasing of the Premises to Tenant. Further, Master Lessor:   (i) consents to Tenant's construction of the improvements reflected in Exhibit C of the Lease and all alterations and modifications required in connection therewith; (ii) consents to Tenant's erection and maintenance, at its sole expense (except as otherwise provided in the Lease), of all signage reflected in Exhibit J of the Lease, including the locations thereof as depicted in such Exhibit; (iii) consents to Tenant's installation of Communication Equipment pursuant to Section 12.2 of the Lease and agrees to the terms of Section 12.2.2 of the Lease relating to roof repairs and Tenant's Communication Equipment.

4.      Master Lessor and Tenant agree that neither of them has any liability to the other by reason of any default by Landlord under the Master Lease, and that their only liability to each other with respect to Tenant's use of the Premises is as expressly provided herein.  Furthermore, Tenant has no liability to Master Lessor under the Lease or otherwise until the expiration or earlier termination of the Master Lease and Master Lessor's assumption of the Lease, pursuant to Paragraph 5 of this Agreement.  Nothing contained herein or in the Lease shall release Landlord from its obligations under the Master Lease.

5.      Provided that Tenant is not in default so as to permit Landlord to terminate the Lease or Tenant's right to possession of the Premises, and notwithstanding any contrary provisions in the Master Lease, Master Lessor (i) shall not disturb or deprive Tenant in or of its use, quiet enjoyment and possession (or its right to use, quiet enjoyment and possession) of the Premises, or of any part thereof, or any right, benefit or privilege granted to or inuring to the benefit of Tenant

under the Lease (including any right of renewal or extension thereof); (ii) shall not terminate or affect the Lease; (iii) shall recognize Tenant's rights, benefits and privileges under the Lease; and, (iv) shall recognize the leasehold estate of Tenant under all of the terms, covenants, and conditions of the Lease for the remaining balance of the Term of the Lease with the same force and effect as if Master Lessor were the Landlord under the Lease. Master Lessor hereby covenants that any sale by Master Lessor of the Shopping Center pursuant to the exercise of any rights and remedies under the Master Lease or otherwise, shall be made subject to the Lease and the rights of Tenant thereunder. However, in no event shall Master Lessor be:

(a)    Liable for any act or omission of Landlord arising prior to the date Master Lessor takes possession of Landlord's interest in the Lease except to the extent such act or omission is of a continuing nature, such as, for example, a repair obligation;

(b)    Liable for any offsets or deficiencies which Tenant might be entitled to assert against Landlord arising prior to the date Master Lessor takes possession of Landlord's interest in the Lease, except to the extent that Master Lessor has received the benefit of the act of Tenant giving rise to the right of deduction, such as, for example, relief of an obligation that would otherwise have been paid by Master Lessor as Landlord;

(c)    Bound by any payment of rent or additional rent made by Tenant to Landlord for more than one (1) month in advance, which payment was not required under the terms of the Lease;

(d)    Bound by any amendment or modification of the Lease executed after the date of this Agreement which: (i) increases Landlord's obligations or reduces Tenant's obligations under the Lease; and, (ii) is made without Master Lessor's prior written consent (except to the extent that the Lease may specifically contemplate any amendment or modification thereof).

6.    In the event of the termination or expiration of the term of the Master Lease for any reason whatsoever, and if Tenant is not in default under the terms and conditions of the Lease so as to permit the Landlord thereunder to terminate the Lease, Tenant shall not be made a party in the action or proceeding to terminate the Master Lease. Further, Tenant shall not be evicted or moved or its possession or right to possession of the Premises under the terms of the Lease be disturbed or in any way interfered with. Subject to the provisions of this Agreement, Tenant will attorn to Master Lessor or any other party which retains or obtains title to the Shopping Center (without the encumbrance of the Master Lease) pursuant to any remedy provided for by the Master Lease or otherwise. Such attornment shall be effective and self-operative without the execution of any other instruments on the part of any party, provided that Master Lessor notifies Tenant thereof, and, in all events, the Lease shall continue in full force and effect, subject to the terms of this Agreement, as a direct Lease between Master Lessor (or such party) and Tenant under all of the exact and verbatim terms and provisions of the Lease (including any rights of Tenant to renew or extend the Term thereof), without the necessity for executing any new lease. In the event of such attornment, Master Lessor shall be deemed to have assumed and shall assume the performance of all of the affirmative covenants of Landlord occurring under the Lease from and after the time Master Lessor becomes the landlord and until such time as such obligations are assumed by a bona fide purchaser, if any.

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/636060.1

EXHIBIT F-1
Page 3

02/06/15
FINAL

7.    Tenant hereby confirms that the Lease is in full force and effect. The parties hereto agree that, as between Landlord and Tenant, all of the provisions of the Lease shall be superior and paramount to the Master Lease. In the event of any inconsistency between the provisions of the Master Lease and the provisions of the Lease, as between Landlord and Tenant, the provisions of the Lease shall supersede and prevail. In the event of any conflict or inconsistency between the terms of this Agreement and the terms of the Master Lease, the terms of this Agreement shall supersede and prevail and, accordingly, the provisions of the Master Lease as they apply to the Premises, are amended to the extent necessary to reconcile such conflicts or inconsistencies. Notwithstanding anything to the contrary elsewhere in this Agreement, the terms and provisions of the Lease are not to be incorporated herein except as expressly provided in this Agreement.

8.    Nothing contained in this Agreement shall be deemed to reduce or abrogate any rights of Tenant to cure any default of Landlord under the Lease in accordance with and subject to the provisions of the Lease and/or to deduct from rental such amounts which Tenant may be entitled to so deduct under the provisions of the Lease.

9.    Unless and until Master Lessor or any subsequent purchaser succeeds to the interest of Landlord under the Lease, Landlord shall continue to perform Landlord's obligations and duties under the Lease. Landlord shall also perform Landlord's obligations and duties and shall comply with all of the terms, covenants and conditions of the Master Lease which are binding upon Landlord. Master Lessor, Landlord and Tenant agree that, in the event of a default by Landlord under the Master Lease, Tenant shall have the right, but not the obligation, to cure Landlord's default under the Master Lease, and to pursue against Landlord any remedies available under the Lease, and at law or in equity.

10.    If, under the provisions of the Master Lease or the Lease, Master Lessor is entitled to receive rent due under the Lease in the event of a default by Landlord under the Master Lease, after receipt of notice from Master Lessor to Tenant (at the address set forth below) that rents under the Lease should be paid to Master Lessor, Tenant shall thereafter pay to Master Lessor all monies thereafter due to Landlord under the Lease. In such event, Tenant shall be entitled to rely solely upon such notice, and Landlord and Master Lessor hereby indemnify and agree to defend and hold Tenant harmless from and against any and all expenses, losses, claims, damages or liabilities arising out of Tenant's compliance with such notice or performance of the obligations under the Lease by Tenant made in good faith in reliance on and pursuant to such notice. Tenant shall be entitled to full credit under the Lease for any rents paid to Master Lessor in accordance with the provisions hereof. Any dispute between Master Lessor (or any other purchaser) and Landlord as to the existence of a default by Landlord under the provisions of the Master Lease, shall be dealt with and adjusted solely between Master Lessor (or any subsequent purchaser) and Landlord, and Tenant shall not be made a party thereto.

11.    Master Lessor shall use the proceeds of any insurance recovery or condemnation award for the purposes stated in the Lease.

"North Decatur"          EXHIBIT F-1          02/06/15
Suburban Plaza            Page 4              FINAL
Decatur, GA
Store No. 1741
6061.1165/636060.1

12.     On and after the date of the Lease, and throughout the Term of the Lease, Master Lessor and Landlord shall not enter into any cancellation, termination, amendment or modification of the Master Lease (a "Master Lease Amendment") without Tenant's prior written consent, which consent shall not be unreasonably withheld.  However, Tenant's withholding of such consent shall be deemed reasonable, among other reasons, if the proposed Master Lease Amendment will: (i) conflict with the provisions of the Lease; or (ii) increase Tenant's obligations and/or reduce Landlord's obligations under the Lease; or (iii) reduce Tenant's rights and/or increase Landlord's rights under the Lease; (iv) reduce Tenant's rights under the Master Lease which Tenant is privileged to enjoy by reason of its tenancy and rights under the Lease; or (v) materially and adversely affect Tenant's use of the Store or Tenant's use of the Common Areas of the Shopping Center.

