**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>JOANN INC., et al.,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 25-10068 (CTG)<br>(Jointly Administered)<br><br>Hearing Date: To be scheduled if necessary<br>Re: D.I. 760, 930 |

**OBJECTION OF MYRTLE BEACH FARMS COMPANY, INC. TO AMENDED FIRST
NOTICE OF ASSUMPTION AND ASSIGNMENT
OF CERTAIN EXECUTORY CONTRACTS AND/OR UNEXPIRED LEASES**

Myrtle Beach Farms Company, Inc. ("Landlord"), by and through its undersigned counsel, hereby submits this objection (the "Objection") to the proposed assumption and assignment of its unexpired lease as set forth in the Amended First Notice of Assumption and Assignment of Certain Executory Contracts and/or Unexpired Leases (D.I. 930) (the "Assumption Notice"), and respectfully states as follows:

**BACKGROUND**

1. On January 15, 2025, the above-captioned debtors and debtors in possession commenced these chapter 11 cases by filing their voluntary petitions for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

2. Landlord, as landlord, and Debtor Jo-Ann Stores, LLC (the "Debtor"), as tenant, are parties to that certain Lease Agreement dated as of January 28, 2022 (the "Myrtle Beach Lease") for the property located at 1120 Seaboard St., Myrtle Beach, South Carolina (designated

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: JOANN Inc. (5540); Needle Holdings LLC (3814); Jo-Ann Stores, LLC (0629); Creative Tech Solutions LLC (6734); Creativebug, LLC (3208); WeaveUp, Inc. (5633); JAS Aviation, LLC (9570); joann.com, LLC (1594); JOANN Ditto Holdings Inc. (9652); Dittopatterns LLC (0452); JOANN Holdings 1, LLC (9030); JOANN Holdings 2, LLC (6408); and Jo-Ann Stores Support Center, Inc. (5027). The Debtors' mailing address is 5555 Darrow Road, Hudson, Ohio 44236.

by the Debtors as Store #2566 on the Assignment Notice) (the "Premises") in a retail shopping center known as Seaboard Commons in Myrtle Beach, South Carolina ("Seaboard Commons"). A true and correct copy of the Myrtle Beach Lease is attached hereto and incorporated hereby as **Exhibit A**. The monthly rent under the Myrtle Beach Lease is $28,437.50 plus CAM of $4,587.10 per month (increases 3% each year), insurance of $3,963.81 per month (estimated, billed monthly and reconciled at the end of the year) and taxes (to be paid annually upon receipt of tax bill from Landlord).

3. The Myrtle Beach Lease is a lease "of real property in a shopping center," as that term is used in 11 U.S.C. § 365(b)(3).

4. On April 28, 2025, the Debtors filed the First Notice of Assumption and Assignment of Certain Executory Contracts and/or Unexpired Leases (D.I. 760). On May 12, 2025, Landlord filed the Objection of Myrtle Beach Farms Company, Inc. to First Notice of Assumption and Assignment of Certain Executory Contracts and/or Unexpired Leases (D.I. 851).

5. On May 16, 2025, the Debtors filed the Assumption Notice. The Myrtle Beach Lease is identified on Page 22 of 37 of Exhibit B to the Assumption Notice with a proposed cure amount of $38,121.49. Pursuant to the Assumption Notice, the Debtors seek to assign the Myrtle Beach Lease to Burlington Coat Factory Warehouse Corporation ("Burlington") pursuant to 11 U.S.C. § 365. Neither the Debtors nor Burlington have provided Landlord with any explanation of what use Burlington intends for the Premises.

## ARGUMENT

**I. Assumption and Assignment of Shopping Center Leases Under § 365.**

6. Section 365 of the Bankruptcy Code governs the assumption and assignment of executory contracts and unexpired leases. In general, in order to assume an unexpired lease, a

debtor in possession need only cure the arrearages and provide adequate assurance of future performance under such lease. *See* 11 U.S.C. § 365(b)(1). Similarly, the debtor may assume and assign an unexpired lease only if "adequate assurance of future performance by the assignee of such . . . lease is provided, whether or not there has been a default in such . . . lease." *Id.*, § 365(f)(2)(B).

