**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| JOANN INC., *et al.*,[1] | ) | Case No. 25-10068 (CTG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: Docket No. 1010** |

**AFFIDAVIT OF PUBLICATION**
**REGARDING NOTICE OF HEARING TO CONSIDER**
**(I) FINAL APPROVAL OF THE DISCLOSURE STATEMENT AND**
**(II) CONFIRMATION OF THE DEBTORS' JOINT CHAPTER 11 PLAN**

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: JOANN Inc. (5540); Needle Holdings LLC (3814); Jo-Ann Stores, LLC (0629); Creative Tech Solutions LLC (6734); Creativebug, LLC (3208); WeaveUp, Inc. (5633); JAS Aviation, LLC (9570); joann.com, LLC (1594); JOANN Ditto Holdings Inc. (9652); Dittopatterns LLC (0452); JOANN Holdings 1, LLC (9030); JOANN Holdings 2, LLC (6408); and Jo-Ann Stores Support Center, Inc. (5027). The Debtors' mailing address is 5555 Darrow Road, Hudson, Ohio 44236.



The New York Times Company

620 8th Avenue
New York, NY 10018
nytimes.com

# PROOF OF PUBLICATION

May 30, 2025

I, Tami Bacon, in my capacity as a Principal Clerk of the Publisher of The New York Times, a daily newspaper of general circulation printed and published in the City, County, and State of New York, hereby certify that the advertisement annexed hereto was published in the editions of The New York Times on the following date or dates, to wit on.

5/30/2025, NY/NATL, pg B3

Tami Bacon

Sworn to me this 30th day of May, 2025

Shannon Schmidt
Online Notary Public
State of New York
Nassau County
Commission #: 01SC0033223
Commission Expires: 01/28/2029

**TECHNOLOGY**

# A.I. Chipmaker's Revenue Jumps 69% Despite Sales Limits

By TRIPP MICKLE

SAN FRANCISCO — Nvidia's business prospects have been whipsawed by the U.S. government lately. Last month, the government blocked the sale of artificial intelligence chips to China. Weeks later, it approved the sale of similar chips to the Middle East.

Amid the turmoil, Nvidia still maintained its breakneck growth as the leading provider of the computer chips used for building artificial intelligence.

Nvidia said on Wednesday that sales in its most recent quarter rose 69 percent from a year earlier to $44.1 billion. Its net income rose 26 percent to $18.78 billion. The company exceeded Wall Street's expectations for sales of $43.28 billion, but fell short of predictions for a profit of $19.49 billion.

Nvidia's revenue and profit rose even though, it said on Wednesday, the Trump administration's restrictions on chips to China will cost it $4.5 billion, a billion dollars less than it estimated in mid-April. The restrictions have pushed Nvidia out of the market for A.I. chips in China, the world's largest buyer of semiconductors, which are used to power smartphones, cars and other electronics.

Nvidia also projected that revenue in the current quarter would rise 50 percent from a year ago to $45 billion, as it expands sales of its newest A.I. chip, Blackwell. The sales forecast is in line with Wall Street's prediction of $45.75 billion, suggesting that the tech industry's embrace of artificial intelligence is in its early stages, with ample room to run.

Shares in Nvidia rose more than 4 percent in after-hours trading. It finished the trading day as the second-most-valuable company in the world behind Microsoft and ahead of Apple, with a market value of $3.3 trillion.

"Every nation now sees A.I. as core to the next industrial revolution," Jensen Huang, Nvidia's chief executive, said during a call with analysts on Wednesday.

MIKE KAI CHEN FOR THE NEW YORK TIMES

**Nvidia said sales in its most recent quarter climbed to $44.1 billion. New rules restrict the sale of A.I. chips to China.**

The company is showing its strength even among the tech industry's largest companies. For the first time in the A.I. era, its quarterly sales surpassed those of Meta, the social media pioneer. Nvidia's net income was 13 percent larger than Meta's profit in their most recent quarters.

Nvidia has been the early winner in the tech industry's race to develop artificial intelligence. Under Mr. Huang, Nvidia cornered the market on A.I. chips by being the first chipmaker to develop the software and servers that would train A.I. systems to recognize images and predict words.

But government officials have grown increasingly alarmed about the way adversaries like China could use A.I. to develop autonomous weapons and coordinate military strikes. Those worries have led Washington officials to crack down on Nvidia's sales.

