## **EXHIBIT A**

Sale Order

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| _____ | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| JOANN INC., *et al.*,[1] | ) | Case No. 25-10068 (CTG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| _____ | ) | |

## ORDER (I) AUTHORIZING AND APPROVING PURCHASE AGREEMENT WITH SVP SEWING BRANDS LLC, (II) AUTHORIZING THE SALE OF CERTAIN PURCHASED ASSETS FREE AND CLEAR OF ALL ENCUMBRANCES AND (III) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] filed by the above-captioned debtors in possession (the "**Debtors**") upon the direction of GA Joann Retail Partnership, LLC (the "**Agent**"), in its capacity as agent for the Debtors pursuant to the *Order (A) Approving and Authorizing Sale of the Debtors' Assets, Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, and (B) Granting Related Relief* [Docket No. 520] (the "**Approval Order**"); and the Court having reviewed the Motion and the declaration of Steven Smith in support thereof (the "**Smith Declaration**"); and it appearing that no other or further notice of the Motion or the requested relief need be provided; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; and it appearing that the legal and factual bases set forth in this Motion and the Smith Declaration, and presented at the hearing, if any, conducted by this Court on the Motion (the "**Hearing**"), establish just cause for the relief granted herein; and after due deliberation thereon,

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: JOANN Inc. (5540); Needle Holdings LLC (3814); Jo-Ann Stores, LLC (0629); Creative Tech Solutions LLC (6734); Creativebug, LLC (3208); WeaveUp, Inc. (5633); JAS Aviation, LLC (9570); joann.com, LLC (1594); JOANN Ditto Holdings Inc. (9652); Dittopatterns LLC (0452); JOANN Holdings 1, LLC (9030); JOANN Holdings 2, LLC (6408); and Jo-Ann Stores Support Center, Inc. (5027). The Debtors' mailing address is 5555 Darrow Road, Hudson, Ohio 44236.

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or the Purchase Agreement (as defined herein), as applicable.

**THE COURT HEREBY FINDS AND DETERMINES THAT:**

A.     **Findings and Conclusions:** The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such. All findings of fact and conclusions of law announced by the Court at the Hearing are hereby incorporated herein to the extent not inconsistent herewith.

B.     **Jurisdiction and Venue.** This Court has jurisdiction to hear and determine the Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue of the Chapter 11 Cases and proceeding is proper in this District and this Court under 28 U.S.C. §§ 1408 and 1409.

C.     **Statutory Predicates.** The statutory predicates for the relief requested in the Motion are sections 105 and 363 of the Bankruptcy Code. Such relief is also warranted pursuant to Bankruptcy Rules 2002, 6004, 6006, 9006, and 9019, and Local Rules 2002-1 and 6004-1.

D.     **Final Order.** This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds there is no just reason for delay in the implementation of this Order and expressly directs entry of judgment as set forth herein.

E.     **Sufficiency of Notice.** Due, proper, timely, adequate and sufficient notice of the Motion and the relief granted herein has been provided in accordance with sections 102(1), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 9006, 9007, and 9014, and Local Rules

2

2002-1 and 6004-1. A reasonable opportunity to object or be heard regarding the relief requested in the Motion and provided herein was afforded to all parties in interest.

      F.      **The Agent**. The Approval Order granted the Agent the exclusive right to market and sell, and/or otherwise designate the purchasers, licensees and assignees of, any of all of the assets of the Debtors, including the Purchased Assets (as defined herein), free and clear of all Encumbrances (as defined herein), including the power to (i) direct the Debtors to assume and assign contracts and leases pursuant to the procedures described in the Approval Order and (ii) release the purchasers of the Debtors' assets from any and all claims under the Master Sublease, without further order of this Court.  Notwithstanding the foregoing, the Approval Order expressly permits the Agent and/or the Debtors the right to seek a further order of the Court in respect of any sale of the Debtors' assets.

      G.      **The Purchase Agreement.**  The Agent has entered into that certain *Intellectual Property Asset Purchase Agreement* dated as of May 23, 2025, a copy of which is attached hereto as **Exhibit 1** (as it may be amended, modified, or supplemented in accordance with the terms thereof and of this Order, the "**Purchase Agreement**"), with SVP Sewing Brands LLC or a special purpose vehicle designated thereby ("**SVP**") for the sale of the assets identified therein (the "**Purchased Assets**").

      H.      **Fair Consideration.** The consideration provided by SVP for the Purchased Assets pursuant to the Purchase Agreement: (a) is fair and reasonable, (b) will provide a greater recovery for the Debtors' estates than would be provided by any other practical available alternative, and (c) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of each applicable state, territory, possession, or the District of Columbia.

      I.      **Business Judgment.** The Agent has demonstrated good, sufficient and sound business reasons and justifications for entering into the Purchase Agreement in accordance with

3

its obligations under the Agency Agreement.

J.    **Arm's Length Sale.** The negotiations with respect to the Purchase Agreement were (a) non-collusive, (b) conducted by the Agent, Tiger Capital Group, LLC, and Wilmington Savings Fund Society, FSB (collectively, the "**Agent Group**") and SVP at arm's length and in good faith, (c) complied in all respects with the Approval Order, and (d) were substantively and procedurally fair to all parties in interest. Neither the Agent Group nor SVP has engaged in any conduct that would cause or permit the Purchase Agreement or the sale of the Purchased Assets (the "**Sale Transaction**") to be avoided. Neither the Agent Group nor SVP have engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code or require imposition of costs or damages under section 363(n) of the Bankruptcy Code.

K.    **Good Faith Purchaser.** SVP is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and is therefore entitled to the full protection of that provision in respect of the Sale Transaction. SVP proceeded in good faith in all respects in connection with each term of the Purchase Agreement (and any ancillary documents executed in connection with the foregoing) and the Sale Transaction. The Agent Group was free to deal with any other party interested in buying some or all of the Purchased Assets. The protections afforded to SVP by section 363(m) of the Bankruptcy Code are integral to the Sale Transaction, and SVP would not consummate the Sale Transaction without such protections.

L.    **SVP is Not an Insider**. Neither SVP nor any of its affiliates, officers, directors, managers, shareholders, members or any of their respective successors or assigns is an "insider" of the Debtors or the Agent, as that term is defined under section 101(31) of the Bankruptcy Code. No common identity of directors, managers, controlling shareholders, or members exists between the Debtors, the Agent, and SVP.

M.    **No Illegal Purpose**. The Purchase Agreement was not entered into, and neither the Agent nor SVP propose to consummate the Sale Transaction for the purpose of (a) escaping

liability for any of the Debtors' debts, or (b) hindering, delaying or defrauding the Debtors' present or future creditors.

N.     **Sale Free and Clear.** (a) One or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied, and the Agent has the power to transfer the Purchased Assets to SVP free and clear of all claims (including, without limitation, any and all "claims" as that term is defined in section 101(5) of the Bankruptcy Code), liens (including, without limitation, any statutory, mechanic's, builders, materialmen's or similar lien on real and/or personal property and any and all "liens" as that term is defined in section 101(37) of the Bankruptcy Code), liabilities, interests, rights, and other encumbrances, including, without limitation, the following: all mortgages, restrictions (including, without limitation, any restriction on the use, voting rights, transfer rights, claims for receipt of income or other exercise of any attributes of ownership), hypothecations, charges, indentures, loan agreements, instruments, leases, licenses, sublicenses, options, deeds of trust, security interests, equity interests, conditional sale rights or other title retention agreements, pledges, judgments, demands, rights of first refusal, consent rights, offsets, contract rights, rights of setoff, rights of recovery, reimbursement rights, contribution claims, indemnity rights, exoneration rights, product liability claims, alter-ego claims, to the greatest degree allowed by applicable law, environmental rights and claims (including, without limitation, toxic tort claims), labor rights and claims, employment rights and claims, pension rights and claims, tax claims, regulatory violations by any governmental entity, decrees of any court (other than this Order) or foreign or domestic governmental entity, charges of any kind or nature, debts arising in any way in connection with any agreements, acts, or failures to act, reclamation claims, obligation claims, demands, guaranties, option rights or claims, rights, contractual or other commitment rights and claims, and all other obligations or matters of any kind and nature, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded

or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non- contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, senior or subordinated, whether arising prior to or subsequent to the commencement of these Chapter 11 Cases but prior to the Closing Date, and whether imposed by agreement, understanding, law, equity or otherwise, including claims otherwise arising under any theory, law or doctrine of successor or transferee liability or related theories , and specifically any liability under the Master Sublease, excluding only Permitted Encumbrances and Assumed Liabilities (all of the foregoing, collectively, the "**Encumbrances**"), (b) SVP would not have entered into the Purchase Agreement and would not consummate the Sale Transaction if (i) the transfer of the Purchased Assets was not free and clear of all Encumbrances, or (ii) SVP would, or in the future could, be liable for or subject to any Encumbrances. (c) Not being able to transfer the Purchased Assets free and clear of all Encumbrances would adversely impact the Agent's ability to maximize the value of the Purchased Assets (on behalf of itself and the Debtors), and the transfer of the Purchased Assets other than pursuant to a transfer that is free and clear of all Encumbrances would be of substantially less benefit to the Debtors' estates.

O.      **Validity of Transfer.** The consummation of the transactions contemplated by the Purchase Agreement, including, without limitation, the Sale Transaction, is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 365(b) and 365(f) thereof, and all of the applicable requirements of such sections have been complied with in respect of the transactions contemplated under the Purchase Agreement. The Purchase Agreement has been duly and validly executed and delivered by the Agent Group and SVP.

P.      **Releases.** This Court has jurisdiction under 28 U.S.C. §§ 1334(a) and 1334(b) to approve the releases set forth in Exhibits E and F to the Purchase Agreement (the "**Releases**"). Section 105(a) of the Bankruptcy Code permits approval of the Releases. Based upon the record

in these chapter 11 cases, the Releases (i) were consensual; (ii) were given in exchange for and are supported by fair consideration provided by each of the releasing parties; (iii) were an integral part of inducing the Agent Group and SVP to enter into the Purchase Agreement and are essential to the Sale Transaction; (iv) were negotiated at arms' length and in good faith between the Agent Group (on behalf of itself and the Debtors) and SVP and its affiliates; and (v) are fair, equitable, and reasonable. Accordingly, based upon the record of these Chapter 11 Cases, this Court finds that the Releases are consistent with the Bankruptcy Code and other applicable law. The Releases are appropriately tailored to the circumstances of these Chapter 11 Cases and reasonable in scope. The Agent has the authority to grant the releases on behalf of the Debtors and the Releases shall be binding in all respects upon: (i) all pre-petition and post-petition creditors of the Debtors, (ii) all interest holders of the Debtors, (iii) any Court-appointed committee, (iv) all successors and assigns of the Debtors and their affiliates and subsidiaries, and (v) any trustees, examiners, "responsible persons" or other fiduciaries appointed in these Chapter 11 Cases or upon a conversion of these Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, including a chapter 7 trustee (collectively, the "**Parties in Interest**"), and the Releases shall not be subject to rejection or avoidance under any circumstances by any party. If any of the Chapter 11 Cases is dismissed under section 1112 of the Bankruptcy Code, this Order and the rights granted to SVP hereunder shall remain effective and, notwithstanding such dismissal, shall remain binding on the Parties in Interest.

Q.    **Compelling Circumstances for an Immediate Sale.** To maximize the value of the Purchased Assets, it is essential that the transactions contemplated by the Purchase Agreement occur within the respective time periods set forth therein. Time is of the essence in consummating the transactions contemplated by the Purchase Agreement including, without limitation, the Sale Transaction. Accordingly, there is cause to waive the stays contemplated by Bankruptcy Rules 6004 and 6006. The Agent (on behalf of itself and the Debtors) has demonstrated compelling

circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the transactions contemplated by the Purchase Agreement. The transactions contemplated by the Purchase Agreement do not impermissibly restructure the rights of the Debtors' creditors nor impermissibly dictate the terms of a chapter 11 plan for the Debtors, and therefore, do not constitute a sub rosa plan.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1. **<u>Findings of Fact and Conclusions of Law</u>**. The above-referenced findings of fact and conclusions of law are hereby incorporated by reference as though fully set forth herein.

2. **<u>Motion Granted.</u>** The Motion is granted as provided herein, and entry into and performance under the Purchase Agreement attached hereto as **<u>Exhibit 1</u>** and the consummation of the transactions contemplated thereby, including, without limitation, the Sale Transaction, is authorized and approved.

3. **<u>Objections are Overruled.</u>** Any objections and responses to the Motion or the relief requested therein that have not been withdrawn, waived, settled, or resolved, and all reservations of rights included in such objections and responses, are overruled on the merits and denied with prejudice. All persons and entities given notice of the Motion that failed to timely object thereto are deemed to consent to the relief granted herein, including for purposes of sections 363(f)(2), 365(c)(1), and 365(e)(2) of the Bankruptcy Code.

### A. Approval of the Purchase Agreement and the Sale Transaction

4. The Purchase Agreement, all ancillary documents, the transactions contemplated thereby, including, without limitation, the Sale Transaction, and all the terms and conditions thereof, are approved. The failure specifically to include any particular provision of the Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision; the Court hereby authorizes and approves the Purchase Agreement in its entirety. For

the avoidance of doubt, as of the Closing Date, SVP shall have a general unsecured claim against the Debtors in the amount set forth in <u>Table 1</u> below, which shall be deemed "allowed" for all purposes of the Chapter 11 Cases and any successor cases.

**<u>Table 1 – Allowed Claim</u>**

| Claim No. | Debtor | Allowed Amount | Claim Class |
|-----------|--------|----------------|-------------|
| 11676 | Jo-Ann Stores, LLC | Not less than $8,412,826.57 | General Unsecured |

5.    The Agent and its officers, employees and agents are authorized and directed to take any and all actions necessary, appropriate or reasonably requested by SVP to perform, consummate, implement and close the Sale Transaction, including, without limitation, (a) the sale to SVP of all Purchased Assets in accordance with the terms and conditions set forth in the Purchase Agreement and this Order, and (b) execution, acknowledgment and delivery of such deeds, assignments, conveyances and other assurance, documents and instruments of transfer and any action for purposes of assigning, transferring, granting, conveying and confirming to SVP or reducing to its possession, the Purchased Assets, all without further order of this Court. The Agent is further authorized to pay, without further order of this Court, whether before, at or after the Closing Date, any expenses or costs that are required to be paid by the Agent under the Purchase Agreement or this Order in order to consummate the Sale Transaction or perform its obligations under the Purchase Agreement.

6.    All persons and entities, including, without limitation, the Debtors, the Agent Group, the Debtors' estates, any and all debt security holders, equity security holders, governmental tax and regulatory authorities, lenders, customers, vendors, employees, former employees, litigation claimants, trustees, trade creditors, and any other creditors (or any affiliate, agent, successor, or assign of any of the foregoing) who may or do hold any Encumbrances (whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising

9

prior to or subsequent to the commencement of these Chapter 11 Cases but before the Closing Date, whether imposed by agreement, understanding, law, equity or otherwise), arising under or out of, in connection with, or in any way relating to, the Debtors, the Chapter 11 Cases, the Purchased Assets, the transfer of the Agent's interests in the Purchased Assets, the operation or ownership of the Purchased Assets prior to the Closing Date, or the Sale Transaction, are hereby prohibited, forever barred, estopped, and permanently enjoined from asserting or pursuing such Encumbrances against SVP, its affiliates, successors, assigns, or property, including the Purchased Assets, including, without limitation, taking any of the following actions with respect to any such Encumbrances: (a) commencing or continuing in any manner any action, whether at law or in equity, in any judicial, administrative, arbitral, or any other proceeding, against SVP, its affiliates, successors, assigns, assets (including the Purchased Assets), and/or properties; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against SVP, its affiliates, successors, assigns, assets (including the Purchased Assets), and/or properties; (c) creating, perfecting, or enforcing any Encumbrance against SVP, its affiliates, any of their respective successors, assigns, assets (including the Purchased Assets), and/or properties; (d) asserting a setoff, or, right of subrogation of any kind against any obligation due from SVP, its affiliates or any of its successors or assigns; or (e) commencing or continuing any action in any manner or place that does not comply, or is inconsistent, with the provisions of this Order, the Purchase Agreement, or the agreements or actions contemplated or taken in respect thereof, including the Agent's ability to transfer the Purchased Assets to SVP, in accordance with the terms of this Order and the Purchase Agreement. No person or entity shall assert or pursue any such Encumbrance against SVP or its affiliates, successors or assigns.

