## Exhibit A

**Big Lots Transcript**

```
 1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
 2
                                      .  Chapter 11
 3   IN RE:                           .  Case No. 24-11967 (JKS)
                                      .
 4   BIG LOTS, INC., et al.,          .  (Jointly Administered)
                                      .
 5                                    .  Courtroom No. 6
                                      .  824 North Market Street
 6              Debtors.              .  Wilmington, Delaware 19801
                                      .
 7                                    .  Tuesday, January 21, 2025
 8   . . . . . . . . . . . . . . . .  .  11:00 a.m.

 9                       TRANSCRIPT OF HEARING
             BEFORE THE HONORABLE J. KATE STICKLES
10                UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12   For the Debtors:          Adam Shpeen, Esquire
                               Stephen Piraino, Esquire
13                             Kevin Winiarski, Esquire
                               Jacob Goldberger, Esquire
14                             DAVIS POLK & WARDWELL LLP
                               450 Lexington Avenue
15                             New York, New York 10017
16
     For the Committee:        Justin Alberto, Esquire
17                             COLE SCHOTZ P.C.
                               500 Delaware Avenue, Suite 200
18                             Wilmington, Delaware 19801
19   (APPEARANCES CONTINUED)

20   Audio Operator:           Gauri Patel, ECRO

21   Transcription Company:    Reliable
                               1007 N. Orange Street
22                             Wilmington, Delaware 19801
                               (302)654-8080
23                             Email:  gmatthews@reliable-co.com

24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
```

1 | APPEARANCES (CONTINUED):

2 | For Brixmor Operating
Partnership:                    Laurel Roglen, Esquire
3 |                              BALLARD SPAHR LLP
                                919 North Market Street
4 |                              11th Floor
                                Wilmington, Delaware 19801
5 |
For Expressway
6 | Marketplace, LLC:            Ivan Gold, Esquire
                                ALLEN MATKINS LECK GAMBLE
7 |                                MALLORY & NATSIS LLP
                                3 Embarcadero Center
8 |                              12th Floor
                                San Francisco, California 94111
9 |
For Gordon Brothers:           Steven Fox, Esquire
10 |                             RIEMER & BRAUNSTEIN LLP
                                Times Square Tower, Suite 2506
11 |                            Seven Times Square
                                New York, New York 10036
12 |
For 5620 Nolensville
13 | Pike, LLC:                  Alan Root, Esquire
                                CHIPMAN BROWN CICERO & COLE, LLP
14 |                            1313 North Market Street
                                Suite 5400
15 |                            Wilmington, Delaware 19801
16 |
For Burlington Coat
Factory Warehouse
17 | Corporation:               Hailey Oestreich, Esquire
                                JACKSON WALKER LLP
18 |                            2323 Ross Avenue
                                Suite 600
19 |                            Dallas, Texas 75201
20 |
For Edgewater Park
Urban Renewal, LLC:            Seth Niederman, Esquire
21 |                            FOX ROTHSCHILD LLP
                                1201 North Market Street
22 |                            Suite 1200
                                Wilmington, Delaware 19801
23 |

24 |

25 |

1  APPEARANCES (CONTINUED):

2  For Aldi, Inc.:          Karen Bifferato, Esquire
                            CONNOLLY GALLAGHER LLP
3                           1201 North Market Street
                            20th Floor
4                           Wilmington, Delaware 19801

5                           James Rossow, Esquire
6                           RUBIN & LEVIN, PC
                            135 North Pennsylvania Street
7                           Suite 1400
                            Indianapolis, Indiana 46204
8
    For Ogden Plaza,
9   BDPM Group, and
    Hartsville DE, LLC:     Carl Kunz, III, Esquire
10                          MORRIS JAMES LLP
                            500 Delaware Avenue
11                          Suite 1500
                            Wilmington, Delaware 19801
12
13  For Highland and
    Sterling, LLC;
14  Big Holdings 2, LLC:    Leslie Heilman, Esquire
                            BALLARD SPAHR LLP
15                          919 North Market Street
                            11th Floor
16                          Wilmington, Delaware 19801

17  For Ross:               Kevin Mann, Esquire
18                          Cross & Simon LLC
                            1105 North Market Street
19                          Suite 901
                            Wilmington, Delaware 19801

20

21

22

23

24

25

1                                INDEX

2   MOTIONS:                                                    PAGE

3   Agenda
4   Item 18:  Ashley Furniture's Motion for Relief          10
              from the Automatic Stay (D.I. 1603,
5             filed 1/7/25)

6   Agenda
    Item 15:  Motion of Debtors for Entry of an Order       11
7             (I) Extending Time to Assume or Reject
              Unexpired Leases of Nonresidential Real
8             Property and (II) Granting Related
              Relief (D.I. 1351, filed 12/13/24)
9
              Court's Ruling:                                21
10

11  Agenda
    Item 13:  Thirty-five Individual Motions Seeking        22
12            to Compel Payment of Asserted
              Administrative Expenses Under Sections
13            503 and 365 of the Bankruptcy Code. For
              Movants and D.I. Numbers, See Attached
14            Exhibit A.

15            Court's Ruling:                                32

16  Agenda
    Item 19:  Motion of Highland and Sterling, LLC and      33
17            Big Holdings 2, LLC to (A) Compel
              Immediate Rejection of Lease and
18            Surrender Possession of the Premises
              Pursuant to 11 U.S.C. § 365 or,
19            Alternatively, (B) Grant Landlord Relief
              from Stay Pursuant to 11 U.S.C. § 362(d);
20            and (C) for Related Relief (D.I. 1605,
              filed 1/7/25)
21

22

23

24

25

5

1
INDEX

2    MOTIONS:                                                        PAGE

3    Agenda
     Item 14: Fourth Notice of (A) Bid Deadline, (B)                  37
4              Sale Hearing, and (C) Potential
5              Assumption and Assignment of Certain
               Unexpired Leases (D.I. 1236, filed
6              11/25/24)

7              Court's Ruling:                                        95

8

9    EXHIBITS:                                                       PAGE

10   Debtors Lease Exhibits                                          38

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (Proceedings commence at 1:01 p.m.)

2           THE COURT:  Good afternoon, everyone.  Please be

3    seated.

4           This is Judge Stickles.  We're on the record in Big

5    Lots, Case No. 24-11967.

6           Good afternoon.

7           MR. SHPEEN:  Good afternoon, Your Honor.  Quickly,

8    I just wanted to do a mic check to make sure everybody on

9    Zoom can hear us at the podium.

10          So, again, good afternoon, Your Honor.  For the

11   record Adam Shpeen of Davis Polk on behalf of the debtors and

12   debtors-in-possession. I am joined today by my colleagues,

13   Brian Resnick, Stephen Piraino, and others from the Davis

14   Polk law firm as well our co-counsel from Morris Nichols.

15          Your Honor, we filed an agenda last week on January

16   16th for today's hearing at Docket No. 1739.  We filed an

17   amended agenda the following day on January 17th at Docket

18   No. 1776, a further amended agenda last night at Docket No.

19   1784, and a yet further amended agenda filed about 45 minutes

20   ago at Docket No. 1798.

21          The good news is that the reason we've been filing

22   so many amended agendas, as my colleague, Mr. Piraino, will

23   discuss, is that many of the items that were originally

24   scheduled to be heard today have either been consensually

25   resolved or we have agreement to adjourn the matter until our

1  next omnibus hearing which is currently scheduled for

2  February 26th.

3        Your Honor, before we get into the specific agenda

4  items we thought it might be helpful to give Your Honor and

5  other parties in interest a brief status update since the

6  sale concluded about two weeks ago.  So, Your Honor, the good

7  news is that the GRP sale transaction was consummated on

8  schedule.  It closed on Friday, January 3rd, the day after

9  Your Honor entered the sale order.  We filed a notice of sale

10  closing on January 6th at Docket No. 1588.

11        Your Honor may have seen that five notices of

12  appeal were filed last week on January 16th, which was the

13  final day of the 14-day appeal period, with respect to the

14  GRP sale order and the accompanying orders shortening notice.

15  I won't discuss in any detail today except to say that the

16  debtors believe that these appeals are meritless and we'll

17  respond in due course.  Since the sale to GRP closed, we have

18  been -- we, the debtors, have been primarily focused on a few

19  critical work streams.

20        First, with respect to the transfer of assets to

21  GBRP and other designated buyers in the winddown of our

22  operations, the debtors and GBRP have been performing under

23  the terms of the sale agreement. The debtors have been

24  receiving payments according to the budget schedule that was

25  worked out as part of the APA and we have been working with

1  GBRP in transferring designated assets in accordance with the

2  asset purchase agreement.  So, that process is proceeding

3  well and at pace.

4      Second, just to preview for Your Honor as a coming

5  attraction, Your Honor may recall that one of the main

6  excluded assets from the GBRP sale was the debtors corporate

7  headquarters where the debtors will retain any proceeds of

8  the sale of the headquarters in excess of $10 million.  The

9  debtors have been in advance discussions with a buyer and

10 have been trading drafts of the sale agreement.  We may be

11 before Your Honor very soon requesting approval to proceed

12 with the sale of that asset.

13     Third, the debtors filed their exclusivity period

14 extension motion with respect to a plan and disclosure

15 statement on January 6th at Docket No. 1590. The debtors were

16 pleased that no parties objected to the requested relief and

17 that this Court enter the exclusivity extension order prior

18 to this hearing at Docket No. 1755.

19     Zooming out, we, the debtors, are in close dialogue

20 with the committee regarding how best to resolve these cases.

21 That is front of mind and we intend to do so to resolve so

22 these cases in a manner that is most efficient, whether

23 that's through a plan, a conversion, or dismissal.  So, no

24 decision has been made yet.  We are actively considering all

25 options but the extension of our exclusive period to file a

1  plan and disclosure statement is certainly helpful with

2  respect to that process.

3         Fourth and finally, one agenda item that we would

4  like to get out of the way at the outset has to do with -- is

5  the two motions filed by Nexus that was scheduled to be heard

6  today. I am pleased to announce that as reflected on the

7  agenda, Nexus has agreed to adjourn both motions to a later

8  date because the debtors and the committee have reached a

9  settlement in principle to resolve our and the committee's

10  objections with respect to those motions.

11         We, the committee, Nexus, are working to document

12  this settlement as we speak via stipulation, which we're told

13  Nexus aims to file under certification of counsel in very

14  short order following this hearing.  So, we wanted to, you

15  know, cross that off of the agenda for today.  And I don't

16  know whether counsel for Nexus is on the line, if they wanted

17  to say anything, so I will pause, but we can move on from

18  that agenda item.

19         So, with that, Your Honor, unless Your Honor has

20  any questions regarding the update, I will turn the podium

21  over to Mr. Piraino to walk through the specific agenda

22  items.

23         THE COURT:  Okay.

24         MR. PIRAINO:  Good afternoon, Your Honor.

25         THE COURT:  Good afternoon.

1          MR. PIRAINO:  Stephen Piraino, Davis Polk &

2    Wardwell on behalf of the debtors.

3          Your Honor, just before going into the substance I

4    just wanted to give a quick roadmap of how we would like to

5    proceed today.  First, there is a stipulation in progress

6    with Ashley Furniture to resolve their lift stay that my

7    colleague, Mr. Winiarski, will go through very briefly just

8    to give the Court an update on that.  We would then like to

9    go through our 365(d)(4) extension motion, address the

10   various administrative expense claim motions that were filed

11   and then end with the various lease sale matters as set forth

12   in the agenda.

13         THE COURT:  Are the parties in agreement to that?

14         MR. PIRAINO:  Okay, thank you, Your Honor.  With

15   that I will just cede the podium quickly to Mr. Winiarski.

16         MR. WINIARSKI:  Good afternoon, Your Honor.  Kevin

17   Winiarski, Davis Polk, on behalf of the debtors.

18         I rise now just to briefly discuss the Ahsley

19   Furniture lift stay motion, which Ashley filed at Docket No.

20   1603.  As Your Honor may know from Ashley's papers, the

21   motion sought to lift the automatic stay so that Ashley could

22   liquidate certain furniture inventory that had previously

23   been manufactured and designated for sale to the debtors

24   pursuant to the terms of a custom supply and manufacturing

25   agreement between Big Lots and Ashley.

1        Your Honor, I am pleased to report that as we

2   previewed in the amended agenda, the debtors, Ahsley, and

3   GBRP have reached a business deal in principle that would

4   allow for the listing of the stay subject to certain terms

5   and conditions on the resale of the afore mentioned furniture

6   inventory.  The parties are currently working to document

7   these terms and a revised form of order which we will expect

8   will be filed under COC by Ashley shortly after this hearing.

9        So, as we noted in the amended agenda, Ashley's

10  motion is not going forward today and we thank both Ashley

11  and GBRP's counsel for working constructively over the last

12  week to resolve the matter. Unless Your Honor has any

13  questions or Ashley's counsel, Mr. Schwaberg (phonetic), I am

14  not sure if he is on the line, has anything to add I will

15  turn the podium back over to Mr. Piraino.

16        Thank you.

17        THE COURT:  Okay, does anybody want to be heard

18  with respect to Ashley?

19      (No verbal response)

20        THE COURT:  Okay, I hear no one.

21        MR. PIRAINO:  Your Honor, again for the record,

22  Stephen Piraino, Davis Polk & Wardwell.

23        Your Honor, I now would like to turn to Docket No.

24  1351 which is the debtors motion for an extension of the

25  365(d)(4) deadline.  The debtors initial 120 day period to

1   assume or reject their unexpired leases expired on January

2   7th, 2025 and this Court entered a bridge order at docket No.

3   1551 extending the deadline through and including today.  The

4   debtors are seeking an extension of the deadline through and

5   including April 7th, 2025 which would be the full 210-day

6   period permitted by the bankruptcy code.

7          As of today, the debtors have over 850 leases and

8   extension of the 365(d)(4) deadline is a critical component

9   to GBRP getting the benefit of its bargain on the designation

10  rights it purchased as part of the asset purchase agreement

11  approved by this Court.  The GBRP sale order at Docket No.

12  1556 confirms this.  There is a finding in Paragraph (u) that

13  states, and I quote, "The designation rights are an integral

14  part of the APA and the sale."

15         As Your Honor will recall from the sale hearing,

16  GBRP purchased designation rights for all of the debtors

17  leases and under the APA the designation rights period would

18  run through February 28th, 2025 and can be extended by GBRP

19  in its sole discretion until March 31st, 2025. The debtors

20  submit that given the designation rights period in the APA

21  extending the deadline as requested in the motion is

22  appropriate under the circumstances.  GBRP certainly needs

23  the certainty that it could exercise their rights as

24  bargained for under the APA and to the extent GBRP does not

25  designate a lease during that period the debtors will need

1  time to determine what to do with those leases which is why

2  the full 210, instead of just to March 31st, is appropriate

3  here.

4         Your Honor, Section 365(d)(4) provides that the

5  deadline can be extended for cause which is, as we know, not

6  defined in the bankruptcy code.  Rather, the decision to

7  extend is within the sound discretion of the Court.  As set

8  forth in our papers, there are certain non-exclusive factors

9  that courts have used to evaluate whether cause exists.  The

10 so-called Burger Boys factors.  We believe that the record in

11 these cases, particularly after the sale hearing,

12 demonstrates that the factors do weigh in favor of extending

13 the deadline.

14        Again, I won't go through all of the factors but,

15 for example, the leases are certainly an important asset of

16 the estate and, again, I will point back to that Paragraph

17 (u) of the sale order that I just quoted.  And, obviously,

18 the value of the designation rights are derivative of the

19 value of the leases themselves.  These cases are certainly

20 complex given the number of leases across the country,

21 numerous landlords.  While the debtors have been before the

22 Court since September, the sale to GBRP has only closed three

23 weeks ago. Importantly, as set forth in the record of the

24 sale hearing, GBRP is paying the go-forward occupancy

25 expenses as set forth in the APA and the agency agreement.

