# Exhibit A

# LEASE AGREEMENT

**Between**

**Wilshire Plaza Investors, LLC**
**"Landlord"**

**and**

**Jo-Ann Stores, LLC**
**"Tenant"**



TABLE OF CONTENTS

| SECTION | HEADING | PAGE |
|---|---|---|
| SECTION 1. | EXHIBITS TO LEASE | 1 |
| SECTION 2. | DEFINITIONS | 2 |
| SECTION 3. | PREMISES | 7 |
| SECTION 4. | TERM AND OPTIONS TO EXTEND | 8 |
| SECTION 5. | FIXED MINIMUM RENT | 9 |
| SECTION 6. | INTENTIONALLY DELETED | 10 |
| SECTION 7. | INTENTIONALLY DELETED | 10 |
| SECTION 8. | TAXES | 10 |
| SECTION 9. | COMMON AREA COSTS | 12 |
| SECTION 10. | CONSTRUCTION OF PREMISES | 15 |
| SECTION 11. | USE | 17 |
| SECTION 12. | COMMON AREAS | 18 |
| SECTION 13. | UTILITIES | 19 |
| SECTION 14. | USE VIOLATION | 19 |
| SECTION 15. | CO-TENANCY | 21 |
| SECTION 16. | RULES AND REGULATIONS | 22 |
| SECTION 17. | ALTERATIONS, INSTALLATIONS AND IMPROVEMENTS BY TENANT | 22 |
| SECTION 18. | REPAIRS AND MAINTENANCE | 22 |
| SECTION 19. | INDEMNIFICATION | 25 |
| SECTION 20. | WAIVER OF CLAIMS | 25 |
| SECTION 21. | PROPERTY AND LIABILITY INSURANCE | 26 |
| SECTION 22. | SIGNS | 27 |
| SECTION 23. | ASSIGNMENT AND SUBLETTING | 28 |
| SECTION 24. | REPAIR AFTER CASUALTY | 29 |
| SECTION 25. | CONDEMNATION | 30 |
| SECTION 26. | REPRESENTATIONS AND COVENANTS OF LANDLORD | 31 |
| SECTION 27. | TENANT'S DEFAULT | 34 |
| SECTION 28. | RIGHTS OF LANDLORD | 36 |
| SECTION 29. | LANDLORD'S DEFAULT | 36 |
| SECTION 30. | MORTGAGE SUBORDINATION | 37 |
| SECTION 31. | NO WAIVER | 38 |
| SECTION 32. | SURRENDER OF PREMISES | 38 |
| SECTION 33. | SHORT FORM LEASE, COMMENCEMENT DATE AGREEMENT | 39 |
| SECTION 34. | NOTICE | 39 |
| SECTION 35. | HAZARDOUS MATERIALS | 40 |
| SECTION 36. | LIMITATION OF LANDLORD'S LIABILITY | 42 |
| SECTION 37. | DELIVERY OF SITE PLAN | 42 |
| SECTION 38. | INTENTIONALLY OMITTED | 42 |
| SECTION 39. | ENTIRE AGREEMENT; WRITING REQUIRED | 43 |
| SECTION 40. | OPERATING COVENANT | 43 |
| SECTION 41. | APPLICABLE LAW AND CONSTRUCTION | 43 |



SECTION 42.    UNAVOIDABLE DELAYS............................................................ 44
SECTION 43.    REASONABLE CONSENT........................................................... 44
SECTION 44.    NO PARTNERSHIP .................................................................... 44
SECTION 45.    ESTOPPEL ................................................................................. 44
SECTION 46.    QUIET ENJOYMENT................................................................. 45
SECTION 47.    HOLDING OVER ....................................................................... 45
SECTION 48.    BROKERS ................................................................................... 45
SECTION 49.    INTENTIONALLY DELETED .................................................... 46
SECTION 50.    CLAIMS LIMITATION ............................................................... 46
SECTION 51.    CAPTIONS .................................................................................. 46
SECTION 52.    VARIATION IN PRONOUNS...................................................... 46
SECTION 53.    SECTION REFERENCES ............................................................ 46
SECTION 54.    BINDING EFFECT OF AGREEMENT ....................................... 46
SECTION 55.    ATTORNEY'S FEES .................................................................... 46
SECTION 56.    OFAC WARRANTY..................................................................... 47
SECTION 57.    PDF/COUNTERPART SIGNATURE ........................................... 47

## LEASE

This Lease is made as of July 12, 2019 between **Wilshire Plaza Investors, LLC**, a Delaware limited liability company ("**Landlord**"), and **Jo-Ann Stores, LLC**, an Ohio limited liability company ("**Tenant**").

Landlord and Tenant covenant and agree as follows:

## SECTION 1.  EXHIBITS TO LEASE

(a)    The following Exhibits are attached to and made a part of this Lease, and are incorporated herein by reference:

Exhibit A.   The description of the lands upon which the Shopping Center is located.

Exhibit B.   The site plan showing the Shopping Center, the location of the Premises, as hereafter defined, the Shopping Center buildings, the Protected Area, the parking areas, driveways and common areas and containing other general information relative to the development of the Shopping Center Site (the "Site Plan").

Exhibit C.  Intentionally Deleted.

Exhibit D.  The FY18 Prototype Plans.

Exhibit D-1.  Tenant's Prototype Signage.

Exhibit E.  Intentionally Deleted.

Exhibit F.  Exclusive and Prohibited Uses.

Exhibit G.  Form of Subordination, Non-Disturbance and Attornment Agreement.

Exhibit H.  Form of Estoppel Certificate.

(b) If there is any conflict or ambiguity between Tenant's Approved Plans and the language in this Lease or any Exhibit attached hereto, Tenant's Approved Plans shall supersede and control.



## SECTION 2. DEFINITIONS

The terms listed below have the respective meanings as follows:

(a)  Additional Rent: Tenant's Proportionate Share of Taxes (Section 8), Tenant's Proportionate Share of Common Area Costs (Section 9), and Tenant's Proportionate Share of Insurance (Section 21).

(b)  Commencement Date: (i) the 151st day after the Delivery Date, or (ii) the day that Tenant opens for business in the Premises, whichever day first occurs. Notwithstanding anything to the contrary in this Lease, unless Tenant otherwise opens for business, the Commencement Date will not occur during any period that:  (1) Tenant has not received all required governmental permits and approvals necessary for Tenant's occupancy, provided Tenant promptly applies for and diligently pursues obtaining such permits and approvals and no less than 45 days prior to the Estimated Delivery Date; or (2) Tenant has not received the fully executed SNDA required under Section 30(a) below. Tenant may elect to open for business during any period identified in the immediately preceding sentence, and in such case, Tenant shall be obligated to pay only Substitute Rent during said period. Also, notwithstanding the foregoing, in no event shall Tenant be required to open or commence the payment of Rent during the period commencing November 15 and ending the next occurring January 31 ("Blackout Period"); and, if the Commencement Date would otherwise occur in the Blackout Period (except for the reason that Tenant opens for business), the Commencement Date shall be deemed to be the first day after the expiration of the Blackout Period unless Tenant opens for business during the Blackout Period then such date shall be the Commencement Date and Tenant shall commence paying full Rent.

(c)  Common Areas: the parking areas, driveways, aisles, sidewalks, malls (whether enclosed or unenclosed), truck storage areas, mechanical rooms, and other common, service and related areas and improvements within the Shopping Center, whether open to the public generally or for the non-exclusive use of one or more tenants, and whether or not shown on Exhibit B, but excluding the roof(s).

(d)  Default Rate:  an annual rate of interest equal to the lesser of 10% per annum or the maximum amount allowed by law.

(e)  Delivery Date: the date that Landlord delivers the Premises to Tenant with all of the Delivery Requirements satisfied and Tenant accepts said delivery by written acknowledgment signed by Tenant's Vice President of Real Estate, Vice President of Store Development or Director of Construction and Store Projects. Tenant shall not unreasonably delay, condition or refuse its acceptance of the Premises. The Delivery Date shall not occur prior to the Estimated Delivery Date (regardless of whether Landlord has satisfied the Delivery Requirements prior to that date), except with Tenant's express written consent, in its sole discretion.

(f)  "Delivery Requirements" means the following:

(1) Landlord's Work shall be substantially complete, with only minor punch-list items remaining than can be completed without interfering with the Tenant's Work in the Premises;

(2) the Premises are delivered to Tenant free and clear of any Hazardous Material, including asbestos, and Landlord represents and warrants as such;

(3) Tenant has received from Landlord results from a slab moisture test indicating that the slab meets or exceeds the acceptable levels of slab moisture per ASTM 2170-2 (Rh 90% or below) (it is also understood and agreed between the parties that floor covering installation shall not occur until this subsection 2(f)(3) has been satisfied), said test must be performed by a certified testing company and shall include a floor plan indicating where the test locations are within the Premises, and if remediation is required, the construction allowance shall be increased by a maximum of $1.00 per square foot to cover the costs of any remediation;

(4) The demolition of the concrete block walls and metal stud and gypsum board walls separating, the sales floor area from the stockroom area.  The walls will be removed from the floor to the underside of the roof and the ceiling will be removed 24" in front of the ceiling furr down and the furr down will also be demolished, removed and disposed of.  The counters and the display area under the mezzanine, stairs, storage room and work room walls will be demolished and disposed of.  The second floor mezzanine will be demolished along with the mechanical equipment located below the mezzanine. All electrical services to the above areas will be terminated back to the panel box which includes the removal of the wire and conduit.

Demolition also includes the removal and disposal of the ceiling tiles, ceiling grid, light fixtures, and HVAC grills and registers; removal of the front office, and removal of all floor covering in the Premises and any hazardous material abatement, and removal of all other store fixtures;

(5) all Common Areas are existing and are in accordance with all applicable Laws, including, without limitation, delivery areas, landscaping and paving, sidewalks, and striping of parking areas; and

(6) Tenant has received a fully executed copy of the SNDA required under Section 30(a).

(g)    Estimated Delivery Date: Landlord's good-faith estimate of the Delivery Date is November 4, 2019.

(h)    Gross Leasable Area: the number of square feet of floor area (excluding non-

retail mezzanine, basement and other such areas), measured from the exterior face of exterior walls, the exterior building line for sidewalk or mall frontage, and the center line of party walls, with no deduction for columns, stairs, elevators, or any interior construction or equipment areas used exclusively by Tenant for the Premises.

With respect to the Shopping Center, the Gross Leasable Area is the total constructed Gross Leasable Area available for the exclusive use and occupancy of tenants within the Shopping Center. With respect to the Premises, the Gross Leasable Area will be the actual completed Gross Leasable Area, as the same exists from time to time.

Any change in Gross Leasable Area, whether of the Premises or Shopping Center, will be deemed in effect on the first day of the next succeeding month following such change. Landlord covenants to advise Tenant of any increase or decrease in the Gross Leasable Area of the Shopping Center due to the construction or demolition of any buildings in the Shopping Center within 60 days of any such change, together with a current Site Plan reflecting such change.

Landlord represents and warrants that the Gross Leasable Area of the Shopping Center intended for exclusive use and occupancy as shown in the Site Plan is approximately 121,709 square feet.

(i)    Hazardous Materials: See Section 35.

(j)    HVAC: heating, ventilating and air conditioning systems exclusively serving the Premises.

(k)    Laws: any and all laws, codes, ordinances or regulations passed into existence by any Public Entity now or hereinafter in existence.

(l)    Lease Year: a period of 12 consecutive calendar months during the Term. The first Lease Year (or Lease Year One) begins on the first day of February next following the Commencement Date, unless the Commencement Date is the first day of February, in which event the first Lease Year begins on the Commencement Date. The first Lease Year will include the first Partial Lease Year, if any. Rent and any limitations on such Rent for purposes of any Partial Lease Year will be proportionately adjusted based upon the actual number of days of such Partial Lease Year in relation to the number of days in a full Lease Year.

(m)    Outside Delivery Date: December 15, 2019 (not subject to Unavoidable Delay).

(n)    Partial Lease Year: the period, if any, of fewer than 12 consecutive calendar months between the Commencement Date and the next occurring February 1 and the period, if any, of less than 12 consecutive calendar months between the last day of the last Lease Year and the expiration of the Term.

(o)    Permitted Use: the sale of fabrics of all kinds; goods sold by the yard; patterns;

knitting supplies, needlepoint, macramé; art materials and supplies; finished crafts, craft materials and supplies; educational aids, materials and supplies; yarns; all types of notions; floral products, artificial flowers and accessories; scrapbooks and scrapbooking supplies and materials; framed artwork; picture frames, framing (both ready-made and custom made) and framing materials and supplies; fabric care items; foam products; ceramics; wearable art and wearable art supplies; miniatures, dolls, hobby items; sewing machines, sewing machine furniture; irons, ironing boards; seasonal merchandise; custom services and custom products using arts and craft and sewing components including, but not limited to, quilting, bow-making, window treatments, floral design, fashion sewing, instructional classes, materials and services; and the incidental sale of (defined as no more than 10% of any individual following item) baskets, wicker items; housewares; linens, curtains, towels, pillows; drapery and upholstery materials; draperies, drapery hardware; blinds, shades, shutters and window treatments; do-it-yourself products and accessories related to sewing and crafting; bridal apparel and accessories, wedding supplies; gift items, cards, party supplies; paper goods, stationery; candles, candlesticks, brass and pottery; indoor and outdoor house decorating products and accessories; furniture; candy and food crafting products (i.e. Wilton cake making and decorating supplies), and assorted beverages such as bottled soda and water sold near checkouts (not to exceed 300 square feet); instructional books and tapes; children's books; toys; vacuum cleaners, lamps, small household appliances; products, accessories related to all of the foregoing, and other items and services customarily offered for sale by a fabric, craft or general merchandise store, and such other related merchandise and services typically offered in the stores operated by Tenant under the name Jo-Ann, Jo-Ann Fabrics and Crafts or such other name under which Tenant may operate in Louisiana. Said use shall not conflict with any exclusives granted within the Shopping Center in effect as of the date hereof, which exclusive uses are set forth on Exhibit F.

(p) Plans and Specifications: The final plans and specifications for the construction of the Premises, in the form of Exhibit D, as the same may be modified by written agreement by and between Landlord and Tenant.

(q) Premises: a portion of the Shopping Center as shown on the Site Plan and located within the Shopping Center, on the Shopping Center Site, consisting of space having approximately 20,250 square feet of Gross Leasable Area, with a minimum frontage of 150 feet (to the center of the side walls).

(r) Protected Area: the area shown on the Site Plan.

(s) Public Entity: the federal, state, county, municipal or other governmental unit, however denominated, and any agency, division, department or public official thereof, now or hereafter having jurisdiction, in any respect, over the Premises, the Shopping Center or Shopping Center Site.

(t) Rent: Fixed Minimum Rent, Additional Rent, and all other monetary obligations of Tenant to Landlord under this Lease.

(u) Shopping Center: the Wilshire Plaza located in Metairie, Louisiana, consisting of



all buildings including the Premises and Common Areas, and other improvements located upon the Shopping Center Site, and outlined on Exhibit B.

(v)    Shopping Center Site: the legal description set forth on Exhibit A, on which the Shopping Center is located.

(w)    Substantially Complete: complete with the exception of minor "punchlist" items that can be completed within 14 days without interfering with the performance of Tenant's Work.

(x)    Substitute Rent: 50% of the Fixed Minimum Rent in lieu of the Fixed Minimum Rent, Percentage Rent (if any), and Additional Rent otherwise required to be paid under this Lease. Tenant is not obligated to pay any Fixed Minimum Rent, Percentage Rent (if any), or Additional Rent at any time when Substitute Rent is payable pursuant to any provisions of this Lease. "Initial Substitute Rent" means 65% of the Fixed Minimum Rent otherwise due, plus 50% of the Additional Rent otherwise due. In addition, Tenant shall not be obligated to be open or operating at the Premises during any period it is entitled to pay Substitute or Initial Substitute Rent. Landlord acknowledges that certain violations of this Lease or specified events hereunder will cause Tenant significant damage, but that actual damages will be impossible to determine. Landlord agrees that the violations and other events specified in the Lease where Tenant is entitled to pay Substitute Rent or Initial Substitute Rent are in fact cases where Tenant will suffer significant damage, but that actual damages will be impossible to determine. Landlord has agreed to Substitute Rent or Initial Substitute Rent as liquidated damages because actual damages are impossible to determine and so liquidated damages represent a fair compromise and is not a penalty. Landlord has agreed to these provisions (and the entire Lease) voluntarily and after consultation with legal counsel.

(y)    Tenant's Proportionate Share: a fraction, the numerator of which is the Gross Leasable Area of the Premises and the denominator of which is the Gross Leasable Area of the Shopping Center. Notwithstanding the foregoing, if any portion of Common Area Costs, Taxes, or Insurance Costs are furnished or directly payable by an individual tenant or occupant as opposed to Landlord, the cost of the item(s) furnished or payable by such tenant or occupant shall not be included in Common Area Costs, Taxes, or Insurance Costs, as the case may be, and the square footage of the tenant or occupant furnishing or paying for such item(s) shall not be included in the calculation of Tenant's Proportionate Share of such item(s). Tenant's Proportionate Share shall be adjusted in the event of any increase or decrease in the Gross Leasable Area of all buildings within the Shopping Center or the Gross Leasable Area of the Premises.

(z)    Tenant's Work: the work, if any, to be performed by or at the direction of Tenant in finishing the Premises as provided in Tenant's Approved Plans.

(aa)   Term: the Initial Term, as hereafter defined, and each Extended Term, as hereafter defined, if any, and any renewals or period of holdover tenancy.



(bb)    Unavoidable Delay: A material delay beyond the reasonable control of the delayed party caused by labor strikes, lock-outs, extraordinary labor troubles, industry-wide inability to procure materials, failure of power, extraordinary restrictive governmental laws or regulations (such as gas rationing), riots, war, military or usurped governmental power, acts of terrorism, sabotage, material fire or other material casualty, or an extraordinary and material act of God (such as a tornado or earthquake), but excluding inadequacy of insurance proceeds, litigation or other disputes, financial inability, lack of suitable financing, delays of the delayed party's contractor and failure to obtain approvals or permits unless otherwise caused by an event of Unavoidable Delay.

## SECTION 3. PREMISES

(a)    For the Rent and upon the terms and conditions contained in this Lease, Landlord leases during the Term, and Tenant leases from Landlord during the Term, the following:

(1) The Premises as described in Section 2(q) hereof, outlined on the Site Plan and further described herein; and,

(2) The right, in common with Landlord and all other tenants of the Shopping Center granted similar rights by Landlord, to the non-exclusive use of all Common Areas. The rights hereby granted with respect to the Common Areas shall constitute easements appurtenant to the Premises and a servitude upon the Shopping Center Site. The benefit and the burden of such easements shall run with and bind the Shopping Center Site.

(3) Subject to local codes, Landlord approval and applicable tenant consents as to location, the right to place one (1) shopping cart corral ("Corral") immediately next to the outside wall of the Premises' entryway on the sidewalk in the Corral Area shown on Exhibit B. Tenant will maintain the Corral in good condition and repair. If Landlord receives notice that Tenant's Corral violates any local code or ordinance, then after receipt of notice from the governing body, Tenant will remove the violating Corral, or move it to a mutually acceptable location.

(b)    Subject to the reasonable consent of Tenant, Landlord expressly reserves the right to maintain, use, repair and replace the pipes, ducts, conduits, utility lines, tunneling and wires leading through the ceiling, plenum areas, columns, partitions, and within or under the floor slabs comprising part of the Premises, but only to the extent that such installations (i) are reasonably necessary to serve the Premises or other parts of the Shopping Center, (ii) are installed in locations that will not interfere with Tenant's use of the Premises or Tenant's permitted signage, (iii) are not exposed within the selling area, and (iv) do not decrease the ceiling height of the Premises. Similarly, notwithstanding anything to the contrary in this Lease, subject to Landlord's prior approval which shall not be unreasonably withheld or delayed, Tenant shall have the right to make installations in or on the Premises   which are consistent with Tenant's prototype plans for other similar stores operated by Tenant or which are part of

Tenant's Leadership in Energy and Environmental Design initiative or other Tenant initiatives. In exercising the foregoing rights, neither Landlord or Tenant shall interfere with the use or occupancy of the Premises or other tenant premises or commence any such work without first notifying the other party, at least 10 days in advance, of the commencement of such work. In no event may Landlord construct any improvements above the Premises or place signs on the exterior walls of the Premises.

(c)    The "Premises" excludes the exterior walls, roof, and the floor slab (excluding floor covering installed by Tenant) and areas beneath the floor slab, and if Tenant installs a mezzanine in the Premises for the storage of inventory and/or fixtures, Tenant shall not pay any Rent on that space.

(d)    Within 60 days following the Commencement Date, Tenant may have its architect ("Tenant's Architect") measure the final Premises to determine the number of Gross Leasable Area of the Premises. If the area reflected by such measurement varies from that set forth in this Lease, then all items of Rent shall be appropriately adjusted, provided, however, that in no event shall any item of Rent be increased by more than 1% because of a variance in area of the Premises and in no event shall the construction allowance be reduced from the amount set forth herein. If Tenant does not perform such measurement within such 60 day period, then the area specified in this Lease shall be deemed to be the Gross Leasable Area of the Premises. If Landlord disputes the measurement of Tenant's Architect, Landlord shall notify Tenant within five business days after receipt by Landlord of such measurement; if Landlord does not timely object to the measurement by Tenant's Architect, Landlord shall be deemed to have approved the measurement by Tenant's Architect. If Landlord does timely object, Landlord shall then have 15 days to have an architect selected by Landlord ("Landlord's Architect") measure the Premises using the procedures set forth herein. If Landlord's Architect disputes the findings of Tenant's Architect, both Architects shall meet in good faith for a period not to exceed 15 days and try to reach agreement on the number of leasable square feet. If the Architects cannot reach agreement within such period, the Architects shall in good faith select a third, independent architect (the "Resolution Architect") to measure the Premises.    The measurement of the Resolution Architect shall be final and binding on all parties. All fees and costs payable to Landlord's Architect shall be paid by Landlord. All fees and costs payable to Tenant's Architect, shall be paid by Tenant. Tenant and Landlord shall each be responsible for one-half of the fees and costs payable to the Resolution Architect.

## SECTION 4.  TERM AND OPTIONS TO EXTEND

(a)    The "Initial Term" begins on the Commencement Date and ends on the last day of the 10th Lease Year, unless sooner terminated as herein provided.

(b)    Landlord grants Tenant the right and option to extend this Lease for three additional periods of five years each (individually called an "Extended Term" and collectively called "Extended Terms"), commencing upon the expiration of the Initial Term or such prior Extended Term, as the case may be. Each Extended Term shall be upon the same terms, covenants and conditions as the Term except for the option to extend then exercised and except



for such changes, if any, in Rent or other Tenant charges as are expressly set forth in this Lease.

(c)     Tenant must deliver written notice to Landlord of its election to extend this Lease for an Extended Term on or before the date that is 180 days before the expiration of the Term or the Extended Term, as the case may be. Concurrently with the exercise of the option by Tenant, Tenant will pay Landlord any unpaid balance of the Rent due during the Extended Term that has accrued as of the date of such notice of extension.

## SECTION 5.  FIXED MINIMUM RENT

(a)     From and after the Commencement Date, Tenant must pay to Landlord, without demand, at the address herein specified for notices to Landlord, Fixed Minimum Rent for the Premises as follows:

(1)     During Lease Years one through five of the Initial Term at the rate of $19.00 per square foot per year; and

(2)     During Lease Years six through ten of the Initial Term at the rate of $20.25 per square foot per year; and

(3)     During the first five-year Extended Term at the rate of $22.00 per square foot per year; and

(4)     During the second five-year Extended Term at the rate of $24.00 per square foot per year; and

(5)     During the third five-year Extended Term at the rate of $26.00 per square foot per year.

The amounts shall include and be in payment of all other charges not specifically set forth in this Lease.

(b)     Tenant must pay monthly installments of Fixed Minimum Rent in advance, without notice, on or before the first day of each month during the Term, commencing on the first day of the first month next following the Commencement Date (unless the Commencement Date is the first day of the month, in which event the first monthly installment shall be due on the Commencement Date). Notwithstanding the foregoing, Landlord must invoice Tenant, which invoicing will not occur more than 30 days before the Commencement Date, for the first monthly installment of Fixed Minimum Rent. In no event will the first rent installment be due until 10 days after Tenant's receipt of this initial invoice. Fixed Minimum Rent for the partial month, if any, after the Commencement Date will be computed on a per diem basis (assuming a 30-day month), and Tenant must pay the Fixed Minimum Rent for such partial month concurrently with the first monthly installment. If Tenant fails to pay Rent on the due date and Landlord notifies Tenant in writing of such failure twice in any Lease Year, then if Tenant fails to pay Rent on the due date thereafter in the same Lease Year, then the Landlord, in addition to



the Rent then owed, is entitled to a late fee of $100 for such third late payment and any such other late payment of Rent thereafter during that Lease Year.

