**Exhibit A-1**

**Assignment Agreement**

## ASSUMED LEASE ASSIGNMENT AGREEMENT

This Assumed Lease Assignment Agreement (this "Assignment Agreement"), dated June 9, 2025 (the "Agreement Date"), is entered into by and among (a) Creativebug Holdings LLC, a Delaware limited liability company ("Assignee"), (b) Jo-Ann Stores, LLC, an Ohio limited liability company, the parent company of Creativebug, LLC, (the "Assignor"), and (c) Parker Associates, a California limited partnership ("Landlord", and with Assignee and Assignor, collectively the "Parties" and each a "Party"). Capitalized terms not otherwise defined herein have the meaning ascribed to such terms in the APA (defined below).

WHEREAS, on January 15, 2025 (the "Petition Date"), JOANN Inc., a Delaware corporation and twelve of its affiliated debtors, including Assignor and Creativebug, LLC (collectively, the "Debtors"), commenced voluntary chapter 11 bankruptcy cases in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which cases are being jointly administered under lead Case No. 25-10068 (CTG);

WHEREAS, on February 26, 2025, the Bankruptcy Court entered an order (the "Approval Order") [D.I. 520] that, among other relief, approved an Agency Agreement, dated as of February 26, 2025, and granted GA Joann Retail Partnership, LLC, a Delaware limited liability company ("Agent") the exclusive right to market and sell, and/or otherwise designate the purchasers, licensees and assignees of, any of all of the assets of the Debtors free and clear of all liens, claims, and encumbrances thereon without further order of the Bankruptcy Court;

WHEREAS, Agent designated Assignee as the purchaser of certain of the Debtors' assets, and by Asset Purchase Agreement dated as May 23, 2025 and all schedules and exhibits thereto (the "APA"), Agent agreed to sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Assignee, and Assignee agreed to purchase, all right, title and interest of the Debtors in, to, or under the Acquired Assets, free and clear of all Encumbrances other than the Assumed Liabilities, which Acquired Assets include the Lease Agreement dated July 26, 2021, between Landlord and Assignor, as amended by that certain First Amendment to Lease Agreement dated July 17, 2024, (collectively, the "Assumed Lease") for the non-residential real property located at 2560 Ninth Street, Suites 314 and 316, Berkeley, California 94710 (the "Premises"), true and correct copies of which are attached hereto as Exhibit A;

WHEREAS, as of the Agreement Date, there are no defaults by the Debtors of any kind or nature under the Assumed Lease other than an aggregate amount of $7,147.10 for rent and additional rent that became due prior to and remained unpaid as of the Petition Date and continues to be unpaid as of the Agreement Date (the "Cure Claim");

WHEREAS, the Debtors seek to assume and assign to Assignee the Assumed Lease pursuant to section 365 of the Bankruptcy Code (the "Assumption and Assignment") consistent with the intent and purpose of the APA and the other Transaction Documents by the execution and delivery of this Assignment Agreement to further evidence the vesting in the Assignee of the Acquired Assets, including the Assumed Lease; and

WHEREAS, Landlord consents to the Assumption and Assignment under the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and undertakings of the parties as set forth below and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.      Assignor shall arrange for the Debtors to submit to the Bankruptcy Court a consent order, in the form attached hereto as Exhibit B, approving the Assumption and Assignment (the "Consent Order"). The Landlord authorizes the Debtors to indicate the Landlord's consent to entry of the Consent Order.

2.      This Assignment Agreement is subject to and shall be effective on the date on which the Consent Order is entered by the Bankruptcy Court (the "Effective Date").

3.      As of 11:59 pm on the Closing Date (as defined in the APA), and subject to entry of the Consent Order by the Bankruptcy Court, Assignor grants, conveys, assigns, and transfers to Assignee, its successors and assigns, any and all of Assignor's right, title and interest in and to the Assumed Lease, together with any and all rights, appurtenances, privileges and benefits thereto and to be derived therefrom. Assignee (a) shall assume and pay to the Landlord the Cure Claim no later than five (5) business days following the Effective Date, together with any amounts arising and due and payable under the Assumed Lease between the Agreement Date and the Effective Date (the "Post Closing Amounts"); and (b) accepts and agrees to assume, pay, perform, observe and discharge all of the terms and conditions of the Assumed Lease required to be performed by the tenant under the Assumed Lease first arising on and after the Effective Date. For avoidance of doubt, Assignee shall have no liability to Landlord or Assignor for the obligations identified in this paragraph 2 unless and until the Closing Date occurs and the Consent Order is entered.

4.      Upon satisfaction of the Cure Claim and the Post Closing Amounts, Landlord shall be barred, estopped, and enjoined from asserting against the Debtors or their successors or assigns any additional cure costs or other claims or interests that arose, accrued, or came due on or before the Effective Date with respect to the Lease; provided that this paragraph shall not bar, estop or enjoin Landlord from seeking recovery from Debtors' available insurance proceeds with respect to any indemnity claims pursuant to the Lease.

5.      All notices and demands to tenant pursuant to Section 32 of the Assumed Lease or otherwise shall be delivered to Assignee as follows:

> Creativebug Holdings LLC
> c/o Peak Media Properties LLC
> 350 Indiana Street, Suite 550
> Golden, CO 80401
> Attention:  David Saabye, CEO
> dsaabye@goldenpeakmedia.com

> with a copy (which shall not constitute notice) to:

> Macanta Investments
> 745 Fifth Avenue, 16th Floor
> New York, NY 10151
> Attn: Golden Peak Media
> botoole@macantainvest.com

6.     The Parties hereby agree that Landlord shall continue to hold the security deposit set forth in the Assumed Lease in accordance with the terms of the Assumed Lease, provided, however, that on the Effective Date, Landlord shall apply the security deposit received from Assignor to the new account of the Assignee.

7.     Assignor shall vacate the Premises and shall surrender to Assignee all rights in and to the Premises no later than the Effective Date, and Assignor hereby grants, sells, transfers and delivers to Assignee any and all of Assignor's right, title and interest in and to all leasehold improvements in and to the Premises and all personal property, fixtures and equipment of any kind or nature located at the Premises, together with all interests, equities, rights and privileges of Assignor therein, in each case solely to the extent same remain on the Premises as of the Effective Date.

8.     Landlord expressly waives any rights to object to the Assumption and Assignment that it would otherwise have, including any tolling of an objection period, and consents to this Assignment Agreement and Assignee's assumption of the Assumed Lease pursuant to the terms and conditions hereof as of the Effective Date; provided, however, that if the Effective Date does not occur by August 31, 2025, the waiver contained in this Paragraph 8 shall be void and of no further force or effect.

9.     Assignee shall notify Landlord promptly upon the Bankruptcy Court's entry of the Consent Order, and shall provide Landlord with a copy thereof.

10.    Each of Assignor and Assignee represents to the other that it has dealt with no broker, finder or other intermediary in connection with this Assignment.

11.    Subject only to the terms and provisions of the APA, this Assignment Agreement constitutes the full and complete understanding between the parties, and all prior discussions, conversations, agreements (including, without limitation, any prior assignment agreement entered into by the parties in connection with the Assumed Lease) and understandings between the parties regarding or concerning the subject of this Assignment are merged herein and superseded by this Assignment. This Assignment may not be changed or modified except in writing executed by each of the parties hereto.  To the extent of any discrepancy between the APA and this Assignment Agreement, the APA shall control.

12.    The Parties acknowledge that they have read and considered this Assignment Agreement carefully, that it was negotiated by their attorneys with their express approval, that they have discussed it in detail with their attorneys, that they have been given a reasonable period of time (as long as they deemed necessary) to consider this Assignment Agreement before signing,

that they fully understand the extent and impact of its provisions, and that they have executed it knowingly and voluntarily and without any coercion, undue influence, threat, or intimidation of any kind whatsoever. Any rule of law or any legal decision that would require interpretation of any claimed ambiguities in this Assignment Agreement against the drafting party has no application and is expressly waived.

13.     This Assignment Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns.

14.     The Parties acknowledge that this Assignment Agreement may not be revoked unless the Effective Date does not occur by August 31, 2025.

15.     All fees, costs and expenses incurred in connection with the negotiation of this Assignment Agreement and the consummation of the transactions contemplated hereby and thereby will be paid by the Party incurring such fees, costs and expenses.

16.     This Assignment Agreement may be executed in any number of counterparts (including via facsimile or other electronic transmission in portable document format (pdf)) with the same effect as if the signatures to each counterpart were upon a single instrument, and all such counterparts together shall be deemed an original of this Assignment Agreement. Delivery of an executed counterpart hereof by means of facsimile or electronic transmission in portable document format (pdf) shall have the same effect as delivery of a physically executed counterpart in person.

17.     Nothing in this Assignment Agreement shall confer any rights, benefits, remedies, obligations, liabilities or claims hereunder upon any person not a Party or a permitted assignee of a Party.

[*Signature page follows*]

IN WITNESS WHEREOF, the Parties have caused this Assignment Agreement to be executed and delivered by their duly authorized representatives as of the date hereof.

**ASSIGNOR:**

JO-ANN STORES, LLC, the parent company of Creativebug, LLC

By: _____
Ann Aber
EVP, Chief Legal & Human Resource Officer

**ASSIGNEE:**

CREATIVEBUG HOLDINGS LLC

By: _____

**LANDLORD:**

PARKER ASSOCIATES

By: _____

*Signature Page to Assumed Lease Assignment Agreement*

IN WITNESS WHEREOF, the Parties have caused this Assignment Agreement to be executed and delivered by their duly authorized representatives as of the date hereof.

**ASSIGNOR:**

JO-ANN STORES, LLC, the parent company of Creativebug, LLC

By: _____

**ASSIGNEE:**

CREATIVEBUG HOLDINGS LLC

By: _____
        David Saabye, Chief Executive Officer

**LANDLORD:**

PARKER ASSOCIATES

By: _____
        Elena Holsman, General Partner

*Signature Page to Assumed Lease Assignment Agreement*

## EXHIBIT A

## <u>Assumed Lease</u>

(*See attached*)

# LEASE AGREEMENT

PARKER ASSOCIATES, a California limited partnership

**"Landlord"**

and

Jo-Ann Stores, LLC, an Ohio  limited liability company, the parent entity of Creativebug, LLC

**"Tenant"**

DATED AS OF: July 26th, 2021

PARKER PLAZA
2550 - 2560 Ninth Street, Berkeley, California

#4300 Berkeley, CA

## TABLE OF CONTENTS

| Paragraph | | Page |
|---|---|---|
| 1. | Premises and Outside Area | 1 |
| 2. | Certain Basic Lease Terms | 1 |
| 3. | Term; Delivery of Possession of Premises | 1 |
| 4. | Premises "As Is" | 2 |
| 5. | Base Rent | 2 |
| 6. | Security Deposit | 3 |
| 7. | Additional Rent: Operating Expenses and Tax Expenses | 3 |
| 8. | Use of Premises; Compliance with Law; Hazardous Substances | 3 |
| 9. | Alterations and Restoration | 5 |
| 10. | Repair | 6 |
| 11. | Abandonment | 7 |
| 12. | Liens | 7 |
| 13. | Assignment and Subletting | 7 |
| 14. | Indemnification | 10 |
| 15. | Insurance | 11 |
| 16. | Mutual Waiver of Subrogation Rights | 12 |
| 17. | Utilities; Services; Parking; Storage | 13 |
| 18. | Personal Property and Other Taxes | 15 |
| 19. | Rules and Regulations | 15 |
| 20. | Surrender; Holding Over | 15 |
| 21. | Subordination and Attornment | 15 |
| 22. | [Intentionally Omitted] | 16 |
| 23. | Entry by Landlord | 16 |
| 24. | Insolvency or Bankruptcy | 16 |
| 25. | Default and Remedies | 16 |
| 26. | Damage or Destruction | 18 |
| 27. | Eminent Domain | 19 |
| 28. | Landlord's Liability; Sale of Project | 19 |
| 29. | Right of Landlord to Perform | 20 |
| 30. | Attorneys' Fees; Waiver of Jury Trial | 20 |
| 31. | Waiver | 20 |
| 32. | Notices | 20 |
| 33. | Intentionally Omitted | 21 |
| 34. | Defined Terms and Marginal Headings | 21 |
| 35. | Time and Applicable Law | 21 |
| 36. | Successors | 21 |
| 37. | Entire Agreement; Modifications; Electronic Signature | 21 |
| 38. | Light and Air | 21 |
| 39. | Name of Project | 22 |
| 40. | Severability | 22 |
| 41. | Authority | 22 |
| 42. | No Offer | 22 |
| 43. | Real Estate Brokers | 22 |
| 44. | Consents and Approvals | 22 |
| 45. | Reserved Rights | 22 |
| 46. | Estoppel Certificates | 23 |
| 47. | Nondisclosure of Lease Terms | 23 |
| 48. | Hazardous Substance Disclosure | 23 |
| 49. | No Discrimination | 23 |

50.   Signage ...................................................................................................... 23
51.   CASp Disclosure........................................................................................... 24
52.   Unavoidable Delay ...................................................................................... 24

EXHIBITS:

Exhibit A –  Outline of Premises
Exhibit B – Asbestos Disclosure Statement
Exhibit C – Rules and Regulations
Exhibit D – Operating Expenses and Tax Expenses
Exhibit E – Work Letter
Exhibit F – Form of Estoppel
Exhibit G – Form SNDA

## LEASE AGREEMENT

THIS LEASE AGREEMENT (this "**Lease**") is made as of July 26, 2021 (the "**Effective Date**"), between PARKER ASSOCIATES, a California limited partnership ("**Landlord**"), and Jo-Ann Stores, LLC, an Ohio limited liability company, the parent entity of Creativebug, LLC ("**Tenant**").

1.      Premises and Outside Area.

 a.      Premises. Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, on the terms and conditions set forth herein, the premises more particularly described Suites 314 & 316 on the attached Exhibit A (the "**Premises**"), which are located within the office building located at 2560 Ninth Street in Berkeley, California (the "**Project**" or "**Building**"). The Project and the land (the "**Land**") on which the Project is located and the other improvements on the Land (including the walkways and landscaping) are referred to herein as the "**Real Property**."

 Tenant's lease of the Premises shall include the right to use, in common with others and subject to the other provisions of this Lease, the portions of the Project that are jointly utilized with the other tenants of the Project and other public portions of the Project ("**Common Areas**"). All of the windows and outside walls of the Premises and any space in the Premises used for shafts, stacks, pipes, conduits, ducts, electrical equipment or other utilities or Building facilities are reserved solely to Landlord and Landlord shall have rights of access through the Premises for the purpose of operating, maintaining and repairing the same. Notwithstanding the foregoing, it is understood and agreed that the designation or use from time to time of the portions of the common area shall not restrict Landlord's use of such areas for such purposes as Landlord shall determine. In addition, during the Lease's term, Landlord may enter into such easements and license agreements with parties other than Tenant as Landlord desires provided no such easements or license has a material adverse effect on Tenant's use or enjoyment of the Premises.

2.      Certain Basic Lease Terms. As used herein, the following terms shall have the meaning specified below:

 a.      Landlord and Tenant agree the Premises contains 4,214 rentable square feet of space.

 b.      Lease term: Approximately Thirty-Six (36) months, commencing on August 1, 2021 or the later date of Substantial Completion of the Tenant Improvements (as described in Exhibit E) to be completed in the Premises pursuant to Paragraph 4 (the "**Commencement Date**"), and ending on the last day of the 36th full calendar month thereafter (the "**Expiration Date**").

 c.      Base Rent: The Initial monthly Base Rent for the period from the Commencement Date until the last day of the twelfth full calendar month thereafter shall be: $10,535 per month. On each anniversary of the Commencement Date (or the first day of a calendar month immediately following the Commencement Date where the Commencement Date did not occur on the first day of a calendar month), monthly Base Rent shall increase by three percent 3% over the monthly Base Rent for the immediately prior full calendar month.

 d.      Security Deposit: Ten Thousand Five Hundred Thirty-Five Dollars ($10,535.00).

 e.      Tenant's Share: 3.795%.

  Base Year: 2021

 f.      Use of Premises: General office use.

 g.      Parking: Number of spaces in Building Garage: 2 at a cost of $0 per space per month.
   Number of spaces in Ninth Street lot: 2 at a cost of $0 per space per month.
   Total Parking cost: $0 per month.

 h.      Real Estate Brokers: Steve Smith of Norheim & Yost on behalf of Tenant.

 i.      Total due on lease execution: $21,070 (Security Deposit and prepaid Base Rent)

3.      Term; Delivery of Possession of Premises.

 a.      Term. The term of this Lease shall commence on the Commencement Date and unless extended or sooner terminated pursuant to the terms hereof, or at law, shall expire on the Expiration Date.

b. **Delivery of Possession**. The parties estimate that the Tenant Improvements will be Substantially Completed no later than August 1, 2021 (the "**Scheduled Commencement Date**"). If Landlord, for any reason whatsoever, cannot deliver possession of the Premises to Tenant on or before the Scheduled Commencement Date, this Lease shall not be void or voidable, nor shall Landlord be liable to Tenant for any loss or damage resulting therefrom, but no rent shall be payable until the date Landlord delivers possession of the Premises to Tenant. Notwithstanding the foregoing, should the Scheduled Commencement Date not occur by September 1, 2021, as extended for Force Majeure, Tenant shall have the right to terminate the Lease upon written notice delivered no later than September 6, 2021, in which event Landlord shall reimburse any prepaid amounts (e.g., security deposit and prepaid rent), and this Lease shall terminate and be of no further force or effect. No delay in delivery of possession of the Premises shall operate to extend the term of this Lease or amend Tenant's obligations under this Lease.

c. **Measurement**. The parties stipulate that the Premises contain the number of rentable square feet set forth in Paragraph 2.a., provided that Landlord reserves the right from time to time to re-measure the Premises and/or the Project in accordance with any generally accepted measurement standards selected by Landlord. Landlord may adjust Tenant's Share based on such re-measurement; however, Base Rent shall not be adjusted as a result of remeasurement during the initial Term.

4. **Premises "As Is"**. Tenant shall accept the Premises in their "as is" state and condition and Landlord shall have no obligation to make or pay for any improvements or renovations in or to the Premises or to otherwise prepare the Premises for Tenant's occupancy except as set forth in the Work Letter attached hereto as Exhibit E. Tenant acknowledges that neither Landlord nor any broker, agent or employee of Landlord has made any representation or promise with respect to the Premises or the Project except as herein expressly set forth, and no right, privilege, easement or license is being acquired by Tenant except as herein expressly set forth.

5. **Base Rent**.

a. Commencing on the Commencement Date, and continuing thereafter, on or before the first day of each calendar month during the term hereof, Tenant shall pay to Landlord, as Base Rent for the Premises, the Base Rent specified in Paragraph 2 above. If the Commencement Date is a day other than the first day of a calendar month, or if this Lease terminates on a day other than the last day of a calendar month, then the Base Rent payable for such partial month shall be appropriately prorated on the basis of a thirty (30)-day month. Base Rent and the Additional Rent specified in Paragraph 7 below shall be paid by Tenant to Landlord, in advance, without deduction, offset, prior notice or demand, in immediately available funds of lawful money of the United States of America, or by good check as described below, to such place as Landlord may from time to time designate in writing. Payments made by check must be drawn either on a California financial institution or on a financial institution that is a member of the federal reserve system.

b. All amounts payable by Tenant to Landlord under this Lease, or otherwise payable in connection with Tenant's occupancy of the Premises, as well as the Base Rent hereunder and Additional Rent under Paragraph 7, shall constitute rent owed by Tenant to Landlord hereunder.

c. Any rent not paid by Tenant to Landlord when due shall bear interest from the date due to the date of payment by Tenant at an annual rate of interest (the "**Interest Rate**") equal to the lesser of (i) ten percent (10%) per annum or (ii) the maximum annual interest rate allowed by law on such due date for business loans (not primarily for personal, family or household purposes) not exempt from the usury law. Notwithstanding the foregoing, no interest shall be payable with respect to the first and second late payment in any 12-month period provided that the overdue amount is paid in full within ten (10) days following written notice from Landlord stating that payment is overdue. Failure by Tenant to pay rent when due but after any applicable cure period, including any interest accrued under this subparagraph, shall constitute an Event of Default (as defined below) giving rise to all the remedies afforded Landlord under this Lease and at law for nonpayment of rent.

d. Tenant acknowledges that late payment of any installment of Base Rent or Additional Rent or any other amount required under this Lease will cause Landlord to incur costs not contemplated by this Lease and that the exact amount of such costs would be extremely difficult and impracticable to fix. Such costs include, without limitation, processing and accounting charges, late charges that may be imposed on Landlord by the terms of any encumbrance or note secured by the Real Property and the loss of the use of the delinquent funds. Therefore, if any installment of Base Rent, Additional Rent or any other amount due from Tenant is not received when due, Tenant shall pay to Landlord on demand, on account of the delinquent payment, an additional sum equal to Two Hundred Fifty Dollars ($250), which additional sum represents a fair and reasonable estimate of the costs that Landlord will incur by reason of late payment by Tenant. Acceptance of any late charge shall not constitute a waiver of Tenant's

default with respect to the overdue amount, nor prevent Landlord from exercising its right to collect interest as provided above, rent, or any other damages, or from exercising any of the other rights and remedies available to Landlord. Notwithstanding the foregoing, no late charge shall be payable with respect to the first and second late payment in any 12-month period provided that the overdue amount is paid in full within ten (10) days following written notice from Landlord stating that payment is overdue.

        d.      No security or guaranty which may now or hereafter be furnished to Landlord for the payment of rent due hereunder or for the performance by Tenant of the other terms of this Lease shall in any way be a bar or defense to any of Landlord's remedies under this Lease or at law.

        e.      Upon or prior to execution of this Lease, Tenant shall deliver to Landlord the amount due for the first full calendar month of the Term, which shall be applied to Base Rent due for the first full calendar month following any rental abatement.

