**EXHIBIT 1**

Purchase Agreement

*Execution Version*

# INTELLECTUAL PROPERTY ASSET PURCHASE AGREEMENT

THIS INTELLECTUAL PROPERTY ASSET PURCHASE AGREEMENT (this "Agreement") is made as of May 23, 2025, by and between Singer Sourcing Limited LLC, a Delaware limited liability company ("Buyer"), and GA Joann Retail Partnership, LLC, a Delaware limited liability company ("Agent"), in its capacity as agent pursuant to the Approval Order (as defined below). Capitalized terms used but not otherwise defined herein have the meaning set forth in Article I.

## RECITALS

WHEREAS, JOANN Inc., a Delaware corporation ("JOANN") and its Subsidiaries, including, without limitation, Ditto, have been engaged in the business of operating retail stores;

WHEREAS, on January 15, 2025, JOANN and twelve of its Affiliates (collectively, the "Debtors") commenced voluntary chapter 11 bankruptcy cases (the "Bankruptcy Cases") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which cases are being jointly administered under lead Case No. 25-10068 (CTG);

WHEREAS, on February 26, 2025, the Bankruptcy Court entered an order (the "Approval Order") [D.I. 520] that, among other relief, approved an Agency Agreement, dated as of February 26, 2025, and granted Agent the exclusive right to market and sell, and/or otherwise designate the purchasers, licensees and assignees of, any of all of the assets of the Debtors free and clear of all liens, claims, and encumbrances thereon (other than the Permitted Encumbrances), including the power to (i) direct the Debtors to assume and assign contracts and leases pursuant to the procedures described in the Approval Order and (ii) release SVP from any and all claims under the Master Sublease, without further order of the Bankruptcy Court; and

WHEREAS, Agent has designated Buyer as the purchaser of the Acquired Assets (defined below), and Buyer desires to purchase all of the Acquired Assets and assume all of the Assumed Liabilities, in each case upon the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties, and covenants herein contained, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, and intending to be legally bound hereby, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1 Definitions. For purposes of this Agreement, the following terms have the meaning specified or referenced below.

"Acquired Assets" has the meaning set forth in Section 2.1.

"Acquired Intellectual Property" has the meaning set forth in Section 2.1.

"Acquired Patents" means any and all of the following: (a) the Patents listed on Schedule 2.1(a); (b) all divisions, continuations and continuations-in-part, that claim priority to, or common priority with, any of the Patents described in clause (a) or any of the Patent applications that resulted in any of the Patents described in clause (a); and (c) all Patents that have issued or in the future issue from any of the foregoing Patent applications, including utility, model and design patents and certificates of invention, together with any reissues, renewals, extensions or additions thereto.

"Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such other Person. For purposes of this definition, "control" when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have correlative meanings.

"Agreement" has the meaning set forth in the Preamble and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto.

"Approval Order" has the meaning set forth in the Recitals.

"Assumed Contracts" has the meaning set forth in Section 2.1(g).

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Bankruptcy Cases" has the meaning set forth in the Recitals.

"Bankruptcy Code" means Title 11 of the United States Code, Section 101 et seq.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Books and Records" has the meaning set forth in Section 2.1(f).

"Business Day" means any day of the year, other than a Saturday or Sunday, on which national banking institutions in New York, New York are open to the public for conducting business and are not required or authorized by Law to close.

"Buyer" has the meaning set forth in the Preamble.

"Closing" has the meaning set forth in Section 4.1.

"Closing Date" has the meaning set forth in Section 4.1.

"Closing Legal Impediment" has the meaning set forth in Section 9.3.

"Contract" means any contract, agreement, undertaking, license, sublicense, sales order, purchase order or other commitment, whether written or oral (including commitments to enter into any of such), that is binding on any Person or any part of its property under applicable Law.

"Customer Data" has the meaning set forth in Section 2.1(e).

"Ditto" means, collectively, Joann Ditto Holdings Inc., an Ohio corporation, Dittopatterns LLC, a Delaware limited liability company (f/k/a Newco JODITO LLC) and Creative Tech Solutions LLC, a Delaware limited liability company.

"Domain Names" means any domain names and uniform resource locators.

"Encumbrance" means any charge, lien, interest, claim, mortgage, license, lease, sublease, hypothecation, deed of trust, pledge, security interest, option, right of use or possession, right of first offer or first refusal, easement, servitude, restrictive covenant, encroachment, encumbrance, or other similar restriction of any kind.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Liabilities" has the meaning set forth in Section 2.3.

"GA Group" has the meaning set forth in the Preamble.

"Governmental Authority" means any United States federal, state, municipal or local or any foreign government, governmental agency or authority, or regulatory or administrative authority, or any court, tribunal or judicial body having jurisdiction, including the Bankruptcy Court.

"Governmental Authorization" means any approval, consent, license, permit, waiver or other authorization issued granted or otherwise made available by or under the authority of any Governmental Authority.

"JOANN" has the meaning set forth in the Recitals.

"Knowledge" means, with respect to any matter in question, in the case of Agent, the actual knowledge of the individuals set forth on Schedule 1.1(k), with respect to such matter.

"Law" means any foreign or domestic law, statute, code, ordinance, rule, regulation, order, judgment, writ, stipulation, award, injunction or decree by any Governmental Authority.

"Liabilities Cutoff Date" means March 21, 2025, at 6:00 p.m. prevailing Eastern Time.

"Liability" means any debt, loss, claim, damage, demand, fine, judgment, penalty, liability or obligation (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, matured or unmatured, liquidated or unliquidated, or due or to become due).

"Master Sublease" means that certain Master Sublease, dated as of July 1, 2019, by and between Jo-Ann Stores, LLC and SVP, as amended, modified or supplemented from time to time.

"Order" means any award, writ, injunction, judgment, order or decree entered, issued, made or rendered by any Governmental Authority.

"Outside Date" has the meaning set forth in Section 11.1(b)(ii).

"Party" or "Parties" means, individually or collectively, Buyer and Agent.

"Patents" means (a) all patents, certificates of invention, applications for certificates of invention, priority patent filings, and patent applications, and (b) any renewals, divisions, continuations (in whole or in part), or requests for continued examination of any of such patents, certificates of invention and patent applications, and any and all patents or certificates of invention issuing thereon, and any and all reissues, reexaminations, extensions, supplementary protection certificates, divisions, renewals, substitutions, confirmations, registrations, revalidations, revisions, and additions of or to any of the foregoing.

"Permitted Encumbrances" means Encumbrances set forth on Schedule 1.1(a).

"Person" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, estate, trust, association, organization or other entity or Governmental Authority.

"Proceeding" means any action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil criminal, administrative or investigative) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority.

"Power of Attorney" means a power of attorney in the form attached hereto as Exhibit A.

"Release Amount" has the meaning set forth in Section 3.1.

"Representative" means, with respect to a particular Person, any director, officer, employee, agent, consultant, advisor or other representative of such Person, including legal counsel, accountants and financial advisors.

"Subsidiary" means any entity with respect to which a specified Person (or a Subsidiary thereof) has the power, through the ownership of securities or otherwise, to elect a majority of the directors or similar managing body.

"SVP" means SVP Sewing Brands LLC, a Delaware limited liability company.

"Tax" or "Taxes" means any federal, state, provincial, local, municipal, foreign or other income, alternative, minimum, add-on minimum, accumulated earnings, personal holding company, franchise, capital stock, net worth, capital, profits, intangibles, windfall profits, gross receipts, value added, sales, use, goods and services, excise, customs duties, transfer, conveyance, mortgage, registration, stamp, documentary, recording, premium, severance, environmental (including taxes under Section 59A of the Code),natural resources, real property, personal property, ad valorem, intangibles, rent, occupancy, license, occupational, employment, unemployment insurance, social security, disability, workers' compensation, payroll, health care, withholding, estimated or other similar tax, duty, levy or other governmental charge or assessment or deficiency thereof (including all interest and penalties thereon and additions thereto), in each case imposed by any Governmental Authority.

"Trademarks" means all trade dress, trademarks and service marks (common law or otherwise), trademark and service mark registrations and applications therefor (including intent to use applications), as well as all goodwill appurtenant to any or all of the foregoing.

"Transaction Documents" means this Agreement, the Domain Name Assignment Agreement substantially in the form attached as Exhibit B hereto, the Trademark Assignment Agreement substantially in the form attached as Exhibit C hereto, the Patent Assignment Agreement substantially in the form attached as Exhibit D hereto, the 503(b)(9) Release substantially in the form attached as Exhibit E hereto, the Master Sublease Release substantially in the form attached as Exhibit F hereto, and any other agreements, instruments or documents entered into pursuant to this Agreement.

"Transfer Taxes" has the meaning set forth in Section 8.1(a).

Section 1.2 Other Definitions and Interpretive Matters.

(a) Unless otherwise indicated to the contrary in this Agreement by the context or use thereof:

(i) When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a day other than a Business Day, the period in question shall end on the next succeeding Business Day.

(ii) Any reference in this Agreement to $ means U.S. dollars.

(iii) Unless the context otherwise requires, all capitalized terms used in the Exhibits and Schedules shall have the respective meanings assigned in this Agreement. No reference to or disclosure of any item or other matter in the Exhibits and Schedules shall be construed as an admission or indication that such item or other matter is material or that such item or other matter is required to be referred to or disclosed in the Exhibits and Schedules. No disclosure in the Exhibits and Schedules relating to any possible breach or violation of any Contract or Law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred. Any information, item, or other disclosures set forth in any Schedule shall be deemed to have been set forth in all other applicable Schedules if the relevance of such disclosure to such other Schedule is reasonably apparent from the facts specified in such disclosure. All Exhibits and Schedules attached or annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.

(iv) Any reference in this Agreement to gender includes all genders, and words importing the singular number also include the plural and vice versa.

(v) The division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in the construction or interpretation of this Agreement. All references in this Agreement to any "Section," "Article," "Schedule," or "Exhibit" are to the corresponding Section, Article, Schedule, or Exhibit of or to this Agreement unless otherwise specified.

(vi) Words such as "herein," "hereof and "hereunder" refer to this Agreement as whole and not merely to a subdivision in which such words appear, unless the context otherwise requires.

(vii) The word "including" or any variation thereof means "including, without limitation," and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(b) No Strict Construction. Buyer, on the one hand, and Agent, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by Buyer, on the one hand, and Agent, on the other hand, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement. Without limitation as to the foregoing, no rule of strict construction construing ambiguities against the draftsperson shall be applied against any Person with respect to this Agreement.

## ARTICLE II
## PURCHASE AND SALE

Section 2.1 Purchase and Sale of the Acquired Assets. Upon the terms and subject to the conditions of this Agreement, on the Closing Date, Agent shall sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer, and Buyer shall purchase, all right, title and interest of the Debtors, free and clear of all Encumbrances other than Permitted Encumbrances, in, to, or under the following (collectively, the "Acquired Assets"):

(a) all Patents, Trademarks and Domain Names listed on Schedule 2.1(a), Acquired Patents, and the right to sue for and recover damages, profits and any other remedy in connection therewith, for past, present or future infringement, misappropriation or other violation related to any such assets (collectively, the "Acquired Intellectual Property");

(b) the social media accounts listed on Schedule 2.1(b);

(c) all software described on Schedule 2.1(c);

(d) all product assets and data described on Schedule 2.1(d);

(e) all customer subscription data listed on Schedule 2.1(e) (the "Customer Data");

(f) all books and records, including all financial, operational and legal documents, whether in electronic or paper form, supporting the Acquired Assets (the Books and Records");

(g) all contracts to which JOANN or Ditto are a party, as identified on Schedule 2.1(g), including any and all amendments thereto (the "Assumed Contracts");

(h)    any subscription revenue attributable to Ditto subscriptions received by JOANN or Agent after the Liabilities Cutoff Date;

(i)    all payment gateway accounts described on Schedule 2.1(i), to the extent such are transferable; and

(j)    all goodwill associated with the assets referenced in this Section 2.1.

Section 2.2    Excluded Assets. All assets, properties, rights, interests or claims of any kind or description of the Debtors other than the Acquired Assets shall be deemed "Excluded Assets" and nothing in this Agreement shall be deemed to constitute an agreement to sell, transfer, assign or convey any Excluded Assets to Buyer.

