**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>JOANN INC., *et al.*,<br><br>            Debtors. | Chapter 11<br><br>Case No. 25-10068 (CTG)<br>(Jointly Administered) |

**DECLARATION OF PETER BAROTT IN SUPPORT OF**
**TAMARACK VILLAGE SHOPPING CENTER, A LIMITED PARTNERSHIP'S**
**MOTION FOR ALLOWANCE AND PAYMENT OF**
**ADMINISTRATIVE EXPENSE CLAIM**

I, Peter Barott, hereby declare under penalty of perjury:

1.     I am an adult individual and am the senior vice president for RCMuir Management, LLC as an agent for Tamarack Village Shopping Center, a Limited Partnership, a Minnesota limited partnership ("Tamarack") which owns the property subject to the Lease (defined below).

2.     I have personal knowledge of the business relationship between Tamarack Village Shopping Center ("Tamarack") and Jo-Ann Stores, LLC ("Debtor").

3.     I have reviewed and am familiar with the motion for allowance and payment of administrative expense claim (the "Motion") seeking to reimburse Tamarack for certain real estate taxes paid on behalf of Debtor in 2025.

4.     Based on my knowledge of this motion and the facts underlying this claim, I make the following declarations.

5.     On February 25, 1997, Tamarack and Debtor (as successor in interest) entered into a lease agreement which was amended three times and was set to expire January 31, 2028 ("the Lease"). A true and correct copy of the Lease and amendments is attached hereto **Exhibit A.**

6.      Section 8 of the Lease outlined certain obligations for both Tamarack and Debtor as it relates to payment of real estate taxes.

7.      Under this same section, Tamarack is required to pay the applicable annual real estate taxes due on the property "before any fine, penalty, interest or cost may be added thereto for nonpayment thereof."

8.      Tamarack was permitted to provide to Debtor with "Statements assessing and prorating the taxes, if any, shall be rendered by Landlord, together with copies of the tax bills for which reimbursement is sought and reasonable verification for the computation of Tenant's Proportionate Share". Section 8 of Lease.

9.      Once these documents are received, Debtor then has thirty days to pay the outstanding amount.

10.     Debtor's pro-rata share of Real Estate Taxes Tamarack paid was $230,821.66.

11.     Tamarack provided Debtor with two invoices and computations of Debtor's pro-rata share on April 15 and April 30, 2025. A true and correct copy of the invoices delivered is attached hereto as **Exhibit B.**

12.     Debtor has failed and refused to pay any portion of its outstanding pro-rata share of real estate taxes.

13.     Debtor also failed to pay January 2025 rent and certain other charges from February to May 2025. Attached hereto as **Exhibit C** is a true and accurate account statement of the amounts remaining unpaid and due by the Debtor. The total unpaid rent and additional charges other than taxes due and owing less than prepetition portion of January is $2,603.76.

14.     The costs of cleaning up from Debtor's going concern sale is estimated at $25,000 and the cost to remove Debtor's signage, as require by the Lease, is $15,000.

15.    To the best of my knowledge, all facts stated in the Motion are true and accurate.

16.    I understand that I am subject to the penalties of perjury if I have willfully misstated any of the information set forth herein.

Dated: June 23, 2025                              /s/ Peter Barott
                                                  PETER BAROTT

# Exhibit A

# LEASE AGREEMENT

### Between

## TAMARACK VILLAGE SHOPPING CENTER
## LANDLORD

### And

## FABRI-CENTERS OF AMERICA, INC.
## TENANT

### Dated: FEBRUARY 25, 1997

## TABLE OF CONTENTS

| SECTION | HEADING | PAGE |
|---|---|---|
| 1 | EXHIBITS TO LEASE | 1 |
| 2 | DEFINITIONS | 1 |
| 3 | PREMISES | 4 |
| 4 | TERM AND OPTIONS TO EXTEND | 5 |
| 5 | FIXED MINIMUM RENT | 5 |
| 6 | PERCENTAGE RENT | 6 |
| 7 | GROSS SALES | 7 |
| 8 | TAXES | 8 |
| 9 | COMMON AREA COSTS | 9 |
| 10 | CONSTRUCTION OF PREMISES | 10 |
| 11 | USE | 11 |
| 12 | COMMON AREAS | 11 |
| 13 | UTILITIES | 12 |
| 14 | MARKET CONDITION | 12 |
| 15 | CO-TENANCY | 12 |
| 16 | RULES AND REGULATIONS; TENANT'S BUSINESS ASSOCIATION | 13 |
| 17 | ALTERATIONS, INSTALLATIONS AND REMOVAL OF IMPROVEMENTS | 13 |
| 18 | REPAIRS AND MAINTENANCE | 14 |
| 19 | LANDLORD'S LIABILITY; INDEMNIFICATION | 15 |
| 20 | WAIVER OF SUBROGATION | 16 |
| 21 | CASUALTY AND PUBLIC LIABILITY INSURANCE | 16 |
| 22 | SIGNS | 17 |
| 23 | ASSIGNMENT AND SUBLETTING | 18 |
| 24 | REPAIR AFTER CASUALTY | 18 |
| 25 | CONDEMNATION | 19 |
| 26 | ADDITIONAL REPRESENTATIONS AND COVENANTS OF LANDLORD | 20 |
| 27 | REMEDIES UPON DEFAULT | 20 |
| 28 | RIGHTS OF LANDLORD | 21 |
| 29 | BREACH OF COVENANT | 21 |
| 30 | MORTGAGE SUBORDINATION | 22 |
| 31 | NO WAIVER OF DEFAULT | 23 |
| 32 | VACATION OF PREMISES | 23 |
| 33 | SHORT FORM LEASE, SUPPLEMENTAL LEASE AGREEMENT | 23 |
| 34 | NOTICE | 24 |
| 35 | HAZARDOUS MATERIALS | 25 |
| 36 | LIMITATION OF LANDLORD'S LIABILITY | 26 |
| 37 | SITE PLAN | 26 |
| 38 | SUBSTITUTE RENT | 26 |
| 39 | PRIOR AGREEMENTS | 27 |
| 40 | NO OPERATING COVENANT | 27 |
| 41 | APPLICABLE LAW AND CONSTRUCTION | 27 |
| 42 | FORCE MAJEURE | 27 |
| 43 | REASONABLE CONSENT | 28 |
| 44 | NO PARTNERSHIP | 28 |
| 45 | MORTGAGE FINANCING | 28 |
| 46 | QUIET ENJOYMENT | 28 |
| 47 | HOLDING OVER | 28 |
| 48 | BROKERS | 28 |
| 49 | EXTRA CHARGES | 28 |
| 50 | CLAIMS LIMITATION | 29 |
| 51 | ATTORNEY'S FEES | 29 |
| 52 | CAPTIONS | 29 |
| 53 | VARIATION IN PRONOUNS | 29 |
| 54 | BINDING EFFECT OF AGREEMENT | 29 |
| 55 | ACCORD AND SATISFACTION | 29 |
| 56 | FINANCIAL STATEMENTS | 29 |

# L E A S E

THIS INDENTURE OF LEASE, dated as of February 25, 1997, by and between TAMARACK VILLAGE SHOPPING CENTER, A LIMITED PARTNERSHIP, a Minnesota limited partnership, having its address located at 2850 Metro Drive, Suite 503, Bloomington, MN 55425 (hereinafter called "Landlord"), and FABRI-CENTERS OF AMERICA, INC., an Ohio corporation, having its address located at 5555 Darrow Road, Hudson, Ohio 44236 (hereinafter called "Tenant").

## W-I-T-N-E-S-S-E-T-H:

EXHIBITS TO LEASE

SECTION 1.  (a)  The following exhibits are attached to and made a part of this Lease, and are incorporated herein by reference:

Exhibit "A".  The description of the lands upon which the Shopping Center is constructed.

Exhibit "B".  The site plan showing the location of the Premises (as hereinafter defined), the Shopping Center buildings, parking areas, driveways and common area and containing other general information relative to the development of the Shopping Center Site (the "Site Plan").

Exhibit "C".  The plans and specifications prepared and provided by Tenant and approved by Landlord, wherein are detailed Landlord's Work (as hereinafter defined) and Tenant's Work (as hereinafter defined) in the Premises.

Exhibit "D".  The plans and specifications prepared and provided by Tenant and approved by Landlord, wherein are detailed Tenant's exterior sign(s).

Exhibit "E".  Existing Exclusive Use provisions in other tenant leases.

Exhibit "F".  Approved Subordination, Non-disturbance and Attornment Agreement.

Exhibit "G".  Sign criteria.

DEFINITIONS

SECTION 2.  As used in this Lease, the terms listed below shall have the respective meanings as follows:

8|7|97  —  1|31|13  exp.

(a)  "Commencement Date" shall mean (i) the One Hundred Fiftieth (150th) day after the Delivery Date or (ii) the day that Tenant opens for and conducts business in the Premises, whichever day shall first occur. Notwithstanding the foregoing, the Commencement Date shall not occur, without the conduct of business in the Premises, during the period from October 1 to December 31, or during any period that the representations and warranties of Landlord set forth in this Lease are not true and complete or Landlord otherwise is not in full compliance with each and every term and obligation imposed on it under this Lease. Further, the Commencement Date shall not occur until Tenant has received all governmental permits required for the performance of Tenant's Work.

(b)  "Common Areas" shall mean the parking areas, driveways, aisles, sidewalks, truck storage areas, and other common, service and related areas and improvements within the Shopping Center, including all ponds, wetlands, the "Tree Preservation Area", common utility rooms, the Shopping Center maintenance area and

common utility lines, whether open to the public generally or for the "non-exclusive" use of one or more tenants, and whether or not shown on Exhibit "B".

(c)    "Delivery Date" shall mean the date that Landlord delivers the Premises, excluding the Additional Space, to Tenant, or the date Tenant receives all the necessary governmental permits required for the performance of Tenant's Work, whichever is earlier.  With regard to the Additional Space the Delivery Date shall mean the date Landlord delivers the Additional Space to Tenant with Landlord's Work complete and with Tenant's having received from Landlord at least thirty (30) days' prior written notice of the specific date of such delivery. Notwithstanding the foregoing, the Delivery Date shall not occur, without the express election of Tenant to the contrary, during the period from October 1 to December 31, or during any period that the representations and warranties of Landlord set forth in this Lease are not true and complete or Landlord otherwise is not in full compliance with each and every term and obligation imposed upon it under this Lease.  Further, the Delivery Date shall not occur until Tenant has received all governmental permits required for the performance of Tenant's Work provided Tenant has diligently pursued all such permits or thirty (30) days after Landlord delivers the Premises, whichever is earlier, unless the reason for Tenant not receiving Tenant's permits is something Landlord, rather than Tenant, is required to do in order of Tenant to get such permits, in which event it shall be ten (10) days after Landlord completes whatever is required of Landlord before Tenant can receive Tenant's permits.

(d)    "Gross Leasable Area" shall mean the number of square feet of floor area on all levels (including any mezzanines, basements or balconies to the extent used for retail purposes) measured from the exterior face of exterior walls and of service corridor walls, the exterior building line for sidewalk or mall frontage, and the center line of party walls, with no deduction for columns, stairs, elevators, or any interior construction or equipment (but excluding outside sales area, enclosed loading docks, enclosed trash areas, maintenance rooms and facilities and other non-leasable space such as utility rooms all of which shall in all cases under this Lease be excluded from the definition of Gross Leasable Area in the Shopping Center).  With respect to the Shopping Center, the Gross Leasable Area shall be the total constructed Gross Leasable Area available for the exclusive use and occupancy within the Shopping Center, whether or not actually rented or open for business, as the same exists from time to time.  With respect to the Premises, the Gross Leasable Area shall be the actual completed Gross Leasable Area as the same exists from time to time.  Any change in Gross Leasable Area, whether of the Premises or Shopping Center, shall be deemed in effect on the first day of the next succeeding month following such change.  Landlord covenants and agrees to advise Tenant of any increase or decrease in the Gross Leasable Area of the Shopping Center promptly upon any such change.  Landlord hereby represents and warrants that the Gross Leasable Area of the Shopping Center intended for exclusive use and occupancy as shown in the Site Plan is Five Hundred Seventy-Five Thousand (575,000) square feet.  Additional buildings will be added to the Gross Leasable Area when completed, which Landlord currently represents that when all construction (which construction shall, except for the space designated for Home Depot, be completed within one (1) year of the Commencement Date) is completed the Gross Leasable Area of the Shopping Center shall measure approximately Seven Hundred Forty Thousand (740,000) square feet.

(e)    "HVAC" shall mean heating, ventilating and air conditioning.

(f)    "Landlord" shall mean the party designated as such in the Preamble to this Lease, and shall include the heirs, executors, administrators, devisees, legatees, personal representatives, successors and assigns, as the case may be, thereof.

(g)    "Landlord's Work" shall mean the work to be performed by or at the direction of Landlord in constructing and/or remodeling the Premises and related improvements as more particularly specified in Section 10 below and in Exhibit "C"..

(h)    "Lease Year" shall mean a period of twelve (12) consecutive calendar months during the Term, the first of which shall begin on the first day of February next

following the Commencement Date, unless the Commencement Date shall be the first day of February, in which event the first Lease Year shall begin on the Commencement Date.

(i)     "Partial Lease Year" shall mean the period, if any, of fewer than twelve (12) consecutive calendar months between the Commencement Date and the first day of the first Lease Year and the period, if any, of less than twelve (12) consecutive calendar months between the last day of the last Lease Year and the expiration of the Term.

(j)     "Plans and Specifications" shall mean the plans and specifications for the construction and/or remodeling of the Premises, in the form of Exhibit "C", as the same may be modified by written agreement by and between Landlord and Tenant.

(k)     "Premises" shall mean a portion of the Shopping Center as shown on the Site Plan and as more fully described in Section 3(a) below.

(l)     "Permitted Use" shall mean the retail sale of fabrics of all kinds, yard goods, linens, curtains, upholstery materials, towels, draperies, drapery hardware, patterns, knitting supplies, needlepoint, macrame, art materials and supplies, craft materials and supplies, wearable art and wearable art supplies, miniatures, dolls, hobby items, framing, bridal apparel and accessories, wedding supplies, floral products, artificial flowers and accessories, gift items, cards, party supplies, paper goods, stationary, candles, candlesticks, foam products, yarns, all types of notions, indoor and outdoor house decorating products and accessories, furniture, do-it-yourself products and accessories, seasonal merchandise, housewares, prepackaged and unpackaged food and food products, coffee, tea, and assorted beverages, instructional books and tapes, children's books, toys, sewing machines, sewing machine furniture, vacuum cleaners, fabric care items, picture frames and framing materials and supplies, custom services, including, but not limited to, quilting, bow-making, window treatments, floral design, alterations, and framing, instructional classes, materials and services, products, accessories related to all of the foregoing, the operation of a coffee shop, and other items and services customarily offered for sale by a fabric, craft and/or general merchandise store, and such other related merchandise and services typically offered in a majority of the stores operated by Tenant under the name Jo-Ann ETC. or Jo-Ann Fabrics and Crafts. Notwithstanding the generality of the foregoing, in no event shall the Permitted Use include the right of Tenant to operate the Premises in violation of any of the existing exclusive use provisions set forth in Exhibit E, so long as such lease remains in full force and effect, or in violation of the provisions of the OEA, so long as those terms and conditions of the OEA shall remain in full force and effect. Tenant hereby covenants and agrees to operate the Premises so as to not violate the said exclusive use provisions and so as not to violate the OEA.

(m)     "Protected Use" shall mean the sale of fabrics of all kinds, yard goods, upholstery materials, patterns, knitting supplies, needlepoint, macrame, artificial flowers and accessories, arts and crafts materials and supplies, yarns and all types of notions, sewing machines, sewing machine furniture and fabric care items.

(n)     "Public Entity" shall mean the Federal, State, county, municipal or other governmental unit however denominated, and any agency, division, department or public official thereof, now or hereafter having jurisdiction, in any respect, over the Premises, the Shopping Center or Shopping Center Site.

(o)     "Rent" shall mean Fixed Minimum Rent, Percentage Rent and all other monetary obligations of Tenant to Landlord under this Lease.

(p)     "Shopping Center" shall mean the TAMARACK VILLAGE SHOPPING CENTER located at Radio Drive and Tamarack, Woodbury, MN _____ consisting of all buildings including the Premises and Common Areas, and other improvements located upon the Shopping Center Site. The store labeled Mervyn's on Exhibit "B" together with a portion of the Common Area serving Mervyn's is owned by Mervyn's, Inc. (hereinafter with any successor herein being referred to as "Mervyn's") and the store

labeled "Champps" together with a portion of the Common Area serving Champps on Exhibit "B" is owned by others and the property labeled "Home Depot" on Exhibit "B" together with a portion of the Common Area serving Home Depot may be sold to Home Depot. Such property so owned shall not be subject to this lease except to the extent provided by the terms of an Operation and Easement Agreement ("OEA") between Landlord and Mervyn's, entered into as to the Shopping Center. This Lease and all of Tenant's rights hereunder are subject to the OEA.

(q) "Shopping Center Site" shall mean the land described on Exhibit "A", on which the Shopping Center is located.

(r) "Sign Drawings" shall mean the plans and specifications for Tenant's exterior sign(s) on the Shopping Center, in the form of Exhibit "D", as the same may be modified by written agreement by and between Landlord and Tenant.

(s) "Tenant" shall mean Fabri-Centers of America, Inc. and the successors and assigns thereof.

(t) "Tenant's Work" shall mean the work, if any, to be performed by or at the direction of Tenant in finishing the Premises as provided in the Plans and Specifications and as provided on Exhibit C, Part 2.

(u) "Term" shall mean the Initial Term, each extended term, if any, and any period of holdover tenancy.

PREMISES

SECTION 3.    (a)    For the Rent and upon the terms and conditions contained in this Lease, Landlord demises, leases and lets to Tenant and Tenant rents and hires from Landlord the following described property:



(i)    The Premises, located within the Shopping Center, on the Shopping Center Site, consisting of the existing space (excluding any mezzanine) having approximately Forty-One Thousand Seven Hundred (41,700) square feet of Gross Leasable Area, with frontage of approximately One Hundred Ninety (190) feet (to the center of the side walls) and a depth of approximately Two Hundred Twenty (220) feet (from the outside of the front and rear walls) plus an additional space located on the side of the Premises along Tamarack Road measuring approximately Four Thousand Three Hundred Seventy (4,370) square feet, with frontage of approximately Thirty-Eight (38) feet and a depth of approximately One Hundred Fifteen (115) feet (measured to the center of the side walls), identified by street address as 8208 Tamarack Village, Woodbury, MN _____ and outlined in red on the Site Plan; and

(ii)    The right, in common with Landlord, all other tenants of the Shopping Center and others granted similar rights by Landlord, to the non-exclusive use of all Common Areas.

The dimensions and the Gross Leasable Area of the Premises shall be adjusted, if necessary, to conform with actual field measurements, and the Fixed Minimum Rent and other charges under this Lease shall be proportionately adjusted on the basis of the actual field measurements, but in no event shall Tenant pay Rent based upon any mezzanine space (unless used for selling purposes rather than for storage or stockroom purposes in which event Tenant agrees to contribute to Common Area costs and Taxes based upon the square footage of mezzanine space used for the purpose of sales) in the Premises.

(b)    Subject to the reasonable consent of Tenant, the Landlord expressly reserves the right to maintain, use, repair and replace the pipes, ducts, conduits, utility lines, tunneling and wires leading through the ceiling, plenum areas, columns, partitions, and within or under the floor slabs comprising part of the Premises, but only to the extent that such installations (i) are reasonably necessary to serve the Premises or other parts of the Shopping Center, (ii) are installed in locations that will not unreasonably interfere with Tenant's use of the Premises or Tenant's permitted signage, (iii) are not exposed within the

selling area, and (iv) do not lessen the ceiling height of the Premises. In exercising the foregoing right, Landlord shall not unreasonably interfere with the use or occupancy of the Premises.

TERM AND OPTIONS TO EXTEND

SECTION 4.    (a)    TO HAVE AND TO HOLD the Premises and the rights granted hereunder unto Tenant, its successors and assigns, for a term (the "Initial Term") commencing on the Commencement Date and ending on the last day of the fifteenth (15th) Lease Year, unless sooner terminated as herein provided. In the event the Commencement Date has not occurred on or before July 1, 1997 extended for force majeure but not later than September 1, 1997 (the "Termination Date"), Tenant shall have the right, exercisable by delivering written notice to Landlord from and after said Termination Date until satisfaction of all conditions to the Commencement Date, to terminate this Lease.

(b)    Landlord hereby grants Tenant the right and option to extend this Lease for three (3) additional periods of five (5) years each, commencing upon the expiration of the Initial Term or such prior extended term, as the case may be. Each extended term shall be upon the same terms, covenants and conditions as the Initial Term of this Lease except for the option to extend then exercised and except for such changes, if any, in other Tenant charges as are expressly set forth in this Lease. Tenant shall notify Landlord in writing as hereinafter provided of its election to extend this Lease ("notice of extension") for an extended term no later than nine (9) months prior to the expiration of the Initial Term or the then current extended term, as the case may be. In the event that Tenant fails to give notice of extension within the period hereinbefore set forth, Tenant's option to extend nevertheless shall remain in full force and effect for a period of thirty (30) days after receipt of written notice from Landlord, subsequent to the expiration of said period, advising Tenant that notice of extension has not been received by Landlord.

It is agreed between Landlord and Tenant that it is the intention of the parties hereto to avoid forfeiture of Tenant's right to exercise the foregoing options through its inadvertent or negligent failure to give notice of extension prior to the passage of said deadline. Landlord agrees that if Tenant shall fail to give notice of extension to Landlord and if Landlord shall fail to give notice to Tenant advising Tenant that notice of extension has not been received by Landlord, Tenant's right to exercise the foregoing option and, at the election of Tenant, this Lease shall both be deemed automatically extended at the end of the then existing term from month to month upon all the terms and conditions then in effect; subject, however, to Landlord's right to terminate this Lease at the end of any month after having given Tenant thirty (30) days prior written notice, provided Tenant does not exercise its option to extend prior to such termination. Regardless of the date on which Tenant delivers the notice of extension to Landlord, the extended term shall be deemed to have commenced upon the expiration of the Initial Term or prior extended term, as the case may be, and Tenant shall deliver to Landlord, together with the notice of extension, any excess rent for the new extended term which has accrued as of the date of such delivery.

FIXED MINIMUM RENT    45,215 SF

SECTION 5.    (a)    Tenant shall pay to Landlord, without demand, at the address herein specified for notices to Landlord, Fixed Minimum Rent for the Premises as follows:

(i)    During the first five (5) Lease Years of the Initial Term at the rate of Three Hundred Seventy-Two Thousand Two Hundred Forty and No/100 Dollars ($372,240.00) per annum Eight and 08/100 Dollars ($8.08 per square foot per year) in equal monthly installments of Thirty-One Thousand Twenty and No/100 Dollars ($31,020.00); and
*30,444.77*

(ii)    During the second five (5) Lease Years of the Initial Term at the rate of Four Hundred Six Thousand Six Hundred Sixty-Eight and No/100 Dollars ($406,668.00) per annum Eight and 83/100 Dollars ($8.83 per square foot per year) in equal monthly installments of Thirty-Three Thousand Eight Hundred Eighty-Nine and No/100 Dollars ($33,889.00); and
*33,270.71*    *399,248.45*

(iii)    During the last five (5) Lease Years of the Initial Term at the rate of Four Hundred Forty-One Thousand Three Hundred Forty-Eight and No/100 Dollars ($441,348.00) per annum Nine and 58/100 Dollars ($9.58 per square foot per year) in equal
*433,159.70*

monthly installments of Thirty-Six Thousand Seven Hundred Seventy-Nine and No/100 Dollars ($36,779.00); and

*[handwritten: 36,096.65]*

*[handwritten: 500,982.00]*

    (iv)    During the first five (5) year extended term at the rate of Five Hundred Ten Thousand Four Hundred Forty-Four and No/100 Dollars ($510,444.00) per annum Eleven and 08/100 Dollars ($11.08 per square foot per year) in equal monthly installments of Forty-Two Thousand Five Hundred Thirty-Seven and No/100 Dollars ($42,537.00); and

*[handwritten: 534,893.45]*    *[handwritten: 41,748.52]*

    (v)    During the second five (5) year extended term at the rate of Five Hundred Forty-Five Thousand Four and No/100 Dollars ($545,004.00) per annum Eleven and 83/100 Dollars ($11.83 per square foot per year) in equal monthly installments of Forty-Five Thousand Four Hundred Seventeen and No/100 Dollars ($45,417.00); and

*[handwritten: 44,574.46]*    *[handwritten: 568,804.70]*

    (vi)    During the third five (5) year extended term at the rate of Five Hundred Seventy-Nine Thousand Five Hundred Fifty-Two and No/100 Dollars ($579,552.00) per annum Twelve and 58/100 Dollars ($12.58 per square foot per year) in equal monthly installments of Forty-Eight Thousand Two Hundred Ninety-Six and No/100 Dollars ($48,296.00).

