# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| JOANN INC., *et al.*,[1] | ) | Case No. 25-10068 (CTG) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | **Re: Docket No. 1353** |

## DECLARATION OF NICHOLAS HAUGHEY IN SUPPORT OF (I) FINAL APPROVAL OF THE DISCLOSURE STATEMENT AND (II) CONFIRMATION OF THE SECOND AMENDED JOINT CHAPTER 11 PLAN OF JOANN INC. AND ITS DEBTOR AFFILIATES (TECHNICAL MODIFICATIONS)

I, Nicholas Haughey, hereby declare under penalty of perjury:[2]

1.     I am a Senior Director with Alvarez & Marsal North America, LLC, (together with its wholly-owned subsidiaries and independent contractors and employees of its professional service provider affiliates, all of which are wholly-owned by its parent company and employees, "A&M"), a restructuring advisory services firm with numerous offices throughout the country. Additional information regarding my background and qualifications is set forth in the *Declaration of Nicholas Haughey in Support of the Debtors' Motion for Entry of an Order*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: JOANN Inc. (5540); Needle Holdings LLC (3814); Jo-Ann Stores, LLC (0629); Creative Tech Solutions LLC (6734); Creativebug, LLC (3208); WeaveUp, Inc. (5633); JAS Aviation, LLC (9570); joann.com, LLC (1594); JOANN Ditto Holdings Inc. (9652); Dittopatterns LLC (0452); JOANN Holdings 1, LLC (9030); JOANN Holdings 2, LLC (6408); and Jo-Ann Stores Support Center, Inc. (5027). The Debtors' mailing address is 5555 Darrow Road, Hudson, Ohio 44236.

[2]    Capitalized terms used but not defined herein have the meaning ascribed to such terms in the *Second Amended Joint Chapter 11 Plan of JOANN Inc. and Its Debtor Affiliates (Technical Modifications)* [Docket No. 1353] (the "Plan"), the *Motion of Debtors for Entry of an Order (I) Conditionally Approving the Adequacy of the Disclosure Statement, (II) Scheduling a Plan Confirmation and Final Disclosure Statement Approval Hearing and Setting Dates and Deadlines, (III) Approving the Solicitation Package and Notice Procedures, (IV) Approving the Form of Ballot and Notices in Connection Therewith, and (V) Granting Related Relief* [Docket No. 811] (the "Conditional Disclosure Statement Motion"), or the *Debtors' Memorandum of Law in Support of an Order (I) Approving the Debtors' Disclosure Statement on a Final Basis and (II) Confirming the Debtors' Second Amended Joint Chapter 11 Plan (Technical Modifications)*, filed concurrently herewith, as applicable.

*(I) Authorizing and Approving the Conduct of Store Closing Sales, with Such Sales to be Free and*

*Clear of All Liens, Claims, and Encumbrances and (II) Granting Related Relief* [Docket No. 391].

2. In my capacity as Senior Director, I am familiar with the Debtors' operations and

business affairs, as well as the Debtors' sale and wind-down efforts.  Accordingly, I am familiar

with the terms of the Plan as well as its negotiation and development.

3. Except as otherwise indicated, all matters set forth in this declaration

(the "Declaration") are based upon (a) my personal knowledge of the Debtors' business,

(b) information learned from my review of relevant documents, (c) information I received from

the team at A&M or the Debtors' management team and other advisors, and (d) my experience as

a restructuring professional.  I am not being specifically compensated for this testimony other than

through payments that are proposed to be received by A&M as in accordance with A&M's

retention order [Docket No. 554].

**General Background and the Development of the Plan**

4. The Debtors commenced these Chapter 11 Cases amidst a liquidity crunch to

reorganize the business as a going concern or to obtain the highest value for the Debtors' assets.

To facilitate obtaining the highest value for the Debtors' assets, the Debtors negotiated and

obtained a stalking horse bid for the right to liquidate all of the Debtors' assets.  Following a

marketing process, the Debtors held a two day auction in which the Debtors designated the

Purchaser as the winning bidder and negotiated, executed, and consummated a transaction for the

exclusive right to market and sell or designate the purchasers, licensees, or assignees of all of the

Debtors' assets.  On February 26, 2025, the Court entered the Approval Order approving the GA

Transaction, and on February 27, 2025, the GA Transaction closed.

5.      On February 26, 2025, the Debtors filed the initial version of the Plan [Docket No. 513].  After discussions and negotiations with various stakeholders, on May 5, 2025, the Debtors filed an amended version of the Plan [Docket No. 809] and a corresponding *Disclosure Statement for the Amended Joint Chapter 11 Plan of JOANN Inc. and Its Debtor Affiliates* (as may be amended, supplemented, or otherwise modified from time to time, the "Disclosure Statement") [Docket No. 810].    After further discussions and negotiations with parties in interest, on May 24, 2025, the Debtors filed a second amended, solicitation version of the Plan [Docket No. 986] and an amended, solicitation version of the Disclosure Statement [Docket No. 987].  Concurrently with the filing of this Declaration, the Debtors filed a further amended version of the Plan, which incorporates subsequent comments received from various stakeholders and technical modifications.

6.      On May 27, 2025, the Bankruptcy Court entered the conditional disclosure statement order [Docket No. 994] (the "Conditional Disclosure Statement Order") that (a) conditionally approved the Disclosure Statement on an interim basis and established a schedule for Confirmation, (b) approved, on an interim basis, procedures for (i) the solicitation and tabulation of votes on the Plan and (ii) Holders of Claims in Non-Voting Classes to opt in to the Plan's Third-Party Release, all as more fully set forth in the Conditional Disclosure Statement Motion.

