## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| JOANN INC., *et al.*,[1] | ) | Case No. 25-10068 (CTG) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | **Hearing Date:** July 31, 2025, at 10:00 a.m. (ET) |
|  | ) | Re: Docket Nos. 760, 823, 851, 859, 876, 930, 945, 995 and 1055 |

## BURLINGTON STORES, INC.'S OMNIBUS REPLY TO OBJECTIONS TO BURLINGTON'S ASSIGNMENT AND ASSUMPTION OF MYRTLE BEACH, SC, WASHINGTON, UT, BELLEVUE, NE, FLAGSTAFF, AZ, AND FAYETTEVILLE, AR LEASES

Burlington Stores, Inc.[2] ("Burlington") states as follows (this "Reply") in response to the objections of (i) Myrtle Beach Farms Company, Inc. (the "Myrtle Beach Landlord") [Docket Nos. 851, 1016] (the "Myrtle Beach Objection"), (ii) Progress Square Partners Limited Partnership, an Oregon limited partnership, and DC Cotton Mill, LLC, a California limited liability company, as tenants in common (collectively, the "Washington Landlord") [Docket Nos. 823, 943] the ("Washington Objection"), (iii) BV Wolf Creek, LLC (the "Bellevue Landlord") [Docket No. 945] (the "Bellevue Objection"), (iv) LNN Enterprises, Inc. (the "Flagstaff Landlord") [Docket No. 1055] (the "Flagstaff Objection"), and (v) DLC Management Corporation, as managing agent for Spring Creek Improvements, LLC (the "Fayetteville Landlord, and together with the Myrtle Beach

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: JOANN Inc. (5540); Needle Holdings LLC (3814); Jo-Ann Stores, LLC (0629); Creative Tech Solutions LLC (6734); Creativebug, LLC (3208); WeaveUp, Inc. (5633); JAS Aviation, LLC (9570); joann.com, LLC (1594); JOANN Ditto Holdings Inc. (9652); JOANN Holdings 1, LLC (9030); JOANN Holdings 2, LLC (6408); and Jo-Ann Stores Support Center, Inc. (5027). The Debtors' mailing address is 5555 Darrow Road, Hudson, Ohio 44236.

[2]  Burlington Stores, Inc. is the parent of the designated Buyer, Burlington Coat Factory Warehouse Corporation, for the Leases (as defined herein) listed in Schedule 2 attached to the *Amended First Notice of Assumption and Assignment of Certain Executory Contacts and/or Unexpired Leases* [Docket No. 930] (the "Notice").

Landlord, the Washington Landlord, the Bellevue Landlord, and the Flagstaff Landlord, the "Landlords") [Docket No. 859] (the "Fayetteville Objection," and together with the Myrtle Beach Objection, the Washington Objection, the Bellevue Objection, and the Flagstaff Objection, the "Objections") regarding certain leases for real property at Store #2566 located at 1120 Seaboard Street, Myrtle Beach, SC (the "Myrtle Beach Lease"), Store #2329 located at 720 W. Telegraph Street, Washington, UT (the "Washington Lease"), Store # 2456 located at 10521 S. 15th Street, Bellevue, NE (the "Bellevue Lease"), Store # 1831 located at 1514 S Riordan Ranch Street, Flagstaff, AZ (the "Flagstaff Lease"), and Store #1894 located at 3835 North Mall Ave., Fayetteville, AR (the "Fayetteville Lease," and together with the Myrtle Beach Lease, the Washington Lease, the Bellevue Lease, and the Flagstaff Lease, the "Leases").

## **Preliminary Statement**

1.      Burlington—a nationally recognized off-price retailer and Fortune 500 company—is the proposed assignee of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for the Leases.  Burlington was the successful bidder for forty-six (46) of the Debtors' unexpired leases of nonresidential real property in the lease asset sale process run by GA Joann Retail Partnership, LLC ("GA"), whose purchase of the designation rights for such Lease assets generated significant funds for the benefit of the Debtors' estates.  As such, Burlington has been a valuable partner to the Debtors and to GA.

2.      Many of the Objections to Burlington's assignment were prompted by a targeted letter campaign from Burlington's direct competitor, Ross—a third party tenant in the respective shopping centers—threatening retaliation if Landlords do not seek to enforce *later-in-time* exclusives to block Burlington.  The "Ross Exclusive" on its face does not apply to existing tenants such as Joann, or its assigns, Burlington, under the terms of the Leases (with the exception of

Myrtle Beach Lease[3]).  Notwithstanding repeated and consistent rulings across jurisdictions in favor of Burlington on this very issue, the Landlords continue to make the same hollow arguments to shield themselves, increasing transaction costs and uncertainty for all parties-in-interest.

3.      Thus, to the extent the Landlords oppose the proposed assignment to Burlington because it might breach certain later-in-time exclusivity provisions of another lease in the shopping center—*e.g.*, the Ross Leases—the Court should reject that argument as flawed and inconsistent with case law in this and other jurisdictions.  *See* Transcript of August 30, 2023 Hearing, Docket No. 2115, pp. 116–120, *In re Bed Bath & Beyond, Inc.*, Case No. 23-13359 (VFP) (Bankr. D.N.J. 2023) ("*Bed Bath & Beyond* Tr.")[4] ("When [the] canons of statutory construction are applied, it becomes clear to the Court that the phrase 'any other lease' could not have been intended and was not intended to mean a subsequent lease between a landlord and a third party as to which the debtor was not a party."); Transcript of January 21, 2025 Hearing, [Docket No. 1838] p. 61, *In re Big Lots, Inc., et al.*, Case No. 24-11967 (JKS) (Bankr. D. Del.) ("*Big Lots* Tr.")[5] (agreeing with the reasoning in *Sears*[6] and *Bed, Bath, & Beyond* that the phrase "any other lease" in section 365(b)(3)(c) does not mean later-in-time leases).

4.      Other Landlords are simply trying to recapture their below market leases without bidding on them at auction, causing the Debtors to forfeit such value and transferring a windfall to a single landlord creditor as opposed to all creditors.[7] They ask this Court to prioritize sections

---

[3]    In the case of Myrtle Beach—because the Myrtle Beach Lease is expressly subject to the Ross Exclusive— Burlington has prepared an illustrative schematic showing how Burlington will operate within the Ross Exclusive contained in that Lease.

[4]    A true and correct copy of the *Bed Bath & Beyond* transcript is attached hereto as **Exhibit A**.

[5]    A true and correct copy of the *Big Lots* transcript is attached hereto as **Exhibit B**.

[6]    *MOAC Mall Holdings LLC v. Transform Holdco LLC (In re Sears Holdings Corp).*, 613 B.R. 51 (S.D.N.Y. 2020) (referred to herein as "*Sears*").

[7]    *See, e.g.*, *MOAC Mall Holdings LLC v. Transform Holdco LLC (In re Sears Holdings Corp.)*, 661 B.R. 298, 322 (S.D.N.Y. 2024) ("[T]he purpose of chapter 11 is . . . not to provide windfalls to any, or to allow landlords to

365(b)(3)(C) and (D) __*over*__ 365(f) on the basis of ambiguous or nominally restrictive permitted use clauses, or internally conflicting Leases.  Section 365(f) is undoubtedly qualified by the landlord protections codified in sections 365(b)(3)(C) and (D), but they too must ultimately further the purposes of the Bankruptcy Code and the Court should interpret them in harmony with section 365(f).  *See United Hospital Center, Inc. v. Richardson*, 757 F.2d 1445, 1451 (4th Cir. 1985) (explaining that the court's task is to "'interpret the words of the [statute] in light of the purposes [the Legislature] sought to serve,' and to arrive at a construction which is 'most harmonious' with the statutory scheme and general purpose. [. . .] Should there be some inconsistency between the two statutes or sections of a single statute, courts, in construing the statues, so far as it is possible, should seek to steer a 'middle course that vitiates neither provision but implements to the fullest extent possible the directives of each.'") (internal citations omitted).  *See generally Bed Bath & Beyond* Tr. at 124 ("365(b) should be read in harmony with 365(f)"); *Sears*, 613 B.R. at 68 ("Section 365(f)(2)(B) is not specific about what 'adequate assurance' would require; § 365(b)(3) fills in that blank when the debtor has a lease for space in a shopping center; and § 365(b)(3)(D) prohibits assignments that would disrupt the tenant mix. But given the lack of any statutory definition for the words 'tenant mix,' and the several possibilities for what it might mean, it makes perfect sense to interpret the phrase 'tenant mix' for purposes of § 365(b)(3)(D) in light of the lease whose performance is being assured.")

5.    With the overarching goal of the Bankruptcy Code as its guidepost, the Court maintains discretion to interpret the Leases in a practical, commercial manner that honors both

---

improve the position they occupied as a result of a bad bargain prior to bankruptcy."); *In re Rock 49th Rest. Corp.*, 2010 WL 1418863 at *21 (Bankr. S.D.N.Y. April 7, 2010) ("Section 365 does not give a landlord the right to improve its position upon the bankruptcy of the tenant.  The statute affords no relief to a landlord simply because it might seek to escape a bargain it made."); *In re Ames Dept. Stores, Inc.*, 348 B.R. 91, 98 (Bankr. S.D.N.Y. 2006) ("Congress has determined that the economic value in below market leases is to go to creditor bodies generally, and not to a windfall for a single creditor.").

sections 365(b)(3) and 365(f) and vitiates neither.  *See In re Ames Dept. Stores, Inc.*, 348 B.R. 91,

98 (Bankr. S.D.N.Y. 2006) ("[S]ubject only to statutory safeguards, the value of a debtor's lease

should go to the debtor's creditors, and . . . leases can be sold to achieve that end—with or without

landlord consent. . . . the norm in bankruptcy [is] to implement that Congressional policy in order

to benefit the general body of the debtor's creditors, and not the single creditor landlord that would

like to get a lease back. . . . Congress has determined that the economic value in below market

leases is to go to creditor bodies generally, and not to a windfall for a single creditor.").  Simply

stated, it is common for landlords to bid on their own below-market leases, benefitting both

themselves and the Debtors' estates.  These landlords chose not to bid.

6.     For these reasons, Burlington requests that this Court overrule the Objections and

approve the assumption and assignment of the Leases to Burlington.

### **REPLY**

I.     **Myrtle Beach Lease:** *Burlington Has Established Adequate Assurance of Future Performance Under the Myrtle Beach Lease Because (i) Burlington Will Comply with All Applicable Exclusives and (ii) the Permitted Use Provision Does Not Prevent Assignment to Burlington.*

7.     The Myrtle Beach Lease is subject to a prior-in-time exclusive that limits the off-

price sale of apparel to 10,000 square feet in any tenant's store.  It provides that:

> If Tenant is located on Lot 3 or Lot 4 which is currently comprised of Units 3A, 3B1, 420, 3C, 3D, and 3E, or Unit 1, ***Tenant shall not devote more than ten thousand (10,000) square feet of its premises for the Off Price Sale of apparel***.  For purposes of this paragraph, "Off Price Sale" is defined as the retail sale of merchandise on an everyday basis at prices reduced from those charged by full price retailers, such as full price department stores….Examples of Off Price Sale retailers include Marshall's, Nordstrom Rack, Goody's, Factory 2U, Burlington Coat, SteinMart, and Filene's Basement.)." (the "Ross Exclusive")

Myrtle Beach Lease, Exh. F (emphasis added).  The JoAnn premises are located in unit 3D, and

Burlington has agreed to restrict its usage of the premises to comply with such exclusive.  *See*

Morrow Dec. ¶¶ **10-11**.  As such, the foregoing is not a basis for the Myrtle Beach Landlord to oppose the Debtors' assignment to Burlington.

8.    Next, the Myrtle Beach Landlord argues that Burlington cannot comply with the Permitted Use provision in the Myrtle Beach Lease, which Landlord claims is "limited solely to the sale of specific items." *See* Myrtle Beach Objection at ¶ 22. However, it is not.  There is a Definition clause (Section 2) and a Use clause (Section 11), and the Myrtle Beach Landlord attempts to confuse the two.  The Definition clause defines what a typical JoAnn's use is. The Use clause of the Lease, however, states how JoAnn may use the Premises:

> The Premises ***may*** be used for the Permitted Use, provided the Premises ***shall*** ***not*** be used in violation of (a) the OEA, (b) the exclusive uses of other tenants as are set forth on Exhibit F-1 attached hereto (collectively, the "Exclusive Uses"), or (c) the prohibited uses of the OEA or of other tenants as are set forth on Exhibit F-2 attached hereto (collectively, the "Prohibited Uses").

Myrtle Beach Lease § 11 (emphasis added).  The use clause assures JoAnn that they can operate a typical JoAnn store so long as it does not violate the OEA or the exclusive uses set forth on Exhibit F-1 nor F2 of the JoAnn's Lease, but it does not limit JoAnn such use.  The use of the word "may" instead of "shall" or "may only" is critical: "may" is a right; "shall not" is a restriction.  JoAnn ***may*** operate a JoAnn store (this is not a requirement or restriction), but JoAnn ***shall not*** operate in violation of the OEA, Exhibit F-1 or Exhibit F-2 of the Myrtle Beach Lease.

9.    This becomes clearer when coupled with the assignment and subletting provisions of the Myrtle Beach Lease which permit the tenant to assign or sublet the lease to a national or regional retail tenant selling full price merchandise assuming certain conditions were met (none of which include compliance with the permitted use provision—the Myrtle Beach Lease does not envision nor require the exclusive operation of a fabric and craft store.  *See* Myrtle Beach Lease § 23; *Whitlock v. Stewart Title Guar. Co.*, 399 S.C. 610, 614 (2012) ("Courts must enforce, not

write, contracts . . . and their language must be given its plain, ordinary and popular meaning."). While the assignment provision in the Myrtle Beach Lease is riddled with various *conditions* to assignment that are unenforceable under Bankruptcy Code section 365(f), the provision is instructive for purposes of interpreting the relative strictness of the permitted use clause.  Where a lease ostensibly contains a very limited permitted use clause, but permits assignment—or even *conditions* assignment—without regard to such permitted use, the permitted use is ineffectual on its face, and the Debtors should be allowed to pursue the assignment of those leases notwithstanding such clauses.

10.    If the permitted use provision is interpreted as Landlord suggests (oppressively limiting the use so as to only allow the operation of a JoAnn store), this could be deemed unenforceable on this basis alone.  *See In re Rickel Home Ctrs.*, 240 B.R. 826 (D. Del. 1998) (excising use provision in lease that limited stores to use as either Channel Home Centers or home improvement centers and finding that use restrictions made it impossible for the debtor to assign the lease to any entity); 130 Cong. Rec. S8891 (daily ed. June 29, 1984), *reprinted in* 1984 U.S.C.C.A.N. 590, 600 (Senator Hatch, in explaining the 1984 amendment to § 365(b)(3)(C), said that the "amendment is not intended to enforce requirements to operate under a specified trade name."); *see generally In re Joshua Slocum Ltd.*, 922 F.2d 1081, 1090 (3d Cir. 1990) ("Even under the tightly drawn definition of 'adequate assurance' in the shopping center context, Congress did not envision literal compliance with all lease provisions.").

II.    **<u>Washington, UT Lease:</u>** *The Proposed Assignment of the Washington Lease to Burlington Should be Authorized Because (i) the Permitted Use Provision Does Not Prevent Assignment to Burlington, and (ii) Section 365(b)(3)(c) Does Not Require Burlington to Comply with Later-in-Time Exclusives.*

11.    The Washington Landlord argues that "there is no construction of the [Washington] Lease which would render operation by a Burlington a Permitted Use of the Debtors' premises."

Washington Objection at 9. Similar to the Myrtle Beach Lease, the Washington Lease contains a specific, but ultimately permissive, permitted use _**definition**_:

> Permitted Use: Subject to the restrictions set forth on Exhibit "F"[8] attached hereto, Tenant **_may_** use the Premises for the sale of any of the following: bolted and/or unfinished fabrics of any kind, fabrics sold by the yard, upholstery materials, fabrics with patterns, knitting supplies, needlepoint supplies, macrame supplies, artificial flowers, all types of arts and crafts materials and supplies (including jewelry arts and crafts), framed artwork; custom framing, scrapbooks and scrapbooking supplies and materials, yarns and all types of notions used for knitting, sewing, needlepoint and upholstery, sewing machines, sewing machine furniture, fabric care items and products, accessories and services related to all of the foregoing and other items and services customarily offered for sale by a fabric and arts and crafts store.

Second Amendment § 8 (emphasis added). The "permitted use" _**definition**_ was amended when Joann assumed the Washington Lease in 2012. Contrast that with the permitted use _**provision**_, as opposed to definition, of the Washington Lease which contains strict "shall" language, waivable only with consent of the Washington Landlord:

> Subject to the restrictions set forth of Exhibit "F" attached hereto, Tenant **_shall_** use the Premises for the Permitted Use set forth in Article 1, and **_shall_** use the Premises under the trade name specified in Article 1. **_Tenant shall not use nor permit the Premises to be used for any other purpose or purposes or under any other trade name whatsoever without the prior written consent of Landlord, which consent shall not be unreasonably withheld._**

Washington Lease § 5.1 (emphasis added). Because the new (amended) definition of "permitted use" does not modify the permitted use provision in the Washington Lease, the two sections must be reconciled. The amended definition softens the language, intentionally using "may" instead of "shall" to describe the permitted uses.

---

[8]  Exhibit F contains no restrictions relevant to the Washington Objection or proposed assignment of the Washington Lease.

12.     Other provisions in the Washington Lease support a permissive, rather than restrictive, interpretation of permitted use.  Subject to certain conditions, the Washington Lease is freely assignable *without landlord consent* in the event the Tenant remains primarily liable on the Washington Lease and complies with the exclusive and prohibited uses:

> Landlord's consent shall not be required in connection with the following "Permitted Transfers": . . . (iii) Tenant's assignment of all of its rights under the Lease to any other entity so long as, at all times during such assignment, (A) *the business and operations of the proposed assignee do not violate any exclusive and/or prohibited uses applicable to the Premises and/or Tenant hereunder as of the date of the proposed assignment* and (B) the originally-named Tenant hereunder remains primarily liable for all obligations of the "Tenant" under this Lease as a principal and not as a surety….

Washington Lease §12.2.  In fact, the only time the use of an assignee is limited in the assignment context is in connection with a merger, consolidation or similar transaction.[9]

13.     Here, the Washington Landlord *did not* bargain for a specific use in the event of assignment.  *See* Washington Lease §12.2.  In short, the permitted use provisions in the Washington Lease cannot be read to prevent assignment to Burlington because the Washington Lease permits assignment to other entities who would *not* be operating within the permitted use definition (*i.e.*, as a fabric and arts and crafts store).  *See Trak Auto Corp. v. West Town Center LLC (In re Trak Auto Corp.)*, 367 F.3d 237, 244 (4th Cir. 2004) (citing *In re Ames Dep't Stores, Inc.*, 121 B.R. 160, 165 n.4 (Bankr. S.D.N.Y. 1990)) (the purpose of section 365(b)(3)(C) "is to

---

[9]     Section 12.2 (Permitted Transfers) only requires compliance with Section 5.1 (Permitted Use) for a permitted transfer under subsection (ii) ("Tenant's assignment of all of its rights under this Lease to any corporation, partnership or other business entity which results from a merger or consolidation of or with a Tenant or sale of all or substantially all of the assets of Tenant to a corporation or entity, provided that in each case such assignee has a tangible net worth at least equal to that of the Tenant as of the date of this Lease (hereinafter referred to as the "Tangible Net Worth Threshold"), as evidenced by financial statements reasonably acceptable to Landlord and provided to Landlord at least ten (10) business days prior to the date of the proposed assignment; and the assignee agrees to use the Premises in strict accordance with Section 5.1 above."  Washington Lease §12.2(ii).

preserve the landlord's ***bargained-for protections*** with respect to premises use . . . .") (emphasis added).

14.    Alternatively, if the Court interprets the permitted use terms of the Washington Lease as the Landlord suggests, the permitted use provision should be stricken as anti-assignment under Bankruptcy Code section 365(f).  The Second Amendment provides that "[a]s of the Effective Date, Tenant's registered trade name is: Jo-Ann Fabric and Craft Stores®."   Second Amendment § 2.  The permitted use ***provision*** requires use of the Jo-Ann Fabric and Craft Stores® trade name.  *See* Washington Lease, § 2 of Second Amendment.  That is plainly anti-assignment. *See In re Rickel Home Ctrs.*, 240 B.R. 826 (D. Del. 1998) (excising use provision in lease that limited stores to use as either Channel Home Centers or home improvement centers and finding that use restrictions made it impossible for the debtor to assign the lease to any entity); 130 Cong. Rec. S8891 (daily ed. June 29, 1984), *reprinted in* 1984 U.S.C.C.A.N. 590, 600 (Senator Hatch, in explaining the 1984 amendment to § 365(b)(3)(C), said that the "amendment is not intended to enforce requirements to operate under a specified trade name."); *see also Trak Auto*, 367 F.3d at 245 (citing same); *see generally In re Joshua Slocum Ltd.*, 922 F.2d 1081, 1090 (3d Cir. 1990) ("Even under the tightly drawn definition of 'adequate assurance' in the shopping center context, Congress did not envision literal compliance with all lease provisions.").

15.    The Washington Landlord also argues that "assignment to Burlington will cause the Landlord to default under the terms of the Ross Lease" and that "section 365(b)(3)(C) prohibits assignments which 'breach any . . . provision contained in any other lease.'"   Washington Objection at 11.  First, the phrase "any other lease" does not refer to later-in-time leases between the Landlord and a third-party tenant.  *Bed Bath & Beyond, Inc.* Tr. at 116–120; *Big Lots* Tr. at 61. Second, the Ross Exclusive does not apply to "Existing Tenants who, in accordance with the terms

of existing leases . . . cannot be prohibited from so operating . . . ."  Ross Lease § 15.3.  The term "Existing Tenants" is defined as "those tenants or occupants of the Shopping Center listed on Exhibit N *or to any assignees or sublessees* of such tenants ("Existing Tenants") who, in accordance with the terms of existing leases or occupancy agreements in effect on the Effective Date, cannot be prohibited from so operating, but only for the balance of the term(s) of such existing lease(s) or occupancy agreement(s)." Ross Lease 3.2.1 (emphasis added).  Jo-Ann Stores, Inc. is listed as an Existing Tenant on Exhibit N of the Ross Lease.  *See* Ross Lease, Exhibit N. Therefore, the Ross Exclusive does not apply to the Washington Lease.

16.    Finally, the Washington Landlord refers in passing to its interest in preserving the tenant mix.  Washington Objection at 10.  Courts agree that tenant mix and balance are determined by reference to contractual protections within the debtor's lease.  *See In re Ames Dept. Stores, Inc.*, 121 B.R. 160, 165 (Bankr. S.D.N.Y. 1990) ("It is, nevertheless, clear that section 365(b)(3)(D) must be interpreted to refer to contractual protections and not undefined notion of tenant mix."); *see also Toys "R" Us*, 587 B.R. 304, 310–11 n.4 (Bankr. E.D. Va. 2018) (tenant mix intent must be established in reference to the lease between the debtor and landlord); *Sears*, 613 B.R. at 64–68 (same).

17.    Where the terms of a lease allow assignment "regardless of impact on tenant mix," "it would be anomalous to interpret section 365(b)(3)(D) to preclude" the debtor from assigning such lease.  *In re Ames Dept. Stores, Inc.*, 121 B.R. 160, 164 (Bankr. S.D.N.Y. 1990).  The Washington Lease is assignable so long as the assignee complies with applicable prohibited and exclusive uses.  Washington Lease § 12.2.  The Ross Exclusive is not applicable to the Premises and/or the Tenant hereunder as discussed above and thus does not prevent assignment to

Burlington under the terms of the Washington Lease.  *Id.*    As such, the assignment should be permitted "regardless of impact on tenant mix." *Ames*, 121 B.R. at 164.

18.    Alternatively, the Washington Landlord has failed to meet its burden of establishing that the Washington Lease contains specific contractual protections that create an intentional tenant mix.  The *Trak Auto* case, relied upon by the *Bed Bath & Beyond* court (*see Bed Bath & Beyond* Tr. at 129–35), instructs that it is a landlord's burden to establish an intended tenant mix:

> Finally, as a predicate to finding that a Shopping Center is entitled to protection under § 365(b)(3)(D), the lessor must demonstrate that there was an intended tenant mix in the first instance.  *See In re Sun TV*, 234 B.R. at 366–71. Intent to create a diverse tenant mix must be established in light of the lease terms.  *In re Ames Department Stores, Inc.*, 121 B.R. 160,165 (Bankr. S.D.N.Y. 1990).  In order to establish that the proposed assignment to A&E would disturb the tenant mix of the Shopping Center, LaSalle must establish that the alleged tenant mix was part of the bargained-for-exchange of its lease and the leases of the other tenants.

*LaSalle Nat'l Trust, N.A. v. Trak Auto Corp.*, 288 B.R. 114, 125 (E.D. Va. 2003).  Such intent is shown by a master agreement between all shopping center tenants, a financing agreement to which the debtor's lease is explicitly made subject, other explicit lease terms regarding tenant mix, or that the landlord sought or obtained lease amendments from existing shopping center tenants when a new tenant was moving in.  *See id.* at 125–26 (rejecting landlord's argument that exclusive use provisions binding on subsequent assignees create a tenant mix);[10] *see also Bed Bath & Beyond*

---

[10]    The *LaSalle* court explains in detail that leases must be specific to show a protected "tenant mix":

> LaSalle argues that the Lease contains exclusive use clauses which are binding on any subsequent assignee and, that these use provisions create a tenant mix. However, the Bankruptcy Court found that the lease contained restrictive use provisions, which as discussed *supra* at Part A., were properly excised under § 365(b)(1), because LaSalle failed to carry its burden of production on the existence of exclusive use clauses in its leases. April 24 Order, p.8. As the Bankruptcy Court noted, the "purpose of an exclusive use clause is to provide protection to a single tenant." April 24 Order (citing *In re Sun TV, supra*). The Bankruptcy Court found that it lacked "any evidence relating to the intent behind the use provisions" and, therefore, held that the "debtors lease contained only restrictive use clauses." *Id.* at 9. Appellate review of the record reveals no

Tr. at 126–27 (noting that the landlord did not seek modification of Bed Bath & Beyond's lease with respect to tenant mix after it granted an exclusive to a later-in-time tenant). Because that level of required evidence is not present here, the objection must be overruled.

III.     **Bellevue, NE Lease:** *The Proposed Assignment of the Bellevue Lease to Burlington Should be Authorized Because Section 365(b)(3)(c) Does Not Require Burlington to Comply with Later-in-Time Exclusives.*

19.     The Bellevue Objection states that "[b]ased on the restrictions and limitations in paragraph 15.3 of the Ross Lease . . . the assignment of the [Bellevue] Lease to the Assignee would be a breach of [Bellevue's] separate lease agreement with Ross." Bellevue Objection at 11.

20.     As a threshold matter, the phrase "any other lease" in section 365(b)(3)(C), again, does not refer to later-in-time leases between the Landlord and a third-party tenant, so the Debtors' proposed assignment to Burlington does not run afoul that section. *Bed Bath & Beyond* Tr. at 119–24; *Big Lots* Tr. at 60 (finding that "the phrase 'then-existing' does not apply to a future, unknown assignment"). The Bellevue Lease predates the Bellevue Landlord's lease with Ross.

21.     Second, the Ross Exclusive states that "Section 15.3(a)…[is not] intended to affect the existing tenants set forth on Exhibit K." Ross Lease § 15.3(b)(ii). Jo-Ann Fabrics is listed as an Existing Tenant on Exhibit K of the Bellevue-Ross Lease. Ross Lease, p. 59. Therefore, the Ross Exclusive does not apply to the Bellevue Lease, and the Landlord's concerns are unfounded.

22.     The Bellevue Landlord also argues that it is entitled to attorneys' fees as part of its cure payment under a prevailing party clause contained in the Bellevue Lease. If anything, the Bellevue Landlord is seeking to enforce its lease with Ross against the Debtor, a non-party to the Ross lease—not seeking to enforce the Bellevue Lease itself. Therefore, the prevailing party

---

evidence concerning the intent of the use provisions and Appellant's brief fails to assert any.

*LaSalle*, 288 B.R. at 125–26.

clause does not apply.  The Bellevue Landlord may not obtain an advisory opinion from this Court in its dispute with Ross and then pass that cost to the Debtors or Burlington.  Further, indemnification claims and attorneys' fees are not rent under the Bellevue Lease.  The Bellevue Landlord may not recover attorneys' fees or potential indemnification obligations under a prevailing party clause if it does not "prevail" in enforcing a use provision in the Bellevue Lease and blocking the assignment to Burlington.  With respect to indemnification, if any other claims subject to the indemnity provisions of the Bellevue Lease exist, Burlington is unaware of such claims, and presumably the Bellevue Landlord would have described them in the Bellevue Objection.

IV.    **Flagstaff, AZ Lease:** *The Proposed Assignment of the Flagstaff Lease to Burlington Should be Authorized Because the Flagstaff Lease Allows the Tenant to Change Its Use.*

23.    The Flagstaff Landlord opposes the assignment to Burlington because "the business conducted by Burlington is not at all contemplated by the permitted uses under the Lease." Flagstaff Objection at 11.  The Flagstaff Lease provides that the "Premises shall be used for the purpose of the operation of a retail sale of all types of fabrics, notions, arts and crafts, artificial flowers, sewing machines and other items normally sold in a fabric and arts and crafts store." Flagstaff Lease § 4.  The Flagstaff Lease is actually a sublease pursuant to a 1979 master lease between the Flagstaff Landlord and a grocery store.  In December 1991, the grocery store subleased the premises to SOFRO Fabrics, which eventually merged into Joann.  The 1991 Sublease originally provided in section 6.1:

> 6.1 Use. Notwithstanding anything set forth in Exhibit A, the Premises shall be used by Sublessee only for the purposes of wholesale and retail sales of any and all types of fabrics, notions, crafts and sewing machines and other items normally sold in a SOFRO FABRICS stores (dba House of Fabrics). **Sublessee, may, with Sublessor's written approval, alter such use to another lawful use, provided that Sublesee is not then in default under this Sublease and provided that it informs the Sublessor in**

**writing of its intent to alter such use. Sublessor shall not unreasonably refuse Sublessee's request to alter its use of the Premises.** Sublessee shall comply with all other terms of the Master Lease with respect to the use and operation of the Premises, except as provided in this Paragraph.

Flagstaff 1991 Sublease § 6.1 (emphasis added).

24.     Then, on July 28, 2020, the Fourth Amendment to Lease Agreement (the "Fourth Amendment") was executed, which provides:

> 4.    Use of Premises.    The first two paragraph of Section VI of the Master Lease and the first sentence of Section 6 of the Sublease shall be deleted and replaced with the following:
>
> The Premises shall be used for the purpose of the operation of a retail sale of all types of fabrics, notions, arts and crafts, artificial flowers, sewing machines and other items normally sold in a fabric and arts and crafts store.

Fourth Amendment ¶ 4.

25.     The bolded language in the original section 6.1 (regarding a change of use with consent), conveniently omitted in the Flagstaff Objection, is still valid per the plain terms of the Fourth Amendment, which is the most recent amendment to the lease documents and only deletes the first sentence of Sublease section 6.1. The Sublessee, Joann, has provided written notice of the assignment through the filing of its *Amended First Notice of Assumption and Assignment of Certain Executory Contracts and/or Unexpired Leases* [Docket No. 930]. Upon information and belief, the Debtors are current on postpetition rent and are not in default under the Flagstaff Lease (save for any *ipso facto* clauses that are unenforceable in bankruptcy).

26.     Therefore, the only impediment to the Debtors' assignment of the Flagstaff Lease is the landlord's consent, which may not be unreasonably withheld, and which more importantly, is not required under section 365(f), to the extent it restricts assignment. *See, e.g., In re Jamesway Corp.*, 201 B.R. 73, 78 (Bankr. S.D.N.Y. 1982)) ("The essence of Subsections [365(f)] (1) and (3) is that all contractual provisions, not merely those entitled 'anti-assignment clauses' are subject to

the court's scrutiny regarding their anti-assignment effect."). Even if the Flagstaff Landlord's consent were required here, there is no good faith basis upon which the Flagstaff Landlord could reasonably withhold consent to the proposed change in use—which substitutes a profitable tenant for an insolvent one—other than to recapture value. This is the essence of anti-assignment.

27.     In the face of plain contract terms that abrogate the use restrictions in the Flagstaff Lease, the Flagstaff Landlord cannot rely on section 365(b)(3) to enlarge its rights. Allowing the Flagstaff Landlord to rely on section 365(b)(3) improperly "turns 365(b)(3)(C) and (D) into a sword rather than a shield, a sword that bestows upon the landlords a commercial competitive advantage that actually allows them to improve their position to the detriment of the debtors' estate." *Bed Bath & Beyond* Tr. at 117.

**V.    Fayetteville, AR Lease:** *The Proposed Assignment of the Fayetteville Lease to Burlington Should be Authorized Because Section 365(b)(3)(C) Does Not Require Burlington to Comply with Later-in-Time Exclusives.*

28.     The Fayetteville Landlord, also compelled by Ross, likewise is attempting to enforce the obligations it granted to Ross in a later-in-time lease against the Debtors. Again, the argument that Bankruptcy Code section 365(b)(3)(C) requires the Court to enforce exclusive use clauses granted by a landlord to subsequent tenants been rejected by courts in this and other jurisdictions. As discussed above, the phrase "any other lease" does not refer to later-in-time leases between the Landlord and a third-party tenant. *Bed Bath & Beyond, Inc.* Tr. at 116–120; *Big Lots* Tr. at 61. The Fayetteville Lease predates the Fayetteville Landlord's lease with Ross, therefore, any exclusives granted to Ross are not a basis upon which to prevent assignment to Burlington.

29.     Here again, the Ross Exclusive simply does not apply: "The tenants and occupants operating in Landlord's Parcel as of the Effective Date (including TJ Maxx) under the Existing Leases (including renewals thereof) listed on Exhibit K shall not be subject to the use restriction set forth in Section 15.3(a) above. However, if Landlord has the right of consent to any change in

use of the premises occupied by a tenant or occupant operating under an Existing Lease, Landlord shall not consent to any use in such premises in violation of the use restriction(s) set forth in Section 15.3(a) above." Ross Lease § 15.3. Upon information and belief, Jo-Ann Stores, Inc. is listed as an Existing Tenant on Exhibit K of the Ross Lease.[11] Therefore, the Ross Exclusive does not apply to the Fayetteville Lease. In any case, the assumption and assignment process overseen by this Court is a judicial action that does not require or seek the Fayetteville Landlord's consent.

30.     Finally, the Fayetteville Landlord argues that the cure amount should include (1) indemnification "against various claims, liabilities and expenses" and (2) unspecified attorneys' fees. If any claims exist that are subject to the indemnity provisions of the Fayetteville Lease, Burlington is unaware of such claims, and presumably the Fayetteville Landlord would have described them in the Fayetteville Objection. With respect to the Fayetteville Landlord's alleged attorneys' fees, the Fayetteville Lease does not provide that the attorneys' fees become due as rent. Section 24(a) of the Fayetteville Lease provides that Tenant is responsible for Landlord's attorneys' fees after Landlord terminates the lease or terminates the Tenant's right to possession of the Premises, but neither condition has occurred. The only other place in the Fayetteville Lease that entitles the Fayetteville Landlord to recover its attorneys' fees is section 19, regarding indemnification of claims "in connection with loss, damage, or injury to persons or property occurring in, upon or about, or arising out of the Demised Premises…" This section of the Fayetteville Lease is likewise not being invoked. Landlord cannot show it is entitled to recover attorneys' fees as cure under section 365 of the Bankruptcy Code.

---

[11]     As of the date of this filing, the Fayetteville Landlord has not shared the entirety of the Fayetteville Ross Lease with Burlington.

31.     In conclusion, the Objections should be overruled, and the assignment of the Leases should be approved.

Dated: July 28, 2025

*/s/ Kristhy M. Peguero*

**JACKSON WALKER LLP**
Kristhy M. Peguero (TX Bar No. 24102776)
Victoria Argeroplos (TX Bar No. 24105799)
1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone: (713) 752-4200
Email:    kpeguero@jw.com

William Farmer (TX Bar No. 24127156)
2323 Ross Avenue, Suite 600
Dallas, TX 75201
Telephone: (214) 953-5859
Email:  wfarmer@jw.com

*Co-Counsel for Burlington Stores, Inc.*

**Exhibit A**

**In re Bed Bath & Beyond, Inc., Case No. 23-13359 (VFP)**
**(Bankr. D. N.J. 2023), 8/30/2023 Hr'g Tr., Docket No. 2115**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

IN RE:                          .    Case No. 23-13359-VFP
                                .
BED BATH & BEYOND, INC., .           M.L.K. Federal Building
et al.,                         .    50 Walnut Street, 3rd Floor
                                .    Newark, NJ 07102
            Debtors.            .
                                .    August 30, 2023
. . . . . . . . . . . . .             10:09 a.m.

TRANSCRIPT OF SALE HEARING WITH RESPECT TO PHASE I LEASES
BEFORE HONORABLE VINCENT F. PAPALIA
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:          Kirkland & Ellis LLP
                          By:  ROSS J. FIEDLER, ESQ.
                               EMILY E. GEIER, P.C.
                          601 Lexington Avenue
                          New York, NY 10022

                          Kirkland & Ellis LLP
                          By:  CASEY McGUSHIN, ESQ.
                          300 North LaSalle
                          Chicago, IL  60654

                          Kirkland & Ellis LLP
                          By:  CHRISTINE SHANG, ESQ.
                          609 Main Street
                          Houston, TX  77002

                          Cole Schotz, P.C.
                          By:  WARREN A. USATINE, ESQ.
                          Court Plaza North, 25 Main Street
                          Hackensack, New Jersey 07601

Audio Operator:           Juan Filgueiras

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311     Fax No. (609) 587-3599**

2

APPEARANCES (Cont'd):

```
For Pinnacle Hills, LLC: Kelley Drye & Warren LLP
                         By:  ROBERT L. LeHANE, ESQ.
                              CHRISTINE ISAACS, ESQ.
                         3 World Trade Center
                         175 Greenwich Street
                         New York, NY 10007

                         Kelley Drye & Warren LLP
                         By:  WILLIAM S. GYVES, ESQ.
                              PHILIP A. WEINTRAUB, ESQ.
                         3 World Trade Center
                         175 Greenwich Street
                         New York, NY 10007

For Michaels Stores,     Lowenstein Sandler, LLP
Inc.:                    By:  PHILIP J. GROSS, ESQ.
                         One Lowenstein Drive
                         Roseland, New Jersey 07068

                         Lowenstein Sandler, LLP
                         By:  KENNETH A. ROSEN, ESQ.
                         1251 Avenue of the Americas
                         New York, NY 10020

For DPEG Fountains, LP:  Porzio, Bromberg & Newman, P.C.
                         By:  JOHN S. MAIRO, ESQ.
                         100 Southgate Parkway
                         P.O. Box 1997
                         Morristown, NJ 07962

                         Porzio, Bromberg & Newman, P.C.
                         BY:  DEAN M. OSWALD, ESQ.
                         1675 Broadway, Suite 1810
                         New York, NY 10019

For Michaels Stores,     White & Case, LLP
Inc.:                    By:  SAMUEL P. HERSHEY, ESQ.
                         1221 Avenue of the Americas
                         New York, New York 10020

                         White & Case, LLP
                         By:  LAURA E. BACCASH, ESQ.
                         111 South Wacker Drive, Suite 5100
                         Chicago, IL  60606-4302
```

APPEARANCES (Cont'd):

| | |
|---|---|
| For Michaels Stores, Inc. | White & Case, LLP<br>By:  DEVIN RIVERO, ESQ.<br>Southeast Financial Center<br>200 South Biscayne Blvd., Suite 4900<br>Miami, FL  33131-2352 |
| For Burlington Coat Factory Warehouse Corporation: | Womble Bond Dickinson (US) LLP<br>By:  WOJCIECH F. JUNG, ESQ.<br>950 Third Avenue, Suite 2400<br>New York, NY  10022 |

- - -

4

1  (Proceedings commenced at 10:29 a.m.)

2  THE COURT:  Okay.  Good morning.

3  MR. FIEDLER:  Good morning, Your Honor.

4  THE COURT:  It is Wednesday, August 30th --

5  ELECTRONIC INTERRUPTION:  Recording in progress.

6  THE COURT:  Good morning, everyone.  It is Wednesday,

7  August 30, 2023.  This is the United States Bankruptcy Court

8  for the District of New Jersey, and we are here in the case of

9  Bed Bath & Beyond, Inc., et al., 23-13359, and it's an

10  evidentiary hearing with regard to the debtors' motion to

11  assume and assign three leases, one at the Pinnacle Hill

12  Shopping Center, Serramonte, and Fountains.

13  I know you filed an amended agenda last night, so why

14  don't we get started and I have a couple of preliminary

15  comments and then we can proceed.

16  MR. FIEDLER:  Okay.  Great, Your Honor.  Good

17  morning.  Ross Fiedler of Kirkland and Ellis on behalf of the

18  debtors.  I'm joined by my partners, Emily Geier and Casey

19  McGushin, along with my colleague, Christine Shang, and co-

20  counsel, Warren Usatine, from Cole Schotz.

21  THE COURT:  Okay.  Good morning.

22  MR. FIEDLER:  Your Honor, as you noted, we filed an

23  amended agenda yesterday at Docket Number 2085.  As you'll

24  note, there was a rejection motion at Docket 1613, which we've

25  resolved one of the objections, and we'll file an order for

1  Your Honor's consideration.  We have adjourned that rejection

2  motion solely as it relates to the remaining lease in Addison,

3  Texas, to September 12th.

4          But with that, as Your Honor mentioned, we're here

5  today on one key matter, that's the assignment of these three

6  leases.  I'm happy to proceed or if Your Honor wanted to make

7  those preliminary comments.  However Your Honor would like to

8  proceed.

9          THE COURT:  Well, I do have some preliminary comments

10 and questions and they mostly relate to how we're going to

11 proceed today.  The first one is opening statements.  I've read

12 the papers.  I have a good feel for what the facts and

13 arguments are up to this point, certainly.  And I'm fine with a

14 very brief opening statement, and I'm also fine with dispensing

15 with opening statements and also proceeding directly with, and

16 this is going to fall into my second and third questions, the

17 evidentiary presentation.

18         So do the parties wish to make opening statements?

19 And that goes to the --

20         MR. FIEDLER:  Yeah.

21         THE COURT:  -- debtors and the landlords and whomever

22 else is here to be heard.

23         MR. FIEDLER:  Your Honor, I'd like to just make a few

24 comments at the outset to set the stage for the key issues and

25 facts.  I think we can dispense with opening statements.

6

1          On the evidentiary point, which I was planning to

2    make, why don't I just turn to that now.  We do have basically

3    a fully stipulated evidentiary record that consists of the

4    leases, which, as Your Honor noted, is the Pinnacle Hills

5    lease, the Serramonte lease, and the Fountains lease.  Those

6    are the debtors leases.

7          THE COURT:  Right.

8          MR. FIEDLER:  The other leases are the landlord

9    leases with other third-party shopping center tenants.  That's

10   the Hobby Lobby lease, the Dollar Tree lease, and the two Ross

11   Store leases.  We also have testimony, which consists of the

12   declarations and the deposition transcripts.  As to the

13   depositions of Mr. Amendola and Mr. Aronoff, the parties have

14   agreed to certain excerpts to the deposition transcripts which

15   were submitted to chambers last night via email by Mr. Usatine

16   and Ms. Isaacs of Kelley Drye.

17         As to the declarations, those include the Amendola

18   declaration from the debtors at Docket Number 2062; the Aronoff

19   declaration and the Elliott declaration from Pinnacle Hills,

20   filed at Docket Number 1927 and 28, respectively; the Bell

21   declaration from Serramonte filed at Docket Number 1930; and

22   finally, the Dhanani declaration from Fountains at Docket

23   Number 1573.

24         With respect to Serramonte, we have filed the

25   stipulation of facts at Docket Number 2087.

1           THE COURT:  Oh, I didn't --

2           MR. FIEDLER:  I don't know if Your Honor saw that.

3           THE COURT:  That's what I was going to ask, because I

4    thought there was going to be a stipulation of facts, and I

5    didn't see it, so --

6           MR. FIEDLER:  I have a copy if you'd like me to --

7           THE COURT:  Yeah.  I mean, obviously, since I didn't

8    see it, I didn't read it, so I would need a moment to read

9    that.  Are you saying this applies only to the Serramonte

10   lease, or?

11          MR. FIEDLER:  That's right, only Serramonte.

12   Although we do have another stipulation of facts, which I

13   understand was just filed, and that's for the Fountains lease.

14   So, apologies for getting that to Your Honor after the hearing

15   started, but it took a little while to tie the bow on that.

16          THE COURT:  And not as to the Pinnacle --

17          MR. FIEDLER:  Pinnacle Hills, we've agreed to rely on

18   the leases and the testimony, which includes the deposition

19   transcript excerpts that were submitted to Your Honor, as well

20   as the declarations.  Well, certain of the declarations.

21          THE COURT:  All right.  So then, I guess that does --

22          MR. FIEDLER:  So, unless Your Honor has any questions

23   on the evidence, I would, given the agreement on the parties,

24   ask that we submit those documents into evidence.

25          THE COURT:  Yeah.  Well, I'll ask if there are any

8

1  objections.  But I do have that question first, is that it was

2  my understanding that there was going to be some type of

3  evidentiary hearing today with testimony.  But as I understand

4  what you're saying and Mr. Gyves' letter, although I wanted to

5  just confirm it, is that it seems like you're saying there's no

6  more testimony that's going to be needed and we're going to

7  proceed on the record as you just outlined it.

8          MR. FIEDLER:  That's correct, Your Honor.

9          THE COURT:  So are we headed right to the closing

10 argument?  Is that where this is?

11         MR. FIEDLER:  I can give Your Honor just a brief

12 overview to set the stage.  We do have three objections, but

13 they're all very similar and they share a lot of commonalities,

14 and I think we can address each lease objection individually,

15 starting with Pinnacle Hills.  Or if Your Honor would just like

16 to go straight forward with all of them, we can proceed that

17 way as well.

18         THE COURT:  I'm not going to tell you how you present

19 your case.  You can present it in whichever way you believe is

20 most appropriate.  And also, same goes for the landlords.  And

21 to the extent there's any -- I don't think anyone else filed

22 papers as far as I can tell, so I think that's really the scope

23 of it.

24         And then, I just wanted to clarify one other thing.

25 I did have one final question.  The way this was presented to

 1 me, at least initially, and I think almost all throughout

 2 except maybe towards the very end of the submissions, was that

 3 I was being asked to rule on whether the adequate assurance

 4 requirements of 365(b)(3)(C) and (D) were satisfied.  And

 5 that's what this is all about.

 6       There was some discussion of adequate assurance as to

 7 financial condition, but that seemed to have been addressed in

 8 the sense that the debtor said they'll provide whatever they

 9 need, whatever is requested reasonably.  And I thought

10 percentage rent might have slipped in there at the end, too,

11 but it wasn't a focus of anything and I'm not sure there's

12 really much evidence or kind of any evidence on that at at this

13 point.  So that was what I think is my last question.

14       MR. FIEDLER:  Okay.  Yeah.  That's right, Your Honor.

15 It's just 365(b)(3)(C) and (D), and I'll get to that in a

16 moment.  I think before we proceed, if it's all right with Your

17 Honor, if we could just proceed with getting the evidence

18 submitted and then we can go to a statement and argument after

19 that.

20       THE COURT:  Okay.  So the landlord's heard

21 Mr. Fiedler's presentation as to what the evidence is.  And if

22 there's any clarification or addition or whatever that needs to

23 be made, then why don't we do that?

24       MR. FIEDLER:  Your Honor, we also submitted three

25 additional documents relating to the Pinnacle Hills Shopping

10

1   Center directory and stores that were emailed to your chambers.

2   I have them here and we would like to add that to the

3   evidentiary record as well.  The landlord and Michaels are both

4   aware of that as well.

5          THE COURT:  This is different than the PowerPoint

6   that was provided?

7          MR. FIEDLER:  That's right.  This is just an overview

8   of the directory and map of the shopping center at Pinnacle

9   Hills --

10         THE COURT:  Okay.

11         MR. FIEDLER:  -- and the stores therein.

12         THE COURT:  And then, I thought -- I wasn't correct.

13  I said it was my last question, but it wasn't really my last

14  question because there also seems to have been, I want to use

15  the right word, but I thought we were initially talking about

16  the Pinnacle Hills Shopping Center, and then subsequently, the

17  focus was with the whatever hundred-plus stores and

18  subsequently, there was a lot of discussion of the power

19  center, which is, as I understood it, is kind of a subset of

20  the Pinnacle Hills Shopping Center.  But the shopping center we

21  were talking about and I thought that was agreed to was the

22  Pinnacle Hills Shopping Center.

23         MR. FIEDLER:  That is our understanding, Your Honor,

24  and that is part of our argument, that we should be looking at

25  the shopping center broadly and not the power center, which is

1 a subset of collection of stores within the broader shopping

2 center.  But, yes, we will certainly touch on that.

3          THE COURT:  All right.

4          MR. FIEDLER:  Okay, so --

5          THE COURT:  Mr. LeHane.  Yeah.

6          He wanted to comment.  I invited other comments on

7 your presentation.  It sounded like you were done.

8          MR. LEHANE:  Good morning, Your Honor.  Robert

9 Lehane, Kelley Drye and Warren, on behalf of Pinnacle Hills,

10 the landlord at Rogers, Arkansas, and Daly City Serramonte

11 Center, LLC, the landlord at the Serramonte Center in Daly

12 City, California.

13          With me today are my partner, Bill Gyves, associate

14 Philip Weintraub, and from Brookfield Properties, the owner of

15 Pinnacle Hills, Jeffrey Aronoff is here in Court today, Your

16 Honor.

17          THE COURT:  Okay.  Well, good morning and welcome.

18          MR. LEHANE:  Thank you very much, Your Honor.

19          We know we've got a lot to get through this morning.

20 We appreciate and I agree with Mr. Fiedler's recitation of what

21 the agreements that we've reached with respect to the evidence

22 that should be in the record.  We do have an amendment or a

23 supplement as well with respect to some of the deposition

24 transcripts.  We just want to add and supplement, there are

25 some additional pages of Mr. Amendola's deposition excerpts,

12

1   which Mr. Gyves will point out.  But other than that, we agree,

2   but we would also, for the record, disagree about any agreement

3   on what the relevant shopping center is.  There's no agreement

4   on that and that's subject of today's discussion, Your Honor.

5           Thank you.

6           THE COURT:  All right.

7           So, you were going to tell me those read-ins from

8   Amendola's deposition?

9           MR. GYVES:  Good morning, Your Honor.  Am I okay here

10  or shall I get up there?

11          THE COURT:  Well, I understand that it's better at

12  the podium for recording purposes.

13          MR. GYVES:  Easy enough.

14          Good morning, Your Honor.

15          THE COURT:  Good morning.

16          MR. GYVES:  Bill Gyves, Kelley Drye.

17          The only addition that we would propose and we've

18  conferred with counsel for debtors and Michaels is, in our rush

19  to get you deposition excerpts yesterday, I dropped one page

20  and 14 lines from the Amendola deposition.  So we would like to

21  supplement our Exhibit 6 with Page 42 of the Amendola

22  deposition, Lines 2 through 16.

23          THE COURT:  Page 42, let me get there.

24          MR. GYVES:  4-2, Lines 2 through 16.

25          THE COURT:  Did you say 42?

1          MR. GYVES:  Page 42.

2          THE COURT:  I don't have it.

3          MR. GYVES:  That's what I have.

4          THE COURT:  Okay.  I was looking for it and I didn't

5    see it.

6          MR. GYVES:  That's what I should have gotten to you

7    yesterday.

8          THE COURT:  All right.  Thank you.

9          MR. GYVES:  And that's all we have on that, Your

10   Honor.  Thank you.

11         THE COURT:  9 through?

12         MR. GYVES:  2 through 1-6.

13         THE COURT:  Okay.

14         MR. GYVES:  All right.  Thank you.

15         THE COURT:  Got it.  Thank you.

16         MR. HERSHEY:  Good morning, Your Honor.  Sam Hershey

17   from White and Case for Michaels Stores.  I'm joined by my

18   colleagues Laura Baccash and Devin Rivero.

19         I just want to note for the avoidance of doubt that

20   Michaels also was part of the conversations between the debtors

21   and the landlord regarding how we will proceed today, and

22   Michaels agrees with the agreement that was reached.

23         THE COURT:  Of course.

24         MR. HERSHEY:  Thank you.

25         MR. FIEDLER:  Okay.  Your Honor, with that, why don't

14

1  I proceed.

2         As I mentioned, we have three separate objections

3  filed by three distinct landlords.  These are leases that the

4  debtors are seeking to assign.  They're valuable leases.  It's

5  not disputed that they're under market, which is to say that

6  Bed Bath currently rents these properties for less than the

7  landlord could otherwise rent the property if the debtors were

8  to reject the leases and return the property to the landlords.

9         And so, that's part of the reason why we have

10 substantial bids from Michaels and Burlington to take these

11 leases on.  And I think it's easy to see why the objecting

12 landlords do not want to see their properties assigned to the

13 new tenants on the current lease terms.

14        Despite having had the opportunity to participate in

15 the auction for these leases by putting forth competitive bids

16 just like everyone else, the landlords opted not to.  They're

17 now looking to claw back their leases by other means.

18 Specifically, as Your Honor noted, there are two really

19 distinct, I'll say, novel legal arguments at play.

20        First is that the landlord --

21        THE COURT:  Can I stop you, though, for one second?

22 I don't want to interrupt your flow, but you said they did not

23 bid at the auction of landlords.  What significance do you want

24 me to attach to that?

25        MR. FIEDLER:  The significance, Your Honor, is they

1  had the opportunity to bid for an under market lease and get

2  their lease back by the auction process that was established by

3  the debtors.  But in their decision, they opted not to, and now

4  are trying to stand in the way of the lease assignments by

5  mischaracterizing the law and not participating in the debtors'

6  auction process.  Also at --

7        THE COURT:  But are you saying that they had some

8  obligation to do that or --

9        MR. FIEDLER:  Not necessarily, Your Honor, that they

10 had an obligation, but we have Michaels and Burlington paying

11 significant amounts for these leases, nearly $1.5 million, and

12 we don't have a backup bidder.  And so there's a lot of money

13 at stake for the debtors' estate and its stakeholders in a case

14 where, as you've seen, every dollar really matters.

15        But as I was mentioning, two distinct legal

16 arguments.  First, the landlords are arguing that the Bed Bath

17 lease would violate, the lease assignment would violate

18 365(b)(3)(C) because it would breach an exclusive provision set

19 forth in the landlord's lease, not with the debtors but with

20 some other unaffiliated third party in the shopping center.

21        The second main argument the landlords make is that

22 the proposed assignments to Michaels and to Burlington would

23 disrupt the tenant mix and balance in the underlying shopping

24 centers, purportedly in violation of 365(b)(3)(D) of the

25 Bankruptcy Code.  Your Honor, as you'll hear today from the

1  debtors, from Burlington, from Michaels, none of these

2  objections can survive legal scrutiny, much less the evidence

3  in the record before you.

4         So, overall, Your Honor, throughout these cases, the

5  debtors have been really successful in monetizing the value of

6  their leases and if the proposed assignments are approved, as I

7  mentioned, there's nearly $1.5 million set to inure to the

8  estate for the benefit of key stakeholders.

9         Let me just also say this, Your Honor, there have

10 been hundreds of leased properties up for auction in these

11 cases and issues have been raised by landlords with a number of

12 the proposed lease sales.  And that's evidenced by the jam-

13 packed docket that Your Honor has seen.  But valid objections

14 have been filed and the debtors have exercised their discretion

15 appropriately to address those objections.  And so there's been

16 a number of valid use restrictions in the debtors' leases where

17 the debtors chose not to proceed with valuable lease sales.

18        But here is a little different, Your Honor.  The

19 debtors can't sit back and abide by any land grabs by the

20 landlords to recapture their under market leases, not only as a

21 result of not participating in the auction, but in

22 characterizing the law it fundamentally at odds with the

23 existing authority.  So, that's just a flavor of the issues,

24 Your Honor.  I'm happy to just turn to argument now on the

25 Pinnacle Hills lease, if that's acceptable to you.

1          THE COURT:  So I guess that's where we are.  So we're

2  really going straight to oral argument.

3          MR. FIEDLER:  That's right, Your Honor.

4          THE COURT:  Okay.  That wasn't exactly the way I

5  thought it was going to proceed but that's fine, so why don't

6  we get started?

7          MR. FIEDLER:  Okay.  Great.  Thank you, Your Honor.

8          THE COURT:  Does anyone have any issue with that?

9              (No audible response)

10          THE COURT:  Okay.

11          MR. FIEDLER:  So, Your Honor, Pinnacle Hills first,

12  where I'd like to start is the plain terms of the Pinnacle

13  Hills lease, which clearly permit the debtors to assign the

14  lease to Michaels, and the landlord hasn't proposed anything

15  that would suggest otherwise.

16          So, first, under the Pinnacle Hills lease, the

17  debtors are authorized to use the premises for any permitted

18  use, and that term is broadly defined as any lawful use not

19  specifically prohibited by Section 13.11 of the lease.  And

20  when we turn to that section of the lease, the language

21  provides that the tenant cannot use the premises, one, for any

22  prohibited use, or two, in violation of any of the existing

23  exclusives.

24          Now, on the first point, prohibited uses, those are

25  identified in Exhibit L of the lease, and they include things

1  like laundromats, medical centers, tattoo parlors, and other

2  non-retail uses.  They do not, however, include things like the

3  operation of a Michaels store.  And the debtors believe the

4  landlord is largely in agreement with that.

5        I'd just point Your Honor to Page 69 of Mr. Aronoff's

6  deposition transcript.

7        THE COURT:  All right.  Let me just grab that.

8  This is Amendola.

9        MR. FIEDLER:  I know, there's a lot.

10        THE COURT:  Okay.  Page 69?

11        MR. FIEDLER:  Page 69.

12        Essentially, Mr. Aronoff was asked whether after his

13  review of Exhibit L whether any of the prohibited uses on that

14  exhibit raised an issue as to Michaels store and the operation

15  of a Michaels store and whether that would violate any of the

16  enumerated uses in that exhibit.  And Mr. Aronoff clearly

17  confirmed that they didn't.  And I think that's not only

18  evidence that this operation of a Michaels store is permitted

19  as it doesn't violate any of the enumerated uses in that

20  exhibit, but the landlord hasn't proposed anything to suggest

21  otherwise.

22        The second point I'd make is on the existing

23  exclusives.  Section 13.3.1 of the lease obligates the debtors

24  to honor the existing exclusives that are identified in

25  Exhibit K1 of the lease.  The existing exclusives include eight

1  tenants, none of them are Hobby Lobby or Dollar Tree. And I

2  think Mr. Aronoff acknowledges that fact in Page 72 of his

3  deposition transcript.

4          But more importantly, Your Honor, the Pinnacle Hills

5  lease and the discussion of existing exclusives expressly

6  disclaims any obligation by the debtors to honor any exclusives

7  besides the existing exclusives. And what that's getting at is

8  really any future exclusives. And on this point, I think

9  there's a few points to note from Mr. Aronoff's testimony,

10 which is first, on Pages 76 and 77, Mr. Aronoff acknowledges

11 that the Bed Bath lease makes clear that if an exclusive is not

12 expressly mentioned in that Exhibit K1 of the Bed Bath lease,

13 then it is not binding on Bed Bath which is, I think, an

14 important point, Your Honor, that there are no exclusives

15 within the lease that would prohibit the assignment to

16 Michaels.

17         Second, Your Honor, on Pages 74 and 75 of his

18 deposition transcript, Mr. Aronoff acknowledges that there was

19 never an amendment to the Bed Bath lease with the landlord that

20 would have bound Bed Bath to the Hobby Lobby or the Dollar Tree

21 exclusives. And in fact, the landlord never asked for such an

22 amendment, even though it had the option to.

23         And what's interesting here, Your Honor, is that the

24 landlord has had an opportunity previously to offer that to Bed

25 Bath. Years ago, when the landlord was agreeing to bring Hobby

 1  Lobby into the shopping center, it had to look to Bed Bath to

 2  get express approval for entering into the Hobby Lobby lease.

 3  And as Mr. Aronoff makes clear in his testimony, that prior

 4  amendment to the Bed Bath lease, which included allowing Hobby

 5  Lobby to come into the shopping center, did not include any

 6  exclusive for Hobby Lobby or any other tenants in the shopping

 7  center.

 8          And so while the landlord had the option to ask for

 9  that, for some reason it chose not to.

10          THE COURT:  What did you refer to pages of the --

11          MR. FIEDLER:  Yeah.  That was Page 74 and 75 and 76

12  and 77 of the deposition transcript.

13          THE COURT:  Okay.

14          MR. FIEDLER:  And, Your Honor, as the debtor's

15  witness, Mr.  Amendola, makes clear in his declaration, leases

16  often include these sorts of future exclusives and landlords

17  expressly require tenants to comply with the future exclusive,

18  and that was noticeably missing from the Pinnacle Hills lease.

19  And so, I think it's clear, Your Honor, that just based on the

20  plain language of the lease, an assignment to Michaels does not

21  violate the prohibited use or the exclusive use provision or

22  any other provision in the lease.

23          And, Your Honor, since the landlord is unable to show

24  that the plain terms of the Pinnacle Hills lease prohibit the

25  assignment to Michaels, the landlord instead turns to a gross

 1  mischaracterization of the language of Section 365(b)(3)(c) to

 2  stand in the way of the assignment.

 3      As Your Honor is aware, there's two key elements to

 4  365(b)(3).  When a debtor looks to assume and assign a lease,

 5  first, assumption and assignment of such lease is subject to

 6  all provisions thereof.  And second, it will not breach any

 7  such provision contained in any lease, financing arrangement,

 8  or master agreement relating to such shopping center.

 9      And I think what's important to note here, Your

10  Honor --

11      THE COURT:  What is the gross mischaracterization

12  there?  I mean, I understand the various arguments as to why

13  your side is saying that really refers to leases to which the

14  debtor was subject, but doesn't it say any other lease in the

15  shopping center?

16      MR. FIEDLER:  Your Honor, I think the case law on

17  this is very clear, both in the Toys case, the Trak Auto case,

18  the cases from SDNY and Martin Paint Stores and Ames Department

19  Stores, which is that that language is referring to any lease

20  that the debtors have entered into or master agreement relating

21  to the shopping center that the debtor has entered into.  And

22  it cannot be the case, and Congress did not intend it to be the

23  case, that the debtor would be bound by potentially several

24  hundred provisions in hundreds of leases to which it could not

25  possibly know about because it never negotiated those leases,

1  it never signed off on the provisions in those leases,

2  primarily because here, the lease that the debtor entered into

3  came well over 10 years before the other leases that the

4  landlords are referring to.

5      THE COURT:  Am I allowed to, I think you just kind of

6  implicitly said that that is what it says, but they can't have

7  meant that.  So, it says it, but you're asking me to say that's

8  what it says, but it can't be what they meant.

9      MR. FIEDLER:  Well, I think --

10     THE COURT:  Isn't that what the argument is?

11     MR. FIEDLER:  I think there's two points on that,

12 Your Honor.

13     The language says it will not breach any such

14 provision contained in any other lease, right?  And it is a

15 tenant of contract law that a party can't breach a contract to

16 which it was never a party.  And so that language is referring

17 to leases that the debtor had actually entered into or master

18 agreements that document the terms of the shopping center,

19 which we noticeably don't have here in the Pinnacle Hills

20 lease.

21     THE COURT:  But isn't the landlord saying, and I

22 don't want to steal anyone's thunder, but isn't the landlord

23 saying that in response to that argument that the lease between

24 Hobby Lobby and the landlord is being breached?  And that's a

25 lease in the shopping center.

1  MR. FIEDLER:  That's right, Your Honor, but the lease

2  is being breached by the landlord not the debtor, and I think

3  what's important to note here is the legislative history which

4  really supports the reading that the debtors and Michaels have

5  proposed, which is that Congress intended this language to

6  preserve the landlord's rights in respect of its lease with the

7  debtor and any other applicable agreements, and that includes

8  master agreements to which the debtors had entered into.

9  Specifically, when enacting 365(b)(3), the House

10 Judiciary Committee discussed the import of looking at the

11 debtor lease.  And I'm quoting from a report which says, "A

12 shopping center is often carefully planned and apprised, and

13 though it consists of numerous individual tenants, the center

14 is planned as a single unit, often subject to a master lease or

15 financing agreement.  Under those agreements, the tenant mix in

16 a shopping center may be as important to the lessor as the

17 promised rental payments."

18 And I know we're delving a bit into tenant mix, but I

19 think it's abundant and clear that the House Judiciary Report

20 and the other legislative history bits that are cited in our

21 papers make clear that the master lease or the financing

22 agreement that Congress speaks of is one in which the debtor,

23 as the shopping center tenant, had entered into and made itself

24 bound by.

25 And I think, Your Honor, the <u>Toys</u> case rightly

1 recognized this, and you'll hear a lot about the <u>Toys</u> case

2 because the facts there are nearly identical to the facts here.

3 And there, the Court said that the assignment could go through

4 because the assignment did not violate the terms in the

5 debtor's lease, which the debtor had bargained for with the

6 landlord.

7      And I think what that court was getting at is what

8 is, not only did Congress not intend for a debtor to be bound

9 by several hundred leases, but recognized the practical

10 importance of not making a party bound by a contract to which

11 it has no clue about what's in it. And so I think any other

12 reading, including the reading that the landlords propose,

13 would lead to the absurd result that the debtors must be

14 knowledgeable about the terms, provisions of potentially

15 hundreds of other contracts to which they never entered into.

16      THE COURT: So the argument really is that the plain

17 language says what it says, and the general rule is that if the

18 language is plain, the analysis really ends there unless it

19 leads to an absurd result and that's what's being argued here.

20      MR. FIEDLER: Well, that's right, Your Honor. I

21 think the plain language was intended to refer to leases and

22 other agreements to which the debtors were actually party to.

23 And the legislative history supports that and the fact that it

24 would lead to these absurd results and unjust results that a

25 debtor would be bound by a contract it has no clue about

1 clearly weighs in favor of not only the debtors' reading of the

2 statute, but the several other courts that have read the

3 statute the same way, both in <u>Toys</u>, in <u>Trak Auto</u>, and a number

4 of the SDNY cases.

5       THE COURT:  So then it's even a little further than

6 that.  It's kind of the flip of the landlord plain language

7 argument.  You're saying the plain language of (b)(3) and (C)

8 refers to only the lease with the debtor.

9       MR. FIEDLER:  That's right, Your Honor.  Or any

10 master agreement that the debtor had entered into as part of

11 the shopping center arrangement.

12       THE COURT:  But don't I have to go to legislative

13 history or other sources to get to that?

14       MR. FIEDLER:  Well, I think, Your Honor, yes, the

15 case law is pretty clear.  I did not see one case cited in the

16 landlord's, not only Pinnacle Hills' landlord, but the

17 Serramonte and Fountains landlord briefs, which said a court

18 was looking to something other than a debtor's lease in

19 analyzing the assignability of a contract under 365(b)(3).  So

20 I think that's important to note that accepting the landlord's

21 reading would really be breaking ground here and at odds with

22 all of the existing case law as well as the legislative

23 history.

24       THE COURT:  Okay.

25       MR. FIEDLER:  With that, Your Honor, I'd like to turn

1  to the landlord's reading of 365(b)(3) as it relates to

2  365(f)(1), which really turns a blind eye to the fundamental

3  protection that the bankruptcy accords debtors, which is, as

4  Your Honor's aware, the Code greatly favors the debtors' free

5  assignability of its contracts.  And in that spirit, courts,

6  both in this circuit and others, acknowledge that

7  Section 365(b)(3) of the Bankruptcy Code is not meant to be

8  read in isolation, but rather is meant to be read in

9  conjunction with 365(f), which it explicitly cross references.

10       And this is exactly what the Court held in the

11  Delaware case in <u>Rickel Home Centers</u>.  And so when interpreting

12  365(f), courts have construed the terms of leases to not only

13  render unenforceable lease provisions would prohibit assignment

14  outright, but also those lease provisions that are so

15  restrictive that they constitute *de facto* anti-assignment

16  provisions.

17       And here, Your Honor, I can't think of a more clear

18  *de facto* anti-assignment provision than the imposition of the

19  exclusivity provisions in the Hobby Lobby lease and the Dollar

20  Tree lease, which --

21       THE COURT:  But doesn't it say (f)(1) says except as

22  provided in (B) and (C) of 365?  And wasn't it amended to make

23  that clear.

24       MR. FIEDLER:  That's right, Your Honor.  But as the

25  <u>Toys</u> court pointed out, and as the Fourth Circuit held in <u>Trak</u>

1    <u>Auto</u>, that did not mean that 365(f)(1) can never be used to

2    invalidate a clause prohibiting or restricting assignment in a

3    shopping center lease.  And I think that is largely exactly in

4    line with Congress's intent, which is that what Congress meant

5    in focusing on restrictive provisions was to focus on those

6    provisions that are in a debtor tenant lease that it had agreed

7    to.

8            And to the extent the bankruptcy court at the time

9    was seeking to disregard those covenants in a proving

10   assignment, that is what Congress intended to avoid.  And so, I

11   think the provisions that are in the Hobby Lobby lease and the

12   Dollar Tree lease are not binding on the debtors simply because

13   they constitute *de facto* anti-assignment clauses under

14   365(f)(1).

15           THE COURT:  But all they're saying is that -- in

16   other words, let's just say, for example, that the Hobby Lobby

17   lease was entered into before the Bed Bath & Beyond lease, and

18   there was restriction on that.  That would prohibit the

19   assignment, right?

20           MR. FIEDLER:  Well, I think, Your Honor, to engage in

21   your hypothetical, there have been a number of objections in

22   these cases filed because there were prior in time exclusives,

23   and the debtors didn't go forward with those assignments in

24   part because they were prior in time.  Here, we're talking

25   about leases that came at least 10, in some cases, 15 years

1 after the debtors entered into their lease.  And so --

2          THE COURT:  Right.  So it's not -- so but I guess

3 that -- my point was that it's not that C is an anti-assignment

4 clause or prohibits the assignment.  It just says a valid

5 restrictive use has to be honored in a shopping center lease,

6 right?

7          MR. FIEDLER:  Well, I think, Your Honor, Congress was

8 clear that those restrictive provisions are those to which the

9 debtor tenant had agreed.  As explained by Senator Hatch in the

10 Congressional House Report, he's made clear that it is my

11 understanding sorry, I'll start over.

12          Congress decided that use or similar restrictions in

13 a retail lease, which the retailer can't evade under non-

14 bankruptcy law, should not be evaded in bankruptcy.  It's my

15 understanding from Mr. Hatch that some bankruptcy judges have

16 not followed this mandate.  Under another provision of the

17 Code, Section 365(f), a number of bankruptcy judges have

18 misconstrued the Code and allowed the assignment of a lease

19 even though the terms of the lease are not being followed.

20          And clearly in that language, Mr. Hatch is referring

21 to the lease that the debtors had entered into.  And so I think

22 that's important to note that 365(f)(1) can be used or should

23 be viewed in conjunction with 365(b)(3)(C) to prevent the

24 assignment, or to allow the assignment of a lease despite a

25 restrictive covenant in a lease in which the debtors were not

1  party to.

2        So, unless Your Honor has any other questions on

3  that, I'd like to turn now to tenant mix, which as Your Honor

4  is aware, the landlords assert that the proposed assignment to

5  Michaels will disrupt tenant mix and balance in violation of

6  (b)(3)(D) of the Bankruptcy Code. All of the evidence in the

7  record and the controlling legal precedent on this tells a very

8  different story, Your Honor.

9        As Your Honor may know, as with 365(b)(3)(C),

10 365(b)(3)(D) must be interpreted to refer to the contractual

11 protections in the debtors' lease or a master lease in which

12 the debtor had been party to. That is directly from the Ames

13 Department Stores case the Toys R Us opinion as well. And,

14 Your Honor, as I've mentioned, there's no master lease or

15 similar arrangement in the Pinnacle Hill Shopping Center, which

16 you would ordinarily suspect at a shopping center. And the

17 landlord really hasn't pointed to any provision within the

18 debtors' lease that would speak to the intent to maintain some

19 sort of tenant mix and balance in the shopping center that

20 would otherwise prohibit the assignment to Michaels. But --

21        THE COURT: Well, what about the one that allows them

22 to terminate? I understand that's not enforceable in

23 bankruptcy, but what about the one that allows them to

24 terminate if they don't agree with the proposed use?

25        MR. FIEDLER: That's right, Your Honor. The landlord

1  does assert that Section 15 of the lease it has a right to

2  terminate the lease outside of bankruptcy.  But they do

3  acknowledge that that provision would be an anti-assignment

4  clause unenforceable in Chapter 11.  But what the landlord

5  conveniently omits is that the landlord would be required to

6  pay the tenant substantial damages in the case it were to

7  terminate the lease based on a proposed unacceptable

8  assignment.

9         So by blocking the assignment in Chapter 11 and not

10 paying the tenant substantial damages that it otherwise would

11 outside of Chapter 11, the landlord is asking the Court to

12 enlarge the bargain for protections that it had agreed to back

13 when it signed the lease.  And, Your Honor, the debtors don't

14 think that is appropriate, nor does the case law support that.

15        THE COURT:  But my question to you was, I thought

16 your argument was that they didn't deal with the use in the

17 lease.  And I think the argument that's being made is that they

18 dealt with it by saying it's a termination if they don't like

19 it and they have to pay substantial damages or whatever the

20 damages are.  I don't really know what they are.  But they have

21 to pay damages if they don't agree with the use.  That feels

22 like they were concerned about the use to me.

23        MR. FIEDLER:  Well, I think, Your Honor, this goes

24 back to the point I made a little while ago, which is, if the

25 landlord really thought that the coexistence of Michaels and

1   Hobby Lobby and Dollar Tree and Michaels would be detrimental

2   to the tenant mix, they would have negotiated that in the

3   debtors' lease.  And they had the opportunity to do so when

4   they asked Bed Bath & Beyond to waive the otherwise prohibition

5   on Hobby Lobby coming into the center.

6           And so Mr. Aronoff made clear in his deposition

7   testimony that they had the opportunity to do so and they opted

8   not to.  And I think that speaks to the fact that the landlord

9   is not seeking to -- there hasn't been an intent within the

10  lease to maintain tenant mix and balance.

11          But I do want to hit on one rather interesting and I

12  think flawed point, which Your Honor mentioned at the outset of

13  the hearing, which is that despite the clear language in the

14  statute referring to shopping center, when looking at tenant

15  mix, the landlord is saying we must look at a few stores within

16  the shopping center and not the whole shopping center itself.

17  And I think that's a very dangerous argument to make, Your

18  Honor, because the shopping center is clearly defined in the

19  lease as encompassing the entire Pinnacle Hills property, not

20  just the power center, which is only consisting of 12 stores

21  and a fraction of the square footage of the over million square

22  feet shopping center.

23          And I think --

24          THE COURT:  I was going to ask Mr. Lehane that

25  because that's what I thought it said as well.

1          MR. FIEDLER:  Yeah.

2          THE COURT:  I guess we'll save that for when he's up

3    here.

4          MR. FIEDLER:  I think, Your Honor, I'd like to point

5    the Court to page 65 of Mr. Aronoff's declaration.  And more --

6    sorry, not his declaration, his deposition transcript.

7          When Mr. Aronoff was asked whether referring to in

8    analyzing tenant mix of the large complex, which is called the

9    Pinnacle Hills Shopping Center, as defined in the lease,

10   whether he was looking at that in analyzing tenant mix, or

11   whether he was looking at analyzing tenant mix just in respect

12   to the power center, he confirmed, and I quote, "that the

13   Pinnacle Hills Shopping Center was not in our discussion.  It

14   was only the power center."

15         And like I mentioned, the definition of shopping

16   center in the lease clearly refers to Pinnacle Hills Shopping

17   Center as a whole, and it's not in any way limited to any

18   subdivision within the shopping center like the power center.

19   And I believe Mr. Aronoff acknowledged that in Pages 40 and 41

20   of his deposition transcript.

21         So, it's therefore really unclear, Your Honor, what

22   evidence the landlord has put forward as to the lease agreement

23   itself and the shopping center to support the notion that

24   tenant mix is somehow disrupted at the shopping center as a

25   whole.  And so, I don't think it's appropriate, Your Honor, to

1  look to a few stores within a shopping center that has over a

2  hundred stores and over about a million square feet and limit

3  the tenant mix analysis to just about 250,000 square feet.

4         But, again, if we were to analyze tenant mix outside

5  of the intention of the contractual terms that the debtors

6  agreed to, like I said, there's over 100 stores in the Pinnacle

7  Hills Shopping Center.  There's at least 28 women's clothing

8  stores, five children's stores, five department stores, six

9  electronic stores, seven jewelry stores, and more and more.

10 And of those a hundred, many of them sell the exact same items.

11 But what is more telling is that over a hundred of those

12 stores, there's only two stores that the landlord has

13 identified that sell craft items.  And not even both of those,

14 the landlord admits, are not craft focused retailers.

15        And I'd like to point the Court to Page 46 and

16 Page 48 of Mr. Aronoff's deposition transcript.  Here, after

17 scrolling through the entire tenant roster of the Pinnacle

18 Hills Shopping Center with Mr. Aronoff, Mr. Aronoff admitted

19 that Hobby Lobby was the only craft focused retailer in the

20 shopping center and that he didn't know whether Dollar Tree was

21 even a craft focused retailer, though he acknowledged they do

22 engage in the selling of certain craft items.

23        And so, adding another retailer like Michaels that is

24 engaged in the selling of craft products certainly does not

25 disrupt the tenant mix of a shopping center with over a hundred

1   stores and perhaps two that are engaged in the sale of craft

2   products.  But, I think more telling, Your Honor, is as

3   explained in Mr. Amendola's declaration, Michaels and Hobby

4   Lobby coexist in at least 30 shopping centers across the

5   country.  And the landlord generally agrees with that.  Indeed,

6   Ms. Elliott's declaration acknowledges that at at least 19 of

7   those locations, those two tenants coexist and likely more.

8           And the same is true of Dollar Tree and Michaels.

9   And I think for that reason, Your Honor, there is a reason for

10  that, Your Honor, and Mr. Amendola makes that clear in his

11  declaration, which is that companies, particularly retailers,

12  actually like to be located in close proximity to their

13  competition because of the additional foot traffic it would

14  bring, not only their store, but to the shopping center as a

15  whole.

16          And assuming Michaels was a direct competitor of

17  Hobby Lobby and Dollar Tree, which I'm not sure they are, those

18  tenants may gain the additional foot traffic from bringing

19  Michaels in there.

20          THE COURT:  You're not sure if Hobby Lobby and

21  Michaels are direct competitors?  Or Hobby Lobby and Dollar

22  Tree?  Or both?

23          MR. FIEDLER:  Michaels and Hobby Lobby and Michaels

24  and Dollar Tree.

25          THE COURT:  You're saying Michaels and Hobby Lobby

1  are not competitors?

2      MR. FIEDLER:  I think, Your Honor, Mr. Aronoff's

3  testimony focuses on Hobby Lobby being a craft focused

4  retailer, and so it's possible that they are competitors.  They

5  likely are.  But certainly not with respect to Dollar Tree.

6      But I think, Your Honor, the more important point is

7  Congress's intent when enacting 365(b)(3), which I've hit on a

8  bunch, which was to preserve the bargain for exchange between

9  the parties and that's the debtor tenant and the landlord.  And

10 so, as I've mentioned, if there was any issue that the landlord

11 foresaw with tenant mix and balance in bringing a store like

12 Michaels into the shopping center, they would have negotiated

13 that in the Bed Bath lease.  And I really don't think it's

14 appropriate for the bankruptcy court to entertain the

15 landlord's request to enlarge the rights in its lease in

16 Chapter 11 that it otherwise wouldn't have outside.

17     Lastly, Your Honor, I'd like to just turn to the rent

18 abatement and damages point that was raised by the landlord

19 where the landlord argues that the proposed assignment should

20 be denied because if the lease is assigned, the landlord may be

21 subject to certain rent abatements by Hobby Lobby under the

22 terms of the Hobby Lobby lease.  I think this argument fails on

23 many grounds, Your Honor, and is frankly irrelevant to the

24 discussion of the assignability of the contract under

25 365(b)(3).

1          First, Your Honor, there's nothing in the case law,

2   and the landlord hasn't pointed to a case, that suggests a

3   bankruptcy court must consider a landlord's supposed expected

4   losses from its other contractual arrangements with other

5   parties that the debtors don't know about as a result of the

6   assignment of the lease.  As the bankruptcy court in the <u>Ames</u>

7   <u>Department Stores</u> case explained, Congress has determined that

8   subject to certain statutory safeguards, the value of the

9   debtors' leases should go to the debtors' creditors and that

10  leases may be sold to achieve that end with or without the

11  landlord's consent.

12          There is one point I'd like to make about the Hobby

13  Lobby lease, which is there is an express provision in that

14  lease related to rent abatement, which says in the event the

15  tenant violates the Hobby Lobby exclusive without the

16  landlord's consent, then rent abatement would be triggered.

17  And I think, Your Honor, by overruling the objection and

18  maintaining the status quo with respect to the language of

19  365(b)(3), the landlord would have met that requirement and

20  would not be subject to the damages that it claims it might be.

21          That's the same view that the <u>Martin Paint Stores</u>

22  case took in the Southern District of New York, as well as the

23  view that the <u>Toys</u> court took in the Eastern District of

24  Virginia that essentially a court order is a judicial action

25  that may render the landlord incapable of complying with a

37

 1  restriction on another lease, and therefore would excuse the

 2  landlord's performance under that provision.

 3       THE COURT:  What Martin Paint Store case are you

 4  referring to because there's a few of them, and I thought, or

 5  at least two, and one of them wasn't even really a shopping

 6  center case as I understood it.

 7       MR. FIEDLER:  I was referring, Your Honor, to cite

 8  199 B.R. 258 (1996).

 9       THE COURT:  I don't have at my fingertips whether

10  that's the one I'm referring to.  I know what Toys R Us says,

11  but I don't know Martin Paints.  At least one of them did not

12  have to address the issue because of well, didn't have to

13  address the issue because it wasn't a shopping center and then

14  there was another one where there was no standing found.  So

15  I'm not sure what Martin Paints adds to the discussion at this

16  moment.

17       MR. FIEDLER:  Your Honor, I think it's really the

18  point that the law excuses performance if there's a legal

19  impossibility of actually performing.  And that's the quote

20  from the Martin Paint case, I believe, which gets to the point

21  here that if the landlord can't possibly consent, it doesn't

22  need to be bound by the abatement provision in the Hobby Lobby

23  lease.

24       So, with that, Your Honor, I think that really

25  concludes my argument.  I will say there is a lot of money at

1   stake here.  We do not have any backup bidders.  The landlord's

2   reading of this statute would call into question any debtor's

3   ability to maximize value of its estate for the benefit of all

4   of its stakeholders, not just the landlord.

5          And I think accepting the landlord's reading of this

6   statute would really jeopardize not only retail debtors but any

7   debtor's ability to restructure in Chapter 11.

8          THE COURT:  Okay.  Thank you.

9          MR. FIEDLER:  Thank you, Your Honor.

10         THE COURT:  I mean, in terms of order, I think we're

11  dealing with the Pinnacle Hills Shopping Center, at least, and

12  Michaels certainly was supportive of that.  It seems to me it

13  makes sense to hear from Michaels and then hear from the

14  landlord.  Otherwise, there might be --

15         MR. FIEDLER:  I think that makes sense, Your Honor.

16         THE COURT:  All right.

17         MR. FIEDLER:  Thank you.

18         THE COURT:  Mr. Hershey.

19         MR. HERSHEY:  Good morning, Your Honor.  Sam Hershey

20  from White and Case on behalf of Michaels Stores.

21         Just a few preliminary notes.  I know that Mr. LeHane

22  transmitted some slides last night and I have some thoughts on

23  those but I think those thoughts are best saved for rebuttal

24  after Mr. LeHane goes through them.  So, I just wanted to up

25  front reserve some time for rebuttal with the Court's

1  permission.

2          I do not have a slide deck for Your Honor.

3  Everything that Michaels wanted Your Honor to consider was in

4  our briefs, and on that note, I do just want to say, at the

5  start of the hearing, Your Honor referenced the debtors' briefs

6  and the landlord's briefs.  Michaels did, of course, also file

7  briefs, specifically a reply at Docket Number 1383, and a sur-

8  surreply on Docket Number 2059.  I just wanted that on the

9  record.

10          THE COURT:  Of course, Michaels has been here

11  throughout.  I apologize for that omission.

12          MR. HERSHEY:  I just wanted to avoid --

13          THE COURT:  I did not forget.  I just omitted that.

14          MR. HERSHEY:  That's all I wanted to confirm.  Thank

15  you, Your Honor.  I appreciate that.

16          Anyway, despite not having slides, I do want to give

17  Your Honor a brief roadmap of where I'm going to go today.

18  There are really, as everyone's observed, two sections of the

19  Code at issue, 365(b)(3)(C) and 365(b)(3)(D).  I'm going to

20  discuss each of them in turn.  I think I will be able to avoid

21  overlapping too much with Mr. Fiedler's argument.  But what I

22  want to do is talk about each, and in respect of each, what the

23  law is and what the law should be.  Because I think what Your

24  Honor will find is that the law overwhelmingly, in some cases

25  totally, supports the debtors' and Michaels' position, but also

1  that's the way it should be, because under the landlord's

2  proposed view of the world, restructurings by retail debtors

3  would be completely impossible.

4         And I'll get there, but before I do, let's start with

5  the actual plain language of Subsection C.  And I will just

6  read it to make things simple.  This is 365(b)(3)(C) starting

7  with (3).

8         "For the purposes of Paragraph (1) of this subsection

9         and Paragraph (2)(b) of Subsection (f), adequate

10        assurance of future performance of a lease of real

11        property in a shopping center includes adequate

12        assurance,"

13  and cutting down to (C):

14        "[T]hat assumption or assignment of such lease is

15        subject to all the provisions thereof, including, but

16        not limited to, provisions such as radius, location,

17        use, or exclusivity provisions, and will not breach

18        any such provision contained in any other lease,

19        financing agreement, or master agreement relating to

20        such shopping center."

21        So, the first thing that becomes really clear,

22  looking at this, is Congress is focused on the lease at issue

23  to be assigned.  We see that in "such lease" and "thereof," the

24  reference is clearly to the lease.  But then of course there is

25  a second part of that talks about other leases, financing

41

agreements, master agreements.  And look, like items are
grouped together.  I forget the Latin expression for that, but
we're talking about a master agreement that is by definition an
agreement that the debtor will be a party to because it applies
to all tenants, a financing agreement, again, an agreement that
would apply to all tenants that a debtor would be party to, and
then I guess where the rubber meets the road is with other
leases.

       And it's perfectly possible to imagine a situation
where a debtor has multiple leases in a shopping center.
Particularly, say, a franchise, where a franchisor might have
multiple franchise locations in the same shopping center.  And
what the Code is guaranteeing to a landlord is that a debtor
will not be able to use the terms of one of its leases to
breach the terms of other leases to which it is a party with
the landlord.

       In other words, the Code is guaranteeing the benefit
of the bargain that the landlord has with the debtor, right,
not giving the debtor greater rights than what are in the
leases that the debtor has actually agreed to.  And on that
note, I think we have confirmation of that point in the use of
the term "breach."

       As Mr. Fiedler observed, and as the landlord has
agreed in its briefing, a party can only breach an agreement if
it is a party to that agreement.  What that means is that the

1   debtors' assignment to Michaels of their lease cannot be a

2   breach by the debtors of the Hobby Lobby lease.  The debtors

3   are not party to that lease.  It cannot be a breach by Michaels

4   of the Hobby Lobby lease.  Michaels is not party to that lease.

5   And I'll take it one step further, I actually disagree with

6   Mr. Fiedler on this point.  It's not a breach by the landlord

7   of that lease with Hobby Lobby.  The landlord standing

8   helplessly by and watching by operation of the Bankruptcy Code

9   its lease be assigned over its objection is not taking any

10  steps to breach that lease.

11          There's no breach of contract claim that Hobby Lobby

12  can now bring against the landlord saying, "You did this, and

13  by doing this, you breached our agreement."  To the contrary,

14  the landlord has been working very hard, as we know full well,

15  to prevent the assignment to Michaels, and therefore, is not in

16  any kind of breach.

17          There is, however, a breach happening here, and I

18  think it needs to be noted.  The breach that's happening here

19  is a breach by the landlord of the debtors' lease.  The

20  landlord is seeking to import into that lease terms that the

21  debtors never agreed to.  And it's worth noting that it's a

22  black letter rule under the Bankruptcy Code that a bankruptcy

23  does not modify a contract.  But that is exactly what the

24  landlord is trying to do by taking terms that were agreed to

25  after the debtors entered into their lease with the landlord

1  and seeking to apply them.

2       THE COURT:  But doesn't the Bankruptcy Code modify

3  contracts all the time, including particularly 365?

4       MR. HERSHEY:  Well, fair enough, Your Honor.  I think

5  there are examples where the Bankruptcy Code carves out

6  exceptions to that rule.  For example, anti-assignment

7  provisions and rules those out.  But it is generally a tenant

8  that, except for those exceptions, there is not a modification

9  to a contract simply by the fact of a bankruptcy which is what

10 the landlord is trying to do.

11      And I'll just note, Your Honor, there was an easy

12 solution to this.  There are multiple easy solutions to this

13 that the landlord could have pursued before bankruptcy, right.

14 The landlord could have written different restrictions into the

15 debtors' lease.  It could have said, this lease is only to be

16 used for bedding, or whatever other purposes Bed Bath & Beyond

17 would use it for.  Or it could have said, this lease is subject

18 to all future exclusives that this landlord may enter into.

19 There are leases that say that.  This is not one of them.

20      The landlord could have had a master agreement

21 between all the tenants in the shopping center that says the

22 leases in the shopping center should be used only for the

23 purposes agreed to in that lease.  That happens as well.  It

24 didn't happen here.  And the Code actually specifically

25 references master agreements for that reason.  And the landlord

44

1  could have bid.  Came to the auction, knew about it, chose not

2  to bid, right.  That would be a way to avoid the damages that

3  it claims it's facing.  I agree with Your Honor, there is no

4  obligation for the landlord to do that, but it was an option.

5  And it could have avoided being here today if it had bid.  It

6  chose not to.  Michaels was the sole bidder at auction with no

7  backup bidder, and that's why we're here today.

8          So moving on from the plain language of the statute,

9  I do want to focus a bit on the cases, and Mr. Fiedler said it

10 perfectly.  Every case that we are aware of that was cited by

11 any party favors the debtors' and Michaels' position.  That's

12 from the Ames case in 1991 from the Southern District of New

13 York to the Trak Auto case, which is by the way the only

14 Circuit level case on this issue from 2004, the Fourth Circuit,

15 all the way up to the Toys R Us case in 2018.

16          And I want to pause there and just note, there's no

17 disagreement among the parties that the Toys R Us case is

18 directly on point.  The facts are squarely on four with what

19 Your Honor is confronting today.  So not only is the landlord

20 asking Your Honor to be the first court to rule differently and

21 break from precedent on these issues, but also to rule against

22 a case that considered these issues directly and decided in

23 favor of the debtors and Michaels.  And we think that's

24 important.

25          THE COURT:  Well, if they're saying that Toys R Us

1  got it wrong.  That's basically it, right.

2       MR. HERSHEY:  Yeah.  Look, Your Honor, I agree.  I

3  will note that Toys R Us is in line with a substantial body of

4  precedent.  There is not a single case that's been cited that

5  rules differently.  So I understand the landlord disagrees with

6  the case.  But all the body of the law that's been cited is in

7  line with Toys R Us.

8       I'll note, and Mr. Fiedler touched on this, it's not

9  just the case law that supports the debtors' and Michaels'

10 position, the Congressional record is crystal clear that what

11 Congress was seeking to protect was the landlord's bargain for

12 protections in its lease with the debtors.  That's why so many

13 of the cases that come out our way quote the Congressional

14 record, and I'm going to do the same.  Here's a quote.

15            "When an owner enters into a use clause with a retail

16            tenant forbidding assignments of the lease for a use

17            different than that specified in the lease, that

18            clause should be honored."

19       All right.  That was Senator Orrin Hatch in 2005

20 talking about the Bankruptcy Abuse Prevention and Consumer

21 Protection Act.  Here's another one.

22            "Congress decided that use or similar restrictions in

23            a retail lease, which the retailer cannot evade under

24            non-bankruptcy law, should not be evaded in

25            bankruptcy."

46

1  Again, Senator Hatch focusing on the terms of the lease.

2         And last, this is from the House report on the Act

3  that I just mentioned.

4         "Section 404(b) amends Section 365(f)(1) to assure

5          that Section 365(f) does not override any part of

6          Section 365(b).  Therefore, for example, assumption

7          or assignment of a lease of real property in a

8          shopping center must be subject to the provisions of

9          the lease, such as use clauses."

10  Again, Congressional focus on the lease itself.  There is not a

11  single example I'm aware of of Congress focusing on anything

12  other than the provisions of the lease and the landlord's

13  bargain for benefits under that lease.

14         Now, there is one case that the landlord tries to

15  rely on in support of its argument under Subsection C, excuse

16  me.  That's the Sears case.  And I'll just pause here and say

17  it must have been a very difficult decision by the landlord to

18  cite that case because Sears completely supports the debtors'

19  and Michaels' position on Subsection D.  And for that reason,

20  I'll be coming back to Sears momentarily when I get to

21  Subsection D.

22         But in the meantime, I want to note two things.

23  First, the landlord's reliance on Sears isn't really based on

24  Sears' discussion of Subsection C.  It's based on Sears'

25  discussion of Subsection A and the sort of application of that

1  Subsection C, or that discussion, rather, to C.  There's no

2  basis for that in the Sears decision.  The Sears decision never

3  says and this analysis should be applied to Subsection C.  In

4  fact, the Sears analysis completely disclaims such an

5  application.  And I'll just read from that case where the Sears

6  court, and this is I can give Your Honor the pincite.  It's

7  613 B.R. 51, 78.

8         The Sears court refers to 365(b)(3)(A) as having more

9  stringent requirements and saying that it differs substantially

10  from how a use clause or restriction on assignment addresses

11  the landlord's ability to control the look and feel of its

12  property.  The Sears court also says, "The Bankruptcy Code,"

13  this is, sorry pincite 70, same case, "The Bankruptcy Code

14  cannot be read to place the landlord in a better position than

15  it would have occupied absent the bankruptcy."

16         And that's actually a good segue to the point I want

17  to make about what the law should be, right.  The landlord's

18  position in bankruptcy and outside of bankruptcy.

19         Let's look at how things would work if the landlord

20  had its way, okay.  There's no dispute that outside of

21  bankruptcy, this lease could be assigned to Michaels.  There's

22  no provision limiting the assignment right of Bed Bath & Beyond

23  to assign to Michaels.

24         THE COURT:  Other than the termination.

25         MR. HERSHEY:  Other than the termination provision,

1 which is --

2        THE COURT: But that's a pretty big other, isn't it?

3        MR. HERSHEY: Well, fair enough, Your Honor, except

4 to note that focusing specifically on the use provisions, which

5 I think are what's relevant here because the termination right

6 doesn't apply in bankruptcy, I think that's what we have to

7 look at, is what Congress intended for the exclusive

8 provisions. That's what C focuses on, so let's look at that.

9        There's no use provision, no exclusive use provision

10 that would limit the assignment to Michaels. Now, under the

11 landlord's perspective, if the landlord had its way, the

12 debtors would be limited in their ability to assign their lease

13 not just by the terms that they negotiated and agreed to, but

14 by the terms of every other lease in the shopping center that

15 they had no part in negotiating and never agreed to. And in

16 fact, in this case, were negotiated and agreed over a decade

17 after the debtors negotiated their lease.

18        Not only that, these are terms that the debtors do

19 not know and cannot know. They are confidential, commercially

20 sensitive terms in lease agreements that are not public and are

21 not made public. And we know this firsthand because when this

22 dispute started, we asked the landlord for a copy of the Hobby

23 Lobby lease, and they refused. And when we pressed, they gave

24 us this, which is on the docket. This is the redacted copy of

25 the Hobby Lobby lease. Pages and pages of redactions of terms

1 that we still don't know and we can't know, right, but that the

2 landlord might come forward and say, actually, there's this

3 term that you had no way of knowing about, that's secret and

4 confidential, but that bars you from making this assignment.

5     THE COURT:  But I mean, if there was something in

6 there that supported their position.  If there was, for

7 example, if there was a use restriction in there or some other

8 term that indicated that, for example, Bed Bath & Beyond had

9 agreed to it, or they had to go get their consent or something

10 like that, I would --

11     MR. HERSHEY:  Well, presumably, Your Honor, if we

12 agreed to the term, we would know about it or we'd be subject

13 to it.  We would say, if we, for example, had in our lease a

14 clause that said, "This lease is subject to all future

15 exclusives," right, we would be saying, we may not know what

16 those exclusives are, but we're subject to them.  There's

17 nothing like that here.  We have no ability -- we've never

18 agreed to those terms.  We have no ability to know them.

19     And I get it.  I mean, the last thing a landlord

20 wants is for one tenant to know what's in another tenant's

21 lease.  It makes perfect sense why these would be secret and

22 confidential.  But what the landlord is arguing is that debtors

23 effectively go into bankruptcy blind giving up their rights

24 under their lease and making themselves subject to all other

25 leases not knowing what those leases say.  That cannot be what

1  the law is.

2          And to be clear, we're not talking about a small

3  number of terms that the debtor makes itself subject to.  I

4  want to turn back, actually, to the language of the statute,

5  which I read, which says that the assignment must comply with

6  certain terms and, here I'm going to quote, "including but not

7  limited to, provisions such as radius, location, use, or

8  exclusivity."

9          So that's four specific terms, "radius, location,

10  use, and exclusivity," that the landlord claims it can rely on

11  to block an assignment, but it's not limited, right.  It's

12  "including, but not limited to."  There's a potential infinite

13  number of terms that the landlord can come into court and say,

14  because this term is in another lease that the debtor never

15  agreed to, never negotiated, didn't know about, we are able to

16  block the assignment.

17          And here's where things get a little interesting.

18  The landlord argues in its surreply, and Mr. Fiedler touched on

19  this, that only the leases in the power center, which is a 12-

20  store subset of the 100-store promenade, can be used to block

21  the assignment.  And we all know why the landlord made this

22  argument.  Because the landlord doesn't want to make the

23  extreme argument.  There are hundreds of leases with hundreds

24  and hundreds of terms that it could rely on.  It wants to try

25  to limit its position to focus just on 12 because the Court may

1 be more likely to agree if the position is less extreme.  I

2 have three responses to that.

3 And the first is that even if we were just talking

4 about 12 other leases, based on the four non-exclusive terms in

5 the statute that I just read, that's about 50 terms still that

6 the landlord could come into Court and argue, any one of which

7 blocks the assignment.  But second, the landlord is simply

8 wrong.  As Mr. Aronoff acknowledged in his deposition, and as

9 clear in the terms of the lease, and I'll read the lease,

10 Section 1134 says the following, creates the defined term

11 shopping center.

12 And it says, "The shopping center, known as Pinnacle

13 Hills Promenade, located in Rogers, Arkansas, consists of two

14 retail shopping centers, which shall be operated as a single

15 integrated shopping center.  One, the so called big box center,

16 in which the premises shall be located, containing

17 approximately, whatever, square feet.  That's called the power

18 center.  And, two, the regional outdoor mall anchored by

19 certain stores designated the promenade."  Okay.

20 The lease makes crystal clear that as far as the

21 plain terms of the debtors' and the landlord's agreement are

22 concerned, there is just one shopping center, and all of these

23 terms apply to that shopping center with 100 plus stores.  And

24 the last thing I'll say on this point is that, regardless of

25 the legal distinction under the lease between the 12-store

52

1  power center, the 100-store promenade, it's really irrelevant,

2  because whatever this Court rules doesn't just apply to this

3  case.  It applies to every case.  As we note in our brief, the

4  result of the Court ruling in the landlord's favor is that

5  debtors will have fewer rights in bankruptcy than they would

6  have out of bankruptcy.

7          Out of bankruptcy, as I said, and subject to I

8  understand the termination provision, but just focusing on the

9  use provisions, there's no dispute that a tenant's ability to

10  assign its lease is based solely on the terms of its lease, and

11  the terms of other leases to which it is not party are

12  irrelevant.  But in bankruptcy, according to the landlord, all

13  that changes.  In bankruptcy, even if the debtors' lease had no

14  provision that would preclude a proposed assignment, as is the

15  case here, the landlord can step forward and say, "Sorry.

16  Lease Number 67 has this term that prevents the assignment."

17  Or, "Sorry.  Lease Number 114 has this term, and you can't make

18  the assignment."  That's not what the law is.  It's not what

19  the law should be.

20          I'm going to turn quickly to Subsection D.  I think I

21  can be brief here.  I'm going to touch on the evidence,

22  although I think Mr. Fiedler did an excellent job with it, and

23  I'm going to largely rest on his discussion of the evidence.  I

24  also think the parties have sort of moved on from the evidence.

25  As Your Honor observed, we were supposed to have a big

1  evidentiary hearing.  That's not what happened today.  And I

2  think the reason for that is really this is about the law, and

3  that's always been Michaels' position, and I think the cases

4  bear that out.

5          And in terms of the law, the best place to start is

6  the Sears case because the landlord relies on that case, and I

7  don't think the landlord can credibly argue that the Sears

8  court got it exactly right on one subsection of 365(b)(3), but

9  exactly wrong on another section of 365(b)(3).  And on

10 Section 365(b)(3)(D), Sears completely supports the debtors'

11 and Michaels' position.  And I'll just read from that case.

12 This is at pincite 74.

13          "Put more generally, where there are few or no use

14          restrictions on a demised premises,"

15 I want to pause and just focus on use restrictions, because

16 that's what the Court considered, not other terms, not related

17 to use restrictions, but use restrictions.

18          "[A]nd the assignee agrees to be bound by whatever

19          restrictions do exist,"

20 as the (indiscernible) has here,

21          "[A] court may deem the adequate assurances under

22          365(b)(3)(D) to have been given."

23 That's it.  Right.  The focus is on the lease, the use

24 restrictions in the lease, and whether those are satisfied.

25          And there is no dispute that with respect to the use

54

1 provisions here, those are satisfied, and therefore so is

2 365(b)(3)(D).

3        Now, Sears also does a very good job, and I want to

4 note this, distinguishing the one case the landlord identifies

5 in support of its position on Subsection D, and that's the

6 Federated Stores case, which is out of Ohio from 1991.  And

7 what Sears observes is that the landlord's ability in that case

8 to block the assignment under Subsection D was based not on

9 protections the landlord received or bargained for under the

10 debtors' lease, but rather under the debtors' plan that of

11 course was entered into subsequent to the lease, and obviously

12 that's not the case here.

13        Now, with regard to the evidence, I want to make just

14 one point.  I think I have to address the Powers declaration.

15 We're not putting it into evidence today and I just didn't want

16 to not say anything about it.  But what I do want to note is

17 that I don't think we even need it in evidence because the

18 Elliott declaration submitted by the landlord basically puts

19 everything in the Powers declaration into evidence for us.  And

20 in particular, what the Elliott declaration shows is that

21 Michaels and Hobby Lobby coexist in dozens of shopping centers,

22 in some cases, right next door to each other.

23        The last thing I want to touch on is I want to

24 address the landlord's alleged damages that it claims it will

25 incur from the assignment to Michaels, which, by the way, are

1  damages that it bargained for and it agreed to under the Hobby

2  Lobby lease.  But look, in the first instance, I would note

3  that those damages are illusory.

4        Under the Hobby Lobby lease, as long as the landlord

5  makes good faith efforts to object to the assignment, damages

6  cannot be enforced.  Moreover, Mr. Fiedler, and I know Your

7  Honor discussed this, the <u>Toys</u> case expressly addressed this

8  issue and held that if the Court enters an order approving the

9  assignment, then the landlord is not in breach.

10        Second, the landlord's alleged damages, even if real,

11  are simply irrelevant.  There is no provision of the Code that

12  instructs the Court to consider those damages.  And I don't

13  mean to be glib here, but as Judge Glenn of the Southern

14  District once said to me, sometimes in restructurings, people

15  get restructured.

16        There are hundreds, thousands of unsecured creditors

17  in this case who are recovering pennies on the dollar.  There

18  are lots and lots of people who could stand up before Your

19  Honor and complain about what's happening to them in this

20  bankruptcy case.  And it happens every day of every week of

21  every month of every year in this building.  That's bankruptcy

22  court.  It's just how it is.

23        Now, the Bankruptcy Code does provide certain special

24  protections to landlords, and those provisions should be

25  enforced.  But what the Court should not do is create new

56

1  protections that have no basis under the law and that impede

2  the ability of debtors to restructure, as the landlord seeks to

3  do here.

4          Thank you.

5          THE COURT:  But isn't the argument that, the whole

6  argument is it's not a new protection, it's what it says.

7  That's the whole argument.

8          MR. HERSHEY:  Well, that no court has ever found to

9  exist.  I mean, that's why it's new.  Yeah.  Yes, Your Honor.

10 No court has ever found this.  The Congressional record doesn't

11 indicate it.  That is the basis for my saying it would be a new

12 protection for this Court to break new ground and break from

13 precedent, frankly.

14         THE COURT:  Okay.  Thank you.

15         MR. HERSHEY:  Thank you, Your Honor.

16         THE COURT:  Mr. LeHane.

17         MR. LEHANE:  Good afternoon, Your Honor.  Robert

18 LeHane, Kelley Drye and Warren, on behalf of Pinnacle

19 Hills LLC, the landlord at Rogers, Arkansas, and also Daly City

20 Serramonte Center, the landlord at the Serramonte Center.

21         Your Honor, it's been briefed extensively.  Just

22 heard a lot from Mr. Fiedler and Mr. Hershey.  The essential

23 summary of our argument, I think they've stated it well, and

24 you, I think, understand it as well.  Our view is the proposed

25 assignment to Michaels will breach use restrictions in two

1  other tenant leases in the shopping center, Hobby Lobby and

2  Dollar Tree.

3        And, Your Honor, those are protected leases.  The

4  fundamental disagreement here is, A, that the statute, we

5  believe, is absolutely clear.  We don't think you need to go

6  beyond the plain meaning of the statute.  We think the Third

7  Circuit is very clear on that in the case law.  We also think

8  it's important to note, the Third Circuit in <u>Joshua Slocum</u>

9  pointed out, this is a very heightened burden.  But since the

10 debtors and Michaels have spent a tremendous amount of time on

11 legislative history, we think it's important then for us to

12 visit the legislative history.  So I want to talk about the

13 plain meaning, the legislative history, and common sense, Your

14 Honor.

15       So, with respect to tenant mix and balance, common

16 sense just tells you when you put the number one competitor one

17 door down from its competitor in a specific arts and crafts

18 retail chain, that you're going to disrupt the tenant mix and

19 balance in that power center.  I'm happy to talk about the

20 shopping center and whether we're defining one larger shopping

21 center that the lease clearly says is two shopping centers

22 later.

23       THE COURT:  But when you say that, it's clear that --

24 but there is evidence that not only that sometimes it's better

25 to have competitors next to each other, but also that, in fact,

1 there's at least two that I recall from Ms. Elliott's

2 declaration that say they're adjacent to each other, Hobby

3 Lobby and --

4        MR. LEHANE:  Right.

5        THE COURT:  -- Michaels.

6        MR. LEHANE:  Right.  Well, I'd like to discuss that

7 when we discuss tenant mix, but I would also submit that tenant

8 mix is about this shopping center, not any other shopping

9 centers.  For that reason, Powers declaration was irrelevant.

10 We went through it because it would have been put in evidence,

11 but it's not relevant to the analysis of this shopping center

12 and tenant mix in this shopping center.

13        But, Your Honor, I think it's helpful to actually

14 look at what we're talking about here and take a look at it.

15 So, what we have here is the Pinnacle Plaza is a 12-store power

16 center that's circled in blue, and it's in the upper right hand

17 corner.  And the promenade is below that, you have the

18 promenade, and it's a much larger number of stores.  If it

19 would help Your Honor, I have this also in paper, so you could

20 look at it on paper.

21        But, the power center is made up of those stores.

22 Bed Bath & Beyond is highlighted in yellow.  There's T.J. Maxx

23 in the middle, and there is the Hobby Lobby store right next to

24 it.  And there are nine other stores in that separate power

25 center, a shopping center, and as the only evidence we have on

59

1  that is from Jeffrey Aronoff, from Senior Vice President, who

2  was involved in this whole project.  He's been there.  He has

3  personal knowledge.  And he specializes in optimizing the

4  tenant mix and balance in shopping centers.

5       This is treated as a shopping center.  Promenade is a

6  shopping center, and, yes, Mr. Hershey read into the record

7  exactly what the lease says.  There's two shopping centers that

8  they operate as one integrated shopping center.

9       THE COURT:  So I'm supposed to effect the plain

10  language on 365(b)(3)(C), but not in the lease?

11       MR. LEHANE:  And the lease as well because the lease

12  says there's two shopping centers that we're going to treat as

13  one integrated shopping center.

14       THE COURT:  As one integrated.

15       MR. LEHANE:  Yeah.

16       THE COURT:  And the parties agreed to it.  That's not

17  even a -- that one I have a hard time with because there's an

18  agreement that it's one integrated center.  So why would they

19  agree that is one integrated center when that's an issue in

20  every shopping center case?  It's used to be an issue, but then

21  landlords dealt with it by saying, this is a shopping center

22  and you got to agree to that, right.  So I'm having a hard time

23  with that.

24       MR. LEHANE:  Okay.  Do you want me to address tenant

25  mix right now?  Or can I go through --

1          THE COURT:  I mean, I think you are addressing it

2   because you're telling me that I've got to consider just the

3   power center, even though that's not what the lease defines as

4   an integrated shopping center.

5          MR. LEHANE:  Well, let me try to encapsulate the

6   argument on that and then I want to walk through this as well.

7          It's the debtors' burden to show that there will not

8   be any disruption in tenant mix and balance in the center and

9   the evidence doesn't show that.  In fact, the evidence shows

10  the opposite.  Both Mr. Aronoff and even Mr. Amendola admitted

11  there will be an impact and there will be a disruption in

12  tenant mix and balance.  It's in both declarations.  So not

13  only do the debtors not have any evidence showing that there

14  will not be any disruption, but the evidence to the contrary

15  shows that there will be a disruption in the tenant mix and

16  balance in the shopping center.

17         So I think the debtors have not met their burden with

18  regard to tenant mix and balance.  It is the debtor's burden

19  and they simply haven't met it.  And common sense says that if

20  you put the number one retailer in arts and crafts one door

21  down from its number one competitor, there's going to be a

22  disruption.  The other evidence, I believe, that this will

23  disrupt the tenant mix and balance is the fact that the two

24  other tenants in that portion of the shopping center have

25  specific provisions in their leases saying that this is a

1  protected use or a prohibited use would be to allow either an

2  arts and crafts retailer specialized in that within this part

3  of the shopping center, the power center, or expressly,

4  Michaels is expressly a prohibited use under the Dollar Tree

5  lease.

6       THE COURT:  What did Bed Bath & Beyond know about

7  that?

8       MR. LEHANE:  Bed Bath & Beyond didn't know anything

9  about it, Your Honor.  That's a great question.  It was

10  executed 15 years before these two other leases were entered.

11  And that gets to the question of the balance between what the

12  shopping center protections did when the Code was enacted in

13  1978, and how the 1978 Bankruptcy Code drastically changed the

14  rights of landlords after the bankruptcy had been filed.

15       So I think it's important, since we're talking about

16  legislative history, to keep in mind, prior to 1978, Your

17  Honor, the lease provisions that said if the debtor files for

18  bankruptcy, I can terminate my lease, that was enforceable.

19  And all the anti-assignment provisions in the leases were

20  enforceable.  So, the Bankruptcy Code does a wonderful thing

21  for debtors and the debtors have done a good job of that here.

22       They have managed to dispose of over 200 leases.

23  They've brought in $65 million.  They've closed on 135 lease

24  assignments.  I think that utterly contradicts their worries

25  that if you read the statute as it's written, as we believe

62

1 it's interpreted, you'll have absurd results.  It's belied by

2 the results that have already been achieved in this case.

3 　　　　But let's also talk about what Congress did when it

4 passed the Bankruptcy Code in 1978 and it put 365 in place and

5 it took out the *ipso facto* provisions in leases and it took out

6 the anti-assignment provisions in leases.  It also very

7 specifically and very intentionally protected shopping centers.

8 Not just the landlords, Your Honor, but all of the participants

9 in the shopping center system.

10 　　　　It expressly protected the other tenants, the solvent

11 tenants.  And it also protected the lenders.  Other parties

12 than the debtor and the landlord are protected.  Let's look at

13 a couple snippets from the actual Congressional record from the

14 Shopping Center's Protections Improvements Act of 1982.  The

15 title of the Act was designed to protect all of the

16 participants in the shopping center.  Why?  Because shopping

17 centers were an incredibly important part of the American

18 economy and they remain so.

19 　　　　In 1978, there was approximately tens of thousands of

20 shopping centers.  Now, there are more than 100,000 shopping

21 centers in the country.  Congress said, shopping centers are an

22 important sector of U.S. retail trade.  The linchpin of the

23 entire operation is the freely accepted and openly negotiated

24 contractual agreements among the parties.  While the operation

25 of the bankruptcy law necessarily alters contractual

63

1  relationships, these alterations have direct and potentially

2  crippling impacts on other shopping center businesses and

3  consequently must be strictly limited and minimized.

4       They also said that Congress recognized and sought to

5  deal with the potential harm to shopping centers and their

6  solvent tenants, which arise when one tenant becomes bankrupt.

7  They weren't talking about what happened when the lease was

8  initially entered into, they were talking about protecting the

9  tenants in the shopping center when one tenant files for

10  bankruptcy and goes to assign the leases.

11       THE COURT:  But which way does this cut, Mr. -- this

12  is the first time I'm seeing this, I think.  I don't know if

13  this was in the papers.  Was this in the papers?

14       MR. LEHANE:  We cited to the Congressional record and

15  we cited to the legislative history in the paper, Your Honor --

16  in our papers, and we'll go back to that.  But --

17       THE COURT:  But which way does this cut?  It says,

18  "The linchpin of this entire operation is freely accepted and

19  openly negotiated contractual agreements among the parties."  I

20  mean --

21       MR. LEHANE:  And then, what it goes on to say,

22  though, is that to the extent the Bankruptcy Code is going to

23  alter the contractual relationships, which it does to the

24  landlord by removing, as you've noted, its right to terminate

25  these leases, right, it must do so in a way that minimizes the

64

1    harm and is strictly limited.  And there's another quote that

2    says, when the trustee is unable to find a lease that can be

3    assumed and assigned without violating use provisions, then the

4    lease should revert to the landlord.

5         So I think we'd like to also walk through adequate

6    assurance of future performance.  And this is part of the

7    Bankruptcy Code since inception.  And 365(b)(1) starts with

8    that it's the debtor's burden to provide adequate assurance of

9    future performance at the time of the assumption of the lease,

10   right.  So this adequate assurance is now.

11        And then 365(b)(3), we've talked about them a lot, A

12   through D, those are the specific, that's the heart of the

13   shopping center protections.  And A and B, Your Honor, really

14   go to the relationship between the landlord and its debtor,

15   right.  A is that the source of rent must be assured and there

16   will be similar financial condition and operating performance

17   between the assignee and the debtor at the time the lease was

18   entered into.  And B says there'll be no reduction in

19   percentage rent.  C and D, Your Honor, go to protection of the

20   other tenants and they have since the inception of the Code.

21        Let's look at what 365(b)(3)(C) looked like when the

22   Code was first passed in 1978.  It was only one clause.  And

23   what it said was that "Assumption or assignment of the lease

24   will not breach substantially any provision, such as radius,

25   location, exclusivity, in any other financing agreement or

1 master agreement or lease relating to such shopping center."

2 It was only one clause, and it only protected the

3 other tenants in the shopping center.  That was the 1978

4 version of the Code.  There was a problem.  Some debtors were

5 arguing that this assignment, even though it will reach the

6 terms of my lease with the debtor, a use, a radius or

7 exclusivity provision, since it won't breach any other leases

8 in the shopping center, then I can go forward and have this

9 assignment and the Court can ignore the provisions in the

10 debtors' lease with the tenant as anti-assignment provisions.

11 So in 1984, the Code was amended to deal specifically

12 with that problem.  And when it did so, it specifically said in

13 the legislative history, the debtors are ignoring the terms of

14 their own leases and arguing that they're only required to

15 comply with the other non-debtor leases.  So the solution was

16 to break this provision into two clauses and make sure that in

17 connection with an assignment that the assignment can't breach

18 the terms of the lease between the landlord and the debtor and

19 similarly, will not breach any such provision with any other

20 lease financing arrangement or agreement relating to such

21 shopping center.

22 THE COURT:  I didn't see any case that -- and maybe

23 you can tell me otherwise.  I didn't see any case pre-'84 or

24 after '84 that cited to a provision in a lease to which the

25 debtor was not party, or a master agreement to which the debtor

1 was not party, or a financing agreement to which the debtor was

2 not subject, that said, this is how it works.

3      MR. LEHANE:  Well, we would submit, Your Honor, that

4 the plain language of this statute is so clear that it's never

5 before been litigated to final decision until Toys R Us in

6 2018.  That's really the only decision.  And as we've pointed

7 out at length in our briefs, the Toys R Us decision is deeply

8 flawed.

9      First, it relies on Trak Auto.  Your Honor, Trak Auto

10 didn't deal with other leases.  It dealt with the lease that

11 the debtor had with the tenant and it went in favor of the

12 landlord because the debtor tried to assign a lease to someone

13 that was not an auto supplier.  Trak Auto was an auto supplier

14 and that lease said you have to be an auto supplier in order to

15 use this.  And so Trak Auto, in favor of the landlord.  It does

16 not support the logic of the Toys R Us decision.

17      *In dicta* in that, Trak Auto talks about Ames.  And

18 unfortunately, the Ames decision that they refer to was also

19 not about 365(b)(3)(C).  So, Toys R Us also ignores the whole

20 second clause.  We really believe it's a deeply flawed decision

21 and it's not binding on this Court.

22      THE COURT:  Okay.  So you're saying it's just because

23 it's so clear, it's not litigated.

24      MR. LEHANE:  It hasn't been litigated.

25      THE COURT:  Okay.

67

1          MR. LEHANE:  So there's also the common sense portion

2     of it and what Congress was clearly trying to do in the

3     legislative history was protect all of the participants in a

4     shopping center, not just the landlord.  And we've heard

5     argument that it's only protecting agreements with the

6     landlord.  Financing agreements, Your Honor, are oftentimes the

7     agreements between the landlord and its lender.  And they

8     may --

9          THE COURT:  Right, and they're recorded.

10          MR. LEHANE:  Right.

11          The debtor wouldn't be -- no tenant would be a party

12     to a financing agreement between the landlord and its lenders.

13     But those are also protected agreements.  There also may be

14     reciprocal easement agreements.  The Three A's Holdings case is

15     a good example, and there's others, where the agreement that's

16     being referred to that can't be breached is some zoning

17     agreement, agreement with adjacent property owners, or a

18     municipality stating -- the debtors have nothing to do with

19     those.  The tenants don't enter into those agreements, the

20     landlord does.

21          THE COURT:  But in Three A's, it was a restriction to

22     which the debtor was subject.  And the financing agreement

23     either would be recorded or would be disclosed in the lease as

24     saying this is a restriction in the use, so therefore, you

25     can't do it.  So, that's different than any other lease

68

1 being -- any lease that is entered into 14 years later, or a

2 lease that the debtor doesn't know anything about, and it's

3 troubling to me.

4          I'll be completely forthright.  The plain language

5 argument, I get it.  It's a good argument.  And this argument

6 is a good argument, too.  The debtors' argument and Michaels'

7 argument is a good argument also.  I think they're good

8 arguments both ways.  I guess I'm having a little bit of

9 trouble with a fundamental fairness kind of issues to how you

10 make somebody subject to the terms of a contract with somebody

11 else that you have no knowledge of.  It's hard to -- there was

12 discussion of common sense on the mix.  This gets into common

13 sense as well.

14          MR. LEHANE:  Yeah.  And I think, Your Honor, the

15 answer to that is, though, that outside of bankruptcy, the

16 landlord still had the right to terminate these.  And maybe

17 there would have been some economic consequences or damages,

18 and outside of bankruptcy, they can weigh that.  They could

19 have said, hey, Michaels wants to move into the vacant Bed

20 Bath & Beyond space.  We're not in bankruptcy.  We will suffer

21 damages, our other tenants, Dollar Tree, and Hobby Lobby.  The

22 provisions in their leases allow them to assert damages us, and

23 they could weigh that.  But the Bankruptcy Code removes that

24 right, right.

25          THE COURT:  Let me ask you this, Mr. LeHane.  You're

69

1  a well regarded, experienced, knowledgeable landlord lawyer,

2  right.  And doesn't this look like, and I like looking at words

3  of documents and things like that.  When you look at the lease,

4  Pinnacle Hill Lease with Bed Bath & Beyond, it looks like the

5  landlord, with its really capable lawyers, negotiating and

6  using its bargaining power with respect to Bed Bath & Beyond,

7  which I think at the time was a very, very powerful and

8  desirable tenant, going back and forth on lease terms, and they

9  came up with a recognition that, you know what, we might put

10 these use restrictions in here and have these issues in here,

11 or these limitations in here, but if there's a problem and, for

12 example, in this case, some crazy bankruptcy court says you can

13 assign this anyway, as long as you fight it, I'm not faulting

14 anyone for using violation in the objection.

15        But to say violation in the lease, right, as opposed

16 to breach, it shall be a breach of the lease to assign to

17 someone outside the use restriction.  If it's to say a

18 violation is different than a breach and doesn't give right, it

19 wouldn't even give rise to any enforcement right because they

20 dealt with it and that was a function of the bargaining power

21 between the parties that Bed Bath & Beyond negotiated for a

22 freely assignable lease.

23        And the landlord said, yeah, I want to get you in

24 here and I got you in here and I had to give up the veto right,

25 I guess, over the use restriction.  But, A, I'm dealing with it

1 in this challenge provision and, B, then I can just go ahead

2 and enter into a contract or lease with Hobby Lobby and say,

3 you can't have one of the stores that was expressly permitted

4 by the assignment in the BBB Pinnacle Hills lease.

5          That's a lot.  Okay.  That's like --

6          MR. LEHANE:  I want to answer your question if I

7 can --

8          THE COURT:  Usually, to be subject to something,

9 you've got to agree to it.

10          MR. LEHANE:  Well, excuse me?

11          THE COURT:  To be subject to something, you have to

12 agree to it usually, right?  I mean --

13          MR. LEHANE:  True.  But I think it's important to

14 keep the background context.  The landlord had rights and only

15 the bankruptcy filing of Bed Bath & Beyond took those rights

16 away.  The Bankruptcy Code takes a bunch of rights away, but at

17 the same time it then protects the participants in that

18 complicated economic unit.

19          THE COURT:  And isn't the landlord protected?  So if

20 the Hobby Lobby lease was entered into before the Bed Bath &

21 Beyond lease and there was a use restriction that said you

22 can't have a Michaels in here in the Hobby Lobby lease, we

23 wouldn't be talking about this.  It would be over.  Right?

24          MR. LEHANE:  That's correct.

25          THE COURT:  We would be done.  The landlord

1  couldn't --

2          MR. LEHANE:  Wait, excuse me, in the Hobby Lobby

3  lease?

4          THE COURT:  I'm sorry?

5          MR. LEHANE:  In the Hobby Lobby lease, there is.  It

6  says you can't allow Michaels.

7          THE COURT:  I'm sorry.  In the Hobby Lobby lease

8  before the Bed Bath & Beyond.  If the timing was reversed,

9  right.  The timing was reversed.  Hobby Lobby is before --

10          MR. LEHANE:  Bed, Bath --

11          THE COURT:  -- Bed Bath & Beyond --

12          MR. LEHANE:  Certainly --

13          THE COURT:  And then, the Bed Bath & Beyond lease

14  says you can't, you can assign, but you can't assign to another

15  arts and crafts store.

16          MR. LEHANE:  Right.

17          THE COURT:  Then the landlord is fully protected with

18  respect to the benefit of its bargain, right?

19          MR. LEHANE:  Right.  But the landlord can only

20  protect the benefits of bargain to the extent it knows what its

21  shopping center looks like now.  And shopping centers are

22  dynamic places, right.  The leases don't all terminate at the

23  same time.  Things change over time, as evidenced by the Dollar

24  Tree lease and the Hobby Lobby lease, which have come in within

25  the last five years.  The situation now is drastically

1 different than it was 15 years ago when the Bed Bath & Beyond

2 lease was put in place.  And Congress specifically protected

3 the shopping centers now, at the time of the assumption, by

4 giving protections to those other tenants for the situation

5 now.  And I think that's the plain meaning of the argument.

6        You can drive down really deeply on breach versus

7 violation, but the plain reading and the way the statute was

8 originally written was this is going to protect the other

9 tenants against the failure of one tenant now, and the harms

10 aren't that tremendous and terrific.  I will say the original

11 bid that Michaels put in for this was $100,000, Your Honor, and

12 there has been exponentially greater amount of time spent on

13 that because the absurd results that have been suggested by

14 counsel for Michaels and the debtor, we would say are

15 contradicted by the tremendous results achieved to date.

16        Whereas, the Toys R Us decision we believe is wrong

17 and we believe following it would do extreme harm and undermine

18 the specific protections that Congress intended the other

19 participants in the shopping center industry to have.  And it's

20 a very careful balance.

21        And also, I'll say this.  There's a lot of, or not a

22 lot, but some mention by both Mr. Fiedler and Mr. Hershey that

23 there's nothing in the Bankruptcy Code that could otherwise

24 protect these landlords against these harms.  And that's just

25 absolutely incorrect as well.  There's a very broad provision

1    that says -- it's 363(e) -- anytime the debtor sells, uses, or

2    leases anything that another party has an interest in, the

3    bankruptcy court shall provide adequate protection to the other

4    parties with an interest in that property being used, sold, or

5    leased.

6         That's a very broad provision.  It's used in a lot of

7    other contexts, right, and the Bankruptcy Code weighs and

8    balances the harm when it's considering lifting the automatic

9    stay or considering the appointment of examiners.  It

10   oftentimes demands that the courts look to the potential harms

11   by what's going to happen.

12        Here we have a very specific provision of the

13   Bankruptcy Code.  Congress said you must protect the shopping

14   centers not just the landlords, but the other parties as well.

15   The financing agreements, the master agreements, and the other

16   leases in the shopping center.  And we think a very plain

17   language, common sense read is why there's very little

18   litigation on this.

19        I think if you read the decisions underlying Toys R

20   Us, they're deeply flawed.  And with respect to Sears, the

21   important point of Sears, that the district court said this is

22   a heightened standard, and the bankruptcy courts can't just

23   rewrite the standards that Congress put in place because they

24   don't like them.  And why it's relevant here is because, in

25   that case, it went to, A, it was the financial condition and

74

1  the judge found that transform is perfectly fine.  It's got a

2  net worth of $50 million, but he also found it is not of

3  similar financial condition to the debtor when the tenant

4  entered into this lease because when Sears entered into the

5  initial lease, it was one of the most powerful financial

6  companies in the world.  They just were not similar.

7       And the district court judge said you may be correct

8  that it is significant financial wherewithal, but that's not

9  what the Bankruptcy Code says.  And what the Bankruptcy Code

10 says is very specific and clear and you can't just rewrite that

11 to suit your purposes.  So we think that here it would be

12 suiting the purposes to let one narrow set of transactions go

13 through that really is a very small subset, even of the total

14 leases the debtors has tried to assign.  They've assigned 135

15 leases successfully.  We're hung up on three of them because

16 they fall within protections that Congress provided to the

17 Bankruptcy Code.

18      That's less than 5 percent of their total lease

19 assignments.  It's far less than the total amount of leases

20 that they had, Your Honor.  So, look, we understand that it's

21 very important for the debtor to maximize its value.  Both of

22 these clients are also creditors of the estate, right.  But it

23 is a liquidating company, right, and they are difficult

24 decisions.  We don't think that the need to maximize value

25 trumps the protections that Congress granted to the shopping

1 centers.

2          And in short, you --

3          THE COURT:  How about in the _Sears_ case that I

4 thought -- I think that was Judge McMahon.

5          MR. LEHANE:  It was.  Colleen McMahon.  Correct.

6          THE COURT:  She went into a very, very detailed and

7 thoughtful discussion about D, and how -- which D runs --

8          MR. LEHANE:  The D argument --

9          THE COURT:  -- in all candor, completely contrary to

10 your C argument in a lot of ways, and your D arguments, because

11 you said you just got to look at it in the context of the

12 bargain between the debtor and the landlord.

13          MR. LEHANE:  But you need to have evidence that there

14 will be no disruption and she found there was no evidence of a

15 disruption.

16          Here, to the contrary, the only evidence that we have

17 is that there will be a disruption.  Not only from the

18 declaration of Jeff Aronoff, who specializes in tenant mix and

19 balance, right.  He worked on these properties specifically.

20 He's been there.  This is what Jeff Aronoff does, right.  And

21 he said there will absolutely be an impact, and a negative

22 impact, on the tenant mix and balance in the shopping center.

23          THE COURT:  But if you look at it in the context of

24 the Hobby Lobby Pinnacle, I mean, I'm sorry, Bed Bath & Beyond

25 Pinnacle lease, is it fair for Pinnacle Hills to get Hobby

1   Lobby as a tenant in part on the basis of the free

2   assignability clause, and then, 14 years later, enter into a

3   lease with a third party that they know nothing about, that Bed

4   Bath & Beyond knows nothing about, and then restrict that very

5   broad assignment provision?  Isn't that kind of having it both

6   ways?

7          MR. LEHANE:  They had the right to terminate outside

8   of bankruptcy, Your Honor, and --

9          THE COURT:  Yeah, but you know that that's one that's

10  not the 365(f) --

11         MR. LEHANE:  Right.

12         THE COURT:  -- and all that.  That's different.  But

13  you know, that the other, as far as the B and C and all that.

14  But I'm just having a bit of a more difficult time with that.

15  It just seems like an unintended benefit to parties that

16  were -- to the landlord who got the benefit of the tenant in

17  the first place, and then just eviscerates it by entering into

18  another agreement 14 years later that restricts the use in a

19  manner that wasn't contemplated by that lease.

20         MR. LEHANE:  Well, look, we think it's, in my mind,

21  it's commercially reasonable for them to say Bed Bath & Beyond

22  can use that for whatever they want to now, right.  But, and if

23  Bed Bath & Beyond changed its use, there was nothing that

24  Pinnacle Hills could have done or the Pinnacle power center.

25         THE COURT:  Arts and crafts.

77

1         MR. LEHANE:  Right.  Bed Bath & Beyond had an

2   unlimited lawful use, right.  But the point is, once you file

3   for bankruptcy, you stop paying rent, you can reject the lease,

4   completely breach it, right.  And our claims under that are

5   capped and we'll get paid whatever it is.  In this case, there

6   will probably be no return.  And we no longer have that right

7   to terminate.  That was really the protection they had, was to

8   say, if we're in a situation where the assignment is going to

9   breach these other two leases, we have the ability to say, hey,

10  Bed Bath & Beyond, you can't do that assignment.

11        And obviously, at that point, Bed Bath & Beyond has

12  decided they want out if they're going to assign it outside of

13  bankruptcy.  And the landlord and Bed Bath & Beyond, by that

14  15.1.2, are able to have that negotiation, essentially.

15        THE COURT:  So, if Bed Bath & Beyond just was doing a

16  reorganization and part of the reorganization was that they

17  were going to shift their focus from bed and bath to arts and

18  crafts, and Hobby Lobby was already there, right, Hobby Lobby

19  was already in there as an arts and crafts store.

20        MR. LEHANE:  We would have a very different

21  conversation going on, Your Honor, because if there's no

22  assumption in an assignment of the lease, right, and then I

23  believe that --

24        THE COURT:  No, I said assumption.  I said there is

25  assumption.

78

1          MR. LEHANE:  Right, but there's no assignment.

2          THE COURT:  Right.

3          MR. LEHANE:  Right, there's just assumption for

4    purposes of changing their use.  I think it's a very different

5    conversation.

6          Bed Bath & Beyond had almost unfettered use of the

7    premises, and that is different.

8          THE COURT:  Why?

9          MR. LEHANE:  Because there's no assignment and the

10   Bankruptcy Code is very clear about this.

11         THE COURT:  So what?

12         MR. LEHANE:  So you don't get your shopping center --

13         THE COURT:  If I do the plain language, right --

14         MR. LEHANE:  Yeah.

15         THE COURT:  If I do the plain language, wouldn't them

16   changing to the -- it says the assumption or assignment, it

17   doesn't say the assumption and assignment.  It says assumption

18   or assignment is subject to the provision of any other lease.

19   And the Hobby Lobby lease says you can't have another arts and

20   crafts store.  Why is that different?

21         MR. LEHANE:  Perhaps we would be -- I haven't

22   considered this one before, Your Honor.  I guess it is.

23   It's --

24         THE COURT:  It's not a bad argument.

25         MR. LeHANE:  It's not a bad one.  It's a good one.

1                          (Laughter)

2              THE COURT:  All right.

3              MR. LeHANE:  And, look, going to 365(d)(3) to tenant

4   mix to (d), it used to say substantial disruption.  It doesn't

5   anymore.  They amended it, right.  It's now any disruption, and

6   it's their burden to show that there will not be any

7   disruption.  And I think the evidence that we have shows that

8   there will be a disruption.  So as a result, I think the

9   assignment also fails on the tenant mix arguments.

10             THE COURT:  Okay.  All right.

11             MR. LeHANE:  You know, Your --

12             THE COURT:  I appreciate that.  I thank you.  Well, I

13  guess parties wanted some rebuttal, and we'll get to 12:20.  So

14  I don't know what the plan is with regard to the other leases.

15  Can you help me on that?  Is that --

16             MR. LeHANE:  So I think I probably can from my

17  perspective, Serramonte Center.  We also represent Daly City

18  Serramonte Center.  And many of the arguments are almost

19  exactly the same.  There may be some nuance to them, and

20  counsel for Burlington or the debtors may want to make some.

21             But those are -- you have competitors, Burlington,

22  Ross.  And the Ross leases, it's undisputed that they have

23  provisions in them which say you can't operate a certain

24  percentage of the square footage in this center as a discount

25  retailer, and that's what Burlington would be operated as.  So

1 the argument is you'll be breaching these.

2    Now there's some nuance to those, but I think the

3 larger arguments are the same, that Congress was protecting the

4 landlord and the shopping center and the other tenants.

5    THE COURT: Even if they didn't have an agreement?

6    MR. LeHANE: Right. Yeah.

7    THE COURT: Debtor.

8    MR. LeHANE: Yeah, I think --

9    THE COURT: Or warrants subject to something that's

10 --

11    MR. LeHANE: That's right.

12    THE COURT: -- runs with the land --

13    MR. LeHANE: Right.

14    THE COURT: -- like a master -- like the reciprocal

15 --

16    MR. LeHANE: Yeah.

17    THE COURT: -- easement agreement and/or restrictive

18 covenants or a master agreement or -- well, that might not run

19 with the land.

20    MR. LeHANE: Yeah.

21    THE COURT: But a financing agreement, that kind of

22 thing.

23    MR. LeHANE: Can you put the one other slide up,

24 Phil?

25    There is one quote from the congressional legislation

1 that we think is, it's actually exactly the same hypothetical

2 that we have here where the legislative history says if you had

3 a women's wear store assigned to a men's wear store, that could

4 have a negative impact on the other men's wear stores in the

5 shopping center and we're protecting against that, that with

6 both (c) and (d).

7      So certainly appreciate it, but the similarities

8 between the arguments, Serramonte lease also has the right to

9 terminate.  The 15.2.1, it's almost exactly identical, right.

10 And it would clearly breach the Ross exclusive protective use

11 provision.  Happy to answer any other questions on that.

12      THE COURT:  I asked you enough questions.

13      MR. LeHANE:  All right.  Thank you, Your Honor.

14      THE COURT:  Thank you.

15      MR. MAIRO:  Your Honor, for the record, John Mairo of

16 Porzio Bromberg & Newman on behalf of the Landlord DPEG

17 Fountains, LP.  Are we going to conclude with the Pinnacle

18 arguments and then turn to Serramonte and DPEG?  That's how I

19 understood it.  Or are we trying to do it all in one enchilada?

20      THE COURT:  Well, I think that's exactly the question

21 I had.  And I think what Mr. LeHane said is that it's really

22 the same arguments with Serramonte, just perhaps some nuances.

23 So I think the rebuttal, unless you're going to just tell me

24 that you agree with what Mr. LeHane said and then that would be

25 for rebuttal for them, I guess.  Unless you want to make new

1  and different arguments.

2         MR. MAIRO:  I certainly want to argue for DPEG

3  Fountains some different arguments.  I don't know if it makes

4  sense to do it now or let them rebut to the Pinnacle and

5  Serramonte.

6         THE COURT:  I think we might as well just finish

7  Pinnacle right now, so yeah.

8         MR. FIEDLER:  Okay, Your Honor.  I'll be fairly quick

9  here.  Just --

10        THE COURT:  Everybody says that.

11        MR. FIEDLER:  Yeah.  Just a few points on rebuttal.

12        Mr. LeHane talked about common sense at the outset.

13 Not common sense to put the number one competitor next to each

14 other.  I don't know if they're the number one competitor, but

15 the landlord acknowledges in Ms. Elliott's declaration that it

16 happens all the time.  At least 19 times and perhaps 30 times

17 are they next to each other.

18        And so I think the common-sense argument in that

19 respect is a little far-fetched.  I will also say there was

20 nothing prohibiting Hobby Lobby from entering into an amendment

21 with the landlord right when Bed Bath filed to add every

22 exclusive under the sun under its lease just knowing that Bed

23 Bath might assign its lease out to another party.

24        And so it would be unfathomable to think that the

25 debtors would be bound by an amendment to that lease that adds

1 say 100 exclusives including every other store that Bed Bath or

2 Bed Bath was seeking to assign to a new tenant.  And so common

3 sensically, I don't think we should be binding the debtor to a

4 lease that is subsequent in time and which the debtor had no

5 clue was entered into.  That's the first point on common sense.

6      The second point is on tenant mix.  The landlord

7 asked the Court to look to the Power Center and not the

8 shopping center.  And I think the inquiry ends right there.

9 The shopping center is clearly defined in the lease as one

10 integrated shopping center that includes the Power Center and

11 the Promenade.  And it would be one thing if the landlord said

12 the tenant mix and the Power Center will certainly be upset but

13 the tenant mix and the whole shopping center will be upset, as

14 well.  They didn't do that.

15      As Mr. Aronoff made clear in his testimony in his

16 declaration, it wasn't even part of the discussion to address

17 the shopping center.  They only addressed the Power Center, and

18 there's a reason for that, because there was no intent behind

19 tenant mix and use for the entire shopping center.  And even if

20 there was, the landlord can't prove that it's disrupted by

21 adding Michaels.

22      I will also say, Your Honor --

23      THE COURT:  What about I think he said that you don't

24 have any evidence that the tenant mix won't be disrupted?

25      MR. FIEDLER:  Well, I think there's a wealth of

1  evidence, Your Honor.  First, the idea that there are over a

2  hundred stores in the shopping center and the landlord admits

3  that there's only one that is engaged in a craft item-oriented

4  business and that's Hobby Lobby.  The other potentially being

5  Dollar Tree, the landlord couldn't even confirm if that was a

6  craft-oriented business.  And granted, they do sell craft

7  items, but there are several other stores in the shopping

8  center that sell the same exact items.

9          Further, there's nothing in the lease or in a master

10 agreement relating to the shopping center that specifies some

11 intent to get to tenant mix and balance.

12         THE COURT:  There is a master agreement?

13         MR. FIEDLER:  There is not.

14         THE COURT:  No.

15         MR. FIEDLER:  And that's my point, Your Honor.

16         THE COURT:  I thought you said there's nothing in the

17 lease or the master agreement.

18         MR. FIEDLER:  Or a master agreement.  There --

19         THE COURT:  There's no --

20         MR. FIEDLER:  There is no --

21         THE COURT:  There's nothing in the lease and there is

22 no master agreement.

23         MR. FIEDLER:  That's right.

24         So tenant mix requires an intended tenant mix.  And

25 there's a great example for why context matters and why that

1   interpretation should be applied to 365(b)(3)(C).  Tenant mix

2   does not exist in a vacuum, and a court can't decide what

3   selection of stores is an ideal tenant mix.  And I think the

4   evidence shows that the landlord can't prove there's an ideal

5   tenant mix, it can't prove there's a tenant mix that was

6   intended.  And I think the evidence shows that there is no

7   tenant mix that is being upset here.

8           THE COURT:  But that's not their burden.  The burden

9   is on the debtor to show that there's no disruption to the

10  tenant mix.

11          MR. FIEDLER:  That's right, Your Honor.  I think the

12  Amendola declaration proves that.  I think the directory that

13  we submitted to Your Honor shows that.  And there's nothing in

14  the landlord's deposition or testimony that would show any

15  disruption to the tenant mix in the shopping center.  They're

16  only talking about a subcollection of stores in the Power

17  Center.  And that's just tenant mix.

18          I will say and want to address the point which is

19  what we were discussion not too long ago about it being black

20  letter law that you can't modify a lease subject to certain

21  exceptions.  What the landlord is asking you to do, Your Honor,

22  is place additional restrictions in the Bed Bath lease that it

23  didn't negotiate or ask to negotiate in the lease it executed

24  or any subsequent amendment.  So rewriting the lease to put an

25  additional restriction on the debtors' ability to assign it is

1    not appropriate.

2            While the Bankruptcy Code does allow the modification

3    of certain contracts, it doesn't do so in favor of non-debtor

4    parties, as the Court ruled in Bon Ton Restaurant & Pastry Shop

5    in the Northern District of Illinois, "It is not intended that

6    a non-debtor party should acquire greater rights in a case

7    under the Code than he has outside of the Code.  A lessor

8    cannot insist that bankruptcy law give him what the lease

9    itself does not."

10           And I think that --

11           THE COURT:  I don't remember that case.  Was that

12   case cited to me?

13           MR. FIEDLER:  It's 53 B.R. 789, Your Honor, 1985 out

14   of Northern District of Illinois.

15           THE COURT:  What was the name of it?

16           MR. FIEDLER:  Bon Ton Restaurant & Pastry Shop.

17           THE COURT:  Okay.

18           MR. FIEDLER:  And so that's what's really key, Your

19   Honor, that the landlord is asking the Court to rewrite the

20   lease.

21           And the last point I'll make about the rent abatement

22   is it's really irrelevant -- or I'll stay on tenant mix for a

23   second.  It's really irrelevant what might happen to one tenant

24   in the shopping mall, shopping center.  The landlord makes the

25   argument that Hobby Lobby would be significantly disadvantaged

1  by putting Michaels a store away from it even though that

2  exists in numerous shopping centers throughout the country.

3      But what tenant mix really gets at is the proposed

4  assignment creating an upset of the balance of the entire

5  shopping center, not just what happens to Hobby Lobby.

6      And so I think, Your Honor, I can conclude there

7  unless you have any questions.  I do want to make actually one

8  more point, and I'm going a little longer than I said I would.

9  But I think you're right, Your Honor.  If there is a covenant

10  or zoning or master agreement that's recorded on the property

11  that makes it enforceable against the debtor, there is notice

12  in the record that the circumstance is that the debtor be bound

13  by whatever is in that agreement.  And if there was a

14  restriction on the property, we would be bound by that and we

15  would be put on notice of that.

16      But it begs the question why there's not a master

17  agreement here or some sort of covenant prescribing certain use

18  restrictions, particularly if this was supposed to be a

19  shopping center that we're talking about.  And so I think the

20  fact that there's no master agreement is important in kind of

21  relaying the fact that the landlord did not intend a tenant mix

22  that the tenants be bound by.

23      So with that, Your Honor, I'll conclude unless you

24  have any questions.

25      THE COURT:  No, I don't have any more questions.

1 Thank you.

2          MR. FIEDLER:  Thank you, Your Honor.

3          MR. HERSHEY:  Good afternoon.  I guess now it's

4 afternoon, Your Honor.  Sam Hershey from White & Case for

5 Michaels.  I will be extremely brief.

6          Two points, the first is Mr. LeHane makes the

7 argument that Section 365(b)(3)(C) so obviously applies to the

8 leases of other tenants in the shopping center that it's never

9 been litigated.  If it's so obvious, why has court after court

10 said the opposite?  I mean even if it is dicta, as he observes,

11 court after court that we have cited to you have said that you

12 look solely to the debtors' lease.  Those courts have not found

13 it so obvious that that provision means you look to other

14 leases.

15          THE COURT:  Well, other than Toys 'R Us, there's not

16 that many courts that --

17          MR. HERSHEY:  Well, no, that's not true, Your Honor.

18 The Trak Auto case, the Ames case, I mean those cases -- I mean

19 his response is that it's dicta, but those cases do say you

20 look to the debtors' lease to determine the application of use

21 provisions under 365(b)(3)(C).

22          The same could be said for the congressional record.

23 Mr. LeHane went through a presentation with a lot of slides.  I

24 did not see a single slide showing a quote from the

25 congressional record saying we have to look to other leases

89

1 beyond the leases that the debtor has agreed to, whether that's

2 a master lease or the lease that the debtor has in the shopping

3 center.

4         The last point I'll make, Your Honor, is on tenant

5 mix and balance. We have an unambiguous lease agreement here.

6 I'm not sure we need to look to the extrinsic evidence. I

7 think we look to that lease agreement. But even if we were to

8 do so, tenant mix is about the nature of the shopping center.

9 I think Mr. LeHane actually made this point when talking about

10 the men's wear versus women's wear. It attracts a different

11 clientele. That's what it's about, about letting in a tattoo

12 parlor or a burlesque club, something like that, not letting in

13 a competitor to one of the existing tenants.

14         When Your Honor reads Mr. Aronoff's declaration or,

15 sorry, his deposition transcript, rather, you'll see again and

16 again examples that he just walked through of competitors

17 existing within the Promenade shopping center. It's very

18 common for competitors to exist in the same shopping center.

19 That's not what tenant mix is about. It's about the nature of

20 the center, the nature of the clientele.

21         Thank you very much.

22         THE COURT:  Thank you.

23         Mr. LeHane.

24

25         MR. LeHANE:  Thank you very much, Your Honor. I'll

90

1 try to be very brief.

2      First of all, co-existence does not mean successful

3 co-existence.  I think whatever may be happening elsewhere with

4 Michaels and Hobby Lobby is irrelevant, right.  And even the

5 debtors' witness, Mr. Amendola, who by the way and I'd suggest

6 that you look at it, he has no expertise in tenant mix and

7 balance, limited familiarity with the concepts.  But he admits

8 that Michaels will have a negative impact on the Hobby Lobby

9 lease sales and will have a negative impact on tenant mix and

10 balance in the shopping center, right, so --

11      THE COURT:  Well, didn't you say it might be

12 initially negative and then it will be positive?

13      MR. LeHANE:  Exactly.  There will be a negative

14 impact.  And the statute doesn't say substantial.  It says any

15 impact.  And even their witness admits that, and Jeff Aronoff

16 who specializes in this absolutely states in his declaration

17 that putting Hobby Lobby -- Michaels right next to Hobby Lobby

18 in that portion of the shopping center will disrupt the tenant

19 mix and balance in the shopping center.  It's the debtors'

20 burden to show there will be no disruption.

21      Mr. Fiedler and Mr. Hershey, with all due respect,

22 are not experts in tenant mix and balance.  The only witness we

23 have heard that has any experience in tenant witness -- tenant

24 mix and balance is Jeff Aronoff, Senior Vice-President of

25 Brookfield Properties.  And his declaration makes it absolutely

1  clear that there will be a disruption of tenant mix and balance

2  in the shopping center.  Thank you very much, Your Honor.

3           THE COURT:  Thank you.  I appreciate it.

4           All right.  I think we're concluded with the

5  Pinnacle's and Serramonte, and now we move on to Fountains.  Is

6  there a -- I mean I think probably it makes sense for Mr. Mairo

7  to give his presentation and then we would go to your response.

8  Does that make sense or do you want to go first?  It's your

9  motion.

10          MR. FIEDLER:  It's fine if Mr. Mairo goes first.

11          THE COURT:  Okay.

12          MR. MAIRO:  Thank you, Your Honor.

13          For the record, John Mairo of Porzio Bromberg &

14  Newman on behalf of the Landlord DPEG Fountains LP.

15          Your Honor, DPEG is pursuing its objection based on

16  365(b)(3)(C) grounds, the use exclusivity provisions of another

17  lease in the Fountains shopping center would be breached.

18  We're no longer pursuing a tenant mix/balance argument under

19  365(b)(3)(D).  We have stipulated to certain facts and that

20  will be getting sent to Your Honor within the next I think half

21  hour.

22          And the Fountains lease is attached to the stipulated

23  facts.  And part of the stipulated facts is that the parties

24  have agreed that the Fountains Center is a shopping center for

25  purposes of 365.  And we have stipulated, as well, that a true

92

1  and correct copy of the DPEG and Ross lease are attached to the

2  objection that we filed that was at ECF 1344.

3          There has been a reference to Mr. Amendola's

4  declaration being admitted into evidence.  I do want to point

5  out that his declaration does not state that he reviewed the

6  DPEG-Ross lease, nor did Mr. Amendola speak to whether the use

7  exclusivity provisions of the DPEG-Ross lease would be violated

8  or breached.

9          DPEG contends that the debtors have not met their

10  burden of showing adequate assurance.  Your Honor, I view this

11  as fairly straightforward.  365(b)(3)(C) is clear on its face.

12  And the proposed assignment to Burlington must be shown to not

13  breach any use or exclusivity provision in the DPEG-Ross lease

14  which is another lease in the shopping center.

15          And the DPEG-Ross lease says, and this is at Section

16  15.3(a) that, "No tenant or occupant of the shopping center

17  other than tenant may use" -- and then I'm skipping over some

18  unnecessary language -- "use its premises for the off-price

19  sale as hereinafter defined of merchandise or, B, use more than

20  10,000 square feet of leaseable floor area of its premises for

21  the sale of apparel except for discount department store in

22  excess of 85,000 square feet of leaseable floor area."

23          Then further on in that Section 15.3(a), Burlington

24  is identified as an off-price retailer.  And the Bed Bath lease

25  that we're in question here to be assigned is for over 25,000

93

1 square feet.  Obviously, much more than 10,000.

2          So on its face, the use exclusivity provision is

3 getting breached violated.  Then you go to subpart (b) in the

4 Ross lease, Section 15(b), the exceptions.  And, first of all,

5 it says that the section is limited to tenants and occupants

6 operating as of the effective date under the existing leases.

7 But importantly, this section, 15.3(b), is different than the

8 Serramonte-Ross lease which appears to extend exceptions to

9 "any assignments or subleases of tenants on the effective

10 date."

11          However, under the DPEG lease, the Ross-DPEG lease,

12 even though Bed Bath was excepted as a current tenant, there is

13 no language relating to assignments.  So if Burlington violates

14 or breaches the use exclusivity provisions, 15.3(b) does not

15 except out Burlington.  Accordingly, under Section

16 365(b)(3)(C), the assignment Burlington would breach the DPEG-

17 Ross lease's use exclusivity provisions so the proposed

18 assumption to Burlington must be denied.

19          Now a couple of other points, Your Honor, there was

20 reference made at the outset about the Dhanani declaration,

21 which is DPEG's declaration in support of its objection, being

22 admitted into evidence, and that's at Document 1573 on the

23 docket.  Paragraphs 11 and 12 of that declaration, in Paragraph

24 11, it certified that it's his understanding, the declarant's,

25 that the proposed assignment of the Bed Bath lease to

1 Burlington if approved would result in a violation of Section

2 15.3 of the Ross lease, which would expose DPEG to potential

3 damages in the form of, A, termination of the Ross lease which

4 has approximately 66 months remaining and approximate rent owed

5 for that time period of over one and a half million dollars or,

6 B, Ross would have the option of paying substituted rent of

7 either its minimum rent or two percent of gross sales during

8 the preceding month.

9 　　　　　The point there, Your Honor, as has been talked about

10 with respect to the Pinnacle lease, the landlord here could be

11 exposed to significant claims from Ross.  And the language of

12 365(b)(3)(C) talks about a breach.  It doesn't talk about

13 debtors' breach, landlord's breach, tenant's breach.  It's just

14 a breach of another lease.  And I know there was a little

15 disagreement on this side as to whether use exclusivity

16 provision that is violated, would it be considered a breach.

17 　　　　　Mr. Fiedler said the landlord would be breaching, not

18 the debtor.  Mr. Hershey said I'm not sure the landlord would.

19 But neither of these folks are going to be the Court and be

20 determining whether or not my client is going to be facing

21 claims from Ross.  And that ties in with something Mr. LeHane

22 mentioned in terms of 363(e), adequate protection.

23 　　　　　If this is going to be sold in some way, the

24 leasehold interest, we need to be adequately protected.  And

25 that would be setting aside significant sums for the benefit of

1  my client to be able to protect itself against any type of

2  claims that may be brought.

3          And the other paragraph I wanted to raise in the

4  certification is Paragraph 12.  Just that Ross has objected to

5  the assignment of this lease to my client, has directed them to

6  consider and to pursue an objection because of Section 15.3 of

7  the lease.

8          I also want to just hit upon something that has been

9  raised and Mr. LeHane covered this, as well.  But there's been

10  a fair amount of discussion in the papers as well as in oral

11  argument about how on a certain level, like the sky is falling

12  if Your Honor were to uphold these objections.  Retail cases

13  would end.  It would turn the Bankruptcy Code on its head.

14  It's just not true.

15          And as Mr. LeHane detailed, the Bed Bath case proves

16  it.  The enforcement of 365(b)(3) as argued by the landlords

17  before you today will only impact three proposed assumptions,

18  and the debtors have successfully assigned over I think I heard

19  125 shopping center leases.  So applying 365(b)(3)(C) according

20  to its terms which are clear, plain meaning, would not lead to

21  absurd results.

22          Another point that was made is, oh, you're taking

23  value potentially away from the estate if the objections are

24  upheld.  Well, look, maybe a little bit less would be paid by

25  Burlington but, Your Honor, as Mr. LeHane said, that's all part

1  of the balance of the Bankruptcy Code.  There are provisions

2  that protect nondebtors.

3       And Burlington acknowledges in its pleading that

4  price adjustments have already occurred to its bid.  In

5  Paragraph 2 of Burlington's reply which is at ECF 2058,

6  Burlington admitted, "The debtors withdrew one lease from their

7  bid package resulting in an adjustment to the purchase price."

8  Presumably, a similar price adjustment would occur if the

9  Fountain's lease was removed.  Thus, the debtors' estate would

10  still get the benefit of Burlington's bid for all the other

11  leases.

12       And I guess I'll just close, Your Honor, with a point

13  that I think I heard towards the end from Mr. Fiedler saying to

14  the Court that it's not appropriate to rewrite leases.  I would

15  say my argument in sum is that it's not appropriate for this

16  Court to rewrite the Bankruptcy Code, specifically Section

17  365(b)(3)(C).

18       THE COURT:  Well, I guess I'm being asked to

19  interpret what that other lease provision means, and that's

20  where I'm having the issue.  But also, on the adequate

21  protection argument, if the lease is assigned subject to all

22  its terms, the Bed Bath-Fountain's lease, then what else --

23  what other adequate protection would debtor be required to

24  provide if the lease is being assigned subject to all its

25  terms?

1         MR. MAIRO:  I think the request would be to set aside

2    money from that for some type of reserve to protect the

3    landlords in the event they're faced with lawsuits from Ross.

4         THE COURT:  To protect the landlord from the breach

5    of its agreement with the third party that came after the

6    debtors' Bed Bath and the landlord's lease was Bed Bath &

7    Beyond.

8         MR. MAIRO:  That would be right, Your Honor.  But on

9    a certain level, I also don't want to lose sight of the primary

10   argument that in my view we don't even go there because a

11   strict application of the Bankruptcy Code requires denial of

12   the assignment.

13        THE COURT:  Right.  That argument I get.  I totally

14   get that.

15        MR. MAIRO:  Thank you, Your Honor.

16        THE COURT:  Thank you.

17        MR. FIEDLER:  All right.  Back again, Your Honor.

18        THE COURT:  All right.

19        MR. FIEDLER:  Just real quick, Your Honor, I did not

20   hear anything in Mr. Mairo's recitation that would be different

21   than the Pinnacle Hills' assignment or the Serramonte

22   assignment.  And so all the arguments previously made in

23   support of the Michaels assignment I think apply equally to

24   this assignment.  I just want to correct --

25        THE COURT:  Well, to be fair, I think what he's

98

1 saying is it doesn't have like the Pinnacle Hills-Bed Bath &

2 Beyond lease, it doesn't have that out if you're contesting the

3 assignment in good faith.  Is that right or am I wrong on that,

4 Mr. Mairo or no?

5        MR. MAIRO:  I'm not aware of that provision, Your

6 Honor.

7        THE COURT:  Okay.

8        MR. FIEDLER:  Okay.  So just a few points, Your

9 Honor.  Mr. Mairo said I think that if the objection was

10 sustained, Burlington would just pull it out and we'd still get

11 the other leases.  The estate's still going to lose money if

12 that happens.  There is almost $1.5 million at stake here.  And

13 so my question to Mr. Mairo and his client is at what point is

14 the money to be gained by the estate not enough, right?

15        And so, yes, Burlington had 44 leases.  One of those

16 was pulled out because the lease was actually terminated, and

17 Your Honor was made aware of that.  But there is significant

18 money at stake.

19        The second point refers to the first thing Mr. Mairo

20 said I think was that Mr. Amendola didn't review the Fountains

21 lease in his declaration, but in Paragraph 17 of his

22 declaration, it makes clear that he did.  And that says, "In

23 reviewing the Fountain lease, I understand" and it continues

24 on.  But I'll turn just to the provisions of the Fountain lease

25 itself.

99

1          Under 25(b) of the Fountains lease, the debtors are

2     authorized to assign the lease for certain permitted uses.  The

3     Fountain leases further provides tenants, assignees, and

4     sublessees shall be permitted to use the premises or applicable

5     portion thereof for the uses permitted by Section 25.  The

6     prohibited uses in turn fail to prohibit the operation of the

7     Fountains lease premises by Burlington.  There's nothing in the

8     Fountain lease that would prohibit Burlington from using that

9     premises for its apparel operations.

10          And similar to the Pinnacle Hills violation, the

11    landlord here is violating the warranties and representations

12    that it made in the use of the premises by objecting to the

13    assignment here.

14          Notwithstanding the fact that the Fountains lease

15    expressly permits the assignment of the lease to Burlington,

16    Fountains also alleges that the lease will violate exclusives

17    and a non-debtor tenant lease in the non-debtor lease of Ross

18    Stores.  I think we made ourselves clear in the prior

19    discussion with Pinnacle Hills that Bed Bath should not be

20    bound by an exclusive in a lease to which it did not enter into

21    and could not have possibly known about.

22          And so I think the lease expressly permits the use by

23    Burlington.  There's no exclusive within the lease that would

24    prohibit the assignment to Burlington.  And there is a

25    provision in Section 23(d)(3) that talks about the future

1 exclusives and says that the lease provides that any future

2 exclusive should not relate to the sale, rental or distribution

3 of apparel or apparel accessories.  And I think Burlington fits

4 squarely within that definition of 23(d)(3) of the lease.

5           And so I think the lease expressly provides or

6 permits for the assignment to Burlington.  There's nothing in

7 the lease that the landlord has pointed to that would say

8 otherwise.  And unless Your Honor has any questions, I think

9 we'd rest on the argument we made in connection with the

10 Pinnacle Hills assignment.

11           THE COURT:  I think they're basically the same

12 arguments except for these nuances, those details.

13           Mr. Mairo?  Oh, I'm sorry, Burlington is -- I think

14 Burlington didn't --

15           MR. JUNG:  Good afternoon, Your Honor.

16           Wojciech Jung, Womble Bond Dickinson, on behalf of

17 Burlington.  Your Honor, the way we view the issues before Your

18 Honor is that they are squarely legal issues and not so much

19 factual issues.  As Mr. Mairo said, we did enter into a

20 stipulation that's probably being filed as I speak.  But the

21 issue, Your Honor, as I said is legal.  Plenty of argument has

22 been made by the debtors, by Michaels that are fully applicable

23 to the leases that Burlington seeks to take over.

24           Your Honor, I would specifically address briefly

25 issues raised by Mr. Mairo that Your Honor's ruling in the

1 landlord's favor would not disrupt the assignment and

2 assumptions of leases in retail cases.  And he specifically

3 points to the fact that the debtor was successful in assuming

4 and assigning many leases to prospective buyers, potential

5 buyers, including Burlington.

6      But as Your Honor noted in other context, the meaning

7 of that, if any, could be turned around.  One could say that

8 the other landlords subject to those leases did not take the

9 absurd position that the two landlords are taking here, right.

10 One could say they were rational.  They did not fight the

11 debtors' proposed assumptions because the law and the statute

12 is quite clear.

13      The statute refers to the lease in question which is

14 a debtor cannot be bound by a lease that it is not a party to.

15 Any by analogy, Your Honor, there is plenty of case law in the

16 context of claim objections related to rejection damages, for

17 example, when a debtor rejects a lease.  And when someone else

18 files a rejection damage claim saying, hey, I was somehow

19 impacted by the debtors' rejection of a third-party claim,

20 courts clearly say that that party has no right to complain

21 because it did not -- it is not, excuse me, a party to that

22 lease.

23      And, Your Honor, that analogy I would suggest is

24 squarely applicable here.  So, Your Honor, for those reasons

25 and incorporating arguments raised by Michaels and the debtors,

1  we would rest on the papers and request tat Your Honor --

2        THE COURT:  I'm not sure I understood the last

3  argument.  Could you say --

4        MR. JUNG:  I apologize?

5        THE COURT:  The last argument, what was that?  The

6  one that you just made about --

7        MR. JUNG:  With respect to --

8        THE COURT:  The rejection.

9        MR. JUNG:  Correct, Your Honor.  There are instances

10 where a debtor rejects a contract and a third party, another

11 party to the contract files a claim before a bankruptcy court

12 that's saying I was somehow impacted by the rejection of that

13 contract and seeks whatever damages they would seek from the

14 debtor.

15        And there are cases, there are plenty of cases that

16 say that, sure, maybe you're somehow impacted by the debtors'

17 rejection of a contract, but you have no reason to complain

18 because you are not a party to that contract.  The debtor has

19 never contracted to protect you.

20        Your Honor, similarly, here I would say that the

21 landlord assumes the risk when it enters into a contract that

22 that contract may be assigned to someone else.  And the only

23 meaningful way to protect itself in that situation is to

24 expressly contract or enter into provisions and agreements in a

25 contract that prevents or prohibits the tenant from assuming a

1  contract to a party the landlord may not find acceptable.

2        Thank you, Your Honor.

3        THE COURT:  Thank you.

4        Mr. Mairo, do you have any rebuttal?

5        MR. MAIRO:  Thank you, Your Honor.

6        John Mairo for the record.

7        If I heard Mr. Jung correctly, I think he's on some

8  level characterized our arguments as absurd and irrational.  I

9  completely disagree.  I don't understand --

10        THE COURT:  No, I'm not finding any arguments are

11  absurd or irrational.  For example, I don't know out of the

12  other landlords' leases that were assumed and assigned whether

13  parties had potential objections or didn't have them.  So I

14  don't know how I can as to the use.  So I don't know how I can

15  give that any weight one way or the other.  It just doesn't

16  seem to -- it's just not something that is a fact in this case.

17  It's just not here.  So I'm not going to --

18        MR. MAIRO:  Fair enough, Your Honor.

19        THE COURT:  I'm not going to consider that either

20  way.

21        MR. MAIRO:  Thank you, Your Honor.  Again, and

22  certainly we view it as just a strict application of the

23  Bankruptcy Code.

24        And I wanted to just hit upon something that Mr.

25  Fiedler mentioned in terms of Mr. Amendola's declaration.  He

1  does not reference the DPEG-Ross lease.  In Paragraph 5, he

2  describes reviewing the leases of Bed Bath & Beyond's leases

3  with the leases that are considered to be assumed and assigned.

4  And then Paragraph 17 that Mr. Fiedler referenced is not the

5  DPEG-Ross lease.  That's again the Bed Bath-Fountains lease.

6          So I just wanted to be clear that Mr. Amendola's

7  declaration he does not say he reviewed the Ross-DPEG lease, he

8  does not reference it in Paragraph 17.  And it is the debtors'

9  burden to establish adequate assurance.  And I don't believe

10  they have, Your Honor.

11          THE COURT:  Well, there's no dispute that the

12  Fountains lease with Ross prohibits the Burlington use, right?

13          MR. MAIRO:  I agree.

14          THE COURT:  So, in contrast, that is something that's

15  in the record.

16          MR. MAIRO:  Thank you, Your Honor.

17          THE COURT:  Thank you.

18          All right.  That's it for the presentations I guess.

19  And it's 1:00, so that's a good time to break.  I need to

20  digest all this, and I know there's time pressures involved in

21  the sense that there's -- well, this is -- I think the

22  landlords were gracious in saying no rent during this period

23  from July 31st to August 31st while this gets decided.  I don't

24  know if it goes beyond that, but I would like to decide this

25  today but I may need some time.

1          And I was wondering whether -- I mean there's a lot

2     of parties here that are very -- that are charging the estate

3     or charging their clients.  And it's going to be a couple of

4     hours at least or sometime later this afternoon.  So if the

5     parties want to go back to their offices and work on other

6     things or limit the time for now and I'll go bank on the record

7     and I anticipate being able to read my decision into the record

8     later on, although with today's technology, maybe you can work

9     from here and it doesn't really matter.  But I give you that

10    option.

11         MR. FIEDLER:  I just want to make one note, Your

12    Honor.  While Mr. LeHane's clients have agreed to waive

13    obligations for September, the same is not true for the

14    Fountains landlord.  And I think it's our position that any

15    obligation for rent in September would not be required from the

16    debtors.  And to the extent Your Honor were to rule in their

17    favor, there will just be a lease termination or rejection as

18    of the end of this month.

19         THE COURT:  In other words, another reason for me to

20    decide today.

21         MR. FIEDLER:  I don't want to put pressure on you.

22         THE COURT:  No.  That's all right.  I can handle it.

23         MR. FIELDER:  All right.  Thank you, Your Honor.

24         MR. HERSHEY:  Sam Hershey from White & Case, Your

25    Honor, for Michaels.  If Your Honor wants counsel to stay,

1  we're certainly happy to.  Otherwise, I think at least the

2  White & Case team are based in New York and we would return to

3  the office and join virtually when Your Honor reads your

4  ruling.  Whatever Your Honor prefers, of course.

5           THE COURT:  I have no preference.  I'm just going to

6  --

7           MR. HERSHEY:  I think that's what we'll do, Your

8  Honor.

9           THE COURT:  I was just offering it to you as a way to

10  hopefully limit the expense to -- because, like I say, it could

11  be --a few hours, you know.

12           MR. HERSHEY:  And that's our goal too is to limit the

13  expense.  That's what we'll do.  We'll join virtually later

14  whenever Your Honor is ready to read the ruling.

15           THE COURT:  All right.

16           MR. HERSHEY:  Thank you very much.

17           THE COURT:  And otherwise, we'll make -- you know

18  what, and then I was just thinking of another alternative,

19  Juan, is that we could also make conference rooms available to

20  the parties.  They can go there.

21           MR. FIEDLER:  Your Honor, does it make sense to maybe

22  set a time later for today to put forth a conference call

23  available for folks that aren't going to be joining in the

24  courtroom or does it make sense for everyone to join via Zoom

25  at that time?

1          THE COURT:  I think since everybody's been doing it

2    by Zoom all along, I think we should continue the Zoom.

3          MR. FIEDLER:  Okay.

4          THE COURT:  Those kinds of issues are not my forte.

5          MR. FIEDLER:  Yeah, yeah, yeah.  I understand.

6    That's on us.

7          THE COURT:  I'm fine with people appearing by Zoom,

8    appearing in person.  What I do know is that Court Solutions

9    and Zoom doesn't usually work, so it's going to be Zoom or in

10   person.

11         MR. FIEDLER:  Okay.  Yeah, I've experienced that

12   before, by the way.

13         THE COURT:  All right.

14         MR. FIEDLER:  All right.  Thank you, Your Honor.

15         THE COURT:  Thank you.

16         All right.  Thank you for all the professionalism,

17   and really exceptional presentations.  You make my decision a

18   difficult one, but that's what I have to do and I'm going to --

19   I have every intent of deciding today, okay.

20         Thank you very much.

21         MULTIPLE COUNSEL:  Thank you, Your Honor.

22         THE COURT:  Thank you.  Bye bye.

23         (Recess at 1:02 p.m./Reconvened at 5:25 p.m.)

24         THE COURT:  Okay.  We're back on the record in the

25   Bed Bath & Beyond case, 23-13359.  We had a hearing this

1 morning at which certain evidence was admitted into the record.

2 I'll describe it in more detail in a few moments.  But

3 basically, there were stipulations, there were deposition

4 transcripts that were admitted in excerpts.  And there were

5 also declarations that were admitted.  However, there was no

6 testimony.  And there was extensive argument.

7         So before the Court today are the objections filed by

8 three landlords to the motion of the debtors here, Bed Bath &

9 Beyond, Inc., and its affiliated entities, we'll collectively

10 call them the debtors, to the assignment of certain leases by

11 the debtors.  Two of the leases are intended to be assigned to

12 Burlington Stores, and those assignments are opposed by the

13 Daly City Serramonte Center, which I'll call Serramonte, and

14 Landlord DPEG Fountains, LP.  We'll call them Fountains.

15         The third is intended to be assigned to Michaels

16 Stores, and that assignment is opposed by the Landlord Pinnacle

17 Hills, LLC, Pinnacle we'll call them, and collectively the

18 objecting landlords.  The objections are based primarily on or

19 really exclusively on 11 U.S.C. 365(b)(3)(C) and (D) which

20 apply to shopping centers and are referred to as the use,

21 restrictive use and tenant mix and balance provisions.

22         There has been extensive briefing on the issues

23 before the Court including the following papers.  As to the

24 Pinnacle proposed assignment with Michaels as the proposed

25 assignee, is Document 1323, an objection to the assignment

1  filed by Pinnacle on 7/12; Document 1383, a response by

2  Michaels filed on 7/17; Document 1926, a surreply by Pinnacle

3  filed on August 18th and supported by the declarations of

4  Jeffrey Aronoff at 1927 and Kristin S. Elliott at 1928.

5        Document 2059 was a further reply by Michaels filed

6  on August 25th.  Document 2062 was an omnibus response by the

7  debtor filed on 8/25 and supported by the declaration of Emilio

8  Amendola, Document 2062-1.

9        As to the Serramonte lease, which is the proposed

10  assignee as Burlington, there was Document 1388, a limited

11  objection filed by the Landlord Serramonte on 7/12.  And on

12  August 18th, a supplemental objection was filed by Daly City

13  Serramonte at 1929 and supported by the declaration of Ernst

14  Bell.  And then there was a Burlington omnibus reply filed on

15  8/25, Document 2058, and the omnibus response by the debtor on

16  8/25, as I noted at 2062 and 2062-1.  There also was a

17  stipulation of undisputed facts at Docket 2087.

18        And then, finally, as to the Fountains lease, and the

19  assignee again proposed is Burlington, Document 1933; a

20  supplemental objection by Fountains and a joinder in Pinnacle's

21  opposition to the Michaels arguments; Document 1573, a

22  certification of Nikhil Dhanani, filed by Fountains.  The

23  Burlington omnibus reply at 2058, and the debtors' omnibus

24  reply at 2062 and 2062-1.

25        As I noted briefly earlier, the Court scheduled an

1   evidentiary hearing on these motions for today, but the need

2   for live testimony was obviated by the parties' agreement to

3   admit into evidence the direct testimony contained in each of

4   the declarations described above.  In addition, the parties

5   agreed to admit into evidence in lieu of cross-examination

6   certain excerpted portions of the depositions of Mr. Aronoff

7   and Mr. Amendola.  And then, finally, as noted, the debtor and

8   the Serramonte landlord and the debtor and the Fountain

9   landlord submitted stipulations today.

10          The Court admits each of these documents into

11  evidence.  As a result, today's hearing consisted entirely of

12  the arguments of counsel as well as the admission of those

13  documents.

14          By way of background, the debtors filed these cases

15  under Chapter 11 for reorganization on April 23rd, 2023.  The

16  debtors have indicated a primary focus in this case has been to

17  maximize the value of its assets for all stakeholders including

18  through the sale of its below-market leases which is also

19  referred to as lease optimization efforts.  These efforts

20  included conducting Phase I and Phase II Lease auctions.

21      Numerous objections were filed to those proposed

22  assumptions and assignments.  The objections were based on cure

23  costs and adequate assurance, also, the debtors' financial

24  ability to perform.  And those objections were largely or

25  completely resolved.  There were also other objections based on

1    those issues, as well as tenant mix and exclusivity provisions.

2         Most of those as far as this Court knows have also

3    been resolved, although I'm not 100 percent sure which way

4    they've all been resolved.  I assume some resulted in

5    withdrawal of the leases from the motion and some were in

6    connection with withdrawal of the objections.  That said, the

7    objections that are the focus of today's hearing relate

8    exclusively to the tenant mix and exclusive use provisions in

9    the leases and only those grounds, 365(b)(3)(C) and (D), as

10   acknowledged by the parties.

11        This Court has jurisdiction over this matter under 28

12   U.S.C. 1334(b), and the standing orders of reference entered by

13   the District Court for New Jersey on July 10th, 1984, as

14   amended on September 18th, 2012.  This is a core proceeding

15   under 28 U.S.C. 157(b)(2)(A) and (O).  Venue is proper in this

16   Court under 28 U.S.C. 1408.

17        The Court issues the following findings of fact and

18   conclusions of law pursuant to Federal Rule of Bankruptcy

19   Procedure 7052.  To the extent any of the findings of fact

20   might constitute conclusions of law, they're adopted as such,

21   and the reverse is also true.

22        The applicable law under 365(f)(2)(B), a trustee or

23   debtor in possession that seeks to assign an unexpired lease to

24   provide adequate assurance of future performance by the

25   assignee.  Section 365(b)(3) then defines what adequate

112

1 assurance of future performance means in the context of a lease

2 in a shopping center.

3       Section 365(b)(3) of the Bankruptcy Code has four

4 subsections applicable to shopping centers including (C) and

5 (D) which as noted are at issue today.  Subsection (C) requires

6 adequate assurance that "assumption or assignment of such a

7 lease is subject to all the provisions thereof, including but

8 not limited to provisions such as a radius, location, use, or

9 exclusivity provision and will not breach any provision

10 contained in any other lease, financing agreement, or master

11 agreement relating to such shopping center."

12       That's (C), and the focus there is in any other lease

13 relating to such shopping center.  And subsection (D) requires

14 adequate assurance that assumption or assignment of such lease

15 will not disrupt any tenant mix or balance in such shopping

16 center.  That's 11 U.S.C. 365(3)(D).

17       Shopping centers are not defined by the Bankruptcy

18 Code, but here they are defined by the lease between Bed Bath &

19 Beyond and Pinnacle, the landlord.  And Section 1134 of the

20 lease provides that the shopping center known as Pinnacle Hills

21 Promenade located in Rogers, Arkansas, the shopping center

22 consists of two retail shopping centers which shall be operated

23 as a single operating -- single integrated shopping center.

24       So there was some dispute today that frankly caught

25 the Court a bit by surprise as to whether the shopping center

1  consisted of the integrated shopping center known as the

2  Promenade, Pinnacle Hills Promenade, which consists of over 100

3  stores, or what was so-called Power Center which includes just

4  12 stores but may be defined as big box retailers that include

5  the lease with Bed Bath & Beyond that is sought to be assigned

6  to Michaels as well as the leases with Dollar Tree and Hobby

7  Lobby.  They're all in the Power Center.

8          I'm going to go by the lease and find that the

9  shopping center consists of the two shopping centers that are

10  operated as a single integrated shopping center.  So that is

11  the Court's holding on that point, which is based on the

12  agreement of the parties and is pretty clear to me.

13          Based on the pre-hearing briefing and evidence and

14  argument presented today, the Court is convinced that the

15  objections under 365(b)(3)(C) and (D) could be resolved as a

16  matter of law as was suggested by certain of the parties.  But

17  the Court will first address the legal issues which largely

18  overlap and also Fountains and Serramonte both expressly joined

19  in the Pinnacle surreply.  And then the Court will address the

20  certain factual issues under 365(b)(3)(D) in the alternative.

21          The landlord's primary argument under 365(b)(3)(C) is

22  that the assignments to Michaels and Burlington as proposed

23  should be prohibited because the addition of those stores to

24  the shopping malls would violate the exclusive use provisions

25  the objecting landlords have granted in leases entered into

1  subsequent to the leases with the debtors and in some cases, in

2  most cases, more than ten years after the lease with Bed Bath &

3  Beyond.

4  But as to the plain language, the Supreme Court has

5  instructed that when the meaning of the statute is plain, the

6  Court's inquiry and there, that's <u>Bostock v Clayton County,</u>

7  <u>Georgia</u>, 141 S.Ct. 1731, 1749. The Third Circuit feels the

8  same way. <u>Burton v. Schamp</u>, for example, 25 F.4th 198, 207 (3d

9  Cir. 2022), quoting, "As always statutory interpretation begins

10 with an examination of the statute's plain language."

11 Accordingly, this Court turns first to the disputed

12 phrase provision in 365(b)(3)(C) that states that the

13 assignment proposed will not breach any radius, location, use,

14 or exclusivity provision in "any other lease, financing

15 agreement, or master agreement in such shopping center relating

16 to such shopping center."

17 There are no temporal or other restrictions on this

18 phrase, thus, the objecting landlords argue that that should be

19 the end of the analysis. In other words, a proposed assignment

20 must not breach any other lease, with emphasis on the word

21 "any," a landlord may have entered into with respect to the

22 subject shopping center including those such as the ones

23 Pinnacle has with Hobby Lobby and Dollar Tree and the other

24 leases relating to the Serramonte and Fountains shopping

25 center, all of which were entered into years after the Bed Bath

1  & Beyond lease.

2          In the case of the Hobby Lobby and Dollar Tree lease,

3  they were more than a decade after the debtors' lease, 14 years

4  as to Hobby Lobby and 12 as to the debtor -- as to Dollar

5  Store.  The same is generally true as to the lease with the

6  Serramonte which was entered into about three years before and

7  with Ross and the one with Ross and Fountains which was also

8  many years, entered into many years after the BBB lease.

9          And the Court acknowledges that there is appeal to

10 the plain language argument, and it is frankly one that I

11 struggled with.  But I don't believe that the plain language

12 canon or principle is the only one that is at play here for

13 various reasons, which I will describe.  The Court will also

14 consider Supreme Court precedent that holds the plain meaning

15 of legislation should be conclusive except in rare cases in

16 which the literal application of the statute would --

17          UNIDENTIFIED SPEAKER:  (Indiscernible).  I don't

18 think so.

19          THE COURT:  I'm sorry.

20          UNIDENTIFIED SPEAKER:  I'm not --

21          THE COURT:  Hello?

22          I'm just going to continue.  The literal application

23 of the statute will produce a result demonstrably at odds with

24 the intentions of its drafters.  Griffin v. Oceanic

25 Contractors, Inc., 458 U.S. 564, 571.  This Court finds that

1  this is one of those rare cases where a strictly literal

2  application of the phrase "any other lease" in 365(b)(3)(C)

3  would be at odds with the intentions of the drafters of 365.

4         The Court also will consider the related principle of

5  statutory interpretation that the provisions of the statute

6  must be read in the context of the statutory scheme as a whole.

7  Gundy v. United States, 139 S.Ct. 2116, 2126 (2019).  Statutory

8  interpretation is a holistic endeavor which determines meaning

9  by looking not to isolates words but to text and context along

10  with purpose and history.

11         When those canons of statutory construction are

12  applied, it becomes clear to the Court that the phrase "any

13  other lease" could not have been intended and was not intended

14  to mean a subsequent lease between a landlord and a third party

15  as to which the debtor was not a party.

16         As the District Court for the Southern District of

17  New York persuasively explained in the Sears case, the

18  provisions of 365(b) must be read in harmony with 365(f)(2)(B),

19  Sears Holding Corp, 613 B.R. 51,68 (S.D.N.Y. 2020).

20         That court relied extensively on the Ames Department

21  Store cases in the Bankruptcy Court for the Southern District

22  of New York where the Ames court noted that subject only to

23  certain statutory safeguards, the value of the debtors' leases

24  should go to the debtors' creditors and that leases can be sold

25  to that end with or without the landlord's consent.  Ames

1 Department Stores, 348 B.R. 91,98 (Bankr. S.D.N.Y. 2006). The

2 Ames cases were the earlier cases that Judge McMahon relied on.

3 As the Burlington Stores' objection notes, the

4 landlords, the proposed interpretation turns 365(b)(3)(C) and

5 (D) into a sword rather than a shield, a sword that bestows

6 upon the landlords a commercially competitive advantage that

7 actually allows them to improve their position to the detriment

8 of the debtors' estate.

9 And that is because applying the plain language

10 argument here would mean that the debtors are bound by

11 restrictive use and similar provisions in any other leases that

12 were entered into after the Bed Bath & Beyond leases, in these

13 cases, often more than a decade later, and make the broad

14 assignment provisions negotiated for by BBB unenforceable based

15 on the landlords' agreement with a third party that the debtor

16 never knew about or much less agreed to.

17 And it would also violate the provisions in the BBB

18 lease that say that BBB is not required to honor any exclusive

19 subsequently given by the landlord. Thus, the ability of

20 debtors to maximize the proceeds from their leases would or

21 could be severely curtailed by landlords' agreement with other

22 tenants to limit the uses for which the BBB premises were

23 expressly allowed to be used without BBB, Bed Bath & Beyond

24 agreeing to those terms.

25 The landlords would be permitted to eviscerate the

1  debtors' negotiated bargain, a broad assignment provision, by

2  subsequently entering into an agreement with any third party in

3  the same shopping center that restricts uses that Bed Bath &

4  Beyond was expressly permitted to have under their lease.  That

5  would seriously limit BBB's assignment's rights without its

6  knowledge or consent.  And this frankly makes no sense to the

7  Court, especially in light of the legislative history that I

8  will also discuss.

9          The House Report from when the Modern Bankruptcy Code

10  was enacted in 1978 in discussing the shopping mall protections

11  in 365 states that, "To assure the landlord of his bargains for

12  exchange, the court would have to consider factors such as the

13  nature of the business to be conducted by the trustee or his

14  assignee whether that business complies with the requirements

15  of any master agreement and whether the business proposed to be

16  conducted would result in a breach of other clauses and master

17  agreements relating, for example, to tenant mix and location as

18  per House Report 95-595 at 348-349, 1978 U.S.C.C.A.N.

19  5963,6305."

20          It just demonstrates that from the very beginning,

21  the focus was on a landlord's bargain for his rights with the

22  debtor, not with the third parties, including things like

23  master agreements to which the debtor would be the party.

24  Then, in 1984 when Congress decided to enhance or reduce any

25  confusion or lack of clarity in 365(b)(3), the legislative

1  history makes plain that Congress's purpose was to ensure that

2  "the lessor and the other tenants maintain the benefit of the

3  original bargain with the debtor."

4  Later when -- that's Senate Report No. 65, 98th

5  Cong., 166 1ST Sess. 67-68 (1983). And I emphasize original

6  bargain with the debtor. Later, when changes were made to the

7  365 by BAPCPA, Senator Hatch stated, "The bill helped clarify

8  that an owner should be able to attain control over the mix of

9  retail uses in the shopping center. When an owner enters into

10 a use clause with a retail tenant forbidding assignments of the

11 lease for a use different than that specified in the lease, the

12 clause should be honored." 151 Cong. Rec. S. 2455-2361 (March

13 10, 2005).

14 In this case, it is acknowledged by all that the

15 leases at issue do not contain a use clause that would forbid

16 the proposed assignments to Michaels or Burlington.

17 In response, the objecting landlords point to a

18 portion of the legislative history that states that Section

19 (b)(3) provides that in lease situations common to shopping

20 centers, protections must be provided for the lessor if the

21 trustee assumes the lease, including protecting against a

22 decline in percentage rents, breach of agreements with other

23 tenants, and preservation of tenant mix.

24 In this Court's view, that statement is not

25 consistent with those already cited. The phrase "breach of

120

1  agreements with other tenants" must be understood to mean

2  breach of agreements with other tenants that were in existence

3  at the time the debtor entered into the lease and would either

4  be incorporated into the lease or part of an agreement or part

5  of a master agreement, not subsequently entered into leases

6  that the debtor had no knowledge of or agreed to.

7      Any other interpretation would expand the rights of a

8  shopping center landlord outside of bankruptcy result which has

9  been virtually as far as this Court knows universally rejected

10 in the case law.  See, for example, Great Atlantic & Pacific

11 Tea Company, Inc., 472 B.R. 666-675 (S.D.N.Y. 2012).

12     Section 365 does not give the landlord the right to

13 improve its position on the bankruptcy of the tenant.  In re

14 Sears Holding, 613 B.R. 51,70 (S.D.N.Y. 2020).

15     The Bankruptcy Code cannot be read to place the

16 landlord in a better position than it would have been absent

17 the bankruptcy.  And also, as the Third Circuit noted in the

18 Joshua Slocum case, Congress has suggested that the

19 modification of a contracting party's rights is not to be taken

20 lightly, 922 F.2d. 1081 at 1091 (3d Cir. 1990).  At the same

21 time, the Joshua Slocum court noted that the non-debtor party,

22 here the landlord, that the policy is to require that the

23 non-debtor party receive the full benefit of his bargain.

24     Further, the language that is at issue here as to not

25 breaching any provision contained in any other lease, the

121

1 argument is made by the debtor and Michaels and also Burlington
2 is that a debtor can't breach a contract to which it's a party.
3 Pinnacle's lease with Hobby Lobby, for example, provides that
4 is to be governed by the laws of Arkansas, and Arkansas law
5 provides that before a contractual provision can be enforced,
6 there must be privity of contract between the parties.

7       There was no privity of contract between Bed Bath &
8 Beyond and Hobby Lobby or Dollar Tree.  In each instance, Bed
9 Bath & Beyond's lease precluded those leases in time, and there
10 was no provision in the Bed Bath & Beyond lease that made it
11 subject to future lease restrictions.  In fact, the exact
12 opposite is true.  Section 13.3.2 of the June 1st, 2007 lease
13 between Pinnacle and Bed Bath & Beyond states that, "Except as
14 expressly set forth in this Section 3.3, tenant shall not be
15 obligated to honor any exclusive granted to landlord in any
16 shopping center."

17       The objecting landlord's reading of the statute would
18 also write that "bargain for" provision our of the BBB lease
19 and that, as noted, is not what was intended according to the
20 legislative history, as cited above.  It would also give the
21 landlord extra unbargained for rights by actually breaching the
22 lease with the debtor.  And I just can't find that that's what
23 Congress intended.  It just doesn't make sense to me.

24       And by reading the statute in this way and in
25 harmony, what I'm saying is that you start out with 365(b) and

1  its focus is on the lease with the debtor and the landlord.

2  And that's where it all derives from. And then that's the

3  context. And then if you read it the way I think it is

4  intended is that it wouldn't read the words out of the statute.

5  It would just say that, for example, it would be

6  enforced where the lease was subject to a master lease

7  agreement that said the lease -- the proposed use was

8  prohibited or a reciprocal easement agreement as in the Three

9  A's case that was in place before the tenant agreed to lease

10  the premises, or a financing agreement that was recorded and

11  which the tenant knew about and agreed to or acknowledged or

12  consented to in advance.

13  None of those things are here, but it would allow for

14  the enforcement of the restrictive use provisions in many many

15  cases, and this Court dares to say in cases where that's what

16  was intended and that was what was bargained for by the party.

17  And so, by this reading and I believe I am harmonizing the

18  legitimate commercial expectations of the debtor, the landlord,

19  and other tenants and Congress in enacting 365(b)(3)(C).

20  Outside of bankruptcy, the tenant such as Hobby Lobby

21  could not have expected that the provisions of his lease would

22  supersede provisions in existing tenant lease that was entered

23  into 14 years before. And then that gets into the other issue

24  where the landlord candidly acknowledges that you can't enforce

25  -- that there's a provision in the leases that allows the

1  landlord to terminate the lease in the event of an assignment

2  that it does not approve of.

3          But as the landlords also candidly and forthrightly

4  acknowledged, that kind of provision would not be enforceable

5  in the bankruptcy court.  So that kind of provision would not

6  be enforceable, and we're left with the provisions that allow

7  for the assignment to virtually any -- for any use that's not

8  prohibited by law, essentially.

9          All that said, and as the landlords point out,

10 there's no binding precedent in this jurisdiction, as neither

11 the Third Circuit nor the Supreme Court has ruled on this

12 precise issue.  In a case from another jurisdiction that has

13 been heavily discussed here and factually nearly identical,

14 it's very rare that there's a virtually identical case, but the

15 Toys "R" Us case is one, 587 B.R. 304.

16         It even involved a Ross lease that was a lease with

17 Toys "R" Us that was proposed to be assigned to a Burlington

18 and that they would have been adjacent to each other.  And the

19 court allowed that assignment that was alleged to violate the

20 exclusive use provisions of another lease that was entered into

21 many years after the subject lease with the debtor and that was

22 sought to be assigned.

23         The Court specifically found that the cases cited by

24 landlord did not support its plain language argument argument,

25 although I'll admit there wasn't a long discussion on that.

1  That's at 310.  Nonetheless, Pinnacle urges the Court not to

2  follow <u>Toys</u>, arguing that it was wrongly decided because it did

3  not examine the plain meaning of the statute and relied on

4  dicta from the Fourth Circuit's <u>Trak Auto</u> opinion.

5       The Court is not persuaded by that argument because

6  this Court's own examination of the plain meaning of the

7  statute led it to the same conclusion.  And I will note that

8  that conclusion that it doesn't violate the plain language of

9  the statute was at least tacitly and preliminarily adopted by

10 the district court in the <u>Toys "R" Us</u> case when it refused to

11 grant the landlord a stay pending appeal of the <u>Toys "R" Us</u>

12 decision because the landlord could not show a likelihood of

13 success on the merits based on, among other things, the plain

14 language argument.  That's <u>Brea Union Plaza I, LLC v. Toys "R"</u>

15 <u>Us</u>, 2018 Lexis 123049*3 (E.D.Va. 2018).

16      Pinnacle would suggest that this Court should follow

17 the guidance in the <u>Sears Holding Corp</u> case, 613 B.R. 5172, a

18 case that was referred to earlier.  That case, though,

19 addressed 365(b)(3)(A) and (D) rather than (C), but the

20 rationale behind that ruling and particularly that 365(b)

21 should be read in harmony with 365(f) actually cuts in favor of

22 this Court's ruling today because it's a holistic analysis and

23 that 365(f) refers to the lease with the debtor and so does the

24 beginning of 365.

25      There's also the argument that there will be harm to

1  the landlords because there will be rent abatements with Hobby

2  Lobby and Dollar Tree and also with the other stores in the

3  Fountains and Serramonte malls.  The Court also disagrees with

4  that argument because at least certainly in the case of the

5  Pinnacle lease, Section 7.4 provides that any use which would

6  otherwise violate a tenant's exclusive shall not be allowed to

7  continue for any assignment unless landlord does not have a

8  right to approve such assignment.  Here, it is the bankruptcy

9  court and not the landlord that has a right to approve the

10  assignment.

11       Similarly, Section 7.5 of the Hobby Lobby lease

12  provides that a tenant shall not be entitled to abatement and

13  rent if the landlord promptly initiates and diligently pursues

14  all commercially reasonable remedies including without

15  limitation legal action for final approval.  Here, Pinnacle

16  promptly initiated and is diligently pursuing its objection to

17  the proposed assignment.  It's acting in accordance with the

18  lease by bringing the issue before the Court and allowing the

19  Court to decide if the assignment violates the Bankruptcy Code.

20       And as the Toys "R" Us and Martin Store courts

21  observed, the assumption and assignment of the lease is a

22  judicial action that may render the landlord unable to comply

23  with the restriction contained in another lease and the law

24  would excuse performance that has been rendered legally

25  impossible or -- that's 199 B.R. 265.  Or similarly, that

 1  provision 7.5 says that the rent isn't going to be abated as

 2  long as the landlord proceeds with the objection.

 3      And so, similarly, the <u>Toys "R" Us</u> court

 4  alternatively found that the assignment would not breach the

 5  exclusivity provision because the Court's order would render

 6  the landlord without the capacity to prevent Burlington's

 7  intended use which was based on the lease with Ross Stores that

 8  only applied if the landlord had the capacity to prevent a

 9  tenant from selling off-price apparel.

10      And then I also have to note the use of the word

11  "violation" rather than breach, and I think this lease is a

12  very heavily negotiated document and by extremely sophisticated

13  attorneys that, whether it's 2007 or 2019 or 2021, had the

14  Bankruptcy Code and the related assignment provisions in mind

15  when it was drafted.  And a violation is not necessarily a

16  breach as is particularly true in this case with 7.5 because as

17  I understand the lease and as I read the lease, it couldn't be

18  terminated and there wouldn't be any rent abatement as long as

19  the landlord is diligently prosecuting the objection.

20      So then I also note that the Fountains landlord makes

21  a similar argument that it could be exposed to substantial

22  damages pursuant to its lease with Ross, but that 15.3(a) of

23  the Ross-Fountains lease provides that landlord, if it had the

24  capacity to do so, shall not permit any other tenant or

25  occupant of the shopping center to use its premises for the

1   off-price sale of merchandise.

2          So the damages arguments appear to be possibly

3   illusory or, alternatively, I would say the one thing that's

4   clear is that the landlord had knowledge of the Hobby Lobby

5   broad assignment provisions when it entered into these leases.

6   And whether it was to entice the new tenants to enter into the

7   lease or it was just part of the whole negotiating process,

8   what ended up happening was that the landlord gave the

9   exclusive use provisions to the other tenants without getting

10  BBB's consent, without modifying BBB's lease, without BBB even

11  having knowledge of the use restrictions.

12         And I also adopt the argument of the debtors and the

13  tenants that -- the proposed tenants that the damages, if any,

14  and this is what I was getting at, are the result of the

15  landlord's actions that it undertook knowingly in violation of

16  not only the assignment provisions of the Bed Bath & Beyond

17  lease but also the provision that says that they're not going

18  to be bound by any exclusive, yet the landlords are seeking to

19  enforce exclusives of the other tenants.

20         I'm going to find then that I'm not required to

21  reject the proposed assignments based on the plain language of

22  365(b)(3) for all those reasons.  But even in the alternative,

23  even if I were to give effect, full effect to the landlord's

24  plain language argument, the proposed assignments to Michaels

25  and Burlington that I noted here would not result in a breach

1 at all as the lease will continue and the landlord did what it

2 was supposed to do to make it continue.

3       And I'm also reading 365(b)(3)(C) in a manner that

4 places in context with the rest of 365 and allows the landlord

5 to the full benefit of what it bargained for and allows the

6 tenant, debtor tenant to maximize its recovery when it's

7 legally permissive to do so and doesn't effectively not only

8 provide greater rights to the landlord than are available

9 outside of bankruptcy, but also would allow the landlord to

10 breach the lease and specifically the provision that allows --

11 that says that it's not bound by future exclusives and then

12 benefit from that breach.

13       So it respects the rights, this interpretation

14 respects the rights of both parties but doesn't eviscerate any

15 clause at all. What it does is I believe interpret it in a way

16 that was intended by the legislature and the cases that

17 construe it including the very thorough and persuasive opinion

18 of Judge McMahon in the <u>Sears</u> case.

19       So on all those grounds, whether it's because it

20 would lead to a result that was never intended as in the case

21 before the Court here or whether on the basis that you read the

22 statute in context or also on the basis that even if you read

23 it the way the landlords are asking, there is no breach of the

24 lease because the debtor was not party to it and the debtor was

25 not party to it. And if there was a breach -- well, not party

1 to it and also the lease itself provides that there's no rent

2 abatement or other damages recoverable in that instance.

3 So I am going to reject the 365(b)(3)(C) arguments as

4 for the reasons described.

5 Subsection (D), turning to that now, requires

6 adequate assurance that assumption or assignment of such lease

7 will not disrupt any tenant mix or balance in the shopping

8 center. That's (3)(D). On this issue, the objecting

9 landlord's arguments is that allowing Michaels and Burlington

10 into the shopping centers is unacceptable because they are

11 direct competitors of other tenants such as Hobby Lobby, Dollar

12 Tree, and Ross/Dress For Less. In fact, some of the leases

13 specifically name these proposed assignees.

14 Oh, I should note here also that Fountains at this

15 point indicated that it was not pursuing the 365(b)(3)(D)

16 argument, so it just applies to the Pinnacle and Serramonte

17 stores.

18 And while it is undeniably debtors' burden to

19 demonstrate adequate assurance under 365(f), in the case of the

20 tenant mix, that burden arises -- before that burden arises,

21 "The burden is on the landlord to establish the existence of an

22 intended tenant mix, and that requires more than simply

23 demonstrating that it has provided each of its tenants with

24 exclusivity provisions." In re Toys "R" Us, 598 B.R. 233, 242.

25 As the district court found in the Lasalle-Trak Auto

130

1   case, "As a predicate to a finding that a shopping center is

2   entitled to protection under 365(b)(3)(D), the lessor must

3   demonstrate that there was an intended tenant mix in the first

4   instance.  Intent to create a diverse tenant mix must be

5   established in light of the lease terms.  In order to establish

6   that the proposed assignment" -- omitting a word or two there

7   -- "would disturb the tenant mix of the shopping center -- In

8   order to establish that the proposed assignment would have

9   disturbed a tenant mix of the shopping center, the landlord

10  must establish that the tenant mix was part of its bargained-

11  for exchanged in its lease and leases with the other tenants."

12  Lasalle v. Trak Auto, 288 B.R. 114,125 (E.D.Va. 2003)  Also

13  Toys "R" Us Property Co I, 2019 WL *6 (E.D.Va. February 11,

14  2019).

15          Here, as noted, the debtors had a virtually

16  unrestricted right to use the premises for any lawful purpose

17  which would include arts and crafts stores or discount apparel

18  stores.  Then, the Court further notes that tenant mix or

19  balance is not defined in the Bankruptcy Code, but the Court

20  agrees with the reasoning in Sears where the Court in a very

21  detailed and well-reasoned opinion found that given the lack of

22  any statutory definition for the words "tenant mix" and the

23  several possibilities for what it might mean, it makes perfect

24  sense to interpret the phrase "tenant mix" for the purposes of

25  365(b)(3)(D) in light of the lease whose performance is being

1  assured because the tenancy governed by that lease is part of

2  the tenant mix at the shopping center.  <u>Sears</u> 613 B.R. 68.

3         And here, I'm going to adopt the -- and really, in

4  total, the district court's reasoning at Pages 65 to 71 where

5  the court discussed in great detail the legal basis for that

6  interpretation in light of the case law, in light of

7  legislative history, in light of principles of statutory

8  construction.  And although the case is relied upon by the

9  landlords for the (A) portion and the (A) discussion, I find

10 the (D) discussion to be of particular relevance not only here

11 but also in the case of -- I'm sorry, I need to get the case

12 here -- in the case of the analysis for (3)(C), by analogy,

13 because it does require a focus on the lease at issue.

14        And that court, I'll just note in its conclusion

15 after that lengthy and detailed analysis, concluded as follows:

16 "The bankruptcy court cannot be read to place the landlord in a

17 better position than it would have occupied absent the

18 bankruptcy."  That's the <u>Great Atlantic & Pacific Tea Company</u>

19 case, 472 B.R. 675.

20        And then quoting from that case, "Section 365 does

21 not give a landlord the right to improve its position upon the

22 bankruptcy of the tenant.  The statute affords no relief to a

23 landlord simply because it might seek to escape a bargain it

24 made, quoting <u>Rock 49th Restaurant</u> case.

25        So then the court then concludes in support of the

1   argument and the words that the tenant mix will not be

2   disrupted, that must be read to guarantee the preservation of

3   the very businesses or at least the same type and number of

4   businesses that were resident in the mall just before Sears

5   declared bankruptcy.  And then it went on to distinguish the

6   Federated case which I agree with that is a distinguishing

7   factor, also.

8           So I think as a matter of law, I need to look at the

9   lease again between Bed Bath & Beyond and the respective

10  landlords.  And in none of those leases was any of these uses

11  prohibited.  So the landlords didn't care to negotiate that in

12  or weren't able to negotiate that into the leases when they

13  entered into the lease with Bed Bath & Beyond.  And maybe that

14  was because Bed Bath & Beyond wouldn't agree to it without it.

15  And so then to allow the landlord to just get out of that

16  provision because the debtor filed bankruptcy just does not

17  make sense to this Court.

18          So I think in that context, I don't really need to

19  look at other -- and especially in the context of the entire

20  shopping center.  When you look at the lease, the lease, these

21  uses are permitted, so why would that result in a disruption in

22  the tenant mix and balance as was contemplated by Congress and

23  the case law in light of the agreement between the parties, the

24  landlord and the tenant?

25          At the hearing on August 30th, the parties stipulated

1   to asserted facts and also the leases were all stipulated into

2   evidence.  No one pointed out in those leases where the tenant

3   mix was subject to a master lease or some particular tenant mix

4   that the debtor agreed to.  In fact, the opposite is true is

5   that the landlord granted Bed Bath & Beyond very broad rights

6   to assign the lease and, in fact, did not require it to honor

7   any exclusives.

8          So the tenant mix could have been affected by that

9   because it wasn't required to honor any exclusives, but that

10  was the deal.  And to give the landlord more rights than it

11  would have outside of the bankruptcy again is inconsistent for

12  the reasons stated.

13         So, again, I think I can decide that as a matter of

14  law.  But to the extent that we need to get into facts, the

15  Court finds that the evidence falls short of establishing that

16  the existing tenant mix is going to be disrupted in the

17  shopping center as opposed to the Power Center.  The only

18  evidence that was submitted in Mr. Aronoff's certification

19  says, "The contractual use, exclusive use, and assignment

20  provisions of the leases of the various tenants of the Power

21  Center including the Hobby Lobby lease, the BBY lease, and the

22  Dollar Tree lease allow landlord to control the tenant mix and

23  balance at the Power Center and the Promenade."

24         He had to limit it to the Power Center to even make

25  that statement.  But as the Court previously found, the

1  shopping center includes the 100-plus stores and the two stores

2  that -- the two arts and crafts stores that will be there are

3  two out of a hundred.  And they are very close to each other,

4  but to the extent again I have to consider facts and this goes

5  to the Elliott certification and the -- I'm not sure where it

6  stands on the Power certification.

7      But the Elliott certification makes clear that there

8  are plenty of places in the country where Michaels and Hobby

9  Lobby co-exist and where also the other proof about it that

10 Ross and Burlington co-exist in various places.  But I think

11 that gives further support to you have to look at the agreement

12 between the two key parties' argument because it is a function

13 of the individual leases.

14     In some places, the Michaels and the Hobby Lobby at

15 least two are right next to each other.  So in those cases,

16 that did not obviously by definition disrupt the tenant mix and

17 balance because they're there together.  And there's plenty of

18 other instances where even taking away the ones as to which

19 there's some question, there are a few stores away in the same

20 center.

21     So that's why you have to look at the agreement

22 between the parties, and whether it was for whatever reasons

23 the parties agreed that Bed Bath & Beyond could assign to

24 essentially whomever it wanted, that to me means that the

25 tenant mix was not that important because you could assign to

1  anyone who wasn't operating something illegal or a tattoo

2  parlor or something like that.

3          And, further, there is an indication that there would

4  be some possible diminishment in traffic at the Hobby Lobby

5  store, for example, when the Michaels first opens.  But then

6  that there might be beneficial synergies to that.  I don't

7  know.  I'm not an expert in that, but that also seems to make

8  sense to me.

9          And in any event, I don't find that the landlords met

10 their initial burden as to the mix.  But even considering the

11 facts that were provided in the context of the lease, I can't

12 find that there was a disruption of the tenant mix and balance

13 as contemplated by 365(b)(3)(D).

14         So that's the Court's ruling.  I'm going to allow the

15 assignment subject to all the terms of the leases including

16 whatever restrictions there might be and whatever the terms

17 are, they are.  There's no change in any of the terms.  It's

18 just being assigned exactly as it was or as is.  So that's the

19 Court's ruling.

20         MR. LeHANE:  Your Honor, Robert LeHane for the

21 record, Kelley Drye & Warren, on behalf of the Pinnacle

22 landlord and the Serramonte landlord.  Just a few questions,

23 Your Honor?

24         THE COURT:  Sure.

25         MR. LeHANE:  Is all of the evidence offered by all of

136

1 the parties now admitted into evidence?  I just want to --

2        THE COURT:  Yeah.  I didn't say that?  I'm sorry.

3 It's all admitted into evidence.

4        MR. LeHANE:  Okay.  That includes the leases, the

5 declarations, the Aronoff, the Elliott, the deposition

6 transcript excerpts, and the declaration exhibits?

7        THE COURT:  I meant to say that when I listed all of

8 them.

9        MR. LeHANE:  Yeah.

10        THE COURT:  But apparently I forgot.

11        MR. LeHANE:  Right.

12        THE COURT:  But they're all admitted into evidence.

13        MR. LeHANE:  The additional slides, the -- okay.

14        THE COURT:  They're all in.

15        MR. LeHANE:  Okay.  Now with respect to an order, we

16 would ask that we have time to work through an order, and we

17 would ask for that there would be the typical time to allow the

18 parties to as for file a notice of appeal and not that the

19 order be enforceable immediately.  We would ask to have some

20 time to work through that with counsel for the debtor.

21        THE COURT:  Okay.  That's no problem.  But I'm going

22 to tell you right now I'm not going to say that you can't have

23 those 14 days at least to try to come to the form of order or

24 do whatever it is that you want to do in connection with any

25 appeal.

1        I kind of said this, but maybe I didn't directly say

2 it.  This was a difficult decision for me.  There was a lot of

3 good arguments on both sides, and it required a lot of thought

4 and a lot of consideration and a lot of reading of cases and

5 hundred-page leases in small print.  And that's the way I came

6 out, but it's a difficult issue.  And I appreciate the

7 arguments on both sides.

8        And as much as I appreciate the arguments on both

9 sides, I more appreciate the absolutely impeccable and really

10 in many ways unprecedented professionalism, courtesy, and

11 respect that the parties have shown for each other throughout

12 these proceedings.  I have to call them one way or another, and

13 that means somebody wins and somebody loses.

14        But I appreciate that all the effort that goes into

15 this and even more the professionalism and good faith that has

16 been shown.  For example, that the landlord said let the lease

17 payment go for 30 days or actually 60 days.  That's good faith,

18 to me.  Okay?

19        MR. LeHANE:  Thank you very much, Your Honor.

20        THE COURT:  Thank you.

21        So we'll just mark this order to be submitted.  And

22 you know our Rules, this is not going to happen, but our Rules

23 provide that if the parties can agree, one party can submit on

24 seven days' notice and the other party has the right to object

25 and submit their own form of order.  I think the form of order

1  should be pretty simple, but I haven't seen that mean simple

2  ones in this case.  I'll be waiting on it and I'll be ready to

3  enter it when it's the appropriate time.  Okay?

4          Thank you very much.

5          MULTIPLE COUNSEL:  Thank you, Your Honor.

6          THE COURT:  Much appreciated again.  Have a good

7  afternoon.

8          UNIDENTIFIED COUNSEL:  Same to you.

9          UNIDENTIFIED COUNSEL:  Thank you, Your Honor.

10          THE COURT:  I'm sorry for keeping everybody late, but

11  I'm glad we got it done today.  I think it's helpful to all

12  involved.

13          (Proceedings concluded at 6:29 p.m.)

14                    *  *  *  *  *

15

16

17

18

19

20

21

22

23

24

25

1              **C E R T I F I C A T I O N**

2              We, KAREN K. WATSON AND DIPTI PATEL, court approved

3    transcribers, certify that the foregoing is a correct

4    transcript from the official electronic sound recording of the

5    proceedings in the above-entitled matter, and to the best of

6    our ability.

7

8    /s/ Karen K. Watson

9    KAREN WATSON, CET-1039

10

11   /s/ Dipti Patel

12   DIPTI PATEL, CET-997

13   J&J COURT TRANSCRIBERS, INC.      DATE:  September 1, 2023

14

15

16

17

18

19

20

21

22

23

24

25

**Exhibit B**

**In re Big Lots, Inc., et al., Case No. 24-11967 (JKS)**
**(Bankr. D. Del. 2024), 1/21/2025, Docket No. 1838**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|                              |     |                           |
| ---------------------------- | --- | ------------------------- |
|                              | .   | Chapter 11                |
| IN RE:                       | .   | Case No. 24-11967 (JKS)   |
|                              | .   |                           |
| BIG LOTS, INC., *et al.*,    | .   | (Jointly Administered)    |
|                              | .   |                           |
|                              | .   | Courtroom No. 6           |
|                              | .   | 824 North Market Street   |
|              Debtors.        | .   | Wilmington, Delaware 19801 |
|                              | .   |                           |
|                              | .   | Tuesday, January 21, 2025 |
| . . . . . . . . . . . . . . . . | . | 11:00 a.m.               |

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE J. KATE STICKLES
UNITED STATES BANKRUPTCY JUDGE

<u>APPEARANCES</u>:

| For the Debtors:        | Adam Shpeen, Esquire          |
| ----------------------- | ----------------------------- |
|                         | Stephen Piraino, Esquire      |
|                         | Kevin Winiarski, Esquire      |
|                         | Jacob Goldberger, Esquire     |
|                         | DAVIS POLK & WARDWELL LLP     |
|                         | 450 Lexington Avenue          |
|                         | New York, New York 10017      |
|                         |                               |
| For the Committee:      | Justin Alberto, Esquire       |
|                         | COLE SCHOTZ P.C.              |
|                         | 500 Delaware Avenue, Suite 200 |
|                         | Wilmington, Delaware 19801    |

(APPEARANCES CONTINUED)

| Audio Operator:         | Gauri Patel, ECRO             |
| ----------------------- | ----------------------------- |
|                         |                               |
| Transcription Company:  | Reliable                      |
|                         | 1007 N. Orange Street         |
|                         | Wilmington, Delaware 19801    |
|                         | (302)654-8080                 |
|                         | Email: gmatthews@reliable-co.com |

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1  APPEARANCES (CONTINUED):

2  For Brixmor Operating
   Partnership:              Laurel Roglen, Esquire
3                            BALLARD SPAHR LLP
                             919 North Market Street
4                            11th Floor
                             Wilmington, Delaware 19801
5
   For Expressway
6  Marketplace, LLC:         Ivan Gold, Esquire
                             ALLEN MATKINS LECK GAMBLE
7                              MALLORY & NATSIS LLP
                             3 Embarcadero Center
8                            12th Floor
                             San Francisco, California 94111
9
   For Gordon Brothers:      Steven Fox, Esquire
10                           RIEMER & BRAUNSTEIN LLP
                             Times Square Tower, Suite 2506
11                           Seven Times Square
                             New York, New York 10036
12
   For 5620 Nolensville
13 Pike, LLC:                Alan Root, Esquire
                             CHIPMAN BROWN CICERO & COLE, LLP
14                           1313 North Market Street
                             Suite 5400
15                           Wilmington, Delaware 19801

16 For Burlington Coat
   Factory Warehouse
17 Corporation:              Hailey Oestreich, Esquire
                             JACKSON WALKER LLP
18                           2323 Ross Avenue
                             Suite 600
19                           Dallas, Texas 75201

20 For Edgewater Park
   Urban Renewal, LLC:       Seth Niederman, Esquire
21                           FOX ROTHSCHILD LLP
                             1201 North Market Street
22                           Suite 1200
                             Wilmington, Delaware 19801
23

24

25

1  <u>APPEARANCES (CONTINUED)</u>:

2  For Aldi, Inc.:           Karen Bifferato, Esquire
                             CONNOLLY GALLAGHER LLP
3                            1201 North Market Street
                             20th Floor
4                            Wilmington, Delaware 19801

5                            James Rossow, Esquire
                             RUBIN & LEVIN, PC
6                            135 North Pennsylvania Street
                             Suite 1400
7                            Indianapolis, Indiana 46204

8  For Ogden Plaza,
   BDPM Group, and
9  Hartsville DE, LLC:       Carl Kunz, III, Esquire
                             MORRIS JAMES LLP
10                           500 Delaware Avenue
                             Suite 1500
11                           Wilmington, Delaware 19801

12
   For Highland and
13 Sterling, LLC;
   Big Holdings 2, LLC:      Leslie Heilman, Esquire
14                           BALLARD SPAHR LLP
                             919 North Market Street
15                           11th Floor
                             Wilmington, Delaware 19801
16

17 For Ross:                 Kevin Mann, Esquire
                             Cross & Simon LLC
18                           1105 North Market Street
                             Suite 901
19                           Wilmington, Delaware 19801

20

21

22

23

24

25

1                                INDEX

2   MOTIONS:                                              PAGE

3   Agenda
4   Item 18:  Ashley Furniture's Motion for Relief        10
                from the Automatic Stay (D.I. 1603,
5               filed 1/7/25)

6   Agenda
7   Item 15:  Motion of Debtors for Entry of an Order     11
                (I) Extending Time to Assume or Reject
                Unexpired Leases of Nonresidential Real
8               Property and (II) Granting Related
                Relief (D.I. 1351, filed 12/13/24)
9
                Court's Ruling:                           21
10

11  Agenda
    Item 13:  Thirty-five Individual Motions Seeking      22
12              to Compel Payment of Asserted
                Administrative Expenses Under Sections
13              503 and 365 of the Bankruptcy Code. For
                Movants and D.I. Numbers, See Attached
14              Exhibit A.

15              Court's Ruling:                           32

16  Agenda
    Item 19:  Motion of Highland and Sterling, LLC and    33
17              Big Holdings 2, LLC to (A) Compel
                Immediate Rejection of Lease and
18              Surrender Possession of the Premises
                Pursuant to 11 U.S.C. § 365 or,
19              Alternatively, (B) Grant Landlord Relief
                from Stay Pursuant to 11 U.S.C. § 362(d);
20              and (C) for Related Relief (D.I. 1605,
                filed 1/7/25)
21

22

23

24

25

1                                    INDEX

2       MOTIONS:                                        PAGE

3       Agenda
        Item 14: Fourth Notice of (A) Bid Deadline, (B)        37
4                Sale Hearing, and (C) Potential
                 Assumption and Assignment of Certain
5                Unexpired Leases (D.I. 1236, filed
                 11/25/24)
6

7                Court's Ruling:                         95

8

9       EXHIBITS:                                        PAGE

10      Debtors Lease Exhibits                           38

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (Proceedings commence at 1:01 p.m.)

2            THE COURT:  Good afternoon, everyone.  Please be

3    seated.

4            This is Judge Stickles.  We're on the record in Big

5    Lots, Case No. 24-11967.

6            Good afternoon.

7            MR. SHPEEN:  Good afternoon, Your Honor.  Quickly,

8    I just wanted to do a mic check to make sure everybody on

9    Zoom can hear us at the podium.

10           So, again, good afternoon, Your Honor.  For the

11   record Adam Shpeen of Davis Polk on behalf of the debtors and

12   debtors-in-possession. I am joined today by my colleagues,

13   Brian Resnick, Stephen Piraino, and others from the Davis

14   Polk law firm as well our co-counsel from Morris Nichols.

15           Your Honor, we filed an agenda last week on January

16   16th for today's hearing at Docket No. 1739.  We filed an

17   amended agenda the following day on January 17th at Docket

18   No. 1776, a further amended agenda last night at Docket No.

19   1784, and a yet further amended agenda filed about 45 minutes

20   ago at Docket No. 1798.

21           The good news is that the reason we've been filing

22   so many amended agendas, as my colleague, Mr. Piraino, will

23   discuss, is that many of the items that were originally

24   scheduled to be heard today have either been consensually

25   resolved or we have agreement to adjourn the matter until our

1  next omnibus hearing which is currently scheduled for

2  February 26th.

3           Your Honor, before we get into the specific agenda

4  items we thought it might be helpful to give Your Honor and

5  other parties in interest a brief status update since the

6  sale concluded about two weeks ago.  So, Your Honor, the good

7  news is that the GRP sale transaction was consummated on

8  schedule.  It closed on Friday, January 3rd, the day after

9  Your Honor entered the sale order.  We filed a notice of sale

10 closing on January 6th at Docket No. 1588.

11          Your Honor may have seen that five notices of

12 appeal were filed last week on January 16th, which was the

13 final day of the 14-day appeal period, with respect to the

14 GRP sale order and the accompanying orders shortening notice.

15 I won't discuss in any detail today except to say that the

16 debtors believe that these appeals are meritless and we'll

17 respond in due course.  Since the sale to GRP closed, we have

18 been -- we, the debtors, have been primarily focused on a few

19 critical work streams.

20          First, with respect to the transfer of assets to

21 GBRP and other designated buyers in the winddown of our

22 operations, the debtors and GBRP have been performing under

23 the terms of the sale agreement. The debtors have been

24 receiving payments according to the budget schedule that was

25 worked out as part of the APA and we have been working with

1  GBRP in transferring designated assets in accordance with the

2  asset purchase agreement.  So, that process is proceeding

3  well and at pace.

4       Second, just to preview for Your Honor as a coming

5  attraction, Your Honor may recall that one of the main

6  excluded assets from the GBRP sale was the debtors corporate

7  headquarters where the debtors will retain any proceeds of

8  the sale of the headquarters in excess of $10 million.  The

9  debtors have been in advance discussions with a buyer and

10  have been trading drafts of the sale agreement.  We may be

11  before Your Honor very soon requesting approval to proceed

12  with the sale of that asset.

13       Third, the debtors filed their exclusivity period

14  extension motion with respect to a plan and disclosure

15  statement on January 6th at Docket No. 1590. The debtors were

16  pleased that no parties objected to the requested relief and

17  that this Court enter the exclusivity extension order prior

18  to this hearing at Docket No. 1755.

19       Zooming out, we, the debtors, are in close dialogue

20  with the committee regarding how best to resolve these cases.

21  That is front of mind and we intend to do so to resolve so

22  these cases in a manner that is most efficient, whether

23  that's through a plan, a conversion, or dismissal.  So, no

24  decision has been made yet.  We are actively considering all

25  options but the extension of our exclusive period to file a

1  plan and disclosure statement is certainly helpful with

2  respect to that process.

3          Fourth and finally, one agenda item that we would

4  like to get out of the way at the outset has to do with -- is

5  the two motions filed by Nexus that was scheduled to be heard

6  today. I am pleased to announce that as reflected on the

7  agenda, Nexus has agreed to adjourn both motions to a later

8  date because the debtors and the committee have reached a

9  settlement in principle to resolve our and the committee's

10  objections with respect to those motions.

11          We, the committee, Nexus, are working to document

12  this settlement as we speak via stipulation, which we're told

13  Nexus aims to file under certification of counsel in very

14  short order following this hearing.  So, we wanted to, you

15  know, cross that off of the agenda for today.  And I don't

16  know whether counsel for Nexus is on the line, if they wanted

17  to say anything, so I will pause, but we can move on from

18  that agenda item.

19          So, with that, Your Honor, unless Your Honor has

20  any questions regarding the update, I will turn the podium

21  over to Mr. Piraino to walk through the specific agenda

22  items.

23          THE COURT:  Okay.

24          MR. PIRAINO:  Good afternoon, Your Honor.

25          THE COURT:  Good afternoon.

1          MR. PIRAINO:  Stephen Piraino, Davis Polk &

2  Wardwell on behalf of the debtors.

3          Your Honor, just before going into the substance I

4  just wanted to give a quick roadmap of how we would like to

5  proceed today.  First, there is a stipulation in progress

6  with Ashley Furniture to resolve their lift stay that my

7  colleague, Mr. Winiarski, will go through very briefly just

8  to give the Court an update on that.  We would then like to

9  go through our 365(d)(4) extension motion, address the

10  various administrative expense claim motions that were filed

11  and then end with the various lease sale matters as set forth

12  in the agenda.

13          THE COURT:  Are the parties in agreement to that?

14          MR. PIRAINO:  Okay, thank you, Your Honor.  With

15  that I will just cede the podium quickly to Mr. Winiarski.

16          MR. WINIARSKI:  Good afternoon, Your Honor.  Kevin

17  Winiarski, Davis Polk, on behalf of the debtors.

18          I rise now just to briefly discuss the Ahsley

19  Furniture lift stay motion, which Ashley filed at Docket No.

20  1603.  As Your Honor may know from Ashley's papers, the

21  motion sought to lift the automatic stay so that Ashley could

22  liquidate certain furniture inventory that had previously

23  been manufactured and designated for sale to the debtors

24  pursuant to the terms of a custom supply and manufacturing

25  agreement between Big Lots and Ashley.

1          Your Honor, I am pleased to report that as we

2    previewed in the amended agenda, the debtors, Ahsley, and

3    GBRP have reached a business deal in principle that would

4    allow for the listing of the stay subject to certain terms

5    and conditions on the resale of the afore mentioned furniture

6    inventory.  The parties are currently working to document

7    these terms and a revised form of order which we will expect

8    will be filed under COC by Ashley shortly after this hearing.

9          So, as we noted in the amended agenda, Ashley's

10   motion is not going forward today and we thank both Ashley

11   and GBRP's counsel for working constructively over the last

12   week to resolve the matter. Unless Your Honor has any

13   questions or Ashley's counsel, Mr. Schwaberg (phonetic), I am

14   not sure if he is on the line, has anything to add I will

15   turn the podium back over to Mr. Piraino.

16          Thank you.

17          THE COURT:  Okay, does anybody want to be heard

18   with respect to Ashley?

19       (No verbal response)

20          THE COURT:  Okay, I hear no one.

21          MR. PIRAINO:  Your Honor, again for the record,

22   Stephen Piraino, Davis Polk & Wardwell.

23          Your Honor, I now would like to turn to Docket No.

24   1351 which is the debtors motion for an extension of the

25   365(d)(4) deadline.  The debtors initial 120 day period to

1   assume or reject their unexpired leases expired on January

2   7th, 2025 and this Court entered a bridge order at docket No.

3   1551 extending the deadline through and including today.  The

4   debtors are seeking an extension of the deadline through and

5   including April 7th, 2025 which would be the full 210-day

6   period permitted by the bankruptcy code.

7           As of today, the debtors have over 850 leases and

8   extension of the 365(d)(4) deadline is a critical component

9   to GBRP getting the benefit of its bargain on the designation

10  rights it purchased as part of the asset purchase agreement

11  approved by this Court.  The GBRP sale order at Docket No.

12  1556 confirms this.  There is a finding in Paragraph (u) that

13  states, and I quote, "The designation rights are an integral

14  part of the APA and the sale."

15          As Your Honor will recall from the sale hearing,

16  GBRP purchased designation rights for all of the debtors

17  leases and under the APA the designation rights period would

18  run through February 28th, 2025 and can be extended by GBRP

19  in its sole discretion until March 31st, 2025. The debtors

20  submit that given the designation rights period in the APA

21  extending the deadline as requested in the motion is

22  appropriate under the circumstances.  GBRP certainly needs

23  the certainty that it could exercise their rights as

24  bargained for under the APA and to the extent GBRP does not

25  designate a lease during that period the debtors will need

1  time to determine what to do with those leases which is why

2  the full 210, instead of just to March 31st, is appropriate

3  here.

4           Your Honor, Section 365(d)(4) provides that the

5  deadline can be extended for cause which is, as we know, not

6  defined in the bankruptcy code.  Rather, the decision to

7  extend is within the sound discretion of the Court.  As set

8  forth in our papers, there are certain non-exclusive factors

9  that courts have used to evaluate whether cause exists.  The

10  so-called Burger Boys factors.  We believe that the record in

11  these cases, particularly after the sale hearing,

12  demonstrates that the factors do weigh in favor of extending

13  the deadline.

14           Again, I won't go through all of the factors but,

15  for example, the leases are certainly an important asset of

16  the estate and, again, I will point back to that Paragraph

17  (u) of the sale order that I just quoted.  And, obviously,

18  the value of the designation rights are derivative of the

19  value of the leases themselves.  These cases are certainly

20  complex given the number of leases across the country,

21  numerous landlords.  While the debtors have been before the

22  Court since September, the sale to GBRP has only closed three

23  weeks ago. Importantly, as set forth in the record of the

24  sale hearing, GBRP is paying the go-forward occupancy

25  expenses as set forth in the APA and the agency agreement.

1          Your Honor, there were eight objections filed.  We

2     are pleased that we resolved all but one at this point.  Just

3     to go through those quickly:

4          Docket 1435 was filed by various landlords, that

5     has been withdrawn.

6          Docket No. 1439 was filed by Core Shoppes, also

7     withdrawn.

8          Shortly before the hearing Steger Towne Crossing

9     withdrew their objection.  Their objection was filed at 1440.

10          We were able to resolve in advance of the hearing

11     the objections filed by Commodore at 1447 and Kin at 1438.

12          Then we have also had constructive dialog with Mr.

13     Gold who filed an objection at Docket No. 1701 and Ms. Roglen

14     who filed at Docket 1703.  With respect to Mr. Gold, I think

15     we are just confirming some amounts but we should, otherwise,

16     be there.  And with respect to Ms. Roglen who has a good

17     number, as you know, of landlords in this case, we are still

18     confirming a few numbers but believe that we have resolution

19     as set forth -- as I will set forth right now.

20          I guess two pieces to that.  One, we are continuing

21     to go through our records to make sure that our records, the

22     landlords records on go forward expenses are clarified, that

23     everything matches up.  Second, realizing that there is a

24     good amount of work to do to go through the 20 or so leases

25     that are remaining, what we would propose solely with respect

1    to the leases at 1703 is to extend the deadline to our next

2    omnibus hearing.  Hopefully by then it will all be resolved

3    and that we could then announce a resolution and have it

4    extended for the full period but certainly understand Ms.

5    Roglen's desire to reserve rights there.

6            So that really leaves just one objection which was

7    the objection filed at 1414 by Edgewater Park and this was

8    filed on December 23rd and I think the date here is

9    particularly relevant.  It was filed after the status

10   conference on December 19th where we announced that the Nexus

11   sale was not going forward but it was before the GBRP sale

12   hearing, before the sale was approved, before the motion was

13   even filed.  We think that the facts have certainly changed

14   since the filing of that objection.

15           For example, the movant there alleges that, and I

16   am quoting from the objection, "There is little reason to

17   suspect that the unexpired leases will play a crucial role in

18   the debtors reorganization."  Obviously, the designation

19   rights and the GBRP APA certainly undercuts that.  And given

20   that the facts and circumstances are very different the

21   debtors, through the GBRP sale order, are paying the go

22   forward freight we believe that the objection should be

23   overruled.

24           So, I will just pause there.

25           THE COURT:  Okay, let me hear from the objector.

1          MR. ALBERTO:  Good afternoon, Your Honor.

2          THE COURT:  Did the committee want to be heard?  I

3  just -- let me hear anybody who is in support of the motion.

4          MR. ALBERTO:  Thank you, Your Honor.  Justin

5  Alberto from Cole Schotz on behalf of the committee.

6          Very briefly, a little less then a month ago we

7  stood before this Court and took the position that allowing

8  the GBRP liquidation, as opposed to immediate conversion was

9  in the best interest of these estates as the most value

10  maximizing alternative that was available at that time but

11  only on the express condition that stub-rent and post-

12  petition rent continued not only to be budgeted but paid.

13          I understand this to be the case.  We thank the

14  debtors and their professionals and the landlords ands their

15  professionals in working through the reconciliations but as

16  long as that is the case the UCC supports this motion which I

17  believe is necessary to give effect to the GBRP APA and allow

18  these liquidations to continue.

19          Thank you.

20          THE COURT:  Thank you.

21          MR. FOX:  Good afternoon, Your Honor.  Steven Fox,

22  Reimer & Braunstein, on behalf of Gordon Brothers Retail

23  Partners LLC in its capacity as buyer under the asset

24  purchase agreement approved by Your Honor in your January

25  2nd, 2025 order.

1          I won't repeat everything that Mr. Piraino said,

2    but suffice it to say that the designation rights, as

3    reflected in this Court's order, were a critical and

4    essential component of the asset purchase agreement and the

5    overall transaction approved by this Court.  To date, my

6    client has committed over $400 million to this transaction

7    between the initial purchase price payment, stub-rent

8    payments and the budgeted expenses in addition to the amounts

9    payable under the agency agreement which is part of the asset

10   purchase agreement.  A critical component of that is the

11   designation rights.

12          As Your Honor will see in the last three items on

13   today's agenda, we have been working diligently with the

14   debtors and third parties to realize value in respect of the

15   designation rights.  We do expect, as has been publicly

16   announced, that Variety Wholesalers, our partner in this

17   transaction, will be designating not fewer then 200 stores as

18   early as this Friday which will be the subject of notices

19   that will be filed with the Court shortly thereafter but this

20   process is moving a pace with diligence and vigilance and

21   with the cooperation of all the parties concerned.  We

22   believe that the 365(d)(4) extension is not only warranted

23   here but also essential in order to give us the full benefit

24   of the transaction that was previously approved by this Court

25   and we would ask that you do so today.

1           Thank you, Your Honor.  Happy to respond to any

2    questions you may have.

3           THE COURT:  No thank you.

4           MR. GOLD:  Good afternoon, Your Honor.  Ivan Gold

5    of Allen Matkins.

6           We had filed an objection, as Mr. Piraino noted, at

7    1701 on behalf of two landlords affiliated with River Oaks

8    Properties.  Just so the record is clear and complete, we

9    have been working with the debtors.  The stub-rent has been

10   paid, other sums have been paid.  There are, I'll call it,

11   some loose ends or short pays with respect to January that in

12   the big scheme of things are de minimis enough that we will

13   figure out a way to solve that problem.  Obviously, with the

14   appropriate reservation of rights if we don't but with that

15   those remedies would be separate from the (d)(4) objection.

16   Our objection at 1701 can be considered resolved and

17   withdrawn for purposes of an extension.

18          THE COURT:  Thank you.

19          MR. GOLD:  Thank you, Your Honor.

20          UNIDENTIFIED SPEAKER:  Good afternoon, Your Honor.

21          THE COURT:  Excuse me, one more.

22          UNIDENTIFIED SPEAKER:  I'll sit back down.

23          THE COURT:  Ms. Roglen.

24          MS. ROGLEN:  Good afternoon, Your Honor.  Laurel

25   Roglen of Ballard Spahr on behalf of various landlords.

1      As. Mr. Piraino noted, we did file an objection to

2  the 365(d)(4) extension motion at Docket No. 1703.  We have

3  approximately 30 remaining leases that have not yet been

4  rejected in these cases and we have been working diligently

5  with our clients, and with the debtors, and their

6  professionals to identify any issues with payment of post-

7  closing lease obligations and stub-rent.  We have identified

8  about a dozen right now that haven't been resolved yet but

9  that is just, frankly, I think largely a function of timing

10  from when the sale closed, when those obligations became due,

11  when Gordon Brothers funded, when those payments were then

12  made to landlords.

13      So, we agree with the resolution, as Mr. Piraino

14  noted, that we will do an extension with respect to our

15  clients, we will agree and will not oppose entry of an order

16  extending the 365(d)(4) deadline through the next omnibus

17  hearing date on February 26th to hopefully allow us to

18  resolve all these issues and if not to bring it back before

19  this Court, of course, without prejudice to rights of the

20  debtors to obtain a further extension at that time.

21      Thank you, Your Honor.

22      THE COURT:  Anyone else?

23      MR. NIEDERMAN:  Thank you, Your Honor.  Seth

24  Niederman from Fox Rothschild on behalf of Edgewater Park

25  Urban Renewal, LLC.

1          Your Honor, we did file an objection.  As we state

2    in our papers, our client has prospective tenants that are

3    interested in the property and are asking for when they can

4    get it, when it will be available, which is an uncertain item

5    at this point.  We feel that the 120 days have passed, more

6    then 120 days, with the bridge order and that it is

7    appropriate, at least as to our lease and we are not saying

8    in total as to the motion, that the deadline not be extended.

9          I understand the argument as to the change in

10   circumstances but from what I hear on that argument is that

11   the extension is critical to GBRP, not to the debtors.  That

12   is an important distinction.  GBRP bought these designation

13   rights subject to a looming deadline to assume or reject.  At

14   this point extending it would be doing so for the benefit of

15   GBRP not for the debtors.

16         So, I will rest there on my papers.  Beyond that,

17   happy to answer any questions but we feel, at least, as to

18   the Edgewater lease the deadline should not be extended.

19         THE COURT:  I'm curious, have there been

20   communications with respect to specifically the Edgewater

21   Park lease?

22         MR. NIEDERMAN:  I know there have been discussions

23   about payments but as to the assumption or rejection not to

24   my knowledge.

25         MR. PIRAINO:  Your Honor, for the record Stephen

1  Piraino, Davis Polk & Wardwell, on behalf of the debtors.

2          Just very briefly, Your Honor, I think the first

3  point sort of who is this important to, of course, its

4  important to GBRP but its equally important to the debtors

5  who are a party to the APA.  This is a core of our

6  reorganization, the core of these cases, and we have

7  obligations under the APA, you know, including to insure that

8  GBRP can exercise its designation rights so incredibly

9  important to us.

10         Then, you know, with respect to ongoing

11 discussions, you know, myself, Mr. Fox, we are always

12 available to discuss with folks.  You know, we are happy to

13 have conversations.  That being said, you know, we do believe

14 that there is sufficient cause to extend the deadline and we

15 appreciate that folks are reserving rights, as Ms. Roglen and

16 Mr. Gold said, but we do believe that is appropriate to

17 extend the deadline at this point.

18         THE COURT:  Do you want to be heard further?

19         MR. NIEDERMAN:  Nothing further, Your Honor.

20         THE COURT:  I am going to overrule the objection of

21 Edgewater Park and grant the extension but I want Edgewater

22 Park continued to the next hearing together with Ms. Roglen.

23 I do find, as a general matter, that cause exists to extend

24 the deadline for 90 days including the importance of

25 preserving optionality with respect to the leases and the

1  time required to give effect to the designation rights.  But

2  as required by 365(d) debtors must continue timely payment on

3  account of post-petition rent obligations arising with

4  respect to these unexpired leases.

5        MR. PIRAINO:  Thank you, Your Honor.  Understood.

6  We will work right after this hearing, or, frankly, folks at

7  our office can do it during this hearing, with counsel to

8  Edgewater and with Ms. Roglen on the form of order which we

9  will submit under COC so we can get that signed up today.

10        THE COURT:  Okay, thank you.

11        MR. NIEDERMAN:  Thank you, Your Honor.  May I be

12  excused?

13        THE COURT:  Yes, you may be excused.

14        MR. PIRAINO:  And if Your Honor will just allow me

15  to grab my notes that I forgot.

16        THE COURT:  Yes, certainly.  And anyone else who

17  wishes to be excused after their matter is presented feel

18  free to leave.

19        MR. PIRAINO:  Okay, Your Honor, the next place that

20  we would like to go is on the administrative claims motions.

21  There are three that are before the Court today and before

22  ceding to counsel who has filed -- the Morris James firm

23  filed those three motions.  I did want to give Your Honor an

24  update on where we stand given the volume that were filed and

25  as Mr. Shpeen mentioned in his opening remarks that we are

1  proposing a process for the reconciliation of administrative

2  expense claims.

3       So, there are two categories of these, the trade

4  vendors and the landlords.  Starting with the trade vendors,

5  six movants had filed motions before the sale hearing and an

6  additional 17 were filed after the sale hearing that were

7  originally noticed for today.  Just, you know, for sake of

8  completeness there are a good number of motions that were

9  originally set for the February hearing.  So, just focusing

10 on what was originally noticed for today.

11      Of those 23 motions, each of the movants has agreed

12 to adjourn until the February omnibus hearing and I do just

13 want to specifically note two of those motions, Giftree

14 Crafts Docket No. 1584, and Hybrid Promotions Docket No.

15 1421.  We have, obviously, been in contact with counsel to

16 all of the movants but with respect to Giftree specifically,

17 you know, we have taken a look at our records, they have

18 taken a look at their records, I think we have a very small

19 difference, about $5,000.

20      So, we are happy to continue working with Miss

21 (indiscernible), counsel to Giftree, to make sure that our

22 numbers align with their numbers.  Similarly, with Hybrid

23 Promotions, we and AlixPartners have been in repeated contact

24 with their counsel, Mr. Carroll, and understand the delta

25 between their asserted claim amount and what our records show

1  is also quite small.  So, you know, we will certainly

2  continue working with Mr. Carroll to reconcile those amounts

3  on our end.

4         Then with respect to the landlord movants, there

5  were 12 motions filed for stub-rent and other amounts

6  purported to be due under Section 365(d)(3). So, of those 12

7  we were able to fully resolve one, Paragon Windermere and

8  Lebanon Windermere (phonetic), that was for stub-rent and

9  that has been paid in accordance with the GBRP sale order.

10  The remaining motions were either adjourned, those eight, or

11  the three motions filed by the Morris James firm, Ogden

12  Plaza, BDPM Group, and Hartsville which are going forward

13  today.

14         Just to say, you know, we strongly believe going

15  forward on those three motions today is not the right -- it's

16  inappropriate given the circumstances of the case right now.

17  We are continuing to reconcile amounts that are due.  We

18  think it's appropriate to, frankly, let the process play out

19  a little bit more.  As Mr. Fox noted, there will be further

20  clarity at the end of the week which stores are being

21  assumed. If the stores are being assumed cure costs are

22  naturally going to take care of these amounts; otherwise, we

23  are continuing to reconcile and it does take time.  I will,

24  you know, let the Morris James folks handle their motion and

25  we can respond at that point.

1          THE COURT:  Can I stop you there a minute.

2          MR. PIRAINO:  Sure.

3          THE COURT:  Is there an actual process in place.  I

4    know the motion, you know, asked for the Court to defer until

5    there was a process.  Is there a process?

6          MR. PIRAINO:  So, Your Honor, we are going to be --

7    this leads me, sort of, to the next piece of this which is to

8    give a walkthrough of the --

9          THE COURT:  Yes.

10         MR. PIRAINO:  -- proposed procedures.  So, we are

11   going to be filing a motion with these procedures.  We are

12   continuing to work with Mr. Alberto and the committee on

13   them.  We will be sharing a form of the motion with them.

14   Obviously, welcome their feedback.  But if Your Honor would

15   allow, I just would like to walk through what we are

16   proposing to do.

17         So, thinking of this as, sort of, three pillars.

18   The first pillar of the procedures would be the establishment

19   of a bar date for pre-sale closing administrative claims.

20   So, everything up to January 3rd we would propose, again

21   subject to discussions with the committee, around 21 days for

22   a bar date which we believe would give folks adequate notice.

23   The second pillar of that is, you know, the actual allowance

24   process.  While, you know, we do need to set a bar date we

25   also don't want to make this unduly burdensome on creditors.

1  So, we think that the most transparent and equitable way to

2  reconcile the claims would be to file and serve, essentially,

3  a schedule like we would do with prepetition claims that list

4  out what the debtors believe to be their administrative

5  expense exposure for trade vendors, for landlords.

6         If a claimant agrees with what is scheduled then no

7  further action is required. If they don't agree with what is

8  scheduled, they would file a proof of claim form.  We would

9  provide a form with our motion. The debtors would then have a

10 period of time to reconcile any disputed amounts.  And we are

11 hopeful that we, of course, could continue working

12 constructively with parties to avoid coming back before the

13 Court but if there is an amount that we can't reconcile then

14 we would seek Your Honor's intervention.

15        So, you know, again, the procedures are not in

16 front of you today.  There are a couple of details that need

17 to be ironed out but we do believe rather than the filing of

18 -- I think we are probably at 50 plus motions and expending

19 estate resources, resources of everyone in this room going

20 motion by motion that doing a process like this will both

21 protect claimants rights and promote judicial efficiency and

22 economy.

23        THE COURT:  So, speaking of resources and economy,

24 so for those parties who have already filed motions would

25 they then have to file separate --

1          MR. PIRAINO:  No, Your Honor.  We will, of course -

2  - they will be scheduled and if -- you know, just to use an

3  example, if we schedule it for $1 and in their motion, they

4  ask for $5 they won't have to file a separate claim.  We will

5  know that from the filing of the motion and what they

6  asserted in there that there is a disputed amount.

7          THE COURT:  Okay, and would you anticipate getting

8  this motion on file for a February hearing?

9          MR. PIRAINO:  Yes, Your Honor.  We would like to

10  get it on file in advance.  February 11th would be 14 days'

11  notice but we are working hard to get it on file in advance

12  of that so that it could then be heard on the 26th.

13          THE COURT:  Okay, is the hearing February 26th?

14          MR. PIRAINO:  Yes.  So, I guess the 12th is the 14

15  days.  Math is not my strong suit today.  And, Your Honor,

16  just to say, at this point with the -- again, I will cede the

17  podium in just a minute to the ones that have not been

18  adjourned but we do believe that granting any of the motions

19  at this point would just, sort of, undermine the process.  We

20  realize there is not a motion before you but we were able to

21  get, you know, 30 some odd folks on board with the contours

22  of this process and we believe it would be unfair to the

23  remaining claimants to, sort of, do these on an ad hoc basis.

24          THE COURT:  Okay.

25          MR. ALBERTO:  Good afternoon, again, Your Honor.

1  Justin Alberto, Cole Schotz, on behalf of the committee.

2          The committee is fully supportive of claims being

3  filed, reconciled to whatever extent possible, ultimately

4  paid as quickly as possible.  That process should be orderly

5  and organized both to give claimants a fair opportunity to

6  submit their claims and also to minimize any costs of the

7  estate professionals expended in reconciling them.  What that

8  process shouldn't be, Your Honor, is a race to the

9  courthouse.  That would be inconsistent with this Court's

10 precedent and while it may benefit a few, I would believe it

11 would cause more harm to the many since not every creditor in

12 this case has the benefit of attentive counsel and likely

13 won't understand that they even have to file a claim until

14 they receive notice of an admin claims bar date.

15          So, with that, Your Honor, I think these are better

16 off left for an orderly process and we look forward to

17 continuing to work with the debtors in what that process and

18 the details look like.

19          THE COURT:  Okay, can I ask one question --

20          MR. ALBERTO:  Of course.

21          THE COURT:  -- before the debtors and the committee

22 sit down.  Do I understand that you talked about the pre-sale

23 closing and I think I might have derailed your presentation.

24 Were there more than one bucket?

25          MR. PIRAINO:  So, Your Honor, for the record

1   Stephen Piraino.

2           With respect to the procedures, it would just be

3   for the pre-sale. The post-sale will be paid in accordance

4   with the administration budget as noted at the sale hearing.

5           THE COURT:  Okay.  Mr. Kunz.

6           MR. KUNZ:  Good afternoon, Your Honor.  Carl Kunz

7   on behalf of objections filed by Ogden at 1436, BDPM at 1451,

8   Shops at Hartsville at 1566.

9           Your Honor, I appreciate the debtors wanting a

10  streamlined process but I will start with, you know, we were

11  at a hearing for a long time on New Years Eve where the issue

12  of what exactly go forward expenses were and which ones were

13  going to be paid, we had been asking for a month as to

14  whether that includes the true ups that had been billed and

15  will become due under 365(d)(3) that Your Honor just said is

16  material with respect to, at least, in this particular

17  circumstance BDPM, which is owed $45 plus thousand dollars as

18  of tomorrow, and Shops at Hartsville which will be owed

19  $22,000 plus as of the 27th, next Monday.

20          All we did, Your Honor, we were happy to continue

21  with the other 32 motions that were filed as long as we got

22  assurances that those amounts would be paid as and when due.

23  The debtors would not provide that confirmation and have not

24  provided that confirmation as of today.  And the fact is,

25  Your Honor, there was absolutely no substantive response to

1  our motion.  Despite having the bills for over a month or a

2  month, there has been no question about those bills whether

3  they're due, whether they're appropriately calculated; they

4  have had them and we have had not response as to whether they

5  have a question about them or whether they are going to pay

6  them most importantly.

7       Instead, the response says, well, we shouldn't have

8  to do anything.  We're going to provide a process for dealing

9  with administrative claims that Your Honor just heard.  The

10 fact is there is a process, its called 365(d)(3).  Those

11 amounts become due under the terms of the lease within 30

12 days of being billed.  They have been billed.  The debtors

13 ought to be able to know now whether those amounts are going

14 to be paid or not.  That is all we ask.  If they are not, one

15 of my clients wants to immediately cease GOB sales at their

16 property, that's BDPM, and have that lease returned to them

17 immediately.  If they are going to be paid then BDPM, like

18 others, will have to ride out the process so long as those

19 amounts are being paid in the ordinary course but as of right

20 now, we have no assurances that those amounts are either

21 budgeted or are going to be paid in the ordinary course.  We

22 think we are entitled to that.

23      So, Your Honor, again, BDPM is due $45,000 plus as

24 of tomorrow and Shops at Hartsville is due $22,000 plus as of

25 January 26th but I think its ultimately Monday, if I have my

1  dates correct.  Your Honor, that is all that we are asking

2  for is a confirmation today, no testimony, no anything.  Our

3  go forward expenses under 365(d)(3) that are becoming due are

4  they going to be paid.  I don't need to wait for an

5  administrative process that may be heard at the end of

6  February.  We are not lumped into that administrative

7  process.  Some of my clients are.  Some of my clients had

8  pre-closing administrative claims and they will be in that

9  process but for, at least, BDPM and Hartsville they are not

10  in that process with respect to these payments and I would

11  like to know whether they are not going to be paid or not.

12           Thank you.

13           THE COURT:  Okay, let me hear from the debtors.

14           MR. PIRAINO:  Your Honor, for the record Stephen

15  Piraino, Davis Polk & Wardwell.

16           Your Honor, with respect to the asserted amounts,

17  you know, the debtors are happy to continue to work with Mr.

18  Kunz.  Again, I think we do need to go -- there is, again,

19  over 800 some odd leases here. I do think we need to

20  reconcile our records against his and be given an opportunity

21  to do that.  We are not looking to undo the sale order or

22  what was budgeted. It will be paid pursuant to the sale

23  order.  We just need the opportunity to go through these and,

24  again, we are happy to work with Mr. Kunz on that.

25           THE COURT:  Anyone else want to be heard?

1          (No verbal response)

2          THE CORUT:  I am very sympathetic -- Mr. Kunz, did

3    you want to be heard?

4          MR. KUNZ:  No, Your Honor.

5          THE COURT:  Okay. I am very sympathetic to the

6    objectors in this case but I also agree with the debtors and

7    the committee that under the facts of this case it isn't a

8    prudent use of time or expense engaging in ad hoc litigation

9    of claims.  So, the debtors really do need to implement,

10   timely implement, an orderly process to reconcile and

11   determine the validity of administrative expense claims.

12   It's important that this process be orderly and equitable but

13   its also important that the debtors communicate with

14   creditors.

15          So, at the expense of sounding like your mom, I am

16   going to suggest that the parties here speak because I don't

17   want the end of February to roll around and we're in the same

18   predicament we are here today adjourning because we haven't

19   had an opportunity to look at claims.  And I mean that as no

20   disrespect to anyone.

21          MR. PIRAINO:  Of course, Your Honor. Completely

22   understood.  We definitely will use the time between now and

23   the next hearing to resolve as much of this as we can.  We

24   certainly want to get people on board with the procedures and

25   folks such as Mr. Kunz who believe that it may be a post-

1  closing and covered by the APA, we will certainly work with

2  him and hopefully not have to bring any further disputes

3  before Your Honor.

4          THE COURT:  Thank you.

5          MR. PIRAINO:  Thank you, Your Honor.

6          THE COURT:  I welcome disputes.  What I don't

7  appreciate is when parties indicate that they haven't gotten

8  responses and that is all I am asking is to have

9  communication.

10          MR. PIRAINO:  Understood, Your Honor.

11          THE COURT:  You may disagree ultimately, and that's

12  fine, but communicate.

13          MR. PIRAINO:  Understood, Your Honor.  And at this

14  point I think the next group of items on the agenda relate to

15  certain lease matters, so I will cede the podium to my

16  colleague, Mr. Goldberger.

17          THE COURT:  Okay.

18          MR. GOLDBERGER:  Good afternoon, Your Honor.  Jacob

19  Goldberger, Davis Polk, on behalf of the debtors.

20          There is one item that I think we can dispense with

21  quickly and that is the motion that Ms. Heilman filed to

22  compel rejection.  We have been working constructively with

23  the counterparties there.  You know, the debtors filed this

24  morning a notice of designation rights notice that we

25  believe, and we're in agreement with Ms. Heilman, can push

1   this matter.  I think we are going to reach out to Chambers

2   to see if we can find some time to schedule calendars

3   approving at the end of that designation period, some time in

4   February, but I will cede to Ms. Heilman.

5          THE COURT:  Okay, bring me up to speed.  Sorry, I

6   am not sure what all has been filed. I have been focusing

7   exclusively on the agenda so if there is something else

8   filed, please let me know.

9          MS. HEILMAN:  Good afternoon, Your Honor.  For the

10  record Leslie Heilman of Ballard Spahr on behalf of the

11  landlord, Highland and Sterling, LLC and Big Holdings 2, LLC,

12  for Big Lots store located in National City, California.

13         I am happy to bring you up to speed with respect to

14  the motion that I am presenting today; although, Mr.

15  Goldberger almost stole my thunder.  But we are here today on

16  the landlords motion to compel the immediate rejection of the

17  lease and surrender of the premises or in the alternative we

18  sought relief from stay which was filed as a result of a

19  number of the debtors defaults, among other reasons, with

20  respect to the lease and it was filed at Docket 1605 on

21  January 7th.

22         The debtors in turn filed an objection to the

23  motion on January 15th at Docket No. 1727 which did make an

24  umber of factual assertions that we don't believe were

25  supported by any evidence. So, in response we did serve them

1  with discovery on January 16th with a return date of

2  yesterday at noon.  The debtors have objected to those

3  document requests in their entirety so all those responses

4  are still outstanding but notwithstanding the debtors

5  informally provide the landlord with two schedules to the APA

6  that they believe are responsive to the landlords request and

7  the landlord is still reviewing those documents.

8          In addition, since the filing of the motion, the

9  debtors have communicated to the landlord that the utilities,

10 security system and insurance to the premises have been

11 reinstated and will remain in place, at least, through the

12 end of January.  An open point, Your Honor, with respect to

13 that immediate harm to the landlord is that we will need to

14 work to make sure the February operating expenses are

15 covered.  And about two hours before today's hearing the

16 debtors now have filed a designation notice designating the

17 lease for assumption and assignment to Burlington Coat

18 Factory; nothing like waiting till the last minute.

19          THE COURT:  I enjoyed reading your papers.

20          MS. HEILMAN:  Your Honor, we do believe that many

21 of the issues presented by the motion continue to exist but

22 we also recognize the economy is a scale and we do believe

23 there is some overlap in the issues that will be determined

24 in connection with the assignment notice.  In that regard we

25 do believe that we would like to treat today as a scheduling

1  conference on the motion and we would like to seek some time

2  though from Your Honor before the February 26th omnibus

3  hearing because time is of the essence. This lease is sitting

4  dark and there are reasons its in considerable default. The

5  stub-rent has not been paid.  So, the landlord continues to

6  be harmed here but we do believe there is an overlap and we

7  want to use the time to respond to the assignment notice,

8  raise the issues that are present in our motion in

9  conjunction with there, and reach an agreement on a schedule.

10        Shortly before the hearing, the parties were able

11  to confer and they do believe the week of the 10th is open

12  for the parties.  Mainly the 13th is all parties seem to be

13  available if Your Honor is available.  That is a date that we

14  would like to set a hearing that week.

15        THE COURT:  Okay, I am going to have Chambers look

16  for a date while we're here and we will get back to you.

17        MS. HEILMAN:  In addition to that, Your Honor, I

18  believe the objection deadline on the assignment notice will

19  be February 4th.  The week of -- we were talking about the

20  week of the 10th for a hearing and February 10th as a reply

21  deadline for both parties, both the landlord to reply to its

22  motion and for the debtor to reply to any objection filed by

23  the landlord.

24        In the meantime, I do believe the parties will

25  continue to work consensually to resolve the issues. There

1  are discussions ongoing with respect to the stub-rent, the

2  payment of the stub-rent.  The landlord is in discussions

3  with Burlington. All parties are working towards a resolution

4  and we do hope that we will narrow any issues prior to that

5  hearing.

6          THE COURT:  Okay, I appreciate the parties working

7  together. Thank you.

8          MR. GOLDBERGER:  Your Honor, that brings us to the

9  next lease sale matter which is a lease sale, proposed

10 assumption and assignment to Burlington for the lease in

11 Nashville.  This is something that the debtors and GBRP seek

12 to pursue.  As an initial matter we filed, in connection with

13 our reply to objections from the landlord and from Ross a

14 motion to seal the Ross lease.  We would appreciate if the

15 Court could enter that motion as an initial matter.

16         THE COURT:  Does anyone object to the sealing of

17 the Ross lease?

18     (No verbal response)

19         THE COURT:  Okay, I hear no one.  I will enter that

20 order.

21         MR. GOLDBERGER:  Thank you, Your Honor.

22         There are four pieces of evidence that we would

23 like to enter into evidence that we have listed on our

24 exhibit list for today that we filed this morning.

25         THE COURT:  Do you have a copy of that exhibit list

1   or can you tell me a docket number?

2          MR. GOLDBERGER:  The four items are the debtors

3   lease, the Ross lease, Ross is a co-tenant in the shopping

4   center, the first leased modification is the debtors lease

5   modification, and the memorandum of lease of the Ross lease.

6   So, those are the four items that we understand all parties

7   are in agreement to enter into evidence.

8          THE COURT:  Does anyone object to the admission

9   into evidence of those four documents, which are Docket

10  Numbers 1737-1, 17 -- they're all 1731.  Anyone object?

11      (No verbal response)

12         THE COURT:  Okay, I hear no one.  They're

13  admitted.

14      (Exhibits received in evidence)

15         MR. GOLDBERGER:  Thank you, Your Honor.  With

16  respect to the objections themselves and the question before

17  Your Honor, the question before Your Honor today is very

18  narrow.  Let me start by explaining what the question is not.

19  The question is not whether the debtors' lease allows for

20  this assumption and assignment to Burlington.  The assignment

21  and use provisions of the debtors' lease undeniably provide

22  authority for the debtors to assign this lease to Burlington.

23         With respect to Ross's restrictive use provision

24  referencing Burlington, the applicable state law is clear.

25  The debtors' bargained for the expanse of assignment and

1  usage rights they have under their lease. and Ross and the

2  landlord were in no position to unilaterally restrict those

3  rights at a later point.  The landlord and Ross admit as

4  much.  Neither objection so much as mentions the debtors'

5  lease in connection with this issue.

6          The issue before Your Honor today really has

7  nothing to do with the debtors' lease at all.  Rather, the

8  question before Your Honor is the narrow legal question of

9  interpreting Section 365(b)(3).  Those provisions describe

10  the heightened standard for adequate assurance in the

11  shopping center context and require, in part, adequate

12  assurance that the assignment of the lease will not breach

13  any exclusivity provisions in other leases in the shopping

14  center.

15          The question is simple:  Are those Code provisions

16  intended to protect the rights landlords bargain for in their

17  leases with debtor tenants, or did Congress gift landlords

18  new rights they don't have under applicable state law simply

19  because a debtor/tenant filed for bankruptcy.  The answer,

20  Your Honor, is clear in the words of the Code, the

21  legislative history, and case law.

22          Under the Code, adequate assurance is only

23  assurance of obligations existing under the debtors' lease.

24  What 365(b)(3)(C) means is that, to the extent that the

25  debtors' lease requires them to abide by restrictive

1  provisions in other shopping center leases, compliance with

2  those restrictions must be adequately assured upon lease

3  assumption and assignment.

4         What 365(b)(1) says is that the trustee must

5  provide adequate assurance of future performance under such

6  contract or lease.  The entire concept of adequate assurance

7  is to assure performance of obligations under the relevant

8  lease.  365(b)(3) then adds that for the purposes of

9  paragraph (1) of this subsection, adequate assurance of

10  future performance of a lease of real property in a shopping

11  center includes adequate assurance, et cetera.  By its

12  explicit language, 365(b)(3) is clarifying the words adequate

13  assurance of paragraph 1, it is not impacting the fact that

14  adequate assurance is entirely assurance of performance under

15  such contract or lease.

16         The intent of 365(b)(3) is simple.  In the

17  shopping center world, many landlords enter into carefully

18  structured leases that preserve a certain tenant mix and

19  interact with other leases in intentional ways.  Often, if

20  one stick is pulled out, the whole tower can collapse.

21  Congress made clear in 365(b)(3) that to the extent a

22  debtor's lease was designed to be subject to other leases in

23  a shopping center, the landlord's interest in keeping the

24  shopping center structure intact is valuable enough to

25  enforce against the debtor and their assignee, but Congress

1  is not simply giving out freebies on the back of a bankrupt

2  debtor.  The legislative history says the same thing.

3          As the Third Circuit Court of Appeals in the

4  Joshua Slocum case said that the intent of Congress in

5  365(b)(3) is to assure a landlord of his bargained-for

6  exchange.  The Fourth Circuit in In re Trak Auto also

7  explained that, "Congress's purpose in 365(b)(3)(C) is to

8  preserve the landlord's bargained-for protections with

9  respect to premises use and other matter that are spelled out

10  in the lease between the debtor and the tenant."

11          365(b)(3) is all about protecting existing rights,

12  not creating new ones.  The case law says the same thing.  In

13  the Toys "R" Us bankruptcy, the debtor tenant sought to

14  assign a lease to Burlington in the face of a restrictive use

15  provision in a Ross lease, the same facts that are here

16  today.  The Toys "R" Us court concluded that the preexisting

17  Toys R Us lease was not subject to the Ross exclusive use

18  provision or restrictive use provision under state law and

19  that, therefore, 365(b)(3) was inapplicable.  The Toys "R" Us

20  court got it right and the debtors urge this Court to approve

21  this identical assignment.

22          We will rest on our papers and the Amendola

23  declaration filed at Docket 1375 with respect to our

24  arguments that the Ross lease by its terms doesn't restrict

25  this assignment.

1            And with respect to the 180-day go-dark period

2    that Burlington is seeking, we just note that the go-dark

3    period should be a matter of mutual interest.  Burlington

4    will be paying rent for the property upon assumption and is

5    incentivized to get up and running as quickly as possible.

6            And with respect to the form of order, we believe

7    that the form of order entered in connection with the other

8    December-waived lease sales is appropriate, but we've had

9    constructive dialogue with the counterparties and I think we

10   can get to a place of mutual agreement on a form of order if

11   this Court approves the assignment to Burlington.

12           THE COURT:  Okay, thank you.

13           MS. OESTREICH:  Good afternoon, Your Honor, Hailey

14   Oestreich with Jackson Walker on behalf of Burlington here

15   today.  I know we just heard from debtors, so I agree with

16   their points, and Burlington, as noted in our papers, fully

17   agrees and supports and would like to partake in their

18   argument.  I'm not going to go back over everything for the

19   sake of efficiency, but there are a couple points that I

20   would like to make.

21           As debtors' counsel noted, there have not been any

22   questions about whether Burlington, a Fortune 500 company,

23   has provided or can provide adequate assurance for this

24   lease.  As debtors' counsel has noted, we're really here

25   talking about the Ross lease, who is a third party not only

1  to this bankruptcy, but actually to the assignment at issue

2  here.

3          As debtors' counsel noted, that this lease,

4  debtors' lease does not have any restrictions that would

5  prohibit this assignment if we weren't in the bankruptcy

6  context.  Instead, what landlord and Ross are asking you to

7  do today, Your Honor, is make it so that the debtor actually

8  has less rights and less of a chance to recover for the

9  benefit of the estate in the bankruptcy context than out of

10  it.

11          For all the reasons that debtors' counsel

12  discussed about the language of the Code, the harmony of

13  Section 365(b) and (b)(1) and (b)(3), and just the entire

14  purpose of bankruptcy as a whole, we believe that Ross and

15  landlord's interpretation of 365(b)(3)(C) should be rejected,

16  and a strict reading should be rejected, because of the

17  bizarre consequence that it could create in this case of

18  granting a landlord additional rights in a bankruptcy that

19  they would not have outside of it.

20          Your Honor, on the go-dark objection, we agree

21  with debtors' analysis and that the go-dark provision is in

22  fact an anti-assignment provision.  As debtor said, my

23  clients, if they did get this lease, would be paying rent

24  during the go-dark period and would have every incentive to

25  make the go-dark period as limited as possible.

1          The final point that I would just like to make is

2     the impact that this might have on third party bidders such

3     as my client.  My clients went through a bidding process,

4     were the successful bidder, and won through that process the

5     right to assign this lease.  By putting third parties in a

6     position where they can spend money to not only go through

7     the process, presumably win by becoming the successful

8     bidder, but then having a fight where they're expending more

9     cost to try to deal with these outside-party leases that

10    don't actually govern the lease at issue, it could really

11    have a chilling effect on who's willing to jump into this

12    sphere if there's always kind of a bogeyman that might be in

13    the closet that they have to keep an eye out.

14          And for those reasons, Your Honor, because the

15    assignment to Burlington would not violate the terms of

16    debtors' lease that we're trying to assign, Ross's and

17    landlord's objection should be overruled here.

18          THE COURT:  Thank you.

19          MR. FOX:  For the record, Your Honor, Steven Fox,

20    Riemer & Braunstein, on behalf of GBRP.

21          As you will hear for the next period of weeks a

22    common theme and that is the value ascribed to the

23    designation rights and the rights under the asset purchase

24    agreement acquired by my client, this is the first in a

25    series that you're going to hear, and we are acutely

1  sensitive to any effort by a landlord to expand its rights

2  and otherwise limit the debtors' rights in respect of

3  assumptions and assignments and to graft onto -- terms into

4  the existing leases that don't presently exist, and otherwise

5  seek to circumscribe the debtors' ability in furtherance of

6  anti-assignment clauses.  We expect that these are types of

7  issues, given the age of some of the debtors' leases that are

8  going to crop up again, and we'd like to, as the saying goes,

9  nip it in the bud as quickly as we can.

10         This is a critical component for my client.  We

11  believe that the facts support approval of the assumption and

12  assignment and grant of the debtors' request here before the

13  Court.  As Counsel noted, there is no actual objection to

14  assumption and assignment relating to adequate assurance or

15  any other dispute with respect to cure amounts or otherwise,

16  and my client is four-square in favor of proceeding today

17  with the assumption and assignment to Burlington.

18         THE COURT:  Thank you.

19         MR. FOX:  Thank you, Your Honor.

20         MR. ROOT:  Good afternoon, Your Honor, for the

21  record, Alan Root of Chipman Brown Cicero & Cole on behalf of

22  5620 Nolensville Pike LLC, which is the landlord for the

23  shopping center at issue in Nashville, Tennessee.

24         I'll give my presentation in a moment, but I just

25  wanted to address the last comment that Burlington made when

1  they were at the podium that they went through a process.  I

2  saw Your Honor nodding at that and I understand that

3  argument, but I want to be clear on two points.  One, the

4  memorandum of lease, which is in evidence, Your Honor, was

5  publicly recorded in 2022 in Davidson County, Tennessee,

6  that's public record.  It has the Ross exclusivity provisions

7  in there.  So this is not as if they were a bidder that are

8  finding out about this at the first time while we're here at

9  the podium, Your Honor, or after our objection was filed.

10         And further, Your Honor, Nolensville participated

11  in that auction and prior to the auction did raise this

12  issue.  Nolensville was actually the backup bidder at

13  $250,000, so there's only a $50,000 difference between the

14  successful bid and the backup bid here, Your Honor.  So these

15  are not issues that came up post-auction, Your Honor, and so

16  I think the parties were aware.  So, to the extent there's an

17  argument that they went through this process, they expended

18  resources, it's not as if they're learning about it for the

19  first time after the auction.

20         THE COURT:  So would your argument be then it's

21  case specific with respect to each lease that the landlord

22  should investigate -- or the party to whom the lease is being

23  assigned should independently go look at the lease and all

24  the other leases in the shopping center to determine whether

25  there are restrictions to subsequently signed leases?

1    MR. ROOT:  Well, Your Honor, I think factually

2  here that certainly could be an important factor, Your Honor.

3  I mean, all the parties were well aware of this.

4    In general, Your Honor, I think Section

5  365(b)(3)(C) is very clear, it has two requirements, the

6  debtors and Burlington have the burden on those.  It's not

7  just to show that there's no violation of the debtors' lease

8  being assigned, but they also have to show that it won't

9  violate other leases in the shopping center, including

10 exclusivity provisions.

11    That's what the Code provides.  The cases are sort

12 of all over the place on this, Your Honor, and we recognize

13 that cases like Toys "R" Us have said otherwise, but,

14 respectfully, those cases are outside the Third Circuit, I

15 think they got them wrong.  They've collapsed the statutory

16 provision into one requirement when there are two.  And I

17 think the Third Circuit in Joshua Slocum recognized that you

18 need to look not just to the debtors' lease, but to the other

19 leases in the shopping center, because that's what

20 365(b)(3)(C) says Your Honor should do.  And it's very clear

21 here, Your Honor, that Section 15.3 of the Ross lease

22 prohibits other off-price competitors in the shopping center

23 and it specifically names Burlington as a competitor.

24    And, unlike the cases like Toys "R" Us that were

25 cited by the debtors, I think there's a factual distinction

1  here as well, Your Honor.  Everybody said you only need to

2  look at the Ross lease, well, I don't think that's true.  I

3  think the Burlington lease -- or, excuse me, the Big Lots

4  lease that's being assigned and which is also in evidence has

5  provisions in it that provide -- specifically at Section 4(a)

6  that provide that you can use it for any other purpose, the

7  leased premises for any other purposes, provided that it does

8  not violate then-existing exclusive use rights in the

9  shopping center.  So there is a provision in the lease that

10  is being assigned that references other exclusivity

11  provisions, Your Honor.

12          And we think, Your Honor, that puts us squarely in

13  other cases that have come out the way we are arguing here,

14  Your Honor, which includes the Eastern District of Virginia

15  decision in Heilig-Meyers, which is at 294 B.R. 660.  There

16  the court looked both at the debtor lease being assigned and

17  at the lease that was -- another shopping center lease that

18  had an exclusivity provision and, on similar facts, denied

19  the assumption and assignment because it violated the

20  exclusivity provisions of the non-debtor lease.

21          Your Honor, I'd also point you to the Three A's

22  Holdings case with Judge Shannon, which is at 364 B.R. 550.

23  There Judge Shannon, in applying 365(b)(3)(C), looked not

24  just at the debtor lease, but also at restrictive covenants

25  and restrictive use provisions that were recorded publicly,

1  and found that the assignment violated those and denied the

2  assumption and assignment.

3          So, Your Honor, I think, as a general statement,

4  the Code -- the plain meaning of the Code says what it says,

5  but I think factually here as well, Your Honor, I think we

6  fall into a camp of cases that would prevent assignment of

7  this particular lease.

8          THE COURT:  Let me ask you -- you cited to (4)(a),

9  what does 4(a) mean by the provision "then-existing"?

10         MR. ROOT:  That's a good question, Your Honor, and

11 I read through that and gave that some thought.  I think what

12 it means here, Your Honor, is it says you can use it for any

13 other retail purpose as long as when you're going to use it

14 for that other purpose, at the time you're going to use it

15 for that other purpose, it doesn't violate any then-existing

16 use rights in the shopping center.  Well, the purpose is

17 going to change upon assignment, it's no longer going to be

18 Big Lots, it's going to be Burlington.  So you need to look

19 at it as then as now, when the use changes, if the assignment

20 was today, the use changes today, and is there an exclusivity

21 provision in play today that would be violated.

22         Your Honor, I just want to make sure I don't have

23 any other arguments here.  I just wanted to point out, again,

24 we are the backup bidder here, I don't think there's any --

25 to the extent the other cases like Toys "R" Us were focused

1  on the idea of maximizing the value of lease portfolios,

2  certainly we understand the desire to maximize the value of

3  lease portfolios in an effort for debtor to maximize the

4  value of its assets, but factually, again, while that may be

5  a policy reason to generally allow for assignment over

6  exclusivity provisions, here there's no value-maximization

7  issue.  We're talking about a $50,000 difference between the

8  successful bid and the backup bid.  It's not as if it's

9  $300,000 or nothing here, Your Honor.  So I don't think

10  there's any windfall to the landlord or any prejudice to the

11  debtors here, Your Honor.

12          Thank you.

13          THE COURT:  Okay.  Thank you.

14          MR. MANN:  Good afternoon, Your Honor, Kevin Mann

15  from Cross & Simon on behalf of Ross.

16          I rise mostly just to join in with Mr. Root's

17  argument, but there's one thing I did want to point out, and

18  I think Your Honor noted this when you looked at the word

19  then-existing in the lease.  It doesn't say now existing, it

20  doesn't just say existing, it says then-existing, which would

21  lead us to believe that it would be at the time that the

22  change is made, which will be here at the time of the

23  assignment.  So I think that puts us a little closer to Toys

24  "R" Us.  Even if we determine that Toys "R" Us was improperly

25  decided, we can still say that this is distinguishable from

1  Toys "R" Us because Toys "R" Us, the lease that was being

2  assigned did not contain any provisions that required

3  compliance with any other lease's use restrictions.

4           The last thing I wanted to point out, Your Honor,

5  is -- I think everybody has talked about the Joshua Slocum

6  case, that case does say that the legislative intent behind

7  the shopping center amendments was to protect the rights of

8  lessors and the center's other tenants.  Congress recognized

9  that, unlike the usual situation where a lease assignment

10  affects only the lessor, an assignment of a shopping center

11  lease to an outside party can have a significant detrimental

12  impact on others, in particular the center's other tenants.

13           So with that, Your Honor, I have nothing further,

14  but would ask that Your Honor deny this assignment.  Thank

15  you.

16           MR. GOLDBERGER:  Your Honor, with respect to 4(a)

17  in the debtors' lease, there's a reason this wasn't mentioned

18  at all in the papers that were filed.  The permitted uses

19  generally permit the right to use and occupy the demised

20  premises for the purpose of the sale of general merchandise

21  and there's no "provided, however" with respect to the sale

22  of general merchandise.  And we believe that it's clear that

23  Burlington is a retailer that, you know, sells general

24  merchandise, and that's why this wasn't raised in any of the

25  papers and there's no proviso that says that any then-

1  existing exclusive use rights apply to that type of sale --

2  or that type of usage.

3         We also do believe that then-existing is a

4  reference to the time of the entry of this lease, but we

5  would argue that the use here is general -- the use is the

6  sale of general merchandise and is not subject to that

7  provision of the lease at all.

8         We'd also say that with respect to the Joshua

9  Slocum case, the case there makes clear that Congress's

10 intent was to protect the bargained-for rights, and that

11 includes the bargained-for rights of the other tenants in the

12 shopping center, that's for sure.  And that's part of the

13 structure of a shopping center, but the debtors were here

14 first and the debtors bargained for the rights that they

15 have, and there's nothing in the Code or in the legislative

16 history that we believe provides a right that wouldn't exist

17 if this would have been -- if the debtors would have tried to

18 do this assumption on September 8th of last year, a day

19 before this -- the day before this bankruptcy case started.

20         THE COURT:  Let me just -- bear with me one

21 second.

22         What is your response with respect to the

23 memorandum of lease having been on file?

24         MR. GOLDBERGER:  So we understand that the

25 memorandum of lease was public and parties were on notice of

1  the fact that there was a subsequent lease that had certain

2  rights vis-a-vis the -- that tenant, Ross, and the landlord,

3  but to the extent that those aren't binding on the debtor

4  under applicable state law -- and, again, it doesn't seem

5  like this case would be in front of a judiciary if it would

6  have been -- if the assumption and -- if the assignment would

7  have been proposed on September 8th.

8           So we don't think it's necessary to look into the

9  -- you know, anything that's publicly filed with respect to

10 leases that aren't binding on the debtors' lease and that the

11 debtor isn't responsible for under applicable state law.

12          THE COURT:  Thank you.

13          MR. GOLDBERGER:  Thank you, Your Honor.

14          MR. FOX:  For the record, Your Honor, Steven Fox,

15 I rise just briefly for two points in response to Counsel's

16 suggestion that there's no prejudice from denying approval of

17 the assignment today and forcing us to turn to a backup bid.

18          Candidly, Your Honor, we believe my client will be

19 prejudiced in two respects.  First, the risk and potential of

20 a negative precedent which could have lasting effect on some

21 800-plus other leases that we are in the process of in the

22 market now looking to assume and assign for value.  To allow

23 a landlord to graft additional rights and restrictions that

24 don't presently exist in the debtors' leases will

25 dramatically negatively impact on our marketing opportunities

1  going forward.

2          THE COURT:  Well, how do you reconcile that with

3  the cases the objectors cite?

4          MR. FOX:  Your Honor, we don't believe those cases

5  support their position.  And, as debtors' counsel has said,

6  the statute supports enforcement of the debtors' lease and

7  any restrictions in the debtors' lease.  The debtors' lease

8  here does not include the type of restriction that the Ross

9  lease suggests exists.  The fact that it was publicly of

10  record here too, in my opinion, Your Honor, in my view is of

11  no moment.  Yes, parties may have been on notice, either

12  constructively or actually, and maybe they assumed some risk

13  in that regard, but at the same time those parties when they

14  appeared and bid on the lease were entitled to rely upon what

15  they believe is an appropriate interpretation of the statute

16  and the applicable case law.  And that suggests, Your Honor,

17  the result that the debtors seek today, and that is approval

18  of assumption and assignment of the debtors' lease, which is

19  not subject to any further restrictions of any other lease in

20  the center.

21          Your Honor, the reality here is, you know, to the

22  extent that these are shopping center leases, the debtors

23  don't necessarily, in the absence of a specific restriction

24  appearing in their lease, have access to the leases of every

25  other tenant in the centers.  And certainly my client doesn't

1  have access to those because those are confidential, private,

2  proprietary information between the landlords and those other

3  lessees.  So --

4          THE COURT:  Does it make a difference, though,

5  that they raised it at the auction?

6          MR. FOX:  No, Your Honor, I don't believe it does

7  because, again, you're entitled -- both the debtors and the

8  counterparties who were bidding on these leases, including my

9  client, who are running a process now pursuant to the asset

10 purchase agreement and the designation rights it acquired,

11 has the right to rely upon what it understands the law is in

12 this Court, as well as the case law that has come before this

13 case.  The collective interpretation of the debtors and my

14 client is that the case law supports assumption and

15 assignment and not enforcement of the restriction that Ross,

16 who in my view is a mere interloper here in this case -- it

17 is not a creditor, it's not a landlord, and therefore it

18 doesn't have any rights in this court whatsoever.  The

19 landlord does, but we think the landlord is wrong on the

20 facts and the law.

21          Also on the question of prejudice, Your Honor,

22 yes, there's an economic component to this certainly.  The

23 landlord suggests that, well, if we get less money, it's not

24 prejudicial to us.  We fundamentally disagree with that

25 notion.  I'm not ashamed to say this is about money, you

1    know.  As I said earlier in my remarks at the outset, my

2    client has committed over $400 million to this transaction

3    and continues to fund essential expenses of this estate in

4    furtherance of its commitments under the asset purchase

5    agreement, and in consideration and exchange for that, Your

6    Honor, we're entitled, we believe, to have our rights

7    enforced by this Court, and that specifically includes the

8    designation rights that were part of the asset purchase

9    agreement and a critical component of the transaction.

10          So we would urge this Court to overrule the

11   landlord's and Ross's debtors and approve the debtors' motion

12   seeking assumption and assignment.

13          Thank you, Your Honor.

14          THE COURT:  Thank you.

15          MS. OESTREICH:  Your Honor, Hailey Oestreich of

16   Jackson Walker on behalf of Burlington.  I would just like to

17   make one final point.

18          As you're aware, the debtors' lease is

19   significantly older from the Ross lease -- than the Ross

20   lease, I believe by about 11 years.  Debtors' lease

21   originally did have an exclusivity provision, but you'll see

22   in Exhibit 3, the first lease modification of debtors' lease,

23   the debtors actually made a concession and modified their

24   lease in order to let Ross into the shopping center.  There

25   was a bargain and the parties bargained to change debtors'

1 rights.

2         Ross, at the time, and landlord, at the time,

3 didn't bargain for Big Lots debtors to give up their free

4 assignment provision with no conditions on it.  That's what

5 the parties agreed to when all of these parties were brought

6 together at the same time that debtors would keep their

7 provision, they gave them the free right to assign to anyone

8 without landlord's consent.  If we're talking about the

9 bargained-for rights, enforcing the provision as debtor -- or

10 enforcing the assignment as debtors have requested and

11 overruling Ross and landlord's objections is what the parties

12 have bargained for when they all first came together back in

13 the beginning.

14         MR. ROOT:  Your Honor, again, briefly, Alan Root,

15 for the record, on behalf of the landlord.

16         I would just come back to the plain language of

17 the statute, Your Honor, and Counsel said we got it wrong on

18 the law.  Well, respectfully, the law is all over the place

19 on this issue.  And the Third Circuit, to the extent it's

20 spoken on it, has spoken on it in Joshua Slocum and did --

21 whether it's dicta or whether it's a holding did indicate

22 that you should be looking at not just the debtor lease, but

23 the other leases in the shopping center, and that's what

24 365(b)(3)(C) says on its face.  The plain language has two

25 tests, you look at the debtors' lease, and you make sure that

1  it also -- the assignment doesn't violate the leases of the

2  other tenants in the shopping center.

3         Now, I understand there's policy arguments here,

4  but Congress enacted what it enacted, and that's the plain

5  language of the statute.  And, Your Honor, we think you

6  should enforce the plain language, especially in the facts

7  and circumstances that we've discussed here, Your Honor.

8         THE COURT:  Thank you.

9         MR. GOLDBERGER:  Just one final point, Your Honor.

10 The case law in this circuit is limited, but I would just

11 point Your Honor to the language in the Joshua Slocum case

12 quoting from Congress that the purpose of 365(b)(3) is,

13 quote, "to assure a landlord of his bargained-for exchange."

14         And, as the Counsel for Burlington made clear and

15 as the leases here indicate, the bargained-for exchange was

16 that the debtors would have the ability to assign and use the

17 premises consistent with this proposed assumption and

18 assignment, and that's the proposed assumption and assignment

19 we believe the Court should allow.

20         THE COURT:  Okay, thank you.

21         Anything further?

22    (No verbal response)

23         THE COURT:  Okay.  We're going to take a brief

24 recess.  I would say probably I'll be back around 2:30.

25 Okay?  Thank you.

1          (Recess taken at 2:15 p.m.)

2          (Proceedings resumed at 2:43 p.m.)

3               THE COURT:  Please be seated.  Thank you,

4    everyone, for your patience.  I appreciate you being patient

5    and allowing me the time to look at my notes.

6               The landlord and Ross oppose the proposed

7    assignment of the Nolensville lease to Burlington because it

8    will breach certain exclusivity provisions contained in the

9    Ross lease.  The landlord argues that pursuant to 11 U.S.C.

10   Section 365(b)(3) debtor cannot provide adequate assurance of

11   future performance, and the Court must deny the proposed

12   assignment to the proposed assignee.

13              The Nolensville lease is freely assignable

14   pursuant to its terms.  Section 22 of the lease provides that

15   Big Lots "shall have the right at any time... to assign this

16   lease without landlord's consent, provided that no such...

17   assignment shall relieve tenant of any of its obligations

18   thereunder."

19              In addition, paragraph 4 of the Nolensville lease

20   permits Big Lots to use and occupy the premises for a number

21   of retail purposes, including "for the sale of general

22   merchandise."

23              Under paragraph 4(a), any covenants or

24   restrictions of record affecting Big Lots' use were attached

25   and incorporated in the Nolensville lease in Article 7(b) and

1   in Exhibit F.  The Court disagrees with the objectors and

2   finds the phrase "then-existing" does not apply to a future,

3   unknown assignment.

4         The Ross lease was entered into after the

5   Nolensville lease.  Section 15.3 of the Ross lease prohibits

6   the use of the premises for the "off-price sale of

7   merchandise," or the use of more than 10,000 square feet of

8   any premises at the shopping plaza for the display and/or

9   sale of apparel on an off-price basis.

10        The landlord and Ross contend that the proposed

11  assignee is an off-price retailer that intends to use the

12  premise for the off-price sale of merchandise.  They note

13  that this lease specifically restricts Burlington.  The Ross

14  protection provision at 15.3, however, "shall not apply to

15  the existing tenants listed on Exhibit L."

16        Here, the debtors are existing tenants under the

17  lease.  Big Lots is also listed on Exhibit L of the Ross

18  lease.

19        The Ross lease does not restrict Nolensville lease

20  assignment.  The lease being assigned contains no provision

21  requiring compliance with the Ross exclusive use provision;

22  accordingly, the debtors' proposed assignment to Burlington

23  does not violate the terms of the Nolensville lease.

24        Similar to Toys "R" Us, the lease to be assigned

25  was executed long before the Ross lease was in effect, and

1    the lease here included nothing that requires adherence to

2    the provisions of the Ross lease.  On the other hand, Three

3    A's is distinguishable.  Unlike the issue here, Three A's

4    involved covenants that run with the land and the

5    interpretation of a permitted use under California state law.

6              This Court agrees with the reasoning of the

7    District Court for the Southern District of New York in Sears

8    and the New Jersey Bankruptcy Court in Bed Bath & Beyond that

9    the provisions of Section 365(b) must be read in harmony with

10   365(f)(2)(B) and that the phrase "any other lease" could not

11   have been intended to mean a subsequent lease between a

12   landlord and a third party to which the debtor was not a

13   party.

14             Applying the plain language argument would mean

15   that the debtors are bound by restrictive use provisions in

16   other leases that were entered into after the Big Lots lease,

17   making the broad assignment provisions negotiated for by Big

18   Lots unenforceable based on the landlord's subsequent

19   agreement with a third party that the debtors were not party.

20   As the Court explained in Bed Bath & Beyond, the ability of

21   debtors to maximize the proceeds from their leases would or

22   could be severely curtailed by landlord's subsequent

23   agreement with other tenants to limit the use for which the

24   debtor's premises were expressly allowed to be used without

25   debtor agreeing to those terms.  Landlords would be permitted

1 to eviscerate the debtor's negotiated bargain, a broad

2 assignment provision, by subsequently entering into an

3 agreement with any third party in the same shopping center

4 that restricts uses the debtor was expressly permitted to

5 have under the lease.

6             So the debtors' assignment of the Nolensville

7 lease is permitted, including the going-dark provision, and

8 I'll overrule the objection.

9             I understand that there's a revised form of order

10 that will be submitted.  And I would just ask that you do a

11 clean and blackline under certification of counsel.

12            MR. GOLDBERGER:  Yes, we will, Your Honor.  Thank

13 you.

14            THE COURT:  Okay.  Is there anything further?

15            MR. PIRAINO:  Your Honor, for the record, Stephen

16 Piraino, Davis Polk & Wardwell.  There's one last thing we'd

17 just like to note for you, Your Honor, as filed on our

18 agenda.  As you may recall, there were three lease holdovers

19 from December, one of which was related to the Vero Beach

20 property.

21            THE COURT:  Yes.

22            MR. PIRAINO:  The debtors do not intend to proceed

23 with the assumption and assignment with respect to Aldi's

24 and, in furtherance of GBRP's designation rights, a

25 certificate of counsel has been filed to approve a

1  stipulation to enter into a lease termination agreement.

2          THE COURT:  Okay.

3          MR. PIRAINO:  We understand that Counsel to Aldi's

4  would like to be heard on that, but I would just like to very

5  quickly let Your Honor know the debtors' position on this and

6  sort of how this, you know, sort of unfolded.

7          As Your Honor will recall, we had our November

8  lease waive, some things were carried over and, you know, at

9  the 19th we said we would push things to January.  Obviously,

10 something happened between the 19th and today, the sale to

11 GBRP, including the sale of designation rights with respect

12 to all of our leases.  GBRP recognized that, you know, there

13 were -- that there had been a prior process, they engaged

14 with parties who were part of that prior process and, for

15 example and what you just ruled on, the designation decision

16 was the same as what the debtors would have done.  That's not

17 the case in every instance.  For example, here, GBRP's

18 exercise of their designation rights was with respect to a

19 termination and, as Your Honor will have probably seen in the

20 docket, the landlord here, you know, before any of this all

21 happened --

22         THE COURT:  This is PAM right?

23         COUNSEL:  Yes.

24         THE COURT:  Okay, all right.  I just want -- oh,

25 that's --

1            MR. PIRAINO:  I needed my helpers back there.

2            THE COURT:  I'm sorry, that's an acronym.  Yes.

3            MR. PIRAINO:  That's okay.  Yes.

4            THE COURT:  Okay, I just wanted to make sure we

5    were talking about the right thing.

6            MR. PIRAINO:  Yes.  We think we've called all of

7    these properties by different things.

8            So, you know, they've designated their -- decided

9    to designate this through the termination with the landlord.

10   Before that happened, even before the sale hearing, we

11   understood the landlord was going to take issue with Aldi's.

12   So the decision was made not just out of the blue, but,

13   frankly, to resolve potential litigation, to enter into this

14   termination.  The estate supported that because avoiding

15   litigation at this point for the estate is a prudent use of

16   resources.

17           And just one last -- one last piece.  Your Honor

18   has approved, I think we're up to four or five of these lease

19   sale procedures.  So we know there's an order out there,

20   there was an auction that occurred pursuant to the lease sale

21   procedures, but the lease sale procedures, there's two

22   important points I just want to note for the Court.  The

23   first is the debtors' acceptance of bids only occurs upon

24   approval of the bids, nothing has been approved, and sort of

25   the corollary to that is the debtors at any time can

1  terminate the sale process and pursue an alternative

2  transaction.  I think it's very clear we did pursue an

3  alternative transaction, the GBRP sale.

4           So, with that, our position is we're not going

5  forward.  The certificate of counsel is on file at 1783, and

6  we believe that it's consistent with the sale order and

7  GBRP's designation rights.

8           THE COURT:  Okay.  Good afternoon, Ms. Bifferato.

9           MS. BIFFERATO:  Good afternoon, Your Honor, Karen

10  Bifferato on behalf of Aldi, Inc.

11           I rise briefly to introduce my co-counsel, Mr.

12  James Rossow from Rubin & Levin in Indiana.  He's been

13  previously admitted *pro hac vice*.  We filed those papers

14  actually back in mid-December when we were teed up for a

15  December 19th hearing.  We actually thought everything was

16  going forward at the 19th hearing in December, it was not.  A

17  lot has happened, and it's actually the process that we want

18  to talk to the Court about today.

19           And before I hand the podium over to Mr. Rossow I

20  did just want to mention, because debtors' counsel brought it

21  up, the certification of counsel regarding the lease

22  termination; that was filed under certification of counsel

23  last night, we saw it today, we have a problem with it as of,

24  you know, right now, depending on what happens.  But we would

25  ask that the Court not enter the order and we would submit

1  that it should not have been under certification of counsel,

2  but we'll get to that in Mr. Rossow's presentation.

3          THE COURT:  Okay.

4          MS. BIFFERATO:  Thank you.

5          THE COURT:  Well, I haven't seen it and it hasn't

6  been entered.  So --

7          MS. BIFFERATO:  Great.  Thank you.

8          MR. ROSSOW:  Thank you, Your Honor, Jim Rossow,

9  Rubin Levin, Indianapolis, Indiana, on behalf of Aldi, Inc.

10 If the Court will permit me to walk through the story to

11 provide context and of how we got here and why we're here on

12 a hearing that I think the debtors believe, along with Gordon

13 Brothers, was mooted by a lease termination agreement that

14 was filed last night.

15          Aldi has participated as a bidder in this case for

16 three properties.  The Court has already found and approved

17 transactions with three other properties in which Aldi was

18 found to be a successful bidder.  We have experience bidding

19 in these cases.  Aldi has 2400 stores, they happen to be

20 postured that they are a good buyer for stores of this size.

21 And in other cases, I know the parties mentioned Toys "R" Us,

22 Aldi was involved in Toys "R" Us as a bidder.  Any stores

23 that have that footprint are ones where Aldi is a candidate

24 to be a buyer.  As a result, we have been a bidder in many

25 bankruptcy cases.

1          A&G that has run this, brokering the liquidation

2    of leasehold interests, obviously, is quite well renowned.

3    We have been part of that process for many years.  We know

4    A&G well, we hold them in the highest regard, they run great

5    auctions, and we've participated in many auctions, which

6    brings us to Vero Beach.  Well, if I can, let me back up.

7          There is one location, Taylor, Michigan, and

8    Taylor, Michigan is a location that was in a shopping center.

9    And I want to mention Taylor, Michigan because the lease at

10   issue in Vero Beach is not in a shopping center under the

11   Joshua Slocum factors.  So that lease was under a shopping

12   center, it had an alcohol restriction, and that's what this

13   is about is an alcohol restriction.  The debtors invited us

14   to contact the landlords because they knew that the landlords

15   would be taking issue with Aldi attempting to acquire a lease

16   free and clear of an alcohol restriction.  I believe the

17   landlord in that case is represented by Kirkland & Ellis.  We

18   worked with them, worked out an amendment, and also paid the

19   estate some price to acquire leasehold interest, and then

20   amend the lease to address the landlord's concerns and also

21   allow for operation and the sale of alcohol.

22          THE COURT:  This meaning the Michigan?

23          MR. ROSSOW:  That's the Michigan case and this is

24   different.  And I wanted to sort of explain that because we

25   -- certainly we understand the difference and I think we bid

1   a much lower amount for the Taylor, Michigan case -- store

2   location.  Here, we bid on an auction held December 4th,

3   after competitive bidding.  We were the first opening bid at

4   $150,000.  There was also a cure amount that was at issue.  I

5   think at the auction, Mike Matlat at A&G, who runs the

6   auction, had indicated with I think Mr. Goldberger also

7   clarifying that there was a cure amount, roughly, at the time

8   was determined to be $80,000.

9         So Aldi bid 150, plus cure, give or take, call it

10  a $230,000 bid, but the dollar amount to the estate was

11  $150,000.  Havertys was also a competitive bidder.  Of the

12  locations that went up for auction, Burlington was there,

13  that was a notable event, and there were issues in which the

14  landlord made its objections clear.  But Aldi bid, and it was

15  a spirited round of bidding, and we went from $150,000 at

16  $10,000 increments, with some skips in between, and Aldi

17  wound up the highest bidder at $800,000.  Havertys was a

18  backup bidder at $750,000.

19        On December 5th, the debtor filed its notice of

20  the successful bidders, and the hearing, I believe, was set

21  for December 19th, as Mr. Goldberger had indicated.

22        The landlord filed its objection on December 12th,

23  I believe, and that objection, I would characterize that

24  diplomatically -- and I don't take issue with it, but I think

25  it's true -- it was a placeholder objection.  It was an

1   objection that said this is in a shopping center and, broadly

2   speaking, citing the principle of *cum onere*, that the lease

3   obligations must be borne by the assignee in their full

4   regard.

5          We had discussion -- when I say we, the Aldi team

6   had discussions with landlord's counsel to try to resolve

7   these issues and it -- I should back up.  So we had made a

8   determination that this was not in a shopping center.  I

9   really don't think it's controversial, but we have a document

10  in which the landlord indicates that it's in a shopping

11  center.

12         So there's -- and I'm going to -- we have a brief

13  on file that elucidates this, Your Honor, so I don't think I

14  need to go into great detail, but there is a mall that was

15  developed to the north of this property, that mall had

16  excepted out the parcel that we're calling the Big Lots

17  parcel.  So it really -- it's not part of that REA, I don't

18  think there's a colorable argument.  There is with respect to

19  our parcel, the parcel in question, there's Big Lots and

20  Mattress Firm.  So there are two buildings, they each have

21  parking space.  They're contiguous, there's ingress and

22  egress, there's -- you know, there's the ability to move

23  between parking spaces, but their parking is separate, I

24  mean, one for one store, one for the other, they're facing

25  opposite directions.  There is a declaration, but that

1  declaration deals with very minimal issues of maintenance.

2         So, under the Joshua Slocum factors, this property

3  is not in a shopping center.  And somebody may disagree with

4  me, but I -- you know, I'd love to have that argument because

5  I believe we can prevail on that point.

6         What it does have is an alcohol restriction.  And

7  so, under our analysis, that alcohol restriction would not be

8  subject to the heightened 365(b)(3) standards regarding use

9  that we've been talking about, but would be subject to

10  scrutiny as to whether or not it is an anti-assignment

11  provision.  We just heard earlier some discussion, I believe

12  Burlington may have pointed out that the go-dark provision in

13  the Burlington lease was *de facto* anti-assignment, right?

14  Certainly something that comes up all the time.  In fact, in

15  this case the lease -- in our lease there really isn't a true

16  go-dark provision.  There is a continuous operation

17  provision, but it doesn't read the way that we typically see

18  a go-dark provision.

19         So, anyway, Your Honor, we're here, we believe we

20  have a lease that we paid good value for, that it was below

21  market.  The idea -- and we have presented a declaration from

22  Jordan Ford, the director of real estate for Aldi, it

23  indicated what is obviously true, which is that where an Aldi

24  can sell beer and wine in this market in Florida, that's

25  where customer sales are better.  So they do better when they

1 can sell beer and wine in Florida.

2          And I should say, just contextually, Florida is a

3 state where beer and wine licenses are relatively plentiful,

4 they're not a scarce commodity.  So when people do their

5 shopping, they want to pick up their beer and wine and that's

6 just sort of a competitive advantage.  So that's why Aldi

7 paid -- offered to pay $800,000.

8          So, fast-forward, we have the objection.  It is a

9 -- maybe a barebones objection.  We had some discussions with

10 landlord's counsel, as the debtors had invited us to do to

11 try to resolve our issues, I think they were happy.  If we

12 had resolved that issue, they would have been happy to stand

13 by our transaction.

14                    So we filed our brief and

15 our supporting documentation, keeping in mind that we didn't

16 really know what we were arguing against.  So we had to argue

17 about the shopping center not having really received a cogent

18 argument about that, we argued about the alcohol restriction.

19 We cited the Toys "R" Us cases, Aldi was a party in the Toys

20 "R" Us cases.  There are two decisions that came out of Toys

21 "R" Us, one of them involves Aldi and it involves the

22 shopping center issue -- not the use restriction issue, but a

23 shopping center issue.  And it involves the shopping center

24 issue, not the use-restriction issue, but a shopping center

25 issue, so we're familiar with Toys "R" Us.

1          But that brings us to more recent events.  So,

2    ALDI, from our perspective, we thought we were having a

3    hearing on December 19th.  There was some discussion about

4    moving that hearing off.  We were more than willing to do

5    that.  To be honest, the issue, which makes sense from the

6    debtors' perspective is if they were going to continue the

7    hearing, they wanted to make sure that the backup bidder

8    would stand by and be prepared to close, and the second issue

9    is the rent accrual.

10         It turns out that this lease, the rent was paid

11   quarterly, so we actually had until March before the next

12   rent is paid, so that provided time, which is why we thought

13   we would have a hearing, here in January.  So, we filed our

14   papers.  What we saw is we didn't hear from the debtors.  I'm

15   sorry, we didn't hear from the landlord and we had some

16   discussion with debtors' counsel, Mr. Goldberger about our

17   negotiations.  They asked to see some language that we

18   provided in typical leases.

19         And Mr. Gold is here representing the landlords,

20   so he may speak to this issue and I'd like an opportunity to

21   respond, if I may, but in any case, what we were told last

22   week, we were informed that there was a lease-termination

23   agreement that was worked out and that they, the debtors

24   would not be proceeding with our transaction.

25         I will say, in termination of communication, and I

1   understand this happens, I know that this -- a lot has

2   happened in this case.  I heard Mr. Fox talk about a $400

3   million investment by Gordon Brothers.  I get it.  But we

4   come in here in these cases in good faith.  We play by the

5   rules.

6          Your Honor, when Mike Matlat (phonetic) runs these

7   auctions, the debtors' counsel transcribes those auctions,

8   they require us all to listen to the bid procedures and

9   confirm that we will play by the rules.  We will not collude.

10  We will not engage in anything other than bidding and good

11  faith and that's what we do, and that's why we're here, Your

12  Honor.

13         So, we find out that the deal, the landlord worked

14  out a deal with, ostensibly with Gordon Brothers.  It appears

15  less than clear whether it's Gordon Brothers or the debtors;

16  it's rely both.  I asked for the disclosure of the amount of

17  consideration, because I knew that that might be an issue.  I

18  didn't get an answer.  I asked repeatedly.  I've asked three

19  times in the last eight days since we were told that a lease-

20  termination agreement would be forthcoming.

21         We filed it last night, so what was filed under

22  certification last night, Your Honor, that you didn't look at

23  is a lease termination and the part that I cared about is how

24  much was being paid by the landlord to the debtors.  And this

25  was also proved by Gordon Brothers.  The amount is roughly

1  $660,000, but --

2          THE COURT:  Say that again, $660,000 paid by whom?

3          MR. ROSSOW:  Paid, ostensibly, and I could be

4  corrected, by the landlord to terminate.

5          There is a cure provision, because, obviously, if

6  we're at 800,000 and they're at 660, something doesn't add

7  up.  If you do the math, it works out to, wait for it,

8  $800,000.  Not a penny more than what we bid.  Not even a

9  topper, on top of what we bid.  So, they bid the exact same

10  as what we bid and now we're -- now, I understand that's

11  going out under certification.

12          So, to back up, we thought we were having a

13  hearing today.  I understand the events that happened in

14  December, Your Honor, and I want to carefully talk about that

15  and address -- I think I sort of previewed my argument, which

16  is why counsel talked about this issue about having the right

17  to pursue alternative bids, because I understand that's what

18  the point is.

19          And I would point out that there is a declaration

20  that has not been admitted into evidence today, but it's on

21  the record and it was identified as an exhibit, and that is

22  the declaration from Emilio Amendola, as to the bidding

23  process.  That was filed on December 17th and that includes

24  the sworn statements that ALDI was the highest-and-best bid

25  for the Vero Beach property, all the kind of language that we

1  welcome and we agree with and that apparently was as true --

2  was true on December 17th and theoretically is still true

3  today.

4          So, with respect to the Gordon Brothers

5  transaction, because we weren't -- we now -- now, we get it.

6  Now, I get why we have -- why I'm arguing for whether I even

7  get to have an argument, Your Honor, and that is that the

8  Gordon Brothers transaction ostensibly applies to the leases

9  that, these leases that were subject to the auction that had

10 not yet closed.

11         I will say that, as you know, Your Honor, there

12 was the Nexus transaction and Nexus had worked with ALDI to

13 provide capital for many of those leases on the Nexus side,

14 but we were not pursuing those to the auction process that

15 A&G was handling.  So the four -- the three locations that I

16 referred to earlier were the ones that were running outside

17 of the Nexus process.

18         So, from our perspective, it made sense that we

19 would pursue the transactions that already booked, that were

20 ready to close, but for a few objections by the landlord that

21 when the Nexus transaction fell through, that the debtor

22 pursued an alternative with Gordon Brothers.  I will say

23 that, and I know the timing, but it's simply for the record,

24 that that motion was filed on a Friday, December 27th.  It

25 was filed on shortened notice.  There was a notice, a 2002(c)

1   notice.  I would respectfully submit that that notice did not

2   indicate what assets were being sold.  It certainly did not

3   disclose that the leasing question that we had an interest in

4   was being sold.  We thought that that was set over for a

5   hearing and we thought that that, maybe rightly or wrongly,

6   that that would proceed outside of Gordon Brothers.  After

7   all, the money was already under contract and would, once

8   approved, come into this estate, independent of anything that

9   Gordon Brothers did.

10          And keep in mind, Your Honor, that Burlington is,

11   in fact, a transaction that proceeded at auction that the

12   debtors elected to proceed with, whereas, this transaction,

13   they've elected not to proceed with and take the position

14   that Gordon Brothers has the right to terminate.  So, as Your

15   Honor knows, there was great urgency.  Your Honor had a

16   hearing on Monday, indicated that an order would be entered.

17          I will say that there was an asset purchase

18   agreement filed with that motion.  That asset purchase

19   agreement refers to a schedule of "365 contracts."  Now, that

20   schedule was not filed with the Court, which happens.  I know

21   that happens in these cases, but it wasn't filed with the

22   Court.

23          The Court held a hearing.  The Court entered an

24   order.  When the Court entered an order, I should say there

25   was an amended asset purchase agreement filed shortly before

1  the Court entered its order on January 2nd.  That amended

2  purchase agreement actually did away with the term 365

3  contracts, but it referred to, instead, "disclosure

4  schedules."

5           The disclosure schedules, then, also, referred to

6  365 contracts.  So it wasn't a direct schedule; it was a

7  separate sub schedule of the disclosure schedules.  And as

8  Your Honor probably knows where I'm getting is, there were no

9  contracts filed with that amended asset purchase agreement.

10  Nothing on record with the Court.

11          And when the Court entered the order and the order

12  was attached, that order that's attached also doesn't have

13  any of these contracts.  So there's nothing on record with

14  respect to the Court's entry of an order indicating that this

15  asset would be part of the assets that were being sold to

16  Gordon Brothers.

17          So, with respect to the process, obviously, we

18  weren't given an opportunity to bid competitively.  I will

19  tell everybody a secret, which is that we had more authority

20  to bid at the auction on December 4th, but Havertys stopped

21  bidding, so I didn't volunteer more money from ALDI to pay

22  for the leasehold interest because Havertys didn't want to

23  pay anymore.  So, we were the highest bidder at $800,000.

24          I certainly am offering -- if you want to have the

25  auction right now, we'll increase our bid, but it's notable

1  that the landlord didn't even increase, they didn't even top

2  our bid.

3            And I understand what's going to be said.  The

4  argument is going to be made that there's a litigation risk

5  associated with the cost.  And so I will make the argument

6  that's in our brief that also comes from Toys "R" Us.  And

7  I'm not giving sole deference to Toys "R" Us, Your Honor, but

8  it is instructive and I think this point is relevant, which

9  is, what is the value to the estate, right.

10           I think I heard it made in connection with the

11 argument by the landlord as the backup bidder in Burlington.

12 I think landlord counsel in that case said that we're only

13 $50,000 away and the answer is, of course you weren't.

14 Because if there weren't two bidders bidding competitively,

15 then the initial bid would have been the highest bid.

16           So, in our case, I don't even know what Havertys'

17 initial bid was, but it was something less than $150,000.  So

18 the competitive bidding process increased the bid up to

19 $800,000.

20           Now, why is that?  It's because we believe that

21 the Court has the ability to sell and assign this lease free

22 and clear of the alcohol use restriction.

23           I will say that I have had -- and I'm not asking

24 the Court to determine that today.  You know, Your Honor, I

25 don't want to win in Court.  I want to not lose.  And I'd

1  like to not lose today by at least having an opportunity for

2  the Court to address this issue, perhaps, at a full hearing,

3  both, with respect to the Gordon Brothers' transaction, with

4  respect to the request for termination, and what may underlie

5  that.

6          So, for example, and I want to be very careful,

7  but it occurs to me that I have not heard of Havertys, and I

8  would not suggest they're doing anything wrong, but is it

9  possible that Havertys might want to acquire this site and

10  they may also be in the background of the transaction

11  involving the landlord?  It's possible.  I wouldn't even

12  accuse anybody.  I'm not suggesting that it's improper.

13          But at least it would be something that would be

14  relevant for purposes of competitive bidding for enhancing

15  the bankruptcy estate.  I know there will be a lot of

16  comments from counsel, and if I can, I'll reply, hopefully

17  very briefly, Your Honor, to all those comments.

18          I know Mr. Gold.  I've had discussions with

19  Mr. Gold.  We had a spirited discussion during the break and

20  I know he will make some (indiscernible) remarks, but what I

21  would say, Your Honor, is we're not trying -- you know, I'm

22  not trying -- I just want a fair shake.  And ALDI wants to

23  come back in these bankruptcy cases, and they will, they will

24  be back.  They happen to be in a position where they have --

25  they're the kind of business right now that is in the times

1  we are, they are able to acquire and expand and they're in

2  that trajectory.

3            So, I can respond to specific issues.  I will say

4  if this is turning into a hearing on what I thought it

5  originally was, which was an evidentiary hearing on something

6  where the landlord has a burden, I have evidence, but I'm not

7  sure that's what -- you know, we have our brief.  I will say

8  that we filed exhibits with our brief.  Many of those are

9  certified copies of records, so they're automatically

10 admitted if the Court would consider looking at those.  I

11 believe those are admissible without the foundation, but we

12 also have a declaration from Jordan Ford.

13           I don't think that the issues in the Ford

14 declaration, I think they go to adequate assurance issues,

15 but I'm happy to address those.  So, with that, Your Honor,

16 if I have the opportunity to respond, I'll turn it over to

17 the other parties.

18           THE COURT:  Thank you.

19           MR. FOX:  Good afternoon, again, Your Honor.

20           Steven Fox, Riemer & Braunstein, on behalf of

21 Gordon Brothers Retail Partners.

22           Your Honor, I'll be brief if I can.  First and

23 foremost, I want the record to be clear that from Gordon

24 Brothers' perspective, we have absolutely no criticism of

25 ALDI in this circumstance.  We have every reason to believe

1  that in the process that Mr. Rossow described, that ALDI

2  conducted itself in all instances, in good faith.  And we

3  also completely understand and get the fact that Mr. Rossow

4  and his client are disappointed with where we are today, but

5  the fact remains twofold.

6           First, the debtors have already advised this Court

7  that it does not intend to pursue the transaction with ALDI,

8  pursuant to the results of the auction, conducted back in

9  December, as described.  So, as a fundamental and starting

10 point matter with this Court, there is nothing before the

11 Court today on this matter.  And while I appreciate the

12 background that Mr. Rossow described to the Court, about the

13 Michigan lease and about their view on Vero Beach, the fact

14 remains that on January 2nd, this Court entered an order

15 approving a transaction between the debtors and Gordon

16 Brothers.

17          As has been described in earlier remarks today,

18 that transaction critically included designation rights over

19 the entire universe and population of the debtors' leases and

20 contracts.  My client, having evaluated the facts and

21 circumstances of this particular lease and the positions of

22 the parties, the debtors, the landlord, and ALDI, as the

23 putative successful bidder back in December, made a conscious

24 business decision, as is its exclusive right under the asset

25 purchase agreement and the sale order from January 2nd, to go

1  and pivot in a different direction.

2          And rather than take on the litigation risk, as

3  described, it decided that it would negotiate, in conjunction

4  with the debtors, a lease-termination agreement with the

5  landlord.  In my view, the fact that the dollars and cents

6  may be equivalent is of no moment.  This is a business

7  decision solely in the discretion of Gordon Brothers and,

8  again, we mean no disrespect and no criticism of ALDI in this

9  regard, but it is a business decision we've made.

10         We are not under any contractual or other

11 obligation, statute or otherwise, to conduct any further

12 competitive auction.  In this particular instance, we

13 determined not to do that.

14         Mr. Rossow described much about, you know, the

15 hearing back on December 30 and December 31st, which led to

16 the January 2nd sale approval order.  The fact remains that

17 his colleagues were present at that hearing on Zoom and made

18 no mention whatsoever of their interests, made no attempt to

19 exclude these assets, and as a result, these assets were

20 included or this lease was included in the assets, subject to

21 the asset purchase agreement.

22         There is nothing for this Court to decide today,

23 insofar as Mr. Rossow's client is concerned.  What is going

24 to be before the Court, as Mr. Piraino mentioned, is a

25 certification of counsel, accompanied by a lease-termination

1  agreement that has been approved by the debtors and Gordon

2  Brothers, consented to us, by us, pursuant to which we intend

3  to terminate the lease on consent with the landlord, pursuant

4  to paragraph 42 of the sale order.  We believe that is

5  entirely appropriate by way of procedure, which the sale

6  order explicitly provides that if there's an agreement among

7  the parties, no hearing is required, no further objection

8  period is required between those two principal parties, and

9  we would ask the Court when it has an opportunity to review

10  the certification of counsel, to enter an order approving the

11  lease termination, as negotiated among the parties.

12         I'm happy to respond to any questions you may

13  have, Your Honor.

14         THE COURT:  No, I'll hear from others.

15         MR. FOX:  Thank you, Your Honor.

16         MR. GOLD:  Good afternoon, again, Your Honor.

17         Ivan Gold of Alan Matkins.  I'm co-counsel with

18  Mr. McDaniel for Premium Asset Management, PAM, not the

19  kitchen product.

20         Your Honor, I'm going to start by quoting a

21  longtime practitioner in front of this Court, Ms. Heilman's

22  mentor, David Pollack.  David once built an entire argument

23  around an old ad campaign:  There's Hertz and there's not

24  exactly.  And I channel that, because listening to

25  Mr. Rossow's comments, I heard a lot of "not exactly."  I

1   heard a lot of conflating issues.  I heard a lot of

2   conflating timeline.  And I'd like to respond to the high

3   points.

4           We start with the fact that the debtor made clear

5   on Friday, they filed an agenda, that they weren't moving

6   forward.  That was preceded by phone conversations and emails

7   earlier in the week.  The debtor advised and Mr. Rossow

8   acknowledged he spoke to Mr. Goldberger earlier in the week

9   that Gordon Brothers had decided to go another way.

10          Well, I don't want to have to call Mr. Goldberger

11  to the stand to establish the timeline that the reply brief

12  or whatever you want to call it, filed by ALDI and the

13  witness list, followed that phone call.  They knew Gordon

14  Brothers was going another way.  What you saw is docket

15  grandstanding, that they were going to go forward whether

16  anyone else liked it or not, and we saw a lot of that today.

17          We saw a lot of argument about things that are

18  moot.  I don't know -- I think I just sat through, not one,

19  but two motions for reconsideration.  I think we saw a motion

20  for reconsideration of your original bidding procedures

21  order, Your Honor, back at Docket 612, which, Mr. Piraino

22  referred to as paragraph 8 of the Court-approved bidding

23  procedures says:

24          "Doing a deal with the debtor is not an acceptance

25  of the deal under an order is entered by the Court."

1              That didn't happen.

2              Paragraph 12 of the same bidding procedures

3    contains the traditional fiduciary out and in the language

4    there it says that the debtor, in its discretion, at any

5    time, prior to entry of this Court's order, may pursue an

6    alternative transaction.

7              Exhibit A to the existence of an alternative

8    transaction is my friend, Mr. Fox, who I know is

9    uncomfortable today, because I don't think in the long time

10   we've known each other, we've ever agreed more on a single

11   topic than what's before the Court this afternoon.

12        (Laughter)

13             MR. GOLD:  But the fact is, Your Honor --

14             MR. FOX:  For the record, Your Honor, I am

15   uncomfortable.

16        (Laughter)

17             MR. GOLD:  Your Honor, counsel for ALDI said that

18   he referred to being mooted by the lease-termination

19   agreement.  That's false; they were mooted by the Gordon

20   Brothers' sale order.  This was not an excluded asset.  The

21   debtor chose to go another way.  Gordon Brothers bought it,

22   bag and baggage, bought the deals, and they now have the

23   decision-making ability, which they have exercised, under the

24   designation rights.

25             So, not one order, but two support just simply

 1  going forward with the transaction with the landlord.  All

 2  the references about the auction and A&G, in the bluntest

 3  terms, Your Honor, A&G was ousted by your ruling on the 2nd.

 4  That process ended.  We had two days of hearings where

 5  everybody involved in this case had an opportunity to be

 6  heard, ask for clarifications, objections.

 7            Was ALDI here to say, Hey, Your Honor, we have

 8  this pending transaction.  Can I get a clarification?  Are we

 9  done?  Do I now talk to Gordon Brothers?  Are we still on?

10            They didn't do any of that.

11            So the fact is, Your Honor, that the process that

12  Mr. Rossow complains about is history, like so much of this

13  case.  That was then, and since entry of your order

14  authorizing the Gordon Brothers' sale transaction, this is

15  now.  And under that transaction, as well as paragraphs 8

16  and 12 of the bidding procedures, the debtor sold these, the

17  rights to make decisions regarding the Vero Beach lease and

18  others, and Gordon Brothers, in its business judgment, which

19  it bargained, and as Mr. Fox said earlier, paid handsomely

20  for, they've decided to go another way.

21            Now, Mr. Rossow said that they played by the

22  rules, and that may very well have been true, but the fact is

23  that the rules changed.  That was a consequence of the

24  failure of the Nexus transaction, the debtor being compelled

25  to pursue an alternate transaction, which was contemplated,

1  and this Court approving that alternative transaction.

2        The price the landlord paid is not particularly

3  relevant, or will pay, because of the litigation risks.  Your

4  Honor, I was fully prepared, but for the deal, to litigate

5  with ALDI.  We noticed the deposition.  You can see that

6  reflected in the docket.  That was withdrawn in reliance on

7  the fact that we had the deal.  That was the deposition of

8  the debtors' representatives.

9        We had quite a robust hearing, Your Honor, because

10 I would have told you Toys "R" Us doesn't matter.  This is

11 free and clear of an alcohol restriction.  This was bargained

12 for in a lease in 2023 and I would argue to you that if you

13 have the lease in front of you, and you don't, and this isn't

14 the entirety of my argument, it's just to respond about the

15 litigation risks, that I would argue to you it was a risk

16 management and insurance provision.  I would also tell you

17 that ALDI's form of APA, which is on file with the Court, is

18 greedy.  And, yes, I choose that word very purposefully,

19 because it didn't just wasn't to invalidate it for 365(f)

20 purposes, it wanted you to excise that provision for all

21 time.  It wanted to transfer it free and clear, which I would

22 have argued to you is completely impermissible under the

23 Code, I don't care what case you cite.

24        I would also argue that there were indemnification

25 problems with the ALDI APA, which excluded historical events

1  for which the debtor had insurance.  We solved that problem

2  in the Nexus sale order.  We solved that problem with the

3  Gordon Brothers' sale order.

4           But ALDIs didn't solve that problem; they defied

5  it.  I would argue that even if you went ahead with ALDIs, I

6  would object on the basis of your Gordon Brothers sale order

7  that says that those indemnification issues will be handled,

8  but that's not what the ALDI APA said.

9           So, when Mr. Fox and his client made the

10 determination to go another way, they not only had the right

11 to do it under this Court's order, it was rational, because

12 when Mr. Rossow says, Oh, there was no topping, yes, the

13 litigation risks and the litigation costs, and to prove how

14 invisible that apparently is to ALDI, he stands before you

15 and is suggesting all these really wild procedures that we

16 need to have going forward, just so ALDI can take their next

17 shot at a process that passed them by.  The cost would only

18 go up, Your Honor, and that's the decision Gordon Brothers

19 made and that's the decision they paid for and that's the

20 decision-making ability you approved as part of that

21 transaction.

22          So, as to get back to where Mr. Piraino started, I

23 don't think there's anything before the Court today, and

24 we've been talking for a while, but the debtor is not going

25 forward with that transaction.  As they were entitled to do,

1  the debtor pursued an alternative transaction, as they were

2  entitled to do.

3         Gordon Brothers, who became the decision-maker

4  under your January 2nd order, as they were entitled to do,

5  has made a different decision.  They are following the

6  procedures under paragraph 42 of that order, with the

7  certification of counsel, as they're entitled to do under

8  this Court's order.  So, I don't see any grounds for

9  upsetting where we are and where we have been over the last

10 several weeks.

11        Although, this is not precisely the forum, but the

12 Third Circuit has long held that disgruntled bidders

13 generally don't have standing, so even if you think it's a

14 continuation of the same process, a winning bidder has been

15 declared under procedures and the discretion that you

16 granted.  And just because ALDIs thought they had a deal, and

17 I'm not suggesting at one time that might not have been in

18 good faith, but the fact is that your orders made it clear

19 there isn't a deal until you sign an order.

20        And we can look at the -- I don't know, I think we

21 probably passed 1800 items on the docket by the time the

22 hearing is done today -- you will not find an order approving

23 the assignment of the Vero Beach lease in any of the 1800

24 items on the docket, Your Honor.  So, without that order,

25 they had no right to claim they had a deal and the rules

1  changed from the 30th to 31st, the 2nd, whichever date we

2  want to pick.  I'd like to think I wasn't the only one who

3  could tell what was going on because I sat in your courtroom

4  for those two days, but it was apparent that this was no

5  longer the A&G process; this was now the Gordon Brothers

6  process.

7            Gordon Brothers isn't required to have an auction.

8  They get to do this at their own discretion.  They can

9  privately market it.  They can solicit lease termination bids

10 from landlords, as I'll tell you they're doing with other

11 clients of mine, or they can run a public process.  But they

12 paid, as part of the multimillion-dollar consideration, they

13 paid for that flexibility.  They paid for that optionality

14 and they have exercised it, and there's no reason to

15 reconsider, at this point, that process, which has been

16 approved by this Court and is in the process of being

17 implemented.

18            Thank you, Your Honor.

19            MR. PIRAINO:  Your Honor, for the record, Stephen

20 Piraino, Davis Polk & Wardwell, on behalf of the debtors.

21            Your Honor, very briefly, I fully agree with what

22 Mr. Gold and Mr. Fox said.  I think one point -- I guess,

23 just two points.  You know, one, importantly, from the

24 estate's perspective, we've been here for a good amount of

25 time today already on this issue.  We chose not to -- well,

1  I'm sorry -- Gordon Brothers decided not to go forward with

2  this through their designation rights.  The debtors have an

3  obligation to follow those designation rights, which is why

4  we, also, are not going forward and we think it's in the

5  estate's best interests for the process that was approved by

6  the APA, the sale order to be followed here and to not

7  continue to have to expend resources on that.

8        And, also, I just think it's very important, just

9  to underscore what Mr. Gold said about playing by the rules.

10  The rules were the sale procedures.  Those rules did change.

11  They're the designation rights procedures.  We don't need to

12  get into a complicated evidentiary hearing on that.  I think

13  it's very clear, based on this Court's orders, where we're

14  at, who has the ability to elect what happens with these

15  leases.  It's Gordon Brothers; they paid for it.

16        And I'd also -- just one last thing -- I said only

17  two, I'll do three things -- the certification of counsel,

18  which attaches the termination agreement, there is a waiver

19  for rejection damages.  There is a benefit to the estate from

20  this, so it's sort of an added bonus for the estate.  We

21  avoid litigation.  We're complying with our obligations to

22  ensure that Gordon Brothers has their designation rights.

23  And we're also getting the claims waiver, which, obviously,

24  is beneficial to everyone who has a claim against the

25  debtors.  Thank you.

1           THE COURT:  Thank you.

2           MR. ROSSOW:  Thank you, Your Honor.

3           Jim Rossow, Rubin & Levin, for ALDI.

4           I do want to make a couple of brief points.  One

5    is that the deposition that was noticed was a deposition of

6    the debtors' representative; it wasn't a deposition of ALDI.

7    We would have been more than happy to press forward.

8           I think, I'm surmising that the debtor didn't want

9    to have a witness stand for deposition.  I don't think the

10   Court should read anything into that, other than the fact

11   that the debtors' posture was to not engage in any

12   litigation.

13          With respect to the, with the sale procedures, we

14   get it.  This is bankruptcy.  Courts have flexibility.  But

15   this assumption and assignment agreement is subject to New

16   York law and New York, like many states, has an implied

17   covenant of good faith and fair dealing.

18          My position is, and this will be relevant in other

19   cases, Your Honor, is that we can't have this in these cases.

20   A&G and the debtor identified ALDI's Vero Beach bid as the

21   highest-and-best offer.  And it's understood that the debtor

22   will protect that transaction.  Yes, we understand there's

23   some litigation involved, but litigation is what drove the

24   price.

25          I heard arguments that somehow the consideration

1   that's being paid doesn't matter, but it kind of does matter,

2   doesn't it.  It does matter because the math works out to

3   exactly the same as what the ALDI offer is, right.  Because

4   if it didn't matter, Your Honor, I think you'd see a

5   different number.  And, you know, if it were me, it might be

6   more.

7           I will stand by our proposal that we're prepared

8   to pay more.  I have authority.  I mean, if it's okay, I

9   won't say what my maximum authority is, but it's to go higher

10  than the $800,000.  It's to pay higher -- I will tell

11  you 810, we'll go higher than that.  So, we're prepared to

12  pay more if we had a fair opportunity.

13          I think the -- once you're in the transaction,

14  proceed, protect the transaction.  I don't -- and I'm not

15  criticizing the Court, but the identification of assets, it's

16  not part of the notice.  It's not part of the motion.  It's

17  not part of the purchase agreement.  It's not part of the

18  amended purchase agreement.  That is what I'm being told

19  poured my future in concrete and mooted everything, is an

20  identification of assets that were never attached to anything

21  on the docket.

22          So, Your Honor, I understand that this is

23  difficult, but I can say that I'm not happy that we're here,

24  but we bid in good faith and now I see, frankly, the

25  transaction with the landlord to be diplomatic and somewhat

1 complementary is the landlord's counsel, and Mr. Gold became

2 involved after that objection was filed, so he's talking

3 about arguments that -- he's talking about the arguments that

4 he would have been a formidable opponent; arguments that were

5 never made in the objection.  They were never made to the

6 Court and that's the posture that we go into what would be a

7 contested hearing.

8          And he is right, in terms of the timing of the

9 brief.  We actually -- it takes us some time to prepare these

10 briefs, so we had drafted it, but we hadn't actually filed

11 it, in terms of the timing.  I think we needed an affidavit

12 that we filed that we hadn't got a signature on.

13          So it's not that the debtor disclosed to us that

14 there was a lease termination being negotiated and then all

15 of a sudden, you know, in a day, we drafted a brief.  We were

16 drafting our response.  We were fully intending to litigate.

17          Frankly, we were intending to litigate because we

18 kind of didn't think we were going to get much support from

19 the debtor, but that's okay.  We're happy to do our job and

20 ask the Court for relief, but that didn't happen in this

21 case.

22          So, Your Honor, I would just say that with respect

23 to the transaction, please don't approve the certification.

24 I thought certification of counsel was in a situation where

25 the parties didn't -- where there were no disputes as to the

1  relief that was being requested.  And I know, Your Honor, I'm

2  not -- I'm only admitted *pro hac* here, so I defer to the

3  parties, but I can just tell you that without any animosity,

4  and I will tell you, I heard a lot of animosity, a lot of

5  the -- I mean, frankly, *ad hominem*.

6    I don't feel that way towards the lawyers, but I do know

7    that this is a process in which, from the outside, it looks

8    like the landlord who never appeared at the auction, who

9    chose not to bid, chose not to assert an objection, all

10   they did is notice up a deposition and the apparent

11   posturing collapsed and then they did a deal with, they did

12   a deal directly with the assignee of the buyer -- of the

13   debtor, Gordon Brothers -- or the buyer of the debtors'

14   assets.

15        So, I mean, it looks like they saw that they were

16  not going to get relief in an actual contested proceeding,

17  and so they did a separate transaction.  So thank you, Your

18  Honor.

19        THE COURT:  Thank you.

20    Anything further?

21      (No verbal response)

22        THE COURT:  I'm going to overrule the objection.

23  I appreciate counsel's comments here this afternoon and I

24  appreciate ALDI's participation in this process, but the bid

25  procedures provided that the debtors' presentation to the

1  Court of successful bids and alternative bids would not

2  constitute the debtors' acceptance of such bids, which

3  acceptance will only occur upon approval of such bids by the

4  Court.

5          The sale order approved the sale of the

6  designation rights.  Gordon Brothers has a court order

7  approving its designation rights and Gordon Brothers paid for

8  optionality, and it has exercised that optionality and

9  proceeded differently under the circumstances.

10         So, I will review the matter under certification,

11 but let me clarify for counsel, given what's gone on here

12 today, I would ask that counsel have an opportunity to at

13 least review the order under certification of counsel and

14 communicate with the debtors and Gordon Brothers, with

15 respect to the certification and the landlord PAM.  And, of

16 course, hopefully, you'll be able to promptly submit that to

17 the Court.

18         MR. PIRAINO:  Your Honor, for the record, Stephen

19 Piraino of Davis Polk & Wardwell.

20         It's, of course, fine and, you know, we look

21 forward to whatever comments there may be, which we'll

22 discuss with Mr. Fox.

23         Just one last thing on the scheduling.  Just to

24 alert Your Honor on, I believe, the week of March 19th, we

25 have an omnibus hearing scheduled.  There are some conflicts,

1   so we're going to be reaching out to chambers to see if

2   there's an alternative time, but we did just want to let Your

3   Honor know that we will be reaching out to your courtroom

4   deputy to see if there's an alternative time.

5          THE COURT:  Okay.  And you also need a hearing

6   sometime the week of February 10th?

7          MR. PIRAINO:  Yes, and I think both, Ms. Heilman

8   and Mr. Fox have assisted on that, so, perhaps, I'll let

9   Ms. Heilman handle that.

10          MS. HEILMAN:  Good afternoon, Your Honor.

11          Leslie Heilman, Ballard Spahr, for the record, for

12   the landlord of Highland.

13          Your Honor, yes, we wanted to revisit the week of

14   the 10th for a hearing date, with respect to the Store

15   Number 4126 and the assignment to Burlington.  I think

16   Burlington would also like to be heard, as to availability,

17   as well, depending on what your Court's availability is.

18          THE COURT:  We may have to move a couple of things

19   to try to get something, because I have no availability on

20   the 12th or the 13th and the 14th, I have a contested matter

21   in the morning, so I may have to call and see how much time

22   they think.  And then the next week starts with a holiday.

23          MR. FOX:  Your Honor, Steven Fox.

24          We would be fine the holiday week.  We understand

25   Monday the 17th is not an option.  We've already imposed upon

1   Your Honor enough for holidays.  But subject to Ms. Heilman's

2   willingness to move into that week, we'd be, certainly, from

3   Gordon Brothers' perspective, we'd be fine with that.

4            THE COURT:  What are we contemplating, in terms of

5   time?

6            MR. FOX:  Hard to say, Your Honor.

7            Ms. Heilman is unhappy with the result of the

8   transaction that's going -- that is the subject of the second

9   designation notice filed earlier today.  Her client wants

10  control over the lease and we have designated it for

11  assumption and assignment to Burlington.

12           Now, you've heard many issues about Burlington.

13  We don't think there will be an adequate assurance of future

14  performance question there.  They have been approved by this

15  Court as an assignee on multiple occasions, including in this

16  case, but I don't want to speak for Ms. Heilman.  She's very

17  creative.  I'm sure she'll come up with something, so it's

18  hard to predict what we would expect.

19           But the designation notices on file, it does

20  trigger a 14-day objection period.  I think the debtors,

21  Gordon Brothers --

22           THE COURT:  Was this filed today?

23           MS. HEILMAN:  Yes.

24           MR. FOX:  It does, Your Honor, but we can set a

25  hearing within X number of days after that so we have some

1  flexibility among the parties.  Sooner is obviously better.

2          I, personally, will be in Las Vegas for a

3  conference the week of the 10th, so I share Your Honor's

4  difficulty in scheduling that week, but we are available the

5  following week.

6          MS. HEILMAN:  Your Honor, in terms of timing, as I

7  stand here today, I can't really tell you how long it would

8  be.  I mean, we've had -- there have been other matters

9  before you today that talked about whether or not it's a

10 designation rights asset and not a designation rights asset.

11 Your Honor, we're continuing to do discovery on that.

12         Contrary to some of the other matters you've heard

13 today, this particular lease was not subject to any bidding

14 procedures or bidding process, so the paragraphs 8 and 12 do

15 not apply to this particular lease, Your Honor.  And there is

16 considerable harm that is still running to the landlord.  I

17 don't believe we have confirmation today that the insurance,

18 utilities, and security will remain into February.  We only

19 have assurances through January.

20         We have been addressing these issues with the

21 debtor since October.  None of the rents have been paid on

22 this lease at all.  We have a half a million dollars that is

23 outstanding to the debtor.  We have reservations of rights in

24 the designation notice that says that they're going to

25 contest the cure.

1  Your Honor, time is of the essence.  We've asked

2  for a hearing the week after the designation notice was

3  filed.  We're not really sure why it was filed today.  We had

4  a pseudo auction on this lease a week ago Monday and we were

5  told on Wednesday that it was a designated asset, but the

6  debtors waited until today to file their notice of

7  assumption.

8  That now pushes us into February.  This should

9  have all been concluded, actually, by the end of December,

10  which is the position of the landlord.  But we're now into

11  January and now we're at the end of January into February.

12  Your Honor, respectfully, the matter needs to move

13  forward.  And I understand that Gordon Brothers paid for

14  optionality and is exercising that optionality, but we do

15  dispute that it's a designation rights asset.  We raised

16  these concerns prior to the sale hearing and got no response.

17  And, Your Honor, we do dispute that it was a designation

18  rights asset and that any benefit, if any, should be going to

19  the estate, and that the lease-termination agreement that was

20  accepted by the debtors, outside of any process, should be

21  approved by this Court and the landlord should get its space

22  back so no further harm is done.

23  MR. PIRAINO:  Your Honor, for the record, Stephen

24  Peraino, Davis Polk.

25  I'm not going to respond to each of Ms. Heilman's

1  points, but I do just want to, on insurance and utilities.

2  Obviously, the debtor, and Mr. Fox has confirmed on behalf of

3  GBRP, we'll ensure that if the hearing is the week of

4  the 17th, whatever works for the Court, that utilities,

5  insurance, et cetera, will be maintained through the hearing.

6  We certainly wouldn't cut it off prior to any hearing.

7         THE COURT:  Okay.  Well, let me ask you this, does

8  the response deadline have to be 14 days as to this, take it

9  or leave it?

10         MR. PIRAINO:  I mean, pursuant to the sale order,

11  yes, I think that the parties could discuss, because,

12  obviously, we've been in receipt of Ms. Heilman's motion for

13  some time.

14         THE COURT:  Right.

15         MR. PIRAINO:  We could certainly discuss a more

16  expedited briefing schedule if that --

17         THE COURT:  I'm going to have my chambers look at

18  dates and see what can be compressed, but obviously, this

19  doesn't sound like something that's going to take an hour.

20  So, we'll get back to you about a date.

21         MR. PIRAINO:  Understood, Your Honor.

22         THE COURT:  And, hopefully, we'll get back to you

23  this afternoon.

24         MR. PIRAINO:  Okay.  Understood.

25         And we'll, obviously, be in touch with Ms. Heilman

1  and Mr. Fox and we'll respond promptly.

2           And then, I guess, with respect to the order that

3  would need to be entered today, the 365(d)(4) order, with

4  thanks to Ms. Roglen and some of my colleagues back at the

5  office, I think we have incorporated sort of the comments to

6  push both, Ms. Roglen, or, I guess, accelerate the deadline

7  for Ms. Roglen and the edge order.  Folks will send that

8  around to Ms. Roglen and to Fox Rothschild and then have that

9  submitted, hopefully, very shortly, so that it can be entered

10 today if that's okay, Your Honor?

11          THE COURT:  Yep.

12          MR. PIRAINO:  Okay.  So, from the debtors'

13 perspective -- from our perspective, nothing further, but I

14 believe Burlington might have one more thing.

15          MS. PEGUERO:  Good afternoon, Your Honor.

16          Kristhy Peguero, Jackson Walker, on behalf of

17 Burlington Stores, and my 9010 application is on file, and it

18 may have been granted in the time that we've sat here at the

19 hearing.

20          I just wanted to request that if Your Honor sends

21 communication to the debtors and to GB and to the landlord,

22 with respect to the hearing date, that Burlington be

23 included, to the extent that --

24          THE COURT:  Okay.  We don't maintain emails.

25          If there's certain parties that -- and it's not

1  our habit to communicate with counsel.  Our habit is to, or

2  practice is to let debtor, the United States Trustee, and

3  whoever the opponent is, and they should share the date with

4  you.

5          MS. PEGUERO:  Wonderful, okay.

6          THE COURT:  But it will not go beyond scheduling a

7  date.

8          MS. PEGUERO:  Okay.  Wonderful.  Thank you.

9          THE COURT:  If there's an issue with that, then

10  the parties need to let us know, okay.

11         MS. PEGUERO:  Thank you, Your Honor.

12         MR. PIRAINO:  And just to confirm, Your Honor,

13  once we get, you know, emails on the scheduling, we'll, of

14  course, include the Burlington folks, as they're a relevant

15  party here.

16         THE COURT:  Right.  Understood.  Okay.

17         MR. PIRAINO:  So, I think with that, we have

18  nothing further for today.  So, we very much thank Your Honor

19  for your time.

20         THE COURT:  Okay.  Thank you.

21         Everybody have a good afternoon and I'll see you

22  shortly.  We stand adjourned.

23         MR. PIRAINO:  Thank you, Your Honor.

24         COUNSEL:  Thank you, Your Honor.

25      (Proceedings concluded at 3:47 p.m.)

CERTIFICATION

1

2          We certify that the foregoing is a correct

3     transcript from the electronic sound recording of the

4     proceedings in the above-entitled matter to the best of our

5     knowledge and ability.

6

7     /s/ William J. Garling                    January 23, 2025

8     William J. Garling, CET-543

9     Certified Court Transcriptionist

10    For Reliable

11

12    /s/ Tracey J. Williams                    January 23, 2025

13    Tracey J. Williams, CET-914

14    Certified Court Transcriptionist

15    For Reliable

16

17

18

19

20

21

22

23

24

25