# EXHIBIT 4

January 28, 2022 Lease Agreement between Myrtle Beach Farms Company, Inc., as Landlord, and Jo-Ann Stores, LLC, as Tenant (the "Myrtle Beach Lease")

# LEASE AGREEMENT

Between

**Myrtle Beach Farms Company, Inc.**
**"Landlord"**

and

**Jo-Ann Stores, LLC**
**"Tenant"**

## TABLE OF CONTENTS

| SECTION | HEADING | PAGE |
|---|---|---|
| SECTION 1. | EXHIBITS TO LEASE | 1 |
| SECTION 2. | DEFINITIONS | 2 |
| SECTION 3. | PREMISES | 7 |
| SECTION 4. | TERM AND OPTIONS TO EXTEND | 9 |
| SECTION 5. | FIXED MINIMUM RENT | 9 |
| SECTION 6. | INTENTIONALLY DELETED | 9 |
| SECTION 7. | GROSS SALES | 10 |
| SECTION 8. | TAXES | 12 |
| SECTION 9. | COMMON AREA COSTS | 14 |
| SECTION 10. | CONSTRUCTION OF PREMISES | 14 |
| SECTION 11. | USE | 17 |
| SECTION 12. | COMMON AREAS | 17 |
| SECTION 13. | UTILITIES | 18 |
| SECTION 14. | USE VIOLATION | 19 |
| SECTION 15. | CO-TENANCY | 20 |
| SECTION 16. | RULES AND REGULATIONS | 22 |
| SECTION 17. | ALTERATIONS, INSTALLATIONS AND IMPROVEMENTS BY TENANT | 23 |
| SECTION 18. | REPAIRS AND MAINTENANCE | 23 |
| SECTION 19. | INDEMNIFICATION | 26 |
| SECTION 20. | WAIVER OF CLAIMS | 26 |
| SECTION 21. | PROPERTY AND LIABILITY INSURANCE | 27 |
| SECTION 22. | SIGNS | 31 |
| SECTION 23. | ASSIGNMENT AND SUBLETTING | 29 |
| SECTION 24. | REPAIR AFTER CASUALTY | 30 |
| SECTION 25. | CONDEMNATION | 32 |
| SECTION 26. | REPRESENTATIONS AND COVENANTS OF LANDLORD | 33 |
| SECTION 27. | TENANT'S DEFAULT | 37 |
| SECTION 28. | RIGHTS OF LANDLORD | 38 |
| SECTION 29. | LANDLORD'S DEFAULT | 39 |
| SECTION 30. | MORTGAGE SUBORDINATION | 39 |
| SECTION 31. | NO WAIVER | 40 |
| SECTION 32. | SURRENDER OF PREMISES | 40 |
| SECTION 33. | SHORT FORM LEASE, COMMENCEMENT DATE AGREEMENT | 41 |
| SECTION 34. | NOTICE | 41 |
| SECTION 35. | HAZARDOUS MATERIALS | 42 |
| SECTION 36. | LIMITATION OF LANDLORD'S LIABILITY | 44 |
| SECTION 37. | DELIVERY OF SITE PLAN | 44 |
| SECTION 38. | INTENTIONALLY DELETED | 47 |
| SECTION 39. | ENTIRE AGREEMENT; WRITING REQUIRED | 45 |
| SECTION 40. | OPERATING COVENANT | 45 |
| SECTION 41. | APPLICABLE LAW AND CONSTRUCTION | 46 |

i

SECTION 42.    UNAVOIDABLE DELAYS..............................................................46
SECTION 43.    REASONABLE CONSENT............................................................47
SECTION 44.    NO PARTNERSHIP.......................................................................47
SECTION 45.    ESTOPPEL ....................................................................................47
SECTION 46.    QUIET ENJOYMENT....................................................................47
SECTION 47.    HOLDING OVER ..........................................................................47
SECTION 48.    BROKERS ......................................................................................48
SECTION 49.    INTENTIONALLY DELETED ......................................................50
SECTION 50.    CLAIMS LIMITATION .................................................................48
SECTION 51.    CAPTIONS .....................................................................................48
SECTION 52.    VARIATION IN PRONOUNS........................................................49
SECTION 53.    SECTION REFERENCES ..............................................................49
SECTION 54.    BINDING EFFECT OF AGREEMENT ........................................49
SECTION 55.    ATTORNEY'S FEES .....................................................................49
SECTION 56.    OFAC WARRANTY.......................................................................49
SECTION 57.    PDF/COUNTERPART SIGNATURE ...........................................50

## LEASE

This Lease is made as of *January 28*, 2022 ("Effective Date"), between **Myrtle Beach Farms Company, Inc.**, a South Carolina corporation ("Landlord"), and **Jo-Ann Stores, LLC**, an Ohio limited liability company ("Tenant").

Landlord and Tenant covenant and agree as follows:

## SECTION 1. EXHIBITS TO LEASE

(a)  The following Exhibits are attached to and made a part of this Lease, and are incorporated herein by reference:

Exhibit A.  Legal Description of Shopping Center.

Exhibit B.  The site plan showing the Shopping Center, the Tax Parcel, the location of the Premises, the Shopping Center building, and the Protected Area, and containing a general illustration of the Common Areas and other general information relative to the development of the Shopping Center (the "Site Plan").

Exhibit C.  The site plan showing the Restricted Property.

Exhibit D.  Form of Commencement Date Agreement.

Exhibit D-1.  Tenant's Prototype Signage Plans.

Exhibit E.  Rules and Regulations for Shopping Center.

Exhibit F-1.  Exclusive Uses.

Exhibit F-2.  Prohibited Uses.

Exhibit G.  Form of Subordination, Non-Disturbance and Attornment Agreement.

Exhibit H.  Form of Estoppel Certificate.

(b)  If there is any conflict or ambiguity between the Approved Plans (as defined below), the language in this Lease or any Exhibit attached hereto, the order of precedence shall be the Approved Plans, then this Lease and finally the Exhibits unless expressly stated otherwise.

## SECTION 2.  DEFINITIONS

The terms listed below have the respective meanings as follows:

(a)    Additional Rent: All additional sums, charges, or amounts of whatever nature to be paid by Tenant to Landlord in accordance with the provisions of this Lease, whether or not such sums, charges or amounts are referred to as Additional Rent, including, but not limited to, Tenant's Proportionate Share of Taxes (Section 8), Tenant's Fixed Common Area Costs (Section 9), and Tenant's Proportionate Share of Insurance Costs (Section 21).

(b)    Commencement Date: (1) the 150th day after the Delivery Date; or (2) the day that Tenant opens for business in the Premises, whichever day first occurs. Notwithstanding anything to the contrary in this Lease, unless Tenant elects to open for business, the Commencement Date shall not occur during any period that Tenant has not received all required governmental permits and approvals necessary for Tenant's occupancy, provided Tenant promptly applies for and diligently pursues obtaining such permits and approvals. Also, notwithstanding the foregoing, in no event shall Tenant be required to open or commence the payment of Rent during the period commencing November 15th and ending the next occurring January 31st ("Blackout Period"); and, if the Commencement Date would otherwise occur in the Blackout Period (except for the reason that Tenant opens for business), the Commencement Date shall be deemed to be the first day after the expiration of the Blackout Period unless Tenant opens for business from the Premises, in which event the Commencement Date shall be the date Tenant opens for business from the Premises.

(c)    Common Areas: the parking areas, driveways, aisles, sidewalks, malls (whether enclosed or unenclosed), truck storage areas, mechanical rooms, and other common, service and related areas and improvements within the Shopping Center, whether open to the public generally or for the non-exclusive use of one or more tenants, and whether or not shown on Exhibit B, but excluding the roof(s).

(d)    Default Rate: an annual rate of interest equal to twelve percent (12%), or, if less, the highest rate permitted by law.

(e)    Delivery Date: the date that Landlord delivers the Premises to Tenant with all of the Delivery Requirements (as defined below) satisfied and Tenant accepts said delivery by written acknowledgement signed by Tenant's National Director of Real Estate, Manager of Store Development or Manager of Construction and Facilities (Tenant's Representative).  Tenant shall not unreasonably delay, condition or refuse its acceptance of the Premises. The Delivery Date shall not occur prior to the Estimated Delivery Date (regardless of whether Landlord has satisfied the Delivery Requirements prior to that date), except with Tenant's express written consent, in its sole discretion.

(f)    "Delivery Requirements" means the following:

(1)    Landlord's Work is Substantially Complete (as defined below);

2

      (2)     The Premises are delivered to Tenant free and clear of any Hazardous Material that would violate environmental laws, including asbestos, and Landlord shall provide an Asbestos Containing Materials (ACM) analysis report provided by an independent third party; and

      (3)     All Common Areas have been substantially completed in accordance with all applicable Laws, including, without limitation, delivery areas, landscaping and paving, sidewalks, and striping of parking areas.

  (g)    Intentionally deleted.

  (h)    Estimated Delivery Date: Landlord's good faith estimate of the Delivery Date is February 13, 2022.

  (i)    Comparable Class: A class of tenants and/or a standard for the condition, maintenance and cleanliness of a shopping center that is comparable to or greater than the class of tenants occupying the Shopping Center as of the Effective Date and/or the standard of the condition, maintenance and cleanliness of the Shopping Center as of the Effective Date.

  (j)    Gross Leasable Area or GLA: the number of square feet of floor area (excluding non-retail mezzanine, basement and other such areas), measured from the exterior face of exterior walls, the exterior building line for sidewalk or mall frontage, and the center line of party walls, with no deduction for columns, stairs, elevators, or any interior construction or equipment areas used exclusively by Tenant for the Premises.

     With respect to the Shopping Center, the Gross Leasable Area is the total constructed Gross Leasable Area available for the exclusive use and occupancy of tenants within the Shopping Center.  With respect to the Premises, the Gross Leasable Area shall be the actual completed Gross Leasable Area, as the same exists from time to time.

     Any change in Gross Leasable Area, whether of the Premises or Shopping Center, shall be deemed in effect on the first day of the next succeeding month following such change. Landlord covenants to advise Tenant of any increase or decrease in the Gross Leasable Area of the Shopping Center due to the construction or demolition of any buildings in the Shopping Center within sixty (60) days of any such change, together with a current Site Plan reflecting such change. The GLA for the Shopping Center intended for exclusive use and occupancy as shown in the Site Plan is approximately 221,708 square feet.

  (k)    Hazardous Materials:  See Section 35.

  (l)    HVAC: heating, ventilating and air conditioning exclusively serving the Premises.

  (m)    Landlord's Work: the work to be performed by or at the direction of Landlord in constructing and/or remodeling the Premises and related improvements to satisfy the following requirements: (i) that the Premises shall be free of all fixtures; (ii) the Delivery Requirements set

forth in Sections 2(f)(2) and 2(f)(3) above; and (iii) the warranties and guarantees of Landlord set forth in Sections 10(b) and 18(b) and Landlord's obligations in Section 18(e).

(n)    Laws: any and all laws, codes, ordinances or regulations passed into existence by any Public Entity (as defined below) now or hereinafter in existence.

(o)    Lease Year: a period of twelve (12) consecutive calendar months during the Term. The first Lease Year (or Lease Year One) begins on the first day of February following the Commencement Date, unless the Commencement Date is the first day of February, in which event the first Lease Year begins on the Commencement Date. The first Lease Year shall include the first Partial Lease Year, if any. Rent and any limitations on such Rent for purposes of any Partial Lease Year shall be proportionately adjusted based upon the actual number of days of such Partial Lease Year in relation to the number of days in a full Lease Year.

(p)    OEA:  The parties agree that the Shopping Center is subject to that certain Operation and Easement Agreement dated August 8, 1994 and recorded at Book 1764, Page 654 in the Horry County Records, as amended by that certain First Amendment to Operation and Easement Agreement dated March 12, 2020 and as further amended from time to time (collectively, the "OEA"), true copies of which have been heretofore provided to Tenant by Landlord. During the Term of this Lease, Landlord may amend, modify, alter or extend the OEA without the prior written consent of Tenant, provided that if such amendment, modification, alteration or extension of the OEA would have a material and adverse effect on Tenant's use or occupancy of, and/or access to, the Premises for the Permitted Use, Landlord shall obtain Tenant's prior written consent to such amendment, modification, alteration or extension of the OEA. If Tenant's consent is required pursuant to this paragraph and Landlord shall not have received Tenant's consent, this Lease shall not be subject or subordinate to said amendment, modification, alteration or extension. If Tenant's consent is required pursuant to this paragraph and Landlord requests Tenant's consent to any amendment, modification, alteration or extension to the OEA, such consent will not be unreasonably withheld, denied, or delayed by Tenant. If Tenant fails to respond to Landlord's request for consent within thirty (30) days after Tenant's receipt of such request, Landlord shall deliver to Tenant a second written notice, then if Tenant fails to respond to Landlord's request for consent within fifteen (15) days after Tenant's receipt of such second notice, it shall be deemed that Tenant has consented to such amendment, modification, alteration or extension of the OEA. Landlord warrants that to the best of its knowledge, the OEA is in full force and effect without any existing violation or breach thereunder by Landlord. Landlord shall not be liable to Tenant for any violations of this Lease by parties to the OEA other than Landlord; provided, however, Landlord agrees to use commercially reasonable efforts to enforce the easement rights and other obligations and restrictions contained in the OEA on Tenant's behalf after Tenant provides written notice of such need to Landlord.

(q)    Outside Delivery Date: May 22, 2022.

(r)    Partial Lease Year: the period, if any, of fewer than twelve (12) consecutive calendar months between the Commencement Date and the next occurring February 1 and the period, if any, of less than twelve (12) consecutive calendar months between the last day of the last Lease Year and the expiration of the Term.

4

(s)     Permitted Use: subject to the Exclusive Uses on Exhibit F-1 and Prohibited Uses on Exhibit F-2, attached hereto, and the terms and provisions of the OEA, as used herein, "Permitted Use" shall solely mean the sale of fabrics of all kinds; goods sold by the yard; patterns; knitting supplies, needlepoint, and macramé; art materials and supplies; finished crafts, craft materials and supplies; educational aids, materials and supplies; yarns; all types of notions; floral products, artificial flowers and accessories; scrapbooks and scrapbooking supplies and materials; framed artwork; picture frames, framing (both ready-made and custom made) and framing materials and supplies; fabric care items; foam products; ceramics; wearable art and wearable art supplies; miniatures, dolls, and other similar hobby-related items; sewing machines and sewing machine furniture; irons and ironing boards; seasonal merchandise found in a typical Jo-Ann Fabrics and Crafts store; custom services and custom products using arts and craft and sewing components including, but not limited to, quilting, bow-making, window treatments, floral design, fashion sewing, instructional classes, materials and services; and the incidental sale of (defined as no more than 10% of the sales floor of any individual following item) baskets and other wicker items; housewares; linens, curtains, towels, and pillows; drapery and upholstery materials; draperies and drapery hardware; blinds, shades, shutters and window treatments; do it yourself products and accessories related to sewing and crafting; bridal apparel and accessories, and wedding supplies; gift items, cards, and party supplies; paper goods and stationery; candles, candlesticks, brass and pottery; indoor and outdoor house decorating products and accessories; furniture; prepackaged and unpackaged food and food products, coffee, tea, and assorted non-alcoholic beverages (not to exceed 1,000 square feet); instructional books and tapes; children's books; toys; vacuum cleaners, lamps, and other small household sewing and craft related appliances; accessories related to all of the foregoing, and other items and services customarily offered for sale by a fabric, craft store, and such other related merchandise and services typically offered in the stores operated by Tenant (as such stores exist as of the Commencement Date) under the name Jo-Ann, Jo-Ann Fabrics and Crafts, or such other name under which the majority of Jo-Ann and Jo-Ann Fabrics and Crafts stores in South Carolina choose to operate.

(t)     Premises: a portion of the Shopping Center as shown on the Site Plan and located within the Shopping Center, consisting of space having approximately 32,500 square feet of Gross Leasable Area, with a minimum frontage of 159 feet (to the center of the side walls) (Unit #0003D).

(u)     Protected Area: the area hatched in bold on the Site Plan.

(v)     Protected Use: See Section 14.

(w)     Intentionally deleted.

(x)     Public Entity: the federal, state, county, municipal or other governmental unit, however denominated, and any agency, division, department or public official thereof, now or hereafter having jurisdiction, in any respect, over the Premises, the Shopping Center or Total Property.

(y)     Rent: Fixed Minimum Rent, Additional Rent, and all other monetary obligations of Tenant to Landlord under this Lease.

5

(z)     Shopping Center: that certain shopping center located on that tract of land located in Myrtle Beach, South Carolina, consisting of all buildings including the Premises and Common Areas, and other improvements located upon the Shopping Center, and outlined on Exhibit B. Tenant acknowledges that the Shopping Center is part of a larger property defined as the Total Property in the OEA and described in more detail in the OEA, which commonly referred to as "Seaboard Commons" (the "Total Property").

(aa)     Intentionally deleted.

(bb)     Substantially Complete or Substantial Completion: complete with the exception of minor Punchlist Items (as defined below) that can be completed within fourteen (14) days without interfering with the performance of Tenant's Work.

(cc)     Substitute Rent:  fifty percent (50%) of the Fixed Minimum Rent in lieu of the Fixed Minimum Rent otherwise required to be paid under this Lease.  Tenant is not obligated to pay any Fixed Minimum Rent at any time when Substitute Rent is payable pursuant to any provision of this Lease.  Landlord acknowledges that certain violations of this Lease or specified events hereunder shall cause Tenant significant damage, but that actual damages shall be impossible to determine.  Landlord and Tenant each agrees that the violations and other events specified in this Lease where Tenant is entitled to pay Substitute Rent are in fact cases where Tenant shall suffer significant damage, but that actual damages shall be impossible to determine. Landlord and Tenant has each agreed to Substitute Rent as liquidated damages because actual damages are impossible to determine and so liquidated damages represent a fair compromise and is not a penalty. Landlord and Tenant has each agreed to these provisions (and the entire Lease) voluntarily and after consultation with legal counsel.

(dd)     Tenant's Proportionate Share: (i) for Insurance Costs, is equal to a fraction, the numerator of which is the Gross Leasable Area of the Premises and the denominator of which is the Gross Leasable Area of the Shopping Center, and (ii) for Taxes, is equal to a fraction, the numerator of which is the Gross Leasable Area of the Premises and the denominator of which is the Gross Leasable Area of the Tax Parcel. Notwithstanding the foregoing, if any portion of Taxes or Insurance Costs are furnished or directly payable by an individual tenant or occupant directly to a third-party provider or vendor as opposed to payable by Landlord, the cost of the item(s) furnished or payable by such tenant or occupant shall not be included in Taxes or Insurance Costs, as the case may be, and the square footage of the tenant or occupant furnishing or paying for such item(s) shall not be included in the calculation of Tenant's Proportionate Share of such item(s). Tenant's Proportionate Share for Taxes or Insurance Costs payable by Tenant shall be adjusted in the event of any increase or decrease in the Gross Leasable Area of all buildings within the Tax Parcel or Shopping Center or the Gross Leasable Area of the Premises.

(ee)     Tenant's Work: the work, if any, to be performed by or at the direction of Tenant in finishing the Premises as provided in Tenant's Approved Plans (as defined below).

(ff)     Term: the Initial Term, as hereafter defined, and each Extended Term, as hereafter defined, if any, and any renewals or period of holdover tenancy.

#2566 MYRTLE BEACH, SC

(gg)    Unavoidable Delay: A material delay beyond the reasonable control of the delayed party caused by labor strikes, lock-outs, extraordinary labor troubles, industry-wide inability to procure materials, or other national, state or local health emergency, extraordinary restrictive governmental laws or regulations (such as gas rationing), riots, war, martial law, military or usurped governmental power, acts of domestic terrorism, sabotage, material fire or other material casualty, natural disaster or an act of God (such as an epidemic or pandemic, tornado, flood or earthquake), but excluding inadequacy of insurance proceeds, litigation or other disputes, financial inability, lack of suitable financing, delays of the delayed party's contractor and failure to obtain approvals or permits unless otherwise caused by an event of Unavoidable Delay.

## SECTION 3.  PREMISES

(a)    For the Rent and upon the terms and conditions contained in this Lease, Landlord leases during the Term, and Tenant leases from Landlord during the Term, the following:

(1)    The Premises as shown by crosshatch on the Site Plan and further described herein;

(2)    The right, in common with Landlord and all other tenants of the Shopping Center granted similar rights by Landlord, to the non-exclusive use of all Common Areas. The rights hereby granted with respect to the Common Areas shall constitute easements appurtenant to the Premises and a servitude upon the Shopping Center. The benefit and the burden of such easements shall run with and bind the Shopping Center;

(3)    Subject to the OEA and local codes, and with Landlord's prior written approval, Tenant shall have the right, at no additional charge by Landlord, to place one (1) storage container during seasonal selling seasons and up to twenty (20) storage containers during interior alterations, changes, improvements or remodel to the Premises ("Containers") in a location at, near, or next to Tenant's loading dock in the Protected Area, or at any other location mutually agreed upon by Landlord and Tenant; up to four (4) curbside pickup parking lot signs to indicate that the parking space is for the exclusive use of Tenant's curbside pickup customers only ("Curbside Parking"); and shopping cart corrals ("Corrals") in Tenant's Protected Area in the parking lot and at, near or next to the outside of the Premises' entryway on the sidewalk. The location of the Containers, Curbside Parking, and Corrals shall be subject Landlord's approval. Tenant's Corrals shall take up no more than two (2) parking lot spaces. Each Container shall not exceed 10 feet in width and 40 feet in length. Tenant shall maintain the Containers, Corrals, Curbside Parking and Cardboard Bails (defined below) in good condition and repair. If Landlord receives notice that Tenant's Containers, Corrals, Curbside Parking or Cardboard Bails violate the OEA, any tenant restrictions or any local code or ordinance, then after receipt of notice from the governing body or other party, Tenant shall

7

remove the violating Containers, Corrals, Curbside Parking or Cardboard Bails or move them to an acceptable location. In addition, Tenant shall have the right to store up to five (5) bales of cardboard at the exterior of the Premises and each bale has dimensions of approximately 5' x 5' ("Cardboard Bails"); and

(4)     Notwithstanding anything contained herein, subject to the OEA and local codes, and with Landlord's prior written approval, Tenant shall have the right to display merchandise on the sidewalk on both sides of the storefront door of the Premises ("Sidewalk Sales") no more often than four (4) weeks in each calendar quarter (unless part of a chainwide event), provided that such display does not extend beyond fifteen (15) feet in either direction, does not interfere with pedestrian access and is at least 10 feet away from any adjacent tenant's premises.

