# EXHIBIT 5

October 23, 2006 Shopping Center Lease between Cotton Mill II, LLC, as Landlord, and Provo Craft and Novelty, Inc., as Tenant (the "Washington Lease")

**SHOPPING CENTER**

**LEASE**

between

**COTTON MILL II, LLC,**
**a Utah limited liability company**

**"Landlord"**

and

**PROVO CRAFT AND NOVELTY, INC.,**
**a Utah corporation**

**"Tenant"**

for Premises located at

**Cotton Mill II**
**Washington, Utah**

*October 23*, 2006

0126-0011 \ Cotton Mill II Roberts Crafts Lease v12

**SHOPPING CENTER
LEASE**

**Table of Contents**

| | | |
|---|---|---|
| Article 1 | BASIC LEASE PROVISIONS | 1 |
| Article 2 | TENANT IMPROVEMENTS/LEASE TERM | 2 |
| Article 3 | RENT AND OTHER CHARGES | 4 |
| Article 4 | COMMON AREAS AND OPERATIONAL EXPENSES | 5 |
| Article 5 | USE AND OPERATION | 9 |
| Article 6 | UTILITIES SERVICES | 11 |
| Article 7 | INDEMNITY AND INSURANCE | 12 |
| Article 8 | SIGNS | 14 |
| Article 9 | MAINTENANCE AND SANITATION | 16 |
| Article 10 | ALTERATIONS, REPAIRS AND LIENS | 17 |
| Article 11 | FIXTURES AND PERSONAL PROPERTY | 17 |
| Article 12 | TRANSFERS | 18 |
| Article 13 | DAMAGE OR DESTRUCTION | 19 |
| Article 14 | DEFAULTS; REMEDIES | 20 |
| Article 15 | QUIET POSSESSION | 23 |
| Article 16 | ATTORNEYS' FEES | 23 |
| Article 17 | EMINENT DOMAIN | 23 |
| Article 18 | MORTGAGE AND ATTORNMENT | 24 |
| Article 19 | SURRENDER OF PREMISES | 25 |
| Article 20 | HOLDING OVER | 25 |
| Article 21 | NOTICES | 25 |
| Article 22 | SALE OF PREMISES BY LANDLORD OR RE-LEASING | 26 |
| Article 23 | INTENTIONALLY DELETED | 26 |
| Article 24 | INTENTIONALLY DELETED | 26 |
| Article 25 | NO PERSONAL LIABILITY OF LANDLORD | 26 |
| Article 26 | LATE PAYMENT CHARGE | 26 |
| Article 27 | DISCONTINUANCE OF BUSINESS | 27 |
| Article 28 | DEFAULT BY LANDLORD | 27 |
| Article 29 | INTENTIONALLY DELETED | 27 |
| Article 30 | MISCELLANEOUS PROVISIONS | 27 |

i

## EXHIBITS

Exhibit "A"    -    Legal Description of Shopping Center

Exhibit "B"    -    Site Plan of Shopping Center

Exhibit "C"    -    Rules and Regulations

Exhibit "D"    -    Landlord's Work

Exhibit "E"    -    Sign Criteria

Exhibit "E-1"       Tenant's Building Signage

Exhibit "E-2"       Tenant's Pylon and Monument Signage

Exhibit "E-3"       Location of Tenant's Signage on Pylon and Monument Signs

Exhibit "F"    -    Exclusives and Use Restrictions

FOR AND IN CONSIDERATION of the rent and other charges hereinafter reserved and upon the covenants and conditions hereof, Landlord does hereby lease to Tenant the Premises in the Shopping Center as specified in the Basic Lease Provisions below. The site plan attached hereto and made a part hereof as Exhibit "B" depicts the Shopping Center and the approximate location of the Premises. Tenant acknowledges that Exhibit "B" is only a preliminary site plan for leasing purposes only, and Landlord reserves the right to make changes from time to time in lease lines as well as the general leasing plan and Common Areas as shown on Exhibit "B" so long as such changes do not materially and adversely change the size or visibility of, or the access to, the Premises.

### ARTICLE 1
### BASIC LEASE PROVISIONS

| | | |
|---|---|---|
| 1. | **Shopping Center:** | The real property described on Exhibit "A" attached hereto and depicted on Exhibit "B" attached hereto. |
| 2. | **Developer Tract:** | The term "Developer Tract" means the property described as the "Developer Tract" in the REA. |
| 3. | **Outparcels:** | The term "Outparcels" means the property described as the "Outparcels" in the REA. |
| 4. | **Kohl's Tract:** | The term "Kohl's Tract" means the property described as the "Kohl's Tract" in the REA. |
| 5. | **Landlord:** | Cotton Mill II, LLC, a Utah limited liability company |
| 6. | **Tenant:** | Provo Craft and Novelty, Inc., a Utah corporation |
| 7. | **Tenant's Trade Name:** | Robert's Crafts |
| 8. | **Landlord's address for notice purposes:** | Cotton Mill II, LLC<br>c/o Forum Capital, L.C.<br>4800 North Scottsdale Road, Suite 1200<br>Scottsdale, Arizona 85251<br>Attention: R. Paul Barker<br>Fax: 480-425-4650<br><br>with a copy to:<br><br>R. Michael Valenzuela<br>Valenzuela & Broadfoot PLC<br>2398 East Camelback Road, Suite 760<br>Phoenix, Arizona 85016<br>Fax: 602-474-5755 |
| 9. | **Tenant's address for notice purposes:** | Provo Craft and Novelty, Inc.<br>151 East 3450 North<br>Spanish Fork, Utah 84660<br>Attention: Karl Larsen<br>Fax: 801-794-9004 |
| 10. | **Floor Area of Premises:** | Approximately 23,500 rentable square feet. |

11.  **Initial Term:**                    Ten (10) years (see Article 2).

12.  **Renewal Terms:**              Four (4) consecutive five (5) year Renewal Terms (see Article 2).

13.  **Minimum Annual Rent:** (see Article 3)

| Applicable Portion of Term | Minimum Annual Rent Per Square Foot of Floor Area | Minimum Annual Rent | Monthly Payment |
|---|---|---|---|
| **Initial Term** | | | |
| Months 1 – 60 | $12.25 | $287,875.00 | $23,989.58 |
| Months 61 – 120 | $13.45 | $316,075.00 | $26,339.58 |
| **Renewal Terms** | | | |
| Months 121 – 180 | $14.77 | $347,095.00 | $28,924.58 |
| Months 181 – 240 | $16.22 | $381,170.00 | $31,764.17 |
| Months 241 – 300 | $17.82 | $418,770.00 | $34,897.50 |
| Months 301 – 360 | $19.58 | $460,130.00 | $38,344.17 |

14.  **Security Deposit:**            None

15.  **Permitted Use:**               Subject to the restrictions set forth on Exhibit "F", Tenant may use the Premises for the operation of a retail "craft store", which sells arts and crafts, art supplies, craft supplies, picture frames and/or picture framing services, artificial flowers and/or plants, artificial floral and/or plant arrangements, and wedding and/or party goods.

16.  **Brokers:**                        Forum Capital, L.C. and NAI Utah Commercial.

17.  **Building:**                       The building in which the Premises are located.

18.  **REA:**                            The Reciprocal Easement Agreement executed by Landlord and Kohl's Department Stores, Inc., a Delaware corporation, that has been or will be recorded against the Shopping Center, a copy of which Landlord has provided to Tenant as of the date of this Lease.

19.  **State:**                          The State of Utah.

20.  **City:**                           The City of Washington, Utah.

The capitalized terms set forth above in Article 1, when used in this Lease, shall have the meanings given to them above in Article 1.

## ARTICLE 2
## TENANT IMPROVEMENTS/LEASE TERM

2.1  Delivery of Possession.  Landlord, at Landlord's sole cost and expense (which shall include Landlord's architecture and design costs in connection with Landlord's Work), shall construct the Premises substantially in accordance with the building specifications set forth on Exhibit "D" attached

2

hereto (the "Landlord's Work"), and Landlord shall deliver possession of the Premises to Tenant, along with written notice of such delivery, upon the substantial completion of Landlord's Work ("Substantial Completion"). Prior to Landlord's completion of its final architectural drawings for the Landlord's Work, Landlord shall obtain Tenant's written approval as to the proposed locations of support columns within the Premises as such locations relate to the Tenant's Work (as defined below), such Tenant approval not to be unreasonably withheld, conditioned or delayed. Landlord shall use its best efforts to complete Landlord's Work on or before July 15, 2007, however and notwithstanding the above, Substantial Completion of Landlord's Work is estimated to occur on or before August 15, 2007 (the "Outside Delivery Date"), provided this Lease is fully-executed by the parties hereto on or before October 23, 2006 (the "Proposed Lease Execution Date"). Landlord shall be required to give Tenant written notice no later than one hundred twenty (120) days prior to the Outside Delivery Date. Subject to the remaining provisions of this Section 2.1, and if Landlord's 120 day notice of the Outside Delivery Date (as required in this section above) is prior to August 15, 2007 (hereinafter referred to as the "Early Delivery Date" and upon Landlord giving written notice to Tenant of an Early Delivery Date (prior to August 15, 2007, and if Substantial Completion of the Landlord's Work fails to occur on the Early Delivery Date, then Landlord will credit to Tenant against Minimum Annual Rent $500.00 per day for each day of delay after the Early Delivery Date until Substantial Completion occurs. If Tenant receives any such rent credit, then the Initial Term will be extended by the number of days of penalty with such rent credit. The $500.00 per day penalty described above shall only apply until August 15, 2007—thereafter the penalty described below shall apply. Subject to the remaining provisions of this Section 2.1, if Substantial Completion of the Landlord's Work fails to occur on or before the Outside Delivery Date, then Landlord will credit to Tenant against Minimum Annual Rent and Tenant's proportionate share of Real Property Taxes, Property Insurance and Common Area Expenses (collectively, "Aggregate Rent") first becoming due under this Lease an amount equal to two day's Aggregate Rent for each day of delay after the Outside Delivery Date until Substantial Completion occurs. If Tenant receives any such rent credit, then the Initial Term will be extended by the number of days of Aggregate Rent payable with such rent credit. Notwithstanding anything to the contrary contained in this Section 2.1, the Outside Delivery Date will be extended day-for-day by reason of (i) delays in the completion of Landlord's Work caused by Tenant, (ii) events of Force Majeure (as defined below) and, (iii) delays in the full execution of this Lease by the parties hereto beyond the Proposed Lease Execution Date (e.g., if this Lease is not fully executed until October 31, 2006, then the Outside Delivery Date will be extended by thirty (30) days as a result thereof). Tenant's rights under this section will be Tenant's sole and exclusive rights and remedies against Landlord for any delay in achieving Substantial Completion of the Landlord's Work. It is the parties intent that Landlord's Work shall consist of the construction of the gray shell and other improvements to the Premises as expressly described on Exhibit "D" and that Tenant would not perform any work therein other than the installation of Tenant's trade fixtures, equipment, furniture and inventory (the "Tenant's Work"). Within fifteen (15) days following the Substantial Completion of Landlord's Work, Tenant shall commence the installation of Tenant's Work and thereafter Tenant shall diligently pursue Tenant's Work to completion. Upon Substantial Completion of the Landlord's Work, Landlord shall have the right to have Landlord's architect calculate the Floor Area of the Premises, and if the calculation shows a Floor Area that is different than the Floor Area set forth in Article 1, the Lease shall be amended so as to reflect the actual Floor Area and corresponding Minimum Annual Rent and other charges, amounts and calculations which are based on the actual Floor Area.

2.2 Commencement of Term. The "Preliminary Term" of this Lease shall begin on the earlier of (i) the date when Landlord delivers possession of the Premises to Tenant or (ii) the date when Tenant first enters the Premises for the purpose of performing any of the Tenant's Work, and shall continue until the Rent Commencement Date, and thereafter, the Initial Term will continue for the period of time set in Article 1; provided, however, that if the Initial Term ends on other than the last day of a calendar month, then the Initial Term shall be automatically extended to the last day of such calendar month. The "Term" of this Lease shall include the Preliminary Term, the Initial Term, and any properly exercised extensions or renewals thereof. Landlord agrees to deliver to Tenant, and Tenant agrees to accept from Landlord, possession of the Premises upon notice from Landlord that the Landlord's Work has been substantially completed.

2.3 <u>Rent Commencement Date</u>. The "Rent Commencement Date" shall occur on the date that is one hundred eighty (180) days after Landlord has delivered possession of the Premises to Tenant with Landlord's Work substantially completed.

2.4 <u>Tenant's Work/Opening for Business</u>. Tenant shall complete Tenant's Work and open for business within ninety (90) days following Landlord's delivery of possession of the Premises to Tenant with Landlord's Work substantially completed. During said period, Tenant, at its sole cost and expense, shall perform all of Tenant's Work and shall equip the Premises with all trade fixtures and personal property suitable or appropriate for the regular and normal operation of Tenant's business.

2.5 <u>Renewal Terms</u>. Provided no Event of Default is in existence and no event has occurred or state of facts exists which if continued uncured would, with the lapse of time or the delivery of notice, or both, constitute an Event of Default, Tenant shall have the option to extend the Initial Term for the number of Renewal Terms set forth in Article 1 (each a "Renewal Term"). Tenant's occupancy of the Premises during the Renewal Terms shall be governed by all of the terms, conditions, covenants and provisions of this Lease except that Tenant shall have no further option to extend the Initial Term after the expiration of all of the Renewal Terms. If Tenant desires to exercise its option to extend the Initial Term, it must give Landlord notice in writing of its intent to do so at least twelve (12) months prior to the expiration of the Initial Term. If Tenant desires to exercise its option to extend an additional Renewal Term after the first Renewal Term, Tenant must give Landlord notice in writing of its intent to do so at least six (6) months prior to the expiration of the then-current Renewal Term. Upon the commencement of a Renewal Term, all references herein to the Term shall mean the Preliminary Term and the Initial Term as extended by the applicable Renewal Term.

## ARTICLE 3
## RENT AND OTHER CHARGES

3.1 <u>Minimum Annual Rent</u>. Tenant agrees to pay to Landlord for the use and occupancy of the Premises, at the times and in the manner hereinafter provided, the Minimum Annual Rent specified in Article 1 above (also referred to herein sometimes as "rent"), as the same may be adjusted from time to time as provided therein and elsewhere in this Lease. Minimum Annual Rent shall be payable in advance in twelve (12) equal monthly installments beginning on the Rent Commencement Date and continuing on the first day of each calendar month thereafter, without recoupment, setoff, deduction or demand of any kind; provided however, if the Rent Commencement Date falls on a day other than the first day of a calendar month, then the Minimum Annual Rent for the first fractional month shall be prorated on the basis of a thirty (30) day month. All other payments required to be made under the terms of this Lease which require proration on a time basis shall be prorated on the same basis. Minimum Annual Rent for the Initial Term and the Renewal Terms will be as stated in Article 1.

3.2 <u>Definition of Real Property Taxes</u>. As used herein, the term "Real Property Taxes" shall include general real property and improvement taxes, and any form of assessment, re-assessment, license fee, license tax, business license tax, in lieu tax, levy, charge, penalty, or similar imposition, imposed by any authority having the direct power to tax, including, without limitation, any city, county, state or federal government, or any school, or any agency or other public body, as against any legal or equitable interest of Landlord in the Shopping Center, and all costs and expenses reasonably incurred by Landlord in protesting any or all of the foregoing.

3.3 <u>Tenant's Proportionate Share of Real Property Taxes</u>. Tenant's proportionate share of Real Property Taxes relative to buildings or improvements then constructed on the tax parcel within which the Premises is located (the "Tax Parcel") will be a fraction, the numerator of which is the Floor Area of the Premises and the denominator of which is the Floor Area of all buildings then constructed on the Tax Parcel. Each time the total Floor Area of all buildings constructed on or within the Tax Parcel increases or decreases after the date of this Lease or upon completion of the construction of all such buildings, Tenant's proportionate share of Real Property Taxes relative to buildings or improvements then

constructed on the Tax Parcel will be recalculated by dividing the Floor Area of the Premises by the Floor Area of all buildings then constructed on the Tax Parcel. Tenant's proportionate share of Real Property Taxes relative to the land making up the Tax Parcel, not including the Buildings or improvements constructed thereon, will be a fraction, the numerator of which is the Floor Area of the Premises and the denominator of which is the Floor Area of all buildings which are anticipated to be constructed on the Tax Parcel. As of the date of this Lease, Landlord's good faith estimate of the aggregate Floor Area of all buildings which are anticipated to be constructed on the Tax Parcel is 92,407 square feet; provided, however, that Landlord may adjust this estimate from time-to-time during the Term in Landlord's commercially reasonable discretion.

3.4 <u>Tenant's Proportionate Share of Property Insurance</u>. Tenant's proportionate share of the Property Insurance will be a fraction, the numerator of which is the Floor Area of the Premises and the denominator of which is the Floor Area of all buildings within the Shopping Center for which Landlord maintains such Property Insurance from time to time.

3.5 <u>Real Property Taxes and Property Insurance Payments</u>. Concurrently with each payment of Minimum Annual Rent, Tenant shall pay to Landlord, on account of Real Property Taxes and Property Insurance, such amounts as Landlord shall from time to time estimate to be Tenant's proportionate share thereof. Landlord shall deliver to Tenant at least once annually a statement setting forth the actual amounts incurred by Landlord for Real Property Taxes and Property Insurance, Tenant's proportionate share thereof, and the basis for computing the same, and if such actual amounts exceed Tenant's payments hereunder for the applicable year, Tenant shall pay the deficiency to Landlord within thirty (30) days after receipt of such statement. If payments made by Tenant for said year exceed such actual amounts, Tenant shall be entitled to a credit against the next such payment(s) of such costs and expenses coming due under this Article or to a refund if this Lease has expired.

