# EXHIBIT 6

February 29, 2012 Second Amendment to Lease and Consent Agreement between Cotton Mill II, LLC and Jo-Ann Stores, Inc. (the "<u>Washington Lease Second Amendment</u>")

## SECOND AMENDMENT TO LEASE AND CONSENT AGREEMENT

This Second Amendment to Lease and Consent Agreement ("Amendment") is dated as of this 29th day of February, 2012, but made effective as of the Effective Date (as defined below) by and between **COTTON MILL II, LLC**, a Utah limited liability company ("Landlord") and **JO-ANN STORES, INC.**, an Ohio corporation ("Tenant").

### WITNESSETH:

WHEREAS, Landlord and Tenant, through its predecessor-in-interest, entered into a certain Shopping Center Lease dated October 23, 2006 (the "Original Lease"), as amended by a certain First Amendment to Shopping Center Lease dated as of October 27, 2006 (as amended, the "Lease");

WHEREAS, the Lease relates to certain premises consisting of 23,500 square feet of ground floor area ("Premises") in a shopping center located in Washington, Utah 84780, which shopping center is more particularly described in the Lease ("Shopping Center");

WHEREAS, Tenant desires to succeed to the right, title and interest of Provo Craft & Novelty, Inc., dba Roberts Arts and Crafts ("PCN") in the Lease and to the Premises through an Assignment and Assumption of Lease to be effective March 1, 2012, or as soon as possible thereafter (the "Assignment"). A copy of the form of Assignment is attached hereto and marked as Exhibit A;

WHEREAS, Tenant and PCN request that Landlord consent to the Assignment;

WHEREAS, the Lease expires on June 20, 2018; and

WHEREAS, Landlord desires to give its consent to the Assignment and Tenant desires to modify the Lease as hereinafter set forth.

NOW, THEREFORE, In consideration of the mutual covenants hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    <u>Recitals.</u> The foregoing recitals are incorporated herein by reference. Capitalized and defined terms used in this Amendment shall have the same meanings as those ascribed to them in the Lease, unless the context clearly dictates otherwise. Any reference herein to a "Party" shall mean Landlord or Tenant and any reference herein to "Parties" shall mean Landlord and Tenant. If there is any conflict between this Amendment and the Lease, this Amendment shall control. This Amendment and Landlord's consent to the Assignment will not become effective until the "Effective Date", which will be the later of (a) March 1, 2012, (b) the date of Landlord's receipt of fully-executed originals of this Amendment and the Assignment, (c) the date of Landlord's receipt of all amounts required to be paid by Tenant to Landlord at the time of Tenant's execution of this Amendment, and (d) the date on which Landlord has obtained all third-party consents required for Landlord's execution of this Amendment.

0126.0011 / Second Amendment to Lease v8

2.     <u>Trade Name</u>. As of the Effective Date, Tenant's registered trade name is: *Jo-Ann Fabric and Craft Stores®*.

3.     <u>Term.</u> The Initial Term of the Lease commenced on June 21, 2008 (or the Rent Commencement Date pursuant to Article 1 of the Lease) and ends on June 20, 2018.

4.     <u>Rent</u>. Commencing on the Effective Date, and notwithstanding anything to the contrary contained in the Lease:

     (a)     Minimum Annual Rent under the Lease shall be as set forth in the below rent chart.

     (b)     Tenant shall pay additional rent and all other charges in accordance with the terms of the Lease; however, it  understood by the parties that beginning in 2014, Tenant's proportionate share of Controllable Common Area Expenses (as defined below) for each calendar year will not exceed the Controllable Common Area Expenses Cap (as defined below). The term "Controllable Common Area Expenses" means all Common Area Expenses other than snow removal, Real Property Taxes, utilities, Property Insurance, and other insurance. The "Controllable Common Area Expenses Cap" for 2014 will be calculated by multiplying actual Controllable Common Area Expenses for 2013 by 105%. The Controllable Common Area Expenses Cap will increase by 5%, compounded annually, for each calendar year after 2014. If the Premises are expanded at any time during the Term, there will be a proportionate increase in the Controllable Common Area Expenses Cap.

     (c)     There shall be no so-called "percentage rent" owed by Tenant (the Parties hereby acknowledging that the Lease does not presently contain any requirement for Tenant to pay percentage rent).

5.     <u>Prior Rent Payments</u>. The parties acknowledge and agree that PCN has paid all Minimum Annual Rent due under the Lease through February 28, 2012, and that PCN has paid Tenant's Proportionate of Common Area Expenses (based solely on Landlord's estimate) through February 28, 2012.

6.     <u>Options.</u> At the expiration of the Initial Term, Tenant has the option to renew the Lease for four (4) additional 5-year periods in accordance with the terms of the Lease upon the terms and conditions of the Lease except as modified herein.

