# EXHIBIT 7

November 11, 2014 Lease Agreement between Wolf Creek Center, LLC, as Landlord, and Jo-Ann Stores, LLC, as Tenant (the "<u>Bellevue Lease</u>")

# LEASE AGREEMENT

Between

### Wolf Creek Center, LLC
### "Landlord"

and

### Jo-Ann Stores, LLC
### "Tenant"

Dated: November 11, 2014

## TABLE OF CONTENTS

| SECTION | HEADING | PAGE |
|---------|---------|------|

SECTION 1.  EXHIBITS TO LEASE ........................................................................... 1
SECTION 2.  DEFINITIONS ..................................................................................... 1
SECTION 3.  PREMISES ......................................................................................... 6
SECTION 4.  TERM AND OPTIONS TO EXTEND........................................................ 8
SECTION 5.  FIXED MINIMUM RENT....................................................................... 8
SECTION 6.  PERCENTAGE RENT ......................................................................... 10
SECTION 7.  GROSS SALES ................................................................................. 10
SECTION 8.  TAXES............................................................................................. 13
SECTION 9.  COMMON AREA COSTS..................................................................... 15
SECTION 10. CONSTRUCTION OF PREMISES........................................................... 19
SECTION 11. USE ................................................................................................ 21
SECTION 12. COMMON AREAS ............................................................................. 22
SECTION 13. UTILITIES ....................................................................................... 23
SECTION 14. USE VIOLATION .............................................................................. 23
SECTION 15. CO-TENANCY................................................................................... 24
SECTION 16. RULES AND REGULATIONS ............................................................... 25
SECTION 17. ALTERATIONS, INSTALLATIONS AND IMPROVEMENTS BY TENANT. 26
SECTION 18. REPAIRS AND MAINTENANCE ........................................................... 26
SECTION 19. INDEMNIFICATION ........................................................................... 29
SECTION 20. WAIVER OF CLAIMS........................................................................ 29
SECTION 21. PROPERTY AND LIABILITY INSURANCE ..................................... 30
SECTION 22. SIGNS ............................................................................................ 31
SECTION 23. ASSIGNMENT AND SUBLETTING........................................................ 32
SECTION 24. REPAIR AFTER CASUALTY ............................................................... 33
SECTION 25. CONDEMNATION .............................................................................. 35
SECTION 26. REPRESENTATIONS AND COVENANTS OF LANDLORD......................... 36
SECTION 27. TENANT'S DEFAULT ........................................................................ 39
SECTION 28. RIGHTS OF LANDLORD .................................................................... 40
SECTION 29. LANDLORD'S DEFAULT .................................................................... 41
SECTION 30. MORTGAGE SUBORDINATION ........................................................... 41
SECTION 31. NO WAIVER .................................................................................... 42
SECTION 32. SURRENDER OF PREMISES................................................................ 42
SECTION 33. SHORT FORM LEASE, COMMENCEMENT DATE AGREEMENT ............. 43
SECTION 34. NOTICE .......................................................................................... 43
SECTION 35. HAZARDOUS MATERIALS ................................................................. 44
SECTION 36. LIMITATION OF LANDLORD'S LIABILITY............................................ 46
SECTION 37. DELIVERY OF SITE PLAN ................................................................ 47
SECTION 38. INTENTIONALLY OMITTED................................................................ 47
SECTION 39. ENTIRE AGREEMENT; WRITING REQUIRED ........................................ 47
SECTION 40. OPERATING COVENANT .................................................................... 47
SECTION 41. APPLICABLE LAW AND CONSTRUCTION ............................................ 48

SECTION 42. UNAVOIDABLE DELAYS ........................................................................... 49
SECTION 43. REASONABLE CONSENT .......................................................................... 49
SECTION 44. NO PARTNERSHIP ...................................................................................... 49
SECTION 45. ESTOPPEL ..................................................................................................... 49
SECTION 46. QUIET ENJOYMENT .................................................................................. 50
SECTION 47. HOLDING OVER ......................................................................................... 50
SECTION 48. BROKERS ...................................................................................................... 50
SECTION 49. CAP ON ADDITIONAL RENT ................................................................... 50
SECTION 50. CLAIMS LIMITATION ............................................................................... 51
SECTION 51. CAPTIONS .................................................................................................... 51
SECTION 52. VARIATION IN PRONOUNS ..................................................................... 51
SECTION 53. SECTION REFERENCES ............................................................................ 51
SECTION 54. BINDING EFFECT OF AGREEMENT ...................................................... 51
SECTION 55. ATTORNEY'S FEES .................................................................................... 51
SECTION 56. OFAC WARRANTY ..................................................................................... 52
SECTION 57. PDF/COUNTERPART SIGNATURE ......................................................... 52

## LEASE

This Lease is made as of *November 11*, 2014, between Wolf Creek Center, LLC, a Nebraska limited liability company ("Landlord"), and Jo-Ann Stores, LLC, an Ohio limited liability company ("Tenant").

Landlord and Tenant covenant and agree as follows:

## SECTION 1.  EXHIBITS TO LEASE

(a)     The following Exhibits are attached to and made a part of this Lease, and are incorporated herein by reference:

Exhibit A.  The description of the lands upon which the Shopping Center is located.

Exhibit B.  The site plan showing the Shopping Center, the location of the Premises, as hereafter defined, the Shopping Center buildings, the Protected Area, the parking areas, driveways and common areas and containing other general information relative to the development of the Shopping Center Site (the "Site Plan").

Exhibit C.  Scope of Work Matrix.

Exhibit D.  The FY16 22K Prototype Plans.

Exhibit D-1.  Tenant's Prototype Signage.

Exhibit E.  Intentionally Deleted.

Exhibit F.  The Exclusive Uses of Other Tenants.

Exhibit G.  Form of Subordination, Non-Disturbance and Attornment Agreement.

Exhibit H.  Form of Estoppel Certificate.

(b) If there is any conflict or ambiguity between Tenant's Approved Plans and the language in this Lease or any Exhibit attached hereto, Tenant's Approved Plans shall supersede and control.

## SECTION 2.  DEFINITIONS

The terms listed below have the respective meanings as follows:

(a)     Additional Rent: Tenant's Proportionate Share of Taxes (Section 8), Tenant's Fixed Common Area Cost (Section 9), and Tenant's Proportionate Share of Insurance (Section 21).

(b)     Commencement Date: (i) the 151st day after the Delivery Date, or (ii) the day that

Tenant opens for business to the public in the Premises, whichever day first occurs. Notwithstanding anything to the contrary in this Lease, unless Tenant otherwise opens for business, the Commencement Date will not occur during any period that: (1) Tenant has not received all required governmental permits and approvals necessary for Tenant's occupancy, provided Tenant promptly applies for and diligently pursues obtaining such permits and approvals; or (2) Tenant has not received the fully executed SNDA required under Section 30(a) below. Tenant may elect to open for business during any period identified in the immediately preceding sentence, and in such case, Tenant shall be obligated to pay only Substitute Rent during said period. Also, notwithstanding the foregoing, in no event shall Tenant be required to open or commence the payment of Rent during the period commencing November 15 and ending the next occurring January 31 ("Blackout Period"); and, if the Commencement Date would otherwise occur in the Blackout Period (except for the reason that Tenant opens for business), the Commencement Date shall be deemed to be the first day after the expiration of the Blackout Period. If Tenant opens during the Blackout Period, then Tenant is obligated to pay only Substitute Rent during the Blackout Period.

(c)     Common Areas: the parking areas, driveways, aisles, sidewalks, malls (whether enclosed or unenclosed), truck storage areas, mechanical rooms, and other common, service and related areas and improvements within the Shopping Center, whether open to the public generally or for the non-exclusive use of one or more tenants, and whether or not shown on Exhibit B, but excluding the roof(s).

(d)     Default Rate: an annual rate of interest equal to twelve and one-half percentage points over the three-month London Interbank Offered Rate (LIBOR), as published in the Wall Street Journal as of the date of default.

(e)     Delivery Date: the date that Landlord delivers the Premises to Tenant with all of the Delivery Requirements satisfied and Tenant accepts said delivery by written acknowledgment signed by Tenant's Senior Vice President of Real Estate, Vice President of Store Development or Director of Construction and Store Projects. Tenant shall not unreasonably delay, condition or refuse its acceptance of the Premises. The Delivery Date shall not occur prior to the Estimated Delivery Date (regardless of whether Landlord has satisfied the Delivery Requirements prior to that date), except with Tenant's express written consent, in its sole discretion.

(f)     "Delivery Requirements" means the following:

(1) Landlord has substantially completed all work designated as Landlord's responsibility in Exhibit C attached hereto;

(2) the Premises are delivered to Tenant free and clear of any Hazardous Material, including asbestos, and Landlord represents and warrants as such;

(3) Tenant has received from Landlord results from a slab moisture test indicating that the slab meets or exceeds the acceptable levels of slab moisture per ASTM

#2456 Wolf Creek Plaza, Bellevue, NE
Execution Version

2170-2 (Rh 90% or below) (it is also understood and agreed between the parties that floor covering installation shall not occur until this subsection 2(f)(6) has been satisfied), said test must be performed by a certified testing company and shall include a floor plan indicating where the test locations are within the Premises;

(4) all Common Areas have been substantially completed in accordance with all applicable Laws (and in all events sufficient so as not to interfere with Tenant's Work or issuance of governmental permits and approvals), including, without limitation, all paving of the parking lot, service areas and access roads, curbing (including curb cuts), site lighting, striping, sidewalks, loading dock area and landscaping; and

(5) Tenant has received a fully executed copy of the SNDA required under Section 30(a).

(g)    Estimated Delivery Date: Landlord's good-faith estimate of the Delivery Date is December 8, 2014.

(h)    Gross Leasable Area: the number of square feet of floor area (excluding non-retail mezzanine, basement and other such areas), measured from the exterior face of exterior walls, the exterior building line for sidewalk or mall frontage, and the center line of party walls, with no deduction for columns, stairs, elevators, or any interior construction or equipment areas used exclusively by Tenant for the Premises.

With respect to the Shopping Center, the Gross Leasable Area is the total constructed Gross Leasable Area available for the exclusive use and occupancy of tenants within the Shopping Center. With respect to the Premises, the Gross Leasable Area will be the actual completed Gross Leasable Area, as the same exists from time to time.

Any change in Gross Leasable Area, whether of the Premises or Shopping Center, will be deemed in effect on the first day of the next succeeding month following such change. Landlord covenants to advise Tenant of any increase or decrease in the Gross Leasable Area of the Shopping Center due to the construction or demolition of any buildings in the Shopping Center within 60 days of any such change, together with a current Site Plan reflecting such change.

Landlord represents and warrants that the Gross Leasable Area of the Shopping Center intended for exclusive use and occupancy as shown in the Site Plan is 118,533 square feet.

(i)    Hazardous Materials:  See Section 35.

(j)    HVAC: heating, ventilating and air conditioning exclusively serving the Premises.

(k)    Laws: any and all laws, codes, ordinances or regulations passed into existence by any Public Entity now or hereinafter in existence.

(l)    Lease Year: a period of 12 consecutive calendar months during the Term. The first Lease Year (or Lease Year One) begins on the first day of February next following the Commencement Date, unless the Commencement Date is the first day of February, in which event the first Lease Year begins on the Commencement Date. The first Lease Year will include the first Partial Lease Year, if any. Rent and any limitations on such Rent for purposes of any Partial Lease Year will be proportionately adjusted based upon the actual number of days of such Partial Lease Year in relation to the number of days in a full Lease Year.

(m)    Outside Delivery Date: June 1, 2015.

(n)    Partial Lease Year: the period, if any, of fewer than 12 consecutive calendar months between the Commencement Date and the next occurring February 1 and the period, if any, of less than 12 consecutive calendar months between the last day of the last Lease Year and the expiration of the Term.

(o)    Permitted Use: any lawful retail purpose, not in violation of an exclusive use by another tenant in effect in the Shopping Center as of the date hereof, which exclusive uses are set forth on Exhibit F.

(p)    Plans and Specifications: The final plans and specifications for the construction of the Premises, in the form of Exhibit D, as the same may be modified by written agreement by and between Landlord and Tenant.

(q)    Premises: a portion of the Shopping Center as shown on the Site Plan and located within the Shopping Center, on the Shopping Center Site, consisting of space having approximately 23,865 square feet of Gross Leasable Area, with a minimum frontage of 115 feet (to the center of the side walls) and having an address of 10521 South 15th Street, Bellevue, Nebraska  68123.

(r)    Protected Area: the area shown on the Site Plan.

(s)    Protected Use: the sale of fabrics of all kinds, goods sold by the yard, upholstery materials, scrapbooks and scrapbooking supplies and materials, patterns, yarns and knitting supplies, needlepoint, macramé, artificial flowers and accessories, arts and crafts materials and supplies,  all types of notions, custom framing, framed artwork, sewing machines, sewing machine furniture, products, accessories and services related to all of the foregoing, and other items and services customarily offered for sale by a fabric and/or arts and crafts store.

(t)    Public Entity: the federal, state, county, municipal or other governmental unit, however denominated, and any agency, division, department or public official thereof, now or

hereafter having jurisdiction, in any respect, over the Premises, the Shopping Center or Shopping Center Site.

      (u)     Intentionally omitted.

      (v)     Rent: Fixed Minimum Rent, Additional Rent, and all other monetary obligations of Tenant to Landlord under this Lease.

      (w)     Shopping Center: the Wolf Creek Plaza Shopping Center located in Bellevue, Nebraska, consisting of all buildings including the Premises and Common Areas, and other improvements located upon the Shopping Center Site, and outlined on Exhibit B.

      (x)     Shopping Center Site: the legal description set forth on Exhibit A, on which the Shopping Center is located.

      (y)     Substantially Complete: complete with the exception of minor "punchlist" items that can be completed within 14 days without interfering with the performance of Tenant's Work.

      (z)     Substitute Rent:  50% of the Fixed Minimum Rent in lieu of the Fixed Minimum Rent, Percentage Rent, and Additional Rent otherwise required to be paid under this Lease. Tenant is not obligated to pay any Fixed Minimum Rent, Percentage Rent, or Additional Rent at any time when Substitute Rent is payable pursuant to any provision of this Lease. In addition, Tenant shall not be obligated to be open or operating at the Premises during any period it is entitled to pay Substitute Rent.  Landlord acknowledges that certain violations of this Lease or specified events hereunder will cause Tenant significant damage, but that actual damages will be impossible to determine.  Landlord agrees that the violations and other events specified in the Lease where Tenant is entitled to pay Substitute Rent are in fact cases where Tenant will suffer significant damage, but that actual damages will be impossible to determine.  Landlord has agreed to Substitute Rent as liquidated damages because actual damages are impossible to determine and so liquidated damages represent a fair compromise and is not a penalty. Landlord has agreed to these provisions (and the entire Lease) voluntarily and after consultation with legal counsel.

      (aa)     Tenant's Proportionate Share: a fraction, the numerator of which is the Gross Leasable Area of the Premises and the denominator of which is the Gross Leasable Area of the Shopping Center. Notwithstanding the foregoing, if any portion of Common Area Costs, Taxes, or Insurance Costs are furnished or directly payable by an individual tenant or occupant as opposed to Landlord, the cost of the item(s) furnished or payable by such tenant or occupant shall not be included in Common Area Costs, Taxes, or Insurance Costs, as the case may be, and the square footage of the tenant or occupant furnishing or paying for such item(s) shall not be included in the calculation of Tenant's Proportionate Share of such item(s). Tenant's Proportionate Share shall be adjusted in the event of any increase or decrease in the Gross Leasable Area of all buildings within the Shopping Center or the Gross Leasable Area of the Premises.

(bb)    Tenant's Work: the work, if any, to be performed by or at the direction of Tenant in finishing the Premises as provided in Tenant's Approved Plans.

(cc)    Term: the Initial Term, as hereafter defined, and each Extended Term, as hereafter defined, if any, and any renewals or period of holdover tenancy.

(dd)    Unavoidable Delay: A material delay beyond the reasonable control of the delayed party caused by labor strikes, lock-outs, extraordinary labor troubles, industry-wide inability to procure materials, failure of power, extraordinary restrictive governmental laws or regulations (such as gas rationing), riots, war, military or usurped governmental power, acts of terrorism, sabotage, material fire or other material casualty, or an extraordinary and material act of God (such as a tornado or earthquake), but excluding inadequacy of insurance proceeds, litigation or other disputes, financial inability, lack of suitable financing, delays of the delayed party's contractor and failure to obtain approvals or permits unless otherwise caused by an event of Unavoidable Delay.

**SECTION 3. PREMISES**

(a)    For the Rent and upon the terms and conditions contained in this Lease, Landlord leases during the Term, and Tenant leases from Landlord during the Term, the following:

(1) The Premises as described in Section 2(q) hereof, outlined on the Site Plan and further described herein; and,

(2) The right, in common with Landlord and all other tenants of the Shopping Center granted similar rights by Landlord, to the non-exclusive use of all Common Areas. The rights hereby granted with respect to the Common Areas shall constitute easements appurtenant to the Premises and a servitude upon the Shopping Center Site. The benefit and the burden of such easements shall run with and bind the Shopping Center Site.

(3) Subject to local codes, the right to place (i) one storage container ("Container") during seasonal selling seasons, not to exceed one hundred twenty (120) days during each selling season, in a location at, near, or next to Tenant's loading dock in the Container Area shown on Exhibit B, or at any other location mutually agreed upon by Landlord and Tenant, and (ii) shopping cart corrals ("Corrals") in Tenant's Protected Area in the parking lot and at, near or next to the outside of the Premises' entryway on the sidewalk. Tenant's Corrals shall take up no more than four parking lot spaces, the location of which shall be within Tenant's Protected Area, as shown on the Site Plan, such location to be mutually agreeable to both Landlord and Tenant. The Container will not exceed 10 feet in width and 40 feet in length. Tenant will maintain the Container and Corrals in good condition and repair. If Landlord receives notice that Tenant's Container or Corrals violate any local code or ordinance, then after receipt of notice from the

governing body, Tenant will remove the violating Container or Corrals, or move them to an acceptable location. In addition Tenant shall have the right to store up to five bales of cardboard at the exterior of the Premises and each bale has dimensions of approximately 5' x 5'.

(4) Notwithstanding anything contained herein, Tenant has the right to display merchandise on the sidewalk on both sides of the storefront door of the Premises, provided that such display does not extend beyond 30 feet in either direction and is at least 10 feet way from any adjacent tenant's premises and allows adequate pedestrian access (a minimum of four (4) feet unobstructed walkway).

(b)     Subject to the reasonable consent of Tenant, Landlord expressly reserves the right to maintain, use, repair and replace the pipes, ducts, conduits, utility lines, tunneling and wires leading through the ceiling, plenum areas, columns, partitions, and within or under the floor slabs comprising part of the Premises, but only to the extent that such installations (i) are reasonably necessary to serve the Premises or other parts of the Shopping Center, (ii) are installed in locations that will not interfere with Tenant's use of the Premises or Tenant's permitted signage, (iii) are not exposed within the selling area, and (iv) do not decrease the ceiling height of the Premises. Similarly, notwithstanding anything to the contrary in this Lease, Tenant shall have the right to make installations around the Premises (e.g., the roof) which are consistent with Tenant's prototype plans for other similar stores operated by Tenant or which are part of Tenant's Leadership in Energy and Environmental Design initiative or other Tenant initiatives. In exercising the foregoing rights, neither Landlord or Tenant shall interfere with the use or occupancy of the Premises or other tenant premises or commence any such work without first notifying the other party, at least 10 days in advance, of the commencement of such work. In no event may Landlord construct any improvements above the Premises or place signs on the exterior walls of the Premises.

(c)     The "Premises" excludes the exterior walls, roof, and the floor slab (excluding floor covering installed by Tenant) and areas beneath the floor slab, and if Tenant installs a mezzanine in the Premises for the storage of inventory and/or fixtures, Tenant shall not pay any Rent on that space.

(d)     Within 60 days following the Commencement Date, either party may have its architect (the "Original Architect") measure the Premises to determine the Gross Leasable Area of the Premises. If the area reflected by such measurement varies from that set forth in this Lease, then all items of Rent shall be appropriately adjusted, provided, however, that in no event shall any item of Rent be increased by more than 1% because of a variance in area of the Premises and in no event shall the construction allowance be reduced from the amount set forth herein. If the other party disputes the measurement of the Original Architect, the disputing party shall notify the other within five business days after receipt by the disputing party of such measurement; if the disputing party does not timely object to the measurement by the Original Architect, the disputing party shall be deemed to have approved the measurement by the Original Architect. If the disputing party does timely object, it shall then have 15 days to have an architect selected by it (the "Disputing Party's

Architect") measure the Premises using the procedures set forth herein. If the Disputing Party's Architect disputes the findings of the Original Architect, both Architects shall meet in good faith for a period not to exceed 15 days and try to reach agreement on the number of leasable square feet. If the Architects cannot reach agreement within such period, the Architects shall in good faith select a third, independent architect (the "Resolution Architect") to measure the Premises. The measurement of the Resolution Architect shall be final and binding on all parties. All fees and costs payable to the Original Architect shall be paid by the party retaining the Original Architect, and all fees and costs payable to the Disputing Party's Architect shall be paid by the disputing party. Tenant and Landlord shall each be responsible for one-half of the fees and costs payable to the Resolution Architect.

## SECTION 4. TERM AND OPTIONS TO EXTEND

(a)     The "Initial Term" begins on the Commencement Date and ends on the last day of the 10th Lease Year (inclusive of the first Partial Lease Year, if any), unless sooner terminated as herein provided.

