# EXHIBIT 8

April 6, 1979 Lease between White Pine Associates II, an Arizona limited partnership, as Landlord, and Arden-Mayfair, Inc., a Delaware corporation, as Tenant (the "<u>Flagstaff Lease</u>")

L E A S E

## T A B L E   O F   C O N T E N T S

| Article | | Page |
|---|---|---|
| I | Term | 1-2 |
| II | Option to Renew | 2 |
| III | Rental | 2-4 |
| IV | Improvements | 4-5 |
| V | Common Facilities | 5-7 |
| VI | Use of Premises | 8 |
| VII | Utility Charges | 8 |
| VIII | Taxes | 9 |
| IX | Alterations | 9-10 |
| X | Repairs | 10 |
| XI | Right to Enter | 10-11 |
| XII | Destruction of Premises | 11-12 |
| XIII | Fixtures | 12-13 |
| XIV | Liability and Fire Insurance | 13-14 |
| XV | Default by Lessor | 14-15 |
| XVI | Default by Lessee | 15 |
| XVII | Liens | 16 |
| XVIII | Attorney Fees | 16 |
| XIX | Assignment | 16 |
| XX | Notices | 17 |
| XXI | Condemnation | 17-18 |
| XXII | Quiet Possession and Subordination | 18 |
| XXIII | Building and Cotenancy Requirements | 19 |
| XXIV | Lessee Attorney for Lessor | 19 |
| XXV | Miscellaneous | 19-21 |

Exhibit

| ADDENDUM | | 1-4 |
|---|---|---|
| "A" | Legal Description | -- |
| "A-1" | Plot Plan | - |
| "B" | Plans and Specifications for a Supermarket Building | 1-5 |

WHITE PINE ASSOCIATES, II — "LESSOR"

ARDEN-MAYFAIR, INC. — "LESSEE"

<u>LEASE</u>

(Long Form)

THIS LEASE, executed the 6th day of _____ April _____, 1979 ,

by and between <u>WHITE PINE ASSOCIATES, II, An Arizona Limited</u>

<u>Partnership -------------------------------------------------------</u>

hereinafter referred to as "Lessor," and ARDEN-MAYFAIR, INC., a Delaware

corporation, having its principal place of business at 5900 South Eastern

Avenue, Commerce, California, hereinafter referred to as "Lessee,"

<u>W I T N E S S E T H</u>:

In consideration of the rent herein specified to be paid by

Lessee, and the covenants and conditions herein mentioned, Lessor does

hereby lease, let and demise unto Lessee, and Lessee does hereby rent

from Lessor, the premises now known as the NEC of Milton Road and University

in the City of Flagstaff, County of Coconino, in the State of Arizona

Avenue,/  and more particularly described in Exhibit "A" and plot plan as Exhi-

t "A-1"

attached thereto and made a part hereof.

The above described premises, together with the building and

appurtenances located thereon, or to be constructed thereon, as more

specifically provided hereinafter, are herein referred to as "the demised

premises."

TO HAVE AND TO HOLD the same unto said Lessee, its successors

and assigns for the period and upon the terms and conditions hereinafter

set forth.  The Lessee agrees to deliver to the Lessor physical possession

of the demised premises upon the termination of the term hereof or any

extension thereof, in good condition, wear and tear, damage by fire, or

damage from any other cause not directly attributable to the negligence

of the Lessee excepted.

I

TERM                     The term of this Lease shall commence on the day

the supermarket building to be constructed on

the premises described above opens for business to the general public but

- 1 -


INITIAL

in no event later than sixty (60) days after said market building and
improvements are completed and Lessee has received exclusive possession
of the premises, and shall terminate twenty ~~(20)~~ five (25) years from the last day
of the calendar month in which the lease term commences.

INITIAL 

In the event, the buildings are to be constructed pursuant to
this Lease, the parties hereto shall designate in writing the date on
which this Lease commences. When the exact dates of the lease term are
determined as aforesaid, then they shall be entered as follows:
Lease term commenced _Aug. 18, 1982_ and terminates _Aug 31, 2007_

II

OPTION TO RENEW          Lessor hereby grants to Lessee ten_ (10) separate
                         options to renew this Lease for additional con-
secutive periods of five_ (5) years each, beginning with the termination
of the original term hereunder upon the same terms and conditions herein

INITIAL

stated . ~~except that the annual minimum rental shall be reduced twenty five~~
~~percent (25%) and the rates of percentage rental, if any, shall be reduced~~
~~one-fourth of one percent (1/4 of 1%)~~. Lessee shall give Lessor written

INITIAL

notice of its intention to exercise its option hereunder not less than
six (6) months
~~ninety (90) days~~ prior to the expiration of the then existing term of this
Lease. Failure to exercise any extension option shall terminate all subsequent extension
options.

III

RENTAL                   Lessee agrees to pay to Lessor as annual minimum
                         rental for the demised premises during the term
of this Lease, ONE HUNDRED EIGHT THOUSAND FOUR HUNDRED FIFTY EIGHT DOLLARS
nd NO/100

INITIAL

($ 108,458.00  ), payable in equal monthly installments of NINE THOUSAND
THIRTY EIGHT DOLLARS AND 17/100-------- ----------------- ($ 9,038.17---- ).
lonthly rental shall be paid in advance on the fifteenth (15th) day of
ach and every calendar month of the said lease term. Rent for the
nitial fraction of a month shall be prorated. (See Paragraph (2) of
ddendum attached hereto).

Lessee further agrees to pay to Lessor, as percentage rental, a sum equal to ___ONE PERCENT___ ( 1 %) of annual gross sales in excess of TEN MILLION EIGHT HUNDRED FORTY FIVE THOUSAND EIGHT HUNDRED DOLLARS AND NO/100 ($10,845,800.00). (See Paragraph (2) of Addendum attached hereto).

~~( %) of annual gross sales over _____~~

~~_____ ($_____), LESS:~~ → INITIAL

~~The minimum rent previously paid for such annual period, any amounts paid by Lessee for real property taxes and assessments, operating and maintenance expenses of the common facilities, and any fire and extended coverage insurance premiums, all as provided herein. Any payments made by Lessee for said reimbursement of real property taxes and assessments, operating and maintenance expenses of the common facilities, and for fire and extended coverage insurance premiums not recovered from percentage rent may be carried forward and deducted from percentage rent payable in subsequent years.~~

Percentage rent shall be payable on or before the thirtieth (30th) day following the close of each lease year, however, percentage rent shall not be payable on sales for the first fractional calendar month and the next six (6) calendar months following the commencement of this Lease term, to allow for opening expenses and promotions. An annual statement of gross sales shall be submitted to Lessor with the percentage rent payment, if any, and this statement shall be final and uncontestable unless Lessor, within one (1) year after said statement is mailed or delivered by the Lessee to the Lessor, shall specify in writing its objections thereto. Lessee agrees that the foregoing payments of percentage rent shall be payable to Lessor on a semi-annual basis as interim payments to be annually adjusted. Lessee shall keep a record of all sales made upon or from said premises, including sales made by subtenants, and this record, including cash register readings, shall be open for inspection by Lessor.

In computing the gross sales (the term "gross sales" is more particularly described in Article  XXV hereof), the cost of the following items shall be deducted:  Cost of trading stamps, sales and excise taxes paid, refunds for returnable containers, and merchandise returned; and in the case of telephones, children's rides, and other vending machines owned and controlled by someone other than Lessee, gross sales shall

- 3 -

include only the receipts that may be payable to Lessee.  The Lessee
makes no representation or warranty as to the sale which it expects to
make in the demised premises.

INITIAL

~~Each twelve (12) calendar month period thereafter shall con-
stitute a lease year (the term "lease year") is more particularly described
in Article XXV hereof.~~

Should the Lessee at any time vacate its store in the demised
premises, or sublet all of said store, then in any such event, anything
in this Lease to the contrary notwithstanding, it is hereby mutually
agreed that the Lessee shall pay to the Lessor annually during the
remainder of the term of this Lease, in addition to the annual mimimum
rent, a sum equal to one-third (1/3rd) of the percentage rent (if any)
paid by the Lessee to the Lessor pursuant to the provisions of this
article for the three (3) calendar years next preceding the vacating of
said store or the making of such Sublease, and shall pay the same in
equal monthly installments at the times and in the manner more
particularly set forth in this Lease.  Upon the vacating of said store
or the making of such Sublease, all of the covenants and provisions
contained in the preceding paragraphs relative to percentage rental shall
be of no further force and effect.

