# EXHIBIT 11

January 13, 2010 Lease Agreement between DDR MDT Fayetteville Spring Creek LLC, as Landlord, and Jo-Ann Stores, Inc., as Tenant (the "<u>Fayetteville Lease</u>")

# LEASE AGREEMENT

Between

## DDR MDT FAYETTEVILLE SPRING CREEK LLC
### "Landlord"

and

## Jo-Ann Stores, Inc.
### "Tenant"

Dated: ~~December~~ January 13, 2010 ~~, 2009~~

SECTION................................................................................................................ PAGE

SECTION 1 EXHIBITS TO LEASE AND DEFINITIONS ......................................... 1

SECTION 2 PREMISES ................................................................................................ 8

SECTION 3 TERM AND OPTIONS TO RENEW ................................................... 12

SECTION 4 FIXED RENT .......................................................................................... 14

SECTION 5 PERCENTAGE RENT ........................................................................... 14

SECTION 6 GROSS SALES DEFINED .................................................................... 15

SECTION 7 TAXES AND ASSESSMENTS. ............................................................ 17

SECTION 8 COMMON AREA COSTS .................................................................... 19

SECTION 9 CONSTRUCTION OF PREMISES ...................................................... 21

SECTION 10 USE AND OPERATION ...................................................................... 29

SECTION 11 COMMON AREAS, PROTECTED AREA ........................................ 30

SECTION 12 UTILITIES ............................................................................................ 31

SECTION 13 MARKET AVAILABILITY ................................................................ 31

SECTION 14 RULES AND REGULATIONS: TENANTS' BUSINESS ASSOCIATION. 33

SECTION 15 ALTERATIONS, INSTALLATIONS AND REMOVAL OF
IMPROVEMENTS BY TENANT ............................................................................... 33

SECTION 16 REPAIRS AND MAINTENANCE ..................................................... 34

SECTION 17 WAIVER OF LIABILITY BY TENANT ........................................... 37

SECTION 18 WAIVER OF SUBROGATION AND WAIVER OF CLAIMS ...................... 37

SECTION 19 INDEMNIFICATION AND PUBLIC LIABILITY INSURANCE ................ 38

SECTION 20 SIGNS .................................................................................................... 41

SECTION 21 ASSIGNMENT AND SUBLETTING ................................................ 42

SECTION 22 REPAIR AFTER CASUALTY ............................................................ 43

SECTION 23 CONDEMNATION ............................................................................... 45

SECTION 24 LANDLORD'S REMEDIES UPON DEFAULT ................................ 46

SECTION 25 RIGHTS OF LANDLORD .................................................................. 47

SECTION 26 BREACH OF COVENANT .................................................................. 48

i

**SECTION 27 MORTGAGE SUBORDINATION** ................................................................. 48

**SECTION 28 NO WAIVER OF DEFAULT** ..................................................................... 49

**SECTION 29 VACATION OF PREMISES** ...................................................................... 49

**SECTION 30 SHORT FORM LEASE** ........................................................................... 50

**SECTION 31 RENT DEMAND** ................................................................................. 50

**SECTION 32 NOTICES** ......................................................................................... 50

**SECTION 33 MERCHANTS ASSOCIATION** ................................................................. 51

**SECTION 34 APPLICABLE LAW AND CONSTRUCTION** ................................................. 51

**SECTION 35** ....................................................................................................... 52

**UNAVOIDABLE DELAY** ....................................................................................... 52

**SECTION 36 REASONABLE CONSENT** ..................................................................... 52

**SECTION 37 NO PARTNERSHIP** ............................................................................. 52

**SECTION 38 MORTGAGE FINANCING** ..................................................................... 52

**SECTION 39 QUIET ENJOYMENT** ........................................................................... 52

**SECTION 40 HOLDING OVER** ................................................................................ 53

**SECTION 41 BROKER** ......................................................................................... 53

**SECTION 42 CAPTIONS** ....................................................................................... 53

**SECTION 43 VARIATION IN PRONOUNS** ................................................................. 53

**SECTION 44 BINDING EFFECT OF AGREEMENT** ...................................................... 54

**SECTION 45 EXCULPATORY CLAUSE** ..................................................................... 54

**SECTION 46 CAP ON FIRST-LEASE YEAR COSTS** ...................................................... 54

**SECTION 47 TENANT'S RIGHT TO TERMINATE** ...................................................... 55

**SECTION 48 ADDITIONAL PROHIBITED USES** .......................................................... 56

## LEASE

THIS INDENTURE OF LEASE ("Lease") dated as of ~~December ___,~~ 2009 *January 13, 2010* ("Effective Date"), by and between DDR MDT FAYETTEVILLE SPRING CREEK LLC, a Delaware limited liability company (hereinafter called "Landlord"), and JO-ANN STORES, INC., an Ohio corporation (hereinafter called "Tenant").

### WITNESSETH:

### SECTION 1

### EXHIBITS TO LEASE AND DEFINITIONS

(a)    The following listed exhibits are attached to and made a part of this Lease:

EXHIBIT "A".        The description of the lands upon which the Spring Creek Centre in Fayetteville, Arkansas is constructed, sometimes hereinafter referred to as the "Shopping Center Parcel".

EXHIBIT "B".        The site plan showing the proposed location of the Shopping Center buildings, Protected Area, parking areas, Cart Corral Area, Pylon Sign locations, driveways and Common Areas (hereinafter defined) and containing other general information relating to the proposed development of the Shopping Center Parcel.

EXHIBIT "C".        The preliminary plans and specifications identifying the scope of Landlord's Work (hereinafter defined).  Upon mutual acceptance by Landlord and Tenant in accordance with the terms of this Lease, the Final Plans and Specifications (hereinafter defined) shall be deemed substituted in place of the preliminary plans and specifications.

EXHIBIT "D".        Tenant's prototypical plans and specifications for Tenant's Work (hereinafter defined) and Tenant's sign package as described in Section 20 of this Lease.  Upon mutual acceptance by Landlord and Tenant in accordance with the terms of this Lease, the Tenant Final Plans and Specifications (hereinafter defined) shall be deemed substituted in place of the prototypical plans and specifications.

EXHIBIT "D-1".        Depicts Tenant's prototypical signage and elevations, the Pylon Signs upon which Tenant may be permitted to install its identification panel pursuant to Exhibit D-4 and subject to the terms of this Lease, and the position of Tenant's signage on the Pylon Signs.

EXHIBIT "D-2".        General Contractor's Affidavit and Partial Lien Waiver and Subcontractor's Partial Lien Waiver.

EXHIBIT "D-3".    General    Contractor's    Affidavit    and    Lien    Waiver    and Subcontractor's Lien Waiver.

EXHIBIT "D-4".    Signage guidelines for all tenant signs.

EXHIBIT "E".    Project Coordination Guidelines.

EXHIBIT "E-1".    Division of Work construction matrix.

EXHIBIT "F".    List of Exclusive, Prohibited and Restricted Uses and Exclusive Use Covenants.

EXHIBIT "G".    Permitted Exceptions

EXHIBIT "H".    List of Additional Prohibited Uses.

If there is any conflict between the language in this Lease and the content of any of the aforementioned Exhibits, then the content of the Exhibit shall control.  Notwithstanding the foregoing, if there is any conflict between the content of any of the aforementioned Exhibits and the requirements of applicable laws, rules, regulations, ordinances and/or codes (collectively, "Laws"), then such Laws shall control.

(a-1)    The term "Additional Prohibited Use(s)" shall mean any one or more of the additional prohibited uses set forth in Exhibit H.

(b)    The term "Breakpoint" shall have the meaning set forth in Section 5(a).

(c)    The term "Cart Corral Area" shall mean the area shown on Exhibit "B".

(d)    The term "Commencement Date" shall be and mean the earlier of (i) the one hundred fiftieth (150th) day following that date that Landlord shall deliver the Demised Premises with Landlord's Work substantially completed (hereinafter defined) to Tenant in accordance with the requirements of this Lease (the "Fixturing Period"), or (ii) the date Tenant shall initially open for business in the Demised Premises.  Notwithstanding the foregoing, in no event shall the Commencement Date occur between the period commencing November 15 and ending February 28/29 ("Blackout Period") (except as otherwise expressly provided for herein to the contrary); and, if the Commencement Date would otherwise occur in the Blackout Period, then the Commencement Date shall be deemed to be the next occurring March 1 after the Blackout Period.  If Tenant opens for business in the Demised Premises during the Blackout Period, then the Commencement Date shall be deemed to have occurred on the date Tenant first so opens for business in the Demised Premises (except as otherwise expressly provided for herein to the contrary).

(e)    The term "Common Areas" means the parking areas, driveways, aisles, sidewalks and other common and service areas within the Shopping Center Parcel with the improvements therein, whether or not shown on Exhibit "B" and as the same may be changed by the Landlord from time to time.

(f)    The term "Common Area Charge" shall have the meaning set forth in Section 8(a).

(g)    The term "Delivery Date" means the date that Landlord delivers the Demised Premises to Tenant with all of the Delivery Requirements satisfied. The Delivery Date shall not occur prior to May 31, 2010.

(h)    The term "Co-Tenancy Event" shall have the meaning set forth in Section 3(d).

(i)    The term "Demised Premises" shall mean a portion of the Shopping Center as shown on Exhibit B and as more fully described in Section 2(a).

(j)    "Delivery Requirements" means the following:

(1)    Landlord's Work is substantially completed (hereinafter defined);

(2)    the Demised Premises are delivered to Tenant free and clear of any Hazardous Material (hereinafter defined), and Landlord represents and warrants as such. "Hazardous Material" means any hazardous, toxic or regulated substance, asbestos, mold, any  petroleum products, and any other chemical or substance in amounts, compounds, or concentrations, which violates any applicable law, rule, regulation, ordinance, code or public health or safety standards set by any local government authority having jurisdiction over the Shopping Center, the state in which the Demised Premises are located, or the United States of America, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (collectively, "Environmental Laws"); provided, however, a Hazardous Material shall not include such small amounts of chemicals and other similar substances which are both (i) customarily used as janitorial or office supplies or stocked as merchandise in retail operations not prohibited by this Lease and otherwise in compliance with Environmental Laws, and (ii) used only in a manner consistent with all applicable Environmental Laws;

(3)    Intentionally Deleted;

(4)    all Common Areas existing as of the date of this Lease, as shown on Exhibit "B", including, without limitation, any parking lot areas, service areas and access roads, curbing (including curb cuts), site lighting, sidewalks, loading dock area and landscaping, comply with all applicable Laws;

(5)    Tenant has received from Landlord at least sixty (60) days prior written notice of the date Landlord will deliver the Demised Premises to Tenant (the "Delivery Notice") (it being understood that Landlord shall issue a single Delivery Notice);

(6)    Intentionally Deleted;

(7)    Intentionally Deleted;

#3826

Fayetteville AR
EXECUTION COPY December 17, 2009

3

(8)    Intentionally Deleted; and

(9)    Tenant has received a fully executed copy of the SNDA (hereinafter defined), and if not required because there are no financing encumbrances, Landlord will make a representation of such fact to Tenant.

(k)    The term "Extended Term(s)" shall have the meaning set forth in Section 3(b).

(l)    The term "Estimated Delivery Date" shall be Landlord's good faith estimate of the Delivery Date and is May 31, 2010. In addition, Landlord and Tenant hereby agree that the delivery date specified in Landlord's Delivery Notice to Tenant can be postponed by Tenant up to a maximum of twenty (20) days by Tenant providing Landlord with a revised (i.e., postponed) delivery date ("Postponed Date") in writing within seven (7) days of the date the Delivery Notice is delivered to Tenant; provided, however, if Tenant elects to postpone the delivery date identified in the Delivery Notice and the same causes the Commencement Date to occur within the Blackout Period, then Tenant shall not be permitted to delay the Commencement Date as otherwise provided for to the contrary in Section 1(c). By way of example only, if Landlord delivers to Tenant a Delivery Notice on April 30, 2010 and identifies a delivery date of May 31, 2010, then Tenant shall have the right to postpone such delivery date to June 20, 2010 by providing Landlord written notice of the Postponed Date on or before May 7, 2010. For all purposes under this Lease, if Tenant establishes a Postponed Date pursuant to this provision, then the Postponed Date shall be deemed the delivery date specified in the Delivery Notice.

(m)    The term "Final Plans and Specifications" shall have the meaning set forth in Section 9 and such Final Plans and Specifications shall be attached as Exhibit C when completed, as noted above.

(n)    The term "Fixed Minimum Rent" shall have the meaning set forth in Section 4(a).

(o)    The term "Gross Sales" shall have the meaning set forth in Section 6(a).

(p)    The term "Gross Sales Kick-Out" shall have the meaning set forth in Section 47(a).

(q)    The term "Gross Sales Termination Date" shall have the meaning set forth in Section 47(a).

(r)    The term "HVAC" means and refers to heating, ventilating and air conditioning.

(s)    The term "Initial Term" shall have the meaning set forth in Section 3(a).

(t)    The term "Landlord" and "Tenant" shall be deemed to include the heirs, executors, administrators, devisees, legatees, personal representatives, successors and assigns, respectively, of the parties hereto.

(u)    The term "Landlord's Work shall have the meaning set forth in Section 9.

(v)    The term "Landlord's Delivery Notice" shall have the meaning set forth in Section 9.

(w)    The term "Lease Year" shall mean twelve (12) consecutive calendar months during the Initial Term or any Extended Term. The first Lease Year (or Lease Year One) begins on the first day of February next following the Commencement Date, unless the Commencement Date is the first day of February, in which event the first Lease Year begins on the Commencement Date, and Lease Year One shall expire on the first January 31st to occur thereafter. The first Lease Year will include the first Partial Lease Year, if any. Each subsequent Lease Year shall commence on February 1 and expire on January 31. For purposes of this Lease, "Partial Lease Year" shall be defined as the period, if any, of fewer than 12 consecutive calendar months between the Commencement Date and the next succeeding January 31 and the period, if any, of less than 12 consecutive calendar months between the last day of the last full Lease Year and the expiration of the Term.

(x)    The term "Minimum Occupancy Condition" shall have the meaning set forth in Section 3(d).

(y)    The term "Minimum Sales Period" shall have the meaning set forth in Section 47(a).

(z)    The term "Minimum Sales Requirement" shall have the meaning set forth in Section 47(a).

(aa)    The term "Protected Use" shall mean the sale of any of the following: fabrics of all kinds and such other related materials sold by the yard, upholstery materials, patterns, knitting supplies, needlepoint, macramé, artificial flowers and accessories, arts and crafts materials and supplies; custom framing, scrapbooks and scrapbooking supplies and materials, yarns and all types of notions, sewing machines, and sewing machine furniture specifically crafted for sewing purposes (collectively, "Primary Protected Use Items"), and fabric care items, products, accessories and services related to all of the foregoing and other items and services customarily offered for sale by a fabric and arts and crafts store (such other items and services collectively referred to as "Incidental Protected Use Items"). Tenant shall have the right to change an item that is otherwise an Incidental Protected Use Item to a Primary Protected Use Item provided that (1) Tenant delivers fifteen (15) business days' prior written notice of any such change to Landlord, (2) such Protected Use item is sold from at least five percent (5%) of the sales floor area of the Demised Premises, (3) the scope of the Protected Use item included as a Primary Protected Use Item is limited to the specific type or category of item actually sold by Tenant, and (4) Landlord does not within such fifteen (15) business day period reasonably and in good faith (i) object in writing to whether the Protected Use item in fact is included within the class of items that

otherwise constitute an Incidental Protected Use Item or (ii) require greater clarification regarding the Protected Use item that will become a Primary Protected Use Item. If Landlord objects in writing to Tenant's request to expand the Primary Protected Use Items and/or Landlord requires greater clarification regarding the item that is to become a Primary Protected Use Item as provided for in the preceding sentence, then Landlord and Tenant, shall use reasonable efforts to promptly resolve any such objection or need for clarification. Landlord and Tenant agree and acknowledge that any Protected Use item that is changed from an Incidental Protected Use Item to a Primary Protected Use Item shall not apply to any tenant leases or extensions, amendments or renewals thereof existing prior to the effective date for the change in the classification of the Protected Use item and shall only be effective with respect to new tenant leases executed after the effective date for the change in classification of the Protected Use item.

(bb) The term "Notice of Recapture" shall have the meaning set forth in Section 10(c).

(cc) Intentionally Deleted.

(dd) The term "Protected Area" shall mean the area shown on Exhibit B.

(ee) The term "Percentage Rent" shall have the meaning set forth in Section 5(a).

(ff) The term "Pylon Signs" shall mean the multi-tenant pylon signs upon which Tenant may be permitted to install its identification panel pursuant to Exhibit D-1 (subject to the terms of this Lease), the locations of which are shown on Exhibit "B".

(gg) The term "Rent Tax" shall have the meaning set forth in Section in 7(c).

(hh) The term "Rent Year" shall mean twelve (12) consecutive calendar months during the Initial Term or any Extended Term during which Rent is payable. The first Rent Year begins on the Commencement Date and shall expire on the last day of the twelfth (12th) full calendar month after the Commencement Date. Each succeeding Rent Year shall commence on the day immediately succeeding the last day of the preceding Rent Year and expire on the last day of the twelfth (12th) consecutive month thereafter. For purposes of any Partial Rent Year, Fixed Minimum Rent, any limitations on such Fixed Minimum Rent and the Breakpoint will be proportionately adjusted based upon the actual number of days of such Partial Rent Year in relation to the number of days in a full Rent Year. For purposes of this Lease, "Partial Rent Year" shall be defined as the period, if any, of fewer than 12 full consecutive calendar months between the last day of the last full Rent Year and the expiration of the Term.

(ii) The term "Shopping Center" means the Spring Creek Centre in Fayetteville, Arkansas, consisting of all buildings, common areas and improvements located entirely or partially upon the Shopping Center Parcel and additional land as said Shopping Center is contracted or expanded from time to time. The Shopping Center Parcel, which is owned in fee simple by Landlord, is also hereinafter referred to as "Landlord's Parcel". As of the date hereof, the initial gross leasable area of the buildings within the Shopping Center Parcel shall equal approximately 262,827 square

feet. Subject to the terms, conditions and requirements of this Lease, Landlord shall be permitted to contract, expand and/or otherwise modify the Shopping Center and the improvements located thereon from time to time throughout the Term.

(jj)    The term "Shopping Center Parcel" shall have the meaning set forth in Section 1(a).

(kk)    The term "substantially completed" means the completion of Landlord's Work in accordance with the requirements of the Final Plans and Specifications with the exception of Punchlist Items. "Punchlist Items" shall mean such minor items of fit or finish which do not materially affect either the performance of Tenant's Work (hereinafter defined) or Tenant's ability to conduct its normal business operations in the Demised Premises, as determined in Tenant's reasonable discretion.

(ll)    The term "Substitute Rent" shall have the meaning set forth in Section 3(d).

(mm) The term "Taxes" shall have the meaning set forth in Section 7(a).

(nn)    The term "Required Delivery Date" means the date specified in the Delivery Notice to Tenant delivered pursuant to Section 1(i)(5), subject to delays caused by an Unavoidable Delay (hereinafter defined).

(oo)    The term "Tenant's Work" shall have the meaning set forth in Section 9.

(pp)    The term "Term" shall have the meaning set forth in Section 3(a).

(qq)    The term "Co-Tenancy Termination Date" shall have the meaning set forth in Section 3(d).

(rr)    The term "Termination Date" shall mean September 13, 2010.

(ss)    The term "Unavoidable Delay" shall mean a material delay beyond the reasonable control of the delayed party caused by the acts, omissions or negligence of the other party to this Lease or such party's agents, employees or contractors (it being agreed and understood that, for purposes of this definition, the contractors set forth in Exhibit E that will be utilized by Landlord for portions of Landlord's Work are considered to be Landlord's contractors, regardless of the fact that such contractors were presented to Landlord by Tenant and must be utilized by Landlord pursuant to the terms of this Lease), labor strikes, lock-outs, extraordinary labor troubles, industry-wide inability to procure materials, failure of power, extraordinary restrictive governmental laws or regulations (such as gas rationing), riots, war, military or usurped governmental power, acts of terrorism, sabotage, material fire or other material casualty, or an extraordinary and material act of God (such as a tornado or earthquake), failure to obtain approvals or permits unless the delayed party fails to timely apply for such approvals or permits in accordance with the terms of this Lease and thereafter diligently pursue the same, but excluding inadequacy of insurance proceeds, litigation or other disputes, financial inability, lack of suitable financing, delays of the delayed party's contractor.

## SECTION 2

## PREMISES

(a)    For the rent and upon the agreements contained in this Lease, Landlord leases to Tenant and Tenant rents from Landlord the Demised Premises described as follows:

(i)    Situated in the City of Fayetteville, State of Arkansas consisting of approximately nineteen thousand two hundred sixty-seven (19,267) square feet of ground floor area and ninety (90) feet of frontage and identified on Exhibit "B" as the "Demised Premises".

(ii)    Subject to local codes, the right to place two (2) shopping cart corrals of standard size ("Corral(s)") within the Cart Corral Area as shown on Exhibit "B" attached hereto. Notwithstanding anything contained in this Lease to the contrary, Tenant's right to use the Corrals shall be subject to the following terms, conditions and restrictions:

(1) All applicable terms and provisions of this Lease shall apply to Tenant's use of the Corrals (it being understood that no Rent shall be payable with respect to the Corrals).

(2) The use of the Corrals shall not unreasonably and significantly interfere with the conduct and operation of the business of any other tenant or occupant of the Shopping Center and shall not otherwise affect the use and operation of any portion of the Common Areas outside of the area of the Corrals, including, without limitation, vehicle and pedestrian ingress and egress.

(3) Tenant, for itself and for its agents, employees, contractors, subcontractors and representatives, and for those claiming by or through any of them (collectively, the "Tenant Group"), hereby releases Landlord and its members, officers, directors, partners, employees, agents, mortgagees, licensees, tenants, contractors, guests and invitees (and their respective members, officers, directors, partners, employees, agents, mortgagees, licensees, contractors, guests and invitees)(collectively, the "Landlord Group") from any and all (a) liability, loss, claim, demand, lien, damage, penalty, fine, interest, cost and expense (including, without limitation, reasonable attorneys' fees and litigation costs), and (b) damage, destruction or theft of property, that may arise from, in connection with the use of the Corrals. Tenant hereby agrees to defend, hold harmless and indemnify Landlord and the Landlord Group from and against any and all claims, costs, expenses (including, but not limited to, reasonable attorneys fees and litigation costs), damages, judgments, demands, penalties, fines, interest and liabilities, and for any and all loss of life, injury

to persons or damage to property due to or resulting from or in any way arising out of, directly or indirectly, the use of the Corrals.

(4)   Notwithstanding anything contained herein to the contrary, Tenant shall be solely responsible for (i) the maintenance, repair and replacement of the Corrals, and (ii) any claims, costs, expenses, damages, judgments, demands, penalties, fines, interest and liabilities resulting from or in any way arising out of, directly or indirectly, the use of the Corrals, including, without limitation, the negligence, acts and omissions of Tenant or its agents, employees or contractors in connection therewith.

(5)   Upon the expiration or earlier termination of this Lease, Tenant shall, at its cost and expense, immediately repair and restore, to substantially the same condition as existed immediately prior to the installation of such Corrals, any portion of the Common Areas and/or Shopping Center that shall be damaged or destroyed by Tenant or any of the Tenant Group due to, on account of, or otherwise arising out of the use of the Corrals.

(6)   Tenant shall be solely responsible for the maintenance, repair and/or replacement of the Corrals and shall maintain the same in good condition and repair.   Tenant's use of the Corrals shall comply with all applicable Laws.   If Landlord or Tenant receives notice that Tenant's Corral(s) violate any applicable law, then after receipt of notice from the governing body, Tenant shall remove the violating Corral(s), or move them to an acceptable location within the Cart Corral Area, if any; provided, however, such other acceptable location shall in no event exceed the area of three (3) parking lot spaces.

(7)   Notwithstanding anything contained in this Lease to the contrary, in the event any tenant, licensee or other occupant under any Existing Leases (as defined below) or a party to that certain Second Amended and Restated Declaration of Restrictions and Grant of Easements for Spring Creek Center (the "REA") recorded as Document No. 98-66343 in Washington County, Arkansas (collectively, the "Existing Tenants") notifies Landlord that the installation and/or operation of Tenant's Corral(s) violates that tenant's or occupant's Existing Lease or the REA,  then Landlord will use commercially reasonable efforts to obtain written consent from such Existing Tenant (at no cost or consideration to Landlord) for the placement of Tenant's Corral(s) within the Cart Corral Area.   Tenant, at Tenant's sole cost and expense, shall remove the applicable Corral(s) from the Shopping Center within five (5) business days after receiving notice from Landlord of the objection of the Existing Tenant to the Corral(s) and Landlord's failure to obtained the aforementioned written consent.   For purposes of this paragraph, "Existing Leases" means all leases,

occupancy agreements, subleases, and/or licenses with respect to the Shopping Center in effect as of the Effective Date, and any renewals, amendments and/or extensions thereof.

(b)    Said Demised Premises shall be located on the parcel of land within the Shopping Center Parcel identified on Exhibit "B". Prior to the Commencement Date, Landlord or Tenant shall have the right to remeasure the Demised Premises (from the exterior face of any exterior walls and from the centerline of common walls) to determine the actual gross leasable area of the Demised Premises. In the event either party elects to remeasure the Demised Premises prior to the Commencement Date and such remeasurement discloses that the actual gross leasable area of the Demised Premises is either more or less than the gross leasable area of the Demised Premises as set forth in the preceding paragraph, Landlord and Tenant shall execute an amendment to the Lease (i) reflecting the actual gross leasable area of the Demised Premises, (ii) adjusting the Fixed Minimum Rent to reflect an amount equal to the product obtained by multiplying the actual gross leasable area of the Demised Premises and the rental rate per square foot set forth in this Lease, (iii) adjusting the Tenant Allowance to reflect an amount equal to the product obtained by multiplying the actual gross leasable area of the Demised Premises and the Negotiated Build-Out Amount rate per square foot set forth in this Lease, and (iv) adjusting the Breakpoint in proportion with the adjustment made to the Fixed Minimum Rent. In the event the remeasurement discloses that the actual gross leasable area of the Demised Premises is either more or less than the gross leasable area of the Demised Premises as set forth in the preceding paragraph, all charges accruing under this Lease paid to Landlord by Tenant prior to the remeasurement shall be adjusted in the manner hereinafter provided. If, as a result of the remeasurement, it is determined that the actual gross leasable area of the Demised Premises is more than the gross leasable area of the Demised Premises as set forth above, Tenant shall pay to Landlord the difference between the charges actually due and the charges actually paid within fifteen (15) days after receipt of a statement therefor. If, as a result of the remeasurement it is determined that the actual gross leasable area of the Demised Premises is less than the gross leasable area of the Demised Premises as set forth above, Landlord shall credit the excess of each charge accruing under this Lease against the amount of each such charge next becoming due. The actual gross leasable area of the Demised Premises as determined by the remeasurement shall be conclusive and binding on the parties, unless either party, acting reasonably and in good faith, disputes the accuracy of any such remeasurement. In the event Landlord and Tenant cannot mutually agree on the remeasurement, Landlord and Tenant will agree on an architect who will remeasure the Demised Premises and the results of such remeasurement will be binding upon Landlord and Tenant. Each party will bear the cost of its own architect; however, if any architect is jointly selected, Landlord and Tenant will share the cost of such architect equally. Notwithstanding anything to the contrary set forth hereinabove, if actual field measurements indicate a gross leasable area larger than set forth above in Section 2(a)(i), then there shall be no adjustment in gross leasable area of the Demised Premises beyond an increase to 19,460 square feet (it being understood that in such case and for all purposes under this Lease, the Demised Premises gross leasable area shall be deemed to be 19,460 square feet), unless Tenant requested in writing that the gross leasable area be increased, in which case the gross leasable area shall be increased

accordingly, and all calculations under this Lease will be based upon this deemed size (including the calculation of the Tenant Allowance).

(c)    The Landlord expressly reserves the right to install, maintain, use, repair and replace the pipes, ducts, conduits and wires leading through the Demised Premises serving other parts of the Shopping Center, provided same are in locations that will not materially interfere with Tenant's use thereof and provided said items aforestated are not exposed within the selling area and will not lessen the ceiling height in the Demised Premises, and Landlord will not construct any additional stores above the Demised Premises.  Similarly, notwithstanding anything to the contrary in this Lease, Tenant shall have the right to make installations around the Demised Premises (e.g., the roof) which are consistent with Tenant's prototype plans for other similar stores operated by Tenant or which are part of Tenant's Leadership in Energy and Environmental Design ("LEED") initiative or other Tenant initiatives (it being agreed and understood that if such installations will occur on the roof, Tenant shall be required to utilize Landlord's roofing contractor, provided such roofing contractor's pricing is competitive with pricing from roofing contractor(s) of Tenant's choice); provided, however, Landlord's prior written consent, which consent may be withheld in Landlord's sole discretion, shall be required in connection with any installation, alteration, modification or other improvement in and/or to the Demised Premises that is structural in nature or that affects the utility or mechanical systems or any other portion of any other premises in the Shopping Center. In exercising the foregoing rights, neither Landlord or Tenant shall interfere with the use or occupancy of the Demised Premises or other tenant premises or commence any such work without first notifying the other party, at least ten (10) days in advance, of the commencement of such work. In no event may Landlord construct any improvements above the Demised Premises that materially and adversely affects Tenant's ability to operate its business from the Demised Premises, including, without limitation, implementing its LEED initiative, or place signs on the exterior walls of the Demised Premises.

(d)    Landlord represents, warrants and guarantees that the Demised Premises and the Shopping Center, which are the subject matters of this Lease, are zoned as of the date hereof so as to permit the operation of a retail use thereon and that there shall be no building, zoning and/or sanitary code violations on the Demised Premises in connection with the completion of Landlord's Work.

(e)    With respect to Hazardous Material, Landlord represents, warrants and covenants to Tenant that (i) if any Hazardous Material at the Premises, not caused by Tenant, creates a health hazard to Tenant's employees or guests or is required by Law to be removed, abated, or otherwise remediated, then Landlord must perform a removal, abatement or remediation of said Hazardous Material; and (ii) if, Landlord fails to commence said removal, abatement or remediation within 30 days of notice of the presence of Hazardous Material described in the preceding subsection "(i)" and diligently pursue said removal, abatement or remediation to completion, then Tenant may, at its option, remove, abate or otherwise remediate such Hazardous Material and Landlord must reimburse Tenant within 30 days of receipt of an invoice for Tenant's cost of such removal, abatement or remediation, and if not so reimbursed, Tenant may offset such cost, together with interest at the Default Rate from the date of Tenant's expenditures, against Rent.

## SECTION 3

## <u>TERM AND OPTIONS TO RENEW</u>

(a)    The term of this Lease shall be for a period of ten (10) Lease Years (the "Initial Term") commencing on the Commencement Date and ending on the date of expiration of the tenth (10th) Lease Year. The Initial Term and any extension thereof for any Extended Terms properly exercised in accordance with Section 3(b) below, shall sometimes hereinafter be referred to as the "Term".

(b)    Provided Tenant shall not be in default of the terms and conditions of this Lease beyond any applicable cure period as set forth in this Lease, Landlord hereby grants to Tenant the right and option to extend this Lease for three (3) additional period(s) of five (5) Lease Years each (the "Extended Term(s)"). Subject to the last sentence of this Section 3(b), Tenant shall notify Landlord in writing of its election to extend this Lease for any Extended Term no later than nine (9) months prior to the expiration of the Initial Term or the then current Extended Term. Notice thereof shall be deemed sufficient if given in the manner hereinafter provided. Any such Extended Term shall be upon all the terms and conditions as the Initial Term, except that the Demised Premises shall be leased in their then "as-is" condition (but such is not intended to relieve Landlord of any maintenance and repair obligations in this Lease), Tenant shall have no further option to extend the Term beyond the third (3rd) Extended Term and the Fixed Minimum Rent shall be increased as follows: For the first Extended Term, the Fixed Minimum Rent shall be increased to $202,303.50 per annum ($10.50 p.s.f.), payable in equal monthly installments of $16,858.63. For the second Extended Term, Fixed Minimum Rent shall be increased to $221,570.50 per annum ($11.50 p.s.f.), payable in equal monthly installments of $18,464.21. For the third Extended Term, Fixed Minimum Rent shall be increased to $240,837.50 per annum ($12.50 p.s.f.), payable in equal monthly installments of $20,069.79. For purposes of calculating Percentage Rent during the Extended Terms, the Breakpoint shall be increased to equal the quotient obtained by dividing the Fixed Minimum Rent payable during the applicable Extension Term by three percent (3%). In the event that Tenant fails to give notice to Landlord of its intention to exercise any Extended Term hereunder prior to the period of time hereinbefore set forth, Tenant's option to renew shall nevertheless remain in full force and effect for a period of thirty (30) days after receipt of written notice from Landlord ("Extended Term Notice"), subsequent to the hereinbefore stated period of time within which notice of renewal is to be given to Landlord, advising Tenant that notice of renewal has not been received by Landlord.

(c)    The parties acknowledge and agree that there is no opening co-tenancy requirement in this Lease.

(d)    Landlord agrees that during the Term either of the following shall be opened, occupied, and operating: (i) both Wal-Mart (or its assignees, sublessees or Replacement Tenant(s)) and Home Depot (or its assignees, sublessees or Replacement Tenant(s)), or (ii) Wal-Mart or Home Depot (or their respective assignees, sublessees or Replacement Tenant(s), as applicable) and one (1) tenant occupying eighteen thousand (18,000) square feet or more within the Shopping Center Parcel (collectively, the "Minimum Occupancy Condition"). In the event the Minimum Occupancy Condition

immediately be entitled to pay Substitute Rent until the satisfaction of such Co-Tenancy Event, except as provided below. As used in this Lease, the term "Substitute Rent" shall mean an amount equal to fifty percent (50%) of the then applicable monthly installment of Fixed Minimum Rent, in lieu of Fixed Minimum Rent and Percentage Rent; provided, however, nothing herein shall be construed to relieve Tenant of its obligation to pay Tenant's proportionate share of Taxes, Common Area Charge or Tenant's Insurance Charge. The computation of Substitute Rent shall commence on the date of the occurrence of a Co-Tenancy Event and shall be paid in monthly installments in the same manner as payments of full Fixed Minimum Rent. In addition, Landlord further agrees that if Replacement Tenants are not open and operating such that the Minimum Occupancy Condition is satisfied by the conclusion of the eighteen (18) consecutive month period after the occurrence of such Co-Tenancy Event, then Tenant shall have the right and the option to (i) terminate this Lease by giving Landlord ninety (90) days notice of Tenant's intent to terminate this Lease, which notice shall be given within thirty (30) days after the expiration of such eighteen (18) month period, or (ii) commence paying the greater of Substitute Rent or five percent (5%) of Gross Sales (the latter being payable in the same manner and at the same time as Percentage Rent would have been payable hereunder), but in no event shall the amount set forth in this clause "(ii)" be greater than the Fixed Minimum Rent that would have been payable had there been no Co-Tenancy Event, until the satisfaction of such Co-Tenancy Event. If Tenant fails to exercise the termination option within such thirty (30) day period, Tenant shall be deemed to have elected the option set forth in clause (ii) above. Termination of this Lease shall be effective ninety (90) days after the date of Tenant's written notice to Landlord (the "Co-Tenancy Termination Date"); provided, however, Tenant shall be obligated to pay to Landlord all sums due and owing by Tenant to Landlord up to and including the Co-Tenancy Termination Date. The obligation of Tenant to pay any such sums shall survive the termination of this Lease. For purposes of this Lease, a "Replacement Tenant" shall mean a single regional or national retail tenant suitable for occupancy in a first-class shopping center, which first-class shopping center shall be based on the tenant-mix existing at the Shopping Center as of the Effective Date, and operating under one trade name after the commencement of such substitute operation. For purposes of this Lease, "national" shall mean a retailer operating at least 50 stores, and "regional" shall mean a retailer operating at least 15 stores in Arkansas and the states contiguous to Arkansas. Furthermore, (i) with respect to Wal-Mart, the Replacement Tenant(s) must occupy at least, in the aggregate, 100,000 square feet of the former Wal-Mart, one of which shall occupy at least 40,000 square feet, and (ii) with respect to Home Depot, the Replacement Tenant(s) must occupy at least, in the aggregate, 70,000 square feet of the former Home Depot, one of which shall occupy at least 25,000 square feet.

### SECTION 4

### FIXED RENT

(a)    Subject to the terms of Section 3(d) above, commencing on the Commencement Date, Tenant agrees without notice or demand and without any deduction or setoff (except as otherwise provided in this Lease) to pay to Landlord at Landlord's office, or such other place as Landlord may from time to time designate, as a fixed minimum rent for the Demised Premises during the Term (the "Fixed Minimum

occupy at least, in the aggregate, 70,000 square feet of the former Home Depot, one of which shall occupy at least 25,000 square feet.

