EXHIBIT A

# LEASE AGREEMENT

Between

**Mobile Festival Centre, LLC**
**"Landlord"**

and

**Jo-Ann Stores, Inc.**
**"Tenant"**

Dated:  December _____, 2012

## TABLE OF CONTENTS

SECTION                              HEADING                                    PAGE

SECTION 1.     EXHIBITS TO LEASE ............................................................. 1
SECTION 2.     DEFINITIONS ...................................................................... 2
SECTION 3.     PREMISES ........................................................................... 7
SECTION 4.     TERM AND OPTIONS TO EXTEND ................................. 9
SECTION 5.     FIXED MINIMUM RENT ..................................................... 9
SECTION 6.     PERCENTAGE RENT ......................................................... 10
SECTION 7.     GROSS SALES .................................................................. 10
SECTION 8.     TAXES ............................................................................... 13
SECTION 9.     COMMON AREA COSTS .................................................... 14
SECTION 10.    CONSTRUCTION OF PREMISES ..................................... 17
SECTION 11.    USE .................................................................................... 20
SECTION 12.    COMMON AREAS .............................................................. 20
SECTION 13.    UTILITIES .......................................................................... 21
SECTION 14.    USE VIOLATION ............................................................... 21
SECTION 15.    CO-TENANCY ..................................................................... 23
SECTION 16.    RULES AND REGULATIONS ........................................... 24
SECTION 17.    ALTERATIONS, INSTALLATIONS AND IMPROVEMENTS BY TENANT
               ............................................................................................ 24
SECTION 18.    REPAIRS AND MAINTENANCE ....................................... 25
SECTION 19.    INDEMNIFICATION ......................................................... 26
SECTION 20.    WAIVER OF CLAIMS ........................................................ 27
SECTION 21.    PROPERTY AND LIABILITY INSURANCE ..................... 27
SECTION 22.    SIGNS ................................................................................ 29
SECTION 23.    ASSIGNMENT AND SUBLETTING .................................. 30
SECTION 24.    REPAIR AFTER CASUALTY ........................................... 31
SECTION 25.    CONDEMNATION .............................................................. 32
SECTION 26.    REPRESENTATIONS AND COVENANTS OF LANDLORD.................... 33
SECTION 27.    REMEDIES UPON DEFAULT ........................................... 37
SECTION 28.    RIGHTS OF LANDLORD ................................................... 38
SECTION 29.    BREACH OF COVENANT .................................................. 39
SECTION 30.    MORTGAGE SUBORDINATION ...................................... 39
SECTION 31.    NO WAIVER ...................................................................... 41
SECTION 32.    SURRENDER OF PREMISES ........................................... 41
SECTION 33.    SHORT FORM LEASE, COMMENCEMENT DATE AGREEMENT ........ 41
SECTION 34.    NOTICE .............................................................................. 42
SECTION 35.    HAZARDOUS MATERIALS ............................................... 43
SECTION 36.    LIMITATION OF LANDLORD'S LIABILITY ..................... 45
SECTION 37.    SITE PLAN ........................................................................ 45
SECTION 38.    INTENTIONALLY OMITTED ............................................ 45

i

SECTION 39.    PRIOR AGREEMENTS ................................................................................. 45
SECTION 40.    NO OPERATING COVENANT ................................................................... 46
SECTION 41.    APPLICABLE LAW AND CONSTRUCTION ........................................... 46
SECTION 42.    UNAVOIDABLE DELAYS .......................................................................... 46
SECTION 43.    REASONABLE CONSENT .......................................................................... 47
SECTION 44.    NO PARTNERSHIP ...................................................................................... 47
SECTION 45.    ESTOPPEL ..................................................................................................... 47
SECTION 46.    QUIET ENJOYMENT................................................................................... 47
SECTION 47.    HOLDING OVER........................................................................................... 48
SECTION 48.    BROKERS ....................................................................................................... 49
SECTION 49.    INTENTIONALLY OMITTED ................................................................... 49
SECTION 50.    INTENTIONALLY OMITTED ................................................................... 49
SECTION 51.    CAPTIONS ..................................................................................................... 49
SECTION 52.    VARIATION IN PRONOUNS ..................................................................... 49
SECTION 53.    SECTION REFERENCES............................................................................. 49
SECTION 54.    BINDING EFFECT OF AGREEMENT...................................................... 49
SECTION 55.    ATTORNEY'S FEES ..................................................................................... 50
SECTION 56.    OFAC WARRANTY ..................................................................................... 50

ii

# LEASE

This Lease is made as of December _____, 2012, between **MOBILE FESTIVAL CENTRE, LLC,** a Delaware limited liability company, ("Landlord"), and **JO-ANN STORES, INC.,** an Ohio corporation ("Tenant").

Landlord and Tenant covenant and agree as follows:

## SECTION 1.  EXHIBITS TO LEASE

(a)    The following exhibits are attached to and made a part of this Lease, and are incorporated herein by reference:

Exhibit A.  The description of the lands upon which the Shopping Center is located.

Exhibit B.  The site plan showing the Shopping Center, the location of the Premises, as hereafter defined, the Shopping Center buildings, the Protected Area, Future Build/Permitted Build Area, Unrestricted Area, the parking areas, driveways and common areas and containing other general information relative to the development of the Shopping Center Site (the "Site Plan").

Exhibit C.  Intentionally deleted.

Exhibit D.  Tenant's plans and specs (CDs which means construction documents).  To be attached post execution.

Exhibit D-1.  Prototype signage, as approved by Landlord and Tenant.

Exhibit E.  Intentionally deleted.

Exhibit F.  The Exclusive and Restricted Uses affecting the Shopping Center.

Exhibit G.  Intentionally deleted.

Exhibit H.  Form of Estoppel Certificate.

(b) If there is any conflict between the language in this Lease and the content of any of the aforementioned Exhibits, the content of the Exhibit shall control.

Mobile Festival Centre, Mobile, AL
EXECUTION VERSION: 12-11-12

## SECTION 2.  DEFINITIONS

The terms listed below have the respective meanings as follows:

(a)    Additional Rent: Tenant's Proportionate Share of Taxes (Section 8), Tenant's Proportionate Share of Common Area Costs (Section 9), and Tenant's Proportionate Share of Insurance (Section 21).

(b)    Commencement Date: (i) August 30, 2013, or (ii) the day that Tenant opens for business in the Premises, whichever day first occurs. Notwithstanding anything to the contrary in this Lease, unless Tenant otherwise opens for business, the Commencement Date will not occur during any period that Tenant has not received all required governmental permits and approvals necessary for Tenant's occupancy, provided Tenant promptly applies for and diligently pursues obtaining such permits and approvals. Tenant may elect to open for business during any period identified in the immediately preceding sentence, and in such case, Tenant shall be obligated to pay full Rent during said period. Also, notwithstanding the foregoing, in no event shall Tenant be required to open or commence the payment of Rent during the period commencing November 15 and ending the next occurring January 31 ("Blackout Period"); and, if the Commencement Date would otherwise occur in the Blackout Period (except for the reason that Tenant opens for business), the Commencement Date shall be deemed to be the first day after the expiration of the Blackout Period. If Tenant opens during the Blackout Period, then Tenant is obligated to pay only Substitute Rent during the Blackout Period.

(c)    Common Areas: the parking areas, driveways, aisles, sidewalks, malls (whether enclosed or unenclosed), truck storage areas, mechanical rooms, and other common, service and related areas and improvements within the Shopping Center, whether open to the public generally or for the non-exclusive use of one or more tenants, and whether or not shown on Exhibit B, but excluding the roof(s).

(d)    Default Rate: the greater of an annual rate of interest equal to 12% or three percentage points over Prime Rate, as published in the Wall Street Journal as of the date of default.

(e)    Delivery Date: the date that Landlord delivers the Premises to Tenant with all of the Delivery Requirements satisfied and Tenant accepts said delivery by written acknowledgment signed by Tenant's Vice President of Real Estate and Store Development, Director of Store Development or Director of Construction and Facilities. Tenant shall not unreasonably delay, condition or refuse its acceptance of the Premises and if Tenant's Vice President of Real Estate and Store Development, Director of Store Development or Director of Construction and Facilities does not respond within three business days after written notice of delivery, Tenant shall be deemed to have accepted the Premises. The Delivery Date may occur prior to the Required Delivery Date or Estimated Delivery Date if Landlord has satisfied the Delivery Requirements and upon thirty (30) days prior written notice to Tenant ("Early Delivery"), provided, however, that such Early Delivery shall not commence Tenant's obligations to pay Rent and Additional Rent, which shall commence upon the Commencement Date.

2

(f)     "Delivery Requirements" means the following:

(1) the Premises are delivered to Tenant free and clear of any Hazardous Material, including asbestos, and Landlord represents and warrants as such, and in a broom clean condition free of debris and all personal property of any prior tenant or other party;

(2) all Common Areas have been delivered in their as-is condition and LL represents that they are in compliance with Laws;

(3) Tenant shall have received from Landlord results from a slab moisture test indicating that the slab meets or exceeds the acceptable levels of slab moisture per ASTM F 2170-2 (Rh 90% or less); and

(4) Tenant has received from Landlord at least thirty (30) days prior written notice (the "Delivery Notice") of the date (the "Required Delivery Date") it will deliver the Premises to Tenant. It is agreed and understood that only one (1) Delivery Notice will be delivered.

(g)     Estimated Delivery Date: Landlord's good-faith estimate of the Delivery Date is April 29, 2013.

(h)     Gross Leasable Area: the number of square feet of floor area (excluding non-retail mezzanine, basement and other such areas), measured from the exterior face of exterior walls, the exterior building line for sidewalk or mall frontage, and the center line of party walls, with no deduction for columns, stairs, elevators, or any interior construction or equipment areas used exclusively by Tenant for the Premises.

With respect to the Shopping Center, the Gross Leasable Area is the total constructed Gross Leasable Area available for the exclusive use and occupancy of tenants within the Shopping Center, whether or not actually rented or open for business, as the same exists from time to time.

With respect to the Premises, the Gross Leasable Area will be the actual completed Gross Leasable Area, as the same exists from time to time.

Any change in Gross Leasable Area, whether of the Premises or Shopping Center, will be deemed in effect on the first day of the next succeeding month following such change. Landlord shall use commercially reasonable efforts to advise Tenant of any increase or decrease in the Gross Leasable Area of the Shopping Center due to the construction or demolition of any buildings in the Shopping Center within 60 days of any such change, together with a current Site Plan reflecting such change.

3

Landlord represents and warrants that the Gross Leasable Area of the Shopping Center intended for non-exclusive use and occupancy as shown in the Site Plan is approximately 380,619 square feet.

(i)    Hazardous Materials: See Section 35.

(j)    HVAC: heating, ventilating and air conditioning.

(k)    Landlord's Work: None; the Landlord shall deliver the Premises in its "As-is" condition to the Tenant, except as is required to satisfy the Delivery Requirements and Section 18(b) hereof.

(l)    Laws: any and all laws, codes, ordinances or regulations passed into existence by any Public Entity now or hereinafter in existence.

(m)    Lease Year: a period of 12 consecutive calendar months during the Term. The first Lease Year (or Lease Year One) begins on the first day of February next following the Commencement Date, unless the Commencement Date is the first day of February, in which event the first Lease Year begins on the Commencement Date. The first Lease Year will include the first Partial Lease Year, if any. Rent and any limitations on such Rent for purposes of any Partial Lease Year will be proportionately adjusted based upon the actual number of days of such Partial Lease Year in relation to the number of days in a full Lease Year.

(n)    Partial Lease Year: the period, if any, of fewer than 12 consecutive calendar months between the Commencement Date and the first day of the first Lease Year and the period, if any, of less than 12 consecutive calendar months between the last day of the last Lease Year and the expiration of the Term.

(o)    Permitted Use: Subject to any exclusives or prohibited use restrictions set forth on Exhibit F (including the exclusive of Bed, Bath and Beyond for which Tenant shall obtain a waiver from Bed, Bath and Beyond as set forth below), the sale of fabrics of all kinds; goods sold by the yard; linens, curtains, drapery and upholstery materials; towels, pillows, draperies, drapery hardware, blinds, shades, shutters; patterns, knitting supplies, needlepoint, macramé; art materials and supplies; finished crafts, craft materials and supplies; ceramics, wearable art and wearable art supplies; miniatures, dolls, hobby items; framed artwork; picture frames, framing (both ready made and custom made) and framing materials and supplies; bridal apparel and accessories, wedding supplies; floral products, artificial flowers and accessories; gift items, cards, party supplies, paper goods; scrapbooks and scrapbooking supplies and materials; stationery; candles, candlesticks, brass and pottery; foam products, yarns, all types of notions; indoor and outdoor house decorating products and accessories; furniture, do-it-yourself products and accessories; seasonal merchandise; baskets, wicker items, housewares; prepackaged and unpackaged food and food products, coffee, tea, and assorted beverages; instructional books and tapes; children's books, toys; sewing machines, sewing machine furniture; vacuum cleaners; fabric care items; lamps, small household appliances, irons, ironing

4

boards; custom services and custom products using arts and craft and sewing components, including, but not limited to, quilting, bow-making, window treatments, floral design, fashion sewing, instructional classes, materials and services; products, accessories related to all of the foregoing, and other items and services customarily offered for sale by a fabric or craft or general merchandise store, and such other related merchandise and services typically offered in a majority of the stores in the Alabama region and operated by Tenant under the name Jo-Ann, Jo-Ann Fabrics and Crafts or such other name under which Tenant may operate provided that Tenant continues to operate as a fabric and/or craft store.

Landlord has advised Tenant that Tenant's Permitted Use violates an exclusive use clause benefitting another tenant in the Shopping Center, commonly known as Bed, Bath and Beyond. Tenant agrees, at Tenant's sole cost and expense, to attempt to obtain Bed, Bath and Beyond's consent to Tenant's Permitted Use, in a form reasonably acceptable to Landlord and Tenant. Therefore, this Lease is subject to and contingent upon Tenant obtaining such consent; and in the event Tenant fails to obtain this consent within sixty (60) days after the date this Lease is fully executed by Landlord and Tenant, then this Lease shall be deemed null and void. However, Tenant acknowledges that Landlord may withhold its execution of this Lease until Tenant obtains the aforementioned consent.

(p)    Plans and Specifications: the final plans and specifications for the construction or remodeling of the Premises, in the form of Exhibit D, as the same may be modified by written agreement by and between Landlord and Tenant.

(q)    Premises: a portion of the Shopping Center as shown on the Site Plan and as more fully described in Section 3(a) below.

(r)    Protected Area: the area shown on the Site Plan.

(s)    Protected Use: Sale of fabrics of all kinds, goods sold by the yard, upholstery materials, scrapbooks and scrapbooking materials and supplies, patterns, yarns and knitting supplies, needlepoint, macramé, artificial flowers and accessories, arts and crafts materials and supplies, all types of notions, custom framing, framed artwork, sewing machines, sewing machine furniture, Products, accessories and services related to all of the foregoing.

(t)    Prototype Plans: Shell Plans marked as Prototype drawings dated March, 2010, previously provided to Landlord and available on Tenant's portal (to which Landlord has been provided access).

(u)    Public Entity: the federal, state, county, municipal or other governmental unit, however denominated, and any agency, division, department or public official thereof, now or hereafter having jurisdiction, in any respect, over the Premises, the Shopping Center or Shopping Center Site.

(v)    Rent: Fixed Minimum Rent, Additional Rent, Percentage Rent and all other monetary obligations of Tenant to Landlord under this Lease. To the extent either party is obligated to pay or

5

reimburse the other party for any fees or charges in this Lease, including but not limited to attorney fees, such reimbursing party shall only be obligated for such fees to the extent that such fees are reasonable,

(w)     Required Delivery Date: The date specified in Landlord's Delivery Notice. If Landlord fails to issue a Delivery Notice on or before the date that is thirty (30) days prior to the Estimated Delivery Date, then the Required Delivery Date for all purposes under this Lease shall be deemed to be the Estimated Delivery Date.

