**Exhibit D**

**July 31, 2025 Transcript**

<pre>
 1                    UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE
 2

 3  IN RE:                        .  Chapter 11
                                  .  Case No. 25-10068 (CTG)
 4  JOANN INC., et al.,           .
                                  .  (Jointly Administered)
 5          Debtors.              .
                                  .
 6  . . . . . . . . . . . . . . . .
                                  .
 7  JOANN INC., et al.,           .  Adversary Proceeding
                                  .  Case No. 25-51022 (CTG)
 8          Plaintiffs,           .
                                  .
 9  v.                            .
                                  .
10  ADVANTUS, CORP.; FAIFIELD .
    PROCESSING CORP.; GWEN        .
11  STUDIOS, LLC; LOW TECH        .
    TOY CLUB, LLC; ORMO           .
12  ITHALAT IHRACAT A.S.;         .
    SPRINGS CREATIVE PRODUCTS .    Courtroom No. 7
13  GROUP, LLC,                   .  824 Market Street
                                  .  Wilmington, Delaware 19801
14          Defendants.           .
                                  .  Thursday, July 31, 2025
15  . . . . . . . . . . . . . .   .  9:30 a.m.

16

                       TRANSCRIPT OF HYBRID HEARING
17            BEFORE THE HONORABLE CRAIG T. GOLDBLATT
                   UNITED STATES BANKRUPTCY JUDGE
18

19

20  Audio Operator:          ECRO

21  Transcription Company:   Reliable
                             The Nemours Building
22                           1007 N. Orange Street, Suite 110
                             Wilmington, Delaware 19801
23                           Telephone: (302)654-8080
                             Email:  gmatthews@reliable-co.com
24
    Proceedings recorded by electronic sound recording,
25  transcript produced by transcription service.
</pre>

```
 1   APPEARANCES:

 2   For the Debtor and
     Plan Administrator:        Patrick J. Reilley, Esquire
 3                              COLE SCHOTZ, P.C.
                                500 Delaware Avenue
 4                              Suite 600
                                Wilmington, Delaware 19801
 5
                                -and-
 6
                                William E. Arnault, Esquire
 7                              KIRKLAND & ELLIS, LLP
                                333 West Wolf Point Plaza
 8                              Chicago, Illinois 60654

 9   For Advantus Corp.:        Gordon Z. Novod, Esquire
                                GRANT & EISENHOFER, P.A.
10                              485 Lexington Avenue
                                29th Floor
11                              New York, New York 10017

12   For Burlington
     Stores, Inc.:              Victoria N. Argeroplos, Esquire
13                              Kristhy M. Peguero, Esquire
                                JACKSON WALKER, LLP
14                              1401 McKinney Street
                                Suite 1900
15                              Houston, Texas 77010

16   For Progress Square
     Partners and CD
17   Cotton Mill:               Michael St. James, Esquire
                                ST. JAMES LAW, P.C.
18                              236 West Portal Avenue
                                Suite 305
19                              San Francisco, California 94127

20   For Myrtle Beach Farms
     Company, Inc. and
21   LNN Enterprises:           Michael G. Busenkell, Esquire
                                GELLERT SEITZ BUSENKELL & BROWN, LLC
22                              1201 North Orange Street
                                3rd Floor
23                              Wilmington, Delaware 19801

24

25
```

<u>APPEARANCES (CONTINUED)</u>:

```
For BV Wolf Creek, LLC:   Scott J. Leonhardt, Esquire
                          ESBROOK, P.C.
                          1000 North West Street
                          Suite 1200
                          Wilmington, Delaware 19801

For DLC Management
Corporation:              Scott L. Fleischer, Esquire
                          BARCLAY DAMON, LLP
                          1270 Avenue of the Americas
                          Suite 2310
                          New York, New York 10020
```

1                                INDEX

2  MOTIONS:                                                    PAGE

3  Agenda
   Item 2:    Amended First Notice of Assumption and          26
4             Assignment of Certain Executory Contract
              and/or Unexpired Leases
5             (Filed May 16, 2025) [Docket No. 930]

6             Court's Ruling:

7  Agenda
   Item 3:    Debtors' Motion to (I) Enforce the Automatic     8
8             Stay; (II) Enforce the Sale Order; and (III)
              for a Preliminary Injunction Pursuant to
9             Sections 105(a) and 362(a) of the Bankruptcy
              Code (Filed June 14, 2025) [Adv. Proceeding
10            No. 25-51022] [Adv. Docket No. 3]

11            Court's Ruling:                                  24

12 Agenda
   Item 4:    Motion of Burlington Stores, Inc. for Leave to   29
13            File Late Amended Omnibus Reply to
              Objections to Burlington's Assignment and
14            Assumption of Myrtle Beach, SC,
              Washington, UT, Bellevue, NE, Flagstaff, AZ,
15            and Fayetteville, AR Leases (Filed
              July 29, 2025) [Docket No. 1475]
16
              Court's Ruling:                                  30
17

18

19

20

21

22

23

24

25

1                              EXHIBITS

2  EXHIBITS FOR
   BURLINGTON STORES:                                PAGE
3
   Burling exhibits *en masse*                        31
4

5
   EXHIBITS FOR
6  MYRTLE BEACH FARMS:                                PAGE

7  1 - No description given                            43

8  2 - Ross lease                                      43

9  3 - Notice of Ross                                  43

10 6 - Burlington Stores 10-K                          43

11 7 - No description given                            43

12

13 EXHIBITS FOR
   BV WOLF CREEK:                                     PAGE
14
   A - BV lease                                        61
15
   B - Ross lease                                      61
16
   C - Letter from Ross to BV, 5/05/25                 61
17

18

19 DECLARATIONS:                                      PAGE

20 1 - Declaration of Emilio Amendola                  33

21

22 Transcriptionist's Certificate                     110

23

24

25

1      (Proceedings commenced at 9:30 a.m.)

2            THE COURT:  Thank you, be seated.

3            So, good morning.  We are on the record in, well,

4   the main case is, In re JOANN, Inc., which is 25-10068.  I

5   understand we also have a status in the adversary.  That is

6   JOANN v Advantus, et al., which is Adversary 25-51022.

7            Mr. Reilley?

8            MR. REILLEY:  Good morning, Your Honor.

9            Patrick Reilley from Cole Schotz, here on behalf

10   of the debtors and plan administrator.

11           Your Honor, turning to the agenda, Item 2, our

12   contested assumption objections, there are approximately six

13   scheduled to go forward today.  And Item 3, as Your Honor

14   mentioned, is the discovery status conference in the

15   adversary proceeding.

16           Your Honor, if it's acceptable, I would propose to

17   proceed with the status conference first.  There are a number

18   of folks on the Zoom regarding this conference and we

19   received a request if this could be held first in the

20   scheduling.

21           THE COURT:  In the absence of any party telling me

22   you need to proceed otherwise, I'm happy to proceed as the

23   parties suggest.

24           MR. REILLEY:  Thank you, Your Honor.

25           Some of these issues for the status conference

1  were previewed on the parties' joint submission requesting

2  oral argument.  At Adversary Docket 16, the parties provided

3  a statement of the issues.  And my co-counsel, Bill Arnault,

4  I see, from Kirkland, is on the Zoom, as well as Gordon Novod

5  is on the Zoom for the Ohio plaintiffs/defendants.

6            THE COURT:  Okay.

7            MR. REILLEY:  So, with that, I'll turn it over to

8  Mr. Arnault and Mr. Novod --

9            THE COURT:  Okay.

10            MR. REILLEY:  -- to address the Court.

11            THE COURT:  So, I'm happy to hear from the

12  parties.  I should say, I do recall reading the joint

13  statement when it came in, whenever that was, and I haven't

14  refreshed myself on what it said.  So if you can assume as

15  little knowledge as you're able, that would be helpful.

16            MR. REILLEY:  Your Honor, to the extent helpful, I

17  do have a hard copy I could hand up.

18            THE COURT:  That actually would be helpful.

19            MR. REILLEY:  All right.  May I approach?

20            THE COURT:  You may.

21            And I would have reviewed it before getting on the

22  bench if I were smart.

23       (Pause)

24            THE COURT:  All right.  Why don't I hear from the

25  parties and I'll work my way through this as we go.

1          MR. ARNAULT:  Sure.

2          Good morning, Your Honor.  Bill Arnault from

3   Kirkland & Ellis, on behalf of the plaintiffs in the

4   adversary proceeding.

5          THE COURT:  Okay.  You can proceed.

6          MR. ARNAULT:  All right.

7          Well, first of all, Your Honor, thank you for

8   fitting us in this morning for a status conference.  As we

9   lay out there, the oral request for -- or the request for

10  oral argument, we actually thought a status conference would

11  be helpful here because there's just like a threshold issue

12  between the parties, as to how to proceed.  And it really

13  comes down to, what does the hearing on our motion to enforce

14  the sale order entail from an evidentiary perspective, if

15  any, and then connected to that is whether there's any

16  discovery that's necessary before we move to oral argument --

17         THE COURT:  I'm sorry, Mr. Novod, I apologize for

18  interrupting, but I just want to make sure I've got my brain

19  wrapped fully around it.

20         As I recall, the theory of -- your theory, in

21  support of the motion to enforce the injunction or the

22  adversary proceeding or what have you, I take it, is that the

23  claims that the individual claimants are pursuing are

24  essentially estate causes of action under Emoral or what have

25  you and, therefore, because the estate sold those claims to

1  the buyer, the individuals don't have them and can't pursue

2  them.

3          Am I right about what's at issue?

4          MR. ARNAULT:  That's exactly right, Your Honor.

5  That's one issue, whether these are direct or derivative

6  claims.  And our view is that they're derivative claims, so

7  they were sold under the sale order.

8          And as it pertains to the status conference and

9  discovery, our view is that that's solely a legal question,

10  such that no evidence is required.  And based on looking at

11  all the cases, the legal framework here, we think that really

12  all that's required is just an examination of the complaint

13  and more specifically, what is the theory of liability and

14  the nature of the claims?  And it's not meant to be some

15  analysis into the merits of the claims.

16          THE COURT:  Right.

17          MR. ARNAULT:  And, really, look, what it -- sorry,

18  Your Honor --

19          THE COURT:  No, go --

20          MR. ARNAULT:  -- what I --

21          THE COURT:  -- ahead.

22          MR. ARNAULT:  -- I liken this to a motion to

23  dismiss --

24          THE COURT:  Yeah.

25          MR. ARNAULT:  -- type of argument where you look

1    at the complaint; accept essentially as true; what are the

2    allegations in the complaint; what are the claims that have

3    been asserted.  And I think if I'm right that that's the

4    correct legal framework, then we don't need discovery to test

5    the veracity of the allegations, because it's their

6    allegations that are in the complaint that the Court needs to

7    examine to make that determination.

8            And I think consistent with that theory of the

9    world and how they should proceed, as we've told counsel for

10   the Ohio plaintiffs, we're not going to call any witnesses.

11   We're not going to seek to introduce additional evidence,

12   because, (A), I just don't think that's the correct approach,

13   and, (B), as a practical matter, we start to get into, how

14   does that discovery overlap with the underlying action, and I

15   just don't know how you start to police a deposition in that

16   scenario.  And, of course, we have the practical overlay of a

17   limited wind-down budget, so spending the next however many

18   months doing depositions, responding to 40 document

19   requests, 20 interrogatories, it doesn't seem like the best

20   approach here when I do think this is just a legal question,

21   particularly because, initially, we had filed a motion for an

22   injunction and the concern was that the Ohio State Court

23   action would get out in front of this threshold question.

24           Now that that is subject to remand briefing,

25   transfer briefing, there's no longer that concern and so it's

1  really been narrowed to this legal question of direct versus

2  derivative, for which, again, we don't think we need any

3  evidence.  We don't think that's the right way to analyze it.

4       And so we think given the state of play and the

5  legal framework here, proceeding to oral argument on those

6  issues is the best course of action both, because it's the

7  right process, but also practically.

8       THE COURT:  All right.  So --

9       MR. ARNAULT:  So, that's -- sorry, Your Honor -- I

10  think that's really the issue.

11       THE COURT:  So, that's very helpful, Mr. Arnault.

12       So, let me just offer a few observations and then

13  a question and then I'll turn it over to opposing counsel.

14  So, again, look, just so everyone understands where, at least

15  what I think I understand, you know, I've addressed the

16  question when someone is trying to pursue, outside of

17  bankruptcy, a claim that someone contends was a resolved

18  estate cause of action twice before, in TPC, which sort of

19  ping-ponged back and forth and then in FGMC.  And in both

20  cases, my analysis was from sort of what Mr. Arnault said, I

21  didn't care.  I didn't need to understand the merits of the

22  underlying claim.  I took the allegations of the complaint as

23  what they were.

24       And the question was, do these alleged claims that

25  belong to the plaintiffs or do these alleged claims that

1  belong to the estate and are, therefore, essentially no

2  longer available to the claimants, because they've been

3  resolved either under the plan or a sale or what have you.

4  That's also -- I believe Judge Horan had this issue last week

5  and wrote an opinion that proceeded on that same analysis.

6  So I guess I incline to think that's the way to think about

7  this problem, though, I want to hear from the other side and

8  see -- get their perspective on it.

9          But, Mr. Arnault, if you could just bring me up to

10  speed, the underlying claims here were brought in State Court

11  and then I take it, removed by whom?

12          MR. NOVOD:  I could speak to that if that's okay

13  with debtors' counsel?

14          THE COURT:  Sure.

15          MR. NOVOD:  And for the record, this is Gordon

16  Novod of the law firm, Grant & Eisenhofer.  I represent the

17  six individual plaintiffs in the Ohio case, and for today's

18  purposes, we are defendants in this adversary proceeding, but

19  I'll refer to them as the "Ohio plaintiffs" if that's okay,

20  Your Honor?

21          THE COURT:  I understand that, thank you.

22          MR. NOVOD:  Okay.  And I am here with my co-

23  counsel, Frank Griffin, who is a Delaware-barred attorney.  I

24  am admitted, I believe, *pro hac* in the case, so I appreciate

25  Your Honor willing to hear me today.

1          THE COURT:  Certainly.

2          MR. NOVOD:  Your Honor, let me -- I'll address the

3    underlying issue and I'll address the procedural background,

4    as well, in course.  And then I'm going to get to your

5    question about the framework that you're looking at it and

6    why this doesn't fit that framework.

7          THE COURT:  Okay.

8          MR. NOVOD:  And so, just initially, my clients

9    filed actions in a single compliant in the Ohio Court of

10   Common Claims in Akron, Ohio, which is the same court in

11   which the debtor is situated.  The claims, themselves, are

12   brought against a number of former employees of JOANN's, as

13   well as two former officers of JOANN's.  The claims at issue

14   in that case, as pled, are actual -- excuse me -- they are

15   common fraud, that's one, and negligent misrepresentation.

16          Now, the common law fraud claims are pled in the

17   complaint with the necessary elements having been pled, which

18   are an omission, or misstatement, reliance, *scienter*, as well

19   as damages.  These are not -- and I'll get to it directly --

20   but these are not derivative claims in any way; these are

21   direct claims under State law.  They exist and have existed

22   forever for those purposes.  And they're not claims that the

23   debtors' estate could ever step into the shoes of the

24   individual creditor and prove reliance.

25          THE COURT:  So, I get -- I think I understand your

1  theory there, though, of course, today, the merits of that

2  isn't what's in front of me.

3          MR. NOVOD:  Right.

4          THE COURT:  The question is, what do I need to

5  know in order to answer that question.

6          MR. NOVOD:  Yes, so let me get to that, Your

7  Honor.

8          THE COURT:  Okay.

9          MR. NOVOD:  The first thing is just within the

10  Emoral construct, you know, the debtors here have, candidly,

11  asked the Court to throw procedure on its head.  And a motion

12  to dismiss, that's one way of treating it, but this feels a

13  lot more to me like a motion for summary judgment by the

14  debtor, where the debtor is saying, as a matter of law, there

15  are no disputed facts and they have an entitlement to some

16  judgment here --

17          THE COURT:  So --

18          MR. NOVOD:  -- as opposed to a motion to dismiss.

19          THE COURT:  Mr. Novod, look, if the complaint, if

20  taking the allegations here, I mean, maybe it's the motion to

21  enforce the injunction is effectively judgment on the

22  pleadings if we can -- I take it you don't have any issue

23  with, on the motion the debtors have brought, my accepting

24  the fact of the allegations in the complaint as this is what

25  you're alleging, right?

