**Exhibit D**

**Burlington Stores, Inc. United States Securities and Exchange Commission Form 10-K For the fiscal year ending February 1, 2025**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## FORM 10-K

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended February 1, 2025**

OR

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _____ to _____**

**Commission File Number 001-36107**

# BURLINGTON STORES, INC.

### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **80-0895227** |
| **(State or Other Jurisdiction of Incorporation or Organization)** | **(I.R.S. Employer Identification No.)** |
| **2006 Route 130 North** | |
| **Burlington, New Jersey** | **08016** |
| **(Address of Principal Executive Offices)** | **(Zip Code)** |

**(609) 387-7800**

**(Registrant's telephone number, including area code)**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| **Common Stock, par value $0.0001 per share** | **BURL** | **New York Stock Exchange** |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.    Yes ☒    No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.    Yes ☐    No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☒    No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).    Yes ☒    No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-Accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).    Yes ☐    No ☒

The aggregate market value of the common stock held by non-affiliates of the registrant on August 3, 2024, the last business day of the registrant's most recently completed second fiscal quarter, was $15,853,219,442. The aggregate market value was computed by reference to the closing price of the common stock on such date.

As of March 1, 2025, there were 63,204,621 shares of common stock of the registrant outstanding.

**Documents Incorporated By Reference:**

Certain provisions of the registrant's definitive proxy statement for the 2025 Annual Meeting of Stockholders, to be filed within 120 days of the close of the registrant's 2024 fiscal year, are incorporated by reference in Part III of this Form 10-K to the extent described herein.

| | | |
|---|---|---|
| Auditor Firm Id:    34 | Auditor Name:    Deloitte & Touche LLP | Auditor Location:    Morristown, New Jersey |

**BURLINGTON STORES, INC.**
**INDEX TO REPORT ON FORM 10-K**

**FOR THE FISCAL YEAR ENDED FEBRUARY 1, 2025**

| | | PAGE |
|---|---|---|
| **PART I.** | | |
| Item 1. | Business | 1 |
| Item 1A. | Risk Factors | 6 |
| Item 1B. | Unresolved Staff Comments | 18 |
| Item 1C. | Cybersecurity | 18 |
| Item 2. | Properties | 19 |
| Item 3. | Legal Proceedings | 20 |
| Item 4. | Mine Safety Disclosures | 20 |
| **PART II.** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 21 |
| Item 6. | Reserved | 23 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 24 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 39 |
| Item 8. | Financial Statements and Supplementary Data | 41 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 77 |
| Item 9A. | Controls and Procedures | 77 |
| Item 9B. | Other Information | 80 |
| Item 9C. | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 81 |
| **PART III.** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 81 |
| Item 11. | Executive Compensation | 81 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 81 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 81 |
| Item 14. | Principal Accountant Fees and Services | 81 |
| **PART IV.** | | |
| Item 15. | Exhibits and Financial Statement Schedules | 82 |
| Item 16. | Form 10-K Summary | 88 |
| **SIGNATURES** | | 89 |

**CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS**

This Annual Report contains forward-looking statements that are based on current expectations, estimates, forecasts and projections about us, the industry in which we operate and other matters, as well as management's beliefs and assumptions. For example, when we use words such as "projects," "expects," "anticipates," "intends," "plans," "believes," "seeks," "estimates," "should," "would," "could," "will," "opportunity," "potential" or "may," variations of such words or other words that convey uncertainty of future events or outcomes, or make any other statement that is not a historical fact, we are making "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended (Securities Act), and Section 21E of the Securities Exchange Act of 1934, as amended (the Exchange Act). These forward-looking statements may relate to such matters as future impacts of current macroeconomic conditions, our future actions, including expected store openings and closings, ongoing strategic initiatives and the intended results of those initiatives, future performance or results, anticipated sales, expenses and interest rates, the effect of the adoption of recent or future accounting pronouncements and the outcome of contingencies such as legal proceedings. Our forward-looking statements are subject to risks and uncertainties. Actual events or results may differ materially from the events or results anticipated in these forward-looking statements as a result of a variety of factors, including each of the factors discussed in Item 1A, Risk Factors as well as risks and uncertainties discussed elsewhere in this Annual Report. While we believe that our assumptions are reasonable, we caution that it is very difficult to predict the impact of known factors, and it is impossible for us to anticipate all factors that could affect our actual future events or results. In light of these risks and uncertainties, the forward-looking events and circumstances discussed in this Annual Report might not occur. In addition, as a result of these and other factors, our past financial performance should not be relied on as an indication of future performance. The cautionary statements referred to in this section also should be considered in connection with any subsequent written or oral forward-looking statements that may be issued by us or persons acting on our behalf. We do not undertake to publicly update or revise our forward-looking statements, except as required by law, even if experience or future changes make it clear that any projected results expressed or implied in such statements will not be realized. If we do update one or more forward-looking statements, no inference should be made that we will make additional updates with respect to those or other forward-looking statements.

## PART I

### Item 1.   Business Overview

We are a nationally recognized off-price retailer of high-quality, branded merchandise at everyday low prices. We opened our first store in Burlington, New Jersey in 1972, selling primarily coats and outerwear. Since then, we have expanded our store base to 1,108 stores as of February 1, 2025, in 46 states, Washington D.C. and Puerto Rico. We have diversified our product categories by offering an extensive selection of in-season, fashion-focused merchandise at up to 60% off other retailers' prices, including: women's ready-to-wear apparel, menswear, youth apparel, baby, beauty, footwear, accessories, home, toys, gifts and coats. We sell a broad selection of desirable, first-quality, current-brand, labeled merchandise acquired directly from nationally recognized manufacturers and other suppliers.

We continue to focus on a number of ongoing initiatives aimed at increasing our overall profitability by driving comparable store sales growth, expanding and enhancing our retail store base, and enhancing operating margins. These initiatives include, but are not limited to, those discussed under "Ongoing Initiatives for Fiscal 2025" in Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations.

As used in this Annual Report, the terms "Company," "we," "us," or "our" refer to Burlington Stores, Inc. and all of its subsidiaries.

### Fiscal Year End

We define our fiscal year as the 52- or 53-week period ending on the Saturday closest to January 31. This Annual Report covers the 52-week fiscal year ended February 1, 2025 (Fiscal 2024), the 53-week fiscal year ended February 3, 2024 (Fiscal 2023), and the 52-week fiscal year ended January 28, 2023 (Fiscal 2022).

### Our Stores

Over 99% of our net sales are derived from stores we operate as Burlington Stores. We believe that our customers are attracted to our stores principally by the availability of a large assortment of first-quality, current, brand-name merchandise at everyday low prices.

Burlington Stores offer customers a complete line of merchandise, including: women's ready-to-wear apparel, menswear, youth apparel, baby, beauty, footwear, accessories, home, toys, gifts and coats. Our broad selection provides a wide range of apparel,

1

accessories and furnishings for all ages. Our strategy to chase the sales trend allows us the flexibility to purchase less pre-season merchandise with the balance purchased in-season and opportunistically. It also provides us with the flexibility to shift purchases between suppliers and categories. This enables us to obtain better terms with our suppliers, which we expect to help offset any rising costs of goods. Furthermore, we believe the "treasure hunt" nature of the off-price buying experience drives frequent visits to our stores.

Our store base is geographically diversified with stores located in 46 states, Washington D.C. and Puerto Rico as set forth below:

| State | Number of Stores | State | Number of Stores | State | Number of Stores |
|---|---|---|---|---|---|
| AK | 2 | KY | 9 | NY | 70 |
| AL | 12 | LA | 11 | OH | 31 |
| AR | 8 | MA | 25 | OK | 16 |
| AZ | 25 | MD | 24 | OR | 7 |
| CA | 112 | ME | 2 | PA | 42 |
| CO | 16 | MI | 30 | PR | 22 |
| CT | 16 | MN | 14 | RI | 6 |
| DC | 1 | MO | 12 | SC | 13 |
| DE | 3 | MS | 4 | SD | 2 |
| FL | 119 | NC | 36 | TN | 17 |
| GA | 37 | ND | 1 | TX | 123 |
| IA | 5 | NE | 5 | UT | 9 |
| ID | 3 | NH | 6 | VA | 33 |
| IL | 45 | NJ | 53 | WA | 18 |
| IN | 19 | NM | 5 | WI | 16 |
| KS | 9 | NV | 13 | WV | 1 |

**Store Expansion and Real Estate Strategy**

We continue to explore expansion opportunities both within our current market areas and in other regions. We believe that our ability to find satisfactory locations for our stores is essential for the continued growth of our business. The opening of stores generally is contingent upon a number of factors, including the availability of desirable locations with suitable structures and the negotiation of acceptable lease terms.

We have a proven track record of new store expansion. Our store base has grown from 13 stores in 1980 to 1,108 stores as of February 1, 2025. Based on our smaller store prototype, as well as the ongoing opportunity presented by accelerating retail disruption and industry wide store closures, our long-term store target remains at 2,000 stores. If we identify appropriate locations, including locations that fit our smaller store prototype, we believe that we will be able to execute our growth strategy without significantly impacting our current stores. The table below shows our store openings and closings each of the last three fiscal years.

| | Fiscal 2024 | Fiscal 2023 | Fiscal 2022 |
|---|---|---|---|
| Stores (beginning of period) | 1,007 | 927 | 840 |
| Stores opened(a)(b) | 116 | 91 | 91 |
| Stores closed(a) | (15) | (11) | (4) |
| Stores (end of period) | 1,108 | 1,007 | 927 |

(a) Exclusive of relocations during Fiscal 2024, Fiscal 2023 and Fiscal 2022 of 31, 13 and 22 stores, respectively.

(b) Stores opened during Fiscal 2024, Fiscal 2023 and Fiscal 2022 had an average size of approximately 27,000, 27,000 and 28,000 square feet, respectively.

The total gross square footage of all stores as of the end of Fiscal 2024, Fiscal 2023, and Fiscal 2022 was 51.8 million, 51.5 million, and 50.7 million, respectively. Of this total square footage, the area that represents the total selling square footage for all stores as of the end of Fiscal 2024, Fiscal 2023, and Fiscal 2022 was 32.7 million, 31.5 million, and 31.0 million respectively.

**Distribution and Warehousing**

We have six distribution centers that shipped more than 99% of merchandise units to our stores in Fiscal 2024. The remaining merchandise units are drop shipped by our vendors directly to our stores. Our three east coast distribution centers are located in Edgewater Park, New Jersey; Burlington, New Jersey; and Logan, New Jersey, which became fully operational in Fiscal 2024. Our

three west coast distribution centers are located in San Bernardino, California, Redlands, California, and Riverside, California. These six distribution centers occupy an aggregate of 5,135,000 square feet, and each includes processing, shipping and storage capabilities. In addition, we entered into a lease with a purchase option during Fiscal 2023 for an additional distribution center in Ellabell, Georgia occupying approximately 2,057,000 square feet. The purchase option was exercised during Fiscal 2024. This building is expected to be fully operational during Fiscal 2026.

We also operate warehousing facilities to support our distribution centers. The east coast has two supporting warehouses located in Burlington, New Jersey. The west coast has three supporting warehouses located in Redlands, California, Riverside, California, and San Bernardino, California. These five warehousing facilities occupy an aggregate of 2,383,000 square feet and primarily serve as storage facilities. We previously operated a third warehousing facility in Burlington, New Jersey, which was closed during Fiscal 2023.

| | Calendar Year Operational | Size (sq. feet) | Leased or Owned |
|---|---|---|---|
| **Primary Distribution Centers:** | | | |
| Edgewater Park, New Jersey (Route 130 South)(a) | 2004 | 648,000 | Owned |
| Burlington, New Jersey (Daniels Way) | 2014 | 1,000,000 | Leased |
| Logan, New Jersey | 2022 | 1,029,000 | Leased |
| San Bernardino, California (E. Mill St.) | 2006 | 758,000 | Leased |
| Redlands, California (Pioneer Ave.) | 2014 | 800,000 | Leased |
| Riverside, California (Cactus Ave.)(c) | 2021 | 900,000 | Leased |
| Ellabell, Georgia(b) | 2026 | 2,057,000 | Owned |
| **Warehousing Facilities:** | | | |
| Burlington, New Jersey (Route 130 North)(a) | 1987 | 525,000 | Owned |
| Burlington, New Jersey (Richards Run) | 2017 | 511,000 | Leased |
| Redlands, California (River Bluff Ave.) | 2017 | 543,000 | Leased |
| Riverside, California (Oleander Ave.) | 2023 | 410,000 | Leased |
| San Bernardino, California (Waterman Ave.) | 2020 | 394,000 | Leased |

(a) Inclusive of corporate offices.

(b) We entered into a lease with a purchase option during Fiscal 2023 for an additional distribution center in Ellabell, Georgia. The purchase option was exercised during Fiscal 2024. This building is expected to be fully operational during Fiscal 2026.

(c) During Fiscal 2024, we negotiated a purchase agreement for the Cactus Ave. distribution center in Riverside, California.

In addition to the distribution centers that we operate, we have arrangements with third parties for the use of pool point facilities, which we believe streamline and optimize our distribution network.

## Customer Service

We are committed to providing our customers with an enjoyable shopping experience in stores that are clean, neat and easy to shop. In training our associates, our goal is to emphasize friendly customer service and a sense of professional pride.

We have empowered our store teams to provide a satisfying customer experience for every customer in every store, every day. We have and continue to streamline processes and strive to create opportunities for fast and friendly customer interactions. Our goal is to facilitate a "treasure-hunt" experience for our customers with clean, organized merchandise presentations that highlight the brands, value and diversity of selection within our frequently refreshed assortments.

## Our Off-Price Sourcing and Merchandising Model

We believe that our ability to chase sales within the off-price model enables us to provide our customers with products that are nationally branded, fashionable, high quality and at a compelling value. We have an experienced team of General Merchandise Managers, Divisional Merchandise Managers and buyers that are continually focused on improving comparable store inventory turnover, inventory age and freshness of merchandise.

We continue to improve the quality of our brand portfolio, driven by the growth of our merchandising team, wide breadth of our product categories, and a vendor community increasingly committed to grow with Burlington. We carry many different brands, none of which accounted for more than 6% of our net purchases during Fiscal 2024, Fiscal 2023 or Fiscal 2022. We have no long-term

purchase commitments or arrangements with any of our suppliers, and believe that we are not dependent on any one supplier. We continue to have good working relationships with our suppliers.

We have designed our merchant organization so that buyers focus primarily on buying, planners focus primarily on planning, and information systems help inform data-driven decisions for both groups. Buyers are in the market each week and focus on purchasing great products for great value. We seek to purchase a majority of our merchandise in-season. Buyers spend time interacting face-to-face with new and existing vendors and continuously evaluating trends in the market to which we believe our customers would respond positively. Our buyers use a merchant scorecard that rates products across four key attributes—fashion, quality, brand and price—to help formalize a framework for buying decisions.

Our merchandising model allows us to provide our customers with a wide breadth of product categories. Sales percentage by major product category over the last three fiscal years was as follows:

| Category | Fiscal 2024 | Fiscal 2023 | Fiscal 2022 |
|---|---|---|---|
| Ladies apparel | 21% | 21% | 22% |
| Accessories and shoes | 27% | 27% | 24% |
| Home | 20% | 20% | 21% |
| Mens apparel | 17% | 17% | 17% |
| Kids apparel and baby | 12% | 12% | 12% |
| Outerwear | 3% | 3% | 4% |

**Human Capital Resources**

Attracting, developing and retaining top talent is key to our growth, and our success depends on cultivating an engaged and motivated workforce. Our goal is to create a welcoming and inclusive environment where our associates can build a career for life.

*Oversight and Management*

Our Human Resources department is tasked with managing associate-related matters, including recruiting and hiring, compensation and benefits, performance management, and learning and development. In addition, our management and cross-functional teams also work closely to evaluate human capital management issues such as associate retention and workplace safety, as well as to implement measures to mitigate these risks.  This process is informed by the results of our annual associate survey, which is discussed in further detail below.

Our Board of Directors and Board committees provide oversight on certain human capital matters. For example, our Compensation Committee is responsible for, among other things, developing and reviewing executive management succession plans and reviewing our compensation policies for executives and associates generally to assess (i) whether the compensation structure establishes appropriate incentives and (ii) the risks associated with such policies and practices.

*Associates*

As of February 1, 2025, we employed 77,532 associates, of which 78% were part-time or seasonal associates. Of our associates, 90% worked in our stores, 7% worked in our distribution centers and 3% worked in our corporate organization. As of February 1, 2025, 73% of our associates are female, and 79% of our associates have a racial or ethnic minority background.

Our staffing requirements fluctuate during the year as a result of the seasonality of our business. We hire additional associates and increase the hours of part-time associates during seasonal peak selling periods. As of February 1, 2025, associates at one of our stores were subject to a collective bargaining agreement.

*Corporate Culture*

We recognize the critical importance of talent and culture to our success. Our value proposition, "Our Burlington," which defines who we are as an employer and what is important to us as a team, is based on five tenets:

•  *We Are an Off-Price Retailer*: We deliver great values to our customers every day.
•  *We Live by Our Core Values*: Drive Results. Trust & Respect Each Other. Build Teams & Partnerships.
•  *We Believe Everyone Matters*: We listen to the individual viewpoints of our diverse workforce through open and honest communication.

4

- *We Win Together*: We recognize those who make a difference. Great performance leads to exciting career opportunities.
- *We Are a Caring Company*: We have a caring work environment, and the generosity of our associates and customers helps to improve the communities we live and work in and beyond.

We conduct an annual associate survey to measure associate engagement. The survey results help us understand the associate experience, evaluate our performance, identify our strengths and pinpoint opportunities for improvement.

*Learning and Development*

We support our associates' career growth by offering a blended learning approach that includes online education, on-the-job training, coaching and career development. All associates, including full- and part-time, in our stores, distribution centers and corporate offices, are offered training and development opportunities. Our learning and development programs are integral to the development of our associates and enable them to take on new and expanded roles across our organization.

*Compensation and Benefits*

As part of our commitment to offer competitive wages, Burlington works to ensure that our pay structure aligns with industry standards. In addition to being merit based, Burlington reviews compensation for all associates at every level of the business based on market analysis, seeking to ensure associates are fairly and appropriately compensated. Through this process, we have increased the wages of our hourly associates every year since 2010. We also offer a wide array of benefits for our associates and their families, including health and wellness and retirement benefits.

**Customer Demographic**

Our core customer is 25-49 years old, is more ethnically diverse than the general population, and most have an annual household income of $25,000-$100,000. The core customer is educated, resides in mid- to large-sized metropolitan areas and shops for themselves, their family, and their home. We appeal to value seeking and brand conscious customers who understand the off-price model and love the thrill of the hunt.

**Marketing and Advertising**

We use a mix of broad-based and targeted marketing strategies to efficiently deliver the right message to our audience at the right time. Broad-based strategies include television and radio, while our digital and streaming audio strategies allow for more personalized and targeted messaging. Email reaches our best customers, while social media marketing, including relationships with influencers, allows for authentic consumer engagement. Burlington.com highlights our great merchandise values, while encouraging customers to visit our stores to discover fantastic deals on the brands and products they love - from stylish apparel to everything they need and want for their entire family and home.

**Competition**

The U.S. retail apparel and home furnishings markets are highly fragmented and competitive. We compete on the basis of a combination of factors, including, among others, price, breadth, quality and style of merchandise offered, in-store experience, level of customer service, ability to identify and respond to new and emerging fashion trends, brand image and scalability. We compete for business with department stores, off-price retailers, specialty stores, online retailers, discount stores, wholesale clubs, and outlet stores, as well as with certain traditional, full-price retail chains that have developed off-price concepts. At various times throughout the year, traditional full-price department store chains and specialty shops offer brand-name merchandise at substantial markdowns, which can result in prices approximating those offered by us at our stores.

**Seasonality**

Our business, like that of most retailers, is subject to seasonal influences. In the second half of the year, which includes the back-to-school and holiday seasons, we generally realize a higher level of sales and net income. Weather is also a contributing factor to the sale of our merchandise. Generally, our sales are higher if the weather is cold during the Fall and warm during the early Spring. Sales of cold weather clothing are increased by early cold weather during the Fall, while sales of warm weather clothing are improved by early warm weather conditions in the Spring. Although we have diversified our product offerings, we believe traffic to our stores is still driven, in part, by weather patterns.

**Trademarks**

We are the owner of certain registered and common law trademarks, service marks and tradenames (collectively referred to as the Marks) that we use in connection with our business. Our Marks include, but are not limited to, "Burlington," "Burlington Coat Factory," "B, *stylized*" and "DEALS. BRANDS. WOW!" We consider these Marks and the accompanying name recognition to be valuable to our business. We believe that our rights to these properties are adequately protected. Our rights in these Marks endure for as long as they are used.

**Available Information**

We are subject to the reporting requirements of the Exchange Act. Therefore, we file reports, proxy statements and other information with the Securities and Exchange Commission (SEC). The SEC maintains a website (www.sec.gov) that contains reports, proxy and information statements, and other information regarding issuers that file electronically with the SEC, including us.

You can access financial and other information about us on the Investor Relations page of our website at www.burlingtoninvestors.com. We make available through our website, free of charge, copies of our annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and amendments to those reports filed with or furnished to the SEC under Section 13(a) or 15(d) of the Exchange Act as soon as reasonably practicable after electronically filing or furnishing such material to the SEC.

Investors and others should note that we currently announce material information using SEC filings, press releases, public conference calls and webcasts. In the future, we will continue to use these channels to distribute material information about the Company, and may also utilize our website and/or various social media sites to communicate important information about the Company, key personnel, new brands and services, trends, new marketing campaigns, corporate initiatives and other matters. Information that we post on our website or on social media channels could be deemed material; therefore, we encourage investors, the media, our customers, business partners and others interested in the Company to review the information posted on our website, as well as the following social media channels: Facebook (www.facebook.com/BurlingtonStores) and X (formerly Twitter) (www.x.com/burlington). Any updates to the list of social media channels we may use to communicate material information will be posted on the Investor Relations page of our website at www.burlingtoninvestors.com.

The information contained on, or accessible through, our website and these social media channels is not part of this Annual Report and is therefore not incorporated by reference. The references to our website and these social media channels are intended to be inactive textual references only.

**Item 1A. Risk Factors**

Set forth below are material risks and uncertainties that could adversely affect our results of operations, financial condition or cash flows and cause our actual results to differ materially from those expressed in forward-looking statements made by us. Although we believe that we have identified and discussed below the key risks and uncertainties affecting our business, there may be additional risks and uncertainties that are not presently known or that are not currently believed to be material that may adversely affect our results of operations, financial condition or cash flows. Before making an investment decision, you should carefully consider the risks and uncertainties described below together with all of the other information included or incorporated by reference in this Annual Report.

**Macroeconomic, Industry and Business Risks**

***A downturn in general economic conditions or consumer spending or inflationary conditions could adversely affect our business.***

Consumer spending levels and shopping behaviors are affected by various economic conditions, which can affect our business or the retail industry generally as a result. These factors include, among other things, prevailing global economic conditions, inflation (including the costs of basic necessities and other goods), levels of employment, salaries and wage rates, prevailing interest rates, housing costs, energy costs, commodities pricing, income tax rates and policies, consumer confidence and consumer perception of economic conditions. In addition, consumer purchasing patterns may be influenced by consumers' disposable income, credit availability and debt levels. Slowdown in the U.S. economy, an uncertain global economic outlook, interest rate volatility, or a credit crisis could adversely affect consumer spending habits, resulting in lower net sales and profits than expected on a quarterly or annual basis. Consumer confidence is also affected by the domestic and international political situation and periods of social unrest. The occurrence of terrorist acts or other hostilities in or affecting the U.S. could lead to a decrease in spending by consumers. In addition, natural disasters, industrial accidents, acts of war or global international conflicts (such as the conflict in Ukraine or the conflict in the Middle East), and public health issues (such as pandemics or epidemics) have in the past and may in the future have the effect of disrupting supplies and raising prices globally which, in turn, may have adverse effects on the world and U.S. economies and lead to a

6

downturn in consumer confidence and spending. Certain of these risks, such as risks arising from political volatility, may be enhanced in 2025 in light of the U.S. administration's change in trade and tariff policies.

There can be no assurance that we will be able to offset inflationary pressure and other fluctuations in costs in the future, or that consumer behavior or our business, operations, liquidity, and/or financial results, will not be negatively affected by continued inflation in the future. We may not be able to adequately increase our prices over time to offset increased costs, whether due to inflation or otherwise. Any decreases in consumer discretionary spending could result in a decrease in store traffic and same store sales, all of which could negatively affect the Company's business, operations, liquidity, financial results and/or stock price, particularly if consumer spending levels are depressed for a prolonged period of time.

***We face increased competition from other retailers that could adversely affect our business.***

The retail sector is highly competitive, and retailers are constantly adjusting their business models, promotional activities and pricing strategies in response to changing conditions. We compete on the basis of a combination of factors, including, among others, price, breadth, quality and style of merchandise offered, in-store experience, level of customer service, ability to identify and respond to new and emerging fashion trends, brand image and scalability. We compete with a wide variety of retailers for customers, vendors, suitable store locations and personnel. Some of our competitors are larger than we are or have more experience than we do in selling certain product lines or through certain channels. Additionally, existing competitors may consolidate with other retailers, expand their merchandise offerings, expand their e-commerce capabilities, and/or add new sales channels, change their pricing strategies, or use technology more effectively than we do, including the use of artificial intelligence. More generally, consumer e-commerce spending may continue to increase, as it has in recent years, while our business is exclusively in brick-and-mortar stores. If we fail to compete effectively, our sales and results of operations could be adversely affected.

In order to increase traffic and drive consumer spending, competitors, including department stores, mass merchants and specialty apparel stores, have been offering brand-name merchandise at substantial markdowns. Continuation of this trend, or the possible effect on consumer buying patterns that improving economic conditions could have, may cause consumer demand to shift from off-price retailers to other retailers, which could have a material adverse effect on our business and results of operations.

Certain traditional, full-price retail chains have developed off-price concepts, which may directly compete with our business. Our competitors, including such retail chains, may seek to emulate facets of our business strategy, which could result in a reduction of any competitive advantage or special appeal that we might possess. In addition, most of our products are sold to us on a non-exclusive basis. As a result, our current and future competitors may be able to duplicate or improve on some or all of our product offerings that we believe are important in differentiating our stores. If our competitors were to duplicate or improve on some or all of our in-store experience or product offerings, obtaining the products we sell may become increasingly difficult, competition for customers may increase, and our competitive position and our business could suffer.

***Our net sales, operating income and inventory levels fluctuate on a seasonal basis.***

Our net sales and operating income fluctuate seasonally, with a higher level of our operating income typically realized during the second half of the year. Any decrease in sales or margins during this period could have a disproportionate effect on our financial condition and results of operations. Seasonal fluctuations also affect our inventory levels. We must carry a significant amount of inventory, especially before the holiday season selling period. If we are not successful in selling our inventory, we may have to write down our inventory or sell it at significantly reduced prices or we may not be able to sell such inventory at all, which could have a material adverse effect on our financial condition and results of operations.

***A reduction in traffic to, or the closing of, the other destination retailers in the shopping areas where our stores are located could significantly reduce our sales.***

Many of our stores are strategically located in off-mall shopping areas known as "power centers." Power centers typically contain three to five big-box anchor stores along with a variety of smaller specialty tenants. Due to many of our stores being located in such shopping areas, our sales are derived, in part, from the volume of traffic generated by the other destination retailers and the anchor stores in power centers where our stores are located. Customer traffic to these shopping areas may be adversely affected by the closing of such destination retailers or anchor stores, or by a reduction in traffic to such stores resulting from a regional or global economic downturn, a general downturn in the local area where our store is located, increased competition from alternative retail options such as those accessible via the internet or a decline in the desirability of the shopping environment of a particular power center. Such a reduction in customer traffic would reduce our sales and leave us with excess inventory, which could have a material adverse effect on our business, financial condition, profitability and cash flows. We may respond by increasing markdowns or transferring product to other stores to reduce excess inventory, which would further decrease our gross profits and net income.

***Failure to identify customer trends and preferences to meet customer demand could negatively impact our performance and reputation.***

7

Because our success depends on our ability to meet customer demand, we work to follow customer trends and preferences on an ongoing basis and to buy inventory in response to those trends and preferences. However, identifying consumer trends and preferences in the diverse product lines and many markets in which we do business and successfully meeting customer demand across those lines and for those markets on a timely basis is challenging. Although our flexible business model allows us to buy close to need and in response to consumer preferences and trends, and to expand and contract merchandise categories in response to consumers' changing tastes, we may not do so successfully, which could adversely affect our sales and the markdowns required to move the resulting excess inventory will adversely affect our operating margins.

Customers may also have expectations about how they shop in stores, or more generally engage with businesses across different channels or media (through internet-based and other digital or mobile channels or particular forms of social media), which may vary across demographics and may evolve rapidly. Customers are increasingly using technology and mobile devices to rapidly compare products and prices and to purchase products. Failure to effectively meet these changing expectations and demands may adversely impact our reputation and our financial results.

***We may be unable to meet evolving regulatory requirements and stakeholder expectations regarding  environmental, social or governance (ESG) matters.***

Many stakeholders, including investors, customers, employees, consumers and others, have increasingly focused on ESG topics, including environmental sustainability and corporate social responsibility matters such as climate change, packaging and waste reduction, and energy consumption in a variety of ways that are not necessarily consistent. We face pressures from certain constituencies to meet our goals related to, and to make significant advancements toward achievements in, these areas. Achievement of our goals is subject to risks and uncertainties, many of which are outside of our control, and it is possible that we may fail to achieve these goals or that these constituencies may not be satisfied with the goals we set or our efforts to achieve them. Our disclosure on these matters and our failure, or perceived failure, to meet our goals and otherwise address these matters to our stakeholders' satisfaction, could harm our reputation, which could negatively impact our business, our relationship with our various stakeholders, and our results of operations.  In addition, we could be criticized for the scope of our ESG initiatives. Our failure to meet shifting stakeholder expectations could negatively impact our brand, image, reputation, credibility, and the willingness of our customers and suppliers to do business with us.

In addition, complying with ESG-related rules and regulations, including collecting, measuring and reporting related data, can be costly, difficult and time consuming. Significant expenditures and commitment of time by management, employees and outside advisors may be involved in developing, implementing and overseeing policies, practices and internal controls related to ESG risk and performance, and we may undertake additional costs to meet our reporting and compliance obligations related to ESG matters.  For example, the State of California recently passed the Climate Corporate Data Accountability Act and the Climate-Related Financial Risk Act that will impose broad climate-related disclosure obligations on companies doing business in California and may increase our costs of compliance as a result.

We also may face stakeholder scrutiny, potential governmental enforcement actions or private litigation regarding our ESG initiatives and sustainability goals, or our disclosure of those goals and our metrics for measuring achievement of them, which may increase our costs of compliance, damage our reputation, or cause investors or consumers to lose confidence in us.

***Extreme and/or unseasonable weather conditions caused by climate change or otherwise, or natural disasters, could have a significant adverse effect on our business.***

Our business is susceptible to risks associated with climate change, which may cause more frequent and extreme weather events. Extreme weather conditions in the areas in which our stores or distribution centers are located - especially in areas with a high concentration of our stores - could have a material adverse effect on our business, financial condition and results of operations. For example, heavy snowfall or other extreme weather conditions over a prolonged period, caused by climate change or otherwise, might make it difficult for our customers or employees to travel to our stores. In addition, natural disasters such as hurricanes, tornados, floods, earthquakes, and other extreme weather or climate conditions, or a combination of these or other factors, could severely damage or destroy one or more of our stores or distribution facilities located in the affected areas, or disrupt our computer systems, thereby disrupting our business operations. Any of these events or circumstances also could disrupt the operations of one or more of our vendors. Day-to-day operations, particularly our ability to receive products from our vendors or transport products to our stores, could be adversely affected, or we could be required to close stores.

Our business is also susceptible to unseasonable weather conditions. For example, extended periods of unseasonably warm temperatures during the Fall or Winter seasons or cool weather during the Spring or Summer seasons could render a portion of our inventory incompatible with those unseasonable conditions, particularly in light of our historical product mix. These prolonged unseasonable weather conditions could adversely affect our business, financial condition and results of operations. In addition, because higher net sales historically have occurred during the second half of the year, unseasonably warm weather during these months could have a disproportionately large effect on our business and materially adversely affect our financial condition and results of operations.

***Public health crises, epidemics or pandemics have had, and could in the future have, a negative impact on the Company's business and operations.***

Public health crises, epidemics or pandemics have had, and could in the future have, a negative impact on our business and operations, including Company sales and cash flow. Such public health crises, epidemics and pandemics have the potential to create significant volatility, uncertainty and worldwide economic disruption, resulting in an economic slowdown of potentially extended duration, as seen with the COVID-19 pandemic. Such public health crises, epidemics and pandemics, could adversely affect our business and financial results, they may also have the effect of heightening many of the other risks described throughout this Annual Report.

## Strategic Risks

***We may not be able to sustain our growth plans or successfully implement our long-range strategic goals.***

Our growth largely depends on our ability to successfully open and operate new stores, as well as to expand our distribution capabilities in order to support that growth. While we have identified numerous market opportunities that we believe will allow us to operate 2,000 stores over the long term, the success of these strategies is dependent upon, among other things, the current retail environment, the identification of suitable markets and the availability of real estate that meets our criteria for traffic, square footage, co-tenancies, lease economics, demographics and other factors, the negotiation of acceptable lease terms, construction costs, the availability of financing, the hiring, training and retention of competent sales personnel, and the effective management of inventory to meet the needs of new and existing stores on a timely basis.

Notably, as we continue to evolve our off-price model, we plan on more effectively chasing the sales trend, making greater investments in our merchandising capabilities, operating with leaner inventories, improving operational flexibility, and challenging expenses, among other strategic initiatives. Executing these initiatives while also maintaining the current pace of our expansion may place increased demands on our operational, managerial and administrative resources. These initiatives may require us to increase the number of merchants and other associates we employ, modify how we manage our liquidity and inventory, as well as to monitor and upgrade our management information and other systems and our distribution infrastructure.

We may not be able to successfully execute our growth and other strategies on a timely basis or at all. If we fail to implement these strategies successfully, if we cannot keep up with the pace required for execution, or if these strategies do not yield the desired outcomes, our financial condition and results of operations would be adversely affected.

***Failure to execute our opportunistic buying and inventory management process could adversely affect our business.***

We purchase the majority of our inventory opportunistically, with our buyers purchasing close to need. Establishing the "treasure hunt" nature of the off-price buying experience to drive traffic to our stores requires us to offer changing assortments of merchandise in our stores. While opportunistic purchasing provides our buyers the ability to buy at desirable times and prices, in the quantities we need and into market trends, it places considerable discretion with our buyers, which subjects us to risks related to the pricing, quantity, nature and timing of inventory flowing to our stores. If we are unable to provide frequent replenishment of fresh, high quality, attractively priced merchandise in our stores, it could adversely affect traffic to our stores as well as our sales and margins. We base our purchases of inventory, in part, on our sales forecasts. If our sales forecasts do not match customer demand, we may experience higher inventory levels and need to mark down excess or slow-moving inventory, leading to decreased profit margins, or we may have insufficient inventory to meet customer demand, leading to lost sales, either of which could adversely affect our financial performance. We need to purchase inventory sufficiently below conventional retail to maintain our pricing differential to regular department and specialty store prices, and to attract customers and sustain our margins, which we may not achieve at various times and which could adversely affect our results.

In order to better serve our customers and maximize sales, we must properly execute our inventory management strategies by appropriately allocating merchandise among our stores, timely and efficiently distributing inventory to such locations, maintaining an appropriate mix and level of inventory in such locations, appropriately changing the allocation of floor space of stores among product categories to respond to customer demand, and effectively managing pricing and markdowns, and there is no assurance we will be able to do so. In addition, as we execute inventory localization initiatives, there could be disruptions in inventory flow and placement. Failure to effectively execute our opportunistic inventory buying and inventory management strategies could adversely affect our performance and our reputation.

In addition to our own execution, we may need to react to factors affecting inventory flow that are outside our control, such as adverse weather, natural disasters, epidemics or pandemics or other changes in conditions affecting our vendors and others in our supply chain, such as political instability, labor issues (including strikes or threats of strikes and scarcity of labor) and increased labor costs, reduced freight capacity and other transportation issues, or increasing cost of regulations. If we are not able to adjust appropriately to such factors, our inventory management may be affected, which could impact our performance and our reputation.

**Operational Risks**

***If we cannot optimize our existing stores or maintain favorable lease terms, our growth strategy and profitability could be negatively impacted.***

We lease substantially all of our store locations. Most of our current leases expire at various dates after ten-year terms, the majority of which are subject to our option to renew such leases for several additional five-year periods. While we have the right to terminate some of our leases under specified conditions, including by making specified payments, we may not be able to terminate a particular lease if or when we would like to close a particular store. If we decide to close stores, we are generally required to continue to perform obligations under the applicable leases, which generally include, among other things, paying rent and operating expenses for the balance of the lease term, or paying to exercise rights to terminate, and performing any of these obligations may be expensive. When we assign leases or sublease space to third parties, we may remain liable on the lease obligations, which could lead to significant expense if the assignee or sublessee does not perform. In addition, when the lease terms for the stores in our ongoing operations expire, our ability to renew such expiring leases on commercially acceptable terms or, if such leases cannot be renewed, our ability to lease a suitable alternative location, and our ability to enter into leases for new stores on favorable terms will each depend on many factors, some of which may not be within our control, such as conditions in the local real estate market, competition for desirable properties and our relationships with current and prospective lessors. As we renew and replace our store leases, we also strive to optimize the size of our existing stores to ensure maximum space utilization, which frequently means adjusting operations to accommodate smaller space through alternative floor plans and inventory turn optimization.

In addition, to the extent that our new store openings are in existing markets, we may experience reduced net sales volumes in existing stores in those markets. If we experience a decline in performance or lease payment allowances from our lessors become unavailable, we may slow or discontinue store openings, relocations, refreshes and/or remodels.

If any of the foregoing occurs, our growth and profitability may be negatively impacted.

***If we are unable to purchase attractive brand name merchandise in sufficient quantities at competitive prices, we may be unable to offer an appealing merchandise mix and our sales may be harmed.***

Our ability to purchase merchandise opportunistically from third party vendors depends upon the continuous, sufficient availability of high-quality merchandise that we can acquire at prices sufficiently below those paid by conventional retailers in order to achieve the value proposition we strive to provide to our customers. Some of our key vendors may limit the number of retail channels they use to sell their merchandise, which may result in intense competition among retailers to obtain and sell these goods. Moreover, we typically buy products from our vendors on a purchase order basis. We have no long-term purchase contracts with any of our vendors and, therefore, have no contractual assurances of continued supply, pricing or access to products, and any vendor could change the terms upon which they sell to us or discontinue selling to us at any time. Finally, if our vendors are better able to manage their inventory levels and reduce the amount of their excess inventory, the amount of high-quality merchandise available to us could be materially reduced.

If our relationships with our vendors are disrupted, we may not be able to acquire the merchandise we require in sufficient quantities or on terms acceptable to us. Any inability to acquire high quality merchandise would have a negative effect on our business and operating results because we would be missing products from our merchandise mix unless and until alternative supply arrangements were made, resulting in deferred or lost sales. In addition, events that adversely affect our vendors could impair our ability to obtain desired merchandise in sufficient quantities. Such events include difficulties or problems associated with our vendors' businesses, finances, labor, importation of products, costs, production, insurance and reputation.

***Our failure to attract, train and retain quality employees and temporary personnel in sufficient numbers could adversely affect our business.***

Our performance depends on recruiting, developing, training and retaining quality store, distribution center and other employees in large numbers as well as experienced buying and management personnel, and we invest significant resources in training and motivating them to maintain a high level of job satisfaction. Many of our store and distribution center employees are in entry level or part-time positions with historically high rates of turnover, which can lead to increased training and retention costs, particularly if employment opportunities increase. Availability and skill of employees may differ across markets in which we do business and in new markets we enter, and we need to manage our labor needs effectively.

In addition, because of the distinctive nature of our off-price model, we must provide significant internal training and development for key employees across the company, including within our buying organization. Similar to other retailers, we face challenges in securing and retaining sufficient talent in management and other key areas for many reasons, including competition in the retail industry generally and for talent in various geographic markets. If we do not continue to attract qualified individuals, train

10

them in our business model, support their development and retain them, our performance could be adversely affected or our growth could be limited.

We are also dependent upon temporary personnel to adequately staff our distribution facilities, with heightened dependence during busy periods such as the holiday season. Although we strive to secure long-term contracts on favorable terms with our service providers and other vendors, we may not be able to avoid unexpected operating cost increases in the future, such as those associated with minimum wage increases or enhanced health care requirements. In addition, there can be no assurance that we will receive adequate assistance from our temporary personnel, or that there will be sufficient sources of suitable temporary personnel to meet our demand. Any such failure to meet our staffing needs or any material increases in associate turnover rates could have a material adverse effect on our business or results of operations. Further, any negative publicity regarding the agencies from which we source temporary personnel, such as in connection with immigration issues or employment practices, could damage our reputation, disrupt our ability to obtain needed labor or result in financial harm to our business.

***Labor costs, including healthcare costs, and other challenges from our large workforce may adversely affect our results and profitability.***

We have a large workforce, and our ability to meet our labor needs while controlling costs, including costs of providing health, retirement and other associate benefits, is subject to various factors such as unemployment levels; prevailing wage rates and minimum wage requirements; participant benefit levels; economic conditions; interest rate changes; health and other insurance costs; and the regulatory environment, including health care legislation, and with respect to governmental labor and employment and associate benefits programs and requirements. When wage rates or benefit levels increase in the market or the unemployment rate is otherwise low, increasing our wages or benefits to compete for employees may cause our earnings to decrease, while failing to increase our wages or benefits competitively or reducing our wages or benefits could result in a decline in our ability to attract or retain employees or in the quality of our workforce, causing our customer service or performance to suffer, which could negatively impact our results.

***Parties with whom we do business may be subject to insolvency risks or may otherwise become unable or unwilling to perform their obligations to us.***

We are party to contracts, transactions and business relationships with various third parties, including vendors, suppliers, service providers and lenders, pursuant to which such third parties have performance, payment and other obligations to us. In some cases, we depend upon such third parties to provide essential leaseholds, products, services or other benefits, including with respect to store and distribution center locations, merchandise, advertising, software development and support, logistics, other agreements for goods and services in order to operate our business in the ordinary course, extensions of credit, hedging instruments and other vital matters. Economic, industry and market conditions could result in increased risks to us associated with the potential financial distress of such third parties.

If any of the third parties with which we do business become subject to bankruptcy, receivership or similar insolvency proceedings, our rights and benefits in relation to our contracts, transactions and business relationships with such third parties could be terminated, modified in a manner adverse to us, or otherwise impaired. We cannot make any assurances that we would be able to arrange for alternate or replacement contracts, transactions or business relationships on terms as favorable as our existing contracts, transactions or business relationships, if at all. Any inability on our part to do so could negatively affect our cash flows, financial condition and results of operations.

***Many of our vendors produce merchandise overseas, and our business is exposed to the risk of foreign and domestic operations and international tax policies and trade relations.***

We do not own or operate any manufacturing facilities. As a result, we are dependent upon the timely receipt of quality merchandise from vendors, many of which produce merchandise overseas. Factors which affect overseas production could affect our vendors and, in turn, our ability to obtain inventory and the price levels at which they may be obtained. Factors that cause an increase in merchandise costs or a decrease in supply could lead to generally lower sales and gross margins in the retail industry.

Such factors include:

- political or labor instability in countries where vendors are located or at foreign ports which could result in lengthy shipment delays, which, particularly if timed ahead of the Fall and Winter peak selling periods, could materially and adversely affect our ability to stock inventory on a timely basis;

- disruptions in the operations of domestic ports through which we import our merchandise, including labor disputes involving work slowdowns, lockouts or strikes, which could require us and/or our vendors to ship merchandise to alternative ports in the United States or through the use of more expensive means, and shipping to alternative ports in the United States could result in increased lead times and transportation costs; disruptions at ports through which we import our goods could also result in unanticipated inventory shortages;

11

- political or military conflict, which could cause a delay in the transportation of our products to us and an increase in transportation costs;

- heightened terrorism security concerns, which could subject imported goods to additional, more frequent or more thorough inspections, leading to delays in deliveries or impoundment of goods for extended periods;

- disease epidemics, pandemics, outbreaks and other health-related concerns, which could result in closed factories, reduced workforces, scarcity of raw materials and scrutiny or embargoing of goods produced in affected areas;

- natural disasters and industrial accidents, which could have the effect of curtailing production and disrupting supplies;

- increases in labor and production costs in goods-producing countries, which would result in an increase in our inventory costs;

- the migration and development of manufacturers, which can affect where our products are or will be produced;

- fluctuation in our vendors' local currency against the dollar, which may increase our cost of goods sold; and

- changes in import duties, tariffs, taxes, charges, quotas, loss of "most favored nation" trading status with the United States for a particular foreign country and trade restrictions (including the United States imposing antidumping or countervailing duty orders, safeguards, remedies or compensation and retaliation due to illegal foreign trade practices).

Any of the foregoing factors, or a combination thereof, could have a material adverse effect on our business.

Over the past few years, uncertainty has increased with respect to tax and trade policies, tariffs and government regulations affecting trade between the U.S. and other countries. Although we source the majority of our merchandise from third party vendors located in the U.S., the production of that merchandise occurs primarily overseas. As a result, we continue to evaluate the impact of currently effective tariffs, as well as any additional proposed tariffs, on our supply chain, costs, sales and profitability. We can provide no assurance that any strategies we implement to mitigate the impact of such tariffs or other trade actions will be successful.

In addition, other major developments in tax policy or trade relations, such as the disallowance of tax deductions for imported merchandise or the imposition of additional unilateral tariffs on imported products, could increase the cost of products purchased from suppliers in such countries or restrict the importation of products from such countries, which in turn could have a material adverse effect on our business, results of operations and liquidity.

***Any disruption to our distribution network could cause disruptions in our business, a loss of sales and profits, increases in our expenses, and other material adverse effects.***

Most of the merchandise we purchase is shipped directly to our distribution centers, where it is prepared for shipment to the appropriate stores. The success of our stores depends in part on their timely receipt of merchandise, and a strong, efficient and flexible distribution network is critical to our ability to grow and to maintain a low-cost operating structure. A disruption within our distribution network, including the shutdown of or loss of significant capacity by one or more of our current primary distribution centers could adversely affect our ability to deliver inventory in a timely manner and significantly disrupt our business. In addition, any failure to continue to add capacity to our existing distribution centers and build out planned additional distribution centers timely and cost effectively could adversely affect our business.

In addition to the distribution centers that we operate, we have arrangements with third parties for the use of pool point facilities, which we believe streamline and optimize our distribution network. If complications arise with a pool point facility or its operator, or if any such facility is severely damaged or destroyed, it may cause delays in the delivery of our merchandise to our stores. We also may be affected by disruptions in the global transportation network such as port strikes, weather conditions, work stoppages or other labor unrest, which may also adversely affect our ability to deliver inventory on a timely basis. We also depend upon third-party carriers for shipment of merchandise; any interruption in service by these carriers for any reason could cause disruptions in our business, a loss of sales and profits, and other material adverse effects.

***If we are unable to protect our information systems against service interruption, misappropriation of data, breaches of security, or other cyber-related attacks, our operations could be disrupted, we may suffer financial losses and our reputation may be damaged.***

We rely extensively on various information systems, including data centers, hardware, software and applications to manage many aspects of our business, including to process and record transactions in our stores, to enable effective communication systems, to plan and track inventory flow, to manage logistics and to generate performance and financial reports. In addition, some aspects of our business, like that of most retailers, involve the receipt, storage and transmission of customers' personal information and consumer preferences, as well as confidential information about our employees, our vendors and our Company, some of which is entrusted to third-party service providers and vendors. We are dependent on the integrity, security and consistent operations of these systems and related back-up systems, software, tools (including encryption technology) and monitoring to maintain reliable operations, provide

security and oversight for processing, transmission, storage and the protection of confidential information, and to recover from unexpected outages.

Like most major corporations, we, our customers and our third-party services providers face an evolving, increasing threat landscape in which cybercriminals, among others, employ a complex array of techniques designed to disrupt operations and/or access personal and other sensitive information, including, for example, the use of fraudulent or stolen access credentials, malware, ransomware, phishing, denial of service and other types of attacks. Hardware, software or applications we develop or obtain from third parties may contain defects in design or manufacture or other problems that are not presently known and could unexpectedly compromise information security. In addition, our employees, contractors or third parties with which we do business or to which we outsource business operations may attempt to circumvent our security measures in order to misappropriate such information, and may purposefully or inadvertently cause a breach involving such information or become subject to various other cyber-crimes. Further, our computer systems and the third-party systems of our vendors are also subject to damage or interruption from a number of non-criminal causes, including power outages; computer and telecommunications failures; computer viruses; and design or usage errors by our employees or contractors.  Moreover, the rapid evolution and increased adoption of artificial intelligence, Software as a Service (SaaS) and cloud technologies may intensify our cybersecurity risks.

If we or third parties with which we do business were to fall victim to successful cyber-attacks or experience other material cybersecurity incidents, including the loss of individually identifiable customer or other confidential data or the inability to provide contracted services, we may incur substantial costs and suffer other negative consequences, which may include:

- remediation costs, such as liability for stolen assets or information, repairs of system damage or replacement of systems, and incentives to customers or business partners in an effort to maintain relationships after an attack;

- increased cybersecurity protection costs, which may include the cost of continuing to make organizational changes, deploy additional personnel and protection technologies, train employees, and engage third party consultants;

- lost revenues resulting from operational disruption or the unauthorized use of proprietary information or the failure to retain or attract customers following an attack;

- litigation and legal risks, including regulatory actions by state and federal governmental authorities;

- increased cybersecurity and other insurance premiums;

- reputational damage that adversely affects customer or investor confidence; and

- damage to our competitiveness, stock price, and long-term stockholder value.

We employ various security measures and technologies to actively monitor, prevent, mitigate, and recover from cyber-attacks.  Despite advances in security hardware, and software, the methods and tools used to obtain unauthorized access, disable or degrade service, or sabotage systems are constantly changing and evolving, and may be difficult to anticipate or detect, and there is no guarantee that the proactive measures we put in place will be adequate to safeguard against all data security breaches or misuses of data. As many of our non-store associates continue to work in a hybrid model, we face an increased risk due to the potential interruptions to internal or external information technology infrastructure as well as ongoing threats and attempts to breach our security networks. The Company carries information security risk insurance that is designed to mitigate against certain potential losses arising from a cybersecurity incident. However, there is no guarantee that this insurance coverage will be sufficient to cover all possible claims and we could suffer losses that could have a material adverse effect on our business.

Although we endeavor to maintain reliable operations and protect consumer identity and payment information through the development  of security talent and the implementation of technologies, processes and procedures, including training programs for employees to raise awareness about phishing, malware and other cyber risks, we could experience increased costs associated with maintaining these protections as threats of cyber-attacks increase in sophistication and complexity. In addition, there are inherent risks associated with modifying or replacing systems, and with new or changed relationships, including accurately capturing and maintaining data, realizing the expected benefit of the change and managing the potential disruption of the operation of the systems as the changes are implemented. Potential issues associated with implementing technology initiatives and the time and resources required to optimize the benefits of new elements of our systems and infrastructure could reduce the efficiency of our operations in the short term.

***We are subject to payment-related risks that could increase our operating costs, expose us to fraud or theft, subject us to potential liability and potentially disrupt our business.***

We accept payments using a variety of methods, including cash, checks, credit and debit cards, and gift cards, and we may offer new payment options over time. Acceptance of these payment methods subjects us to rules, regulations, contractual obligations and compliance requirements, including payment network rules and operating guidelines, data security standards and certification

13

requirements, and rules governing electronic funds transfers. These requirements may change over time or be reinterpreted, making compliance more difficult or costly.

For certain payment methods, including credit and debit cards, we pay interchange and other fees, which may increase over time and raise our operating costs. We rely on third parties to provide payment processing services, including the processing of credit cards, debit cards, and other forms of electronic payment. If these companies become unable to provide these services to us, or if their systems are compromised, it could potentially disrupt our business. The payment methods that we offer also subject us to potential fraud and theft by criminals, who are becoming increasingly sophisticated, seeking to obtain unauthorized access to or exploit weaknesses that may exist in the payment systems. If we fail to comply with applicable rules or requirements for the payment methods we accept, or if payment-related data is compromised due to a breach or misuse of data, we may be liable for costs incurred by payment card issuing banks and other third parties or subject to fines and higher transaction fees, or our ability to accept or facilitate certain types of payments may be impaired. In addition, our customers could lose confidence in certain payment types, which may result in a shift to other payment types or potential changes to our payment systems that may result in higher costs. As a result, our business and operating results could be adversely affected.

***Our future growth and profitability could be adversely affected if our advertising and marketing programs are not effective in generating sufficient levels of customer awareness and traffic.***

We rely on advertising to increase consumer awareness of our product offerings and pricing to drive traffic to our stores. In addition, we rely and will increasingly rely on other forms of media advertising, including digital, social media and e-marketing. Our future growth and profitability will depend in part upon the effectiveness and efficiency of our advertising and marketing programs. Our advertising and marketing programs may not be successful if we do not:

- manage advertising and marketing costs effectively in order to maintain acceptable operating margins and return on our marketing investment; and

- convert customer awareness into actual store visits and product purchases.

Our planned advertising and marketing expenditures may not result in increased total or comparable store sales or generate sufficient levels of product awareness. Further, we may not be able to manage our advertising and marketing expenditures on a cost-effective basis. Additionally, some of our competitors may have substantially larger marketing budgets, which may provide them with a competitive advantage over us.

***Damage to our corporate reputation or brand could adversely affect our sales and operating results.***

Building brand reputation is important to our continuing success. Our reputation is partially based on perceptions of various subjective qualities and overall integrity. Any incident that erodes the trust or confidence of our customers or the general public could adversely affect our reputation and business, particularly if the incident results in significant adverse publicity or governmental inquiry. Such an incident could also include alleged acts or omissions by or situations involving our vendors (or their contractors or subcontractors), the landlords for our stores, or our associates outside of work, and may pertain to social or political issues or protests largely unrelated to our business. In addition, information concerning us, whether or not true, may be instantly and easily posted on social media platforms and similar devices at any time, which information may be adverse to our reputation or business.

The harm may be immediate without affording us an opportunity for redress or correction. Damage to our reputation in any form could result in declines in customer loyalty and sales, affect our vendor relationships, development opportunities and associate retention, and otherwise adversely affect our business.

***The loss of executives or other key personnel may disrupt our business and adversely affect our financial results.***

We depend on the contributions of key personnel in various functions for our continued success. These executives and other key personnel may be hired by our competitors, some of which have considerably more financial resources than we do. The loss of key personnel, or the inability to hire, train, motivate and retain qualified employees, or changes to our organizational structure, operating results, or business model that adversely affect morale or retention, could adversely affect our business, financial condition and results of operations.

Effective succession planning is also a key factor for our success. Our failure to enable the effective transfer of knowledge and facilitate smooth transitions with regard to key personnel could adversely affect our strategic planning and execution and negatively affect our business, financial condition and results of operations. If we fail to enable the effective transfer of knowledge and facilitate smooth transitions for key personnel, the operating results and future growth for our business could be adversely affected, and the morale and productivity of the workforce could be disrupted.

**Legal, Regulatory, Compliance and Tax Risks**

***Difficulty complying with existing and changing laws, rules, regulations and local codes could negatively affect our business operations and financial performance.***

We are subject to federal, state and local laws, rules and regulations in the operation of our business. In addition to complying with current laws, rules and regulations, we must also comply with new and changing laws and regulations, executive orders and other directives, new regulatory initiatives, evolving interpretation of existing laws by judicial and regulatory authorities, and reforms in jurisdictions where we do business. Complying with local zoning codes, real estate land use restrictions, employment-related laws, and other local laws across numerous jurisdictions is particularly challenging as we grow the number of our stores in new municipalities and need to stay abreast of changes  in such local laws. The increasing proliferation of local laws, some of which may be conflicting, further complicates our efforts to comply with all of the various laws, rules and regulations that apply to our business. We could also be negatively impacted by changes in government regulations, initiatives or programs in areas including taxes, healthcare, immigration and environmental protection.

All of the above legal, regulatory and administrative requirements may, individually or collectively, affect multiple aspects of our business, including those involving labor and employment benefits; health, welfare and finance; real estate management; consumer protection and product safety; climate change, supply chain, energy and waste; electronic communications, data protection and privacy; protection of third-party intellectual property rights; and income taxes. Changes to these laws and regulations could increase our costs of compliance or of doing business, and could adversely affect our operating results. In addition, we require our vendors to adhere to various conduct, compliance and other requirements, including those relating to employment and labor (including wages and working conditions), health and safety, and anti-bribery standards. Although we have implemented policies and procedures to facilitate compliance with laws and regulations, this does not guarantee that vendors and other third parties with whom we do business will not violate such laws and regulations or our policies. If we or other third parties with whom we do business fail to comply with these laws, rules and regulations, we may be subject to judgments, fines or other costs or penalties, which could materially adversely affect our business operations and financial performance.

***The insurance we carry may not always pay, or be sufficient to pay or reimburse us, for our losses.***

We are primarily self-insured and we purchase insurance only for catastrophic types of events for such risks as workers' compensation, employment practices liability, employee health benefits, product and other general liability claims, among others. If we suffer a substantial loss that is not covered by commercial insurance or our self-insurance reserves, the loss and related expenses could harm our business and operating results.

***Issues with safety and merchandise shrinkage could damage our sales and financial results.***

Various governmental authorities in the jurisdictions where we do business regulate the safety of the merchandise we sell to consumers. Regulations and standards in this area, including those related to the U.S. Consumer Product Safety Improvement Act of 2008, state regulations like California's Proposition 65, and similar legislation, impose restrictions and requirements on the merchandise we sell in our stores. These regulations change from time to time as new federal, state or local regulations are enacted. If we or our merchandise vendors are unable to comply with regulatory requirements on a timely basis or at all, or to adequately monitor new regulations that may apply to existing or new merchandise categories, significant fines or penalties could be incurred or we could have to curtail some aspects of our sales or operations, which could have a material adverse effect on our financial results.

We rely on our vendors to provide quality merchandise that complies with applicable product safety laws and other applicable laws, but they may not comply with their obligations to do so. Although our arrangements with our vendors frequently provide for indemnification for product liabilities, the vendors may fail to honor those obligations to an extent we consider sufficient or at all. Issues with the safety of merchandise, and issues with the authenticity of merchandise, or customer concerns about such issues, regardless of our fault, could cause damage to our reputation and could result in lost sales, uninsured product liability claims or losses, merchandise recalls and increased costs, and regulatory, civil or criminal fines or penalties, any of which could have a material adverse effect on our financial results.

An unfavorable, uncertain or volatile economic environment, as we have experienced recently as a result of inflation, fluctuating interest rates and supply chain disruptions, among other things, has and may continue to cause an increase in inventory shrinkage. Risk of loss or theft of assets, including inventory shrinkage, is inherent in the retail business, and we experienced increased shrinkage, as well as increased loss prevention costs, in recent years. Loss or theft may be caused by error or misconduct of associates, customers, vendors, organized retail theft, or other third parties. Our inability to effectively prevent and/or minimize the loss or theft of assets, or to effectively reduce the impact of those losses, could adversely affect our financial performance.  Additionally, acts of violence at, or threatened against, our stores, including active shooter situations, may, in addition to other operational impact, result in damage and restricted access to our stores and/or store closures for short or extended periods of time, all of which could materially adversely affect our financial performance.

15

***Compliance with increasingly rigorous privacy and data security regulations could be costly, affect or limit our business opportunities and how we collect and/or use data, and potentially subject us to fines and lawsuits.***

As described above, the protection of customer, employee, vendor and Company data is critical to our business. As the regulatory environment relating to retailers' and other companies' obligation to protect such sensitive data becomes increasingly rigorous, with new and evolving requirements applicable to our business, compliance with those requirements could result in additional costs and could have a significant impact on our current and planned privacy, data protection and information security-related practices, our collection, use, sharing, retention and safeguarding of customer and/or employee information, and some of our current or future business plans. A material failure on our part to comply could subject us to fines or other regulatory sanctions and potentially to lawsuits.

In recent years, there has been increasing regulatory enforcement and litigation activity in the areas of privacy, data protection and information security in various states in which we operate. Compliance with the evolving privacy regulatory landscape will likely increase the costs of doing business, especially if we face differing regulatory requirements across multiple jurisdictions and/or a lack of adequate regulatory guidance. New legislation or regulations, including any potential comprehensive federal privacy legislation, as well as any associated inquiries or investigations or any other government actions, could also result in negative publicity, require significant management time and attention, and subject us to remedies that may harm our business, including fines or demands or orders that we modify or cease existing business practices.

***Legal and regulatory proceedings could have an adverse impact on our results of operations.***

We are subject to various legal and regulatory proceedings relating to our business, certain of which may involve jurisdictions with reputations for aggressive application of laws and procedures against corporate defendants. We are impacted by trends in litigation, such as representative claims under the California Private Attorneys' General Act and class action litigation brought under various consumer protection, employment, and privacy and information security laws. Accruals are established based on our best estimates of our potential liability. However, we cannot accurately predict the ultimate outcome of any such proceedings due to the inherent uncertainties of litigation. Regardless of the outcome or whether the claims are meritorious, legal and regulatory proceedings may require that we devote substantial time and expense to defend our Company. Unfavorable rulings could result in a material adverse impact on our business, financial condition or results of operations.

***Use of social media by the Company or third parties at our direction in violation of applicable laws and regulations may adversely impact our reputation or subject us to fines or other penalties.***

There has been a substantial increase in the use of social media platforms and other forms of internet-based communications, which allow individuals access to a broad audience of consumers and other interested persons. We have increasingly utilized social media in our marketing and employment recruiting efforts in order to reach as many current and potential new customers and potential employment candidates as efficiently and cost effectively as possible, and have also retained third parties, such as influencers, with expertise and distinction in the social media realm to bolster our social media efforts and our perceived affiliation with these individuals could cause us brand or reputational damage in the event they are perceived to be or take actions inconsistent with our brands and values. As laws and regulations rapidly evolve to govern the use of these platforms, the failure by us, our employees or third parties acting at our direction to abide by applicable laws and regulations in the use of these platforms could adversely impact our reputation or subject us to fines or other penalties.

**Risk Related to Our Substantial Indebtedness and Corporate Structure**

***Our ability to generate sufficient cash depends on numerous factors beyond our control, and we may be unable to generate sufficient cash flow to service our debt obligations.***

As of February 1, 2025, our obligations include (i) $1,238.9 million, inclusive of original issue discount, under our senior secured term loan facility (Term Loan Facility) and (ii) $156.2 million under our 2.25% Convertible Notes due April 15, 2025 (our "2025 Convertible Notes") and $297.1 million under our 1.25% Convertible Notes due December 15, 2027 (our "2027 Convertible Notes" and, together with our 2025 Convertible Notes, our "Convertible Notes"). We had no outstanding balance on our $900.0 million asset-based lending facility (ABL Line of Credit) as of February 3, 2024. Our debt obligations also include $25.0 million of finance lease obligations as of February 1, 2025. Estimated cash required to make interest payments for these debt obligations, net of the impact of our interest rate swap, amounts to approximately $70.1 million in the aggregate for the fiscal year ending January 31, 2026.

Our ability to make payments on and to refinance our debt, and to fund planned capital expenditures, will depend on our ability to generate cash in the future, which is to some extent subject to general economic, financial, competitive, legislative, regulatory and other factors that are beyond our control. If we are unable to generate sufficient cash flow to service our debt and meet our other commitments, we will be required to adopt one or more alternatives, such as refinancing all or a portion of our debt, selling material

assets or operations or raising additional debt or equity capital. We may not be able to successfully carry out any of these actions on a timely basis, on commercially reasonable terms or at all, or be assured that these actions would be sufficient to meet our capital requirements. In addition, the terms of our existing or future debt agreements may restrict us from affecting any of these alternatives.

***Our failure to comply with the agreements relating to our outstanding indebtedness, including as a result of events beyond our control, could result in an event of default that could materially and adversely affect our results of operations and our financial condition.***

If an event of default under any of the agreements relating to our outstanding indebtedness occurred, the holders of the defaulted debt could cause all amounts outstanding with respect to that debt to be due and payable immediately. Our assets or cash flow may not be sufficient to fully repay borrowings under our outstanding debt instruments if accelerated upon an event of default, resulting in a need for an alternate source of funding. We cannot make any assurances that we would be able to obtain such an alternate source of funding on satisfactory terms, if at all, and our inability to do so could cause the holders of our securities to experience a partial or total loss of their investments in the Company. Further, if we are unable to repay, refinance or restructure our secured indebtedness, the holders of such debt could proceed against the collateral securing that indebtedness through foreclosure proceedings and/or by forcing us into bankruptcy or liquidation. In addition, any event of default or acceleration under one debt instrument could also result in an event of default under one or more of our other debt instruments.

***The conditional conversion feature of the 2027 Convertible Notes, if triggered, may adversely affect our financial condition and operating results.***

In the event the conditional conversion feature of our 2027 Convertible Notes is triggered, holders of our 2027 Convertible Notes will be entitled to convert their notes at any time during specified periods at their option. If one or more holders elect to convert their 2027 Convertible Notes, we would be required to settle the principal portion of our conversion obligation in cash, which could adversely affect our liquidity. In addition, even if holders of our 2027 Convertible Notes do not elect to convert their notes, we could be required under applicable accounting rules to reclassify all or a portion of the outstanding principal of the 2027 Convertible Notes as a current rather than long-term liability, which would result in a material reduction of our net working capital. Our 2025 Convertible Notes are now convertible at any time until the close of business on the second scheduled trading day immediately preceding the maturity date of April 15, 2025.

***Conversion of the Convertible Notes will dilute the ownership interest of existing stockholders, including holders who had previously converted their Convertible Notes, or may otherwise depress the price of our common stock.***

The conversion of some or all of the Convertible Notes will dilute the ownership interests of existing stockholders, as we will deliver shares of our common stock with respect to any excess over principal upon conversion of any of the Convertible Notes. Our Convertible Notes may from time to time in the future be convertible at the option of their holders prior to their scheduled terms under certain circumstances and our 2025 Convertible Notes are now convertible at any time until the close of business on the second scheduled trading day immediately preceding the maturity date of April 15, 2025. Any sales in the public market of the common stock issuable upon such conversion could adversely affect prevailing market prices of our common stock. In addition, the existence of the Convertible Notes may encourage short selling by market participants because the conversion of the Convertible Notes could be used to satisfy short positions, or anticipated conversion of the Convertible Notes into shares of our common stock could depress the price of our common stock.

***We are a holding company and rely on dividends, distributions and other payments, advances and transfers of funds from our subsidiaries to meet our obligations.***

We are a holding company that does not conduct any business operations of our own. As a result, we are largely dependent upon cash dividends and distributions and other transfers from our subsidiaries to meet our obligations. The deterioration of income from, or other available assets of, our subsidiaries for any reason could limit or impair their ability to pay dividends or other distributions to us.

### Risks Related to Ownership of Our Common Stock

***Our stock price has been and may continue to be volatile.***

The market price of our common stock has fluctuated substantially in the past and may continue to fluctuate significantly. For example, in Fiscal 2024, our stock price fluctuated from a high of $298.89 to a low of $174.64. Future announcements or disclosures concerning us or any of our competitors, our strategic initiatives, our sales and profitability, our financial condition, any quarterly variations in actual or anticipated operating results or comparable sales, any failure to meet analysts' expectations and sales of large blocks of our common stock, among other factors, could cause the market price of our common stock to fluctuate substantially. In

addition, the stock market has experienced price and volume fluctuations that have affected the market price of many retail and other stocks that have often been unrelated or disproportionate to the operating performance of these companies.

***Anti-takeover provisions in our charter documents and Delaware law might discourage or delay acquisition attempts for us that stockholders might consider favorable.***

Our amended and restated certificate of incorporation and amended and restated bylaws contain provisions that may make the acquisition of the Company more difficult without the approval of our Board of Directors. These provisions:

- authorize the issuance of undesignated preferred stock, the terms of which may be established and the shares of which may be issued without stockholder approval, and which may include super voting, special approval, dividend, or other rights or preferences superior to the rights of the holders of common stock;

- prohibit stockholder action by written consent, requiring all stockholder actions be taken at a meeting of our stockholders;

- establish advance notice requirements for nominations for elections to our Board of Directors or for proposing matters that can be acted upon by stockholders at stockholder meetings;

- establish a classified Board of Directors, as a result of which our Board of Directors is divided into three classes, with each class serving for staggered three-year terms, which will be phased out by the time of the 2027 Annual Meeting of Stockholders, in accordance with an amendment to our Certificate of Incorporation, approved by our stockholders in 2024, to declassify the Board in phases and provide for the annual election of the entire Board for one-year terms;

- until the 2027 Annual Meeting of Stockholders, limit the ability of stockholders to remove directors only for cause and only upon the affirmative vote of at least 75% of the voting power of all outstanding shares of capital stock entitled to vote generally in the election of directors, voting together as a single class; beginning with the 2027 Annual Meeting of Stockholders, when the Board will no longer be classified, directors may be removed with or without cause as required by Delaware law;

- prohibit stockholders from calling special meetings of stockholders;

- provide that the Board of Directors is expressly authorized to alter or repeal our amended and restated bylaws; and

- require the approval of holders of at least 75% of the outstanding shares of our voting common stock to amend the amended and restated bylaws and certain provisions of the amended and restated certificate of incorporation.

These anti-takeover provisions and other provisions under Delaware law could discourage, delay or prevent a transaction involving a change in control of the Company, even if doing so would benefit our stockholders. These provisions could also discourage proxy contests and make it more difficult for stockholders to elect directors they choose or to cause us to take other corporate actions they desire.

***Our business could be impacted as a result of actions by activist stockholders or others.***

From time to time, we may be subject to legal and business challenges in the operation of our Company due to stockholder proposals, media campaigns, proxy contests, and other such actions instituted by activist stockholders or others. Responding to such actions could be costly and time-consuming, disrupt our operations, may not align with our business strategies and could divert the attention of our Board of Directors and senior management from the pursuit of current business strategies. Perceived uncertainties as to our future direction as a result of stockholder activism or potential changes to the composition of the Board of Directors may lead to the perception of a change in the direction of the business or other instability, and may affect our stock price or may make it more difficult to attract and retain qualified personnel and business partners.

## Item 1B. Unresolved Staff Comments

Not Applicable.

## Item 1C. Cybersecurity

*Risk Governance and Oversight*

Cybersecurity represents an important component of the Company's overall cross-functional approach to risk management. Our cybersecurity practices are integrated into the Company's enterprise risk management (ERM) approach, and cybersecurity risks are among the core enterprise risks identified for oversight by the Board through our annual ERM assessment. While the Board is ultimately responsible for risk oversight, the Audit Committee oversees the overall review of our policies and procedures with respect to risk assessment and risk management, and has oversight of information technology and security matters, which includes cybersecurity strategies and risks, as well as data privacy and data protection (Information Security). The Audit Committee oversees

18

the management of risks from cybersecurity threats, including the policies, processes, and practices that the Company's management implements to address risks from cybersecurity threats.

On a quarterly basis, our Chief Information Officer (CIO) and Chief Information Security Officer (CISO) report to the Audit Committee on our Information Security program, including presentations and reports on cybersecurity risks, which address a wide range of topics including, for example, recent developments, security initiatives, vulnerability assessments, the threat environment, technological trends, and information security considerations arising with respect to the Company's peers and vendors; recent cybersecurity-related developments; strategic activities; and the execution of our cybersecurity awareness training. In turn, the chair of the Audit Committee reports out to the full Board on a quarterly basis regarding these matters, among other matters addressed by the Audit Committee.

Management utilizes a cross-functional approach designed to address the risk from cybersecurity threats, involving senior management personnel from the technology, operations, legal, risk management, internal audit and other key business functions, as well as members of the Company's Board and the Audit Committee of the Board. The Company's CIO, with support from our CISO and the other members of the cybersecurity team, is the member of the Company's management that is principally responsible for overseeing the Company's cybersecurity risk management program.

The CIO, in coordination with the CISO, works to implement a program designed to protect the Company's information systems from cybersecurity threats and to promptly respond to cybersecurity incidents. To facilitate the success of this program, the cybersecurity team works to address cybersecurity threats and respond to cybersecurity incidents in accordance with the Company's written incident response plan. The CISO and cybersecurity team regularly meet to monitor the prevention, detection, mitigation and remediation of cybersecurity incidents, and the CISO consults with the CIO and executive management, including the Chief Executive Officer, to report such incidents to the Audit Committee and the Board and initiate a response to incidents when appropriate.

We believe our cybersecurity team, led by our CISO, has the appropriate expertise, background and depth of experience to manage risks arising from cybersecurity threats. Our CISO is a credentialed and industry-recognized security executive with over 20 years' experience in healthcare, government and the private sector implementing enterprise cybersecurity and privacy programs, building high performing teams, creating a risk-aware culture, managing cybersecurity incidents, and communicating cyber risks to boards of directors. He holds a Master degree in Computer Engineering and has obtained certifications, including Certified Information Security Manager and Certified Information Systems Security Professional. Prior to joining Burlington, the CISO served as the CISO at Hospital for Special Surgery for 6 years and as a CISO at NYC Health+Hospitals for 4 years. Our CISO reports to our CIO, who has more than 25 years of information technology leadership experience. Together our CIO and CISO have decades of leadership experience in information technology, cybersecurity and retail.

*Risk Management*

We have created a cybersecurity program that endeavors to prevent, detect, contain and respond to material risks from cybersecurity threats and incidents and integrate cybersecurity risk into our enterprise risk management framework and activities. Our program consists of policies and procedures for identification, assessment, remediation, response, and reporting of cybersecurity threats and incidents. The cybersecurity program is a part of our company's ERM framework and activities. The cybersecurity program employs a risk-based approach and draws upon a combination of industry standard frameworks, including the National Institute of Standards and Technology (NIST) Cybersecurity Framework and the Payment Card Industry Data Security Standard (PCI DSS).

Our cybersecurity risk management approach and processes are designed to manage risks from cybersecurity threats associated with our use of third-party service providers, ranging from vendor cyber vetting to conducting security assessments and monitoring activities. We also operate an employee awareness and training program to help ensure all relevant associates are equipped to recognize and respond to potential threats. Additionally, we leverage threat intelligence technologies to inform our response posture to potential emerging threats to our digital business infrastructure and systems. Furthermore, we engage with third-party cybersecurity consultants and technology vendors to assess our cybersecurity program and test our technical capabilities. The Company also carries information security risk insurance that is designed to mitigate against certain potential losses arising from a cybersecurity incident.

To date, we have not identified any risks from cybersecurity threats, including as a result of any previous cybersecurity incidents, that have materially affected or are reasonably likely to materially affect the Company, including its business strategy, results of operations, or financial condition. As further discussed in Item 1A, Risk Factors, if we are unable to protect our information systems against service interruption, misappropriation of data, breaches of security, or other cyber-related attacks, our operations could be disrupted, we may suffer financial losses and our reputation may be damaged.

## Item 2.    Properties

We own the land and/or buildings for 23 of our stores and have leases for 1,085 of our stores. Our new stores are generally leased for an initial term of ten years, the majority of which are subject to our option to renew such leases for several additional five-year periods. Store leases generally provide for fixed monthly rental payments, plus the payment, in most cases, of real estate taxes

and other charges with escalation clauses. In some locations, our store leases contain formulas providing for the payment of additional rent based on sales. Some of our stores are freestanding or located in regional power centers, strip shopping centers or in malls.

We own approximately 235 acres of land in Burlington and Florence, New Jersey on which we have constructed our corporate campus, which includes our corporate headquarters and the Burlington, New Jersey (Route 130 North) warehousing facility. We own approximately 43 acres of land in Edgewater Park, New Jersey on which we have constructed our Edgewater Park, New Jersey (Route 130 South) distribution center and an office facility. We lease approximately 103,000 square feet of office space in New York City (east coast buying office), and 50,000 square feet of office space in Los Angeles, California (west coast buying office). During Fiscal 2024, we signed a lease for an additional approximately 68,000 square feet of space at the east coast buying office, which we expect to take possession of during Fiscal 2025.

As described in Item 1, Business, we currently operate multiple distribution centers and warehousing facilities.

### Item 3.   Legal Proceedings

In the course of business, the Company is party to class or collective actions alleging violations of federal and state wage and hour and other labor statutes, representative claims under the California Private Attorneys' General Act and various other lawsuits and regulatory proceedings from time to time including, among others, commercial, product, employee, customer, intellectual property, privacy and other claims. Actions against us are in various procedural stages. Many of these proceedings raise factual and legal issues and are subject to uncertainties. Refer to Note 14, "Commitments and Contingencies," to our Consolidated Financial Statements for further detail.

### Item 4.   Mine Safety Disclosures

Not applicable.

20

**PART II**

**Item 5.   Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities**

*Market Information*

Our common stock is listed on the New York Stock Exchange under the symbol "BURL."

*Holders*

As of March 1, 2025, we had one holder of record of our common stock. This figure does not include the significantly greater number of beneficial holders of our common stock.

*Dividends*

We have not declared, and do not anticipate declaring in the near term, dividends on shares of our common stock. We currently do, and intend to continue to, retain all available funds and any future earnings to fund all of the Company's capital expenditures, business initiatives, and to support any potential opportunistic capital structure initiatives. Any determination to pay dividends in the future will be at the discretion of our Board of Directors and will depend upon results of operations, financial condition, contractual restrictions, including those under agreements governing our existing indebtedness, or any potential future indebtedness we may incur, restrictions imposed by applicable law, capital requirements and other factors our Board of Directors deems relevant.

In addition, since we are a holding company, substantially all of the assets shown on our consolidated balance sheets are held by our subsidiaries. Accordingly, our earnings, cash flow and ability to pay dividends are largely dependent upon the earnings and cash flows of our subsidiaries and the distribution or other payment of such earnings to us in the form of dividends.

*Stock Performance Graph*

The performance graph below and related information shall not be deemed "soliciting material" or to be "filed" with the SEC for purposes of Section 18 of the Exchange Act, or otherwise subject to the liabilities under that Section, and shall not be deemed to be incorporated by reference into any future filing under the Securities Act or the Exchange Act, except to the extent that we specifically incorporate it by reference into such filing.

The following graph compares the cumulative total stockholder return on our common stock from the closing prices as of the end of each fiscal year from February 1, 2020 through February 1, 2025, with the return on the Standard & Poor's (S&P) 500 Index and the Dow Jones United States Apparel Retailers Index over the same period. This graph assumes an initial investment of $100 and

21

assumes the reinvestment of dividends, if any. Such returns are based on historical results and are not intended to suggest future performance.



| Company / Index | Base Period February 1, 2020 | Indexed Returns for Fiscal Years Ended | | | | |
|---|---|---|---|---|---|---|
| | | January 30, 2021 | January 29, 2022 | January 28, 2023 | February 3, 2024 | February 1, 2025 |
| Burlington Stores, Inc. | $ 100.00 | $ 114.45 | $ 105.90 | $ 104.10 | $ 90.46 | $ 130.56 |
| S&P 500 Index | $ 100.00 | $ 115.15 | $ 137.40 | $ 126.20 | $ 153.73 | $ 187.27 |
| Dow Jones U.S. Apparel Retailers Index | $ 100.00 | $ 106.22 | $ 114.78 | $ 124.59 | $ 141.23 | $ 173.20 |

22

*Purchases of Equity Securities by the Issuer and Affiliated Purchasers*

The following table provides information regarding our purchases of common stock during the three fiscal months ended February 1, 2025:

| Month | Total Number of Shares Purchased | Average Price Paid Per Share(1) | Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs(2) | Approximate Dollar Value of Shares That May Yet Be Purchased Under the Plans or Programs (in thousands) |
|---|---|---|---|---|
| November 3, 2024 through November 30, 2024 | 55,351 | 257.39 | 55,351 | 310,377 |
| December 1, 2024 through January 4, 2024 | 116,885 | 289.93 | 116,885 | 276,488 |
| January 5, 2024 through February 1, 2025 | 46,207 | 288.42 | 46,207 | 263,161 |
| **Total** | 218,443 | | 218,443 | |

(1)    Includes commissions for the shares repurchased under our publicly announced share repurchase programs.

(2)    On August 15, 2023, our Board of Directors authorized the repurchase of up to $500 million of common stock, which is authorized to be executed through August 2025. For a further discussion of our share repurchase program, see "Part II, Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources—Share Repurchase Program."

**Item 6.    Reserved**

**Item 7.   Management's Discussion and Analysis of Financial Condition and Results of Operations**

*The following discussion summarizes the significant factors affecting our consolidated operating results, financial condition, liquidity and cash flows as of and for the periods presented below. The following discussion and analysis should be read in conjunction with our Consolidated Financial Statements, including the notes thereto, appearing elsewhere in this Annual Report.*

*In addition to historical information, this discussion and analysis contains forward-looking statements based on current expectations that involve risks, uncertainties and assumptions, such as our plans, objectives, expectations and intentions as further described under the caption above entitled "Cautionary Statement Regarding Forward-Looking Statements." Our actual results or other events and the timing of events may differ materially from those anticipated in these forward-looking statements as a result of various factors, including those set forth in Item 1A, Risk Factors and elsewhere in this Annual Report.*

## General

We are a nationally recognized off-price retailer of high-quality, branded merchandise at everyday low prices. We opened our first store in Burlington, New Jersey in 1972, selling primarily coats and outerwear. Since then, we have expanded our store base to 1,108 stores as of February 1, 2025 in 46 states, Washington D.C. and Puerto Rico. We have diversified our product categories by offering an extensive selection of in-season, fashion-focused merchandise at up to 60% off other retailers' prices, including: women's ready-to-wear apparel, menswear, youth apparel, baby, beauty, footwear, accessories, home, toys, gifts and coats. We sell a broad selection of desirable, first-quality, current-brand, labeled merchandise acquired directly from nationally-recognized manufacturers and other suppliers.

## Executive Summary

*Store Openings, Closings and Relocations*

During the fiscal year ended February 1, 2025 (Fiscal 2024), we opened 147 new stores, inclusive of 31 relocations, and closed 15 stores, exclusive of the aforementioned relocations, bringing our store count as of February 1, 2025 to 1,108 stores. We continue to pursue our growth plans and invest in capital projects that meet our financial requirements. During the fiscal year ending January 31, 2026 (Fiscal 2025), we plan to open approximately 100 net new stores.

## Fiscal Year Ended

Our fiscal year ends on the Saturday closest to January 31. We report fiscal years under a 52/53-week format and as a result, certain fiscal years will contain 53 weeks. Fiscal 2024 included 52 weeks, the fiscal year ended February 3, 2024 (Fiscal 2023) included 53 weeks, and the fiscal year ended January 28, 2023 (Fiscal 2022) included 52 weeks. Fiscal 2025 will have 52 weeks.

## Ongoing Initiatives for Fiscal 2025

We continue to focus on a number of ongoing initiatives aimed at increasing our overall profitability. These initiatives include, but are not limited to:

- **Driving Comparable Store Sales Growth.**

We strive to increase comparable store sales through the following initiatives:

- *More Effectively Chasing the Sales Trend.* We plan sales using conservative comparable store sales growth, holding and controlling liquidity, closely analyzing the sales trend by business, and remaining ready to chase that trend. We believe that these actions will also allow us to take more advantage of great opportunistic buys.

- *Operating with Leaner Inventories.* We are planning to carry less inventory in our stores going forward compared to historical levels, which we believe should result in the customer finding a higher mix of fresh receipts and great merchandise values. We believe that this should drive faster turns and lower markdowns, while simultaneously improving our customers' shopping experience.

- *Investment in Merchandising Capabilities.* We plan to continue investing in training and coaching, improved tools and reporting, incremental headcount, especially in growing or under-developed businesses, and other forms of

24

merchant support. We believe that these investments should improve our ability to strengthen vendor relationships, source great merchandise buys, more accurately assess value, and better forecast and chase the sales trend.

- *Enhancing Existing Categories and Introducing New Categories.* We have opportunities to expand our offerings in certain existing categories, such as ladies' and junior apparel, beauty, and home merchandise, and maintain the flexibility to introduce new categories as we expand our merchandising capabilities.

- **Expanding and Enhancing Our Retail Store Base.**

We intend to expand and enhance our retail store base through the following initiatives:

- *Adhering to a Market Focused and Financially Disciplined Real Estate Strategy.* We have grown our store base consistently since our founding in 1972. We believe there is significant opportunity to expand our retail store base in the United States. As a result of our smaller store prototype, we have identified numerous market opportunities that we believe will allow us to operate 2,000 stores over the long term. We expect to average about 100 net new stores per year, for a total of 500 net new stores over the five-year period from Fiscal 2024 through Fiscal 2028.

- *Enhancing the Store Experience.* We continue to invest in select store relocations and downsizes to improve the customer experience, taking into consideration the age, size, sales, and location of a store. Relocations provide an opportunity, upon lease expirations, to right-size our stores, improve our competitive positioning, incorporate our new prototype store designs and reduce occupancy costs. Downsizes provide an opportunity to right-size our stores, within our existing space, improve co-tenancy, incorporate our new store designs and reduce occupancy costs.

- **Enhancing Operating Margins.**

We intend to increase our operating margins through the following initiatives:

- *Improving Operational Flexibility.* Our store and supply chain teams must continue to respond to the sales chase, enhancing their ability at flexing up and down based on trends, and allowing us to maximize leverage on sales.

- *Optimizing Markdowns.* We believe that our markdown system allows us to maximize sales and gross margin dollars based on forward-looking sales forecasts, sell-through targets and exit dates. Additionally, as we plan to carry less inventory in our stores compared to historical levels, we expect to drive faster turns, which should reduce the amount of markdowns taken compared to historical levels.

- *Optimizing the Supply Chain.* Our transportation initiatives have led to lower freight costs compared to recent levels, and we believe our efficiency and labor productivity initiatives will continue to result in lower supply chain costs over the next several years. We also believe there are longer-term supply chain opportunities through investments in automation and new purpose built processing buildings, and owning (rather than leasing) a larger portion of our warehouse network going forward.

- *Challenging Expenses to Drive Operating Leverage.* We believe sales growth will drive fixed cost operating leverage. In addition, by more conservatively planning our comparable store sales growth, we are forcing even tighter expense control throughout all areas of our business. We believe that this should put us in a strong position to drive favorable operating leverage on any sales ahead of the plan. Additionally, we plan to continue challenging the processes and operating norms throughout the organization with the belief that this will lead to incremental efficiency improvements and savings.

*Uncertainties and Challenges*

As we strive to increase profitability, there are uncertainties and challenges that we face that could have a material impact on our revenues or income.

*General Economic Conditions.* There remains a high level of uncertainty in the current macroeconomic and geopolitical environments, and prolonged inflationary pressures continue to negatively impact the discretionary spending of the low-income shopper, our core customer. In addition to inflation, consumer spending habits, including spending for the merchandise that we sell, are affected by, among other things, prevailing global economic conditions, the costs of basic necessities and other goods, levels of employment, salaries and wage rates, prevailing interest rates, reductions in government benefits and lower tax refunds, housing costs, energy costs, commodities pricing, income tax rates and policies, consumer confidence and consumer perception of economic conditions. In addition, consumer purchasing patterns are generally influenced by consumers' disposable income, credit availability and debt levels.

25

A broad, protracted slowdown or downturn in the U.S. economy, an extended period of high unemployment or inflation rates, an uncertain domestic or global economic outlook or a financial crisis could adversely affect consumer spending habits resulting in lower net sales and profits than expected on a quarterly or annual basis. Conversely, if inflation continues to decline, it could benefit our core customers who have been impacted by the higher cost of living since early 2022, and if economic growth slows, it could cause moderate and higher-income shoppers to become more value conscious. Either of these developments, if they occur, would be expected to improve our business. Consumer confidence is also affected by the domestic and international political situation. Our financial condition and operations could be impacted by changes in government regulations, initiatives or programs in areas including, but not limited to, trade and tariffs, taxes, healthcare, and immigration.  In addition,  trade and tariff regulations could have an indirect impact on consumer prices. The outbreak or escalation of war, or the occurrence of terrorist acts or other hostilities in or affecting the U.S., or public health issues such as pandemics or epidemics, could lead to a decrease in spending by consumers. In addition, natural disasters, public health issues, industrial accidents and acts of war or conflicts in various parts of the world (such as the conflict in the Middle East), could have the effect of disrupting supplies and raising prices globally which, in turn, may have adverse effects on the world and U.S. economies and lead to a downturn in consumer confidence and spending.

We closely monitor our net sales, gross margin and expenses. We have performed scenario planning such that if our net sales decline for an extended period of time, we have identified variable costs that could be reduced to partially mitigate the impact of these declines. If we were to experience adverse sales trends and if our efforts to counteract the impacts of these trends are not sufficiently effective, there could be a negative impact on our financial performance and position in future fiscal periods.

*Seasonality of Sales and Weather Conditions*. Our business, like that of most retailers, is subject to seasonal influences. In the second half of the year, which includes the back-to-school and holiday seasons, we generally realize a higher level of sales and net income.

Weather continues to be a contributing factor to the sale of our merchandise. Generally, our sales are higher if the weather is cold during the Fall and warm during the early Spring. Sales of cold weather clothing are generally increased by early cold weather during the Fall, while sales of warm weather clothing are generally increased by early warm weather conditions in the Spring. Although we have diversified our product offerings, we believe traffic to our stores is still driven, in part, by weather patterns.

*Competition and Margin Pressure*. We believe that in order to remain competitive with retailers, including off-price retailers and discount stores, we must continue to offer brand-name merchandise at a discount to prices offered by other retailers as well as an assortment of merchandise that is appealing to our customers.

The U.S. retail apparel and home furnishings markets are highly fragmented and competitive. We compete for business with department stores, off-price retailers, internet retailers, specialty stores, discount stores, wholesale clubs, and outlet stores as well as with certain traditional, full-price retail chains that have developed off-price concepts. At various times throughout the year, traditional full-price department store chains and specialty shops offer brand-name merchandise at substantial markdowns, which can result in prices approximating those offered by us at our Burlington Stores. We anticipate that competition will increase in the future. Therefore, we will continue to look for ways to differentiate our stores from those of our competitors.

The U.S. retail industry continues to face increased pressure on margins as overall challenging retail conditions have led consumers to be more value conscious. Additionally, lower-to-moderate income shoppers continue to face economic pressure due to higher cost of living. Our strategy to chase the sales trend allows us the flexibility to purchase less pre-season merchandise with the balance purchased in-season and opportunistically. It also provides us with the flexibility to shift purchases between suppliers and categories. We believe that this enables us to obtain better terms with our suppliers, which we expect will help offset any rising costs of goods.

**Key Performance and Non-GAAP Measures**

We consider numerous factors in assessing our performance. Key performance and non-GAAP measures used by management include net income, Adjusted Net Income, Adjusted EBITDA, Adjusted EBIT, comparable store sales, gross margin, inventory and liquidity.

*Net income*. We earned net income of $503.6 million during Fiscal 2024 compared with $339.6 million during Fiscal 2023. This increase was primarily driven by higher sales and increased gross margin rate. Refer to the section below entitled "Results of Operations" for further explanation.

*Adjusted Net Income, Adjusted EBITDA and Adjusted EBIT*: Adjusted Net Income, Adjusted EBITDA and Adjusted EBIT are non-GAAP financial measures of our performance.

We define Adjusted Net Income as net income, exclusive of the following items, if applicable: (i) net favorable lease costs; (ii) loss on extinguishment of debt; (iii) costs related to debt amendments; (iv) impairment charges; (v) amounts related to certain litigation matters; and (vi) other unusual, non-recurring expenses, losses, charges or gains, all of which are tax effected to arrive at Adjusted Net Income.

We define Adjusted EBITDA as net income, exclusive of the following items, if applicable: (i) interest expense; (ii) interest income; (iii) loss on extinguishment of debt; (iv) costs related to debt amendments; (v) income tax expense; (vi) depreciation and amortization; (vii) net favorable lease costs; (viii) impairment charges; (ix) amounts related to certain litigation matters; and (x) other unusual, non-recurring expenses, losses, charges or gains.

We define Adjusted EBIT as net income, exclusive of the following items, if applicable: (i) interest expense; (ii) interest income; (iii) loss on extinguishment of debt; (iv) costs related to debt amendments; (v) income tax expense; (vi) impairment charges; (vii) net favorable lease costs; (viii) amounts related to certain litigation matters; and (ix) other unusual, non-recurring expenses, losses, charges or gains.

We present Adjusted Net Income, Adjusted EBITDA and Adjusted EBIT because we believe they are useful supplemental measures in evaluating the performance of our business and provide greater transparency into our results of operations. In particular, we believe that excluding certain items that may vary substantially in frequency and magnitude from what we consider to be our core operating results are useful supplemental measures that assist investors and management in evaluating our ability to generate earnings and leverage sales, and to more readily compare core operating results between past and future periods.

We believe that these non-GAAP measures provide investors helpful information with respect to our operations and financial condition. Other companies in the retail industry may calculate these non-GAAP measures differently such that our calculation may not be directly comparable.

Adjusted Net Income has limitations as an analytical tool, and should not be considered either in isolation or as a substitute for net income or other data prepared in accordance with GAAP. Among other limitations, Adjusted Net Income does not reflect the following items, net of their tax effect:

- net favorable lease costs;

- losses on extinguishment of debt;

- costs related to debt amendments;

- impairment charges on long-lived assets;

- amounts charged for certain litigation matters; and

- other unusual, non-recurring expenses, losses, charges or gains.

During Fiscal 2024, Adjusted Net Income improved $134.6 million to $527.9 million. This increase was primarily driven by higher sales and increased gross margin rate. Refer to the section below entitled "Results of Operations" for further explanation.

The following table shows our reconciliation of net income to Adjusted Net Income for Fiscal 2024, Fiscal 2023 and Fiscal 2022:

| | (in thousands) | | |
|---|---|---|---|
| | Fiscal Year Ended | | |
| | February 1, 2025 | February 3, 2024 (53 Weeks) | January 28, 2023 |
| **Reconciliation of net income to Adjusted Net Income:** | | | |
| Net income | $ 503,639 | $ 339,649 | $ 230,123 |
| Net favorable lease costs (a) | 11,189 | 15,263 | 18,591 |
| Loss on extinguishment of debt (b) | 1,412 | 38,274 | 14,657 |
| Costs related to debt amendments (c) | 4,553 | 97 | — |
| Impairment charges - long-lived assets | 12,921 | 6,367 | 21,402 |
| Litigation matters (d) | 2,525 | 1,500 | 10,500 |
| Tax effect (e) | (8,298) | (7,770) | (14,503) |
| **Adjusted Net Income** | $ 527,941 | $ 393,380 | $ 280,770 |

(a)   Net favorable lease costs represent the non-cash expense associated with favorable and unfavorable leases that were recorded as a result of purchase accounting related to the April 13, 2006 Bain Capital acquisition of Burlington Coat Factory Warehouse Corporation (the Merger Transaction). These expenses are recorded in the line item "Selling, general and administrative expenses" in our Consolidated Statements of Income.

(b)   Fiscal 2024 amount relates to the partial write-off of the original issue discount and deferred debt costs related to the September 2024 extension and upsize of the Term Loan Facility. Prior year amounts relate to the partial repurchases of the 2025 Convertible Notes in Fiscal 2023 and Fiscal 2022, and the exchange of a portion of the 2025 Convertible Notes in Fiscal 2023.

(c)   Fiscal 2024 amount relates to the September 2024 extension and upsizing of the Term Loan Facility in the third quarter of Fiscal 2024. Fiscal 2023 amount relates to the Term Loan Facility amendment in the second quarter of Fiscal 2023 changing from the Adjusted LIBOR Rate to the Adjusted Term SOFR Rate.

(d)   Represents amounts charged for certain litigation matters.

(e)   Tax effect is calculated based on the effective tax rates (before discrete items) for the respective periods, adjusted for the tax effect for the impact of items (a) through (d).

Adjusted EBIT and Adjusted EBITDA have limitations as analytical tools, and should not be considered either in isolation or as a substitute for net income or other data prepared in accordance with GAAP. Among other limitations, Adjusted EBIT does not reflect:

•    net interest expense;

•    net favorable lease costs;

•    losses on the extinguishment of debt;

•    costs related to debt issuances and amendments;

•    amounts charged for certain litigation matters;

•    impairment charges on long-lived assets;

•    income tax expense; and

•    other unusual, non-recurring expenses, losses, charges or gains.

Adjusted EBITDA is further adjusted for cash requirements for replacement of assets. Although depreciation and amortization are non-cash charges, the assets being depreciated and amortized will likely have to be replaced in the future

During Fiscal 2024, Adjusted EBIT improved $164.4 million to $745.4 million. During Fiscal 2024, Adjusted EBITDA improved $204.9 million to $1,093.0 million. These increases were primarily driven by higher sales and increased gross margin rate. Refer to the section below entitled "Results of Operations" for further explanation.

The following table shows our reconciliation of net income to Adjusted EBIT and Adjusted EBITDA for Fiscal 2024, Fiscal 2023 and Fiscal 2022:

| | (unaudited) | | |
| --- | --- | --- | --- |
| | Fiscal Year Ended | | |
| | February 1, 2025 | February 3, 2024 (53 Weeks) | January 28, 2023 |
| **Reconciliation of net income to Adjusted EBIT and Adjusted EBITDA** | | | |
| Net income | $    503,639 | $    339,649 | $    230,123 |
| Interest expense | 69,522 | 78,399 | 66,474 |
| Interest income | (31,519) | (24,633) | (8,799) |
| Net favorable lease costs (a) | 11,189 | 15,263 | 18,591 |
| Loss on extinguishment of debt (b) | 1,412 | 38,274 | 14,657 |
| Costs related to debt amendments (c) | 4,553 | 97 | — |
| Impairment charges - long-lived assets | 12,921 | 6,367 | 21,402 |
| Litigation matters (d) | 2,525 | 1,500 | 10,500 |
| Income tax expense | 171,175 | 126,124 | 77,386 |
| **Adjusted EBIT** | 745,417 | 581,040 | 430,334 |
| Depreciation and amortization | 347,575 | 307,064 | 270,398 |
| **Adjusted EBITDA** | $ 1,092,992 | $    888,104 | $    700,732 |

(a)   Net favorable lease costs represent the non-cash expense associated with favorable and unfavorable leases that were recorded as a result of purchase accounting related to the Merger Transaction. These expenses are recorded in the line item "Selling, general and administrative expenses" in our Consolidated Statements of Income.

(b)   Fiscal 2024 amount relates to the partial write-off of the original issue discount and deferred debt costs related to the September 2024 extension and upsize of the Term Loan Facility. Prior year amounts relate to the partial repurchases of the 2025 Convertible Notes in Fiscal 2023 and Fiscal 2022, and the exchange of a portion of the 2025 Convertible Notes in Fiscal 2023.

(c)   Fiscal 2024 amount relates to the September 2024 extension and upsizing of the Term Loan Facility in the third quarter of Fiscal 2024. Fiscal 2023 amount relates to the Term Loan Facility amendment in the second quarter of Fiscal 2023 changing from the Adjusted LIBOR Rate to the Adjusted Term SOFR Rate.

(d)   Represents amounts charged for certain litigation matters.

*Comparable Store Sales*. Comparable store sales measure performance of a store during the current reporting period against the performance of the same store in the corresponding period of a prior year. The method of calculating comparable store sales varies across the retail industry. As a result, our definition of comparable store sales may differ from other retailers.

We define comparable store sales as merchandise sales of those stores commencing on the first day of the fiscal month one year after the end of their grand opening activities, which normally conclude within the first two months of operations. If a store is closed for seven or more days during a month, our policy is to remove that store from our calculation of comparable store sales for any such month, as well as during the month(s) of their grand re-opening activities. The table below depicts the change in our comparable store sales during Fiscal 2024, Fiscal 2023 and Fiscal 2022, all of which are calculated on a 52-week basis.

| | Fiscal Year Ended |
| --- | --- |
| February 1, 2025 | 4% |
| February 3, 2024 | 4% |
| January 28, 2023 | -13% |

Various factors affect comparable store sales, including, but not limited to, weather conditions, current economic conditions, the timing of our releases of new merchandise and promotional events, the general retail sales environment, consumer preferences and buying trends, changes in sales mix among distribution channels, competition, and the success of marketing programs.

*Gross Margin*. Gross margin is the difference between net sales and the cost of sales. Our cost of sales and gross margin may not be comparable to those of other entities, since some entities may include all of the costs related to their buying and distribution functions, certain store-related costs and other costs, in cost of sales. We include certain of these costs in the line items "Selling, general and administrative expenses" and "Depreciation and amortization" in our Consolidated Statements of Income. We include in our "Cost of sales" line item all costs of merchandise (net of purchase discounts and certain vendor allowances), inbound freight, distribution center outbound freight and certain merchandise acquisition costs, primarily commissions and import fees.

Gross margin as a percentage of net sales expanded to 43.2% during Fiscal 2024, compared with 42.5% during Fiscal 2023, driven primarily by higher merchandise margins and improved freight costs.

Product sourcing costs, which are included in selling, general and administrative expenses, decreased approximately 50 basis points as a percentage of net sales during the fiscal year ended February 3, 2024, compared with the fiscal year ended February 3, 2024, primarily driven by supply chain efficiency initiatives. Product sourcing costs include the costs of processing goods through our supply chain and buying costs.

*Inventory*. Inventory at February 1, 2025 increased to $1,250.8 million from $1,087.8 million at February 3, 2024. This increase primarily relates to 101 net new stores since the end of Fiscal 2023 and an increase in reserve inventory, partially offset by a decrease in comparable store inventory.

Reserve inventory includes all inventory that is being stored for release either later in the season, or in a subsequent season. We intend to use our reserve merchandise to effectively chase sales trends. Reserve inventory was 46% of total inventory at the end of Fiscal 2024 compared to 39% at the end Fiscal 2023.

In order to better serve our customers and maximize sales, we continue to refine our merchandising mix and inventory levels within our stores. By appropriately managing our inventories, we believe we will be better able to deliver a continual flow of fresh merchandise to our customers.

*Liquidity*. Liquidity measures our ability to generate cash. Management measures liquidity through cash flow, which is the measure of cash generated from or used in operating, financing, and investing activities. Cash and cash equivalents increased $69.3 million during Fiscal 2024, compared with an increase of $46.2 million during Fiscal 2023. Refer to the section below entitled "Liquidity and Capital Resources" for further explanation.

**Results of Operations**

The following table sets forth certain items in the Consolidated Statements of Income as a percentage of net sales for the periods indicated.

| | Percentage of Net Sales Fiscal Year Ended | | |
|---|---|---|---|
| | February 1, 2025 | February 3, 2024 | January 28, 2023 |
| Net sales | 100.0% | 100.0% | 100.0% |
| Other revenue | 0.2 | 0.2 | 0.2 |
| Total revenue | 100.2 | 100.2 | 100.2 |
| Cost of sales | 56.8 | 57.5 | 59.6 |
| Selling, general and administrative expenses | 33.4 | 33.9 | 33.1 |
| Costs related to debt amendments | 0.0 | 0.0 | — |
| Depreciation and amortization | 3.3 | 3.2 | 3.1 |
| Impairment charges - long-lived assets | 0.1 | 0.1 | 0.2 |
| Other income - net | (0.5) | (0.4) | (0.3) |
| Loss on extinguishment of debt | 0.0 | 0.4 | 0.2 |
| Interest expense | 0.7 | 0.8 | 0.8 |
| Total costs and expenses | 93.8 | 95.5 | 96.7 |
| Income before income tax expense | 6.4 | 4.7 | 3.5 |
| Income tax expense | 1.6 | 1.3 | 0.9 |
| Net income | 4.8% | 3.4% | 2.6% |

***Performance for Fiscal Year Ended February 1, 2025 (Fiscal 2024) Compared with Fiscal Year Ended February 3, 2024 (Fiscal 2023)***

*Net sales*

Net sales improved $907.8 million, or 9.3%, to $10,616.7 million, primarily driven by 101 net new stores since the end of Fiscal 2023 and an increase of 4% in comparable store sales during Fiscal 2024.

*Cost of sales*

Cost of sales as a percentage of net sales decreased to 56.8% during Fiscal 2024, compared with 57.5% during Fiscal 2023, primarily driven by higher merchandise margins and improved freight costs. On a dollar basis, cost of sales increased $441.2 million, or 7.9%, primarily driven by our overall increase in sales.

*Selling, general and administrative expenses*

Selling, general and administrative expenses as a percentage of net sales decreased to 33.4% during the fiscal year ended February 1, 2025, compared to 33.9% during the fiscal year ended February 3, 2024. The decrease was primarily driven by supply chain efficiency initiatives and leverage on fixed expenses, partially offset by investments in store payroll and higher incentive costs. On a dollar basis, selling, general and administrative expenses increased by $258.7 million, or 7.9%, to $3,547.0 million during the fiscal year ended February 1, 2025. The increase was primarily driven by our 101 net new stores opened since the end of Fiscal 2023.

During Fiscal 2024 and Fiscal 2023, the Company acquired leases through bankruptcy proceedings. The acquisition of these leases resulted in $15.7 million and $18.4 million of pre-opening costs that are recorded in the line item, "Selling, general and administrative expenses" in our Consolidated Statements of Income during Fiscal 2024 and Fiscal 2023, respectively.

*Depreciation and amortization*

Depreciation and amortization expense amounted to $347.6 million during Fiscal 2024, compared with $307.1 million during Fiscal 2023. The increase in depreciation and amortization expense was primarily driven by capital expenditures related to new and non-comparable stores and our supply chain investments.

*Impairment charges—long-lived assets*

Impairment charges related to long-lived assets were $12.9 million and $6.4 million during Fiscal 2024 and Fiscal 2023, respectively. Fiscal 2024 relates to two owned stores selling below carrying value, unrecoverable fixed assets at six underperforming stores, and two stores relocated and closed before the end of the respective lease-end dates. Fiscal 2023 relates to unrecoverable fixed assets at eleven underperforming stores and unrecoverable lease assets at three of those stores.

The recoverability assessment related to these store-level assets requires various judgments and estimates, including estimates related to future revenues, gross margin rates, store expenses and other assumptions. We base these estimates upon our past and expected future performance. We believe our estimates are appropriate in light of current market conditions. However, future impairment charges could be required if we do not achieve our current revenue or cash flow projections for each store. Refer to Note 4, "Impairment Charges," for further discussion.

*Other income, net*

Other income, net improved $7.3 million to $48.2 million during Fiscal 2024. The improvement in other income was primarily driven by increased interest income from higher cash balance and interest rates.

*Loss on Extinguishment of Debt*

During Fiscal 2024, debt extinguishment charges amounted to $1.4 million related to the partial write-off of the original issue discount and deferred debt costs, as a result of the September 2024 extension and upsize of our Term Loan Facility. During Fiscal 2023 we entered into separate, privately negotiated exchange agreements with certain holders of the 2025 Convertible Notes, whereby the holders exchanged $241.2 million in aggregate principal amount of 2025 Convertible Notes held by them for $255.0 million in aggregate principal amount of 2027 Convertible Notes, as well as $110.3 million in aggregate principal amount of 2025 Convertible Notes held by them for $133.3 million in cash. These exchanges resulted in aggregate pre-tax debt extinguishment charges of $38.3 million. Refer to Note 5, "Long Term Debt," for further discussion regarding our debt transactions.

*Interest expense*

Interest expense decreased $8.9 million to $69.5 million. This decrease was primarily related to accumulated other comprehensive income on our previous interest rate swap, which was fully amortized as of the end of Fiscal 2023. Additionally, we had a lower average balance of 2025 Convertible Notes, and a lower interest rate on the 2027 Convertible Notes compared to the 2025 Convertible Notes that were extinguished, partially offset by a higher average balance due to the September 2024 extension and upsize of the Term Loan Facility during the third quarter of Fiscal 2024.

The average interest rate on the Term Loan Facility was 7.0% and 7.2% for the fiscal year ended February 1, 2025 and the fiscal year ended February 3, 2024, respectively. The average balance on the Term Loan Facility, excluding the original issue discount, was $1,047.0 million and $942.5 million for the fiscal year ended February 1, 2025 and the fiscal year ended February 3, 2024, respectively.

*Income tax expense*

Income tax expense was $171.2 million for Fiscal 2024 compared with $126.1 million for Fiscal 2023. The effective tax rate was 25.4% related to pretax income of $674.8 million for Fiscal 2024, and 27.1% related to pretax income of $465.8 million for Fiscal 2023. The increase in income tax expense is primarily due to higher pre-tax income. The higher tax rate in the prior period is primarily attributable to the disallowance of certain debt extinguishment costs related to the partial repurchase of the 2025 Convertible Notes in Fiscal 2023.

*Net income*

We earned net income of $503.6 million during Fiscal 2024 compared with net income of $339.6 million for Fiscal 2023. This increase was primarily driven by higher sales and increased gross margin rate. Net income included $11.7 million and $13.8 million of expense, net of income taxes, for Fiscal 2024 and Fiscal 2023, respectively, related to the bankruptcy acquired leases.

**Performance for Fiscal Year Ended February 3, 2024 (Fiscal 2023) Compared with Fiscal Year Ended January 28, 2023 (Fiscal 2022)**

For a discussion related to Fiscal 2023 performance compared to Fiscal 2022 performance, refer to Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations," included in our Annual Report on Form 10-K for the fiscal year ended February 3, 2024 (Fiscal 2023 10-K).

**Liquidity and Capital Resources**

Our ability to satisfy interest payment and future principal payment obligations on our outstanding debt will depend largely on our future performance which, in turn, is subject to prevailing economic conditions and to financial, business and other factors beyond our control. If we do not have sufficient cash flow to service interest payment and future principal payment obligations on our outstanding indebtedness and if we cannot borrow or obtain equity financing to satisfy those obligations, our business and results of operations will be materially adversely affected. We cannot be assured that any replacement borrowing or equity financing could be successfully completed on terms similar to our current financing agreements, or at all. Refer to "Debt and Hedging" below for recent debt transactions completed.

We believe that cash generated from operations, along with our existing cash and our ABL Line of Credit, will be sufficient to fund our expected cash flow requirements for at least the next twelve months as well as the foreseeable future, including planned capital expenditures and repayment of the 2025 Convertible Notes. However, there can be no assurance that we would be able to offset declines in our comparable store sales with savings initiatives.

As market conditions warrant, we may, from time to time, repurchase our outstanding debt securities in the open market, in privately negotiated transactions, by tender offer, by exchange transaction or otherwise. Such repurchases, if any, will depend on prevailing market conditions, our liquidity and other factors and may be commenced or suspended at any time. The amounts involved and total consideration paid may be material.

From time to time, we evaluate options to opportunistically increase, refinance or extend our debt. Our assessment will be based on our capital needs for, among other things, facility purchases, capital improvements and expenditures. No assurance can be given that we will enter into such agreements.

### Cash Flows

#### Cash Flows for Fiscal 2024 Compared with Fiscal 2023

We generated $69.3 million of cash flows during Fiscal 2024 compared with $46.2 million during Fiscal 2023.

Net cash provided by operating activities amounted to $863.4 million and $868.7 million during Fiscal 2024 and Fiscal 2023, respectively. The decrease in our operating cash flows was primarily driven by changes in working capital, partially offset by improved net income.

Net cash used in investing activities was $882.3 million and $503.7 million during Fiscal 2024 and Fiscal 2023, respectively. This change was primarily the result of an increase in capital expenditures related to supply chain initiatives resulting from the purchase of the distribution center in Ellabell, Georgia, as well as increased store openings.

Net cash provided by financing activities was $88.2 million during Fiscal 2024 compared to a use of $318.8 million during Fiscal 2023. This change was primarily driven by the September 2024 extension and upsizing of the Term Loan Facility during the third quarter of Fiscal 2024 as well as net payment on the Convertible Notes during Fiscal 2023.

Changes in working capital also impact our cash flows. Working capital equals current assets minus current liabilities. We had working capital at February 1, 2025 of $356.3 million compared with $298.2 million at February 3, 2024. The increase in working capital was primarily driven by increased inventory, increased cash balance, and increased prepaid assets, partially offset by increased current maturities of long term debt related to the 2025 Convertible Notes and increased accounts payable.

#### Cash Flows for Fiscal 2023 Compared with Fiscal 2022

For a discussion of our cash flows for Fiscal 2023 compared to Fiscal 2022, refer to Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations," included in our Fiscal 2023 10-K.

### Capital Expenditures

For Fiscal 2024, capital expenditures, net of $28.9 million of landlord allowances, amounted to $843.9 million (inclusive of accrued capital expenditures). These capital expenditures include approximately $334.9 million, net of the previously mentioned landlord allowances, for store expenditures (new stores, remodels and other store expenditures). In addition, we made capital expenditures of $384.8 million to support our supply chain initiatives, largely related to the purchase of the distribution center in Ellabell, Georgia, with the remaining capital to support information technology and other business initiatives. We incurred capital expenditures of $522.5 million (inclusive of accrued capital expenditures), net of approximately $14.6 million of landlord allowances, during Fiscal 2023.

33

We estimate that we will spend approximately $950 million, net of approximately $55 million of landlord allowances, in capital expenditures during Fiscal 2025, including approximately $390 million, net of the previously mentioned landlord allowances, for store expenditures (new stores, remodels and other store expenditures). In addition, we estimate that we will spend approximately $460 million to support our supply chain initiatives, largely related to a purchase agreement for the Cactus Ave. distribution center in Riverside, California, which was negotiated during Fiscal 2024. The remaining capital will be used to support our information technology and other business initiatives.

### Share Repurchase Program

On August 15, 2023, our Board of Directors authorized the repurchase of up to $500 million of common stock, which is authorized to be executed through August 2025.

During Fiscal 2024, we repurchased 1,013,561 shares of common stock for $241.9 million under our share repurchase program. As of February 1, 2025, we had $263.2 million remaining under our share repurchase authorization.

We are authorized to repurchase shares of our outstanding common stock from time to time on the open market or in privately negotiated transactions under our repurchase program. The timing and amount of stock repurchases will depend on a variety of factors, including the market conditions as well as corporate and regulatory considerations. Our share repurchase program may be suspended, modified or discontinued at any time, and we have no obligation to repurchase any amount of our common stock under the program.

### Dividends

We currently do, and intend to continue to, retain all available funds and any future earnings to fund all of the Company's capital expenditures, business initiatives, and to support any potential opportunistic capital structure initiatives. Therefore, at this time, we do not anticipate paying cash dividends in the near term. Our ability to pay dividends on our common stock will be limited by restrictions on the ability of our subsidiaries to pay dividends or make distributions under the terms of current and any future agreements governing our indebtedness. Any future determination to pay dividends will be at the discretion of our Board of Directors, subject to compliance with covenants in our current and future agreements governing our indebtedness, and will depend upon our results of operations, financial condition, capital requirements and other factors that our Board of Directors deems relevant.

In addition, since we are a holding company, substantially all of the assets shown on our Consolidated Balance Sheets are held by our subsidiaries. Accordingly, our earnings, cash flow and ability to pay dividends are largely dependent upon the earnings and cash flows of our subsidiaries and the distribution or other payment of such earnings to us in the form of dividends.

### Debt and Hedging

As of February 1, 2025, our obligations, inclusive of original issue discount, include $1,238.9 million under our Term Loan Facility, $453.2 million of Convertible Notes and no outstanding borrowings on our ABL Line of Credit. Our debt obligations also include $25.0 million of finance lease obligations as of February 1, 2025. Refer to Note 5 to our Consolidated Financial Statements, "Long Term Debt," for an overview of the terms and conditions of these instruments.

### Term Loan Facility

BCFWC and certain of its subsidiaries and holding companies are party to a Credit Agreement (as amended, supplemented and otherwise modified, the Term Loan Facility) that provides for term loans in an aggregate principal amount as of February 1, 2025 of $1,246.9 million maturing on September 24, 2031.

On September 24, 2024, we entered into an amendment to the Term Loan Facility dated as of February 24, 2011 (the "Amendment"), which among other things, (i) refinanced the outstanding $933 million principal amount of Term B-6 Loans with Term B-7 Loans in an aggregate principal amount of $1,250 million, which includes incremental term loans in an aggregate principal amount of $317 million, (ii) extended the maturity date from June 24, 2028 to September 24, 2031, and (iii) reduced the interest rate margins applicable to our term loan facility from 1.00% to 0.75%, in the case of prime rate loans, and from 2.00% to 1.75%, in the case of SOFR loans, with a 0.00% SOFR floor, and removed the SOFR adjustment. The Term B-7 Loans were issued with an original issue discount of 99.5.

The Term Loan Facility is collateralized by a first lien on BCFWC's and each guarantor's equity interests, equipment, intellectual property, and certain favorable leases and real estate, and certain related assets and proceeds thereof (subject to certain exceptions), and a second lien on BCFWC's and each guarantor's other assets and proceeds thereof (subject to certain exceptions).

At February 1, 2025, our borrowing rate related to the Term Loan Facility was 6.1%.

*ABL Line of Credit*

BCFWC and certain of its subsidiaries and holding companies are party to a Second Amended and Restated Credit Agreement (as amended, supplemented and otherwise modified, the ABL Line of Credit) that provides for $900.0 million of revolving commitments (subject to a borrowing base limitation) maturing on December 22, 2026, and, subject to the satisfaction of certain conditions, BCFWC can increase the aggregate amount of commitments up to $1,200 million. The interest rate margin applicable under the ABL Line of Credit is 1.125% to 1.375% in the case of a daily Secured Overnight Financing Rate (SOFR) rate or a term SOFR rate (in each case, plus a credit spread adjustment of 0.10%), and 0.125% to 0.375% in the case of a prime rate, depending on the average daily availability of the lesser of (a) the total commitments or (b) the borrowing base. The ABL Line of Credit is collateralized by a first priority lien on BCFWC's and each guarantor's inventory, receivables, bank accounts, and certain related assets and proceeds thereof (subject to certain exceptions), and a second priority lien on BCFWC's and each guarantor's other assets and proceeds thereof (other than real estate and subject to certain exceptions).

On June 26, 2023, BCFWC entered into a Fifth Amendment to the Second Amended and Restated Credit Agreement, which increased the sublimit for letters of credit thereunder from $150 million to $250 million. The letter of credit sublimit was subsequently reduced to $200 million.

At February 1, 2025, we had $827.0 million available under the ABL Line of Credit. We did not have any borrowings during Fiscal 2024.

*2025 Convertible Notes*

On April 16, 2020, we issued $805.0 million of 2025 Convertible Notes. The 2025 Convertible Notes have an initial conversion rate of 4.5418 shares per $1,000 principal amount of 2025 Convertible Notes (equivalent to an initial conversion price of approximately $220.18 per share of the Company's common stock), subject to adjustment if certain events occur.

The 2025 Convertible Notes are general unsecured obligations of the Company. The 2025 Convertible Notes bear interest at a rate of 2.25% per year, payable semi-annually in cash, in arrears on April 15 and October 15 of each year, beginning on October 15, 2020. The 2025 Convertible Notes will mature on April 15, 2025, unless earlier converted, redeemed or repurchased.

During the first quarter of Fiscal 2023, we entered into separate, privately negotiated exchange agreements with certain holders of the 2025 Convertible Notes. Under the terms of the exchange agreements, the holders exchanged $110.3 million in aggregate principal amount of 2025 Convertible Notes held by them for $133.3 million in cash. These exchanges resulted in aggregate pre-tax debt extinguishment charges of $24.6 million.

The 2025 Convertible Notes are convertible at the option of the holders at any time until the close of business on the second scheduled trading day immediately preceding the maturity date of April 15, 2025. The 2025 Convertible Notes have an initial conversion rate of 4.5418 shares per $1,000 principal amount of 2025 Convertible Notes (equivalent to an initial conversion price of approximately $220.18 per share of our common stock), subject to adjustment if certain events occur. The initial conversion price represents a conversion premium of approximately 32.50% over $166.17 per share, the last reported sale price of our common stock on April 13, 2020 (the pricing date of the offering) on the New York Stock Exchange. During the first quarter of Fiscal 2021, the Company made an irrevocable settlement election for any conversions of the 2025 Convertible Notes. Upon conversion, we will pay cash for the principal amount. For any excess above principal, we will deliver shares of its common stock. We are able to redeem for cash all or any portion of the 2025 Convertible Notes, at our option, if the last reported sale price of the Company's common stock is equal to or greater than 130% of the conversion price for a specified period of time, at a redemption price equal to 100% of the principal aggregate amount of the 2025 Convertible Notes to be redeemed, plus accrued and unpaid interest, if any, to, but excluding, the redemption date.

Holders of the 2025 Convertible Notes may require us to repurchase their 2025 Convertible Notes upon the occurrence of certain events that constitute a fundamental change under the indenture governing the 2025 Convertible Notes at a purchase price equal to 100% of the principal amount thereof, plus accrued and unpaid interest to, but excluding, the date of repurchase. In connection with certain corporate events or if we issue a notice of redemption, it will, under certain circumstances, increase the

35

conversion rate for holders who elect to convert their 2025 Convertible Notes in connection with such corporate event or during the relevant redemption period for such 2025 Convertible Notes.

*2027 Convertible Notes*

On September 12, 2023, we closed the issuance of approximately $297.1 million aggregate principal amount of our 2027 Convertible Notes pursuant to separate, privately negotiated exchange and subscription agreements with a limited number of holders of our 2025 Convertible Notes and certain investors, in each case pursuant to exemptions from registration under the Securities Act of 1933. We exchanged approximately $241.2 million in aggregate principal amount of the 2025 Convertible Notes for approximately $255.0 million in aggregate principal amount of the 2027 Convertible Notes. We also issued approximately $42.1 million in aggregate principal amount of 2027 Convertible Notes in a private placement to certain investors. An aggregate of up to 1,422,568 shares of common stock may be issued upon conversion of the 2027 Convertible Notes, which number is subject to adjustment up to an aggregate of 1,911,372 shares following certain corporate events that occur prior to the maturity date or if we issue a notice of redemption, and which is also subject to certain anti-dilution adjustments.

The 2027 Convertible Notes bear interest at a rate of 1.25% per year, payable semi-annually in arrears on June 15 and December 15 of each year, beginning on December 15, 2023. The 2027 Convertible Notes will mature on December 15, 2027, unless earlier converted, redeemed or repurchased.

Prior to the close of business on the business day immediately preceding September 15, 2027, the 2027 Convertible Notes will be convertible at the option of the holders only upon the occurrence of certain events and during certain periods. Thereafter, the 2027 Convertible Notes will be convertible at the option of the holders at any time until the close of business on the second scheduled trading day immediately preceding the maturity date of December 15, 2027. The 2027 Convertible Notes have an initial conversion rate of 4.8560 shares per $1,000 principal amount of 2027 Convertible Notes (equivalent to an initial conversion price of approximately $205.93 per share of our common stock), subject to adjustment if certain events occur. The initial conversion price represents a conversion premium of approximately 32.50% over $155.42 per share, the last reported sale price of our common stock on September 7, 2023 on The New York Stock Exchange. Upon conversion, we will pay cash for the aggregate principal amount of 2027 Convertible Notes being converted, and pay (and deliver, if applicable) cash, shares of our common stock or a combination thereof, at our election, in respect of the remainder (if any) of our conversion obligation in excess of such aggregate principal amount. We will not be able to redeem the 2027 Convertible Notes prior to December 20, 2025. On or after December 20, 2025 and prior to the 21st scheduled trading day immediately preceding December 15, 2027, we will be able to redeem for cash all or any portion of the 2027 Convertible Notes, at our option, if the last reported sale price of our common stock is equal to or greater than 130% of the conversion price for a specified period of time, at a redemption price equal to 100% of the aggregate principal amount of the 2027 Convertible Notes to be redeemed, plus accrued and unpaid interest, if any, to, but excluding, the redemption date.

If we undergo a fundamental change, subject to certain conditions, holders of the 2027 Convertible Notes may require us to repurchase for cash all or any portion of our 2027 New Convertible Notes. The fundamental change repurchase price will be 100% of the aggregate principal amount of the 2027 Convertible Notes to be repurchased plus any accrued and unpaid interest to, but excluding, the fundamental change repurchase date.

*Hedging*

We have interest rate swaps which hedge $800.0 million of variable rate exposure under our Term Loan Facility. The interest rate swaps are designated as cash flow hedges and expire on September 24, 2031. Refer to Note 6, "Derivative Instruments and Hedging Activities," for further discussion regarding our derivative transactions.

*Certain Information Concerning Material Cash Requirements*

The following table sets forth certain information regarding our obligations to make future payments under current contracts as of February 1, 2025:

| | | | Payments Due By Period | | |
|---|---|---|---|---|---|
| | Total | 1 Year | 2-3 Years | 4-5 Years | Thereafter |
| | | | (in thousands) | | |
| Debt obligations(1) | $ 1,700,099 | $ 168,655 | $ 322,069 | $ 25,000 | $ 1,184,375 |
| Interest on debt obligations(2) | 434,953 | 70,130 | 136,093 | 127,289 | 101,441 |
| Finance lease obligations(3) | 35,040 | 3,526 | 7,280 | 5,551 | 18,683 |
| Operating lease obligations(4) | 4,715,685 | 614,333 | 1,289,378 | 1,100,382 | 1,711,592 |
| Purchase obligations(5) | 1,594,025 | 1,594,025 | — | — | — |
| Other(6) | 3,969 | 2,980 | 989 | — | — |
| Total | $ 8,483,771 | $ 2,453,649 | $ 1,755,809 | $ 1,258,222 | $ 3,016,091 |

(1) Represents future principal payments on outstanding borrowings as of February 1, 2025.

(2) Represents interest payments on (i) the outstanding balance of the Term Loan Facility with an interest rate of 6.1%; (ii) $800.0 million interest rate swap; (iii) the outstanding balance of the 2025 Convertible Notes; and (iv) the outstanding balance of the 2027 Convertible Notes.

(3) Finance lease obligations include future interest payments.

(4) Represents minimum rent payments for operating leases under the current terms. The above table excludes approximately $451.4 million for 66 stores that we have committed to open or relocate but have not yet taken possession of the space.

(5) Represents commitments to purchase merchandise that have not been received as of February 1, 2025. The table above excludes estimated commitments for non-merchandise goods of approximately $395 million, which primarily relates to capital expenditures for our stores and supply chain, largely related to a purchase agreement for the Cactus Ave. distribution center in Riverside, California, as well as other miscellaneous operating expenses.

(6) Represents severance payments in the normal course of business that are included in the line item "Selling, general and administrative expenses" in our Consolidated Statements of Income.

The table above excludes ASC Topic No. 740 "Income Taxes" (Topic No. 740) liabilities which represent uncertain tax positions related to temporary differences. The total Topic No. 740 liability was $8.1 million, inclusive of $5.8 million of interest and penalties, neither of which is presented in the table above as we are not certain if and when these payments would be required.

The table above excludes our irrevocable letters of credit guaranteeing payment and performance under certain leases, insurance contracts, debt agreements, merchandising agreements and utility agreements in the amount of $52.5 million as of February 1, 2025.

As of February 1, 2025, insurance reserves amounted to $102.8 million. These amounts are excluded from the table above as we are not certain if and when these payments would be required.

**Critical Accounting Policies and Estimates**

Our Consolidated Financial Statements have been prepared in accordance with GAAP. We believe there are several accounting policies that are critical to understanding our historical and future performance as these policies affect the reported amounts of revenues and other significant areas that involve management's judgments and estimates. The preparation of our Consolidated Financial Statements requires management to make estimates and assumptions that affect (i) the reported amounts of assets and liabilities; (ii) the disclosure of contingent assets and liabilities at the date of the Consolidated Financial Statements; and (iii) the reported amounts of revenues and expenses during the reporting period. On an ongoing basis, management evaluates its estimates and judgments, including those related to revenue recognition, inventories, long-lived assets, intangible assets, goodwill, insurance reserves, leases, and income taxes. Historical experience and various other factors that are believed to be reasonable under the circumstances form the basis for making estimates and judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. Actual results may differ from these estimates under different assumptions or conditions. As events continue to evolve and additional information becomes available, our estimates may change materially in future periods. A critical accounting estimate meets two criteria: (1) it requires assumptions about highly uncertain matters and (2) there would be a material effect on the Consolidated Financial Statements from either using a different, although reasonable, amount within the range of the estimate in the current period or from reasonably likely period-to-period changes in the estimate.

While there are a number of accounting policies, methods and estimates affecting our Consolidated Financial Statements as addressed in Note 1 to our Consolidated Financial Statements, "Summary of Significant Accounting Policies," areas that are particularly critical and significant include:

*Revenue Recognition.* While our revenue recognition does not involve significant judgment, it represents an important accounting policy. We record revenue at the time control of goods are transferred to the customer, which we determine to be at point of sale and delivery of merchandise, net of allowances for estimated future returns, which is estimated based on historical return rates. We present sales, net of sales taxes, in our Consolidated Statements of Income. We account for layaway sales in compliance with ASC Topic No. 606 "Revenue from Contracts with Customers." Layaway sales are recognized upon delivery of merchandise to the customer. The amount of cash received upon initiation of the layaway is recorded as a deposit liability within the line item "Other current liabilities" in our Consolidated Balance Sheets. Stored value cards (gift cards and store credits issued for merchandise returns) are recorded as a liability at the time of issuance, and the related sale is recorded upon redemption.

We estimate and recognize stored value card breakage income in proportion to actual stored value card redemptions. We determine an estimated stored value card breakage rate by continuously evaluating historical redemption data. Breakage income is recognized on a monthly basis in proportion to the historical redemption patterns for those stored value cards for which the likelihood of redemption is remote.

*Inventory.* Our inventory is valued at the lower of cost or market using the retail inventory method. Under the retail inventory method, the valuation of inventory and the resulting gross margin are determined by applying a calculated cost to retail ratio to the retail value of inventory. The retail inventory method is an averaging method that results in valuing inventory at the lower of cost or market provided markdowns are taken timely to reduce the retail value of inventory. Inherent in the retail inventory method calculation are certain significant management judgments and estimates including merchandise markups, markdowns and shortage, which significantly impact the ending inventory valuation as well as the resulting gross margin. Management believes that our retail inventory method provides an inventory valuation which approximates cost using a first-in, first-out assumption and results in carrying value at the lower of cost or market. We reserve for aged inventory based on historical trends and specific identification. Our aged inventory reserve contains uncertainties as the calculations require management to make assumptions and to apply judgment regarding a number of factors, including market conditions, the selling environment, historical results and current inventory trends. A 1% change in the dollar amount of retail markdowns would have resulted in an increase in markdown dollars, at cost, of approximately $2.5 million for Fiscal 2024.

Estimates are used to record inventory shortage at retail stores between physical inventories. Actual physical inventories are conducted at least annually to calculate actual shortage. While we make estimates on the basis of the best information available to us at the time the estimates are made, over accruals or under accruals of shortage may be identified as a result of the physical inventory counts, requiring adjustments.

*Insurance Reserves.* We have risk participation agreements with insurance carriers with respect to workers' compensation, general liability insurance and health insurance. Pursuant to these arrangements, we are responsible for paying individual claims up to designated dollar limits. The amounts included in our costs related to these claims are estimated and can vary based on changes in assumptions or claims experience included in the associated insurance programs. For example, changes in legal trends and interpretations, as well as changes in the nature and method of how claims are settled, can impact ultimate costs. An increase in workers' compensation claims by employees, health insurance claims by employees or general liability claims may result in a corresponding increase in our costs related to these claims. Insurance reserves amounted to $102.8 million and $94.8 million at February 1, 2025 and February 3, 2024, respectively.

## Recent Accounting Pronouncements

Refer to Note 2, "Recent Accounting Pronouncements," of our Consolidated Financial Statements for a discussion of recent accounting pronouncements and their impact on our Consolidated Financial Statements.

## Fluctuations in Operating Results

We expect that our revenues and operating results may fluctuate from fiscal quarter to fiscal quarter or over the longer term. Certain of the general factors that may cause such fluctuations are discussed in Item 1A, Risk Factors and elsewhere in this Annual Report.

*Inflation*

There can be no assurance that we will be able to offset inflationary pressure in the future by increasing prices or through other means, or that our business will not be negatively affected by continued inflation in the future. We may not be able to adequately increase our prices over time to offset increased costs, whether due to inflation or otherwise. Any decreases in consumer discretionary spending could result in a decrease in store traffic and same store sales, all of which could negatively affect our business, operations, liquidity, financial results and/or stock price, particularly if consumer spending levels are depressed for a prolonged period of time.

The U.S. retail industry continues to face increased pressure on margins as commodity prices increase and the overall challenging retail conditions have led consumers to be more value conscious. Additionally, lower-to-moderate income shoppers continue to face economic pressure due to higher cost of living. Our strategy of chasing sales, in which we purchase both pre-season and in-season merchandise, allows us the flexibility to purchase less pre-season with the balance purchased in-season and opportunistically. It also provides us the flexibility to shift purchases between suppliers and categories. This enables us to obtain better terms with our suppliers, which we expect to help offset the expected rising costs of goods.

*Market Risk*

We are exposed to market risks relating to fluctuations in interest rates. Our borrowings contain floating rate obligations and are subject to interest rate fluctuations. The objective of our financial risk management is to minimize the negative impact of interest rate fluctuations on our earnings and cash flows. We manage interest rate risk through the use of our interest rate swap contracts.

As more fully described in Note 6 to our Consolidated Financial Statements, "Derivative Instruments and Hedging Activities," we enter into interest rate derivative contracts to manage interest rate risks associated with our long term debt obligations. The effective portion of changes in the fair value of derivatives designated and that qualify as cash flow hedges is recorded in the line item "Accumulated other comprehensive income" on the Consolidated Balance Sheets and is subsequently reclassified into earnings in the period that the hedged forecasted transaction affects earnings. We continue to have exposure to interest rate risks to the extent they are not hedged.

## Item 7A. Quantitative and Qualitative Disclosures About Market Risk

We are exposed to certain market risks as part of our ongoing business operations. Primary exposures include changes in interest rates, as borrowings under our ABL Line of Credit and Term Loan Facility bear interest based on SOFR, in each case plus an applicable borrowing margin. The interest rate of our Term Loan Facility is also dependent on the prime rate, and the federal funds rate as further discussed in Note 5 to our Consolidated Financial Statements, "Long Term Debt." On September 24, 2024, the Company entered into an amendment to the Credit Agreement dated as of February 24, 2011, which among other things, (i) refinanced the outstanding $933 million principal amount of term B-6 loans with term B-7 loans in an aggregate principal amount of $1,250 million, which includes incremental term loans in an aggregate principal amount of $317 million, (ii) extended the maturity date from June 24, 2028 to September 24, 2031, and (iii) reduced the interest rate margins applicable to the Company's term loan facility from 1.00% to 0.75%, in the case of prime rate loans, and from 2.00% to 1.75%, in the case of SOFR loans, with a 0.00% SOFR floor, and removing the SOFR adjustment.

We manage our interest rate risk through the use of interest rate derivative contracts. For our floating-rate debt, interest rate changes generally impact our earnings and cash flows, assuming other factors are held constant.

On September 27, 2024, the Company terminated the previous $450 million interest rate swap, and entered into a new interest rate swap in the notional amount of $500 million with a blended interest rate of 2.83%. On this same date, the Company also entered into a new interest rate swap for $300 million with an interest rate of 3.37%. Refer to Note 6, "Derivative Instruments and Hedging Activities," for further discussion regarding our derivative transactions.

We have unlimited interest rate risk related to borrowings on our variable rate debt in excess of the notional principal amount of our interest rate swap contract.

At February 1, 2025, we had $1,246.9 million of floating-rate debt, exclusive of original issue discount. Based on this, a one percentage point interest rate increase or decrease as of February 1, 2025 (after considering our interest rate swap contract and assuming current borrowing level remains constant), would cause an increase or decrease, respectively, to cash interest expense of $4.4 million per year. This sensitivity analysis assumes our mix of financial instruments and all other variables will remain constant in future periods. These assumptions are made in order to facilitate the analysis and are not necessarily indicative of our future intentions.

Our ability to satisfy our interest payment obligations on our outstanding debt will depend largely on our future performance, which, in turn, is in part subject to prevailing economic conditions and to financial, business and other factors beyond our control. If we do not have sufficient cash flow to service our interest payment obligations on our outstanding indebtedness and if we cannot borrow or obtain equity financing to satisfy those obligations, our business and results of operations will be materially adversely affected. We cannot be assured that any replacement borrowing or equity financing could be successfully completed.

40

**Item 8.   FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

| | Page |
|---|---|
| **Consolidated Financial Statements** | |
| Report of Independent Registered Public Accounting Firm | 41 |
| Consolidated Statements of Income for the fiscal years ended February 1, 2025, February 3, 2024 and January 28, 2023 | 43 |
| Consolidated Statements of Comprehensive Income for the fiscal years ended February 1, 2025, February 3, 2024 and January 28, 2023 | 44 |
| Consolidated Balance Sheets as of February 1, 2025 and February 3, 2024 | 45 |
| Consolidated Statements of Cash Flows for the fiscal years ended February 1, 2025, February 3, 2024 and January 28, 2023 | 46 |
| Consolidated Statements of Stockholders' Equity for the fiscal years ended February 1, 2025, February 3, 2024 and January 28, 2023 | 47 |
| Notes to Consolidated Financial Statements for the fiscal years ended February 1, 2025, February 3, 2024 and January 28, 2023 | 48 |

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the shareholders and the Board of Directors of Burlington Stores, Inc.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Burlington Stores, Inc. and subsidiaries (the "Company") as of February 1, 2025 and February 3, 2024, the related consolidated statements of income, comprehensive income, stockholders' equity, and cash flows, for each of the three years in the period ended February 1, 2025, and the related notes and the schedules listed in the Index at Item 15 (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of February 1, 2025 and February 3, 2024, and the results of its operations and its cash flows for each of the three years in the period ended February 1, 2025, in conformity with accounting principles generally accepted in the United States of America.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of February 1, 2025, based on criteria established in Internal Control — Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated March 17, 2025, expressed an unqualified opinion on the Company's internal control over financial reporting.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical Audit Matter**

The critical audit matter communicated below is a matter arising from the current-period audit of the financial statements that was communicated or required to be communicated to the audit committee and that (1) relates to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing a separate opinion on the critical audit matter or on the accounts or disclosures to which it relates.

***Retail Inventory Method—Impact of Markdowns—Refer to Note 1 to the financial statements***

*Critical Audit Matter Description*

The Company values merchandise inventories at the lower of cost or market using the retail inventory method. Under this method, the valuation of inventories at cost and the resulting gross margins are determined by applying a calculated cost-to-retail ratio to the retail value of inventories. The retail inventory method is an averaging method that results in valuing inventory at the lower of cost or market provided markdowns are taken timely to reduce the retail value of inventory.

The judgments involved in determining when to record markdowns can significantly impact the ending inventory valuation and the resulting gross profit. Given the significant judgments necessary to identify and record markdowns timely, performing audit procedures to evaluate the timeliness of markdowns involved a high degree of auditor judgment.

*How the Critical Audit Matter Was Addressed in the Audit*

Our audit procedures related to the timing of markdowns taken included the following, among others:

- We tested the effectiveness of management's controls over inventory valuation, specifically those over the determination and execution of markdowns.

- We made a selection of markdowns recorded throughout the year to test the accuracy and timeliness of markdowns taken.

- We made a selection of markdowns recorded after year-end to determine if the selected markdowns should have been taken as of the year-end balance sheet date.

- We made a selection of purchases made throughout the year; determined if those purchases were subsequently marked down; and, if marked down, that the markdown was recorded timely.

- We analyzed trends in the aging of inventory to determine if there were any significant fluctuations in aged inventory that would indicate markdowns were not taken timely.

- We developed an expectation of markdowns in ending inventory based on historical relationships between markdowns and inventory balances on hand and compared to recorded markdowns.

/s/ Deloitte & Touche LLP

Morristown, New Jersey
March 17, 2025

We have served as the Company's auditor since 1983.

**BURLINGTON STORES, INC.**
**CONSOLIDATED STATEMENTS OF INCOME**
**(All amounts in thousands, except per share data)**

| | Fiscal Year Ended | | |
|---|---|---|---|
| | February 1, 2025 | February 3, 2024 (53 Weeks) | January 28, 2023 |
| **REVENUES:** | | | |
| Net sales | $ 10,616,743 | $ 9,708,973 | $ 8,684,545 |
| Other revenue | 18,080 | 18,494 | 18,059 |
| **Total revenue** | 10,634,823 | 9,727,467 | 8,702,604 |
| **COSTS AND EXPENSES:** | | | |
| Cost of sales | 6,025,272 | 5,584,060 | 5,171,715 |
| Selling, general and administrative expenses | 3,546,967 | 3,288,315 | 2,877,356 |
| Costs related to debt amendments | 4,553 | 97 | — |
| Depreciation and amortization | 347,575 | 307,064 | 270,398 |
| Impairment charges - long-lived assets | 12,921 | 6,367 | 21,402 |
| Other income - net | (48,213) | (40,882) | (26,907) |
| Loss on extinguishment of debt | 1,412 | 38,274 | 14,657 |
| Interest expense | 69,522 | 78,399 | 66,474 |
| **Total costs and expenses** | 9,960,009 | 9,261,694 | 8,395,095 |
| **Income before income tax expense** | 674,814 | 465,773 | 307,509 |
| Income tax expense | 171,175 | 126,124 | 77,386 |
| **Net income** | $ 503,639 | $ 339,649 | $ 230,123 |
| | | | |
| Net income per common share: | | | |
| Common stock - basic | $ 7.91 | $ 5.25 | $ 3.51 |
| Common stock - diluted | $ 7.80 | $ 5.23 | $ 3.49 |
| Weighted average number of common shares: | | | |
| Common stock - basic | 63,634 | 64,672 | 65,637 |
| Common stock - diluted | 64,595 | 64,917 | 65,901 |

See Notes to Consolidated Financial Statements.

**BURLINGTON STORES, INC.**
**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME**
**(All amounts in thousands)**

| | Fiscal Year Ended | | | | | |
|---|---|---|---|---|---|---|
| | February 1, 2025 | | February 3, 2024 (53 Weeks) | | January 28, 2023 | |
| Net income | $ | 503,639 | $ | 339,649 | $ | 230,123 |
| Other comprehensive income, net of tax: | | | | | | |
| Interest rate derivative contracts: | | | | | | |
| Net unrealized gain arising during the period | | 22,438 | | 10,460 | | 27,726 |
| Net reclassification into earnings during the period | | (13,449) | | (5,675) | | 5,463 |
| Other comprehensive income, net of tax | | 8,989 | | 4,785 | | 33,189 |
| **Total comprehensive income** | $ | 512,628 | $ | 344,434 | $ | 263,312 |

See Notes to Consolidated Financial Statements.

44

**BURLINGTON STORES, INC.**
**CONSOLIDATED BALANCE SHEETS**
**(All amounts in thousands, except share and per share data)**

| | | February 1, 2025 | | February 3, 2024 |
|---|---|---:|---|---:|
| **ASSETS** | | | | |
| **Current assets:** | | | | |
| Cash and cash equivalents | $ | 994,698 | $ | 925,359 |
| Accounts receivable—net of allowance for doubtful accounts of $2,959 and $2,313, respectively | | 88,079 | | 74,361 |
| Merchandise inventories | | 1,250,775 | | 1,087,841 |
| Assets held for disposal | | 32,193 | | 23,299 |
| Prepaid and other current assets | | 263,058 | | 216,164 |
| **Total current assets** | | 2,628,803 | | 2,327,024 |
| Property and equipment—net | | 2,369,720 | | 1,880,325 |
| Operating lease assets | | 3,386,852 | | 3,132,768 |
| Tradenames | | 238,000 | | 238,000 |
| Goodwill | | 47,064 | | 47,064 |
| Deferred tax assets | | 2,248 | | 2,436 |
| Other assets | | 97,726 | | 79,223 |
| **Total assets** | $ | 8,770,413 | $ | 7,706,840 |
| | | | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | |
| **Current liabilities:** | | | | |
| Accounts payable | $ | 1,038,148 | $ | 956,350 |
| Current operating lease liabilities | | 406,891 | | 411,395 |
| Other current liabilities | | 656,581 | | 647,338 |
| Current maturities of long term debt | | 170,891 | | 13,703 |
| **Total current liabilities** | | 2,272,511 | | 2,028,786 |
| Long term debt | | 1,539,918 | | 1,394,942 |
| Long term operating lease liabilities | | 3,253,825 | | 2,984,794 |
| Other liabilities | | 74,402 | | 73,793 |
| Deferred tax liabilities | | 259,261 | | 227,593 |
| Commitments and contingencies (Note 14) | | | | |
| **Stockholders' equity:** | | | | |
| Preferred stock, $0.0001 par value: authorized: 50,000,000 shares; no shares issued and outstanding | | — | | — |
| Common stock, $0.0001 par value: | | | | |
| Authorized: 500,000,000 shares | | | | |
| Issued: 82,805,353 shares and 82,399,577 shares, respectively | | | | |
| Outstanding: 63,284,385 shares, 63,964,371 shares, respectively | | 8 | | 8 |
| Additional paid-in-capital | | 2,237,579 | | 2,118,356 |
| Accumulated earnings | | 1,487,703 | | 984,064 |
| Accumulated other comprehensive income | | 42,522 | | 33,533 |
| Treasury stock, at cost | | (2,397,316) | | (2,139,029) |
| **Total stockholders' equity** | | 1,370,496 | | 996,932 |
| **Total liabilities and stockholders' equity** | $ | 8,770,413 | $ | 7,706,840 |

See Notes to Consolidated Financial Statements.

45

## BURLINGTON STORES, INC.
## CONSOLIDATED STATEMENTS OF CASH FLOWS
### (All amounts in thousands)

| | Fiscal Year Ended | | |
| --- | --- | --- | --- |
| | February 1, 2025 | February 3, 2024 (53 Weeks) | January 28, 2023 |
| **OPERATING ACTIVITIES** | | | |
| Net income | $ 503,639 | $ 339,649 | $ 230,123 |
| Adjustments to reconcile net income to net cash provided by operating activities | | | |
| Depreciation and amortization | 347,575 | 307,064 | 270,398 |
| Impairment charges—long-lived assets | 12,921 | 6,367 | 21,402 |
| Amortization of deferred financing costs | 3,079 | 3,193 | 3,633 |
| Accretion of long term debt instruments | 1,041 | 958 | 949 |
| Deferred income taxes | 28,637 | 20,663 | (25,431 ) |
| Loss on extinguishment of debt | 1,412 | 38,274 | 14,657 |
| Non-cash stock compensation expense | 87,572 | 83,948 | 67,480 |
| Non-cash lease expense | (9,856 ) | (7,724 ) | (523 ) |
| Cash received from landlord allowances | 28,872 | 14,585 | 23,137 |
| Changes in assets and liabilities: | | | |
| Accounts receivable | (14,253 ) | (4,464 ) | (13,012 ) |
| Merchandise inventories | (162,934 ) | 94,141 | (160,974 ) |
| Prepaid and other current assets | (46,894 ) | (84,473 ) | 244,852 |
| Accounts payable | 86,505 | (21,953 ) | (125,006 ) |
| Other current liabilities | 10,368 | 80,774 | 44,830 |
| Other long term assets and long term liabilities | 1,136 | 3,651 | (360 ) |
| Other operating activities | (15,444 ) | (5,918 ) | 230 |
| **Net cash provided by operating activities** | 863,376 | 868,735 | 596,385 |
| **INVESTING ACTIVITIES** | | | |
| Cash paid for property and equipment | (880,384 ) | (492,644 ) | (447,393 ) |
| Lease acquisition costs | (11,599 ) | (24,640 ) | (3,710 ) |
| Net proceeds from sale of property and equipment and assets held for sale | 9,729 | 13,539 | 27,961 |
| **Net cash used in investing activities** | (882,254 ) | (503,745 ) | (423,142 ) |
| **FINANCING ACTIVITIES** | | | |
| Proceeds from long term debt—Term Loan Facility | 605,843 | — | — |
| Principal payments on long term debt—Term Loan Facility | (302,597 ) | (9,614 ) | (9,614 ) |
| Proceeds from long term debt— 2027 Convertible Notes | — | 297,069 | — |
| Principal payment on long term debt— 2025 Convertible Notes | — | (386,519 ) | (78,240 ) |
| Purchase of treasury shares | (256,293 ) | (243,188 ) | (316,896 ) |
| Proceeds from stock option exercises | 31,651 | 18,783 | 20,592 |
| Other financing activities | 9,613 | 4,633 | (7,553 ) |
| **Net cash provided by (used in) financing activities** | 88,217 | (318,836 ) | (391,711 ) |
| Increase (decrease) in cash and cash equivalents | 69,339 | 46,154 | (218,468 ) |
| Cash and cash equivalents at beginning of period | 925,359 | 879,205 | 1,097,673 |
| **Cash and cash equivalents at end of period** | $ 994,698 | $ 925,359 | $ 879,205 |
| **Supplemental disclosure of cash flow information:** | | | |
| Interest paid | $ 84,614 | $ 88,148 | $ 51,445 |
| Income tax payments (refund) - net | $ 170,259 | $ 86,237 | $ (208,333 ) |
| **Non-cash investing and financing activities:** | | | |
| Finance lease modification | $ (1,523 ) | $ — | $ (6,042 ) |
| Accrued purchases of property and equipment | $ 102,829 | $ 110,475 | $ 66,007 |
| Exchange of noncash assets | $ — | $ — | $ 7,300 |

See Notes to Consolidated Financial Statements.

46

**BURLINGTON STORES, INC.**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**
**(All dollar amounts in thousands)**

| | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Accumulated Other Comprehensive Income (Loss) | Treasury Stock | | Total |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | | | | Shares | Amount | |
| **Balance at January 29, 2022** | 81,677,315 | $ 7 | $ 1,927,554 | $ 414,292 | $ (4,441) | (15,185,760) | $ (1,576,995) | $ 760,417 |
| Net income | — | — | — | 230,123 | — | — | — | 230,123 |
| Stock options exercised | 168,720 | 1 | 20,591 | — | — | — | — | 20,592 |
| Shares used for tax withholding | — | — | — | — | — | (75,710) | (14,238) | (14,238) |
| Shares purchased as part of publicly announced programs | — | — | — | — | — | (1,756,811) | (302,658) | (302,658) |
| Vesting of restricted shares, net of forfeitures of 199 restricted shares | 191,959 | — | — | — | — | — | — | — |
| Stock based compensation | — | — | 67,480 | — | — | — | — | 67,480 |
| Unrealized gains on interest rate derivative contracts, net of related taxes of $10.1 million | — | — | — | — | 27,726 | — | — | 27,726 |
| Amount reclassified into earnings, net of related taxes of $2.0 million | — | — | — | — | 5,463 | — | — | 5,463 |
| **Balance at January 28, 2023** | 82,037,994 | 8 | 2,015,625 | 644,415 | 28,748 | (17,018,281) | (1,893,891) | 794,905 |
| Net income | — | — | — | 339,649 | — | — | — | 339,649 |
| Stock options exercised | 157,003 | — | 18,783 | — | — | — | — | 18,783 |
| Shares used for tax withholding | — | — | — | — | — | (62,894) | (11,255) | (11,255) |
| Shares purchased as part of publicly announced programs, inclusive of $1.9 million related to excise tax | — | — | — | — | — | (1,354,031) | (233,883) | (233,883) |
| Vesting of restricted shares | 204,580 | — | — | — | — | — | — | — |
| Stock based compensation | — | — | 83,948 | — | — | — | — | 83,948 |
| Unrealized gains on interest rate derivative contracts, net of related taxes of $3.8 million | — | — | — | — | 10,460 | — | — | 10,460 |
| Amount reclassified into earnings, net of related taxes of $2.1 million | — | — | — | — | (5,675) | — | — | (5,675) |
| **Balance at February 3, 2024** | 82,399,577 | 8 | 2,118,356 | 984,064 | 33,533 | (18,435,206) | (2,139,029) | 996,932 |
| Net income | — | — | — | 503,639 | — | — | — | 503,639 |
| Stock options exercised | 189,919 | — | 31,651 | — | — | — | — | 31,651 |
| Shares used for tax withholding | — | — | — | — | — | (72,201) | (14,370) | (14,370) |
| Shares purchased as part of publicly announced programs, inclusive of $2.0 million related to excise tax | — | — | — | — | — | (1,013,561) | (243,917) | (243,917) |
| Vesting of restricted shares | 215,857 | — | — | — | — | — | — | — |
| Stock based compensation | — | — | 87,572 | — | — | — | — | 87,572 |
| Unrealized gains on interest rate derivative contracts, net of related taxes of $8.1 million | — | — | — | — | 22,438 | — | — | 22,438 |
| Amount reclassified into earnings, net of related taxes of $4.9 million | — | — | — | — | (13,449) | — | — | (13,449) |
| **Balance at February 1, 2025** | 82,805,353 | $ 8 | 2,237,579 | 1,487,703 | $ 42,522 | (19,520,968) | $ (2,397,316) | 1,370,496 |

See Notes to Consolidated Financial Statements.

47

**BURLINGTON STORES, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

### 1. Summary of Significant Accounting Policies

*Business*

As of February 1, 2025, Burlington Stores, Inc., a Delaware corporation (collectively with its subsidiaries, the Company), has expanded its store base to 1,108 retail stores in 46 states, Washington D.C. and Puerto Rico. The Company sells in-season, fashion-focused merchandise at up to 60% off other retailers' prices, including: women's ready-to-wear apparel, menswear, youth apparel, baby, beauty, footwear, accessories, home, toys, gifts and coats. As of February 1, 2025, the Company operated stores under the names "Burlington Stores" (1,107 stores), and "Cohoes Fashions" (1 store). Cohoes Fashions offers products similar to those offered by Burlington Stores.

*Basis of Consolidation and Presentation*

The accompanying Consolidated Financial Statements have been prepared in accordance with accounting principles generally accepted in the United States of America (GAAP). The Consolidated Financial Statements include the accounts of Burlington Stores, Inc. and its subsidiaries. All inter-company accounts and transactions have been eliminated in consolidation.

*Fiscal Years*

The Company defines its fiscal year as the 52 or 53-week period ending on the Saturday closest to January 31. The fiscal year ended February 1, 2025 (Fiscal 2024) consisted of 52 weeks, the fiscal year ended February 3, 2024 (Fiscal 2023) consisted of 53 weeks, and the fiscal year ended January 28, 2023 (Fiscal 2022) consisted of 52 weeks.

*Use of Estimates*

Certain amounts included in the Consolidated Financial Statements are estimated based on historical experience, currently available information and management's judgment as to the expected outcome of future conditions and circumstances. While every effort is made to ensure the integrity of such estimates, actual results could differ from these estimates, and such differences could have a material impact on the Company's Consolidated Financial Statements.

*Cash and Cash Equivalents*

Cash and cash equivalents represent cash and short-term, highly liquid investments with maturities of three months or less at the time of purchase. Book cash overdrafts are included in the line item "Accounts payable" on the Company's Consolidated Balance Sheets.

*Accounts Receivable*

Accounts receivable consist of credit card receivables, interest receivables, and other receivables. Accounts receivable are recorded at net realizable value, which approximates fair value. The Company provides an allowance for doubtful accounts for amounts deemed uncollectible.

*Inventories*

Merchandise inventories are valued at the lower of cost or market, as determined by the retail inventory method. Under the retail inventory method, the valuation of inventories at cost and the resulting gross margins are calculated by applying a calculated cost to retail ratio to the retail value of inventories. The Company regularly records a provision for estimated shortage, thereby reducing the carrying value of merchandise inventory. Complete physical inventories of all of the Company's stores and warehouses are performed no less frequently than annually, with the recorded amount of merchandise inventory being adjusted to coincide with these physical counts.

The Company records its cost of merchandise (net of purchase discounts and certain vendor allowances), certain merchandise acquisition costs (primarily commissions and import fees), inbound freight, outbound freight from distribution centers, and freight on internally transferred merchandise in the line item "Cost of sales" in the Company's Consolidated Statements of Income.

Costs associated with the Company's distribution, buying, and store receiving functions (product sourcing costs) are included in the line items "Selling, general and administrative expenses" and "Depreciation and amortization" in the Company's Consolidated Statements of Income. Product sourcing costs included within the line item "Selling, general and administrative expenses" amounted to $800.3 million, $780.3 million and $677.8 million during Fiscal 2024, Fiscal 2023 and Fiscal 2022, respectively. Depreciation and amortization related to the distribution and purchasing functions for the same periods amounted to $85.3 million, $68.8 million and $56.3 million, respectively.

*Property and Equipment*

Property and equipment are recorded at cost. Depreciation is computed using the straight-line method over the estimated useful lives of the assets, which range from 10 to 40 years for buildings, depending upon the expected useful life of the facility, and 3 to 15 years for store fixtures and equipment. Leasehold improvements are amortized over the lease term, including any reasonably assured renewal options or the expected economic life of the improvement, whichever is less. Repairs and maintenance expenditures are expensed as incurred. Renewals and betterments, which significantly extend the useful lives of existing property and equipment, are capitalized. Assets recorded under finance leases are recorded at the present value of minimum lease payments and are amortized over the lease term. Amortization of assets recorded as finance leases is included in the line item "Depreciation and amortization" in the Company's Consolidated Statements of Income. The carrying value of all long-lived assets is reviewed for impairment whenever events or changes in circumstances indicate that the carrying value of an asset may not be recoverable, in accordance with ASC Topic No. 360 *"Property, Plant, and Equipment"* (Topic No. 360). Refer to Note 4, "Impairment Charges," for further discussion of the Company's measurement of impairment of long-lived assets.

*Impairment of Long-Lived Assets*

The Company reviews its long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of assets held and used is measured by a comparison of the carrying amount of an asset to undiscounted pre-tax future net cash flows expected to be generated by that asset. If the undiscounted future cash flows are not adequate to recover the carrying value of the asset, an impairment charge is recognized for the amount by which the carrying amount of the assets exceeds the fair value of such assets. Refer to Note 4, "Impairment Charges," for further discussion of the Company's measurement of impairment of long-lived assets.

*Capitalized Computer Software Costs*

The Company accounts for capitalized software in accordance with ASC Topic No. 350 "Intangibles—Goodwill and Other" (Topic No. 350) which requires the capitalization of certain costs incurred in connection with developing or obtaining software for internal use. The Company capitalized $33.3 million, $33.9 million, and $26.1 million relating to these costs during Fiscal 2024, Fiscal 2023, and Fiscal 2022, respectively.

*Intangible Assets*

The Company accounts for intangible assets in accordance with Topic No. 350. The Company's intangible assets represent tradenames. The tradename asset "Burlington" is expected to generate cash flows indefinitely and, therefore, is accounted for as an indefinite-lived asset not subject to amortization. The Company evaluates its intangible assets for possible impairment as follows:

The Company tests identifiable intangible assets with an indefinite life for impairment on an annual basis, or when a triggering event occurs, relying on a number of factors that include operating results, business plans and projected future cash flows. The impairment test consists of a comparison of the fair value of the indefinite-lived intangible asset with its carrying amount. On the first business day of the second quarter, the Company's annual assessment date, the Company performed a quantitative analysis and determined that the fair values of each of the Company's identifiable intangible assets are greater than their respective carrying values. There were no impairment charges recorded during Fiscal 2024, Fiscal 2023 or Fiscal 2022 related to indefinite-lived intangible assets.

Intangible assets at February 1, 2025 and February 3, 2024 consist primarily of tradenames.

| | *(in thousands)* | | | | | |
|---|---|---|---|---|---|---|
| | **February 1, 2025** | | | **February 3, 2024** | | |
| | **Gross Carrying Amount** | **Accumulated Amortization** | **Net Amount** | **Gross Carrying Amount** | **Accumulated Amortization** | **Net Amount** |
| Tradenames | $    238,000 | $    — | $    238,000 | $    238,000 | $    — | $    238,000 |

*Goodwill*

Goodwill represents the excess of the acquisition cost over the estimated fair value of tangible assets and other identifiable intangible assets acquired less liabilities assumed. Topic No. 350 requires a comparison, at least annually, of the carrying value of the assets and liabilities associated with a reporting unit, including goodwill, with the fair value of the reporting unit. The Company determines fair value through multiple widely accepted valuation techniques. These techniques use a variety of assumptions including projected market conditions, discount rates and future cash flows. If the carrying value of the assets and liabilities exceeds the fair value of the reporting unit, the Company would calculate the implied fair value of its reporting unit goodwill as compared with the carrying value of its reporting unit goodwill to determine the appropriate impairment charge. On the first business day of the second fiscal quarter, the Company's annual assessment date, the Company performed a quantitative analysis and determined that the fair value of the Company's reporting unit was greater than its carrying value. There were no impairment charges related to goodwill during Fiscal 2024, Fiscal 2023 or Fiscal 2022.

*Other Assets*

Other assets consist primarily of the fair value of derivative contracts, landlord-owned store assets that the Company has paid for as part of its lease, and deferred financing costs associated with the Company's senior secured asset-based revolving credit facility (the ABL Line of Credit). Landlord-owned assets represent leasehold improvements at certain stores for which the Company has paid and derives a benefit, but the landlord has retained title. These assets are amortized over the lease term inclusive of reasonably assured renewal options, and are included in the line item "Depreciation and amortization" in the Company's Consolidated Statements of Income. Deferred financing costs are amortized over the life of the ABL Line of Credit using the interest method of amortization. Amortization of deferred financing costs is recorded in the line item "Interest expense" in the Company's Consolidated Statements of Income.

*Other Current Liabilities*

Other current liabilities primarily consist of accrued payroll costs, self-insurance reserves, customer liabilities, accrued operating expenses, sales tax payable, payroll taxes payable and other miscellaneous items. Customer liabilities totaled $36.8 million and $37.0 million as of February 1, 2025 and February 3, 2024, respectively.

The Company has risk participation agreements with insurance carriers with respect to workers' compensation, general liability insurance and health insurance. Pursuant to these arrangements, the Company is responsible for paying individual claims up to designated dollar limits. The amounts related to these claims are estimated and can vary based on changes in assumptions or claims experience included in the associated insurance programs. An increase in workers' compensation claims, health insurance claims or general liability claims may result in a corresponding increase in costs related to these claims. Self-insurance reserves as of February 1, 2025 and February 3, 2024 were:

| | *(in thousands)* | |
|---|---|---|
| | **February 1, 2025** | **February 3, 2024** |
| Short-term self-insurance reserve | $      41,309 | $      38,295 |
| Long-term self-insurance reserve | 61,475 | 56,530 |
| **Total** | $      102,784 | $      94,825 |

*Other Liabilities*

Other liabilities primarily consist of the long term portion of self-insurance reserves and tax liabilities associated with the uncertain tax positions recognized by the Company in accordance with ASC Topic No. 740 "Income Taxes" (Topic No. 740).

*Revenue Recognition*

The Company records revenue at the time control of the goods are transferred to the customer, which the Company determines to be at point of sale and delivery of merchandise, net of allowances for estimated future returns, which is estimated based on historical return rates. The Company presents sales, net of sales taxes, in its Consolidated Statements of Income. Sales percentage by major product category is as follows:

| Category | Fiscal 2024 | Fiscal 2023 | Fiscal 2022 |
|---|---|---|---|
| Ladies apparel | 21% | 21% | 22% |
| Accessories and shoes | 27% | 27% | 24% |
| Home | 20% | 20% | 21% |
| Mens apparel | 17% | 17% | 17% |
| Kids apparel and baby | 12% | 12% | 12% |
| Outerwear | 3% | 3% | 4% |

The Company accounts for layaway sales in compliance with ASC Topic No. 606 "Revenue from Contracts with Customers" (Topic No. 606). Layaway sales are recognized upon delivery of merchandise to the customer. The amount of cash received upon initiation of the layaway is recorded as a deposit liability in the line item "Other current liabilities" in the Company's Consolidated Balance Sheets. Stored value cards (gift cards and store credits issued for merchandise returns) are recorded as a liability at the time of issuance, and the related sale is recorded upon redemption.

The Company determines an estimated stored value card breakage rate by continuously evaluating historical redemption data. Breakage income is recognized monthly in proportion to the historical redemption patterns for those stored value cards for which the likelihood of redemption is remote.

The Company has a private label credit card program, in which customers earn reward points for purchases made using the card. The Company reduces net sales for the dollar value of any points earned at the time of the initial transaction, and subsequently recognizes net sales at the time the points are redeemed or expired. The Company receives royalty revenue based on a percentage of all purchases made on the card, which is recognized within net sales at the time of the initial transaction.

*Other Revenue*

Other revenue consists of service fees (layaway and other miscellaneous service charges), subleased rental income and certain revenue received from the bank related to the Company's private label credit card (PLCC) as shown in the table below:

| | *(in thousands)* | | |
|---|---|---|---|
| | **Fiscal Years Ended** | | |
| | **February 1, 2025** | **February 3, 2024** | **January 28, 2023** |
| Service fees | $ 3,928 | $ 4,165 | $ 4,131 |
| Subleased rental income and other | 9,041 | 9,317 | 9,444 |
| PLCC | 5,111 | 5,012 | 4,484 |
| **Total** | $ 18,080 | $ 18,494 | $ 18,059 |

*Advertising Costs*

The Company's advertising costs consist primarily of video, audio and digital marketing. Advertising costs are expensed the first time the advertising takes place, and are included in the line item "Selling, general and administrative expenses" on the Company's Consolidated Statements of Income. During Fiscal 2024, Fiscal 2023 and Fiscal 2022, advertising costs were $35.3 million, $36.5 million and $33.8 million, respectively.

*Income Taxes*

The Company accounts for income taxes in accordance with Topic No. 740. Deferred income taxes reflect the impact of temporary differences between amounts of assets and liabilities for financial reporting purposes and such amounts as measured by tax laws. A valuation allowance against the Company's deferred tax assets is recorded when it is more likely than not that some portion or all of the deferred tax assets will not be realized. In determining the need for a valuation allowance, management is required to make assumptions and to apply judgment, including forecasting future earnings, taxable income, and the mix of earnings in the jurisdictions in which the Company operates. Management periodically assesses the need for a valuation allowance based on the Company's

current and anticipated results of operations. The need for and the amount of a valuation allowance can change in the near term if operating results and projections change significantly.

Topic No. 740 requires the recognition in the Company's Consolidated Financial Statements of the impact of a tax position taken or expected to be taken in a tax return, if that position is "more likely than not" to be sustained upon examination by the relevant taxing authority, based on the technical merits of the position. The tax benefits recognized in the Company's Consolidated Financial Statements from such a position are measured based on the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate resolution. The Company records interest and penalties related to unrecognized tax benefits as part of income taxes.

*Other Income, Net*

Other income, net, consists of interest income, gains and losses on insurance proceeds, net gains and losses on disposition of assets, gift card breakage, and other miscellaneous items. The Company recognized $3.0 million of gain on insurance recoveries during Fiscal 2022, and none during Fiscal 2023 and Fiscal 2024. The Company also recognized $5.0 million during Fiscal 2023 related to the sale of certain state tax credits. There were no sales of tax credits during Fiscal 2024 and Fiscal 2022.

*Comprehensive Income*

Comprehensive income is comprised of net income and the effective portion of changes in the fair value of derivatives designated and that qualify as cash flow hedges, less amounts reclassified into earnings.

*Lease Accounting*

The Company leases store locations, distribution centers and office space used in its operations. The Company accounts for these types of leases in accordance with ASC Topic No. 842, "Leases" (Topic No. 842), which requires that leases be evaluated and classified as operating or finance leases for financial reporting purposes. The lease liability is calculated as the present value of the remaining future lease payments over the lease term, including reasonably assured renewal options. The discount rates used in valuing the Company's leases are not readily determinable, and are based on the Company's incremental borrowing rate on a fully collateralized basis. In calculating its incremental borrowing rate, the Company uses a retail industry yield curve, adjusted for the Company's credit profile. The right-of-use asset for operating leases is based on the lease liability plus initial direct costs and prepaid lease payments, less landlord incentives received.

The Company's operating lease cost, included in the line item "Selling, general and administrative expenses" on its Consolidated Statements of Income, includes amortization of right-of-use assets, interest on lease liabilities, as well as any variable and short-term lease cost. The Company commences recording operating lease cost when the underlying asset is made available for use.

Assets held under finance leases are included in the line item "Property and equipment—net of accumulated depreciation and amortization" in the Company's Consolidated Balance Sheets.

*Stock-Based Compensation*

The Company accounts for stock-based compensation in accordance with ASC Topic No. 718, "Stock Compensation" (Topic No. 718), which requires companies to record stock compensation expense for all non-vested and new awards beginning as of the grant date and through the end of the vesting period. Refer to Note 9, "Stock-Based Compensation," for further details.

*Net Income Per Share*

Net income per share is calculated using the treasury stock method. Refer to Note 8, "Net Income Per Share," for further details.

*Credit Risk*

Financial instruments that potentially subject the Company to concentrations of credit risk consist principally of cash, cash equivalents and investments. The Company manages the credit risk associated with cash equivalents and investments by investing with high-quality institutions and, by policy, limiting investments only to those which meet prescribed investment guidelines. The Company maintains cash accounts that, at times, may exceed federally insured limits. The Company has not experienced any losses from maintaining cash accounts in excess of such limits. Management believes that it is not exposed to any significant risks on its cash and cash equivalent accounts.

*Segment Information*

The Company reports segment information in accordance with ASC Topic No. 280 "Segment Reporting," and has one reportable segment. The Company derives all revenue in the United States and manages its business activities on a consolidated basis.

The Company is an off-price retailer that derives revenues from customers by providing a complete line of value-priced apparel, including: women's ready-to-wear apparel, menswear, youth apparel, baby, beauty, footwear, accessories, home, toys, gifts and coats. The Company's chief operating decision maker (CODM) is the Chief Executive Officer of the Company.

The CODM assesses performance for the segment and decides how to allocate resources based on net income that also is reported on the Consolidated Statements of Income. The measure of segment assets is reported on the Consolidated Balance Sheets as total assets. Net income is used to monitor budget versus actual results, as well as actual results compared to the prior period. These comparisons are used in assessing performance of the segment and in establishing management's allocation of resources. Below is an extract of certain disaggregated expense information that is regularly provided to the CODM.

| | *(in thousands)* | | | | | |
|---|---|---|---|---|---|---|
| | **Fiscal Year Ended** | | | | | |
| | **February 1, 2025** | | **February 3, 2024 (53 Weeks)** | | **January 28, 2023** | |
| Total revenue | $ | 10,634,823 | $ | 9,727,467 | $ | 8,702,604 |
| | | | | | | |
| Cost of sales | | 6,025,272 | | 5,584,060 | | 5,171,715 |
| Product sourcing costs | | 800,324 | | 780,286 | | 677,817 |
| Other segment expenses (a) | | 2,746,643 | | 2,508,029 | | 2,199,539 |
| Costs related to debt amendments | | 4,553 | | 97 | | - |
| Depreciation and amortization | | 347,575 | | 307,064 | | 270,398 |
| Impairment charges - long-lived assets | | 12,921 | | 6,367 | | 21,402 |
| Other income - net | | (48,213 ) | | (40,882 ) | | (26,907 ) |
| Loss on extinguishment of debt | | 1,412 | | 38,274 | | 14,657 |
| Interest expense | | 69,522 | | 78,399 | | 66,474 |
| Income tax expense | | 171,175 | | 126,124 | | 77,386 |
| Net income | $ | 503,639 | $ | 339,649 | $ | 230,123 |

(a)    The other segment expenses category includes store related costs, store payroll costs, corporate costs, marketing & strategy costs, and other store & selling expenses.

## 2. Recent Accounting Pronouncements

In November 2023, the FASB issued ASU 2023-07, "Segment Reporting (Topic 280): Improvements to Reportable Segment Disclosures" (ASU 2023-07) to improve reportable segment disclosure requirements, primarily through enhanced disclosures about significant segment expenses. Refer to Note 1, "Summary of Significant Accounting Policies," for the Company's disclosure in accordance with ASU 2023-07.

There were no other new accounting standards that had a material impact on the Company's Consolidated Financial Statements and notes thereto during Fiscal 2024.

*Accounting Pronouncements Not Yet Adopted*

In December 2023, the FASB issued ASU 2023-09, "Income Taxes (Topics 740): Improvements to Income Tax Disclosures" (ASU 2023-09) to expand the disclosure requirements for income taxes, specifically related to the rate reconciliation and income taxes paid. ASU 2023-09 is effective for annual reporting periods beginning after December 15, 2024, with early adoption permitted and can be applied on either a prospective or retroactive basis. The Company is currently evaluating the impact of ASU 2023-09 on its disclosures in the consolidated financial statements.

In November 2024, the FASB issued ASU 2024-03, "Income Statement—Reporting Comprehensive Income—Expense Disaggregation Disclosures (Subtopic 220-40): Disaggregation of income statement expenses" (ASU 2024-03), which requires disaggregated disclosure of income statement expenses for public business entities. ASU 2024-03 is effective for fiscal years beginning after December 15, 2026, and interim periods within fiscal years beginning after December 15, 2027, with early adoption permitted. The Company is currently evaluating the impact of ASU 2024-03 on its disclosures in the consolidated financial statements.

**3. Property and Equipment**

Property and equipment consist of:

| | Useful Lives | *(in thousands)* | |
| --- | --- | --- | --- |
| | | February 1, 2025 | February 3, 2024 |
| Land | N/A | $ 82,692 | $ 105,645 |
| Buildings | 10 to 40 Years | 363,658 | 413,634 |
| Store fixtures and equipment | 3 to 15 Years | 1,828,472 | 1,575,798 |
| Software | 3 to 10 Years | 387,200 | 365,899 |
| Leasehold improvements | Shorter of lease term or useful life | 1,180,491 | 996,994 |
| Construction in progress | N/A | 584,124 | 375,305 |
| Total property and equipment at cost | | 4,426,637 | 3,833,275 |
| Less: accumulated depreciation and amortization | | (2,056,917) | (1,952,950) |
| Total property and equipment, net of accumulated depreciation and amortization | | $ 2,369,720 | $ 1,880,325 |

As of February 1, 2025 and February 3, 2024, assets, net of accumulated amortization of $13.2 million and $17.1 million, respectively, held under finance leases amounted to approximately $18.4 million and $21.8 million, respectively, and are included in the line item "Buildings" in the foregoing table. Amortization expense related to finance leases is included in the line item "Depreciation and amortization" in the Company's Consolidated Statements of Income. The total amount of depreciation expense during Fiscal 2024, Fiscal 2023 and Fiscal 2022 was $311.4 million, $273.5 million and $237.8 million, respectively.

Internally developed software is amortized on a straight line basis over three to ten years and is recorded in the line item "Depreciation and amortization" in the Company's Consolidated Statements of Income. Amortization of internally developed software amounted to $25.7 million, $23.0 million and $21.2 million during Fiscal 2024, Fiscal 2023 and Fiscal 2022, respectively.

Landlord-owned assets represent leasehold improvements at certain stores for which the Company has paid and derives a benefit, but the landlord has retained title. These assets are amortized over the lease term inclusive of reasonably assured renewal options. Amortization of landlord-owned assets was $10.4 million, $10.6 million and $11.4 million, during Fiscal 2024, Fiscal 2023 and Fiscal 2022, respectively, and was included in the line item "Depreciation and amortization" in the Company's Consolidated Statements of Income.

During Fiscal 2024, Fiscal 2023 and Fiscal 2022, the Company recorded impairment charges related to property and equipment of $11.2 million, $3.7 million and $20.1 million, respectively. These charges are recorded in the line item "Impairment charges—long-lived assets" in the Company's Consolidated Statements of Income. Refer to Note 4, "Impairment Charges," for further discussion.

**4. Impairment Charges**

Impairment charges recorded during Fiscal 2024, Fiscal 2023 and Fiscal 2022 amounted to $12.9 million, $6.4 million and $21.4 million, respectively. Impairment charges are primarily related to declines in revenues and operating results of certain stores in Fiscal 2024, Fiscal 2023, and Fiscal 2022, as well as sales of owned properties in Fiscal 2024 and Fiscal 2022. Impairment charges during these periods related to the following:

| | *(in thousands)* | | |
| --- | --- | --- | --- |
| | Fiscal Years Ended | | |
| Asset Categories | February 1, 2025 | February 3, 2024 | January 28, 2023 |
| Store fixtures and equipment | $ 1,402 | $ 2,471 | $ 2,981 |
| Leasehold improvements | 422 | 1,272 | 2,097 |
| Operating lease assets | 1,763 | 2,623 | 1,286 |
| Buildings | 1,437 | — | 8,687 |
| Land | 7,882 | — | 4,968 |
| Other assets | 15 | 1 | 1,383 |
| **Total** | $ 12,921 | $ 6,367 | $ 21,402 |

The Company recorded impairment charges related to store-level assets for 10 stores during Fiscal 2024, 11 stores during Fiscal 2023, and 16 stores during Fiscal 2022.

Long-lived assets are measured at fair value on a non-recurring basis for purposes of calculating impairment using the fair value hierarchy of ASC Topic No. 820 "Fair Value Measurements" (Topic No. 820). Refer to Note 13, "Fair Value of Financial Instruments," for further discussion of the Company's fair value hierarchy. The fair value of the Company's long-lived assets is calculated using a discounted cash-flow model that used level 3 inputs. In calculating future cash flows, the Company makes estimates regarding future operating results and market rent rates, based on its experience and knowledge of market factors in which the retail location is located. The assets impaired had a remaining carrying value after impairments of $56.8 million, $73.0 million, and $99.0 million during Fiscal 2024, Fiscal 2023, and Fiscal 2022, respectively, primarily related to the right-of-use assets.

## 5. Long Term Debt

Long term debt consists of:

| | | | *(in thousands)* | |
| --- | --- | --- | --- | --- |
| | | February 1, 2025 | | February 3, 2024 |
| Senior secured term loan facility, adjusted SOFR (with a floor of 0.00%) plus 1.75%, matures on September 24, 2031 | $ | 1,238,921 | $ | 933,355 |
| Convertible senior notes, 2.25%, mature on April 15, 2025 | | 156,155 | | 156,155 |
| Convertible senior notes, 1.25%, mature on December 15, 2027 | | 297,069 | | 297,069 |
| ABL senior secured revolving facility, SOFR plus spread based on average outstanding balance, matures on December 22, 2026 | | — | | — |
| Finance lease obligations | | 24,980 | | 29,069 |
| Unamortized deferred financing costs | | (6,316) | | (7,003) |
| Total debt | | 1,710,809 | | 1,408,645 |
| Less: current maturities | | (170,891) | | (13,703) |
| Long term debt, net of current maturities | $ | 1,539,918 | $ | 1,394,942 |

*Term Loan Facility*

BCFWC and certain of its subsidiaries and holding companies are party to a Credit Agreement (as amended, supplemented and otherwise modified, the Term Loan Facility) that provides for term loans in an aggregate principal amount as of February 1, 2025 of $1,246.9 million maturing on September 24, 2031.

On September 24, 2024, the Company entered into an amendment to the Term Loan Facility dated as of February 24, 2011 (the "Amendment"), which among other things, (i) refinanced the outstanding $933 million principal amount of Term B-6 Loans with Term B-7 Loans in an aggregate principal amount of $1,250 million, which includes incremental term loans in an aggregate principal amount of $317 million, (ii) extended the maturity date from June 24, 2028 to September 24, 2031, and (iii) reduced the interest rate margins applicable to the Company's term loan facility from 1.00% to 0.75%, in the case of prime rate loans, and from 2.00% to 1.75%, in the case of SOFR loans, with a 0.00% SOFR floor, and removed the SOFR adjustment. The Term B-7 Loans were issued with an original issue discount of 99.5.

The Term Loan Facility is collateralized by a first lien on BCFWC's and each guarantor's equity interests, equipment, intellectual property, and certain favorable leases and real estate, and certain related assets and proceeds thereof (subject to certain exceptions), and a second lien on BCFWC's and each guarantor's other assets and proceeds thereof (subject to certain exceptions).

As of February 1, 2025 and February 3, 2024, the Company's borrowing rate related to the Term Loan Facility, exclusive of the impact of interest rate swaps, was 6.1% and 7.4%, respectively.

*2025 Convertible Notes*

On April 16, 2020, the Company issued its 2025 Convertible Notes. The 2025 Convertible Notes are general unsecured obligations of the Company. The 2025 Convertible Notes bear interest at a rate of 2.25% per year, payable semi-annually in cash, in arrears, on April 15 and October 15 of each year. The 2025 Convertible Notes will mature on April 15, 2025, unless earlier converted, redeemed or repurchased.

During the first quarter of Fiscal 2023, the Company entered into separate, privately negotiated exchange agreements with certain holders of the 2025 Convertible Notes. Under the terms of the exchange agreements, the holders exchanged $110.3 million in aggregate principal amount of 2025 Convertible Notes held by them for $133.3 million in cash. These exchanges resulted in aggregate pre-tax debt extinguishment charges of $24.6 million.

The 2025 Convertible Notes are convertible at the option of the holders at any time until the close of business on the second scheduled trading day immediately preceding the maturity date of April 15, 2025. The 2025 Convertible Notes have an initial conversion rate of 4.5418 shares per $1,000 principal amount of 2025 Convertible Notes (equivalent to an initial conversion price of approximately $220.18 per share of the Company's common stock), subject to adjustment if certain events occur. The initial conversion price represents a conversion premium of approximately 32.50% over $166.17 per share, the last reported sale price of the Company's common stock on April 13, 2020 (the pricing date of the offering) on the New York Stock Exchange. During the first quarter of Fiscal 2021, the Company made an irrevocable settlement election for any conversions of the 2025 Convertible Notes. Upon conversion, the Company will pay cash for the principal amount. For any excess above principal, the Company will deliver shares of its common stock. The Company may redeem for cash all or any portion of the 2025 Convertible Notes, at its option, if the last reported sale price of the Company's common stock is equal to or greater than 130% of the conversion price for a specified period of time, at a redemption price equal to 100% of the principal aggregate amount of the 2025 Convertible Notes to be redeemed, plus accrued and unpaid interest, if any, to, but excluding, the redemption date.

Holders of the 2025 Convertible Notes may require the Company to repurchase their 2025 Convertible Notes upon the occurrence of certain events that constitute a fundamental change under the indenture governing the 2025 Convertible Notes at a purchase price equal to 100% of the principal amount thereof, plus accrued and unpaid interest to, but excluding, the date of repurchase. In connection with certain corporate events or if the Company issues a notice of redemption, it will, under certain circumstances, increase the conversion rate for holders who elect to convert their 2025 Convertible Notes in connection with such corporate event or during the relevant redemption period for such 2025 Convertible Notes. The effective interest rate is 2.8%.

*2027 Convertible Notes*

On September 12, 2023, the Company closed the issuance of approximately $297.1 million aggregate principal amount of its 2027 Convertible Notes pursuant to separate, privately negotiated exchange and subscription agreements with a limited number of holders of its 2025 Convertible Notes and certain investors, in each case pursuant to exemptions from registration under the Securities Act of 1933. The Company exchanged approximately $241.2 million in aggregate principal amount of the 2025 Convertible Notes for approximately $255.0 million in aggregate principal amount of 2027 Convertible Notes. This exchange resulted in aggregate pre-tax debt extinguishment charges of $13.6 million. The Company also issued approximately $42.1 million in aggregate principal amount of 2027 Convertible Notes in a private placement to certain investors. An aggregate of up to 1,422,568 shares of common stock may be issued upon conversion of the 2027 Convertible Notes, which number is subject to adjustment up to an aggregate of 1,911,372 shares following certain corporate events that occur prior to the maturity date or if the Company issues a notice of redemption, and which is also subject to certain anti-dilution adjustments.

The 2027 Convertible Notes bear interest at a rate of 1.25% per year, payable semi-annually in arrears on June 15 and December 15 of each year, beginning on December 15, 2023. The 2027 Convertible Notes will mature on December 15, 2027, unless earlier converted, redeemed or repurchased.

Prior to the close of business on the business day immediately preceding September 15, 2027, the 2027 Convertible Notes will be convertible at the option of the holders only upon the occurrence of certain events and during certain periods. Thereafter, the 2027 Convertible Notes will be convertible at the option of the holders at any time until the close of business on the second scheduled trading day immediately preceding the maturity date of December 15, 2027. The 2027 Convertible Notes have an initial conversion rate of 4.8560 shares per $1,000 principal amount of 2027 Convertible Notes (equivalent to an initial conversion price of approximately $205.93 per share of the Company's common stock), subject to adjustment if certain events occur. The initial conversion price represents a conversion premium of approximately 32.50% over $155.42 per share, the last reported sale price of the Company's common stock on September 7, 2023 on The New York Stock Exchange. Upon conversion, the Company will pay cash for the aggregate principal amount of 2027 Convertible Notes being converted, and pay (and deliver, if applicable) cash, shares of the Company's common stock or a combination thereof, at its election, in respect of the remainder (if any) of the Company's conversion obligation in excess of such aggregate principal amount. The Company will not be able to redeem the 2027 Convertible Notes prior to December 20, 2025. On or after December 20, 2025 and prior to the 21st scheduled trading day immediately preceding December 15, 2027, the Company will be able to redeem for cash all or any portion of the 2027 Convertible Notes, at its option, if the last reported sale price of the Company's common stock is equal to or greater than 130% of the conversion price for a specified period of time, at a redemption price equal to 100% of the aggregate principal amount of the 2027 Convertible Notes to be redeemed, plus accrued and unpaid interest, if any, to, but excluding, the redemption date.

If the Company undergoes a fundamental change, subject to certain conditions, holders of the 2027 Convertible Notes may require the Company to repurchase for cash all or any portion of their 2027 New Convertible Notes. The fundamental change repurchase price will be 100% of the aggregate principal amount of the 2027 Convertible Notes to be repurchased plus any accrued and unpaid interest to, but excluding, the fundamental change repurchase date. The effective interest rate is 1.7%.

*ABL Line of Credit*

BCFWC and certain of its subsidiaries and holding companies are party to a Second Amended and Restated Credit Agreement (as amended, supplemented and otherwise modified, the ABL Line of Credit) that provides for $900.0 million of revolving commitments (subject to a borrowing base limitation) maturing on December 22, 2026, and, subject to the satisfaction of certain conditions, BCFWC can increase the aggregate amount of commitments up to $1,200 million. The interest rate margin applicable under the ABL Line of Credit is 1.125% to 1.375% in the case of a daily SOFR rate or a term SOFR rate (in each case, plus a credit spread adjustment of 0.10%), and 0.125% to 0.375% in the case of a prime rate, depending on the average daily availability of the lesser of (a) the total commitments or (b) the borrowing base. The ABL Line of Credit is collateralized by a first priority lien on BCFWC's and each guarantor's inventory, receivables, bank accounts, and certain related assets and proceeds thereof (subject to certain exceptions), and a second priority lien on BCFWC's and each guarantor's other assets and proceeds thereof (other than real estate and subject to certain exceptions).

On June 26, 2023, BCFWC entered into a Fifth Amendment to the Second Amended and Restated Credit Agreement, which increased the sublimit for letters of credit thereunder from $150 million to $250 million. The letter of credit sublimit was subsequently reduced to $200 million.

At February 3, 2024, the Company had $708.8 million available under the ABL Line of Credit. The Company did not have any borrowings during Fiscal 2023.

At February 1, 2025, the Company had $827.0 million available under the ABL Line of Credit. The Company did not have any borrowings during Fiscal 2024.

*Deferred Financing Costs*

The Company had $1.4 million and $2.1 million in deferred financing costs associated with its ABL Line of Credit as of February 1, 2025 and February 3, 2024, respectively, which are recorded in the line item "Other assets" in the Company's Consolidated Balance Sheets. In addition, the Company had $6.3 million and $7.0 million of deferred financing costs associated with its Term Loan Facility and Convertible Notes, recorded in the line item "Long term debt" in the Company's Consolidated Balance Sheets as of February 1, 2025 and February 3, 2024, respectively.

Amortization of deferred financing costs amounted to $3.1 million, $3.2 million and $3.6 million during Fiscal 2024, Fiscal 2023 and Fiscal 2022, respectively, which was included in the line item "Interest expense" in the Company's Consolidated Statements of Income.

Amortization expense related to deferred financing costs as of February 1, 2025 for each of the next five fiscal years and thereafter is estimated to be as follows:

| Fiscal Years | (in thousands) |
|---|---:|
| 2025 | $  2,511 |
| 2026 | 2,283 |
| 2027 | 1,505 |
| 2028 | 387 |
| 2029 | 375 |
| Thereafter | 609 |
| **Total** | $  7,670 |

Deferred financing costs have a weighted average amortization period of approximately 3.9 years.

*Scheduled Maturities*

Scheduled maturities of the Company's long term debt obligations, as they exist as of February 1, 2025, in each of the next five fiscal years and thereafter are as follows:

| | | *(in thousands)*<br>Total Debt |
|---|---|---|
| **Fiscal Years:** | | |
| 2025 | $ | 168,655 |
| 2026 | | 12,500 |
| 2027 | | 309,569 |
| 2028 | | 12,500 |
| 2029 | | 12,500 |
| Thereafter | | 1,184,375 |
| **Total** | | 1,700,099 |
| Less: unamortized discount | | (7,954) |
| Less: unamortized deferred financing costs | | (6,316) |
| Finance lease liabilities | | 24,980 |
| Total debt | $ | 1,710,809 |

## 6. Derivative Instruments and Hedging Activities

The Company accounts for derivatives and hedging activities in accordance with ASC Topic No. 815 "Derivatives and Hedging" (Topic No. 815). Topic No. 815 provides the disclosure requirements for derivatives and hedging activities with the intent to provide users of financial statements with an enhanced understanding of: (i) how and why an entity uses derivative instruments, (ii) how the entity accounts for derivative instruments and related hedged items, and (iii) how derivative instruments and related hedged items affect an entity's financial position, financial performance, and cash flows. Further, qualitative disclosures are required that explain the Company's objectives and strategies for using derivatives, as well as quantitative disclosures about the fair value of gains and losses on derivative instruments, and disclosures about credit-risk-related contingent features in derivative instruments.

As required by Topic No. 815, the Company records all derivatives on the balance sheet at fair value and adjusts them to market on a quarterly basis. The accounting for changes in the fair value of derivatives depends on the intended use of the derivative, whether the Company has elected to designate a derivative in a hedging relationship and apply hedge accounting, and whether the hedging relationship has satisfied the criteria necessary to apply hedge accounting. Derivatives designated and qualifying as a hedge of the exposure to variability in expected future cash flows, or other types of forecasted transactions, are considered cash flow hedges. Hedge accounting generally provides for the matching of the timing of gain or loss recognition on the hedging instrument with the earnings effect of the hedged forecasted transactions in a cash flow hedge. The Company may enter into derivative contracts that are intended to economically hedge certain of its risk, even though hedge accounting does not apply or the Company elects not to apply hedge accounting.

The Company has used interest rate swap contracts to add stability to interest expense and to manage its exposure to interest rate movements. The fair value of these contracts are determined using the market standard methodology of discounted future variable cash flows. The variable cash flows of the interest rate swap contract are determined using the market standard methodology of discounting the future expected cash receipts that would occur if variable interest rates rise or fall compared to current levels in conjunction with the fixed cash payments. The variable interest rates used in the calculation of projected receipts on the swap contracts are based on an expectation of future interest rates derived from observable market interest rate curves and volatilities. In addition, to comply with the provisions of Topic No. 820, credit valuation adjustments, which consider the impact of any credit enhancements to the contracts, are incorporated in the fair values to account for potential nonperformance risk. In adjusting the fair value of its derivative contracts for the effect of nonperformance risk, the Company has considered any applicable credit enhancements such as collateral postings, thresholds, mutual puts, and guarantees.

In accordance with Topic No. 820, the Company made an accounting policy election to measure the credit risk of its derivative financial instruments that are subject to master netting agreements on a net basis by counterparty portfolio. There is no impact of netting because the Company's only derivatives are interest rate swap contracts that are with separate counterparties and are under separate master netting agreements.

Although the Company has determined that the majority of the inputs used to value its derivatives fall within Level 2 of the fair value hierarchy, the credit valuation adjustments associated with its derivatives utilize Level 3 inputs, such as estimates of current

58

credit spreads to evaluate the likelihood of default by the Company and its counterparties. However, as of February 1, 2025 and February 3, 2024, the Company has assessed the significance of the impact of the credit valuation adjustments on the overall valuation of its derivative positions and has determined that the credit valuation adjustment is not significant to the overall valuation of its derivative portfolio. As a result, the Company classifies its derivative valuations in Level 2 of the fair value hierarchy.

The Company is exposed to certain risks arising from both its business operations and economic conditions. The Company principally manages its exposures to a wide variety of business and operational risks through management of its core business activities. The Company manages economic risks, including interest rate, liquidity, and credit risk primarily by managing the amount, sources, and duration of its debt funding and the use of derivative financial instruments. Specifically, the Company enters into derivative financial instruments to manage exposures that arise from business activities that result in the payment of future known and uncertain cash amounts, the value of which are determined by interest rates. The Company uses derivative financial instruments to manage differences in the amount, timing, and duration of the Company's known or expected cash payments principally related to the Company's borrowings.

*Cash Flow Hedges of Interest Rate Risk*

On September 27, 2024, the Company terminated its previous $450 million interest rate swap, and entered into a new interest rate swap in the notional amount of $500 million with a blended interest rate of 2.83%. On this same date, the Company also entered into a new interest rate swap for $300 million with an interest rate of 3.37%. These interest rate swap agreements are designated as cash flow hedges.

During Fiscal 2024, the Company's derivatives were used to hedge the variable cash flows associated with existing variable-rate debt. The effective portion of changes in the fair value of derivatives designated and that qualify as cash flow hedges are recorded in the line item "Accumulated other comprehensive income" on the Company's Consolidated Balance Sheets and are subsequently reclassified into earnings in the period that the hedged forecasted transaction affects earnings. Amounts reported in accumulated other comprehensive income related to the Company's derivative contracts will be reclassified to interest expense as interest payments are made on the Company's variable-rate debt. As of February 1, 2025, the Company estimates that $14.2 million will be reclassified as a reduction to interest expense during the next twelve months.

As of February 1, 2025, the Company had the following outstanding interest rate derivative that was designated as a cash flow hedge of interest rate risk:

| Interest Rate Derivative | Number of Instruments | Notional Aggregate Principal Amount | Interest Swap Rate | Maturity Date |
|---|---|---|---|---|
| Interest rate swap contract | Two | $800.0 million | 2.83% - 3.37% | September 24, 2031 |

*Tabular Disclosure*

The tables below present the fair value of the Company's derivative financial instruments on a gross basis, as well as their classification on the Company's Consolidated Balance Sheets:

| | *(in thousands)* | | | | |
|---|---|---|---|---|---|
| | **Fair Values of Derivative Instruments** | | | | |
| | **February 1, 2025** | | **February 3, 2024** | | |
| **Derivatives Designated as Hedging Instruments** | **Balance Sheet Location** | **Fair Value** | | **Balance Sheet Location** | **Fair Value** |
| Interest rate swap contracts | Other assets | $ | 45,699 | Other assets | $ 29,075 |

The following table presents the unrealized gains deferred to accumulated other comprehensive income resulting from the Company's derivative instruments designated as cash flow hedging instruments for each of the reporting periods.

| | *(in thousands)* | | | | | |
|---|---|---|---|---|---|---|
| | **Fiscal Year Ended** | | | | | |
| **Interest Rate Derivatives:** | **February 1, 2025** | | **February 3, 2024** | | **January 28, 2023** | |
| Unrealized gains, before taxes | $ | 30,563 | $ | 14,243 | $ | 37,864 |
| Income tax benefit | | (8,125) | | (3,783) | | (10,138) |
| Unrealized gains, net of taxes | $ | 22,438 | $ | 10,460 | $ | 27,726 |

59

The following table presents information about the reclassification of losses from accumulated other comprehensive income into earnings related to the Company's derivative instruments designated as cash flow hedging instruments for each of the reporting periods.

| | (in thousands) | | |
|---|---|---|---|
| | Fiscal Year Ended | | |
| Component of Earnings: | February 1, 2025 | February 3, 2024 | January 28, 2023 |
| Interest (benefit) expense | $ (18,355 ) | $ (7,749 ) | $ 7,479 |
| Income tax expense (benefit) | 4,906 | 2,074 | (2,016 ) |
| Net reclassification into earnings | $ (13,449 ) | $ (5,675 ) | $ 5,463 |

## 7. Capital Stock

*Common Stock*

As of February 1, 2025, the total amount of the Company's authorized capital stock consisted of 500,000,000 shares of common stock, par value $0.0001 per share, and 50,000,000 shares of undesignated preferred stock, par value of $0.0001 per share.

The Company's common stock is not entitled to preemptive or other similar subscription rights to purchase any of the Company's securities. The Company's common stock is neither convertible nor redeemable. Unless the Company's Board of Directors determines otherwise, the Company will issue all of the Company's capital stock in uncertificated form.

*Preferred Stock*

The Company does not have any shares of preferred stock issued or outstanding. The Company's Board of Directors has the authority to issue shares of preferred stock from time to time on terms it may determine, to divide shares of preferred stock into one or more series and to fix the designations, preferences, privileges, and restrictions of preferred stock, including dividend rights, conversion rights, voting rights, terms of redemption, liquidation preference, sinking fund terms, and the number of shares constituting any series or the designation of any series to the fullest extent permitted by the General Corporation Law of the State of Delaware. The issuance of the Company's preferred stock could have the effect of decreasing the trading price of the Company's common stock, restricting dividends on the Company's capital stock, diluting the voting power of the Company's common stock, impairing the liquidation rights of the Company's capital stock, or delaying or preventing a change in control of the Company.

*Dividend Rights*

Each holder of shares of the Company's capital stock will be entitled to receive such dividends and other distributions in cash, stock or property as may be declared by the Company's Board of Directors from time to time out of the Company's assets or funds legally available for dividends or other distributions. These rights are subject to the preferential rights of any class or series of the Company's preferred stock.

*Treasury Stock*

The Company accounts for treasury stock under the cost method.

During Fiscal 2024, the Company acquired 72,201 shares of common stock from employees for approximately $14.4 million to satisfy their minimum statutory tax withholdings related to the vesting of restricted stock awards, which was recorded in the line item "Treasury stock" on the Company's Consolidated Balance Sheets, and the line item "Purchase of treasury shares" on the Company's Consolidated Statements of Cash Flows.

*Share Repurchase Program*

On August 15, 2023, the Company's Board of Directors authorized the repurchase of up to $500 million of common stock, which is authorized to be executed through August 2025.

These repurchase programs are funded using the Company's available cash and borrowings under the ABL Line of Credit.

During Fiscal 2024, the Company repurchased 1,013,561 shares of common stock for $241.9 million under its share repurchase program. As of the end of Fiscal 2024, the Company had $263.2 million remaining under this share repurchase authorization.

## 8. Net Income Per Share

Basic net income per share is calculated by dividing net income by the weighted-average number of common shares outstanding. Dilutive net income per share is calculated by dividing net income by the weighted-average number of common shares and potentially dilutive securities outstanding during the period using the treasury stock method for the Company's stock option, restricted stock and restricted stock unit awards, and the if-converted method for the 2025 Convertible Notes and 2027 Convertible Notes.

| | *(in thousands, except per share data)* | | |
| | **Fiscal Year Ended** | | |
| | **February 1, 2025** | **February 3, 2024** | **January 28, 2023** |
|---|---|---|---|
| *Basic net income per share* | | | |
| Net income | $ 503,639 | $ 339,649 | $ 230,123 |
| Weighted average number of common shares – basic | 63,634 | 64,672 | 65,637 |
| Net income per common share – basic | $ 7.91 | $ 5.25 | $ 3.51 |
| *Diluted net income per share* | | | |
| Net income | $ 503,639 | $ 339,649 | $ 230,123 |
| Shares for basic and diluted net income per share: | | | |
| Weighted average number of common shares – basic | 63,634 | 64,672 | 65,637 |
| Assumed exercise of stock options and vesting of restricted stock | 673 | 245 | 264 |
| Assumed conversion of convertible debt | 288 | — | — |
| Weighted average number of common shares – diluted | 64,595 | 64,917 | 65,901 |
| Net income per common share – diluted | $ 7.80 | $ 5.23 | $ 3.49 |

Approximately 405,000 shares, 1,524,000 shares and 1,068,000 shares were excluded from diluted net income per share for Fiscal 2024, Fiscal 2023 and Fiscal 2022, respectively, since their effect was anti-dilutive.

## 9. Stock-Based Compensation

On May 18, 2022, the Company's stockholders  approved the Company's 2022 Omnibus Incentive Plan (the 2022 Plan). The 2022 Plan provides for the granting of stock options, restricted stock and other forms of awards to key employees and directors of the Company or its affiliates.

The Company accounts for awards issued under the Plans in accordance with Topic No. 718. As of February 1, 2025, there were  4,017,058 shares of common stock available for issuance under the Company's 2022 Omnibus Incentive Plan.

Non-cash stock compensation expense is as follows:

| | *(in thousands)* | | |
| | **Fiscal Year Ended** | | |
| **Type of Non-Cash Stock Compensation** | **February 1, 2025** | **February 3, 2024** | **January 28, 2023** |
|---|---|---|---|
| Restricted stock unit grants (a) | $ 43,005 | $ 43,037 | $ 37,749 |
| Stock option grants (a) | 19,543 | 19,502 | 19,274 |
| Performance stock unit grants (a) | 25,024 | 21,409 | 10,457 |
| Total (b) | $ 87,572 | $ 83,948 | $ 67,480 |

(a) Included in the line item "Selling, general and administrative expenses" in the Company's Consolidated Statements of Income.

(b) The amounts presented in the table above exclude the effect of income taxes. The tax benefit related to the Company's non-cash stock compensation was $15.6 million, $15.5 million and $12.5 million during Fiscal 2024, Fiscal 2023 and Fiscal 2022, respectively.

*Stock Options*

Options granted during Fiscal 2024, Fiscal 2023 and Fiscal 2022, were all service-based awards granted under the Plans at the following exercise prices:

|  | Exercise Price Ranges | |
|---|---|---|
|  | From | To |
| Fiscal 2024 | $ 178.02 | $ 290.34 |
| Fiscal 2023 | $ 118.58 | $ 234.15 |
| Fiscal 2022 | $ 115.65 | $ 236.93 |

All awards granted during Fiscal 2024, Fiscal 2023 and Fiscal 2022 generally vest in either one-fourth annual increments or one-third annual increments (subject to continued employment through the applicable vesting date). The final exercise date for any option granted is the tenth anniversary of the grant date. Options granted during Fiscal 2024, Fiscal 2023 and Fiscal 2022 become exercisable if the grantee's employment is terminated without cause or, in some instances, the recipient resigns with good reason, within a certain period of time following a change in control. Unless determined otherwise by the plan administrator, upon cessation of employment other than for cause, the majority of options that have not vested will terminate immediately, and unexercised vested options will be exercisable for a period of 60 to 180 days.

As of February 1, 2025, the Company had 1,456,342 options outstanding to purchase shares of common stock, and there was $39.6 million of unearned non-cash stock-based option compensation that the Company expects to recognize as expense over a weighted average period of 2.6 years. The awards are expensed on a straight-line basis over the requisite service period.

Stock option transactions during Fiscal 2024 are summarized as follows:

|  | Number of Shares | Weighted Average Exercise Price Per Share |
|---|---|---|
| Options outstanding, February 3, 2024 | 1,356,258 | $ 197.90 |
| Options granted | 379,413 | 181.30 |
| Options exercised (a) | (189,919) | 166.64 |
| Options forfeited | (89,410) | 212.25 |
| Options outstanding, February 1, 2025 | 1,456,342 | 196.77 |

(a)   Options exercised during Fiscal 2024 had a total intrinsic value of $14.0 million.

The following table summarizes information about the stock options vested and expected to vest during the contractual term, as well as options exercisable:

|  | Options | Weighted Average Remaining Contractual Life (Years) | Weighted Average Exercise Price | Aggregate Intrinsic Value (in millions) |
|---|---|---|---|---|
| Options vested and expected to vest | 1,456,342 | 7.0 | $ 196.77 | $ 131.8 |
| Options exercisable | 711,819 | 5.4 | $ 202.32 | $ 61.7 |

During Fiscal 2024, the fair value of each stock option granted was estimated on the date of grant using the Black Scholes option pricing model. The fair value of each stock option granted during Fiscal 2024 was estimated using the following assumptions on a weighted average basis:

| | Fiscal Year Ended February 1, 2025 |
|---|---|
| Risk-free interest rate | 4.7% |
| Expected volatility | 42.1% |
| Expected life (years) | 4.0 |
| Contractual life (years) | 10.0 |
| Expected dividend yield | 0% |
| Grant date fair value of options issued | $ 69.60 |

The expected dividend yield was based on the Company's expectation of not paying dividends in the near term. To evaluate its volatility factor, the Company uses the historical volatility of its stock price over the expected life of the options. The risk free interest rate was based on the U.S. Treasury rates for U.S. Treasury zero-coupon bonds with maturities similar to those of the expected term of the awards being valued. The expected life of the options was estimated using historical exercise rates.

*Restricted Stock Awards*

Restricted stock awards granted during Fiscal 2024 were all service-based awards. The fair value of each unit of restricted stock granted during Fiscal 2024 was based upon the closing price of the Company's common stock on the grant date. Most of the awards outstanding as of February 1, 2025 have graded vesting provisions that generally vest in one-fourth annual increments (subject to continued employment through the applicable vesting date). Certain awards outstanding as of February 1, 2025 cliff vest at the end of a designated service period, ranging from two years to four years from the grant date. Awards granted to non-employee members of the Company's Board of Directors vest 100% on the first anniversary of the grant date. Following a change of control, all unvested restricted stock awards shall remain unvested, provided, however, that 100% of such shares shall vest if, following such change of control, the employment of the recipient is terminated without cause or, in some instances, the recipient resigns with good reason, within a certain period of time following a change in control.

As of February 1, 2025, there was approximately $77.8 million of unearned non-cash stock-based compensation related to restricted stock awards that the Company expects to recognize as expense over a weighted average period of 2.3 years. The awards are expensed on a straight-line basis over the requisite service periods.

Award grant, vesting and forfeiture transactions during Fiscal 2024 are summarized as follows:

| | Number of Shares | | Weighted Average Grant Date Fair Value Per Award |
|---|---|---|---|
| Non-vested awards outstanding, February 3, 2024 | 570,952 | $ | 204.97 |
| Awards granted | 316,511 | | 184.66 |
| Awards vested (a) | (171,322) | | 223.86 |
| Awards forfeited | (62,735) | | 198.25 |
| Non-vested awards outstanding, February 1, 2025 | 653,406 | | 190.83 |

(a)   Restricted stock awards vested during Fiscal 2024 had a total intrinsic value of $33.1 million.

*Performance Share Units*

The Company grants performance-based restricted stock units to its senior executives. Vesting of the performance stock units granted in Fiscal 2022, Fiscal 2023, and Fiscal 2024 are based on continued service and the achievement of pre-established adjusted net income per share growth over a three-year performance period. Based on the Company's achievement of these goals, each award may be earned up to 200% of the target award. In the event that actual performance is below threshold, no award will be made. Compensation costs recognized on the performance stock units are adjusted, as applicable, for performance above or below the target specified in the award.

As of February 1, 2025, there was approximately $34.0 million of unearned non-cash stock-based compensation related to performance share units that the Company expects to recognize as expense over a weighted average period of 1.7 years. The awards are expensed on a straight-line basis over the requisite service periods.

Performance share unit transactions during Fiscal 2024 are summarized as follows:

| | Number of Shares | | Weighted Average Grant Date Fair Value Per Award |
|---|---|---|---|
| Non-vested awards outstanding, February 3, 2024 | 226,917 | $ | 217.29 |
| Awards granted | 124,821 | | 185.19 |
| Awards vested (a) | (44,535) | | 319.32 |
| Awards forfeited | (14,333) | | 211.76 |
| Non-vested awards outstanding, February 1, 2025 | 292,870 | | 188.37 |

(a)    Performance-based stock awards vested during Fiscal 2024 had a total intrinsic value of $10.1 million.

## 10. Lease Commitments

The Company's leases primarily consist of stores, distribution facilities and office space under operating and finance leases that will expire principally during the next 30 years. The leases typically include renewal options at five-year intervals and escalation clauses. Lease renewals are only included in the lease liability to the extent that they are reasonably assured of being exercised. The Company's leases typically provide for contingent rentals based on a percentage of gross sales. Contingent rentals are not included in the lease liability, and they are recognized as variable lease cost when incurred.

The following is a schedule of the Company's future lease payments:

| | (in thousands) | | | |
|---|---|---|---|---|
| Fiscal Year | Operating Leases | | Finance Leases | |
| 2025 | $ | 614,333 | $ | 3,526 |
| 2026 | | 660,917 | | 3,640 |
| 2027 | | 628,461 | | 3,640 |
| 2028 | | 584,041 | | 3,447 |
| 2029 | | 516,341 | | 2,104 |
| Thereafter | | 1,711,592 | | 18,683 |
| Total future minimum lease payments | | 4,715,685 | | 35,040 |
| Amount representing interest | | (1,054,969) | | (10,060) |
| Total lease liabilities | | 3,660,716 | | 24,980 |
| Less: current portion of lease liabilities | | (406,891) | | (2,236) |
| Total long term lease liabilities | $ | 3,253,825 | $ | 22,744 |
| | | | | |
| Weighted average discount rate | | 6.0% | | 5.5% |
| Weighted average remaining lease term (years) | | 7.9 | | 12.1 |

The above schedule excludes approximately $451.4 million for 66 stores that the Company has committed to open or relocate but has not yet taken possession of the space. The discount rates used in valuing the Company's leases are not readily determinable, and are based on the Company's incremental borrowing rate on a fully collateralized basis.

The table above includes a lease liability for the Company's Cactus Ave. distribution center in Riverside, CA. The Company signed an agreement to purchase this facility during Fiscal 2024.

64

The following is a schedule of net lease costs for the years indicated:

| | *(in thousands)* Fiscal Year Ended | | |
|---|---|---|---|
| | February 1, 2025 | February 3, 2024 | January 28, 2023 |
| Finance lease cost: | | | |
| Amortization of finance lease asset (a) | $ 2,573 | $ 3,506 | $ 4,210 |
| Interest on lease liabilities (b) | 1,439 | 1,858 | 2,561 |
| Operating lease cost (c) | 628,433 | 587,214 | 523,980 |
| Variable lease cost (c) | 254,586 | 235,223 | 205,876 |
| Total lease cost | 887,031 | 827,801 | 736,627 |
| Impairment (gain) on sale and leaseback transaction (d) | 8,959 | (1,958) | — |
| Less all rental income (e) | (5,377) | (5,733) | (5,650) |
| Total net rent expense (f) | $ 890,613 | $ 820,110 | $ 730,977 |

(a)   Included in the line item "Depreciation and amortization" in the Company's Consolidated Statements of Income.

(b)   Included in the line item "Interest expense" in the Company's Consolidated Statements of Income.

(c)   Included in the line item "Selling, general and administrative expenses" in the Company's Consolidated Statements of Income. Variable lease cost is primarily comprised of real estate taxes, common area maintenance, insurance and percentage rent.

(d)   Impairment included in the line item "Impairment charges - long-lived assets" and gain included in line item "Other income - net" in the Company's Consolidated Statements of Income.

(e)   Included in the line item "Other revenue" in the Company's Consolidated Statements of Income.

(f)   Excludes an immaterial amount of short-term lease cost.

Supplemental cash flow disclosures related to leases are as follows:

| | *(in thousands)* Fiscal Year Ended | | |
|---|---|---|---|
| | February 1, 2025 | February 3, 2024 | January 28, 2023 |
| Cash paid for amounts included in the measurement of lease liabilities: | | | |
| Cash payments arising from operating lease liabilities (a) | $ 638,361 | $ 595,028 | $ 525,098 |
| Cash payments for the principal portion of finance lease liabilities (b) | $ 2,566 | $ 4,378 | $ 4,455 |
| Cash payments for the interest portion of finance lease liabilities (a) | $ 1,439 | $ 1,858 | $ 2,561 |
| Supplemental non-cash information: | | | |
| Operating lease liabilities arising from obtaining right-of-use assets | $ 737,222 | $ 611,569 | $ 712,688 |

(a)   Included within operating activities in the Company's Consolidated Statements of Cash Flows.

(b)   Included within financing activities in the Company's Consolidated Statements of Cash Flows.

## 11. Employee Retirement Plans

The Company maintains separate defined contribution 401(k) retirement savings and profit-sharing plans covering employees in the United States and Puerto Rico who meet specified age and service requirements. The discretionary profit-sharing component (which the Company has not utilized since 2005 and has no current plans to utilize) is entirely funded by the Company, and the Company also makes additional matching contributions to the 401(k) component of the plans. Participating employees can voluntarily elect to contribute a percentage of their earnings to the 401(k) component of the plans (up to certain prescribed limits) through a cash or deferred (salary deferral) feature qualifying under Section 401(k) of the Internal Revenue Code (401(k) Plan).

The Company recorded $16.5 million, $15.6 million and $15.6 million of 401(k) Plan match expense during Fiscal 2024, Fiscal 2023 and Fiscal 2022 respectively, which is included in the line item "Selling, general and administrative expenses" on the Company's Consolidated Statements of Income.

**12. Income Taxes**

Income before income taxes was as follows for Fiscal 2024, Fiscal 2023 and Fiscal 2022:

| | *(in thousands)* | | |
| | Year Ended | | |
| | February 1, 2025 | February 3, 2024 | January 28, 2023 |
|---|---|---|---|
| Domestic | $ 659,414 | $ 454,491 | $ 297,440 |
| Foreign | 15,400 | 11,282 | 10,069 |
| Total income before income taxes | $ 674,814 | $ 465,773 | $ 307,509 |

Income tax expense (benefit) was as follows for Fiscal 2024, Fiscal 2023 and Fiscal 2022:

| | *(in thousands)* | | |
| | Year Ended | | |
| | February 1, 2025 | February 3, 2024 | January 28, 2023 |
|---|---|---|---|
| Current: | | | |
| Federal | $ 105,828 | $ 85,834 | $ 86,299 |
| State | 31,116 | 16,150 | 13,494 |
| Foreign | 5,594 | 3,477 | 3,024 |
| Subtotal | 142,538 | 105,461 | 102,817 |
| Deferred: | | | |
| Federal | 25,560 | 12,583 | (28,980) |
| State | 2,889 | 7,311 | 2,796 |
| Foreign | 188 | 769 | 753 |
| Subtotal | 28,637 | 20,663 | (25,431) |
| Total income tax expense | $ 171,175 | $ 126,124 | $ 77,386 |

The tax rate reconciliations were as follows for Fiscal 2024, Fiscal 2023 and Fiscal 2022:

| | Fiscal Year Ended | | |
| | February 1, 2025 | February 3, 2024 | January 28, 2023 |
|---|---|---|---|
| Tax at statutory rate | 21.0% | 21.0% | 21.0% |
| State income taxes, net of federal benefit | 4.5 | 4.5 | 5.3 |
| Tax credits | (0.9) | (1.2) | (2.2) |
| Non-deductible expenses | 1.4 | 1.7 | 2.1 |
| Loss from extinguishment of convertible debt | - | 1.8 | 0.9 |
| Other | (0.6) | (0.7) | (1.9) |
| Effective tax rate | 25.4% | 27.1% | 25.2% |

66

The tax effects of temporary differences are included in deferred tax accounts as follows:

| | *(in thousands)* | | | |
| | February 1, 2025 | | February 3, 2024 | |
| | Tax Assets | Tax Liabilities | Tax Assets | Tax Liabilities |
|---|---|---|---|---|
| Non-current deferred tax assets and liabilities: | | | | |
| Property and equipment basis adjustments | $ — | $ 264,774 | $ — | $ 236,711 |
| Operating lease liability | 950,808 | — | 872,903 | — |
| Operating lease asset | — | 879,433 | — | 805,610 |
| Intangibles—indefinite-lived | — | 63,791 | — | 63,892 |
| Employee benefit compensation | 31,917 | — | 27,194 | — |
| State net operating losses (net of federal benefit) | 4,513 | — | 5,726 | — |
| Tax credits | 8,342 | — | 10,774 | — |
| Other | — | 35,653 | — | 24,116 |
| Valuation allowance | (8,942) | — | (11,425) | — |
| Total non-current deferred tax assets and liabilities | $ 986,638 | $ 1,243,651 | $ 905,172 | $ 1,130,329 |
| Net deferred tax liability | | $ 257,013 | | $ 225,157 |

As of February 1, 2025, the Company has a deferred tax asset related to net operating losses of $4.5 million, inclusive of $4.1 million of state net operating losses which will expire at various dates between 2025 and 2040 and $0.4 million of deferred tax assets recorded for Puerto Rico net operating loss carry-forwards that will expire in 2025. As of February 1, 2025, the Company had tax credit carry-forwards totaling $8.3 million, inclusive of $4.9 million in foreign tax credits, which will begin to expire in Fiscal 2033 and $3.4 million in state tax credit carry-forwards, which will begin to expire in Fiscal 2025.

As of February 3, 2024, the Company had a deferred tax asset related to net operating losses of $5.7 million, inclusive of $5.4 million of state net operating losses, and $0.3 million of deferred tax assets recorded for Puerto Rico net operating loss carry-forwards. As of February 3, 2024, the Company had tax credit carry-forwards of $10.8 million, inclusive of state tax credit carry-forwards of $10.4 million, and $0.4 million of Puerto Rico AMT credits.

The Company believes it is more likely than not that certain state net operating loss carry-forwards and credits will not be realized. To account for this risk, the Company has established a valuation allowance totaling $8.9 million, inclusive of $4.9 million for foreign tax credit carry-forwards, $0.6 million for state net operating losses, $3.0 million for state tax credit carry-forwards, and $0.4 million for Puerto Rico net operating loss carry-forwards. If the Company's assumptions change and it determines that these net operating losses or credits can be realized, the resulting tax benefits from reversing the valuation allowance on deferred tax assets as of February 1, 2025 will be recorded to the Company's Consolidated Statement of Income. As of February 3, 2024, the Company provided a total valuation allowance of $11.4 million, inclusive of $1.3 million of valuation allowance related to state net operating losses, $9.8 million related to tax credit carry-forwards and $0.3 million related to Puerto Rico's net operating loss.

A reconciliation of the beginning and ending amount of gross unrecognized tax benefits (exclusive of interest and penalties) is as follows:

|  | *(in thousands)* Gross Unrecognized Tax Benefits, Exclusive of Interest and Penalties |
|---|---|
| Balance at January 29, 2022 | $ 4,787 |
| Additions for tax positions of the current year | — |
| Additions for tax positions of prior years | — |
| Reduction for tax positions of prior years | (782) |
| Settlements | — |
| Lapse of statute of limitations | (72) |
| Balance at January 28, 2023 | 3,933 |
| Additions for tax positions of the current year | — |
| Additions for tax positions of prior years | — |
| Reduction for tax positions of prior years | (783) |
| Settlements | — |
| Lapse of statute of limitations | (18) |
| Balance at February 3, 2024 | 3,132 |
| Additions for tax positions of the current year | — |
| Additions for tax positions of prior years | — |
| Reduction for tax positions of prior years | (783) |
| Settlements | — |
| Lapse of statute of limitations | — |
| Balance at February 1, 2025 | $ 2,349 |

As of February 1, 2025, the Company reported total unrecognized benefits of $2.3 million, of which $1.9 million would affect the Company's effective tax rate if recognized. As a result of previous positions taken and current period activity, the Company recorded a net benefit of $1.0 million of interest and penalties during Fiscal 2024 in the line item "Income tax expense" in the Company's Consolidated Statements of Income. Cumulative interest and penalties of $5.8 million are recorded in the line item "Other liabilities" in the Company's Consolidated Balance Sheet as of February 1, 2025. The Company recognizes interest and penalties related to unrecognized tax benefits as part of income taxes. Within the next twelve months, the Company does not expect any significant changes in its unrecognized tax benefits.

As of February 3, 2024, the Company reported total unrecognized benefits of $3.1 million, of which $2.5 million would affect the Company's effective tax rate if recognized. As a result of previous positions taken, the Company recorded a net benefit of $0.8 million of interest and penalties during Fiscal 2023 in the line item "Income tax expense" in the Company's Consolidated Statements of Income. Cumulative interest and penalties of $7.0 million are recorded in the line item "Other liabilities" in the Company's Consolidated Balance Sheets as of February 3, 2024.

The Company files tax returns in the U.S. federal jurisdiction, Puerto Rico, and various state jurisdictions. The Company is open to examination by the IRS under the applicable statutes of limitations for Fiscal Years 2021 through 2024. The Company or its subsidiaries' state and Puerto Rico income tax returns are open to audit for Fiscal Years 2020 through 2024 with a few exceptions, under the applicable statutes of limitations. There are ongoing state audits in several jurisdictions, and the Company has accrued for possible exposures as required under Topic No. 740. The Company does not expect the settlement of these audits to have a material impact to its financial results.

### 13. Fair Value of Financial Instruments

The Company accounts for fair value measurements in accordance with Topic No. 820 which defines fair value, establishes a framework for measurement and expands disclosure about fair value measurements. Topic No. 820 defines fair value as the price that

68

would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date (exit price), and classifies the inputs used to measure fair value into the following hierarchy:

| | |
|---|---|
| Level 1: | Quoted prices for identical assets or liabilities in active markets. |
| Level 2: | Quoted market prices for similar assets or liabilities in active markets; quoted prices for identical or similar assets or liabilities in markets that are not active; and model-derived valuations whose inputs are observable or whose significant value drivers are observable. |
| Level 3: | Pricing inputs that are unobservable for the assets and liabilities, and include situations where there is little, if any, market activity for the assets and liabilities. |

The inputs into the determination of fair value require significant management judgment or estimation.

The carrying amounts of cash equivalents, accounts receivable and accounts payable approximate fair value due to the short-term nature of these instruments.

Refer to Note 6, "Derivative Instruments and Hedging Activities," for further discussion regarding the fair value of the Company's interest rate swap contract.

Refer to Note 4, "Impairment Charges," for further discussion regarding the fair value of the Company's long-lived assets after impairment.

*Financial Assets*

The fair values of the Company's financial assets and the hierarchy of the level of inputs as of February 1, 2025 and February 3, 2024 are summarized below:

| | *(in thousands)* | |
|---|---|---|
| | **Fair Value Measurements at** | |
| | **February 1, 2025** | **February 3, 2024** |
| **Level 1** | | |
| Cash equivalents (including restricted cash equivalents) | $ 728,443 | $ 657,292 |

*Financial Liabilities*

The fair values of the Company's financial liabilities are summarized below:

| | *(in thousands)* | | | |
|---|---|---|---|---|
| | **February 1, 2025** | | **February 3, 2024** | |
| | **Principal Amount** | **Fair Value** | **Principal Amount** | **Fair Value** |
| Term Loan Facility | $ 1,246,875 | $ 1,250,965 | $ 937,379 | $ 934,450 |
| 2025 Convertible Notes | 156,155 | 202,852 | 156,155 | 169,384 |
| 2027 Convertible Notes | 297,069 | 444,674 | 297,069 | 342,384 |
| ABL Line of Credit (a) | — | — | — | — |
| Total debt (b) | $ 1,700,099 | $ 1,898,491 | $ 1,390,603 | $ 1,446,218 |

| | |
|---|---|
| (a) | To the extent the Company has any outstanding borrowings under the ABL Line of Credit, the fair value would approximate its reported value, because the interest rate is variable and reflects current market rates, due to its short term nature. |
| (b) | The table above excludes finance lease obligations, debt discount and deferred debt costs. |

The fair values presented herein are based on pertinent information available to management as of the respective year end dates. The estimated fair values of the Company's debt are classified as Level 2 in the fair value hierarchy, and are based on current market quotes received from inactive markets. Although management is not aware of any factors that could significantly affect the estimated

69

fair value amounts, such amounts have not been comprehensively revalued for purposes of these financial statements since that date, and current estimates of fair value may differ from amounts presented herein.

## 14. Commitments and Contingencies

*Legal*

In the course of business, the Company is party to class or collective actions alleging violations of federal and state wage and hour and other labor statutes, representative claims under the California Private Attorneys' General Act and various other lawsuits and regulatory proceedings from time to time including, among others, commercial, product, employee, customer, intellectual property, privacy and other claims. Actions against us are in various procedural stages. Many of these proceedings raise factual and legal issues and are subject to uncertainties. While no assurance can be given as to the ultimate outcome of these matters, the Company believes that the final resolution of these actions will not have a material adverse effect on the Company's results of operations, financial position, liquidity or capital resources.

*Letters of Credit*

The Company had irrevocable letters of credit in the amounts of $52.5 million and $75.8 million as of February 1, 2025 and February 3, 2024, respectively.

Letters of credit outstanding as of February 1, 2025 and February 3, 2024 amounted to $51.9 million and $75.8 million, respectively, guaranteeing performance under various lease agreements, insurance contracts, and utility agreements. The Company also had outstanding letters of credit arrangements in the aggregate amount of $0.6 million at February 1, 2025, related to certain merchandising agreements, and none at February 3, 2024. Based on the terms of the agreement governing the ABL Line of Credit, the Company had the ability to enter into letters of credit up to $147.5 million and $174.2 million as of February 1, 2025 and February 3, 2024, respectively.

*Inventory Purchase Commitments*

The Company had $1,594.0 million of purchase commitments related to goods that were not received as of February 1, 2025.

**Schedule I**

**CONDENSED FINANCIAL INFORMATION
OF REGISTRANT**

**Parent Company Information
Burlington Stores, Inc.**

**Condensed Statements of Income and Comprehensive Income**

| | | Fiscal Years Ended | | |
|---|---|---|---|---|
| | February 1, 2025 | February 3, 2024 | January 28, 2023 |
| | (in thousands) | | |
| **REVENUES:** | | | |
| Total revenue | $ — | $ — | $ — |
| **COSTS AND EXPENSES:** | | | |
| Interest expense, net | — | — | — |
| Total costs and expenses | — | — | — |
| Income before provision for income tax | — | — | — |
| Provision for income tax | — | — | — |
| Earnings from equity investment, net of income taxes | $ 503,639 | $ 339,649 | $ 230,123 |
| Net income | $ 503,639 | $ 339,649 | $ 230,123 |
| Other comprehensive income, net of tax: | | | |
| Interest rate derivative contracts: | | | |
| Net unrealized gains arising during the period | 22,438 | 10,460 | 27,726 |
| Net reclassification into earnings during the period | (13,449) | (5,675) | 5,463 |
| Total comprehensive income | $ 512,628 | $ 344,434 | $ 263,312 |

See Notes to Condensed Financial Statements

71

CONDENSED FINANCIAL INFORMATION
OF REGISTRANT

**Parent Company Information
Burlington Stores, Inc.**

**Condensed Balance Sheets**

| | As of | | | |
|---|---|---|---|---|
| | February 1, 2025 | | February 3, 2024 | |
| | (in thousands) | | | |
| **ASSETS:** | | | | |
| Cash and cash equivalents | $ | 572 | $ | 50 |
| **Total current assets** | | 572 | | 50 |
| Investment in subsidiaries | | 1,819,365 | | 1,444,273 |
| **Total assets** | $ | 1,819,937 | $ | 1,444,323 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY:** | | | | |
| Current maturities of long term debt | $ | 156,155 | $ | — |
| **Current liabilities** | | 156,155 | | — |
| Long term debt | | 293,286 | | 447,391 |
| Commitments and contingencies | | | | |
| **Total stockholders' equity** | | 1,370,496 | | 996,932 |
| **Total liabilities and stockholders' equity** | $ | 1,819,937 | $ | 1,444,323 |

See Notes to Condensed Financial Statements

**CONDENSED FINANCIAL INFORMATION
OF REGISTRANT**

**Parent Company Information
Burlington Stores, Inc.**

**Condensed Statements of Cash Flows**

| | | Fiscal Years Ended | |
| --- | --- | --- | --- |
| | February 1, 2025 | February 3, 2024 | January 28, 2023 |
| | | (in thousands) | |
| **OPERATING ACTIVITIES:** | | | |
| Net cash provided by operating activities | $ — | $ — | $ — |
| **INVESTING ACTIVITIES:** | | | |
| Net contribution from subsidiaries | 225,164 | 313,713 | 374,233 |
| Net cash provided by investing activities | 225,164 | 313,713 | 374,233 |
| **FINANCING ACTIVITIES:** | | | |
| Proceeds from long term debt - 2027 Convertible Notes | — | 297,069 | — |
| Principal payment on long term debt - 2025 Convertible Notes | — | (386,519) | (78,240) |
| Purchase of treasury shares | (256,293) | (243,188) | (316,896) |
| Proceeds from stock option exercises | 31,651 | 18,783 | 20,592 |
| Net cash used in financing activities | (224,642) | (313,855) | (374,544) |
| Increase (decrease) in cash and cash equivalents | 522 | (142) | (311) |
| Cash and cash equivalents at beginning of period | 50 | 192 | 503 |
| Cash and cash equivalents at end of period | $ 572 | $ 50 | $ 192 |

See Notes to Condensed Financial Statements

**CONDENSED FINANCIAL INFORMATION
OF REGISTRANT**

**Parent Company Information
Burlington Stores, Inc.**

**Note 1. Basis of Presentation**

Burlington Stores, Inc. (the Parent Company) is a holding company that conducts substantially all of its business operations through its subsidiaries. Capitalized terms not otherwise defined in this Schedule I shall have the meanings ascribed to them in the Notes to Consolidated Financial Statements. The Parent Company's ability to pay dividends on Parent Company's common stock will be limited by restrictions on the ability of Parent Company's subsidiaries to pay dividends or make distributions under the terms of current and future agreements governing the indebtedness of Parent Company's subsidiaries. In addition to other baskets under the agreements governing its indebtedness, the Parent Company and its subsidiaries are permitted to make dividends and distributions under the Term Loan Facility so long as there is no event of default and the consolidated leverage ratio of the Parent Company and its subsidiaries does not exceed 3.50 to 1.00, and under the ABL Line of Credit as long as certain restricted payment conditions are satisfied.

The accompanying Condensed Financial Statements include the accounts of the Parent Company and, on an equity basis, its consolidated subsidiaries and affiliates. Accordingly, these Condensed Financial Statements have been presented on a "parent-only" basis. Under a parent-only presentation, the Parent Company's investments in its consolidated subsidiaries are presented under the equity method of accounting. Other than debt related costs, the Parent Company incurs certain corporate costs which are borne by the Parent Company's subsidiaries. Such costs are not significant. These parent-only financials statements are not the general-purpose financial statements of Burlington Stores, Inc., and they should be read in conjunction with Burlington Stores, Inc.'s audited Consolidated Financial Statements included elsewhere herein.

**Note 2. Dividends**

As discussed above, the terms of current and future agreements governing the indebtedness of the Parent Company and its subsidiaries include, or may include, limitations on the ability of such subsidiaries and the Parent Company to pay dividends, subject to certain exceptions set forth in such agreements.

**Note 3. Stock-Based Compensation**

Non-cash stock compensation expense of $87.6 million, $83.9 million and $67.5 million has been pushed down to Parent Company's subsidiaries for Fiscal 2024, Fiscal 2023 and Fiscal 2022, respectively.

**Note 4. Long Term Debt**

On April 16, 2020, the Parent Company issued $805.0 million of 2025 Convertible Notes. The 2025 Convertible Notes have an initial conversion rate of 4.5418 shares per $1,000 principal amount of 2025 Convertible Notes (equivalent to an initial conversion price of approximately $220.18 per share of the Company's common stock), subject to adjustment if certain events occur. The 2025 Convertible Notes are general unsecured obligations of the Parent Company.

The 2025 Convertible Notes bear interest at a rate of 2.25% per year, payable semi-annually in cash, in arrears on April 15 and October 15 of each year, beginning on October 15, 2020. The 2025 Convertible Notes will mature on April 15, 2025, unless earlier converted, redeemed or repurchased.

During the first quarter of Fiscal 2022, the Parent Company entered into separate, privately negotiated exchange agreements with certain holders of the 2025 Convertible Notes. Under the terms of the exchange agreements, the holders exchanged $64.6 million in aggregate principal amount of 2025 Convertible Notes held by them for $78.2 million in cash. These exchanges resulted in aggregate pre-tax debt extinguishment charges of $14.7 million.

During the first quarter of Fiscal 2023, the Parent Company entered into separate, privately negotiated exchange agreements with certain holders of the 2025 Convertible Notes. Under the terms of the exchange agreements, the holders exchanged $110.3 million in aggregate principal amount of 2025 Convertible Notes held by them for $133.3 million in cash. These exchanges resulted in aggregate pre-tax debt extinguishment charges of $24.6 million.

74

On September 12, 2023, the Parent Company closed the issuance of approximately $297.1 million aggregate principal amount of our 2027 Convertible Notes pursuant to separate, privately negotiated exchange and subscription agreements with a limited number of holders of our 2025 Convertible Notes and certain investors, in each case pursuant to exemptions from registration under the Securities Act of 1933. The Parent Company exchanged approximately $241.2 million in aggregate principal amount of the 2025 Convertible Notes for approximately $255.0 million in aggregate principal amount of the 2027 Convertible Notes. The Parent Company also issued approximately $42.1 million in aggregate principal amount of 2027 Convertible Notes in a private placement to certain investors. An aggregate of up to 1,422,568 shares of common stock may be issued upon conversion of the 2027 Convertible Notes, which number is subject to adjustment up to an aggregate of 1,911,372 shares following certain corporate events that occur prior to the maturity date or if we issue a notice of redemption, and which is also subject to certain anti-dilution adjustments.

The 2027 Convertible Notes bear interest at a rate of 1.25% per year, payable semi-annually in arrears on June 15 and December 15 of each year, beginning on December 15, 2023. The 2027 Convertible Notes will mature on December 15, 2027, unless earlier converted, redeemed or repurchased.

BCFWC and Burlington Merchandising Corporation, a Delaware corporation, wholly owned subsidiaries of the Company, have entered into a promissory note, in which they jointly and severally have promised to pay to the Parent an amount equal to the principal of the 2025 Convertible Notes and 2027 Convertible Notes. In connection with the promissory note, there was a $453.2 million intercompany note receivable as of both February 1, 2025 and February 3, 2024 related to the cash transferred to Parent subsidiaries for the Convertible Notes, which is included in the line item "Investment in subsidiaries" in the Condensed Balance Sheets. The interest rate and repayment terms of the intercompany note receivable are consistent with that of the 2025 Convertible Notes and 2027 Convertible Notes.

Included in the Condensed Statements of Income and Comprehensive Income is the following for each of the periods indicated:

| | | *(in thousands)* | | | |
| --- | --- | --- | --- | --- | --- |
| | | Fiscal Year Ended | | | |
| | February 3, 2024 | | February 3, 2024 | | January 28, 2023 |
| Convertible notes interest expense | $ | 9,294 | $ | (10,875) | $ | (14,281) |
| Intercompany note receivable interest expense | | (9,294) | | 10,875 | | 14,281 |
| Loss on extinguishment of convertible notes | | — | | (38,274) | | (14,657) |
| Gain on extinguishment of intercompany note receivable | | — | | 38,274 | | 14,657 |
| Interest expense, net | $ | — | $ | — | $ | — |

Refer also to Note 5 to the Consolidated financial statements.

## Note 5. Capital Stock

*Treasury Stock*

The Parent Company accounts for treasury stock under the cost method.

During Fiscal 2024, the Parent Company acquired 72,201 shares of common stock from employees for approximately $14.4 million to satisfy their minimum statutory tax withholdings related to the vesting of restricted stock awards, which was recorded in the line item "Purchase of treasury shares" on the Parent Company's Condensed Statements of Cash Flows.

*Share Repurchase Program*

On August 15, 2023, the Parent Company's Board of Directors authorized the repurchase of up to $500 million of common stock, which is authorized to be executed through August 2025.

During Fiscal 2024, the Parent Company repurchased 1,013,561 shares of common stock for $241.9 million under its share repurchase program. As of the end of Fiscal 2024, the Parent Company had $263.2 million remaining under this share repurchase authorization.

**BURLINGTON STORES, INC.**
**Schedule II—Valuation and Qualifying Accounts and Reserves**
**(All amounts in thousands)**

| Description | Balance at Beginning of Period | Charged to Costs & Expenses | Charged to Other Accounts(1) | Accounts Written Off or Deductions(2) | Balance at End of Period |
|---|---|---|---|---|---|
| Year ended February 1, 2025 | | | | | |
| Allowance for doubtful accounts | $ 2,313 | $ 1,769 | $ — | $ 1,123 | $ 2,959 |
| Valuation allowances on deferred tax assets | $ 11,425 | $ — | $ (2,483) | $ — | $ 8,942 |
| Year ended February 3, 2024 | | | | | |
| Allowance for doubtful accounts | $ 1,252 | $ 1,209 | $ — | $ 148 | $ 2,313 |
| Valuation allowances on deferred tax assets | $ 13,060 | $ — | $ (1,635) | $ — | $ 11,425 |
| Year ended January 28, 2023 | | | | | |
| Allowance for doubtful accounts | $ 3,305 | $ 291 | $ — | $ 2,344 | $ 1,252 |
| Valuation allowances on deferred tax assets | $ 12,864 | $ — | $ 196 | $ — | $ 13,060 |

**Notes:**

(1)  Amounts related to valuation allowances on deferred taxes are charged to income tax expense.

(2)  Actual allowances.

**Item 9.   Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

None.

**Item 9A. Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures**

Our management team, under the supervision and with the participation of our principal executive officer and our principal financial officer, evaluated the effectiveness of the design and operation of our disclosure controls and procedures as such term is defined under Rule 13a-15(e) promulgated under the Exchange Act, as of the last day of the fiscal period covered by this Annual Report, February 1, 2025. The term disclosure controls and procedures means our controls and other procedures that are designed to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is accumulated and communicated to management, including our principal executive and principal financial officer, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure. Based on this evaluation, our principal executive officer and our principal financial officer concluded that our disclosure controls and procedures were effective as of February 1, 2025.

**Management's Annual Report on Internal Control over Financial Reporting**

Management is responsible for establishing and maintaining adequate internal control over financial reporting. Internal control over financial reporting is defined in Rule 13a-15(f) and Rule 15d-15(f) under the Exchange Act as a process designed by, or under the supervision of, the issuer's principal executive and principal financial officers, or persons performing similar functions, and effected by the issuer's Board of Directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP and includes those policies and procedures that:

- pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;

- provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP, and that receipts and expenditures of the issuer are being made only in accordance with authorizations of management and directors of the issuer; and

- provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the issuer's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In accordance with the internal control reporting requirement of the SEC, management completed an assessment of the adequacy of our internal control over financial reporting as of February 1, 2025. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in *Internal Control—Integrated Framework (2013)*.

Based on this assessment and the criteria in the COSO framework, management has concluded that, as of February 1, 2025, our internal control over financial reporting was effective.

Deloitte & Touche LLP, the independent registered public accounting firm that audited and reported on our consolidated financial statements contained herein, has audited the effectiveness of our internal control over financial reporting as of February 1, 2025, and has issued an attestation report on the effectiveness of our internal control over financial reporting included herein.

**Changes in Internal Control over Financial Reporting**

During the fourth quarter of Fiscal 2024, there were no changes in our internal control over financial reporting that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the shareholders and the Board of Directors of Burlington Stores, Inc.

**Opinion on Internal Control over Financial Reporting**

We have audited the internal control over financial reporting of Burlington Stores, Inc. and subsidiaries (the "Company") as of February 1, 2025 based on criteria established in Internal Control — Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of February 1, 2025, based on criteria established in Internal Control — Integrated Framework (2013) issued by COSO.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated financial statements as of and for the year ended February 1, 2025, of the Company and our report dated March 17, 2025, expressed an unqualified opinion on those financial statements.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Annual Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ Deloitte & Touche LLP

Morristown, New Jersey

March 17, 2025

79

**Item 9B. Other Information.**

*Amendment to Amended and Restated Bylaws*

On March 12, 2025, the Board of Directors of Burlington Stores, Inc. approved and adopted an amendment to and restatement of the Company's Amended and Restated Bylaws (Restated Bylaws), which became effective immediately. The Restated Bylaws were amended and restated as follows:

- Modifications to the provisions relating to advance notice of director nominations and other business at annual stockholder meetings, including to update, enhance, clarify or limit the scope of information and disclosures required regarding noticing stockholders, proposed nominees and other related persons, and to define and modify the definition of certain terms.

- Certain other ministerial changes, clarifications, technical edits and updates.

The foregoing summary of the Restated Bylaws does not purport to be a complete description of the amendments made to the Company's Amended and Restated Bylaws. It is qualified in its entirety by reference to the complete text of the Restated Bylaws which is attached as Exhibit 3.2 to this Annual Report on Form 10-K and is incorporated by reference herein.

*Adoption, Modification or Termination of Rule 10b5-1 Trading Arrangements and Non-Rule 10b5-1 Trading Arrangements*

During the fiscal quarter ended February 1, 2025, no director or officer of the Company adopted, modified or terminated a "Rule 10b5-1 trading arrangement" or "non-Rule 10b5-1 trading arrangement," as each term is defined in Item 408 of Regulation S-K.

**Item 9C. Disclosure Regarding Foreign Jurisdictions that Prevent Inspections.**

Not applicable.

## Part III

**Item 10.  Directors, Executive Officers and Corporate Governance**

For the information required by this Item 10, see "Election of Directors," "Information About Our Executive Officers," "Corporate Governance," "Board Committees" and "Insider Trading Policy" in the Proxy Statement for our 2025 Annual Meeting of Stockholders (the "Proxy Statement"), which information is incorporated herein by reference. The Proxy Statement will be filed within 120 days of the close of our 2024 fiscal year.

**Item 11.  Executive Compensation**

For the information required by this Item 11, see "Executive Compensation" and "Director Compensation" in the Proxy Statement, which information (excluding the information under the subheading "Pay Versus Performance") is incorporated herein by reference.

**Item 12.  Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters**

For the information required by this Item 12, see "Ownership of Securities" and "Securities Authorized for Issuance Under Equity Compensation Plans" in the Proxy Statement, which information is incorporated herein by reference.

**Item 13.  Certain Relationships and Related Transactions, and Director Independence**

For the information required by this Item 13, see "Certain Relationships and Related Person Transactions" and "Corporate Governance" in the Proxy Statement, which information is incorporated herein by reference.

**Item 14.  Principal Accountant Fees and Services**

For the information required by this Item 14, see "Principal Accountant Fees and Services" and "Policy on Audit Committee Pre-Approval of Audit and Permissible Non-Audit Services" in the Proxy Statement, which information is incorporated herein by reference.

PART IV

**Item 15.  Exhibits and Financial Statement Schedules**

(a)  *Documents Filed as Part of this Report*

**(1) Financial Statements**. The Consolidated Financial Statements filed as part of this Annual Report are listed on the Index to Consolidated Financial Statements on page 41 of this Annual Report.

**(2) Financial Statement Schedules**. Schedule I—Condensed Financial Information of Registrant filed as part of this Annual Report is starting on page 70. Schedule II—Valuation and Qualifying Accounts filed as part of this Annual Report is set forth on page 76 of this Annual Report. All other financial statement schedules have been omitted here because they are not applicable, not required, or the information is shown in the Consolidated Financial Statements or notes thereto.

**(3) Exhibits Required by Item 601 of Regulation S-K**. The following is a list of exhibits required by Item 601 of Regulation S-K and filed as part of this Annual Report. Exhibits that previously have been filed are incorporated herein by reference. Exhibits filed prior to June 2013 are incorporated herein by reference to filings of Burlington Coat Factory Investments Holdings, Inc. (File No. 333-137916-110).

| Exhibit Number | Exhibit Description | Incorporated by Reference | |
|---|---|---|---|
| | | **Form** | **Filing Date** |
| 3.1 | Amended and Restated Certificate of Incorporation of Burlington Stores, Inc. | Quarterly Report on Form 10-Q | May 30, 2024 |
| 3.2† | Amended and Restated Bylaws of Burlington Stores, Inc. | | |
| 4.1† | Description of the Registrant's Securities. | | |
| 4.2 | Indenture (including the form of Convertible Note), dated as of April 16, 2020, between Burlington Stores, Inc. and Wilmington Trust, National Association | Current Report on Form 8-K | April 16, 2020 |
| 4.3 | Indenture, dated as of September 12, 2023, between the Company and Wilmington Trust, National Association, as trustee (including form of 1.25% Convertible Senior Notes due 2027) | Current Report on Form 8-K | September 18, 2023 |
| 10.1 | Credit Agreement, dated February 24, 2011, by and among Burlington Coat Factory Warehouse Corporation, as borrower, the facility guarantors signatory thereto, JPMorgan Chase Bank, N.A., as administrative agent and as collateral agent, Goldman Sachs Lending Partners LLC, the lenders party thereto, and J.P. Morgan Securities LLC, Goldman Sachs Lending Partners LLC, Merrill Lynch, Pierce, Fenner & Smith Incorporated and Wells Fargo Securities, LLC, as joint lead arrangers and joint bookrunners. | Current Report on Form 8-K | February 24, 2011 |
| 10.1.1 | Amendment No. 1, dated May 16, 2012, to the Credit Agreement, dated February 24, 2011, by and among Burlington Coat Factory Warehouse Corporation, the lenders party thereto, JPMorgan Chase Bank, N.A., as administrative agent and as collateral agent, and the other parties thereto. | Current Report on Form 8-K | May 17, 2012 |
| 10.1.2 | Amendment No. 2, dated February 15, 2013, to the Credit Agreement, dated February 24, 2011, by and among Burlington Coat Factory Warehouse Corporation, the lender parties thereto, JPMorgan Chase Bank, N.A., as administrative agent and as collateral agent, and the other parties thereto. | Current Report on Form 8-K | February 21, 2013 |
| 10.1.3 | Amendment No. 3, dated May 17, 2013, to the Credit Agreement, dated February 24, 2011, by and among Burlington Coat Factory Warehouse Corporation, the | Current Report on Form 8-K | May 22, 2013 |

82

| | lenders party thereto, JPMorgan Chase Bank, N.A., as administrative agent and as collateral agent. | | |
|---|---|---|---|
| 10.1.4 | Amendment No. 4, dated August 13, 2014, to the Credit Agreement, dated February 24, 2011, by and among Burlington Coat Factory Warehouse Corporation, the lenders party thereto, JPMorgan Chase Bank, N.A., as administrative agent and as collateral agent. | Current Report on Form 8-K | August 18, 2014 |
| 10.1.5 | Amendment No. 5, dated July 29, 2016, to the Credit Agreement, dated February 24, 2011, by and among Burlington Coat Factory Warehouse Corporation, the lenders party thereto, JPMorgan Chase Bank, N.A., as administrative agent and as collateral agent. | Current Report on Form 8-K | July 29, 2016 |
| 10.1.6 | Amendment No. 6 to the Credit Agreement, dated November 17, 2017, to the Credit Agreement, dated February 24, 2011, by and among Burlington Coat Factory Warehouse Corporation, the lenders party thereto, JPMorgan Chase Bank, N.A., as administrative agent and as collateral agent. | Current Report on Form 8-K | November 21, 2017 |
| 10.1.7 | Amendment No. 7 to the Credit Agreement, dated November 2, 2018, to the Credit Agreement, dated February 24, 2011, by and among Burlington Coat Factory Warehouse Corporation, the lenders party thereto, JPMorgan Chase Bank, N.A., as administrative agent and as collateral agent. | Current Report on Form 8-K | November 8, 2018 |
| 10.1.8 | Amendment No. 8 to the Credit Agreement, dated February 26, 2020, to the Credit Agreement, dated February 24, 2011, by and among Burlington Coat Factory Warehouse Corporation, the lenders party thereto, JPMorgan Chase Bank, N.A., as administrative agent and as collateral agent. | Current Report on Form 8-K | March 3, 2020 |
| 10.1.9 | Amendment No. 9, dated as of June 24, 2021, to the Credit Agreement dated as of February 24, 2011, by and among Burlington Coat Factory Warehouse Corporation, JPMorgan Chase Bank, N.A., as administrative agent, and the lenders and facility guarantors party thereto. | Current Report on Form 8-K | June 25, 2021 |
| 10.1.10 | Amendment No. 10, dated as of May 11, 2023, to the Credit Agreement dated as of February 24, 2011, by and among Burlington Coat Factory Warehouse Corporation, JPMorgan Chase Bank, N.A., as administrative agent, and the lenders and facility guarantors party thereto. | Quarterly Report on Form 10-Q | May 25, 2023 |
| 10.1.11 | Amendment No. 11, dated as of September 24, 2021, to the Credit Agreement dated as of February 24, 2011 (as amended), by and among Burlington Coat Factory Warehouse Corporation, JPMorgan Chase Bank, N.A., as administrative agent, and the lenders and facility guarantors party thereto. | Current Report on Form 8-K | September 26, 2024 |
| 10.2 | Second Amended and Restated Credit Agreement, dated September 2, 2011, among Burlington Coat Factory Warehouse Corporation, as lead borrower, the borrowers named therein and the facility guarantors party thereto, Bank of America, N.A., as administrative agent and as collateral agent, Wells Fargo Capital Finance, LLC and JPMorgan Chase Bank, N.A., as co-syndication agents, and Suntrust Bank and U.S. Bank, National Association, as co-documentation agents, the lenders named therein, Merrill Lynch, Pierce, Fenner & Smith Incorporated and Wells Fargo Capital Finance, LLC, as joint lead arrangers, and Merrill Lynch, Pierce, Fenner & Smith | Current Report on Form 8-K | September 9, 2011 |

| | Incorporated and Wells Fargo Capital Finance, LLC, as joint bookrunners. | | |
|---|---|---|---|
| 10.2.1 | First Amendment to Second Amended and Restated Credit Agreement, dated August 13, 2014, by and among Burlington Coat Factory Warehouse Corporation, as lead borrower, the other borrowers party thereto, the facility guarantors thereto, the lenders party thereto and Bank of America, N.A., as administrative agent and collateral agent. | Current Report on Form 8-K | August 18, 2014 |
| 10.2.2 | Second Amendment to Second Amended and Restated Credit Agreement, dated June 29, 2018, by and among Burlington Coat Factory Warehouse Corporation, as lead borrower, the other borrowers party thereto, the facility guarantors thereto, the lenders party thereto and Bank of America, N.A., as administrative agent and collateral agent. | Current Report on Form 8-K | July 2, 2018 |
| 10.2.3 | Consent and Technical Modification Agreement, dated December 3, 2018, by and between Burlington Coat Factory Warehouse Corporation, as lead borrower, and Bank of America, N.A., as administrative agent | Annual Report on Form 10-K | March 20, 2019 |
| 10.2.4 | Consent and Technical Modification Agreement, dated as of April 7, 2020, by and between Burlington Coat Factory Warehouse Corporation and Bank of America, N.A. | Quarterly Report on Form 10-Q | May 29, 2020 |
| 10.2.5 | Third Amendment to Second Amended and Restated Credit Agreement, dated as of December 22, 2021, by and among Burlington Coat Factory Warehouse Corporation, as lead borrower, the other borrowers party thereto, the facility guarantors party thereto, each lender party thereto, and Bank of America, N.A., as administrative agent and collateral agent. | Current Report on Form 8-K | December 22, 2021 |
| 10.2.6 | Fourth Amendment to Second Amended and Restated Credit Agreement, dated as of July 20, 2022, by and among Burlington Coat Factory Warehouse Corporation, as lead borrower, the other borrowers party thereto, the facility guarantors party thereto, each lender party thereto, and Bank of America, N.A., as administrative agent and collateral agent. | Current Report on Form 8-K | July 22, 2022 |
| 10.2.7 | Fifth Amendment to Second Amended and Restated Credit Agreement, dated as of June 26, 2023, by and among Burlington Coat Factory Warehouse Corporation, as lead borrower, the other borrowers party thereto, the facility guarantors party thereto, each lender party thereto, and Bank of America, N.A., as administrative agent and collateral agent. | Quarterly Report on Form 10-Q | August 24, 2023 |
| 10.3 | Guaranty, dated April 13, 2006, by the facility guarantors party thereto in favor of Bank of America, N.A., as administrative Agent and Bank of America, N.A., as Collateral Agent. | Registration Statement on Form S-4 | October 10, 2006 |
| 10.4 | Security Agreement, dated April 13, 2006, by and among each of the borrowers party thereto, each of the facility guarantors party thereto, and Bank of America, N.A., as collateral agent. | Registration Statement on Form S-4 | October 10, 2006 |
| 10.5 | Intellectual Property Security Agreement, dated April 13, 2006, by and among each of the borrowers party thereto, each of the facility guarantors party thereto, and Bank of America, N.A., as collateral agent. | Registration Statement on Form S-4 | October 10, 2006 |
| 10.6 | Pledge Agreement, dated April 13, 2006, by and between Burlington Coat Factory Holdings, Inc., Burlington Coat | Registration Statement on Form S-4 | October 10, 2006 |

| | Factory Investments Holdings, Inc., Burlington Coat Factory Warehouse Corporation, Burlington Coat Factory Realty Corp., Burlington Coat Factory Purchasing, Inc., K&T Acquisition Corp., Burlington Coat Factory of New York, LLC, Burlington Coat Factory Warehouse of Baytown, Inc., Burlington Coat Factory of Texas, Inc., as the pledgors, and Bank of America, N.A., as collateral agent. | | |
|---|---|---|---|
| 10.7+ | Amended and Restated Employment Agreement, dated July 28, 2015, by and among Burlington Coat Factory Warehouse Corporation and Jennifer Vecchio. | Quarterly Report on Form 10-Q | August 31, 2015 |
| 10.7.1+ | Amendment, dated May 19, 2017, to the Amended and Restated Employment Agreement, dated July 28, 2015, by and among Burlington Coat Factory Warehouse Corporation and Jennifer Vecchio. | Current Report on Form 8-K | May 22, 2017 |
| 10.7.2+ | Amendment No. 2, dated March 12, 2021, to the Amended and Restated Employment Agreement, dated July 28, 2015, by and among Burlington Coat Factory Warehouse Corporation and Jennifer Vecchio. | Annual Report on Form 10-K | March 15, 2021 |
| 10.8+ | Employment Agreement, dated as of April 23, 2019, by and between Burlington Stores, Inc. and Michael O'Sullivan. | Current Report on Form 8-K | April 23, 2019 |
| 10.9+ | Employment Agreement dated May 24, 2022 by and between Burlington Stores, Inc. and Kristin Wolfe. | Current Report on Form 8-K | May 26, 2022 |
| 10.10+ | Form of Directors and Officers Indemnification Agreement. | Registration Statement on Form S-1/A | September 10, 2013 |
| 10.11+ | Burlington Stores, Inc. 2013 Omnibus Incentive Plan, as amended and restated May 17, 2017. | Current Report on Form 8-K | May 22, 2017 |
| 10.12+ | Burlington Stores, Inc. 2022 Omnibus Incentive Plan | Current Report on Form 8-K | May 24, 2022 |
| 10.13+ | Form of Non-Qualified Stock Option Agreement between Burlington Stores, Inc. and Employees with Employment Agreements or Subject to the Executive Severance Plan pursuant to Burlington Stores, Inc. 2013 Omnibus Incentive Plan, as amended and restated May 17, 2017 (for grants made from and after May 2017 and prior to May 2019). | Current Report on Form 8-K | May 22, 2017 |
| 10.14+ | Form of Non-Qualified Stock Option Agreement between Burlington Stores, Inc. and Employees without Employment Agreements pursuant to Burlington Stores, Inc. 2013 Omnibus Incentive Plan, as amended and restated May 17, 2017 (for grants made from and after May 2017 and prior to May 2019). | Current Report on Form 8-K | May 22, 2017 |
| 10.15+ | Form of Restricted Stock Unit Award Notice and Agreement between Burlington Stores, Inc. and award recipients pursuant to the Burlington Stores, Inc. 2013 Omnibus Incentive Plan, as amended and restated May 17, 2017 (for grants made from and after May 2019). | Quarterly Report on Form 10-Q | June 3, 2019 |
| 10.16+ | Form of Stock Option Award Notice and Agreement between Burlington Stores, Inc. and award recipients pursuant to the Burlington Stores, Inc. 2013 Omnibus Incentive Plan, as amended and restated May 17, 2017 (for grants made from and after May 2019). | Quarterly Report on Form 10-Q | June 3, 2019 |
| 10.17+ | Form of Restricted Stock Unit Award Notice and Agreement between Burlington Stores, Inc. and Kristin | Current Report on Form 8-K | May 26, 2022 |

| | Wolfe pursuant to the Burlington Stores, Inc. 2022 Omnibus Incentive Plan (for Make-Whole RSU Award). | | |
|---|---|---|---|
| 10.18+ | Form of Stock Option Award Notice and Agreement between Burlington Stores, Inc. and Kristin Wolfe pursuant to the Burlington Stores, Inc. 2022 Omnibus Incentive Plan (for Make-Whole Option Award). | Current Report on Form 8-K | May 26, 2022 |
| 10.19+ | Form of Stock Option Award Notice and Agreement between Burlington Stores, Inc. and award recipients pursuant to the Burlington Stores, Inc. 2022 Omnibus Incentive Plan. | Quarterly Report on Form 10-Q | August 25, 2022 |
| 10.20+ | Form of Stock Option Award Notice and Agreement between Burlington Stores, Inc. and award recipients pursuant to the Burlington Stores, Inc. 2022 Omnibus Incentive Plan (for grants made to certain merchandising and planning associates). | Quarterly Report on Form 10-Q | August 25, 2022 |
| 10.21+ | Form of Restricted Stock Unit Award Notice and Agreement between Burlington Stores, Inc. and award recipients pursuant to the Burlington Stores, Inc. 2022 Omnibus Incentive Plan. | Quarterly Report on Form 10-Q | August 25, 2022 |
| 10.22+ | Form of Restricted Stock Unit Award Notice and Agreement between Burlington Stores, Inc. and award recipients pursuant to the Burlington Stores, Inc. 2022 Omnibus Incentive Plan (for grants made to certain merchandising and planning associates). | Quarterly Report on Form 10-Q | August 25, 2022 |
| 10.23+ | Form of Performance-Based Restricted Stock Unit Award Notice and Agreement between Burlington Stores, Inc. and award recipients pursuant to the Burlington Stores, Inc. 2022 Omnibus Incentive Plan. | Quarterly Report on Form 10-Q | August 25, 2022 |
| 10.24+ | Form of Performance-Based Restricted Stock Unit Award Notice and Agreement between Burlington Stores, Inc. and award recipients pursuant to the Burlington Stores, Inc. 2022 Omnibus Incentive Plan (for grants made to certain merchandising and planning associates). | Quarterly Report on Form 10-Q | August 25, 2022 |
| 10.25+ | Form of Restricted Stock Unit Award Notice and Agreement between Burlington Stores, Inc. and award recipients pursuant to the Burlington Stores, Inc. 2022 Omnibus Incentive Plan (for special grants made to certain merchandising and planning associates). | Quarterly Report on Form 10-Q | August 25, 2022 |
| 10.26+ | Form of Stock Option Award Notice and Agreement between Burlington Stores, Inc. and award recipients pursuant to the Burlington Stores, Inc. 2022 Omnibus Incentive Plan (for special grants made to certain merchandising and planning associates). | Quarterly Report on Form 10-Q | August 25, 2022 |
| 10.27+ | Form of Restricted Stock Unit Award Notice and Agreement between Burlington Stores, Inc. and award recipients pursuant to the Burlington Stores, Inc. 2022 Omnibus Incentive Plan (for special grants made to all other associates). | Quarterly Report on Form 10-Q | August 25, 2022 |
| 10.28+ | Form of Stock Option Award Notice and Agreement between Burlington Stores, Inc. and award recipients pursuant to the Burlington Stores, Inc. 2022 Omnibus Incentive Plan (for special grants made to all other associates). | Quarterly Report on Form 10-Q | August 25, 2022 |
| 10.29+ | Form of Restricted Stock Unit Award Notice and Agreement between Burlington Stores, Inc. and non-employee directors pursuant to the Burlington Stores, Inc. 2022 Omnibus Incentive Plan. | Quarterly Report on Form 10-Q | August 25, 2022 |

86

| 10.30 | Security Agreement, dated as of April 16, 2020, among Burlington Coat Factory Warehouse Corporation, the Grantors party thereto and Wilmington Trust, National Association, in its capacity as collateral agent under the Indenture | Current Report on Form 8-K | April 16, 2020 |
|---|---|---|---|
| 10.31 | Intellectual Property Security Agreement, dated as of April 16, 2020, among Burlington Coat Factory Warehouse Corporation, the Grantors party thereto and Wilmington Trust, National Association, in its capacity as collateral agent under the Indenture | Current Report on Form 8-K | April 16, 2020 |
| 10.32 | Pledge Agreement, dated as of April 16, 2020, among Burlington Coat Factory Warehouse Corporation, the Grantors party thereto, Wilmington Trust, National Association, in its capacity as collateral agent under the Indenture | Current Report on Form 8-K | April 16, 2020 |
| 10.33 | ABL Intercreditor Agreement, dated as of April 16, 2020, among Burlington Coat Factory Warehouse Corporation, the Guarantors party thereto, the Bank of America, N.A., in its capacity as administrative agent and collateral agent under the ABL Facility, JPMorgan Chase Bank, N.A., as administrative agent and collateral agent under the Term Loan Facility, and Wilmington Trust, National Association, in its capacity as collateral agent and trustee under the Indenture | Current Report on Form 8-K | April 16, 2020 |
| 10.34+ | Form of Restricted Stock Unit Award Notice and Agreement between Burlington Stores, Inc. and award recipients pursuant to the Burlington Stores, Inc. 2013 Omnibus Incentive Plan, as amended and restated May 17, 2017 (for special grants made from and after May 20, 2020). | Quarterly Report on Form 10-Q | August 27, 2020 |
| 10.35+ | Form of Restricted Stock Unit Award Notice and Agreement between Burlington Stores, Inc. and award recipients pursuant to the Burlington Stores, Inc. 2013 Omnibus Incentive Plan, as amended and restated May 17, 2017 (for grants made to certain merchandising and planning associates from and after May 3, 2021). | Quarterly Report on Form 10-Q | May 27, 2021 |
| 10.36+ | Form of Stock Option Award Notice and Agreement between Burlington Stores, Inc. and award recipients pursuant to the Burlington Stores, Inc. 2013 Omnibus Incentive Plan, as amended and restated May 17, 2017 (for grants made to certain merchandising and planning associates from and after May 3, 2021). | Quarterly Report on Form 10-Q | May 27, 2021 |
| 10.37+ | Burlington Stores, Inc. Executive Severance Plan (Merchandising & Planning) (Effective March 26, 2021). | Quarterly Report on Form 10-Q | May 27, 2021 |
| 10.38+ | Burlington Stores, Inc. Executive Severance Plan (Amended and Restated Effective March 26, 2021). | Quarterly Report on Form 10-Q | May 27, 2021 |
| 10.39+ | Employment Agreement dated July 12, 2021 by and between Burlington Stores, Inc. and Travis Marquette. | Current Report on Form 8-K | July 15, 2021 |
| 10.40+ | Form of Restricted Stock Unit Award Notice and Agreement between Burlington Stores, Inc. and award recipients pursuant to the Burlington Stores, Inc. 2013 Omnibus Incentive Plan, as amended and restated May 17, 2017 (for special grants made to certain merchandising and planning associates). | Annual Report on Form 10-K | March 16, 2022 |
| 19.1† | Statement of Policy Concerning Securities Trading. | | |
| 21.1† | List of Subsidiaries of Burlington Stores, Inc. | | |
| 23.1† | Consent of Deloitte & Touche LLP. | | |

| 31.1† | Certification of Principal Executive Officer required by Rule 13a-14(a) or Rule 15d-14(a) of the Securities Exchange Act of 1934, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. | | |
|---|---|---|---|
| 31.2† | Certification of Principal Financial Officer required by Rule 13a-14(a) or Rule 15d-14(a) of the Securities Exchange Act of 1934, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. | | |
| 32.1† | Certification of Principal Executive Officer pursuant to 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. | | |
| 32.2† | Certification of Principal Financial Officer pursuant to 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. | | |
| 97.1 | Burlington Stores, Inc. Policy on Recoupment of Incentive Compensation | Annual Report on Form 10-K | March 15, 2024 |
| 101.INS† | Inline XBRL Instance Document – the instance document does not appear in Interactive Data File, because its XBRL tags are embedded within the Inline XBRL document. | | |
| 101.SCH† | Inline XBRL Taxonomy Extension Schema Document | | |
| 101.CAL† | Inline Taxonomy Extension Calculation Linkbase Document | | |
| 101.DEF† | Inline XBRL Taxonomy Extension Definition Linkbase Document | | |
| 101.LAB† | Inline XBRL Taxonomy Extension Label Linkbase Document | | |
| 101.PRE† | Inline XBRL Taxonomy Extension Presentation Linkbase Document | | |
| 104† | Cover Page Interactive Data File (formatted as inline XBRL and contained in Exhibit 101) | | |

+    Indicates management contract or compensatory plan or arrangement.
†    Filed or furnished herewith.


**Item 16.  Form 10-K Summary**

None.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this Report to be signed on its behalf by the undersigned, thereunto duly authorized.

**BURLINGTON STORES, INC.**

By:      /s/ Michael O'Sullivan
              Michael O'Sullivan
              **Chief Executive Officer**

Date: March 17, 2025

Pursuant to the requirements of the Securities Exchange Act of 1934, this Report has been signed below by the following persons on behalf of the registrant and in the capacities indicated on the 14th day of March 2025.

| **Signature** | **Title** |
| --- | --- |
| /s/ Michael O'Sullivan<br>**Michael O'Sullivan** | Chief Executive Officer and Director<br>(Principal Executive Officer) |
| /s/ Kristin Wolfe<br>**Kristin Wolfe** | Chief Financial Officer<br>(Principal Financial Officer) |
| /s/ Stephen Ferroni<br>**Stephen Ferroni** | Chief Accounting Officer<br>(Principal Accounting Officer) |
| /s/ Ted English<br>**Ted English** | Director |
| /s/ Shira Goodman<br>**Shira Goodman** | Director |
| /s/ Michael Goodwin<br>**Michael Goodwin** | Director |
| /s/ Jordan Hitch<br>**Jordan Hitch** | Director |
| /s/ John Mahoney<br>**John Mahoney** | Director |
| /s/ William McNamara<br>**William McNamara** | Director |
| /s/ Jessica Rodriguez<br>**Jessica Rodriguez** | Director |
| /s/ Laura Sen<br>**Laura Sen** | Director |
| /s/ Paul Sullivan<br>**Paul Sullivan** | Director |
| /s/ Mary Ann Tocio<br>**Mary Ann Tocio** | Director |

90

**Exhibit 3.2**

### AMENDED AND RESTATED BYLAWS
### OF BURLINGTON STORES, INC.

*A Delaware corporation*

(Adopted as of March 12, 2025)

### ARTICLE I.
### OFFICES

Section 1.<u>Registered Office</u>. The address of the registered office of Burlington Stores, Inc. (the "Corporation") in the State of Delaware, and the name of the Corporation's registered agent at such address, shall be as set forth in the Amended and Restated Certificate of Incorporation of the Corporation (as the same may be amended and/or restated from time to time, the "Certificate of Incorporation"). The registered office and/or registered agent of the Corporation may be changed from time to time by action of the Board of Directors of the Corporation (the "Board of Directors").

Section 2.<u>Other Offices</u>. The Corporation may have an office or offices other than said registered office at such place or places, either within or outside the State of Delaware, as the Board of Directors shall from time to time determine or the business of the Corporation may from time to time require.

### ARTICLE II.
### MEETINGS OF STOCKHOLDERS

Section 1.<u>Place of Meetings</u>. All meetings of stockholders shall be held at such place, if any, as may be designated from time to time by the Board of Directors. The Board of Directors may designate such place of meeting, either within or outside the State of Delaware, or the Board of Directors may, in its sole discretion, determine that a meeting shall not be held at any place, but may instead be held solely by means of remote communication in accordance with Section 211(a) of the General Corporation Law of the State of Delaware.

Section 2.<u>Annual Meeting</u>. An annual meeting of the stockholders shall be held on such date and at such time as is specified by the Board of Directors. At the annual meeting, stockholders shall elect directors and transact such other business as may be properly brought before the annual meeting pursuant to Section 11 of ARTICLE II hereof. The Board of Directors may postpone, reschedule or cancel any previously scheduled annual meeting of the stockholders.

Section 3.<u>Special Meetings</u>. Special meetings of the stockholders may only be called in the manner provided in the Certificate of Incorporation. Business transacted at any special meeting of stockholders shall be limited to the purpose or purposes stated in the Corporation's notice of the meeting given by or at the direction of the Board of Directors or by the Secretary (solely to the extent and in the manner provided by the Certificate of Incorporation). The Board

of Directors may postpone, reschedule or cancel any previously scheduled special meeting of stockholders.

Section 4. Notice.

(a)    Timing; Contents. Whenever stockholders are required or permitted to take action at a meeting, written notice of each annual and special meeting of stockholders stating the date, time and place, if any, of the meeting, the means of remote communication, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at such meeting, the record date for determining the stockholders entitled to vote at the meeting (if such date is different than the record date for stockholders entitled to notice of the meeting) and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be given by or at the direction of the Board of Directors or by the Secretary (solely to the extent and in the manner provided by the Certificate of Incorporation), to each stockholder of record entitled to vote thereat not less than ten (10) nor more than sixty (60) days before the date of the meeting except as otherwise required by law.

(b)    Form of Notice. All such notices shall be delivered in writing or by a form of electronic transmission (if permitted under the circumstances by the General Corporation Law of the State of Delaware). If mailed, such notice shall be deemed to be delivered when deposited in the United States mail, postage prepaid, addressed to the stockholder at his, her or its address as the same appears on the records of the Corporation. If given by facsimile telecommunication, such notice shall be deemed given when directed to a number at which the stockholder has consented to receive notice by facsimile. Subject to the limitations of Section 2.4(d) of this ARTICLE II, if given by electronic transmission, such notice shall be deemed given: (i) by electronic mail, when directed to an electronic mail address unless the stockholder has notified the Corporation in writing or by electronic transmission of an objection to receiving notice by electronic mail or such notice is prohibited under the General Corporation Law of the State of Delaware; (ii) if by a posting on an electronic network together with separate notice to the stockholder of such specific posting, upon the later of (x) such posting and (y) the giving of such separate notice by United States mail or facsimile transmission; and (iii) if by any other form of electronic transmission, when directed to the stockholder. An affidavit of the Secretary or an Assistant Secretary of the Corporation, the transfer agent of the Corporation or any other agent of the Corporation that the notice has been given shall, in the absence of fraud, be *prima facie* evidence of the facts stated therein.

(c)    Waiver of Notice. Whenever notice is required to be given under any provisions of the General Corporation Law of the State of Delaware, the Certificate of Incorporation or these Bylaws, a written waiver thereof, signed by the stockholder entitled to notice, or a waiver by electronic transmission by the person or entity entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to notice. Neither the business to be transacted at, nor the purpose of, any meeting of stockholders of the Corporation need be specified in any waiver of notice of such meeting. Attendance of a stockholder of the Corporation at a meeting of stockholders shall constitute a waiver of notice of such meeting, except when the stockholder attends for the express purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened.

2

(d)    <u>Notice by Electronic Delivery</u>. Without limiting the manner by which notice otherwise may be given effectively to stockholders of the Corporation pursuant to the General Corporation Law of the State of Delaware, the Certificate of Incorporation or these Bylaws, any notice to stockholders of the Corporation given by the Corporation under any provision of the General Corporation Law of the State of Delaware, the Certificate of Incorporation or these Bylaws shall be effective if given by a form of electronic transmission under the circumstances permitted by the General Corporation Law of the State of Delaware. For purposes of these Bylaws, except as otherwise limited by applicable law, the term "electronic transmission" means any form of communication not directly involving the physical transmission of paper, including the use of, or participation in, one or more electronic networks or databases (including one or more distributed electronic networks or databases), that creates a record that may be retained, retrieved and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such a recipient through an automated process.

Section 5.<u>List of Stockholders</u>. The Corporation shall prepare at least 10 days before every meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting (provided, however, if the record date for determining the stockholders entitled to vote is less than 10 days before the meeting date, the list shall reflect the stockholders entitled to vote as of the tenth day before the meeting date), arranged in alphabetical order, and showing the address of each stockholder and the number of shares registered in the name of each stockholder. Nothing contained in this section shall require the Corporation to include electronic mail addresses or other electronic contact information on such list. Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting for a period of at least 10 days ending on the day before the meeting: (a) on a reasonably accessible electronic network, provided that the information required to gain access to such list is provided with the notice of the meeting or (b) during ordinary business hours, at the principal place of business of the Corporation. In the event the Corporation determines to make the list available on an electronic network, the Corporation may take reasonable steps to ensure that such information is available only to stockholders of the Corporation. The stock ledger of the Corporation shall be the only evidence as to who are the stockholders entitled to examine the list of stockholders required by this section or to vote in person or by proxy at any meeting of stockholders.

Section 6.<u>Quorum</u>. Except as otherwise provided by the General Corporation Law of the State of Delaware, the Certificate of Incorporation or these Bylaws, the holders of a majority in voting power of the shares of capital stock of the Corporation issued and outstanding and entitled to vote at the meeting, present in person, present by means of remote communication, if any, or represented by proxy at the meeting, shall constitute a quorum for the transaction of business at all meetings of the stockholders. If a quorum is not present, the holders of a majority of the shares present in person, present by means of remote communication, if any, or represented by proxy at the meeting and entitled to vote at the meeting, may adjourn the meeting to another time and/or place. Where a separate vote by a class or classes or series is required by law or by the Certificate of Incorporation, the holders of a majority in voting power of the shares of such class or classes or series of capital stock issued and outstanding and entitled to vote on such matter, present in person or represented by proxy, shall constitute a quorum entitled to take action with respect to that vote on the matter. A quorum, once established at a meeting, shall not be broken by the withdrawal of enough votes to leave less than a quorum.

3

Section 7. <u>Adjourned Meetings</u>. Any meeting of stockholders, annual or special, may be adjourned from time to time to any other time and to any other place by the chair of the meeting or by the stockholders present or represented at the meeting and entitled to vote thereon, although less than a quorum. When a meeting is adjourned to another time and place, notice need not be given of the adjourned meeting (including an adjournment taken to address a technical failure to convene or continue a meeting using remote communication) if the time and place, if any, thereof, and the means of remote communication, if any, by which stockholders and proxy holders may be deemed to be present in person or represented by proxy and vote at such adjourned or recessed meeting, are (a) announced at the meeting at which the adjournment is taken, (b) displayed during the time scheduled for the meeting, on the same electronic network used to enable stockholders and proxy holders to participate in the meeting by means of remote communication or (c) set forth in the notice of meeting given in accordance with these Bylaws. At the adjourned meeting the Corporation may transact any business which might have been transacted at the original meeting. If the adjournment is for more than 30 days, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting. If after the adjournment a new record date for stockholders entitled to vote is fixed for the adjourned meeting, the Board of Directors shall fix a new record date for notice of such adjourned meeting in accordance with Section 213(a) of the General Corporation Law of the State of Delaware, and shall give notice of the adjourned meeting to each stockholder of record entitled to vote at such adjourned meeting as of the record date fixed for notice of such adjourned meeting.

Section 8. <u>Vote Required</u>. When a quorum is present at any meeting of stockholders, the affirmative vote of the holders of a majority in voting power of the shares of capital stock present in person, present by means of remote communication, if any, or represented by proxy at the meeting and entitled to vote on the subject matter shall decide any question brought before the meeting, unless by express provisions of an applicable law or regulation applicable to the Corporation or its securities or of the rules or regulations of any stock exchange applicable to the Corporation or of the Certificate of Incorporation or of these Bylaws a different vote is required, in which case such express provision shall govern and control the decision of such question. Each director of the Corporation shall be elected by a majority of the votes cast by the shares present in person, present by means of remote communication, if any, or represented by proxy at the meeting and entitled to vote in the election of such directors; provided, however, in any contested election of directors (as defined below), the directors shall be elected by a plurality of the votes of the shares present in person, present by means of remote communication, if any, or represented by proxy at the meeting and entitled to vote on the election of directors. For purposes of this Article II, Section 8, (a) a "contested election of directors" shall mean an annual or special meeting of the Corporation with respect to which (i) the Secretary of the Corporation receives a notice that a stockholder has nominated or intends to nominate a person for election to the Board of Directors in compliance with the requirements for stockholder nominees for director set forth in Article II of these Bylaws, and (ii) such nomination has not been withdrawn by such stockholder on or prior to the tenth (10th) day before the Corporation first mails its notice of meeting for such meeting to the stockholders; and (b) a "majority of the votes cast" means that the number of votes cast "for" the election of a director must exceed the number of votes cast "against" the election of that director (with "abstentions" and "broker non-votes" not counted as a vote cast either "for" or "against" that director's election).

4

Section 9. <u>Voting Rights</u>. Except as otherwise provided by the General Corporation Law of the State of Delaware or the Certificate of Incorporation (including any certificate of designation in respect of any series of preferred stock), each holder of record of capital stock shall at every meeting of the stockholders be entitled to one vote for each share of capital stock held by such stockholder on the record date for voting for such meeting.

Section 10. <u>Proxies</u>. Each stockholder entitled to vote at a meeting of stockholders may authorize another person or persons to act for such stockholder by proxy executed or transmitted in a manner permitted by applicable law, but no such proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period. A duly executed proxy shall be irrevocable if it states that it is irrevocable and if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power. A proxy may be made irrevocable regardless of whether the interest with which it is coupled is an interest in the stock itself or an interest in the Corporation generally. At each meeting of stockholders, and before any voting commences, all proxies filed at or before the meeting shall be submitted to and examined by the Secretary or a person designated by the Secretary, and no shares may be represented or voted under a proxy that has been found to be invalid or irregular.

Section 11. <u>Business Brought Before a Meeting of the Stockholders</u>.

(a)    <u>Annual Meetings</u>.

(1)    At an annual meeting of the stockholders, only such nominations of persons for election to the Board of Directors shall be considered and such other business shall be conducted as shall have been properly brought before the meeting. To be properly brought before an annual meeting, nominations and other business must be a proper matter for stockholder action under Delaware law and must be (A) specified in the notice of meeting (or any supplement thereto) given by or at the direction of the Board of Directors, (B) brought before the meeting by or at the direction of the Board of Directors, (C) properly brought before the meeting by a stockholder who (i) is a stockholder of record of the Corporation both at the time the notice provided for in paragraph (a) of this Section 11 of ARTICLE II is delivered to the Secretary of the Corporation and on the record date for the determination of stockholders entitled to vote at the annual meeting of stockholders, (ii) is entitled to vote at the meeting, and (iii) complies with the notice procedures set forth in paragraph (a) of this Section 11 of ARTICLE II or (D) properly brought by an Eligible Stockholder (as defined below) with respect to the nomination of a director for election pursuant to and in compliance with Section 12 of ARTICLE II. For nominations or other business to be properly brought before an annual meeting by a stockholder pursuant to the foregoing clause (C), the stockholder must have given timely notice thereof in writing and in proper form to the Secretary of the Corporation. To be timely, a stockholder's notice must be delivered to or mailed and received at the principal executive offices of the Corporation not later than the Close of Business on the ninetieth (90th) day nor earlier than the one hundred twentieth (120th) day prior to the first anniversary of the preceding year's annual meeting (provided, however, that in the event that there was no annual meeting in the prior year or the date of the annual meeting is more than thirty (30) days before or more than seventy (70) days after such anniversary date, notice by the stockholder must be so delivered not earlier than the one hundred

5

twentieth (120th) day prior to such annual meeting and not later than the Close of Business on the later of the ninetieth (90th) day prior to such annual meeting or the tenth (10th) day following the day on which public announcement of the date of such meeting is first made by the Corporation). In no event shall any adjournment, deferral or postponement of an annual meeting or the public announcement thereof commence a new time period (or extend any time period) for the giving of a stockholder's notice as described above.

(2)        A stockholder's notice providing for the nomination of a person or persons for election as a director or directors of the Corporation shall set forth:

(A)        as to the stockholder giving notice and any Stockholder Associated Person:

(i)        the name and address of such stockholder, as they appear on the Corporation's books, and of any Stockholder Associated Person,

(ii)        the class or series and number of shares of capital stock of the Corporation which are, directly or indirectly, beneficially owned  (provided that a person shall in all events be deemed to beneficially own any shares of any class or series and number of shares of capital stock of the Corporation as to which such person has a right to acquire beneficial ownership at any time in the future, whether such right is exercisable immediately or only after the passage of time or the fulfillment of a condition) or owned of record by such stockholder or any Stockholder Associated Person and the date or dates on which such shares were acquired,

(iii)        the name of each nominee holder for, and number of, any securities of the Corporation owned beneficially but not of record by such stockholder or any Stockholder Associated Person and any pledge by such stockholder or any Stockholder Associated Person with respect to any of such securities,

(iv)        (A) a description of all agreements, arrangements or understandings, written or oral, (including any derivative or short positions, profit interests, hedging transactions, forwards, futures, swaps, options, warrants, convertible securities, stock appreciation or similar rights, repurchase agreements or arrangements, borrowed or loaned shares and so-called "stock borrowing" agreements or arrangements) that have been entered into by, or on behalf of, such stockholder or any Stockholder Associated Person, the effect or intent of which is to mitigate loss, manage risk or benefit from changes in the price of any securities of the Corporation, or maintain, increase or decrease the voting power of such stockholder or Stockholder Associated Person with respect to securities of the Corporation, whether or not such instrument or right shall be subject to settlement in underlying shares of capital stock of the Corporation (any of the

6

foregoing, a "Derivative Security") and (B) all other information relating to such Derivative Securities that would be required to be disclosed in a proxy statement in connection with the solicitation of proxies by such stockholder or any Stockholder Associated Person in support of the business proposed by such stockholder, if any, or for the election of any Proposed Nominee in a contested election pursuant to the Proxy Rules if the creation, termination or modification of such Derivative Securities were treated the same as trading in the securities of the Corporation under the Proxy Rules,

(v)        any substantial interest, direct or indirect (including any existing or prospective commercial, business or contractual relationship with the Corporation), of such stockholder or, to the knowledge of such stockholder (or the beneficial owner(s) on whose behalf such stockholder is submitting notice), any Stockholder Associated Person in the Corporation or any Affiliate thereof or in the proposed nominations to be brought before the meeting by such stockholder, other than an interest arising from the ownership of Corporation securities where such stockholder or Stockholder Associated Person receives no extra or special benefit not shared on a *pro rata* basis by all other holders of the same class or series,

(vi)       any rights to dividends on the shares of the Corporation owned beneficially by such stockholder or Stockholder Associated Person that are separated or separable from the underlying shares of the Corporation,

(vii)      any proportionate interest in shares of the Corporation or Derivative Securities held, directly or indirectly, by a general or limited partnership, limited liability company or similar entity in which such stockholder or Stockholder Associated Person (A) is a general partner or, directly or indirectly, beneficially owns an interest in a general partner of such general or limited partnership or (B) is the manager, managing member or, directly or indirectly, beneficially owns an interest in a manager or managing member of such limited liability company or similar entity,

(viii)     a description of all agreements, arrangements, and understandings (including the name(s) of any parties) (A) between or among such stockholder and any Stockholder Associated Person, or (B) between or among such stockholder or, to the knowledge of such stockholder (or the beneficial owner(s) on whose behalf such Noticing Party is submitting a notice to the Corporation), any Stockholder Associated Person, on the one hand, and any other person(s), on the other hand, in each case, relating to acquiring, holding, voting or disposing of any securities of the Corporation, including any proxy (other than any revocable proxy given in response to a solicitation made pursuant to,

7

and in accordance with, the Proxy Rules by way of a solicitation statement filed on Schedule 14A);

(ix)        all information that would be required to be set forth in a Schedule 13D filed pursuant to Rule 13d-1(a) under the Securities Exchange Act of 1934, as amended (such act, and the rules and regulations promulgated thereunder, the "Exchange Act"), or an amendment pursuant to Rule 13d-2(a) under the Exchange Act if such a statement were required to be filed under the Exchange Act by such stockholder or any Stockholder Associated Person with respect to the Corporation (regardless of whether such person or entity is actually required to file a Schedule 13D), including a description of any agreement, arrangement or understanding that would be required to be disclosed by such stockholder or Stockholder Associated Person pursuant to Item 5 or Item 6 of Schedule 13D,

(x)        a statement as to whether such stockholder or any Stockholder Associated Person intends to (A) deliver a proxy statement and form of proxy to holders of at least the percentage of the Corporation's voting shares required under applicable law to elect such stockholder's nominees, (B) solicit proxies in support of the election of any such Proposed Nominee in accordance with Rule 14a-19 under the Exchange Act or (C) engage in a solicitation (within the meaning of Exchange Act Rule 14a-1(l)) with respect to such nominations and if so, the name of each participant (as defined in Item 4 of Schedule 14A under the Exchange Act) in such solicitation,

(xi)        a representation that the stockholder is a holder of record of shares of the Corporation entitled to vote at such meeting and intends to appear or cause a qualified representative (as defined below) of such stockholder to appear in person, by proxy or by remote communication (if applicable) at the meeting to propose such nomination, and an acknowledgment that, if such stockholder (or a qualified representative of such stockholder) does not appear to present such nominees at such meeting, the Corporation need not present such nominees for a vote at such meeting, notwithstanding that proxies in respect of such vote may have been received by the Corporation,

(xii)        any securities or any Derivative Securities, in each case with a market value of more than $1,000,000, in any Competing Business (as defined in any exhibit filed or incorporated by reference in the annual report on Form 10-K or amendment thereto most recently filed by the Corporation with the Securities and Exchange Commission or in Item 8.01 of any current report on Form 8-K filed by the Corporation with the Securities and Exchange Commission thereafter but prior to the tenth (10th) day before the deadline for a stockholder's notice under

8

this Section 11) (each, a "Principal Competitor") held by such stockholder or any Stockholder Associated Person,

(xiii)        any direct or indirect interest (other than solely as a result of security ownership) of such stockholder or Stockholder Associated Person in any contract or arrangement with the Corporation, any Affiliate of the Corporation or any Principal Competitor of the Corporation (including any employment agreement, collective bargaining agreement or consulting agreement),

(xiv)        the names and addresses of other stockholders or other beneficial owners known by such stockholder to provide financial support for the nomination(s) submitted by such stockholder and, to the extent known, the class and number of all shares of the Corporation's capital stock owned beneficially or of record by such other stockholder(s) or other beneficial owner(s),

(xv)        a certification that such stockholder and each Stockholder Associated Person has complied with all applicable federal, state and other legal requirements in connection with such stockholder's or Stockholder Associated Person's acquisition of shares of capital stock or other securities of the Corporation and such stockholder's or Stockholder Associated Person's acts or omissions as a stockholder of the Corporation, if such Stockholder Associated Person is a stockholder of the Corporation,

(xvi)        a representation that (A) neither such stockholder nor any Stockholder Associated Person has breached any agreement, arrangement or understanding with the Corporation except as disclosed to the Corporation pursuant hereto and (B) such stockholder and each Stockholder Associated Person has complied, and will comply, with all applicable requirements of state law and the Exchange Act with respect to the matters set forth in this Section 11 of ARTICLE II,

(xvii)        any other information relating to such stockholder or any Stockholder Associated Person that would be required to be disclosed in a proxy statement in connection with solicitations of proxies by such stockholder or any Stockholder Associated Person for the election of directors in a contested election pursuant to the Proxy Rules, and

(xviii)        such additional information that the Corporation may reasonably request regarding the solicitation of proxies from the Corporation's stockholders by such stockholder and any Stockholder Association;

provided, however, that the disclosures described in the foregoing subclauses (i) through (xviii) shall not include any such disclosures with respect to the ordinary

9

course business activities of any depositary or any broker, dealer, commercial bank, trust company or other nominee who would be required to provide disclosures pursuant to this Section 11 of ARTICLE II solely as a result of being the stockholder directed to prepare and submit the notice required by these Bylaws on behalf of a beneficial owner (any such entity, an "Exempt Party"); and

(B)  as to each person whom the stockholder proposes to nominate for election or reelection as a director (each, a "Proposed Nominee"):

(i)  the name, age, business address and residential address of such Proposed Nominee,

(ii)  the principal occupation and employment of such Proposed Nominee,

(iii)  all information relating to such Proposed Nominee and such Proposed Nominee's Associates that would be required to be disclosed in a proxy statement in connection with solicitations of proxies by such stockholder or any Stockholder Associated Person for the election of directors in a contested election pursuant to the Proxy Rules,

(iv)  a description of all direct and indirect compensation and other material monetary agreements, arrangements and understandings, written or oral, during the past three years, and any other material relationships, between or among such Proposed Nominee, on the one hand, and such stockholder, the beneficial owner(s), if any, on whose behalf the nomination is made or any Stockholder Associated Persons (other than such Proposed Nominee), on the other hand, or that such Proposed Nominee knows any of such Proposed Nominee's Associates has with such stockholder, the beneficial owner(s), if any, on whose behalf the nomination is made, or any Stockholder Associated Person (other than such Proposed Nominee), including, without limitation, all information that would be required to be disclosed pursuant to Item 404 promulgated under Regulation S-K if such stockholder or beneficial owner(s), or any Stockholder Associated Person (other than the Proposed Nominee), were the "registrant" for purposes of such rule and the Proposed Nominee were a director or executive officer of such registrant,

(v)  a completed and signed questionnaire regarding the background and qualifications of such Proposed Nominee to serve as a director in the form required by the Corporation, a copy of which shall be provided by the Secretary upon written request of any stockholder of record within ten (10) days after receiving such request,

10

(vi)      a written representation and agreement completed by such Proposed Nominee in the form required by the Corporation (which form the Secretary of the Corporation shall provide upon written request of any stockholder of record within ten (10) days after receiving such request) providing that such person: (A) is not and will not become a party to any agreement, arrangement or understanding with, and has not given any commitment or assurance to, any person or entity as to how such person, if elected as a director of the Corporation, will act or vote on any issue or question (a "Voting Commitment") that has not been disclosed to the Corporation or any Voting Commitment that could limit or interfere with such person's ability to comply, if elected as a director of the Corporation, with such person's fiduciary duties under applicable law; (B) is not and will not become a party to any agreement, arrangement or understanding with any person or entity other than the Corporation with respect to any direct or indirect compensation, reimbursement or indemnification in connection with service or action as a director or nominee with respect to the Corporation that has not been disclosed to the Corporation; (C) will, if elected as a director of the Corporation, comply with all applicable rules of any securities exchanges upon which the Corporation's securities are listed, the Certificate of Incorporation, these Bylaws, all applicable publicly disclosed corporate governance, ethics, conflict of interest, confidentiality, stock ownership and trading policies and all other guidelines and policies of the Corporation generally applicable to directors (which other guidelines and policies will be provided to such person within five (5) business days after the Secretary receives any written request therefor from such person), and all applicable fiduciary duties under state law; (D) will provide facts, statements and other information in all communications with the Corporation and its stockholders that are or will be true and correct in all material respects and that do not and will not omit to state any fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading in any material respect; (E) consents to being named in the Corporation's proxy statement and form of proxy as a nominee and to serving as a director if elected, (F) intends to serve as a director for the full term for which such person is to stand for election, and (G) consents to the public disclosure of information regarding or relating to such person provided to the Corporation by such person or otherwise pursuant to these Bylaws, and

(vii)      such additional information that the Corporation may reasonably request to determine the eligibility or qualifications of such person to serve as a director or an independent director of the Corporation, or that could be material to a reasonable stockholder's understanding of the qualifications and/or independence, or lack thereof, of such person as a director.

11

(3)         A stockholder's notice regarding business proposed to be brought before a meeting of stockholders other than the nomination of persons for election to the Board of Directors shall set forth:

(A)             as to the proposed business:

(i)         a brief description of the business desired to be brought before such meeting, including the text of any resolution proposed for consideration by the stockholders (including the specific wording of any proposed amendment to the Bylaws or the Certificate of Incorporation),

(ii)         a brief description of the reasons for conducting such business at the meeting,

(iii)         any other information relating to such business that would be required to be disclosed in a proxy statement in connection with solicitations of proxies by the stockholder proposing such business or any Stockholder Associated Person in support of such business pursuant to the Proxy Rules; and

(iv)         such additional information that the Corporation may reasonably request regarding the business that such stockholder proposes to bring before the meeting, and

(B)             as to the stockholder giving notice and any Stockholder Associated Person, the information called for by clauses (A)(i) through (A)(xviii) of the immediately preceding paragraph (2), except that any references to nominations in such clauses shall be deemed to be references to the proposed business.

(b)         Special Meetings of Stockholders. Special meetings of the stockholders of the Corporation may be called only in the manner set forth in the Certificate of Incorporation. Only such business shall be conducted at a special meeting of stockholders as is a proper matter for stockholder action under Delaware law and as shall have been brought before the meeting pursuant to the Corporation's notice of meeting. Nominations of persons for election to the Board of Directors may be made at a special meeting of stockholders at which directors are to be elected pursuant to the Corporation's notice of meeting (1) by or at the direction of the Board of Directors or by the Secretary (solely to the extent and in the manner provided by the Certificate of Incorporation) or (2) provided that the Board of Directors has determined that directors shall be elected at such meeting, by any stockholder of the Corporation who (i) is a stockholder of record of the Corporation (and, with respect to any beneficial owner, if different, on whose behalf such nomination or nominations are made, only if such beneficial owner is the beneficial owner of shares of the Corporation) at the time the notice provided for in paragraph (b) of this Section 11

12

of ARTICLE II is delivered to the Corporation's Secretary and the record date for the determination of stockholders entitled to vote at the special meeting, (ii) is entitled to vote at the meeting and upon such election and (iii) complies with the notice procedures set forth in this paragraph (c) of this Section 11 of ARTICLE II. In the event the Corporation calls a special meeting of stockholders for the purpose of electing one or more directors to the Board of Directors, a stockholder nominating a person to be elected to the Board of Directors pursuant to the foregoing clause (2) must have given timely notice thereof in writing and in proper form.  To be timely, such notice must be delivered to or mailed and received by the Corporation's Secretary at the principal executive offices of the Corporation not earlier than the one hundred twentieth (120th) day prior to such special meeting and not later than the Close of Business on the later of the ninetieth (90th) day prior to such special meeting or the tenth (10th) day following the day on which public announcement is first made of the date of the special meeting. In no event shall any adjournment, deferral or postponement of a special meeting or the public announcement thereof commence a new time period (or extend any time period) for the giving of a stockholder's notice as described above.  To be in proper form, such notice shall include all information required pursuant to paragraph (a) of this Section 11 of ARTICLE II, and such stockholder and any Proposed Nominee shall comply with paragraph (b) of this Section 11 of ARTICLE II, as if such notice were being submitted in connection with an annual meeting of shareholders.

> (c)  <u>General</u>.

(1)  Only such persons who are nominated in accordance with the procedures set forth in this Section 11 of ARTICLE II or Section 12 of ARTICLE II shall be eligible to be elected at an annual or special meeting of stockholders of the Corporation to serve as directors and only such business shall be conducted at a meeting of stockholders as shall have been brought before the meeting in accordance with the procedures set forth in this Section 11 of ARTICLE II. Notwithstanding the foregoing provisions of this Section 11 of ARTICLE II, if the stockholder (or a qualified representative of the stockholder) submitting notice hereunder does not appear at the annual or special meeting of stockholders of the Corporation to present a nomination or proposed business, such nomination shall be disregarded and such proposed business shall not be transacted, notwithstanding that proxies in respect of such vote may have been received by the Corporation.

(2)  Notwithstanding the foregoing provisions of this Section 11 of ARTICLE II, a stockholder shall also comply with all applicable requirements of the Exchange Act and the rules and regulations thereunder with respect to the matters set forth in this Section 11 of ARTICLE II.

(3)  Nothing in this section shall be deemed to (a) affect any rights of (1) stockholders to request inclusion of proposals in the Corporation's proxy statement pursuant to Rule 14a-8 under the Exchange Act or (2) stockholders to request inclusion of nominees, (b) confer upon any stockholder a right to have a nominee or any proposed business included in the Corporation's proxy statement pursuant to  the Exchange Act and the rules and regulations thereunder or (c) affect any rights of the holders of any series of preferred

13

stock to elect directors pursuant to any applicable provisions of the Certificate of Incorporation.

(4)        The Board of the Directors or the chair of the meeting of stockholders shall, if the facts warrant, determine and declare to the meeting that a nomination was not properly made or any business was not properly brought before the meeting, as the case may be, in accordance with the provisions of this Section 11 of ARTICLE II; if the Board of Directors or the chair of the meeting should so determine, the chair of the meeting shall so declare to the meeting and any such nomination not properly made or any business not properly brought before the meeting, as the case may be, shall not be transacted, notwithstanding that proxies in respect of such vote may have been received by the Corporation.

(5)        A stockholder submitting notice pursuant to this Section 11 of ARTICLE II shall update such notice, if necessary, such that the information provided or required to be provided in such notice shall be true and correct in all material respects as of (A) the record date for determining the stockholders entitled to receive notice of the meeting and (B) the date that is ten (10) business days prior to the meeting (or any postponement, rescheduling or adjournment thereof), and such update shall (i) be received by the Secretary of the Corporation at the principal executive offices of the Corporation (x) not later than the Close of Business five (5) business days after the record date for determining the stockholders entitled to receive notice of such meeting (in the case of an update required to be made under clause (A)) and (y) not later than the Close of Business seven (7) business days prior to the date for the meeting or, if practicable, any postponement, rescheduling or adjournment thereof (and, if not practicable, on the first practicable date prior to the date to which the meeting has been postponed, rescheduled or adjourned) (in the case of an update required to be made pursuant to clause (B)), (ii) be made only to the extent that information has changed since such stockholder's prior submission and (iii) clearly identify the information that has changed in a material respect since such stockholder's prior submission. For the avoidance of doubt, any information provided pursuant to this Section 11(c)(5) shall not be deemed to cure any deficiencies or inaccuracies in a notice previously delivered pursuant to this Section 11 of ARTICLE II and shall not extend the time period for the delivery of notice pursuant to this Section 11 of ARTICLE II. If such stockholder fails to provide such written update within such period, the information as to which such written update relates may be deemed not to have been provided in accordance with this Section 11.

(6)        If any information submitted pursuant to this Section 11 of ARTICLE II by any such stockholder nominating individuals for election or reelection as a director or proposing business for consideration at a stockholder meeting shall be inaccurate in any material respect (as determined by the Board of Directors or a committee thereof), such information shall be deemed not to have been provided in accordance with this Section 11 of ARTICLE II. Any such stockholder shall notify the Secretary of the Corporation in writing at the principal executive offices of the Corporation of any material inaccuracy or change in any information submitted pursuant to this Section 11 (including if any such stockholder, beneficial owner or any Stockholder Associated Person no longer intends to solicit proxies in accordance with the representation made pursuant to this Section 11 of

14

ARTICLE II) within two (2) business days after becoming aware of such inaccuracy or change, and any such notification shall clearly identify the material inaccuracy or change, it being understood that no such notification may cure any deficiencies or inaccuracies with respect to any prior submission by such stockholder. Upon written request of the Secretary of the Corporation on behalf of the Board of Directors (or a duly authorized committee thereof), any such stockholder shall provide, within seven (7) business days after delivery of such request (or such other period as may be specified in such request), (a) written verification, reasonably satisfactory to the Board of Directors, any committee thereof or any authorized officer of the Corporation, to demonstrate the accuracy of any information submitted by such stockholder pursuant to this Section 11 of ARTICLE II and (b) a written affirmation of any information submitted by such stockholder pursuant to this Section 11 of ARTICLE II as of an earlier date. If such stockholder fails to provide such written verification or affirmation within such period, the information as to which written verification or affirmation was requested may be deemed not to have been provided in accordance with this Section 11 of ARTICLE II.

(7)        Notwithstanding anything herein to the contrary, if (A) any stockholder or any Stockholder Associated Person provides notice pursuant to Rule 14a-19(b) under the Exchange Act with respect to any Proposed Nominee and (B) (1) such stockholder or Stockholder Associated Person subsequently either (x) notifies the Corporation that such stockholder or Stockholder Associated Person no longer intends to solicit proxies in support of the election or reelection of such Proposed Nominee in accordance with Rule 14a-19(b) under the Exchange Act or (y) fails to comply with the requirements of Rule 14a-19(a)(2) or Rule 14a-19(a)(3) under the Exchange Act (or fails to timely provide reasonable evidence sufficient to satisfy the Corporation that such stockholder or Stockholder Associated Person has met the requirements of Rule 14a-19(a)(3) under the Exchange Act in accordance with the following sentence) and (2) no other stockholder or Stockholder Associated Person that has provided notice pursuant to Rule 14a-19(b) under the Exchange Act with respect to such Proposed Nominee (x) to the Corporation's knowledge based on information provided pursuant to Rule 14a-19 under the Exchange Act or these Bylaws, still intends to solicit proxies in support of the election or reelection of such Proposed Nominee in accordance with Rule 14a-19(b) under the Exchange Act and (y) has complied with the requirements of Rule 14a-19(a)(2) and Rule 14a-19(a)(3) under the Exchange Act and the requirements set forth in the following sentence, then the Corporation shall disregard any proxies solicited for the election of such nominee. Upon request by the Corporation, if any stockholder or any Stockholder Associated Person provides notice pursuant to Rule 14a-19(b) under the Exchange Act, such stockholder shall deliver to the Secretary, no later than five (5) business days prior to the applicable meeting date, reasonable evidence that the requirements of Rule 14a-19(a)(3) under the Exchange Act have been satisfied.

(8)        The number of Proposed Nominees whom a stockholder may include in a notice under this Section 11 of ARTICLE II may not exceed the number of directors to be elected at such meeting (based on public disclosure by the Corporation prior to the date of such notice), and for the avoidance of doubt, no stockholder shall be entitled to make additional or substitute nominations following the expiration of the time periods set forth in this Section 11 of ARTICLE II.

(9)          Any written notice, supplement, update or other information required to be delivered by a stockholder to the Corporation pursuant to this Section 11 of ARTICLE II must be given by personal delivery, by overnight courier or by registered or certified mail, postage prepaid, to the Secretary at the Corporation's principal executive offices and shall be deemed not to have been delivered unless so given.

(10)         For purposes of these Bylaws, (A) "Affiliate" and "Associate" each shall have the respective meanings set forth in Rule 12b-2 under the Exchange Act; (B) "beneficial owner" or "beneficially owned" shall have the meaning set forth for such terms in Section 13(d) of the Exchange Act; (C) "Close of Business" shall mean 5:00 p.m. Eastern Time on any calendar day, whether or not the day is a business day; (D) "Proxy Rules" shall mean Section 14 of the Exchange Act and the rules promulgated thereunder; (E) "public announcement" shall mean disclosure in a press release reported by Dow Jones News Service, Associated Press or a comparable national news service in the United States or in a document publicly filed by the Corporation with the Securities and Exchange Commission pursuant to Sections 13, 14 or 15(d) of the Exchange Act; (F) a "qualified representative" of a person shall mean a person who is a duly authorized officer, manager or partner of such person or has been authorized by a writing executed by such person or an electronic transmission delivered by such person to act for such person as proxy at the meeting of stockholders, which such writing or electronic transmission, or a reliable reproduction of the writing or electronic transmission, shall be produced by the qualified representative at the meeting of stockholders; and (G) a "Stockholder Associated Person" of any stockholder or beneficial owner on whose behalf such stockholder is providing notice pursuant to this Section 11 of ARTICLE II shall mean (i) any Affiliate or Associate of such stockholder (other than any such stockholder that is an Exempt Party) or beneficial owner, (ii) any beneficial owner of any stock or other securities of the Corporation owned of record by such stockholder or beneficial owner (other than any such stockholder that is an Exempt Party), (iii) any person or entity who is a member of a "group" (as such term is used in Rule 13d-5 under the Exchange Act) with such stockholder or such beneficial owner with respect to acquiring, holding, voting or disposing of any securities of the Corporation, (iv) Affiliate any participant (as defined in paragraphs (a)(ii)-(vi) of Instruction 3 to Item 4 of Schedule 14A) with such stockholder or such beneficial owner with respect to any proposed business or nominations, as applicable, under these Bylaws, and (v) any Proposed Nominee.

Section 12.Proxy Access for Director Nominations.

(a)     Proxy Access Eligibility.  Whenever the Board of Directors solicits proxies with respect to the election of directors at an annual meeting of the stockholders, subject to the provisions of this Section 12 of ARTICLE II, the Corporation shall include in its proxy statement, in addition to any persons nominated for election by the Board of Directors or any committee thereof, the name, together with the Required Information (as defined below), of any person nominated for election (the "Stockholder Nominee") to the Board of Directors by a stockholder or group of no more than twenty (20) stockholders that satisfies the requirements of this Section 12 of ARTICLE II (such stockholder or group, including each member thereof to the extent the context requires, the "Eligible Stockholder") and that expressly elects at the time of providing the notice required by this Section 12 of ARTICLE II (the "Notice of Proxy Access

16

Nomination") to have such nominee included in the Corporation's proxy materials pursuant to this Section 12 of ARTICLE II. For purposes of this Section 12 of ARTICLE II, the "Required Information" that the Corporation will include in its proxy statement is (i) the information provided to the Secretary concerning the Stockholder Nominee and the Eligible Stockholder that is required to be disclosed in the Corporation's proxy statement pursuant to the Exchange Act and the rules and regulations thereunder and (ii) if the Eligible Stockholder so elects, a Supporting Statement (as defined below). The Required Information must be provided with the Notice of Proxy Access Nomination. Nothing in this Section 12 of ARTICLE II shall limit the Corporation's ability to solicit against any Stockholder Nominee or include in its proxy materials the Corporation's own statements or other information relating to any Eligible Stockholder or Stockholder Nominee, including any information provided to the Corporation pursuant to this Section 12 of ARTICLE II.

(b)    Maximum Number of Stockholder Nominees.  The maximum number of Stockholder Nominees nominated by all Eligible Stockholders that will be included in the Corporation's proxy materials with respect to an annual meeting of the stockholders shall not exceed the greater of two (2) directors or twenty percent (20%) of the number of directors in office as of the last day on which a Notice of Proxy Access Nomination may be delivered pursuant to and in accordance with this Section 12 of ARTICLE II (the "Final Proxy Access Nomination Date") or, if such amount is not a whole number, the closest whole number below twenty percent (20%) of such number of directors.  In the event that one or more vacancies for any reason occurs on the Board of Directors after the Final Proxy Access Nomination Date but before the date of the annual meeting and the Board of Directors resolves to reduce the size of the Board of Directors in connection therewith, the maximum number of Stockholder Nominees included in the Corporation's proxy materials shall be calculated based on the number of directors in office as so reduced.  The maximum number of Stockholder Nominees provided for in this Section 12 of ARTICLE II for any annual meeting of the stockholders shall be reduced by (i) the number of directors (if any) in office as of the Final Proxy Access Nomination Date who were included in the Corporation's proxy materials as a Stockholder Nominee for any of the two (2) preceding annual meetings of the stockholders (including any individual counted as a Stockholder Nominee pursuant to the immediately succeeding sentence) and whom the Board of Directors decides to nominate for re-election to the Board of Directors at such annual meeting and (ii) the number of individuals (if any) who will be included in the Corporation's proxy statement as nominees recommended by the Board of Directors pursuant to an agreement, arrangement or other understanding with a stockholder or group of stockholders (other than any such agreement, arrangement or understanding entered into in a connection with an acquisition of capital stock from the Corporation by such stockholder or group of stockholders).  For purposes of determining when the maximum number of Stockholder Nominees provided for in this Section 12 of ARTICLE II has been reached, each of the following persons shall be counted as one of the Stockholder Nominees: (A) any individual nominated by an Eligible Stockholder for inclusion in the Corporation's proxy materials pursuant to this Section 12 of ARTICLE II whose nomination is subsequently withdrawn and (B) any individual nominated by an Eligible Stockholder for inclusion in the Corporation's proxy materials pursuant to this Section 12 of ARTICLE II whom the Board of Directors decides to nominate for election to the Board of Directors.  Any Eligible Stockholder submitting more than one Stockholder Nominee for inclusion in the Corporation's proxy materials pursuant to this Section 12 of ARTICLE II shall rank such Stockholder Nominees based on the order in which the Eligible Stockholder desires

17

such Stockholder Nominees to be selected for inclusion in the Corporation's proxy materials. In the event that the number of Stockholder Nominees submitted by Eligible Stockholders pursuant to this Section 12 of ARTICLE II exceeds the maximum number of Stockholder Nominees provided for in this Section 12 of ARTICLE II, the highest ranking Stockholder Nominee who meets the requirements of this Section 12 of ARTICLE II from each Eligible Stockholder will be selected for inclusion in the Corporation's proxy materials until the maximum number is reached, going in order of the amount (largest to smallest) of shares of stock of the Corporation each Eligible Stockholder disclosed as owned in its Notice of Proxy Access Nomination. If the maximum number is not reached after the highest ranking Stockholder Nominee who meets the requirements of this Section 12 of ARTICLE II from each Eligible Stockholder has been selected, then the next highest ranking Stockholder Nominee who meets the requirements of this Section 12 of ARTICLE II from each Eligible Stockholder will be selected for inclusion in the Corporation's proxy materials, and this process will continue as many times as necessary, following the same order each time, until the maximum number is reached.

(c)    _Required Shares and Minimum Holding Period_.  In order to make a nomination pursuant to this Section 12 of ARTICLE II, an Eligible Stockholder must have continuously owned (as hereinafter defined) for at least three (3) years as of the date the Notice of Proxy Access Nomination is delivered to the Secretary in accordance with this Section 12 of ARTICLE II (the "Minimum Holding Period") a number of shares of stock of the Corporation that represents at least three percent (3%) of the voting power of the shares of stock of the Corporation entitled to vote in the election of directors (the "Required Shares") and must continue to own the Required Shares through the date of the annual meeting.  For purposes of this Section 12 of ARTICLE II, an Eligible Stockholder shall be deemed to "own" only those outstanding shares of stock of the Corporation as to which the stockholder possesses both (1) the full voting and investment rights pertaining to the shares and (2) the full economic interest in (including the opportunity for profit from and risk of loss on) such shares, provided that the number of shares calculated in accordance with the immediately preceding clauses (1) and (2) shall not include any shares: (x) sold by such stockholder or any of its Affiliates in any transaction that has not been settled or closed, (y) borrowed by such stockholder or any of its Affiliates for any purposes or purchased by such stockholder or any of its Affiliates pursuant to an agreement to resell or (z) subject to any option, warrant, forward contract, swap, contract of sale, other derivative or similar instrument or agreement entered into by such stockholder or any of its Affiliates, whether any such instrument or agreement is to be settled with shares or with cash based on the notional amount or value of shares of outstanding stock of the Corporation, if, in any such case, such instrument or agreement has, or is intended to have, the purpose or effect of: (i) reducing in any manner, to any extent or at any time in the future, such stockholder's or its Affiliates' full right to vote or direct the voting of any such shares and/or (ii) hedging, offsetting or altering to any degree any gain or loss realized or realizable from maintaining the full economic ownership of such shares by such stockholder or Affiliate.  A stockholder shall "own" shares held in the name of a nominee or other intermediary so long as the stockholder retains the right to instruct how the shares are voted with respect to the election of directors and possesses the full economic interest in the shares.  A person's ownership of shares shall be deemed to continue during any period in which (A) the stockholder has loaned such shares, provided that the person has the power to recall such loaned shares on five (5) business days' notice or (B) the stockholder has delegated any voting power by means of a proxy, power of attorney or other instrument or arrangement which is revocable at any time by the stockholder.  The terms

18

"owned," "owning" and other variations of the word "own" shall have correlative meanings.  Whether outstanding shares of the stock of the Corporation are "owned" for these purposes shall be determined by the Board of Directors or any committee thereof.

        (d)    <u>Requirements for a Group</u>.

(1)      Whenever the Eligible Stockholder consists of a group of stockholders: (A) a group of funds under common management and control shall be treated as one stockholder, (B) each provision in this Section 12 of ARTICLE II that requires the Eligible Stockholder to provide any written statements, representations, undertakings, agreements or other instruments or to meet any other conditions shall be deemed to require each stockholder (including each individual fund that is a member of a group of funds treated as one stockholder) that is a member of such group to provide such statements, representations, undertakings, agreements or other instruments and to meet such other conditions (except that the members of such group may aggregate their shareholdings in order to meet the three percent (3%) ownership requirement of the "Required Shares" definition), (C) a breach of any obligation, agreement or representation under this Section 12 of ARTICLE II by any member of such group shall be deemed a breach by the Eligible Stockholder and (D) the Notice of Proxy Access Nomination must designate one member of the group for purposes of receiving communications, notices and inquiries from the Corporation and otherwise authorize such member to act on behalf of all members of the group with respect to all matters relating to the nomination under this Section 12 of ARTICLE II (including withdrawal of the nomination).

(2)      Whenever the Eligible Stockholder consists of a group of stockholders aggregating their shareholdings in order to meet the three percent (3%) ownership requirement of the "Required Shares" definition: (A) such ownership shall be determined by aggregating the lowest number of shares continuously owned by each such stockholder during the Minimum Holding Period and (B) the Notice of Proxy Access Nomination must indicate, for each such stockholder, such lowest number of shares continuously owned by such stockholder during the Minimum Holding Period.

(3)      Any group of funds whose shares are aggregated for purposes of constituting an Eligible Stockholder must, within five (5) business days after the date of the Notice of Proxy Access Nomination, provide documentation reasonably satisfactory to the Corporation that demonstrates that the funds are under common management and investment control.  No person may be a member of more than one group of stockholders constituting an Eligible Stockholder with respect to any annual meeting.  For the avoidance of doubt, a stockholder may withdraw from a group of stockholders constituting an Eligible Stockholder at any time prior to the annual meeting and if, as a result of such withdrawal, the Eligible Stockholder no longer owns the Required Shares, the nomination shall be disregarded.

        (e)    <u>Deadline for Notice of Proxy Access Nomination</u>.  Nominations by stockholders pursuant to this Section 12 of ARTICLE II must be made pursuant to timely notice to the Secretary of the Corporation in accordance with this Section 12 of ARTICLE II.  To be

19

timely, a Notice of Proxy Access Nomination must be delivered to or mailed and received at the principal executive offices of the Corporation not later than the Close of Business on the one hundred twentieth (120th) day nor earlier than the one hundred fiftieth (150th) day prior to the first anniversary of the date (as stated in the Corporation's proxy materials) the Corporation's definitive proxy statement was first made available to stockholders in connection with the preceding year's annual meeting (provided, however, that in the event that there was no annual meeting in the prior year or the date of the annual meeting is more than thirty (30) days before or more than seventy (70) days after such anniversary date, a Notice of Proxy Access Nomination must be so delivered not earlier than the one hundred fiftieth (150th) day prior to such annual meeting and not later than the Close of Business on the later of the one hundred twentieth (120th) day prior to such annual meeting or the tenth (10th) day following the day on which public announcement of the date of such meeting is first made by the Corporation). In no event shall any adjournment, deferral or postponement of an annual meeting or the public announcement thereof commence a new time period (or extend any time period) for the giving of a stockholder's notice as described above.

(f)    _Requirements for Notice of Proxy Access Nomination_.  To be in proper form for purposes of this Section 12 of ARTICLE II, the Notice of Proxy Access Nomination must include or be accompanied by the following:

(1)        the information and representations that would be required to be set forth in a stockholder's notice providing for the nomination of a person or persons for election as a director or directors of the Corporation pursuant to Section 11 of ARTICLE II,

(2)        such person's written consent to being named in the Corporation's proxy statement and form of proxy as a nominee and to serving as a director if elected, including a written statement of such person's intention to serve as a director for the full term for which such person is to stand for election,

(3)        in form and substance reasonably satisfactory to the Corporation, one or more written statements from the record holder of the Required Shares (and from each intermediary through which the Required Shares are or have been held during the Minimum Holding Period) verifying that the Eligible Stockholder owns, and has owned continuously for the Minimum Holding Period, the Required Shares, and the Eligible Stockholder's agreement to provide one or more written statements from the record holder and such intermediaries verifying the Eligible Stockholder's continuous ownership of the Required Shares through the record date for determining the stockholders entitled to receive notice of the annual meeting, which statements must be provided within five (5) business days after the record date,

(4)        a copy of the Schedule 14N that has been filed with the Securities and Exchange Commission as required by Rule 14a-18 under the Exchange Act,

(5)        a representation in form and substance reasonably satisfactory to the Corporation that the Eligible Stockholder: (A) will continue to hold the Required Shares through the date of the annual meeting, (B) acquired the Required Shares in the ordinary course of business and not with the intent to change or influence control at the Corporation, and

20

does not presently have such intent, (C) has not nominated and will not nominate for election to the Board of Directors at the annual meeting any person other than the Stockholder Nominee(s) it is nominating pursuant to this Section 12 of ARTICLE II, (D) has not engaged and will not engage in, and has not and will not be a "participant" in another person's, "solicitation" within the meaning of Rule 14a-1(l) under the Exchange Act in support of the election of any individual as a director at the annual meeting other than its Stockholder Nominee(s) or a nominee of the Board of Directors, (E) has not distributed and will not distribute to any stockholder of the Corporation any form of proxy for the annual meeting other than the form distributed by the Corporation, (F) has complied and will comply with all laws and regulations applicable to solicitations and the use, if any, of soliciting material in connection with the annual meeting, (G) will file with the Securities and Exchange Commission any solicitation or other communication with the Corporation's stockholders relating to the meeting at which the Stockholder Nominee will be nominated, regardless of whether any such filing is required under Regulation 14A of the Exchange Act or whether any exemption from filing is available for such solicitation or other communication under Regulation 14A of the Exchange Act and (H) has provided and will provide facts, statements and other information in all communications with the Corporation and its stockholders that are or will be true and correct in all material respects and do not and will not omit to state a material fact necessary in order to make such information, in light of the circumstances under which it was or will be made or provided, not misleading, and

(6)         an undertaking in form and substance reasonably satisfactory to the Corporation that the Eligible Stockholder agrees to: (A) assume all liability stemming from any legal or regulatory violation arising out of communications with the stockholders of the Corporation by the Eligible Stockholder, its Affiliates and associates or their respective agents and representatives, either before or after providing a Notice of Proxy Access Nomination pursuant to this Section 12 of ARTICLE II, or out of the facts, statements or other information that the Eligible Stockholder or its Stockholder Nominee(s) provided to the Corporation in connection with the inclusion of such Stockholder Nominee(s) in the Corporation's proxy materials, and (B) indemnify and hold harmless the Corporation and each of its directors, officers and employees individually against any liability, loss or damages in connection with any threatened or pending action, suit or proceeding, whether legal, administrative or investigative, against the Corporation or any of its directors, officers or employees arising out of any nomination submitted by the Eligible Stockholder pursuant to this Section 12 of ARTICLE II.

(g)         Supporting Statement.  The Eligible Stockholder may, at its option, provide to the Secretary of the Corporation, at the time the Notice of Proxy Access Nomination is provided, a written statement, not to exceed 500 words, in support of the Stockholder Nominee(s)' candidacy (a "Supporting Statement").  Only one Supporting Statement may be submitted by an Eligible Stockholder (including any group of stockholders together constituting an Eligible Stockholder) in support of its Stockholder Nominee(s).  Notwithstanding anything to the contrary contained in this Section 12 of ARTICLE II, the Corporation may omit from its proxy materials any information or Supporting Statement (or portion thereof) that it, in good faith, believes is untrue in any material respect (or omits to state a material fact necessary in

21

order to make the statements, in light of the circumstances under which they were made, not misleading) or would violate any applicable law or regulation.

(h)    Eligible Stockholder and Stockholder Nominee Duty to Update.

(1)    If any information submitted pursuant to this Section 12 of ARTICLE II shall be inaccurate in any material respect (as determined by the Board of Directors or a committee thereof), such information shall be deemed not to have been provided in accordance with this Section 12 of ARTICLE II. The Eligible Stockholder shall notify the Secretary of the Corporation in writing at the principal executive offices of the Corporation of any inaccuracy or change in any information submitted pursuant to this Section 12 within two (2) business days after becoming aware of such inaccuracy or change, and any such notification shall clearly identify the inaccuracy or change, it being understood that no such notification may cure any deficiencies or inaccuracies with respect to any prior submission by such stockholder. Upon written request of the Secretary of the Corporation on behalf of the Board of Directors (or a duly authorized committee thereof), such Eligible Stockholder shall provide, within seven (7) business days after delivery of such request (or such other period as may be specified in such request), (A) written verification, reasonably satisfactory to the Board of Directors, any committee thereof or any authorized officer of the Corporation, to demonstrate the accuracy of any information submitted by such stockholder pursuant to this Section 12 of ARTICLE II and (B) a written affirmation of any information submitted by such Eligible Stockholder pursuant to this Section 12 of ARTICLE II as of an earlier date. If such Eligible Stockholder fails to provide such written verification or affirmation within such period, the information as to which written verification or affirmation was requested may be deemed not to have been provided in accordance with this Section 12 of ARTICLE II.

(2)    The Eligible Stockholder shall update the Notice of Proxy Access Nomination, if necessary, such that the information provided or required to be provided in such Notice of Proxy Access Nomination shall be true and correct as of (A) the record date for determining the stockholders entitled to receive notice of the meeting and (B) the date that is ten (10) business days prior to the meeting (or any postponement, rescheduling or adjournment thereof), and such update shall (i) be received by the Secretary of the Corporation at the principal executive offices of the Corporation (x) not later than the Close of Business five (5) business days after the record date for determining the stockholders entitled to receive notice of such meeting (in the case of an update required to be made under clause (A)) and (y) not later than the Close of Business seven (7) business days prior to the date for the meeting or, if practicable, any postponement, rescheduling or adjournment thereof (and, if not practicable, on the first practicable date prior to the date to which the meeting has been postponed, rescheduled or adjourned) (in the case of an update required to be made pursuant to clause (B)), (ii) be made only to the extent that information has changed since such Eligible Stockholder's prior submission and (iii) clearly identify the information that has changed since the Eligible Stockholder's prior submission. For the avoidance of doubt, any information provided pursuant to this Section 12(H)(2) shall not be deemed to cure any deficiencies or inaccuracies in a notice previously delivered pursuant to this Section 12 of ARTICLE II and shall not extend the time period for the delivery of notice pursuant to this Section 12 of ARTICLE II. If such

22

Eligible Stockholder fails to provide such written update within such period, the information as to which such written update relates may be deemed not to have been provided in accordance with this Section 12.

        (i)    <u>Other Reasons to Exclude Stockholder Nominee</u>.

(1)        Notwithstanding anything to the contrary contained in this Section 12 of ARTICLE II the Corporation shall not be required to include, pursuant to this Section 12 of ARTICLE II, a Stockholder Nominee in its proxy materials: (A) for any meeting of stockholders for which the Secretary of the Corporation receives notice that the Eligible Stockholder or any other stockholder intends to nominate one or more persons for election to the Board of Directors pursuant to the advance notice requirements for stockholder nominees set forth in Section 11 of ARTICLE II of these Bylaws, (B) if such Stockholder Nominee would not be an independent director under the listing standards of each principal U.S. exchange on which the common stock of the Corporation of listed, any applicable rules of the Securities and Exchange Commission and any publicly disclosed standards used by the Board of Directors in determining and disclosing independence of the Corporation's directors, in each case as determined by the Board of Directors or any committee thereof, (C) if such Stockholder Nominee's election as a member of the Board of Directors would cause the Corporation to be in violation of these Bylaws, the Certificate of Incorporation, the rules and listing standards of the principal United States securities exchange(s) upon which the common stock of the Corporation is listed or traded or any applicable state or federal law, rule or regulation, (D) if such Stockholder Nominee is or has been, within the past three (3) years, an officer or director of a competitor, as defined in Section 8 of the Clayton Antitrust Act of 1914, (E) who is a named subject of a pending criminal proceeding (excluding traffic violations and other minor offenses) or has been convicted in such a criminal proceeding within the past ten (10) years, (F) if such Stockholder Nominee is subject to any order of the type specified in Rule 506(d) of Regulation D promulgated under the Securities Act of 1933, as amended, (G) if such Stockholder Nominee or the Eligible Stockholder who nominated such Stockholder Nominee provides any facts, statements or other information to the Corporation or its stockholders required or requested pursuant to this Section 12 of ARTICLE II that is not true and correct in all material respects or that omits a material fact necessary to make such information, in light of the circumstances in which it is made or provided, not misleading, or (H) if such Stockholder Nominee or the Eligible Stockholder who nominated such Stockholder Nominee otherwise contravenes any of the agreements or representations made by such Stockholder Nominee or Eligible Stockholder or fails to comply with its obligations pursuant to this Section 12 of ARTICLE II.

(2)        Notwithstanding anything to the contrary contained in this Section 12 of ARTICLE II, if either: (A) a Stockholder Nominee and/or the applicable Eligible Stockholder breaches any of its or their obligations, agreements or representations under this Section 12 of ARTICLE II, or (B) the Stockholder Nominee otherwise becomes ineligible for inclusion in the Corporation's proxy materials pursuant to this Section 12 of ARTICLE II or dies, becomes disabled in a manner rendering such Stockholder Nominee unable to perform the duties that would be required for a director of the Corporation or is

23

otherwise disqualified from being nominated for election or serving as a director of the Corporation, in each case under this clause (2) as determined by the Board of Directors, any committee thereof or the chair of the annual meeting, then: (i) the Corporation may omit or, to the extent feasible, remove the information concerning such Stockholder Nominee and the related Supporting Statement from its proxy materials and/or otherwise communicate to its stockholders that such Stockholder Nominee will not be eligible for election at the annual meeting, (ii) the Corporation shall not be required to include in its proxy materials for that annual meeting any successor or replacement nominee proposed by the applicable Eligible Stockholder or any other Eligible Stockholder, and (iii) the Board of Directors or the chair of the annual meeting shall declare such nomination to be invalid, such nomination shall be disregarded notwithstanding that proxies in respect of such vote may have been received by the Corporation and the named proxies will not vote any proxies received from stockholders with respect to such Stockholder Nominee.  In addition, if the Eligible Stockholder (or a representative thereof) does not appear at the annual meeting to present any nomination pursuant to this Section 12 of ARTICLE II, except to the extent required by Rule 14a-19 promulgated under the Exchange Act such nomination shall be disregarded as provided in the immediately preceding clause (iii).

(j)      <u>Resubmission of Stockholder Nominee</u>.  Any Stockholder Nominee who is included in the Corporation's proxy materials for a particular annual meeting of stockholders but either (A) withdraws from or becomes ineligible or unavailable for election at the annual meeting or (B) does not receive at least twenty five percent (25%) of the votes cast in favor of such Stockholder Nominee's election, will be ineligible to be a Stockholder Nominee pursuant to this Section 12 of ARTICLE II for the next two (2) annual meetings of the Corporation's stockholders.

(k)      <u>Exclusivity</u>.  This Section 12 of ARTICLE II provides the exclusive method for a stockholder to include nominees for election to the Board in the Corporation's proxy materials, except to the extent required by Rule 14a-19 promulgated under the Exchange Act.

Section 13. <u>Fixing a Record Date for Stockholder Meetings</u>. In order that the Corporation may determine the stockholders entitled to notice of any meeting of stockholders or any adjournment thereof, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall not be more than sixty (60) nor less than ten (10) days before the date of such meeting. If the Board of Directors so fixes a date, such date shall also be the record date for determining the stockholders entitled to vote at such meeting unless the Board of Directors determines, at the time it fixes such record date, that a later date on or before the date of the meeting shall be the date for making such determination. If no record date is fixed by the Board of Directors, the record date for determining stockholders entitled to notice of and to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held. A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board of Directors may fix a new record date for determination of stockholders entitled to vote at the adjourned meeting, and in such case shall

24

also fix as the record date for stockholders entitled to notice of such adjourned meeting the same or an earlier date as that fixed for determination of stockholders entitled to vote in accordance with the foregoing provisions of this Section 13 of ARTICLE II at the adjourned meeting.

Section 14. Fixing a Record Date for Other Purposes. In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment or any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purposes of any other lawful action, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than sixty (60) days prior to such action. If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

Section 15. Conduct of Meetings.

(a)    Generally. Meetings of stockholders shall be presided over by a chair designated by the Board of Directors, or in his or her absence, by the Chair of the Board, if any, or in the absence of the Chair of the Board, by the Chief Executive Officer, or in the absence of the Chief Executive Officer, by the President, or in the absence of the President, by the Chief Financial Officer, or in the absence of all of the foregoing, by the most senior officer of the Corporation present at the meeting. The Secretary shall act as secretary of the meeting, but in the absence of the Secretary, the chair of the meeting may appoint any person to act as secretary of the meeting.

(b)    Rules, Regulations and Procedures. The Board of Directors may adopt by resolution such rules, regulations and procedures for the conduct of any meeting of stockholders of the Corporation as it shall deem appropriate, including, without limitation, such guidelines and procedures as it may deem appropriate regarding the participation by means of remote communication of stockholders and proxyholders not physically present at a meeting. Except to the extent inconsistent with such rules, regulations and procedures as adopted by the Board of Directors, the chair of any meeting of stockholders shall have the right and authority to prescribe such rules, regulations and procedures and to do all such acts as, in the judgment of such chair, are appropriate for the proper conduct of the meeting. Such rules, regulations or procedures, whether adopted by the Board of Directors or prescribed by the chair of the meeting, may include, without limitation, the following: (i) the establishment of an agenda or order of business for the meeting; (ii) rules and procedures for maintaining order at the meeting and the safety of those present; (iii) limitations on attendance at or participation in the meeting to stockholders of record of the Corporation, their duly authorized and constituted proxies or such other persons as shall be determined; (iv) restrictions on entry to the meeting after the time fixed for the commencement thereof; (v) limitations on the time allotted to questions or comments by participants; (vi) removal of any stockholder or any other individual who refuses to comply with meeting rules, regulations or procedures; (vii) the conclusion, recess or adjournment of the meeting, regardless of whether a quorum is present, to a later date and time and at a place, if any, announced at the meeting; (viii) restrictions on the use of audio and video recording devices, cell phones and other electronic devices; (ix) rules, regulations or procedures for compliance with any state or local laws or regulations including those concerning safety, health and security; (x)

25

procedures (if any) requiring attendees to provide the Corporation advance notice of their intent to attend the meeting; and (xi) any rules, regulations or procedures as the chair may deem appropriate regarding the participation by means of remote communication of stockholders and proxyholders not physically present at a meeting, whether such meeting is to be held at a designated place or solely by means of remote communication. The Board of Directors or the chair of a stockholder meeting, in addition to making any other determinations that may be appropriate regarding the conduct of the meeting, shall determine and declare to the meeting that a matter of business was not properly brought before the meeting, and, if the Board of Directors or the chair should so determine, the chair shall so declare to the meeting and any such matter of business not properly brought before the meeting shall not be transacted or considered. Unless and to the extent determined by the Board of Directors or the chair of the meeting, meetings of stockholders shall not be required to be held in accordance with the rules of parliamentary procedure. The chair of the meeting, or his or her designee, shall announce at the meeting when the polls for each matter to be voted upon at the meeting will be opened and closed. After the polls close, no ballots, proxies or votes or any revocations or changes thereto may be accepted. The chair of the meeting shall have the power to adjourn the meeting to another place, if any, date and time or to recess the meeting.

(c)     Inspectors of Elections. The Corporation may, and to the extent required by law shall, in advance of any meeting of stockholders, appoint one or more inspectors of election to act at the meeting and make a written report thereof. One or more other persons may be designated as alternate inspectors to replace any inspector who fails to act. If no inspector or alternate is able to act at a meeting of stockholders, the chair of the meeting shall appoint one or more inspectors to act at the meeting. Unless otherwise required by law, inspectors may be officers, employees or agents of the Corporation. Each inspector, before entering upon the discharge of such inspector's duties, shall take and sign an oath faithfully to execute the duties of inspector with strict impartiality and according to the best of such inspector's ability. The inspector shall have the duties prescribed by law and shall take charge of the polls and, when the vote is completed, shall make a certificate of the result of the vote taken and of such other facts as may be required by law.

ARTICLE III.
DIRECTORS

Section 1. General Powers. Except as otherwise provided by the Certificate of Incorporation or the General Corporation Law of the State of Delaware, the business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors.  No person shall be eligible for election or appointment as a director unless such person has, within ten (10) days following any reasonable request therefor from the Board of Directors or any committee thereof, made himself or herself available to be interviewed by the Board of Directors (or any committee or other subset thereof) with respect to such person's qualifications to serve as a director or any other matter reasonably related to such person's candidacy or service as a director of the Corporation.

Section 2. Annual Meetings. Except as otherwise from time to time determined by resolution of the Board of Directors, an annual meeting of the Board of Directors shall be held

26

without other notice than this Bylaw immediately after, and at the same place (if any) as, the annual meeting of stockholders.

Section 3. <u>Regular Meetings and Special Meetings</u>. Regular meetings, other than the annual meeting, of the Board of Directors may be held without notice at such time and at such place as shall from time to time be determined by resolution of the Board of Directors. Special meetings of the Board of Directors may be called by the chair of the board, the Chief Executive Officer or the President (in either case, if such person is a director) or upon the written request of at least a majority of the directors then in office.

Section 4. <u>Notice of Meetings</u>. Notice of regular meetings of the Board of Directors need not be given except as otherwise required by law or these Bylaws. Notice of each special meeting of the Board of Directors, and of each regular and annual meeting of the Board of Directors for which notice shall be required, shall be given by the Secretary as hereinafter provided in this Section 4. Any such notice shall state the time and place of the meeting. Notice of any special meeting, and of any regular or annual meeting for which notice is required, shall be given to each director at least (a) 24 hours before the meeting, if the notice is given by telephone, by delivery in person, or sent by telex, telecopy, electronic mail or similar means, or in the case of a special meeting, on such shorter notice as the person or persons calling such meeting may deem necessary or appropriate in the circumstances, or (b) 5 days before the meeting if delivered by mail to the director's residence or usual place of business. Such notice shall be deemed to be delivered when deposited in the United States mail so addressed, with postage prepaid, or when transmitted if sent by telex, telecopy, email or similar means. Neither the business to be transacted at, nor the purpose of, any special meeting of the Board of Directors need be specified in the notice or waiver of notice of such meeting.

Section 5. <u>Chair of the Board, Quorum, Required Vote and Adjournment</u>. The Board of Directors may elect from among its ranks, by the affirmative vote of a majority of the total number of directors then in office, a Chair of the Board, who shall preside at all meetings of the Board of Directors at which he or she is present and shall have such powers and perform such duties as the Board of Directors may from time to time prescribe. If the Chair of the Board is not present at a meeting of the Board of Directors, the Lead Independent Director (if any) shall preside at such meeting, and, if the Lead Independent Director is not present at such meeting, the Chief Executive Officer shall preside at such meeting (if the Chief Executive Officer is a director and is not also Chair of the Board), and, if the Chief Executive Officer is not present at such meeting or is not a director, the President shall preside at such meeting (if the President is a director and is not also the Chair of the Board or the Chief Executive Officer), and, if the President is not present at such meeting or is not a director, a majority of the directors present at such meeting then in office shall elect one of their members to so preside. A majority of the total number of directors shall constitute a quorum for the transaction of business. Unless by express provision of an applicable law, the Certificate of Incorporation or these Bylaws a different vote is required, the vote of a majority of directors present at a meeting at which a quorum is present shall be the act of the Board of Directors. If a quorum shall not be present at any meeting of the Board of Directors, the directors present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

27

Section 6.<u>Committees</u>. The Board of Directors (i) may designate one or more committees consisting of one or more of the directors of the Corporation and (ii) shall, during such period of time as any securities of the Corporation are listed on a national securities exchange, designate all committees required by the rules and regulations of such exchange. The Board of Directors may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of such committee. Except to the extent restricted by applicable law or the Certificate of Incorporation, each such committee, to the extent provided in the resolution creating it, shall have and may exercise all the powers and authority of the Board of Directors. Each such committee shall serve at the pleasure of the Board of Directors as may be determined from time to time by resolution adopted by the Board of Directors or as required by the rules and regulations of such exchange, if applicable. Each committee shall keep regular minutes of its meetings and report the same to the Board of Directors upon request.

Section 7.<u>Committee Rules</u>. Each committee of the Board of Directors may fix its own rules of procedure and shall hold its meetings as provided by such rules, except as may otherwise be provided by a resolution of the Board of Directors designating such committee. Unless otherwise provided in such a resolution, the presence of at least a majority of the members of the committee shall be necessary to constitute a quorum. All matters shall be determined by a majority vote of the members present at a meeting at which a quorum is present. Unless otherwise provided in such a resolution, in the event that a member and that member's alternate, if alternates are designated by the Board of Directors, of such committee is or are absent or disqualified, the member or members thereof present at any meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in place of any such absent or disqualified member.

Section 8.<u>Telephonic and Other Meetings</u>. Unless restricted by the Certificate of Incorporation, any one or more members of the Board of Directors or any committee thereof may participate in and act at any meeting of the Board of Directors or such committee by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other. Participation by such means shall constitute presence in person at a meeting.

Section 9.<u>Waiver of Notice</u> . Any director may waive notice of any meeting of the Board of Directors, or any committee thereof, by a written waiver signed by the director entitled to the notice, or a waiver by electronic transmission by the director entitled to notice, whether before or after the time stated therein. Attendance of a director at a meeting of the Board of Directors, or of any committee thereof, shall constitute a waiver of notice of such meeting, except when the director attends for the express purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened.

Section 10.<u>Action by Written Consent</u>. Unless otherwise restricted by the Certificate of Incorporation, any action required or permitted to be taken at any meeting of the Board of Directors, or of any committee thereof, may be taken without a meeting if all members of the Board of Directors or such committee, as the case may be, consent thereto in writing or by

28

electronic transmission, and the writing or writings or electronic transmission or transmissions are filed with the minutes of proceedings of the Board of Directors or committee. Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

Section 11.<u>Compensation</u>. The Board of Directors shall have the authority to fix the compensation, including fees and reimbursement of expenses, of directors for services to the Corporation in any capacity.

Section 12.<u>Reliance on Books and Records</u>. A member of the Board of Directors, or a member of any committee designated by the Board of Directors shall, in the performance of such director's duties, be fully protected in relying in good faith upon records of the Corporation and upon such information, opinions, reports or statements presented to the Corporation by any of the Corporation's officers or employees, or committees of the Board of Directors, or by any other person as to matters the director reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Corporation.

Section 13.<u>Resignation</u>. Any director may resign by delivering a resignation in writing or by electronic transmission to the Corporation. Such resignation shall be effective upon delivery unless it is specified to be effective at some later time or upon the happening of some later event or events.

ARTICLE IV.
OFFICERS

Section 1.<u>Number, Titles</u>. The officers of the Corporation shall be elected by the Board of Directors and may consist of a Chief Executive Officer, a President, a Chief Financial Officer, one or more Vice Presidents, a Secretary and such other officers and assistant officers as may be deemed necessary or desirable by the Board of Directors. Any number of offices may be held by the same person, except that neither the Chief Executive Officer nor the President shall also hold the office of Secretary. In its discretion, the Board of Directors may choose not to fill any office for any period as it may deem advisable, except that the offices of Chief Executive Officer and Secretary shall be filled as expeditiously as possible.

Section 2.<u>Election and Term of Office</u>. The officers of the Corporation shall be elected annually by the Board of Directors at its first meeting held after each annual meeting of stockholders or as soon thereafter as convenient. Vacancies may be filled or new offices created and filled at any meeting of the Board of Directors. Each officer shall hold office until a successor is duly elected and qualified or until his or her earlier death, resignation, removal, disqualification, or retirement as hereinafter provided.

Section 3.<u>Removal</u>. Any officer or agent elected by the Board of Directors may be removed by the Board of Directors at its sole discretion, but such removal shall be without prejudice to the contract rights, if any, of the person so removed.

29

Section 4.<u>Vacancies</u>. Any vacancy occurring in any office because of death, resignation, removal, disqualification, retirement or otherwise may be filled by the Board of Directors.

Section 5.<u>Compensation</u>. Compensation of all executive officers shall be approved by the Board of Directors, and no officer shall be prevented from receiving such compensation by virtue of his or her also being a director of the Corporation; provided, however, that compensation of some or all executive officers may be determined by a committee established for that purpose if so authorized by the Board of Directors or as required by applicable law or any applicable rule or regulation, including any rule or regulation of any stock exchange upon which the Corporation's securities are then listed for trading.

Section 6.<u>Chief Executive Officer</u>. The Chief Executive Officer shall have, subject to the supervision, direction and control of the Board of Directors, the general powers and duties of supervision, direction, and management of the business and affairs of the Corporation, including, without limitation, all powers necessary to direct and control the organizational and reporting relationships within the Corporation. The Chief Executive Officer shall see that all orders and resolutions of the Board of Directors are carried into effect. In addition, the Chief Executive Officer shall have such other powers and perform such other duties as may be delegated to him or her by the Board of Directors or as are set forth in the Certificate of Incorporation or these Bylaws. If the Board of Directors has not elected or appointed a President or the office of the President is otherwise vacant, and no officer otherwise functions with the powers and duties of the President, then, unless otherwise determined by the Board of Directors, the Chief Executive Officer shall also have all the powers and duties of the President.

Section 7.<u>The President</u>. The President, if there is such an officer and the Board of Directors so directs, shall serve as chief operating officer and have the powers and duties customarily and usually associated with the office of chief operating officer unless the Board of Directors provides for another officer to serve as chief operating officer (or to have the powers and duties of chief operating officer). The President shall have such other powers and perform such other duties as may be delegated to him or her from time to time by the Board of Directors or the Chief Executive Officer. If the Board of Directors has not elected or appointed a Chief Executive Officer or the office of Chief Executive Officer is otherwise vacant, then, unless otherwise determined by the Board of Directors, the President shall also have all the powers and duties of the Chief Executive Officer.

Section 8.<u>Vice Presidents</u>. Each Vice President shall have the powers and duties delegated to him or her by the Board of Directors or the President. One Vice President may be designated by the Board of Directors to perform the duties and exercise the powers of the President in the event of the President's absence or disability.

Section 9.<u>The Secretary and Assistant Secretaries</u>. The Secretary shall issue all authorized notices for, and shall keep minutes of, all meetings of the stockholders and the Board of Directors. He or she shall have charge of the corporate books and shall perform other duties as the Board of Directors may from time to time prescribe.

30

Any Assistant Secretary, if there is such an officer, shall perform such duties and possess such powers as the Board of Directors, the Chief Executive Officer, President or the Secretary may from time to time prescribe. In the event of the absence, inability or refusal to act of the Secretary, the Assistant Secretary (or if there shall be more than one, the Assistant Secretaries in the order determined by the Board of Directors), shall perform the duties and exercise the powers of the Secretary.

Section 10. The Chief Financial Officer, Treasurer and Assistant Treasurers. The Chief Financial Officer shall keep or cause to be kept the books of account of the Corporation in a thorough and proper manner and shall render statements of the financial affairs of the Corporation in such form and as often as required by the Board of Directors, the Chief Executive Officer or the President. The Chief Financial Officer, subject to the order of the Board of Directors, shall have the custody of all funds and securities of the Corporation. The Chief Financial Officer shall perform other duties commonly incident to such office and shall also perform such other duties and have such other powers as the Board of Directors, the Chief Executive Officer or the President shall designate from time to time. The Chief Executive Officer or President may direct the Treasurer or any Assistant Treasurer, if there is such an officer, to assume and perform the duties of the Chief Financial Officer in the absence or disability of the Chief Financial Officer, and each Treasurer and Assistant Treasurer shall perform other duties commonly incident to such office and shall also perform such other duties and have such other powers as the Board of Directors, the Chief Executive Officer or the President shall designate from time to time.

Section 11. Other Officers, Assistant Officers and Agents. Officers, assistant officers and agents, if any, other than those whose duties are provided for in these Bylaws, shall have such authority and perform such duties as may from time to time be prescribed by resolution of the Board of Directors.

Section 12. Delegation of Authority. The Board of Directors may by resolution delegate the powers and duties of such officer to any other officer or to any director, or to any other person whom it may select.

Section 13. Officers' Bonds or Other Security. If required by the Board of Directors, any officer of the Corporation shall give a bond or other security for the faithful performance of his duties, in such amount and with such surety as the Board of Directors may require.

Section 14. Absence or Disability of Officers. In the case of the absence or disability of any officer of the Corporation and of any person hereby authorized to act in such officer's place during such officer's absence or disability, the Board of Directors may by resolution delegate the powers and duties of such officer to any other officer or to any director, or to any other person selected by it.

ARTICLE V.
STOCK

Section 1. Uncertificated Shares; Certificated Shares. The shares of stock of the Corporation shall be uncertificated, provided that the Board of Directors of the Corporation may

31

provide by resolution or resolutions that some or all of any or all classes or series of its stock shall be represented by certificates. Any such resolution shall not apply to shares represented by a certificate until such certificate is surrendered to the Corporation. Every holder of stock represented by certificates shall be entitled to have a certificate signed by, or in the name of the Corporation by, (i) the Chair of the Board, or the President or Vice President and (ii) the Treasurer or an Assistant Treasurer, or the Secretary or an Assistant Secretary. Any or all signatures on any such certificate may be a facsimile. In case any officer, transfer agent or registrar who has signed, whose facsimile signature has been used on or who has duly affixed a facsimile signature or signatures to any such certificate or certificates shall cease to be such officer, transfer agent or registrar of the Corporation whether because of death, resignation or otherwise before such certificate or certificates have been issued by the Corporation, such certificate or certificates may nevertheless be issued as though the person or persons who signed such certificate or certificates, whose facsimile signature or signatures have been used thereon or who duly affixed a facsimile signature or signatures thereon had not ceased to be such officer, transfer agent or registrar of the Corporation.

Section 2. Transfers of Stock. Transfers of shares of stock of the Corporation shall be made only on the stock record of the Corporation by the holder of record thereof or by his, her or its attorney thereunto authorized by the power of attorney duly executed and filed with the Secretary of the Corporation or the transfer agent thereof. Certificated shares, if any, shall be transferred only upon surrender of the certificate or certificates representing such shares, properly endorsed or accompanied by a duly executed stock transfer power. Uncertificated shares shall be transferred by delivery of a duly executed stock transfer power. Registration of transfer of any shares shall be subject to applicable provisions of the Certificate of Incorporation and applicable law with respect to the transfer of such shares. The Board of Directors may make such additional rules and regulations as it may deem expedient concerning the issue and transfer of shares of stock of the Corporation.

Section 3. Transfer Agent. The Board of Directors may appoint a bank or trust company organized under the laws of the United States or any state thereof to act as its transfer agent or registrar, or both in connection with the transfer of any class or series of securities of the Corporation.

Section 4. Lost, Stolen or Destroyed Certificates. The Corporation may issue or direct a new certificate or certificates or uncertificated shares to be issued in place of any certificate or certificates previously issued by the Corporation alleged to have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the person claiming the certificate of stock to be lost, stolen or destroyed. When authorizing such issue of a new certificate or certificates, or of uncertificated shares, the Corporation may, in its discretion and as a condition precedent to the issuance thereof, require the owner of such lost, stolen or destroyed certificate or certificates, or his or her legal representative, to give the Corporation a bond sufficient to indemnify the Corporation against any claim that may be made against the Corporation on account of the loss, theft or destruction of any such certificate or the issuance of such new certificate or uncertificated shares.

Section 5. Registered Stockholders. The Corporation shall be entitled to recognize the exclusive right of a person registered on its records as the owner of shares of stock of the

32

Corporation to receive dividends, to vote, to receive notifications and otherwise to exercise all the rights and powers of an owner of such shares. The Corporation shall not be bound to recognize any equitable or other claim to or interest in any such shares of stock on the part of any other person, whether or not it shall have express or other notice thereof, except as otherwise provided by the laws of the State of Delaware.

## ARTICLE VI.
## GENERAL PROVISIONS

Section 1. <u>Dividends</u>. Subject to the provisions of the Certificate of Incorporation, dividends upon the shares of capital stock of the Corporation may be declared by the Board of Directors in accordance with applicable law. Dividends may be paid in cash, in property, in shares of the capital stock or in any combination thereof, subject to the provisions of applicable law and the Certificate of Incorporation. Before payment of any dividend, there may be set aside out of any funds of the Corporation available for dividends such sum or sums as the Board of Directors from time to time, in its absolute discretion, think proper as a reserve or reserves to meet contingencies, or for equalizing dividends, or for repairing or maintaining any property of the Corporation or for such other purpose as the Board of Directors may think conducive to the interests of the Corporation. The Board of Directors may modify or abolish any such reserves in the manner in which it was created.

Section 2. <u>Contracts</u>. In addition to the powers otherwise granted to officers pursuant to ARTICLE IV hereof, the Board of Directors may authorize any officer or officers, or any agent or agents, in the name and on behalf of the Corporation to enter into or execute and deliver any and all deeds, bonds, mortgages, contracts and other obligations or instruments, and such authority may be general or confined to specific instances.

Section 3. <u>Fiscal Year</u>. The fiscal year of the Corporation shall be fixed by resolution of the Board of Directors.

Section 4. <u>Corporate Seal</u>. The Board of Directors may provide a corporate seal which shall be in the form as the Board of Directors shall from time to time determine. The seal may be used by causing it or a facsimile thereof to be impressed or affixed or reproduced or otherwise. Notwithstanding the foregoing, no seal shall be required by virtue of this section.

Section 5. <u>Voting Securities Owned By Corporation</u>. Voting securities in any other corporation held by the Corporation shall be voted (or consents in writing may be provided in respect thereof) by the Chief Executive Officer, the President, the Chief Financial Officer, the Treasurer, the Secretary or any Vice President, unless the Board of Directors specifically confers authority to vote (or express consent in writing) with respect thereto, which authority may be general or confined to specific instances, upon some other person or officer. Any person authorized to vote or express consent with respect to such securities shall have the power to appoint proxies, with general power of substitution.

Section 6. <u>Inspection of Books and Records</u>. The Board of Directors shall have power from time to time to determine to what extent and at what times and places and under what conditions and regulations the accounts and books of the Corporation, or any of them, shall

33

be open to the inspection of the stockholders; and no stockholder shall have any right to inspect any account or book or document of the Corporation, except as conferred by the laws of the State of Delaware.

Section 7.<u>Time Periods</u>. Unless otherwise provided by applicable law, in applying any provision of these Bylaws which requires that an act be done or not be done a specified number of days prior to an event or that an act be done during a period of a specified number of days prior to an event, calendar days shall be used, the day of the doing of the act shall be excluded and the day of the event shall be included.

Section 8.<u>Section Headings</u>. Section headings in these Bylaws are for convenience of reference only and shall not be given any substantive effect in limiting or otherwise construing any provision herein.

Section 9.<u>Inconsistent Provisions</u>. In the event that any provision of these Bylaws is or becomes inconsistent with any provision of the Certificate of Incorporation, the General Corporation Law of the State of Delaware or any other applicable law, the provision of these Bylaws shall not be given any effect to the extent of such inconsistency but shall otherwise be given full force and effect.

ARTICLE VII.
<u>GENERAL PROVISIONS</u>

Section 1.<u>Right to Indemnification</u>. Each person who was or is made a party or is threatened to be made a party to or is otherwise involved (including involvement, without limitation, as a witness) in any actual or threatened action, suit or proceeding, whether civil, criminal, administrative or investigative (a "proceeding"), by reason of the fact that such person is or was a director or officer of the Corporation or, while a director or officer of the Corporation, is or was serving at the request of the Corporation as an employee or agent of the Corporation or as a director, officer, partner, member, trustee, administrator, employee or agent of another corporation or of a partnership, joint venture, limited liability company, trust or other enterprise, including service with respect to an employee benefit plan (an "indemnitee"), whether the basis of such proceeding is alleged action in an official capacity as a director or officer or in any other capacity while serving as a director or officer, shall be indemnified and held harmless by the Corporation to the fullest extent authorized by the General Corporation Law of the State of Delaware, as the same exists or may hereafter be amended, against all expense, liability and loss (including attorneys' fees and related disbursements, judgments, fines, excise taxes or penalties under the Employee Retirement Income Security Act of 1974, as amended from time to time ("ERISA"), and any other penalties and amounts paid or to be paid in settlement) reasonably incurred or suffered by such indemnitee in connection therewith and such indemnification shall continue as to an indemnitee who has ceased to be a director or officer of the Corporation (or has ceased to serve, at the request of the Corporation, as an employee or agent of the Corporation or as a director, officer, partner, member, trustee, administrator, employee or agent of another corporation or of a partnership, joint venture, limited liability company, trust or other enterprise, including service with respect to an employee benefit plan) and shall inure to the benefit of the indemnitee's heirs, executors and administrators; provided, however, that, except as provided in Section 2 of this ARTICLE VII with respect to proceedings to enforce rights to indemnification

34

or advancement of expenses, the Corporation shall indemnify any such indemnitee in connection with a proceeding (or part thereof) initiated by such indemnitee only if such proceeding (or part thereof) was authorized in the first instance by the Board of Directors of the Corporation. The right to indemnification conferred in this Section 1 of this ARTICLE VII shall be a contract right and shall include the obligation of the Corporation to pay the expenses incurred in defending any such proceeding in advance of its final disposition (an "advancement of expenses"); provided, however, that an advancement of expenses incurred by an indemnitee shall be made only upon delivery to the Corporation of an undertaking (an "undertaking"), by or on behalf of such indemnitee, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal (a "final adjudication") that such indemnitee is not entitled to be indemnified for such expenses under this Section 1 or otherwise. The Corporation may, by action of its Board of Directors, provide indemnification and advancement of expenses to employees and agents of the Corporation with the same or lesser scope and effect as the foregoing indemnification and advancement of expenses of directors and officers.

Section 2. Procedure for Indemnification. If a claim for indemnification under this Article VII (which may only be made following the final disposition of such proceeding) is not paid in full within sixty days after the Corporation has received a claim therefor by the indemnitee, or if a claim for any advancement of expenses under this Article VII is not paid in full within thirty days after the Corporation has received a statement or statements requesting such amounts to be advanced (provided that the indemnitee has delivered the undertaking contemplated by Section 1 of this Article VII), the indemnitee shall thereupon (but not before) be entitled to file suit to recover the unpaid amount of such claim. Such person's costs and expenses incurred in connection with successfully establishing his or her right to indemnification, in whole or in part, in any such action shall also be indemnified by the Corporation to the fullest extent permitted by law. It shall be a defense to any action by a director or officer for indemnification or the advancement of expenses (other than an action brought to enforce a claim for the advancement of expenses where the undertaking required pursuant to Section 2 of this ARTICLE VII, if any, has been tendered to the Corporation) that the claimant has not met the standards of conduct which make it permissible under the General Corporation Law of the State of Delaware for the Corporation to indemnify the claimant for the amount claimed, but the burden of proving such defense shall be on the Corporation. Neither the failure of the Corporation (including its directors, a committee thereof, independent legal counsel or its stockholders) to have made a determination prior to the commencement of such action that indemnification of the claimant is proper in the circumstances because such person has met the applicable standard of conduct set forth in the General Corporation Law of the State of Delaware, nor an actual determination by the Corporation (including its directors, a committee thereof, independent legal counsel or its stockholders) that the claimant has not met such applicable standard of conduct, shall be a defense to the action or create a presumption that the claimant has not met the applicable standard of conduct. The procedure for indemnification of other employees and agents of the Corporation for whom indemnification and advancement of expenses is provided pursuant to Section 1 of this ARTICLE VII shall be the same procedure set forth in this Section 2 for directors or officers of the Corporation, unless otherwise set forth in the action of the Board of Directors providing indemnification and advancement of expenses for such employees or agents of the Corporation.

35

Section 3.<u>Insurance</u>. The Corporation may purchase and maintain insurance on its own behalf and on behalf of any person who is or was or has agreed to become a director, officer, employee or agent of the Corporation or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, including service with respect to an employee benefit plan, against any expense, liability or loss asserted against him or her and incurred by him or her in any such capacity, or arising out of his or her status as such, whether or not the Corporation would have the power to indemnify such person against such expenses, liability or loss under the General Corporation Law of the State of Delaware.

Section 4.<u>Service for Subsidiaries</u>. Any person serving as a director, officer, employee or agent of another corporation, partnership, limited liability company, joint venture or other enterprise, at least 50% of whose equity interests are owned directly or indirectly by the Corporation (a "subsidiary" for this ARTICLE VII) shall be conclusively presumed to be serving in such capacity at the request of the Corporation.

Section 5.<u>Reliance</u>. Persons who after the date of the adoption of this provision become or remain directors or officers of the Corporation or who, while a director or officer of the Corporation, become or remain a director, officer, employee or agent of a subsidiary, shall be conclusively presumed to have relied on the rights to indemnification, advancement of expenses and other rights contained in this ARTICLE VII in entering into or continuing such service. The rights to indemnification and to the advancement of expenses conferred in this ARTICLE VII shall apply to claims made against an indemnitee arising out of acts or omissions which occurred or occur both prior and subsequent to the adoption hereof.

Section 6.<u>Other Rights; Continuation of Rights to Indemnification</u>. The rights to indemnification and to the advancement of expenses conferred in this ARTICLE VII shall not be exclusive of any other right which any person may have or hereafter acquire under the Certificate of Incorporation, these Bylaws or under any statute, agreement, vote of stockholders or disinterested directors or otherwise. All rights to indemnification and to the advancement of expenses under this ARTICLE VII shall be deemed to be a contract between the Corporation and each indemnitee who serves or served in such capacity at any time while this ARTICLE VII is in effect. Any repeal or modification of this ARTICLE VII or any repeal or modification of relevant provisions of the General Corporation Law of the State of Delaware or any other applicable laws shall not in any way diminish any rights to indemnification and advancement of expenses of such indemnitee or the obligations of the Corporation arising hereunder with respect to any proceeding arising out of, or relating to, any actions, transactions or facts occurring prior to the final adoption of such repeal or modification.

Section 7.<u>Merger or Consolidation</u>. For purposes of this ARTICLE VII, references to the "Corporation" shall include, in addition to the resulting or surviving corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers and employees or agents, so that any person who is or was a director, officer, employee or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, shall stand in the same position

under this ARTICLE VII with respect to the resulting or surviving corporation as he or she would have with respect to such constituent corporation if its separate existence had continued.

Section 8. Savings Clause. If this ARTICLE VII or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Corporation shall nevertheless indemnify and advance expenses to each person entitled to indemnification or advancement of expenses under Section 1 of this ARTICLE VII as to all expense, liability and loss (including attorneys' fees and related disbursements, judgments, fines, ERISA excise taxes and penalties, and any other penalties and amounts paid or to be paid in settlement) actually and reasonably incurred or suffered by such person and for which indemnification or advancement of expenses is available to such person pursuant to this ARTICLE VII to the fullest extent permitted by any applicable portion of this ARTICLE VII that shall not have been invalidated and to the fullest extent permitted by applicable law.

ARTICLE VIII.
EMERGENCY BYLAWS

Section 1. Emergency Bylaws. This Article VIII shall be operative during any emergency, disaster or catastrophe, as referred to in Section 110 of the General Corporation Law of the State of Delaware or other similar emergency condition (including a pandemic), as a result of which a quorum of the Board of Directors or a committee thereof cannot readily be convened for action (each, an "Emergency"), notwithstanding any different or conflicting provision in the preceding Sections of these Bylaws or in the Certificate of Incorporation.  To the extent not inconsistent with the provisions of this Article VIII, the preceding sections of these Bylaws and the provisions of the Certificate of Incorporation shall remain in effect during such Emergency, and upon termination of such Emergency, the provisions of this Article VIII shall cease to be operative unless and until another Emergency shall occur.

Section 2. Meetings; Notice.  During any Emergency, a meeting of the Board of Directors or any committee thereof may be called by any member of the Board of Directors or such committee or the Chair of the Board, the Chief Executive Officer, the President or the Secretary of the Corporation.  Notice of the place, date and time of the meeting shall be given by any available means of communication by the person calling the meeting to such of the directors or committee members and Designated Officers (as defined below) as, in the judgment of the person calling the meeting, it may be feasible to reach.  Such notice shall be given at such time in advance of the meeting as, in the judgment of the person calling the meeting, circumstances permit.

Section 3. Quorum.  At any meeting of the Board of Directors called in accordance with Section 2 of this Article VIII, the presence or participation of three (3) directors shall constitute a quorum for the transaction of business, and at any meeting of any committee of the Board of Directors called in accordance with Section 2 of this Article VIII, the presence or participation of one (1) committee member shall constitute a quorum for the transaction of business.  In the event that no directors are able to attend a meeting of the Board of Directors or any committee thereof, then the Designated Officers in attendance shall serve as directors, or committee members, as the case may be, for the meeting, without any additional quorum

37

requirement and will have full powers to act as directors, or committee members, as the case may be, of the Corporation.

Section 4.<u>Liability</u>.  No officer, director or employee of the Corporation acting in accordance with the provisions of this <u>Article VIII</u> shall be liable except for willful misconduct.

Section 5.<u>Amendments</u>.  At any meeting called in accordance with Section 2 of this Article VIII, the Board of Directors, or any committee thereof, as the case may be, may modify, amend or add to the provisions of this <u>Article VIII</u> as it deems it to be in the best interests of the Corporation and as is practical or necessary for the circumstances of the Emergency.

Section 6.<u>Repeal or Change</u>.  The provisions of this <u>Article VIII</u> shall be subject to repeal or change by further action of the Board of Directors or by action of the stockholders, but no such repeal or change shall modify the provisions of Section 4 of this Article VIII with regard to action taken prior to the time of such repeal or change.

Section 7.<u>Definitions</u>.  For purposes of this <u>Article VIII</u>, the term "Designated Officer" means an officer identified on a numbered list of officers of the Corporation who shall be deemed to be, in the order in which they appear on the list up until a quorum is obtained, directors of the Corporation, or members of a committee of the Board of Directors, as the case may be, for purposes of obtaining a quorum during an Emergency, if a quorum of directors or committee members, as the case may be, cannot otherwise be obtained during such Emergency, which officers have been designated by the Board of Directors from time to time but in any event prior to such time or times as an Emergency may have occurred.

ARTICLE IX.
<u>AMENDMENTS</u>

These Bylaws may be amended, altered, changed or repealed or new Bylaws adopted only in accordance with Article Nine, Section 2 of the Certificate of Incorporation.

38

**Exhibit 4.1**

DESCRIPTION OF THE REGISTRANT'S SECURITIES REGISTERED PURSUANT TO SECTION 12 OF THE SECURITIES EXCHANGE ACT OF 1934

Burlington Stores, Inc. ("Burlington" or the "Company") has one class of securities registered under Section 12 of the Securities Exchange Act of 1934, as amended: our Common Stock, par value $0.0001 per share (the "Common Stock").

The following description of our Common Stock is a summary of certain key terms and does not purport to be complete. It is subject to and qualified in its entirety by reference to our Amended and Restated Certificate of Incorporation (the "Certificate of Incorporation") and our Amended and Restated Bylaws (the "Bylaws"), each of which is incorporated by reference as an exhibit to the Annual Report on Form 10-K of which this Exhibit 4.1 is a part.

**General**

Under our Certificate of Incorporation, Burlington is authorized to issue up to 500,000,000 shares of our Common Stock and up to 50,000,000 shares of preferred stock, par value $0.0001 per share (the "Preferred Stock"). The outstanding shares of our Common Stock are fully paid and non-assessable.

**Description Of Common Stock**

***No Preemptive, Redemption or Conversion Rights***

Our Common Stock is not redeemable, is not subject to sinking fund provisions, does not have any conversion rights and is not subject to call. Holders of shares of Common Stock do not have preemptive rights to acquire newly issued shares.

***Voting Rights***

We have one class of stock outstanding, our Common Stock, all holders of which have one vote per share in all elections of directors and on all other matters submitted to a vote of stockholders of Burlington. Holders of shares of Common Stock do not have cumulative voting rights. Directors elected at a meeting of stockholders are elected by the vote of the majority of the votes cast by shares present in person, present by means of remote communication, if any, or represented by proxy at the meeting and entitled to vote thereon, provided that in any contested election of directors the directors shall be elected by a plurality of the shares present in person, present by means of remote communication, if any, or represented by proxy and entitled to vote thereon. All other matters submitted to a vote of stockholders are decided by the affirmative vote of a majority of the voting power of the shares present in person, present by means of remote communication, if any, or represented by proxy at the meeting and entitled to vote thereon, unless the matter is one upon which a different vote is required by express provision of law or regulation, rules or regulations of any applicable stock exchange, our Certificate of Incorporation or our Bylaws.

***Board of Directors***

Subject to any rights of the holders of any series of Preferred Stock to elect additional directors under specified circumstances, our Board is divided into three classes as nearly equal in size as is practicable. Each of the three classes of directors serves a staggered three-year term.

In 2024, the Company's stockholders approved an amendment to our Certificate of Incorporation to declassify the Board in phases and provide for the annual election of the entire Board for one-year terms, such that the Board will be fully declassified by the 2027 Annual Meeting of Stockholders (the "Declassification Amendment").

Vacancies on the Board may be filled by persons elected by a majority of the remaining directors. A director elected to fill a vacancy shall be elected for the unexpired term of his or her predecessor in office, and a director chosen to fill a position resulting from an increase in the number of directors shall hold office until the next annual meeting of stockholders and until his or her successor is duly elected and qualified, or his or her earlier death, resignation, removal or retirement.

In each case, a director will continue to hold office until such director's successor has been duly elected and qualified or until his or her earlier death, resignation, removal or retirement.

### *Dividend Rights*

Subject to the rights of the holders of any series of Preferred Stock and other provisions of the Certificate of Incorporation, holders of Common Stock are entitled to receive equally, on a per share basis, dividends and other distributions in cash, securities or other property of the Company, if any, as and when declared by our Board of Directors from time to time out of assets or funds of the Company legally available therefor.

### *Liquidation, Dissolution or Similar Rights*

Upon liquidation, dissolution or winding up of the affairs of Burlington, after payment of the Company's debts and subject to the rights of the holders of shares of any series of Preferred Stock upon such dissolution, liquidation or winding up, the remaining net assets of the Company would be distributed among holders of shares of Common Stock equally on a per share basis.

### Preferred Stock

Under our Certificate of Incorporation, without further stockholder action, our Board of Directors is authorized to provide for the issuance of all or any of the shares of Preferred Stock in one or more series, to establish the number of shares to be included in each such series, and to fix the voting powers (full, limited or no voting powers), designations, powers, preferences, and relative, participating, optional or other rights, if any, and any qualifications, limitations or restrictions thereof. The rights of the holders of our Common Stock are subject to, and may be adversely affected by, the rights of the holders of shares of any series of Preferred Stock that we may designate and issue in the future.

### Anti-Takeover Effects of Provisions of our Certificate of Incorporation and Bylaws

Our Certificate of Incorporation and Bylaws contain provisions that, in addition to being applicable in other contexts, could delay or discourage some transactions involving an actual or potential change in control of Burlington or its management. For example, our Certificate of Incorporation and Bylaws contain certain anti-takeover provisions, which:

- authorize the issuance of Preferred Stock as described above;

- prohibit stockholder action by written consent, requiring all stockholder actions be taken at a meeting of our stockholders;

- establish advance notice requirements for nominations for elections to our Board of Directors or for proposing matters that can be acted upon by stockholders at stockholder meetings;

- establish a classified Board of Directors as described above, which will be phased out by the time of the 2027 Annual Meeting of Stockholders, in accordance with the Declassification Amendment;

- until the 2027 Annual Meeting of Stockholders, limit the ability of stockholders to remove directors only for cause and only upon the affirmative vote of at least 75% of the voting power of all outstanding shares of capital stock entitled to vote generally in the election of directors, voting together as a single class. Beginning with the 2027 Annual Meeting of Stockholders, when the Board will no longer be classified, directors may be removed with or without cause as required by Delaware law;

- prohibit stockholders from calling special meetings of stockholders;

- provide that the Board of Directors is expressly authorized to alter or repeal our Bylaws; and

- require the approval of holders of at least 75% of the voting power of all outstanding shares of capital stock of the Company entitled to vote generally in the election of directors, voting together as a single class to amend the Bylaws and certain provisions of the Certificate of Incorporation.



**Exhibit 19.1**

<span style="color:red">**Statement of Policy Concerning Securities Trading**</span>

## PURPOSE

This Statement of Policy Concerning Securities Trading (the "Policy") provides guidelines with respect to transactions in the securities of Burlington Stores, Inc. (the "Company"). This Policy is intended to promote compliance with laws that prohibit certain persons who are aware of material non-public information about a company from: (i) trading in securities of that company; or (ii) providing material non-public information to other persons who may trade on the basis of that information.

## POLICY REQUIREMENTS

All Company personnel are required to comply with applicable law and this Policy, which may be broader and may prohibit conduct that is permitted by applicable law. Compliance with this Policy is required of all "corporate personnel" of the Company. The term "corporate personnel" means:

A.   all associates (both salaried and non-salaried) based in the Company's corporate or buying offices;

B.   all field, distribution center and store operations associates (both salaried and non-salaried) who are included on the corporate payroll;

C.   all members of the Company's Board of Directors; and

D.   such other persons the Company may from time to time determine should be subject to this Policy, such as contractors or consultants, who may have access to material, non-public information.

This Policy applies to family members of corporate personnel who reside with them (including a spouse, a child, a child away at college, stepchildren, grandchildren, parents, stepparents, grandparents, siblings and in-laws), anyone else who lives in their household, and any family members who do not live in their household but whose transactions in Company securities are directed by them or are subject to their influence or control, such as parents or children who consult with them before trading in the Company's securities (collectively referred to as "Family Members"). This Policy also applies to any entities that are influenced or controlled by any corporate personnel, including any corporations, partnerships or trust. Corporate personnel are responsible for both ensuring that these other persons or entities comply with this Policy and for the transactions of these other persons or entities and, as a result, corporate personnel should treat all such transactions for the purposes of this Policy and applicable securities laws as if the transactions were for their own account.

This Policy applies to transactions in the Company's securities, including the Company's common stock (currently traded on the New York Stock Exchange), options to purchase common stock, restricted stock units, or any other type of securities that the Company may issue, including (but not limited to) preferred stock, convertible notes and warrants, as well as derivative securities that are not issued by the Company, such as exchange-traded put or call options or swaps relating to the Company's securities. Transactions subject to this Policy also include gifts of Company securities, which may include gifts to trusts for estate planning purposes, as well as donations to a charitable organization.

This Policy should not be interpreted to modify any agreements the Company and corporate personnel may have entered into regarding the disclosure of confidential information.



1. <u>**Prohibition Against Trading and Tipping While Aware of Material, Non-Public Information**</u>.

Generally, it is illegal and a violation of this Policy to trade in securities of the Company or any other entity while you are in possession of material non-public information about the Company or that entity. It also violates Company policy for any corporate personnel in possession of material, non-public information regarding the Company to communicate such material, non-public information to another person who might be expected to trade while in possession of such information or to recommend that another person buy or sell the Company's securities. In all cases, the responsibility for determining whether an individual is in possession of material non-public information rests with that individual, and any action on the part of the Company or any associate pursuant to this Policy (or otherwise) does not in any way constitute legal advice or insulate an individual from liability under applicable securities laws.

A. *Material Information.* Information is <u>material</u> if it could reasonably affect a reasonable person's investment decision whether to buy, sell or hold the Company's securities. Any information that could be expected to affect the Company's stock price, whether it is positive or negative, should be considered material. Although it is not possible to list all types of information that might be deemed material under particular circumstances, information concerning the following subjects is often found material: (i) sales or operating results, internal forecasts or budgets; (ii) projections of future earnings or losses, or other earnings guidance, as well as changes to previously announced earnings guidance, or the decision to suspend earnings guidance; (iii) significant acquisitions or dispositions (including mergers, tender offers and asset purchase or sale transactions); (iv) major product changes or introductions; (v) special dividends or changes in dividend policy, the declaration of a stock split or an offering of additional securities; (vi) changes in debt ratings; (vii) significant write-downs of assets or additions to reserves for bad debts or contingent liabilities; (viii) liquidity problems; (ix) significant management developments or changes; (x) significant financing transactions or unannounced Company share repurchase programs; (xi) major corporate, distribution center or field reorganizations; (xii) significant litigations or governmental investigations (or the resolution of such litigations or investigations); and (xiii) a significant cybersecurity incident, such as a data breach, or any other significant disruption in the Company's operations or loss, potential loss, breach or unauthorized access of its property or assets, whether at its facilities or through its information technology infrastructure.

There is no bright-line standard for assessing materiality; rather, materiality is based on an assessment of all of the facts and circumstances, and is often evaluated by enforcement authorities with the benefit of hindsight, so caution should be exercised. Any questions in this area should be directed to the Company's General Counsel or Assistant General Counsel.

B. *Non-Public Information.* Information is <u>non-public</u> if it has not been disclosed to the public. Even after disclosure has been made, the Company does not consider information to be sufficiently absorbed by the market until the second business day after it has been disclosed by means likely to result in widespread public awareness through, for example, filings with the Securities and Exchange Commission ("SEC"), press releases or publicly accessible conference calls (by way of example and for purposes of clarification, if the Company were to release quarterly results on a Thursday, such information would be considered "public" under this Policy as of the following Monday).

C. *Applicability Following Termination.* This Policy continues to apply to transactions in Company securities even after termination of employment or other service to the Company or a subsidiary. If corporate personnel are aware of material, non-public information when their employment or service relationship terminates, they may not trade in Company securities until that information becomes public or is no longer material. If termination of employment or other service of corporate personnel occurs during a blackout period (as defined in this Policy), such corporate personnel may not trade in Company securities until the opening of the next Window Period, when the pre-clearance procedures specified in Section 2 below will also cease to apply.



2. **Window Periods and Additional Procedures**.

It is not permissible for any corporate personnel to engage in any transaction in the Company's securities unless such transaction complies with applicable securities law and, except as noted in Section 3 below, occurs inside a period in which transactions are permitted (a "Window Period"). Any period of time during which transactions are not permitted is referred to as a "blackout period."

A. *Quarterly Window Period*. The "Window Period" generally means the period beginning on the second business day following the release of the Company's quarterly or annual financial results (e.g., if the Company releases results on a Thursday, the Window Period would open on the following Monday) and ending approximately fifteen (15) business days later. However, it is anticipated that any Window Period following the release of earnings for the Company's third fiscal quarter will be shorter. Window Period open and end dates will be announced each quarter via internal Company communication channels.

The Company reserves the right to delay opening, close or not open a Window Period at any time if events or circumstances indicate that taking such action is prudent. In such event, the Company will inform corporate personnel accordingly but may not disclose the reason for such delay or closure. If corporate personnel are informed of such delay or closure, the existence of such delay or closure should not be disclosed to any other person, as it may be considered material, non-public information. A person in possession of material, non-public information about the Company may not engage in any transaction involving the Company's securities either outside or inside the Window Period.

B. *Additional Procedures*. The Company has established additional procedures to assist the Company in the administration of this Policy, to facilitate compliance with laws prohibiting insider trading while in possession of material, non-public information, and to avoid the appearance of any impropriety. These additional procedures are applicable only to members of the Company's Board of Directors ("directors"), officers subject to Section 16 of the Exchange Act ("officers") and any additional persons designated from time to time by the Company's General Counsel (collectively, the "Pre-Clearance Individuals"), as well as the Family Members of Pre-Clearance Individuals. It is not permissible for any Pre-Clearance Individual to engage in any transaction in the Company's securities without such individual first obtaining pre-clearance of the transaction from the General Counsel (or his or her designee), or, if the transaction involves the General Counsel, from the Chief Executive Officer or the Chief Financial Officer. The officer providing such pre-clearance is referred to herein as the "Pre-Clearance Officer." A request for pre-clearance should be submitted to the Pre-Clearance Officer in advance of the proposed transaction. However, the Pre-Clearance Officer is under no obligation to approve, and may determine not to permit, any transaction submitted for pre-clearance, even if the transaction falls inside a "Window Period." If pre-clearance is denied, such denial must be kept confidential by the person requesting pre-clearance. If pre-clearance is granted, it remains the responsibility of the corporate personnel seeking pre-clearance to ensure that he or she is not in possession of material non-public information. Unless earlier revoked, pre-clearance of a transaction is valid for three business days. If the transaction is not executed within that time, the person requesting pre-clearance must request pre-clearance again.

From time to time, an event may occur that is material to the Company and is known only by certain parties. So long as the event remains material and non-public, individuals designated by the Pre-Clearance Officer may not trade in the Company's securities. The existence of an event-specific blackout will not be announced. If, however, a person whose trades are subject to pre-clearance requests permission to trade in the Company's securities during an event-specific blackout, the Pre-Clearance Officer will inform the requester of the existence of a blackout period, without disclosing the reason for the blackout. Any person made aware of the existence of an event-specific blackout should not disclose the existence of the blackout to any other person. The failure of the Pre-Clearance Officer to designate a person as being subject to an event-specific blackout will not relieve that person of the obligation not to trade while aware of material, non-public information.



3. **Transactions Under Company Plans**.

A. *Stock Option Exercises*. This Policy does not apply to the exercise for cash of a stock option acquired pursuant to the Company's plans, or to an election to have the Company withhold shares subject to an option to satisfy tax withholding requirements. The prohibition does apply, however, to any sale of stock as part of a broker assisted cashless exercise of an option, or any other form of cashless exercise or market sale for the purpose of generating the cash needed to pay the exercise price of an option.

B. *Restricted Stock or Restricted Stock Unit Awards*. This Policy does not apply with respect to the vesting of restricted stock or restricted stock units or the settlement of performance-based restricted stock units, or an election to have the Company withhold shares of stock to satisfy tax withholding requirements upon any vesting or settlement of any such award. The prohibition does apply, however, to any market sale of Company stock underlying any such awards.

4. **Rule 10b5-1 Trading Plans**.

A. *Individual Plans*. Rule 10b5-1 under the Securities Exchange Act of 1934, as amended (the "Exchange Act") provides an affirmative defense to insider trading liability. In order to be eligible to rely on this defense, a person subject to this Policy must enter into a Rule 10b5-1 trading plan for transactions in Company securities that meets certain conditions specified in the Rule (a "Rule 10b5-1 Plan") and in this Section. If the Plan meets these conditions, transactions in Company securities may occur even when the person who has entered into the plan is aware of material, non-public information. The following guidelines apply to all Rule 10b5-1 Plans:

i.  Persons subject to this Policy may not enter into, modify or terminate a Rule 10b5-1 Plan during a blackout period or while aware of material, non-public information.

ii.  All Rule 10b5-1 Plans must have a duration of at least 6 months and no more than 2 years.

iii.  For directors and officers, no transaction may take place under a Rule 10b5-1 Plan until the later of after (a) 90 days after adoption or modification of the Rule 10b5-1 Plan or (b) two business days following the disclosure of the Company's financial results in a Form 10-Q or Form 10-K for the fiscal quarter (the Company's fourth fiscal quarter in the case of a Form 10-K) in which the Rule 10b5-1 Plan was adopted or modified (but in any event, this "cooling-off period" is subject to a maximum of 120 days after adoption of the plan). For persons other than directors and officers, no transaction may take place under a Rule 10b5-1 Plan until 30 days following the adoption or modification of a Rule 10b5-1 plan.

iv.  Subject to certain limited exceptions specified in Rule 10b5-1, persons subject to this Policy entering into a Rule 10b5-1 Plan may not: (i) have more than one plan in effect at any time, or (ii) have more than one 10b5-1 plan in place during any 12-month period that is designed to effect a single transaction.

v.  Persons subject to this Policy must act in good faith with respect to a Rule 10b5-1 Plan. A Rule 10b5-1 Plan cannot be entered into as part of a plan or scheme to evade the prohibition of Rule 10b-5. Therefore, modifications to an existing Rule 10b5-1 Plan are discouraged, as a Rule 10b5-1 Plan should be adopted with the intention that it will not be amended or terminated prior to its expiration.

vi.  Officers and directors must include a representation to the Company at the time of adoption or modification of a Rule 10b5-1 Plan that (i) the person is not aware of material non-public information about the Company or Company securities, and (ii) the person is adopting the plan in good faith and not as part of plan or scheme to evade the prohibitions of Rule 10b5-1.



vii.   Once a Rule 10b5-1 Plan is adopted, the person adopting the plan must not exercise any influence over the amount of securities to be traded, the price at which they are to be traded or the date of the trade. The plan must either specify the amount, pricing and timing of transactions in advance or delegate discretion on these matters to an independent third party.

The Company must make certain disclosures in SEC filings concerning Rule 10b5-1 Plans. Officers and directors of the Company must provide any information requested by the Company regarding Rule 10b5-1 Plans for the purpose of providing the disclosures or any other disclosures that the Company deems to be appropriate under the circumstances.  All Rule 10b5-1 Plans must be approved in advance by the Pre-Clearance Officer and meet the conditions specified in the Rule and in this Section. No further pre-approval of transactions conducted pursuant to an approved Rule 10b5-1 Plan will be required.

B.   *Company Plans*.  It is Company policy to comply with applicable securities laws concerning trading in Company securities on the Company's behalf.  From time to time, the Company may repurchase its securities pursuant to a Rule 10b5-1 Plan or otherwise.  Rule 10b5-1 Plans relating to any such repurchases shall be subject to the guidelines set forth in the immediately preceding section except that they are not subject to a cooling off period and will not be subject to the limitations on plan duration or multiple and single-trade plans.

5.   **Trading Reports Required by the SEC**.

The Company requires that all officers and directors submit to the Pre-Clearance Officer (or his or her designee) a copy of any trade order or confirmation relating to the purchase, sale or gift of the Company's securities (including any purchase, sale or gift that was previously pre-cleared or completed under a Rule 10b5-1 Plan) within one business day of such transaction.  This information is necessary to enable the Company to monitor compliance by officers and directors and to assist such persons in properly reporting such transactions pursuant to Section 16 of the Exchange Act and the SEC's rules thereunder. Under SEC rules, the preparation and filing of Section 16 reports is the sole responsibility of the reporting person.  The Company can facilitate compliance by officers and directors to the extent they provide the Company with the information required by this Section 5, but the Company does not assume any legal responsibility for the filing of Section 16 reports.

6.   **Hedging and Pledging Policy**

All corporate personnel are prohibited from: (1) directly or indirectly engaging in hedging or monetization transactions, through transactions in the Company's securities or through the use of financial instruments designed for such purpose; (2) engaging in short-term or speculative transactions in the Company's securities that could create heightened legal risk and/or the appearance of improper or inappropriate conduct by such persons; and (3) holding the Company's securities in a margin account or otherwise pledging the Company's securities as collateral for a loan.

A.   *Hedging or Monetization Transactions*.  Hedging or monetization transactions can be accomplished through a number of possible mechanisms, including, but not limited to, through the use of financial instruments such as exchange funds, prepaid variable forwards, equity swaps, puts, calls, collars, forwards and other derivative instruments, or through the establishment of a short position in the securities of the Company.  Such hedging and monetization transactions may permit persons to continue to own the securities of the Company obtained through the Company's benefit plans or otherwise, but without the full risks and rewards of ownership. When that occurs, such persons may no longer have the same objectives as the Company's other stockholders.  Accordingly, corporate personnel may not engage in any hedging or monetization transactions with respect to the Company's securities.

B.   *Short-Term or Speculative Transactions*.   Certain short-term or speculative transactions in the Company's securities by corporate personnel create the potential for heightened legal risk and/or the appearance of improper or inappropriate conduct involving the Company's securities.  Accordingly, corporate personnel may not engage in the following transactions:



i.    *Short Sal*es. Short sales of the Company's securities (*i.e.*, the sale of a security that the seller does not own) may evidence an expectation on the part of the seller that the securities will decline in value, and therefore have the potential to signal to the market that the seller lacks confidence in the Company's prospects. In addition, short sales may reduce a seller's incentive to seek to improve the Company's performance. For these reasons, short sales of the Company's securities by corporate personnel are prohibited. Short sales arising in certain types of hedging transactions are governed by Section A above.

ii.    *Publicly-Traded Options*. Given the relatively short term of publicly-traded options, transactions in options may cause corporate personnel to focus on short-term performance at the expense of the Company's long term objectives. Accordingly, transactions by corporate personnel in put options, call options or other derivative securities related to the Company's securities, on an exchange or in any other organized market, are prohibited. Transactions in options arising in certain types of hedging transactions are governed by Section A above.

C.    *Margin Accounts and Pledged Securities*. Securities held in a margin account as collateral for a margin loan may be sold by the broker without the customer's consent if the customer fails to meet a margin call. Similarly, securities pledged (or hypothecated) as collateral for a loan may be sold in foreclosure if the borrower defaults on the loan. Because a margin sale or foreclosure sale may occur at a time when the pledgor is aware of material, non-public information or otherwise is not permitted to trade in the Company's securities, corporate personnel are prohibited from holding the Company's securities in a margin account or otherwise pledging the Company's securities as collateral for a loan. Pledges of Company securities arising from certain types of hedging transactions are governed by Section A above.

7.    **Consequences of Violations**.

The purchase or sale of securities while aware of material non-public information, or the disclosure of material non-public information to others who then trade in the Company's securities, is prohibited by federal and state laws. Insider trading violations are pursued vigorously by the SEC, U.S. Attorneys and state enforcement authorities. Punishment for insider trading violations is severe, and could include significant fines and imprisonment, as well as liability for the Company. In addition, failure to comply with this Policy may subject the individual to disciplinary action by the Company, including termination for cause, whether or not the associate's failure to comply results in a violation of law.

8.    **Implementation**.

The Board of Directors or the Chief Executive Officer (or his or her designees) may adopt such reasonable procedures as deemed necessary or desirable in order to implement this Policy.

*    *    *    *

*If you have any doubt as to your responsibilities under this Policy, please seek clarification and guidance from the Chief Financial Officer, the General Counsel or the Assistant General Counsel before you act.*

| ADMINISTRATION |
| --- |

This Policy is administered by the Legal department. Compliance with this Policy is mandatory, unless an exception applies. Exceptions to this Policy must have a reasonable basis and require prior written approval of Burlington's General Counsel. Additionally, all Associates are required to report actual or suspected violations of this Policy. There will be no retaliation for reports made in good faith. Any questions regarding a potential conflict between this Policy and applicable law, or any determination that a provision of this Policy is in conflict with applicable law should be directed to the General Counsel's Office.

**Exhibit 21.1**

**Subsidiaries of Burlington Stores, Inc.**

| Exact Name of Subsidiaries of Registrant as Specified in their Charter | State or Other Jurisdiction of Incorporation or Organization |
|---|---|
| Burlington Holdings, LLC | Delaware |
| Burlington Coat Factory Holdings, LLC | Delaware |
| Burlington Coat Factory Investments Holdings, Inc. | Delaware |
| Burlington Coat Factory Warehouse Corporation | Florida |
| Burlington Merchandising Corporation | Delaware |
| Burlington Coat Factory of Texas, Inc. | Florida |
| Burlington Coat Factory of Texas, L.P. | Florida |
| Burlington Coat Factory of Kentucky, Inc. | Kentucky |
| Burlington Coat Factory Realty of Edgewater Park, Inc. | New Jersey |
| Burlington Coat Factory Realty of Pinebrook, Inc. | New Jersey |
| Burlington Coat Factory Warehouse of Edgewater Park, Inc. | New Jersey |
| Burlington Coat Factory Warehouse of Edgewater Park Urban Renewal Corp. | New Jersey |
| Burlington Coat Factory Warehouse of New Jersey, Inc. | New Jersey |
| BCF Florence Urban Renewal, LLC | New Jersey |
| Burlington Coat Factory of Puerto Rico, LLC | Puerto Rico |
| Burlington Coat Factory Warehouse of Baytown, Inc. | Texas |
| Burlington Coat Factory of Pocono Crossing, LLC | Virginia |
| Florence Insurance Company, Inc. | New Jersey |
| Burlington Distribution Corp. | Delaware |
| Burlington Stores Charitable Foundation | Delaware |
| Burlington GA Distribution, LLC | Delaware |
| Burlington Distribution Ellabell, LLC | Delaware |
| Burlington Distribution Riverside, LLC | Delaware |

**Exhibit 23.1**

CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We consent to the incorporation by reference in Registration Statements Nos. 333-191637 and 333-265071 on Form S-8 of our reports dated March 17, 2025, relating to the financial statements of Burlington Stores, Inc. and subsidiaries, and the effectiveness of Burlington Stores, Inc.'s internal control over financial reporting appearing in this Annual Report on Form 10-K for the year ended February 1, 2025.

/s/ Deloitte & Touche LLP
New York, New York
March 17, 2025

**Exhibit 31.1**

I, Michael O'Sullivan, certify that:

1. I have reviewed this annual report on Form 10-K of Burlington Stores, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 17, 2025

/s/ Michael O'Sullivan
Michael O'Sullivan
Chief Executive Officer
(Principal Executive Officer)

**Exhibit 31.2**

I, Kristin Wolfe, certify that:

1. I have reviewed this annual report on Form 10-K of Burlington Stores, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 17, 2025
/s/ Kristin Wolfe
Kristin Wolfe
Chief Financial Officer
(Principal Financial Officer)

**Exhibit 32.1**

**CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350**
**AS ADOPTED PURSUANT TO SECTION 906 OF**
**THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of Burlington Stores, Inc. (the "Company") on Form 10-K for the period ending February 1, 2025, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Michael O'Sullivan, Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002, that:

    (1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

    (2) The information contained in the Report fairly presents, in all material respects, the financial position and results of operations of the Company.

Date: March 17, 2025

/s/ Michael O'Sullivan
Michael O'Sullivan
Chief Executive Officer
(Principal Executive Officer)

**Exhibit 32.2**

**CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350**
**AS ADOPTED PURSUANT TO SECTION 906 OF**
**THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of Burlington Stores, Inc. (the "Company") on Form 10-K for the period ending February 1, 2025, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Kristin Wolfe, Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002, that:

    (1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

    (2) The information contained in the Report fairly presents, in all material respects, the financial position and results of operations of the Company.

Date: March 17, 2025

/s/ Kristin Wolfe
Kristin Wolfe
Chief Financial Officer
(Principal Financial Officer)