13.     No modification, amendment, waiver or release of any provision of this Agreement or of any right, obligation, claim or cause of action arising hereunder shall be valid or binding for any purpose whatsoever unless in writing and duly executed by the party against which the same is brought to be asserted.

14.     This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns, including, without limitation, the covenants of Master Lessor herein shall be specifically binding upon any purchaser of the Shopping Center.

15.     In the event any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, said provision(s) shall be void and of no further force or effect.

16.     This Agreement shall be governed and construed according to the laws of the state where the Shopping Center is located.

17.     Provided that Tenant is not in default under the Lease, Master Lessor shall not institute any litigation naming Tenant as a defendant or otherwise terminating Tenant's leasehold interest in the Shopping Center or the Premises unless Tenant is required to be named in such litigation by law, and only so long as Tenant's failure to defend against any such action shall not result in a waiver of its rights to continued possession under the Lease as set forth in this Agreement.  The term "Master Lessor" as used herein shall include any successor-in-interest to Master Lessor.

18.     To be effective, any notice or other communication given pursuant to this Agreement must be in writing and sent by postage paid by United States registered or certified mail with return receipt requested.  Rejection or other refusal to accept, or inability to deliver because of a changed address of which no notice has been given, will constitute receipt of the notice or other communication.  For purposes hereof, Master Lessor's address is:

_____
_____
_____

1    and Tenant's address is:

2                    Ross Dress For Less, Inc.
3                    5130 Hacienda Drive
4                    Dublin, CA  94568-7579
5                    Attn.:  Real Estate Legal Notice Department
6
7    and Landlord's address is:

8                    Suburban Plaza, LLC
9                    c/o Selig Enterprises, Inc.
10                   1100 Spring Street, Suite 550
11                   Atlanta, GA  30309
12                   Attn.:  Bill Stogner
13
14   With a copy to:

15                   Selig Enterprises, Inc.
16                   1100 Spring Street, Suite 550
17                   Atlanta, GA  30309
18                   Attn.:  Kenneth J. Clayman, Esq.
19
20                   At any time(s), each party may change its address for the purposes hereof by giving
21   the other party a change of address notice in the manner stated above.

22          19.     If Master Lessor or Landlord delivers a notice to the other party of the other party's
23   default under the Master Lease, the notifying party shall also concurrently deliver a copy of such
24   notice to Tenant.

25          20.     This Agreement (a) contains the entire understanding of Master Lessor, Landlord
26   and Tenant regarding the matters dealt with herein (any prior written or oral agreements between
27   them as to such matters being superseded hereby), (b) can be modified or waived in whole or in part
28   only by a written instrument signed on behalf of the party against whom enforcement of the
29   modification or waiver is sought, and (c) will bind and inure to the benefit of the parties hereto and
30   their respective successors and assigns.

31          21.     In the event of any litigation arising out of the enforcement or interpretation of any
32   of the provisions of this Agreement, the unsuccessful party shall pay to the prevailing party its
33   reasonable attorneys' fees, including costs of suit, discovery and appeal.  The "prevailing party" shall
34   be that party who obtains substantially the relief sought in the action.

35          22.     In the event the Lease is terminated as a result of Landlord's bankruptcy or
36   reorganization, whereby Master Lessor retains or obtains fee title to the Shopping Center (without
37   the encumbrance of the Master Lease), Master Lessor agrees that the Lease shall remain in effect as
38   between Master Lessor (as landlord) and Tenant, subject to the terms of this Agreement, and, upon
39   Tenant's written request, Master Lessor and Tenant agree to execute a reinstatement agreement
40   documenting that the Lease has been reinstated as between Master Lessor (as landlord) and Tenant

1  and that the terms and conditions thereof shall be as stated in the Lease, subject to the provisions of
2  this Agreement.

3      23.    The parties hereto covenant and agree that they shall execute such other and further
4  documents as are or may become necessary to carry out the objectives of this Agreement.

5          IN WITNESS WHEREOF, the parties have caused this Agreement to be executed
6  as of the day and year first written above.

**TENANT:**                                      **MASTER LESSOR:**
**ROSS DRESS FOR LESS, INC.,**                   _____,
**a Virginia corporation**                       a _____


By:_____            By:_____
    Gregg McGillis                              Name:_____
Its:  Senior Vice President, Property Development  Its:_____

Witness:  _____            Witness:  _____
Printed Name:    _____             Printed Name:    _____
Witness:  _____            Witness:  _____
Printed Name:    _____             Printed Name:    _____
*Notary must be one of the witnesses           *Notary must be one of the witnesses


**LANDLORD:**
**SUBURBAN PLAZA, LLC,**
**a Georgia limited liability company**

By:  Selig Enterprises, Inc.,
     a Georgia corporation
Its:  Manager


By:_____
Name:_____
Its:_____

Witness:  _____
Printed Name:    _____
Witness:  _____
Printed Name:    _____
*Notary must be one of the witnesses

7

1

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

2

State of California                 )
                                           )
County of Alameda             )

3

4

5 On _____ before me, _____,

6 a Notary Public, personally appeared Gregg McGillis, who proved to me on the basis of satisfactory

7 evidence to be the person~~(s)~~ whose name~~(s)~~ is~~/are~~ subscribed to the within instrument and

8 acknowledged to me that he~~/she/they~~ executed the same in his~~/her/their~~ authorized capacity~~(ies)~~,

9 and that by his~~/her/their~~ signature~~(s)~~ on the instrument the person~~(s)~~, or the entity upon behalf of

10 which the person~~(s)~~ acted, executed the instrument.

11

12 I certify under PENALTY OF PERJURY under the laws of the State of California that the

13 foregoing paragraph is true and correct.

14

15 WITNESS my hand and official seal.

16

                                           _____

17                                                     Notary Public

18

19

20

State of_____)
                                     )
County of_____)

21

22

23 On _____ before me, _____, a Notary Public,

24 personally appeared _____, personally known to me or who

25 proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are

26 subscribed to the within instrument and acknowledged to me that he/she/they executed the same in

27 his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the

28 person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

29

30

31 WITNESS my hand and official seal.

32

                                           _____
                                                    Notary Public

"North Decatur"                         EXHIBIT F-1                       02/06/15
Suburban Plaza                            Page 8                              FINAL
Decatur, GA
Store No. 1741
6061.1165/636060.1

1

State of_____)
                                )
County of_____)

2
3
4    On _____ before me, _____, a Notary Public,
5    personally appeared _____, personally known to me or who
6    proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
7    subscribed to the within instrument and acknowledged to me that he/she/they executed the same in
8    his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
9    person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.
10
11
12   WITNESS my hand and official seal.
13

_____
                                Notary Public

14
15

## EXHIBIT G

## CONSTRUCTION COMPLETION NOTICE

1.  The "Lease"
    | | |
    |---|---|
    | Landlord: | Suburban Plaza, LLC |
    | Tenant: | Ross Dress For Less, Inc. |
    | Location: | Decatur, GA |
    | Lease Dated: | _____ |

2.  All terms used herein shall be as defined in the Lease.

3.  Date of this Notice:        _____

4.  Ross Store #:        1741
    Project Address:   N. Decatur Rd. & Scott Blvd.

5.  Pursuant to Section 5.4 of the Lease, this shall constitute the "Construction Completion Notice":

    (a)  The "Delivery Date," shall occur on: _____.

    (b)  Landlord acknowledges that all the requirements specified in Article 2, "Delivery Date," will be satisfied by the date specified in subparagraph (a), above.

    (c)  Landlord has a fully executed contract for Landlord's Construction Obligations, with [Insert name of Landlord's General Contractor and contact person for General Contractor]: _____, Contact Person: _____.

    (d)  Attached hereto as **Schedule 1** is a construction schedule with respect to Landlord's Construction Obligations, initialed by Landlord's contractor, which confirms that all of Landlord's Construction Obligations will be completed by the Delivery Date set forth in subparagraph (a), above.

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/636064.1

EXHIBIT G
1

02/06/15
FINAL

(e)    Landlord has obtained all building permits for Landlord's Construction Obligations, a copy of which is/are attached hereto as **Schedule 2**.