7. However, "[t]he Bankruptcy Code imposes heightened restrictions on the assumption and assignment of leases for shopping centers," which are intended "to protect the rights of the lessors and the center's other tenants." *Appeal of Denney (In re Joshua Slocum, Ltd.)*, 922 F.2d 1081, 1086 (3d Cir. 1990). Specifically, § 365(b)(3) of the Bankruptcy Code provides,

(3) For the purposes of . . . paragraph (2)(B) of subsection (f), adequate assurance of future performance of a lease of real property in a shopping center includes adequate assurance—

> (A) of the source of rent and other consideration due under such lease, and in the case of an assignment, that the financial condition and operating performance of the proposed assignee and its guarantors, if any, shall be similar to the financial condition and operating performance of the debtor and its guarantors, if any, as of the time the debtor became the lessee under the lease;
>
> (B) that any percentage rent due under such lease will not decline substantially;
>
> (C) that assumption or assignment of such lease is subject to all the provisions thereof, including (but not limited to) provisions such as a radius, location, use, or exclusivity provision, and will not breach any such provision contained in any other lease, financing agreement, or master agreement relating to such shopping center; and
>
> (D) that assumption or assignment of such lease will not disrupt any tenant mix or balance in such shopping center.

11 U.S.C. § 365(b)(3). And those specific provisions of § 365(b)(3) control over § 365(f)(1) of the Bankruptcy Code relating to the unenforceability of anti-assignment clauses. *See Trak Auto Corp. v. W. Town Ctr. LLC (In re Trak Auto Corp.)*, 367 F.3d 237, 243–44 (4th Cir. 2004); *see*

3

*also* Bankruptcy Abuse Prevention and Consumer Protection Act (BAPCPA) of 2005, Pub. L. No. 109-8, § 404(b), 119 Stat. 23, 105 (codifying holding in Trak Auto by amending § 365(f)(1) to be subject to § 365(b)). With § 365(b)(3)'s heightened restrictions, "Congress recognized that unlike the usual situation where a lease assignment affects only the lessor, an assignment of a shopping center lease to an outside party can have a significant detrimental impact on others, in particular, the center's other tenants." *Joshua Slocum*, 922 F.2d at 1086.

8. The provision of adequate assurance of future performance of a lease is an affirmative duty of the debtors, and the debtors have "the ultimate burden of persuasion that the lease is one subject to assumption [and assignment] and that all requirements for assumption [and assignment] have been met." *In re Rachels Indus., Inc.*, 109 B.R. 797, 802 (Bankr. W.D. Tenn. 1990) (*citing Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309–10 (5th Cir. 1985)).

9. Here, with respect to the proposed assumption and assignment of the Myrtle Beach Lease, the Debtors have not met their burden of showing that adequate assurance of future performance will be provided by Burlington under the heightened restrictions of the Bankruptcy Code.

**1. Seaboard Commons Constitutes a "Shopping Center."**

10. As an initial matter, Seaboard Commons constitutes a "shopping center" as that term is used in § 365(b)(3) of the Bankruptcy Code, making the Myrtle Beach Lease of the Premises a "lease of real property in a shopping center" subject to the Bankruptcy Code's heightened restrictions on the assumption and assignment thereof.

11. In determining whether premises constitute a "shopping center" under § 365(b)(3), courts have typically considered the following factors from the *Joshua Slocum* decision: (1)

whether there is a combination of leases; (2) whether a single landlord holds all of the leases; (3) whether all tenants are engaged in the commercial retail distribution of goods; (4) the presence of a common parking area; (5) whether the premises was purposefully developed as a shopping center; (6) the existence of a master lease; (7) the existence of fixed hours during which all stores are open; (8) the existence of joint advertising; (9) whether there is contractual interdependence of the tenants as evidenced by restrictive-use provision in their leases; (10) the existence of percentage rent provision in the leases; (11) whether tenants have the right to terminate their leases if the anchor tenant terminates its lease; (12) whether tenants jointly participate in trash removal and other maintenance; (13) the existence of a tenant mix; and (14) the contiguity of the stores. *See In re Ames Dep't Stores, Inc.*, 348 B.R. 91, 95 (Bankr. S.D.N.Y. 2006) (*citing Joshua Slocum*, 922 F.2d at 1087–88). Out of these factors, "it is likely that the most important characteristic will be a combination of leases held by a single landlord, leased to commercial retail distributors of goods, with the presence of a common parking area." *Id*. (internal quotation marks omitted).