Mr. Huang spent much of the past few months pushing back on that by traveling the world to meet with government officials. An April meeting with President Trump proved to be unsuccessful when the Commerce Department later pushed forward on limiting sales to China. Mr. Huang later flew to Beijing, where he pledged to find a new way to sell chips there, and then to Taiwan, where he complained that the U.S. government's restrictions had been a failure.

His efforts haven't changed the trajectory of Nvidia's business in China. Since the U.S. government began restricting chip exports, Nvidia's sales in China have been cut to 13 percent of total revenue from 21 percent two years ago. The company said it would lose $8 billion in the current quarter because of the Trump administration's restrictions.

On Wednesday, Mr. Huang broadened his attack on U.S. restrictions of chip sales to China. He said in prepared remarks that China was the world's largest A.I. market and that the company that won there would be the global leader. He said the U.S. assumption that it could prevent China from manufacturing competitive chips "was always questionable, and now it's clearly wrong."

"Shielding Chinese chipmakers from U.S. competition only strengthens them abroad and weakens America's position," Mr. Huang said.

Mr. Huang has had more success in persuading the U.S. government to loosen up sales to other countries. After his urging, the Trump administration rolled back Biden-era rules that restricted A.I. chip sales abroad. The change paved the way to a blockbuster deal this month between the United States and the United Arab Emirates to build the world's largest international hub of A.I. data centers.

Nvidia has made selling more chips to governments a key part of its strategy. The company relies on customers like Microsoft, Amazon, Google and Meta for a large portion of its sales. It wants to expand its customer base by adding buyers across Europe and Asia, including the Middle East, where A.I. could be part of the national infrastructure much like a telecommunications network, Mr. Huang has said.

The United States also doesn't have the energy resources to support the current demand for data centers. The maximum amount of power available this year for many companies is 50 megawatts, enough to support about 25,000 of Nvidia's newest A.I. chips. By comparison, OpenAI is planning a 200-megawatt data center next year at an A.I. campus in Abu Dhabi that could support 100,000 of Nvidia's chips.

The deal was important because Nvidia has a window to sell to countries before competition for A.I. chips increases, said Holger Mueller, principal analyst at Constellation Research, a tech research firm.

"Now they're the only game in town," Mr. Mueller said of Nvidia. "These Middle East countries really need them."

# Victoria's Secret Stays Offline After Breach

By JENNY GROSS

Victoria's Secret's website remained offline on Thursday, days after the lingerie company was hit by a cyberattack that has disrupted its online sales and sent its stock price lower.

The company said that it had taken its website and some in-store services down as a precaution, with teams working around the clock to restore operations. Its physical stores remained open.

As of Thursday morning, Victoria's Secret's share price had fallen 8 percent since Tuesday. The company did not confirm when the security incident took place, but shoppers reported seeing effects of the outage on social media earlier this week. It was unclear who perpetrated the attack on Victoria's Secret, which is based in Reynoldsburg, Ohio.

The cyberattack was the latest example of a high-profile digital breach at a major retailer, raising questions about companies' preparedness and the security of customer data.

Earlier this month, Marks & Spencer, the British retailer, was hit by a cyberattack that left the company unable to process online orders for weeks. The company told customers that some personal data had been taken, though not usable card or payment details or passwords. It said there was no evidence that the data had been shared, but said it was prompting customers to change their passwords regardless.

Also in late April, Harrods, the luxury department store based in Britain, experienced brief disruptions, restricting internet access at its sites as a security measure.

Ransomware attacks, which can disrupt services in addition to stealing customer data, have increased in recent years. Organizations across sectors have been targeted, including hospitals.

Cody Barrow, the chief executive of Eclectic IQ, a cybersecurity services company, said the attack on Victoria's Secret could underscore the vulnerability of retailers, many of whom rely on third party systems, such as payment providers.

"To me what it says is that retailers are still not segmenting systems well enough to contain incidents," Mr. Barrow said. "Third parties are the biggest blind spot right now, especially for retailers."

# Energy Department Unveils Supercomputer That Merges With A.I.

By DON CLARK

SAN FRANCISCO — Scientific computing and artificial intelligence were once separate worlds, using different kinds of calculations on distinctly different hardware. But the two fields are steadily merging, as shown by a massive new machine coming to Berkeley, Calif.