7.    Pursuant to section 365 and 363, as applicable, of the Bankruptcy Code, the applicable Debtors and the Agent Group are authorized to assume the Assumed Contracts and

assign the Assumed Contracts and otherwise transfer the other Assumed Liabilities to SVP.  To the extent a Cure Amount is owed to a counterparty to any Assumed Contract (each, a "**Contract Counterparty**"), SVP shall pay the Cure Amount. Any objection of a Contract Counterparty to the assumption or assignment of any Assumed Contact, any Cure Amount, or seeking adequate assurance of future performance, to the extent not otherwise resolved by agreement, or by separate order of the Court, is hereby overruled. There shall be no accelerations, assignment fees, increases, or any other fees charged to SVP or the Agent as a result of the transfer of the Purchased Assets or the assumption and assignment of the Assumed Contracts or transfer of the other Assumed Liabilities. Upon payment of the Cure Amount in accordance with the Purchase Agreement, the Debtors, the Agent, and SVP shall be released by the applicable Contract Counterparty from any and all claims and causes of action of any nature whatsoever based on or relating to the Assigned Liabilities arising before the Closing Date, and the Debtors, the Agent, and SVP shall have no liability for such claims or causes of actions.

8.    Except for the Assumed Liabilities, SVP shall assume none of the Debtors' obligations. Counterparties of the Debtors' executory contracts and unexpired lease, other than Assumed Contracts, are barred, estopped, and permanently enjoined from asserting against SVP or its successors and assigns or its property any assignment fee, acceleration, default, breach or claim or pecuniary loss.

9.    The sale of the Purchased Assets to SVP under the Purchase Agreement shall not be avoided under any statutory or common law fraudulent conveyance and fraudulent transfer theories whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof or the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing.

### B.  Transfer of the Purchased Assets Free and Clear

10.  Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the transfer of the

Purchased Assets to SVP shall be a legal, valid, and effective transfer of the Purchased Assets, and shall vest SVP with all right, title, and interest of the Agent or the Debtors in the Purchased Assets free and clear of all Encumbrances. Following the Closing Date, no holder of any Encumbrance shall interfere with SVP's title to, or use and enjoyment of, the Purchased Assets based on or related to any such Encumbrance.

11.    Those holders of any Encumbrances who did not object or who withdrew their objections to the Motion, are deemed to have consented to the Sale Transaction pursuant to section 363(f)(2) of the Bankruptcy Code.

12.    As a result of any action taken in connection with the Purchase Agreement, the consummation of the transactions contemplated thereby, including, without limitation, the Sale Transaction, or the transfer or operation of the Purchased Assets, (i) neither SVP nor any of its affiliates shall be deemed to be a mere continuation of the Agent or any of the Debtors or their estates, nor shall there be deemed to be a continuity or common identity among SVP, the Agent, any of the Debtors, or any of their respective affiliates, or any continuity of enterprise among SVP, the Agent, any of the Debtors, or any of their respective affiliates; (ii) neither SVP nor any of its affiliates shall be deemed to be holding themselves out to the public as a continuation of any of the Debtors; (iii) neither SVP nor any of its affiliates shall be deemed a successor to the of the Debtors or their estates; and (iv) none of the transactions contemplated by the Purchase Agreement, including, without limitation, the Sale Transaction, amounts to a consolidation, merger, or *de facto* merger of SVP or any of its affiliates with or into the Agent or any of the Debtors.

13.    Without limiting the generality of the foregoing, and other than as may be set forth in the Purchase Agreement, none of SVP, its affiliates, the present or contemplated members or shareholders of SVP and its affiliates, nor the Purchased Assets shall have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or equity, or

by payment, setoff (except for setoffs exercised prior to the Petition Date), or otherwise, directly or indirectly, any claims or Encumbrances relating to any U.S. federal, state or local income tax liabilities, that the Debtors or the Agent may incur in connection with consummation of the transactions contemplated by the Purchase Agreement including, without limitation, the Sale Transaction, or that the Debtors and the Agent have otherwise incurred prior to the consummation of the transactions contemplated by the Purchase Agreement.

14.   On the Closing Date, all right, title and interest in and to, and possession of, the Purchased Assets shall be immediately vested in SVP pursuant to sections 105(a), 363(b), and 363(f) of the Bankruptcy Code free and clear of any and all Encumbrances. Such transfer shall constitute a legal, valid, binding and effective transfer of, and shall vest SVP with, all right, title and interest in and to, and possession of, the Purchased Assets. All persons and entities, presently or on or after the Closing Date, in possession of some or all of the Purchased Assets shall surrender possession of such Purchased Assets to SVP on or prior to the Closing Date or at such time thereafter as SVP may request.

15.   The holders of any Encumbrances are directed to execute such documents and take all other actions as may be necessary to terminate, discharge or release their Encumbrances.

16.   This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department or office. This Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registrars of patents, trademarks or other intellectual property, administrative agencies, governmental departments, secretaries of state, federal and local officials and all other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file, register or otherwise record or release any documents or instruments; and each of the foregoing persons and entities is

13

hereby authorized to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the Sale Transaction.

17.  If any person or entity that has filed financing statements, mechanic's liens, *lis pendens* or other documents or agreements evidencing any Encumbrance shall not have delivered to the Debtors on or prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Encumbrances with respect to the Purchased Assets, (a) the Agent or SVP by virtue of its power of attorney is hereby authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Purchased Assets; (b) SVP is hereby authorized to file, register or otherwise record a certified copy of this Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Encumbrances; and (c) SVP may seek in this Court or any other court to compel appropriate parties to execute termination statements, instruments of satisfaction and releases of all Encumbrances with respect to the Purchased Assets. Notwithstanding the foregoing, the provisions of this Order shall be self-executing, and neither the Debtors, the Agent, nor SVP shall be required to execute or file releases, termination statements, assignments, consents or other instruments in order to effectuate, consummate and implement the provisions of this Order.

### C.  No Successor or Transferee Liability

18.  Except as provided in the Purchase Agreement, notwithstanding the entry of this Order and the occurrence of the Closing Date, SVP (and any of its affiliates, successors, or assigns), as a result of any action taken in connection with the Purchase Agreement, the consummation of the transactions contemplated thereby, including, without limitation, the Sale Transaction, or the transfer or operation of the Purchased Assets, shall not be deemed to: (a) be a legal successor or successor employer to the Agent Group or any Debtor (including with

14

respect to any health or benefit plans) or otherwise be deemed a successor to the Agent Group or any Debtor, and shall instead be, and be deemed to be, a new employer with respect to all federal or state unemployment laws, including any unemployment compensation or tax laws, or any other similar federal or state laws; (b) have, *de facto*, or otherwise, merged or consolidated with or into the Agent Group or any Debtor; or (c) be an alter ego or mere continuation or substantial continuation of the Agent Group or any Debtor or the enterprise of any Debtor, including, in the case of each of (a)-(c), without limitation, (x) within the meaning of any foreign, federal, state or local revenue law, pension law, the Employee Retirement Income Security Act, the Consolidated Omnibus Budget Reconciliation Act, the WARN Act (29 U.S.C. §§ 2101 et seq.) ("**WARN**"), to the greatest degree allowed by applicable law, the Comprehensive Environmental Response Compensation and Liability Act ("**CERCLA**"), to the greatest degree allowed by applicable law, the Fair Labor Standard Act, Title VII of the Civil Rights Act of 1964 (as amended), the Age Discrimination and Employment Act of 1967 (as amended), the Federal Rehabilitation Act of 1973 (as amended), the National Labor Relations Act, 29 U.S.C. § 151, et seq. or (y) in respect of (1) to the greatest degree allowed by applicable law, any environmental liabilities, debts, claims or obligations arising from conditions existing on or prior to the Closing Date (including, without limitation, the presence of hazardous, toxic, polluting, or contaminating substances or wastes), which may be asserted on any basis, including, without limitation, under CERCLA, and (2) any liabilities, penalties, costs, debts or obligations of or required to be paid by the Debtors for any taxes of any kind for any period, labor, employment, or other law, rule or regulation (including, without limitation, filing requirements under any such laws, rules or regulations), or (3) any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine.

19.   Without limiting the generality of the foregoing, and except as otherwise provided in the Purchase Agreement and this Order, neither SVP nor any of its affiliates shall have any

responsibility for any (a) liability or other obligation of the Agent Group or the Debtors related to the Purchased Assets, or (b) any claims against the Agent Group or the Debtors or any of their predecessors or affiliates. By virtue of the purchase of the Purchased Assets, neither SVP nor any of its affiliates shall have any liability whatsoever with respect to the Agent Group's or the Debtors' (or their predecessors' or affiliates') respective businesses or operations or any of the Agent Group's or the Debtors' (or their predecessors' or affiliates') obligations based, in whole or part, directly or indirectly, on any theory of successor or vicarious liability of any kind or character, or based upon any theory of antitrust, to the greatest degree allowed by applicable law, environmental (including, but not limited to CERCLA), successor or transferee liability, *de facto* merger or substantial continuity, labor and employment (including, but not limited to, WARN) or products liability law, whether known or unknown as of the Closing Date, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated, including any liabilities or non-monetary obligations on account of the Debtors' employment agreements or health or benefit plans, any settlement or injunction or any liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Purchased Assets prior to the Closing Date (collectively, with the potential claims set forth in paragraph 13, "**Successor or Transferee Liability**"). SVP would not have acquired the Purchased Assets but for the foregoing protections against Successor or Transferee Liability. For the avoidance of doubt, the provisions of this paragraph are in addition to the provisions in paragraph 13 and shall in no way limit, or be interpreted as contradicting or qualifying, the provisions in paragraph 13.

20.   Neither SVP nor any of its affiliates, successors, assigns, equity holders, employees or professionals shall have or incur any liability to, or be subject to any action by, the Agent Group or the Debtors or any of their estates, predecessors, successors, or assigns, arising out of the negotiation, investigation, preparation, execution, delivery of the Purchase Agreement and

the entry into and consummation of the sale of the Purchased Assets, except as expressly provided in the Purchase Agreement and this Order.

21.   Nothing in this Order or the Purchase Agreement shall require SVP or any of its affiliates to (a) continue or maintain in effect, or assume any liability in respect of any employee, former employee, collective bargaining agreement, pension, welfare, fringe benefit or any other benefit plan, trust arrangement or other agreements to which any Debtor is a party or have any responsibility therefor including, without limitation, medical, welfare and pension benefits payable after retirement or other termination of employment; or (b) assume any responsibility as a fiduciary, plan sponsor or otherwise, for making any contribution to, or in respect of the funding, investment or administration of any employee benefit plan, arrangement or agreement (including but not limited to pension plans) or the termination of any such plan, arrangement or agreement.

22.   No bulk sales law or similar law of any state or other jurisdiction shall apply in any way to the transactions approved by this Order, including, without limitation, the Purchase Agreement and the Sale Transaction.

23.   Effective upon the Closing Date, all persons and entities are forever prohibited and enjoined from commencing or continuing in any manner any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral or other proceeding against the Purchased Assets, SVP, affiliates, successors or assigns, with respect to any Successor or Transferee Liability, including the following actions with respect to Successor or Transferee Liability:

a)   commencing or continuing any action or other proceeding pending or threatened;

b)   enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order;

c)   creating, perfecting or enforcing any Encumbrance;

d)   asserting any setoff or right of subrogation;

e) commencing or continuing any action, in any manner or place, that does not comply with, or is inconsistent with, the provisions of this Order or other orders of this Court, or the agreements or actions contemplated or taken in respect hereof; or

### D. Good Faith; Arm's Length Sale

24. The reversal or modification on appeal of the authorization provided herein to consummate the Sale Transaction shall not affect the validity of the Sale Transaction or any term of the Purchase Agreement and shall not result in the unwinding of the Sale Transaction. SVP, as a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code, is entitled to the full protections under section 363(m) of the Bankruptcy Code.

### E. Related Relief

25. Each and every federal, state and governmental agency or department, and any other person or entity, is hereby authorized to accept any and all documents and instruments in connection with or necessary to consummate the Sale Transaction contemplated by the Purchase Agreement.

26. To the extent this Order is inconsistent with any prior order or pleading filed in these Chapter 11 Cases related to the Motion, the terms of this Order shall govern. To the extent there is any inconsistency between the terms of this Order and the terms of the Purchase Agreement, the terms of the Purchase Agreement shall govern.

27. This Order and the Purchase Agreement shall be binding in all respects upon all pre-petition and post-petition creditors of the Debtors, all interest holders of the Debtors, any Court-appointed committee, all successors and assigns of the Debtors and their affiliates and subsidiaries, and any trustees, examiners, "responsible persons" or other fiduciaries appointed in these Chapter 11 Cases or upon a conversion of these Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, including a chapter 7 trustee, and the Purchase Agreement and the Sale Transaction shall not be subject to rejection or avoidance under any circumstances by any party. If any of the Chapter 11 Cases is dismissed under section 1112 of the Bankruptcy

Code, this Order and the rights granted to SVP hereunder shall remain effective and, notwithstanding such dismissal, shall remain binding on all parties in interest. For the avoidance of doubt, the Debtors' inability to satisfy in full all administrative expense claims of the Debtors' estates shall not be a basis for termination, rejection or avoidance (as applicable) of the Purchase Agreement or the Sale Transaction.

28. **Releases**. Effective upon the Closing Date, the Releases shall be binding upon the Agent Group, the Debtors, and SVP. If the Purchase Agreement is terminated for any reason other than pursuant to Section 11.1(d) of the Purchase Agreement, Hilco IP Services, LLC, d/b/a Hilco Streambank are hereby directed to take all actions necessary to cause the Release Amount to be returned to SVP within two (2) business days thereafter.

29. This Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the Purchase Agreement, all amendments thereto and any waivers and consents thereunder, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale Transaction, including any and all disputes with any Contract Counterparty and any party that has, or asserts, possession, control or other rights in respect of any of the Purchased Assets; *provided*, *however*, that, in the event this Court abstains from exercising or declines to exercise jurisdiction with respect to the Purchase Agreement or this Order, such abstention or refusal shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction of any other court having competent jurisdiction with respect to any such matter. This Court retains jurisdiction to compel delivery of the Purchased Assets over any claims, including any Successor and Transferee Liability brought against SVP, the Agent, the Debtors, and their respective assets, regarding the Purchased Assets, and to enter orders, as appropriate, pursuant to sections 105(a) or 363 of the Bankruptcy Code (or other applicable provisions) necessary to transfer the Purchased Assets to SVP.

30.    At any time prior to the Closing Date, SVP or the Agent may terminate the Purchase Agreement pursuant to the terms thereof without any penalty or liability to SVP, the Agent, or the Debtors (or their estates), except as set forth in the Purchase Agreement.

31.    The Purchase Agreement and any related agreements, documents, or other instruments may be modified, amended or supplemented by the parties thereto and in accordance with the terms thereof, without further order of this Court; *provided*, that any such modification, amendment, or supplement does not have a material adverse effect on the Debtors' estates.

32.    This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding any provision in the Bankruptcy Rules to the contrary, including but not limited to Bankruptcy Rules 6004(h) and 6006(d), the Court expressly finds there is no reason for delay in the implementation of this Order and, accordingly: (a) the terms of this Order shall be immediately effective and enforceable upon its entry and the 14-day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is hereby expressly waived and shall not apply; (b) the implementation, enforcement or realization of the relief granted in this Order is not subject to any stay ; and (c) the Debtors, the Agent and SVP may, each in its discretion and without further delay, take any action and perform any act authorized under this Order.

33.    SVP shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code, to give any notice permitted by the Purchase Agreement or to enforce any of its remedies under the Purchase Agreement or any other sale-related document. The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence; provided, however, that this Court shall retain exclusive jurisdiction over any and all disputes with respect thereto.

34.    Nothing contained in any chapter 11 plan to be confirmed in these Chapter 11 Cases or any order to be entered in these Chapter 11 Cases (including any order entered after

conversion of these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code) shall alter, conflict with, or derogate from, the provisions of the Purchase Agreement or this Order. In the event there is a direct conflict between the terms of this Order and the terms of any subsequent chapter 11 plan or any order to be entered in these Chapter 11 Cases (including any order entered after conversion of these Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code), the terms of this Order shall control.

35.   The provisions of this Order are non-severable and mutually dependent.

36.   SVP has standing to seek to enforce the terms of this Order.

37.   All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

## **EXHIBIT 1**

Purchase Agreement

## INTELLECTUAL PROPERTY ASSET PURCHASE AGREEMENT

THIS INTELLECTUAL PROPERTY ASSET PURCHASE AGREEMENT (this "Agreement") is made as of May 23, 2025, by and between Singer Sourcing Limited LLC, a Delaware limited liability company ("Buyer"), and GA Joann Retail Partnership, LLC, a Delaware limited liability company ("Agent"), in its capacity as agent pursuant to the Approval Order (as defined below).  Capitalized terms used but not otherwise defined herein have the meaning set forth in Article I.