1    Your Honor, there were eight objections filed.  We

2  are pleased that we resolved all but one at this point.  Just

3  to go through those quickly:

4    Docket 1435 was filed by various landlords, that

5  has been withdrawn.

6    Docket No. 1439 was filed by Core Shoppes, also

7  withdrawn.

8    Shortly before the hearing Steger Towne Crossing

9  withdrew their objection.  Their objection was filed at 1440.

10    We were able to resolve in advance of the hearing

11  the objections filed by Commodore at 1447 and Kin at 1438.

12    Then we have also had constructive dialog with Mr.

13  Gold who filed an objection at Docket No. 1701 and Ms. Roglen

14  who filed at Docket 1703.  With respect to Mr. Gold, I think

15  we are just confirming some amounts but we should, otherwise,

16  be there.  And with respect to Ms. Roglen who has a good

17  number, as you know, of landlords in this case, we are still

18  confirming a few numbers but believe that we have resolution

19  as set forth -- as I will set forth right now.

20    I guess two pieces to that.  One, we are continuing

21  to go through our records to make sure that our records, the

22  landlords records on go forward expenses are clarified, that

23  everything matches up.  Second, realizing that there is a

24  good amount of work to do to go through the 20 or so leases

25  that are remaining, what we would propose solely with respect

1  to the leases at 1703 is to extend the deadline to our next

2  omnibus hearing.  Hopefully by then it will all be resolved

3  and that we could then announce a resolution and have it

4  extended for the full period but certainly understand Ms.

5  Roglen's desire to reserve rights there.

6        So that really leaves just one objection which was

7  the objection filed at 1414 by Edgewater Park and this was

8  filed on December 23rd and I think the date here is

9  particularly relevant.  It was filed after the status

10  conference on December 19th where we announced that the Nexus

11  sale was not going forward but it was before the GBRP sale

12  hearing, before the sale was approved, before the motion was

13  even filed.  We think that the facts have certainly changed

14  since the filing of that objection.

15        For example, the movant there alleges that, and I

16  am quoting from the objection, "There is little reason to

17  suspect that the unexpired leases will play a crucial role in

18  the debtors reorganization."  Obviously, the designation

19  rights and the GBRP APA certainly undercuts that.  And given

20  that the facts and circumstances are very different the

21  debtors, through the GBRP sale order, are paying the go

22  forward freight we believe that the objection should be

23  overruled.

24        So, I will just pause there.

25        THE COURT:  Okay, let me hear from the objector.

1          MR. ALBERTO:  Good afternoon, Your Honor.

2          THE COURT:  Did the committee want to be heard?  I

3    just -- let me hear anybody who is in support of the motion.

4          MR. ALBERTO:  Thank you, Your Honor.  Justin

5    Alberto from Cole Schotz on behalf of the committee.

6          Very briefly, a little less then a month ago we

7    stood before this Court and took the position that allowing

8    the GBRP liquidation, as opposed to immediate conversion was

9    in the best interest of these estates as the most value

10   maximizing alternative that was available at that time but

11   only on the express condition that stub-rent and post-

12   petition rent continued not only to be budgeted but paid.

13         I understand this to be the case.  We thank the

14   debtors and their professionals and the landlords ands their

15   professionals in working through the reconciliations but as

16   long as that is the case the UCC supports this motion which I

17   believe is necessary to give effect to the GBRP APA and allow

18   these liquidations to continue.

19         Thank you.

20         THE COURT:  Thank you.

21         MR. FOX:  Good afternoon, Your Honor.  Steven Fox,

22   Reimer & Braunstein, on behalf of Gordon Brothers Retail

23   Partners LLC in its capacity as buyer under the asset

24   purchase agreement approved by Your Honor in your January

25   2nd, 2025 order.

1       I won't repeat everything that Mr. Piraino said,

2   but suffice it to say that the designation rights, as

3   reflected in this Court's order, were a critical and

4   essential component of the asset purchase agreement and the

5   overall transaction approved by this Court.  To date, my

6   client has committed over $400 million to this transaction

7   between the initial purchase price payment, stub-rent

8   payments and the budgeted expenses in addition to the amounts

9   payable under the agency agreement which is part of the asset

10  purchase agreement.  A critical component of that is the

11  designation rights.

12      As Your Honor will see in the last three items on

13  today's agenda, we have been working diligently with the

14  debtors and third parties to realize value in respect of the

15  designation rights.  We do expect, as has been publicly

16  announced, that Variety Wholesalers, our partner in this

17  transaction, will be designating not fewer then 200 stores as

18  early as this Friday which will be the subject of notices

19  that will be filed with the Court shortly thereafter but this

20  process is moving a pace with diligence and vigilance and

21  with the cooperation of all the parties concerned.  We

22  believe that the 365(d)(4) extension is not only warranted

23  here but also essential in order to give us the full benefit

24  of the transaction that was previously approved by this Court

25  and we would ask that you do so today.

1       Thank you, Your Honor.  Happy to respond to any

2   questions you may have.

3       THE COURT:  No thank you.

4       MR. GOLD:  Good afternoon, Your Honor.  Ivan Gold

5   of Allen Matkins.

6       We had filed an objection, as Mr. Piraino noted, at

7   1701 on behalf of two landlords affiliated with River Oaks

8   Properties.  Just so the record is clear and complete, we

9   have been working with the debtors.  The stub-rent has been

10  paid, other sums have been paid.  There are, I'll call it,

11  some loose ends or short pays with respect to January that in

12  the big scheme of things are de minimis enough that we will

13  figure out a way to solve that problem.  Obviously, with the

14  appropriate reservation of rights if we don't but with that

15  those remedies would be separate from the (d)(4) objection.

16  Our objection at 1701 can be considered resolved and

17  withdrawn for purposes of an extension.

18      THE COURT:  Thank you.

19      MR. GOLD:  Thank you, Your Honor.

20      UNIDENTIFIED SPEAKER:  Good afternoon, Your Honor.

21      THE COURT:  Excuse me, one more.

22      UNIDENTIFIED SPEAKER:  I'll sit back down.

23      THE COURT:  Ms. Roglen.

24      MS. ROGLEN:  Good afternoon, Your Honor.  Laurel

25  Roglen of Ballard Spahr on behalf of various landlords.

1        As. Mr. Piraino noted, we did file an objection to

2   the 365(d)(4) extension motion at Docket No. 1703.  We have

3   approximately 30 remaining leases that have not yet been

4   rejected in these cases and we have been working diligently

5   with our clients, and with the debtors, and their

6   professionals to identify any issues with payment of post-

7   closing lease obligations and stub-rent.  We have identified

8   about a dozen right now that haven't been resolved yet but

9   that is just, frankly, I think largely a function of timing

10  from when the sale closed, when those obligations became due,

11  when Gordon Brothers funded, when those payments were then

12  made to landlords.

13       So, we agree with the resolution, as Mr. Piraino

14  noted, that we will do an extension with respect to our

15  clients, we will agree and will not oppose entry of an order

16  extending the 365(d)(4) deadline through the next omnibus

17  hearing date on February 26th to hopefully allow us to

18  resolve all these issues and if not to bring it back before

19  this Court, of course, without prejudice to rights of the

20  debtors to obtain a further extension at that time.

21       Thank you, Your Honor.

22       THE COURT:  Anyone else?

23       MR. NIEDERMAN:  Thank you, Your Honor.  Seth

24  Niederman from Fox Rothschild on behalf of Edgewater Park

25  Urban Renewal, LLC.

1          Your Honor, we did file an objection.  As we state

2    in our papers, our client has prospective tenants that are

3    interested in the property and are asking for when they can

4    get it, when it will be available, which is an uncertain item

5    at this point.  We feel that the 120 days have passed, more

6    then 120 days, with the bridge order and that it is

7    appropriate, at least as to our lease and we are not saying

8    in total as to the motion, that the deadline not be extended.

9          I understand the argument as to the change in

10   circumstances but from what I hear on that argument is that

11   the extension is critical to GBRP, not to the debtors.  That

12   is an important distinction.  GBRP bought these designation

13   rights subject to a looming deadline to assume or reject.  At

14   this point extending it would be doing so for the benefit of

15   GBRP not for the debtors.

16         So, I will rest there on my papers.  Beyond that,

17   happy to answer any questions but we feel, at least, as to

18   the Edgewater lease the deadline should not be extended.

19         THE COURT:  I'm curious, have there been

20   communications with respect to specifically the Edgewater

21   Park lease?

22         MR. NIEDERMAN:  I know there have been discussions

23   about payments but as to the assumption or rejection not to

24   my knowledge.

25         MR. PIRAINO:  Your Honor, for the record Stephen

1  Piraino, Davis Polk & Wardwell, on behalf of the debtors.

2           Just very briefly, Your Honor, I think the first

3  point sort of who is this important to, of course, its

4  important to GBRP but its equally important to the debtors

5  who are a party to the APA.  This is a core of our

6  reorganization, the core of these cases, and we have

7  obligations under the APA, you know, including to insure that

8  GBRP can exercise its designation rights so incredibly

9  important to us.

10          Then, you know, with respect to ongoing

11  discussions, you know, myself, Mr. Fox, we are always

12  available to discuss with folks.  You know, we are happy to

13  have conversations.  That being said, you know, we do believe

14  that there is sufficient cause to extend the deadline and we

15  appreciate that folks are reserving rights, as Ms. Roglen and

16  Mr. Gold said, but we do believe that is appropriate to

17  extend the deadline at this point.

18          THE COURT:  Do you want to be heard further?

19          MR. NIEDERMAN:  Nothing further, Your Honor.

20          THE COURT:  I am going to overrule the objection of

21  Edgewater Park and grant the extension but I want Edgewater

22  Park continued to the next hearing together with Ms. Roglen.

23  I do find, as a general matter, that cause exists to extend

24  the deadline for 90 days including the importance of

25  preserving optionality with respect to the leases and the

1  time required to give effect to the designation rights.  But

2  as required by 365(d) debtors must continue timely payment on

3  account of post-petition rent obligations arising with

4  respect to these unexpired leases.

5       MR. PIRAINO:  Thank you, Your Honor.  Understood.

6  We will work right after this hearing, or, frankly, folks at

7  our office can do it during this hearing, with counsel to

8  Edgewater and with Ms. Roglen on the form of order which we

9  will submit under COC so we can get that signed up today.

10       THE COURT:  Okay, thank you.

11       MR. NIEDERMAN:  Thank you, Your Honor.  May I be

12  excused?

13       THE COURT:  Yes, you may be excused.

14       MR. PIRAINO:  And if Your Honor will just allow me

15  to grab my notes that I forgot.

16       THE COURT:  Yes, certainly.  And anyone else who

17  wishes to be excused after their matter is presented feel

18  free to leave.

19       MR. PIRAINO:  Okay, Your Honor, the next place that

20  we would like to go is on the administrative claims motions.

21  There are three that are before the Court today and before

22  ceding to counsel who has filed -- the Morris James firm

23  filed those three motions.  I did want to give Your Honor an

24  update on where we stand given the volume that were filed and

25  as Mr. Shpeen mentioned in his opening remarks that we are

1 proposing a process for the reconciliation of administrative

2 expense claims.

3          So, there are two categories of these, the trade

4 vendors and the landlords.  Starting with the trade vendors,

5 six movants had filed motions before the sale hearing and an

6 additional 17 were filed after the sale hearing that were

7 originally noticed for today.  Just, you know, for sake of

8 completeness there are a good number of motions that were

9 originally set for the February hearing.  So, just focusing

10 on what was originally noticed for today.

11          Of those 23 motions, each of the movants has agreed

12 to adjourn until the February omnibus hearing and I do just

13 want to specifically note two of those motions, Giftree

14 Crafts Docket No. 1584, and Hybrid Promotions Docket No.

15 1421.  We have, obviously, been in contact with counsel to

16 all of the movants but with respect to Giftree specifically,

17 you know, we have taken a look at our records, they have

18 taken a look at their records, I think we have a very small

19 difference, about $5,000.

20          So, we are happy to continue working with Miss

21 (indiscernible), counsel to Giftree, to make sure that our

22 numbers align with their numbers.  Similarly, with Hybrid

23 Promotions, we and AlixPartners have been in repeated contact

24 with their counsel, Mr. Carroll, and understand the delta

25 between their asserted claim amount and what our records show

1  is also quite small.  So, you know, we will certainly

2  continue working with Mr. Carroll to reconcile those amounts

3  on our end.

4         Then with respect to the landlord movants, there

5  were 12 motions filed for stub-rent and other amounts

6  purported to be due under Section 365(d)(3). So, of those 12

7  we were able to fully resolve one, Paragon Windermere and

8  Lebanon Windermere (phonetic), that was for stub-rent and

9  that has been paid in accordance with the GBRP sale order.

10 The remaining motions were either adjourned, those eight, or

11 the three motions filed by the Morris James firm, Ogden

12 Plaza, BDPM Group, and Hartsville which are going forward

13 today.

14        Just to say, you know, we strongly believe going

15 forward on those three motions today is not the right -- it's

16 inappropriate given the circumstances of the case right now.

17 We are continuing to reconcile amounts that are due.  We

18 think it's appropriate to, frankly, let the process play out

19 a little bit more.  As Mr. Fox noted, there will be further

20 clarity at the end of the week which stores are being

21 assumed. If the stores are being assumed cure costs are

22 naturally going to take care of these amounts; otherwise, we

23 are continuing to reconcile and it does take time.  I will,

24 you know, let the Morris James folks handle their motion and

25 we can respond at that point.

1          THE COURT:  Can I stop you there a minute.

2          MR. PIRAINO:  Sure.

3          THE COURT:  Is there an actual process in place.  I

4    know the motion, you know, asked for the Court to defer until

5    there was a process.  Is there a process?

6          MR. PIRAINO:  So, Your Honor, we are going to be --

7    this leads me, sort of, to the next piece of this which is to

8    give a walkthrough of the --

9          THE COURT:  Yes.

10         MR. PIRAINO:  -- proposed procedures.  So, we are

11   going to be filing a motion with these procedures.  We are

12   continuing to work with Mr. Alberto and the committee on

13   them.  We will be sharing a form of the motion with them.

14   Obviously, welcome their feedback.  But if Your Honor would

15   allow, I just would like to walk through what we are

16   proposing to do.

17         So, thinking of this as, sort of, three pillars.

18   The first pillar of the procedures would be the establishment

19   of a bar date for pre-sale closing administrative claims.

20   So, everything up to January 3rd we would propose, again

21   subject to discussions with the committee, around 21 days for

22   a bar date which we believe would give folks adequate notice.

23   The second pillar of that is, you know, the actual allowance

24   process.  While, you know, we do need to set a bar date we

25   also don't want to make this unduly burdensome on creditors.

1  So, we think that the most transparent and equitable way to

2  reconcile the claims would be to file and serve, essentially,

3  a schedule like we would do with prepetition claims that list

4  out what the debtors believe to be their administrative

5  expense exposure for trade vendors, for landlords.

6        If a claimant agrees with what is scheduled then no

7  further action is required. If they don't agree with what is

8  scheduled, they would file a proof of claim form.  We would

9  provide a form with our motion. The debtors would then have a

10 period of time to reconcile any disputed amounts.  And we are

11 hopeful that we, of course, could continue working

12 constructively with parties to avoid coming back before the

13 Court but if there is an amount that we can't reconcile then

14 we would seek Your Honor's intervention.

15       So, you know, again, the procedures are not in

16 front of you today.  There are a couple of details that need

17 to be ironed out but we do believe rather than the filing of

18 -- I think we are probably at 50 plus motions and expending

19 estate resources, resources of everyone in this room going

20 motion by motion that doing a process like this will both

21 protect claimants rights and promote judicial efficiency and

22 economy.