## SECTION 6.  INTENTIONALLY DELETED

## SECTION 7.  INTENTIONALLY DELETED

## SECTION 8.  TAXES

(a)    Landlord covenants and warrants that the entire Shopping Center is located on tax parcel identification number 0820038274 (the "Tax Parcel"), that the Tax Parcel does not extend beyond the perimeter of the Shopping Center Site and that the improvements comprising the Shopping Center (including the Premises and Common Areas) as set forth on Exhibit B are the only improvements now located or to be located thereon which will be considered for the tax value for which Tenant shall be responsible for its Proportionate Share thereof. Once or twice per Lease Year, depending on when tax bills are issued by the government authority, Tenant must pay to Landlord the Tenant's Proportionate Share of real estate taxes ("Taxes") levied upon the Tax Parcel and paid by Landlord during each year of the Term, after reducing Taxes (i) by the amount of any contributions for Taxes paid by any party having the right to use the Common Areas but not a tenant of the Shopping Center, and (ii) by any rollback, discount for timely or early payment, credit or reduction that has been granted or issued by any taxing authority or governmental group or agency. Notwithstanding the foregoing, if the Premises, or a portion of the Shopping Center including the Premises, is separately assessed, then Tenant will pay, as Tenant's allocable share of Taxes, the lower of: (1) Tenant's Proportionate Share of Taxes, or (2) Tenant's Fraction of Taxes, with Tenant's Fraction being a fraction whose numerator is the Gross Leasable Area of the Premises and whose denominator is the Gross Leasable Area of all buildings within such separately assessed parcel. Tenant will pay Tenant's Proportionate Share of Taxes within 30 days after receipt of Landlord's statement assessing and prorating the Taxes, together with copies of receipted tax bills for which payment is sought and reasonable verification for the computation of Tenant's Proportionate Share. For the first Lease Year, Tenant's proportionate share of Taxes is estimated to be $2.50 per square foot of Gross Leasable Area of the Premises; and, Landlord represents that said amount is a good faith estimate of the actual Taxes that would be due if Tenant were paying its full Proportionate Share of Taxes for said Lease Year.

(b)    Intentionally deleted.

(c)    In no event will Tenant pay for Taxes for a time period longer than the Term.

(d)    The parties acknowledge that only Landlord has the right to dispute the assessed value of Shopping Center (which is the only way to attempt to control the real estate taxes). For this reason, Landlord shall have the duty to timely compare the then current value of the Shopping Center (utilizing the income approach, with a capitalization rate based upon recent sales(s) of comparable shopping centers) to the assessed value of the Shopping Center determined by the taxing authority. If variance is greater than 5%, Landlord is required to



pursue reduction. Tenant is responsible for its pro-rata share of all costs associated with pursuit. If Landlord fails to pursue, payment of taxes will be capped at 5% increase per year until Landlord pursues.   Alternatively, Landlord may annually engage a national or regional real estate tax assessment firm and utilize their assessment and recommendation regarding appeal of assessment values.  Landlord will provide such assessment evaluation for the Shopping Center upon Tenant request.

(e)    If any Taxes may be paid in installments, subject to the exclusions below, only the installments coming due during the Term will be included within Taxes. Landlord must use best efforts to minimize the Taxes assessed against the Tax Parcel.

(f)    Tenant must pay before delinquency all municipal, county and state taxes assessed during the Term against any leasehold interest and personal property of any kind, owned by or placed in, upon or about the Premises by Tenant.

(g)    Notwithstanding anything to the contrary, the following are excluded from Taxes:

(1) Any portion of the Taxes assessed: (A) against tenant improvements and tenant space completion work, whether constructed by Landlord or by any other party;  or (B) against additional buildings or other taxable improvements not now constructed on the Tax Parcel; or (C) otherwise attributable to any increase in the assessed value of the Tax Parcel by reason of such improvements or work;

(2) Any portion of the Taxes attributable to a revaluation of the Tax Parcel arising out of a sale or other change in the ownership thereof or of any interest therein;

(3) Any portion of the Taxes in the nature of fees, charges or assessments for governmental services or improvements related to the initial construction or any alteration, expansion or rehabilitation of the Shopping Center or other improvement of the Tax Parcel (beyond the upkeep and repair of the Shopping Center that is necessary to keep the same in first-class condition);

(4) Any tax or fee that applies generally to all business owners or operators, as opposed to owners of real property;

(5) Any impact fee, user fee, exaction fee, environmental fee or other tax paid as a prerequisite to construction of the Shopping Center, or any addition or improvement thereto;

(6) Estate tax, inheritance tax, succession tax, capital levy tax, corporate franchise tax, margin tax, rent tax, profits tax, gross receipts tax, income



tax, conveyance fee or transfer tax and the like;

(7) Any assessment, bond, tax, or other finance vehicle that is (A) imposed as a result of Landlord's initial construction of the Shopping Center, or (B) used to fund construction of additions or improvements to the Shopping Center; and

(8) Any penalty, interest or other charge attributable to Landlord's late or delinquent payment of Taxes.

## SECTION 9. COMMON AREA COSTS

(a)     In addition to payment of the Fixed Minimum Rent, Tenant must pay to Landlord Tenant's Proportionate Share of Landlord's reasonable and actual costs applicable to the Shopping Center for the operation and maintenance of the Common Areas ("Common Area Costs"), after reducing such Common Area Costs by (i) the amount of any contributions toward Common Area Costs paid by tenants paying such costs directly to a third-party provider or any party not a tenant of the Shopping Center; and (ii) all fees and revenue collected or paid to Landlord for parking in, at, on, near or around the Shopping Center. Subject to the cap in Section 49, Tenant must pay to Landlord in 12 equal installments, each in advance on the first day of every calendar month, an estimated sum toward Tenant's Proportionate Share of Common Area Costs. During the first Lease Year, the actual amount paid by Tenant will not exceed the rate of $0.78 per year multiplied by the Gross Leasable Area of the Premises. For Lease Years after the first Lease Year, the monthly sum may be adjusted annually by Landlord to reflect actual changes in the Common Area Costs, subject to the cap in subsection (c) below.

(b)     On or before April 1 of each year, Landlord must provide Tenant with a statement assessing and prorating the Common Area Costs, together with a certified statement of the Gross Leasable Area of the Shopping Center and copies of all bills for which payment is sought.  If Landlord fails to provide the annual reconciliation statement, then Tenant has the right to suspend payment of Common Area Costs until such statement is received. Tenant must pay to Landlord, within 30 days of such receipt, any deficiency owed to Landlord.  If Tenant's estimated payments are in excess of Tenant's Proportionate Share in any Lease Year, then such excess will be offset against Tenant Rent for the following Lease Year unless such Lease Year is the final Lease Year of Tenant's occupancy, in which case Landlord must refund such overpayment to Tenant within 30 days after delivery of the annual statement.

(c)     Notwithstanding the anything to the contrary, in no event will Tenant's Proportionate Share of Common Area Costs increase by more than 5% per year (non-cumulative basis) above that amount actually paid by Tenant for the previous Lease Year.

(d)     Tenant and its agent have the right to audit and inspect Landlord's books and records pertaining to Common Area Costs, Taxes and Insurance Costs for only up to two years after the close of the then current calendar year upon 15 days written notice. If any audit or review of Landlord's books and records determines that Tenant has overpaid any Common Area

Costs, Taxes or Insurance Costs, then Tenant has the right to offset any overpayment against Rent, but if Tenant is in the last Lease Year of the Term, then Landlord must refund the overpayment to Tenant within 30 days after notice from Tenant. If any such audit or review determines that Tenant has overpaid any Common Area Costs, Taxes or Insurance by more than 5%, then Landlord must pay to Tenant the reasonable cost of such audit or review; otherwise the audit or review shall be at Tenant's sole cost and expense. Landlord shall be responsible for providing Tenant with books and records for Tenant's additional rent contribution for the preceding calendar year and such additional periods required under this Lease. Any such audit shall be conducted at Landlord's main office during business hours and shall not be conducted more than once per applicable calendar year.

(e)     The payment of such Common Area Costs is in consideration of Landlord's maintenance and operation of the Common Areas, and Landlord must use such payment for that purpose.

(f)     Notwithstanding anything to the contrary, the following are excluded from Common Area Costs:

(1)     the original cost, or depreciation of the original cost, of constructing, erecting and installing the Shopping Center, the Common Areas, common facilities and related services;

(2)     principal and interest payments pursuant to any mortgage that encumbers the Premises or Shopping Center;

(3)     Taxes;

(4)     administrative charges, management fees, fees based upon a percentage calculation, leasing commissions or any other fee or charge regardless of the name (including, without limitation, salaries of all kinds, social security, taxes, insurance, part-time or full-time labor, any fees paid to manage the Shopping Center including those paid to a third party management company, and similar costs and expenses) that is related to the management and operation of the Shopping Center;

(5)     expenses incurred due to the negligence or willful misconduct of Landlord or any occupant of the Shopping Center or their respective agents or employees;

(6)     costs and expenses incurred for repairs or replacements due to faulty construction, faulty workmanship or structural defects;

(7)     expenses related to an individual occupants of the Shopping Center or to a particular tenant space, or to buildings;



(8)     any cost, fees, fines or penalties, or interest thereon, related to violations by Landlord or any occupant of any Law; and the cost of compliance with Laws enacted after the date hereof;

(9)     capital expenditures (a capital expenditure is defined as an item or items costing $1,000 or more and having a useful life of at least one year); other than a "Permitted Capital Expenditure." A Permitted Capital Expenditure is limited to the following:  repaving of the parking lot(s) not more frequently than once every 10 years; provided, however, that each Permitted Capital Expenditure must be amortized on a straight-line basis over the useful life of the related improvement based on federal income tax guidelines, but in no event less than five years, and only the amount of the annual amortization shall be included in Common Area Costs for any Lease Year within the useful life so determined;

(10)    reserves for replacement;

(11)    costs for insuring the Common Areas, but this exclusion does not limit Landlord's rights of reimbursement, if any, under Section 21;

(12)    cost of advertising, marketing, decorating, redecorating, or special cleaning or other services not provided on a regular basis;

(13)    all costs and expenses relative to the solicitation and execution of leases for space in the Shopping Center;

(14)    all costs and expenses related to the operation, maintenance and repair of any garage space in the Shopping Center;

(15)    the cost of any repair or replacement made by Landlord because of the total or partial destruction of the Shopping Center or the condemnation of a portion of the Shopping Center or the Shopping Center Site;

(16)    any operating expense paid to a related corporation, entity or person that is in excess of that amount that would have been paid absent such relationship;

(17)    the cost of overtime or other expenses incurred by or on behalf of Landlord to correct any default of Landlord or for work performed by or on behalf of Landlord where such work is expressly provided in this Lease or any other lease the cost of which was/is to be borne at Landlord's expense;

(18)    any cost that is paid or reimbursed by third parties, including warranties and guarantees and including any cost that is paid or reimbursed by

insurance (or would have been covered by insurance required to be maintained by Landlord);

(19)    the amount of any insurance deductible or self-insured retentions; and

(20)    payments made under any easement, operating agreement, license, restrictive covenant, or any instrument relating to the payment or sharing of costs among property owners;

(21)    costs disproportionately incurred by or on behalf of one or more tenants, including, without limitation, all costs relating to a food court area; and

(22)    costs and expenses incurred with respect to the correction, disposal, investigation, removal, transportation, or treatment of Hazardous Material.

(g)    Landlord must use best efforts to keep Common Area Costs to a minimum subject, however, to the obligation of Landlord to maintain the Shopping Center as a first-class retail project.

(h)    Landlord covenants that there will be no duplication of costs between those payable by Tenant within this section and under this section and any other section of this Lease.

## SECTION 10.  CONSTRUCTION OF PREMISES

(a)    Tenant, at its sole cost and expense, shall hereafter deliver to Landlord for Landlord's approval not to be unreasonably withheld, a copy of Tenant's proposed plans and specifications and sign drawings (the "Proposed Plans") within 60 days of Lease execution. Landlord shall not in any event withhold its approval of any plans and specifications to the extent they comply with Tenant's prototype plans attached hereto as Exhibit D. If Landlord fails to approve or disapprove, in writing, the Proposed Plans within 15 days after receipt thereof from Tenant, then such approval will be deemed to have been given. If Landlord furnishes Tenant a written response, Tenant will resubmit revised Proposed Plans within 10 days after having received Landlord's response, and Landlord will then have a 10-day period within which to review the same.  If Landlord fails to respond within 10 days, then such revision will be deemed approved.  Such review process will continue until the Proposed Plans are acceptable to both Landlord and Tenant once approved by Landlord and Tenant such plans may be referred to herein as "Tenant's Approved Plans.". If the parties do not reach agreement on the Tenant's Proposed Plans within 90 days after their first submission to Landlord, Tenant may terminate this Lease upon written notice to the Landlord within 15 days after such 90-day period. Within 15 days of Tenant's receipt of the approved Plans and Specifications, Tenant shall apply for all required governmental permits and approvals necessary for Tenant's Work and signage, and Tenant shall diligently pursue obtaining such permits and approvals. If Tenant is unable to secure the required governmental permits and approvals within 60 days of Tenant's application therefor ("Permit Period") despite good faith efforts, then Landlord shall have the right to pursue such permits and approvals on behalf of Tenant for an additional 60 days (if Landlord



elects to pursue such permits and approvals, said 120 day period shall hereinafter referred to as the "Permit Period"). If the required governmental permits and approvals have not been obtained during the Permit Period, despite good faith efforts by Tenant, Tenant and Landlord shall have the right to terminate this Lease by delivering written notice to the other of its intent to terminate the Lease within 30 days after the end of the Permit Period. If Tenant and Landlord fail to exercise their right to terminate this Lease during said 30 day period, the right to terminate established under this section shall be null and void. After delivery of the termination notice, Tenant and Landlord shall be relieved of all obligations under this Lease and shall not be liable to the other for damages or otherwise.

(b)    Landlord represents, warrants and covenants to Tenant that on the Delivery Date all vestiges of prior tenant signage, including holes, mountings and coloration, shall be removed ("Prior Signage") and the Premises will comply with all Laws, including, without limitation, all Laws with respect to Hazardous Material, and: (i) if any Prior Signage is present, then Landlord must perform such removal or Tenant may, at its option, remove the Prior Signage and Landlord must reimburse Tenant within 30 days for Tenant's cost of such removal, abatement or remediation, plus 15% administrative fee, and if not so reimbursed, Tenant may deduct such amount from Rent; (ii) if any Hazardous Material, not caused by Tenant, is required by Law to be removed, abated, or otherwise remediated, then Landlord must perform such removal, abatement or remediation; or (iii) with respect to Hazardous Material if, as a result of, or as a condition to, Tenant's Work, any Hazardous Material is required by Law to be removed, abated, or otherwise remediated, then Tenant may, at its option, remove, abate or otherwise remediate such Hazardous Material and Landlord must reimburse Tenant within 30 days for Tenant's actual cost of such removal, abatement or remediation, and if not so reimbursed, Tenant may deduct the cost from Rent.  Subject to: (1) the immediately prior sentence, (2) the repair obligations of Landlord, (3) any work outlined in Section 2(f)(4) of this Lease, and (4) the provisions of this Lease, Tenant will take possession of the Premises on the Delivery Date on an "as is" basis. Notwithstanding anything to the contrary in this Lease, if removal, abatement or remediation is required under Subsection 10(b)(ii) or (iii) hereof ("Remediation Period"), then the Commencement Date shall be delayed on a day for day basis for each day of the Remediation Period.

(c)    Tenant shall hereafter have access to the Premises for inspection, taking measurements, making plans, erecting temporary or permanent signs and the performance of Tenant's Work as may be appropriate or desirable by Tenant without being deemed thereby to have taken possession or accepted delivery of the Premises; provided, however, that Tenant shall indemnify, defend and hold Landlord harmless from and against any and all claims or losses arising from Tenant's entry upon the Premises, except to the extent caused by Landlord, its agents, employees or contractors.   In no event will Tenant be required to accept delivery of the Premises unless and until the Delivery Requirements have been satisfied. No agent or non-employee representative of Tenant has the authority to accept delivery of the Premises. Only direct employees of Tenant with a title of Director or above can accept delivery, which acceptance must be in writing. Any purported acceptance by a non-authorized person or that is not in writing is not binding upon Tenant.

(d)    Landlord shall use its best efforts to cause the Delivery Date to occur by the Estimated Delivery Date.  If the Delivery Date does not occur by the Outside Delivery Date, Landlord must pay to Tenant the sum of $1,000.00 for each day (the "Per Diem Payment") between the Outside Delivery Date and the earlier to occur of (i) the Delivery Date or (ii) the date Tenant terminates this Lease in accordance with Section 10(e). If Landlord fails to pay Tenant the Per Diem Payment within 15 days after written notice by Tenant, then Tenant will have the right (without limiting any other right or remedy of Tenant to collect such payment) to deduct such amount, together with interest thereon at the Default Rate, from Rent and other payments due Landlord.  Landlord and Tenant agree that it will be difficult to determine the precise amount of damages that Tenant will incur as a result of the failure of the Delivery Date to occur by the Outside Delivery Date.  Therefore, Landlord and Tenant agree that the Per Diem Payment constitute liquidated damages for such failure.  If the Delivery Date does not occur by the Outside Delivery Date, said liquidated damages shall be payable irrespective of the date Tenant actually opens for and conducts business in the Premises.

(e)    If the Delivery Date has not occurred on or before the Outside Delivery Date, then Tenant has the right to terminate this Lease by delivering written notice to Landlord at any time from and after the Outside Delivery Date but before the Delivery Date. After delivery of Tenant's notice of termination, Tenant shall be relieved of all obligations hereunder and shall not be liable to Landlord in damages or otherwise. In the event Tenant so terminates this Lease, Landlord shall be liable to Tenant for all payments due Tenant under Section 10(d) and, in addition, immediately shall reimburse Tenant for all legal (not to exceed $5,000.00) and architectural and engineering fees (not to exceed $20,000.00) incurred by Tenant in connection with this Lease.  This Section 10(e) survives the termination of this Lease.

(f)    Landlord must pay Tenant a "construction allowance" in the amount of $795,000.00, irrespective of costs or the size of the Premises, as follows: (i) 45% to be paid to Tenant within 45 days of the Delivery Date; (ii) 45% to be paid to Tenant within 105 days after the Delivery Date; and (iii) the final 10% to be paid to Tenant within 30 days after Tenant opens for business in the Premises.  As a condition precedent to the payment of each of the installments referenced above, Tenant shall have commenced Tenant's buildout of the Premises and Tenant shall provide conditional and final lien waivers in excess of $10,000.00 from Tenant's contractors, as applicable. If Landlord fails to pay Tenant any portion of the construction allowance in accordance with this Lease, then Tenant will have the right (without limiting any other right or remedy of Tenant) to deduct such amount from Rent (as a setoff or as recoupment in the case of bankruptcy), together with interest thereon at the Default Rate. Landlord will wire-transfer the construction allowance to Tenant's bank as follows: Bank of America, 100 West 33rd Street, New York, NY 10001, ABA : 026009593 (in the event Landlord elects to submit an ACH transmission, the number is: 111000012);  Jo-Ann Account No.: 4427216208;  Account Name: Jo-Ann Stores, LLC Store #2544.

**SECTION 11.  USE**

(a)    The Premises may be used for the Permitted Use and, except as provided otherwise in this Section 11 and subject to the prior consent of Landlord not to be unreasonably



withheld, for any other lawful retail use.

(b)     Subject always to the right to use the Premises for the Permitted Use, the Premises will not be used in violation of the exclusive uses as are set forth on Exhibit F. Landlord represents that the use restrictions accurately reflect exclusives, uses and encumbrances that presently encumber the Premises as terms of existing leases of Shopping Center premises (the uses covered by such restrictions are collectively referred to as the "Restricted Uses" and individually as a "Restricted Use"). Upon the expiration or earlier termination of the lease or other written instrument containing a Restricted Use, the Premises will not be subject to such Restricted Use under this Lease and such use will no longer be a Restricted Use. Upon the request of Tenant, Landlord promptly will advise Tenant which Restricted Uses still encumber the Premises and will furnish to Tenant the documentary support therefor.

## SECTION 12.  COMMON AREAS

(a)     Landlord, at its own cost and expense (except as otherwise specified in Section 9 or Section 21) must construct, install, operate, manage, repair and maintain the Common Areas in a first-class, neat and clean condition for the benefit of Tenant and Tenant's customers, employees, licensees and invitees. Landlord's obligations with respect to the Common Areas include, but are not limited to:

(1) Equipping and lighting the Common Areas;

(2) Maintaining the surfaces of all sidewalks, restriping and maintenance of paved and parking areas in a level, smooth and evenly covered condition with the type of surfacing material originally installed or such substitute as shall in all respects be equal in quality to the original;

(3) Removing all ice and snow, papers, mud and sand, debris, filth and refuse and thoroughly sweeping the Common Areas to keep them in a clean and orderly condition;

(4) Placing, keeping in good condition and repair and replacing all utility lines, any necessary appropriate directional signs, markers and curbs;

(5) Maintaining, trimming and watering, mowing and weeding all landscaped areas and making such replacements of shrubs and other landscaping as is necessary;

(6) If necessary as determined by Landlord, security arrangements including private police and similar services and functions.

(b)     Landlord may close any Common Areas temporarily, at such times as to cause the least possible interruption or interference with Tenant's business, to make repairs or changes, to prevent the acquisition of public rights in such Common Areas or to discourage



non-customer parking; but, in no event will the Protected Area be closed (except in the event of an emergency) without the prior reasonable consent of Tenant.  In no event shall Landlord designate the Protected Area as an employee parking area or otherwise permit the Protected Area to be used for employee parking.

(c)    Landlord must keep the Common Areas clean and well lighted from dusk until at least one-half hour after the close of Tenant's business and remove snow from the parking areas, driveways and sidewalks as promptly as possible.  Landlord cannot impose any parking charges for the parking of automobiles in the parking areas.  Landlord cannot grant the exclusive use of the sidewalk space or parking areas near the front of the Premises or in the exterior area near the rear door of the Premises.

## SECTION 13.  UTILITIES

Landlord, at its sole cost and expense, must cause all utilities furnished to the Premises to be separately metered so that only the service provided to the Premises will be reflected in utility bills rendered to Tenant by the respective supplying public utility companies.  Tenant must pay, when due, bills for utilities furnished to the Premises by public utility companies from and after the Delivery Date, including water, gas, electricity and telephone and the like, as are separately metered and charged directly to Tenant.

## SECTION 14.  USE VIOLATION

(a)    Landlord shall not lease, license or sell any space in the Restricted Property to a direct category competitor of Tenant, which is a fabric store, arts and crafts store or sewing machine store ("Protected Use"), such as by way of example and not limited to Michael's Arts & Crafts, AC Moore, Sierra Pacific Crafts, Ben Franklin Arts & Crafts, Beverly's, Calico Corners, Hobby Lobby, Singer, Bernina, Viking White, Husqvarna and Pfaff.  If any portion of any Restricted Property is used or occupied by such a direct category competitor (a "Use Violation"), then Tenant shall have the right to pay Substitute Rent until such Use Violation ceases. In addition, during the time that any Use Violation exists, Tenant has the right to terminate this Lease by giving 60 days' written notice to Landlord, in which event all further obligations hereunder shall terminate on the date specified in Tenant's notice, and any Rent (including Substitute Rent) paid in advance by Tenant must be refunded to Tenant within 30 days after termination of the Lease.

(b)    The foregoing restriction in subsection (a) will not apply to any tenant of the Restricted Property under a lease executed prior to the date of this Lease to the extent such tenant's lease (as the same exists on the date hereof) permits it to sell items that are included in the Protected Use without Landlord's consent, but this clause shall not apply if Landlord permits an expansion of such tenant's premises for a use that would violate this Section 14 if Landlord reasonably and legally may refuse to grant such permission, and further Landlord covenants with Tenant not to modify or amend any such tenant's lease in any manner that would permit such tenant to sell any items comprising the Protected Use to an extent greater than such tenant is permitted to sell such items under its existing lease.