    6.      <u>Security Deposit</u>.

        a.      <u>Delivery of Security Deposit</u>.  Upon execution of this Lease, Tenant shall deliver to Landlord the Security Deposit specified in Paragraph 2.d. above as security for Tenant's performance of all of Tenant's covenants and obligations under this Lease; provided, however, that the Security Deposit is not an advance rent deposit or an advance payment of any other kind, nor a measure of Landlord's damages upon Tenant's default. Landlord shall not be required to segregate the Security Deposit from its other funds and no interest shall accrue or be payable to Tenant with respect thereto. Landlord may (but shall not be required to) use the Security Deposit or any portion thereof to cure any Event of Default or to compensate Landlord for any damage Landlord incurs as a result of Tenant's failure to perform any of its covenants or obligations hereunder, it being understood that any use of the Security Deposit shall not constitute a bar or defense to any of Landlord's remedies under this Lease or at law. In such event and upon written notice from Landlord to Tenant specifying the amount of the Security Deposit so utilized, Tenant shall immediately deposit with Landlord an amount sufficient to return the Security Deposit to the amount required under Paragraph 2.d. Tenant's failure to make such payment to Landlord within ten (10) business days of Landlord's notice shall constitute an Event of Default. If Tenant is not in default at the expiration or termination of this Lease, Landlord shall return to Tenant the Security Deposit or the balance thereof then held by Landlord; provided, however, that in no event shall any such return be construed as an admission by Landlord that Tenant has performed all of its covenants and obligations hereunder. Tenant hereby unconditionally and irrevocably waives the benefits and protections of California Civil Code Section 1950.7, and, without limitation of the scope of such waiver, acknowledges that Landlord may use all or any part of the Security Deposit to compensate Landlord for damages resulting from termination of this Lease and the tenancy created hereunder (including, without limitation, damages recoverable under California Civil Code Section 1951.2).

        b.      <u>Assignment Upon Transfer</u>.  If Landlord conveys or transfers its interest in the Building and, as a part of such conveyance or transfer, Landlord assigns its interest in this Lease: (i) the Security Deposit (or any portion thereof not previously applied) shall be transferred to Landlord's successor with written confirmation thereof provided by Landlord to Tenant; and (ii) upon Landlord's provision of written notice to Tenant of such transfer, Landlord shall be released and discharged from any further liability to Tenant with respect to the Security Deposit.

    7.      <u>Additional Rent: Operating Expenses and Tax Expenses</u>.  Tenant shall pay Tenant's Share of (a) refuse and recycling removal for the Project; (b) any security services; and (c) window washing for the Project, which shall be invoiced to Tenant on a quarterly basis and paid within thirty (30) days of invoicing.  At Landlord's option, Tenant shall pay Operating Expenses and Tax Expenses pursuant to <u>Exhibit D</u>, attached hereto and incorporated herein by this reference.  If the Commencement Date is a day other than the first day of a calendar year or if this Lease terminates or expires on a day other than the last day of a calendar year, the Additional Rent payable by Tenant pursuant to this Paragraph 7 applicable to such partial calendar year shall be prorated on the basis that the number of days of such partial calendar year bears to three hundred sixty (360).  The amounts payable under this Paragraph 7 (including <u>Exhibit D</u>) are referred to as "**Additional Rent**".

    8.      <u>Use of Premises: Compliance with Law; Hazardous Substances</u>.

        a.      <u>Use of Premises.</u>  Tenant shall use and occupy the Premises solely for general office uses.

b.      Prohibited Activities.  Tenant shall not do or suffer or permit anything to be done in or about the Premises or the Real Property, nor bring or keep anything therein, which would in any way subject Landlord, Landlord's agents or the holder of any Superior Interest (as defined below) to any liability, increase the premium rate of or affect any fire, casualty, liability, rent or other insurance relating to the Real Property or the Project, or cause a cancellation of, or give rise to any defense by the insurer to any claim under, or conflict with, any policies for such insurance.  If any act or omission of Tenant results in any such increase in premium rates, Tenant shall pay to Landlord upon demand the amount of such increase.  Tenant shall not do or suffer or permit anything to be done in or about the Premises or the Real Property which will in any way obstruct or interfere with the rights of other tenants or occupants of the Project or injure or annoy them, or use or suffer or permit the Premises to be used for any immoral, unlawful or objectionable purpose, nor shall Tenant cause, maintain, suffer or permit any nuisance in, on or about the Premises or the Real Property.  Without limiting the foregoing, no loudspeakers or other similar device which can be heard outside the Premises shall, without the prior written approval of Landlord, be used in or about the Premises. Tenant shall not commit or suffer to be committed any waste in, to or about the Premises. Landlord may from time to time conduct fire and life safety training for tenants of the Project, including evacuation drills and similar procedures. Tenant agrees to participate if reasonably possible in such activities as reasonably requested by Landlord.

c.      Compliance with Law.  Tenant shall not do or permit anything to be done in or about the Premises which will in any way conflict with any local, state or federal law, ordinance, rule, regulation, code, order or recommendation of any governmental entity or insurance requirement (collectively, "Legal Requirement") now in force or which may hereafter be enacted. Tenant, at its sole cost and expense, shall promptly comply with all such present and future Legal Requirements relating to the condition, use or occupancy of the Premises, and shall perform all work to the Premises or other portions of the Real Property required to effect such compliance (or, at Landlord's election, Landlord may perform such work at Tenant's cost).  Notwithstanding the foregoing, however, Tenant shall not be required to perform any structural changes to the Premises or work to any other portion of the Real Property unless such changes are related to or affected or triggered by (i) Tenant's Alterations (defined below), (ii) Tenant's particular use of the Premises (as distinguished from general office use), (iii) Tenant's particular employees or employment practices, or (iv) the construction of the Tenant's Work ("Trigger Provisions").  The judgment of any court of competent jurisdiction or the admission of Tenant in an action against Tenant, whether or not Landlord is a party thereto, that Tenant has violated any Legal Requirement shall be conclusive of that fact as between Landlord and Tenant.  Tenant shall immediately furnish Landlord with any notices received from any insurance company or governmental agency or inspection bureau regarding any unsafe or unlawful conditions within the Premises or the violation of any Legal Requirement.  Notwithstanding the foregoing, upon reasonable prior notice to Tenant, Landlord may elect to perform, on behalf of Tenant and at Tenant's expense, any work to any portion of the Project or Real Property that is not within the Premises, which is Tenant's responsibility pursuant to the foregoing Trigger Provisions, and Tenant shall pay to Landlord the cost thereof within ten (10) days after Landlord's demand therefor.

Landlord, at its sole cost and expense (subject to the inclusion of such costs in Operating Expenses), shall be responsible for correcting any violations of Legal Requirements with respect to (a) those portions of the Project that are reasonably anticipated to be in Tenant's path of travel during the Lease Term, and (b) structural elements of the Building, in all events to the extent such violations are not "grandfathered" in or elements for which Tenant is responsible under this Paragraph 8.c. above, and to the extent that the violation adversely impacts Tenant's use of the Building or the Premises, provided that Landlord's obligation shall not apply to the extent that the violation arises from Tenant's negligence, misconduct or Alterations (and in such events, Tenant shall effect the compliance at its sole cost).  Notwithstanding the foregoing, Landlord shall have the right to contest any alleged violation in good faith, including, without limitation, the right to apply for and obtain a waiver or deferment of compliance, the right to assert any and all defenses allowed by law and the right to appeal any decisions, judgments or rulings to the fullest extent permitted by law.  Landlord, after the exhaustion of any and all rights to appeal or contest, will make all repairs, additions, alterations or improvements necessary to comply with the terms of any final order or judgment to the extent required under this Paragraph 8.c.

d.      Hazardous Substances.  Tenant shall not cause or permit the storage, use, generation, release, handling or disposal of (collectively, "Handling") of any Hazardous Substances (as defined below), in, on, or about the Premises or the Real Property by Tenant or any agents, employees, contractors, licensees, subtenants, customers, guests or invitees of Tenant (collectively with Tenant, "Tenant Parties" and each individually, a "Tenant Party"), except that Tenant shall be permitted to use normal quantities of office supplies or products (such as copier fluids or cleaning supplies) customarily used in the conduct of general office activities ("Common Office Chemicals"), provided that the Handling of such Common Office Chemicals shall comply at all times with all Legal Requirements. Notwithstanding anything to the contrary contained herein, however, in no event shall Tenant permit

any usage of Common Office Chemicals in a manner that may cause the Premises or the Real Property to be contaminated by any Hazardous Substances or in violation of any Hazardous Materials Laws. Tenant shall immediately advise Landlord in writing of (a) any and all enforcement, cleanup, remedial, removal, or other governmental or regulatory actions instituted, completed, or threatened pursuant to any Hazardous Materials Laws relating to any Hazardous Substances affecting the Premises; and (b) all claims made or threatened by any third party against Tenant, Landlord, the Premises or the Real Property relating to damage, contribution, cost recovery, compensation, loss, or injury resulting from any Hazardous Substances on or about the Premises. Without Landlord's prior written consent, Tenant shall not take any remedial action or enter into any agreements or settlements in response to the presence of any Hazardous Substances in, on, or about the Premises. Tenant shall be solely responsible for and shall indemnify, defend and hold Landlord and all other Indemnitees (as defined in Paragraph 14.b. below), harmless from and against all Claims (as defined in Paragraph 14.b. below), arising out of or in connection with, or otherwise relating to (i) any Handling of Hazardous Substances by any Tenant Party or Tenant's breach of its obligations hereunder, or (ii) any removal, cleanup, or restoration work and materials necessary to return the Real Property or any other property of whatever nature located on the Real Property to their condition existing prior to the Handling of Hazardous Substances in, on or about the Premises by any Tenant Party. Tenant's obligations under this paragraph shall survive the expiration or other termination of this Lease. For purposes of this Lease, "**Hazardous Substances**" means any explosive, radioactive materials, hazardous wastes, or hazardous substances, including without limitation asbestos containing materials, PCB's, CFC's, or substances defined as "hazardous substances" in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. Section 9601-9657; the Hazardous Materials Transportation Act of 1975, 49 U.S.C. Section 1801-1812; the Resource Conservation and Recovery Act of 1976, 42 U.S.C. Section 6901-6987; or any other Legal Requirement regulating, relating to, or imposing liability or standards of conduct concerning any such materials or substances now or at any time hereafter in effect (collectively, "**Hazardous Materials Laws**").

Tenant acknowledges that mold spores are present essentially everywhere and mold and fungus can grow in almost any moist location. Tenant shall adopt and enforce good housekeeping practices, ventilation and vigilant moisture control within the Premises (particularly in kitchen areas, janitorial closets, bathrooms, and in and around HVAC systems and associated drains) for the prevention of mold (such measures, "**Mold Prevention Practices**"). Without limiting its obligations, Tenant, at its expense, shall keep and maintain the Premises in good order and condition and use reasonable efforts to comply with the Mold Prevention Practices. Tenant shall immediately notify Landlord if it observes, suspects, has reason to believe that any mold condition exists at the Premises.

e.  Landlord Obligations.  Throughout the Term, Landlord shall not bring Hazardous Materials onto the Project except for standard cleaning and construction-related materials, and only in compliance with Legal Requirements and applicable Hazardous Materials Laws. If any violation of Hazardous Materials Laws is located outside of the Premises and is the responsibility of another tenant of the Building to correct, or a third party, then Landlord shall use commercially reasonable efforts to cause such tenant or third party to promptly correct the violation, but Landlord shall not be required to commence litigation, arbitration or other court proceedings to compel such compliance nor shall Landlord be responsible for correcting such noncompliance; provided, however, that where a violation of Hazardous Materials Laws creates an unsafe or potentially unsafe condition for Tenant's employees in the Premises or Building, and Landlord does not cause the responsible tenant or third party to commence efforts to cure same (or commence such remediation work or other remedy itself) within one hundred eighty (180) days of learning of the violation, then Tenant may terminate this Lease at any time prior to the violation being cured on thirty (30) days' written notice to Landlord.

9.  Alterations and Restoration.

a.  Tenant shall not make or permit to be made any alterations, modifications, additions, decorations or improvements to the Premises or the Real Property, or any other work whatsoever that would directly or indirectly involve the penetration or removal (whether permanent or temporary) of, or require access through, in, under, or above any floor, wall or ceiling, or surface or covering thereof in the Premises (collectively, "**Alterations**"), except as expressly provided in this Paragraph 9. If Tenant desires any Alteration, Tenant must obtain Landlord's prior written approval of such Alteration (which may be withheld by Landlord in its sole and absolute discretion).

b.  All Alterations shall be made at Tenant's sole cost and expense (including the expense of complying with all present and future Legal Requirements, including those regarding asbestos, if applicable, and any other work required to be performed in other areas within or outside the Premises by reason of the Alterations). Tenant shall either (i) arrange for Landlord to perform the work on terms and conditions acceptable to Landlord and

Tenant, each in its sole discretion or (ii) bid the project out to contractors approved by Landlord in writing in advance (which approval shall not be unreasonably withheld). Tenant shall provide Landlord with a copy of the information submitted to bidders at such time as the bidders receive their copy.

        c.      Tenant's contractor shall be subject to Landlord's approval, which shall not be unreasonably withheld, and (1) have substantial recent experience in the construction of tenant improvements in similar buildings, (2) be licensed by the State of California (as evidenced by Tenant's submission to Landlord of Tenant's contractor's state license number), and (3) have the capacity to be bonded by a recognized surety company (and reasonable evidence thereof shall be provided to Landlord upon request).

        d.      All such work shall be performed diligently and in a first-class workmanlike manner and in accordance with plans and specifications approved by Landlord, and shall comply with all Legal Requirements (at Tenant's sole cost and expense) and Landlord's construction standards, procedures, conditions and requirements for the Project as in effect from time to time (including Landlord's commercially reasonable requirements relating to insurance and contractor qualifications). Default by Tenant in the payment of any sums agreed to be paid by Tenant for or in connection with an Alteration (regardless of whether such agreement is pursuant to this Paragraph 9 or separate instrument) shall entitle Landlord to all the same remedies as for non-payment of rent hereunder. Any Alterations, including, without limitation, moveable partitions that are affixed to the Premises (but excluding moveable, free standing partitions) and all carpeting, shall at once become part of the Project and the property of Landlord. Tenant shall give Landlord not less than thirty (30) days' prior written notice of the date the construction of the Alteration is to commence. Landlord may post and record an appropriate notice of nonresponsibility with respect to any Alteration and Tenant shall maintain any such notices posted by Landlord in or on the Premises.

        e.      Unless Landlord agrees otherwise in writing, all Alterations made for or by Tenant shall be removed by Tenant from the Premises at the expiration or sooner termination of this Lease and the Premises shall be restored by Tenant to their condition prior to the making of the Alterations, ordinary wear and tear excepted. The removal of the Alterations and the restoration of the Premises shall be performed by a general contractor selected by Tenant and approved by Landlord, in which event Tenant shall pay the general contractor's fees and costs in connection with such work. Any separate work letter or other agreement which is hereafter entered into between Landlord and Tenant pertaining to Alterations shall be deemed to automatically incorporate the terms of this Lease without the necessity for further reference thereto.

        f.      Tenant acknowledges that: (a) the Building and Premises may not comply in certain respects with the requirements of the Americans With Disabilities Act and similar laws, but that due to "grandfathering," no upgrades are currently required with respect thereto; and (b) certain portions of the Building may contain asbestos containing materials, but Landlord has been advised that any such materials are non-friable and do not represent a health risk. Tenant shall be responsible for any changes to the Building, or removal of such materials, if necessitated in connection with Tenant's Alterations, installations, improvements.

        10.      Repair. From and after the Commencement, Tenant, at Tenant's sole cost and expense, shall keep the Premises and every part thereof (including the interior surface of the walls and ceilings of the Premises, those portions of the building systems located within and exclusively serving the Premises, including the interior fixtures, utility systems and equipment, and improvements and Alterations) in good condition and repair. Without limiting the generality of the foregoing, Tenant shall be responsible for the maintenance, repair and restoration (including replacement, if necessary) of any windows or other glass surfaces within the Premises.

        Landlord, at its sole cost and expense but subject to allowable Operating Expenses, shall maintain the exterior or the Premises and all Common Areas including, but not limited to maintenance, repair and replacement of the roof (water tight and leak free), foundation and slab, side walls and ceilings up to the interior surface of the Premises, building systems outside the Premises or not exclusively serving the Premises, and landscaping.

        Except as otherwise provided in Paragraph 25.c., Tenant waives all rights to make repairs at the expense of Landlord as provided by any Legal Requirement now or hereafter in effect. It is specifically understood and agreed that, except as specifically set forth in this Lease, Landlord has no obligation and has made no promises to alter, remodel, improve, repair, decorate or paint the Premises or any part thereof, and that no representations respecting the condition of the Premises or the Project have been made by Landlord to Tenant. Tenant hereby waives

the provisions of California Civil Code Sections 1932(1), 1941 and 1942 and of any similar Legal Requirement now or hereafter in effect.

11. **Abandonment**. Tenant shall not vacate or abandon the Premises for in excess of thirty (30) consecutive days. Tenant understands that if Tenant leaves the Premises or any part thereof vacant, the risk of fire, other casualty and vandalism to the Premises and the Building will be increased. Accordingly, such action by Tenant shall constitute an Event of Default hereunder regardless of whether Tenant continues to pay Base Rent and Additional Rent under this Lease. Upon the expiration or earlier termination of this Lease, or if Tenant abandons, vacates or surrenders all or any part of the Premises or is dispossessed of the Premises by process of law, or otherwise, any movable furniture, equipment, trade fixtures, or other personal property belonging to Tenant and left on the Premises shall at the option of Landlord be deemed to be abandoned and, whether or not the property is deemed abandoned, Landlord shall have the right to remove such property from the Premises and charge Tenant for the removal and any restoration of the Premises as provided in Paragraph 9. Landlord may charge Tenant for the storage of Tenant's property left on the Premises at such rates as Landlord may from time to time reasonably determine, or Landlord may, at its option, store Tenant's property in a public warehouse at Tenant's expense. Notwithstanding the foregoing, neither the provisions of this Paragraph 11 nor any other provision of this Lease shall impose upon Landlord any obligation to care for or preserve any of Tenant's property left upon the Premises, and Tenant hereby waives and releases Landlord from any claim or liability in connection with the removal of such property from the Premises and the storage thereof. Landlord's action or inaction with regard to the provisions of this Paragraph 11 shall not be construed as a waiver of Landlord's right to require Tenant to remove its property, restore any damage to the Premises and the Building caused by such removal, and make any restoration required pursuant to Paragraph 9 above.