Section 2.3    Assumed Liabilities. Upon the terms and subject to the conditions of this Agreement, Buyer shall assume and agree to perform and discharge, when due (in accordance with their respective terms and subject to the respective conditions thereof), (y) as of the Liabilities Cutoff Date, and pay directly, or where not feasible to so pay directly, to reimburse Agent for, the full weekly *pro rata* Liabilities identified on Schedule 2.3 (the "Assumed Overhead") and, (z) as of the Closing, all Assumed Contracts and any and all cure amounts associated with such Assumed Contracts to the extent identified on Schedule 2.1(g) (as such schedule may be modified by Court order or otherwise agreed to by the Buyer and the applicable counterparties thereto) (clauses (y) and (z) collectively, the "Assumed Liabilities"). Notwithstanding the foregoing or any provision in this Agreement to the contrary, except in respect of all cure amounts associated with the Assumed Contracts which Buyer acknowledges and agrees it hereby assumes regardless of the circumstances under which such Assumed Liabilities arose, Buyer shall (a) only assume the Assumed Liabilities to the extent such Assumed Liabilities (i) arise, accrue or relate to the period after the Liabilities Cutoff Date or the Closing, as applicable, and do not arise from or relate to any breach, default, negligence, willful misconduct or fault by or of Agent and (ii) do not arise from or relate to any event, circumstance or condition occurring or existing on or prior to the Liabilities Cutoff Date, or the Closing, as applicable, that, with notice or lapse of time would constitute or result in a breach, default, negligence, willful misconduct or fault by or of Agent, and (b) not assume and shall not be obligated to assume or be obliged to pay, perform, or otherwise discharge, and Agent or the Debtors shall be solely and exclusively liable with respect to, any Liability of Agent or the Debtors, respectively, that is not an Assumed Liability (such Liabilities, collectively, the "Excluded Liabilities").

Section 2.4    Further Assurances.

(a)    From time to time after the Closing, Agent shall, upon Buyer's request and at Buyer's cost and expense, and within a reasonable period of time, execute and deliver to Buyer such other instruments of transfer as shall be reasonably necessary to vest in Buyer title to the Acquired Assets, and Agent, on the one hand, and Buyer, on the other hand, shall, at their own cost and expense, use their respective commercially reasonable efforts to take, or cause to be taken, all appropriate action, do or cause to be done all things necessary under applicable Law, and execute and deliver such instruments and documents and to take such other actions, as may be required to consummate the transactions contemplated by this Agreement at or after the Closing;

provided that nothing in this Section 2.4 shall prohibit Agent or the Debtors from ceasing operations or winding up the Debtors' affairs following the Closing.

(b) If, following the Closing, Buyer or Agent become aware that any Debtor owns any asset or right that is an Acquired Asset, such Party shall promptly inform the Buyer or Agent, as applicable, of that fact. Thereafter, at the request of Buyer, Agent shall, for a period of time not to exceed forty-five (45) days after the Closing, execute such documents as may be reasonably necessary to cause the transfer of, and Agent shall thereafter transfer, any such asset or right to Buyer or any other entities nominated by Buyer for no consideration and Buyer shall do all such things as are reasonably necessary to facilitate such transfer.

(c) With respect to any Acquired Asset for which consent or approval is required for transfer or assignment but is not obtained prior to the Closing, (i) at the Closing, Agent shall deliver (or cause the relevant Debtor to deliver) to Buyer a Power of Attorney; and (ii) from and after the Closing, Agent shall reasonably cooperate, at Buyer's sole cost and expense, with Buyer in any reasonable arrangement that Buyer may request to provide Buyer with all of the benefits of, or under, the applicable Acquired Assets including taking actions reasonably required to enforce (at no cost to Agent), for the benefit of Buyer, any and all rights of Agent against any party to the applicable Acquired Asset.

**ARTICLE III**
**RELEASE AMOUNT**

Section 3.1 Consideration. The consideration for the purchase, sale, assignment and conveyance of the Debtors' right, title, and interest in, to, and under the Acquired Assets shall consist of:

(a) an amount in cash equal to $800,000 in satisfaction of any and all Liabilities or other amounts that SVP or its Affiliates may owe in connection with the Master Sublease (the "Release Amount");

(b) the release by Buyer of all actual or purported rights to Section 503(b)(9) priority with respect to Buyer's claims against the Debtors;

(c) the surrender of all units of ready-to sell non-machine inventory remaining in the Buyer's store locations as of April 14, 2025; and

(d) the assumption of the Assumed Liabilities, including, for the avoidance of doubt, the payment of all Assumed Overhead, either directly to the applicable vendor(s) or to Agent in reimbursement therefor.

Section 3.2 Closing Date Payments. At the Closing, Buyer shall pay an amount in cash equal to the Release Amount by wire transfer of immediately available funds to Agent in an account designated by Agent.

Section 3.3 Discharge of Assumed Liabilities After Closing. Following the Closing, Buyer shall pay, perform or satisfy the Assumed Liabilities from time to time and as such Assumed Liabilities become due and payable or are required to be performed or satisfied in accordance with

their respective terms unless Buyer in good faith contests, or causes to be contested, the amount or validity thereof.

**ARTICLE IV**
**CLOSING**

Section 4.1 Closing Date. Upon the terms and subject to the conditions hereof, the closing of the sale of the Acquired Assets and the assumption of the Assumed Liabilities contemplated hereby (the "Closing") shall take place by the electronic or physical exchange of documents at 10:00 a.m., New York City time, no later than the second (2nd) Business Day following the date on which the conditions set forth in Article IX and Article X have been satisfied or (if permissible) waived (other than the conditions that by their nature are to be satisfied by actions taken at the Closing, but subject to the satisfaction or (if permissible) waiver of such conditions), or at such other place or time as Buyer and the Agent may mutually agree. The date and time at which the Closing actually occurs is referred to as the "Closing Date."

Section 4.2 Buyer's Deliveries. At the Closing, Buyer shall deliver to Agent:

(a) the Release Amount in accordance with Section 3.1;

(b) all unpaid Assumed Overhead, if any;

(c) a release, duly executed by Buyer, releasing all actual or purported rights to Section 503(b)(9) priority with respect to Buyer's claims against the Debtors, in accordance with Section 3.1(b), substantially in the form attached as Exhibit E hereto (the "503(b)(9) Release");

(d) to the extent not delivered prior to Closing, all the right, title and interest of Buyer in, to or under any or all of the units of ready-to-sell non-machine inventory that remained in the Buyer's store locations as of April 14, 2025;

(e) each other Transaction Document not previously executed to which Buyer is a party, duly executed by Buyer;

(f) the certificates of Buyer to be received by Agent pursuant to Sections 10.1 and 10.2: and

(g) such assignments and other good and sufficient instruments of assumption and transfer, in form and substance reasonably satisfactory to Agent and Buyer, which are necessary to transfer and assign the Acquired Assets and Assumed Liabilities to Buyer.

Section 4.3 Agent's Deliveries. At the Closing, Agent shall deliver to Buyer (or, to the extent a Debtor is a necessary party to any such deliverable, cause the relevant Debtor to deliver to Buyer):

(a) each other Transaction Document to which Agent is a party, duly executed by Agent;

(b)     a release, substantially in the form of Exhibit F hereto, duly executed by the Agent on behalf of itself and the Debtors, releasing SVP from all claims under the Master Sublease (the "Master Sublease Release");

(c)     the certificates of the Company to be received by Buyer pursuant to Sections 9.1 and 9.2; and

(d)     such bills of sale, deeds, endorsements, assignments, UCC terminations and other filings and other good and sufficient instruments, in form and substance reasonably satisfactory to Buyer and Agent, which are necessary to vest in Buyer all the right, title and interest of the Debtors in, to or under any or all of the Acquired Assets free and clear of Encumbrances.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF AGENT

Except as set forth in the Schedules, Agent hereby represents and warrants to Buyer as follows:

Section 5.1     Organization and Good Standing. Agent is an entity duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization. As set forth in the Approval Order, Agent has the requisite corporate or similar power and authority to designate Buyer as the acquiror of the Acquired Assets. Agent is not in default under or in violation of any provision of its organizational documents.

Section 5.2     Authority; Validity; Consents.

(a)     Agent has, as applicable, the requisite corporate power and authority necessary to enter into and perform its obligations under this Agreement and the other Transaction Documents to which Agent is a party and to consummate the transactions contemplated hereby and thereby. This Agreement has been duly and validly executed and delivered by Agent and each other Transaction Document required to be executed and delivered by Agent at the Closing will be duly and validly executed and delivered by Agent at the Closing. This Agreement and, when executed, the other Transaction Documents will, constitute the legal, valid and binding obligations of Agent, enforceable against Agent in accordance with their respective terms, except as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity.

(b)     Except for notices, filings and consents required in connection with the Bankruptcy Cases, Agent is not required to give any notice to, make any filing with or obtain any consent from any Governmental Authority in connection with the execution and delivery of this Agreement and the other Transaction Documents or the consummation or performance of any of the transactions contemplated hereby and thereby.

Section 5.3     No Conflicts. When the consents and other actions described in Section 5.2 have been obtained and taken, the execution, delivery and performance by Agent of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not (a) result in the breach of any

of the terms and provisions of, or constitute a default under, or conflict with, or cause any acceleration of any obligation of Agent under any Contract or other instrument to which Agent or any Acquired Assets are bound, (b) conflict with or result in a violation or breach of, or default under, any provision of the organizational documents of Agent or (c) conflict with or result in a violation or breach of any provision of any Law, Order or Governmental Authorization applicable to Agent or the Acquired Assets, except for any such conflict, violation, breach or default, individually or in the agreement, would not reasonably be expected to prevent or materially delay the consummation of the transactions contemplated hereby.

Section 5.4 Title to Acquired Assets. Upon delivery to Buyer on the Closing Date of the instruments of transfer contemplated by Section 4.3, and subject to the terms of the Approval Order, Agent will cause the Debtors to thereby transfer to Buyer, marketable title to or, a valid contractual interest in all of the Acquired Assets, free and clear of all Encumbrances, except for Permitted Encumbrances.

Section 5.5 Legal Proceedings. Except for the Bankruptcy Cases or as set forth on Schedule 5.5, there is no Proceeding or Order pending or, to the Knowledge of Agent, threatened, against Agent that (a) seeks to restrain or prohibit or otherwise challenge or delay the consummation, legality or validity of the transactions contemplated hereby or (b) relates to or affects the Acquired Assets. There are no outstanding Orders or unsatisfied judgments, penalties or awards against, relating to or affecting the Acquired Assets and, to the Knowledge of Agent, no event has occurred or circumstances exist that may give rise to or serve as a basis for any such Proceeding or Order.

Section 5.6 Brokers or Finders. Except for Hilco Streambank (whose fees and expenses shall be borne solely by Agent), Agent has not incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement, the other Transaction Documents or the transactions contemplated hereby or thereby for which Buyer is or will become liable.

Section 5.7 Acquired Assets.

(a) To the Knowledge of Agent:

(i) One or more of the Debtors is the legal and beneficial owner of the entire right, title and interest in and to the Acquired Assets and have valid rights in and to, including, but not limited to, all rights to use, reproduce, publish, distribute, transmit, perform, display, and create derivative works of, as applicable, such Acquired Assets as is used in the Debtors' ordinary course of business, in each case, free and clear of all Encumbrances. (other than Permitted Encumbrances). The Acquired Assets do not infringe, misappropriate or otherwise violate any intellectual property right or other right of any third party. As provided by Agent, the software described on Schedule 2.1(c) does not contain any harmful or malicious code.

(ii) There are no claims (including any oppositions, interferences or re-examinations) settled, pending or, to the Knowledge of Agent, threatened in writing (including in the form of offers to obtain a license) challenging the validity, enforceability, registrability or ownership of any Acquired Asserts or the Debtors rights with respect to any Acquired Assets.

None of the Debtors is subject to any outstanding or prospective Order (including any motion or petition therefor) that does or would restrict or impair the use of the Acquired Assets. The acquisition of the Acquired Assets does not (i) conflict with or violate any applicable Law; (ii) require the consent, approval or authorization of any governmental or regulatory authority or other third party; or (iii) require the provision of any payment or other consideration to any third party (other than the cure amounts in respect of the Assumed Contracts).

Section 5.8 No Other Representations or Warranties; Full Disclosure; No Survival. Except for the representations and warranties contained in this Article V (subject to the disclosures set forth on the Schedules), neither Agent nor any other Person makes any other express or implied representation or warranty with respect to Agent, the Acquired Assets, the Assumed Liabilities or the transactions contemplated by this Agreement, and Agent disclaims any other representations or warranties, whether made by Agent, any Affiliate of Agent, any Debtor, any affiliate of any Debtor, or any of Agent's, the Debtors', or their Affiliates' respective Representatives. Except for the representations and warranties contained in this Article V (subject to the disclosures set forth on the Schedules), Agent (a) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Acquired Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) and (b) disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Buyer or its Affiliates or Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Buyer by any Representative of Agent or any of its Affiliates). Agent makes no representations or warranties to Buyer regarding the probable success or profitability of the Acquired Assets or the use thereof. The representations and warranties of Agent will expire upon the earlier of the Closing Date or the termination of this Agreement.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Agent as follows:

Section 6.1 Organization and Good Standing. Buyer is a limited liability company, duly organized, validly existing and in good standing under the laws of its jurisdiction of organization. Buyer has the requisite power and authority to own or lease and to operate and use Buyer's properties and to carry on Buyer's business as now conducted.