*[handwritten: 47,400.40]*

Said amounts shall include and be in payment of all other charges not specifically set forth in this Lease.

    (b)    Monthly installments of Fixed Minimum Rent shall be paid in advance on or before the first (1st) day of each month during the Term, commencing on the first (1st) day of the first (1st) month next following the Commencement Date (unless the Commencement Date is the first (1st) day of the month, in which event the first (1st) monthly installment shall be due on the Commencement Date). Notwithstanding the foregoing, Landlord shall invoice Tenant, up to thirty (30) days prior to the Commencement Date, for the first monthly installment of Fixed Minimum Rent, and in no event shall such installment be due prior to ten (10) days following the Commencement Date. Fixed Minimum Rent for the partial month, if any, following the Commencement Date shall be computed on a per diem basis (assuming a thirty (30) day month), and Tenant shall pay the Fixed Minimum Rent for such partial month concurrently with the first (1st) monthly installment. Notwithstanding the foregoing, payment of Rent shall not commence until such time that Landlord unconditionally approves in writing both Exhibits "C" and "D".

PERCENTAGE RENT

    SECTION 6.    (a)    In addition to Fixed Minimum Rent, Tenant shall pay to Landlord Percentage Rent for each Lease Year and Partial Lease Year in the amount, if any, by which four percent (4%) of Tenant's annual Gross Sales of all goods and services other than patterns, and zero percent (0%) of Tenant's sale of patterns for such Lease Year or Partial Lease Year exceeds the Fixed Minimum Rent payable during each such Lease Year or Partial Lease Year.

    (b)    Notwithstanding the terms of Paragraph (a) above, Percentage Rent for the first Partial Lease Year, if any, shall be based upon Gross Sales for the twelve (12) month period commencing on the Commencement Date and expiring on the first anniversary of the Commencement Date, and Percentage Rent for the last Partial Lease Year, if any, shall be based upon Gross Sales during the twelve (12) month period ending on the last date of the Term (each of the foregoing periods hereinafter referred to as a "Special Computation Period"). Percentage Rent payable for each such Partial Lease Year shall be based upon a computation of the Fixed Minimum Rent payable during the Special Computation Period and the prorata portion of the Percentage Rent applicable thereto for the number of days included within the respective Partial Lease Year.

    (c)    Percentage Rent for each Lease Year and Partial Lease Year shall be payable on an annual basis within the later to occur of (x) thirty (30) days of receipt by Tenant of Landlord's estimated calculation of Tenant Gross Sales for the preceding year, or (y) seventy-five (75) days following the last day of such Lease Year or Special Computation Period, as the case may be.

    (d)    Tenant agrees to deliver to Landlord (i) within thirty (30) days after the end of each month during the Term, a statement signed by an officer of Tenant showing Gross Sales for the preceding month, and (ii) within the later to occur of (x) thirty (30) days of receipt by Tenant of Landlord's

estimated calculation of Tenant Gross Sales for the preceding year, or (y) seventy-five (75) days after the end of each Lease Year or Special Computation Period, as the case may be, a statement certified by an officer of Tenant showing Gross Sales for such Lease Year or Special Computation Period, as the case may be.

## GROSS SALES

SECTION 7.    (a)    The term "Gross Sales" as used herein shall include the entire amount of the actual receipts, whether cash or otherwise, from all sales of merchandise and services for all business conducted in, on or from the Premises, including mail or telephone orders received at the Premises and filled from the Premises or elsewhere (but excluding mail, telephone or other orders filled at the Premises but originating elsewhere). Each sale upon installment or credit shall be treated as a sale for the full amount thereof in the month during which such sale shall be made, irrespective of the time when Tenant shall receive payment (whether full or partial) from its customers. Layaway sales, so-called, shall be included in the Gross Sales of the respective computation period only to the extent of payments received during that computation period. Notwithstanding the foregoing, Tenant shall not be obligated to verify, not be liable for the accuracy or inaccuracy of and shall not be placed in default due to any Gross Sales reported or not reported by any assignee, sublessee, concessionaire or licensee of Tenant. Should Landlord confirm that an error has been made in the reporting or failure in reporting by any such assignee, sublessee, concessionaire or licensee of Tenant, which error would result in additional Percentage Rent being due and owing by Tenant, then Tenant agrees to pay such additional Percentage Rent within thirty (30) days of Landlord's notice to Tenant of such error along with verification by Landlord of such amount being due and owing. Tenant agrees to use due diligence to confirm the accuracy of any of the Gross Sales of any of Tenant's subtenants, concessionaires or licensees. There shall not be included in Gross Sales (or shall be deducted from Gross Sales as the case may be) (i) sums collected and paid out for any sales tax or excise tax imposed by any duly constituted governmental authority; (ii) the value or price of merchandise exchanged between the stores of Tenant, or the affiliates of Tenant, if any, where such exchange of merchandise is made solely for the convenient operation of the business of Tenant or the affiliate of Tenant and not for the purpose of consummating a sale which theretofore has been made at, in, from or upon the Premises, and/or for the purpose of depriving Landlord of the benefit of a sale which otherwise would be made at, in, from or upon the Premises; (iii) the amount of returns to shippers or manufacturers; (iv) sales to employees made at a discount (up to a total of two percent (2%) of Tenant's annual Gross Sales per year); (v) financing charges to customers whether or not separately stated or billed; (vi) service charges to customers who buy a budget or deferred payment plan; (vii) revenue from gift certificates until redeemed at the Premises; (viii) revenue from vending machines used solely for the benefit of employees; (ix) the amount of any cash or credit refund made upon any sale where the merchandise sold, or some part thereof, is thereafter returned by the purchaser and accepted by Tenant; (x) sales of fixtures not in the ordinary course of Tenant's business; (xi) any and/or all sums and credits received in settlement of claims for loss or damage to merchandise; (xii) nonretail bulk sales of merchandise outside of the ordinary course of business on the Premises; (xiii) merchandise donated to charitable or non-profit organizations; (xiv) fees for classes or demonstrations; (xv) the value attributed to merchandise taken in trade; (xvi) referrals to affiliates of or other divisions of Tenant; (xvii) fees for gift wrapping, mailing and other customer services provided on a not for profit basis; (xviii) sales of lottery tickets, special event tickets and the like (provided, however, that commissions paid to Tenant thereon shall be included in Gross Sales); or (xix) the amount of credit sales and credit accounts incurred at the Premises which are written off as bad debts and deducted as an expense (up to a total of three percent (3%) of Tenant's annual Gross Sales per year).

(b)    Landlord shall have the right at any time within two (2) years after the close of each Lease Year and Partial Lease Year, but not more often than once with respect to any Lease Year and Partial Lease Year, to inspect such records and cause an audit to be made by any independent accountant designated in writing by Landlord of all of the books of account, documents, records, returns, papers and files of Tenant relating to Gross Sales for such Lease Year made at, in, on or from the Premises, and Tenant, upon at least three (3) days prior request of Landlord, shall make all such records available for such examination at the address in the United States specified in this Lease for notices to Tenant during regular business hours. Landlord agrees that any information obtained from all such records and reports examined by it or by its designated accountant shall be held in strict confidence. All actions or claims for additional Percentage Rent, and, if applicable, Common Area Costs, Taxes, Insurance, Fixed Minimum Rent and any other monetary obligations shall be barred after said two (2) year period. If Landlord shall have such an audit made for any Lease Year or Partial Lease Year and the Gross Sales shown by Tenant's statement for such Lease Year or Partial Lease Year have been understated by more than three percent (3%) and if such

understatement resulted in an underpayment of Percentage Rent by at least Five Thousand and No/100 Dollars ($5,000.00), then Tenant, in addition to immediately paying the Landlord the full amount of the understated Percentage Rent as determined by such audit, shall pay the Landlord the reasonable cost of such audit; otherwise said audit shall be at Landlord's sole cost and expense. Tenant makes no representation or warranty as to the sales which it expects to make in the Premises.

      (c)     The Gross Sales of any Lease Year or Partial Lease Year, as the case may be, and the Percentage Rent due thereon, if any, shall have no bearing on or connection with the Gross Sales of any other Lease Year or Partial Lease Year.

TAXES

      SECTION 8.     (a)  Landlord covenants and warrants that the Tax Parcel on which the part of the Shopping Center wherein the Premises is located (the "Tax Parcel") and outlined on Exhibit "B" and designated as "Tax Parcel" shall not extend beyond the perimeter of the Shopping Center Site and that the improvements comprising the Shopping Center within such Tax Parcel (including the Premises and Common Areas) are the only improvements now located thereon. Tenant agrees to pay to Landlord each year during the Term Tenant's Proportionate Share of real estate taxes, including installments of special assessments payable therein, levied upon the Tax Parcel and paid by Landlord in that year (after reducing such taxes by the amount of any contributions for such taxes paid by any party having the right to use the Common Areas but not a tenant of the Shopping Center, and, further, reducing such amount by any rollback, credit or reduction which has been granted or issued by any taxing authority or governmental group or agency). Tenant's proportionate share of such costs shall be based on the ratio the Gross Leasable Area of the Premises bears to the Gross Leasable Area in said Tax Parcel, but excluding portions of buildings for which such taxes and assessments are directly allocated to those such tenants. Tenant shall also reimburse Landlord for rent taxes, gross receipt taxes, excise and similar taxes, if any, paid by Landlord on rents received from Tenant to Landlord for the Premises. Tenant's proportionate share for the first and last Calendar Years of the Term shall be prorated based upon the number of days of said Calender Year during which the Term of this lease is in effect. Tenant shall pay all personal property and other taxes on its property in the Premises. Statements assessing and prorating the taxes, if any, shall be rendered by Landlord, together with copies of the tax bills for which reimbursement is sought and reasonable verification for the computation of Tenant's Proportionate Share. Tenant shall pay its Proportionate Share thereof within thirty (30) days of the receipt of such statements, but in no event more than thirty (30) days in advance of the due date. Landlord agrees to thereafter provide Tenant a copy of the receipted Tax bill once payment has been made. Landlord hereby covenants and agrees to pay such taxes to the taxing authority before any penalties or interest accrue.

      (b)     So long as Landlord is not contesting such taxes, after request by Tenant, Tenant may, if joined by tenants, including Tenant, which represent at least (50%) of the Gross Leasable Area in the Tax Parcel, at its own cost and expense, undertake by appropriate proceedings to review or contest any taxes levied or assessed with respect to the Tax Parcel for any tax year during the Term. Landlord shall, unless otherwise required by Law or Landlord's Mortgagee, have no right to pay the same during the pendency of such proceedings, except to the extent necessary to avoid forfeiture, so long as Tenant shall first have provided Landlord with a bond or other security, reasonably satisfactory to Landlord, in an amount equal to the taxes so contested, plus any penalty or interest resulting from nonpayment thereof. Any documents required to enable Tenant to prosecute any such proceedings shall be executed and delivered by Landlord on request of Tenant. Any refund received as a result of such proceedings shall be applied first to reimburse the party or parties contesting such Taxes for its expenses of prosecuting such proceedings, including reasonable attorney's fees, second to Tenant as proportional reimbursement for taxes paid by Tenant to Landlord for the tax year or years which are the subject of such proceedings, and the balance shall become the property of Landlord. If anyone other than Tenant (including Landlord) successfully contests such taxes, the resulting refund, if any, after deduction of expenses for conducting such proceedings, shall be prorated and Tenant's Proportionate Share paid to Tenant.

      (c)     Notwithstanding any provision herein to the contrary, the real estate taxes to which Tenant is required to contribute shall not include any penalty, interest, except as provided in (b) above, or other charge attributable to Landlord payment of taxes later than the earliest permitted payment date:

      (d)    Tenant shall pay all personal property and other taxes on its property located in the Premises.

Any assessments included within the real estate taxes with respect to which reimbursement is sought shall be deemed to be paid, to the extent permitted by governmental authority, in installments over the longest permissible period. Landlord agrees to use best efforts to minimize the real estate taxes assessed against the Tax Parcel.

## COMMON AREA COSTS

      SECTION 9.    In addition to payment of the Fixed Minimum Rent, Percentage Rent and proportionate taxes set forth in this Lease, Tenant shall pay to Landlord its Proportionate Share of Landlord's reasonable costs for the operation, maintenance, repair and replacement of the Common Areas. Common Area Costs include costs of operation, maintenance, security, enforcing Common Area rules and regulations, repair and replacement of all Common Areas and common facilities of the Shopping Center, including but not limited to all ponds, wetlands and Tree Preservation Areas that Landlord is required to maintain in connection with the Shopping Center, and all common utility lines; including but not limited to depreciation on common area maintenance vehicles and maintenance equipment; the cost of operating, lighting, cleaning, snow removal, common area trash removal, recycling and recycling centers, traffic regulation, security guards or patrols and other on site personnel (including vehicles, equipment, uniforms, tools and communication devices); the cost of paving, curbs, sidewalks, parking areas, landscaping (including sprinkling), drainage, lighting and maintenance facilities (including the cost of utilities, repair and replacement); seasonal decorations; common area utilities; the cost of maintenance and service contracts related to any of the foregoing; any insurance deductibles incurred by Landlord in connection with any casualty or claim covered by insurance maintained in accordance herewith; all salaries, benefits, payroll taxes and compensation directly and actually incurred in connection with such operation and maintenance; the cost of remediation, removal and/or abatement of hazardous or toxic substances, wastes or materials from or within the Shopping Center if the presence thereof has been caused by a party or parties other than Landlord or any tenant of the Shopping Center; and reasonable legal fees arising from picketers in the common areas and other disputes relating to the common areas. Tenant's Proportionate Share of such Common Area Costs shall be based on the proportion the Gross Leasable Area in the Premises bears to the total Gross Leasable Area of the Shopping Center. Tenant's obligation under this Section 9 for any partial calendar year included in the term of this lease shall be prorated on a per diem basis. Tenant shall pay to Landlord in twelve (12) equal installments, each in advance on the first (1st) day of each and every calendar month, an estimated sum, towards Tenant's share of Common Area costs, which sum during the first (1st) Lease Year shall be at the rate of One and 50/100 Dollars ($1.50) per annum multiplied by the number of square feet of Gross Leasable Area within the Premises. This estimated sum shall be subject to reasonable annual adjustments by Landlord to reflect anticipated changes in the Common Area costs. Within ninety (90) days after the end of each Lease Year, Landlord shall provide Tenant with an itemized statement assessing and prorating the Common Area costs Should Tenant elect to review and/or audit Landlord's books, then Landlord agrees to provide Tenant, upon request, copies of all bills for which payment is sought. The payment of such Common Area costs shall be considered as "additional rent" hereunder, shall be in consideration of Landlord's maintenance of said Common Areas, shall be used by Landlord for operating, maintaining, repairing and replacing the Common Areas and shall be subject to all provisions of this Lease applicable to default in the payment of rent. Tenant shall pay to Landlord within thirty (30) days of such receipt, any deficiency owed to Landlord. In the event that Tenant's estimated payments are in excess of Tenant's Proportionate Share in any Lease Year, then such excess shall be applied to the following Lease Year unless such Lease Year is the final Lease Year of Tenant's occupancy, in which case such overpayment by Tenant shall be refunded to Tenant within thirty (30) days after the end of such Lease Year. Tenant shall have the same right to inspect Landlord's books and records pertaining to Common Area Costs as Landlord has to inspect Tenant's records pertaining to Gross Sales except such inspection shall not occur in the months of March or December. Notwithstanding the generality of the foregoing, in no event shall the Common Area costs include amounts for (i) depreciation of the original cost of constructing, erecting and installing the Shopping Center, the Common Areas, common facilities (not including depreciation on maintenance vehicles and equipment) and related services; or (ii) principal and interest payments pursuant to any mortgage which encumbers the Premises or Shopping Center; or (iii) taxes; or (iv) administrative charges, management fees, fees based upon a percentage calculation or leasing commissions; or (v) excess premiums for insurance covering the Common Areas occasioned by the extra-hazardous use or activities of occupants other than Tenant; or (vi) expenses incurred due to the negligence or willful misconduct of Landlord,

Landlord's agents or employees; or (vii) costs and expenses incurred for repairs or replacements due to faulty construction, faulty workmanship or structural defects; or (viii) expenses related to an individual occupant of the Shopping Center or to a particular tenant space; or (ix) any costs, fees, fines or penalties, or interest thereon, related to violations by Landlord or any occupant of any governmental law, ordinance, code, rule or regulation; or (x) capital expenditures unless such capital expenditures are for the replacement of any capital items (versus any new items) and amortized over a ten (10) year period using straight-line depreciation with only the amortized portion annually being passed onto Tenant under Common Area Costs; or (xi) reserves for replacement ; or (xii) costs for insuring the Common Area pursuant to Section 21(c) hereof. Landlord shall use best efforts to keep Common Area costs to a minimum subject, however, to the obligation of Landlord to maintain the Shopping Center as a high class retail project. If any tenant of the Shopping Center maintains any portion of the Common Area in the Shopping Center in whole or in part, or maintain any facilities therein or furnishes any services which would otherwise be included as Common Area costs or pays directly for costs which would otherwise be included in Common Area costs, the costs thereof and the Gross Leasable Area of its premises shall be excluded in determining Tenant's obligation hereunder to the extent of the maintenance services furnished by or costs incurred by said tenant; provided, however, by way of example should a tenant furnish its own snow plowing service such tenant's Gross Leasable Area will be excluded for snow plowing service only and not for other Common Area Costs.

CONSTRUCTION OF PREMISES

        SECTION 10.     (a)    Landlord shall construct the four thousand three hundred seventy (4,370) square foot portion of the Premises (the "Additional Space") as shown or referred to on the Plans and Specifications in accordance with Landlord's Work on the Plans and Specifications attached hereto as Exhibit "C" and in accordance with the zoning, building, environmental, health and safety codes of the governmental units in which the Premises are situated. Such construction ("Landlord's Work") shall be completed and possession of the completed Premises shall be delivered to Tenant for performing Tenant's Work and the installation of Tenant's fixtures, furnishings, equipment and inventory and the other conditions to the Delivery Date shall be satisfied on or before May 15, 1997 (the "Outside Completion Date").

        (b)    Landlord shall give Tenant written notice of the delivery of the Additional Space not less than fifteen (15) days prior thereto. Thereafter Tenant shall have access to the Additional Space for inspection and performance of Tenant's Work. In no event shall Tenant be required to accept delivery of the Additional Space unless and until all conditions to the occurrence of the Delivery Date have been satisfied.

        (c)    Landlord shall deliver to Tenant the Premises on or before ten ( 10) days after Tenant has executed and delivered this Lease (the "Premises Delivery Date"). Landlord represents and warrants that on the Premises Delivery Date, the Premises shall comply with each and every zoning, building, environmental, health and safety code of each Public Entity and otherwise shall be free of Hazardous Material. Subject to the immediately prior sentence, the repair obligations of Landlord and the other provisions of this Lease, Tenant shall take possession of the Premises on the Premises Delivery Date on an "as-is" basis as of the date of Tenant's execution and delivery of this Lease. Notwithstanding the foregoing, Landlord agrees that (i) the rear door of the Premises, as well as the exterior area (the "Exterior Area") surrounding the rear door of the Premises shall not be blocked and/or obstructed in any fashion or manner so as to adversely affect Tenant's use of said door and the Exterior Area, and (ii) as part of Landlord's Work, the Exterior Area shall be paved.

        (d)    If Landlord does not deliver the Premises in the condition as herein required by the Premises Delivery Date, then Tenant shall have the right, but shall not be obligated, to accept delivery of possession of the Premises.

        (e)    If Landlord does not deliver the Premises to Tenant by the Premises Delivery Date, then Tenant shall have the right to cancel this Lease (without limiting any other right or remedy of Tenant) by giving written notice to Landlord at any time thereafter but before Landlord delivers the Premises to Tenant. After Tenant's notice of cancellation, Tenant shall be relieved of all obligations hereunder and Tenant shall not be liable to landlord in damages or otherwise. In the event this Lease shall be canceled pursuant to this Section, Landlord shall be liable to Tenant for all actual and consequential damages incurred by Tenant in consummating the Lease, including, but not limited to, legal, architectural and engineering fees. The provisions contained in the preceding sentence shall survive cancellation of this Lease.

(f)    In the event Landlord does not deliver the Premises to Tenant within ten (10) days of execution of this Lease or the Additional Space to Tenant in the condition as herein required by May 30, 1997 (the "Preferred Delivery Date"), Landlord shall pay to Tenant the sum of Two Thousand and No/100 Dollars ($2,000.00) for each day between the Preferred Delivery Date and the earlier to occur of (i) the day Landlord delivers the Premises or the Additional Space, as the case may be, in the condition as herein required or (ii) the Termination Date (as defined in Section 4(a)) of this Lease. If Landlord fails to pay Tenant as aforesaid, then Tenant shall have the right (without limiting any other right or remedy of Tenant) to deduct such amount from rent and other payments due Landlord. The liability of Landlord under this paragraph shall be in addition to all other claims which Tenant may have against Landlord for the failure of Landlord to deliver the Premises by the Preferred Delivery Date.

(g)    Landlord covenants and agrees to pay to Tenant, , a "Construction Allowance" in the amount of Eleven and No/100 Dollars ($11.00) multiplied by the Gross Leasable Area of the Premises. Landlord shall pay Tenant One Hundred Sixty-Five Thousand and No/100 Dollars ($165,000.00) upon execution of this Lease, another One Hundred Sixty-Five Thousand and No/100 Dollars ($165,000.00) within ten (10) days of Tenant's certification to Landlord that such work is at least fifty percent (50%) completed, and the remaining Construction Allowance within ten (10) days of Landlord's receipt of (i) a certificate of completion for Tenant's Work shall have been signed by Tenant's general contractor for Tenant's Work and delivered to Landlord; (ii) Tenant shall have delivered to Landlord written evidence of payment to, and copies of signed final, complete and unconditional lien waivers from Tenant's general contractor(s), and (iii) Tenant has opened for business for at least one (1) day. Such Construction Allowance is to be used to reimburse Tenant for costs and expenses incurred by Tenant in connection with the performance of Tenant's Work and certain leasehold improvements to be performed by Tenant in the Premises. In the event that the total of such costs and expenses is less than the Construction Allowance, Tenant shall nonetheless be entitled to receive all of the Construction Allowance, subject to the terms and conditions set forth in this Subsection (g). Tenant's work shall be performed in accordance with plans and specifications prepared by or on behalf of Tenant and approved in writing by Landlord. Tenant shall immediately correct any labor problems caused by the use of outside contractors which results in a labor dispute effecting other parts of the Shopping Center. In no event shall any such approval by Landlord constitute any warranty by Landlord to Tenant as to the adequacy of the design, workmanship or quality of any work or materials for Tenant's intended use or impose any liability upon Landlord in connection with the performance of Tenant's Work. Tenant shall cause Tenant's Work to be performed in accordance with such other reasonable conditions as Landlord may impose during performance of Tenant's Work. Tenant shall not, in connection with the performance of Tenant's Work create any nuisance or otherwise interfere with the use of the Shopping Center or any part thereof by Landlord or other tenants. Tenant shall at all times cause the Premises and adjacent area to be free of waste or rubbish arising in connection with the performance of Tenant's Work by suppliers, contractors, subcontractors or workers. Upon completion of Tenant's Work, Tenant shall cause its contractor to proceed promptly to remove all rubbish, tools, equipment and surplus materials relating to the performance of Tenant's Work from the Shopping Center. Any and all damage caused by Tenant's contractor or its subcontractors to any property of Landlord or other tenants in the Shopping Center shall be promptly repaired to Landlord's reasonable satisfaction, at Tenant's expense.