7.      In accordance with the Solicitation Procedures, the Debtors served the solicitation packages (the "Solicitation Packages") on Holders of Claims entitled to vote on the Plan (the "Voting Classes").  The Solicitation Packages, served on May 29, 2025, included:  (a) a cover letter describing the contents of the Solicitation Package, providing a link to solicitation versions of the Plan, Disclosure Statement, and Conditional Disclosure Statement Order, and

3

urging the Holders of Claims in the Voting Classes to vote to accept the Plan; (b) the Combined Hearing Notice; and (c) a link to the applicable Ballot.  Additionally, the Debtors served Holders of Claims in Non-Voting Classes with the Non-Voting Status Notices, which included links to the Disclosure Statement, Plan, Conditional Disclosure Statement Order, Combined Hearing Notice, Plan Supplement, Opt-In Form, and other related documents.  The Debtors also published the Combined Hearing Notice in *The New York Times* on May 30, 2025 [Docket No. 1045].

8.      On June 20, 2025, the Debtors filed the initial Plan Supplement [Docket No. 1241].  On July 7, 2025, the Debtors also filed the *Declaration of Craig E. Johnson of Kroll Restructuring Administration LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Second Amended Joint Chapter 11 Plan of JOANN Inc. and Its Debtor Affiliates* (the "Voting Report") [Docket No. 1348], reflecting that Class 3, Prepetition Term Loan Claims, and Class 4, General Unsecured Claims voted to accept the Plan.

9.      As discussed herein, it is my opinion that the Disclosure Statement contains "adequate information."  Further, I believe that the Plan satisfies the applicable Bankruptcy Code requirements for Confirmation of the Plan, as I understand such requirements, and that prompt Confirmation and Consummation of the Plan is in the best interests of the Debtors, their creditors, and all other parties in interest.  Accordingly, I believe that the Bankruptcy Court should approve the Disclosure Statement on a final basis and confirm the Plan.

## The Disclosure Statement Should be Approved on a Final Basis

**I.      The Disclosure Statement Should be Approved on a Final Basis Under Section 1125 of the Bankruptcy Code.**

10.      It is my understanding that Section 1125 of the Bankruptcy Code requires a disclosure statement to contain "adequate information" so that a hypothetical investor may make an informed judgment about the plan.  For the reasons set forth below, I believe the Disclosure

Statement contains adequate information for creditors to make an informed judgment about the Plan.

11.     The Disclosure Statement includes a description of:

a.     ***The Debtors' Corporate History, Structure, and Business Overview***.  An overview of the Debtors' corporate history, business operations, organizational structure, and capital structure is described in Article IV of the Disclosure Statement;

b.     ***Events Leading to the Chapter 11 Filings***.  An overview of the Debtors' emergence from its Prior Cases and attempts to overcome liquidity constraints and market challenges are described in Article V of the Disclosure Statement;

c.     ***Material Developments and Anticipated Events of the Chapter 11 Cases***.  A summary of the course of events in the Chapter 11 Cases, including the sale process, is described in Article VI of the Disclosure Statement;

d.     ***Risk Factors***.  Certain risks associated with the Debtors' business, as well as certain risks associated with forward-looking statements and an overall disclaimer as to the information provided by and set forth in the Disclosure Statement, are described in Article VII of the Disclosure Statement;

e.     ***Solicitation and Voting Procedures***.  A description of the procedures for soliciting votes to accept or reject the Plan and voting on the Plan is provided in Article VIII of the Disclosure Statement;

f.     ***Confirmation of the Plan***.  Confirmation procedures and statutory requirements for confirmation and consummation of the Plan are described in Article IX of the Disclosure Statement;

g.     ***Certain United States Federal Income Tax Consequences***.  A description of certain U.S. federal income tax law consequences of the Plan is provided in Article X of the Disclosure Statement;

h.     ***Releases and Retained Causes of Action***.  A description of the Plan's release provisions is provided in Article III.A.4 of the Disclosure Statement, and a description of the Plan's details regarding the Plan Administrator's ability to pursue Retained Causes of Action, as appropriate, is provided in Article III.B.11 of the Disclosure Statement; and

i.     ***Recommendation***.  A recommendation by the Debtors that Holders of Claims in the Voting Classes should vote to accept the Plan is included in Article XI of the Disclosure Statement.

## The Plan Satisfies the Requirements for Confirmation

12.     For the reasons detailed below and after consultation with the Debtors' advisors, I believe the Plan satisfies the applicable Bankruptcy Code requirements for confirmation of a chapter 11 plan.  Specifically, it is my understanding that the Plan:  (a) complies with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code, including sections 1122 and 1123 of the Bankruptcy Code;  (b) satisfies the mandatory requirements of section 1123(a) of the Bankruptcy Code; and (c) is consistent with section 1123(b) of the Bankruptcy Code.  I have set forth the reasons for such belief below, except where such compliance is apparent on the face of the Plan, the Plan Supplement, and the related documents, or where it will be established by evidence introduced at the Combined Hearing.

**I.      The Plan Satisfies Each Requirement for Confirmation.**

**A.      The Plan Complies with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(1)).**

13.     I believe that the Plan complies with section 1129(a)(1) of the Bankruptcy Code, which requires the Plan to comply with sections 1122 and 1123 of the Bankruptcy Code in all respects.

**1.      The Plan's Classification of Claims and Interests Under Section 1122 of the Bankruptcy Code Is Appropriate.**

14.     Article III.B of the Plan provides for the separate classification of Claims and Interests as follows:

| Class | Claim or Interest | Status | Voting Rights |
|:---:|:---:|:---:|:---:|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | Prepetition Term Loan Claims | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 6 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |

| Class | Claim or Interest | Status | Voting Rights |
|:---:|:---:|:---:|:---:|
| 7 | Interests in JOANN | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 8 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

15.     I believe each Class is composed of substantially similar Claims or Interests, and each instance of separate classifications of similar Claims and Interests was based on valid factual and legal reasons.  No classification has been made for purposes of gerrymandering votes.