(b)     Landlord expressly reserves the right to maintain, use, repair and replace the pipes, ducts, conduits, utility lines, tunneling and wires leading through the ceiling, plenum areas, columns, partitions, and within or under the floor slabs comprising part of the Premises, but only to the extent that such installations (1) are reasonably necessary to serve the Premises or other parts of the Shopping Center; (2) are installed in locations that shall not interfere with Tenant's use of the Premises or Tenant's permitted signage; (3) are not exposed within the selling area; and (4) do not decrease the ceiling height of the Premises. Similarly, subject to Landlord's prior written approval, Tenant shall have the right to make installations around the Premises (e.g., the roof, provided that any roof installations shall be made by Landlord's roofing contractor and do not affect Landlord's roof warranty) which are consistent with Tenant's prototype plans for other similar stores operated by Tenant or which are part of Tenant's Leadership in Energy and Environmental Design initiative or other Tenant initiatives. In exercising the foregoing rights, neither Landlord nor Tenant shall interfere with the use or occupancy of the Premises or other tenant premises or commence any such work without first notifying the other party, at least ten (10) days in advance, of the commencement of such work. In no event may Landlord construct any improvements above the Premises or place signs on the exterior walls of the Premises except for notices of non-responsibility that may be permissible by State law.

(c)     The "Premises" excludes the exterior walls, roof, and the floor slab (excluding floor covering installed by Tenant) and areas beneath the floor slab, and if Tenant installs a mezzanine in the Premises for the storage of inventory and/or fixtures, Tenant shall not pay any Rent on that space.

(d)     At any time up to the Commencement Date, either party's architect may measure the Premises. If the Gross Leasable Area in such measurement varies from the GLA in this Lease, then all items of Rent shall be appropriately adjusted; provided, however, that in no event shall any item of Rent be increased by more than one percent (1%) because of a variance in area of the Premises, and in no event shall the Construction Allowance be adjusted from the amount set forth herein. If neither party performs such measurement, then the area specified in this Lease shall be deemed to be the Gross Leasable Area of the Premises. If a party disputes the measurement, the disputing party shall notify the measuring party within five (5) days after receipt of such

8

#2566 MYRTLE BEACH, SC

measurement; if neither party timely objects to the measurement, then the measurement shall be deemed approved by both parties. If a party timely objects, the disputing party shall then have fifteen (15) days for its architect to measure the Premises. If the disputing party's architect disputes the findings of the measuring party's architect, both architects shall meet in good faith to agree on the number of leasable square feet. If the architects cannot agree within fifteen (15) days, they shall in good faith select a third, independent architect (the "Resolution Architect") to measure the Premises, whose measurement shall be final and binding. All fees and costs payable to Landlord's architect shall be paid by Landlord. All fees and costs payable to Tenant's architect shall be paid by Tenant. Tenant and Landlord shall each pay one-half of the fees and costs payable to the Resolution Architect.

## SECTION 4.  TERM AND OPTIONS TO EXTEND

(a)  The "Initial Term" begins on the Commencement Date and ends on the last day of the 10th Lease Year, unless sooner terminated as herein provided.

(b)  Provided Tenant is not in default of this Lease beyond applicable notice and cure periods (i) at the time Tenant provides written notification to Landlord electing to renew or (ii) at the commencement of the Extended Term, Landlord grants Tenant the right and option to extend this Lease for three (3) additional periods of five (5) years each (individually called an "Extended Term" and collectively called "Extended Terms"), commencing upon the expiration of the Initial Term or such prior Extended Term, as the case may be. Each Extended Term shall be upon the same terms, covenants and conditions as the Term except for the option to extend then exercised and except for such changes, if any, in Rent or other Tenant charges as are expressly set forth in this Lease.

(c)  Tenant must deliver written notice to Landlord of its election to extend this Lease for an Extended Term on or before the date that is two hundred seventy (270) days before the expiration of the Term or the Extended Term (the "Option Notification Deadline"), as the case may be. Time shall be of the essence with respect to this provision. Concurrently with the exercise of the option by Tenant, Tenant shall pay Landlord any unpaid balance of the Rent due during the Extended Term that has accrued as of the date of such notice of extension.

## SECTION 5.  FIXED MINIMUM RENT

(a)  From and after the Commencement Date, Tenant must pay to Landlord, without demand, at the address herein specified for notices to Landlord, Fixed Minimum Rent for the Premises as follows:

(1)  During Lease Years one (1) through five (5) of the Initial Term at the rate of $10.50 per square foot per year; and

(2)  During Lease Years six (6) through ten (10) of the Initial Term at the rate of $11.55 per square foot per year; and

9

    (3)      During the first five-year Extended Term at the rate of $12.71 per square foot per year; and

    (4)      During the second five-year Extended Term at the rate of $13.98 per square foot per year; and

    (5)      During the third five-year Extended Term at the rate of $15.37 per square foot per year; and

The amounts shall include and be in payment of all other charges not specifically set forth in this Lease.

    (b)    Tenant must pay monthly installments of Fixed Minimum Rent in advance on or before the first day of each month during the Term, commencing on the first day of the first month next following the Commencement Date (unless the Commencement Date is the first day of the month, in which event the first monthly installment shall be due on the Commencement Date). Notwithstanding the foregoing, Landlord must invoice Tenant, which invoicing shall not occur more than thirty (30) days before the Commencement Date, for the first monthly installment of Fixed Minimum Rent. In no event shall the first Rent installment be due until ten (10) days after Tenant's receipt of this initial invoice. Fixed Minimum Rent for the partial month, if any, after the Commencement Date shall be computed on a per diem basis (assuming a thirty (30) day month), and Tenant must pay the Fixed Minimum Rent for such partial month concurrently with the first monthly installment. If Tenant fails to pay Rent on the due date and Landlord notifies Tenant in writing of such failure twice in any Lease Year, then if Tenant fails to pay Rent on the due date thereafter in the same Lease Year, then Landlord, in addition to the Rent then owed, is entitled to a late fee of One Hundred Dollars ($100.00) for such third late payment and any such other late payment of Rent thereafter during that Lease Year.

    (c)    **Notwithstanding the foregoing, Tenant shall not pay any Fixed Minimum Rent from the Commencement Date through the seventeenth (17th) month of the Initial Term.**

## SECTION 6.  INTENTIONALLY DELETED

## SECTION 7.  GROSS SALES

    (a)    "Gross Sales" means the entire amount of the actual receipts, whether cash or otherwise, from all sales of merchandise and services for all business conducted in, on or from the Premises, including mail or telephone orders received at the Premises and filled from the Premises or elsewhere (but excluding mail, telephone, internet or other orders filled at the Premises but originating elsewhere).  Each sale upon installment or credit shall be treated as a sale for the full amount thereof in the month during which such sale shall be made, irrespective of the time when Tenant shall receive payment (whether full or partial) from its customers. Layaway sales, so-called, shall be included in the Gross Sales of the respective computation period only to the extent of payments received during that computation period.  Notwithstanding the foregoing, with respect to assignees, sublessees, concessionaires and licensees of Tenant that,

10

together, occupy no more than 1,000 square feet of Gross Leasable Area, Tenant shall not be obligated to report and include with Tenant's Gross Sales, the sales generated by them, although any payments to Tenant by such entity shall be included in Gross Sales.

      (b)    Notwithstanding anything to the contrary, the following are excluded from Gross Sales:

        (1)    sums collected and paid out for any sales tax or excise tax imposed by any duly constituted governmental authority;

        (2)    the value or price of merchandise exchanged between the stores of Tenant, or the affiliates of Tenant, if any, where such exchange of merchandise is made solely for the convenient operation of the business of Tenant or the affiliate of Tenant and not for the purpose of consummating a sale which has been made at, in, from or upon the Premises, or for the purpose of depriving Landlord of the benefit of a sale which otherwise would be made at, in, from or upon the Premises;

        (3)    the amount of returns to shippers or manufacturers;

        (4)    sales to employees made at a discount, not to exceed two percent (2%) of Gross Sales in any given Lease Year;

        (5)    non-sufficient funds check charges or financing charges to customers whether or not separately stated or billed;

        (6)    service charges to customers who buy a budget or deferred payment plan;

        (7)    revenue from gift certificates or gift cards until redeemed at the Premises;

        (8)    revenue from vending machines used solely for the benefit of employees;

        (9)    the amount of any cash or credit refund made upon any sale where the merchandise sold, or some part thereof, is thereafter returned by the purchaser and accepted by Tenant;

        (10)    sales of fixtures;

        (11)    all sums and credits received in settlement of claims for loss or damage to merchandise;

        (12)    non-retail bulk sales of merchandise outside of the ordinary course of business on the Premises;

        (13)    tax exempt sales or merchandise donated or sold at a discount to charitable or non-profit organizations;

#2566 MYRTLE BEACH, SC

(14)    fees for classes or demonstrations;

(15)    the value attributed to merchandise taken in trade;

(16)    referrals to affiliates of or other divisions of Tenant;

(17)    fees for gift wrapping, mailing and other customer services provided on a not for profit basis;

(18)    sales of lottery tickets, special event tickets and the like (but the commissions paid to Tenant shall be included in Gross Sales);

(19)    the amount of credit sales and credit accounts incurred at the Premises which are written off as bad debts and deducted as an expense; and

(20)    sales of patterns.

(c)    The Gross Sales of any Lease Year or Partial Lease Year, as the case may be, have no bearing on or connection with the Gross Sales of any other Lease Year or Partial Lease Year.

(d)    Tenant shall deliver to Landlord within seventy-five (75) days after the end of each Lease Year a statement showing Gross Sales for such Lease Year.

**SECTION 8.  TAXES**

(a)    Landlord covenants and warrants that, as of the Effective Date, (i) the Premises are located on the parcel identified as Tax Map# 173-00-03-205/Pin# 425-06-03-0019 (the "Tax Parcel"), which is hatched on the Site Plan, and (ii) the improvements within the Tax Parcel, as set forth on Exhibit B, are the only improvements now located or to be located thereon which shall be considered for the tax value for which Tenant shall be responsible for its Proportionate Share thereof. Once or twice per Lease Year, depending on when tax bills are issued by the government authority, Tenant must pay to Landlord the Tenant's Proportionate Share of real estate taxes ("Taxes") levied upon the Tax Parcel and paid by Landlord during each year of the Term, after reducing Taxes (1) by the amount of any contributions for Taxes paid by any party having the right to use the Common Areas but not a tenant of the Shopping Center; and (2) by any rollback, discount for timely or early payment, credit or reduction that has been granted or issued by any taxing authority or governmental group or agency.

Tenant shall pay Tenant's Proportionate Share of Taxes within thirty (30) days after receipt of Landlord's statement assessing and prorating the Taxes, together with copies of receipted tax bills for which payment is sought and reasonable verification for the computation of Tenant's Proportionate Share. For the remainder of the calendar year in which the Commencement Date occurs, Landlord estimates that Tenant will pay approximately $1.60 per square foot of Gross Leasable Area of the Premises for Taxes (prorated for any partial year); and, Landlord represents that said amount is a good faith estimate of the actual Taxes that would be due if Tenant were

12

paying Tenant's Proportionate Share of Taxes directly for said calendar year. Tenant shall have the right to audit and inspect Landlord's books and records pertaining to Taxes as set forth in Section 21(e) below.

      (i)           In no event shall Tenant pay for Taxes for a time period longer than the Term.

      (ii)          The parties acknowledge that only Landlord has the right to dispute the assessed value of the Tax Parcel (which is the only way to attempt to control the real estate taxes). For this reason, Landlord shall have the duty to timely compare the then current value of the Tax Parcel (utilizing generally accepted methods of valuation) to the assessed value of the Tax Parcel determined by the taxing authority. If the tax increase associated with previously assessed real property is greater than fifteen percent (15%), Landlord is required to pursue reduction. Tenant is responsible for its pro-rata share of all costs associated with pursuit. If Landlord fails to pursue, payment of Taxes shall be capped at fifteen percent (15%) increase per year on previously assessed real property until Landlord pursues.

      (iii)        If any Taxes may be paid in installments, subject to the exclusions below, only the installments coming due during the Term shall be included within Taxes. Landlord shall use reasonable efforts to minimize the Taxes assessed against the Tax Parcel.

      (iv)        Tenant must pay before delinquency all municipal, county and state taxes assessed during the Term against any leasehold interest and personal property of any kind, owned by or placed in, upon or about the Premises by Tenant.

      (v)         Notwithstanding anything to the contrary, the following are excluded from Taxes:

      (1)    Any portion of the Taxes assessed: (A) against interior tenant improvements and tenant interior space completion work, whether constructed by Landlord or by any other party; or (B) against additional buildings or other taxable improvements not now constructed on the Tax Parcel; or (C) otherwise attributable to any increase in the assessed value of the Tax Parcel by reason of such interior improvements or work;

      (2)    Any portion of the Taxes in the nature of fees, charges or assessments for governmental services or improvements related to the initial construction or any alteration, expansion or rehabilitation of the Shopping Center or other improvement of the Tax Parcel (beyond the upkeep and repair of the Shopping Center that is necessary to keep the same in first-class condition);

      (3)    Any tax or fee that applies generally to all business owners or operators, as opposed to owners of real property;

(4)    Any impact fee, user fee, exaction fee, environmental fee or other tax paid as a prerequisite to construction of the Shopping Center, or any addition or improvement thereto;

(5)    Estate tax, inheritance tax, succession tax, capital levy tax, corporate franchise tax, margin tax, rent tax, profits tax, gross receipts tax, income tax, conveyance fee or transfer tax and the like;

(6)    Any assessment, bond, tax, or other finance vehicle that is (A) imposed as a result of Landlord's initial construction of the Shopping Center; or (B) used to fund construction of additions or improvements to the Shopping Center; and

(7)    Any penalty, interest or other charge attributable to Landlord's late or delinquent payment of Taxes except to the extent Tenant does not pay its share of Taxes in a timely manner.

## SECTION 9.  COMMON AREA COSTS

(a)    Commencing on the Commencement Date and continuing monthly throughout the Term, Tenant shall pay to Landlord on a monthly basis, along with the monthly installment of Fixed Minimum Rent payable by Tenant to Landlord, as Additional Rent, a fixed amount as Tenant's contribution for costs and expenses incurred by Landlord in operating, maintaining, or repairing the Shopping Center and Common Areas, including the costs for maintaining the insurance described in Subsection 21(a) ("Tenant's Fixed Common Area Costs").  Tenant's Fixed Common Area Costs for the remainder of the calendar year in which the Commencement Date occurs shall be $1.55 per square foot.  Thereafter during the Term, Tenant's Fixed Common Area Costs shall increase on January 1 of each year by an amount equal to three percent (3%) over Tenant's Fixed Common Area Costs for the immediately preceding calendar year.  Tenant's Fixed Common Area Costs is not subject to review or audit.

## SECTION 10.  CONSTRUCTION OF PREMISES

(a)    On or before the date which is seventy-five (75) days prior to the Estimated Delivery Date, Tenant, at its sole cost and expense, shall deliver to Landlord for Landlord's approval not to be unreasonably withheld, a copy of Tenant's proposed plans and specifications and sign drawings relating to Tenant's Work (the "Proposed Plans").  If Landlord fails to approve or disapprove, in writing, the Proposed Plans within fifteen (15) days after receipt thereof from Tenant and Landlord thereafter fails to respond in writing within seven (7) days after receiving a second written request from Tenant, then such approval shall be deemed to have been given.  If Landlord furnishes Tenant a written response, Tenant shall resubmit revised Proposed Plans within ten (10) days after having received Landlord's response, and Landlord shall then have a ten (10) day period within which to review the same.  If Landlord fails to respond within ten (10) days and Landlord thereafter fails to respond in writing within seven (7) days after receiving a second written request from Tenant, then such revision shall be deemed approved.  Such review process shall continue until the Proposed Plans are acceptable to both Landlord and Tenant.  Once

14

approved by Landlord and Tenant such plans may be referred to herein as "Tenant's Approved Plans." Tenant's Approved Plans and Landlord's Approved Plans (if any) shall collectively be referred to as the "Approved Plans". If the parties do not reach agreement on the Tenant's Proposed Plans within ninety (90) days after their first submission to Landlord, Tenant may terminate this Lease upon written notice to Landlord within fifteen (15) days after such ninety (90) day period. Within fifteen (15) days after Landlord and Tenant reach agreement on Tenant's Approved Plans, Tenant shall apply for all required governmental permits and approvals necessary to commence Tenant's Work (collectively, the "Tenant's Work Approvals"), and Tenant shall diligently pursue obtaining the Tenant's Work Approvals. If Tenant is unable to secure the Tenant's Work Approvals within sixty (60) days of Tenant's application therefor ("Permit Period") despite good faith efforts, then Landlord shall have the right to pursue the Tenant's Work Approvals on behalf of Tenant for an additional sixty (60) days (if Landlord elects to pursue such permits and approvals, said one hundred twenty (120) day period shall hereinafter referred to as the "Permit Period"). If the Tenant's Work Approvals have not been obtained during the Permit Period, despite good faith efforts by Tenant, Tenant shall have the right to terminate this Lease by delivering written notice to Landlord of its intent to terminate this Lease to Landlord within thirty (30) days after the end of the Permit Period. If Tenant fails to exercise its right to terminate this Lease during said thirty (30) day period, the right to terminate established under this Section shall be null and void. After delivery of any termination notice to Landlord under this Section 10(a), Tenant shall be relieved of all obligations under this Lease (except for any obligations that survive the expiration or earlier termination of this Lease) and shall not be liable to Landlord for damages or otherwise as a result of such termination.

(b)    Subject to satisfaction of the Delivery Requirements, Tenant shall take possession of the Premises on the Delivery Date on an "as is" "where is" basis, with all faults, except that Landlord warrants and guarantees (i) that all structural portions of the Premises and the roof (water tight and leak free), utility cables, mains and conduits, electrical, gas, plumbing, sprinkler, and sewer systems, upon the Delivery Date, (A) shall be in good working order and repair (it is agreed and understood that the floor slab moisture shall not exceed the acceptable levels of slab moisture per ASTM 2170-2 (Rh ninety percent (90%) or below) and (B) shall meet ASTM requirements to allow for the installation of resilient flooring; (ii) that the Premises and Common Areas surrounding the Premises are water tight (for example, there is no standing water outside or inside of the Premises), and shall not be in violation of any Laws; and (iii) that, upon the Delivery Date, the Premises shall be free of all fixtures.

(c)    Following the Effective Date and Landlord's receipt of all required certificates of insurance from Tenant, but subject to all applicable Laws and requirements of any Public Entity, Tenant shall hereafter have access to the Premises for inspection, taking measurements, making plans, erecting temporary or permanent signs and the performance of Tenant's Work as may be appropriate by Tenant without being deemed thereby to have taken possession or accepted delivery of the Premises; provided, however, that (i) Tenant must provide prior written notice to Landlord of its intent to access the Premises (and if there is an existing tenant in the Premises, such tenant must consent to such access); (ii) Tenant may be accompanied by a Landlord representative during such access; and (iii) Tenant shall indemnify, defend and hold harmless Landlord from and against any and all claims or losses arising from Tenant's entry upon the Premises, except to the extent caused by Landlord, its agents, employees or contractors.

#2566 MYRTLE BEACH, SC

(d)     If the Delivery Date does not occur by the Outside Delivery Date, then provided such delay is not caused in whole or in part by an Unavoidable Delay or by any act or omission by Tenant or its employees or contractors, Landlord shall pay Tenant Twenty-Five Thousand Dollars ($25,000.00) (the "Lump Sum Payment") within thirty (30) days after the Outside Delivery Date. In addition, Landlord shall pay Tenant Five Hundred Dollars ($500.00) for each day (the "Per Diem Payment") between the Outside Delivery Date and the earlier to occur of (1) the Delivery Date; or (2) the date Tenant terminates this Lease in accordance with Section 10(e), and the Per Diem Payment shall be payable within thirty (30) days after the earlier to occur of (1) and (2). If Landlord fails to pay Tenant the Lump Sum Payment and/or the Per Diem Payment pursuant to the preceding sentence, then Tenant shall provide notice to Landlord of nonpayment, and if Landlord fails to make such payment within ten (10) days after notice, Tenant shall have the right (without limiting any other right or remedy of Tenant to collect such payment) to deduct such amount, together with interest thereon at the Default Rate, from Rent. Landlord and Tenant agree that it shall be difficult to determine the precise amount of damages that Tenant shall incur as a result of the failure of the Delivery Date to occur by the Estimated Delivery Date. Therefore, Landlord and Tenant agree that the Per Diem Payment and the Lump Sum Payment constitutes liquidated damages for such failure. If the Delivery Date does not occur by the Estimated Delivery Date, said liquidated damages shall be payable irrespective of the date Tenant actually opens for and conducts business in the Premises.

(e)     If the Delivery Date has not occurred on or before the Outside Delivery Date, then provided such delay is not caused in whole or in part by an Unavoidable Delay or by any act or omission by Tenant or its employees or contracts, Tenant shall have the right to terminate this Lease by delivering written notice to Landlord at any time from and after the Outside Delivery Date but before the Delivery Date. After delivery of Tenant's notice of termination, Tenant shall be relieved of all obligations and liability hereunder. If Tenant so terminates this Lease, Landlord shall be liable to Tenant for all payments due Tenant under Section 10(d). In addition, Landlord shall reimburse Tenant for all architectural and engineering fees not to exceed Forty Thousand Dollars ($40,000.00) incurred by Tenant in connection with this Lease, payable within ten (10) days after Landlord's receipt of documentation from Tenant showing such costs and proof of payment thereof by Tenant. This Section 10(e) survives the termination of this Lease.