3.6 <u>Rent Taxes</u>. Concurrently with each payment of Minimum Annual Rent, Tenant shall pay to Landlord any excise, transaction privilege, sales, occupancy, or similar tax (except income tax) now or hereafter levied or imposed upon Landlord on account of, attributed to or measured by rent or other charges payable by Tenant hereunder.

3.7 <u>Other Charges</u>. Tenant shall pay to Landlord when due, as additional rent, without recoupment, setoff, deduction or demand of any kind, all sums of money required to be paid pursuant to this Article and all other sums of money or charges required to be paid by Tenant under this Lease (herein sometimes called "other charges"). If such other charges are not paid at the time provided in this Lease, they shall nevertheless be collectible with the next installment of Minimum Annual Rent thereafter falling due, but nothing herein contained shall be deemed to suspend or delay the payment of any such other charges at the time the same become due and payable hereunder, or limit any other remedy of Landlord. If Tenant shall fail to pay, when the same is due and payable, any rent or other charge, such unpaid amounts shall bear interest at the rate of twelve percent (12%) per annum from the date due to the date of payment.

3.8 <u>Place of Payment</u>. All rent and other charges shall be paid by Tenant to Landlord at the first address specified for service of notices upon Landlord in Article 1 of this Lease, or at such other place as may from time to time be designated by Landlord in writing.

## ARTICLE 4
## COMMON AREAS AND OPERATIONAL EXPENSES

4.1 <u>Common Areas Defined</u>. The "Common Areas" shall consist of all areas and facilities in the Shopping Center which shall not be within the exterior walls of the premises of a tenant or occupant and which shall from time to time be available for the non-exclusive use of the tenants and occupants of the Shopping Center and their customers, licensees and invitees, including, without limitation, all parking areas, parking structures, driveways, sidewalks, walkways, malls, service corridors, loading platforms,

canopies, elevators, escalators, washrooms, lounges and shelters, if any. Landlord expressly reserves the right and privilege in its sole and unfettered discretion of determining the nature and extent of the Common Areas and whether portions thereof shall be surface, underground or multiple-deck, and of making such changes therein and thereto from time to time as in its opinion are deemed to be desirable and for the best interests of all persons using the Common Areas, including, without limitation, (1) the location, relocation, addition and/or removal of driveways, entrances, exits, parking spaces, patio areas, seating areas, outdoor dining areas, mall areas, building walkways and sidewalks; (2) the placement of kiosks, carts and advertising, entertainment, promotional and other displays and events; (3) the direction and flow of traffic; (4) the installation of prohibited areas and landscaped areas; and (5) the construction and/or removal of buildings, retail areas, decked or subsurface parking and other improvements and facilities thereof. Notwithstanding the foregoing, Landlord shall not materially and adversely change the access to, or the visibility of, the Premises without the prior written consent of Tenant, such consent not to be unreasonably withheld, conditioned or delayed; provided, however, that construction anywhere within the pad sites depicted on Exhibit "B" shall not be deemed to materially or adversely change the visibility of the Premises.

4.2 <u>Use of Common Areas</u>. To the extent permitted under the REA, Tenant and its employees, customers, licensees and invitees are, except as otherwise specifically provided in this Lease, privileged to use the Common Areas in common with other persons during the Term while such employees, customers, licensees and invitees are shopping or otherwise conducting permitted business in the Shopping Center.

4.3 <u>Common Area Expenses</u>. Landlord shall keep or cause to be kept the Common Areas of the Developer Tract in good order condition and repair and in a reasonably clean condition, and shall repair any damage to the facilities thereof. Except as provided in Section 4.4 below, all costs and expenses (including also, at Landlord's election, appropriate reserves) incurred by Landlord in connection with the Common Areas of the Developer Tract (collectively hereinafter "Common Area Expenses") shall be charged and prorated in the manner hereinafter set forth. Common Area Expenses shall include, but not be limited to, all sums expended or incurred in connection with such Common Areas for janitorial services; sweeping and parking lot cleaning; snow and ice removal; painting (including, but not limited to, the painting of exterior faces of exterior building walls); resurfacing; restriping; general maintenance and repairs and replacements of a non-capital nature, which shall include, without limitation, the maintenance, repair and non-capital replacement of sprinkler systems, sidewalks, curbs, parking areas, and shopping center signs and other identification signs, planting and landscaping, fountains, courts, stages and canopies (if any), fire protection systems, security alarm systems, lighting systems, storm drainage systems and any other utility systems, all costs and expenses associated with any maintenance agreement entered into by Landlord for the regular servicing and/or maintenance of any heating, ventilating and air conditioning ("HVAC") systems in the Shopping Center (other than any maintenance agreement for the servicing and/or maintenance of any HVAC systems serving the Premises, which shall be entered into by Tenant at Tenant's sole cost and expense pursuant to Section 9.1 below), and all other such tangible items from time to time associated with the Common Areas. Common Area Expenses shall also include, but are not limited to, lighting and other utilities; the cost of seasonal decorations; personnel to implement services deemed necessary by Landlord in carrying out its obligations under this Article, including, without limitation, the cost of security guards; personal property taxes and assessments on the improvements in such Common Areas as reasonably allocable by Landlord; rental paid for maintenance and operating machinery and equipment; compliance with all environmental, remedial and other laws, ordinances, rules, regulations, requirements, directions, guidelines and orders now or hereafter in effect from time to time except such as relate to Landlord's original construction of the Shopping Center or its construction obligations with respect thereto; public liability and property damage insurance; and common area or maintenance expenses incurred by Landlord pursuant to any recorded instruments encumbering the Developer Tract. Common Area Expenses will also include a management fee equal to fifteen percent (15%) of all other expenses included within Common Area Expenses for each year. Landlord may cause any or all of said services to be provided by an independent contractor or contractors. Should Landlord make available additional land for parking or other common area purposes, then Common Area Expenses

6

shall also include similar expenses incurred in connection with said additional land. Notwithstanding anything to the contrary contained in Article 9 hereof, Landlord may at its option arrange for the collection or removal of trash from the Developer Tract for and on behalf of any tenant or occupant. In the event such option is exercised, the cost thereof shall be included in, charged and prorated to said tenants and occupants as additional Common Area Expenses; provided, however, that if a tenant of the Shopping Center shall operate a restaurant or there shall be other tenant(s) for whom the cost of collection and removal of trash is significantly in excess of the costs thereof of the balance of the tenants in the Shopping Center, then such excess costs shall be allocated to such restaurant or other tenant.

4.4 <u>Structural Component and Roof Maintenance and Repair</u>. Subject to the following sentence, Landlord, at Landlord's sole cost and expense, shall maintain and repair, or cause to be maintained and repaired, exterior walls, structural components and roofs within the Developer Tract; provided, however, that exterior walls shall not include store fronts, glass, window frames or cases, doors or door frames, all of which shall be maintained by Tenant pursuant to Section 9.1 below. Notwithstanding the foregoing, if Tenant modifies any structural components of the Premises or adds additional structural components thereto, then Tenant shall maintain and repair all such structural components at Tenant's sole cost and expense.

4.5 <u>Proportionate Share</u>. Tenant's proportionate share of Common Area Expenses shall be equal to the product of Common Area Expenses multiplied by a fraction, the numerator of which is the Floor Area of the Premises and the denominator of which is the Floor Area of all buildings within the Developer Tract from time to time for which Landlord is maintaining the Common Areas; provided, however, that Tenant's proportionate share of Common Area Expenses for the first twelve (12) months of the Term following the Rent Commencement Date will not exceed the product of $1.50 multiplied by the Floor Area of the Premises (or $35,250.00 in the aggregate for such 12-month period assuming the Premises consists of 23,500 rentable square feet of Floor Area). From and after the expiration of said twelve (12) month period, no such cap shall apply. Tenant shall pay to Landlord Tenant's proportionate share of such Common Area Expenses in the following manner:

(a) As of the Rent Commencement Date, but subject to adjustment as hereinafter set forth in this subsection (a), Tenant shall pay on the first day of each calendar month of the Term an amount equal to one-twelfth of its proportionate share of Common Area Expenses, as reasonably estimated by Landlord. The foregoing estimate may be adjusted by Landlord periodically on the basis of Landlord's experience and reasonably anticipated costs.

(b) Within one hundred twenty (120) days after the end of each year, Landlord shall furnish Tenant a statement covering the year just expired, certified as correct by an authorized representative of Landlord, showing the total Common Area Expenses for such year, the amount of Tenant's proportionate share of such Common Area Expenses for such year and the payments made by Tenant during such year as set forth in subsection (a) above. If Tenant's proportionate share of actual Common Area Expenses exceeds the payments made by Tenant, Tenant shall pay Landlord the deficiency within thirty (30) days after receipt of such statement. If the payments made by Tenant exceed Tenant's proportionate share of actual Common Area Expenses, Tenant shall be entitled to a credit against the next such payment(s) coming due under subsection (a) above or to a refund if this Lease has expired, which refund shall be paid at the time of delivery of Landlord's statement.

(c) Notwithstanding the foregoing, certain components of Common Area Expenses may be allocated solely to the tenants and occupants that receive the benefit of the applicable component of Common Area Expenses, such as, for example, the maintenance and repair of the Building, trash removal and shared utilities, in which event Tenant's proportionate share of such amounts will be determined by multiplying such amounts by a fraction, the numerator of which is the Floor Area of the Premises and the denominator of which is the Floor Area of the spaces of all tenants and occupants that receive the benefit of the applicable component of Common Area

7

Expenses. Such proration shall be subject to the same exception as contained in the last clause of Section 4.3.

4.6 <u>Floor Area</u>. The term "Floor Area" shall mean the floor area of all buildings available for the exclusive use and occupancy by a tenant or occupant measured from the exterior surface of exterior walls (and from the exteriors thereof, in the case of openings) and from the center of walls dividing any premises from other premises. Floor Area shall not include the second level of any multilevel stock areas, truck tunnels, docks, areas for truck tunnels, areas for docks, areas for truck loading and unloading (to the extent such facilities lie outside exterior building lines), outdoor dining areas, or any utility and/or mechanical equipment areas. No deduction or exclusion shall be made from Floor Area by reason of columns, stairs, elevators, escalators, or other interior construction or equipment within the Premises. The foregoing provisions of this Section 4.6 to the contrary notwithstanding, for purposes of computing the total Floor Area of the Developer Tract, the Floor Area of all pads and outparcels shall be excluded therefrom to the extent the owners or occupants thereof are responsible for the costs and expenses allocable to such pads or outparcels.

4.7 <u>Motor Vehicles/Obstructions</u>. Landlord shall not be liable for any damage to motor vehicles of customers or employees or for loss of property from within such motor vehicles. It shall be the duty of Tenant to keep all parking areas free and clear of any obstructions created or permitted by Tenant or resulting from Tenant's operation, and to permit the use of any of said areas only for normal parking and ingress and egress by the said customers, patrons and service suppliers to and from the building occupied by Tenant and the other tenants of Landlord. Tenant shall keep the sidewalks abutting the Premises clear and shall not permit any business or display of merchandise to be operated or maintained in front of the Premises; provided, however, that Tenant shall be entitled to conduct periodic sidewalk sales or sales or displays of seasonal merchandise on the sidewalks abutting the Premises so long as such sales and/or displays are not prohibited under the REA and so long as Tenant secures any and all approvals required under the REA prior to conducting any such sales and/or displays. Except as expressly set forth in this Lease to the contrary, Tenant shall not permit any form of advertising or promotional item outside of the Premises or in window areas or on the roof, including but not limited to signs, banners, decorations, tents, radio remotes, music, food vendors, contests, inflatables, or balloons; provided, however, that Tenant shall be entitled to decorate or otherwise post professionally designed and prepared signs and banners on the interior of the windows and doors of the Premises. Notwithstanding the foregoing, in no event shall Tenant be permitted to paint such signs or banners on the windows or doors of the Premises, and, if Landlord receives notification from another party to, or benefited by, the REA that such signs and banners violate the REA, Landlord shall so notify Tenant and Tenant will then immediately remove such violating signs and banners from the windows and doors of the Premises.

4.8 <u>Rules and Regulations</u>. Landlord shall have the right to establish and, from time to time, to change, alter and amend such reasonable rules and regulations (including the exclusion of employees parking therefrom) as may be deemed necessary or advisable for the proper and efficient operation and maintenance of said Common Areas. The rules and regulations herein provided for may include, without limitation, the hours during which the Common Areas shall be open for use; provided, however, that the hours the Common Areas are open for use shall not be less than the minimum hours of operation set forth in Section 5.4 below. Tenant agrees to conform to and abide by all such rules and regulations in its use and the use of its customers and patrons with respect to said automobile parking areas; provided, however, that all such rules and regulations and such types of operation or validation of parking checks and other matters affecting the customers and patrons of Tenant shall apply equally and without discrimination to all persons entitled to the use of said automobile parking areas. Subject to the foregoing provision of this Section 4.8, the initial rules and regulations with which Tenant agrees to comply are attached hereto and made a part hereof as <u>Exhibit "C"</u>.

4.9 <u>Employee Parking</u>. Landlord at all times shall have the right to designate the particular parking area to be used by any or all of Tenant's employees and any such designation may be changed from time to time; provided, however, that Landlord shall provide that the Tenant's employee parking for

8

after dark and evening hour parking shall be located reasonably close to, and, if reasonably possible, in front of, the entrance to the Premises. Tenant shall cause its employees to park their cars only in those portions of the parking area, if any, designated for that purpose by Landlord. If Tenant parks its cars in parking areas designated for patrons, then Landlord may charge Tenant Ten Dollars ($10.00) per day for each day or partial day per car parked in such areas. Landlord may also charge Tenant's employees, but not Tenant, for each day such employee shall park in the parking areas designated for patrons. All amounts due under the provisions of this paragraph shall be payable by Tenant within ten (10) days after demand therefor. Tenant hereby authorizes Landlord to tow away from the Shopping Center any car or cars belonging to Tenant or its employees parked in violation of this paragraph, and/or to attach violation stickers or notices to such cars.

## ARTICLE 5
## USE AND OPERATION

5.1 <u>Tenant's Use and Trade Name</u>. Subject to the restrictions set forth on <u>Exhibit "F"</u> attached hereto, Tenant shall use the Premises for the Permitted Use set forth in Article 1, and shall use the Premises under the trade name specified in Article 1. Tenant shall not use nor permit the Premises to be used for any other purpose or purposes or under any other trade name whatsoever without the prior written consent of Landlord, which consent shall not be unreasonably withheld. Notwithstanding the foregoing, Tenant will not permit the Premises to be used for any use or purpose which is restricted or prohibited by any instrument which was recorded prior to the date of this Lease. Tenant further covenants and agrees that it will not use, nor suffer or permit any person or persons to use, the Premises or any part thereof for any use or purpose in violation of the laws, ordinances, regulations or requirements which are now or hereafter in effect from time to time of the United States of America, the State or the local, municipal or county governing body or other lawful authorities. This Lease is, and shall at all times remain, subject and subordinate to the REA. Notwithstanding the foregoing, Landlord, to Landlord's knowledge, is unaware of any restrictions or prohibitions contained in any zoning or building ordinances applicable to the Shopping Center, the leases of any other tenants in the Shopping Center or any conditions, covenants and restrictions (including the REA) encumbering the Shopping Center that would prevent Tenant from using the Premises for the Permitted Use set forth in Article 1.

5.2 <u>Insurance Use Restrictions</u>. Tenant agrees not to conduct and operate its business in any manner which could jeopardize or increase the rate of any fire or other insurance or so that the same shall constitute a nuisance to or interfere with the other property of Landlord or its business or the property or business of other tenants or occupants of the Shopping Center. Tenant may not display or sell merchandise, or allow carts, portable signs, devices or any other objects to be stored or to remain outside the defined exterior walls or roof and permanent doorways of the Premises; provided, however, that Tenant shall be entitled to conduct periodic sidewalk sales or the display or sale of seasonal merchandise on the sidewalks abutting the Premises, so long as such sales and/or displays are not prohibited under the REA and so long as Tenant secures any and all approvals required under the REA prior to conducting any such sales and/or displays.

5.3 <u>Deliveries</u>. Tenant shall use commercially reasonable efforts to complete or cause to be completed all deliveries, loading, unloading and services to the Premises prior to 10:00 a.m. of each day, and to prevent delivery trucks or other vehicles servicing the Premises from parking or standing in service areas for undue periods of time. All deliveries, loading, unloading, and customer pick-ups shall be made through the rear entrance of the Premises. So long as not prohibited under any of the terms and provisions of the REA, from September 1 through December 31 of each calendar year during the Term, Tenant shall be permitted to keep and maintain up to two (2) storage containers within that certain area of the Developer Tract designated as "Temporary Storage Container Area" on <u>Exhibit "B"</u>. If Landlord notifies Tenant that such storage containers violate the REA, then Tenant will immediately remove such storage containers from the Shopping Center. Other than such storage containers, Tenant shall not permit or cause to be permitted to erect, place, maintain or otherwise have in any manner or form (whether on a temporary or permanent basis) any sheds, trailers or other structures or vehicles for storage

9

or other purposes anywhere on, about or within the Shopping Center. Tenant shall be solely responsible for any and all fines, duties and liens whatsoever imposed upon Landlord or the Shopping Center by any governmental body or agency having jurisdiction thereover pertaining to any such structure or vehicle which is in violation of any ordinance, rule, law, directive, regulation, requirement, guideline or order of such body or agency. Landlord reserves the right to further reasonably regulate the activities of Tenant in regard to deliveries and servicing of the Premises, and Tenant agrees to abide by such further reasonable regulations of Landlord.