7.     <u>Rent Chart.</u>

| **Months** | **$ PSF** | **$ Monthly Payment** |
| --- | --- | --- |
| Effective Date – 5/31/2013 | $ 12.25 | $ 23,989.58 |
| 6/1/2013-6/19/2018 | $ 13.45 | $ 26,339.58 |
| **1st Option** | | |
| 6/20/2018 – | $ 11.00 | $ 21,541.67 |

0126.0011 / Second Amendment to Lease v8

| **Months** | **$ PSF** | **$ Monthly Payment** |
|---|---|---|
| 12/31/2023 | | |
| | | |
| **2nd Option** | | |
| | | |
| 1/1/2024 - 12/31/2028 | $ 12.00 | $ 23,500.00 |
| | | |
| **3rd Option** | | |
| | | |
| 1/1/2029 - 12/31/2033 | $ 13.00 | $ 25,458.33 |
| | | |
| **4th Option** | | |
| | | |
| 1/1/2034 - 12/31/2038 | $ 15.50 | $ 30,354.17 |

8.    Use of Premises. Paragraph 15 of the Basic Lease Provisions is deleted in its entirety and is replaced with the following:

"Permitted Use:  Subject to the restrictions set forth on Exhibit "F", Tenant may use the Premises for the sale of any of the following: bolted and/or unfinished fabrics of any kind, fabrics sold by the yard, upholstery materials, fabrics with patterns, knitting supplies, needlepoint supplies, macramé supplies, artificial flowers, all types of arts and crafts materials and supplies (including jewelry arts and crafts), framed artwork; custom framing, scrapbooks and scrapbooking supplies and materials, yarns and all types of notions used for knitting, sewing, needlepoint and upholstery, sewing machines, sewing machine furniture, fabric care items and products, accessories and services related to all of the foregoing and other items and services customarily offered for sale by a fabric and arts and crafts store."

9.    Protected Use. As of the Effective Date, the first and last sentences of Section 30.23 of the Original Lease are deleted in their entirety and the following sentences are substituted in lieu thereof  (and any conflicts between the language of the Original Lease and this Amendment shall be resolved in favor of this Amendment):

"30.23 Exclusive Use.  Subsequent to the Effective Date (as defined in the Second Amendment to Lease and Consent Agreement) and continuing throughout the  Term, so long as no Event of Default exists hereunder, Landlord agrees, during the time that Jo-Ann Stores, Inc., an Ohio corporation constitutes the "Tenant" under this Lease, that Landlord will not enter into a lease for space within the Shopping Center to a "direct category competitor of Tenant" (which means a retail store whose primary business is (i) a store selling bolted and/or unfinished fabrics, (ii) an arts and crafts store (selling, for example, artificial flowers and accessories designed for use with artificial flowers, or needle craft supplies and materials, or scrapbooking supplies and materials, and/or framing or custom framing), or (iii) a sewing machine store), such as, by way of example and not limited to, Michaels Arts & Crafts, AC Moore, Hobby Lobby, Sierra Pacific Crafts, Ben Franklin Arts & Crafts,

Page 3

Beverlys, Hancock Fabrics, Calico Corners, Hobby Lobby, Archivers, Recollections, Aaron Brothers custom framing, Singer, Bernina, Viking White, Husquervarna and Pfaff (herein referred to as a "Restricted Use Clause" or "Protected Use"). Notwithstanding the foregoing, any other tenant or occupant of the Shopping Center may sell bolted and/or unfinished fabrics, arts and crafts supplies (including artificial flowers and accessories designed for use with artificial flowers, needle craft supplies and materials, scrapbooking supplies and materials, and framing or custom framing) and/or sewing machines on an incidental basis, which means that the aggregate annual gross sales of such items by such tenant or occupant from its premises shall not exceed fifteen percent (15%) of the total annual gross sales from such premises. Notwithstanding the foregoing, this Section 30.23 will not apply to (a) any leases entered into by Landlord prior to the Effective Date nor any amendments or renewals of such leases, assignments of such leases or sublessees under such leases, or (b) the premises leased by Landlord to 5B Red Robin St. George, LLC, or (c) any business operating primarily as a drug store. If the tenant under any lease entered into by Landlord prior to the Effective Date requests Landlord's consent to an assignment of its lease or a subletting of its premises, Landlord will use commercially reasonable efforts to condition its consent on the tenant's agreement to be bound by the Restricted Use Clause; provided, however, that if Landlord determines, in its sole and unfettered discretion, that it is unable to impose such condition or that imposing such condition could expose Landlord to liability with respect to such lease, then Landlord will not attempt to impose such condition on the tenant."

10.    <u>Continuous Use</u>. Notwithstanding anything to the contrary contained in the Lease, Tenant shall have the right to cease operating in the Premises provided Tenant continues to pay all Minimum Annual Rent and other charges due and payable under the Lease and continues to perform all other obligations under the Lease. Should Tenant cease operations, the provisions of Article 27 of the Original Lease will apply.