(b)     Landlord grants Tenant the right and option to extend this Lease for three additional periods of five years each (individually called an "Extended Term" and collectively called "Extended Terms"), commencing upon the expiration of the Initial Term or such prior Extended Term, as the case may be. Each Extended Term shall be upon the same terms, covenants and conditions as the Term except for the option to extend then exercised and except for such changes, if any, in Rent or other Tenant charges as are expressly set forth in this Lease.

(c)     Tenant must deliver written notice to Landlord of its election to extend this Lease for an Extended Term on or before the later to occur of the following: (1) the date that is 180 days before the expiration of the Term or the Extended Term, as the case may be; or (2) the date that is 30 days after Tenant's receipt of written notice from Landlord indicating that the time period in which Tenant has to exercise its option has expired. If the Term expires before such notice from Landlord, and Tenant continues in possession of the Premises after such expiration, the Term will be extended automatically on a month to month basis until 30 days after the date Landlord has given such notice, or Tenant surrenders the Premises to Landlord, or Tenant exercises its option, in which case the Extended Term will be deemed to have commenced upon the expiration of the Initial Term (or prior Extended Term, as the case may be). Concurrently with the exercise of the option by Tenant, Tenant will pay Landlord any unpaid balance of the Rent due during the Extended Term that has accrued as of the date of such notice of extension.

## SECTION 5. FIXED MINIMUM RENT

(a)     From and after the Commencement Date, Tenant must pay to Landlord, without demand, at the address herein specified for notices to Landlord, Fixed Minimum Rent for the Premises as follows:

(1)     During the first twelve (12) full calendar months of the first Lease Year (inclusive of the first Partial Lease Year) at the rate of $0.00 per square foot per year (i.e., Fixed Minimum Rent shall be fully abated for the first twelve months of the Initial Term); and

(2)     During any portion of the first Lease Year following the first twelve (12) months of the Initial Term, at the rate of $9.00 per square foot per year; and

(3)     During Lease Years two through five of the Initial Term at the rate of $9.00 per square foot per year; and

(4)     During Lease Years six through ten of the Initial Term at the rate of $10.00 per square foot per year; and

(5)     During the first five-year Extended Term at the rate of $11.00 per square foot per year; and

(6)     During the second five-year Extended Term at the rate of $12.00 per square foot per year; and

(7)     During the third five-year Extended Term at the rate of $13.00 per square foot per year.

The amounts shall include and be in payment of all other charges not specifically set forth in this Lease.

(b)     Tenant must pay to Landlord, without demand, monthly installments of Fixed Minimum Rent in advance on or before the first day of each month during the Term, commencing on the first day of the first month next following the Commencement Date (unless the Commencement Date is the first day of the month, in which event the first monthly installment shall be due on the Commencement Date). Notwithstanding the foregoing, Landlord must invoice Tenant, which invoicing will not occur before the Commencement Date, for the first monthly installment of Fixed Minimum Rent. In no event will the first rent installment be due until ten days after Tenant's receipt of this initial invoice. Fixed Minimum Rent for the partial month, if any, after the Commencement Date will be computed on a per diem basis (assuming a 30-day month), and Tenant must pay the Fixed Minimum Rent for such partial month concurrently with the first monthly installment. If Tenant fails to pay Rent on the due date and Landlord notifies Tenant in writing of such failure twice in any Lease Year, then if Tenant fails to pay Rent on the due date thereafter in the same Lease Year, then the Landlord, in addition to the Rent then owed, is entitled to a late fee of ten percent (10%) of the Rent then owed for such third late payment and any such other late payment of Rent thereafter during that Lease Year.

## SECTION 6.  PERCENTAGE RENT

(a)      In addition to Fixed Minimum Rent, Tenant must pay to Landlord Percentage Rent for each Lease Year and Partial Lease Year, if any, in the amount by which 5% of Tenant's annual Gross Sales (hereinafter defined) of all goods and services for such Lease Year or Partial Lease Year, if any, exceeds the Fixed Minimum Rent payable during each such Lease Year or Partial Lease Year.

(b)      Percentage Rent for the first Partial Lease Year, if any, shall be based upon Gross Sales for any period less than 12 months commencing on the Commencement Date and expiring on the next occurring January 31, and Percentage Rent for the last Partial Lease Year, if any, shall be based upon Gross Sales during any period that is less than 12 months between the last day of the last Lease Year and the expiration of the Term  (each of the foregoing periods referred to as a "Special Computation Period").

(c)      Percentage Rent for each Lease Year and Partial Lease Year is payable on an annual basis within 75 days after the last day of such Lease Year or Special Computation Period, as the case may be.

(d)      Notwithstanding anything to the contrary, if any time Tenant pays Substitute Rent, Tenant shall not be required to pay Percentage Rent pursuant to this Section, during the time Substitute Rent is paid

## SECTION 7.  GROSS SALES

(a)      "Gross Sales" means the entire amount of the actual receipts, whether cash or otherwise, from all sales of merchandise and services for all business conducted in, on or from the Premises, including mail or telephone orders received at the Premises and filled from the Premises or elsewhere (but excluding mail, telephone, internet or other orders filled at the Premises but originating elsewhere).  Each sale upon installment or credit shall be treated as a sale for the full amount thereof in the month during which such sale shall be made, irrespective of the time when Tenant shall receive payment (whether full or partial) from its customers.  Layaway sales, so-called, shall be included in the Gross Sales of the respective computation period only to the extent of payments received during that computation period.  Notwithstanding the foregoing, with respect to assignees, sublessees, concessionaires and licensees of Tenant that, together, occupy no more than 1,000 square feet of Gross Leasable Area, Tenant shall  not be obligated to report and include with Tenant's Gross Sales, the sales generated by them, although any payments to Tenant by such entity will be included in Gross Sales.

(b)      Notwithstanding anything to the contrary, the following are excluded from Gross Sales:

(1)     sums collected and paid out for any sales tax or excise tax imposed by any duly constituted governmental authority;

(2)     the value or price of merchandise exchanged between the stores of Tenant, or the affiliates of Tenant, if any, where such exchange of merchandise is made solely for the convenient operation of the business of Tenant or the affiliate of Tenant and not for the purpose of consummating a sale which has been made at, in, from or upon the Premises, or for the purpose of depriving Landlord of the benefit of a sale which otherwise would be made at, in, from or upon the Premises;

(3)     the amount of returns to shippers or manufacturers;

(4)     sales to employees made at a discount not in excess of 5% of Gross Sales in any Lease Year;

(5)     non-sufficient funds check charges or financing charges to customers whether or not separately stated or billed;

(6)     service charges to customers who buy a budget or deferred payment plan;

(7)     revenue from gift certificates or gift cards until redeemed at the Premises;

(8)     revenue from vending machines used solely for the benefit of employees;

(9)     the amount of any cash or credit refund made upon any sale where the merchandise sold, or some part thereof, is thereafter returned by the purchaser and accepted by Tenant;

(10)    sales of fixtures;

(11)    all sums and credits received in settlement of claims for loss or damage to merchandise;

(12)    non-retail bulk sales of merchandise outside of the ordinary course of business on the Premises;

(13)    tax exempt sales or merchandise donated or sold at a discount to charitable or non-profit organizations;

(14)    fees for classes or demonstrations;

(15)    the value attributed to merchandise taken in trade;

(16)    referrals to affiliates of or other divisions of Tenant;

(17)    fees for gift wrapping, mailing and other customer services provided on a not for profit basis;

(18)    sales of lottery tickets, special event tickets and the like (but the commissions paid to Tenant shall be included in Gross Sales);

(19)    the amount of credit sales and credit accounts incurred at the Premises which are written off as bad debts and deducted as an expense; and

(20)    sale of patterns not in excess of 5% of Gross Sales.

(c)    The Gross Sales of any Lease Year or Partial Lease Year, as the case may be, and the Percentage Rent due thereon, if any, have no bearing on or connection with the Gross Sales of any other Lease Year or Partial Lease Year.

(d)    Tenant will deliver to Landlord within 75 days after the end of each Lease Year or Special Computation Period, as the case may be, a statement accurately showing Gross Sales for such Lease Year or Special Computation Period, as the case may be.

(e)    At any time within three years after the close of each Lease Year or Partial Lease Year, but not more than once with respect to any Lease Year and Partial Lease Year, Landlord may cause an audit to be made by any accountant or employee of Landlord designated in writing by Landlord of all of the books of account, documents, records, returns, papers and files of Tenant relating to Gross Sales for such Lease Year made at, in, on or from the Premises. Tenant, upon at least twenty (20) days prior request of Landlord, shall make all such records available for such examination at the address specified in this Lease for notices to Tenant during regular business hours. Landlord must hold in strict confidence any information obtained from all such records and reports examined by it or its designated accountant; provided, however, Landlord may disclose such information to Landlord's lender or prospective lender or purchaser of the Shopping Center, or applicable governmental authorities. If Landlord makes an audit for any Lease Year or Partial Lease Year, and the Gross Sales shown by Tenant's statement for such Lease Year or Partial Lease Year have been understated by more than three percent (3%) and if such understatement resulted in an underpayment of Percentage Rent by at least $1,000.00, then Tenant, in addition to immediately paying to Landlord the full amount of the understated Percentage Rent as determined by such audit, must pay to Landlord the reasonable cost of such audit, not to exceed $1,000.00; otherwise the audit will be at Landlord's sole cost and expense. Tenant makes no representation or warranty as to the sales that it expects to make in the Premises. Tenant's obligations to submit such information and to pay Percentage Rent for any Lease Year or Partial Lease Year shall survive the expiration or earlier termination of the Lease Term.

## SECTION 8.  TAXES

(a)     Landlord covenants and warrants that the entire Shopping Center is located on tax parcel identification number 0011572012 (the "Tax Parcel"), that the Tax Parcel does not extend beyond the perimeter of the Shopping Center Site and that the improvements comprising the Shopping Center (including the Premises and Common Areas) as set forth on Exhibit B are the only improvements now located or to be located thereon which will be considered for the tax value for which Tenant shall be responsible for its Proportionate Share thereof. Once or twice per Lease Year, depending on when tax bills are issued by the government authority, Tenant must pay to Landlord the Tenant's Proportionate Share of real estate taxes ("Taxes") levied upon the Tax Parcel and paid by Landlord during each year of the Term, after reducing Taxes (i) by the amount of any contributions for Taxes paid by any party having the right to use the Common Areas but not a tenant of the Shopping Center, and (ii) by any rollback, discount for timely or early payment, credit or reduction that has been granted or issued by any taxing authority or governmental group or agency. Notwithstanding the foregoing, if the Premises, or a portion of the Shopping Center including the Premises, is separately assessed, then Tenant will pay, as Tenant's allocable share of Taxes, the lower of: (1) Tenant's Proportionate Share of Taxes, or (2) Tenant's Fraction of Taxes, with Tenant's Fraction being a fraction whose numerator is the Gross Leasable Area of the Premises and whose denominator is the Gross Leasable Area of all buildings within such separately assessed parcel. Tenant will pay Tenant's Proportionate Share of Taxes within 30 days after receipt of Landlord's statement assessing and prorating the Taxes, together with copies of receipted tax bills for which payment is sought and reasonable verification for the computation of Tenant's Proportionate Share. For the first Lease Year, Tenant shall pay no more than $1.97 per square foot of Gross Leasable Area of the Premises for Taxes; and, Landlord represents that said amount is the actual Taxes that were due for the 2013 calendar year and is a good faith estimate of the actual Taxes that would be due if Tenant were paying its full Proportionate Share of Taxes for the first Lease Year.

(b)     Intentionally omitted.

(c)     In no event will Tenant pay for Taxes for a time period longer than the Term.

(d)     The parties acknowledge that only Landlord has the right to dispute the assessed value of Shopping Center (which is the only way to attempt to control the real estate taxes). For this reason, Landlord shall have the duty to timely compare the then current value of the Shopping Center (utilizing the income approach, with a capitalization rate based upon recent sales(s) of comparable shopping centers) to the assessed value of the Shopping Center determined by the taxing authority. If variance is greater than 5%, Landlord is required to pursue reduction. Tenant is responsible for its pro-rata share of all costs associated with pursuit. If Landlord fails to pursue, payment of taxes will be capped at 5% increase per year until Landlord pursues.

(e)     If any Taxes may be paid in installments, subject to the exclusions below, only the installments coming due during the Term will be included within Taxes. Landlord must use best good faith efforts to minimize the Taxes assessed against the Tax Parcel.

(f)     Tenant must pay before delinquency all municipal, county and state taxes assessed during the Term against any leasehold interest and personal property of any kind, owned by or placed in, upon or about the Premises by Tenant.

(g)     Notwithstanding anything to the contrary, and excluding any revaluations to the extent resulting directly from Tenant improvements to the Premises, the following are excluded from Taxes:

     (1) Any portion of the Taxes assessed: (A) against other tenant improvements and tenant space completion work, whether constructed by Landlord or by any other party; or (B) against additional buildings or other taxable improvements not now constructed on the Tax Parcel; or (C) otherwise attributable to any increase in the assessed value of the Tax Parcel by reason of such other improvements or work;

     (2) Any portion of the Taxes attributable to a revaluation of the Tax Parcel arising out of a sale or other change in the ownership thereof or of any interest therein more often than once every five years;

     (3) Any portion of the Taxes in the nature of fees, charges or assessments for governmental services or improvements related to the initial construction or any alteration, expansion or rehabilitation of the Shopping Center or other improvement of the Tax Parcel (beyond the upkeep and repair of the Shopping Center that is necessary to keep the same in first-class condition);

     (4) Any tax or fee that applies generally to all business owners or operators, as opposed to owners of real property;

     (5) Any impact fee, user fee, exaction fee, environmental fee or other tax paid as a prerequisite to construction of the Shopping Center, or any addition or improvement thereto;

     (6) Estate tax, inheritance tax, succession tax, capital levy tax, corporate franchise tax, margin tax, rent tax, profits tax, gross receipts tax, income tax, conveyance fee or transfer tax and the like;

     (7) Any assessment, bond, tax, or other finance vehicle that is (A) imposed as a result of Landlord's initial construction of the Shopping Center, or (B) used

      to fund construction of additions or improvements to the Shopping Center; and

      (8)    Any penalty, interest or other charge attributable to Landlord's late or delinquent payment of Taxes.

## SECTION 9. COMMON AREA COSTS

      (a)    In addition to payment of the Fixed Minimum Rent, Tenant must pay to Landlord for the First Lease Year an amount equal to $2.30 per square foot per year multiplied by the Gross Leasable Area of the Premises (which fixed dollar amount shall be referred to as "Fixed Common Area Cost") for the cost of operation, maintenance and utilities of the Common Areas ("Common Area Costs"). For subsequent Lease Years, Tenant must pay to Landlord the Fixed Common Area Cost and any increase as set forth below. The Fixed Common Area Cost shall increase by 3% per year for Lease Years two through five of the Initial Term, commencing on the first day of each such Lease Year. The Fixed Common Area Cost shall be "reset" for the sixth Lease Year of the Initial Term and the first Lease Year of each Extended Term (the first day of each such Lease Year referred to as a "Reset Date") to be the average of the actual Common Area Costs for each of the three years immediately prior to the applicable Reset Date. The reset Fixed Common Area Cost shall increase 3% per year for Lease Years seven through ten of the Initial Term and the second through fifth Lease Year of each Extended Term, as the case may be, commencing on the first day of each such Lease Year.

      (b)    On or before April 1 of each year, Landlord must provide Tenant with a statement of the Common Area Costs, together with a certified statement of the Gross Leasable Area of the Shopping Center and copies of all bills for which payment is sought. If Landlord fails to provide the annual reconciliation statement ("Annual Reconciliation"), then Tenant has the right to suspend payment of Common Area Costs until such statement is received. Tenant must pay to Landlord, within thirty (30) days of receipt of the Annual Reconciliation, any deficiency owed to Landlord. If Tenant's estimated payments are in excess of Tenant's Proportionate Share in any Lease Year, then such excess will be applied to the following Lease Year unless such Lease Year is the final Lease Year of Tenant's occupancy, in which case Landlord must refund such overpayment to Tenant within thirty (30) days of receipt of the Annual Reconciliation. Landlord shall not increase Tenant's monthly installments for a subsequent Lease Year until the Annual Reconciliation for the prior Lease Year is issued and only if such prior Lease Year Annual Reconciliation provides that Tenant's monthly installments paid during said prior Lease Year were less than the actual amount of Tenant's Common Area Costs for said prior Lease Year, or Landlord provides evidence to Tenant that an increase in monthly installments is reasonably justified.

      (c)    Tenant and its agent have the right to audit and inspect Landlord's books and records pertaining to Common Area Costs, Taxes and Insurance Costs with respect to any years upon which a "reset" shall depend, at any time upon 15 days written notice. If any audit or review of Landlord's books and records determines that Tenant has overpaid any Common Area Costs, Taxes or

Insurance Costs, then Tenant has the right to offset any overpayment against Rent, but if Tenant is in the last Lease Year of the Term, then Landlord must refund the overpayment to Tenant within 30 days after notice from Tenant. If any such audit or review determines that Tenant has overpaid any Common Area Costs, Taxes or Insurance by more than 5%, then Landlord must pay to Tenant the reasonable cost of such audit or review not to exceed $1,000.00; otherwise the audit or review shall be at Tenant's sole cost and expense. Landlord shall be responsible for providing Tenant with books and records for Tenant's additional rent contribution for the preceding calendar year and such additional periods required under this Lease. Notwithstanding the foregoing to the contrary, Tenant's right to examine such records shall be subject to the following terms and conditions:

(1)     Tenant must not then be in breach or default of the Lease beyond the expiration of applicable notice and cure periods;

(2)     Such examination shall be conducted only during regular business hours at the office in the continental United States where Landlord maintains Common Area Costs expense records and only after Tenant gives Landlord thirty (30) days prior written notice;

(3)     Tenant may not conduct more than one (1) examination during any Lease Year. Examinations will not be permitted during the months of January, February, March and December;

(4)     In the written notice required under subparagraph 2 above, Tenant must specifically designate the Lease Year(s) that Tenant intends to examine, which shall be a Lease Year(s) within three (3) years of the date of the examination but must be within the term of this Lease; and

(5)     Tenant shall deliver to Landlord a copy of the results of such examination within fifteen (15) days of its receipt by Tenant.


(d)     The payment of such Common Area Costs is in consideration of Landlord's maintenance and operation of the Common Areas, and Landlord must use such payment for that purpose.

(e)     Notwithstanding anything to the contrary, the following are excluded from Common Area Costs:

(1)     the original cost, or depreciation of the original cost, of constructing, erecting and installing the Shopping Center, the Common Areas, common facilities and related services;

(2)     principal and interest payments pursuant to any mortgage that encumbers the Premises or Shopping Center;

(3)     Taxes (sales taxes associated with Common Area Costs shall be considered Common Area Costs);

(4)     other administrative charges, management fees, fees based upon a percentage calculation, leasing commissions or any other fee or charge regardless of the name (including, without limitation, salaries of all kinds, social security, taxes, insurance, part-time or full-time labor, any fees paid to manage the Shopping Center including those paid to a third party management company, and similar costs and expenses) that is related to the management and operation of the Shopping Center; except Landlord may include an administrative fee in an amount not to exceed 7.5% of the Common Area Costs for the period to which such fee relates;

(5)     expenses incurred due to the negligence or willful misconduct of Landlord or any occupant of the Shopping Center or their respective agents or employees;

(6)     costs and expenses incurred for repairs or replacements due to faulty construction, faulty workmanship or structural defects;

(7)     expenses related to an individual occupants of the Shopping Center or to a particular tenant space, or to buildings;

(8)     any cost, fees, fines or penalties, or interest thereon, related to violations by Landlord or any occupant of any Law; and the cost of compliance with Laws enacted after the date hereof;

(9)     capital expenditures (a capital expenditure is defined as an item or items costing $1,000 or more and having a useful life of at least one year); other than a "Permitted Capital Expenditure." A Permitted Capital Expenditure is limited to the following: repaving of the parking lot(s) not more frequently than once every ten years; provided, however, that each Permitted Capital Expenditure must be amortized on a straight-line basis over the useful life of the related improvement based on federal income tax guidelines, but in no event less than seven years, and only the amount of the annual amortization shall be included in Common Area Costs for any Lease Year within the useful life so determined;

(10)    reserves for replacement;

(11)    costs for insuring the Common Areas, but this exclusion does not limit Landlord's rights of reimbursement, if any, under Section 21;

(12)    cost of advertising, marketing, decorating, redecorating, or special cleaning or other services not provided on a regular basis;

(13)    all costs and expenses relative to the solicitation and execution of leases for space in the Shopping Center;

(14)    all costs and expenses related to the operation, maintenance and repair of any garage space in the Shopping Center;

(15)    the cost of any repair or replacement made by Landlord because of the total or partial destruction of the Shopping Center or the condemnation of a portion of the Shopping Center or the Shopping Center Site;

(16)    any operating expense paid to a related corporation, entity or person that is in excess of that amount that would have been paid absent such relationship;

(17)    the cost of overtime or other expenses incurred by or on behalf of Landlord to correct any default of Landlord or for work performed by or on behalf of Landlord where such work is expressly provided in this Lease or any other lease the cost of which was/is to be borne at Landlord's expense;

(18)    any cost that is paid or reimbursed by third parties, including warranties and guarantees and including any cost that is paid or reimbursed by insurance (or would have been covered by insurance required to be maintained by Landlord);

(19)    payments made under any easement, operating agreement, license, restrictive covenant, or any instrument relating to the payment or sharing of costs among property owners;

(20)    costs disproportionately incurred by or on behalf of one or more tenants, including, without limitation, all costs relating to a food court area; and

(21)    costs and expenses incurred with respect to the correction, disposal, investigation, removal, transportation, or treatment of Hazardous Material.

(f)    Landlord must use best efforts to keep Common Area Costs to a minimum subject, however, to the obligation of Landlord to maintain the Shopping Center as a first-class retail project.