IV

IMPROVEMENTS          Lessor agrees to construct a building of tilt-up
                      concrete or masonry construction on the demised
premises containing approximately twenty five thousand four hundred
(25,400 ) square feet of gross floor area (the term "gross floor" area is
more particularly described in Article XXV hereof), as provided in plans and
specifications prepared by Lessor's architect, which plans and specifi-
cations shall be approved by both parties hereto in writing prior to the
commencement of construction of said building.  All construction shall be
in accordance with such plans and specifications and shall include those
items described in Exhibit "B" attached hereto.

Lessee will provide the architect with a floor plan showing the
location of trade fixtures and plumbing and electrical outlets no later
than ~~sixty (60)~~ thirty (30) days after the date of execution hereof and within ~~sixty~~ ninety

INITIAL

- 4 -

INITIAL

~~(60)~~ 90 7 days after receipt of such floor plan, Lessor agrees that its

architect will provide Lessee with completed plans and specifications.
subject to adverse weather conditions and
other causes beyond the Lessor's control
Said building is to be commenced immediately/upon approval of

INITIAL

such plans and specifications and the construction diligently prosecuted

until completion.  Lessor covenants that the building to be constructed

on the premises will be constructed so as to comply with all laws, rules,

and regulations of all public offices and governmental agencies applicable

at the time of such construction so as to permit Lessee to use the

premises as a public supermarket.  Should Lessor be unable to complete

construction prior to __November 1_____, 19 _80_, then in such event,

Lessee may at any time thereafter terminate and cancel this Lease by

notice in writing to the Lessor and upon the giving of such notice each

party shall be released from any and all obligations and liabilities to

the other.

V

COMMON FACILITIES        The common facilities shall consist of, but not

be limited to:

(1)  Adequate sidewalks, abutting each of
the pedestrian entrances to the demised premises;

(2)  A service drive not less than twenty
feet (20') wide, connecting the Lessee's freight re-
ceiving facilities, with a public street or highway;

(3)  Parking area(s) to accommodate not
less than __six hundred_____ ( 600) automobiles, including
space for at least one hundred fifty (150) automobiles, in
the area as shown crosshatched on said Plot Plan;

(4)  Entrances, and exits, from and to
public streets and highways;

INITIA..

(5)  And all other public areas, as shown
on said Plot Plan, including landscaping.

Lessor shall, at its own expense, provide a paved and lighted

ground level automobile parking area acceptable to Lessee upon which no

structure of any kind may be erected and no underground parking shall be

placed thereunder.

Lessor shall cause said parking area to be maintained and

operated at all times for the purpose of providing free parking facilities

for the automobiles of the customers and employees of Lessee and other

tenants of the shopping center (the term "shopping center" is more particu-

larly described in Article XXV hereof).

The Lessor hereby grants to the Lessee, its customers, employees and visitors, a non-exclusive easement throughout the term hereof to use, in common with others entitled to similar use thereof, all of the aforementioned common facilities and in addition thereto, any similar future facilities.

Without limiting the foregoing obligation of Lessor to maintain the common facilities, Lessor shall during the term hereof:

(1)  Maintain the parking area to accommodate not less than  six hundred  ( 600 ) automobile parking spaces;

(2)  Maintain the surface of the parking area in a level and smooth condition (without chuckholes), and evenly covered using first quality paving materials of concrete or asphalt.

(3)  Provide for proper drainage in order to prevent any areas of standing water;

(4)  Maintain the parking area, all sidewalks, curbs, landscaped areas and other public areas, in a clean, safe, presentable and sanitary condition;

(5)  Provide adequate lighting for the parking lot area and surrounding buildings and place such appropriate directional signs, markers and parking space lines as shall reasonably be required for the convenience and proper use of the common facilities;

(6)  At least once every five (5) years, or sooner if required, resurface the parking area and place such appropriate directional signs, markers, and parking space lines as above required.

Lessee Agrees to pay to Lessor its proportionate share (the term "proportionate share" is more particularly described in Article XXV hereof), of the operating and maintenance expenses of said common facilities, but in no event shall Lessee's share exceed _____*_____ ($    ) per month.

During each lease year of the term hereof, Lessee agrees to pay monthly, at the same time as the monthly minimum rental payments are payable, an estimated monthly amount which shall be applied against its proportionate share of the operating and maintenance expenses of said common facilities as hereinabove set forth.  In no event shall the monthly estimated amount exceed an amount equal to one-twelfth (1/12th) of the proportionate share for said common facilities paid by Lessee during the preceding lease year.  Within thirty (30) days following the end of each lease year, Lessor will determine its actual operating and maintenance expenses for said common facilities and Lessee's proportionate share

INITIAL

* the greater of 1/10th of one percent of gross sales made by Lessee in the demised premises or 30 cents per calendar year for each sq. ft. of the building located on the demised premises for the first five (5) years of the lease term hereof increasing 6 cents per sq. ft. at the commencement of each five (5) year period thereafter throughout the original term of this Lease, or any extensions thereof.

- 6 -

thereof (within limitations hereinbefore described) and will furnish to Lessee a written statement of such costs and allocation in reasonable detail.  Concurrently with the rendition of said statement, Lessor shall (1) bill Lessee for any amount due, or (2) refund to Lessee any over-payment made by Lessee during the lease year.

During the first lease year hereof, the parties agree that the estimated monthly amount to be paid by Lessee hereunder shall be FIVE HUNDRED FORTY FIVE AND NO/100--- ($545.00) per month.

Operating and maintenance expenses of the common facilities include the cost of: public liability insurance covering injury to or death of any one person in the sum of not less than One Million Dollars ($1,000,000.00) and covering injury to or death of more than one person injured in any one accident in the sum of not less than Five Million Dollars ($5,000,000.00) and property damage in the sum of One Hundred Thousand Dollars ($100,000.00) with Lessee being named as an additional insured, painting of exterior walls, labor, equipment, materials, security, utilities and supplies used in connection with the maintenance of the common facilities, plus ten percent (10%) of the total cost of such items to cover administration and overhead. It shall not include the cost of any improvements which under accept-able accounting practice would be deemed to be capital assets. ~~Any payments made by Lessee for such operating and maintenance expenses, referred to in this Article, are recoverable from percentage rent, as provided for in Article III hereof.~~

INITIAL

Except as set forth above, Lessor may establish and from time to time change rules and regulations deemed reasonable and necessary for the proper operation and maintenance of the common facilities, but no charge for parking may be made to employees or to customers of Lessee without its prior written consent.

Lessee shall have the right to exclusively use approximately one thousand (1,000) square feet of parking area adjacent to the front or sides of the demised premises for a period of three (3) weeks immediately preceding Christmas each year for the sale of Christmas trees.  Said area shall be designated on the plot plan attached hereto and such use shall be subject to appropriate governmental regulations.

- 7 -

## VI

INITIAL

USE OF PREMISES     The demised premises may be used ~~by Lessee~~ for

the purpose of conducting therein a general retail

grocery supermarket for the sale of all foods, liquor, wine and beer,
                        health and beauty aids,
tobacco, drugs,/sundries, candy, hardware, clothing, home and building

supplies, garden supplies, nursery stock, seeds, flowers, Christmas trees,

barbecue and patio furniture and supplies, and all other types of mer-

chandise and services offered or sold by public supermarkets including a

fountain, coffee shop and/or restaurant, ~~any or all of which may be sold~~

~~or offered at the election of Lessee through the use of separate depart-~~

~~ments,~~ and for any other legal use.

Lessor covenants that Lessee's market shall be the only grocery

supermarket located in the said shopping center and that Lessee shall

have the exclusive right to the sale of meat, bakery products, (so long as
Lessee shall maintain a bake on, or bake off bakery on the demised premises),
/delicatessen
items, liquor, wine and beer, except that (a) liquor, wine and beer may be

sold by a drug store, if any, and (b) wine may be sold by a wine and cheese
specialty shop.
Lessee agrees to keep the premises clean and free of unsightly

rubbish and agrees that it will not knowingly commit or cause to be

committed by its employees or subtenants any violation of the applicable

laws, rules or regulations relating to sanitation.