## SECTION 4

## FIXED RENT

(a)    Subject to the terms of Section 3(d) above, commencing on the Commencement Date, Tenant agrees without notice or demand and without any deduction or setoff (except as otherwise provided in this Lease) to pay to Landlord at Landlord's office, or such other place as Landlord may from time to time designate, as a fixed minimum rent for the Demised Premises during the Term (the "Fixed Minimum Rent"), the sum of $163,769.50 per annum ($8.50 p.s.f.), in equal monthly installments of $13,647.46, in advance, during Rent Years one (1) through five (5) (inclusive), and the sum of $183,036.50 per annum ($9.50 p.s.f.), in equal monthly installments of $15,253.04 in advance, during Rent Years six (6) through ten (10) (inclusive).  Said amount shall be in addition to all other charges as specifically set forth in the body of this Lease, including but not limited to Percentage Rent, Tenant's proportionate share of Taxes, Tenant's Common Area Charge and Tenant's Insurance Charge, all of which shall be deemed "additional rent" hereunder and shall be collectible as such ("additional rent", together with the Fixed Minimum Rent, collectively referred to herein as the "Rent").

(b)    Fixed Minimum Rent for any partial month which is due at the commencement of the Term (in the event the Commencement Date is not the first day of a calendar month) shall be pro-rated for the fractional portion of such month based on the number of days in such month and computed on the basis of the Tenant's Fixed Minimum Rent hereinbefore set forth and Tenant shall pay the Fixed Minimum Rent for each such day, to Landlord, on the Commencement Date.

## SECTION 5

## PERCENTAGE RENT

(a)    Throughout the Initial Term, once "Gross Sales" (as defined below in Section 6) reach the Breakpoint for such Rent Year, Tenant shall pay percentage rent on the basis of three percent (3%) of all Gross Sales in excess of the Breakpoint ("Percentage Rent").  "Breakpoint" shall be (i) $5,458,983.00 for each of Rent Years one (1) through five (5) (inclusive) (subject to adjustment pursuant to 5(c) below), and (ii) $6,101,217.00 for each of Rent Years six (6) through ten (10) (inclusive) (subject to adjustment pursuant to 5(c) below)

(b)    During each Extended Term, the Breakpoint shall be adjusted as set forth in Section 3(b) and Percentage Rent shall be payable hereunder accordingly.

(c)    In the event the (i) Fixed Minimum Rent is reduced or abated as a result of a casualty pursuant to Section 22 of this Lease or a condemnation pursuant to Section 23 of this Lease, or (ii) if Tenant is not open for business to the public in the Demised Premises for any reason, the Breakpoint shall be reduced proportionately during the

#3826

14

period of time the Fixed Minimum Rent is reduced or abated or the period of time Tenant is not open for business to the public in the Demised Premises, as applicable.

## SECTION 6

## GROSS SALES DEFINED

(a)    The term "Gross Sales" as used herein shall be construed to include the entire amount of the actual sales price, whether for cash or otherwise, of all sales of merchandise, services and other receipts whatsoever of all business conducted in, on or from the Demised Premises, including all deposits not refunded to purchasers, orders taken, although said orders may be filled elsewhere, and sales and receipts by any sublessee, concessionaire or licensee or otherwise in said Demised Premises (except as otherwise provided below).   Each sale upon installment or credit shall be treated as a sale for the full price in the month during which such sale shall be made, irrespective of the time when Tenant shall receive payment (whether full or partial) from its customers.   Layaway sales, so-called, shall be included in the Gross Sales of the respective Rent Year to the extent of the down payment and any further payments made thereupon during the respective Rent Year.   Notwithstanding the foregoing, the Tenant's Gross Sales shall not include:

(1) uncollected or uncollectible credit accounts up to a maximum of two percent (2%) of Gross Sales per year, (2) sums collected or paid out for any sales or excise tax imposed by any duly constructed governmental authority, (3) exchange of merchandise between the stores of Tenant or subsidiary corporations of Tenant, if any, where such exchange of goods or merchandise are made solely for the convenient operation of the business of Tenant and not for the purpose of consummating a sale which theretofore has been made at, in, from or upon the Demised Premises and/or for the purpose of depriving Landlord of the benefit of a sale which would be made at, in, from or upon the Demised Premises, (4) sales to employees (not to exceed one percent (1%) of Gross Sales made at a discount), (5) financing charges to customers whether or not separately stated or billed, (6) gift certificates until redeemed at Demised Premises, (7) the unpaid balance of deferred payment plans if written off as uncollectible (up to a maximum of two percent (2%) of Gross Sales), (8) revenue from vending machines used solely for the benefit of employees, (9) the amount of any cash refund made upon any sale where the merchandise sold, or some part thereof, is thereafter returned by the purchaser and accepted by the Tenant, (10) sales of fixtures, (11) any and all sums and credits received in settlement of claims for loss or damage to merchandise, (12) non-retail bulk sales of merchandise at the termination of the business on the Demised Premises, (13) merchandise donated to charitable organizations, (14) the amount of returns to shippers or manufacturers, (15) sales attributable to

operations of any permitted third party subtenants (other than subtenants who are the affiliates or subsidiaries of Tenant); provided, however, that the Breakpoint shall be reduced by the same percentage as the percentage of gross leasable area of the Demised Premises occupied by any such subtenant(s) or third party occupant(s), and (16) sales of patterns.

(b)    Tenant agrees to deliver to Landlord within thirty (30) days after the end of each month during the Term, a complete statement signed by a representative of Tenant showing Gross Sales for the preceding month.

(c)    Landlord shall have the right at any time within three (3) years after the close of each Rent Year (defined as the date upon which Tenant's annual statement of Gross Sales is received by Landlord), but not more often than once with respect to any Rent Year, to audit all of the books of account, documents, records, returns, papers and files of Tenant relating to Gross Sales of any Rent Year made at, in, on and/or from the Demised Premises, and Tenant on request of Landlord shall make all such records available for such examination at the office specified in this Lease to which notices to Tenant are to be addressed.  All actions or claims for additional Percentage Rent shall be barred after said three (3) year period.  If Landlord shall have such an audit made for any Rent Year and the Gross Sales shown by Tenant's statement for such Rent Year should be found to be understated by more than three percent (3%), unless Tenant shall in good faith contest the results of Landlord's audit, then Tenant, in addition to immediately paying to Landlord the full amount of the understated Percentage Rent, as determined by such audit, shall pay, as additional rent, to Landlord the reasonable cost of such audit, not to exceed Two Thousand Five Hundred and 00/100 Dollars ($2,500.00).  Such examinations and audits may be made by any accountant designated in writing by Landlord from time to time.  Tenant makes no representation or warranty as to the sales which it expects to make in the Demised Premises and the Landlord agrees to treat all such records and reports as strictly confidential.

(d)    Tenant agrees to cause a statement of the Gross Sales of Tenant made at, in, on and/or from the Demised Premises for each Rent Year to be certified by an officer of Tenant within seventy-five (75) days after the end of such Rent Year, and a copy of such statement shall be delivered by Tenant to Landlord within such seventy-five (75) day period and, concurrently with delivery of said statement, Tenant agrees to pay Landlord as additional rent, the amount of Percentage Rent, if any, due to Landlord for such Rent Year.

(e)    All statements deliverable by Tenant to Landlord under this Lease shall be delivered to the place where rent is then payable, or at such other place or places as Landlord may from time to time direct by written notice to Tenant.  Landlord, prior to the commencement of the Term, shall designate the first such place.

(f)    Computation of the Percentage Rent specified herein shall be made separately with regard to each Rent Year, it being understood and agreed that the Gross Sales of any Rent Year and the Percentage Rent due thereon, shall have no bearing on, or connection with, the Gross Sales of any other Rent Year, except as provided in Section 4.  It is further understood and agreed that Landlord shall in no event be

construed or held to be a partner or associate of Tenant in the conduct of Tenant's business, nor shall Landlord be liable for any debts incurred by Tenant in the conduct of Tenant's business, but it is understood and agreed that the relationship is and at all times shall remain that of Landlord and Tenant.  Landlord and Tenant acknowledge and agree that neither shall be subject to any implied obligations (including, without limitation, any obligation for Tenant to continuously operate in the Demised Premises beyond the period set forth in Section 10) by reason of the fact that this Lease provides for the payment of Percentage Rent.

## SECTION 7

### TAXES AND ASSESSMENTS.

(a)    Tenant agrees to pay Tenant's proportionate share of all real estate taxes and assessments, together with any and all reasonable expenses incurred by Landlord in negotiating, appealing or contesting such taxes and assessments, both general and special, levied and assessed during the Term against the land, buildings, and all other improvements which may be added thereto, or constructed within Landlord's Parcel which includes only tax parcel identification numbers 765-18025-100, 765-18025-000, 765-18026-001, 765-18024-205, 765-18024-200 and 765-18024-100 ("Taxes").  The term Taxes shall be further defined as the amount set forth on any invoice or statement issued by the taxing authority for Landlord's Parcel which is due and payable by Landlord in the calendar month prior to the accrual of any penalties and/or interest. Tenant's proportionate share shall be the total amount of the Taxes multiplied by a fraction, the numerator of which shall be the number of square feet of gross leasable area within the Demised Premises, and the denominator of which shall be the gross leasable area of the existing buildings within Landlord's Parcel at the time the Taxes were levied or assessed, but excluding the gross leasable area of any buildings within the Landlord's Parcel which are separately assessed for tax purposes and billed to an entity other than Landlord or paid in full (without any subsidy by Tenant through Tenant's proportionate share of Taxes) directly by an entity other than Landlord, even though billed to Landlord.

(b)    Tenant shall pay to Landlord as additional rent Tenant's proportionate share of Taxes within thirty (30) days of receiving a copy of the receipted tax bill for Landlord's Parcel from Landlord.  If Tenant's proportionate share of Taxes with respect to any tax year is less than the total amount paid by Tenant for such period, the excess shall be credited against the payments with respect to Taxes next becoming due.  If Tenant's proportionate share of Taxes for any tax year exceeds the total amount paid by Tenant for such period, Tenant shall pay the difference to Landlord upon demand. Landlord represents that the calendar year 2008 assessed tax rate on the Shopping Center that will be paid in 2009 is equal to or less than $0.88 per square foot of gross leasable area of the Shopping Center.  Notwithstanding the foregoing, in no event during the Initial Term shall Tenant's proportionate share of Taxes for any Lease Year exceed fifty percent (50%) of the then current Fixed Minimum Rent for said Lease Year.

(c)    If any governmental taxing authority shall levy, assess, or impose any tax, excise or assessment (other than income or franchise tax) upon or against the rents

payable by Tenant to Landlord ("Rent Tax"), either by way of substitution for or in addition to any existing tax on land, buildings or otherwise, Tenant shall directly pay, or reimburse Landlord for, the Rent Tax, as the case may be.

(d)    The following are excluded from Taxes:

(1)    Any portion of Taxes in the nature of fees, charges or assessments for governmental services or governmental improvements related to the initial construction of improvements on the Landlord's Parcel;

(2)    Any tax or fee that applies generally to all business owners or operators, as opposed to owners of real property; and income, corporate, franchise, inheritance, estate, or gift taxes;

(3)    Any impact fee, user fee, exaction fee, environmental fee or other tax paid as a prerequisite to construction of Landlord's Parcel or any addition or improvement thereto;

(4)    Any assessment, bond, tax, or other finance vehicle that is (A) imposed as a result of Landlord's initial construction of Landlord's Parcel, or (B) used to fund construction of additions or improvements to Landlord's Parcel;

(5)    Any penalty, interest or other charge attributable to Landlord's late or delinquent payment of Taxes, except as caused by Tenant's delinquent payment of Tenant's proportionate share of Taxes; and

(6)    The portion of any Tax or increase thereof which may be levied as a result of a revaluation of the Landlord's Parcel due to the voluntary or involuntary assignment or transfer of all or any portion of Landlord's interest in Landlord's Parcel that otherwise would not be assessed against the Landlord's Parcel, but for such voluntary or involuntary assignment or transfer (by way of example only, if the Tax assessor's regular-course-of-business increase in assessed value of Landlord's Parcel is 3% and a transfer of Landlord's Parcel led to a 10% increase in assessed value of Landlord's Parcel during the same period, Tenant would be only responsible for the Tax related to the 3% increase in assessed value of Landlord's Parcel, in addition to the Tax that Tenant was previously responsible for).

(e)    Intentionally Deleted.

(f)    If any special assessments in excess of $250,000.00 (that constitute a portion of Taxes) may be paid in installments, Landlord will cause such Taxes to be paid over the longest installment period allowed, and, subject to the exclusions above, only the installments coming due during the Term will be included within Taxes.

## SECTION 8

## COMMON AREA COSTS

(a)    Tenant shall pay to Landlord as a "Common Area Charge" a proportionate share of all costs and expenses of every kind and nature paid or incurred by Landlord in operating, maintaining, repairing and managing the Common Areas, including but not be limited to, cleaning, lighting, repairing, painting, and maintaining, all Common Area improvements within the Shopping Center; snow removal, landscaping and security; total compensation and benefits (including premiums for workmen's compensation) paid to or on behalf of employees implementing all services indicated in Tenant's Common Area Charge; personal property taxes; supplies; fire protection; utility charges; licenses and permit fees; reasonable depreciation of equipment used in operating and maintaining the Common Areas and rent paid for leasing such equipment; and, an administrative and management fee not to exceed five percent (5%) of the total cost of the foregoing items.    Tenant's Common Area Charge shall be determined by multiplying the total cost incurred by Landlord by a fraction, the numerator of which shall be the number of square feet of gross leasable area within the Demised Premises, and the denominator of which shall be the gross leasable area within all of the buildings in the Shopping Center during such Lease Year, excluding the square footage of any tenant or occupant in the Shopping Center which provides at its own expense maintenance for the portion of the Common Areas within such tenant's demised premises or occupant's property.

(b)    Tenant's Common Area Charge shall be paid, as additional rent, in monthly installments on the first day of each month in an amount to be estimated by Landlord.  Subsequent to the expiration of each Lease Year, Landlord shall furnish to Tenant a statement of the actual amount of Tenant's proportionate share of such Common Area Charge for such Lease Year ("Annual Reconciliation") and within thirty (30) days of issuance of the Annual Reconciliation, Tenant shall pay to Landlord or Landlord shall remit to Tenant, as the case may be, the difference between the estimated amounts paid by Tenant during said Lease Year and the actual amount of Tenant's Common Area Charge for such Lease Year as shown on the Annual Reconciliation. Landlord shall not increase Tenant's monthly installments for a subsequent Lease Year until the Annual Reconciliation for the prior Lease Year is issued and only if such prior Lease Year Annual Reconciliation provides that Tenant's monthly installments paid during said prior Lease Year were less than the actual amount of Tenant's Common Area Charge for said prior Lease Year or Landlord provides evidence to Tenant that an increase in monthly installments is reasonable justified. Notwithstanding the foregoing, Tenant's annual Common Area Charge shall not increase by more than five percent (5%) each Lease Year (on a non-cumulative basis and it being understood that Lease Year One, for purposes of this maximum amount of increase only, shall not include any Partial Lease Year) during the Term; provided, however, the foregoing limitation shall not apply to Landlord's cost of Common Area snow and ice removal, utilities, and security.

(c)    Tenant shall have the right at any time within three (3) years after the close of each Lease Year (defined as the later of (i) the date upon which Landlord's

annual reconciliation statement of Common Area Charge is received by Tenant; or (ii) if Landlord's annual reconciliation statement of Common Area Charge is received by Tenant during the No-Audit Period (hereinafter defined), the next occurring March 31), upon no less than thirty (30) days prior written notice, but not more often than once with respect to any Lease Year, to audit all of the books of account, documents, records, receipts, bills, papers and files of Landlord relating to Common Area Charge of any Lease Year, and Landlord on request of Tenant shall make all such records available for such examination at the office specified in this Lease to which notices to Landlord are to be addressed.  All actions or claims by Tenant for excess payments or recovery of Common Area Charge shall be barred after said three (3) year period.  If Tenant shall have such an audit made for any Lease Year and the Common Area Charge for such Lease Year should be found to be overstated by more than three percent (3%), unless Landlord shall in good faith contest the results of Tenant's audit then Landlord, in addition to promptly paying the Tenant the full amount of the overstated Common Area Charge, as determined by such audit, shall pay to Tenant the reasonable cost of such audit, not to exceed Two Thousand Five Hundred and 00/100 Dollars ($2,500.00).  Such examinations and audits may be made by any accountant, agent, or internal staff auditor of Tenant designated in writing by Tenant from time to time.  Any such audit shall not occur during the months of January, February or March ("No-Audit Period").  Tenant agrees to treat all such records and reports as strictly confidential.

(d)    Notwithstanding anything to the contrary, the following are excluded from Common Area Charge:

(1)    the original cost, or depreciation of the original cost, of constructing, erecting and installing Landlord's Parcel, the Common Areas, common facilities and related services;

(2)    principal and interest payments pursuant to any mortgage that encumbers the Demised Premises or Landlord's Parcel;

(3)    Taxes;

(4)    administrative charges, management fees, fees based upon a percentage calculation, leasing commissions, or any other fee or charge regardless of the name (including, without limitation, salaries of all kinds, social security, taxes, insurance, part-time or full-time labor, any fees paid to manage Landlord's Parcel including those paid to a third party management company, and similar costs and expenses) that is related to the management and operation of Landlord's Parcel (except for the 5% charge for administrative and management costs set forth in Section 8(a) above);

(5)    expenses incurred due to the negligence or willful misconduct of Landlord;

(6)    costs and expenses incurred for repairs due to faulty construction faulty workmanship or structural defects;

(7)    any cost, fees, fines or penalties, or interest thereon, related to violations by Landlord of any law, ordinance, code, rule or regulation;

(8)    capital expenditures, defined as an item costing $5,000 or more all having a useful life of more than one year, excluding any capital cost or expenditure incurred not more frequently than once every seven (7) years as a result of Landlord's repavement of the parking areas (the "Permitted Capital Expenditure"). Tenant's Common Area Charge for each Lease Year shall include only the annual amount of depreciation for the Permitted Capital Expenditure permitted under GAAP or IRC guidelines (calculated on a straight-line basis) applicable to such Lease Year. The amortization of such depreciation shall be based upon the normal useful life of such item as specified under GAAP or the IRC guidelines, but in no event shall be less than seven (7) years;

(9)    reserves for replacement;

(10)    cost of advertising, marketing, decorating, redecorating;

(11)    expenses incurred by, or on behalf of, Landlord to correct any default of Landlord; and

(12)    the cost for work performed by, or on behalf of, Landlord where such work is expressly provided in this Lease or any other lease to, be borne at Landlord's expense.

(e)    Landlord warrants and covenants that there will be no duplication of expense or recovery from Tenant between this Section and any other provision of this Lease.

## SECTION 9

## CONSTRUCTION OF PREMISES

(a)    Within sixty (60) days after execution of this Lease by Landlord and Tenant ("Landlord Plans Delivery Date"), Landlord must prepare and submit to Tenant, for Tenant's approval (which approval shall not be unreasonably withheld or conditioned by Tenant), proposed Plans and Specifications (the "Landlord's Proposed Plans"), which Landlord's Proposed Plans will be based upon Exhibit C attached hereto. If Landlord's Proposed Plans are not delivered to Tenant by the Landlord Plans Delivery Date, subject to delays caused by Unavoidable Delays, then for each day past the Landlord Plans Delivery Date that the plans are not delivered, the Fixturing Period shall be extended on a day-for-day basis until Landlord's Proposed Plans are delivered to Tenant. Within ten (10) days after Landlord's delivery to Tenant of the Landlord's Proposed Plans, Tenant shall provide written approval (which approval shall not be unreasonably withheld or conditioned by Tenant) of Landlord's Proposed Plans or provide comments to Landlord in adequate detail to permit Landlord's architect to prepare revisions to such Landlord's Proposed Plans. If Tenant fails to approve or disapprove, in writing, the Landlord's Proposed Plans within ten (10) days after delivery thereof from Landlord, then such approval shall be deemed to have been granted. If Tenant furnishes Landlord a detailed written response, Landlord agrees to resubmit revised Landlord's Proposed Plans within ten (10) days after having received Tenant's response and Tenant will then have a five (5) business day period within which to review the same. If Tenant fails to respond within said five (5) business days,

#3826

21

then such revision will be deemed approved. Such review process will continue until the Landlord's Proposed Plans are acceptable to both Landlord and Tenant. If the parties, despite their good faith and diligent efforts, do not reach agreement on the Landlord's Proposed Plans by the Outside Landlord Plan Approval Date (defined below), then Tenant or Landlord may terminate this Lease upon written notice to the other party within fifteen (15) days after such Outside Landlord Plan Approval Date. If Tenant or Landlord fails to exercise its right to terminate this Lease during said fifteen (15) day period, the right to terminate established under the preceding sentence shall be null and void. Landlord, at its sole cost and expense, must perform its work shown on the Final Plans and Specifications in accordance with the Project Coordination Guidelines, Exhibit "E-1" and in accordance with all applicable Laws (collectively, "Landlord's Work"). Landlord, at its sole cost and expense, shall be required to obtain a temporary certificate of occupancy or a comparable document, if so required by local law and/or ordinance, and all permits pertaining to the completion of Landlord's Work. Within five (5) business days of Landlord's receipt of the Final Plans and Specifications, Landlord shall apply for all required governmental permits and approvals necessary to commence Landlord's Work, and Landlord shall diligently pursue obtaining such permits and approvals. Notwithstanding anything contained in this Lease to the contrary, if Landlord fails to submit, deliver, re-submit and/or re-deliver Landlord's Proposed Plans (or any revisions thereto) and/or the Landlord Final Plans (or any revisions thereto) to Tenant or to the applicable governmental authority, as the case may be, for review and approval as set forth in this Section 9, and/or if Landlord fails to diligently pursue any and all permits and approvals required to commence Landlord's Work in accordance with the terms of this Lease, subject to delays caused by Unavoidable Delays, then, in addition to any other right or remedy available to Tenant in accordance with the terms of this Lease, the Outside Landlord Plan Approval Date, at Tenant's sole option, shall be extended on a day for day basis based on the number of days of delay caused by any such Landlord failure to comply with the requirements of this Section 9. Landlord shall notify Tenant in the Delivery Notice (which requires at least sixty (60) days advance notice) of the date that the Demised Premises will be offered for delivery to Tenant and Landlord's Work shall be substantially completed (i.e., as previously defined, said date is the Required Delivery Date). In no event shall Tenant be required to accept delivery of the Demised Premises unless and until all the Delivery Requirements have been satisfied or otherwise waived in writing by Tenant. At any time between the issuance of the Delivery Notice and the actual Delivery Date, Tenant and its agents, employees and contactors shall have access to the Demised Premises for inspection, taking measurements, making plans, and performing Tenant's Work (without being deemed thereby to have taken possession or accepted delivery of the Demised Premises; provided, however, that (i) Tenant and its agents, employees and/or contractors shall not, during the course of such work, materially interfere with the performance of Landlord's Work, as reasonably determined by Landlord, (ii) Tenant shall indemnify, defend and hold Landlord harmless from and against any and all claims or losses arising from Tenant's and/or its agents', employees' or contactors' entry upon the Demised Premises, except to the extent caused by the negligence or intentional misconduct of Landlord, or Landlord's agents, employees or contractors, and (iii) Tenant shall otherwise comply with the applicable terms, conditions and requirements of this Lease, including, without limitation, the applicable insurance requirements provided for in Section 19. Provided Landlord and Tenant have mutually approved the Final Plans and Specifications on or before February 1, 2010 (the "Outside Landlord Plan Approval Date") or such Final Plans and Specifications are otherwise deemed approved in accordance with the terms of this Lease, Landlord agrees to make commercially reasonable efforts to deliver the Demised Premises to Tenant in accordance with the Final Plans and Specifications on the Estimated

#3826

22

Fayetteville AR
EXECUTION COPY December 17, 2009

Delivery Date, subject to Unavoidable Delays and the Delivery Notice requirement otherwise set forth herein (provided, however Tenant shall not be required to accept possession of the Demised Premises before the Estimated Delivery Date). As used herein, the term "Final Plans and Specifications" shall mean those plans and specifications prepared by Landlord's architect in accordance with Exhibit "C" attached hereto and approved in writing by Tenant or otherwise deemed approved by Tenant in accordance with the terms of this Lease.

(b) The Delivery Requirements must be satisfied on or before the Required Delivery Date. Landlord shall deliver at least seven (7) days' prior written notice ("Walk-through Notice"), to the attention of Tenant's Vice President of Real Estate and Store Development, Director of Store Development and Director of Construction and Facilities (at Tenant's notice address otherwise provided for in this Lease), that the Demised Premises are or will be available for a joint inspection by Landlord, or Landlord's designated representative, and Tenant to confirm that Landlord has substantially completed Landlord's Work in accordance with the terms, conditions and requirements of this Lease, which walk-through inspection shall occur on the date identified in Landlord's Walk-through Notice.

(1) If Tenant is not present at the Demised Premises on the date of the walk-through inspection as identified in the Walk-Through Notice, subject to delays caused by Unavoidable Delay, then Landlord's Work shall be deemed to be substantially completed.

(2) If, after completion of the walk-through inspection of the Demised Premises, Tenant alleges that Landlord's Work has not been substantially completed in accordance with the requirements of this Lease, then Tenant shall deliver oral notice thereof to Landlord, or Landlord's representative, at the expiration of such walk-through inspection and within three (3) business days thereafter Tenant shall deliver to Landlord written notice ("Deficiency Notice") identifying in adequate detail the portion(s) of Landlord's Work that Tenant alleges is/are deficient. Provided that Landlord does not dispute the validity of Tenant's alleged deficiencies within three (3) business days after receipt of Tenant's Deficiency Notice, then Landlord shall diligently and good faith pursue the completion of such deficiencies until the same are substantially completed, at which time Landlord shall deliver to Tenant an additional Walk-through Notice in accordance with the terms and conditions of this Section in order for Tenant to confirm the substantial completion of Landlord's Work and Landlord and Tenant will continue this process until Tenant has confirmed that Landlord's Work is substantially completed or Landlord's Work is otherwise deemed to be substantially completed, as the case may be.

(3) If Landlord disputes the validity of Tenant's alleged deficiencies with respect to the substantial completion of Landlord's Work, then Landlord shall deliver written notice of the same ("Dispute Notice") to Tenant within three (3) business days after receipt of Tenant's Deficiency Notice, and thereafter, Landlord and Tenant shall diligently and in good faith endeavor to resolve such dispute. If the parties are unable to resolve such dispute within five (5) business days after the delivery of Landlord's Dispute Notice, then Landlord's architect and Tenant's architect shall mutually select an independent, third-party architect licensed in the State of Arkansas to resolve said dispute and the decision of such architect shall be binding upon Landlord and Tenant.

#3826

23

The unsuccessful party shall be solely responsible for the payment of the fees of such independent, third-party architect.

(4)    If, after completion of the walk-through inspection of the Demised Premises, Tenant identifies certain Punchlist Items, then within three (3) business days after such walk-through inspection Tenant shall deliver written notice ("Punchlist Notice") thereof to Landlord and Landlord shall thereafter diligently and good faith pursue the completion of such Punchlist Items, which Punchlist Items shall be completed by Landlord within twenty-one (21) days after delivery of Tenant's Punchlist Notice, subject to delays caused by Unavoidable Delays.  If Landlord fails to complete the Punchlist Items within such twenty-one (21) day period, subject to delays caused by Unavoidable Delays, then Tenant, after delivery of five (5) days' prior written notice that the Punchlist Items remain incomplete, may complete such Punchlist Items on behalf of Landlord and Landlord shall reimburse Tenant for the cost thereof, plus a fifteen percent (15%) administrative charge and interest at the Default Rate (hereinafter defined) until Tenant is fully reimbursed. If Landlord fails to reimburse Tenant as set forth in this subsection "(4)", then Tenant may offset such un-reimbursed amount, plus such fifteen percent (15%) administrative charge, together with such interest at the Default Rate from the date of Tenant's expenditures, against Rent.

(5) If, after completion of the walk-though inspection of the Demised Premises, Tenant has determined that Landlord's Work has been completed in accordance with the terms of this Lease, then Tenant shall deliver written notice thereof ("Acceptance Notice") within three (3) business days after such walk-through inspection. If Tenant has not otherwise delivered a Deficiency Notice or Punchlist Notice in accordance with the terms above and Tenant fails to deliver the Acceptance Notice within the three (3) business day period provided for in the preceding sentence, then Landlord's Work shall be deemed to be completed in accordance with the terms of this Lease.

(c)    Within fifteen (15) days from the Effective Date, Tenant shall prepare and deliver to Landlord for Landlord's approval the preliminary plans and specifications ("Preliminary Plans") identifying the scope of Tenant's Work (as hereinafter defined).  As long as the Preliminary Plans are consistent with the prototypical plans attached hereto as Exhibit "D" revised to take into account the existing design of the building of which the Demised Premises is a part (the "Building"), and does not provide for the Tenant's Work to include any exterior alterations to the Building (but may provide that Landlord's Work will include exterior alterations to the Building to accommodate Tenant's prototypical signage and anchor element), Landlord shall not unreasonably withhold its approval of the Preliminary Plans.  Within thirty (30) days from approval of the Preliminary Plans ("Tenant Plans Delivery Date"), Tenant shall prepare and deliver to Landlord for Landlord's approval, which approval shall not be unreasonably withheld, conditioned or delayed, detailed plans and specifications ("Tenant's Proposed Plans") of the improvements to the Demised Premises to be constructed by Tenant in compliance with the approved Preliminary Plans and Exhibit "E" attached hereto and made a part hereof and applicable Laws ("Tenant's Work"). Landlord shall provide written approval (which approval shall not be unreasonably withheld or conditioned by Landlord) of Tenant's Proposed Plans or provide comments to Tenant and Tenant's architect (at such architect's notice address as provided for in Exhibit E attached hereto) in adequate detail to permit Tenant's architect to prepare revisions to such Tenant's Proposed Plans within ten (10) days from delivery

#3826

24

Fayetteville AR
EXECUTION COPY December 17, 2009

of Landlord's comments.  Landlord's failure to approve Tenant's Proposed Plans or provide detailed comments for revision of Tenant's Proposed Plans within such ten (10) day period shall be deemed Landlord's approval of Tenant's Proposed Plans.  If Landlord furnishes Tenant a detailed written response, Tenant agrees to resubmit revised Tenant's Proposed Plans within ten (10) days after delivery of Landlord's response and Landlord shall then have a five (5) business day period within which to review the same.  If Landlord fails to respond within said five (5) business days, then such revision will be deemed approved.  Such review process will continue until the Tenant's Proposed Plans are acceptable to both Landlord and Tenant.  As used herein, the term "Tenant Final Plans and Specifications" shall mean those plans and specifications prepared by Tenant's architect in accordance with Exhibit "D" attached hereto and the approved Preliminary Plans and approved in writing by Landlord or otherwise deemed approved by Landlord in accordance with the terms of this Lease.  Within five (5) days from receipt of Landlord's approval of the Tenant Final Plans and Specifications, Tenant shall apply for any and all permits and other governmental approvals necessary to commence Tenant's Work and Tenant will diligently pursue such application until approved.  Tenant shall not modify the Tenant Final Plans and Specifications approved by Landlord without Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed.  Upon Landlord's delivery of the Demised Premises, and provided Landlord has approved the Tenant Final Plans and Specifications and Tenant has obtained all permits and approvals required to commence Tenant's Work, Tenant shall commence construction of Tenant's Work in accordance with the Tenant Final Plans and Specifications and all applicable Laws.  Tenant shall not commence any work in the Demised Premises until Tenant provides proof of, as required by this Lease, or delivers to Landlord a policy of public liability and property damage insurance in accordance with the requirements of this Lease.  Tenant agrees that Tenant's Work within the Demised Premises and all other work undertaken by Tenant in the Demised Premises shall be performed in a first-class and workmanlike manner and all equipment, fixtures and installations to be installed by Tenant in connection with Tenant's Work shall be new and/or like-new and in usable condition.  In the event Landlord and Tenant have not mutually approved the Tenant Final Plans and Specifications, despite their good faith and diligent efforts, on or before sixty (60) days after the Tenant Plans Delivery Date ("Outside Tenant Plan Approval Date"), Tenant may terminate this Lease upon written notice to the Landlord, which written notice must be delivered within fifteen (15) days after such Outside Tenant Plan Approval Date.  If Tenant fails to exercise its right to terminate this Lease during said fifteen (15) day period, then Tenant's right to terminate this Lease as established under the preceding sentence shall be null and void and of no further force and effect.  Thereafter, Landlord and Tenant shall diligently proceed with the approval process and the Fixturing Period shall be extended one (1) day for each day after the Outside Tenant Plan Approval Date that Tenant's Final Plans and Specifications are not mutually approved.  If despite Landlord and Tenant's reasonable and diligent efforts the Tenant Final Plans and Specifications are not approved by Landlord and Tenant within sixty (60) days after the Outside Tenant Plan Approval Date, then either Landlord or Tenant shall have the right to terminate this Lease by delivering written notice thereof to the other party, in which case this Lease shall be null and void and of no further force and effect, except for any obligations of the parties that expressly survive the expiration or earlier termination of this Lease or that have accrued prior to such termination date. Notwithstanding anything contained herein to the contrary, if Tenant fails to submit, deliver, re-submit and/or re-deliver Tenant's Proposed Plans (or any revisions thereto) and/or the Tenant Final Plans (or any revisions thereto) as set forth in this Section 9, then, in addition to any other right or remedy available to Landlord in accordance with the terms of this Lease, the Outside Tenant Plan Approval Date shall be extended on a day for day basis based on

#3826

25

the number of days of delay caused by any such Tenant failure to comply with the requirements of this Section 9.

(d)    Tenant, at its sole cost and expense, shall be obligated to obtain all permits, licenses, consents and approvals pertaining to the operation of its business and the completion of Tenant's Work, including, without limitation, the permanent certificate of occupancy or comparable document for occupancy of the Demised Premises.  At any time prior to the actual Delivery Date, Tenant and its agents, employees and contactors shall have access to the Demised Premises for inspection, taking measurements, making plans and erecting temporary or permanent signs and the performance of Tenant's Work as may be appropriate or desirable by Tenant without being deemed thereby to have taken possession or accepted delivery of the Demised Premises; provided, however, that (i) Tenant shall indemnify, defend and hold Landlord harmless from and against any and all claims or losses arising from Tenant's and/or its agents', employees' or contactors' entry upon the Demised Premises, except to the extent caused by the negligence or intentional misconduct of Landlord, or Landlord's agents, employees or contractors, and (ii) Tenant shall otherwise comply with the applicable terms, conditions and requirements of this Lease, including, without limitation, the applicable insurance requirements provided for in Section 19.  In no event will Tenant be required to accept delivery of the Demised Premises unless and until all the Delivery Requirements have been satisfied.  If Landlord fails to provide Tenant with the Delivery Notice, as required herein, which establishes the Required Delivery Date, then under such circumstances, the Commencement Date, irrespective of the day that Tenant opens for and conducts business in the Premises, shall be delayed by the number of days equal to sixty (60) days minus the number of days of actual written notice of the Required Delivery Date given by Landlord to Tenant.

(e)    The Delivery Requirements must be satisfied on or before the Required Delivery Date.  If the Delivery Date does not occur by the Required Delivery Date, subject to delays caused by an Unavoidable Delay, Landlord must pay Tenant $25,000.00 (the "Lump Sum Payment") as liquidated damages.  In addition, Landlord must pay Tenant $3,000.00 for each day as further liquidated damages (the "Per Diem Payment" and collectively, with the Lump Sum Payment, the "Liquidated Damages") between the Required Delivery Date, subject to delays caused by an Unavoidable Delay, and the earlier to occur of (i) the Delivery Date or (ii) the date Tenant terminates this Lease in accordance with Section 9(f).  If Landlord fails to pay Tenant the Lump Sum Payment and/or the Per Diem Payment, then Tenant will have the right (without limiting any other right or remedy of Tenant to collect such payment) to deduct such amount, together with interest thereon at the Default Rate, from Rent.  Landlord and Tenant agree that it will be difficult to determine the precise amount of damages that Tenant will incur as a result of the failure of the Delivery Date to occur by the Required Delivery Date, therefore, Landlord and Tenant agree that the Per Diem Payment and the Lump Sum Payment constitute liquidated damages for such failure. If the Delivery Date does not occur by the Required Delivery Date, subject to delays caused by an Unavoidable Delay, said Liquidated Damages shall be payable irrespective of the date Tenant actually opens for and conducts business in the Demised Premises.  Notwithstanding anything contained herein to the contrary, Tenant agrees and acknowledges that the Liquidated Damages are Tenant's sole remedy for Landlord's failure to deliver possession of the Demised Premises to Tenant on or prior to the Required Delivery Date.