(x)     Shopping Center: Mobile Festival Centre, located in Mobile, Alabama, consisting of all buildings including the Premises and Common Areas, and other improvements located upon the Shopping Center Site, and outlined on Exhibit B.

(y)     Shopping Center Site: the legal description set forth on Exhibit A, on which the Shopping Center is located.

(z)     Sign Drawings: the portion of the final plans and specifications for Tenant's pylon signs and exterior sign(s) on or about the Shopping Center which is a part of Exhibit D and as set forth on Exhibit D-1, as the same may be modified by written agreement by and between Landlord and Tenant.

(aa)    Substantially Complete: complete with the exception of minor "punchlist" items that can be completed within 14 days without interfering with the performance of Tenant's Work.

(bb)    Substitute Rent: the greater of (i) 5% of Tenant's Gross Sales (but in no event greater than the Fixed Minimum Rent which would otherwise be payable), or (ii) 65% of the Fixed Minimum Rent, in either case, in lieu of the Fixed Minimum Rent and Percentage Rent. Tenant is obligated to pay Additional Rent at any time when Substitute Rent is payable pursuant to any provision of this Lease.

(cc)    Tenant's Proportionate Share: a fraction, the numerator of which is the Gross Leasable Area of the Premises and the denominator of which is the Gross Leasable Area of the Shopping Center. Notwithstanding the foregoing, if any portion of Common Area Costs, Taxes, or Insurance Costs are furnished or directly payable by an individual tenant or occupant as opposed to Landlord, the cost of the item(s) furnished or payable by such tenant or occupant shall not be included in Common Area Costs, Taxes, or Insurance Costs, as the case may be, and the square footage of the tenant or occupant furnishing or paying for such item(s) shall not be included in the calculation of Tenant's Proportionate Share of such item(s). Tenant's Proportionate Share shall be adjusted in the event of any increase or decrease in the Gross Leasable Area of all buildings within the Shopping Center or the Gross Leasable Area of the Premises.

(dd)    Tenant's Work: the work, if any, to be performed by or at the direction of Tenant in finishing the Premises as provided in the Plans and Specifications.

6

(ee)   Term: the Initial Term, as hereafter defined, and each Extended Term, as hereafter defined, if any, and any renewals or period of holdover tenancy.

(ff)   Termination Date: April 29, 2014.

(gg)   Unavoidable Delay: A material delay beyond the reasonable control of the delayed party caused by labor strikes, lock-outs, extraordinary labor troubles, industry-wide inability to procure materials, failure of power, extraordinary restrictive governmental laws or regulations (such as gas rationing), riots, war, military or usurped governmental power, acts of terrorism, sabotage, material fire or other material casualty, or an extraordinary and material act of God (such as a tornado or earthquake), but excluding inadequacy of insurance proceeds, litigation or other disputes, financial inability, lack of suitable financing, delays of the delayed party's contractor and failure to obtain approvals or permits unless otherwise caused by an event of Unavoidable Delay.

## SECTION 3.  PREMISES

(a)   For the Rent and upon the terms and conditions contained in this Lease, Landlord leases to Tenant during the Term, and Tenant leases from Landlord during the Term, the following:

(1) The Premises, located within the Shopping Center, on the Shopping Center Site, consisting of space having approximately 21,364 square feet of Gross Leasable Area, with frontage of approximately 119 feet, identified by street address as 3701 Airport Boulevard, Mobile, Alabama 36608, and outlined on the Site Plan, and Tenant acknowledges that the Shopping Center, the Premises and this Lease are subject to the terms and conditions of that certain Construction, Operating and Reciprocal Easement Agreement, by and among Circuit city Stores, Inc., and James D. Tatum, James B. Cofer, and Richard N. Cooper, as Tenants in Common, dated March 20, 1986, as it may have been amended, supplemented and/or assigned (collectively the "REA"),  providing for, among other things, standards and procedures for common area maintenance and operation, restrictions on building design and signage, and prohibited uses; and

(2) The right, in common with Landlord and all other tenants of the Shopping Center granted similar rights by Landlord, to the non-exclusive use of all Common Areas. The rights hereby granted with respect to the Common Areas shall constitute easements appurtenant to the Premises and a servitude upon the Shopping Center Site. The benefit and the burden of such easements shall run with and bind the Shopping Center Site.

(3) Subject to local codes, existing lease restrictions, and the REA, Tenant shall have, the right to place shopping cart corrals ("Corral(s)") at, near or next to the outside of the Premises. Tenant will maintain the Corral(s) in good condition and repair,

subject to the REA and local codes. If Landlord receives notice that Tenant's Corral(s) violate any local code or ordinance, then after receipt of notice from the governing body, Tenant will remove the violating Corral(s), or move it to an acceptable location. Tenant shall indemnify Landlord for any and all claims or repairs relating to the Corral(s).

(b)    Subject to the reasonable consent of Tenant, Landlord expressly reserves the right to maintain, use, repair and replace the pipes, ducts, conduits, utility lines, tunneling and wires leading through the ceiling, plenum areas, columns, partitions, and within or under the floor slabs comprising part of the Premises, but only to the extent that such installations (i) are reasonably necessary to serve the Premises or other parts of the Shopping Center, (ii) are installed in locations that will not unreasonably interfere with Tenant's use of the Premises or Tenant's permitted signage, (iii) are not exposed within the selling area, and (iv) do not decrease the ceiling height of the Premises. Similarly, notwithstanding anything to the contrary in this Lease, Tenant shall have the right to make installations around the Premises (e.g., the roof) which are consistent with Tenant's prototype plans for other similar stores operated by Tenant or which are part of Tenant's Leadership in Energy and Environmental Design initiative or other Tenant initiatives provided that Tenant obtains Landlord's written consent to any such installations prior to said installation. In exercising the foregoing rights, neither Landlord or Tenant shall interfere with the use or occupancy of the Premises or other tenant premises or commence any such work without first notifying the other party, at least 10 days in advance, of the commencement of such work.

(c)    The "Premises" excludes the exterior walls, roof, and areas beneath the floor slab except to the extent that Tenant actually uses said areas (it being understood that if mechanical systems serving the Premises reside in an area under the floor slab, then Tenant shall not be considered as "actually using said area" under the floor slab.)

(d)    Within 60 days after the Commencement Date, either party has the right to measure the Premises. If the parties cannot agree to the measurement, then representatives of Landlord and Tenant will jointly measure the Premises. If such representatives cannot agree, then the Premises will be measured by an architect jointly selected by Landlord and Tenant, whose fee will be paid equally by Landlord and Tenant, and the measurement of the floor area by such architect will bind Landlord and Tenant. If actual field measurements indicate a Gross Leasable Area smaller than set forth above in Section 3(a)(1), then Rent and the construction allowance, will be reduced on the basis of the actual field measurements. If actual field measurements indicate a Gross Leasable Area larger than set forth above in Section 3(a)(1), then there shall be no adjustment in Rent or the construction allowance beyond an increase to 21,578 square feet (it being understood that in such case and for all purposes under this Lease, the Premises Gross Leasable Area shall be deemed to be 21,578 square feet), unless Tenant requested in writing that the Gross Leasable Area be increased, in which case the Rent and the construction allowance shall be increased accordingly.

8

## SECTION 4.  TERM AND OPTIONS TO EXTEND

(a)     The Initial Term begins on the Commencement Date and ends on the last day of the 10th Lease Year, unless sooner terminated as herein provided.

(b)     Landlord grants Tenant the right and option to extend this Lease for two (2) additional periods of five (5) years each (individually called an "Extended Term" and collectively called "Extended Terms"), commencing upon the expiration of the Initial Term or such prior Extended Term, as the case may be. Each Extended Term shall be upon the same terms, covenants and conditions as the Term except for the option to extend then exercised and except for such changes, if any, in Rent or other Tenant charges as are expressly set forth in this Lease.

(c)     Tenant must deliver written notice to Landlord of its election to extend this Lease for an Extended Term on or before the date that is 270 days before the expiration of the Term.

## SECTION 5.  FIXED MINIMUM RENT

(a)     From and after the Commencement Date, Tenant must pay to Landlord, without demand, at the address herein specified for notices to Landlord, Fixed Minimum Rent for the Premises as follows:

(1) During Lease Years One through Five of the Initial Term at the rate of $224,322.00 per year ($10.50 per square foot) in equal monthly installments of $18,693.50; and

(2) During Lease Years Six through Ten of the Initial Term at the rate of $245,686.00 per year ($11.50 per square foot) in equal monthly installments of $20,473.83; and

(3) During the first five-year Extended Term at the rate $267,050.00 per year ($12.50 per square foot) in equal monthly installments of $22,254.17; and

(4) During the second five-year Extended Term at the rate $288,414.00 per year ($13.50 per square foot) in equal monthly installments $24,034.50.

The amounts shall include and be in payment of all other charges not specifically set forth in this Lease.

Tenant must pay monthly installments of Fixed Minimum Rent in advance on or before the first day of each month during the Term, commencing on the first day of the first month next following the Commencement Date (unless the Commencement Date is the first day of the month, in which event the first monthly installment shall be due on the Commencement Date). Notwithstanding the foregoing, Landlord must invoice Tenant, which invoicing will not occur before the Commencement Date, for the first monthly installment of Fixed Minimum Rent. In no event will the first rent installment be due until 10 days after Tenant's receipt of this initial invoice. Fixed Minimum Rent for the partial month, if

9

any, after the Commencement Date will be computed on a per diem basis (assuming a 30-day month), and Tenant must pay the Fixed Minimum Rent for such partial month concurrently with the first monthly installment. If Tenant fails to pay Rent on the due date and Landlord notifies Tenant in writing of such failure twice in any Lease Year, then if Tenant fails to pay Rent on the due date thereafter in the same Lease Year, then the Landlord, in addition to the Rent then owed, is entitled to a late fee of $100 for such third late payment and any such other late payment of Rent thereafter during that Lease Year. Tenant shall pay to Landlord any tax or license fee measured by Tenant's Rents receivable by Landlord ("Rent Tax"). The Rent Tax shall be paid by Tenant each month with monthly payments of Rent.

## SECTION 6.   PERCENTAGE RENT

(a)    In addition to Fixed Minimum Rent, Tenant must pay to Landlord Percentage Rent for each Lease Year and Partial Lease Year equal to the product of (1) the amount of Gross Sales in excess of the Breakpoint, multiplied by (2) four percent (4%). The "Breakpoint" is the quotient of (a) annual Fixed Minimum Rental, divided by (b) four percent (4%).

(b)    Notwithstanding Section 6(a), Percentage Rent for the first Partial Lease Year, if any, shall be based upon Gross Sales for the twelve (12) month period commencing on the Commencement Date and expiring on the first anniversary of the Commencement Date, and Percentage Rent for the last Partial Lease Year, if any, shall be based upon Gross Sales during the twelve (12) month period ending on the last date of the Term (each of the foregoing periods referred to as a "Special Computation Period"). Percentage Rent payable for each such Partial Lease Year shall be based upon a computation of the Percentage Rent payable during the Special Computation Period and the pro-rata portion of the Percentage Rent applicable thereto for the number of days included within the respective Partial Lease Year.

(c)    Percentage Rent for each Lease Year and Partial Lease Year is payable on an annual basis within seventy-five (75) days after the last day of such Lease Year or Special Computation Period, as the case may be.

(d)    Tenant will deliver to Landlord (i) within thirty (30) days after the end of each month, a statement showing Gross Sales for the preceding month, and (ii) within seventy-five (75) days after the end of each Lease Year or Special Computation Period, as the case may be, a statement certified by an officer of Tenant showing Gross Sales for such Lease Year or Special Computation Period, as the case may be.

## SECTION 7. GROSS SALES

(a)    "Gross Sales" means the entire amount of the actual receipts, whether cash or otherwise, from all sales of merchandise and services for all business conducted in, on or from the

10

Premises, including mail or telephone orders received at the Premises and filled from the Premises or elsewhere (but excluding mail, telephone, internet or other orders filled at the Premises but originating elsewhere). Each sale upon installment or credit shall be treated as a sale for the full amount thereof in the month during which such sale shall be made, irrespective of the time when Tenant shall receive payment (whether full or partial) from its customers. Layaway sales, so-called, shall be included in the Gross Sales of the respective computation period only to the extent of payments received during that computation period. Notwithstanding the foregoing, Tenant shall not be obligated to report and include with Tenant's Gross Sales, the sales generated by any assignee, sublessee, concessionaire or licensee of Tenant.

(b)    Notwithstanding anything to the contrary, the following are excluded from Gross Sales:

(1)    sums collected and paid out for any sales tax or excise tax imposed by any duly constituted governmental authority;

(2)    the value or price of merchandise exchanged between the stores of Tenant, or the affiliates of Tenant, if any, where such exchange of merchandise is made solely for the convenient operation of the business of Tenant or the affiliate of Tenant and not for the purpose of consummating a sale which has been made at, in, from or upon the Premises, or for the purpose of depriving Landlord of the benefit of a sale which otherwise would be made at, in, from or upon the Premises;

(3)    the amount of returns to shippers or manufacturers;

(4)    sales to employees made at a discount, not to exceed 1% of Tenant's Gross Sales;

(5)    non-sufficient funds check charges or financing charges to customers whether or not separately stated or billed;

(6)    service charges to customers who buy a budget or deferred payment plan;

(7)    revenue from gift certificates or gift cards until redeemed at the Premises;

(8)    revenue from vending machines used solely for the benefit of employees;

(9)    the amount of any cash or credit refund made upon any sale where the merchandise sold, or some part thereof, is thereafter returned by the purchaser and accepted by Tenant;

(10)    sales of fixtures;

11

(11)    all sums and credits received in settlement of claims for loss or damage to merchandise;

(12)    non-retail bulk sales of merchandise outside of the ordinary course of business on the Premises;

(13)    tax exempt sales or merchandise donated or sold at a discount to charitable or non-profit organizations;

(14)    fees for classes or demonstrations, up to an amount not to exceed 5% of Gross Sales;

(15)    the value attributed to merchandise taken in trade;

(16)    referrals to affiliates of or other divisions of Tenant;

(17)    fees for gift wrapping, mailing and other customer services provided on a not for profit basis;

(18)    sales of lottery tickets, special event tickets and the like (but the commissions paid to Tenant shall be included in Gross Sales);

(19)    the amount of credit sales and credit accounts incurred at the Premises which are written off as bad debts and deducted as an expense not to exceed 1% of Tenant's Gross Sales;

(20)    sales by any sublessee, concessionaire or licensee in the Premises, except that any payments to Tenant by such entity will be included in Gross Sales; and

(21)    sale of patterns, up to an amount not to exceed 5% of Gross Sales.

(c)    At any time within three years after the close of each Lease Year and Partial Lease Year, but not more often than once with respect to any Lease Year and Partial Lease Year, Landlord may cause an audit to be made by any accountant designated in writing by Landlord of all of the books of account, documents, records, returns, papers and files of Tenant relating to Gross Sales for such Lease Year made at, in, on or from the Premises.  Tenant, upon at least 20 days prior request of Landlord, shall make all such records available for such examination at the address specified in this Lease for notices to Tenant during regular business hours.  Landlord must hold in strict confidence any information obtained from all such records and reports examined by it or by its designated accountant, except as required by law, or a commercial lender or prospective purchaser. If Landlord makes an audit for any Lease Year or Partial Lease Year, and the Gross Sales shown by Tenant's statement for such Lease Year or Partial Lease Year have been understated by more than 3% and if such understatement resulted in an underpayment of Percentage Rent by at least $1,000, then Tenant,

in addition to immediately paying to Landlord the full amount of the understated Percentage Rent as determined by such audit, must pay to Landlord the reasonable cost of such audit, not to exceed $1,000; otherwise the audit will be at Landlord's sole cost and expense.  Tenant makes no representation or warranty as to the sales that it expects to make in the Premises.