1          MR. NOVOD:  I do not; however, Your Honor, I do

2  believe that the debtors' motion and their reply brief make

3  factual assertions which go to the very merits of the claim

4  and whether that's going to be a direct or a derivative

5  claim.

6          And, for example, you have before you, our joint

7  statement.  We listed seven different instances of factual

8  statements in the debtors' reply brief, as well as the

9  debtors' brief, which make factual allegations that go to the

10  application of <u>Emoral</u> and that we sought discovery on.  And

11  so, in my view, the debtor can't make those judgments and

12  those assertions, such as every creditor has a similar claim,

13  and injury is the ones being asserted by the Ohio plaintiffs.

14  That's in paragraph 1 of their reply brief.

15          THE COURT:  All right.  So, I think I understand

16  where you are.  Can I back up a second to my earlier

17  question --

18          MR. NOVOD:  Of course.

19          THE COURT:  -- because the motion that is

20  literally in front of me is a motion for a preliminary

21  injunction, right?

22          MR. NOVOD:  Well, it was --

23          THE COURT:  Not -- I'm sorry?

24          MR. NOVOD:  -- but not anymore.

25          THE COURT:  I'm sorry?

1          MR. NOVOD:  It's not anymore.

2          THE COURT:  Okay.  So help me with that.

3          MR. NOVOD:  Yeah, in their reply brief, the

4   debtors said, We're no longer seeking a preliminary

5   injunction; rather, wherever seeking enforcement solely of

6   the sale order.  That's the debtors, what they said in their

7   papers --

8          THE COURT:  Okay.

9          MR. NOVOD:  -- in this earliest edition.

10          THE COURT:  So they want, essentially, a permanent

11   injunction, not a preliminary injunction?

12          MR. NOVOD:  That's right.

13          THE COURT:  Okay.

14          MR. NOVOD:  So, and the debtors' explanation was,

15   we sought that at a time and we didn't want that getting

16   ahead of plan confirmation, but now since the plan has gone

17   effective, in essence, what the debtor is looking for -- and

18   this is really the wind-down debtor at this point, not the

19   debtor anymore -- but the wind-down debtor is really seeking

20   a permanent injunction and a finding from Your Honor that the

21   filing of our complaint in Ohio State Court violated the

22   terms of the automatic stay, which was then in force, as

23   applicable to the debtors' estates, and that the claims

24   themselves were sold to the purchaser.

25          THE COURT:  All right.  So let's just talk about a

1   rational process, then, for how we resolve that dispute.

2           So, the paper that was filed was a motion for a

3   preliminary injunction.  That's been overtaken by events and

4   it sounds to me just applying the rules to this context, what

5   the debtor is actually asking for is judgment on the

6   pleadings.

7           And your response, though, is just a -- what I'm

8   trying to figure out is, how if I'm just going to be, you

9   know, adherent to the rules, do we figure out what's a

10  question of law that's properly before me and where do we

11  live in a world in which if there's a factual dispute, you're

12  entitled to discovery before I resolve a factual dispute and

13  I'm just trying to play it down the middle here in that

14  regard.

15          If the debtors -- if I treat the debtors' paper as

16  a motion for a judgment on the pleadings, sort of with the

17  only thing outside the four corners of the complaint that's

18  considered is your complaint that's attached to their motion,

19  and I just, then, have a hearing on whether they're entitled

20  to judgment on the pleadings or not.  And if you -- I'll give

21  you another chance to respond if this is the right framework,

22  but if that's the right framework, it seems to me it would be

23  a perfectly fair response for you to say, No, they're not

24  entitled to judgment on the pleadings because their claim

25  depends on facts that are outside the pleadings and,

 1  therefore, they're not entitled to the relief.  And then,

 2  either they are or aren't entitled to relief, just by

 3  comparing the complaint to the law, right, the application of

 4  Emoral, or not, and if their relief depends on their proving

 5  facts that are outside the four corners, then they lose.

 6          Why don't I do that before opening the door to

 7  discovery?  And if they have introduced facts -- we only

 8  proceed this way if they are effectively willing to live in a

 9  world in which I don't consider them.

10          MR. NOVOD:  Well, Your Honor, just to address that

11  briefly --

12          THE COURT:  Yeah.

13          MR. NOVOD:  -- before I kick it back over to the

14  defendants or, excuse me, the debtors' counsel.

15          THE COURT:  Yep.

16          MR. NOVOD:  Their motion paper and their reply

17  brief are riddled with facts that we've asked for discovery

18  on.  And I don't know if you -- I can't separate the two and

19  I --

20          THE COURT:  All right.  Look, if the debtors have

21  effectively converted a motion for a preliminary injunction

22  into a motion for a judgment on the pleadings and you say,

23  Look, I want to understand what the target is, make them

24  refile it as a motion for judgment on the pleadings, I guess

25  I think that's not a -- like, I don't want to put form over

1  substance, but if you want -- I think you're not outside your

2  rights to say before we treat this, you know, chicken as an

3  orangutan, why don't you file a piece of paper that actually

4  is the chicken.

5          MR. NOVOD:  I would agree with that, Your Honor.

6          THE COURT:  I'm sorry, I shouldn't be allowed to

7  extemporize this way.

8          MR. NOVOD:  No, I hear you; I would agree with

9  that Your Honor.  Because, candidly, right now, the nature of

10  our interrogatories, where we don't understand the factual

11  contentions that are made in the papers.

12          THE COURT:  All right.

13          MR. ARNAULT:  And this is, indeed, is something

14  that relies on zero facts.

15          And, by the way, I don't think an <u>Emoral</u> analysis,

16  you can reach, without actually underlying or understanding

17  the facts on which the debtor makes the case, that these are

18  actually derivative claims, rather than direct claims.  And I

19  don't think a debtor can make those claims solely on the

20  basis of the claimant.

21          THE COURT:  Well, look, I'm not seeking to

22  prejudice your rights --

23          MR. ARNAULT:  Those are issues for another day.

24          THE COURT:  -- to make that argument.  I'm not

25  sure I agree with that, but we can have that conversation

1  later.

2          But, Mr. Arnault, what about in the first

3  instance, the, like, okay, you want to move for judgment on

4  the pleadings; give me that piece of paper; let them respond

5  to it; and then let's proceed that way.

6          MR. ARNAULT:  Your Honor, that's totally fine.  We

7  have actually talked about that, just because, as I

8  mentioned, events had overtaken the initial relief that we

9  were seeking, so, really, this is a motion to enforce the

10  sale order, which I think we can style as a motion for a

11  judgment on the pleadings.

12          And, again, I -- and so we are happy to cabin this

13  to the complaint.  I think that that is the correct legal

14  analysis here and the correct framework and we don't need to

15  go outside.  And we shouldn't be going outside the complaint,

16  and, in fact, if you -- I don't want to get too far ahead of

17  ourselves, but if you look at the allegations in the

18  complaint, they're all -- there's a number of generalized

19  allegations about the representations that were made to the

20  company's vendor base.  So we tethered what was in our reply

21  brief and what's in our pleadings to what's actually in the

22  complaint, but that's not the today issue.

23          THE COURT:  Right.

24          MR. ARNAULT:  But I say all that, and so we're

25  happy to refile something that is narrowed down to what we

1  believe are actually the -- what remains at issue and then

2  proceed to -- well, I guess we'll see how we proceed -- but I

3  think in that world, you know, it's --

4           THE COURT:  So --

5           MR. ARNAULT:  So, we have the courage of our

6  convictions, because we believe -- we think this is how it

7  works, and what we're hearing is, Well, you need evidence and

8  if I don't put evidence on, then that's on me.

9           THE COURT:  No, I hear you there, and I'm very

10 happy for parties to actually try to meet their applicable

11 burdens, you know, that is how we do this.  But it seems to

12 me that the first question is, procedurally, what is this

13 proceeding, and then once we solve that, the rest of the

14 pieces, then, fall into place.

15           But can we go back to my earlier question -- I'm

16 happy to hear from either of you -- the underlying State

17 Court action has been removed to --

18           MR. NOVOD:  Yes?

19           THE COURT:  -- presumably, in the first instance

20 to --

21           MR. NOVOD:  Let me address that, Your Honor.

22           THE COURT:  Yeah, go ahead.  Thank you.

23           MR. NOVOD:  So, the underlying -- so the debtor

24 filed its adversary proceeding against my clients on a

25 Friday.  Saturday, it filed their stay motion.  And Sunday --

1  excuse me -- Monday, there was a notice of removal filed,

2  followed by a motion to transfer venue.

3          THE COURT:  Filed by whom?

4          MR. NOVOD:  A -- excuse me -- by the defendants in

5  the Ohio action, filed a notice of removal, so they removed

6  it from State Court to Federal Court.  And then later that

7  day, the Ohio defendants filed a notice of, or a motion to

8  transfer venue.

9          THE COURT:  Okay.

10          MR. NOVOD:  Now, those -- and then subsequently to

11  that, my clients, one, opposed the motion to transfer venue,

12  and, secondly, filed both, a motion to remand, as well as a

13  motion for abstention.

14          THE COURT:  Okay.

15          MR. NOVOD:  The briefing on the motion to transfer

16  venue is now complete.  Briefing on the motion for abstention

17  and the motion for remand will be complete tomorrow when we

18  file our reply briefs.

19          THE COURT:  Got it, okay.  And that is either in

20  the District Court or Bankruptcy Court in Ohio --

21          MR. NOVOD:  That's --

22          THE COURT:  -- and depending on how the reference

23  works there?

24          MR. NOVOD:  Yeah, it's in the District Court for

25  the -- it's sitting in Akron, but it is the District Court,

1  not the Bankruptcy Court.

2          THE COURT:  Okay.

3          MR. NOVOD:  So, there's a little bit of a limbo

4  there as to where things are.

5          The basis for removal was related to subject-

6  matter jurisdiction and we've opposed removal on the basis

7  of, as well as we've asked for abstention on the basis that

8  we didn't think they could meet subject-matter jurisdiction

9  there.

10         THE COURT:  Okay.  All right.

11         So that's what obviates the emergency for the

12 preliminary injunction.  But it's not like the underlying

13 case is in front of me so that it makes more sense to resolve

14 this as a motion to dismiss the underlying suit.  We'll still

15 make sense to proceed with a separate adversary, because who

16 knows where that case will end up; that's up to a Court in

17 Ohio.

18         Okay.  But you've answered my question.  I'm sorry

19 for being the slowest one in the room, but as those of you

20 who --

21         MR. NOVOD:  There's a lot going on here, Your

22 Honor --

23         THE COURT:  And I'm --

24         MR. NOVOD:  -- and if you'll just indulge me for

25 just one additional point, Your Honor?

1          THE COURT:  Certainly.

2          MR. NOVOD:  We do have discovery disputes, but in

3  light of the fact that the debtor is proceeding, or at least

4  proposing to proceed with the filing of the new motion, to

5  set this up procedurally, I would propose just to hold those

6  disputes in abeyance until we actually know whether Your

7  Honor will find that discovery is appropriate or whether this

8  can be dealt with at the beginning.

9          THE COURT:  So --

10          MR. NOVOD:  So, we're not going to mature.  In our

11  statement that we filed with the Court the week before last,

12  we said that there were disputes that we would bring to the

13  Court when those were ripe.  I don't think you'll be seeing

14  those anytime soon, until Your Honor decides this other

15  motion.

16          THE COURT:  Okay.  That makes -- that seems

17  eminently sensible to me.

18          Mr. Arnault, any objection to that?

19          MR. ARNAULT:  No objection to that, Your Honor.

20          THE COURT:  Okay.  So it sounds like we've got a

21  plan on how to proceed.  I'm happy to leave to the parties to

22  work out scheduling or just to rely on default to the Local

23  Rules.  But if -- I'll treat, essentially, the pending motion

24  for a preliminary injunction as, essentially, effectively

25  mooted, overtaken by events or whatever you want to say.

1            And the debtor will file, or the defendants, or

2   however you want to think of it -- a plaintiff in the

3   adversary -- a motion for judgment on the pleadings.  And

4   when that is fully briefed, I'm happy to set a time to hear

5   it and we'll take it from there.  And everyone's rights on

6   the merits of that are fully preserved, including the

7   argument to say this turns on facts.

8            Okay.  Is that -- everyone on the same page there?

9            MR. NOVOD:  Yes, Your Honor.

10           MR. ARNAULT:  That makes sense to us, Your Honor.

11  Thank you.

12           THE COURT:  Okay.  All right.

13           So I think we now have --

14           MR. NOVOD:  Thank you, Your Honor.

15           THE COURT:  Anything else in connection with the

16  adversary that we should talk about or are we good?

17           MR. NOVOD:  We're good.

18           MR. ARNAULT:  We're good.

19           THE COURT:  Okay.  Thank you very much.  I

20  appreciate that.

21           And anyone who's just here for that, don't -- you

22  don't need to humor me; you're welcome to go.

23           MR. NOVOD:  All right.

24           MR. ARNAULT:  Thank you.

25           THE COURT:  All right.  Mr. Reilley?

1       MR. REILLEY:  All right.  Your Honor, just for the

2   record, Patrick Reilley from Cole Schotz.

3       So, Your Honor, turning back to the Agenda Item 2

4   is the debtors' amended first notice of assumption and

5   assignment of contracts.  We're scheduled to go forward today

6   on six objections.

7       Your Honor, the parties have worked to try to

8   streamline this hearing for today and in terms of proceeding,

9   subject to Your Honor's, certainly, thoughts and views, I

10  would propose that we just proceed one by one on -- if you

11  look at page 4 of the hearing agenda under "status," we've

12  identified the six objections -- and I would proceed to -- I

13  would propose to proceed, one by one, starting with Cotton

14  Mill, where the parties can present evidence and then turn to

15  argument.  Counsel for Burlington is in the courtroom, who

16  will respond to the objections.

17      So, unless Your Honor has a different way of

18  proceeding, I would just propose one by one, start with the

19  evidence, and then argument.

20      THE COURT:  So, let me first ask, is there any

21  party in interest that has a problem with proceeding that way

22  or is that agreeable to the parties?

23      MS. ARGEROPLOS:  I'll just stand up for

24  Burlington, Your Honor.  Victoria Argeroplos, on behalf of

25  Burlington Stores.

1          That's the order that we think that it makes sense

2   to go in.  The landlord's objected and we replied, so...

3          THE COURT:  Okay.  Mr. St. James, I see you've

4   turned on your camera.

5          Any objection to proceeding in the manner that

6   Mr. Reilley suggests?

7          MR. ST. JAMES:  No, Your Honor.

8          THE COURT:  Okay.  All right.

9          So I'm happy to proceed that way.  Let me make

10  this one slight request for help.  So, I was away for the

11  last three days and I just got back into town.  I haven't

12  read the papers and I certainly am familiar with the

13  overarching legal principles, but in terms of, like, the

14  specifics of each of the leases, don't count on me to

15  remember what you said in the pleadings about the specific

16  terms.  I think if you can, you know -- well, I try to be

17  prepared and I think we can proceed, I think, don't assume I

18  remember too much about the differences among each of the six

19  disputes.

20         MS. ARGEROPLOS:  Got it, Judge.  Thank you.

21         THE COURT:  Okay.

22         MS. ARGEROPLOS:  And while I'm up here, we have --

23  there were many leases that were set for today.  One of the

24  six that Counsel mentioned has been resolved.  My colleague

25  Kristhy Peguero will come up to talk about what has been

1  resolved.

2           THE COURT:  Okay.  Very well.

3           MS. PEGUERO:  Good morning, Your Honor.

4           Kristhy Peguero, on behalf of Burlington Stores.

5           My co-counsel is correct, the romanette (ii),

6  Widewaters Group, Inc., with respect to Canadaigua Park in

7  Canadaigua, New York, has been resolved.  And Mr. Fleischer

8  is opposing counsel on that matter, and I'm sure can confirm

9  that we have an agreement in principle and intend to submit a

10 sale order under certification --

11          THE COURT:  Okay.  Mr. Fleischer --

12          MS. PEGUERO:  -- for Your Honor's consideration.

13          THE COURT:  -- is that your understanding?

14          MR. FLEISCHER:  Yes, and good morning, Your Honor.

15          Scott Fleischer of Barclays Damon, on behalf of

16 the Widewaters Group, Inc.