**SUBURBAN PLAZA, LLC,**
**a Georgia limited liability company**

By:  Selig Enterprises, Inc.,
  a Georgia corporation
Its:  Manager


By:_____
Name:_____
Its:_____

Witness: _____
Printed Name: _____
Witness: _____
Printed Name: _____

Dated: _____

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/636064.1

EXHIBIT G
2

02/06/15
FINAL

# SCHEDULE 1

**SCHEDULE 2**

# EXHIBIT H

## EXCLUSIVE USES

*From the Easement with Covenants and Restrictions Affecting Land ("ECR"), made as of June 14, 2014, by and between Wal-Mart Stores East, LP, a Delaware limited partnership ("Wal-Mart") and Suburban Plaza, LLC, a Georgia limited liability company ("Owner"), recorded June 20, 2014 as Document No. 2014089721 in Deed Book 24435, Page 122, DeKalb County, Georgia:*

2.     **Use.** Except as provided in Section 3 below, the Remainder of the Shopping Center may be used for any lawful purpose, provided that no restaurant may be located within the "**Restaurant Restricted Area**" shown on **Exhibit "A."** The **Wal-Mart Tract** may be used for any lawful principally retail purpose. Nothing contained in this ECR shall be construed to contain a covenant, either express or implied, for Wal-Mart to either commence the operation of a business or thereafter continuously operate a business on the **Wal-Mart Tract**. Wal-Mart may, at Wal-Mart's sole discretion and at any time, cease the operation of Wal-Mart's business on the **Wal-Mart Tract**; and Owner hereby waives any legal action for damages or for equitable relief which might be available to Owner because of such cessation of business activity by Wal-Mart. In no event shall any of the Tracts nor any portion thereof be used at any time in any of the manners or purposes expressly prohibited in **Exhibit "D"** or **Exhibit "E"** attached hereto.

3.     **Competing Business.** As long as Wal-Mart or an affiliate is the lessee or owner of the **Wal-Mart Tract**, no space in the **Remainder of the Shopping Center**, shall be used, leased or occupied by or conveyed to any other party for primary use as or in support of (a) a Grocery Store or Supermarket, as defined in this **Paragraph 3**, (b) a Discount Department Store or other Discount Store, as defined in this **Paragraph 3**, (c) a pharmacy, (d) a variety, general or "dollar store" (with the exception of the operation of a Family Dollar store during the term of the existing lease with such tenant), (e) a membership warehouse club, (f) a Gas Station/Convenience Store, as defined in this **Paragraph 3**, or (g) as any combination of the

foregoing uses (the "**Competing Uses**"). In the event of material breach of this covenant, Wal-Mart shall have the right to seek any remedies afforded by either law or equity, including, without limitation, the rights to injunctive relief.

•     "**Grocery Store**" or "**Supermarket**," as those terms are used herein, shall mean a food store or food department containing more than 3,000 square feet each of gross leasable area in the **Remainder of the Shopping Center**, for the purpose of selling food for consumption off the premises, which shall include, without limitation, the sale of dry, refrigerated or frozen groceries, meat, seafood, poultry, produce, delicatessen or bakery products, refrigerated or frozen dairy products, or any grocery products normally sold in such stores or departments.

• "**Discount Department Store**" or "**Discount Store**," as those terms are used herein, shall mean a discount department store or discount store in the Remainder of the Shopping Center, for the purpose of selling a **full** line of **both** hard goods and soft goods (e.g., clothing, cards, gifts, electronics, garden supplies, furniture, pharmacy, lawnmowers, toys, health and beauty aids, hardware items, bath accessories and auto accessories) at a discount in a retail operation similar to that of Wal-Mart.

• "**Gas Station/Convenience Store**" as used herein shall mean a retail store or operation of any size dispensing motor fuels or fuel additives by pump, container, or any future method of dispensing and introducing fuel into automobiles, trucks, or other transportation devices whether or not such activities are primary to such store or operation.

## MAIL PLUS MORE

Provided (i) Tenant is not in Tenant Default of this lease beyond any applicable cure period, and (ii) Tenant is operating and has continuously operated a business in the Premises in accordance with the Use of Premises, Landlord hereby agrees not to lease any portion of the Shopping Center as an "Unpermitted Competing Business." An "Unpermitted Competing Business" is hereby defined as any "local/mom and pop" tenant containing less than one thousand five hundred (1,500) square feet operating a mail services (including, without limitation, faxing and copying) business operation. Notwithstanding anything to the contrary in the foregoing sentence, this provision shall not be applicable to (i) any tenants in the Shopping Center, their successors and assigns, who currently have leases which permit such tenants to operate an "Unpermitted Competing Business", or (ii) a "Permitted Competing Business," defined as (i) any "national tenant", such as UPS, Kinkos, Staples, Office Depot or any other national or regional copy, printing, office supply, shipping or sign business, and (ii) any "local/mom and pop" tenant containing one thousand five hundred (1,500) square feet or more operating a mail services (including, without limitation, faxing and copying) business operation.

## MOE'S SOUTHWEST GRILL

Provided (i) Tenant is not in Default of this lease beyond any applicable cure period and (ii) Tenant is operating a business in the Premises in accordance with the Use of Premises, Landlord hereby agrees not to lease any portion of the Shopping Center as a "Competing Business". A "Competing Business" is hereby defined as (i) any operation similar in concept as a "Willie's Mexicana", "Chipotle", "Burrito Art", or "Baja Fresh" or (ii) more than one (1) restaurant (other than Tenant) in excess of 1,500 square feet with dine-in capabilities. Notwithstanding anything to the contrary in the foregoing sentence, this provision shall not be applicable to any tenants in the Shopping Center, their successors and assigns, who currently have leases which permit such tenants to operate a "Competing Business".

"North Decatur"   EXHIBIT H   02/06/15
Suburban Plaza    2     FINAL
Decatur, GA
Store No. 1741
6061.1165/646602.3

## PIZZA HUT

Provided (i) Tenant is not in Default of this lease beyond any applicable cure period and (ii) Tenant is operating a business in the Premises in accordance with Paragraph 1.1 (P), Landlord hereby agrees not to lease any portion of the Shopping Center, as it may be expanded or modified from time to time, as a "Competing Business." A "Competing Business" is hereby defined as any business whose primary use is the retail sale of pizza and chicken wings. Notwithstanding anything to the contrary in the foregoing, this provision shall not be applicable to: (i) any tenants in the Shopping Center, their successors and assigns, who have leases prior to the date of this lease, which permit such tenants to operate a "Competing Business", (ii) any leases prior to the date of this lease which permit such tenants to operate as "any lawful, retail purpose", or (iii) any family-style full-service Italian restaurant; provided such restaurant does not derive fifteen (15%) percent or more of its retail sales from the sale of pizza, or chicken wings. Further, this exclusive shall not survive a lease assignment, except for any such assignment as may be permitted or approved under Article X of this lease.

## JO-ANN'S

So long as Tenant is (A) not in material uncured monetary default under the Lease, (B) open for business to the general public in all of the Premises as a fully-staffed, fully-stocked and fully-fixtured store, and is being primarily used full-time for the Protected Use: Landlord shall not, after the date of this Lease (it being acknowledged that tenants operating under leases executed prior to this date or this Lease shall not be subject to the this covenant), knowingly and intentionally sell or lease to any party other than Tenant for use in any premises in the Shopping Center other than the Premises (the "Other Premises") to a party other than Tenant (the "Other Tenant") whose primary use is the Protected Use, nor shall Landlord give an approval where Landlord has the sole right to object, to any Other Tenant to utilize any Other Premises for the primary use as the Protected Use (the "Leasing Covenant"). The Leasing Covenant is not an "exclusive" right granting Tenant the right to be the only premises in the Shopping Center utilizing the Protected Use, but is rather only a "personal" leasing covenant, which does not run with the land, between Landlord and Tenant, and shall not in any way prohibit Landlord from entering into a retail lease containing an "open" use clause or other use clause which does not restrict any Other Tenant's use (i.e., a provision permitting any lawful retail use or words of similar import). Moreover, the Leasing Covenant shall not restrict Landlord from leasing any Other Premises to any Other Tenant for the Protected Use, provided that to Landlord's knowledge the primary business of such Other Tenant is not going to be for the Protected Use. For purposes of this clause, such Other Tenants whose current uses constitute a violation of the Leasing Covenant and are accordingly specifically excluded include, without limitation, those businesses such as and similar to Cost Plus, Kirkland's, home accessory stores and gift stores. (By way of example: Landlord will not lease to a competitor such as Michael's, Hobby Lobby, Hancock Fabrics, nor will Landlord permit any Other Tenant to sublease Other Premises to one of these competitors if Landlord has the right to withhold such consent. However Ross, Home Goods and Wal-Mart shall specifically be excluded from such Leasing Covenant.)