12. Here, on balance, the relevant *Joshua Slocum* factors establish that Seaboard Commons is a shopping center.

13. First, there are a combination of leases for Seaboard Commons.

14. Second, all of the leases of Seaboard Commons are owned by the same entity, Myrtle Beach Farms Company, Inc. Under the Myrtle Beach Lease, the "Shopping Center" consists of Target, World Market, Scrubs and Beyond, Ross, TJ Maxx, Joann and Dollar Tree.

15. Third, all of the tenants of Seaboard Commons are engaged in the commercial retail distribution of goods, with Seaboard Commons' major tenants (i.e. Lowe's, Ross Dress for Less and Dollar Tree Stores) being commercial retailers.

16. Fourth, Seaboard Commons has a common parking area stretching the entire width of Seaboard Commons that is made available to the patrons of Seaboard Commons.

17. Fifth, Seaboard Commons was purposefully developed as a shopping center as evidenced by the Rules and Regulations for Shopping Center attached to the Myrtle Beach Lease as Exhibit E. This is also clear from the Operation and Easement Agreement for Seaboard Commons which identifies the contiguous lease parcels as a "shopping center" with a common area, parking and various permitted uses.

18. Sixth, there is significant contractual interdependence of the tenants as evidenced by the restrictive-use provisions in their leases as set forth in the Myrtle Beach Lease, one of the more recent leases entered into in Seaboard Commons, which sets forth all of the other tenants' exclusive uses in Seaboard Commons. *See* Myrtle Beach Lease, Section 11, Exhibit F-1 and Exhibit F-2.

19. Seventh, there is contiguity of the stores in Seaboard Commons. All of the stores are located on a contiguous tract of land, and all of the stores operated by the major tenants are essentially lined up next to one another in a nearly continuous line.

20. Lastly, there is joint advertising. Seaboard Commons has a pylon sign that includes advertising for Target, World Market, Scrubs and Beyond, Ross, TJ Maxx and Joann.

**2. The Debtors Have Not Shown that Adequate Assurance of Future Performance Can Be Provided by Burlington Coat Factory.**

21. According to the adequate assurance information provided to Landlord (Burlington's 10-k and 8-k), Burlington Stores, Inc. is:

> a nationally recognized off-price retailer of high-quality, branded merchandise at everyday low prices. We opened our first store in Burlington, New Jersey in 1972, selling primarily coats and outerwear. Since then, we have expanded our store base to 1,103 stores as of November 2, 2024 in 46 states, Washington D.C. and Puerto Rico. We have diversified

>our product categories by offering an extensive selection of in-season, fashion focused merchandise at up to 60% off other retailers' prices, including: women's ready-to-wear apparel, menswear, youth apparel, baby, beauty, footwear, accessories, home, toys, gifts and coats. We sell a broad selection of desirable, first-quality, current-brand, labeled merchandise acquired directly from nationally-recognized manufacturers and other suppliers.

Though not made explicit to Landlord, it is assumed that Burlington, if confirmed as the assignee of the Myrtle Beach Lease, intends to operate a Burlington Coat Factory retail store in the Premises.

22. The Debtors have not met their burden in demonstrating that adequate assurance of future performance can be provided by Burlington under § 365(b)(3).

  a. ***Assignment of the Lease to Burlington Will Breach the Myrtle Beach Lease and the Lease with Ross Dress for Less.***

    i. **The Myrtle Beach Lease.**

23. First, to the extent that Burlington intends to use the Premises as a Burlington Coat Factory retail store, the Debtors have not shown how such use would comply with the use provisions of the Myrtle Beach Lease. The "Permitted Use" in Section 2(s) of the Myrtle Beach Lease is limited solely to the sale of specific items. Section 2(s) of the Myrtle Beach Lease provides, in relevant part:

>Permitted Use: subject to the Exclusive Uses on Exhibit F-1 and Prohibited Uses on Exhibit F-2, attached hereto, and the terms and provisions of the OEA, as used herein, "Permitted Use" shall solely mean the sale of fabrics of all kinds; goods sold by the yard; patterns; knitting supplies, needlepoint, and macrame; art materials and supplies; finished crafts, craft materials and supplies; educational aids, materials and supplies; yams; all types of notions; floral products, artificial flowers and accessories; scrapbooks and scrapbooking supplies and materials; framed artwork; picture frames, framing (both ready-made and custom made) and framing materials and supplies; fabric care items; foam products; ceramics; wearable art and wearable art supplies; miniatures, dolls, and other similar hobby-related items; sewing machines and sewing machine furniture; irons and ironing boards; seasonal merchandise found in a typical Jo-Ann Fabrics and Crafts

> store; custom services and custom products using arts and craft and sewing components including, but not limited to, quilting, bow-making, window treatments, floral design, fashion sewing, instructional classes, materials and services; and the incidental sale of ( defined as no more than 10% of the sales floor of any individual following item) baskets and other wicker items; housewares; linens, curtains, towels, and pillows; drapery and upholstery materials; draperies and drapery hardware; blinds, shades, shutters and window treatments; do it yourself products and accessories related to sewing and crafting; bridal apparel and accessories, and wedding supplies; gift items, cards, and party supplies; paper goods and stationery; candles, candlesticks, brass and pottery; indoor and outdoor house decorating products and accessories; furniture; prepackaged and unpackaged food and food products, coffee, tea, and assorted non-alcoholic beverages (not to exceed 1,000 square feet); instructional books and tapes; children's books; toys; vacuum cleaners, lamps, and other small household sewing and craft related appliances; accessories related to all of the foregoing, and other items and services customarily offered for sale by a fabric, craft store, and such other related merchandise and services typically offered in the stores operated by Tenant (as such stores exist as of the Commencement Date) under the name Jo-Ann, Jo-Ann Fabrics and Crafts, or such other name under which the majority of Jo-Ann and Jo-Ann Fabrics and Crafts stores in South Carolina choose to operate.

*See* Myrtle Beach Lease § 2(s). As a result, if Burlington intends to operate a clothing store at the Premises, such operation would be in violation of the Myrtle Beach Lease's limited permitted uses.

24.    The proposed order attached to the Assumption Notice (the "Proposed Order") contains provisions that would change the terms of the lease by making certain provisions unenforceable, including allowing Burlington to operate for its intended purpose regardless of the permitted use in the lease. Specifically, the Proposed Order provides, among other things:

> Solely with respect to the transactions contemplated by this Order and the Assignment Agreement, the following provisions in the Leases shall be deemed unenforceable (the "Unenforceable Provisions"):
>
> a.    a provision prohibiting Burlington's intended use of the premises

Proposed Order ¶ 9.

25.    As set forth above, Seaboard Commons is a "shopping center" under Bankruptcy Code section 365(b)(3). As such, any assignment of the Myrtle Beach Lease is subject to any use

8

provisions contained therein.  *See In re Three A's Holdings, L.L.C.*, 364 B.R. 550, 561 (Bankr. D. Del. 2007); *In re Sun TV & Appliances, Inc.*, 234 B.R. 356, 370 (Bankr. D. Del. 1999).

### ii.    Lease with Ross Dress for Less.

26. The Debtors cannot provide adequate assurance under the second clause of § 365(b)(3)(C) as the assignment of the Myrtle Beach Lease to Burlington will cause a breach of the lease between Ross Dress for Less, Inc. ("Ross") and Landlord (the "Ross Lease"), under which Ross currently operates a Ross Dress for Less "off-price" department store within Seaboard Commons.  A true and correct copy of the Ross Lease is attached hereto as **Exhibit B.**

27. With certain limited exceptions not relevant here, section 15.3 of the Ross Lease effectively prohibits any other tenant of Seaboard Commons from using its premises as a retail store for the sale of "off-price" apparel, specifically identifying "Burlington Coat" as an example of such a retailer:

> 15.3. Protection.
>
> 15.3.1.  Without the prior written consent of Tenant, which consent may be withheld in the absolute and sole discretion of Tenant, no tenant or occupant of the Shopping Center (other than Tenant) may use, and Landlord, if it has the capacity to do so, shall not permit any other tenant or occupant of the Shopping Center to use in excess of ten thousand (10,000) square feet of its premises for the Off Price Sale (as hereinafter defined) of apparel ("Tenant's Exclusive Use"). For purposes of this Section 15.3, "Off Price Sale" shall mean the retail sale of merchandise on an everyday basis at prices reduced from those charged by full price retailers, such as full price department stores; provided, however, this definition shall not prohibit sales events by a retailer at a price discounted from that retailer's every day price. (As of the Effective Date, examples of Off Price Sale retailers include such retailers as Marshalls, Nordstrom Rack, Goody's, Factory 2U, Burlington Coat, SteinMart, and Filene's Basement.) A violation of either of the foregoing provisions is a "Protection Violation".