On Thursday, the Department of Energy's laboratory near the University of California, Berkeley, campus said it had selected Dell Technologies to deliver its next flagship supercomputer in 2026. The system will use Nvidia chips tailored for A.I. calculations and the simulations common to energy research and other fields.

Lawrence Berkeley National Laboratory expects the new machine — to be named for Jennifer Doudna, a Berkeley biochemist who shared the 2020 Nobel Prize for chemistry — to offer more than a tenfold speed boost over the lab's most powerful current system. If fully outfitted, the machine could be the Energy Department's biggest resource for tasks like training A.I. models, said Jonathan Carter, associate laboratory director for computing sciences at the Berkeley center.

The supercomputer stands out for its technology choices, which indicate the growing desire for government labs to adopt more technologies from commercial A.I. systems. Nvidia chips, though widely used by big cloud companies as well as in supercomputers, were passed over by the Energy Department for three previous record-setting machines that were assembled by Hewlett Packard Enterprise. Dell has hardly been a player in the highest end of the supercomputer market, but it has had success in large commercial A.I. installations.

"HPE has been sweeping the D.O.E. space," said Addison Snell, the chief executive of Intersect360 Research, which tracks the supercomputer market. "This is a big win for Dell."

Supercomputers — which are systems that take up entire rooms first used for jobs like designing weapons and cracking codes — have long been symbols for national prowess in technology.

The Energy Department, which typically purchases the government's biggest computers, devoted $1.8 billion over eight years to reach what the industry calls "exascale" performance, topped by a $600 million supercomputer at Lawrence Livermore National Laboratory called El Capitan. The Trump administration has not set a comparable funding target, nor has a price for the Berkeley system been released.

But Chris Wright, secretary of energy, who has compared A.I.'s development to the Manhattan Project, called the Doudna machine a key tool for winning the global A.I. race in remarks prepared for a Thursday event in Berkeley to announce the system.

Supercomputers have historically relied on precise calculations, handling data in what are known as 64-bit chunks. Commercial A.I. systems often use simpler 16-bit or 8-bit instructions, sacrificing accuracy for higher speed. Being able to use a mix of calculations in supercomputers powered by graphics processing units, the chips Nvidia sells for A.I., opens up many computing jobs, said Dion Harris, Nvidia's head of data center product marketing.

The National Energy Research Scientific Computing Center at Berkeley already used Nvidia's GPUs in a system called Perlmutter. Doudna will use a future version called Rubin but, in a key technical departure, will also use a general-purpose Nvidia processor based on technology from the British company Arm rather than Intel and Advanced Micro Devices chips.

Mr. Carter, the laboratory director, said Doudna's design was partly driven by the need to serve various tasks used by the center's 11,000 users. Researchers are increasingly using A.I. to improve simulations of phenomena such as how water removes heat from geothermal fields, he said.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

In re: JOANN INC., *et al.*,[1] Debtors. ) Chapter 11, Case No. 25-10068 (CTG) ) (Jointly Administered)

**NOTICE OF HEARING TO CONSIDER (I) FINAL APPROVAL OF THE DISCLOSURE STATEMENT AND (II) CONFIRMATION OF THE DEBTORS' JOINT CHAPTER 11 PLAN**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

On May 27, 2025, the United States Bankruptcy Court for the District of Delaware (the "Court") entered an order [Docket No. 994] (the "Conditional Disclosure Statement Order"): (a) authorizing the above-captioned debtors and debtors in possession (collectively, the "Debtors") to solicit votes on the *Second Amended Joint Chapter 11 Plan of JOANN Inc. and Its Debtor Affiliates* [Docket No. 986] (as modified, amended, or supplemented from time to time, the "Plan");[2] (b) conditionally approving the *Amended Disclosure Statement for the Second Amended Joint Chapter 11 Plan of JOANN Inc. and Its Debtor Affiliates* [Docket No. 987] (as modified, amended, or supplemented from time to time, the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation package; (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan; and (e) granting related relief.

The hearing at which the Court will consider Confirmation of the Plan and final approval of the Disclosure Statement (the "Combined Hearing") will commence on **July 10, 2025, at 10:00 a.m., prevailing Eastern Time**, before the Honorable Craig T. Goldblatt, in the United States Bankruptcy Court for the District of Delaware, located at 824 Market St. N, Third Floor, Wilmington, DE 19801.