## RECITALS

WHEREAS, JOANN Inc., a Delaware corporation ("JOANN") and its Subsidiaries, including, without limitation, Ditto, have been engaged in the business of operating retail stores;

WHEREAS, on January 15, 2025, JOANN and twelve of its Affiliates (collectively, the "Debtors") commenced voluntary chapter 11 bankruptcy cases (the "Bankruptcy Cases") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which cases are being jointly administered under lead Case No. 25-10068 (CTG);

WHEREAS, on February 26, 2025, the Bankruptcy Court entered an order (the "Approval Order") [D.I. 520] that, among other relief, approved an Agency Agreement, dated as of February 26, 2025, and granted Agent the exclusive right to market and sell, and/or otherwise designate the purchasers, licensees and assignees of, any of all of the assets of the Debtors free and clear of all liens, claims, and encumbrances thereon (other than the Permitted Encumbrances), including the power to (i) direct the Debtors to assume and assign contracts and leases pursuant to the procedures described in the Approval Order and (ii) release SVP from any and all claims under the Master Sublease, without further order of the Bankruptcy Court; and

WHEREAS, Agent has designated Buyer as the purchaser of the Acquired Assets (defined below), and Buyer desires to purchase all of the Acquired Assets and assume all of the Assumed Liabilities, in each case upon the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties, and covenants herein contained, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, and intending to be legally bound hereby, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1    Definitions. For purposes of this Agreement, the following terms have the meaning specified or referenced below.

"Acquired Assets" has the meaning set forth in Section 2.1.

"Acquired Intellectual Property" has the meaning set forth in Section 2.1.

"Acquired Patents" means any and all of the following: (a) the Patents listed on Schedule 2.1(a); (b) all divisions, continuations and continuations-in-part, that claim priority to, or common priority with, any of the Patents described in clause (a) or any of the Patent applications that resulted in any of the Patents described in clause (a); and (c) all Patents that have issued or in the future issue from any of the foregoing Patent applications, including utility, model and design patents and certificates of invention, together with any reissues, renewals, extensions or additions thereto.

"Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such other Person. For purposes of this definition, "control" when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have correlative meanings.

"Agreement" has the meaning set forth in the Preamble and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto.

"Approval Order" has the meaning set forth in the Recitals.

"Assumed Contracts" has the meaning set forth in Section 2.1(g).

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Bankruptcy Cases" has the meaning set forth in the Recitals.

"Bankruptcy Code" means Title 11 of the United States Code, Section 101 et seq.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Books and Records" has the meaning set forth in Section 2.1(f).

"Business Day" means any day of the year, other than a Saturday or Sunday, on which national banking institutions in New York, New York are open to the public for conducting business and are not required or authorized by Law to close.

"Buyer" has the meaning set forth in the Preamble.

"Closing" has the meaning set forth in Section 4.1.

"Closing Date" has the meaning set forth in Section 4.1.

"Closing Legal Impediment" has the meaning set forth in Section 9.3.

"Contract" means any contract, agreement, undertaking, license, sublicense, sales order, purchase order or other commitment, whether written or oral (including commitments to enter into any of such), that is binding on any Person or any part of its property under applicable Law.

"Customer Data" has the meaning set forth in Section 2.1(e).

"Ditto" means, collectively, Joann Ditto Holdings Inc., an Ohio corporation, Dittopatterns LLC, a Delaware limited liability company (f/k/a Newco JODITO LLC) and Creative Tech Solutions LLC, a Delaware limited liability company.

"Domain Names" means any domain names and uniform resource locators.

"Encumbrance" means any charge, lien, interest, claim, mortgage, license, lease, sublease, hypothecation, deed of trust, pledge, security interest, option, right of use or possession, right of first offer or first refusal, easement, servitude, restrictive covenant, encroachment, encumbrance, or other similar restriction of any kind.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Liabilities" has the meaning set forth in Section 2.3.

"GA Group" has the meaning set forth in the Preamble.

"Governmental Authority" means any United States federal, state, municipal or local or any foreign government, governmental agency or authority, or regulatory or administrative authority, or any court, tribunal or judicial body having jurisdiction, including the Bankruptcy Court.

"Governmental Authorization" means any approval, consent, license, permit, waiver or other authorization issued granted or otherwise made available by or under the authority of any Governmental Authority.

"JOANN" has the meaning set forth in the Recitals.

"Knowledge" means, with respect to any matter in question, in the case of Agent, the actual knowledge of the individuals set forth on Schedule 1.1(k), with respect to such matter.

"Law" means any foreign or domestic law, statute, code, ordinance, rule, regulation, order, judgment, writ, stipulation, award, injunction or decree by any Governmental Authority.

"Liabilities Cutoff Date" means March 21, 2025, at 6:00 p.m. prevailing Eastern Time.

"Liability" means any debt, loss, claim, damage, demand, fine, judgment, penalty, liability or obligation (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, matured or unmatured, liquidated or unliquidated, or due or to become due).

"Master Sublease" means that certain Master Sublease, dated as of July 1, 2019, by and between Jo-Ann Stores, LLC and SVP, as amended, modified or supplemented from time to time.

"Order" means any award, writ, injunction, judgment, order or decree entered, issued, made or rendered by any Governmental Authority.

"Outside Date" has the meaning set forth in Section 11.1(b)(ii).

"Party" or "Parties" means, individually or collectively, Buyer and Agent.

"Patents" means (a) all patents, certificates of invention, applications for certificates of invention, priority patent filings, and patent applications, and (b) any renewals, divisions, continuations (in whole or in part), or requests for continued examination of any of such patents, certificates of invention and patent applications, and any and all patents or certificates of invention issuing thereon, and any and all reissues, reexaminations, extensions, supplementary protection certificates, divisions, renewals, substitutions, confirmations, registrations, revalidations, revisions, and additions of or to any of the foregoing.

"Permitted Encumbrances" means Encumbrances set forth on Schedule 1.1(a).

"Person" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, estate, trust, association, organization or other entity or Governmental Authority.

"Proceeding" means any action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil criminal, administrative or investigative) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority.

"Power of Attorney" means a power of attorney in the form attached hereto as Exhibit A.

"Release Amount" has the meaning set forth in Section 3.1.

"Representative" means, with respect to a particular Person, any director, officer, employee, agent, consultant, advisor or other representative of such Person, including legal counsel, accountants and financial advisors.

"Subsidiary" means any entity with respect to which a specified Person (or a Subsidiary thereof) has the power, through the ownership of securities or otherwise, to elect a majority of the directors or similar managing body.

"SVP" means SVP Sewing Brands LLC, a Delaware limited liability company.

"Tax" or "Taxes" means any federal, state, provincial, local, municipal, foreign or other income, alternative, minimum, add-on minimum, accumulated earnings, personal holding company, franchise, capital stock, net worth, capital, profits, intangibles, windfall profits, gross receipts, value added, sales, use, goods and services, excise, customs duties, transfer, conveyance, mortgage, registration, stamp, documentary, recording, premium, severance, environmental (including taxes under Section 59A of the Code),natural resources, real property, personal property, ad valorem, intangibles, rent, occupancy, license, occupational, employment, unemployment insurance, social security, disability, workers' compensation, payroll, health care, withholding, estimated or other similar tax, duty, levy or other governmental charge or assessment or deficiency thereof (including all interest and penalties thereon and additions thereto), in each case imposed by any Governmental Authority.

"Trademarks" means all trade dress, trademarks and service marks (common law or otherwise), trademark and service mark registrations and applications therefor (including intent to use applications), as well as all goodwill appurtenant to any or all of the foregoing.

"Transaction Documents" means this Agreement, the Domain Name Assignment Agreement substantially in the form attached as Exhibit B hereto, the Trademark Assignment Agreement substantially in the form attached as Exhibit C hereto, the Patent Assignment Agreement substantially in the form attached as Exhibit D hereto, the 503(b)(9) Release substantially in the form attached as Exhibit E hereto, the Master Sublease Release substantially in the form attached as Exhibit F hereto, and any other agreements, instruments or documents entered into pursuant to this Agreement.

"Transfer Taxes" has the meaning set forth in Section 8.1(a).

Section 1.2    Other Definitions and Interpretive Matters.

(a)    Unless otherwise indicated to the contrary in this Agreement by the context or use thereof:

(i)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a day other than a Business Day, the period in question shall end on the next succeeding Business Day.

(ii)    Any reference in this Agreement to $ means U.S. dollars.

(iii)    Unless the context otherwise requires, all capitalized terms used in the Exhibits and Schedules shall have the respective meanings assigned in this Agreement.  No reference to or disclosure of any item or other matter in the Exhibits and Schedules shall be construed as an admission or indication that such item or other matter is material or that such item or other matter is required to be referred to or disclosed in the Exhibits and Schedules.  No disclosure in the Exhibits and Schedules relating to any possible breach or violation of any Contract or Law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred.  Any information, item, or other disclosures set forth in any Schedule shall be deemed to have been set forth in all other applicable Schedules if the relevance of such disclosure to such other Schedule is reasonably apparent from the facts specified in such disclosure.  All Exhibits and Schedules attached or annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.

(iv)    Any reference in this Agreement to gender includes all genders, and words importing the singular number also include the plural and vice versa.

(v)    The division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in the construction or interpretation of this Agreement.  All references in this Agreement to any "Section," "Article," "Schedule," or "Exhibit" are to the corresponding Section, Article, Schedule, or Exhibit of or to this Agreement unless otherwise specified.

(vi)    Words such as "herein," "hereof" and "hereunder" refer to this Agreement as whole and not merely to a subdivision in which such words appear, unless the context otherwise requires.

(vii)    The word "including" or any variation thereof means "including, without limitation," and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(b)    <u>No Strict Construction</u>.  Buyer, on the one hand, and Agent, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by Buyer, on the one hand, and Agent, on the other hand, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.  Without limitation as to the foregoing, no rule of strict construction construing ambiguities against the draftsperson shall be applied against any Person with respect to this Agreement.

## ARTICLE II
## PURCHASE AND SALE

Section 2.1    <u>Purchase and Sale of the Acquired Assets</u>. Upon the terms and subject to the conditions of this Agreement, on the Closing Date, Agent shall sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer, and Buyer shall purchase, all right, title and interest of the Debtors, free and clear of all Encumbrances other than Permitted Encumbrances, in, to, or under the following (collectively, the "<u>Acquired Assets</u>"):

(a)    all Patents, Trademarks and Domain Names listed on <u>Schedule 2.1(a)</u>, Acquired Patents, and the right to sue for and recover damages, profits and any other remedy in connection therewith, for past, present or future infringement, misappropriation or other violation related to any such assets (collectively, the "<u>Acquired Intellectual Property</u>");

(b)    the social media accounts listed on <u>Schedule 2.1(b)</u>;

(c)    all software described on <u>Schedule 2.1(c)</u>;

(d)    all product assets and data described on <u>Schedule 2.1(d)</u>;

(e)    all customer subscription data listed on <u>Schedule 2.1(e)</u> (the "<u>Customer Data</u>");

(f)    all books and records, including all financial, operational and legal documents, whether in electronic or paper form, supporting the Acquired Assets (the <u>Books and Records</u>");

(g)    all contracts to which JOANN or Ditto are a party, as identified on <u>Schedule 2.1(g)</u>, including any and all amendments thereto (the "<u>Assumed Contracts</u>");

(h)     any subscription revenue attributable to Ditto subscriptions received by JOANN or Agent after the Liabilities Cutoff Date;

(i)     all payment gateway accounts described on Schedule 2.1(i), to the extent such are transferable; and

(j)     all goodwill associated with the assets referenced in this Section 2.1.

Section 2.2     Excluded Assets. All assets, properties, rights, interests or claims of any kind or description of the Debtors other than the Acquired Assets shall be deemed "Excluded Assets" and nothing in this Agreement shall be deemed to constitute an agreement to sell, transfer, assign or convey any Excluded Assets to Buyer.

Section 2.3     Assumed Liabilities. Upon the terms and subject to the conditions of this Agreement, Buyer shall assume and agree to perform and discharge, when due (in accordance with their respective terms and subject to the respective conditions thereof), (y) as of the Liabilities Cutoff Date, and pay directly, or where not feasible to so pay directly, to reimburse Agent for, the full weekly *pro rata* Liabilities identified on Schedule 2.3 (the "Assumed Overhead") and, (z) as of the Closing, all Assumed Contracts and any and all cure amounts associated with such Assumed Contracts to the extent identified on Schedule 2.1(g) (as such schedule may be modified by Court order or otherwise agreed to by the Buyer and the applicable counterparties thereto) (clauses (y) and (z) collectively, the "Assumed Liabilities").  Notwithstanding the foregoing or any provision in this Agreement to the contrary, except in respect of all cure amounts associated with the Assumed Contracts which Buyer acknowledges and agrees it hereby assumes regardless of the circumstances under which such Assumed Liabilities arose, Buyer shall (a) only assume the Assumed Liabilities to the extent such Assumed Liabilities (i) arise, accrue or relate to the period after the Liabilities Cutoff Date or the Closing, as applicable, and do not arise from or relate to any breach, default, negligence, willful misconduct or fault by or of Agent and (ii) do not arise from or relate to any event, circumstance or condition occurring or existing on or prior to the Liabilities Cutoff Date, or the Closing, as applicable, that, with notice or lapse of time would constitute or result in a breach, default, negligence, willful misconduct or fault by or of Agent, and (b) not assume and shall not be obligated to assume or be obliged to pay, perform, or otherwise discharge, and Agent or the Debtors shall be solely and exclusively liable with respect to, any Liability of Agent or the Debtors, respectively, that is not an Assumed Liability (such Liabilities, collectively, the "Excluded Liabilities").

Section 2.4     Further Assurances.

(a)     From time to time after the Closing, Agent shall, upon Buyer's request and at Buyer's cost and expense, and within a reasonable period of time, execute and deliver to Buyer such other instruments of transfer as shall be reasonably necessary to vest in Buyer title to the Acquired Assets, and Agent, on the one hand, and Buyer, on the other hand, shall, at their own cost and expense, use their respective commercially reasonable efforts to take, or cause to be taken, all appropriate action, do or cause to be done all things necessary under applicable Law, and execute and deliver such instruments and documents and to take such other actions, as may be required to consummate the transactions contemplated by this Agreement at or after the Closing;

provided that nothing in this <u>Section 2.4</u> shall prohibit Agent or the Debtors from ceasing operations or winding up the Debtors' affairs following the Closing.

(b)     If, following the Closing, Buyer or Agent become aware that any Debtor owns any asset or right that is an Acquired Asset, such Party shall promptly inform the Buyer or Agent, as applicable, of that fact. Thereafter, at the request of Buyer, Agent shall, for a period of time not to exceed forty-five (45) days after the Closing, execute such documents as may be reasonably necessary to cause the transfer of, and Agent shall thereafter transfer, any such asset or right to Buyer or any other entities nominated by Buyer for no consideration and Buyer shall do all such things as are reasonably necessary to facilitate such transfer.

(c)     With respect to any Acquired Asset for which consent or approval is required for transfer or assignment but is not obtained prior to the Closing, (i) at the Closing, Agent shall deliver (or cause the relevant Debtor to deliver) to Buyer a Power of Attorney; and (ii) from and after the Closing, Agent shall reasonably cooperate, at Buyer's sole cost and expense, with Buyer in any reasonable arrangement that Buyer may request to provide Buyer with all of the benefits of, or under, the applicable Acquired Assets including taking actions reasonably required to enforce (at no cost to Agent), for the benefit of Buyer, any and all rights of Agent against any party to the applicable Acquired Asset.

## ARTICLE III
## RELEASE AMOUNT

Section 3.1     <u>Consideration</u>. The consideration for the purchase, sale, assignment and conveyance of the Debtors' right, title, and interest in, to, and under the Acquired Assets shall consist of:

(a)     an amount in cash equal to $800,000 in satisfaction of any and all Liabilities or other amounts that SVP or its Affiliates may owe in connection with the Master Sublease (the "<u>Release Amount</u>");

(b)     the release by Buyer of all actual or purported rights to Section 503(b)(9) priority with respect to Buyer's claims against the Debtors;

(c)     the surrender of all units of ready-to sell non-machine inventory remaining in the Buyer's store locations as of April 14, 2025; and

(d)     the assumption of the Assumed Liabilities, including, for the avoidance of doubt, the payment of all Assumed Overhead, either directly to the applicable vendor(s) or to Agent in reimbursement therefor.

Section 3.2     <u>Closing Date Payments</u>. At the Closing, Buyer shall pay an amount in cash equal to the Release Amount by wire transfer of immediately available funds to Agent in an account designated by Agent.

Section 3.3     <u>Discharge of Assumed Liabilities After Closing</u>. Following the Closing, Buyer shall pay, perform or satisfy the Assumed Liabilities from time to time and as such Assumed Liabilities become due and payable or are required to be performed or satisfied in accordance with

their respective terms unless Buyer in good faith contests, or causes to be contested, the amount or validity thereof.

## ARTICLE IV
## CLOSING

Section 4.1    <u>Closing Date</u>. Upon the terms and subject to the conditions hereof, the closing of the sale of the Acquired Assets and the assumption of the Assumed Liabilities contemplated hereby (the "<u>Closing</u>") shall take place by the electronic or physical exchange of documents at 10:00 a.m., New York City time, no later than the second (2nd) Business Day following the date on which the conditions set forth in <u>Article IX</u> and <u>Article X</u> have been satisfied or (if permissible) waived (other than the conditions that by their nature are to be satisfied by actions taken at the Closing, but subject to the satisfaction or (if permissible) waiver of such conditions), or at such other place or time as Buyer and the Agent may mutually agree. The date and time at which the Closing actually occurs is referred to as the "<u>Closing Date</u>."