23       THE COURT:  So, speaking of resources and economy,

24 so for those parties who have already filed motions would

25 they then have to file separate --

1          MR. PIRAINO:  No, Your Honor.  We will, of course -

2  - they will be scheduled and if -- you know, just to use an

3  example, if we schedule it for $1 and in their motion, they

4  ask for $5 they won't have to file a separate claim.  We will

5  know that from the filing of the motion and what they

6  asserted in there that there is a disputed amount.

7          THE COURT:  Okay, and would you anticipate getting

8  this motion on file for a February hearing?

9          MR. PIRAINO:  Yes, Your Honor.  We would like to

10  get it on file in advance.  February 11th would be 14 days'

11  notice but we are working hard to get it on file in advance

12  of that so that it could then be heard on the 26th.

13          THE COURT:  Okay, is the hearing February 26th?

14          MR. PIRAINO:  Yes.  So, I guess the 12th is the 14

15  days.  Math is not my strong suit today.  And, Your Honor,

16  just to say, at this point with the -- again, I will cede the

17  podium in just a minute to the ones that have not been

18  adjourned but we do believe that granting any of the motions

19  at this point would just, sort of, undermine the process.  We

20  realize there is not a motion before you but we were able to

21  get, you know, 30 some odd folks on board with the contours

22  of this process and we believe it would be unfair to the

23  remaining claimants to, sort of, do these on an ad hoc basis.

24          THE COURT:  Okay.

25          MR. ALBERTO:  Good afternoon, again, Your Honor.

1  Justin Alberto, Cole Schotz, on behalf of the committee.

2          The committee is fully supportive of claims being

3  filed, reconciled to whatever extent possible, ultimately

4  paid as quickly as possible.  That process should be orderly

5  and organized both to give claimants a fair opportunity to

6  submit their claims and also to minimize any costs of the

7  estate professionals expended in reconciling them.  What that

8  process shouldn't be, Your Honor, is a race to the

9  courthouse.  That would be inconsistent with this Court's

10  precedent and while it may benefit a few, I would believe it

11  would cause more harm to the many since not every creditor in

12  this case has the benefit of attentive counsel and likely

13  won't understand that they even have to file a claim until

14  they receive notice of an admin claims bar date.

15          So, with that, Your Honor, I think these are better

16  off left for an orderly process and we look forward to

17  continuing to work with the debtors in what that process and

18  the details look like.

19          THE COURT:  Okay, can I ask one question --

20          MR. ALBERTO:  Of course.

21          THE COURT:  -- before the debtors and the committee

22  sit down.  Do I understand that you talked about the pre-sale

23  closing and I think I might have derailed your presentation.

24  Were there more than one bucket?

25          MR. PIRAINO:  So, Your Honor, for the record

1  Stephen Piraino.

2          With respect to the procedures, it would just be

3  for the pre-sale. The post-sale will be paid in accordance

4  with the administration budget as noted at the sale hearing.

5          THE COURT:  Okay.  Mr. Kunz.

6          MR. KUNZ:  Good afternoon, Your Honor.  Carl Kunz

7  on behalf of objections filed by Ogden at 1436, BDPM at 1451,

8  Shops at Hartsville at 1566.

9          Your Honor, I appreciate the debtors wanting a

10 streamlined process but I will start with, you know, we were

11 at a hearing for a long time on New Years Eve where the issue

12 of what exactly go forward expenses were and which ones were

13 going to be paid, we had been asking for a month as to

14 whether that includes the true ups that had been billed and

15 will become due under 365(d)(3) that Your Honor just said is

16 material with respect to, at least, in this particular

17 circumstance BDPM, which is owed $45 plus thousand dollars as

18 of tomorrow, and Shops at Hartsville which will be owed

19 $22,000 plus as of the 27th, next Monday.

20          All we did, Your Honor, we were happy to continue

21 with the other 32 motions that were filed as long as we got

22 assurances that those amounts would be paid as and when due.

23 The debtors would not provide that confirmation and have not

24 provided that confirmation as of today.  And the fact is,

25 Your Honor, there was absolutely no substantive response to

1   our motion.  Despite having the bills for over a month or a

2   month, there has been no question about those bills whether

3   they're due, whether they're appropriately calculated; they

4   have had them and we have had not response as to whether they

5   have a question about them or whether they are going to pay

6   them most importantly.

7           Instead, the response says, well, we shouldn't have

8   to do anything.  We're going to provide a process for dealing

9   with administrative claims that Your Honor just heard.  The

10  fact is there is a process, its called 365(d)(3).  Those

11  amounts become due under the terms of the lease within 30

12  days of being billed.  They have been billed.  The debtors

13  ought to be able to know now whether those amounts are going

14  to be paid or not.  That is all we ask.  If they are not, one

15  of my clients wants to immediately cease GOB sales at their

16  property, that's BDPM, and have that lease returned to them

17  immediately.  If they are going to be paid then BDPM, like

18  others, will have to ride out the process so long as those

19  amounts are being paid in the ordinary course but as of right

20  now, we have no assurances that those amounts are either

21  budgeted or are going to be paid in the ordinary course.  We

22  think we are entitled to that.

23          So, Your Honor, again, BDPM is due $45,000 plus as

24  of tomorrow and Shops at Hartsville is due $22,000 plus as of

25  January 26th but I think its ultimately Monday, if I have my

1  dates correct.  Your Honor, that is all that we are asking

2  for is a confirmation today, no testimony, no anything.  Our

3  go forward expenses under 365(d)(3) that are becoming due are

4  they going to be paid.  I don't need to wait for an

5  administrative process that may be heard at the end of

6  February.  We are not lumped into that administrative

7  process.  Some of my clients are.  Some of my clients had

8  pre-closing administrative claims and they will be in that

9  process but for, at least, BDPM and Hartsville they are not

10  in that process with respect to these payments and I would

11  like to know whether they are not going to be paid or not.

12         Thank you.

13         THE COURT:  Okay, let me hear from the debtors.

14         MR. PIRAINO:  Your Honor, for the record Stephen

15  Piraino, Davis Polk & Wardwell.

16         Your Honor, with respect to the asserted amounts,

17  you know, the debtors are happy to continue to work with Mr.

18  Kunz.  Again, I think we do need to go -- there is, again,

19  over 800 some odd leases here. I do think we need to

20  reconcile our records against his and be given an opportunity

21  to do that.  We are not looking to undo the sale order or

22  what was budgeted. It will be paid pursuant to the sale

23  order.  We just need the opportunity to go through these and,

24  again, we are happy to work with Mr. Kunz on that.

25         THE COURT:  Anyone else want to be heard?

1     (No verbal response)

2          THE CORUT:  I am very sympathetic -- Mr. Kunz, did

3     you want to be heard?

4          MR. KUNZ:  No, Your Honor.

5          THE COURT:  Okay. I am very sympathetic to the

6     objectors in this case but I also agree with the debtors and

7     the committee that under the facts of this case it isn't a

8     prudent use of time or expense engaging in ad hoc litigation

9     of claims.  So, the debtors really do need to implement,

10    timely implement, an orderly process to reconcile and

11    determine the validity of administrative expense claims.

12    It's important that this process be orderly and equitable but

13    its also important that the debtors communicate with

14    creditors.

15          So, at the expense of sounding like your mom, I am

16    going to suggest that the parties here speak because I don't

17    want the end of February to roll around and we're in the same

18    predicament we are here today adjourning because we haven't

19    had an opportunity to look at claims.  And I mean that as no

20    disrespect to anyone.

21          MR. PIRAINO:  Of course, Your Honor. Completely

22    understood.  We definitely will use the time between now and

23    the next hearing to resolve as much of this as we can.  We

24    certainly want to get people on board with the procedures and

25    folks such as Mr. Kunz who believe that it may be a post-

1  closing and covered by the APA, we will certainly work with

2  him and hopefully not have to bring any further disputes

3  before Your Honor.

4          THE COURT:  Thank you.

5          MR. PIRAINO:  Thank you, Your Honor.

6          THE COURT:  I welcome disputes.  What I don't

7  appreciate is when parties indicate that they haven't gotten

8  responses and that is all I am asking is to have

9  communication.

10          MR. PIRAINO:  Understood, Your Honor.

11          THE COURT:  You may disagree ultimately, and that's

12  fine, but communicate.

13          MR. PIRAINO:  Understood, Your Honor.  And at this

14  point I think the next group of items on the agenda relate to

15  certain lease matters, so I will cede the podium to my

16  colleague, Mr. Goldberger.

17          THE COURT:  Okay.

18          MR. GOLDBERGER:  Good afternoon, Your Honor.  Jacob

19  Goldberger, Davis Polk, on behalf of the debtors.

20          There is one item that I think we can dispense with

21  quickly and that is the motion that Ms. Heilman filed to

22  compel rejection.  We have been working constructively with

23  the counterparties there.  You know, the debtors filed this

24  morning a notice of designation rights notice that we

25  believe, and we're in agreement with Ms. Heilman, can push

1  this matter.  I think we are going to reach out to Chambers

2  to see if we can find some time to schedule calendars

3  approving at the end of that designation period, some time in

4  February, but I will cede to Ms. Heilman.

5          THE COURT:  Okay, bring me up to speed.  Sorry, I

6  am not sure what all has been filed. I have been focusing

7  exclusively on the agenda so if there is something else

8  filed, please let me know.

9          MS. HEILMAN:  Good afternoon, Your Honor.  For the

10  record Leslie Heilman of Ballard Spahr on behalf of the

11  landlord, Highland and Sterling, LLC and Big Holdings 2, LLC,

12  for Big Lots store located in National City, California.

13          I am happy to bring you up to speed with respect to

14  the motion that I am presenting today; although, Mr.

15  Goldberger almost stole my thunder.  But we are here today on

16  the landlords motion to compel the immediate rejection of the

17  lease and surrender of the premises or in the alternative we

18  sought relief from stay which was filed as a result of a

19  number of the debtors defaults, among other reasons, with

20  respect to the lease and it was filed at Docket 1605 on

21  January 7th.

22          The debtors in turn filed an objection to the

23  motion on January 15th at Docket No. 1727 which did make an

24  umber of factual assertions that we don't believe were

25  supported by any evidence. So, in response we did serve them

1   with discovery on January 16th with a return date of

2   yesterday at noon.  The debtors have objected to those

3   document requests in their entirety so all those responses

4   are still outstanding but notwithstanding the debtors

5   informally provide the landlord with two schedules to the APA

6   that they believe are responsive to the landlords request and

7   the landlord is still reviewing those documents.

8           In addition, since the filing of the motion, the

9   debtors have communicated to the landlord that the utilities,

10  security system and insurance to the premises have been

11  reinstated and will remain in place, at least, through the

12  end of January.  An open point, Your Honor, with respect to

13  that immediate harm to the landlord is that we will need to

14  work to make sure the February operating expenses are

15  covered.  And about two hours before today's hearing the

16  debtors now have filed a designation notice designating the

17  lease for assumption and assignment to Burlington Coat

18  Factory; nothing like waiting till the last minute.

19          THE COURT:  I enjoyed reading your papers.

20          MS. HEILMAN:  Your Honor, we do believe that many

21  of the issues presented by the motion continue to exist but

22  we also recognize the economy is a scale and we do believe

23  there is some overlap in the issues that will be determined

24  in connection with the assignment notice.  In that regard we

25  do believe that we would like to treat today as a scheduling

1   conference on the motion and we would like to seek some time

2   though from Your Honor before the February 26th omnibus

3   hearing because time is of the essence. This lease is sitting

4   dark and there are reasons its in considerable default. The

5   stub-rent has not been paid.  So, the landlord continues to

6   be harmed here but we do believe there is an overlap and we

7   want to use the time to respond to the assignment notice,

8   raise the issues that are present in our motion in

9   conjunction with there, and reach an agreement on a schedule.

10       Shortly before the hearing, the parties were able

11  to confer and they do believe the week of the 10th is open

12  for the parties.  Mainly the 13th is all parties seem to be

13  available if Your Honor is available.  That is a date that we

14  would like to set a hearing that week.

15       THE COURT:  Okay, I am going to have Chambers look

16  for a date while we're here and we will get back to you.

17       MS. HEILMAN:  In addition to that, Your Honor, I

18  believe the objection deadline on the assignment notice will

19  be February 4th.  The week of -- we were talking about the

20  week of the 10th for a hearing and February 10th as a reply

21  deadline for both parties, both the landlord to reply to its

22  motion and for the debtor to reply to any objection filed by

23  the landlord.

24       In the meantime, I do believe the parties will

25  continue to work consensually to resolve the issues. There

1  are discussions ongoing with respect to the stub-rent, the

2  payment of the stub-rent.  The landlord is in discussions

3  with Burlington. All parties are working towards a resolution

4  and we do hope that we will narrow any issues prior to that

5  hearing.

6          THE COURT:  Okay, I appreciate the parties working

7  together. Thank you.

8          MR. GOLDBERGER:  Your Honor, that brings us to the

9  next lease sale matter which is a lease sale, proposed

10 assumption and assignment to Burlington for the lease in

11 Nashville.  This is something that the debtors and GBRP seek

12 to pursue.  As an initial matter we filed, in connection with

13 our reply to objections from the landlord and from Ross a

14 motion to seal the Ross lease.  We would appreciate if the

15 Court could enter that motion as an initial matter.

16         THE COURT:  Does anyone object to the sealing of

17 the Ross lease?

18    (No verbal response)

19         THE COURT:  Okay, I hear no one.  I will enter that

20 order.

21         MR. GOLDBERGER:  Thank you, Your Honor.

22         There are four pieces of evidence that we would

23 like to enter into evidence that we have listed on our

24 exhibit list for today that we filed this morning.

25         THE COURT:  Do you have a copy of that exhibit list

1  or can you tell me a docket number?

2          MR. GOLDBERGER:  The four items are the debtors

3  lease, the Ross lease, Ross is a co-tenant in the shopping

4  center, the first leased modification is the debtors lease

5  modification, and the memorandum of lease of the Ross lease.

6  So, those are the four items that we understand all parties

7  are in agreement to enter into evidence.

8          THE COURT:  Does anyone object to the admission

9  into evidence of those four documents, which are Docket

10  Numbers 1737-1, 17 -- they're all 1731.  Anyone object?

11      (No verbal response)

12          THE COURT:  Okay, I hear no one.  They're

13  admitted.

14      (Exhibits received in evidence)

15          MR. GOLDBERGER:  Thank you, Your Honor.  With

16  respect to the objections themselves and the question before

17  Your Honor, the question before Your Honor today is very

18  narrow.  Let me start by explaining what the question is not.

19  The question is not whether the debtors' lease allows for

20  this assumption and assignment to Burlington.  The assignment

21  and use provisions of the debtors' lease undeniably provide

22  authority for the debtors to assign this lease to Burlington.

23          With respect to Ross's restrictive use provision

24  referencing Burlington, the applicable state law is clear.

25  The debtors' bargained for the expanse of assignment and

 1   usage rights they have under their lease. and Ross and the

 2   landlord were in no position to unilaterally restrict those

 3   rights at a later point.  The landlord and Ross admit as

 4   much.  Neither objection so much as mentions the debtors'

 5   lease in connection with this issue.

 6          The issue before Your Honor today really has

 7   nothing to do with the debtors' lease at all.  Rather, the

 8   question before Your Honor is the narrow legal question of

 9   interpreting Section 365(b)(3).  Those provisions describe

10   the heightened standard for adequate assurance in the

11   shopping center context and require, in part, adequate

12   assurance that the assignment of the lease will not breach

13   any exclusivity provisions in other leases in the shopping

14   center.

15          The question is simple:  Are those Code provisions

16   intended to protect the rights landlords bargain for in their

17   leases with debtor tenants, or did Congress gift landlords

18   new rights they don't have under applicable state law simply

19   because a debtor/tenant filed for bankruptcy.  The answer,

20   Your Honor, is clear in the words of the Code, the

21   legislative history, and case law.