Store #2544, Wilshire Plaza, Metairie, LA
EXECUTION VERSION: July 1, 2019
UB Document No.: 2578017v.6

(c)     In the event that Tenant's Protected Use is violated, the computation of Substitute Rent shall commence on the first day of the violation of the Use Violation, and shall be paid in monthly installments.

(d)     Notwithstanding anything to the contrary, in the event of a Use Violation by any tenant or occupant who conducts or operates in violation of the Protected Use without Landlord consenting to or granting such tenant or occupant the right to do so (a "rogue tenant"), then Tenant's right to pay Substitute Rent and terminate this Lease will be deferred, provided that Landlord commences court action to cure or eliminate the Use Violation by the rogue tenant within 30 days of it first occurrence and diligently pursues same to completion (which diligence by Landlord must include appeals to the highest state court, if lower court rulings are adverse to Landlord and allow the Use Violation to continue). If Landlord does not take such action against the rogue tenant as described in the immediately preceding sentence, then Tenant may exercise its termination right and right to pay Substitute Rent at any time.

(e)     Tenant's failure to exercise the termination option contained in this Section 14 is not a waiver of Tenant's continuing right to do so as long as such Use Violation continues. Without limiting Tenant's rights and remedies under this Section 14, Tenant has the right to equitable relief (including injunction) in the event of a Use Violation.

(f)     "Restricted Property" means the Shopping Center, any additions thereto or outparcels thereof.

(g)     Landlord covenants and agrees to use diligent, good faith, commercially reasonable efforts to cure any breach or violation of this Section, including, without limitation, seeking and diligently prosecuting all available legal and equitable remedies to compel or otherwise cause cessation of the Use Violation.

## SECTION 15.  CO-TENANCY

(a)     <u>Opening Co-Tenancy</u>.

(i)     The Opening Co-Tenancy Requirement means that two of four of the following: Fresh Market, Office Depot, Walgreens and Big Lots (the "Anchor Tenants") are open for business to the public during normal operating hours from substantially all the premises as shown on the Site Plan (the "Anchor Tenant Premises"). Notwithstanding anything to the contrary, Tenant is not required to open for business, nor is Tenant obligated for the payment of Rent, until the Opening Co-Tenancy Requirement is met.

(ii)     If Tenant elects to open for business before the date that the Opening Co-Tenancy Requirement is met, then from the date Tenant opens for business until the Opening Co-Tenancy Requirement is met, Tenant may pay Substitute Rent.

(iii)     If the Opening Co-Tenancy Requirement is not met for 12 months from

the date the Commencement Date would otherwise have occurred, then Tenant has the right to terminate this Lease by giving 90 days prior written notice to Landlord during the next six month period. If Tenant does not terminate this Lease within such time, Tenant shall thereupon return to full Rent hereunder.

(b)    Ongoing Co-Tenancy.

(i)    The Ongoing Co-Tenancy Requirement means that two of the four Anchor Tenants, or their successors or assigns, or replacement anchors, are open for business to the public during normal operating hours from substantially all the Anchor Tenant Premises.

(ii)    If, at any time after the satisfaction of the Opening Co-Tenancy Requirement or the period during which Tenant may terminate Lease expired, the Ongoing Co-Tenancy Requirement is not met for a period of 120 days, then Tenant may pay Initial Substitute Rent until the Ongoing Co-Tenancy Requirement is satisfied. If Landlord has not satisfied the Ongoing Co-Tenancy Requirement within 12 months of the original date that the second Anchor Tenant ceased doing business, Tenant may terminate the Lease upon 90 days prior written notice to Landlord.  If the Ongoing Co-Tenancy requirement is not met within 18 months, Tenant may terminate this Lease upon 90 days prior written notice to Landlord during the next six month period.  If Tenant does not exercise its right to terminate during said six month period, then such termination right shall expire and be of no further force or effect and Tenant, at the end of such six-month period, shall immediately commence payment of full Rent as outlined in this Lease.

(c)    Definitions.

(i)    A single national or regional comparable retail tenant suitable for occupancy in a first-class shopping center and operating under one trade name in 75% of the Anchor Tenant Premises, will be deemed to be an "Anchor Tenant" after the commencement of such substitute operation, except that holiday, seasonal and other temporary tenants that occupy the Anchor Tenant Premises for less than 180 consecutive days will not be deemed an Anchor Tenant. Up to two national or regional comparable retail tenants, occupying 75% of the Anchor Tenant Premises, suitable for occupancy in a first-class shopping center will, on a collective basis, be deemed to be an "Anchor Tenant" after the commencement of such substitute operation by both tenants.

(ii)    For purposes of this Lease, "national" shall mean a first-class retailer operating at least 50 stores, and "regional" shall mean a first-class retailer operating at least 10 stores in Louisiana and the states contiguous to Louisiana.

(iii)    A "retail tenant" is a non-residential, non-office tenant, under a lease with a term of at least three years who sells goods and services to consumers, provided that any tenant that has office space within its premises incidental to a retail use shall still be considered a retail tenant.



## SECTION 16.  RULES AND REGULATIONS

(a)      Landlord may, for the general welfare of the Shopping Center or the avoidance of nuisance, impose reasonable rules and regulations of general application governing the conduct of tenants in the Shopping Center and the use of the Common Areas (it is agreed and understood that such rules and regulations and any subsequent modifications thereto, notwithstanding anything to the contrary in this Lease, shall be subject and subordinate to the terms and conditions of the body of this Lease so that in the event of any conflict or inconsistency between the terms hereof and such rules and regulations, the terms hereof shall supersede and control.)  Tenant will comply with and perform any and all such rules and regulations imposed by Landlord so long as such rules and regulations do not limit the rights or expand the obligations of Tenant under this Lease and all occupants of the Shopping Center are subject to and comply with such rules and regulations.  Landlord must use best efforts to enforce such rules and regulations.

(b)      Tenant is not required to join or maintain membership in any tenant's business association sponsored by or for the Shopping Center, nor is Tenant required to pay any of the costs of the activities conducted by such association.

## SECTION 17.  ALTERATIONS,  INSTALLATIONS  AND  IMPROVEMENTS  BY TENANT

(a)      Tenant, without Landlord's consent, has the right to make such interior alterations, changes and improvements to the Premises as Tenant may desire for the conduct of Tenant's business and for the full beneficial use of the Premises; except for structural changes, alterations or improvements, which require Landlord's consent, which consent must not be unreasonably withheld or delayed.  Tenant will pay all costs and expenses of its improvements, will make such changes, alterations and improvements in a good and workmanlike manner, in accordance with all applicable laws and building regulations, and free and clear of any mechanic's liens or other liens or claims in connection with the making of such changes, alterations and improvements.

(b)      Except as otherwise provided, all signs, furnishings, trade fixtures, inventory, equipment and other removable property installed in the Premises by Tenant will remain the personal property of Tenant, will not be subject to any Landlord's lien or lien or security interest against the property of Landlord, and may be removed from the Premises by Tenant within 60 days after the termination of this Lease. If any of the foregoing is affixed to the Premises, Tenant will repair any damage caused by removal.

## SECTION 18.  REPAIRS AND MAINTENANCE

(a)      Except as otherwise provided, Tenant will maintain the interior, non-structural portion of the Premises, at its sole cost and expense, in an attractive, clean and sanitary condition.

(b)    Landlord warrants and guarantees that all structural portions of the Premises and the roof (water tight and leak free), utility cables, mains and conduits, electrical, plumbing, sewer systems are, and will be upon the Delivery Date, in compliance with laws and in good working order and repair.   Tenant acknowledges there is no sprinkler system serving the Premises.

(c)    Subject to Section 18(d), and except for damage caused by fire or other casualties or taking by eminent domain or conveyance in lieu thereof: Tenant, at its sole cost and expense, must make all interior nonstructural repairs to the Premises, including doors and windows, and (1) all repairs to the plumbing systems exclusively serving the Premises from the meter to and including the plumbing system in the interior of the Premises, and (2) the electrical system exclusively serving the Premises from Tenant's electrical panel to and including the electrical systems in the remainder of the interior of the Premises. Notwithstanding the foregoing, Tenant is not required to make any: (i) repairs of damage covered by insurance maintained or required to be maintained by Landlord; (ii) repairs necessitated by reason of the negligence, willful misconduct, or default of Landlord, its agents, employees or contractors; (iii) repairs to the plumbing, electrical or other similar units and systems where such repairs would necessitate going through or into the structural walls, or roof of the Premises; (iv) replacement of any plumbing, electrical or similar units or systems not exclusively serving the Premises. All of the repairs and replacements referred to in the immediately preceding sentence will be performed by Landlord at its sole cost and expense.

(d)    Landlord, at its sole cost and expense, must make all repairs to the Premises other than those that Tenant is required to make.  Landlord's obligations include, but are not limited to, repairs to the structural portions of the Premises (both interior and exterior), the roof, floor slab, foundation, exterior walls, any interior damage caused by roof leaks or water/sewage backing up into the Premises no matter where from (unless caused by the Tenant or originating in the Premises), and all repairs or replacements to the (x) plumbing systems or any portion thereof up to (but not including) the meter, and (y) the electrical system up to (but not including) Tenant's electrical panel.   In making any repairs or replacements, Landlord must not unreasonably interfere with Tenant's normal operations and business.  Landlord assigns to Tenant all warranties and guarantees, if any, with respect to any and all construction and equipment on the Premises to be maintained by Tenant.

(e)    Landlord will deliver the existing HVAC units and system "AS IS".  Tenant shall be responsible for all preventative maintenance, repairs and replacements of the HVAC unit(s) during the Initial Term and all Lease extensions or renewals. Notwithstanding anything to the contrary in the Lease, if Tenant should replace or repair the HVAC system or any part thereof during the final two years of the Initial Term or any Lease extension or renewal, if any, and not remain in possession of the Premises pursuant to a subsequent Lease extension or renewal, then the Landlord shall reimburse Tenant, within 30 days of the deliver back of possession of the Premises to the Landlord, for (i) the un-amortized cost of said replacement based on a straight-line amortization schedule over the useful life of the equipment in accordance with federal income tax guidelines (in no event less than 15 years), or  (ii) the actual cost of the repair in



excess of $1,500.00 (it being understood that Tenant shall be responsible for the first $1500.00, as the case may be.

(f)     Tenant will maintain the Premises, at its expense, free and clear of all rubbish, garbage and trash and place such rubbish, garbage and trash in the containers provided by Tenant. Tenant, at its own cost and expense, will dispose of all rubbish, garbage and trash on a timely basis. Landlord will provide an area for Tenant's trash compactor or containers, at Landlord's sole cost and expense, within 20 feet of the rear of the back door to the Premises.

(g)     Subject to this Section 18, Tenant will keep the Premises in an orderly and sanitary condition, free from vermin, rodents, bugs and other pests, and Landlord must keep the Common Areas in an orderly and sanitary condition, free from vermin, rodents, bugs and other pests. Notwithstanding the foregoing, Landlord is responsible for the extermination of termites, carpenter ants, and other insects capable of causing structural damage in, on or about the Premises, the Common Areas, and all parts of the Shopping Center. Landlord must require all tenants of the Shopping Center to keep their spaces in an orderly and sanitary condition, free from vermin, rodents, bugs and other pests.

(h)     Tenant is responsible for making any interior non-structural alterations of or improvements to the Premises that are required by any Public Entity after the Delivery Date, except to the extent that such responsibility is imposed upon Landlord in the next following sentence or otherwise under this Lease (including Section 18(c) above).    Landlord is responsible, at its sole cost and expense, for making all alterations of or improvements to the Premises that are required by any Public Entity (which requirement may arise as a result of Tenant seeking approval from a Public Entity for interior non-structural alterations and improvements to the Premises) and that (i) are structural in nature or (ii) relate to the exterior thereof, including the Common Areas.

(i)     Landlord and Tenant acknowledge that responsibility for compliance with the terms and conditions of Title III of the Americans with Disabilities Act ("ADA") may be allocated between Landlord and Tenant. Notwithstanding anything to the contrary contained in the Lease, Landlord and Tenant agree that the responsibility for compliance with the ADA shall be allocated as follows: (i) Tenant shall be responsible for compliance with the provisions of Title III of the ADA with respect to the construction by Tenant of Tenant's Work, if any, and Tenant's alterations within the Premises, (ii) Landlord shall be responsible for compliance with the provisions of Title III of the ADA in providing all of Landlord's Work required under this Lease, if any, and with respect to any structural matters within the Premises and (iii) Landlord shall be responsible for compliance with the provisions of Title III of the ADA with respect to the parking areas, sidewalks and walkways, together with all other Common Areas of the Shopping Center not included within the Premises and not otherwise part of Tenant's Work or Tenant's alterations within the Premises. Landlord and Tenant each agree to indemnify and hold each other harmless from and against any claims, damages, costs, and liabilities arising out of Landlord's or Tenant's failure, or alleged failure, as the case may be, to comply with Title III of the ADA as set forth above, which indemnification obligation shall survive the expiration or termination of the Lease. Landlord and Tenant each agree that the allocation of responsibility



for ADA compliance shall not require Landlord or Tenant to supervise, monitor, or otherwise review the compliance activities of the other with respect to its assumed responsibilities for ADA compliance as set forth herein. The allocation of responsibility for ADA compliance between Landlord and Tenant, and the obligations of Landlord and Tenant established by such allocations, shall supersede any other provisions of the Lease that may contradict or otherwise differ from the requirements of this section.

## SECTION 19.  INDEMNIFICATION

(a)     Subject to Section 20, Landlord must indemnify, defend and hold Tenant harmless from and against any and all claims, demands, actions, damages, liability and expense in connection with the loss, damage or injury to persons or property, arising out of or related to: (i) the negligence or willful misconduct of the Landlord, Landlord's agents, contractors or employees, or (ii) the breach by Landlord of this Lease.

(b)     Subject to Section 20, Tenant must indemnify, defend and hold Landlord harmless from and against any and all claims, demands, actions, damages, liability and expense in connection with the loss, damage or injury to persons or property, arising out of or related to: (i) the negligence or willful misconduct of the Tenant, Tenant's agents, contractors or employees, or (ii) the breach by Tenant of this Lease.

(c)     If either party, without fault on its part, is made a party to any litigation commenced by or against the other party, then such other party shall protect and hold such first party harmless and shall pay all costs, expenses and reasonable attorney's fees incurred or paid by such first party in connection with the litigation.

This Section 19 survives the expiration or termination of this Lease.

## SECTION 20.  WAIVER OF CLAIMS

Notwithstanding any provision to the contrary, Landlord and Tenant waive any and all right of recovery, claim, action or cause of action against the other, their respective agents and employees, for any loss or damage that may occur to the Premises or the Shopping Center or any additions or improvements thereto, or any contents therein, by reason of fire, the elements or any other cause which could be insured against under the terms of a standard special form insurance policy or policies, or for which Landlord or Tenant may be reimbursed as a result of insurance coverage insuring any loss suffered by either party, regardless of cause or origin, including the negligence of Landlord or Tenant, or their respective agents and employees. This waiver applies regardless of whether either party actually obtains property insurance, and regardless of whether any insurance proceeds are collected.  Notwithstanding the above, Landlord and Tenant agree and acknowledge that the waiver of claims herein contained shall expressly exclude any loss paid by the insured in the form of a deductible or self-insured retention. All property insurance policies required under this Lease covering the Premises or the Shopping Center must expressly waive any right on the part of the insurer against the other party for damage to or destruction of the Premises or the Shopping Center resulting from the



acts or omissions of the other party.

## SECTION 21.  PROPERTY AND LIABILITY INSURANCE

(a)    Landlord must keep in full force and effect Commercial General Liability Insurance and Umbrella Insurance with respect to the Shopping Center, including the Common Areas, naming Tenant as an additional insured thereunder to the extent its interest may appear, with nationally recognized companies rated no lower than A-, IX by A.M. Best Company with total minimum limits to apply per location of $2 million on account of bodily injuries or death and/or property damage resulting from one occurrence. Landlord must deposit a certificate or other evidence of such insurance with Tenant.

(b)    Tenant must keep in full force and effect Commercial General Liability Insurance and Umbrella Insurance with respect to the Premises, naming Landlord as an additional insured to the extent its interest may appear, with nationally recognized companies rated no lower than A-, IX by A.M. Best Company with total minimum limits to apply per location of $2 million on account of bodily injuries or death and/or property damage resulting from one occurrence. Tenant's evidence of insurance is maintained by Tenant's insurer on the website of Tenant's insurance broker, which can be accessed through Tenant's website, "JoAnn.com."

(c)    Landlord must keep the Premises and the Shopping Center, including Common Areas, insured against loss or damage by fire, lightning, vandalism and malicious mischief, and such other perils as are now or may hereafter be comprehended in the term "All Risk Coverage" or "special form" coverage or "Special Form Cause of Loss" (or other  terms that become the insurance industry standard in the future), including, without limitation,  earthquake and flood, if in an area that is designated as an earthquake or flood zone, boiler and machinery, plate glass, power failure, mold, windstorm, terrorism, seepage or leakage and loss of rent damage, in amounts equal to at least 80% of the full replacement value thereof.  Such insurance must cover improvements in the Premises owned by Landlord to the extent that the same are customarily insurable as part of the realty, but will not include the cost of restoration of Tenant's furniture, furnishings, inventory, equipment and other personal property.  Notwithstanding anything to the contrary, Landlord is solely responsible for any and all deductibles and self-insured retentions.

(d)    In addition to the payment of Fixed Minimum Rent, Tenant must pay its Proportionate Share of the premium paid by Landlord for maintaining the insurance for the Shopping Center required under subsections 21(a) and 21(c) (the "Insurance Costs").  Tenant must pay to Landlord in 12 equal installments, each in advance on the first day of each and every calendar month, an estimated sum towards Tenant's Proportionate Share of the Insurance Costs. During the first Lease Year, the insurance paid by Tenant is estimated to be $0.86 per year multiplied by the Gross Leasable Area of the Premises, which amount is Landlord's good faith estimate of the full amount of Tenant's Proportionate Share of Insurance Costs for the first Lease Year if Tenant were to pay Tenant's actual Proportionate Share of Insurance Costs for said period.  This sum is subject to annual adjustments by Landlord to reflect actual changes in the Insurance Costs.  On or before April 1 Landlord must provide Tenant with a statement



assessing and prorating the Insurance Costs together with copies of all bills for which payment is sought. Tenant must pay to Landlord within 30 days of such receipt any deficiency owed to Landlord. If Tenant's estimated payments are in excess of Tenant's Proportionate Share in any Lease Year, then such excess will be offset against Rent for the following Lease Year unless such Lease Year is the final Lease Year of Tenant's occupancy, in which case Landlord must refund such overpayment to Tenant within 30 days after the end of such Lease Year. Landlord covenants that there will be no duplication of costs between this Section and any other Section of this Lease.

## SECTION 22.  SIGNS

(a)      Tenant has the right to install and maintain a sign or individual letters ("JOANN, handmade happiness" or any other name or slogan that Tenant may adopt) or signs on the front, side, rear or any other fascia of the Premises, as well as the right to install two (2) sided panels in the position formerly occupied by Gordons on the Veterans Boulevard pylon structure located in the Shopping Center, and departmental signs on the front fascia in addition to its regular sign, all in accordance with Tenant's Prototype Signage Plans attached hereto as Exhibit D-1.  All signs will comply with all requirements of any Public Entity, and Tenant will obtain all necessary permits or licenses. Notwithstanding the foregoing, Tenant is entitled to seek and receive a variance from any Public Entity so as to allow Tenant to have the size, color, number, etc., of signs that Tenant desires, including storefront signs, pylon signs, banner signs and monument signs. Landlord must fully cooperate and assist, at Tenant's sole cost and expense, Tenant with any such variance. Tenant's sole cost for the pylon and/or monument sign(s) shall be the cost to fabricate and install Tenant's panels. Tenant shall have the right to move to a higher panel on the pylon structure if the city approves same and any drawings associated therewith shall be prepared by Tenant.

(b)      Tenant's sign package shall be approved in accordance with the same process for approval of the plans for Premises build-out as outlined in Section 10 hereof.  In no event shall Landlord object to any part of Tenant's sign drawings to the extent the same is consistent with Tenant's Prototype Signage Plans attached hereto as Exhibit D-1.

(c)      In addition to the foregoing signs, Tenant has the right to install and maintain a professionally prepared banner sign periodically in front of the Premises in the location and manner identified on Exhibit D-1.

(d)      Tenant must maintain its signs in good condition and repair at all times, and must save the Landlord harmless from injury to person or property arising from the erection and maintenance of the signs. Upon vacating the Premises, Tenant must remove all signs and repair (exclusive of painting) all damage caused by such removal.

(e)      If Landlord renovates all or any portion of the Shopping Center, which renovation requires a change to the facade and/or the removal of any of Tenant's sign(s), Landlord shall not materially change the appearance of the façade without Tenant's consent and shall notify Tenant at least 45 days before the removal of sign(s). Landlord will bear the cost of



such removal and reinstallation, together with the cost of any damage to the sign(s) as a result of such removal or reinstallation. Further, Landlord must provide and install on or about the Shopping Center, at Landlord's sole cost and expense, a banner or other type of temporary sign(s) identifying Tenant's trade name, which banner or sign(s) must be equal in size to Tenant's existing sign and approved by Tenant before such installation.

## SECTION 23.  ASSIGNMENT AND SUBLETTING

(a)     Tenant has the right to assign this Lease or sublet all or any part of the Premises for any lawful retail use with Landlord's prior written consent, which consent must not be unreasonably withheld or delayed, and which consent must not be denied in any event where (i) such assignment or subletting does not violate any existing exclusive use and/or prohibited use of another tenant open and operating from the Shopping Center (Landlord must provide Tenant with a list of existing exclusives and prohibited uses upon Tenant's request or consent is deemed given and Landlord indemnifies Tenant); (ii) Tenant remains responsible for the payment of Rent, unless expressly released in writing by Landlord; and (iii) in the case of assignment, such assignee assumes in writing all the terms and provisions of this Lease to be performed or observed by Tenant.  Notwithstanding the foregoing, Tenant may assign this Lease or sublet all or any part of the Premises, in each case without the prior consent of Landlord as long as such assignee does not violate any existing exclusive use or prohibited use of another tenant open and operating in the Shopping Center of which Tenant has received written notice (and provided nothing herein shall limit the assignee's right to conduct the Permitted Use herein), to: (1) a parent; subsidiary; affiliated corporation; successor to Tenant; (2) or the parent of Tenant by way of merger, reorganization, consolidation, corporate restructuring, purchase of stock or assets, or the like; or (3) any entity that acquires a substantial number of Tenant's stores either generally or in the metropolitan area or state where the Premises are located.  Tenant may also sublet, without the consent of Landlord, not more than 10% of the Gross Leasable Area of the Premises for the operation of one or more departments within the business operation of Tenant.

(b)     In the event Tenant assigns the Lease to any assignee which has a verifiable net worth according to GAAP (excluding Goodwill) equal to or greater than Tenant with a minimum of 25 stores open and operation, Tenant shall be relieved of all obligations and liabilities thereafter arising.

## SECTION 24.  REPAIR AFTER CASUALTY

(a)     In the event of damage to or destruction of the Premises by casualty or any other cause whatsoever, then, except as otherwise provided in this Section, Landlord shall forthwith proceed to repair such damage and restore the Premises to substantially their condition at the time of such damage or, at Tenant's option, Landlord shall repair, rebuild and restore the Premises in accordance with such plans and specifications as are then generally in use by Tenant for the construction of one of Tenant's prototypical stores and related structures so long as the repaired, rebuilt or replaced Premises will have a value not less than its value just prior to said loss and Tenant will pay any additional cost resulting from such change to the extent it is not covered by the insurance proceeds.  Landlord must begin and diligently pursue to completion the restoration and repair within 60 days of the event of damage or destruction.  Any repair or restoration of the Premises must be completed within 180 days after the event of damage or destruction. Within 30 days after an event of damage or destruction, Landlord must deliver to Tenant notice of the anticipated period of restoration.

(b)     If 40% or more of the Premises are destroyed or damaged during the last two years of the Term, then each of Landlord and Tenant has the right to terminate this Lease as of the date of such damage or destruction by giving written notice thereof within 30 days after the date of the damage or destruction. If Tenant, within 30 days after receipt of Landlord's written notice of termination, gives Landlord written notice of its intention to extend this Lease for any additional Extended Term then available to Tenant, then the notice of Landlord to terminate this Lease will be of no force and effect.  If Tenant elects to extend this Lease for any additional Extended Terms then available to Tenant, Landlord must use its best efforts to restore the Premises to its former condition in accordance with Subsection (a) above.