12. **Liens**. Tenant shall not permit any mechanic's, materialman's or other liens arising out of work performed at the Premises by or on behalf of Tenant to be filed against the fee of the Real Property nor against Tenant's interest in the Premises. Landlord shall have the right to post and keep posted on the Premises any notices which it deems necessary for protection from such liens. If any such liens are filed and not released, Landlord may, upon thirty (30) days' written notice to Tenant (or such lesser time as is required by Landlord's lender, but in no event less than twenty (20) days), without waiving its rights based on such breach by Tenant and without releasing Tenant from any obligations hereunder, pay and satisfy the same and in such event the sums so paid by Landlord shall be due and payable by Tenant immediately without notice or demand, with interest from the date paid by Landlord through the date Tenant pays Landlord; at the Interest Rate. Tenant agrees to indemnify, defend and hold Landlord and the other Landlord Indemnitees (as defined below) harmless from and against any Claims (as defined below) for mechanics', materialmen's or other liens in connection with any Alterations, repairs or any work performed, materials furnished or obligations incurred by or for Tenant.

13. **Assignment and Subletting**.

a. **Landlord's Consent**. Landlord's and Tenant's agreement with regard to Tenant's right to transfer all or part of its interest in the Premises is as expressly set forth in this Paragraph 13. Tenant agrees that, except upon Landlord's prior written consent, which consent shall not (subject to Landlord's rights under Paragraph 13.g. below) be unreasonably withheld, neither this Lease nor all or any part of the leasehold interest created hereby shall, directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, be assigned, mortgaged, pledged, encumbered or otherwise transferred by Tenant or Tenant's legal representatives or successors in interest (collectively, an "**assignment**") and neither the Premises nor any part thereof shall be sublet or be used or occupied for any purpose by anyone other than Tenant (collectively, a "**sublease**"). Any assignment or subletting without Landlord's prior written consent shall, at Landlord's option, be void and shall constitute an Event of Default entitling Landlord to exercise all remedies available to Landlord under this Lease and at law.

The parties hereto agree and acknowledge that, among other circumstances for which Landlord may reasonably withhold its consent to an assignment or sublease, it shall be reasonable for Landlord to withhold its consent where: (i) the assignment or subletting would increase the operating costs for the Building or the burden on the Building services, or generate additional foot traffic or security concerns in the Building, (ii) the space will be used in a manner inconsistent with its previously established use or not in accordance with Legal Requirements, including zoning; (iii) the proposed assignee or subtenant is a current tenant of the Building or a prospective tenant of the Building; (iv) Landlord disapproves of the proposed assignee's or subtenant's reputation or creditworthiness; (v) Landlord determines that the character of the business that would be conducted by the proposed assignee or subtenant at the Premises, or the manner of conducting such business, would be inconsistent with the character of

#4300 Berkeley, CA

7

the Building as a first-class office building; (vi) the proposed assignee or subtenant is an entity or related to an entity with whom Landlord or any affiliate of Landlord has had adverse dealings; (vii) the assignment or subletting may conflict with any exclusive uses granted to other tenants of the Real Property, or with the terms of any easement, covenant, condition or restriction, or other agreement affecting the Real Property; (viii) the assignment or subletting would involve a change in use from that expressly permitted under this Lease; (ix) Landlord determines that the proposed assignee may be unable to perform all of Tenant's obligations under this Lease or the proposed subtenant may be unable to perform all of its obligations under the proposed sublease; or (x) as of the date Tenant requests Landlord's consent or as of the date Landlord responds thereto, a breach or default by Tenant under this Lease shall have occurred and be continuing. Landlord's foregoing rights and options shall continue throughout the entire term of this Lease.

      b.     **Definition of Assignment**. For purposes of this Paragraph 13, the following events shall be deemed an assignment or sublease, as appropriate: (i) the issuance of equity interests (whether stock, partnership interests or otherwise) in Tenant or any subtenant or assignee, or any entity controlling any of them, to any person or group of related persons, in a single transaction or a series of related or unrelated transactions, such that, following such issuance, such person or group shall have Control (as defined below) of Tenant or any subtenant or assignee; (ii) a transfer of Control of Tenant or any subtenant or assignee, or any entity controlling any of them, in a single transaction or a series of related or unrelated transactions (including, without limitation, by consolidation, merger, acquisition or reorganization), except that the transfer of outstanding capital stock or other listed equity interests by persons or parties other than "insiders" within the meaning of the Securities Exchange Act of 1934, as amended, through the "over-the-counter" market or any recognized national or international securities exchange, shall not be included in determining whether Control has been transferred; (iii) a reduction of Tenant's assets to the point that this Lease is substantially Tenant's only asset; (iv) a change or conversion in the form of entity of Tenant, any subtenant or assignee, or any entity controlling any of them, which has the effect of limiting the liability of any of the partners, members or other owners of such entity; or (v) the agreement by a third party to assume, take over, or reimburse Tenant for, any or all of Tenant's obligations under this Lease, in order to induce Tenant to lease space with such third party. "**Control**" shall mean direct or indirect ownership of fifty percent (50%) or more of all of the voting stock of a corporation or fifty percent (50%) or more of the legal or equitable interest in any other business entity, or the power to direct the operations of any entity (by equity ownership, contract or otherwise).

      c.     **Landlord Collection**. If this Lease is assigned, whether or not in violation of the terms of this Lease, Landlord may collect rent from the assignee. If the Premises or any part thereof is sublet, Landlord may, upon an Event of Default by Tenant hereunder, collect rent from the subtenant. In either event, Landlord shall apply the amount collected from the assignee or subtenant to Tenant's monetary obligations hereunder.

      d.     **No Waiver**. The consent by Landlord to an assignment or subletting hereunder shall not relieve Tenant or any assignee or subtenant from the requirement of obtaining Landlord's express prior written consent to any other or further assignment or subletting. In no event shall any subtenant be permitted to assign its sublease or to further sublet all or any portion of its subleased premises without Landlord's prior written consent, which consent may be withheld by Landlord it its sole and absolute discretion. Neither an assignment or subletting nor the collection of rent by Landlord from any person other than Tenant, nor the application of any such rent as provided in Paragraph 13.c. shall be deemed a waiver of any of the provisions of this Paragraph 13 or release Tenant from its obligation to comply with the provisions of this Lease and Tenant shall remain fully and primarily liable for all of Tenant's obligations under this Lease. If Landlord approves of an assignment or subletting hereunder and this Lease contains any renewal options, expansion options, rights of first refusal, rights of first negotiation or any other rights or options pertaining to additional space in the Building, such rights and/or options shall not run to the subtenant or assignee, it being agreed by the parties hereto that any such rights and options are personal to the Tenant originally named herein and may not be transferred.

      e.     **Processing Expenses**. Tenant shall reimburse Landlord for Landlord's reasonable attorneys' fees incurred in connection with any proposed sublet or assignment, which fees, unless Tenant or the proposed subtenant or assignee requests substantial changes to Landlord's standard form of consent in connection with the proposed assignment or sublease, shall not exceed One Thousand Five Hundred Dollars ($1,500.00) for any single proposed transaction.

      f.     **Consideration to Landlord**. In the event of any assignment or sublease, whether or not requiring Landlord's consent, Landlord shall be entitled to receive, as additional rent hereunder, fifty percent (50%) of any consideration paid by the assignee or subtenant to Tenant (if any) for the assignment or sublease and, in the

case of a sublease, fifty percent (50%) of the excess of the amount of rent paid for the sublet space by the subtenant over the amount of monthly Base Rent under Paragraph 5 above attributable to the sublet space, which amounts shall be paid monthly by Tenant to Landlord. Such amounts shall be payable to Landlord within thirty (30) days following Tenant's receipt of such consideration from or on behalf of the subtenant or assignee.

        g.     **Procedures**. If Tenant desires to assign this Lease or any interest therein or sublet all or part of the Premises, Tenant shall give Landlord written notice thereof and the terms proposed (the "**Sublease Notice**"), which Sublease Notice, shall be accompanied by Tenant's proposed assignment or sublease agreement (in which the proposed assignee or subtenant shall be named, shall be executed by Tenant and the proposed assignee or subtenant, and which agreement shall otherwise meet the requirements of Paragraph 13.h. below), together with a current financial statement of such proposed assignee or subtenant and any other information reasonably requested by Landlord. Landlord shall have the prior right and option (to be exercised by written notice to Tenant given within thirty (30) days after receipt of Tenant's notice): (i) in the case of any proposed sublet, to sublet from Tenant any portion of the Premises proposed by Tenant to be sublet, for the term for which such portion is proposed to be sublet, but at the lesser of the proposed sublease rent or the same rent (including Additional Rent as provided for in Paragraph 7 above) as Tenant is required to pay to Landlord under this Lease for the same space, computed on a pro rata square footage basis, (ii) to terminate this Lease in its entirety (in the case of any proposed assignment) or as it pertains to the portion of the Premises so proposed by Tenant to be sublet (in the case of any proposed sublet), or (iii) to approve or reasonably disapprove the proposed assignment or sublease. If Landlord exercises its option in (i), above, then Landlord may, at Landlord's sole cost, construct improvements in the subject space and, so long as the improvements are suitable for general office purposes, Landlord shall have no obligation to restore the subject space to its original condition following the termination of the sublease (and in no event shall Tenant have any removal or restoration obligation with respect to any improvements constructed in the subject space by Landlord). If Landlord exercises any option to sublet or to terminate, any costs of demising the portion of the Premises affected by such subleasing or termination shall be borne by subtenant or Tenant. In addition, Landlord shall have no liability for any real estate brokerage commission(s) or with respect to any of the costs and expenses that Tenant may have incurred in connection with its proposed assignment or subletting, and Tenant agrees to indemnify, defend and hold Landlord and all other Landlord Indemnitees harmless from and against any and all Claims (as defined in Paragraph 14.b. below), including, without limitation, claims for commissions, arising from such proposed assignment or subletting. Landlord's foregoing rights and options shall continue throughout the entire term of this Lease.

        h.     **Documentation**. No permitted assignment or subletting by Tenant shall be effective until there has been delivered to Landlord a fully executed counterpart of the assignment or sublease which expressly provides that (i) the assignee or subtenant may not further assign this Lease or the sublease, as applicable, or sublet the Premises or any portion thereof, without Landlord's prior written consent (which, in the case of a further assignment proposed by an assignee of this Lease, shall not be unreasonably withheld, subject to Landlord's rights under the provisions of this Paragraph 13, and in the case of a subtenant's assignment of its sublease or further subletting of its subleased premises or any portion thereof, may be withheld in Landlord's sole and absolute discretion), (ii) the assignee or subtenant will comply with all of the provisions of this Lease, and Landlord may enforce the Lease provisions directly against such assignee or subtenant, (iii) in the case of an assignment, the assignee assumes all of Tenant's obligations under this Lease arising on or after the date of the assignment, and (iv) in the case of a sublease, the subtenant agrees to be and remain jointly and severally liable with Tenant for the payment of rent pertaining to the sublet space in the amount set forth in the sublease, and for the performance of all of the terms and provisions of this Lease applicable to the sublet space unless mutually agreed upon otherwise by Landlord in writing (in its sole and absolute discretion). In addition to the foregoing, no assignment or sublease by Tenant shall be effective until there has been delivered to Landlord a fully executed counterpart of Landlord's standard consent to assignment or consent to sublease form. The failure or refusal of a subtenant or assignee to execute any such instrument shall not release or discharge the subtenant or assignee from its liability as set forth above. Notwithstanding the foregoing, however, no subtenant or assignee shall be permitted to occupy the Premises or any portion thereof unless and until such subtenant or assignee provides Landlord with certificates evidencing that such subtenant or assignee is carrying all insurance coverage required of Tenant under this Lease.

        i.     **No Merger**. Without limiting any of the provisions of this Paragraph 13, if Tenant has entered into any subleases of any portion of the Premises, the voluntary or other surrender of this Lease by Tenant, or a mutual cancellation by Landlord and Tenant, shall not work a merger, and shall, at the option of Landlord, terminate all or any existing subleases or subtenancies or, at the option of Landlord, operate as an assignment to Landlord of any or all such subleases or subtenancies. If Landlord does elect that such surrender or cancellation operate as an

assignment of such subleases or subtenancies, Landlord shall in no way be liable for any previous act or omission by Tenant under the subleases or for the return of any deposit(s) under the subleases that have not been actually delivered to Landlord, nor shall Landlord be bound by any sublease modification(s) executed without Landlord's consent or for any advance rental payment by the subtenant in excess of one month's rent.

14.    Indemnification.

a.    Limitation of Liability. Landlord and the holders of any Superior Interests shall not be liable to Tenant and Tenant hereby waives all claims against such parties for any loss, injury or other damage to person or property in or about the Premises or the Real Property from any cause whatsoever, including without limitation, water leakage of any character from the roof, walls, basement, fire sprinklers, appliances, HVAC system, plumbing or other portion of the Premises or the Real Property, or gas, fire, explosion, falling plaster, steam, electricity, or any malfunction within the Premises or the Real Property, or any infectious disease; provided, however, that the foregoing waiver shall be inapplicable to any loss, injury or damage resulting directly from Landlord's active negligence or willful misconduct. Tenant acknowledges that from time to time throughout the term of this Lease, construction work may be performed in and about the Project and the Real Property by Landlord, contractors of Landlord, or other tenants or their contractors, and that such construction work may result in noise and disruption to Tenant's business. In addition to and without limiting the foregoing waiver or any other provision of this Lease, Tenant agrees that Landlord shall not be liable for, and Tenant expressly waives and releases Landlord and the other Indemnitees from any Claims, including without limitation, any and all consequential damages or interruption or loss of business, income or profits, or claims of actual or constructive eviction or for abatement of rental, arising or alleged to be arising as a result of any such construction activity.

To the extent that the Premises are damaged or any Tenant Parties are injured as a result of another tenant's negligence or misconduct, upon request from Tenant, and at Tenant's sole cost, Landlord shall reasonably cooperate with Tenant to allow Tenant to pursue any rights available to Landlord under the written lease between Landlord and such other tenant, but only to the extent allowed under applicable Legal Requirements and the terms of the tenant's lease (including without limitation any waiver of subrogation provisions that are binding on Landlord).

b.    Tenant Indemnity. Tenant shall hold Landlord and the holders of any Superior Interest, and the constituent shareholders, partners or other owners thereof, and all of their agents, contractors, servants, officers, directors, employees and licensees (collectively with Landlord, the "Landlord Indemnitees") harmless from and indemnify the Landlord Indemnitees against any and all claims, liabilities, damages, costs and expenses, including reasonable attorneys' fees and costs incurred in defending against the same (collectively, "Claims"), to the extent arising from (a) the negligent acts or omissions of Tenant or any other Tenant Parties in, on or about the Real Property (including, without limitation, in connection with Tenant's use of any parking or storage), or (b) any construction or other work undertaken by or on behalf of Tenant in, on or about the Premises, whether prior to or during the term of this Lease, or (c) any breach under this Lease by Tenant, or (d) any accident, injury or damage, howsoever and by whomsoever caused, to any person or property, occurring in, on or about the Premises, or (e) any Claims related to death, injury, illness, virus, or infectious diseases contracted in or about the Building; except to the extent such Claims are caused directly by the active negligence or willful misconduct of Landlord or its authorized representatives. In case any action or proceeding be brought against any of the Landlord Indemnitees by reason of any such Claim, Tenant, upon notice from Landlord, covenants to resist and defend at Tenant's sole expense such action or proceeding by counsel reasonably satisfactory to Landlord, and Landlord and the Landlord Indemnitees shall cooperate with Tenant in such defense as required by Tenant and the counsel. The provisions of this Paragraph 14.b. shall survive the expiration or earlier termination of this Lease with respect to any injury, illness, death or damage occurring prior to such expiration or termination.

c.    Landlord Indemnity. Landlord shall hold Tenant and the constituent shareholders, partners or other owners thereof, and all of their agents, employees, officers and directors (collectively with Tenant, the "Tenant Indemnitees") harmless from and indemnify the Tenant Indemnitees against any and all Claims to the extent arising from: (a) Landlord's and its agents', contractors' and employees' active negligence or willful misconduct or (b) any breach or default in the performance of Landlord's obligations under this Lease that remains uncured following expiration of applicable notice and cure periods, except to the extent arising from or related to the active negligence or willful misconduct of Tenant and any Tenant Parties. In case any action or proceeding be brought against any of the Tenant Indemnitees by reason of any such Claim, Landlord, upon notice from Tenant, covenants to resist and defend at Landlord's sole expense such action or proceeding by counsel reasonably satisfactory to Tenant, and Tenant and the Tenant Indemnitees shall cooperate with Landlord in such defense as required by Landlord and the

counsel. The provisions of this Paragraph 14.c. shall survive the expiration or earlier termination of this Lease with respect to any injury, illness, death or damage occurring prior to such expiration or termination.

d.      Active Negligence. For purposes of this Lease, the term "active negligence" shall have the meaning set forth in *Rossmoor Sanitation, Inc. v. Pylon, Inc.,* 13 Cal. 3d 622, 629 (1975): "Passive negligence is found in mere nonfeasance, such as the failure to discover a dangerous condition or to perform a duty imposed by law.... Active negligence, on the other hand, is found if an indemnitee has personally participated in an affirmative act of negligence, was connected with negligent acts or omissions by knowledge or acquiescence, or has failed to perform a precise duty which the indemnitee had agreed to perform."

15.    Insurance.

a.      Tenant's Insurance. Tenant shall, at Tenant's expense, maintain during the term of this Lease (and, if Tenant occupies or conducts activities in or about the Premises prior to or after the term hereof, then also during such pre-term or post-term period):

(I)      commercial general liability insurance utilizing the standard ISO Occurrence Form CG0001, or equivalent, insuring against liability for bodily injury and property damage occurring on the Premises and/or in the common areas of the Premises, such insurance to include, but not be limited to, coverages known as personal and advertising injury, products and completed operations liability and contractual liability with a single limited per occurrence of not less than One Million Dollars ($1,000,000) for all bodily injury and property damage liability claims and an annual aggregate of not less than Two Million Dollars ($2,000,000) for all claims and shall include endorsements (a) deleting any employee exclusion on personal injury coverage, (b) including coverage for injuries to or caused by employees, and (c) providing for blanket contractual liability coverage (including Tenant's indemnity obligations herein this Lease) and such insurance shall be (w) primary and non-contributory, (x) provide for severability of interests, and (y) provide that an act or omission of one of the insureds shall not reduce or void coverage to any other insureds;

(ii)      workers' compensation insurance in statutory limits, together with employer's liability insurance coverage in the amount of at least One Million Dollars ($1,000,000) for bodily injury by accident and One Million Dollars ($1,000,000) for bodily injury by disease, which policies shall contain a waiver of subrogation in favor of Landlord;

(iii)      property insurance covering the Tenant's furniture, fixtures, equipment and other personal property in, upon or about the Premises and alteration to the Premises made by Tenant in an amount equal to one hundred percent (100%) of the insurable replacement cost of the insured property including endorsements to such insurance for (a) storefront glass, (b) loss of business income for not less than twelve (12) months from the date of loss, (c) extra expense in such amounts as will reimburse the Tenant for direct or indirect loss of earnings and incurred costs attributable to perils commonly covered by the Tenant's property insurance for not less than twelve (12) months from the date of loss, and (d) loss caused by mechanical or electrical equipment breakdown (commonly referred to as boiler and machinery), such coverage to be provided on the ISO Causes of Loss-Special Form CP 1030, or equivalent, and shall include sprinkler leakage endorsement and so long as this Lease is in effect require the proceeds of such insurance to be used for the repair or replacement of the furniture, fixtures, equipment and other personal property so insured;

(iv)      comprehensive automobile liability insurance with a minimum coverage of One Million Dollars ($1,000,000) per occurrence, combined single limit, which insurance shall cover liability arising out of any auto or other vehicle, including owned, hired and non-owned vehicles;

(v)      any other form or forms of insurance Landlord may reasonably require from time to time.