Section 6.2 Authority; Validity; Consents.

(a) Buyer has the requisite power and authority necessary to enter into and perform its obligations under this Agreement and the other Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance of this Agreement by Buyer and the consummation by Buyer of the transactions contemplated herein have been duly and validly authorized by all requisite corporate or similar actions in respect thereof. This Agreement has been duly and validly executed and delivered by Buyer and each other Transaction Document to which Buyer is a party will be duly and validly executed and delivered by Buyer at the Closing. This Agreement constitutes and, when

executed, the other Transaction Documents to which Buyer is a party will constitute, the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with their respective terms, except as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity.

(b) Except for notices, filings and consents required in connection with the Bankruptcy Cases, including, for the avoidance of doubt, any motions required in connection with Bankruptcy Court approval of this Agreement, Buyer is not and will not be required to give any notice to or obtain any consent from any Person in connection with the execution and delivery of this Agreement and the other Transaction Documents to which it is a party or the consummation or performance of any of the transactions contemplated hereby or thereby.

Section 6.3 No Conflict. When the consents and other actions described in Section 6.2 have been obtained and taken, the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions provided for herein and therein will not result in the breach of any of the terms and provisions of, or constitute a default under, or conflict with, or cause any acceleration of any obligation of Buyer under (a) any Contract or other instrument to which it is bound, (b) any provision of the organizational documents of Buyer, or (c) any Law, Order or Governmental Authorization applicable to Buyer, except for any such conflict, violation, breach or default, individually or in the agreement, would not reasonably be expected to prevent or materially delay the consummation of the transactions contemplated hereby.

Section 6.4 Availability of Funds; Solvency. Buyer has and will have at the Closing sufficient cash in immediately available funds to pay the Release Amount and any other costs, fees and expenses required to be paid by it under this Agreement, including, for the avoidance of doubt, the Assumed Overhead, and the other Transaction Documents. As of the Closing and immediately after consummating the transactions contemplated by this Agreement and the other transactions contemplated by the Transaction Documents, Buyer will not (a) be insolvent (either because Buyer's financial condition is such that the sum of Buyer's debts is greater than the fair value of Buyer's assets or because the present fair value of Buyer's assets will be less than the amount required to pay Buyer's probable Liability on Buyer's debts as they become absolute and matured), (b) have unreasonably small capital with which to engage in Buyer's business or (c) have incurred or plan to incur debts beyond Buyer's ability to repay such debts as they become absolute and matured.

Section 6.5 Litigation. There are no Proceedings pending or, to the knowledge of Buyer, threatened, that would affect in any material respect Buyer's ability to perform Buyer's obligations under this Agreement or any other Transaction Documents or to consummate the transactions contemplated hereby or thereby.

Section 6.6 Brokers or Finders. Neither Buyer nor any Person acting on behalf of Buyer has paid or become obligated to pay any fee or commission to any broker, finder, investment banker, agent or intermediary for or on account of the transactions contemplated by this Agreement for which Agent is or will become liable.

Section 6.7 Condition of Acquired Assets: Representations. Notwithstanding anything contained in this Agreement to the contrary, Buyer acknowledges and agrees that Agent is not making any representations or warranties whatsoever, express or implied, beyond those expressly given by Agent in Article V (subject to the disclosures set forth on the Schedules), and Buyer acknowledges and agrees that, except for the representations and warranties contained in Article V, the Acquired Assets are being transferred on a "where is" and, as to condition, "as is" basis. Buyer acknowledges that it has conducted to Buyer's satisfaction Buyer's own independent investigation of the Debtors' business and, in making the determination to proceed with the transactions contemplated by this Agreement, Buyer has relied on the representations and warranties expressly given by Agent in Article V and the results of Buyer's own independent investigation. Buyer has received or may receive from Agent certain projections, forward-looking statements and other forecasts and certain business plan information. Buyer acknowledges that there are uncertainties inherent in attempting to make such estimates, projections and other forecasts and plans, that Buyer is familiar with such uncertainties, that Buyer is taking full responsibility for making Buyer's own evaluation of the adequacy and accuracy of all estimates, projections and other forecasts and plans so furnished to Buyer (including the reasonableness of the assumptions underlying such estimates, projections, forecasts or plans), and that Buyer shall have no claim against anyone with respect thereto. Accordingly, Buyer acknowledges that Agent makes no representation or warranty with respect to such estimates, projections, forecasts or plans (including the reasonableness of the assumptions underlying such estimates, projections, forecasts or plans).

## ARTICLE VII
## ACTIONS PRIOR TO THE CLOSING DATE

Section 7.1 Operations Prior to the Closing Date. Agent covenants and agrees that, except (i) as expressly contemplated by this Agreement, (ii) with the prior written consent of Buyer (which consent shall not be unreasonably withheld or delayed), (iii) as required by the Bankruptcy Court or (iv) as otherwise required by Law, after the date of this Agreement and prior to the Closing Date, (a) Agent shall, and shall direct the Debtors to, use commercially reasonable efforts, taking into account the Debtors' status as debtors in possession in the Bankruptcy Cases, to maintain and preserve the Acquired Assets in their present condition and (b) without limiting the generality of the foregoing, Agent shall not, and shall use commercially reasonable efforts to direct the Debtors not to:

(i) sell, lease (as lessor), transfer or otherwise dispose of, or mortgage or pledge, or voluntarily impose or suffer to be imposed any Encumbrance (other than existing Assumed Liabilities and Permitted Encumbrances) on, any Acquired Asset;

(ii) cancel or compromise any claim or waive or release any right, in each case, that is a claim or right related to an Acquired Asset;

(iii) (A) abandon, disclaim, dedicate to the public, permit to lapse, sell, transfer, lease, assign or otherwise dispose of, or grant any security interest in or to any Acquired Assets, or (B) grant to any Person any license, or enter into any covenant not to sue, with respect to any Acquired Assets, other than non-exclusive licenses granted in the ordinary course of business; or

(iv) enter into any agreement or commitment to take any action prohibited by this Section 7.1.

Section 7.2    Bankruptcy Court Filings.  Agent shall give, or cause the Debtors to give, all notices required to be given by applicable Law, to all Persons entitled thereto, of any motions, orders, hearings and other proceedings relating to this Agreement and the transactions contemplated hereby and thereby and such additional notice as ordered by the Bankruptcy Court or as Buyer may reasonably request.

Section 7.3    Third Party Consents and Acknowledgements. Between the date hereof and the earlier of the termination of this Agreement or the Closing Date, Agent shall use their commercially reasonable efforts to obtain, or to cause the Debtors to obtain, all third party consents required for the consummation of the transactions contemplated hereby to the extent such consents are not provided for or satisfied by the Approval Order.

Section 7.4    Governmental Approvals. Agent and Buyer shall use reasonable best efforts, and shall cooperate with each other, to do or cause to be done, all things necessary, proper or advisable consistent with applicable confidentiality and legal requirements to cause the conditions precedent to the Closing to be satisfied and to cause the Closing to occur, including to secure any consents and approvals of any Governmental Authority required to be obtained by them, in order to permit the consummation of the transactions contemplated by this Agreement, or to otherwise satisfy the conditions precedent set forth in this Agreement, in each case as necessary to the extent such consents are not provided for or satisfied by the Approval Order; provided, however, that Agent shall not make any agreement or understanding affecting the Acquired Assets as a condition for obtaining any such consents or approvals except with the prior written consent of Buyer.

Section 7.5    Notice of Certain Events. From the date hereof until the Closing, Agent shall promptly notify Buyer in writing of (a) has resulted in, or could reasonably be expected to result in, the failure of any of the conditions precedent set forth in this Agreement to be satisfied; or (b) any notice or other communication from any Person alleging that the consent of a third party is or may be required in connection with the transactions contemplated by this Agreement.

## ARTICLE VIII
## ADDITIONAL AGREEMENTS

Section 8.1    Taxes.

(a) Any sales, use, property transfer or gains, documentary, stamp, registration, recording or similar Tax (including, for certainty, goods and services tax, harmonized sales tax and land transfer tax) payable in connection with the sale or transfer of the Acquired Assets ("Transfer Taxes") shall be borne by Buyer and, to the extent Agent is required by applicable Law to pay Transfer Taxes, such Transfer Taxes shall be paid by Buyer to Agent at Closing.  Agent and Buyer shall use reasonable efforts and cooperate in good faith to exempt the sale and transfer of the Acquired Assets from any such Transfer Taxes.  Agent shall, or shall cause the Debtors to, prepare and file all necessary Tax Returns or other documents with respect to all such Transfer Taxes; provided, however, that in the event any such Tax Return requires execution by Buyer,

Agent shall deliver to Buyer a copy of such Tax Return at least three (3) Business Days before the due date thereof, and Buyer shall promptly execute such Tax Return and deliver it to Agent, which shall cause it to be filed.

(b) Each of Buyer and Agent agrees to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Acquired Assets (including access to Documents) as is reasonably necessary for the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any taxing authority and the prosecution or defense of any claims, suit or proceeding relating to any Tax; provided, however, that (other than as required pursuant to this Section 8.1(b) neither Buyer nor Agent shall be required to disclose the contents of its income tax returns to any Person. Any expenses incurred in furnishing such information or assistance pursuant to this Section 8.1(b) shall be borne by the Party requesting it.

(c) Notwithstanding any other provisions in this Agreement, Buyer and Agent hereby waive compliance with all "bulk sales," "bulk transfer" and similar laws that may be applicable with respect to the sale and transfer of any or all of the Acquired Assets to Buyer.

Section 8.2 Use of Acquired Assets Post-Closing. After the date hereof and until June 1, 2025, Agent, the Debtors, and their respective agents may continue to use the Acquired Assets in connection with the sale of Debtors' merchandise by means of a "going out of business," "store closing," "sale on everything," "everything must go," or similar sale. Agent shall not close the Ditto Salesforce instance, destroy data contained therein, or restrict access to such Salesforce instance at any time prior to June 1, 2025. Nothing in this Agreement shall prohibit or otherwise restrict Debtors from winding down their operations and affairs or dissolving their business entities following the Closing

Section 8.3 Confidentiality. From and after the Closing, Agent shall hold in confidence any and all information, whether written or oral, concerning the Acquired Assets, except to the extent that such information (a) is generally available to and known by the public through no fault of Agent or (b) is lawfully acquired by Agent, any of its Affiliates or their respective Representatives from and after the Closing from sources which are not prohibited from disclosing such information by a legal, contractual or fiduciary obligation. If Agent is compelled to disclose any information by any Proceeding or by other requirements of Law or Order, Agent shall promptly notify Buyer in writing and shall disclose only that portion of such information which Agent is, based on advice of counsel, legally required to be disclosed, provided that Agent shall, at Buyer's expense, use commercially reasonable efforts to obtain an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.

## ARTICLE IX
## CONDITIONS PRECEDENT TO THE OBLIGATION OF BUYER TO CLOSE

Buyer's obligation to consummate the transactions contemplated by this Agreement is subject to the satisfaction or waiver, at or prior to the Closing, of each of the following conditions:

Section 9.1 Accuracy of Representations. The representations and warranties of Agent contained in (a) Sections 5.1, 5.2, 5.3 and 5.6 shall be true and correct in all respects as of the date

hereof and as of the Closing Date as though made on and as of the Closing Date (except that those representations and warranties which address matters only as of a particular date need only be true and correct as of such date) and (b) the other representations set forth in Article V shall be true and correct as of the date hereof and in all material respects as of the Closing Date as though made on and as of the Closing Date (except that (i) those representations and warranties which address matters only as of a particular date need only be true and correct as of such date and (ii) any representations and warranties qualified by materiality shall be true and correct in all respects). Buyer shall have received a certificate of Agent, signed by a duly authorized officer of Agent, to that effect.

Section 9.2    Agent's Performance.  Agent shall have performed and complied with in all material respects the covenants and agreements that Agent is required to perform or comply with pursuant to this Agreement at or prior to the Closing, and Buyer shall have received a certificate of Agent to such effect signed by a duly authorized officer of Agent.