The covenant set forth above is hereby acknowledged to be a material consideration to Tenant in executing this Lease, the breach of which shall cause irreparable and severe harm. The foregoing covenant shall run with the land and shall bind Landlord, its successors and assigns.

USE

SECTION 11.    The Premises may be used for the Permitted Use, a use which is equal to or lesser than twenty-five percent (25%) of the primary business of another tenant open and operating from the Shopping Center, and for any other lawful retail use as long as the use is not in violation of the existing OEA and/or in violation of the existing exclusive use provisions set forth on Exhibit E hereto so long as the lease containing such restriction and/or the pertinent portion of the OEA is still in full force and effect.

COMMON AREAS

SECTION 12.    (a)    Landlord shall construct, install, operate, manage, equip, light, repair, replace and maintain the Common Areas in a serviceable, neat and sightly condition for the

benefit of Tenant and Tenant's customers, employees, licensees and invitees. Landlord's obligations with respect to the Common Areas shall include, but not be limited to, equipping, lighting, snow and ice removal, cleaning, gardening, landscaping, public liability and property damage insurance, repairs, replacements, striping and line painting, sanitary control, attending the parking areas, security arrangements including private police and similar services and functions. Landlord may close any Common Areas temporarily, at such times as to cause the least possible interruption or interference with Tenant's business, to make repairs or changes, to prevent the acquisition of public rights in such Common Areas or to discourage non-customer parking; provided, however, in no event shall the Protected Area shown on the Site Plan be closed (except in the event of an emergency) without the prior reasonable consent of Tenant. In no event shall Landlord designate the Protected Area as an employee parking area or otherwise permit the Protected Area to be used for employee parking.

      (b)    Landlord shall keep the Common Areas clean and well lighted from dusk until at least one-half hour after the close of Tenant's business and remove snow from the parking areas, driveways and sidewalks as promptly as possible. Landlord shall not impose any parking charges for the parking of automobiles in the parking areas. Landlord shall not grant any rights in, nor permit special or exclusive use of, the sidewalk space or parking areas near the front of the Premises or in the Exterior Area near the rear door of the Premises all as shown in the areas designated "no special or exclusive use" on the Site Plan.

## UTILITIES

      SECTION 13.    Landlord shall, at its sole cost and expense, cause all utilities furnished to the Premises to be separately metered so that only the service provided to the Premises will be reflected in utility bills rendered to Tenant by the respective supplying public utility companies. Tenant shall pay, when due, bills for utilities furnished to the Premises by public utility companies during the Term of this Lease, including water, sewer, gas, electricity and telephone and the like, as are separately metered and/or charged directly to Tenant.

## MARKET CONDITION

      SECTION 14.    Excluding Mervyns', Home Depot, Champs, and Cub Foods premises in the event (i) Landlord allows, in any manner whatsoever, any portion of the Shopping Center, or any additions thereto, other than the Premises, are used or occupied for the Protected Use or if any sales area therein is designated for the Protected Use (either of the foregoing being referred to as a "Market Condition"), or (ii) Landlord fails to diligently pursue such party violating the Market Condition and cause them to cease violating such Market Condition (excluding Mervyn's, Cub Foods and Home Depot) Tenant shall have the right and option, so long as such violation continues, either to (i) pay as substitute rent only an amount equal to fifty percent (50%) of the Fixed Minimum Rent per month, in lieu of the Fixed Minimum Rent and Percent Rent required to be paid hereunder (hereinafter referred to as "Substitute Rent"), or (ii) terminate this Lease by giving written notice to Landlord, in which event all further obligations hereunder shall terminate; provided, however, that the foregoing provision shall not apply to any store in which the Protected Use accounts for no more than twenty-five percent (25%) of its Gross Sales during any period of thirty (30) days or more as verified to Tenant from time to time upon request of Tenant. If Tenant elects the option in (i) above, it shall be without prejudice to a future election of the option set forth in (ii) above, so long as such violation continues. Substitute Rent shall be paid in monthly installments at the time in which Fixed Minimum Rent was due as provided in Section 5(b) hereof. The covenants set forth above are hereby acknowledged to be a material consideration to Tenant in executing this Lease, the breach of which shall cause irreparable and severe harm. The foregoing covenant shall run with the land and shall bind Landlord, its successors and assigns. In no event shall this provision apply to existing tenants (i.e. those having fully executed lease agreements as of the date of this Lease) to the extent Landlord cannot control their use or consent to a change in use.

## CO-TENANCY

      SECTION 15.    (a)    Excluding any opening co-tenancy requirements, Landlord represents and warrants that Landlord has not granted any type of co-tenancy or anchor tenant provision (i.e. an Anchor Tenant provision shall mean either a provision which results in the reduction in rent payments and/or termination rights in the event of a vacation of space by an Anchor Tenant (Cub Foods, Home Place, Circuit City, Toys R Us, Galyan's, Office Max and Petsmart shall hereinafter be collectively

defined as "Anchor Tenants" and individually defined as an "Anchor Tenant") to any tenant of the Shopping Center and shall not do so in the future.  Should Landlord at any time, whether past, present or future, grant any type of co-tenancy or anchor tenant provision to any tenant or occupant of any space or building located on the site plan, then the Terms and Conditions of this Section 15 shall immediately become in full force and effect, but until such time occurs then the Terms and Conditions of Section 15 shall not be enforceable by Tenant against Landlord.

(b)    To induce Tenant to enter into this Lease and fulfill its obligations hereunder, Landlord covenants and warrants that in the event, at any time during the Term of this Lease, Landlord grants any option to another tenant of the Shopping Center to (i) terminate its lease and/or (ii) be entitled to rent relief by reason of any continuing cotenancy condition not being satisfied within the Shopping Center or any portion thereof, then Landlord shall immediately notify Tenant as to such right so granted to such other tenant, and Tenant shall have the same rights and on the same terms and conditions as granted to such other tenant.  Nothing contained in this Section 15 shall lessen or diminish any other rights by Tenant under this Lease, including without limitation those pertaining to the initial Cotenancy Condition.  If Tenant exercises an option, if such favored nation tenant had such option, to terminate this Lease pursuant to this Section 15, Landlord shall, on or before the effective date of such termination pay to Tenant an amount equal to the unamortized portion of the cost of Tenant's Work plus any additional cost and expenses incurred by Tenant during the Term hereof, which amount shall then be amortized over a ten (10) year period using straight line depreciation computed in accordance with Generally Accepted Accounting Principles, less any allowance paid by Landlord to Tenant.  The provisions of this Section 15 shall survive any such termination of this Lease.  The actual cost to Tenant of the entire Tenant's work, including, without limitation, all costs for services, labor and materials, equipment and machinery installed in or upon the Premises and fees incurred in connection with obtaining Permits or otherwise paid to any Governmental Authority, which costs shall be depreciated on a straight line basis over the useful life of Tenant's Work under generally accepted accounting principles; plus the cost of any material additions or non-moveable leasehold improvements made or installed by Tenant which are permanent in nature and increase the value of the Premises, depreciated on a straight line basis over the useful life of such additions, improvements, or fixtures under generally accepted accounting principles.

(c)    The covenants set forth in Subsection (b) above are hereby acknowledged to be a material consideration to Tenant in executing this Lease, the breach of which shall cause irreparable and severe harm.  The foregoing covenant shall run with the land and shall bind Landlord, its successors and assigns.

## RULES AND REGULATIONS; TENANT'S BUSINESS ASSOCIATION

SECTION 16.    (a)    Landlord has the right at any time and from time to time, for the general welfare of the Shopping Center or the avoidance of nuisance, to impose reasonable rules and regulations of general application governing the conduct of tenants in the Shopping Center and the use of the Common Areas.  Tenant agrees to comply with and perform any and all such rules and regulations imposed by Landlord so long as such rules and regulations do not limit the rights or materially expand the obligations of Tenant under this Lease and all occupants similarly situated of the Shopping Center are subject to and comply with such rules and regulations.  Landlord shall use best efforts to enforce such rules and regulations.

(b)    Landlord agrees and warrants that Tenant shall not be required under any circumstances to join and/or maintain membership in any tenant's business association sponsored by or for the Shopping Center, nor shall Tenant be required to pay any of the cost of the activities conducted by such association.  Nothing contained herein shall preclude or prevent Tenant from joining and/or maintaining a membership in any tenants' business association, if Tenant shall so elect.  In the event Tenant elects to join any tenants' business association, Tenant shall contribute to such association only the amount which Tenant agrees to contribute.

## ALTERATIONS, INSTALLATIONS AND REMOVAL OF IMPROVEMENTS BY TENANT

SECTION 17.    (a)    Tenant shall have the right during the continuance of this Lease to make such interior alterations, changes and improvements to the Premises (except structural changes, alterations or improvements, which may be made by Tenant only with Landlord's reasonable consent) as Tenant may desire for the conduct of Tenant's business and for the full beneficial use of the

Premises; provided Tenant shall pay all costs and expenses thereof, shall make such changes, alterations and improvements in a good and workmanlike manner, in accordance with all applicable laws and building regulations, all at Tenant's sole cost and expense, and free and clear of any mechanic's liens or other liens or claims in connection with the making of such changes, alterations and improvements.

   (b) Except as otherwise provided, all signs, furnishings, trade fixtures, inventory, equipment and other removable property installed in the Premises by Tenant shall remain the personal property of Tenant, shall not be subject to any Landlord's lien or lien or security interest against the property of Landlord, and may be removed by Tenant upon the termination of this Lease, provided that any of such as are affixed to the Premises and require severance may be removed only if Tenant shall repair any damage caused by such removal.

   (c) Tenant shall promptly pay all contractors and materialmen, so as to minimize the possibility of a lien attaching to the Premises, and should any lien be made or filed, Tenant shall bond against or discharge the same within ten (10) days after written request by Landlord. Nothing in this Lease shall be construed as a consent on the part of Landlord to subject Landlord's estate in the Premises to any lien or liability under the lien laws of the State of Minnesota. Landlord may post on the Premises one (1) notice of non-responsibility of Landlord for work done in the Premises or liens in connection therewith as provided by Minnesota law, which notice shall not exceed 8½" x 11", or the minimum necessary to give Landlord protection under applicable Minnesota law, whatever is greater.

REPAIRS AND MAINTENANCE

   SECTION 18. (a) Except as hereinafter to the contrary provided, Tenant agrees at all times to maintain the interior, non-structural portion of the Premises, at its sole cost and expense, in an attractive, clean and sanitary condition.

   (b) Landlord warrants and guarantees that all structural portions of the Premises and the roof, utility cables, mains and conduits, the HVAC, electrical, gas, plumbing, sprinkler, and sewer systems are, and shall be upon the Commencement Date, in good working order and repair, and that there are not, and shall not be on the Commencement Date, any violations of any building, health, environmental, safety and/or sanitary laws, ordinances, or regulations of any Public Entity. Landlord, at no cost to Tenant, agrees to promptly correct any such code violations which exist on the Commencement Date no matter when discovered , and to promptly replace and/or repair, in a good and workmanlike manner and using the highest quality materials, any defects in workmanship, material and/or equipment which may appear in, on or about Landlord's Work during the first year of the Term, unless such would not have the possibility of appearing during such one (1) year period then such one (1) year period shall be extended until such defect appears, but in no event beyond a three (3) year period.

   (c) Subject to Paragraph (b) above and except for damage caused by fire and other casualties and taking by eminent domain or conveyance in lieu thereof: (i) Tenant, at Tenant's sole cost and expense, shall make all interior nonstructural repairs to the Premises, including doors and windows; provided, however, that Tenant shall not be required to make any repair of damage covered by insurance maintained or required to be maintained by the Landlord, or to make structural repairs or repairs necessitated by reason of the neglect, fault or default of Landlord, its agents, employees or contractors, or to make repairs to the plumbing, gas, electrical or other similar units and systems where such repairs would necessitate going through or into the floors, walls, roof or ceilings of the Premises unless such systems serve the Premises solely; and (ii) Landlord, at Landlord's sole cost and expense, shall make all repairs to the Premises and the Common Areas other than those which Tenant is required to make including repairs to the structural portions of the Premises (both interior and exterior), the roof, slab, and all major repairs or replacements to the electrical, plumbing or sewer systems or any portion thereof up to where they serve the Premises solely. In making any repairs or replacements, Landlord shall not unreasonably interfere with Tenant's normal operations and business. Landlord hereby assigns to Tenant all warranties and guarantees, if any, with respect to any and all construction and equipment on the Premises to be maintained by Tenant.

   (d) Anything contained herein to the contrary notwithstanding, Landlord represents and warrants that the existing HVAC system consists of at least twelve (12) units having a combined nominal cooling capacity of not less than Ninety Three (93) tons. Further, Landlord warrants and guarantees that the HVAC system is now, and shall be on the Commencement Date, in good and proper

operating condition; and in the event any malfunction or failure of operations shall occur in said HVAC system within a period of one (1) year from the Commencement Date, Landlord further warrants and guarantees that Landlord shall maintain and promptly repair said HVAC system, and, if necessary, replace said system, and/or any parts of said system, so as to restore said system to a good and proper operating condition during said one (1) year period. Should Landlord replace any of the HVAC units or the HVAC system Landlord shall contract for a one (1) year warranty on the new HVAC unit(s) and/or HVAC system together with a five (5) year extended warranty covering the compressor(s) and the heat exchanger(s). Landlord agrees to have all such warranties assigned to Tenant. Tenant agrees, at Tenant's sole cost and expense, that as of the Commencement Date, Tenant shall contract with a reputable HVAC contractor calling for regularly scheduled maintenance on such HVAC system. Thereafter, Tenant shall assume all responsibility for the maintenance, repair and replacement of said HVAC system.

(e)     Tenant agrees to maintain the Premises, at its expense, free and clear of all rubbish, garbage and trash in the containers provided by Tenant, which containers shall be of sufficient size to satisfy rubbish, garbage and trash requirements of Tenant. Tenant, at its own cost and expense, shall dispose of all said rubbish, garbage and trash on a timely basis.

(f)     Subject to the provisions of this Section 18, Tenant agrees to keep the Premises in an orderly and sanitary condition, free from vermin, rodents, bugs and other pests and Landlord agrees to keep the Common Areas in an orderly and sanitary condition, free from vermin, rodents, bugs and other pests. Landlord shall require all tenants of the Shopping Center to keep their spaces in an orderly and sanitary condition.

(g)     Notwithstanding any provision in this Lease to the contrary, Tenant shall be responsible for making any interior non-structural alterations of or improvements to the Premises that are required by any Public Entity following the Delivery Date, except to the extent that such responsibility is imposed upon Landlord in the next following sentence or otherwise under this Lease. Landlord shall be responsible, at its sole cost and expense, for making all alterations of or improvements to the Premises that are required by any Public Entity and that (i) are structural in nature, (ii) relate to the exterior thereof, (iii) relate to the sprinkler, utility or life safety systems therein unless totally self-contained within the Premises or (iv) relate to the handicapped or disabled as required under existing law.

(h)     Tenant shall not keep, maintain or permit any outside storage, carts or pallets or trash cans in any area or location not designated for such items and, if any such items remain outside of a designated area three (3) days after Landlord has notified Tenant, Landlord may remove such items and the reasonable cost shall be billed to Tenant as Additional Rent and shall be immediately due and payable.

(i)     Tenant shall reimburse Landlord for the cost of exterior repairs to the building in which the Premises are located including, without limitation, brick tuck pointing, painting, repainting drivit, replacement of caulking, power washing and removal of graffiti. Notwithstanding the foregoing, Tenant shall not be obligated to pay Landlord for roof maintenance, repair or replacement in the Initial Term of this Lease. Commencing with the first Extended Term, if the roof needs replacement, Tenant shall reimburse Landlord therefor by paying monthly one one-hundred twentieth (1/120) of the amortized cost of said roof replacement for a period of the lesser of (i) the remainder of Tenant's occupancy in the Premises, or (ii) one hundred twenty (120) months. All other exterior repair costs, as set forth above, shall be payable within thirty (30) days after Landlord invoices Tenant for the cost thereof. In addition, during each extended term Tenant shall pay all costs related to the repair and maintenance of the roof directly above the Premises.

LANDLORD'S LIABILITY

SECTION 19.     (a)     Except as otherwise specifically provided in this Lease, Landlord and Landlord's agents and employees shall not be liable for damage to person or property sustained by Tenant resulting from any accident or occurrence in the Premises including, but not limited to, claims for damage resulting from: (i) any equipment or appurtenances becoming out of repair; (ii) injury done or occasioned by wind; (iii) any defect in or failure of plumbing, HVAC equipment, electric wiring, gas, water and steam pipes, stairs or walks; (iv) broken glass; (v) the backing up of any sewer pipe or downspout; (vi) the bursting, leaking or running of any tank, tub, washstand, water closet, waste pipe, drain or any other pipe or tank in, upon or about the Premises; (vii) the escape of steam or hot water; (viii) water, snow or ice

being upon or coming through the roof, skylight, trap door, stairs, walks or any other place upon or near the Premises; and (ix) the falling of any fixture, plaster or stucco.

(b)     Without limiting any liability between Landlord or Tenant imposed under this Lease or under law, Landlord shall be liable to Tenant for damages if (i) Landlord, after receipt of written notice from Tenant or actual knowledge, fails to commence and complete repairs which are the Landlord's obligation, within a reasonable time under the circumstances then existing, or (ii) if such damage is otherwise caused by the act, omission or negligence of Landlord, its agents, employees, or contractors.

(c)     Tenant hereby indemnifies and saves Landlord harmless from and against any and all claims, demands, actions, damages, liability and expense in connection with loss, damage or injury to persons or property occurring in, on or about, or arising out of the Premises, or occasioned wholly or in part by any act or omission of Tenant, Tenant's agents, contractors, or employees. Landlord hereby indemnifies and saves Tenant harmless from and against any and all claims, demands, actions, damages, liability and expense in connection with the loss, damage or injury to persons or property whether for injuries to persons or loss of life, or damage to property, arising in connection with the acts or omissions of the Landlord, Landlord's agents, contractors or employees, or arising in connection with the use or operation of the Common Areas.

(d)     In case either party shall, without fault on its part, be made a party to any litigation commenced by or against the other party, then such other party shall protect and hold such first party harmless and shall pay all costs, expenses and reasonable attorney's fees incurred or paid by such first party in connection with such litigation. The breaching party shall also pay all costs, expenses, and reasonable attorney's fees that may be incurred or paid by either party in enforcing the covenants and agreements of this Lease.

## WAIVER OF SUBROGATION

SECTION 20.     Notwithstanding any provision to the contrary, Landlord and Tenant do hereby waive any and all right of recovery, claim, action or cause of action against the other, their respective agents and employees, for any loss or damage that may occur to the Premises or the Shopping Center or any additions or improvements thereto, or any contents therein, by reason of fire, the elements or any other cause which could be insured against under the terms of a standard all risk insurance policy or policies, or for which Landlord or Tenant may be reimbursed as a result of insurance coverage effecting any loss suffered by either party hereto, regardless of cause or origin, including the negligence of Landlord or Tenant, or their respective agents and employees. All insurance policies required under the terms and conditions of this Lease carried by either party covering the Premises and/or the Shopping Center shall expressly waive any right on the part of the insurer against the other party for damage to or destruction of the Premises and/or the Shopping Center resulting from the acts or omissions of the other party. Any additional charge by the insurance company for such waiver shall be paid by the party benefiting from such waiver.

## CASUALTY AND PUBLIC LIABILITY INSURANCE

SECTION 21.     (a)     Landlord shall, during the Termkeep in full force and effect Commercial General Liability Insurance and Umbrella Insurance with respect to the Shopping Center, including the Common Areas, naming Tenant as an additional insured thereunder to the extent its interest may appear, with nationally recognized companies rated no lower than A- , VIII by A.M. Best Company with total minimum limits to apply per location of $2,000,000.00 on account of bodily injuries or death and/or property damage resulting from one (1) occurrence and shall deposit the policy or policies of such insurance, or certificates thereof, with Tenant.

(b)     Tenant shall, at all times during the Term, at its own expense, keep in full force and effect Commercial General Liability Insurance and Umbrella Insurance with respect to the Premises, naming Landlord as an additional insured to the extent its interest may appear, with nationally recognized companies rated no lower than A- , VIII by A.M. Best Company with total minimum limits to apply per location of $2,000,000.00 on account of bodily injuries or death and/or property damage resulting from one (1) occurrence and upon request shall deposit the policy or policies of such insurance, or certificates thereof, with Landlord.

(c)    Landlord shall keep the Premises and the Shopping Center, including Common Areas, insured against loss or damage by fire, lightning, vandalism and malicious mischief, and such other perils as are now or may hereafter be comprehended in the term "All Risk Coverage", in amounts equal to at least eighty percent (80%) of the full replacement value thereof, or such greater amounts as may be required to prevent the application of co-insurance provisions and such other insurance as Landlord may deem advisable or as required by Landlord's Mortgagee for the Shopping Center. Such insurance shall cover improvements in the Premises owned by Landlord to the extent that the same are customarily insurable as part of the realty, but shall not include the cost of restoration of Tenant's trade fixtures, furniture, furnishings, inventory, equipment and other personal property.

(d)    Tenant shall reimburse Landlord for Tenant's share of the payments of the premiums on all insurance procured by Landlord pursuant to Paragraph (c) of this Section 21 (and reimbursement for Paragraph (a) of this Section 21 shall be in Section 9 hereof). Tenant's share of such costs shall be based on the ratio the Gross Leasable Area in the Premises bears to the Gross Leasable Area in the Shopping Center, excluding any space separately insured. Landlord may bill Tenant for Tenant's share of such costs on a monthly, quarterly, semi-annual or annual basis. The amount billed may be based on an estimate until the actual premiums are available, and when available an adjustment shall be made and any difference shall be payable based on Tenant's actual share as determined. Landlord may provide its insurance hereunder under a blanket insurance policy provided it provides the coverages required herein.

SIGNS

SECTION 22.    (a)    Tenant shall have the right, subject to appropriate governmental approval, to install and maintain a sign or signs on the front fascia of the Premises measuring approximately six (6) feet by sixty (60) feet, a sign facing Tamarack Road measuring approximately six (6) feet by sixty (60) feet, as well as a sign on the pylon identified as pylon D on Exhibit "B". Tenant shall pay all costs of its panel, including installation, on the said pylon which panel shall conform to Landlord's criteria for pylon sign panels. After installation, Tenant shall pay its share of all costs of maintenance, repairs and replacement of the said pylon including electricity used by said pylon. Tenant's costs for said pylon shall be payable monthly within thirty (30) days after Landlord's billing therefore. Tenant's share shall be based upon the total square footage of Tenant's pylon sign panel bears to the total gross square footage of all sign panels on the pylon including the Shopping Center sign panel, if any. Tenant's pylon signage shall be in the position previously occupied by media play on each side of each pylon. In addition, Tenant shall have the right to install a sign on the rear of the Premises. All signs shall comply with all requirements of appropriate governmental authority, and Exhibit "G", and all necessary permits or licenses shall be obtained by Tenant. Tenant shall maintain its signs in good condition and repair at all times, and shall save the Landlord harmless from injury to person or property arising from the erection and maintenance of said signs. Upon vacating the Premises, Tenant shall remove all signs and repair all damage caused by such removal. Landlord covenants and warrants that it has approved Tenant's signs and the Sign Drawings attached hereto as Exhibit "D" prior to or simultaneously with its execution of this Lease. In the event that sewing machines and/or craft items are sold in the Premises, Tenant shall have the right to erect a "Singer", "craft" and/or similar sign(s) on the front fascia in addition to its regular sign; provided, such signs meet the requirements of Exhibit "G".