16.     First, dissimilar Claims and Interests are not classified together under the Plan. Generally speaking, the classification scheme follows the Debtors' capital structure.  For example, debt and equity are classified separately, and secured debt is classified separately from unsecured debt.  Other aspects of the classification scheme reasonably recognize the different legal or factual nature of Claims or Interests.

17.     For example, the classification scheme distinguishes Holders of Prepetition Term Loan Claims (Class 3) from Holders of General Unsecured Claims (Class 4), because, unlike Prepetition Term Loan Claims, General Unsecured Claims are not secured and are entirely unrelated to the Prepetition Term Loans.  As another example, Other Secured Claims (Class 1) and Other Priority Claims (Class 2) are classified separately due to their required treatment under the Bankruptcy Code.

18.     There are valid reasons for separately classifying the various Classes of Claims and Interests created under the Plan.  In each instance, the Plan classifies Claims and Interests based upon their different rights and attributes.  Additionally, each of the Claims or Interests in each particular Class is substantially similar to the other Claims or Interests in such Class.  Accordingly, I believe the Plan fully complies with and satisfies section 1122 of the Bankruptcy Code.

### 2. The Plan Satisfies the Mandatory Requirements of Section 1123(a) of the Bankruptcy Code.

19.     Based on my review of the Plan and consultation with the Debtors' other advisors, I believe that the Plan satisfies the six applicable[3] requirements set forth in section 1123(a) of the Bankruptcy Code because:

- Article III of the Plan designates classes of claims and interests;

- Article III of the Plan identifies unimpaired classes of claims and interests;

- Article III of the Plan specifies treatment of impaired classes of claims and interests;

- Article III of the Plan provides the same treatment for each claim or interest of a particular class, unless the holder of a particular claim agrees to a less favorable treatment of such particular claim or interest;

- Article IV of the Plan provides adequate means for its implementation, including by providing for, among other things, consummation of the Wind-Down Transactions, the appointment of a Plan Administrator, and establishment of the GUC Trust;

- Article IV of the Plan is consistent with the interests of creditors and equity security holders and with public policy regarding the manner of selection of the company's officers and directors by appointing the Plan Administrator as the director and officer of the Wind-Down Debtors who shall succeed to the powers of directors and officers and permitting the Plan Administrator to act for the Wind-Down Debtors in accordance with her fiduciary duties, subject to terms of the Plan.

### B. The Discretionary Contents of the Plan Are Appropriate and Should Be Approved.

20.     The Plan incorporates the Committee Settlement, authorized in part by or under the Approval Order, and approves certain other terms of the Committee Settlement as provided in Article IV.E of the Plan, among the Debtors and various parties in interest, including the Committee and the Prepetition Term Loan Ad Hoc Group and implements comments received

---

3    It is my understanding that, because the Debtors and the Wind-Down Debtors are not issuing any new securities under the Plan, the confirmation requirements set forth in section 1123(a)(6) of the Bankruptcy Code are inapplicable to these Chapter 11 Cases.  In addition, I understand that section 1123(a)(8) of the Bankruptcy Code is only applicable to individual debtors.

from other parties in interest, including the U.S. Trustee. I believe the terms of the Committee

Settlement were the product of arm's-length negotiations and resolves matters that may otherwise

have required costly and protracted litigation to resolve, and for which the post-litigation outcome

was uncertain.

> **1.      The Plan Appropriately Implements Settlements of Claims and Interests in Compliance with the Bankruptcy Code and the Bankruptcy Rules.**

21.      The Plan includes various discretionary provisions that are consistent with

section 1123(b) of the Bankruptcy Code. For example, the Plan incorporates a settlement of

certain Claims and Interests authorized by or under the Approval Order, approves certain terms

pursuant to the Committee Settlement, impairs certain Classes of Claims and Interests and leaves

others Unimpaired, proposes treatment for Executory Contracts and Unexpired Leases, provides a

structure for Claim allowance and disallowance and establishes a distribution process for the

satisfaction of Allowed Claims entitled to distributions under the Plan. In addition, the Plan

contains provisions implementing certain releases and exculpations, and permanently enjoining

certain causes of action.

22.      I believe each of these provisions is appropriate because, among other things, each

is the product of arm's-length negotiations and has been critical to obtaining the support of the

various constituencies for the Plan. Such provisions are discussed in turn below but, in summary,

satisfy the requirements of section 1123(b) of the Bankruptcy Code.

> **2.      The Plan's Release, Exculpation, and Injunction Provisions Satisfy Section 1123(b) of the Bankruptcy Code.**

23.      The Plan includes certain releases, an exculpation provision, and an injunction

provision. I believe these discretionary provisions are the product of extensive arm's -length

negotiations, are supported by the Debtors and key creditor constituents, and, as I have been advised, are consistent with applicable precedent.

<b>a. The Debtor Releases in the Plan Are Appropriate</b>.

24. Article VIII.B of the Plan provides for certain releases by the Debtors, the Wind-Down Debtors, and their Estates of various Claims and Causes of Action, including any derivative claims, that the Debtors, the Wind-Down Debtors, or their Estates or affiliates could assert against each of the Released Parties (the "<u>Debtor Releases</u>").

25. The Debtor Releases are a core component of the negotiated Committee Settlement reflected in the Plan, and it was and is necessary to secure support for the Plan among the Prepetition Term Loan Agent, the Prepetition Term Loan Lenders, and the Committee. Absent these parties' support, the Debtors would be unable to confirm the Plan and thus unable to consummate the Wind-Down Transactions.