(f)     If, as a result of, or as a condition to, Landlord's Work, any Hazardous Material is required by Law to be removed, abated, or otherwise remediated, then Landlord must perform such removal, abatement or remediation. If, as a result of, or as a condition to Tenant's Work, any pre-existing Hazardous Material is required by Law to be removed, abated, or otherwise remediated, then Landlord must reimburse Tenant within thirty (30) days for Tenant's cost of such removal, abatement or remediation, and if not so reimbursed, Tenant may deduct the cost from Rent.

(g)     Landlord shall pay Tenant a "Construction Allowance" in the amount of Six Hundred Forty-Seven Thousand Five Hundred Dollars ($647,500.00), irrespective of costs or the size of the Premises, as follows: (1) fifty percent (50%) to be paid to Tenant within thirty (30) days of the completion of Tenant's Work as per Tenant's architect; and (2) fifty percent (50%) within thirty (30) days of Tenant's opening in the Premises and delivery to Landlord of the

16

following: (i) a lien waiver from Tenant's general contractor; (ii) lien waivers for any of Tenant's vendors with invoices of Ten Thousand Dollars ($10,000.00) or more; (iii) an AIA schedule of values; (iv) copies of "as built" plans (hard copy and electronic); and (v) a copy of the Certificate of Occupancy. Notwithstanding the foregoing, if such lien waivers have not been provided, in no event shall the balance of the Construction Allowance due to Tenant be withheld more than thirty (30) days beyond the statutorily defined period in which liens may be filed, if no liens have been filed during said period. If Landlord fails to pay Tenant any portion of the Construction Allowance in accordance with this Lease, then after providing Landlord with thirty (30) days' written notice without cure and so long as Tenant is not in default of this Lease and no good-faith dispute exists between Landlord and Tenant with respect to payment of the Construction Allowance, Tenant shall have the right (without limiting any other right or remedy of Tenant) to deduct such amount from Rent (as a setoff or as recoupment in the case of bankruptcy), together with interest thereon at the Default Rate. Landlord shall wire-transfer the Construction Allowance to Tenant's bank as follows: Bank of America, 100 West 33rd Street, New York, NY 10001, ABA: 026009593 (in the event Landlord elects to submit an ACH transmission, the number is: 111000012); JOANN Account No.: 4427216208;  Account Name: Jo-Ann Stores, LLC Store #2566.

**SECTION 11.  USE**

The Premises may be used for the Permitted Use, provided the Premises shall not be used in violation of (a) the OEA, (b) the exclusive uses of other tenants as are set forth on Exhibit F-1 attached hereto (collectively, the "Exclusive Uses"), or (c) the prohibited uses of the OEA or of other tenants as are set forth on Exhibit F-2 attached hereto (collectively, the "Prohibited Uses"). Landlord represents that the OEA, the Exclusive Uses and the Prohibited Uses accurately reflect exclusives, uses and encumbrances that presently encumber the Premises as terms of existing leases of the Total Property or the OEA (the uses covered by such restrictions are collectively referred to as the "Restricted Uses" and individually as a "Restricted Use"). Upon the expiration or earlier termination of the lease or other written instrument containing a Restricted Use, the Premises shall not be subject to such Restricted Use under this Lease and such use shall no longer be a Restricted Use. Upon the request of Tenant, Landlord promptly shall advise Tenant which Restricted Uses still encumber the Premises and shall furnish to Tenant the documentary support therefor.

**SECTION 12.  COMMON AREAS**

(a)    Landlord, at its own cost and expense (except as otherwise specified in Section 21) must construct, install, operate, manage, repair and maintain the Common Areas in a neat and clean condition of Comparable Class for the benefit of Tenant and Tenant's customers, employees, licensees and invitees. Landlord's obligations with respect to the Common Areas include, but are not limited to:

(1)    Equipping and lighting the Common Areas;

(2)    Maintaining the surfaces of all sidewalks, restriping and maintenance of paved and parking areas in a level, smooth and evenly covered condition

17

with the type of surfacing material originally installed or such substitute as shall in all respects be equal in quality to the original;

(3)    Removing all ice and snow, papers, mud and sand, debris, filth and refuse and thoroughly sweeping the Common Areas to keep them in a clean and orderly condition;

(4)    Placing, keeping in good condition and repair and replacing all utility lines, any necessary appropriate directional signs, markers and curbs;

(5)    Maintaining, trimming and watering, mowing and weeding all landscaped areas and making such replacements of shrubs and other landscaping as is necessary; and

(6)    Security arrangements including private police and similar services and functions, as determined by Landlord in Landlord's reasonable discretion.

(b)    Landlord may close any Common Areas temporarily, at such times as to cause the least possible interruption or interference with Tenant's business, to make repairs or changes, to prevent the acquisition of public rights in such Common Areas or to discourage non-customer parking; but, in no event shall the Protected Area be closed (except (i) in the event of an emergency or (ii) if required pursuant to the OEA or applicable Law or (iii) as necessary for Landlord to comply with Section 12(a), provided that, prior to any such closure for the purposes of compliance with Section 12(a), which is not an emergency, Landlord shall provide reasonable notice to Tenant) without the prior reasonable consent of Tenant.  In no event shall Landlord designate the Protected Area as an employee parking area or otherwise permit the Protected Area to be used for employee parking.

(c)    Landlord must keep the Common Areas clean and well lighted from dusk until at least one-half hour after the close of Tenant's business and remove snow from the parking areas, driveways and sidewalks promptly. Landlord shall not impose any parking charges for the parking of automobiles in the parking areas. Landlord shall not grant any rights in, or permit special or exclusive use of, the sidewalk space or parking areas directly in front of the Premises or in the exterior area near the rear door of the Premises.

## SECTION 13.   UTILITIES

Landlord, at its sole cost and expense, shall cause all utilities furnished to the Premises (including Common Area lighting) to be separately metered so that only the service provided to the Premises shall be reflected in utility bills rendered to Tenant by the respective supplying public utility companies, except that water may be sub-metered and paid directly to Landlord.  Tenant must pay, when due, bills for utilities furnished to the Premises by public utility companies from and after the Delivery Date, including water, gas, electricity, telephone and the like, as are separately metered and charged directly to Tenant.   Tenant shall have the right, it its sole discretion, to choose its provider for telephone, internet, cable, and the like.  If required, Landlord

18

shall provide consent, not to be unreasonably withheld or delayed, to access the Premises for installation or repair of any such utilities.

## SECTION 14.  USE VIOLATION

(a)    Landlord shall not lease, license or sell any space in the area of the Shopping Center which is hatched on Exhibit C (the "Restricted Property") to a direct category competitor of Tenant, which is a fabric store, arts and crafts store or sewing machine store (the "Protected Use"), such as by way of example and not limited to Michaels Arts & Crafts, Sierra Pacific Crafts, Ben Franklin Arts & Crafts, Beverly's, Calico Corners, Hobby Lobby, and Aaron Brothers custom framing.  The Protected Use will not apply to (i) any tenant whose lease, as may be amended, renewed or extended, is in effect prior to the Effective Date of this Lease, as well as a new lease entered into with such tenant after the Effective Date for the same unit or any other unit within the Shopping Center, including the Restricted Property, so long as such tenant is continuing to operate under the new lease for substantially the same purpose as permitted in its prior lease; (ii) any tenant Landlord is legally or contractually prohibited from subjecting the tenant's permitted use to the Protected Use; (iii) any tenant under a lease as a successor to or assignee of any tenant whose lease is in effect prior to the Effective Date of this Lease; or (iv) furniture stores (such as, by way of example and not limitation, Havertys and Rooms to Go), general merchandise stores (such as, by way of example and not limitation, Pier 1 Imports and World Market) or home improvement stores (such as, by way of example and not limitation, Home Depot and Lowes Home Improvement), which may carry products similar to those found in a direct category competitor of Tenant.

(b)    If any portion of any Restricted Property is used or occupied for the Protected Use, subject to any deferral in the case of a "rogue tenant" as set forth in Section 14(d) (each a "Use Violation"), then Tenant is obligated to pay only Substitute Rent until such Use Violation ceases. Landlord and Tenant intend, and the term "Use Violation" shall be construed, that any use or occupancy in the Restricted Property for the Protected Use by a rogue tenant shall be deemed a "Use Violation" only as set forth in Section 14(d).  In addition, during the time that any Use Violation exists, Tenant has the right to terminate this Lease by giving sixty (60) days' written notice to Landlord (unless such Use Violation is cured within such sixty (60) day period, in which case this Lease shall not terminate), in which event all further obligations hereunder shall terminate on the date specified in Tenant's notice, and any Rent (including Substitute Rent) paid in advance by Tenant must be refunded to Tenant within thirty (30) days after termination of this Lease. Substitute Rent and the right of termination set forth in this Section 14(b), and if applicable Alternate Substitute Rent set forth in Section 14(h), shall be Tenant's sole and exclusive remedy for any Use Violation.

(c)    In the event that Tenant's Protected Use is violated, the computation of Substitute Rent shall commence on the first day of the violation of the Use Violation and shall be paid in monthly installments.

(d)    Notwithstanding anything to the contrary, in the event that any tenant or occupant who conducts or operates in violation of the Protected Use without Landlord consenting to or granting such tenant or occupant the right to do so (a "rogue tenant"), then a Use Violation shall

19

not be deemed to have occurred and Tenant's right to pay Substitute Rent and terminate this Lease shall be deferred, provided that Landlord commences court action to cure or eliminate the violation of the Protected Use by the rogue tenant within thirty (30) days after Landlord's receipt of written notice from Tenant thereof and diligently pursues same to completion (which diligence by Landlord must include appeals to the highest state court, if lower court rulings are adverse to Landlord and allow the violation to continue). If Landlord does not take such action against the rogue tenant as described in the immediately preceding sentence, then a Use Violation shall have been deemed to have occurred and Tenant may exercise its termination right and right to pay Substitute Rent at any time as set forth in Section 14(b).

(e)     Tenant's failure to exercise the termination option is not a waiver of Tenant's continuing right to do so as long as such Use Violation continues.

(f)     Intentionally deleted.

(g)     Landlord covenants and agrees to use diligent, good faith, commercially reasonable efforts to cure any breach or violation of this Section, including, without limitation, seeking and diligently prosecuting all available legal and equitable remedies to compel or otherwise cause cessation of the Use Violation.

(h)     If at any time during which a Use Violation exists and Tenant is already entitled to pay Substitute Rent pursuant to Section 15 of this Lease ("Section 15 Prior Substitute Rent Reason"), then, in lieu of paying Substitute Rent, Tenant shall be entitled to pay Alternate Substitute Rent until such time as the Use Violation is satisfied or until such time as the Section 15 Prior Substitute Rent Reason is satisfied, in which case Tenant shall be obligated to pay Substitute Rent in accordance with the terms of this Section 14. As used in this Lease, "Alternate Substitute Rent" shall mean fifty percent (50%) of the Substitute Rent.

## SECTION 15.  CO-TENANCY

(a)     Opening Co-Tenancy.

(1)     The Opening Co-Tenancy Requirement means that at least three (3) of the following tenants, or Replacement Anchor(s) for one or more of such tenants, are open to the public: (i) Target; (ii) Lowe's Home Improvement (each, an "Anchor Tenant"); (iii) Ross; (iv) TJ Maxx; and (v) Cost Plus World Market (each, a "Junior Anchor Tenant").

(2)     If the Opening Co-Tenancy Requirement is not met as of the Commencement Date, Tenant shall not be required to open until the Opening Co-Tenancy Requirement is satisfied. If Tenant elects to open for business before the date that the Opening Co-Tenancy Requirement is met, then from the date Tenant opens for business until the Opening Co-Tenancy Requirement is met or the conditions provided in subsection (3) below have been satisfied, Tenant may pay Substitute Rent.

20

#2566 MYRTLE BEACH, SC

(3)     If the Opening Co-Tenancy Requirement remains unsatisfied for twelve (12) months from the Commencement Date, then Tenant has the right and option (A) to continue its tenancy upon the terms and conditions of this Lease subject to its right to pay Substitute Rent until the earlier of the date that the Opening Co-Tenancy Requirement has been satisfied or one hundred eighty (180) days following the twelve (12) month period above; or (B) to terminate this Lease by giving ninety (90) days' prior written notice to Landlord within one hundred eighty (180) days after said twelve (12) month period.  Failure to timely exercise the termination option shall waive Tenant's right to do so and Tenant shall commence payment of full Fixed Minimum Rent.  If Tenant elects to terminate this Lease, all further obligations hereunder shall terminate effective ninety (90) days after the date of Tenant's notice, and in such event any Rent paid in advance shall be immediately refunded to Tenant.

(b)     Ongoing Co-Tenancy.

(1)     Ongoing Co-Tenancy Violation shall mean that one (1) Anchor Tenant and two (2) Junior Anchor Tenants, or their successors or assigns or Replacement Anchors, cease doing business in their current locations and the vacancy continues for one hundred twenty (120) days.

(2)     Commencing any time after the twenty-fourth (24th) month of the Initial Term, if there shall be an Ongoing Co-Tenancy Violation, then Tenant shall immediately pay Substitute Rent.  Tenant shall have the right to pay Substitute Rent for a maximum of eighteen (18) months.

(3)     If the Ongoing Co-Tenancy Violation is not cured within twelve (12) months, then without limiting Tenant's right to pay Substitute Rent, Tenant may terminate this Lease upon ninety (90) days' written notice to Landlord, delivered at any time thereafter prior to the earlier of (i) the last day of the twenty-fourth (24th) month of the Initial Term or (ii) the date the Ongoing Co-Tenancy Violation is cured.

(c)     Definitions.

(1)     "Replacement Anchor" for an Anchor Tenant or Junior Anchor Tenant means a single national or regional Retail Tenant suitable for occupancy in a shopping center of Comparable Class and operating under one trade name and occupying and conducting business in at least seventy-five percent (75%) of the Anchor Tenant or Junior Anchor Tenant premises being replaced, as applicable,  except that holiday, seasonal and other temporary tenants that occupy the Anchor Tenant or Junior Anchor Tenant premises for less than one hundred eighty (180) consecutive days shall not be deemed a Replacement Anchor.  Up to three (3) national or regional comparable Retail Tenants, each occupying a minimum of 20,000

21

contiguous square feet under a single trade name within the Anchor Tenant or Junior Anchor Tenant, as applicable, may be deemed on a collective basis to be a "Replacement Anchor" after the commencement of such substitute operations by such tenants.

(2)     For purposes of this Lease, "national" shall mean a retailer of Comparable Class operating at least seventy-five (75) stores in multiple states, and "regional" shall mean a retailer of Comparable Class operating at least fifteen (15) stores in multiple states.

(3)     A "Retail Tenant" is a non-residential, non-office tenant, under a lease with an initial lease term of at least three (3) years who sells goods to consumers, provided that any tenant that has office space within its premises incidental to a retail use shall still be considered a Retail Tenant. For clarification purposes only, restaurants and salons shall be considered Retail Tenants. Real estate or securities brokerage offices, financial or tax planning services, accounting offices, insurance or legal services, travel agencies, banks, gymnasium containing less than 10,000 square feet, cinemas, bowling alleys, comedy clubs, medical offices, dental offices and the like shall not be considered Retail Tenants.

(d)     Dual Violations. If at any time during which the Opening Co-Tenancy Requirement or Ongoing Co-Tenancy Violation has not been met or exists (collectively referred to as "Co-Tenancy Violation"), as the case may be, and Tenant is already entitled to pay Substitute Rent pursuant to Section 14 of this Lease ("Section 14 Prior Substitute Rent Reason"), then, in lieu of paying Substitute Rent for such Co-Tenancy Violation and in addition to all remedies available at law and in equity, Tenant shall be entitled to pay Alternate Substitute Rent until such time as the Co-Tenancy Violation is satisfied or until such time as the Section 14 Prior Substitute Rent Reason is satisfied, in which case Tenant shall be obligated to pay Substitute Rent, as applicable, in accordance with the terms of this Section 15.

(e)     Exception. Any Anchor Tenant, Junior Anchor or its Replacement Anchor, which is not open to the public or doing business due to an assignment or subletting, damage and destruction, or remodeling (in all of the foregoing cases, not to exceed 30 days), or Unavoidable Delays shall (1) be considered to be open to the public for purposes of determining whether the Opening Co-Tenancy Requirement has been satisfied, and (2) not be considered to have ceased doing business for purposes of determining whether an Ongoing Co-Tenancy Violation exists.

**SECTION 16.   RULES AND REGULATIONS**

(a)     The rules and regulations (the "Rules and Regulations") described in Exhibit E attached hereto, for the Shopping Center, Common Areas, and the Premises which Landlord may hereafter from time to time, reasonably adopt and promulgate for the government and management of the Shopping Center are hereby made a part of this Lease and shall, during the Term, be in all things observed and performed by Tenant and by Tenant's employees and agents, provided that any modifications to the  Rules and Regulations after the Effective Date shall not limit the rights

22

or expand the obligations of Tenant under this Lease. Landlord shall use reasonable efforts to enforce such rules and regulations in a uniform manner.  It is agreed and understood that any modifications to the Rules and Regulations after the Effective Date, shall be subject and subordinate to the terms and conditions of the body of this Lease so that in the event of any conflict or inconsistency between the terms hereof and such rules and regulations, the terms hereof shall supersede and control.

(b)    Tenant is not required to join or maintain membership in any tenant's business association sponsored by or for the Shopping Center, nor is Tenant required to pay any of the costs of the activities conducted by such association.

## SECTION 17.  ALTERATIONS, INSTALLATIONS AND IMPROVEMENTS BY TENANT

(a)    Tenant, without Landlord's consent, has the right to make such interior alterations, changes and improvements to the Premises as Tenant may desire for the conduct of Tenant's business and for the full beneficial use of the Premises; except for changes, alterations or improvements to the structure of the building or the mechanical systems serving the Premises, which require Landlord's consent, which consent must not be unreasonably withheld or delayed. Tenant shall pay all costs and expenses of its improvements, shall make such changes, alterations and improvements in a good and workmanlike manner, in accordance with all applicable Laws and building regulations, and free and clear of any mechanic's liens or other liens or claims in connection with the making of such changes, alterations and improvements.

(b)    Except as otherwise provided, all signs, furnishings, trade fixtures, inventory, equipment and other removable property installed in the Premises by Tenant (as distinguished from leasehold improvements, which leasehold improvements include, without limitation, any HVAC unit(s), compressors, lighting fixtures, exhaust hoods, toilets, sinks, hot water heaters, fire suppression systems,  floor covering, built-in furnishings, awnings and walk-in refrigeration units located in or serving the Premises, whether such leasehold improvements were made to the Premises by Landlord or Tenant) shall remain the personal property of Tenant, shall not be subject to any Landlord's lien or lien or security interest against the property of Landlord, and may be removed from the Premises by Tenant upon the termination of this Lease. If any of the foregoing is affixed to the Premises, Tenant shall repair any damage caused by removal.

## SECTION 18.  REPAIRS AND MAINTENANCE

(a)    Except as otherwise provided, Tenant shall maintain the interior, non-structural portion of the Premises, at its sole cost and expense, in an attractive, clean and sanitary condition.

(b)    Landlord warrants and guarantees that all structural portions of the Premises and the roof (water tight and leak free), utility cables, mains and conduits, electrical, gas, plumbing, sprinkler, and sewer systems, upon the Delivery Date, (i) shall be in good working order and repair (it is agreed and understood that the floor slab moisture shall not exceed the acceptable levels of slab moisture per ASTM 2170-2 (Rh ninety percent (90%) or below) and shall meet ASTM requirements to allow for the installation of resilient flooring, and that the Premises and Common Areas surrounding the Premises are water tight (for example, there is no standing water

23

outside or inside of the Premises)), and (ii) shall not be in violation of any Laws. Landlord, at no cost to Tenant, must promptly correct any code violations that existed as of the Delivery Date subsequently found to exist and promptly replace or repair, in a good and workmanlike manner and using first-quality materials, any defects in workmanship, material or equipment that may appear in, on or about Landlord's Work during the Term.

(c)        Subject to Section 18(d), and except for damage caused by fire or other casualties or taking by eminent domain or conveyance in lieu thereof: Tenant, at its sole cost and expense, must make all interior nonstructural repairs to the Premises, including doors and windows, and (1) all repairs or replacements to the plumbing and gas systems exclusively serving the Premises from their respective meters to and including the plumbing and gas systems in the interior of the Premises; and (2) the electrical system exclusively serving the Premises from Tenant's electrical panel to and including the electrical systems in the remainder of the interior of the Premises. Notwithstanding the foregoing, Tenant is not required to make any: (i) repairs of damage covered by insurance maintained or required to be maintained by Landlord; (ii) repairs necessitated by reason of the negligence or willful misconduct of, or default of this Lease by, Landlord, its agents, employees or contractors; (iii) repairs to the plumbing, gas, electrical or other similar units and systems where such repairs would necessitate going through or into the floor slab, structural walls, or roof of the Premises; (iv) replacement of any plumbing, gas, electrical or similar units or systems, with the exception of subparagraphs (1) and (2) above; or (v) replacement of the sprinkler, life safety or other detection or suppression system or costs to bring such systems up to code. All of the repairs and replacements referred to in the immediately preceding sentence shall be performed by Landlord at its sole cost and expense.