5.4 <u>Operating Days and Hours</u>. Tenant agrees to operate the Premises throughout the Term during such hours as Tenant reasonably establishes (which hours shall in all events include, at a minimum, 9:00 a.m. through 9:00 p.m., Mon.-Sat.; provided, however, that Tenant reserves the right to close on Tenant's selected holidays and to reduce the hours of operation on such holidays or on the days just prior to such holidays. Tenant shall open the Premises for business to the public, fully stocked and staffed, for at least one (1) day on or before the date that is ninety (90) days following Landlord's delivery of possession of the Premises to Tenant with Landlord's Work substantially completed as otherwise required under Article 27 below. Tenant further agrees to fully utilize the Premises for its business at this location and to keep and maintain upon the Premises competent personnel and an adequate stock of merchandise and trade fixtures to service and supply the usual and ordinary demands and requirements of its customers. In the event Tenant fails to open as herein required, in addition to all other rights and remedies available to Landlord, whether hereunder or at law or in equity, and notwithstanding anything in this Lease to the contrary, the Minimum Annual Rent due hereunder shall be increased to an amount equal to 125% of the then Minimum Annual Rent on a per diem basis for each day the Premises are not so open. Tenant shall keep its Premises in a neat, clean and orderly condition and its display windows well lighted from dusk until such reasonable time as Tenant shall reasonably establish unless prevented by causes beyond Tenant's reasonable control.

5.5 <u>Other Use Restrictions</u>. Tenant shall not permit the Premises or the Common Areas to be used for any use or purpose specified in <u>Exhibit "F"</u> attached hereto.

5.6 <u>Hazardous Materials</u>. Tenant covenants and agrees not to use, generate, release, manage, treat, manufacture, store, or dispose of, on, under or about, or transport to or from (any of the foregoing hereinafter a "Use") the Premises any Hazardous Materials (other than De Minimis Amounts). In the event Tenant breaches the foregoing covenant, in addition to all other rights and remedies Landlord may have whether hereunder or at law or in equity, Landlord at its option may either (a) require Tenant to immediately upon demand therefor remove, abate and/or otherwise remedy all such Hazardous Materials using licensed contractors approved by Landlord or (b) Landlord may without further notice to Tenant perform or cause to be performed such removal, abatement and/or remedial work for and on behalf of Tenant. Tenant further covenants and agrees to give Landlord immediate notice of any Use of Hazardous Materials (other than De Minimis Amounts) on, under or about the Premises (and to immediately deliver to Landlord copies of any and all notices from anyone of violations or alleged violations of Hazardous Materials on, under or about the Premises) and to pay all costs and expenses associated with enforcement, abatement, removal, remedial or other governmental or regulatory actions, agreements or orders threatened, instituted or completed pursuant to any Hazardous Materials Laws, and all audits, tests, investigations, cleanup, reports, permits, licenses, approvals and other such items incurred in connection with any efforts to complete, satisfy or resolve any matters, issues or concerns, whether governmental or otherwise, arising out of or in any way related to the Use of Hazardous Materials in any amount by Tenant or its employees, agents, invitees, subtenants, licensees, assignees or contractors, other than De Minimis Amounts. In addition, Tenant further covenants and agrees to execute and deliver to Landlord, within ten (10) days following Landlord's request therefor, such certificates, affidavits, representations, and the like, as Landlord may request from time to time as to Tenant's best knowledge and belief concerning to the Use of Hazardous Materials on, under or about the Premises. For purposes of this Lease (1) the term "Hazardous Materials" shall include, but not be limited to, asbestos, urea formaldehyde, polychlorinated biphenyls, oil, petroleum products, pesticides, radioactive materials, hazardous wastes, toxic substances and any other related or dangerous, toxic or hazardous chemical,

10

material or substance in any form or combination of forms (i.e., solid, liquid, gaseous and/or otherwise) regulated or defined as hazardous or as a pollutant or contaminant in, or the Use of or exposure to which is prohibited, limited, governed or regulated by, any Hazardous Materials Laws; (2) the term "De Minimis Amounts" shall mean, with respect to any given level of Hazardous Materials, that such level or quantity of Hazardous Materials in any form or combination of forms and as used, stored or managed or transported by Tenant (i) does not constitute a violation of any Hazardous Materials Laws and (ii) is customarily employed in, or associated with, similar retail projects in the county in which the Premises are located; and (3) the term "Hazardous Materials Laws" shall mean any federal, state, county, municipal, local or other statute, law, ordinance or regulation now or hereafter enacted which may relate to or deal with the protection of human health or the environment, including, but not limited to, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. Section 9601, et seq; the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq; the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq; the Federal Water Pollution Control Act, 33 U.S.C. Section 1251, et seq; the Toxic Substances Control Act of 1976, 15 U.S.C. Section 2601, et seq; and any rules, regulations or guidelines adopted or promulgated pursuant to any of the foregoing as they may be amended or replaced from time to time. Notwithstanding anything to the contrary contained in this Lease, in the event any of the equipment serving the Premises such as, but not limited to, refrigerators, air conditioning systems, and supplemental heating, ventilating and air conditioning systems utilize refrigerants containing chlorofluorocarbons (sometimes commonly referred to as "CFC's") except such equipment as shall have been installed by Landlord or its contractors in the construction of the Premises, the Building or the Shopping Center, Landlord, in its sole discretion, shall have the option to require Tenant, at its sole cost and expense, to remove such equipment at the expiration or earlier termination of the Lease Term.

Tenant releases and will indemnify, protect, defend (with counsel reasonably acceptable to Landlord) and hold harmless the Landlord, its property manager, and their respective affiliates and officers, directors, partners, shareholders, members and employees, from and against any and all claims, actions, demands, liabilities, damages, costs, penalties, forfeitures, losses and expenses including, without limitation, reasonable attorneys' fees (collectively, "Claims"), arising or resulting, in whole or in part, directly or indirectly, from the presence, treatment, storage, transportation, disposal, release or management of Hazardous Materials in, on, under, about or from the Shopping Center (including water tables and atmosphere), but only to the extent arising from Tenant's use or occupancy of the Premises or Shopping Center and only to the extent that Tenant's use, storage, transportation, disposal, release or management of such Hazardous Materials are in violation of Hazardous Materials Laws. Tenant's obligations under this paragraph include, without limitation and whether foreseeable or unforeseeable, (a) the costs of any required or necessary repair, compliance, investigations, clean-up, monitoring, response, detoxification or decontamination of the Shopping Center; (b) the costs of implementing any closure, remediation or other required action in connection therewith; (c) the value of any loss of use and any diminution in value of the Shopping Center and adjacent and nearby properties, including groundwater; and (d) consultants' fees, experts' fees and response costs. The obligations of Tenant under this paragraph shall survive the expiration or earlier termination of this Lease.

**ARTICLE 6**
**UTILITIES SERVICES**

6.1 Utility Installation. Landlord agrees that it will cause to be made available to Tenant upon the Premises facilities for the delivery to and distribution within the Premises of water, electricity, and telephone service, and for the removal of sewage from the Premises. Tenant agrees to use such utilities with respect to the Premises.

6.2 Payment of Utility Cost. Tenant agrees, at its own expense, to pay for all water, electricity, gas, telephone, and all other utilities used by Tenant on the Premises from and after the commencement of any alterations or installations to the Premises made by Tenant and continuing during the Term, and Tenant agrees to provide, at Tenant's sole cost and expense, any check meters of the type required by

11

Landlord. In the event that any utilities are furnished by Landlord, whether sub-metered or otherwise, then and in that event Tenant shall pay Landlord for such utilities, but the rates charged to Tenant by Landlord shall not exceed those of the local public utility company if its services were furnished directly to Tenant.

6.3 No Liability. Landlord shall not be liable in damages or otherwise for any failure or interruption of any utility service being furnished to the Premises, unless the same shall have been caused by Landlord's negligence and Landlord shall have been unable to cure such failure or interruption within 48 hours following notice from Tenant, in which event Tenant as its exclusive remedy for such failure or interruption will be entitled to an abatement of Minimum Annual Rent for the number of days Tenant is prohibited from operating or conducting its business and is closed to the public. In no event shall any such failure or interruption entitle Tenant to terminate this Lease or, except to the extent of any abatement permitted pursuant to this Section 6.3, withhold any rent or any other sums due pursuant to the terms of this Lease.

### ARTICLE 7
### INDEMNITY AND INSURANCE

7.1 Indemnification and Waiver. Tenant agrees that Landlord shall not be liable for any damage or liability of any kind or for any injury to or death of persons or damage to property of Tenant or any other person during the Term, from any cause whatsoever, by reason of the use, occupancy or enjoyment of the Premises or the operation of business therein or therefrom by Tenant or any person thereon or holding under Tenant. Tenant hereby agrees to defend, indemnify and save harmless Landlord from all such liability whatsoever including, without limitation, liability on account of any real or claimed damage or injury and from all liens, Claims and demands arising out of (i) the use of the Premises and its facilities, (ii) any repairs or alterations which Tenant may make upon said Premises, and (iii) any failure of Tenant in any respect to comply with and perform all of the requirements and provisions of this Lease. This obligation to indemnify as herein provided shall survive the expiration or earlier termination of this Lease for acts or omissions occurring prior to such expiration or earlier termination, and shall additionally include the reasonable costs of legal counsel and investigation costs and all other reasonable costs, expenses and liabilities incurred in connection with any and all claims of damage.

7.2 Tenant's Insurance Obligation. Tenant shall procure and maintain during the Term, at Tenant's sole cost, the following types of insurance, in the amounts specified and in the form hereinafter provided:

(a) Commercial General Liability Insurance: Commercial general liability insurance with a combined single limit of not less than Three Million Dollars ($3,000,000.00) in the aggregate and per occurrence, insuring against any and all liability of the insured with respect to the Premises or arising out of the maintenance, use or occupancy thereof. If the permitted uses permit the sale or service of alcoholic beverages on the Premises, then during any period that Tenant is actually serving or offering the same for sale Tenant shall either obtain a liquor liability policy or liquor liability endorsement to said commercial general liability policy insuring such liability in an amount not less than Three Million Dollars ($3,000,000.00) per occurrence. All insurance shall specifically insure the performance by Tenant of the indemnity agreement contained in Section 7.1.

(b) Plate Glass: Insurance covering all plate glass on the Premises; provided, that Tenant may elect to self insure for such plate glass.

(c) Heating and Cooling Equipment: Boiler and machinery insurance on all heating and cooling equipment, boilers and other pressure vessels and systems, whether fired or unfired, located in or serving the Premises.

(d) Tenant Improvements: Insurance covering all of Tenant's Work, Tenant's leasehold improvements, alterations or additions permitted under Article 10 hereof, and Tenant's trade

fixtures, merchandise and personal property from time to time in, on or upon the Premises, in an amount not less than their full replacement cost, without depreciation, from time to time during the Term, providing protection against any peril included within the classification "Special Form (All Risk) Coverage". All policy proceeds shall be used for the repair or replacement of the property damaged or destroyed unless this Lease shall cease and terminate under the provisions of Article 13 hereof, in which event of termination such proceeds attributable to the Tenant's Work and leasehold improvements (and to all other items of property becoming or to become the property of Landlord upon such termination), but not the proceeds attributable to Tenant's trade fixtures, merchandise and other personal property, shall be paid and disbursed directly to Landlord.

     (e) Workers' Compensation: Statutory workers' compensation insurance required by any employee benefit acts or other similar statutes applicable where the work is to be performed as will protect Tenant from any and all liability under the aforementioned acts and statutes with limits as are required by Utah state laws.

7.3 Policy Requirements.  All policies of insurance provided for herein shall be issued by insurance companies with a general policyholder's rating of not less than A+ and a financial rating of not less than Class VIII as rated in the most current available Best's Key Rating Guide for insurance companies or by such insurer as shall otherwise be satisfactory to Landlord and qualified to do business in the State. All such policies of Tenant shall be issued in the name of Tenant, with Landlord, the fee owner of the Premises if other than Landlord, Landlord's managing agent and first mortgagee or beneficiary named as additional insureds, which policies shall be for the mutual and joint benefit and protection of Tenant, Landlord, the fee owner of the Premises if other than Landlord, and Landlord's managing agent and first mortgagee or beneficiary. Certificates of such insurance will be delivered to Landlord within ten (10) days prior to delivery of possession of the Premises to Tenant and thereafter at least thirty (30) days prior to the expiration of the term of each such policy. The above commercial general liability insurance policy shall contain a standard Insurance Services Office "Severability of Interests" clause allowing Landlord as an additional insured to recover under said policy for any loss occasioned to it or its servants, agents, employees or contractors, by reason of any negligence of Tenant. As often as any such policy shall expire or terminate, renewal or additional policies shall be procured and maintained by Tenant in like manner and to like extent. All policies of insurance required hereunder of Tenant must contain a provision that the company writing said policy will give to Landlord at least thirty (30) days' notice in writing in advance of any cancellation or lapse or any reduction in the types or limits of insurance. All public liability, property damage and other casualty policies of Tenant shall be written as primary policies, with no right to any contribution from, and not in excess of, any insurance coverage which Landlord may carry to protect its interests.

7.4 Blanket Coverage. Tenant's obligations to carry the insurance provided for herein may be brought within the coverage of a so-called blanket policy or policies of insurance carried and maintained by Tenant; provided, however, that Landlord, the fee owner of the Premises if other than Landlord, and Landlord's managing agent and first mortgagee or beneficiary shall be named as additional insureds thereunder as their interests may appear, and that the coverage afforded Landlord will not be reduced or diminished by reason of the use of such blanket policy or policies of insurance, and provided further that the requirements set forth herein are otherwise satisfied. Tenant agrees to permit Landlord at all reasonable times to inspect the policies of insurance of Tenant covering risks upon the Premises for which policies or copies thereof are not delivered to Landlord.

7.5 Landlord's Insurance Obligations. Landlord shall maintain in effect during the Term a policy or policies of insurance covering the Building, including the leasehold improvements (if any) included within Landlord's Work (but excluding portions of the Building which Landlord has permitted the occupant thereof to insure or self-insure) in an amount of not less than one hundred percent (100%) of the full insurable value thereof (exclusive of excavations, foundations, footings and commercially reasonable deductibles), providing protection against any peril generally included within the classification "Special Form (All Risk) Coverage", and such further insurance as Landlord deems necessary or desirable

13

("Property Insurance"). The Property Insurance will not cover Tenant's Work, Tenant's leasehold improvements, alterations or additions permitted under Article 10 hereof, or Tenant's trade fixtures, merchandise or other personal property. Landlord's obligation to carry Property Insurance may be brought within the coverage of a so-called blanket policy or policies of insurance carried and maintained by Landlord, provided that the coverage afforded will not be reduced or diminished by reason of the use of such blanket policy of insurance. Such policies may contain rent loss insurance in favor of Landlord.

7.6 <u>Insurance Use Restrictions</u>. Tenant agrees that it will not at any time during the Term carry any stock of goods or do anything in or about the Premises which will increase the insurance rates upon the Building. Tenant agrees to pay to Landlord upon demand the amount of any increase in premium for property and liability insurance that may be charged during the Term on the amount of insurance to be carried by Landlord resulting from the foregoing or from Tenant doing any act in or about the Premises which does so increase the insurance rates, whether or not Landlord shall have consented to such act on the part of Tenant. If Tenant installs upon the Premises any electrical equipment which constitutes an overload on the electrical lines of the Premises, Tenant shall at its own expense make whatever changes or provide whatever equipment safeguards are necessary to comply with the requirement of the insurance underwriters and any governmental authority having jurisdiction thereover, but nothing herein contained shall be deemed to constitute Landlord's consent to such overloading.

7.7 <u>Waiver of Subrogation</u>. Notwithstanding anything to the contrary contained in this Lease, Landlord and Tenant each hereby waive any rights, and, on behalf of their respective insurers, hereby waive any right of subrogation therefor, one may have against the other on account of any loss or damage occasioned to Landlord or Tenant, as the case may be, their respective properties, the Premises or its contents, or to other portions of the Shopping Center, arising from any risk generally covered by a "Special Form (All Risk) Coverage" policy or by a sprinkler leakage or water damage policy in the State regardless of whether or not such coverage is being carried (or is in any manner self-insured) by the party waiving such rights. Each party hereto covenants and agrees to obtain from their respective insurance carriers as to such policies of insurance a waiver of such carrier's rights of recovery under subrogation or otherwise against such other party. For purposes of this Section 7.7 only, the term "Landlord" shall be deemed to include Landlord, the fee owner of the Premises if other than Landlord, and their respective agents, servants, employees and contractors.