11.    <u>Use Restrictions</u>. Exhibit "F" of the Original Lease is deleted in its entirety and is replaced with Exhibit "F" attached hereto.

12.    <u>Notices.</u> Landlord's and Tenant's notice addresses under the Lease are hereby amended by deleting the addresses set forth therein and substituting the following therefor:

if to Landlord:    Cotton Mill II, LLC
c/o Forum Capital, L.C.
4800 North Scottsdale Road, Suite 1200
Scottsdale, AZ 85251
Attn: R. Paul Barker

With a copy to:    R. Michael Valenzuela
P.O. Box 32964
Phoenix, AZ 85064

if to the Tenant at:    Jo-Ann Stores, Inc.
5555 Darrow Road
Hudson, OH 44236
Attn: Senior Vice President, Real Estate

Page 4

with a copy to:    Jo-Ann Stores, Inc.
5555 Darrow Road
Hudson, OH 44236
Attn: Senior Legal Counsel

13.    Tenant Signage. Subject to Tenant obtaining all approvals required under Article 8 of the Original Lease and Tenant complying with Article 8, at its sole cost, Tenant has the right to install and maintain signage on the exterior of the Premises and on the Monument Sign and the Pylon Sign. Tenant's compliance with Article 8 includes Tenant's submittal to Landlord of site-specific plans and specifications for any signage to be installed by Tenant. Tenant further agrees that it shall comply with all state, federal, and local laws, statutes, ordinances, rules and regulations governing the Premises ("Laws"). In determining whether to grant its approval of Tenant's proposed signage, Landlord's decision will be based primarily on the parameters set forth in the Sign Criteria attached to the Original Lease as Exhibit "E". Notwithstanding anything to the contrary in such Sign Criteria, Tenant and Landlord acknowledge and agree that, subject to Tenant obtaining all approvals required by applicable Laws and Tenant's compliance with the REA:

(a)    Tenant's sign lettering of the word "Jo-Ann" on the exterior front of the building shall be 48" in height and the sign sub-lettering of the words "fabric and crafts" shall be 24" in height, with a total length of said sign being 25 feet, as indicated on the marked-up prototype plans, a copy of which is attached hereto and marked Exhibit B;

(b)    Tenant's sign lettering of the word "Jo-Ann" on the exterior side of the building shall be 36" in height and the sign sub-lettering of the words "fabric and crafts" shall be 18" in height, with a total length of said sign being 18' 8", as indicated on the marked-up prototype plans, a copy of which is attached hereto and marked Exhibit B;

(c)    Tenant has the right to install temporary signage as described on Exhibit B;

(d)    Tenant has the right to install interior window signage (approximately 3 or 4 such signs of the size depicted on Exhibit B, professionally prepared, with the design to be agreed upon by Landlord and Tenant) consistent with Tenant's regional or national marketing efforts, subject to the REA;

(e)    Approval by Landlord of the foregoing items "(a)" through "(d)" is not an opinion or representation by Landlord of compliance of such signage with Laws and the REA; and, Tenant shall remain exclusively responsible for compliance with Laws and the REA with regard to such signage.

14.    Landlord Representation. Landlord represents and warrants to Tenant that, as of the Effective Date:

(a)    The Lease and any ancillary documents executed in connection with the Lease constitutes the entire written agreement between PCN and Landlord and has not been modified or amended, except as indicated herein;

(b)    The Lease is in full force and effect; and

Page 5

(c)     To the undersigned's actual knowledge, PCN is not currently in default under the Lease (and there is nothing through the passage of time or otherwise which would lead to a default) and there are no pending litigation matters involving the Premises.

15.    Consent to Assignment.  Landlord hereby consents to the assignment of the Lease (as modified hereby) by PCN to Tenant pursuant to the form of assignment document that substantially complies with the attached Exhibit A.  This assignment does not release PCN from any obligation or liability under the Lease and PCN remains liable to Landlord after such assignment as a principal and not as a surety.  Pursuant to Section 12.5 of the Lease, Tenant shall pay Landlord a fee of $750 concurrently with its execution of this Amendment.

16.    As-Is.  Subject to Tenant's right to modify signage pursuant to Section 13 hereof and the repair and maintenance obligations of Landlord under the terms of the Lease, Tenant will take possession of the Premises on March 1, 2012 on an "as is" basis, and Tenant hereby accepts the condition of the Premises on the Effective Date.

17.    Broker.  Each of the parties hereto represents and warrants that, other than the brokerage commission payable by Landlord to Forum Capital, L.C., and by Landlord and PCN to Nick Clark pursuant to separate agreements, there are no other brokerage commissions or finders' fees of any kind due in connection with this Amendment, and each of the parties hereto agrees to indemnify the other against, and hold it harmless from, any and all liabilities, damages, costs, claims and obligations arising from any claim (including, without limitation, the cost of reasonable attorneys' fees in connection therewith) for a commission or finders' fee based on the act of the indemnifying party.