(g)    Landlord covenants that there will be no duplication of costs between those payable by Tenant within this section and under this section and any other section of this Lease.

## SECTION 10.  CONSTRUCTION OF PREMISES

(a)    Tenant, at its sole cost and expense, shall hereafter deliver to Landlord for Landlord's approval not to be unreasonably withheld, a copy of Tenant's proposed plans and specifications and sign drawings (the "Proposed Plans").  Landlord shall not in any event withhold its approval of any plans and specifications to the extent they comply with Tenant's prototype plans attached hereto as Exhibit D. If Landlord fails to approve or disapprove, in writing, the Proposed Plans within 15 days after receipt thereof from Tenant, then such approval will be deemed to have been given. If Landlord furnishes Tenant a written response, Tenant will resubmit revised Proposed Plans within 10 days after having received Landlord's response, and Landlord will then have a 10-day period within which to review the same.  If Landlord fails to respond within 10 days, then such revision will be deemed approved.  Such review process will continue until the Proposed Plans are acceptable to both Landlord and Tenant once approved by Landlord and Tenant such plans may be referred to herein as "Tenant's Approved Plans."). If the parties do not reach agreement on the Tenant's Proposed Plans within 90 days after their first submission to Landlord, Tenant may terminate this Lease upon written notice to the Landlord within 15 days after such 90-day period Within 15 days of Tenant's receipt of the approved Plans and Specifications, Tenant shall apply for all required governmental permits and approvals necessary for Tenant's Work and signage, and Tenant shall diligently pursue obtaining such permits and approvals. If Tenant is unable to secure the required governmental permits and approvals within 60 days of Tenant's application therefor ("Permit Period") despite good faith efforts, then Landlord shall have the right to pursue such permits and approvals on behalf of Tenant for an additional 60 days (if Landlord elects to pursue such permits and approvals, said 120 day period shall hereinafter referred to as the "Permit Period"). If the required governmental permits and approvals have not been obtained during the Permit Period, despite good faith efforts by Tenant, Tenant shall have the right to terminate this Lease by delivering written notice to Landlord of its intent to terminate the Lease to the Landlord within 30 days after the end of the Permit Period. If Tenant fails to exercise its right to terminate this Lease during said 30 day period, the right to terminate established under this section shall be null and void. After delivery of  the termination notice to Landlord, Tenant shall be relieved of all obligations under this Lease and shall not be liable to Landlord for damages or otherwise.

(b)    Landlord represents, warrants and covenants to Tenant that on the Delivery Date all vestiges of prior tenant  signage, including holes, mountings and coloration, shall be removed ("Prior Signage") and the Premises will comply with all Laws, including, without limitation, all Laws with respect to Hazardous Material, and: (i) if  any Prior Signage is present, then Landlord must perform such removal or Tenant may, at its option, remove the Prior Signage and Landlord must reimburse Tenant within 30 days for Tenant's cost of such removal, abatement or remediation, plus 15% administrative fee, and if not so reimbursed, Tenant may deduct such amount from Rent; (ii) if any Hazardous Material, not caused by Tenant, is required by Law to be removed, abated, or otherwise remediated, then Landlord must perform such removal, abatement or remediation; or (iii)

with respect to Hazardous Material if, as a result of, or as a condition to, Tenant's Work, any Hazardous Material is required by Law to be removed, abated, or otherwise remediated, then Tenant may, at its option, remove, abate or otherwise remediate such Hazardous Material and Landlord must reimburse Tenant within 30 days for Tenant's cost of such removal, abatement or remediation, and if not so reimbursed, Tenant may deduct the cost from Rent. Subject to: (1) the immediately prior sentence, (2) the repair obligations of Landlord, (3) any work designated as Landlord's responsibility on Exhibit C attached hereto, and (4) the provisions of this Lease, Tenant will take possession of the Premises on the Delivery Date on an "as is" basis. Notwithstanding anything to the contrary in this Lease, if removal, abatement or remediation is required under Subsection 10(b)(ii) or (iii) hereof ("Remediation Period"), then the Commencement Date shall be delayed on a day for day basis for each day of the Remediation Period.

(c)    Tenant shall hereafter have access to the Premises for inspection, taking measurements, making plans, erecting temporary or permanent signs and the performance of Tenant's Work as may be appropriate or desirable by Tenant without being deemed thereby to have taken possession or accepted delivery of the Premises; provided, however, that Tenant shall indemnify, defend and hold Landlord harmless from and against any and all claims or losses arising from Tenant's entry upon the Premises, except to the extent caused by Landlord, its agents, employees or contractors. In no event will Tenant be required to accept delivery of the Premises unless and until the Delivery Requirements have been satisfied. No agent or non-employee representative of Tenant has the authority to accept delivery of the Premises. Only direct employees of Tenant with a title of Director or above can accept delivery, which acceptance must be in writing. Any purported acceptance by a non-authorized person or that is not in writing is not binding upon Tenant.

(d)    Reserved.

(e)    Landlord shall use its best efforts to cause the Delivery Date to occur by the Estimated Delivery Date. If the Delivery Date does not occur by the Estimated Delivery Date, Landlord must pay to Tenant the sum of $50,000.00 (the "Lump Sum Payment"). In addition, Landlord must pay to Tenant the sum of $1,000.00 for each day (the "Per Diem Payment") between the Estimated Delivery Date and the earlier to occur of (i) the Delivery Date or (ii) the date Tenant terminates this Lease in accordance with Section 10(f). If Landlord fails to pay Tenant the Lump Sum Payment and/or the Per Diem Payment, then Tenant will have the right (without limiting any other right or remedy of Tenant to collect such payment) to deduct such amount, together with interest thereon at the Default Rate, from Rent and other payments due Landlord. Landlord and Tenant agree that it will be difficult to determine the precise amount of damages that Tenant will incur as a result of the failure of the Delivery Date to occur by the Estimated Delivery Date. Therefore, Landlord and Tenant agree that the Per Diem Payment and the Lump Sum Payment constitute liquidated damages for such failure. If the Delivery Date does not occur by the Estimated Delivery Date, said liquidated damages shall be payable irrespective of the date Tenant actually opens for and conducts business in the Premises.

(f)     If the Delivery Date has not occurred on or before the Outside Delivery Date, then Tenant has the right to terminate this Lease by delivering written notice to Landlord at any time from and after the Outside Delivery Date but before the Delivery Date. After delivery of Tenant's notice of termination, Tenant shall be relieved of all obligations hereunder and shall not be liable to Landlord in damages or otherwise.  In the event Tenant so terminates this Lease, Landlord shall be liable to Tenant for all payments due Tenant under Section 10(e) and, in addition, immediately shall reimburse Tenant for all legal fees not in excess of $10,000.00 and all architectural and engineering fees not in excess of $20,000.00 incurred by Tenant in connection with this Lease.  This Section 10(f) survives the termination of this Lease.

(g)     Landlord must pay Tenant a "construction allowance" in the amount of $501,165.00 ($21.00 per square foot), irrespective of costs, as follows: (i) 60% of the construction allowance to be paid to Tenant on or before the Estimated Delivery Date, (ii) 30% of the construction allowance within 60 days after the Estimated Delivery Date, and (iii) the 10% remaining balance of the construction allowance within 30 days after (A) Tenant has opened for business from the Premises and is not then in default of the Lease beyond all applicable cure periods (but upon cure of such default Tenant's right to receive the 10% remaining balance shall again apply); (B) Tenant's Work is Substantially Complete in accordance with Tenant's Approved Plans as verified by Tenant's architect; (C) Tenant has received a certificate of occupancy or equivalent for the Premises; and (D) Tenant has delivered to Landlord a lien waiver from Tenant's general contractor or construction manager, as the case may be, for services and deliverables in excess of $10,000.00; provided, however, if  the lien waiver and release is not provided, in no event shall the balance of the construction allowance due Tenant be withheld beyond the statutorily defined period in which liens may be filed, if no liens have been filed during said period; and provided, further, that Landlord's obligation to pay the balance of the construction allowance shall be suspended during any period that Tenant is in default of any of its obligations under this Lease beyond all applicable notice and cure periods until cured. If Landlord fails to pay Tenant any portion of the construction allowance in accordance with this Lease,  then Tenant will have the right (without limiting any other right or remedy of Tenant) to deduct such amount from Rent (as a setoff or as recoupment in the case of bankruptcy), together with interest thereon at the Default Rate. Landlord will wire-transfer the construction allowance to Tenant's bank as follows: Bank of America, 100 West 33rd Street, New York, NY 10001, ABA : 026009593 (in the event Landlord elects to submit an ACH transmission, the number is: 111000012); Jo-Ann Account No.: 4427216208;  Account Name: Jo-Ann Stores, LLC Store #2456. Tenant agrees that the Landlord Contribution shall not be used for the purchase of Tenant's merchandise, but shall be used for any of Tenant's leasehold improvements, as well as architectural fees, GC or architect supervision fees, general GC Overhead and Profit, general conditions and permits.

## SECTION 11.  USE

The Premises may be used for the Permitted Use, provided the Premises shall not be used in violation of the exclusive uses as are set forth on Exhibit F. Landlord represents that the use restrictions accurately reflect exclusives, uses and encumbrances that presently encumber the

#2456 Wolf Creek Plaza, Bellevue, NE
Execution Version

- 21 -

Premises as terms of existing leases of Shopping Center premises (the uses covered by such restrictions are collectively referred to as the "Restricted Uses" and individually as a "Restricted Use"). Upon the expiration or earlier termination of the lease or other written instrument containing a Restricted Use, the Premises will not be subject to such Restricted Use under this Lease and such use will no longer be a Restricted Use. Upon the request of Tenant, Landlord promptly will advise Tenant which Restricted Uses still encumber the Premises and will furnish to Tenant the documentary support therefor.

## SECTION 12.   COMMON AREAS

(a)     Landlord, at its own cost and expense (except as otherwise specified in Section 9 or Section 21) must construct, install, operate, manage, repair and maintain the Common Areas in a first-class, neat and clean condition for the benefit of Tenant and Tenant's customers, employees, licensees and invitees. Landlord's obligations with respect to the Common Areas include, but are not limited to:

(1) Equipping and lighting the Common Areas;

(2) Maintaining the surfaces of all sidewalks, restriping and maintenance of paved and parking areas in a level, smooth and evenly covered condition with the type of surfacing material originally installed or such substitute as shall in all respects be equal in quality to the original;

(3) Removing all ice and snow, papers, mud and sand, debris, filth and refuse and thoroughly sweeping the Common Areas to keep them in a clean and orderly condition;

(4) Placing, keeping in good condition and repair and replacing all utility lines, any necessary appropriate directional signs, markers and curbs;

(5) Maintaining, trimming and watering, mowing and weeding all landscaped areas and making such replacements of shrubs and other landscaping as is necessary;

(6) security arrangements including private police and similar services and functions.

(b)     Landlord may close any Common Areas temporarily, at such times as to cause the least possible interruption or interference with Tenant's business, to make repairs or changes, to prevent the acquisition of public rights in such Common Areas or to discourage non-customer parking; but, in no event will the Protected Area be closed (except in the event of an emergency) without the prior reasonable consent of Tenant. In no event shall Landlord designate the Protected Area as an employee parking area or otherwise permit the Protected Area to be used for employee parking.

(c)    Landlord must keep the Common Areas clean and well lighted from dusk until at least one-half hour after the close of Tenant's business and remove snow from the parking areas, driveways and sidewalks as promptly as possible. Landlord cannot impose any parking charges for the parking of automobiles in the parking areas. Landlord cannot grant any rights in, or permit special or exclusive use of, the sidewalk space or parking areas near the front of the Premises or in the exterior area near the rear door of the Premises.

## SECTION 13.  UTILITIES

Landlord, at its sole cost and expense, must cause all utilities furnished to the Premises to be separately metered (water may be submetered) so that only the service provided to the Premises will be reflected in utility bills rendered to Tenant by the respective supplying public utility companies. Tenant must pay, when due, bills for utilities furnished to the Premises by public utility companies from and after the Delivery Date, including water, gas, electricity and telephone and the like, as are separately metered and charged directly to Tenant.

## SECTION 14.  USE VIOLATION

(a)    If any portion of any Restricted Property (defined below) is used or occupied for the Protected Use, or if any sales area therein is designated for the Protected Use (either event being referred to as a "Use Violation"), then, in addition to all remedies available at law and in equity, Tenant is obligated to pay only Substitute Rent until such Use Violation ceases. In addition, during the time that any Use Violation exists, Tenant has the right to terminate this Lease by giving 60 days written notice to Landlord, in which event all further obligations hereunder shall terminate on the date specified in Tenant's notice, and any Rent (including Substitute Rent) paid in advance by Tenant must be refunded to Tenant within 30 days after termination of the Lease.

(b)    The foregoing restriction in subsection (a) will not apply to: (1) any tenant of the Restricted Property devoting the lesser of (x) 5% of its Gross Leasable Area to the sale of items comprising the Protected Use, or (y) 1,000 square feet to the sale of items comprising the Protected Use (it being understood that any tenant that devotes the greater of either Subsection (b)(1)(x) or Subsection (b)(1)(y) hereof to the sale of items comprising the Protected Use, shall be considered a tenant whose primary use is the  Protected Use and that ½ of the adjacent aisle space shall be included in computing the foregoing areas); or (2) any tenant of the Restricted Property under a lease executed prior to the date of this Lease to the extent such tenant's lease (as the same exists on the date hereof) permits it to sell items that are included in the Protected Use without Landlord's consent, and Landlord covenants with Tenant not to modify or amend any such tenant's lease in any manner that would permit such tenant to sell any items comprising the Protected Use to an extent greater than such tenant is permitted to sell such items under its existing lease (but this exception for an existing tenant shall continue to apply notwithstanding any expansion or relocation of such tenant's premises, and whether or not such expansion or relocation requires any modification or amendment to such tenant's existing lease).

(c)     In the event that Tenant's Protected Use is violated, the computation of Substitute Rent shall commence on the first day of the violation of the Use Violation, and shall be paid in monthly installments.

(d)     Notwithstanding anything to the contrary, in the event of a Use Violation by any tenant or occupant who conducts or operates in violation of the Protected Use without Landlord consenting to or granting such tenant or occupant the right to do so (a "rogue tenant"), then Tenant's right to pay Substitute Rent and terminate this Lease will be deferred, provided that Landlord commences court action to cure or eliminate the Use Violation by the rogue tenant within 30 days of it first occurrence and diligently pursues same to completion (which diligence by Landlord must include appeals to the highest state court, if lower court rulings are adverse to Landlord and allow the Use Violation to continue). If Landlord does not take such action against the rogue tenant as described in the immediately preceding sentence, then Tenant may exercise its termination right and right to pay Substitute Rent at any time.

(e)     Tenant's failure to exercise the termination option is not a waiver of Tenant's continuing right to do so as long as such Use Violation continues. Without limiting Tenant's rights and remedies under this Section 14, Tenant has the right to equitable relief (including injunction) in the event of a Use Violation.

(f)     "Restricted Property" means the Shopping Center, any additions thereto or outparcels thereof.

(g)     Landlord covenants and agrees to use diligent, good faith, commercially reasonable efforts to cure any breach or violation of this Section, including, without limitation, seeking and diligently prosecuting all available legal and equitable remedies to compel or otherwise cause cessation of the Use Violation.

(h)     Notwithstanding anything to the contrary contained herein, if at any time during which a Use Violation exists and Tenant is entitled to pay Substitute Rent pursuant to another provision under this Lease ("Prior Substitute Rent Reason"), then, in lieu of paying Substitute Rent, and in addition to all remedies available at law and in equity Tenant shall be entitled to pay Alternate Substitute Rent until such time as the Use Violation is satisfied or until such time as the Prior Substitute Rent Reason is satisfied, in which case Tenant shall be obligated to pay Substitute Rent in accordance with the terms of this Section 14. As used in this Lease, "Alternate Substitute Rent" shall mean 50% of the Substitute Rent.

## SECTION 15.  CO-TENANCY

(a)     Ongoing Co-Tenancy.

(i)     Subject to the terms of this Section 15(b) below, the Ongoing Co-Tenancy Requirement means that Walmart and either Gordman's or Petco (the "Anchor Tenants") are open

#2456 Wolf Creek Plaza, Bellevue, NE
Execution Version

for business to the public during normal operating hours from substantially all the premises as shown on the Site Plan (the "Anchor Tenant Premises").

        (ii)    If, at any time on or after the Commencement Date the Ongoing Co-Tenancy Requirement is not met, then Tenant may pay Substitute Rent until the Ongoing Co-Tenancy Requirement is satisfied. If at any time the Ongoing Co-Tenancy Requirement is not met for a period of 12 months, then without limiting Tenant's right to pay Substitute Rent, Tenant may terminate this Lease upon 90 days written notice to Landlord delivered at any time thereafter prior to the date the Ongoing Co-Tenancy Requirement is satisfied.

        (b)    <u>Definitions</u>.

        (i)    A single national comparable retail tenant suitable for occupancy in a first-class shopping center and operating under one trade name in 80% of an Anchor Tenant Premises will be deemed to be an "Anchor Tenant" after the commencement of such substitute operation.

        (ii)    For purposes of this Lease, "national" shall mean a first-class retailer operating at least 75 stores in at least three states.

        (iii)    A "comparable retail tenant" is a general merchandiser (such as Target), home goods store (such as Home Goods), an electronics store (such as Best Buy), a sporting goods store (such as Dick's or Sports Authority), a bookstore (such as Borders or Barnes and Noble), a fashion clothing store that does not regularly sell at discount, or a grocery store that does not regularly sell at discount, under a lease with a term of at least five years, who sells goods to consumers and who attracts the quantity and type of high frequency shopper attracted by the Anchor Tenant that is being replaced.

        (c)    <u>Dual Violations</u>.    Notwithstanding anything to the contrary contained herein, if at any time during which the Ongoing Co-Tenancy Requirement has not been met or exists (a "Co-Tenancy Violation"), and Tenant is entitled to pay Substitute Rent pursuant to Section 14 or Section 26 of this Lease ("Prior Substitute Rent Reason"), then, in lieu of paying Substitute Rent for such Co-Tenancy Violation and in addition to all remedies available at law and in equity, Tenant shall be entitled to pay Alternate Substitute Rent until such time as the Co-Tenancy Violation is satisfied or until such time as the Prior Substitute Rent Reason is satisfied, in which case Tenant shall be obligated to pay Substitute Rent, as applicable, in accordance with the terms of this Section 15.

## SECTION 16.  RULES AND REGULATIONS

    (a)    Landlord may, for the general welfare of the Shopping Center or the avoidance of nuisance, impose reasonable rules and regulations of general application governing the conduct of tenants in the Shopping Center and the use of the Common Areas (it is agreed and understood that such rules and regulations and any subsequent modifications thereto, notwithstanding anything to the contrary in this Lease, shall be subject and subordinate to the terms and conditions of the body

of this Lease so that in the event of any conflict or inconsistency between the terms hereof and such rules and regulations, the terms hereof shall supersede and control.) Tenant will comply with and perform any and all such rules and regulations imposed by Landlord so long as such rules and regulations do not limit the rights or expand the obligations of Tenant under this Lease and all occupants of the Shopping Center are subject to and comply with such rules and regulations. Landlord must use best efforts to enforce such rules and regulations.

(b)     Tenant is not required to join or maintain membership in any tenant's business association sponsored by or for the Shopping Center, nor is Tenant required to pay any of the costs of the activities conducted by such association.

## SECTION 17.  ALTERATIONS, INSTALLATIONS AND IMPROVEMENTS BY TENANT

(a)     Tenant, without Landlord's consent, has the right to make such interior alterations, changes and improvements to the Premises as Tenant may desire for the conduct of Tenant's business and for the full beneficial use of the Premises; except for structural changes, alterations or improvements that would affect the roof of the Premises, which require Landlord's consent, which consent must not be unreasonably withheld or delayed.  Tenant will pay all costs and expenses of its improvements, will make such changes, alterations and improvements in a good and workmanlike manner, in accordance with all applicable laws and building regulations, and free and clear of any mechanic's liens or other liens or claims in connection with the making of such changes, alterations and improvements.

(b)     Except as otherwise provided, all signs, furnishings, trade fixtures, inventory, equipment and other removable property installed in the Premises by Tenant will remain the personal property of Tenant, will not be subject to any Landlord's lien or lien or security interest against the property of Landlord, and may be removed from the Premises by Tenant upon the termination of this Lease. If any of the foregoing is affixed to the Premises, Tenant will repair any damage caused by removal.

## SECTION 18.  REPAIRS AND MAINTENANCE

(a)     Except as otherwise provided, Tenant will maintain the interior, non-structural portion of the Premises, at its sole cost and expense, in an attractive, clean and sanitary condition.

(b)     Landlord shall deliver the Premises "AS IS" (subject to the Delivery Requirements), except for work designated as Landlord's responsibility on the Tenant's Standard Division of Work Matrix attached as Exhibit C, and except as otherwise stated in Section 10(b) above, and except that Landlord warrants and guarantees that all structural portions of the Premises and the roof (water tight and leak free), utility cables, mains and conduits, electrical, gas, plumbing, sprinkler, sewer systems are, and will be upon the Delivery Date, in compliance with laws and in good working order and repair.