## VII

UTILITY CHARGES     The Lessor agrees at the Lessors own cost and

expense to provide to the demised premises

throughout the term hereof such sewer facilities and such utilities as

the Lessee may require and to supply and maintain adequate separate meters

for the purpose of measuring all such utilities consumed by Lessee in the

demised premises.

Lessee agrees to pay during the term of this Lease all charges

for such utilities (including but not limiting same to light power, gas,
        garbage
ter,/and sewer charges) used by Lessee in connection with the operation

of the demised premises.

VIII

TAXES                    Lessee shall pay all taxes on personal property

                          and trade fixtures placed by Lessee in the

demised premises.

        Lessee also agrees to pay its proportionate share of all real

estate taxes and assessments levied upon the demised premises before the

delinquency date and upon the presentation of all tax bills from the

Lessor.* Lessor agrees to present such tax bills and/or notice of

assessment to Lessee in sufficient time to pay or enable Lessee to appeal

such real estate taxes and assessments should it elect to do so.  Should

Lessee elect to appeal such real estate taxes and assessments, Lessor

agrees to join with the Lessee in such appeal, but any costs in connection

therewith shall be borne by the Lessee.  Should Lessee be successful in

obtaining a reduction in real estate taxes, then any refunds and/or costs

in connection with such appeal shall be prorated and Lessor shall refund

to Lessee a proportionate share of the net reduction.  Any assessments

which by law may be paid in installments may be so paid by Lessee and

Lessee shall be obligated to pay only the installments that are due during

the term of this Lease.  ~~Any payments made by Lessee for all real estate~~

~~taxes and assessments are recoverable from percentage rent as provided~~

~~for in Article III hereof.~~ Lessee shall pay to Lessor any tax levied by
any governmental authority on rents or rental income required to be paid
by Lessee to Lessor under the terms of this Lease.

IX

ALTERATIONS              Lessee shall have the right at its sole cost and

                          expense to make such alterations or changes,

structural or otherwise, to the building and appurtenances located on

the demised premises, as it shall deem necessary or desirable for the

proper and efficient operation of its business provided, however, that

no structural alterations or changes shall be made which would impair

the structural integrity of said building and appurtenances.  No exterior

alterations or changes shall be made to the building's elevation, without

Lessor's prior written consent, which consent shall not be unreasonably

withheld.  Such changes or alterations shall conform with applicable

building codes and zoning regulations.  However, anything in this Lease

*In the event real estate taxes assessed against Lessee's building and the
Lessor's common facilities can be separately identified by a separate tax
bill or otherwise, the amount assessed against the building occupied by
Lessee plus Lessee's proportionate share of real estate taxes assessed against
the common facilities shall be the amount due from Lessee.  In the event
such separate identification is not possible Lessee's share of the real
estate taxes and common facilities shall be its proportionate share.

to the contrary notwithstanding the Lessor agrees that the Lessee shall
not have the obligation at the end of the term of this Lease or any
extension  thereof to restore the premises to the condition in which
they were originally.

X

REPAIRS                        Lessee agrees to make and pay for all repairs
                               to the roof and to the interior of the demised
premises, (including plate glass in windows and doors), which it deems
necessary to
/keep the same in a good state of repair, except such repairs as are
hereinafter provided to be made by the Lessor.

    Any construction, alteration, addition, or structural repair
to the demised premises required by any statute or rule, order, code or
regulation of a governmental agency, shall be made by and at the expense
of Lessor, unless such requirement is caused solely by reason of, and in
connection with, the operation by Lessee of its business on the demised
premises.

    Lessor shall maintain and keep in good order, condition and
repair the foundation, exterior walls (including plate glass frames and
moldings), ~~roof~~, sidewalks and curbs and all structural parts of the
building including/concealed plumbing and electrical systems.  However,
Lessee shall maintain all exposed plumbing and electrical fixtures and
equipment and shall repair clogged plumbing within the demised premises
caused by its use.  In connection with Lessor's obligation to maintain
the exterior of the building, the entire paintable exterior shall be
painted a color acceptable to Lessee at least once every five (5) years
during the lease term.

    Lessor shall be responsible for repairs to any part of the
building which become necessary by reason of defective workmanship or
materials used in the construction of the building.  Lessor agrees to
promptly repair said defects as required.

XI

RIGHT TO ENTER                 The right is reserved to Lessor, its agents and
                               workmen, at all reasonable times to enter upon

any part of the demised premises for the purpose of inspecting the same and making any repairs required for the protection or preservation of the building or its equipment or appurtenances.  Such repairs should be made during non-business hours, but, in any event, shall be performed in such a manner that the least possible interference occurs to Lessee's business.  Lessor and Lessee shall have the right to post notices of nonresponsibility on the demised premises.  Lessor may, during the last thirty (30) days of the lease term, post a "For Rent" sign no larger than 3' x 5' in dimensions.

XII

DESTRUCTION OF                If, during the term of this Lease, the demised
    PREMISES
                             premises or more than ten percent (10%) of the

other building, as shown on the Plot Plan are damaged or destroyed so

that they cannot be repaired with due diligence within one hundred
            (said 180 days shall be extended by that amount of time during
            which weather conditions preclude such repairs)
eighty (180) days after such destruction or damage,  then this Lease

shall, at the option of Lessee, terminate as of the date of such

destruction.  The option to terminate shall be valid notwithstanding any

such destruction may have been caused by a negligent act or omission on

the part of Lessee, its agents, employees and subtenants.  Said option
                by written notice
must be exercised/within forty-five (45) days from the date of damage or

destruction.  If there shall be a termination, as provided for above,

Lessee shall immediately surrender and yield up said premises and all
                            after Lessee's election to terminate
interest therein to Lessor within thirty (30) days, in which event Lessee

shall not be liable for any further payments of rental or any other

monetary obligations (the term "monetary obligation" is more particularly

described in Article XXV hereof),  on account of this Lease, and Lessor

shall refund any prepaid rentals and any other monetary obligations of

Lessee for the period subsequent to the destruction, and Lessor may, in

that event, re-enter and repossess said premises and be discharged from

this Lease and may remove all persons therefrom.

In the event the demised premises or said other buildings are

not sufficiently damaged to provide Lessee with the option to terminate,

as provided above, or in the event the Lessee does not exercise said

option to terminate within forty-five (45) days after any such damage or

destruction, then, and in such event, Lessor shall promptly repair the

- 11 -

same and an abatement shall be made from the minimum rent and other monetary obligations of Lessee, if any, corresponding to the time during which and the extent to which the premises cannot be used by Lessee after the damages have occurred and before their repair.

XIII

FIXTURES    .        Lessor shall not acquire any title or interest in any fixtures, equipment, property or materials, installed on the demised premises by or on behalf of Lessee, and Lessor hereby waives all lien rights, if any, therein or thereto.  Lessee may at any time or from time to time remove or exchange any or all of such fixtures, equipment, property or materials, and Lessee shall have thirty (30) days after the termination of this Lease to remove same from the demised premises, but shall repair, at its sole expense, all damage that may result from such removal.

Lessee expects to lease a portion of the trade fixtures and equipment (hereinafter referred to as "equipment") to be installed in the demised premises, and it will be necessary for Lessor to waive any lien rights with respect to said equipment for the benefit of the owner of said equipment.  Lessor, therefore, agrees, for the benefit of the owner its successors and assigns, of any such equipment which Lessee may lease for installation in the demised premises and any such equipment which may from time to time be substituted therefor, and with the knowledge and understanding that such owner, its successors and assigns, will rely on this agreement in leasing said equipment to Lessee, as follows:

(1)  Title to the equipment shall at all times remain in the owner of said equipment, its successors or assigns, and at no time shall title become vested in Lessor, or be subject to any lien or claims of Lessor against Lessee or its successors and assigns, including any claims based on any default of Lessee under this Lease.  The equipment shall be deemed to constitute personal property and in no event shall the equipment become or be considered as part of the realty in which it is located or to which it may be attached, regardless of the manner of installation of the equipment in the premises.

(2)  The owner of said equipment shall have the right at any time to enter upon the premises in order to remove the equipment pursuant to the terms of the lease of the equipment or any other agreement which it may enter into with Lessee, or by virtue of its rights under the law.  If Lessee shall fail to remove the equipment from the premises within any period of

- 12 -

INITIAL



time specified in this Lease for the removal of personal property upon the expiration or earlier termination of this Lease, the owner of said equipment shall have the right within ten (10) days thereafter, to enter upon the premises and remove the equipment, without obtaining the prior consent of Lessor; provided, however, such owner repairs any damage to the premises caused by reason of such removal.