(f)    In the event Landlord fails to deliver the Demised Premises to Tenant on or before the Termination Date, irrespective of an Unavoidable Delay, Tenant shall have the right to terminate this Lease upon thirty (30) days prior notice to Landlord (whereupon all parties shall be released from any liability hereunder, except Landlord's obligation to pay the aforestated Liquidated Damages to Tenant); provided, however, in the event Landlord delivers the Demised Premises to Tenant within such thirty (30) day notice period, Tenant's notice of termination shall be deemed rescinded and this Lease shall remain in full force and effect. In the event Landlord and Tenant have not mutually approved the Tenant Final Plans and Specifications on or before the Outside Tenant Plan Approval Date and provided Tenant has not terminated this Lease pursuant to Section 9(b), then Landlord's obligation to deliver the Demised Premises to Tenant on the Required Delivery Date, and Tenant's right to receive Liquidated Damages shall be extended one (1) day for each day after the Outside Tenant Plan Approval Date, until Landlord and Tenant have mutually approved the Tenant Final Plans and Specifications.

(g)    Provided Tenant is not in monetary default in excess of Twenty-Five Thousand Dollars ($25,000.00), beyond the lapse of any applicable notice or cure period (it being agreed and understood that once the monetary default is corrected by Tenant, Tenant shall have the full rights granted in this sentence with no diminution thereof), Landlord shall contribute to Tenant an amount equal to Five Hundred Thirty-Nine Thousand Four Hundred Seventy-Six and 00/100 Dollars ($539,476.00) (such amount hereinafter referred to as the "Tenant Allowance"; the Tenant Allowance being based upon $28.00 per square foot of gross leasable area, which amount is hereinafter referred to as the "Negotiated Build-Out Amount") for the cost of Tenant's Work (excluding trade fixtures, equipment, inventory and signage) within the Demised Premises. It is understood and agreed that the Tenant Allowance shall be a contribution to Tenant to complete Tenant's Work (excluding trade fixtures, equipment, inventory and signage) within the Demised Premises as detailed in the Tenant Final Plans and Specifications. Landlord shall pay the Tenant Allowance to Tenant in three (3) installments as follows:

A.    Landlord shall pay to Tenant the sum of One Hundred Thirty-Four Thousand Eight Hundred Sixty-Nine and 00/100 Dollars ($134,869.00) (i.e., 25% of the Tenant Allowance) within thirty (30) days after Landlord delivers the Demised Premises to Tenant.

B.    Landlord shall pay to Tenant the sum of Two Hundred Sixty-Nine Thousand Seven Hundred Thirty-Eight and 00/100 Dollars ($269,738.00) (i.e., 50% of the Tenant Allowance) within thirty (30) days of Landlord's receipt of the following documentation:

(i)    A statement executed by an authorized representative of Tenant and Tenant's general contractor certifying to Landlord that Tenant has completed fifty percent (50%) or more of Tenant's Work;

(ii)    A partial lien waiver from Tenant's general contractor, in the form of Exhibit "D-2" attached hereto and made a part hereof; and

(iii)    A partial lien waiver in the form of Exhibit "D-2" attached hereto, executed by every subcontractor, laborer and material supplier engaged in or supplying lienable labor or materials in excess of Five Thousand and 00/100 Dollars ($5,000.00).

#3826

27

C. Landlord shall pay to Tenant the balance of the Tenant Allowance within thirty (30) days after Tenant has opened for business in the Premises, paid to Landlord Rent for the first month and furnished to Landlord the following:

    (i) A certification signed by an officer of the Tenant certifying that the Tenant's Work has been fully completed in accordance with the Tenant Final Plans and Specifications;

    (ii) The lien waiver of Tenant's general contractor, in the form of Exhibit "D-3" attached hereto and made a part hereof, stating that (i) Tenant's Work has been fully completed in accordance with the plans and specifications approved by Landlord; subject, however, to verification thereof by Landlord's architect and/or contractor, which verification shall occur no later than ten (10) days after the date Tenant furnishes the lien waiver of Tenant's general contractor to Landlord (if Landlord fails to respond regarding said verification within said ten (10) day period, then such verification shall be deemed made and this subsection "i" shall be deemed satisfied), and (ii) all subcontractors, laborers and material suppliers have been paid in full;

    (iii) A lien waiver in the form of Exhibit "D-3" attached hereto, executed by every subcontractor, laborer and material supplier engaged in or supplying lienable labor or materials in excess of Five Thousand and 00/100 Dollars ($5,000.00); and

    (iv) A certificate of use and occupancy (or equivalent) for the Demised Premises issued by the appropriate governmental authority.

Landlord reserves the right to offset against the Tenant Allowance all costs and/or expenses incurred by Landlord to repair any damage to the Shopping Center caused by Tenant or Tenant's contractor during the performance of Tenant's Work; provided, however, prior to said offset (i) Landlord delivered to Tenant fifteen (15) days advance written notice of its intent to offset ("Offset Notice"); (ii) the Offset Notice describes said damage in detail; and (iii) Tenant has not repaired said damage prior to Landlord's offset. In the event this Lease shall be terminated as the result of a Tenant default, beyond the lapse of any applicable notice or cure period, prior to the natural expiration of the Initial Term, Tenant shall pay to Landlord the unamortized portion of the Tenant Allowance, said amortization to be computed on a straight-line basis over the Initial Term, together with interest thereon at the Default Rate.

If Landlord fails to pay Tenant any portion of the Tenant Allowance in accordance with this Lease, then Tenant will have the right (without limiting any other right or remedy of Tenant) to deduct such amount from Rent, together with interest thereon at the Default Rate, in an amount not to exceed fifty percent (50%) of Rent during any given month until Tenant is fully reimbursed. Landlord will wire-transfer the Tenant Allowance to Tenant's bank as follows: Key Bank, 127 Public Square, Cleveland, OH 44114, ABA: 041001039, Account #1061502834.

## SECTION 10

## USE AND OPERATION

(a)    The Demised Premises may be used for any lawful retail purpose, provided such purpose is not in violation of any existing exclusives, prohibited or restricted uses as set forth on Exhibit F.

(b)    Within the five (5) month period following Landlord's delivery of the Demised Premises to Tenant, subject to an Unavoidable Delay, Tenant shall open its store for business, fully fixtured, stocked and staffed as a typical Jo-Ann Fabric and Craft store for at least one (1) day ("Operation Period"). After the Operation Period, Tenant shall have the right, in its sole discretion, to cease operations at the Demised Premises by delivering written notice thereof to Landlord, and thereafter shall be under no duty or obligation, either expressed or implied, to open, reopen, remain open, operate, or thereafter to continually conduct business from the Demised Premises at any time during the Term. After the Operation Period, Tenant's failure to open, reopen, remain open, operate, or thereafter to continually conduct business from the Demised Premises will not in any way be deemed an event of default under this Lease, nor will such failure otherwise entitle Landlord to begin or to maintain any action, suit or proceeding, whether in law or in equity, relating in any way to Tenant's failure to open, reopen, remain open, operate, or thereafter to continually conduct business from the Demised Premises.

(c)    If at anytime during the Term, all or substantially all of the Demised Premises are not open for business to the public for a period of one hundred eighty (180) consecutive days for any reason other than an event of casualty or eminent domain, permitted remodeling or assigning or subletting (provided, however, in no event shall the Demised Premises be vacant for more than ninety (90) days due to remodeling or assigning/subletting), then Landlord shall have the right, but not the obligation, to recapture the Demised Premises by providing thirty (30) days' written notice to Tenant ("Notice of Recapture"). Landlord's Notice of Recapture shall set forth a date (the "Recapture Termination Date") for the termination of this Lease, and upon such date, this Lease shall be null and void and of no further force or effect, except for accrued liabilities by either party which shall survive termination of this Lease and any other obligation of either party that expressly survives the expiration or earlier termination of this Lease. Notwithstanding the foregoing, within thirty (30) days after delivery of the Notice of Recapture, Tenant shall have the right, but not the obligation, to delivery written notice to Landlord electing to re-open for business in one hundred percent (100%) of the Demised Premises, fully fixtured, stocked and staffed, in which case, such Notice of Recapture shall be null and void and of no further force and effect, provided that Tenant actually re-opens for business as set forth in this sentence within sixty (60) days after the delivery of the Notice of Recapture. On or prior to the Recapture Termination Date, Landlord shall pay to Tenant the unamortized portion of the cost of Tenant's initial leasehold improvements constructed within the Demised Premises prior to the Commencement Date (excluding the cost of any improvements constructed by or on behalf of Tenant by using the actual Tenant Allowance paid to or on behalf of Tenant by Landlord in accordance with the requirements of this Lease), the

cost of which the parties hereto stipulate is One Hundred Fifty Thousand and 00/100 Dollars ($150,000.00). The amortization of Tenant's leasehold improvements shall be calculated on a straight-line basis over the Initial Term commencing as of the Commencement Date.

## SECTION 11

## <u>COMMON AREAS, PROTECTED AREA</u>

(a)    Tenant and Tenant's customers, employees and visitors shall have the right, in common with all others granted similar rights by Landlord, to the non-exclusive use of all Common Areas provided by the Landlord from time to time from Shopping Center Parcel and to the non-exclusive use of all Common Areas for which Landlord has the right to use.

(b)    Landlord shall operate, manage, equip, light, repair and maintain the Common Areas and the Shopping Center as a first-class retail project in compliance with all applicable Laws, and the Shopping Center will be occupied only for normal retail uses customarily conducted in first-class shopping centers, which first-class shopping center shall be based on the tenant-mix existing at the Shopping Center as of the date of this Lease. Landlord may at any time close temporarily any Common Areas to make repairs or changes, to prevent the acquisition of public rights in such area or to discourage non-customer parking.

(c)    Landlord agrees to keep the Common Areas clean and well lighted and to remove snow from the parking areas, driveways and sidewalks as promptly as possible. Landlord shall not impose any parking charges for the parking of automobiles in the parking areas. Landlord shall not grant any rights in the sidewalk space around the Demised Premises without Tenant's consent.

(d)    Landlord shall maintain a parking ratio for the Shopping Center in compliance with all applicable Laws, including any zoning variances obtained by Landlord, provided Tenant approves such zoning variance.

(e)    Notwithstanding any other provision to the contrary contained in this Lease, provided and subject to the conditions that (i) Tenant shall not be in monetary default of this Lease in excess of Twenty-Five Thousand and 00/100 Dollars ($25,000.00) beyond the lapse of any applicable notice and cure period (it being agreed and understood that once the monetary default is corrected by Tenant, Tenant shall have the full rights granted in this sentence with no diminution thereof, subject to the other condition contained in clause (ii) below), and (ii) Tenant shall lease, occupy, be open and operating in the entire Demised Premises, Landlord agrees that (1) it shall not change or modify in any material manner, the portion of the Common Areas designated on Exhibit B as the "Protected Area" without Tenant's prior approval (which approval shall not be unreasonably withheld, conditioned or delayed), and (2) it shall not erect or construct any buildings or other structures (other than light poles and other customary Common Area structures) within the Protected Area without Tenant's prior approval (which approval shall not be unreasonably withheld, conditioned or delayed); provided, however, Tenant's approval shall not be required for any change within the Protected

Area required by applicable law. With regard to this Section 11(e), a Tenant denial of approval shall be considered "reasonable" if the change or modification to the Common Area or Landlord's construction in the Protected Area, as the case may be, (A) materially diminishes the accessibility of the Demised Premises to and from the parking areas within the Common Areas and the other stores in the Shopping Center; (B) materially diminishes the visibility of the front of the Demised Premises (including, without limitation, the signage thereon) from public highways, parking areas or other stores in the Shopping Center; (C) materially diminishes the access to or the utility of the service areas serving the Demised Premises; (D) has the effect of materially increasing the monetary obligations of Tenant under this Lease; or (E) otherwise materially adversely affects the conduct of business from the Demised Premises or the rights of Tenant under this Lease.

## SECTION 12

## UTILITIES

Tenant shall promptly pay for utilities rendered or furnished to the Demised Premises as of the date that possession of the Premises is delivered to Tenant in accordance with the requirements of this Lease and otherwise during the Term of this Lease, including water, gas, electricity and sewer system maintenance charges. Landlord will separately meter or submeter the water, electrical and gas services being supplied to the Demised Premises as part of Landlord's Work.

## SECTION 13

## MARKET AVAILABILITY

(a)    An express condition of Tenant's agreement to pay Rent (including Percentage Rent, if applicable) and to induce Tenant to enter into this Lease and fulfill its obligations hereunder, Landlord covenants that, except with regard to Tenant and except as otherwise expressly provided for herein to the contrary, Landlord shall not lease any space in Shopping Center Parcel or permit the use and occupancy of any such space by any person, partnership, joint venture, corporation of any other entity whose primary business is the sale of the Protected Use items (either event referred to as a "Use Violation" or "Violation of Protected Use"). In the case of a Use Violation (subject to Section 13(d)), Tenant shall have the right, as its sole option, (i) to pay Substitute Rent and (ii) to terminate this Lease by giving Landlord written notice of termination, which termination shall be effective sixty (60) days after the date Landlord receives Tenant's notice of termination; provided, however, if Tenant elects to terminate this Lease by delivering written notice thereof to Landlord, then Landlord may nullify such termination by curing the Use Violation within thirty (30) days after delivery of Tenant's termination notice. The foregoing restriction shall not apply to (1) a general discount department store or a full service department store such as Kohl's, Wal-Mart, JC Penney, Target, Nordstrom, Nordstrom Rack, Ross Dress for Less or TJ Maxx, a grocery store, a home improvement store such as Lowes and Home Depot, a Home Goods retailer such as HomeGoods, Bed Bath and Beyond, Anna's Linens, and Tuesday Morning, a discount wholesale operator such as Sam's Club, BJ's Wholesale, or Costco or any individual tenant or occupant occupying eighty thousand (80,000) square feet or more of gross leasable area (excluding the area designated on Exhibit B as the

#3826

31

"North Area") or to any individual tenant or occupant occupying fifty thousand (50,000) square feet or more of gross leasable area within the North Area; provided, however, Landlord and Tenant agree and acknowledge that Landlord shall in no event lease space in the Shopping Center Parcel to a direct category competitor ("Direct Category Competitor") of Tenant (fabric store, arts and craft store or sewing machine store), such as, by way of example only, Michael's Arts and Crafts, AC Moore, MH Designs, Ben Franklin Arts & Crafts, Hancock Fabrics, Calico Corners, Hobby Lobby, Garden Ridge, Flower Factory, Old Time Pottery, Archivers, Recollections, Aaron Brothers Custom Framing, Singer Bernina, Viking White, Husqervarna and Pfaff, (and any such tenant or occupant executing a lease or occupancy agreement after the date of this Lease shall not be permitted to subdivide its space and sublease or assign a portion of such space to an occupant that is a Direct Category Competitor of Tenant); and (2) any other tenant or occupant whose lease or occupancy agreement, as of the date of this Lease, does not prohibit the subject premises to be used for the Protected Use hereinabove described; provided, however, to the extent Landlord shall have a right to consent or approve a change of use of such premises which would violate the Protected Use hereinabove described, Landlord agrees to withhold such consent or approval. "Primary business" for purposes of this Section shall mean the sale of the Protected Use items from more than the lesser of (ii) two-thousand (2,000) square feet, or (ii) ten percent (10%) of the gross leasable area of the demised premises of such tenant or occupant of the Shopping Center. Notwithstanding anything to the contrary contained herein, the foregoing restriction shall not prevent any third party otherwise restricted herein from using its premises for the incidental sale of Primary Protected Use Items and/or Incidental Protected Use Items. As used herein, the term "incidental sale" shall mean the lesser of (i) two thousand (2,000) square feet or (ii) ten percent (10%) or less of such tenant's gross leasable area. Notwithstanding anything to the contrary contained herein, the foregoing restriction shall not prevent any third party otherwise restricted herein from using its premises for the "primary sale" of the Incidental Protected Use Items. For purposes of the immediately preceding sentence, "primary sale" shall mean that the Incidental Protected Use Items are sold from ten percent (10%) or more of the gross leasable area of a tenant's premises or otherwise constitute ten percent (10%) or more of the gross sales of any such tenant. The foregoing covenant shall run with the land and shall bind Landlord, its successors and assigns. Notwithstanding anything contained herein to the contrary, if (1) Tenant ceases to operate its business at the Demised Premises as a fabric and arts and craft store, or (2) (a) Tenant exercises its right to assign this Lease or sublet the Demised Premises pursuant to the terms, conditions and requirements of Section 21, and (b) Tenant's assignee or sublessee does not operate its business in the Demised Premises as a fabric and arts and craft store, then Tenant's Protected Use shall no longer apply to the Shopping Center, unless Tenant subsequently re-opens for business within the Demised Premises as a fabric and arts and crafts store and Tenant delivers written notice thereof to Landlord ("Re-opening Date"); however, any lease and/or occupancy agreement entered into by Landlord after the occurrence of the event in subsection "(1)" or "(2)" of this sentence and prior to the Re-opening Date that would otherwise violate Tenant's Protected Use shall be a permitted exception to Tenant's Protected Use.

(b)    In the event that Tenant's Protected Use is violated, the computation of Substitute Rent shall commence on the first (1st) day of the violation of Protected Use, and shall be paid in monthly installments. Nothing herein shall be construed to relieve Tenant of its obligation to pay Tenant's proportionate share of Taxes, Common Area charge or Tenant's Insurance Charge. The foregoing covenant shall run with the land and shall bind Landlord, its successors and assigns.

(c)     It is hereby acknowledged between Landlord and Tenant that the foregoing exclusive has been included herein at the sole request of Tenant, and in the event that the foregoing exclusive shall be construed to be, or shall be declared to be, invalid by the decision of any court or any governmental agency having jurisdiction over such matters or by the enactment of any law, ordinance or regulation, Tenant agrees to indemnify and hold harmless Landlord against any and all losses arising out of the inclusion of the foregoing exclusive herein.

(d)     Notwithstanding anything to the contrary, in the event of a Use Violation by any tenant or occupant who conducts or operates in violation of the Protected Use without Landlord consenting to or granting such tenant or occupant the right to do so (a "rogue tenant"), then Tenant's right to pay Substitute Rent and terminate this Lease will be deferred, provided that Landlord commences court action to cure or eliminate the Use Violation by the rogue tenant within 30 days after notice from Tenant and diligently pursues same to completion (which diligence by Landlord must include appeals to the highest state court, if lower court rulings are adverse to Landlord and allow the Use Violation to continue). If Landlord does not take such action against the rogue tenant as described in the immediately preceding sentence, then Tenant may exercise its termination right and right to pay Substitute Rent at any time.

## SECTION 14

## RULES AND REGULATIONS: TENANTS' BUSINESS ASSOCIATION

Tenant agrees that Landlord has the right at any time and from time to time, for the general welfare of the Shopping Center or the avoidance of nuisance, to impose reasonable rules and regulations of general application governing the conduct of tenants in the Shopping Center and the use of the Common Areas, provided such rules and regulations do not limit Tenant's rights or expand its obligations under this Lease and provide such rules and regulations are uniformly applied and enforced against all tenants in the Shopping Center Parcel. Subject to the foregoing, Tenant, as a covenant and condition of this Lease, agrees to comply with and perform any and all such rules and regulations imposed by Landlord.

## SECTION 15

## ALTERATIONS, INSTALLATIONS AND REMOVAL OF IMPROVEMENTS BY TENANT

(a)     Tenant shall have the right during the continuance of this Lease to make such interior alterations, changes and improvements to the Demised Premises (except structural alterations, changes or improvements) as may be proper and necessary for the conduct of Tenant's business and for the beneficial use of the Demised Premises (including, but not limited to, Tenant's Work) provided Tenant shall pay all costs and expenses thereof, shall make such alterations, changes and improvements in a good and workmanlike manner, using union labor only, if so required, and in accordance with all applicable Laws, and shall pay for all such alterations, changes and improvements. Tenant hereby completely and fully indemnifies Landlord against any mechanic's liens or other liens or claims in connection with the making of such alterations, changes and improvements, except for those arising out of Landlord's Work or any other work

performed by Landlord or at Landlord's direction, including such work for the benefit of Tenant.

(b)    Except as otherwise provided, all signs, furnishings, trade fixtures and other removable equipment installed in the Demised Premises by Tenant and paid for by Tenant shall remain the property of Tenant, shall not be subject to any Landlord's lien, and may be removed by Tenant upon the termination of this Lease, provided that any of such as are affixed to the Demised Premises and require severance may be removed only if Tenant shall repair any damage caused by such removal.  If Tenant does not remove and Landlord requests the removal of same, Landlord shall give Tenant thirty (30) days notice to remove said fixtures and if Tenant does not, Landlord may do so and charge Tenant for the cost of removal, including the cost of restoration.

(c)    Notwithstanding anything contained herein to the contrary, Tenant agrees and acknowledges that Landlord's prior written consent, which consent may be withheld in Landlord's sole discretion, shall be required in connection with any installation, alteration, modification or other improvement in and/or to the Demised Premises to be performed by or on behalf of Tenant that is structural in nature or that affects the utility or mechanical systems or any other portion of any other premises in the Shopping Center.

## SECTION 16

## REPAIRS AND MAINTENANCE

(a)    Landlord warrants and guarantees that Landlord's Work shall be performed in a good and workmanlike manner, and Landlord, at no cost to Tenant, agrees to promptly replace and/or repair, in a good and workmanlike manner and using first quality materials, any defects in Landlord's Work which may appear in, on or about the Demised Premises within a period of one (1) year following the date upon which Landlord delivers possession of the Demised Premises to Tenant as required hereunder; provided, however, that Landlord shall not be required to make repairs necessitated by reason of the neglect, fault or default of Tenant, Tenant's agents, employees, contractors or customers or by reason of structural and exterior work done or installed by Tenant, and provided further, notwithstanding anything in this Lease to the contrary, Tenant, not Landlord, shall make all repairs, replacements and alterations to the Demised Premises which Landlord is required to maintain and which may be required as the result of repairs, alterations, other improvements or installation made by Tenant, or any assignee, subtenant or concessionaire of Tenant or the agent of any of them.  Landlord shall keep (1) the Common Areas in good repair (which cost therefor shall be subject to inclusion in the Common Area Charge pursuant to this Lease), and (2) the foundations, roof, floor slab and structural portions of and the exterior of the Demised Premises (excluding Tenant's exterior signage, the storefront of the Demised Premises and any other improvements constructed on the exterior of the Demised Premises by Tenant in accordance with the terms of this Lease) in good repair (which cost therefor shall be at Landlord's sole cost and expense, unless the cost of any repairs to the exterior of the Demised Premises is otherwise a permissible expense under the Common Area Charge pursuant to the terms of Section 8 of this Lease), except in either case, for repairs required thereto by reason of the gross negligence or willful misconduct of Tenant or Tenant's employees, agents, or contractors, in which case Landlord shall perform such repairs at Tenant's sole cost and

expense.  The provisions of this Section shall not apply in the case of damage or destruction by fire or other casualty or by eminent domain, in which events the obligations of Landlord shall be controlled by either Section 22 or Section 23 hereof.  It is expressly understood that Landlord shall not be responsible for any portions of the Demised Premises constructed by Tenant.

(b)    Except for damage caused by fire and other casualties, Tenant, at Tenant's sole cost and expense, shall make (i) all interior repairs to the Demised Premises (and make replacements when necessary), subject to Section 16(a), including doors and windows (inclusive of exterior doors and windows), (ii) Tenant's exterior signage, the storefront of the Demised Premises and any other improvements constructed on the exterior of the Demised Premises by Tenant in accordance with the terms of this Lease and (iii) all systems exclusively serving the Demised Premises (it being understood that Tenant's obligation shall be point(s) of common connection for such systems and continuing throughout the Demised Premises, subject to other provisions of this Lease) (including, subject to subsection (c) below, the HVAC system, and the plumbing, gas, electrical or other similar systems exclusively serving the Demised Premises); provided, however, that Tenant shall not be required to make structural repairs or repairs necessitated by reason of the neglect, fault or default of Landlord, its agents, employees or contractors; Landlord, at Landlord's sole cost and expense, except as otherwise noted herein to the contrary, shall make all repairs or replacements to the exterior of the Demised Premises as provided for in Section 16(a) (excluding exterior doors and windows, Tenant's exterior signage, the storefront of the Demised Premises and any other improvements constructed on the exterior of the Demised Premises by Tenant in accordance with the terms of this Lease) including, but not limited to, the structural portions (both interior and exterior), roof, floor, and, electrical (including utility cables, mains and conduits), plumbing or sewer systems or any portion thereof up to the point(s) of common connection (collectively, "Utility Systems"); provided, however, Landlord and Tenant agree and acknowledge that the cost of repairing and/or replacing the Utility Systems may otherwise be a permissible expense under the Common Area Charge pursuant to the terms of Section 8 of this Lease.  The references to "common connection" in this Lease shall mean the point at which a utility line that services the Demised Premises meets with another utility line or other utility lines that do not exclusively service the Demised Premises.  Notwithstanding the foregoing, Tenant is not required to make, and shall not make (i) repairs of damage covered by insurance maintained or required to be maintained by Landlord unless such repairs were caused by the gross negligence or willful misconduct of Tenant or Tenant's agents, employees or contractors;; (ii) repairs necessitated by reason of the gross negligence or willful misconduct of, Landlord, or Landlord's agents, employees or contractors; or (iii) repairs to the plumbing, gas, electrical or other similar units and systems where such repairs are outside of the Demised Premises beyond the point(s) of common connection for such systems or would necessitate going through or into the floor slab, structural walls, or roof of the Demised Premises (excluding the HVAC system, which Tenant shall repair and maintain in accordance with Section 16(c) hereof).  All of the repairs and replacements referred to in the immediately preceding sentence will be performed by Landlord at its sole cost and expense; provided costs for repairs and replacements referred to in clause (iii) may be included in the Common Area Charge pursuant to the terms of Section 8 of this Lease and repairs and replacements necessitated by reason of the gross negligence or willful misconduct of Tenant, Tenant's agents, employees or contractors shall be billed

back to Tenant as additional rent and shall be payable by Tenant within thirty (30) days after receipt of billing. In making any repairs or replacements, Landlord shall not unreasonably interfere with Tenant's normal operations and business and Tenant shall not unreasonably interfere with the normal operations and business of other tenants and occupants of the Shopping Center.

(c)     Tenant acknowledges and agrees that the HVAC system is being delivered to Tenant in its "as-is" condition. To the extent available, Landlord agrees that it shall assign or otherwise transfer to Tenant any existing HVAC warranties. Tenant shall be responsible maintaining during the Term a contract for routine maintenance to the HVAC system and otherwise be responsible for repair, maintenance and replacement of the HVAC system servicing the Demised Premises. Notwithstanding anything to the contrary in the Lease, if Tenant should replace the HVAC system or any part thereof or repair the HVAC system (excluding routine maintenance as otherwise provided for in this Lease) during the final two (2) years of the Term or any Lease extension or renewal, and such replacement and/or repairs was not caused by Tenant's failure to properly maintain and repair the same in accordance with the requirements of this Lease or otherwise caused by the negligence or willful misconduct of Tenant or Tenant's agents, employees or contractors, and Tenant elects not remain in possession of the Demised Premises pursuant to a subsequent Lease extension or renewal, then the Landlord shall reimburse Tenant, within thirty (30) days after the date Tenant surrenders possession of the Demised Premises to the Landlord, for (i) the un-amortized cost of said replacement based on a straight-line amortization schedule over the useful life of the equipment in accordance with federal income tax guidelines or (ii) the actual cost of the repairs in excess of Five Thousand and 00/100 Dollars ($5,000.00), as the case may be; provided, however, the actual cost of said replacement or repairs shall be reasonable and Tenant shall be required to deliver to Landlord evidence, in form and substance reasonably acceptable to Landlord, of the actual cost of said replacement or repairs.

(d) Anything contained herein to the contrary notwithstanding, with the exception of fire and other casualty, whereby it is the Landlord's responsibility to repair and/or replace same, Tenant shall be responsible for the repairs and replacements of all broken glass (including plate glass) on the Demised Premises and shall replace immediately all such broken glass with glass of the same kind and of equal quality as that being replaced.

#3826

36

Fayetteville AR
EXECUTION COPY December 17, 2009

## SECTION 17

## WAIVER OF LIABILITY BY TENANT

(a)    Landlord and Landlord's agents and employees shall not be liable for, and Tenant waives all claims for damage to person or property sustained by Tenant or any person, claiming rights under this Lease resulting from any accident or occurrence in, upon or about the Demised Premises or any other part of the Shopping Center.

(b)    Said waiver shall include but not be limited to claims for damage resulting from: (i) any equipment or appurtenances becoming out of repair; (ii) injury done or occasioned by wind; (iii) any defect in or failure of plumbing, heating or air conditioning equipment, electric wiring, gas, water and stem pipes, stairs, rail or walks; (iv) broken glass; (v) the backing up of any sewer pipe or downspout; (vi) the bursting, leaking or running of any tank, tub, washstand, water closet, water pipe, drain or any other pipe or tank in, upon or about the Demised Premises; (vii) the escape of steam or hot water; (viii) water, snow or ice being upon or coming through the roof, skylight, trap door, stairs, walks or any other place upon or near the Demised Premises; (ix) the falling of any fixture, plaster or stucco; and (x) any act, omission or negligence of trespassers, co-tenants or of other persons or occupants of the building of which the Demised Premises is a part or adjoining or contiguous buildings or of owners of adjacent or contiguous property.

(c)    Notwithstanding the foregoing, Landlord may become liable to Tenant for damages to Tenant's property if Landlord, after receipt of written notice from Tenant, fails to commence and complete repairs, which are the Landlord's obligation, within a reasonable time under the circumstances then existing.

## SECTION 18

## WAIVER OF SUBROGATION AND WAIVER OF CLAIMS

All insurance policies required to be carried by either party covering the Demised Premises, including, but not limited, to contents, fire, and casualty insurance, shall to the extent permitted by law expressly waive any right on the part of the insurer against the other party. The parties hereto agree that their policies will include such waiver clause or endorsement so long as the same shall be obtainable without extra cost, or if extra shall be charged therefor, so long as the other party pays such extra cost. If cost shall be chargeable therefor, each party shall advise the other thereof and of the amount of extra cost, and the other party, at its election, may pay the same, but shall not be obligated to do so. The failure of any insurance policy to include such waiver clause or endorsement shall not affect the validity of this Lease. Tenant and Landlord further agree to waive all claims, causes of action and rights of recovery against the other, and their respective agents, officers, and employees, for any injury to or death of persons or any damage or destruction of persons, property or business which shall occur on or about the Demised Premises originating from any cause whatsoever including the negligence of either party and their respective agents, officers, and employees to the extent such injury, death or property damage is required to be covered by a policy or policies maintained by either Landlord or Tenant pursuant to this Lease. Notwithstanding the above, Landlord and Tenant agree and

#3826

37

Fayetteville AR
EXECUTION COPY December 17, 2009

acknowledge that the waiver of subrogation herein contained shall expressly exclude any loss paid by the insured in the form of a deductible.

## SECTION 19

## INDEMNIFICATION AND PUBLIC LIABILITY INSURANCE

(a)    Tenant will indemnify, defend Landlord and save Landlord harmless from and against any and all claims, actions, damages, liability and expense and demands in connection with loss, damage or injury to persons or property occurring in, upon or about, or arising out of the Demised Premises (except as caused by the negligence of Landlord, its employees, agents or contractors), or occasioned wholly or in part by any act or omission of Tenant, Tenant's agents, contractors, customers or employees. The Landlord shall indemnify, defend and save harmless Tenant from and against any and all claims, actions, damages, liability and expense and demands in connection with loss, damage or injury to persons or property occasioned wholly or in part by any act or omission of the Landlord, Landlord's agents, contractors or employees, or occurring in, upon or about, or arising out of the use of the Common Areas (if any), as defined in this Lease (except as caused by the negligence of Tenant, its employees, agents or contractors). In case either party shall, without fault on its part, be made a party to any litigation commenced by or against the other party, then such other party shall protect and hold such first party harmless and shall pay all costs, expenses and reasonable attorney's fees incurred or paid by such first party in connection with such litigation. The breaching party shall also pay all costs, expenses, and reasonable attorney's fees that may be incurred or paid by either party in enforcing the covenants and agreements of this Lease, provided a default is actually determined to have occurred by a court of law, if necessary, before the non-defaulting party is entitled to reimbursement for its reasonable expenses and attorney's fees.

(b)    Effective as of the date Tenant first enters the Demised Premises and continuing throughout the Initial Term and any extensions or renewals thereof, including, without limitation, any holdover with or without Landlord's consent, Tenant shall procure, pay for and keep in full force and effect, the following types of insurance:

(1)    Commercial General Liability Insurance Policy insuring the Demised Premises and Tenant's use thereof, together with contractual liability endorsements covering Tenant's obligations set forth in Section 19(a), above, in a form satisfactory to Landlord with companies having an A.M. Best Rating or its equivalent of A-VIII or better, and with a minimum limit of One Million and 00/100 Dollars ($1,000,000.00) on account of bodily injuries to or death or property damage for each occurrence and a minimum limit of Two Million and 00/100 Dollars ($2,000,000.00) annual general aggregate. The aggregate limit may be satisfied through a combination of primary and umbrella/excess liability insurance. Such insurance shall also provide that the general aggregate limits apply separately to each insured location, if applicable. The foregoing policy shall name Landlord and Developers Diversified Realty Corporation, and such other parties as Landlord may from time to time designate in writing to Tenant as additional insureds

under Tenant's insurance policy (or in lieu of naming said parties as additional insureds, provide an additional insureds endorsement in form and substance reasonably acceptable to Landlord and which serves the same effect) and shall bear endorsements to the effect that the insurer agrees to notify all additional insureds not less than thirty (30) days in advance of any modification or cancellation thereof;

(2)     Special Form Cause of Loss Policy insuring against fire and such other risks as are, from time to time, included in standard extended coverage endorsements (including, but not limited to earthquake, flood, boiler and machinery, plate glass, power failure, mold, windstorm, terrorism, seepage or leakage), insuring all leasehold and building improvements in the Demised Premises which were originally constructed by Tenant, Tenant's stock-in-trade, trade fixtures, furniture, furnishings, special equipment, floor and wall coverings, and all other items of personal property of Tenant located on or within the Demised Premises, such coverage to be in an amount equal to one hundred percent (100%) of the replacement cost thereof.   The foregoing policy shall name Landlord and Developers Diversified Realty Corporation, and such other parties as Landlord may from time to time designate in writing to Tenant as an additional insured under Tenant's insurance policy (or in lieu of naming said parties as additional insureds, provide an additional insureds endorsement in form and substance reasonably acceptable to Landlord and which serves the same effect) and shall bear endorsements to the effect that the insurer agrees to notify all additional insureds not less than thirty (30) days in advance of any modification or cancellation thereof;

(3)     Workers' compensation insurance (meeting the requirements of the state workers' compensation laws) and employer liability insurance covering all of Tenant's employees at the Demised Premises.   Tenant shall also use good faith efforts to ensure all contractors, sub-contractors, vendors, leased employees, and temporary employees are properly insured for workers' compensation;

(4)     Business interruption or loss of income insurance in an amount equal to the Fixed Minimum Rent, Percentage Rent, if any, and any other additional rent payable under this Lease for a minimum period of twelve (12) months.   Notwithstanding the foregoing, Tenant may self-insure for the insurance provided for in this subsection (4);

(5)     Plate glass insurance covering all plate glass on the Demised Premises at full replacement value.   Notwithstanding the

#3826

39

Fayetteville AR
EXECUTION COPY December 17, 2009

foregoing, Tenant may self-insure for the insurance provided for in this subsection (5); and

(6)     Any insurance policies designated necessary by Landlord, acting reasonably and in good faith, with regard to Tenant's, or Tenant's contractors' construction of Tenant's Work, as well as with regard to the construction of alterations including, but not limited to, contingent liability and "all risk" builders' risk insurance, provided that such insurance policies are consistent with the practices of other owners of similar shopping centers within the vicinity of the Shopping Center.

Evidence of insurance is maintained by Tenant's insurer on the website of Tenant's insurance broker, which can be accessed through Tenant's website, "JoAnn.com." If said evidence cannot be accessed by Landlord through Tenant's website, upon written request from Landlord, Tenant shall deposit with Landlord prior to the date of any use or occupancy of the Demised Premises by Tenant certificates evidencing Tenant's compliance with each of the required coverages. To the extent that any of the foregoing policies shall change in name and/or coverage due to general changes in the insurance industry, Tenant shall obtain and maintain the equivalent policies and coverages as are then recognized in the insurance industry.