The Gross Sales of any Lease Year or Partial Lease Year, as the case may be, and the Percentage Rent due thereon, if any, have no bearing on or connection with the Gross Sales of any other Lease Year or Partial Lease Year.

## SECTION 8. TAXES

(a)    Landlord covenants and warrants that the entire Shopping Center is located on tax parcel identification numbers, R022807252000005.003, R022807252000005.005, R022807252000005.002, and R022807252000005 (the "Tax Parcels"), that the Tax Parcels and the improvements comprising the Shopping Center (including the Premises and Common Areas) are as set forth on Exhibit B are the only improvements now located which will be currently considered for the tax value for which Tenant shall be responsible for its Proportionate Share thereof. Once or twice per Lease Year, depending on when tax bills are issued by the government authority, Tenant must pay to Landlord Tenant's Proportionate Share of real estate taxes ("Taxes") levied upon the Tax Parcels and paid by Landlord during each year of the Term, after reducing Taxes (i) by the amount of any contributions for Taxes paid by any party having the right to use the Common Areas but not a tenant of the Shopping Center, and (ii) by any rollback, discount for timely or early payment, credit or reduction that has been granted or issued by any taxing authority or governmental group or agency. Tenant's Proportionate Share of Taxes is a fraction whose numerator is the Gross Leasable Area of the Premises (21,364 square feet) and whose denominator is the Gross Leasable Area of all buildings within the Tax Parcels (380,619 square feet). Tenant will pay Tenant's Proportionate Share of Taxes on Tenant's Tax Parcel within 30 days after receipt of Landlord's statement assessing and prorating the Taxes, together with copies of receipted tax bills for which payment is sought and reasonable verification for the computation of Tenant's Proportionate Share. For the first Lease Year, Landlord states that Tenant shall pay no more than $0.79 per square foot of Gross Leasable Area of the Premises for Taxes; and, Landlord represents that said amount is a good faith estimate of the actual Taxes that would be due if Tenant were paying its full Proportionate Share of Taxes for said Lease Year.

In no event will Tenant pay for Taxes for a time period longer than the Term.

(b)    If the Taxes increase by more than (ten) 10 percent in any given tax year, Landlord shall contest such Taxes with the appropriate taxing authority, and Tenant shall be responsible for its Proportionate Share of all costs and expenses related to such contest.  Any refund received as a result of such proceedings shall be applied first to reimburse Landlord for its expenses of prosecuting such proceedings, including reasonable attorney's fees, second to Tenant as proportional reimbursement for Taxes paid by Tenant to Landlord for the tax year or years which are the subject of such proceedings, and the balance shall become the property of Landlord.  Only Landlord shall have the right to contest the Taxes and any assessments against the Tax Parcels.

13

(c)    If any Taxes may be paid in installments, Landlord will cause such taxes to be paid over the longest installment period allowed, and, subject to the exclusions below, only the installments coming due during the Term will be included within Taxes. Landlord must use commercially reasonable efforts to minimize the Taxes assessed against the Tax Parcel.

(d)    Tenant must pay before delinquency all municipal, county and state taxes assessed during the Term against any leasehold interest and personal property of any kind, owned by or placed in, upon or about the Premises by Tenant.

(e)    Intentionally Deleted.

(f)    Notwithstanding anything to the contrary, the following are excluded from Taxes:

(1)    Any portion of the Taxes attributable to a revaluation of the Tax Parcel arising out of a sale or other change in the ownership thereof or of any interest therein occurring more than once every five (5) years;

(2)    Any portion of the Taxes in the nature of fees, charges or assessments for governmental services or improvements related to the initial construction;

(3)    Estate tax, inheritance tax, succession tax, capital levy tax, corporate franchise tax, gross receipts tax, income tax, conveyance fee or transfer tax;

(4)    Any assessment, bond, tax, or other finance vehicle that is (A) imposed as a result of Landlord's initial construction of the Shopping Center, or (B) used to fund construction of additions or improvements to the Shopping Center; and

(5)    Any penalty, interest or other charge attributable to Landlord's late or delinquent payment of Taxes.

## SECTION 9. COMMON AREA COSTS

(a)    In addition to payment of the Fixed Minimum Rent, Tenant must pay to Landlord Tenant's Proportionate Share of Landlord's reasonable costs for the operation and maintenance of the Common Areas ("Common Area Costs"), on a monthly basis. Landlord's good faith estimate of Tenant's Proportionate Share of the Common Area Costs for the First Lease Year is $1.06 per square foot. Tenant's Proportionate Share of Common Area Costs shall not increase by more than five percent (5%) (on a non-cumulative basis, excluding exterior utilities, snow and ice removal costs, and

14

security) in any Lease Year above Tenant's Proportionate Share of Common Area Costs for the prior Lease Year, except that Tenant's Proportionate Share of Common Area Costs for the sixth Lease Year of the Initial Term and the first Lease Year of each Extended Term shall be the actual Common Area Costs for such year (the first day of each such Lease Year referred to as a "Reset Date"). After Tenant's Proportionate Share of Common Area Costs has been reset to the actual amount as set forth hereinabove, said amount shall not increase by more than five percent (5%) (on a non-cumulative basis, excluding exterior utilities, snow and ice removal costs, and security) over the prior year.

(b)     On or before April 1 of the sixth Lease Year of the Initial Term and the first Lease Year of each Extended Term, Landlord must provide Tenant with a statement assessing and prorating the actual Common Area Costs for the year immediately prior to the applicable Reset Date, together with a certified statement of the Gross Leasable Area of the Shopping Center and copies of all bills used to support the reset Common Area Cost figure. If Landlord fails to provide the aforementioned information, then Tenant has the right to continue paying the Common Area Cost paid in the previous Lease Year until such information is received..

(c)     The payment of such Common Area Costs is in consideration of Landlord's maintenance and operation of the Common Areas, and Landlord must use such payment for that purpose.

(d)     Notwithstanding anything to the contrary, the following are excluded from Common Area Costs:

(i)      the original cost or depreciation of the original cost of constructing, erecting and installing the Shopping Center, the Common Areas, common facilities and related services;

(ii)     principal and interest payments pursuant to any mortgage which encumbers the Premises or Shopping Center;

(iii)    Taxes;

(iv)    administrative charges (other than the Permitted Administrative Fee, as defined below), management fees, fees based upon a percentage calculation, leasing commissions, or any other fee or charge, regardless of name (including, without limitation, salaries of all kinds, social security, taxes, part-time or full-time labor, any fees paid to manage the Shopping Center, including those paid to a third party management company, and similar costs and expenses), related to the management, supervision, and/or operation of the Shopping Center;

(v)     roof repairs in the Shopping Center as the roof is not part of the Common Areas and is Landlord's sole responsibility to maintain and repair;

15

(vi)     expenses incurred due to the negligence or willful misconduct of Landlord or any occupant of the Shopping Center or their respective agents or employees;

(vii)    costs and expenses incurred for repairs or replacements due to faulty construction, faulty workmanship or structural defects;

(viii)   expenses related to an individual occupant of the Shopping Center or to a particular tenant space;

(ix)     any costs, fees, fines or penalties, or interest thereon, related to violations by Landlord or any occupant of any governmental law, ordinance, code, rule or regulation;

(x)      capital expenditures other than "Permitted Capital Expenditures." Permitted Capital Expenditures means repaving of the parking lot(s) not more frequently than once every seven years and the cost of compliance with Laws not enacted as of the date of this Lease; provided, however, that Permitted Capital Expenditures must be amortized over the useful life of such expenditure based on federal income tax guidelines, but in no event less than seven years, and only the amount of the annual amortization shall be included in Common Area Costs in any Lease Year;

(xi)     reserves for replacement;

(xii)    costs for insuring the Common Area, but this exclusion does not limit Landlord's rights of reimbursement under Section 21;

(xiii)   cost of advertising, marketing, decorating, redecorating, or special cleaning or other services not provided on a regular basis;

(xiv)    all costs and expenses relative to the solicitation and execution of leases for space in the Shopping Center;

(xv)     all costs and expenses related to the operation, maintenance and repair of any garage space in the Shopping Center;

(xvi)    the cost of any repair or replacement made by Landlord because of the total or partial destruction of the Shopping Center or the condemnation of a portion of the Shopping Center or the Shopping Center Site;

(xvii)   any operating expense paid to a related corporation, entity or person that is in excess of that amount that would have been paid absent such relationship;

16

(xviii)   the cost of overtime or other expenses incurred by or on behalf of Landlord to correct any default of Landlord or for work performed by or on behalf of Landlord where such work is expressly provided in this Lease or any other lease to be borne at Landlord's expense; and,

(xix)   any insurance deductible or self-insured retentions.

For purposes hereof, the term "Permitted Administrative Fee" shall mean an amount equal to 7% of the amount of Common Area Costs in respect to which Tenant is required to make a contribution hereunder. The Permitted Administrative Fee is included in Tenant's First Lease Year payment of $1.06 per square foot per year set forth above and at all times will remain included therein and be subject to the cap in Section 9(a).

(e)   Landlord must use commercially reasonable efforts to keep Common Area Costs to a minimum subject, however, to the obligation of Landlord to maintain the Shopping Center as a first-class retail project.

(f)   Landlord covenants that there will be no duplication of costs between those payable by Tenant under this section and any other section of this Lease.

## SECTION 10.   CONSTRUCTION OF PREMISES

(a)   During the period commencing January 1, 2013 and ending March 6, 2013, Tenant shall, using Tenant's architect, cause to have prepared and delivered to Landlord for Landlord's approval, a copy of Tenant's proposed plans and specifications and sign drawings (the "Proposed Plans"). Landlord shall furnish Tenant with a written response within 15 days of receipt of the Proposed Plans or such Proposed Plans shall be deemed accepted. Tenant will resubmit revised Proposed Plans within 10 days after having received Landlord's response, and Landlord will then have a 10-day period within which to review the same. Such review process will continue until the Proposed Plans are acceptable to both Landlord and Tenant. If the parties do not reach agreement on the Proposed Plans within 90 days after their first submission to Landlord, either party may terminate this Lease upon written notice to the other within 15 days after such 90-day period. Within 15 days of Tenant's receipt of the approved Plans and Specifications, Tenant  shall apply for all required governmental permits and approvals necessary for Tenant's Work (the "Permits"), and Tenant shall diligently pursue obtaining such Permits. If Tenant is unable to secure the Permits within 90 days of Tenant's application therefor ("Permit Period"), despite good faith efforts by Tenant, either party shall have the right to terminate this Lease by delivering written notice to the other of its intent to terminate the Lease within 30 days after the end of the Permit Period. TIME IS OF THE ESSENCE WITH RESPECT TO THIS ARTICLE. If either party fails to exercise its right to terminate this Lease during said 30 day period, the right to terminate established under this section shall be null and void. After delivery of the termination notice, each party shall be relieved of all obligations under this Lease and shall not be liable to the other for damages or otherwise; provided, however, that Landlord shall have the right to nullify Tenant's termination by written notice to Tenant within ten (10) days of Landlord's

17

receipt of Tenant's termination notice, and Landlord shall sixty (60) days to attempt to obtain the Permits on Tenant's behalf. If Landlord fails to obtain the Permits during such 60 day period, this Lease shall automatically terminate and thereafter each party shall be relieved of all obligations under this Lease and shall not be liable to the other for damages or otherwise.

(b)     Tenant acknowledges that the Premises is presently occupied by another tenant (the "Existing Tenant") under a different lease. Landlord is in the process of recapturing the Premises from the Existing Tenant. In the event Landlord is delayed in obtaining possession of the Leased Premises from the Existing Tenant beyond March 30, 2013, then Landlord will be delayed in delivering possession of the Leased Premises to Tenant. Notwithstanding anything contained in the Lease to the contrary, Landlord shall not issue the Delivery Notice until Landlord has obtained possession of the Leased Premises from the Existing Tenant. If Landlord fails to issue the Delivery Notice by the Estimated Delivery Date because it has not recaptured the Premises from the Existing Tenant, then either party shall have the right to terminate this Lease on thirty (30) days prior written notice to the other party at any time thereafter and prior to the issuance of the Delivery Notice, Landlord agrees to pay Tenant its actual costs (not to exceed $8,000) involved in getting this Lease signed, and no Lump Sum Payment or Per Diem Payment shall be due.

(c)     "Hazardous Materials" shall mean any hazardous or toxic substance, material or waste (including, without limitation, asbestos) which has been declared, prior to the date hereof, by the federal government to pose a material risk of injury to health, safety, or property and the use or disposal of which is regulated by the federal government. In the event, within 30 days after the Delivery Date, Tenant discovers any Hazardous Materials inside the Premises (such as asbestos), and such Hazardous Materials are determined to have been in existence at the Premises prior to the Delivery Date, Landlord shall remove and dispose of such Hazardous Materials.

(d)     Tenant shall hereafter have access to the Premises for inspection, taking measurements, making plans, erecting temporary or permanent signs and the performance of Tenant's Work as may be appropriate or desirable by Tenant without being deemed thereby to have taken possession or accepted delivery of the Premises; provided, however, that Tenant shall not, during the course of such work, materially interfere with the performance of Landlord's Work and shall indemnify, defend and hold Landlord harmless from and against any and all claims or losses arising from Tenant's entry upon or activities within the Premises, except to the extent caused by Landlord, its agents, employees or contractors. In no event will Tenant be required to accept delivery of the Premises unless and until the Delivery Requirements have been satisfied. No agent or non-employee representative of Tenant has the authority to accept delivery of the Premises. Only direct employees of Tenant with a title of Director or above can accept delivery, which acceptance must be in writing. Any purported acceptance by a non-authorized person or that is not in writing is not binding upon Tenant.

(e)     Intentionally deleted.

(f)     If the Delivery Date does not occur by the Required Delivery Date except if due to Unavoidable Delays, casualty or condemnation, Landlord must pay to Tenant the sum of $25,000.00

(the "Lump Sum Payment"). In addition, Landlord must pay to Tenant the sum of $1,000.00 for each day (the "Per Diem Payment") between the Required Delivery Date and the earlier to occur of (i) the Delivery Date, or (ii) the Termination Date. If Landlord fails to pay Tenant the Lump Sum Payment and/or the Per Diem Payment, then Tenant will have the right (without limiting any other right or remedy of Tenant to collect such payment) to deduct such amount, together with interest thereon at the Default Rate, from Rent and other payments due Landlord. Landlord and Tenant agree that it will be difficult to determine the precise amount of damages that Tenant will incur as a result of the failure of the Delivery Date to occur by the Required Delivery Date. Therefore, Landlord and Tenant agree that the Per Diem Payment and the Lump Sum Payment constitute liquidated damages for such failure. If the Delivery Date does not occur by the Required Delivery Date, said liquidated damages shall be payable irrespective of the date Tenant actually opens for and conducts business in the Premises. Notwithstanding anything contained herein: (1) if the Delivery Date otherwise occurs during a Blackout Period, the Per Diem Payment shall stop as of the date the Delivery Date would occur in the absence of any Blackout Period; and (ii) in all events the Per Diem Payment shall stop accruing as of December 31, 2013.

(g)      If the Delivery Date has not occurred on or before the Termination Date, then Tenant has the right to terminate this Lease by delivering written notice to Landlord at any time from and after the Termination Date but before the Delivery Date. After delivery of Tenant's notice of termination, Tenant shall be relieved of all obligations hereunder and shall not be liable to Landlord in damages or otherwise. In the event Tenant so terminates this Lease, Landlord shall be liable to Tenant for all payments due Tenant under Section 10(f) and, in addition, immediately shall reimburse Tenant for all reasonable legal and architectural fees incurred by Tenant in connection with this Lease, not to exceed an aggregate amount of Twenty Thousand and 00/100ths Dollars ($20,000.00). This Section 10(g) survives the termination of this Lease.