17          We were able to resolve that objection, so that

18 one can be marked off.  I am still here on one of the other

19 objections for DLC Management, so you'll be hearing from me

20 again shortly.

21          THE COURT:  Okay.  Very well.

22          So, on that, we won't proceed today; I'll wait for

23 a form of order under certification, and in the absence sense

24 of something very strange happening, we'll enter that order.

25          MS. PEGUERO:  Thank you, Your Honor.

1           THE COURT:  Okay.

2           MS. ARGEROPLOS:  Okay.  And one more quick item,

3  Your Honor.  We filed our original reply at Docket 1457 and

4  then an amended reply at Docket 1474.  That was filed after

5  the deadline, so we have a motion for leave to file the late

6  reply, the late amended reply at Docket 1475.  The amendment

7  only refers to the landlord for the Bellevue store; that's BV

8  Wolf Creek LLC.

9           Counsel, after we filed our original reply,

10 informed us that we had inadvertently left off one of the

11 arguments.  So, he -- so, we have filed the amended reply

12 that only addresses that one argument.  There's nothing else

13 changed in the original, so I don't think it should be too

14 controversial.

15          THE COURT:  Okay.  So I've read 1474, which is the

16 amended reply.  When you say it only addresses one, you mean

17 the only addition is one?

18          MS. ARGEROPLOS:  Correct.

19          THE COURT:  So, it isn't something I've missed if

20 that's all I've read?

21          MS. ARGEROPLOS:  Right.

22          It's all in the amended reply --

23          THE COURT:  Okay.

24          MS. ARGEROPLOS:  -- plus the new paragraph that we

25 added, or two paragraphs --

1          THE COURT:  Got it, okay.

2          MS. ARGEROPLOS:  -- to help you.

3          THE COURT:  So the question is, do you have leave

4  to file the reply that I've already read?

5          MS. ARGEROPLOS:  Yes, Judge.

6      (Laughter)

7          THE COURT:  Okay.  Any objection to the motion for

8  leave to file the reply that I have already read?

9      (No verbal response)

10         THE COURT:  Seeing -- Mr. St. James, I see you've

11  turned on your camera.  Are you asking to be heard --

12         MR. ST. JAMES:  I apologize, Your Honor.

13         I was the first landlord --

14         THE COURT:  I see.  So, you're only dealing with

15  the first issue --

16         MR. ST. JAMES:  -- but I can turn off my camera.

17         THE COURT:  -- not trying to excise from my brain

18  what is already there.

19         MR. ST. JAMES:  No, Your Honor.

20         THE COURT:  It sounds painful.

21         MS. ARGEROPLOS:  It does.

22         THE COURT:  Okay.  So with that, seeing no

23  objection, we will grant the motion for leave to file the

24  reply and we will go ahead and get that order entered.

25         MS. ARGEROPLOS:  Thank you, Judge.

1          We'll upload a proposed order.  And then our

2   witness and exhibit list is at Docket 1471.  I would like to

3   offer all of our exhibits into evidence.

4          THE COURT:  Okay.  Is there any -- and this is --

5   we're not, now, on just the first of them; this is the

6   evidentiary record, with respect to all six?

7          MS. ARGEROPLOS:  Correct, Judge.

8          THE COURT:  Okay.  So, is there any party in

9   interest that objects to the introduction into evidence of

10  any of the witnesses on Burlington's exhibit list?

11      (No verbal response)

12         THE COURT:  Okay.  Seeing none, they will be

13  admitted.

14      (Burlington Exhibits received into evidence)

15         MS. ARGEROPLOS:  Okay.

16         THE COURT:  But, again, to the extent that they

17  come up, you know, don't -- you won't hurt my feelings if you

18  assume I don't know exactly what they say and walk me through

19  them.

20         MS. ARGEROPLOS:  Of course, Judge.  Thank you.

21         I will turn it over to the landlords now.

22         THE COURT:  Okay.  Very well.

23         Mister -- actually, no, you won't, because

24  Mr. Reilley wants the podium.

25      (Laughter)

1          MR. REILLEY:  Your Honor, if I may, before turning

2    it over the landlords, I'd actually like to move a

3    declaration, as well; it's the declaration of Emilio Amendola

4    of A&G Real Estate Partners at Docket 1480.

5          THE COURT:  Okay.  Any objection to the

6    introduction into evidence of the landlord -- I'm sorry -- of

7    the declaration?

8        (No verbal response)

9          THE COURT:  Okay.  I'm seeing none.

10         And is there any party in interest that wishes to

11   cross-examine the declarant?

12       (No verbal response)

13         THE COURT:  Okay.  Seeing none, you can proceed.

14         MR. REILLEY:  Thank you.

15         And I should note, the declarant is on the Zoom

16   and we did contact counsel in advance to ensure that they

17   didn't intend to cross.  And this declaration will be

18   admitted to Your Honor for this matter and two others, not

19   for all five; just two more, but I'll just admit it now.

20         THE COURT:  I see.  So let's back up.

21         So, the first of the matters is which?

22         MR. REILLEY:  Cotton Mill --

23         THE COURT:  Okay.

24         MR. REILLEY:  -- which is number one on the

25   status.

1          THE COURT:  Got it.  Okay.

2          And so what you're saying is that the declaration

3   at 1480 is admitted for the purposes of the Cotton Mill

4   dispute and you may seek to introduce it for others, but it's

5   not introduced for the purposes of all?

6          MR. REILLEY:  That's correct.

7          Not to hide a ball, it'll be introduced -- and I

8   guess I can do it now if that's --

9          THE COURT:  That's fine.  If it's consensual, we

10  may as well just clean up the record.

11         MR. REILLEY:  Then we'll introduce it for the

12  purposes of the Myrtle Beach Farms Company matter, which is

13  number three -- again, we spoke with Mr. Busenkell in

14  advance; we don't expect cross-examination -- and then in LNN

15  Enterprises, which is number six.

16         THE COURT:  Okay.  Any objection from the affected

17  parties to the introduction of the declaration for that

18  purpose?

19  (No verbal response)

20         THE COURT:  Okay.  Seeing none, the declaration

21  will be admitted for those purposes.

22      (Amendola Declaration received in evidence)

23         THE COURT:  And then do any of those parties

24  intend to cross-examine the witness?

25      (No verbal response)

1    THE COURT:  Okay.  Seeing none, I think we're

2  good.  The declaration is admitted and we can proceed on that

3  record.

4    MR. REILLEY:  Okay.  Thank you, and I'll turn it

5  over to Mr. St. James.

6    THE COURT:  Okay.  Mr. St. James?

7    MR. ST. JAMES:  Good morning, Your Honor.  Thank

8  you for permitting me to appear by Zoom.

9    Your Honor, we have entered into a stipulation of

10  facts with the debtor and Burlington.  It's at Docket 1487.

11  So that addresses the factual issues for us and we would

12  simply proceed to oral argument.

13    THE COURT:  Okay.  Can you just give me a quick

14  second.  I have that declaration up and I looked at it

15  quickly, but it's short enough that having refreshing won't

16  do any harm.

17    (Pause)

18    THE COURT:  Okay.  I think I understand.

19    You can proceed.

20    MR. ST. JAMES:  Thank you, Your Honor.

21    Your Honor, I understand that the Court is

22  familiar with this area of law and I don't intend to belabor

23  much of it.  But the last time the Court addressed it, at

24  least in this case, perhaps the last time the Court addressed

25  it, was in the context of an assignment of a JOANN's lease in

1  Queen City [sic], Arizona, to a Dollar Tree store.  And there

2  are some fairly dramatic difference between this case and

3  that and I wanted to highlight them for the Court, because I

4  do for the think that the Court's approach to the Queen Creek

5  store is really guidance for this case.

6          Now, in Queen Creek, sorry, the Dollar Tree's --

7  Dollar Tree was already a tenant in the shopping center and

8  the purpose of the acquisition of the JOANN lease was to

9  relocate within the showing center and presumably not to

10 extend its existing lease, but to acquire a different one.

11         In our case, very much the contrary.  Ross is the

12 only discount store in the center and the exclusivity

13 provisions that Ross has insisted on actually further the

14 landlord's objectives with the tenant mix because it prevents

15 us from becoming just a discount center; it's a single

16 discount store in an otherwise non-discount shopping center.

17 So that is one issue that's very different from Queen City --

18         THE COURT:  Right.

19         MR. ST. JAMES:  -- Queen Creek.

20         The other issue that's very different is that in

21 Queen Creek, the use clause permitted any lawful retail use.

22 Well, in our case, the definition for permitted use lists,

23 perhaps, two dozen things that are very much JOANN types of

24 things, crafts and, you know, cloth and things like that, and

25 it's a use clause that fits JOANN and does not fit the world

1  of other things.  And it's backed by a use provision that

2  requires that the tenant shall use the premises for a

3  permitted use.

4        Now, Burlington makes much of the fact that the

5  definition includes the word "may" and says that "may" is

6  permissive.  Well, I agree, and so maybe if JOANN's wanted to

7  sell Native American pottery, maybe that would fit one the

8  main part of the definition.  But I don't think you can

9  stretch "may" to include, either, auto parts or, in this

10 case, discount clothing, and so in our case, the permitted

11 use is a meaningful restriction.

12       And what I'd turn to toward the end now is, you

13 know, the use restrictions have been applied by Bankruptcy

14 Courts.  It was kind of peculiar in Burlington's brief to

15 read the bankruptcy decision in auto track [sic], which

16 overrode the use provisions without a reference to the fact

17 that the Fourth Circuit explicitly reversed and held that, in

18 fact, the use provision would govern and would prevent the

19 assignment of a store that was supposed to be an auto parts

20 store to a differing use.

21       THE COURT:  So, Mr. St. James, can I just cut you

22 off for a second, just so -- to see if we can level set about

23 what are the agreed legal principles and then we can talk

24 about -- or if the legal principles are disagreed or are not

25 agreed and then we can talk about the application of those

1  principles.  Because here's what I think I understand, right,

2  obviously, a straight prohibition to assignment is overridden

3  by 365 and the debtors and Burlington point to case law, and

4  this seems to make sense, that says, look, even if you've got

5  a thing that is sufficiently tailored to an existing party,

6  that that's, essentially, an anti-assignment clause in

7  disguise and we elevate substance over form and if it's a --

8  if we don't enforce a prohibition on assignment, nor do we

9  enforce a disguised, you know, anti-assignment provision.

10        So let me pause there.  Did you disagree --

11  holding aside the question of whether that's what's going on

12  here or not, as a statement of law, do you see --

13  Mr. St. James, do you disagree with that proposition?

14        MR. ST. JAMES:  No, Your Honor, I do not disagree

15  with that proposition.

16        THE COURT:  Okay.  And then the other point about

17  the enforceability of use restrictions, as I understand the

18  state of the law as it exists, and this is perhaps less

19  crystal clear than it might be, but at least the emerging

20  consensus seems to be the approach adopted in Bed Bath &

21  Beyond and in Big Lots, which says, Look, as of the time the

22  debtor and the counterparty entered into their agreement, if

23  there are use restrictions in place as of that point in time,

24  they remain enforceable under the shopping center provisions.

25  But if the debtor does something thereafter that ties its

1  hands further, that doesn't bind the estate.

2          That's, at least, how I understand the --

3  basically, the -- right, the debtor isn't bound and the

4  estate isn't bound by restrictions that weren't, wouldn't

5  have been knowable by the debtor at the time it entered into

6  the lease with the counterparty.  And if the counterparty

7  does some further restriction later, that can't fairly be

8  enforceable against the estate because the estate has no

9  ability or the debtor, you know, the debtor, as the estate's

10 predecessor, had no ability to sign on to that or effect

11 that.

12          Does anyone disagree that that's -- I mean, look,

13 reserving your rights to say that those cases are wrongly

14 decided, I'll say I've -- that's what I -- that is the

15 principle that I've applied in disputes here in the past.  I

16 don't think I've gotten even a lot of meaningful pushback

17 about it.  Everyone's rights are reserved and if you want to,

18 you know -- I'm not asking to -- for anyone to walk away from

19 an argument, but does anyone take issue with that proposition

20 for this purpose?

21          Mr. St. James, is that --

22          MR. ST. JAMES:  Well, Your Honor, what --

23          THE COURT:  Yeah?

24          MR. ST. JAMES:  What I would say, I understand the

25 Court's position and I accept it.  I would say that the

1    combination of stripping the use provision and then not

2    enforcing an exclusivity clause, which otherwise could have

3    been enforced simply with the use provision, is sort of a

4    one-two punch that I think is not warranted.  But I can't

5    challenge the fact that there are recent decisions like the

6    ones you referred to that seem to do that.

7              THE COURT:  Okay.  And so I take it you think that

8    if I were simply to apply those principles, then this lease

9    is -- you think that they shouldn't be combined.  Let me hear

10   you out.

11             If both of those principles are read

12   independently, then what is the legal justification for

13   parsing, treating the application of them together

14   differently than we would treat the application of either of

15   them independently.

16             MR. ST. JAMES:  Well, it seems to me that it makes

17   it really impossible for the landlord to govern the path of

18   its shopping center.  We had contractual provisions which

19   would have ensured that we had, we'll call it an "upscale

20   center" with a single discount store and with everything else

21   of a quality like JOANN's.

22             And, first, we lose the ability to strict it to

23   stores like JOANN's and then we lose the ability to prevent

24   discount stores from stepping in.  And that fundamentally

25   changes the nature of the center in a way that I think the

1   shopping center amendments were not intending.

2          THE COURT:  Okay.  But if you had use restrictions

3   that weren't anti-assignment provisions in disguise, but

4   were, instead, use restrictions that might limit the universe

5   of assignees to protect the nature of the center and those

6   were in place at the time of the lease with JOANN's, you'd be

7   able to do so.

8          So your grievance here is that you didn't enter

9   into those restrictions until after the debtors had already

10  entered into their lease with your client, right?

11         MR. ST. JAMES:  I'm sorry, Your Honor.

12         I accept what the Court is saying, yes.

13         THE COURT:  All right.  So, I think I -- look, I

14  think I understand what you're saying.  I'm inclined to

15  approve the lease by application of those principles.  I'm

16  persuaded by the reasoning of the Court in New Jersey in Bed

17  Bath & Beyond and by Judge Stickles in Big Lots.  I also am

18  persuaded by the basic proposition that if, to the extent

19  Section 365 prohibits a flat anti-assignment provision, it

20  also operates to bar what are, in substance, anti-assignment

21  provisions that are just written using different words.

22         I think Mr. St. James' description of the

23  restrictions in this lease essentially conceded that that's

24  what this is, that it was designed for JOANN's.  So that,

25  effectively, is an anti-assignment provision that would be

1  voided by the application of Section 365, and so for those

2  reasons, I will enter an order authorizing the assignment.

3          MS. ARGEROPLOS:  Thank you, Your Honor.

4          MR. ST. JAMES:  Thank you, Your Honor.

5          THE COURT:  Thank you.  If the parties can submit

6  an order so providing, that would be helpful.

7          MS. ARGEROPLOS:  Yes, Your Honor.

8          THE COURT:  Okay.  Where to from here?

9          And then, thank you, Mr. St. James.  I appreciate

10 your argument and, candidly, the straightforward candor in

11 addressing these issues.

12         MR. ST. JAMES:  Thank you, Your Honor.

13         MR. REILLEY:  Your Honor, next, we have Myrtle

14 Beach Farms Company.

15         THE COURT:  Okay.  Very well.

16         Mr. Busenkell, I take it you're next?

17         MR. BUSENKELL:  Good morning, Your Honor.

18         Michael Busenkell of Gilbert Seitz Busenkell &

19 Brown, on behalf of Myrtle Beach Farms.

20         As the name indicates, they are the landlord for

21 the property in Myrtle Beach that's been identified on the

22 assignment notice.  Our lease was entered into with JOANN

23 back in January of 2022 and it's for property at 1120

24 Seaboard Street in Myrtle Beach.

25         The parties -- and let me take a step back.

1  There's a housekeeping matter.  We have stipulated to

2  exhibits.  I have given a copy to counsel for Burlington,

3  counsel for the debtors, and Ms. Barksdale.