Protected Use shall mean the sale of any of the following: fabrics of all kinds, goods sold by the yard, upholstery materials (excluding furniture store), scrapbooks and scrapbooking

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/646602.3

EXHIBIT H
3

02/06/15
FINAL

materials and supplies, patterns, yarns and knitting supplies, needlepoint, macramé, artificial flowers and accessories, arts and craft materials and supplies, all types of notions related to sewing and fabrics, custom framing, sewing machines, sewing machine furniture, products, accessories and services related to all of the foregoing ("Exclusive Use Items").

## LA FITNESS

PRIMARY USES. The "Primary Uses" of the Premises shall be for the operation of a health club and fitness facility which may include, without limitation, weight and aerobic training, exercise dancing, yoga, Pilates, Zumba, racquetball/squash, personal training, aerobics, health and fitness related programs, free weights, spinning/cycling, circuit training, boxing, basketball, swimming pool, swim lessons, racquetball/squash lessons, sauna and whirlpool facilities. As part of the health club and fitness facility operated within the Building, Tenant may use portions of the Building for uses ancillary to a health club and fitness facility (hereinafter, the "Ancillary Uses"), including, but not limited to, a health club and fitness facility related pro shop selling apparel and other fitness related items, physical therapy center, spa services, sports medicine, weight loss and nutritional advising, therapeutic massage, chiropractic care, tanning salon, juice bar, vitamin and nutritional supplement sales, ATM machines located inside the Building, vending machines located inside the Building, child care facility for members, and food and beverage service (including the sale of healthy and/or natural foods), as well as the sale of exercise and/or health related videos and/or DVDs and other related electronic media items. In addition, Tenant shall be permitted to use portions of the Premises for storage and office uses incidental to the Primary Uses. Subject to Exhibit J-1 attached hereto, Landlord hereby represents, warrants and covenants to Tenant that Tenant's operation of business from the Premises for the Primary Uses does not and will not violate any agreements respecting exclusive use rights or restrictions on use within the Project or any portion thereof. Provided that Tenant is not in default of this lease beyond any applicable notice and cure period, Tenant (or its successor or assigns) shall have the right throughout the Term and all Option Terms to operate for uses permitted under this lease and, subject to the rights of existing Project tenants under leases in effect as of the Effective Date ("Existing Tenants") identified in Exhibit J-2 attached hereto (and extensions or renewals thereof), so long as Tenant (or its successor or assigns) is operating as a health club and fitness facility in at least sixty percent (60%) of the Premises, Landlord will not allow any other non-retail fitness related operation (including, without limitation, health club, aerobics, yoga, Pilates, dance studio offering fitness-oriented classes such as Zumba, spinning/cycling, circuit training, personal training, basketball, boxing, cardiovascular or jazzercise operations) to operate in the Project (and Landlord will not amend the ECR to permit such uses in the Project). Only for purposes of the immediately preceding sentence, in order for Tenant to be deemed to be operating a "health club and fitness facility", such facility must include court sports, swimming area and men's/women's locker rooms. Tenant shall not be deemed to have ceased operating its business if it closes or ceases operations on account of remodeling, repairs or condemnation provided, with respect to remodeling, Tenant is diligently pursuing completion of same or for not more than two hundred seventy (270) days in connection with an assignment or sublease of the Premises. In the event of a breach of the foregoing, Tenant shall be entitled to injunctive relief and any other available remedy. The foregoing shall not, however, preclude Landlord from permitting another Project tenant to engage in the retail sale of fitness equipment for off-premises use or the operation of any of the Ancillary Uses, and any of the following uses shall expressly be permitted: (a) tanning salon, (b) weight loss clinic, (c) retail store specializing in sale of

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/646602.3

EXHIBIT H
4

02/06/15
FINAL

athletic apparel and equipment, such as without limitation, Dick's Sporting Goods or The Sports Authority, (d) subject to Section 8.4, physician or chiropractic or other medical office, including without limitation, occupational and physical therapy or a day spa such as Spa Sydell or therapeutic massage provider, such as Massage Envy, provided that none of the uses described in this sentence shall offer exercise or personal training components and that further provided that any day spa or therapeutic massage providers shall not exceed 10,000 square feet of Floor Area in the Project, (e) retail store or pharmacy offering the sale of nutritional supplements, such as without limitation, CVS or GNC, or (f) any children's gymnasium catering to children under the age of 18 or offering activities such as gymnastics and dance. If any governmental license(s) or permit(s) shall be required for the proper and lawful conduct of Tenant's business or other activity carried on in the Premises, or if a failure to procure such a license or permit might or would in any way adversely affect Landlord or the Premises, then Tenant, at Tenant's expense, shall duly procure and thereafter maintain such license(s) or permit(s) and submit the same for inspection by Landlord upon request. Tenant, at Tenant's expense, shall at all times materially comply with the requirements of such license(s) or permit(s).

## HomeGoods

Landlord agrees that, from the date hereof until expiration of the term of this lease, no other premises in the Shopping Center (excluding Wal-Mart) shall at any time contain more than fifteen thousand (15,000) square feet of leasable floor area therein primarily used or occupied for, or devoted to, the sale or display of the following categories of items: linens and domestics, window treatments, floor coverings, bathroom items, bedding, wall décor, housewares, table top goods, glassware, flatware, cookware, kitchen utensils, closet, shelving and storage items and home accessories (all of the foregoing hereinafter referred to as a "Competing Use" and the merchandise referred to therein as the "Protected Merchandise"). The computation of such leasable floor area shall include one half (1/2) of all floor area in any aisles, corridors or similar spaces adjacent to or abutting any racks, gondolas, shelves, cabinets, counters or other fixtures or equipment containing or used for the sale or display of the Protected Merchandise.

Notwithstanding anything in this lease to the contrary, the following tenants shall not be deemed a Competing Use or Prohibited Use and shall be permitted to operate within the Shopping Center without regard to such use restrictions: T.J. Maxx, T.J. Maxx 'N More, Marshalls, Mega Marshalls, Ross Dress For Less, Inc. (or its affiliates), A.J. Wright, Nordstrom Rack, Jo Ann's, Kirkland's, Pier One. Furthermore, this Paragraph 4 shall not apply with respect to rights previously granted to tenants or occupants with respect to Prohibited Use or Competing Use under leases or agreements existing as of the date hereof.

## STARBUCKS

So long as Tenant is (a) not in material uncured monetary default under the Lease, and (b) open for business to the general public in all of the Premises as a fully-staffed, fully-stocked and fully-fixtured store, and is being primarily used full-time for the Coffee Use: Landlord shall not knowingly and intentionally sell or lease to any party other than Tenant in any premises in the Shopping Center other than the Premises (the "Other Premises") to a party other than Tenant (the "Other Tenant") whose primary use is the Coffee Use, nor shall Landlord give an approval that Landlord has the sole

right to give, to any Other Tenant to utilize any Other Premises for the primary use as the Coffee Use (the "Leasing Covenant"). The Leasing Covenant is not an "*exclusive*" right granting Tenant the right to be the only Other Premises in the Shopping Center utilizing the Coffee Use, but is rather only a "*personal*" leasing covenant, which does not run with the land, between Landlord and Tenant, and shall not in any way prohibit Landlord from entering into a retail lease containing an "open" use clause or other use clause which does not restrict any Other Tenant's use (*i.e.*, a provision permitting any lawful retail use or words of similar import). Moreover, the Leasing Covenant shall not restrict Landlord from leasing any Other Premises to any Other Tenant for the Coffee Use, provided that the primary business of such Other Tenant is not the Coffee Use. In the event that Landlord knowingly and intentionally violates this provision, Tenant shall have all rights afforded to Tenant at law and in equity. For purposes of this clause, such Other Tenants whose current uses constitute a violation of the Lease Covenant and are accordingly specifically excluded include, without limitation, those businesses currently operating under the trade names *Caribou, Joe's Coffee, PJ's Coffee, Cambridge Coffee, Dillworth Coffee, Dunkin' Donuts, Krispy Kreme, San Francisco Coffee* and *Aurora Coffee House*. This prohibitive Leasing Covenant does *not* apply to any Other Tenant who intends to operate a fast casual restaurant, including, without limitation, *Atlanta Bread, Boston Market, Chipotle, Jason's Deli, Panera Bread Bakery Café* or *Quizno* so long as their Coffee Use is not greater than 20% of gross sales and which 20% or less of such Other Tenant's square footage is not primarily devoted to the Coffee Use.