This section of the Ross Lease further recognizes that there can be a breach of the lease either by Landlord or the violating tenant that then makes various remedies available to Ross:

> If Landlord (or any employee, agent, officer or director of Landlord) causes a Protection Violation ("Landlord Protection Violation"), Tenant, in addition to all other remedies available at law and at equity, including injunctive relief, shall have the ongoing right to either terminate this lease or remain in possession of the Store and commencing on the first day of the Protection Violation and continuing throughout the period of the Protection Violation, Tenant shall have the right to pay Substitute Rent within fifteen (15) days after the close of each calendar month. If any tenant or occupant (as opposed to Landlord) causes a Protection Violation ("Rogue Tenant Violation"), Tenant, in addition to all other remedies available at law or in equity, including injunctive relief, shall, commencing thirty (30) days after Tenant gives notice to Landlord of such Rogue Tenant Violation provided that such Rogue Tenant Violation continues after such thirty (30) day period, have the ongoing right either to terminate this Lease or remain in possession of the Store and pay Substitute Rent for as long as such Rogue Tenant Violation continues. The parties agree that the monetary damages to be suffered by Tenant as a result of a breach by Landlord (or Landlord's tenant(s)) of the provisions of this Section 15.3 are difficult to ascertain and that the payment of Substitute Rent, after negotiation, constitutes the best estimate by the parties of the amount of such damage. If Tenant elects to terminate this Lease as provided in this Section 15.3, this Lease shall terminate on a date indicated by Tenant in its notice of termination, which in no event shall be sooner than thirty (30) nor later than ninety (90) days after the date of Tenant's notice of termination. In the event of termination, Landlord shall be obligated to pay Tenant for the Unamortized Cost of Tenant's leasehold improvements in the Store, which costs Tenant agrees to specify in its notice of termination and upon written request from Landlord, Tenant shall provide reasonable supporting documentation of the Unamortized Cost. If Tenant elects to pay Substitute Rent, (a) such payment of Substitute Rent shall be retroactive to the date any such Landlord Protection Violation or Rogue Tenant Violation commenced, and Tenant shall deduct any overpayments of Rent from Rent coming due under this Lease, and (b) at such time as all such Landlord Protection Violations or Rogue Tenant Violations, as the case may be, cease (the "Cure Date"), Rent shall resume at the rate which would have pertained at the Cure Date had the Landlord Protection Violation or Rogue Tenant Violation not occurred. The provisions of this Section 15.3 shall apply to any subsequent Protection Violation.

See **Exhibit B**, Ross Lease § 15.3.

28. Accordingly, assigning the Myrtle Beach Lease to Burlington will cause a breach or violation of the Ross Lease, which means that the Debtors cannot overcome § 365(b)(3)(C). Indeed, Landlord has received notice from Ross claiming that an assignment to Burlington would be a violation of the Ross Lease.

29. To the extent that Burlington intends to engage in the Off Price Sale of apparel in 10,000 square feet or less of the Premises, Landlord objects to the assignment of the Myrtle Beach Lease to Burlington to the extent Burlington's operation of the remaining 20,000 square feet of remaining space would violate other tenant leases at Seaboard Commons and/or a lease between Landlord and a tenant operating as Dick's Sporting Goods in a nearby shopping center. As noted above, Seaboard Commons includes a number of other retail tenants. These include Haverty's, World Market, Office Max and Lowe's Home Improvement. To the extent Burlington fills the rest of the Premises with non-apparel items, Landlord objects to such use to the extent it would violate the tenant leases of Havertys' (prohibiting the use of more than 50% of the sales floor area of the premises for the sale of furniture, rugs and mattresses), World Market (prohibiting the operation of the premises primarily for the sale of prepackaged gourmet food and/or wicker or rattan furniture), Lowe's Home Improvement (limiting operations of a home décor center to less than 5,000 square feet), OfficeMax (limiting the sale of office, home office, school and business supplies, furniture and equipment and of computer and electronic products), or Dick's Sporting Goods (limiting the sale of sporting goods equipment, apparel and footwear). Burlington has not disclosed its intended use for the remaining 22,500 square feet of the Premises; however, to the extent such use violates provisions of other tenants' leases at Seaboard Commons or the lease with Dick's Sporting Goods, Burlington cannot meet is burden of demonstrating adequate assurance under § 365(b)(3)(C) of the Bankruptcy Code.