On the Effective Date, each Executory Contract or Unexpired Lease not previously assumed, assumed and assigned, or rejected shall be deemed automatically rejected, other than those that: (1) are specifically described in the Plan as to be assumed in connection with Confirmation of the Plan, are identified on a Cure Notice, are identified on the Schedule of Assumed Executory Contracts and Unexpired Leases, or were assumed as part of the GA Transaction; (2) have been previously assumed or rejected by the Debtors pursuant to any other Bankruptcy Court order; (3) are the subject of a Filed motion to assume, assume and assign, or reject such Executory Contract or Unexpired Lease (or of a Filed objection with respect thereto) that is pending on the Confirmation Date; (4) are a contract, release, or other agreement or document entered into in connection with the Plan; or (5) are an Insurance Policy.

**PLEASE BE ADVISED:** THE COMBINED HEARING MAY BE CONTINUED FROM TIME TO TIME BY THE COURT OR THE DEBTORS **WITHOUT FURTHER NOTICE** OTHER THAN BY SUCH ADJOURNMENT BEING ANNOUNCED IN OPEN COURT OR BY A NOTICE OF ADJOURNMENT FILED WITH THE COURT AND SERVED ON ALL PARTIES ENTITLED TO NOTICE.

ANY SUCH NOTICES OF ADJOURNMENT ARE AVAILABLE FREE OF CHARGE ON THE DEBTORS' CASE WEBSITE AT HTTPS://CASES.RA.KROLL.COM/JOANN2025.

**CRITICAL INFORMATION REGARDING VOTING ON THE PLAN**

**Voting Record Date.** The voting record date is **May 23, 2025**, which was the date for determining which Holders of Claims in Classes 3 and 4 are entitled to vote on the Plan.

**Voting Deadline.** The deadline for voting on the Plan is **June 30, 2025, at 4:00 p.m., prevailing Eastern Time** (the "Voting Deadline"). If you received a Solicitation Package, including a Ballot and intend to vote on the Plan you ***must***: (a) follow the instructions carefully; (b) complete ***all*** of the required information on the ballot; and (c) execute and return your completed Ballot according to and as set forth in detail in the voting instructions so that it is ***actually received*** by the Debtors' claims and noticing agent, Kroll Restructuring Administration LLC (the "Claims and Noticing Agent") on or before the Voting Deadline. ***A failure to follow such instructions may disqualify your vote.***

**CRITICAL INFORMATION REGARDING OBJECTING TO THE CONFIRMATION OF THE PLAN AND/OR FINAL APPROVAL OF THE DISCLOSURE STATEMENT**

ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **ARTICLE VIII.C CONTAINS A THIRD-PARTY RELEASE**. THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