Section 4.2    <u>Buyer's Deliveries</u>. At the Closing, Buyer shall deliver to Agent:

(a)    the Release Amount in accordance with <u>Section 3.1</u>;

(b)    all unpaid Assumed Overhead, if any;

(c)    a release, duly executed by Buyer, releasing all actual or purported rights to Section 503(b)(9) priority with respect to Buyer's claims against the Debtors, in accordance with <u>Section 3.1(b)</u>, substantially in the form attached as <u>Exhibit E</u> hereto (the "<u>503(b)(9) Release</u>");

(d)    to the extent not delivered prior to Closing, all the right, title and interest of Buyer in, to or under any or all of the units of ready-to-sell non-machine inventory that remained in the Buyer's store locations as of April 14, 2025;

(e)    each other Transaction Document not previously executed to which Buyer is a party, duly executed by Buyer;

(f)    the certificates of Buyer to be received by Agent pursuant to <u>Sections 10.1</u> and <u>10.2</u>: and

(g)    such assignments and other good and sufficient instruments of assumption and transfer, in form and substance reasonably satisfactory to Agent and Buyer, which are necessary to transfer and assign the Acquired Assets and Assumed Liabilities to Buyer.

Section 4.3    <u>Agent's Deliveries</u>. At the Closing, Agent shall deliver to Buyer (or, to the extent a Debtor is a necessary party to any such deliverable, cause the relevant Debtor to deliver to Buyer):

(a)    each other Transaction Document to which Agent is a party, duly executed by Agent;

(b)      a release, substantially in the form of <u>Exhibit F</u> hereto, duly executed by the Agent on behalf of itself and the Debtors, releasing SVP from all claims under the Master Sublease (the "<u>Master Sublease Release</u>");

(c)      the certificates of the Company to be received by Buyer pursuant to <u>Sections 9.1</u> and <u>9.2</u>; and

(d)      such bills of sale, deeds, endorsements, assignments, UCC terminations and other filings and other good and sufficient instruments, in form and substance reasonably satisfactory to Buyer and Agent, which are necessary to vest in Buyer all the right, title and interest of the Debtors in, to or under any or all of the Acquired Assets free and clear of Encumbrances.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF AGENT

Except as set forth in the Schedules, Agent hereby represents and warrants to Buyer as follows:

Section 5.1      <u>Organization and Good Standing</u>.  Agent is an entity duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization.  As set forth in the Approval Order, Agent has the requisite corporate or similar power and authority to designate Buyer as the acquiror of the Acquired Assets.  Agent is not in default under or in violation of any provision of its organizational documents.

Section 5.2      <u>Authority; Validity; Consents</u>.

(a)      Agent has, as applicable, the requisite corporate power and authority necessary to enter into and perform its obligations under this Agreement and the other Transaction Documents to which Agent is a party and to consummate the transactions contemplated hereby and thereby.  This Agreement has been duly and validly executed and delivered by Agent and each other Transaction Document required to be executed and delivered by Agent at the Closing will be duly and validly executed and delivered by Agent at the Closing.  This Agreement and, when executed, the other Transaction Documents will, constitute the legal, valid and binding obligations of Agent, enforceable against Agent in accordance with their respective terms, except as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity.

(b)      Except for notices, filings and consents required in connection with the Bankruptcy Cases, Agent is not required to give any notice to, make any filing with or obtain any consent from any Governmental Authority in connection with the execution and delivery of this Agreement and the other Transaction Documents or the consummation or performance of any of the transactions contemplated hereby and thereby.

Section 5.3      <u>No Conflicts</u>. When the consents and other actions described in <u>Section 5.2</u> have been obtained and taken, the execution, delivery and performance by Agent of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not (a) result in the breach of any

-10-

of the terms and provisions of, or constitute a default under, or conflict with, or cause any acceleration of any obligation of Agent under any Contract or other instrument to which Agent or any Acquired Assets are bound, (b) conflict with or result in a violation or breach of, or default under, any provision of the organizational documents of Agent or (c) conflict with or result in a violation or breach of any provision of any Law, Order or Governmental Authorization applicable to Agent or the Acquired Assets, except for any such conflict, violation, breach or default, individually or in the agreement, would not reasonably be expected to prevent or materially delay the consummation of the transactions contemplated hereby.

Section 5.4    <u>Title to Acquired Assets</u>.  Upon delivery to Buyer on the Closing Date of the instruments of transfer contemplated by <u>Section 4.3</u>, and subject to the terms of the Approval Order, Agent will cause the Debtors to thereby transfer to Buyer, marketable title to or, a valid contractual interest in all of the Acquired Assets, free and clear of all Encumbrances, except for Permitted Encumbrances.

Section 5.5    <u>Legal Proceedings</u>. Except for the Bankruptcy Cases or as set forth on <u>Schedule 5.5</u>, there is no Proceeding or Order pending or, to the Knowledge of Agent, threatened, against Agent that (a) seeks to restrain or prohibit or otherwise challenge or delay the consummation, legality or validity of the transactions contemplated hereby or (b) relates to or affects the Acquired Assets.  There are no outstanding Orders or unsatisfied judgments, penalties or awards against, relating to or affecting the Acquired Assets and, to the Knowledge of Agent, no event has occurred or circumstances exist that may give rise to or serve as a basis for any such Proceeding or Order.

Section 5.6    <u>Brokers or Finders</u>. Except for Hilco Streambank (whose fees and expenses shall be borne solely by Agent), Agent has not incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement, the other Transaction Documents or the transactions contemplated hereby or thereby for which Buyer is or will become liable.

Section 5.7    <u>Acquired Assets</u>.

(a)    To the Knowledge of Agent:

(i)    One or more of the Debtors is the legal and beneficial owner of the entire right, title and interest in and to the Acquired Assets and have valid rights in and to, including, but not limited to, all rights to use, reproduce, publish, distribute, transmit, perform, display, and create derivative works of, as applicable, such Acquired Assets as is used in the Debtors' ordinary course of business, in each case, free and clear of all Encumbrances. (other than Permitted Encumbrances). The Acquired Assets do not infringe, misappropriate or otherwise violate any intellectual property right or other right of any third party. As provided by Agent, the software described on <u>Schedule 2.1(c)</u> does not contain any harmful or malicious code.

(ii)    There are no claims (including any oppositions, interferences or re-examinations) settled, pending or, to the Knowledge of Agent, threatened in writing (including in the form of offers to obtain a license) challenging the validity, enforceability, registrability or ownership of any Acquired Asserts or the Debtors rights with respect to any Acquired Assets.

-11-

None of the Debtors is subject to any outstanding or prospective Order (including any motion or petition therefor) that does or would restrict or impair the use of the Acquired Assets. The acquisition of the Acquired Assets does not (i) conflict with or violate any applicable Law; (ii) require the consent, approval or authorization of any governmental or regulatory authority or other third party; or (iii) require the provision of any payment or other consideration to any third party (other than the cure amounts in respect of the Assumed Contracts).

Section 5.8    No Other Representations or Warranties; Full Disclosure; No Survival. Except for the representations and warranties contained in this Article V (subject to the disclosures set forth on the Schedules), neither Agent nor any other Person makes any other express or implied representation or warranty with respect to Agent, the Acquired Assets, the Assumed Liabilities or the transactions contemplated by this Agreement, and Agent disclaims any other representations or warranties, whether made by Agent, any Affiliate of Agent, any Debtor, any affiliate of any Debtor, or any of Agent's, the Debtors', or their Affiliates' respective Representatives. Except for the representations and warranties contained in this Article V (subject to the disclosures set forth on the Schedules), Agent (a) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Acquired Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) and (b) disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Buyer or its Affiliates or Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Buyer by any Representative of Agent or any of its Affiliates). Agent makes no representations or warranties to Buyer regarding the probable success or profitability of the Acquired Assets or the use thereof. The representations and warranties of Agent will expire upon the earlier of the Closing Date or the termination of this Agreement.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Agent as follows:

Section 6.1    Organization and Good Standing.  Buyer is a limited liability company, duly organized, validly existing and in good standing under the laws of its jurisdiction of organization. Buyer has the requisite power and authority to own or lease and to operate and use Buyer's properties and to carry on Buyer's business as now conducted.

Section 6.2    Authority; Validity; Consents.

(a)    Buyer has the requisite power and authority necessary to enter into and perform its obligations under this Agreement and the other Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance of this Agreement by Buyer and the consummation by Buyer of the transactions contemplated herein have been duly and validly authorized by all requisite corporate or similar actions in respect thereof.  This Agreement has been duly and validly executed and delivered by Buyer and each other Transaction Document to which Buyer is a party will be duly and validly executed and delivered by Buyer at the Closing.  This Agreement constitutes and, when

-12-

executed, the other Transaction Documents to which Buyer is a party will constitute, the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with their respective terms, except as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity.

(b)    Except for notices, filings and consents required in connection with the Bankruptcy Cases, including, for the avoidance of doubt, any motions required in connection with Bankruptcy Court approval of this Agreement, Buyer is not and will not be required to give any notice to or obtain any consent from any Person in connection with the execution and delivery of this Agreement and the other Transaction Documents to which it is a party or the consummation or performance of any of the transactions contemplated hereby or thereby.

Section 6.3    No Conflict.  When the consents and other actions described in Section 6.2 have been obtained and taken, the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions provided for herein and therein will not result in the breach of any of the terms and provisions of, or constitute a default under, or conflict with, or cause any acceleration of any obligation of Buyer under (a) any Contract or other instrument to which it is bound, (b) any provision of the organizational documents of Buyer, or (c) any Law, Order or Governmental Authorization applicable to Buyer, except for any such conflict, violation, breach or default, individually or in the agreement, would not reasonably be expected to prevent or materially delay the consummation of the transactions contemplated hereby.

Section 6.4    Availability of Funds; Solvency.  Buyer has and will have at the Closing sufficient cash in immediately available funds to pay the Release Amount and any other costs, fees and expenses required to be paid by it under this Agreement, including, for the avoidance of doubt, the Assumed Overhead, and the other Transaction Documents.  As of the Closing and immediately after consummating the transactions contemplated by this Agreement and the other transactions contemplated by the Transaction Documents, Buyer will not (a) be insolvent (either because Buyer's financial condition is such that the sum of Buyer's debts is greater than the fair value of Buyer's assets or because the present fair value of Buyer's assets will be less than the amount required to pay Buyer's probable Liability on Buyer's debts as they become absolute and matured), (b) have unreasonably small capital with which to engage in Buyer's business or (c) have incurred or plan to incur debts beyond Buyer's ability to repay such debts as they become absolute and matured.

Section 6.5    Litigation.  There are no Proceedings pending or, to the knowledge of Buyer, threatened, that would affect in any material respect Buyer's ability to perform Buyer's obligations under this Agreement or any other Transaction Documents or to consummate the transactions contemplated hereby or thereby.

Section 6.6    Brokers or Finders.  Neither Buyer nor any Person acting on behalf of Buyer has paid or become obligated to pay any fee or commission to any broker, finder, investment banker, agent or intermediary for or on account of the transactions contemplated by this Agreement for which Agent is or will become liable.

Section 6.7    Condition of Acquired Assets: Representations. Notwithstanding anything contained in this Agreement to the contrary, Buyer acknowledges and agrees that Agent is not making any representations or warranties whatsoever, express or implied, beyond those expressly given by Agent in Article V (subject to the disclosures set forth on the Schedules), and Buyer acknowledges and agrees that, except for the representations and warranties contained in Article V, the Acquired Assets are being transferred on a "where is" and, as to condition, "as is" basis. Buyer acknowledges that it has conducted to Buyer's satisfaction Buyer's own independent investigation of the Debtors' business and, in making the determination to proceed with the transactions contemplated by this Agreement, Buyer has relied on the representations and warranties expressly given by Agent in Article V and the results of Buyer's own independent investigation. Buyer has received or may receive from Agent certain projections, forward-looking statements and other forecasts and certain business plan information. Buyer acknowledges that there are uncertainties inherent in attempting to make such estimates, projections and other forecasts and plans, that Buyer is familiar with such uncertainties, that Buyer is taking full responsibility for making Buyer's own evaluation of the adequacy and accuracy of all estimates, projections and other forecasts and plans so furnished to Buyer (including the reasonableness of the assumptions underlying such estimates, projections, forecasts or plans), and that Buyer shall have no claim against anyone with respect thereto.  Accordingly, Buyer acknowledges that Agent makes no representation or warranty with respect to such estimates, projections, forecasts or plans (including the reasonableness of the assumptions underlying such estimates, projections, forecasts or plans).

## ARTICLE VII
## ACTIONS PRIOR TO THE CLOSING DATE

Section 7.1    Operations Prior to the Closing Date.  Agent covenants and agrees that, except (i) as expressly contemplated by this Agreement, (ii) with the prior written consent of Buyer (which consent shall not be unreasonably withheld or delayed), (iii) as required by the Bankruptcy Court or (iv) as otherwise required by Law, after the date of this Agreement and prior to the Closing Date, (a) Agent shall, and shall direct the Debtors to, use commercially reasonable efforts, taking into account the Debtors' status as debtors in possession in the Bankruptcy Cases, to maintain and preserve the Acquired Assets in their present condition and (b) without limiting the generality of the foregoing, Agent shall not, and shall use commercially reasonable efforts to direct the Debtors not to:

        (i)    sell, lease (as lessor), transfer or otherwise dispose of, or mortgage or pledge, or voluntarily impose or suffer to be imposed any Encumbrance (other than existing Assumed Liabilities and Permitted Encumbrances) on, any Acquired Asset;

        (ii)    cancel or compromise any claim or waive or release any right, in each case, that is a claim or right related to an Acquired Asset;

        (iii)    (A) abandon, disclaim, dedicate to the public, permit to lapse, sell, transfer, lease, assign or otherwise dispose of, or grant any security interest in or to any Acquired Assets, or (B) grant to any Person any license, or enter into any covenant not to sue, with respect to any Acquired Assets, other than non-exclusive licenses granted in the ordinary course of business; or

(iv) enter into any agreement or commitment to take any action prohibited by this <u>Section 7.1</u>.

Section 7.2 <u>Bankruptcy Court Filings</u>.  Agent shall give, or cause the Debtors to give, all notices required to be given by applicable Law, to all Persons entitled thereto, of any motions, orders, hearings and other proceedings relating to this Agreement and the transactions contemplated hereby and thereby and such additional notice as ordered by the Bankruptcy Court or as Buyer may reasonably request.

Section 7.3 <u>Third Party Consents and Acknowledgements</u>. Between the date hereof and the earlier of the termination of this Agreement or the Closing Date, Agent shall use their commercially reasonable efforts to obtain, or to cause the Debtors to obtain, all third party consents required for the consummation of the transactions contemplated hereby to the extent such consents are not provided for or satisfied by the Approval Order.

Section 7.4 <u>Governmental Approvals</u>. Agent and Buyer shall use reasonable best efforts, and shall cooperate with each other, to do or cause to be done, all things necessary, proper or advisable consistent with applicable confidentiality and legal requirements to cause the conditions precedent to the Closing to be satisfied and to cause the Closing to occur, including to secure any consents and approvals of any Governmental Authority required to be obtained by them, in order to permit the consummation of the transactions contemplated by this Agreement, or to otherwise satisfy the conditions precedent set forth in this Agreement, in each case as necessary to the extent such consents are not provided for or satisfied by the Approval Order; <u>provided</u>, <u>however</u>, that Agent shall not make any agreement or understanding affecting the Acquired Assets as a condition for obtaining any such consents or approvals except with the prior written consent of Buyer.

Section 7.5 <u>Notice of Certain Events</u>. From the date hereof until the Closing, Agent shall promptly notify Buyer in writing of (a) has resulted in, or could reasonably be expected to result in, the failure of any of the conditions precedent set forth in this Agreement to be satisfied; or (b) any notice or other communication from any Person alleging that the consent of a third party is or may be required in connection with the transactions contemplated by this Agreement.

## ARTICLE VIII
## ADDITIONAL AGREEMENTS

Section 8.1 <u>Taxes</u>.

(a) Any sales, use, property transfer or gains, documentary, stamp, registration, recording or similar Tax (including, for certainty, goods and services tax, harmonized sales tax and land transfer tax) payable in connection with the sale or transfer of the Acquired Assets ("<u>Transfer Taxes</u>") shall be borne by Buyer and, to the extent Agent is required by applicable Law to pay Transfer Taxes, such Transfer Taxes shall be paid by Buyer to Agent at Closing.  Agent and Buyer shall use reasonable efforts and cooperate in good faith to exempt the sale and transfer of the Acquired Assets from any such Transfer Taxes.  Agent shall, or shall cause the Debtors to, prepare and file all necessary Tax Returns or other documents with respect to all such Transfer Taxes; <u>provided</u>, <u>however</u>, that in the event any such Tax Return requires execution by Buyer,

Agent shall deliver to Buyer a copy of such Tax Return at least three (3) Business Days before the due date thereof, and Buyer shall promptly execute such Tax Return and deliver it to Agent, which shall cause it to be filed.