22          Under the Code, adequate assurance is only

23   assurance of obligations existing under the debtors' lease.

24   What 365(b)(3)(C) means is that, to the extent that the

25   debtors' lease requires them to abide by restrictive

1  provisions in other shopping center leases, compliance with

2  those restrictions must be adequately assured upon lease

3  assumption and assignment.

4          What 365(b)(1) says is that the trustee must

5  provide adequate assurance of future performance under such

6  contract or lease.  The entire concept of adequate assurance

7  is to assure performance of obligations under the relevant

8  lease.  365(b)(3) then adds that for the purposes of

9  paragraph (1) of this subsection, adequate assurance of

10 future performance of a lease of real property in a shopping

11 center includes adequate assurance, et cetera.  By its

12 explicit language, 365(b)(3) is clarifying the words adequate

13 assurance of paragraph 1, it is not impacting the fact that

14 adequate assurance is entirely assurance of performance under

15 such contract or lease.

16         The intent of 365(b)(3) is simple.  In the

17 shopping center world, many landlords enter into carefully

18 structured leases that preserve a certain tenant mix and

19 interact with other leases in intentional ways.  Often, if

20 one stick is pulled out, the whole tower can collapse.

21 Congress made clear in 365(b)(3) that to the extent a

22 debtor's lease was designed to be subject to other leases in

23 a shopping center, the landlord's interest in keeping the

24 shopping center structure intact is valuable enough to

25 enforce against the debtor and their assignee, but Congress

1   is not simply giving out freebies on the back of a bankrupt

2   debtor.  The legislative history says the same thing.

3          As the Third Circuit Court of Appeals in the

4   Joshua Slocum case said that the intent of Congress in

5   365(b)(3) is to assure a landlord of his bargained-for

6   exchange.  The Fourth Circuit in In re Trak Auto also

7   explained that, "Congress's purpose in 365(b)(3)(C) is to

8   preserve the landlord's bargained-for protections with

9   respect to premises use and other matter that are spelled out

10  in the lease between the debtor and the tenant."

11         365(b)(3) is all about protecting existing rights,

12  not creating new ones.  The case law says the same thing.  In

13  the Toys "R" Us bankruptcy, the debtor tenant sought to

14  assign a lease to Burlington in the face of a restrictive use

15  provision in a Ross lease, the same facts that are here

16  today.  The Toys "R" Us court concluded that the preexisting

17  Toys R Us lease was not subject to the Ross exclusive use

18  provision or restrictive use provision under state law and

19  that, therefore, 365(b)(3) was inapplicable.  The Toys "R" Us

20  court got it right and the debtors urge this Court to approve

21  this identical assignment.

22         We will rest on our papers and the Amendola

23  declaration filed at Docket 1375 with respect to our

24  arguments that the Ross lease by its terms doesn't restrict

25  this assignment.

1          And with respect to the 180-day go-dark period

2    that Burlington is seeking, we just note that the go-dark

3    period should be a matter of mutual interest.  Burlington

4    will be paying rent for the property upon assumption and is

5    incentivized to get up and running as quickly as possible.

6          And with respect to the form of order, we believe

7    that the form of order entered in connection with the other

8    December-waived lease sales is appropriate, but we've had

9    constructive dialogue with the counterparties and I think we

10   can get to a place of mutual agreement on a form of order if

11   this Court approves the assignment to Burlington.

12          THE COURT:  Okay, thank you.

13          MS. OESTREICH:  Good afternoon, Your Honor, Hailey

14   Oestreich with Jackson Walker on behalf of Burlington here

15   today.  I know we just heard from debtors, so I agree with

16   their points, and Burlington, as noted in our papers, fully

17   agrees and supports and would like to partake in their

18   argument.  I'm not going to go back over everything for the

19   sake of efficiency, but there are a couple points that I

20   would like to make.

21          As debtors' counsel noted, there have not been any

22   questions about whether Burlington, a Fortune 500 company,

23   has provided or can provide adequate assurance for this

24   lease.  As debtors' counsel has noted, we're really here

25   talking about the Ross lease, who is a third party not only

1 to this bankruptcy, but actually to the assignment at issue

2 here.

3        As debtors' counsel noted, that this lease,

4 debtors' lease does not have any restrictions that would

5 prohibit this assignment if we weren't in the bankruptcy

6 context.  Instead, what landlord and Ross are asking you to

7 do today, Your Honor, is make it so that the debtor actually

8 has less rights and less of a chance to recover for the

9 benefit of the estate in the bankruptcy context than out of

10 it.

11        For all the reasons that debtors' counsel

12 discussed about the language of the Code, the harmony of

13 Section 365(b) and (b)(1) and (b)(3), and just the entire

14 purpose of bankruptcy as a whole, we believe that Ross and

15 landlord's interpretation of 365(b)(3)(C) should be rejected,

16 and a strict reading should be rejected, because of the

17 bizarre consequence that it could create in this case of

18 granting a landlord additional rights in a bankruptcy that

19 they would not have outside of it.

20        Your Honor, on the go-dark objection, we agree

21 with debtors' analysis and that the go-dark provision is in

22 fact an anti-assignment provision.  As debtor said, my

23 clients, if they did get this lease, would be paying rent

24 during the go-dark period and would have every incentive to

25 make the go-dark period as limited as possible.

1        The final point that I would just like to make is

2    the impact that this might have on third party bidders such

3    as my client.  My clients went through a bidding process,

4    were the successful bidder, and won through that process the

5    right to assign this lease.  By putting third parties in a

6    position where they can spend money to not only go through

7    the process, presumably win by becoming the successful

8    bidder, but then having a fight where they're expending more

9    cost to try to deal with these outside-party leases that

10   don't actually govern the lease at issue, it could really

11   have a chilling effect on who's willing to jump into this

12   sphere if there's always kind of a bogeyman that might be in

13   the closet that they have to keep an eye out.

14        And for those reasons, Your Honor, because the

15   assignment to Burlington would not violate the terms of

16   debtors' lease that we're trying to assign, Ross's and

17   landlord's objection should be overruled here.

18        THE COURT:  Thank you.

19        MR. FOX:  For the record, Your Honor, Steven Fox,

20   Riemer & Braunstein, on behalf of GBRP.

21        As you will hear for the next period of weeks a

22   common theme and that is the value ascribed to the

23   designation rights and the rights under the asset purchase

24   agreement acquired by my client, this is the first in a

25   series that you're going to hear, and we are acutely

1  sensitive to any effort by a landlord to expand its rights

2  and otherwise limit the debtors' rights in respect of

3  assumptions and assignments and to graft onto -- terms into

4  the existing leases that don't presently exist, and otherwise

5  seek to circumscribe the debtors' ability in furtherance of

6  anti-assignment clauses.  We expect that these are types of

7  issues, given the age of some of the debtors' leases that are

8  going to crop up again, and we'd like to, as the saying goes,

9  nip it in the bud as quickly as we can.

10          This is a critical component for my client.  We

11  believe that the facts support approval of the assumption and

12  assignment and grant of the debtors' request here before the

13  Court.  As Counsel noted, there is no actual objection to

14  assumption and assignment relating to adequate assurance or

15  any other dispute with respect to cure amounts or otherwise,

16  and my client is four-square in favor of proceeding today

17  with the assumption and assignment to Burlington.

18          THE COURT:  Thank you.

19          MR. FOX:  Thank you, Your Honor.

20          MR. ROOT:  Good afternoon, Your Honor, for the

21  record, Alan Root of Chipman Brown Cicero & Cole on behalf of

22  5620 Nolensville Pike LLC, which is the landlord for the

23  shopping center at issue in Nashville, Tennessee.

24          I'll give my presentation in a moment, but I just

25  wanted to address the last comment that Burlington made when

1  they were at the podium that they went through a process.  I

2  saw Your Honor nodding at that and I understand that

3  argument, but I want to be clear on two points.  One, the

4  memorandum of lease, which is in evidence, Your Honor, was

5  publicly recorded in 2022 in Davidson County, Tennessee,

6  that's public record.  It has the Ross exclusivity provisions

7  in there.  So this is not as if they were a bidder that are

8  finding out about this at the first time while we're here at

9  the podium, Your Honor, or after our objection was filed.

10        And further, Your Honor, Nolensville participated

11  in that auction and prior to the auction did raise this

12  issue.  Nolensville was actually the backup bidder at

13  $250,000, so there's only a $50,000 difference between the

14  successful bid and the backup bid here, Your Honor.  So these

15  are not issues that came up post-auction, Your Honor, and so

16  I think the parties were aware.  So, to the extent there's an

17  argument that they went through this process, they expended

18  resources, it's not as if they're learning about it for the

19  first time after the auction.

20        THE COURT:  So would your argument be then it's

21  case specific with respect to each lease that the landlord

22  should investigate -- or the party to whom the lease is being

23  assigned should independently go look at the lease and all

24  the other leases in the shopping center to determine whether

25  there are restrictions to subsequently signed leases?

1      MR. ROOT:  Well, Your Honor, I think factually

2  here that certainly could be an important factor, Your Honor.

3  I mean, all the parties were well aware of this.

4      In general, Your Honor, I think Section

5  365(b)(3)(C) is very clear, it has two requirements, the

6  debtors and Burlington have the burden on those.  It's not

7  just to show that there's no violation of the debtors' lease

8  being assigned, but they also have to show that it won't

9  violate other leases in the shopping center, including

10  exclusivity provisions.

11      That's what the Code provides.  The cases are sort

12  of all over the place on this, Your Honor, and we recognize

13  that cases like Toys "R" Us have said otherwise, but,

14  respectfully, those cases are outside the Third Circuit, I

15  think they got them wrong.  They've collapsed the statutory

16  provision into one requirement when there are two.  And I

17  think the Third Circuit in Joshua Slocum recognized that you

18  need to look not just to the debtors' lease, but to the other

19  leases in the shopping center, because that's what

20  365(b)(3)(C) says Your Honor should do.  And it's very clear

21  here, Your Honor, that Section 15.3 of the Ross lease

22  prohibits other off-price competitors in the shopping center

23  and it specifically names Burlington as a competitor.

24      And, unlike the cases like Toys "R" Us that were

25  cited by the debtors, I think there's a factual distinction

1  here as well, Your Honor.  Everybody said you only need to

2  look at the Ross lease, well, I don't think that's true.  I

3  think the Burlington lease -- or, excuse me, the Big Lots

4  lease that's being assigned and which is also in evidence has

5  provisions in it that provide -- specifically at Section 4(a)

6  that provide that you can use it for any other purpose, the

7  leased premises for any other purposes, provided that it does

8  not violate then-existing exclusive use rights in the

9  shopping center.  So there is a provision in the lease that

10 is being assigned that references other exclusivity

11 provisions, Your Honor.

12         And we think, Your Honor, that puts us squarely in

13 other cases that have come out the way we are arguing here,

14 Your Honor, which includes the Eastern District of Virginia

15 decision in Heilig-Meyers, which is at 294 B.R. 660.  There

16 the court looked both at the debtor lease being assigned and

17 at the lease that was -- another shopping center lease that

18 had an exclusivity provision and, on similar facts, denied

19 the assumption and assignment because it violated the

20 exclusivity provisions of the non-debtor lease.

21         Your Honor, I'd also point you to the Three A's

22 Holdings case with Judge Shannon, which is at 364 B.R. 550.

23 There Judge Shannon, in applying 365(b)(3)(C), looked not

24 just at the debtor lease, but also at restrictive covenants

25 and restrictive use provisions that were recorded publicly,

1    and found that the assignment violated those and denied the

2    assumption and assignment.

3         So, Your Honor, I think, as a general statement,

4    the Code -- the plain meaning of the Code says what it says,

5    but I think factually here as well, Your Honor, I think we

6    fall into a camp of cases that would prevent assignment of

7    this particular lease.

8         THE COURT:  Let me ask you -- you cited to (4)(a),

9    what does 4(a) mean by the provision "then-existing"?

10         MR. ROOT:  That's a good question, Your Honor, and

11    I read through that and gave that some thought.  I think what

12    it means here, Your Honor, is it says you can use it for any

13    other retail purpose as long as when you're going to use it

14    for that other purpose, at the time you're going to use it

15    for that other purpose, it doesn't violate any then-existing

16    use rights in the shopping center.  Well, the purpose is

17    going to change upon assignment, it's no longer going to be

18    Big Lots, it's going to be Burlington.  So you need to look

19    at it as then as now, when the use changes, if the assignment

20    was today, the use changes today, and is there an exclusivity

21    provision in play today that would be violated.

22         Your Honor, I just want to make sure I don't have

23    any other arguments here.  I just wanted to point out, again,

24    we are the backup bidder here, I don't think there's any --

25    to the extent the other cases like Toys "R" Us were focused

1  on the idea of maximizing the value of lease portfolios,

2  certainly we understand the desire to maximize the value of

3  lease portfolios in an effort for debtor to maximize the

4  value of its assets, but factually, again, while that may be

5  a policy reason to generally allow for assignment over

6  exclusivity provisions, here there's no value-maximization

7  issue.  We're talking about a $50,000 difference between the

8  successful bid and the backup bid.  It's not as if it's

9  $300,000 or nothing here, Your Honor.  So I don't think

10 there's any windfall to the landlord or any prejudice to the

11 debtors here, Your Honor.

12          Thank you.

13          THE COURT:  Okay.  Thank you.

14          MR. MANN:  Good afternoon, Your Honor, Kevin Mann

15 from Cross & Simon on behalf of Ross.

16          I rise mostly just to join in with Mr. Root's

17 argument, but there's one thing I did want to point out, and

18 I think Your Honor noted this when you looked at the word

19 then-existing in the lease.  It doesn't say now existing, it

20 doesn't just say existing, it says then-existing, which would

21 lead us to believe that it would be at the time that the

22 change is made, which will be here at the time of the

23 assignment.  So I think that puts us a little closer to Toys

24 "R" Us.  Even if we determine that Toys "R" Us was improperly

25 decided, we can still say that this is distinguishable from

1  Toys "R" Us because Toys "R" Us, the lease that was being

2  assigned did not contain any provisions that required

3  compliance with any other lease's use restrictions.

4          The last thing I wanted to point out, Your Honor,

5  is -- I think everybody has talked about the Joshua Slocum

6  case, that case does say that the legislative intent behind

7  the shopping center amendments was to protect the rights of

8  lessors and the center's other tenants.  Congress recognized

9  that, unlike the usual situation where a lease assignment

10 affects only the lessor, an assignment of a shopping center

11 lease to an outside party can have a significant detrimental

12 impact on others, in particular the center's other tenants.

13         So with that, Your Honor, I have nothing further,

14 but would ask that Your Honor deny this assignment.  Thank

15 you.

16         MR. GOLDBERGER:  Your Honor, with respect to 4(a)

17 in the debtors' lease, there's a reason this wasn't mentioned

18 at all in the papers that were filed.  The permitted uses

19 generally permit the right to use and occupy the demised

20 premises for the purpose of the sale of general merchandise

21 and there's no "provided, however" with respect to the sale

22 of general merchandise.  And we believe that it's clear that

23 Burlington is a retailer that, you know, sells general

24 merchandise, and that's why this wasn't raised in any of the

25 papers and there's no proviso that says that any then-

1  existing exclusive use rights apply to that type of sale --

2  or that type of usage.

3        We also do believe that then-existing is a

4  reference to the time of the entry of this lease, but we

5  would argue that the use here is general -- the use is the

6  sale of general merchandise and is not subject to that

7  provision of the lease at all.