(c)     In the event of any damage or destruction to the Premises, then all Rent shall be abated or reduced proportionately during any period in which, by reason of such damage or destruction, there is interference with the operation of the business of Tenant in the Premises, having due regard to the extent to which Tenant may be required to discontinue its business in the Premises, and such abatement or reduction shall continue for the period commencing with such destruction or damage and ending with: (i) the completion by Landlord of such work of repair or restoration as Landlord is obligated to do; and (ii) the expiration of a period of 90 days thereafter to enable Tenant to re-fixture the Premises and reopen for business, but said 90 day period shall be deemed to have ended if Tenant shall reopen for business to the public prior to the expiration thereof. In the event of any act of God or other event of force majeure which in Tenant's reasonable business judgment makes it unsafe or inadvisable to conduct business at the Premises, and as a result Tenant closes for business at the Premises, then all Rent shall be abated from the date of such event and closure until the date on which Tenant reasonably determines it can reopen for business at the Premises.

(d)     If any other portion of the Shopping Center is either partially or substantially damaged (irrespective of whether the Premises shall have been damaged or destroyed), Landlord shall proceed promptly to rebuild the same. During any period of time that by reason

of such damage or destruction there is any material and adverse interference with access to or parking for the Premises, Tenant may pay Substitute Rent; and, if it is impracticable for Tenant, in the reasonable exercise of its business judgment, to remain open for business and Tenant elects to close down until such damage or destruction has been repaired or rubble, etc., removed, there shall be a full abatement of Rent and all other charges payable hereunder until access to or parking for the Premises is restored.

In any event, if Landlord shall not commence, in good faith, repair and restoration work within 60 days after any damage which Landlord is required to repair pursuant to the terms hereof (which period shall be extended to 90 days if required by Landlord's insurance policy), or if Landlord shall fail with all due diligence to continue with such repair and restoration work to completion (which completion shall in no event exceed 180 days from the date of the casualty), then Tenant shall, in addition to all other available remedies at law or equity or otherwise provided herein, have the option to terminate this Lease by giving notice of its election to do so to Landlord.

(e)     If this Lease is terminated pursuant to this section, Landlord must refund within 15 days of notice any Rent paid in advance.

(f)     If Landlord elects, or is required by this Section 24, to repair the Premises or the Shopping Center, then Landlord must notify Tenant in writing when the repairs are completed. The repairs will be not be deemed completed unless and until the repairs are actually completed in accordance with the terms of this Lease and Tenant has thereafter received written notice of such completion.

## SECTION 25.  CONDEMNATION

(a)     If 50% or more of the Gross Leasable Area of the Premises or 50% or more of the Gross Leasable Area of the Shopping Center is taken by condemnation or right of eminent domain or conveyed in lieu thereof or taken in any other manner for a period of three (3) months or longer  (a "Taking"), this Lease will terminate at the option of either party as of the day possession is taken by or title vests in the taking authority, and both parties will be released from any further liability hereunder.

(b)     In the event of a Taking of less than 50%, but more than 5%, of the Gross Leasable Area of the Premises, or a Taking of any portion of the Protected Area, then Tenant has the right to terminate this Lease and any further liability hereunder if, in the reasonable determination of Tenant, the Premises cannot be economically operated for, or are unsuitable, for the intended purposes of this Lease.  Any such termination is effective as of the day possession is taken by, or title to the portion taken vests in, the taking authority.

(c)     In the event of a Taking of less than 50%, but more than 15%, of the Gross Leasable Area of the Shopping Center (including the Common Areas), then (i) Tenant has the right to terminate this Lease and any further liability hereunder if, in Tenant's reasonable determination, the Premises cannot be economically operated for, or are unsuitable for, their



intended purposes; and (ii) Landlord has the right to terminate this Lease and any further liability hereunder if, in Landlord's reasonable determination, the Shopping Center cannot be economically operated for, or are unsuitable for, their intended purposes. Any such termination is effective as of the day possession is taken by, or title to the portion taken vests in, the taking authority.

(d)　　In the event of a Taking of any portion of the Premises or the Shopping Center, upon which this Lease is not terminated, Landlord must restore the remainder of the Premises or the Shopping Center (including the Common Areas), with reasonable speed to a complete architectural unit as nearly like its condition prior to such partial Taking as shall be practicable, and if during or after the work of restoration Tenant is deprived of all or a part of the use of the Premises, the Rent will abate for so long as Tenant is deprived of such use and until Tenant has rebuilt, refixtured and restocked the Premises, as necessary, in the same proportion as that portion of the Premises taken bears to the entire Premises.

(e)　　All damages awarded in connection with the Taking of the Premises, whether allowed as compensation for diminution in value to the leasehold or to the fee of the Premises, belong to the Landlord; but, if Tenant has made any material leasehold improvements to the Premises, or alterations or structural changes and repairs to the Premises, at its own expense (regardless of when made), Tenant and not Landlord is entitled to claim an award for the unamortized balance of Tenant's cost thereof. If the condemning authority does not make a separate award therefor, Landlord, subject to the rights of any mortgagee, must assign a portion of its award equal to such unamortized cost to Tenant. If Landlord in obtaining its award uses Tenant's cost items, then Tenant is entitled, subject to the rights of any first Mortgagee, to a proportionate share of Landlord's award based upon the costs. Tenant is also entitled to claim an award for loss of business, damage to merchandise and fixtures, removal and reinstallation costs and moving expenses, in a separate action only.

## SECTION 26.　REPRESENTATIONS AND COVENANTS OF LANDLORD

(a)　　On the date hereof and hereafter during the Term as applicable, Landlord represents, warrants and covenants to Tenant as follows:

(1)　　The Shopping Center Site is zoned to permit the use of the Shopping Center for general retail purposes, and the Premises are zoned to permit their use as a retail store conducting the Permitted Use, as of right (i.e., without any special permit, approval, variance or other waiver);

(2)　　The legal description set forth on Exhibit A matches the Shopping Center depicted on the Site Plan (i.e., Exhibit B) and includes no additional property therein;

(3)　　The Common Areas, Premises (excluding Tenant's Work or other alterations made by or on behalf of Tenant) and all structural portions of the Shopping Center comply with all Laws;



(4)     Landlord will provide surface parking spaces in the Common Areas on an unreserved basis and without cost in the amount required by Laws;

(5)     Unless required by a Public Entity, no building, edifice or obstruction will be placed on the Shopping Center Site and no addition or alteration will be made to the Shopping Center (A) that materially interferes with the accessibility of the Premises to and from the parking areas within the Common Areas and the other stores in the Shopping Center; (B) that materially diminishes the visibility of the front of the Premises (including, without limitation, the signage thereon) from public highways, parking areas or other stores in the Shopping Center; (C) that materially diminishes the access to or the utility of the service areas serving the Premises; (D) that has the effect of increasing the monetary obligations of Tenant under this Lease; or (E) that otherwise adversely affects the conduct of business from the Premises or the rights of Tenant under this Lease. Without limiting the generality of the foregoing, in no event will any improvement or alteration (including a reduction in size of the Protected Area through any means (except through an eminent domain proceeding), including, for example, a reduction in the Shopping Center or Shopping Center Site, or a change in the parking layout or configuration or traffic patterns of vehicles or pedestrians) be made to the "Protected Area" as shown on the Site Plan;

(6)     The Site Plan correctly and completely shows all improvements on or to be made to the Shopping Center Site;

(7)     Intentionally Deleted;

(8)     Landlord will maintain, operate and manage the Shopping Center as a retail project in compliance with all Laws, and the Shopping Center will be used and occupied only for normal retail uses customarily conducted in similar shopping centers in the New Orleans area;

(9)     Except to the extent currently existing at the Shopping Center under leases in effect as of the Effective Date of this Lease for as long as such leases remain in effect (but this exception shall not apply if Landlord permits an expansion of such tenant's premises for a use set forth below if Landlord reasonably and legally may refuse to grant such permission, and further Landlord covenants with Tenant not to modify or amend any such tenant's lease in any manner that would permit such a prohibited use to an extent greater than such tenant is permitted to conduct such use under its existing lease), in no event will the Shopping Center or any portion thereof be used as or for any of the following:

(i)      auditorium, meeting or banquet hall;

(ii)     church, bingo hall or a place of public assembly;

(iii)    library or school (includes, but not limited to a beauty school, barber college, reading room, place of instruction or any other operation serving primarily students or trainees rather than retail customers) except Kumon or Mathnasium;

(iv)     for the sale or service of automobiles or other vehicles;

(v)      night club or bar serving alcoholic beverages except as incidental to a restaurant ("incidental" shall be defined as deriving less than 25% of gross sales from the sale alcoholic beverages);

(vi)     funeral parlor; massage parlor except tenants such as Massage Envy;

(vii)    animal boarding (kennel);

(viii)   discotheque, dance hall or otherwise for musical/dance reviews or topless/nude shows;

(ix)     bowling alley or skating rink;

(x)      car wash;

(xi)     off-track betting establishment, gambling, gaming, video gaming, etc.;

(xii)    pool room, game room or amusement arcade (defined as any establishment containing more than a combination of three electronic, pinball or other games), gallery or store or pinball arcade within 200 feet of the Premises

(xiii)   so-called "flea market" or second hand used goods or consignment store (except tenants such as Plato's Closet, etc.);

(xiv)    store selling primarily distressed or damaged merchandise;

(xv)     intentionally deleted;

(xvi)    so-called "head shop" or night club;

(xvii)   gun range or gun shop;

(xviii)  for warehousing, except as incidental to a retail business;

(xix)    adult book store or store selling or exhibiting sexually explicit materials;

(xx)     any business or use that emits offensive odors, fumes, dust or vapors or is a public or private nuisance or emits loud noise or objectionable sounds or creates fir, explosive or other hazard (e.g./, motorized vehicle repair or body shop), provided, however, tire, battery or auto parts retail locations shall not be precluded under this Restricted Use;

(xxi)    abortion clinic, aids clinic, drug treatment facility or bodily fluid collection facility, homeless shelter or halfway house;

(xxii)   business office usage, not to exceed 10% of the GLA of the Shopping Center;

(xxiii)  intentionally deleted;

(xxiv)   laundromat;

(xxv)    intentionally deleted;



(xxvi)  marijuana dispensary; or
(xxvii) tattoo parlor.

(10)   Landlord owns fee simple title to the Shopping Center free and clear of all mortgages except for the existing mortgage in favor of Wilmington Trust, National Association, as Trustee for the registered holders of Wells Fargo Commercial Mortgage Trust 2016 C32, Commercial Mortgage Pass-Through Certificates, Series 2016.   There are no claims of other parties, restrictions, reservations, or defects in Landlord's title which could interfere with or impair Tenant's rights under this Lease or Tenant's use, occupancy, or enjoyment of the Premises;

(11)   At the time of the Delivery Date, there are no planned or contemplated taxes and assessments, either general and specific, whether ad valorem, specific or otherwise, with respect to the Shopping Center; and,

(12)   To the best of Landlord's knowledge, the Premises are free of Hazardous Material as of the Delivery Date.

(b)     Notwithstanding anything in the foregoing to the contrary, Tenant shall have no remedy for a violation of subsection (9), including but not limited to the right to pay Substitute Rent, if such violation is caused by another tenant or occupant in the Shopping Center violating a provision of its lease or license agreement regarding its premises, which either does not permit or specifically prohibits the use that violates such subsections, provided Landlord uses good faith efforts to enforce Landlord's rights under such lease or license agreement, including filing an appropriate legal action to obtain a temporary restraining order, preliminary injunction, or order resulting from an arbitration proceeding enjoining the violation within 30 days after written request from Tenant and Landlord diligently pursues cure through completion.

(c)     The representations, warranties and covenants in this Section 26 are material considerations and inducements to Tenant in executing this Lease, the breach of which will cause irreparable and severe harm to Tenant.   Without limiting any other right or remedy of Tenant, in the event of a breach of the representations, warranties, and covenants in this Section 26 that occurs for a period of 30 or more days, Tenant has the right after providing Landlord with 30 days' prior written notice to pay Substitute Rent during the period of such breach.

## SECTION 27.  TENANT'S DEFAULT

(a)     Landlord may, by written notice to Tenant, terminate this Lease, or without terminating this Lease re-enter the Premises by summary proceedings, and may dispossess the Tenant if:

(1)   Tenant fails to pay Rent on or before the due date and then fails to pay same within 10 days after receipt of written notice from Landlord;

(2)     Tenant is in material default in the performance of any of the covenants, terms, conditions and provisions of this Lease, and Tenant fails to remedy such default within 30 days after receipt of written notice thereof (but Tenant will not be deemed to be in default if Tenant commences to remedy the default within the 30-day period and proceeds to cure with due diligence);

(3)     Tenant is adjudged bankrupt or makes an assignment for the benefit of creditors, or if a receiver of any property of Tenant in, upon or about the Premises is appointed in any action, suit or proceeding by or against Tenant and is not removed within 90 days (unless such 90-day period is extended by court order, in which event the time period will be as established by court order or established by such person(s) or entity acting under or for the court) after appointment; or

(4)     The interest of Tenant in the Premises is offered for sale or sold under execution or other legal process, and if not rescinded within 90 days after written notice from Landlord to Tenant.

Landlord must mitigate its damages. In the event of re-entry Landlord must use best efforts to relet the Premises and, in the event of a reletting, must apply the rent therefrom first to the payment of Landlord's reasonable expenses incurred and paid by reason of Tenant's default, next to the reasonable expense of reletting, including, but not limited to, reasonably necessary repairs to the Premises, and then to the payment of rent and all other sums due from Tenant, with Tenant remaining liable for any deficiency. Any and all deficiencies shall be payable by Tenant monthly on the date provided for the payment of Fixed Minimum Rent. Notwithstanding anything to the contrary in this Lease, if Tenant has in good faith disputed an alleged monetary default for an amount which is less than two months of Rent, and if Landlord obtains a final judgment adverse to Tenant with regard to said amount, wholly or in part, Tenant may within 30 days of the date of the journalized final judgment pay the amount set forth in the final judgment to Landlord and retain the right to possession of the Premises and all of its rights under the Lease, notwithstanding any termination of the Lease pursuant to the Lease or at law or in equity, which may have occurred as a result of said monetary default.

(b)     In the event of a default by either party of any of the terms, provisions, covenants or conditions of this Lease, the other party has the right to invoke any remedy provided at law or in equity; except, however, Landlord is not entitled to terminate this Lease or to dispossess Tenant except for a material default and in no event is Landlord entitled to accelerate Rent. Notwithstanding anything contained herein, in no event is Landlord entitled to exercise self-help to lock out Tenant or forcibly retake possession of the Premises without due legal process and an appropriate court order. All remedies are cumulative and concurrent.

(c)     Notwithstanding anything to the contrary, with respect to any alleged default of Tenant other than a default in the payment of Rent, or other sums of money, if Tenant notifies the Landlord, within 30 days after Landlord's notice of such default, that Tenant disputes such alleged default and Tenant files within the 30-day period an action in a court of competent jurisdiction contesting such alleged default, then Tenant will not be deemed to be in default with respect to such matter. If a final judgment is adverse to Tenant, wholly or in part, Tenant must immediately begin to correct the matters complained of by Landlord, or that portion thereof as to which such judgment shall have been adverse to Tenant, and complete the correction within 30 days after such judgment, or if more than 30 days are reasonably required to complete such correction, correct the same within 30 days and prosecute the same to completion with reasonable diligence and must reimburse Landlord for its reasonable legal fees.

## SECTION 28. RIGHTS OF LANDLORD

(a)     Landlord reserves the right at all reasonable times during Tenant's business hours and upon prior reasonable notice to Tenant (except in the event of emergency, when notice is not required) by itself or its duly authorized agents, to  inspect the Premises and, to make such repairs as Landlord is obligated to make to the Premises.  In exercising the foregoing right, Landlord must not interrupt or disrupt Tenant's business or unreasonably disrupt access to the Premises by Tenant, Tenant's employees, agents, invitees and customers.

(b)     If Landlord makes any payments on behalf of Tenant, which are Tenant's obligation, to fulfill Tenant's covenants, then any amount so paid by Landlord are declared to be "Additional Rent" and are due and payable to Landlord from Tenant with the next installment of Fixed Minimum Rent due thereafter, together with interest thereon at the Default Rate from the date of such advance to the repayment thereof in full.

(c)     Landlord has the right during the last two months before the expiration of this Lease, so long as it does not interfere with Tenant's business, to exhibit the Premises and put up the usual notice "for rent" or "for sale", which notice will not be removed or hidden by Tenant. No more than one sign will be placed upon the Premises and the sign cannot exceed 12 feet square.

## SECTION 29.  LANDLORD'S DEFAULT

(a)     If Landlord fails to keep and perform any covenant or agreement to be kept and performed by Landlord, then Tenant, in addition to all other remedies now or hereafter afforded or provided by this Lease, at law or in equity, has the right to:  (i) perform such covenant or agreement for or on behalf of Landlord or make good any such default, and any amount or amounts that the Tenant advances on Landlord's behalf must be repaid by Landlord to Tenant on demand, together with interest thereon at the Default Rate from the date of such advance to the repayment thereof in full or (ii) deposit the installments of rent and other cash payments accruing under this Lease into an escrow account with any third party with instructions to pay such sums to Landlord when Landlord has performed the covenants and agreements to be performed by Landlord or, if Tenant performs such covenants and agreements for or on behalf of Landlord,



when any amounts advanced by Tenant for the performance of such covenants and agreements, together with all accrued interest thereon, have been repaid in full, and, if any such amounts have not been repaid in full on or before the 60th day after such funds are deposited into escrow, to return such funds to Tenant for set-off against the amounts advanced; or (iii) any combination of (i) and (ii).

(b)     Except in the event of emergency, before performing any covenant or agreement on behalf of Landlord, Tenant will provide Landlord with written notice of Landlord's default and Tenant's intent to perform such covenant or agreement, and Landlord will have 30 days within which to complete performance of the same (and Landlord will not be deemed to be in default if Landlord commences to remedy the default within the 30-day period and proceeds to cure with due diligence). For purposes hereof, "emergency" means (i) any event which poses immediate threat of injury or damage to persons or property or (ii) any event which, in Tenant's judgment, threatens Tenant's ability to open for business as scheduled or materially impairs or interferes with Tenant's business operations.

(c)     If Landlord fails to pay any sum to Tenant when due, and if such failure continues for 10 days after receipt of notice from Tenant, Tenant has the right, without forfeiture of its other rights hereunder, at its election, to setoff and deduct the same, together with interest thereon at the Default Rate, from Rent. Notwithstanding the foregoing, Tenant's rights of offset under Section 10 hereof will be governed by Section 10.

## SECTION 30. MORTGAGE SUBORDINATION

(a)     Landlord must obtain and deliver to Tenant a non-disturbance and attornment agreement, substantially in the form of Exhibit G (the "SNDA"), from any existing ground lessor, mortgagee or lien holder.

(b)     Landlord reserves the right to request from Tenant a waiver of priority of Tenant's leasehold estate hereunder for the purpose of subordinating Tenant's leasehold estate in favor of a first mortgage lien or any refinancing or replacement of a first mortgage loan that Landlord may hereafter deem necessary or desirable. Tenant, upon such request by Landlord, will execute and deliver an agreement substantially in the form of Exhibit G. The word "mortgage" means (y) any lease of land only or of land and buildings in a sale-lease-back transaction involving all or any part of the Shopping Center, or (z) any mortgage, deed of trust or other similar security instruments constituting a lien upon all or any part of the Shopping Center, whether the same shall be in existence as of the date hereof or created hereafter, and any modifications, extensions, renewals and replacements thereof. "Mortgagee" means a party having the benefit of a mortgage, whether as lessor, Mortgagee, trustee or note-holder.

(c)     After a change in ownership of all or any portion of the Shopping Center that requires a change in the Rent payee, or assignment of this Lease by Landlord that requires a change in the Rent payee, Tenant shall have no obligation to pay Rent to the new payee until Tenant receives written notice from Landlord confirming the name and address of the new payee.

Store #2544, Wilshire Plaza, Metairie, LA
EXECUTION VERSION: July 1, 2019
UB Document No.: 2578017v.6



(d)    If Tenant receives a written notice from any party claiming a collateral interest in this Lease or in the Rent and, by reason thereof, a present entitlement to collect the Rent, Tenant has the right to pay Rent to such party, which payment will satisfy any and all liabilities of Tenant to Landlord with respect to such payment, without obligation on Tenant to make further inquiry but subject to such party's providing to Tenant a copy of the instrument pursuant to which such party claims entitlement and to such claim being plausible on the face of such instrument.

## SECTION 31. NO WAIVER

No waiver by either party of any of the terms, covenants, provisions or conditions in this Lease, and no waiver of any legal or equitable relief or remedy, will be implied by the failure of either party to assert any rights, or to declare any forfeiture, or for any other reason. No waiver of any of the terms, provisions, covenants, rules and regulations herein will be valid unless it is in writing signed by both parties. No waiver by either party, or forgiveness of performance by either party in respect to one or more tenants of the Shopping Center, will constitute a waiver or forgiveness of performance in favor of Tenant, Landlord or any other tenant. The waiver or the forgiveness of performance of any one or more of the terms, provisions, conditions, rules and regulations of this Lease will not be claimed or pleaded by Tenant or Landlord to excuse a subsequent failure of performance of any of the terms, provisions, conditions, covenants, rules and regulations of this Lease.

## SECTION 32.  SURRENDER OF PREMISES

(a)    Tenant must deliver up and surrender to Landlord possession of the Premises, and all improvements permanently attached to the Premises during the Term, upon the expiration of this Lease, or its termination in any way, in as good condition and repair as the same are in on the Commencement Date (excepting damage by fire or other casualty which could be covered by a standard "All-Risk Coverage" or "special form" insurance policy, ordinary wear and tear, authorized alterations and modifications, and decay, neglect, fault or default of Landlord and taking by eminent domain or conveyance in lieu thereof). Upon the expiration or earlier termination of this Lease, Tenant will deliver the keys at the office of Landlord or Landlord's agent. Tenant will have an additional ten-day Rent-free period after expiration or termination of the Lease to remove its signs, trade fixtures, furnishings, inventory, equipment, furniture and other personal property and any such items not removed during the ten-day period shall be deemed abandoned by Tenant.

(b)    Tenant has the right, while the Lease remains in effect, to place a banner sign at the front of the Premises, in a place visible to Tenant's customers, directing Tenant's customer's to another store of Tenant or providing Tenant's customers with information and a telephone number. If the Lease has terminated or expired, then Landlord must leave the sign at the front of the Premises until the earlier to occur of (1) 60 days after Tenant vacates the Premises; or (2) a new tenant opens for business in that location.

Store #2544, Wilshire Plaza, Metairie, LA
EXECUTION VERSION: July 1, 2019
UB Document No.: 2578017v.6

## SECTION 33.   SHORT FORM LEASE, COMMENCEMENT DATE AGREEMENT

(a)      Neither party may record this Lease, but if either party requests that a Short Form Lease or a Memorandum of Lease be recorded, then the other party must execute such Agreement, which Agreement will contain the information set forth below. The Short Form Lease or Memorandum of Lease will describe the Premises and the rights herein demised, the Term, and the extension rights (if any), any exclusive granted to Tenant and other provisions hereof reasonably requested by Tenant.   The failure to record the Short Form Lease or Memorandum of Lease will not affect or impair the validity and effectiveness of this Lease, and this Lease will control in the event of any inconsistency between the two.  The party requesting that the Short Form Lease or Memorandum of Lease be recorded must prepare and pay all costs of recording the Short Form Lease or Memorandum of Lease, and the other party must execute at any and all times such Short Form Lease or Memorandum of Lease and any other instruments as may be required for such recording.

(b)      At the time that the Commencement Date is established, the parties will promptly enter into a Commencement Date Agreement, setting forth the actual commencement and expiration of the Initial Term and any extensions thereof, any applicable kickout dates, the then current Gross Leasable Area of the Premises and the corresponding Rent, which Commencement Date Agreement may be recorded by either party if both parties agree to said recordation in advance. If the recipient of such request does not object to the Commencement Date specified in such request within 30 days after receipt of the request, the date specified in such request shall be deemed to be the Commencement Date herein.