The above described policies shall protect Tenant, as named insured, and shall protect Landlord and all the other Landlord Indemnitees and any other parties designated by Landlord, as additional insureds; shall insure Landlord's and such other parties' contingent liability with regard to acts or omissions of Tenant; shall specifically include all liability assumed by Tenant under this Lease subject to policy terms, conditions and exclusions; and, if

subject to deductibles, shall provide for deductible amounts. After the initial Term, but no more often than once every five (5) years upon prior written notice, Landlord reserves the right to reasonably increase the foregoing amount of liability coverage from time to time as Landlord reasonably determines is required to adequately protect Landlord and the other parties designated by Landlord from the matters insured thereby (provided, however, that Landlord makes no representation that the limits of liability required hereunder from time to time shall be adequate to protect Tenant), but not more frequently than every five (5) years, and to require that Tenant cause any of its contractors, vendors, movers or other parties conducting activities in or about or occupying the Premises to obtain and maintain insurance as reasonably determined by Landlord and as to which Landlord and such other parties designated by Landlord shall be additional insureds.

b.      **Policy Form.**  Each insurance policy required pursuant to Paragraph 15.a. above shall be issued by an insurance company licensed in the State of California and with a general policyholders' rating of at least "A-" and a financial size ranking of "Class VII" or higher in the most recent edition of Best's Insurance Guide. Certificates of Insurance shall be in the form of the ACORD 27 (Evidence of Property Insurance) and the ACORD 25-S (Certificate of Liability Insurance), or equivalent, and such certificates shall be delivered to the Landlord. Each Insurance policy shall (i) provide that it may not be materially changed, cancelled or allowed to lapse unless thirty (30) days' prior written notice to Landlord and any other insureds designated by Landlord is first given, (ii) provide that no act or omission of Tenant shall affect or limit the obligations of the insurer with respect to any other insured, (iii) include all waiver of subrogation rights endorsements necessary to effect the provisions of Paragraph 16 below, and (iv) provide that the policy and the coverage provided shall be primary, that Landlord, although an additional insured, shall nevertheless be entitled to recovery under such policy for any damage to Landlord or the other Landlord Indemnitees by reason of acts or omissions of Tenant, and that any coverage carried by Landlord shall be noncontributory with respect to policies carried by Tenant. Each such insurance policy or a certificate thereof shall may be found at www.JOANN.com/insurance on or before the effective date of such policy and prior to expiration. Landlord may at any time, and from time to time, inspect and/or copy any and all insurance policies required by this Lease.

c.      Landlord must keep in full force and effect Commercial General Liability Insurance with respect to the Real Property, including the Common Areas, with nationally recognized companies rated no lower than A-, IX by A.M. Best Company with total minimum limits to apply per location of $2 million on account of bodily injuries or death and/or property damage resulting from one occurrence. Landlord must deposit a certificate or other evidence of such insurance with Tenant. This limit may be achieved in combination with umbrella coverage.

d.      Landlord must keep the Premises and the Real Property, including Common Areas, insured against loss or damage by fire, lightning, vandalism and malicious mischief, and such other perils as are now or may hereafter be comprehended in the term "All Risk Coverage" or "special form" coverage or "Special Form Cause of Loss" (or other  terms that become the insurance industry standard in the future), including, without limitation, earthquake and flood, if in an area that is designated as an earthquake or flood zone, boiler and machinery, plate glass, power failure, mold, windstorm, terrorism, seepage or leakage and loss of rent damage, in amounts equal to at least eighty (80%) percent of the full replacement value thereof, or such greater amounts as may be required to prevent the application of co-insurance provisions. Such insurance must cover improvements in the Premises owned by Landlord to the extent that the same are customarily insurable as part of the realty, but shall not include the cost of restoration of Tenant's furniture, furnishings, inventory, equipment and other personal property. Notwithstanding anything to the contrary, Landlord is solely responsible for any and all deductibles and self-insured retentions.

e.      **No Ownership.**  Nothing in this Paragraph 15 shall be construed as creating or implying the existence of (i) any ownership by Tenant of any fixtures, additions, Alterations, or improvements in or to the Premises or (ii) any right on Tenant's part to make any addition, Alteration or improvement in or to the Premises.

16.     **Mutual Waiver of Subrogation Rights**.  Each party hereto hereby releases the other respective party and Landlord and Tenant Indemnitees, and the respective partners, shareholders, agents, employees, officers, directors and authorized representatives of such released party, from any claims such releasing party may have for damage to the Project, the Premises or any of such releasing party's fixtures, personal property, improvements and alterations in or about the Premises, the Project or the Real Property that is caused by or results from risks insured against under any "special form" insurance policies actually carried by such releasing party or deemed to be carried by such releasing party; provided, however, that such waiver shall be limited to the extent of the net insurance proceeds payable by the relevant insurance company with respect to such loss or damage (or in the case of deemed coverage, the net proceeds that would have been payable). For purposes of this Paragraph 16, Tenant shall be

deemed to be carrying any of the insurance policies required pursuant to Paragraph 15 but not actually carried by Tenant, and Landlord shall be deemed to carry standard fire and extended coverage policies on the Real Property.

17.    **Utilities; Services; Parking; Storage**.

a.    **Basic Services.** Tenant shall arrange for and directly pay for any and all utilities needed within the Premises including, without limitation (i) electrical power, (ii) gas, (iii) internet and telephone service, (iv) HVAC for the Premises, (v) regular janitorial services (including removal of refuse from the Premises and pest control), and (vi) adequate security in Tenant's sole discretion if needed to protect Tenant Parties and Tenant's personal property. Landlord shall arrange and pay for water and sewage to the Building; provided, however, that where Landlord reasonably determines that Tenant's use is in excess of previously established usage for standard office tenants in the Building, Tenant shall pay all costs in connection with its excess use within thirty (30) days following Landlord's demand therefor. Tenant shall comply with all Legal Requirements concerning (i) separation of refuse and recycling, and shall not allow refuse to collect within the Premises or parking area, and (ii) janitorial services. To the extent that any utilities consumed at the Premises are not separately metered, Landlord shall arrange for such utilities and Tenant shall pay its pro-rata share, as reasonably determined by Landlord, with such payment to be made on a monthly basis within thirty (30) days following Tenant's receipt of Landlord's invoice therefor. If Landlord determines that the Premises are not being maintained in accordance with first class standards, Landlord may notify Tenant, specifying in reasonable detail the basis for Landlord's determination that Tenant's janitorial services are inadequate, and, after delivery of such notice, Landlord shall have the right to provide janitorial services to the Premises, at Tenant's sole cost and expense.

b.    **Utility Connections.** Tenant shall not connect or use any apparatus or device in the Premises that would exceed the capacity of the existing panel or transformer serving the Premises. Tenant shall not connect with electric current (except through existing outlets in the Premises or such additional outlets as may be installed in the Premises as part of the Tenant's Work or Alterations approved by Landlord), or water pipes, any apparatus or device for the purpose of using electrical current or water. Landlord will not permit additional coring or channeling of the floor of the Premises in order to install new electric outlets in the Premises unless Landlord is satisfied, on the basis of such information to be supplied by Tenant at Tenant's expense, that coring and/or channeling of the floor in order to install such additional outlets will not weaken the structure of the floor.

c.    **Temperature Balance**. If the temperature otherwise maintained in any portion of the Premises by the heating system is affected as a result of (i) the type or quantity of any lights, machines or equipment (including without limitation typical office equipment) used by Tenant in the Premises, (ii) the occupancy of such portion of the Premises by more than one person per two hundred (200) square feet of rentable area therein, or (iii) any rearrangement of partitioning or other improvements, then at Tenant's sole cost, Landlord may install any equipment, or modify any existing equipment Landlord deems necessary to restore the temperature balance (such new equipment or modifications to existing equipment termed herein **"Temperature Balance Equipment"**). Tenant agrees to cooperate with Landlord and to abide by the regulations and requirements which Landlord may prescribe for the proper functioning and protection of the heating system. Landlord makes no representation to Tenant regarding the adequacy or fitness of any equipment in the Building to maintain temperatures that may be required for, or because of, any of Tenant's equipment in the Premises, and Landlord shall have no liability for loss or damage suffered by Tenant or others in connection therewith.

d.    **Interruption of Services**. Landlord's obligation to provide utilities and services for the Premises are subject to the Rules and Regulations of the Project, applicable Legal Requirements (including the rules or actions of the public utility company furnishing the utility or service), and shutdowns for maintenance and repairs, for security purposes, or due to strikes, lockouts, labor disputes, fire or other casualty, acts of God, acts of PG&E or other providers or other causes beyond the control of Landlord. In the event of an interruption in, or failure or inability to provide any service or utility for the Premises for any reason, such interruption, failure or inability shall not constitute an eviction of Tenant, constructive or otherwise, or impose upon Landlord any liability whatsoever, including, but not limited to, liability for consequential damages or loss of business by Tenant. Notwithstanding the foregoing, Tenant hereby waives the provisions any other existing or future Legal Requirement permitting the termination of this Lease due to such interruption, failure or inability.

Notwithstanding anything in this Paragraph 17.d. to the contrary, where the interruption in utilities or services prevents Tenant from using all or a portion of the Premises (and Tenant does not use same), and is caused by the active

negligence or misconduct of Landlord and its agents and employees, Tenant shall provide Landlord with five (5) business days written notice of such interruption and, where Landlord does not restore the utility or service within such time (subject to Force Majeure), rent shall abate beginning on the sixth (6th) business day and continuing until the interruption, failure or inability is restored.  Such rental abatement shall be in proportion to the amount of space that cannot be used by Tenant and is not being used due to the interruption (e.g., if 25% of the space cannot be used, the abatement shall be for 25% of the rent otherwise payable).

   e.  **Governmental Controls.**  In the event any governmental authority having jurisdiction over the Real Property or the Project promulgates or revises any Legal Requirement or building, fire or other code or imposes mandatory or voluntary controls or guidelines on Landlord or the Real Property or the Project relating to the use or conservation of energy or utilities or the reduction of automobile or other emissions (collectively, **"Controls"**) or in the event Landlord is required or elects to make alterations to the Real Property or the Project in order to comply with such mandatory or voluntary Controls, Landlord may, in its sole discretion, comply with such Controls or make such alterations to the Real Property or the Project related thereto.  Such compliance and the making of such alterations shall not constitute an eviction of Tenant, constructive or otherwise, or impose upon Landlord any liability whatsoever, including, but not limited to, liability for consequential damages or loss of business by Tenant.

   f.  **Security**.  Landlord may, at its option, arrange for a security patrol of the Project.  Tenant acknowledges that any safety and security devices, services and programs provided by Landlord from time to time, if any, may not prevent theft or other criminal acts, or insure the safety of persons or property, and Tenant expressly assumes the risk that any safety device, service or program may not be effective or may malfunction or be circumvented.  In all events and notwithstanding any provision of this Lease to the contrary, Landlord and the other Landlord Indemnitees shall not be liable to Tenant, and to the maximum extent permitted by law, Tenant hereby waives any claim against the Landlord Indemnitees for any unauthorized or criminal entry of third parties into the Premises or the Building, any injury to or death of persons, or any loss of property in and about the Premises, Building or Real Property caused by or resulting from any unauthorized or criminal acts of third parties, regardless of any action, inaction, failure, breakdown, malfunction and/or insufficiency of the security services provided by Landlord, or any allegation of active or passive negligence on the part of Landlord or the other Indemnitees. Tenant shall obtain insurance coverage to the extent Tenant desires protection against criminal acts and other losses.  Notwithstanding the foregoing, if Landlord or its employees, agents and contractors enter the Premises outside of Tenant's standard hours of operation, and Landlord or its employees, agents and contractors fails to close and lock the door to the Premises upon departing, such failure shall be considered "active negligence" by Landlord and Landlord shall be liable for losses incurred by Tenant in connection with a third party's wrongful or criminal entry into the unlocked Premises.

   g.  **Parking**.  During the Term of this Lease, Tenant shall lease from Landlord the  parking spaces described in Paragraph 2.g. above for use by its employees only.  Tenant shall pay Landlord the fee described in Paragraph 2.g., which may be adjusted from time to time by Landlord but not more than once in any given twelve (12) month period.  Parking fees shall be Additional Rent payable in advance together with Base Rent payments. The use of the parking areas shall be subject to the Rules and Regulations.  Tenant may only park normally sized passenger automobiles or motorcycles, fully contained inside the marked stalls. Tenant shall not use more parking spaces than its allotment. Tenant shall not use any parking spaces specifically assigned by Landlord to other tenants of the Project.  Tenant shall not allow any contractor, agent or employee vehicles be loaded, unloaded, or parked in areas other than those designated by Landlord for such activities.  If Tenant permits or allows any of the prohibited activities described herein, then Landlord shall have the right, without notice, in addition to such other rights and remedies that it may have, to remove or tow away the vehicle involved and charge the cost thereof to Tenant, which cost shall be immediately payable by Tenant upon demand by Landlord.  Absent Landlord's active negligence or intentional misconduct, Landlord shall not be liable for any loss, injury or damage to persons using any Building parking areas, or automobiles or other property therein, it being agreed that, to the fullest extent permitted by law, the use of any parking shall be at the sole risk of Tenant and its employees, agents and invitees.  Landlord may temporarily close the parking area for maintenance and repairs or for a Force Majeure event upon reasonable notice to Tenant, and upon ten (10) days' prior notice to Tenant, may reassign parking spaces in connection with any renovation or development of the Real Property or any portion thereof.

   h.  **Storage**.  If and to the extent that any parking area is assigned to Tenant for its exclusive use, Tenant shall be allowed to use the storage platform located within such parking space solely for the storage of office-related files and supplies, and in no event shall such storage be used for any Hazardous Materials, explosive or flammable items, perishable items, items unrelated to Tenant's business being conducted at the Premises, or in

violation of Legal Requirements.  Any items placed in the storage area shall be at Tenant's sole risk.  Tenant shall ensure that its storage is limited to the designated area/platform, which shall be maintained so as to have a neat appearance at all times.  In no event shall stored items "overflow" the storage area, or be placed on the floor, walls or otherwise in or about the designated parking space or parking areas.  For avoidance of doubt, Tenant may not install additional cabinet in or about its parking space(s), nor may it place items other than a working and registered passenger automobile in such space.  In no event shall the parking space and storage area be used other than for their intended use.

18.     Personal Property and Other Taxes.  Tenant shall pay, before delinquency, any and all taxes, fees, charges or other governmental impositions levied or assessed against Landlord or Tenant (a) upon Tenant's equipment, furniture, fixtures, improvements and other personal property (including carpeting installed by Tenant) located in the Premises, (b) by virtue of any Alterations made by Tenant to the Premises, (c) in connection with any parking, and (d) upon this transaction or any document to which Tenant is a party creating or transferring an interest or an estate in the Premises. If any such fee, charge or other governmental imposition is paid by Landlord, Tenant shall reimburse Landlord for Landlord's payment upon demand.

19.     Rules and Regulations.  Tenant shall comply with the rules and regulations set forth on Exhibit C attached hereto, as such rules and regulations may be modified or amended by Landlord from time to time (the "Rules and Regulations").  Landlord shall not be responsible to Tenant for the nonperformance or noncompliance by any other tenant or occupant of the Project or of or with any of the Rules and Regulations; however, Landlord shall make commercially reasonable efforts to enforce them in a nondiscriminatory manner. In the event of any conflict between the Rules and Regulations and the balance of this Lease, the balance of this Lease shall control.

20.     Surrender; Holding Over.

a.     Surrender.  Upon the expiration or other termination of this Lease, Tenant shall surrender the Premises to Landlord vacant and broom-clean, with all Improvements and Alterations (except as provided below) in their original condition, except for reasonable wear and tear, damage from casualty or condemnation and any changes resulting from approved Alterations; provided, however, that prior to the expiration or termination of this Lease Tenant shall remove from the Premises any Alterations that Tenant is required by Landlord to remove under the provisions of this Lease, and all of Tenant's personal property and trade fixtures. If such removal is not completed at the expiration or other termination of this Lease, Landlord may remove the same at Tenant's expense (which costs shall constitute Landlord damages, and allow application of the Security Deposit under Paragraph 6 above).  Any damage to the Premises or the Project caused by such removal shall be repaired promptly by Tenant (including the patching or repairing of ceilings and walls) or, if Tenant fails to do so, Landlord may do so at Tenant's expense. The removal of Alterations from the Premises shall be governed by Paragraph 9 above. Tenant's obligations under this paragraph shall survive the expiration or other termination of this Lease. Upon expiration or termination of this Lease, Tenant shall (i) surrender all keys to the Premises or any other part of the Project and shall make known to Landlord the combination of locks on all safes, cabinets and vaults that may be located in the Premises, and (ii) have the carpets professionally cleaned, and deliver the receipt for such cleaning to Landlord.

b.     Holding Over.  If Tenant remains in possession of the Premises after the expiration or earlier termination of this Lease (including where Tenant fails to surrender the Premises in the condition required under Paragraph 20.a), Tenant's continued possession shall be on the basis of a tenancy at sufferance and Tenant shall pay as rent during the holdover period (i) for the first full or partial month of holdover, an amount equal to Base Rent in an amount equal to one hundred fifty percent (150%) of the Base Rent and Additional Rent payable under this Lease for the last full month prior to the date of such expiration or termination, and (ii) for any holdover in excess of thirty (30) days, an amount equal to two hundred percent (200%) of the Base Rent plus Additional Rent payable under this Lease for the last full month prior to the date of such expiration or termination.  Landlord's acceptance of rent after such holding over shall not result in any other tenancy or in a renewal of the original term of this Lease.

21.     Subordination and Attornment.  This Lease is expressly made subject and subordinate to any mortgage, deed of trust, ground lease, underlying lease or like encumbrance affecting any part of the Real Property or any interest of Landlord therein which is now existing and any present or future modification, amendment or supplement to any of the foregoing, and to any advances made thereunder (any of the foregoing being a "Superior Interest") without the necessity of any further documentation evidencing such subordination; provided that Landlord shall, upon execution of this Lease, execute and deliver to Tenant a document evidencing the subordination of this

Lease to its current Superior Interest holder, in substantially the form as is attached hereto as **Exhibit G** (the "**SNDA**"), and make commercially reasonable efforts to have its current Superior Interest holder execute the SNDA within thirty (30) days following the Effective Date. Where a Superior Interest is created following the Effective Date, Landlord shall make commercially reasonable efforts to have the new holder sign the SNDA within thirty (30) days. Tenant agrees to negotiate in good faith changes to the SNDA required by the Superior Interest holder. If the interest of Landlord in the Real Property or the Project is transferred to any person ("**Purchaser**") pursuant to or in lieu of foreclosure or other proceedings for enforcement of any Superior Interest, Tenant shall immediately attorn to the Purchaser, and this Lease shall continue in full force and effect as a direct lease between the Purchaser and Tenant on the terms and conditions set forth herein, provided that Purchaser acquires and accepts the Real Property or the Project subject to this Lease. Notwithstanding the subordination of this Lease to Superior Interests as set forth above, the holder of any Superior Interest may at any time (including as part of foreclosure or other proceedings for enforcement of such Superior Interest), upon written notice to Tenant, elect to have this Lease be prior and superior to such Superior Interest.

22.    [Intentionally Omitted].

23.    Entry by Landlord.  Landlord may, at any and all reasonable times but upon twenty-four (24) hours' notice (except in an emergency, where no notice shall be required), enter the Premises to (a) inspect the same and to determine whether Tenant is in compliance with its obligations hereunder, (b) supply any service Landlord is required or permitted to provide hereunder, (c) show the Premises to prospective lenders, purchasers or tenants (but as to tenants, only during the last twelve (12) months of the then current Term), (d) post notices of nonresponsibility, and (e) alter, improve or repair the Premises or any other portion of the Real Property. In connection with any such alteration, improvement or repair, Landlord may erect in the Premises or elsewhere in the Real Property scaffolding and other structures reasonably required for the work to be performed. In no event shall such entry or work entitle Tenant to an abatement of rent, constitute an eviction of Tenant, constructive or otherwise, or impose upon Landlord any liability whatsoever, including but not limited to liability for consequential damages or loss of business or profits by Tenant. Landlord shall use commercially reasonable efforts to cause all such work to be done in such a manner as to cause as little interference to Tenant as reasonably possible without incurring additional expense. Landlord shall at all times retain a key and be provided with any code with which to unlock all of the doors in the Premises (including any security alarm code for the Premises), except with respect to Tenant's vaults and safes. If an emergency necessitates immediate access to the Premises, Landlord may use whatever force is necessary to enter the Premises and any such entry to the Premises shall not constitute a forcible or unlawful entry into the Premises, a detainer of the Premises, or an eviction of Tenant from the Premises, or any portion thereof.