Section 9.3    No Order.  No Governmental Authority shall have enacted, issued, promulgated or entered any Order which is in effect and has the effect of making illegal or otherwise prohibiting the consummation of the transactions contemplated by this Agreement (a "Closing Legal Impediment"); provided, however, that prior to asserting this condition Buyer shall have taken all actions required by Section 7.2 to prevent the occurrence or entry of any such Closing Legal Impediment and to remove or appeal as promptly as possible any such Closing Legal Impediment.

Section 9.4    Bankruptcy Court Order.  The Approval Order shall remain in effect and shall not have been stayed pending appeal, reversed, revoked, modified, or vacated.

Section 9.5    Bankruptcy Court Approvals.  The Bankruptcy Court shall have entered an unstayed order approving the Master Sublease Release and the transfer of the Acquired Assets to the Buyer in accordance with this Agreement, which order shall contain a finding that Buyer is a "good faith" purchaser for purposes of section 363(m) of the Bankruptcy Code and shall be in form and substance reasonably acceptable to Buyer.

Section 9.6    Closing Deliverables.  Agent shall have delivered or caused to be delivered to Buyer each of the items to be delivered by Agent in accordance with Section 4.3.

## ARTICLE X
## CONDITIONS PRECEDENT TO THE OBLIGATION OF AGENT TO CLOSE

Agent's obligation to consummate the transactions contemplated by this Agreement is subject to the satisfaction or waiver, at or prior to the Closing, of each of the following conditions:

Section 10.1    Accuracy of Representations.  The representations and warranties of Buyer contained in Article VI shall be true and correct as of the date hereof and in all material respects as of the Closing Date as though made on and as of the Closing Date (except that (i) those representations and warranties which address matters only as of a particular date need only be true and correct as of such date and (ii) any representations and warranties qualified by materiality shall

be true and correct in all respects). Agent shall have received a certificate of Buyer, signed by a duly authorized officer of Buyer, to that effect.

Section 10.2    Buyer's Performance. Buyer shall have performed and complied with in all material respects the covenants and agreements that Buyer is required to perform or comply with pursuant to this Agreement at or prior to the Closing, and Agent shall have received a certificate of Buyer to such effect signed by a duly authorized officer thereof.

Section 10.3    No Order. No Closing Legal Impediment shall be in effect; provided, however, that prior to asserting this condition Agent shall have taken all actions required by Section 7.2 to prevent the occurrence or entry of any such Closing Legal Impediment and to remove or appeal as promptly as possible any such Closing Legal Impediment.

Section 10.4    Bankruptcy Court Order. The Approval Order shall remain in effect and shall not have been stayed pending appeal, reversed, revoked, modified, or vacated; *provided*, for the avoidance of doubt, that any such stay, reversal, revocation, modification, or vacatur entered directly or indirectly at the request or with the support of the Agent shall not relieve the Agent of its obligations hereunder.

Section 10.5    Closing Deliverables. Buyer shall have delivered or caused to be delivered to Agent each of the items to be delivered by Buyer in accordance with Section 4.2.

## ARTICLE XI
## TERMINATION

Section 11.1    Termination Events. Anything contained in this Agreement to the contrary notwithstanding (other than as provided in the last sentence of this Section 11.1) this Agreement may be terminated at any time prior to the Closing Date:

(a)    by mutual written consent of the Agent and Buyer; or

(b)    by either Agent or Buyer:

(i)    if a Governmental Authority issues a final, non-appealable Order permanently prohibiting the transactions contemplated hereby; provided, however, that the right to terminate this Agreement pursuant to this Section 11.1(b)(i) shall not be available to any Party whose breach of any of its representations, warranties, covenants or agreements contained herein has resulted in such failure to approve or such Order;

(ii)    if the Closing shall not have occurred by the close of business on June 30, 2025 (the "Outside Date"); provided, however, that the right to terminate this Agreement pursuant to this Section 11.1(b)(ii) shall not be available to any Party whose breach of any of such Party's representations, warranties, covenants, or agreements contained herein results in the failure of the Closing to be consummated by such time; or

(iii)    if the Approval Order is stayed pending appeal, reversed, revoked, modified, or vacated; *provided*, for the avoidance of doubt, that any such stay, reversal, revocation,

modification, or vacatur entered directly or indirectly at the request or with the support of the Agent shall not relieve the Agent of its obligations hereunder.

(c) by Buyer:

(i) in the event of any breach of any of Agent's agreements, covenants, representations or warranties contained herein that would result in the failure of a condition set forth in Section 9.1 or 9.2 to be satisfied, and Agent has failed to cure such breach by the earlier of (A) the Outside Date and (B) the date that is 15 days after receipt of Buyer's written notice of such breach; provided, however, that Buyer is then not in material breach of any of Buyer's representations, warranties, covenants or agreements contained in this Agreement; or

(d) by Agent:

(i) except as provided in Section 11.1(d)(ii), in the event of any breach of any of Buyer's agreements, covenants, representations or warranties contained herein that would result in the failure of a condition set forth in Section 10.1 or 10.2 to be satisfied, and the failure of Buyer to cure such breach by the earlier of (A) the Outside Date and (B) the date that is 15 days after receipt of Agent's written notice of such breach; provided, however, that Agent is not then in material breach of any of their representations, warranties, covenants or agreements contained in this Agreement; or

(ii) if (A) the conditions to Closing in Article IX have been satisfied (or waived by Buyer), other than those conditions that by their nature can only be satisfied at Closing, (B) Agent has provided Buyer with written notice that Agent is prepared to consummate the transactions contemplated by this Agreement, and (C) the Closing does not occur within five (5) Business Days following Agent's delivery of such notice to Buyer.

Section 11.2 Procedures Upon Termination. In the event of termination pursuant to Section 11.1, the terminating party will give written notice thereof to the other party or parties, and this Agreement will terminate as described in Section 11.1, and the purchase and sale of the Acquired Assets hereunder will be abandoned, without further action by Buyer or Agent.

Section 11.3 Effect of Termination. In the event that this Agreement is terminated as provided herein, each of the Parties will be relieved of its duties and obligations arising under this Agreement after the date of such termination and there will be no liability or obligation on Buyer, Agent or any of their respective Representatives; provided, however, that the provisions of this Section 11.3 and Article XII and, to the extent necessary to effectuate the foregoing enumerated provisions, Section 1.1 hereof, will survive any such termination and will be enforceable hereunder; provided, further, that nothing in this Article XI will be deemed to release any party from liability for any breach of this Agreement prior to termination.

**ARTICLE XII**
**GENERAL PROVISIONS**

Section 12.1 Notices. Any notice, consent or other communication required or permitted under this Agreement shall be in writing and shall be delivered (a) in person, (b) by a nationally

recognized courier for overnight delivery service, or (c) by email or other electronic means, confirmed by telephone or return email (including an automated return receipt), to the persons indicated below. A notice or communication shall be deemed to have been effectively given (i) if in person, upon personal delivery to the Party to whom the notice is directed, (ii) if by nationally recognized courier, one Business Day after delivery to such courier, and (iii) if by email or other electronic means, when sent and confirmed by telephone or return email. Rejection or other refusal to accept or inability to deliver because of changed address of which no notice has been received shall also constitute receipt. Any such notice, election, demand, request or response shall be addressed as follows:

(a) If to Agent, then to:

GA Joann Retail Partnership, LLC
2829 Townsgate Road, Suite 103
Westlake Village, CA 91361
Attn: Scott K. Carpenter, scarpenter@gagroup.com
Tim Shilling, tshilling@gagroup.com
Legal Department, legal@brileyfin.com

with a copy (which shall not constitute notice) to:

Lowenstein Sandler LLP
One Lowenstein Drive
Roseland, NJ 07068
Attn: Andrew D. Behlmann, abehlmann@lowenstein.com;
Jean Nicolas Samedi Jr., jsamedi@lowenstein.com;
Emily Jewell, ejewell@lowenstein.com

If to Buyer, then to:

Singer Sourcing Limited LLC
300 2nd Avenue South
Suite 300
Nashville, TN 37201
Attn: Legal Department, contracts@svpworldwide.com

Section 12.2 Amendment; Waiver. No amendment, modification or discharge of this Agreement, and no consent or waiver hereunder, shall be valid or binding unless set forth in writing and duly executed by the Party against whom enforcement of the amendment, modification, discharge, consent or waiver is sought and such amendment, modification, discharge, consent or waiver is delivered substantially contemporaneously to each other Party. Any such waiver shall constitute a waiver only with respect to the specific matter described in such writing and shall in no way impair the rights of the Party granting such waiver in any other respect or at any other time. Neither the waiver by any of the Parties of a breach of or a default under any of the provisions of this Agreement, nor the failure by any of the Parties, on one or more occasions, to enforce any of the provisions of this Agreement or to exercise any right or privilege hereunder shall be construed

as a waiver of any other breach or default of a similar nature, or as a waiver of any of such provisions, rights or privileges hereunder. No course of dealing between or among the Parties shall be deemed effective to modify, amend or discharge any part of this Agreement or any rights to payment of any Party under or by reason of this Agreement. Upon the occurrence of the Closing, any condition set forth in Article IX or Article X that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing. Neither Party may rely on the failure of any condition set forth in Article IX or Article X, as applicable, to be satisfied if such failure was caused by such Party's failure to perform any of its obligations under this Agreement including its obligation to use its reasonable best efforts to consummate the transactions contemplated hereby as required under this Agreement.

Section 12.3   Entire Agreement. This Agreement (including the Schedules and the Exhibits) and the other Transaction Documents contain all of the terms, conditions and representations and warranties agreed to by the Parties relating to the subject matter of this Agreement and supersede all prior and contemporaneous agreements, understandings, negotiations, correspondence, undertakings and communications of the Parties or their representatives, oral or written, respecting such subject matter. The representations, warranties, covenants and agreements contained in this Agreement (including the Schedules and the Exhibits) and the other Transaction Documents are intended, among other things, to allocate the economic cost and the risks inherent in the transactions contemplated hereby and thereby, including risks associated with matters as to which the party making such representations and warranties has no knowledge or only incomplete knowledge, and such representations and warranties may be qualified by disclosures contained in the Schedules. Consequently, Persons other than the Parties may not rely upon the representations and warranties in this Agreement as characterizations of actual facts or circumstances as of the date of this Agreement or as of any other date.

Section 12.4   No Presumption as to Drafting. Each of the parties acknowledges that it has been represented by legal counsel in connection with this Agreement and the other Transaction Documents and the transactions contemplated hereby and thereby.  Accordingly, any rule of law or any legal decision that would require interpretation of any claimed ambiguities in this Agreement or the Transaction Documents against the drafting party has no application and is expressly waived.

Section 12.5   Assignment. This Agreement, and the rights, interests and obligations hereunder, shall not be assigned by any Party by operation of law or otherwise without the express written consent of the other Parties (which consent maybe granted or withheld in the sole discretion of such other Party); provided, however, that Buyer shall be permitted, upon prior notice to Agent, to assign all or part of Buyer's rights or obligations hereunder to an Affiliate, but no such assignment shall relieve Buyer of Buyer's obligations under this Agreement.

Section 12.6   Severability. The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and

the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability.

Section 12.7    Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver.

(a)    This Agreement shall be governed by and interpreted in accordance with the laws of the State of Delaware without reference to any conflict of laws provisions thereof, except where governed by the Bankruptcy Code.    Each of the Parties irrevocably and unconditionally submits, for itself and its properties, to the exclusive jurisdiction of the Bankruptcy Court, in any action or proceeding arising out of or relating to this Agreement.

(b)    EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY) EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 12.7.

Section 12.8    Counterparts. This Agreement may be executed in any number of counterparts (including via facsimile or other electronic transmission in portable document format (pdf)) with the same effect as if the signatures to each counterpart were upon a single instrument, and all such counterparts together shall be deemed an original of this Agreement. This Agreement shall become effective when, and only when, each Party shall have received a counterpart hereof signed by the other Party. Delivery of an executed counterpart hereof by means of facsimile or electronic transmission in portable document format (pdf) shall have the same effect as delivery of a physically executed counterpart in person.

Section 12.9    Parties in Interest. Nothing in this Agreement shall confer any rights, benefits, remedies, obligations, liabilities or claims hereunder upon any Person not a Party or a permitted assignee of a Party.