(b)    The covenants set forth in Subsection (a) above are hereby acknowledged to be a material consideration to Tenant in executing this Lease, the breach of which shall cause irreparable and severe harm. The foregoing covenant shall run with the land and shall bind Landlord, its successors and assigns.

(c)    Should Landlord renovate all or any portion of the Shopping Center, which renovation requires the removal of any of Tenant's sign(s), Landlord shall first notify Tenant at least forty-five (45) days prior to the removal of such sign(s) and the cost of such removal and reinstallation together with the cost of any damage to said sign(s) as a result of such removal and/or reinstallation shall be borne solely by Landlord. Further, Landlord agrees to provide and install on or about the Shopping Center, at Landlord's sole cost and expense, a banner or other type of temporary sign(s) identifying Tenant's trade name, which banner or sign(s) shall be approved by Tenant prior to such installation.

ASSIGNMENT AND SUBLETTING

SECTION 23.    Tenant shall have the unrestricted right to assign this Lease or sublet all or any part of the Premises to any party for any lawful purpose permitted pursuant to the terms of Section 11 hereof.

REPAIR AFTER CASUALTY

SECTION 24.    (a)    In the event of damage to or destruction of the Shopping Center or any portion thereof (including the Premises) by casualty or any other cause whatsoever, then, except as otherwise provided in this Section, Landlord shall, as promptly as is reasonable commence and diligently pursue to completion the restoration and repair thereof; provided, however, that Landlord shall be obligated to repair the Premises only to their condition on the Delivery Date (subject to alterations thereof required by changes in governmental code). Any repair or restoration of the Premises shall be completed within one hundred eighty (180) days following the event of damage or destruction and the repair and restoration of other portions of the Shopping Center shall be completed as quickly as possible provided, however, nothing herein contained shall be deemed to require Landlord to restore the Shopping Center to contain more than Four Hundred Thousand (400,000) square feet of rentable area. Within thirty (30) days after an event of damage or destruction or as soon thereafter as is practical, Landlord shall deliver to Tenant notice of the anticipated period of restoration. Except as otherwise provided in this Section, Tenant shall not have the right to terminate this Lease by reason of damage to or destruction of the Shopping Center (including the Premises); provided, however, that in the event of any damage or destruction to the Premises, or of damage or destruction to any other portion of the Shopping Center (including the Common Area) that interferes with access to the Premises or the conduct of business therein, and a just and proportionate part of the Rent shall be abated until the Premises or other portion of the Shopping Center are so repaired based upon the time and the extent to which the Premises are untenantable.

(b)    Notwithstanding the terms of Paragraph (a) above, Landlord may terminate this Lease and shall have no restoration and repair responsibility in the event of damage to or destruction of the Shopping Center if (i) the cost of repair or restoration exceeds twenty-five percent (25%) of the replacement value of the Shopping Center, (ii) the cost of repair or restoration exceeds Three Million and No/100 Dollars ($3,000,000.00) and the event or destruction was not insured and was not insurable under the insurance coverage required of Landlord hereunder or if the insurance proceeds payable as a result of the damage or destruction have been applied by the Shopping Center mortgagee against the mortgage debt thereon or (iii) the reasonable period of time for substantial completion of the repair and restoration shall exceed one (1) year; provided, however, as a condition to the termination by Landlord of this Lease under this Paragraph (b), (1) the leases of all other occupants in the Shopping Center similarly situated (excluding only the Anchor Tenants) must also have been terminated by reason of the event of damage and destruction and (2) Landlord must have no intent and be under no obligation to rebuild the portion of the Shopping Center in which the Premises are located.

(c)    In the event the Premises have been damaged or destroyed and Landlord has not completed the restoration and repair thereof within one hundred eighty (180) days as required in Paragraph (a) above, Tenant shall have the right to terminate this Lease. In the event of damage or destruction to any portion of the Shopping Center other than the Premises which is not repaired, or by Landlord's estimate cannot be repaired, within one (1) year from the event thereof, Tenant shall have the right to terminate this Lease but shall have no other claim against Landlord for failure to repair except to the extent that Landlord has failed to use reasonable efforts to complete such repairs as hereinabove required.

(d)    In addition to all rights to terminate this Lease granted to the parties in this Section, if the Premises are destroyed or damaged during the last two (2) years of the Term to the extent that the cost to repair and restore the same is fifty percent (50%) or more of the value of the Premises immediately prior to such damage or destruction, then Landlord and Tenant shall each have the right to terminate this Lease as of the date of such damage or destruction by giving written notice thereof within thirty (30) days after the date of said damage or destruction; provided, however, that if Tenant, within thirty (30) days following receipt of Landlord's written notice of termination, shall give Landlord written notice of its intention to extend this Lease for any additional option periods then available to Tenant, then the notice of Landlord to terminate this Lease shall be of no force and effect. In the event Tenant elects to extend this Lease for any additional option periods then available to Tenant, Landlord shall use its best efforts to restore

the Premises to its former condition with all reasonable speed and a just and proportionate part of the Rent shall be abated until the Premises or other portion of the Shopping Center are so repaired based upon the time and the extent to which the Premises are untenantable and Tenant has reopened for business in that portion of the Premises, or thirty (30) days after the Premises become tenantable, whichever is sooner. If this Lease shall be terminated pursuant to this Subsection, any annual minimum rental and other charges paid in advance shall be immediately refunded to Tenant, and Tenant shall have an additional thirty (30) days, Rent free, within which to remove its property from the Premises.

(e)    Anything contained herein to the contrary notwithstanding, in the event this Lease shall be terminated by Landlord under this Section, and if after such termination Landlord commences to rebuild the Premises or the Shopping Center, as the case may be, at any time within two (2) years of such termination notice, then Tenant shall have the right, but shall not be obligated, to lease space in the Shopping Center comparable to the Premises (the "Substitute Premises") upon the same terms and conditions and for the balance of the originally contemplated term hereof. Notwithstanding termination of this Lease, Landlord shall notify Tenant of its intention to repair or restore the Premises or the Shopping Center, as the case may be, whereupon Tenant shall have thirty (30) days after receipt thereof within which to give Landlord notice of Tenant's intention to accept such Substitute Premises on the terms and conditions of this Lease and setting forth the period within which such repair or restoration must be completed as a condition of Tenant's acceptance of the Substituted Premises. The provisions of this Subsection 24(e) shall survive any termination of this Lease.

CONDEMNATION

SECTION 25.    (a)    In the event that thirty percent (30%) or more of the Gross Leasable Area of the Premises and/or fifty percent (50%) or more of the Gross Leasable Area of the Shopping Center shall be taken by condemnation or right of eminent domain or conveyed in lieu thereof (a "Taking"), this Lease shall terminate at the option of either party as of the day possession shall be taken by or title shall vest in the taking authority, and Landlord and Tenant shall each be released from any further liability hereunder. In the event of a Taking of less than thirty percent (30%), but more than five percent (5%), of the Gross Leasable Area of the Premises and/or less than fifty percent (50%), but more than ten percent (10%), of the Gross Leasable Area of the Northwest Quadrant of the Shopping Center as shown on Exhibit "B", including the Common Areas, Tenant shall be entitled to terminate this Lease and any further liability hereunder if, in the determination of Tenant, the Premises cannot be economically operated for or are unsuitable for the intended purposes of this Lease. Any such termination shall become effective as of the day possession shall be taken by or title to the portion taken shall vest in the taking authority; provided, however, that Tenant shall have an additional thirty (30) days, rent free, within which to remove its property from the Premises. In the event of a Taking of any portion of the Premises and/or the Shopping Center, upon which this Lease is not terminated, Landlord agrees to restore the remainder of the Premises and/or the Shopping Center, including the Common Areas, with reasonable speed to a complete architectural unit as nearly like its condition prior to such partial taking as shall be practicable provided, however, nothing herein contained shall be deemed to require Landlord to restore the Shopping Center to contain more than Four Hundred Thousand (400,000) square feet of rentable area, and a just and proportionate part of the Rent shall be abated until the Premises or other portion of the Shopping Center are so repaired based upon the time and the extent to which the Premises are untenantable and Tenant has reopened for business in that portion of the Premises, or thirty (30) days after the Premises become tenantable, whichever is sooner.

(b)    All damages awarded in connection with the taking of the Premises, whether allowed as compensation for diminution in value to the leasehold or to the fee of the Premises, shall belong to the Landlord; provided, however, if Tenant has made any material leasehold improvements to the Premises, and/or alterations or structural changes and repairs to the Premises, at its own expense excluding the initial improvements contemplated herein, Tenant and not Landlord shall be entitled to claim an award for the unamortized balance of Tenant's cost thereof, and in the event the condemning authority shall not make a separate award therefore, Landlord, subject to the rights of any mortgagee, shall assign a portion of its award equal to such unamortized cost to Tenant. In the event Landlord in obtaining its award uses Tenant's cost items, then Tenant shall be entitled, subject to the rights of any first mortgagee, to a Proportionate Share of Landlord's award based upon said costs. Tenant shall also be entitled to claim a separate award for loss of business, damage to merchandise and fixtures, removal and reinstallation costs and moving expenses, in a separate action only.

ADDITIONAL REPRESENTATIONS AND COVENANTS OF LANDLORD

        SECTION 26.    (a)    On the date hereof and hereafter during the Term, Landlord represents, warrants and covenants as follows:

        (i)    From and after the date of this Lease through the expiration of the Term, the Shopping Center Site will be zoned to permit the use as a retail Shopping Center or the Shopping Center will otherwise be permitted (including, without limitation, the Premises) for general retail purposes including, without limitation, the Protected Use; and

        (ii)    The Common Areas, Premises (excluding, however, the Tenant's Work or other alterations made by or on behalf of Tenant therein) and all structural portions of the Shopping Center now comply with all building, safety, sanitary, and environmental laws, ordinances, rules, codes and regulations of any Public Entity having jurisdiction thereover; and

        (iii)    Surface parking spaces will be provided in the Common Areas at all times during the Term, on an unreserved basis and without cost, with at least four point five (4.5) parking spaces being provided for each one thousand (1,000) square feet of Gross Leasable Area within the Shopping Center; and

        (iv)    No building, edifice or obstruction will be placed on the Shopping Center Site except as shown on the Site Plan in the Northwest Quadrant of the Shopping Center or main drive aisles of the Shopping Center; and

        (v)    The Site Plan correctly and completely shows all improvements on or to be made to the Shopping Center Site as contemplated as of the date of this Lease; and

        (vi)    The Shopping Center shall be maintained, operated and managed as a good quality retail project in compliance with all laws, regulations and orders and shall be used and occupied only for normal retail uses customarily conducted in a good quality shopping centers; and in no event shall the Shopping Center or any portion thereof be used in violation of the OEA (all of the foregoing collectively referred to as the "Prohibited Uses").

        (b)    The foregoing representations, warranties and agreements are material considerations and inducements to Tenant in executing this Lease.

REMEDIES UPON DEFAULT

        SECTION 27.    (a)    If Tenant shall at any time be in material default in the performance of any of the covenants, terms, conditions and provisions of this Lease, and Tenant shall fail to remedy such default within fifteen (15) days after receipt of written notice thereof from Landlord in the event the default is as to payment of Fixed Minimum Rent or other regularly scheduled amounts, or within thirty (30) days after receipt thereof if the default relates to any other matter (but Tenant shall not be deemed to be in default if Tenant commences to remedy said defaults other than relating to payment of Fixed Minimum Rent or other regularly scheduled amounts within said thirty (30) day period and proceeds therewith with due diligence), or if Tenant shall be adjudged bankrupt or shall make an assignment for the benefit of creditors, or if a receiver of any property of Tenant in, upon or about the Premises be appointed in any action, suit or proceeding by or against Tenant and is not removed within ninety (90) days (unless such ninety (90) day period is extended by court order then the time period will be as established by court order or established by such person(s) or entity acting under or for the court) after appointment, or if the interest of Tenant in the Premises shall be offered for sale or sold under execution or other legal process, and if any of said actions are not rescinded within ninety (90) days following written notice from Landlord to Tenant, then Landlord may, by written notice to Tenant, terminate this Lease, or without terminating this Lease re-enter the Premises by summary proceedings, and may dispossess the Tenant. In the event of such re-entry Landlord shall use commercially reasonable efforts to relet the Premises and, in the event of a reletting, shall apply the rent therefrom first to the payment of Landlord's reasonable expenses incurred and paid by reason of Tenant's default, next to the reasonable expense of reletting, including, but not limited to, reasonably necessary repairs to the Premises, and then to the payment of rent and all other sums due from Tenant hereunder, Tenant

remaining liable for any deficiency. Any and all deficiencies shall be payable by Tenant monthly on the date herein provided for the payment of Fixed Minimum Rent.

(b)     In the event of a default by either party of any of the terms, provisions, covenants or conditions of this Lease, the other party shall have the right to invoke any remedy provided at law or in equity; except, however, Landlord shall not be entitled to terminate this Lease or to dispossess Tenant except for a material default and in no event shall Landlord be entitled to accelerate Fixed Minimum Rent or the other charges hereunder. All remedies shall be cumulative and concurrent.

(c)     Notwithstanding anything to the contrary contained herein, with respect to any alleged default of Tenant other than a default in the payment of rent, or other sums of money, if Tenant shall notify the Landlord, within thirty (30) days after Landlord's notice of such default, that Tenant disputes such alleged default and Tenant shall file within said thirty (30) day period an action in a court of competent jurisdiction contesting such alleged default, then Tenant shall not be deemed to be in default under this Lease with respect to such matter provided that if a final judgment shall be adverse to Tenant, wholly or in part, Tenant shall forthwith commence to correct the matters complained of by Landlord, or that portion thereof as to which such judgment shall have been adverse to it, and complete the correction thereof within thirty (30) days after such judgment, or if more than thirty (30) days are reasonably required to complete such correction, commence to correct the same within such thirty (30) days and prosecute the same to completion with reasonable diligence.

RIGHTS OF LANDLORD

SECTION 28.     (a)     Landlord reserves the right at all reasonable times during Tenant's business hours and upon prior reasonable notice to Tenant (except in the event of emergency, in which case such right is exercisable by Landlord at any time without prior notice) to go upon and inspect the Premises and every part thereof and, to make such repairs, alterations and additions as Landlord is obligated to make to the Premises. In exercising the foregoing right, Landlord shall not unreasonably interrupt or unreasonably disrupt Tenant's business or unreasonably disrupt access to the Premises by Tenant, Tenant's employees, agents, invitees and customers.

(b)     If Landlord shall make any payments on behalf of Tenant, which are Tenant's obligation, in order to fulfill Tenant's covenants, then any amount so paid by Landlord are agreed and declared to be "additional rent" and shall be due and payable to Landlord from Tenant with the next installment of Fixed Minimum Rent due thereafter under this Lease, together with interest thereon at the rate of twelve percent (12%) per annum from the date of such advance to the repayment thereof in full. In the event of any breach hereunder by Tenant and Tenant shall have failed to cure such breach within thirty (30) days of notice from Landlord (which thirty (30) days shall be extended so long as Tenant has commended to cure such breach and continues to cure same using due diligence, but no notice shall be required in the event of an emergency, then Landlord may immediately or any time thereafter, after five (5) days written notice, cure such breach for the account and at the expense of Tenant. If Landlord at any time, by reason of such breach, is compelled to pay, or elects to pay, any sum of money or to do any act which will require the payment of any sum of money, or is compelled to incur any expense, including reasonable attorneys' fees, in instituting or prosecuting any action or proceeding to enforce Landlord's rights hereunder, the sum or sums so paid by Landlord, shall be deemed to be Additional Rent hereunder and shall be due from Tenant to Landlord on demand, together with interest thereon at twelve percent (12%) per annum.

(c)     Landlord shall have the right during the last six (6) months prior to the expiration of this Lease, provided that same shall not interfere with Tenant's business, to have access to the Premises for the purpose of exhibiting said Premises and during the last two (2) months for putting up the usual notice "for rent" or "for sale", which notice shall not be removed, obliterated or hidden by Tenant. No more than one (1) such sign shall be placed upon the Premises and said sign shall not exceed fifteen feet (15') square.

BREACH OF COVENANT

SECTION 29.     In the event Landlord fails to keep and perform any of the covenants or agreements in this Lease contained on the part of said Landlord to be kept and performed, Tenant, in addition to all other remedies now or hereafter afforded or provided by this Lease, at law or in

equity, may, at its election, after Landlord has failed to cure the same after thirty (30) days notice (extended for failures which reasonably take longer than thirty (30) days to cure), but no notice or cure period is required in the event of an emergency, (i) perform such covenant or agreement for or on behalf of Landlord or make good any such default, and any amount or amounts which the Tenant shall advance on Landlord's behalf shall be repaid by Landlord to Tenant on demand, together with interest thereon at the rate of twelve percent (12%) per annum from the date of such advance to the repayment thereof in full, and if Landlord shall not repay any such amount or amounts within fifteen (15) days after demand, Tenant may, without forfeiture of its rights hereunder, at its election, set-off and deduct same, together with interest thereon as aforesaid, from one-half (1/2) of the installments of Fixed Minimum Rent accruing under this Lease, and/or (ii) deposit the installments of Fixed Minimum Rent into an escrow account with any third party with instructions to pay such sums over to Landlord when Landlord has performed the covenants and agreements to be performed by Landlord hereunder, or, if Tenant performs such covenants and agreements for or on behalf of Landlord as hereinabove provided, when any amounts advanced by Tenant for the performance of such covenants and agreements, together with all accrued interest thereon, have been repaid in full, and, if any such amounts have not been repaid in full on or before the sixtieth (60th) day after such funds are deposited into escrow, to return such funds to Tenant for set-off against the amounts advanced as hereinabove provided.

MORTGAGE SUBORDINATION

      SECTION 30.    (a)    Landlord reserves the right to require from Tenant, a waiver of priority of Tenant's leasehold estate hereunder, for the purpose of subordinating Tenant's leasehold estate in favor of a first mortgage lien or any refinancing or replacement of a first mortgage loan that Landlord may hereafter deem necessary or desirable from time to time, and Tenant, upon request by Landlord, subject to the conditions set forth in Section 30(b) below, agrees to execute at any and all times such instruments that may be required by any such lending institution or prospective first mortgagee in order to effectuate such waiver of priority and subordination of Tenant's leasehold estate; provided, however, that no such instrument shall expand Tenant's obligations under this Lease. Landlord agrees to obtain a subordination, non-disturbance and attornment agreement in the form of Exhibit E hereto from the holder of any mortgage existing at the time of the execution of this Lease or the recording of a Memorandum of Lease.

      (b)    It is a condition, however, of the subordination provisions of Subsection (a) above, that Landlord shall procure from any such Mortgagee an agreement in writing, which shall be delivered to Tenant, providing in substance that (i) so long as Tenant shall faithfully discharge the obligations on its part to be kept and performed under the terms of this Lease, Tenant's tenancy will not be disturbed nor this Lease affected by any default or foreclosure under such mortgage, and that the Mortgagee agrees that this Lease shall remain in full force and effect even though default in and foreclosure under the mortgage may occur, and (ii) such Mortgagee shall permit insurance proceeds or condemnation awards, as the case may be, to be used for any restoration and repair required by the provisions of this Lease as set forth in the Sections entitled "Repair after Casualty" and "Condemnation". The word "mortgage" as used herein means (i) any lease of land only or of land and buildings in a sale-lease-back transaction involving all or any part of the Shopping Center, or (ii) any mortgage, deed of trust or other similar security instruments constituting a lien upon all or any part of the Shopping Center, whether the same shall be in existence as of the date hereof or created hereafter, and any modifications, extensions, renewals and replacements thereof. "Mortgagee" as used herein means a party having the benefit of a mortgage, whether as lessor, Mortgagee, trustee or note-holder.

      (c)    No change in ownership of all or any portion of the Shopping Center, or assignment of this Lease, or the rentals provided for herein, shall be binding upon Tenant for any purpose until after Tenant has been furnished with evidence, including photostat or certified copy of deed or assignment, showing change in ownership, or assignment.

      (d)    To the extent not inconsistent with any agreement between Tenant and any Mortgagee, which agreement shall govern, in the event Tenant receives a written notice from any party claiming a collateral interest in this Lease or in the Rent hereunder and, by reason thereof, a present entitlement to collect the Rent under this Lease, Tenant shall have the right either (i) to pay such Rent to such party which payment shall satisfy any and all liabilities of Tenant to Landlord with respect to such payment without obligation on the part of Tenant to make further inquiry but subject to such party's providing to Tenant a copy of the instrument pursuant to which such party claims such entitlement and to such claim

being plausible on the face of such instrument, or (ii) to withhold such Rent pending the determination by a court of competent jurisdiction of the entitlement thereto.

## NO WAIVER OF DEFAULT

SECTION 31.    No waiver by either party of any of the terms, covenants, provisions or conditions set forth in this Lease, and no waiver of any legal or equitable relief or remedy shall be implied by the failure of either party to assert any rights, or to declare any forfeiture, or for any other reason, and no waiver of any of said terms, provisions, covenants, rules and regulations shall be valid unless it shall be in writing signed by the party giving the waiver or by both parties hereto. No waiver by either party or forgiveness of performance by either party in respect to one or more tenants of the Shopping Center shall constitute a waiver or forgiveness of performance in favor of Tenant, Landlord or any other tenant, nor shall the waiver or the forgiveness of performance of any one or more of the terms, provisions, conditions, rules and regulations of this Lease be claimed or pleaded by Tenant or Landlord to excuse a subsequent failure of performance of any of the terms, provisions, conditions, covenants, rules and regulations of this Lease.

## VACATION OF PREMISES

SECTION 32.    (a)    Tenant shall deliver up and surrender to Landlord possession of the Premises, including all Landlord's Work (and replacements thereof) and all improvements permanently attached to the Premises during the term, upon the expiration of this Lease, or its termination in any way, in as good condition and repair as the same shall be at the Commencement Date (damage by fire or other casualty which could be covered by a standard extended coverage insurance policy, ordinary wear and tear and decay, neglect, fault or default of Landlord and taking by eminent domain or conveyance in lieu thereof only excepted). Landlord shall notify Tenant of any problems with the condition of the Premises within thirty (30) days of delivery of the keys by Tenant to Landlord; otherwise, the date Tenant delivers the keys to the Premises to Landlord, Landlord agrees that the Premises are in an acceptable form and Tenant shall have no obligation whatsoever to repair the Premises, remove any fixtures or merchandise or to do any other work in or to the Premises which Tenant may have been obligated to do prior to delivering the Premises to Landlord. Tenant agrees to deliver the keys at the office of Landlord or Landlord's agent; provided, however, that Tenant shall have the right to remove its signs, trade fixtures, furnishings, inventory, equipment, furniture and other personal property.

(b)    Tenant shall have the right, not more than forty-five (45) days before the date Tenant vacates the Premises, to place a sign at the front of the Premises, in a place visible to Tenant's customers, directing Tenant's customer's to another store of Tenant's and/or providing Tenant's customers with a telephone number. Tenant shall be entitled to leave said sign at the front of the Premises until the earlier to occur of (i) three months after Tenant vacates the Premises, or (ii) the date a new tenant opens for business in the Premises. All personal property of Tenant left in or about the Premises upon the termination of this lease shall become the property of Landlord to be disposed of, at Landlord's sole cost and expense, as Landlord deems expedient.

## SHORT FORM LEASE, SUPPLEMENTAL LEASE AGREEMENT

SECTION 33.    (a)    This Lease may not be recorded, but in the event either party requests that a Short Form Lease or a Memorandum of Lease be recorded, then the other party shall execute such Agreement, which Agreement shall contain the information as set forth below. The Short Form Lease or Memorandum of Lease shall describe the Premises and the rights herein demised, the term of this Lease, and the extension rights (if any), any exclusive granted to Tenant and other non-monetary provisions hereof reasonably requested by Tenant; provided, however, that the failure to record said Short Form Lease or Memorandum of Lease shall not affect or impair the validity and effectiveness of this Lease, and that the terms and provisions of this Lease shall control in the event of any inconsistency therewith. The party requesting that the Short Form Lease or Memorandum of Lease be recorded shall prepare and pay all costs of recording the Short Form Lease or Memorandum of Lease, and the other party agrees to execute at any and all times such Short Form Lease or Memorandum of Lease and any other instruments as may be required for such recording.