26. *First*, I understand that each Released Party has made a substantial contribution to the Debtors' Estates. I understand the Released Parties not only expended significant time and resources analyzing and negotiating the terms of the Cash Collateral Order, the GA Transaction Documents, and the Plan, but also gave up economic interests to facilitate the Debtors' Chapter 11 Cases. For example, the Prepetition ABL Agent, Prepetition ABL Lenders, Prepetition FILO Agent, and Prepetition FILO Lenders provided valuable consideration by consenting to the Debtors' use of cash collateral. Additionally, the Prepetition ABL Agent and the Prepetition FILO Agent agreed to give the $1,000,000 FILO Reserve to the GUC Trust for the benefit of Holders of General Unsecured Claims, and the Purchaser committed to provide the GUC Trust with the GUC Guarantee of up to $1,500,000. The Debtors' directors, officers, employees, professionals, and other agents who served in such capacity on or after the Petition Date have been involved in

10

negotiating, formulating, and implementing the GA Transaction and the Plan. I believe that these measures, among others, provided the Debtors with access to the liquidity necessary to commence, and operate during, these Chapter 11 Cases, enabled the Debtors to consummate the GA Transaction, and have allowed the Debtors to chart a path toward an orderly and cost-efficient Wind-Down on the terms set forth in the Plan. Without the Releases contemplated in the Plan, I understand stakeholders may have continued to litigate over the Estates, which would cause related Wind-Down issues and additional expenses. I believe the Releases provide finality, facilitate the consummation of the Plan, and allow for an orderly Wind-Down. In the absence of the aforementioned parties' contributions, I believe the Wind-Down process pursued by the Debtors and contemplated by the Plan would be significantly more challenging to effectuate.

27. **Second**, I understand the Debtor Releases are essential to the success of the Debtors' Plan because they constitute an integral term of the Plan. I understand that, absent the Debtor Releases, the Debtors may not have been able to build the level of consensus with respect to the Plan and the transactions contemplated thereby. I understand the Debtor Releases are the product of arm's-length negotiations between the Debtors and their key stakeholders, and are limited in scope. The Debtor Releases do not release any entity other than the Released Parties, their respective Affiliates, and each of their Related Parties (to the extent such Related Parties would be obligated to grant a release under principles of agency if they were so directed by the Releasing Parties to which they are related) or Debtor Related Parties, as applicable, and does not release the Claims and Causes of Action expressly set forth and preserved by the Plan. In consideration for the Debtor Releases, the Debtors and their Estates will receive mutual releases from potential Claims and Causes of Action of each of the Releasing Parties.

28.    ***Third,*** as evidenced by the Voting Report, the Debtors' stakeholders overwhelmingly support the Plan, and no stakeholder has objected to the Debtor Releases contained in the Plan.  The Voting Classes voted to accept the Plan., which evidences the Debtors' stakeholders' support for the Debtor Release and Plan.

29.    ***Fourth***, an identity of interest exists between the Debtors and the Released Parties. I understand that whether there is an identity of interest depends on whether the debtor and non-debtor are sufficiently interlinked such that a lawsuit against the non-debtor would effectively be a lawsuit against the debtor or would deplete the assets of the debtor's estate.  I understand that lawsuits against the Released Parties may implicate the Debtors, and each Released Party shares a common goal with the Debtors in seeing the Plan succeed and implementing the transactions contemplated thereunder.

30.    For these reasons, I believe that the Debtor Releases are justified, are a sound exercise of the Debtors' business judgment, are in the best interests of creditors and all stakeholders, as they are an integral part of the Plan, and satisfy key factors I have been advised are considered by courts in determining whether a debtor release is proper.

### b.    The Third-Party Release Is Consensual.

31.    In addition to the Debtor Releases, the Plan provides for certain mutual releases by certain Holders of Claims and Interests.  Specifically, Article VIII.C of the Plan provides that each Releasing Party shall release any and all Claims and Causes of Action such party could assert against the Released Parties (the "Third-Party Release"), with certain limited exceptions. The Releasing Parties include, each of, and in each case in its capacity as such:  (a) the Debtors; (b) each of the Wind-Down Debtors; (c) the Plan Administrator; (d) the Prepetition ABL Lenders; (e) the Prepetition FILO Lenders; (f) the Prepetition Term Loan Lenders; (g) the Prepetition ABL

Agent; (h) the Prepetition FILO Agent; (i) the Prepetition Term Loan Agent; (j) all Holders of Claims against the Debtors who vote to accept the Plan; (k) all Holders of Claims against the Debtors who vote to reject the Plan and who affirmatively opt in to the releases provided by the Plan; (l) all Holders of Claims against the Debtors who are deemed to reject the Plan and who affirmatively opt in to the releases provided by the Plan; (m) all Holders of Claims against the Debtors who are deemed to accept the Plan and who affirmatively opt in to the releases provided by the Plan; (n) all Holders of Interests in the Debtors who affirmatively opt in to the releases provided by the Plan; (o) the Committee and its members (solely in their capacity as Committee members and not as Holders of Claims); (p) each current and former Affiliate of each Entity in clause (a) through the following clause (q) for which such Entity is legally entitled to bind such Affiliate to the releases contained in the Plan under applicable non-bankruptcy law; and (q) each Related Party of each Entity in clause (a) through this clause (q) for which such Affiliate or Entity is legally entitled to bind such Related Party to the releases contained in the Plan under applicable non-bankruptcy law; *provided* that each such Entity that elects not to opt into the releases contained in this Plan, such that it is not a Releasing Party in its capacity as a Holder of a Claim or Interest shall nevertheless be a Releasing Party in each other capacity applicable to such Entity.[4]  I believe the Third-Party Release is consensual and integral to the Plan, and I have been advised that it is consistent with established Third Circuit law.

32.     The Third-Party Release is also a core component of the negotiated Committee Settlement reflected in the Plan, and it was and is necessary to secure support for the Plan among the Prepetition Term Loan Agent, the Prepetition Term Loan Ad Hoc Group, and the Committee.