(d)        Landlord, at its sole cost and expense, must make all repairs to the Premises other than those that Tenant is required to make. Landlord's obligations include, but are not limited to, repairs to the structural portions of the Premises (both interior and exterior), the roof, floor slab, foundation, exterior walls, any interior damage caused by roof leaks or water/sewage backing up into the Premises except if such backing up is caused by reason of any act or omission, or default of this Lease, by Tenant, its agents, employees, contractors or invitees, and all repairs or replacements to the (x) gas and plumbing systems or any portion thereof up to (but not including) their respective meters, and (y) the electrical system up to (but not including) Tenant's electrical panel. In making any repairs or replacements, Landlord must not unreasonably interfere with Tenant's normal operations and business. Landlord assigns to Tenant the non-exclusive benefit of all warranties and guarantees, if any, with respect to any and all construction and equipment on the Premises to be maintained by Tenant. Notwithstanding the foregoing, if the necessity for such repairs set forth in this Section 18(d) shall have arisen from or shall have been caused by the gross negligence, willful misconduct or default of Tenant, its agents, employees, or contractors, to the extent such damage is not covered by proceeds from property insurance actually maintained or required to be maintained by Landlord hereunder, Landlord may make or cause the same to be made, but shall not be obligated to do so, and Tenant agrees to pay to Landlord promptly upon Landlord's demand, as Additional Rent, the cost of such repairs, if made. In the event Landlord elects not to make such repairs, Landlord may require Tenant to make such repairs at Tenant's sole cost and expense.

24

(e)    Landlord shall deliver the existing HVAC units and system in working condition on the Delivery Date. Tenant shall be responsible for all preventative maintenance, repairs and replacements of the HVAC unit(s) during the Term and Option periods.

(f)    Tenant shall maintain the Premises, at its expense, free and clear of all rubbish, garbage and trash and place such rubbish, garbage and trash in the containers provided by Tenant. Tenant, at its own cost and expense, shall dispose of all rubbish, garbage and trash on a timely basis with the provider of its choice. Landlord shall provide an area for Tenant's trash compactor or containers, at Landlord's sole cost and expense, within 20 feet of the rear of the back door to the Premises.

(g)    Subject to this Section 18, Tenant shall keep the Premises in an orderly and sanitary condition, free from vermin, rodents, bugs and other pests, and Landlord must keep the Common Areas in an orderly and sanitary condition, free from vermin, rodents, bugs and other pests. Notwithstanding the foregoing, Landlord is responsible for the extermination of termites, carpenter ants, and other insects capable of causing structural damage in, on or about the Premises, the Common Areas, and all parts of the Shopping Center. Landlord must require all tenants of the Shopping Center to keep their spaces in an orderly and sanitary condition, free from vermin, rodents, bugs and other pests.

(h)    Tenant is responsible for making any interior non-structural alterations of or improvements to the Premises that are required by any Public Entity after the Delivery Date, except to the extent that such responsibility is imposed upon Landlord in the next following sentence or otherwise under this Lease (including Section 18(c) above). Landlord is responsible, at its sole cost and expense, for making all alterations of or improvements to the Premises that are required by any Public Entity (which requirement may arise as a result of Tenant seeking approval from a Public Entity for alterations and improvements to the Premises) and that (1) are structural in nature (excluding the façade changes Tenant has proposed); (2) relate to the exterior thereof, including the Common Areas; (3) require replacement of the sprinkler, utility or life safety systems therein or costs to bring such systems up to code; or (4) relate to the handicapped or disabled, but this clause (4) does not require Landlord to make any "path of travel" alterations or improvements or those otherwise relating to Tenant's fixtures and placement thereof.

(i)    Landlord and Tenant acknowledge that responsibility for compliance with the terms and conditions of Title III of the Americans with Disabilities Act ("ADA") may be allocated between Landlord and Tenant. Notwithstanding anything to the contrary contained in this Lease, Landlord and Tenant agree that the responsibility for compliance with the ADA shall be allocated as follows: (1) Tenant shall be responsible for compliance with the provisions of Title III of the ADA with respect to the construction by Tenant of Tenant's Work, if any, and Tenant's alterations within the Premises; (2) Landlord shall be responsible for compliance with the provisions of Title III of the ADA in providing all of Landlord's Work required under this Lease, if any, and with respect to any structural matters within the Premises; and (3) Landlord shall be responsible for compliance with the provisions of Title III of the ADA with respect to the parking areas, sidewalks and walkways, together with all other Common Areas of the Shopping Center not included within the Premises and not otherwise part of Tenant's Work or Tenant's alterations within the Premises. Landlord and Tenant each agree to indemnify and hold harmless each other from and against any claims, damages, costs, and liabilities arising out of Landlord's or Tenant's failure, or

25

alleged failure, as the case may be, to comply with Title III of the ADA as set forth above, which indemnification obligation shall survive the expiration or termination of this Lease. Landlord and Tenant each agree that the allocation of responsibility for ADA compliance shall not require Landlord or Tenant to supervise, monitor, or otherwise review the compliance activities of the other with respect to its assumed responsibilities for ADA compliance as set forth herein. The allocation of responsibility for ADA compliance between Landlord and Tenant, and the obligations of Landlord and Tenant established by such allocations, shall supersede any other provisions of this Lease that may contradict or otherwise differ from the requirements of this Section.

## SECTION 19.  INDEMNIFICATION

(a)  Subject to Section 20, Landlord shall indemnify, defend and hold harmless Tenant from and against any and all claims, demands, actions, damages, liability and expense, including reasonable attorneys' fees and expenses, in connection with the loss, damage or injury to persons or property, arising out of or related to: (1) the negligence or willful misconduct of Landlord, Landlord's agents, contractors or employees; (2) the breach by Landlord of this Lease; or (3) the use or operation of the Common Areas and all other space in the Shopping Center not designated for the exclusive use of one tenant.

(b)  Subject to Section 20, Tenant shall indemnify, defend and hold harmless Landlord from and against any and all claims, demands, actions, damages, liability and expense, including reasonable attorneys' fees and expenses, in connection with the loss, damage or injury to persons or property, arising out of or related to: (1) the negligence or willful misconduct of Tenant, Tenant's agents, contractors or employees; (2) the use or operation of the Premises; (3) the installation, servicing, using or removal of Containers, Corrals, Curbside Parking, Cardboard Bails, Tenant's Sidewalk Sales, and any attachments or installations to the Premises' roof made by Tenant pursuant to Section 3(b), except to the extent arising from the negligence or willful misconduct of Landlord, Landlord's agents, contractors or employees; (4) any event, incident or occurrence within the Premises, except to the extent arising from the negligence or willful misconduct of Landlord, Landlord's agents, contractors or employees; or (5) the breach by Tenant of this Lease.

This Section 19 survives the expiration or termination of this Lease.

## SECTION 20.  WAIVER OF CLAIMS

Notwithstanding any provision to the contrary, Landlord and Tenant waive any and all right of recovery, claim, action or cause of action against the other, their respective agents and employees, for any loss or damage that may occur to the Premises or the Shopping Center or any additions or improvements thereto, or any contents therein, by reason of fire, the elements or any other cause which could be insured against under the terms of a standard special form insurance policy or policies, or for which Landlord or Tenant may be reimbursed as a result of insurance coverage insuring any loss suffered by either party, regardless of cause or origin, including the negligence of Landlord or Tenant, or their respective agents and employees. This waiver applies regardless of whether either party actually obtains property insurance, and regardless of whether

26

any insurance proceeds are collected. Notwithstanding the above, Landlord and Tenant agree and acknowledge that the waiver of claims herein contained shall expressly exclude any loss paid by the insured in the form of a deductible or self-insured retention. All property insurance policies required under this Lease covering the Premises or the Shopping Center must expressly waive any right on the part of the insurer against the other party for damage to or destruction of the Premises or the Shopping Center resulting from the acts or omissions of the other party.

## SECTION 21.  PROPERTY AND LIABILITY INSURANCE

(a)    Landlord must keep in full force and effect Commercial General Liability Insurance and Umbrella Insurance with respect to the Shopping Center, including the Common Areas, naming Tenant as an additional insured thereunder to the extent its interest may appear, with nationally recognized companies rated no lower than A-, IX by A.M. Best Company with total minimum limits to apply per location of $2 million on account of bodily injuries or death and/or property damage resulting from one occurrence, and shall include a waiver of subrogation in favor of Tenant and provide for a 30-day written notice of cancellation from its insurer (currently subject to a $50 million Commercial General Liability policy aggregate as may change from year to year). Landlord must deposit a certificate or other evidence of such insurance with Tenant.

(b)    Tenant must obtain prior to the Delivery Date or entering the Premises for any reason, and shall keep in full force and effect throughout the Term, Commercial General Liability Insurance and Umbrella Insurance with respect to the Premises, naming Landlord as an additional insured to the extent its interest may appear, with nationally recognized companies rated no lower than A-, IX by A.M. Best Company with total minimum limits to apply per location of $2 million on account of bodily injuries or death and/or property damage resulting from one occurrence, and shall include a waiver of subrogation in favor of Landlord and provide for a 30-day written notice of cancellation from its insurer. Tenant's evidence of insurance is maintained by Tenant's insurer on the website of Tenant's insurance broker, which can be accessed through Tenant's website, "www.joann.com/insurance."

(c)    Landlord must keep the Shopping Center insured against loss or damage by fire, lightning, vandalism and malicious mischief, and such other perils as are now or may hereafter be comprehended in the term "All Risk Coverage" or "special form" coverage or "Special Form Cause of Loss" (or other terms that become the insurance industry standard in the future), including, without limitation, earthquake and flood, boiler and machinery, plate glass, power failure, windstorm, terrorism, seepage or leakage and loss of rent damage, in amounts equal to at least eighty percent (80%) of the full replacement value thereof, or such greater amounts as may be required to prevent the application of co-insurance provisions.  Such insurance must cover improvements in the Premises owned by Landlord to the extent the same are customarily insurable as part of the realty, but shall not include the cost of restoration of Tenant's furniture, furnishings, inventory, equipment and other personal property. Notwithstanding anything to the contrary, Landlord is solely responsible for any and all deductibles and self-insured retentions.

(d)    In addition to the payment of Fixed Minimum Rent, Tenant must pay Tenant's Proportionate Share of the costs paid by Landlord for maintaining the insurance for the Shopping

#2566 MYRTLE BEACH, SC

Center required under Subsection 21(c) (the "Insurance Costs"). For clarity, the liability insurance for the Shopping Center required under Subsection 21(a) shall be included in Tenant's Fixed Common Area Costs. Tenant shall pay Tenant's Proportionate Share of Insurance Costs within thirty (30) days after receipt of Landlord's statement assessing and prorating the Insurance Costs, together with copies of the annual invoice from Landlord's broker and the computation of Tenant's Proportionate Share (collectively, the "Insurance Statement"). During the first Lease Year, the insurance paid by Tenant is estimated at the rate of $0.70 per year multiplied by the Gross Leasable Area of the Premises, which amount is Landlord's good faith estimate of the full amount of Tenant's Proportionate Share of Insurance Costs for the calendar year in which the Commencement Date occurs if Tenant were to pay Tenant's Proportionate Share of Insurance Costs directly for said period. This sum is subject to annual adjustments by Landlord to reflect actual changes in the Insurance Costs. On or before June 1 Landlord shall provide Tenant with the Insurance Statement. Tenant must pay to Landlord within thirty (30) days of receipt of the Insurance Statement any deficiency owed to Landlord. If Tenant's estimated payments are in excess of Tenant's Proportionate Share in any calendar year, then such excess shall be applied to the following calendar year unless such calendar year is the final calendar year of Tenant's occupancy, in which case Landlord must refund such overpayment to Tenant within thirty (30) days after Landlord's calculation of Tenant's Proportionate Share for such calendar year. Landlord covenants that there shall be no duplication of costs between this Section and any other Section of this Lease.

(e)    Audit Rights: Tenant and its agent shall have the right to audit and inspect Landlord's books and records pertaining to Taxes and Insurance Costs, upon thirty (30) days' written notice, with such an audit or inspection to be conducted no more than once every three (3) years (and each calendar year may only be audited one time). If any audit or review of Landlord's books and records determines that Tenant has overpaid any Taxes or Insurance Costs, then Tenant has the right to offset any overpayment against Rent, but if Tenant is in the last Lease Year of the Term, then Landlord must refund the overpayment to Tenant within thirty (30) days after notice from Tenant. If any such audit or review determines that Tenant has overpaid any Taxes or Insurance Costs by more than seven and one-half percent (7½%), then Landlord must pay to Tenant the reasonable cost of such audit or review; otherwise, the audit or review shall be at Tenant's sole cost and expense. If Landlord elects not to provide the books and records pursuant to this Section 21(e) electronically, Landlord shall be responsible for providing Tenant with access to such books and records at Landlord's corporate office or other designated location by Landlord, and Landlord shall make available such books and records for up to three (3) calendar years immediately preceding Tenant's request. Notwithstanding the foregoing, Landlord's obligations pursuant to this Section 21(e) for books and records related to Insurance Costs shall be limited to the provision of copies of annual invoices from Landlord's broker.

## SECTION 22.  SIGNS

(a)    Subject to Section 22(b), Tenant has the right to install and maintain a sign or individual letters ("JOANN, handmade happiness" or any other name or slogan that Tenant may adopt) or signs on the front, side, rear or any other fascia of the Premises, as well as a sign or signs on the directory(ies) and pylon(s) including installation of a two-sided panel on the Commons Avenue & Highway 17 Bypass pylon sign structure in the position previously occupied by AC

28

Moore, located in or around the Shopping Center or for use by any of the tenants of the Shopping Center, and departmental signs on the front fascia in addition to its regular sign, all in accordance with Tenant's Prototype Signage Plans attached hereto as Exhibit D-1. All signs shall comply with all requirements of the OEA and any Public Entity, and Tenant shall obtain all necessary permits or licenses. Notwithstanding the foregoing, Tenant is entitled to seek and receive a variance from any Public Entity so as to allow Tenant to have the size, color, number, etc., of signs that Tenant desires, including storefront signs, pylon signs, and monument signs, and Landlord shall use commercially reasonable efforts to cooperate and assist Tenant with any such variance. Tenant's sole cost for the pylon and/or monument sign(s) shall be the cost to fabricate and install Tenant's panels.

(b)     All of Tenant's signage is subject to approval by Landlord, in accordance with the same process for approval of the plans for Premises build-out as outlined in Section 10 hereof. Landlord hereby approves of Tenant's Prototype Signage Plans attached hereto as Exhibit D-1.

(c)     Prior to the Commencement Date, Tenant has the right to install and maintain a professionally prepared banner sign on the inside of the Premises, stating "coming soon," and/or "now hiring," provided same shall be submitted to Landlord for approval and are in accordance with applicable Laws and the OEA. After the Commencement Date, Tenant has the right to temporarily install and maintain a professionally prepared banner signs advertising any special event (i.e., "now hiring", "Grand Opening", "Sidewalk Sale") on the inside of the Premises from time to time provided same shall be submitted to Landlord for approval and are in accordance with applicable Laws and the OEA.

(d)     Tenant must maintain its signs in good condition and repair at all times, and must save Landlord harmless from injury to person or property arising from the erection and maintenance of the signs. Prior to vacating the Premises, Tenant must remove all signs and repair (exclusive of painting) all damage caused by such removal.

(e)     If Landlord renovates all or any portion of the Shopping Center, which renovation requires a change to the facade and/or the removal of any of Tenant's sign(s), Landlord shall not materially change the appearance of the façade without Tenant's consent and shall notify Tenant at least forty-five (45) days before the removal of sign(s). Landlord shall bear the cost of such removal and reinstallation, together with the cost of any damage to the sign(s) as a result of such removal or reinstallation. Further, Landlord must provide and install on or about the Shopping Center, at Landlord's sole cost and expense, a banner or other type of temporary sign(s) identifying Tenant's trade name, which banner or sign(s) must be equal in size to Tenant's existing sign and approved by Tenant before such installation.

## SECTION 23.   ASSIGNMENT AND SUBLETTING

(a)     Tenant has the right to assign this Lease or sublet all or any part of the Premises with the prior written consent of Landlord, which consent must not be unreasonably withheld or delayed, and which consent must not be denied in the event of an assignment where (1) such assignment or subletting does not violate any existing exclusive or restriction applicable to the Premises of another tenant of Landlord or any affiliate of Landlord (Landlord must provide Tenant

29

with a list of existing exclusives applicable to the Premises upon Tenant's request); (2) such assignee is a "national" or "regional" Retail Tenant (as defined in Section 15(c)(2) and (3) of this Lease) selling full price merchandise; (3) Tenant remains responsible for the payment of Rent, unless expressly released in writing by Landlord; and (4) such assignee assumes in writing all the terms and provisions of this Lease to be performed or observed by Tenant.  Notwithstanding the foregoing, Tenant may assign this Lease or sublet all or any part of the Premises subject to the terms of this Lease, in each case without the prior consent of Landlord but upon prior written notice to Landlord, to: (i) a parent, subsidiary, or affiliated corporation; successor to Tenant; (ii) the parent of Tenant by way of merger, reorganization, consolidation, corporate restructuring, purchase of stock or assets, or the like; or (iii) any entity that acquires all of Tenant's stores in the State of South Carolina.  Tenant may also sublet, without the consent of Landlord, not more than ten percent (10%) of the Gross Leasable area of the Premises for the operation of one or more departments within the business operation of Tenant so long as such operation does not violate any existing exclusive or restriction applicable to the Premises of another tenant of Landlord or any affiliate of Landlord.

(b)    If Tenant assigns this Lease and Tenant's assignee or any subsequent assignee has, at the time of the assignment, or attains at any time after the assignment, a tangible net worth (exclusive of goodwill) of at least $100 Million with at least twenty-five (25) stores open and operating, then Tenant shall be released and discharged from any further liability under this Lease. Such net worth shall be determined as of the end of the most recent fiscal year preceding the intended release unless more current figures are available.

## SECTION 24.  REPAIR AFTER CASUALTY

(a)    In the event of damage to or destruction of the Premises by casualty or any other cause whatsoever, then, except as otherwise provided in this Section, Landlord shall forthwith proceed to repair such damage and restore the Premises to substantially their condition at the time of such damage or, at Tenant's option, Landlord shall repair, rebuild and restore the Premises in accordance with such plans and specifications as are then generally in use by Tenant for the construction of one of Tenant's prototypical stores and related structures so long as the repaired, rebuilt or replaced Premises shall have a value not less than its value just prior to said loss and Tenant shall pay any additional cost resulting from such change to the extent it is not covered by the insurance proceeds.  Landlord must begin and diligently pursue to completion the restoration and repair within ninety (90) days of the event of damage or destruction.  Any repair or restoration of the Premises must be completed within two hundred forty (240) days after the event of damage or destruction.  Within sixty (60) days after an event of damage or destruction, Landlord must deliver to Tenant notice of the anticipated period of restoration.

(b)    If forty percent (40%) or more of the Premises are destroyed or damaged during the last two years of the Term, then each of Landlord and Tenant has the right to terminate this Lease.  Landlord may terminate this Lease as of the date of such damage or destruction by giving written notice thereof within sixty (60) days after the date of the damage or destruction. If Tenant, within thirty (30) days after receipt of Landlord's written notice of termination, gives Landlord written notice of its intention to extend this Lease for any additional Extended Term then available to Tenant, then the notice of Landlord to terminate this Lease shall be of no force and effect.  If Tenant elects to extend this Lease for any additional Extended Terms then available to Tenant,

30

Landlord must use its best efforts to restore the Premises to its former condition in accordance with Subsection (a) above. Tenant may terminate this Lease as of the date of such damage or destruction by giving written notice thereof to Landlord no later than sixty (60) days after Tenant's receipt of notice from Landlord providing the anticipated period of restoration.

(c)     In the event of any damage or destruction to the Premises, then all Rent shall be abated or reduced proportionately during any period in which, by reason of such damage or destruction, there is interference with the operation of the business of Tenant in the Premises, having due regard to the extent to which Tenant may be required to discontinue its business in the Premises, and such abatement or reduction shall continue for the period commencing with such destruction or damage and ending with: (1) the completion by Landlord of such work of repair or restoration as Landlord is obligated to do; and (2) the expiration of a period of one hundred fifty (150) days thereafter to enable Tenant to re-fixture the Premises and reopen for business, but said one hundred fifty (150) day period shall be deemed to have ended if Tenant shall reopen for business to the public prior to the expiration thereof.

(d)     If any other portion of the Shopping Center is either partially or substantially damaged (irrespective of whether the Premises shall have been damaged or destroyed), Landlord, to the extent permitted in other leases, shall proceed promptly to rebuild the same. During any period of time that by reason of such damage or destruction there is any interference with access to or parking for the Premises, Tenant may pay Substitute Rent; and, if it is impracticable for Tenant, in the reasonable exercise of its business judgment, to remain open for business and Tenant elects to close down until such damage or destruction has been repaired or rubble, etc., removed, there shall be a full abatement of Rent and all other charges payable hereunder until Landlord's completion of the restoration work.

(e)     In any event, if Landlord shall not commence, in good faith, repair and restoration work within ninety (90) days after any damage which Landlord is required to repair pursuant to the terms of this Section 24 (which period shall be extended to one hundred fifty (150) days if required by Landlord's insurance policy), or if Landlord shall fail with all due diligence to continue with such repair and restoration work to completion (which completion shall in no event exceed two hundred forty (240) days from the date of the casualty), then Tenant shall have the following rights:

(1)     to terminate this Lease by giving notice of its election to do so to Landlord; or

(2)     to the extent the damage is to the Premises or Protected Area, upon notice to Landlord to restore the Premises and/or Protected Area to its former condition in accordance with Subsection (a) or (d) above, as applicable, or have same done, in which event Landlord shall make the insurance proceeds available to Tenant for the completion of such restoration, and to the extent the insurance proceeds actually received by Tenant are insufficient to pay for all costs incurred by Tenant in connection with such restoration, Landlord shall reimburse Tenant for all restoration costs incurred by Tenant within thirty (30) days after Tenant's request. If

31

Landlord has not reimbursed Tenant within such thirty (30) day period, Tenant may deduct all such costs, together with interest at the Default Rate herein, from the Rent next becoming due after the expiration of said thirty (30) day period.

(f)    If this Lease is terminated pursuant to this Section, Landlord must refund within fifteen (15) days of notice any Rent paid in advance.

(g)    If Landlord elects, or is required by this Section 24, to repair the Premises or the Shopping Center, then Landlord must notify Tenant in writing when the repairs are completed. The repairs shall not be deemed completed unless and until the repairs are actually completed in accordance with the terms of this Lease and Tenant has thereafter received written notice of such completion.