## ARTICLE 8
## SIGNS

8.1 <u>Sign Criteria; Exterior Building Signage</u>. Tenant acknowledges that the Premises are a part of an integrated Shopping Center and that control of all signs by Landlord is essential to the maintenance of uniformity, propriety and aesthetic values in said Shopping Center. Tenant shall be entitled to decorate or otherwise post professionally designed and prepared signs and banners on the interior of the windows and doors of the Premises; provided, however, that in no event shall Tenant be permitted to paint such signs or banners on the windows or doors of the Premises; and, provided, further, however, that if Landlord receives notification from another party to, or benefited by, the REA that such signs and banners violate the REA, Landlord shall so notify Tenant and Tenant will then immediately remove such violating signs and banners from the windows and doors of the Premises. Except for the signs and banners which may be placed on the interior of the windows and doors of the Premises as described in the preceding sentence, Tenant shall not place on or about the exterior of the Premises or on the windows or doors thereof (and within 24 inches of any such window or door) any sign or other material without Landlord's prior written approval. Tenant shall submit all exterior sign plans for Landlord's prior approval. Additionally, Tenant shall not place or maintain any sign, symbol or advertisement on or adjacent to the exterior walls of, or above, the Premises or any building or structure in the Shopping Center, except signs complying with the general sign criteria set forth in Section 7.2 of the REA and any other sign criteria applicable to the Developer Tract attached hereto and incorporated herein as <u>Exhibit "E"</u> (the "Sign Criteria"). Subject to Tenant obtaining all necessary governmental approvals and otherwise complying with this Article 8, Tenant shall have the right to install one or more signs on the exterior walls of the

14

Building in accordance with the specifications set forth in Section 7.2 of the REA and the Sign Criteria, including signage containing Tenant's corporate colors and logo as described on the conceptual drawings previously provided from Tenant to Landlord attached hereto and incorporated herein as Exhibit "E-1" (the "Conceptual Building Signage"). Landlord hereby approves the Conceptual Building Signage and will not object to the proposed size of the Conceptual Building Signage as shown on Exhibit "E-1", notwithstanding the fact that the proposed size of the Conceptual Building Signage may not strictly conform to the requirements of the Sign Criteria; provided, however, that if Landlord notifies Tenant that any governmental body objects to the size of the Tenant's Building signage as being in violation of the Sign Criteria, then Tenant will immediately remove such objectionable signage or modify such signage in order to cause such signage to comply with the Sign Criteria size requirements. In the event Tenant desires to modify Tenant's exterior building signage in any manner during the Term such that such signage differs in design, size or otherwise from the Conceptual Building Signage, then Tenant will submit such modified signage to Landlord for Landlord's written approval thereof prior to the installation of any modified signage at the Shopping Center, such Landlord approval not to be unreasonably withheld, conditioned or delayed so long as such modified signage complies with all applicable governmental requirements, the signage requirements of the REA and the Sign Criteria. Tenant, at Tenant's sole cost and expense, shall pay for any and all design, fabrication, installation, maintenance and repair costs associated with Tenant's exterior signage. Additionally, Tenant, at Tenant's sole cost and expense, shall cause Tenant's exterior signage to be removed from the Building on or before the expiration or sooner termination of this Lease and Tenant shall promptly repair any damage to the Building or otherwise to the Shopping Center as a result of such removal.

8.2 Pylon/Monument Signage. Subject to Landlord's approval, compliance with governmental requirements and the requirements of the REA, Tenant shall have the right to place and maintain Tenant's identification signage on one (1) double-faced sign panel on that certain pylon sign depicted on Exhibit "B" (the "Pylon Sign") and on that certain monument sign depicted on Exhibit "B" (the "Monument Sign"), all such signage to be designed in accordance with the conceptual drawings attached hereto and incorporated herein as Exhibit "E-2". In the event Tenant's desires to modify Tenant's pylon and/or monument signage in any manner during the Term such that such signage differs in design, size or otherwise from the conceptual drawings attached as Exhibit "E-2", then Tenant will submit such modified signage to Landlord for Landlord's written approval thereof prior to the installation of any signage designed in accordance therewith upon the Pylon Sign and/or the Monument Sign, such Landlord approval not to be unreasonably withheld, conditioned or delayed so long as such modified signage complies with all applicable governmental requirements, the signage requirements of the REA and the Sign Criteria. Tenant's sign panels shall be located on the Pylon Sign and on the Monument Sign in the positions depicted on Exhibit "E-3" attached hereto and incorporated herein. Landlord shall operate, maintain and repair such signs as set forth in the REA. Tenant, at Tenant's sole cost and expense, shall pay for any and all design, fabrication, installation, maintenance and repair costs associated with Tenant's panels to be located on the Pylon Sign and on the Monument Sign. Additionally, Tenant, at Tenant's sole cost and expense, shall cause such panels to be removed from the Pylon Sign and from the Monument Sign on or before the expiration or sooner termination of this Lease and Tenant shall promptly repair any damage to the Pylon Sign, the Monument Sign or otherwise to the Shopping Center as a result of such removal.

8.3 Sign Removal. Notwithstanding the above, Tenant shall upon request of Landlord immediately remove any exterior or interior sign, advertisement, decoration, lettering or notice which Tenant has placed or permitted to be placed in, upon, above or about the Premises and which Landlord reasonably deems objectionable or offensive, and if Tenant fails or refuses so to do Landlord may enter upon the Premises and remove the same. Tenant shall be solely responsible for any and all fines, duties and liens whatsoever imposed upon Landlord or the Shopping Center by any governmental body or agency having jurisdiction thereover pertaining to any sign which Tenant has placed or permitted to be placed in, upon, above or about the Premises which is in violation of any ordinance, rule, law, directive, regulation, requirement, guideline or order of such body or agency.

## ARTICLE 9
## MAINTENANCE AND SANITATION

9.1 <u>Tenant's Obligations</u> Tenant shall repair any damage to the Premises caused by Tenant or its employees, agents, customers, invitees or licensees.  Tenant shall repair any damage to the Shopping Center caused by Tenant or its employees or agents.  Tenant shall maintain, repair and replace, and shall keep in good order and condition, the interior of the Premises, all doors, locks, windows, window casements and frames, plate glass, the heating, ventilating and air conditioning equipment serving the Premises, the signage of Tenant, and the fire protection system serving the Premises, and shall be responsible for all items of maintenance, repair, alteration, improvement or replacement as may at any time and from time to time be required to comply with all environmental, remedial and other laws, ordinances, rules, directions, regulations, requirements, guidelines and orders now or hereafter in effect from time to time of governmental and public bodies and agencies which shall impose any duty upon Landlord or Tenant with respect to the use, occupancy or alteration of the Premises or any portion thereof, including, but not limited to, the Williams-Steiger Occupational Safety and Health Act, the Clean Air Act and, subject to Section 30.22, the Americans with Disabilities Act.  Tenant's obligations under this Section 9.1 shall include, without limitation, the maintenance, repair and replacement of interior utilities, pipes and conduits, fixtures, electrical wiring, switches, lighting, bulbs, floor coverings, walls and ceilings.  Tenant shall comply with all requirements for the installation and periodic maintenance of the fire extinguishers or automatic dry chemical extinguishing system.  If Tenant refuses or neglects to perform its obligations under this Section 9.1, Landlord shall have the right, upon giving Tenant reasonable written notice of its election to do so, to enter the Premises and to perform such obligations on behalf of and for the account of Tenant.  In such event such work shall be paid for by Tenant promptly upon receipt of a bill therefor. Tenant shall enter into a contract with a service company licensed and experienced in servicing HVAC equipment and specified by Landlord for monthly maintenance of the HVAC equipment serving the Premises and shall provide Landlord with a copy of such service contract within ten (10) days following its execution.  Landlord, however, shall have the right, at Landlord's sole option, to obtain and keep any such HVAC service contract in force and, in such event, at Landlord's option, Tenant shall pay the costs of such contract directly to the service company, or reimburse Landlord directly for such costs.  Tenant shall not decorate or paint the exterior of the Premises, or any part thereof, except in the manner and color approved by Landlord.

9.2 <u>Landlord's Obligation</u>.  Landlord's maintenance and repair obligations are as set forth in Sections 4.3 and 4.4.  Landlord shall not in any way be liable to Tenant for failure to make repairs as specifically required under the Lease unless Tenant has previously notified Landlord in writing of the need for such repairs and Landlord has failed to commence and complete said repairs within the time period set forth in Article 28 hereof.

9.3 <u>Intentionally Deleted</u>.

9.4 <u>Right to Enter</u>.  Tenant agrees to permit Landlord and its agents, employees, servants and contractors to enter the Premises at all times during usual business hours for the purpose of inspecting same and upon reasonable notice to Tenant for the purpose of performing any of Landlord's maintenance or repair obligations.  In addition, Tenant agrees to permit Landlord and the tenants (and their agents and contractors) of other stores in the Shopping Center to enter the Premises, upon reasonable advance notice (except in the event of an emergency, in which no such advance notice shall be required, but Landlord shall provide notice of such entry as soon as is reasonably practicable thereafter under the circumstances), in order to install, replace or repair electrical, plumbing or other utility systems above the ceiling, below the floor or within the walls of the Premises, provided that the entry by such parties and their work in or upon the Premises shall not unreasonably interfere with the business of Tenant and that such parties shall promptly repair and restore any damage to the Premises or to Tenant's property occasioned by such entry or work.

16

9.5 <u>Trash</u>.  Tenant shall obtain and maintain its own trash receptacles and trash removal service. Tenant must place such trash receptacles in locations designated and redesignated by Landlord from time to time, and shall not permit the overflow of refuse from its receptacles nor the placement of trash outside of its receptacles. Notwithstanding the foregoing, Landlord may at its option arrange for the collection or removal of trash from the Shopping Center for and on behalf of any tenant or occupant. In the event such option is exercised, the cost thereof shall be included in, charged and prorated to said tenants and occupants as additional Common Area Expenses.

## ARTICLE 10
## ALTERATIONS, REPAIRS AND LIENS

10.1   <u>Consent Required</u>.  Except for the Tenant's Work, Tenant shall not permit any alterations, improvements, additions or installations to be made in or to the Premises without the prior written consent of Landlord. Any work performed by, for or on behalf of Tenant pursuant to this Section 10.1 costing in the aggregate in excess of Ten Thousand Dollars ($10,000.00) shall be performed only after Tenant has provided Landlord with reasonable assurances that Tenant has the means to pay for any and all such work. If Tenant retains the services of any third-party contractor to perform alterations, improvements, additions or installations in or to the Premises, Tenant shall, each time it makes a payment to such contractor, obtain all lien waivers from such contractor that are available under the laws of the State. Within five (5) business days after Landlord's request, Tenant will provide Landlord with copies of any of the documents or lien waivers referenced in this Section 10.1

10.2   <u>Liens</u>.  If any lien should be asserted against the Premises or the Shopping Center arising out of work performed or materials furnished upon or at the instance of Tenant, Tenant shall, within five (5) days thereafter, cause said lien to be discharged either by paying the same, by recording a surety or other bond, or recording a notice of release of the lien and substitution of cash deposit or bond in accordance with the provisions of applicable law.

## ARTICLE 11
## FIXTURES AND PERSONAL PROPERTY

11.1   <u>Ownership</u>.  Any trade fixtures, furniture, signs and other personal property of Tenant not permanently affixed to the Premises shall remain the property of Tenant, and Landlord agrees that Tenant shall have the right, provided Tenant is not in default under the terms of this Lease, at any time, and from time to time, to remove any and all of its trade fixtures, furniture, signs and other personal property which it may have stored or installed in the Premises, including, without limitation, counters, shelving, showcases, mirrors and other movable personal property.  Tenant, at its expense, shall immediately repair any damage occasioned to the Premises by reason of the removal of any such trade fixtures, furniture, signs, and other personal property, and upon expiration or earlier termination of this Lease, Tenant shall leave the Premises in a neat and clean condition and free of debris. All trade fixtures, signs, furniture and other personal property installed in or attached to the Premises by Tenant must be new when so installed or attached, or, if used, shall be like new or consistent with the condition of trade fixtures and furniture which Tenant has installed in other of its stores in the Utah marketplace.  All improvements made to the Premises by Tenant, including, but not limited to, floor coverings, and carpeting, but excluding trade fixtures, furniture, signs and other personal property of Tenant not permanently affixed to the Premises, shall become the property of Landlord upon the expiration or earlier termination of this Lease.

11.2   <u>Removal</u>.  If Tenant fails to remove any of its trade fixtures, furniture, signs and other personal property upon expiration or the sooner termination of this Lease, Landlord may, at Landlord's option, retain all or any of such property and, at Landlord's option, title thereto shall, thereupon vest in Landlord, or Landlord may remove from the Premises and dispose of, in any manner, all or any portion of such property, in which latter event Tenant shall, upon demand, pay to Landlord the actual expense of such removal and disposition and the repair of any and all damage to the Premises resulting from or caused by such removal.

17

11.3    Personal Property Taxes. Tenant shall pay before delinquency all taxes, assessments, license fees and public charges levied, assessed or imposed upon its business operation, as well as upon its trade fixtures, merchandise and other personal property in or upon the Premises. In the event any such items of property are assessed with property of Landlord, such assessment shall be divided between Landlord and Tenant to the end that Tenant shall pay only its equitable portion of such assessment as determined by Landlord. No taxes, assessments, fees or charges referred to in this paragraph shall be considered Real Property Taxes under this Lease.

## ARTICLE 12
## TRANSFERS

12.1    Transfers. Except with regard to Permitted Transfers (as defined below), Tenant will not transfer, assign, encumber, pledge or hypothecate this Lease or any right or interest hereunder, or sublet the Premises or any part thereof (hereinafter collectively called a "Transfer"), without first obtaining Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed. No Transfer (whether voluntary or involuntary, by operation of law or otherwise) other than a Permitted Transfer will be valid or effective without such prior written consent. Should Tenant attempt to make or allow to be made any Transfer other than a Permitted Transfer without Landlord's prior written consent, or should any of Tenant's rights under this Lease be sold or otherwise transferred by or under court order or legal process or otherwise, then, and in any of the foregoing events Landlord may, at its option, treat such act as an Event of Default by Tenant. Should Landlord consent to a Transfer, such consent will not constitute a waiver of any of the restrictions or prohibitions of this Article, and such restrictions and prohibitions shall apply to each successive Transfer. Notwithstanding anything to the contrary contained in this Article 12, the term "Transfer" does not include the sale of any or all of the shares of stock of Tenant.

12.2    Permitted Transfers. Landlord's consent shall not be required in connection with the following "Permitted Transfers": (i) the sale of stock in Tenant pursuant to either (a) an initial public offering after which Tenant's stock will be publicly traded on a nationally recognized exchange, or (b) a venture capital financing provided by a nationally, regionally or locally recognized venture capital firm; (ii) Tenant's assignment of all of its rights under this Lease to any corporation, partnership or other business entity which results from a merger or consolidation of or with Tenant or sale of all or substantially all of the assets of Tenant to a corporation or entity, provided that in each case such assignee has a tangible net worth at least equal to that of Tenant as of the date of this Lease (hereinafter referred to as the "Tangible Net Worth Threshold"), as evidenced by financial statements reasonably acceptable to Landlord and provided to Landlord at least ten (10) business days prior to the date of the proposed assignment; and the assignee agrees to use the Premises in strict accordance with Section 5.1 above; and (iii) Tenant's assignment of all of its rights under this Lease to any other entity so long as, at all times during such assignment, (A) the business and operations of the proposed assignee do not violate any exclusive and/or prohibited uses applicable to the Premises and/or the Tenant hereunder as of the date of the proposed assignment and (B) the originally-named Tenant hereunder remains primarily liable for all obligations of the "Tenant" under this Lease as a principal and not as a surety (as more particularly described in Section 12.4 below) and maintains a tangible net worth at least equal to the Tangible Net Worth Threshold.

12.3    Transfer Documentation. Irrespective of whether a proposed Transfer constitutes a Permitted Transfer or otherwise, if Tenant desires at any time to Transfer this Lease or any portion of the Premises, it shall first notify Landlord of its desire to do so and shall submit in writing to Landlord: (a) the name of the proposed transferee (and whether the proposed Transfer constitutes a Permitted Transfer); (b) the nature of the proposed transferee's business to be carried on in the Premises; (c) the terms and the provisions of the proposed instrument of Transfer; and (d) such financial information as Landlord may reasonably request concerning the proposed transferee.

12.4    No Release from Liability. Landlord may collect Minimum Annual Rent and other charges directly from a transferee, and apply the amount so collected first to the monthly installments of Minimum

Annual Rent and then to other charges, and the balance, if any, to Tenant, but no such collection shall be deemed a waiver of Landlord's rights under this Article or the acceptance of the proposed transferee. Notwithstanding any Transfer (made with or without the consent of Landlord), including, without limitation, Permitted Transfers, the persons or entities constituting the original Tenant under this Lease and all persons or entities thereafter acquiring the Tenant's interest under this Lease will be and remain jointly and severally liable for all obligations under this Lease as a principal and not as a surety and will not be released from the performance of any of the terms, covenants or conditions of this Lease as a result of a Transfer.

12.5    Landlord's Expenses. Tenant shall, upon demand, reimburse Landlord for its administrative expenses and for legal, accounting and other out-of-pocket expenses incurred by Landlord in connection with any proposed or actual Transfer, not to exceed $750.00 per Transfer request.

12.6    Assumption Agreement. In connection with any and all Transfers, including, without limitation, Permitted Transfers, Tenant and the transferee will execute and deliver to Landlord an instrument in form and substance acceptable to Landlord in which (a) the transferee adopts this Lease and assumes and agrees to perform, jointly and severally with Tenant, all of the obligations of Tenant hereunder, and (b) Tenant acknowledges that it remains primarily liable for the payment of Minimum Annual Rent and other charges and the performance of all other obligations hereunder.

12.7    Withholding of Consent. By way of example and without limitation, the parties agree it will be reasonable for Landlord to withhold its consent to a Transfer other than a Permitted Transfer if, in Landlord's reasonable business judgment, the present tangible net worth of the proposed transferee is less than the collective tangible net worth of Tenant and any and all guarantors as of the date hereof.