18.    Lender Consent.  Notwithstanding anything to the contrary in the Lease or any other document to which Tenant and Landlord are parties, Landlord and Tenant agree that in the event any lender of Landlord, or any other interested party, must give its consent prior to the execution of this document by Landlord, it shall be Landlord's responsibility to obtain such consent.

19.    Assignment.  This Amendment inures to the benefit of and binds the successors and assigns, respectively, of both the Landlord and Tenant.

20.    Counterpart and PDF Signature.  This Amendment may be executed in multiple counterparts, each of which shall constitute an original and all of which taken together shall constitute one and same agreement binding upon the parties, notwithstanding that all the parties are not signatories to the same counterpart. In order to facilitate the finalization of this Amendment, the parties agree that signatures transmitted by facsimile machine or signatures transmitted via e-mail in a "PDF" format may be used in place of original signatures on this Amendment.  Each party intends to be bound by such party's facsimile or "PDF" format signature on this Amendment, is aware that the other parties are relying on such party's facsimile or "PDF" format signature, and hereby waives any defenses to the enforcement of this Amendment based upon the form of signature.  Promptly following any facsimile transmittal or e-mail transmittal of "PDF" format signatures, the parties shall deliver to the other parties the original executed Amendment by reputable overnight courier to the notice addresses set forth in the Lease (it being agreed and understood that the delivery of such original shall not be a condition to the binding nature of the facsimile or electronic copy of the document provided such document is received by the parties).

21.    Captions.  The captions and headings in this Amendment are for convenience only and not a part of this Amendment and do not in any way limit, define, construe or describe the scope or intent of the terms or provisions of this Amendment.

22.    Authority.  If either party is not an individual, the person signing this document on behalf of Tenant or Landlord, as the case may be, represents (by such signature) that he or she has been duly authorized by the subject party to execute this document and that such signature creates a binding obligation of Tenant or Landlord, as the case may be.

*[Remainder of Page Intentionally Left Blank – Signatures Follow on Next Page]*

0126.0011 / Second Amendment to Lease v8

The parties have signed this Amendment as of the date first above written.

Landlord:
**COTTON MILL II, LLC**

By:  Forum Capital, L.C., a Utah limited liability company
Its:  Managing Member

By: _____
R. Paul Barker
Managing Member

Tenant:
**JO-ANN STORES, INC.**

Legal
GM
Approval

By: _____
Travis Smith
Chief Executive Officer and President

And

By: _____
James Kerr
Executive Vice President and
Chief Financial Officer

k:\attorney\grm documents\leases\fy 2012\roberts leases\washington (st. george), ut\lease amendment (lad)\st. george ut second_amendment_to_lease_v5 execution version (grm 02272012).doc

0126.0011 / Second Amendment to Lease v8

STATE OF ARIZONA      )
                             )SS

COUNTY OF MARICOPA   )

BEFORE ME, a Notary Public in and for said County and State, personally appeared R. Paul Barker, known to me to be the Managing Member of Forum Capital, L.C., the limited liability company that executed the foregoing instrument as Managing Member of **COTTON MILL II, LLC,** a Utah limited liability company, who acknowledged that she/he did sign the foregoing instrument on behalf of said entity, and that the same is the free act and deed of said entity and the free act and deed of such officer.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at *Scottsdale Arizona*, on February *28*, 2012.



NOTARY PUBLIC

STATE OF OHIO          )
                             )SS

COUNTY OF SUMMIT   )

BEFORE ME, a Notary Public in and for said County and State, personally appeared **JO-ANN STORES, INC.,** an Ohio corporation, the corporation that executed the foregoing instrument, by Travis Smith, its chief executive officer and president, and James Kerr, its executive vice president and chief financial officer, who acknowledged before me that they did sign the foregoing instrument on behalf of said corporation, and that the same is the free act and deed of said corporation and the free act and deed of such officers.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at Hudson, Ohio, on February *29*, 2012.

**BONITA MARIE CAESAR**
Notary Public, State of Ohio
My Commission Expires
August 17, 2012

NOTARY PUBLIC

Page 9

0126.0011 / Second Amendment to Lease v8

# EXHIBIT A

## Form of Assignment and Assumption of Lease effective March 1, 2012

THIS ASSIGNMENT AND ASSUMPTION OF LEASE (this "Assignment") is made this _____ day of _____, 2012, is by and between PROVO CRAFT & NOVELTY, INC., a Utah corporation (dba PCN Arts and Crafts) ("Assignor"), and JO-ANN STORES, INC., an Ohio corporation ("Assignee").