(c)     Subject to Section 18(d), and except for damage caused by fire or other casualties or taking by eminent domain or conveyance in lieu thereof: Tenant, at its sole cost and expense, must make all interior nonstructural repairs to the Premises, including doors and windows, and (1) all repairs to the plumbing and gas systems exclusively serving the Premises from their respective meters to and including the plumbing and gas systems in the interior of the Premises, and (2) the electrical system exclusively serving the Premises from Tenant's electrical panel to and including the electrical systems in the remainder of the interior of the Premises. Notwithstanding the foregoing, Tenant is not required to make any: (i) repairs of damage covered by insurance maintained or required to be maintained by Landlord; (ii) repairs necessitated by reason of the negligence, willful misconduct, or default of Landlord, its agents, employees or contractors; (iii) repairs to the plumbing, gas, electrical or other similar units and systems where such repairs would necessitate going through or into the floor slab, structural walls, or roof of the Premises; (iv) replacement of any plumbing, gas, electrical or similar units or systems; or (v) repair or replacement of the sprinkler, life safety or other detection or suppression system. All of the repairs and replacements referred to in the immediately preceding sentence will be performed by Landlord at its sole cost and expense.

(d)     Landlord, at its sole cost and expense, must make all repairs to the Premises other than those that Tenant is required to make. Landlord's obligations include, but are not limited to, repairs to the structural portions of the Premises (both interior and exterior), the roof, floor slab, foundation, exterior walls, any interior damage caused by roof leaks or water/sewage backing up into the Premises no matter where from, and all repairs or replacements to the (x) gas and plumbing systems or any portion thereof up to (but not including) their respective meters, and (y) the electrical system up to (but not including) Tenant's electrical panel. In making any repairs or replacements, Landlord must not unreasonably interfere with Tenant's normal operations and business. Landlord assigns to Tenant all warranties and guarantees, if any, with respect to any and all construction and equipment on the Premises to be maintained by Tenant.

(e)     Landlord will deliver the existing HVAC units and system in good working condition and per Tenant's minimum heating and cooling specifications and in accordance with Tenant's Prototype Plans. Landlord will warrant those HVAC units for the first 36 months commencing with the Rent Commencement Date ("Warranty Period"). Commencing on the first day after the expiration of the Warranty Period, Tenant will be responsible for all repairs and replacements of the HVAC unit(s) or if the Landlord must replace any of the HVAC unit(s) (replacement must include a five-year extended warranty covering the compressor(s) and a ten-year extended warranty covering the heat exchangers) during the Warranty Period, Landlord will assign the warranties to Tenant and Tenant will then be responsible for all repairs and replacements to the replaced HVAC unit(s) from the date of such assignment forward, except as specifically set forth herein. In addition, Landlord has provided the Tenant with a survey of the existing conditions of the HVAC units along with pictures, manufacturer's name, plus the serial and model numbers, and tonnage for each HVAC unit. Notwithstanding anything to the contrary in the Lease, if Tenant should replace or repair the HVAC system or any part thereof during the final two years of the Initial Term or any Lease extension or renewal, if any, and not remain in possession of the Premises pursuant to a subsequent

Lease extension or renewal, then the Landlord shall reimburse Tenant, within 30 days of the deliver back of possession of the Premises to the Landlord, for (i) the un-amortized cost of said replacement based on a straight-line amortization schedule over the useful life of the equipment in accordance with federal income tax guidelines (in no event less than 15 years), or (ii) the actual cost of the repair in excess of $1,500.00 (it being understood that Tenant shall be responsible for the first $1,500.00 of cost for any such repair), as the case may be.

(f)    Tenant will maintain the Premises, at its expense, free and clear of all rubbish, garbage and trash and place such rubbish, garbage and trash in the containers provided by Tenant. Tenant, at its own cost and expense, will dispose of all rubbish, garbage and trash on a timely basis. Landlord will provide an area for Tenant's trash compactor or containers, at Landlord's sole cost and expense, within 20 feet of the rear of the back door to the Premises.

(g)    Subject to this Section 18, Tenant will keep the Premises in an orderly and sanitary condition, free from vermin, rodents, bugs and other pests, and Landlord must keep the Common Areas in an orderly and sanitary condition, free from vermin, rodents, bugs and other pests. Notwithstanding the foregoing, Landlord is responsible for the extermination of termites, carpenter ants, and other insects capable of causing structural damage in, on or about the Premises, the Common Areas, and all parts of the Shopping Center. Landlord must require all tenants of the Shopping Center to keep their spaces in an orderly and sanitary condition, free from vermin, rodents, bugs and other pests.

(h)    Notwithstanding anything to the contrary, Tenant is responsible for making any interior non-structural alterations of or improvements to the Premises that are required by any Public Entity after the Delivery Date, except to the extent that such responsibility is imposed upon Landlord in the next following sentence or otherwise under this Lease. Landlord is responsible, at its sole cost and expense, for making all alterations of or improvements to the Premises that are required by any Public Entity due to changes in Laws after the Delivery Date, which alterations or improvements (i) are structural in nature, or (ii) relate to the exterior thereof, including the Common Areas. Solely for the avoidance of doubt, nothing in this Section 18(h) shall be construed as requiring Landlord to make alterations or improvements due to changes in Laws after the Delivery Date if such alterations and improvements are required due specifically to Tenant's Protected Use within the Premises, as opposed to retail uses or other uses in general.

(i)    Landlord and Tenant acknowledge that responsibility for compliance with the terms and conditions of Title III of the Americans with Disabilities Act ("ADA") may be allocated between Landlord and Tenant. Notwithstanding anything to the contrary contained in the Lease, Landlord and Tenant agree that the responsibility for compliance with the ADA shall be allocated as follows: (i) Tenant shall be responsible for compliance with the provisions of Title III of the ADA with respect to the construction by Tenant of Tenant's Work, if any, and Tenant's alterations within the Premises, (ii) Landlord shall be responsible for compliance with the provisions of Title III of the ADA in providing all of Landlord's Work required under this Lease, if any, and with respect to any structural matters within the Premises except for Tenant's changes to the structural matters, and (iii)

Landlord shall be responsible for compliance with the provisions of Title III of the ADA with respect to the parking areas, sidewalks and walkways, together with all other Common Areas of the Shopping Center not included within the Premises and not otherwise part of Tenant's Work or Tenant's alterations within the Premises.  Landlord and Tenant each agree to indemnify and hold each other harmless from and against any claims, damages, costs, and liabilities arising out of Landlord's or Tenant's failure, or alleged failure, as the case may be, to comply with Title III of the ADA as set forth above, which indemnification obligation shall survive the expiration or termination of the Lease.  Landlord and Tenant each agree that the allocation of responsibility for ADA compliance shall not require Landlord or Tenant to supervise, monitor, or otherwise review the compliance activities of the other with respect to its assumed responsibilities for ADA compliance as set forth herein.  The allocation of responsibility for ADA compliance between Landlord and Tenant, and the obligations of Landlord and Tenant established by such allocations, shall supersede any other provisions of the Lease that may contradict or otherwise differ from the requirements of this section.

## SECTION 19.   INDEMNIFICATION

(a)     Subject to Section 20, Landlord must indemnify, defend and hold Tenant harmless from and against any and all claims, demands, actions, damages, liability and expense in connection with the loss, damage or injury to persons or property, arising out of or related to the acts or omissions of the Landlord, Landlord's agents, contractors or employees, or arising out of the use or operation of the Common Areas and all other space in the Shopping Center not designated for the exclusive use of one tenant, except as caused by the negligence or willful misconduct of Tenant, its agents, employees, contractors or representatives.

(b)     Subject to Section 20, Tenant must indemnify, defend and hold Landlord harmless from and against any and all claims, demands, actions, damages, liability and expense in connection with loss, damage or injury to persons or property (1) occurring in, on or about, or arising out of the Premises, except as caused by the negligence or willful misconduct of Landlord, its agents, employees, contractors or representatives; or (2) arising out of the acts or omissions of Tenant, Tenant's agents, contractors, or employees.

(c)     If either party, without fault on its part, is made a party to any litigation commenced by or against the other party, then such other party shall protect and hold such first party harmless and shall pay all costs, expenses and reasonable attorney's fees incurred or paid by such first party in connection with the litigation.

This Section 19 survives the expiration or termination of this Lease.

## SECTION 20.   WAIVER OF CLAIMS

Notwithstanding any provision to the contrary, Landlord and Tenant waive any and all right of recovery, claim, action or cause of action against the other, their respective agents and employees, for any loss or damage that may occur to the Premises or the Shopping Center or any additions or

improvements thereto, or any contents therein, by reason of fire, the elements or any other cause which could be insured against under the terms of a standard special form insurance policy or policies, or for which Landlord or Tenant may be reimbursed as a result of insurance coverage insuring any loss suffered by either party, regardless of cause or origin, including the negligence of Landlord or Tenant, or their respective agents and employees.  This waiver applies regardless of whether either party actually obtains property insurance, and regardless of whether any insurance proceeds are collected.  Notwithstanding the above, Landlord and Tenant agree and acknowledge that the waiver of claims herein contained shall expressly exclude any loss paid by the insured in the form of a deductible or self-insured retention. All property insurance policies required under this Lease covering the Premises or the Shopping Center must expressly waive any right on the part of the insurer against the other party for damage to or destruction of the Premises or the Shopping Center resulting from the acts or omissions of the other party.

## SECTION 21.  PROPERTY AND LIABILITY INSURANCE

(a)    Landlord must keep in full force and effect Commercial General Liability Insurance and Umbrella Insurance with respect to the Shopping Center, including the Common Areas, naming Tenant as an additional insured thereunder to the extent its interest may appear, with nationally recognized companies rated no lower than A-, IX by A.M. Best Company with total minimum limits to apply per location of $2 million on account of bodily injuries or death and/or property damage resulting from one occurrence. Landlord must deposit a certificate or other evidence of such insurance with Tenant.

(b)    Tenant must keep in full force and effect Commercial General Liability Insurance and Umbrella Insurance with respect to the Premises, naming Landlord as an additional insured to the extent its interest may appear, with nationally recognized companies rated no lower than A-, IX by A.M. Best Company with total minimum limits to apply per location of $2 million on account of bodily injuries or death and/or property damage resulting from one occurrence. Tenant's evidence of insurance is maintained by Tenant's insurer on the website of Tenant's insurance broker, which can be accessed through Tenant's website, "JoAnn.com."

(c)    Landlord must keep the Premises and the Shopping Center, including Common Areas, insured against loss or damage by fire, lightning, vandalism and malicious mischief, and such other perils as are now or may hereafter be comprehended in the term "All Risk Coverage" or "special form" coverage or "Special Form Cause of Loss" (or other terms that become the insurance industry standard in the future), including, without limitation, earthquake and flood, if in an area that is designated as an earthquake or flood zone, boiler and machinery, plate glass, power failure, mold, windstorm, terrorism, seepage or leakage and loss of rent damage, in amounts equal to at least 80% of the full replacement value thereof, or such greater amounts as may be required to prevent the application of co-insurance provisions.  Such insurance must cover improvements in the Premises owned by Landlord to the extent that the same are customarily insurable as part of the realty, but will not include the cost of restoration of Tenant's trade fixtures, furniture, furnishings, inventory, equipment and other personal property.    Tenant is solely responsible for any such damage.

(d)    In addition to the payment of Fixed Minimum Rent, Tenant must pay its Proportionate Share of the premium paid by Landlord for maintaining the insurance for the Shopping Center required under subsections 21(a) and 21(c) (the "Insurance Costs"). Tenant must pay to Landlord in 12 equal installments, each in advance on the first day of each and every calendar month, an estimated sum towards Tenant's Proportionate Share of the Insurance Costs. During the first Lease Year, the insurance paid by Tenant will not exceed the rate of $0.15 per year multiplied by the Gross Leasable Area of the Premises, which amount is Landlord's good faith estimate of the full amount of Tenant's Proportionate Share of Insurance Costs for the first Lease Year if Tenant were to pay Tenant's actual Proportionate Share of Insurance Costs for said period. This sum is subject to annual adjustments by Landlord to reflect actual changes in the Insurance Costs. On or before April 1 Landlord must provide Tenant with a statement assessing and prorating the Insurance Costs together with copies of all bills for which payment is sought. Tenant must pay to Landlord within 30 days of such receipt any deficiency owed to Landlord. If Tenant's estimated payments are in excess of Tenant's Proportionate Share in any Lease Year, then such excess will be applied to the following Lease Year unless such Lease Year is the final Lease Year of Tenant's occupancy, in which case Landlord must refund such overpayment to Tenant within 30 days after the end of such Lease Year. Landlord covenants that there will be no duplication of costs between this Section and any other Section of this Lease.

## SECTION 22.  SIGNS

(a)    Tenant has the right to install and maintain a sign or individual letters ("Jo-Ann, Fabric and Crafts" or any other name or slogan that Tenant may adopt) or signs on the front, side, rear or any other fascia of the Premises, as well as two-sided pylon panel on the pylon sign located on Cornhusker Road, as well as a sign or signs on the directory(ies), if any, located in or around the Shopping Center or for use by any of the tenants of the Shopping Center, and "framing," "craft" and similar departmental signs on the front fascia in addition to its regular sign, all in accordance with Tenant's Prototype Signage attached hereto as Exhibit D-1. Tenant's pylon signage will be in the second position on the Cornhusker Road pylon (i.e., the position currently occupied by the Michaels pylon panel). All signs will comply with all requirements of any Public Entity, and Tenant will obtain all necessary permits or licenses. Notwithstanding the foregoing, Tenant is entitled to seek and receive a variance from any Public Entity so as to allow Tenant to have the size, color, number, etc., of signs that Tenant desires, including storefront signs, pylon signs, banner signs and monument signs. Landlord must fully cooperate and assist Tenant with any such variance. Tenant's sole cost for the pylon and/or monument sign(s) shall be the cost to fabricate and install Tenant's panels.

(b)    Tenant's sign package shall be approved in accordance with the same process for approval of the plans for Premises build-out as outlined in Section 10 hereof. In no event shall Landlord object to any part of Tenant's sign drawings to the extent the same is consistent with Tenant's Prototype Signage Plans attached hereto as Exhibit D-1.

(c)    In addition to the foregoing signs, Tenant has the right to install and maintain a professionally prepared banner sign periodically in front of the Premises in the location and manner identified on Exhibit D-1.

(d)    Tenant must maintain its signs in good condition and repair at all times, and must save the Landlord harmless from injury to person or property arising from the erection and maintenance of the signs. Upon vacating the Premises, Tenant must remove all signs and repair (exclusive of painting) all damage caused by such removal.

(e)    If Landlord renovates all or any portion of the Shopping Center, which renovation requires a change to the facade and/or the removal of any of Tenant's sign(s), Landlord shall not materially change the appearance of the façade without Tenant's consent and shall notify Tenant at least 45 days before the removal of sign(s). Landlord will bear the cost of such removal and reinstallation, together with the cost of any damage to the sign(s) as a result of such removal or reinstallation. Further, Landlord must provide and install on or about the Shopping Center, at Landlord's sole cost and expense, a banner or other type of temporary sign(s) identifying Tenant's trade name, which banner or sign(s) must be equal in size to Tenant's existing sign and approved by Tenant before such installation.

## SECTION 23.  ASSIGNMENT AND SUBLETTING

(a)    Tenant has the right to assign this Lease or sublet all or any part of the Premises for any lawful retail use with Landlord's prior written consent, not to be unreasonably withheld, conditioned, or delayed, and which consent shall not be denied if (i) such assignee's or subtenant's use is a retail use and does not violate any prohibited uses or any exclusive use rights granted to other tenants in the Shopping Center that exist on the date of the assignment or sublease (subject, however, to Landlord's advising Tenant of such rights and restrictions), (ii) Tenant remains responsible for the payment of Rent, unless expressly released in writing by Landlord or pursuant to subparagraph (b) below; and (iii) in the case of an assignment, the assignee assumes in writing all the terms and provisions of this Lease to be performed or observed by Tenant.  Within 15 days after the receipt of a written request from Tenant, Landlord must deliver to Tenant notice of any restrictions on the use of the Premises enforceable at the Shopping Center.  Failure to deliver to Tenant a list of any restrictions will constitute Landlord's covenant that there are not restrictions on the use of the Premises for any use and Landlord must indemnify, defend and hold Tenant harmless if there actually is a restriction. A change in effective voting control of the Tenant does not constitute an assignment of the Lease. Landlord agrees to enter into a commercially reasonable recognition agreement with such subtenant or assignee.

(b)    If Tenant assigns this Lease and Tenant's assignee or any subsequent assignee has, at the time of the assignment, or attains at any time after the assignment, a net worth of at least $100 Million and operates at any time not less than 25 stores, then Tenant shall be released and discharged from any further liability under this Lease. Such net worth shall be determined as of the

end of the most recent fiscal year preceding the intended release unless more current figures are available.

(c)    Notwithstanding any provision of this Lease to the contrary, Tenant may assign this Lease without Landlord's consent, or sublet all or any part of the Premises without Landlord's consent (but in no event to more than two subtenants), to: (1) any parent, subsidiary, affiliate, or successor of Tenant, (2) the parent of Tenant by way of merger, reorganization, consolidation, corporate restructuring, purchase of stock or assets, or the like, or (3) any entity that acquires fifty percent or more of Tenant's stores generally or Tenant's stores the State of Nebraska and bordering states. Furthermore, Tenant may sublet, without the consent of Landlord, not more than 10% of the Gross Leasable Area of the Premises for the operation of one or more departments within the business operations of Tenant, provided any ingress to such sublet department is accessible only from within the Premises.

## SECTION 24.    REPAIR AFTER CASUALTY

(a)    In the event of damage to or destruction of the Shopping Center or any portion thereof (including the Premises) by casualty or any other cause whatsoever, then, except as otherwise provided in this Section, Landlord must begin and diligently pursue to completion the restoration and repair within 30 days of the event of damage or destruction. Landlord is obligated to repair the Premises only to their condition on the Delivery Date (subject to alterations thereof required by changes in governmental code). Any repair or restoration of the Premises must be completed within 180 days after the event of damage or destruction. Any repair and restoration of the Shopping Center (other than the Premises) must be completed as quickly as possible. Within 30 days after an event of damage or destruction, Landlord must deliver to Tenant notice of the anticipated period of restoration. In no event shall the Landlord be required to repair or replace Tenant's stock in trade, fixtures, signs, furniture, furnishings, floor coverings or other equipment.

(b)    In the event of any damage or destruction to the Premises, then all Rent will abate pro-rata using the same ratio that the portion of the Premises rendered unusable (in Tenant's reasonable judgment) bears to the Gross Leasable Area of the Premises. In the event of damage or destruction to any other portion of the Shopping Center (including the Common Area) that interferes with access to the Premises or the conduct of business therein, then Tenant will pay only Substitute Rent until the completion of Landlord's repair and restoration.

(c)    Notwithstanding Section 24(a), Landlord may terminate this Lease and has no restoration and repair responsibility in the event of damage to or destruction of the Shopping Center if (i) the cost of repair or restoration exceeds 75% of the replacement value of the Shopping Center and the event or destruction was not insurable under the insurance coverage required of Landlord hereunder; or (ii) the reasonable period for substantial completion of the repair and restoration exceeds eighteen months. As a condition to Landlord's termination of this Lease under this subsection: (1) the leases of all other occupants in the Shopping Center must also have been

terminated by reason of the event of damage and destruction; and (2) Landlord must have no intent and be under no obligation to rebuild the Shopping Center.

(d)  If the Premises are damaged or destroyed and Landlord has not completed the restoration and repair thereof within 180 days as required in Section 24(a), then Tenant has the right, without waiving any other right or remedy against Landlord, to terminate this Lease. If any portion of the Shopping Center other than the Premises is not repaired, or by Landlord's estimate cannot be repaired, within one year from the event of damage or destruction, then Tenant has the right to terminate this Lease but has no other claim against Landlord for failure to repair except to the extent that Landlord has failed to use reasonable efforts to complete such repairs.

(e)  In addition to all rights to terminate this Lease granted to the parties in this Section, if 40% or more of the Premises are destroyed or damaged during the last two years of the Term, then each of Landlord and Tenant has the right to terminate this Lease as of the date of such damage or destruction by giving written notice thereof within 30 days after the date of the damage or destruction. If Tenant, within 30 days after receipt of Landlord's written notice of termination, gives Landlord written notice of its intention to extend this Lease for any additional Extended Term then available to Tenant, then the notice of Landlord to terminate this Lease will be of no force and effect.  If Tenant elects to extend this Lease for any additional Extended Terms then available to Tenant, Landlord must use its best efforts to restore the Premises to its former condition with all reasonable speed, and all Rent will abate pro-rata as set forth in subsection (b).

(f)  If this Lease is terminated pursuant to this section, Landlord must refund within 15 days of notice any Rent paid in advance.

(g)  Notwithstanding anything to the contrary, if Landlord terminates the Lease under this section, and if after such termination Landlord rebuilds the Premises or the Shopping Center, as the case may be, at any time within the Term (including extensions thereof), then Tenant has the right, at its option, to lease space in the Shopping Center comparable to the Premises (the "Substitute Premises") upon the same terms and conditions and for the balance of the Term.  Notwithstanding termination of this Lease, Landlord must notify Tenant of its intention to repair or restore the Premises or the Shopping Center, as the case may be, whereupon Tenant has 30 days after receipt to give Landlord notice of Tenant's intention to accept such Substitute Premises on the terms and conditions of this Lease and setting forth the period within which such repair or restoration must be completed as a condition of Tenant's acceptance of the Substituted Premises. This subsection 24(g) survives termination of this Lease.

(h)  If Landlord elects, or is required by this Section 24, to repair the Premises or the Shopping Center, then Landlord must notify Tenant in writing when the repairs are completed. The repairs will be not be deemed completed unless and until the repairs are actually completed in accordance with the terms of this Lease and Tenant has thereafter received written notice of such completion.

(i)      If the Lease is not terminated under the terms of this Section 24, then Rent will cease abating and become due and payable on the later of the date (i) 180 days after the date that Landlord completes its restoration of the Premises as required hereunder, and (ii) Tenant has rebuilt, refixtured and restocked the Premises, or should have rebuilt, refixtured and restocked the Premises if utilizing commercially reasonable efforts.