XIV

LIABILITY AND
FIRE INSURANCE                Lessee agrees to carry and maintain in full force

and effect throughout the term of this Lease, public liability and property damage insurance with recognized insurance companies authorized to transact business within the state in which the premises are located covering the demised premises. The liability policies shall protect both Lessor and Lessee covering injury to or death of any one person in the sum of not less than ONE MILLION DOLLARS ---------($1,000,000.00) and covering injury to or death of more than one person injured in any one accident in the sum of not less than FIVE MILLION DOLLARS ------- ($ 5,000,000.00). Property damage insurance shall protect Lessor and Lessee in the sum of ONE HUNDRED THOUSAND AND NO/100 -------- ($ 100,000.00). Lessor shall be furnished with copies of said policies and all endorsements thereto, or certificates evidencing such coverage is in effect.

Lessor shall provide and pay for fire and extended coverage insurance, upon the building on the demised premises, including all fixtures and equipment therein installed by Lessor, for the full replacement value thereof, without deduction for depreciation, but exclusive of excavations, foundations, and footings. Lessee' agrees to pay to Lessor the cost, or Lessee's proportionate share of such insurance upon the presentation of receipted bills.

Lessor and Lessee do hereby mutually waive their entire right of recovery and any right of subrogation and do hereby release each other, their agents, employees and subtenants from liability for any and all damage to or destruction of the premises covered by said fire insurance, which is caused by any negligence or act of omission on the part of Lessor, Lessee, their agents, employees or subtenants.

Lessee may elect upon written notice to Lessor to provide and pay for such fire and extended coverage insurance, as hereinabove provided. Lessee and Lessor agree that any insurance proceeds shall be made available

- 13 -

INITIAL


for the restoration and repair of the building, on the demised premises.
Said policy shall name Lessee, Lessor, and, at Lessor's request, the
holder of any first mortgage or first deed of trust encumbering the
demised premises as insureds, as their interests may appear.  Promptly
upon the effective date of such insurance or any renewal or replacement
thereof, Lessee shall provide Lessor with a certificate or certificates
evidencing the insurance coverages required by this Article, providing
that such insurance shall not be terminated without at least thirty (30)
days prior written notice to Lessor.

~~Lessee may recover the cost of premiums for such insurance~~ INITIAL
~~from percentage rent as provided herein.~~

XV

DEFAULT BY LESSOR          The Lessor agrees that if the Lessor fails to pay
any installment of taxes or assessments or any
interest, principal, costs or other charges upon any mortgage or mortgages
or other liens and encumbrances affecting the demised premises and to
which this Lease may be subordinate when any of the same become due, or
if Lessor fails to make any repairs or do any work required of the Lessor
by the provisions of this Lease, or in any other respect fails to perform
any covenant or agreement in this Lease contained on the part of the Lessor
to be performed, then and in any such event or events the Lessee, after the INITIAL
continuance of any such failure or default for ~~fifteen (15)~~ thirty (30) days after
notice in writing thereof is given by the Lessee to the Lessor, may pay
said taxes, assessments, interest, principal, costs and other charges,
and cure such defaults all on behalf of and at the expense of the Lessor,
and do all necessary work and make all necessary payments in connection
therewith including but not limiting the same to the payment of any counsel
fees, costs and charges of or in connection with any legal action which
may have been brought, and the Lessor agrees to pay to the Lessee forth-
with the amount so paid by the Lessee, together with interest thereon at
the rate of __ten__ percent (10%) per annum, and agrees that the Lessee
may withhold any and all rental payments and other payments thereafter
becoming due to the Lessor pursuant to the provisions of this Lease or
any extension thereof, and may apply the same to the payment of such

- 14 -

indebtedness of the Lessor to the Lessee until such indebtedness is
fully paid with interest thereon as herein provided.  Nothing herein
contained shall preclude the Lessee from proceeding to collect the amount
so paid by it as aforesaid without waiting for rental offsets to accrue,
and if at the expiration of this Lease or any extension thereof there
shall be any sums owing by the Lessor to the Lessee, this Lease may at
the election of the Lessee be extended and continue in full force and
effect until January 31st of the year following the date when the
indebtedness of the Lessor to the Lessee shall have been fully paid.

XVI

DEFAULT BY LESSEE        In the event Lessee shall (a) at any time default
in the payment of any rental herein provided for,
or in the performance of any of its covenants, agreements or obligations
hereunder, and shall fail to cure such default (or commence to cure such
default and complete said cure within a reasonable time), within fifteen
(15 ) days after receipt by Lessee of written notice from Lessor, or (b)
make a general assignment for the benefit of creditors, or file a voluntary
petition in bankruptcy, or be adjudicated bankrupt or insolvent, or permit
a receiver to be appointed to take possession of a substantial portion of
its assets or of this leasehold, and such assignment, bankruptcy, insol-
vency, or receivership proceeding shall not be dismissed within thirty
(30) days, then Lessor may, either with or without notice or demand:

>(1)  Without terminating this Lease, re-enter the
demised premises and relet the whole or any part thereof for
the account of Lessee, and may collect said rent and apply it
on the amount then or to become due from Lessee hereunder and
on any expense of such reletting, and may at any time, or from
time to time, recover from Lessee the balance then due; or

>(2)  Terminate this Lease and re-enter the premises
either with or without process of law, and expel and remove
therefrom Lessee or any or all parties occupying the same, using
such force as may be necessary so to do, and without prejudice
to any remedies that might be otherwise available for rent
accrued and unpaid prior to such termination.

Lessor shall not by a re-entry or other act be deemed to have
terminated this Lease unless Lessor shall have given written notice of
termination.

The remedies of Lessor specified herein shall be cumulative as
to each other and as to all such allowed by law; provided, however, that
nothing contained in this Paragraph XVI shall be construed as limiting
any other legal or equitable remedy Lessor may otherwise have against
Lessee.

INITIAL

- 15 -

XVII

LIENS                    Lessee agrees that it will at all times save and
                         keep Lessor and the demised premises free and
harmless of and from any liability on account of or in respect to any
liens for work and labor done or materials furnished at the instance and
request of Lessee in, on or about the demised premises.

XVIII

ATTORNEY FEES            In the event of litigation arising from default
                         in the performance of any of the provisions of
this Lease by either party, the prevailing party in such litigation
shall be entitled to receive from the other party reasonable attorney
fees and costs of suit incurred in connection with said litigation.  In
the event that either party shall, by reason of any act or omission in
violation of the terms hereof, or by any other reason arising out of the
Lessor-Lessee relationship, be made a party to any litigation commenced
by a third party, then the party hereto performing the said act or
suffering the said omission shall pay all costs, expenses and reasonable
attorney fees incurred by the other party hereto which arise from or are
in connection with such litigation.

XIX

ASSIGNMENT               Lessee shall not assign this Lease without the
                         prior written consent of Lessor, which Lessor
agrees will not be unreasonably withheld.  The Lessee is hereby given
the right to sublet the demised premises or any part thereof, but not-
withstanding such subletting the Lessee shall continue liable for the
performance of the terms, conditions and covenants of this Lease.  No
such assignment or subletting shall allow any use which is (a) not
authorized by this Lease, or (b) which would violate the use provisions of
leases with other tenants in the shopping center who are then actively
engaged in such use in said center.  Nothing herein contained shall
require the consent of
/Lessor to an assignment of this Lease by Lessee to a parent corporation
or to the surviving corporation in the event of a consolidation or merger.

        Notwithstanding anything in the foregoing to the contrary if Lessee
desires to sublease the entire demised premises, it shall give Lessor
written notice of its intention so to do, within ninety (90) days after
receipt of such notice, Lessor may elect in writing to terminate the Lease
effective not more than ninety (90) days after such election and each party
shall be relieved of any further obligation to the other under this Lease
as of the termination date.  In the event that Lessor elects to terminate
the Lease hereunder, Lessee shall be given a period of not less than
thirty (30) days within which to remove its inventory and fixtures from the
premises.

- 16 -



XX

NOTICES                    Notices and demands shall be forwarded by

registered or certified mail, postage prepaid, to:

Lessor:  White Pines Associates, II
         7442 East Butherus Drive
         Scottsdale, Arizona 85260

Lessee:  Arden-Mayfair, Inc.
         P. O. Box 2256, Terminal Annex
         L. A., California 90051

subject to the right of either party to designate by notice in writing

any new address to which notices, demands and installments of rental may

be sent.