(c)     Landlord agrees to carry insurance under a Special Form Cause of Loss Policy (or an equivalent policy that becomes the insurance industry standard in the future) on the Shopping Center improvements constructed by Landlord in an amount equal to at least eighty percent (80%) of the insurable value of such improvements, together with endorsements insuring against such other risks as Landlord deems appropriate (including, but not limited to, earthquake, flood, boiler and machinery, plate glass, power failure, mold, windstorm, terrorism, seepage or leakage and loss of rent) and in such amounts, with such terms and with such insurers, all as Landlord deems appropriate in Landlord's sole discretion. Such insurance shall specifically exclude Tenant's personal property. Landlord shall also maintain in full force and effect throughout the Term commercial general liability insurance with regard to the Common Areas with minimum limits of One Million and 00/100 Dollars ($1,000,000.00) per occurrence, Two Million and 00/100 Dollars ($2,000,000.00) general aggregate, for bodily injury, death and property damage liability. Landlord shall have the right to carry its insurance under "blanket" and/or "umbrella" policies covering the Shopping Center and other properties. Any insurance policies maintained by Landlord may include deductibles, self-insured retentions or the like in amounts determined by Landlord, in Landlord's sole discretion. Landlord shall have the right, but not the obligation, to maintain commercial insurance policies covering some or all of the deductibles, self-insured retentions or the like which are provided in any of Landlord's other insurance policies. The insurance policies maintained by Landlord pursuant to this Section are individually and collectively referred to herein as "Landlord's Insurance". Tenant agrees that Tenant's contribution to the foregoing insurance shall be as provided for in Section 19(d) of this Lease and Tenant shall pay its proportionate share of Landlord's Insurance per said Section which may include the cost of insuring or providing additional coverage for any deductibles; provided, however, that Tenant shall have no rights in said policy or policies maintained by Landlord and shall not, by reason of such reimbursement, be entitled to be a named insured there under.

Tenant agrees to pay Landlord the following amounts which collectively constitute Tenant's "Insurance Charge": (A) Tenant's proportionate share of the cost and expense of Landlord's Insurance, plus (B) Tenant's proportionate share of any deductible or self-insured retention actually paid in connection with Landlord's Insurance. Tenant agrees to pay to Landlord, in monthly installments, in advance on the first day of each month, Tenant's estimated Insurance Charge for Landlord's Insurance, including, but not limited to any coverage maintained by Landlord for deductibles or self-insured retentions as determined by Landlord in Landlord's sole discretion. For purposes of this paragraph, Tenant's proportionate share of Landlord's Insurance shall be the total amount of the Insurance Charge multiplied by a fraction, the numerator of which shall be the number of square feet of gross leasable area within the Demised Premises, and the denominator of which shall be the gross leasable area of the existing buildings within Landlord's Parcel at the time the Insurance Charge accrued, but excluding the gross leasable area of any buildings within the Landlord's Parcel of a tenant or occupant that maintains property damage insurance on its building and/or commercial general liability insurance for the Common Areas within its parcel. Subsequent to the expiration of the period used by Landlord in estimating Tenant's proportionate share of Landlord's Insurance, Landlord shall furnish to Tenant a statement of the actual amount of Tenant's proportionate share of Landlord's Insurance for such period and within fifteen (15) days from receipt of Landlord's statement, Tenant shall pay to Landlord or Landlord shall remit to Tenant, as the case may be, the difference between the estimated amounts paid by Tenant and the actual amount of Tenant's Insurance Charge for such period as shown by such statement. In the event Landlord maintains blanket and/or umbrella policies which insures premises or risks in addition to the Shopping Center or the rents there from, the statement of the insurer shall be conclusive as to the portion of the total premium attributable to the Shopping Center.

## SECTION 20

## SIGNS

Tenant shall have the right, subject to compliance with all requirements of appropriate governmental authority and Exhibit "D-4" attached hereto, to erect, at its sole cost and expense, its standard exterior signage (individual letters spelling "Jo-Ann" above an "experience the creativity" sign, together with departmental signs, if any) as depicted in Tenant's approved sign package attached hereto as Exhibit "D" on the front and rear of the Demised Premises and all necessary permits or licenses shall be obtained by Tenant. Tenant shall maintain all signs in good condition and repair at all times, and shall save the Landlord harmless from injury to person or property, arising from the erection and maintenance of said signs. Upon vacating the Demised Premises Tenant shall remove all signs and repair all damage caused by such removal. A drawing of Tenant's prototype sign(s) is/are attached hereto as Exhibit "D-1". Tenant's complete sign package as described in this Section 20, is hereby fully approved by Landlord and is set forth on Exhibits "D" and "D-1", and except as otherwise set forth herein, is subject only to governmental approval. If Tenant does not remove signs per this Section, Landlord, upon giving Tenant three (3) days notice, may elect to remove same and charge Tenant for the cost of removal and restoration. Landlord shall use commercially reasonable efforts to obtain any governmental and third party approvals necessary so that Tenant may, at Tenant's sole cost and expense, install identification panels on Pylon Sign #1 in the position designated on Exhibit "D-1". Upon such approvals, Landlord shall construct a sign cabinet at Landlord's sole cost and expense, 50% of which will be available for Tenant's installation of its identification panels as

#3826

41

set forth above.   If space on Pylon Sign #1 is not available despite Landlord's commercially reasonable efforts, Landlord shall use commercially reasonable efforts to obtain any governmental and third party approvals necessary so that Tenant may, at Tenant's sole cost and expense, install identification panels on Pylon Sign #2 in the position designated on Exhibit D-1. Tenant shall be responsible for the fabrication, installation and replacement of its identification panels at its sole cost and expense.  If Tenant shall at any time erect its identification panels on the Pylon Sign, Tenant shall have the right, at Tenant's sole cost and expense, to replace its Pylon Sign panels in the event Tenant shall change its trade name, subject to compliance with the requirements of Exhibit "D-4" and all applicable Laws.   Any change and/or modification to Tenant's signage as shown in the approved sign package included in Exhibit "D" and/or as otherwise shown on Exhibit "D-1" shall require Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed.

## SECTION 21

## ASSIGNMENT AND SUBLETTING

Tenant has the right to assign this Lease or sublet all or any part of the Demised Premises for any lawful retail purpose that does not violate any of the then current exclusives and/or restrictions applicable to the Shopping Center with the prior written consent of Landlord, which consent must not be unreasonably conditioned, withheld or delayed, and which consent must not be denied in any event where (i) such assignment or subletting does not violate any existing exclusive or restrictions of another tenant or occupant from the Shopping Center Parcel existing at the time of the proposed assignment or sublease; (ii) Tenant remains responsible for the payment of rent, unless expressly released in writing by Landlord, as determined by Landlord in Landlord's sole discretion; and (iii) in the case of assignment, such assignee assumes in writing all the terms and provisions of this Lease to be performed or observed by Tenant, and in the case of a sublease, such sublessee acknowledges and agrees in writing to comply with all of the terms and provisions of this Lease to be performed or observed by Tenant. Notwithstanding the foregoing, Tenant may assign this Lease or sublet all or any part of the Demised Premises, in each case without the prior consent of Landlord, to: (1) a parent; subsidiary; affiliated entity; successor to Tenant; (2) or the parent of Tenant by way of merger, reorganization, consolidation, corporate restructuring, purchase of stock or assets, or the like; or (3) any entity that acquires a substantial number of Tenant's stores either generally or in the metropolitan area where the Demised Premises are located. Tenant may also sublet, without the consent of Landlord, not more than thirty percent (30%) of the Gross Leasable Area of the Demised Premises for the operation of one or more departments within the business operation of Tenant. Within 15 business days after the receipt of a written request from Tenant, Landlord must deliver to Tenant notice of any restrictions on the use of the Demised Premises enforceable by any other tenants of the Shopping Center Parcel.  Failure to deliver to Tenant a list of any restrictions will constitute Landlord's covenant that there are not restrictions on the use of the Demised Premises for any use and Landlord must indemnify, defend and hold Tenant harmless if there actually is a restriction.  If Tenant sublets a portion of the Demised Premises in such a way that the sublet space is separated from the rest of the Demised Premises by demising walls and/or a separate entrance, then at least sixty (60) days prior to the expiration or termination of this Lease, Tenant shall deliver written notice thereof to Landlord and Landlord shall have thirty (30) days after receipt of such notice to advise Tenant whether or not Tenant is required, at Tenant's sole cost and expense, to remove such demising walls and/or separate entrance and return the Demised

#3826

42

Premises to the condition existing prior to the construction of such sublet space within the Demised Premises (collectively, "Sublet Space Work"), Landlord's failure to notify Tenant of its election in accordance with the terms and conditions of the preceding sentence shall be deemed to mean that Tenant is not required to complete the Sublet Space Work.  Landlord and Tenant agree and acknowledge that if Tenant is required pursuant to the terms and conditions of this Section to complete the Sublet Space Work, then such Sublet Space Work shall be completed on or prior to sixty (60) days after the expiration or termination of this Lease.  In the event that the Sublet Space Work is not completed on or prior to sixty (60) days after the expiration or termination of this Lease, then Landlord may complete such Sublet Space work and Tenant shall reimburse Landlord for all actual and reasonable costs and expenses incurred by Landlord, plus an administrative charge equal to fifteen percent (15%) of the costs of the Sublet Space Work, which reimbursement shall be paid within ten (10) business days after the date Landlord delivers to Tenant documentation of the cost of such Sublet Space Work.  The terms and conditions of this Section shall survive the expiration or termination of this Lease.  Notwithstanding anything contained herein to the contrary, Tenant, or its successors, assigns or sublessees, shall not be permitted to subdivide the Demised Premises into more than three (3) spaces, one of which must be at least ten thousand (10,000) square feet.

## SECTION 22

## REPAIR AFTER CASUALTY

(a)    If the Demised Premises shall be destroyed or so injured by any cause so as to be unfit, in whole or in part, for occupancy and such destruction or injury could reasonably be repaired within nine (9) months from the happening of such destruction of injury, then Tenant shall not be entitled to surrender possession of the Demised Premises nor shall Tenant's liability to pay rent under this Lease cease without the mutual consent of the parties hereto; but in case of any such destruction or injury Landlord shall repair the same with all reasonable speed and shall complete such repairs within nine (9) months from the happening of such injury, and if during such period Tenant shall be unable to use all or any portion of the Demised Premises, then all rent shall abate proportionately using the same ratio that the unusable portion of the Demised Premises bears to the total square footage of the Demised Premises.

(b)    If such destruction or injury cannot reasonably be repaired within nine (9) months from the happening thereof, Landlord shall notify Tenant within ninety (90) days after the happening of such destruction or injury whether or not Landlord will repair or rebuild.  If Landlord elects not to repair or rebuild, this Lease shall be terminated.  If Landlord shall elect to repair or rebuild, Landlord shall specify the time, in writing, within which such repairs or reconstruction will be completed, and Tenant shall have the option, within thirty (30) days after the receipt of such notice, to elect either to terminate this Lease and any further liability hereunder or to extend the Term of the Lease by a period of time equivalent to the time from the happening of such destruction or injury until the Demised Premises is restored to substantially its former condition.  In the event Tenant elects to extend the Term of this Lease, Landlord shall restore the Demised Premises to substantially its former condition within the time specified in the notice, and Tenant shall not be liable to pay rent for the period from the time of such destruction or injury until the Demised Premises are so restored to its

former condition. In the event this Lease shall be terminated pursuant to this Paragraph, any Fixed Minimum Rent and other charges paid in advance shall be immediately refunded to Tenant, and Tenant shall have an additional thirty (30) days, rent free, within which to remove its property from the Demised Premises.

(c)     In addition to all rights to cancel or terminate this Lease given to the parties in the two (2) preceding paragraphs, if the Demised Premises are destroyed or damaged during the last two (2) years of the Term, to the extent of fifty percent (50%) or more of the then replacement value of the Demised Premises, then Landlord or Tenant shall have the right to cancel or terminate this Lease as of the date of such damage or destruction by giving written notice thereof within thirty (30) days after the date of said damage or destruction; provided, however, that if Tenant shall, within thirty (30) days following receipt of Landlord's written notice of cancellation, give Landlord written notice of its intention to renew this Lease for any additional Extended Term(s) available to Tenant under the terms of this Lease, then the written notice of Landlord to terminate this Lease shall be of no force and effect, provided not more than fifty percent (50%) of the then replacement value of the Landlord's Parcel is not destroyed or damaged. In the event Tenant elects to renew this Lease for any Extended Term available to Tenant under the terms of this Lease, Landlord shall use its commercially reasonable efforts to restore the Demised Premises to substantially its former condition with all reasonable speed, and Tenant shall not be liable to pay rent for the period from the time of such destruction or injury until the Demised Premises is so restored to substantially its former condition. In the event this Lease shall be terminated pursuant to this paragraph, any Fixed Minimum Rent and other charges paid in advance shall be immediately refunded to Tenant, and Tenant shall have an additional thirty (30) days, rent free, within which to remove its property from the Demised Premises.

(d)     If fifty percent (50%) or more of the buildings on Shopping Center Parcel (exclusive of the Demised Premises) shall be destroyed or so injured by any cause to be unfit for occupancy, Landlord shall notify Tenant in writing within ninety (90) days after the happening of such destruction or injury whether or not Landlord will repair or rebuild the buildings on Shopping Center Parcel. If Landlord shall elect to repair or rebuild, Landlord shall specify in writing the time within which such repairs or reconstruction will be completed. If Landlord elects to rebuild the building on Shopping Center Parcel but such destruction or injury to the buildings on Shopping Center Parcel cannot be repaired by Landlord within twelve (12) months from the happening thereof, Tenant shall have the option, within thirty (30) days after the receipt of such written notice from Landlord, to elect either to terminate this Lease and further liability hereunder, or to extend the term of the Lease by a period of time equivalent to the time from the happening of such destruction or injury until the buildings on Shopping Center Parcel are restored to substantially their former condition. In the event this Lease shall be terminated pursuant to this Paragraph, any Fixed Minimum Rent and other charges paid in advance shall be immediately refunded to Tenant, and Tenant shall have an additional thirty (30) days, rent free, within which to remove its property from the Demised Premises.

(e)     Anything contained herein to the contrary notwithstanding, in the event this Lease shall be canceled as a result of Landlord's decision not to repair or rebuild

Shopping Center Parcel and/or the Demised Premises, as set out in Subsections (b) and (d) herein, and if after such cancellation Landlord shall rebuild Shopping Center Parcel and/or said Demised Premises at any time within the period of time set out in the Initial Term, then, in such an event, Tenant shall have a first option and right of refusal for a demised premises in Shopping Center Parcel comparable to the Demised Premises presently being demised to Tenant, upon the same terms and conditions as that being offered to theft comparable tenants.  Tenant shall have thirty (30) days after receipt of written notice from Landlord of Landlord's intention to repair or rebuild Shopping Center Parcel, within which to give Landlord written notice of Tenant's intention to enter into a new lease with Landlord.

## SECTION 23

## CONDEMNATION

(a)    In the event the entire Demised Premises shall be taken by condemnation or right of eminent domain, either Landlord or Tenant shall have the right to terminate this Lease as of the day possession shall be taken by the taking authority, and Landlord and Tenant shall be released from any further liability hereunder thereafter accruing.  In the event fifty percent (50%) or more of the buildings on the Shopping Center Parcel, exclusive of the Demised Premises, shall be taken by condemnation or right of eminent domain and Landlord shall terminate the remaining unaffected leaseholds, this Lease shall terminate as of the day possession shall be taken by the condemning or taking authority, and Landlord and Tenant shall be released from any obligations or liability hereunder thereafter accruing.  In the event only a portion of the Demised Premises shall be taken by condemnation or right of eminent domain and such portion so taken renders the balance unsuitable for the operation of a Jo-Ann superstore, either the Landlord or the Tenant shall be entitled to terminate this Lease, such termination to become effective as of the day possession shall be taken provided thirty (30) days notice in writing of such termination is given, and Tenant shall have an additional thirty (30) days, rent free, within which to remove its property from the Demised Premises.  If, in such case, this Lease is not terminated, and Landlord agrees to restore the Demised Premises, with reasonable speed, to an architectural unit as nearly like its condition prior to such taking as shall be practicable, and if during and/or after the work of restoration Tenant is deprived of all or a part of the use of the Demised Premises, an appropriate reduction of rent, depending upon the time during which and the portion of said Demised Premises of which Tenant is deprived, shall be granted, and an appropriate reduction in the base sales figures shall be made.

(b)    All damages awarded in connection with the taking of the Demised Premises, whether allowed as compensation for diminution in value to the leasehold or to the fee of the Demised Premises, shall belong to Landlord; provided, however, if Tenant has made any material leasehold improvements to the Demised Premises, and/or alterations and structural repairs to the Demised Premises, at its own expense (regardless of when made), Tenant and not Landlord shall be entitled to a separate claim for the unamortized balance of Tenant's costs thereof and in the event the condemning authority shall not make a separate award therefor, Landlord and Tenant shall jointly petition the Court to make an apportionment of the award made by the

condemning authority, and Landlord shall assign to Tenant a portion of said award equal to the amount so apportioned by the Court. In the event the Court will not or shall not make an apportionment of said award, a proportionate amount of said award, as agreed upon by both Landlord and Tenant or determined as a result of submitting to arbitration, shall be assigned by Landlord to Tenant. Notwithstanding the foregoing, Tenant shall also be entitled to a separate claim for loss of business, damage to merchandise and fixtures, removal and re-installation costs and moving expenses in a separate action only, and in the event Landlord in obtaining its award uses Tenant's cost items, then Tenant shall be entitled to a proportionate share of Landlord's award based upon said costs. Any claim by Landlord and/or Tenant shall be subordinate to the rights of any first mortgagee.

## SECTION 24

## LANDLORD'S REMEDIES UPON DEFAULT

(a)    If Tenant shall at any time be in default in the payment of rent or other sums of money required to be paid by Tenant hereunder, or in the performance of any of the covenants, terms, conditions, provisions, rules and regulations of this Lease, and Tenant shall fail to remedy such default within ten (10) days after receipt of written notice thereof from Landlord, in the event the default is as to payment of rent or other sums of money ("monetary default"), or within thirty (30) days after receipt thereof, if the default relates to matters other than the payment of rent and other sums of money ("non-monetary default") (but Tenant shall not be deemed to be in default if Tenant commences to remedy said defaults other than relate to payment of rent and other sums of money within said thirty (30) days period, and proceeds therewith with due diligence), except in either case (i.e., monetary default or non-monetary default), if Tenant is in good faith disputing such alleged default or is seeking additional information with regard to said alleged default, then in such case(s) said 10-day or 30-day notice period shall be extended, provided that Tenant is diligently and in good faith endeavoring to resolve such dispute or obtain such additional information to ascertain the validity of said alleged default; however, in no event shall a monetary default or non-monetary default be suspended for more than an additional twenty (20) days after the date of the expiration of the ten (10) and thirty (30) day cure periods provided for above, or if Tenant shall file a voluntary petition in bankruptcy or shall commit waste, or if Tenant or any guarantor of Tenant shall be adjudged bankrupt or shall make an assignment for the benefit of creditors, or if a receiver of any property of Tenant in, upon or about the Demised Premises be appointed in any action, suit or proceeding by or against Tenant and not removed within ninety (90) days after appointment, or if any involuntary petition is filed against Tenant and not removed within ninety (90) days or if the interest of Tenant in the Demised Premises shall be offered for sale or sold under execution or other legal process, Landlord in addition to all other remedies given to Landlord in law or in equity may by written notice to Tenant terminate this Lease, or without terminating this Lease re-enter the Demised Premises by summary proceedings or otherwise, and in any event may dispossess Tenant, it being the understanding that under no circumstances is the Lease to be an asset for Tenant's creditors by operation of law or otherwise. In the event of such re-entry Landlord may relet the Demised Premises without being obligated so to do, and in the event of a reletting may apply the

rent therefrom first to the payment of Landlord's expenses, including attorneys' fees incurred by reason of Tenant's default, next, to the expense of reletting, including, but not limited to, the repairs, renovation or alteration of the Demised Premises, and then to the payment of rent and all other sums due from Tenant hereunder, Tenant remaining liable for any deficiency.

(b)   In the event of a default or threatened default by Tenant of any of the terms, provisions, covenants, conditions, rules and regulations of this Lease, Landlord shall have the right to invoke any remedy permitted to Landlord in law or in equity. All remedies available to Landlord arc declared to be cumulative and concurrent.   No termination of this Lease nor any taking or recovering of possession of the Demised Premises by reason of Tenant's default shall deprive the Landlord of any of its remedies or actions against Tenant and Tenant shall remain liable for all past or future rent, including all additional rent, and, if required to pay same under the terms of this Lease, insurance premiums, and all other charges and rent payable by Tenant under this Lease, during and for the balance of the Initial Term (and if during any Extended Term then the remainder of such Extended Term), nor shall the bringing of any action for rent or other default be construed as a waiver of the right to obtain possession of the Demised Premises.

## SECTION 25

## <u>RIGHTS OF LANDLORD</u>

(a)   Landlord reserves the right at all reasonable times, by itself or its duly authorized agents, to go upon and inspect the Demised Premises and every part thereof, and at its option to make repairs, alterations and additions to the Demised Premises and the Shopping Center. Landlord shall use its best efforts not to interrupt and/or disrupt Tenant's business and access to the Demised Premises by Tenant's employees, agents and customers nor permanently or unreasonably obstruct Tenant's, Tenant's agents, employees and customers access to the Demised Premises. Landlord, other than shown on Exhibit B, will not allow a kiosk, edifice, building or other structure to be placed or erected within the "Protected Area" shown on Exhibit B so as not to adversely affect the view of, the show windows of the Demised Premises or impede traffic to or from the Demised Premises.

(b)   If Landlord shall make any payments on behalf of Tenant, which are Tenant's obligations, in order to fulfill Tenant's covenants, then any amounts to be paid by Landlord are agreed and declared to be "additional rent" and shall be due and payable to Landlord from Tenant with the next installment of Fixed Minimum Rent due thereafter under this Lease, together with interest thereon at the rate of eight percent (8%) per annum ("Default Rate") from the date of such advance to the repayment thereof in full.

(c)   Landlord shall have the right during the last two (2) months of the Term, provided that same shall not interfere with Tenant's business, to have access to the Demised Premises for the purpose of exhibiting said Demised Premises and putting up the usual notice "to rent" or "for sale", which notice shall not be removed, obliterated

or hidden by Tenant. No more than one (1) sign shall be placed upon the Demised Premises and said sign shall not exceed thirty-six (36) square inches.

(d)    Tenant shall have the right, on or before the date Tenant vacates the Demised Premises, to place a non-illuminated sign upon the storefront of the Demised Premises in a place visible to Tenant's customers, directing Tenant's customers to another store of Tenant's and/or providing Tenant's customers with a telephone number. Tenant shall be entitled to leave said sign on the Demised Premises until the earlier to occur of (i) sixty (60) days after the date Tenant vacates the Demised Premises, or (ii) the date that a Landlord shall deliver the Demised Premises or any portion thereof, to a successor tenant. Such sign installed by Tenant shall be professionally manufactured and shall not exceed a size of three (3) feet by three (3) feet. Tenant shall not install said sign earlier than thirty (30) days prior to the date that Tenant shall vacate the Demised Premises.

## SECTION 26

## BREACH OF COVENANT

(a)    In the event the Landlord shall fail or neglect to keep and perform any of the covenants or agreements in this Lease contained on the part of said Landlord to be kept and performed, the Tenant, in addition to all other remedies now or hereafter afforded or provided by law, may at its election, and thirty (30) days after receipt by Landlord of written notice from the Tenant to cure the specified default, perform such covenant or agreement for or on behalf of the Landlord or make good any such default, (but Landlord shall not be deemed to be in default if Landlord commences to remedy said defaults within said thirty (30) day period, and proceeds therewith with due diligence), and any amount or amounts which the Tenant shall advance on that behalf, shall be repaid by the Landlord to the Tenant on demand, together with interest thereon at the rate of eight percent (8%) per annum from the date of such advance to the repayment thereof in full; and if the Landlord shall not repay any such amount or amounts within ten (10) days from demand, the Tenant may, without forfeiture of its term herein, deduct same, together with interest thereon as aforesaid, from the next installment or installments of rent to accrue under this Lease; provided, however, that Tenant may cure any such default as aforesaid prior to the expiration of said waiting period, but after notice to the Landlord, if it is necessary to protect the Demised Premises or the Tenant's interest therein, or to prevent injury or damage to persons or property. Tenant's remedies in the case of a Landlord default shall be cumulative and concurrent and Tenant shall have the right to invoke any remedy permitted at law or in equity.

## SECTION 27

## MORTGAGE SUBORDINATION

(a)    Landlord reserves the right to demand and obtain from the Tenant a waiver of priority of Tenant's lien arising by virtue of the within leasehold estate, thereby subordinating Tenant's said lien in favor of a mortgage loan, or in favor of any mortgage lien or any refinancing or replacement loan that may become necessary or

#3826

48

desirable from time to time to the Landlord in the future, and Tenant, upon demand by the Landlord for same and subject to Section 27(b) below, agrees to execute at any and all times such instruments, including, without limitation, a subordination, non-disturbance and attornment agreement ("SNDA"), that may be required by any such lending institution or prospective mortgagee in order to effectuate such waiver of priority and subordination of Tenant's lien. If Tenant, within thirty (30) days after receipt of such instrument by Tenant, fails to execute the same and provided the condition set forth in Section 27 (b) has been satisfied, Landlord is hereby authorized to execute the same as attorney-in-fact for Tenant. So long as Tenant has not assigned this Lease or sublet any or all of the Demised Premises, (other than as permitted under Section 21 herein) the preceding sentence shall not be applicable.

(b)    It is a condition, however, of the subordination and lien provision herein provided, that Landlord shall procure from any such mortgagee a SNDA containing terms, conditions and requirements reasonably acceptable to Landlord, Landlord's lender and Tenant. The word mortgage as used herein includes mortgage, deed of trust or other similar instruments and any modifications, extensions, renewals and replacements thereof.

## SECTION 28

## NO WAIVER OF DEFAULT

No waiver by either party of any of the terms, covenants, provisions, conditions, rules and regulations required by this Lease, and no waiver of any legal or equitable relief or remedy shall be implied by the failure of either party to assert any rights, or to declare any forfeiture, or for any other reason, and no waiver of any of said terms, provisions, covenants, rules and regulations shall be valid unless it shall be in writing signed by both parties hereto. No waiver by Landlord or forgiveness of performance by Landlord in respect to one or more tenants of the Shopping Center in which the Demised Premises are located shall constitute a waiver of forgiveness of performance in favor of Tenant herein, or any other tenant, nor shall the waiver of any pledge of this Lease or the forgiveness of performance of any one or more of the terms, provisions, conditions, rules and regulations of this Lease be claimed or pleaded by Tenant to excuse a subsequent pledge or failure of performance of any of the terms, provisions, conditions, covenants, rules and regulations of this Lease.

## SECTION 29

## VACATION OF PREMISES

Tenant shall deliver up and surrender to Landlord possession of the Demised Premises, including all Tenant's work (and all replacements thereof and all fixtures permanently attached to the Demised Premises during the Term (except such fixtures as Landlord shall direct Tenant to remove), upon the expiration of this Lease, or its termination in any way, in as good condition and repair as the same shall be at the commencement of said Term (damage by fire or other casualty which is covered by Landlord's standard extended coverage insurance policy, ordinary wear and tear and decay, neglect, fault or default of Landlord and taking by eminent domain only

#3826

49

excepted) and deliver the keys at the office of Landlord or Landlord's agent. If Tenant does not remove the fixtures that Landlord directs it to remove, Landlord may after ten (10) days written notice to Tenant remove the same and charge the Tenant for the cost of removal and restoration.

<div align="center">

## SECTION 30

## SHORT FORM LEASE

</div>

This Lease shall not be recorded, but either party may, upon the written consent of the other party, record a Short Form Lease, Memorandum of Lease or Agreement in which shall be described the property herein demised, the Term of this Lease, and renewal rights (if there be any), any exclusive granted to Tenant, and reference to this Lease; provided, however, that the failure to record said Short Form Lease, Memorandum of Lease or Agreement shall not affect or impair the validity and effectiveness of this Lease. The party requesting that the Short Form Lease, Memorandum of Lease or Agreement be recorded shall pay all costs of recording the Short Form Lease, Memorandum of Lease, or Agreement, and the other party agrees to execute at any and all times such instruments as may be required for such recording. If such Short Form Lease, Memorandum of Lease or Agreement is recorded, then, on the termination of this Lease, Tenant shall execute, acknowledge and deliver to Landlord an instrument in writing terminating and releasing the same. The obligation provided for in this Section shall survive the termination of this Lease.

<div align="center">

## SECTION 31

## RENT DEMAND

</div>

Every demand for rent, wherever and whenever made, shall have the same effect as if made at the time it falls due and at the place of payment, and after the service of any notice or commencement of any site, or final judgment therein, Landlord may receive and collect any rent due, and such collection or receipt shall not operate as a waiver of nor affect such notice, suit or judgment.

<div align="center">

## SECTION 32

## NOTICES

</div>

Any notices or consent required to be given by or on behalf of either party upon the other shall be in writing and shall be given by Registered or Certified Mail, return receipt requested, postage prepaid, or nationally recognized overnight courier providing written evidence of receipt addressed, to-wit:

to the Landlord at:

DDR MDT Fayetteville Spring Creek LLC
c/o Developers Diversified Realty Corporation
3300 Enterprise Parkway
Beachwood, Ohio 44122
Attention: Executive Vice President

#3826

50

Fayetteville AR
EXECUTION COPY December 17, 2009

with a copy to:

> Developers Diversified Realty Corporation
> 3300 Enterprise Parkway
> Beachwood, Ohio 44122
> Attention: General Counsel

and to the Tenant at:

> Jo-Ann Stores, Inc.
> 5555 Darrow Road
> Hudson, Ohio 44236
> Attn: Vice President – Real Estate

with a copy to:

> Jo-Ann Stores, Inc.
> 5555 Darrow Road
> Hudson, Ohio 44236
> Attn: Senior Legal Counsel

or at such other address as may be specified from time to time, in writing, delivered to the other party, and notice shall be deemed given upon the date of actual receipt or first rejection.

## SECTION 33

## MERCHANTS ASSOCIATION

None.

## SECTION 34

## APPLICABLE LAW AND CONSTRUCTION

The laws of the State of Arkansas shall govern the validity, performance and enforcement of this Lease. The invalidity or unenforceability of any provision of this Lease shall not affect or impair any other provision. The submission of this document for examination does not constitute an offer to lease, or a reservation of or option for the Demised Premises and becomes effective only upon execution and delivery thereof by Landlord and Tenant. Any negotiations, considerations, representations and understandings between the parties are incorporated herein and may be modified or altered only by agreement in writing between the parties. Tenant shall have no right to cancel or rescind this Lease except as said right is expressly granted herein. This Lease has been negotiated by Landlord and Tenant and this Lease, together with all of the terms and provisions hereof; shall not be deemed to have been prepared by either Landlord or Tenant, but by both equally.

#3826

51

Fayetteville AR
EXECUTION COPY December 17, 2009

## SECTION 35

## UNAVOIDABLE DELAY

In the event that either party hereto shall be delayed or hindered in or prevented from the performance of any act required hereunder by reason of an Unavoidable Delay, then performance of such act shall be excused for the period of the delay and the period of the performance of any such act, including the payment of Fixed Minimum Rent, Percentage Rent, additional rent or any other payments required by the terms of this Lease, shall be extended for a period equivalent to the period of such delay.

## SECTION 36

## REASONABLE CONSENT

Wherever the consent or approval of either party hereto shall be required herein, such consent or approval shall not be unreasonably or arbitrarily withheld or delayed, except as to structural alteration.

## SECTION 37

## NO PARTNERSHIP

Landlord does not, in any way or for any purpose, become a partner of the Tenant in the conduct of Tenant's business, or otherwise, or joint venturer, or a member of a joint enterprise with Tenant.

## SECTION 38

## MORTGAGE FINANCING

Tenant will cooperate with Landlord so that Landlord will be able to procure mortgage financing for the Shopping Center. Upon request, Tenant agrees to execute and deliver to Landlord estoppel or offset letters as required by Landlords mortgage lenders.

## SECTION 39

## QUIET ENJOYMENT

Landlord hereby covenants and agrees that if Tenant shall perform all of the covenants and agreements herein stipulated to be performed on Tenant's part, Tenant shall at all times during the continuance hereof have peaceable and quiet enjoyment and possession of the Demised Premises without any manner or let or hindrance from Landlord or any person or persons, subject to the provisions of this Lease and the provisions set forth on Exhibit "G" attached hereto and made a part hereof.

## SECTION 40

## HOLDING OVER

If, at the expiration of the Term of this Lease and provided Landlord has not provided Tenant with a notice to vacate the Demised Premises ninety (90) days prior to lease expiration, Tenant continues to occupy the Demised Premises, such holding over shall not constitute a renewal of this Lease, but Tenant shall be a tenant from month to month, at the same rent and under the same terms and conditions as in effect during the just expired term of this Lease, and either party may terminate the Lease during said month-to month tenancy upon 90 days prior written notice to the other party; provided, however, Landlord shall not specify a Lease termination date to be during the period commencing November 1 and ending on the immediately following January 31. If Tenant does not vacate the Demised Premises as required in Landlord's ninety-day notice of termination (either prior to the expiration of the Lease or during the month-to-month period), Tenant shall be considered a tenant at sufferance and the Fixed Minimum Rent shall be 150% of the Fixed Minimum Rent due and payable at the expiration of said ninety-day notice period.

## SECTION 41

## BROKER

Except for The Retail Connection, which represents Tenant and will be paid by Landlord pursuant to a separate agreement ("Broker's Commission"), each of the parties represents and warrants that there are no claims for brokerage commissions or finder's fees in connection with the execution of this Lease, and agrees to indemnify the other against, and hold it harmless from, all liabilities arising from any such claim, including, without limitation, the cost of legal fees in connection therewith.

## SECTION 42

## CAPTIONS

Any paragraph titles or captions contained in this Lease are for convenience only and shall not be deemed part of the context of this Lease.

## SECTION 43

## VARIATION IN PRONOUNS

All the terms and words used in this Lease regardless of the number and gender in which they are used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context or sense of this Lease or any paragraph or clause herein may require, the same as if such words had been hilly and properly written in the number and gender.

## SECTION 44

## BINDING EFFECT OF AGREEMENT

This Lease and all of the covenants, conditions, provisions and restrictions herein contained shall inure to the benefit of and be binding upon the heirs, executors, administrators, devisees, legatees, personal representatives, successors and assigns, respectively, of both the Landlord and Tenant.

## SECTION 45

## EXCULPATORY CLAUSE

(a)    Notwithstanding anything to the contrary provided in this Lease, it is specifically understood and agreed, such agreement being a primary consideration for the execution of this Lease by Landlord, that if Landlord shall fail to perform any covenant, term or condition of this Lease upon Landlord's part to be performed and, as a consequence of such default, Tenant shall recover a money judgment against Landlord, such judgment shall be satisfied only out of the proceeds of sale received upon execution of such judgment and levy thereon against the right, title, and interest of Landlord in the Shopping Center, as the same may then be encumbered, and neither Landlord, nor, if Landlord be a partnership, any of the partners comprising such partnership shall be liable for any deficiency.   It is understood that in no event shall Tenant have any right to levy execution against any property of Landlord other than its interest in the Shopping Center as hereinbefore expressly provided.

(b)    If Landlord, as above deemed, shall sell or transfer the fee or the leasehold interest therein, such grantor or transferor shall thereafter be entirely relieved of all terms, covenants and obligations thereafter to be performed by Landlord under the terms of this Lease, provided that (i) any amount then due and payable to Tenant or for which such grantor or transferor would then owe to Tenant shall be paid to Tenant; (ii) any funds then in the hands of Landlord in which Tenant has an interest shall be turned over, subject to such interest, to the then grantee or transferee; and (iii) notice of such transfer and assumption shall be delivered to Tenant.

## SECTION 46

## CAP ON FIRST-LEASE YEAR COSTS

During the First Lease Year (for purposes of this cap, the First Lease Year shall not include any Partial Lease Year), Tenant's Common Area Charge shall not exceed the product obtained by multiplying $1.77 times the number of square feet of gross leasable area of the Demised Premises. During the First Lease Year (for purposes of this cap, the First Lease Year shall not include any Partial Lease Year), Tenant's Insurance Charge shall not exceed the product obtained by multiplying $0.43 times the number of square feet of gross leasable area of the Demised Premises.