(h)      Landlord must pay Tenant a "construction allowance" in the amount of $427,280.00 ($20.00 per square foot), as follows: 100% to be paid to Tenant within thirty (30) days following the later to occur of each of the following (and Tenant's written notice to Landlord of same): (i) Tenant has opened for business to the public in the Premises, (ii) the Commencement Date, and (iii) delivery to Landlord by Tenant of the all lien waivers and final releases for services/deliverables in excess of $5,000.00 from any contractor or construction manager, as the case may be, provided, however, if (x) a portion of lien waivers and releases are delivered to Landlord, then Landlord shall release funds to Tenant to the extent said lien waivers and releases are provided, or (y) the lien waiver and release is not provided, in no event shall amounts be withheld beyond the statutorily defined period in which liens may be filed, if no liens have been filed during said period. Notwithstanding the foregoing, if a lien is filed, whether before or after the statutory period, Tenant agrees to bond over said lien and indemnify Landlord for any claims or losses relating thereto. If Landlord fails to pay Tenant any portion of the construction allowance within 30 days of Tenant's notice and remittance of proper documentation as required under this Lease, then Tenant will have the right (without limiting any other right or remedy of Tenant) to deduct such amount from Rent, together with interest thereon at the Default Rate. The construction allowance is for the purpose of constructing or improving qualified long-term real property for use in the Tenant's trade or business at the Premises; and Tenant

19

improvements shall remain the property of Landlord at the termination or early expiration of the Lease. In no event shall the construction allowance be used to pay for fixtures or inventory, but up to fifteen percent (15%) of the construction allowance can be used for the following, including but not limited to: architectural and engineering fees; permits fees, leasehold improvements (including all labor and overhead and profit and general conditions expenses); POS and security systems; balers or compactors; fixture installation costs by store and corporate employees and third party employees; pre-opening costs associated with store set-up (includes store and corporate payroll, travel, lodging and meal expenses); in-house store planning and design costs not to exceed $50,000.00; storefront window film and/or graphics. Landlord will wire-transfer the construction allowance to Tenant's bank as follows: Bank of America, 100 West 33rd Street, New York, New York 10001; ABA: 026009593 (in the event Landlord elects to submit an ACH transmission, the number is: 111000012); Jo-Ann Account No.: 4427216208; Account Name: Jo-Ann Stores, Inc..

## SECTION 11.  USE

(a)      Except as set forth in subsection (b) below, the Premises may be used for the Permitted Use, and subject to Landlord's prior written consent not to be unreasonably withheld and subject to compliance with any then existing exclusive rights, the prohibited uses set forth on Exhibit F and the Prohibited Uses as defined in Section 26, any lawful retail use. Landlord will advise Tenant of any existing exclusives affecting the Shopping Center within 15 days after Tenant's written request.

(b)      Notwithstanding anything contained herein, in no event shall the Premises be used in violation of any exclusives or prohibited use restrictions set forth on Exhibit F or for any use that is a Prohibited Use as defined in Section 26. Landlord represents that the use restrictions accurately reflect exclusives, uses and encumbrances that presently encumber the Premises as terms of existing leases of or other documents affecting the Shopping Center (the uses covered by such restrictions are collectively referred to as the "Restricted Uses" and individually as a "Restricted Use"). Upon the expiration or earlier termination of the lease or other written instrument containing a Restricted Use, the Premises will not be subject to such Restricted Use under this Lease and such use will no longer be a Restricted Use.  Upon the request of Tenant, Landlord promptly will advise Tenant which Restricted Uses still encumber the Premises and will furnish to Tenant the documentary support therefor.

## SECTION 12.  COMMON AREAS

(a)      Landlord, at its own cost and expense (except as otherwise specified in Section 9 or Section 21) must construct, install, operate, manage, repair and maintain the Common Areas in a first-class, neat and clean condition for the benefit of Tenant and Tenant's customers, employees, licensees and invitees. Landlord's obligations with respect to the Common Areas include, but are not limited to:

(1) Equipping and lighting the Common Areas;

(2) Maintaining the surfaces of all sidewalks, restriping and maintenance of paved and

20

parking areas in a commercially reasonable condition with the type of surfacing material originally installed or such substitute as shall in all respects be equal in quality to the original;

(3) Removing all ice and snow, papers, mud and sand, debris, filth and refuse and thoroughly sweeping the Common Areas to keep them in a clean and orderly condition;

(4) Placing, keeping in good condition and repair and replacing all utility lines outside of the Leased Premises, any necessary appropriate directional signs, markers and curbs;

(5) Maintaining, trimming and watering, mowing and weeding all landscaped areas and making such replacements of shrubs and other landscaping as is necessary;

(6) security arrangements including private police and similar services and functions as is necessary in Landlord's sole discretion.

(b)     Landlord may close any Common Areas temporarily, at such times as to cause the least possible interruption or interference with Tenant's business, to make repairs or changes, to prevent the acquisition of public rights in such Common Areas or to discourage non-customer parking; but, in no event will the Protected Area be closed (except in the event of an emergency) without the prior reasonable consent of Tenant. In no event shall Landlord designate the Protected Area as an employee parking area or otherwise permit the Protected Area to be used for employee parking.

(c)     Landlord must keep the Common Areas clean and well lighted from dusk until at least one-half hour after the close of Tenant's business and remove snow from the parking areas and driveways as promptly as possible. Landlord cannot impose any parking charges for the parking of automobiles in the parking areas. Landlord cannot grant any rights in, or permit special or exclusive use of, the sidewalk space or parking areas immediately in front of the Premises or in the exterior area immediately behind the rear door of the Premises.

## SECTION 13.  UTILITIES

Landlord, at its sole cost and expense, must cause all utilities furnished to the Premises to be separately metered (or submetered) so that only the service provided to the Premises will be reflected in utility bills rendered to Tenant by the respective supplying public utility companies. Tenant must pay, when due, bills for utilities furnished to the Premises by public utility companies from and after the Delivery Date, including gas, electricity and telephone and the like, as are separately metered (or submetered) and charged directly to Tenant.

## SECTION 14.  USE VIOLATION

(a)     During any time Tenant or its successor or assign is open and operating the Permitted Use , if any portion of any Restricted Property (defined below) is used or occupied for the Protected

21

Use, or if any sales area therein is designated for the Protected Use, and the same is not cured within 30 days after written notice to Landlord (either event being referred to as a "Use Violation"), then Tenant is obligated to pay only Substitute Rent until the date such Use Violation ceases. In addition, if the Use Violation is not cured with 120 days after written notice to Landlord, during the time that any Use Violation exists, Tenant shall have the right to terminate this Lease by giving 60 days written notice to Landlord, in which event all further obligations hereunder shall terminate on the date specified in Tenant's notice, and any Rent (including Substitute Rent) paid in advance by Tenant must be refunded to Tenant within 30 days after termination of the Lease.

(b)    The foregoing restriction in subsection (a) will not apply to: (1) any tenant of the Restricted Property devoting the lesser of (x) 10% of its Gross Leasable Area to the sale of items comprising the Protected Use, or (y) 1,500 square feet of its Gross Leasable Area to the sale of items comprising the Protected Use (and no limitation shall be placed on how many individual merchandise items are within said area); (2) Bed, Bath & Beyond, Ross Stores as well as any tenant in excess of 50,000 square feet of Gross Leasable Area, except for direct category competitors of Tenant, such as, by way of example only, Hobby Lobby, Michael's, and AC Moore; (3) any tenant in the Restricted Property under a lease executed prior to the date of this Lease to the extent such tenant's lease (as the same exists on the date hereof) permits it to sell items that are included in the Protected Use without Landlord's consent. Additionally, the exclusive for upholstery materials shall not apply to furniture stores, and any tenant occupying between 20,000 and 49,999 contiguous square feet under a single trade name will be allowed to devote up to 2,000 square feet of its Gross Leasable Area to the sale of items comprising the Protected Use (and no limitation shall be placed on how many individual merchandise items are within said area) so long as such tenant is not a direct category competitor, and a typical Bed Bath & Beyond store and a typical Party City store shall be permitted.

(c)    Tenant's failure to exercise the termination option is not a waiver of Tenant's continuing right to do so as long as such Use Violation continues. Without limiting Tenant's rights and remedies under this Section 14, Tenant has the right to equitable relief (including injunction) in the event of a Use Violation.

(d)    "Restricted Property" means the Shopping Center and any additions thereto or outparcels thereof owned or controlled by Landlord.

(e)    Landlord covenants and agrees to use diligent, good faith, commercially reasonable efforts to cure any breach or violation of this Section.

(f)    Notwithstanding anything in the foregoing to the contrary, Tenant shall have no remedy for a violation of this Section 14, including but not limited to the right to pay Substitute Rent or terminate this Lease, if another tenant or occupant in the Restricted Property violates a provision of its lease or license agreement regarding its premises, which either does not permit or specifically prohibits the Use Violation that violates Tenant's exclusive rights and Landlord uses good faith efforts to enforce Landlord's rights under such lease or license agreement.

22

(g)      Tenant has the right (but not the obligation) to independently pursue the enforcement of the Protected Use and to act to cure or eliminate a Use Violation (without limiting its right to pay Substitute Rent to the extent otherwise provided for herein). Notwithstanding any of the foregoing, Tenant's right to pay Substitute Rent and its right to pursue enforcement of the Protected Use shall not be deemed to relieve Landlord of Landlord's obligations to enforce the Protected Use and Landlord covenants to use diligent, good faith efforts to cure any Use Violation, including without limitation obtaining injunctive relief and restraining orders.

(h)      Tenant's exclusive rights hereunder shall not apply during any period that Tenant is not open and operating for the Permitted Use at the Premises, excluding temporary closures due to casualty, eminent domain, Unavoidable Delay or reasonable periods for remodeling.

## SECTION 15.   COTENANCY

### A.        OPENING COTENANCY – Intentionally Omitted.

### B.        ON-GOING COTENANCY -

The Ongoing Co-Tenancy Requirement means that at least three Anchor Tenants are open for business to the public during normal operating hours.

If, at any time during the Term of this Lease, the Ongoing Co-Tenancy Requirement is not met for nine consecutive months except for casualty or remodeling, then Tenant may thereafter pay alternate Fixed Minimum Rent equal to the greater of 50% of the Fixed Minimum Rent otherwise due, or 5% of Gross Sales not to exceed the Fixed Minimum Rent otherwise due, until the Ongoing Co-Tenancy Requirement is satisfied. Tenant is obligated to pay all Additional Rent due during any such periods. If the Ongoing Co-Tenancy requirement is not met within 24 months of the initial failure, then Tenant shall have the one time right to terminate this Lease upon 60 days written notice to Landlord delivered at any time within 60 days thereafter.

The "Anchor Tenants" are Academy Sports, HH Gregg, Ross and Bed, Bath and Beyond, or their replacements which satisfy the terms of this section 15 and each of their respective premises as it exists on the date of execution of this Lease shall be referred to as its "Anchor Tenant Premises". In the case of Academy Sports or its replacement(s) which satisfy the terms of this Section 15, Landlord will have been deemed to have cured the co-tenancy violation if it leases in the aggregate at least 85% of the Academy Sports premises (as it exists as of the effective date of this Lease) to no more than three  national replacement tenants, each operating under separate trade names and occupying and conducting business in at least 18,000 square feet, except that one replacement tenant may occupy and conduct business in at least 10,000, and any such national replacement tenant(s) occupying at least 85% of the original Academy Sports premises shall be considered an "Anchor Tenant" henceforth upon opening to the public (it being agreed and understood that if more than one tenant replaces Academy Sports, all tenants in the aggregate, occupying at least 85% of the original Academy Sports premises, shall be considered an "Anchor Tenant").  In the case of HH Gregg, Ross and Bed, Bath and Beyond or their replacements which satisfy the terms of this Section 15, Landlord will have been

23

deemed to have cured the Ongoing Co-Tenancy Requirement if it leases to a single regional or national tenant occupying at least 85% of the Anchor Tenant Premises of the Anchor Tenant being replaced and such replacement regional or national tenant shall be considered an "Anchor Tenant" henceforth upon opening to the public.

For purposes of this Lease, "national" shall mean a first-class retailer operating at least 50 stores, and "regional" shall mean a first-class retailer operating at least 25 stores in Alabama and the states contiguous to Alabama.

## SECTION 16.    RULES AND REGULATIONS

(a)    Landlord may, for the general welfare of the Shopping Center or the avoidance of nuisance, impose reasonable rules and regulations of general application governing the conduct of tenants in the Shopping Center and the use of the Common Areas.  Tenant will comply with and perform any and all such rules and regulations imposed by Landlord so long as such rules and regulations do not limit the rights or expand the obligations of Tenant under this Lease and all occupants of the Shopping Center are subject to and comply with such rules and regulations. Landlord must use commercially reasonable efforts to enforce such rules and regulations. Notwithstanding the foregoing, subject to local codes, existing lease restrictions, and the REA, Tenant has the right to display merchandise on the sidewalk on both sides of the storefront door of the Premises.

(b)    Tenant is not required to join or maintain membership in any tenant's business association sponsored by or for the Shopping Center, nor is Tenant required to pay any of the costs of the activities conducted by such association.

## SECTION 17.    ALTERATIONS, INSTALLATIONS AND IMPROVEMENTS BY TENANT

(a)    Tenant, without Landlord's consent, has the right to make such interior alterations, changes and improvements to the Premises as Tenant may desire for the conduct of Tenant's business and for the full beneficial use of the Premises; except for structural changes, alterations or improvements, which require Landlord's consent, which consent must not be unreasonably withheld or delayed.  Tenant will pay all costs and expenses of its improvements, will make such changes, alterations and improvements in a good and workmanlike manner, in accordance with all applicable laws and building regulations, and free and clear of any mechanic's liens or other liens or claims in connection with the making of such changes, alterations and improvements.

(b)    Except as otherwise provide all signs, furnishings, trade fixtures, inventory, equipment and other removable property installed in the Premises by Tenant will remain the personal property of Tenant, will not be subject to any Landlord's lien or lien or security interest against the property of Landlord, and may be removed by Tenant upon the termination of this Lease. If any of the foregoing is affixed to the Premises, Tenant will repair any damage caused by removal.

24

Mobile Festival Centre, Mobile, AL
EXECUTION VERSION: 12-11-12

## SECTION 18.    REPAIRS AND MAINTENANCE

(a)    Except as otherwise provided, Tenant will maintain the interior, non-structural portion of the Premises, at its sole cost and expense, in an attractive, clean and sanitary condition.

(b)    Landlord warrants and guarantees that all structural portions of the Premises and the roof, utility cables, mains and conduits, HVAC, electrical, gas, plumbing, sprinkler, and sewer systems are, and will be upon the Delivery Date, in good working order and repair, and that there are not, and will not be on the Delivery Date, any violations of any Laws.

(c)    Subject to Section 18(d), and except for damage caused by fire or other casualties or taking by eminent domain or conveyance in lieu thereof: Tenant, at its sole cost and expense, must make all interior nonstructural repairs to the Premises, including doors and windows, and (1) all repairs to the plumbing and gas systems exclusively serving the Premises from their respective meters to and including the plumbing and gas systems in the interior of the Premises, (2) subject to Section 18(e), the HVAC system, including those components located outside of the Premises, and (3) the electrical system exclusively serving the Premises from Tenant's electrical panel to and including the electrical systems in the remainder of the interior of the Premises. Notwithstanding the foregoing, Tenant is not required to make any: (i) repairs of damage covered by insurance maintained or required to be maintained by Landlord; (ii) repairs necessitated by reason of the negligence, willful misconduct, or default of Landlord, its agents, employees or contractors; (iii) repairs to the plumbing, gas, electrical or other similar units and systems where such repairs would necessitate going through or into the floor slab, structural walls, or roof of the Premises; (iv) replacement of any plumbing, gas, electrical or similar units or systems unless caused by the negligence or willful misconduct of Tenant, its agents, employees or contractors; or (v) repair or replacement of the sprinkler, life safety or other detection or suppression system unless such repairs are caused by the negligence or willful misconduct of Tenant. All of the repairs and replacements referred to in the immediately preceding sentence will be performed by Landlord at its sole cost and expense.