4            THE COURT:  That's this binder?

5            MR. BUSENKELL:  I can't see it from all the way

6  over here.

7       (Laughter)

8            THE COURT:  If it says "Myrtle Beach" on it, is

9  that --

10            MR. BUSENKELL:  That would be it; yes, Your Honor.

11            THE COURT:  Okay.  Very well.

12            MR. BUSENKELL:  The parties have also stipulated

13  that Seaboard Commons, which is the name of the shopping

14  center in Myrtle Beach that this property is a part of, is a

15  shopping center, as defined under the Bankruptcy Code.

16            MS. ARGEROPLOS:  And, Your Honor, I'll just

17  clarify.

18            Burlington stipulates to the admissibility of --

19  let's see -- Exhibit 1 on the Myrtle Beach list is the lease

20  with the debtors, so that's one of our exhibits, too; we

21  agree to that.  We stipulate to the admissibility of

22  Exhibits 2 and 3, the Ross documents; not for the truth of

23  the matter asserted, just for the fact that they exist.

24  Exhibits 4 and 5, we are not in agreement on, and Exhibits 6

25  and 7 are our documents, so we don't have a problem with

1   those.

2          THE COURT:  Okay.  So Exhibits 1, 6, and 7 come

3   in; is that right?

4          MS. ARGEROPLOS:  Yes, Judge.

5      (Myrtle Beach Exhibits 1, 6, and 7 received in

6   evidence)

7          THE COURT:  Hold on.

8      (Pause)

9          THE COURT:  Exhibits 4 and 5, the parties agree

10  are admitted --

11         MS. ARGEROPLOS:  Not 4 and 5.

12         THE COURT:  -- for the fact of -- they're the Ross

13  documents, so they're admitted for non-hearsay purposes?

14         MS. ARGEROPLOS:  Those are 2 and 3, Your Honor.

15         THE COURT:  Oh, I apologize.  I apologize.

16         4 and 5 are the disputed ones.  2 and 3 are

17  admitted for non-hearsay purposes.

18     (Myrtle Beach Exhibits 2 and 3 received in evidence)

19         THE COURT:  And then 4 and 5, you've got a dispute

20  that, I take it someone has to decide, and that's probably my

21  job.

22         MS. ARGEROPLOS:  Yes, Judge.

23         THE COURT:  Okay.  Very well.

24         MS. ARGEROPLOS:  I object on hearsay grounds --

25         THE COURT:  Okay.

1          MS. ARGEROPLOS:  -- and lack of authentication.

2          THE COURT:  Okay.  So, let me hear from the

3   parties on that.

4          MR. BUSENKELL:  And, Your Honor, frankly, I'm a

5   little surprised, because I thought we had agreed to these

6   exhibits.  I don't need them, so that's fine.  It's a little

7   upsetting, but we'll proceed, as is.

8          THE COURT:  Okay.  So let me take it -- let me

9   make sure I understand.

10          You're agreeing not to seek their admission under

11   the circumstances?

12          MR. BUSENKELL:  That's right, Your Honor.

13          THE COURT:  Okay.  Very well.

14          So, 4 and 5 won't be admitted, and I'm happy to

15   proceed otherwise.

16          MR. BUSENKELL:  So Seaboard Commons, Your Honor,

17   is comprised of a number of stores:  T.J. Maxx; Target;

18   Lowe's; Scrubs & Beyond, which, honestly, I've never heard of

19   before this case; Dollar Tree; Office Max; and, importantly,

20   for purposes of our objection, Ross Dress for Less.

21          The Ross lease, which is Exhibit 2 in our binder,

22   has an exclusivity provision that, to paraphrase, says, you

23   know, there can't be any other stores in Seaboard Commons

24   that use 10,000 square feet or more to sell discount apparel.

25   I don't think it's disputed that Burlington is an off-price

1  retailer, per their 10-K, which is Exhibit 6.  They identify

2  themselves as an off-price retailer.

3          So the assignment of the JOANN lease to Burlington

4  would violate the broadest exclusivity provision.

5          THE COURT:  Okay.  And tell me about the

6  chronology here.

7          MR. BUSENKELL:  Oh, yeah.  I'm sorry, Your Honor.

8          The Ross lease predates the JOANN lease --

9          THE COURT:  I see.

10          MR. BUSENKELL:  -- by a lot.

11          THE COURT:  Okay.

12          MR. BUSENKELL:  It's not -- that's not an issue.

13          And, in fact, Your Honor, my client has received a

14  notice from Ross claiming that an assignment to Burlington

15  would be a violation of the Ross lease and that they were

16  exercise their remedies under the lease, which we don't need

17  to get into, but that's Exhibit 3 in our binder.

18          THE COURT:  Okay.

19          MR. BUSENKELL:  Your Honor, that exclusivity

20  provision dovetails with the JOANN lease in that (f)(1) to

21  the JOANN lease outlines the exclusive uses of other tenants

22  in the Seaboard Commons Shopping Center.  So it's kind of

23  like the reverse side of the coin.

24          And Number 8 on (f)(1) to the JOANN lease

25  expressly states that the tenant, JOANN, can't devote more

1   than 10,000 square feet to the sale of off-price apparel.

2            THE COURT:  I see.  So, just so I understand this,

3   at the time that your client entered into the lease with

4   JOANN, it was already bound under its Ross lease.  That lease

5   said it couldn't use more than 10,000 feet for discount

6   merchandise --

7            MR. BUSENKELL:  Square feet, yes.

8            THE COURT:  -- and JOANN's lease, essentially --

9            MR. BUSENKELL:  Mirrors that.

10           THE COURT:  -- is designed to comply --

11           MR. BUSENKELL:  Yes.

12           THE COURT:  -- with the Ross lease.

13           MR. BUSENKELL:  In fact, (f)(1) to the JOANN lease

14  lists similar exclusivity provisions with respect to all the

15  other tenants --

16           THE COURT:  Okay.

17           MR. BUSENKELL:  -- in the Seaboard Commons --

18           THE COURT:  So far so good.

19           MR. BUSENKELL:  -- Shopping Center.

20           THE COURT:  I'm with you that far.

21           MR. BUSENKELL:  Excuse me?

22           THE COURT:  I'm with you that far.

23           MR. BUSENKELL:  Okay.

24           THE COURT:  What happens next?

25           MR. BUSENKELL:  Your Honor, you know, I've

1  reviewed the Jeffers declaration that Burlington filed as an

2  offer of adequate assurance.  You know, frankly, I think it

3  reads more like an aspirational goal, rather than any

4  commitment to operate under 10,000 square feet.

5          And I apologize, Your Honor, I'm not sure if

6  you've had a chance to read that declaration.

7          THE COURT:  So, hold --

8          MS. ARGEROPLOS:  It's Docket 1468, Your Honor, and

9  it's Exhibit 1 on our exhibit list.

10          THE COURT:  I -- okay, I have that, and so --

11          Okay.  So let me ask this question, if you agree

12  that the assignee can take it, so long as the assignee is

13  bound to the same restrictions that are in your lease, then

14  what's wrong with -- and you're concerned that his

15  declaration isn't good enough, why don't you take that

16  language and put it in the order?

17          MR. BUSENKELL:  Well, that's actually what I

18  suggested to Burlington and I haven't gotten a response.

19          There's an order that Your Honor has entered in

20  the case, and, Your Honor, I'm not expecting you to remember,

21  because you've probably had dozens of these.  It's the

22  overlook --

23          THE COURT:  And I'm particularly dim.

24      (Laughter)

25          MR. BUSENKELL:  -- the overlook order --

1          THE COURT:  Uh-huh.

2          MR. BUSENKELL:  -- which includes language that

3    would give us comfort and --

4          THE COURT:  All right.  Okay.

5          I understand your position.  Look, I'd start --

6    let me -- I'm interested in hearing from them, because it

7    seems to me you're entitled to an order not to trust me, so

8    if their argument is I should just trust them, let me -- I

9    guess I'm inclined to give them the chance to explain why

10   that ought to be.

11         MR. BUSENKELL:  Sure, Your Honor.

12         THE COURT:  Okay.

13         MS. ARGEROPLOS:  I will be quick.

14      (Counsel confers)

15         MS. ARGEROPLOS:  Okay.  Thank you, Your Honor.

16         Just quickly, you know, the declaration

17   establishes that we can and will use the premises, use less

18   than 10,000 square feet.

19         THE COURT:  Okay.  So what's the problem with the

20   order so providing?

21         MS. ARGEROPLOS:  I mean, the -- if we have an

22   order that says that, that's fine.  I don't remember being

23   asked that, but that's okay.

24         THE COURT:  All right.  So, look, I can't undo the

25   conversations you've had --

1              MS. ARGEROPLOS:  Right, exactly.

2              THE COURT:  -- before, but if his ask is, just

3    take -- imagine that there was no discussion of any prior

4    conversation --

5              MS. ARGEROPLOS:  Yes.

6              THE COURT:  -- and their ask is (g), so long as

7    you're legally required to comply with the existing

8    restrictions, we've got no beef with the assignment --

9              MR. BUSENKELL:  Right.

10             THE COURT:  -- can the order so provide it?

11             I take your answer to that is "yes"?

12             MS. ARGEROPLOS:  Yes, it can.

13             We don't want the order to just be specific to

14   Ross; we'll just generally state that we will comply with the

15   existing exclusives, because there are others.

16             THE COURT:  Okay.  Well, but they should identify

17   what they are, so that if there's a dispute over the

18   enforcement, I'll understand what I've ordered.

19             MS. ARGEROPLOS:  Exactly.  That's fine, Your

20   Honor.

21             THE COURT:  Okay.  Mr. Busenkell, any problem with

22   that?

23             MR. BUSENKELL:  Your Honor, I mean, I can shed

24   some more light on that.  The language from the overlook

25   order that I know Your Honor probably doesn't recall --

1          THE COURT:  Right.

2          MR. BUSENKELL:  -- that was entered, it says:

3          Notwithstanding anything here and to the contrary,

4   from  and  after  the  closing  date,  the  restrictions  set

5   forth -- in that case, it was Exhibit F; in our case, it's

6   Exhibit F(1) and F(2) -- to the lease are, and continue to be

7   binding  on  the  tenant  under  the  lease  for  as  long  as  blah,

8   blah, blah.

9          THE COURT:  All right.  So I think I've said

10  enough words for you to understand how I think about this

11  question and that what we've got left is a wordsmithing issue

12  that I'm probably best to leave to very capable professionals

13  to work through.  If there's a dispute that arises over how

14  to capture this, everyone's rights to come back to me and ask

15  me to resolve it are reserved.  But this sounds like

16  something that a phone call should be able to resolve.

17          MS. ARGEROPLOS:  We've got it, Judge.

18          MR. BUSENKELL:  Your Honor, I'll go back to my

19  office and try to find some capable professionals, but I

20  understand what Your Honor's saying.

21      (Laughter)

22          THE COURT:  All right.  I'll leave that alone,

23  because I thought I was the only one who did self-effacing

24  humor here --

25      (Laughter)

1              THE COURT:  -- but very well.  Thank you,

2    Mr. Busenkell.

3              Okay.  So where to from here?

4              MR. REILLEY:  Your Honor, next, it's DLC

5    Management Corporation.

6              MR. FLEISCHER:  Good morning, again, Your Honor.

7              Scott Fleischer of Barclays Damon, on behalf of

8    DLC Management Corporation, the managing agent for Spring

9    Creek Owner, LLC, just the landlord of what's referred to as

10   "Store 1894, Fayetteville, Arkansas."

11             First of all, just thanks for entering my *pro hac*

12   order at Docket 1489.  With me on the line today is our local

13   counsel, Eric Langston (phonetic).

14             So, if I may proceed from here?

15             THE COURT:  You may proceed.

16             MR. FLEISCHER:  Thank you, Your Honor.

17             So, we have a similar issue with the first

18   landlord, at least, factually, in terms of timing, right.

19   This was a JOANN lease from 2010 and a Ross lease from 2024,

20   just to level set for you.

21             Let me go through, if it's all right with you,

22   some of the provisions of the JOANN use clause and the

23   assignment clause.  This was, again, somewhat in response to

24   a letter that was sent by Ross to the landlord, right,

25   highlighting this potential violation of the Ross lease.  So

1  the landlord is somewhat agnostic as to the result here and

2  just wants to make sure that if there is authority for the

3  assignment to take place, that it is for the reasons that I

4  would imagine you would rule on, which is sort of the "lack

5  of landlord consent" piece, right, to weigh in on this

6  assignment, which would then help provide comfort on that

7  Ross issue.

8        I'm not asking you to decide a Ross-lease issue

9  directly, but what I'm asking is just for, you know, a little

10  bit of allowance to read some of the lease provisions and

11  then for your ruling to be based on that.

12        THE COURT:  Okay.  Understood.

13        MR. FLEISCHER:  Thank you.

14        So, we filed an initial objection to the proposed

15  assumption and assignment at Docket 859 and followed that

16  with a supplemental objection at Docket 1473, and the latter,

17  of which was the focus of Burlington's omnibus reply and

18  these sort of Ross-related issues.

19        So the JOANN lease, again, entered into in 2010,

20  it permits the premises to be used for any lawful retail

21  purpose, as long as it's not in violation of the exclusives

22  that existed as of execution of the lease, right.  So it has

23  a whole list of them; Burlington's intended use would not

24  violate those exclusive, prohibited uses or restricted uses

25  at that time.

1          Now, the JOANN lease also has an assignment

2    provision.  It first provides JOANN with the right to assign

3    the lease, again, for any lawful retail purpose, except here,

4    it says, "that doesn't violate the then-current exclusives,"

5    meaning the exclusives that were in place at the time of the

6    proposed assignment that are applicable to the shopping

7    center.  So it's a bit of a different time measure that

8    appears to be intended there.

9          And they can do that, it says, "with the prior

10   written consent of the landlord, which consent must not be

11   unreasonably conditioned, withheld, or delayed."  It then

12   goes on to say, "Consent must not be denied where," and then

13   it lists three scenarios that all have to take place, one of

14   which is that the assignment doesn't violate, again, any

15   existing, exclusive, or restrictions of another tenant in the

16   center.  At -- it says, "At the time of the proposed

17   assignment, JOANN must remain responsible for payment of

18   rent, unless released by the landlord," and the assignee

19   would have to assume in writing all terms and provisions of

20   the lease.

21         So, I think next, perhaps, maybe the more

22   important part of the assignment provision, which says:

23         "Notwithstanding the foregoing, JOANN may assign

24   this lease without the prior consent of the landlord to any

25   entity that acquires a substantial number of tenants' stores,

1  either generally, or in the metropolitan area, where the

2  premises is located."

3          So that, perhaps, may be the easiest and most

4  direct path here in that assignment provision, to show that,

5  perhaps, the landlord does not have the ability to withhold

6  consent to this assignment, given that Burlington was the

7  successful bidder for approximately 46 of the debtors' store

8  leases; a significant portion of the portfolio.  It would be

9  obviously more significant once you consider the hundreds of

10  leases that were rejected.

11          So, if Your Honor were to rule that Burlington's

12  acquisition of approximately 46 of those leases constitutes a

13  substantial number of Jo-Ann Stores, then the inquiry should

14  seemingly end there, as it would be clear --

15          THE COURT:  Okay.  Did you dispute the correct --

16          MR. FLEISCHER:  -- the landlord --

17          THE COURT:  Do you dispute the correctness of that

18  proposition?

19          MR. FLEISCHER:  I do not dispute it.  I am

20  bringing it --

21          THE COURT:  Okay.  That seems to make it easy.

22          MR. FLEISCHER:  I'm bringing it to the Court's

23  attention, not knowing for sure, right, whether that's

24  applicable, is how I understand it.

25          THE COURT:  No, look, I understand where you are

1   and that you're -- you -- look, I get the reasonably

2   precarious position that the landlord finds itself in and I

3   don't mean to put a pin in it to make it harder for you, but

4   I can't help myself.

5        (Laughter)

6        THE COURT:  Look, I do think it's not unfair to

7   ask, you know, are you objecting -- what is your objection

8   and are you pressing it?  And I understand your position, but

9   it sounds like you don't dispute that, in fact, the --

10  Burlington has taken on a substantial number of Jo-Ann Stores

11  and that that fact triggers an override, essentially, to your

12  client's right to withhold its consent to the assignment.