> A coffee store or restaurant use specializing *primarily* in the sale of, (a)whole or ground coffee beans (b) espresso, espresso-based drinks, coffee-based drinks or whole bean coffee drinks, (c) tea or tea-based drinks, (d) brewed coffee, and (e) blended non-alcoholic beverages (collectively, the "Coffee Use").

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/646602.3

EXHIBIT H
6

02/06/15
FINAL

## EXHIBIT I

### PERMITTED TITLE EXCEPTIONS

ROSS DRESS FOR LESS, INC. ("Tenant"), agrees to take its leasehold interest subject only to the following items and exceptions stated in that certain Commitment for Title Insurance issued by Old Republic National Title Insurance Company, dated January 7, 2015 and numbered 2-27711(M)(1), for the subject location in Decatur, Georgia:

From Schedule B:

Exceptions numbered 1 through 3.

However, with respect to the leases referred to in Exception numbered 3, Tenant does not accept or agree to be subject to any provisions of such leases, except to the extent expressly set forth in the Lease between Tenant and SUBURBAN PLAZA, LLC.

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/841976.1

EXHIBIT I

02/06/15
FINAL



SITE PLAN
NOT TO SCALE

VICINITY MAP
NOT TO SCALE

#1741 N. DECATUR (#698 RELO)
Suburban Plaza
SWC N. Decatur Rd. & Church St.
North Decatur, GA

EXHIBIT J
PAGE 1 OF 10

bill moore & associates



**TK-E**

**SHEET S1**

**Notes:**

LANDLORD TO PROVIDE:
• ADEQUATE ACCESS BEHIND LOGO LETTERS FOR INSTALLATION AND MAINTENANCE, PER ARTICLE 600 OF THE N.E.C.
• ONE (1) 20 AMP 120V ISOLATED SIGN CIRCUIT AND JUNCTION BOX TO AREA BEHIND SIGN LETTERS CONNECTED TO THE ENERGY MANAGEMENT SYSTEM
• AT LEAST 1/2" THICK PLYWOOD BACKING BEHIND ALL E.I.F.S. WALL SYSTEMS FOR SIGN AND BANNER SUPPORT

SIGN FASCIA TO BE FREE OF JOINTS & REVEALS, AND OF A LIGHT COLOR (MINIMUM 80% L.R.V.) TO PROVIDE HIGH CONTRAST AND VISIBILITY FOR THE SIGN.

ALL COLORS ARE SUBJECT TO ROSS STORES, INC. REVIEW AND APPROVAL. COLOR APPEARANCE MAY BE ALTERED BY PRINTING. SEE APPROVED FINAL CONSTRUCTION DRAWINGS FOR COLOR SPECIFICATIONS.

A SIGN VARIANCE IS REQUIRED AND LL DOESN'T WARRANT THAT TENANT CAN OBTAIN A VARIANCE

**A** 72"H INDIVIDUAL "ROSS" PAN CHANNEL LETTER-LOK LOGO LETTERS: FACE6: TUF-GLAS 6G 2121D-54 MATTE BLUE RETURNS: 6"D ALUM. W/ WHITE FINISH TRIM CAP: 2" WHITE JEWELITE LETTER BACKS: ALUMINUM LEDS: INSEM 55-K01.2CL-RW 9000K WHITE MOUNTING: 1/4"-20 GALV. THRU BOLTS PEG OFF: 1/2" SPACERS

**B** 30"H INDIVIDUAL "DFL" LOGO LETTERS: ALL CALLOUTS SAME AS "ROSS" EXCEPT: RETURNS: 5"D ALUM. W/ WHITE FINISH TRIM CAP: 1" WHITE JEWELITE

**C** 23"H X 48"W X10'D DOUBLE-FACE INTERNALLY ILLUMINATED UNDER-CANOPY SIGN, SEE SHEET UC FOR DETAILS.

**D** 24"H X 48"W X 1"D SINTRA OVAL "ROSS" LOGO WALL PLAQUE TWO (2) REQUIRED AS SHOWN, SEE SHEET E FOR DETAILS.

**1** SIGN FASCIA BY LANDLORD, SEE NOTES

**2** CLEAR ANODIZED ALUMINUM STOREFRONT & DOORS BY LANDLORD

**3** FROSTED FILM BY LANDLORD

**4** ADJACENT PARAPET MAY NOT BE HIGHER THAN THE ROSS BASE BUILDING

**5** SET OF 5 EYEBOLTS, TWO (2) REQUIRED AS SHOWN

**1** STOREFRONT • NORTHWEST • NORTH DECATUR ROAD • ELEVATION

SCALE: 3/32" = 1'-0"

**ROSS DRESS FOR LESS**
**#1741 N. DECATUR (#698 RELO)**
Suburban Plaza
SWC N. Decatur Rd. & Church St.
North Decatur, GA

bill moore & associates
1307 adams ave.
costa mesa, ca.
phone: ph 949 631-0153
www.billmoore.com

EXHIBIT J
PAGE 2 OF 10





**Installation Instructions:**
- FIELD VERIFY AND CONFIRM TO BMA EXACT FACE DIMENSIONS, STRUCTURE AND LIGHTING CONDITIONS
- PROVIDE BMA WITH LOGO PLOT (PROOF) PRIOR TO FABRICATION
- PROVIDE BMA WITH PHOTOS OF FINISHED DISPLAY

(A) TENANT FACE DECORATION BY ROSS STORES, INC.;
2'-73/4"H X 16'-1/4"W SURFACE DECORATED WITH
3M 3630-167 SUTAN BLUE VINYL.
24"H "ROSS" AND 10"H "DRESS FOR LESS"
LOGO COPY.
TWO (2) FACES REQUIRED: ONE (1) ON EACH SIDE OF DOUBLE-FACE PYLON SIGN
IN TENANT POSITION AS SHOWN.

1. PYLON STRUCTURE, FOOTINGS, CABINETS, FINISHES, LIGHTING,
FACES AND ELECTRICAL SERVICE PROVIDED AND MAINTAINED BY LANDLORD

2. NEW BLANK PAN-FORMED TENANT FACES PROVIDED BY LANDLORD

3. OTHER TENANT FACES SHOWN FOR REFERENCE ONLY

(2) **ROSS TENANT FACE DETAIL**
SCALE: 1/2" = 1'-0"

EQ | 24" | EQ
2'-73/4"
EQ+1" | 8'-0" | 7" | 5'-8" | EQ+1"
16'-1/4"
10" | 4" | 10"

(A)

---

(1) **PYLON PHOTORENDERING · EAST**
N. DECATUR ROAD: SEE SHEET K FOR LOCATION
APPROX. SCALE 3/16" = 1'-0"

**#1741 N. DECATUR (#698 RELO)**
Suburban Plaza
SWC N. Decatur Rd. & Church St.
North Decatur, GA

bill moore & associates
1107 Adabina Ave.
p.o. box 6153
alabina, ca 94706-0153
510/654-0296 fax 526-6092
www.billmoore.com

drawn    09/24/14
EXHIBIT 1

SHEET
P1

EXHIBIT J
PAGE 3 of 10

ROSS DRESS FOR LESS



Ⓐ TENANT FACE DECORATION BY ROSS STORES, INC.
3'-0"H X 14'-3"W (VISIBLE OPENING) SURFACE DECORATED WITH
3M 3630-167 SULTAN BLUE VINYL.
24"H "ROSS" AND 10"H "DRESS FOR LESS"
LOGO COPY.
TWO (2) FACES REQUIRED: ONE (1) ON EACH SIDE OF DOUBLE-FACE PYLON SIGN
IN TENANT POSITION AS SHOWN.