    b. ***Assignment of the Myrtle Beach Lease to Burlington Will Disrupt the Tenant Mix and Balance in Seaboard Commons.***

30. Likewise, the Debtors are also unable to provide adequate assurance under § 365(b)(3)(D), i.e., that the assignment of the Myrtle Beach Lease to Burlington will not disrupt the tenant mix or balance in Seaboard Commons.

11

31. Most notably, Burlington will be operating a type of store that already exists in Seaboard Commons. Not only will a Burlington Coat Factory store be directly competing with the existing Ross Dress for Less, T.J. Maxx and Dollar Tree Stores in Seaboard Commons (as all are off-price retailers), but Burlington's store will be immediately next to both T.J. Maxx and Dollar Tree. Allowing Burlington to do as much would clearly disrupt the current tenant mix and balance in Seaboard Commons and would also cause harm to Landlord's existing tenants. *Cf. Hannaford Bros., Co. v. Ames Dep't Stores, Inc. (In re Ames Dep't Stores, Inc.)*, 316 B.R. 772, 795–96 (Bankr. S.D.N.Y. 2004) (declining to invalidate provision in recorded declaration prohibiting operation of competing supermarket under § 365(f) when assignee intended to use the leased premises as a competing supermarket to the detriment of the existing supermarket operator while leased premises could be used for various other purposes, other than as a supermarket). As a result, the Debtors cannot meet their burden under § 365(b)(3)(D).

II. **Demand for Security Pursuant to Section 365(l) of the Bankruptcy Code.**

32. Section 365(l) of the Bankruptcy Code provides that:

> If an unexpired lease under which the debtor is the lessee is assigned pursuant to this section, the lessor of the property may require a deposit or other security for the performance of the debtor's obligations under the lease substantially the same as would have been required by the landlord upon the initial leasing to a similar tenant.

11 U.S.C. § 365(l).

33. In the ordinary course of business, Landlord requires security deposits, letters of credit, or guaranties (including without limitation so-called "bad boy" personal guarantees) when leasing (or assessing an assignment of a lease) to tenants based on their financial information and history. In event that the Court approves assumption and assignment of the Myrtle Beach Lease

Case 25-10068-CTG    Doc 1016    Filed 05/29/25    Page 13 of 15

to the Proposed Assignee, Landlord may require and demands security in accordance with section 365(l) of the Bankruptcy Code based upon the proposed assignee's creditworthiness.

### III. The Proposed Cure Amount Is Insufficient and Subject to Change.

34. In order to assume and assign an unexpired lease, a debtor must first satisfy section 365(b)(1)(A) of the Bankruptcy Code, which requires that a debtor either cure all defaults existing under a lease, or provide the landlord with adequate assurance that it will promptly cure such defaults. 11 U.S.C. § 365(b)(1)(A).

35. The Debtors identify a proposed cure amount of $38,121.49 with respect to the Myrtle Beach Lease. However, the Debtors currently owe $48,283.39, representing the 2024 Tax Reconciliation of $53,085.79 less certain overpayments of $3,669.41 and $1,133.00, respectively. A copy of the May 5, 2025 Lease Statement is attached hereto and incorporated hereby as **Exhibit C.**

36. The cure amount identified herein does not include cure amounts that may become due and owing after the date hereof, or any amounts that are currently unknown or undetermined by the Landlord. The Landlord reserves the right to amend or supplement this Objection and any statement of cure amount as necessary or appropriate under the circumstances, including without limitation to account for further property inspections, reconciliations or adjustments which have not yet been billed or have not yet become due under the terms of the Myrtle Beach Lease, amounts that become due and owing after the date hereof, or amounts that the Landlord becomes aware of after the date hereof.