**Plan Objection Deadline**. The deadline for filing objections to confirmation of the Plan and/or final approval of the Disclosure Statement, as applicable, is **June 27, 2025, at 4:00 p.m., prevailing Eastern Time** (the "Plan Objection Deadline"). All such objections ***must***: (a) be in writing; (b) conform to the Bankruptcy Code, Bankruptcy Rules, the Local Rules, and any orders of the Court; (c) state, with particularity, the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan or Disclosure Statement (as applicable) that would resolve such objection; and (d) be filed with the Court (contemporaneously with a proof of sertvice) and served upon the following parties so as to be ***actually received*** on or before the Plan Objection Deadline: (i) the Debtors, JOANN Inc., 5555 Darrow Road, Hudson, Ohio 44236, Attn.: Ann Aber, EVP, Chief Legal and Human Resources Officer; (ii) co-counsel to the Debtors, (a) Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn.: Aparna Yenamandra, P.C. (aparna.yenamandra@kirkland.com) and 333 West Wolf Point Plaza, Chicago Illinois 60654, Attn.: Jeffrey Michalik (jeff.michalik@kirkland.com), and Lindsey Blumenthal (lindsey.blumenthal@kirkland.com) and (b) Cole Schotz P.C., 500 Delaware Avenue, Suite 1410, Wilmington, Delaware 19801, Attn.: Patrick J. Reilley (preilley@coleschotz.com), Stacy L. Newman (snewman@coleschotz.com), Michael E. Fitzpatrick (mfitzpatrick@coleschotz.com), and Jack M. Dougherty (jdougherty@coleschotz.com); (iii) the United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn.: Malcolm M. Bates (malcolm.m.bates@usdoj.gov); (iv) counsel to the Prepetition Term Loan Ad Hoc Group, (a) Gibson, Dunn & Crutcher LLP, 200 Park Avenue New York, New York 10166, Attn.: Scott J. Greenberg (SGreenberg@gibsondunn.com), Matthew J. Williams (MJWilliams@gibsondunn.com), and Kevin Liang (KLiang@gibsondunn.com), (b) Glenn Agre Bergman & Fuentes LLP, 1185 Avenue of Americas, 22nd Floor, New York, New York 10035, Attn: Andrew K. Glenn (agless@glenagre.com) and Malak S. Doss (mdoss@glenagre.com) and (c) Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, 16th Floor, Wilmington, Delaware 19801, Attn: Donna Culver (dculver@morrisnichols.com), Robert Dehney (rdehney@morrisnichols.com), Matthew Harvey (mharvey@morrisnichols.com), and Brenna Dolphin (bdolphin@morrisnichols.com); (v) counsel to the Prepetition Term Loan Agent, ArentFox Schiff LLP, 1301 Avenue of the Americas, 42nd Floor, New York, New York 10019, Attn.: Jeffrey Gleit (jeffrey.gleit@afslaw.com) and 1717 K Street NW, Washington, D.C. 20006, Attn.: Jonathan Bagg (jonathan.bagg@afslaw.com), and 233 South Wacker Drive, Suite 7100, Chicago, Illinois 60606, Attn.: Matthew Bentley (matthew.bentley@afslaw.com); and (vi) the Committee, Kelley Drye & Warren LLP, 3 World Trade Center, 175 Greenwich Street, New York, New York 10007, Attn.: Jason R. Adams (jadams@kelleydrye.com), Andres Barajas (abarajas@kelleydrye.com), Connie Y. Choe (cchoe@kelleydrye.com), Maeghan J. McLoughlin (mmcloughlin@kelleydrye.com), Randall L. Morrison (rmorrison@kelleydrye.com) and Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, Delaware 19801, Attn.: James E. O'Neill (joneill@pszjlaw.com), Bradford J. Sandler (bsandler@pszjlaw.com), and Eric R. Wilson (ewilson@pszjlaw.com).

**Please be advised that Article VIII of the Plan contains the following release, exculpation, and injunction provisions:**[3]

Article VIII.B of the Plan provides for a release by the Debtors (the "**Debtor Release**"): **Notwithstanding anything contained in the Plan or the Confirmation Order to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, upon entry of the Confirmation Order and effective as of the Effective Date, to the fullest extent permitted by applicable law, each Released Party is, and is deemed hereby to be, fully, conclusively, absolutely, unconditionally, irrevocably, and forever released by each and all of the Debtors, the Wind-Down Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, including any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Wind-Down Debtors, or their Estates, that any such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against or Interest in a Debtor, the Wind-Down Debtors, or other Entity, or that any Holder of any Claim against or Interest in a Debtor, the Wind-Down Debtors, or other Entity could have asserted on behalf of the Debtors or the Wind-Down Debtors (but excluding any and all direct claims any such Holder of a Claim or Interest may have), to the extent such Claim or Cause of Action (x) has not been sold pursuant to the GA Transaction Documents and Approval Order(s) and (y) is based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Wind-Down Debtors (including the Debtors' and the Wind-Down Debtors' capital structure, management, ownership, or operation thereof or otherwise), the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor or Wind-Down Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts (including the marketing, bidding, auction, and sale-related processes leading to the GA Transaction), the purchase, sale, or rescission of any security of the Debtors or the Wind-Down Debtors, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors or the Wind-Down Debtors or any GUC Trust Causes of Action that constitute Avoidance Actions), intercompany transactions between or among a Debtor, the Wind-Down Debtors, or an Affiliate of a Debtor and another Debtor, the Wind-Down Debtors, or Affiliate of a Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Disclosure Statement, the Plan, the Plan Supplement, the GA Transaction, any other Definitive Document or any Wind-Down Transaction, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan, the Plan Supplement, the GA Transaction, any other Definitive Document, any of the Wind-Down Transactions, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of the GA Transaction, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for any claims arising from or related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence.**

**Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release: (1) any obligations arising on or after the Effective Date (solely to the extent such obligation does not arise from any acts or omissions prior to the Effective Date) of any party or Entity under the Plan, the Confirmation Order, or any post-Effective Date transaction contemplated by the Plan or the Wind-Down Transactions, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the Wind-Down Transactions; or (2) any matters retained by the Wind-Down Debtors pursuant to the Schedule of Retained Causes of Action.**

Article VIII.C of the Plan provides for a third-party release by the Releasing Parties (the "**Third-Party Release**"): **Except as otherwise expressly set forth in the Plan or the Confirmation Order, effective as of the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed hereby to be, fully, conclusively, absolutely, unconditionally, irrevocably, and forever released by each Releasing Party from any and all claims and Causes of Action, whether known or unknown, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Wind-Down Debtors, or their Estates, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to or in any manner arising from, in whole or in part, the Debtors or the Wind-Down Debtors (including the Debtors' and the Wind-Down Debtors' capital structure, management, ownership, or operation thereof or otherwise), the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor or Wind-Down Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts (including the marketing, bidding, auction, and sale-related processes leading to the GA Transaction), the purchase, sale, or rescission of any security of the Debtors or the Wind-Down Debtors, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted by the Debtors or the Wind-Down Debtors or any GUC Trust Causes of Action that constitute Avoidance Actions), intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Disclosure Statement, the Plan, the Plan Supplement, the GA Transaction, any other Definitive Document, or any Wind-Down Transaction, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan, the Plan Supplement, the GA Transaction, any other Definitive Document, any of the Wind-Down Transactions, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of the GA Transaction, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for any claims arising from or related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence.**

**Notwithstanding anything to the contrary in the foregoing, the Third-Party Release does not release (1) any obligations arising on or after the Effective Date (solely to the extent such obligation does not arise from any acts or omissions prior to the Effective Date) of any party or Entity under the Plan, the Confirmation Order, or any post-Effective Date transaction contemplated by the Plan or the Wind-Down Transactions, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the Wind-Down Transactions or (2) the rights of any Holder of Allowed Claims to receive distributions under the Plan.**

UNDER THE PLAN, "***AVOIDANCE ACTIONS***" MEAN ANY AND ALL AVOIDANCE, RECOVERY, OR SUBORDINATION ACTIONS OR REMEDIES THAT MAY BE BROUGHT BY OR ON BEHALF OF THE DEBTORS OR THEIR ESTATES UNDER THE BANKRUPTCY CODE OR APPLICABLE NON BANKRUPTCY LAW, INCLUDING ACTIONS OR REMEDIES UNDER SECTIONS 544, 547, 548, 549, 550, 551, 552, OR 553 OF THE BANKRUPTCY CODE.

UNDER THE PLAN, "***EXCLUDED PARTIES***" MEANS, COLLECTIVELY, (A) ANY PERSON OR ENTITY THAT IS OR MAY BE LIABLE TO ANY OF THE DEBTORS (OR ANY SUCCESSOR THERETO) OR THE GUC TRUST IN RESPECT OF ANY RETAINED CAUSES OF ACTION OR GUC TRUST CAUSES OF ACTION, IF ANY, AND (B) ANY HOLDER OF INTERESTS IN JOANN INC. (SOLELY IN ITS CAPACITY AS SUCH) THAT IS NOT A RELEASING PARTY.

UNDER THE PLAN, "***RELEASED PARTIES***" MEANS, EACH OF, AND IN EACH CASE IN ITS CAPACITY AS SUCH: (A) THE DEBTORS; (B) EACH OF THE WIND DOWN DEBTORS; (C) THE PLAN ADMINISTRATOR; (D) THE PREPETITION ABL LENDERS; (E) THE PREPETITION FILO LENDERS; (F) THE PREPETITION TERM LOAN LENDERS; (G) THE PREPETITION ABL AGENT; (H) THE PREPETITION FILO AGENT; (I) THE PREPETITION TERM LOAN AGENT; (J) THE RELEASING PARTIES; (K) THE COMMITTEE AND ITS MEMBERS (IN THEIR CAPACITY AS COMMITTEE MEMBERS); (L) THE GUC TRUST AND THE GUC TRUSTEE; (M) THE PURCHASER; (N) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH THE FOLLOWING CLAUSE (O); AND (O) EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH THIS CLAUSE (O); PROVIDED HOWEVER, THAT NONE OF THE EXCLUDED PARTIES SHALL BE RELEASED PARTIES.