(b)    Each of Buyer and Agent agrees to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Acquired Assets (including access to Documents) as is reasonably necessary for the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any taxing authority and the prosecution or defense of any claims, suit or proceeding relating to any Tax; provided, however, that (other than as required pursuant to this Section 8.1(b)) neither Buyer nor Agent shall be required to disclose the contents of its income tax returns to any Person. Any expenses incurred in furnishing such information or assistance pursuant to this Section 8.1(b) shall be borne by the Party requesting it.

(c)    Notwithstanding any other provisions in this Agreement, Buyer and Agent hereby waive compliance with all "bulk sales," "bulk transfer" and similar laws that may be applicable with respect to the sale and transfer of any or all of the Acquired Assets to Buyer.

Section 8.2    Use of Acquired Assets Post-Closing.  After the date hereof and until June 1, 2025, Agent, the Debtors, and their respective agents may continue to use the Acquired Assets in connection with the sale of Debtors' merchandise by means of a "going out of business," "store closing," "sale on everything," "everything must go," or similar sale. Agent shall not close the Ditto Salesforce instance, destroy data contained therein, or restrict access to such Salesforce instance at any time prior to June 1, 2025. Nothing in this Agreement shall prohibit or otherwise restrict Debtors from winding down their operations and affairs or dissolving their business entities following the Closing

Section 8.3    Confidentiality. From and after the Closing, Agent shall hold in confidence any and all information, whether written or oral, concerning the Acquired Assets, except to the extent that such information (a) is generally available to and known by the public through no fault of Agent or (b) is lawfully acquired by Agent, any of its Affiliates or their respective Representatives from and after the Closing from sources which are not prohibited from disclosing such information by a legal, contractual or fiduciary obligation.  If Agent is compelled to disclose any information by any Proceeding or by other requirements of Law or Order, Agent shall promptly notify Buyer in writing and shall disclose only that portion of such information which Agent is, based on advice of counsel, legally required to be disclosed, provided that Agent shall, at Buyer's expense, use commercially reasonable efforts to obtain an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.

## ARTICLE IX
## CONDITIONS PRECEDENT TO THE OBLIGATION OF BUYER TO CLOSE

Buyer's obligation to consummate the transactions contemplated by this Agreement is subject to the satisfaction or waiver, at or prior to the Closing, of each of the following conditions:

Section 9.1    Accuracy of Representations. The representations and warranties of Agent contained in (a) Sections 5.1, 5.2, 5.3 and 5.6 shall be true and correct in all respects as of the date

hereof and as of the Closing Date as though made on and as of the Closing Date (except that those representations and warranties which address matters only as of a particular date need only be true and correct as of such date) and (b) the other representations set forth in Article V shall be true and correct as of the date hereof and in all material respects as of the Closing Date as though made on and as of the Closing Date (except that (i) those representations and warranties which address matters only as of a particular date need only be true and correct as of such date and (ii) any representations and warranties qualified by materiality shall be true and correct in all respects). Buyer shall have received a certificate of Agent, signed by a duly authorized officer of Agent, to that effect.

Section 9.2    Agent's Performance.  Agent shall have performed and complied with in all material respects the covenants and agreements that Agent is required to perform or comply with pursuant to this Agreement at or prior to the Closing, and Buyer shall have received a certificate of Agent to such effect signed by a duly authorized officer of Agent.

Section 9.3    No Order.  No Governmental Authority shall have enacted, issued, promulgated or entered any Order which is in effect and has the effect of making illegal or otherwise prohibiting the consummation of the transactions contemplated by this Agreement (a "Closing Legal Impediment"); provided, however, that prior to asserting this condition Buyer shall have taken all actions required by Section 7.2 to prevent the occurrence or entry of any such Closing Legal Impediment and to remove or appeal as promptly as possible any such Closing Legal Impediment.

Section 9.4    Bankruptcy Court Order.  The Approval Order shall remain in effect and shall not have been stayed pending appeal, reversed, revoked, modified, or vacated.

Section 9.5    Bankruptcy Court Approvals.  The Bankruptcy Court shall have entered an unstayed order approving the Master Sublease Release and the transfer of the Acquired Assets to the Buyer in accordance with this Agreement, which order shall contain a finding that Buyer is a "good faith" purchaser for purposes of section 363(m) of the Bankruptcy Code and shall be in form and substance reasonably acceptable to Buyer.

Section 9.6    Closing Deliverables.  Agent shall have delivered or caused to be delivered to Buyer each of the items to be delivered by Agent in accordance with Section 4.3.

## ARTICLE X
## CONDITIONS PRECEDENT TO THE OBLIGATION OF AGENT TO CLOSE

Agent's obligation to consummate the transactions contemplated by this Agreement is subject to the satisfaction or waiver, at or prior to the Closing, of each of the following conditions:

Section 10.1    Accuracy of Representations.  The representations and warranties of Buyer contained in Article VI shall be true and correct as of the date hereof and in all material respects as of the Closing Date as though made on and as of the Closing Date (except that (i) those representations and warranties which address matters only as of a particular date need only be true and correct as of such date and (ii) any representations and warranties qualified by materiality shall

be true and correct in all respects).  Agent shall have received a certificate of Buyer, signed by a duly authorized officer of Buyer, to that effect.

Section 10.2    Buyer's Performance. Buyer shall have performed and complied with in all material respects the covenants and agreements that Buyer is required to perform or comply with pursuant to this Agreement at or prior to the Closing, and Agent shall have received a certificate of Buyer to such effect signed by a duly authorized officer thereof.

Section 10.3    No Order. No Closing Legal Impediment shall be in effect; provided, however, that prior to asserting this condition Agent shall have taken all actions required by Section 7.2 to prevent the occurrence or entry of any such Closing Legal Impediment and to remove or appeal as promptly as possible any such Closing Legal Impediment.

Section 10.4    Bankruptcy Court Order. The Approval Order shall remain in effect and shall not have been stayed pending appeal, reversed, revoked, modified, or vacated; provided, for the avoidance of doubt, that any such stay, reversal, revocation, modification, or vacatur entered directly or indirectly at the request or with the support of the Agent shall not relieve the Agent of its obligations hereunder.

Section 10.5    Closing Deliverables. Buyer shall have delivered or caused to be delivered to Agent each of the items to be delivered by Buyer in accordance with Section 4.2.

# ARTICLE XI
# TERMINATION

Section 11.1    Termination Events.  Anything contained in this Agreement to the contrary notwithstanding (other than as provided in the last sentence of this Section 11.1) this Agreement may be terminated at any time prior to the Closing Date:

(a)    by mutual written consent of the Agent and Buyer; or

(b)    by either Agent or Buyer:

(i)    if a Governmental Authority issues a final, non-appealable Order permanently prohibiting the transactions contemplated hereby; provided, however, that the right to terminate this Agreement pursuant to this Section 11.1(b)(i) shall not be available to any Party whose breach of any of its representations, warranties, covenants or agreements contained herein has resulted in such failure to approve or such Order;

(ii)    if the Closing shall not have occurred by the close of business on June 30, 2025 (the "Outside Date"); provided, however, that the right to terminate this Agreement pursuant to this Section 11.1(b)(ii) shall not be available to any Party whose breach of any of such Party's representations, warranties, covenants, or agreements contained herein results in the failure of the Closing to be consummated by such time; or

(iii)    if the Approval Order is stayed pending appeal, reversed, revoked, modified, or vacated; provided, for the avoidance of doubt, that any such stay, reversal, revocation,

-18-

modification, or vacatur entered directly or indirectly at the request or with the support of the Agent shall not relieve the Agent of its obligations hereunder.

        (c)     by Buyer:

        (i)     in the event of any breach of any of Agent's agreements, covenants, representations or warranties contained herein that would result in the failure of a condition set forth in <u>Section 9.1</u> or <u>9.2</u> to be satisfied, and Agent has failed to cure such breach by the earlier of (A) the Outside Date and (B) the date that is 15 days after receipt of Buyer's written notice of such breach; <u>provided</u>, <u>however</u>, that Buyer is then not in material breach of any of Buyer's representations, warranties, covenants or agreements contained in this Agreement; or

        (d)     by Agent:

        (i)     except as provided in <u>Section 11.1(d)(ii)</u>, in the event of any breach of any of Buyer's agreements, covenants, representations or warranties contained herein that would result in the failure of a condition set forth in <u>Section 10.1</u> or <u>10.2</u> to be satisfied, and the failure of Buyer to cure such breach by the earlier of (A) the Outside Date and (B) the date that is 15 days after receipt of Agent's written notice of such breach; <u>provided</u>, <u>however</u>, that Agent is not then in material breach of any of their representations, warranties, covenants or agreements contained in this Agreement; or

        (ii)     if (A) the conditions to Closing in <u>Article IX</u> have been satisfied (or waived by Buyer), other than those conditions that by their nature can only be satisfied at Closing, (B) Agent has provided Buyer with written notice that Agent is prepared to consummate the transactions contemplated by this Agreement, and (C) the Closing does not occur within five (5) Business Days following Agent's delivery of such notice to Buyer.

        Section 11.2   <u>Procedures Upon Termination</u>.  In the event of termination pursuant to <u>Section 11.1</u>, the terminating party will give written notice thereof to the other party or parties, and this Agreement will terminate as described in <u>Section 11.1</u>, and the purchase and sale of the Acquired Assets hereunder will be abandoned, without further action by Buyer or Agent.

        Section 11.3   <u>Effect of Termination</u>.  In the event that this Agreement is terminated as provided herein, each of the Parties will be relieved of its duties and obligations arising under this Agreement after the date of such termination and there will be no liability or obligation on Buyer, Agent or any of their respective Representatives; <u>provided</u>, <u>however</u>, that the provisions of this <u>Section 11.3</u> and <u>Article XII</u> and, to the extent necessary to effectuate the foregoing enumerated provisions, <u>Section 1.1</u> hereof, will survive any such termination and will be enforceable hereunder; <u>provided</u>, <u>further</u>, that nothing in this <u>Article XI</u> will be deemed to release any party from liability for any breach of this Agreement prior to termination.

## ARTICLE XII
## GENERAL PROVISIONS

        Section 12.1   <u>Notices</u>. Any notice, consent or other communication required or permitted under this Agreement shall be in writing and shall be delivered (a) in person, (b) by a nationally

recognized courier for overnight delivery service, or (c) by email or other electronic means, confirmed by telephone or return email (including an automated return receipt), to the persons indicated below.  A notice or communication shall be deemed to have been effectively given (i) if in person, upon personal delivery to the Party to whom the notice is directed, (ii) if by nationally recognized courier, one Business Day after delivery to such courier, and (iii) if by email or other electronic means, when sent and confirmed by telephone or return email. Rejection or other refusal to accept or inability to deliver because of changed address of which no notice has been received shall also constitute receipt. Any such notice, election, demand, request or response shall be addressed as follows:

      (a)     If to Agent, then to:

GA Joann Retail Partnership, LLC
2829 Townsgate Road, Suite 103
Westlake Village, CA 91361
Attn:   Scott K. Carpenter, scarpenter@gagroup.com
       Tim Shilling, tshilling@gagroup.com
       Legal Department, legal@brileyfin.com

with a copy (which shall not constitute notice) to:

Lowenstein Sandler LLP
One Lowenstein Drive
Roseland, NJ 07068
Attn:   Andrew D. Behlmann, abehlmann@lowenstein.com;
       Jean Nicolas Samedi Jr., jsamedi@lowenstein.com;
       Emily Jewell, ejewell@lowenstein.com

If to Buyer, then to:

Singer Sourcing Limited LLC
300 2nd Avenue South
Suite 300
Nashville, TN 37201
Attn:   Legal Department, contracts@svpworldwide.com

Section 12.2   <u>Amendment; Waiver</u>. No amendment, modification or discharge of this Agreement, and no consent or waiver hereunder, shall be valid or binding unless set forth in writing and duly executed by the Party against whom enforcement of the amendment, modification, discharge, consent or waiver is sought and such amendment, modification, discharge, consent or waiver is delivered substantially contemporaneously to each other Party.  Any such waiver shall constitute a waiver only with respect to the specific matter described in such writing and shall in no way impair the rights of the Party granting such waiver in any other respect or at any other time. Neither the waiver by any of the Parties of a breach of or a default under any of the provisions of this Agreement, nor the failure by any of the Parties, on one or more occasions, to enforce any of the provisions of this Agreement or to exercise any right or privilege hereunder shall be construed

as a waiver of any other breach or default of a similar nature, or as a waiver of any of such provisions, rights or privileges hereunder. No course of dealing between or among the Parties shall be deemed effective to modify, amend or discharge any part of this Agreement or any rights to payment of any Party under or by reason of this Agreement. Upon the occurrence of the Closing, any condition set forth in Article IX or Article X that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing. Neither Party may rely on the failure of any condition set forth in Article IX or Article X, as applicable, to be satisfied if such failure was caused by such Party's failure to perform any of its obligations under this Agreement including its obligation to use its reasonable best efforts to consummate the transactions contemplated hereby as required under this Agreement.

Section 12.3    Entire Agreement. This Agreement (including the Schedules and the Exhibits) and the other Transaction Documents contain all of the terms, conditions and representations and warranties agreed to by the Parties relating to the subject matter of this Agreement and supersede all prior and contemporaneous agreements, understandings, negotiations, correspondence, undertakings and communications of the Parties or their representatives, oral or written, respecting such subject matter. The representations, warranties, covenants and agreements contained in this Agreement (including the Schedules and the Exhibits) and the other Transaction Documents are intended, among other things, to allocate the economic cost and the risks inherent in the transactions contemplated hereby and thereby, including risks associated with matters as to which the party making such representations and warranties has no knowledge or only incomplete knowledge, and such representations and warranties may be qualified by disclosures contained in the Schedules. Consequently, Persons other than the Parties may not rely upon the representations and warranties in this Agreement as characterizations of actual facts or circumstances as of the date of this Agreement or as of any other date.

Section 12.4    No Presumption as to Drafting. Each of the parties acknowledges that it has been represented by legal counsel in connection with this Agreement and the other Transaction Documents and the transactions contemplated hereby and thereby. Accordingly, any rule of law or any legal decision that would require interpretation of any claimed ambiguities in this Agreement or the Transaction Documents against the drafting party has no application and is expressly waived.

Section 12.5    Assignment. This Agreement, and the rights, interests and obligations hereunder, shall not be assigned by any Party by operation of law or otherwise without the express written consent of the other Parties (which consent maybe granted or withheld in the sole discretion of such other Party); provided, however, that Buyer shall be permitted, upon prior notice to Agent, to assign all or part of Buyer's rights or obligations hereunder to an Affiliate, but no such assignment shall relieve Buyer of Buyer's obligations under this Agreement.

Section 12.6    Severability. The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and

the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability.

Section 12.7    Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver.

(a)    This Agreement shall be governed by and interpreted in accordance with the laws of the State of Delaware without reference to any conflict of laws provisions thereof, except where governed by the Bankruptcy Code.    Each of the Parties irrevocably and unconditionally submits, for itself and its properties, to the exclusive jurisdiction of the Bankruptcy Court, in any action or proceeding arising out of or relating to this Agreement.

(b)    EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY) EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 12.7.

Section 12.8    Counterparts. This Agreement may be executed in any number of counterparts (including via facsimile or other electronic transmission in portable document format (pdf)) with the same effect as if the signatures to each counterpart were upon a single instrument, and all such counterparts together shall be deemed an original of this Agreement. This Agreement shall become effective when, and only when, each Party shall have received a counterpart hereof signed by the other Party. Delivery of an executed counterpart hereof by means of facsimile or electronic transmission in portable document format (pdf) shall have the same effect as delivery of a physically executed counterpart in person.

Section 12.9    Parties in Interest. Nothing in this Agreement shall confer any rights, benefits, remedies, obligations, liabilities or claims hereunder upon any Person not a Party or a permitted assignee of a Party.

Section 12.10 Non-Recourse. All claims, obligations, liabilities or causes of action (whether in contract or in tort, in law or in equity or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with or relate in any manner to this Agreement, the negotiation, execution or performance of this Agreement (including any representation or warranty made in connection with or as an inducement to this Agreement) or the transactions contemplated hereby may be made only against (and are those solely of) the Persons that are expressly identified as Parties to this Agreement.  No other Person, including any of their Affiliates, directors, officers, employees, incorporators, members, partners, managers, stockholders, agents, attorneys, or representatives of, or any financial advisors or lenders to, any of the foregoing shall have any liabilities (whether in contract or in tort, in law or in equity, or granted by statute) for any claims, causes of action, obligations or liabilities arising under, out of,

-22-

in connection with, or related in any manner to, this Agreement or based on, in respect of, or by reason of, this Agreement or its negotiation, execution, performance or breach.