8        We'd also say that with respect to the Joshua

9  Slocum case, the case there makes clear that Congress's

10  intent was to protect the bargained-for rights, and that

11  includes the bargained-for rights of the other tenants in the

12  shopping center, that's for sure.  And that's part of the

13  structure of a shopping center, but the debtors were here

14  first and the debtors bargained for the rights that they

15  have, and there's nothing in the Code or in the legislative

16  history that we believe provides a right that wouldn't exist

17  if this would have been -- if the debtors would have tried to

18  do this assumption on September 8th of last year, a day

19  before this -- the day before this bankruptcy case started.

20        THE COURT:  Let me just -- bear with me one

21  second.

22        What is your response with respect to the

23  memorandum of lease having been on file?

24        MR. GOLDBERGER:  So we understand that the

25  memorandum of lease was public and parties were on notice of

1 the fact that there was a subsequent lease that had certain

2 rights vis-a-vis the -- that tenant, Ross, and the landlord,

3 but to the extent that those aren't binding on the debtor

4 under applicable state law -- and, again, it doesn't seem

5 like this case would be in front of a judiciary if it would

6 have been -- if the assumption and -- if the assignment would

7 have been proposed on September 8th.

8       So we don't think it's necessary to look into the

9 -- you know, anything that's publicly filed with respect to

10 leases that aren't binding on the debtors' lease and that the

11 debtor isn't responsible for under applicable state law.

12       THE COURT:  Thank you.

13       MR. GOLDBERGER:  Thank you, Your Honor.

14       MR. FOX:  For the record, Your Honor, Steven Fox,

15 I rise just briefly for two points in response to Counsel's

16 suggestion that there's no prejudice from denying approval of

17 the assignment today and forcing us to turn to a backup bid.

18       Candidly, Your Honor, we believe my client will be

19 prejudiced in two respects.  First, the risk and potential of

20 a negative precedent which could have lasting effect on some

21 800-plus other leases that we are in the process of in the

22 market now looking to assume and assign for value.  To allow

23 a landlord to graft additional rights and restrictions that

24 don't presently exist in the debtors' leases will

25 dramatically negatively impact on our marketing opportunities

1  going forward.

2        THE COURT:  Well, how do you reconcile that with

3  the cases the objectors cite?

4        MR. FOX:  Your Honor, we don't believe those cases

5  support their position.  And, as debtors' counsel has said,

6  the statute supports enforcement of the debtors' lease and

7  any restrictions in the debtors' lease.  The debtors' lease

8  here does not include the type of restriction that the Ross

9  lease suggests exists.  The fact that it was publicly of

10  record here too, in my opinion, Your Honor, in my view is of

11  no moment.  Yes, parties may have been on notice, either

12  constructively or actually, and maybe they assumed some risk

13  in that regard, but at the same time those parties when they

14  appeared and bid on the lease were entitled to rely upon what

15  they believe is an appropriate interpretation of the statute

16  and the applicable case law.  And that suggests, Your Honor,

17  the result that the debtors seek today, and that is approval

18  of assumption and assignment of the debtors' lease, which is

19  not subject to any further restrictions of any other lease in

20  the center.

21        Your Honor, the reality here is, you know, to the

22  extent that these are shopping center leases, the debtors

23  don't necessarily, in the absence of a specific restriction

24  appearing in their lease, have access to the leases of every

25  other tenant in the centers.  And certainly my client doesn't

1    have access to those because those are confidential, private,

2    proprietary information between the landlords and those other

3    lessees.  So --

4               THE COURT:  Does it make a difference, though,

5    that they raised it at the auction?

6               MR. FOX:  No, Your Honor, I don't believe it does

7    because, again, you're entitled -- both the debtors and the

8    counterparties who were bidding on these leases, including my

9    client, who are running a process now pursuant to the asset

10   purchase agreement and the designation rights it acquired,

11   has the right to rely upon what it understands the law is in

12   this Court, as well as the case law that has come before this

13   case.  The collective interpretation of the debtors and my

14   client is that the case law supports assumption and

15   assignment and not enforcement of the restriction that Ross,

16   who in my view is a mere interloper here in this case -- it

17   is not a creditor, it's not a landlord, and therefore it

18   doesn't have any rights in this court whatsoever.  The

19   landlord does, but we think the landlord is wrong on the

20   facts and the law.

21              Also on the question of prejudice, Your Honor,

22   yes, there's an economic component to this certainly.  The

23   landlord suggests that, well, if we get less money, it's not

24   prejudicial to us.  We fundamentally disagree with that

25   notion.  I'm not ashamed to say this is about money, you

1  know.  As I said earlier in my remarks at the outset, my

2  client has committed over $400 million to this transaction

3  and continues to fund essential expenses of this estate in

4  furtherance of its commitments under the asset purchase

5  agreement, and in consideration and exchange for that, Your

6  Honor, we're entitled, we believe, to have our rights

7  enforced by this Court, and that specifically includes the

8  designation rights that were part of the asset purchase

9  agreement and a critical component of the transaction.

10         So we would urge this Court to overrule the

11  landlord's and Ross's debtors and approve the debtors' motion

12  seeking assumption and assignment.

13         Thank you, Your Honor.

14         THE COURT:  Thank you.

15         MS. OESTREICH:  Your Honor, Hailey Oestreich of

16  Jackson Walker on behalf of Burlington.  I would just like to

17  make one final point.

18         As you're aware, the debtors' lease is

19  significantly older from the Ross lease -- than the Ross

20  lease, I believe by about 11 years.  Debtors' lease

21  originally did have an exclusivity provision, but you'll see

22  in Exhibit 3, the first lease modification of debtors' lease,

23  the debtors actually made a concession and modified their

24  lease in order to let Ross into the shopping center.  There

25  was a bargain and the parties bargained to change debtors'

1  rights.

2          Ross, at the time, and landlord, at the time,

3  didn't bargain for Big Lots debtors to give up their free

4  assignment provision with no conditions on it.  That's what

5  the parties agreed to when all of these parties were brought

6  together at the same time that debtors would keep their

7  provision, they gave them the free right to assign to anyone

8  without landlord's consent.  If we're talking about the

9  bargained-for rights, enforcing the provision as debtor -- or

10  enforcing the assignment as debtors have requested and

11  overruling Ross and landlord's objections is what the parties

12  have bargained for when they all first came together back in

13  the beginning.

14          MR. ROOT:  Your Honor, again, briefly, Alan Root,

15  for the record, on behalf of the landlord.

16          I would just come back to the plain language of

17  the statute, Your Honor, and Counsel said we got it wrong on

18  the law.  Well, respectfully, the law is all over the place

19  on this issue.  And the Third Circuit, to the extent it's

20  spoken on it, has spoken on it in Joshua Slocum and did --

21  whether it's dicta or whether it's a holding did indicate

22  that you should be looking at not just the debtor lease, but

23  the other leases in the shopping center, and that's what

24  365(b)(3)(C) says on its face.  The plain language has two

25  tests, you look at the debtors' lease, and you make sure that

1  it also -- the assignment doesn't violate the leases of the

2  other tenants in the shopping center.

3          Now, I understand there's policy arguments here,

4  but Congress enacted what it enacted, and that's the plain

5  language of the statute.  And, Your Honor, we think you

6  should enforce the plain language, especially in the facts

7  and circumstances that we've discussed here, Your Honor.

8          THE COURT:  Thank you.

9          MR. GOLDBERGER:  Just one final point, Your Honor.

10  The case law in this circuit is limited, but I would just

11  point Your Honor to the language in the Joshua Slocum case

12  quoting from Congress that the purpose of 365(b)(3) is,

13  quote, "to assure a landlord of his bargained-for exchange."

14          And, as the Counsel for Burlington made clear and

15  as the leases here indicate, the bargained-for exchange was

16  that the debtors would have the ability to assign and use the

17  premises consistent with this proposed assumption and

18  assignment, and that's the proposed assumption and assignment

19  we believe the Court should allow.

20          THE COURT:  Okay, thank you.

21          Anything further?

22      (No verbal response)

23          THE COURT:  Okay.  We're going to take a brief

24  recess.  I would say probably I'll be back around 2:30.

25  Okay?  Thank you.

1        (Recess taken at 2:15 p.m.)

2        (Proceedings resumed at 2:43 p.m.)

3            THE COURT:  Please be seated.  Thank you,

4   everyone, for your patience.  I appreciate you being patient

5   and allowing me the time to look at my notes.

6            The landlord and Ross oppose the proposed

7   assignment of the Nolensville lease to Burlington because it

8   will breach certain exclusivity provisions contained in the

9   Ross lease.  The landlord argues that pursuant to 11 U.S.C.

10  Section 365(b)(3) debtor cannot provide adequate assurance of

11  future performance, and the Court must deny the proposed

12  assignment to the proposed assignee.

13           The Nolensville lease is freely assignable

14  pursuant to its terms.  Section 22 of the lease provides that

15  Big Lots "shall have the right at any time... to assign this

16  lease without landlord's consent, provided that no such...

17  assignment shall relieve tenant of any of its obligations

18  thereunder."

19           In addition, paragraph 4 of the Nolensville lease

20  permits Big Lots to use and occupy the premises for a number

21  of retail purposes, including "for the sale of general

22  merchandise."

23           Under paragraph 4(a), any covenants or

24  restrictions of record affecting Big Lots' use were attached

25  and incorporated in the Nolensville lease in Article 7(b) and

1  in Exhibit F.  The Court disagrees with the objectors and

2  finds the phrase "then-existing" does not apply to a future,

3  unknown assignment.

4          The Ross lease was entered into after the

5  Nolensville lease.  Section 15.3 of the Ross lease prohibits

6  the use of the premises for the "off-price sale of

7  merchandise," or the use of more than 10,000 square feet of

8  any premises at the shopping plaza for the display and/or

9  sale of apparel on an off-price basis.

10          The landlord and Ross contend that the proposed

11  assignee is an off-price retailer that intends to use the

12  premise for the off-price sale of merchandise.  They note

13  that this lease specifically restricts Burlington.  The Ross

14  protection provision at 15.3, however, "shall not apply to

15  the existing tenants listed on Exhibit L."

16          Here, the debtors are existing tenants under the

17  lease.  Big Lots is also listed on Exhibit L of the Ross

18  lease.

19          The Ross lease does not restrict Nolensville lease

20  assignment.  The lease being assigned contains no provision

21  requiring compliance with the Ross exclusive use provision;

22  accordingly, the debtors' proposed assignment to Burlington

23  does not violate the terms of the Nolensville lease.

24          Similar to Toys "R" Us, the lease to be assigned

25  was executed long before the Ross lease was in effect, and

1  the lease here included nothing that requires adherence to

2  the provisions of the Ross lease.  On the other hand, Three

3  A's is distinguishable.  Unlike the issue here, Three A's

4  involved covenants that run with the land and the

5  interpretation of a permitted use under California state law.

6          This Court agrees with the reasoning of the

7  District Court for the Southern District of New York in Sears

8  and the New Jersey Bankruptcy Court in Bed Bath & Beyond that

9  the provisions of Section 365(b) must be read in harmony with

10  365(f)(2)(B) and that the phrase "any other lease" could not

11  have been intended to mean a subsequent lease between a

12  landlord and a third party to which the debtor was not a

13  party.

14          Applying the plain language argument would mean

15  that the debtors are bound by restrictive use provisions in

16  other leases that were entered into after the Big Lots lease,

17  making the broad assignment provisions negotiated for by Big

18  Lots unenforceable based on the landlord's subsequent

19  agreement with a third party that the debtors were not party.

20  As the Court explained in Bed Bath & Beyond, the ability of

21  debtors to maximize the proceeds from their leases would or

22  could be severely curtailed by landlord's subsequent

23  agreement with other tenants to limit the use for which the

24  debtor's premises were expressly allowed to be used without

25  debtor agreeing to those terms.  Landlords would be permitted

1 to eviscerate the debtor's negotiated bargain, a broad

2 assignment provision, by subsequently entering into an

3 agreement with any third party in the same shopping center

4 that restricts uses the debtor was expressly permitted to

5 have under the lease.

6      So the debtors' assignment of the Nolensville

7 lease is permitted, including the going-dark provision, and

8 I'll overrule the objection.

9      I understand that there's a revised form of order

10 that will be submitted. And I would just ask that you do a

11 clean and blackline under certification of counsel.

12      MR. GOLDBERGER: Yes, we will, Your Honor. Thank

13 you.

14      THE COURT: Okay. Is there anything further?

15      MR. PIRAINO: Your Honor, for the record, Stephen

16 Piraino, Davis Polk & Wardwell. There's one last thing we'd

17 just like to note for you, Your Honor, as filed on our

18 agenda. As you may recall, there were three lease holdovers

19 from December, one of which was related to the Vero Beach

20 property.

21      THE COURT: Yes.

22      MR. PIRAINO: The debtors do not intend to proceed

23 with the assumption and assignment with respect to Aldi's

24 and, in furtherance of GBRP's designation rights, a

25 certificate of counsel has been filed to approve a

1  stipulation to enter into a lease termination agreement.

2          THE COURT:  Okay.

3          MR. PIRAINO:  We understand that Counsel to Aldi's

4  would like to be heard on that, but I would just like to very

5  quickly let Your Honor know the debtors' position on this and

6  sort of how this, you know, sort of unfolded.

7          As Your Honor will recall, we had our November

8  lease waive, some things were carried over and, you know, at

9  the 19th we said we would push things to January.  Obviously,

10  something happened between the 19th and today, the sale to

11  GBRP, including the sale of designation rights with respect

12  to all of our leases.  GBRP recognized that, you know, there

13  were -- that there had been a prior process, they engaged

14  with parties who were part of that prior process and, for

15  example and what you just ruled on, the designation decision

16  was the same as what the debtors would have done.  That's not

17  the case in every instance.  For example, here, GBRP's

18  exercise of their designation rights was with respect to a

19  termination and, as Your Honor will have probably seen in the

20  docket, the landlord here, you know, before any of this all

21  happened --

22          THE COURT:  This is PAM right?

23          COUNSEL:  Yes.

24          THE COURT:  Okay, all right.  I just want -- oh,

25  that's --

1          MR. PIRAINO:  I needed my helpers back there.

2          THE COURT:  I'm sorry, that's an acronym.  Yes.

3          MR. PIRAINO:  That's okay.  Yes.

4          THE COURT:  Okay, I just wanted to make sure we

5     were talking about the right thing.

6          MR. PIRAINO:  Yes.  We think we've called all of

7     these properties by different things.

8          So, you know, they've designated their -- decided

9     to designate this through the termination with the landlord.

10    Before that happened, even before the sale hearing, we

11    understood the landlord was going to take issue with Aldi's.

12    So the decision was made not just out of the blue, but,

13    frankly, to resolve potential litigation, to enter into this

14    termination.  The estate supported that because avoiding

15    litigation at this point for the estate is a prudent use of

16    resources.

17         And just one last -- one last piece.  Your Honor

18    has approved, I think we're up to four or five of these lease

19    sale procedures.  So we know there's an order out there,

20    there was an auction that occurred pursuant to the lease sale

21    procedures, but the lease sale procedures, there's two

22    important points I just want to note for the Court.  The

23    first is the debtors' acceptance of bids only occurs upon

24    approval of the bids, nothing has been approved, and sort of

25    the corollary to that is the debtors at any time can

1   terminate the sale process and pursue an alternative

2   transaction.  I think it's very clear we did pursue an

3   alternative transaction, the GBRP sale.

4           So, with that, our position is we're not going

5   forward.  The certificate of counsel is on file at 1783, and

6   we believe that it's consistent with the sale order and

7   GBRP's designation rights.

8           THE COURT:  Okay.  Good afternoon, Ms. Bifferato.

9           MS. BIFFERATO:  Good afternoon, Your Honor, Karen

10  Bifferato on behalf of Aldi, Inc.

11          I rise briefly to introduce my co-counsel, Mr.

12  James Rossow from Rubin & Levin in Indiana.  He's been

13  previously admitted *pro hac vice*.  We filed those papers

14  actually back in mid-December when we were teed up for a

15  December 19th hearing.  We actually thought everything was

16  going forward at the 19th hearing in December, it was not.  A

17  lot has happened, and it's actually the process that we want

18  to talk to the Court about today.