## SECTION 34.   NOTICE

Any notices, statements, acknowledgments and consents required to be given by or on behalf of either party to the other must be in writing and must be given by Certified U.S. Mail, or by private courier service requiring a signed acknowledgment of delivery (such as Federal Express) addressed as follows:

if to the Landlord at:        Wilshire Plaza Investors, LLC
                              c/o Victory Real Estate Investments, LLC
                              240 Brookstone Centre Parkway
                              Columbus, Georgia 31904
                              Attn: Legal Department

if to the Tenant at:          Jo-Ann Stores, LLC
                              5555 Darrow Road
                              Hudson, Ohio 44236
                              Attn:  National Director of Real Estate

with a copy to:             Jo-Ann Stores, LLC
                              5555 Darrow Road
                              Hudson, Ohio 44236



Attn: Senior Legal Counsel

or at such other address of Landlord or, Tenant as may be specified by such a notice. Any notice sent by certified mail is deemed to have been served three days after deposit thereof with the U.S. Postal Service. Any notice sent by courier service is deemed to have been served as of the next business day (excluding Saturdays, Sundays, and any federal government holidays). Notwithstanding the foregoing, the time period in which a response to any such notice must be given, or in which an action must be commenced or be taken, will commence to run on the date of receipt by the addressee thereof as shown on the return receipt or acknowledgment of delivery for such notice. Rejection or other refusal to accept, or the inability to deliver because of changed address of which no notice was given, will be deemed to be receipt of notice as of the date of such rejection, refusal or inability to deliver. Notwithstanding anything to the contrary, Tenant may give facsimile notice of the need of emergency repairs, followed promptly by notice as required above.

## SECTION 35. HAZARDOUS MATERIALS

(a)    Tenant must not cause or permit the escape, disposal or release of any Hazardous Material (as hereafter defined) in violation of Law. Tenant must not allow the storage or use of Hazardous Material in any manner not sanctioned by Law, nor allow to be brought into the Shopping Center any Hazardous Material except to use in the ordinary course of Tenant's business. Tenant must defend, indemnify and hold Landlord harmless from and against any and all claims, losses, liabilities, damages, penalties, fines and expenses (including, without limitation, consequential damages, cleanup and other remedial and restoration costs, fees for consultants and experts and reasonable attorneys' fees and other costs of litigation arising by reason of any of the aforesaid or any action against Tenant under this indemnity) arising directly or indirectly from, out of or by reason of the release of Hazardous Materials in the Shopping Center occurring during the Term caused by Tenant or Tenant's contractors, agents or employees or persons acting under Tenant. This indemnity survives the expiration or earlier termination of the Term.

(b)    Landlord must not cause or permit any Hazardous Material to exist in the Premises. In addition, Landlord must not cause or permit any Hazardous Material to be sold, used, stored, brought upon or disposed of (collectively a "Use") in, on, under or about the Shopping Center (including the Premises, before the Delivery Date) without in each case: (i) obtaining all necessary permits required in connection therewith; and (ii) complying with all permit requirements; and (iii) otherwise taking all appropriate steps and making adequate arrangements to assure that such Use is in the ordinary course of business in the operation of the Shopping Center. Such Use must be performed safely and without contamination of the Shopping Center and the Shopping Center Site or any portion thereof and fully in compliance with all applicable Laws. Landlord must defend, indemnify and hold Tenant harmless from and against any and all claims, losses, liabilities, damages, penalties, fines and expenses (including, without limitation, consequential damages, cleanup and other remedial and restoration costs, fees for consultants and experts and reasonable attorneys' fees and other costs of litigation arising by reason of any of the aforesaid or any action against Landlord under this indemnity)

arising directly or indirectly from, out of or by reason of the release of Hazardous Materials in the Shopping Center occurring during the Term caused by Landlord or Landlord's contractors, agents or employees or persons acting under Landlord. It is a condition of this indemnification that Landlord receive notice of any such claim by Tenant promptly after Tenant first has knowledge thereof. This indemnity survives the expiration or early termination of this Lease.

(c)     If either party receives any written notice of Hazardous Discharge or Environmental Complaint that specifically identifies the Premises or the Common Areas or describes a condition that materially impairs or could materially impair the occupancy, use and enjoyment of the Premises, then the receiving party must give immediate oral and written notice of same to the other party detailing all relevant facts and circumstances within the knowledge of the receiving party.

(d)     If Tenant's use, occupancy and enjoyment ("Occupancy") of the Premises is materially interfered with by reason of this existence or remediation of any Hazardous Material located on, in or under the Shopping Center or on the Shopping Center Site (except for any Hazardous Material used by Tenant), then (i) throughout such period of interference, a fair and just proportion of the Rent and other charges payable (taking into account the nature of the interference to Tenant's Occupancy), will be abated, and (ii) if Tenant's occupancy is substantially impaired for three months or more, then Tenant has the right to terminate this Lease by giving written notice to the other of its election to do so, whereupon this Lease will automatically terminate and end effective as of the date of such notice and neither party will have any further obligations hereunder. Landlord may nullify Tenant's notice of termination if Landlord is diligently corrects the Hazardous Material interference and completes the job in accordance with all applicable governmental laws, codes, regulations and requirements within three months after the date of Tenant's termination notice. The abatement provided in clause (i) of this subsection will continue throughout the period of such correction by Landlord.

(e)     "Hazardous Material" means (i) any waste, pollutant, material, substance or contaminant which is or becomes listed, defined, or classified as having properties harmful to health, safety, or indoor or outdoor environment; and (ii) any substance or material that is or becomes regulated by any Public Entity by reason of the hazardous or toxic qualities of such substance or material; and (iii) any other toxic or hazardous substance, regardless of whether the same is regulated, including, without limitation, so-called "black mold," any mycotoxin, and any other mold capable of producing a toxic or allergic reaction in humans (including, without limitation, Stachybotrys, S. atra, S. chartarum, Aspergillus, Fusarium, Coccidioides). Without limiting the generality of the forgoing, Hazardous Material includes oil, petroleum, petroleum-fraction or petroleum-derived substance; urea formaldehyde foam insulation; asbestos and asbestos-containing materials; and any electrical equipment that contains any oil or dye-electric fluid containing polychlorinated biphenyls.

(f)     "Hazardous Discharge" means the presence, use, release, dispersal, emission, spill, discharge or cleanup of any Hazardous Material (i) on or about or emanating from the Shopping Center or the Shopping Center Site, or (ii) arising out of the use and occupancy of or operations within the Shopping Center, or (iii) caused by Landlord or other occupant of the



Shopping Center or the employees, contractors, invitees or agents thereof.

(g)    "Environmental Complaint" means any complaint, investigation, order, citation, or action with regard to any Hazardous Discharge, air emissions, water discharges, noise emissions or any other environmental, health or safety matter pertaining to or emanating from the Shopping Center from any Public Entity.

## SECTION 36.   LIMITATION OF LANDLORD'S LIABILITY

(a)    If Landlord fails to perform any covenant, term or condition on Landlord's part to be performed, and as a consequence of such default Tenant recovers a money judgment against Landlord, such judgment will be satisfied only out of (i) the proceeds of sale received upon execution of such judgment and levy thereon against the right, title and interest of Landlord in the Shopping Center, (ii) the rents and other income from such property receivable by Landlord, and (iii) the consideration received by Landlord for the sale or other disposition of all or any part of Landlord's right, title and interest in the Shopping Center, which consideration is deemed to include any assets at any time after such sale or disposition held by Landlord having a value not exceeding that of the proceeds of such sale or other disposition, and Landlord shall not be liable for any deficiency.

(b)    Notwithstanding subsection (a), in the event of fraud on the part of Landlord or Landlord's failure to perform any covenant or obligation of Landlord under Sections 10, 12, 14, 24, 25 or 35 the aforesaid limitation on liability is inapplicable. This Section will not be deemed to deny to Tenant, or limit its right to obtain, injunctive relief or specific performance of Landlord's covenants under this Lease or to avail itself of any other right or remedy (not involving a personal liability of Landlord in excess of the limits of personal liability fixed by this Section) which may be accorded Tenant by Law or under this Lease by reason of Landlord's failure to perform its obligations thereunder including, but not limited to, the rights and remedies granted Tenant under Section 29.

## SECTION 37.   DELIVERY OF SITE PLAN

Within 30 days after Tenant's written request therefor, Landlord must provide Tenant with a copy of the most current available site plan of the Shopping Center, which must reflect: (a) the Gross Leasable Area of the Shopping Center as actually constructed; (b) the names and location and the Gross Leasable Area of the premises occupied by the respective tenants thereof; and (c) those premises in the Shopping Center, if any, which are not then currently occupied and open for business. If Landlord fails to provide this information within the period allowed, then Tenant has the right to suspend the payment of monthly installments of Additional Rent, or Rent if there is no Additional Rent, until delivery of the information, which Additional Rent or Rent, as the case may be, shall be paid in full upon Landlord's compliance with this Section 37.

## SECTION 38.   INTENTIONALLY OMITTED

## SECTION 39.  ENTIRE AGREEMENT; WRITING REQUIRED

This Lease contains all of the agreements of the parties with respect to any matter covered or mentioned in this Lease, and no prior agreement, understanding or representation pertaining to any such matter will be effective for any purpose.  No provision of this Lease may be changed, deleted, modified or amended, except by an agreement in writing signed by the parties.

## SECTION 40.  OPERATING COVENANT

(a)    Tenant will open from the Premises within 90 days after the Commencement Date and continue to operate from the Premises during Tenant's normal business hours for a period of at least one full day (the "Operation Period"), but for an assignment or subletting, damage and destruction, remodeling, eminent domain, Unavoidable Delays, or such other right as provided for under this Lease or under law or equity.  After the Operation Period, notwithstanding anything contained in this Lease, expressly or impliedly, to the contrary, and notwithstanding the agreement for the payment by Tenant of Rent (including Substitute Rent or other percentage rent), Tenant is under no duty or obligation, either expressed or implied, to open, reopen, remain open, operate, or thereafter to continually conduct business from the Premises at any time during the Term.  After the Operation Period, Tenant's failure to open, reopen, remain open, operate, or thereafter to continually conduct business from the Premises will not in any way be deemed an event of default under this Lease, nor will such failure otherwise entitle Landlord to begin or to maintain any action, suit or proceeding, whether in law or in equity, relating in any way to Tenant's failure to open, reopen, remain open, operate, or thereafter to continually conduct business from the Premises.

(b)    If Tenant ceases to operate its business from the Premises for 180 consecutive days, but for an assignment or subletting, damage and destruction, remodeling, eminent domain, Unavoidable Delays, or such other right as provided for under this Lease or under law or equity, then Landlord has the right to recapture the Premises with 90 days prior written notice to Tenant.  If Landlord terminates the Lease, it must do so by written notice to Tenant. Tenant will have the right, within 30 days of receipt of Landlord's termination notice, to advise Landlord that Tenant will reopen for business from the Premises. If Tenant elects to reopen for business, then it must do so within 60 days of its notice to Landlord or such greater time as is reasonably necessary under the circumstances; otherwise, Tenant's notice will be null and void.  Tenant's obligations under this Lease will terminate as of the date of such notice.

## SECTION 41.  APPLICABLE LAW AND CONSTRUCTION

The laws of the state within which the Premises are located govern the validity, performance and enforcement of this Lease without regard to its conflicts of law principles.  If one or more of the provisions of this Lease is held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability will not affect or impair any other provision of this Lease, and this Lease will be construed as if such invalid, illegal or unenforceable provision had not been contained herein.  The submission of this document for

examination does not constitute an offer to lease, or a reservation of or option for the Premises, and this Lease becomes effective only upon execution and delivery thereof by both Landlord and Tenant. This Lease has been negotiated by Landlord and Tenant and will not be deemed to have been prepared by either Landlord or Tenant, but by both equally. All prior negotiations, considerations, representations and understandings between the parties are and shall be deemed to be incorporated and merged into this Lease and shall not be construed as having survived the execution hereof so that only the provisions of this Lease shall govern the respective rights and obligations of the parties hereto to the same effect as if all such negotiations, considerations, representations and understandings shall have never been made or given by either party to the other party hereto.

## SECTION 42.  UNAVOIDABLE DELAYS

Except as otherwise expressly provided herein, if either party is delayed or hindered in or prevented from the performance of any obligation required hereunder by Unavoidable Delay, the time for performance of such obligation shall be extended for the period of the delay, provided that Unavoidable Delay will not excuse prompt and timely payments, including Rent, when due under this Lease except when (A) the Commencement Date is delayed by reason of Unavoidable Delay; or (B) such payment is excused pursuant to other provisions of this Lease. However, no delay will be excused by this section unless (1) the delayed party notifies the other party in writing of the delay within 21 days of the event giving rise to such delay; (2) the delayed party has exhausted all other resources available at reasonable costs to avoid such delay; and (3) the delayed party diligently pursues completion of the activity that was delayed. Notwithstanding anything to the contrary in this Lease, under no circumstances will Unavoidable Delay extend the time for performance of any obligation by more than 90 days.

## SECTION 43.  REASONABLE CONSENT

Wherever either party's consent or approval is required, such consent or approval must not be unreasonably or arbitrarily withheld or delayed, unless otherwise expressly stated.

## SECTION 44.  NO PARTNERSHIP

Landlord and Tenant acknowledge that neither of them in any way or for any purpose becomes a partner or an associate of the other in the conduct of Tenant's business, the operation of the Shopping Center or otherwise, or a joint venture, or a member of a joint enterprise with the other.  Neither party is liable for payment of the debts or performance of any obligation of the other. The relationship is and shall be that of Landlord and Tenant.

## SECTION 45.  ESTOPPEL

Within 30 days after request, Tenant will execute and deliver to Landlord a Tenant Estoppel Certificate substantially in the form of Exhibit H. Within 30 days after request, Landlord will execute and deliver to Tenant a written instrument certifying that this Lease is unmodified and in full force and effect, or if there has been any modification, that this Lease is



in full force and effect as modified and stating all such modifications; specifying the dates to which Rent has been paid; stating whether there exists any default in the performance by either party under any provision of this Lease; and certifying as to such other matters as Tenant reasonably may request. With regard to any estoppel certificates related to this Lease, the Lease will take precedence over the contents of such estoppel certificates, should a conflict arise. Landlord shall be entitled to receive an Estoppel Certificate and/or SNDA from Tenant at no fee to Landlord once during any 12 month period. For each additional Estoppel Certificate and/or SNDA requested during any such 12 month period, Landlord shall be required to pay Tenant under this Lease a non-refundable fee in the amount of $250.00 for each new Estoppel Certificate and each new SNDA requested from and provided by Tenant to cover Tenant's administrative, legal and other costs and expenses incurred in processing, negotiating and drafting said documents and Tenant is hereby authorized to deduct said amount from Rent next due.

## SECTION 46.  QUIET ENJOYMENT

Landlord represents and warrants to Tenant that Landlord is well seized of fee simple title to the Premises and the Shopping Center and has full power and authority to execute and deliver this Lease. Landlord covenants to Tenant that Tenant shall at all times have peaceable and quiet enjoyment and possession of the Premises and of the rights granted hereunder without any manner of hindrance from Landlord or any other person or persons, if Tenant performs all the covenants and agreements to be performed on Tenant's part. If a violation of this the section occurs, in addition to any other remedies available to Tenant, Tenant shall have the right to pay Substitute Rent commencing on the first date of the violation and continuing until such violation is cured.

## SECTION 47.  HOLDING OVER

If, at the expiration of the Term, Tenant continues to occupy the Premises, such holding over shall not constitute a renewal of this Lease, but Tenant shall be a tenant from month to month, at the same rent and under the same terms and conditions as in effect immediately prior to the commencement of the month to month tenancy, and either party may terminate the Lease during said month to month tenancy upon 90 days prior written notice to the other party; provided, however, Landlord shall not specify a Lease termination date to be during the period commencing September 1 and ending on the immediately following January 31.

## SECTION 48.  BROKERS

Each party represents to the other party that it has not dealt with any party with regard to the Premises or this Lease, except that Rick Kirschman represents Tenant in this transaction. Landlord will pay Tenant's broker pursuant to a separate agreement between Landlord and Tenant's broker and it is agreed that if Landlord does not pay Tenant's broker, Tenant shall have the right to pay Tenant's broker for fees due and set-off said amounts against Rent due Landlord. Each party will indemnify and hold the other party harmless from and against any loss, cost, liability and expense, including reasonable attorney's fees, arising out of a breach of



its representation in this section.

## SECTION 49.  INTENTIONALLY DELETED

## SECTION 50.  CLAIMS LIMITATION

All actions or claims by Landlord for Rent shall be barred three years after the end of each Lease Year or Partial Lease Year, except that in the case of any component of Additional Rent, the same will not be barred until three years after Tenant's receipt of Landlord's annual reconciliation statement furnished with respect to that Lease Year or Partial Lease Year. All actions or claims by Tenant for recovery of excess payments of Rent shall be barred three years after the end of each Lease Year or Partial Lease Year, except that in the case of any component of Additional Rent, the same will not be barred until three years after Tenant's receipt of Landlord's annual reconciliation statement furnished with respect to that Lease Year or Partial Lease Year. The forgoing limitations shall not apply in the event of fraud or willful misstatement of the amounts so stated.

## SECTION 51.  CAPTIONS

Any paragraph titles or captions contained in this Lease are for convenience only and do not define, limit or otherwise modify the scope or intent of this Lease.

## SECTION 52.  VARIATION IN PRONOUNS

All the terms and words used in this Lease, regardless of the number and gender in which they are used, will be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context or sense of this Lease or any paragraph or clause herein may require, the same as if such words had been fully and properly written the number and gender.

## SECTION 53.  SECTION REFERENCES

All references to any section number(s) refer to the Section contained in this Lease.

## SECTION 54.  BINDING EFFECT OF AGREEMENT

This Lease and all of the covenants, conditions, provisions and restrictions herein inures to the benefit of and binds the heirs, executors, administrators, devisees, legatees, personal representatives, successors and assigns, respectively, of Landlord and Tenant.

## SECTION 55.  ATTORNEY'S FEES

If Landlord or Tenant is required to enforce this Lease, then the non-prevailing party must pay to the prevailing party the prevailing party's arbitration costs (if any), court costs and reasonable attorney's fees. This provision applies to court costs and attorney's fees incurred in



any trial and appellate courts.

## SECTION 56.  OFAC WARRANTY

Each party represents and warrants to the other party that the representing party (a) is not acting, directly or indirectly, for or on behalf of any person, group, entity, or nation named by any Executive Order or the U.S. Treasury Department as a terrorist, "Specially Designated National and Blocked Person," or other banned or blocked person, entity, nation, or transaction pursuant to any law, order, rule, or regulation that is enforced or administered by the Office of Foreign Assets Control, and (b) is not engaged in this lease transaction, directly or indirectly, on behalf of, or instigating or facilitating this lease transaction, directly or indirectly, on behalf of any such person, group, entity or nation. The breaching party must defend, indemnify, and hold harmless the other party from and against all claims, damages, losses, risks, liabilities, and expenses (including reasonable attorney's fees and costs) arising from or related to any breach of the forgoing representation.

## SECTION 57.  PDF/COUNTERPART SIGNATURE

This Lease may be executed in multiple counterparts, each of which shall constitute an original and all of which taken together shall constitute one and same agreement binding upon the parties, notwithstanding that all the parties are not signatories to the same counterpart. In order to facilitate the finalization of this Lease, the parties agree that signatures transmitted by facsimile machine or signatures transmitted via e-mail in a "PDF" format may be used in place of original signatures on this Lease. Each party intends to be bound by such party's facsimile or "PDF" format signature on this Lease, is aware that the other parties are relying on such party's facsimile or "PDF" format signature, and hereby waives any defenses to the enforcement of this Lease based upon the form of signature. Promptly following any facsimile transmittal or e-mail transmittal of "PDF" format signatures, the parties shall deliver to the other parties the original executed Lease by reputable overnight courier to the notice addresses listed herein (it being agreed and understood that the delivery of such original shall not be a condition to the binding nature of the facsimile or electronic copy of the document provided such document is received by the parties).

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

In witness whereof, the parties have signed this Lease as of the date listed above.

**Signed in the Presence of:**

_Casie RRl_
_____

_Bill Age_
_____

LANDLORD:
**WILSHIRE PLAZA INVESTORS, LLC**

By: _Keith Walker_
_____

Name: _Keith Walker_
_____

Title: _Secretary_
_____
_KW 7-16-19_

Employer Identification Number: _51-0517527_
_____

**Signed in the Presence of:**

_Kristi Robison_
_____

_Kristi Robison_
_____

TENANT:
**JO-ANN STORES, LLC**

By: _[signature]_
_____

Name: _Matt Susz_

Title: _CFO_

And

By: _[signature]_
_____

Name: _Wade Miquelon_

Title: _CEO and President_

_RQ4_
_7-9-19_
_#2544_

48

STATE OF *Georgia*    )
                       ) SS
COUNTY OF *Muscogee*    )

BEFORE ME, a Notary Public in and for said County and State, personally appeared **Wilshire Plaza Investors, LLC**, a Delaware limited liability company, by *Keith Walker*, its *Secretary*, who did sign the foregoing instrument on behalf of the limited liability company and that the same is his/her free act and deed of the corporation and personally and as such authorized representative.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at *Columbus*, *Georgia*, this *16th* day of *July*, 2019.

_____
NOTARY PUBLIC

*(Notary seal: PEGGY THORNE, NOTARY PUBLIC, MUSCOGEE COUNTY, GEORGIA, EXP. 08/31/2020)*

STATE OF OHIO        )
                      ) SS
COUNTY OF SUMMIT     )

BEFORE ME, a Notary Public in and for said County and State, personally appeared **JO-ANN STORES, LLC**, an Ohio limited liability company, by *Matthew Supp*, *CFO* and *Wade Miguelon*, *CEO and President*, who acknowledged that they did sign the foregoing instrument on behalf of said corporation and that the same is their free act and deed personally and as such officers.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at Hudson, Ohio, this *12th* day of *July*, 2019.

_____
NOTARY PUBLIC

*(Notary seal: NOTARIAL SEAL, STATE OF OHIO)*

**WENDY S. BLASICK**
Notary Public, State of Ohio
My Commission Expires 05-20-2024

Store #2544, Wilshire Plaza, Metairie, LA
EXECUTION VERSION: July 1, 2019
UB Document No.: 2578017v.6

Exhibit A

**Shopping Center Legal Description**

Overall:

A tract of land containing 7.685 acres or 334,730 square feet, located on Lots A-1 & A-2, Square 7, Wilshire Heights, Section B, situated in Section 125, Township 12 South, Range 11 East Jefferson Parish, Louisiana and being more particularly described as follows:

Beginning at the intersection of the northerly right of way line of Veterans Memorial Boulevard and the easterly right of way line of Martin Behrman Avenue, said point being the "Point of Beginning" and labeled "P.O.B.1." Then continuing along the easterly right of way line of Martin Behrman Avenue N 02°03'36" E a distance of 789.20 feet to a point, said point being located at the intersection of the easterly right of way line of Martin Behrman Avenue and the southerly right of way line of Dumaine Street; then continuing along the southerly right of way line of Dumaine Street S 87°56'24" E a distance of 424.14 feet to a point; then departing said right of way line S 02°03'36" W a distance of 789.20 feet to a point, said point being located along the northerly right of way line of Veterans Memorial Boulevard; then continuing along said right of way line N 87°56'24" W a distance of 424.14 feet to the "Point of Beginning".

Lot A-1:

A tract of land designated as "LOT A-1", containing 7.354 acres or 320,330 square feet, Square 7, Wilshire Heights, Section B, situated in Section 125, Township 12 South, Range 11 East, Jefferson Parish, Louisiana and being more particularly described as follows:

Beginning at the intersection of the northerly right of way line of Veterans Memorial Boulevard and the easterly right of way line of Martin Behrman Avenue, said point being the "POINT OF COMMENCEMENT" and labeled "P.O.C." Then continuing along the easterly right of way line of Martin Behrman Avenue N 02°03'36" E a distance of 120.00 feet to a point, said point being the "POINT OF BEGINNING" and labeled "P.O.B.2." Then continuing along the easterly right of way line of martin Behrman Avenue N 02°03'36" E a distance of 669.20 feet to a point, said point being located  at the intersection of the easterly right of way line of Martin Behrman Avenue and the southerly right of way line of Dumaine Street; then continuing along the southerly right of way line of Dumaine Street S 87°56'24" E a distance of 424.14 feet to a point; then departing said right of way line S 02°03'36" W a distance of 789.20 feet to a point, said pint being located along the northerly right of way line of Veterans Memorial Boulevard; then continuing along said right of way line N 87°56'24" W a distance of 304.14 feet to a point; then departing said right of way line N 02°03'36" E a distance of 120.00 feet to a point; then N 87°56'24" W a distance of 120.00 feet to the "POINT OF BEGINNING".