24.    Insolvency or Bankruptcy.  The occurrence of any of the following shall constitute an Event of Default under Paragraph 25 below: (a) Tenant makes an assignment for the benefit of creditors, is adjudicated an insolvent, files a petition seeking any reorganization, arrangement, liquidation, dissolution or similar arrangement under any state or federal law, or Tenant consents to or acquiesces in the appointment of a trustee, receiver or liquidator for the Premises, for Tenant or for all or any substantial part of Tenant's assets; or (b) Tenant fails within ninety (90) days after the commencement of any proceedings against Tenant seeking reorganization, liquidation, dissolution or similar relief, to have such proceedings dismissed, or to have any trustee, receiver or liquidator for the Premises, or for all or any substantial part of Tenant's assets, vacated and removed; or (c) Tenant is unable, or admits in writing its inability, to pay its debts as they mature; or (d) Tenant gives notice to any governmental body of its insolvency or pending insolvency, or of its suspension or pending suspension of operations.  In no event shall this Lease be assigned or assignable by reason of any voluntary or involuntary bankruptcy, insolvency or reorganization proceedings, nor shall any rights or privileges hereunder be an asset of Tenant, the trustee, debtor-in-possession, or the debtor's estate in any bankruptcy, insolvency or reorganization proceedings.

25.    Default and Remedies.

a.    Events of Default.  The occurrence of any of the following shall constitute an "**Event of Default**" by Tenant:

1.    Tenant fails to pay when due Base Rent, Additional Rent or any other rent due hereunder, provided that Landlord shall provide Tenant with written notice and ten (10) days to cure for the first two (2) such monetary defaults in any twelve (12) month period (after which time no notice shall be required); or

#4300 Berkeley, CA

2.   Tenant fails to deliver any estoppel certificate, subordination agreement, or any other document (on commercially reasonable terms) required pursuant to this Lease, within the applicable period set forth therein, and such notice continues for ten (10) days after written notice of such default is provided to Tenant; or

3.   Tenant violates the bankruptcy and insolvency provisions of Paragraph 24 above; or

4.   Tenant assigns this Lease or subleases any portion of the Premises in violation of Paragraph 13 above; or

5.   Tenant fails to comply with any other provision of this Lease in the manner and within the time required and such failure continues for thirty (30) days following written notice of such default to Tenant.

b.   Remedies.  Upon the occurrence of an Event of Default Landlord shall have the following remedies, which shall not be exclusive but shall be cumulative and shall be in addition to any other remedies now or hereafter allowed by law:

1.   Landlord may terminate Tenant's right to possession of the Premises at any time by written notice to Tenant. Tenant expressly acknowledges that in the absence of such written notice from Landlord, no other act of Landlord, including, but not limited to, its re-entry into the Premises, its efforts to relet the Premises, its reletting of the Premises for Tenant's account, its storage of Tenant's personal property and trade fixtures, its acceptance of keys to the Premises from Tenant, its appointment of a receiver, or its exercise of any other rights and remedies under this Paragraph 25 or otherwise at law, shall constitute an acceptance of Tenant's surrender of the Premises or constitute a termination of this Lease or of Tenant's right to possession of the Premises.  Upon such termination in writing of Tenant's right to possession of the Premises, this Lease shall terminate and Landlord shall be entitled to recover damages for such breach, including but not limited to the following: (i) the reasonable cost of recovering the Premises; plus (ii) the reasonable cost of removing Tenant's Alterations, trade fixtures and improvements; plus (iii) all unpaid rent due or earned hereunder prior to the date of termination, less the proceeds of any reletting or any rental received from subtenants prior to the date of termination applied as provided in Paragraph 25.b.2. below, together with interest at the Interest Rate, on such sums from the date such rent is due and payable until the date of the award of damages; plus (iv) unamortized portion of any allowances, concessions, rental abatements, brokerage commissions and the like provided to Tenant or paid by Landlord in connection with this Lease; plus (v) such other amounts in addition to or in lieu of the foregoing as may be permitted from time to time by applicable law, including without limitation any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom.  The judgment shall include the amount of rent which would be payable by Tenant under this Lease, however, such amount shall be required to be paid over time: in no instance does Landlord have the right to accelerate rent.

2.   Landlord has the remedy described in California Civil Code Section 1951.4 (a landlord may continue the lease in effect after the tenant's breach and abandonment and recover rent as it becomes due, if the tenant has the right to sublet and assign subject only to reasonable limitations), and may continue this Lease in full force and effect and may enforce all of its rights and remedies under this Lease, including, but not limited to, the right to recover rent as it becomes due. Following surrender of the Premises after Event of Default, Landlord may enter the Premises without terminating this Lease and sublet all or any part of the Premises for Tenant's account to any person, for such term (which may be a period beyond the remaining term of this Lease), at such rents and on such other terms and conditions as Landlord deems advisable. In the event of any such subletting, rents received by Landlord from such subletting shall be applied (i) first, to the payment of the costs of maintaining, preserving, altering and preparing the Premises for subletting, the other costs of subletting, including but not limited to reasonable brokers' commissions, attorneys' fees and expenses of removal of Tenant's personal property, trade fixtures and Alterations; (ii) second, to the payment of rent then due and payable hereunder; (iii) third, the balance, if any, shall be held by Landlord as an additional Security Deposit and applied or returned as provided in Paragraph 6. If the rents received by Landlord from such subletting, after application as provided above, are insufficient in any month to pay the rent due and payable hereunder for such month, Tenant shall pay such deficiency to Landlord monthly upon

17

demand. Notwithstanding any such subletting for Tenant's account without termination, Landlord may at any time thereafter, by written notice to Tenant, elect to terminate this Lease by virtue of a previous Event of Default. During the continuance of an Event of Default, for so long as Landlord does not terminate Tenant's right to possession of the Premises and subject to Paragraph 13 [Assignment and Subletting] and the options granted to Landlord thereunder, Landlord shall not unreasonably withhold its consent to an assignment or sublease of Tenant's interest in the Premises or in this Lease.

        3.    Landlord may require Tenant to remove any and all Alterations from the Premises or, if Tenant fails to do so within ten (10) days after Landlord's request, Landlord may do so at Tenant's expense.

        4.    Landlord may exercise its rights under Paragraph 29 below.

        c.    **Landlord's Default**.  Landlord shall not be in default under this Lease unless it fails to keep and perform any covenant or agreement to be kept and performed by Landlord, and such default continues following thirty (30) days written notice to Landlord and opportunity to cure (as extended for Force Majeure) (a "**Landlord Default**"), provided that if the cure will take longer than thirty (30) days, it shall not be a Landlord Default so long as Landlord commences cure within such 30-day period and diligently pursues same to completion. If Landlord fails to maintain or repair the Building or Real Property under this Lease, and (i) such failure is a Landlord Default, and (ii) the Landlord Default prevents Tenant from using all or any portion of the Premises, then following an additional three (3) business days' written notice to Landlord, Tenant, in addition to all other remedies now or hereafter afforded or provided by this Lease, at law or in equity, has the right to cure such Landlord Default, and any reasonable, actual, out-of-pocket amount or amounts that Tenant advances to cure such Landlord Default by Landlord (the "**Cure Cost**") shall be repaid by Landlord to Tenant within ten (10) business days of demand, accompanied by reasonable evidence of payment, together with interest from the date due until repayment thereof.  Following a Landlord Default, Tenant may deposit its next payment of Base Rent due under this Lease into an escrow account with a reputable third party escrow company with instructions to (i) pay such sums to Landlord when Landlord has cured the Landlord Default (e.g., maintained or repaired the Building or Real Property as required under this Lease) or (ii) if Tenant effects the cure as provided above, and Landlord does not reimburse Tenant as required above, to return to Tenant an amount required to compensate Tenant for the costs so incurred.  At such time as (i) or (ii) have occurred, the escrow (or remaining balance) shall be released to Landlord (and Tenant shall be liable for any amounts owed but not delivered to Landlord by the escrow company).  Notwithstanding anything in this Lease to the contrary, however, in no event shall the amount deposited into the escrow or the cost of the repair(s) effected by Tenant in any 12-month period exceed one (1) month's Base Rent.  Where Tenant effects the repair, Tenant shall be paid interest at the Interest Rate from the date of its demand for payment (accompanied by receipts and other evidence of payment) until payment is made by Landlord or from the escrow.

In the event of emergency (e.g. a condition that threatens imminent, substantial harm to person or property), where Tenant cannot reach Landlord notwithstanding commercially reasonable efforts, if may effect a cure under this Paragraph 25.c. without advance notice to Landlord, but shall advise Landlord as soon as possible.

      26.    **Damage or Destruction**.  If all or any part of the Premises or any material portion of the balance of the Real Property is damaged by fire or other casualty, and the damage can, in Landlord's reasonable opinion, be repaired within two hundred forty (240) days of the damage, then Landlord shall repair the damage and this Lease shall remain in full force and effect. Following a casualty even, Landlord may terminate this Lease on thirty (30) days' notice to Tenant only if: (i) Landlord's mortgagee retains insurance proceeds or Landlord is otherwise not provided with sufficient insurance proceeds to restore the Building or Premises; or (ii) a substantial part of the Building is destroyed and Landlord determines not to redevelop the Building in a manner similar to that currently existing; provided that where Landlord redevelops the Building as an office building, and such redevelopment is completed within eighteen (18) months following the date of the casualty, Tenant shall have the right to lease office space of approximately the same size as the Premises at the same rental rate, for the same term, and otherwise on the same terms and conditions as are contained in this Lease, which right shall be exercised by Tenant (if at all) within fifteen (15) days of Landlord's written request that Tenant so elect (which written request from Landlord shall contain basic information about the replacement premises, including the location of the replacement premises, anticipated delivery date, etc.).  Where the Premises are not repaired within twelve (12) months following the date of the casualty, as extended for Force Majeure (the "**Repair Deadline**"), Tenant may terminate this Lease on written notice to Landlord delivered within ten (10) days following the Repair Deadline, time being of the essence.

If the fire or other casualty damages the Premises or the common areas of the Real Property necessary for Tenant's use and occupancy of the Premises, Tenant ceases to use any portion of the Premises as a result of such damage, and the damage does not result from the negligence or willful misconduct of Tenant or any other Tenant Parties, then during the period the Premises or portion thereof are rendered unusable by such damage and repair, Tenant's Base Rent and Additional Rent under Paragraphs 5 and 7 above shall be proportionately reduced based upon the extent to which the damage and repair prevents Tenant from conducting, and Tenant does not conduct, its business at the Premises. Landlord shall not be obligated to repair or replace any of Tenant's movable furniture, equipment, trade fixtures, and other personal property, nor any Alterations installed in the Premises by Tenant, and no damage to any of the foregoing shall entitle Tenant to any abatement, and Tenant shall, at Tenant's sole cost and expense, repair and replace such items. All such repair and replacement of Alterations shall be constructed in accordance with Paragraph 9 above regarding Alterations.

A total destruction of the Building shall automatically terminate this Lease. In no event shall Tenant be entitled to any compensation or damages from Landlord for loss of use of the whole or any part of the Premises or for any inconvenience occasioned by any such destruction, rebuilding or restoration of the Premises or access thereto, except for the rent abatement expressly provided above. Tenant hereby waives California Civil Code Sections 1932(2) and 1933(4), providing for termination of hiring upon destruction of the thing hired and Sections 1941 and 1942, providing for repairs to and of premises.

27. **Eminent Domain**.

a. If fifty percent (50%) or more of the Premises is taken by any public or quasi-public authority under the power of eminent domain, or any agreement in lieu thereof for a period of three (3) months or longer (a "**taking**"), this Lease shall terminate at the option of either party. If less than 50% of the Premises is taken, Tenant may terminate this Lease upon written notice to Landlord within ninety (90) days after the taking; provided, however, that Tenant's right to terminate this Lease is conditioned upon the remaining portion of the Premises being of such size or configuration that such remaining portion of the Premises is unusable or uneconomical for Tenant's business. Landlord shall be entitled to all compensation, damages, income, rent awards and interest thereon whatsoever which may be paid or made in connection with any taking and Tenant shall have no claim against Landlord or any governmental authority for the value of any unexpired term of this Lease or of any of the improvements or Alterations in the Premises; provided, however, that the foregoing shall not prohibit Tenant from prosecuting a separate claim against the taking authority for an amount separately designated for Tenant's relocation expenses or the interruption of or damage to Tenant's business or as compensation for Tenant's personal property, trade fixtures, Alterations or other improvements paid for by Tenant so long as any award to Tenant will not reduce the award to Landlord.

In the event of a partial taking of the Premises which does not result in a termination of this Lease, the Base Rent and Additional Rent under Paragraphs 5 and 7 hereunder shall be equitably reduced.

b. Notwithstanding the foregoing, if all or any portion of the Premises is taken for a period of time of one (1) year or less ending prior to the end of the term of this Lease, this Lease shall remain in full force and effect and Tenant shall continue to pay all rent and to perform all of its obligations under this Lease; provided, however, that Tenant shall be entitled to all compensation, damages, income, rent awards and interest thereon that is paid or made in connection with such temporary taking of the Premises (or portion thereof), except that any such compensation in excess of the rent or other amounts payable to Landlord hereunder shall be promptly paid over to Landlord as received. Landlord and Tenant each hereby waive the provisions of California Code of Civil Procedure Section 1265.130 and any other applicable existing or future Legal Requirement providing for, or allowing either party to petition the courts of the state in which the Real Property is located for, a termination of this Lease upon a partial taking of the Premises and/or the Project.

28. **Landlord's Liability; Sale of Project**. The term "**Landlord**," as used in this Lease, shall mean only the owner or owners of the Real Property at the time in question. Notwithstanding any other provision of this Lease, the liability of Landlord for its obligations under this Lease is limited solely to Landlord's interest in the Real Property as the same may from time to time be encumbered. No personal liability shall at any time be asserted or enforceable against any other assets of Landlord or against the constituent shareholders, partners, members, or other owners of Landlord, or the directors, officers, employees and agents of Landlord or such constituent shareholder, partner, member or other owner, on account of any of Landlord's obligations or actions under this Lease. In addition, in the event of any conveyance of title to the Real Property, then the grantor or transferor shall be relieved of all liability with

respect to Landlord's obligations to be performed under this Lease after the date of such conveyance. Upon any conveyance of title to the Real Property, the grantee or transferee shall be deemed to have assumed Landlord's obligations to be performed under this Lease from and after the date of such conveyance, subject to the limitations on liability set forth above in this Paragraph 28. If Tenant provides Landlord with any security for Tenant's performance of its obligations hereunder, Landlord shall transfer such security to the grantee or transferee of Landlord's interest in the Real Property, and upon completion of such transfer Landlord shall be released from any further responsibility or liability for such security. Neither party shall be liable for any consequential damages or interruption or loss of business, income or profits, or claims of constructive eviction, nor shall Landlord be liable for loss of or damage to artwork, currency, jewelry, bullion, unique or valuable documents, securities or other valuables, or for other property not in the nature of ordinary fixtures, furnishings and equipment used in general administrative and executive office activities and functions (collectively, "Special Claims").

29.      Right of Landlord to Perform.  If Tenant fails to make any payment required hereunder (other than Base Rent and Additional Rent) or fails to perform any other of its obligations hereunder, Landlord may, but shall not be obliged to, and without waiving any default of Tenant or releasing Tenant from any obligations to Landlord hereunder, make any such payment or perform any other such obligation on Tenant's behalf. All sums so paid by Landlord and all necessary incidental costs in connection with the performance by Landlord of an obligation of Tenant (together with interest thereon from the date of such payment by Landlord until paid at the Interest Rate) shall be payable by Tenant to Landlord upon demand, and Tenant's failure to make such payment upon demand shall entitle Landlord to the same rights and remedies provided Landlord in the event of non-payment of rent.  Landlord's exercise of its rights under this Paragraph 29 shall not waive or cure any Event of Default.

30.      Attorneys' Fees; Waiver of Jury Trial.  In the event of any action or proceeding between Landlord and Tenant (including an action or proceeding between Landlord and the trustee or debtor in possession while Tenant is a debtor in a proceeding under any bankruptcy law) to enforce any provision of this Lease, the losing party shall pay to the prevailing party all costs and expenses, including, without limitation, reasonable attorneys' fees and expenses, incurred in such action and in any appeal in connection therewith by such prevailing party. The "prevailing party" will be determined by the court before whom the action was brought based upon an assessment of which party's major arguments or positions taken in the suit or proceeding could fairly be said to have prevailed over the other party's major arguments or positions on major disputed issues in the court's decision. Notwithstanding the foregoing, however, Landlord shall be deemed the prevailing party in any unlawful detainer or other action or proceeding instituted by Landlord based upon any default or alleged default of Tenant hereunder if (i) judgment is entered in favor of Landlord.

IF ANY ACTION OR PROCEEDING BETWEEN LANDLORD AND TENANT TO ENFORCE THE PROVISIONS OF THIS LEASE (INCLUDING AN ACTION OR PROCEEDING BETWEEN LANDLORD AND THE TRUSTEE OR DEBTOR IN POSSESSION WHILE TENANT IS A DEBTOR IN A PROCEEDING UNDER ANY BANKRUPTCY LAW) PROCEEDS TO TRIAL, LANDLORD AND TENANT HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY IN SUCH TRIAL. Landlord and Tenant agree that this paragraph constitutes a written consent to waiver of trial by jury within the meaning of California Code of Civil Procedure Section 631(a)(2), and Tenant does hereby authorize and empower Landlord to file this paragraph and/or this Lease, as required, with the clerk or judge of any court of competent jurisdiction as a written consent to waiver of jury trial.

31.      Waiver.  No provisions of this Lease shall be deemed waived by either party unless such waiver is in a writing signed by the waiving party. The waiver of any breach of any provision of this Lease shall not be deemed a waiver of any subsequent breach of the same or any other provision of this Lease. No delay or omission in the exercise of any right or remedy upon any default shall impair such right or remedy or be construed as a waiver. Landlord's acceptance of any payments of rent due under this Lease shall not be deemed a waiver of any default by Tenant under this Lease (including Tenant's recurrent failure to timely pay rent) other than Tenant's nonpayment of the accepted sums, and no endorsement or statement on any check or accompanying any check or payment shall be deemed an accord and satisfaction, consent to or approval of any act by Tenant requiring Landlord's consent or approval shall not be deemed to waive or render unnecessary Landlord's consent to or approval of any subsequent act by Tenant.

32.      Notices.  All notices and demands which may or are required to be given by either party to the other hereunder shall be in writing. All notices and demands by Landlord to Tenant shall be delivered personally or sent by United States certified mail, postage prepaid, or by any reputable overnight or same-day courier, addressed to Tenant at Jo-Ann Stores, LCC #4300, Attn: Creativebug General Manager, 5555 Darrow Rd., Hudson, Ohio 44236 with a

copy to Attn: Legal Counsel at the same address or to such other place as Tenant may from time to time designate by notice to Landlord hereunder.  All notices and demands by Tenant to Landlord shall be delivered personally or sent by United States certified mail, postage prepaid, or by any reputable overnight or same-day courier, addressed to Landlord as follows:

> Parker Associates
> 2560 Ninth Street, Suite 117
> Berkeley, CA 94710
> Attention:  Shauna Roberts and Elena Holsman

Notices delivered personally or sent same-day courier will be effective immediately upon delivery to the addressee at the designated address; notices sent by overnight courier will be effective one (1) business day after acceptance by the service for delivery; notices sent by mail will be effective three (3) business days after mailing. In the event Tenant requests multiple notices hereunder, Tenant will be bound by such notice from the earlier of the effective times of the multiple notices.

33.    Intentionally Omitted.

34.    Defined Terms and Marginal Headings.  Words used in this Lease, regardless of the number and gender specifically used, shall be deemed and construed to include any other number, singular or plural, and any other gender (masculine, feminine, neuter or other gender), as the context requires. The headings and titles to the paragraphs of this Lease are for convenience only and are not to be used to interpret or construe this Lease. Wherever the term "including" or "includes" is used in this Lease it shall be construed as if followed by the phrase "without limitation." The language in all parts of this Lease shall in all cases be construed as a whole and in accordance with its fair meaning and not construed for or against any party simply because one party was the drafter thereof.

35.    Time and Applicable Law.  Time is of the essence of this Lease and of each and all of its provisions. This Lease shall be governed by and construed in accordance with the laws of the State of California, and the venue of any action or proceeding under this Lease shall be the City of Berkeley and County of Alameda, California.