Section 12.10 Non-Recourse. All claims, obligations, liabilities or causes of action (whether in contract or in tort, in law or in equity or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with or relate in any manner to this Agreement, the negotiation, execution or performance of this Agreement (including any representation or warranty made in connection with or as an inducement to this Agreement) or the transactions contemplated hereby may be made only against (and are those solely of) the Persons that are expressly identified as Parties to this Agreement.    No other Person, including any of their Affiliates, directors, officers, employees, incorporators, members, partners, managers, stockholders, agents, attorneys, or representatives of, or any financial advisors or lenders to, any of the foregoing shall have any liabilities (whether in contract or in tort, in law or in equity, or granted by statute) for any claims, causes of action, obligations or liabilities arising under, out of,

in connection with, or related in any manner to, this Agreement or based on, in respect of, or by reason of, this Agreement or its negotiation, execution, performance or breach.

Section 12.11 Schedules; Materiality. The inclusion of any matter in any Schedule shall be deemed to be an inclusion for all purposes of this Agreement, to the extent that such disclosure is sufficient to identify the Section to which such disclosure is responsive, but inclusion therein shall not be deemed to constitute an admission, or otherwise imply, that any such matter is material or creates a measure for materiality for purposes of this Agreement. The disclosure of any particular fact or item in any Schedule shall not be deemed an admission as to whether the fact or item is "material".

Section 12.12 Specific Performance.   The Parties acknowledge and agree that (a) irreparable injury, for which monetary damages, even if available, would not be an adequate remedy, will occur in the event that any of the provisions of this Agreement are not performed in accordance with the specific terms hereof or are otherwise breached, and (b) the non-breaching Party or Parties shall therefore be entitled, in addition to any other remedies that may be available, to obtain (without the posting of any bond) specific performance of the terms of this Agreement, if any Proceeding is brought by the non-breaching Party or Parties to enforce this Agreement, the Party in breach shall waive the defense that there is an adequate remedy at law.

Section 12.13 Survival. All covenants and agreements contained herein that by their terms are to be performed in whole or in part, or which prohibit actions, subsequent to the Closing shall survive the Closing in accordance with their terms. All other covenants and agreements contained herein, and all representations and warranties contained herein or in any certificated deliveries hereunder, shall not survive the Closing, and shall thereupon terminate.

*Signature Page Follows*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their duly authorized representatives as of the date hereof.

**SINGER SOURCING LIMITED LLC**

Signed by:

By: ______________________
908E2CAA7676435...
Name: Rob Will
Title: CEO

**GA JOANN RETAIL PARTNERSHIP, LLC**

By: Scott Carpenter
Name: Scott Carpenter
Title: CEO

# **EXHIBIT A**

## **Form of Power of Attorney**

*See attached.*

# POWER OF ATTORNEY

THIS POWER OF ATTORNEY (this "Power") is delivered as of May [•], 2025 (the "Effective Date"), by [•], a [•] ("Grantor").

**WHEREAS**, on January 15, 2025, JOANN Inc., a Delaware corporation ("JOANN") and twelve of its affiliates (collectively, the "Debtors") commenced voluntary chapter 11 bankruptcy cases (the "Bankruptcy Cases") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which cases are being jointly administered under lead Case No. 25-10068 (CTG);

**WHEREAS**, on February 26, 2025, the Bankruptcy Court entered an order (the "Approval Order") [D.I. 520] that, among other relief, approved an Agency Agreement, dated as of February 26, 2025, and granted GA Joann Retail Partnership, LLC, a Delaware limited liability company ("Agent"), the exclusive right to market and sell, and/or otherwise designate the purchasers, licensees and assignees of, any of all of the assets of the Debtors free and clear of all liens, claims, and encumbrances thereon without further order of the Bankruptcy Court;

**WHEREAS**, pursuant to that certain Intellectual Property Asset Purchase Agreement dated May [•], 2025 (the "Purchase Agreement"), by and between the Agent and Singer Sourcing Limited LLC, a Delaware limited liability company ("Buyer"), as buyer, the Agent agreed to sell, convey, assign, transfer and deliver to the Buyer all of the Acquired Assets (as defined in the Purchase Agreement); and

**WHEREAS**, the closing of the transactions contemplated by the Purchase Agreement has occurred (the "Closing"), and the Grantor desires to grant to the Buyer and its designees an irrevocable power of attorney to evidence and secure the Buyer's right, title and interest in and to the Acquired Assets and to enable the Buyer to take any and all further actions that the Buyer deems necessary or advisable to vest, perfect or enforce such right, title and interest.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Grantor hereby constitutes and appoints the Buyer, and each officer, director, manager, employee or agent thereof from time to time designated in writing by the Buyer (each, an "Attorney-in-Fact" and collectively, the "Attorneys-in-Fact"), with full power of substitution and resubstitution, as the Grantor's true and lawful attorney, irrevocably and coupled with an interest, to act in the name, place and stead of the Grantor or otherwise on the Grantor's behalf, for the limited purpose of executing, delivering, filing and recording, and doing all acts and things necessary, desirable or appropriate in the judgment of any Attorney-in-Fact to effectuate, evidence, consummate, confirm, preserve, maintain, defend, enforce, assign or otherwise transfer to or for the benefit of the Buyer all right, title and interest in, to and under the Acquired Assets, including without limitation the following powers:

(a) to execute, acknowledge, swear to, verify, deliver, record, file and publish any bills of sale, deeds, assignments, endorsements, transfers, certificates, affidavits, financing statements, termination statements, continuations, amendments, notices, powers of attorney, consents, approvals, applications, elections, proxies, waivers, waivers of conflict, proofs of claim, withdrawals or substitutions of counsel, licenses, sublicenses, registrations, maintenance documents, declarations, instruments or other documents of any kind or nature (collectively, "Instruments") that any Attorney-in-Fact may deem necessary or appropriate to transfer, evidence or confirm the transfer of any Acquired Asset or any interest therein to the Buyer or its affiliates, or to vest, perfect, continue, re-file or update the Buyer's title to or security interest in any Acquired Asset;

(b) to endorse, deposit, negotiate, assign or collect on behalf of any Debtor any checks, drafts or other instruments made payable to such Debtor and relating solely to any Acquired Asset, including without limitation any cash, cash equivalents, accounts, accounts receivable, intercompany receivables or proceeds of any Acquired Asset;

(c) to prosecute, compromise, settle or otherwise resolve any claim, demand, action, cause of action, counterclaim, setoff or defense constituting or relating to any Acquired Asset, including without limitation the right to appear in or before any court, agency, arbitrator or other tribunal, to file pleadings, motions and proofs of claim, to vote or otherwise act in any insolvency or bankruptcy proceeding, and to retain counsel, accountants or other professionals at the expense of the Debtors' estate if and to the extent approved by the Bankruptcy Court or otherwise permitted under the Bankruptcy Code;

(d) to take any action required or permitted under any contract or permit included among the Acquired Assets, including without limitation (i) issuing or accepting notices, waivers, consents or approvals, (ii) exercising or delegating rights, remedies, options or elections, (iii) delivering or demanding performance, and (iv) pursuing or defending arbitrations, mediations or litigation, all to the same extent as any Debtor might do;

(e) to request, demand, receive and give acquittance for any mail, shipments, parcels or other communications addressed to the Debtors that relate solely to the Acquired Assets and to open, read and deal with the same;

(f) to prepare, execute and file any tax returns, declarations, schedules, elections or other documents in any Debtor's name but solely with respect to any taxable period, item or asset included in or attributable to the Acquired Assets and, in connection therewith, to pay or contest any taxes and to receive and endorse any refund checks or other payments; and

(g) to do and perform every act necessary, desirable or appropriate in the judgment of any Attorney-in-Fact to carry out the foregoing, as fully and to the same extent as any Debtor could do if personally present and acting.

The Grantor hereby ratifies and confirms, and agrees to ratify and confirm, all lawful acts performed by any Attorney-in-Fact pursuant to this Power. This Power is irrevocable and is coupled with an interest, and shall not be affected by the subsequent dissolution, liquidation, bankruptcy, insolvency, conversion, appointment of a trustee or examiner, restructuring, reorganization, assignment for the benefit of creditors, receivership or other proceeding affecting the Debtors or their property, or by the passage of time, and, in any such event, each Attorney-in-Fact shall continue to act under this Power until the earlier of (i) the date on which all obligations of the Agent and/or Debtors under the Purchase Agreement have been fully performed or satisfied and all Acquired Assets have been fully and finally transferred to the Buyer, and (ii) the date on which this Power is terminated by written instrument executed by the Buyer.

The Grantor hereby waives, to the fullest extent permitted by law, any requirement that any Attorney-in-Fact post bond as a condition to or in connection with the exercise of any power granted under this Power.

This Power shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to its conflict of laws principles. Any action, suit or proceeding arising out of or relating to this Power or the transactions contemplated hereby shall be brought exclusively in the Bankruptcy Court, and, if the Bankruptcy Court declines jurisdiction, in any federal or state court located in New Castle County, Delaware and the Grantor hereby submits to the jurisdiction of such courts and waives any objection based on venue or *forum non conveniens*.

If any provision of this Power is held to be invalid or unenforceable, such provision shall be ineffective only to the extent of such invalidity or unenforceability, and the remaining provisions shall remain in full force and effect.

[*remainder of page intentionally left blank*]

IN WITNESS WHEREOF, the Grantor has duly delivered this Power of Attorney as of the Effective Date.

**[•]**

By:_________________________________
Name:_______________________________
Title: _______________________________

State of __________ )

County of __________ ) ss.:

On this ___ day of _______ , 2025, before me, the undersigned, a Notary Public in and for said state, personally appeared ______________________, who acknowledged himself/herself to be the ____________________ of __________________________________, and that he/she, as such officer, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the name of the grantor by himself/herself as such officer.

IN WITNESS WHEREOF I hereunto set my hand and official seal.

___________________________________
Notary Public

My commission expires: __________

# EXHIBIT B

## Form of Domain Name Assignment Agreement

*See attached.*

# DOMAIN NAME ASSIGNMENT

This DOMAIN NAME ASSIGNMENT is made effective as of [●], 2025 by and between Dittopatterns LLC, a Delaware limited liability company ("Assignor"), and Singer Sourcing Limited LLC, a Delaware limited liability company ("Assignee").

WHEREAS, GA Joann Retail Partnership, LLC, a Delaware limited liability company ("Agent") and Assignee are parties to that certain Asset Purchase Agreement, dated as of May [●], 2025 (the "Agreement"), pursuant to which Agent sold, conveyed, transferred and assigned to Assignee, and Assignee purchased and acquired from Agent, all of Assignor's right, title, and interest in, among other things, the domain names in the attached Schedule 1 (the "Domain Names"), including the goodwill of the business connected with the use thereof and symbolized thereby; and

WHEREAS, pursuant to the Agreement, Assignor and Assignee are required to execute this Assignment.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby expressly acknowledged, Assignor does hereby convey, transfer and assign to Assignee all of Assignor's right, title, and interest in and to Domain Names, as well as all rights of Assignor to sue or otherwise recover for any past, present and future infringement, dilution or other violation or impairment thereof.

[*Signatures on next page*]

**ASSIGNOR:**

DITTOPATTERNS LLC

By: ________________________________
Name:______________________________
Title:______________________________
Date:______________________________

**ASSIGNEE:**

SINGER SOURCING LIMITED LLC

By: ________________________________
Name:______________________________
Title:______________________________
Date:______________________________

**Schedule 1**
Domain Names

| Domain Name | Expiration Date | Registrar |
|---|---|---|
| Dittopatterns.com | 7/12/2025 | Network Solutions |
| Dittoprojector.com | 7/12/2025 | Network Solutions |
| Dittosite.com | 10/7/2025 | Network Solutions |
| Easyditto.com | 10/7/2025 | Network Solutions |
| Liveditto.com | 10/7/2025 | Network Solutions |
| Newditto.com | 10/7/2025 | Network Solutions |
| Nopapersewing.com | 11/16/2025 | Network Solutions |
| Paperlesssewing.com | 11/16/2025 | Network Solutions |
| Patternprojection.com | 10/31/2026 | Network Solutions |
| Sewditto.com | 7/12/2025 | Network Solutions |
| Sewpaperless.biz | 10/31/2026 | Network Solutions |
| Sewpaperless.com | 10/31/2026 | Network Solutions |
| Sewpaperless.co | 10/30/2026 | Network Solutions |

# EXHIBIT C

## Form of Trademark Assignment Agreement

*See attached.*

# TRADEMARK ASSIGNMENT

This TRADEMARK ASSIGNMENT of United States Registrations and Applications is made effective as of [●], 2025 by and between Jo-Ann Stores, LLC, an Ohio limited liability company ("Assignor"), and Singer Sourcing Limited LLC, a Delaware limited liability company ("Assignee").