(b)    At the time that the Commencement Date of the term of this Lease is firmly established, the parties shall promptly enter into a Supplemental Lease Agreement, setting forth the actual commencement and expiration of the Initial Term and any extensions thereof and describing the Premises, but containing no further provisions of this Lease, which Supplemental Lease Agreement may be recorded by either party. If the Commencement Date is firmly established before a Short Form Lease or Memorandum of Lease has been executed by the parties, the Short Form Lease or Memorandum of Lease and the Supplemental Lease Agreement may be consolidated into a single recordable document.

NOTICE

SECTION 34.    Any notices, statements, acknowledgments and consents required to be given by or on behalf of either party to the other shall be in writing and shall be given by mailing such Registered or Certified Mail, or by private courier service requiring a signed acknowledgment of delivery (such as Federal Express) addressed as follows:

if to the Landlord at:

Tamarack Village Shopping Center, A Limited Partnership
2850 Metro Drive, Suite 503
Bloomington, MN  55425

with a copy to:

c/o Robert C. Muir Company
2424 North Federal Highway, Suite 459
Boca Raton, Florida  33431

and a copy of any default notices to  Mortgagee provided Landlord has given Tenant notice of such Mortgagee and its notice address  and which Mortgagee as of the date of this Lease is as follows:

First Bank National Association
First Bank Place
601 Second Avenue South
Minneapolis, MN  55402
Attn:  Real Estate Banking Division

if to the Tenant at:

Fabri-Centers of America, Inc.
5555 Darrow Road
Hudson, Ohio  44236
Attn:  Vice President - Corporate Finance

with a copy to:

Thompson, Hine and Flory
3900 Society Center
127 Public Square
Cleveland, Ohio  44114-1216
Attn:  Samuel R. Knezevic, Esq.

*deleted no longer valid 7/12/04*

or at such other address of Landlord, Landlord's counsel, Tenant or Tenant's counsel as may be specified by such a notice from time to time. Any notice sent by registered or certified mail or courier service shall be deemed to have been served as of the date it is mailed or transmitted in accordance with the foregoing provisions; however, the time period in which a response to any such notice must be given, or in which action must commence or be taken, shall commence to run from the date of receipt by the addressee thereof as shown on the return receipt or acknowledgment of delivery for such notice.  Rejection or other refusal to accept or the inability to deliver because of changed address of which no notice was given shall be deemed to be receipt of such notice as of the date of such rejection, refusal or inability to deliver.  Notwithstanding anything to the contrary herein, Tenant may give facsimile notice of the need of emergency repairs, followed promptly by certified mail notice.

HAZARDOUS MATERIALS

SECTION 35. (a) Tenant shall not (either with or without negligence) cause or permit the escape, disposal or release of any Hazardous Material (as hereinafter defined) in violation of law. Tenant shall not allow the storage or use of Hazardous Material in any manner not sanctioned by law, nor allow to be brought into the Shopping Center any Hazardous Material except to use in the ordinary course of Tenant's business. Tenant shall indemnify Landlord in the manner elsewhere provided in this Lease from any release of Hazardous Materials in the Shopping Center occurring during the Term if caused by Tenant or Tenant's contractors, agents or employees or persons acting under Tenant. It is a condition to this hold harmless and indemnification that Tenant shall receive notice of any claim by Landlord promptly after Landlord first has knowledge thereof. The within covenants shall survive the expiration or earlier termination of the Term.

(b) Landlord shall not cause or permit any Hazardous Material to be sold, used, stored, brought upon or disposed of (collectively a "Use") in, on, under or about the Shopping Center without in each case obtaining all necessary permits required in connection therewith and complying with all permit requirements, if any, and otherwise taking all appropriate steps and making adequate arrangements to assure that such Use is in the ordinary course of business in the operation of the Shopping Center and will be performed safely and without contamination of the Shopping Center and the Shopping Center Site or any portion thereof and fully in compliance with all applicable law.

(c) If Landlord receives any written notice of Hazardous Discharge or Environmental Complaint that specifically identifies the Premises or the Common Areas and/or describes a condition that materially impairs or could materially impair the occupancy, use and enjoyment of the Premises during the Term, Landlord shall give immediate oral and written notice of same to Tenant detailing all relevant facts and circumstances within the knowledge of Landlord.

(d) Without limiting any other agreement of indemnity by Landlord of Tenant, Landlord hereby agrees to defend, indemnify and hold Tenant harmless from and against any and all claims, losses, liabilities, damages, penalties, fines and expenses (including, without limitation, consequential damages, cleanup and other remedial and restoration costs, fees for consultants and experts and reasonable attorneys' fees and other costs of litigation arising by reason of any of the aforesaid or any action against Landlord under this indemnity) arising directly or indirectly from, out of or by reason of any breach of Landlord's obligations under this Section. It is a condition of this indemnification and hold harmless that Landlord shall receive notice of any such claim by Tenant promptly after Tenant first has knowledge thereof. The within representations, warranties and covenants shall survive the expiration or early termination of this Lease.

(e) In the event that Tenant's use, occupancy and enjoyment of ("Occupancy") in the Premises shall be materially interfered with by reason of this existence or remediation of any Hazardous Material located on, in or under the Shopping Center or on the Shopping Center Site (except for any Hazardous Material used by Tenant), then (i) throughout such period of interference, a fair and just proportion of the rents and other charges payable hereunder taking into account the nature of the interference to Tenant's Occupancy, shall be abated, and (ii) if Tenant's occupancy shall be substantially impaired for a period of three (3) months or more, then Tenant or Landlord shall have the right to terminate this Lease by giving written notice to the other of its election to do so, whereupon this Lease shall automatically terminate and end effective as of the date of such notice and neither party shall have any further obligations hereunder; PROVIDED, HOWEVER, Landlord may nullify Tenant's notice of termination if at the time such notice is given Landlord shall be diligently prosecuting the rectification of such Hazardous Material interference and thereafter complete the rectification in accordance with all applicable governmental laws, codes, regulations and requirements within three (3) months after the date of Tenant's termination notice, whereupon this Lease shall continue in full force and effect in accordance with its terms, it being understood and agreed that the abatement provided in clause (i) of this paragraph shall continue throughout the period of such rectification by Landlord.

(f) "Hazardous Material" shall mean (i) any waste, pollutant or contaminant which is or becomes regulated by the federal government or any state, local or other governmental entity (or any agency thereof) having jurisdiction over the Shopping Center and the operations conducted thereon (the

"government authority") and (ii) any substance or material which is or becomes regulated by any governmental authority by reason of the hazardous or toxic qualities of such substance or material.

(g)    "Hazardous Discharge" shall mean the presence, use, release, dispersal, emission, spill, discharge or cleanup of any Hazardous Material (a) on or about or emanating from the Shopping Center or the Shopping Center Site, or (b) arising out of the use and occupancy of or operations within the Shopping Center, or (c) caused by Landlord, Tenant, or other occupant of the Shopping Center or the employees, contractors, invitees or agents thereof.

(h)    "Environmental Complaint" shall mean any complaint, investigation, order, citation, or action with regard to any Hazardous Discharge, air emissions, water discharges, noise emissions or any other environmental, health or safety matter pertaining to or emanating from the Shopping Center from any governmental authority.

(i)    Landlord agrees that the Premises and the Common Areas, at all times during the Term, will be free of any airborne contaminants or other dangerous atmospheric condition originating from the Shopping Center or resulting from operation of the Shopping Center (excluding, however, contaminants or conditions introduced or caused by Tenant or those occupying the Premises by or through Tenant) which poses an immediate and serious health risk to the persons that are therein from time to time. The terms of this Section providing an indemnification from Landlord to Tenant on account of Hazardous Material and the other rights of Tenant hereinabove provided on account of the presence of Hazardous Material shall apply to a breach by Landlord of the foregoing representation and warranty.

LIMITATION OF LANDLORD'S LIABILITY

SECTION 36.    If Landlord shall fail to perform any covenant, term or condition of this Lease upon Landlord's part to be performed and as a consequence of such default Tenant shall recover a money judgment against Landlord, such judgment shall be satisfied only out of (i) the proceeds of sale received upon execution of such judgment and levy thereon against the right, title and interest of Landlord in the Shopping Center, (ii) the rents and other income from such property receivable by Landlord, and (iii) the consideration received by Landlord for the sale or other disposition of all or any part of Landlord's right, title and interest in the Shopping Center (which consideration shall be deemed to include any assets at any time after such sale or disposition held by Landlord having a value not exceeding that of the proceeds of such sale or other disposition), and Landlord shall not be liable for any deficiency; provided, however, that in the event of fraud on the part of Landlord or Landlord's failure to perform any covenant or obligation of Landlord under Section 10 the aforestated limitation on liability shall be inapplicable. The provisions of this Section shall not be deemed to deny to Tenant, or limit its right to obtain, injunctive relief or specific performance of Landlord's covenants under this Lease or to avail itself of any other right or remedy (not involving a personal liability of Landlord in excess of the limits of personal liability fixed by this Section) which may be accorded Tenant by law or under the terms of this Lease by reason of Landlord's failure to perform its obligations thereunder including, but not limited to, the rights and remedies granted Tenant under Section 29 above.

SITE PLAN

SECTION 37.    At any time throughout the Term, within thirty (30) days after Tenant's written request therefor, Landlord shall provide Tenant with a copy of the most current available site plan of the Shopping Center, which shall reflect: (a) the Gross Leasable Area of the Shopping Center as actually constructed; and (b) the names and the exact location and the Gross Leasable Area of the premises occupied by the respective tenants thereof. Failure of Landlord to provide said information within the period allowed shall result in the suspension of the payment of Fixed Minimum Rent until delivery of said information.

SUBSTITUTE RENT

SECTION 38.    Tenant shall be entitled to invoke the right to pay Substitute Rent on a retroactive basis back to the date that the condition or circumstance giving rise to such right first existed. In the case of such retroactive application of Substitute Rent, Tenant may offset any excess payments of Rent against future Rent payments.

## PRIOR AGREEMENTS

SECTION 39.        This Lease contains all of the agreements of the parties hereto with respect to any matter covered or mentioned in this Lease, and no prior agreement, understanding or representation pertaining to any such matter shall be effective for any purpose. No provision of this Lease may be amended or added to except by an agreement in writing signed by the parties hereto or their respective successors in interest.

## NO OPERATING COVENANT

SECTION 40.        (a)        Tenant agrees to initially open for business for at least one (1) day (fully stocked and fixtured) within ninety (90) days of the Commencement Date. Thereafter, anything contained in this Lease, expressly or impliedly, to the contrary notwithstanding, and notwithstanding the agreement herein contained for the payment by Tenant of Rent (including Substitute Rent), it is specifically and expressly understood and agreed that Tenant shall be under no duty or obligation, either express or implied, to thereafter to continuously conduct, its business in the Premises at any time during the Term. Further, Tenant's failure to remain open for business in the Premises shall not in any way be deemed an event of default under this Lease nor shall such a failure otherwise entitle Landlord to commence or to maintain any action, suit, or proceeding, whether in law or in equity, relating in any way to Tenant's failure to open or thereafter to continuously conduct its business in the Premises.

(b)        Notwithstanding the foregoing, in the event Tenant shall elect to discontinue its operation of business from the Premises or has in fact discontinued its operation of business from the Premises, for reasons other than an assignment or subletting, damage and destruction, remodeling or eminent domain, prior to any such election, Tenant shall, by written notice, offer the return of the Premises to Landlord. The Landlord within thirty (30) days of receipt of said written notice, shall have the option to either (i) accept said Premises without further liability upon the Tenant as to the rights and obligations of the Lease, or (ii) reject said offer and if Tenant has not discontinued its operation of business from the Premises, permit the Tenant to discontinue Tenant's operation of business from the Premises subject to the conditions of this subsection. If Landlord elects to accept the Premises pursuant to (i) herein, Tenant shall have sixty (60) days from receipt of Landlord's written notice of such election to rescind its offer of return of the Premises. Should Tenant not elect to rescind the notice, then the termination shall be effective on the earlier of (x) the date Tenant delivers the keys to Landlord, or (y) sixty (60) days after Landlord's notice to Tenant of Landlord's desire to take back the Premises. If Landlord elects to reject the Premises pursuant to (ii) herein, then Tenant shall vacate the Premises within sixty (60) days of receipt of Landlord's written notice of such election, and at any time thereafter Landlord shall have the right to terminate this lease on thirty (30) days written notice to Tenant. Until such time as Landlord elects to terminate this Lease, Tenant shall be obligated only for the payment of Fixed Minimum Rent and additional charges as due and payable under the Lease.

## APPLICABLE LAW AND CONSTRUCTION

SECTION 41.        The laws of the State of MINNESOTA shall govern the validity, performance and enforcement of this Lease. If one or more of the provisions of this Lease shall for any reason be held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect or impair any other provision of this Lease, but this Lease shall be construed as if such invalid, illegal or unenforceable provision had not been contained herein. The submission of this document for examination does not constitute an offer to lease, or a reservation of or option for the Premises, and this Lease becomes effective only upon execution and delivery thereof by Landlord and Tenant. All negotiations, considerations, representations and understandings between the parties are incorporated herein and may be modified or altered only by agreement in writing between the parties. Tenant shall have no right to cancel or rescind this Lease except as said right is expressly granted herein. This Lease has been negotiated by Landlord and Tenant and the Lease, together with all of the terms and provisions hereof, shall not be deemed to have been prepared by either Landlord or Tenant, but by both equally.

## FORCE MAJEURE

SECTION 42.        Except as otherwise expressly provided herein, in the event that either party hereto shall be delayed or hindered in or prevented from the performance of any act required

hereunder by reason of strikes, lockouts, inability to procure materials, failure of power, restrictive governmental laws or regulations, riots, insurrection, war or any other reason of a like nature not the fault of the party delayed in performing work or doing any act required under the terms of this Lease, then performance of such act shall be excused for the period of the delay and the period of the performance of any such act(excluding the payment of Fixed Minimum Rent, Percentage Rent, additional rent or any other payments required by the terms of this Lease) shall be extended for a period equivalent to the period of such delay.

REASONABLE CONSENT

SECTION 43.    Wherever Landlord's or Tenant's consent or approval shall be required herein, such consent or approval shall not be unreasonably or arbitrarily withheld or delayed.

NO PARTNERSHIP

SECTION 44.    Landlord and Tenant acknowledge that neither of them in any way or for any purpose becomes a partner or an associate of the other in the conduct of Tenant's business, the operation of the Shopping Center or otherwise, or a joint venturer, or a member of a joint enterprise with the other. Neither party shall be liable for payment of the debts or performance of any obligation of the other, it being understood and intended that the relationship is and shall be that of Landlord and Tenant.

MORTGAGE FINANCING

SECTION 45.    Upon request, Tenant agrees to execute and deliver to Landlord, within fifteen (15) days of written request, letters as reasonably required by Landlord's mortgage lenders setting forth the basic terms and status of the leasehold created hereby.

QUIET ENJOYMENT

SECTION 46.    In addition to the other covenants set forth in this Lease, Landlord hereby covenants and agrees that it is well seized of fee simple title to the Premises and the Shopping Center and has full power and authority to execute and deliver this Lease, and that if Tenant shall perform all of the covenants and agreements herein stipulated to be performed on Tenant's part, Tenant shall at all times during the continuance hereof have peaceable and quiet enjoyment and possession of the Premises and of the rights granted hereunder without any manner of let or hindrance from Landlord or any other person or persons claiming under Landlord.

HOLDING OVER

SECTION 47.    If, at the expiration of the Initial Term of this Lease and any extensions thereof, Tenant continues to occupy the Premises, such holding over shall not constitute a renewal of this Lease, but Tenant shall be a tenant from month to month, at a Fixed Minimum Rent equal to 110% of the Fixed Minimum Rent payable prior to such holdover period, otherwise under the same terms and conditions as in effect during the next preceding term of this Lease.

BROKERS

SECTION 48.    Landlord and Tenant each represents to the other that it has not dealt with any broker in regard to the Premises or this Lease, and each agrees to indemnify and hold the other harmless from and against any loss, cost, liability or expense, including reasonable attorneys' fees, arising out of the failure of its representations hereunder.

EXTRA CHARGES

SECTION 49.    INTENTIONALLY DELETED.

CLAIMS LIMITATION

                SECTION 50.      Landlord and Tenant agree that all actions or claims for additional or excess payments or refunds of excess payments, as the case may be, of Fixed Minimum Rent, Percentage Rent, Common Area Costs, Taxes, Insurance, and any other monetary obligations shall be barred two (2) years after the close of each Lease Year or Partial Lease Year.

ATTORNEY'S FEES

                SECTION 51.            Without otherwise limiting Landlord's or Tenant's rights to attorney's fees pursuant to the other terms of this Lease, in the event of litigation between the parties that actually goes to trial and/or any appellate court, the prevailing party shall be entitled to receive its attorney's fees from the other party.

CAPTIONS

                SECTION 52.      Any paragraph titles or captions contained in this Lease are for convenience only and shall not be deemed to define, limit or otherwise modify the scope or intent of this Lease.

VARIATION IN PRONOUNS

                SECTION 53.      All the terms and words used in this Lease, regardless of the number and gender in which they are used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context or sense of this Lease or any paragraph or clause herein may require, the same as if such words had been fully and properly written the number and gender.

BINDING EFFECT OF AGREEMENT

                SECTION 54.      This Lease and all of the covenants, conditions, provisions and restrictions herein contained shall inure to the benefit of and be binding upon the heirs, executors, administrators, devisees, legatees, personal representatives, successors and assigns, respectively, of both the Landlord and Tenant.

ACCORD AND SATISFACTION

                SECTION 55.      No payment by Tenant or receipt by Landlord of a lesser amount than the monthly rent herein stipulated shall be deemed to be other than on account of the earliest stipulated rent, nor shall any endorsement or statement on any check or any letter accompanying any check or payment as rent be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such rent or pursue any other remedy in this lease provided.

FINANCIAL STATEMENTS

                SECTION 56.  Tenant shall, within ten (10) days after request therefor from Landlord, provide a copy of Tenant's most recent annual and/or quarterly financial statements, certified by Tenant to be true and correct, which financial statements may be disclosed to the Mortgagee.

IN WITNESS WHEREOF, the parties hereto set their hands to four (4) counterparts hereof, each of which having the same force and effect, as of the date first hereinabove written.

Signed in the presence of:

TAMARACK VILLAGE SHOPPING CENTER, A LIMITED PARTNERSHIP

By: TAMARACK VILLAGE SHOPPING CENTER CORPORATION, GENERAL PARTNER

By: _____

Elizabeth J. Husser

Federal Identification #:_____41-1806351_____

**LANDLORD**

FABRI-CENTERS OF AMERICA, INC.

By: _____

Patricia Heilmann

Jackie Caropinski

And: _____

**TENANT**

STATE OF   FLORIDA      )
                        )SS
COUNTY OF  PALM BEACH   )

BEFORE ME, a Notary Public in and for said County and State, personally appeared TAMARACK VILLAGE SHOPPING CENTER, A LIMITED PARTNERSHIP, by TAMARACK VILLAGE SHOPPING CENTER CORPORATION, GENERAL PARTNER, by ___ROBERT C. MUIR___, its ___President___, who did sign the foregoing instrument on behalf of said partnership and that the same is his free act and deed of said partnership.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at ___Boca Raton___, ___Florida___, this _3rd_ day of ___March___, 1997.

_____
NOTARY PUBLIC

Elizabeth J. Husser
Notary Public, State of Florida
Commission No. CC 495569
My Commission Expires 11/25/99
1-800-3-NOTARY - Fla. Notary Service & Bonding Co.

STATE OF OHIO      )
                   )SS
COUNTY OF SUMMIT   )

BEFORE ME, a Notary Public in and for said County and State, personally appeared FABRI-CENTERS OF AMERICA, INC., an Ohio corporation, by ___ALAN ROSSKAMM___, its ___PRESIDENT___ and ___FRANCIS PICCIRILLO___, its ___SENIOR VICE PRESIDENT___ respectively, who acknowledged that they did sign the foregoing instrument on behalf of said corporation, and that the same is the free act and deed of said corporation and their free act and deed personally and as such officers.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at Hudson, Ohio, this _27th_ day of ___February___, 1997.

_____
NOTARY PUBLIC

PATRICIA HEILMANN, Notary Public
STATE OF OHIO - Summit County
My Commission Expires July 28, 1997



SITE PLAN
EXHIBIT "B"

TAMARACK VILLAGE

**EXHIBIT A TO LEASE BETWEEN TAMARACK VILLAGE
SHOPPING CENTER, A LIMITED PARTNERSHIP
AND FABRI-CENTERS OF AMERICA, INC.**

Legal Description

Tract 1:        Lots 4 and 6, Block 1, Tamarack Village and Lot 2, Block 1 and Outlot A,
Tamarack Village 2nd Addition.

Tract 2:        Lots 1 and 5, Block 1, Tamarack Village and Lot 1, Block 1, Tamarack
Village 2nd Addition, are or will be owned by others and are subject to
this lease only to the extent provided in the OEA.