---

[4]     The Confirmation Order also provides that any party who mutually agrees with the Debtors in writing (email to be sufficient) to be a Releasing Party shall also be deemed a Releasing Party under the Plan.

As noted above, absent these parties' support, the Debtors would be unable to confirm the Plan and thus unable to consummate the Wind-Down Transactions. The Third-Party Release also helps ensure an orderly, efficient wind-down of the Wind-Down Debtors, with mutual releases by and among the Releasing Parties and Released Parties. Importantly, I understand the Third-Party Release only applies to parties who have (a) actively participated in the Plan process, including in the formulation and negotiation of the Third-Party Release or (b) otherwise taken some affirmative action to manifest their assent to the Third-Party Release (*e.g.*, by timely submitting an Opt-In Form). Accordingly, the Third-Party Release is consensual under the applicable legal standard, as I understand it.

### C. The Exculpation Provision Is Appropriate.

33. Article VIII.D of the Plan provides for the exculpation of the Exculpated Parties (the "Exculpation Provision"). I believe the exculpation is fair and appropriate under the facts and circumstances of these Chapter 11 Cases. The Plan's Exculpation Provision is the product of arm's-length negotiations, was critical to obtaining the support of various constituencies for the Plan, and, as part of the Plan, has received support from the Debtors' stakeholders. I believe the Exculpation Provision was important to the development of a feasible, confirmable Plan, and the Exculpated Parties participated in these Chapter 11 Cases in reliance upon the protections afforded to those constituents by the exculpation.

34. The Exculpated Parties have participated in formulating and negotiating the Plan, and they should be entitled to protection from exposure to any lawsuits filed by disgruntled creditors or other unsatisfied parties. Here, the Debtors and their officers, directors, and professionals actively negotiated in good faith with Holders of Claims and Interests across the Debtors' capital structure in connection with the Plan and these Chapter 11 Cases. Such

negotiations were extensive, and the resulting agreements were implemented in good faith with a high degree of transparency, and as a result, the Plan enjoys support from Holders of Claims entitled to vote. Furthermore, the exculpation is limited to claims arising from acts during these Chapter 11 Cases and does not extend beyond such time period.

35.     Additionally, the promise of exculpation played a significant role in facilitating Plan negotiations. All of the Exculpated Parties played a key role in developing the Plan that paved the way for a value-maximizing resolution of these Chapter 11 Cases, and such parties may not have been so inclined to participate in the plan process without the promise of exculpation. It is my understanding that exculpation for parties participating in the plan process is appropriate where plan negotiations could not have occurred without protection from liability.

36.     Accordingly, I have been advised that under the circumstances, particularly where the Plan, including the Exculpation Provision, is supported by the requisite voting Classes in these Chapter 11 Cases, it is appropriate for the Bankruptcy Court to approve the Exculpation Provision, and to find that the Exculpated Parties have acted in good faith and in compliance with the law.

**D.     The Injunction Provision Is Appropriate.**

37.     The injunction provision set forth in Article VIII.E of the Plan (the "Injunction Provision") implements the Plan's release and exculpation provisions by permanently enjoining all Entities from commencing or maintaining any action against the Debtors, the Wind-Down Debtors, the Exculpated Parties, or the Released Parties on account of, or in connection with, or with respect to, any Claims or Interests released or otherwise settled under the Plan; *provided*, *however*, that the Debtors and Wind-Down Debtors, in their capacities as Released Parties, shall receive the benefit of the Injunction through and until the date upon which all remaining property of the Debtors' estates vested in the Wind-Down Debtors has been fully

liquidated, administered and distributed.  I believe the Injunction Provision is fair, appropriate, and a necessary part of the Plan.

**E.    The Plan Complies with Section 1123(d) of the Bankruptcy Code.**

38.    Article V.C of the Plan provides for the satisfaction of all monetary defaults under each Executory Contract and Unexpired Lease assumed pursuant to the Plan in accordance with section 365 of the Bankruptcy Code by payment of the default amount in Cash on the Effective Date, subject to certain limitations set forth in the Plan, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  I understand that the Debtors, the Wind-Down Debtors, and the Plan Administrator, as applicable, may alter, amend, modify, or supplement the Assumed Executory Contracts and Unexpired Leases Schedule. Accordingly, it is my understanding that the Plan complies with section 1123(d) of the Bankruptcy Code.

**F.    The Debtors Have Complied with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(2)).**

39.    I understand that the Debtors have satisfied section 1129(a)(2) of the Bankruptcy Code, which requires the plan proponent to comply with the applicable provisions of the Bankruptcy Code.

**1.    The Debtors Complied with the Disclosure and Solicitation Requirements of Section 1125 of the Bankruptcy Code.**

40.    Before the Debtors solicited votes on the Plan, the Bankruptcy Court conditionally approved the Disclosure Statement in accordance with section 1125(a)(1) of the Bankruptcy Code. The Bankruptcy Court also approved the Solicitation Procedures and related materials on a conditional basis.  As stated in the Voting Report, the Debtors, through Kroll Restructuring Administration LLC, complied with the requirements of the Conditional Disclosure Statement

Order in connection with the solicitation process, thereby satisfying sections 1125(a) and 1125(b) of the Bankruptcy Code.  The Debtors also satisfied section 1125(c) of the Bankruptcy Code by making the same Disclosure Statement available to all Holders of Claims or Interests.  Moreover, at all times, the Debtors and their advisors acted in good faith and took appropriate actions in compliance with the Bankruptcy Code in connection with the solicitation of the Plan.

41.    Based on the foregoing, I believe the Debtors have complied in all respects with the solicitation requirements of section 1125 of the Bankruptcy Code and the Conditional Disclosure Statement Order, and no party has asserted otherwise.