## SECTION 25.  CONDEMNATION

(a)    If fifty percent (50%) or more of the Gross Leasable Area of the Premises or fifty percent (50%) or more of the Gross Leasable Area of the Shopping Center is taken by condemnation or right of eminent domain or conveyed in lieu thereof or taken in any other manner for a period of three (3) months or longer  (a "Taking"), this Lease shall terminate at the option of either party as of the day possession is taken by or title vests in the taking authority, and both parties shall be released from any further liability hereunder.

(b)    In the event of a Taking of less than fifty percent (50%), but more than five percent (5%), of the Gross Leasable Area of the Premises, or a Taking of any portion of the Protected Area, then Tenant has the right to terminate this Lease and any further liability hereunder if, in the reasonable determination of Tenant, the Premises cannot be economically operated for, or are unsuitable, for the intended purposes of this Lease.  Any such termination is effective as of the day possession is taken by, or title to the portion taken vests in, the taking authority.

(c)    In the event of a Taking of less than fifty percent (50%), but more than five percent (5%), of the Gross Leasable Area of the Shopping Center (including the Common Areas), then (1) Tenant has the right to terminate this Lease and any further liability hereunder if, in Tenant's reasonable determination, the Premises cannot be economically operated for, or are unsuitable for, their intended purposes; and (2) Landlord has the right to terminate this Lease and any further liability hereunder if, in Landlord's reasonable determination, the Shopping Center cannot be economically operated for, or are unsuitable for, their intended purposes. Any such termination is effective as of the day possession is taken by, or title to the portion taken vests in, the taking authority.

(d)    In the event of a Taking of any portion of the Premises or the Shopping Center, upon which this Lease is not terminated, Landlord must restore the remainder of the Premises and the Shopping Center (including the Common Areas), with reasonable speed to a complete architectural unit as nearly like its condition prior to such partial Taking as shall be practicable, and if during or after the work of restoration Tenant is deprived of all or a part of the use of the

32

Premises, the Rent shall abate for so long as Tenant is deprived of such use and until Tenant has rebuilt, refixtured and restocked the Premises, as necessary, in the same proportion as that portion of the Premises taken bears to the entire Premises.

(e)    All damages awarded in connection with the Taking of the Premises, whether allowed as compensation for diminution in value to the leasehold or to the fee of the Premises, shall belong to Landlord; but, if Tenant has made any material leasehold improvements to the Premises, or alterations or structural changes and repairs to the Premises, at its own expense (regardless of when made), Tenant and not Landlord is entitled to claim an award for the unamortized balance of Tenant's cost thereof. If the condemning authority does not make a separate award therefor, Landlord, subject to the rights of any mortgagee, must assign a portion of its award equal to such unamortized cost to Tenant. If Landlord in obtaining its award uses Tenant's cost items, then Tenant is entitled, subject to the rights of any first mortgagee, to a proportionate share of Landlord's award based upon the costs. Tenant is also entitled to claim an award for loss of business, damage to merchandise and fixtures, removal and reinstallation costs and moving expenses, in a separate action only.

## SECTION 26.  REPRESENTATIONS AND COVENANTS OF LANDLORD

(a)    Landlord represents, warrants and covenants to Tenant, all to Landlord's actual knowledge, as follows:

(1)    As of the Effective Date, the Total Property is zoned to permit the use of the Shopping Center for general retail purposes, and the Premises are zoned to permit their use as a retail store conducting the Permitted Use, as of right (i.e., without any special permit, approval, variance or other waiver);

(2)    As of the Effective Date, the legal description set forth on Exhibit A matches the Shopping Center outlined on the Site Plan (i.e., Exhibit B) and includes no additional property therein;

(3)    As of the Delivery Date, the Common Areas, Premises (excluding Tenant's Work or other alterations made by or on behalf of Tenant, but not excluding Landlord's Work or work directed by Landlord on or behalf of Tenant) and all structural portions of the Shopping Center comply with all Laws;

(4)    Landlord shall provide surface parking spaces in the Common Areas without cost, at the lesser of (i) five parking spaces being provided for each 1,000 square feet of Gross Leasable Area within the Shopping Center, or (ii) the amount required by Laws;

(5)    During the Term, except for structures or improvements existing as of the Effective Date, no building, edifice or obstruction shall be placed on or within the Protected Area and no addition or alteration shall be made to the Protected Area (A) that diminishes the accessibility of the Premises to and from the parking areas within the Common Areas and the other stores in

33

the Shopping Center; (B) that diminishes the visibility of the front of the Premises (including, without limitation, the signage thereon) from public highways, parking areas or other stores in the Shopping Center; (C) that diminishes the access to or the utility of the service areas serving the Premises; (D) that has the effect of materially increasing the monetary obligations of Tenant under this Lease; or (E) that otherwise adversely affects the conduct of business from the Premises or the rights of Tenant under this Lease. Without limiting the generality of the foregoing, in no event shall any improvement or alteration (including a reduction in size of the Protected Area through any means (except through an eminent domain proceeding), including, for example, a reduction in the Shopping Center, or a change in the parking layout or configuration or traffic patterns of vehicles or pedestrians) be made to the Protected Area as shown on the Site Plan;

(6)     As of the Effective Date, the Site Plan correctly and completely shows substantially all improvements on the Shopping Center;

(7)     The boundaries of the  Shopping Center outlined on the Site Plan and the buildings within the Shopping Center as illustrated on the Site Plan shall not be expanded or contracted (excluding any rights of Landlord or any tenant of the Shopping Center to expand or contract its premises and subject to any changes due to casualty or condemnation);

(8)     During the Term, Landlord shall maintain, operate and manage the Shopping Center as a retail project of Comparable Class in compliance with all Laws, and the Shopping Center shall be used and occupied only for customary uses by Retail Tenants (as defined in Section 15(c)(3) of this Lease) conducted in shopping centers of Comparable Class;

(9)     Subject to the rights of any tenants or other occupants of the Shopping Center existing as of the Effective Date, in no event shall the Shopping Center or any portion thereof be used as or for any of the following:

(i)      a movie theater;
(ii)     a banquet hall;
(iii)    any church, auditorium, meeting hall or other place of public assembly;
(iv)     a bingo hall;
(v)      a library;
(vi)     any school, training or educational facility, including but not limited to: beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers; provided however, this prohibition shall not be applicable to (A) on-site employee training provided by any tenant, that is incidental to the conduct

34

of such tenant's business from its premises or (B) operations of similar quality to Sylvan Learning Center, Chyten, and Kumon Math & Reading Center;

(vii)     any automobile, truck, trailer, boat or recreational vehicles sales;

(viii)    any bar whose reasonably projected annual gross revenues derived from the sale of alcoholic beverages for on-premises consumption exceeds thirty percent (30%) of the gross revenues of such business;

(ix)      any business devoted to the primary sale of alcoholic beverages, whether packaged or not; provided, however, that this paragraph shall not apply to (1) any business occupying premises greater than 5,000 square feet; (2) any restaurant (i) deriving not more than forty percent (40%) of its gross revenues from the sale of liquor, beer, and wine, and (ii) which does not promote itself as a sports bar; (3) incidental sales of liquor, beer, and/or wine in full-line grocery stores; and (4) a first class retailer of fine wine, beer and spirits of similar quality to that of Total Wine or Bevmo!;

(x)       any funeral parlor;

(xi)      a massage parlor (as further clarification, the term "massage parlor" does not refer to any national or regional chain operating at least twenty (20) locations, such as Massage Envy, Hand & Stone or Elements) or modeling studio; any overnight-stay pet facilities, veterinary hospital or animal raising facilities (except that this prohibition shall not prohibit pet shops);

(xii)     any nightclub or discotheque;

(xiii)    an adult entertainment club or dance hall;

(xiv)     karate or dance studio;

(xv)      gymnasium, bowling alley, skating rink, arcade, game room, amusement arcade (defined as any establishment containing more than a combination of three electronic, pinball or other games), video game arcade, pool room, or car wash;

(xvi)     off-track betting establishment or gambling facility; provided, however, this prohibition shall not apply to the sale of state lottery tickets, governmental sponsored gambling activities, or charitable gambling activities, so long as such governmental and/or charitable activities are incidental to the business operation being conducted by a tenant from its premises;

(xvii)    any "second hand" store including but not limited to, flea markets, pawn shops, so-called "tent" or "flea market" sales;

(xviii)   consignment store (excluding stores carrying incidental consignments) or second-hand store whose principal business is selling used merchandise, except for first-class consignment shops such as Plato's Closet, Game Stop, and Play-It-Again-Sports;

35

(xix)      adult book store or sexually-oriented shop or so-called "head shop";

(xx)      gun range or gun shop;

(xxi)      any operation primarily used as a storage warehouse operation, except as incidental to a retail business;

(xxii)      any use which emits or results in strong, unusual, offensive or obnoxious odors, fumes, dust or vapors, emits objectionable noise or sound which can be heard or smelled outside of any building in the Shopping Center; provided, however, tire, battery or auto parts retail locations and nail or hair salons shall not be precluded under this prohibition;

(xxiii)      any use that creates fire, explosive or other hazard (e.g., motorized vehicle repair or body shop); provided, however, tire, battery or auto parts retail locations shall not be precluded under this prohibition;

(xxiv)      abortion clinic, AIDs clinic, drug treatment facility or bodily fluid collection facility; homeless shelter or halfway house;

(xxv)      not more than ten percent (10%) of the total floor area of the Shopping Center may be used for Retail Office and/or Business Office (for purposes of this paragraph, "Business Office" shall mean an office which does not provide services directly to consumers, and "Retail Office" shall mean an office which provides services directly to consumers, including but not limited to financial institutions, real estate, stock brokerages, title companies, and escrow offices, travel and insurance agencies, and medical, dental and legal clinics);

(xxvi)      a laundromat; provided, however. this prohibition shall not be applicable to nominal supportive facilities for on-site service oriented to pickup and delivery by the ultimate consumer as the same may be found in retail shopping districts in the metropolitan area where the Shopping Center is located;

(xxvii)      marijuana dispensary; or

(xxviii)      operation any "tattoo facility," as defined in S.C. Code Ann. 44-34-10, et seq., or S.C. Code Ann. 44-34-90, or any amendment or modification thereto, or as such terms are defined in any other local, state or federal law, ordinance, rule or regulation.

(10)      Landlord owns fee simple title to the Shopping Center (except the improvements on the Target tract, which is the subject of a ground lease) free and clear of all liens and encumbrances. As of the Effective Date, there are no claims of other parties, restrictions, reservations, or defects in Landlord's title which could interfere with or impair Tenant's rights under this Lease or Tenant's use, occupancy, or enjoyment of the Premises;

(11)      At the time of the Delivery Date, there are no planned or contemplated taxes and assessments, either general and specific, whether ad valorem,

36

specific or otherwise, with respect to the Shopping Center other than Taxes; and

    (12)    At the time of the Delivery Date, the Premises are free of Hazardous Material.

    (b)    The representations, warranties and covenants in Section 26(a) of this Lease are material considerations and inducements to Tenant in executing this Lease, the breach of which shall cause irreparable and severe harm to Tenant. Without limiting any other right or remedy of Tenant, in the event of a breach of the representations, warranties, and covenants in Section 26(a) of this Lease, Tenant has the right after providing Landlord with thirty (30) days' prior written notice (1) to terminate this Lease at any time during the period of such breach; or (2) to pay Substitute Rent during the period of such breach.

## SECTION 27. TENANT'S DEFAULT

    (a)    Landlord may, by written notice to Tenant, terminate this Lease, or without terminating this Lease re-enter the Premises, and may dispossess Tenant if:

    (1)    Tenant fails to pay Rent on or before the due date and then fails to pay same within ten (10) days after receipt of written notice from Landlord sent to Tenant's notice address;

    (2)    Tenant is in default in the performance of any of the covenants, terms, conditions and provisions of this Lease, and Tenant fails to remedy such default within thirty (30) days after receipt of written notice thereof (but Tenant shall not be deemed to be in default if Tenant commences to remedy the default within the thirty (30) day period and proceeds to cure with due diligence) from Landlord sent to Tenant's notice address;

    (3)    Tenant is adjudged bankrupt or makes an assignment for the benefit of creditors, or if a receiver of any property of Tenant in, upon or about the Premises is appointed in any action, suit or proceeding by or against Tenant and is not removed within ninety (90) days (unless such ninety (90) day period is extended by court order, in which event the time period shall be as established by court order or established by such person(s) or entity acting under or for the court) after appointment; or

    (4)    The interest of Tenant in the Premises is offered for sale or sold under execution or other legal process, and if not rescinded within ninety (90) days after written notice from Landlord to Tenant's notice address.

Landlord shall use reasonable efforts to mitigate its damages; provided, however, Landlord's duty to mitigate damages shall be limited to Landlord's standard efforts to lease vacant space in the Shopping Center; provided, further Landlord shall not have to give preference to re-leasing the Premises over other vacant space in the Shopping Center. In the event of re-entry Landlord must

#2566 MYRTLE BEACH, SC

use reasonable efforts to relet the Premises and, in the event of a reletting, must apply the rent therefrom first to the payment of Landlord's reasonable expenses incurred and paid by reason of Tenant's default, next to the reasonable expense of reletting, including, but not limited to, reasonably necessary repairs to the Premises, and then to the payment of Rent and all other sums due from Tenant, with Tenant remaining liable for any deficiency.  Any and all deficiencies shall be payable by Tenant monthly on the date provided for the payment of Fixed Minimum Rent. Notwithstanding anything to the contrary in this Lease, if Tenant has in good faith disputed an alleged monetary default for an amount which is less than two months of Rent, and if Landlord obtains a final judgment adverse to Tenant with regard to said amount, wholly or in part, Tenant may within twenty (20) days of the date of the journalized final judgment pay the amount set forth in the final judgment to Landlord and retain the right to possession of the Premises and all of its rights under this Lease, notwithstanding any termination of this Lease pursuant to this Lease or at law or in equity, which may have occurred as a result of said monetary default.

(b)    In the event of a default by either party of any of the terms, provisions, covenants or conditions of this Lease, the other party has the right to invoke any remedy provided at law or in equity; except, however, Landlord is not entitled to terminate this Lease or to dispossess Tenant except for a default  described in Section 27(a)(1)-(4) of this Lease and in no event is Landlord entitled to accelerate Rent. Notwithstanding anything contained herein, in no event is Landlord entitled to exercise self-help to lock out Tenant or forcibly retake possession of the Premises without due legal process and an appropriate court order. All remedies are cumulative and concurrent.

## SECTION 28. RIGHTS OF LANDLORD

(a)    Landlord reserves the right at all reasonable times during Tenant's business hours and upon prior reasonable notice to Tenant (except in the event of emergency, when notice is not required) by itself or its duly authorized agents, to  inspect the Premises and, to make such repairs as Landlord is obligated to make to the Premises.  In exercising the foregoing right, Landlord must not unreasonably interrupt or disrupt Tenant's business or unreasonably disrupt access to the Premises by Tenant, Tenant's employees, agents, invitees and customers.

(b)    If Landlord makes any payments on behalf of Tenant, which are Tenant's obligation, to fulfill Tenant's covenants, then any amount so paid by Landlord are declared to be "Additional Rent" and are due and payable to Landlord from Tenant with the next installment of Fixed Minimum Rent due thereafter, together with interest thereon at the Default Rate from the date of such advance to the repayment thereof in full.

(c)    Landlord has the right during the last three (3) months before the expiration of this Lease, so long as it does not interfere with Tenant's business, to exhibit the Premises and put up the usual notice "for rent" or "for sale", which notice shall not be removed or hidden by Tenant. No more than one sign shall be placed upon the Premises and the sign cannot exceed 12 feet square.

#2566 MYRTLE BEACH, SC

## SECTION 29.  LANDLORD'S DEFAULT

(a)    If Landlord fails to keep and perform any covenant or agreement to be kept and performed by Landlord, then subject to the notice and cure periods set forth in Section 29(b), Tenant, in addition to all other remedies now or hereafter afforded or provided by this Lease, at law or in equity, has the right to perform such covenant or agreement for or on behalf of Landlord or make good any such default, and any amount or amounts that Tenant advances on Landlord's behalf must be repaid by Landlord to Tenant on demand, together with interest thereon at the Default Rate from the date of such advance to the repayment thereof in full.

(b)    Except in the event of emergency, before performing any covenant or agreement on behalf of Landlord, Tenant shall provide Landlord with written notice of Landlord's alleged default and if Landlord fails to complete performance of the same within thirty (30) days after Landlord's receipt of such written notice, then Tenant shall deliver to Landlord a second written notice of Landlord's alleged default and Tenant's intent to perform such covenant or agreement and Landlord shall have ten (10) days after Landlord's receipt of such second written notice of Landlord's alleged default to complete performance of the same (and Landlord shall not be deemed to be in default if Landlord commences to remedy the default within the ten (10) day period and proceeds to cure with due diligence).  For purposes hereof, "emergency" means (1) any event which poses immediate threat of injury or damage to persons or property; or (2) any event which, in Tenant's judgment, threatens Tenant's ability to open for business as scheduled or materially impairs or interferes with Tenant's business operations.

(c)    If Landlord fails to pay any sum to Tenant when due, and if such failure continues for thirty (30) days after receipt of notice from Tenant, Tenant has the right, without forfeiture of its other rights hereunder, at its election, to setoff and deduct the same, together with interest thereon at the Default Rate, from up to fifty percent (50%) of Fixed Minimum Rent. Notwithstanding the foregoing, Tenant's rights of offset under Section 10 hereof shall be governed by Section 10.

## SECTION 30. MORTGAGE SUBORDINATION

(a)    Landlord must obtain and deliver to Tenant a non-disturbance and attornment agreement, substantially in the form of Exhibit G (the "SNDA"), from any existing ground lessor, mortgagee or lien holder.

(b)    Landlord reserves the right to request from Tenant a waiver of priority of Tenant's leasehold estate hereunder for the purpose of subordinating Tenant's leasehold estate in favor of a first mortgage lien or any refinancing or replacement of a first mortgage loan that Landlord may hereafter deem necessary or desirable.  Tenant, upon such request by Landlord, shall execute and deliver an agreement substantially in the form of Exhibit G. The word "mortgage" means (1) any lease of land only or of land and buildings in a sale-lease-back transaction involving all or any part of the Shopping Center; or (2) any mortgage, deed of trust or other similar security instruments constituting a lien upon all or any part of the Shopping Center, whether the same shall be in existence as of the date hereof or created hereafter, and any modifications, extensions,

39

renewals and replacements thereof. "Mortgagee" means a party having the benefit of a mortgage, whether as lessor, Mortgagee, trustee or note-holder.

(c)    After a change in ownership of all or any portion of the Shopping Center that requires a change in the Rent payee, or assignment of this Lease by Landlord that requires a change in the Rent payee, Tenant shall have no obligation to pay Rent to the new payee until Tenant receives written notice from Landlord confirming the name and address of the new payee.

(d)    If Tenant receives a written notice from any party claiming a collateral interest in this Lease or in the Rent and, by reason thereof, a present entitlement to collect the Rent, Tenant has the right either (1) to pay Rent to such party, which payment shall satisfy any and all liabilities of Tenant to Landlord with respect to such payment, without obligation on Tenant to make further inquiry but subject to such party's providing to Tenant a copy of the instrument pursuant to which such party claims entitlement and to such claim being plausible on the face of such instrument; or (2) to withhold Rent from Landlord and pay same to an escrow agent or a court pending the determination by a court of competent jurisdiction of the entitlement thereto.

## SECTION 31. NO WAIVER

No waiver by either party of any of the terms, covenants, provisions or conditions in this Lease, and no waiver of any legal or equitable relief or remedy, shall be implied by the failure of either party to assert any rights, or to declare any forfeiture, or for any other reason. No waiver of any of the terms, provisions, covenants, rules and regulations herein shall be valid unless it is in writing signed by both parties. No waiver by either party, or forgiveness of performance by either party in respect to one or more tenants of the Shopping Center, shall constitute a waiver or forgiveness of performance in favor of Tenant, Landlord or any other tenant. The waiver or the forgiveness of performance of any one or more of the terms, provisions, conditions, rules and regulations of this Lease shall not be claimed or pleaded by Tenant or Landlord to excuse a subsequent failure of performance of any of the terms, provisions, conditions, covenants, rules and regulations of this Lease.

## SECTION 32.  SURRENDER OF PREMISES

(a)    Tenant must deliver up and surrender to Landlord possession of the Premises, including all Landlord's Work (and replacements thereof) and all improvements permanently attached to the Premises during the Term, upon the expiration of this Lease, or its termination in any way, in as good condition and repair as the same are in on the Commencement Date (excepting damage by fire or other casualty which could be covered by a standard "All-Risk Coverage" or "special form" insurance policy, ordinary wear and tear, authorized alterations and modifications, and decay, neglect, fault or default of Landlord and taking by eminent domain or conveyance in lieu thereof). Upon the expiration or earlier termination of this Lease, Tenant shall deliver the keys at the office of Landlord or Landlord's agent. Tenant shall have an additional ten-day Rent-free period after expiration or termination of the Lease to remove its signs, trade fixtures, furnishings, inventory, equipment, furniture and other personal property, provided that Tenant complies with all obligations under this Lease, except the obligation to pay Rent, during such ten-day period.

#2566 MYRTLE BEACH, SC

(b)      Tenant has the right, during the last thirty (30) days of the Term and provided that Tenant is open and operating for the Permitted Use, to place a banner sign at the front of the interior of the Premises, in a place visible to Tenant's customers, directing Tenant's customers to another store of Tenant or providing Tenant's customers with information and a telephone number.