12.8    General Restrictions on Transfers. In connection with any and all Transfers, except the Permitted Transfers, Tenant will pay to Landlord, as additional rent, fifty percent (50%) of any amount Tenant receives on account of the Transfer of the Lease (net of Tenant's reasonable, documented out-of-pocket leasing costs and commissions incurred in connection with the Transfer) in excess of the amounts this Lease otherwise requires Tenant to pay. Any attempted Transfer in violation of this Article 12 is null and void at Landlord's sole and absolute discretion and constitutes an Event of Default under this Lease.

## ARTICLE 13
## DAMAGE OR DESTRUCTION

13.1    Insured Casualty. If the Premises or the Building are destroyed or damaged by fire or other casualty to such an extent that they cannot be repaired and restored within one hundred twenty (120) days, either Landlord or Tenant shall have the option to terminate this Lease; otherwise Landlord shall forthwith and with due diligence, repair and restore the Building and Premises to substantially their condition immediately prior to such damage or destruction, subject however, to the availability to Landlord of insurance proceeds therefor from Landlord's insurer and/or Landlord's mortgagee or trust deed holder, as the case may be.

13.2    Damage Near End of Term. If the damage or destruction referred to in the preceding paragraph amounts to at least 25% of the Premises and occurs during the last twelve (12) months of the Term, then Landlord shall have the option, at its sole election, to terminate this Lease effective as of the date of such damage or destruction, unless Tenant shall be entitled to exercise a renewal option to extend the term of this Lease and shall exercise such renewal option within thirty (30) days after the date of Landlord's election to terminate under the terms of this Section 13.2, and in the event of such termination any unearned rents paid in advance shall be refunded within thirty (30) days of such termination. Such election must be made and notice thereof given to Tenant within thirty (30) days from the date of such damage or destruction. If this Lease shall not be terminated as provided in this paragraph, the Building and Premises shall be repaired and restored as hereinabove provided.

19

13.3    Damage to Shopping Center.  If 50% or more of the total area of all the buildings in the Shopping Center shall be damaged or destroyed by fire or other casualty, either Landlord or Tenant shall have the option, at their election, to terminate this Lease by notice to the other party at any time within ninety (90) days from the date of such happening.

13.4    Right of Entry/Construction Obligations.  In the event Landlord is either obligated or elects to repair and restore the Building and Premises under any of the provisions of this Article, such repair and restoration shall only be to the extent of Landlord's Work.  Landlord shall have the immediate right to enter the Premises for such purposes. During the period of such repair and restoration, Tenant's Minimum Annual Rent shall be abated proportionately to the extent that the Premises are rendered untenantable and Tenant is unable to operate its business therein. Failure of Tenant to permit such entry, in addition to being a default hereunder, shall delay the abatement of Minimum Annual Rent hereunder, if any, for a period of time equal to the extent of any such delay.  Tenant shall be responsible for the repair and restoration of all Tenant's Work and Tenant's leasehold improvements, if any, and Tenant's trade fixtures and other property in the Premises.

13.5    Uninsured Casualty.  In the event that the Premises are partially or totally destroyed as a result of any casualty or peril not covered by insurance required to be carried by Landlord hereunder, Landlord may, within a period of one hundred-twenty (120) days after the occurrence of such destruction, terminate this Lease.

13.6    Mutual Release/No Statutory Termination.  Upon any termination of this Lease under any of the provisions of this Article, each party shall be released thereby without further obligations to the other party coincident with the surrender of possession of the Premises to Landlord, except for items which have theretofore accrued and are then unpaid and for rights of indemnification for acts or omissions occurring prior to such termination and surrender.  Tenant hereby waives any statutory rights of termination or abatement of rent which may arise by reason of any partial or total destruction of the Premises which Landlord is obligated to restore or may restore under any of the provisions of this Article.

## ARTICLE 14
## DEFAULTS; REMEDIES

14.1    Events of Default.  The occurrence of any of the following shall constitute a material default of this Lease by Tenant ("Event of Default"):

(a)  Any failure by Tenant to pay any rent or other charge required to be paid under this Lease, or any part thereof, where such failure continues for five (5) business days after written notice thereof from Landlord to Tenant; or

(b)  Any failure by Tenant to observe or perform any other provision, covenant or condition of this Lease to be observed or performed by Tenant where such failure continues for thirty (30) days after written notice thereof from Landlord to Tenant; provided that if the nature of such default is such that the same cannot reasonably be cured within a thirty (30) day period, Tenant shall not be deemed to be in default if it shall commence such cure within such period and thereafter rectify and cure said default with due diligence; or

(c)  Abandonment or vacation of the Premises by Tenant (as used in this Lease with respect to the Premises, the terms "vacate" and "abandon" shall be deemed to include, without limitation, the failure of Tenant to be open to the public for business in the Premises for a period of thirty (30) consecutive days that the Shopping Center shall be open for business to the public unless such failure is excused or permitted under the express terms of this Lease); or

(d)  Tenant or any guarantor of Tenant's obligations under this Lease makes an assignment for the benefit of creditors, files a petition in bankruptcy, takes the benefit of any

20

insolvency act, is dissolved or adjudicated a bankrupt, or an involuntary petition in bankruptcy is filed by any party against Tenant or any guarantor, a receiver is appointed for Tenant's business or its assets, or Tenant's assets are otherwise seized by process of law.

If, within any twelve (12) month period during the Term hereof, Tenant shall have failed to perform or been in default under the same provision of this Lease more than two (2) times and Landlord, because of such failures or defaults, shall have served upon Tenant within said twelve-month period two (2) or more notices of any such failure or default, then any third or subsequent default under said provision within said twelve-month period shall be deemed a noncurable default and Landlord, in addition to all other rights and remedies it may have hereunder, shall be entitled to immediate possession of the Premises.

14.2    Remedies.  Upon an Event of Default, Landlord, in addition to any and all other rights and remedies available to it at law or in equity, at its option, without further notice or demand of any kind to Tenant or to any other person, may do any one or more of the following:

(a) Declare the Term hereof ended and reenter the Premises and take possession thereof and remove all persons therefrom, and Tenant shall have no further claim thereon or hereunder; or

(b) Without declaring the Term hereof ended, reenter the Premises and occupy the whole or any part thereof for and on account of Tenant and collect any unpaid rent and other charges, which have become payable, or which may thereafter become payable; or

(c) Even though it may have initially reentered the Premises without termination of the Term, thereafter elect to terminate the Term and all of the rights of Tenant in or to the Premises.

Should Landlord have reentered the Premises under the provisions of subsection (b) above, Landlord shall not be deemed to have terminated the Term, or the liability of Tenant to pay any rent or other charges thereafter accruing, or to have terminated Tenant's liability for damages under any of the provisions hereof, by any such reentry or by any action, in unlawful detainer or otherwise, to obtain possession of the Premises, unless Landlord shall have notified Tenant in writing that it has so elected to terminate the Term, and Tenant further covenants that the service by Landlord of any notice pursuant to the unlawful detainer statutes of the State and the surrender of possession pursuant to such notice shall not (unless Landlord elects to the contrary at the time of or at any time subsequent to the serving of such notice and such election is evidenced by a written notice to Tenant) be deemed to be a termination of the Term.  In the event of any entry or taking possession of the Premises as aforesaid, Landlord shall have the right, but not the obligation, to remove therefrom all or any part of the personal property located therein and may place the same in storage at a public warehouse at the expense and risk of Tenant. In addition, Tenant agrees to pay to Landlord as additional damages, whether or not this Lease is terminated by Landlord, the cost of repairs, alterations, redecorating, leasing commissions and Landlord's other expenses incurred in reletting the Premises to a new lessee, and further agrees that Landlord may execute any lease in its own name, the lessee therein named being under no obligation whatsoever to see to the application by Landlord of any rent collected by Landlord from such lessee, and Tenant hereunder having no right or authority whatsoever to collect any rent from such lessee.

14.3    Landlord's Current Damages. Landlord is authorized to make such repairs, redecorating, refurbishments or improvements to the Premises as may be necessary for the purpose of attempting to relet the Premises, and the costs and expenses incurred in respect of such repairs, redecorating, refurbishments and improvements shall be paid by Tenant to Landlord within five (5) business days after receipt of Landlord's statement.  If Landlord shall exercise any of the remedies stated above, Landlord shall be entitled to recover from Tenant all damages incurred by Landlord by reason of the Event of Default, which shall include, without limitation, (a) the equivalent of the amount of the Minimum Annual Rent and other charges which would be payable under this Lease by Tenant for the remainder of the Term if this Lease were still in effect, less (b) the net proceeds of any reletting by Landlord after deducting all of

21

Landlord's expenses in connection with such reletting, which shall include, without limitation, repossession costs, repairs, redecorating, refurbishments or improvements to the Premises, brokerage commissions, attorneys' fees, and legal expenses. Tenant shall pay such current damages to Landlord, in the amount set forth in the preceding sentence (hereinafter called the "Deficiency"), in monthly installments on the days on which the Minimum Annual Rent would have been payable under this Lease if this Lease were still in effect. Notwithstanding anything to the contrary contained in this Article 14, upon the occurrence of an Event of Default, Landlord will mitigate Landlord's damages as a result thereof in accordance with all applicable laws.

14.4    Landlord's Final Damages.  At any time after an Event of Default, whether or not Landlord has collected any monthly Deficiency, Landlord shall be entitled to recover from Tenant, and Tenant shall pay to Landlord, on demand, as final damages for the applicable Event of Default, the sum of (a) the then present worth (at a discount at the rate of 8% per annum) of (i) the aggregate of the Minimum Annual Rent and other charges to be paid by Tenant hereunder for the unexpired portion of the term of this Lease (assuming this Lease had not been terminated), less (ii) the fair market rental value of the Premises during such period, plus (b) repossession costs, Landlord's expenses in connection with any attempts is may have made to relet the Premises (which shall include, without limitation, repairs, redecorating, refurbishments or improvements to the Premises and  brokerage commissions), attorneys' fees, legal expenses, and all other damages incurred by Landlord as a result of such Event of Default.  Nothing contained in this Article shall limit or prejudice the right of Landlord to prove for and obtain, as damages, an amount equal to the maximum allowed by any statute or rule of law in effect at the time when, and governing the proceedings in which, such damages are to be proved, whether or not such amount be greater, equal to or less than the damages referred to above.

14.5    Landlord's Lien/Security Interest.  Tenant agrees that Landlord shall have a landlord's lien, and, subject to the remaining provisions of this Section 14.5, additionally hereby separately grants to Landlord a first and prior security interest, in, on and against all personal property of Tenant from time to time situated on the Premises, which lien and security interest shall secure the payment of all rent and other charges payable by Tenant to Landlord under the terms hereof.  Tenant expressly acknowledges and agrees that, in addition to all other rights and remedies Landlord may have hereunder or at law or in equity, in the event of any default of Tenant hereunder, Landlord shall have any and all rights and remedies granted a secured party under the Uniform Commercial Code then in effect in the State. Notwithstanding the foregoing, subject to the remaining conditions of this Section 14.5, Landlord's lien rights with respect to Tenant's personal property located at the Premises shall be subordinate to the lien of any equipment lessor or lender with an ownership or security interest in such personal property whose name and address has been previously provided to Landlord.  If requested by Tenant, Landlord will execute a document evidencing such subordination, in a form reasonably acceptable to Landlord, and including Landlord's rights described in this Section 14.5. Within twenty (20) days after written notice from Landlord to Tenant's equipment lessor or lender that Tenant has defaulted (beyond all applicable cure periods) under the Lease, Tenant's lender shall have the right to remove such personal property from the Premises, such removal to be upon all of the terms and conditions of this Lease, failing which Landlord's lien rights shall no longer be subordinate to the rights of such lender and Landlord shall thereupon have the right to take such personal property and sell or otherwise dispose of it as Landlord shall deem appropriate in its sole discretion.

14.6    No Waiver.  The waiver by Landlord of any breach of any term, covenant or condition herein contained shall not be deemed to be a waiver of such term, covenant or condition or any subsequent breach of the same or any other term, covenant or condition herein contained. The subsequent acceptance of rent or other charges hereunder by Landlord shall not be deemed to be a waiver of any preceding breach of Tenant of any term, covenant or condition of this Lease, other than the failure of Tenant to pay the particular rent or other charge so accepted, regardless of Landlord's knowledge of such preceding breach at the time of acceptance of such rent or other charge. No endorsement or statement on any check or any letter accompanying any check or payment of a lesser amount of any rent or other charge hereunder shall be deemed an accord and satisfaction, and Landlord's

22

acceptance of such check or lesser amount shall be on account thereof only and without prejudice to Landlord's right to recover the balance of such rent or other charge, with none of Landlord's rights and remedies being affected thereby. No covenant, term or condition of this Lease shall be deemed to have been waived by Landlord unless such waiver shall be in writing by Landlord.

## ARTICLE 15
## QUIET POSSESSION

Landlord agrees that Tenant, upon paying the rent and other charges and performing the covenants and conditions of this Lease, shall quietly have, hold and enjoy the Premises during the Term and any extension thereof without hindrance from Landlord, subject to the provisions of this Lease and to all mortgages, deeds of trust, ground or underlying leases, zoning laws, restrictive covenants, easements, rights-of-ways, agreements and encumbrances to which this Lease is or may become subordinate.

## ARTICLE 16
## ATTORNEYS' FEES

In the event that either Landlord or Tenant shall institute any action or proceeding against the other relating to the provisions of this Lease, or any default hereunder, the unsuccessful party in such action or proceeding agrees to pay to the successful party all attorneys' fees and costs incurred therein by the successful party. Likewise, Landlord shall be entitled to all attorneys' fees incurred in the preparation and service of any notice or demand hereunder based on the breach of any provision of this Lease by Tenant, whether or not a legal action is subsequently commenced.

## ARTICLE 17
## EMINENT DOMAIN

17.1    Termination of Lease.

(a) Entire Taking: In the event the entire Premises shall be taken under the power of eminent domain, or sold under the threat of the exercise of the power of eminent domain (a "taking"), then this Lease shall automatically terminate as of the date Tenant is required by the condemning agency to vacate (the "date of taking") the Premises. All rent and other charges shall be paid and prorated through the date of taking.

(b) Partial Taking of Premises: In the event a portion of the Premises shall be taken (also a "taking") and the use thereof is materially impaired thereby, then either Landlord or Tenant shall have the right to terminate this Lease as of the date of taking upon giving the other written notice of such election not later than thirty (30) days from the date of taking. All rent and other charges shall be paid through the date of taking. If the use of the Premises is not materially impaired by the taking, or if materially impaired but neither party terminates this Lease, then in either such event this Lease shall continue in full force and effect with respect to the remainder of the Premises except that, as of the date of taking, Minimum Annual Rent shall be reduced by an amount which is equal to the proportion thereof that the area taken bears to the entire area of the Premises before the taking, and Landlord shall, at its cost and expense, as soon as reasonably possible, restore the Premises on the land remaining to a complete unit of like quality and character as existed prior to such taking, subject, however, to the availability to Landlord of condemnation proceeds from the condemning authority and/or Landlord's mortgagee or trust deed holder, as the case may be. Tenant hereby waives any statutory rights of termination which may arise by reason of any partial taking of the Premises.

(c) Taking of Shopping Center: In the event an essential access to the Shopping Center or more than twenty-five (25%) percent of the ground area of the Shopping Center is taken (also a "taking"), then Landlord and Tenant shall each have the right to terminate this Lease as of the

23

date of taking of such portion upon giving the other party written notice of such election not later than thirty (30) days from the date of taking. All rent and other charges shall be paid through the date of taking.

17.2    Eminent Domain Awards.    Any award or payment for the taking of all or any part of the Premises or the Shopping Center shall be the property of Landlord, whether such award or payment shall be made as a compensation for the diminution and value of any leasehold interest and/or for the taking of the fee, and/or for severance damages. In no event shall Tenant be entitled to receive any portion of any payment or award made by a condemning authority with respect to the condemnation of the Premises or the Shopping Center, and Tenant hereby waives any and all such claims to such awards or payments.

17.3    Personal Property of Tenant.    Nothing in this Lease shall prevent Tenant from making a claim against the condemning authority for Tenant's personal property taken or damaged by the condemning authority or for relocation expenses.