### <u>W I T N E S S E T H:</u>

WHEREAS, Assignor and Assignee have entered into that certain Lease Assignment Agreement, dated _____, 2012 (the "Master Agreement"), and the Lease (as defined below) is one of the leases that are the subject of the Master Agreement;

WHEREAS, Assignor and _____, a Utah limited liability company (the "Landlord"), entered into that certain Lease dated _____ _____, _____ and all subsequent amendments and modifications (the "Lease"), affecting a portion (said portion, the "Demised Premises") of that certain real property located in _____, Utah in _____ Shopping Center which Demised Premises is shown on <u>Exhibit "A"</u> attached hereto and incorporated herein by reference;

WHEREAS, pursuant to Article ____ of the Lease, Assignor has the right to assign the Lease subject to the prior consent of Landlord, which consent shall be secured through a separate document described below;

WHEREAS, pursuant to the Master Agreement, Assignor desires to assign the Lease to Assignee and Assignee desires to accept the assignment of the Lease from Assignor and to assume all of Assignor's duties and obligations thereunder;

WHEREAS, pursuant to that certain Second Amendment to Lease and Consent Agreement dated _____, 2012 (the "Second Amendment"), Landlord has consented to the assignment of such Lease by Assignor to Assignee; and

WHEREAS, the foregoing recitals are incorporated herein by reference.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee hereby agree as follows:

1.      <u>Recitals</u>. Capitalized and defined terms used in this Assignment shall have the same meanings as those ascribed to them in the Lease, unless the context clearly dictates otherwise. If there is any conflict between this Assignment and the Lease, the Lease shall control.

2.      <u>Assignment</u>. Assignor hereby grants, assigns, transfers and conveys unto Assignee, its successors and assigns, all of Assignor's right, title and interest as tenant in, to, and under the Lease and any memorandum of leases and subordination, attornment and non-disturbance agreements effective as of the Effective Date, as that term is defined in the Second Amendment.

0126.0003 / Second Amendment to Lease v8

3.    <u>Assumption</u>. Except as otherwise expressly provided herein, Assignee hereby accepts the foregoing assignment and, in consideration thereof, Assignee hereby agrees to assume, observe, perform, fulfill and be bound by all terms, covenants, conditions and obligations of the Assignor as Tenant under the Lease with respect to any period from and after the Effective Date in the same manner and to the same extent as if Assignee were the Tenant named therein.

4.    <u>Assignor's Representations</u>. Assignor hereby represents and warrants to Assignee that:

(a)    Without limiting the representations and warranties set forth in the Master Agreement, attached hereto as <u>Exhibit "B"</u> is a true and complete copy of the Lease and there have been no amendments or modifications thereto not contained in such <u>Exhibit "B"</u>;

(b)    The annual obligations of Assignor under the Lease, in addition to annual minimum rent, is estimated, based on the Lease and historical costs, as follows:

    i.    Real Estate Taxes: $_____ and tax thereon of $_____;
    ii.    Common Area Maintenance ("CAM") charges: $_____ and tax thereon of $_____;
    iii.    Insurance charges: $ (included in CAM); and
    iv.    Other charges: $ None <u>(it being agreed and understood that irrespective of the fact that there were no other charges during the periods defined hereinabove, Assignee is responsible for "other charges" which may arise in accordance with the terms of the Lease)</u>.

(c)    Landlord has delivered all improvements to the Demised Premises required to be furnished by Landlord under the Lease.

5.    <u>Indemnification</u>.    Assignor and Assignee acknowledge that any right to indemnification shall be governed by the terms of the Master Agreement.

6.    <u>Notices</u>. Notices hereunder shall be given by United States mail, postage prepaid, certified with return receipt requested, by hand delivery, or by a nationally recognized overnight courier (with evidence of receipt) and shall be effective upon receipt or refusal of receipt, and shall be addressed to the parties as follows:

If to Assignor:    Provo Craft and Novelty Inc.
    151 E. 3450 N.
    Spanish Fork, UT  84660

If to Assignee:    Jo-Ann Stores, Inc.
    5555 Darrow Road
    Hudson, Ohio 44236
    Attention: Senior Vice President, Real Estate

with a copy to:    Jo-Ann Stores, Inc.
    5555 Darrow Road
    Hudson, Ohio 44236

Exhibit A – Page 2

Attention: Senior Legal Counsel

Address for service of notice may be changed by written notice to the other party.

7.     Successors and Assigns.  The terms and conditions of this Assignment shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

8.     Counterparts.  This Assignment may be executed in counterparts and by facsimile, each of which shall be deemed an original, and all of which shall constitute one document.

9.     Governing Law, Venue.  This Agreement shall be governed by and construed and enforced in accordance with the substantive laws of the State of Ohio, without giving effect to any conflict of law principles.  The parties shall exercise any right or remedy herein exclusively in the Courts of Summit County, Ohio or in the United States District Court, Northern District of Ohio.  Each party consents to the exercise of jurisdiction and venue in these courts.

10.     Proration of Rent and Other Charges.  As between Assignor and Assignee, proration of rent and other charges shall be done in accordance with the terms of the Master Agreement.