**SECTION 25.   CONDEMNATION**

(a)      If 50% or more of the Gross Leasable Area of the Premises or 50% or more of the Gross Leasable Area of the Shopping Center is taken by condemnation or right of eminent domain or conveyed in lieu thereof or taken in any other manner for a period of three (3) months or longer (a "Taking"), this Lease will terminate at the option of either party as of the day possession is taken by or title vests in the taking authority, and both parties will be released from any further liability hereunder.

(b)      In the event of a Taking of less than 50%, but more than 5%, of the Gross Leasable Area of the Premises, or a Taking of any portion of the Protected Area, then Tenant has the right to terminate this Lease and any further liability hereunder if, in the reasonable determination of Tenant, the Premises cannot be economically operated for, or are unsuitable, for the intended purposes of this Lease.  Any such termination is effective as of the day possession is taken by, or title to the portion taken vests in, the taking authority.

(c)      In the event of a Taking of less than 50%, but more than 10%, of the Gross Leasable Area of the Shopping Center (including the Common Areas), then (i) Tenant has the right to terminate this Lease and any further liability hereunder if, in Tenant's reasonable determination, the Premises cannot be economically operated for, or are unsuitable for, their intended purposes; and (ii) Landlord has the right to terminate this Lease and any further liability hereunder if, in Landlord's reasonable determination, the Shopping Center cannot be economically operated for, or are unsuitable for, their intended purposes. Any such termination is effective as of the day possession is taken by, or title to the portion taken vests in, the taking authority

(d)      In the event of a Taking of any portion of the Premises or the Shopping Center, upon which this Lease is not terminated, Landlord must restore the remainder of the Premises or the Shopping Center (including the Common Areas), with reasonable speed to a complete architectural unit as nearly like its condition prior to such partial Taking as shall be practicable, and if during or after the work of restoration Tenant is deprived of all or a part of the use of the Premises, the Rent will abate for so long as Tenant is deprived of such use and until Tenant has rebuilt, refixtured and restocked the Premises, as necessary , in the same proportion as that portion of the Premises taken bears to the entire Premises.

(e)      All damages awarded in connection with the Taking of the Premises, whether allowed as compensation for diminution in value to the leasehold or to the fee of the Premises, belong to the Landlord; but, if Tenant has made any material leasehold improvements to the

Premises, or alterations or structural changes and repairs to the Premises, at its own expense (regardless of when made), Tenant and not Landlord is entitled to claim an award for the unamortized balance of Tenant's cost thereof. If the condemning authority does not make a separate award therefor, Landlord, subject to the rights of any mortgagee, must assign a portion of its award equal to such unamortized cost to Tenant. If Landlord in obtaining its award uses Tenant's cost items, then Tenant is entitled, subject to the rights of any first Mortgagee, to a proportionate share of Landlord's award based upon the costs. Tenant is also entitled to claim an award for loss of business, damage to merchandise and fixtures, removal and reinstallation costs and moving expenses, in a separate action only.

## SECTION 26.  REPRESENTATIONS AND COVENANTS OF LANDLORD

(a)    On the date hereof and hereafter during the Term, Landlord represents, warrants and covenants to Tenant as follows:

(1)    The Shopping Center Site is zoned to permit the use of the Shopping Center for general retail purposes, and the Premises are zoned to permit their use as a retail store conducting the Permitted Use, as of right (i.e., without any special permit, approval, variance or other waiver);

(2)    The legal description set forth on Exhibit A matches the Shopping Center depicted on the Site Plan (i.e., Exhibit B) and includes no additional property therein;

(3)    The Common Areas, Premises (excluding Tenant's Work or other alterations made by or on behalf of Tenant) and all structural portions of the Shopping Center comply with all Laws;

(4)    Landlord will provide surface parking spaces in the Common Areas on an unreserved basis and without cost, with at least five parking spaces being provided for each 1,000 square feet of Gross Leasable Area within the Shopping Center or the amount required by Laws, whichever is greater;

(5)    No building, edifice or obstruction will be placed on the Shopping Center Site and no addition or alteration will be made to the Shopping Center (A) that diminishes the accessibility of the Premises to and from the parking areas within the Common Areas and the other stores in the Shopping Center; (B) that diminishes the visibility of the front of the Premises (including, without limitation, the signage thereon) from public highways, parking areas or other stores in the Shopping Center; (C) that diminishes the access to or the utility of the service areas serving the Premises; (D) that has the effect of increasing the monetary obligations of Tenant under this Lease; or (E) that otherwise

adversely affects the conduct of business from the Premises or the rights of Tenant under this Lease. Without limiting the generality of the foregoing, in no event will any improvement or alteration (including a reduction in size of the Protected Area through any means (except through an eminent domain proceeding), including, for example, a reduction in the Shopping Center or Shopping Center Site, or a change in the parking layout or configuration or traffic patterns of vehicles or pedestrians) be made to the "Protected Area" as shown on the Site Plan;

(6)     The Site Plan correctly and completely shows all improvements on or to be made to the Shopping Center Site;

(7)     The Shopping Center will not be expanded or contracted;

(8)     Landlord will maintain, operate and manage the Shopping Center as a first-class retail project in compliance with all Laws, and the Shopping Center will be used and occupied only for normal retail uses customarily conducted in first-class shopping centers.

(9)     In no event will the Shopping Center or any portion thereof be used as or for any of the following:

     (i)      a movie theater; auditorium; meeting or banquet hall;

     (ii)     church; bingo hall or a place of public assembly;

     (iii)    library or school (includes, but not limited to, a beauty school, barber college, reading room, place of instruction or any other operation serving primarily students or trainees rather than retail customers);

     (iv)     for the sale or service of automobiles or other vehicles;

     (v)      night club or bar serving alcoholic beverages except as incidental to a restaurant ("incidental" shall be defined as deriving less than 25% of gross sales from the sale alcoholic beverages); or liquor or beverage store;

     (vi)     funeral parlor; massage parlor;

     (vii)    animal clinic or animal boarding (kennel);

     (viii)   discotheque; dance hall or otherwise for musical/dance reviews or topless/nude shows;

     (ix)     karate studio; gymnasium; bowling alley; or skating rink;

     (x)      car wash;

     (xi)     off-track betting establishment, gambling, gaming, video gaming, etc.;

     (xii)    pool room, game room or amusement arcade (defined as any establishment containing more than a combination of three

electronic, pinball or other games), gallery or store or pinball arcade;

(xiii)  so-called "flea market"; or second hand. used goods or consignment store;

(xiv)  store selling primarily distressed or damaged merchandise;

(xv)  health club or spa;

(xvi)  so-called "head shop"; or night club;

(xvii)  gun range or gun shop;

(xviii)  for warehousing, except as incidental to a retail business;

(xix)  adult book store or store selling or exhibiting sexually explicit materials;

(xx)  any business or use that emits offensive odors, fumes, dust or vapors or is a public or private nuisance or emits loud noise or objectionable sounds or creates fire, explosive or other hazard (e.g., motorized vehicle repair or body shop); provided, however, tire, battery or auto parts retail locations shall not be precluded under this Restricted Use;

(xxi)  abortion clinic, aids clinic, drug treatment facility or bodily fluid collection facility; homeless shelter or halfway house;

(xxii)  business office usage;

(xxiii)  animal kennel;

(xxiv)  laundromat;

(xxv)  any non-retail use;

(xxvi)  marijuana dispensary; or

(xxvii) tattoo parlor.

(10)  Landlord owns fee simple title to the Shopping Center free and clear of all liens and encumbrances except for the lien of the existing mortgage in favor of Voya Investment Management.  There are no claims of other parties, restrictions, reservations, or defects in Landlord's title which could interfere with or impair Tenant's rights under this Lease or Tenant's use, occupancy, or enjoyment of the Premises;

(11)  At the time of the Delivery Date, there are no planned or contemplated taxes and assessments, either general and specific, whether ad valorem, specific or otherwise, with respect to the Shopping Center; and,

(12)  To the best of Landlord's knowledge, the Premises are free of Hazardous Material.

(b)  The representations, warranties and covenants in this Lease are material considerations and inducements to Tenant in executing this Lease, the breach of which will cause irreparable and severe harm to Tenant.  Without limiting any other right or remedy of Tenant, in the

event of a breach of the representations, warranties, and covenants, Tenant has the right after providing Landlord with 30 days' prior written notice (i) to terminate this Lease at any time during the period of such breach; (ii) to pay Substitute Rent during the period of such breach. Provided, however, if the alleged breach cannot be reasonably cured within 30 days, and Landlord is engaged in prudent efforts to cure such alleged default within the 30-day period and proceeds to cure with due diligence, Landlord shall not be deemed to be in default.

## SECTION 27.  TENANT'S DEFAULT

(a)     Landlord may, by written notice to Tenant, terminate this Lease, or without terminating this Lease re-enter the Premises by summary proceedings, and may dispossess the Tenant if:

(1)     Tenant fails to pay Rent on or before the due date and then fails to pay same within 10 days after receipt of written notice from Landlord;

(2)     Tenant is in material default in the performance of any of the covenants, terms, conditions and provisions of this Lease, and Tenant fails to remedy such default within 30 days after receipt of written notice thereof (but Tenant will not be deemed to be in default if Tenant commences to remedy the default within the 30-day period and proceeds to cure with due diligence);

(3)     Tenant is adjudged bankrupt or makes an assignment for the benefit of creditors, or if a receiver of any property of Tenant in, upon or about the Premises is appointed in any action, suit or proceeding by or against Tenant and is not removed within 90 days (unless such 90-day period is extended by court order, in which event the time period will be as established by court order or established by such person(s) or entity acting under or for the court) after appointment; or

(4)     The interest of Tenant in the Premises is offered for sale or sold under execution or other legal process, and if not rescinded within 90 days after written notice from Landlord to Tenant.

Landlord must mitigate its damages. In the event of re-entry Landlord must use best efforts to relet the Premises and, in the event of a reletting, must apply the rent therefrom first to the payment of Landlord's reasonable expenses incurred and paid by reason of Tenant's default, next to the reasonable expense of reletting, including, but not limited to, reasonably necessary repairs to the Premises, and then to the payment of rent and all other sums due from Tenant, with Tenant remaining liable for any deficiency.  Any and all deficiencies shall be payable by Tenant monthly on the date provided for the payment of Fixed Minimum Rent. Notwithstanding anything to the contrary in this Lease, if Tenant has in good faith disputed an alleged monetary

default for an amount which is less than two months of Rent, and if Landlord obtains a final judgment adverse to Tenant with regard to said amount, wholly or in part, Tenant may within 30 days of the date of the journalized final judgment pay the amount set forth in the final judgment to Landlord and retain the right to possession of the Premises and all of its rights under the Lease, notwithstanding any termination of the Lease pursuant to the Lease or at law or in equity, which may have occurred as a result of said monetary default.

(b)     In the event of a default by either party of any of the terms, provisions, covenants or conditions of this Lease, the other party has the right to invoke any remedy provided at law or in equity; except, however, Landlord is not entitled to terminate this Lease or to dispossess Tenant except for a material default and in no event is Landlord entitled to accelerate Rent. Notwithstanding anything contained herein, in no event is Landlord entitled to exercise self help to lock out Tenant or forcibly retake possession of the Premises without due legal process and an appropriate court order. All remedies are cumulative and concurrent.

(c)     Notwithstanding anything to the contrary, with respect to any alleged default of Tenant other than a default in the payment of Rent, or other sums of money, if Tenant notifies the Landlord, within 30 days after Landlord's notice of such default, that Tenant in good faith disputes such alleged default for any amount which is less than two (2) months' Rent and Tenant files within the 30-day period an action in a court of competent jurisdiction contesting such alleged default, then Tenant will not be deemed to be in default with respect to such matter. If a final judgment is adverse to Tenant, wholly or in part, Tenant must immediately begin to correct the matters complained of by Landlord, or that portion thereof as to which such judgment shall have been adverse to Tenant, and complete the correction within 30 days after such judgment, or if more than 30 days are reasonably required to complete such correction, correct the same within 30 days and prosecute the same to completion with reasonable diligence.

## SECTION 28. RIGHTS OF LANDLORD

(a)     Landlord reserves the right at all reasonable times during Tenant's business hours and upon prior reasonable notice to Tenant (except in the event of emergency, when notice is not required) by itself or its duly authorized agents, to  inspect the Premises and, to make such repairs as Landlord is obligated to make to the Premises.  In exercising the foregoing right, Landlord must not interrupt or disrupt Tenant's business or unreasonably disrupt access to the Premises by Tenant, Tenant's employees, agents, invitees and customers.

(b)     If Landlord makes any payments on behalf of Tenant, which are Tenant's obligation, to fulfill Tenant's covenants, then any amount so paid by Landlord are declared to be "Additional Rent" and are due and payable to Landlord from Tenant with the next installment of Fixed Minimum Rent due thereafter, together with interest thereon at the Default Rate from the date of such advance to the repayment thereof in full.

(c)     Landlord has the right during the last two months before the expiration of this Lease, so long as it does not interfere with Tenant's business, to exhibit the Premises and put up the usual notice "for rent" or "for sale", which notice will not be removed or hidden by Tenant. No more than one sign will be placed upon the Premises and the sign cannot exceed 12 feet square.

## SECTION 29.  LANDLORD'S DEFAULT

(a)     If Landlord fails to keep and perform any covenant or agreement to be kept and performed by Landlord, then Tenant, in addition to all other remedies now or hereafter afforded or provided by this Lease, at law or in equity, has the right to: (i) perform such covenant or agreement for or on behalf of Landlord or make good any such default, and any amount or amounts that the Tenant advances on Landlord's behalf must be repaid by Landlord to Tenant on demand, together with interest thereon at the Default Rate from the date of such advance to the repayment thereof in full or (ii) deposit the installments of rent and other cash payments accruing under this Lease into an escrow account with any third party with instructions to pay such sums to Landlord when Landlord has performed the covenants and agreements to be performed by Landlord or, if Tenant performs such covenants and agreements for or on behalf of Landlord, when any amounts advanced by Tenant for the performance of such covenants and agreements, together with all accrued interest thereon, have been repaid in full, and, if any such amounts have not been repaid in full on or before the 60th day after such funds are deposited into escrow, to return such funds to Tenant for set-off against the amounts advanced; or (iii) any combination of (i) and (ii).

(b)     Except in the event of emergency, before performing any covenant or agreement on behalf of Landlord, Tenant will provide Landlord with written notice of Landlord's default and Tenant's intent to perform such covenant or agreement, and Landlord will have 30 days within which to complete performance of the same (and Landlord will not be deemed to be in default if Landlord commences to remedy the default within the 30-day period and proceeds to cure with due diligence). For purposes hereof, "emergency" means (i) any event which poses immediate threat of injury or damage to persons or property or (ii) any event which, in Tenant's judgment, threatens Tenant's ability to open for business as scheduled or impairs or interferes with Tenant's business operations.

(c)     If Landlord fails to pay any sum to Tenant when due, and if such failure continues for 10 days after receipt of notice from Tenant, Tenant has the right, without forfeiture of its other rights hereunder, at its election, to setoff and deduct the same, together with interest thereon at the Default Rate, from Rent. Notwithstanding the foregoing, Tenant's rights of offset under Section 10 hereof will be governed by Section 10.

## SECTION 30. MORTGAGE SUBORDINATION

(a)     Landlord must obtain and deliver to Tenant a non-disturbance and attornment agreement, substantially in the form of Exhibit G (the "SNDA"), from any existing ground lessor, mortgagee or lien holder.

(b)    Landlord reserves the right to request from Tenant a waiver of priority of Tenant's leasehold estate hereunder for the purpose of subordinating Tenant's leasehold estate in favor of a first mortgage lien or any refinancing or replacement of a first mortgage loan that Landlord may hereafter deem necessary or desirable. Tenant, upon such request by Landlord, will execute and deliver an agreement substantially in the form of Exhibit G. The word "mortgage" means (y) any lease of land only or of land and buildings in a sale-lease-back transaction involving all or any part of the Shopping Center, or (z) any mortgage, deed of trust or other similar security instruments constituting a lien upon all or any part of the Shopping Center, whether the same shall be in existence as of the date hereof or created hereafter, and any modifications, extensions, renewals and replacements thereof. "Mortgagee" means a party having the benefit of a mortgage, whether as lessor, Mortgagee, trustee or note-holder.

(c)    After a change in ownership of all or any portion of the Shopping Center that requires a change in the Rent payee, or assignment of this Lease by Landlord that requires a change in the Rent payee, Tenant shall have no obligation to pay Rent to the new payee until Tenant receives written notice from Landlord confirming the name and address of the new payee.

(d)    If Tenant receives a written notice from any party claiming a collateral interest in this Lease or in the Rent and, by reason thereof, a present entitlement to collect the Rent, Tenant has the right to withhold Rent from Landlord and pay same to an escrow agent or a court pending the determination by a court of competent jurisdiction of the entitlement thereto.

## SECTION 31. NO WAIVER

No waiver by either party of any of the terms, covenants, provisions or conditions in this Lease, and no waiver of any legal or equitable relief or remedy, will be implied by the failure of either party to assert any rights, or to declare any forfeiture, or for any other reason. No waiver of any of the terms, provisions, covenants, rules and regulations herein will be valid unless it is in writing signed by both parties. No waiver by either party, or forgiveness of performance by either party in respect to one or more tenants of the Shopping Center, will constitute a waiver or forgiveness of performance in favor of Tenant, Landlord or any other tenant. The waiver or the forgiveness of performance of any one or more of the terms, provisions, conditions, rules and regulations of this Lease will not be claimed or pleaded by Tenant or Landlord to excuse a subsequent failure of performance of any of the terms, provisions, conditions, covenants, rules and regulations of this Lease.

## SECTION 32.  SURRENDER OF PREMISES

(a)    Tenant must deliver up and surrender to Landlord possession of the Premises, and all improvements permanently attached to the Premises during the Term, upon the expiration of this Lease, or its termination in any way, in as good condition and repair as the same are in on the Commencement Date (excepting damage by fire or other casualty which could be covered by a standard "All-Risk Coverage" or "special form" insurance policy, ordinary wear and tear, authorized

#2456 Wolf Creek Plaza, Bellevue, NE
Execution Version

- 42 -

alterations and modifications, and decay, neglect, fault or default of Landlord and taking by eminent domain or conveyance in lieu thereof). Upon the expiration or earlier termination of this Lease, Tenant will deliver the keys at the office of Landlord or Landlord's agent. Tenant will have an additional ten-day Rent-free period after expiration or termination of the Lease to remove its signs, trade fixtures, furnishings, inventory, equipment, furniture and other personal property.

(b)    Tenant has the right, while the Lease remains in effect, to place a banner sign at the front of the Premises, in a place visible to Tenant's customers, directing Tenant's customer's to another store of Tenant or providing Tenant's customers with information and a telephone number. If the Lease has terminated or expired, then Landlord must leave the sign at the front of the Premises until the earlier to occur of (1) 90 days after Tenant vacates the Premises; or (2) a new tenant opens for business in that location.

**SECTION 33.  SHORT FORM LEASE, COMMENCEMENT DATE AGREEMENT**

(a)    Neither party may record this Lease, but if either party requests that a Short Form Lease or a Memorandum of Lease be recorded, then the other party must execute such Agreement, which Agreement will contain the information set forth below. The Short Form Lease or Memorandum of Lease will describe the Premises and the rights herein demised, the Term, and the extension rights (if any), any exclusive granted to Tenant and other provisions hereof reasonably requested by Tenant. The failure to record the Short Form Lease or Memorandum of Lease will not affect or impair the validity and effectiveness of this Lease, and this Lease will control in the event of any inconsistency between the two.  The party requesting that the Short Form Lease or Memorandum of Lease be recorded must prepare and pay all costs of recording the Short Form Lease or Memorandum of Lease, and the other party must execute at any and all times such Short Form Lease or Memorandum of Lease and any other instruments as may be required for such recording.

(b)    At the time that the Commencement Date is established, the parties will promptly enter into a Commencement Date Agreement, setting forth the actual commencement and expiration of the Initial Term and any extensions thereof, any applicable kickout dates, the then current Gross Leasable Area of the Premises and the corresponding Rent, which Commencement Date Agreement may be recorded by either party if both parties agree to said recordation in advance. If the recipient of such request does not object to the Commencement Date specified in such request within 30 days after receipt of the request, the date specified in such request shall be deemed to be the Commencement Date herein.

**SECTION 34.  NOTICE**

Any notices, statements, acknowledgments and consents required to be given by or on behalf of either party to the other must be in writing and must be given by Certified U.S. Mail, or by private courier service requiring a signed acknowledgment of delivery (such as Federal Express) addressed as follows:

#2456 Wolf Creek Plaza, Bellevue, NE
Execution Version

- 43 -

if to the Landlord at:

        Wolf Creek Center, LLC
        818 Tara Plaza
        Papillion, Nebraska  68046
        Attn:  Michael J. Hogan, Manager

with a copy to:

        Pansing Hogan Ernst & Bachman LLP
        10250 Regency Circle, Suite 300
        Omaha, Nebraska  68114
        Attn:  James D. Buser, Esquire

if to the Tenant at:

        Jo-Ann Stores, LLC
        5555 Darrow Road
        Hudson, Ohio 44236
        Attn:  Vice President of Real Estate

with a copy to:

        Jo-Ann Stores, LLC
        5555 Darrow Road
        Hudson, Ohio 44236
        Attn:  Senior Legal Counsel

or at such other address of Landlord or, Tenant as may be specified by such a notice.  Any notice sent by certified mail is deemed to have been served three days after deposit thereof with the U.S. Postal Service. Any notice sent by courier service is deemed to have been served as of the next business day (excluding Saturdays, Sundays, and any federal government holidays). Notwithstanding the foregoing, the time period in which a response to any such notice must be given, or in which an action must be commenced or be taken, will commence to run on the date of receipt by the addressee thereof as shown on the return receipt or acknowledgment of delivery for such notice.  Rejection or other refusal to accept, or the inability to deliver because of changed address of which no notice was given, will be deemed to be receipt of notice as of the date of such rejection, refusal or inability to deliver.  Notwithstanding anything to the contrary, Tenant may give facsimile notice of the need of emergency repairs, followed promptly by notice as required above.