XXI

CONDEMNATION               In the event proceedings be taken by any lawful

authority to condemn or otherwise acquire any

part of the gross floor area of the building on the demised premises,

or in excess of ten percent (10%) of the common facilities as shown on

the Plot Plan, or in excess of five percent (5%) of the common facilities

crosshatched on the Plot Plan, the Lessee shall have the option by written

notice to Lessor at any time prior to the date the demised premises are

taken by the condemning authority and for a period of thirty (30) days

thereafter, to terminate this Lease, effective as of the date of

possession.  In the event of such termination, prepaid rentals and any

other monetary obligations of Lessee for the period subsequent to the

termination shall be refunded to Lessee.

Should Lessee not elect to so terminate this Lease, or should

any such taking not be sufficient to allow Lessee such option to

terminate, this Lease shall continue in full force and effect, and

Lessor, at its own cost and expense, shall restore, repair, and remodel

the building on the demised premises and/or the common facilities to the

extent necessary to provide a store or building suitable for the business

of Lessee permitted to be conducted therein under the provisions of this

Lease.  Lessee shall be entitled to a reduction in minimum rent and any

other monetary obligations thereafter required to be paid, which re-

duction shall be the greater of either; (a) in proportion to the ratio

- 17 -


INITIAL

which the number of square feet of gross floor area of the building taken
bears to the original number of square feet of gross floor area of the
building, or (b) an annual amount equal to nine percent (9%) of the total
award (1) attributable to the taking of the common facilities as shown on
the Plot Plan, or (2) attributable to a portion of the common facilities
taken which is closest to the demised premises and is three times the
number of square feet in the demised premises; whichever is the smaller,
received by Lessor for such condemnation, less the amount expended by
Lessor for restoring the premises and for expenses directly related to
obtaining the award.  Lessee shall also be entitled to a reasonable
suspension or diminution of the rent and any other monetary obligations
thereafter required to be paid hereunder during the time required for
any restoration and repair, taking into consideration the time and extent
of interference with Lessee's business.

Each party hereto shall be free to make claim against any
condemning authority for the amount of the actual, provable damage done
to each of them.

XXII

QUIET POSSESSION AND      Lessor hereby covenants, warrants and agrees that
SUBORDINATION
                          at all times during the term hereof, provided
Lessee is not in default hereunder, Lessee shall have full, peaceful and
quiet possession of the demised premises, and further that Lessor owns
the demised premises in fee simple, has full right and power to make this
Lease, and that there are no mortgages, deeds or trust or liens superior
to this Lease on the demised premises, and all other areas, if any, the
use of which is granted to Lessee hereunder.

The Lessor agrees, prior to delivery by the Lessee of an
executed copy of this Lease, to furnish to the Lessee without cost to
the Lessee, proof satisfactory to the Lessee that the Lessor's title is
in accordance with the foregoing covenants. and an agreement executed by
the mortgagee if any, in form satisfactory to the Lessee, subordinating
each mortgage effecting said premises to this Lease.

Lessee agrees that this Lease shall be
subordinate to any mortgages or trust deeds that may hereafter be placed upon the Premises,
to any and all advances made or to be made under them, to the interest and all obligations
secured by them, and to all renewals, replacements and extensions of them.  Provided,
however, the mortgagee or beneficiary named in any such mortgages or trust deeds shall
recognize the lease of the Lessee in the event of foreclosure if the Lessee is not in
default under the terms of this Lease, and Lessee's tenancy shall not be disturbed.

- 18 -



XXIII

BUILDING & COTENANCY
REQUIREMENTS

The Lessor agrees at the Lessor's expense to con-
or cause to be constructed
struct /in addition to the demised premises, a

retail store building or buildings having not less than forty five thousand

area
(45,000) square feet of gross floor /~~space~~ all as shown on the Plot Plan

marked Exhibit "A"-1.

Notwithstanding anything in this Lease to the contrary, the

term of this Lease shall not commence as stated in Article I until Lessor
with Long's Drug Store requring Long's to construct a store
has executed a bona fide agreement / having not less than ten thousand (10,000)
leases
square feet of gross floor area and /with other retail tenants having not

less than ten thousand (10,000) square feet of gross floor area in the aggre-

gate.
Store                  retail
/Said Long's Drug/ and other /tenants shall be open for business on or

before the date Lessee opens for business.  In the event Lessor defaults

in the performance of this provision, Lessee shall have the option to

terminate this Lease or to delay the opening of its business and to delay

the commencement of the lease term until the said Long's Drug Store
retail
and other /tenants have opened for business to the public.

XXIV

LESSEE ATTORNEY FOR
LESSOR

The Lessor hereby appoints and constitutes the

Lessee the Lessor's true and lawful attorney in

fact in the Lessor's name to apply for and secure from any governmental

authority having jurisdiction thereover any permits or licenses which may

be necessary in connection with the ~~construction of any new building area~~

~~and the~~ making of any alterations, additions, changes and repairs.

Lessor agrees upon request by the Lessee to execute or join in the execu-

tion of any application for such permits and licenses.

XXV

MISCELLANEOUS

The waiver of either party of any of the covenants

herein contained shall not be deemed a waiver of

such party's right to enforce the same or any other covenant contained

herein.  The rights and remedies given to the parties hereunder shall be

in addition, and not in lieu of, any right or remedy as provided by law.

- 19 -

If Lessee shall hold the premises beyond the term herein specified, or any renewal thereof, with the consent, express or implied, of Lessor, such holding over shall be construed to be a month-to-month tenancy, /unless otherwise mutually agreed upon. upon the same terms and conditions as set forth in this Lease,

INITIAL

The term "Lessor" shall include the plural, if necessary.  All terms used in the singular or in the masculine gender shall apply to the plural or to the feminine or neuter gender as the context requires.

The term "gross floor area" shall be defined to include all floor area within any building constructed upon the shopping center measured from the exterior surface of exterior walls and from the center of common walls, but, shall be exclusive of truck ramps, loading and delivery docks.

The term "proportionate share" is based on the total gross floor area (in square feet) of the building on the demised premises in proportion to the total gross floor area of all buildings in the shopping center.

The term "shopping center" shall include the demised premises, all other retail store building, and the common facilities as shown on the said Plot Plan.

The term "monetary obligations" shall include Lessee's payments for percentage rent, taxes, insurance, and parking.

The term "minimum rental" as used herein shall be defined to include the basic rental when the Lease does provide for percentage rental.

The term "gross sales" as used herein shall mean the gross sales of all merchandise at, in or from the demised premises and its licensees and/ or concessionaires, if any.

INITIAL

The term "lease year" means in reference to the first lease year, the period from the date of commencement of the lease term to the expiration of twelve (12) calendar months after the last day of the calendar month in which the lease term commences.  Each twelve (12) calendar month period thereafter shall constitute a lease year.

INITIAL

The article headings are for convenience only, and shall not be considered in the interpretation thereof.

In the event of any controversy, the laws of the city and county and state in which the premises are located, applicable to such controversy, shall prevail.

- 20 -

Neither this Lease or any part thereof shall be construed to create a joint enterprise, a partnership, or any other relationship except that of Lessor and Lessee.

This Lease shall apply to and bind the heirs, executors, administrators, successors and assigns of the parties hereto.

No modification of this Lease shall be binding unless evidenced by an agreement in writing signed by each of the parties hereto.

Lessee and Lessor agree to execute a short form of Lease and Lessor agrees to cause said short form to be recorded at Lessor's expense and to provide Lessee with a recorded copy thereof.

IN WITNESS WHEREOF, Lessor and Lessee have caused this agreement to be executed on the day and year first hereinabove set forth.

WHITE PINE ASSOCIATES, II

By: _____
                General Partner

By: _____

                                    "LESSOR"


ARDEN-MAYFAIR, INC.