#3826

54

Fayetteville AR
EXECUTION COPY December 17, 2009

## SECTION 47

### TENANT'S RIGHT TO TERMINATE

(a)    Provided that Tenant is not in monetary default of its obligations under this Lease in excess of Twenty-Five Thousand and 00/100 Dollars ($25,000), beyond the lapse of any applicable notice or cure period (it being agreed and understood that once the monetary default is corrected by Tenant, Tenant shall have the full rights granted in this sentence with no diminution thereof, subject to the conditions contained in this sentence; provided, however, any such monetary default of which Tenant has received notice must be cured by Tenant prior to the later to occur of (i) the expiration of the Minimum Sales Period (as defined below), or (ii) the expiration of any applicable cure period), and Tenant has been continuously open and operating in the Demised Premises from and after the Commencement Date, excluding any closures as the result of damage or destruction, eminent domain, permitted remodeling or alterations or Unavoidable Delay (collectively, "Permitted Closures"), if Tenant's Gross Sales during the twelve (12) month period commencing with the thirty-seventh (37th) month of the Initial Term and ending with the forty-eighth (48th) month of the Initial Term (the "Minimum Sales Period") do not exceed One Million Nine Hundred Twenty-Six Thousand Seven Hundred and No/100 ($1,926,700.00) (the "Minimum Sales Requirement"), then Tenant shall have the right, exercisable by written notice to Landlord during the ninety (90) day period after the expiration of the Minimum Sales Period ("Gross Sales Termination Period"), to terminate this Lease, such termination right being Tenant's "Gross Sales Kick-Out". Notwithstanding the foregoing, in the event that, during any consecutive twelve (12) month period during the Initial Term prior to the expiration of the Minimum Sales Period, Tenant's Gross Sales shall exceed the Minimum Sales Requirement, the foregoing right to terminate this Lease shall automatically be deemed null and void and of no further force and effect (the "Automatic Kick-Out Termination").    In the event the Automatic Kick-Out Termination becomes effective, Tenant shall immediately notify Landlord. Tenant will execute an acknowledgment of the Automatic Kick-Out Termination within ten (10) days of request for same from Landlord of said event; provided, that, failure to provide such notice shall not affect the occurrence of the Automatic Kick-Out Termination. The Minimum Sales Requirement shall be equitably reduced in the event the Demised Premises is closed for any of the permitted reasons noted above during the Minimum Sales Period. Termination of this Lease shall be effective twelve (12) months after Landlord's receipt of Tenant's written notice (the "Gross Sales Termination Date"); provided, however, that Tenant shall pay to Landlord all sums due and owing by Tenant to Landlord up to and including the Gross Sales Termination Date within fifteen (15) days after said sums are demanded by Landlord. Any sums which have not been exactly determined by Landlord as of the Gross Sales Termination Date shall be paid by Tenant to Landlord within fifteen (15) days after receipt by Tenant of a statement for said sums. The obligation of Tenant to pay any such sums shall survive the termination of this Lease. If Tenant has the right to exercise the Gross Sales Kick-Out and Tenant does not terminate this Lease during the Gross Sales Termination Period, Tenant shall be deemed to have waived its right to terminate this Lease pursuant to this Section 47 and the Gross Sales Kick-Out shall be null and void and of no further force and effect. Notwithstanding anything in this Lease to the contrary, in the event the Demised

Premises is closed for any reason at any time prior the expiration of the Minimum Sales Period, other than due to Permitted Closures, Tenant shall be deemed to have waived its right to terminate this Lease under this Section 47 and the Tenant's Gross Sales Kick-Out shall be null and void and of no further force and effect.

(b)    In the event Tenant exercises the Gross Sales Kick-Out pursuant to this Section 47, Tenant shall pay to Landlord the sum of $250,000 and reimburse Landlord for the unamortized portion of the amount of Broker's Commission paid by Landlord, said amortization to be computed on a straight-line basis over the Initial Term, which payments shall be made simultaneously with delivery of Tenant's termination notice. The obligation under this Section 47(b) shall survive termination of this Lease.

(c)    If, during the period prior to the expiration of the Minimum Sales Period, Tenant, or any of its principal shareholders, management employees, or any affiliate or subsidiary of Tenant, directly or indirectly shall operate, manage or have any interest in any other competing store or business (including a department or concession within another store) that sells any of the Protected Use items or operates under the Jo-Ann Fabrics and Crafts trade name, within five (5) miles from the nearest outside boundary of the Shopping Center, then, as Landlord's sole remedy, Tenant shall be deemed to have waived its right to terminate this Lease under this Section 47 and the Tenant's Gross Sales Kick-Out shall be null and void and of no further force and effect.

(d)    In the event Tenant exercises the Gross Sales Kick-Out pursuant to this Section 47, Landlord shall have the ongoing right during the twelve (12) month period immediately preceding the Gross Sales Termination Date to terminate this Lease and recapture the Demised Premises by providing Tenant ninety (90) days' prior written notice; provided, however, that in exercising such recapture right, Landlord may not specify a Lease termination date that would occur during the period commencing September 1 through the immediately succeeding January 31. If Landlord exercises its right under this Section 47(d), this Lease shall terminate as of the date provided for in Landlord's notice.

## SECTION 48

## ADDITIONAL PROHIBITED USES

(a)    An express condition of Tenant's agreement to pay Rent (including Percentage Rent, if applicable) and to induce Tenant to enter into this Lease and fulfill its obligations hereunder, Landlord covenants that, except as otherwise expressly provided for herein to the contrary, Landlord shall not lease any space in Shopping Center Parcel or permit the use and occupancy of any such space by any person, partnership, joint venture, corporation of any other entity engaged in an Additional Prohibited Use (either event referred to as a "Additional Prohibited Use Violation" or "Additional Violation of Prohibited Use"), excluding tenants and/or occupants of the Shopping Center Parcel that have entered into leases and/or occupancy agreements prior to the Effective Date that do not otherwise prohibit such tenants and/or occupants from uses their respective premises for any of the Additional Prohibited Uses. In the case of an Additional Prohibited Use Violation (subject to Section 48(d)), Tenant shall have the right, as its sole option, (i) to pay Substitute Rent and (ii) to terminate this

Lease by giving Landlord written notice of termination, which termination shall be effective sixty (60) days after the date Landlord receives Tenant's notice of termination; provided, however, if Tenant elects to terminate this Lease by delivering written notice thereof to Landlord, then Landlord may nullify such termination by curing the Additional Prohibited Use Violation within thirty (30) days after delivery of Tenant's termination notice.

(b)    The Additional Prohibited Uses referenced in subsection (a) above shall not apply to (i) any individual tenant or occupant occupying fifty thousand (50,000) square feet or more of gross leasable area; (ii) the following home goods retailers: Bed, Bath and Beyond, HomeGoods, Tuesday Morning and Anna's Linens; and (iii) any other tenant or occupant whose lease or occupancy agreement, as of the date of this Lease, does not prohibit the subject premises to be used for the Additional Prohibited Uses hereinabove described; provided, however, to the extent Landlord shall have a right to consent or approve a change of use of such premises which would violate any Additional Prohibited Use hereinabove described, Landlord agrees to withhold such consent or approval. Notwithstanding anything contained herein to the contrary, if (1) Tenant ceases to operate its business at the Demised Premises (except during any periods of Permitted Closures), or (2) Tenant exercises its right to assign this Lease or sublet the Demised Premises pursuant to the terms, conditions and requirements of Section 21, and Tenant's assignee or sublessee does not operate its business in the Demised Premises, then the Additional Prohibited Uses shall no longer apply to the Shopping Center, unless Tenant subsequently re-opens for business within the Demised Premises and Tenant delivers written notice thereof to Landlord ("Demised Premises Re-opening Date"); however, any lease and/or occupancy agreement entered into by Landlord after the occurrence of the event in subsection "(1)" or "(2)" of this sentence and prior to the Demised Premises Re-opening Date that would otherwise violate the Additional Prohibited Uses shall be a permitted exception to the Additional Prohibited Uses.

(c)    As an express condition of Landlord's agreement to enter into this Lease, Tenant covenants that Tenant shall not use or permit its Demised Premises to be used for any Additional Prohibited Use.

(d)    In the event that an Additional Prohibited Use Violation occurs, the computation of Substitute Rent shall commence on the first (1st) day of the violation of an Additional Prohibited Use, and shall be paid in monthly installments. Nothing herein shall be construed to relieve Tenant of its obligation to pay Tenant's proportionate share of Taxes, Common Area charge or Tenant's Insurance Charge. The foregoing covenant shall run with the land and shall bind Landlord, its successors and assigns.

(e)    It is hereby acknowledged between Landlord and Tenant that the foregoing prohibition has been included herein at the sole request of Tenant, and in the event that the foregoing prohibition shall be construed to be, or shall be declared to be, invalid by the decision of any court or any governmental agency having jurisdiction over such matters or by the enactment of any law, ordinance or regulation, Tenant agrees to indemnify and hold harmless Landlord against any and all losses arising out of the prohibition set forth herein.

(f)    Notwithstanding anything to the contrary, in the event of an Additional Prohibited Use Violation by any tenant or occupant who conducts or operates in violation of the Additional Prohibited Use without Landlord consenting to or granting such tenant or occupant the right to do so (a "rogue tenant"), then Tenant's right to pay Substitute Rent and terminate this Lease will be deferred, provided that Landlord commences court action to cure or eliminate the Additional Prohibited Use Violation by the rogue tenant within 30 days after notice from Tenant and diligently pursues same to completion (which diligence by Landlord must include appeals to the highest state court, if lower court rulings are adverse to Landlord and allow the Additional Prohibited Use Violation to continue). If Landlord does not take such action against the rogue tenant as described in the immediately preceding sentence, then Tenant may exercise its termination right and right to pay Substitute Rent at any time.

[Signature blocks on following page]

IN WITNESS WHEREOF, the Landlord and Tenant have caused this Lease to be signed, in quintuplicate, as of the date and year first above written.

WITNESSES AS TO LANDLORD:

LANDLORD:

**DDR MDT FAYETTEVILLE SPRING CREEK LLC,** a Delaware limited liability company
    By: DDR Macquarie Fund LLC, its
        Managing Member
    By: Macquarie DDR Management LLC, its
        Managing Member
    By: DDR MDT Holdings II Trust, its
        Managing Member

_Rachel Kuhn_
RACHEL KUHN (Print Name)

_Lou Ann Anghel_
LOU ANN ANGHEL (Print Name)

By: _____
Name: ROBIN WALKER-GIBBONS
Title: Executive Vice President

WITNESSES AS TO TENANT:

TENANT:

**JO-ANN STORES, INC.**

_Susan M. Jannarih_

By: _Darrell Webb_
    Darrell Webb, Chief Executive Officer and
    President

_Pat Hull_

And

By: _____
    James Kerr, Executive Vice President and
    Chief Financial Officer

#3826

59

Fayetteville AR
EXECUTION COPY December 17, 2009

STATE OF OHIO            )
                        ) SS:
COUNTY OF CUYAHOGA       )

BEFORE ME, a Notary Public, in and for said County and State, personally appeared _Robin Walker-Gibbons, Executive V.P._ of DDR MDT FAYETTEVILLE SPRING CREEK LLC, the limited liability company which executed the foregoing instrument, who acknowledged that she did execute the foregoing instrument on behalf of said limited liability company and the same is her free and voluntary act and deed as Executive Vice President of said limited liability company and is the free act and deed of said limited liability company for the uses and purposes therein set forth.

IN WITNESS WHERE have hereunto set my hand and official seal at Beachwood, Ohio, this _13th_ day of _January_, ~~2009~~ _2010_

_Lou Ann Anghel_
Notary Public

LOU ANN ANGHEL, Notary Public
State of Ohio, Cuyahoga County
My commission expires March 28, 2010

STATE OF OHIO            )
                        ) SS
COUNTY OF SUMMIT         )

BEFORE ME, a Notary Public in and for said County and State, personally appeared **JO-ANN STORES, INC.**, an Ohio corporation, by Darrell Webb, its chief executive officer and president, and James Kerr, its executive vice president and chief financial officer, who acknowledged that they did sign the foregoing instrument on behalf of said corporation and that the same is their free act and deed personally and as such officers.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at Hudson, Ohio, this _18th_ day of December, 2009.

_Bonita Marie Caesar_
NOTARY PUBLIC



BONITA MARIE CAESAR
Notary Public, State of Ohio
My Commission Expires
August 17, 2012

#3826

60

Fayetteville AR
EXECUTION COPY December 17, 2009

## EXHIBIT A

Legal Description of the Shopping Center Parcel

Tract I

Lot 5 of Spring Park Subdivision, Phase II, in the City of Fayetteville, Arkansas, as per plat in Plat Book 12, Page 49A among the records of the Circuit Clerk and Ex-Officio Recorder of Washington County, Arkansas.

And

Lot 6 Spring Park Subdivision, Phase II, in the City of Fayetteville, Arkansas, as per plat in Plat Book 12, Page 102 among the records of the Circuit Clerk and Ex-Officio Recorder of Washington County.

Tract II

Lot 9A Spring Park Subdivision, Phase III, in the City of Fayetteville, Arkansas, as per Land Document 97-074998 among the records of Circuit Clerk and Ex-Officio Recorder of Washington County, Arkansas.

TOGETHER WITH non-exclusive appurtenant easement rights over Lot 9B Spring Park Subdivision, Phase III, as set forth in that certain Declaration of Restrictions and Grant of Easements, recorded as Document No. 97-81689 of aforesaid Washington County Records.

Tract III

Revised Lot 7, of Spring Park Subdivision, Phase II, City of Fayetteville, Washington County, Arkansas, as shown on Plat recorded in Book 15, Page 113 in the office of the Circuit Clerk and Ex-Officio Recorder of Washington County, Arkansas. (Being all of Lot 7 and part of Lot 4R, Spring Park Subdivision, Phase II).

Tract IV

Revised Lot 4R of Spring Park Subdivision, Phase II, City of Fayetteville, Washington County, Arkansas, as recorded in Book 15, Page 113 of the office of the Circuit Clerk and Ex-Officio Recorder of Washington County, Arkansas, being more particularly described as follows:

Beginning at the Southeast corner of Lot 4R, filed for record in Book 13, Page 79 in the Office of the Circuit Clerk and Ex-Officio Recorder of Washington County, Arkansas, and run thence South 89 deg. 20' 57" West 80 feet; thence North 00 deg. 38' 56" West 312.85 feet; thence along a curve to the right an arc distance of 50.90 feet, said curve has a delta angle of 24 deg. 18' 17", a radius of 120 feet and a chord which bears North 11 deg. 30' 13" East 50.52 feet; thence North

#3826

A-1

23 deg. 39' 21" East 68.93 feet; thence North 00 deg. 38' 56" East 399.22 feet; thence East 121 feet to the Northwest corner of Lot 3A of Spring Park Subdivision Phase II; thence along the Western line of said Lot 3A South 00 deg. 38' 56" East 662.91 feet; South 89 deg. 21' 04" West 80 feet; South 00 deg. 38' 56" East 160 feet to the point of beginning.

Tract V
Revised Lot 3A, Spring Park Subdivision Phase II, in the City of Fayetteville, Washington County, Arkansas, according to the Lot Line Adjustment Plat, recorded August 5, 1998, under Land Record Document No. 98-66643, records of Washington County, Arkansas, more particularly described as a part of Lot 3 and all of Lot 3A of Spring Park Subdivision Phase II in the City of Fayetteville, Arkansas; being part of the NW 1/4 of the NE 1/4 and part of the NE 1/4 of the NW 1/4, Section 26, Township 17 North, Range 30 West, Washington County, Arkansas, being more particularly described as follows:

Commencing at the S.W. corner of said NE 1/4 of the NW 1/4; thence North 89 deg. 20' 57" East 1208.13 feet to the point of beginning, being the S.W. corner of the original Lot 3A of Spring Park Subdivision Phase II; thence North 00 deg. 38' 56" West 160 feet along the West line of said Original Lot 3A; thence North 89 deg. 21' 04" East 80 feet; thence North 00 deg. 38' 56" West 662.91 feet to the N.W. corner of said Original Lot 3A; thence East 151.79 feet to the N.E. corner of Revised Lot 3A; thence South 00 deg. 38' 52" East 821.19 feet to the South line of Lot 3 of said Spring Park Subdivision Phase II; thence along said South line of Lot 3 South 89 deg. 21' 04" West 124.11 feet; thence South 89 deg. 20' 57" West 107.65 feet to the point of beginning.

TOGETHER WITH non-exclusive appurtenant rights and easements as set forth in that certain Party Wall, Easement and Encroachment Agreement by and between Developers Diversified Finance Corporation and Home Depot U.S.A., Inc. recorded as Land Document No. 99001733 of the records of Washington County, Arkansas.

AS TO ALL TRACTS:

TOGETHER WITH the non-exclusive rights to common areas as contained in the Second Amended and Restated Declaration of Restrictions and Grant of Easements for Spring Creek Center, as shown in Land Document No. 98-66343, of the records of Washington County, Arkansas.

#3826

## __EXHIBIT B__

Site Plan

(attached hereto)

#3826



**DISCLAIMER**

THIS DRAWING IS FOR GENERAL INFORMATION PURPOSES ONLY. ANY AND ALL FEATURES, MATTERS AND OTHER INFORMATION DEPICTED HEREON OR CONTAINED HEREIN ARE FOR ILLUSTRATIVE MARKETING PURPOSES ONLY, ARE SUBJECT TO MODIFICATION WITHOUT NOTICE, ARE NOT INTENDED TO BE RELIED UPON BY ANY PART AND ARE NOT INTENDED TO CONSTITUTE REPRESENTATIONS OR WARRANTIES AS TO OWNERSHIP OF THE REAL PROPERTY DEPICTED HEREON, THE SIZE AND NATURE OF IMPROVEMENTS TO BE CONSTRUCTED (OR THAT ANY IMPROVEMENTS WILL BE CONSTRUCTED) OR THE IDENTITY OR NATURE OF ANY OCCUPANTS THEREOF, EXCEPT FOR THE PROTECTED AREA, CART CORRAL AREA, DEMISED PREMISES AND THE BOUNDARY OF THE SHOPPING CENTER (AS GENERALLY SHOWN ON THIS SITE PLAN)

*Pylon #2*

*Pylon #1*

EXHIBIT B

E JOYCE BLVD    80' R/W

COLLEGE AVE

US HWY NO. 71

**SPRING CREEK CENTRE**
464 E Joyce Blvd
Fayetteville, Arkansas  72703
Latitude: 36.122, Longitude: -94.14954

HWY 71 S

| | DEMISED PREMISES |
| | PROTECTED AREA |
| | NORTH AREA |
| | NOT PART OF SHOPPING CENTER |

SHOPPING CENTER

12.14.09

## EXHIBIT C

**Preliminary Plans and Specifications
Identifying the Scope of Landlord's Work**

The scope of Landlord's Work is outlined in Sections I through IX of Exhibit E attached to this Lease.  The Preliminary Plans and Specifications for Landlord's Work are shown in the drawing titled "JOANN LOD – SPRING CREEK CENTRE" attached to this Exhibit C.

#3826



## **EXHIBIT D**

Tenant's Work Exhibit

(attached hereto)

#3826

DIVISION OF WORK MATRIX APPROVED AS SHOWN BELOW

| | |
|---|---|
| Name (Jo-Ann Stores, Inc.) | Name (Owner Representative) |
| Title | Title |
| Date | Date |

NOTE: MATRIX TO BE REVIEWED AND MODIFIED AS REQUIRED FOR EACH PROJECT.

FURNISHED & INSTALLED — DIVISION OF WORK: TURN-KEY

ALL WORK SHOWN ON PLAN TO BE COMPLETED BY LANDLORD AT LANDLORD'S EXPENSE UNLESS NOTED "TO BE COMPLETED BY JO ANN STORES"

| JO ANN | LANDLORD | NOT APPLICABLE | ITEM |
|---|---|---|---|
| | ● | | OBTAIN ALL APPLICABLE PERMITS AND CERTIFICATE OF OCCUPANCY, TURN OVER CODE COMPLIANT BUILDING |
| | ● | | PERMIT FEES |
| | ● | | CONSTRUCTION DOCUMENTS |
| | ● | | UTILITY FEES |
| | ● | | SEPARATION OF UTILITIES |
| | ● | | ALL UTILITY SERVICE AND METERS |
| | ● | | DEMOLITION-SITE (IF APPLICABLE) |
| | ● | | SIDEWALK (REPAIR/REPLACE/MODIFY) |
| | ● | | CURBS |
| | ● | | PARKING LOT PAVING AND STRIPING |
| | ● | | PARKING LOT RESEALING AND RESTRIPING |
| | ● | | HANDICAP CURB AND CROSSWALK STRIPING AT ENTRY |
| | ● | | STOP SIGNS AT PEDESTRIAN CROSSWALK AT ENTRY |
| | ● | | CMU CART CORRALS (AT SIDEWALK) |
| ● | | | CART CORRALS (IN PARKING LOT) |
| | ● | | LANDSCAPING |
| | ● | | LANDSCAPE MAINTENANCE - TRIMMING TREES, SHRUBS TO MAINTAIN VISIBILITY OF BUILDING AND MONUMENT SIGNS |
| | ● | | PARKING LOT LIGHTING (3 FOOTCANDLE AVERAGE) |
| | ● | | MONUMENT/PYLON SIGN STRUCTURE |
| | ● | | MONUMENT/PYLON SIGN ELECTRICAL |
| ● | | | MONUMENT/PYLON SIGN PANELS |
| | ● | | RECESSED TRUCK DOCK/RAMP/RETAINING WALL |
| | ● | | DEMOLITION - BUILDING (IF APPLICABLE) |
| | ● | | STRUCTURAL INTEGRITY OF BUILDING |
| | ● | | PERFORM FACILITY TESTING AND INSPECTION (INCL: CONCRETE SLAB MOISTURE TEST, ROOF INSPECTION, HVAC INSPECTION, ASBESTOS AND MOLD SURVEY) (EXISTING BUILDING ONLY) |
| | ● | | REMEDY IF SLAB MOISTURE IS DETECTED |
| | ● | | ASBESTOS ABATEMENT |
| | ● | | ROOF (REPAIR/REPLACE/NEW) |
| | ● | | EXTERIOR WALLS (NEW/REPAIR) |
| | ● | | EXTERIOR DOORS INCLUDING DOCK DOOR, COMPACTOR DOOR |
| | ● | | EXTERIOR LIGHTING - BUILDING MOUNTED |
| | ● | | FRONT FACADE/ENTRY (JO ANN PROTOTYPICAL ELEMENT) |
| ● | | | FACADE SIGNAGE |
| ● | | | TEMPORARY BANNERS (NOW HIRING, COMING SOON, NOW OPEN, ETC.) |
| ● | | | WINDOW GRAPHICS / FILM ON STOREFRONT GLASS |
| | ● | | CONCRETE SLAB (NEW AND/OR MODIFICATIONS) |
| | ● | | PERFORM MOISTURE SLAB TESTING ON NEW CONCRETE |
| | ● | | PROTOTYPICAL VESTIBULE (INCL. AUTOMATIC SLIDING DOORS) |
| | ● | | STOREFRONT FRAMING AND GLAZING |
| | ● | | DEMOLITION - INTERIOR (IF APPLICABLE) |
| | ● | | DEMISING WALLS - METAL STUDS AND INSULATION |
| | ● | | DEMISING WALLS - GYPSUM WALL BOARD (JO ANN SIDE) |
| | ● | | INTERIOR PARTITIONS (NEW AND/OR MODIFICATIONS) |
| | ● | | MISC. WOOD BLOCKING/ FURRING, ETC. |
| | ● | | PAINTING |
| | ● | | DOORS AND HARDWARE |
| | ● | | FLOORING: VCT FLOORING, BASE, AND TRANSITION STRIPS |
| | ● | | CARPET |
| | ● | | CERAMIC TILE |
| | ● | | RESTROOM ACCESSORIES |
| | ● | | CABINETRY/ CASEWORK IN BREAKROOM AND OFFICES |
| | ● | | ELECTRICAL POWER ROOM & INVERTER PANEL |
| | ● | | ALL ELECTRICAL (CONDUIT, WIRE AND RECEPTACLES) |
| | ● | | LIGHT FIXTURES |
| | ● | | EMERGENCY, EXIT AND MISC. LIGHT FIXTURES |
| | ● | | POWER POLES (GC TO INSTALL AFTER TURNOVER DATE) |
| | ● | | BALER ELECTRICAL |
| | ● | | ENERGY MANAGEMENT SYSTEM AND SENSORS |
| | ● | | HVAC UNITS - NEW |
| | ● | | HVAC (INTERIOR DISTRIBUTION DUCTWORK) |
| | ● | | HVAC DIST. MATERIAL (DIFFUSERS, SMOKE DETECTORS, REMOTE TEST STATIONS, SAMPLING TUBES, ANNUNCIATORS, EXHAUST FANS) |
| | ● | | VESTIBULE AND STOCK ROOM HEATERS (IF APPLICABLE) |
| | ● | | PLUMBING MAIN SERVICE |
| | ● | | PLUMBING (BRANCH LINES NEW AND/OR MODIFICATIONS) |
| | ● | | PLUMBING FIXTURES (INCLUDING HOT WATER HEATER) |
| | ● | | ELECTRIC WATER COOLER(S) |
| | ● | | SPRINKLER MAINS |
| | ● | | SPRINKLER BRANCH LINES AND HEADS |
| | ● | | FIRE ALARM SYSTEM |
| | ● | | FIRE EXTINGUISHERS |
| | ● | | FIRE EXTINGUISHER LOCATION STICKERS/ COMMISSIONING |
| | ● | | INCOMING TELEPHONE SERVICE (25 PAIR) |
| | ● | | TELEPHONE CONDUIT AND PHONE BOARD |
| | ● | | DATA CONDUIT (FOR REGISTER SYSTEM) W/ PULL STRINGS |
| ● | | | TELEPHONES |
| ● | | | DATA LINES FOR REGISTER SYSTEM |
| ● | | | LOSS PREVENTION SYSTEM (BURGLAR) |
| ● | | | STORE FIXTURES AND MERCHANDISING HARDWARE |
| ● | | | INSTALLATION OF STORE FIXTURES |
| ● | | | STOCK ROOM SHELVING |
| ● | | | BALER UNIT |

A1 DIVISION OF WORK MATRIX

M:\JoAnn Etc\Prototype\Proto Block Plans\Turnkey\BP-1, 9/3/2009 8:49:07 AM, MTWISS

H4 VICINITY MAP

## H7 VENDOR LIST

(NO SUBSTITUTES ACCEPTED)

**ALARM (FIRE & BURGLAR)**
ADT SECURITY SERVICES, INC.
9100 MARKET PLACE
CLEVELAND, OHIO 44147-2833
LYNDA STAKEL (678-565-5834)
lstakel@adt.com

**AUTOMATIC SLIDING DOORS**
BESAM AUTOMATED ENTRANCE SYSTEMS
92 N. MAIN ST., BUILDING 19
WINDSOR, NJ 08561
DARRELL VANDELEUR (609-528-2580)
dvandeleur@besam-usa.com

**CARPET/FLOORING**
MANNINGTON COMMERCIAL
411 GREENBRIAR DR.
AVON LAKE, OH 44012
JOYCE HOLBERT (706-629-7301)
joyce_holbert@mannington.com

**CLOSE-OUT PACKAGE**
DIGITAL RELIANCE, INC.
386 CHARMEL PL.
COLUMBUS, OH 43235
JERRY GALBREATH (614-430-5950)
jg@digital-reliance.com

**BALER**
(N.I.C. - FOR REFERENCE ONLY)
MARATHON EQUIPMENT COMPANY
JAMES W. RICCI, JR. (256-457-7855)
jamesr@marathonequipment.com

**DOOR HARDWARE**
BASS SECURITY SERVICES, INC.
26701 RICHMOND ROAD
BEDFORD HEIGHTS, OH 44146
JOHN BUCKLEY (888-774-3400 X 194)
jbuckley@bass-security.com

**DOORS AND FRAMES**
GIRTMAN & ASSOCIATES
7115 COCKRILL BEND BLVD.
NASHVILLE, TN 37209
AMY BAKER (615) 350-6000 x 129
abaker@girtman.com

**ELECTRICAL POWER ROOM**
PCX CORPORATION
33 PONY FARM ROAD
CLAYTON, NC 27520
MARTY KLAMMER (919-247-8547)
mklammer@pcxcorp.com

**ENERGY MANAGEMENT**
ROTH BROTHERS
3847 CRUM ROAD
YOUNGSTOWN, OH 44515-0209
BEN RIVERA (800-872-7684)
brivera@rothbros.com

**FIRE EXTINGUISHER COMMISSIONING**
NATIONAL FIRE SERVICE
3851 CLEARVIEW CT.
GURNEE, IL 60031-1247
DON STEWART (888-464-0134)
don@nfs-fire.com

**HVAC UNITS**
TRANE COMPANY
31200 BAINBRIDGE RD., P.O. BOX 39280
SOLON, OH 44139
HARRY HAKENSON (440-248-3400)
hhakenson2@trane.com

**LIGHTING PACKAGE**
H. LEFF ELECTRIC CO.
1163 EAST 40TH ST.
CLEVELAND, OHIO 44114-3894
SHANNON SKODA (216-325-1597)
sskoda@leffelectric.com

**CARPET TILE**
GRAND ENTRANCE
4640 WEDGEWOOD BLVD.; SUITE 108
FREDERICK, MD 21709
ASHLEY OBERHOLZER (888-424-6287)
aoberholzer@c-sgroup.com

**SIGNAGE**
(N.I.C. - FOR REFERENCE ONLY)
BLAIR COMPANIES
5107 KISSELL AVE.
ALTOONA, PA 16601
TOM GLUNT (814-283-2040)
tglunt@blaircompanies.com

**TEMPORARY SIGNAGE**
(N.I.C. - FOR REFERENCE ONLY)
BLAIR COMPANIES
5107 KISSELL AVE.
ALTOONA, PA 16601
TOM GLUNT (814-283-2040)
tglunt@blaircompanies.com

## H11 DRAWING INDEX

| DWG. # | DRAWING TITLE |
|---|---|
| BP-1 | ARCHITECTURAL DATA SHEET |
| BP-2 | FLOOR PLAN |
| BP-3 | EXTERIOR ELEVATIONS |
| BP-4 | SITE PLAN & SIGNAGE DETAILS |
| BP-5 | REFLECTED CEILING PLAN |

## D4 FINISH SCHEDULE

| CODE | MATERIAL | MANUFACTURER | PRODUCT NO. | DESCRIPTION | REMARKS | FLAME SPREAD RATING | LOCATION | CONTACT |
|---|---|---|---|---|---|---|---|---|
| ACT-1 | ACOUSTICAL CEILING TILE | ARMSTRONG | 2712 | DUNE SECOND LOOK | 24" X 48" (STANDARD WHITE) | CLASS A | BACK OF HOUSE | |
| ACT-2 | ACOUSTICAL CEILING TILE | ARMSTRONG | 870 | CLEAN ROOM VL (UNPERFORATED) | 24" X 48" (STANDARD WHITE) | FIRE GUARD | BACK OF HOUSE | |
| CB-1 | VINYL COVE BASE | MANNINGTON-BURKE MERCER | #244 | OFF-WHITE 4" | 4" HEIGHT .080" THICKNESS | - | BACK OF HOUSE | CONTACT: JOYCE HOLBERT (706)-629-7301 |
| CB-2 | VINYL COVE BASE | MANNINGTON-BURKE MERCER | #701 | BLACK 4" | 4" HEIGHT .080" THICKNESS | - | SALES AREA | CONTACT: JOYCE HOLBERT (706)-629-7301 |
| CMU-1 | CONCRETE BLOCK | AKRON BRICK & BLOCK | - | IVORY | 8" SPLIT-FACE | - | MAIN FIELD | |
| CMU-2 | CONCRETE BLOCK | AKRON BRICK & BLOCK | - | CREVISE TAN | 8" SPLIT-FACE | - | BASE | |
| CPT-1 | CARPET TILE | MANNINGTON | JO-ANN 6 | INFINITY MODULAR | 18" X 18" | CLASS A | VIKING LEASE AREA/CLASSROOM | CONTACT: JOYCE HOLBERT (706)-629-7301 |
| CPT-2 | CARPET TILE | GRAND ENTRANCE | - | WROUGHT IRON, POWER POINT WITH GRIPFAST | | ASTM E-648: CLASS II | ENTRY VESTIBULE | CONTACT: ASHLEY OBERHOLZER (888) 424-6287 |
| CT-1 | CERAMIC TILE | AMERICAN OLEAN | - | MATTE GLAZED WALL TILE 87 ALMOND | 4.25 X 4.25 | CLASS A | RESTROOM WALL FIELD | |
| CT-2 | CERAMIC TILE | DAL TILE | - | D452 - CYPRESS | 2" X 2" | CLASS A | RESTROOM WALL ACCENT | |
| CT-3 | CERAMIC TILE | AMERICAN OLEAN | - | SATIN GLO - D12 ALMOND | 2" X 2" | CLASS A | RESTROOM WALL ACCENT | |
| EIFS-1 | EXTERIOR INSULATION FINISH SYSTEM | DRYVIT | - | 441A CAPTIVA | FINISH: SANDBLAST | - | ENTRANCE | |
| EIFS-2 | EXTERIOR INSULATION FINISH SYSTEM | DRYVIT | - | 310 CHINA WHITE | FINISH: SANDBLAST | - | CROWN MOLDING | |
| FRP-1 | FIBERGLASS REINFORCED PANEL | MARLITE | P-140 | IVORY - SANITARY WALL FRP | | CLASS A / CLASS C | CORRIDOR/ JANITOR CLOSET | |
| GT-1 | GROUT | TEC | 902 | IVORY | | - | RESTROOM WALLS | |
| P-1 | PAINT | SHERWIN WILLIAMS | SW7105 | PAPERWHITE - EGG SHELL B20W SERIES | PRIMER: PREPRITE (B28W200) FINISH: PROMAR 200 LATEX | CLASS A | GENERAL | REFER TO SPEC SECTION 099100 FOR PAINT @ DOORS & FRAMES |
| P-2 | PAINT | SHERWIN WILLIAMS | SW6679 | FULL MOON - EGG SHELL B20W SERIES | PRIMER: PREPRITE (B28W200) FINISH: PROMAR 200 LATEX | CLASS A | VESTIBULE | |
| P-3 | PAINT | SHERWIN WILLIAMS | SW6252 | ICE CUBE - FLAT B42 SERIES | PRIMER: DTM PRIMER B66 A50 FINISH: WATERBORNE DRYFALL | CLASS A | CEILING | |
| P-4 | PAINT | SHERWIN WILLIAMS | SW6468 | HUNT CLUB - EGG SHELL B20W SERIES | PRIMER: PREPRITE (B28W200) FINISH: PROMAR 200 LATEX | CLASS A | SALES FLOOR STRIPING | |
| P-5 | PAINT | SHERWIN WILLIAMS | SW2831 | CLASSICAL GOLD - EGG SHELL B20W SERIES | PRIMER: PREPRITE (B28W200) FINISH: PROMAR 200 LATEX | CLASS A | SALES FLOOR STRIPING | |
| P-6 | PAINT | SHERWIN WILLIAMS | SW6549 | ASH VIOLET - EGG SHELL B20W SERIES | PRIMER: PREPRITE (B28W200) FINISH: PROMAR 200 LATEX | CLASS A | SALES FLOOR STRIPING | |
| P-7 | PAINT | SHERWIN WILLIAMS | SW6115 | TOTALLY TAN - EGG SHELL B20W SERIES | PRIMER: PREPRITE (B28W200) FINISH: PROMAR 200 LATEX | CLASS A | SALES FLOOR STRIPING | |
| P-8 | PAINT | SHERWIN WILLIAMS | SW6212 | QUIETUDE - EGG SHELL B20W SERIES | PRIMER: PREPRITE (B28W200) FINISH: PROMAR 200 LATEX | CLASS A | SALES FLOOR STRIPING | |
| P-9 | PAINT | SHERWIN WILLIAMS | JO ANN GREEN | FORMULA: [A41T214 BASE] [YJ-4OZ. 16/32] [L1-6OZ. 4/32] [YI 4/32] [W1 28/32] | ALL SURFACE ENAMEL | - | EXT. GREEN ACCENT BAND | AVAILABLE @ ANY SHERWIN WILLIAMS STORE |
| P-10 | PAINT; EIFS-1 MATCH | SHERWIN WILLIAMS | SW6379 | JERSEY CREAM | A-100 LATEX / EXTERIOR A8 SERIES | - | ENTRANCE | |
| P-11 | PAINT; EIFS-2 MATCH | SHERWIN WILLIAMS | SW7103 | WHITE TAIL | A-100 LATEX / EXTERIOR A8 SERIES | - | VESTIBULE | |
| P-12 | PAINT; CMU-1 MATCH | SHERWIN WILLIAMS | SW6385 | DOVER WHITE | A-100 LATEX / EXTERIOR A8 SERIES | - | MAIN FIELD | |
| P-13 | PAINT; CMU-2 MATCH | SHERWIN WILLIAMS | SW6148 | WOOL SKEIN | A-100 LATEX / EXTERIOR A8 SERIES | - | BASE | |
| PC-1 | PAINTED CONCRETE | SHERWIN WILLIAMS | HS 1000 | ARMORSEAL - EPOXY - DECK GRAY | - | CLASS A | STOCK ROOM | |
| PC-2 | PAINTED CONCRETE | SHERWIN WILLIAMS | HS 1000 | ARMORSEAL - EPOXY - SAFETY YELLOW | - | CLASS A | STOCK ROOM EGRESS PATH | |
| PL-1 | PLASTIC LAMINATE | WILSONART | 7911-60 | MANITOBA MAPLE | - | CLASS B | CASEWORK/ CANOPY SYSTEM | |
| PL-2 | PLASTIC LAMINATE | WILSONART | D403-60 | WHITE SAND | - | CLASS B | ENTRY WINDOW SILL | |
| RF-1 | RESILIENT FLOORING | MANNINGTON ESSENTIALS | JO-ANN 1 | WHITE | 12" X 12" | CLASS A | SALES FLOOR/BACK OF HOUSE | CONTACT: JOYCE HOLBERT (706)-629-7301 |
| RF-2 | RESILIENT FLOORING | MANNINGTON ESSENTIALS | JO-ANN 2 | SEASPRAY | 12" X 12" | - | SALES FLOOR | CONTACT: JOYCE HOLBERT (706)-629-7301 |
| RF-3 | RESILIENT FLOORING | MANNINGTON ESSENTIALS | JO-ANN 3 | FOREST | 12" X 12" | CLASS A | SALES FLOOR | CONTACT: JOYCE HOLBERT (706)-629-7301 |
| RF-4 | RESILIENT FLOORING | MANNINGTON BIOSPEC | JO-ANN 4 | SPEARMINT | 6' W X 82' L ROLL SIZE | CLASS A | RESTROOMS | CONTACT: JOYCE HOLBERT (706)-629-7301 |
| RF-5 | RESILIENT FLOORING | MANNINGTON BIOSPEC | JO-ANN 5 | ECRU | 6' W X 82' L ROLL SIZE | CLASS A | BREAKROOM | CONTACT: JOYCE HOLBERT (706)-629-7301 |

## A4 CODE NOTES

THESE PROTOTYPE DRAWINGS ARE BASED ON THE 2006 INTERNATIONAL BUILDING CODE. FOR SITE-SPECIFIC PROJECTS, DRAWINGS SHALL BE ALTERED TO COMPLY WITH ALL APPLICABLE STATE AND LOCAL CODES AND REGULATIONS.