(d)    Landlord, at its sole cost and expense, unless caused by the negligence or willful misconduct of Tenant, its agents, employees or contractors  shall make all repairs to the Premises other than those that Tenant is required to make. Landlord's obligations except to the extent caused by the negligence or willful misconduct of Tenant, its agents, employees or contractors include, but are not limited to, repairs to the structural portions of the Premises (both interior and exterior), the roof (including all gutters and downspouts), floor slab, foundation, exterior walls, any interior damage caused by roof leaks or water/sewage backing up into the Premises no matter where from, and all repairs or replacements to the (x) gas and plumbing systems or any portion thereof up to (but not including) their respective meters, and (y) the electrical system up to (but not including) Tenant's electrical panel unless such repairs are caused by the negligence or willful misconduct of Tenant. In making any repairs or replacements, Landlord must not unreasonably interfere with Tenant's normal operations and business.  Landlord assigns to Tenant all warranties and guarantees, if any, with

25

respect to any and all construction and equipment on the Premises to be maintained by Tenant. Notwithstanding anything to the contrary, Tenant is responsible for making any interior non-structural alterations of or improvements to the Premises that are required by any Public Entity after the Delivery Date, except to the extent that such responsibility is imposed upon Landlord in the next following sentence or otherwise under this Lease.  Landlord is responsible, at its sole cost and expense, for making all alterations of or improvements to the Premises that are required by any Public Entity and that (i) are structural in nature, (ii) relate to the exterior thereof, including the Common Areas, (iii) relate to the sprinkler, utility or life safety systems therein (provided, however, that with respect to the items identified in this subsection "(iii)", Tenant shall be responsible for making any alteration or improvements necessitated by Tenant's specific use of the Premises), or (iv) relate to the handicapped or disabled, but this clause (iv) does not require Landlord to make any "path of travel" alterations or improvements or those otherwise relating to Tenant's fixtures and placement thereof.

(e)     Notwithstanding anything to the contrary in the Lease, if Tenant should replace the HVAC system or any part thereof (or repair major components of the HVAC system) during the final two years of the Initial Term or any Lease extension or renewal, and not remain in possession of the Premises pursuant to a subsequent Lease extension or renewal, then the Landlord shall reimburse Tenant, within 30 days of the delivery back of possession of the Premises to the Landlord, for (i) the unamortized cost of said replacement based on a straight-line amortization schedule over the useful life of the equipment in accordance with federal income tax guidelines (in no event less than 15 years), or (ii) the actual cost of the repair, as the case may be.

(f)     Tenant will maintain the Premises, at its expense, free and clear of all rubbish, garbage and trash and place such rubbish, garbage and trash in the containers provided by Tenant. Tenant, at its own cost and expense, will dispose of all rubbish, garbage and trash on a timely basis.  Landlord will provide an area for Tenant's trash compactor or containers, at Landlord's sole cost and expense, within 20 feet of the rear of the back door to the Premises.

(g)     Subject to this Section 18, Tenant will keep the Premises in an orderly and sanitary condition, free from vermin, rodents, bugs and other pests, and Landlord must keep the Common Areas in an orderly and sanitary condition, free from vermin, rodents, bugs and other pests. Notwithstanding the foregoing, Landlord is responsible for the extermination of termites, carpenter ants, and other insects capable of causing structural damage in, on or about the Common Areas, and all parts of the Shopping Center. Landlord must require all tenants of the Shopping Center to keep their spaces in an orderly and sanitary condition, free from vermin, rodents, bugs and other pests.

## SECTION 19.     INDEMNIFICATION

(a)     Subject to Section 20, Landlord must indemnify, defend and hold Tenant harmless from and against any and all claims, demands, actions, damages, liability and expense (including reasonable attorney fees) in connection with the loss, damage or injury to persons or property, arising out of or related to the acts or omissions of the Landlord, Landlord's agents, contractors or employees, or arising out of the use or operation of the Common Areas and all other space in the Shopping Center

26

not designated for the exclusive use of one tenant, except as caused by the negligence or willful misconduct of Tenant, its agents, employees, contractors or representatives.

(b)     Subject to Section 20, Tenant must indemnify, defend and hold Landlord harmless from and against any and all claims, demands, actions, damages, liability and expense (including reasonable attorney fees) in connection with loss, damage or injury to persons or property (1) occurring in, on or about, or arising out of the Premises, except as caused by the negligence or willful misconduct of Landlord, its agents, employees, contractors or representatives; or (2) arising out of the acts or omissions of Tenant, Tenant's agents, contractors, or employees.

(c)     In no event shall either party be subject to loss of business or consequential damages, except as otherwise provided in Section 35.

This Section 19 survives the expiration or termination of this Lease.

## SECTION 20.    WAIVER OF CLAIMS

Notwithstanding any provision to the contrary, Landlord and Tenant waive any and all right of recovery, claim, action or cause of action against the other, their respective agents and employees, for any loss or damage that may occur to the Premises or the Shopping Center or any additions or improvements thereto, or any contents therein, by reason of fire, the elements or any other cause required to be insured against under the terms of a standard special form insurance policy or policies, or for which Landlord or Tenant may be reimbursed as a result of insurance coverage insuring any loss suffered by either party, regardless of cause or origin, including the negligence of Landlord or Tenant, or their respective agents and employees. This waiver applies regardless of whether either party actually obtains property insurance, and regardless of whether any insurance proceeds are collected. Notwithstanding the above, Landlord and Tenant agree and acknowledge that the waiver of claims herein contained shall expressly exclude any loss paid by the insured in the form of a deductible. All property insurance policies required under this Lease covering the Premises or the Shopping Center must expressly waive any right on the part of the insurer against the other party for damage to or destruction of the Premises or the Shopping Center resulting from the acts or omissions of the other party.

## SECTION 21.    PROPERTY AND LIABILITY INSURANCE

(a)     Landlord, must keep in full force and effect Commercial General Liability Insurance and Umbrella Insurance with respect to the Shopping Center, including the Common Areas, naming Tenant as an additional insured thereunder to the extent its interest may appear, with nationally recognized companies rated no lower than A-, IX by A.M. Best Company with total minimum limits to apply per location of $2 million on account of bodily injuries or death and/or property damage resulting from one occurrence. Landlord shall deposit a certificate or other evidence of such insurance if requested by Tenant.

27

(b)     Tenant must keep in full force and effect Commercial General Liability Insurance and Umbrella Insurance with respect to the Premises, naming Landlord as an additional insured to the extent its interest may appear, with nationally recognized companies rated no lower than A-, IX by A.M. Best Company with total minimum limits to apply per location of $2 million on account of bodily injuries or death and/or property damage resulting from one occurrence. Tenant's evidence of insurance is maintained by Tenant's insurer on the website of Tenant's insurance broker, which can be accessed through Tenant's website, "JoAnn.com." If such information can not be obtained through Tenant's website, or if this Lease is assigned, then Tenant agrees to provide a copy of such insurance certificate upon Landlord's written request.

(c)     Landlord must keep the Premises and the Shopping Center, including Common Areas, insured against loss or damage by fire, lightning, vandalism and malicious mischief, and such other perils as are now or may hereafter be comprehended in the term "All Risk Coverage" or "special form" coverage or "Special Form Cause of Loss" (or other terms that become the insurance industry standard in the future) , including, without limitation, earthquake and flood (if in an area that is designated as an earthquake or flood zone), boiler and machinery, plate glass, power failure, mold, windstorm, terrorism, seepage or leakage and loss of rent damage, in amounts equal to at least 80% of the full replacement value thereof, or such greater amounts as may be required to prevent the application of co-insurance provisions. Such insurance must cover improvements in the Premises owned by Landlord to the extent that the same are customarily insurable as part of the realty, but will not include the cost of restoration of Tenant's trade fixtures, furniture, furnishings, inventory, equipment and other personal property. Notwithstanding anything to the contrary, Landlord is solely responsible for any and all deductibles and self-insured retentions.

(d)     In addition to the payment of Fixed Minimum Rent, Tenant must pay its share of the premium paid by Landlord for maintaining the insurance for the Shopping Center required under subsections 21(a) and 21(c) (the "Insurance Costs"). Tenant must pay to Landlord in 12 equal installments, each in advance on the first day of each and every calendar month, an estimated sum towards Tenant's Proportionate Share of the Insurance Costs. During the first Lease Year, the insurance paid by Tenant shall not exceed the rate of $0.33 per year multiplied by the Gross Leasable Area of the Premises, which amount is Landlord's good faith estimate of the full amount of Tenant's Proportionate Share of Insurance Costs for the first Lease Year if Tenant were to pay Tenant's actual Proportionate Share of Insurance Costs for said period. This sum is subject to annual adjustments by Landlord to reflect actual changes in the Insurance Costs. On or before April 1 Landlord must provide Tenant with a statement assessing and prorating the Insurance Costs together with copies of all bills for which payment is sought. Tenant must pay to Landlord within 30 days of such receipt any deficiency owed to Landlord. If Tenant's estimated payments are in excess of Tenant's Proportionate Share in any Lease Year, then such excess will be applied to the following Lease Year unless such Lease Year is the final Lease Year of Tenant's occupancy, in which case Landlord must refund such overpayment to Tenant within 30 days after the end of such Lease Year. Landlord covenants that there will be no duplication of costs between this Section and any other Section of this Lease.

28

## SECTION 22.   SIGNS

(a)   Tenant has the right to install and maintain a sign or individual letters ("Jo-Ann, experience the creativity" or any other name or slogan that Tenant may adopt) or signs on the front, side, rear or any other fascia of the Premises, as well as a sign or signs on the pylon(s), if any, located in or around the Shopping Center or for use by any of the tenants of the Shopping Center, and "framing," "craft" and similar departmental signs on the front fascia in addition to its regular sign, all in accordance with Exhibit D-1 subject to all laws and Landlord's prior written approval (except with regard to the signs in the sign package set forth on Exhibit D-1, which is deemed approved at the time of execution of this Lease by Landlord). Tenant shall pay for the actual costs to manufacture its signs and Tenant will be responsible for all costs associated with their installation. Tenant's pylon signage will be in the position on the existing pylons as shown on Exhibit D-1. All signs will comply with all requirements of any Public Entity, and Tenant will obtain all necessary permits or licenses. Notwithstanding the foregoing, Tenant is entitled to seek and receive a variance from any Public Entity so as to allow Tenant to have the size, color, number, etc., of signs that Tenant desires, including storefront signs, pylon signs, banner signs and monument signs at its sole costs and expense. Landlord must fully cooperate and assist Tenant with any such variance at no cost to Landlord, and Landlord shall not be obligated to grant any concession to the municipality in order for Tenant to receive any variance. Tenant's sole cost for the pylon and/or monument sign(s) shall be the cost to fabricate and install Tenant's panels, plus any ongoing maintenance costs charged which is included in Landlord's good faith estimate of the First Lear Year Common Area Cost which is set forth in Section 9(a).

(b)   Tenant's complete sign package as described in this Section 22, is hereby fully approved by Landlord and is set forth on Exhibit D-1, and except as otherwise set forth herein, is subject only to governmental approval.

(c)   In addition to the foregoing signs, Tenant has the right to install and maintain a professionally prepared banner sign periodically (not to exceed six times per year) in front of the Premises in the location and manner identified on Exhibit D-1 subject to local codes and laws.

(d)   Tenant must maintain its signs in good condition and repair at all times, and must save the Landlord harmless from injury to person or property arising from the erection and maintenance of the signs. Upon vacating the Premises, Tenant must remove all signs and repair (exclusive of painting) all damage caused by such removal.

(e)   If Landlord renovates all or any portion of the Shopping Center, which renovation requires the removal of any of Tenant's sign(s), Landlord must first notify Tenant at least 45 days before the removal of such sign(s) and Landlord will bear the cost of such removal and reinstallation, together with the cost of any damage to the sign(s) as a result of such removal or reinstallation. Further, Landlord must provide and install on or about the Shopping Center, at Landlord's sole cost and expense, a banner or other type of temporary sign(s) identifying Tenant's trade name, which

29

banner or sign(s) must be equal in size to Tenant's existing sign and approved by Tenant before such installation.

## SECTION 23.    ASSIGNMENT AND SUBLETTING

(a)    Tenant has the right to assign this Lease or sublet all or any part of the Premises  for any lawful retail purpose provided (i) that such assignee or sublessee uses the Premises for a primary use that does not violate any exclusive use rights granted to other tenants in the Shopping Center that exist on the date of the assignment or sublease (subject, however, to Landlord's advising Tenant of such rights); and  (ii) that Tenant remains responsible for the payment of Rent and other obligations of the Tenant hereunder, unless expressly released in writing by Landlord. Within 30 days after the receipt of a written request from Tenant (which written request from Tenant must include a copy of the proposed assignment or sublease), Landlord must deliver to Tenant notice of any restrictions on the use of the Premises enforceable by any other tenants of the Shopping Center.  If, after an additional 15 day written notice from Landlord to Tenant wherein Tenant requests that Landlord provide Tenant with any restrictions, Landlord fails to deliver to Tenant a list of any restrictions, then such inaction shall be deemed to constitute Landlord's covenant that there are not restrictions on the use of the Premises for any use and Tenant shall rely upon such covenant. A change in effective voting control of the Tenant does not constitute an assignment of the Lease. Landlord agrees to enter into a commercially reasonable recognition agreement with such subtenant or assignee.

(b)    If Tenant assigns this Lease the Premises and Tenant's assignee or any subsequent assignee has, at the time of the assignment or subletting, or attains at any time after the assignment, a net worth of at least $100 Million, then Tenant shall be released and discharged from any further liability under this Lease from and after the date of the assignment. Such net worth shall be determined as of the end of the most recent fiscal year preceding the intended release unless more current figures are available.

(c)    Anything contained in this Lease to the contrary notwithstanding, (i) Tenant shall not sublease the Leased Premises unless the Tenant derives substantially all of its income with respect to the Leased Premises from subleasing substantially all of the Leased Premises and the subrent or other amounts received or accrued by Tenant from subleasing the Leased Premises is not based on the income or profits of any person, excluding for this purpose subrent or other amounts based on a fixed percentage or percentages of gross receipt or gross sales of any person, and (ii) Tenant shall not assign, convey, sell, pledge, mortgage, hypothecate or otherwise encumber, transfer or dispose of all or any part of this Lease or Tenant's leasehold estate hereunder with any person, or in any manner, which could cause any portion of the amounts received by Landlord pursuant to this Lease to fail to qualify as "rents from real property" within the meaning of section 856(d) of the Internal Revenue Code of 1986, as amended (the "Code"), or any similar or successor provision thereto or which would cause any other income of Landlord to fail to qualify as income described in section 856(c)(2) of the Code.

## SECTION 24.    REPAIR AFTER CASUALTY

(a)    In the event of damage to or destruction of the Shopping Center or any portion thereof (including the Premises) by casualty or any other cause whatsoever, then, except as otherwise provided in this Section, Landlord must commence and diligently pursue to completion the restoration and repair thereof; but Landlord is obligated to repair the Premises only to their condition on the Delivery Date (subject to alterations thereof required by changes in governmental code).    Any repair or restoration of the Premises must be completed within 365 days after the event of damage or destruction, and the repair and restoration of other portions of the Shopping Center must be completed as quickly as reasonably possible.    Within 30 days after an event of damage or destruction, Landlord must deliver to Tenant notice of the anticipated period of restoration.    Except as otherwise provided in this Section, Tenant has no right to terminate this Lease by reason of damage to or destruction of the Shopping Center (including the Premises).    In the event of damage or destruction to the Premises, then all Rent will abate pro rata using the same ratio that the portion of the Premises rendered unusable (in Tenant's commercially reasonable judgment) bears to the Gross Leasable Area of the Premises.    In the event of any damage or destruction to any other portion of the Shopping Center (including the Common Area) that interferes with access to the Premises or the conduct of business therein, Rent will be reduced in a fair and equitable manner based upon the amount of interference until the completion of Landlord's repair and restoration.