13       Is that essentially correct?

14       MR. FLEISCHER:  That is an accurate statement.

15       So, I guess, with -- right -- with just, you know,

16  maybe someone's potential opinion as to that fact, what I was

17  hoping to do today was get a ruling on that fact so we would

18  be sure, right, of where that ability of the landlord to

19  withhold consent stands.

20       THE COURT:  Got it.

21       Okay.  And, look, I'm not purporting to resolve

22  any dispute other than the one that's in front of me and the

23  collateral consequences of that will be what they will be and

24  are not for me to decide.

25       MR. FLEISCHER:  Understood.

1          THE COURT:  But based on the record in front of

2    me, I'm perfectly happy to make a finding that under these

3    circumstances, the notwithstanding clause is applicable, such

4    that your client may not withhold its consent.  And on that

5    basis, I will approve the assignment.

6          MR. FLEISCHER:  Understood, Your Honor.

7          And thank you for that finding; that is very

8    helpful.  And I don't believe we have any sort of remaining

9    issues on that specific point.

10          THE COURT:  Okay.

11          MR. FLEISCHER:  We were, just as a cleanup matter,

12    finalize the cure reconciliation for this.  I don't know if

13    we want to get into this now.  I figured we could probably

14    put a pin in that and come back to it.

15          THE COURT:  If the parties are continuing --

16          MR. FLEISCHER:  I don't think we need to litigate

17    that, but...

18          THE COURT:  Yeah, if the parties are continuing to

19    talk and want time before they submit an order that addresses

20    that, I'm happy to give you that space; obviously, if there's

21    a dispute that you want me to resolve, I'm also happy to do

22    that.  But if you want time -- it sounds like you're both

23    saying, Let us continue talking and we'll come back to you if

24    we've got a problem.

25          Is that -- am I understanding that correctly?

1    MR. FLEISCHER:  Yes, it is.

2         There were some even going into last night and

3  this morning with a representative of JOANN NGA Group.  We're

4  not far apart; it's something like a few thousand dollars, so

5  I suspect we'll be able to figure that out.  And if there is

6  a need for entry of an order in the meantime, then, perhaps,

7  we can make a notation that the cure amount is still

8  subject --

9         THE COURT:  You can certainly --

10         MR. FLEISCHER:  -- to reconciliation.

11         THE COURT:  -- carve that out.  That's fine.  If

12  you want to come back and spend a hundred thousand dollars

13  litigating your two-thousand-dollar dispute, your right to do

14  that is also preserved.  So I'm happy to let -- you know,

15  enter whatever order is agreed.  That's, obviously, subject

16  to review, you know, in the ordinary course.  And then you

17  can, you know, tailor it however is appropriate, to the

18  circumstances.

19         MR. FLEISCHER:  Understood, Your Honor.

20         That works for us.

21         THE COURT:  Okay.

22         MS. ARGEROPLOS:  Thank you, Your Honor.

23         THE COURT:  All right.  So, Mr. Reilley, where to

24  from here?

25         MR. REILLEY:  Your Honor, we have two left.  Next

1  is BF Wolf Creek, LLC.

2             THE COURT:  Okay.

3             MR. LEONHARDT:  One moment, Your Honor.

4        (Counsel confers)

5             MR. LEONHARDT:  All right.  Good morning, Your

6  Honor.  For the record, Scott Leonhardt from Esbrook P.C.,

7  appearing today on behalf of landlord, BV Wolf Creek, LLC.

8             Your Honor, we did confer with counsel to

9  Burlington and have some stipulated facts to put on the

10 record.  So, as a matter of housekeeping, I'd like to proceed

11 with doing that first.

12            THE COURT:  Certainly.

13            MR. LEONHARDT:  BV -- what I'll refer to my client

14 as "BV" -- BV is the landlord and debtor Jo-Ann Stores is the

15 tenant under a November 11, 2024, written lease agreement, as

16 amended, for the lease of 23,865 square feet of retail space,

17 located at the shopping center known as the "Wolf Creek Plaza

18 Shopping Center" in Bellevue, Nebraska, defined as the

19 "Bellevue Shopping Center."

20            Previously, I sent an exhibit binder to chambers.

21            THE COURT:  That hasn't made it onto the bench,

22 but --

23            MR. LEONHARDT:  I have an extra copy, if I may

24 approach?

25            THE COURT:  Okay.  That would -- if I should read

1  it, then it would be great.

2          MR. LEONHARDT:  And I apologize, I thought my

3  office had delivered it, Your Honor.

4          THE COURT:  No -- and it may have, because this

5  could be my fault.  Never eliminate that possibility.

6      (Pause)

7          MR. LEONHARDT:  And one thing I would note, Your

8  Honor, our first exhibit, Exhibit A, is actually a copy of

9  the lease.  Burlington also admitted a copy.

10          When I was preparing -- and it always seems that

11  this is the case -- arguably, the most important provision of

12  the lease is Exhibit F, which is the restricted use

13  provisions, and the copy that's in my binder does not have

14  that, but luckily for me, the copy that Burlington admitted

15  does --

16          THE COURT:  Okay.

17          MR. LEONHARDT:  -- so I'll be relying on theirs,

18  as opposed to ours, and I apologize to all the parties for

19  that.

20          THE COURT:  Okay.

21          MR. LEONHARDT:  So back to the stipulations.

22          So, attached is a true and correct copy of the BV

23  lease, which would be the Exhibit A.  Burlington has agreed

24  to the admissibility of that, not for the truth, but it has a

25  legal effect.

1          THE COURT:  Understood.

2          MR. LEONHARDT:  BV is the landlord -- oh, I'm

3   sorry -- the Bellevue Shopping Center is a shopping center

4   within the meaning of 11 U.S.C. 365(b)(3).  BV is the

5   landlord and Ross Dress for Less, defined as "Ross" is the

6   tenant.  For other retail space in the Bellevue Shopping

7   Center, the Ross lease that's included in our binder as

8   Exhibit B is a true and correct copy.  It's admissible with

9   the caveat, not for the truth, but just for the legal effect

10  that it has.

11          On or about May 5th, 2025, Ross delivered a letter

12  to BV.  A copy of that letter is in Exhibit C to our binder.

13  That letter is admissible, not for the truth, but just for

14  the legal effect that it has.

15          The proposed assignee of the BV lease is

16  Burlington Coat Factory Warehouse Corporation.  Burlington

17  intends to engage in the operation of typical, a typical

18  Burlington store, which includes the off-price sale of

19  merchandise in the space if it becomes the new tenant under

20  the BV lease, provided that Burlington does not make any

21  representations or agreement regarding the definition of

22  "off-price sale."

23          So, with that, Your Honor, I would like to proceed

24  with the admission of BV's Exhibits A through C, with the

25  *caveat* that we're actually going to be admitting and relying

1  on the more complete version of the lease previously admitted

2  by Burlington.

3        THE COURT:  Okay.  Any objection, either to the

4  stipulation or to the admissibility of those documents,

5  subject to the limitations described?

6        MS. ARGEROPLOS:  No objection.

7        THE COURT:  Okay.  So those will be admitted under

8  those terms and you can proceed.

9     (BV Wolf Creek Exhibits A, B, and C received into

10  evidence)

11        MR. LEONHARDT:  Great.  Thank you, Your Honor.

12        And if it's okay with Your Honor, I think my facts

13  are very similarly situated to BLS, except we don't have the

14  "notwithstanding."  But before we dive into the facts, I have

15  to confess, I'm having a little trouble with the law, so I

16  was hoping we could unpack that first --

17        THE COURT:  Certainly.

18        MR. LEONHARDT:  -- if that's okay with you?

19        Okay.  So we have 365(b)(3).  Congress added it to

20  provide special protections to landlords of shopping center

21  leases.  The key provision for purposes of today

22  is 365(b)(3)(C), and that, of course, enhances what's

23  required for adequate assurance before a lease of a

24  commercial shopping center can be assumed and assigned.  And

25  the next of that statute provides that assumption or

1  assignment of such lease is subject to all provisions thereof

2  including, but not limited to provisions such as radius,

3  location, use, or exclusivity provisions, and will not breach

4  any such provision contained in any such lease, financing

5  agreement, or master agreement related to such shopping

6  center.

7  THE COURT:  Uh-huh.

8  MR. LEONHARDT:  So, this has been interpreted by

9  this Court, and I know Your Honor has relied on Judge

10  Stickles' ruling in Big Lots to read in that that provision

11  on the non-assignability if there's a violation of the use

12  restriction, applies to those leases in effect as of the date

13  of --

14  THE COURT:  Uh-huh.

15  MR. LEONHARDT:  -- the lease that's purported to

16  be assigned.  So I appreciate that, and I may disagree with

17  it, but I think it's important that we ask, then, why?  You

18  know, how did we get there?  How did we write that into what

19  Congress put into the Bankruptcy Code?

20  THE COURT:  Uh-huh.

21  MR. LEONHARDT:  So, I would refer to the

22  transcript that's actually attached to Burlington's amended

23  reply.  And I know judges here aren't, were not thrilled when

24  we're reading from transcripts of other judges just to

25  (indiscernible) --

1          THE COURT:  It doesn't bother me.

2          MR. LEONHARDT:  Okay.  (Indiscernible) right all

3  along.  So I would -- and Judge Stickles says:

4          "Applying the plain language argument would mean

5  that the debtors are bound by restrictive use provisions and

6  other leases that were entered into after Big Lots' lease,

7  making the broad assignment provisions and negotiated for by

8  Big Lots, unenforceable, based on the landlord's supplemental

9  agreement with a third party that the debtors were not a

10 party."

11         And then she goes on to say:

12         "Landlords would be permitted to eviscerate the

13 debtors' negotiated bargain.  A broad assignment provision by

14 subsequently entering into an agreement with any third party

15 in the same shopping center that restricts use as the debtor

16 was expressly permitted to have under the lease."

17         So I'm just trying to understand why in this

18 district, where we're adding this provision to 365(b)(3)(C),

19 and particularly, the second clause.  And my understanding is

20 that we're doing that to respect the broad assignment

21 provisions that were negotiated for by debtors and that if

22 the debtors had agreed with a tenant that this lease can be

23 assigned, we're not going to rewrite that lease by operation

24 of 365(b)(3)(C).

25         Is it -- am I -- is that it or what am I missing?

1              THE COURT:  Look, let me say a few things --

2              MR. LEONHARDT:  Okay.

3              THE COURT:  -- for what it's worth.

4         First of all, I'll say a few words about my

5    general approach to this kind of question.  I think as a

6    general proposition, it is better for all parties if the law

7    is as clear and consent as possible, and that clear and

8    consent is, in some ways, more important than perfect.

9    Sometimes some of what we do is a little bit like, which side

10   of the road do we drive on; like, we could live with either,

11   but have the answer be, Well, it kind of depends on which

12   judge's name comes off the wheel, is a sort of bad way to

13   resolve that kind of question.

14             I think that if I were looking at this from first

15   principles, you could make reasoned arguments about

16   reading 365(b)(3)(C) either way.  That you can say, on the

17   one hand, look, it's a general rule that when a Court enters

18   a judgment, you look at the facts as of the time the Court is

19   entering the judgment.  And you could you say on that basis,

20   look, it is subject to a restriction as of now and it says

21   that those restrictions are enforceable.  That's not --

22   that's a colorable argument.

23             I also think it's a perfectly colorable and

24   rational argument to say, Oh, come on, this is -- that it

25   would -- it doesn't -- it makes more sense to read this to be

1    directed to the point of time at which the debtor enters into

2    the agreement with the landlord at issue, and that if you

3    read it any other way, it would sort of be inconsistent.

4    That it wouldn't make sense to have the estate's rights,

5    right -- the estate here is the successor to the debtor, and

6    that it wouldn't make sense to have the estate's rights

7    diminished by virtue of a subsequent agreement that the

8    landlord enters into, over which the debtor didn't have

9    control.

10            Candidly, I think the case for reading it that way

11    is enhanced by some of what we heard earlier today, which is

12    there are circumstances in which landlords -- there's an

13    express agreement between the parties to excuse the debtor

14    from a later-arising agreement.  So we had that provision in

15    the BF Wolf Creek dispute, in which there was a provision

16    that basically was limited to the circumstances at the time.

17            And to me, if you had that and didn't have the

18    "notwithstanding provision" on which that case resolved, you

19    could say this case would be different from Big Lots.  And if

20    the debtor entity expressly agrees to be bound by subsequent

21    agreements, over which it has no control, then the notion

22    that the estate should be in the same position as the debtor

23    would be a pretty persuasive one.

24            But I do think the fact that that's a sort of

25    commercially common thing supports the view of Big Lots and

1  of the other case, whose name I forgot --

2        MS. ARGEROPLOS:  Bed Bath & Beyond.

3        THE COURT:  -- and Bed Bath & Beyond, that we,

4  otherwise, should read (b)(3) the way those Courts have read

5  it.

6        And to me, look, where you have arguable,

7  colorable cases on both sides, my own disposition is that

8  following the decision of one of my colleagues is better for

9  the law, which isn't to say if I looked at it and said, I

10 can't bring myself there, I wouldn't say no, and I've --

11 there've been circumstances where I've done that, but this

12 isn't one of them.  I -- this is a case where I think I'm

13 not -- I'm not at all disrespectful to your point.  I could

14 imagine a Court coming out that way, but I think this

15 argument is, candidly, at least as strong and the interests

16 of predictability and clarity counsel strongly in favor for

17 following that precedent.

18        So, that's where I am.  I don't know if that's

19 helpful to you.

20        MR. LEONHARDT:  Extraordinarily helpful and I

21 really appreciate it.

22        THE COURT:  Okay.

23        MR. LEONHARDT:  So I would say we're at least

24 accepting in Judge Stickles' ruling, as you alluded to, that

25 the parties can provide an intent in the precise language of

1  the assignment provision and, if there was a notwithstanding,

2  then it would be a different analysis.  So I think that is a

3  great time to take us to our assignment provision, which is

4  in Section 23.

5          THE COURT:  Okay.  That's Exhibit A in your

6  binder?

7          MR. LEONHARDT:  Yes.  And my binder -- my binder

8  actually does have 23.  I will let you -- I can point you to

9  their exhibit that has Schedule F, which we --

10          THE COURT:  Right, I understand.

11          MR. LEONHARDT:  -- I don't think we need to go to,

12  but we can -- Exhibit F, rather.

13          THE COURT:  Section 23 on page 32.

14          MR. LEONHARDT:  Assignment and subletting?

15          THE COURT:  Yep.

16          MR. LEONHARDT:  Okay.  So this says, "Tenant has

17  the right to assign this lease or sublet all or any part of

18  the premises for any lawful retail use with landlord's prior

19  written consent not to be unreasonably withheld, conditioned,

20  or delayed, and which consent shall not be denied if such

21  assignees or subtenants' use is a retail use and does not

22  violate any prohibited uses or any exclusive rights granted

23  to other tenants in the shopping center that exist on the

24  date of the assignment or sublease."

25          THE COURT:  Yep.

1    MR. LEONHARDT:  So I would respectfully submit we

2  don't have the notwithstanding here and, per Your Honor's

3  commentary, we're distinguishable and actually relying kind

4  of on the reasoning of Big Lots --

5    THE COURT:  Oh, I see.  You're saying here that

6  the sublease at the end of one means the -- so let's slow

7  down.

8    MR. LEONHARDT:  It's not the hallmark of clarity,

9  Section 23.

10    THE COURT:  Well, that's unfortunate because

11  that's what I think we have to make sense of.

12    MS. ARGEROPLOS:  Well, I'll respond, Your Honor.

13  I mean, we've got arguments too.

14    THE COURT:  I understand, but let me try to do

15  this in a vaguely orderly way, just for a change of pace.

16    (Laughter)

17    THE COURT:  Tenant has the right to assign this

18  lease or sublet all or any part of the premises with the

19  consent not to be reasonably withheld if the assignee or --

20  so it talks separately about assignee and subtenants, right?

21  It's about both assignment and sublease.  On the date of the

22  assignment or sublease.

23    I see.  So you're saying that this contemplates

24  the possibility that after the debtor had entered this

25  agreement that we have essentially the case that I said we

1    didn't have in BV, which is a case in which the debtor when

2    it entered into the lease with your client sort of expressly

3    agreed that the counterparty, the landlord, could restrict

4    itself further, and that the debtor would be bound by those

5    restrictions if it did.