1  PYLON STRUCTURE, FOOTINGS, CABINETS, FINISHES, LIGHTING,
FACES AND ELECTRICAL SERVICE PROVIDED AND MAINTAINED BY LANDLORD

2  NEW BLANK PAN-FORMED TENANT FACES PROVIDED BY LANDLORD

3  OTHER TENANT FACES SHOWN FOR REFERENCE ONLY

Installation Instructions:
• FIELD VERIFY AND CONFIRM TO BMA EXACT FACE DIMENSIONS,
  STRUCTURE AND LIGHTING CONDITIONS
• PROVIDE BMA WITH LOGO PLOT (PROOF) PRIOR TO FABRICATION
• PROVIDE BMA WITH PHOTOS OF FINISHED DISPLAY

CHURCH ST.          PARKING LOT

① PYLON PHOTORENDERING · NORTHEAST
CHURCH STREET: SEE SHEET K FOR LOCATION
APPROX. SCALE: 3/16" = 1'-0"

② ROSS TENANT FACE DETAIL
SCALE: 3/8" = 1'-0"

EQ+1"    7'-2"    6"    5'-9"    EQ+1"
3'-0"H    24"    EQ    EQ

10"
4"
10"

Ⓐ

MEMBERS
ISA   CSA

1057 adams ave.
p.o. box 6153
albany, ca 94706-0153
510/524-0296 fax 526-0692
www.blairmoore.com
bill moore & associates

#1741 N. DECATUR (#698 RELO)
Suburban Plaza
SWC N. Decatur Rd. & Church St.
North Decatur, GA

ROSS
DRESS FOR LESS

EXHIBIT    J
PAGE    4    OF    10

drawn
EXHIBIT J

09/23/14
02/06/15

SHEET
P2

**SHEET EL**

**Notes:**

SEE SHEET S1 FOR PLAQUE LOCATIONS.

GENERAL CONTRACTOR TO PROVIDE:

• VERIFICATION AND PREPARATION OF WALL SURFACE –
IF WALL SURFACE IS UNEVEN (EXAMPLE SPLITFACE CMU) OR
STONE VENEER), GENERAL CONTRACTOR TO KNOCK DOWN
ROUGH SURFACE 2" BEYOND EDGE OF PLAQUE SO IT WILL
SIT FLUSH AGAINST THE WALL. SEE SECTION A-A BELOW.

BMA TO PROVIDE:

• PLAQUES, HARDWARE AND INSTALLATION PATTERNS
TO SIGN INSTALLER.
• FULL-SIZED OVAL TEMPLATE TO GENERAL CONTRACTOR
TO FACILITATE RESURFACING OF WALL AREA BEHIND
PLAQUES. BMA TO VERIFY WALL FINISH BEFORE
SENDING PATTERN

SIGN INSTALLER TO PROVIDE:
• GE CONSTRUCTION SCS1200 SILICONE SEALANT

**Installation Instructions:**

• DRILL FIVE (5) 5/16" DIA. X 3" DEEP HOLES INTO WALL AS PER PATTERN.
• SCREW 3" X 1/4-20 MACHINE-THREAD END OF GALV. FURNITURE BOLTS
INTO EMPTY T-NUTS INTO BACK OF PLAQUE UNTIL THEY CONTACT THE PVC.
(DO NOT OVER-TIGHTEN)
• USING GE CONSTRUCTION SCS 1200 SILICONE SEALANT, FILL HOLES IN
WALL. COAT SCREW-THREAD ENDS OF FURNITURE BOLTS AND APPLY
HEAVY BEAD TO BACK OF PLAQUE
• MOUNT PLAQUE ONTO WALL BY PUSHING BOLTS INTO HOLES UNTIL
PLAQUE IS FLUSH AGAINST WALL SURFACE.

(A) 24"H X 48"W X TD SINTRA OVAL "ROSS" LOGO
WALL PLAQUE. SEE SHEET S1 FOR LOCATION(S).

(B) DIGITALLY PRINTED 3M CONTROL TAC GRAPHIC:
8.6"H X 35"W WHITE "ROSS" COPY
.25" PMS #296C DARK BLUE COPY OUTLINE
PMS #2945C BLUE BACKGROUND
.25" PMS #296C DARK BLUE 1ST OUTLINE,
.625" WHITE 2ND OUTLINE
.875" PMS #2945C BLUE 3RD OUTLINE

(C) CLEAR "TEDLAR" GRAFFITI GUARD FILM
OVERLAY

(D) 2" DRESSED AREA (IF NECESSARY)

**(1) OVAL ENTRANCE LOGO PLAQUE ELEVATION**

SCALE: 1-1/2" = 1'-0"

**(2) SECTION A-A' AT MOUNT**

SCALE: 1-1/2" = 1'-0"

CLEAR "TEDLAR" GRAFFITI PROTECTIVE FILM
(USE WET CLOTH & SOAP TO REMOVE MARKS)

24"H X 48"W X TD SINTRA PVC PLAQUE
WITH DIGITALLY PRINTED GRAPHIC OVERLAY

1" WHITE PVC SINTRA BOARD W/ ALL
EXPOSED SURFACES PRIMED AND SEALED,
EDGE PAINTED W/ GLOSS FINISH PAINT
TO MATCH PMS #2945C BLUE

FINISH WALL MATERIAL

THREADED 1/4-20 T-NUT PRE-SET INTO
SINTRA BACKING. TYPICAL OF FIVE (5)

1/4-20 X 3" GALV. FURNITURE BOLT
TYPICAL OF FIVE (5)

GE CONSTRUCTION SCS 1200
SILICONE SEALANT

5/16" DIA. X 3"D HOLE IN WALL
TYPICAL OF FIVE (5)

2" DRESSED AREA
(IF APPLICABLE)

2" DRESSED AREA
(IF APPLICABLE)

3" HOLE

3" X 1/4-20
GALV. STUD.

SEE NOTES FOR
APPLICABLE CONDITIONS

72" ABOVE
WALKWAY
(TYP.)

WALKWAY
(TYP.)

**ROSS**
**DRESS FOR LESS**

**#1741 NORTH DECATUR**
Suburban Plaza
SWC N. Decatur Road & Church Street
North Decatur, Georgia

| drawn | 09/12/14 |
| Exhibit J | 02/06/15 |

1057 tatano ave.
p.o. box 6153
aurora, co 80046-0153
303.693.4516 fax 303.693.3092
**bill moore & associates**

EXHIBIT J
PAGE 5 OF 10

**Notes:**

SEE SHEET S1 FOR UNDER-CANOPY SIGN LOCATION.

GENERAL CONTRACTOR TO PROVIDE:
- ACCESS ABOVE CEILING FOR SIGN INSTALLATION.
- 120V ELECTRICAL SERVICE
- J-BOX WITHIN FIVE (5) FEET OF SIGN LOCATION (CONNECTED TO ENERGY MANAGEMENT SYSTEM).

BMA TO PROVIDE:
- DOUBLE-FACED ALUMINUM CABINET
- ESCUTCHEON PLATES AT CEILING

SIGN INSTALLER TO PROVIDE:
- WOOD OR STEEL ANGLE CROSS MEMBER (AND WOOD BLOCKING IF NECESSARY):
  SEE LETTER "B"
- 2 SCREWS FOR ESCUTCHEON PLATE; PRIME AND PAINT PLATES AND SCREW HEADS TO MATCH CEILING;
  SEE LETTER "C"
- 1-1/2" DIA. GALVANIZED STEEL PIPE SUPPORTS (TYP. OF TWO), THREAD ENDS TO SECURE INSIDE CABINET AND ABOVE CEILING, PRIME AND PAINT TO MATCH CEILING; SEE LETTER "D"

**Installer to:**

(F) CABINET: 23" X 46" X 10" DOUBLE-FACED ALUMINUM PRIMED W/ ZINC CHROMATE; CABINET EDGE AND 1" RETAINERS PAINTED TO MATCH SULTAN BLUE (PMS 286).

(G) 1/4" DIA. DRAINHOLE AT BOTTOM OF CABINET (TYP.)

(H) WEATHERPROOF SILICONE SEAL AROUND PIPE PENETRATIONS INTO CABINET (TYP.)

(1) FACES: 0.177 (3/16") WHITE LEXAN FACE WITH 8 1/4"+ "ROSS" COPY AND 3/4"W WHITE IN-LINE REVERSED VINYL ON 3M 3630-157 SULTAN BLUE TRANSLUCENT VINYL OVERLAY

- DRILL 2" DIA. HOLES FOR PIPE SUPPORTS; FASTEN PIPES WITH FENDER WASHERS AND LOCK NUTS AS REQUIRED.
- PROVIDE AND CUT TO LENGTH 1-1/2" DIA. GALVANIZED STEEL PIPE SUPPORTS; THREAD ENDS TO SECURE INSIDE CABINET AND ABOVE CEILING, PRIME AND PAINT TO MATCH CEILING.
- PROVIDE AND USE TWO (2) SCREWS TO SECURE ESCUTCHEON PLATES; PRIME AND PAINT PLATES AND SCREW HEADS TO MATCH CEILING.