37. Landlord maintains that Section 365(b)(1)(B) of the Bankruptcy Code requires compensation to the landlord for sums incurred for attorneys' fees in connection with the bankruptcy case. *See In re Crown Books Corp.*, 269 B.R. 12, 15 (Bankr. D. Del. 2001); *In re Child*

13

*World Inc.*, 161 B.R. 349 (S.D.N.Y 1993) (Section 365(b)(1)(B) allows for recovery of attorneys' fees if based upon the language of the lease).

38. The cure amounts necessary to assume the Lease with the Debtors through the proposed sale hearing date, not including pecuniary losses incurred by 7080 Hollywood, and any further adjustments for charges due under the lease which are not yet known, are $48,283.39 plus attorneys' fees of $3,000.

### IV. The Myrtle Beach Lease Must be Assumed and Assigned *Cum Onere*.

39. It is well settled that a debtor seeking to assume a lease must do so "*cum onere*," accepting both its benefits and burdens. *In re Fleming Cos.,* 499 F.3d 300, 308 (3d Cir. 2007). The requirement that lease assumptions be *cum onere* applies equally to assignments, as assumption of an unexpired lease "is a necessary prerequisite to its assignment under § 365." *In re Sunterra Corp.*, 361 F.3d 257, 266 (4th Cir. 2004) (citing 11 U.S.C. § 365(f)(2)). Therefore, to the extent the Debtors seek to assume and assign the Myrtle Beach Lease, the Debtors have a continuing obligation to pay additional rent and charges, including, but not limited to, adjustments and reconciliations for the Debtors' proportionate share of certain common area maintenance, real property taxes, water, insurance premiums and any percentage rent which has accrued, or will accrue under the Myrtle Beach Lease through any assumption and assignment of the Myrtle Beach Lease and are not yet due ("Accrued but Unbilled or Not Yet Due Rent and Charges").

40. Additionally, the identified cure amounts do not include contractual obligations to indemnify the Landlord for events occurring prior to any assumption and assignment of the Myrtle Beach Lease. The Myrtle Beach Lease obligates the Debtor to indemnify and hold the Landlord harmless from and against various claims, liabilities, and expenses ("Indemnity Obligations"). *See* Myrtle Beach Lease § 19. The Debtors' responsibility for Accrued but Unbilled or Not Yet Due

Rent and Charges and satisfaction of their Indemnity Obligations must be assumed by any assignee *cum onere*, as they are essential to the Landlord's entitlement pursuant to Section 365(b)(1) of the Bankruptcy Code to adequate assurance of future performance. This assumption must be made clear in any assumption and assignment order covering the Myrtle Beach Lease, in the event the Court approves assumption and assignment.

## **RESERVATION OF RIGHTS AND JOINDER**

41.     Landlord reserves its rights to supplement this Objection and make such other and further objections as they deem necessary or appropriate, including with respect to any (i) amended proposed cure amounts, (ii) proposed form of assumption and assignment order covering the Myrtle Beach Lease, and (iii) modifications or additions to the adequate assurance information provided by the Debtors and/or Proposed Assignee.

42.     The Landlord hereby joins any other objections filed by the Debtors' other landlords to the extent such objections are not inconsistent with the relief sought herein.

**WHEREFORE,** Landlord respectfully requests that the Court (i) deny the Debtors' proposed assumption and assignment of the Myrtle Beach Lease to the Proposed Assignee and (ii) grant such other and further relief in favor of the Landlord as the Court may deem just or proper.

| | |
|---|---|
| Dated: May 29, 2025<br>Wilmington, Delaware | GELLERT SEITZ BUSENKELL & BROWN, LLC<br><br> /s/ *Michael Busenkell*<br>Michael Busenkell (DE 3933)<br>1201 N. Orange Street, Suite 300<br>Wilmington, DE 19801<br>Telephone: 302-425-5812<br>Facsimile: 302-425-5814<br>Email: mbusenkell@gsbblaw.com<br><br>*Counsel to Myrtle Beach Farms Company, Inc.* |