UNDER THE PLAN, "***RELEASING PARTIES***" MEANS, EACH OF, AND IN EACH CASE IN ITS CAPACITY AS SUCH: (A) THE DEBTORS; (B) EACH OF THE WIND DOWN DEBTORS; (C) THE PLAN ADMINISTRATOR; (D) THE PREPETITION ABL LENDERS; (E) THE PREPETITION FILO LENDERS; (F) THE PREPETITION TERM LOAN LENDERS; (G) THE PREPETITION ABL AGENT; (H) THE PREPETITION FILO AGENT; (I) THE PREPETITION TERM LOAN AGENT; (J) ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS WHO VOTE TO ACCEPT THE PLAN AND WHO AFFIRMATIVELY OPT IN TO THE RELEASES PROVIDED BY THE PLAN; (K) ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS WHO VOTE TO REJECT THE PLAN AND WHO AFFIRMATIVELY OPT IN TO THE RELEASES PROVIDED BY THE PLAN; (L) ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS WHO ARE DEEMED TO REJECT THE PLAN AND WHO AFFIRMATIVELY OPT IN TO THE RELEASES PROVIDED BY THE PLAN; (M) ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS WHO ARE DEEMED TO ACCEPT THE PLAN AND WHO AFFIRMATIVELY OPT IN TO THE RELEASES PROVIDED BY THE PLAN; (N) ALL HOLDERS OF INTERESTS IN THE DEBTORS WHO AFFIRMATIVELY OPT IN TO THE RELEASES PROVIDED BY THE PLAN; (O) THE COMMITTEE AND ITS MEMBERS (SOLELY IN THEIR CAPACITY AS COMMITTEE MEMBERS AND NOT AS HOLDERS OF CLAIMS); (P) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH THE FOLLOWING CLAUSE (Q) FOR WHICH SUCH ENTITY IS LEGALLY ENTITLED TO BIND SUCH AFFILIATE TO THE RELEASES CONTAINED IN THE PLAN UNDER APPLICABLE NON BANKRUPTCY LAW; AND (Q) EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH THIS CLAUSE (Q) FOR WHICH SUCH AFFILIATE OR ENTITY IS LEGALLY ENTITLED TO BIND SUCH RELATED PARTY TO THE RELEASES CONTAINED IN THE PLAN UNDER APPLICABLE NON BANKRUPTCY LAW; PROVIDED THAT EACH SUCH ENTITY THAT ELECTS NOT TO OPT INTO THE RELEASES CONTAINED IN THE PLAN, SUCH THAT IT IS NOT A RELEASING PARTY IN ITS CAPACITY AS A HOLDER OF A CLAIM OR INTEREST SHALL NEVERTHELESS BE A RELEASING PARTY IN EACH OTHER CAPACITY APPLICABLE TO SUCH ENTITY.

Article VIII.D of the Plan provides for an exculpation of certain parties (the "**Exculpation**"): **Except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur any liability for, and each such party shall be exculpated from any Cause of Action for any claim related to any act or omission occurring between the Petition Date and the Effective Date in connection with, relating to or arising out of the Chapter 11 Cases prior to the Effective Date, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the GA Transaction, the Plan, the**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION**

In re: GLOBAL CLEAN ENERGY HOLDINGS, INC., *et al.*,[1] Debtors. ) Chapter 11 ) Case No. 25-90113 (ARP) ) (Jointly Administered)

**NOTICE OF DEADLINES FOR THE FILING OF PROOFS OF CLAIM, INCLUDING REQUESTS FOR PAYMENTS UNDER SECTION 503(b)(9) OF THE BANKRUPTCY CODE**

**THE CLAIMS BAR DATE IS JUNE 20, 2025, AT 4:00 P.M., PREVAILING CENTRAL TIME**

**THE GOVERNMENTAL CLAIMS BAR DATE IS OCTOBER 13, 2025, AT 4:00 P.M., PREVAILING CENTRAL TIME**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**