Section 12.11 <u>Schedules; Materiality</u>. The inclusion of any matter in any Schedule shall be deemed to be an inclusion for all purposes of this Agreement, to the extent that such disclosure is sufficient to identify the Section to which such disclosure is responsive, but inclusion therein shall not be deemed to constitute an admission, or otherwise imply, that any such matter is material or creates a measure for materiality for purposes of this Agreement.  The disclosure of any particular fact or item in any Schedule shall not be deemed an admission as to whether the fact or item is "material".

Section 12.12 <u>Specific Performance</u>.   The Parties acknowledge and agree that (a) irreparable injury, for which monetary damages, even if available, would not be an adequate remedy, will occur in the event that any of the provisions of this Agreement are not performed in accordance with the specific terms hereof or are otherwise breached, and (b) the non-breaching Party or Parties shall therefore be entitled, in addition to any other remedies that may be available, to obtain (without the posting of any bond) specific performance of the terms of this Agreement, if any Proceeding is brought by the non-breaching Party or Parties to enforce this Agreement, the Party in breach shall waive the defense that there is an adequate remedy at law.

Section 12.13 <u>Survival</u>. All covenants and agreements contained herein that by their terms are to be performed in whole or in part, or which prohibit actions, subsequent to the Closing shall survive the Closing in accordance with their terms. All other covenants and agreements contained herein, and all representations and warranties contained herein or in any certificated deliveries hereunder, shall not survive the Closing, and shall thereupon terminate.

*Signature Page Follows*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their duly authorized representatives as of the date hereof.

**SINGER SOURCING LIMITED LLC**

By: _____
   908E2CAA7676435...

Name: Rob Will

Title: CEO

[SIGNATURE PAGE TO INTELLECTUAL PROPERTY ASSET PURCHASE AGREEMENT]

**GA JOANN RETAIL PARTNERSHIP, LLC**

By: _____

Name: Scott Carpenter

Title: CEO

[SIGNATURE PAGE TO INTELLECTUAL PROPERTY ASSET PURCHASE AGREEMENT]

## <u>EXHIBIT A</u>

**Form of Power of Attorney**

*See attached.*

## POWER OF ATTORNEY

THIS POWER OF ATTORNEY (this "Power") is delivered as of May [•], 2025 (the "Effective Date"), by [•], a [•] ("Grantor").

**WHEREAS**, on January 15, 2025, JOANN Inc., a Delaware corporation ("JOANN") and twelve of its affiliates (collectively, the "Debtors") commenced voluntary chapter 11 bankruptcy cases (the "Bankruptcy Cases") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which cases are being jointly administered under lead Case No. 25-10068 (CTG);

**WHEREAS**, on February 26, 2025, the Bankruptcy Court entered an order (the "Approval Order") [D.I. 520] that, among other relief, approved an Agency Agreement, dated as of February 26, 2025, and granted GA Joann Retail Partnership, LLC, a Delaware limited liability company ("Agent"), the exclusive right to market and sell, and/or otherwise designate the purchasers, licensees and assignees of, any of all of the assets of the Debtors free and clear of all liens, claims, and encumbrances thereon without further order of the Bankruptcy Court;

**WHEREAS**, pursuant to that certain Intellectual Property Asset Purchase Agreement dated May [•], 2025 (the "Purchase Agreement"), by and between the Agent and Singer Sourcing Limited LLC, a Delaware limited liability company ("Buyer"), as buyer, the Agent agreed to sell, convey, assign, transfer and deliver to the Buyer all of the Acquired Assets (as defined in the Purchase Agreement); and

**WHEREAS**, the closing of the transactions contemplated by the Purchase Agreement has occurred (the "Closing"), and the Grantor desires to grant to the Buyer and its designees an irrevocable power of attorney to evidence and secure the Buyer's right, title and interest in and to the Acquired Assets and to enable the Buyer to take any and all further actions that the Buyer deems necessary or advisable to vest, perfect or enforce such right, title and interest.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Grantor hereby constitutes and appoints the Buyer, and each officer, director, manager, employee or agent thereof from time to time designated in writing by the Buyer (each, an "Attorney-in-Fact" and collectively, the "Attorneys-in-Fact"), with full power of substitution and resubstitution, as the Grantor's true and lawful attorney, irrevocably and coupled with an interest, to act in the name, place and stead of the Grantor or otherwise on the Grantor's behalf, for the limited purpose of executing, delivering, filing and recording, and doing all acts and things necessary, desirable or appropriate in the judgment of any Attorney-in-Fact to effectuate, evidence, consummate, confirm, preserve, maintain, defend, enforce, assign or otherwise transfer to or for the benefit of the Buyer all right, title and interest in, to and under the Acquired Assets, including without limitation the following powers:

(a) to execute, acknowledge, swear to, verify, deliver, record, file and publish any bills of sale, deeds, assignments, endorsements, transfers, certificates, affidavits, financing statements, termination statements, continuations, amendments, notices, powers of attorney, consents, approvals, applications, elections, proxies, waivers, waivers of conflict, proofs of claim, withdrawals or substitutions of counsel, licenses, sublicenses, registrations, maintenance documents, declarations, instruments or other documents of any kind or nature (collectively, "Instruments") that any Attorney-in-Fact may deem necessary or appropriate to transfer, evidence or confirm the transfer of any Acquired Asset or any interest therein to the Buyer or its affiliates, or to vest, perfect, continue, re-file or update the Buyer's title to or security interest in any Acquired Asset;

(b) to endorse, deposit, negotiate, assign or collect on behalf of any Debtor any checks, drafts or other instruments made payable to such Debtor and relating solely to any Acquired Asset, including without limitation any cash, cash equivalents, accounts, accounts receivable, intercompany receivables or proceeds of any Acquired Asset;

(c) to prosecute, compromise, settle or otherwise resolve any claim, demand, action, cause of action, counterclaim, setoff or defense constituting or relating to any Acquired Asset, including without limitation the right to appear in or before any court, agency, arbitrator or other tribunal, to file pleadings, motions and proofs of claim, to vote or otherwise act in any insolvency or bankruptcy proceeding, and to retain counsel, accountants or other professionals at the expense of the Debtors' estate if and to the extent approved by the Bankruptcy Court or otherwise permitted under the Bankruptcy Code;

(d) to take any action required or permitted under any contract or permit included among the Acquired Assets, including without limitation (i) issuing or accepting notices, waivers, consents or approvals, (ii) exercising or delegating rights, remedies, options or elections, (iii) delivering or demanding performance, and (iv) pursuing or defending arbitrations, mediations or litigation, all to the same extent as any Debtor might do;

(e) to request, demand, receive and give acquittance for any mail, shipments, parcels or other communications addressed to the Debtors that relate solely to the Acquired Assets and to open, read and deal with the same;

(f) to prepare, execute and file any tax returns, declarations, schedules, elections or other documents in any Debtor's name but solely with respect to any taxable period, item or asset included in or attributable to the Acquired Assets and, in connection therewith, to pay or contest any taxes and to receive and endorse any refund checks or other payments; and

(g) to do and perform every act necessary, desirable or appropriate in the judgment of any Attorney-in-Fact to carry out the foregoing, as fully and to the same extent as any Debtor could do if personally present and acting.

The Grantor hereby ratifies and confirms, and agrees to ratify and confirm, all lawful acts performed by any Attorney-in-Fact pursuant to this Power. This Power is irrevocable and is coupled with an interest, and shall not be affected by the subsequent dissolution, liquidation, bankruptcy, insolvency, conversion, appointment of a trustee or examiner, restructuring, reorganization, assignment for the benefit of creditors, receivership or other proceeding affecting the Debtors or their property, or by the passage of time, and, in any such event, each Attorney-in-Fact shall continue to act under this Power until the earlier of (i) the date on which all obligations of the Agent and/or Debtors under the Purchase Agreement have been fully performed or satisfied and all Acquired Assets have been fully and finally transferred to the Buyer, and (ii) the date on which this Power is terminated by written instrument executed by the Buyer.

The Grantor hereby waives, to the fullest extent permitted by law, any requirement that any Attorney-in-Fact post bond as a condition to or in connection with the exercise of any power granted under this Power.

This Power shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to its conflict of laws principles. Any action, suit or proceeding arising out of or relating to this Power or the transactions contemplated hereby shall be brought exclusively in the Bankruptcy Court, and, if the Bankruptcy Court declines jurisdiction, in any federal or state court located in New Castle County, Delaware and the Grantor hereby submits to the jurisdiction of such courts and waives any objection based on venue or *forum non conveniens*.

If any provision of this Power is held to be invalid or unenforceable, such provision shall be ineffective only to the extent of such invalidity or unenforceability, and the remaining provisions shall remain in full force and effect.

[*remainder of page intentionally left blank*]

IN WITNESS WHEREOF, the Grantor has duly delivered this Power of Attorney as of the Effective Date.

[•]

By:_____
Name:_____
Title: _____

State of _____ )

County of _____ ) ss.:

On this ____ day of _____ , 2025, before me, the undersigned, a Notary Public in and for said state, personally appeared _____, who acknowledged himself/herself to be the _____ of _____, and that he/she, as such officer, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the name of the grantor by himself/herself as such officer.

IN WITNESS WHEREOF I hereunto set my hand and official seal.

_____
Notary Public

My commission expires: _____

## <u>EXHIBIT B</u>

**Form of Domain Name Assignment Agreement**

*See attached.*

## <u>DOMAIN NAME ASSIGNMENT</u>

This DOMAIN NAME ASSIGNMENT is made effective as of [●], 2025 by and between Dittopatterns LLC, a Delaware limited liability company ("<u>Assignor</u>"), and Singer Sourcing Limited LLC, a Delaware limited liability company ("<u>Assignee</u>").

WHEREAS, GA Joann Retail Partnership, LLC, a Delaware limited liability company ("<u>Agent</u>") and Assignee are parties to that certain Asset Purchase Agreement, dated as of May [●], 2025 (the "<u>Agreement</u>"), pursuant to which Agent sold, conveyed, transferred and assigned to Assignee, and Assignee purchased and acquired from Agent, all of Assignor's right, title, and interest in, among other things, the domain names in the attached <u>Schedule 1</u> (the "<u>Domain Names</u>"), including the goodwill of the business connected with the use thereof and symbolized thereby; and

WHEREAS, pursuant to the Agreement, Assignor and Assignee are required to execute this Assignment.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby expressly acknowledged, Assignor does hereby convey, transfer and assign to Assignee all of Assignor's right, title, and interest in and to Domain Names, as well as all rights of Assignor to sue or otherwise recover for any past, present and future infringement, dilution or other violation or impairment thereof.

[*Signatures on next page*]

**ASSIGNOR:**

DITTOPATTERNS LLC

By: _____
Name:_____
Title:_____
Date:_____

**ASSIGNEE:**

SINGER SOURCING LIMITED LLC

By: _____
Name:_____
Title:_____
Date:_____

**Schedule 1**
Domain Names

| Domain Name | Expiration Date | Registrar |
|---|---|---|
| Dittopatterns.com | 7/12/2025 | Network Solutions |
| Dittoprojector.com | 7/12/2025 | Network Solutions |
| Dittosite.com | 10/7/2025 | Network Solutions |
| Easyditto.com | 10/7/2025 | Network Solutions |
| Liveditto.com | 10/7/2025 | Network Solutions |
| Newditto.com | 10/7/2025 | Network Solutions |
| Nopapersewing.com | 11/16/2025 | Network Solutions |
| Paperlesssewing.com | 11/16/2025 | Network Solutions |
| Patternprojection.com | 10/31/2026 | Network Solutions |
| Sewditto.com | 7/12/2025 | Network Solutions |
| Sewpaperless.biz | 10/31/2026 | Network Solutions |
| Sewpaperless.com | 10/31/2026 | Network Solutions |
| Sewpaperless.co | 10/30/2026 | Network Solutions |

**<u>EXHIBIT C</u>**

**Form of Trademark Assignment Agreement**

*See attached.*

## TRADEMARK ASSIGNMENT

This TRADEMARK ASSIGNMENT of United States Registrations and Applications is made effective as of [●], 2025 by and between Jo-Ann Stores, LLC, an Ohio limited liability company ("Assignor"), and Singer Sourcing Limited LLC, a Delaware limited liability company ("Assignee").

WHEREAS, GA Joann Retail Partnership, LLC, a Delaware limited liability company ("Agent") and Assignee are parties to that certain Asset Purchase Agreement, dated as of May [●], 2025 (the "Agreement"), pursuant to which Agent sold, conveyed, transferred and assigned to Assignee, and Assignee purchased and acquired from Agent, all of Assignor's right, title, and interest in, among other things, the marks listed in the attached Schedule 1 (the "Trademarks"), including the goodwill of the business connected with the use thereof and symbolized thereby; and

WHEREAS, pursuant to the Agreement, Assignor and Assignee are required to execute this Assignment.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby expressly acknowledged, Assignor does hereby convey, transfer and assign to Assignee all of Assignor's right, title, and interest in and to Trademarks, together with the goodwill of the business connected with the use of and symbolized by the Trademarks, as well as all rights of Assignor to sue or otherwise recover for any past, present and future infringement, dilution or other violation or impairment thereof. Assignor hereby authorizes the Commissioner for Trademarks in the United States Patent and Trademark Office to record and register this Trademark Assignment upon Assignee's request.

*[Signatures on next page]*

**ASSIGNOR:**

JO-ANN STORES, LLC


By: _____
Name:_____
Title:_____
Date:_____

**ASSIGNEE:**

SINGER SOURCING LIMITED LLC


By: _____
Name:_____
Title:_____
Date:_____

## Schedule 1
Trademarks

| Country | Mark | File Date | App. No. | Reg. Date | Reg. No. | Goods and Services (original application) | Owner | Status |
|---------|------|-----------|----------|-----------|----------|-------------------------------------------|-------|--------|
| U.S. | Ditto (standard character / word mark) | 05-27-20 | 88/934,676 | 08-01-23 | 7,127,649 | Class 9 - Projector for projecting sewing patterns onto a work surface for subsequent tracing and cutting of fabric; computer application software for use with a projector for storing sewing patterns and projecting sewing patterns onto a work surface for subsequent tracing and cutting of fabric; mobile app for use with a projector for storing sewing patterns and projecting sewing patterns onto a work surface for subsequent tracing and cutting of fabric; computer application software for storing and displaying sewing patterns; mobile app for storing and displaying sewing patterns<br><br>Second application – accessories:<br>Class 8 rotary cutters<br>Class 16 cutting mats<br>Class 20 fabric weights; pattern weights | Jo-Ann Stores, LLC | Registered |
| | | 04/20/21 | 90979610 (original application 90/657,956) | 05-30-23 | 7,069,541 | | | Registered in class 6, 16 (class 8 not pursued) |
| U.S. | Ditto (stylized / design mark) | 10-06-20 | 90/237,174 | 05-16-23 | 7,055,877 | Class 9 - Projector for projecting sewing patterns onto a work surface for subsequent tracing and cutting of fabric; computer application software for use with a projector for storing sewing patterns and projecting sewing patterns onto a work surface for subsequent tracing and cutting of fabric; mobile app for use with a projector for storing sewing patterns and projecting sewing patterns onto a work surface for subsequent tracing and cutting of fabric; computer application software for storing and displaying sewing patterns; mobile app for storing and displaying sewing patterns<br><br>Second application – | Jo-Ann Stores, LLC | Registered |
| | | 04/21/21 | 90979611 (original application 90/657,966) | 05-30-23 | 7,069,542 | | | Registered in class 6, 16 (class 8 not pursued) |

| Country | Mark | File Date | App. No. | Reg. Date | Reg. No. | Goods and Services (original application) | Owner | Status |
|---------|------|-----------|----------|-----------|----------|-------------------------------------------|-------|--------|
|  |  |  |  |  |  | accessories: Class 8 rotary cutters Class 16 cutting mats Class 20 fabric weights; pattern weights |  |  |

## EXHIBIT D

**Form of Patent Assignment Agreement**

*See attached.*

## PATENT ASSIGNMENT

This PATENT ASSIGNMENT of Patents and/or Patent Applications is made effective as of [●], 2025 by and between Dittopatterns LLC, a Delaware limited liability company ("Assignor"), and Singer Sourcing Limited LLC, a Delaware limited liability company ("Assignee").