19          And before I hand the podium over to Mr. Rossow I

20  did just want to mention, because debtors' counsel brought it

21  up, the certification of counsel regarding the lease

22  termination; that was filed under certification of counsel

23  last night, we saw it today, we have a problem with it as of,

24  you know, right now, depending on what happens.  But we would

25  ask that the Court not enter the order and we would submit

1  that it should not have been under certification of counsel,

2  but we'll get to that in Mr. Rossow's presentation.

3          THE COURT:  Okay.

4          MS. BIFFERATO:  Thank you.

5          THE COURT:  Well, I haven't seen it and it hasn't

6  been entered.  So --

7          MS. BIFFERATO:  Great.  Thank you.

8          MR. ROSSOW:  Thank you, Your Honor, Jim Rossow,

9  Rubin Levin, Indianapolis, Indiana, on behalf of Aldi, Inc.

10  If the Court will permit me to walk through the story to

11  provide context and of how we got here and why we're here on

12  a hearing that I think the debtors believe, along with Gordon

13  Brothers, was mooted by a lease termination agreement that

14  was filed last night.

15          Aldi has participated as a bidder in this case for

16  three properties.  The Court has already found and approved

17  transactions with three other properties in which Aldi was

18  found to be a successful bidder.  We have experience bidding

19  in these cases.  Aldi has 2400 stores, they happen to be

20  postured that they are a good buyer for stores of this size.

21  And in other cases, I know the parties mentioned Toys "R" Us,

22  Aldi was involved in Toys "R" Us as a bidder.  Any stores

23  that have that footprint are ones where Aldi is a candidate

24  to be a buyer.  As a result, we have been a bidder in many

25  bankruptcy cases.

1          A&G that has run this, brokering the liquidation

2    of leasehold interests, obviously, is quite well renowned.

3    We have been part of that process for many years.  We know

4    A&G well, we hold them in the highest regard, they run great

5    auctions, and we've participated in many auctions, which

6    brings us to Vero Beach.  Well, if I can, let me back up.

7          There is one location, Taylor, Michigan, and

8    Taylor, Michigan is a location that was in a shopping center.

9    And I want to mention Taylor, Michigan because the lease at

10   issue in Vero Beach is not in a shopping center under the

11   Joshua Slocum factors.  So that lease was under a shopping

12   center, it had an alcohol restriction, and that's what this

13   is about is an alcohol restriction.  The debtors invited us

14   to contact the landlords because they knew that the landlords

15   would be taking issue with Aldi attempting to acquire a lease

16   free and clear of an alcohol restriction.  I believe the

17   landlord in that case is represented by Kirkland & Ellis.  We

18   worked with them, worked out an amendment, and also paid the

19   estate some price to acquire leasehold interest, and then

20   amend the lease to address the landlord's concerns and also

21   allow for operation and the sale of alcohol.

22          THE COURT:  This meaning the Michigan?

23          MR. ROSSOW:  That's the Michigan case and this is

24   different.  And I wanted to sort of explain that because we

25   -- certainly we understand the difference and I think we bid

1    a much lower amount for the Taylor, Michigan case -- store

2    location.  Here, we bid on an auction held December 4th,

3    after competitive bidding.  We were the first opening bid at

4    $150,000.  There was also a cure amount that was at issue.  I

5    think at the auction, Mike Matlat at A&G, who runs the

6    auction, had indicated with I think Mr. Goldberger also

7    clarifying that there was a cure amount, roughly, at the time

8    was determined to be $80,000.

9            So Aldi bid 150, plus cure, give or take, call it

10   a $230,000 bid, but the dollar amount to the estate was

11   $150,000.  Havertys was also a competitive bidder.  Of the

12   locations that went up for auction, Burlington was there,

13   that was a notable event, and there were issues in which the

14   landlord made its objections clear.  But Aldi bid, and it was

15   a spirited round of bidding, and we went from $150,000 at

16   $10,000 increments, with some skips in between, and Aldi

17   wound up the highest bidder at $800,000.  Havertys was a

18   backup bidder at $750,000.

19           On December 5th, the debtor filed its notice of

20   the successful bidders, and the hearing, I believe, was set

21   for December 19th, as Mr. Goldberger had indicated.

22           The landlord filed its objection on December 12th,

23   I believe, and that objection, I would characterize that

24   diplomatically -- and I don't take issue with it, but I think

25   it's true -- it was a placeholder objection.  It was an

1  objection that said this is in a shopping center and, broadly

2  speaking, citing the principle of *cum onere*, that the lease

3  obligations must be borne by the assignee in their full

4  regard.

5          We had discussion -- when I say we, the Aldi team

6  had discussions with landlord's counsel to try to resolve

7  these issues and it -- I should back up.  So we had made a

8  determination that this was not in a shopping center.  I

9  really don't think it's controversial, but we have a document

10 in which the landlord indicates that it's in a shopping

11 center.

12         So there's -- and I'm going to -- we have a brief

13 on file that elucidates this, Your Honor, so I don't think I

14 need to go into great detail, but there is a mall that was

15 developed to the north of this property, that mall had

16 excepted out the parcel that we're calling the Big Lots

17 parcel.  So it really -- it's not part of that REA, I don't

18 think there's a colorable argument.  There is with respect to

19 our parcel, the parcel in question, there's Big Lots and

20 Mattress Firm.  So there are two buildings, they each have

21 parking space.  They're contiguous, there's ingress and

22 egress, there's -- you know, there's the ability to move

23 between parking spaces, but their parking is separate, I

24 mean, one for one store, one for the other, they're facing

25 opposite directions.  There is a declaration, but that

1   declaration deals with very minimal issues of maintenance.

2          So, under the Joshua Slocum factors, this property

3   is not in a shopping center.  And somebody may disagree with

4   me, but I -- you know, I'd love to have that argument because

5   I believe we can prevail on that point.

6          What it does have is an alcohol restriction.  And

7   so, under our analysis, that alcohol restriction would not be

8   subject to the heightened 365(b)(3) standards regarding use

9   that we've been talking about, but would be subject to

10  scrutiny as to whether or not it is an anti-assignment

11  provision.  We just heard earlier some discussion, I believe

12  Burlington may have pointed out that the go-dark provision in

13  the Burlington lease was *de facto* anti-assignment, right?

14  Certainly something that comes up all the time.  In fact, in

15  this case the lease -- in our lease there really isn't a true

16  go-dark provision.  There is a continuous operation

17  provision, but it doesn't read the way that we typically see

18  a go-dark provision.

19         So, anyway, Your Honor, we're here, we believe we

20  have a lease that we paid good value for, that it was below

21  market.  The idea -- and we have presented a declaration from

22  Jordan Ford, the director of real estate for Aldi, it

23  indicated what is obviously true, which is that where an Aldi

24  can sell beer and wine in this market in Florida, that's

25  where customer sales are better.  So they do better when they

1  can sell beer and wine in Florida.

2         And I should say, just contextually, Florida is a

3  state where beer and wine licenses are relatively plentiful,

4  they're not a scarce commodity.  So when people do their

5  shopping, they want to pick up their beer and wine and that's

6  just sort of a competitive advantage.  So that's why Aldi

7  paid -- offered to pay $800,000.

8         So, fast-forward, we have the objection.  It is a

9  -- maybe a barebones objection.  We had some discussions with

10  landlord's counsel, as the debtors had invited us to do to

11  try to resolve our issues, I think they were happy.  If we

12  had resolved that issue, they would have been happy to stand

13  by our transaction.

14                       So we filed our brief and

15  our supporting documentation, keeping in mind that we didn't

16  really know what we were arguing against.  So we had to argue

17  about the shopping center not having really received a cogent

18  argument about that, we argued about the alcohol restriction.

19  We cited the Toys "R" Us cases, Aldi was a party in the Toys

20  "R" Us cases.  There are two decisions that came out of Toys

21  "R" Us, one of them involves Aldi and it involves the

22  shopping center issue -- not the use restriction issue, but a

23  shopping center issue.  And it involves the shopping center

24  issue, not the use-restriction issue, but a shopping center

25  issue, so we're familiar with Toys "R" Us.

1          But that brings us to more recent events.  So,

2    ALDI, from our perspective, we thought we were having a

3    hearing on December 19th.  There was some discussion about

4    moving that hearing off.  We were more than willing to do

5    that.  To be honest, the issue, which makes sense from the

6    debtors' perspective is if they were going to continue the

7    hearing, they wanted to make sure that the backup bidder

8    would stand by and be prepared to close, and the second issue

9    is the rent accrual.

10          It turns out that this lease, the rent was paid

11   quarterly, so we actually had until March before the next

12   rent is paid, so that provided time, which is why we thought

13   we would have a hearing, here in January.  So, we filed our

14   papers.  What we saw is we didn't hear from the debtors.  I'm

15   sorry, we didn't hear from the landlord and we had some

16   discussion with debtors' counsel, Mr. Goldberger about our

17   negotiations.  They asked to see some language that we

18   provided in typical leases.

19          And Mr. Gold is here representing the landlords,

20   so he may speak to this issue and I'd like an opportunity to

21   respond, if I may, but in any case, what we were told last

22   week, we were informed that there was a lease-termination

23   agreement that was worked out and that they, the debtors

24   would not be proceeding with our transaction.

25          I will say, in termination of communication, and I

1  understand this happens, I know that this -- a lot has

2  happened in this case.  I heard Mr. Fox talk about a $400

3  million investment by Gordon Brothers.  I get it.  But we

4  come in here in these cases in good faith.  We play by the

5  rules.

6          Your Honor, when Mike Matlat (phonetic) runs these

7  auctions, the debtors' counsel transcribes those auctions,

8  they require us all to listen to the bid procedures and

9  confirm that we will play by the rules.  We will not collude.

10  We will not engage in anything other than bidding and good

11  faith and that's what we do, and that's why we're here, Your

12  Honor.

13          So, we find out that the deal, the landlord worked

14  out a deal with, ostensibly with Gordon Brothers.  It appears

15  less than clear whether it's Gordon Brothers or the debtors;

16  it's rely both.  I asked for the disclosure of the amount of

17  consideration, because I knew that that might be an issue.  I

18  didn't get an answer.  I asked repeatedly.  I've asked three

19  times in the last eight days since we were told that a lease-

20  termination agreement would be forthcoming.

21          We filed it last night, so what was filed under

22  certification last night, Your Honor, that you didn't look at

23  is a lease termination and the part that I cared about is how

24  much was being paid by the landlord to the debtors.  And this

25  was also proved by Gordon Brothers.  The amount is roughly

1   $660,000, but --

2                THE COURT:  Say that again, $660,000 paid by whom?

3                MR. ROSSOW:  Paid, ostensibly, and I could be

4   corrected, by the landlord to terminate.

5                There is a cure provision, because, obviously, if

6   we're at 800,000 and they're at 660, something doesn't add

7   up.  If you do the math, it works out to, wait for it,

8   $800,000.  Not a penny more than what we bid.  Not even a

9   topper, on top of what we bid.  So, they bid the exact same

10  as what we bid and now we're -- now, I understand that's

11  going out under certification.

12               So, to back up, we thought we were having a

13  hearing today.  I understand the events that happened in

14  December, Your Honor, and I want to carefully talk about that

15  and address -- I think I sort of previewed my argument, which

16  is why counsel talked about this issue about having the right

17  to pursue alternative bids, because I understand that's what

18  the point is.

19               And I would point out that there is a declaration

20  that has not been admitted into evidence today, but it's on

21  the record and it was identified as an exhibit, and that is

22  the declaration from Emilio Amendola, as to the bidding

23  process.  That was filed on December 17th and that includes

24  the sworn statements that ALDI was the highest-and-best bid

25  for the Vero Beach property, all the kind of language that we

1 welcome and we agree with and that apparently was as true --

2 was true on December 17th and theoretically is still true

3 today.

4        So, with respect to the Gordon Brothers

5 transaction, because we weren't -- we now -- now, we get it.

6 Now, I get why we have -- why I'm arguing for whether I even

7 get to have an argument, Your Honor, and that is that the

8 Gordon Brothers transaction ostensibly applies to the leases

9 that, these leases that were subject to the auction that had

10 not yet closed.

11        I will say that, as you know, Your Honor, there

12 was the Nexus transaction and Nexus had worked with ALDI to

13 provide capital for many of those leases on the Nexus side,

14 but we were not pursuing those to the auction process that

15 A&G was handling.  So the four -- the three locations that I

16 referred to earlier were the ones that were running outside

17 of the Nexus process.

18        So, from our perspective, it made sense that we

19 would pursue the transactions that already booked, that were

20 ready to close, but for a few objections by the landlord that

21 when the Nexus transaction fell through, that the debtor

22 pursued an alternative with Gordon Brothers.  I will say

23 that, and I know the timing, but it's simply for the record,

24 that that motion was filed on a Friday, December 27th.  It

25 was filed on shortened notice.  There was a notice, a 2002(c)

1  notice.  I would respectfully submit that that notice did not

2  indicate what assets were being sold.  It certainly did not

3  disclose that the leasing question that we had an interest in

4  was being sold.  We thought that that was set over for a

5  hearing and we thought that that, maybe rightly or wrongly,

6  that that would proceed outside of Gordon Brothers.  After

7  all, the money was already under contract and would, once

8  approved, come into this estate, independent of anything that

9  Gordon Brothers did.

10         And keep in mind, Your Honor, that Burlington is,

11  in fact, a transaction that proceeded at auction that the

12  debtors elected to proceed with, whereas, this transaction,

13  they've elected not to proceed with and take the position

14  that Gordon Brothers has the right to terminate.  So, as Your

15  Honor knows, there was great urgency.  Your Honor had a

16  hearing on Monday, indicated that an order would be entered.

17         I will say that there was an asset purchase

18  agreement filed with that motion.  That asset purchase

19  agreement refers to a schedule of "365 contracts."  Now, that

20  schedule was not filed with the Court, which happens.  I know

21  that happens in these cases, but it wasn't filed with the

22  Court.

23         The Court held a hearing.  The Court entered an

24  order.  When the Court entered an order, I should say there

25  was an amended asset purchase agreement filed shortly before

1  the Court entered its order on January 2nd.  That amended

2  purchase agreement actually did away with the term 365

3  contracts, but it referred to, instead, "disclosure

4  schedules."

5        The disclosure schedules, then, also, referred to

6  365 contracts.  So it wasn't a direct schedule; it was a

7  separate sub schedule of the disclosure schedules.  And as

8  Your Honor probably knows where I'm getting is, there were no

9  contracts filed with that amended asset purchase agreement.

10 Nothing on record with the Court.

11       And when the Court entered the order and the order

12 was attached, that order that's attached also doesn't have

13 any of these contracts.  So there's nothing on record with

14 respect to the Court's entry of an order indicating that this

15 asset would be part of the assets that were being sold to

16 Gordon Brothers.

17       So, with respect to the process, obviously, we

18 weren't given an opportunity to bid competitively.  I will

19 tell everybody a secret, which is that we had more authority

20 to bid at the auction on December 4th, but Havertys stopped

21 bidding, so I didn't volunteer more money from ALDI to pay

22 for the leasehold interest because Havertys didn't want to

23 pay anymore.  So, we were the highest bidder at $800,000.

24       I certainly am offering -- if you want to have the

25 auction right now, we'll increase our bid, but it's notable

1  that the landlord didn't even increase, they didn't even top

2  our bid.

3          And I understand what's going to be said.  The

4  argument is going to be made that there's a litigation risk

5  associated with the cost.  And so I will make the argument

6  that's in our brief that also comes from Toys "R" Us.  And

7  I'm not giving sole deference to Toys "R" Us, Your Honor, but

8  it is instructive and I think this point is relevant, which

9  is, what is the value to the estate, right.