<u>Lot A-2:</u>

A tract of land designated as "LOT A—2", containing 0.331 acres or 14,430 square feet, Square 7, Wilshire Heights, Section B, situated in Section 125, Township 12 South, Range 11 East, Jefferson Parish, Louisiana and being more particularly described as follows:

Beginning at the intersection of the northerly right of way line of Veterans Memorial Boulevard and the easterly right of way line of Martin Behrman Avenue, said point being the "POINT OF BEGINNING" and labeled "P.O.B.1." Then continuing along the easterly right of way line of Martin Behrman Avenue n 02°03'36" e A DISTANCE OF 120.00 FEET TO A POINT, THEN DEPARTING SAID RIGHT OF WAY LINE s 87°56'24" e A DISTANCE OF 120.00 FEET TO A POINT; THEN s 02°03'36" w A DISTANCE OF 120.00 FEET TO A POINT, SAID POINT BEING LOCATED ALONG THE NORTHERLY RIGHT OF WAY LINE OF Veterans Memorial Boulevard; then continuing along said right of way line N 87°56'24" W a distance of 120.00 feet to the Point of Beginning.

Exhibit B
Site Plan



Premises

Anchor Tenant Premises

Shopping Center Boundary

Protected Area

Cart Corral Area

<u>Exhibit C</u>

**Intentionally Deleted**

Exhibit C

<u>Exhibit D</u>

**FY18 Prototype Plans**

Exhibit D-1

**Tenant's Prototype Signage Plans.**







Individual 5" Front-Lit Channel Letters, Remote



JOANN

Individual 5" Front-Lit Channel Letters, Remote



**SIGN A**

| | |
|---|---|
| Type | Utilize 5" Front Lit Channel Ltrs Remote |
| Illumination | Internally Illuminated LED |
| Square Footage | 67.39 |

## JOANN

**Electrical Detail:**
White LEDs
(X) 50w Power Supplies
Total Amps: X.XX
(1) 20 amp 120V C'cuit Req.

**General Notes:**
This sign is to be installed in accordance with the requirements of Article 600 of the National Electrical Code.

1. Generated circuit branch per NEC 680 / NEC 210
2. Existing branch circuit in compliance with NEC 600.5, not to exceed 20 amps
3. Sign is to be UL listed per NEC 600.3
4. UL disconnect switch per NEC 600.6 - required per sign to comply to latest wiring "manufacturer"
   "If multiple signs, a disconnect is permitted but not required for each sign"

### Sign Layout Detail
Scale: 3/8"=1'-0"

42"

15'-1¼"  [228 3/4"]

**Specifications: Channel Letters**

1. Existing Faces: To be determined
2. 0.040" Alum. 'rtn' letter rtns, 5" pre-fin'd 3/4c white
3. 1" Jewelite trim cap (3/4w) bonded to face #3 pan head screws to returns.
   Note: 2" trim cap for 6" rtn sizes 5/4" and larger
4. 0.063" pre-finished white alum w/ all backs fastened to returns. See #9
   VOC comp. paint 300/ white class cauls to prevent moisture penetration.
5. White LEDs
6. 3/16 #7236 White Acrylic faces
7. Disconnect switch UL Outdoor rated toggle type w/ neoprene boot per NEC 600.6
8. Primary electrical feed # UL conduit / customer supplied UL junction box
9. Power Supplies within UL enclosure (rem'd/dbl kb, 1/4" x 1" rain screws
10. Mounting Hardware to suit



① ② ③ ④ ⑤ ⑥

### Section @ LED Channel Letter
Scale: N.T.S.

v. Drain holes at bottom
v. Verticals of tight bundles
To access voltage only

① ⑥ ⑦ ⑧ ⑨ ⑩

**Individual 5" Front-Lit Channel Letters, Remote**

**APEX** SIGN GROUP













**SIGN A**

| | |
|---|---|
| Type | Individual Channel Letters on Raceway |
| Illumination | Internally Illuminated LED |
| Square Footage | XXX SF |

**Color Specifications:**
- PMS 375 Green

**Electrical Details:**

White LEDs
(A) 60w Power Supplies
Total Amps: X.XX
(1) 20 amp 120v Circuit Req.

**General Notes:**

This sign is to be installed in accordance with the requirements of Article 600 of the National Electrical Code.

1) Galvanized and/or bonded per NEC 600.7 NEC 250
2) Existing branch circuit of compliance with NEC 230.95 not to exceed 20 amps
3) Sign to be on UL listed per NEC 600.3
4) UL disconnect located per NEC 600.6 (as required per sign) compliance before leaving manufacturer. "If more than one sign, a disconnect is permitted but not required for each section.

**Sign Layout Detail**
Scale: 3/8" = 1'-0"

JOANN

**Specifications:**

1. Existing Facade: To be determined
2. 3/16" Aluminum Return covers painted to match PMS 375 Green
3. Jewelite trim cap (per PMS #375 Green) bonded to face and #8 pan head screws to returns
4. .080 pre-finished white aluminum backs fastened to returns. Sealed w/ VOC compliant 3M Holista silicone caulk to prevent moisture penetration
5. White LEDs
6. 3/16 #2447 White Acrylic faces w/ custom printed (Oralvinyl) dual color film to match PMS 375 Green
7. Disconnect switch UL Outdoor rated toggle type w/ neoprene boot per NEC 600.6
8. Power Supplies
9. Primary electrical feed w/ UL conduit concealed supplied UL junction box
10. .090 profile extruded aluminum raceway, (7" x 4 ½") w/ weathertight cover. All painted to match the "ouzle-color" TBD
11. ½" Aluminum mounting clips. Maximum 16" from each end at every 48" o.c. (TYP)
12. ½" Aluminum #8 x .3 reach #8, (1/32" to raceway) flanges thru bolt attachment to large letters
13. Mounting fasteners to suit

**Section @ LED Channel Letter**
**Raceway**
Scale: N.T.S.

JOANN

**Individual 5" Front-Lit Channel Letters, Raceway Mounted (Standard)**

Apex SIGN GROUP









**JOANN**

**Individual 5" Front-Lit Channel Letters, Remote**

**APEX SIGN GROUP**

| SIGN A | 30" dia x 14" FELT Grade Pylon |
|---|---|
| Type | Individual Front-Lit Channel Qty. Remote |
| Illumination | Internally Illuminated LED |
| Square Footage | 86.80 |

**Electrical Detail:**
10-Total LEDs
(A) Slide-Power Supplies
Total Amps: X.XX
(1) 20 amp 120V Circuit Req.

**General Notes:**
This sign is to be installed in accordance with the requirements of Article 600 of the National Electrical Code.

**Electrical Detail:**

1. General and bonded per NEC 600.7/NEC 250
2. Electrical branch circuit #1 compliance with NEC 600.5, not to exceed 20 amps
3. 1.5 gm to be UL listed per NEC 600.3
4. UL disconnect switch per NEC 600.6 req. and per sign component before housing mark check "on" not mounted for each section

**Specifications: Channel Letters**

1. Exterior Faces: To be confirmed
2. 0.040 Aluminum letter return pre-finished white. 5" x 3" deep return and 3" or deeper
3. 1 Drive "x" through (white) bonded to faces. #6 pan head screws to returns.
   Note: 2 encodes for faces 54" and larger
4. 0.063 pre-finished white aluminum faces fastened to returns. Seal w/ VOC comp. seal 5/32 white 3/32 caulk to prevent moisture penetration.
5. WP #1 LEDs
6. 3/16" #7125 White Acrylic faces
7. Disconnect switch UL Outdoor rated toggle type w/ req. one 600.6 per NEC 600.6
8. Primary electrical feed — UL conduit / customer supplied. UL jct com box
9. Power Supplies within UL enclosure (removable) incl. 1/4" x 1" pan screws
10. Mounting Hardware to suit

**Sign Layout Detail**
Scale 3/8" = 1'-0"

**Section @ LED Channel Letter**
Scale N.T.S.







**SIGN A**

| | |
|---|---|
| Type | Individual Front-Lit Channel Ltr. Remote |
| Illumination | Internally Illuminated LED |
| Square Footage | 18± X |

**Sign Layout Detail**
Scale: 1/2" = 1'-0"

7'-11 1/4" [95 1/4"]
87 3/4
21"
54

**Section @ LED Channel Letter**
Scale: N.T.S.

**Electrical Detail:**

White LEDs
(A) Slim Power Supplies
Total Amps: X.XX
(1) 20 Amp 120V Circuit Req.

**General Notes:**

This sign is to be installed in accordance with the requirements of Article 600 of the National Electrical Code.

**Specifications: Channel Letters**

1. Existing Fascia – To be determined.
2. (0.040) Aluminum letter return/back, prefinished white 5" & 3" "Joann" and 3" for tag line.
3. 1" (bleed) trim cap (welded/bonded to top tab) #6 pan head screws to returns.
4. (0.063) Trim/retaining nut to a uniform, black fastened to returns. 5/8" and larger.
   Note: 2" trim caps for letters 54" and larger.
5. White LEDs
6. VDC compatible 30V white letters. Caulk to prevent moisture penetration.
7. 3/16" #7213 White Acrylic faces.
8. Disconnect switch. U.L./C.U.L. listed/upgrade type as required per 2008 per NEC 600.6
9. Primary electrical feed in U.L. conduit. Balance supplied by U.L. per contractor.
10. Power Supplies within U.L. enclosure (remote/label). 1/4" x 1" pan screws.

**General Notes:**

1) Grounding and bonding per NEC 600.7 & NEC 250.
2) Existing branch circuit on own grounded 20 amps.
3) All signs to be UL listed per NEC 600.3
4) UL disconnect switch per NEC 600.6 required on sign component before leaving manufacturer.
*For multiple signs a disconnect is permitted but not required for each source.

**JOANN**

**Individual 5" Front-Lit Channel Letters, Remote**

**Apex** SIGN GROUP



| SIGN A | |
|---|---|
| Type | |
| Illuminated | |
| Sheet Footage | 240.00 |

Internally Illuminated LED

**JOANN**

**Individual 5" Front-Lit Channel Letters, Remote**



## Electrical Detail

WP for LEDs
(N) Slim Power Supplies
Total Amps. X.XX
(1) 20 amp 120V Circuit Req.



## General Notes:

This sign is to be installed in accordance with the requirements and Article EX of the National Electrical Code.

1) Glow, conduit and junction box per NEC 600.7 NEC 250 NEC E 01.5, not to exceed 20 amps.
2) Existing branch circuit in compliance with NEC E 05.5, not to exceed 20 amps.
3) Sign is to be UL listed per NEC EX.3
4) J.J. disconnect switch per NEC 600.6 mounted per sign component before leaving manufacturer.
For all Apex signs, a disconnect is permitted but not required for each sector.

## Sign Layout Detail
Scale: 1/2" = 1'-6"

8'-8 3/4"    [101'- 3/4"]
23 1/4"    97 1/4"    60"

27.4"    .38"
70.1"

## Specifications, Channel Letters

1. Existing Facade. To be determined
2. (N) 040 Alum'num letter returns pre-finished white. 5" or "Joann and 3" for sign net
3. 1" provide trim cap (which bonded) to face. #6 per letter screws to returns
4. (N) 063 pre-finished white aluminum backs (fastened to return. See in VOC compliant sign white stain caulk to prevent moisture penetration.
5. (N) Wall LEDs
6. 3/16" #7328 White Acrylic faces
7. Disconnect switch UL Outdoor rated/toggle type w/ mounted into per NEC 6C3-6
8. Primary electrical feed in UL conduit / customer supplies. Junction box
9. Power Supplies within UL enclosure (removable lid. 14" x 1" nut screws
10. Mounting Hardware to suit

## Section @ LED Channel Letter
Scale: N.T.S





**Apex** SIGN GROUP

Exhibit D-1, Page 19

| SIGN A | |
|---|---|
| Type | Inc idual Front Li Channel (Rc. Remote |
| Illumination | Inter y _ ite w AC LED |
| Square Footage | XXX.XX |









**Color Specifications:**

■ PMS # 375 Green

**Electrical Detail:**

White LEDs
(X) 60w Power Supplies
Total A mps: X.XX
(1) 20 amp 120V Circuit Req



**General Notes:**

This sign is to be installed in accordance with the requirements of Article E 6.0 of the National Electrical Code.

1) Grounded at the outlet box per NEC 600.7 NEC 250
NEC 6 C 0.5.  not to exceed 20 amps
2) Existing branch circuit in compliance with
NEC 6 C 0.5.  not to exceed 20 amps
3) Sign is to be UL listed per NEC 600.3
4) UL disconnect sw itch per NEC 600.6 requ. ed per sign component before leaving manufacturer'
"For multiple signs, a disconnect is permitted but not required for each section.

**Sign Layout Detail**
Scale: 3/8" = 1'-0"

**Specifications: Channel Letters**

1   Eoso y Face lec. to be determined
2   0 040" Alumin an letter retain s painted to match PMS # 375 Green
3   1" prewelded 3mm cap (pen PMS # C N Green) bonded to face. #8 pan head screws to return.
    Note: 2" trim caps for letters 54" and larger
4   0.063" pre-finished white alum num back (painted) 2' return s. Scal w:
    VDC compliant 360 white alum num back (painted) 2' return s. Scal w:
5   12 Vo t LEDs
6   3/16" #2447 White Acrylic faces w /custom painted (Day night) dual color film to match
    PMS 376 Green
7   Disconnect switch . A. O duo razed toggle type w /motor line back per NEC E D-6
8   Primary electrical feed in UL condu t : customer supplied A. per distrib ox
9   Power Supp   es w/in UL enclosure (removable lid)  14' x 1' trus screws
10  Mounting fit xture to buil

**Section @ LED Channel Letter**
Scale: N T S





○ 1
○ 2
○ 3
○ 4
○ 5
○ 6
○ 7
○ 9
○ 10
○ 8



JOANN

Individual 5" Front-Lit Channel Letters, Remote

Apex SIGN GROUP

| SIGN A | |
|---|---|
| Type: | XX" Joann XX" half-scale No. |
| Elevation: | Individual Channel Letters w/ Raceway |
| | Front-Lit, Illuminated, LED |
| Square Footage | XXX.XX |





**Color Specifications:**

▢ PMS #376 Green

**Electrical Detail:**
White LEDs
(X) 60w Power Supplies
Total Amps: X.XX
(1) 20 amp 120V Circuit Req.

**General Notes:**

This sign is to be installed in accordance with the requirements of Article 600 of the National Electrical Code.

1) Sign and conductors per N.E.C 600.7 & N.E.C 250.
2) Secondary branch circuit in compliance with N.E.C 600.5, not to exceed 20 amps.
3) Sign is to be UL listed per N.E.C 600.3
4) U.L. disconnect switch per N.E.C 600.6 mounted per sign component before running main disconnect. For multiple signs a disconnect is permitted but not required for each section.

**Sign Layout Detail**
Scale: 3/8" = 1'-0"

**Specifications:**

1. Backer/Facade: To be determined.
2. .040" Aluminum letter returns are painted white.
3. 1" trimcap on top (white) bonded to face and all per head screws to returns.
4. .060 per-finished white aluminum backs fastened to returns. Seal w/ VOC compliant .180 white latex caulk to prevent moisture penetration.
5. White LEDs
6. 3/16" #7328 White Acrylic faces.
7. Disconnect switch. UL Outdoor rated keypad type w/ neoprene boot per NEC 600.6
8. Primary electrical inlet in UL conduit via.servo supplied U.L. junction box.
9. Power Supplies.
10. Low profile extruded aluminum raceway (7" x 4 1/2") in welded/riveted. All painted to match PMS #376 Green (or green painted faces).
11. 2" Aluminum mounting clips. Min. 6" from each end at one every 48" o.c. (TYP).
12. 1" studs. 3/16" aluminum 366 (face to raceway fastening). They bolt attachment kit - large letters.
13. Mounting hardware to suit.

• Bolt holes all letter of studs pass w/ right tie/ics.

**Section @ LED Channel Letter**
**Raceway**
Scale: N.T.S.





**Individual 5" Front-Lit Channel Letters, Raceway Mounted (Standard)**

| SIGN A | |
|---|---|
| Type | Individual Channel Letters or Raceway |
| Part Number | Internally Illuminated LED |
| Square Footage | XXX XX |



# JOANN

*handmade happiness*

**Sign Layout Detail**
Scale: 3/8" = 1'-0"





**Color Specifications:**

PMS #375 Green

**Electrical Detail:**

White LEDs
(A) 60W Power Supplies
Total Amps: X.XX
(1) 20 amp 120V Circuit Req.

**General Notes:**

This sign to be installed in accordance with the requirements of Article 600 of the National Electrical Code.

1) Ground rod and bar and per NEC 600.7 NEC 25C

2) Locking branch circuit of compliance with NEC 600.5, to be exceed 20 amps.

3) Sign to be 24 v.l. listed per NEC 600.3

4) UL disconnect switch per UEC 600.6 required per sign, or separate before turning on "power" for multiple signs, a disconnect is permitted but not required for each section.



**Individual 5" Front-Lit Channel Letters, Raceway Mounted (Standard)**

**Specifications:**

1. Existing "J" Facade: To be documented
2. 3.040" Aluminum return return 5 pre-text to match PMS #375 Green
3. ".060 return trim cap (color PMS #375 Green, bonded to face and 48 pre face screws to returns.
4. Nora 2" trim caps for return 1.5" and larger
5. 3/16" pre-flexxes total aluminum backs base return to returns. Seal w/
6. VHD compound .060 weld skin back to pre coat medium penetration
7. WP-air LED's
8. 3/16 12441 WP 3x Acrylic faces w/ colors period to Day-may" / dual color trim 3x in 2"x3"
9. PMS 3/16 Green
10. Disconnect box 3/8" UL Outdoor rated loops w/ box w integ 3/4" box base box per NEC 600.6
11. Power Supplies
12. Primary electrical feed in UL conduit / casing to supplied UL, p/f from box
13. Low profile extruded aluminum raceway / 7" x 4 1/2" w w/ raised of screws, All painted to match the "base-color" (ED)
14. Aluminum mounting clips, 6 bars in 16 "bar" each end of every 48" o.c. (TYP)
15. Weeps 3/16" or return 48. Water for raceway 48/sealed) This bd attached to bar w/ bolts
16. Mounting hardware to suit

**Section @ LED Channel Letter**
Scale: NTS

**Raceway**










SIGN A

| Type | replacement panels 3/16" w thk |
| Actual Size | polycarbonate w approved vinyl |
| Vendor Size | TBD |
| Square Footage | XX.XX |



## New Replacement Panel - Existing D/F Pylon
### QTY 2 (1 SET)
Scale 3/4" = 1'-0"

TBD

30"

③ ② ①



### Temporary Graphic Detail
Scale NTS

*Temporary & removable cover stock vinyl, 3M Matte changeable w/ 3M IJ25-30 Print, 3M 8624 Overlaminate







**Existing**

## Specifications:

1. New 3/16" white polycarbonate

2. approved vinyl to match PMS 3PEC Green, 3M #IJ30-10's Brilliant Green

3. Existing Retainer (Visual Opening)

Multi-Tenant Sign - Standard Face Replacement



**Proposed**

Exhibit D-1, Page 23









**JOANN**

Emergency Exit / Receiving Signage



**Receiving**
12" x 18"

**JOANN**
**RECEIVING HOURS**
8am - 4pm  Monday - Friday

To be installed on exterior of each man-door with border that runs first & fourth & sides to full up door panel as required

**Emergency Exit**
18" x 18"

**EMERGENCY EXIT**
**DO NOT BLOCK**

To be installed on exterior of each metal exit door at M-54 during graphics build & sign

**BASIC:** .063 White aluminum

**GRAPHICS:** Digitally printed on 3M 180 scotch Vinyl applied to alum or Digitally printed White Vinyl backer for use on Glass doors

**MOUNTING:** Clear silicone as req'd

**NOTE:** To be installed with permanent tape package

### Color Specifications
- PMS 376 Green
- 3M IJ-63-10 White Controtac



APEX SIGN GROUP

Exhibit D-1, Page 25







8'-0" X 4'-0" SF BANNER W/ ROPE CHANNEL, (ROPE INCLUDED)

**BANNER:** 12 oz. Mesh banner w/ overall 85% material & 15% holes; 1" Hem - Top & Bottom for rope channel & grommets along top & bottom edge rib, 24" on centers

**GRAPHICS:** Digitally printed to match colors shown.

**INSTALLATION:** Banner secured using rope & bungdog method.

**NOTE:** TO SUPPLY 100 FEET 3/8" THICK ROPE w/TY WIRE

INSTALL WEEK (10)

Banner Layout Detail





**SIZE A: 18" X 36"**



NOW
HIRING

happy place

APPLY ONLINE

**SIZE B: 24" X 48"**



NOW
HIRING

happy place

APPLY ONLINE

INSTALL WEEK 12

**SIZE A: 18" X 36"**

STORE
OPENS

MON 00 0000

**SIZE B: 24" X 48"**

STORE
OPENS

MON 00 0000

VINYL
GRAPHICS
TO BE APPLIED
AT A LATER DATE

INSTALL WEEK 12

**BANNER:** 13 oz. banner material w/ 1" sewn hem & brass grommets on all (4) four corners.
All colors to be reinforced.

**GRAPHICS:** Digitally printed for each colors shown.

**INSTALL:** To be installed with suction cups in windows.

**NOTE:** SITE-SPECIFIC DRAWINGS TO BE PROVIDED FOR APPROVAL PRIOR TO PRODUCTION

**Quantity: (1) One required**



**COLOR PALETTE**

QUANTITY: (9) nine pcs each of numbers 0 thru 09 and (1) exclamation (!). Numbers to be one black vinyl address based graphics to apply to banner as necessary

NOTE: BANNER WILL BE PRINTED ONE WITH 30 DAY OF THE BANNER IN WEEK 1 BASE SIGN WITH DISPLAY


JOANN

Banner Layout Detail


APEX
SIGN GROUP











Barricade Sample Layout Detail

ALL DETAILS TO BE CONFIRMED

COLOR PALETTE

INTERIOR WALL BARRICADE
NOT TO SCALE

SIZES TO VARY PER LOCATION

JOANN
open a new door to
creativity
#HANDMADEWITHJOANN

PHOTOS WILL BE PROVIDED BY
JOANN MARKETING 1 MONTH
PRIOR TO INSTALL BASED ON
CURRENT INSTAGRAM TRENDS

Exhibit D-1, Page 29



**Banner Layout Detail**



SIGN COMPANY TO INSTALL THE NIGHT BEFORE OPENING

**NOW OPEN PACKAGE**
Scale 1/4" = 1'-0"



side 1



side 2

**5'-0" x 14'-0" MESH BANNER**

**BANNER:** 12 oz. Mesh banner material 65% screen. & 15% hot 3's; 1" Hm top & bottom for rope channel & grommets along top & bottom edge min. 2" on centers

**GRAPHIC:** Digitally printed to match color 1 shown

**INSTALLATION:** Banner secured using rope & sandbag method

**NOTE:** AFG SIGN TO SUPPLY 100 FEET 3/8" THICK ROPE WITH WIRE

Quantity, (2) Two as building allows. Quantity of banners will be site specific

**COLOR PALETTE**

MEDIUM
LVE, Ref



JOANN

Banner Layout Detail

TO BE SHIPPED TO STORE /4 WEEKS BEFORE CONSTRUCTION START DATE



6' X 11'-6" 4 PANELS IN-LINE GRAPHIC #1

REMODEL PACKAGE
SCALE: ¼" = 1'-0"

creativity is messy

Thanks for your patience while we work to bring you fresh inspiration!



COLOR PALETTE:

BANNER: 13 oz. banner material w/ 1" sewn hem & brass grommets on all (4) four corners. All corners to be reinforced

GRAPHICS: Digitally printed to match colors shown

INSTALL: To be installed in windows using suction cups

Quantity: (1) one required



Apex
SIGN GROUP





**REMODEL PACKAGE**
Scale: 1"=1'-0"



SIZE A: 48" X 120"



SIZE B: 24" X 36"

**BANNER:** 13 oz. banner material w/ 1" sewn hem & brass grommets on all (4) four corners. A. corners to be reinforced

**GRAPHICS:** Digitally printed to match colors shown

**INSTALL:** To be installed with suction cups at windows

**NOTE:** SITE SPECIFIC DRAWINGS TO BE PROVIDED FOR APPROVAL PRIOR TO PRODUCTION

**Quantity: (1) One required**

TO BE SHIPPED TO STORE (4) WEEKS BEFORE CONSTRUCTION START DATE



**COLOR PALETTE**

JOANN

Banner Layout Detail

Apex

Exhibit D-1, Page 32







**JOANN**

"A" Frame Sandwich Board Detail

TO BE SHIPPED TO STORE 4-8 WEEKS BEFORE CONSTRUCTION START DATE



Banner Layout Detail

TO BE SHIPPED TO STORE (2) WEEKS BEFORE CONSTRUCTION START DATE

8'-6" X 7'-6" US BANNER W/ GROMMETS



*Creativity is messy*

Thanks for your patience while we work to bring you fresh inspiration!