36.    Successors.  Subject to the provisions of Paragraphs 13 and 28 above, the covenants and conditions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors, executors, administrators and assigns.

37.    Entire Agreement; Modifications; Electronic Signature.  This Lease (including any exhibit, rider or attachment hereto) constitutes the entire agreement between Landlord and Tenant with respect to Tenant's lease of the Premises. No provision of this Lease may be amended or otherwise modified except by an agreement in writing signed by the parties hereto. Neither Landlord nor Landlord's agents have made any representations or warranties with respect to the Premises, the Project, the Real Property or this Lease except as expressly set forth herein, including without limitation any representations or warranties as to the suitability or fitness of the Premises for the conduct of Tenant's business or for any other purpose, nor has Landlord or its agents agreed to undertake any alterations or construct any improvements to the Premises except those, if any, expressly provided in this Lease, and no rights, easements or licenses shall be acquired by Tenant by implication or otherwise unless expressly set forth herein.

This Lease may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, California's Uniform Electronic Transactions Act (Cal. Civ. Code § 1633.1, et seq.) or other applicable law) or other transmission method, and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes. The parties will rely on any electronic signature provided in connection with this Lease as valid and effective for all purposes in performing services pursuant to this Lease.

38.    Light and Air.  Tenant agrees that no diminution of light, air or view by any structure which may hereafter be erected (whether or not by Landlord) shall entitle Tenant to any reduction of rent hereunder, result in any liability of Landlord to Tenant, or in any other way affect this Lease.

39.     Name of Project.  Tenant shall not use the name of the Project for any purpose other than as the address of the business conducted by Tenant in the Premises without the written consent of Landlord.  Landlord reserves the right to change the name of the Project at any time in its sole discretion by written notice to Tenant and Landlord shall not be liable to Tenant for any loss, cost or expense on account of any such change of name.

40.     Severability.  If any provision of this Lease or the application thereof to any person or circumstance shall be invalid or unenforceable to any extent, the remainder of this Lease and the application of such provisions to other persons or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

41.     Authority.  If Landlord or Tenant is a corporation, partnership, trust, association or other entity, Landlord and Tenant and each person executing this Lease on behalf of Landlord and Tenant respectively, hereby covenants and warrants that (a) it is duly incorporated or otherwise established or formed and validly existing under the laws of its state of incorporation, establishment or formation, (b) it is duly qualified to do business in the state in which the Real Property is located, (c) it has full corporate, partnership, trust, association or other appropriate power and authority to enter into this Lease and to perform all obligations hereunder to be performed by it, and (d) each person (and all of the persons if more than one signs) signing this Lease is duly and validly authorized to do so.

42.     No Offer.  Submission of this instrument for examination and signature by Tenant does not constitute an offer to lease or a reservation of or option for lease, and is not effective as a lease or otherwise until execution and delivery by both Landlord and Tenant.

43.     Real Estate Brokers.  Each party represents and warrants that it has negotiated this Lease directly with the real estate broker(s) identified in Paragraph 2.h. and has not authorized or employed, or acted by implication to authorize or to employ, any other real estate broker or salesman to act for or in connection with this Lease.  Each party shall indemnify, defend and hold the other harmless from and against any and all Claims by any real estate broker or salesman other than the real estate broker(s) identified in Paragraph 2.h. for a commission, finder's fee or other compensation as a result of Tenant's entering into this Lease. Landlord agrees to pay the real estate broker(s) identified in Paragraph 2.h. pursuant to a separate agreement.

44.     Consents and Approvals.  Wherever the consent, approval, judgment or determination of Landlord is required or permitted under this Lease, Landlord may exercise its sole discretion in granting or withholding such consent or approval or in making such judgment or determination without reference to any extrinsic standard of reasonableness, unless the provision providing for such consent, approval, judgment or determination specifies that Landlord's consent or approval is not to be unreasonably withheld, or that the standard for such consent, approval, judgment or determination is to be reasonable, or otherwise specifies the standards under which Landlord may withhold its consent.  If it is determined that Landlord failed to give its consent or approval where it was required to do so under this Lease, Tenant's sole remedy will be an order of specific performance or mandatory injunction of the Landlord's agreement to give its consent or approval. The review and/or approval by Landlord of any item shall not impose upon Landlord any liability for accuracy or sufficiency of any such item or the quality or suitability of such item for its intended use. Any such review or approval is for the sole purpose of protecting Landlord's interest in the Real Property, and neither Tenant nor any Tenant Party nor any person or entity claiming by, through or under Tenant, nor any other third party shall have any rights hereunder by virtue of such review and/or approval by Landlord.

45.     Reserved Rights.  Landlord retains and shall have the rights set forth in subsection (a), (b), and (c), exercisable without notice and without liability to Tenant for damage or injury to property, person or business and without effecting an eviction, constructive or actual, or disturbance of Tenant's use or possession of the Premises or giving rise to any claim for rent abatement:

a.     To grant to anyone the exclusive right to conduct any business or render any service in or to the Project and its tenants, provided that such exclusive right shall not operate to require Tenant to use or patronize such business or service or to exclude Tenant from its use of the Premises expressly permitted herein.

b.     To perform, or cause or permit to be performed, at any time and from time to time, including during Business Hours, construction in the common areas and facilities or other leased areas in the Real Property.

c.    To reduce, increase, enclose or otherwise change at any time and from time to time the size, number, location, lay-out and nature of the common areas and facilities and other tenancies and premises in the Real Property and to create additional rentable areas through use or enclosure of common areas.

46.    Estoppel Certificates.

a.    At any time and from time to time, upon not less than twenty (20) days' prior notice from Landlord, Tenant shall execute, acknowledge and deliver to Landlord a statement certifying the commencement date of this Lease, stating that this Lease is unmodified and in full force and effect (or if there have been modifications, that this Lease is in full force and effect as modified and the date and nature of each such modification), that to Tenant's actual knowledge Landlord is not in default under this Lease (or, if Landlord is in default, specifying the nature of such default), that to Tenant's actual knowledge Tenant is not in default under this Lease (or, if Tenant is in default, specifying the nature of such default), the current amounts of and the dates to which the Base Rent and Additional Rent have been paid, and setting forth such other matters as may be reasonably requested by Landlord in the form as provided for in Exhibit F. Any such statement may be relied upon by a prospective purchaser of the Real Property or by a lender obtaining a lien on the Real Property as security. Tenant acknowledges and agrees that its failure to execute such certificate may cause Landlord serious financial damage by causing the failure of a sale or financing transaction and giving Landlord all of its rights and remedies under Paragraph 25 above, including its right to damages caused by the loss of such sale or financing.

47.    Nondisclosure of Lease Terms.  The parties agree that the terms of this Lease are confidential, and that disclosure of the terms hereof could adversely affect the other party. Landlord and Tenant hereby agree that Landlord and Tenant and its partners, officers, directors, employees, agents, real estate brokers and sales persons and attorneys respectively shall not disclose the terms of this Lease to any other person without the prior written consent, except to any attorneys, accountants in connection with the preparation of financial statements or tax returns, to an assignee of this Lease or sublessee of the Premises, or to an entity or person to whom disclosure is required by applicable law or in connection with any action brought to enforce this Lease.

48.    Hazardous Substance Disclosure.  California law requires landlords to disclose to tenants the existence of certain hazardous substances. Accordingly, the existence of gasoline and other automotive fluids, maintenance fluids, copying fluids and other office supplies and equipment, certain construction and finish materials, tobacco smoke, cosmetics and other personal items, and asbestos-containing materials ("ACM") must be disclosed. Gasoline and other automotive fluids are found in the parking area of the Project. Cleaning, lubricating and hydraulic fluids used in the operation and maintenance of the Project are found in the utility areas of the Project not generally accessible to Building occupants or the public. Many occupants use copy machines and printers with associated fluids and toners, and pens, markers, inks, and office equipment that may contain hazardous substances. Certain adhesives, paints and other construction materials and finishes used in portions of the Project may contain hazardous substances. Although smoking is prohibited in the public areas of the Project, these areas may, from time to time, be exposed to tobacco smoke. Project occupants and other persons entering the Project from time to time may use or carry prescription and non-prescription drugs, perfumes, cosmetics and other toiletries, and foods and beverages, some of which may contain hazardous substances. Landlord has made no special investigation of the Premises with respect to any hazardous substances. Landlord hereby discloses to Tenant that the Building contains ACM and lead based paints and Tenant acknowledges such disclosure.  Attached hereto as Exhibit B is an Asbestos Disclosure Statement describing such matters as the location of ACM in the Building.  Tenant acknowledges that such Asbestos Disclosure Statement complies with the requirements of California Health & Safety Code §§ 25915 et seq.  Landlord has no actual knowledge of any ACM in the Building.

49.    No Discrimination.  The parties covenant by and for itself and its successors, heirs, personal representatives and assigns and all persons claiming under or through it that there shall be no discrimination against or segregation of any person or of a group of persons on account of race, color, religion, creed, sex, sexual orientation or national origin in the leasing, subleasing, transferring, use, occupancy, tenure or enjoyment of the Premises nor shall Landlord or Tenant or any person claiming under or through it establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy of tenants, lessees, sublessees, subtenants or assignees of the Premises.

50.    Signage.  Landlord, at Tenant's expense, shall install a sign identifying Tenant's business at the entrance to the Premises in accordance with the Building's standard signage criteria.

51.    CASp Disclosure; OFAC.

a.    CASP. This disclosure is made pursuant to Section 1938 of the California Civil Code. As of the date of this Lease, the Premises and the common areas expected to be in Tenant's path of travel during the Lease term, have not undergone an inspection by a Certified Access Specialist (CASp) regarding compliance with construction-related accessibility standards. A CASp can inspect the subject premises and determine whether the subject premises comply with all of the applicable construction-related accessibility standards under state law. Although state law does not require a CASp inspection of the subject premises, the commercial property owner or lessor may not prohibit the lessee or tenant from obtaining a CASp inspection of the subject premises for the occupancy or potential occupancy of the lessee or tenant, if requested by the lessee or tenant. The parties shall mutually agree on the arrangements for the time and manner of the CASp inspection, the payment of the fee for the CASp inspection, and the cost of making any repairs necessary to correct violations of construction-related accessibility standards within the premises. For avoidance of doubt, in no event shall Landlord be required to make any repairs or modifications unless required by Legal Requirements, and in all events subject to Paragraph 9.f. above; Tenant shall be required to comply with Paragraph 8.c. at its sole cost.

b.    OFAC. Each of Landlord and Tenant hereby represents and warrants to the other party that, to the representing party's knowledge, as of the date of this Lease, neither the representing party nor any individual, entity, or organization holding any (or, if a publicly traded entity, a significant) ownership or controlling interest in the representing party, nor any officer or director of such entity, is an individual, entity, or organization with whom any United States law, regulation, or executive order prohibits U.S. companies and individuals from dealing, including, without limitation, names appearing on the U.S. Department of Treasury's Office of Foreign Assets Control's Specially Designated Nationals and Blocked Persons List. If the foregoing representation by a representing party is presently or later becomes untrue, the representing party shall be in material breach of this Lease and the other party shall have the remedies provided to such party under this Lease for a material breach. Further, the parties shall indemnify and hold harmless the other from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, attorneys' fees and costs) incurred by the indemnified party arising from or relating to breach of the foregoing representation, which indemnity obligation shall survive the expiration or earlier termination of this Lease.

52.    Unavoidable Delay. Any obligation of either party hereunder that is delayed or not performed due to Force Majeure shall not constitute a default hereunder and shall be performed within a reasonable time after the end of such cause for delay or nonperformance; provided, however, an event of Force Majeure shall not relieve Tenant of its obligation to make timely payments of rent or other amounts due and payable under this Lease. As used herein, Force Majeure means the occurrence of any event (other than financial inability) outside a party's reasonable control that actually delays, interrupts or prevents Landlord or Tenant from performing any of its obligations under this Lease, and such delay, interruption or prevention is due to fire, casualty, act of God, governmental act, action or inaction (including, without limitation, government delays in issuing any required building, construction, occupancy or other permit, certificate or approval or performing any inspection or review in connection therewith), act(s) of war, terror or terrorism, strike, labor dispute or disruptions, disruptions in the supply chain or other inability to procure materials or labor, actual or threatened health emergency (including without limitation, epidemic, pandemic, famine, disease, plague, and quarantine), or any other cause beyond such party's reasonable control (whether similar or dissimilar) (each "**Force Majeure**"). Tenant waives any rights it may have under Section 1511 of the Civil Code of California. Upon the occurrence of a Force Majeure, the party affected thereby must promptly notify the other of the nature of the event and the anticipated delay caused by such event.

[SIGNATURE PAGE TO FOLLOW]

THIS LEASE IS EXECUTED by Landlord and Tenant as of the Effective Date.

**LANDLORD:**

PARKER ASSOCIATES, a California limited partnership

By:

Name: Elena Holsman

Title: General Partner

Date: 7/20/21

**TENANT:**

Jo-Ann Stores, LLC, an Ohio limited liability company, the parent entity of Creativebug, LLC

By:

Name: Matt Susz

Title: Senior Vice President and Chief Financial Officer

Date: 7/28/21

By:

Name: Ann Aber

Title: Senior Vice President, Secretary & General Counsel

Date: 7-28-21

## EXHIBIT A

### Outline of Premises





EXHIBIT B AND FLOORPLAN FOR

EXHIBIT C

SPACE 316

MEZZANINE

SCALE 1/8" = 1'
FIELD VERIFY ALL MEASUREMENTS

EXHIBIT A

#4300 Berkeley, CA



~~EXHIBIT B~~

THE PREMISES



EXHIBIT A

## EXHIBIT B

### Asbestos Disclosure Statement

#### ASBESTOS DISCLOSURE STATEMENT AND PROPOSITION 65 WARNING

CALIFORNIA LAW REQUIRES LANDLORDS AND TENANTS OF COMMERCIAL BUILDINGS CONSTRUCTED PRIOR TO 1979 TO NOTIFY CERTAIN PEOPLE, INCLUDING EACH OTHER AND THEIR RESPECTIVE EMPLOYEES WORKING WITHIN SUCH BUILDING, OF ANY KNOWLEDGE THEY MAY HAVE REGARDING ANY ASBESTOS-CONTAINING MATERIALS ("ACM") IN SUCH BUILDING.

California law also requires persons in the course of doing business where activities may result in exposure to asbestos and other substances regulated under the Safe Drinking Water and Toxic Enforcement Act of 1986, commonly referred to as Proposition 65, to be provided a clear and reasonable warning.

WARNING:  Areas of the Building contain a substance known to the State of California to cause cancer, or reproductive toxicity.

We have no reason to believe that ACM in the Building is currently in a condition to release asbestos fibers that would pose a significant health hazard to the Building's occupants.  You should take into consideration that our knowledge as to the absence of health risks is based solely upon general information, and that we have no special knowledge concerning potential health risks resulting from exposure to asbestos in the Building.  We encourage you to contact local or state public agencies if you wish to obtain a better understanding of the potential impacts resulting from exposure to asbestos.

Because any tenant alterations or other work at the Building could disturb ACM and possibly release asbestos fibers in the air, we must require that you obtain our written approval prior to beginning such projects.  This includes major alterations, but might also include such activities as drilling or boring holes, installing electrical, telecommunications or computer lines, sanding floors, removing ceiling tiles or other work which disturbs ACM.  In many cases, such activities will not affect ACM, but nevertheless you must notify and check with the Landlord, in advance, because any release of ACM due to any of these activities may present a health risk.

Exhibit B

## EXHIBIT C

## RULES AND REGULATIONS

1.      No sign, placard, picture, advertisement, name or notice shall be inscribed, displayed or printed or affixed on or to any part of the outside or inside of the Project or any part of the Premises visible from the exterior of the Premises without the prior written consent of Landlord, which consent may be withheld in Landlord's sole discretion. Landlord shall have the right to remove, at Tenant's expense and without notice to Tenant, any such sign, placard, picture, advertisement, name or notice that has not been approved by Landlord.  All approved signs or lettering on doors and walls shall be printed, painted, affixed or inscribed at the expense of Tenant by a person approved of by Landlord.

If Landlord notifies Tenant in writing that Landlord objects to any curtains, blinds, shades or screens attached to or hung in or used in connection with any window or door of the Premises, such use of such curtains, blinds, shades or screens shall be removed immediately by Tenant. No awning shall be permitted on any part of the Premises.

2.      Any Building directory will be provided exclusively for the display of the name and location of tenants only and Landlord reserves the right to exclude any other names therefrom.

3.      The sidewalks, halls, passages, exits, entrances, elevators and stairways shall not be obstructed by any of the Tenant Parties or used by Tenant for any purpose other than for ingress to and egress from its Premises. All doors opening to public corridors shall be kept closed at all times except for normal ingress and egress to the Premises.  The halls, passages, exits, entrances, elevators, stairways, balconies and roof are not for the use of the general public and Landlord shall in all cases retain the right to control and prevent access thereto by all persons whose presence in the judgment of Landlord shall be prejudicial to the safety, character, reputation and interests of the Building and its tenants. No tenant and no employees or invitees of any tenant shall go upon the roof of the Building.

4.      Tenant shall not alter any lock or install any new or additional locks or any bolts on any interior or exterior door of the Premises without the prior written consent of Landlord.  Landlord reserves the right to close and keep locked all entrance and exit doors of the Building during such hours as are customary for comparable buildings.

5.      The toilet rooms, toilets, urinals, wash bowls and other apparatus shall not be used for any purpose other than that for which they were constructed and no foreign substance of any kind whatsoever shall be thrown therein and the expense of any breakage, stoppage or damage resulting from the violation of this rule shall be borne by the tenant who, or whose employees or invitees, shall have caused it.

6.      Tenant shall not overload the floor of the Premises or mark, drive nails, screw or drill into the partitions, woodwork or plaster or in any way deface the Premises or any part thereof.  Natural wood may not be painted without Landlord's prior written consent.

7.      No furniture, freight or equipment of any kind shall be brought into the Building without the consent of Landlord and all moving of the same into or out of the Building shall be done at such time and in such manner as Landlord shall designate. Landlord shall have the right to prescribe the weight, size and position of all safes and other heavy equipment brought into the Building and also the times and manner of moving the same in and out of the Building. Safes or other heavy objects shall, if considered necessary by Landlord, stand on a platform of such thickness as is necessary to properly distribute the weight. Landlord will not be responsible for loss of or damage to any such safe or property from any cause, and all damage done to the Building by moving or maintaining any such safe or other property shall be repaired at the expense of Tenant. The elevator designated for freight by Landlord shall be available for use by all tenants in the Building during the hours and pursuant to such procedures as Landlord may determine from time to time. The persons employed to move Tenant's equipment, material, furniture or other property in or out of the Building must be acceptable to Landlord. The moving company must be a locally recognized professional mover, whose primary business is the performing of relocation services, and must be bonded and fully insured. In no event shall Tenant employ any person or company whose presence may give rise to a labor or other disturbance in the Real Property. A certificate or other verification of such insurance must be received and approved by Landlord prior to the start of any moving operations. Insurance must be sufficient in Landlord's sole opinion, to cover all personal liability, theft or damage to the Real Property, including, but not limited to, floor coverings, doors,

EXHIBIT C

#4300 Berkeley, CA
4849-5544-2672, v. 8

walls, elevators, stairs, foliage and landscaping. Special care must be taken to prevent damage to foliage and landscaping during adverse weather. All moving operations shall be conducted at such times and in such a manner as Landlord shall direct, and all moving shall take place during non-business hours unless Landlord agrees in writing otherwise.

8.      Tenant shall not employ any person or persons other than the janitor of Landlord for the purpose of cleaning the Premises, unless otherwise agreed to by Landlord. Except with the written consent of Landlord, no person or persons other than those approved by Landlord shall be permitted to enter the Building for the purpose of cleaning the Building or the Premises. Tenant shall not cause any unnecessary labor by reason of Tenant's carelessness or indifference in the preservation of good order and cleanliness.

9.      Tenant shall not use, keep or permit to be used or kept any foul or noxious gas or substance in the Premises, or permit or suffer the Premises to be occupied or used in a manner offensive or objectionable to Landlord or other occupants of the Building by reason of noise, odors and/or vibrations, or interfere in any way with other tenants or those having business therein, nor shall any animals or birds be brought in or kept in or about the Premises or the Building. In no event shall Tenant keep, use, or permit to be used in the Premises or the Building any guns, firearm, explosive devices or ammunition.