WHEREAS, GA Joann Retail Partnership, LLC, a Delaware limited liability company ("Agent") and Assignee are parties to that certain Asset Purchase Agreement, dated as of May [●], 2025 (the "Agreement"), pursuant to which Agent sold, conveyed, transferred and assigned to Assignee, and Assignee purchased and acquired from Agent, all of Assignor's right, title, and interest in, among other things, the marks listed in the attached Schedule 1 (the "Trademarks"), including the goodwill of the business connected with the use thereof and symbolized thereby; and

WHEREAS, pursuant to the Agreement, Assignor and Assignee are required to execute this Assignment.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby expressly acknowledged, Assignor does hereby convey, transfer and assign to Assignee all of Assignor's right, title, and interest in and to Trademarks, together with the goodwill of the business connected with the use of and symbolized by the Trademarks, as well as all rights of Assignor to sue or otherwise recover for any past, present and future infringement, dilution or other violation or impairment thereof. Assignor hereby authorizes the Commissioner for Trademarks in the United States Patent and Trademark Office to record and register this Trademark Assignment upon Assignee's request.

[*Signatures on next page*]

**ASSIGNOR:**

JO-ANN STORES, LLC

By: ________________________________
Name:______________________________
Title:_______________________________
Date:_______________________________

**ASSIGNEE:**

SINGER SOURCING LIMITED LLC

By: ________________________________
Name:______________________________
Title:_______________________________
Date:_______________________________

**Schedule 1**
Trademarks

| Country | Mark | File Date | App. No. | Reg. Date | Reg. No. | Goods and Services (original application) | Owner | Status |
|---|---|---|---|---|---|---|---|---|
| U.S. | Ditto (standard character / word mark) | 05-27-20<br><br>04/20/21 | 88/934,676<br><br>90979610 (original application 90/657,956) | 08-01-23<br><br>05-30-23 | 7,127,649<br><br>7,069,541 | Class 9 - Projector for projecting sewing patterns onto a work surface for subsequent tracing and cutting of fabric; computer application software for use with a projector for storing sewing patterns and projecting sewing patterns onto a work surface for subsequent tracing and cutting of fabric; mobile app for use with a projector for storing sewing patterns and projecting sewing patterns onto a work surface for subsequent tracing and cutting of fabric; computer application software for storing and displaying sewing patterns; mobile app for storing and displaying sewing patterns<br><br>Second application – accessories:<br>Class 8 rotary cutters<br>Class 16 cutting mats<br>Class 20 fabric weights; pattern weights | Jo-Ann Stores, LLC | Registered<br><br>Registered in class 6, 16 (class 8 not pursued) |
| U.S. | Ditto (stylized / design mark) | 10-06-20<br><br>04/21/21 | 90/237,174<br><br>90979611 (original application 90/657,966) | 05-16-23<br><br>05-30-23 | 7,055,877<br><br>7,069,542 | Class 9 - Projector for projecting sewing patterns onto a work surface for subsequent tracing and cutting of fabric; computer application software for use with a projector for storing sewing patterns and projecting sewing patterns onto a work surface for subsequent tracing and cutting of fabric; mobile app for use with a projector for storing sewing patterns and projecting sewing patterns onto a work surface for subsequent tracing and cutting of fabric; computer application software for storing and displaying sewing patterns; mobile app for storing and displaying sewing patterns<br><br>Second application – | Jo-Ann Stores, LLC | Registered<br><br>Registered in class 6, 16 (class 8 not pursued) |

| Country | Mark | File Date | App. No. | Reg. Date | Reg. No. | Goods and Services (original application) | Owner | Status |
|---|---|---|---|---|---|---|---|---|
| | | | | | | accessories:<br>Class 8 rotary cutters<br>Class 16 cutting mats<br>Class 20 fabric weights; pattern weights | | |

# EXHIBIT D

## Form of Patent Assignment Agreement

*See attached.*

# PATENT ASSIGNMENT

This PATENT ASSIGNMENT of Patents and/or Patent Applications is made effective as of **[●]**, 2025 by and between Dittopatterns LLC, a Delaware limited liability company ("Assignor"), and Singer Sourcing Limited LLC, a Delaware limited liability company ("Assignee").

WHEREAS, GA Joann Retail Partnership, LLC, a Delaware limited liability company ("Agent") and Assignee are parties to that certain Asset Purchase Agreement, dated as of May [●], 2025 (the "Agreement"), pursuant to which Agent sold, conveyed, transferred and assigned to Assignee, and Assignee purchased and acquired from Agent, all of Assignor's right, title, and interest in, among other things, the patents and patent applications listed in the attached Schedule 1 (the "Patents"); and

WHEREAS, pursuant to the Agreement, Assignor and Assignee are required to execute this Assignment.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby expressly acknowledged, Assignor does hereby convey, transfer and assign to Assignee all of Assignor's right, title, and interest in and to the Patents, as well as all rights of Assignor to sue or otherwise recover for any past, present and future infringement or other violation or impairment thereof. Assignor hereby authorizes the Commissioner for Patents in the United States Patent and Trademark Office and any officials of foreign countries to record and register this Patent Assignment upon Assignee's request.

[*Signatures on next page*]

**ASSIGNOR:**

DITTOPATTERNS LLC

By: ________________________________
Name:_______________________________
Title:_______________________________
Date:_______________________________

**ASSIGNEE:**

SINGER SOURCING LIMITED LLC

By: ________________________________
Name:_______________________________
Title:_______________________________
Date:_______________________________

**Schedule 1**
Patents

| Title | Jurisdiction | File Date | App. No. | Issue Date | Patent No. | Description | Owner | Status | Expiration |
|---|---|---|---|---|---|---|---|---|---|
| Method of Projecting Sewing Pattern Pieces onto Fabric – continuation filing | USA | 08-24-20 | 17/001,040 | 02-21-23 | 11,583,021 | Utility patent. Continuation of patent US 10,750,810 B2. | Dittopatterns LLC (f/k/a Newco Jodito LLC) | **Issued** | 05-04-2038 |
| Method of Formatting Sewing Patterns for paperless use | USA | 02-01-19 | 16/350,932 | 05-11-21 | 11,003,903 B2 | Utility patent. See body of patent. | Dittopatterns LLC (f/k/a Newco Jodito LLC) (purchased from E. Caven) | **Issued** | 03-02-2039<br><br>Next maintenance fee due in Nov. 2028 |
| Method of Projecting Sewing Pattern Pieces onto Fabric | USA | 12-24-17 | 15/853,807 | 08-25-20 | 10,750,810 B2 | Utility patent. See body of patent. | Dittopatterns LLC (f/k/a Newco Jodito LLC) (purchased from E. Caven) | **Issued** | 08-10-2038 |

| Title | Jurisdiction | File Date | App. No. | Issue Date | Patent No. | Description | Owner | Status | Expiration |
|---|---|---|---|---|---|---|---|---|---|
| Image Projecting System and Methods | USA | 05-12-21 | 17/318,708 | 12-10-24 | 12,164,217 | Utility patent. See body of patent. Original hardware patent application in the United States<br><br>Non-provisional (includes provisional applications filed 12-22-20 and 05-12-20) | Dittopatterns LLC (f/k/a Newco Jodito LLC) | **Issued**<br><br>Issuance fee paid October 29, 2024<br><br>Notice of Allowance issued July 30, 2024.<br><br>Published on 11-18-21 as Pub. No. 2021-0356849 A1. Amendment filed in January 2023. | 05-10-43<br><br>First maintenance fee due 12-10-27 |
| Image Projecting System and Methods | USA | 12-06-24 | 18/972,135 | no issuance | no issuance | Continuation of Patent 12,164,217 | Dittopatterns LLC | [Pending. No examination yet.] | |
| Image Projecting System and Methods | USA | 11-11-23 | 18/268,878<br><br>PCT / US2021 / 058984<br><br>(PCT 2) | no issuance | no issuance | Software / splicing. Improvements to U.S. Patent Application No. 17/318,708 and to PCT 1 (PCT / US2021 / 032021) | Dittopatterns LLC (f/k/a Newco Jodito LLC) | [Pending. No examination yet.] Published on 06-30-22 as Pub. No. WO 2022/139974 | |
| Image Projecting System and Methods | Canada | 11-3-2022 | 3,177,784 | no apparent issuance | no apparent issuance | Ties back to PCT 1 (PCT / US2021 / 032021) that was filed 05-12-21 | Dittopatterns LLC (f/k/a Newco Jodito LLC) | [Pending] Next fee due May 12, 2025. Request for examination due on same day. | |
| Image Projecting System and Methods | Canada | 06-20-23 | 3,202,950<br><br>003644-0040 | no apparent issuance | no apparent issuance | Ties back to PCT 2 (PCT / US2021 / 058984) | Dittopatterns LLC (f/k/a Newco Jodito LLC) | [Pending] Next fee due November 11, 2025. Request for examination due on same day. | |

| Title | Jurisdiction | File Date | App. No. | Issue Date | Patent No. | Description | Owner | Status | Expiration |
|---|---|---|---|---|---|---|---|---|---|
| Image Projection System and Method | China | National Entry | 202180086913 4/5 | no apparent issuance | no apparent issuance | | Dittopatterns LLC (f/k/a Newco Jodito LLC) | Pending | |
| Image Projecting Systems and Methods | Australia | National Entry | 2021409118 | no apparent issuance | no apparent issuance | | Dittopatterns LLC (f/k/a Newco Jodito LLC) | Pending | |
| Image Projecting Systems and Methods | Mexico | National Entry | 2023007531 | no apparent issuance | no apparent issuance | | Dittopatterns LLC (f/k/a Newco Jodito LLC) | Pending | |
| Image Projecting Systems and Methods | European Patent Register | Regional Entry | 21911838 | no apparent issuance | no apparent issuance | | Dittopatterns LLC (f/k/a Newco Jodito LLC) | Pending | |
| SISTEMA DE PROJEÇÃO PARA PROJETAR PADRÕES DE COSTURA EM UMA SUPERFÍCIE | Brazil | National Entry | 112022023024 | no apparent issuance | no apparent issuance | | Dittopatterns LLC (f/k/a Newco Jodito LLC) | Pending | |
| Image Projection System and Method | Japan | National Entry | 2022568707 | no apparent issuance | no apparent issuance | | Dittopatterns LLC (f/k/a Newco Jodito LLC) | Pending | |
| Image Projecting Systems and Methods | Mexico | National Entry | 2022014269 | no apparent issuance | no apparent issuance | | Dittopatterns LLC (f/k/a Newco Jodito LLC) | Pending | |
| Image Projection and System | China | National Entry | 202180034635.1 | no apparent issuance | no apparent issuance | | Dittopatterns LLC (f/k/a Newco Jodito LLC) | Pending | |

# EXHIBIT E

## Form of 503(b)(9) Release

*See attached.*

# RELEASE

WHEREAS, SVP Sewing Brands LLC ("SVP") and GA Joann Retail Partnership, LLC ("Agent") are parties to an Asset Purchase Agreement dated as of May __, 2025 (the "APA"). Capitalized terms used but not defined herein have the meanings given thereto in the APA.

WHEREAS, pursuant to the APA, Agent has agreed to sell and SVP has agreed to purchase certain Acquired Assets of JOANN Inc. and its affiliated chapter 11 debtors in possession (the "Debtors" and their chapter 11 bankruptcy cases, the "Chapter 11 Cases") on the terms and conditions set forth in the APA.

WHEREAS, the Debtors have scheduled the following general unsecured claims of SVP in the Chapter 11 Cases (the "Scheduled Claims")

| Schedule No. | Debtor | Amount |
|---|---|---|
| 6284353 | Jo-Ann Stores, LLC | $2,715,968.29 |
| 6285319 | joann.com, LLC | $19,625.44 |
| 6286852 | Jo-Ann Stores, LLC | $3,255,564.24 |

WHEREAS, on April 4, 2025, SVP filed the following proofs of claim in the Chapter 11 Cases (the "Filed Claims"):

| Claim No. | Debtor | Amount |
|---|---|---|
| 11581 | JOANN Ditto Holdings Inc. | Unliquidated |
| 11676 | Jo-Ann Stores, LLC | $8,412,826.57 |

WHEREAS, the Filed Claims assert general unsecured claims, claims entitled to administrative expense priority pursuant to section 503(b)(9) of the Bankruptcy Code, and claims entitled to secured or other priority treatment on account of SVP's alleged reclamation and setoff rights.

WHEREAS, pursuant to the APA, as part of the consideration for the transactions contemplated thereby, SVP has agreed to waive all of its claims against the Debtors other than general unsecured claims, and Agent, as agent for the Debtors, has agreed to waive any and all claims against SVP under the Master Sublease.