**GPD ASSOCIATES**

ENGINEERS • ARCHITECTS • PLANNERS
520 South Main Street          Suite 2531
Akron, Ohio            44311-1010
330-434-4900      FAX 330-434-1391

DATE RECEIVED

MAR 1 0 1997

STORE PLAN/CONSTRUCTION

95024.48

To: Greg Struve - Robert Muir Company
From: Rebecca McAdams - GPD Associates

EXHIBIT C
(TENANT PORTION)

Revised 3/6/97

Jo-Ann Etc. - Woodbury, MN

| Drawing Name | | Date Issued | Latest Revision |
|---|---|---|---|
| T1 | Title Sheet | 2-21-97 | 3/4/97 |
| A1 | Demolition Plan | 2-21-97 | 3/4/97 |
| A2 | Floor Plan | 2-21-97 | 3/4/97 |
| A3 | Reflected Ceiling Plan | 2-21-97 | 3/4/97 |
| A4 | Details and Section | 2-21-97 | 3/4/97 |
| A5 | Schedules & Exterior Elevations | 2-21-97 | 3/4/97 *SEE NOTE (1) |
| A6 | Interior elevations | 2-21-97 | 3/4/97 |
| A7 | Floor Finish Plan | 2-21-97 | 3/4/97 |
| E1 | Electrical Notes, Symbols and Details | 2-21-97 | 3/4/97 *SEE NOTE (2) |
| E2 | Lighting Plan | 2-21-97 | 3/4/97 |
| E3 | Power Plan | 2-21-97 | 3/4/97 |
| SP1 | Specifications | 2-21-97 | — |

* NOTES:

(1) ELEVATION REPLACES LANDLORD WORK WITH LANDLORD CREDIT OF $1277.00. TENANT ACCEPTS ELEVATION "AS-IS". SIGNAGE SUBJECT TO GOVERNMENT APPROVAL

(2) SIGNAGE AND EXTERIOR LIGHTING CONTACTORS AVAILABLE FOR CENTRAL LANDLORD CONTROL

# EXHIBIT "C" - 2-6-97

LANDLORD PORTION
1 OF 3

| SHEET INDEX | | ISSUE DATE | | | | |
|---|---|---|---|---|---|---|
| | | | REVISION DATE | | | |
| **ARCHITECTURAL** | | | | | | |
| T100 | COVER SHEET | 2-6-96 | | | | |
| A101 | FLOOR PLAN | 2-6-96 | | | | |
| A201 | ROOF PLAN AND DETAILS | 2-6-96 | | | | |
| A401 | EXTERIOR ELEVATIONS  ✱ SEE NOTE | 2-6-96 | | | | |
| A501 | WALL SECTIONS | 2-6-96 | | | | |
| A601 | OPENING SCHEDULE ELEVATIONS AND DETAILS | 2-6-96 | | | | |
| | | | | | | |
| **STRUCTURAL** | | | | | | |
| S1 | GENERAL STRUCTURAL NOTES AND TYPICAL DETAILS | 2-3-96 | | | | |
| S2 | FOUNDATION PLAN AND DETAILS | 2-3-96 | | | | |
| S3 | ROOF FRAMING PLAN AND DETAILS | 2-3-96 | | | | |
| | | | | | | |
| **MECHANICAL** | | | | | | |
| M1 | MECHANICAL FLOOR PLAN | 2-7-96 | | | | |
| M2 | MECHANICAL DETAILS, SCHEDULES, AND SPECIFICATIONS | 2-7-96 | | | | |
| | | | | | | |
| **ELECTRICAL** | | | | | | |
| E1 | ELECTRICAL FLOOR PLAN | 2-7-96 | | | | |

# JO-ANN ETC.
## ADDITION PACKAGE
### 8208 TAMARACK VILLAGE
### WOODBURY, MN  55125

✱ NO EXTERIOR ELEVATION WORK BY LANDLORD
SEE TENANT PLAN A5

JO-ANN ETC. - WOODBURY, MN

EXHIBIT C

LANDLORD 2 OF 3        MD9708A

**DOCUMENT 00015 - TABLE OF CONTENTS**

**INTRODUCTION**

00010    Title and Certification
00015    Table of Contents

**DIVISION 0 - BIDDING REQUIREMENTS, CONTRACT FORMS AND CONDITIONS OF THE CONTRACT**

00020    Invitation to Bidders
00100    Instruction to Bidders
00120    Supplementary Instructions to Bidders
00220    Soil Data
00700    General Conditions of the Contract
00800    Supplementary General Conditions of the Contract
00960    Substitution Request Form

**DIVISION 1 - GENERAL REQUIREMENTS**

01002    Summary of Work
01005    Administrative Provisions
01095    Industry Standards, Acronyms and Abbreviations
01200    Project Meetings
01300    Submittals
01400    Quality Control
01500    Construction Facilities and Temporary Controls
01600    Material and Equipment
01700    Contract Closeout

**DIVISION 2 - SITEWORK**

02220    Building Area Earthwork

**DIVISION 3 - CONCRETE**

03001    Concrete
03200    Concrete Reinforcement

**DIVISION 4 - MASONRY**

04300    Unit Masonry System

**DIVISION 5 - METAL**

05110    Structural Steel Framing Fabrication
05120    Structural Steel Framing Erection
05311    Steel Deck
05500    Metal Fabrications

**DIVISION 6 - WOOD AND PLASTICS**

06100    Rough Carpentry

TABLE OF CONTENTS

# EXHIBIT C

MD9708A

JO-ANN ETC. - WOODBURY, MN

LANDLORD
3 OF 3

## DIVISION 7 - THERMAL AND MOISTURE PROTECTION

| | |
|---|---|
| 07181 | Water Repellent Coating |
| 07200 | Insulation |
| 07241 | Exterior Insulation and Finish System |
| 07531 | Elastomeric Sheet Roofing - Fully Adhered |
| 07533 | Elastomeric Sheet Roofing - Mechanically Attached |
| 07620 | Sheet Metal Flashing and Trim |
| 07900 | Joint Sealers |

## DIVISION 8 - DOORS AND WINDOWS

| | |
|---|---|
| 08110 | Steel Doors and Frames |
| 08355 | Traffic Doors |
| 08710 | Hardware |

## DIVISION 9 - FINISHES

| | |
|---|---|
| 09250 | Gypsum Board Systems |
| 09900 | Painting |

## DIVISION 10 - SPECIALTIES

| | |
|---|---|
| 10522 | Fire Extinguishers and Accessories |
| 10990 | Miscellaneous Specialties |

## DIVISION 11 - EQUIPMENT

(Not Required)

## DIVISION 12 - FURNISHINGS

(Not Required)

## DIVISIONS 13 & 14

(Not Required)

## DIVISION 15 - MECHANICAL

See Drawings

## DIVISION 16 - ELECTRICAL

See Drawings

END OF TABLE OF CONTENTS

TABLE OF CONTENTS

## EXHIBIT E TO LEASE BETWEEN TAMARACK VILLAGE SHOPPING CENTER, A LIMITED PARTNERSHIP AND FABRI-CENTERS OF AMERICA, INC.

### Existing Exclusive Use Provisions

Tenant agrees that Tenant will not put the Premises to any use which is violative of the following exclusives granted to or reserved for specific major tenants (the term "primary use" as hereafter used in this Exhibit E shall mean any use or combination of uses which exceeds 25% of Tenant's floor area):

   1. As a supermarket, grocery store, food store, drug store or pharmacy.

   2. For the retail sale of pets, pet food or other pet products or pet services as a primary use.

   3. For the sale of consumer, office or automotive electronic products or major appliances as a primary use.

   4. For the sale of (i) domestic bedroom and/or bathroom goods (including, without limitation, linens and towels, area rugs, and basket and basket products), and/or (ii) kitchen products and small and handheld appliances (including without limitation glassware, cookware, kitchen appliances, dinnerware, flatware/cutlery, and other miscellaneous kitchen products) (including by way of example those businesses operated by Bed Bath and Beyond, Linens 'n Things, Waccamaw Pottery, and HomeFest) as a primary use.

   5. The retail sale of office, home office, school or business products, office, home office, school or business supplies or equipment; or office furniture as a primary use or for the primary purpose of a copy center or "kinko" type of operation.

   6. For the sale of toys, outdoor play equipment, children's wheel goods (the foregoing shall not apply to a full line bicycle store), layettes, infant furnishings, infant, juvenile and children's furniture, infant, juvenile and children's books and records, family and adult games, video and electronics games and game equipment or computers and accompanying software, used primarily for game purposes as a primary use.

   7. The sale, offering for sale and/or display of sporting goods or sporting equipment, including boats, motors, boat trailers, guns, hunting equipment, racquet sports equipment, golf equipment, archery equipment, swimming, scuba and other marine equipment, athletic footwear, fishing tackle and

equipment, water skis, snow skis, bicycles, camping equipment, exercise equipment and non-motorized camping trailers.

8.      Lease, rent, occupy, use or permit to be occupied or used for the primary use of the sale, rental or servicing of multi-media electronics and telecommunications products and equipment, and/or for training in the use and operation of computer hardware and software usage and, for the primary use of the sale, rental or servicing of computer hardware.

## EXHIBIT F TO LEASE BETWEEN TAMARACK VILLAGE SHOPPING CENTER, A LIMITED PARTNERSHIP AND FABRI-CENTERS OF AMERICA, INC.

## SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT ("Agreement") is made as of February ____, 1997, by and among FIRST BANK NATIONAL ASSOCIATION, a national banking association ("Lender"), TAMARACK VILLAGE SHOPPING CENTER, A LIMITED PARTNERSHIP, a Minnesota limited partnership ("Lessor") and FABRI-CENTERS OF AMERICA, INC., an Ohio corporation ("Lessee").

### RECITALS:

A.     Lessor and Lessee entered into that certain lease dated February ____, 1997 ("Lease"), concerning premises ("Premises") in the shopping center development known as Tamarack Village Shopping Center ("Project") located on that certain real property in the City of Woodbury, in Washington County, Minnesota legally described on the attached **Exhibit A** ("Land");

B.     The Project has been mortgaged to Lender under a Combination Mortgage, Security Agreement and Fixture Financing Statement dated November 10, 1995, recorded in the office of the County Recorder of Washington County, Minnesota, as Document No. 866376, as amended by Amendment No. 1 to Mortgage dated April 10, 1996, recorded in the office of the County Recorder of Washington County, Minnesota, as Document No. 881308 (as amended, modified, supplemented, and renewed, "Mortgage"), as security for a loan from Lender to Lessor ("Loan") in the original principal amount of FORTY-ONE MILLION AND NO/100THS DOLLARS ($41,000,000.00);

C.     Lender has required the execution of this Agreement as a condition to making said Loan; and

D.     Lender, Lessor and Lessee have agreed to the following with respect to their mutual rights and obligations pursuant to and under the Lease and the Mortgage;

NOW, THEREFORE, for and in consideration of the mutual covenants and agreements herein contained, the making of the Loan by Lender to Lessor and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby covenant and agree as follows:

1.   **SUBORDINATION.** The Lease and all rights and interests of Lessee under the Lease are hereby declared, and will remain, unconditionally subject and subordinate to the Mortgage in all respects.

2.   **NON-DISTURBANCE.** Provided that no default by Lessee under the Lease then exists beyond any applicable notice and cure period provided by the Lease, Tenant's occupancy of the Premises shall not be disturbed and the Lease shall not be extinguished or terminated by an action or proceeding to foreclose or otherwise enforce the Mortgage or by a conveyance in lieu of foreclosure, but rather, the Lease shall continue in full force and effect and the owner of the Property following a foreclosure sale or conveyance in lieu of foreclosure ("New Owner") shall recognize and accept Lessee as tenant under the Lease.

3.   **ATTORNMENT.** Upon Lessee's receipt of notice that New Owner has acquired the Property, Lessee will attorn to and recognize such New Owner as its substitute lessor under the Lease. Lessee's attornment to and recognition of New Owner pursuant to this Agreement will be effective and self-operative immediately upon Lessee's receipt of such notice without the execution or delivery of any further instrument. Upon New Owner's request, Lessee will execute and deliver an instrument acknowledging Lessee's attornment to and recognition of New Owner, if it doesn't change the Lease.

4.   **NEW OWNER.** New Owner will be bound, as the lessor, to Lessee under all covenants and conditions of the Lease for the remainder of the term of the Lease and any renewal or extension thereof pursuant to the terms of the Lease, except that New Owner:

   (i)   will not be bound by any provision of the Lease restricting the use of any properties owned by New Owner, other than the Property;

   (ii)   will not be liable for any act, omission, or breach by any prior or subsequent lessor under the Lease;

   (iii)   will, upon any sale or other transfer by New Owner of its interest in the Premises, automatically be released and discharged from all liability thereafter accruing under the Lease, provided that the transferee assumes in writing all of the lessor's obligations under the Lease occurring after the transfer.

5.   **MISCELLANEOUS.**

   a.   **No Advance Rent.** Lessee will not pay the rent or any other sums due under the Lease more than two months in advance.

-2-

b.     **Assignment of Rents.** Lessor and Lessee acknowledge that Lender is entitled, pursuant to an Assignment of Leases and Rents executed by Lessor in favor of Lender, to receive and collect all rent payable under the Lease directly from Lessee. Lessee agrees to pay all of said rent directly to Lender upon receipt of a written request from Lender. Until Lessee receives such request from Lender, Lessee will pay all of said rent to Lessor in accordance with the provisions of the Lease. Upon Lessee's receipt of such request, Lessee will not be required to determine whether Lessor is in default under the Loan or the Mortgage and Lessor shall defend, indemnify and hold Lessee harmless for the payment of said rent as required hereunder.

c.     **No Modification or Termination.** Lessor will not cancel or terminate the Lease or amend, modify, supplement, or in any manner alter any of its terms without the prior written consent of Lender.

d.     **No Other Subordination.** Lessor will not during the term of the Mortgage, permit the Lease to become subordinate to the lien of any mortgage or security instrument in favor of any person or entity other Lender.

e.     **Successors and Assigns.** This Agreement will be binding upon and will inure to the benefit of the parties hereto and their respective heirs, executors, administrators, personal representatives, successors and assigns, including any New Owner.

f.     **Governing Law.** This Agreement and the Lease will be governed by and construed and interpreted in accordance with the internal laws of the State of Minnesota.

g.     **Counterparts.** This Agreement may be signed in counterparts and each counterpart shall be effective as an original when counterparts have been signed by all parties.

IN WITNESS WHEREOF, this Agreement has been duly executed as of the day and year first above written.

WITNESSETH:                          FIRST BANK NATIONAL
                                     ASSOCIATION, a national banking
                                     association

_____

_____     By_____
                                     Its_____
                                             Lender

TAMARACK VILLAGE SHOPPING
CENTER, A LIMITED PARTNERSHIP,
a Minnesota limited partnership

By   TAMARACK VILLAGE
    SHOPPING CENTER
    CORPORATION, a Minnesota
    corporation, its general partner

By _____
  Its _____
      Lessor


FABRI-CENTERS OF AMERICA, INC.,
an Ohio corporation


By_____
  Its_____
      Lessee

-4-

STATE OF MINNESOTA )
                   ) ss.
COUNTY OF HENNEPIN )

The foregoing was acknowledged before me this ___ day of February, 1997, by
_____ the _____ of First Bank National Association, a
national banking association under the laws of the United States of America, on
behalf of said national banking association.

                                        _____
                                        Notary Public

STATE OF ~~MINNESOTA~~ FLORIDA )
COUNTY OF ~~HENNEPIN~~ PALM BEACH ) ss.

The foregoing was acknowledged before me this 3rd day of ~~February,~~ March 1997, by
Robert C. Muir the President of Tamarack Village Shopping Center
Corporation, a Minnesota corporation, the general partner of Tamarack Village
Shopping Center, A Limited Partnership, a Minnesota limited partnership under
the laws of the State of Minnesota, on behalf of said corporation and limited
partnership.

                                        _Elizabeth J. Husser_
                                        Notary Public

                                        ╔══════════════════════════════╗
                                        ║        Elizabeth J. Husser     ║
                                        ║  Notary Public, State of Florida ║
                                        ║    Commission No. CC 495569     ║
                                        ║  My Commission Expires 11/25/99 ║
                                        ║ 1-800-3-NOTARY - Fla. Notary Service & Bonding Co. ║
                                        ╚══════════════════════════════╝

STATE OF OHIO        )
                     ) ss.
COUNTY OF CUYAHOGA   )

The foregoing was acknowledged before me this _____ day of
February, 1997, by _____, the _____ of FABRI-CENTERS
OF AMERICA, INC., an Ohio corporation under the laws of the State of Ohio on
behalf of said corporation.

                                        _____
                                        Notary Public

This document was drafted by:
Dorsey & Whitney LLP (LRK)
Pillsbury Center South
220 South Sixth Street
Minneapolis, MN  55402-1498

**Exhibit A**

Legal Description

Lots 4 and 6, Block 1, Tamarack Village, according to the Plat thereof recorded in the office of the Washington County, Minnesota recorder and Lot 2, Block 1 and Outlot A, Tamarack Village 2nd Addition, according to the recorded plat thereof recorded in the office of the Washington County, Minnesota recorder.

EXHIBIT G TO LEASE BETWEEN TAMARACK VILLAGE
SHOPPING CENTER, A LIMITED PARTNERSHIP
AND FABRI-CENTERS OF AMERICA, INC.

Sign Criteria

These criteria have been established for the purpose of assuring an outstanding shopping center, and for the mutual benefit of all tenants. Conformance will be strictly enforced; and any installed nonconforming or unapproved signs must be brought into conformance at the expense of Tenant.

The Project Architect is to administer and interpret the criteria, but is not empowered to authorize any departure without written consent of the Landlord.

A.    GENERAL REQUIREMENTS

1.    Each tenant shall submit or cause to be submitted to the Project Architect for approval before fabrication at lease three copies of detailed drawings covering the location, size, layout, design and color for the proposed sign, including all lettering and/or graphics.

2.    No signs shall be permitted on the exterior of the shopping center unless approved by the Project Architect and the Landlord.

3.    All permits for signs and their installation shall be obtained by the tenant or his representative.

4.    Tenant shall be responsible for the fulfillment of all requirements and specifications.

5.    Any temporary banners and signage shall be by appropriate permit and approved by the Landlord.

6.    All signage will remain lighted until at least 12 midnight, seven days a week unless revised by Landlord. Each sign shall be connected, by Tenant's sign contractor, to the centralized timer provided by Landlord. Connection for the timer shall be at the rear wall of the demised premises.

7.    No signage, banners or other elements will be allowed on the exterior of any tenant space without the permission of Landlord.

8. Landlord reserves the right to limit window signage. Tenants are encouraged to submit such signage for approval.

B. DESIGN REQUIREMENTS

1. Center standard shall be individual, internally lit letters. All exposed sides and unlit letter areas shall be painted to match Landlord specified color.

2. Signs shall be permitted only within the sign areas as designed by the Project Architect and as shown on the plans.

3. The total sign area (rectangle enclosing each group of letters, symbols, or logos) shall not exceed ten percent (10%) of the area of the store front.

4. While it is desired to permit tenants to present to the public their typical sign image, signs which do not conform to the dimensions and location described in Sections above will be reviewed by the Landlord with the major tenants for approval.

5. No signs perpendicular to the face of the building shall be permitted unless uniformly established by the Project Architect, and as shown on the approved improvement plans.

6. No signs of any sort shall be permitted on canopy roofs or building roofs.

7. Wording of signs shall not include the product sold except as a part of Tenant's trade name or insignia.

8. No sign, or any portion thereof, may project above the parapet or top of wall upon which it is mounted.

C. GENERAL SPECIFICATIONS

1. Flashing, moving or audible signs will not be permitted.

2. All electrical signs shall bear the UL label, and their installation must comply with all applicable building and electrical codes.

3. No exposed conduit, tubing or raceways will be permitted. No exposed neon lighting shall be used on signs, symbols or decorative elements unless approved by the Landlord. Tenants shall be fully responsible for the maintenance and repair of neon signs and shall promptly repair any broken or nonfunctioning

neon signs.  Any broken or nonfunctioning neon sign which is not promptly repaired shall be removed.  Any temporary replacement sign shall conform to the Sign Criteria.

    4.     All conductors, transformers and other equipment shall be concealed.

    5.     Electrical service to all signs shall be on Tenant's meter and not be part of common area construction or operation costs.

    6.     All metal components, bolts, fastenings and clips shall be of hot dipped galvanized iron, stainless steel, aluminum, brass or bronze, and no black iron materials of any type will be permitted.

    7.     All exterior letters or signs exposed to the weather shall be mounted with at lease 3/4" clearance from the building wall to permit proper dirt and water drainage.

    8.     Location of all openings for conduit and sleeves in sign panels of building walls shall be indicated by the sign contractor on drawings submitted to the Project Architect.  Sign contractor shall install same in accordance with the approved drawings.

    9.     All penetrations of the building required for sign installation shall be neatly sealed in a watertight condition.

    10.     Landlord shall provide, at Tenant's expense, a rear door sign placard with two inch high block letters, identifying Tenant's name and address. Where more than one tenant uses the same door, each name and address shall be applied.  Color of letters and placard will be as selected by Landlord.  Landlord will also provide Tenant's address or suite number with three-inch high die-cut vinyl block numbers attached to the glass above or to the side of Tenant's main entrance.

    11.     No signmaker's labels or other identification will be permitted on the exposed surface of the sign, except those required by local ordinance which in any event will be in an inconspicuous location.

    12.     Tenant will be fully responsible for its sign contractor.

    13.     Tenant shall repair any damage to any work caused by its sign contractor's work.

## LEASE MODIFICATION AGREEMENT

THIS AGREEMENT, made as of the 3rd day of November, 1997, by and between TAMARACK VILLAGE SHOPPING CENTER, A LIMITED PARTNERSHIP, a Minnesota limited partnership, having its address located at 2850 Metro Drive, Suite 503, Bloomington, MN 55425 (the "Landlord") and FABRI-CENTERS OF AMERICA, INC., an Ohio corporation, having its address located at 5555 Darrow Road, Hudson, Ohio 44236 (the "Tenant").

### W I T N E S S E T H :

WHEREAS, Landlord and Tenant entered into a Lease Agreement dated February 25, 1997 (the "Lease"), wherein certain described Premises consisting of approximately Forty-Six Thousand Seventy (46,070) square feet of ground floor area (the "Premises") located in the TAMARACK VILLAGE SHOPPING CENTER, Woodbury, Minnesota (the "Shopping Center") was leased to Tenant; and

WHEREAS, Section 3(a) of the Lease entitled "PREMISES" provides that the dimensions of the Premises will be adjusted and Rent and other charges will also be adjusted based on such field measurements; and

WHEREAS, Landlord's ~~Architect, Miller Dunwiddie, Inc.,~~ *Engineer, BRW* has provided Tenant with a copy of as-built drawings which indicate the square footage of the Premises being Forty-Five Thousand Two Hundred Fifteen (45,215) square feet; and

WHEREAS, Landlord and Tenant desire to modify the Lease to reflect the actual square footage of the Premises.

NOW, THEREFORE, in consideration of the mutual covenants hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      Section 3(a) of the Lease entitled "PREMISES" shall be modified as follows: "Notwithstanding anything in the Lease to the contrary, the parties hereto acknowledge that the Gross Leasable Area of the Premises shall be Forty-Five Thousand Two Hundred Fifteen (45,215) square feet."

2.      The indented portion of Section 5(a) of the Lease entitled "FIXED MINIMUM RENT" shall be deleted in its entirety and the following substituted in lieu thereof:

(i)      During the first five (5) Lease Years of the Initial Term at the rate of Three Hundred Sixty-Five Thousand Three Hundred Thirty-Seven and 20/100 Dollars ($365,337.20) per annum in equal monthly installments of Thirty Thousand Four Hundred Forty-Four and 77/100 Dollars ($30,444.77); and

(ii)      During the second five (5) Lease Years of the Initial Term at the rate of Three Hundred Ninety-Nine Thousand Two Hundred Forty-Eight and 45/100 Dollars ($399,248.45) per annum in equal monthly installments of Thirty-Three Thousand Two Hundred Seventy and 70/100 Dollars ($33,270.70); and

(iii)      During the last five (5) Lease Years of the Initial Term at the rate of Four Hundred Thirty-Three Thousand One Hundred Fifty-Nine and 70/100 Dollars ($433,159.70) per annum in equal monthly installments of Thirty-Six Thousand Ninety-Six and 65/100 Dollars ($36,096.65); and

(iv)      During the first five (5) year extended term at the rate of Five Hundred Thousand Nine Hundred Eighty-Two and 20/100 Dollars ($500,982.20) per annum in equal monthly installments of Forty-One Thousand Seven Hundred Forty-Eight and 52/100 Dollars ($41,748.52); and

(v)    During the second five (5) year extended term at the rate of Five Hundred Thirty-Four Thousand Eight Hundred Ninety-Three and 45/100 Dollars ($534,893.45) per annum in equal monthly installments of Forty-Four Thousand Five Hundred Seventy-Four and 45/100 Dollars ($44,574.45); and

(vi)    During the third five (5) year extended term at the rate of Five Hundred Sixty-Eight Thousand Eight Hundred Four and 70/100 Dollars ($568,804.70) per annum in equal monthly installments of Forty-Seven Thousand Four Hundred and 39/100 Dollars ($47,400.39).

3.    Except as amended herein, all the terms, covenants and provisions of the Lease shall be and remain in full force and effect, and are hereby ratified and confirmed.

4.    This Lease Modification Agreement and all of the terms, covenants, conditions, provisions, and restrictions herein contained shall inure to the benefit of and be binding upon the heirs, executors, administrators, devisees, legatees, personal representatives, successors and assigns, respectively, of both Landlord and Tenant.

IN WITNESS WHEREOF, the parties hereunto have executed this Agreement as of the date first hereinabove written.

Witnesses:

_Kathleen Klatt_

_Eileen Strand_

TAMARACK VILLAGE SHOPPING CENTER, A LIMITED PARTNERSHIP,

By:  TAMARACK VILLAGE SHOPPING CENTER CORPORATION, GENERAL PARTNER

By: _____  Kelly J. Doran
                                Asst. V.P.

Federal Identification No:   41-1806351

Witnesses:

_Patricia Heilman_

_Patricia Moyer_

FABRI-CENTERS OF AMERICA, INC.

By: _____

And: _____

TENANT

STATE OF MiNNESotA )
                   )SS
COUNTY OF HENNEPiN )

     BEFORE ME, a Notary Public in and for said County and State, personally appeared TAMARACK VILLAGE SHOPPING CENTER, A LIMITED PARTNERSHIP, by TAMARACK VILLAGE SHOPPING CENTER CORPORATION, GENERAL PARTNER, by KELLY J. DoRAN, its Ass'T. VICE PRESIDENT, who did sign the foregoing instrument on behalf of said corporation and that the same is his free act and deed of said corporation and personally and as such officer.

     IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at BLooMiNGToN, MN, this 5th day of NoVEMBER, 1997.

            _Phyllis J. Strand_
            NOTARY PUBLIC

          PHYLLIS J. STRAND
          NOTARY PUBLIC-MINNESOTA
          HENNEPIN COUNTY
          My Commission Expires 1-31-2000

STATE OF OHIO    )
        )SS
COUNTY OF SUMMIT  )

     BEFORE ME, a Notary Public in and for said County and State, personally appeared FABRI-CENTERS OF AMERICA, INC., an Ohio corporation, by ALAN ROSSKAMM, its PRESIDENT and JOHN Z. STEC, its SENIOR VICE PRESIDENT respectively, who acknowledged that they did sign the foregoing instrument on behalf of said corporation, and that the same is the free act and deed of said corporation and their free act and deed personally and as such officers.

     IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at Hudson, Ohio, this 4th day of November, 1997.

            _Patricia Heilmann_
            NOTARY PUBLIC

        PATRICIA HEILMANN, Notary Public
        STATE OF OHIO - Summit County
        My Commission Expires July 31, 2002

## SECOND AMENDMENT TO LEASE AGREEMENT

THIS SECOND AMENDMENT TO LEASE AGREEMENT ("Second Amendment") is entered into this _____day of _____ 2006 by and between Tamarack Village Shopping Center, A Limited Partnership, a Minnesota limited partnership ("Landlord") and JO-ANN STORES, INC., an Ohio Corporation ("Tenant").

### RECITALS:

A.  Landlord and Fabri-Centers of America, Inc., ~~Tenant's predecessor-in-interest~~, entered into a Lease dated February 25, 1997, and amended by a Lease Modification Agreement dated November 3,1997 and a letter consenting to changes in site plans signed by Tenant on May 27, 2003 (as amended by the Lease Modification Agreement and letter the "Lease") relative to premises in the Tamarack Village Shopping Center, Woodbury, Minnesota.

*Tenant, formerly known as* [handwritten]

B.  The parties have agreed to enter into this Amendment to evidence their agreements as to a new directional sign in the Center.

NOW THEREFORE, in consideration of the forgoing and One Dollar and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Landlord and Tenant agree as follows:

1.  All terms in this Second Amendment which are not defined in this Second Amendment but are defined in the Lease, shall have the meaning assigned to such terms in the Lease.

2.  Landlord has constructed a directional sign ("Directional Sign") at the entrance to the Southwest Quadrant of the Shopping Center from the Permanent Drive.

3.  Tenant shall have a license to place on the Directional Sign a directional sign panel in the location as shown on Exhibit A attached hereto ("License"). The term of the License shall be the same as the term of the Lease except that Landlord shall have the right to revoke the License at any time by giving 60 days notice to Tenant if Landlord, in its sole discretion, determines that such revocation is in the best interests of the Shopping Center.  In the event that the revocation takes place in the first 5 years of the term of this License, Landlord shall reimburse Tenant for 1/60th of the cost of Tenant acquiring and installing Tenant's initial panel on the Directional Sign for every month between the effective date of termination of the License and the end of the 60th month following Tenant's installation of its sign panel.  Tenant shall furnish Landlord with evidence of said cost within 30 days of Landlord's revocation notice and Landlord shall reimburse Tenant for the unamortized cost pursuant to the above determination within 30 days after receipt of Tenant's cost evidence.

4.  Landlord approves Tenant's original panel sign as submitted by Tenant and approved by Landlord subject to its comments thereon on January 13, 2006, a

190 27 [handwritten]

copy of which is attached as Exhibit B.  Any changes in Tenant's sign panel shall require Landlord's approval, which approval shall not be unreasonably withheld, delayed or conditioned.

5.  Landlord shall at all times maintain the Directional Sign in good  order and repair.  Tenant shall at all times maintain its sign panel on the Directional Sign in good order and repair.

6.  Tenant shall during the term of the License pay to Landlord its pro rata share, being a fraction the numerator of which is one and the denominator of which is the number of tenant sign panels on the Directional Sign of the cost of repair, maintenance and replacement of the Direction Sign and electrical charges pertaining thereto (but excluding any cost or expense pertaining to the repair, maintenance or replacement of any other tenants identification sign panels).  Tenant shall pay all such costs within 30 days after a billing therefore by Landlord containing an itemization of such costs. Landlord may bill such costs at such intervals as Landlord shall determine, but in no event more often than monthly.  It is agreed the electric costs may be based on costs shown on a separate meter or as shown by periodic test metering estimates.

7.  At the end of the term of this License, Tenant shall remove its sign panel and repair any damage to the Directional Sign caused by such removal.

8.  Except as specifically set forth in this Second Amendment, all the terms and conditions of the Lease shall continue in full force and effect without change. Time is of the essence of this Second Amendment.

9.  This Second Amendment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.                .

10. This Second Amendment shall be governed by the laws of the State of Minnesota.

11. In the event of inconsistency between the provisions of this Second Amendment and any provisions of the Lease, the provisions of this Second Amendment shall govern.

1402-2

IN WITNESS WHEREOF, the undersigned have entered into this Second Amendment on the date set forth above.

LANDLORD:

TAMARACK VILLAGE SHOPPING
CENTER, A LIMITED PARTNERSHIP
By Tamarack Village Shopping Center
Corporation

By _____

Title _____

TENANT:

JO-ANN STORES, INC., an Ohio
Corporation

By _____
                    Jeffrey N. Fink
Title _____ Vice President, Real Estate

1902-3



Exhibit A



ALL RETURNS:
SHERWIN WILLIAMS
#SW 2429
"PALAIS WHITE"

PIN MOUNT LETTERS
INDIVIDUALLY 3/4" OFF
BUILDING FACE WITH
NO VISIBLE STANDOFFS

See pg. 3
for drawing measurements
my expand to
5'-5" × 3'

5'-5"   5'-5"
5'-0"   5'-0"   3'

3.75 SQ. FT.

Yellow acrylic face arrow

MONUMENT SIGN LOCATION

Provide sheet noted
enclosure on rear of sign
for sign wiring & transformer. Paint
to match brick color of adjacent
steel noted enclosure.

Exhibit B
Page 1 of 2

scale: 1" = 1'

"JOANN" — LED CHANNEL LETTERS

CUSTOM FABRICATED .080 ALUMINUM 5" DEEP CHANNEL RETURNS FINISHED WHITE. 3/16" #7328 WHITE PLEX FACES
2" WHITE TRIMCAP MC-LOUVERS — ILLUMINATED W/ DOUBLE STROKE AND WHITE LED's CUT?
REQ'D. FOR THIS PRODUCT. ILLUMINATION, POWERED BY 60 MA. TRANSFORMERS. INVITE FABRICATION AND INSTALLATION PER U.L.
SPECIFICATIONS.

(2) SETS REQ'D
FOR EXISTING
D/F MONUMENT SIGN

Letter Cross Section Detail

SCALE: 1/4" = 1'

NOTICE: PRINTS ARE THE EXCLUSIVE PROPERTY OF THE MC SIGN COMPANY" ANY UN-AUTHORIZED USE OR DUPLICATION WILL RESULT IN A $1000.00 CHARGE © MC SIGN CO. 1998

MC SIGN COMPANY
8959 TYLER BLVD.
MENTOR, OHIO 44060
TEL. 440-953-2280 FAX 440-953-2285

JO-ANN
experience the creativity
#1902 WOODBURY, MN

| Client: | Document Location: | | Customer Approval/Date: |
| --- | --- | --- | --- |
| JO-ANN | TIM/JOANN | | Drawn by: HV |
| Location: | Filename: #1902 WOODBURY, MN | | Drawing #: 0509-16-19 |
| | Date: 9-16-05 | Scale: SHOWN | |
| | Rev. 9-21-05 | Square Ft. SHOWN | |

☒ APPROVED AS NOTED
☐ APPROVED
☐ NOT APPROVED
☐ REVISE AND RESUBMIT
Brad Thome 1/13/06



## THIRD AMENDMENT TO LEASE AGREEMENT

This Third Amendment to Lease Agreement ("Amendment") is made as of April 1, 2020 between Tamarack Village Shopping Center, A Limited Partnership, a Minnesota limited partnership ("Landlord"), and Jo-Ann Stores, LLC, an Ohio limited liability company (f/k/a Jo-Ann Stores, Inc., an Ohio corporation) ("Tenant").

## RECITALS:

A.    Landlord and Tenant entered into a certain Lease dated February 25, 1997 (the "Original Lease") which lease was modified by (a) Lease Modification Agreement dated November 3, 1997, (b) Letter Agreement dated May 27, 2003, (c) Second Amendment to Lease Agreement dated March 6, 2006, and (d) Notice Letter dated July 24, 2014 (all of the foregoing are collectively referred to hereafter as the "Lease");

B.    The Lease relates to certain premises consisting of approximately 45,215 square feet of ground floor area ("Premises") in the shopping center known as Tamarack Village Shopping Center located in Woodbury, Minnesota ("Shopping Center");

C.    As evidenced by a Certificate of Conversion filed with the Office of the Ohio Secretary of State on January 24, 2014, Tenant converted its organizational structure from an Ohio corporation to an Ohio limited liability company;

D.    The Lease expires on January 31, 2023; and

E.    Landlord and Tenant desire to extend and modify the Lease as set forth below.

In consideration of the mutual covenants set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## AGREEMENT:

1.    <u>Recitals</u>.  The foregoing recitals are incorporated herein by reference. Capitalized words used in this Amendment without definition have the same meanings as those ascribed to them in the Lease.  If there is any conflict between this Amendment and the Lease, this Amendment controls.

2.    <u>Exercise</u>.  Tenant hereby exercises its final option for a five-year extended term pursuant to the Lease, for the period commencing February 1, 2023 and expiring January 31, 2028 (the "Third Extension Term"), and Landlord acknowledges and accepts Tenant's exercise thereof, and the extension of the term, in accordance therewith.  During the Third Extension Term, Fixed Minimum Rent shall be due at the annual rate of Twelve and 58/100 Dollars ($12.58) per square foot and shall be payable, at the times and in the manner set forth in the Lease, in monthly installments equal to $47,400.39.

3.    <u>Rent</u>.  Commencing April 1, 2020, and notwithstanding anything to the contrary in the Lease, Tenant's Fixed Minimum Rent (but not Tenant's share of Common Area Costs, Taxes, Insurance or other items of additional rent) for the three (3) months of April, May and June of 2020 shall be abated in full (the "Abatement Period"), and all late fees, interest or other penalties with respect thereto are void and fully waived.  Landlord acknowledges and agrees that each notice of default issued by Landlord (if any) regarding nonpayment of rent for any period during the Abatement Period is hereby fully revoked, rescinded, null, and void.

4.    <u>Removal of Co-Tenancy Requirement</u>.  Tenant agrees that, effective as of the date of this Amendment, the provisions of Section 15 of the Original Lease including, without limitation, the co-tenancy provision from the Gordman's lease that is the subject of the Notice Letter dated July 24, 2014 and that was incorporated into the Lease pursuant to Section 15, shall be of no further force or effect.

5.    <u>Broker</u>.  Landlord and Tenant each represent and warrant to the other that there are no brokerage commissions or finders' fees of any kind due in connection with this Amendment as a result of the actions of the representing party.  Each party must defend, indemnify and hold the other party harmless against and from all liabilities, damages, costs, claims and obligations arising from a breach of such representation (including, without limitation, reasonable attorneys' fees).

6.    <u>Landlord's Notice Address</u>.  Landlord's address for notices under the Lease is amended as follows:

| | |
|---|---|
| Landlord: | Tamarack Village Shopping Center, A Limited Partnership<br>c/o Cushman & Wakefield<br>3500 American Blvd. W., Suite 200<br>Bloomington, Minnesota 55431 |
| With a copy to: | RC Muir Management, LLC<br>Attn:  Kristin Muir, CEO<br>334 NE 1st Avenue<br>Delray Beach, Florida 33444 |

7.    <u>Lender Consent</u>.  Notwithstanding anything to the contrary in the Lease or any other document to which Tenant and Landlord are parties, in the event any lender, ground lessor, or other party claiming interest by or through Landlord, requests or requires consent before the execution of this document, (a) it is Landlord's responsibility to obtain such consent, (b) Landlord hereby represents that it has obtained such consent, if required, and (c) regardless if consent is actually obtained, this document is fully binding and effective upon signature.

8.    <u>Binding Effect</u>.  This Amendment inures to the benefit of and binds the parties and their successors and permitted assigns.  The Lease, as herein amended, remains in full force and effect.

9.    <u>Counterpart and PDF Signature</u>.  This Amendment may be signed in multiple counterparts, each of which constitutes an original and all of which taken together constitute one and

same agreement. Electronic signatures or signatures transmitted via e-mail in a "PDF" may be used in place of original signatures on this Amendment.  Each party intends to be bound by its electronic or "PDF" signature on this Amendment, is aware that the other parties are relying on its electronic or "PDF" signature, and waives any defenses to the enforcement of this Amendment based upon the form of signature.

       10.    <u>Captions</u>.  The captions and headings in this Amendment are for convenience only and not a part of this Amendment and do not in any way limit, define, construe or describe the scope or intent of the provisions of this Amendment.

*[Remainder of Page Intentionally Left Blank – Signatures Follow on Next Page]*

#1902 Tamarack Village S/C (Woodbury, MN)

The parties have executed and delivered this Amendment as of the date first above written.

LANDLORD:

Tamarack Village Shopping Center, A Limited Partnership, a Minnesota limited partnership

By:    Tamarack Village Shopping Center Corporation, a Minnesota corporation

By:    _____    6/22/2020
       Kristin Muir
       CEO

TENANT:

Jo-Ann Stores, LLC,
an Ohio limited liability company

By:    _____    6/20/2020
       Matthew Susz, Senior Vice President
       Chief Financial Officer

# Exhibit B

Tamarack Village Shopping Ctr
8278 Tamarack Village
Woodbury, MN  55125



| | 4/15/2025 | | ACCOUNT NUMBER |
|---|---|---|---|

Fabri-Centers of America, Inc.
Vice President - Corporate Finance
5555 Darrow Road
Hudson, OH  44236

INVOICE #:  042508

01000619      1

**MAKE CHECKS PAYABLE TO:**   Tamarack Village Shopping Center, LP          BALANCE DUE      115,410.83

| Date | Code | Suite Id | Description | Charges | Payments | Amount Due |
|---|---|---|---|---|---|---|
| 4/15/2025 | RT1 | 1003 | 1st Half 2025 RE Taxes | 115,410.83 | .00 | 115,410.83 |

| | 4/15/2025 | | ACCOUNT NUMBER |
|---|---|---|---|

Please send this portion of the statement with your remittance.

INVOICE #:  042508
Fabri-Centers of America, Inc.

01000619      1

Tamarack Village Shopping Center, LP
c/o Cushman & Wakefield
SDS 12-2659, PO Box 86
Minneapolis, MN  55486-2659

| Current | 30 | 60 | 90 | 120 | BALANCE DUE |
|---|---|---|---|---|---|
| 115,410.83 | 0.00 | 0.00 | 0.00 | 0.00 | 115,410.83 |

# Tamarack Village
## 2025 Real Estate Taxes
### First Half 2025

**Lot 2, Block 1**
**Property ID 04.028.21.31.0011 - Main Center**

| | |
|---|---|
| 2025 Annual Tax | $2,397,600.93 |
| Special Assessments | $7,263.07 |
| Annual Total | $2,404,864.00 |
| First Half Total | $1,202,432.00 |
| Second Half Total | $1,202,432.00 |

| TENANT | UNIT NUMBER | SQUARE FEET | PRO-RATA SHARE | TENANT ALLOCATION |
|---|---|---|---|---|
| Jo-Ann #1902 | 1003 | 45,215 | 9.598117% | $ 115,410.83 |

| | | | | |
|---|---|---|---|---|
| Total GLA of Tax Parcel | | 471,082 | 100% | $1,202,432.00 |



**Washington County**

Property Records & Taxpayer Services
14949 62nd St N - PO Box 200
Stillwater, MN 55082-0200
(651) 430-6175
www.washingtoncountymn.gov

## TAX STATEMENT 2025

2024  Values for Taxes Payable in

### VALUES AND CLASSIFICATION

| Taxes Payable Year: | 2024 | 2025 |
|---|---|---|
| **Step 1** Estimated Market Value: | 85,800,100 | 85,800,100 |
| Homestead Exclusion: | | |
| Taxable Market Value: | 85,800,100 | 85,800,100 |
| New Improvements: | | |
| Property Classification: | Comm/Ind | Comm/Ind |

**Step 2** **PROPOSED TAX**
*Did not include special assessments or referenda approved by the voters at the November election*   $2,393,398.00

*Sent in March 2024*

*Sent in November 2024*

**Step 3** **PROPERTY TAX STATEMENT**

| | | |
|---|---|---|
| First half taxes due | May 15 | $1,202,432.00 |
| Second half taxes due | October 15 | $1,202,432.00 |
| Total Taxes Due in 2025: | | $2,404,864.00 |

**Property ID: 04.028.21.31.0011**  **Bill #: 3175330**

**Taxpayer:**
99204*343**G50**1.39**7/10*********AUTOALL FOR AADC 553
TAMARACK VILLAGE SHOPPING CENTER LP
CUSHMAN & WAKEFIELD
3500 AMERICAN BLVD W STE 200
BLOOMINGTON MN 55431-1096

## $$$
### REFUNDS?

*You may be eligible for one or even two refunds to reduce your property tax. Read the back of this statement to find out how to apply.*

**Property Address:**

**Property Description:**
TAMARACK 2ND ADD Lot 2 Block 1

**Line 13 Special Assessment Detail:**
2021 Roadway Rehab          6690.55
SWWS STORMWATER UTILITY-PAY 2025    572.52

**Principal:**  7263.07
**Interest:**   0.00

### Tax Detail for Your Property:

| Taxes Payable Year: | | 2024 | 2025 |
|---|---|---|---|
| 1. Use this amount on Form M1PR to see if you are eligible for a property tax refund. File by August 15. If this box is checked, you owe delinquent taxes and are not eligible. | | | $0.00 |
| 2. Use these amounts on Form M1PR to see if you are eligible for a special refund. ☐ | | $0.00 | |
| 3. Property taxes before credits | | $2,279,696.89 | $2,397,600.93 |
| 4. Credits that reduce property taxes | A. Agricultural and rural land credits | $0.00 | $0.00 |
| | B. Other Credits | $0.00 | $0.00 |
| **5. Property taxes after credits** | | **$2,279,696.89** | **$2,397,600.93** |
| 6. WASHINGTON COUNTY | A. County General | $253,130.99 | $254,670.80 |
| | B. County Regional Rail Authority | $1,258.01 | $1,193.71 |
| 7. CITY OF WOODBURY | | $317,708.25 | $332,815.39 |
| 8. State General Tax | | $501,806.81 | $494,320.99 |
| 9. ISD 622 NSP/MPWD/OAK | A. Voter approved levies | $192,790.19 | $179,276.74 |
| | B. Other Local Levies | $274,675.89 | $290,230.29 |
| 10. Special Taxing Districts | A. Metropolitan Council | $6,792.81 | $6,109.55 |
| | B. Metropolitan Council Transit | $9,317.01 | $10,377.11 |
| | C. Metropolitan Mosquito Control | $3,463.97 | $3,539.68 |
| | D. South Washington Watershed | $7,277.34 | $7,499.87 |
| | E. County CDA | $11,781.55 | $11,961.65 |
| | F. City HRA | $0.00 | $1,710.67 |
| | G. Fiscal Disparities | $694,084.40 | $801,870.04 |
| 11. Non-school voter approved referenda levies | | $5,609.67 | $2,024.44 |
| 12. Total property tax before special assessments | | $2,279,696.89 | $2,397,600.93 |
| 13. Special assessments | | $21,317.11 | $7,263.07 |
| **14. TOTAL PROPERTY TAX AND SPECIAL ASSESSMENTS** | | **$2,301,014.00** | **$2,404,864.00** |

---

2-21-25_v2    **Please fold on perforation BEFORE tearing**

✂ **Detach at perforation** & mail this stub with your 2nd half payment in the enclosed envelope

## PAYABLE 2025 2nd HALF PAYMENT STUB

**TO AVOID PENALTY PAY ON OR BEFORE: October 15**

**Property ID: 04.028.21.31.0011**  **Bill #: 3175330**

Comm/Ind

*SECOND HALF TAX AMT*
**$1,202,432.00**

**Taxpayer:**
TAMARACK VILLAGE SHOPPING CENTER LP
CUSHMAN & WAKEFIELD
3500 AMERICAN BLVD W STE 200
BLOOMINGTON MN 55431

*No Receipt sent. Your canceled check is proof of payment. Do not send postdated checks.*
*MAKE CHECKS PAYABLE TO:*    ☐ CHECK  ☐ CASH

WASHINGTON COUNTY
P.O. BOX 200
STILLWATER MN 55082-0200

0402821310011 2 00000120243200 0

---

**Please fold on perforation BEFORE tearing**

✂ **Detach at perforation** & mail this stub with your 1st half payment in the enclosed envelope

## PAYABLE 2025 1st HALF PAYMENT STUB

**TO AVOID PENALTY PAY ON OR BEFORE: May 15**

**Property ID: 04.028.21.31.0011**  **Bill #: 3175330**

Comm/Ind

*FIRST HALF TAX AMT*
**$1,202,432.00**

**Taxpayer:**
TAMARACK VILLAGE SHOPPING CENTER LP
CUSHMAN & WAKEFIELD
3500 AMERICAN BLVD W STE 200
BLOOMINGTON MN 55431

*No Receipt sent. Your canceled check is proof of payment. Do not send postdated checks.*
*MAKE CHECKS PAYABLE TO:*    ☐ CHECK  ☐ CASH

WASHINGTON COUNTY
P.O. BOX 200
STILLWATER MN 55082-0200

0402821310011 1 00000120243200 2

99204  4/5

## $$$ REFUNDS

You **may** qualify for one or both refunds from the State of Minnesota based on your 2025 Property Taxes.

If you owned and occupied this property as your homestead on January 2, 2025, you **may** qualify for one or both of the following homestead credit refunds:

1. **Property Tax Refund** - If your taxes exceed certain income-based thresholds, <u>and</u> your total household income is less than $139,320.

2. **Special Property Tax Refund** - If you also owned and occupied this property as your homestead on January 2, 2024 and **both** of the following are true:
   - The net property tax on your homestead increased by more than 12% from 2024 to 2025.
   - The increase was at least $100, not due to improvements on the property.

For Form M1PR and instructions:

 www.revenue.state.mn.us

 (651) 296-3781

 Minnesota Tax Forms
Mail Station 1421
St. Paul, MN 55146-1421

*Make sure to provide your Property ID Number on your M1PR to ensure prompt processing.*

| Property Type: | 2025 | | | | | | | | | | | 2026 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | May 16 | June 1 | July 1 | Aug 1 | Sep 1 | Sep 3 | Oct 1 | Oct 16 | Nov 1 | Nov 18 | Dec 1 | Jan 2 |
| **Homesteads and Cabins** | | | | | | | | | | | | |
| 1st Half | 2% | 4% | 5% | 6% | 7% | - | 8% | 8% | 8% | - | 8% | 10% |
| 2nd Half | | | | | | | | 2% | 4% | - | 5% | 7% |
| Both Unpaid | | | | | | | | 5% | 6% | - | 6.5% | 8.5% |
| **Agricultural Homesteads** | | | | | | | | | | | | |
| 1st Half | 2% | 4% | 5% | 6% | 7% | - | 8% | 8% | 8% | 8% | 8% | 10% |
| 2nd Half | | | | | | | | | 2% | 4% | 6% | 8% |
| Both Unpaid | | | | | | | | | 5% | 6% | 6% | 8% |
| **Nonhomesteads** | | | | | | | | | | | | |
| 1st Half | 4% | 8% | 9% | 10% | 11% | - | 12% | 12% | 12% | - | 12% | 14% |
| 2nd Half | | | | | | | | 4% | 8% | - | 9% | 11% |
| Both Unpaid | | | | | | | | 8% | 10% | - | 10.5% | 12.5% |
| **Agricultural Nonhomesteads** | | | | | | | | | | | | |
| 1st Half | 4% | 8% | 9% | 10% | 11% | - | 12% | 12% | 12% | 12% | 12% | 14% |
| 2nd Half | | | | | | | | | 4% | 4% | 8% | 10% |
| Both Unpaid | | | | | | | | | 8% | 8% | 10% | 12% |
| **Personal Property** | 8% | 8% | 8% | 8% | 8% | - | 8% | 8% | 8% | 8% | 8% | 8% |
| **Manufactured Homes** | | | | | | | | | | | | |
| 1st half | - | - | - | - | - | 8% | 8% | 8% | 8% | 8% | 8% | 8% |
| 2nd half | - | - | - | - | - | - | - | - | 8% | 8% | 8% | 8% |

**Penalty for Late Payment of Property Tax:**
If you pay your first half or second half property tax after the due dates, a penalty will be added to your tax. The later you pay, the greater the penalty you must pay. The table shows the penalty amounts added to your tax if your property taxes are not paid before the date shown.