### 2.    The Debtors Have Satisfied the Plan Acceptance Requirements of Section 1126 of the Bankruptcy Code.

42.    The Debtors solicited votes on the Plan only from the Voting Classes: Class 3 (Prepetition Term Loan Claims) and Class 4 (General Unsecured Claims).  The Voting Report reflects the results of the voting process in accordance with section 1126 of the Bankruptcy Code— Class 3 (Prepetition Term Loan Claims) and Class 4 (General Unsecured Claims) voted to accept the Plan.  Based on the foregoing, I believe that the Debtors have satisfied the requirements of section 1129(a)(2) of the Bankruptcy Code, and no party has asserted otherwise.

### G.    The Plan Was Proposed in Good Faith and Not by Any Means Forbidden by Law (Section 1129(a)(3)).

43.    I believe the Plan was proposed with honesty, good intentions, and a desire to maximize the value of the Debtors' assets.  Throughout these cases, the Debtors worked to build consensus among their various stakeholders.  The Plan is the result of extensive arm's-length negotiations among the Debtors, the Prepetition Term Loan Lenders, the Prepetition Term Loan Agent, the Committee, and their respective advisors.

44.     In light of the foregoing, and based on consultation with the Debtors' other advisors, I believe that Plan fully complies with and satisfies all of the requirements of section 1129(a)(3) of the Bankruptcy Code.

**H.     The Plan Provides for Court Approval of Certain Administrative Payments (Section 1129(a)(4)).**

45.     All payments made or to be made by the Debtors for services or for costs or expenses in connection with these Chapter 11 Cases prior to the Confirmation Date, including all budgeted Professional Fee Claims, have been approved by, or are subject to approval of, the Bankruptcy Court.   Article II.C of the Plan provides that all final requests for payment of Professional Fee Claims shall be filed no later than forty-five days after the Effective Date for determination by the Bankruptcy Court, after notice and a hearing, in accordance with the procedures established by the Bankruptcy Court.   Therefore, it is my understanding that the Plan complies with the requirements of section 1129(a)(4) of the Bankruptcy Code.

**I.     The Debtors Complied with the Governance Disclosure Requirement (Section 1129(a)(5)).**

46.     The Plan provides that the Plan Administrator will act for the Wind-Down Debtors in accordance with her fiduciary duties and also provides that, on the Effective Date, the authority, power, and incumbency of the persons acting as directors and officers of the Debtors shall be deemed to have resigned, solely in their capacities as such.   At that time, I understand that Ann Aber, the current general counsel of JOANN, will be appointed as the director and officer of the Wind-Down Debtors, and a board made up of two individuals appointed by GA Joann Retail Partnership, LLC will oversee material decisions made by the Plan Administrator.   I also understand that the GUC Trust, administered by the GUC Trustee, Steven Balasiano, through MHR Advisory Group, LLC, will be established for the purpose of pursuing or liquidating the

18

GUC Trust Assets, reconciling and objecting to General Unsecured Claims, and making Plan Distributions to GUC Trust Beneficiaries in accordance with the terms of the GUC Trust Agreement and the Plan.  Accordingly, I believe the above facts and circumstances comply with all of the elements of section 1129(a)(5) of the Bankruptcy Code.

> **J.      The Plan Does Not Require Governmental Approval of Rate Changes (Section 1129(a)(6)).**

47.    The Plan does not provide for any rate changes, and it is my understanding that there is no governmental regulatory commission that has jurisdiction over the Debtors' or the Wind-Down Debtors' rates.

> **K.      The Plan Is in the Best Interests of Creditors and Interest Holders (Section 1129(a)(7)).**

48.    Section 1129(a)(7) of the Bankruptcy Code requires that each Holder of an Impaired Claim or Interest either (a) accepts the Plan or (b) receives or retains property having a value, as of the Effective Date, that is not less than the value such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code under the Plan.  This requirement is known as the "best interests" test.  The best interests test applies to each non-consenting member of an impaired class and is generally satisfied through a comparison of the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation of that debtor's estate against the estimated recoveries under that debtor's chapter 11 plan.

49.    The Debtors and their advisors have considered the probable result of a hypothetical chapter 7 liquidation of the Debtors' assets in light of the fact that the Debtors are liquidating their assets and winding down their estates in chapter 11.  I believe that the recovery to be available to Holders of Allowed Claims or Interests under the Plan—if any—will be not less than the recoveries expected to be available in a chapter 7 liquidation—if any.  Moreover, the Plan provides for the

establishment of the GUC Trust, wherein the GUC Trust Recovery Pool will be distributed to GUC Trust Beneficiaries in accordance with the GUC Trust Agreement. The GUC Trust construct reflected in the Plan provides Holders of General Unsecured Claims with a potential recovery opportunity that they otherwise would not have in a chapter 7 liquidation. Specifically, the Prepetition ABL Agent and the Prepetition FILO Agent agreed to give the $1,000,000 FILO Reserve to the GUC Trust for the benefit of Holders of General Unsecured Claims, and the Purchaser committed to provide the GUC Trust with the GUC Guarantee of up to $1,500,000 if 503(b)(9) Savings did not otherwise provide the GUC Trust with that amount pursuant to the 503(b)(9) Reconciliation Procedures. Accordingly, I believe that the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.

**L.      The Plan Can Be Confirmed Notwithstanding the Requirements of Section 1129(a)(8) of the Bankruptcy Code.**

50.      Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests must either accept a plan or be unimpaired under a plan. It is my understanding that Holders of Claims and Interests in Class 7 (Interests in JOANN) and Class 8 (Section 510(b) Claims) are deemed to have rejected the Plan and, thus, were not entitled to vote. However, notwithstanding that Classes 7 and 8 are deemed to reject the Plan, the Plan is confirmable because it satisfies section 1129(a)(10) and section 1129(b) of the Bankruptcy Code, as discussed in greater detail below.