## SECTION 33.    SHORT FORM LEASE, COMMENCEMENT DATE AGREEMENT

(a)      Neither party may record this Lease, but if either party requests that a Short Form Lease or a Memorandum of Lease be recorded, then the other party must execute such agreement, which agreement shall contain the information set forth below. The Short Form Lease or Memorandum of Lease shall describe the Premises and the rights herein demised, the Term, and the extension rights (if any), any exclusive granted to Tenant and other provisions hereof reasonably requested by Tenant.  The failure to record the Short Form Lease or Memorandum of Lease shall not affect or impair the validity and effectiveness of this Lease, and this Lease shall control in the event of any inconsistency between the two.  The party requesting that the Short Form Lease or Memorandum of Lease be recorded must prepare and pay all costs of recording the Short Form Lease or Memorandum of Lease, and the other party must execute at any and all times such Short Form Lease or Memorandum of Lease and any other instruments as may be required for such recording.

(b)      At the time that the Commencement Date is established, the parties shall promptly enter into a Commencement Date Agreement using a form attached hereto as Exhibit D, setting forth the actual commencement and expiration of the Initial Term and any extensions thereof, any applicable kickout dates, the then current Gross Leasable Area of the Premises and the corresponding Rent.  If the recipient of such request does not object to the Commencement Date specified in such request within thirty (30) days after receipt of the request, the date specified in such request shall be deemed to be the Commencement Date herein.

## SECTION 34.    NOTICE

Any notices, statements, acknowledgments and consents required to be given by or on behalf of either party to the other must be in writing and must be given by Certified U.S. Mail, or by private courier service requiring a signed acknowledgment of delivery (such as Fed Ex) addressed as follows:

if to Landlord at:            Myrtle Beach Farms Company, Inc.
                              8820 Marina Parkway
                              Myrtle Beach, South Carolina 29572
                              Attn: Lease Administration

if to Tenant at:              Jo-Ann Stores, LLC, Store #2566
                              5555 Darrow Road
                              Hudson, Ohio 44236
                              Attn:  National Director of Real Estate

with a copy to:                     Jo-Ann Stores, LLC, Store #2566
                                    5555 Darrow Road
                                    Hudson, Ohio 44236
                                    Attn: Legal Counsel

or at such other address of Landlord or, Tenant as may be specified by such a notice. Any notice sent by certified mail is deemed to have been served three days after deposit thereof with the U.S. Postal Service. Any notice sent by courier service is deemed to have been served as of the next business day (excluding Saturdays, Sundays, and any federal government holidays). Notwithstanding the foregoing, the time period in which a response to any such notice must be given, or in which an action must be commenced or be taken, shall commence to run on the date of receipt by the addressee thereof as shown on the return receipt or acknowledgment of delivery for such notice. Rejection or other refusal to accept, or the inability to deliver because of changed address of which no notice was given, shall be deemed to be receipt of notice as of the date of such rejection, refusal or inability to deliver. Notwithstanding anything to the contrary, Tenant may give electronic notice, to lease.administration@bccompany.com with a required copy to len.riek@bccompany.com, of the need of emergency repairs, followed promptly by notice by private courier (such as FedEx).

## SECTION 35. HAZARDOUS MATERIALS

(a)    Tenant must not cause or permit the escape, disposal or release of any Hazardous Material (as hereafter defined) in violation of Law. Tenant must not allow the storage or use of Hazardous Material in any manner not sanctioned by Law, nor allow to be brought into the Shopping Center any Hazardous Material in violation of Law. Tenant must defend, indemnify and hold harmless Landlord from and against any and all claims, losses, liabilities, damages, penalties, fines and expenses (including, without limitation, consequential damages, cleanup and other remedial and restoration costs, fees for consultants and experts and reasonable attorneys' fees and other costs of litigation arising by reason of any of the aforesaid or any action against Landlord under this indemnity) arising directly or indirectly from, out of or by reason of the release of Hazardous Materials in the Shopping Center occurring during the Term caused by Tenant or Tenant's contractors, agents or employees or persons acting under Tenant. It is a condition to indemnification that Tenant receive notice of any claim by Landlord promptly after Landlord first has knowledge thereof. This indemnity survives the expiration or earlier termination of this Lease.

(b)    Landlord must not cause or permit any Hazardous Material to exist in the Premises in violation of Law. In addition, Landlord must not cause or permit any Hazardous Material to be sold, used, stored, brought upon or disposed of (collectively a "Use") in, on, under or about the Shopping Center (including the Premises, before the Delivery Date) without in each case: (1) obtaining all necessary permits required in connection therewith; (2) complying with all permit requirements; and (3) otherwise taking all appropriate steps and making adequate arrangements to assure that such Use is in the ordinary course of business in the operation of the Shopping Center. Such Use must be performed safely and without contamination of the Shopping Center and the Total Property or any portion thereof and fully in compliance with all applicable Laws. Landlord must defend, indemnify and hold harmless Tenant from and against any and all claims,

42

losses, liabilities, damages, penalties, fines and expenses (including, without limitation, consequential damages, cleanup and other remedial and restoration costs, fees for consultants and experts and reasonable attorneys' fees and other costs of litigation arising by reason of any of the aforesaid or any action against Tenant under this indemnity) arising directly or indirectly from, out of or by reason of the release of Hazardous Materials in the Shopping Center occurring during the Term caused by Landlord or Landlord's contractors, agents or employees or persons acting under Landlord. It is a condition of this indemnification that Landlord receive notice of any such claim by Tenant promptly after Tenant first has knowledge thereof.  This indemnity survives the expiration or early termination of this Lease.

(c)    If either party receives any written notice of Hazardous Discharge or Environmental Complaint that specifically identifies the Premises or the Common Areas or describes a condition that materially impairs or could materially impair the occupancy, use and enjoyment of the Premises, then the receiving party must give immediate oral and written notice of same to the other party detailing all relevant facts and circumstances within the knowledge of the receiving party.

(d)    If Tenant's use, occupancy and enjoyment ("Occupancy") of the Premises is materially interfered with by reason of this existence or remediation of any Hazardous Material located on, in or under the Shopping Center or on the Total Property (except for any Hazardous Material used by Tenant or Tenant's contractors, agents or employees or persons acting under Tenant), then (1) throughout such period of interference, a fair and just proportion of the Rent and other charges payable (taking into account the nature of the interference to Tenant's Occupancy), shall be abated; and (2) if Tenant's occupancy is substantially impaired for three (3) months or more, then Tenant has the right to terminate this Lease by giving written notice to the other of its election to do so, whereupon this Lease shall automatically terminate and end effective as of the date of such notice and neither party shall have any further obligations hereunder. Landlord may nullify Tenant's notice of termination if Landlord is diligently corrects the Hazardous Material interference and completes the job in accordance with all applicable governmental laws, codes, regulations and requirements within three (3) months after the date of Tenant's termination notice. The abatement provided in clause (1) of this Subsection shall continue throughout the period of such correction by Landlord.

(e)    "Hazardous Material" means (1) any waste, pollutant, material, substance or contaminant which is or becomes listed, defined, or classified as having properties harmful to health, safety, or indoor or outdoor environment; (2) any substance or material that is or becomes regulated by any Public Entity by reason of the hazardous or toxic qualities of such substance or material; and (3) any other toxic or hazardous substance, regardless of whether the same is regulated, including, without limitation, so-called "black mold," any mycotoxin, and any other mold capable of producing a toxic or allergic reaction in humans (including, without limitation, Stachybotrys, S. atra, S. chartarum, Aspergillus, Fusarium, Coccidioides). Without limiting the generality of the forgoing, Hazardous Material includes oil, petroleum, petroleum-fraction or petroleum-derived substance; urea formaldehyde foam insulation; asbestos and asbestos-containing materials; and any electrical equipment that contains any oil or dye-electric fluid containing polychlorinated biphenyls.

43

(f)     "Hazardous Discharge" means the presence, use, release, dispersal, emission, spill, discharge or cleanup of any Hazardous Material (1) on or about or emanating from the Shopping Center or the Total Property; (2) arising out of the use and occupancy of or operations within the Shopping Center; or (3) caused by Landlord or other occupant of the Shopping Center or the employees, contractors, invitees or agents thereof.

(g)     "Environmental Complaint" means any complaint, investigation, order, citation, or action with regard to any Hazardous Discharge, air emissions, water discharges, noise emissions or any other environmental, health or safety matter pertaining to or emanating from the Shopping Center from any Public Entity.

## SECTION 36.   LIMITATION OF LANDLORD'S LIABILITY

(a)     If Landlord fails to perform any covenant, term or condition on Landlord's part to be performed, and as a consequence of such default Tenant recovers a money judgment against Landlord, such judgment shall be satisfied only out of (1) the proceeds of sale received upon execution of such judgment and levy thereon against the right, title and interest of Landlord in the Shopping Center; (2) the rents and other income from such property receivable by Landlord; and (3) the consideration received by Landlord for the sale or other disposition of all or any part of Landlord's right, title and interest in the Shopping Center, which consideration is deemed to include any assets at any time after such sale or disposition held by Landlord having a value not exceeding that of the proceeds of such sale or other disposition, and Landlord shall not be liable for any deficiency.

(b)     In the event of fraud or intentional misconduct on the part of Landlord, as established by a final, non-appealable decision of a court of competent jurisdiction, the limitation on liability in Section 36(a) is inapplicable.  This Section shall not be deemed to deny to Tenant, or limit its right to obtain, injunctive relief or specific performance of Landlord's covenants under this Lease or to avail itself of any other right or remedy (not involving a personal liability of Landlord in excess of the limits of personal liability fixed by this Section) which may be accorded Tenant by Law or under this Lease by reason of Landlord's failure to perform its obligations thereunder including, but not limited to, the rights and remedies granted Tenant under Section 29. For purposes of this Section 36(b), "intentional misconduct" means that Landlord had actual knowledge of the wrongfulness of the conduct and that there was a high probability of injury or damage to Tenant and, despite that knowledge, Landlord intentionally pursued such course of conduct, resulting in injury or damage to Tenant.

## SECTION 37.   DELIVERY OF SITE PLAN

Within thirty (30) days after Tenant's written request therefor, but not more than two times in any calendar year, Landlord must provide Tenant with a copy of the most current available site plan of the Shopping Center, which must reflect: (a) the Gross Leasable Area of the Shopping Center as actually constructed; (b) the names and location and the Gross Leasable Area of the premises occupied by the respective tenants thereof; and (c) those premises in the Shopping Center, if any, which are not then currently occupied and open for business. If Landlord fails to provide this information within the period allowed, Tenant shall deliver to Landlord a second

44

written notice, then if Landlord fails to provide this information within fifteen (15) days after Landlord's receipt of such second notice, Tenant shall have the right to suspend the payment of monthly installments of Additional Rent, or Rent if there is no Additional Rent, until delivery of the information, which Additional Rent or Rent, as the case may be, shall be paid in full upon Landlord's compliance with this Section 37.

## SECTION 38.   INTENTIONALLY DELETED

## SECTION 39.   ENTIRE AGREEMENT; WRITING REQUIRED

This Lease contains all of the agreements of the parties with respect to any matter covered or mentioned in this Lease, and no prior agreement, understanding or representation pertaining to any such matter shall be effective for any purpose.  No provision of this Lease may be changed, deleted, modified or amended, except by an agreement in writing signed by the parties.

## SECTION 40.   OPERATING COVENANT

Tenant shall open from the Premises within ninety (90) days after the Commencement Date and continue to operate from the Premises during Tenant's normal business hours for a period of at least one (1) full day (the "Operation Period"), but for an assignment or subletting (not to exceed 30 days), damage and destruction, remodeling (not to exceed 30 days), eminent domain, Unavoidable Delays, or such other right as provided for under this Lease or under law or equity. After the Operation Period, notwithstanding anything contained in this Lease, expressly or impliedly, to the contrary, and notwithstanding the agreement for the payment by Tenant of Rent (including Substitute Rent or other percentage rent), Tenant is under no duty or obligation, either expressed or implied, to open, reopen, remain open, operate, or thereafter to continually conduct business from the Premises at any time during the Term.  After the Operation Period, Tenant's failure to open, reopen, remain open, operate, or thereafter to continually conduct business from the Premises shall not in any way be deemed an event of default under this Lease, nor shall such failure otherwise entitle Landlord to begin or to maintain any action, suit or proceeding, whether in law or in equity, relating in any way to Tenant's failure to open, reopen, remain open, operate, or thereafter to continually conduct business from the Premises. Nothing in this Section 40 shall be interpreted to relieve Tenant of any of its obligations as set forth in this Lease.

If Tenant ceases to operate its business from the Premises for one hundred twenty (120) consecutive days, for reasons other than an assignment or subletting (not to exceed 30 days), Tenant's inability to operate in the Premises due to damage and destruction, remodeling (not to exceed 30 days in any calendar year), Tenant's inability to operate in the Premises due to eminent domain, Unavoidable Delays, or such other right as provided for under this Lease or under law or equity, then Landlord has the right to terminate this Lease upon sixty (60) days' prior written notice. Tenant shall have the right, within thirty (30) days of receipt of Landlord's termination notice, to advise Landlord that Tenant shall reopen for business from the Premises. If Tenant elects to reopen for business, then it must do so within sixty (60) days of its notice to Landlord or such greater time as is reasonably necessary under the circumstances; otherwise, Tenant's notice shall be null and void.

#2566 MYRTLE BEACH, SC

During the first five (5) Lease Years of the Initial Term only, Tenant shall not, directly or indirectly, operate, manage or have any interest in any other store or business which is similar to or in competition with the Permitted Use within five (5) miles of the Shopping Center except in other properties owned and/or operated by Landlord or any of its affiliates (the "Radius Restriction"). The foregoing Radius Restriction shall not apply to any store or business acquired by Tenant either by way of merger or acquisition. Any violation of the Radius Restriction constitutes an Event of Default. Without limiting any other rights Landlord may have under this Lease, in the event the Radius Restriction is violated, Tenant shall pay Fixed Minimum Rent equal 125% of the sum of the then-current Fixed Minimum Rent until the violation is cured.

## SECTION 41.   APPLICABLE LAW AND CONSTRUCTION

The laws of the state within which the Premises are located govern the validity, performance and enforcement of this Lease without regard to its conflicts of law principles. If one or more of the provisions of this Lease is held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect or impair any other provision of this Lease, and this Lease shall be construed as if such invalid, illegal or unenforceable provision had not been contained herein. The submission of this document for examination does not constitute an offer to lease, or a reservation of or option for the Premises, and this Lease becomes effective only upon execution and delivery thereof by both Landlord and Tenant. This Lease has been negotiated by Landlord and Tenant and shall not be deemed to have been prepared by either Landlord or Tenant, but by both equally. All prior negotiations, considerations, representations and understandings between the parties are and shall be deemed to be incorporated and merged into this Lease and shall not be construed as having survived the execution hereof so that only the provisions of this Lease shall govern the respective rights and obligations of the parties hereto to the same effect as if all such negotiations, considerations, representations and understandings shall have never been made or given by either party to the other party hereto.

## SECTION 42.   UNAVOIDABLE DELAYS

Except as otherwise expressly provided herein, if either party is delayed or hindered in or prevented from the performance of any obligation required hereunder by Unavoidable Delay, the time for performance of such obligation shall be extended for the period of the delay, provided that Unavoidable Delay shall not excuse prompt and timely payments, including Rent, when due under this Lease except when  such payment is expressly excused pursuant to other provisions of this Lease.  However, no delay shall be excused by this Section unless (x) the delayed party notifies the other party in writing of the delay within twenty-one (21) days of the event giving rise to such delay; (y) the delayed party has exhausted all other resources available at reasonable costs to avoid such delay; and (z) the delayed party diligently pursues completion of the activity that was delayed. Notwithstanding anything to the contrary in this Lease, under no circumstances shall Unavoidable Delay extend the time for performance of any obligation by more than ninety (90) days.

46

## SECTION 43.   REASONABLE CONSENT

Wherever either party's consent or approval is required, such consent or approval must not be unreasonably or arbitrarily withheld or delayed, unless otherwise expressly stated.

## SECTION 44.   NO PARTNERSHIP

Landlord and Tenant acknowledge that neither of them in any way or for any purpose becomes a partner or an associate of the other in the conduct of Tenant's business, the operation of the Shopping Center or otherwise, or a joint venture, or a member of a joint enterprise with the other.  Neither party is liable for payment of the debts or performance of any obligation of the other. The relationship is and shall be that of Landlord and Tenant.

## SECTION 45.   ESTOPPEL

Within thirty (30) days after request, Tenant shall execute and deliver to Landlord a Tenant Estoppel Certificate substantially in the form of Exhibit H. Within thirty (30) days after request, Landlord shall execute and deliver to Tenant a written instrument certifying that this Lease is unmodified and in full force and effect, or if there has been any modification, that this Lease is in full force and effect as modified and stating all such modifications; specifying the dates to which Rent has been paid; stating whether there exists any default in the performance by either party under any provision of this Lease; and certifying as to such other matters as Tenant reasonably may request. With regard to any estoppel certificates related to this Lease, this Lease shall take precedence over the contents of such estoppel certificates, should a conflict arise. Landlord shall be required to pay Tenant under this Lease a non-refundable fee in the amount of Five Hundred Dollars ($500.00) for each new Estoppel Certificate and each new SNDA requested from and provided by Tenant to cover Tenant's administrative, legal and other costs and expenses incurred in processing, negotiating and drafting said documents and Tenant is hereby authorized to deduct said amount from Rent next due. Notwithstanding the foregoing, the first Estoppel Certificate and SNDA, in a calendar year, shall be free of charge.

## SECTION 46.   QUIET ENJOYMENT

Landlord represents and warrants to Tenant that Landlord is well seized of fee simple title to the Premises and the Shopping Center (except the improvements on the Target tract, which is the subject of a ground lease) and has full power and authority to execute and deliver this Lease. Landlord covenants to Tenant that Tenant shall at all times have peaceable and quiet enjoyment and possession of the Premises and of the rights granted hereunder without any manner of hindrance from Landlord or any other person or persons if Tenant performs all the covenants and agreements to be performed on Tenant's part.

## SECTION 47.   HOLDING OVER

If, at the expiration of the Term, Tenant continues to occupy the Premises, such holding over shall not constitute a renewal of this Lease, but Tenant shall be a tenant from month-to-month, under the same terms and conditions as in effect immediately prior to the commencement

47

of the month-to-month tenancy, except that Fixed Minimum Rent shall be one hundred twenty-five percent (125%) of the Then-Current Rate. For purposes of this Section 47, "Then-Current Rate" shall mean the amount of Fixed Minimum Rent as set forth in Section 5(a) for the then-current Lease Year or Extended Term, without regard to whether Tenant has the right to pay Substitute Rent or Alternate Substitute Rent. Either party may terminate this Lease during said month-to-month tenancy upon sixty (60) days' prior written notice to the other party; provided, however, neither Landlord or Tenant shall specify a Lease termination date during the period commencing September 1 and ending on the immediately following January 31. If Tenant remains in possession of the Premises after Landlord has provided written notice, then Tenant's Fixed Minimum Rent shall be one hundred fifty percent (150%) of the Then-Current Rate. If Tenant fails to surrender the Premises on the sixtieth (60th) day after Landlord has provided notice to Tenant pursuant to this Section 47, Tenant will indemnify Landlord against all claims and demands made by any succeeding tenants against Landlord, founded upon delay by Landlord in delivering possession of the Premises to such succeeding tenant caused by Tenant holding over. The foregoing indemnification provision and the obligations arising thereunder shall survive any expiration or termination of this Lease.

## SECTION 48.  BROKERS

Each party represents to the other party that it has not dealt with any party with regard to the Premises or this Lease, except that Alan Freeman of The Shopping Center Group represents Tenant in this transaction. Landlord shall pay Tenant's broker pursuant to a separate agreement between Landlord and Tenant's broker. Each party shall indemnify and hold harmless the other party from and against any loss, cost, liability and expense, including reasonable attorneys' fees, arising out of a breach of its representation in this Section.

## SECTION 49.  INTENTIONALLY DELETED.

## SECTION 50.  CLAIMS LIMITATION

All actions or claims by Landlord for Rent shall be barred three years after the end of each Lease Year or Partial Lease Year. All actions or claims by Tenant for recovery of excess payments of Rent shall be barred three years after the end of each Lease Year or Partial Lease Year, except that in the case of any component of Additional Rent (excluding Tenant's Fixed Common Area Costs), the same shall not be barred until three years after Tenant's receipt of Landlord's annual reconciliation statement furnished with respect to that Lease Year or Partial Lease Year. The forgoing limitations shall not apply in the event of fraud or willful misstatement of the amounts so stated.

## SECTION 51.  CAPTIONS

Any paragraph titles or captions contained in this Lease are for convenience only and do not define, limit or otherwise modify the scope or intent of this Lease.

#2566 MYRTLE BEACH, SC

**SECTION 52.  VARIATION IN PRONOUNS**

All the terms and words used in this Lease, regardless of the number and gender in which they are used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context or sense of this Lease or any paragraph or clause herein may require, the same as if such words had been fully and properly written the number and gender.

**SECTION 53.  SECTION REFERENCES**

All references to any Section number(s) refer to the Section contained in this Lease.

**SECTION 54.  BINDING EFFECT OF AGREEMENT**

This Lease and all of the covenants, conditions, provisions and restrictions herein inures to the benefit of and binds the heirs, executors, administrators, devisees, legatees, personal representatives, successors and assigns, respectively, of Landlord and Tenant.

**SECTION 55.  ATTORNEYS' FEES**

If Landlord or Tenant commence any action or suit under or related to this Lease, then the non-prevailing party shall pay to the prevailing party all arbitration costs (if any), fees, expenses and court costs, including reasonable attorneys' fees and expenses, incurred or paid by the prevailing party. This provision applies to court costs and attorneys' fees and expenses incurred in any trial and appellate courts.

**SECTION 56.       OFAC WARRANTY**

Each party represents and warrants to the other party that the representing party (a) is not acting, directly or indirectly, for or on behalf of any person, group, entity, or nation named by any Executive Order or the U.S. Treasury Department as a terrorist, "Specially Designated National and Blocked Person," or other banned or blocked person, entity, nation, or transaction pursuant to any law, order, rule, or regulation that is enforced or administered by the Office of Foreign Assets Control; and (b) is not engaged in this lease transaction, directly or indirectly, on behalf of, or instigating or facilitating this lease transaction, directly or indirectly, on behalf of any such person, group, entity or nation. The breaching party must defend, indemnify, and hold harmless the other party from and against all claims, damages, losses, risks, liabilities, and expenses (including reasonable attorneys' fees and costs) arising from or related to any breach of the forgoing representation.