## ARTICLE 18
## MORTGAGE AND ATTORNMENT

18.1    Subordination.    This Lease and Tenant's rights hereunder are and shall automatically be and become subordinated to the interest of any lessor under any present or future sale and leaseback of the land and/or buildings in which the Premises are situated (herein referred to in this Article as a "Ground Lease"), as well as to the lien of any mortgage or deed of trust now or existing or hereafter placed upon the land and/or Building or against any buildings hereafter placed upon the land of which the Premises are a part, and to all advances made or hereafter to be made upon the security thereof. The foregoing subordination shall be self-operative and no further instrument of subordination shall be required to effectuate such subordination; provided, however, that the automatic subordination to any future mortgage or deed of trust provided for in this Section 18.1 is expressly conditioned upon the lender's agreement that as long as no Event of Default occurs under this Lease, the lender will not disturb Tenant's rights of possession under this Lease. If requested by Landlord or any lessor, mortgagee or beneficiary under a deed of trust, Tenant shall from time to time execute any instruments reasonably required by such lessor, mortgagee or beneficiary to further evidence the aforementioned subordination. If such mortgagee or beneficiary should at any time require that Tenant's rights hereunder be senior and superior to the lien of such mortgage or deed of trust, Tenant agrees that such mortgagee or beneficiary may, without the signature or further consent of Tenant, execute and place of record an instrument subordinating the lien of such mortgage or deed of trust to the rights of Tenant hereunder, provided that Tenant shall be furnished a copy of such instrument, together with the pertinent recording information. It is further agreed that if any party succeeds to the interest of the Landlord under this Lease (hereinafter referred to as a "successor" in this Article) as a result of the termination of a ground lease, the foreclosure or trustee's sale under a mortgage or deed of trust, or as a result of a deed in lieu of foreclosure or otherwise, the liability of such successor shall exist only so long as such successor is the owner of the Shopping Center or the land on which the Shopping Center is located, or any portion thereof, and such liability shall not continue or survive after further transfer of ownership. No successor shall be liable for any act or omission of any prior landlord hereunder, nor shall Tenant be entitled to any offset against or deduction from rent due hereunder after such date by reason of any act or omission of any prior landlord hereunder. Further, Tenant agrees that no such successor shall be bound by the prepayment of said rent or other changes made in excess of thirty (30) days before the date on which such payment is due. If Tenant fails within ten (10) days after written demand therefor to execute and deliver any instruments as may be necessary or proper to effectuate any of the covenants of Tenant set forth above in this Section 18.1, Tenant hereby makes, constitutes and irrevocably appoints any one of the Landlord or its beneficiaries as its attorney-in-fact (such power of attorney being coupled with an interest) to execute and deliver any such instruments for and in the name of Tenant.

18.2    Attornment.    In the event any proceedings are brought for foreclosure of any such mortgage or deed of trust, or in the event of the exercise of the power of sale under any deed of trust, or in

24

the event any such ground lease shall be terminated, Tenant shall attorn to the successor landlord upon any such foreclosure or sale or termination, as the case may be, and recognize such successor as Landlord under this Lease.

18.3    Estoppel Certificate.  Tenant shall, from time to time, within ten (10) days after written request by Landlord, execute, acknowledge and deliver to Landlord a statement in writing certifying: (a) that this Lease is unmodified and in full force and effect (or, if modified, stating the nature of such modification and certifying that this Lease, as so modified, is in full force and effect); (b) the dates to which Minimum Annual Rent and other charges are paid in advance, if any; (c) that there are no breaches or defaults on the part of Landlord hereunder (or specifying such breaches or defaults if any are claimed); (d) that Tenant has paid Landlord the Security Deposit (if any), (e) the Rent Commencement Date and the scheduled expiration date of the Term; (f) the rights (if any) of Tenant to extend or renew this Lease; (g) the amount of Minimum Annual Rent and other charges currently payable under this Lease; and (h) such other information and facts Landlord may reasonably require.  Any such statement may be relied upon by any prospective or existing purchaser, ground lessor or lessee or mortgagee of all or any portion of the Premises, as well as by any other assignee of Landlord's interest in this Lease.  If Tenant fails to execute and return such statement within such ten-day period, any prospective or existing purchaser, ground lessor or lessee or mortgagee shall be entitled to rely upon the information and facts set forth therein as being true and correct, and Tenant shall be estopped from later denying, contradicting or taking any position inconsistent with the information and facts set forth in such statement.

### ARTICLE 19
### SURRENDER OF PREMISES

Tenant shall, upon expiration or earlier termination of the Term, surrender the Premises in good condition and repair, reasonable wear and tear excepted.  Tenant shall promptly surrender all keys for the Premises at the place then fixed for payment of rent and shall inform Landlord of combinations on any locks and safes on the Premises.  At the expiration or earlier termination of the Term, Tenant shall execute, acknowledge and deliver to Landlord, within five (5) days after written demand from Landlord to Tenant, any quit-claim deed or other document required by a reputable title company to remove the cloud of this Lease from title to the real property upon which the Premises are situated.

### ARTICLE 20
### HOLDING OVER

If Tenant remains in possession of the Premises after the expiration of this Lease and without the execution of a new lease and without Landlord's written consent, Tenant shall be deemed to be occupying the Premises without claim of right and Tenant shall pay Landlord for all costs arising out of loss or liability resulting from delay by Tenant in so surrendering the Premises as above provided and shall pay a charge for each day of occupancy in an amount equal to 150% of the Minimum Annual Rent and other charges (on a daily basis) payable by Tenant under this Lease immediately prior to the expiration of this Lease.  Tenant shall indemnify, defend and hold Landlord harmless from and against any loss or liability resulting from delay by Tenant in so surrendering the Premises, including, without limitation, any claims made by any succeeding tenant founded on such delay.

### ARTICLE 21
### NOTICES

All notices, demands and requests under this Lease shall be in writing, and shall not be effective unless given by prepaid registered or certified mail, return receipt requested, by nationally recognized commercial overnight courier service, or by hand-delivery with a signed acknowledgement of receipt by the receiving party, addressed to the parties at their addresses stated in Article 1 of this Lease, or at such other address as either party may hereafter designate by written notice to the other party.  The effective date of all notices shall be the date of receipt by the party to whom the notice is addressed or, if receipt of such notice is

25

not accepted or is not possible due to a change in address for which the sending party did not receive notice, the effective date of such a notice shall be the date of mailing such notice, if mailed, the date of delivery to a courier service, if delivered by courier, or the date of attempted delivery, if hand-delivered.

### ARTICLE 22
### SALE OF PREMISES BY LANDLORD OR RE-LEASING

In the event of any sale, exchange or other transfer of the Premises by Landlord and assignment by Landlord of this Lease, Landlord shall be and is hereby entirely relieved of all liability under all of its covenants and obligations contained in or derived from this Lease; and Tenant shall attorn to the party acquiring the Premises from Landlord. Landlord and its authorized agents and representatives shall be entitled to enter the Premises during business hours upon reasonable prior written notice for the purpose of exhibiting the same to prospective purchasers and, during the final six (6) months of the Term or renewal thereof, Landlord shall be entitled to exhibit the Premises for rent and/or for sale and to display thereon in such manner as will not unreasonably interfere with Tenant's business the usual "For Sale" or "For Lease" signs.

### ARTICLE 23
### INTENTIONALLY DELETED

### ARTICLE 24
### INTENTIONALLY DELETED

### ARTICLE 25
### NO PERSONAL LIABILITY OF LANDLORD

Landlord shall have no personal liability under this Lease, and if Landlord becomes obligated to pay Tenant any judgment arising out of any failure by the Landlord to perform or observe any of the terms, covenants, conditions or provisions to be performed or observed by Landlord under this Lease, Tenant shall be limited in the satisfaction of such judgment solely to Landlord's interest in the Shopping Center, and no other property or assets of Landlord or the individual partners, directors, officers, shareholders or members of Landlord shall be subject to levy, execution or other enforcement procedure whatsoever for the satisfaction of any such judgment.

### ARTICLE 26
### LATE PAYMENT CHARGE

Tenant hereby acknowledges that late payment by Tenant to Landlord of rent or other charges due hereunder will cause Landlord to incur costs not contemplated by this Lease, the exact amount of which is extremely difficult to ascertain. Such costs include, but are not limited to, processing and accounting charges, and late charges which may be imposed upon Landlord by the terms of any mortgage or deed of trust covering the Premises. Accordingly, if any installment of rent or other charge due from Tenant shall not be received by Landlord or Landlord's designee when said amount is due Tenant shall pay to Landlord a late charge equal to the greater of (a) five percent (5%) of the amount then due and unpaid or (b) Four Hundred Dollars ($400.00) and, in addition to said greater amount, any and all attorneys' fees and costs incurred by Landlord by reason of Tenant's failure to pay such rent or other charges when due hereunder; provided, however, that no such late charge shall accrue in connection with the first (but not any other) late payment by Tenant in any calendar year during the Term until the date that is ten (10) days after the date when such payment is due. The parties hereby agree that such late charge represents a fair and reasonable estimate of the costs that Landlord will incur by reason of the late payment by Tenant. Acceptance of such late charge by Landlord shall in no event constitute a waiver of Tenant's default with respect to such overdue amount, nor prevent Landlord from exercising any of the other rights and remedies granted hereunder. Tenant hereby agrees that if Tenant is subject to consecutive late charges for longer than thirty (30) days, Minimum Annual Rent for the following twelve (12) months shall automatically be adjusted to be payable quarterly, in advance, commencing upon the first day of the month following such consecutive late month and continuing for the

next twelve (12) months on a quarterly basis in advance.

## ARTICLE 27
## DISCONTINUANCE OF BUSINESS

If Tenant does not open for business to the public, fully stocked and staffed, within ninety (90) days following Landlord's delivery of possession of the Premises to Tenant with Landlord's Work substantially completed, or if Tenant discontinues business operations from the Premises as required under this Lease after having opened for business to the public, Landlord shall have the right to terminate this Lease by giving Tenant sixty (60) days prior written notice of its intention to do so.  If Landlord gives notice of its intention to terminate this Lease pursuant to this Article, this Lease shall terminate sixty (60) days after Tenant's receipt of such notice unless, during such sixty (60) day period, Tenant gives written notice to Landlord of Tenant's intention to reopen or recommence business operations from the Premises, in which event this Lease shall remain in effect for an additional period of sixty (60) days (for a total of one hundred twenty (120) days) from the date of Landlord's notice, at the end of which time the Lease will automatically terminate without further notice or demand unless Tenant shall once again be open for business to the public from the Premises as required under this Lease, fully stocked and staffed.

## ARTICLE 28
## DEFAULT BY LANDLORD

Landlord shall not be in default of this Lease unless and until Landlord shall fail to perform or observe any of the covenants, provisions or conditions contained in this Lease on its part to be performed or observed, and such failure continues for thirty (30) days after written notice of failure is given by Tenant to Landlord (or if more than thirty (30) days shall be required because of the nature of the failure, if Landlord shall fail to commence the curing of such failure within such thirty (30) day period and proceed diligently thereafter to complete such cure).  Upon any default by Landlord under this Lease, Tenant may pursue any right or remedy available to it at law or in equity, including an action for damages or specific performance or both; provided, however, Landlord shall only be responsible to Tenant for any actual damages sustained by Tenant as a result of Landlord's breach, but not punitive, special or consequential damages.  Notwithstanding anything to the contrary contained in this Lease, Tenant shall not have any right to terminate this Lease or, except as may be specifically provided in this Lease following damage by fire or other casualty, to abate or offset Minimum Annual Rent or other charges.  Should Tenant give written notice to Landlord of any failure to perform or observe any of the covenants, provisions or conditions contained in this Lease on Landlord's part to be performed or observed, Tenant shall concurrently give a copy of such notice to the holder of any mortgages or deeds of trust against the Premises or the lessor of any ground lease, and prior to Tenant exercising any remedies based on such failure, the holder of such mortgage or deed of trust and/or the lessor under such ground lease shall be given the same period of time as Landlord to correct or remedy such default.  If and when such holder of such mortgage or deed of trust and/or the lessor under any such ground lease has made performance on behalf of Landlord, the default of Landlord shall be deemed cured.

## ARTICLE 29
## INTENTIONALLY DELETED

## ARTICLE 30
## MISCELLANEOUS PROVISIONS

30.1    Partial Invalidity.  If any provision of this Lease is determined to be void by any court of competent jurisdiction, such determination shall not affect any other provision of this Lease and such other provision shall remain in full force and effect.  If any provision of this Lease is capable of two constructions, one of which would render the provision void and one of which would render the provision valid, the provision shall be interpreted in the manner which would render it valid.

27

30.2    Reimbursement.  All covenants and terms herein contained to be performed by Tenant shall be performed by it at its expense, and if Landlord shall pay any sum of money or do any act which required the payment of money by reason of the failure of Tenant to perform such covenant or term, the sum or sums of money so paid shall be considered additional rent and shall be payable by Tenant on the first of the month next succeeding such payment, together with interest at the rate of twelve percent (12%) per annum.

30.3    Grant of Easements.  Tenant hereby consents to any and all conveyances or grants of easements upon the Premises which Landlord reasonably determines to be necessary in order to adequately provide utilities to, or ingress and egress from, the Premises.

30.4    No Dedication.  In order to establish that the Shopping Center, and any portion thereof, is and will continue to remain private property, Landlord shall have unrestricted right in Landlord's sole discretion, with respect to the entire Shopping Center and/or any portion thereof owned or controlled by Landlord, to close the same to the general public for one (1) day in each calendar year, and in connection therewith, to seal off all entrances to the Shopping Center, or any portion thereof.

30.5    Warranty of Authority.  If Tenant is other than a natural person, the persons executing this Lease on behalf of Tenant hereby covenant and warrant that they are duly authorized to execute this Lease on behalf of Tenant; Tenant is duly qualified in all respects; all steps have been taken prior to the date hereof to qualify Tenant to do business in the State; all franchise and other taxes have been paid to date; and all forms, reports, fees and other documents necessary to comply with applicable laws will be filed when due.

30.6    Joint and Several Liability.  If more than one person, corporation or other entity is named as Tenant in this Lease and executes the same as such, then and in such event, the word "Tenant" wherever used in this Lease is intended to refer to all such persons, corporations or other entities, and the liability of such persons, corporations or other entities for compliance with and performance of all the terms, covenants and provisions of this Lease shall be joint and several. If Tenant shall be a partnership, the liability of each and every partner thereof for compliance with and performance of all the terms, covenants and provisions of this Lease shall be joint and several, and no withdrawing partner shall be relieved of any liability hereunder as the result of any such withdrawal. If Tenant is composed in whole or in part of a husband and wife, the separate estate of each spouse as well as their community property shall be liable hereunder.

30.7    Entire Agreement.  It is understood and acknowledged that there are no oral agreements between the parties hereto affecting this Lease, and this Lease supersedes and cancels any and all previous negotiations, arrangements, brochures, agreements and understandings, if any, between the parties hereto or displayed by Landlord to Tenant with respect to the subject matter thereof, and none thereof shall be used to interpret or construe this Lease. This Lease is and shall be considered to be the only agreement between the parties hereto and their representatives and agents. All negotiations and oral agreements acceptable to both parties have been merged into and are included herein, and no modification of this Lease shall be effective unless the same shall be in writing and be signed by the parties hereto or, as the case may be, their respective successors or assigns.  There are no other representations or warranties between the parties and all reliance with respect to representations is solely upon the representations and agreements contained in this document.  Tenant shall not record this lease nor any memorandum or short form thereof.

30.8    Right to Lease.  Landlord reserves the absolute right to effect such other tenancies in the Shopping Center as Landlord in the exercise of its sole business judgment shall determine to best promote the interests of the Shopping Center.  Subject to the terms and provisions of Section 30.20, Tenant does not rely on the fact, nor does Landlord represent, that any specific tenant or type or number of tenants shall during the Term occupy any space in the Shopping Center.

28

0126-0011 \ Cotton Mill II Roberts Crafts Lease v12

30.9    <u>Governing Law</u>. The laws of the State shall govern the validity, construction, performance and enforcement of this Lease. Should either party institute legal action to enforce any obligation contained herein, each party waives the right to a jury in any action, proceeding or counterclaim brought by either of them against the other on any matters whatsoever arising under this Lease. Although the printed provisions of this Lease were drawn by Landlord, this Lease shall not be construed either for or against Landlord or Tenant, but shall be interpreted in accordance with the general tenor of its language.

30.10    <u>Cumulative Rights</u>.    The various rights, options, elections, powers and remedies of Landlord contained in this Lease shall be construed as cumulative and no one of them shall be exclusive of any of the others, or of any other legal or equitable remedy which Landlord might otherwise have in the event of default by Tenant in the terms hereof, and the exercise of one right or remedy by Landlord shall not impair its right to any other right or remedy until all obligations imposed upon Tenant have been fully performed.

30.11    <u>Time</u>. Time is of the essence with respect to the performance of each of the covenants and agreements contained in this Lease.

30.12    <u>Relationship of Parties</u>. Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third person to create the relationship between Landlord and Tenant of principal and agent or of partnership or of joint venture or of any association between Landlord and Tenant, and neither the method of computation of rent nor any other provision contained in this Lease nor any acts of the parties hereto shall be deemed to create any relationship between Landlord and Tenant other than the relationship of landlord and tenant.

30.13    <u>Document Review</u>. In the event Tenant makes any request upon Landlord causing or requiring Landlord to process, review, negotiate and/or prepare (or cause to be processed, reviewed, negotiated and/or prepared) any document or documents in connection with or arising out of or as a result of this Lease, then, except as may be expressly stated elsewhere herein, Tenant agrees to reimburse Landlord or its designee promptly upon demand for all of Landlord's costs and expenses (including but not limited to attorneys' fees) in conjunction with each such request, not to exceed $750.00 per request.

30.14    <u>Usury</u>. Notwithstanding any provision contained herein to the contrary, if any interest rate specified in this Lease is higher than the rate then permitted by law, such interest rate specified herein shall automatically be adjusted from time to time to the maximum rate permitted by law.

30.15    <u>Brokerage</u>. Landlord and Tenant each represents and warrants to the other that it has not had any dealings with any realtors, brokers, finders or agents in connection with this Lease (except as may be specifically set forth in the Basic Lease Provisions) and each releases and agrees to indemnify the other from and against any Claims based on the failure or alleged failure to pay any realtors, brokers, finders or agents (other than any brokers specified in the Basic Lease Provisions) and from any cost, expense or liability for any compensation, commission or charges claimed by any realtors, brokers, finders or agents (other than any brokers specified in the Basic Lease Provisions) claiming by, through or on behalf of it with respect to this Lease or the negotiation of this Lease. Landlord will pay any brokers named in the Basic Lease Provisions in accordance with one or more separate agreements between Landlord and such brokers.