11.     Recording.  This Assignment shall not be recorded..

12.     Further Assurances.  Assignor and Assignee agree that, at any time and from time to time, either at or following the Assignment Date, upon written request of the other party, it shall execute and deliver all such further documents and do all such other acts and things as may be reasonably required to confirm or consummate the within transaction, including, but not limited to, the correction of proration errors and the preparation, execution and delivery of documents and furnishing of all information required under applicable local, state or federal law with respect to the transaction contemplated by this Assignment.  The provisions of this Section 12 shall survive the Assignment Date for a period of two (2) years in accordance with the terms of the Master Agreement.

13.     Survival of Master Agreement. As between Assignor and Assignee, the terms and provisions of the Master Agreement between Assignor and Assignee, including without limitation those relating to indemnification agreements, shall survive the execution and delivery of this Assignment and shall not be merged herein.

14.     Assignment Date.  As used herein, the Assignment Date shall be _____ _____, 2012.

**IN WITNESS WHEREOF**, the parties hereto have caused this instrument to be duly executed on the day and year first set forth above.

Witnessed by:                                    **ASSIGNOR:**

                                                 **PROVO CRAFT & NOVELTY, INC.,**
_____                a Utah corporation

Printed:_____

Exhibit A – Page 3

0126.0003 / Second Amendment to Lease v8

By:_____

_____

_____

Printed:_____

_____

Printed:_____

**ASSIGNEE:**

**JO-ANN STORES, INC.,**
an Ohio corporation

_____

Printed:_____

By:_____
      Jeffrey N. Fink,
      Senior Vice President Real Estate

Exhibit A – Page 4

EXHIBIT A TO ASSIGNMENT AND ASSUMPTION

Demised Premises

EXHIBIT B TO ASSIGNMENT AND ASSUMPTION

Copy of Lease

# EXHIBIT B

## Marked-up Prototype Plans



Exhibit B Page 1



Exhibit _B_ Page 2



Exhibit B Page 2



Exhibit B ___ Page 4

**EXHIBIT "F"**

**Exclusives and Use Restrictions**

Tenant shall not, without the prior written consent of Landlord, permit the Premises to be used for any of the following uses or purposes, and Tenant shall not, without the prior written consent of Landlord, use the Common Areas for any of the following uses or purposes:

1.      Any use or purpose prohibited by that certain Reciprocal Easement Agreement between Cotton Mill II, LLC, and Kohl's Department Stores, Inc. (as amended, the "REA"), which shall include, without limitation, the following:

(a)      Warehouse, storage (except on an ancillary basis in connection with a use not otherwise prohibited hereunder) or for any assembling, manufacturing, distilling, refining, smelting, agricultural or mining operation;

(b)      "Second hand" store whose principal business is selling used merchandise, thrift shops, Salvation Army type stores, "goodwill" type stores, and similar businesses;

(c)      Mobile home park, trailer court, labor camp, junk yard, or stock yard (except that this provision shall not prohibit the temporary use of construction trailers during any periods of construction, reconstruction or maintenance);

(d)      Dumping, disposing, incinerating, or reducing of garbage (exclusive of dumpsters for the temporary storage of garbage and any garbage compactors, in each case which are regularly emptied so as to minimize offensive odors);

(e)      Fire, going out of business, relocation, bankruptcy or similar sales (unless pursuant to court order);

(f)      Central laundry, dry cleaning plant, or laundromat; provided, however, this restriction shall not apply to any dry cleaning facility providing on site service oriented to pickup and delivery by the ultimate consumer, including, nominal supporting facilities;

(g)      Selling or leasing new or used automobiles, trucks, trailers, or recreational vehicles;

(h)      Any bowling alley, skating rink, or business whose annual gross sales of alcoholic beverages from its premises exceeds 40% of the total annual gross sales from such premises, dance hall, discotheque, night club, amusement gallery, gymnasium or video game room (except that this shall not prohibit up to five video games within a business not otherwise prohibited hereunder) or off track betting parlor;

(i)      Veterinary hospital or animal raising or boarding facilities (except that this restriction shall not be deemed to preclude the operation of pet shops or a business

Exhibit F – Page 1

engaged in the retail sale of pets, pet food, and other products and services related to pets and animals, such as PETsMART or Petco);

(j)     Funeral home or mortuary;

(k)     Any establishment which stocks, displays, sells, rents or offers for sale or rent any (i) pornographic material (except that this restriction shall not apply to any national or regional bookstore such as Borders Books or Barnes & Noble); or (ii) any merchandise or material commonly used or intended for use with or in consumption of any narcotic, dangerous drug or other controlled substance, including without limitation, any hashish pipe, waterpipe, bong, cilium, pipe screens, rolling papers, rolling devices, coke spoons or roach clips;

(l)     Flea market;

(m)     Car wash;