## SECTION 35.  HAZARDOUS MATERIALS

(a)    Tenant must not cause or permit the escape, disposal or release of any Hazardous Material (as hereafter defined) in violation of Law.  Tenant must not allow the storage or use of Hazardous Material in any manner not sanctioned by Law, nor allow to be brought into the Shopping Center any Hazardous Material except to use in the ordinary course of Tenant's business. Tenant must defend, indemnify and hold Landlord harmless from and against any and all claims,

#2456 Wolf Creek Plaza, Bellevue, NE
Execution Version

losses, liabilities, damages, penalties, fines and expenses (including, without limitation, consequential damages, cleanup and other remedial and restoration costs, fees for consultants and experts and reasonable attorneys' fees and other costs of litigation arising by reason of any of the aforesaid or any action against Tenant under this indemnity) arising directly or indirectly from, out of or by reason of the release of Hazardous Materials in the Shopping Center occurring during the Term caused by Tenant or Tenant's contractors, agents or employees or persons acting under Tenant. It is a condition to indemnification that Tenant receive notice of any claim by Landlord promptly after Landlord first has knowledge thereof. This indemnity survives the expiration or earlier termination of the Term.

(b)     Landlord must not cause or permit any Hazardous Material to exist in the Premises. In addition, Landlord must not cause or permit any Hazardous Material to be sold, used, stored, brought upon or disposed of (collectively a "Use") in, on, under or about the Shopping Center (including the Premises, before the Delivery Date) without in each case: (i) obtaining all necessary permits required in connection therewith; and (ii) complying with all permit requirements; and (iii) otherwise taking all appropriate steps and making adequate arrangements to assure that such Use is in the ordinary course of business in the operation of the Shopping Center. Such Use must be performed safely and without contamination of the Shopping Center and the Shopping Center Site or any portion thereof and fully in compliance with all applicable Laws. Landlord must defend, indemnify and hold Tenant harmless from and against any and all claims, losses, liabilities, damages, penalties, fines and expenses (including, without limitation, consequential damages, cleanup and other remedial and restoration costs, fees for consultants and experts and reasonable attorneys' fees and other costs of litigation arising by reason of any of the aforesaid or any action against Landlord under this indemnity) arising directly or indirectly from, out of or by reason of the release of Hazardous Materials in the Shopping Center occurring during the Term caused by Landlord or Landlord's contractors, agents or employees or persons acting under Landlord. It is a condition of this indemnification that Landlord receive notice of any such claim by Tenant promptly after Tenant first has knowledge thereof. This indemnity survives the expiration or early termination of this Lease.

(c)     If either party receives any written notice of Hazardous Discharge or Environmental Complaint that specifically identifies the Premises or the Common Areas or describes a condition that materially impairs or could materially impair the occupancy, use and enjoyment of the Premises, then the receiving party must give immediate oral and written notice of same to the other party detailing all relevant facts and circumstances within the knowledge of the receiving party.

(d)     If Tenant's use, occupancy and enjoyment ("Occupancy") of the Premises is materially interfered with by reason of this existence or remediation of any Hazardous Material located on, in or under the Shopping Center or on the Shopping Center Site (except for any Hazardous Material used by Tenant), then (i) throughout such period of interference, a fair and just proportion of the Rent and other charges payable (taking into account the nature of the interference to Tenant's Occupancy), will be abated, and (ii) if Tenant's occupancy is substantially impaired for three months or more, then Tenant has the right to terminate this Lease by giving written notice to

#2456 Wolf Creek Plaza, Bellevue, NE
Execution Version

- 45 -

the other of its election to do so, whereupon this Lease will automatically terminate and end effective as of the date of such notice and neither party will have any further obligations hereunder. Landlord may nullify Tenant's notice of termination if Landlord is diligently corrects the Hazardous Material interference and completes the job in accordance with all applicable governmental laws, codes, regulations and requirements within three months after the date of Tenant's termination notice. The abatement provided in clause (i) of this subsection will continue throughout the period of such correction by Landlord.

(e)     "Hazardous Material" means (i) any waste, pollutant, material, substance or contaminant which is or becomes listed, defined, or classified as having properties harmful to health, safety, or indoor or outdoor environment; and (ii) any substance or material that is or becomes regulated by any Public Entity by reason of the hazardous or toxic qualities of such substance or material; and (iii) any other toxic or hazardous substance, regardless of whether the same is regulated, including, without limitation, so-called "black mold," any mycotoxin, and any other mold capable of producing a toxic or allergic reaction in humans (including, without limitation, Stachybotrys, S. atra, S. chartarum, Aspergillus, Fusarium, Coccidioides). Without limiting the generality of the forgoing, Hazardous Material includes oil, petroleum, petroleum-fraction or petroleum-derived substance; urea formaldehyde foam insulation; asbestos and asbestos-containing materials; and any electrical equipment that contains any oil or dye-electric fluid containing polychlorinated biphenyls.

(f)     "Hazardous Discharge" means the presence, use, release, dispersal, emission, spill, discharge or cleanup of any Hazardous Material (i) on or about or emanating from the Shopping Center or the Shopping Center Site, or (ii) arising out of the use and occupancy of or operations within the Shopping Center, or (iii) caused by Landlord or other occupant of the Shopping Center or the employees, contractors, invitees or agents thereof.

(g)     "Environmental Complaint" means any complaint, investigation, order, citation, or action with regard to any Hazardous Discharge, air emissions, water discharges, noise emissions or any other environmental, health or safety matter pertaining to or emanating from the Shopping Center from any Public Entity.

## SECTION 36.   LIMITATION OF LANDLORD'S LIABILITY

(a)     If Landlord fails to perform any covenant, term or condition on Landlord's part to be performed, and as a consequence of such default Tenant recovers a money judgment against Landlord, such judgment will be satisfied only out of (i) the proceeds of sale received upon execution of such judgment and levy thereon against the right, title and interest of Landlord in the Shopping Center, (ii) the rents and other income from such property receivable by Landlord, and (iii) the consideration received by Landlord for the sale or other disposition of all or any part of Landlord's right, title and interest in the Shopping Center, which consideration is deemed to include any assets at any time after such sale or disposition held by Landlord having a value not exceeding

that of the proceeds of such sale or other disposition, and Landlord shall not be liable for any deficiency.

(b)      Notwithstanding subsection (a), in the event of fraud on the part of Landlord or Landlord's failure to perform any covenant or obligation of Landlord under Sections 10, 12, 14, 24, 25 or 35 the aforesaid limitation on liability is inapplicable. This Section will not be deemed to deny to Tenant, or limit its right to obtain, injunctive relief or specific performance of Landlord's covenants under this Lease or to avail itself of any other right or remedy (not involving a personal liability of Landlord in excess of the limits of personal liability fixed by this Section) which may be accorded Tenant by Law or under this Lease by reason of Landlord's failure to perform its obligations thereunder including, but not limited to, the rights and remedies granted Tenant under Section 29.

**SECTION 37.   DELIVERY OF SITE PLAN**

Within 30 days after Tenant's written request therefor, Landlord must provide Tenant with a copy of the most current available site plan of the Shopping Center, which must reflect: (a) the Gross Leasable Area of the Shopping Center as actually constructed; (b) the names and location and the Gross Leasable Area of the premises occupied by the respective tenants thereof; and (c) those premises in the Shopping Center, if any, which are not then currently occupied and open for business. If Landlord fails to provide this information within the period allowed , then Tenant has the right to suspend the payment of monthly installments of Additional Rent, or Rent if there is no Additional Rent, until delivery of the information, which Additional Rent or Rent, as the case may be, shall be paid in full upon Landlord's compliance with this Section 37.

**SECTION 38.   INTENTIONALLY OMITTED**

**SECTION 39.   ENTIRE AGREEMENT; WRITING REQUIRED**

This Lease contains all of the agreements of the parties with respect to any matter covered or mentioned in this Lease, and no prior agreement, understanding or representation pertaining to any such matter will be effective for any purpose. No provision of this Lease may be changed, deleted, modified or amended, except by an agreement in writing signed by the parties.

**SECTION 40.   OPERATING COVENANT**

(a)      Tenant will open to the public from the Premises as a fully stocked and staffed Jo-Ann Fabric and Craft Retail Store within 90 days after the Commencement Date and continue to operate from the Premises during Tenant's normal business hours for a period of at least one full day (the "Operation Period"), but for an assignment or subletting, damage and destruction, remodeling, eminent domain, Unavoidable Delays, or such other right as provided for under this Lease or under law or equity.  After the Operation Period, notwithstanding anything contained in this Lease, expressly or impliedly, to the contrary, and notwithstanding the agreement for the payment by Tenant

#2456 Wolf Creek Plaza, Bellevue, NE
Execution Version

of Rent (including Substitute Rent or other percentage rent), Tenant is under no duty or obligation, either expressed or implied, to open, reopen, remain open, operate, or thereafter to continually conduct business from the Premises at any time during the Term. After the Operation Period, Tenant's failure to open, reopen, remain open, operate, or thereafter to continually conduct business from the Premises will not in any way be deemed an event of default under this Lease, nor will such failure otherwise entitle Landlord to begin or to maintain any action, suit or proceeding, whether in law or in equity, relating in any way to Tenant's failure to open, reopen, remain open, operate, or thereafter to continually conduct business from the Premises.

(b)      If Tenant ceases to operate its business from the Premises for 90 consecutive days, but for an assignment or subletting, damage and destruction, remodeling, eminent domain, Unavoidable Delays, or such other right as provided for under this Lease or under law or equity, then Landlord has the right to terminate the Lease upon 120 days prior written notice. If Landlord terminates the Lease, it must do so by written notice to Tenant. Tenant will have the right, within 30 days of receipt of Landlord's termination notice, to advise Landlord that Tenant will reopen for business from the Premises. If Tenant elects to reopen for business, then it must do so within 30 days of its notice to Landlord or such greater time as is reasonably necessary under the circumstances; otherwise, Tenant's notice will be null and void. If Landlord terminates this Lease as provided above, Landlord shall pay to Tenant an amount equal to the Unamortized Costs of Tenant's Work and all other fees, costs, and charges incurred by Tenant in preparation for opening the Premises for business. Tenant's obligations under this Lease will terminate as of the date of such notice and payment. For the purpose of this Lease, the Unamortized Costs shall be an amount equal to the Initial Costs amortized on a straight line basis over the term of this Lease (including any option periods). The Initial Costs shall consist of the cost of improvements that Tenant made to the Premises prior to opening for business therein as well as any the cost of any permanent improvements to the Premises that Tenant has made less the amount of the construction allowance, if any, paid the Tenant.

## SECTION 41.  APPLICABLE LAW AND CONSTRUCTION

The laws of the state within which the Premises are located govern the validity, performance and enforcement of this Lease without regard to its conflicts of law principles. If one or more of the provisions of this Lease is held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability will not affect or impair any other provision of this Lease, and this Lease will be construed as if such invalid, illegal or unenforceable provision had not been contained herein. The submission of this document for examination does not constitute an offer to lease, or a reservation of or option for the Premises, and this Lease becomes effective only upon execution and delivery thereof by both Landlord and Tenant. This Lease has been negotiated by Landlord and Tenant and will not be deemed to have been prepared by either Landlord or Tenant, but by both equally. All prior negotiations, considerations, representations and understandings between the parties are and shall be deemed to be incorporated and merged into this Lease and shall not be construed as having survived the execution hereof so that only the provisions of this Lease shall govern the respective rights and obligations of the parties hereto to the same effect as if all such

negotiations, considerations, representations and understandings shall have never been made or given by either party to the other party hereto.

## SECTION 42.  UNAVOIDABLE DELAYS

Except as otherwise expressly provided herein, if either party is delayed or hindered in or prevented from the performance of any obligation required hereunder by Unavoidable Delay, the time for performance of such obligation shall be extended for the period of the delay, provided that Unavoidable Delay will not excuse prompt and timely payments, including Rent, when due under this Lease except when (A) the Commencement Date is delayed by reason of Unavoidable Delay; or (B) such payment is excused pursuant to other provisions of this Lease.  However, no delay will be excused by this section unless (1) the delayed party notifies the other party in writing of the delay within 21 days of the event giving rise to such delay; (2) the delayed party has exhausted all other resources available at reasonable costs to avoid such delay; and (3) the delayed party diligently pursues completion of the activity that was delayed. Notwithstanding anything to the contrary in this Lease, under no circumstances will Unavoidable Delay extend the time for performance of any obligation by more than 90 days.

## SECTION 43.  REASONABLE CONSENT

Wherever either party's consent or approval is required, such consent or approval must not be unreasonably or arbitrarily withheld or delayed, unless otherwise expressly stated.

## SECTION 44.  NO PARTNERSHIP

Landlord and Tenant acknowledge that neither of them in any way or for any purpose becomes a partner or an associate of the other in the conduct of Tenant's business, the operation of the Shopping Center or otherwise, or a joint venture, or a member of a joint enterprise with the other.  Neither party is liable for payment of the debts or performance of any obligation of the other. The relationship is and shall be that of Landlord and Tenant.

## SECTION 45.  ESTOPPEL

Within 30 days after request, Tenant will execute and deliver to Landlord a Tenant Estoppel Certificate substantially in the form of Exhibit H. Within 30 days after request, Landlord will execute and deliver to Tenant a written instrument certifying that this Lease is unmodified and in full force and effect, or if there has been any modification, that this Lease is in full force and effect as modified and stating all such modifications; specifying the dates to which Rent has been paid; stating whether there exists any default in the performance by either party under any provision of this Lease; and certifying as to such other matters as Tenant reasonably may request. With regard to any estoppel certificates related to this Lease, the Lease will take precedence over the contents of such estoppel certificates, should a conflict arise. Landlord shall be required to pay Tenant under this Lease a non-refundable fee in the amount of $1,500.00 for each new Estoppel Certificate and

each new SNDA requested from and provided by Tenant to cover Tenant's administrative, legal and other costs and expenses incurred in processing, negotiating and drafting said documents and Tenant is hereby authorized to deduct said amount from Rent next due.

## SECTION 46.  QUIET ENJOYMENT

Landlord represents and warrants to Tenant that Landlord is well seized of fee simple title to the Premises and the Shopping Center and has full power and authority to execute and deliver this Lease. Landlord covenants to Tenant that Tenant shall at all times have peaceable and quiet enjoyment and possession of the Premises and of the rights granted hereunder without any manner of hindrance from Landlord or any other person or persons, if Tenant performs all the covenants and agreements to be performed on Tenant's part. If a violation of this the section occurs, in addition to any other remedies available to Tenant, Tenant shall have the right to pay Substitute Rent commencing on the first date of the violation and continuing until such violation is cured.

## SECTION 47.  HOLDING OVER

If, at the expiration of the Term, Tenant continues to occupy the Premises, such holding over shall not constitute a renewal of this Lease, but Tenant shall be a tenant from month to month, under the same terms and conditions as in effect immediately prior to the commencement of the month to month tenancy except that Fixed Minimum Rent shall be 125% of the Fixed Minimum Rent in effect for the month immediately preceding such month to month tenancy, and either party may terminate the Lease during said month to month tenancy upon 90 days prior written notice to the other party; provided, however, Landlord shall not specify a Lease termination date to be during the period commencing September 1 and ending on the immediately following January 31.

## SECTION 48.  BROKERS

Each party represents to the other party that it has not dealt with any party with regard to the Premises or this Lease, except that Rick Quinlevan of The Lerner Company represents Tenant in this transaction.  Landlord will pay Tenant's broker pursuant to a separate agreement between Landlord and Tenant's broker and it is agreed that if Landlord does not pay Tenant's broker, Tenant shall have the right to pay Tenant's broker for fees due and set-off said amounts against Rent due Landlord. Each party will indemnify and hold the other party harmless from and against any loss, cost, liability and expense, including reasonable attorney's fees, arising out of a breach of its representation in this section.

## SECTION 49.  CAP ON ADDITIONAL RENT

During Lease Years one through five Tenant's total cost for all Additional Rent shall not exceed $4.50 per year multiplied by the Gross Leasable Area of the Premises.

## SECTION 50.   CLAIMS LIMITATION

All actions or claims by Landlord for Rent shall be barred three years after the end of each Lease Year or Partial Lease Year. All actions or claims by Tenant for recovery of excess payments of Rent shall be barred three years after the end of each Lease Year or Partial Lease Year, except that in the case of any component of Additional Rent, the same will not be barred until three years after Tenant's receipt of Landlord's annual reconciliation statement furnished with respect to that Lease Year or Partial Lease Year. The forgoing limitations shall not apply in the event of fraud or willful mis-statement of the amounts so stated.

## SECTION 51.   CAPTIONS

Any paragraph titles or captions contained in this Lease are for convenience only and do not define, limit or otherwise modify the scope or intent of this Lease.

## SECTION 52.   VARIATION IN PRONOUNS

All the terms and words used in this Lease, regardless of the number and gender in which they are used, will be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context or sense of this Lease or any paragraph or clause herein may require, the same as if such words had been fully and properly written the number and gender.

## SECTION 53.   SECTION REFERENCES

All references to any section number(s) refer to the Section contained in this Lease.

## SECTION 54.   BINDING EFFECT OF AGREEMENT

This Lease and all of the covenants, conditions, provisions and restrictions herein inures to the benefit of and binds the heirs, executors, administrators, devisees, legatees, personal representatives, successors and assigns, respectively, of Landlord and Tenant.

## SECTION 55.   ATTORNEY'S FEES

If Landlord or Tenant is required to enforce this Lease, then the non-prevailing party must pay to the prevailing party the prevailing party's arbitration costs (if any), court costs and reasonable attorney's fees. This provision applies to court costs and attorneys fees incurred in any trial and appellate courts.

## SECTION 56. OFAC WARRANTY

Each party represents and warrants to the other party that the representing party (a) is not acting, directly or indirectly, for or on behalf of any person, group, entity, or nation named by any Executive Order or the U.S. Treasury Department as a terrorist, "Specially Designated National and Blocked Person," or other banned or blocked person, entity, nation, or transaction pursuant to any law, order, rule, or regulation that is enforced or administered by the Office of Foreign Assets Control, and (b) is not engaged in this lease transaction, directly or indirectly, on behalf of, or instigating or facilitating this lease transaction, directly or indirectly, on behalf of any such person, group, entity or nation. The breaching party must defend, indemnify, and hold harmless the other party from and against all claims, damages, losses, risks, liabilities, and expenses (including reasonable attorney's fees and costs) arising from or related to any breach of the forgoing representation.

## SECTION 57.  PDF/COUNTERPART SIGNATURE

This Lease may be executed in multiple counterparts, each of which shall constitute an original and all of which taken together shall constitute one and same agreement binding upon the parties, notwithstanding that all the parties are not signatories to the same counterpart. In order to facilitate the finalization of this Lease, the parties agree that signatures transmitted by facsimile machine or signatures transmitted via e-mail in a "PDF" format may be used in place of original signatures on this Lease.  Each party intends to be bound by such party's facsimile or "PDF" format signature on this Lease, is aware that the other parties are relying on such party's facsimile or "PDF" format signature, and hereby waives any defenses to the enforcement of this Lease based upon the form of signature.  Promptly following any facsimile transmittal or e-mail transmittal of "PDF" format signatures, the parties shall deliver to the other parties the original executed Lease by reputable overnight courier to the notice addresses listed herein (it being agreed and understood that the delivery of such original shall not be a condition to the binding nature of the facsimile or electronic copy of the document provided such document is received by the parties).


**[THE BALANCE OF THIS PAGE LEFT INTENTIONALLY BLANK –
SIGNATURES APPEAR ON THE FOLLOWING PAGES]**

#2456 Wolf Creek Plaza, Bellevue, NE
Execution Version

In witness whereof, the parties have signed this Lease as of the date listed above.

Signed in the Presence of:

*Maureen McPherson*

_____

LANDLORD:

**WOLF CREEK CENTER, LLC**, a Nebraska
limited liability company

By: *Michael J Hogan*

Name:  Michael J. Hogan

Title:   Manager

Employer Identification Number:  06-1714287

Signed in the Presence of:

*Pat Bobek*

_____

TENANT:

**JO-ANN STORES, LLC**, an Ohio limited
liability company

By: _____
    James Kerr, Interim Chief Executive Officer
    and Interim President

And

By: *David B Goldston*_____
    David B. Goldston, Senior Vice President,
    General Counsel and Secretary

*MES*

#2456 Wolf Creek Plaza, Bellevue, NE
Execution Version

- 53 -

STATE OF NEBRASKA )
) SS
COUNTY OF DOUGLAS )

BEFORE ME, a Notary Public in and for said County and State, personally appeared **WOLF CREEK CENTER, LLC**, a Nebraska limited liability company, by Michael J. Hogan, its Manager, who did sign the foregoing instrument on behalf of the limited liability company and that the same is his free act and deed of the company and personally and as such authorized representative.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at Papillion, Nebraska, this _11_ day of _November_, 2014.