By: _____
                Vice President

By: _____
                Secretary

                                    "LESSEE"

INITIAL

ADDENDUM

(1)   Lessor agrees to pay up to but in no event more than the sum of FIVE HUNDRED TWENTY THOUSAND SEVEN HUNDRED DOLLARS ($520,700.00) of the  costs of construction  as said term is defined herein-below for the completion of the building, to be construc-ted upon the demised premises pursuant to Article IV of this Lease. In the event that the said  costs of construction  exceed  the sum of FIVE HUNDRED TWENTY THOUSAND SEVEN HUNDRED DOLLARS ($520,700.00), then Lessee, for a period not to exceed forty-five (45) days, shall have the right to attempt to renegotiate the contract sum with the general contractor and/or to modify the approved plans and specifica-tions in order to reduce the  costs of construction  to FIVE HUNDRED TWENTY THOUSAND SEVEN HUNDRED DOLLARS ($520,700.00), or less.  In the event that Lessee is unsuccessful in reducing the  costs of construction to FIVE HUNDRED TWENTY THOUSAND SEVEN HUNDRED DOLLARS ($520,700.00), or less, within said forty-five (45) day time period, then Lessee shall either (i) pay on demand to Lessor, within fifteen (15) days after receipt of a written itemization of all costs, a sum equal to the amount by which said  costs of construction  exceed the sum of FIVE HUNDRED TWENTY THOUSAND SEVEN HUNDRED DOLLARS ($520,700.00), or (ii) Lessee may elect to pay an additional increased annual minimum rental pursuant to the provisions of Article III of this Lease, which increased annual minimum rental shall be a monthly payment in advance INITIAL equal to .79166 .91667 percent 9.5% 11.0% (on an annual basis), of the amount by which the total  costs of construction  exceed the sum of FIVE HUNDRED TWENTY THOUSAND SEVEN HUNDRED DOLLARS ($520,700.00).  In such latter event the figure TEN MILLION EIGHT HUNDRED FORTY FIVE THOUSAND EIGHT HUNDRED DOLLARS AND NO/100 ($10,845,800.00) used in the computation of percentage rental, pursuant to the provisions of Article III of this Lease, shall be increased by an amount equal to 9.5 11.0% percent of the amount by which the total  costs of construction  exceed the sum of FIVE HUNDRED TWENTY THOUSAND SEVEN HUNDRED DOLLARS ($520,700.00).  On request of Lessee, all construction contracts shall be awarded through standard competitive bidding by contractors approved in writing by Lessee,

such approval not to be unreasonably withheld.  The term

costs of construction  shall include cost for all of the

following items:

INITIAL

> (a)    Actual low bid costs (or the negotiated bid costs

with Lessee's approval) of Lessee's building in accordance with the
approved plans and specifications as set forth in Article IV of this Lease

> (b)    Fees, permits, licenses, inspections and certificates

required for Lessee's building by any governmental authority;

> (c)    Changes in approved plans and specifications requested

by Lessor and/or required by governmental authority and approved

by Lessee;

> (d)    Construction of Lessee's complete fire sprinkler

system (including detector check valves and vaults), and all utili-

ties within the building.

The term  costs of construction  shall not include costs for

any of the following items:

> (a)    Offsite improvement costs and costs to construct the

common facilities improvements;

> (b)    Excavation, soil preparation, soil tests and grading the

building pad and common facilities;

> (c)    Architects', engineers' and surveyors' fees and expenses

for Lessee's building, excepting those applicable to change orders

requested by Lessee.

In the event that the costs of construction are in excess of

excess of SIX HUNDRED THIRTY FIVE THOUSAND DOLLARS ($635,000.00),

Lessor shall promptly notify Lessee of the amount of such

costs of construction prior to the commencement of construction.  In

the event Lessee and Lessor are unable to mutually agree upon a

means of reducing the said costs of construction below

SIX HUNDRED THIRTY FIVE THOUSAND DOLLARS ($635,000.00), within forty-

five (45) days of Lessee's receipt of said notice, Lessee may may

elect to terminate this Lease by giving written notice of such

termination to the Lessor within fifteen (15) days of the expiration

of said forty-five (45) day period and in such event, this Lease shall

automatically terminate thirty (30) days following the receipt of such

notice of termination unless the Lessor, within such thirty (30) day

period, elects to pay, the amount by which the costs of construction

exceed SIX HUNDRED THIRTY FIVE THOUSAND DOLLARS ($635,000.00),
(in which event the costs of construction shall be deemed to be
SIX HUNDRED THIRTY FIVE THOUSAND DOLLARS ($635,000.00) for the pur-
poses of the preceding paragraph), or (ii)  pay the amount by which
the costs of construction exceed FIVE HUNDRED TWENTY THOUSAND SEVEN
HUNDRED DOLLARS $520,700.00), or to increase the annual minimum
rental, as hereinabove provided.

(2)   Notwithstanding the provisions of Article III hereof, Lessee
agrees to pay to Lessor, and Lessor agrees to accept from Lessee
as annual minimum rental for the demised premises during the terms of
this Lease, and any extension thereof, the following sums payable in
equal monthly installments:

   A.    During the first lease year the sum of EIGHTY EIGHT THOUSAND
NINE HUNDRED DOLLARS ($88,900.00) payable at the rate of SEVEN THOUSAND
FOUR HUNDRED EIGHT DOLLARS AND 33/100 ($7,408.33) per month.

   B.    During the second lease year the sum of NINETY TWO THOUSAND
EIGHT HUNDRED ELEVEN DOLLARS AND 60/100 ($92,811.60) payable at the rate
of SEVEN THOUSAND SEVEN HUNDRED THIRTY FOUR DOLLARS AND 30/100 (7,734.30)
per month.

   C.    During the third lease year the sum of NINETY SIX THOUSAND
SEVEN HUNDRED TWENTY THREE DOLLARS AND 24/100 ($96,723.24) payable at the
rate of EIGHT THOUSAND SIXTY DOLLARS AND 27/100 ($8,060.27) per month.

   D.    During the fourth lease year the sum of ONE HUNDRED THOUSAND
SIX HUNDRED THIRTY FOUR DOLLARS AND 76/100 ($100,634.76) payable at the
rate of EIGHT THOUSAND THREE HUNDRED EIGHTY SIX DOLLARS AND 23/100
($8,386.23) per month.

   E.    During the fifth lease year the sum of ONE HUNDRED FOUR
THOUSAND FIVE HUNDRED FORTY SIX DOLLARS AND 40/100 ($104,546.40) payable
at the rate of EIGHT THOUSAND SEVEN HUNDRED TWELVE DOLLARS AND 20/100
($8,712.20) per month.

   F.    For the sixth lease year and each subsequent lease year
thereafter the sum of ONE HUNDRED EIGHT THOUSAND FOUR HUNDRED FIFTY
EIGHT DOLLARS AND NO/100 ($108,458.00) payable at the rate of

INITIAL



NINE THOUSAND THIRTY EIGHT DOLLARS AND 17/100 ($9,038.17) per month.
Rent for fractions of a month shall be prorated.

Notwithstanding the provisions of Article III hereof, Lessee further
agrees to pay the Lessor as percentage rental each lease year a sum
equal to one percent (1%) of Lessee's gross sales that exceed:

A. EIGHT MILLION EIGHT HUNDRED NINETY THOUSAND DOLLARS AND
NO/100 ($8,890,000.00) during the first lease year.

B. NINE MILLION TWO HUNDRED EIGHTY ONE THOUSAND ONE
HUNDRED SIXTY DOLLARS AND NO/100 ($9,281,160.00) during the second lease
year.

C. NINE MILLION SIX HUNDRED SEVENTY TWO THOUSAND THREE
HUNDRED TWENTY FOUR DOLLARS AND NO/100 ($9,672,324.00) during the third
lease year.

D. TEN MILLION SIXTY THREE THOUSAND FOUR HUNDRED SEVENTY
SIX DOLLARS AND NO/100 ($10,063,476.00) during the fourth lease year.

E. TEN MILLION FOUR HUNDRED FIFTY FOUR SIX HUNDRED FORTY
THOUSAND DOLLARS AND NO/100 ($10,454,640.00) during the fifth lease
year.

F. TEN MILLION EIGHT HUNDRED FORTY FIVE THOUSAND EIGHT
HUNDRED DOLLARS AND NO/100 ($10,845,800.00) during the sixth
lease year and each subsequent lease year thereafter.


Monthly rentals shall be paid in advance on the fifteenth (15th)
day of each and every calendar month of the said Lease term.

INITIAL



PLANS AND SPECIFICATIONS
FOR A
SUPERMARKET BUILDING

Lessor shall provide to Lessee before proceeding with architectural plans the following for approval by Arden-Mayfair, Inc. A topographical survey showing existing and new grades, proposed building location on site, paved areas, driveways and curb cuts, lighting, drainage, and existing utilities locations, also pylon sign location.