**USE GROUP:** M (MERCANTILE)

**CONSTRUCTION TYPE:** TYPE II-B, NON-COMBUSTIBLE, UNPROTECTED, FULLY SPRINKLERED

**HEIGHT AND AREA LIMITATIONS:** 4 STORIES/ 12,500 SF
(ALLOWABLE INCREASE OF 300% FOR SPRINKLERED BLDG.) =37,500 SF

**SEISMIC ZONE:** I

**OCCUPANT LOAD:**

| | | |
|---|---|---|
| SALES AREA: | 22,522 NET S.F./30 = | 751 OCCUPANTS |
| OFFICES: | 911 NET S.F./100 = | 10 OCCUPANTS |
| STOCKROOM: | 992 NET S.F./300 = | 4 OCCUPANTS |
| TOTAL NUMBER OF OCCUPANTS: | | 765 OCCUPANTS |

**MAXIMUM TRAVEL DISTANCE TO AN EXIT:** 250 FEET (W/ SPRINKLER SYSTEM)

**REQUIRED EGRESS WIDTH:** 0.15 X 765 = 114.7 INCHES

**ACTUAL EGRESS WIDTH:** 228 INCHES

**NUMBER OF EXITS REQUIRED:** 3

**NUMBER OF EXITS PROVIDED:** 4

**PLUMBING FIXTURES:**
MALE: 1 WC, 1 LAVATORY
FEMALE: 1 WC, 1 LAVATORY
1 JANITORIAL SINK
2 DRINKING FOUNTAINS (1 ADA COMPLIANT)

A7 GRAPHIC SYMBOLS

**EXHIBIT C.1** ??/??/??
STORE #: ????-
?????? SHOPPING CENTER
????? RD.
ANYWHERE, STATE ?????
LANDLORD APPROVAL OF SCOPE OF WORK

NAME DATE

TITLE

JOANN APPROVAL OF SCOPE OF WORK

NAME DATE

TITLE

STORE PLANNING APPROVAL
PLEASE SIGN BOTH SETS AND FORWARD ONE SET TO CRAIG EDGE,
DIRECTOR OF STORE PLANNING AT:
5555 DARROW RD. HUDSON, OHIO 44236

REFER TO FULL SET OF JO-ANN PROTOTYPE DRAWINGS FOR MORE SPECIFIC AND COMPLETE PROTOTYPE INFORMATION.

A11 SIGN OFF

JO-ANN fabrics and crafts
BLOCK PLAN DOCUMENTS
~~TURNKEY~~ SHELL

| No. | Revisions/Submissions | Date |
|---|---|---|

design-forum architects, Inc.
7575 Paragon Road, Dayton, Ohio 45459 Telephone: (937) 439-4400

© 2008 DESIGN FORUM ARCHITECTS

NOTES:
THESE DRAWINGS ARE CONCEPTUAL DOCUMENTS ONLY AND ARE NOT TO BE USED FOR CONSTRUCTION. DRAWINGS SHALL BE ALTERED TO COMPLY WITH ALL APPLICABLE STATE AND LOCAL CODES BY THE PROJECT ARCHITECT WHEN CREATING THE CONSTRUCTION DOCUMENTS.

THESE DOCUMENTS CONTAIN PROPRIETARY AND CONFIDENTIAL INFORMATION OF JO-ANN STORES, INC. NO PORTION OF THIS DOCUMENT MAY BE USED, REPRODUCED OR SHARED OUTSIDE OF THE COMPANY WITHOUT THE PRIOR WRITTEN PERMISSION OF JO ANN STORES.

| | |
|---|---|
| Project No. | 264486.01 |
| Scale | AS NOTED |
| Drawn | DF |
| Checked | MT/DR |
| Date | December 1, 2008 |
| Drawing Title | ARCHITECTURAL DATA SHEET |
| Drawing No. | BP-1 |

**JO-ANN** fabrics and crafts
BLOCK PLAN DOCUMENTS
SHELL

## G1 — GENERAL NOTES

A. BUILDING SHALL BE CONSTRUCTED TO MEET MINIMUM ASHRAE/IES STANDARD 90.1-1999 REQUIREMENTS.

B. COORDINATE EXTERIOR LIGHTING WITH LANDLORD STANDARDS. FINAL APPROVAL OF EXTERIOR LIGHTING BY JO-ANN STORES, INC. ALL EXTERIOR LIGHTING TO BE RUN TO LANDLORD'S HOUSE PANEL.

C. THE GENERAL CONTRACTOR IS TO PROVIDE FIRE STOPS AND DRAFT STOPS AS REQUIRED PER CODE.

D. PROVIDE INSULATION ON AND/OR IN ALL EXTERIOR WALLS. TOTAL EXTERIOR WALL ASSEMBLY R-VALUE SHALL COMPLY WITH CODE REQUIREMENTS FOR THE PROJECT LOCATION. REFER TO SPECIFICATIONS FOR MINIMUM R-VALUE AND INSULATION REQUIREMENTS — (MINIMUM MINIMUM VALUE OF R-13)

E. ROOF INSULATION (R-30 MIN.) SHALL BE ROOF OR EXTERIOR OF ROOF DECK. NOTE INSULATION TO UNDERSIDE OF DECK IS NOT PERMISSIBLE.

F. ALL EXTERIOR WINDOW AND DOOR DIMENSIONS ARE TO MASONRY BLOCK OPENINGS.

G. G.C. TO PERFORM SLAB MOISTURE TEST AND VERIFY ACCEPTABLE LEVELS PRIOR TO VCT INSTALLATION. IF TEST REACHES THAT SLAB MOISTURE LEVELS DO NOT MEET MANUFACTURER RECOMMENDATIONS FOR VCT INSTALLATION, NOTIFY TENANT IMMEDIATELY. REFER TO SPECIFICATIONS FOR FURTHER INFORMATION.

## G3 — ARCHITECT/ENGINEER NOTES

A. THE NUMBER OF EXITS INDICATED ARE THE MINIMUM REQUIRED. ADDITIONAL EXITS SHALL BE PROVIDED IF REQUIRED BY LOCAL BUILDING DEPARTMENT REQUIREMENTS.

B. DOCK HEIGHT AND ACTUAL STRUCTURAL MEMBER SIZES MAY VARY DEPENDING ON LOCAL CODE REQUIREMENTS AND LOADING CAPACITIES. SITE SPECIFIC ARCHITECT/ENGINEER TO ALLOW FOR MINIMUM OF 24" BETWEEN BOTTOM OF JOIST GIRDERS AND BOTTOM OF STRIP FLUORESCENT LIGHTING

C. SITE SPECIFIC ARCHITECT/ENGINEER TO NOTIFY JO-ANN STORES, INC. OF ANY POTENTIAL OBSTRUCTIONS IN SALES FLOOR AREA UP TO 14'-0" A.F.F. THIS WOULD INCLUDE ALL ITEMS INCLUDING THE INSPECTION TEST STATIONS, CLEAN-OUTS, ROOF DRAINS, ELECTRICAL CONDUIT, SPRINKLER LINES, ETC.

## G6 — HVAC/ELECTRICAL
### MINIMUM REQUIREMENTS

A. MECHANICAL DISTRIBUTION SHALL BE SIZED TO MEET A MINIMUM REQUIREMENT OF 1 TON PER 400 SQ. FT.

B. ELECTRICAL DISTRIBUTION SHALL BE SIZED TO MEET A MINIMUM OF 600 AMP (277/480V) INCOMING SERVICE. LANDLORD SHALL BE RESPONSIBLE TO PROVIDE REQUIRED SERVICE FEED TO DISCONNECT, CT CABINET AND METER SOCKET LOCATED ON REAR WALL OF BUILDING PER LOCAL CODE REQUIREMENTS.

## G9 — LIGHTING FIXTURE LEGEND

| FIXTURE NUMBER | FIXTURE SYMBOL | TYPE |
|---|---|---|
| A | [square] | EXTERIOR WALL PACK @ 12'-0" A.F.F. |
| B | [circle] | METAL HALIDE CAN LIGHT @ 13'-4" A.F.F. |

EXHIBIT C-3    11/11/YY
STORE # YYYY-
YYYYY SHOPPING CENTER
YYYYY RD.
ANYWHERE, STATE YYYYY
LANDLORD APPROVAL OF SCOPE OF WORK

NAME _____ DATE _____
TITLE _____
JOANN APPROVAL OF SCOPE OF WORK

NAME _____ DATE _____
TITLE _____
STORE PLANNING APPROVAL

PLEASE SIGN BOTH SETS AND FORWARD ONE SET TO CRAIG EDGE,
DIRECTOR OF STORE PLANNING AT:
5555 DARROW RD. HUDSON, OHIO 44236

## SHEET NOTES

1. SHELL ARCHITECT/ SHELL GENERAL CONTRACTOR SHALL BE RESPONSIBLE FOR PROVIDING/ COORDINATING RECESSED DOCK PIT AND LEVELER INSTALLATION AND DIMENSIONS AS REQUIRED BY DOCK LEVELER MANUFACTURER AND SITE-SPECIFIC CONDITIONS.
2. CONCRETE SIDEWALK; 15'-6" WIDE MINIMUM.
3. WALL PACKS AS REQUIRED; CONNECT TO LANDLORD HOUSE PANEL.
4. SPRINKLER RISER LOCATION W/ PIPE RAIL PROTECTION 36" A.F.F. AS REQUIRED.
5. PROVIDE CONCRETE PAD/RAMP/PAD. AS REQUIRED DEPENDING ON SITE SPECIFIC GRADE CONDITIONS.
6. G.C. NOT TO POUR CONCRETE IN THIS AREA TO ALLOW FOR PLUMBING STUB-UPS.
7. TRENCH DRAIN— TIE INTO NEAREST CATCH BASIN.
8. CONCRETE RETAINING WALL W/ RAILING.
9. 3-5/8" METAL STUD FRAMING, INSULATION & 5/8" GYP. BOARD FROM FLOOR TO DECK @ SALES AREA WALLS.  FINISH TO PAINT READY CONDITION.
10. DUMPSTER ENCLOSURE LOCATION.
11. PROVIDE OVERHEAD DOOR, DOCK SEAL AND DOCK BUMPERS.
12. 6" CONCRETE PIPE BOLLARD.
13. 30" X 36" ROOF HATCH ABOVE.
14. TRANSFORMER LOCATION W/ CONCRETE PAD.
15. 3'-8" TALL GATE CONTROL.
16. ADA HANDICAP RAMP.
17. 6" THICK POURED CONCRETE RAMP WITH STEEL REINFORCEMENT. IF RECESSED DOCK IS NOT PROVIDED, GC SHALL PROVIDE A 12' X 40' REINFORCED CONCRETE PAD FOR TRUCK DELIVERIES.  PROVIDE MINIMUM 15'0" CLEARANCE.
18. LINE OF RTU ROOF PENETRATION ABOVE.

## WALL LEGEND

| | |
|---|---|
| [hatched] | NEW CMU WALL |
| [solid] | NEW GYP. BD. WALL |

SALES FLOOR LOWEST DECK HEIGHT:
18'-0" A.F.F.
SALES AREA BOTTOM OF LOWEST STEEL:
14'-0" A.F.F.

## A1 — FLOOR PLAN
3/32"=1'-0"

**design forum** architects inc.
7575 Paragon Road, Dayton, Ohio 45459 Telephone (937) 435-8400

© 2008 DESIGN FORUM ARCHITECTS

NOTES:
THESE DRAWINGS AND CONCEPTUAL DOCUMENTS ONLY AND ARE NOT TO BE USED FOR CONSTRUCTION. DRAWINGS SHALL BE ALTERED TO COMPLY WITH ALL APPLICABLE CODES AND LOCAL ORDES BY THE PROJECT ARCHITECT WHEN ORDERING THE DOCUMENTS.

THESE DOCUMENTS CONTAIN PROPRIETARY AND CONFIDENTIAL INFORMATION OF JO-ANN STORES, INC. NO PORTION OF THIS DOCUMENT MAY BE USED, REPRODUCED OR RELEASED BY THE COMPANY WITHOUT THE PRIOR WRITTEN PERMISSION OF JO-ANN STORES.

| | |
|---|---|
| Project No. | 266446.01 |
| Scale | 3/32" = 1'-0" |
| Drawn | DF |
| Checked | MF/DB |
| Date | December 1, 2008 |

Drawing Title
**FLOOR PLAN**

Drawing No.
**BP-2**

**G1 — EXTERIOR ELEVATION** — REAR — 1/8"=1'-0"

**D1 — EXTERIOR ELEVATION** — SIDE — 1/8"=1'-0"

**A1 — EXTERIOR ELEVATION** — FRONT — 1/8"=1'-0"

JO ANN RESERVES THE RIGHT TO ADD A FOURTH CATEGORY SIGN "HOME" IF SIGN VENDOR CAN OBTAIN APPROVAL FROM LOCAL AUTHORITIES

## SHEET NOTES

1. GUARDRAIL @ LOADING DOCK
2. SIGNAGE TO BE SUPPLIED & INSTALLED BY JOANN. GENERAL CONTRACTOR/ELECTRICAL CONTRACTOR TO PROVIDE BLOCKING & COORDINATE POWER REQUIREMENTS W/ SIGN MANUFACTURER. FINAL SIGN WIRING BY ELECTRICAL CONTRACTOR
3. CONCRETE PIPE BOLLARD
4. EIFS SHOWN W/ METAL CAP FLASHING.
5. EXTERIOR LIGHTING CONNECTED TO LANDLORD'S HOUSE PANEL.
6. CAP FLASHING TO MATCH P-12
7. EIFS PILASTER
8. AUTOMATIC SLIDING DOOR WITH ALUMINUM STOREFRONT FRAMING AND GLAZING SYSTEM ABOVE.
9. PROVIDE OVERHEAD DOOR, DOCK SEAL AND DOCK BUMPERS.
10. SIGNAGE SHOWN AT SIDE ELEVATION WILL BE SHOWN AS JO ANN STORES INC. DEEMS NECESSARY ON A SITE BY SITE BASIS.
11. TRANSFORMER ON CONCRETE PAD.
12. 6" GUTTER W/ DOWNSPOUT, PAINT P-12
13. OMIT CART CORRAL.
14. OMIT BASE AT CANOPY PIER.
15. DUMPSTER ENCLOSURE LOCATION.
16. SIGNAGE SHOWN AT SIDE ELEVATION WILL BE SHOWN AS JO ANN STORES INC. DEEMS NECESSARY ON A SITE BY SITE SCENARIO.

## GENERAL NOTES

A. ROOF DRAINAGE DESIGN MAY REQUIRE THAT COPING NOT OCCUR ON SIDE OR REAR ELEVATIONS OF BUILDING. COORDINATE THESE ELEVATIONS WITH ROOF DRAINAGE DESIGN.
B. "+" TEMPERED GLASS.
C. GENERAL CONTRACTOR TO PROVIDE CONTROL JOINTS AT 30'-0" O.C. TYPICALLY AND ACCORDING TO LOCAL JURISDICTION REQUIREMENTS.
D. JO ANN RESERVES THE RIGHT TO PROVIDE ADDITIONAL BUILDING SIGNS AS SITE-SPECIFIC CONDITIONS AND VISIBILITY DICTATE.
E. GC TO VERIFY ELECTRICAL REQUIREMENTS WITH JO ANN NATIONAL ACCOUNT SIGNAGE VENDOR.
F. IN CASES WHERE A CANOPY IS PROVIDED ALONG THE ENTIRE FRONT FACADE, THE GC SHALL PROVIDE ACCESS PANEL(S) AS REQUIRED FOR SIGNAGE ELECTRICAL ACCESSIBILITY.

EXHIBIT C.3
STORE #: ????-
????? SHOPPING CENTER
????? RD.
ANYWHERE, STATE ?????
LANDLORD APPROVAL OF SCOPE OF WORK

JOANN APPROVAL OF SCOPE OF WORK

STORE DRAWING APPROVAL
PLEASE SIGN BOTH SETS AND FORWARD ONE SET TO CRAIG EDGE,
DIRECTOR OF STORE PLANNING AT:
5555 DARROW RD, HUDSON, OHIO 44236

**JO-ANN** fabrics and crafts
BLOCK PLAN DOCUMENTS
SHELL

**design·forum** architects, inc.
7575 Paragon Road, Dayton, Ohio 45459 Telephone: (937) 439-4400

© 2008 DESIGN FORUM ARCHITECTS

Project No. 264466.01
Scale AS NOTED
Drawn DF
Checked MT/DR
Date December 1, 2008

## EXTERIOR ELEVATIONS

Drawing No. **BP-3**

## SHEET NOTES

1. BOLLARD AND HANDICAP ACCESSIBLE PARKING SIGNAGE.
2. PYLON SIGN.
3. EXTERIOR LIGHTING.
4. H.C. RAMP.
5. LOCATION OF TEMPORARY BARRIERS.
6. COVERED CART STORAGE AND ENTRY CANOPY.
7. 6" CONCRETE PIPE BOLLARDS.
8. CONCRETE RAMP FOR LOADING DOCK; PROVIDE MINIMUM 150' CLEARANCE.
9. DUMPSTER ENCLOSURE ON CONCRETE PAD.
10. FREE-STANDING PRIMARY CAR CORRAL PROVIDED AND INSTALLED BY JO ANN STORES.
11. STOP SIGN (PAINTED "STOP" SIGNS CENTERED ON JO ANN ENTRY.
12. PREFERRED CROSSWALK W/ STOP SIGNS CENTERED ON JO ANN ENTRY LOCATION.
13. TRANSFORMER WITH CONCRETE PAD AND PROTECTIVE PIPE BOLLARDS.
14. PREFERRED INCOMING WATER AND GAS UTILITY LOCATION.

## GENERAL SITE NOTES

A. THIS SITE PLAN IS SCHEMATIC. ACTUAL CONDITIONS MAY VARY. COORDINATE ALL PARKING, LANDSCAPING, CIRCULATION AND DELIVERY ROUTES WITH JO ANN STORES, INC. AND LOCAL AUTHORITIES.
B. SITE SIGNAGE TO BE MODIFIED FOR EACH SPECIFIC SITE AND ACCORDING TO LOCAL JURISDICTION REQUIREMENTS.
C. LANDSCAPING AND IRRIGATION PER GOVERNING JURISDICTION AND/ OR LANDLORD'S REQUIREMENTS.
D. FOR EXACT PARKING SPACE DIMENSION AND COUNT REQUIREMENTS, SEE LOCAL AUTHORITIES.
E. MINIMUM OF 1 PARKING SPACE FOR EVERY 200 S. FT. OF BUILDING AREA REQUIRED BY TENANT.  COORDINATE EXACT PARKING REQUIREMENTS WITH LOCAL GOVERNING AUTHORITIES.
F. SITE NEEDS TO ACCOMMODATE A 150' MINIMUM CLEARANCE FROM BACK OF OVERHEAD DOOR AT BUILDING FOR TRUCK ACCESS.
G. SCREENING OF DUMPSTER AND/ OR RECEIVING AREA SHALL BE AS REQUIRED BY LOCAL CODES/ ORDINANCES.
H. IF EXISTING CONDITION DEPICTS (2) RECESSED DOCKS THEN A CONTRACTOR IS TO BE USED.  LANDLORD ARCHITECT TO VERIFY CONTRACTOR DOCK & COMPACTOR CLEARANCES W/ JOANN.

## PARKING SPACES

1 PARKING SPACE FOR EVERY 200 SQUARE FEET
25,212 SQ FT / 200 = 126 SPACES REQUIRED
430  TOTAL CARS PROVIDED
9    HANDICAP PARKING SPACES REQUIRED
9    HANDICAP PARKING SPACES PROVIDED

430  TOTAL PARKING SPACES (COORDINATE EXACT PARKING REQUIREMENTS WITH LOCAL GOVERNING AUTHORITIES)

EXHIBIT C.4                                                    11/?/??
STORE #: ????-
?????? SHOPPING CENTER
????? RD.
ANYWHERE, STATE ?????
LANDLORD APPROVAL OF SCOPE OF WORK

NAME _____   DATE _____

JOANN APPROVAL OF SCOPE OF WORK

NAME _____   DATE _____

TITLE _____

STORE PLANNING APPROVAL

PLEASE SEND BOTH SETS AND FORWARD ONE SET TO CRAIG EDGE,
DIRECTOR OF STORE PLANNING AT:
5555 DARROW RD. HUDSON, OHIO 44236

---

**PYLON/MONUMENT SIGN**

APPROX. PANEL WIDTH

JO-ANN
fabrics and crafts

TENANT 'B'

TENANT 'C'  TENANT 'D'

THE PYLON SIGN SHOWN DOES NOT REPRESENT THE ACTUAL PYLON ON SITE. LLD IS RESPONSIBLE FOR PYLON DESIGN, CONSTRUCTION AND PERMITS. JO-ANN SIGN VENDOR WILL COORDINATE WITH JO-ANN TO FINAL DESIGN REQUIREMENTS FOR THE JOANN PANEL.

NOTE:
PANEL PROVIDED AND INSTALLED BY TENANT; ALL GRAPHICS ARE SIZED TO COME 6" AWAY FROM MOLDING, AT LOWEST OR TALLEST AXIS TO REDUCE NEGATIVE MARGIN SPACE.

**SITE SIGN**

JO-ANN
fabrics and crafts
NEW STORE OPENS

**NOW OPEN - FRONT**
1'-9" X 2'-6"

**THANK YOU - BACK**
1'-9" X 2'-6"

**NOW OPEN**

**GRAND OPENING - BACK**
8'-0" X 2'-0"

JO-ANN
fabrics and crafts stores
COMING SOON    NOW OPEN
1.888.919.0000

8'-0" X 14'-0" 2 IF BANNER W/ GROMMETS

JO-ANN
fabrics and crafts stores
COMING SOON    NOW OPEN
1.888.919.0000

8'-0" X 14'-0" 2 IF BANNER W/ GROMMETS

JO-ANN
fabrics and crafts stores
COMING SOON

8'-0" X 14'-0" 2 IF BANNER W/ GROMMETS

JO-ANN
NOW OPEN

NOW OPEN  FRONT
2 X 3
DOUBLESIDED

THANK YOU
FOR SHOPPING AT
JO-ANN

NOW OPEN  BACK
2 X 3
DOUBLESIDED

JO-ANN
RECEIVING ROOM

SINGLE FACED
.063 ALUMINUM SIGNAGE
INSTALLED W/ PERMANENT SIGNAGE

NOTE:
ALL TEMPORARY SIGNAGE SHOWN IS PROVIDED AND INSTALLED BY JO ANN STORES, INC. THE GENERAL CONTRACTOR IS RESPONSIBLE FOR THE BANNERS STAYING UP FOR THE DURATION OF CONSTRUCTION.

---

BUILDING FOOTPRINT
25,212 SQ FT.

150'-0"

---

| A1 | SIGNAGE | A3 | SIGNAGE | A6 | SITE PLAN |
| | | | | | 1"=50' |

---

JO-ANN
fabrics and crafts

design forum
architects, inc.
7575 Paragon Road, Dayton, Ohio 45459 Telephone (937) 439-4400

© 2008 DESIGN FORUM ARCHITECTS
THESE DRAWINGS ARE CONCEPTUAL DOCUMENTS ONLY AND ARE NOT TO BE USED FOR CONSTRUCTION.  DRAWINGS SHALL BE ALTERED TO COMPLY WITH ALL APPLICABLE STATE AND LOCAL CODES BY THE PROJECT ARCHITECT WHEN COVERING THE CONSTRUCTION DOCUMENTS.
THESE DOCUMENTS CONTAIN PROPRIETARY AND CONFIDENTIAL INFORMATION OF DESIGN FORUM, INC. NO PORTION OF THIS DOCUMENT MAY BE USED, REPRODUCED OR SHARED OUTSIDE OF JOANN WITHOUT THE PRIOR WRITTEN PERMISSION OF DESIGN FORUM.

Project No.  264466.01
Scale  AS NOTED
Drawn  DF
Checked  MV/DR
Date  December 1, 2008
Drawing Title

SITE PLAN &
SIGNAGE
DETAILS

Drawing No.
BP-4

BLOCK PLAN DOCUMENTS
SHELL

**EXHIBIT D-1**

**Tenant's Prototype Sign Drawings and Pylon Sign**



## LED CHANNEL LETTERS
scale: 3/16"=1'-0"

JOANN: 156.3 sq. ft.
FABRICS & CRAFTS: 64.5 sq. ft.
TOTAL: 220.8 sq. ft.

**LED FLUSH MOUNTED SELF CONTAINED CHANNELS:** JO·ANN

| | |
|---|---|
| FACES: | 3/16" #2447 White acrylic w/ Avery Bottle Green vinyl overlay |
| TRIMCAP: | 2" White jewelite |
| RETURNS: | 8" deep .063 alum. - White |
| BACKS: | .063 Alum. - pre-painted White |
| ILLUMINATION: | GEGLMXS6 Green Tetra Max LED's with self contained power supplies as req'd by manufacturer |
| MOUNTING: | Surface mounted, flush |

**LED FLUSH MOUNTED REMOTE CHANNELS:** fabrics and crafts

| | |
|---|---|
| FACES: | 3/16" #2447 White acrylic w/ Avery Bottle Green vinyl overlay |
| TRIMCAP: | 1" White jewelite |
| RETURNS: | 5" deep .063 alum. - White |
| BACKS: | .063 Alum. - pre-painted White |
| ILLUMINATION: | GEGLMXS6 Green Tetra Max LED's with remote power supplies as req'd by manufacturer |
| MOUNTING: | Surface mounted, flush |

**COLOR MATCHING**

Avery A6682-T
Bottle Green

9'-0" overall
31'-3"
5'-0"
16-3/4"
f= 2'-4-1/2"
27'-2"

Dept Signage specs on page 3

Scale: 1/16"=1'
TOP OF PARAPET 26'-0" AFF
26'-0" AFF
32'

seasonal   classes          decor   floral

**SECTION VIEW**

## MC SIGN COMPANY
8959 TYLER BLVD.
MENTOR, OHIO 44060
PH. 440-209-6200 FAX 440-209-6277

| CLIENT: | JO·ANN fabrics and crafts | |
|---|---|---|
| ADDRESS: | VARIOUS | |

| TICKET #: N/A | DRAWING #: 091210-1 | DATE: 12/10/09 |
|---|---|---|
| PROJECT MANAGER: ELIZABETH MERRITT | | DESIGNER: SS |
| ELECTRONIC FILE LOCATION & NAME: JOANN/PROTOTYPE/ FY2011 PROTOTYPES | | |
| REVIEWED BY: | | DATE: |

| REVISION HISTORY | | |
|---|---|---|
| DATE: | CHANGES MADE: | |

# Sign On.™
Partner with the best.

CLIENT SIGNATURE & APPROVAL DATE:

NOTICE: PRINTS ARE THE EXCLUSIVE PROPERTY OF "MC SIGN COMPANY" ANY UN-AUTHORIZED USE OR DUPLICATION WILL RESULT IN A 20% CHARGE PER OCCURRENCE PER THE VALUE OF THE DISPLAY ©MC SIGN CO. 1998



**LED CHANNEL LETTERS**
scale: 3/16"= 1'-0"

JOANN: 156.3 sq. ft.
FABRICS & CRAFTS: 64.5 sq. ft.
TOTAL: 220.8 sq. ft.

**LED FLUSH MOUNTED SELF CONTAINED CHANNELS:**  JO·ANN

FACES: 3/16" #2447 White acrylic w/ Avery Bottle Green vinyl overlay
TRIMCAP: 2" White jewelite
RETURNS: 8" deep .063 alum. - White
BACKS: .063 Alum. - pre-painted White
ILLUMINATION: GEGLMXS6 Green Tetra Max LED's with self contained power supplies as req'd by manufacturer
MOUNTING: Surface mounted, flush

**LED FLUSH MOUNTED REMOTE CHANNELS:**  fabrics and crafts

FACES: 3/16" #2447 White acrylic w/ Avery Bottle Green vinyl overlay
TRIMCAP: 1" White jewelite
RETURNS: 5" deep .063 alum. - White
BACKS: .063 Alum. - pre-painted White
ILLUMINATION: GEGLMXS6 Green Tetra Max LED's with remote power supplies as req'd by manufacturer
MOUNTING: Surface mounted, flush

**COLOR MATCHING**

Avery A6682-T
Bottle Green

Proposed Signage                          Scale: 1/32"=1'

**SECTION VIEW**

**MC SIGN COMPANY**

8959 TYLER BLVD.
MENTOR, OHIO 44060
PH. 440-209-6200 FAX 440-209-6277

CLIENT: JO·ANN fabrics and crafts
ADDRESS:                VARIOUS

TICKET #:  N/A
DRAWING #:  091210-2
DATE:  12/10/09

PROJECT MANAGER:  ELIZABETH MERRITT
DESIGNER:  SS

ELECTRONIC FILE LOCATION & NAME:
JOANN/PROTOTYPE/FY2011 PROTOTYPES

REVIEWED BY:                DATE:

REVISION HISTORY
DATE:        CHANGES MADE:

**Sign On.** ™
Partner with the best.

CLIENT SIGNATURE & APPROVAL DATE:

NOTICE: PRINTS ARE THE EXCLUSIVE PROPERTY OF "MC SIGN COMPANY" ANY UN-AUTHORIZED USE OR DUPLICATION WILL RESULT IN A 20% CHARGE PER OCCURRENCE PER THE VALUE OF THE DISPLAY ©MC SIGN CO. 1998



**NON-ILLUMINATED, DEPARTMENT SIGNAGE**
scale: 3/8"=1'-0"

FLORAL: 8.6 sq. ft.
SEASONAL: 31.3 sq. ft.

DECOR: 10.2 sq. ft.
CLASSES: 13.2 sq. ft.

61-5/8"    73-1/8"    95"

20" floral    20" decor    20" classes

225- 1/8"

20" seasonal

**NON-ILLUMINATED REVERSE CHANNELS**

**FACES:** .090 alum. painted White

**RETURNS:** .063 alum. 3" deep welded
to faces; Painted White

**MOUNTING:** Stud mounted flush as req'd

Scale: 1/16"=1'

TOP OF PARAPET
26'-0" AFF

26'-0" AFF

JO-ANN
fabrics and crafts

Channel letter
specs on page 1

Copy to be centered
vertically in Green color band

seasonal   classes          decor   floral

**SECTION VIEW**

DRILL MASONRY
FILL HOLE W/ SILICONE
OR SIMILAR ADHESIVE

STUD WELD
BEHIND
LETTER FLUSH
W/ WALL

ALUMINUM
LETTERS

STUDS BONDED
OR WELDED TO
ALUMINUM FACE

WALL

**MC SIGN COMPANY**
8959 TYLER BLVD.
MENTOR, OHIO 44060
PH. 440-209-6200 FAX 440-209-6277

CLIENT: JO-ANN fabrics and crafts

ADDRESS: VARIOUS

TICKET #:  DRAWING #: 091210-3  DATE: 12/10/09
N/A
PROJECT MANAGER: ELIZABETH MERRITT  DESIGNER: SS
ELECTRONIC FILE LOCATION & NAME:
J/JOANN/PROTOTYPE/FY2011 PROTOTYPES
REVIEWED BY:  DATE:

REVISION HISTORY
DATE:    CHANGES MADE:

**Sign On.**
Partner with the best.
CLIENT SIGNATURE & APPROVAL DATE:

NOTICE: PRINTS ARE THE EXCLUSIVE PROPERTY OF "MC SIGN COMPANY" ANY UN-AUTHORIZED USE OR DUPLICATION WILL RESULT IN A 20% CHARGE PER OCCURRENCE PER THE VALUE OF THE DISPLAY©MC SIGN CO. 1998







NOTICE: PRINTS ARE THE EXCLUSIVE PROPERTY OF "MC SIGN COMPANY" ANY UN-AUTHORIZED USE OR DUPLICATION WILL RESULT IN A 20% CHARGE PER OCCURRENCE PER THE VALUE OF THE DISPLAY©MC SIGN CO. 1998





## **EXHIBIT D-2**

GENERAL CONTRACTOR'S AFFIDAVIT AND PARTIAL LIEN WAIVER

STATEOF _____ )
                                             ) ss.:
COUNTYOF _____ )

TO WHOM IT MAY CONCERN:

The undersigned has been employed by Jo-Ann Stores, Inc. to furnish labor and/or materials as general contractor or subcontractor (circle one) for the improvement to, or materials supplied to, certain premises known as _____ of the Spring Creek Centre (the "Project") in the County of Washington, State of Arkansas, of which DDR MDT Fayetteville Spring Creek LLC (the "Owner") is the owner, hereby agrees:

Now, therefore, this __ day of _____, 20__, for and consideration of the partial payment(s) received as of the date hereof, the receipt of which is hereby acknowledged, the undersigned does hereby waive and release, any lien rights to, or claim of lien with respect to the Project, and the improvements thereon, and on the moneys or other considerations due or to be come due from Jo-Ann Stores, Inc. on account of labor, services, materials, fixtures, apparatus, or machinery furnished up to the date of this instrument by the undersigned in connection with or arising out of the aforesaid Project.

_____

By:_____
Name:
Title:

Sworn to before me and subscribed in my presence this ___ day of _____ 20__.

Notary Public

#3826

**EXHIBIT D-3**

### GENERAL CONTRACTOR'S AFFIDAVIT AND LIEN WAIVER AND SUBCONTRACTOR'S LIEN WAIVER

STATE OF _____ )
                          ) ss.:
COUNTY OF _____ )

TO:    Jo-Ann Stores, Inc. ("Tenant")
       and
       DDR MDT Fayetteville Spring Creek LLC ("Landlord")

Unit No.:
Store Name: JoAnn
Shopping Center: Spring Creek Centre (the "Real Estate")
Location: Fayetteville, Arkansas

_____ being duly sworn and authorized, deposes and says that this affidavit is made on behalf of _____ (the "Company") as its _____ and is the free act and deed of the undersigned and the Company.

Furthermore, for and in consideration of $_____ paid to the Company, the receipt and sufficiency of which are hereby acknowledged, the Company does hereby waive, release and relinquish any and all liens, lien rights, claims or demands of any kind whatsoever which the Company now has or may hereafter acquire against the Tenant, the Landlord, the Real Estate referenced above and/or the improvements thereon for any and all work, labor, materials, equipment, machinery or other goods and services rendered, performed or furnished at the above referenced location (the "Work").

The Undersigned further warrants and represents that:

(i)    Any and all amounts owed by or on behalf of the Company to any other party for the Work, or any portion thereof, furnished by such other party on behalf of the Company, have been paid in full;

(ii)   The Company agrees to indemnify, defend and hold harmless the Tenant and Landlord, and its agents, directors, employees, members, managers and shareholders, as the case may be, from and against any and all claims, causes of action, loss, damage, cost and expense (including reasonable attorneys' fees) as a result of any breach of the warranties and representations herein;

(iii)  The Work has been fully performed in accordance with the plans and specifications and in conformance with the requirements of any building code authority having jurisdiction over the performance of the Work; and

(iv)   The Company guarantees all materials and workmanship for a period of one (1) year from the date of execution of this instrument.

#3826

Subscribed and sworn to
before me this __ day
of _____ ,20__.