(b)    Notwithstanding the terms of Section 24(a), Landlord may terminate this Lease and has no restoration and repair responsibility in the event of damage to or destruction of the Shopping Center if (i) the cost of repair or restoration exceeds 45% of the replacement value of the Shopping Center and either the event or destruction was not insurable under the insurance coverage required of Landlord hereunder or the insurance proceeds payable as a result of the damage or destruction have been applied by the Shopping Center mortgagee against the mortgage debt thereon; or (ii) the reasonable period for substantial completion of the repair and restoration exceeds one year; provided, however, as a condition to the termination by Landlord of this Lease under this subsection (b): (A) the leases of all other occupants in the Shopping Center must also have been terminated by reason of the event of damage and destruction, and (B) Landlord must have no intent and be under no obligation to rebuild the Shopping Center.

(c)    If the Premises are damaged or destroyed and Landlord has not completed the restoration and repair thereof within 365 days, subject to Unavoidable Delay, as required in Section 24(a), then Tenant has the right, without waiving any other right or remedy against Landlord, to terminate this Lease; provided, however, that such termination shall be deemed null and void if Landlord completes such restoration or repairs within 30 days after Landlord's receipt of Tenant's termination notice.    In the event of damage or destruction to any portion of the Shopping Center other than the Premises which is not repaired, or by Landlord's estimate cannot be repaired, within one year from the event thereof, Tenant has the right to terminate this Lease but has no other claim against Landlord for failure to repair except to the extent that Landlord has failed to use reasonable efforts to complete such repairs as required; provided, however, that such termination shall be deemed null and

31

void if Landlord completes such restoration or repairs within 30 days after Landlord's receipt of Tenant's termination notice.

(d)    In addition to all rights to terminate this Lease granted to the parties in this Section, if the Premises are destroyed or damaged during the last two years of the Term to the extent that 50% or more of the floor area of the Premises is not usable, then each of Landlord and Tenant has the right to terminate this Lease as of the date of such damage or destruction by giving written notice thereof within 30 days after the date of the damage or destruction; but, if Tenant, within 30 days after receipt of Landlord's written notice of termination, gives Landlord written notice of its intention to extend this Lease for any additional Extended Terms then available to Tenant, then the notice of Landlord to terminate this Lease will be of no force and effect. If Tenant elects to extend this Lease for any additional Extended Terms then available to Tenant, Landlord must use its reasonable efforts to restore the Premises to its former condition with all reasonable speed. If this Lease is terminated pursuant to this subsection, Landlord must refund within 15 days of notice any Rent and other charges paid in advance.

(e)    Notwithstanding anything to the contrary, if this Lease is terminated under this Section, and if after such termination Landlord commences to rebuild the Premises or the Shopping Center, as the case may be, at any time within one year after the termination of this Lease, then Tenant has the right, at its option, to lease space in the Shopping Center comparable to the Premises (the "Substitute Premises") upon the same terms and conditions and for the balance of the Term. Notwithstanding termination of this Lease, Landlord must notify Tenant of its intention to repair or restore the Premises or the Shopping Center, as the case may be, whereupon Tenant has 30 days after receipt to give Landlord notice of Tenant's intention to accept such Substitute Premises on the terms and conditions of this Lease (except for tenant improvement allowance, and any free rent period) and setting forth the period within which such repair or restoration must be completed as a condition of Tenant's acceptance of the Substituted Premises. This Subsection 24(e) survives termination of this Lease.

## SECTION 25. CONDEMNATION

(a)    If 30% or more of the Gross Leasable Area of the Premises or 50% or more of the Gross Leasable Area of the Shopping Center is taken by condemnation or right of eminent domain or conveyed in lieu thereof (a "Taking"), this Lease will terminate at the option of either party as of the day possession is taken by or title vests in the taking authority, and both parties will be released from any further liability hereunder.

(b)    In the event of a Taking of less than 30%, but more than 5%, of the Gross Leasable Area of the Premises, then Tenant has the right to terminate this Lease and any further liability hereunder if, in the reasonable determination of Tenant, the Premises cannot be economically operated for, or are unsuitable, for the intended purposes of this Lease. Any such termination is effective as of the day possession is taken by, or title to the portion taken vests in, the taking authority.

(c)    In the event of a Taking of less than 50%, but more than 10%, of the Gross Leasable Area of the Shopping Center (including the Common Areas), then (i) Tenant has the right to terminate

32

this Lease and any further liability hereunder if, in Tenant's reasonable determination, the Premises cannot be economically operated for, or are unsuitable for, their intended purposes; and (ii) Landlord has the right to terminate this Lease and any further liability hereunder if, in Landlord's reasonable determination, the Shopping Center cannot be economically operated for, or are unsuitable for, their intended purposes. Any such termination is effective as of the day possession is taken by, or title to the portion taken vests in, the taking authority.

(d)     In the event of a Taking of any portion of the Premises or the Shopping Center, upon which this Lease is not terminated, Landlord shall (to the extent possible) restore the remainder of the Premises or the Shopping Center (including the Common Areas), with reasonable speed to a complete architectural unit as nearly like its condition prior to such partial taking as shall be practicable, and if during or after the work of restoration Tenant is deprived of all or a part of the use of the Premises, the Rent will abate for so long as Tenant is deprived of such use, in the same proportion as that portion of the Premises taken bears to the entire Premises.

(e)     All damages awarded in connection with the taking of the Premises, whether allowed as compensation for diminution in value to the leasehold or to the fee of the Premises, belong to the Landlord; but, if Tenant has made any material leasehold improvements to the Premises, or alterations or structural changes and repairs to the Premises, at its own expense (regardless of when made), Tenant and not Landlord is entitled to claim an award for the unamortized balance of Tenant's cost thereof provided Landlord's award is not reduced thereby. If the condemning authority docs not make a separate award therefor, Landlord, subject to the rights of any mortgagee, must assign a portion of its award equal to such unamortized cost to Tenant. If Landlord in obtaining its award uses Tenant's cost items, then Tenant is entitled, subject to the rights of any first Mortgagee, to a proportionate share of Landlord's award based upon the costs. Tenant is also entitled to claim an award for loss of business, damage to merchandise and fixtures, removal and reinstallation costs and moving expenses, in a separate action only.

## SECTION 26.    REPRESENTATIONS AND COVENANTS OF LANDLORD

(a)     On the date hereof and hereafter during the Term, Landlord represents, warrants and covenants to Tenant as follows:

(1)     The Shopping Center Site is zoned to permit the use of the Shopping Center for general retail purposes, including the Permitted Use);

(2)     The Common Areas, Premises (excluding Tenant's Work or other alterations made by or on behalf of Tenant, but not excluding Landlord's Work or work directed by Landlord on or behalf of Tenant) and all structural portions of the Shopping Center comply with all Laws;

33

(3)     Landlord will provide surface parking spaces in the Common Areas on an unreserved basis and without cost, in compliance with law;

(4)     Without the written consent of Tenant, not to be unreasonably withheld or delayed, no building, edifice or obstruction will be placed on the Shopping Center Site and no addition or alteration will be made to the Shopping Center (except to the Future Build\Permitted Build Area as shown on Exhibit B) (A) that materially diminishes access to the Premises; (B) that materially diminishes the visibility of the Premises; or (C) that has the effect of materially increasing the monetary obligations of Tenant under this Lease. Notwithstanding the foregoing, in no event will any improvement or alteration (including a change in the parking layout or configuration or traffic patterns of vehicles or pedestrians) be made to the "Protected Area" as shown on the Site Plan.

(5)     The Site Plan correctly and completely shows all improvements on the Shopping Center Site;

(6)     Landlord will maintain, operate and manage the Shopping Center as a first-class retail project in compliance with all Laws, and the Shopping Center will be used and occupied only for normal retail uses customarily conducted in first-class shopping centers.

(7)     In no event will the Shopping Center or any portion thereof be used as or for any of the following (the "Prohibited Uses"):

     (i)     a movie theater, except if located in the Permitted Area set forth on Exhibit B; auditorium; meeting or banquet hall;

     (ii)     church; bingo hall or a place of public assembly;

     (iii)     library or school (other than a Sylvan Learning Center or similar learning establishment commonly found in first-class shopping centers, so long as such uses, in the aggregate, use no more than 7,000 square feet of gross leasable area);

     (iv)     for the sale or service of automobiles or other vehicles;

     (v)     night club or bar serving alcoholic beverages except as incidental to a restaurant ("incidental" shall be defined as deriving less than 40% of gross sales from the sale alcoholic beverages); or liquor or beverage store, except a first-class liquor or beverage store that is part of a regional or national chain (such as "Total Wine") shall be permitted provided it is located at least one hundred feet (100') from the Premises;

     (vi)     funeral parlor;

(vii)   animal clinic or animal boarding except as incidental to PETCO or Petsmart or similar tenant);

(viii)  discotheque; topless/nude shows;

(ix)    karate studio, gymnasium or health club or spa or dance hall (provided, however, that this clause (ix) shall not prohibit any karate studio, gymnasium, health club, spa or dance hall facility to be located in the Permitted Area, provided each such establishment is commonly found in a first-class shopping center);bowling alley; or skating rink;

(x)     car wash;

(xi)    off-track betting establishment;

(xii)   pool room , game room or amusement arcade (defined as any establishment containing more than a combination of three electronic, pinball or other games), gallery or store or pinball arcade; except that a video game arcade or bowling alley shall be permitted in the Shopping Center provided that (A) such video game arcade or bowling alley is an integral part of a "Dave & Buster's," "Chuck E. Cheese" or equivalent use, and (B) the front doors of the "Dave & Buster's," "Chuck E. Cheese" or equivalent use shall not be located within three hundred (300) feet of the front and side perimeter walls of the Premises;

(xiii)  so-called "flea market"; or second hand, used goods or consignment store (except that second-hand retail stores such as "Second Swing", "Play It Again Sports" or other types of tenants that specialize in the sale of specific types or lines of secondhand goods (e.g., used sporting goods or used computer or video games) and is commonly found in a first class shopping center shall be permitted);

(xiv)   store selling primarily distressed or damaged merchandise;

(xv)    so-called "head shop"; or night club;

(xvi)   gun range or gun shop (excluding the incidental sale by a full service sporting goods or department store such as Dicks and/or Wal-Mart);

(xvii)  for warehousing in excess of 2,000 sf, except as incidental to a retail business;

(xviii) adult book store or store selling or exhibiting sexually explicit materials except as incidental to a retail book store and typically sold in a Barnes and Noble;

(xix)   business office usage, except that real estate brokers, insurance services, tax preparation services, chiropractic, stock brokers, title companies, medical offices, dental offices, law offices and similar retail service office uses as are typical for comparable

35

shopping centers in the Mobile, Alabama geographical area ("Retail Service Offices") shall be permitted, provided that there are no more than 3 such offices and, provided, further, that such Retail Service Offices, in the aggregate, do not exceed 10,000 square feet of Gross Leasable Area within the Shopping Center (this subsection "xix" shall not apply to the Unrestricted Area set forth on Exhibit B);

(xx)    animal kennel, except as incidental to a veterinarian or as an ancillary service to a pet store such as "Petco" or "Petsmart";

(xxi)   Laundromat; and

(xxii)  any non-retail use within 100 feet of the Premises (this subsection "xxi" shall not apply to the Unrestricted Area set forth on Exhibit B).

(8)    Landlord owns fee simple title to the Shopping Center. There are no mortgages attached against the Shopping Center except for the mortgage in favor of Capmark Bank, a Utah industrial bank.

(9)    There are no claims of other parties, restrictions, reservations, or defects in Landlord's title which could interfere with or impair Tenant's rights under this Lease or Tenant's use, occupancy, or enjoyment of the Premises, it being understood between the parties that Landlord shall be in breach only to the extent such claim, restrictions, reservations, or defects actually interferes with or impairs tenant's rights under this Lease or Tenant's use, occupancy or enjoyment of the Premises.

The foregoing representations, warranties and covenants are material considerations and inducements to Tenant in executing this Lease, the breach of which will cause irreparable and severe harm to Tenant. Without limiting any other right or remedy of Tenant under this Lease or available to Tenant at law or equity by reason of the breach of the representations, warranties, and covenants herein set forth: (1) if Landlord breaches any representation, warranty or covenant contained in subsections (3), (4), or (7) and such breach continues for 30 days after written notice of such breach is delivered to Landlord (but Landlord will not be deemed to be in breach if Landlord promptly commences to remedy the default within the 30 day period and proceeds to cure with due diligence, and successfully completes such cure within a reasonable time thereafter), Tenant has the right (A) to terminate this Lease at any time during the period of such breach; or (B) to pay Substitute Rent during the period of such breach; and (2) if Landlord breaches any other representation, warranty or covenant contained herein and such breach continues for 90 days after written notice of such breach is delivered to Landlord (but Landlord will not be deemed to be in breach if Landlord promptly commences to remedy the default within the 90 day period and proceeds to cure with due diligence, and successfully completes such cure within a reasonable time thereafter), then Landlord shall be deemed in default under the terms of the Lease.

Mobile Festival Centre, Mobile, AL
EXECUTION VERSION: 12-11-12

## SECTION 27.    REMEDIES UPON DEFAULT

(a)    Landlord may, by written notice to Tenant, terminate this Lease, or without terminating this Lease re-enter the Premises by summary proceedings, and may dispossess the Tenant if:

(i)    Tenant fails to pay Rent on or before the due date and then fails to pay same within 10 days after receipt of written notice from Landlord, although Landlord shall only be required to give Tenant notice twice in any Lease Year before Tenant is deemed to be in default;

(ii)    Tenant is in material default in the performance of any of the covenants, terms, conditions and provisions of this Lease, and Tenant fails to remedy such default within 30 days after receipt of written notice thereof (but Tenant will not be deemed to be in default if Tenant commences to remedy the defaults within the 30-day period and proceeds to cure with due diligence);

(iii)    Tenant is adjudged bankrupt or makes an assignment for the benefit of creditors, or if a receiver of any property of Tenant in, upon or about the Premises is appointed in any action, suit or proceeding by or against Tenant and is not removed within 90 days (unless such 90-day period is extended by court order, then the time period will be as established by court order or established by such person(s) or entity acting under or for the court) after appointment;

(iv)    The interest of Tenant in the Premises is offered for sale or sold under execution or other legal process, and is not rescinded within 90 days after written notice from Landlord to Tenant.

In the event of a default by Tenant Landlord must mitigate its damages and use commercially reasonable efforts to relet the Premises and, in the event of a reletting, must apply the rent therefrom first to the payment of Landlord's reasonable expenses incurred and paid by reason of Tenant's default, next to the reasonable expense of reletting, including, but not limited to, reasonably necessary repairs to the Premises, and then to the payment of rent and all other sums due from Tenant, with Tenant remaining liable for any deficiency. Any and all deficiencies shall be payable by Tenant monthly on the date provided for the payment of Fixed Minimum Rent. Notwithstanding anything to the contrary in this Lease, if Tenant is in good faith disputing an alleged default or is seeking additional information with regard to an alleged default, it is hereby agreed and understood that in such case(s) a 10-day or 30-day default notice, as the case may be, which is related to the alleged default and delivered pursuant to the terms of this Lease shall be ineffective.

(b)    In the event of a default by either party of any of the terms, provisions, covenants or conditions of this Lease, the other party has the right to invoke any remedy provided at law or in

37

equity; except, however, Landlord is not entitled to accelerate Rent. All remedies are cumulative and concurrent.

**SECTION 28.    RIGHTS OF LANDLORD**

(a)    Landlord reserves the right at all reasonable times during Tenant's business hours and upon prior reasonable notice to Tenant (except in the event of emergency, when notice is not required) by itself or its duly authorized agents, to go upon and inspect the Premises and every part thereof and, to make such repairs, as Landlord is obligated to make to the Premises. In exercising the foregoing right, Landlord must not interrupt or disrupt Tenant's business or unreasonably disrupt access to the Premises by Tenant, Tenant's employees, agents, invitees and customers, except in the case of an emergency, in which case Landlord must exercise appropriate judgment given the nature of the emergency.