6            MR. LEONHARDT:  Correct, and I think it's the only

7    fair reading.  And I know, you know, my friends at Burlington

8    have a different reading of Section 23 --

9            THE COURT:  Okay.  Well, they'll have a chance to

10   tell me what that is.

11           MR. LEONHARDT:  Okay, and maybe I'll rebut that.

12   I think it's plain on its face.  So maybe we'll get the

13   benefit --

14           THE COURT:  All right --

15           MR. LEONHARDT:  -- of their contentions --

16           THE COURT:  -- fine.

17           MR. LEONHARDT:  -- and I could -- okay.

18           THE COURT:  Okay, very well.  Thank you,

19   Mr. Leonhardt.

20           MR. LEONHARDT:  Sure.  And may I just make one

21   more point?

22           THE COURT:  You may.

23           MR. LEONHARDT:  Okay, thank you.  So the other

24   point is, well, what are the use provisions existing as of

25   the date this lease was entered into.

1          THE COURT:  Right.

2          MR. LEONHARDT:  We had the same chronology problem

3 that all the other landlords you had today.  JOANN's lease

4 is 2014, the Ross lease is 2018.  So, if we look at what the

5 permitted use is -- and this is where I actually need

6 Burlington's exhibit -- that appears on page 4 of the lease,

7 Section 2(o) --

8          THE COURT:  So, in their binder, which exhibit is

9 your lease?

10          MS. ARGEROPLOS:  7, Your Honor.

11          THE COURT:  Okay, thank you.

12          Okay.  And, I'm sorry, which section?

13          MR. LEONHARDT:  2(o) on page 4.

14          THE COURT:  All right, now I'm confused because I

15 think Exhibit 7 in your binder, if I understand it

16 correctly -- oh, no, I'm looking at the Myrtle Beach binder.

17 Hold on.

18          MR. LEONHARDT:  And I have a lot of binders and

19 I've added to the confusion, so I apologize to Your Honor.

20          THE COURT:  I'm sure it's in the -- I can pull up

21 the document.  Hold on one second.

22          MS. ARGEROPLOS:  I've got a binder right for you.

23          THE COURT:  Oh, okay.  I'm also happy to do it

24 that way.  Thank you, thank you very much.

25      (Pause)

1          THE COURT:  Okay, page 4 -- I'm sorry, permitted

2  use, the section (o), is that where we are?

3          MR. LEONHARDT:  Yes.

4          THE COURT:  As set forth in Exhibit F, and then I

5  have to turn to Exhibit F.

6          MR. LEONHARDT:  Yes.  And of course that was the

7  one I was missing.

8          THE COURT:  Right, okay.

9          MR. LEONHARDT:  And then if we look at Exhibit F,

10  8, Gordmans, owner hereby agrees during the term of this

11  lease, provided tenant is not in material default here or

12  beyond the expiration of any notice or cure period, is not to

13  lease, sell, permit any space in Wolf Creek Plaza, as

14  identified by outline red in Exhibit A, for use as a Goodwill

15  store, Kohl's, Mervyn's, Ross Department Stores, TJMaxx, et

16  cetera.

17          THE COURT:  Okay.

18          MR. LEONHARDT:  So I would respectfully submit

19  that under the existing terms of this lease that having Ross

20  come in would violate the use provision.

21          And maybe I should have led with that.  I was

22  honestly interested in 365(b)(3).

23          THE COURT:  So, I'm sorry, help me.  So what in 8

24  prohibits the assignment to -- this identifies not -- they

25  agree that they won't permit a lease to a number of entities,

1  which doesn't include the assignee here.

2          MR. LEONHARDT:  Right.  So (o) says you can use

3  this space for anything as long as it doesn't violate any use

4  restrictions with these tenants on Exhibit F.  Exhibit F

5  lists the use of restrictions and Gordmans on Exhibit F-8

6  says no Ross.

7          THE COURT:  Right, but this isn't an assignment to

8  Ross, it's an assignment to Burlington.

9          MR. LEONHARDT:  Oh, right, right, right, right.

10  Okay.  Okay, I'll drop that one.

11          THE COURT:  Okay.

12          MR. LEONHARDT:  I got confused on that.

13          THE COURT:  No worries.

14          MR. LEONHARDT:  Okay.  Well, I think that's enough

15  on that.  Let's go back to 365(b)(3)(C).  I would

16  respectfully submit, I think there are -- I think,

17  respectfully, Judge Stickles got it wrong.  I appreciate the

18  benefit of having consistent precedent within this court, but

19  I think this is distinguishable.  And maybe we can agree to

20  disagree on the second clause of 365(b)(3)(C), but we can't

21  ignore the first and the second clause.  And going back to

22  that first clause, it says it's subject to all the provisions

23  thereof, and I would say all the provisions thereof include

24  the assignment provision that would prohibit an assignment

25  that violates a use.

1          And I would just -- just to close out, the Ross

2   lease is in the record and that has a similar restriction on

3   operating, you know, discount retailers, the same provision I

4   think you've seen over and over.

5          THE COURT:  Okay.  So, I'm sorry, I'm stuck -- and

6   maybe this doesn't matter -- the distinction between what you

7   refer to as the first and second clauses of (b)(3)(C).

8          MR. LEONHARDT:  Yeah, so let's take another look

9   at it.

10          THE COURT:  Yes, walk me through it.

11          MR. LEONHARDT:  Yeah, that assumption or

12   assignment of such lease is subject to all provisions

13   thereof.

14          THE COURT:  Right.

15          MR. LEONHARDT:  So I would say that means the

16   assignment provision.

17          THE COURT:  Right, and the question -- well, I

18   see, but there I think the specific provisions of 365 that

19   override anti-assignment provisions is more -- speaks more

20   directly to this question, and that that's just an

21   application of the ordinary principle that the specific

22   controls over the general.  And the Code expressly deals with

23   assignment provisions and says in connection with executory

24   contracts we don't respect prohibitions on assignment, which

25   gave rise to the reason for the rest of this provision, which

1 is to say we're not going to allow that to run over a

2 landlord's ability to maintain the basic nature of the

3 shopping center, and it does that by enforcing the

4 provisions -- holding aside anti-assignment provisions --

5 that relate to the categories addressed here.  And the

6 question then is, as of when, and right there that's what Bed

7 Bath & Beyond and Big Lots say, it's as of the time of the

8 agreement with that counterparty.

9        You have an argument here, which I think I'm

10 interested in hearing the other side's response to, which is

11 that's all fine and good, but if the debtor expressly agrees

12 to be subject to whatever its landlord restricts later, then

13 the estate shouldn't be better situated than the debtor was

14 beforehand.  And I guess that makes some sense to me, but I'm

15 interested in hearing from the other side.

16        MR. LEONHARDT:  Got it.  Okay.  And I would just

17 also go back to when we're reading that second clause and we

18 said as of the time, again, the reasoning, Judge Stickles in

19 Big Lots was respecting the assignment provisions.  So I

20 think we have to look at the why we're modifying the second

21 clause, and that's informed by this respect for assignment.

22 So I don't see -- if the why we're modifying that provision

23 of Section 365(d)(3) is because of an assignment provision

24 and we can't use it to overrun it, I think then we also have

25 to go back to the assignment provision.

1          And I think, as far as the anti-assignment

2   provisions, is that -- are you referring to 365(f)?

3          THE COURT:  Yes.

4          MR. LEONHARDT:  And 365(f) says subject to 365(d)?

5          THE COURT:  Right, right, and that makes sense.

6   That's sort of what we're talking about.  We don't generally

7   enforce anti-assignment clauses, we do enforce them where the

8   assignment will effectively change the nature of the shopping

9   center to the extent the landlord negotiated for those

10  protections in its lease with the debtor, and the question

11  is, is it just the terms as of then or if there are

12  subsequent changes do those also -- if the landlord binds

13  itself later to restrictions, do those also prohibit what the

14  trustee in bankruptcy can do.

15         And, again, where I am tentatively subject to

16  hearing the other side is, no, for the reasons that Judge

17  Papalia and Judge Stickles said, we don't impose on the

18  estate subsequent restrictions, A; B, maybe there's an

19  exception to that where the debtor at the time it entered

20  into the lease expressly subjected itself to being further

21  restricted.

22         So that's where I am.  Again, I think I

23  understand -- am I understanding your position?

24         MR. LEONHARDT:  Yeah, you got it.

25         THE COURT:  All right.  And I'm happy to hear from

1  Burlington.

2          MS. ARGEROPLOS:  Thank you, Judge.

3          So there are -- like the other leases, there are

4  often conflicting provisions in the lease that's being

5  assigned and in others, and we can --

6          THE COURT:  Terrific.

7          MS. ARGEROPLOS:  Yeah.

8      (Laughter)

9          MS. ARGEROPLOS:  I mean, it's great, but the whole

10 point of -- you know, the whole point of interpreting the

11 Code in the context of the lease that's being assigned

12 and 365(b)(3)(C) starts with all provisions thereof, we can't

13 allow the landlord to cherry-pick the one that --

14         THE COURT:  No, if in context he's reading the

15 lease incorrectly, that's a perfectly fair response.  So what

16 else should I look at?

17         MS. ARGEROPLOS:  So we have to look at the Ross

18 exclusive in its lease, Section 15.3, that is Mr. Leonhardt's

19 Exhibit 2, and Section 15.3(b)(iii) of the Ross lease states

20 that the Ross exclusive is not intended to affect existing

21 tenants set forth on Exhibit K.

22         THE COURT:  So, slow down because now the moving

23 parts are moving too fast for my little brain.

24         MS. ARGEROPLOS:  I need to pull it up myself,

25 Judge.

1        THE COURT:  So --

2        MS. ARGEROPLOS:  Okay, it would be page 59 on the

3    bottom of --

4        THE COURT:  Okay, so I see the Ross lease --

5        MS. ARGEROPLOS:  -- it will be 63 of the docket

6    stamp, it will be page 63 of the PDF.

7        THE COURT:  Okay.  So I've got the binder version

8    and it's on page 59.  It says in 15.3(a) --

9        MS. ARGEROPLOS:  Yeah.

10       THE COURT:  -- is that where we are?

11       MS. ARGEROPLOS:  (a) is on page 58, right.  Okay.

12   So --

13       THE COURT:  Right, it starts on page 58.  So what

14   particular language are you talking about?

15       MS. ARGEROPLOS:  If you go to the next

16   page, 15.3(b)(iii).  So, go to --

17       THE COURT:  So my 15.3(b) has romanettes (i)

18   and (ii) --

19       MS. ARGEROPLOS:  It's (ii).

20       THE COURT:  -- on page 59.

21       MS. ARGEROPLOS:  I can read, Judge, I promise,

22   it's (ii).

23       THE COURT:  Okay, got it.  15.3(a), which is the

24   restriction --

25       MS. ARGEROPLOS:  Yes.

1          THE COURT:  -- is not intended to prevent

2    drugstores such as or appliance retailers --

3          MS. ARGEROPLOS:  If you skip to the end, nor is it

4    intended to affect the existing tenants set forth on

5    Exhibit K.

6          THE COURT:  Okay.

7          MS. ARGEROPLOS:  All right.  And if we go down to

8    Exhibit K, I believe it's the very last page.  Yeah, there's

9    a list of existing leases.

10          THE COURT:  And it says JOANN Fabrics.

11          MS. ARGEROPLOS:  Right, at number 7.

12          THE COURT:  Okay, so let's put these pieces

13    together.

14          MS. ARGEROPLOS:  Sure.  So, Exhibit --

15    so 15.3(b)(ii) says that the exclusives granted to Ross

16    in 15.3(a) do not affect JOANN's, who is listed on Exhibit K.

17          THE COURT:  I see.  So you're -- so let's just

18    take this in incremental steps.

19          MS. ARGEROPLOS:  Yes.

20          THE COURT:  So, I take it -- well, I don't want to

21    put words in your mouth, but I think what I understand you to

22    be saying is, okay, Judge, even if it's true that when the

23    debtor agrees in the initial lease with the landlord to be

24    bound by subsequent restrictions that the landlord may enter

25    into with later tenants --

1          MS. ARGEROPLOS:  Right.

2          THE COURT:  -- notwithstanding the fact that as a

3  general matter under <u>Best Buy</u> -- under <u>Bed Bath & Beyond</u> and

4  <u>Big Lots</u> we freeze things at the time that the debtor enters

5  into its contract with the landlord, even if we will respect

6  that when the debtor agrees to, here what the debtor agreed

7  to still has an exception that would permit this assignment

8  because the --

9          MS. ARGEROPLOS:  Because the restriction does not

10  apply to the debtor.

11          THE COURT:  -- because the Ross lease has a total

12  carveout for the debtor.

13          MS. ARGEROPLOS:  Exactly.

14          THE COURT:  So this really interesting

15  intellectual question about whether there's an exception to

16  the principle doesn't need to be reached because, even if

17  there is one, we get to the same outcome.

18          MS. ARGEROPLOS:  Right.  And to the extent JOANN

19  agreed on -- I don't remember when the lease was executed,

20  but at execution, to the extent JOANN agreed that it would

21  abide by future exclusives this is a provision that does not

22  apply to JOANN.  So it said, I will agree to things that you

23  do in the future, but the thing that the landlord did in the

24  future doesn't affect JOANN.

25          THE COURT:  Got it.  Okay, I under --

1          MS. ARGEROPLOS:  And that's --

2          THE COURT:  -- all right.

3          MS. ARGEROPLOS:  -- we've got to read all the

4  provisions, right?  And this is -- and so, outside of

5  bankruptcy, JOANN could assign this lease, and that should

6  not change inside of bankruptcy.

7          THE COURT:  It shouldn't be -- it certainly

8  shouldn't be worse off --

9          MS. ARGEROPLOS:  Exactly.

10          THE COURT:  -- in bankruptcy than outside.

11          Okay.  Mr. Leonhardt, what's your response to

12  that?  That on its face is pretty persuasive, so what's your

13  response?

14          MR. LEONHARDT:  Sure.  And we're talking about

15  reading everything, let's go to Exhibit C.  So this is the

16  letter from Ross.

17          THE COURT:  Yep.

18          MR. LEONHARDT:  The second paragraph, while the

19  protection provision does not contain an exception for

20  existing tenants, the exception only extends to signees or

21  sub-lessees of existing tenants, to the extent landlord does

22  not have a right under the JOANN lease to withhold consent to

23  such assignment or sublease, or any change in the use that is

24  otherwise permitted under the JOANN lease.

25          MS. ARGEROPLOS:  I mean -- can I respond, Judge?

1          THE COURT:  Yeah, you may.

2          MS. ARGEROPLOS:  Yeah.  I mean, one, this is the

3    Ross letter, but still, if we look at Section 23(a) of

4    JOANN's lease, which is -- I think that's what's being

5    referred to -- this section does not condition or prohibit

6    any action by the tenant to assign the lease.  This lists

7    out -- this actually restricts the landlord.  The landlord

8    agrees in Section 23(a), I will not withhold my consent if

9    these three conditions exist.  What Ross is doing is saying,

10   please withhold your consent, but that doesn't mean that the

11   lease is not assignable.  We have things that the lease --

12         THE COURT:  Yes, I understand.

13         MS. ARGEROPLOS:  Okay, I will --

14         THE COURT:  I understand.  Okay, anything further?

15         MR. LEONHARDT:  Yes.  I would just like to add,

16   Your Honor, I think we should not read provisions in a way

17   that obviate Section 23 in its entirety.  23 was put there

18   for a purpose and we shouldn't have a reading that renders it

19   superfluous.

20         THE COURT:  But make sense of (b)(ii), though,

21   (b)(ii) says -- it's not superfluous, it applies to people

22   who aren't listed on Exhibit K, but (b)(ii) says it doesn't

23   apply to those listed on K and JOANN is listed on K.  So why

24   don't we just give that it's natural and ordinary meaning?

25         MR. LEONHARDT:  Does it apply to the assignees of

1  Exhibit K.

2          THE COURT:  Well, that's an interesting question,

3  but I don't know that that's in front of me now.  You could

4  argue the assignee gets what the assignor had.

5          MS. ARGEROPLOS:  It's the debtor's right under the

6  lease that it has.  If the language broadly says this does

7  not apply to JOANN, how can it only apply to some of JOANN's

8  rights and not all of them under this lease?