(A) WOOD OR STEEL ANGLE CROSS MEMBER (AND WOOD BLOCKING IF NECESSARY) ANCHORED TO CANOPY JOISTS.

(B) 2" DIA. HOLE FOR PIPE SUPPORTS; FASTEN PIPES WITH FENDER WASHERS AND LOCK NUTS AS REQUIRED

(C) ESCUTCHEON PLATE; SECURE WITH 2 SCREWS, PRIME AND PAINT PLATES AND SCREW HEADS TO MATCH CEILING

(D) 1-1/2" DIA. GALVANIZED STEEL PIPE SUPPORTS (TYP. OF TWO) CUT TO LENGTH FOR FINISH CABINET HEIGHT

(E) DISCONNECT SWITCH; INSTALL CABINET SO SWITCH AND U.L. LABEL FACE STORE

**(1) D/F UNDER-CANOPY FACE DETAIL**   SCALE: 3/4" = 1'-0"

**(2) D/F UNDER-CANOPY FRAMING ELEVATION**   SCALE: 3/4" = 1'-0"

120V PRIMARY ELECTRICAL SERVICE AND J-BOX ABOVE CEILING WITHIN FIVE (5) FEET OF SIGN

46" MAX. PIPE LENGTH; VERIFY BY FIELD CHECK

48" MAX

8'-6" MIN A.F.E.

**(3) SECTION A-A'**   SCALE: 3/4" = 1'-0"

TWO-LAMP BALLAST

1" X 1" METAL RETAINER PAINTED TO MATCH SULTAN BLUE

1-1/2" PIPE FLANGE WELDED TO CABINET EDGE

2" X 2" C CHANNEL LAMP SUPPORT WELDED TO CABINET EDGE

F36-T12-CHO FLUORESCENT LAMP; TYPICAL OF TWO (2)

CABINET EDGE PAINTED TO MATCH SULTAN BLUE

FOG INSIDE OF CABINET WHITE

LAMPS AT 9" O.C.

**#1741 NORTH DECATUR**
Suburban Plaza
SWC N. Decatur Road & Church Street
North Decatur, Georgia

bill moore & associates

| | |
|---|---|
| drawn | 09/12/14 |
| Exhibit J | 02/06/15 |

SHEET UC

EXHIBIT
J
PAGE 6 OF 10

ROSS STORES, INC. REQUIRES AND WILL PROVIDE:

At least one (1) double-faced temporary site sign per street frontage.

Sign installer to confirm location with landlord's contractor prior to installation.

1'-0" X 8'-0" RED
SINGLE FACED BANNER
(WITH HEMS AND GROMMET'S)
TWO (2) BANNERS REQUIRED.

WHITE "NOW OPEN" COPY

NOTE:
ON DATE OF STORE OPENING
SECURE 1'-0" X 8'-0" "NOW OPEN"
BANNERS OVER "COMING SOON"
WORDING

4'-0" X 8'-0" X 3/8" MEDEX SIGN PANEL
W/ WHITE ENAMEL FINISH. EDGES PAINTED WHITE.
TWO (2) PANELS REQUIRED INSTALLED BACK TO BACK
ON TWO (2) POSTS USING LAG BOLTS AND WASHERS

WHITE "ROSS DRESS FOR LESS" LOGO
REVERSED OUT OF BLUE BACKGROUND VINYL.

RED "COMING SOON" COPY

BLUE "DISCOVER US! WWW.ROSSSTORES.COM" COPY

4" X 4" X 10'-0" ROUGH SAWN POSTS PAINTED WHITE
(SEE FOOTING DETAIL AT LEFT)
MAY BE 12'-0" POSTS IF ADDITIONAL HEIGHT
IS NECESSARY FOR THE NOW HIRING PANELS

BLUE VINYL:    3M 7725-17 VIVID BLUE
RED VINYL:     3M 7725-53 CARDINAL RED

③ "NOW OPEN" BANNER

① D/F TEMPORARY SITE SIGN ELEVATION

② TYP. SECTION W/ FTG.

3'-0" DEEP X 1'-0" DIAMETER POST
HOLES (TYPICAL) BACKFILLED WITH
COMPRESSED NATURAL SOIL

GRADE

EXHIBIT    J
PAGE  7  OF  10

bma
bill moore & associates
1057 solano ave.
p.o. box 6153
albany, co 94706-0153
510/524-0096 fax 524-0092
www.billmoore.com

ROSS
DRESS FOR LESS

PROTOTYPE STANDARD SITE SIGN
AND "NOW OPEN" BANNER
GRAPHIC REQUIREMENTS

Issued  01/17/07
05/15/08

revised

SHEET
SS



ROSS STORES, INC. REQUIRES AND WILL PROVIDE:

Temporary "Opening Soon" construction banner package consisting of the following elements on storefront:

(A) 6'-0" x 24'-0" Temporary "Ross Dress For Less Opening Soon, Discover Us! www.rossstores.com" banner. Banner to be installed as soon as wall is complete.

(B) 40" x 50" "Ross Dress For Less Opening Soon!" window banners (2 min.)

(C) Two (2) sets of five (5) Threaded Eye-Bolts at 4'-0" high x 18'-0" wide for banner attachment as shown.

**A** "ROSS DFL OPENING SOON" BANNER DETAIL

**B** WINDOW BANNER DETAIL

**C** EYE-BOLT DETAIL
FOR TILE NICHE
N.T.S.

- TILE TYP.
- TILE SETTING BED
- GALV. METAL COMPRESSION SLEEVE
- CONTINUOUS SEALANT, COLOR TO MATCH TILE
- GALVANIZED METAL, STANDARD #10, 2" THREADED EYE BOLT (PAINT TO MATCH TILE BEHIND)
- GALVANIZED METAL WASHERS (PAINT FINISH SURFACE WASHER TO MATCH TILE BEHIND)
- PLYWOOD SUBSTRATE, TYP.

- BANNERS MUST NEVER BE ATTACHED DIRECTLY TO E.I.F.S. WALLS (CONCRETE, CMU, STUCCO, MASONRY VENEER ARE OK).
- IF SIGN FASCIA IS E.I.F.S., EYE-BOLTS MUST BE PRESENT.
- IF EYE-BOLTS ARE PRESENT, INSTALL BANNER AS SHOWN.
- IF EYE-BOLTS ARE NOT PRESENT ON SIGN FASCIA, BANNER MAY BE INSTALLED ON BASE BUILDING (ONLY IF NOT E.I.F.S.).
- IF BASE BUILDING IS NOT E.I.F.S., BANNER MAY BE INSTALLED ON BASE BUILDING WALLS.
- IF NO EYE-BOLTS ARE PRESENT AND NO NON-E.I.F.S. SURFACES ARE AVAILABLE, DO NOT INSTALL BANNERS. NOTIFY BMA IMMEDIATELY FOR NEW INSTRUCTIONS.

**1** TYPICAL STOREFRONT ELEVATION

0'    8'    16'

PROTOTYPE STOREFRONT
WITH STANDARD "OPENING SOON"
CONSTRUCTION BANNER REQ'MENTS

| | issued | 01/17/07 |
| revised per SM | | 05/13/11 |
| new proto | | 05/02/14 |

**SHEET**
**01a**

1367 solano ave.
p.o. box 653
albany, ca 94706-0153
510/524-0094 fax 524-0092
www.billmoore.com
bill moore & associates

NOTES:
Specific conditions and codes will vary by location. BMA to provide site-specific plans prior to installation.

If storefront canopy is E.I.F.S., then Landlord is to provide plywood backing for sign & banner installation.

"Opening Soon" construction banner package to be provided and installed by BMA, using existing eye-bolts for attachment(s), see notes, above.

Banners not to be installed on dryvit (E.I.F.S.) wall(s). BMA to seal, patch and touch-up any and all other penetrations upon removal of banners.

Ross Stores, Inc. reserves the right to install any other temporary opening promotional material or element they deem appropriate.

EXHIBIT J
PAGE 8 OF 16

ROSS STORES, INC. REQUIRES AND WILL PROVIDE:

Temporary "Opening Soon / Now Open" banner package consisting of the following elements on storefront:

Ⓐ 3'-0" x 16'-0" "Opening Soon / Grand Opening" New Markets only) Install banner along with the installation of the building signs. Tie off to eyebolts at tile niche (by Landlord)

Ⓑ 40" x 50" "Ross Dress For Less Opening Soon" window banners (2 min.)