WHEREAS, GA Joann Retail Partnership, LLC, a Delaware limited liability company ("Agent") and Assignee are parties to that certain Asset Purchase Agreement, dated as of May [●], 2025 (the "Agreement"), pursuant to which Agent sold, conveyed, transferred and assigned to Assignee, and Assignee purchased and acquired from Agent, all of Assignor's right, title, and interest in, among other things, the patents and patent applications listed in the attached Schedule 1 (the "Patents"); and

WHEREAS, pursuant to the Agreement, Assignor and Assignee are required to execute this Assignment.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby expressly acknowledged, Assignor does hereby convey, transfer and assign to Assignee all of Assignor's right, title, and interest in and to the Patents, as well as all rights of Assignor to sue or otherwise recover for any past, present and future infringement or other violation or impairment thereof. Assignor hereby authorizes the Commissioner for Patents in the United States Patent and Trademark Office and any officials of foreign countries to record and register this Patent Assignment upon Assignee's request.

*[Signatures on next page]*

**ASSIGNOR:**                              **ASSIGNEE:**

DITTOPATTERNS LLC                          SINGER SOURCING LIMITED LLC

By: _____        By: _____
Name:_____         Name:_____
Title:_____       Title:_____
Date:_____        Date:_____

**Schedule 1**
Patents

| Title | Jurisdiction | File Date | App. No. | Issue Date | Patent No. | Description | Owner | Status | Expiration |
|-------|-------------|-----------|----------|-----------|------------|-------------|-------|--------|------------|
| Method of Projecting Sewing Pattern Pieces onto Fabric – continuation filing | USA | 08-24-20 | 17/001,040 | 02-21-23 | 11,583,021 | Utility patent. Continuation of patent US 10,750,810 B2. | Dittopatterns LLC (f/k/a Newco Jodito LLC) | **Issued** | 05-04-2038 |
| Method of Formatting Sewing Patterns for paperless use | USA | 02-01-19 | 16/350,932 | 05-11-21 | 11,003,903 B2 | Utility patent. See body of patent. | Dittopatterns LLC (f/k/a Newco Jodito LLC) (purchased from E. Caven) | **Issued** | 03-02-2039  Next maintenance fee due in Nov. 2028 |
| Method of Projecting Sewing Pattern Pieces onto Fabric | USA | 12-24-17 | 15/853,807 | 08-25-20 | 10,750,810 B2 | Utility patent. See body of patent. | Dittopatterns LLC (f/k/a Newco Jodito LLC) (purchased from E. Caven) | **Issued** | 08-10-2038 |

| Title | Jurisdiction | File Date | App. No. | Issue Date | Patent No. | Description | Owner | Status | Expiration |
|-------|-------------|-----------|----------|------------|------------|-------------|-------|---------|-----------|
| Image Projecting System and Methods | USA | 05-12-21 | 17/318,708 | 12-10-24 | 12,164,217 | Utility patent. See body of patent. Original hardware patent application in the United States. Non-provisional (includes provisional applications filed 12-22-20 and 05-12-20) | Dittopatterns LLC (f/k/a Newco Jodito LLC) | **Issued** Issuance fee paid October 29, 2024 Notice of Allowance issued July 30, 2024. Published on 11-18-21 as Pub. No. 2021-0356849 A1. Amendment filed in January 2023. | 05-10-43 First maintenance fee due 12-10-27 |
| Image Projecting System and Methods | USA | 12-06-24 | 18/972,135 | no issuance | no issuance | Continuation of Patent 12,164,217 | Dittopatterns LLC | [Pending. No examination yet.] | |
| Image Projecting System and Methods | USA | 11-11-23 | 18/268,878 PCT / US2021 / 058984 (PCT 2) | no issuance | no issuance | Software / splicing. Improvements to U.S. Patent Application No. 17/318,708 and to PCT 1 (PCT / US2021 / 032021) | Dittopatterns LLC (f/k/a Newco Jodito LLC) | [Pending. No examination yet.] Published on 06-30-22 as Pub. No. WO 2022/139974 | |
| Image Projecting System and Methods | Canada | 11-3-2022 | 3,177,784 | no apparent issuance | no apparent issuance | Ties back to PCT 1 (PCT / US2021 / 032021) that was filed 05-12-21 | Dittopatterns LLC (f/k/a Newco Jodito LLC) | [Pending] Next fee due May 12, 2025. Request for examination due on same day. | |
| Image Projecting System and Methods | Canada | 06-20-23 | 3,202,950 003644-0040 | no apparent issuance | no apparent issuance | Ties back to PCT 2 (PCT / US2021 / 058984) | Dittopatterns LLC (f/k/a Newco Jodito LLC) | [Pending] Next fee due November 11, 2025. Request for examination due on same day. | |

| Title | Jurisdiction | File Date | App. No. | Issue Date | Patent No. | Description | Owner | Status | Expiration |
|---|---|---|---|---|---|---|---|---|---|
| Image Projection System and Method | China | National Entry | 2021800869134/5 | no apparent issuance | no apparent issuance | | Dittopatterns LLC (f/k/a Newco Jodito LLC) | Pending | |
| Image Projecting Systems and Methods | Australia | National Entry | 2021409118 | no apparent issuance | no apparent issuance | | Dittopatterns LLC (f/k/a Newco Jodito LLC) | Pending | |
| Image Projecting Systems and Methods | Mexico | National Entry | 2023007531 | no apparent issuance | no apparent issuance | | Dittopatterns LLC (f/k/a Newco Jodito LLC) | Pending | |
| Image Projecting Systems and Methods | European Patent Register | Regional Entry | 21911838 | no apparent issuance | no apparent issuance | | Dittopatterns LLC (f/k/a Newco Jodito LLC) | Pending | |
| SISTEMA DE PROJEÇÃO PARA PROJETAR PADRÕES DE COSTURA EM UMA SUPERFÍCIE | Brazil | National Entry | 112022023024 | no apparent issuance | no apparent issuance | | Dittopatterns LLC (f/k/a Newco Jodito LLC) | Pending | |
| Image Projection System and Method | Japan | National Entry | 2022568707 | no apparent issuance | no apparent issuance | | Dittopatterns LLC (f/k/a Newco Jodito LLC) | Pending | |
| Image Projecting Systems and Methods | Mexico | National Entry | 2022014269 | no apparent issuance | no apparent issuance | | Dittopatterns LLC (f/k/a Newco Jodito LLC) | Pending | |
| Image Projection and System | China | National Entry | 202180034635.1 | no apparent issuance | no apparent issuance | | Dittopatterns LLC (f/k/a Newco Jodito LLC) | Pending | |

## **EXHIBIT E**

**Form of 503(b)(9) Release**

*See attached.*

## RELEASE

WHEREAS, SVP Sewing Brands LLC ("SVP") and GA Joann Retail Partnership, LLC ("Agent") are parties to an Asset Purchase Agreement dated as of May __, 2025 (the "APA"). Capitalized terms used but not defined herein have the meanings given thereto in the APA.

WHEREAS, pursuant to the APA, Agent has agreed to sell and SVP has agreed to purchase certain Acquired Assets of JOANN Inc. and its affiliated chapter 11 debtors in possession (the "Debtors" and their chapter 11 bankruptcy cases, the "Chapter 11 Cases") on the terms and conditions set forth in the APA.

WHEREAS, the Debtors have scheduled the following general unsecured claims of SVP in the Chapter 11 Cases (the "Scheduled Claims")

| Schedule No. | Debtor | Amount |
|---|---|---|
| 6284353 | Jo-Ann Stores, LLC | $2,715,968.29 |
| 6285319 | joann.com, LLC | $19,625.44 |
| 6286852 | Jo-Ann Stores, LLC | $3,255,564.24 |

WHEREAS, on April 4, 2025, SVP filed the following proofs of claim in the Chapter 11 Cases (the "Filed Claims"):

| Claim No. | Debtor | Amount |
|---|---|---|
| 11581 | JOANN Ditto Holdings Inc. | Unliquidated |
| 11676 | Jo-Ann Stores, LLC | $8,412,826.57 |

WHEREAS, the Filed Claims assert general unsecured claims, claims entitled to administrative expense priority pursuant to section 503(b)(9) of the Bankruptcy Code, and claims entitled to secured or other priority treatment on account of SVP's alleged reclamation and setoff rights.

WHEREAS, pursuant to the APA, as part of the consideration for the transactions contemplated thereby, SVP has agreed to waive all of its claims against the Debtors other than general unsecured claims, and Agent, as agent for the Debtors, has agreed to waive any and all claims against SVP under the Master Sublease.

NOW, THEREFORE, in consideration of the sale of the Acquired Assets and the other consideration being provided to SVP by Agent and the Debtors pursuant to the APA, SVP and Agent hereby agree as follows, in each instance effective only as of the occurrence of the Closing:

1.       Effective upon the occurrence of the Closing, SVP hereby releases, waives, relinquishes, and settles all claims it has, had, or ever could have had against the Debtors arising from any facts, circumstances, acts, or omissions occurring prior to the Closing, other than a single general unsecured claim against Jo-Ann Stores, LLC in the amount of $8,010,104.77 (the "Remaining Claim").

- 1 -

2.      SVP authorizes the Debtors' claims and noticing agent, Kroll Restructuring Administration, to mark all of the Scheduled Claims and the Filed Claims as disallowed and expunged, other than Claim No. 11676, which will be modified on the claims register to reflect the Remaining Claim, a single general unsecured claim against Jo-Ann Stores, LLC in the amount of $8,010,104.77.

3.      Subject to receipt of the Release Amount, Agent, as agent for the Debtors, hereby releases, waives, relinquishes, and settles all claims the Debtors have, had, or ever could have had against SVP under the Master Sublease.

[ *signature pages follow* ]

IN WITNESS WHEREOF, the Parties have caused this Release to be executed and delivered by their duly authorized representatives as of the date hereof.

**SVP SEWING BRANDS LLC**


By:_____

Name:

Title:

**GA JOANN RETAIL PARTNERSHIP, LLC**

By:_____

    Name:

    Title:

# **EXHIBIT F**

**Master Sublease Release**

*See attached.*

**Termination of Master Sublease and Release of Claims Agreement**

This Release of Claims Agreement (the "Agreement") is entered into on [•], 2025 (the "Effective Date"), by and between SVP Sewing Brands LLC ("SVP") and GA Joann Retail Partnership, LLC, in its capacity as agent pursuant to the Approval Order, on behalf of itself and the Debtors (including, without limitation, Jo-Ann Stores, LLC) ("Agent").  SVP and the Agent are referred to herein collectively as the "Parties." The Parties are entering into this Agreement in connection with that certain Intellectual Property Asset Purchase Agreement entered into on [•], 2025, by and between Singer Sourcing Limited LLC, a Delaware limited liability company ("Buyer") and the Agent (the "Asset Purchase Agreement"). Capitalized terms used but not defined herein shall have the meanings set forth in the Asset Purchase Agreement.

## RECITALS

**WHEREAS,** on February 26, 2025, the Bankruptcy Court entered the Approval Order that, among other relief, approved an Agency Agreement, dated as of February 26, 2025, and granted Agent the exclusive right to market and sell, and/or otherwise designate the purchasers, licensees, and assignees of, any of the assets of the Debtors free and clear of all liens, claims, and encumbrances, including the power to (i) direct the Debtors to assume and assign contracts and leases pursuant to the procedures set forth in the Approval Order and (ii) release SVP and its affiliates from certain claims arising from the Master Sublease (as hereafter defined), without further order of the Bankruptcy Court;

**WHEREAS,** under the Asset Purchase Agreement**,** Agent has designated Buyer as the purchaser of the Acquired Assets, and Buyer desires to purchase all of the Acquired Assets and assume all of the Assumed Liabilities, in each case upon the terms and conditions set forth in the Asset Purchase Agreement;

**WHEREAS,** under the Asset Purchase Agreement, Buyer shall pay $800,000 to the Seller in satisfaction of any and all liabilities or other amounts that SVP or its affiliates may owe under or in connection with the Master Sublease, whenever accrued, whether before, on, or after the Closing;

**WHEREAS,** under the Asset Purchase Agreement, the Agent must deliver to Buyer a release, duly executed by Agent, releasing SVP and its affiliates from all claims under or in connection with the Master Sublease; and

**WHEREAS**, the Parties desire to terminate the Master Sublease as of the Effective Date.

**NOW, THEREFORE,** in consideration of the mutual covenants and promises set forth below and for other good and valuable consideration, the receipt and sufficiency of which the Parties acknowledge, and intending to be legally bound, the Parties agree as follows:

## I.    DEFINITIONS

For purposes of this Agreement, the following capitalized terms will have the meanings set forth below:

"Affiliate" means, with respect to any Entity, any other Entity controlled by, controlling, or under common control with such Entity.

"Claims" means any and all past claims, complaints, counterclaims, cross-claims, rights of contribution or indemnity, rights of setoff or recoupment, manners of action, rights of action, causes

of action, judgments, suits, contracts, liabilities, obligations, demands, consequential damages or demands, liens, debts, accounts, promises, warranties, damages, losses, charges, reimbursements, fees, penalties, fines, contributions, costs, expenses, or attorneys' fees, of any kind or character whatsoever, at law or in equity, whether known or unknown, liquidated or unliquidated, direct or indirect, fixed or contingent, suspected or unsuspected, whether or not concealed or hidden, asserted, or that could have been asserted, to the extent arising from the Master Sublease prior to the Effective Date, for any type of relief, including, without limitation, claims for damages based in statute or common law, compensatory damages, penalties, punitive damages, interest, costs or attorneys' fees, restitution, or equitable or injunctive relief. "Claims" shall not include any Claims arising or accruing after the Effective Date.

"Entity" means any person, individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, estate, trust, business trust, sole proprietorship, unincorporated organization or association, governmental entity, or any other entity, whether acting in an individual, fiduciary, or other capacity.

"Master Sublease" means that certain 2019 Master Sublease Agreement by and between Jo-Ann Stores, LLC, as sublandlord, and SVP, as subtenant, dated July 1, 2019, as amended by that certain First Amendment to 2019 Master Sublease dated May 1, 2023.

"Released Claims" means the Claims released by the Releasing Parties.

"Released Parties" means SVP and its Affiliates or a special purpose vehicle designated by SVP.

"Releasing Parties" means the Agent, on behalf of itself and the Debtors.

## II.    AGREEMENT

1.    **Releases.**  As of the Effective Date, the Agent, on behalf of itself and the Debtors, pursuant to its authority under the Approval Order, knowingly, voluntarily, unequivocally, fully, unconditionally, irrevocably, and forever discharge the Released Parties from all Claims.  Nothing contained in this Agreement shall be construed to release, waive, or otherwise affect any obligations of the Released Parties that first arise after the Effective Date, including, without limitation, any obligations of the Released Parties under the Master Sublease that, by their express terms, apply to periods after the Effective Date. All such post-Effective Date obligations of Subtenant (if any) are expressly preserved.

2.    **Unknown Claims.**  Each Releasing Party acknowledges that there is a risk that after the execution of this Agreement, such Releasing Party may (i) discover facts in addition to, or different from, those that such Releasing Party now knows or believes to exist or (ii) discover, incur, or suffer from Released Claims which were unknown or unanticipated at the time this Agreement is executed, including, without limitation, unknown or unanticipated Released Claims which, if known by such Releasing Party on the date this Agreement is being executed, may have materially affected such Releasing Party's decision to execute this Agreement.  Each Releasing Party acknowledges and agrees that it is assuming the risk of such existing unknown and unanticipated Released Claims and agrees that this Agreement applies thereto.  Each of the Releasing Parties understands, acknowledges, and agrees that such Releasing Party is familiar with Section 1542 of the Civil Code of the State of California, which provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

Each of the Releasing Parties expressly waives and relinquishes any rights and benefits that such Releasing Party may have under Section 1542 or any other statute (whether in California, Delaware, or elsewhere) or common law principle of any jurisdiction with a similar effect to the full extent that it may lawfully waive all such rights and benefits pertaining to the subject matter hereof.

3. **Ownership of Claims.**  The Agent represents and warrants that it has the full power and authority, as set forth in the Approval Order, on behalf of itself and the Debtors and their respective estates, to release the Released Claims as contemplated by this Agreement.  The Agent represents and warrants to each Released Party that the Releasing Parties have not assigned or transferred or purported to assign or transfer, and hereby covenants that such Releasing Parties shall not assign or transfer (or purport to assign or transfer), any Released Claim, or any portion thereof or any interest therein, to any non-Party.

4. **No Admission of Wrongdoing.**  It is understood and agreed that this Agreement has been entered into by the Parties solely to accomplish an expeditious resolution and settlement of the matter in controversy and for no other purpose.  In entering this Agreement, the Parties do not admit that they committed any breaches of contract or torts, whether legal or equitable, or violated any federal, state, or local law, any regulations or guidelines promulgated pursuant to those laws, or any other applicable laws, regulations, or guidelines, or any other legal requirements or standards.  Neither this Agreement, nor any of its terms or provisions, nor any of the negotiations connected therewith or relating thereto, shall be construed as an admission or concession of any violation or failure to comply with any applicable agreement, law, regulation, guideline, or any other legal requirement or standard.

5. **Covenant Not to Sue.**  In consideration of the terms herein, each Releasing Party hereby covenants and undertakes not to assert, make any claim, commence, or prosecute any action or proceeding directly relating to or arising from the Released Claims against any of the Released Parties.