10          I think I heard it made in connection with the

11  argument by the landlord as the backup bidder in Burlington.

12  I think landlord counsel in that case said that we're only

13  $50,000 away and the answer is, of course you weren't.

14  Because if there weren't two bidders bidding competitively,

15  then the initial bid would have been the highest bid.

16          So, in our case, I don't even know what Havertys'

17  initial bid was, but it was something less than $150,000.  So

18  the competitive bidding process increased the bid up to

19  $800,000.

20          Now, why is that?  It's because we believe that

21  the Court has the ability to sell and assign this lease free

22  and clear of the alcohol use restriction.

23          I will say that I have had -- and I'm not asking

24  the Court to determine that today.  You know, Your Honor, I

25  don't want to win in Court.  I want to not lose.  And I'd

1  like to not lose today by at least having an opportunity for

2  the Court to address this issue, perhaps, at a full hearing,

3  both, with respect to the Gordon Brothers' transaction, with

4  respect to the request for termination, and what may underlie

5  that.

6          So, for example, and I want to be very careful,

7  but it occurs to me that I have not heard of Havertys, and I

8  would not suggest they're doing anything wrong, but is it

9  possible that Havertys might want to acquire this site and

10 they may also be in the background of the transaction

11 involving the landlord?  It's possible.  I wouldn't even

12 accuse anybody.  I'm not suggesting that it's improper.

13         But at least it would be something that would be

14 relevant for purposes of competitive bidding for enhancing

15 the bankruptcy estate.  I know there will be a lot of

16 comments from counsel, and if I can, I'll reply, hopefully

17 very briefly, Your Honor, to all those comments.

18         I know Mr. Gold.  I've had discussions with

19 Mr. Gold.  We had a spirited discussion during the break and

20 I know he will make some (indiscernible) remarks, but what I

21 would say, Your Honor, is we're not trying -- you know, I'm

22 not trying -- I just want a fair shake.  And ALDI wants to

23 come back in these bankruptcy cases, and they will, they will

24 be back.  They happen to be in a position where they have --

25 they're the kind of business right now that is in the times

1  we are, they are able to acquire and expand and they're in

2  that trajectory.

3          So, I can respond to specific issues.  I will say

4  if this is turning into a hearing on what I thought it

5  originally was, which was an evidentiary hearing on something

6  where the landlord has a burden, I have evidence, but I'm not

7  sure that's what -- you know, we have our brief.  I will say

8  that we filed exhibits with our brief.  Many of those are

9  certified copies of records, so they're automatically

10  admitted if the Court would consider looking at those.  I

11  believe those are admissible without the foundation, but we

12  also have a declaration from Jordan Ford.

13          I don't think that the issues in the Ford

14  declaration, I think they go to adequate assurance issues,

15  but I'm happy to address those.  So, with that, Your Honor,

16  if I have the opportunity to respond, I'll turn it over to

17  the other parties.

18          THE COURT:  Thank you.

19          MR. FOX:  Good afternoon, again, Your Honor.

20          Steven Fox, Riemer & Braunstein, on behalf of

21  Gordon Brothers Retail Partners.

22          Your Honor, I'll be brief if I can.  First and

23  foremost, I want the record to be clear that from Gordon

24  Brothers' perspective, we have absolutely no criticism of

25  ALDI in this circumstance.  We have every reason to believe

1  that in the process that Mr. Rossow described, that ALDI

2  conducted itself in all instances, in good faith.  And we

3  also completely understand and get the fact that Mr. Rossow

4  and his client are disappointed with where we are today, but

5  the fact remains twofold.

6          First, the debtors have already advised this Court

7  that it does not intend to pursue the transaction with ALDI,

8  pursuant to the results of the auction, conducted back in

9  December, as described.  So, as a fundamental and starting

10  point matter with this Court, there is nothing before the

11  Court today on this matter.  And while I appreciate the

12  background that Mr. Rossow described to the Court, about the

13  Michigan lease and about their view on Vero Beach, the fact

14  remains that on January 2nd, this Court entered an order

15  approving a transaction between the debtors and Gordon

16  Brothers.

17          As has been described in earlier remarks today,

18  that transaction critically included designation rights over

19  the entire universe and population of the debtors' leases and

20  contracts.  My client, having evaluated the facts and

21  circumstances of this particular lease and the positions of

22  the parties, the debtors, the landlord, and ALDI, as the

23  putative successful bidder back in December, made a conscious

24  business decision, as is its exclusive right under the asset

25  purchase agreement and the sale order from January 2nd, to go

1    and pivot in a different direction.

2            And rather than take on the litigation risk, as

3    described, it decided that it would negotiate, in conjunction

4    with the debtors, a lease-termination agreement with the

5    landlord.  In my view, the fact that the dollars and cents

6    may be equivalent is of no moment.  This is a business

7    decision solely in the discretion of Gordon Brothers and,

8    again, we mean no disrespect and no criticism of ALDI in this

9    regard, but it is a business decision we've made.

10            We are not under any contractual or other

11    obligation, statute or otherwise, to conduct any further

12    competitive auction.  In this particular instance, we

13    determined not to do that.

14            Mr. Rossow described much about, you know, the

15    hearing back on December 30 and December 31st, which led to

16    the January 2nd sale approval order.  The fact remains that

17    his colleagues were present at that hearing on Zoom and made

18    no mention whatsoever of their interests, made no attempt to

19    exclude these assets, and as a result, these assets were

20    included or this lease was included in the assets, subject to

21    the asset purchase agreement.

22            There is nothing for this Court to decide today,

23    insofar as Mr. Rossow's client is concerned.  What is going

24    to be before the Court, as Mr. Piraino mentioned, is a

25    certification of counsel, accompanied by a lease-termination

1  agreement that has been approved by the debtors and Gordon

2  Brothers, consented to us, by us, pursuant to which we intend

3  to terminate the lease on consent with the landlord, pursuant

4  to paragraph 42 of the sale order.  We believe that is

5  entirely appropriate by way of procedure, which the sale

6  order explicitly provides that if there's an agreement among

7  the parties, no hearing is required, no further objection

8  period is required between those two principal parties, and

9  we would ask the Court when it has an opportunity to review

10  the certification of counsel, to enter an order approving the

11  lease termination, as negotiated among the parties.

12          I'm happy to respond to any questions you may

13  have, Your Honor.

14          THE COURT:  No, I'll hear from others.

15          MR. FOX:  Thank you, Your Honor.

16          MR. GOLD:  Good afternoon, again, Your Honor.

17          Ivan Gold of Alan Matkins.  I'm co-counsel with

18  Mr. McDaniel for Premium Asset Management, PAM, not the

19  kitchen product.

20          Your Honor, I'm going to start by quoting a

21  longtime practitioner in front of this Court, Ms. Heilman's

22  mentor, David Pollack.  David once built an entire argument

23  around an old ad campaign:  There's Hertz and there's not

24  exactly.  And I channel that, because listening to

25  Mr. Rossow's comments, I heard a lot of "not exactly."  I

1  heard a lot of conflating issues.  I heard a lot of

2  conflating timeline.  And I'd like to respond to the high

3  points.

4         We start with the fact that the debtor made clear

5  on Friday, they filed an agenda, that they weren't moving

6  forward.  That was preceded by phone conversations and emails

7  earlier in the week.  The debtor advised and Mr. Rossow

8  acknowledged he spoke to Mr. Goldberger earlier in the week

9  that Gordon Brothers had decided to go another way.

10         Well, I don't want to have to call Mr. Goldberger

11  to the stand to establish the timeline that the reply brief

12  or whatever you want to call it, filed by ALDI and the

13  witness list, followed that phone call.  They knew Gordon

14  Brothers was going another way.  What you saw is docket

15  grandstanding, that they were going to go forward whether

16  anyone else liked it or not, and we saw a lot of that today.

17         We saw a lot of argument about things that are

18  moot.  I don't know -- I think I just sat through, not one,

19  but two motions for reconsideration.  I think we saw a motion

20  for reconsideration of your original bidding procedures

21  order, Your Honor, back at Docket 612, which, Mr. Piraino

22  referred to as paragraph 8 of the Court-approved bidding

23  procedures says:

24         "Doing a deal with the debtor is not an acceptance

25  of the deal under an order is entered by the Court."

1          That didn't happen.

2          Paragraph 12 of the same bidding procedures

3   contains the traditional fiduciary out and in the language

4   there it says that the debtor, in its discretion, at any

5   time, prior to entry of this Court's order, may pursue an

6   alternative transaction.

7          Exhibit A to the existence of an alternative

8   transaction is my friend, Mr. Fox, who I know is

9   uncomfortable today, because I don't think in the long time

10  we've known each other, we've ever agreed more on a single

11  topic than what's before the Court this afternoon.

12       (Laughter)

13          MR. GOLD:  But the fact is, Your Honor --

14          MR. FOX:  For the record, Your Honor, I am

15  uncomfortable.

16       (Laughter)

17          MR. GOLD:  Your Honor, counsel for ALDI said that

18  he referred to being mooted by the lease-termination

19  agreement.  That's false; they were mooted by the Gordon

20  Brothers' sale order.  This was not an excluded asset.  The

21  debtor chose to go another way.  Gordon Brothers bought it,

22  bag and baggage, bought the deals, and they now have the

23  decision-making ability, which they have exercised, under the

24  designation rights.

25          So, not one order, but two support just simply

1  going forward with the transaction with the landlord.  All

2  the references about the auction and A&G, in the bluntest

3  terms, Your Honor, A&G was ousted by your ruling on the 2nd.

4  That process ended.  We had two days of hearings where

5  everybody involved in this case had an opportunity to be

6  heard, ask for clarifications, objections.

7          Was ALDI here to say, Hey, Your Honor, we have

8  this pending transaction.  Can I get a clarification?  Are we

9  done?  Do I now talk to Gordon Brothers?  Are we still on?

10          They didn't do any of that.

11          So the fact is, Your Honor, that the process that

12  Mr. Rossow complains about is history, like so much of this

13  case.  That was then, and since entry of your order

14  authorizing the Gordon Brothers' sale transaction, this is

15  now.  And under that transaction, as well as paragraphs 8

16  and 12 of the bidding procedures, the debtor sold these, the

17  rights to make decisions regarding the Vero Beach lease and

18  others, and Gordon Brothers, in its business judgment, which

19  it bargained, and as Mr. Fox said earlier, paid handsomely

20  for, they've decided to go another way.

21          Now, Mr. Rossow said that they played by the

22  rules, and that may very well have been true, but the fact is

23  that the rules changed.  That was a consequence of the

24  failure of the Nexus transaction, the debtor being compelled

25  to pursue an alternate transaction, which was contemplated,

1  and this Court approving that alternative transaction.

2         The price the landlord paid is not particularly

3  relevant, or will pay, because of the litigation risks.  Your

4  Honor, I was fully prepared, but for the deal, to litigate

5  with ALDI.  We noticed the deposition.  You can see that

6  reflected in the docket.  That was withdrawn in reliance on

7  the fact that we had the deal.  That was the deposition of

8  the debtors' representatives.

9         We had quite a robust hearing, Your Honor, because

10 I would have told you Toys "R" Us doesn't matter.  This is

11 free and clear of an alcohol restriction.  This was bargained

12 for in a lease in 2023 and I would argue to you that if you

13 have the lease in front of you, and you don't, and this isn't

14 the entirety of my argument, it's just to respond about the

15 litigation risks, that I would argue to you it was a risk

16 management and insurance provision.  I would also tell you

17 that ALDI's form of APA, which is on file with the Court, is

18 greedy.  And, yes, I choose that word very purposefully,

19 because it didn't just wasn't to invalidate it for 365(f)

20 purposes, it wanted you to excise that provision for all

21 time.  It wanted to transfer it free and clear, which I would

22 have argued to you is completely impermissible under the

23 Code, I don't care what case you cite.

24         I would also argue that there were indemnification

25 problems with the ALDI APA, which excluded historical events

1  for which the debtor had insurance.  We solved that problem

2  in the Nexus sale order.  We solved that problem with the

3  Gordon Brothers' sale order.

4       But ALDIs didn't solve that problem; they defied

5  it.  I would argue that even if you went ahead with ALDIs, I

6  would object on the basis of your Gordon Brothers sale order

7  that says that those indemnification issues will be handled,

8  but that's not what the ALDI APA said.

9       So, when Mr. Fox and his client made the

10 determination to go another way, they not only had the right

11 to do it under this Court's order, it was rational, because

12 when Mr. Rossow says, Oh, there was no topping, yes, the

13 litigation risks and the litigation costs, and to prove how

14 invisible that apparently is to ALDI, he stands before you

15 and is suggesting all these really wild procedures that we

16 need to have going forward, just so ALDI can take their next

17 shot at a process that passed them by.  The cost would only

18 go up, Your Honor, and that's the decision Gordon Brothers

19 made and that's the decision they paid for and that's the

20 decision-making ability you approved as part of that

21 transaction.

22       So, as to get back to where Mr. Piraino started, I

23 don't think there's anything before the Court today, and

24 we've been talking for a while, but the debtor is not going

25 forward with that transaction.  As they were entitled to do,

1    the debtor pursued an alternative transaction, as they were

2    entitled to do.

3           Gordon Brothers, who became the decision-maker

4    under your January 2nd order, as they were entitled to do,

5    has made a different decision.  They are following the

6    procedures under paragraph 42 of that order, with the

7    certification of counsel, as they're entitled to do under

8    this Court's order.  So, I don't see any grounds for

9    upsetting where we are and where we have been over the last

10   several weeks.

11          Although, this is not precisely the forum, but the

12   Third Circuit has long held that disgruntled bidders

13   generally don't have standing, so even if you think it's a

14   continuation of the same process, a winning bidder has been

15   declared under procedures and the discretion that you

16   granted.  And just because ALDIs thought they had a deal, and

17   I'm not suggesting at one time that might not have been in

18   good faith, but the fact is that your orders made it clear

19   there isn't a deal until you sign an order.

20          And we can look at the -- I don't know, I think we

21   probably passed 1800 items on the docket by the time the

22   hearing is done today -- you will not find an order approving

23   the assignment of the Vero Beach lease in any of the 1800

24   items on the docket, Your Honor.  So, without that order,

25   they had no right to claim they had a deal and the rules

1  changed from the 30th to 31st, the 2nd, whichever date we

2  want to pick.  I'd like to think I wasn't the only one who

3  could tell what was going on because I sat in your courtroom

4  for those two days, but it was apparent that this was no

5  longer the A&G process; this was now the Gordon Brothers

6  process.

7        Gordon Brothers isn't required to have an auction.

8  They get to do this at their own discretion.  They can

9  privately market it.  They can solicit lease termination bids

10  from landlords, as I'll tell you they're doing with other

11  clients of mine, or they can run a public process.  But they

12  paid, as part of the multimillion-dollar consideration, they

13  paid for that flexibility.  They paid for that optionality

14  and they have exercised it, and there's no reason to

15  reconsider, at this point, that process, which has been

16  approved by this Court and is in the process of being

17  implemented.

18        Thank you, Your Honor.

19        MR. PIRAINO:  Your Honor, for the record, Stephen

20  Piraino, Davis Polk & Wardwell, on behalf of the debtors.

21        Your Honor, very briefly, I fully agree with what

22  Mr. Gold and Mr. Fox said.  I think one point -- I guess,

23  just two points.  You know, one, importantly, from the

24  estate's perspective, we've been here for a good amount of

25  time today already on this issue.  We chose not to -- well,

1  I'm sorry -- Gordon Brothers decided not to go forward with

2  this through their designation rights.  The debtors have an

3  obligation to follow those designation rights, which is why

4  we, also, are not going forward and we think it's in the

5  estate's best interests for the process that was approved by

6  the APA, the sale order to be followed here and to not

7  continue to have to expend resources on that.