DOWNSIZE/EXPANSION PACKAGE
Scale: 3/4"=1'-0"

**BANNER:** 13 oz. banner material w/ 1" sewn hem & brass grommets on all (4) four corners. All corners to be reinforced

**GRAPHICS:** Digitally printed to match colors shown

**INSTALL:** To be installed in windows using suction cups

Quantity: (1) one required

COLOR PALETTE:





Exhibit D-1, Page 34



JOANN

Banner Layout Detail



TO BE SHIPPED TO STORE (2) WEEKS BEFORE CONSTRUCTION START DATE



SIZE A: 36" X 58"



SIZE B: 27" X 35"

**OWNED SIZE EXPANSION PACKAGE**
Scale: 3/4" = 1'-0"

**BANNER:** 13 oz. banner material w/ 1" sewn hem
& 3-reiss grommets on all (4) the / corners
All corners to be reinforced

**GRAPHICS:** Digitally printed to match colors shown

**INSTALL:** To be installed with suction cups + windows

**NOTE:** SITE SPECIFIC DRAWINGS TO BE PROVIDED FOR
APPROVAL PRIOR TO PRODUCTION

 

**COLOR PALETTE**



PANTONE #
2292 Green

Quantity (1) One required





JOANN

Coroplast Panel Layout Detail



NOTE: REQUIRED FOR ALL DOWNSIZE
CONFIRM WITH JOANN BEFORE ORDERING FOR EXPANSIONS

3'-3" X 6'-8" COROPLAST SIGNAGE



THIS WAY TO SHOP

TO BE SHIPPED TO STORE (2) WEEKS BEFORE CONSTRUCTION START DATE

DOWNSIZE/EXPANSION PACKAGE
Size 3'-4" × 4'-3"

BASIC:    White coroplast material - grommeted in (4) four corners as shown

GRAPHIC:    Digitally printed to match colors shown

Quantity: (4) four required



COLOR PALETTE









**TO BE SHIPPED TO STORE (2) WEEKS BEFORE CONSTRUCTION START DATE**

**JOANN**

"A" Frame Sandwich Board Detail

**Apex** SIGN GROUP



JOANN

Banner Layout Detail





NOTE: BANNER TO BE USED AT REMODELS, EXPANSIONS & DOWNSIZES

**OPTION A** — 3'-2" 1/E-4" 6/F BANNER

GRAND RE-OPENING

**OPTION B** — 3'-6" 1/E-4" 6/F BANNER

MORE-IN-STORE GRAND OPENING
1000s of new items!

GRAND RE-OPENING PACKAGE
SCALE 10' x 4'

**BANNER:** 12 oz. Vinyl banner material (65% material & 15% holes). 1" Hem top & bottom for rope. Color #1 & grommets along top & bottom edge. min. 24" on centers

**GRAPHICS:** Digitally printed to match colors shown

**INSTALLATION:** Banner secured using rope & zip tie/bag method

**NOTE:** TO SUPPLY 100 FEET 3/8" THICK ROPE WITH WIRE. JOANN TO ADVISE WHICH BANNER IS USED PER SITE

Quantity: (1) One as building allows. Quantity of banners will be site specific

COLOR PALETTE

JOANN

Banner Layout Detail



TO BE INSTALLED WEEK 12



8'-4" 14'-4" 5/F BANNER

WE'RE MOVING

MOVING PACKAGE
SIZE: 12" x 4"

**BANNER:** 12 oz. Mesh banner material 65% material & 15% holes;
1" Hem top & bottom for rope channel
& grommets along top & bottom edge min. 24" on centers

**GRAPHICS:** Digitally printed to match colors shown

**INSTALLATION:** Banner secured using rope & sandbag method

**NOTE:**
TO SUPPLY 100 FEET 3/8" THICK
ROPE WITH HOME

Quantity: (2) Two

Quantity of banners will be site-specific.

COLOR PALETTE

Banner
32 colors



Banner Layout Detail





**MOVING PACKAGE**

**BANNER:** 13 oz. Banner stock/24"w x 1" scrim here
4 Vector grommets set all (4) four corners,
A corners to be reinforced

**GRAPHICS:** D grade printed to match color's shown

**INSTALL:** To be installed w/ ds bracket type as window b

NOTE: SITE SPECIFIC DRAWINGS TO BE PROD. SPECIFICA
APPROVAL PRIOR TO PROJECT ON

**Quantity: (1) One required**

 

**COLOR PALLETTE**









Banner Layout Detail



**ARTWORK TO BE APPROVED!**

**5'-4" X 14'-8" S/F BANNER W/ ROPE CHANNEL (ROPE INCLUDED)**



STORE CLOSING LOCATION
Scale: 1/2" = 4'-0"

**BANNER:** 12 oz. Mesh banner material (65% material & 15% holes).
1" Hem top & bottom for rope channel
& grommets along top & bottom edge min. 24" on centers

**GRAPHICS:** Digitally printed to match colors shown

**INSTALLATION:** Banner secured using rope & sandbag method

**NOTE:** TO SUPPLY (80) FEET 3/8" THICK
ROPE WITH WIRE



**COLOR PALLETTE:**
PRIMARY GREEN



JOANN

Banner Layout Detail



**1'-6" X 1'-6" DF BANNER**

STORE CLOSING
SALE
SHOP Joann.com

VINYL GRAPHICS
TO BE APPLIED
AT A LATER DATE

**ARTWORK TO BE APPROVED!**

**BANNER:** 13 oz. banner material w/ 1" Sewn' hem & brass grommets on all (4) four corners and every (2) two feet. All corners to be reinforced

**GRAPHICS:** Digitally printed to match colors 5"?x.xin

Quantity: (1) One required

**STORE CLOSING LOCATION**
Scale: 1/2" = x"-x"



**COLOR PALETTE:**



**1'-6" X 1'-6" DF CORRUPLAST INSIGNS**

STORE CLOSING
SALE
SHOP Joann.com

VINYL GRAPHICS
TO BE APPLIED
AT A LATER DATE

**BANNER:** White coroplast w/ brass grommets on (2) Two corners - Each installed w/ th (2) two suction cups

**GRAPHICS:** Digitally printed to match colors 5"?x.xin

Quantity: (2) Two required

**DOOR SIGN PACKAGE**
Scale: 1/2" = x"-x"



## Exhibit E

**Intentionally Deleted**



Exhibit F

**Exclusives and Prohibited Uses**

## EXCLUSIVES:

### Angel Nail
Tenant shall have the exclusive right to conduct as a primary business within the Shopping Center the business described in paragraph 10.01.
The Leased Premises are to be used exclusively for the purpose of nail sculpture and polishing. The Leased Premises shall be used for no other purpose and shall not be operated under any other trade name whatsoever. Tenant agrees, unless prevented from doing so by causes beyond Tenant's control, to conduct its business at all times in a high class and reputable manner.

### Big Lots
So long as Tenant is operating a retail store for the close-out sale of general merchandise at the Premises, Landlord on behalf of itself and its assigns, agrees not to let or permit to be occupied any other space in the Shopping Center to any person or entity whose business is substantially similar to Pic 'N' Save's retail operation at time this Lease is executed.

### Fantastic Sam's
Tenant shall have the exclusive right to conduct as a primary business within the Shopping Center the business described in paragraph 10.01 and Lessor agrees that no other hair cutting establishment, including hair cutting, barbers, beauty salons or beauty schools or colleges will be allowed in the Shopping Center during the term of the lease or any renewals.

### Humana
Tenant shall have the exclusive right to provide the services described in the Permitted Use (the "Exclusive Use") in the Shopping Center, provided, however, the Exclusive Use shall not include or apply to: Ii) any anchor tenant(s) (anchor tenant being defined as any tenant occupying more than 5,000 square feet in the Shopping Center), (ii) any existing or future outparcel(s) at the Shopping Center and (iii) the rights of Shopping Center tenants under existing leases.

### Jason's Deli
Exclusive Use.
    (i)    Landlord shall not lease, permit the leasing or subleasing of, or sell any space in the Shopping Center during the Lease Term to any person or entity who will utilize such space, or any part thereof, as a deli-style restaurant or whose primary menu items are salads, soups, and sandwiches (the "Exclusive Use"). As used in this paragraph, 'primary' shall mean gross sales totaling more than twenty percent (20%) of the total sales of any such tenant.
    (ii)    The following tenants shall be prohibited from operating in the Shopping Center and shall be considered a violation of the Exclusive Use: Atlanta Bread Company, Panera,



Au Bon Pain, La Madeleine, Newk's Eatery, McAlister's Deli, Cozi's, Pot Belly's or Chicken Salad Chick or restaurants similar to these concepts.

(iii)    The Exclusive Use shall not apply to the following:

Any grocery store or supermarket;
Any existing tenants operating at the Shopping Center and the rights of existing tenants to sublease their respective premises without Landlord's consent;
Any sandwich/sub shops, including but not limited to, Firehouse Sub's Subway, Jimmy John's, Jersey Mike's or Which Wich;
Any New Orleans traditional Po-Boy sandwich restaurant.

## Legacy Kitchen

Throughout the term of this Lease, as it may be extended under the terms hereof, and provided Tenant has not defaulted under Article 22 of this Lease, Tenant shall have the exclusive right in the Shopping Center to operate a coffee and or a beignet shop, provided, however, the aforesaid use exclusive shall not apply to: anchor tenants, defined as those tenants accompanying more than 10,000 square feet including, but not limited to out parcel tenants, and any existing tenants in the Shopping Center.

## Mathnasium

(I)    Tenant shall have the exclusive right to operate a learning center providing educational tutoring services to students from pre-kindergarten through high school level (the "Exclusive Use") in the Shopping Center.

(II)   The Exclusive Use shall not apply to:
(a) Any tenant(s) occupying more than 5,000 square feet or more in the Shopping Center; or
(b) Any existing tenants at the Shopping Center.

(III)  The Exclusive Use shall be automatically void and of no force and effect in the event that: (a) Tenant fails to continuously operate its business in the Premises in excess of thirty (30) days, excluding temporary closures related to casualty, condemnation, remodeling of the Premises, or (b) Tenant is in default of this Lease beyond any applicable cure period during the Lease Term.

## Walgreens

So long as this lease or any renewal thereof is in force and effect, Lessor will not lease nor permit to be leased to any other tenant, nor to be used by Lessor or any other person, any premises in the entirety of the Shopping Center of which the leased premises form a part, nor any property or building which is owned, or the occupancy whereof is controlled, by Lessor or by any corporation or other business entity in which Lessor, or the stockholders of Lessor, have or own the majority of stock or interest therein, and which is located within a radius of one mile of the outer boundaries of said Shopping Center, for the purpose of operating a general drug store such as is normally operated by lessee including, more particularly, the business of filling prescriptions, employment of a pharmacist or pharmacists, maintenance of a pharmacy or drug



license, sale of pharmaceutical products requiring the services of a pharmacist, operation of a "health and Beauty Aids" type of store, and of the operation of a soda fountain or lunch counter. However, Lessee agrees to permit Spartan Industries, Inc. to operate a soda fountain or lunch snack counter. The restrictions on Lessor contained in this paragraph shall not apply to any Mortgagee of the leased premises or of the Shopping Center of which such premises form a part, should such Mortgagee become the owner of all or any part of Lessor's Shopping Center following a default of such Mortgage.

**The Fresh Market**
On and after the Lease Date, to the extent not prohibited by applicable laws, and except for Pre-Existing Tenants, a Permitted Drug Store, Permitted Food or Drink Establishments, Permitted Nutrition Centers, and Incidental Sales of Grocery Items for off-premises consumption, Landlord covenants that no portion of the Shopping Center other than the Premises shall be used as a grocery store and/or supermarket, or for the sale of any Grocery Items for off-premises consumption (collectively hereinafter, "Tenant's Exclusives"). This covenant shall run with the land throughout the Term. Notwithstanding the exclusion of Pre-Existing Tenants from the foregoing covenant, however, to the extent that any such tenant's or occupant's lease provides a conditional right, subject to Landlord's prior approval, to operate for any use which would otherwise violate Tenant's Exclusives or to assign such lease to an assignee intending to conduct any such use, Landlord shall not grant approval

**The Office Depot**
So long as an office supply store has not ceased to be operating in the Premises for a continuous period in excess of six (6) months (excepting any periods during which remodeling or restoration work is being conducted with due diligence), Landlord shall not permit any Occupant of the Shopping Center, other than Tenant , to: (i) use more than one thousand (1,000) square feet of floor area (in the aggregate) for the sale, leasing, distribution or display of office supplies, including office furniture, office fixtures, office machines and equipment, computers, computer hardware, software and accessories, art supplies, architectural supplies, engineering supplies, photocopying services, facsimile services, or instant print shop services; or (ii) be primarily engaged in the sale, leasing, distribution or display of the items set forth in (i) above. No space in or portion of any real property adjacent to or within 500 feet of the Shopping Center which is now or may subsequently be acquired by Landlord (or a related entity of affiliate of Landlord), shall be leased or occupied by or conveyed to any other party for a competing use in violation of the Tenant's exclusive use set forth in this paragraph.

First Amendment to Lease

a) Tenant's current exclusive reflected in Paragraph B.1 of Exhibit E attached to the Lease (as modified by Section 7(b) above) shall continue to apply with respect to all tenants of the Shopping Center under leases executed prior to the Effective Date. All future tenants of the Shopping Center occupying space from and after the Effective Date, including Fresh Market, shall be subject to the following exclusive (and Paragraph B.1 of Exhibit E attached to the Lease shall be deemed to be modified as follows):

Landlord shall not permit any other tenant or occupant of the Shopping Center,

other than Tenant, to: (i) use more than the lesser of three percent (3%) of its floor area, or (ii) five hundred (500) square feet of floor area (in the aggregate) (in either instance the calculation of floor area shall include entire fixtures, displays and bulk stacks up to ten feet high and one-half of the allocable aisle space adjacent to such fixtures, displays and bulk stacks), for the sale, resale, leasing, distribution or display of office, school or teacher supplies, office furniture, office machines and other office, school or teacher related equipment and accessories (including the sale, resale or remanufacturing of ink and/or toner, either separately, new or into used cartridges), computers, computer hardware, software and related equipment; cellular telephones and telecommunications equipment and related devices (including personal digital assistants ["PDA'] and the like), or "copy/print/ship services" (as hereinafter defined), and any other products, services, and items which are a technological evolution of any of the foregoing, or (ii) be primarily engaged in the sale, leasing, distribution or display of any of the items set forth in (i) above.  No portion of any real property adjacent or contiguous to (separated solely by a road or right of way from) the Shopping Center (or within one (1) mile of the Shopping Center) which is owned or controlled now or at any time hereafter by Landlord (or any related entity or affiliate of Landlord) (the "Related Property") shall be leased or occupied by or conveyed to any other party for a use in violation of this paragraph. Notwithstanding the previous sentence, nothing in this Lease shall be construed as to prevent Landlord (or any related entity or affiliate of Landlord) the (the "Related Property") shall be leased or occupied by or conveyed to any other party for a use in violation of this paragraph.  Notwithstanding the previous sentence, nothing in this Lease shall be construed as to prevent Landlord (or any related entity or affiliate of Landlord) from acquiring assets in the future which meet the definition of Related Property.  Further, to the extent that in the future Landlord acquires assets that meet the definition of Related Property, nothing in this Lease shall require Landlord to infringe upon the existing lease rights of existing tenants at such properties and the acquisition of such shall not be a default under this paragraph.

Finally, nothing in this Lease shall prevent Landlord from amending, extending, renewing or otherwise modifying the leases of any existing tenants who leased space at assets acquired by Landlord in the future which meet the definition of Related Property, provided such tenants were tenants at such asset immediately prior to its acquisition by Landlord (or any related entity or affiliate of Landlord). "Copy/print/ship services" is herein defined as a facility or center (whether in-store or free standing) providing any one or more of the following products and/or services: (a) photocopying and facsimile and printing services, such as reproduction and printing services including full, self, coin and color copying, graphic design, desktop publishing, scanning, faxing and imaging services and binding, collating and finishing of documents; (b) mail services, including mail receiving services, mailbox rental or mailing; or (c) shipping, labeling and packaging services.



## PROHIBITED USES:

### Big Lots

Landlord shall not hereafter sell, lease or rent and will use its best efforts (including, but not limited to, litigation) to prevent any part of the Shopping Center to be used or occupied for any of the following: an unlawful purpose; a movie theater; a theater; an auditorium; a meeting hall; a bingo hall or a place of public assembly; for automobile repairs (mechanical or otherwise); a bowling alley; sales of automobiles or other vehicles; a bar serving alcoholic beverages (except as an incident to a full kitchen restaurant operation); a funeral parlor; a massage parlor; an animal clinic; a medical clinic; a discotheque; a dance hall; a health spa; as a karate, gymnasium, exercise studio or similar type business; or a skating rink; a car wash; as an off track betting establishment; an amusement or game room; so-called "flea market"; for fast-food operation incorporating a coin or token ¬operated amusement room; a second-hand or used goods store; pool room; so-called "head shops"; a night club; a hotel; for offices which in the aggregate exceed five percent (5%) of the total leasable ground floor area of the buildings in the Shopping Center, provided however, the following shall not be included in computing the five percent (5%) limitation (i) office uses incidental to the conduct of permitted retail activities and (ii) retail office uses such as travel agencies, real estate offices, banks and finance companies operating anywhere within the space currently leased to Office Depot, as shown on the Site Plan; schools (including, without limitation, trade school, training school and beauty school); gun range or gun shop; for warehousing, except as incidental to a retail business; an adult book store or store selling or exhibiting pornographic materials; or any business or use which (i) emits offensive odors, fumes, dust or vapors, (ii) is a public or private nuisance, (iii) emits loud noise or sounds which are objectionable or (iv) creates fire, explosives or other hazards.

### The Fresh Market

Tenant covenants and warrants that no portion of the Premises, and Landlord covenants and warrants that no other portion of the Shopping Center (including, without limitation, the Common Area), shall be used or occupied at any time during the Term for any Prohibited Use. Notwithstanding the foregoing, however, this Section 5.2 shall not apply to any Pre-Existing Tenant.

Prohibited Uses(s) means the following: pet and/or pet supply stores within one hundred fifty feet (150') of the nearest wall of Premises (excluding any pet and/or pet supply store located within the Premises); realtors within one hundred feet (100') of the nearest wall of the Premises (excluding any realtor located within the Premises); health clubs or gyms within two hundred fifty feet (250') of the nearest wall of the Premises (excluding any health club or gym located within the Premises); massage parlors or spas (excluding any first-class day spa, or any massage facility does not occupy more than three thousand five hundred (3,500) square feet); movie theaters; churches; places of worship; schools or any training or educational facilities catering primarily to students or trainees rather than retail customers (excluding Sylvan Learning Center, Kumons and any other substantially similar tutoring/educational services concept, as the same typically operate as of the Lease Date); day care centers; any "second hand" store (excluding



national retailers which are commonly located in first-class shopping centers, such as Plato's Closet, once Upon a Child, and Play It Again Sports, as the same typically operate as of the Lease Date) or any "dollar" stores or similar low-cost, single price-point store; Common Area sales or solicitations (except by tenants on the sidewalk in front of their stores which do not unreasonably interfere with pedestrian access or passage); gun stores (other than as an incidental part of any sporting goods store); Food or Drink Establishments (except for any Permitted Food or Drink Establishment and any Permitted Nutrition Center); banquet facilities, peepshows, adult book or adult video stores, or any other sexually oriented businesses; head shops; video game arcades; bingo parlors; night clubs; off-track betting parlors; mobile home parks or trailer courts; car washes; motor vehicle rentals and/pr sales; motor vehicle maintenance, repair and/or parts supply shops, carnivals, amusement parks or circuses; bowling alleys; ice rinks; roller skating rinks; call centers or other second or third shift office users; urgent care facility or any other medical services use which is inconsistent with a first class shopping center in Metairie, Louisiana; Army Navy or government "surplus" stores, fire or bankruptcy sales or auction house operations; cash checking or payday loan/advance business; pawn shops; laundromats, central laundries or dry cleaning plants; mortuaries or funeral homes; hotels, motels apartments or other shot or long-term residences; public or private nuisances; noises or sounds that are objectionable due to intermittence, beat, frequency, shrillness or loudness; obnoxious odors; noxious, toxic, caustic or corrosive fuels or gases, dust, dirt of flash or similar materials in an excessive quantity; distillation, refining, smelting, agriculture or mining operations; labor camps, junkyards, stockyards or animal raising operations; operating involving the dumping, disposal, incineration or reduction of garbage or refuse (except for up to two (2) recycling and donation bins as contemplated under Section 8.3(b) below).

## The Office Depot

Prohibited Uses:
Landlord shall not sell, lease, rent or permit any other premises in the Shopping Center to be used or occupied as a movie theater; theater; auditorium; meeting hall; bingo hall or a place of public assembly; automobile repairs (mechanical or otherwise); bowling alley; sales of automobiles or other vehicles; bar serving alcoholic beverages (except as an incident to a full kitchen restaurant operation); funeral parlor; massage parlor; animal clinic; medical clinic; discotheque; dance hall; health spa; karate, gymnasium, exercise studio or similar type business; skating rink; car wash; off-track betting establishment; amusement or game room; so-called "flea market;" fast-food operation or incorporating a coin or token-operated amusement room; second-hand or used goods store; pool room; so-called "head shops"; night club; hotel; office building; school (including, without limitation trade school, training school and beauty school); gun range or gun shop; or any business or use which omits offensive odors, fumes, dust or vapors; is a public or private nuisance, emits loud noise or sounds which are objectionable; creates fire, explosive or other hazard; warehousing, except as incidental to a retail business; adult book store or store selling or exhibiting pornographic materials.

Landlord shall not sell, lease, rent or permit any other premises in the Shopping Center to be used or occupied for other than normal retail uses customarily located in community strip shopping centers in the state and county where the Shopping Center is located.



Landlord covenants and agrees that there shall be no restaurants within two hundred (200) feet of the Premises, excepting (i) the locations presently utilized for restaurant purposes (including without limitation coffee shops) and (ii) food service establishments smaller than 1,500 sf. primarily engaged in take-out orders for off-premises consumption.

Landlord covenants and agrees that no portion of the Shopping Center shall be used for office use, other than offices incidental to the conduct of permitted activities.

Landlord and shall inure to the benefit of the successors and assigns of the Secured Party, and (ii) all rights hereunder may be exercised by representatives of the Secured Party and its successors and assigns.

Notwithstanding the foregoing, retail office use such as, but not limited to, travel agencies, real estate offices, banks or finance companies, shall be permitted uses in the Shopping Center.

The Prohibited Uses set forth above shall be subject to the existing leases of the present (as of the date of this Lease) Occupants of the Shopping Center, including the Pic 'N' Save lease, whether or not dated prior to the date of this Lease.



Exhibit G

**[ATTACH NEGOTIATED LENDER FORM]**



Recording Requested by
and when Recorded return to:

WELLS FARGO BANK, N.A.
Commercial Mortgage Servicing
Three Wells Fargo
401 S. Tryon Street, 8th Floor
MAC D1050-084
Charlotte, NC 28202
Attention:    CMS Lease Reviews
Loan No.:      416000224

## SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

**Tenant's Trade Name:** <u>Jo-Ann Stores, LLC</u>

**NOTICE: THIS SUBORDINATION AGREEMENT RESULTS IN YOUR LEASEHOLD ESTATE IN THE PROPERTY BECOMING SUBJECT TO AND OF LOWER PRIORITY THAN THE LIEN OF THE SECURITY DOCUMENTS (DEFINED BELOW).**

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT ("Agreement") is made as of _____, 2019, by and between JO-ANN STORES, LLC, an Ohio limited liability company ("Tenant"), and WILMINGTON TRUST, NATIONAL ASSOCIATION, as Trustee for the benefit of the registered holders of Wells Fargo Commercial Mortgage Trust 2016-C32, Commercial Mortgage Pass-Through Certificates, Series 2016-C32 ("Lender").