10.     No cooking shall be done or permitted by Tenant in the Premises, nor shall the Premises be used for the storage of merchandise, for washing clothes, for lodging, or for any improper, objectionable or immoral purposes. Notwithstanding the foregoing, however, Tenant may maintain and use microwave ovens and equipment for brewing coffee, tea, hot chocolate and similar beverages, provided that Tenant shall (i) prevent the emission of any food or cooking odor from leaving the Premises, (ii) be solely responsible for cleaning the areas where such equipment is located and removing food-related waste from the Premises and the Building, or shall pay Landlord's standard rate for such service as an addition to cleaning services ordinarily provided, (iii) maintain and use such areas solely for Tenant's employees and business invitees, not as public facilities, and (iv) keep the Premises free of vermin and other pest infestation and shall exterminate, as needed, in a manner and through contractors reasonably approved by Landlord, preventing any emission of odors, due to extermination, from leaving the Premises. Notwithstanding clause (ii) above, Landlord shall, without special charge, empty and remove the contents of one (1) 15-gallon (or smaller) waste container from the food preparation area so long as such container is fully lined with, and the contents can be removed in, a waterproof plastic liner or bag, supplied by Tenant, which will prevent any leakage of food related waste or odors; provided, however, that if at any time Landlord must pay a premium or special charge to Landlord's cleaning or scavenger contractors for the handling of food-related or so-called "wet" refuse, Landlord's obligation to provide such removal, without special charge, shall cease.

11.     Tenant shall not use or keep in the Premises or the Building any kerosene, gasoline, or inflammable or combustible fluid or material, or use any method of heating or air conditioning other than that supplied by Landlord.

12.     Landlord will direct electricians as to where and how telephone and telegraph wires are to be introduced into the Premises and the Building. No boring or cutting for wires will be allowed without the prior consent of Landlord. The location of telephones, call boxes and other office equipment affixed to the Premises shall be subject to the prior approval of Landlord.

13.     Upon the expiration or earlier termination of the Lease, Tenant shall deliver to Landlord the keys of offices, rooms and toilet rooms which have been furnished by Landlord to Tenant and any copies of such keys which Tenant has made. In the event Tenant has lost any keys furnished by Landlord, Tenant shall pay Landlord for such keys.

14.     Tenant shall not lay linoleum, tile, carpet or other similar floor covering so that the same shall be affixed to the floor of the Premises, except to the extent and in the manner approved in advance by Landlord. The expense of repairing any damage resulting from a violation of this rule or removal of any floor covering shall be borne by the tenant by whom, or by whose contractors, employees or invitees, the damage shall have been caused.

15.     No furniture, packages, supplies, equipment or merchandise will be received in the Building or carried up or down in the elevators, except between such hours and in such elevators as shall be designated by Landlord.

EXHIBIT C

16.     On Saturdays, Sundays and legal holidays, and on other days between the hours of 6:00 P.M. and 8:00 A.M., access to the Building, or to the halls, corridors, elevators or stairways in the Building, or to the Premises may be refused unless the person seeking access is known to the person or employee of the Building in charge and has a pass or is properly identified. Landlord shall in no case be liable for damages for any error with regard to the admission to or exclusion from the Building of any person. In case of invasion, mob, riot, public excitement, or other commotion, Landlord reserves the right to prevent access to the Building during the continuance of the same by closing the doors or otherwise, for the safety of the tenants and protection of property in the Building.

17.     Tenant shall be responsible for insuring that the doors of the Premises are closed and securely locked before leaving the Building and must observe strict care and caution that all water faucets or water apparatus are entirely shut off before Tenant or Tenant's employees leave the Building, and that all electricity, gas or air shall likewise be carefully shut off, so as to prevent waste or damage, and for any default or carelessness Tenant shall make good all injuries sustained by other tenants or occupants of the Building or Landlord. Landlord shall not be responsible to Tenant for loss of property on the Premises, however occurring, or for any damage to the property of Tenant caused by the employees or independent contractors of Landlord or by any other person.

18.     Landlord reserves the right to exclude or expel from the Building any person who, in the judgment of Landlord, is intoxicated or under the influence of liquor or drugs, or who shall in any manner do any act in violation of any of the rules and regulations of the Building.

19.     The requirements of any tenant will be attended to only upon application at the office of the Building. Employees of Landlord shall not perform any work or do anything outside of their regular duties unless under special instructions from Landlord, and no employee will admit any person (tenant or otherwise) to any office without specific instructions from Landlord.

20.     No vending machine or machines of any description shall be installed, maintained or operated upon the Premises without the prior written consent of Landlord.

21.     Tenant and its principals, managers, employees, visitors, contractors, guests and representatives shall at all times comply with Building rules and Legal Requirements (including CDC recommendations) related to infectious diseases, including wearing face masks, not coming to the Building when ill with symptoms indicative of COVID-19, and frequently washing or disinfecting hands.

22.     Tenant shall not use in any space or in the public halls of the Building, any hand trucks except those equipped with rubber tires and rubber side guards.

23.     Tenant shall inform its employees and invitees of the applicable provisions of these rules and regulations. Tenant must comply with Landlord's requests to inform Tenant's employees of items of importance to the Landlord.

## PARKING AND STORAGE RULES AND REGULATIONS

In addition to the parking provisions contained in the Lease to which this Exhibit C is attached, the following rules and regulations shall apply with respect to the use of the Building's parking facilities:

1)     Every parker is required to park and lock his/her own vehicle. All responsibility for damage to or loss of vehicles is assumed by the parker and Landlord shall not be responsible for any such damage or loss by water, fire, defective brakes, the act or omissions of others, theft, or for any other cause.

2)     Tenant shall not park or permit its employees to park in any parking areas designated by Landlord as areas for parking by visitors to the Project. Tenant shall not park any vehicles in the parking areas other than automobiles, motorcycles, motor driven or non-motor driven bicycles or four wheeled trucks.

3)     Any device or form of identification supplied by Landlord as a condition of use of the parking facilities shall remain the property of Landlord. Such parking identification device must be displayed as requested and may not be mutilated in any manner. The serial number of the parking identification device may not be obliterated. Devices are not transferable and any device in the possession of an unauthorized holder will be void.

ExHIBIT C

4)      No extended term storage of vehicles shall be permitted.

5)      Vehicles must be parked entirely within painted stall lines of a single parking stall.

6)      All directional signs and arrows must be observed.

7)      The speed limit within all parking areas shall be five (5) miles per hour.

8)      Parking is prohibited:  (a) in areas not striped for parking; (b) in aisles; (c) where "no parking" signs are posted; (d) on ramps; (e) in cross-hatched areas; and (f) in reserved spaces and in such other areas as may be designated by Landlord or Landlord's parking operator.

9)      Loss or theft of parking identification devices must be reported to the Management Office immediately, and a lost or stolen report must be filed by the Tenant or user of such parking identification device at the time.  Landlord has the right to exclude any vehicle from the parking facilities that does not have an identification device.

10)     Any parking identification devices reported lost or stolen found on any unauthorized car will be confiscated and the illegal holder will be subject to prosecution.

11)     Washing, waxing, cleaning, vacuuming or servicing of any vehicle in the parking lot or anywhere on the Real Property is prohibited.

12)     Tenant's continued right to park in the parking facilities is conditioned upon Tenant abiding by these rules and regulations and those contained in this Lease.  Further, if the Lease terminates for any reason whatsoever, Tenant's right to park in the parking facilities shall terminate concurrently therewith.

13)     Landlord reserves the right to refuse parking access to any person who refuses to comply with these rules and regulations and all city, state or federal ordinances, laws or agreements.  Any violation of the rules shall subject the vehicle to removal, at such vehicle owner's expense.

14)     In  no event may any items be stored or placed in or about parking spaces other than working passenger vehicles.  All files and other items allowed to be stored in the parking garages and areas shall be contained on the platforms above the parking spaces, in a safe manner, without overhanging.

EXHIBIT C

## EXHIBIT D

### Operating Expenses And Tax Expenses

A.      Operating Expenses.  Tenant shall pay to Landlord, at the times hereinafter set forth, Tenant's Share, as specified in Paragraph 2.e. of the Lease, of any increase in the Operating Expenses (as defined below) incurred by Landlord in each calendar year subsequent to the Base Year specified in Paragraph 2.e. of the Lease, over the Operating Expenses incurred by Landlord during the Base Year.

The term "**Operating Expenses**" shall mean the total costs and expenses incurred by Landlord in connection with the management, operation, maintenance, repair, insurance and ownership of the Real Property, including, without limitation, (1) premiums and other charges incurred by Landlord with respect to fire, other casualty, liability insurance, any other insurance as is deemed necessary or advisable in the reasonable judgment of Landlord, or any insurance required by a holder of any Superior Interest (as defined in Paragraph 21), except inclusion of a deductible amount under the applicable insurance policy, which shall be at Landlord's expense; (2) utilities for Common Areas; (3) license, permit and inspection fees; (4) sales, use and excise taxes on goods and services purchased by Landlord in connection with the Real Property and systems and equipment serving the Premises; (5) management fees and expenses not to exceed six percent (6%) of gross rents for the Building; (6) costs of repairs to and maintenance of the Real Property, including building systems and appurtenances thereto and normal repair and replacement of worn-out equipment, facilities and installations, including parking areas (which shall be amortized over its useful live, in no instance less than seven (7) years; (7) fees and expenses for janitorial, guard, window cleaning, exterior and Common Area painting, extermination, water treatment, plumbing and other services and inspection or service contracts; (8) costs of supplies, tools, materials, and equipment used in connection with the operation, maintenance or repair of the Real Property; and (9) and other items typically included as Operating Expenses for similar projects in the East Bay.

Operating Expenses shall not include the following:  (i) depreciation on the Project or equipment or systems therein; (ii) debt service and interest; (iii) rental under any ground or underlying lease; (iv) Tax Expenses (as defined below); (v) attorneys' fees and expenses incurred in connection with lease negotiations with prospective tenants; (vi) the cost (including any amortization thereof) of any improvements or alterations which would be properly classified as capital expenditures according to generally accepted property management practices (except to the extent expressly included in Operating Expenses pursuant to this Paragraph A); (vii) the cost of decorating, improving for tenant occupancy, painting or redecorating portions of the Project to be demised to tenants; and (viii) real estate broker's or other leasing commissions.

B.      Tax Expenses. Tenant shall pay to Landlord as Additional Rent under this Lease, at the times hereinafter set forth, Tenant's Share, as specified in Paragraph 2.e. of the Lease, of any increase in Tax Expenses (as defined below) incurred by Landlord in each calendar year, over Tax Expenses incurred by Landlord during the Base Year. Notwithstanding the foregoing, if any reassessment, reduction or recalculation of any item included in Tax Expenses during the term results in a reduction of Tax Expenses, then for purposes of calculating Tenant's Share of increases in Tax Expenses from and after the calendar year in which such adjustment occurs, Tax Expenses for the Base Year shall be adjusted to reflect such reduction.

The term "**Tax Expenses**" shall mean all taxes, assessments (whether general or special), excises, transit charges, housing fund assessments or other housing charges, improvement districts, levies or fees, ordinary or extraordinary, unforeseen as well as foreseen, of any kind, which are assessed, levied, charged, confirmed or imposed on the Real Property, on Landlord with respect to the Real Property, on the act of entering into leases of space in the Real Property, on the use or occupancy of the Real Property or any part thereof, with respect to services or utilities consumed in the use, occupancy or operation of the Real Property, on any improvements, fixtures and equipment and other personal property of Landlord located in the Real Property and used in connection with the operation of the Real Property, by the United States of America, the State of California, the City of Berkeley and County of Alameda, any political subdivision, public corporation, district or other political or public entity or public authority, and shall also include any other tax, fee or other excise, however described, which may be levied or assessed in lieu of, as a substitute (in whole or in part) for, or as an addition to, any other Tax Expense. Tax Expenses shall include reasonable attorneys' and professional fees, costs and disbursements incurred in connection with proceedings to contest, determine or reduce Tax Expenses. If it shall not be lawful for Tenant to reimburse Landlord for any Tax Expenses as defined herein, the Base Rent payable to Landlord prior to the imposition of such Tax Expenses shall be increased to net Landlord the same net Base Rent after imposition of such Tax Expenses as would have been received by Landlord prior to the imposition of such Tax Expenses. Tax Expenses will include, without limitation, any increase in Tax Expenses based on or attributable to any "change in ownership" of the Real Property or the Premises

(as "change in ownership" is defined in California Construction Article XIIIA, Section 2 and California Revenue and Taxation Code Section 60 et seq., or any amendments or successor statutes) occurring after the Commencement Date.

Tax Expenses shall not include income, franchise, transfer, inheritance, rent, excise or capital stock taxes.

C.      Adjustment for Occupancy Factor.  Notwithstanding any other provision herein to the contrary, in the event the Project is not fully occupied during any calendar year during the term after the Base Year, an adjustment shall be made by Landlord in computing Operating Expenses for such year so that the Operating Expenses shall be computed for such year as though the Project had been fully occupied during such year. The parties agree that statements in this Lease to the effect that Landlord is to perform certain of its obligations hereunder at its own or sole cost and expense shall not be interpreted as excluding any cost from Operating Expenses or Tax Expenses if such cost is an Operating Expense or Tax Expense pursuant to the terms of this Lease. Landlord shall have the right, from time to time, to equitably allocate and prorate some or all of the Operating Expenses among different tenant groups (such as, without limitation, allocating Operating Expenses associated with the common access corridor, common restrooms or similar to those premises exclusively served thereby).

D.      Notice and Payment.  Where Landlord requires that Tenant pay Operating Expenses for any calendar year, on or before the first day of such applicable calendar year, or as soon as practicable thereafter, Landlord shall give to Tenant notice of Landlord's estimate of the Additional Rent, if any, payable by Tenant pursuant to Paragraphs 7 of the Lease for such calendar year subsequent to the Base Year. On or before the first day of each month during each such subsequent calendar year, Tenant shall pay to Landlord one-twelfth (1/12th) of the estimated Additional Rent; provided, however, that if Landlord's notice is not given prior to the first day of any calendar year Tenant shall continue to pay Additional Rent on the basis of the prior year's estimate until the month after Landlord's notice is given.

E.      Annual Accounting.  Where Landlord requires that Tenant pay Operating Expenses, within one hundred fifty (150) days after the close of each calendar year subsequent to the Base Year, Landlord shall deliver to Tenant a statement of the Additional Rent payable under Paragraph 7 of the Lease for such year. If the annual statement shows that Tenant's payments of Additional Rent for such calendar year exceeded Tenant's obligations for the calendar year, Landlord shall credit the excess to the next succeeding installments of estimated Additional Rent or refund to Tenant within thirty (30) days if there are no future installments of Additional Rent. If the annual statement shows that Tenant's payments of Additional Rent for such calendar year were less than Tenant's obligation for such calendar year, Tenant shall pay the deficiency to Landlord within thirty (30) days after delivery of such statement.

## EXHIBIT E

### Work Letter

This Exhibit E forms a part of the Lease to which it is attached. Terms used but not defined herein shall have the meaning set forth in the Lease.

Promptly following the Effective Date, Landlord, at Landlord's sole cost and expense, except as provided below, shall cause Landlord's designated contractor, which may be an affiliate of Landlord ("**Contractor**"), to construct the following improvements to the Premises (the "**Tenant Improvements**"), using Building standard materials and finishes except where otherwise designated, and in compliance with applicable Legal Requirements:

> Landlord shall repaint the walls throughout the Premises, but excluding the ceiling, with Building standard paint. Landlord shall replace the carpet throughout the Premises, with Building standard carpet. Landlord shall install a doorway in the partition wall between Suites 314 and 316.

a. <u>Construction; Substantial Completion</u>. Landlord shall cause Contractor to commence the construction of the Tenant Improvements as soon as is reasonably possible after the execution and delivery of this Lease by Landlord and Tenant. Landlord and Tenant shall cooperate with each other to resolve any issues raised by applicable local building codes. Tenant shall not interfere with Landlord's completion of Tenant Improvements. The Tenant Improvements shall be deemed to be "**Substantially Completed**" when they have, as acknowledged in writing by the Architect or Contractor, been completed in accordance with this <u>Exhibit E</u>, subject only to correction or completion of "**Punch List**" items, which items shall be limited to minor items of incomplete or defective work or materials or mechanical maladjustments that are of such a nature that they do not materially interfere with or impair Tenant's use of the Premises for Tenant's business. The definition of "Substantially Completed" shall also apply to the terms "Substantial Completion" and "Substantially Complete".

b. <u>Tenant Delays</u>. Tenant shall be responsible for, and shall pay to Landlord, any and all costs and expenses incurred by Landlord in connection with any delay in the commencement or completion of any Tenant Improvements and any increase in the cost of Tenant Improvements caused by (i) any Changes requested by Tenant (including any cost or delay resulting from proposed changes that are not ultimately made), (ii) any failure by Tenant to timely pay any amounts due from Tenant hereunder, including any additional costs resulting from any Changes (it being acknowledged that if Tenant fails to make or otherwise delays making such payments, Landlord may stop work on the Tenant Improvements rather than incur costs which Tenant is obligated to fund but has not yet funded and any delay from such a work stoppage will be a Tenant Delay), (iii) the inclusion in the Tenant Improvements by Tenant of any so called "long lead" materials (such as fabrics, paneling, carpeting or other items that are not readily available within industry standard lead times (e.g., custom made items that require time to procure beyond that customarily required for standard items, or items that are currently out of stock and will require extra time to back order) and for which suitable substitutes exist), (iv) Tenant's failure to respond within three (3) Business Days to reasonable inquiries by Landlord or Contractor regarding the construction of the Tenant Improvements, or (v) any other delay requested or caused solely by Tenant (each, a "**Tenant Delay**"). Where a Tenant Delay delays Substantial Completion, as reasonably determined by Landlord, then the Commencement Date shall be deemed to have occurred on the date that it would have occurred but for the Tenant Delay.

c. <u>Delivery Condition</u>. Landlord shall deliver the Premises free from debris or personal property, broom clean, and with all plumbing, lighting, electrical and HVAC systems working and in good repair; provided that such systems shall be presumed to be in good working condition unless Tenant notifies Landlord otherwise within thirty (30) days following the Commencement Date, in which case Landlord's obligation shall be to repair same, and further provided that Landlord shall not be responsible for any repair, maintenance or replacement necessitated by Tenant's actions or inactions.

## EXHIBIT F

### Form of Estoppel Certificate

Location:

Lessor:

Lessee:                    Jo-Ann Stores, LLC, an Ohio limited liability company,
                           the parent entity of Creativebug, LLC

Lease:                     Lease by and between Lessor and Lessee dated _____ ___, 20__, as modified
                           by     (collectively, the "Lease")

Lessee represents that, as of the date hereof:

1.  The Lease constitutes the entire written agreement between Lessee and Lessor and has not been modified or amended, except as indicated herein.

2.  The Lease is in full force and effect.  The term commenced on _____ and expires on _____.  [Lessee has _____ ( ) 5-year options to renew the term thereof.] [Lessee has one 5-year option to renew remaining.] [Lessee has no options to renew the term of the Lease.]

3.  Lessee has taken possession of the premises demised under the Lease (the "Premises") and is occupying the Premises.

4.  To the undersigned's actual knowledge, without inquiry or investigation, the Lessor is not currently in default under the Lease, except as follows: _____, and Lessee reserves all rights and remedies with regard to the aforementioned issues [.] [; provided, however, that common area, tax and insurance reconciliation(s) have not been received from Lessor for the following years: [Insert Years]].  With regard to any and all common area, tax and insurance expenses, Lessee specifically reserves all rights and remedies with respect to any overpayments which may be discovered after the date of this Estoppel Certificate regardless of the year in which the overpayment occurred, including but not limited to, the right to seek reimbursement or offset for any overpayments. [In addition, Lessee is auditing Lessor's common area, tax and insurance expenses; to date, there have been no findings, but the audit is still open, and Lessee reserves any and all rights and remedies with respect thereto.]

    Furthermore, Lessee has not inspected the physical condition of the Real Property, including the common areas, to verify that Lessor is in compliance with its obligations with respect thereto, and Lessee hereby reserves all rights regarding the same.