NOW, THEREFORE, in consideration of the sale of the Acquired Assets and the other consideration being provided to SVP by Agent and the Debtors pursuant to the APA, SVP and Agent hereby agree as follows, in each instance effective only as of the occurrence of the Closing:

1. Effective upon the occurrence of the Closing, SVP hereby releases, waives, relinquishes, and settles all claims it has, had, or ever could have had against the Debtors arising from any facts, circumstances, acts, or omissions occurring prior to the Closing, other than a single general unsecured claim against Jo-Ann Stores, LLC in the amount of $8,010,104.77 (the "Remaining Claim").

2.      SVP authorizes the Debtors' claims and noticing agent, Kroll Restructuring Administration, to mark all of the Scheduled Claims and the Filed Claims as disallowed and expunged, other than Claim No. 11676, which will be modified on the claims register to reflect the Remaining Claim, a single general unsecured claim against Jo-Ann Stores, LLC in the amount of $8,010,104.77.

3.      Subject to receipt of the Release Amount, Agent, as agent for the Debtors, hereby releases, waives, relinquishes, and settles all claims the Debtors have, had, or ever could have had against SVP under the Master Sublease.

[ *signature pages follow* ]

IN WITNESS WHEREOF, the Parties have caused this Release to be executed and delivered by their duly authorized representatives as of the date hereof.

**SVP SEWING BRANDS LLC**

By:________________________________________

Name:

Title:

[ *signature page to release* ]

**GA JOANN RETAIL PARTNERSHIP, LLC**

By:______________________________________

Name:

Title:

[ *signature page to release* ]

# **EXHIBIT F**

## **Master Sublease Release**

*See attached.*

# Termination of Master Sublease and Release of Claims Agreement

This Release of Claims Agreement (the "Agreement") is entered into on [•], 2025 (the "Effective Date"), by and between SVP Sewing Brands LLC ("SVP") and GA Joann Retail Partnership, LLC, in its capacity as agent pursuant to the Approval Order, on behalf of itself and the Debtors (including, without limitation, Jo-Ann Stores, LLC) ("Agent"). SVP and the Agent are referred to herein collectively as the "Parties." The Parties are entering into this Agreement in connection with that certain Intellectual Property Asset Purchase Agreement entered into on [•], 2025, by and between Singer Sourcing Limited LLC, a Delaware limited liability company ("Buyer") and the Agent (the "Asset Purchase Agreement"). Capitalized terms used but not defined herein shall have the meanings set forth in the Asset Purchase Agreement.

## RECITALS

**WHEREAS,** on February 26, 2025, the Bankruptcy Court entered the Approval Order that, among other relief, approved an Agency Agreement, dated as of February 26, 2025, and granted Agent the exclusive right to market and sell, and/or otherwise designate the purchasers, licensees, and assignees of, any of the assets of the Debtors free and clear of all liens, claims, and encumbrances, including the power to (i) direct the Debtors to assume and assign contracts and leases pursuant to the procedures set forth in the Approval Order and (ii) release SVP and its affiliates from certain claims arising from the Master Sublease (as hereafter defined), without further order of the Bankruptcy Court;

**WHEREAS,** under the Asset Purchase Agreement**,** Agent has designated Buyer as the purchaser of the Acquired Assets, and Buyer desires to purchase all of the Acquired Assets and assume all of the Assumed Liabilities, in each case upon the terms and conditions set forth in the Asset Purchase Agreement;

**WHEREAS,** under the Asset Purchase Agreement, Buyer shall pay $800,000 to the Seller in satisfaction of any and all liabilities or other amounts that SVP or its affiliates may owe under or in connection with the Master Sublease, whenever accrued, whether before, on, or after the Closing;

**WHEREAS,** under the Asset Purchase Agreement, the Agent must deliver to Buyer a release, duly executed by Agent, releasing SVP and its affiliates from all claims under or in connection with the Master Sublease; and

**WHEREAS**, the Parties desire to terminate the Master Sublease as of the Effective Date.

**NOW, THEREFORE,** in consideration of the mutual covenants and promises set forth below and for other good and valuable consideration, the receipt and sufficiency of which the Parties acknowledge, and intending to be legally bound, the Parties agree as follows:

## I. DEFINITIONS

For purposes of this Agreement, the following capitalized terms will have the meanings set forth below:

"Affiliate" means, with respect to any Entity, any other Entity controlled by, controlling, or under common control with such Entity.

"Claims" means any and all past claims, complaints, counterclaims, cross-claims, rights of contribution or indemnity, rights of setoff or recoupment, manners of action, rights of action, causes

of action, judgments, suits, contracts, liabilities, obligations, demands, consequential damages or demands, liens, debts, accounts, promises, warranties, damages, losses, charges, reimbursements, fees, penalties, fines, contributions, costs, expenses, or attorneys' fees, of any kind or character whatsoever, at law or in equity, whether known or unknown, liquidated or unliquidated, direct or indirect, fixed or contingent, suspected or unsuspected, whether or not concealed or hidden, asserted, or that could have been asserted, to the extent arising from the Master Sublease prior to the Effective Date, for any type of relief, including, without limitation, claims for damages based in statute or common law, compensatory damages, penalties, punitive damages, interest, costs or attorneys' fees, restitution, or equitable or injunctive relief. "Claims" shall not include any Claims arising or accruing after the Effective Date.

"Entity" means any person, individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, estate, trust, business trust, sole proprietorship, unincorporated organization or association, governmental entity, or any other entity, whether acting in an individual, fiduciary, or other capacity.

"Master Sublease" means that certain 2019 Master Sublease Agreement by and between Jo-Ann Stores, LLC, as sublandlord, and SVP, as subtenant, dated July 1, 2019, as amended by that certain First Amendment to 2019 Master Sublease dated May 1, 2023.

"Released Claims" means the Claims released by the Releasing Parties.

"Released Parties" means SVP and its Affiliates or a special purpose vehicle designated by SVP.

"Releasing Parties" means the Agent, on behalf of itself and the Debtors.

## II. AGREEMENT

1. **Releases.** As of the Effective Date, the Agent, on behalf of itself and the Debtors, pursuant to its authority under the Approval Order, knowingly, voluntarily, unequivocally, fully, unconditionally, irrevocably, and forever discharge the Released Parties from all Claims. Nothing contained in this Agreement shall be construed to release, waive, or otherwise affect any obligations of the Released Parties that first arise after the Effective Date, including, without limitation, any obligations of the Released Parties under the Master Sublease that, by their express terms, apply to periods after the Effective Date. All such post-Effective Date obligations of Subtenant (if any) are expressly preserved.

2. **Unknown Claims.** Each Releasing Party acknowledges that there is a risk that after the execution of this Agreement, such Releasing Party may (i) discover facts in addition to, or different from, those that such Releasing Party now knows or believes to exist or (ii) discover, incur, or suffer from Released Claims which were unknown or unanticipated at the time this Agreement is executed, including, without limitation, unknown or unanticipated Released Claims which, if known by such Releasing Party on the date this Agreement is being executed, may have materially affected such Releasing Party's decision to execute this Agreement. Each Releasing Party acknowledges and agrees that it is assuming the risk of such existing unknown and unanticipated Released Claims and agrees that this Agreement applies thereto. Each of the Releasing Parties understands, acknowledges, and agrees that such Releasing Party is familiar with Section 1542 of the Civil Code of the State of California, which provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

Each of the Releasing Parties expressly waives and relinquishes any rights and benefits that such Releasing Party may have under Section 1542 or any other statute (whether in California, Delaware, or elsewhere) or common law principle of any jurisdiction with a similar effect to the full extent that it may lawfully waive all such rights and benefits pertaining to the subject matter hereof.

3. **Ownership of Claims.** The Agent represents and warrants that it has the full power and authority, as set forth in the Approval Order, on behalf of itself and the Debtors and their respective estates, to release the Released Claims as contemplated by this Agreement. The Agent represents and warrants to each Released Party that the Releasing Parties have not assigned or transferred or purported to assign or transfer, and hereby covenants that such Releasing Parties shall not assign or transfer (or purport to assign or transfer), any Released Claim, or any portion thereof or any interest therein, to any non-Party.

4. **No Admission of Wrongdoing.** It is understood and agreed that this Agreement has been entered into by the Parties solely to accomplish an expeditious resolution and settlement of the matter in controversy and for no other purpose. In entering this Agreement, the Parties do not admit that they committed any breaches of contract or torts, whether legal or equitable, or violated any federal, state, or local law, any regulations or guidelines promulgated pursuant to those laws, or any other applicable laws, regulations, or guidelines, or any other legal requirements or standards. Neither this Agreement, nor any of its terms or provisions, nor any of the negotiations connected therewith or relating thereto, shall be construed as an admission or concession of any violation or failure to comply with any applicable agreement, law, regulation, guideline, or any other legal requirement or standard.

5. **Covenant Not to Sue.** In consideration of the terms herein, each Releasing Party hereby covenants and undertakes not to assert, make any claim, commence, or prosecute any action or proceeding directly relating to or arising from the Released Claims against any of the Released Parties.

6. **Termination of Master Sublease**. Agent, on behalf of Jo-Ann Stores, LLC, and SVP agree that, notwithstanding anything to the contrary set forth in the Master Sublease, the Master Sublease is hereby terminated in its entirety as of the Effective Date (the "Termination Date"), as if the Termination Date were set forth in the Master Sublease as the expiration date of the term of the Master Sublease. As of the Effective Date, neither party shall have any further rights or obligations under the Master Sublease, except for those provisions which by their express terms or by their nature are intended to survive termination or as provided herein. SVP hereby releases Jo-Ann Stores, LLC and Agent from any and all claims, demands, and liabilities arising out of or in connection with the Master Sublease, except for those obligations expressly stated to survive termination. As of the Termination Date, SVP shall have surrendered and delivered possession of the SVP Leased Departments (as defined in the Master Sublease) in accordance with the terms of the Master Sublease

7. **General Representations.** Each Party has carefully read this Agreement, knows its contents, has had the opportunity to consult with counsel concerning the contents, and executes and delivers the Agreement of her/his/its own free will. Each Party affirms to the other that it has considered and

fully understands the legal effect of each term or provision of the Agreement. The Parties represent that they have each knowingly and voluntarily entered into this Agreement following consultation with their respective attorneys, who are the attorneys of their choice, and that the terms of this Agreement have been interpreted and explained by their respective attorneys, and that these terms are fully understood and voluntarily accepted by each Party.

8. **Execution of Counterparts.** This Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original. This Agreement may be electronically executed and delivered to the other Party and the executed, electronic version shall be binding and enforceable as an original.

9. **Entire Agreement; Survival of Representations.** This Agreement and the other Transaction Documents constitute the only existing and binding agreements among the Parties concerning the matters referenced herein, and the Parties acknowledge that there are no other warranties, promises, assurances or representations of any kind, express or implied, upon which the Parties have relied in entering into this Agreement, unless expressly set forth herein.

10. **Governing Law.** This Agreement shall be governed by and interpreted in accordance with the laws of the [State of Delaware] without reference to any conflict of laws provisions thereof, except where governed by the Bankruptcy Code.

11. **Venue and Enforcement.** Each of the Parties irrevocably and unconditionally submits, for itself and its properties, to the exclusive jurisdiction of the Bankruptcy Court, in any action or proceeding arising out of or relating to this Agreement.

12. **Modification.** No modification, waiver, amendment, discharge, or change of this Agreement shall be valid unless the same is in writing and signed by the Party against which the enforcement of such modification, waiver, amendment, discharge, or change is sought.

13. **Authorized Signatories.** Each signatory warrants that the person(s) executing this Agreement on behalf of each Party has full power, capacity, and authority to execute this Agreement on behalf of such Party.

14. **Successors and Assigns; Third-Party Beneficiaries.** This Agreement shall be binding upon the Parties and their respective successors and assigns. Each Released Party that is not directly a Party to this Agreement shall be a third-party beneficiary under, and entitled to enforce, this Agreement as if it were a Party.

15. **Attorneys' Fees.** Each Party shall be responsible for the payment of its own costs and expenses (including reasonable attorneys' fees) incurred in connection with the preparation, negotiation, execution, or delivery of this Agreement.