**Personal Property Located on Leased Government-owned Land:** Taxes may be paid in two installments due at the same time as real property taxes. These taxes are subject to the same penalty schedule and penalty rates as real property taxes. All other personal property taxes are due in full on or before May 15, 2025.

**Note to manufactured homeowners:**
The title to your manufactured home cannot be transferred unless all current year and delinquent personal property taxes are paid at the time of transfer.

## SENIOR CITIZEN PROPERTY TAX DEFERRAL

**The Senior Citizen Deferral Program** provides a <u>low-interest loan</u> to senior citizens having difficulty paying property taxes. This is not a tax forgiveness program, however, this program:
- Limits the maximum amount of property tax paid to 3% of total household income, and
- Ensures the amount of tax paid remains the same as long as you participate in this program.

To be eligible, you must file an application by **November 1, 2025**, as well as:
1. Be at least 65 years old,
2. Have a household income of $96,000 or less, and
3. Have lived in your home for at least 5 years.

To learn more and find an application for this program, or to file an on-line application, go to www.revenue.state.mn.us and type "deferral" into the search box. You may also call the Senior Deferral Administrator at (651) 556-4803 to have the information mailed to you.

Available online, all the time! Access our Washington County website at **www.washingtoncountymn.gov** to:
1. Select the **Property Taxes** tab to pay your property taxes online or to access your property tax information. You may pay your property taxes by either credit card or electronic check.
2. Select the **NOTIFY ME** tab to subscribe to receive an email payment reminder each May and October.

- - - - - - - - - - Please fold on perforation BEFORE tearing - - - - - - - - - -

## THIS STUB MUST ACCOMPANY SECOND HALF PAYMENT

### Pay on or before the due date to avoid penalty

**Please note:**
1. Be certain this statement covers your property. Washington County is not responsible when taxes are paid on the wrong property.
2. Do not send post dated checks. Checks cannot be held for any reason. They will be processed when received.
3. Mailed payments must be postmarked on or before the due date.
4. Visa, MasterCard, Discover and eChecks are available as payment methods online at **www.washingtoncountymn.gov**.

**This is the only statement mailed to you.** If you refinance or discontinue paying your taxes with your mortgage payments, **it is your responsibility** to contact our office to determine any taxes remaining due.

2-21-25_v2          - - - - - - - Please fold on perforation BEFORE tearing - - - - - - -

## THIS STUB MUST ACCOMPANY FIRST HALF PAYMENT

### Pay on or before the due date to avoid penalty

**Please note:**
1. Be certain this statement covers your property. Washington County is not responsible when taxes are paid on the wrong property.
2. Do not send post dated checks. Checks cannot be held for any reason. They will be processed when received.
3. Mailed payments must be postmarked on or before the due date.
4. Visa, MasterCard, Discover and eChecks are available as payment methods online at **www.washingtoncountymn.gov**.

**This is the only statement mailed to you.** If you refinance or discontinue paying your taxes with your mortgage payments, **it is your responsibility** to contact our office to determine any taxes remaining due.

Tamarack Village Shopping Ctr
8278 Tamarack Village
Woodbury, MN  55125



| | 4/30/2025 | ACCOUNT NUMBER | |
|---|---|---|---|

JO-ANN STORES. INC
 Vice President - Corporate
Finance 5555 Darrow Road
Hudson, OH  44236

INVOICE #:  042950

01000619          1

**MAKE CHECKS PAYABLE TO:**   Tamarack Village Shopping Center, LP            BALANCE DUE        115,410.83

| Date | Code | Suite Id | Description | Charges | Payments | Amount Due |
|---|---|---|---|---|---|---|
| 4/30/2025 | RT1 | 1003 | 2nd Half 2025 RE Taxes | 115,410.83 | .00 | 115,410.83 |

Please send this portion of the statement with your remittance.

| | 4/30/2025 | ACCOUNT NUMBER | |
|---|---|---|---|

INVOICE #:  042950
JO-ANN STORES, INC.

01000619          1

Tamarack Village Shopping Center, LP
c/o Cushman & Wakefield
SDS 12-2659, PO Box 86
Minneapolis, MN  55486-2659

| Current | 30 | 60 | 90 | 120 | BALANCE DUE |
|---|---|---|---|---|---|
| 115,410.83 | 0.00 | 0.00 | 0.00 | 0.00 | 115,410.83 |

# Tamarack Village 2025
## Real Estate Taxes
## Second Half 2025

**Lot 2, Block 1**
**Property ID 04.028.21.31.0011 - Main Center**

| | |
|---|---|
| 2025 Annual Tax | $2,397,600.93 |
| Special Assessments | $7,263.07 |
| Annual Total | $2,404,864.00 |
| First Half Total | $1,202,432.00 |
| Second Half Total | $1,202,432.00 |

| TENANT | UNIT NUMBER | SQUARE FEET | PRO-RATA SHARE | TENANT ALLOCATION |
|---|---|---|---|---|
| Jo-Ann #1902 | 1003 | 45,215 | 9.598117% | $  115,410.83 |
| Total GLA of Tax Parcel | | 471,082 | 100% | $1,202,432.00 |



**Washington County**

Property Records & Taxpayer Services
14949 62nd St N - PO Box 200
Stillwater, MN 55082-0200
(651) 430-6175
www.washingtoncountymn.gov

## TAX STATEMENT 2025

2024 Values for Taxes Payable in

### VALUES AND CLASSIFICATION

| Taxes Payable Year: | 2024 | 2025 |
|---|---|---|
| **Step 1** | Estimated Market Value: | 85,800,100 | 85,800,100 |
| | Homestead Exclusion: | | |
| | Taxable Market Value: | 85,800,100 | 85,800,100 |
| | New Improvements: | | |
| | Property Classification: | Comm/Ind | Comm/Ind |

**Property ID: 04.028.21.31.0011    Bill #: 3175330**

**Taxpayer:**
99204*343**G50**1.39**7/10*********AUTOALL FOR AADC 553
TAMARACK VILLAGE SHOPPING CENTER LP
CUSHMAN & WAKEFIELD
3500 AMERICAN BLVD W STE 200
BLOOMINGTON MN 55431-1096

*Sent in March 2024*

### PROPOSED TAX

**Step 2** *Did not include special assessments or referenda approved by the voters at the November election*    $2,393,398.00

*Sent in November 2024*

### PROPERTY TAX STATEMENT

| **Step 3** | First half taxes due | May 15 | $1,202,432.00 |
|---|---|---|---|
| | Second half taxes due | October 15 | $1,202,432.00 |
| | Total Taxes Due in 2025: | | $2,404,864.00 |

## $$$ REFUNDS?

*You may be eligible for one or even two refunds to reduce your property tax. Read the back of this statement to find out how to apply.*

**Property Address:**

**Property Description:**
TAMARACK 2ND ADD Lot 2 Block 1

Line 13 Special Assessment Detail:
2021 Roadway Rehab                 6690.55
SWWS STORMWATER UTILITY-PAY 2025   572.52

Principal:    7263.07
Interest:        0.00

### Tax Detail for Your Property:

| Taxes Payable Year: | | 2024 | 2025 |
|---|---|---|---|
| 1. Use this amount on Form M1PR to see if you are eligible for a property tax refund. File by August 15. If this box is checked, you owe delinquent taxes and are not eligible. | | | $0.00 |
| 2. Use these amounts on Form M1PR to see if you are eligible for a special refund. ☐ | | $0.00 | |
| 3. Property taxes before credits | | $2,279,696.89 | $2,397,600.93 |
| 4. Credits that reduce property taxes | A. Agricultural and rural land credits | $0.00 | $0.00 |
| | B. Other Credits | $0.00 | $0.00 |
| **5. Property taxes after credits** | | **$2,279,696.89** | **$2,397,600.93** |
| 6. WASHINGTON COUNTY | A. County General | $253,130.99 | $254,670.80 |
| | B. County Regional Rail Authority | $1,258.01 | $1,193.71 |
| 7. CITY OF WOODBURY | | $317,708.25 | $332,815.39 |
| 8. State General Tax | | $501,806.81 | $494,320.99 |
| 9. ISD 622 NSP/MPWD/OAK | A. Voter approved levies | $192,790.19 | $179,276.74 |
| | B. Other Local Levies | $274,675.89 | $290,230.29 |
| 10. Special Taxing Districts | A. Metropolitan Council | $6,792.81 | $6,109.55 |
| | B. Metropolitan Council Transit | $9,317.01 | $10,377.11 |
| | C. Metropolitan Mosquito Control | $3,463.97 | $3,539.68 |
| | D. South Washington Watershed | $7,277.34 | $7,499.87 |
| | E. County CDA | $11,781.55 | $11,961.65 |
| | F. City HRA | $0.00 | $1,710.67 |
| | G. Fiscal Disparities | $694,084.40 | $801,870.04 |
| 11. Non-school voter approved referenda levies | | $5,609.67 | $2,024.44 |
| 12. Total property tax before special assessments | | $2,279,696.89 | $2,397,600.93 |
| 13. Special assessments | | $21,317.11 | $7,263.07 |
| **14. TOTAL PROPERTY TAX AND SPECIAL ASSESSMENTS** | | **$2,301,014.00** | **$2,404,864.00** |

---

2-21-25_v2    **Please fold on perforation BEFORE tearing**

✂

**Detach at perforation** & mail this stub with your 2nd half payment in the enclosed envelope

## PAYABLE 2025 2nd HALF PAYMENT STUB

**TO AVOID PENALTY PAY ON OR BEFORE: October 15**

Comm/Ind

**Property ID: 04.028.21.31.0011    Bill #: 3175330**

*SECOND HALF TAX AMT*
**$1,202,432.00**

**Taxpayer:**
TAMARACK VILLAGE SHOPPING CENTER LP
CUSHMAN & WAKEFIELD
3500 AMERICAN BLVD W STE 200
BLOOMINGTON MN 55431

*No Receipt sent. Your canceled check is proof of payment. Do not send postdated checks.*

*MAKE CHECKS PAYABLE TO:*    ☐ CHECK    ☐ CASH

WASHINGTON COUNTY
P.O. BOX 200
STILLWATER MN 55082-0200

0402821310011 2 00000120243200 0

---

**Please fold on perforation BEFORE tearing**

✂

**Detach at perforation** & mail this stub with your 1st half payment in the enclosed envelope

## PAYABLE 2025 1st HALF PAYMENT STUB

**TO AVOID PENALTY PAY ON OR BEFORE: May 15**

Comm/Ind

**Property ID: 04.028.21.31.0011    Bill #: 3175330**

*FIRST HALF TAX AMT*
**$1,202,432.00**

**Taxpayer:**
TAMARACK VILLAGE SHOPPING CENTER LP
CUSHMAN & WAKEFIELD
3500 AMERICAN BLVD W STE 200
BLOOMINGTON MN 55431

*No Receipt sent. Your canceled check is proof of payment. Do not send postdated checks.*

*MAKE CHECKS PAYABLE TO:*    ☐ CHECK    ☐ CASH

WASHINGTON COUNTY
P.O. BOX 200
STILLWATER MN 55082-0200

0402821310011 1 00000120243200 2

99204  4/5

## $$$ REFUNDS

You **may** qualify for one or both refunds from the State of Minnesota based on your 2025 Property Taxes.

If you owned and occupied this property as your homestead on January 2, 2025, you may qualify for one or both of the following homestead credit refunds:

1. **Property Tax Refund** - If your taxes exceed certain income-based thresholds, and your total household income is less than $139,320.

2. **Special Property Tax Refund** - If you also owned and occupied this property as your homestead on January 2, 2024 and **both** of the following are true:
   - The net property tax on your homestead increased by more than 12% from 2024 to 2025.
   - The increase was at least $100, not due to improvements on the property.

For Form M1PR and instructions:

 www.revenue.state.mn.us    (651) 296-3781    Minnesota Tax Forms
Mail Station 1421
St. Paul, MN 55146-1421

*Make sure to provide your Property ID Number on your M1PR to ensure prompt processing.*

| Property Type: | 2025 | | | | | | | | | | | 2026 |
| | May 16 | June 1 | July 1 | Aug 1 | Sep 1 | Sep 3 | Oct 1 | Oct 16 | Nov 1 | Nov 18 | Dec 1 | Jan 2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Homesteads and Cabins** | | | | | | | | | | | | |
| 1st Half | 2% | 4% | 5% | 6% | 7% | - | 8% | 8% | 8% | - | 8% | 10% |
| 2nd Half | - | - | - | - | - | - | - | 2% | 4% | - | 5% | 7% |
| Both Unpaid | - | - | - | - | - | - | - | 5% | 6% | - | 6.5% | 8.5% |
| **Agricultural Homesteads** | | | | | | | | | | | | |
| 1st Half | 2% | 4% | 5% | 6% | 7% | - | 8% | 8% | 8% | 8% | 8% | 10% |
| 2nd Half | - | - | - | - | - | - | - | - | - | 2% | 4% | 6% |
| Both Unpaid | - | - | - | - | - | - | - | - | - | 5% | 6% | 8% |
| **Nonhomesteads** | | | | | | | | | | | | |
| 1st Half | 4% | 8% | 9% | 10% | 11% | - | 12% | 12% | 12% | - | 12% | 14% |
| 2nd Half | - | - | - | - | - | - | - | 4% | 8% | - | 9% | 11% |
| Both Unpaid | - | - | - | - | - | - | - | 8% | 10% | - | 10.5% | 12.5% |
| **Agricultural Nonhomesteads** | | | | | | | | | | | | |
| 1st Half | 4% | 8% | 9% | 10% | 11% | - | 12% | 12% | 12% | 12% | 12% | 14% |
| 2nd Half | - | - | - | - | - | - | - | - | - | 4% | 4% | 6% |
| Both Unpaid | - | - | - | - | - | - | - | - | - | 8% | 8% | 10% |
| | | | | | | | | | | | | 12% |
| **Personal Property** | 8% | 8% | 8% | 8% | 8% | - | 8% | 8% | 8% | 8% | 8% | 8% |
| **Manufactured Homes** | | | | | | | | | | | | |
| 1st half | - | - | - | - | - | 8% | 8% | 8% | 8% | 8% | 8% | 8% |
| 2nd half | - | - | - | - | - | - | - | - | 8% | 8% | 8% | 8% |

**Penalty for Late Payment of Property Tax:**
If you pay your first half or second half property tax after the due dates, a penalty will be added to your tax. The later you pay, the greater the penalty you must pay. The table shows the penalty amounts added to your tax if your property taxes are not paid before the date shown.

**Personal Property Located on Leased Government-owned Land:** Taxes may be paid in two installments due at the same time as real property taxes. These taxes are subject to the same penalty schedule and penalty rates as real property taxes. All other personal property taxes are due in full on or before May 15, 2025.

**Note to manufactured homeowners:**
The title to your manufactured home cannot be transferred unless all current year and delinquent personal property taxes are paid at the time of transfer.

## SENIOR CITIZEN PROPERTY TAX DEFERRAL

**The Senior Citizen Deferral Program** provides a low-interest loan to senior citizens having difficulty paying property taxes. This is not a tax forgiveness program, however, this program:
- Limits the maximum amount of property tax paid to 3% of total household income, and
- Ensures the amount of tax paid remains the same as long as you participate in this program.
   To be eligible, you must file an application by **November 1, 2025**, as well as:
   1. Be at least 65 years old,
   2. Have a household income of $96,000 or less, and
   3. Have lived in your home for at least 5 years.
To learn more and find an application for this program, or to file an on-line application, go to www.revenue.state.mn.us and type "deferral" into the search box. You may also call the Senior Deferral Administrator at (651) 556-4803 to have the information mailed to you.

Available online, all the time! Access our Washington County website at **www.washingtoncountymn.gov** to:
1. Select the **Property Taxes** tab to pay your property taxes online or to access your property tax information. You may pay your property taxes by either credit card or electronic check.
2. Select the **NOTIFY ME** tab to subscribe to receive an email payment reminder each May and October.

Please fold on perforation BEFORE tearing

## THIS STUB MUST ACCOMPANY SECOND HALF PAYMENT

### Pay on or before the due date to avoid penalty

**Please note:**
1. Be certain this statement covers your property. Washington County is not responsible when taxes are paid on the wrong property.
2. Do not send post dated checks. Checks cannot be held for any reason. They will be processed when received.
3. Mailed payments must be postmarked on or before the due date.
4. Visa, MasterCard, Discover and eChecks are available as payment methods online at **www.washingtoncountymn.gov**.

**This is the only statement mailed to you.** If you refinance or discontinue paying your taxes with your mortgage payments, **it is your responsibility** to contact our office to determine any taxes remaining due.

2-21-25_v2       Please fold on perforation BEFORE tearing

## THIS STUB MUST ACCOMPANY FIRST HALF PAYMENT

### Pay on or before the due date to avoid penalty

**Please note:**
1. Be certain this statement covers your property. Washington County is not responsible when taxes are paid on the wrong property.
2. Do not send post dated checks. Checks cannot be held for any reason. They will be processed when received.
3. Mailed payments must be postmarked on or before the due date.
4. Visa, MasterCard, Discover and eChecks are available as payment methods online at **www.washingtoncountymn.gov**.

**This is the only statement mailed to you.** If you refinance or discontinue paying your taxes with your mortgage payments, **it is your responsibility** to contact our office to determine any taxes remaining due.

99204  4/5

# Exhibit C

| | | | | | | | | Page: | 1 |
|---|---|---|---|---|---|---|---|---|---|
| | | | Aged Delinquencies | | | | | Date: | 6/3/2025 |
| | | | Cushman and Wakefield US Inc | | | | | Time: | 12:14 PM |
| BLDG: | 1012306 | | Tamarack Village Shopping Ctr | | | | | | |
| | | | Period: 06/25 | | | | | | |

| Invoice Date | Category | | Source | Amount | Current | 1 Month | 2 Months | 3 Months | 4 Months |
|---|---|---|---|---|---|---|---|---|---|

**1012306-011065   Jo-Ann Stores, LLC**  Master Occupant Id: 01000619-1   Day Due: 1  Delq Day: 10
Samantha   1003   Current   Last Payment: 5/7/2025  60,675.55
(763) 245-2221

| Invoice Date | Category | | Source | Amount | Current | 1 Month | 2 Months | 3 Months | 4 Months |
|---|---|---|---|---|---|---|---|---|---|
| 1/1/2025 | BR1 | Base Rent | CH | 21,406.63 | 0.00 | 0.00 | 0.00 | 0.00 | 21,406.63 |
| 1/1/2025 | CM1 | Common Area Maintenance | CH | 2,645.97 | 0.00 | 0.00 | 0.00 | 0.00 | 2,645.97 |
| 1/1/2025 | IN1 | Insurance | CH | 950.21 | 0.00 | 0.00 | 0.00 | 0.00 | 950.21 |
| 1/1/2025 | RRN | ROOF RENT | CH | 3,050.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3,050.00 |
| 2/1/2025 | CM1 | Common Area Maintenance | CH | 650.94 | 0.00 | 0.00 | 0.00 | 0.00 | 650.94 |
| 3/1/2025 | CM1 | Common Area Maintenance | CH | 100.01 | 0.00 | 0.00 | 0.00 | 100.01 | 0.00 |
| 3/1/2025 | IN1 | Insurance | CH | 550.93 | 0.00 | 0.00 | 0.00 | 550.93 | 0.00 |
| 4/1/2025 | CM1 | Common Area Maintenance | CH | 100.01 | 0.00 | 0.00 | 100.01 | 0.00 | 0.00 |
| 4/1/2025 | IN1 | Insurance | CH | 550.93 | 0.00 | 0.00 | 550.93 | 0.00 | 0.00 |
| 4/15/2025 | RT1 | Real Estate Tax | CH | 115,410.83 | 0.00 | 0.00 | 115,410.83 | 0.00 | 0.00 |
| 4/30/2025 | RT1 | Real Estate Tax | CH | 115,410.83 | 0.00 | 0.00 | 115,410.83 | 0.00 | 0.00 |
| 5/1/2025 | CM1 | Common Area Maintenance | CH | 100.01 | 0.00 | 100.01 | 0.00 | 0.00 | 0.00 |
| 5/1/2025 | IN1 | Insurance | CH | 550.93 | 0.00 | 550.93 | 0.00 | 0.00 | 0.00 |

| | | | Amount | Current | 1 Month | 2 Months | 3 Months | 4 Months |
|---|---|---|---|---|---|---|---|---|
| | BR1 | Base Rent | 21,406.63 | 0.00 | 0.00 | 0.00 | 0.00 | 21,406.63 |
| | CM1 | Common Area Maintenance | 3,596.94 | 0.00 | 100.01 | 100.01 | 100.01 | 3,296.91 |
| | IN1 | Insurance | 2,603.00 | 0.00 | 550.93 | 550.93 | 550.93 | 950.21 |
| | RRN | ROOF RENT | 3,050.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3,050.00 |
| | RT1 | Real Estate Tax | 230,821.66 | 0.00 | 0.00 | 230,821.66 | 0.00 | 0.00 |

| | | Jo-Ann Stores, LLC Total: | 261,478.23 | 0.00 | 650.94 | 231,472.60 | 650.94 | 28,703.75 |
|---|---|---|---|---|---|---|---|---|

| | BR1 | Base Rent | 21,406.63 | 0.00 | 0.00 | 0.00 | 0.00 | 21,406.63 |
|---|---|---|---|---|---|---|---|---|
| | CM1 | Common Area Maintenance | 3,596.94 | 0.00 | 100.01 | 100.01 | 100.01 | 3,296.91 |
| | IN1 | Insurance | 2,603.00 | 0.00 | 550.93 | 550.93 | 550.93 | 950.21 |
| | RRN | ROOF RENT | 3,050.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3,050.00 |
| | RT1 | Real Estate Tax | 230,821.66 | 0.00 | 0.00 | 230,821.66 | 0.00 | 0.00 |

| | | BLDG 1012306 Total: | 261,478.23 | 0.00 | 650.94 | 231,472.60 | 650.94 | 28,703.75 |
|---|---|---|---|---|---|---|---|---|

| | BR1 | Base Rent | 21,406.63 | 0.00 | 0.00 | 0.00 | 0.00 | 21,406.63 |
|---|---|---|---|---|---|---|---|---|
| | CM1 | Common Area Maintenance | 3,596.94 | 0.00 | 100.01 | 100.01 | 100.01 | 3,296.91 |
| | IN1 | Insurance | 2,603.00 | 0.00 | 550.93 | 550.93 | 550.93 | 950.21 |
| | RRN | ROOF RENT | 3,050.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3,050.00 |
| | RT1 | Real Estate Tax | 230,821.66 | 0.00 | 0.00 | 230,821.66 | 0.00 | 0.00 |

| | | Grand Total: | 261,478.23 | 0.00 | 650.94 | 231,472.60 | 650.94 | 28,703.75 |
|---|---|---|---|---|---|---|---|---|