**M.      The Plan Complies with Statutorily Mandated Treatment of Administrative and Priority Tax Claims (Section 1129(a)(9)).**

51.      The Plan generally provides that, unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Wind-Down Debtors, as applicable, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and

Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (a) if such Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Claim (or as soon as reasonably practicable thereafter), without any further action by the Holder of such Allowed Administrative Claim; (d) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors or the Wind-Down Debtors, as applicable; or (e) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court; *provided* that any Allowed Administrative Claim (other than a Professional Fee Claim) that is not an Assumed Liability under any GA Transaction Documents shall instead be satisfied solely by the Debtors or Wind-Down Debtors.

52.    As described below, I believe that the Debtors have sufficient funds or commitments for reimbursement as required by the Agency Agreement to pay all such claims that are Allowed liabilities of the Estates, including Allowed Administrative Claims. The Debtors, the Debtors' advisors, and other parties in interest have worked to determine the total amount of Administrative Claims. Because the Plan provides for specified Cash payments to Holders of

Claims entitled to priority under section 507(a) of the Bankruptcy Code, it is in compliance with section 1129(a)(9) of the Bankruptcy Code.

**N.     At Least One Impaired Class of Claims Accepted the Plan, Excluding the Acceptance of Insiders (Section 1129(a)(10)).**

53.     Section 1129(a)(10) of the Bankruptcy Code provides an alternative to the requirement set forth in section 1129(a)(8) of the Bankruptcy Code that each class of claims or interests must either accept a plan or be unimpaired under the plan.  Specifically, if a class of claims is impaired under a plan, at least one impaired class of claims must accept the plan, excluding acceptance by any insider.  As set forth in the Voting Report, the Debtors have obtained the requisite acceptance to confirm the Plan, independent of any insiders' votes, because Class 3 (Prepetition Term Loan Claims) and Class 4 (General Unsecured Claims) have voted to accept the Plan, and I understand that no Holders of Class 3 (Prepetition Term Loan Claims) or Class 4 (General Unsecured Claims) are insiders of any Debtor.  Therefore, the Plan fully complies with and satisfies all of the requirements of section 1129(a)(10) of the Bankruptcy Code.

**O.     The Plan Is Feasible (Section 1129(a)(11)).**

54.     Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan is not likely to be followed by the liquidation or further reorganization of the debtor or any successor thereto unless such liquidation or reorganization is proposed in the plan.  Simply put, section 1129(a)(11) of the Bankruptcy Code requires a plan to be "feasible."  Here, the Plan contemplates an orderly liquidation of remaining Estate assets and monetization of GUC Trust Assets, with proceeds being distributed pursuant to the Plan and GUC Trust Agreement, along with a Wind-Down of the Debtors' Estates.  In developing the Wind-Down Budget and the Plan, the Debtors and their advisors analyzed the Debtors' and/or Wind-Down Debtors' ability to meet their obligations under the Plan.  Specifically, they analyzed the Debtors' and Wind-Down

Debtors' ability to maintain adequate liquidity to effectively Wind-Down the Wind-Down Debtors' Estates and determined that, following the consummation of the GA Transaction, the Debtors have access to sufficient funding for the activities and expenses that will be incurred in connection with the Wind-Down, including the satisfaction of all Allowed Administrative Claims. The Debtors, along with their professionals, have closely evaluated their Cash situation, including funding requirements under the Agency Agreement and the Plan Administrator Agreement to ensure that they will be able to make all Plan payments required on the Effective Date as well as in the months to come, and as a result anticipate being able to satisfy all Debtor obligations under the Plan.

55.    Specifically, I believe the remaining funding requirements can be categorized as follows, all of which have an available or committed sources of funding:

(i)    **Plan Administrator Budget.**    The Debtors estimate that the Plan Administrator will require a budget of approximately $7.0 million to fund her duties under the Plan.  The Plan Administrator Agreement provides for the funding of the Plan Administrator Budget through estimated Cash on hand as of the Effective Date (not to be less than $3.7 million) and additional funding commitments from the Purchaser.  In addition to projected operating expenses, the Plan Administrator Budget also provides for the payment of post-effective professional fees and fees of the office of the U.S. Trustee;

(ii)    **Operating Expenses Incurred During the Designation Rights Period.** Under the Agency Agreement, which was approved pursuant to the Approval Order, all operating expenses incurred during the Designation Rights Period (as defined in the Agency Agreement) are to be reimbursed by the Purchaser;

(iii)    **Wind-Down Expenses Incurred but Unpaid as of the Effective Date.** Under the Agency Agreement the Debtors received $65.9 million to fund a Wind-Down Budget, including $30.0 million related to potential 503(b)(9) Claims.  I believe that as of the Effective Date, any residual amounts (including those funded into the carve-out account) will be more than sufficient to pay any accrued and unpaid expenses (with an estimated excess of at least $3.7 million available to fund the Plan Administrator Budget

referenced above, as well as excess funding for the Committee Settlement); and

(iv)    **Pre-Agency Agreement Expenses.**  To the extent there are outstanding expenses as of the Effective Date, there will be additional Cash on hand to fund such expenses.

I believe that the sources of funding in subsections (i) through (iv) above are sufficient to pay all administrative claims.  Accordingly, I believe that the Plan is feasible.

**P.    The Plan Provides for Payment of All Fees Under 28 U.S.C. § 1930 (Section 1129(a)(12)).**

56.    Article XII.C of the Plan provides that all Quarterly Fees due and payable pursuant to section 1930 of Title 28 of the Judicial Code before the Effective Date shall be paid by the Debtors.  After the Effective Date, to the extent applicable, the Wind-Down Debtors, the Plan Administrator, or any entity making disbursements on behalf of any of the Wind-Down Debtors, or making disbursements on account of an obligation of any Debtor or Wind-Down Debtor, and the GUC Trust, the GUC Trustee or any entity making disbursements on behalf of the GUC Trust, or making disbursements on account of an obligation of the GUC Trust shall be liable to pay any and all Quarterly Fees when due and payable and shall file with the Bankruptcy Court quarterly reports when they become due.  Accordingly, the Plan fully complies with and satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code.