**SECTION 57.       PDF/COUNTERPART SIGNATURE**

This Lease may be executed in multiple counterparts, each of which shall constitute an original and all of which taken together shall constitute one and same agreement binding upon the parties, notwithstanding that all the parties are not signatories to the same counterpart. In order to

#2566 MYRTLE BEACH, SC

facilitate the finalization of this Lease, the parties agree that signatures transmitted by facsimile machine or signatures transmitted via e-mail in a "PDF" format may be used in place of original signatures on this Lease. Each party intends to be bound by such party's facsimile or "PDF" format signature on this Lease, is aware that the other parties are relying on such party's facsimile or "PDF" format signature, and hereby waives any defenses to the enforcement of this Lease based upon the form of signature. Promptly following any facsimile transmittal or e-mail transmittal of "PDF" format signatures, the parties shall deliver to the other parties the original executed Lease by reputable overnight courier to the notice addresses listed herein (it being agreed and understood that the delivery of such original shall not be a condition to the binding nature of the facsimile or electronic copy of the document provided such document is received by the parties).

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

50

In witness whereof, the parties have signed this Lease as of the Effective Date.

**Signed in the Presence of:**

LANDLORD:
**MYRTLE BEACH FARMS COMPANY, INC.**

By: _____

Name: Chad E. Canson

Title: Chief Financial Officer

Employer Identification Number: 57-0919081

**Signed in the Presence of:**

TENANT:
**JO-ANN STORES, LLC**

By: _____
Matt Susz, Senior Vice President and
Chief Financial Officer

And

By: _____
     Ann Aber, Senior Vice President,
     General Counsel & Secretary

#2566 MYRTLE BEACH, SC

STATE OF _South Carolina_ )
                              ) SS
COUNTY OF _Horry_          )

    BEFORE ME, a Notary Public in and for said County and State, personally appeared **MYRTLE BEACH FARMS COMPANY, INC.**, a South Carolina corporation, by _Chad E Carlson_, its _CFO_, who did sign the foregoing instrument on behalf of the limited liability company and that the same is his/her free act and deed of the company and personally and as such authorized representative.

    IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at _Myrtle Beach, SC_, this _28th_ day of _January_, 20_22_.

                             _Denise D. Dyer_
                                   NOTARY PUBLIC

STATE OF OHIO          )
                          ) SS
COUNTY OF SUMMIT       )

    BEFORE ME, a Notary Public in and for said County and State, personally appeared **JO-ANN STORES, LLC**, an Ohio limited liability company, by Matt Susz, Senior Vice President and Chief Financial Officer and Ann Aber, Senior Vice President, General Counsel & Secretary, who acknowledged that they did sign the foregoing instrument on behalf of said corporation and that the same is their free act and deed personally and as such officers.

    IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at Hudson, Ohio, this _18th_ day of _January_, 20_22_.

                                   NOTARY PUBLIC

RACHEL POLAK
NOTARY PUBLIC, STATE OF OHIO
My Commission Expires 10/28/2022

52

Exhibit A

**Legal Description of Shopping Center**

ALL AND SINGULAR, that certain piece, parcel or lot of land situate, lying, and being in Dogwood Neck Township, Horry County, South Carolina.  Said lot containing 20.20 acres, more or less, and more particularly shown as "LOT 3" on a map entitled "FINAL PLAT OF 64.49 ACRE SUBDIVISION KNOWN AS 'SEABOARD COMMONS' EAST OF U.S. HIGHWAY 17 BYPASS BETWEEN 10TH AND 21ST AVENUES NORTH NEAR MYRTLE BEACH, IN DOGWOOD NECK TOWNSHIP HORRY CO., S.C." prepared for Myrtle Beach Farms Company, Inc. by Associated Land Surveyors, Inc., dated December 16, 1994 with last revision July 7, 1995 and recorded July 13, 1995 in plat book 135, page 35 in the office of the Register of Deeds for Horry County.

## Exhibit B

### Site Plan



## Exhibit C

## Restricted Property



Exhibit C, Page 1

## Exhibit D

## Form of Commencement Date Agreement

# JOANN

Via: FedEx                                                    {Insert date}

{Insert Landlord Address}

RE:  Commencement Date Agreement—Lease dated {Insert Date} by and between {Insert Landlord Name} and Jo-Ann Stores, LLC for the Premises with a GLA of {Insert Premises GLA} located in {Insert Shopping Center Name}, {Insert City and Street}, JOANN Store # {Insert Store #}.

Dear Landlord:
This letter serves to establish the Term and other key dates as required by Section {___} of the Lease.

The Commencement Date of the Initial Term is:
The Expiration Date of the Initial Term is:

- The last date by which the Option Term 1 may be exercised is:
- The last date by which the Option Term 2 may be exercised is:
- The last date by which the Option Term 3 may be exercised is:
- The last date by which the Option Term 4 may be exercised is:
- The last date by which the Sales Kick Out option may be exercised is:

Base Rent Schedule, Initial Term and Option Terms
{Insert Date} through {Insert Date}:   $(Insert Amount}/s.f., which is $(Insert Amount} per month, $(Insert Amount} annually.
{Insert Date} through {Insert Date}:   $(Insert Amount}/s.f., which is $(Insert amount} per month, $(Insert Amount} annually.

1st Option: {Insert Date} through {Insert Date}:  $(Insert Amount}/s.f., which is $(Insert Amount} per month, $(Insert Amount} annually.
2nd Option: {Insert Date} through {Insert Date}:  $(Insert Amount}/s.f., which is $(Insert Amount} per month, $(Insert Amount} annually.
3rd Option: {Insert Date} through {Insert Date}:  $(Insert Amount}/s.f., which is $(Insert Amount} per month, $(Insert Amount} annually.
4th Option: {Insert Date} through {Insert Date}:  $(Insert Amount}/s.f., which is $(Insert Amount} per month, $(Insert Amount} annually.

Please indicate your approval of the foregoing by signing both copies of this letter and returning one copy to my attention.

Sincerely,

Velma M. Quinlan
Lease Administration
velma.quinlan@joann.com
(330) 463-6627

The foregoing is accepted and agreed to this _____ day of _____, 2021.

Insert Landlord name ("Landlord")

By:    _____

Its:    _____

**Corporate Office and Distribution Center**
5555 Darrow Road, Hudson, Ohio 44236, Phone 330-656-2600, www.joann.com

Exhibit D, Page 1

## Exhibit D-1

## Tenant's Prototype Signage Plans



or



<u>Exhibit "E"</u>

**Rules and Regulations for Shopping Center**

1. Firearms are strictly prohibited in the Shopping Center.

2. The Premises shall not be used for lodging or sleeping or for any immoral or illegal purpose.

3. No showcases, sales tables, merchandise displays, signs or other articles shall be put in front of or affixed to any part of the exterior of the Premises, nor placed in the halls, common passageways, corridors or vestibules without the prior written consent of Landlord.

4. Canvassing, soliciting and distribution of handbills other than in the Premises is prohibited.

5. The sidewalk, passages, courts, corridors and halls shall not be obstructed or encumbered by Tenant or used for any purpose other than ingress and egress to and from the Premises.

6. No awnings or other projections shall be attached to the outside walls of the Premises without the prior written consent of Landlord. No curtains, blinds, shades or screens shall be attached to or hung in, or used in connection with, any window or door of the Premises, without prior written consent of Landlord.

7. No sign, signal, advertisement, notice or other lettering shall be exhibited, inscribed, painted or affixed by Tenant on any part of the outside of the Premises, without the prior written consent of Landlord. No handwritten signs are permitted to be affixed to the interior or exterior of the Premises. In the event of the violation of the foregoing by Tenant, Landlord may remove same without notice to Tenant and without any liability and Landlord may charge any expense incurred in such removal to Tenant.

8. The sashes, sash doors, skylights, windows and doors that reflect or admit light and air into the halls, passageways or other public places in the Shopping Center shall not be covered or obstructed by Tenant without written consent of Landlord.

9. There shall not be used in the Premises, or in the public halls of the Shopping Center, either by Tenant or by jobbers or others, in the delivery or receipt of merchandise, any hand trucks, except those equipped with rubber tires. Tenant shall use best efforts to complete or cause to be completed all deliveries, loading, unloading or services to the Premises prior to 10:00 a.m. each day.

10. The water and wash closets and other plumbing fixtures shall not be used for any purpose other than those for which they were constructed and no sweepings, rubbish, rags or other substances shall be thrown therein. All damages resulting from any misuse of the fixtures shall be borne by Tenant who, or whose servants, employees, agents, visitors, invitees or licensees, shall have caused the same.

11. Tenant shall not cause or permit any unusual or objectionable odors to be produced upon or within, or released from, the Premises.

12. Tenant shall use the Premises at all times in compliance with all applicable laws, decrees, ordinances, orders, rules and regulations of all federal, state, county and municipal governmental bodies (including those of the Centers for Disease Control and Prevention, State of South Carolina, South Carolina Department of Health and Environmental Control and local authorities).

<u>Exhibit F-1</u>

**Exclusive Uses**

Notwithstanding anything to the contrary, Tenant is not permitted to operate for any use or otherwise violate any restriction contained in this Exhibit F-1. Landlord shall have the right to change lot, outparcel, or unit numbers from time to time in connection with changes in the Shopping Center, in its discretion, and the exclusive uses listed on this Exhibit F-1 will still apply to such lot, outparcel, or unit as it exists today.

1. <u>Havertys</u>
   If Tenant is located on (i) Lot 3 which is currently comprised of Units 3A, 3B1, 420, 3B2, 3C, 3D, and 3E; (ii) Lot 4 which is currently comprised of Unit 1; (iii) Lot 6 (also known as Outparcel 1(c)) which is currently comprised of Unit 11; (iv) Lot 10 (also known as Outparcel 6) currently comprised of Unit 10; and (v) Lot 13 (also known as Outparcel 2) currently comprised of Units 2, 3, and 4, Tenant shall not operate as a business or operation (including without limitation, any discount retail store, any outlet-type store, store engaged in the sale of furniture or home furnishings on a discount or clearance basis, any store or business engaged in the sale of bedding and/or mattresses, or a manufacturer direct or catalogue store) leasing or occupying spaces that (A) is greater than 12,000 square feet and (B) allocates fifty percent (50%) or more of its sales floor area to the sale of furniture, rugs and mattresses.

   If Tenant is located on Lot 13 (also known as Outparcel 2) currently comprised of Units 2, 3, and 4, Tenant shall not operate as a business or operation primarily engaged (1) in the sale of mattresses, including Sleepys, Mattress Firm, Mattress Outlets, Casper, and Mattress Factory, but specifically excluding Sleep Number, which shall be permitted, or (2) in the sale of home furnishing design services.

2. <u>Chick-fil-A</u>
   If Tenant is located on Outparcel 5 (also known as Lot 16), Tenant shall not operate as a restaurant selling or serving chicken as a principal menu item. For purposes of this paragraph, "a restaurant selling or serving chicken as a principal menu item" is defined as a restaurant deriving twenty-five percent (25%) or more of its gross sales from the sale of chicken.

3. <u>Cost Plus World Market</u>
   If Tenant is located on Lot 4 which is currently comprised of Unit 1, or on Lot 3 which is currently comprised of Units 3A, 420, 3B2, 3C, 3D, and 3E, Tenant shall not operate the premises primarily for the sale of prepackaged gourmet foods, beer and wine for off-premises consumption, and/or furniture made from wicker and/or rattan.

4.   **Dollar Tree**

If Tenant is located on Lot 3 which is currently comprised of Units 3A, 3B1, 420, 3B2, 3C, and 3D, Tenant shall not operate:  (i) its principal business as a single price point variety retail store, (ii) a variety retail operation with the word "Dollar" in its trade name, or (iii) a close-out store such as but not limited to Big Lots, Ollie's or Fred's.  For purposes of this paragraph, "principal business" shall be defined as selling such merchandise in twenty-five percent (25%) or more of the sales floor area (including one- half (1/2) of the adjacent aisle space).

5.   **Lowe's Home Improvement**

If Tenant is located on (i) Outparcel 1(c) (also known as Lot 6) which is currently comprised of Unit 11; (ii) Lot 3 which is currently comprised of Units 3A, 3B1, 420, 3B2, 3C, 3D, and 3E; (iii) Outparcel 4 (also known as Lot 1) which is currently comprised of Unit 5; (iv) Outparcel 6 (also known as Lot 10) which is currently comprised of Unit 10; (v) Outparcel 2 (also known as Lot 13) which is currently comprised of Units 2, 3, and 4; (vi) Outparcel 3(a) (also known as Lot 14) which is currently comprised of Unit 6; (vii) Outparcel 3(b) (also known as Lot 15) which is currently comprised of Unit 10A; or (viii) Lots 9, 11, 12, Tenant shall not operate as: (a) a hardware store or center; (b) a nursery and/or lawn and garden center and/or the sale of Christmas trees; (c) a paint, wall paper, and/or home décor center containing more than five thousand (5,000) square feet of floor area; (d) a retail and/or warehouse home improvement center, lumber yard, building materials supply center; or (e) other stores or centers similar to those operated by Lowe's, Home Depot, Home Depot Expo, Villager's Hardware, 84 Lumber, Wickes, Hughes Lumber, McCoys, Menard's, Sears Hardware, Sears Appliance and Hardware, Great Indoors, Scotty's, Sutherlands, and/or Orchard Supply.

In addition, Tenant shall not devote more than five thousand (5,000) square feet for the operation of (a) a hardware store or center; (b) a nursery and/or lawn and garden center and/or the sale of Christmas trees; or (c) a paint, wall paper, and/or home décor center.

6.   **OfficeMax**

If Tenant is located on (i) Outparcel 2 (also known as Lot 13) which is currently comprised of Units 3 and 4, Tenant shall not (a) operate for the sale of office, home office, school or business products, computers and computer products, office, home office, school or business supplies or equipment; office furniture; or electronics (including by way of example those businesses operated by Office Depot, Staples, Office Shop Warehouse, and Workplace), or for use as a copy center or "Kinko" type of operation (and of which hereinafter are the "OfficeMax Prohibited Uses"); (b) devote more than one thousand (1,000) square feet of space to be used for the OfficeMax Prohibited Uses or five percent (5%) or more of the floor area of the Premises to be used for the OfficeMax Prohibited Uses, whichever is less (ii) Outparcel 3(a) (also known as Lot 14) which is currently comprised of Unit 6; Outparcel 3(b) (also known as Lot 15) which is currently comprised of Unit 10A; Outparcel 4 (also known as Lot 1) which is currently comprised of Unit 5; or Outparcel 5 (also known as Lot 16) which is currently comprised of Unit 8, Tenant shall

not operate for the primary purpose of the operation of an office supply superstore or copy center or business center operation such as by way of example Office Depot, Staples or a Kinko type operation; or (c) operate as a restaurant, delicatessen, nightclub or other entertainment facility, bowling alley, arcade, game room, skating rink, billiard room, theater, movie theater, health club or spa, or for commercial purposes (such as medical or office uses), or for any use that requires parking in excess of five (5) spaces for each one thousand (1,000) square feet of leasable floor area.

7.  Planet Fitness
    If Tenant's Premises is five thousand (5,000) or more square feet, Tenant shall not operate as a health and fitness center.

8.  Ross Dress for Less
    If Tenant is located on Lot 3 or Lot 4 which is currently comprised of Units 3A, 3B1, 420, 3C, 3D, and 3E, or Unit 1, Tenant shall not devote more than ten thousand (10,000) square feet of its premises for the Off Price Sale of apparel. For purposes of this paragraph, "Off Price Sale" is defined as the retail sale of merchandise on an everyday basis at prices reduced from those charged by full price retailers, such as full price department stores; provided, however, this definition shall not prohibit sales events by a retailer at a price discounted from that retailer's every day price. Examples of Off Price Sale retailers include Marshalls, Nordstrom Rack, Goody's, Factory 2U, Burlington Coat, SteinMart, and Filene's Basement.

9.  Scrubs & Beyond
    Tenant shall not offer for sale healthcare professional apparel, shoes designed specifically for the healthcare professional (including, without limitation, nursing clogs), and/or accessories designed specifically for the healthcare professional (including, without limitation, blood pressure cuffs, medical reference books, and stethoscopes); except the foregoing shall not apply to (i) tenants occupying ten thousand (10,000) square feet or more of space, and (ii) tenants with the incidental sale of healthcare professional apparel, shoes designed specifically for the healthcare professional (including, without limitation, nursing clogs), and/or accessories designed specifically for the health care professional. For purposes of this paragraph, "incidental sale" shall mean the sale of such merchandise in ten percent (10%) or less of the overall sales floor area.

10. T.J. Maxx
    Tenant shall not dedicate or devote more than fifteen thousand (15,000) square feet of its floor area to the sale or display of female apparel (as defined by the trade from time to time), including in the computation of such floor area one-half (1/2) of all floor area in any aisles, corridors or similar spaces adjacent to or abutting any racks, gondolas, shelves, cabinets, counters or other fixtures or equipment containing or used for the sale or display of such goods.

11. Chef'Store
    Tenant shall not operate the Premises as Restaurant Depot, Sysco Corporation, Reinhart

Foods, Gordon Food Service or Ben E. Keith (or any wholly owned subsidiary that operates in a similar manner to its parent company).

12.   <u>Dick's Sporting Goods / Golf Galaxy</u>
      Tenant shall not operate the Premises as a Full Line Sporting Goods Store. For purposes of this paragraph, a "Full Line Sporting Goods Store" shall mean a retail store offering a broad assortment of sporting goods equipment, apparel and footwear for multiple sports, such as Academy Sports and similar retailers, and shall not include (i) any store offering predominately hunting, fishing and camping equipment, apparel and footwear, such as Bass Prop Shops and similar retailers, or (ii) any store specializing in the sale of sporting goods for one sport, such as Golfsmith and similar retailers.

<u>Exhibit F-2</u>

**Prohibited Uses**

The Prohibited Uses contained in this Exhibit F-2 have been established by the OEA or have been previously granted to existing tenants of Seaboard Commons.

Notwithstanding anything to the contrary in this Lease, Tenant is not permitted to operate for any use or otherwise violate any restriction contained in this Exhibit F-2. Landlord shall have the right to change lot, outparcel, or unit numbers from time to time in connection with changes in the Shopping Center, in its discretion, and the Prohibited Uses listed on this Exhibit F-2 will still apply to such lot, outparcel, or unit as it exists today.

1.    Tenant shall not permit any "tattooing" or "body art" (whether temporary or permanent), or the operation or establishment of any "tattoo facility," or use of the Premises as a business address for any "tattoo artist" or as an address at which any "tattooing" activity will be performed, as the terms "tattooing," "body art," "tattoo artist" or "tattoo facility" are defined in S.C. Code Ann. 44-34-10, et seq., or S.C. Code Ann. 44-34-90, or any amendment or modification thereto, or as such terms are defined in any other local, state or federal law, ordinance, rule or regulation.

2.    Tenant shall not permit any Gaming Operations ("Gaming Operations" shall mean the use of all or any portion of the Premises for the operation of businesses [including those which involve wagering, gambling or games of skill or chance] which operate or are required to be operated by license or permit from the State of South Carolina Gaming Commission, the South Carolina Department of Revenue or similar agency pursuant to any law, ordinance or regulation enacted by the State of South Carolina or any agency thereof, or any other state, county, municipal or local government authority).

3.    Tenant shall not engage in the promotion or sale to the public of time-share estates or ownership interests in vacation clubs, nor shall Tenant distribute advertising materials related thereto, nor shall Tenant solicit purchasers of the same.

4.    Tenant shall not operate a restaurant, health club, or theater within two hundred (200) feet of Unit 3B1. (Cost Plus World Market)

5.    Tenant shall not operate a "strip" bar or club, "sex" club, gambling establishment or other adult entertainment facility within three hundred (300) feet of Lot 15 currently comprised of Unit 10A (also known as Outparcel 3b). (Chick-fil-A)

6.    Tenant shall not operate a cafeteria, restaurant or theater within two hundred fifty (250) feet of Lot 4 currently comprised of Unit 1. (Lowe's Home Improvement)

7.    Tenant shall not operate a cafeteria, sit-down restaurant, or theater on Lot 6 (also known as Outparcel 1c). (Lowe's Home Improvement)

8.  Tenant shall not operate a restaurant within one hundred (100) feet of the Building Area of Units 3A, 3B2, or 420.  For purposes of this paragraph, "Building Area" shall mean the limited areas of the Shopping Center within which Buildings may be constructed, placed or located; Building Areas are designated on the OEA site plan.  For purposes of this paragraph, "Buildings" shall include any appurtenant canopies, supports, loading docks, truck ramps and other outward extensions. (OEA)

9.  The foregoing restrictions and/or prohibited uses apply to Lot 13 (also known as Outparcel 2): no building, structure or business shall be constructed or operated which shall be inconsistent with the operation of a family-type, retail shopping area; all buildings, structures and business shall be attractive, both in its physical characteristics and in appeal, to customers and retail trade; no use other than retail sales purposes shall be permitted; and no merchandise, equipment or services, including but not limited to, vending machines, promotional devices and similar items, shall be displayed, offered for sale or lease, or stored within the common area; provided however, that the foregoing prohibition shall not be applicable to: (i) the storage of shopping cars, or (ii) temporary Shopping Center promotions, except that no promotional activities will be allowed in the common area without the prior written approval of the occupants of Lot 13 (Outparcel 2). (OfficeMax)

10.  Tenant shall not operate an electronics or appliance store, or any combination thereof, which exceeds fifteen thousand (15,000) square feet of Floor Area, but an office supply superstore shall not constitute an appliance or electronics store. (OfficeMax)

11.  Tenant shall not operate  for any purpose other than retail sales, offices, restaurants or other commercial purposes.  Not more than ten percent (10%) of the total floor area of the Shopping Center may be used for Retail Office and/or Business Office.  For purposes of this paragraph, "Business Office" shall mean an office which does not provide services directly to consumers. For purposes of this paragraph, "Retail Office" shall mean an office which provides services directly to consumers, including but not limited to financial institutions, real estate, stock brokerages, title companies, and escrow offices, travel and insurance agencies, and medical, dental and legal clinics. (OEA)

12.  Tenant shall not operate a restaurant, bar, tavern, sit-down restaurant, cafeteria, delicatessen, nightclub or other entertainment facility, bowling alley, arcade, game room, skating rink, billiard room theater, movie theater, health club or spa, or for commercial purposes (such as medical or office uses), or for any use that requires parking in excess of five (5) spaces for each one thousand (1,000) square feet of leasable floor area on Lot 13 (also known as Outparcel 2). (OfficeMax)

13.  Tenant shall not operate a shopping center management office within two hundred (200) feet from any perimeter walls of Unit 3B2. (Ross Dress for Less)

14.  Tenant shall not operate an ATM or similar machine within one hundred (100) feet of the front and side perimeter walls of Unit 3B2. (Ross Dress for Less)

15.  Tenant shall not operate a restaurant or other "High Intensity Parking User" within five hundred (500) feet of the front and side perimeter walls of Unit 3B2.  For purposes of this

paragraph, a "High Intensity Parking User" shall be defined as a tenant or occupant whose use requires more than five (5) parking spaces per one thousand (1,000) square feet of leasable floor area in accordance with governmental regulations, whichever has a parking requirement, provided however, the foregoing shall not be deemed to prohibit a "High Intensity Parking User" on Lot 6 (also known as Outparcel 1c). (Ross Dress for Less)

16. Tenant shall not operate a school (that is permitted under the OEA) within five hundred (500) feet of any perimeter walls of Unit 3B2. (Ross Dress for Less)

17. Tenant shall not operate an office within three hundred (300) feet of Unit 3C. (T.J. Maxx)

18. Tenant shall not operate for, engage in, or permit any of the following uses in any portion of the Shopping Center (Havertys):

  (i) Any nuisance or use causing loud noises or offensive odors.