30.16    <u>No Offer</u>. The submission of this document to Tenant for examination does not constitute an offer to lease, or a reservation of or option to lease, and becomes effective only upon execution and delivery thereof by Landlord and Tenant. In addition, Landlord and Tenant acknowledge that neither of them shall be bound by the representations, promises or preliminary negotiations with respect to the Premises made by their respective employees or agents. It is their intention that neither party be legally bound in any way until this Lease has been fully executed by both Landlord and Tenant.

30.17   Redevelopment of Shopping Center. Landlord expressly reserves the right and privilege in its sole and unfettered discretion of redeveloping the Shopping Center, including, without limitation, expanding or decreasing the size of the Building (excluding the Premises) or other buildings in the Shopping Center, demolishing portions of the Building (other than the Premises) or other buildings in the Shopping Center, and constructing one or more new buildings or other improvements at the Shopping Center.  Notwithstanding the foregoing, Landlord shall not have the right to construct new or more buildings at the Shopping Center (other than those buildings which are contemplated under Exhibit "B") which materially and adversely change the size or visibility of, or access to, the Premises, without the prior written consent of Tenant.

30.18   Force Majeure.  If either party is delayed in or prevented from performing any obligation under this Lease (excluding, however, the payment of money) by reason of Force Majeure, such party's performance of such obligation will be excused for a period equal to the period of delay actually caused by the Force Majeure event.  In no event will the occurrence of any event of Force Majeure excuse or suspend any of Tenant's obligations to pay rent or any other charges under this Lease after the Rent Commencement Date has occurred.  For purposes of this Lease, "Force Majeure" shall mean acts of God; strikes; lockouts; labor troubles; inability to procure materials; acts of war; terrorist actions; inclement weather; governmental laws or regulations; casualty; orders or directives of any legislative, administrative, or judicial body or any governmental department; inability to obtain any licenses, permissions or authorities (despite commercially reasonable and diligent pursuit of such licenses, permissions or authorities); and other similar or dissimilar causes beyond Landlord's or Tenant's reasonable control.  Notwithstanding the foregoing, promptly following the full execution of this Lease, Landlord will use commercially reasonable efforts to determine the availability of, and Landlord's ability to procure, concrete and Landlord will thereafter incorporate the anticipated timing of such procurement into the construction schedule for Landlord's Work.

30.19   Counterparts.  This Lease may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which, when taken together, shall constitute one and the same instrument.

30.20   Cotenancy.  During the Term, provided that Tenant is open for business from the Premises and no Event of Default exists hereunder, the "On-Going Cotenancy Requirement" shall be deemed satisfied if Kohl's Department Stores, Inc., a Delaware corporation ("Kohl's"), or a replacement tenant ("Replacement Tenant") operating in substantially all of the premises leased to Kohl's on the Kohl's Tract as of the date of this Lease (the "Kohl's Premises"), is open for business at the Shopping Center.  If (i) the On-Going Cotenancy Requirement becomes unsatisfied and remains unsatisfied for thirty (30) consecutive days (the expiration of such 30 consecutive day period being hereinafter referred to as the "Trigger Date"), (ii) such failure of the On-Going Cotenancy Requirement is not the result of casualty, condemnation, temporary remodeling or force majeure events, and (iii) Tenant is open for business in the entire Premises and no Event of Default exists hereunder, then, commencing on the Trigger Date and continuing thereafter until Kohl's or a Replacement Tenant re-opens or opens, as the case may be, for business from all or substantially all of the Kohl's Premises, the monthly installments of Minimum Annual Rental shall equal the lesser of (i) five percent (5%) of Tenant's gross sales from the Premises or (ii) Minimum Annual Rental otherwise due under this Lease absent the provisions of this Section 30.20. If the On-Going Cotenancy Requirement thereafter becomes satisfied (i.e., if Kohl's or a Replacement Tenant re-opens or opens, as the case may be, for business in all or substantially all of the Kohl's Premises), then Tenant shall immediately resume the payment of full Minimum Annual Rental. If the On-Going Cotenancy Requirement remains unsatisfied for three hundred thirty-five (335) consecutive days or longer after the Trigger Date, then either Landlord or Tenant may elect to terminate this Lease by written notice to the other party, in which event this Lease shall terminate on the date that is (90) days thereafter; provided, however, that Tenant, within ten (10) days after Tenant's receipt of Landlord's termination notice, may elect in writing to resume paying full Minimum Annual Rent as of the 1-year anniversary of the Trigger Date and continuing thereafter during the remainder of the Term, and if Tenant makes such election, then

30

Landlord's termination notice, and the provisions of this Section 30.20, will thereafter be deemed null, void and of no further force or effect.

30.21   Landlord's Work Warranty. Landlord warrants that at the time of delivery of the Premises to Tenant all electrical, plumbing and mechanical systems will be in good working order. Landlord also warrants the Landlord's Work, including, without limitation, the HVAC equipment serving the Premises, against defective workmanship and materials for a period of one (1) year after Substantial Completion of the Landlord's Work. Landlord's sole obligation under this warranty is to repair or replace, as necessary, any defective item caused by poor workmanship or materials if Tenant delivers specific written notice of the defective item to Landlord within such one-year period. Landlord has no obligation to repair or replace any item after such one-year period expires. Additionally, Landlord will assign to Tenant, on a non-exclusive basis, any warranties, if any, received by Landlord from (i) Landlord's contractors performing the Landlord's Work and (ii) the manufacturers supplying materials used in connection with the Landlord's Work. THIS EXPRESS WARRANTY IS GIVEN AS THE SOLE AND EXCLUSIVE RIGHT AND REMEDY OF TENANT FOR INCOMPLETE OR DEFECTIVE WORKMANSHIP OR MATERIALS OR OTHER DEFECTS IN THE PREMISES, AND AS ADDITIONAL CONSIDERATION FOR THIS WARRANTY TENANT HEREBY WAIVES AND RELEASES ALL OTHER CLAIMS AND CAUSES OF ACTION AGAINST LANDLORD AND ALL LANDLORD PARTIES BASED ON BREACH OF CONTRACT, TORT, BREACH OF WARRANTY OR OTHER RIGHTS OR CLAIMS, WHETHER EXPRESS OR IMPLIED, THAT MIGHT OTHERWISE BE AVAILABLE UNDER APPLICABLE LAW AS A CONSEQUENCE OF ANY DEFECTS ARISING OUT OF OR RELATING TO THE CONSTRUCTION OF THE BUILDING AND LANDLORD'S WORK. ALL OTHER WARRANTIES ARE EXPRESSLY DISCLAIMED TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAWS.

30.22   Condition of Premises. Landlord agrees that it will construct Landlord's Work, and Tenant agrees that it will construct Tenant's Work, in compliance with the public accommodations provisions of Title III of the Americans With Disabilities Act of 1990 (42 U.S.C. § 12101 et seq.) (the "ADA"), as interpreted and enforced by the governmental bodies having jurisdiction thereof as of the date of substantial completion of Landlord's Work or Tenant's Work, as applicable. Tenant will not be required to make any repairs or improvements to the Common Areas in order to cause such Common Areas to be in compliance with the ADA nor will Tenant be required to make any repairs or improvements to the Premises or Building which result from the failure of Landlord to complete such work in compliance with the ADA. Landlord warrants that, at the time of Substantial Completion of Landlord's Work, the Premises will be free of any Hazardous Materials and meet all current governmental building codes and ordinances, including, but not limited to, those governing electrical, plumbing and fire/life safety systems. Tenant warrants that, at the time of substantial completion of Tenant's Work, Tenant's Work will meet all current governmental building codes and ordinances.

30.23   Exclusive Use. Subsequent to the date of this Lease and continuing throughout the Initial Term, so long as no Event of Default exists hereunder, Landlord agrees, during the time that the originally-named Tenant hereunder constitutes the "Tenant" under this Lease, that Landlord (i) will not enter into a lease for space within the Shopping Center with either of Hobby Lobby or Michaels Stores and (ii) will include a provision in each lease entered into by Landlord after the date of this Lease that will restrict each tenant from conducting as its primary business at the Shopping Center a retail store selling arts and crafts or needle craft supplies and materials or scrapbooking supplies and materials or framing or custom framing (herein referred to as a "Restricted Use Clause"). Notwithstanding the foregoing, other tenants of the Shopping Center may sell arts and crafts or needle craft supplies and materials or scrapbooking supplies and materials or framing or custom framing on an incidental basis, which shall mean that the annual gross sales of such items by a tenant shall not exceed thirty percent (30%) of the total annual gross sales from the Shopping Center by such tenant. If Tenant discontinues the operation of a retail store selling arts and crafts or needle craft supplies and materials or scrapbooking supplies and materials or framing or custom framing as its primary business at the Shopping Center, or if the Restricted Use Clause or any other provisions of this Section 30.23 are deemed to be in violation of applicable law, then in either instance any Restricted Use Clauses and Landlord's obligations under this Section 30.23 will

31

automatically terminate. Tenant does hereby indemnify, defend and hold Landlord harmless from any claim, cost, loss or damage (including reasonable attorneys' fees) incurred or alleged against Landlord by any person, firm or corporation whatsoever by reason of Landlord's compliance, or attempted compliance, with this Section 30.23, and in the event Landlord is made subject to any action, proceeding or penalty with respect to the provisions of this Section 30.23, Tenant will indemnify, defend and hold Landlord harmless from any cost, loss, claim or expense in respect thereto. Notwithstanding the foregoing, this Section 30.23 will not apply to any leases entered into by Landlord prior to the date of this Lease (or any leases being circulated for signature prior to the date of this Lease), nor to any amendments or renewals of such leases, nor to any parcels sold by Landlord prior to the date of this Lease (or any parcels for which Landlord has entered into a purchase agreement prior to the date of this Lease for the sale thereof).

30.24  Relocation of Tenant. At any time on or before the date that is sixty (60) days following the date of this Lease, Landlord may provide Tenant with written notice of Landlord's election to relocate Tenant from the Premises to other space of comparable size, frontage and improvements within the Shopping Center, as such other space is depicted on Exhibit "B" as the "Relocation Space". Prior to or concurrently with the relocation, Landlord will prepare, and the parties will execute, an amendment to this Lease to evidence the relocation and make any necessary changes to the Basic Lease Provisions resulting from the relocation.

**[SIGNATURES APPEAR ON NEXT PAGE.]**

32

IN WITNESS WHEREOF, Landlord and Tenant have duly executed and delivered this Lease as of the day and year first above written.

LANDLORD:

COTTON MILL II, LLC, a Utah limited liability company

By: Forum Capital, L.C., a Utah limited liability company
Its: Managing Member

By: _____
R. Paul Barker
Managing Member

TENANT:

PROVO CRAFT AND NOVELTY, INC., a Utah corporation

By: _____
Its: GM of Operations

33

**EXHIBIT "A"**

**LEGAL DESCRIPTION OF SHOPPING CENTER**

ALL THAT PART OF THE STATE OF UTAH, COUNTY OF WASHINGTON, CITY OF WASHINGTON, BEING PART OF THE SOUTHEAST QUARTER OF SECTION 15, TOWNSHIP 42 SOUTH, RANGE 15 WEST, SALT LAKE BASE AND MERIDIAN, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE QUARTER SECTION LINE OF SAID SECTION 15, SAID POINT BEINGN00°58'52"E GRID (UTAH COORDINATE SYSTEM NAD 83 (1994) SOUTH ZONE) ALONG SAID QUARTER SECTION LINE A DISTANCE OF 1214.48 FEET FROM THE SOUTH QUARTER CORNER OF SAID SECTION 15, WHICH IS THE POINT OF COMMENCEMENT; THENCE N00°58'52"E ALONG SAID QUARTER SECTION LINE 379.34 FEET TO A FOUND UDOT RIGHT OF WAY MONUMENT AT THE BEGINNING OF A NON-TANGENT CURVE CONCAVE TO THE SOUTH WITH A RADIUS OF 1382.40 FEET AND A RADIAL BEARING OF N51°25'05"W, SAID CURVE BEING ON THE SOUTHEASTERLY LINE OF I-15 AS SHOWN ON THE UDOT RIGHT OF WAY PLAT PROJECT NO. SP-15-1(13)10, SHEET NO. RW-8 THROUGH RW-12; THENCE ALONG SAID LINE THE FOLLOWING THREE (3) COURSES: 1) NORTHEASTERLY ALONG SAID CURVE A DISTANCE OF 119.21 FEET, THROUGH A CENTRAL ANGLE OF 4°56'27", 2) N48°07'00"E 213.36 FEET, TO A FOUND UDOT RIGHT OF WAY MONUMENT, 3) N52°31'36"E 894.21 FEET, TO THE INTERSECTION OF SAID LINE WITH THE PROLONGATION OF AN EXISTING FENCE, ON THE WEST LINE OF THE SANDALE SUBDIVISION, PER THE RECORDED PLAT ON FILE, OFFICIAL RECORDS; THENCE S01°29'11"W ALONG THE PROLONGATION AND THE EXISTING FENCE ON SAID WEST LINE 1162.92 FEET, TO THE NORTH LINE OF TELEGRAPH STREET (SR-212) ALSO KNOWN AS OLD HIGHWAY NO. 91; THENCE S67°08'51"W ALONG SAID NORTH LINE 601.59 FEET, TO THE EAST LINE OF THE TELEGRAPH MARKETPLACE SUBDIVISION AMENDED, PER THE RECORDED PLAT ON FILE, OFFICIAL RECORDS, MARKED BY A FOUND REBAR AND CAP STAMPED B&G LS 334569; THENCE N01°00'21"E ALONG SAID EAST LINE 235.18 FEET, TO THE NORTH LINE OF SAID SUBDIVISION, MARKED BY A FOUND REBAR AND CAP STAMPED B&G LS 334569; THENCE N89°10'12"W ALONG SAID NORTH LINE 372.91 FEET TO THE POINT OF BEGINNING.

CONTAINS 18.35 ACRES, MORE OR LESS.

**EXHIBIT "B"**

**SITE PLAN OF SHOPPING CENTER**


**[SEE ATTACHED PAGE(S)]**



## EXHIBIT "C"

## RULES AND REGULATIONS

Tenant shall, at all times during the term of this Lease:

1.      Use, maintain and occupy the Premises in a careful, safe, proper and lawful manner and keep the Premises and its appurtenances in a clean and safe condition.

2.      Keep all glass in the doors and windows of the Premises in clean and good repair subject to the right to place advertising materials on the doors and windows as provided in the Lease.

3.      Not place, maintain or sell any merchandise in any vestibule or entry to the Premises, on the sidewalks adjacent to the Premises (other than as permitted in the Lease with respect to Tenant's outdoor seating area), or elsewhere on the outside of the Premises, except as permitted under the terms of the Lease.

4.      Keep the Premises in a clean, orderly and sanitary condition, free of insects, rodents, vermin and other pests.

5.      Not permit undue accumulations of garbage, trash, rubbish and other refuse in the Premises, and keep refuse in closed containers within the interior of the Premises until removed.  All outdoor trash receptacles must be kept closed and locked at all times other than usual business hours.

6.      Not use, permit or suffer the use of any apparatus or instruments for musical or other sound reproduction or transmission in such a manner that the sound emanating therefrom or caused thereby shall be audible beyond the interior of the Premises.

7.      Not use or permit the use of any flashing lights or search lights beyond the interior of the Premises in a manner so as to constitute a nuisance.

8.      Not deliver or suffer or permit delivery of merchandise to the front entrance of the Premises after 10:00 a.m. on any day.

9.      Light the show windows and exterior signs of the Premises from dusk to dawn or as otherwise directed by Landlord from time to time.

10.      Keep all mechanical apparatus free of vibration and noise which may be transmitted beyond the confines of the Premises.

11.      Not cause or permit objectionable odors to emanate from the Premises.

12.      Not overload the floors or electric wiring without Landlord's prior written consent.

13.      Not use show windows in the Premises for any purpose other than display of merchandise for sale in a neat and attractive manner, except as otherwise provided in the Lease.

14.      Not conduct, permit or suffer any public or private auction sale to be conducted on or from the Premises.

15.      Not solicit business in the parking areas or other common areas and facilities in the Shopping Center or distribute handbills or other advertising materials, and if this provision is violated, Tenant shall pay Landlord the cost of collecting same from the common areas for trash disposal.

C-1

16.     Not use the plumbing facilities in the Premises for any purpose other than that for which they are constructed or dispose of any foreign substances therein, whether through the utilization of "garbage disposal" units or otherwise.  If Tenant uses the Premises for the sale, preparation or service of food for on-premises or off-premises consumption, Tenant shall install such grease traps as shall be necessary or desirable to prevent the accumulation of grease or other wastes in the plumbing facilities servicing the Premises.

17.     Not operate in the Premises or in any of the Shopping Center any coin or token operated vending machine or similar devices for the sale of any merchandise or service, except for soda machines located where the same are not generally available to the public visiting Tenant's store but located to be accessible only for employees or for such of Tenant's customers as are attending classes at the Premises.

18.     Not use any of the Premises for lodging purposes.

19.     Not use, permit, or suffer any skateboards, rollerskates or other moveable contrivance except for or by handicapped persons.

20.     Not permit its employees to smoke at the Shopping Center other than within smoking areas located outside of the Building that are designated and redesignated by Landlord from time to time.

21.     Not use the Premises for sleeping apartments or lodging, nor any auction, distress, going out-of-business, fire or bankruptcy sales.