(n)     Operation whose principal use is a massage parlor; provided this shall not prohibit massages in connection with a beauty salon or health club or athletic facility;

(o)     Living quarters, sleeping apartments or lodging rooms;

(p)     Tattoo parlor;

(q)     Church, school, day care center or related religious or educational facility or religious reading room;

(r)     Automotive service and repair;

(s)     General office use in excess of (i) 10,000 square feet on the Kohl's Tract (as defined in the REA) or (ii) 10,000 square feet on the Developer Tract (as defined in the REA) and the Outparcels (as defined in the REA), in the aggregate, provided that this restriction on general office use paragraph shall not apply to any office used by any occupant so long as any such office is incidental to such occupant's use of the affected premises, and the restriction on general office use shall not apply to offices that provide services directly to consumers, including, without limitation, financial institutions, real estate brokerage offices, securities brokerage offices, title companies, escrow agencies, travel agencies, insurance agencies, medical, dental, optical, chiropractic, and/or legal offices or clinics, and financial, tax planning and/or accounting services (collectively, "Retail Offices") provided, however, that Retail Offices and any general office permitted pursuant to this subsection shall not occupy more than (i) 10% of the floor area constructed on the Kohl's Tract or (ii) 10% of the floor area constructed on the Developer Tract and the Outparcels, in the aggregate;

(t)     Cinema or movie theater;

Exhibit F – Page 2

(u)    Amusement arcades or game rooms (except that this shall not prohibit up to five video games within a business not otherwise prohibited hereunder), or amusement centers; or

(v)    Except on the Kohl's Tract, any department store with over 50,000 square feet of floor area which devotes more than 20,000 square feet of floor area in the aggregate to the sale of apparel provided, however, that the foregoing restriction shall not prohibit the operation of a sporting goods store such as a "Sportsman's Warehouse" or "Gander Mountain" in the Shopping Center. For purposes of this subsection, one-half of the aisle space adjacent to any retail apparel display shall be included in calculating the applicable floor area.

2.    No merchandise, equipment or services, including, but not limited to, vending machines, promotional devices and similar items, shall be displayed, offered for sale or lease, or stored on the sidewalks in front of or alongside the buildings on the Developer Tract or the Outparcels or within the remainder of the common area of the Developer Tract and the Outparcels without the prior written approval of the Approving Parties (as defined in the REA), which approval may be granted or withheld in their sole and absolute discretion. Notwithstanding the foregoing restriction, patio dining areas and other outdoor seating areas associated with restaurant operations shall be permitted on the areas of the Developer Tract indicated on the site plan attached to the REA as outdoor seating and on the Outparcels. Occasional sidewalk sales may be conducted by individual occupants of the Developer Tract provided that such sales by any individual occupant shall not occur more than four times annually with a duration not to exceed five days per occurrence.

3.    No restaurant shall be permitted on the Developer Tract within 200 feet of the building on the Kohl's Tract (excluding sales of food and beverages by another occupant that are incidental to the primary business of such occupant, such as a coffee bar/café in the premises of a bookstore) without the prior written approval of the Approving Party for the Kohl's Tract (as defined in the REA), which approval may be granted or withheld in its sole and absolute discretion.

4.    The Premises shall not be used for the operation of (a) a restaurant using the trade name "Chili's," "Hooters," or "Fuddruckers," or (b) as a full-service restaurant that includes hamburgers as 25% of its menu items. For purposes of this paragraph, "full-service restaurant" shall mean a restaurant that provides wait-persons offering tableside ordering and tableside service. This paragraph does not apply to premises containing 20,000 square feet of floor area or more, not to any sublease of the entirety of such premises.

5.    The Premises shall not be used:

(a)    For the purposes of, or which is permitted to be, the sale of office, home office, school or business products, computers and computer products, office, home office, school or business supplies or equipment; office furniture; mobile or portable telephones or pagers; or electronics (including by way of example those businesses operated by Office Depot, Staples, Office Shop Warehouse, Mardel Christian Office and Education Supply Store, and Workplace); or for use as a business support center, copy center or

Exhibit F – Page 3

"Kinko" type of operation (all of which are referred to in this paragraph as the "Prohibited Uses"), except to the extent permitted by subparagraphs (b), (c), and (d) immediately below;

(b)     For any purpose which would permit more than (i) two thousand (2,000) square feet of space to be used for any Prohibited Uses, or (ii) ten percent (10%) of such user's floor area to be used for purposes of any Prohibited Uses, whichever is less; or

(c)     For any purpose which, taken in the aggregate for the entire Shopping Center, would permit more than five thousand (5,000) square feet of space in the Shopping Center to be used for any of the Prohibited Uses; or

(d)     For a store for the sale and/or servicing of cellular or wireless telephones, pagers, cellular or wireless communication devices, PCS telephones, digital telephones, and related items and services in greater than 2,500 square feet of space in the Shopping Center.