_Maureen McPherson_
NOTARY PUBLIC



STATE OF OHIO )
) SS
COUNTY OF SUMMIT )

BEFORE ME, a Notary Public in and for said County and State, personally appeared **JO-ANN STORES, LLC**, an Ohio limited liability company, by James Kerr, its interim chief executive officer and interim president, and David B. Goldston, its senior vice president, general counsel and secretary, who acknowledged that they did sign the foregoing instrument on behalf of said limited liability company and that the same is their free act and deed personally and as such officers.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at Hudson, Ohio, this ___ day of ~~October~~ 2014.
November

_Ashley Pugh_
NOTARY PUBLIC

Ashley Pugh
Resident Summit County
Notary Public, State of Ohio
My Commission Expires expred 9/2019

#2456 Wolf Creek Plaza, Bellevue, NE
Execution Version

## EXHIBIT A

### Legal Description of Shopping Center

WOLF CREEK CENTER LLC
Lot 6 Wolf Creek Replat 1, Sarpy County Nebraska
10521\S 15th Street

**EXHIBIT B**

**Site Plan**



# Bellevue, NE – Wolf Creek Site Aerial

Shopping Center
Protected Area
Container Area
Anchor Tenant Premises

Exhibit _B_ Page _1_ of _1_

JO-ANN
fabric and craft stores

**EXHIBIT C**

**Scope of Work Matrix**

#2456 Wolf Creek Plaza, Bellevue, NE
Execution Version

# JO·ANN
### fabric and craft stores®

## AS-IS PROJECT

## AS-IS PROJECT

*(Form body consists of a dense multi-column checklist; the small text is illegible in this scan.)*

Michael Dirgan    Manager    9-05-17

Dan M Rivas  MANAGER CONSTRUCTION   8/5/17

STORE NAME:

Exhibit _____ C _____ Page _____ 1



**JO-ANN**
fabric and craft stores®

* ALL WORK IDENTIFIED WITHIN THIS MATRIX TO BE PER CURRENT JO-ANN STORES, INC. PROTOTYPE SET OF PLANS.   NOT ALL PROTOTYPE ITEMS ARE ADDRESSED IN THIS MATRIX. IT IS THE LANDLORD'S RESPONSIBILITY TO COMPLY WITH ALL CURRENT PROTOTYPE REQUIREMENTS AND CURRENT BMP'S.
* LANDLORD SHALL BE REQUIRED TO PURCHASE THROUGH JO-ANN STORES, INC. NATIONAL ACCOUNT VENDORS WHERE REQUIRED PER THE CURRENT PROTOTYPE.
* JO-ANN INTENDS JO-ANN STORES NATIONAL ACCOUNT VENDOR OR JO-ANN STORES GENERAL CONTRACTOR.
* IF THERE IS A DISCREPANCY BETWEEN JO-ANN'S PROTOTYPICAL DOCUMENTS AND THE MATRIX WITH RESPECT TO RESPONSIBILITY FOR ANY ITEM, THIS MATRIX WILL GOVERN AND CONTROL.
* ITEMS CHECKED "AS-IS" ARE DELIVERED IN AS IS CONDITION WITHOUT WARRANTY OR REPRESENTATION EXCEPT AS MAY OTHERWISE BE PROVIDED IN THE LEASE, THIS EXHIBIT OR ANY OTHER EXHIBIT TO THE LEASE.
* ITEMS CHECKED "EXISTING" ARE A WARRANTY AND REPRESENTATION BY LANDLORD THAT THE EXISTING PREMISES MEET THE SPECIFICATIONS AND CONDITIONS DESCRIBED IN THE LINE ITEM AND THAT THE PREMISES WILL BE DELIVERED TO TENANT IN ACCORDANCE THEREWITH.
* ANY AS-IS OR EXISTING CONDITION REQUIRING WORK MUST INCLUDE A CLARIFICATION NOTE.

## Preliminary
## AS-IS PROJECT

## Preliminary
## AS-IS PROJECT

*The body of this page is a dense two-column "Division of Work" matrix with line-item rows and checkbox columns (DIVISION OF WORK, AS-IS, EXISTING, NOT APPLICABLE, JO-ANN, LANDLORD). The detailed line items are too small to transcribe reliably.*

### 1.0 GENERAL
- 1.1 OBTAIN ALL APPLICABLE PERMITS, TEMPORARY CERTIFICATE OF OCCUPANCY FOR FIXTURING/MERCHANDISING, FINAL CERTIFICATE OF OCCUPANCY, TURN OVER CODE COMPLIANT BUILDING TO TENANT
- 1.2 STORE FIXTURE INSTALLATION PERMIT AND ASSOCIATED FEES
- 1.3 PERMIT FEES FOR TENANT IMPROVEMENT CONSTRUCTION
- 1.4 FULL SET ARCHITECTURAL/MECHANICAL/ELECTRICAL/PLUMBING AND STRUCTURAL DOCUMENTS FOR TENANT IMPROVEMENT CONSTRUCTION BASED ON TENANT'S CURRENT PROTOTYPE AND DWG'S
- 1.5 APPROVAL OF CONSTRUCTION DOCUMENTS
- 1.6 PERFORM ROOF INSPECTION THE WEEK CONSTRUCTION STARTS
- 1.7 PERFORM ROOF INSPECTION; PROVIDE RESULTS TO TENANT PRIOR TO LEASE EXECUTION
- 1.8 PERFORM HVAC INSPECTION
- 1.9 PERFORM MOISTURE SLAB TESTING PER ASTM F 1869-08 AND/OR ASTM F 2170-02 STANDARDS (TENANT'S CURRENT PROTOTYPE), PRIOR TO LEASE EXECUTION
- 1.10 REMEDY IF SLAB MOISTURE IS DETECTED
- 1.11 EXISTING SANITARY LINES TO BE SCOPED, RESULTS SENT TO TENANT
- 1.12 COMPLIANCE WITH ALL SEISMIC REQUIREMENTS, IF APPLICABLE
- 1.13 OBTAIN CAD PACKAGE THROUGH TENANT'S NATIONAL ACCOUNT VENDOR

1.9 & 1.10 - Per language in the executed LOI.

### 2.0 UTILITIES
- 2.1 UTILITY FEES (CONNECTION/START UP FEES)
- 2.2 SEPARATE UTILITIES (ELECTRIC, GAS, WATER) DEDICATED SERVICES FOR TENANT, DEDICATED METERS FOR TENANT) COMMUNICATE METER NUMBERS TO TENANT
- 2.3 ALL UTILITY SERVICES BROUGHT TO TENANT SPACE (APPROVED LOCATION)
- 2.4 MINIMUM 400 AMP 277/480V OR 800 AMP 120/208V ELECTRICAL SERVICE WITH METER, CURRENT TRANSFORMER CABINET, DISCONNECT SWITCH(ES) PER TENANT'S LOCATION
- 2.5 SEPARATE SERVICE ACCESS TO ELECTRICAL ROOM, WHEN EXISTING ELECTRICAL EQUIPMENT SERVICES MULTIPLE TENANTS
- 2.6 INCOMING GAS SERVICE AND METER
- 2.7 1-1/2" MINIMUM INCOMING WATER SERVICE, 40 PSI, COORDINATE SERVICE SIZE WITH REQUIRED PLUMBING FIXTURE QUANTITIES
- 2.8 WATER SERVICE BACKFLOW PREVENTER
- 2.9 DEDICATED 4" SANITARY LINE WITH EXTERIOR TIE-IN
- 2.10 PLYWOOD TELEPHONE BOARD (IN TENANT'S REQUIRED LOCATION), 86 GROUND WIRE, 2" CONDUIT, PULL STRING FROM PHONE COMPANY DEMARK TO TENANT'S TELEPHONE BOARD
- 2.11 INCOMING TELEPHONE SERVICE (25 PAIR) BROUGHT TO TENANT'S TELEPHONE BOARD
- 2.12 SEPARATE EXTERIOR ACCESS TO TELEPHONE ROOM, WHEN PHONE COMPANY SERVICE DEMARK SERVES MULTIPLE TENANTS
- 2.13 DEDICATED SPRINKLER/FIRE RISER AND BACKFLOW PREVENTER
- 2.14 SEPARATE EXTERIOR ACCESS TO SPRINKLER ROOM, WHEN SPRINKLER RISER SERVICES MULTIPLE TENANTS
- 2.15 DEDICATED SPRINKLER FLOW SWITCH AND DEDICATED SPRINKLER TAMPER SWITCH INSTALLED ON EXISTING SPRINKLER SYSTEM

2.4 - Main service is a 400A 277/480V service. 2.6 - Existing dedicated meter with 1" line. 2.7 - Existing incoming water service is a 2" line. 2.8 - No existing backflow preventer is indicated on the as-builts.

### 3.0 EXTERIOR - SITE
- 3.1 DEMOLITION-SITE
- 3.2 SIDEWALK - NEW OR EXISTING REPAIRED TO LIKE-NEW CONDITION LEASE LINE TO LEASE LINE
- 3.3 CURBS - NEW OR EXISTING REPAIRED TO LIKE-NEW CONDITION LEASE LINE TO LEASE LINE
- 3.4 PARKING LOT PAVING AND STRIPING, IF NEW CONSTRUCTION
- 3.5 PARKING RESEALING AND RESTRIPING, IF EXISTING
- 3.6 CODE COMPLIANT RAMP WITHIN 15 FT OF CENTERLINE OF ENTRY DOORS - NEW OR EXISTING IN LIKE-NEW CONDITION
- 3.7 SIDEWALK STRIPING AT ENTRY - NEW PAINT
- 3.8 PIPE RAIL CART CORRALS (4' SIDEWALK)
- 3.9 PIPE RAIL CART CORRALS (IN PARKING LOT)
- 3.10 LANDLORD APPROVAL FOR DEDICATED STORAGE AREA FOR 5 CARDBOARD BALES OUTSIDE BUILDING; NEAR OVERHEAD COILING DOOR; AND CONSTRUCTION OF ENCLOSURE IF REQUIRED BY CODE
- 3.11 TRASH DUMPSTER PAD, SLEEVED BOLLARDS AND ENCLOSURE WHEN REQUIRED
- 3.12 TRASH DUMPSTER/RECYCLE CONTAINER
- 3.13 COMPACTOR PAD, SLEEVED BOLLARDS
- 3.14 PARKING LOT LIGHTING PER TENANT'S PROTOTYPE
- 3.15 MONUMENT/PYLON SIGN STRUCTURE
- 3.16 MONUMENT/PYLON SIGN ELECTRICAL
- 3.17 DESIGN OF MONUMENT/PYLON PANEL, IF APPLICABLE
- 3.18 MONUMENT/PYLON SIGN PANELS FOR TENANT

3.13 - Concrete pad is existing, tenant to install bollards.

### 4.0 EXTERIOR - BUILDING
- 4.1 EXTERIOR WALLS - MODIFICATIONS AND/OR PENETRATION
- 4.2 COMPACTOR DOOR (INCLUDING PENETRATION IF APPLICABLE)
- 4.3 ROOF HATCH (INCLUDING ROOF PENETRATION), LADDER & CAGE
- 4.4 TENANT'S EXTERIOR PROTOTYPE FRONT FACADE/ENTRY ELEMENT
- 4.5 TENANT'S MALL PROTOTYPE FRONT FACADE/ENTRY ELEMENT
- 4.6 NON-PROTOTYPE FACADE ENTRY ELEMENT
- 4.7 LOGO RENDERINGS
- 4.8 EXTERIOR EGRESS DOOR(S) QUANTITY PER CODE, LOCATED PER TENANT LAYOUT; ADA COMPLIANT; WITH TENANT'S REQUIRED HARDWARE
- 4.9 FROST SLAB CONSTRUCTION AT EXTERIOR DOORS PER CODE
- 4.10 AT-GRADE DELIVERY DOCK AREA; 14' X 14' CONCRETE PAD WITH ADJACENT MAN DOOR WITH TENANT'S REQUIRED HARDWARE; REAR TRUCK ASLT MUST REST ON PAD, SIZE ACCORDINGLY
- 4.11 RECESSED DELIVERY DOCK (48"x8") WITH ADJACENT MAN DOOR WITH TENANT'S REQUIRED HARDWARE
- 4.12 DELIVERY DOCK EQUIPMENT (LEVELER, SEALS, BUMPERS) OPERATIONAL, LIKE-NEW CONDITION
- 4.13 OVERHEAD COILING DELIVERY/REAR ACCESS DOOR (8'X10') WITH TENANT'S REQUIRED HARDWARE
- 4.14 STOREFRONT FRAMING AND GLAZING
- 4.15 EXTERIOR AUTOMATIC SLIDING ENTRY DOOR UNIT) WITH TENANT'S REQUIRED HARDWARE
- 4.16 FACADE SIGNAGE
- 4.17 TEMPORARY BANNERS (NOW HIRING, COMING SOON, NOW OPEN)
- 4.18 TEMPORARY SITE SIGN

4.6 - Existing façade to be re-used, JAS to paint. 4.12 - Existing dock equipment to be re-used, service by NAV. 4.13 - Existing OHD to be re-used, service by NAV. 4.15 - Existing entry sliders to be re-used, service by NAV.

### 5.0 INTERIOR - BUILDING
- 5.1 CONSTRUCTION OF DEMISING WALLS - METAL STUDS, GYPSUM BOARD, SOUND INSULATION, FINISHED (FIRE RATED, IF REQUIRED BY CODE) FLOOR TO DECK AND PAINT-READY
- 5.2 16' HIGH CLEAR ZONE THROUGHOUT SALES AREA (CEILING/WALLS), AS DEFINED IN TENANT'S PROTOTYPE
- 5.3 INTERIOR DEMOLITION (PARTITIONS, CEILINGS, LIGHTING, FLOORING, AND ALL REMNANTS OF PREVIOUS TENANT'S IMPROVEMENTS, ETC.) IF APPLICABLE
- 5.4 INTERIOR CONCRETE FLOOR SLAB - LEVEL/READY AND FULLY PREPPED, PER TENANT'S PROTOTYPE, FOR NEW FLOORING INSTALLATION, FLOORING, CERAMIC TILE AND SHEET GOODS
- 5.5 INTERIOR CONCRETE FLOOR SLAB - LEVEL/READY, PER TENANT'S PROTOTYPE, FOR POLISHED CONCRETE FINISH
- 5.6 VESTIBULE (INCLUDING WALLS/CEILING CONSTRUCTION, INTERIOR AUTOMATIC SLIDING DOORS, INTERIOR ALUMINUM STOREFRONT FRAMING AND GLAZING)
- 5.7 GYPSUM BOARD ON PERIMETER SALES WALL, CONTROL JOINTS PER TENANT'S PROTOTYPE FINISHED FLOOR TO DECK
- 5.8 INTERIOR PARTITIONS
- 5.9 MISC. WOOD BLOCKING
- 5.10 ALL INTERIOR FINISHES PER TENANT'S PROTOTYPE (INCLUDING WALL PANELS, CORNER GUARDS, COLUMN WRAPS, ETC.)
- 5.11 INTERIOR DOORS WITH TENANT REQUIRED HARDWARE
- 5.12 RESTROOM ACCESSORIES AND FIXTURES PER ADA COMPLIANCE
- 5.13 SUPPLY CABINETRY/CASEWORK FOR OFFICES
- 5.14 INSTALLATION OF CABINETRY/CASEWORK FOR OFFICES
- 5.15 SUPPLY CABINETRY/CASEWORK FOR BREAK ROOM
- 5.16 INSTALLATION OF CABINETRY/CASEWORK IN BREAK ROOM
- 5.17 FIRE EXTINGUISHERS/BRACES/SIGNAGE/COMMISSIONING THROUGH TENANT'S NATIONAL ACCOUNT VENDOR
- 5.18 STORE FIXTURES AND MERCHANDISING HARDWARE PER TENANT'S SITE SPECIFIC LAYOUT
- 5.19 2X6 FRAMING FOR STORE FIXTURE ANCHORING
- 5.20 INSTALLATION OF STORE FIXTURES INCLUDING STOCK ROOM SHELVING
- 5.21 CARDBOARD BALER
- 5.22 4" PVC STORAGE TUBE MOUNTED ON WALL BEHIND BALER
- 5.23 COMPACTOR EQUIPMENT
- 5.24 WINDOW FILM/GRAPHICS AND BLINDS ON STOREFRONT GLASS, WHERE REQUIRED BY TENANT STORE LAYOUT; REVIEWED AND APPROVED BY LANDLORD

5.4 - Existing VCT to be re-used, JAS to repair as needed.

### 6.0 MECHANICAL
- 6.1 DEMOLITION/DISPOSAL OF EXISTING HVAC AND ALL ASSOCIATED DUCTWORK, CAP EXISTING CURBS
- 6.2 HIGH-EFFICIENCY TRANE HVAC UNITS WITH DUCT SMOKE DETECTORS
- 6.3 ROOF PENETRATIONS FOR RTU'S, VENTS, & FLUES
- 6.4 STRUCTURAL SUPPORT FOR RTU'S, AS REQUIRED
- 6.5 ROOF CURBS AND/OR CURB ADAPTORS FOR ROOF TOP UNITS
- 6.6 HVAC - INTERIOR DISTRIBUTION DUCTWORK AND ACCESSORIES PER TENANT'S PROTOTYPE
- 6.7 TRANSPORT THERMOSTATS ON COLUMNS NEAR EACH RTU
- 6.8 ENERGY MANAGEMENT SYSTEM AND TEMPERATURE SENSORS
- 6.9 AIR BALANCE OF HVAC SYSTEM TO TENANT PROTOTYPE STANDARDS
- 6.10 STOCK ROOM HEATER
- 6.11 VESTIBULE HEATER

JAS to reuse the existing HVAC system pursuant to LLD's 3 year warranty. Any modifications to the system shall be at JAS sole cost. 6.10 - stockroom heater to be re-used.

### 7.0 PLUMBING
- 7.1 PLUMBING (BRANCH LINES)
- 7.2 PLUMBING FIXTURES (INCLUDING HOT WATER HEATER)
- 7.3 ELECTRIC WATER COOLER(S)
- 7.4 DEDICATED SPRINKLER BRANCH LINES/MODIFICATION OF HEADS
- 7.5 FIRE ALARM SYSTEM(S) PROTOTYPE - NEW AND/OR MODIFICATIONS

7.2 & 7.3 - Restroom fixtures & water coolers to be re-used.

### 8.0 ELECTRICAL
- 8.1 PREFABRICATED ELECTRICAL POWER WALL UNIT
- 8.2 INSTALLATION AND START UP OF NEXUS WIRELESS MONITORING SYSTEM, LIGHTING CONTROL PANEL, MISCELLANEOUS PANELS AND RACKS
- 8.3 ALL INTERIOR ELECTRICAL DISTRIBUTION, DISTRIBUTION BOXES, ETC.
- 8.4 INTERIOR LIGHT FIXTURES
- 8.5 FACADE SIGNAGE ELECTRICAL/ACCESS PANEL FOR SIGN COMPANY/BLOCKING FOR SIGNAGE
- 8.6 EXTERIOR BUILDING-MOUNTED LIGHT FIXTURES (WALL PACKS, UNDER CANOPY LIGHTING, EMERGENCY LIGHTING) - WIRED PER TENANT'S PROTOTYPE
- 8.7 EMERGENCY, EXIT AND MISCELLANEOUS LIGHT FIXTURES
- 8.8 POWER POLES (TENANT'S GENERAL CONTRACTOR TO INSTALL DURING FIXTURE INSTALLATION)
- 8.9 DATA CONDUIT (FOR REGISTER SYSTEM) WITH PULL STRINGS
- 8.10 TELEPHONES - (COORDINATED BY TENANT GENERAL CONTRACTOR)
- 8.11 DATA LINES FOR REGISTER SYSTEM - (COORDINATED BY TENANT'S GENERAL CONTRACTOR)
- 8.12 CONDUIT AND JUNCTION BOXES FOR LOW VOLTAGE WIRING PER PROTOTYPE PLANS
- 8.13 DATA PREVENTION SYSTEM (BURGLAR) - (COORDINATED BY TENANT'S GENERAL CONTRACTOR)
- 8.14 INSTALLATION OF ELECTRICAL REQUIRED FOR SPECIFIC STORE FIXTURES AFTER INSTALLATION OF THE FIXTURE
- 8.15 CARDBOARD BALER ELECTRICAL
- 8.16 COMPACTOR ELECTRICAL

8.1 - Existing gear to be re-used.

### ADDITIONAL COMMENTS:

DIVISION OF WORK MATRIX APPROVED AS SHOWN

Name (Jo-Ann Stores, Inc.)    Title    Date
Real Estate Director

Name (Owner Representative)    Title    Date

Name (Jo-Ann Stores, Inc.)    Title    Date
Construction Department Representative

STORE NAME:    Wolf Creek Plaza - Former Michael's    DATE:

STORE ADDRESS:    10521 S 15th Street Bellevue, NE    REVISED DATE:

Exhibit ___C___ Page _2_



## EXHIBIT D

## FY16 22K Prototype Plans

Tenant's Prototype Plans are included on the attached compact disc identified as "Prototype 22K - FY16 Real Estate Distribution Set – May 2014". The parties acknowledge receipt by placing their initials thereon.



## EXHIBIT D-1

### Tenant's Prototype Signage

Tenant's Prototype Signage is included on the attached compact disc identified as "Jo-Ann Stores 5' Sign Prototypes and Temporary Banners December 2013". The parties acknowledge receipt by placing their initials thereon.



#2456 Wolf Creek Plaza, Bellevue, NE
Execution Version

# EXHIBIT E

## Intentionally Deleted

#2456 Wolf Creek Plaza, Bellevue, NE
Execution Version

## EXHIBIT F

### LIST OF EXCLUSIVE AND PROHIBITED USES

Tenant shall not use or permit to be used any portion of the Premises for any of the below uses.