Lessor shall provide architectural plans and specifications prepared and stamped by an architect licensed in the state in which the project is located. Such plans shall conform with the requirements set forth below, and with the drawings showing Lessee's mechanical and layout requirements, which drawings will be furnished by Lessee. Approval of said final plans and specifications shall not imply Lessee's approval of the structural or engineering design or the quality of fitness of any materials or devices used.

The following shall consistute an outline of construction requirements to be provided and installed by Lessor for Lessee, Arden-Mayfair, Inc.

(1) Site Development Work

| | |
|---|---|
| 1.1 | All permits and fees. |
| 1.2 | All necessary surveys and soil tests. |
| 1.3 | All site clearance. |
| 1.4 | All excavation, grading and filling. |
| 1.5 | All public utility installation to site and on site to connect to building. |
| 1.6 | Bituminous paved customer and employee parking lot with 1-year guarantee. Provide wheelchair and/or shopping cart ramps from the entrance of the demised premises to the parking lot to 6" crushed rock base with minimum of 2" asphalt after compaction. Six (6) test holes to be bored for testing of specifications. |
| 1.7 | Concrete paved delivery and service area. |
| 1.8 | Concrete paved driveways from street to parking lot including culverts, headwalls, etc., when required. |
| 1.9 | Concrete bases for parking lot light poles. |
| 1.10 | Double striping for angle parking with directional arrows, etc. |
| 1.11 | Precast concrete bumper curbs next to demised premises. |
| 1.12 | Steel pipe guard posts at truck delivery doors. |
| 1.13 | Catch basins and storm sewers for adequate site drainage. |
| 1.14 | Concrete sidewalks and curbing on the premises as required and replace such public sidewalk and curbings as directed. |
| 1.15 | Necessary retaining walls where required by terrain and City Planners. |
| 1.16 | Landscaping of all unpaved area, including public boulevards. |

INITIAL 

(2)  <u>Building Construction</u>

2.1   Steel or concrete framed masonry enclosed structure using
      column centers and wall layout as developed by Lessee.

2.2   Store front glass and entrance and exit doors to be framed
      in aluminum. Store front to be glazed with 1/4" polished
      plate glass, entrance and exit doors to be glazed with
      tempered glass.

2.3   Provide automatic operated door operators for all customer
      entrance-exit doors.

2.4   Masonry enclosed exterior walls having first quality veneer
      such as face brick, natural stone, precast ornamental con-
      crete, glasweld panel or aluminum on such elevations as
      determined by Lessee.  Secondary elevations shall be fur-
      nished with painted concrete masonry or common brick as
      approved by Lessee.

2.5   Canopy construction and front wall parapet to have adequate
      back for mounting sign across entire front of building
      (sign by Lessee).

2.6   Roof installation, roofing and flashing to be guaranteed
      water tight using 20 year bondable specifications.

2.7   Employee toilet and lounge, machine room, to be housed as
      directed by Lessee plans.

2.8   Suspend ceiling above all areas of building using acoustical
      tile (4' x 2' lay-in type in grid system).  Insulate roof
      as directed by Lessee plans and specifications.  (Minimum
      20" grid to joist to clear recessed light fixtures).

2.9   1/8" thick vinyl asbestos floor coverings in all areas
      except food preparation areas, grocery stock space and
      refrigeration equipment room.

2.10  Provide thin set quarry tile in all food preparation areas
      as shown on Lessee plans.

2.11  All floor areas not covered under 9 and 10 to be sealed
      prior to receiving any equipment.

2.12  Provide furring and drywall on sales area exposed masonry
      walls as directed by Lessee's plans.

2.13  Provide all interior stud  and drywall partitions, drop
      soffits, etc. as directed by Lessee's plans.

2.14  Provide all exterior hollow metal doors and pressed steel
      frames, metal roll-up overhead door, all hollow metal or
      solid core wood door and pressed steel frames as directed
      by Lessee's plans.

2.15  All interior double acting aluminum doors (Mayfair's specs).

2.16  All hardware including security devices installed as
      directed.

2.17  Paint all exterior exposed steel, galvanized iron, steel
      doors and frames, plaster and wood on building, and all
      steel bumper posts, light poles.  Paint interior walls,
      or sheetrock ceilings, concrete masonry walls in mezzanine,
      toilet rooms, closets and lounge.

2.18  Steel bar burglarproofing guard at all roof and wall open-
      ings larger than 100 square inches.

2.19  Steel toilet partions and plate glass mirrors in each
      toilet room.  Provide and install shelf, hookstrip and pole
      in employee closets.

2.20  18-gauge stainless steel covers 6'-0" high around all sales
      area columns.

2.21  Adequate pilings where required by subterranean conditions.

2.22  Provide sectional cooler and freezer boxes as shown on
      Lessee's fixture floor plan, as manufactured by Super Freeze
      and Kalt Mfg. Co.  Freezer box floors to be insulated below
      finished floor as per specifications furnished.

INITIAL

INITIAL

(2) **Building Construction (continued)**

2.22   Provide depressed truck well and loading dock.  Minimum width of truck well shall be 22'-0" clear.  When soil conditions do not allow for truck well, provide hydraulic elevators as directed by Lessee.

2.23   Provide dock boards as directed by Lessee.

2.24   Provide all meat tracking supports from roof structure. Meat track and switches to be furnished by Lessee.

(3) **Electrical Work**

3.1   120/208 volt, 3 phase, 4 wire electrical service of capacity as determined by Lessee.

3.2   The necessary service switches and distribution panels to satisfy all ordinances and power and lighting circuiting.

3.3   Provide mercury vapor and supplementary wall wash lighting with maintained lumines of 150 footcandles in main sales area. Also provide lighting in service area, all convenience and power outlets as directed by Lessee's electrical plan.  Parking lot lighting to have a minimum 3 footcandles maintained lighting level at any part of parking lot.  Provide separate service meter for parking lot lighting.

3.4   Wiring for all trade fixtures and signs; such trade fixtures and signs to be furnished by Lessee and hooked up by Lessor.

3.5   Raceways and conduit for intercom and telephone systems.

3.6   Wiring and controls to pylon sign in parking lot, to be on separate meter.

3.7   Emergency lighting.

(4) **Plumbing Work**

4.1   New adequate gas and water services to building as directed by Lessee.

4.2   New adequate sanitary and storm sewers from building and site to public sewers (or an approved private sewer).

4.3   All toilet fixtures, electric water coolers, service and stainless steel scullery sinks, grease traps, floor drains, cleanouts and the necessary waste and vent piping.

4.4   All hot and cold water piping to fixtures and outlets required by Lessee.  Provide and install adequate hot water heaters as directed.  Provide and install all interior gas piping to water heaters and furnaces.

4.5   Roof drains connected to storm sewers where required.

4.6   Automatic sprinkler system as directed by Lessee.

4.7   Complete hook up of all Lessee trade fixtures.

(5) **Heating, Ventilating and Air Conditioning**

5.1   Air handlers and duct heaters to adequately heat the premises within 68-75° at all times.  Heat reclaim coils and such other unit heaters to heat secondary areas as directed by Lessee.  (Oil or coal fired systems not acceptable).

5.2   Air-cooled air conditioning equipment integral with heating system.

5.3   Sufficient controls for principle heating and cooling systems as directed.

INITIAL



(5)   Heating, Ventilating and Air Conditioning (continued)

5.4   The necessary fresh air intakes, relief outlets, and power exhaust fans as directed by Lessee and as required by local ordinances.

5.5   Thermal insulation for all supply ducts from principle heating and cooling units.

(6)   **Exterior Signing**

6.1   Lessor shall furnish and install a shopping center pylon identification sign at a location acceptable to Lessee subject to local codes and regulations.  Such pylon sign is to be designed to accept Lessee's standard identification signs as provided in 6.2 below.

6.2   Lessee shall provide and Lessor shall install Lessee's standard identification signs on the shopping center pylon as provided in 6.1 above.

6.3   Lessee shall furnish and Lessor shall install Lessee's identification signs on the exterior of its building.

(7)   **Lessor's Covenants**

7.1   Lessor shall guarantee all material and workmanship and systems for a period of one year from the date of store opening by Lessee unless such defects are the result of faulty design or construction in which event Lessor shall be responsible for the term of the lease.