Company: _____ _____

By: _____ .
Its: _____ _____


Address:_____ _____

Notary Seal (seal required)

Phone No.:_____ ___

## **EXHIBIT D-4**

Signage guidelines for all tenant signs

(attached hereto)

#3826

EXHIBIT D-4

**Sign Criteria**

The criteria outlined herein is to be used for Landlord design purposes only.  It is the Tenant's responsibility to further conform to all local and state building codes, laws and applicable regulations. Landlord makes no representations with respect to local code and compliance with such regulations, which is the sole responsibility of the Tenant and the Tenant's sign provider.

A.    Definitions

For the purpose of reference in this Exhibit, the following definitions are stated:

1.    Where "Developer-Landlord" is mentioned, reference is to _____ DDR MDT FAYETTEVILLE SPRING CREEK LLC    .

2.    Where "Tenant" is mentioned, reference is to the party leasing the space from the Landlord pursuant to this Lease.

3.    This Exhibit, identified as Exhibit D-4, referred to in your Lease and made a part of said Lease, contains the Developer-Landlord's criteria for Tenant signage.

B.    General

1.    The Tenant shall be required to identify its Premises with signage in accordance with this Exhibit.  Such signage shall be installed prior to Tenant opening for business in the Premises.

2.    Tenant shall bring sign band for the Premises to like new condition prior to installation of signage.

3.    All signs require written approval by the Developer-Landlord, which approval shall be given or denied in accordance with the criteria set forth herein.

4.    Tenant shall, at its own risk and expense, erect such sign(s) (including electrical connections), as are required under this Exhibit, and shall maintain such sign(s) in a good state of repair.  Tenant hereby agrees to indemnify Developer-Landlord with respect to the erection, maintenance, existence or removal of any such sign(s), and further agrees to repair any damage that may be caused by the erection, maintenance, existence or removal of any such sign(s). Upon vacating the premises, Tenant agrees to remove all signs and repair the signband to "as new" condition.

5.    Although signing practices of the Tenant will be considered, such practices will not be controlling.  Landlord will not consider any other shopping center signage, not conforming to this Exhibit, in reviewing Tenant's signage proposal.

6. Tenant shall be required to identify its Premises with storefront signage in accordance with the criteria set forth on Drawing SS-1 (attached) (subject to D-3 below).

7. Tenant shall be required to identify its rear service door (if provided) with one (1) identification sign in accordance with the criteria set forth on Drawing SS-2 (attached).

8. If applicable, Tenant shall be permitted to install one (1) additional identification sign under the canopy directly in front of Tenant's demised Premises in accordance with the criteria set fourth for this shopping Center.

9. If any of the following limitations, restrictions or criteria are found to be invalid under any ordinance, regulation or law to the extent that such limitations, restrictions or criteria is invalid as aforesaid, then the Developer-Landlord, at its sole discretion, may modify such limitations, restrictions or criteria to comply with such local ordinance, regulation or law. In no case shall the invalidity of any one of the foregoing limitations, restrictions or criteria invalidate this Exhibit or the Lease.

C. Storefront Signage - Limitations and Restrictions

1. Tenant's storefront signage must be internally illuminated, individual channel letters ~~mounted to a raceway.~~ The sign ~~and raceway~~ must be mounted to the signband, centered from top to bottom, and centered within the width of the leased Premises, or as located according to the Developer-Landlord's storefront signage layout.

2. All installation methods must comply with local building, electrical and zoning codes and meet "UL" approval.

3. PK housings to remote transformers are required. ~~The raceway required to accommodate wiring and transformers shall be no deeper than eight inches (8") and be no taller than eight inches (8").~~

4. All signs shall have concealed attachment devices, clips, wiring, transformers, lamps, tubes and ballasts.

5. Sign letters or components shall have plastic faces with metal returns and trim caps.

6. The storefront sign shall be connected to a time clock, which will automatically turn the sign on at the start of the business day. It is required that all storefront signage be illuminated during the stores hours of operation and additionally during standard shopping center hours if Tenant is permitted under the Lease to operate on non-standard hours.

7. The manufacturer or installer may not install any promotional decals or labels that are visible to the public.

D.    Storefront Signage - Size Restrictions

1.    Signs shall consist of the Tenant's store name as it appears in the Lease only. Logos will be permitted but must fit within the area restrictions below and must be constructed according to the criteria established herein. The overall size of the sign shall be restricted by this criteria and/or local building codes, but in no case shall be greater than the "sign area" allowed by these criteria. The "sign area" shall be defined as a rectangular area totally enclosing all graphic elements of Tenant's sign.

2.    For Tenant's signs with one (1) line of copy, the "sign area" may not exceed twenty-four inches (24") in height or be longer than 60% of the storefront width. Ascenders and descenders or any graphic elements of the sign must fit within this signage "zone".

3.    For Tenant's signs with two (2) or more lines of copy, the "sign area" may not exceed sixty inches (60")    in height or be longer than 40% of the storefront width. Ascenders and descenders or any graphic elements of the sign must fit within this signage "zone".

E.    Prohibited Types of Signs or Sign Components

The following sign types or components will not be permitted for any part of Tenant's storefront sign or as interior signage within the front four feet (4') of the Leased Premises.

1.    Moving, rotating or flashing signs.

2.    Painted and/or non-illuminated signs.

3.    ~~Banners or flags.~~

4.    Cloth, wood, paper or cardboard signs, stickers or decals around or on exterior surfaces, doors and windows of the Premises.

5.    Noise making devices and components.

6.    Letters, symbols or identification of any nature painted directly on exterior surfaces, doors and windows of the Premises.

7.    Rooftop signs.

8.    Cabinet type storefront signs.

9.    Temporary or promotional type signs in the storefront windows will only be permitted with prior written Developer-Landlord approval and only for a specific period of time.

F.    Approval Procedures

    1.    Approval of store design drawings or working drawings and specifications for Tenant's Premises does not constitute approval of any sign work.  Within fifteen (15) days of signing this Lease, Tenant shall submit to the Developer-Landlord one (1) set of prints for all its proposed sign work.  The drawings shall clearly show the following:

        a.    The location of the proposed storefront sign drawn to scale on the storefront elevation.

        b.    The sign letters and graphics elements drawn to scale and dimensioned, using the proposed fonts and colors.

        c.    The construction details and sections of the actual sign, including attachment methods and construction materials.

    2.    Developer-Landlord shall return to the Tenant the sign drawings, with any comments and/or corrections.  Sign fabricator shall not be allowed to begin fabrication or to install any sign without having, in his possession, a written approval and authorization from the Developer-Landlord.

Developer-Landlord reserves the right in Developer-Landlord's sole discretion to permit exceptions to this Exhibit.  Permission granted to a Tenant to deviate from the strict requirements of this Exhibit shall not entitle any other Tenant similar treatment.

**DRAWING SS-1**



## DRAWING SS-2



### REAR SERVICE DOOR SIGN

SPECIFICATIONS:

1. SIGN SHALL BE ALUMINUM, PAINTED WHITE WITH BLACK PAINTED
   OR APPLIED VINYL LETTERS.
2. FONT STYLE SHALL BE HELVETICA MEDIUM.
3. COPY MAY BE ARRANGED TO TENANT'S REQUIREMENTS.
4. SIGN SHALL BE MOUNTED ON THE CENTER OF THE DOOR 5'0" FROM
   THE BOTTOM OF THE SIGN TO THE BOTTOM OF THE DOOR.

DRAWING SS-2
APRIL 1997

**<u>EXHIBIT E</u>**

Project Coordination Guidelines

(attached hereto)

**EXHIBIT E**



**Jo-Ann Stores, Inc.**
**5555 Darrow Road Hudson, Ohio 44236**
**Phone:  330-656-2600**

## Store Development Department
## Project Coordination Guidelines
### For Jo-Ann Shell Projects
Store #TBD; Fayetteville, AR

December 22, 2009

**TABLE OF CONTENTS**

1.      Project Information
2.      Approved Vendors
3.      Definitions

**Landlord's Scope of Work:**

I.       Administrative Requirements
II.      Site Work
III.     Architectural
IV.      Utilities
V.       Plumbing
VI.      Fire Sprinkler System
VII.     Fire Alarm System
VIII.    Roof
IX.      Slab

**Appendix: (each item is posted to Jo-Ann's portal located at https://portals.joann.com/)**

A.      Approved/Required Vendors
B.      Construction Status Report Form

E-1

Shell Project

*Confidential*

Initials _____/_____

      C.      Contractor Warranty Form
      D.      Shell Information Provided by Landlord

The purpose of this guideline is to summarize some of the main Jo-Ann Stores, Inc., an Ohio corporation (hereinafter referred to as "Jo-Ann" or "Tenant") requirements during the construction of a Jo-Ann Superstore shell. This guideline is a requirement to that certain lease by and between Jo-Ann and DDR MDT Fayetteville Spring Creek LLC, a Delaware limited liability company (hereinafter referred to as "Landlord") dated December _____, 2009 (the "Lease"), attached thereto as <u>Exhibit E</u> and incorporated herein. Compliance by all parties is required. Capitalized and defined terms used in this Exhibit E shall have the same meanings as those ascribed to them in the Lease, unless the context clearly dictates otherwise. **This Exhibit E is a companion to Tenant's Shell Plans and Specifications and one does not replace the other. If there is any conflict between this Exhibit E and Tenant's Plans and Specifications, the Plans and Specifications shall control.**

## 1.    Project Information

Please provide the following information to the Jo-Ann construction project manager within forty-five (45) days from the full execution of the Lease:

- Information listed on Appendix D, e-mailed to Jo-Ann's Construction Department, Attn: Rich Ault, Director, Construction and Special Projects at the address listed below.

Please provide the following information to Rich Ault within ten (10) days of commencement of construction (via email, fax or hard copy):

- Construction schedule
- Copy of the building permit

The following information is provided for your use in planning and constructing the new Jo-Ann Superstore or Jo-Ann Fabrics and Crafts store.

A.   The Jo-Ann construction team is comprised of the following individuals:

| Name and Title | E-Mail | Telephone |
|---|---|---|
| Rich Ault<br>Director, Construction and Special Projects | rich.ault@joann.com | (330) 463-3291 |
| Jim Piar<br>Manager, Store Construction | james.piar@joann.com | (330) 463-6701 |
| Cara Desko<br>Construction Planner | cara.desko@joann.com | (330) 463-6892 |
| Brett Blankenship<br>Construction Specialist | brett.blankenship@joann.com | (330) 463-5965 |

Please feel free to contact any of the above with any questions you may have.

E-2

Shell Project

*Confidential*

Initials _____/_____

B. Landlord shall provide Tenant with the written notice of the Required Delivery Date (as defined in the Lease) in accordance with the terms of Lease.

C. The Plans and Specifications you have agreed to use as your guideline are:

Jo-Ann Shell Plans and Specifications       Dated ___December 1, 2008___
*(available on Tenant's web site)*

D. It is Landlord's responsibility to notify Tenant, in writing, of any/all site-specific exceptions to the JAS P/S (as defined below).

**2.      Approved Vendors**

A. Appendix 'A' is a list of the Jo-Ann approved national account vendors that you are required to utilize for this Jo-Ann Superstore or Jo-Ann Fabrics and Crafts project. No substitutions will be permitted. The Landlord's architect is to send plans to each vendor as early as possible so accurate quotes can be issued by each of the vendors for their service or supply of products. Jo-Ann's website may also be used to post shell bid documents for the National Vendors, in lieu of sending out hardcopies. Electronic shell Construction Documents (CAD and pdf) may be sent the Jo-Ann's architect who will post to the website and alert the vendors of their posting. Jo-Ann has established National Account pricing and delivery terms with all approved vendors to provide you with the best available price for the required product or service with availability to meet the demands of the project schedule.

B. All service agreements provided to the Landlord/Landlord's general contractor, in association with vendor-provided services, must be signed and returned to the vendor within 10 days of issuance.

C. Landlord's general contractor shall order long lead time, National Vendor items (like dock equipment and automatic doors) as soon as possible, in order to keep to the construction schedule.

**3.      Definitions**

The following terms will be used throughout this document, and are defined as such:

Jo-Ann Shell Plans and Specifications (hereinafter referred to as "JAS P/S")– refers to current drawing plans and specifications criteria for Jo-Ann retail store, as found on Tenant's web site.

Block Plans – a set of four (new construction) or five sheets (existing building/rehab) created for a site-specific location by the Tenant's architect. Drawings include a title sheet, floor plan, exterior elevations, site plan and, if applicable, a demo plan. These plans are to be used by the Landlord in the creation of the Tenant's site-specific shell Construction Documents.

Construction Documents – a full set of drawings including, but not limited to, architectural, mechanical, plumbing, structrual and electrical work. Two (2) sets of Construction Documents will be created regarding construction of the Tenant's store; one set of Shell Construction Documents, created by the Landlord's architect at Landlord's sole cost, and one set of Tenant Improvement ("T.I.") Construction Documents at, created by the Tenant's architect at Tenant's sole cost.

E-3

Shell Project

*Confidential*

Initials _____/_____

Building Permit Set – Shell Construcion Documents at 100% complete.

Construction Set – Shell Construction Documents after any and all open issues by Tenant, Tenant's architect, the Building Department, Planning and Zoning, etc. have been addressed. This is the set that the General Contractor will actually construct the building from.  This set will bear the stamp "Final Approved."

---

Landlord, at Landlord's sole cost and expense, shall deliver to Tenant at time of Substantial Completion (as defined below) and in accordance with Tenant's site-specific approved Block Plans, a complete shell building complying with Tenant's Shell Plans and Specs.  Items include but are not limited to:

## I.    Administrative Requirements

1.  It is Landlord's responsibility to notify Tenant, in writing, of any/all site-specific exceptions to these plans and specs.

2.  Landlord shall provide as-built construction documents for the space, electronically where possible to the JoAnn's real estate director.

3.  Landlord shall ensure that JAS Plans and Specifications and the approved Block Plans are forwarded to the shell Architect prior to the development of Tenant's shell drawings.

4.  Landlord shall ensure Landlord's architect, Landlord's general contractor, etc. all adhere to the requirements listed in this Exhibit E.

5.  Should Landlord elect to proceed on a "design-build" basis with any portion of the work, then construction of shell shall proceed in accordance with the system and specifications as noted in the current Jo-Ann Shell Plans and Specifications obtained from Tenant's website.

6.  Landlord shall be responsible for all costs associated with shell permits and fees, site zoning/ planning approvals and fees, site utility permits and fees, and any impact fees associated with the project. Tenant will assume costs associated with the building interior and Tenant-specific building signage.

7.  One existing Pylon and/or monument sign shall be available for Tenant's panel Included shall be dimensioned elevations and site plan indicating location of signage and adjacent roads. Tenant is responsible for design, permits, construction, and installation of its sign panel on the existing sign space available as shown on the sign drawing Exhibit in the Lease.

8.  On or before the Delivery Date (as defined in the Lease), Landlord shall supply Tenant with AIA-certified as-built dimensions and gross leasable area ("GLA") calculations

9.  The Landlord's general contractor is required to provide the following close out materials to Tenant as specified pursuant to the Close Out Package National Account Vendor in either paper or electronic form for conversion into the final close out electronic manual on CD within 60 days of the Delivery Date.

    a.  Copy of the building permit;

    b.  Certificates of inspections (mechanical, electrical, building, and fire marshal; as applicable to the shell);

    c.  List of all subcontractors; including name, trade, contact person, and phone number;

    d.  General and sub-contractor warranty form (attached as Appendix C);

E-4

Shell Project

*Confidential*

Initials _____/_____

    e.   Equipment operation and maintenance manuals and equipment warranties (as applicable to the shell);

    f.    As-Built drawings – originals or electronic file on CD Rom;

    g.   Completed punch list signed off by an authorized Jo-Ann representative;

    h.   Sketch showing locations of shut-off valves for Jo-Ann's water, gas, electric lines, wherever they occur on site.

10.  Jo-Ann's construction document review process shall be as follows:

    a.   Jo-Ann requires a review of the completed shell Construction Documents for compliance with the prototype.  One complete set of shell Construction Documents shall be sent to Jo-Ann's Construction Dept. (11"x17") and one set to Jo-Ann's architect (24"x36") at time of building department submittal. Jo-Ann's architect will combine comments from their review with the comments from the corporate review and return one mark-up set to the Landlord's architect within ten business days of receipt.

    b.   The Landlord's architect will then incorporate any building department comments they have received and all Jo-Ann/Jo-Ann's architect's comments into a final set and return (2) complete sets of Construction Documents (one 24"x36" and one 11"x17") to Jo-Ann's architect for final approval. The drawings will be reviewed to verify comments have been incorporated and the 24"x36" set will be stamped 'Final Approved' by Jo-Ann's architect and returned to the Landlord's architect.  <u>This 'Final Approved' stamped set of drawings must be on-site and be used by the general contractor for construction of the space.</u>

    c.   Landlord's architects shall provide an electronic set (both .dwg and .pdf format) of the 'Final Approved' shell Construction Documents to Jo-Ann for record set and use in completion of the T.I. Construction Documents.  Drawings and .pdf's shall be emailed to Jo-Ann's architect prior to start of shell construction.

11.  Landlord and/or Landlord's general contractor shall be required to e-mail weekly construction status reports, using the form provided as Appendix B attached hereto, and 6-8 progress photos (2 front elevation/entry, 2 rear elevation/dock work, 2-4 interior) to Brett Blankenship at the address listed above by 12:00 pm on each Monday of the project starting on the commencement date of construction through the turnover date and are to be current within 48 hours.  Please note the following:

    a.   The weekly construction status report must include an itemized list of work in progress, items completed since the prior status report, and work scheduled to begin the following week;

    b.   Any revisions to the original construction schedule (provided at commencement of construction) must be submitted with the weekly status report. Landlord/Landlord's General Contractor shall inform the Tenant immediately of any changes that will have a positive or negative impact to delivery on the expected Delivery Date;

    c.   The weekly construction status report must also include any items in which the contractor needs addressed by Jo-Ann, Jo-Ann's national account vendors, or Jo-Ann's project architect along with a date needed for response;

12.  At the end of construction, digital photos of each completed exterior elevation, dock area and 2-3 interior photos shall be emailed to Jim Piar at the address listed above;

E-5

Shell Project

*Confidential*

Initials _____/_____

13. Contractor shall provide Jo-Ann's construction manager with written notification of construction schedule within ten (10) days of the start of construction, and provide all information required under Section 1 of this Exhibit E at or prior to that time;

14. Landlord is to provide Jo-Ann's construction manager the required Delivery Notice in accordance with the Lease;

15. At ninety percent (90%) completion (defined as approximately one week prior to Delivery Date), Jo-Ann's construction manager and/or Jo-Ann's project architect and/or Jo-Ann's T.I. general contractor will visit the site and create the shell construction punchlist (the "Punchlist"). The site supervisor, Landlord, and the contractor's project manager will all receive a copy of the Punchlist within 24 hours of the visit. A schedule for completion of the Punchlist items will be discussed at the end of the on-site meeting;

16. Landlord shall ensure that Landlord's general contractor completes the Tenant-provided Punchlist immediately upon receipt, but not later than 7 days after the "Delivery Date". Unfinished punchlist items remaining after 7 days shall, at Tenant's option, be completed by Tenant and offset against Landlord at cost plus five percent (5%) interest.

II. **Site Work -** as specified on the Block Plans attached as Exhibit C to the Lease and incorporated herein but not limited to the below items;

A. Dock Equipment -- landlord to ensure edge of dock leveler is operational and like new condition. Landlord to install new dock bumpers. Concrete truck receiving pad to be like new condition.

B. Compactor – Landlord to install new compactor door per Jo-Ann plans and specifications. Landlord to relocate exterior roof ladder to accommodate new compactor location. Landlord to modify existing rear stairs to accommodate new compactor location per Jo-Ann plans and specifications. Concrete compactor pad to be like new condition.

C. Egress Door – landlord to install new egress exterior door per code.

D. Prototype Store Front – landlord to construct prototype store front with automatic sliding doors per Jo-Ann plans and specifications.

III. **Architectural -** as specified on the Block Plans attached as Exhibit C to the Lease and incorporated herein;

IV. **Utilities -** including by not limited to:

**A. Temporary Utilities -** If permanent utilties to the Tenant's space are not scheuduled to be completed as of the Delivery Date, temporary utilites, as specified on JAS P/S shall be provided.

**B. Permanent Utilities -** Landlord shall furnish and install the following permanent utility services including all utility meters to the Tenant's space. All utilities shall be underground unless approved by Jo-Ann. Such permanent utilities shall be furnished in accordance with the following requirements:

(i) Sanitary sewer: verify that existing sanitary lines have a minimum slope of 1/8" per foot. Check actual path of sanitary main from new facilities to final main connection or manhole to ensure that no offsets exist greater than 60 degrees and no switchbacks exist. Provide additional cleanouts for existing sanitary main as required. Landlord shall provide scoping of complete line from Tenant's facilities to final main connection or manhole to verify that lines are free from obstructions. Scoping to be completed prior to start of TI construction.

(ii) Exisitng Domestic water line shall be extended at Tenant's point of entry as determined by Jo-Ann as specified on JAS P/S.

E-6

Shell Project

*Confidential*

Initials _____ /__ _____

    (iii)    400 amp electrical service shall be provided at the point of entry with switch gear and disconnect , and a conduit shall be extended from point of connection to Tenant's future panel location as determined by Jo-Ann as specified on JAS P/S.

    (iv)    Telephone ducts, conduit, cable and manhole structures capable of supporting 25 pair service cable, as required by the utility company furnishing the telephone service shall be provided at the point of entry as determined by Jo-Ann as specified on JAS P/S. Minimum two inch conduits from telephone splice box.

    (v)    Natural gas shall be provided from a source and in a supply of sufficient capacity to meet Jo-Ann needs as specified on JAS P/S and provided at the point of entry as determined by Jo-Ann on JAS P/S. .

    (vi)    Existing water supply, and gas lines shall be removed and/ or raised above joist height, to ensure compliance with open deck environment and Tenant's plans and specs

    (vii)    All permanent utilities required shall be available for Tenant to make its connections by the Required Delivery Date.

    (viii)    Storefront exterior under-canopy lighting shall be wired to the location of Tenant's future panel with final hookup and  tie-in by Tenant..

    (ix)    Install new curbs for all new RTU's.

**V.**    **Plumbing** - as specified on Block Plans attached as Exhibit C to the Lease and incorporated herein; items include but are not limited to:

1.    Existing incoming cold water line, extended to deck above plumbing stub area, shall be in accordance with code requirements. Water line to be metered separately from other tenants;

2.    All water supplies to have RPZ valves and back flow-preventer, if required by code, and water-pressure sufficient for normal and proper operation of all water fixtures;

3.    Placement/relocation of all sprinkler and potable water appurtenances (valves, risers, etc,) shall be as specified on JAS P/S.

**VI.**    **Fire Sprinkler System** - as specified on Block Plans attached as Exhibit C to the Lease and incorporated herein; items include but are not limited to:

1.    Complete fire protection system with upturned sprinkler heads located at the deck.

2.    Copy of Sprinkler Certification that sprinkler system design conforms to all requirements and codes. Landlord to forward a copy of permitted sprinkler plans to Tenant upon receipt from building department.

3.    Sprinkler mains/ supply lines shall be raised to maximum height in existing structure, to ensure compliance with open deck environment as specified on the JAS P/S.

4.    Incoming sprinkler main and required backflow preventer shall be placed/relocated in receiving area as specified on the JAS P/S.

**VII.**    **Fire Alarm System** - as specified on the JAS P/S.  When a shell fire alarm system is required by code, Landlord shall install the base Fire Alarm System Jo-Ann's national account vendor.

Shell Project

*Confidential*

Initials _____/_____

**VIII.**   **Roof** - as specified on JAS P/S.  Including but not limited to:

1. All roofs over five (5) years old must be surveyed by a Tenant-approved testing company and the resulting roof survey forwarded to Tenant's construction department as a Lease attachment prior to execution;

2. Tenant shall work with LLD during construction of new roof (if required) and coordinate penetrations and installation of any/all rooftop equipment;

3. Landlord shall provide roofing warranty information to Tenant for coordination regarding any additional new penetrations associated with TI construction;

4. Landlord shall provide roof that is watertight at time of turnover to Tenant at the Required Delivery Date. Tenant agrees to use Landlord-specified roofing company, if applicable, for TI work, to ensure warranty compliance;

"Substantial Completion": All of the items listed under Section I through IX of this Exhibit E shall be shall be one hundred percent (100%) complete to meet the criteria for turnover of the Premises to Tenant on the Delivery Date.  This includes, but is not limited to the following:

- ❑ Signed-off building inspection card (Temporary Certificate of Occupancy, where possible)

- ❑ 100% completion of:

  - ▪ All exit doors, delivery doors, storefront and sliding entry doors

  - ▪ Delivery dock/equipment

  - ▪ Concrete pad/access door for compactor

  - ▪ Utilities available to Tenant as per Exhibit E

  - ▪ Fire protection system

  - ▪ Fire alarm system – if required

- ❑ Site work complete to allow unobstructed Tenant access to completed loading dock for deliveries, including all parking lots, drive aisles, fire lanes, etc.

**IX.**   **Slab**

Landlord shall provide Tenant with a copy of the results of a moisture test of the slab of the Premises indicating that the slab meets or exceeds the acceptable levels of slab moisture per ASTM F1869-98 (5 lbs/l,000 square feet|24 hour) and that the slab has been properly prepared for the installation of Tenant's floor covering.  If at any time during the term of the Lease Tenant's floor covering and/or fixtures and merchandise are damaged and/or in need of repair and/or replacement, then Landlord shall, at Landlord's sole cost and expense, be responsible for all expensed to repair and/or replace such items. Further, if Tenant incurs any expense to prepare the slab or to take any measures to prevent water from seeping through the slab or into the Premises, then those expenses shall be the sole and absolute responsibility of Landlord. In the event Landlord fails to perform its obligations as set forth herein, then after reasonable notice to Landlord, Tenant shall have the right and option to bill Landlord for any of the above work and expense incurred by Tenant, and Landlord shall reimburse Tenant within thirty (30) days of such request. If Landlord does not reimburse Tenant within such thirty (30) days, then Tenant shall have the right and option to offset from Rent any such expense together with interest at the rate of twelve percent (12%) per annum.

E-8

Shell Project

*Confidential*

Initials _____/_____

APPENDIX A
Approved/Required Vendor List

**APPENDIX A**

| Approved/Preferred Architects | | | | |
|---|---|---|---|---|
| Interbrand Design Forum | Architect | 7575 Paragon Rd Dayton ,OH 45459 | 937-312-8853 937-312-8868 | Mike Twiss Bev Pheanis |
| GPD ASSOCIATES | Architect | 520 South Main St.  Suite 2531 Akron, OH  44311-1010 | 330-572-2227 330-572-2161 | Becky Mc Adams Lisa Weaver |
| Menensha Construction Solutions | Architect | 4950 W. 145th Street Hawthorne, CA  90250 | 310-263-3532 | Reza Hadaegh |

| Required National Account Vendors | | | | |
|---|---|---|---|---|
| ADT Security Systems Inc. | Fire Alarm, Burglar Alarm | 9100 Market Place Cleveland, OH 44147 | 330-650-4285 | Lynda Stakel |
| Bailiwick | Low Voltage Wiring | 7630 Commerce Way Eden Prairie, MN 55344 | 952-556-3847 | Tony Pascuzzi |
| Bass Security Systems | CCTV | 26701 Richmond Rd. Bedford Heights, OH 44146 | 216-755-1200 ext 128 | Karen King |
| Bass Security Systems | Door Hardware | 26701 Richmond Rd. Bedford Heights, OH 44146 | 888-774-3400 ext 194 | John Buckley |
| Besam Entrance Systems | Automatic Doors | National Account Center 300 Horizon Center Suite 309 Hamilton, NJ 08691 | 609-528-2580 x120 | Darrell Vandeleur |
| Commerical Dock and Door | Dock Equipment/ Overhead Door | 7653 St. Clair Ave. Mentor, OH  44060-5235 | 440-951-4541 x14 | Eric Liebhardt |
| F.E. Moran | Fire Alarm, Burglar Alarm | 33341 Kelly Road Fraser, MI  48026 | 586-228-5788 | John Maiuri |
| Grand Entrance | Vestibule Walk-off Mat/Carpet | 4640 Wedgewood Blvd. Frederick, MD  21703 | 630 - 807-2528 | Nicole Fikes |
| Hy-Tek Material Handling, Inc. | Conveyor | 2222 Port RD Columbus, OH  43217 | 724-776-1500 | Steve Kiktavy Brenda Rowe |
| Leff Electric Co. | Light Fixtures and Elec. Equipment | 4700 Spring Road. Cleveland, OH 44131 | 800-686-5333 | George Griffith |
| Mannington Commercial | Carpet, VCT | 2430 East 42nd St. Erie PA 16510 | 440-933-9225 | Liz Kuhner |

E-9

Shell Project

*Confidential*

Initials _____/_____

| MC Sign Company | Exterior Building Signs | 8959 Tyler Blvd. Mentor, OH 44060 | 800-627-4460 | Kim Tyler Tammy Ward |
|---|---|---|---|---|
| PCX | Power room, Electrical Distribution Gear | 33 Pony Farm Rd. Clayton, NC 27520 | 919-359-3914 919-359-3944 | Dean DiLillo Mark DiLillo |
| PTNE | Telephone, Video & Data Systems | 1112 N. Meridian Rd Youngstown, OH 44509 | 800-678-4638 | Steve Sava |
| Roth Bros. | Energy Mgmt. System | 3847 Crum Rd. Youngstown, OH 44515 | 800- 872-7684 | Ben Rivera |
| SP Industries | System Specialists | 2982 Jefferson Rd Hopkins, MI 49328 | 800-592-5959 | Brad Duemler |
| Trane Corp | HVAC | 31200 Bainbridge Rd. Solon, OH 44139 | 440-248-3400 | Harry Hakenson |
| Digital Reliance, Inc. | Close Out Electronic Package | 386 Charmel Place Columbus, OH 43235 | 614-430-5950 | Jerry Galbreath |

E-10

Shell Project

*Confidential*

Initials _____/_____

APPENDIX B
Construction Status Report

E-11

Shell Project

*Confidential*

Initials _____/_____

**APPENDIX C**
General Contractors
Warranty of
Workmanship and Materials

Project Number: _____    Project Type: Jo-Ann Superstore

Street Address: _____

City/Township: _____ State: _____ Zip: _____

Jo-Ann's Project Supervisor: _____

Building Permit Issued: _____

Final Certificate of Occupancy: _____

Construction Period (months): _____

Warranty Period From: _____ To: _____ (One Full Year)

Final Project Cost Breakdown per Square Foot (excluding site work): _____

Having completed all work as per the contract agreement in a first class manner in strict accordance with the drawings and specifications, the undersigned General Contractor hereby warrants that all workmanship and materials shall remain th a first class condition for a period of one year from the date of the Final Certificate of Occupancy as shown above.  The contractors shall be responsible for performing all warranty repairs (including labor and material) and securing replacements related to failures of equipment or material s that it has furnished and/or installed free of cost to Jo-Ann Stores Inc., and the Landlord during the warranty period.

For work which may required but is not covered by the warranty, the General Contractor shall perform such work under direct contract with Jo-Ann Stores, Inc. maintaining an hourly rate of $_____ and a material markup of _____% during the warranty period.

E-12

Shell Project

*Confidential*

Initials _____/_____

The undersigned hereby agrees to all terms of this written warranty and shall maintain its content to the fullest in good faith.

General Contractor: _____

Street Address: _____

City: _____ State: _____ Zip: _____

Phone: _____ Fax: _____

Date:_____

Signature: _____

Print name: _____

E-13

Shell Project

*Confidential*

Initials _____/_____

## LANDLORD

| | |
|---|---|
| Name | |
| Address | |
| Contact | |
| Phone | |
| Fax | |
| Email | |

## DEVELOPER

| | |
|---|---|
| Name | |
| Address | |
| Contact | |
| Phone | |
| Fax | |
| Email | |

## GENERAL CONTRACTOR

| | |
|---|---|
| Name | |
| Address | |
| Contact | |
| Phone | |
| Fax | |
| Email | |

## SITE SUPERVISOR

| | |
|---|---|
| Name | |
| Cell phone | |
| Job site phone | |
| Job site fax | |
| Email | |

## X.  LANDLORD'S ARCHITECT

| | |
|---|---|
| Name | |
| Address | |
| Contact | |
| Phone | |
| Fax | |
| Email | |

## LOCATION OF SITE

| | |
|---|---|
| Name of shopping center | |
| Permanent mailing address | |
| Suite # | |
| City | |
| State | |
| Zip Code | |

## XI.  BUILDING DEPARTMENT

| | |
|---|---|
| Name | |
| Address | |
| Contact | |
| Phone | |
| Fax | |
| Email | |

E-14

Shell Project

*Confidential*

Initials _____/_____

## GAS COMPANY

| | |
|---|---|
| Name | |
| Address | |
| Contact | |
| Phone | |
| Fax | |
| Email | |
| Meter # | |

## WATER COMPANY

| | |
|---|---|
| Name | |
| Address | |
| Contact | |
| Phone | |
| Fax | |
| Email | |
| Meter # | |

## XII.  ELECTRIC COMPANY

| | |
|---|---|
| Name | |
| Address | |
| Contact | |
| Phone | |
| Fax | |
| Email | |
| Meter # | |

## XIII.  TELEPHONE COMPANY

| | |
|---|---|
| Name | |
| Address | |
| Contact | |
| Phone | |
| Fax | |
| Email | |

E-15

Shell Project

*Confidential*

Initials _____/_____

| DIVISION OF WORK MATRIX APPROVED AS SHOWN BELOW |
| --- |

| Name (Jo-Ann Stores, Inc.) | Name (Owner Representative) |
| --- | --- |
| Title | Title |
| Date | Date |

**NOTE:** MATRIX TO BE REVIEWED AND MODIFIED AS REQUIRED FOR EACH PROJECT.



JO-ANN
fabrics and crafts
SPRING CREEK CENTRE
464 E JOYCE BLVD
FAYETTEVILLE, AR 72703

**DIVISION OF WORK:    SHELL RE-HAB**

ALL WORK SHOWN ON PLAN TO BE COMPLETED BY LANDLORD AT LANDLORD'S EXPENSE UNLESS NOTED "TO BE COMPLETED BY JO ANN STORES"

Columns: **FURNISHED & INSTALLED** — JO ANN | LANDLORD | NOT APPLICABLE OR EXISTING

| JO ANN | LANDLORD | N/A | DIVISION OF WORK |
| :---: | :---: | :---: | --- |
| | ● | | OBTAIN ALL APPLICABLE PERMITS AND CERTIFICATE OF OCCUPANCY, TURN OVER CODE COMPLIANT BUILDING |
| ● | | | PERMIT FEES |
| ● | | | CONSTRUCTION DOCUMENTS |
| | ● | | UTILITY FEES |
| | | ● | SEPARATION OF UTILITIES |
| | ● | | ALL UTILITY SERVICES AND METERING CAPABILITY |
| | | ● | DEMOLITION-SITE (IF APPLICABLE) |
| | | ● | SIDEWALK (REPAIR/REPLACE/MODIFY) |
| | ● | | CURBS |
| | ● | | PARKING LOT PAVING AND STRIPING |
| | ● | | PARKING LOT RESEALING AND RESTRIPING |
| | ● | | HANDICAP CURB AND CROSSWALK STRIPING AT ENTRY |
| | ● | | STOP SIGNS AT PEDESTRIAN CROSSWALK AT ENTRY |
| | | ● | PIPE RAIL SYSTEM CART CORRALS (AT SIDEWALK) |
| | | ● | CART CORRALS (IN PARKING LOT) |
| | ● | | LANDSCAPING |
| | ● | | LANDSCAPE MAINTENANCE – TRIMMING TREES, SHRUBS TO MAINTAIN VISIBILITY OF BUILDING AND MONUMENT SIGNS |
| | ● | | PARKING LOT LIGHTING (3 FOOTCANDLE AVERAGE) |
| | ● | | MONUMENT/PYLON SIGN STRUCTURE |
| | ● | | MONUMENT/PYLON SIGN ELECTRICAL |
| | ● | | MONUMENT/PYLON SIGN PANELS |
| | | ● | RECESSED TRUCK DOCK/RAMP/RETAINING WALL |
| | | ● | DEMOLITION – BUILDING (IF APPLICABLE) |
| | ● | | STRUCTURAL INTEGRITY OF BUILDING |
| | | ● | PERFORM FACILITY TESTING AND INSPECTION (SOILS: CONCRETE SLAB MOISTURE TEST, PIPING, FLOOR INSPECTIONS, ELEVATION AND MOLD SURVEY) (EXISTING BUILDING ONLY) |
| | | ● | REMEDY IF SLAB MOISTURE IS DETECTED |
| | | ● | ASBESTOS ABATEMENT (IF REQUIRED) |
| | ● | | ROOF (REPAIR/REPLACE/NEW) |
| | ● | | EXTERIOR WALLS (NEW/REPAIR) |
| | ● | | EXTERIOR DOORS INCLUDING DOCK DOOR |
| ● | | | COMPACTOR DOOR |
| | ● | | EXTERIOR LIGHTING – BUILDING MOUNTED |
| | ● | | FRONT FAÇADE/ENTRY (JO ANN PROTOTYPICAL ELEMENT PER FINAL APPROVED PLANS) |
| ● | | | FAÇADE SIGNAGE |
| ● | | | TEMPORARY BANNERS (NOW HIRING, COMING SOON, NOW OPEN, ETC.) |
| ● | | | WINDOW GRAPHICS / FILM ON STOREFRONT GLASS |
| | ● | | CONCRETE SLAB (NEW AND/OR MODIFICATIONS) |
| | ● | | PROTOTYPICAL AUTOMATIC SLIDING DOOR (EXTERIOR) |
| | ● | | STOREFRONT FRAMING AND GLAZING |
| | | ● | DEMOLITION – INTERIOR (IF APPLICABLE) |
| | ● | | DEMISING WALLS – METAL STUDS AND INSULATION |
| | ● | | DEMISING WALLS – GYPSUM WALL BOARD TO DECK (JO ANN SIDE) |
| ● | | | INTERIOR PARTITIONS (NEW AND/OR MODIFICATIONS) |
| ● | | | MISC. WOOD BLOCKING, FURRING, ETC. |
| ● | | | PAINTING |
| ● | | | DOORS AND HARDWARE |
| ● | | | FLOORING: VCT FLOORING, BASE, AND TRANSITION STRIPS |
| ● | | | CARPET |
| ● | | | CERAMIC TILE |
| ● | | | RESTROOM ACCESSORIES |
| ● | | | CABINETRY/ CASEWORK IN BREAKROOM AND OFFICES |
| ● | | | INVERTER PANEL |
| | ● | | ALL ELECTRICAL (CONDUIT, WIRE AND RECEPTACLES) |
| ● | | | LIGHT FIXTURES |
| | ● | | EMERGENCY EXIT AND MISC. LIGHT FIXTURES |
| ● | | | POWER POLES (GC TO INSTALL AFTER TURNOVER DATE) |
| | | ● | BALER ELECTRICAL |
| ● | | | ENERGY MANAGEMENT SYSTEM AND SENSORS |
| ● | | | NEW RTU PENETRATIONS (IF REQUIRED) |
| | ● | | NEW ROOF CURBS (IF REQUIRED) |
| | ● | | HVAC UNITS – NEW |
| ● | | | HVAC (INTERIOR DISTRIBUTION DUCTWORK) |
| ● | | | HVAC DIST. MATERIAL (DIFFUSERS, SMOKE DETECTORS, REMOTE TEST STATIONS, SAMPLING TUBES, ANNUNCIATORS, EXHAUST FANS) |
| | ● | | VESTIBULE AND STOCK ROOM HEATERS (IF APPLICABLE) |
| | ● | | PLUMBING MAIN SERVICE & ALL PLUMBING STUB-UPS |
| ● | | | PLUMBING (BRANCH LINES NEW AND/OR MODIFICATIONS) |
| ● | | | PLUMBING FIXTURES (INCLUDING HOT WATER HEATER) |
| ● | | | ELECTRIC WATER COOLER(S) |
| | ● | | SPRINKLER MAINS |
| ● | | | SPRINKLER BRANCH LINES AND UP-TURNED HEADS |
| ● | | | FIRE ALARM SYSTEM |
| ● | | | FIRE EXTINGUISHERS |
| ● | | | FIRE EXTINGUISHER LOCATION STICKERS/ COMMISSIONING |
| | ● | | INCOMING TELEPHONE SERVICE (25 PAIR) |
| ● | | | TELEPHONE CONDUIT AND PHONE BOARD |
| ● | | | DATA CONDUIT (FOR REGISTER SYSTEM) W/ PULL STRINGS |
| ● | | | TELEPHONES |
| ● | | | DATA LINES FOR REGISTER SYSTEM |
| ● | | | LOSS PREVENTION SYSTEM (BURGLAR) |
| ● | | | STORE FIXTURES AND MERCHANDISING HARDWARE |
| ● | | | INSTALLATION OF STORE FIXTURES |
| ● | | | STOCK ROOM SHELVING |
| | | ● | BALER UNIT |
| | ● | | REPAIRS TO EDGE OF DOCK LEVELER (IF REQUIRED) |
| | | ● | EDGE OF DOCK LEVELER TO BE OPERATIONAL |
| ● | | | INSTALL NEW DOCK BUMPERS |
| | | ● | COMPACTOR UNIT |
| ● | | | COMPACTOR ELECTRICAL |

design forum
architects, inc.
7575 Paragon Road, Dayton, Ohio 45459 Telephone: (937) 439-4400

© 2009 DESIGN FORUM ARCHITECTS

NOTES:
THESE DRAWINGS ARE CONCEPTUAL. DOCUMENTS ONLY AND ARE NOT TO BE USED FOR CONSTRUCTION. DRAWINGS SHALL BE UTILIZED TO COMPLY WITH ALL APPLICABLE STATE AND LOCAL CODES BY THE PROJECT ARCHITECT WHEN CREATING THE CONSTRUCTION DOCUMENTS.