(b)    If Landlord makes any payments on behalf of Tenant, which are Tenant's obligation, to fulfill Tenant's covenants, then any amount so paid by Landlord are agreed and declared to be part of "Additional Rent" and are due and payable to Landlord from Tenant with the next installment of Fixed Minimum Rent due thereafter, together with interest thereon at the Default Rate from the date of such advance to the repayment thereof in full. Further, if Tenant fails to pay Rent on a timely basis and Landlord notifies Tenant in writing of such failure twice in any 12 month period, then if Tenant fails to pay Rent on a timely basis thereafter in the same 12 month period, then the Landlord, in addition to the Rent then owed, is entitled to interest at the Default Rate from the due date of such Rent until repayment in full for such third late payment and any such other late payment of Rent thereafter during that 12 month period.

(c) Landlord has the right during the last six months before the expiration of this Lease, so long as it does not unreasonably interfere with Tenant's business, to have access to the Premises for the purpose of exhibiting the Premises and during the last two months before the expiration of this Lease to put up the usual notice "for rent" or "for sale", which notice will not be removed or hidden by Tenant. No more than one sign will be placed upon the Premises and the sign cannot exceed 12 square feet. In addition, at any time during the Term, upon two business days' prior written notice to Tenant and Tenant's general manager at the Premises, Landlord shall have the right, so long as it does not interfere with Tenant's business, to have access to the Premises for the purpose of exhibiting the Premises to prospective purchasers and lenders.

(d) Notwithstanding anything to the contrary, with respect to any alleged default of Tenant other than a default in the payment of Rent, or other sums of money, if Tenant notifies the Landlord, within 30 days after Tenant's receipt of an effective notice of such default, that Tenant disputes such alleged default and Tenant files within the 30-day period an action in a court of competent jurisdiction contesting such alleged default, then Landlord will agree to hold any action it has with regard to Tenant's default in abeyance pending the resolution of Tenant's action. Tenant will not be deemed to be in default with respect to such matter. If a final judgment is adverse to Tenant, wholly or in part, Tenant must immediately begin to correct the matters complained of by Landlord, or that portion

38

thereof as to which such judgment shall have been adverse to Tenant, and complete the correction within 30 days after such judgment, or if more than 30 days are reasonably required to complete such correction, correct the same within 30 days and prosecute the same to completion with reasonable diligence.

## SECTION 29.   BREACH OF COVENANT

(a)   Subject to the terms of Section 29(b), if Landlord fails to keep and perform any covenant or agreement to be kept and performed by Landlord, Tenant, in addition to all other remedies now or hereafter afforded or provided by this Lease, at law or in equity, has the right to: (i) perform such covenant or agreement for or on behalf of Landlord or make good any such default, and any reasonable amount or amounts which the Tenant advances on Landlord's behalf must be repaid by Landlord to Tenant on demand, together with interest thereon at the Default Rate from the date of such advance to the repayment thereof in full or (ii) deposit the installments of rent and other cash payments accruing under this Lease into an escrow account with any third party with instructions to pay such sums to Landlord when Landlord has performed the covenants and agreements to be performed by Landlord or, if Tenant performs such covenants and agreements for or on behalf of Landlord, when any amounts advanced by Tenant for the performance of such covenants and agreements, together with all accrued interest thereon, have been repaid in full, and, if any such amounts have not been repaid in full on or before the 60th day after such funds are deposited into escrow, to return such funds to Tenant for set-off against the amounts advanced; or (iii) any combination of (i) and (ii).

(b)   Except in the event of emergency, prior to performing any covenant or agreement on behalf of Landlord, Tenant will provide Landlord with written notice of its intent to perform such covenant or agreement and a period of 30 days within which to complete performance of the same (but Tenant shall not be permitted to perform any covenant or agreement if Landlord promptly commences to remedy the default within the 30 day period and proceeds to cure with due diligence, and successfully completes such cure within a reasonable time thereafter).   For purposes hereof, "emergency" means (i) any event which poses immediate threat of injury or damage to persons or property or (ii) any event which, in Tenant's judgment, threatens Tenant's ability to open for business as scheduled or impairs or interferes with Tenant's business operations.

(c)   If Landlord fails to pay any sum to Tenant when due, and if such failure continues for 20 days after receipt of notice from Tenant, Tenant has the right, without forfeiture of its other rights hereunder, at its election, to setoff and deduct the same, together with interest thereon at the Default Rate, from 50% of each installment of Rent (or Substitute Rent) coming due hereunder until all such amounts and all accrued interest thereon have been recouped by Tenant.   Notwithstanding the foregoing, Tenant's rights of offset under Section 10 hereof will be governed by the provisions of Section 10.

## SECTION 30.   MORTGAGE SUBORDINATION

(a)   Landlord represents that the Shopping Center is currently encumbered by a Mortgage,

39

Assignment of Rents and Leases, Security Agreement and Fixture Filing, dated as of February 9, 2007, in favor of Capmark Bank, recorded in the Office of the Judge of Probate in Mobile County, Alabama, on February 14, 2007, in Book 6130, at Page 52, as Instrument Number 2007011477, as amended by that certain Amendment to Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing, dated September 30, 2009, and recorded in Book 6586, at Page 1666, as Instrument Number 2009063099, on October 7, 2009, as amended by that certain Second Amendment to Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing, dated February 1, 2011 and recorded in Book 6751, at Page 1148, as Instrument Number 2011009919, on February 15, 2011, as amended by that certain Third Amendment to Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing, dated February 9, 2012 and recorded in Book 6883, at Page 743, as Instrument Number 2012022770, on April 17, 2012. In the event that Landlord has not obtained consent to this Lease from its current mortgage lender within thirty (30) days after the full execution of this Lease by Landlord and Tenant, then either party shall have the right to terminate this Lease on ten (10) days written notice to the other party at any time after such thirty (30) day period but prior to the date Landlord obtains lender consent, and if Landlord obtains lender consent within such ten (10) day period then any such termination shall be a nullity and the Lease shall continue in full force and effect.

(b)    This Lease will be contingent upon, within 30 days after execution of this Lease by both parties, Tenant and Landlord's mortgage lender having executed a reasonably acceptable subordination, non-disturbance and attornment agreement ("SNDA") (it being understood that said SNDA shall neither expand the obligations nor limit the rights of Tenant under the terms of this Lease). Landlord reserves the right to request from Tenant a waiver of priority of Tenant's leasehold estate hereunder for the purpose of subordinating Tenant's leasehold estate in favor of a first mortgage lien or any refinancing or replacement of a first mortgage loan that Landlord may hereafter deem necessary or desirable. Tenant, upon such request by Landlord, will execute and deliver an agreement substantially in the approved form herein referenced. The word "mortgage" means (y) any lease of land only or of land and buildings in a sale-lease-back transaction involving all or any part of the Shopping Center, or (z) any mortgage, deed of trust or other similar security instruments constituting a lien upon all or any part of the Shopping Center, whether the same shall be in existence as of the date hereof or created hereafter, and any modifications, extensions, renewals and replacements thereof. "Mortgagee" means a party having the benefit of a mortgage, whether as lessor, Mortgagee, trustee or note-holder.

(c)    After a change in ownership of all or any portion of the Shopping Center that requires a change in the Rent payee, or assignment of this Lease by Landlord that requires a change in the Rent payee, Tenant shall have no obligation to pay Rent to the new payee until Tenant receives written notice from Landlord confirming the name and address of the new payee.

(d)    If Tenant receives a written notice from any party claiming a collateral interest in this Lease or in the Rent and, by reason thereof, a present entitlement to collect the Rent, Tenant has the right either (i) to pay Rent to such party, which payment will satisfy any and all liabilities of Tenant to Landlord with respect to such payment, without obligation on Tenant to make further inquiry but

40

subject to such party's providing to Tenant a copy of the instrument pursuant to which such party claims entitlement and to such claim being plausible on the face of such instrument; or (ii) to withhold Rent from Landlord and pay same to an escrow agent or a court pending the determination by a court of competent jurisdiction of the entitlement thereto.

## SECTION 31.    NO WAIVER

No waiver by either party of any of the terms, covenants, provisions or conditions in this Lease, and no waiver of any legal or equitable relief or remedy, will be implied by the failure of either party to assert any rights, or to declare any forfeiture, or for any other reason. No waiver of any of the terms, provisions, covenants, rules and regulations herein will be valid unless it is in writing signed by both parties. No waiver by either party, or forgiveness of performance by either party in respect to one or more tenants of the Shopping Center, will constitute a waiver or forgiveness of performance in favor of Tenant, Landlord or any other tenant. The waiver or the forgiveness of performance of any one or more of the terms, provisions, conditions, rules and regulations of this Lease will not be claimed or pleaded by Tenant or Landlord to excuse a subsequent failure of performance of any of the terms, provisions, conditions, covenants, rules and regulations of this Lease.

## SECTION 32.    SURRENDER OF PREMISES

(a)    Tenant must deliver up and surrender to Landlord possession of the Premises, including all Landlord's Work (and replacements thereof) and all improvements permanently attached to the Premises during the Term, upon the expiration of this Lease, or its termination in any way, in as good condition and repair as the same are in on the Commencement Date (excepting damage by fire or other casualty which could be covered by a standard "All-Risk Coverage" or "special form" insurance policy, ordinary wear and tear, and decay, neglect, fault or default of Landlord and taking by eminent domain or conveyance in lieu thereof). Upon the expiration or earlier termination of this Lease, Tenant will deliver the keys at the office of Landlord or Landlord's agent

(b)    Tenant has the right, during the last 60 days of the Lease Term, to place a banner sign at the front of the Premises, in a place visible to Tenant's customers, directing Tenant's customer's to another store of Tenant or providing Tenant's customers with information and a telephone number.

## SECTION 33.    SHORT FORM LEASE, COMMENCEMENT DATE AGREEMENT

(a)    Neither party may record this Lease, but if either party requests that a Short Form Lease or a Memorandum of Lease be recorded, then the other party must execute such Agreement, which Agreement will contain the information set forth below. The Short Form Lease or Memorandum of Lease will describe the Premises and the rights herein demised, the Term, and the extension rights (if any), any exclusive granted to Tenant and other provisions hereof reasonably requested by Tenant. The failure to record the Short Form Lease or Memorandum of Lease will not affect or impair the validity and effectiveness of this Lease, and this Lease will control in the event of any inconsistency between the two. The party requesting that the Short Form Lease or Memorandum

41

of Lease be recorded must prepare and pay all costs of recording the Short Form Lease or Memorandum of Lease, and the other party must execute at any and all times such Short Form Lease or Memorandum of Lease and any other instruments as may be required for such recording. If Tenant records a Memorandum of Lease, then Tenant shall have an affirmative obligation to remove same at the expiration of the Term.

(b)     At the time that the Commencement Date is established, the parties will promptly enter into a Commencement Date Agreement, setting forth the actual commencement and expiration of the Initial Term and any extensions thereof and any applicable kickout dates and describing the Premises, but containing no further provisions of this Lease, which Commencement Date Agreement may be recorded by either party if there already is a Memorandum of Lease or a Short Form Lease recorded. If the Commencement Date is established before a Short Form Lease or Memorandum of Lease is executed by the parties, the Short Form Lease or Memorandum of Lease and the Commencement Date Agreement may be consolidated into a single recordable document.

## SECTION 34.  NOTICE

Any notices, statements, acknowledgments and consents required to be given by or on behalf of either party to the other must be in writing and must be given by Certified U.S. Mail, or by private courier service requiring a signed acknowledgment of delivery (such as Federal Express) addressed as follows:

if to the Landlord at:

> c/o Kimco Realty Corporation
> 3333 New Hyde Park Road
> Suite 100
> New Hyde Park, NY 11042
> Attn: General Counsel

with a copy to:

> c/o Kimco Realty Corporation
> 1954 Greenspring Drive, Suite 330
> Timonium, Maryland 21093
> Attn:  Regional Counsel

if to the Tenant at:

> Jo-Ann Stores, Inc.
> 5555 Darrow Road
> Hudson, Ohio 44236
> Attn: Senior Vice President, Real Estate

Mobile Festival Centre, Mobile, AL
EXECUTION VERSION: 12-11-12

with a copy to:

> Jo-Ann Stores, Inc.
> 5555 Darrow Road
> Hudson, Ohio 44236
> Attn: Senior Legal Counsel

or at such other address of Landlord or, Tenant as may be specified by such a notice. Any notice sent by certified mail is deemed to have been served three days after deposit thereof with the U.S. Postal Service. Any notice sent by courier service is deemed to have been served as of the next business day (excluding Saturdays, Sundays, and any federal government holidays). Notwithstanding the foregoing, the time period in which a response to any such notice must be given, or in which an action must be commenced or be taken, will commence to run on the date of receipt by the addressee thereof as shown on the return receipt or acknowledgment of delivery for such notice. Rejection or other refusal to accept, or the inability to deliver because of changed address of which no notice was given, will be deemed to be receipt of notice as of the date of such rejection, refusal or inability to deliver. Notwithstanding anything to the contrary, Tenant may give facsimile notice of the need of emergency repairs, followed promptly by notice as required above.

## SECTION 35.  HAZARDOUS MATERIALS

(a)      Tenant must not (either with or without negligence) cause or permit the escape, disposal or release of any Hazardous Material (as hereinafter defined) in violation of Law. Tenant must not allow the storage or use of Hazardous Material in any manner not sanctioned by Law, nor allow to be brought into the Shopping Center any Hazardous Material except to use in the ordinary course of Tenant's business and in compliance with all Laws. Except to the extent caused by Landlord, or Landlord's agents, contractors or employees, Tenant must defend, indemnify, and hold Landlord harmless from and against any and all claims, losses, liabilities, damages, penalties, fines, and expenses (including, without limitation, consequential damages, clean up and other remedial and restoration costs, fees for consultants and experts and reasonable attorneys' fees and other costs of litigation arising by reason of any of the aforesaid or any action against Landlord under this indemnity) arising directly or indirectly from, out of, or by reason of any release of Hazardous Materials in the Shopping Center occurring during the Term if caused by Tenant or Tenant's contractors, agents or employees or persons acting under Tenant. It is a condition to this hold harmless and indemnification that Tenant shall receive notice of any claim by Landlord promptly after Landlord first has knowledge thereof. These covenants and indemnities survive the expiration or earlier termination of the Term.

(b)      Unless caused by Tenant, its contractors, agents or employees or persons acting under Tenant, Landlord must not cause or permit (to the extent Landlord has control) any Hazardous Material to exist in the Premises. In addition, Landlord must not cause or permit (to the extent Landlord has control) any Hazardous Material to be sold, used, stored, brought upon or disposed of (collectively a "Use") in, on, under or about the Shopping Center in violation of applicable Laws.

43

Mobile Festival Centre, Mobile, AL
EXECUTION VERSION: 12-11-12

(c)    If Landlord hereafter receives any written notice of Hazardous Discharge or Environmental Complaint that specifically identifies the Premises or the Common Areas or describes a condition that materially impairs or could materially impair the occupancy, use and enjoyment of the Premises, Landlord must give immediate oral and written notice of same to Tenant detailing all relevant facts and circumstances within the knowledge of Landlord.

(d)    Except to the extent caused by Tenant, or Tenant's agents, contractors or employees, Landlord must defend, indemnify and hold Tenant harmless from and against any and all claims, losses, liabilities, damages, penalties, fines and expenses (including, without limitation, consequential damages, cleanup and other remedial and restoration costs, fees for consultants and experts and reasonable attorneys' fees and other costs of litigation arising by reason of any of the aforesaid or any action against Tenant under this indemnity) arising directly or indirectly from, out of or by reason of any breach of Landlord's obligations under this Section. It is a condition of this indemnification and hold harmless that Landlord receive notice of any such claim by Tenant promptly after Tenant first has knowledge thereof. These representations, warranties, covenants and indemnities survive the expiration or early termination of this Lease.