9          MR. LEONHARDT:  The lease that they negotiated,

10 that JOANN negotiated with my client says we don't have to --

11 and we don't consent -- we don't have to consent to an

12 assignment that violates a use provision.  And the use

13 provision, their whole argument is teed on the use

14 provision -- even though it says as of the date of the

15 assignment, let's not forget about that language, and their

16 argument is, well, the Ross lease, the grandfather provision

17 also applies to assignees.

18          MS. ARGEROPLOS:  No, that's not our argument.

19 We're saying that the Ross lease expressly excepts JOANN from

20 the people that can't be -- or from the Ross exclusive use

21 granted by the landlord.  And Section 23, the assignment

22 provisions, opens with tenant has the right to assign this

23 lease or sublet any part of the premises for any lawful

24 retail use, which consent shall not be denied if.

25          So we have -- there is an excluded middle here,

1   the lease says you can do this, you can use the premises for

2   this.  The lease says I'm not going to withhold my consent if

3   these three things are satisfied, but the landlord doesn't

4   have to consent.

5          THE COURT:  With respect to JOANN?

6          MS. ARGEROPLOS:  With respect to JOANN, right.

7          MR. LEONHARDT:  And, again, it says JOANN can use

8   it for these purposes, it doesn't say JOANN's assignee can

9   use it for these purposes.

10          THE COURT:  Yeah, I don't think that reading makes

11   sense.  I think that -- I think this is -- I don't know how

12   you would write this in order to protect JOANN's right to

13   make assignments other than this way.

14          So, look, I'm -- I think I'm prepared to rule.  I

15   appreciate the argument, this was interesting and helpful,

16   but I'm persuaded -- look, I still think that -- for the

17   reasons I described, I'm inclined to follow the basic

18   approach in Bed Bath & Beyond and in Big Lots.  I am open to

19   the proposition that in a case in which the debtor at the

20   time it entered into the lease with the landlord in question

21   agreed to the proposition that it could be restricted based

22   on that landlord's entering into further agreements with

23   somebody else that there's nothing in -- notwithstanding the

24   rationale in Big Lots that that sort of situation -- that the

25   estate -- if the debtor had given that away prepetition, it

1   shouldn't be taken back by the bankruptcy filing, that we

2   should follow the basic thinking, you know, reflected in

3   Butner and in Chicago Board of Trade about essentially the

4   bankruptcy neither expanding nor contracting in this regard.

5          So, I'm not ruling on that, but I'm open in an

6   appropriate case to hearing and considering that kind of

7   argument, even accepting the rationale of Big Lots, but here

8   I'm persuaded that in these circumstances, while the debtor

9   at some level did agree to future restrictions, the future

10  restrictions at issue have a carveout for the debtor that is

11  controlling.  Here, I think that's the best way to read these

12  provisions, and for that reason, whatever you think about the

13  interesting question I flagged, we don't need to resolve it

14  because the terms of the agreement have a carveout that is

15  applicable here.

16         So, for those reasons, I'll enter an order

17  authorizing the assignment.  And if the parties can submit an

18  appropriate order, that would be helpful.

19         THE COURT:  Mr. Reilley --

20         MR. REILLEY:  Your Honor --

21         THE COURT:  -- one more to go.

22         MR. REILLEY:  -- one more and it's LL -- or it's

23  LLN Enterprises, Inc.

24         THE COURT:  Okay.

25         MR. BUSENKELL:  Mike Busenkell again from Gellert

1  Seitz Busenkell & Brown, this time on behalf of LNN

2  Enterprises, the landlord for the property in Flagstaff,

3  Arizona.

4          We did file an objection based on a use provision.

5  The use provision in this case states that, quote, "The

6  premises shall be used for the purpose of the operation of a

7  retail sale of all types of fabrics, notions, arts and

8  crafts, artificial flowers, sewing machines, and other items

9  normally sold in a fabric and arts and crafts store," close

10 quote.

11         I heard Your Honor's comments during your colloquy

12 with I forget which landlord regarding the use provision.  We

13 raised the objection.  These premises are located in a

14 shopping center, we believe that pursuant to 365(b)(3) that

15 those use provisions should be enforced.

16         THE COURT:  So, slow down.  The language -- is

17 this the anti-assignment in disguise or is this just the

18 timing issue?  Help me with what particular --

19         MR. BUSENKELL:  Well, I don't necessarily agree,

20 but based on what your comments were earlier, I think you

21 would view it as an anti-assignment provision in disguise.

22         THE COURT:  Well, look, let's tease that out

23 because, to me, if the language is written to be this is

24 about JOANN, as I think was acknowledged in the earlier case,

25 that's one thing, if it says stores in the broad category

1 that are kind of like JOANN, but still allows meaningful

2 assignment to other things that exist in the universe, that

3 isn't necessarily the same.  So, walk me through -- is the

4 language in front of me?

5           MR. BUSENKELL:  It should be --

6           THE COURT:  It's in the debtors' binder --

7           MS. ARGEROPLOS:  It's the debtors' binders -- not

8 debtors, sorry, it's in Burlington's binder --

9           THE COURT:  Burlington, I'm sorry.

10          MS. ARGEROPLOS:  -- at Tab 11.

11          THE COURT:  Tab 11.  All right, and so what's the

12 provision?

13          MR. BUSENKELL:  It's the use-of-premises clause --

14          MS. ARGEROPLOS:  Oh, sorry, Tab 10, Your Honor.

15          THE COURT:  Okay, Tab 10.  Use of premises,

16 paragraph 4.

17          I see, so this says it should be limited to a

18 fabric/arts and crafts store.

19          MR. BUSENKELL:  That's right.

20          THE COURT:  And, therefore, you believe that this

21 could be assigned to Michaels --

22          MR. BUSENKELL:  Michaels --

23          THE COURT:  -- or --

24          MR. BUSENKELL:  -- Hobby Lobby.  You know, I don't

25 know of any others, but --

1          THE COURT:  Okay.

2          MR. BUSENKELL:  -- yes.  I don't think it would

3    prohibit the assignment to one of those, we submit that it

4    does prohibit the assignment to Burlington.

5          THE COURT:  Okay.  Let me hear from Burlington on

6    that issue.

7          MS. ARGEROPLOS:  Well, first, I will point Your

8    Honor to the declaration of Mr. Amendola, which says -- which

9    testifies that Michaels, Hobby Lobby, no other fabric and

10   craft stores bid for any of the leases that are in the

11   package.

12         THE COURT:  Well, that's -- why is that either

13   here or there to the relevant question?

14         MS. ARGEROPLOS:  Sure, Judge.  I mean, it makes

15   the -- it tips the scale -- and this is more of an anti-

16   assignment provision in disguise because, theoretically, it

17   could have happened, but here it didn't.  And the --

18         THE COURT:  Well, look, I mean, imagine you have a

19   legitimate use restriction that says no discount stores, that

20   would be enforceable, and the only potential buyer was a

21   discount store, there was no assignee other than that, is

22   that a reason to just ignore the statute?

23         MS. ARGEROPLOS:  No, and that's not exactly the

24   situation we have here.  It says premises shall be used for

25   basically what JOANN does, but the fourth amendment also says

1  that tenant may not assign the lease without the prior

2  written consent of landlords, such consent shall not be

3  unreasonably withheld, and it also has a provision in

4  Section 6.1 of the sublease that the sub-lessee may change

5  its use to any other lawful use without -- and the sub-lessor

6  shall not unreasonably withhold -- or withhold consent to

7  that use.

8          So the provision is narrow in paragraph 4 of the

9  fourth amendment in Tab 10, but, again, there are conflicting

10  provisions in --

11          THE COURT:  So, show me the other provisions that

12  I should focus on.

13          MS. ARGEROPLOS:  Paragraph -- let's see, there's

14  paragraph 7 in Tab 10 that is the you can assign with our

15  prior written consent --

16          THE COURT:  Notwithstanding --

17          MS. ARGEROPLOS:  -- and then if you look at

18  Section -- let's see -- it would be in the original lease,

19  which is Tab -- bear with me, Your Honor, excuse me -- Tab 9

20  is the lease and Tab 8 is the sublease -- or, I'm sorry,

21  Tab 9 is the sublease.  So, if we go to Section 6.1 of that,

22  which is on page -- it's on the third page of Tab 9.

23          THE COURT:  Yes.  Page 2 of the document, 6.1,

24  use, notwithstanding anything set forth in Exhibit A?

25          MS. ARGEROPLOS:  Right.  So that first sentence

1   was replaced by the fourth amendment, by the terms of the

2   fourth amendment, but it says specifically in the fourth

3   amendment the first sentence is replaced, it does not disturb

4   the rest of Section 6.1.

5           If you look at the second sentence, that is where

6   it says -- let's see --

7           THE COURT:  Sub-lessee may, with sub-lessor's

8   written approval, alter such use to another lawful use

9   provided that sub-lessee is not then in default under this

10  sublease.

11          MS. ARGEROPLOS:  Right.  So, if we look at the

12  entire lease, we're looking at a lease that does allow the

13  debtor to change the way the premises are used.  And while

14  the one use provision does seem extremely narrow in light of

15  the rest of the lease, that's not the bargained-for intent

16  that was -- or that's not the intent that was bargained for

17  in the entirety of the lease.  And so really all we're up

18  against here is the landlord's consent, which can't be

19  unreasonably withheld and which can be overruled by this

20  Court via Section 365(f).

21      (Pause)

22          THE COURT:  So, I apologize for being the slowest

23  one in the room here, but can you just walk me through -- and

24  this is probably something I should have understood better

25  before getting on the bench, but help me with the

1   relationship between the lease and the sublease and how these

2   different pieces fit together.

3             MS. ARGEROPLOS:  Sure.  So, the lease -- the

4   original lease is very old, and then --

5             THE COURT:  I see.

6             MS. ARGEROPLOS:  -- the -- and then the premises

7   was sublet from -- the original tenant was a grocery store,

8   who then sublet the lease to a So-Fro Fabrics, which

9   eventually merged into JOANN.

10            THE COURT:  Okay.

11            MS. ARGEROPLOS:  And so then, in like the 90s or

12  later, the lease -- the master lease still exists from

13  like 1974, the sublease is from I think 1991, that might be

14  right, but after a while both documents were amended by JOANN

15  and the landlord in a single document.  So that's why the

16  fourth amendment says the master lease is amended this way

17  and the sublease is amended this way.

18            THE COURT:  Okay.  So --

19            MS. ARGEROPLOS:  So it is a lot of documents --

20            THE COURT:  -- Exhibit --

21            MS. ARGEROPLOS:  -- going around.

22            THE COURT:  -- Exhibit 10, which is the fourth

23  amendment --

24            MS. ARGEROPLOS:  Right.

25            THE COURT:  -- that's the most recent document --

1           MS. ARGEROPLOS:  Correct.

2           THE COURT:  -- and it's between the --

3           MS. ARGEROPLOS:  The debtor and the landlord.

4           THE COURT:  -- the debtor and the landlord, and

5    it's the one that says here are the specific permitted uses

6    of the premises.

7           MS. ARGEROPLOS:  Correct.

8           THE COURT:  And you're saying that the original

9    sublease --

10          MS. ARGEROPLOS:  Is not modified.

11          THE COURT:  -- and that under that original

12   sublease you --

13          MS. ARGEROPLOS:  The debtor has the right to

14   change its use.

15          THE COURT:  So does that make any sense

16   commercially?  If you have a general right to do whatever you

17   want and then you subsequently amend it and say but this is

18   specifically what we're allowed to do, don't you think that

19   ought to control over the general?

20          MS. ARGEROPLOS:  Well, there is also a specific

21   statement in the fourth amendment that says the first

22   sentence is replaced with the following and not the second or

23   third.

24          THE COURT:  I see.  The first two paragraphs of

25   Section 6 of the master lease and the first sentence of

1   Section 6.  Okay, that's a fair point.

2           So, the first sentence of Section 6 of the

3   sublease, and that's where we were.  And that's 6 -- oh, so

4   it's replacing only 6.1.  I see.  It's only the first

5   sentence of 6.1 --

6           MS. ARGEROPLOS:  Right.

7           THE COURT:  -- and the second sentence of 6.1

8   remains in place.

9       (Pause)

10          THE COURT:  Okay, I think I understand.  And --

11  okay.  So, I guess that gives me -- so I think I understand

12  that we're living in a world in which, reading all these

13  documents together, there was an agreed use, but also a

14  provision that said the use could be changed and that -- on

15  consent, but that consent should not be unreasonably

16  withheld.

17          MS. ARGEROPLOS:  Right.

18          THE COURT:  So --

19          MS. ARGEROPLOS:  And if we're going to look at all

20  of the documents, then we need to look at all of -- the lease

21  as a whole, which encompasses all of these provisions, and

22  that lease as a whole is what represents the bargain that the

23  landlord made.

24          THE COURT:  Right, I understand that, and that

25  brings us to a world in which the question is, is consent

1  here being unreasonably withheld, and what's the record that

2  I have in front of me that helps me answer that question?

3          MS. ARGEROPLOS:  Well, you have a debtor that's

4  not paying any rent and you have Burlington who's very

5  willing to pay rent.

6          THE COURT:  Well, I guess I'm -- Mr. Busenkell is

7  entitled to give me the opportunity to tell me --

8          MS. ARGEROPLOS:  Sure.

9          THE COURT:  -- what the record tells me as to why

10  consent is withheld.

11          MR. BUSENKELL:  I'd like to circle back for a

12  second.

13          THE COURT:  Yeah.

14          MR. BUSENKELL:  The language that I think we're

15  glossing over here with respect to the amendment is that

16  there can be a change in the use if there's no default, and

17  there was a default.  We filed a claim in the case that the

18  Court can take --

19          THE COURT:  All right.  So let's assume that I'm

20  going to think that as a bankruptcy law enforcing a

21  restriction on assignment on account of the financial

22  condition of the debtor is --

23          MR. BUSENKELL:  No, it's not -- I'm sorry to

24  interrupt.

25          THE COURT:  No, go ahead.

1          MR. BUSENKELL:  The default that -- is a failure

2   to pay taxes.

3          MS. ARGEROPLOS:  It's a -- well, one, Your Honor,

4   this is not in evidence, so I object to this line of

5   argument, but if we are going to entertain it, the asserted

6   default -- the default that's being asserted is a post-

7   petition default that Mr. Busenkell has a letter that he

8   wrote to the debtor after the petition was filed saying

9   you're in default.  So, if we're going to rely on a post-

10  petition default that was declared in violation of the

11  automatic stay, then we're referring to things that aren't in

12  evidence.

13         THE COURT:  All right, well, all right.  Look, I

14  think --

15         MR. BUSENKELL:  First of all, I didn't write any

16  letter, all right?  Let's be very clear.  And we're not

17  talking about a letter.  I'm just talking about a simple

18  failure to pay property taxes --

19         THE COURT:  Do I have a record in front of me on

20  these points?

21         MR. BUSENKELL:  And the reason being, Your Honor,

22  the reason you don't is because this issue first came up with

23  their amended reply that was filed a couple days ago.  So we

24  didn't have notice that they were going to be raising --

25         THE COURT:  Okay.

1        MR. BUSENKELL:  -- these particular issues.

2        MS. ARGEROPLOS:  That's not true, Your Honor.  The

3   reply was filed with -- the amended reply does not address

4   this issue.  The reply with respect to the issue and with

5   respect to the use provision and the if-the-debtor-is-not-in-

6   default provision was part of the reply that was filed timely

7   and between the time that that reply was filed and today --

8        THE COURT:  Still, if the issue arises in the

9   reply, I think it's fair to say, look, we should give the

10  parties time to present their case.

11       MS. ARGEROPLOS:  Well, but it did -- it did -- the

12  opportunity arose for the landlord to make this argument in

13  his objection, he chose not to.  We brought it up in our

14  reply and there was still time to get a witness or get

15  evidence in the record about a default.

16       MR. BUSENKELL:  They brought it up in their

17  amended reply.