Ⓒ 3'-0" x 15'-0" "Now Hiring" banner

Ⓓ Two (2) sets of five (5) Threaded Eye-Bolts at 4'-0" high x 18'-0" wide for banner attachment as shown (see Sheet 01a).

- BANNERS MUST NEVER BE ATTACHED DIRECTLY TO E.I.F.S. WALLS (CONCRETE, CMU, STUCCO, MASONRY VENEER ARE OK).
- IF SIGN FASCIA IS E.I.F.S., EYE-BOLTS MUST BE PRESENT.
- IF EYE-BOLTS ARE PRESENT, INSTALL BANNER AS SHOWN.
- IF EYE-BOLTS ARE NOT PRESENT ON SIGN FASCIA, BANNER MAY BE INSTALLED ON BASE BUILDING (ONLY IF NOT E.I.F.S.).
- IF BASE BUILDING IS NOT E.I.F.S., BANNER MAY BE INSTALLED ON BASE BUILDING WALLS.
- IF NO EYE-BOLTS ARE PRESENT AND NO NON-E.I.F.S. SURFACES ARE AVAILABLE, DO NOT INSTALL BANNERS. NOTIFY BMA IMMEDIATELY FOR NEW INSTRUCTIONS.



Ⓐ "OPENING SOON" BANNER DETAIL

Ⓑ "NOW HIRING" BANNER DETAIL

① TYPICAL STOREFRONT ELEVATION

0'    8'    16'

EXHIBIT  J
PAGE 9 OF 10

bma
1001 solano ave.
p.o. box 6155
albany, ca 94706-0153
510/524-0296 fax 510/524-6092
www.billmoore.com
bill moore & associates

PROTOTYPE STOREFRONT
WITH STANDARD "OPENING SOON"
"NOW HIRING" BANNER REQ'MENTS

| | issued  01/17/02 |
| New Now Hiring bnr. | 03/15/06 |
| revised per SM | 05/02/14 |

SHEET
01b

NOTES:
Specific conditions and codes will vary by location. BMA to provide site-specific plans prior to installation.

If storefront canopy is E.I.F.S., then Landlord is to provide plywood backing for sign & banner installation.

"Opening Soon/Now Open" banner package to be provided and installed by BMA, using existing eye-bolts for attachments; see notes, above.

Banners not to be installed on dryvit (E.I.F.S.) wall(s). BMA to seal, patch and touch-up all other wall penetrations upon removal of banners.

Ross Stores, Inc. reserves the right to install any other temporary opening promotional material or elements they deem appropriate.



ROSS STORES, INC. REQUIRES AND WILL PROVIDE:

Temporary "Now Open" banner package consisting of the following elements on storefront:

(A) 3'-0" x 16'-0" "Now Open" ("Grand Opening" at New Markets only) installation of the building signs (see Sheet O1a). Tie off to eye-bolts (by landlord). Remove "opening soon" to reveal "Now Open" or "Grand Opening" banner on the day of store opening.

(B) 3'-0" x 15'-0" "Now Hiring" banner to remain at discretion of store manager.

(C) Two (2) sets of five (5) Threaded Eye-Bolts at 4'-0" high x 18'-0" wide for banner attachment as shown (see Sheet O1a).

(D) Multicolor pennant flags to be installed where applicable.

(E) Remove Window Banners

NOTES:
Specific conditions and codes will vary by location.
BMA to provide site-specific plans prior to installation.
If storefront canopy is E.I.F.S., then Landlord is to provide plywood backing for sign & banner installation.
"Now Open" banner package to be provided and installed by BMA, using existing eye-bolts for attachments; see notes, above.
"Now Open" banner package to be installed immediately prior to store opening and to remain for a minimum of thirty (30) days.
Banners not to be installed on dryvit (E.I.F.S.) wall(s).
BMA to seal, patch and touch-up all other wall penetrations upon removal of banners.
Ross Stores, Inc. reserves the right to install any other temporary opening promotional material or elements they deem appropriate.

- BANNERS MUST NEVER BE ATTACHED DIRECTLY TO E.I.F.S. WALLS (CONCRETE, CMU, STUCCO, MASONRY VENEER ARE OK).
- IF SIGN FASCIA IS E.I.F.S., EYE-BOLTS MUST BE PRESENT.
- IF EYE-BOLTS ARE PRESENT, INSTALL BANNER AS SHOWN.
- IF EYE-BOLTS ARE NOT PRESENT ON SIGN FASCIA, BANNER MAY BE INSTALLED ON BASE BUILDING (ONLY IF NOT E.I.F.S.).
- IF BASE BUILDING IS NOT E.I.F.S., BANNER MAY BE INSTALLED ON BASE BUILDING WALLS.
- IF NO EYE-BOLTS ARE PRESENT AND NO NON-E.I.F.S. SURFACES ARE AVAILABLE, DO NOT INSTALL BANNERS. NOTIFY BMA IMMEDIATELY FOR NEW INSTRUCTIONS.

Grand OPENING

NEW MARKET ONLY
ALTERNATE BASE          N.T.S.

Now OPEN

16'-0"

3'-0"

(A) "NOW OPEN" BANNER DETAIL
0'   2'   4'

ROSS
DRESS FOR LESS
Now OPEN

ROSS NOW HIRING

(1) TYPICAL STOREFRONT ELEVATION
0'   8'   16'

EXHIBIT  J
PAGE 16 OF 10

bma
100 solano ave.
p.o. box 6183
albany, ca 94706-0183
510/524-0296 fax 510/524-0672
www.billmoore.com
bill moore & associates

MEMBER
csa

ROSS
DRESS FOR LESS

PROTOTYPE STOREFRONT
WITH STANDARD "NOW OPEN"
CONSTRUCTION BANNER REQ'MENTS

issued  01/17/07
revised  05/15/08
          05/02/14
new Now Hiring bnr.
revised per BMA

SHEET
NO1

## EXHIBIT K

### APPROVED ELEVATIONS

"North Decatur"
Suburban Plaza
Decatur, GA
Store No. 1741
6061.1165/635986.1

EXHIBIT K

02/06/15
FINAL



ASD

INTERIORS  ARCHITECTURE  GRAPHICS

**NOTE    COLOR/ FINISH          MATERIAL**

BR-1     BRICK                   BELDEN BRICK CO. "POLAR BLEND A" JUMBO
                                 (7 5/8"X 2 5/8"X.75")

BR-2     BRICK                   BELDEN BRICK CO. "SEAL BROWN VELOUR A.06-42" MODULAR
                                 (2 1/4"X7 5/8"X.5")

CF-1     CEMENT FIBERBOARD       NICCHIHA FIBER CEMENT "ARCH. BLOCK", 16"x6' PANELS
CM-1     CORRUGATED METAL        IMETCO
MP-1     METAL PANEL             CITADEL ARCH. PRODUCTS, SERIES H "GUN METAL"
MP-2     METAL PANEL             CITADEL ARCH. PRODUCTS, SERIES G "TERRA COTTA"
PT-1     PAINT                   SHERWIN WILLIAMS SW-0030 "COLONIAL YELLOW"
PT-2     PAINT                   BENJAMIN MOORE HC-86 "KINGSPORT GRAY"
PT-3     PAINT                   SHERWIN WILLIAMS SW-6213 "HALCYON"
PT-4     PAINT                   BENJAMIN MOORE 2172-10 "COPPER CLAY"
PT-5     PAINT                   TO MATCH CEMENT FIBERBOARD FINISH
PT-6     PAINT                   BENJAMIN MOORE AF-560 "FLINT"
ST-1     STUCCO                  MATCH SHERWIN WILLIAMS SW0030 "COLONIAL YELLOW"
ST-2     STUCCO                  MATCH BENJAMIN MOORE HC-86 "KINGSPORT GRAY"
ST-3     STUCCO                  MATCH SHERWIN WILLIAMS SW-6213 "HALCYON"
WD-1     ENGINEERED WOOD         RESYSTA PROFILE 1/2 x 5 1/2  COLOR: FVG C51

**Overall NE Elevation**

Scale: 1/32" = 1'-0"

**Suburban Plaza**

01.20.2015

**Exhibit K**