6. **Termination of Master Sublease**.  Agent, on behalf of Jo-Ann Stores, LLC, and SVP agree that, notwithstanding anything to the contrary set forth in the Master Sublease, the Master Sublease is hereby terminated in its entirety as of the Effective Date (the "Termination Date"), as if the Termination Date were set forth in the Master Sublease as the expiration date of the term of the Master Sublease. As of the Effective Date, neither party shall have any further rights or obligations under the Master Sublease, except for those provisions which by their express terms or by their nature are intended to survive termination or as provided herein.  SVP hereby releases Jo-Ann Stores, LLC and Agent from any and all claims, demands, and liabilities arising out of or in connection with the Master Sublease, except for those obligations expressly stated to survive termination. As of the Termination Date, SVP shall have surrendered and delivered possession of the SVP Leased Departments (as defined in the Master Sublease) in accordance with the terms of the Master Sublease

7. **General Representations.**  Each Party has carefully read this Agreement, knows its contents, has had the opportunity to consult with counsel concerning the contents, and executes and delivers the Agreement of her/his/its own free will.  Each Party affirms to the other that it has considered and

fully understands the legal effect of each term or provision of the Agreement. The Parties represent that they have each knowingly and voluntarily entered into this Agreement following consultation with their respective attorneys, who are the attorneys of their choice, and that the terms of this Agreement have been interpreted and explained by their respective attorneys, and that these terms are fully understood and voluntarily accepted by each Party.

8.   **Execution of Counterparts.**  This Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original. This Agreement may be electronically executed and delivered to the other Party and the executed, electronic version shall be binding and enforceable as an original.

9.   **Entire Agreement; Survival of Representations.**  This Agreement and the other Transaction Documents constitute the only existing and binding agreements among the Parties concerning the matters referenced herein, and the Parties acknowledge that there are no other warranties, promises, assurances or representations of any kind, express or implied, upon which the Parties have relied in entering into this Agreement, unless expressly set forth herein.

10.   **Governing Law.**  This Agreement shall be governed by and interpreted in accordance with the laws of the [State of Delaware] without reference to any conflict of laws provisions thereof, except where governed by the Bankruptcy Code.

11.   **Venue and Enforcement.**  Each of the Parties irrevocably and unconditionally submits, for itself and its properties, to the exclusive jurisdiction of the Bankruptcy Court, in any action or proceeding arising out of or relating to this Agreement.

12.   **Modification.**  No modification, waiver, amendment, discharge, or change of this Agreement shall be valid unless the same is in writing and signed by the Party against which the enforcement of such modification, waiver, amendment, discharge, or change is sought.

13.   **Authorized Signatories.**  Each signatory warrants that the person(s) executing this Agreement on behalf of each Party has full power, capacity, and authority to execute this Agreement on behalf of such Party.

14.   **Successors and Assigns; Third-Party Beneficiaries.**  This Agreement shall be binding upon the Parties and their respective successors and assigns. Each Released Party that is not directly a Party to this Agreement shall be a third-party beneficiary under, and entitled to enforce, this Agreement as if it were a Party.

15.   **Attorneys' Fees.**  Each Party shall be responsible for the payment of its own costs and expenses (including reasonable attorneys' fees) incurred in connection with the preparation, negotiation, execution, or delivery of this Agreement.

16.   **Notice.**  Notice is to be provided to the Parties by email, addressed as follows (or to any new address supplied by a Party pursuant to this notice provision):

To the Agent:

    GA Joann Retail Partnership, LLC
    2829 Townsgate Road, Suite 103
    Westlake Village, CA 91361

Attn:    Scott K. Carpenter, scarpenter@gagroup.com
Tim Shilling, tshilling@gagroup.com
Legal Department, legal@brileyfin.com

with a copy (which shall not constitute notice) to:

Lowenstein Sandler LLP
One Lowenstein Drive
Roseland, NJ 07068
Attn:    Andrew D. Behlmann, abehlmann@lowenstein.com;
Jean Nicolas Samedi Jr., jsamedi@lowenstein.com;
Emily Jewell, ejewell@lowenstein.com

To SVP:

Elizabeth Mohan
Chief Legal Officer, SVP Worldwide
Elizabeth.Mohan@SVPWorldwide.com

With a copy (which shall not constitute notice) to:

Counsel to SVP
Attn:    Andrew Harmeyer, Esq.
Milbank LLP
AHarmeyer@milbank.com

[*signature page follows*]

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the Effective Date.


**GA Joann Retail Partnership, LLC**          **SVP Sewing Brands LLC**



By: _____          By: _____
Name:                                 Name:
Title:                                Title:

**Schedule 1.1(a)**

Permitted Encumbrances

None.

**Schedule 1.1(k)**

**Knowledge**

Scott Carpenter

**Schedule 2.1(a)**

Patents

| Title | Jurisdiction | File Date | App. No. | Issue Date | Patent No. | Description | Owner | Status | Expiration |
|---|---|---|---|---|---|---|---|---|---|
| Method of Projecting Sewing Pattern Pieces onto Fabric – continuation filing | USA | 08-24-20 | 17/001,040 | 02-21-23 | 11,583,021 | Utility patent. Continuation of patent US 10,750,810 B2. | Dittopatterns LLC (f/k/a Newco Jodito LLC) | **Issued** | 05-04-2038 |

| Title | Jurisdiction | File Date | App. No. | Issue Date | Patent No. | Description | Owner | Status | Expiration |
|-------|--------------|-----------|----------|------------|------------|-------------|-------|--------|------------|
| Method of Formatting Sewing Patterns for paperless use | USA | 02-01-19 | 16/350,932 | 05-11-21 | 11,003,903 B2 | Utility patent. See body of patent. | Dittopatterns LLC (f/k/a Newco Jodito LLC) (purchased from E. Caven) | **Issued** | 03-02-2039<br><br>Next maintenance fee due in Nov. 2028 |

| Title | Jurisdiction | File Date | App. No. | Issue Date | Patent No. | Description | Owner | Status | Expiration |
|---|---|---|---|---|---|---|---|---|---|
| Method of Projecting Sewing Pattern Pieces onto Fabric | USA | 12-24-17 | 15/853,807 | 08-25-20 | 10,750,810 B2 | Utility patent. See body of patent. | Dittopatterns LLC (f/k/a Newco Jodito LLC) (purchased from E. Caven) | **Issued** | 08-10-2038 |
| Image Projecting System and Methods | USA | 05-12-21 | 17/318,708 | 12-10-24 | 12,164,217 | Utility patent. See body of patent. Original hardware patent application in the United States  Non-provisional (includes provisional applications filed 12-22-20 and 05-12-20) | Dittopatterns LLC (f/k/a Newco Jodito LLC) | **Issued**  Issuance fee paid October 29, 2024  Notice of Allowance issued July 30, 2024.  Published on 11-18-21 as Pub. No. 2021-0356849 A1. Amendment filed in January 2023. | 05-10-43  First maintenance fee due 12-10-27 |

| Title | Jurisdiction | File Date | App. No. | Issue Date | Patent No. | Description | Owner | Status | Expiration |
|---|---|---|---|---|---|---|---|---|---|
| Image Projecting System and Methods | USA | 12-06-24 | 18/972,135 | no issuance | no issuance | Continuation of Patent 12,164,217 | Dittopatterns LLC | [Pending. No examination yet.] | |
| Image Projecting System and Methods | USA | 11-11-23 | 18/268,878<br><br>PCT / US2021 / 058984<br><br>(PCT 2) | no issuance | no issuance | Software / splicing. Improvements to U.S. Patent Application No. 17/318,708 and to PCT 1 (PCT / US2021 / 032021) | Dittopatterns LLC (f/k/a Newco Jodito LLC) | [Pending. No examination yet.] Published on 06-30-22 as Pub. No. WO 2022/139974 | |
| Image Projecting System and Methods | Canada | 11-3-2022 | 3,177,784 | no apparent issuance | no apparent issuance | Ties back to PCT 1 (PCT / US2021 / 032021) that was filed 05-12-21 | Dittopatterns LLC (f/k/a Newco Jodito LLC) | [Pending] Next fee due May 12, 2025. Request for examination due on same day. | |
| Image Projecting System and Methods | Canada | 06-20-23 | 3,202,950<br><br>003644-0040 | no apparent issuance | no apparent issuance | Ties back to PCT 2 (PCT / US2021 / 058984) | Dittopatterns LLC (f/k/a Newco Jodito LLC) | [Pending] Next fee due November 11, 2025. Request for examination due on same day. | |
| Image Projection System and Method | China | National Entry | 2021800869134/5 | no apparent issuance | no apparent issuance | | Dittopatterns LLC (f/k/a Newco Jodito LLC) | Pending | |
| Image Projecting Systems and Methods | Australia | National Entry | 2021409118 | no apparent issuance | no apparent issuance | | Dittopatterns LLC (f/k/a Newco Jodito LLC) | Pending | |

| Title | Jurisdiction | File Date | App. No. | Issue Date | Patent No. | Description | Owner | Status | Expiration |
|-------|-------------|-----------|----------|------------|------------|-------------|-------|--------|------------|
| Image Projecting Systems and Methods | Mexico | National Entry | 2023007531 | no apparent issuance | no apparent issuance | | Dittopatterns LLC (f/k/a Newco Jodito LLC) | Pending | |
| Image Projecting Systems and Methods | European Patent Register | Regional Entry | 21911838 | no apparent issuance | no apparent issuance | | Dittopatterns LLC (f/k/a Newco Jodito LLC) | Pending | |
| SISTEMA DE PROJEÇÃO PARA PROJETAR PADRÕES DE COSTURA EM UMA SUPERFÍCIE | Brazil | National Entry | 112022023024 | no apparent issuance | no apparent issuance | | Dittopatterns LLC (f/k/a Newco Jodito LLC) | Pending | |
| Image Projection System and Method | Japan | National Entry | 2022568707 | no apparent issuance | no apparent issuance | | Dittopatterns LLC (f/k/a Newco Jodito LLC) | Pending | |
| Image Projecting Systems and Methods | Mexico | National Entry | 2022014269 | no apparent issuance | no apparent issuance | | Dittopatterns LLC (f/k/a Newco Jodito LLC) | Pending | |
| Image Projection and System | China | National Entry | 202180034635.1 | no apparent issuance | no apparent issuance | | Dittopatterns LLC (f/k/a Newco Jodito LLC) | Pending | |

<u>Trademarks</u>

| Country | Mark | File Date | App. No. | Reg. Date | Reg. No. | Goods and Services (original application) | Owner | Status |
|---|---|---|---|---|---|---|---|---|
| U.S. | Ditto (standard character / word mark) | 05-27-20 | 88/934,676 | 08-01-23 | 7,127,649 | Class 9 - Projector for projecting sewing patterns onto a work surface for subsequent tracing and cutting of fabric; computer application software for use with a projector for storing sewing patterns and projecting sewing patterns onto a work surface for subsequent tracing and cutting of fabric; mobile app for use with a projector for storing sewing patterns and projecting sewing patterns onto a work surface for subsequent tracing and cutting of fabric; computer application software for storing and displaying sewing patterns; mobile app for storing and displaying sewing patterns | Jo-Ann Stores, LLC | Registered |
| | | 04/20/21 | 90979610 (original application 90/657,956) | 05-30-23 | 7,069,541 | Second application – accessories: Class 8 rotary cutters Class 16 cutting mats Class 20 fabric weights; pattern weights | | Registered in class 6, 16 (class 8 not pursued) |
| U.S. | Ditto (stylized / design mark) | 10-06-20 | 90/237,174 | 05-16-23 | 7,055,877 | Class 9 - Projector for projecting sewing patterns onto a work surface for subsequent tracing and cutting of fabric; computer application software for use with a projector for storing sewing patterns and projecting sewing patterns onto a work surface for subsequent tracing and cutting of fabric; mobile app for use with a projector for storing sewing patterns and projecting sewing patterns onto a work surface for subsequent tracing and cutting of fabric; computer application software for storing and displaying sewing patterns; mobile app for storing and displaying sewing patterns | Jo-Ann Stores, LLC | Registered |
| | | 04/21/21 | 90979611 | 05-30-23 | 7,069,542 | Second application – accessories: Class 8 rotary cutters Class 16 cutting mats Class 20 fabric weights; pattern weights | | |

| Country | Mark | File Date | App. No. | Reg. Date | Reg. No. | Goods and Services (original application) | Owner | Status |
|---|---|---|---|---|---|---|---|---|
|  |  | (original application 90/657,966) |  |  |  |  |  | Registered in class 6, 16 (class 8 not pursued) |

Domain Names

| Domain Name | Expiration Date | Registrar |
|---|---|---|
| Dittopatterns.com | 7/12/2025 | NO-IP |
| Dittoprojector.com | 7/12/2025 | NO-IP |
| Dittosite.com | 10/7/2025 | NO-IP |
| Easyditto.com | 10/7/2025 | NO-IP |
| Liveditto.com | 10/7/2025 | NO-IP |
| Newditto.com | 10/7/2025 | NO-IP |
| Nopapersewing.com | 11/16/2025 | NO-IP |
| Paperlesssewing.com | 11/16/2025 | NO-IP |
| Patternprojection.com | 10/31/2026 | NO-IP |
| Sewditto.com | 7/12/2025 | NO-IP |

| Sewpaperless.biz | 10/31/2026 | NO-IP |
|---|---|---|
| Sewpaperless.com | 10/31/2026 | NO-IP |
| Sewpaperless.co | 10/30/2026 | NO-IP |

**Schedule 2.1(b)**

Social Media Accounts

| Platform | Handle | Followers | URL |
|---|---|---|---|
| Facebook | Ditto Patterns | 1,800 | https://www.facebook.com/dittopatterns |
| TikTok | @dittopatterns | 1,001 | https://www.tiktok.com/@dittopatterns |
| Pinterest | @dittopatterns | 111 | https://www.pinterest.com/dittopatterns/ |
| LinkedIn | Ditto | 560 | https://www.linkedin.com/company/dittopatterns/ |
| Instagram | @dittopatterns | 11,400 | https://www.instagram.com/dittopatterns |
| YouTube | @dittopatterns | 1,850 | https://www.youtube.com/channel/UCA9v7-H5Pp-5OIFDB8_78DQ |

**Schedule 2.1(c)**

Software

Codebases enabling the Ditto software and mobile application, which enable a method of projecting digitally maintained images of sewing patterns as templates onto fabrics via the proprietary Ditto projector device. The software includes features such as projected image calibration and algorithmic methods to correct for accuracy, skew, throw distance, and the like, as well as a splicing engine which enables frame movement and resizing. The software relies upon various non-proprietary, paid third-party integrations for various functionality, including Tailor Nova, which provides a software-as-a-service solution for pattern resizing and scaling. The production environment for the software is hosted on Microsoft Azure.

**Schedule 2.1(d)**

Product Assets and Data

A library comprised of approximately 700 digital design patterns in PDF format, used for projecting cut patterns through the Ditto projector. The patterns are segmented by the following pattern categories:

1. Women's Patterns
2. Men's Patterns
3. Kid's Patterns
4. Craft Patterns
5. Gender-Neutral Patterns

**<u>Schedule 2.1(e)</u>**

<u>Customer Data</u>

All customer subscriber information held within the Ditto Salesforce instance, regardless of whether the Ditto Salesforce instance itself is transferred to Buyer or if the data contained in the Ditto Salesforce instance as of the Closing is transferred to Buyer outside of Salesforce.

**Schedule 2.1(g)**

Assumed Contracts

| Ditto Contracts To Be Assumed and Associated Cure Amounts | |
|---|---|
| **Contract/Contract Counterparty** | **Estimated Cure Amount** |
| Tailor Nova | $23,000 |
| Little Lizard King License | |
| Liesly + Co. License | |
| Madalynne License | |
| StyleARC License | |
| Straight Stitch Society License | |
| Vertex | |
| Novanest | $11,000 |
| | |
| **ESTIMATED TOTAL CURE AMOUNT** | **$34,000** |

- 46 -

**Schedule 2.1(i)**

Payment Gateway Accounts

| Payment Gateway |
| --- |
| Stripe |
| Paypal |

**Schedule 2.3**

Assumed Overhead

| Monthly Ditto Costs | |
|---|---|
| **Category** | **Estimated Monthly Amounts** |
| Monthly Salary Run Rate (Jeff and Amy) | $23,833 |
| Tailor Nova | $4,500 |
| Novanest | $12,000 |
| Azure | $5,500 |
| Consolidated Pattern License Royalties | $200 |
| Consolidated Software Licenses | $130 |
| Website Certifications | $40 |
| Stripe | Transaction Percentage |
| | |
| **ESTIMATED TOTAL MONTHLY AMOUNTS** | **$46,203** |

*Additional Overhead to Be Incurred by Buyer*

Ditto benefits from an integrated Salesforce and Office O365 account through JOANN. Buyer will be responsible for its own contracts with Salesforce and Office or alternatives.