8          And, also, I just think it's very important, just

9  to underscore what Mr. Gold said about playing by the rules.

10  The rules were the sale procedures.  Those rules did change.

11  They're the designation rights procedures.  We don't need to

12  get into a complicated evidentiary hearing on that.  I think

13  it's very clear, based on this Court's orders, where we're

14  at, who has the ability to elect what happens with these

15  leases.  It's Gordon Brothers; they paid for it.

16          And I'd also -- just one last thing -- I said only

17  two, I'll do three things -- the certification of counsel,

18  which attaches the termination agreement, there is a waiver

19  for rejection damages.  There is a benefit to the estate from

20  this, so it's sort of an added bonus for the estate.  We

21  avoid litigation.  We're complying with our obligations to

22  ensure that Gordon Brothers has their designation rights.

23  And we're also getting the claims waiver, which, obviously,

24  is beneficial to everyone who has a claim against the

25  debtors.  Thank you.

1           THE COURT:  Thank you.

2           MR. ROSSOW:  Thank you, Your Honor.

3           Jim Rossow, Rubin & Levin, for ALDI.

4           I do want to make a couple of brief points.  One

5   is that the deposition that was noticed was a deposition of

6   the debtors' representative; it wasn't a deposition of ALDI.

7   We would have been more than happy to press forward.

8           I think, I'm surmising that the debtor didn't want

9   to have a witness stand for deposition.  I don't think the

10  Court should read anything into that, other than the fact

11  that the debtors' posture was to not engage in any

12  litigation.

13          With respect to the, with the sale procedures, we

14  get it.  This is bankruptcy.  Courts have flexibility.  But

15  this assumption and assignment agreement is subject to New

16  York law and New York, like many states, has an implied

17  covenant of good faith and fair dealing.

18          My position is, and this will be relevant in other

19  cases, Your Honor, is that we can't have this in these cases.

20  A&G and the debtor identified ALDI's Vero Beach bid as the

21  highest-and-best offer.  And it's understood that the debtor

22  will protect that transaction.  Yes, we understand there's

23  some litigation involved, but litigation is what drove the

24  price.

25          I heard arguments that somehow the consideration

1  that's being paid doesn't matter, but it kind of does matter,

2  doesn't it.  It does matter because the math works out to

3  exactly the same as what the ALDI offer is, right.  Because

4  if it didn't matter, Your Honor, I think you'd see a

5  different number.  And, you know, if it were me, it might be

6  more.

7        I will stand by our proposal that we're prepared

8  to pay more.  I have authority.  I mean, if it's okay, I

9  won't say what my maximum authority is, but it's to go higher

10 than the $800,000.  It's to pay higher -- I will tell

11 you 810, we'll go higher than that.  So, we're prepared to

12 pay more if we had a fair opportunity.

13       I think the -- once you're in the transaction,

14 proceed, protect the transaction.  I don't -- and I'm not

15 criticizing the Court, but the identification of assets, it's

16 not part of the notice.  It's not part of the motion.  It's

17 not part of the purchase agreement.  It's not part of the

18 amended purchase agreement.  That is what I'm being told

19 poured my future in concrete and mooted everything, is an

20 identification of assets that were never attached to anything

21 on the docket.

22       So, Your Honor, I understand that this is

23 difficult, but I can say that I'm not happy that we're here,

24 but we bid in good faith and now I see, frankly, the

25 transaction with the landlord to be diplomatic and somewhat

1  complementary is the landlord's counsel, and Mr. Gold became

2  involved after that objection was filed, so he's talking

3  about arguments that -- he's talking about the arguments that

4  he would have been a formidable opponent; arguments that were

5  never made in the objection.  They were never made to the

6  Court and that's the posture that we go into what would be a

7  contested hearing.

8           And he is right, in terms of the timing of the

9  brief.  We actually -- it takes us some time to prepare these

10  briefs, so we had drafted it, but we hadn't actually filed

11  it, in terms of the timing.  I think we needed an affidavit

12  that we filed that we hadn't got a signature on.

13          So it's not that the debtor disclosed to us that

14  there was a lease termination being negotiated and then all

15  of a sudden, you know, in a day, we drafted a brief.  We were

16  drafting our response.  We were fully intending to litigate.

17          Frankly, we were intending to litigate because we

18  kind of didn't think we were going to get much support from

19  the debtor, but that's okay.  We're happy to do our job and

20  ask the Court for relief, but that didn't happen in this

21  case.

22          So, Your Honor, I would just say that with respect

23  to the transaction, please don't approve the certification.

24  I thought certification of counsel was in a situation where

25  the parties didn't -- where there were no disputes as to the

1  relief that was being requested.  And I know, Your Honor, I'm

2  not -- I'm only admitted *pro hac* here, so I defer to the

3  parties, but I can just tell you that without any animosity,

4  and I will tell you, I heard a lot of animosity, a lot of

5  the -- I mean, frankly, *ad hominem*.

6     I don't feel that way towards the lawyers, but I do know

7     that this is a process in which, from the outside, it looks

8     like the landlord who never appeared at the auction, who

9     chose not to bid, chose not to assert an objection, all

10    they did is notice up a deposition and the apparent

11    posturing collapsed and then they did a deal with, they did

12    a deal directly with the assignee of the buyer -- of the

13    debtor, Gordon Brothers -- or the buyer of the debtors'

14    assets.

15          So, I mean, it looks like they saw that they were

16  not going to get relief in an actual contested proceeding,

17  and so they did a separate transaction.  So thank you, Your

18  Honor.

19          THE COURT:  Thank you.

20     Anything further?

21        (No verbal response)

22          THE COURT:  I'm going to overrule the objection.

23  I appreciate counsel's comments here this afternoon and I

24  appreciate ALDI's participation in this process, but the bid

25  procedures provided that the debtors' presentation to the

1  Court of successful bids and alternative bids would not

2  constitute the debtors' acceptance of such bids, which

3  acceptance will only occur upon approval of such bids by the

4  Court.

5          The sale order approved the sale of the

6  designation rights.  Gordon Brothers has a court order

7  approving its designation rights and Gordon Brothers paid for

8  optionality, and it has exercised that optionality and

9  proceeded differently under the circumstances.

10          So, I will review the matter under certification,

11  but let me clarify for counsel, given what's gone on here

12  today, I would ask that counsel have an opportunity to at

13  least review the order under certification of counsel and

14  communicate with the debtors and Gordon Brothers, with

15  respect to the certification and the landlord PAM.  And, of

16  course, hopefully, you'll be able to promptly submit that to

17  the Court.

18          MR. PIRAINO:  Your Honor, for the record, Stephen

19  Piraino of Davis Polk & Wardwell.

20          It's, of course, fine and, you know, we look

21  forward to whatever comments there may be, which we'll

22  discuss with Mr. Fox.

23          Just one last thing on the scheduling.  Just to

24  alert Your Honor on, I believe, the week of March 19th, we

25  have an omnibus hearing scheduled.  There are some conflicts,

1  so we're going to be reaching out to chambers to see if

2  there's an alternative time, but we did just want to let Your

3  Honor know that we will be reaching out to your courtroom

4  deputy to see if there's an alternative time.

5         THE COURT:  Okay.  And you also need a hearing

6  sometime the week of February 10th?

7         MR. PIRAINO:  Yes, and I think both, Ms. Heilman

8  and Mr. Fox have assisted on that, so, perhaps, I'll let

9  Ms. Heilman handle that.

10        MS. HEILMAN:  Good afternoon, Your Honor.

11        Leslie Heilman, Ballard Spahr, for the record, for

12  the landlord of Highland.

13        Your Honor, yes, we wanted to revisit the week of

14  the 10th for a hearing date, with respect to the Store

15  Number 4126 and the assignment to Burlington.  I think

16  Burlington would also like to be heard, as to availability,

17  as well, depending on what your Court's availability is.

18        THE COURT:  We may have to move a couple of things

19  to try to get something, because I have no availability on

20  the 12th or the 13th and the 14th, I have a contested matter

21  in the morning, so I may have to call and see how much time

22  they think.  And then the next week starts with a holiday.

23        MR. FOX:  Your Honor, Steven Fox.

24        We would be fine the holiday week.  We understand

25  Monday the 17th is not an option.  We've already imposed upon

1  Your Honor enough for holidays.  But subject to Ms. Heilman's

2  willingness to move into that week, we'd be, certainly, from

3  Gordon Brothers' perspective, we'd be fine with that.

4          THE COURT:  What are we contemplating, in terms of

5  time?

6          MR. FOX:  Hard to say, Your Honor.

7          Ms. Heilman is unhappy with the result of the

8  transaction that's going -- that is the subject of the second

9  designation notice filed earlier today.  Her client wants

10  control over the lease and we have designated it for

11  assumption and assignment to Burlington.

12          Now, you've heard many issues about Burlington.

13  We don't think there will be an adequate assurance of future

14  performance question there.  They have been approved by this

15  Court as an assignee on multiple occasions, including in this

16  case, but I don't want to speak for Ms. Heilman.  She's very

17  creative.  I'm sure she'll come up with something, so it's

18  hard to predict what we would expect.

19          But the designation notices on file, it does

20  trigger a 14-day objection period.  I think the debtors,

21  Gordon Brothers --

22          THE COURT:  Was this filed today?

23          MS. HEILMAN:  Yes.

24          MR. FOX:  It does, Your Honor, but we can set a

25  hearing within X number of days after that so we have some

1  flexibility among the parties.  Sooner is obviously better.

2          I, personally, will be in Las Vegas for a

3  conference the week of the 10th, so I share Your Honor's

4  difficulty in scheduling that week, but we are available the

5  following week.

6          MS. HEILMAN:  Your Honor, in terms of timing, as I

7  stand here today, I can't really tell you how long it would

8  be.  I mean, we've had -- there have been other matters

9  before you today that talked about whether or not it's a

10  designation rights asset and not a designation rights asset.

11  Your Honor, we're continuing to do discovery on that.

12          Contrary to some of the other matters you've heard

13  today, this particular lease was not subject to any bidding

14  procedures or bidding process, so the paragraphs 8 and 12 do

15  not apply to this particular lease, Your Honor.  And there is

16  considerable harm that is still running to the landlord.  I

17  don't believe we have confirmation today that the insurance,

18  utilities, and security will remain into February.  We only

19  have assurances through January.

20          We have been addressing these issues with the

21  debtor since October.  None of the rents have been paid on

22  this lease at all.  We have a half a million dollars that is

23  outstanding to the debtor.  We have reservations of rights in

24  the designation notice that says that they're going to

25  contest the cure.

1    Your Honor, time is of the essence.  We've asked

2  for a hearing the week after the designation notice was

3  filed.  We're not really sure why it was filed today.  We had

4  a pseudo auction on this lease a week ago Monday and we were

5  told on Wednesday that it was a designated asset, but the

6  debtors waited until today to file their notice of

7  assumption.

8    That now pushes us into February.  This should

9  have all been concluded, actually, by the end of December,

10 which is the position of the landlord.  But we're now into

11 January and now we're at the end of January into February.

12   Your Honor, respectfully, the matter needs to move

13 forward.  And I understand that Gordon Brothers paid for

14 optionality and is exercising that optionality, but we do

15 dispute that it's a designation rights asset.  We raised

16 these concerns prior to the sale hearing and got no response.

17 And, Your Honor, we do dispute that it was a designation

18 rights asset and that any benefit, if any, should be going to

19 the estate, and that the lease-termination agreement that was

20 accepted by the debtors, outside of any process, should be

21 approved by this Court and the landlord should get its space

22 back so no further harm is done.

23   MR. PIRAINO:  Your Honor, for the record, Stephen

24 Peraino, Davis Polk.

25   I'm not going to respond to each of Ms. Heilman's

1  points, but I do just want to, on insurance and utilities.

2  Obviously, the debtor, and Mr. Fox has confirmed on behalf of

3  GBRP, we'll ensure that if the hearing is the week of

4  the 17th, whatever works for the Court, that utilities,

5  insurance, et cetera, will be maintained through the hearing.

6  We certainly wouldn't cut it off prior to any hearing.

7         THE COURT:  Okay.  Well, let me ask you this, does

8  the response deadline have to be 14 days as to this, take it

9  or leave it?

10        MR. PIRAINO:  I mean, pursuant to the sale order,

11  yes, I think that the parties could discuss, because,

12  obviously, we've been in receipt of Ms. Heilman's motion for

13  some time.

14        THE COURT:  Right.

15        MR. PIRAINO:  We could certainly discuss a more

16  expedited briefing schedule if that --

17        THE COURT:  I'm going to have my chambers look at

18  dates and see what can be compressed, but obviously, this

19  doesn't sound like something that's going to take an hour.

20  So, we'll get back to you about a date.

21        MR. PIRAINO:  Understood, Your Honor.

22        THE COURT:  And, hopefully, we'll get back to you

23  this afternoon.

24        MR. PIRAINO:  Okay.  Understood.

25        And we'll, obviously, be in touch with Ms. Heilman

1  and Mr. Fox and we'll respond promptly.

2         And then, I guess, with respect to the order that

3  would need to be entered today, the 365(d)(4) order, with

4  thanks to Ms. Roglen and some of my colleagues back at the

5  office, I think we have incorporated sort of the comments to

6  push both, Ms. Roglen, or, I guess, accelerate the deadline

7  for Ms. Roglen and the edge order.  Folks will send that

8  around to Ms. Roglen and to Fox Rothschild and then have that

9  submitted, hopefully, very shortly, so that it can be entered

10 today if that's okay, Your Honor?

11         THE COURT:  Yep.

12         MR. PIRAINO:  Okay.  So, from the debtors'

13 perspective -- from our perspective, nothing further, but I

14 believe Burlington might have one more thing.

15         MS. PEGUERO:  Good afternoon, Your Honor.

16         Kristhy Peguero, Jackson Walker, on behalf of

17 Burlington Stores, and my 9010 application is on file, and it

18 may have been granted in the time that we've sat here at the

19 hearing.

20         I just wanted to request that if Your Honor sends

21 communication to the debtors and to GB and to the landlord,

22 with respect to the hearing date, that Burlington be

23 included, to the extent that --

24         THE COURT:  Okay.  We don't maintain emails.

25         If there's certain parties that -- and it's not

1  our habit to communicate with counsel.  Our habit is to, or

2  practice is to let debtor, the United States Trustee, and

3  whoever the opponent is, and they should share the date with

4  you.

5          MS. PEGUERO:  Wonderful, okay.

6          THE COURT:  But it will not go beyond scheduling a

7  date.

8          MS. PEGUERO:  Okay.  Wonderful.  Thank you.

9          THE COURT:  If there's an issue with that, then

10  the parties need to let us know, okay.

11          MS. PEGUERO:  Thank you, Your Honor.

12          MR. PIRAINO:  And just to confirm, Your Honor,

13  once we get, you know, emails on the scheduling, we'll, of

14  course, include the Burlington folks, as they're a relevant

15  party here.

16          THE COURT:  Right.  Understood.  Okay.

17          MR. PIRAINO:  So, I think with that, we have

18  nothing further for today.  So, we very much thank Your Honor

19  for your time.

20          THE COURT:  Okay.  Thank you.

21          Everybody have a good afternoon and I'll see you

22  shortly.  We stand adjourned.

23          MR. PIRAINO:  Thank you, Your Honor.

24          COUNSEL:  Thank you, Your Honor.

25      (Proceedings concluded at 3:47 p.m.)

1                        CERTIFICATION

2            We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ William J. Garling                    January 23, 2025

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Tracey J. Williams                    January 23, 2025

13   Tracey J. Williams, CET-914

14   Certified Court Transcriptionist

15   For Reliable

16

17

18

19

20

21

22

23

24

25