## R E C I T A L S

A.    WILSHIRE INVESTORS, LLC, a Delaware limited liability company ("Owner") is the owner of the land and improvements comprising all or a part of the Property  located in a certain shopping center  known as Wilshire Plaza Shopping Center located in Metairie, Louisiana,  and more specifically described in <u>Exhibit A</u> attached hereto ("Property").

B.    Tenant is the lessee under a lease dated _____, 2019, executed by Owner (or its predecessor in interest), as landlord, and Tenant, as tenant (as the same may have been amended, the "Lease"), covering certain premises (the "Premises") comprising all or a part of the Property.

C.    Lender is the current holder of a mortgage loan (the "Loan") previously made to Owner, evidenced by a note (the "Note") and secured by, among other things:  (a) a first mortgage, deed of trust or deed to secure debt encumbering the Property (the "Mortgage"); and (b) a first priority assignment of leases and rents on the Property (the "Assignment of Leases and Rents") contained in the Mortgage or in a separate document. The Mortgage and the Assignment of Leases and Rents are collectively referred to as the "Security Documents."  The Note, the Security Documents and all other documents executed in connection with the Loan are collectively referred to as the "Loan Documents."

D.    Tenant has requested Lender's agreement that if Lender forecloses the Mortgage or otherwise exercises Lender's remedies under the Security Documents, Lender will not disturb Tenant's right to quiet possession of the Premises under the terms of the Lease.



E.   Lender is willing to so agree on the terms and conditions provided in this Agreement, including, without limitation, Tenant's agreement to subordinate the Lease and attorn to Lender as provided herein.

NOW, THEREFORE, for mutual consideration, including the mutual covenants and agreements set forth below, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.   **SUBORDINATION**.  The Lease is and shall remain unconditionally subject and subordinate to (a) the liens or charges imposed by the Security Documents, (b) all currently outstanding or future advances secured by the Security Documents, and (c) all renewals, amendments, modifications, consolidations, replacements and extensions of the Security Documents. The subordination described herein is intended by the parties to have the same force and effect as if the Security Documents and such renewals, modifications, consolidations, replacements and extensions of the Security Documents had been executed, acknowledged, delivered and recorded prior to the Lease and any amendments or modifications thereof.

2.   **NON-DISTURBANCE**.  If Lender exercises any of its rights under the Security Documents, including any right of entry on the Property pursuant to the Mortgage or upon a foreclosure of or deed in lieu of foreclosure of the Mortgage, Lender shall not disturb Tenant's right of quiet possession of the Premises under the terms of the Lease, so long as Tenant is not in default under this Agreement or in default beyond any applicable grace period under the Lease.

3.   **ATTORNMENT**.  Notwithstanding anything to the contrary contained in the Lease, should title to the Premises and the landlord's interest in the Lease be transferred to Lender or any other person or entity by foreclosure of or deed in-lieu of foreclosure of the Mortgage, Tenant shall, for the benefit of Lender or such other person or entity, effective immediately and automatically upon the occurrence of any such transfer, attorn to Lender or such other person or entity as landlord under the Lease and shall be bound under all provisions of the Lease including, but not limited to, the obligation to pay all rent required to be paid by Tenant pursuant to the terms of the Lease, for the remainder of the Lease term.

4.   **PROTECTION OF LENDER.**  If Lender succeeds to the interest of landlord under the Lease, Lender shall not be:

(a)   liable for any act or omission of any previous landlord under the Lease;

(b)   subject to any offsets or defenses which Tenant may have against any previous landlord under the Lease, except as provided for in the last paragraph of this Section 4 and in Section 5 of this Agreement;

(c)   bound by any payment of rent or additional rent which Tenant might have paid for more than one month in advance of the due date under the Lease to any previous landlord, except to the extent such payments are actually received by Lender;

(d)   obligated to make any payment to Tenant which any previous landlord was required to make before Lender succeeded to the landlord's interest;

(e)   accountable for any monies deposited with any previous landlord (including security deposits), except to the extent such monies are actually received by Lender;

(f)   bound by any amendment or modification of the Lease or any waiver of any term of the Lease made without Lender's written consent, which consent shall not be unreasonably withheld or delayed;

(g)   bound by any surrender or termination of the Lease made without Lender's written consent (unless effected unilaterally by Tenant pursuant to the express terms of the Lease);

2



(h)   obligated to complete any improvement or construction on the Property or to pay or reimburse Tenant for any tenant improvement allowance, construction allowance or leasing commissions;

(i)   liable for any default of any previous landlord under the Lease;

(j)   bound by any provision in the Lease granting Tenant a purchase option or first right of refusal or offer with regard to the Property.

Furthermore, notwithstanding anything to the contrary contained in this Agreement or the Lease, upon any such succession, the Lease shall be deemed to have been automatically amended to provide that Lender's obligations and liabilities under the Lease shall be limited solely to Lender's interest, if any, in the Property, and the proceeds from any sale or disposition of the Property by Lender (collectively, "Lender's Interest") and, following such succession, Tenant shall look exclusively to Lender's Interest for the payment or discharge of any obligations of Lender under the Lease.

Nothing contained in Sections 4(a), 4(b), or 4(i) above, however, shall relieve Lender from Lender's obligation to cure any repair or maintenance default under the Lease with respect to the Premises by any prior landlord under the Lease (including Owner) which is continuing when Lender succeeds to Owner's interest under the Lease and acquires title to the Premises and which materially interferes with Tenant's use and occupancy of the Premises, provided that (and on the condition that) (i) Lender had written notice of such default in accordance with Section 5 below prior to succeeding to Owner's interest under the Lease and acquiring title to the Premises, (ii) Lender had (and is given) the opportunity to cure such default within the time period provided under Section 5 below, (iii) Lender shall only be obligated to perform any such repair or maintenance obligation to the extent that the failure to perform such obligation materially interferes with Tenant's use and occupancy of the Premises, and (iv) Lender's obligation to cure such default shall be limited solely to performing the repair and/or maintenance obligation as required pursuant to the terms of the Lease (and in no event shall Lender have any other liability or obligation with respect to such default or be liable for any damages in connection therewith). In the event Lender elects not to cure a repair or maintenance default of the previous landlord under the Lease (including Owner) in accordance with the terms of this paragraph and Section 5 below, Tenant's sole remedy is to cure the repair or maintenance default under the Lease and to offset against rent, in an amount equal to fifty percent (50%) of the Fixed Minimum Rent (as defined in the Lease) due monthly until Tenant is reimbursed for the cost to cure the repair or maintenance default; provided however, Tenant shall not be permitted to offset rent for any amount beyond the cost to cure the repair or maintenance default, including any damages in connection therewith.

In addition, notwithstanding anything contained in Section 4 above to the contrary, in the event of a violation under Sections 14 (an "Exclusive Use Violation") or Section 15 (a "Co-Tenancy Violation") of the Lease which is continuing when Lender succeeds to Owner's interest under the Lease and acquires title to the Premises; provided that (and on the condition that) Lender had written notice of such default in accordance with Section 5 below prior to succeeding to Owner's interest under the Lease and acquiring title to the Premises, Tenant shall have the right to pay fifty percent (50%) of the Fixed Minimum Rent (as defined in the Lease) due monthly (a) for a period of time not to exceed twelve (12) months from the date Lender succeeds to Owner's interest under the Lease and acquires title to the Premises in connection with a Co-tenancy Violation (the "Co-Tenancy Rent Abatement Period"), or (b) for a period of time not to exceed twenty-four (24) months from the date Lender succeeds to Owner's interest under the Lease and acquires title to the Premises in connection with an Exclusive Use Violation (the "Exclusive Use Rent Abatement Period"), and at the end of either the Co-Tenancy Rent Abatement Period or the Exclusive Use Rent Abatement Period, Tenant shall either (i) commence payment of the entire Fixed Minimum Rent due monthly, or (ii) shall terminate the Lease.

5.   **LENDER'S RIGHT TO CURE**. Tenant shall deliver to Lender a copy of any notice of any default(s) by landlord under the Lease in the same manner as, and whenever, Tenant shall give any such notice to Owner, and no such notice shall be binding on Lender unless and until a copy of such notice shall have been so delivered to Owner and Lender at the same time and in the same manner. Lender shall have the



right to remedy, or cause to be remedied, any default by Owner under the Lease, and, for such purpose Tenant grants Lender such additional period of time (not to exceed sixty (60) additional days) as may be reasonable to enable Lender to remedy, or cause to be remedied, any such default in addition to the period given to Owner for remedying, or causing to be remedied, any such default. Tenant shall accept performance by Lender of any covenant or condition to be performed by Owner under the Lease with the same force and effect as though performed by Owner. Notwithstanding anything contained in this Agreement or in the Lease to the contrary, Tenant shall not terminate (or seek to terminate) the Lease or abate (or seek to abate) rent under the Lease as a result of a landlord default under the Lease (a) so long as Lender, in good faith, shall have commenced to cure such default within the above-referenced time period and shall be prosecuting the same to completion with reasonable diligence, subject to force majeure, or (b) if possession of the Premises is required in order to cure such default, or if such default is not susceptible of being cured by Lender, so long as Lender, in good faith, shall have notified Tenant that Lender intends to institute enforcement proceedings under the Security Documents, and, thereafter, so long as such proceedings shall have been instituted and shall be prosecuted with reasonable diligence. Nothing contained in the prior sentence shall, however, be deemed to give Tenant any greater rights than those contained in the Lease upon, or as a result of, a landlord default under the Lease. Lender shall have the right, without notice to Tenant or Tenant's consent, to foreclose the Mortgage or to accept a deed in lieu of foreclosure of the Mortgage or otherwise realize upon the Mortgage or to exercise any other remedies under the Security Documents or state law. Nothing contained in this Section 5 shall, however, delay Tenant's self-help repair rights pursuant the Lease (including offset rights related thereto) in the event of an emergency or imminent risk of personal injury or property damage. Although Tenant may exercise self-help as provided above, Lender will not be liable for any damages in connection with the default, act or occurrence giving rise to such self-help right, nor shall Tenant be permitted to deduct any interest from its setoff or deduction from Rent. Tenant may offset against rent, in an amount equal to fifty percent (50%) of the Fixed Minimum Rent (as defined in the Lease) due monthly until Tenant is fully reimbursed for the amount of the emergency self-help repair; provided however, Tenant shall not be permitted to offset rent for any amount in excess of the cost to cure the self-help repair, including any damages or interest in connection therewith.

6.  **ASSIGNMENT OF LEASES AND RENTS**. Tenant consents to the Assignment of Leases and Rents and acknowledges Lender shall have no duty, liability or obligation whatsoever under the Lease or any extension or renewal thereof, either by virtue of said assignment or by any subsequent receipt or collection of rents thereunder, unless Lender shall specifically undertake such liability in writing or unless Lender or its designee or nominee becomes, and then only with respect to periods in which Lender or its designee or nominee becomes, the fee owner of the Premises. Upon Tenant's receipt of a written notice from Lender of a default by Owner under the Loan, Tenant shall thereafter, if requested by Lender, pay rent to Lender in accordance with the terms of the Lease. Lender's delivery of such notice to Tenant, or Tenant's compliance therewith, shall not be deemed to (a) cause Lender to succeed to or assume any obligations or responsibilities of Owner under the Lease or (b) relieve Owner of any of its obligations under the Lease.

7.  **INSURANCE PROCEEDS AND CONDEMNATION AWARDS**. Notwithstanding anything to the contrary contained in this Agreement or the Lease, the terms of the Loan Documents shall continue to govern with respect to the disposition of any insurance proceeds or condemnation awards, and any obligations of Owner to restore the Property following a casualty or condemnation shall, insofar as they apply to Lender, be limited to the amount of any insurance proceeds or condemnation awards received by Lender after the deduction of all costs and expenses incurred in obtaining such proceeds or awards. Following the foreclosure or deed in lieu of foreclosure of the Mortgage, the provisions of this section shall remain in full force and effect unless and until fee title to the Premises becomes vested in a person or entity other than (a) the holder of the Loan at the time of such foreclosure or deed in lieu of foreclosure or (b) a parent, subsidiary or affiliate of such holder. Nothing contained in this Section 7 shall, however, limit any of Tenant's termination rights expressly set forth in Section 24 and Section 25 of the Lease in the event Owner fails to restore the Premises to the extent required by the Lease upon a casualty or eminent domain within the time period(s) required in the Lease.




8.  **ASSIGNMENT OF LEASE BY TENANT**. Tenant shall not assign any right or interest of Tenant under the Lease (except for an assignment that is permitted under the Lease without Owner's consent), without Lender's prior written consent, which consent shall not be unreasonably withheld or delayed.

9.  **MISCELLANEOUS**.

   9.1  **Heirs, Successors and Assigns**. The covenants herein shall be binding upon, and inure to the benefit of, the heirs, successors and assigns of the parties hereto. The term "Lender" as used herein includes any successor or assign of the named Lender herein, including without limitation, any co-lender at the time of making the Loan, any purchaser at a foreclosure sale and any transferee pursuant to a deed in lieu of foreclosure, and their successors and assigns, trustees and agents, as well as any single purpose entity established by Lender to take title to the Property by reason of such foreclosure or deed in lieu of foreclosure. The terms "Tenant" and "Owner" as used herein include any successor or assign of the named Tenant and Owner herein, respectively; provided, however, that such reference to Tenant's or Owner's successors and assigns shall not be construed as Lender's consent to any assignment or other transfer by Tenant or Owner.

   9.2  **Addresses; Request for Notice**. All notices and other communications that are required or permitted to be given to a party under this Agreement shall be in writing and shall be sent to such party, either by personal delivery, by overnight delivery service, by certified first class mail, return receipt requested, or by facsimile transmission, to the address or facsimile number below. All such notices and communications shall be effective upon receipt of such delivery or facsimile transmission. The addresses and facsimile numbers of the parties shall be:

   | Tenant: | Lender: |
   |---|---|
   | Jo-Ann Stores, LLC | WELLS FARGO BANK, N.A. |
   | 5555 Darrow Road | Commercial Mortgage Servicing |
   | Hudson, Ohio 44236 | Three Wells Fargo |
   | Attn: Vice President of Real Estate | 401 S. Tryon Street, 8th Floor |
   | | MAC D1050-084 |
   | with a copy to: | Charlotte, NC 28202 |
   | Jo-Ann Stores, LLC | FAX No.: 704-715-0036 |
   | 5555 Darrow Road | |
   | Hudson, Ohio 44236 | |
   | Attn: Senior Legal Counsel | |

   provided, however, any party shall have the right to change its address for notice hereunder by the giving of written notice thereof to the other party in the manner set forth in this Agreement.

   9.3  **Entire Agreement**. This Agreement constitutes the entire agreement between Lender and Tenant with regard to the subordination of the Lease to the Security Documents and the rights and obligations of Tenant and Lender as to the subject matter of this Agreement, and shall supersede and cancel, but only insofar as would affect the priority between the Security Documents and the Lease, any prior agreements as to such subordination, including, without limitation, those provisions, if any, contained in the Lease which provide for the subordination of the Lease to a deed or deeds of trust, a mortgage or mortgages, a deed or deeds to secure debt or a trust indenture or trust indentures.

   9.4  **Disbursements**. Lender, in making disbursements of any funds pursuant to the Loan Documents, is under no obligation to, nor has Lender represented that it will, monitor or control the application of such funds by the recipient and any application of such funds, including, without limitation, any application of such funds for purposes other than those provided for in the Loan Documents, shall not defeat this agreement to subordinate in whole or in part.

 

**9.5** **Counterparts.** This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute and be construed as one and the same instrument.

**9.6** **Section Headings.** Section headings in this Agreement are for convenience only and are not to be construed as part of this Agreement or in any way limiting or applying the provisions hereof.

**9.7** **Attorneys' Fees.** If any legal action, suit or proceeding is commenced between Tenant and Lender regarding their respective rights and obligations under this Agreement, the prevailing party shall be entitled to recover, in addition to damages or other relief, costs and expenses, attorneys' fees and court costs (including, without limitation, expert witness fees). As used herein, the term "prevailing party" shall mean the party which obtains the principal relief it has sought, whether by compromise settlement or judgment. If the party which commenced or instituted the action, suit or proceeding shall dismiss or discontinue it without the concurrence of the other party, such other party shall be deemed the prevailing party.

**9.8** **Severability.** If any provision of this Agreement is held to be invalid or unenforceable by a court of competent jurisdiction, such provision shall be deemed modified to the extent necessary to be enforceable, or if such modification is not practicable, such provision shall be deemed deleted from this Agreement, and the other provisions of this Agreement shall remain in full force and effect, and shall be liberally construed in favor of Lender.

**9.9** **Termination; Amendment.** Neither this Agreement nor any of the terms hereof may be terminated, amended, supplemented, waived or modified orally, but only by an instrument in writing executed by the party against which enforcement of the termination, amendment, supplement, waiver or modification is sought.

**9.10** **Governing Law.** This Agreement and any claim, controversy or dispute arising under or related to or in connection with this Agreement, the relationship of the parties or the interpretation and enforcement of the rights and duties of the parties shall be governed by the law of the state where the Property is located, without regard to any conflicts of law principles.

**9.11** **Authority.** Tenant and all persons executing this Agreement on behalf of Tenant jointly and severally represent and warrant to Lender that such persons are authorized by Tenant to do so and that such execution hereof is the binding act of Tenant enforceable against Tenant.

**9.12** **Form of Agreement.** Owner and Tenant acknowledge that Wells Fargo Bank, N.A. enters into numerous agreements of this type on a regular basis, both in its own capacity and as a commercial mortgage servicer on behalf of other lenders, and that the specific provisions contained in any agreement of this type entered into by Wells Fargo Bank, N.A. will vary depending on numerous transaction-specific factors, including, without limitation, the borrowers, loan documents, tenants, leases, servicers, servicing agreements and property and market conditions involved in the transaction. Accordingly, Owner and Tenant further acknowledge that the specific provisions contained in this Agreement will not necessarily be acceptable to Wells Fargo Bank, N.A. in connection with any other transaction.

**9.13** **Delivery of SNDA.** Tenant acknowledges and agrees that this Agreement unconditionally satisfies Owner's obligations under the Lease to deliver to Tenant a subordination, non-disturbance and attornment agreement, non-disturbance agreement or other similar agreement from Lender with respect to the Mortgage.

[SIGNATURE AND NOTARY PAGES FOLLOW]

 

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

**LENDER:**

WILMINGTON TRUST, NATIONAL ASSOCIATION, as Trustee for the benefit of the registered holders of Wells Fargo Commercial Mortgage Trust 2016-C32, Commercial Mortgage Pass-Through Certificates, Series 2016-C32

By: WELLS FARGO BANK, NATIONAL ASSOCIATION, as Master Servicer under the Pooling and Servicing Agreement, dated as of February 1, 2016

By:_____
Name:_____
Its:_____

**TENANT:**

**JO-ANN STORES, LLC**, an Ohio limited liability company

By:_____
Name:_____
Its:_____

The undersigned Owner hereby consents to the foregoing Agreement and confirms the facts stated in the foregoing Agreement and the acknowledgement contained in Section 9.12 of the foregoing Agreement.

**OWNER:**

**WILSHIRE PLAZA INVESTORS, LLC**, a Delaware limited liability company

By:    Victory Real Estate Investments, LLC, a Delaware limited liability company, its Sole Member

By:_____
Name:_____
Its:_____

**IT IS RECOMMENDED THAT, PRIOR TO EXECUTING THIS AGREEMENT, THE PARTIES CONSULT WITH THEIR ATTORNEYS WITH RESPECT HERETO.**

**ALL SIGNATURES MUST BE ACKNOWLEDGED.**



STATE OF _____    )
                                      ) SS.
COUNTY OF _____     )

      On _____, 20____, personally appeared the above named _____ _____, a _____ of WELLS FARGO BANK, NATIONAL ASSOCIATION, acting in its authorized capacity as Master Servicer for and on behalf of WILMINGTON TRUST, NATIONAL ASSOCIATION, as Trustee for the benefit of the registered holders of Wells Fargo Commercial Mortgage Trust 2016-C32, Commercial Mortgage Pass-Through Certificates, Series 2016-C32, and acknowledged the foregoing to be the free act and deed of said association, before me.

_____

Notary                                                      Public
My commission expires: _____

_____, SS.

      On _____, 20____, personally appeared the above named _____, the _____, of _____ and acknowledged the foregoing to be the free act and deed of said _____, before me.

_____

Notary                                                      Public
My commission expires: _____

_____, SS.

      On _____, 20____, personally appeared the above named _____, the _____, of _____ and acknowledged the foregoing to be the free act and deed of said _____, before me.

_____

Notary                                                      Public
My commission expires: _____

8

**EXHIBIT A**
**(Description of Property)**



## Exhibit H

### Form of Estoppel Certificate

To:                                                        , together with its successors and assigns

Shopping Center:          located in [City], [ST]

Landlord:

Tenant:          Jo-Ann Stores, LLC, an Ohio limited liability company

Lease:          Lease by and between Landlord and Tenant dated _____ ___, 20__
(the "Original Lease"), as modified by (the "Lease") (together, the "Lease)[two]
(collectively, the "Lease") [three or more]

Tenant represents that, as of the date hereof:

1.  The Lease constitutes the entire written agreement between Tenant and Landlord and has not been modified or amended, except as indicated herein.

2.  The Lease is in full force and effect. The term commenced on _____ and expires on _____. [Tenant has _____( ) 5-year options to renew the term thereof.] [Tenant has one 5-year option to renew remaining] [Tenant has no options to renew the term of the Lease.]

3.  Tenant has taken possession of the premises demised under the Lease (the "Premises") and is occupying the Premises.

4.  To the undersigned's actual knowledge, without inquiry or investigation, the Landlord is not currently in default under the Lease, except as follows: _____, and Tenant reserves all rights and remedies with regard to the aforementioned issues [.]  [; provided, however, that common area, tax and insurance reconciliation(s) have not been received from Landlord for the following years: [Insert Years]].  With regard to any and all common area, tax and insurance expenses, Tenant specifically reserves all rights and remedies with respect to any overpayments which may be discovered subsequent to the date of this Estoppel Certificate regardless of the year in which the overpayment occurred, including but not limited to the right to seek reimbursement or offset for any overpayments. [In addition, Tenant specifically advises that it is auditing Landlord's common area, tax and insurance expenses; to date, there have been no findings, but the audit is still open, and Tenant reserves any and all rights and remedies with respect thereto.]

Furthermore, Tenant has not inspected the Shopping Center, including the common areas, to verify that Landlord is in compliance with its obligations with respect thereto, and Tenant hereby reserves all rights regarding the same.

5.  The monthly Fixed Minimum Rent payable under the Lease is $[_____] and has not been prepaid by more than one month. [Tenant is not paying fixed monthly rent. Rather, Tenant is paying Substitute Rent, as defined in the Lease. The monthly Substitute Rent varies each month according to store sales. Substitute Rent has not been prepaid.]

6.  No security deposit has been made in connection with the Lease.

 

7. Tenant does not have any option or preferential right to purchase all or any part of the Shopping Center.

8. The address for notices to be sent to Tenant is as follows:

> Jo-Ann Stores, LLC
> Attn: National Director of Real Estate
> 5555 Darrow Road
> Hudson, OH 44236
>
> with a copy to:
>
> Jo-Ann Stores, LLC
> Attn: Senior Legal Counsel
> 5555 Darrow Road
> Hudson, OH 44236

9. Nothing contained herein will: (a) amend, modify, waive or rescind any of the terms, conditions, covenants or obligations of the Lease; (b) waive or estop Tenant's right to declare a default based on facts of which the undersigned does not have actual knowledge, without inquiry or investigation; (c) waive or estop Tenant's right to claim any offset, claim or counterclaim resulting from an audit of Landlord's business records or public records; (d) waive or estop any claims, defenses, rights or remedies of Tenant; or (e) relieve the Landlord from any of its obligations under the Lease.

10. Tenant's statements exclude certification as to any matter that may be disclosed by audit, inspection, or examination of Landlord's records or public records relating to charges and monetary items under the Lease.

11. If there is any conflict between this certificate and the Lease, the Lease shall control.

12. Tenant acknowledges that you are relying upon this Estoppel Certificate and the accuracy of the information contained herein. Nevertheless, Tenant will not be liable to any party for damages of any kind whatsoever (whether direct, indirect, special, consequential or any other type) resulting from any statement in this certificate.

13. The undersigned representative of Tenant is duly authorized to execute this instrument on behalf of Tenant.

Dated: _____, 2019.

**JO-ANN STORES, LLC**

By: _____

Name: _____

Title: _____

#XXXX City, State

Exhibit H, Page 2