5.  The monthly Fixed Minimum Rent payable under the Lease is $[_____] and has not been prepaid by more than one month.  [Lessee is not paying fixed monthly rent.  Rather, Lessee is paying Substitute Rent, as defined in the Lease. The monthly Substitute Rent varies each month according to store sales. Substitute Rent has not been prepaid.]

6.  No security deposit has been made in connection with the Lease.

7.  Lessee does not have any option or preferential right to purchase all or any part of the Real Property.

8. The address for notices to be sent to Lessee is as follows:

>       Jo-Ann Stores, LLC, #4300
>       Attn: Creativebut General Manager
>       5555 Darrow Road
>       Hudson, OH 44236

>       with a copy to:

>       Jo-Ann Stores, LLC, #4300
>       c/o Creativebug
>       Attn:  Legal Counsel
>       5555 Darrow Road
>       Hudson, OH 44236

9. Nothing contained herein shall: (a) amend, modify, waive or rescind any of the terms, conditions, covenants or obligations of the Lease; (b) waive or estop Lessee's right to declare a default based on facts of which Lessee does not have actual knowledge, without inquiry or investigation; (c) waive or estop Lessee's right to claim any offset, claim or counterclaim resulting from an audit of Lessor's business records or public records; (d) waive or estop any claims, defenses, rights or remedies of Lessee; or (e) relieve the Lessor from any of its obligations under the Lease.

10. Lessee's statements exclude certification as to any matter that may be disclosed by audit, inspection, or examination of Lessor's records or public records relating to charges and monetary items under the Lease.

14) If there is any conflict between this certificate and the Lease, the Lease shall control.

12. Lessee acknowledges that you are relying upon this Estoppel Certificate and the accuracy of the information contained herein. Nevertheless, Lessee shall not be liable to any party for damages of any kind whatsoever (whether direct, indirect, special, consequential or any other type) resulting from any statement in this certificate.

13. The undersigned representative of Lessee is duly authorized to execute this instrument on behalf of Lessee.

Dated: _____, 20__

>       **JO-ANN STORES, LLC** THE PARENT ENTITY OF
>       **CREATIVEBUG, LLC**


>       By: _____
>       Ann Aber
>       Senior Vice President,
>       General Counsel & Secretary

EXHIBIT G

#4300 Berkeley, CA

## EXHIBIT G

### Form of Subordination, Non-Disturbance and Attornment Agreement

**When recorded, return to:**

Jo-Ann Stores, LLC
Attn: Wendy Blasick
5555 Darrow Road
Hudson, OH 44236

**This Instrument was prepared by:**

Dana R. Saporito
Jo-Ann Stores, LLC
5555 Darrow Road
Hudson, OH 44236

_____ SPACE ABOVE THIS LINE FOR RECORDER'S USE
### SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

This Subordination, Non-Disturbance and Attornment Agreement (the "Agreement") is made as of _____, 20__, by _____ , in its capacity as administrative agent for the Lenders (defined below) ("Lender"), _____ , a _____ [company/corporation] ("Lessor"), and **JO-ANN STORES, LLC**, AN OHIO LIMITED LIABILITY COMPANY, THE PARENT ENTITY OF **CREATIVEBUG, LLC** ("Lessee").

Reference is made to a loan (the "Loan") made by Lender and other lenders (the "Lenders") to Borrower (as defined in the Mortgage) secured by that certain _____ (the "Mortgage") recorded as Instrument No. ___ , Real Property Records of _____ County, _____ , covering the real property legally described on Exhibit A attached hereto and the buildings and improvements thereon (the "Mortgaged Premises").

Reference is made to a Lease Agreement dated _____ , _____ and all subsequent amendments and modifications by and between Lessee and Lessor (the "Lease") of certain premises (the "Premises") located at _____ [Premises address] and consisting of a part of the Mortgaged Premises.

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and in consideration of the mutual promises contained herein, the parties agree as follows:

Lender consents to the Lease and the provisions thereof.

Subject to the terms hereof, the Lease is and shall be subject and subordinate at all times to the lien of the Mortgage and to all renewals, extensions, refinances, modifications, and increases of the Mortgage ("Amendments") to the full extent of all amounts secured thereby and interest thereon, provided that such Amendments do not expand Lessee's obligations or limit Lessee's rights under the Lease (except as agreed to in this Agreement).

If the holder of the Mortgage, or any person claiming under the holder (whether by a foreclosure, deed in lieu of foreclosure, or otherwise), succeeds to the interest of Lessor in the Lease, then Lessee shall recognize and attorn to the holder, or such other person, as its Lessor under the Lease.

In the event of foreclosure or other right asserted under the Mortgage by the holder thereof, the Lease and all of the rights of Lessee thereunder shall continue in full force and effect and shall not be terminated or disturbed

EXHIBIT G

#4300 Berkeley, CA

(whether by a foreclosure, deed in lieu of foreclosure, or otherwise), except in the case of a default by Lessee under the Lease continuing after notice to Lessee and beyond any applicable notice and cure period, and otherwise in accordance with the Lease. Lessee shall not be subject to any pre-foreclosure remedies asserted under the Mortgage or related loan documents. Lender shall not name or join Lessee as a defendant in any exercise of Lender's rights and remedies arising upon a default under the Mortgage, unless applicable law requires Lessee to be made a party as a condition to proceeding against Lessor or prosecuting such rights and remedies. In the latter case, Lender may join Lessee as a defendant in the action only for such purpose and not to terminate the Lease or otherwise adversely affect Lessee's rights under the Lease or this Agreement.

If Lender succeeds to the interest of Lessor under the Lease, Lessee shall have the same rights and remedies against Lender for any default under the Lease, but Lender shall not be:

(a)     liable for any act or omission of any prior Lessor (including Lessor) under the Lease, except for non-monetary defaults of a continuing nature of which Lender has received notice, and latent or patent defects in construction to the same extent that any prior Lessor would be liable, but nothing herein shall be construed to limit Lender's maintenance and repair obligations in its capacity as Lessor under the Lease from and after the date Lender takes title to the Premises, whether or not the need for such repairs or maintenance accrued before or after such date;

(b)     subject to any off-sets or abatements against rent that Lessee may have against any prior Lessor (including Lessor) under the Lease, except (1) for those which, as of the date of foreclosure, were already commenced or notice of their commencement was sent to Lender; (2) for the exercise of rights set forth in the Lease; and (3) for those relating to continuing defaults identified in Subsection (a) above;

(c)     bound by any Minimum Annual Rent that Lessee might have paid for more than the current month to any prior Lessor (including Lessor), except as expressly required under the Lease or actually received by Lender;

(d)     bound by any payment of rents, additional rents or other sums which Lessee may have paid more than one month in advance to Lessor or any prior Lessor unless (1) such sums are actually received by Lender or (2) such prepayment was approved by Lender;

(e)     bound by any amendment or modification to the Lease that shortens the term of the Lease or reduces the rent owed thereunder without the prior consent of Lender, and if Lender does not respond to such request within fifteen (15) days, then consent shall be deemed given by Lender; Lessor is responsible for securing all consents required by Lender; and

(f)     for the construction of any improvements or payment of any Lessee finish allowance required of Lessor under the Lease in the event Lender acquires title to the Premises prior to full completion and acceptance by Lessee of improvements required under the Lease or payment of any such Lessee finish allowance; provided, however, such lack of liability on the part of Lender to this subparagraph shall not affect Lessee's rights of self-help and offset or termination described in the Lease, if any, in the event of such failure to complete such improvements or pay such Lessee finish allowance as long as Lessee has provided all applicable notices and cure periods as required under the Lease and this Agreement.

In the event of any casualty or condemnation (eminent domain), the insurance proceeds or the condemnation award, as the case may be, shall be applied as required by the loan documents evidencing the loan from Lender to Lessor (the "Loan Documents").

Except as provided herein, this Agreement does not constitute a waiver by Lender of any of its rights under

EXHIBIT G

the Mortgage or other Loan Documents, and the Mortgage and other Loan Documents remain in full force and effect and shall be complied with in all respects by Lessor.

Lessee represents and warrants to Lender that Lessee, as of the Lease Effective Date has validly executed the Lease; the Lease is valid, binding and enforceable and is in full force and effect in accordance with its terms; the Lease has not been amended except as stated herein; no rent under the Lease has been paid more than thirty (30) days in advance of its due date.

If Lender shall become the owner of the Premises or the Premises shall be sold by reason of foreclosure or other proceedings brought to enforce the Mortgage or the Premises shall be conveyed by deed in lieu of foreclosure, Lessee agrees that, notwithstanding anything to the contrary contained in the Lease, after such foreclosure sale or conveyance by deed in lieu of foreclosure, Lender shall have no personal liability to Lessee under the Lease and Lessee shall look solely to the estate and property of Lessor in the Premises, to the net proceeds of sale thereof or the rentals received therefrom, for the satisfaction of Lessee's remedies for the collection of a judgment or other judicial process requiring the payment of money by Lessor in the event of any default or breach by Lessor with respect to any of the terms, covenants, and conditions of the Lease to be observed or performed by Lessor and any other obligation of Lessor created by or under the Lease, and no other property or assets of Lender shall be subject to levy, execution or other enforcement procedures for the satisfaction of Lessee's remedies. Further, in the event of any transfer by Lender of Lessor's interest in the Lease, Lender (and in the case of any subsequent transfers or conveyances, the then assignor), including each of its partners, officers, beneficiaries, co-Lessees, shareholders or principals (as the case may be) shall be automatically freed and released, from and after the date of such transfer or conveyance, of all liability for the performance of any covenants and agreements which accrue subsequent to the date of such transfer of Lessor's interest.

No modification, amendment, waiver or release of any provision of this Agreement or of any right, obligation, claim or cause of action arising hereunder shall be valid or effective unless in writing and signed by the parties.

Nothing herein shall amend, waive or rescind any provision or condition of the Lease, or relieve the Lessor from any of its obligations under the Lease.

Lessee shall provide a courtesy copy concurrently to Lender of any notice of default (or breach) from Lessee to Lessor that would allow Lessee to terminate the Lease. Notice to Lessor under the Lease (oral or written) shall not constitute notice to Lender. Lender shall have thirty (30) days from receipt of such notice to effect cure of the same, or if cure cannot be effected within said thirty (30) days due to the nature of the default, Lender shall have a reasonable time to cure provided that it commences cure within said thirty (30) day period of time and diligently carries such cure to completion, which, in no instance, shall be longer than ninety (90) days. Notwithstanding the foregoing, Lender shall have no obligation to cure any default by Lessor except if Lender succeeds to title of the Premises.

Any notices from one party to the other must be in writing and sent via courier (e.g., UPS, Federal Express) or by certified U.S. mail to the following addresses:

|  |  |
|---|---|
| if to Lessee: | Jo-Ann Stores, LLC, #4300 |
|  | Attn: Creativebug General Manager |
|  | 5555 Darrow Road |
|  | Hudson, OH 44236 |
|  |  |
| With a copy to: | Jo-Ann Stores, LLC, #4300 |
|  | c/o Creativebug |
|  | Attn: Legal Counsel |
|  | 5555 Darrow Road |
|  | Hudson, OH 44236 |

EXHIBIT G

if to Lender:

with a copy:

Any notice sent by certified mail shall be deemed received three (3) days after deposit thereof with the U.S. Postal Service. Any notice sent by courier service shall be deemed received as of the next business day (excluding Saturdays, Sundays, and any federal government holidays).

This Agreement inures to and binds the successors and assigns of the respective parties.

This Agreement shall not be effective against Lessee unless and until Lessee has received an original or PDF copy of this Agreement signed by all parties.

This Agreement shall be deemed to be a contract entered into under the laws of California and shall in all respects be governed, construed, applied and enforced in accordance with the laws of California.

This Agreement may be signed in multiple counterparts, each of which shall constitute an original and all of which taken together constitute one and same agreement.

[The remainder of this page is intentionally left blank]

#4300 Berkeley, CA

EXHIBIT G

Exhibit G

Each party's duly authorized representative has signed this Agreement as of the date written above.

LENDER:

, a [company/corporation]

By:
    Name:
    Title: _____

LESSOR:

, a [company/corporation]

By:
    Name:
    Title: _____

LESSEE:

**JO-ANN STORES, LLC,** an Ohio limited liability company,
THE PARENT ENTITY OF **CREATIVEBUG, LLC**

By:_____
    Ann Aber
    Senior Vice President,
    General Counsel & Secretary

*[Notary Signatures Follow on Next Page]*

#4300 Berkeley, CA                    Exhibit G

**Lender's Acknowledgment**

STATE OF _____ )
                        ) SS
COUNTY OF _____ )

BEFORE ME, a Notary Public in and for said County and State, personally appeared _____, a state company/corporation, by _____, its _____, who acknowledged that he/she did sign the foregoing instrument on behalf of said corporation and that the same is his/her free act and deed personally and as such officer.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at _____, _____, this _____ day of _____, 20__.

_____
NOTARY PUBLIC

**ACKNOWLEDGMENT FOR LESSOR**

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

**State of CALIFORNIA** )
                        ) ss.
**County of** _____ )

On May _____, 2021, before me _____, a Notary Public, personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
SIGNATURE OF NOTARY

#4300 Berkeley, CA                    Exhibit G

**Lessee's Acknowledgment**

STATE OF OHIO       )
                            ) SS
COUNTY OF SUMMIT     )

BEFORE ME, a Notary Public in and for said County and State, personally appeared **Jo-Ann Stores, LLC,** an Ohio limited liability company, the parent entity of **Creativebug, LLC,** by Ann Aber, its Senior Vice President, General Counsel & Secretary, who acknowledged before me that she did sign the foregoing instrument on behalf of said limited liability company and that the same is her free act and deed personally and as such officers.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at Hudson, Ohio, this _____ day of _____, 20__.

_____

NOTARY PUBLIC

*[Notary Page to SNDA dated _____, 20__]*

Exhibit G

## EXHIBIT A

### Legal Description of Building

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF BERKELEY, COUNTY OF ALAMEDA, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

PARCEL ONE:

Parcel A, Parcel Map 2881, filed March 7, 1980, Book 116 of Parcel Maps, Pages 49 and 50, Alameda County Records.

APN: 054-1778-002-02

PARCEL TWO:

A non-exclusive easement for ingress and egress, as reserved in the Deed by William H. Schwartz, et ux., recorded March 11, 1980, Series No. 80-043125, Official Records, over and across the Western 10 feet of Parcel B of Parcel Map 2881, filed March 7, 1980, Book 116 of Parcel Maps, OR, Page 49, Alameda County Records.

PARCEL THREE:

Parcel B, Parcel Map 6691, filed February 24, 1994, Book 213 of Parcel Maps, Pages 4 and 5, Alameda County Records.

APN: 054-1779-016

#4300 Berkeley, CA

## FIRST AMENDMENT TO LEASE AGREEMENT

This First Amendment to Lease Agreement ("Amendment") is made as of July 17, 2024 between **Parker Associates**, a California limited liability company ("Landlord"), and **Jo-Ann Stores, LLC**, an Ohio limited liability company ("Tenant").

## RECITALS:

A.    Landlord and Tenant entered into a certain Lease Agreement dated July 26, 2021 (the "Lease");

B.    The Lease relates to certain premises consisting of approximately 4,214 square feet known as Suite 314 and 316 (collectively the "Premises") located within the office building located at 2560 Ninth Street in Berkley, California ("Building");

C.    The Lease expires on July 31, 2024;

D.    Landlord and Tenant desire to extend the Lease as set forth below.

In consideration of the mutual covenants set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## AGREEMENT:

1.    Recitals. The foregoing recitals are incorporated herein by reference. Capitalized words used in this Amendment without definition have the same meanings as those ascribed to them in the Lease. If there is any conflict between this Amendment and the Lease, this Amendment controls.

2.    Term. The Term of the Lease is extended for an additional one (1) year period commencing on August 1, 2024 and expiring on July 31, 2025 (the "Renewal Period"). The new Lease expiration date is July 31, 2025.

3.    Rent. Commencing on the first day of the Renewal Period, and notwithstanding anything to the contrary in the Lease:

(a)    Base Rent shall be: $11, 589.00 per month. On each anniversary, monthly Base Rent shall increase by three percent (3%) over the monthly Base Rent for the immediately prior full calendar month.

(b)    The charges for all common area costs, real estate taxes, insurance charges, additional rent, costs, expenses and pass-throughs payable by Tenant shall remain and be calculated and paid in accordance with the Lease.

4.    Condition. Subject to the terms and conditions of the Lease, Landlord and Tenant acknowledge that Tenant currently occupies the Premises; therefore, Tenant accepts the Premises in its current as-is condition.

5.    Broker. Landlord and Tenant each represent and warrant to the other that there are no brokerage commissions of any kind due in connection with this Amendment other than Mike Raffetto of CBRE (the "Broker") who represented Tenant, and they know of no other real estate broker or agent who is entitled

Page 1 of 4

#4300 Berkley, CA

to a commission in connection with this Amendment. Each party must defend, indemnify and hold the other party harmless against and from all liabilities, damages, costs, claims and obligations arising from a breach of such representation (including, without limitation, reasonable attorneys' fees). Landlord shall be responsible for all leasing commissions payable to Broker pursuant to a separate agreement.

6. .   Notice. Notwithstanding anything contained in the Lease to the contrary, the notice addresses of Tenant and Landlord under the Lease are hereby updated to the following addresses:

| If to Tenant: | Jo-Ann Stores, LLC #4300 |
|---|---|
| | 5555 Darrow Rd. |
| | Hudson, OH 44236 |
| | Attn: Vice President of Real Estate |

| With a copy to: | Jo-Ann Stores, LLC #4300 |
|---|---|
| | 5555 Darrow Rd. |
| | Hudson, OH 44236 |
| | Attn: Legal Counsel |

| Estoppel and SNDA Requests to: | Estoppel-SNDA@joann.com |
|---|---|

| If to Landlord: | Parker Associates |
|---|---|
| | 2560 Ninth Street |
| | Suite 117 |
| | Berkeley, CA 94710 |

7.   Lender Consent. Notwithstanding anything to the contrary in the Lease or any other document to which Tenant and Landlord are parties, in the event any lender, or any other interested party, requests or requires consent before the execution of this document, (a) it is Landlord's responsibility to obtain such consent, (b) Landlord hereby represents that it has obtained such consent, if required, and (c) regardless if consent is actually obtained, this document is fully binding and effective upon signature.

8.   Binding Effect. This Amendment inures to the benefit of and binds the parties and their successors and assigns. The Lease, as herein amended, remains in full force and effect.

9.   Counterpart and PDF Signature. This Amendment may be signed in multiple counterparts, each of which constitutes an original and all of which taken together constitute one and same agreement. Electronic signatures or signatures transmitted via e-mail in a "PDF" may be used in place of original signatures on this Amendment. Each party intends to be bound by its electronic or "PDF" signature on this Amendment, is aware that the other parties are relying on its electronic or "PDF" signature, and waives any defenses to the enforcement of this Amendment based upon the form of signature.

10.   Captions. The captions and headings in this Amendment are for convenience only and not a part of this Amendment and do not in any way limit, define, construe or describe the scope or intent of the provisions of this Amendment.

11.   Severability. Any provisions of this Amendment which are prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any

jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. To the extent permitted by applicable law, the parties hereto waive any provision of law which prohibits or renders void or unenforceable any provision hereof. If the invalidity of any part, provision, representation or warranty of this Amendment shall deprive any party of the economic benefit intended to be conferred by this Amendment, the parties shall negotiate, in good-faith, to develop a structure the economic effect of which is as close as possible to the economic effect of this Amendment without regard to such invalidity.

12.     Entire Agreement. This Amendment contains the entire agreement and understanding among the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements, understandings, inducements and conditions, express or implied, oral or written, of any nature whatsoever with respect to the subject matter hereof. The express terms hereof control and supersede any course of performance and/or usage of the trade inconsistent with any of the terms hereof.

*[Remainder of Page Intentionally Left Blank – Signatures Follow on Next Page]*

#4300 Berkley, CA

The parties have signed this Amendment as of the date first above written.

Landlord:
**Parker Associates**

By: _____

Elena Holsman
General Partner

Tenant:
**Jo-Ann Stores, LLC**

By: _____

Ken Douglas
Vice President, Store Development, Facilities &
Real Estate

DRS for JAS

Page 4 of 4