16. **Notice.** Notice is to be provided to the Parties by email, addressed as follows (or to any new address supplied by a Party pursuant to this notice provision):

To the Agent:

GA Joann Retail Partnership, LLC
2829 Townsgate Road, Suite 103
Westlake Village, CA 91361

      Attn:   Scott K. Carpenter, scarpenter@gagroup.com
                Tim Shilling, tshilling@gagroup.com
                Legal Department, legal@brileyfin.com

with a copy (which shall not constitute notice) to:

Lowenstein Sandler LLP
One Lowenstein Drive
Roseland, NJ 07068
Attn:   Andrew D. Behlmann, abehlmann@lowenstein.com;
         Jean Nicolas Samedi Jr., jsamedi@lowenstein.com;
         Emily Jewell, ejewell@lowenstein.com

To SVP:

Elizabeth Mohan
Chief Legal Officer, SVP Worldwide
Elizabeth.Mohan@SVPWorldwide.com

With a copy (which shall not constitute notice) to:

Counsel to SVP
Attn:   Andrew Harmeyer, Esq.
         Milbank LLP
         AHarmeyer@milbank.com

[*signature page follows*]

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the Effective Date.

**GA Joann Retail Partnership, LLC**

By: ___________________________
Name:
Title:

**SVP Sewing Brands LLC**

By: ___________________________
Name:
Title:

**Schedule 1.1(a)**

ed Encumbrances

**Schedule 1.1(k)**

**Schedule 2.1(a)**

| Title | Jurisdiction | File Date | App. No. | Issue Date | Patent No. | Description | Owner | Status | Expira |
|---|---|---|---|---|---|---|---|---|---|
| of Projecting Pattern Pieces onto - continuation | USA | 08-24-20 | 17/001,040 | 02-21-23 | 11,583,021 | Utility patent. Continuation of patent US 10,750,810 B2. | Dittopatterns LLC (f/k/a Newco Jodito LLC) | **Issued** | 05-04-203 |

| Title | Jurisdiction | File Date | App. No. | Issue Date | Patent No. | Description | Owner | Status | Expira |
|---|---|---|---|---|---|---|---|---|---|
| of Formatting Patterns for s us | USA | 02-01-19 | 16/350,932 | 05-11-21 | 11,003,903 B2 | Utility patent. See body of patent. | Dittopatterns LLC (f/k/a Newco Jodito LLC) (purchased from E. Caven) | **Issued** | 03-02-203<br><br>Next main fee due in 2028 |

| Title | Jurisdiction | File Date | App. No. | Issue Date | Patent No. | Description | Owner | Status | Expira |
|---|---|---|---|---|---|---|---|---|---|
| of Projecting Pattern Pieces onto | USA | 12-24-17 | 15/853,807 | 08-25-20 | 10,750,810 B2 | Utility patent. See body of patent. | Dittopatterns LLC (f/k/a Newco Jodito LLC) (purchased from E. Caven) | **Issued** | 08-10-203 |
| rojecting System thods | USA | 05-12-21 | 17/318,708 | 12-10-24 | 12,164,217 | Utility patent. See body of patent.<br>Original hardware patent application in the United States<br><br>Non-provisional (includes provisional applications filed 12-22-20 and 05-12-20) | Dittopatterns LLC (f/k/a Newco Jodito LLC) | **Issued**<br><br>Issuance fee paid October 29, 2024<br><br>Notice of Allowance issued July 30, 2024.<br><br>Published on 11-18-21 as Pub. No. 2021-0356849 A1.<br>Amendment filed in January 2023. | 05-10-43<br><br>First main fee due 12 |

| Title | Jurisdiction | File Date | App. No. | Issue Date | Patent No. | Description | Owner | Status | Expira |
|---|---|---|---|---|---|---|---|---|---|
| rojecting System thods | USA | 12-06-24 | 18/972,135 | no issuance | no issuance | Continuation of Patent 12,164,217 | Dittopatterns LLC | [Pending. No examination yet.] | |
| rojecting System thods | USA | 11-11-23 | 18/268,878<br><br>PCT / US2021 / 058984<br><br>(PCT 2) | no issuance | no issuance | Software / splicing. Improvements to U.S. Patent Application No. 17/318,708 and to PCT 1 (PCT / US2021 / 032021) | Dittopatterns LLC (f/k/a Newco Jodito LLC) | [Pending. No examination yet.] Published on 06-30-22 as Pub. No. WO 2022/139974 | |
| rojecting System thods | Canada | 11-3-2022 | 3,177,784 | no apparent issuance | no apparent issuance | Ties back to PCT 1 (PCT / US2021 / 032021) that was filed 05-12-21 | Dittopatterns LLC (f/k/a Newco Jodito LLC) | [Pending] Next fee due May 12, 2025. Request for examination due on same day. | |
| rojecting System thods | Canada | 06-20-23 | 3,202,950<br><br>003644-0040 | no apparent issuance | no apparent issuance | Ties back to PCT 2 (PCT / US2021 / 058984) | Dittopatterns LLC (f/k/a Newco Jodito LLC) | [Pending] Next fee due November 11, 2025. Request for examination due on same day. | |
| rojection System thod | China | National Entry | 202180086913 4/5 | no apparent issuance | no apparent issuance | | Dittopatterns LLC (f/k/a Newco Jodito LLC) | Pending | |
| rojecting Systems thods | Australia | National Entry | 2021409118 | no apparent issuance | no apparent issuance | | Dittopatterns LLC (f/k/a Newco Jodito LLC) | Pending | |

| Title | Jurisdiction | File Date | App. No. | Issue Date | Patent No. | Description | Owner | Status | Expira |
|---|---|---|---|---|---|---|---|---|---|
| rojecting Systems thods | Mexico | National Entry | 2023007531 | no apparent issuance | no apparent issuance | | Dittopatterns LLC (f/k/a Newco Jodito LLC) | Pending | |
| rojecting Systems thods | European Patent Register | Regional Entry | 21911838 | no apparent issuance | no apparent issuance | | Dittopatterns LLC (f/k/a Newco Jodito LLC) | Pending | |
| MA DE ÇÃO PARA TAR PADRÕES STURA EM UMA FÍCIE | Brazil | National Entry | 112022023024 | no apparent issuance | no apparent issuance | | Dittopatterns LLC (f/k/a Newco Jodito LLC) | Pending | |
| rojection System thods | Japan | National Entry | 2022568707 | no apparent issuance | no apparent issuance | | Dittopatterns LLC (f/k/a Newco Jodito LLC) | Pending | |
| rojecting Systems thods | Mexico | National Entry | 2022014269 | no apparent issuance | no apparent issuance | | Dittopatterns LLC (f/k/a Newco Jodito LLC) | Pending | |
| rojection and | China | National Entry | 202180034635.1 | no apparent issuance | no apparent issuance | | Dittopatterns LLC (f/k/a Newco Jodito LLC) | Pending | |

arks

| Mark | File Date | App. No. | Reg. Date | Reg. No. | Goods and Services (original application) | Owner | Stat |
|---|---|---|---|---|---|---|---|
| Ditto (standard character / word mark) | 05-27-20 | 88/934,676 | 08-01-23 | 7,127,649 | Class 9 - Projector for projecting sewing patterns onto a work surface for subsequent tracing and cutting of fabric; computer application software for use with a projector for storing sewing patterns and projecting sewing patterns onto a work surface for subsequent tracing and cutting of fabric; mobile app for use with a projector for storing sewing patterns and projecting sewing patterns onto a work surface for subsequent tracing and cutting of fabric; computer application software for storing and displaying sewing patterns; mobile app for storing and displaying sewing patterns | Jo-Ann Stores, LLC | Registered |
| | 04/20/21 | 90979610 (original application 90/657,956) | 05-30-23 | 7,069,541 | Second application – accessories:<br>Class 8 rotary cutters<br>Class 16 cutting mats<br>Class 20 fabric weights; pattern weights | | Registered 6, 16 (class pursued) |
| Ditto (stylized / design mark) | 10-06-20 | 90/237,174 | 05-16-23 | 7,055,877 | Class 9 - Projector for projecting sewing patterns onto a work surface for subsequent tracing and cutting of fabric; computer application software for use with a projector for storing sewing patterns and projecting sewing patterns onto a work surface for subsequent tracing and cutting of fabric; mobile app for use with a projector for storing sewing patterns and projecting sewing patterns onto a work surface for subsequent tracing and cutting of fabric; computer application software for storing and displaying sewing patterns; mobile app for storing and displaying sewing patterns | Jo-Ann Stores, LLC | Registered |
| | 04/21/21 | 90979611 | 05-30-23 | 7,069,542 | Second application – accessories:<br>Class 8 rotary cutters<br>Class 16 cutting mats<br>Class 20 fabric weights; pattern weights | | |

| y | Mark | File Date | App. No. | Reg. Date | Reg. No. | Goods and Services (original application) | Owner | Stat |
|---|---|---|---|---|---|---|---|---|
| | | | (original application 90/657,966) | | | | | Registered 6, 16 (class pursued) |

Names

| main Name | Expiration Date | Registrar |
|---|---|---|
| atterns.com | 7/12/2025 | NO-IP |
| rojector.com | 7/12/2025 | NO-IP |
| te.com | 10/7/2025 | NO-IP |
| tto.com | 10/7/2025 | NO-IP |
| cto.com | 10/7/2025 | NO-IP |
| tto.com | 10/7/2025 | NO-IP |
| ersewing.com | 11/16/2025 | NO-IP |
| esssewing.com | 11/16/2025 | NO-IP |
| projection.com | 10/31/2026 | NO-IP |
| to.com | 7/12/2025 | NO-IP |

| perless.biz | 10/31/2026 | NO-IP |
| --- | --- | --- |
| perless.com | 10/31/2026 | NO-IP |
| perless.co | 10/30/2026 | NO-IP |

**Schedule 2.1(b)**

Media Accounts

| rm | Handle | Followers | URL |
|---|---|---|---|
| ook | Ditto Patterns | 1,800 | https://www.facebook.com/dittopatterns |
| k | @dittopatterns | 1,001 | https://www.tiktok.com/@dittopatterns |
| est | @dittopatterns | 111 | https://www.pinterest.com/dittopatterns/ |
| dIn | Ditto | 560 | https://www.linkedin.com/company/dittopatterns/ |
| ram | @dittopatterns | 11,400 | https://www.instagram.com/dittopatterns |
| be | @dittopatterns | 1,850 | https://www.youtube.com/channel/UCA9v7-H5Pp-5OIFDB8_78DQ |

**Schedule 2.1(c)**

ses enabling the Ditto software and mobile application, which enable a method of projecting digitally maintained images of sewing patterns as templates onto fabrics via the proprieta r device. The software includes features such as projected image calibration and algorithmic methods to correct for accuracy, skew, throw distance, and the like, as well as a splicing nables frame movement and resizing. The software relies upon various non-proprietary, paid third-party integrations for various functionality, including Tailor Nova, which pr e-as-a-service solution for pattern resizing and scaling. The production environment for the software is hosted on Microsoft Azure.

**Schedule 2.1(d)**

Assets and Data

y comprised of approximately 700 digital design patterns in PDF format, used for projecting cut patterns through the Ditto projector. The patterns are segmented by the following
es:

Women's Patterns
Men's Patterns
Kids Patterns
Craft Patterns
Gender-Neutral Patterns

**Schedule 2.1(e)**

er Data

omer subscriber information held within the Ditto Salesforce instance, regardless of whether the Ditto Salesforce instance itself is transferred to Buyer or if the data contained in t

ce instance as of the Closing is transferred to Buyer outside of Salesforce.

**Schedule 2.1(g)**

d Contracts

| Ditto Contracts To Be Assumed and Associated Cure Amounts | |
|---|---|
| **Contract/Contract Counterparty** | **Estimated Cure Amount** |
| ailor Nova | $23,000 |
| ittle Lizard King License | |
| iesel + Co. License | |
| Madlynne License | |
| tyle ARC License | |
| traight Stitch Society License | |
| Vertex | |
| Novanest | $11,000 |
| | |
| **STIMATED TOTAL CURE AMOUNT** | **$34,000** |

**<u>Schedule 2.1(i)</u>**

t Gateway Accounts

| Payment Gateway |
| --- |
| |
| |

**Schedule 2.3**

d Overhead

| Monthly Ditto Costs | |
|---|---|
| **Category** | **Estimated Monthly Amounts** |
| Monthly Salary Run Rate (Jeff and Amy) | $23,833 |
| Tailor Nova | $4,500 |
| Novaest | $12,000 |
| Azure | $5,500 |
| Consolidated Pattern License Royalties | $200 |
| Consolidated Software Licenses | $130 |
| Website Certifications | $40 |
| Stripe | Transaction Percentage |
| | |
| **ESTIMATED TOTAL MONTHLY AMOUNTS** | **$46,203** |

*dditional Overhead to Be Incurred by Buyer*

tto benefits from an integrated Salesforce and Office O365 account through JOANN. Buyer will be responsible for its own contracts with Salesforce and Office or alternatives.