**Q.    Certain Sections Are Not Applicable (11 U.S.C. §§ 1129(a)(13), (14), (15), and (16)).**

57.    Sections 1129(a)(13) through 1129(a)(16) of the Bankruptcy Code do not apply to the Plan because the Debtors have no obligation to pay retiree benefits, are not subject to domestic support obligations, are not "individuals," and are moneyed, business, or commercial corporations, and no party has asserted otherwise.

24

**R.      The Plan Complies with the Other Provisions of Section 1129 of the Bankruptcy Code (Section 1129(c)–(e)).**

58.      The Plan satisfies the remaining provisions of section 1129 of the Bankruptcy Code.  Section 1129(c) of the Bankruptcy Code, prohibiting confirmation of multiple plans, is not implicated because there is only one proposed chapter 11 plan.  The Debtors are proposing the Plan for the purpose of providing for an orderly wind-down of the Debtors' Estates.  The Plan was not filed for the purpose of avoidance of taxes or the application of section 5 of the Securities Act. In addition, no party that is a governmental unit, or any other entity, has requested that the Bankruptcy Court decline to confirm the Plan on such grounds.  The Plan was proposed in good faith and not by any means forbidden by law.  Accordingly, I believe that the Debtors have satisfied the requirements of section 1129(d) of the Bankruptcy Code.

59.      Lastly, section 1129(e) of the Bankruptcy Code is inapplicable because none of the Debtors' chapter 11 cases is a "small business case."  Thus, the Plan satisfies the Bankruptcy Code's mandatory confirmation requirements.

**S.      The Plan Satisfies the Requirements of Section 1129(b) of the Bankruptcy Code.**

60.      The Plan satisfies section 1129(b) of the Bankruptcy Code, thereby rendering the Plan confirmable notwithstanding the failure to satisfy section 1129(a)(8) of the Bankruptcy Code (as described above).

**1.      The Plan Does Not Unfairly Discriminate with Respect to Impaired Classes That Have Not Voted to Accept the Plan.**

61.      I believe that the Plan's treatment of those Classes that are deemed to reject the Plan is proper and not "unfair" because Holders of Claims and Interests with similar legal rights will not be receiving materially different treatment under the Plan.  As I discussed above, the Plan's classification scheme categorizes Claims and Interests based on their priority within the Debtors'

capital structure, their differing legal nature, and their respective rights against the Debtors. Further, Claims and Interests in the Classes that are deemed to reject the Plan are not similarly situated to any other Classes, given their distinctly different legal character from all other Claims and Interests. Accordingly, I believe that the Plan does not discriminate unfairly with respect to Classes of Claims and Interests that are deemed to reject the Plan.

### 2.    The Plan Is Fair and Equitable.

62.    I believe the Plan is "fair and equitable" to Holders of Claims and Interests in those Classes that rejected or are deemed to reject the Plan because the Plan satisfies the absolute priority rule with respect to each of these non-accepting Impaired Classes. Specifically, no Holder of any junior Claim or Interest will receive or retain any property under the Plan on account of such junior Claim or Interest, except to the extent any Holder of a Claim or Interest has agreed to a different treatment or recovery under the terms of the Committee Settlement. To the extent that Intercompany Interests or Intercompany Claims are Reinstated under the Plan, distributions on account of Intercompany Interests or Intercompany Claims are not being received by Holders of such Intercompany Interests or Intercompany Claims on account of their Intercompany Interests or Intercompany Claims but for the purposes of administrative convenience, for the ultimate benefit of all parties in interest. Any Reinstatement of Intercompany Interests or Intercompany Claims will thus have no economic substance.

63.    I understand that pursuant to the Committee Settlement, the parties (i) funded the FILO Reserve which provides for a $1.0 million payment for the benefit of general unsecured creditors, and (ii) agreed to contribute 50% of the 503(b)(9) Savings for the benefit of general unsecured creditors, with a minimum guaranteed contribution from the Purchaser of $1.5 million.

64.     I believe the Plan is fair and equitable with respect to all non-accepting Impaired

Classes of Claims and Interests and satisfies section 1129(b) of the Bankruptcy Code.

**II.     The Waiver of a Stay of the Confirmation Order and the Proposed Modifications to the Plan Are Appropriate.**

**A.     Cause Exists to Waive a Stay of the Confirmation Order.**

65.     As noted above, these Chapter 11 Cases and the related transactions under the Plan

are consensual and have been negotiated and implemented with a high degree of transparency and

public dissemination of information.  The Debtors have undertaken great efforts to efficiently close

the GA Transaction, wind-down the remaining operations, and exit from chapter 11 as soon as

practicable.  Each day the Debtors remain in chapter 11 they incur administrative and professional

costs, which will be reduced if the Debtors emerge expeditiously.   Accordingly, I believe that

cause exists for waiving the stay of the entry of the Confirmation Order such that the Confirmation

Order will be effective immediately upon its entry.

**B.     Modifications to the Plan.**

66.     The Debtors made certain modifications to the Plan, which includes technical

clarifications and resolves certain informal comments from stakeholders.  I understand that such

modifications do not adversely impact creditors who have not consented to such modifications.  I

understand that the changes are permissible modifications to the Plan and are supported by the

Debtors, the Committee, and the U.S. Trustee, and other parties in and interest, and do not reflect

material differences to recoveries of each affected class—*i.e.*, no Holder is "likely" to reconsider

its acceptance.

[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: July 8, 2025                    Respectfully submitted,

*/s/ Nicholas Haughey*
Nicholas Haughey
Senior Director
Alvarez and Marsal North America, LLC