  (ii) Manufacturing facility (except for the manufacture of such goods which are required as necessary incident to the conduct of a particular retail mercantile business).

  (iii) Liquidation outlet, consignment store (excluding stores carrying incidental consignments), pawn shop, or second-hand store whose principal business is selling used merchandise, except for first-class consignment shops such as Plato's Closet, Game Stop, and Play-It-Again-Sports.

  (iv) Massage parlor (as further clarification, the term "massage parlor" does not refer to any national or regional chain operating at least twenty (20) locations, such as Massage Envy, Hand & Stone or Elements) or modeling studio.

  (v) Adult book store or sexually-oriented shop or so-called "head shop."

  (vi) Adult entertainment club, nightclub, dance club/hall, or cocktail lounge.

  (vii) Any business devoted to the primary sale of alcoholic beverages, whether packaged or not; provided, however, that this paragraph shall not apply to (1) any business occupying premises greater than 5,000 square feet; (2) any restaurant (i) deriving not more than forty percent (40%) of its gross revenues from the sale of liquor, beer, and wine, and (ii) which does not promote itself as a sports bar; (3) incidental sales of liquor, beer, and/or wine in full-line grocery stores; and (4) a first class retailer of fine wine, beer and spirits of similar quality to that of Total Wine or Bevmo!.

  (viii) Skating rink, carnival, bingo parlor or any other business using loud speakers.

  (ix) Coin operated laundry.

  (x) Church or similar use.

(xi)  Beauty school, barber college, reading room, place of instruction or any other operation catering primarily to students or trainees other than to retail customers, except for operations of similar quality to Sylvan Learning Center, Chyten, and Kumon Math & Reading Center.

(xii)  Any fire, auction, lost lease, quitting business or bankruptcy sale, and any signage or advertisement for such.  However, inventory liquidation sales are permitted.

(xiii)  Any mobile home park, trailer camp or junkyard.

(xiv)  Any dumping, disposing, incineration or reduction of garbage (other than dumpsters located in the rear of any building and otherwise properly screened from view).

(xv)  Any central laundry or any laundromat.

(xvi)  Any automobile, truck, trailer or R.V. sales, leasing, display or repair.

(xvii)  Any coin-operated car wash.

(xviii)  Any full service carwash or gas station.

(xix)  Any flea market or establishment which sells used merchandise or second hand goods.

(xx)  Any funeral parlor.

(xxi)  Any commonly known or so-called "breastaurants" such as Twin Peaks, Hooters, Tilted Kilt, Bone Daddy's, and the like or any "family entertainment" club or facility, such as Chuck-E-Cheese, Dave and Busters, Discovery Zone, or ESPN Zone.

(xxii)  Any discount retail furniture store or any outlet-type furniture store or store engaged in the sale of furniture or home furnishings on a discount or clearance basis.

19.  Tenant shall not operate for, engage in, or permit any use in any portion of the Shopping Center that is inconsistent with the operation of a first-class retail shopping center.  Without limiting the generality of the foregoing, Tenant shall not operate for, engage in, or permit any of the following uses:

(i)  Any use which emits or results in strong, unusual, offensive or obnoxious odors, fumes, dust or vapors, emits objectionable noise or sound which can be heard or smelled outside of any building in the Shopping Center;

(ii)  Any industrial, factory operations and any operation primarily used as a storage warehouse operation and any assembling, manufacturing, distilling, refining, smelting, agricultural, or mining operation;

(iii)     Any "second hand" store including but not limited to, flea markets, pawn shops, so-called "tent" or "flea market" sales;

(iv)     Any "surplus" store including but not limited to Army, Navy, or government;

(v)     Any mobile home park, trailer court, labor camp, junkyard, recycling facility, or stockyard (except that this provision shall not prohibit the temporary use of construction trailers during periods of construction, reconstruction, or maintenance);

(vi)     Any dumping, disposing, incineration, or reduction of garbage (exclusive of appropriately screened garbage compactors or dumpsters located near the rear of any building);

(vii)     Any fire sale, bankruptcy sale (unless pursuant to a court order) or auction house operation;

(viii)     Any central laundry, dry cleaning plant, or laundromat; provided, however, this prohibition shall not be applicable to nominal supportive facilities for on-site service oriented to pickup and delivery by the ultimate consumer as the same may be found in retail shopping districts in the metropolitan area where the Shopping Center is located;

(ix)     Any automobile, truck, trailer, boat or recreational vehicles sales, leasing, display or body shop repair operation (mechanical or otherwise);

(x)     Any residential purposes, including but not limited to: hotels, motels, living quarters, sleeping apartments, or lodging rooms;

(xi)     Any overnight-stay pet facilities, veterinary hospital or animal raising facilities (except that this prohibition shall not prohibit pet shops);

(xii)     Any mortuary, funeral home or parlor;

(xiii)     Any adult bookstore, adult video store, or any establishment selling or exhibiting pornographic materials or drug-related paraphernalia, or any so called "head shop";

(xiv)     Any restaurant in excess of ten thousand (10,000) square feet of gross leasable floor area;

(xv)     Any restaurant whose gross revenues derived from food sales does not exceed fifty percent (50%);

(xvi)     Any establishment serving alcoholic beverages for on-Premises consumption except as incidental to any permitted restaurant;

(xvii)      Any bar, tavern, restaurant or other establishment whose reasonably projected annual gross revenues derived from the sale of alcoholic beverages for on-Premises consumption exceeds thirty percent (30%) of the gross revenues of such business;

(xviii)     Any nightclub or discotheque;

(xix)       Any use which is a public or private nuisance;

(xx)        Any separately demised newsstand;

(xxi)       Any massage parlor, tanning salon, health club, spa, fitness center, gymnasium, workout facility, or similar type business;

(xxii)      Any bowling alley, skating rink, arcade, game room, amusement or video game arcade, pool or billiard hall or parlor (or room), car wash, dance hall, amusement park, or any other place of recreation;

(xxiii)     Any school, training or educational facility, including but not limited to: beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers; provided however, this prohibition shall not be applicable to on-site employee training provided by Tenant, that is incidental to the conduct of Tenant's business from the Premises;

(xxiv)      Any gambling facility or operation, including but not limited to: off-track or sports betting parlor or establishment; table games such as black-jack or poker; slot machines, video poker/black-jack/keno machines or similar devices; or bingo hall; or any establishment conducting games of chance (excluding the sale of state lottery tickets). Notwithstanding the foregoing, this prohibition shall not apply to governmental sponsored gambling activities, or charitable gambling activities, so long as such governmental and/or charitable activities are incidental to the business operation being conducted by Tenant from the Premises;

(xxv)       Any hardware store over five thousand (5,000) square feet, lawn and garden center over three thousand (3,000) square feet, or paint and/or décor center over five thousand (5,000) square feet;

(xxvi)      Any theater, including but not limited to: movie or live performance;

(xxvii)     Any viewing facility, including but not limited to: sports or other entertainment (whether live, film, audio/visual or video);

(xxviii)    Any catering or banquet hall;

(xxix)      Any health, medical clinic or rehabilitative facility;

(xxx)    Any church, house of worship, auditorium, meeting hall, or other place of public assembly;

(xxxi)    Any commercial purposes (such as medical or office uses);

(xxxii)    Any use that requires parking in excess of five (5) spaces for each one thousand (1,000) square feet of leasable floor area;

(xxxiii)    Any home center, lumber yard, warehouse home center, or building supply operations;

(xxxiv)    Any non-retail sales purposes; and

(xxxv)    Any use other than financial institutions, service shops, offices and retail stores selling merchandise normally carried in other shopping centers.

## Exhibit G

## Form of Subordination, Non-Disturbance and Attornment Agreement

**When recorded, return to:**

Jo-Ann Stores, LLC
Attn: Rachel Polak
5555 Darrow Road
Hudson, OH 44236

**This instrument was prepared by:**

Dana R. Saporito
Jo-Ann Stores, LLC
5555 Darrow Road
Hudson, OH 44236

_____ SPACE ABOVE THIS LINE FOR RECORDER'S USE
## SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

This Subordination, Non-Disturbance and Attornment Agreement (the "Agreement") is made as of _____, 20__, by **[LENDER]** ("Lender"), **[LANDLORD]** ("Landlord"), and **Jo-Ann Stores, LLC**, an Ohio limited liability company ("Tenant").

Reference is made to a loan (the "Mortgage") from Lender to Landlord, dated _____ and recorded on _____, as instrument number _____, in _____, _____ County, [State].

Reference is made to a lease dated _____, _____ [and all subsequent amendments and modifications] by and between Tenant and Landlord (the "Lease") of certain premises situated within the property known as [Shopping Center] located in [City], [ST], and as legally described on Exhibit A attached hereto and incorporated by reference herein and covered by said Mortgage.

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and in consideration of the mutual promises contained herein, the parties agree as follows:

Lender consents to the Lease and the provisions thereof.

Subject to the terms hereof, the Lease is and shall be subject and subordinate at all times to the lien of the Mortgage and to all renewals and extensions of the Mortgage ("Amendments") to the full extent of all amounts secured thereby and interest thereon, provided that such Amendments do not expand Tenant's obligations or limit Tenant's rights under the Lease (except as agreed to in this Agreement).

If the holder of the Mortgage, or any person claiming under the holder (whether by a foreclosure, deed in lieu of foreclosure, or otherwise), succeeds to the interest of Landlord in the Lease, then Tenant shall recognize and attorn to the holder, or such other person, as its landlord under the Lease.

In the event of foreclosure or other right asserted under the Mortgage by the holder thereof, the Lease and all of the rights of Tenant thereunder shall continue in full force and effect and shall not be terminated or disturbed (whether by a foreclosure, deed in lieu of foreclosure, or otherwise), except in the case of a material default by Tenant under the Lease continuing after notice to Tenant and beyond any applicable notice and cure period, and otherwise in accordance with the Lease. Tenant shall not be subject to any pre-foreclosure remedies asserted under the Mortgage or related loan documents. Lender shall not name or join Tenant as a defendant in any exercise of Lender's rights and remedies arising upon a default under the Mortgage, unless applicable law requires Tenant to be made a party as a condition to proceeding against Landlord or prosecuting such rights and remedies. In the latter case, Lender may join Tenant as a defendant in the action only for such purpose and not to terminate the Lease or otherwise adversely affect Tenant's rights under the Lease or this Agreement.

If Lender succeeds to the interest of Landlord under the Lease, Tenant shall have the same rights and remedies against Lender for any default under the Lease, but Lender shall not be:

(a)     liable for any act or omission of any prior landlord (including Landlord) under the Lease, except for non-monetary defaults of a continuing nature of which Lender has received notice, and latent or patent defects in construction to the same extent that any prior landlord would be liable, but nothing herein shall be construed to limit Lender's maintenance and repair obligations in its capacity as landlord under the Lease from and after the date Lender takes title to the Premises, whether or not the need for such repairs or maintenance accrued before or after such date;

(b)     subject to any off-sets or abatements against rent that Tenant may have against any prior landlord (including Landlord) under the Lease, except (1) for those which, as of the date of foreclosure, were already commenced or notice of their commencement was sent; (2) for the exercise of rights set forth in the Lease; and (3) for those relating to continuing defaults identified in Subsection (a) above;

(c)     bound by any Fixed Minimum Rent that Tenant might have paid for more than the current month to any prior landlord (including Landlord), except as expressly required under the Lease or actually received by Lender;

(d)     bound by any payment of rents, additional rents or other sums which Tenant may have paid more than one month in advance to Landlord or any prior landlord unless (1) such sums are actually received by Lender or (2) such prepayment was approved by Lender; and

(e)     bound by any amendment or modification to the Lease that shortens the term of the Lease or reduces the rent owed thereunder without the prior consent of Lender, and if Lender does not respond to such request within fifteen (15) days, then consent shall be deemed given by Lender; Landlord is responsible for securing all consents required by Lender.

In the event of any casualty or condemnation (eminent domain), the insurance proceeds or the condemnation award, as the case may be, shall be applied as required by the Lease.

Except as provided herein, this Agreement does not constitute a waiver by Lender of any of its rights under the Mortgage or related documents, and the Mortgage and any related documents remain in full force and effect and shall be complied with in all respects by Landlord.

No modification, amendment, waiver or release of any provision of this Agreement or of any right, obligation, claim or cause of action arising hereunder shall be valid or effective unless in writing and signed by the parties.

Nothing herein shall amend, waive or rescind any provision or condition of the Lease, or relieve Landlord from any of its obligations under the Lease.

Tenant shall provide a courtesy copy concurrently to Lender of any notice of default (or breach) from Tenant to Landlord that would allow Tenant to terminate the Lease. Lender shall have the same time allowed to Landlord, after Landlord's receipt of notice, to cure the default giving rise to the termination. The opportunity to cure granted to Lender shall be available to Lender only to the extent such opportunity to cure is available to Landlord under the Lease, and such cure period afforded to Lender shall run concurrently with the cure period available to Landlord. Notwithstanding the foregoing, Lender shall have no obligation to cure any default by Landlord except if Lender succeeds to title of the property.

Any notices from one party to the other must be in writing and sent via courier (e.g., UPS, Federal Express) or by certified U.S. mail to the following addresses:

| | |
|---|---|
| if to Tenant: | Jo-Ann Stores, LLC, Store #2566<br>Attn: National Director, Real Estate<br>5555 Darrow Road<br>Hudson, OH 44236 |
| With a copy to: | Jo-Ann Stores, LLC, Store #2566<br>Attn: Legal Counsel<br>5555 Darrow Road<br>Hudson, OH 44236 |
| if to Lender: | [LENDER] |
| with a copy: | _____ |

Landlord represents and warrants to Tenant that all prior mortgages and deeds of trust encumbering the Premises demised under the Lease have been satisfied or shall be satisfied with the proceeds of the Mortgage.

This Agreement inures to and binds the successors and assigns of the respective parties.

This Agreement shall not be effective against Tenant unless and until Tenant has received an original of this Agreement signed by all parties.

This Agreement shall be deemed to be a contract entered into under the laws of [State] and shall in

all respects be governed, construed, applied and enforced in accordance with the laws of [State].

This Agreement may be signed in multiple counterparts, each of which shall constitute an original and all of which taken together constitute one and same agreement.

[The remainder of this page is intentionally left blank]

Each party's duly authorized representative has signed this Agreement as of the date written above.

LENDER:
**[LENDER]**

By:_____

Print Name:_____

Title:_____


LANDLORD:
**[LANDLORD]**

By:_____

Print Name:_____

Title:_____


TENANT:
**Jo-Ann Stores, LLC**

By:_____
    Ann Aber
    Senior Vice President,
    General Counsel & Secretary


*[Notary Signatures Follow on Next Page]*

**Lender's Acknowledgment**

STATE OF _____ )
           ) SS
COUNTY OF _____ )

    BEFORE ME, a Notary Public in and for said County and State, personally appeared _____, a[n] _____, by _____, its _____, who acknowledged that he/she did sign the foregoing instrument on behalf of said corporation and that the same is his/her free act and deed personally and as such officer.

    IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at _____, _____, this _____ day of _____, 20__.

            _____
             NOTARY PUBLIC


**Landlord's Acknowledgment**

STATE OF _____ )
           ) SS
COUNTY OF _____ )

    BEFORE ME, a Notary Public in and for said County and State, personally appeared _____, a[n] _____, by _____, its _____, who acknowledged that he/she did sign the foregoing instrument on behalf of said corporation and that the same is his/her free act and deed personally and as such officer.

    IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at _____, _____, this _____ day of _____, 20__.

            _____
             NOTARY PUBLIC

**Jo-Ann's Acknowledgment**

STATE OF OHIO                          )
                                       ) SS
COUNTY OF SUMMIT                       )

     BEFORE ME, a Notary Public in and for said County and State, personally appeared **Jo-Ann Stores, LLC**, an Ohio limited liability company, by Ann Aber, its Senior Vice President, General Counsel & Secretary, who acknowledged before me that she did sign the foregoing instrument on behalf of said limited liability company and that the same is her free act and deed personally and as such officers.

     IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at Hudson, Ohio, this _____ day of _____, 20__.


_____
NOTARY PUBLIC


*[Notary Page to SNDA dated _____, 20__]*

Exhibit G, Page 7

## EXHIBIT A

### Legal Description of Shopping Center

Exhibit H

## Form of Estoppel Certificate

Shopping Center:

Landlord:

Tenant:                Jo-Ann Stores, LLC, an Ohio limited liability company

Lease:                 Lease by and between Landlord and Tenant dated _____ ___, 20__,
                       as modified by      (collectively, the "Lease")

Tenant represents that, as of the date hereof:

1.  The Lease constitutes the entire written agreement between Tenant and Landlord and has not been modified or amended, except as indicated herein.

2.  The Lease is in full force and effect.  The term commenced on _____ and expires on _____.  [Tenant has _____ ( ) 5-year options to renew the term thereof.]  [Tenant has one 5-year option to renew remaining.]  [Tenant has no options to renew the term of the Lease.]

3.  Tenant has taken possession of the premises demised under the Lease (the "Premises") and is occupying the Premises.

4.  To the undersigned's actual knowledge, without inquiry or investigation, Landlord is not currently in default under the Lease, except as follows: _____, and Tenant reserves all rights and remedies with regard to the aforementioned issues [.] [; provided, however, that common area, tax and insurance reconciliation(s) have not been received from Landlord for the following years: [Insert Years]].  With regard to any and all common area, tax and insurance expenses, Tenant specifically reserves all rights and remedies with respect to any overpayments which may be discovered after the date of this Estoppel Certificate regardless of the year in which the overpayment occurred, including but not limited to, the right to seek reimbursement or offset for any overpayments.  [In addition, Tenant is auditing Landlord's common area, tax and insurance expenses; to date, there have been no findings, but the audit is still open, and Tenant reserves any and all rights and remedies with respect thereto.]

    Furthermore, Tenant has not inspected the physical condition of the Shopping Center, including the common areas, to verify that Landlord is in compliance with its obligations with respect thereto, and Tenant hereby reserves all rights regarding the same.

5.  The monthly Fixed Minimum Rent payable under the Lease is $[_____] and has not been prepaid by more than one month.  [Tenant is not paying fixed monthly rent.  Rather, Tenant is paying Substitute Rent, as defined in the Lease.  The monthly Substitute Rent varies each month according to store sales.  Substitute Rent has not been prepaid.]

6.  No security deposit has been made in connection with the Lease.

7.  Tenant does not have any option or preferential right to purchase all or any part of the Shopping Center.

8.  The address for notices to be sent to Tenant is as follows:

> Jo-Ann Stores, LLC, Store #2566
> Attn:  National Director, Real Estate
> 5555 Darrow Road
> Hudson, OH 44236
>
> with a copy to:
>
> Jo-Ann Stores, LLC, Store #2566
> Attn:  Legal Counsel
> 5555 Darrow Road
> Hudson, OH 44236

9.  Nothing contained herein shall: (a) amend, modify, waive or rescind any of the terms, conditions, covenants or obligations of the Lease; (b) waive or estop Tenant's right to declare a default based on facts of which Tenant does not have actual knowledge, without inquiry or investigation; (c) waive or estop Tenant's right to claim any offset, claim or counterclaim resulting from an audit of Landlord's business records or public records; (d) waive or estop any claims, defenses, rights or remedies of Tenant; or (e) relieve Landlord from any of its obligations under the Lease.

10. Tenant's statements exclude certification as to any matter that may be disclosed by audit, inspection, or examination of Landlord's records or public records relating to charges and monetary items under the Lease.

11. If there is any conflict between this certificate and the Lease, the Lease shall control.

12. Tenant acknowledges that you are relying upon this Estoppel Certificate and the accuracy of the information contained herein. Nevertheless, Tenant shall not be liable to any party for damages of any kind whatsoever (whether direct, indirect, special, consequential or any other type) resulting from any statement in this certificate.

13. The undersigned representative of Tenant is duly authorized to execute this instrument on behalf of _____.

Dated: _____, 20__


> JO-ANN STORES, LLC
>
> By: _____
>         Ann Aber
>         Senior Vice President,
>         General Counsel & Secretary