22.     Not sell merchandise from vending machines or allow any coin-operated vending, gaming, arcade, or video game machines on the Premises.

23.     Not use or operate the Premises so as to emit therefrom any noise, litter, or odor which, in Landlord's reasonable opinion, is obnoxious or otherwise constitutes a public or private nuisance.

24.     Not permit within any part of the Premises the display, sale, rental, or use of any item or thing which, in Landlord's sole opinion, is pornographic, lewd, vulgar, obscene, graphically violent, gang-related or immoral (including, without limitation, any suggestive so-called "adult" newspaper, book, magazine, picture, representation or merchandise of any kind, nude photographs, sexual devices, objects depicting genitalia, or any similar items).

Landlord reserves the right to make such other rules and regulations as in its judgment may from time to time be needed for the safety, care and cleanliness of the Shopping Center and for the preservation of good order therein provided, however, that any such rules and regulations shall not affect the financial terms of the Lease or the Tenant's use of the Common Areas except as otherwise provided in the Lease.

## EXHIBIT "D"

## LANDLORD'S WORK

The following is a description of the construction, and limitations of same, which will be provided by Landlord and is referred to as "Landlord's Work":

## LANDLORD'S WORK

Landlord shall, at its cost and expense construct the building shell of the Premises ("Gray Shell) plus those certain improvements to be included therein as expressly delineated in the plans and specifications attached hereto and made a part hereof and named: "Roberts Crafts Tenant Improvements" dated June 20, 2006 (Roberts Crafts Centerville Plans). The Premises shall be deemed as ready for Tenant's Work and said delivery to Tenant for possession when Landlord shall have substantially completed construction of the portion of the Premises to be occupied exclusively by Tenant in accordance with the foregoing plans.

(See plans and specifications attached hereto)


## TENANT'S WORK

If there are items of initial construction beyond the Landlord's Work which Tenant elects to construct in, on, under or about the Premises, such items of initial construction shall be deemed to be a part of "Tenant's Work" and shall be performed at Tenant's sole cost and expense and in accordance with the terms and conditions of Article 10.

0126-0011 \ Cotton Mill II Roberts Crafts Lease v12

**EXHIBIT "E"**

**SIGN CRITERIA**


**[SEE ATTACHED PAGE(S)]**

COTTON MILL TWO
SIGN PLAN

The purpose of this Sign Exhibit is to establish a quality atmosphere while creating an environment which produces maximum traffic and promotes the greatest sales for all tenants in Cottonmill Two. It is intended that signage be developed in a coordinated and compatible manner. Prior to opening for business, Tenant shall design, construct and install Tenant's signage at Tenant's sole cost and expense in accordance with the Sign Criteria set forth below. Conformance herewith will be strictly enforced and any nonconforming or unapproved signs that are installed by Tenant must be brought into conformance at the expense of Tenant or be removed within (10) days after notice of nonconformance. The landlord is to administer and interpret these criteria:

A.    GENERAL REQUIREMENTS

1.  Tenant shall submit or cause to be submitted to Landlord before fabrication two (2) copies of detailed sign drawings for approval. Drawings shall include location, size, and layout, method of attachment, design and color of the proposed sign including all lettering and / or graphics.

2.  All permits for signs and their installation shall be obtained by Tenant or Tenant's representative. Tenant is responsible for compliance with all governmental criteria and fees.

3.  All Tenant signs shall be constructed and installed, including electrical hook-up, at Tenant's expense and be installed by a licensed sign contractor.

4.  All Tenant signs will be reviewed by Landlord for conformance with this criteria and overall design quality. Approval or disapproval of sign submittal based on aesthetics or design shall remain the sole right of Landlord.

5.  All Tenant signs and their installation shall comply with all local building and electrical codes.

6.  No signs perpendicular to the face of the building or storefront will be permitted.

7.  Electrical service to Tenant's sign shall be controlled by Tenant's time clock and Tenant's electrical meter. Such service and switches shall be provided and installed at Tenant's expense.

8.  It is the Tenant's sole responsibility to keep Tenant's sign maintained in good working order at all times. Signs in need of repair due to electrical

problems, vandalism, acts of nature or wear and tear must be repaired in a timely manner. If Tenant's sign is deemed unsafe, the Landlord reserves the right to disconnect the power to the Tenant's sign at the Tenant's expense.

9. Upon termination of the Lease, Tenant will remove its sign and repair, patch and/or paint any damaged areas caused by the sign to a condition acceptable to Landlord.

B.    GENERAL SPECIFICATIONS

1. Each Tenant is allowed to have one (1) wall sign on the front facing wall, and where applicable a freeway facing wall sign may be granted by the Landlord.

   a. Tenants leasing 15,000 square feet or less. The sign shall not exceed a maximum of 15% of the wall surface area. (Wall surface area means the total surface area of the wall that the sign is to be mounted on; calculated by multiplying the length by the height of the wall.) In no event shall the sign exceed 48" (4 ft.) in height.

   b. Tenants leasing more than 15,000 square feet may have additional square footage at the Landlord's discretion. In no event shall the square footage exceed 20 % of the wall surface area or exceed 48" (4 ft.) in height.

2. All signs shall be pan channel letters, with 5 inch returns, and internally illuminated with translucent faces. Signs must be manufactured from aluminum or other non-corrosive materials.

3. Freestanding signs. Landlord will provide 2 freestanding signs in the shopping center. See attached site plan for the signage locations.
   a. One (1) freestanding monument sign, consisting of 75 square feet, will be mounted on Telegraph Road.
   b. One (1) pylon sign will be mounted for freeway view. Notwithstanding that the Landlord shall apply for a Conditional Use Permit requesting for the maximum of 700 square feet, the sign shall originally be 500 square feet.

C.    SIGNAGE PROHIBITED

1. Individual freestanding signs. Select Tenants may be provided with a Tenant Panel on the Center Signs at the Landlords discretion.

2. Halo illuminated signs.

3.  Sign cabinets.

4.  Banners or other temporary signage.

5.  Signs mounted on raceways.

6.  Signs with exposed lighting sources, or exposed neon.

7.  Non illuminated signs

8.  Signs painted on building.

9.  Flashing, blinking, moving, animated, or audible signs.

10. Vacuum formed plastic lettering

11. No exposed lamps, transformers, tubing, raceways, crossover, conductors or conduit will be permitted.

12. No labels will be permitted on the exposed surface of signs, except those required by local ordinance.

13. Signs other than those approved by the Landlord.

14. No awnings on main store fronts. Awnings on pad sites are subject to Landlord's approval.

D.    MISCELLANEOUS SIGNAGE

1.  Doors and Windows:  Lettering on doors or windows may not be illuminated, shall not exceed two inches (2") in height and shall be submitted to Landlord for approval prior to installation. No temporary or permanent paper signs shall be permitted to be applied to the interior or exterior faces of storefront glass or other storefront materials.

2.  Sidewalks:  No signs shall be placed on sidewalks.

3.  Responsibility:  All Tenant signs, permits, and related or resulting construction shall be Tenant's responsibility and all signs shall be installed under the supervision of Landlord. No sign maker's identification tubs or stickers shall be permitted. Sign Contractor shall repair any damage to property caused by his work.

E.    INSTALLATION

1. Tenant must have Landlord's written approval on exact location and design of the sign in relation to Tenant's storefront prior to installation.

2. Electrical service and hook-up to all signs shall be from Tenant's meter at Tenant's expense. Signs to operate by Tenant's time clock at Tenant's expense.

3. Raceway, conduits, transformers and other equipment must be concealed behind the wall surface.

4. Tenant's sign contractor shall repair any damage caused by said contractor's work or by its agents or employees.

5. Tenant shall be liable for the operations of Tenant's sign contractor.

6. All penetrations of the building structure required for sign installation shall be sealed in a watertight condition and shall be patched to match the adjacent finish.

7. Tenant signs shall not project above the walls upon which they are attached.

Owner:

Cotton Mill II, L.L.C., a
Utah limited liability company,

    By: Forum Capital, LC, a
    Utah limited liability company,
    Its Managing Member,

    By: _____
       R. Paul Barker, Manager

**EXHIBIT "E-1"**

**TENANT'S BUILDING SIGNAGE**

**[SEE ATTACHED PAGE(S)]**

0126-0011 \ Cotton Mill II Roberts Crafts Lease v12





Conceptual only 7/1.W.

WEST ELEVATION
TOTAL SIGNAGE: 174 ☑
TOTAL ALLOWED: 330 ☑

EAST ELEVATION  TOTAL SIGNAGE: 162 ☑
SCALE 1/16"=1'-0" TOTAL SIGNAGE ALLOWED: 165 ☑

**ALLIED ELECTRIC**
**SIGN & AWNING**
PH: (801) 972-5503  FAX: (801) 972-5670
1920 SOUTH 900 WEST, SALT LAKE CITY, UT 84104

Client: *ROBERTS*
Date Last Revised: *7/12/05*      Scale: *3/32" = 1'*    Sales: *JEREMY*
Designer: *Jamie*
Address:

CLIENT IS RESPONSIBLE TO PROVIDE ALL ELECTRICAL TO 5'0" FLAT IF REQUIRED.

**EXHIBIT "E-2"**

**TENANT'S PYLON AND MONUMENT SIGNAGE**

**[SEE ATTACHED PAGE(S)]**

E-2-1





B

**EXHIBIT "E-3"**

**LOCATION OF TENANT'S SIGNAGE
ON PYLON AND MONUMENT SIGNS**

**[SEE ATTACHED PAGE(S)]**

0126-0011 \ Cotton Mill II Roberts Crafts Lease v12





**EXHIBIT "F"**

**EXCLUSIVES AND USE RESTRICTIONS**

Tenant shall not, without the prior written consent of Landlord, permit the Premises to be used for any of the following uses or purposes, and Tenant shall not, without the prior written consent of Landlord, use the Common Areas for any of the following uses or purposes:

1.      The Premises shall not be used for any use or purpose prohibited by that certain Reciprocal Easement Agreement between Cotton Mill II, LLC, and Kohl's Department Stores, Inc. (the "REA"), which shall include, without limitation, the following:

(a)      Warehouse, storage (except on an ancillary basis in connection with a use not otherwise prohibited hereunder) or for any assembling, manufacturing, distilling, refining, smelting, agricultural or mining operation;

(b)      "Second hand" store whose principal business is selling used merchandise, thrift shops, Salvation Army type stores, "goodwill" type stores, and similar businesses;

(c)      Mobile home park, trailer court, labor camp, junk yard, or stock yard (except that this provision shall not prohibit the temporary use of construction trailers during any periods of construction, reconstruction or maintenance);

(d)      Dumping, disposing, incinerating, or reducing of garbage (exclusive of dumpsters for the temporary storage of garbage and any garbage compactors, in each case which are regularly emptied so as to minimize offensive odors);

(e)      Fire, going out of business, relocation, bankruptcy or similar sales (unless pursuant to court order);

(f)      Central laundry, dry cleaning plant, or laundromat; provided, however, this restriction shall not apply to any dry cleaning facility providing on site service oriented to pickup and delivery by the ultimate consumer, including, nominal supporting facilities;

(g)      Selling or leasing new or used automobiles, trucks, trailers, or recreational vehicles;

(h)      Any bowling alley, skating rink, or business whose annual gross sales of alcoholic beverages from its premises exceeds 40% of the total annual gross sales from such premises, dance hall, discotheque, night club, amusement gallery, gymnasium or video game room (except that this shall not prohibit up to five video games within a business not otherwise prohibited hereunder) or off track betting parlor;

(i)      Veterinary hospital or animal raising or boarding facilities (except that this restriction shall not be deemed to preclude the operation of pet shops or a business engaged in the retail sale of pets, pet food, and other products and services related to pets and animals, such as PETsMART or Petco);

(j)      Funeral home or mortuary;

(k)      Any establishment which stocks, displays, sells, rents or offers for sale or rent any (i) pornographic material (except that this restriction shall not apply to any national or regional bookstore such as Borders Books or Barnes & Noble); or (ii) any merchandise or material commonly used or intended for use with or in consumption of any narcotic, dangerous drug or other controlled substance,

F-1

including without limitation, any hashish pipe, waterpipe, bong, cilium, pipe screens, rolling papers, rolling devices, coke spoons or roach clips;

   (l)  Flea market;

   (m)  Car wash;

   (n)  Operation whose principal use is a massage parlor; provided this shall not prohibit massages in connection with a beauty salon or health club or athletic facility;

   (o)  Living quarters, sleeping apartments or lodging rooms;

   (p)  Tattoo parlor;

   (q)  Church, school, day care center or related religious or educational facility or religious reading room;

   (r)  Automotive service and repair;

   (s)  General office use in excess of (i) 10,000 square feet on the Kohl's Tract (as defined in the REA) or (ii) 10,000 square feet on Developer Tract (as defined in the REA) and the Outparcels (as defined in the REA), in the aggregate, provided that this restriction on general office use paragraph shall not apply to any office used by any occupant so long as any such office is incidental to such occupant's use of the affected premises, and the restriction on general office use shall not apply to offices that provide services directly to consumers, including, without limitation, financial institutions, real estate brokerage offices, securities brokerage offices, title companies, escrow agencies, travel agencies, insurance agencies, medical, dental, optical, chiropractic, and/or legal offices or clinics, and financial, tax planning and/or accounting services (collectively, "Retail Offices") provided, however, that Retail Offices and any general office permitted pursuant to this subsection shall not occupy more than (i) 10% of the floor area constructed on the Kohl's Tract or (ii) 10% of the floor area constructed on the Developer Tract and the Outparcels, in the aggregate;

   (t)  Cinema or movie theater;

   (u)  Amusement arcades or game rooms (except that this shall not prohibit up to five video games within a business not otherwise prohibited hereunder), or amusement centers; or

   (v)  Except on the Kohl's Tract, any department store with over 50,000 square feet of floor area which devotes more than 20,000 square feet of floor area in the aggregate to the sale of apparel provided, however, that the foregoing restriction shall not prohibit the operation of a sporting goods store such as a "Sportsman's Warehouse" or "Gander Mountain" in the Shopping Center. For purposes of this subsection, one-half of the aisle space adjacent to any retail apparel display shall be included in calculating the applicable floor area. *[Section 6.2 of REA]*

  2.  No merchandise, equipment or services, including, but not limited to, vending machines, promotional devices and similar items, shall be displayed, offered for sale or lease, or stored on the sidewalks in front of or alongside the buildings on the Developer Tract or the Outparcels or within the remainder of the common area of the Developer Tract and the Outparcels without the prior written approval of the Approving Parties (as defined in the REA), which approval may be granted or withheld in their sole and absolute discretion. Notwithstanding the foregoing restriction, patio dining areas and other outdoor seating areas associated with restaurant operations shall be permitted on the areas of the Developer Tract indicated on the site plan attached to the REA as outdoor seating and on the outparcels. Occasional sidewalk sales may be conducted by individual occupants of the Developer Tract provided that such sales by any individual occupant shall not occur more than four times annually with a duration not to

exceed five days per occurrence. *[Section 6.3 of REA]*

    3.    No restaurant shall be permitted on the Developer Tract within 200 feet of the building on the Kohl's Tract (excluding sales of food and beverages by another occupant that are incidental to the primary business of such occupant, such as a coffee bar/café in the premises of a bookstore) without the prior written approval of the Approving Party for the Kohl's Tract (as defined in the REA), which approval may be granted or withheld in its sole and absolute discretion. *[Section 6.4 of REA]*

    4.    No tenant or occupant will conduct as its primary business at the Shopping Center a retail store engaged in the sale or rental of video products, music products, books, magazines, electronic and video games (collectively, the "Exclusive Use Items") and/or a retail store operating as a Coffee Shop (as hereinafter defined) (herein referred to as a "Restricted Use Clause"). For purposes of this paragraph, the term "Coffee Shop" shall mean a "coffee or espresso bar" or "coffee shop" or similar operation (specifically excluding, without limitation, any donut and/or cookie store [such as Mrs. Fields Cookies] and any bakery [such as Paradise Bakery]) providing its customers with beverages, food and other related items including, without limitation, coffee, tea and other beverages, pastries, sandwiches, snacks and other pre-prepared or packaged food or beverage items, as well as related merchandise, either for sale or complimentary and for either on-site or take-out consumption. Notwithstanding the foregoing, other tenants and occupants of the Shopping Center may sell or rent the Exclusive Use Items on an incidental basis, which shall mean that the annual gross sales from sales or rentals of such items by a tenant or occupant shall not exceed ten percent (10%) of the total annual gross sales from the Shopping Center by such tenant or occupant. Additionally, the sale of coffee, tea or other beverages by a non-Coffee Shop restaurant operator or tenant as an incidental part of its general restaurant operation, shall not be deemed a violation of this Section. *[Section 4.02 of Hastings Entertainment Lease]*

    5.    No Tenant or occupant will (a) conduct as its primary business at the Shopping Center a full-service hamburger restaurant, or (b) operate a restaurant using the trade name "Cheeseburger in Paradise", "TGI Friday", or "Chili's". Notwithstanding the foregoing, other tenants and occupants of the Shopping Center may sell hamburgers on an incidental basis, which shall mean that the annual gross sales of such items by a tenant or occupant shall not exceed fifteen percent (15%) of the total annual gross sales from the Shopping Center by such tenant or occupant. *[Section 12.6 of Red Robin Lease]*

*[Note: The bracketed text appearing at the end of each paragraph of this Exhibit is for reference purposes only and shall not constitute part of this Exhibit.]*

F-3