6.     (a)     No portion of the Shopping Center located within two hundred linear feet (200') of the demising walls of the space originally leased to OfficeMax North America, Inc. (the "OfficeMax Premises") shall be used as a restaurant (except that restaurants shall be permitted on the Pads shown on Exhibit "B" of the OfficeMax lease), or for office purposes (such as medical or office uses, except that (i) a veterinary clinic operated in conjunction with, and as a part of, a PetsMart, Petco, or other similar store shall be permitted, and (ii) offices shall be permitted as set forth in subparagraph (b) below), or for any use that requires parking in excess of five (5) spaces for each one thousand (1,000) square feet of leasable floor area (except that such uses shall be permitted on the Pads shown on Exhibit "B" of the OfficeMax lease), or for any use prohibited under subparagraph (b) immediately below, provided that none of the foregoing shall prohibit the operation of a coffee shop, cafeteria or other food service operation within, and as an incidental part of, a retail store if such food service operation does not have an exterior entrance. For purposes of this subparagraph, any occupant occupying less than two thousand (2,000) square feet of leasable floor area shall not be deemed to be a restaurant.

(b)     No portion of the Shopping Center shall be occupied or used, directly or indirectly, for a nightclub or other entertainment facility, bowling alley, arcade (provided that not more than five (5) video games shall be permitted in retail stores or restaurants), amusement center, theater, movie theater, fitness center, health club or spa (provided that a first-class day spa shall be permitted), game room, skating rink, billiard room, massage parlor (provided that massage services offered on an incidental basis by a day spa, a beauty salon, a medical doctor or chiropractor, shall be permitted, as long as such day spa, beauty salon, medical doctor or chiropractor is not otherwise prohibited hereunder), adult book store or any other purpose which includes the display or sale of pornographic or obscene materials (as determined by prevailing community standards, provided that a general interest bookstore such as Barnes & Noble, Borders Books, or B. Dalton shall be permitted, and films with adult content that are released for general commercial distribution to a full-line video store such as Blockbuster Video, Video Update or Hollywood Video shall be permitted) or off-track betting facility, flea market, pawn shop, second-hand store (except that this provision shall not prohibit a store commonly found in first-class shopping centers that sells blemished or reconditioned goods such as Play It Again Sports or Computer Renaissance, or

Exhibit F – Page 4

a first-class retailer such as Terri's Consign & Design Furnishings, as such stores are generally operated), blood bank, goodwill store, bar, liquor store or store selling alcoholic beverages for off premises consumption (except that (i) a full service grocery store, drugstore, or Cost Plus may sell alcoholic beverages in prepackaged containers, (ii) a gourmet grocer such as Trader Joes' shall be permitted, and (iii) a gourmet or specialty liquor store, such as The Sportsman, shall be permitted), tavern or pub (except as incidental to a restaurant use otherwise permitted hereunder, provided that the reasonably projected annual gross revenues from the sale of alcoholic beverages for on-premises consumption in such restaurant shall not exceed forty percent (40%) of the gross revenues of such restaurant, and further provided, that said forty percent (40%) restriction shall not apply to any national or regional family-oriented, sit-down restaurant such as TGI Fridays, Red Lobster, Olive Garden and Bennigans), ballroom, dance hall, day care center, discotheque, beauty school, barber college, offices (other than a full service bank office, savings and loan association office, credit union, stock brokerages, financial services offices, medical or dental office customarily located in shopping centers or an administrative office incidental to a retail operation or a veterinary clinic located within a pet supply store such as PetsMart, Petco or similar store), place of instruction, reading room or any operation catering primarily to students or trainees rather than to customers.

7.      The Premises shall not be used to sell footwear in the Shopping Center (for purposes of this paragraph, the "Exclusive Use").  The Exclusive Use shall not apply to incidental sales by other tenants and occupants of the Shopping Center (which will mean that other tenants or occupants may sell and/or display footwear from not more than fifteen (15%) percent of the gross leasable area of their premises). In connection with the Exclusive Use, and without intending to limit the scope thereof, the Premises shall not use the following tradenames: DSW, Off Broadway, Shoe Pavilion, Rack Room Shoes, Famous Footwear, Shoe Department, or Foot Quarters.

8.      The Premises shall not be used (a) to sell the following goods and services to retail customers: nutritional supplements and natural groceries, and (b) to operate using the trade name Sprouts, Whole Foods, or Sunflower Markets.  Notwithstanding the foregoing, other tenants and occupants of the Shopping Center may sell nutritional supplements and natural groceries on an incidental basis, which shall mean that the annual gross sales of such items by a tenant or occupant shall not exceed fifteen percent (15%) of the total annual gross sales from the Shopping Center by such tenant or occupant.  This paragraph will not apply to any chain drugstore, including but not limited to, Walgreen's, CVS, or Rite Aid.

0126.0003 / Second Amendment to Lease v8