### EXECUTED LEASES

1.  **BLAZIN WINGS**:  Owner hereby agrees during the term of this lease (provided Tenant is not in material default hereof), not to lease any space in Wolf Creek Plaza as identified by outline in red on **EXHIBIT** A hereto to another person or entity whose primary business is (i) a restaurant featuring chicken wings as an entrée or main menu item or serves them with two (2) or more sauces or (ii) a sports theme restaurant and/or bar or whose lease would permit such a use.  For purposes of this lease, "sports theme bar" shall mean a facility where alcoholic beverages are sold for on-premises consumption and which offers more than three (3) televisions or other video transmitters for customers to view live sporting events.

    The exclusivity provided Tenant in the above paragraph shall immediately expire in the event Tenant's primary business is no longer as a restaurant featuring chicken wings as an entrée or main menu item with a sports theme bar.

2.  **PETCO**:  Subject to rights of tenants under leases existing as of the date hereof and so long as this Lease remains in full force and effect, Landlord covenants and agrees that during the term of this Lease, Tenant shall have the exclusive right to sell pet food, pet supplies, live animals, pet grooming, pet training, and veterinary services in the Shopping Center or any property within four (4) miles of the Shopping Center owned and/or controlled by Landlord or any affiliate of Landlord except for incidental sales.  Incidental sales shall mean the sale or display for sale of such items or services not as the primary use of the competing tenant and taking up no more than five hundred (500) square feet of floor area.  This covenant shall run with the land on which the Shopping Center is located so long as the Premises are used as a pet food and pet supply store.  Landlord agrees not to sell to, lease to, nor approve any sublease or assignment of lease, or change in use, unless prevented by the terms of any lease then currently in force and effect, for any competing tenant, sub-tenant, assignee or user.  Landlord agrees at its sole cost and expense to promptly and continuously enforce this non-competition covenant using all reasonable legal means.  Should Landlord violate the provisions of this covenant, in addition to any other remedies available at law or in equity, Tenant shall have the right to either: (i) reduce the Base Rent to three percent (3%) of Gross Sales for the entire period of the violation; or (ii) should the violation continue for a period in excess of twelve (12) months, commencing on the thirteenth (13th) month and continuing for as long as such violation continues.  Tenant may elect to terminate this Lease upon thirty (30) days advance Notice.  As used in this Lease, the term "Gross Sales" means all sales, both cash and charge, of merchandise and services made in, upon or from the Premises, including telephone sales and orders taken in or from the Premises although such orders may be filled elsewhere, less refunds and allowances to the customer, but excludes any taxes, returned items, interest, service or carrying charges, sales to Tenant's employees, amounts written off as bad debts, sales not in the ordinary course of Tenant's business and postage, handling and shipping charges.

Landlord Initials_____                                    Tenant Initials_____



Exhibit ___F___ Page __1__

3.   **GAMESTOP**:  Owner agrees during the term of this lease so long as Tenant is not in default of any of the terms and conditions herein beyond any applicable cure period it will not lease space within Tenant's building (Building B as shown on Exhibit A) or within Building C (as shown on EXHIBIT A) for the sale of entertainment software, video software or video games.  If Owner violates this foregoing exclusive, Tenant shall have a right to reduce its lease Section 4 Rent by twenty-five percent (25%) as of the effective date of said violation until such violation is corrected.  Tenant agrees that Owner may lease space to Radio Shack in Building B or Building C without the same being in violation of this lease section.

4.   **PAYLESS SHOE STORE**:  Subject to applicable law, Landlord covenants that it may not, directly or indirectly, lease property within the Shopping Center for principal use (50% or more of gross sales) as a retail shoe store, nor may Landlord permit any Shopping Center occupant to lease, directly or indirectly, any portion to a person or entity for such use.  If during the Term a person or entity operates a retail shoe store in the Shopping Center, Tenant's Minimum Rent abates by 50% and Tenant's Percentage Rent abates in its entirety while such violation continues.  The Parties agree that Landlord's granting Tenant this covenant is a condition precedent to Tenant's performance under the Lease.  The preceding recitation of remedies may not be construed to limit Tenant's rights or remedies for violations of this covenant, which remedies specifically include injunctive relief and the right to terminate this Lease.  The foregoing provision shall not apply to Shoe Carnival or any tenant whose lease was entered into prior to October 1, 2002.

5.   **VERIZON WIRELESS**:  Owner shall not use or allow any other person or entity (except Tenant) to use any portion of property/development (Wolf Creek Plaza) for the sale of telecommunications equipment and services, including but not limited to the retail sale, installation and activation of wireless telephones, pagers and wireless telephone and paging service and accessories and related wireless and paging equipment and services, and any other telecommunications products or services which may be generally offered for sale by Tenant.  This exclusivity shall also preclude Owner or any other person or entity to have a kiosk or cart on any portion of the property/development for the exclusive use contained in this section.

Should Owner breach this provision, Tenant shall have the right to pursue all remedies given to it at law or in equity including the right to damages.  In addition, the lease Section 4 Rent shall immediately be reduced by fifty percent (50%) and Tenant shall have the right to terminate this lease upon written notice to Owner and Tenant shall thereby be relieved of all future obligations under the lease provided such notice must be delivered within six (6) months of the purported breach of this provision.  This provision shall not apply to existing leases within Wolf Creek Plaza or to any tenant regardless of when such lease is entered into that has a demised premises equal to or in excess of 10,000 square feet.

6.   **H & R BLOCK**:  Landlord agrees that Landlord will not permit any individual, partnership or corporation ("Competing Business") other than Tenant which engages in any activities similar to Tenant's (including tax preparation, electronic filing or refund anticipation loans), to lease or occupy the Premises or any other space in the same structure in which the Premises are located and owned by Landlord, during the term of this Lease and any extension or renewal thereof.

Should Landlord violate this provision, all rent shall abate in full until such time that the Competing Business no longer occupies space in the Shopping Center.  In addition, beginning on the date the Competing Business vacates the Shopping Center, Landlord shall abate two (2) days of all rent for every one (1) day that the Competing Business occupied space at the Shopping Center.

Landlord Initials_____                                    Tenant Initials_____

Exhibit ___F___ Page _2_

7.  **ASHLEY LYNN TANNING SALON:** Owner agrees during the term of this lease so long as Tenant is not in default of any of the terms and conditions herein beyond any applicable cure period, it will not lease space within Tenant's building as shown on EXHIBIT B to anyone for the sale of tanning services and tanning beds.

8.  **GORDMANS:** Owner hereby agrees during the term of this lease (provided Tenant is not in material default hereof beyond the expiration of any notice or cure periods) not to lease, sell or permit any space in Wolf Creek Plaza as identified by outline in red in Exhibit A for use as a Goodwill Store, Kohl's, Mervyn's, Ross Department Stores, T.J. Maxx, Marshalls, Goody's, or SteinMart.

    This Future Leasing Restriction applies only to leases entered into by Owner subsequent to this lease and shall immediately expire in the event Tenant's business use does not remain consistent with the Section 9 Use identified in this lease.

9.  **PANERA:** Owner hereby agrees during the term of this lease (provided Tenant is not in material default hereof), not to lease any space in Tenant's building as identified by outline in red on EXHIBIT A hereto to any other retail/service provider whose primary line of business is either a bakery, deli, bagel, or specialty coffee retailer, such as Caribou Coffee, Starbucks Coffee, Bruegger's Bagels, Einstein Bagels, Schlotsky's, Atlanta Bread Company and great Harvest Bread Company.

    Owner also agrees that the exclusive provided in this lease Section shall apply to Outlots 1 and 4 as identified on the Exhibit A site plan hereto. Tenant agrees that Summer Kitchen may locate on such Lot 4 and that its operation is not a violation of this Section 47 Exclusive.

10. **GREAT CLIPS:** During the term of this lease so long as Tenant in not in default of any of the terms and conditions contained herein, Owner shall not lease, rent, occupy, or permit to be occupied for use of any space in Tenant's building in Wolf Creek Plaza (said building being comprised of approximately 17,600 gross square feet and further identified as "Tenant's Building" on the Exhibit A site plan), for the purpose of operating a hair cutting salon.

Landlord Initials_____                                      Tenant Initials_____



Exhibit ___E___ Page __3__

## EXHIBIT G
## SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

**When recorded, return to:**

Jo-Ann Stores, LLC
Attn: _____, Paralegal
5555 Darrow Road
Hudson, OH 44236

**This instrument was prepared by:**

Matthew E. Senra, Esq.
Jo-Ann Stores, LLC
5555 Darrow Road
Hudson, OH 44236

_____ SPACE ABOVE THIS LINE FOR RECORDER'S USE

## SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

This Subordination, Non-Disturbance and Attornment Agreement (the "Agreement") is made as of the _____ day of _____, 2014, by and among **[LENDER]** ("Lender"), **[LANDLORD]** ("Landlord"), and **Jo-Ann Stores, LLC**, an Ohio limited liability company ("Tenant"), f/k/a Jo-Ann Stores, Inc.

Reference is made to a loan (the "Mortgage") from Lender to Landlord, dated _____, and recorded on _____, as instrument number _____, in _____, _____ County, [State].

Reference is made to a lease dated _____, 2014 [and all subsequent amendments and modifications] by and between Tenant and Landlord (the "Lease") of certain premises situated within the property known as [Shopping Center] located in [City], [ST], and as legally described on Exhibit A attached hereto and incorporated by reference herein and covered by said Mortgage.

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and in consideration of the mutual promises contained herein, the parties agree as follows:

      1.      Lender consents to the Lease and the provisions thereof.

      2.      Subject to the terms hereof, the Lease is and will be subject and subordinate at all times to the lien of the Mortgage and to all renewals and extensions of the Mortgage ("Amendments") to the full extent of all amounts secured thereby and interest thereon, provided, however, such Amendments do not expand Tenant's obligations or limit Tenant's rights under the Lease (except as agreed to in this Agreement).

      3.      If the holder of the Mortgage, or any person claiming under the holder (whether by a foreclosure, deed in lieu of foreclosure or otherwise), succeeds to the interest of Landlord in the Lease, then Tenant will recognize and attorn to the holder, or such other person, as its landlord under the Lease.

      4.      In the event of foreclosure or other right asserted under the Mortgage by the holder thereof, the Lease and all of the rights of Tenant thereunder will continue in full force and effect and will not be terminated

Page 1 of 8

#2456 Wolf Creek Plaza, Bellevue, NE
Execution Version

or disturbed (whether by a foreclosure, deed in lieu of foreclosure or otherwise), except in the case of a material default by Tenant under the terms of the Lease continuing after notice to Tenant and beyond any applicable notice and grace period and otherwise in accordance with the Lease. Tenant shall not be subject to any pre-foreclosure remedies asserted under the Mortgage or related loan documents. Lender shall not name or join Tenant as a defendant in any exercise of Lender's rights and remedies arising upon a default under the Mortgage unless applicable law requires Tenant to be made a party thereto as a condition to proceeding against Landlord or prosecuting such rights and remedies. In the latter case, Lender may join Tenant as a defendant in such action only for such purpose and not to terminate the Lease or otherwise adversely affect Tenant's rights under the Lease or this Agreement in such action.

5.      If Lender succeeds to the interest of Landlord under the Lease, Tenant will have the same rights and remedies against Lender for any default under the Lease, but Lender will not be:

(a)      liable for any act or omission of any prior landlord (including Landlord) under the Lease, except for non-monetary defaults of a continuing nature of which Lender has received notice, and latent or patent defects in construction to the same extent that any prior landlord would be liable but nothing herein will be construed to limit Lender's maintenance and repair obligations in its capacity as landlord under the Lease;

(b)      subject to any off-sets or abatements against rent that Tenant may have against any prior landlord (including Landlord) due to a default under the Lease, except (i) for those which, as of the date of foreclosure, were already commenced or notice of their commencement was sent, (ii) for the exercise of rights expressly set forth in the Lease, and (iii) for those relating to continuing defaults identified in subsection (a) above it being understood that nothing in this clause is deemed to exclude Lender from responsibility for (A) any "self-help" and "set-off" remedies in the Lease, including, but not limited to, remedies for repairs and maintenance required of the Landlord under the Lease from and after the date Lender takes title to the Premises, whether or not the need for such repairs or maintenance accrued before or after such date and (B) any "set-off" remedies related to the "exclusive use", "co-tenancy" or "prohibited use" provisions in the Lease;

(c)      bound by any Fixed Minimum Rent that Tenant might have paid for more than the current month to any prior landlord (including Landlord), except as expressly required under the Lease or actually received by Lender;

(d)      bound by any payment of rents, additional rents or other sums which Tenant may have paid more than one month in advance to Landlord or any prior landlord unless (i) such sums are actually received by Lender or (ii) such prepayment was expressly approved by Lender; and

(e)      bound by any amendment or modification to the Lease that shortens the term of the Lease or reduces the rent owed thereunder without the prior consent of Lender, and if Lender does not respond to such request within 15 days, then consent will be deemed given by Lender; Landlord is responsible for securing all consents required by Lender.

6.      In the event of any casualty or condemnation (eminent domain), Lender must permit the insurance proceeds or the condemnation award, as the case may be, to be used for any restoration and repair as

Page 2 of 8

#2456 Wolf Creek Plaza, Bellevue, NE
Execution Version

required by the Lease.

7.    Except as expressly provided herein, this Agreement does not constitute a waiver by Lender of any of its rights under the Mortgage or related documents, and the Mortgage and any related documents remain in full force and effect and will be complied with in all respects by Landlord.

8.    No modification, amendment, waiver or release of any provision of this Agreement or of any right, obligation, claim or cause of action arising hereunder will be valid or effective unless in writing and signed by the parties.

9.    Nothing herein will amend, waive or rescind any provision or condition of the Lease or relieve the Landlord from any of its obligations under the Lease.

10.    Tenant will provide a courtesy copy concurrently to Lender of any notice of default (or breach) from Tenant to Landlord that would allow Tenant to terminate the Lease. Lender will have the same time allowed to the Landlord, after Landlord's receipt of notice, to cure the default giving rise to the termination. The opportunity to cure granted to Lender will be available to Lender only to the extent such opportunity to cure is available to Landlord under the Lease, and such cure period afforded to Lender will run concurrently with the cure period available to Landlord. Notwithstanding the foregoing, Lender will have no obligation to cure any default by Landlord except if Lender succeeds to title of the property.

Co-Tenancy and use violations are not considered defaults under the Lease, and Tenant has the right to exercise all remedies related thereto without notice to Lender.

11.    Any notices from one party to the other must be in writing and sent via courier (e.g., UPS, Federal Express) or by certified U.S. mail to the following addresses:

| | |
|---|---|
| if to Tenant: | Jo-Ann Stores, LLC<br>Attn: Vice President, Real Estate<br>5555 Darrow Road<br>Hudson, OH 44236 |
| With a copy to: | Jo-Ann Stores, LLC<br>Attn: Senior Legal Counsel<br>5555 Darrow Road<br>Hudson, OH 44236 |
| if to Lender: | [LENDER] |
| with a copy: | _____ |

12.    Landlord represents and warrants to Tenant that all prior mortgages and deeds of trust encumbering the Premises demised under the Lease have been satisfied or will be satisfied with the proceeds of the Mortgage.

13.    This Agreement inures to and binds the successors and assigns of the respective parties.

14.    This Agreement shall not be effective against Tenant unless and until Tenant has received an original of this Agreement signed by all parties.

#2456 Wolf Creek Plaza, Bellevue, NE
Execution Version

15.     This Agreement shall be deemed to be a contract entered into under the laws of [State] and shall in all respects be governed, construed, applied and enforced in accordance with the laws of [State].

[The remainder of this page is intentionally left blank]

#2456 Wolf Creek Plaza, Bellevue, NE
Execution Version

Each party's duly authorized representative has signed this Agreement as of the date written above.

LENDER:
**[LENDER]**

By:_____

Name:_____

Its:_____

LANDLORD:
**[LANDLORD]**

By:_____

Name:_____

Its:_____

TENANT:
**JO-ANN STORES, LLC**

By:_____
    David B. Goldston
    Senior Vice President,
    General Counsel and Secretary

*[Notary Signatures Follow on Next Page]*

Page 5 of 8

STATE OF _____ )
                                 ) SS
COUNTY OF _____ )


        BEFORE ME, a Notary Public in and for said County and State, personally appeared
_____, a[n] _____, by
_____, its _____, who acknowledged that he/she
did sign the foregoing instrument on behalf of said corporation and that the same is his/her free act and deed
personally and as such officer.

        IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at _____,
_____, this _____ day of _____, 20___.


                                            _____
                                            NOTARY PUBLIC




STATE OF _____ )
                                 ) SS
COUNTY OF _____ )

        BEFORE ME, a Notary Public in and for said County and State, personally appeared
_____, a[n] _____, by
_____, its _____, who acknowledged that he/she
did sign the foregoing instrument on behalf of said corporation and that the same is his/her free act and deed
personally and as such officer.

        IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at _____,
_____, this _____ day of _____, 20___.


                                            _____
                                            NOTARY PUBLIC

#2456 Wolf Creek Plaza, Bellevue, NE
Execution Version

STATE OF OHIO         )
                              ) SS
COUNTY OF SUMMIT   )

BEFORE ME, a Notary Public in and for said County and State, personally appeared **Jo-Ann Stores, LLC**, an Ohio limited liability company, by David B. Goldston, its senior vice president, general counsel and secretary, who acknowledged before me that he did sign the foregoing instrument on behalf of said limited liability company and that the same is his free act and deed personally and as such officers.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at Hudson, Ohio, this _____ day of _____, 2014.

_____
NOTARY PUBLIC

*[Notary Page to SNDA dated _____, 20__ ]*

Page 7 of 8

# EXHIBIT A

## Legal Description of Shopping Center

# EXHIBIT H
## ESTOPPEL CERTIFICATE

To:                                                   , together with its successors and assigns

Shopping Center:          located in [City], [ST]

Landlord:

Tenant:               Jo-Ann Stores, LLC, an Ohio limited liability company **OR**

                     Jo-Ann Stores, LLC, an Ohio limited liability company, formerly known as
                     Jo-Ann Stores, Inc., an Ohio corporation

Lease:                Lease by and between Landlord and Tenant dated _____ ___, 20__
                     (the "Original Lease"), as modified by  (the "Lease") (together, the "Lease)[two]
                     (collectively, the "Lease") [three or more]

Tenant represents that, as of the date hereof:

1. The Lease constitutes the entire written agreement between Tenant and Landlord and has not been modified or amended, except as indicated herein.

2. The Lease is in full force and effect.  The term commenced on _____ and expires on _____.  [Tenant has _____( ) 5-year options to renew the term thereof.] [Tenant has one 5-year option to renew remaining]  [Tenant has no options to renew the term of the Lease.]

3. Tenant has taken possession of the premises demised under the Lease (the "Premises") and is occupying the Premises.

4. To the undersigned's actual knowledge, without inquiry or investigation, the Landlord is not currently in default under the Lease, except as follows: _____, and Tenant reserves all rights and remedies with regard to the aforementioned issues [.]  [; provided, however, that common area, tax and insurance reconciliation(s) have not been received from Landlord for the following years: [Insert Years]].  With regard to any and all common area, tax and insurance expenses, Tenant specifically reserves all rights and remedies with respect to any overpayments which may be discovered subsequent to the date of this Estoppel Certificate regardless of the year in which the overpayment occurred, including but not limited to the right to seek reimbursement or offset for any overpayments.  [In addition, Tenant specifically advises that it is auditing Landlord's common area, tax and insurance expenses; to date, there have been no findings, but the audit is still open, and Tenant reserves any and all rights and remedies with respect thereto.]

   Furthermore, Tenant has not inspected the Shopping Center, including the common areas, to verify that Landlord is in compliance with its obligations with respect thereto, and Tenant hereby reserves all rights regarding the same.

5. The monthly Fixed Minimum Rent payable under the Lease is $[_____] and has not been prepaid by more than one month.  [Tenant is not paying fixed monthly rent.  Rather, Tenant is paying Substitute Rent, as defined in the Lease.  The monthly Substitute Rent varies each month according to store sales.  Substitute Rent has not been prepaid.]

Page 1 of 2

#2456 Wolf Creek Plaza, Bellevue, NE
Execution Version

6. No security deposit has been made in connection with the Lease.

7. Tenant does not have any option or preferential right to purchase all or any part of the Shopping Center.

8. The address for notices to be sent to Tenant is as follows:

>   Jo-Ann Stores, LLC
>   Attn: Vice President, Real Estate
>   5555 Darrow Road
>   Hudson, OH 44236
>
>   with a copy to:
>
>   Jo-Ann Stores, LLC
>   Attn: Senior Legal Counsel
>   5555 Darrow Road
>   Hudson, OH 44236

9. Nothing contained herein will: (a) amend, modify, waive or rescind any of the terms, conditions, covenants or obligations of the Lease; (b) waive or estop Tenant's right to declare a default based on facts of which the undersigned does not have actual knowledge, without inquiry or investigation; (c) waive or estop Tenant's right to claim any offset, claim or counterclaim resulting from an audit of Landlord's business records or public records; (d) waive or estop any claims, defenses, rights or remedies of Tenant; or (e) relieve the Landlord from any of its obligations under the Lease.

10. Tenant's statements exclude certification as to any matter that may be disclosed by audit, inspection, or examination of Landlord's records or public records relating to charges and monetary items under the Lease.

11. If there is any conflict between this certificate and the Lease, the Lease shall control.

12. Tenant acknowledges that you are relying upon this Estoppel Certificate and the accuracy of the information contained herein. Nevertheless, Tenant will not be liable to any party for damages of any kind whatsoever (whether direct, indirect, special, consequential or any other type) resulting from any statement in this certificate.

13. The undersigned representative of Tenant is duly authorized to execute this instrument on behalf of Tenant.

Dated: _____, 2014

>   JO-ANN STORES, LLC
>
>   By: _____
>   David B. Goldston
>   Senior Vice President,
>   General Counsel and Secretary

Page 2 of 2

#2456 Wolf Creek Plaza, Bellevue, NE
Execution Version