7.2   Lessor shall assign the Lessee the benefits of long term warranties, guarantees, or bonds obtained by Lessor for all mechanical equipment, roofing, etc.

7.3   Lessor warrants that the design and construction of the building and all systems that are installed therein comply with the requirements of all state and local buildings and health codes and ordinances and comply with standard requirements of the Occupational Safety and Health Act (O.S.H.A.).

7.4   Lessor hereby agrees to indemnify and keep, save and hold Lessee free from any and all liability and claim for damages by reason of any injury or death to any person or persons, or damage to property of whatever and to whomever belonging, including Lessee's, from any cause or causes whatsoever, resulting from the construction of the premises demised herein.  The Lessor shall purchase and maintain during the aforesaid period of construction such insurance as will protect him from claims set forth below which may arise out of or result from any Contractor's or Subcontractor's operations, or by anyone for whose acts any of them may be liable:

7.4.1   Claims under workmen's compensation, disability benefit and other similar employee acts;

7.4.2   Claims for damages because of bodily injury, occupational sickness or disease, or death of his employees, and claims insured by usual personal injury liability coverage;

7.4.3   Claims for damages because of bodily injury, sickness or disease, or death of any person other than his employees, and claims insured by usual personal injury liability coverage; and,

7.4.4   Claims for damages because of injury to or destruction of tangible property, including loss of use resulting therefrom.

Page 4 of 5

EXHIBIT "B"

INITIAL 

(7)   Lessor's Covenants (continued)

The insurance required in this Article shall be with
companies acceptable to Lessee and shall name the Lessee
as an additional insurance party and shall be with limits
of not less than $200,000.00 for each person, and
$500,000.00 for each occurrence and $100,000.00 for property
damage or with limits required by law, whichever is the
greater.  Lessor also agrees to provide Lessee with a certi-
ficate of issurance of said insurance and of each and every
renewal thereof.  The aforesaid policies shall also provide
that same may not be cancelled or altered except on ten (10)
days prior written notice to Lessee.

It is agreed that Lessee's rights herein shall not be waived
by the installation of its fixtures and equipment prior to
the completion of the construction work.

(8)   Lessor agrees at Lessor's cost to provide Lessee with a full set of
as built plans within thirty (30) days following the completion of
construction of Lessee's building.  In addition, if required by
Lessee, Lessor agrees at Lessor's cost to provide proof satisfactory
to Lessee that Lessor has complied with any or all of the require-
ments set forth above.

(9)   Lessor agrees to assign any warranties to fixtures and equipment
so provided, to Lessee, if such warranties are assignable.  If
said warranties are not assignable, Lessor agrees to exercise the
rights under the warranties on Lessee's behalf.

Page 5 of 5

EXHIBIT "B"

INITIAL



A DESCRIPTION OF PARCEL 1A, UNIVERSITY MEADOWS SHOPPING CENTER

All that portion of the West half of Section 21, Township 21 North,
Range 7 East of the Gila and Salt River Base and Meridian, Coconino
County, Arizona, more particularly described as follows:

Commencing at the South quarter corner of said Section 21, being
monumented with a Brass Cap and Railroad Iron;

Thence S89°23'38" W, along the South line of said Section 21, a dis-
tance of 1,211.32 feet to a point on th easterly right-of-way line
of U. S. Highway 89-A, said point being a highway marker 50 feet
distant from and at a right angle to the highway centerline;

Thence N 1°29'00" W, along the Easterly right-of-way line of U. S.
Higway 89-A, a distance of 1,389.18 feet to a 5/8-inch iron pin
with an aluminum cap;

Thence S 86°17'17" E, a distance of 301.24 feet to a 5/8-inch iron
pin with an aluminum cap;

Thence N 1°29'00" W, parallel to the Easterly right-of-way line of
U. S. Highway 89-A, a distance of 319.18 feet, said point being the
TRUE POINT OF BEGINNING of this description;

Thence N 1°29'00" W, a distance of 408.69 feet, to a 5/8-inch iron
pin with an aluminum cap set in concrete;

Thence N 88°31'00" E, a distance of 500.00 feet to a 5/8-inch iron
pin with an aluminum cap set in concrete;

Thence S 1°29'00" E, a distance of 433.67 feet;

Thence S 88°31'00" W, a distance of 242.00 feet;

Thence N 1°29'00" W, a distance of 24.98 feet;

Thence S 88°31'00" W, a distance of 258.00 feet to the TRUE POINT OF
BEGINNING of this description.



EXHIBIT A

EXHIBIT B

## A DESCRIPTION OF PARCEL 1A, UNIVERSITY MEADOWS SHOPPING CENTER

All that portion of the West half of Section 21, Township 21 North, Range 7 East of the Gila and Salt River Base and Meridian, Coconino County, Arizona, more particularly described as follows:

Commencing at the South quarter corner of said Section 21, being ........ed with a Brass Cap and Railroad Iron;

Thence S89°23'38" W, along the South line of said Section 21, a distance of 1,211.32 feet to a point on th easterly right-of-way line of U. S.  Highway 89-A, said point being a highway marker 50 feet distant from and at a right angle to the highway centerline;

Thence N 1°29'00" W, along the Easterly right-of-way line of U. S. Higway 89-A, a distance of 1,389.18 feet to a 5/8-inch iron pin with an aluminum cap;

Thence S 86°17'17" E, a distance of 301.24 feet to a 5/8-inch iron pin with an aluminum cap;

Thence N 1°00'00" W, parallel to the Easterly right-of-way line of U. S. Highway 89-A, a distance of 319.18 feet, said point being the TRUE POINT OF BEGINNING of this description;

Thence N 1°29'00" W, a distance of 408.69 feet, to a 5/8-inch iron pin with an aluminum cap set in concrete;

Thence N 88°31'00" E, a distance of 500.00 feet to a 5/8-inch iron pin with an aluminum cap set in concrete;

Thence S 1°29'00" E, a distance of 433.67 feet;

Thence S 88°31'00" W, a distance of 242.00 feet;

Thence N 1°29'00" W, a distance of 24.98 feet;

Thence S 88°31'00" W, a distance of 258.00 feet to the TRUE POINT OF BEGINNING of this description.

# PLAT PLAN
SCALE 1"=100'0"

→ NORTH

* NOTES ADDED 5-10-82 BY H.W.P. & G-14-82 & 7-21-82 & 6-2-82

---

### SITE PLAN - EXHIBIT "A-1"
AT

## UNIVERSITY MEADOWS
## SHOPPING CENTER

FLAGSTAFF, ARIZONA

SAGUARO DIVERSIFIED PROJECTS, INC

PHILLIPS & ASSOCIATES, A.C.C.
Howard W. Phillips, AIA
8719 E Lincoln Dr        Scottsdale, AZ
948-7249

MAY 18, 1982
DRAWN BY WML
8110 H
SHEET Nº 1 OF 1

## CONSENT AND SUBORDINATION

ARDEN-MAYFAIR, INC., a Delaware Corporation, as lessee of Learner as to a portion of the real property described in the Declaration as "Parcel 1A" by virtue of that certain unrecorded Lease, a short form memorandum of which was recorded May 5, 1980, in Docket 791, Page 671 through 673, inclusive, Official Records, Coconino County, Arizona, hereby consents to this Amendment and agrees that said Lease shall be subject and subordinate to this Amendment.

ARDEN-MAYFAIR, INC.,
a Delaware Corporation

By _____

Its _____
      Vice President

(Corporation)

STATE OF CALIFORNIA } ss.
COUNTY OF _____ LOS ANGELES _____

On _____ August 16, 1984 _____ before me, the undersigned, a Notary Public in and for said State, personally appeared _____ John C. Tucker _____ personally known to me or proved to me on the basis of satisfactory evidence to be the person who executed the within instrument as the _____ Vice _____ President, and _____ _____ personally known to me or proved to me on the basis of satisfactory evidence to be the person who executed the within instrument as the _____ _____ Secretary of the Corporation that executed the within instrument and acknowledged to me that such corporation executed the within instrument pursuant to its by-laws or a resolution of its board of directors.
WITNESS my hand and official seal.

Signature _____

OFFICIAL SEAL
DOROTHY SIEBERS
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
My comm. expires JUN 11, 1985

(This area for official notarial seal)

- 4 -