THESE DOCUMENTS CONTAIN PROPRIETARY AND CONFIDENTIAL INFORMATION OF JO-ANN STORES, INC. NO PORTION OF THIS DOCUMENT MAY BE USED, REPRODUCED OR SHARED OUTSIDE OF THE COMPANY WITHOUT THE PRIOR WRITTEN PERMISSION OF JO ANN STORES.

| | |
| --- | --- |
| Project No. | 944651.01 |
| Scale | AS NOTED |
| Drawn | DF |
| Checked | MT/DR |
| Date | December 17, 2009 |

Drawing Title

**DIVISION OF WORK MATRIX**

Drawing No.

**E-1**

## EXHIBIT F

## SCHEDULE OF EXCLUSIVE AND PROHIBITED USES

SPRING CREEK CENTRE
FAYETTEVILLE, ARKANSAS

### PROHIBITED USES:

Those uses prohibited in the Shopping Center described in the Second Amended and Restated Declaration of Restrictions and Grant of Easements dated July 28, 1998, between Clary Development Corporation, Home Depot U.S.A., Inc., Ryan's Family Steak Houses, Inc., Developers Diversified Finance Company and Wal-Mart Stores, Inc. *(Applicable to lots 1, 2, 3A, 4R, 5, 6, 7, 8):*

The types of uses permitted in the Shopping Center shall be of a retail and/or commercial nature found in Shopping Centers in Arkansas...The uses prohibited in the Shopping Center are:

a. Funeral homes.
b. Any production, manufacturing, industrial, or storage use of any kind or nature, except for storage of products incidental to the retail sale thereof from the Shopping Center.
c. Undesirable entertainment or recreational facilities. As used herein, "undesirable entertainment or recreational facility" includes, a skating rink, massage parlor, discotheque, dance hall, teen club, night club, bar or tavern, flea market, head shop, pornographic or "adult" store or bowling alley.
d. Training or educational facilities. As used herein, "training or educational facility" includes, but is not limited to, a beauty school, barber college, library, reading room, schools, place of instruction, or any other operation catering primarily to students or trainees rather than to customers. Such term shall not include incidental internal training of staff or employees of any occupant primarily utilizing its premises for uses permitted herein.
e. Any use which creates a nuisance or materially increases noise or the emission of dust, odor (but not including restaurants which are otherwise Permitted), smoke, gases, or except for Lot 2, does not preserve the "sprinkler" fire insurance rates, or increases explosion or radioactive hazards on adjacent Lots.
f. Assembling, manufacturing, distilling, refining, smelting, agriculture, or moving operation.
g. Any mobile home or trailer court, labor camp, junk yard, stock yard, animal raising or veterinary hospital, except the temporary use of construction trailers during the period of construction, reconstruction or maintenance shall also be permitted.
h. Any drilling for, in or removal of subsurface substances.
i. Any dumping, disposing, incinerating or reduction of garbage or refuse (exclusive of garbage compactors located in the rear of any building).
j. Any fire sale, going out of business sale, bankruptcy sale (unless pursuant to a court order), or auction hours operation.

#3826

F-1

    k. Except for Lot 2, any operation of a sit down family-style restaurant having as its primary theme steaks or cafeteria/buffet-style food. Excluded from this provision shall be restaurants primarily serving foods of an ethnic nature (e.g. Italian, Chinese, Mexican, etc.) or restaurants serving breakfast items as a primary feature of its menu; additionally, this provision shall not apply to fast food restaurants.

    l. Any outdoor circuses, outdoor public meetings, or commercial laundry plants.

    m. Any unsightly or unscreened garbage or trash receptacle or accumulations of garbage or trash.

    n. any veterinary hospital.

    o. Any movie theaters or cinemas, except one that is located in excess of five hundred (500) feet from the nearest boundary of Lot 2 and in excess of 375 feet from the initial building(s) located on Lot 4R.

    p. Any health spa, club or fitness center, except for Lot 8.

    q. Any "second hand" store, Army, Navy or government "surplus" store, except for upscale-type stores selling goods of a quality comparable to those sold in Perfect Partners which is currently leasing space in the Improvements located on Lots 5 and 6. However, the restrictions contained in this subsection (q) shall not apply to Lot 8 or Lots 3 and 3A.

## T. J. Maxx:
### (Applicable to lot 9A only)

The Shopping Center shall not be used for any non-retail purposes (repairs, alterations and offices incidental to retailing, and banks and small loan offices, not being deemed non-retail), or for any entertainment purposes such as a bowling alley, skating rink, cinema, bar, nightclub, discotheque, amusement gallery, poolroom, health club, massage parlor, sporting event, sports or game facility, off-track betting club or for any establishment for the sale or display of pornographic materials. There may be up to two restaurants, not in excess of 5,000 square feet each, provided such are not in-line, such buildings are at least 250 feet from the Demised Premises, and are on the west end of the Shopping Center, to the extent such space is shown on the Lease Plan.

## Shoe Carnival:
### (Applicable to lot 9A only)

In no event shall the Shopping Center or any portion thereof be used as of for a movie theater (except as shown on the Site Plan); auditorium; meeting hall; bingo hall or a place of public assembly; library; sale or service of automobiles or other vehicles; bar serving alcoholic beverages except as incidental to a restaurant (no restaurant shall be located within 200 feet of Tenant's front door); funeral parlor; massage parlor; animal clinic; discotheque; dance hall (or otherwise for musical/dance reviews or topless/nude shows); karate, gymnasium, skating rink; car wash; off-track betting establishment; game room; amusement arcade, gallery or store; pinball arcade; so-called "flea market;" second hand or used goods store or store selling primarily distressed or damaged merchandise; pool room; bowling alley; health club or spa; so-called "head shop;" night club; school; gun range or gun shop; or any business or use which emits offensive odors, fumes, dust or vapors; is a public or private nuisance; emits loud noise of sounds which are objectionable; creates fire, explosive or other hazard; warehousing, except as incidental to a retail business; adult book store or store selling or exhibiting sexually explicit

#3826

materials (all of the foregoing collectively referred to as the "Prohibited Uses").

**Cato:**
*(Applicable to lots 7, 3A and 4R only)*
No space contiguous or adjacent to the premises shall be occupied by a pet shop or game room or business in which either is a part thereof, nor shall space within 100 feet of the Premises be occupied by non-retail establishments requiring extensive parking, including, without limitation, a disco, night club amusement arcade, theatre, health spa, bowling alley, or any other non-retail operation or a store featuring sexually explicit materials or products, or drug paraphernalia.

**Bed Bath & Beyond:**
*(Applicable to all lots and phases of Spring Creek Centre)*
(i) No premises (and no portion of any premises) in the Shopping Center or on any land (hereinafter the "Related Land") which is part of Spring Creek Centre or which is contiguous or adjacent to the Shopping Center (which shall include land that would be contiguous or adjacent to the Shopping Center but for any intervening road, street, alley or highway) owned now or at any time in the future by Landlord or any affiliated entity (referring to the actual Landlord from time to time, without regard to land owned by any prior landlords, and excluding from the operation hereof any business existing at the time any future landlord becomes Landlord hereunder) shall be used or occupied for any of the following (except that the underlined uses shall be permitted on any Related Land): unlawful use; pornographic use; "second-hand" or "surplus" store; laundry or dry cleaners; pawn shop; daycare center; veterinary office; living quarters; hotel/motel; manufacturing; bowling alley; off-track betting parlor or other gambling establishment; funeral parlor; skating rink; nightclub, discotheque or dance hall; so-called "head shop;" catering or banquet hall; children's entertainment or activity facility; video rental or viewing; meeting hall; auction hall; place of religious worship; sporting event; karate center; auditorium; warehouse; theater; automobile repair shop, or any business servicing motor vehicles, including without limitation any quick lube oil change service, tire center or gasoline or service station; supermarket; restaurant serving meals for on or off premises consumption except (i) at least 200 feet from any portion of the Premises, but in no event shall the aggregate Floor Area of all restaurants in the Shopping Center exceed 12,000 square feet, (ii) on any Related Land, and (iii) so-called "coffee bars and cafés" shall be permitted incidental to a permitted retail use; beauty parlor and nail salon; billiard parlor; sales office or showroom for automobiles or other vehicles; an establishment serving alcoholic beverages for off premises consumption or for on premises consumption unless incidental to a permitted restaurant use, but in no event shall a so-called "bar" or separate area be permitted for the sale of such beverages; massage parlor; office (excluding office space used in connection with and ancillary to a permitted retail use hereunder); health spa, exercise facility or similar type business; car wash; a so-called "flea market;" carnival, amusement park or circus; video/pinball arcade or game room; customer viewing, entertainment or educational uses; any use generally deemed to be obnoxious or a nuisance; medical offices; any other non-retail uses (herein collectively called the "Prohibited Uses"). The aforesaid Prohibited Uses shall not apply to any Existing Lease which permits any such use.

(ii) As used herein (A) the term "pornographic use" shall include without limitation a store displaying for sale or exhibition books, magazines or other publications containing any

combination of photographs, drawings or sketches of a sexual nature, which are not primarily scientific or educational, or a store offering for exhibition, sale or rental video cassettes or other medium capable of projecting, transmitting or reproducing, independently or in conjunction with another device, machine or equipment, an image or series of images, the content of which has been rated or advertised generally as NC-17 or "X" or unrated by the Motion Picture Rating Association, or any successor thereto, (B) the term "educational uses" shall include without limitation a beauty school, barber school, reading room, place of instruction, or any other activity, facility, school or program catering primarily to students or trainees as opposed to shoppers, and (C) the term "obnoxious or a nuisance" shall include without limitation a use which emits or results in strong, unusual or offensive odors, fumes, dust or vapors, is a public or private nuisance, emits noise or sounds which are objectionable due to intermittence, beat, frequency, shrillness or loudness, creates a hazardous condition, or is used, in whole or in part, as or for warehousing or the dumping or disposing of garbage or refuse.


## EXCLUSIVE USES:

**TJ Maxx:**
*(Applicable to lot 9A only)*
    Landlord agrees that, during the term of this lease, no other premises in the Shopping Center shall at any time contain more than 15,000 square feet of floor area therein used or occupied for, or devoted to, the sale or display of soft goods (as defined by the trade from time to time), including in the computation of such floor area one half (1/2) of all floor area in any aisles, corridors or similar spaces adjacent to or abutting any racks, gondolas, shelves, cabinets, counters or other fixtures or equipment containing or used for the sale or display of soft goods. Additionally, Landlord covenants and agrees that no portion of the rest of the Shopping Center shall be used for an appliance store, a toy store, a sporting goods store or an electronic store that occupies less than fifteen thousand (15,000) square feet within a single space within the Shopping Center, or by anyone whose principal business consists of the sale of appliances, toys, sporting goods or electronics and occupies less than said fifteen thousand (15,000) square feet.

**Shoe Carnival:**
*(Applicable to lot 9A only)*
Except as may be allowed pursuant to existing leases, during the term of this Lease and in order to induce the Tenant to enter into this Lease, neither Landlord nor its successors and assigns, officers, directors, shareholders (holding more than 10% of its stock), parent, affiliated and subsidiary corporations, or affiliated parties or partners shall, directly or indirectly, use, suffer, permit, or consent to the use or occupancy of any part of the Shopping Center of which the Leased Premises are a part, as a retail shoe store, a substantial portion of the sales which are derived from selling men's, women's, or children's shoes and related accessories having a floor area in excess of 3,000 sq. ft., except, one (1) "Payless type" shoe store not to exceed 3,500 sq. ft. This paragraph shall not apply to any tenants open for business on the date hereof or for whom construction is currently proceeding.

**Family Christian Stores:**
*(Applicable to lots 5 and 6 only)*

#3826

F-4

Landlord agrees that during the term and any extended option periods, not to lease to or operate any business which is considered to be of the same type and nature as Tenant, more specifically Christian books, music and products, without the prior written consent of Tenant.

**CiCi's Pizza:**
*(Applicable to lots 5 and 6 only)*
Landlord agrees that Tenant shall have the exclusive right within the Shopping Center for the sale of pizza for dine-in, take-out and/or delivery for off-premises consumption. This shall exclude any existing lease in which such use is already permitted by terms which were expressly set out in such leases prior to the date of final execution of this Lease.

**Cato:**
*(Applicable to lots 7, 3A and 4R only)*
Lessor shall not directly or indirectly enter into any leases in the Shopping Center, or any enlargement thereof, with any national or regional women's apparel chain store.

**Supercuts:**
*(Applicable to lots 7, 3A and 4R only)*
Landlord agrees that it will not enter into a lease or consent to the use and occupancy of any other space within the Shopping Center outlined in green on Exhibit A by a tenant, subtenant, assignee, licensee or concessionaire (collectively "Occupant") whose Principal Business (as hereinafter defined) is the operation of a value-oriented unisex hair salon (the "Exclusive Use"). As used herein, the term "Principal Business" shall mean any business devoting more than 30% of its sales floor area to the operation of a value-oriented unisex hair salon. Notwithstanding anything to the contrary contained herein, the foregoing Exclusive Use shall not be applicable to the units occupied by Wal-Mart, Best Buy, T.J. Maxx, Goody's, Old Navy, Bed Bath & Beyond, and Home Depot, any occupant operating as a full service day spa, any occupant operating as an upscale hair salon operating under an "appointment-only" format with any average adult hair cut price of $20.00 or more, the occupant of any outparcel adjacent to the Shopping Center, any existing Shopping Center tenant whose lease, as of the date of this Lease, does not prohibit the subject premises to be used in violation of the Exclusive Use, or any of their successors, assigns or replacements.

**Bed Bath & Beyond:**
*(Applicable to all lots and phases of Spring Creek Centre)*
Landlord will not lease, rent or occupy or permit any other premises in the Shopping Center (or in any Related Land) to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant or itself, for the sale, rental or distribution, either singly or in any combination, of items contained in any of the following respective categories of items: (i) linens and domestics; (ii) bathroom items; (iii) housewares; (iv) frames and wall art; (v) window treatments; and/or (vi) closet, shelving and storage items (which items, either singly or in any combination, are hereinafter referred to as the "Exclusive Items"). Notwithstanding the foregoing, any tenant or subtenant in the Shopping Center (or in any Related Land) shall have the right to utilize up to an aggregate of five (5) percent of the Floor Area of their respective premises (including an allocable portion of the aisle space adjacent to such selling space) for the sale, rental or distribution of the Exclusive Items; provided, and on the condition that, the aggregate Floor Area

#3826

utilized by all such tenants and subtenants in the Shopping Center, at any one time shall not exceed 7,500 square feet of Floor Area. Despite the foregoing reference to "fully executed and delivered leases in effect on the date hereof," Landlord hereby agrees that current tenants of the Shopping Center (and current or future assignees or sublessees of such current tenants) shall nevertheless be subject to the restrictions contained in this Section in the event that the lease between Landlord and any such tenant requires Landlord's consent to any assignment or sublet or requires Landlord's consent in order to permit a change in the use or an expansion of the applicable premises so as to allow for the sale, rental or distribution of the Exclusive Items. Notwithstanding the foregoing inclusion of any Related Land, Tenant's exclusive shall not apply to the Related Land Small Stores (as hereinafter defined) within that portion of the Related Land which is designated as "Related Land Small Store Area" on Exhibit B. The term "Related Land Small Stores" shall mean retail stores located on Related Land which do not contain a Floor Area in excess of 3,000 square feet each, provided, and on the condition that, there are no more than 2 such Related Land Small Stores at any one time, and the aggregate Floor Area utilized by the Related Land Small Stores for the sale of the Exclusive Items does not exceed 6,000 square feet.

The exclusive rights granted to Tenant in this Section shall inure to the benefit of any assignee of Tenant's interest in this Lease and to any sublessee of a Floor Area of at least 15,000 square feet of the Premises.

**Best Buy:**
*(Applicable to lots 3A, 4R, 5, 6, 7 and 9A only)*
Landlord shall not permit any person or entity other than Tenant in space leased directly or indirectly from Landlord within the Shopping Center, to sell, rent, service and/or warehouse (and, if applicable install in motor vehicles), the following product categories: electronic equipment or appliances (including, without limitation, televisions, stereos, and video recorders); major household appliances (including, without limitation, refrigerators, freezers, stoves, microwave ovens, dishwashers, washers and dryers); personal computers and peripherals, computer software; car radios, stereos, or tape decks; entertainment software including compact discs, music videos and prerecorded tapes; telecopy, facsimile and photocopy machines; photographic cameras or equipment; office equipment, and/or any substitutes for or items which are a technological evolution of the foregoing items; or any other related items. This provision shall not be applicable to the following:

(a)  the incidental sales (as such term is defined hereinafter) of any such products, but shall, however, be applicable to direct competitors of Tenant (as solely determined by Tenant), including, but not limited to, Circuit City, The Good Guys, Incredible Universe, WOW, Media Play, Comp USA, Computer City and Tower Records. For purposes of this provision, "incidental sales" shall be defined as the sale and/or display of any one, all or any combination of Tenant's product categories by any tenant or occupant of the Shopping Center in an area not to exceed the greater of (i) 500 square feet, or (ii) 10% of the total floor area occupied by such tenant or occupant.

(b)  any existing tenant(s) of the Shopping Center and their respective subtenants, successors and assigns, provided that if Landlord ever recovers control of the premises occupied by

any such tenants, then the Protected Product Categories restriction shall then apply to such premises.

(c) any office supply superstore like OfficeMax or Staples.

(d) Barnes and Noble, Borders, Walden Books and Books a Million (collectively, "Approved Book Retailer").

**Gamestop:**
*(Applicable to all lots and phases of Spring Creek Centre)*
Landlord agrees that it will not enter into a lease or consent to the use and occupancy of any other space within the Shopping Center, as designated on Exhibit A-1, by a tenant, subtenant, assignee, licensee or concessionaire whose Premises is 2,000 square feet or less in gross leaseable area (collectively "Occupant") whose Principal Business (as hereinafter defined) is the sale at retail of video games, video game related software and video game systems (the "Exclusive Use"). As used herein, the term "Principal Business" shall mean any business devoting more than 35% of that occupant's sales floor area to the display and retail sale of the Exclusive Use items. Notwithstanding anything to the contrary contained herein, the foregoing Exclusive Use shall not be applicable to the occupant of any outparcel adjacent to the Shopping Center, any occupant selling standup and/or sit-down coin operated video games within the Shopping Center, any existing Shopping Center tenant whose lease, as of the date of this Lease, does not prohibit the subject premises to be used in violation of the Exclusive Use, or any of their successors, assigns or replacements.

**Body Reflections Tan:**
*(Applicable to lots 5 and 6 only)*
Landlord agrees that it will not enter into a lease or consent to the use and occupancy of any other space within the area of the Exclusive Zone described on Exhibit "E", attached hereto and made a part of, by a tenant, subtenant, assignee, licensee or concessionaire (collectively "Occupant") whose Principal Business (as hereinafter defined) is the operation of a tanning salon (the "Exclusive Use"). As used herein, the term "Principal Business" shall mean any business devoting more than fifty percent (50%) of its sales floor area to the operation of a tanning salon. Notwithstanding anything to the contrary contained herein, the foregoing Exclusive Use shall not be applicable to the units occupied by tenants whose gross leasable area is ten thousand (10,000) square feet or more, the occupant of any outparcel within and adjacent to the Exclusive Zone, any existing Shopping Center tenant whose lease, as of the date of this Lease, does not prohibit the subject premises to be used in violation of the Exclusive Use, or any of their successors, assigns or replacements.

**Wal-Mart:**
*(Applicable to lots 3, 3A, 4R, 5, 6 and 7 only)*
No "discount department store" shall be allowed on Lots 3, 3A, 4R, 5, 6 and 7. Nothing herein shall prevent the operation of a Kohl's Department Store on Lots 3A and 4R. ["Discount Department Store" shall mean a single retail establishment which offers to customers in an open bay fashion, where customers select from open inventory, all categories of "general

merchandise" ("general merchandise" means inventories which include all of the following, but which may also include additional categories of inventory, clothing, shoes, appliances, sporting goods, hardware, automotive, dry goods, electronic goods, and lawn and garden) at discount prices.]

## EXHIBIT G

### Permitted Exceptions

1. Restrictions, covenants, conditions and reservations contained in Amended and Restated Declaration of Restrictions and Grant of Easements for Spring Creek Centre, filed for record November 30, 1993 and recorded as Document No. 93-71005; and First Amendment to the Amended and Restated Declaration of Restrictions and Grant of Easements, filed for record February 7, 1995 and recorded as Document No. 95-6432 of Washington County Arkansas records, as amended by Second Amended and Restated Declaration of Restrictions and Grant of Easements for Spring Creek Center, recorded as Land Document No. 98-66343 of records of Washington County, Arkansas.

2. Building setback lines and easements, as shown on plat recorded in Plat Book 12, Page 49-A of records of Washington County, Arkansas, as to Lot 5, Phase II, and as shown on ALTA/ACSM Land Title Survey by Bock & Clark National Surveyor's Network, Project No. 20040310-2, dated April 26, 2004, last revised May 10,2004.

3. Building setback lines and easements, as shown on plat recorded in Plat Book 12, Page 102 of records of . Washington County, Arkansas, as to Lot 6, Phase II, and as shown on ALTA/ACSM Land Title Survey by Bock Clark National Surveyor's Network, Project No. 20040310-2, dated April 26, 2004, last revised May 10, 2004.

4. Building setback lines and easements, as shown on plat recorded in Plat Book 14, Page 01; and on plat recorded as Plat No. 97-074998 of records of Washington County, Arkansas, as to Lot 9A, Phase III, and as shown on ALTA/ACSM Land Title Survey by Bock & Clark National Surveyor's Network, Project No.·2004031O-2, dated April 26, 2004, last revised May 10, 2004.

5. Building setback lines and easements, as shown on plat recorded. as Land Document No. 94-42574 of records of Washington County, Arkansas, as to Lots 5 and 6, Phase II, and as shown on ALTA/ACSM Land Title Survey by Bock & Clark National Surveyor's Network, Project No. 20040310-2, dated April 26, 2004, last revised May 10, 2004.

6. Terms, covenants and conditions of Lease Agreement by and between Clary Development Corporation, an Arkansas corporation, and The TJX Companies, Inc., a Delaware corporation, recorded as Land Document No. 95-7652 of records of Washington County, Arkansas, as to part of Lot 9A, Phase III.

7. Restrictions, covenants, conditions and reservations contained in Declaration of Restrictions and Grant of Easements, recorded as Document No. 97-81689 of records of Washington County, Arkansas, as to Tract II, and terms and conditions thereof, as to appurtenant easements.

8. Terms, powers, provisions, covenants and conditions of Memorandum of Lease executed by Clary Development Corporation, an Arkansas Corporation, as Landlord, to Goody's Family Clothing, Inc., a Tennessee Corporation, as Tenant, dated November 15, 1997, filed for record March 16, 1998 and recorded as Document No. 98-20593 of records of Washington County, Arkansas, as to Tract III.

9. Building setback lines and easements, as shown on Plat recorded in Plat Book 15, Page 113 of records of Washington County, Arkansas, as to Tract III and IV, and as shown on survey

#3826

G-1

prepared by Bock & Clark National Surveyors Network, dated April 26, 2004, last revised May 10, 2004.

10. Memorandum of Lease, by and between Clary Development Corporation, an Arkansas corporation, and The Cato Corporation, dated January 29, 1993, filed for record March 13, 1998 and recorded as Land Document No. 98-2003 of records of Washington County, Arkansas, as to Lot 4RA and Lot 7A, Tract III.

11. Access Easement Agreement by and between Doug Brandon Properties, Inc., an Arkansas Corporation, Grantor, and Nanchar, Inc., an Arkansas Corporation, and Marjorie Brooks, Grantee, filed for record July 16, 1997 and recorded as Document No. 97-47069 of records of Washington County, Arkansas, as to Tract III.

12. Storm Water Drainage Easement Agreement between Clary Development Corporation, an Arkansas corporation, and Nanchar, Inc., an Arkansas Corporation, filed for record November 25, 1998 and recorded as Document No. 98103330 of records of Washington County, Arkansas, as to Tract III and Tract IV.

13. Non-exclusive Right of Way Easement Grant by Clary Development Corporation in favor of City of Fayetteville, Arkansas, a municipal corporation, dated February 24, 1993, filed for record February 26, 1993 and recorded as Document No. 93-10040 of records of Washington County, Arkansas, as to Tract V.

14. Party Wall, Easement and Encroachment Agreement by and between Developers Diversified Finance Corporation and Home Depot U.S.A., Inc., executed November 20, 1998, filed for record November 25, 1998 and recorded as Document No. 98103320 and refiled January 7, 1999, and recorded as Document No. 99001733 of records of Washington County, Arkansas, as to Tract V, and terms and conditions thereof with respect to appurtenant rights and easements.

15. Memorandum of Lease by and between Developers Diversified Finance Corporation, an Ohio Corporation, as Landlord, and Bed, Bath & Beyond, Inc., a New York corporation, dated May 18, 1999, filed for record June 29, 1999 and recorded as Document No. 99058457 of records of Washington County, Arkansas, as to Tract V.

16. The following encroachments specifically noted by surveyor and shown on ALTA/ACSM Land Title Survey by Bock & Clark National Surveyor's Network, Project No. 20040310-2, dated April 26, 2004, last revised May 10, 2004: Tract I - building encroaches a 25-ft. utility easement by 0.9 feet on the southeast corner of the building and 1.2 feet on the southwest corner of the building. Tract III - building encroaches upon setback line by 1.3 feet on the north side of the building and 2.1 feet on the south side of the building.

17. Deed of Trust from DDR MDT Fayetteville Spring Creek LLC to German American Capital Corporation, for $215,000,000.00, filed for record June 7, 2004 al")d recorded as File No. 2004-00022023 of records of Washington County, Arkansas.

18. Assignment of Leases, Rents and Security Deposits, dated as of May 14, 2004, filed for record June 7, 2004 and recorded as File No. 2004-00022024 of records of Washington County, Arkansas.

#3826

## EXHIBIT H

Additional Prohibited Uses

In no event will the Shopping Center or any portion thereof be used as or for any of the following:

(i)     a movie theater; auditorium; meeting or banquet hall (except that one (1) movie theater at least two hundred fifty (250) feet from any point of the storefront of Tenant's Demised Premises shall be permitted);

(ii)    church; bingo hall or a place of public assembly;

(iii)   library or school, except that (1) "Sylvan Learning Centers", "Huntington Learning Centers" or similar learning centers shall be permitted, so long as such use, in the aggregate, is no more than five thousand (5,000) square feet of Gross Leasable Area of the Shopping Center; and (2) beauty or salon schools such as Regency Beauty shall be permitted, so long as such use, in the aggregate, is no more than eight thousand (8,000) square feet of Gross Leasable Area in the Shopping Center and is not located in Units 40, 42, 43, 46 or 48 as shown on the Site Plan; provided, that, any usage pursuant to clause (1) within the area designated on the Site Plan as the "North Area" shall not be counted towards the 5,000 square foot maximum referenced in clause (1) and any usage pursuant to clause (2) within the North Area shall not be counted towards the 8,000 square foot maximum referenced in clause (2).

(iv)    for the sale or service of automobiles or other vehicles, except incidental to a retail store such as Pep Boys;

(v)     head-shop; night club or bar serving alcoholic beverages, except as incidental to a restaurant; or a liquor or beverage store (except that the sale of liquor within a grocery store, supermarket, drug store and/or wholesale club, and a wine store, such as Total Wine, shall also be permitted);

(vi)    funeral parlor; massage parlor (except that first class massage concept stores, such as Massage Envy, and day spas shall be permitted);

(vii)   animal clinic or animal boarding (kennel) (except that the foregoing restrictions shall not apply to any tenant or occupant whose primary business is the retail sale of pets, pet food and supplies (such as Petsmart or Petco) or veterinary services and is commonly found in first-class shopping centers, provided, further, that overnight boarding (indoor only) of pets is limited to that which is incidental to the operations of such tenant or occupant);

(viii)  discotheque; dance hall or otherwise for musical/dance reviews of topless/nude shows;

#3826

H-1

(ix)    gymnasium; health club; karate studio; bowling alley (except as set forth below); or skating rink (except that one (1) health club less than seven thousand five hundred (7,500) square feet located at least two hundred (200) feet from any point of the storefront of Tenant's Demised Premises, and one (1) health club seven thousand five hundred (7,500) square feet or more located at least two hundred (200) feet from any point of the storefront of Tenant's Demised Premises, and one (1) bowling alley, such as The Corner Alley or Strike, at least one hundred fifty (150) feet from any point of the storefront of Tenant's Demised Premises shall be permitted);

(x)    car wash;

(xi)    off-track betting establishment;

(xii)    pool/billiards room or amusement arcade (defined as any establishment containing more than a combination of seven (7) electronic, pinball or other games), gallery or store, except that the pool/billiards room, an amusement arcade or a bowling alley shall be permitted in the Shopping Center provided that (A) such pool/billiards room, amusement arcade or bowling alley is an integral part of a "Dave & Buster's," "Chuck E. Cheese," "Monkey Joe's" or equivalent use, and (B) the "Dave & Buster's," "Chuck E. Cheese," "Monkey Joe's" or equivalent use shall be at least two hundred fifty (250) feet from any point of the storefront of Tenant's Demised Premises;

(xiii)    so-called "flea market" or second hand used goods or consignment store (except that second hand stores that are bona-fide retail discount operations commonly found in similar shopping centers, such as Plato's Closet, Once Upon a Child, Second Swing and Play It Again Sports shall be permitted, and a second hand store such as Savers shall be permitted in the North Area);

(xiv)    store selling primarily distressed or damaged merchandise;

(xv)    gun range or gun shop (except that a gun range or gun shop in connection with a sporting goods or outdoor retailer, such as Dick's Sporting Goods, Gander Mountain or Bass Pro Shop, shall be permitted);

(xvi)    for warehousing (except as incidental to a retail business);

(xvii)    adult book store or store selling or exhibiting sexually explicit materials (except that the sale of adult and explicit materials shall be permitted provided that the same are discretely displayed);

(xviii)    business office usage (except that offices incidental to retail uses and offices providing services to the general public and customarily found in similar shopping centers (e.g., banking for finance services, real estate or securities brokerage services, financial or tax planning services, accounting, insurance or legal services, optical, medical or dental services or travel agencies ("Retail Service Offices") )shall be permitted, provided that such Retail Service Offices, in the aggregate, do not exceed

#3826

H-2

ten percent (10%) of the total Gross Leasable Area of the Shopping Center (excluding the North Area, in which Retail Service Offices are permitted without restriction), and in no event shall any Retail Service Offices be located within one hundred fifty (150) feet from any point of the storefront of Tenant's Demised Premises);

(xix)   laundromat; provided, however, this prohibition shall not be applicable to (i) nominal supportive facilities for on-site service oriented to pickup and delivery by the ultimate consumer or (ii) a dry cleaning plant providing on-site pickup and delivery services so long as such plant does not use Hazardous Materials whose use, storage, or disposal requires a permit and a hazardous waste manifest under applicable Environmental Laws, as the same may be found in similar shopping centers;

(xx)   auction or bankruptcy sale (unless court ordered); pawn shop; outdoor circus, catalogue or other type of call center, carnival or amusement park (except for a children's indoor amusement or recreational facility such as a Monkey Joe's, which shall be at least two hundred fifty (250) feet from any point of the storefront of Tenant's Demised Premises); refinery; any type of blood bank; auditorium, meeting hall, ballroom, or other place of public assembly; and unemployment agency, service or commission; and

(xxi)   any other non-retail uses not otherwise referenced in and/or expressly permitted by the terms of Sections (i) through (xx) of this Exhibit H (collectively, "Additional Non-Retail Uses"); provided, however, that such Additional Non-Retail Uses shall be permitted, provided that such Additional Non-Retail Uses, in the aggregate, do not exceed ten percent (10%) of the total Gross Leasable Area of the Shopping Center (excluding the North Area, in which Additional Non-Retail Uses are permitted without restriction) and are at least one hundred fifty (150) feet from any point of the storefront of Tenant's Demised Premises.

#3826

H-3