(e)    If Tenant's use, occupancy and enjoyment ("Occupancy") of the Premises is materially interfered with by reason of this existence or remediation of any Hazardous Material located on, in or under the Shopping Center or on the Shopping Center Site (except for any Hazardous Material used by Tenant), then (i) throughout such period of interference, a fair and just proportion of the rents and other charges payable taking into account the nature of the interference to Tenant's Occupancy, will be abated, and (ii) if Tenant's occupancy is substantially impaired for three months or more, then Tenant has the right to terminate this Lease by giving written notice to the other of its election to do so, whereupon this Lease will automatically terminate and end effective as of the date of such notice and neither party will have any further obligations hereunder. Landlord may nullify Tenant's notice of termination if at the time such notice is given Landlord is diligently prosecuting the rectification of such Hazardous Material interference and thereafter complete the rectification in accordance with all applicable governmental laws, codes, regulations and requirements within three months after the date of Tenant's termination notice, whereupon this Lease will continue in full force and effect in accordance with its terms, it being understood and agreed that the abatement provided in clause (i) of this Subsection will continue throughout the period of such rectification by Landlord.

(f)    "Hazardous Material" means any waste, substance or material (i) identified in Section 101(14) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as the same may be amended form time to time (herein called "CERCLA"), or (ii) determined to be hazardous, toxic, a pollutant or contaminant, under federal, state, or local statute, law, ordinance, rule, regulation or judicial or administrative order or decision, as the same may be amended from time to time, including, but not limited to, petroleum and petroleum products. The term "release" shall have the meaning given to such term in Section 101(22) of CERCLA.

(g)    "Hazardous Discharge" means the presence, use, release, dispersal, emission, spill, discharge or cleanup of any Hazardous Material (i) on or about or emanating from the Shopping Center

44

or the Shopping Center Site, or (ii) arising out of the use and occupancy of or operations within the Shopping Center, or (iii) caused by Landlord or other occupant of the Shopping Center or the employees, contractors, invitees or agents thereof.

(h)    "Environmental Complaint" means any Public Entity complaint, investigation, order, citation, or action with regard to any Hazardous Discharge.

## SECTION 36.    LIMITATION OF LANDLORD'S LIABILITY

If Landlord fails to perform any covenant, term or condition on Landlord's part to be performed, and as a consequence of such default Tenant recovers a money judgment against Landlord, such judgment will be satisfied only out of (i) the proceeds of sale received upon execution of such judgment and levy thereon against the right, title and interest of Landlord in the Shopping Center, (ii) the rents and other income from such property receivable by Landlord, and (iii) the consideration received by Landlord for the sale or other disposition of all or any part of Landlord's right, title and interest in the Shopping Center, which consideration is deemed to include any assets at any time after such sale or disposition held by Landlord having a value not exceeding that of the proceeds of such sale or other disposition, and Landlord shall not be liable for any deficiency.  Notwithstanding the foregoing, in the event of fraud on the part of Landlord, the aforestated limitation on recovery from Landlord's assets is inapplicable and Tenant shall have the right to attempt recovery from any of Landlord's assets.  This Section will not be deemed to deny to Tenant, or limit its right to obtain, injunctive relief or specific performance of Landlord's covenants under this Lease or to avail itself of any other right or remedy (not involving a personal liability of Landlord in excess of the limits of personal liability fixed by this Section) which may be accorded Tenant by Law or under this Lease by reason of Landlord's failure to perform its obligations thereunder including, but not limited to, the rights and remedies granted Tenant under Section 29.

## SECTION 37.        DELIVERY OF SITE PLAN

Within 30 days after Tenant's written request therefor, Landlord must provide Tenant with a copy of the most current available site plan of the Shopping Center, which must reflect: (a) the Gross Leasable Area of the Shopping Center as actually constructed; (b) the names and location and the Gross Leasable Area of the premises occupied by the respective tenants thereof; and (c) those premises in the Shopping Center, if any, which are not then currently occupied and open for business.

## SECTION 38.    INTENTIONALLY OMITTED

## SECTION 39.    ENTIRE AGREEMENT; WRITING REQUIRED

This Lease contains all of the agreements of the parties with respect to any matter covered or mentioned in this Lease, and no prior agreement, understanding or representation pertaining to any such matter will be effective for any purpose.  No provision of this Lease may be changed, deleted, modified or amended, except by an agreement in writing signed by the parties.

## SECTION 40.  OPERATING COVENANT

(a)      Tenant will open from the Premises within 90 days after the Commencement Date and continue to operate from the Premises during Tenant's normal business hours for a period of at least one full day (the "Operation Period") as a typical Jo-Ann Fabric and Craft Store, but for reasons other than damage and destruction, eminent domain, or Unavoidable Delays.  After the Operation Period, notwithstanding anything contained in this Lease, expressly or impliedly, to the contrary, and notwithstanding the agreement for the payment by Tenant of Rent (including Substitute Rent or other percentage rent), Tenant is under no duty or obligation, either expressed or implied, to open, reopen, remain open, operate, or thereafter to continually conduct business from the Premises at any time during the Term.  After the Operation Period, Tenant's failure to open, reopen, remain open, operate, or thereafter to continually conduct business from the Premises will not in any way be deemed an event of default under this Lease, nor will such failure otherwise entitle Landlord to begin or to maintain any action, suit or proceeding, whether in law or in equity, relating in any way to Tenant's failure to open, reopen, remain open, operate, or thereafter to continually conduct business from the Premises.

(b)      If Tenant ceases to operate its business from the Premises for 90 consecutive days, for reasons other than an assignment or subletting, damage and destruction, remodeling (not to exceed 60 days in any Lease Year), eminent domain or Unavoidable Delays, then Landlord has the right to terminate the Lease.  If Landlord terminates the Lease, it must do so by written notice to Tenant.  Tenant will have the right, within 30 days of receipt of Landlord's termination notice, to advise Landlord that Tenant will reopen for business from the Premises. If Tenant elects to reopen for business, then it must do so within 60 days of its notice to Landlord or such greater time as is reasonably necessary under the circumstances; otherwise, Tenant's notice will be null and void.

## SECTION 41.  APPLICABLE LAW AND CONSTRUCTION

The laws of the State of Alabama govern the validity, performance and enforcement of this Lease without regard to its conflicts of law principles.  If one or more of the provisions of this Lease is held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability will not affect or impair any other provision of this Lease, and this Lease will be construed as if such invalid, illegal or unenforceable provision had not been contained herein.  The submission of this document for examination does not constitute an offer to lease, or a reservation of or option for the Premises, and this Lease becomes effective only upon execution and delivery thereof by both Landlord and Tenant. This Lease has been negotiated by Landlord and Tenant and will not be deemed to have been prepared by either Landlord or Tenant, but by both equally.

## SECTION 42.  UNAVOIDABLE DELAYS

Except as otherwise expressly provided herein, if either party is delayed or hindered in or prevented from the performance of any obligation required hereunder by Unavoidable Delay, the time for performance of such obligation shall be extended for the period of the delay, provided that

46

Unavoidable Delay will not excuse prompt and timely payments, including Rent, when due under this Lease except when (A) the Commencement Date is delayed by reason of Unavoidable Delay; or (B) such payment is excused pursuant to other provisions of this Lease. However, no delay will be excused by this section unless (1) the delayed party notifies the other party in writing of the delay within 21 days of the event giving rise to such delay; (2) the delayed party has exhausted all other resources available at reasonable costs to avoid such delay; and (3) the delayed party diligently pursues completion of the activity that was delayed. Notwithstanding anything to the contrary in this Lease, under no circumstances will Unavoidable Delay extend the time for performance of any obligation by more than six months.

## SECTION 43.  REASONABLE CONSENT

Wherever either party's consent or approval is required, such consent or approval must not be unreasonably or arbitrarily withheld or delayed, unless otherwise expressly stated.

## SECTION 44.  NO PARTNERSHIP

Landlord and Tenant acknowledge that neither of them in any way or for any purpose becomes a partner or an associate of the other in the conduct of Tenant's business, the operation of the Shopping Center or otherwise, or a joint venture, or a member of a joint enterprise with the other. Neither party is liable for payment of the debts or performance of any obligation of the other. The relationship is and shall be that of Landlord and Tenant.

## SECTION 45.  ESTOPPEL

Within 30 days after request, Tenant will execute and deliver to Landlord a Tenant Estoppel Certificate substantially in the form of Exhibit H. Within 30 days after request, Landlord will execute and deliver to Tenant a written instrument certifying that this Lease is unmodified and in full force and effect, or if there has been any modification, that this Lease is in full force and effect as modified and stating all such modifications; specifying the dates to which Rent has been paid; stating whether there exists any default in the performance by either party under any provision of this Lease; and certifying as to such other matters as Tenant reasonably may request. With regard to any estoppel certificates related to this Lease, the Lease will take precedence over the contents of such estoppel certificates, should a conflict arise. Each party shall be required to pay the other a non-refundable fee in the amount of $500.00 for each new Estoppel Certificate and each new SNDA requested to cover the administrative, legal and other costs and expenses incurred in processing, negotiating and drafting said documents.

## SECTION 46.  QUIET ENJOYMENT

Landlord represents and warrants to Tenant that Landlord is well seized of fee simple title to the Premises and the Shopping Center and has full power and authority to execute and deliver this Lease. Landlord covenants to Tenant that Tenant shall at all times have peaceable and quiet enjoyment

47

and possession of the Premises and of the rights granted hereunder without any manner of hindrance from Landlord or any other person or persons, if Tenant performs all the covenants and agreements to be performed on Tenant's part. Notwithstanding the foregoing, this provision is subject to all mortgages, encumbrances, easements and underlying leases to which this Lease may be or become subordinate.

Landlord agrees that during the term of this Lease, but only for so long as Tenant is open for business and is not in material default of any of the provisions of this Lease, Landlord will not hereafter enter into a new lease in the spaces located immediately adjacent to the Leased Premises with a tenant for a use which: (a) produces noise or sound that is objectionable due to intermittence, high frequency, shrillness or loudness; (b) produces obnoxious odors; (c) produces noxious, toxic, caustic or corrosive fumes, fuel or gas; or (d) produces dust, dirt or fly ash in excessive quantities. The aforementioned restrictions shall not apply to: (i) any existing tenants at the Shopping Center which presently, by the terms of their existing leases, may have the right to engage in such uses, or their successors, assigns or replacements; or (ii) any existing leases at the Shopping Center as same may be renewed, extended, modified or amended (except that no such renewal, extension, modification or amendment shall grant a tenant the right to engage in any of the aforementioned prohibited uses where such tenant did not previously have that right).

If this Section 46 is violated, then in addition to any other remedies available to Tenant, after providing Landlord with 30 days advance written notice ("30-Day Notice Period"), during which time Landlord has the opportunity to cure said violation and avoid the penalties set forth hereinafter (it being agreed and understood that if Landlord commences to cure the violation during said 30-day period and diligently pursues said cure to completion, Tenant's remedies set forth herein shall be deferred), Tenant shall have the right commencing on the 1st day after the 30-Day Notice Period to pay Substitute Rent and continuing until the earlier of (i) the date such violation is cured or (ii) the end of the current Lease term (except if the violation has occurred after Tenant has exercised an option to renew or extend the Lease, in which case this subsection "ii" shall be equal to one year after the commencement of the 30-Day Notice Period. In addition, during said one-year period, Tenant shall have the option to terminate this Lease by giving Landlord 90 days advance written notice, with no further obligations under this Lease as of the termination date).

## SECTION 47.  HOLDING OVER

If, at the expiration of the Term, Tenant continues to occupy the Premises, such holding over shall not constitute a renewal of this Lease, but Tenant shall be a tenant from month to month, at the same rent and under the same terms and conditions as in effect during the just expired term of this Lease (except that Fixed Minimum Rent shall be 125% of the Fixed Minimum Rent due and payable prior to enter into the month-to-month period) and either party may terminate the Lease during said month-to month tenancy upon 30 days prior written notice to the other party; provided, however, Landlord shall not specify a Lease termination date to be during the period commencing September 1 and ending on the immediately following January 31. If Tenant does not vacate the Premises as required in Landlord's thirty-day notice of termination, Tenant shall be considered a tenant at

48

sufferance and the Fixed Minimum Rent shall be 200% of the Fixed Minimum Rent due and payable at the expiration of said thirty-day notice period.

## SECTION 48.  BROKERS

Each party represents to the other party that it has not dealt with any party with regard to the Premises or this Lease, except that Aaron Solomon of The Shopping Center Group LLC represents Tenant in this transaction.  Landlord will pay Tenant's broker pursuant to a separate agreement between Landlord and Tenant's broker and it is agreed that if Landlord does not pay Tenant's broker, Tenant shall have the right to pay Tenant's broker for fees due and set-off said amounts against Rent due Landlord. Each party will indemnify and hold the other party harmless from and against any loss, cost, liability and expense, including reasonable attorney's fees, arising out of a breach of its representation in this section.

## SECTION 49.  CAP ON ADDITIONAL RENT

During the First Lease Year, Tenant's total cost for all Additional Rent shall not exceed $2.40 multiplied by the Gross Leasable Area of the Premises.

## SECTION 50.  INTENTIONALLY OMITTED

## SECTION 51.  CAPTIONS

Any paragraph titles or captions contained in this Lease are for convenience only and do not define, limit or otherwise modify the scope or intent of this Lease.

## SECTION 52.  VARIATION IN PRONOUNS

All the terms and words used in this Lease, regardless of the number and gender in which they are used, will be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context or sense of this Lease or any paragraph or clause herein may require, the same as if such words had been fully and properly written the number and gender.

## SECTION 53.  SECTION REFERENCES

All references to any section number(s) refer to the Section contained in this Lease.

## SECTION 54.  BINDING EFFECT OF AGREEMENT

This Lease and all of the covenants, conditions, provisions and restrictions herein inures to the benefit of and binds the heirs, executors, administrators, devisees, legatees, personal representatives, successors and assigns, respectively, of Landlord and Tenant.

49

Mobile Festival Centre, Mobile, AL
EXECUTION VERSION: 12-11-12

## SECTION 55. ATTORNEY'S FEES

If Landlord or Tenant is required to enforce this Lease, then the non-prevailing party must pay to the prevailing party the prevailing party's arbitration costs (if any), court costs and reasonable attorney's fees. This provision applies to court costs and attorneys fees incurred in any trial and appellate courts.

## SECTION 56. OFAC WARRANTY

Each party represents and warrants to the other party that the representing party (a) is not acting, directly or indirectly, for or on behalf of any person, group, entity, or nation named by any Executive Order or the U.S. Treasury Department as a terrorist, "Specially Designated National and Blocked Person," or other banned or blocked person, entity, nation, or transaction pursuant to any law, order, rule, or regulation that is enforced or administered by the Office of Foreign Assets Control, and (b) is not engaged in this lease transaction, directly or indirectly, on behalf of, or instigating or facilitating this lease transaction, directly or indirectly, on behalf of any such person, group, entity or nation. The breaching party must defend, indemnify, and hold harmless the other party from and against all claims, damages, losses, risks, liabilities, and expenses (including reasonable attorney's fees and costs) arising from or related to any breach of the forgoing representation.

*[Remainder of Page Intentionally Left Blank- Signatures Follow on Next Page]*

50

In witness whereof, the parties have signed this Lease as of the date listed above.

LANDLORD:

**MOBILE FESTIVAL CENTRE, LLC**
By: Kimco Retail Opportunity Portfolio II,
    L.L.C., its sole member
By: Kigme II Business Trust, its managing
    Member

By:_____

Name:____Stuart W. Cox_____
          Vice President

Title:_____

Employer Identification Number:  20-5544683

TENANT:

**JO-ANN STORES, INC.**

By:_____
Travis Smith
Chief Executive Officer and President

And

By:_____
James Kerr
Executive Vice President and Chief
Financial Officer