18       MS. ARGEROPLOS:  That's not true, Your Honor.

19  I'll file a redline, if Your Honor wants.

20       THE COURT:  Well, it shouldn't come to that.

21       So, let me make sure I understand where the bid

22  and ask is.  So let's assume that -- so, Mr. Busenkell, your

23  position is, even if it's the case that the assign -- the

24  question is, has consent been reasonably withheld and, I

25  guess to begin, the question is whose burden is it here --

1      MR. BUSENKELL:  Well, I --

2      THE COURT:  -- and I think it's the --

3      MR. BUSENKELL:  I'm sorry to interrupt.  Go ahead.

4      THE COURT:  -- literally -- I'm just puzzling

5  through this out loud, so just humor me for a second -- I

6  think on all of the elements that relate to the relief that

7  the -- I understand we have in this case a designation rights

8  situation, but I think it's fundamentally the debtors'

9  obligation to establish the elements necessary to approve the

10  assignment and, therefore, that that consent is unreasonably

11  withheld has to be shown by the party seeking the relief,

12  which is here the estate, the Plan Representative.

13      And, obviously, one can still use common sense,

14  right?  Presumably, this is -- let's say I am prepared to say

15  that the fact that when you've got an assignment of a below-

16  market lease, which is sort of almost by definition what

17  you're facing, that's enough to say, well, in the absence of

18  there being some other reason why you're withholding consent,

19  that's probably the reason, just as a matter of common sense.

20      Are you with me that far, Mr. Busenkell?

21      MR. BUSENKELL:  Yes, Your Honor.

22      THE COURT:  I think that's enough to shift the

23  burden back to you to say, no, I've got these other

24  legitimate reasons why I'm withholding consent, and that's

25  where -- and so I think that so far is what I think the case

1  is about, and that's where we run into stuff that's not in

2  the record.  And your response is it's not in the record

3  because it arose later, and your response is, that's all fine

4  and good, they should have presented it earlier and it's on

5  them.

6         I've got to say, in this circumstance, given the

7  complexity -- and I'm not going to hold this up for a long

8  time, but I'm inclined to adjourn the hearing on this and

9  give the parties a short period of time to submit whatever

10  supplemental materials they want to submit -- or present

11  evidence, better yet, adjourn the hearing -- and I'm not sure

12  I need more paper, I think I need evidence.  So I'm inclined

13  to find a date when we can have an evidentiary hearing on the

14  question of whether consent was unreasonably withheld.  Is

15  that a sensible way to proceed?

16         MR. BUSENKELL:  Yes, Your Honor.

17         THE COURT:  I mean, am I getting -- do you

18  disagree that this question boils down to, on your theory,

19  which I think I'm accepting, this boils down to the question

20  of whether they've unreasonably withheld their consent, it

21  doesn't require any sort of magic bankruptcy fairy dust to

22  say you've got the right to assign this under non-bankruptcy

23  law, so long as -- you know, with their consent, which may

24  not be unreasonably withheld.  And they have not consented

25  and you're saying but that's unreasonable, that's a factual

1   question, right?

2           MS. ARGEROPLOS:  Right, that is a factual

3   question.  We also have the question of rents, which is

4   otherwise due tomorrow.  And so, I mean, are we going -- what

5   are we going to do, are we going to agree that we're waiving

6   rent?  I mean, that's -- if we're going to postpone the

7   hearing, I think we need to figure out what's going on with

8   the rent too.

9           MR. BUSENKELL:  I think that's reasonable -- I'm

10  sorry.

11          THE COURT:  Yes, Mr. Busenkell.

12          MR. BUSENKELL:  I think that's reasonable, I just

13  would need to talk to my client about that.

14          THE COURT:  Okay.  I mean, look --

15          MR. BUSENKELL:  I'm not -- I'm not in a position

16  to --

17          THE COURT:  -- no one gets free rent.

18          MR. BUSENKELL:  -- waive rent without talking to

19  the client.

20          THE COURT:  No, I hear you.  And so -- and I'm

21  happy -- look, I can't change the fact that rent comes due on

22  a particular day, that is what it is, but I'm happy to have

23  you all come back as promptly as possible and give you a

24  prompt decision.  Look, we can do this tomorrow, as far as

25  I'm concerned.  If you can bring in the evidence, I'm happy

1   to have a hearing, hear a witness, and resolve the factual

2   question about whether consent has been unreasonably

3   withheld.

4          MS. ARGEROPLOS:  That would be fine, Your Honor,

5   but I would ask if Ms. Peguero and I could participate

6   remotely since we have a flight back to Houston.

7          THE COURT:  Not an evidentiary hearing.  It is

8   what it is, but I'm pretty inflexible with respect to

9   evidentiary hearings.

10          MS. ARGEROPLOS:  Okay.

11          THE COURT:  I'm sorry.  And we can do it a

12   different time, if a different time would be better than

13   tomorrow.  I want to be flexible and accommodating, but I'm

14   not having a remote evidentiary hearing.

15          MS. ARGEROPLOS:  Fair enough.  If you'll let us

16   consult with each other real quick and then --

17          THE COURT:  Certainly.

18       (Pause)

19          MS. ARGEROPLOS:  Yeah, should we just take a five-

20   minute --

21          THE COURT:  You can certainly take a break.  And

22   let me just suggest another possibility, just for you to

23   throw in, if there are issues with respect to the

24   availability of the witness and it were otherwise agreed by

25   the parties, I wouldn't be opposed if the parties agreed to

1  it to allow the evidence to come in through a deposition that

2  can be then admitted into evidence with consent, if that

3  would make the parties' lives easier, rather than having a

4  live evidentiary hearing.

5          MS. ARGEROPLOS:  Yeah, maybe just take a five-

6  minute break --

7          THE COURT:  Why don't I give you -- okay, so it is

8  now 11:28, I'll come back on at 11:35.  Does that work?

9          MS. ARGEROPLOS:  Great.

10          THE COURT:  Okay.  Until then, we're in recess.

11  Thank you.

12          MS. ARGEROPLOS:  Thank you, Your Honor.

13      (Recess taken at 11:28 a.m.)

14      (Proceedings resumed at 11:35 a.m.)

15          THE COURT:  Okay.  So --

16          MS. ARGEROPLOS:  Well, we don't have an answer

17  from the landlord.  My request is that if we are going to --

18  if we're going to have another hearing later, then the

19  briefing and the testimony and the evidence needs to be

20  limited on the exact -- on the issue that Your Honor

21  identified and not on something that hasn't already -- that

22  there has been no evidence of today, like I don't want new

23  arguments that weren't in the objection coming in at a later

24  date.

25          THE COURT:  Okay.  Is there an argument for why I

1  should hear brand new things?

2          MR. BUSENKELL:  Your Honor -- and I apologize for

3  not having the answer to this yet, this is Mr. Gellert's

4  client --

5          THE COURT:  No --

6          MR. BUSENKELL:  -- and one thing we were

7  discussing --

8          THE COURT:  Throwing your partner under the bus is

9  always the way to proceed.

10      (Laughter)

11          MR. BUSENKELL:  It is.  You know, the suggestion

12  that we abate rent for August we think is eminently

13  reasonable, but we need to talk with the client --

14          THE COURT:  I understand that.

15          MR. BUSENKELL:  -- and we can do this on a more

16  deliberate pace.  But to answer Your Honor's question, I

17  think the only issue, as I understand it, is whether or not

18  consent is unreasonably withheld.

19          THE COURT:  Exactly, that's the question.  So I

20  think we --

21          MR. BUSENKELL:  I don't --

22          THE COURT:  -- it sounds like you agree about

23  that.

24          MR. BUSENKELL:  Yeah, I don't have the answer and,

25  again --

1          THE COURT:  The answer to what?

2          MR. BUSENKELL:  I mean to what -- we assume that

3  the client, you know, is going to come and testify and --

4          THE COURT:  Give me reasons that are --

5          MR. BUSENKELL:  Yes.

6          THE COURT:  -- appropriate reasons to withhold

7  consent.

8          MR. BUSENKELL:  Yes, right.

9          THE COURT:  Okay.

10          MS. ARGEROPLOS:  And that aren't raised for the

11  first time in the testimony.

12          THE COURT:  Well --

13          MS. ARGEROPLOS:  I just -- I'm worried about --

14          THE COURT:  -- look, in fairness, this issue has

15  morphed --

16          MS. ARGEROPLOS:  Sure.

17          THE COURT:  -- for reasons -- it's actually no

18  one's fault, this happens in life.  And so I think what we

19  now have is a dispute that boils down to the question, has

20  consent been unreasonably withheld, and I'm inclined to give

21  everyone the chance -- I'm not going to protract this, but --

22  and I don't need briefing.  I think that I'm happy to have a

23  witness testify as to the reasons they are not consenting to

24  the assignment and make a decision whether in this context

25  that's reasonable or unreasonable, and I'm not going to --

1  I'm not inclined to restrict the universe of reasons that the

2  witness can testify to.

3          MR. BUSENKELL:  But as to timing, we're going to

4  confer --

5          THE COURT:  The parties need to talk.

6          MR. BUSENKELL:  Yes.  What I was going to do is,

7  you know, confer with Mr. Gellert further, he's going to talk

8  with the client, we'll confer with Burlington's counsel as to

9  a convenient time.  Hopefully, you know, we agree to abate

10  rent and it obviates any urgency here, and we can schedule a

11  time for the hearing.

12          THE COURT:  Okay.

13          MS. ARGEROPLOS:  Yeah, because I might want to

14  take the witness' deposition, so --

15          THE COURT:  You're entitled to that.  I mean,

16  everyone's rights are preserved and I'm happy to do it that

17  way, but I do think having a straight-up hearing on the

18  question, as a matter of fact here, was consent reasonably

19  withheld or not, and have the witness give the reasons, and

20  I'll make a decision whether it's reasonable or unreasonable.

21  And you can work out a procedure among yourselves and if it

22  includes deposing the witness first, that's perfectly fair.

23      (Pause)

24          THE COURT:  Yeah, I'm happy to --

25          MS. PEGUERO:  I'm sorry, Your Honor --

1          THE COURT:  Yeah, go ahead.

2          MS. PEGUERO:  -- may I just jump in?

3          THE COURT:  Certainly.

4          MS. PEGUERO:  I think we just would like to also

5    clarify whether Your Honor has made a ruling with respect to

6    whether even the landlord's consent is required under 365 or

7    could that be withheld, right?

8          THE COURT:  So, back me up.  I've lost track of

9    the provisions and how we got here.  I was sort of just

10   following the argument as it went.

11         MS. PEGUERO:  Right.  So it's a provision in the

12   lease that allows us to change the use, and the landlord has

13   apparently withheld consent, right?

14         THE COURT:  Right.

15         MS. PEGUERO:  So that's why we're --

16         THE COURT:  Right.

17         MS. PEGUERO:  -- wanting to figure out whether

18   that with --

19         THE COURT:  Right, but so let's slow down and back

20   up.  What we have is a general limitation to certain types of

21   uses, which is the kind of -- let's assume I think that

22   that's the kind of limitation that one would enforce and

23   assignment to someone who is outside that.  And so I think

24   there's no -- because -- if I believe that this isn't an

25   anti-assignment provision in disguise that could just be run

1   over, and I'm happy to hear further from -- I don't think

2   that that is -- I mean, I've seen sort of -- there is

3   briefing that touches on that, but if you want to reserve the

4   right to make further argument as to why this is an

5   assignment provision in disguise, I'll give you that

6   opportunity, and if it is an assignment provision in -- an

7   anti-assignment provision in disguise, then I don't need

8   their consent --

9           MS. PEGUERO:  Right.

10          THE COURT:  -- then you can assign no matter what

11  because we just run it over.  If, however, it's an

12  appropriate use restriction, then we get to the question of

13  has consent been unreasonably withheld.

14          MS. PEGUERO:  Okay.

15          THE COURT:  And the first question is a pure legal

16  question and if the parties want to submit further briefing

17  on it, I'm happy to hear it.

18          I guess let me just give you some preliminary

19  reactions.  I understand there's a District Court opinion in

20  this jurisdiction that sort of hinted at the argument that

21  Burlington was making that because no one else showed up to

22  buy, therefore it's an assignment -- it's an anti-assignment

23  provision.  That makes no sense to me --

24          MS. PEGUERO:  Okay.

25          THE COURT:  -- with all respect to Judge Farnan.

1  To me, this is about the nature of the clause, which has to

2  do with what the world looked like at the time the parties

3  wrote this clause and whether -- if you write a clause so

4  that we're talking about a universe of one, that's an anti-

5  assignment provision.

6         MS. PEGUERO:  Yes.

7         THE COURT:  If it's a universe of three, is that

8  an anti-assignment provision?  I don't know.  That's

9  interesting.  And so that I haven't given a lot of thought

10  to.  I have sort of rejected the notion that it turns on the

11  question of who happens to show up to buy at your auction,

12  which I find to be, with all respect to Judge Farnan, that

13  can't -- that doesn't make any sense.  But to the extent even

14  thought about through the question of, at the time it was

15  written, was this clause intended to be an anti-assignment

16  provision or did it operate in fact as an anti-assignment

17  provision, or was there a sufficiently wide universe of other

18  assignees that this is better understood as an appropriate

19  use restriction, I'm happy to give the parties a chance to be

20  heard further on that.  Is that --

21         MS. PEGUERO:  Okay, yes.

22         THE COURT:  -- sensible?

23         MS. PEGUERO:  No, that's a clarification we

24  certainly appreciate.

25         THE COURT:  Okay, okay.  Anything else that I can

 1   do, or should I let you guys talk?

 2            MR. BUSENKELL:  And, Your Honor, just for the

 3   record, I did clarify that we're going to abate rent for --

 4            THE COURT:  Okay.

 5            MR. BUSENKELL:  -- August.  So we'll confer on a

 6   schedule and get with chambers --

 7            THE COURT:  Okay.

 8            MR. BUSENKELL:  -- regarding an appropriate date.

 9            THE COURT:  So, I appreciate the cooperation

10   there.  Is there anything else I can do to be useful?

11            MS. PEGUERO:  No.  Thank you very much for your

12   time, Your Honor.

13            THE COURT:  Okay, all right.  So I'll await

14   hearing from the parties.  We'll make ourselves available to

15   the best of our ability as quickly as we can, and we'll take

16   it from there.

17            Mr. Reilley, anything else from the plan trustee's

18   perspective?

19            MR. REILLEY:  No, we'll coordinate with the

20   parties and get in contact with chambers.  I will say we do

21   have a hearing August 14th with a bunch of claim objections

22   scheduled --

23            THE COURT:  Okay.

24            MR. REILLEY:  -- but I would anticipate that to

25   the extent they are contested, we will work to resolve those

1  with the parties and so --

2           THE COURT:  Okay.  And if that frees up that date

3  and that otherwise works, that's fine.  I'm happy to --

4  whatever works for you, I'm happy to find a way to make it

5  work.

6           MR. REILLEY:  Okay, thank you.  But as far as

7  today, there are no other matters scheduled, and thank you

8  very much, Your Honor, for making time this morning.  I know

9  you say --

10          THE COURT:  This is my job.

11          MR. REILLEY:  -- it's your job, but we do

12  appreciate it, all the parties do, so thank you.

13          THE COURT:  Okay, very well.  Anything else that I

14  can do to be helpful?

15          MS. ARGEROPLOS:  No.  Thank you, Your Honor.

16          THE COURT:  Okay.  Mr. Fleischer, I see you've

17  turned on your camera, anything else from your perspective?

18          MR. FLEISCHER:  Your Honor, just maybe we could

19  hold that date for any potential cure issues we have on the

20  DLC lease as well and we'll just look to work it out the next

21  few days.

22          THE COURT:  I'm happy to give the parties the

23  opportunity to work together and figure out what makes sense

24  in that regard.

25          Okay, anything else I can do?

1          (No verbal response)

2              THE COURT:  Okay.  If not, thanks to all of you.

3    I'm happy to come back whenever I can be useful and, with

4    that, we're adjourned.  Thank you.

5          (Proceedings concluded at 11:44 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          <u>CERTIFICATION</u>

2            We certify that the foregoing is a correct

3   transcript from the electronic sound recording of the

4   proceedings in the above-entitled matter to the best of our

5   knowledge and ability.

6

7   <u>/s/ William J. Garling</u>                    <u>August 1, 2025</u>

8   William J. Garling, CET-543

9   Certified Court Transcriptionist

10  For Reliable

11

12  <u>/s/ Tracey J. Williams</u>                    <u>August 1, 2025</u>

13  Tracey J. Williams, CET-914

14  Certified Court Transcriptionist

15  For Reliable

16

17

18

19

20

21

22

23

24

25