# **EXHIBIT 1**

**The Lease**

**LEASE AGREEMENT**

by and between


**CRAFTY (AL) LLC,**
a Delaware limited liability company


as LANDLORD


and


**JO-ANN STORES, LLC,**
an Ohio limited liability company,


as TENANT


Premises:    3101 Anderson Road, Opelika, Alabama


Dated as of:  June 7, 2021

803746209_13

# TABLE OF CONTENTS

Page

1.    Demise of Premises................................................................................................. 1
2.    Certain Definitions.................................................................................................. 1
3.    Title and Condition ................................................................................................ 8
4.    Use of Leased Premises; Quiet Enjoyment........................................................... 9
5.    Term...................................................................................................................... 10
6.    Basic Rent ............................................................................................................ 11
7.    Additional Rent.................................................................................................... 11
8.    Net Lease; Non-Terminability ............................................................................ 13
9.    Payment of Impositions ....................................................................................... 13
10.   Compliance with Laws and Easement Agreements, Environmental Matters.............. 14
11.   Liens; Recording.................................................................................................. 16
12.   Maintenance and Repair ...................................................................................... 17
13.   Alterations and Improvements............................................................................. 17
14.   Permitted Contests ............................................................................................... 18
15.   Indemnification .................................................................................................... 19
16.   Insurance .............................................................................................................. 20
17.   Casualty and Condemnation ................................................................................ 24
18.   Restoration; Termination Events ......................................................................... 25
19.   Restoration ........................................................................................................... 26
20.   Procedures Upon Purchase .................................................................................. 28
21.   Assignment and Subletting; Prohibition Against Leasehold Financing .............. 29
22.   Events of Default ................................................................................................. 33
23.   Remedies and Damages upon Default ................................................................. 35
24.   Notices.................................................................................................................. 39
25.   Estoppel Certificate ............................................................................................. 39
26.   Surrender.............................................................................................................. 39
27.   No Merger of Title............................................................................................... 40
28.   Books and Records .............................................................................................. 40
29.   Determination of Value........................................................................................ 42
31.   Non-Recourse as to Landlord .............................................................................. 44
32.   Subordination, Non-Disturbance and Attornment .............................................. 45
33.   Tax Treatment; Reporting .................................................................................... 45
34.   Power and Authority. ........................................................................................... 45
35.   Miscellaneous ...................................................................................................... 45
36.   Post-Closing Obligations. .................................................................................... 48
37.   Public Announcements. ........................................................................................ 48

<u>EXHIBITS</u>

Exhibit "A"    - Premises
Exhibit "B"    - Machinery and Equipment
Exhibit "C"    - Schedule of Permitted Encumbrances
Exhibit "D"    - Rent Schedule

LEASE AGREEMENT, made as of this 7th day of June, 2021, between **CRAFTY (AL) LLC,** a Delaware limited liability company ("Landlord"), with an address c/o W. P. Carey Inc., One Manhattan West, 395 9th Avenue, 58th Floor, New York, New York 10001, and **JO-ANN STORES, LLC,** an Ohio limited liability company ("Tenant"), with an address at 5555 DARROW ROAD, HUDSON, OH 44236.

In consideration of the rents and provisions herein stipulated to be paid and performed, Landlord and Tenant hereby covenant and agree as follows:

1.      Demise of Premises.  Landlord hereby demises and lets to Tenant, and Tenant hereby takes and leases from Landlord, for the Term (as defined in Section 2) and upon the provisions hereinafter specified, the following described property (collectively, the "Leased Premises"): (a) the land described in Exhibit "A" attached hereto together with the Appurtenances (collectively, the "Land"); (b) the building containing approximately 702,623 square feet (the "Building"), structures and other improvements now or hereafter constructed on the Land (collectively, the "Improvements"); and (c) the fixtures, machinery, equipment and other property described in Exhibit "B" hereto (collectively, the "Equipment").

2.      Certain Definitions.

"Acquisition Cost" shall mean $48,878,122.

"Additional Rent" shall mean Additional Rent as defined in Paragraph 7.

"Alterations" shall mean all changes, additions, improvements or repairs to, all alterations, reconstructions, restorations, renewals, replacements or removals of and all substitutions or replacements for any of the Improvements or Equipment, both interior and exterior, structural and non-structural, and ordinary and extraordinary.  Notwithstanding the foregoing, it is expressly understood that ordinary maintenance of and repairs to the Leased Premise shall not constitute Alterations for purposes of the Alterations Threshold Amount.

"Alterations Threshold Amount" shall mean $500,000.

"Appurtenances" shall mean all tenements, hereditaments, easements, rights-of-way, rights, privileges in and to the Land, including (a) easements over other lands granted by any Easement Agreement and (b) to the extent Landlord as owner of the Leased Premises has any legal responsibility in connection therewith, any streets, sidewalks, driveways, curbs, ways, alleys, vaults, gores or strips of land adjoining the Land.

"Asset Transfer" shall mean Asset Transfer as defined in Paragraph 21(j).

"Assignment" shall mean any assignment of rents and leases from Landlord to a Lender which (a) encumbers any of the Leased Premises and (b) secures Landlord's obligation to repay a Loan, as the same may be amended, supplemented or modified from time to time.

"Basic Rent" shall mean Basic Rent as defined in Paragraph 6.

"Basic Rent Payment Date" shall mean Basic Rent Payment Date as defined in Paragraph 6.

"Business Day" shall mean any day except any Saturday, any Sunday, any day which is a federal legal holiday in the United States or any day on which banking institutions in the State of Alabama are authorized or required by law or other governmental action to close.

"Casualty" shall mean any damage to or destruction of or which affects the Leased Premises.

"Commencement Date" shall mean Commencement Date as defined in Paragraph 5(a).

"Condemnation" shall mean a Taking.

"Condemnation Notice" shall mean notice from the applicable governmental authority of the institution of or imminent intention to institute a proceeding for Condemnation.

"Costs" of a Person or associated with a specified transaction shall mean all reasonable costs and expenses incurred by such Person or associated with such transaction, including without limitation, attorneys' fees and expenses, court costs, brokerage fees, escrow fees, title insurance premiums, recording fees and transfer taxes, as the circumstances require; provided, however, that "Costs" shall not include (i) any costs and expenses of Landlord related to a sale of the Leased Premises to an affiliate of Landlord or any third-party or (ii) any costs or expenses of the Landlord's financing of the Leased Premises unless such costs or expenses are caused by Tenant.

"Default Rate" shall mean the Default Rate as defined in Paragraph 7(a)(iv).

"Default Termination Amount" shall mean the Default Termination Amount as defined in Paragraph 23(a)(v).

"Easement Agreement" shall mean any conditions, covenants, restrictions, easements, declarations, licenses and other agreements listed as Permitted Encumbrances or as may hereafter affect the Leased Premises.

"Environmental Law" shall mean (a) whenever enacted or promulgated, any applicable federal, state and local law, statute, ordinance, rule, regulation, license, permit, authorization, approval, consent, court order, judgment, decree, injunction, code, requirement or agreement with any governmental entity, (i) relating to pollution (or the cleanup thereof), or the protection of air, water vapor, surface water, groundwater, drinking water supply, land (including land surface or subsurface), plant, aquatic and animal life from injury caused by a Hazardous Substance or (ii) concerning exposure to, or the use, containment, storage, recycling, reclamation, reuse, treatment, generation, discharge, transportation, processing, handling,

labeling, production, disposal or remediation of Hazardous Substances, Hazardous Conditions or Hazardous Activities, in each case as amended and as now or hereafter in effect, and (b) any common law or equitable doctrine (including, without limitation, injunctive relief and tort doctrines such as negligence, nuisance, trespass and strict liability) that may impose liability or obligations for injuries or damages due to or threatened as a result of the presence of, exposure to, or ingestion of, any Hazardous Substance.  The term Environmental Law includes, without limitation, the federal Comprehensive Environmental Response Compensation and Liability Act of 1980, the Superfund Amendments and Reauthorization Act, the federal Water Pollution Control Act, the federal Clean Air Act, the federal Clean Water Act, the federal Resources Conservation and Recovery Act of 1976 (including the Hazardous and Solid Waste Amendments to RCRA), the federal Solid Waste Disposal Act, the federal Toxic Substance Control Act, the federal Insecticide, Fungicide and Rodenticide Act, the federal Occupational Safety and Health Act of 1970, the federal National Environmental Policy Act and the federal Hazardous Materials Transportation Act, each as amended and as now or hereafter in effect and any similar state or local Law.

"Environmental Violation" shall mean (a) any direct or indirect discharge, disposal, spillage, emission, escape, pumping, pouring, injection, leaching, release, seepage, filtration or transporting of any Hazardous Substance at, upon, under, onto or within the Leased Premises, or from the Leased Premises to the environment, in violation of any Environmental Law or in excess of any reportable quantity established under any Environmental Law or which could result in any liability to Landlord, Tenant or Lender, any Federal, state or local government or any other Person for the costs of any removal or remedial action or natural resources damage or for bodily injury or property damage, (b) any deposit, storage, dumping, placement or use of any Hazardous Substance at, upon, under or within the Leased Premises in violation of any Environmental Law or in excess of any reportable quantity established under any Environmental Law or which could result in any liability to any Federal, state or local government or to any other Person for the costs of any removal or remedial action or natural resources damage or for bodily injury or property damage, (c) the abandonment or discarding of any barrels, containers or other receptacles containing any Hazardous Substances in violation of any Environmental Laws, (d) any activity, occurrence or condition which could result in any liability, cost or expense to Landlord or Lender or any other owner or occupier of the Leased Premises, or which could result in a creation of a lien on the Leased Premises under any Environmental Law, or (e) any violation of or noncompliance with any Environmental Law.

"Equipment" shall mean the Equipment as defined in Paragraph 1.

"Event of Default" shall mean an Event of Default as defined in Paragraph 22(a).

"Excluded Property" shall mean the personal property, vehicles, tools, office furniture, computers and equipment, manufacturing equipment and machinery and their related components and dedicated and not shared infrastructure thereto, and other equipment, improvements, intangibles, and trade fixtures used in Tenant's business or the business of any other affiliate of Tenant in the receiving, handling, processing, assembly, manufacture, production, transportation or other operation of Tenant's or an affiliate's business, whether such

assets are owned by, leased, or financed by third party equipment financiers, and whether such assets are now owned or hereafter acquired.

"Fair Market Rental Value" shall mean the fair market rental value of the Leased Premises for the relevant Renewal Term determined in accordance with the procedure specified in Paragraph 29, but subject, in all cases to the limitation set forth in Paragraph 1(c) of Exhibit "D".

"Fair Market Value" shall mean the higher of (a) the fair market value of the Leased Premises as of the Relevant Date as if unaffected and unencumbered by this Lease or (b) the fair market value of the Leased Premises as of the Relevant Date as affected and encumbered by this Lease and assuming that the Term has been extended for all extension periods provided for herein.  For all purposes of this Lease, Fair Market Value shall be determined in accordance with the procedure specified in Paragraph 29.

"Fair Market Value Date" shall mean the date when the Fair Market Value is determined in accordance with Paragraph 29.

"Federal Funds" shall mean federal or other immediately available funds which at the time of payment are legal tender for the payment of public and private debts in the United States of America.

"Guarantor" shall mean JOANN Inc., a Delaware corporation.

"Guaranty" shall mean the Guaranty and Suretyship Agreement dated as of the date hereof from Guarantor to Landlord guaranteeing the payment and performance by Tenant of all of Tenant's obligations under the Lease.

"Hazardous Activity" means any activity, process, procedure or undertaking which directly or indirectly (a) procures, generates or creates any Hazardous Substance; (b) causes or results in (or threatens to cause or result in) the release, seepage, spill, leak, flow, discharge or emission of any Hazardous Substance into the environment (including the air, ground water, watercourses or water systems), (c) involves the containment or storage of any Hazardous Substance; or (d) would cause the Leased Premises or any portion thereof to become a hazardous waste treatment, recycling, reclamation, processing, storage or disposal facility within the meaning of any Environmental Law.

"Hazardous Condition" means any condition which would support any claim or liability under any Environmental Law, including the presence of underground storage tanks.

"Hazardous Substance" means (i) any substance, material, product, petroleum, petroleum product, derivative, compound or mixture, mineral (including asbestos), chemical, gas, medical waste, or other pollutant, in each case whether naturally occurring, man-made or the by-product of any process, that is toxic, harmful or hazardous or acutely hazardous to the environment or public health or safety or (ii) any substance supporting a claim under any Environmental Law, whether or not defined as hazardous as such under any Environmental Law. Hazardous Substances include, without limitation, any toxic or hazardous waste, pollutant, contaminant, industrial waste, petroleum or petroleum-derived substances or waste, radon,

4

radioactive materials, asbestos, asbestos containing materials, microbial matter (including but not limited to mold, mildew and other fungi or bacterial matter which reproduces through the release of spores or the splitting of cells), urea formaldehyde foam insulation, lead and polychlorinated biphenyls.

"Impositions" shall mean the Impositions as defined in Paragraph 9(a).

"Improvements" shall mean the Improvements as defined in Paragraph 1.

"Indemnitee" shall mean an Indemnitee as defined in Paragraph 15.

"Insurance Requirements" shall mean the requirements of all insurance policies required to be maintained in accordance with this Lease.

"Land" shall mean the Land as defined in Paragraph 1.

"Landlord Casualty Event" shall mean a Landlord Casualty Event as defined in Paragraph 5(b).

"Law" shall mean any constitution, statute, rule of law, code, ordinance, order, judgment, decree, injunction, rule, regulation, policy, requirement or administrative or judicial determination, even if unforeseen or extraordinary, of every duly constituted governmental authority, court or agency, now or hereafter enacted or in effect.

"Lease" shall mean this Lease Agreement.

"Lease Year" shall mean, with respect to the first Lease Year, the period commencing on the Commencement Date and ending at midnight on the last day of the twelfth (12th) full consecutive calendar month following the month in which the Commencement Date occurred, and each succeeding twelve (12) month period during the Term.

"Leased Premises" shall mean the Leased Premises as defined in Paragraph 1.

"Legal Requirements" shall mean the requirements of all present and future Laws (including but not limited to Environmental Laws and Laws relating to accessibility to, usability by, and discrimination against, disabled individuals) and all covenants, restrictions and conditions now or hereafter of record which may be applicable to Tenant or to any of the Leased Premises, or to the use, manner of use, occupancy, possession, operation, maintenance, alteration, repair or restoration of any of the Leased Premises, even if compliance therewith necessitates structural changes or improvements or results in interference with the use or enjoyment of any of the Leased Premises or requires Tenant to carry insurance other than as required by this Lease.

"Lender" shall mean any Person (and its respective successors and assigns) which may, on or after the date hereof, make a Loan to Landlord or be the holder of a Note.

"Loan" shall mean any loan made by one or more Lenders to Landlord, which loan is secured by a Mortgage and an Assignment and evidenced by a Note.

"Monetary Obligations" shall mean Rent and all other sums payable by Tenant under this Lease to Landlord, to any third party on behalf of Landlord or to any Indemnitee.

"Moody's" shall mean Moody's Investor Services, Inc.

"Mortgage" shall mean any mortgage or deed of trust from Landlord to a Lender which (a) encumbers any of the Leased Premises and (b) secures Landlord's obligation to repay a Loan, as the same may be amended, supplemented or modified.

"Net Award" shall mean (a) the entire award payable to Landlord or Lender by reason of a Condemnation whether pursuant to a judgment or by agreement or otherwise, or (b) the entire proceeds of any insurance required under clauses (i), (ii) (to the extent payable to Landlord or Lender), (iv), (v) or (vi) of Paragraph 16(a), as the case may be, less any expenses incurred by Landlord and Lender in collecting such award or proceeds and less any awards or proceeds related to the Excluded Property.

"Note" shall mean any promissory note evidencing Landlord's obligation to repay a Loan, as the same may be amended, supplemented or modified.

"Permitted Encumbrances" shall mean those covenants, restrictions, reservations, liens, conditions and easements and other encumbrances, other than any Mortgage or Assignment, listed on Exhibit "C" hereto (but such listing shall not be deemed to revive any such encumbrances that have expired or terminated or are otherwise invalid or unenforceable).

"Person" shall mean an individual, partnership, association, corporation or other entity.

"Prepayment Premium" shall mean any payment required to be made by Landlord to a Lender under a Note or any other document evidencing or securing a Loan (other than payments of principal and/or interest which Landlord is required to make under a Note or a Mortgage) solely by reason of any prepayment or defeasance by Landlord of any principal due under a Note or Mortgage, and which may without limitation take the form of (a) a "make whole" or yield maintenance clause requiring a prepayment premium or (b) a defeasance payment (such defeasance payment to be an amount equal to the positive difference between (i) the total amount required to defease a Loan and (ii) the outstanding principal balance of the Loan as of the date of such defeasance plus reasonable Costs of Landlord and Lender or (c) "breakage costs" or (d) any combination of clauses (a), (b) and (c) above.

"Present Value" of any amount shall mean such amount discounted by a rate per annum which is the lower of (a) the Prime Rate at the time such present value is determined or (b) six percent (6%) per annum.

"Prime Rate" shall mean the annual interest rate as published, from time to time, in The Wall Street Journal as the "Prime Rate" in its column entitled "Money Rate".  The

Prime Rate may not be the lowest rate of interest charged by any "large U.S. money center commercial banks" and Landlord makes no representations or warranties to that effect. In the event The Wall Street Journal ceases publication or ceases to publish the "Prime Rate" as described above, the Prime Rate shall be the average per annum discount rate (the "Discount Rate") on ninety-one (91) day bills ("Treasury Bills") issued from time to time by the United States Treasury at its most recent auction, plus three hundred (300) basis points. If no such 91-day Treasury Bills are then being issued, the Discount Rate shall be the discount rate on Treasury Bills then being issued for the period of time closest to ninety-one (91) days.

"Relevant Amount" shall mean the Default Termination Amount.

"Relevant Date" shall mean the date immediately prior to the Event of Default giving rise to the need to determine Fair Market Value in the event Landlord provides Tenant with notice of its intention to require Tenant to make a termination offer under Paragraph 23(a)(v), as applicable.

"Remaining Sum" shall mean Remaining Sum as defined in Paragraph 19(c).

"Renewal Term" shall mean Renewal Term as defined in Paragraph 5.

"Rent" shall mean, collectively, Basic Rent and Additional Rent.

"S&P" shall mean Standard and Poor's Corporation.

"Site Assessment" shall mean a Site Assessment as defined in Paragraph 10(c).

"State" shall mean the State of Alabama.

"Subsidiary(ies)" of a Person means a corporation, partnership, limited liability company, or other entity in which that Person directly or indirectly owns or controls the shares of stock or other equity interests having ordinary voting power to elect a majority of the board of directors (or appoint other comparable managers) of such corporation, partnership, limited liability company, or other entity.

"Surviving Obligations" shall mean any obligations of Tenant under this Lease, actual or contingent, which arise on or prior to the expiration or prior termination of this Lease or which survive such expiration or termination by their own terms.

"Taking" shall mean (a) any taking of all or a portion of any of the Leased Premises (i) in or by condemnation or other eminent domain proceedings pursuant to any Law, general or special, or (ii) by reason of any agreement with any condemnor in settlement of or under threat of any such condemnation or other eminent domain proceeding, or (b) any de facto condemnation. The Taking shall be considered to have taken place as of the later of the date actual physical possession is taken by the condemnor, or the date on which the right to compensation and damages accrues under the law applicable to the Leased Premises.

"Tenant Group" shall mean Guarantor and its Subsidiaries if and for so long as each such Person shall be part of the group for the purpose of reporting financial positions and results on a consolidated basis. For clarity, this shall not require any individualized reporting of Subsidiaries; only as consolidated into Guarantor's standard reporting.

"Term" shall mean the Term as defined in Paragraph 5.

"Total Casualty" shall mean a Casualty where all or a substantial portion of the Building is totally damaged or destroyed.

"Total Condemnation" shall mean a Condemnation (i) in which a material portion of the Building is taken and Tenant certifies to Landlord that it is unable to continue to use the Leased Premises for its intended use, or (ii) in which a substantial portion of the Improvements are taken and Tenant certifies to Landlord that it is unable to continue to use the Leased Premises for its intended use. For purposes of clause (ii) it is agreed that a Condemnation of a substantial portion of the parking lot would qualify as a Total Condemnation so long as (x) it is then impossible to provide adequate replacement surface parking on the then-remaining Leased Premises and (y) Tenant certifies to Landlord that it is unable to continue to use the Leased Premises for its intended use.

"Warranties" shall mean Warranties as defined in Paragraph 3(d).

"Work" shall mean Work as defined in Paragraph 13(b).

3.    Title and Condition.

(a)    The Leased Premises are demised and let subject to (i) the rights of any Persons in possession of the Leased Premises, (ii) the existing state of title of any of the Leased Premises, including any Permitted Encumbrances, (iii) any state of facts which an accurate survey or physical inspection of the Leased Premises might show, (iv) all Legal Requirements, including any existing violation of any thereof, and (v) the condition of the Leased Premises as of the commencement of the Term, without representation or warranty by Landlord.

(b)    Tenant acknowledges that the Leased Premises is in good condition and repair at the inception of this Lease. LANDLORD LEASES AND WILL LEASE AND TENANT TAKES AND WILL TAKE THE LEASED PREMISES AS IS. TENANT ACKNOWLEDGES THAT LANDLORD (WHETHER ACTING AS LANDLORD HEREUNDER OR IN ANY OTHER CAPACITY) HAS NOT MADE AND WILL NOT MAKE, NOR SHALL LANDLORD BE DEEMED TO HAVE MADE, ANY WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, WITH RESPECT TO ANY OF THE LEASED PREMISES, INCLUDING ANY WARRANTY OR REPRESENTATION AS TO (i) ITS FITNESS, DESIGN OR CONDITION FOR ANY PARTICULAR USE OR PURPOSE, (ii) THE QUALITY OF THE MATERIAL OR WORKMANSHIP THEREIN, (iii) THE EXISTENCE OF ANY DEFECT, LATENT OR PATENT, (iv) LANDLORD'S TITLE THERETO, (v) VALUE, (vi) COMPLIANCE WITH SPECIFICATIONS, (vii) LOCATION, (viii) USE, (ix) CONDITION, (x) MERCHANTABILITY, (xi) QUALITY, (xii) DESCRIPTION, (xiii) DURABILITY, (xiv) OPERATION, (xv) THE EXISTENCE OF

8

ANY HAZARDOUS SUBSTANCE, HAZARDOUS CONDITION OR HAZARDOUS
ACTIVITY OR (xvi) COMPLIANCE OF THE LEASED PREMISES WITH ANY LAW OR
LEGAL REQUIREMENT; AND ALL RISKS INCIDENT THERETO ARE TO BE BORNE
BY TENANT. TENANT ACKNOWLEDGES THAT THE LEASED PREMISES IS OF ITS
SELECTION AND TO ITS SPECIFICATIONS AND THAT THE LEASED PREMISES HAS
BEEN INSPECTED BY TENANT AND IS SATISFACTORY TO IT. IN THE EVENT OF
ANY DEFECT OR DEFICIENCY IN ANY OF THE LEASED PREMISES OF ANY
NATURE, WHETHER LATENT OR PATENT, LANDLORD SHALL NOT HAVE ANY
RESPONSIBILITY OR LIABILITY WITH RESPECT THERETO OR FOR ANY
INCIDENTAL OR CONSEQUENTIAL DAMAGES (INCLUDING STRICT LIABILITY IN
TORT). THE PROVISIONS OF THIS PARAGRAPH 3(b) HAVE BEEN NEGOTIATED,
AND ARE INTENDED TO BE A COMPLETE EXCLUSION AND NEGATION OF ANY
WARRANTIES BY LANDLORD, EXPRESS OR IMPLIED, WITH RESPECT TO ANY OF
THE LEASED PREMISES, ARISING PURSUANT TO THE UNIFORM COMMERCIAL
CODE OR ANY OTHER LAW NOW OR HEREAFTER IN EFFECT OR ARISING
OTHERWISE.

(c)     Tenant represents to Landlord that Tenant has examined the title to
the Leased Premises prior to the execution and delivery of this Lease and has found the same to
be satisfactory for the purposes contemplated hereby. Tenant acknowledges that (i) fee simple
title (both legal and equitable) is in Landlord and that Tenant has only the leasehold right of
possession and use of the Leased Premises, as provided herein, (ii) the Improvements conform to
all material Legal Requirements and all Insurance Requirements, (iii) all easements necessary or
appropriate for the use or operation of the Leased Premises have been obtained, (iv) all
contractors and subcontractors who have performed work on or supplied materials to the Leased
Premises have been fully paid, and all materials and supplies have been fully paid for, (v) the
Improvements have been fully completed in all material respects in a workmanlike manner of
first class quality, and (vi) all Equipment necessary or appropriate for the use or operation of the
Leased Premises has been installed and is presently fully operative in all material respects.

(d)     Landlord hereby assigns to Tenant, without recourse or warranty
whatsoever, all assignable warranties, guaranties, indemnities and similar rights (collectively,
"Warranties") which Landlord may have against any manufacturer, seller, engineer, contractor or
builder in respect of any of the Leased Premises. Such assignment shall remain in effect until the
expiration or earlier termination of this Lease, whereupon such assignment shall cease and all of
the Warranties shall automatically revert to Landlord. In confirmation of such reversion Tenant
shall execute and deliver promptly any certificate or other document reasonably required by
Landlord. Landlord shall also retain the right to enforce any Warranties upon the occurrence of
an Event of Default. Tenant shall enforce the Warranties in accordance with their respective
terms.

4.     Use of Leased Premises; Quiet Enjoyment.

(a)     Tenant may occupy and use the Leased Premises for warehouse,
distribution, fulfillment center, and related, ancillary office, and such other lawful purposes as
may be incidental thereto (e.g., gym or breakroom) and for no other purpose without the prior
written consent of Landlord, such consent not to be unreasonably withheld, conditioned, or

delayed.  Tenant shall not use or occupy or permit any of the Leased Premises to be used or occupied, nor do or permit anything to be done in or on any of the Leased Premises, in a manner which would or might (i) violate any Law, Legal Requirement or Permitted Encumbrance, (ii) make void or voidable or cause any insurer to cancel any insurance required by this Lease, or make it difficult or impossible to obtain any such insurance at commercially reasonable rates, (iii) make void or voidable, cancel or cause to be cancelled or release any of the Warranties, (iv) cause structural injury to any of the Improvements or (v) constitute a public or private nuisance or waste.  In addition, Tenant shall not vacate or abandon the Leased Premises, i.e., Tenant shall not cease ordinary business operations at the Leased Premises (excluding temporary vacations in order to perform Alterations or renovations or restoration work (A) following a Casualty or Condemnation or (B) during a period of up to 180 days commencing upon Landlord's approval of a subtenant in accordance with Paragraph 21(c)).

(b)    Subject to the provisions hereof, so long as no Event of Default has occurred and is continuing, Tenant shall quietly hold, occupy and enjoy the Leased Premises throughout the Term, without any hindrance, ejection or molestation by Landlord with respect to matters that arise after the date hereof, provided that Landlord or its agents may enter upon and examine any of the Leased Premises at such reasonable times as Landlord may select and upon reasonable advance notice of at least forty-eight (48) hours to Tenant (except in the case of an emergency, in which no notice shall be required) for the purpose of inspecting the Leased Premises, verifying compliance or non-compliance by Tenant with its obligations hereunder and the existence or non-existence of an Event of Default or event which with the passage of time and/or notice would constitute an Event of Default, showing the Leased Premises to prospective Lenders and purchasers, making any repairs and taking such other action with respect to the Leased Premises as is permitted by any provision hereof.

5.    Term.

(a)    Subject to the provisions hereof, Tenant shall have and hold the Leased Premises for an initial term of twenty (20) years (such term, as extended or renewed in accordance with the provisions of Section 5(b) and Exhibit D, being called the "Term") commencing on the date hereof (the "Commencement Date") and ending on June 30, 2041 (the "Expiration Date").

(b)    Provided that if, on or prior to June 30, 2041or June 30, 2051, as applicable, this Lease shall not have been terminated pursuant to any provision hereof, then on the June 30, 2041 and June 30, 2051, as applicable (June 30, 2041 and June 30, 2051 as applicable being hereinafter referred to as the  "Renewal Date"), the Term shall be deemed to have been automatically extended for an additional period of ten (10) years (each such extension, a "Renewal Term"), unless (i) Tenant shall notify Landlord in writing in recordable form at least eighteen (18) months prior to the next Renewal Date that Tenant is terminating this Lease as of the next Renewal Date, (ii) a Total Casualty occurs at any time during the Term of this Lease as a direct result of Landlord's intentional conduct and such intentional conduct causes Tenant's claim under the insurance provided for under Paragraph 16(a)(i) of this Lease to be voided, excluded or rejected on such basis (a "Landlord Casualty Event") and this Lease is terminated pursuant to Paragraph 18(d), or (iii) a Total Condemnation occurs at any time during a term of this Lease, and Tenant terminates the Lease in accordance with the terms hereof.  Any such

extension of the Term shall be subject to all of the provisions of this Lease, as the same may be amended, supplemented or modified (except that Tenant shall not have the right to any additional Renewal Terms).

(c)     If Tenant exercises its option not to extend or further extend the Term, or if an Event of Default occurs and is continuing beyond any applicable notice and cure period, then Landlord shall have the right during the remainder of the Term then in effect and, in any event, Landlord shall have the right during the last year of the Term, to (i) advertise the availability of the Leased Premises for sale or reletting and to erect upon the Leased Premises signs indicating such availability and (ii) show the Leased Premises to prospective purchasers or tenants or their agents at such reasonable times as Landlord may select (provided that, in the case of (1) or (2), such efforts shall not unreasonably interfere with the Tenant's operations on the Leased Premises).

6.     Basic Rent.  Tenant shall pay to Landlord, as annual rent for the Leased Premises during the Term, the amounts determined in accordance with Exhibit "D" hereto ("Basic Rent"), payable on or before the first day of each calendar month for such calendar month, commencing on the first (1st) day of the first month following the date hereof and continuing on the same day of each month thereafter during the Term which shall be payable as set forth in said Exhibit "D".  The date that each payment of Basic Rent is due is hereinafter referred to as a "Basic Rent Payment Date".  Each such payment of Basic Rent shall be made via ACH transfer for value in Federal Funds on each Basic Rent Payment Date to Landlord and/or to such one or more other Persons, pursuant to transfer instructions delivered to Tenant from time to time at such addresses and in such proportions as Landlord may direct by fifteen (15) days' prior written notice to Tenant, but no earlier than 10 days after Tenant's receipt of such other documentation as reasonably requested by Tenant to effect payments to such other Persons (i.e., IRS form W-9).

7.     Additional Rent.

(a)     Tenant shall pay and discharge, as additional rent (collectively, "Additional Rent"):

(i)     except as otherwise specifically provided herein, all costs and expenses of Tenant, Landlord and any other Persons specifically referenced herein which are incurred in connection or associated with (A) the ownership, use, non-use, occupancy, monitoring, possession, operation, condition, design, construction, maintenance, alteration, repair or restoration of any of the Leased Premises, (B) the performance of any of Tenant's obligations under this Lease, (C) any sale or other transfer of any of the Leased Premises to Tenant under this Lease (but not any costs or expenses incurred in connection (x) with any sale or transfer of the Leased Premises to a third party or (y) the origination or refinancing of a Mortgage), (D) any Condemnation proceedings, (E) the adjustment, settlement or compromise of any insurance claims involving or arising from any of the Leased Premises, except if such litigation is based solely upon the acts of Landlord, (F) the prosecution, defense or settlement of any litigation involving or arising from any of the Leased Premises, (G) the exercise or enforcement by Landlord, its successors and assigns, of any of its rights under this Lease, (H) any amendment to or modification or termination of this Lease made at the request of Tenant, (I) reasonable Costs

11

of Landlord's counsel and reasonable documented internal Costs of Landlord incurred in connection with any act undertaken by Landlord (or its counsel) at the request of Tenant, any act of Landlord performed on behalf of Tenant at Tenant's request or if Tenant shall have failed to perform after any applicable notice and/or cure periods under this Lease, or the review and monitoring of compliance by Tenant with (x) this Lease (following occurrence and continuance of an Event of Default) and (y) Post-Closing Obligations, (J) the reasonable internal Costs of Landlord incurred in connection with Tenant's failure to act promptly in an emergency situation, (K) all wire fees associated with the transfers of Rent payments, and (L) any other items specifically required to be paid by Tenant under this Lease.  Notwithstanding anything to the contrary set forth in this Paragraph 7(a)(i), Additional Rent shall not include (x) any internal management costs or fees of Landlord, (y) or any internal costs or fees associated with any routine inspections of the Leased Premises.

(ii)     after the date all or any portion of any installment of Basic Rent is due and not paid by the applicable Basic Rent Payment Date, an amount (the "Late Charge") equal to five percent (5%) of the amount of such unpaid installment or portion thereof to reimburse Landlord for its cost and inconvenience incurred as a result of Tenant's delinquency; provided, however, Landlord shall not charge the Late Charge until after Tenant has failed on more than one (1) occasion in any twelve (12) consecutive month period to pay all or any portion of any installment of Basic Rent by the date occurring five (5) Business Days after receiving written notice of such failure.  Tenant acknowledges that the damages to and costs incurred by Landlord resulting from Tenant's late payment of Basic Rent would be difficult, if not impossible, to ascertain with any accuracy, and that the five percent (5%) charge represents Landlord and Tenant's efforts to approximate such potential damages and costs;

(iii)     [intentionally omitted];

(iv)     interest at the rate (the "Default Rate") of five percent (5%) over the Prime Rate per annum on the following sums until paid in full: (A) all overdue installments of Basic Rent from the respective due dates thereof, (B) all overdue amounts of Additional Rent relating to obligations which Landlord shall have paid on behalf of Tenant, from the date of payment thereof by Landlord, and (C) all other overdue amounts of Additional Rent, from the date when any such amount becomes overdue; provided, however, Landlord shall not charge the Default Rate until after Tenant has failed on more than one (1) occasion in any twelve (12) consecutive month period to pay all or any portion of any installment of Basic Rent by the date occurring five (5) Business Days after receiving written notice of such failure; and

(v)     five thousand dollars ($5,000) per month for each month that Tenant fails to deliver the annual and quarterly financial statements that are required to be delivered pursuant to Paragraph 28(b) within five (5) Business Days after receiving written notice of such failure.

(b)     Tenant shall pay and discharge (i) any Additional Rent referred to in Paragraph 7(a)(i) when the same shall become due, provided that amounts which are billed to Landlord or any third party, but not to Tenant, shall be paid within five (5) Business Days after Landlord's written demand for payment thereof, and (ii) any other Additional Rent, within five (5) Business Days after Landlord's written demand for payment thereof.

(c)     In no event shall amounts payable under Paragraph 7(a)(ii), (iii) and (iv) or elsewhere in this Lease exceed the maximum amount permitted by applicable Law.

8.     <u>Net Lease; Non-Terminability</u>.

(a)     This is a net lease and all Monetary Obligations shall be paid without notice or demand and without set-off, counterclaim, recoupment, abatement, suspension, deferment, diminution, deduction, reduction or defense (collectively, a "<u>Set-Off</u>").

(b)     This Lease and the rights of Landlord and the obligations of Tenant hereunder shall not be affected by any event or for any reason or cause whatsoever foreseen or unforeseen.

(c)     The obligations of Tenant hereunder shall be separate and independent covenants and agreements, all Monetary Obligations shall continue to be payable in all events (or, in lieu thereof, Tenant shall pay amounts equal thereto), and the obligations of Tenant hereunder shall continue unaffected unless the requirement to pay or perform the same shall have been terminated pursuant to an express provision of this Lease.  The obligation to pay Rent or amounts equal thereto shall not be affected by any collection of rents by any governmental body pursuant to a tax lien or otherwise, even though such obligation results in a double payment of Rent.  All Rent payable by Tenant hereunder shall constitute "rent" for all purposes (including Section 502(b)(6) of the Federal Bankruptcy Code).

(d)     Except as otherwise expressly provided herein, Tenant shall have no right and hereby waives all rights which it may have under any Law (i) to quit, terminate or surrender this Lease or any of the Leased Premises, or (ii) to any Set-Off of any Monetary Obligations.

9.     <u>Payment of Impositions</u>.

(a)     Tenant shall, before interest or penalties are due thereon, pay and discharge all taxes (including, without limitations, real and personal property, franchise, sales, use, gross receipts, rent and occupancy taxes; which include any margin, excise, or similar tax imposed on the gross revenue or gross income of Landlord ("Gross Revenue Tax"), but only if such Gross Revenue Tax is allocable to Rent), all charges for any easement or agreement maintained for the benefit of any of the Leased Premises, all assessments and levies, all permit, inspection and license fees, all rents and charges for water, sewer, utility and communication services relating to any of the Leased Premises, all ground rents and all other public charges whether of a like or different nature, even if unforeseen or extraordinary, imposed upon or assessed against (i) Tenant, (ii) Tenant's leasehold interest in the Leased Premises, (iii) any of the Leased Premises, or (iv) Landlord as a result of or arising in respect of the ownership, occupancy, leasing, use, possession or sale of any of the Leased Premises, any activity conducted on any of the Leased Premises, or the Rent (collectively, the "<u>Impositions</u>"); provided, that nothing herein shall obligate Tenant to pay (A) income, excess profits or other taxes of Landlord (or Lender) which are determined on the basis of Landlord's (or Lender's) net income or net worth (unless such taxes are in lieu of or a substitute for any other tax, assessment or other charge upon or with respect to the Leased Premises which, if it were in effect, would be payable

by Tenant under the provisions hereof or by the terms of such tax, assessment or other charge and, except for Gross Revenue Tax to the extent expressly provided to be paid for by Tenant hereinabove), (B) any estate, inheritance, succession, gift or similar tax imposed on Landlord or (C) any capital gains tax or conveyance (transfer) fee or tax imposed on Landlord in connection with the sale of the Leased Premises to any Person (other than, with respect to such transfer tax only, Tenant or its designee). Landlord shall have the right to require Tenant to pay, together with scheduled installments of Basic Rent, the amount of the gross receipts or rent tax, if any, payable with respect to the amount of such installment of Basic Rent. If any Imposition may be paid in installments without interest or penalty, Tenant shall have the option to pay such Imposition in installments; in such event, Tenant shall be liable only for those installments which accrue or become due and payable during the Term. Tenant shall be responsible to obtain all bills for the payment of Impositions and shall prepare and file all tax reports required by governmental authorities which relate to the Impositions. Tenant shall deliver to Landlord (1) copies of all settlements and notices pertaining to the Impositions which may be issued by any governmental authority within thirty (30) days after Tenant's receipt thereof, (2) receipts for payment of all taxes required to be paid by Tenant hereunder within thirty (30) days after the due date thereof and (3) receipts for payment of all other Impositions within ten (10) days after Landlord's written request therefor.

(b)     Following the occurrence of an Event of Default (and subject to any applicable cure period) or if Landlord is required by a Lender to pay into escrow funds necessary to pay Escrow Charges (as herein defined), Tenant shall pay Escrow Charges to Landlord such amounts (each an "Escrow Payment") monthly or as required by a Lender (but not more often than monthly) so that there shall be in an escrow account an amount sufficient to pay the Escrow Charges (as hereinafter defined) as they become due. As used herein, "Escrow Charges" shall mean (1) real estate taxes and assessments on or with respect to the Leased Premises or payments in lieu thereof and (2) premiums on any insurance required by this Lease and any reserves for capital improvements, deferred maintenance repair and/or tenant improvements, except that the items in clause (2) shall only be payable as Escrow Charges after the occurrence of an Event of Default (and subject to any applicable cure period). Landlord shall determine the amount of the Escrow Charges (it being agreed that if required by a Lender, such amounts shall equal any corresponding escrow installments required to be paid by Landlord) and the amount of each Escrow Payment. As long as the Escrow Payments are being held by Landlord the Escrow Payments shall not be commingled with other funds of Landlord or other Persons and interest thereon shall accrue for the benefit of Tenant from the date such monies are received and invested until the date such monies are disbursed to pay Escrow Charges. Landlord shall apply the Escrow Payments to the payment of the Escrow Charges in such order or priority as Landlord shall determine or as required by law. If at any time the Escrow Payments theretofore paid to Landlord shall be insufficient for the payment of the Escrow Charges, Tenant, within thirty (30) days after Landlord's demand therefor, shall pay the amount of the deficiency to Landlord.

10.     Compliance with Laws and Easement Agreements, Environmental Matters.

(a)     Tenant shall, at its expense, comply with and conform to, and cause the Leased Premises and any other Person occupying any part of the Leased Premises to

comply with and conform to, all Insurance Requirements and Legal Requirements (including all applicable Environmental Laws).  Tenant shall not at any time (i) cause, permit or suffer to occur any Environmental Violation or (ii) permit any sublessee, assignee or other Person occupying the Leased Premises under or through Tenant to cause, permit or suffer to occur any Environmental Violation and, at the request of Landlord or Lender, Tenant shall promptly remediate or undertake any other appropriate response action to correct any existing Environmental Violation, and (iii) without the prior written consent of Landlord and Lender, permit any drilling or exploration for or extraction, removal, or production of any minerals from the surface or the subsurface of the Land, regardless of the depth thereof or the method of mining or extraction thereof.  Any and all reports prepared for or by Landlord with respect to the Leased Premises shall be for the sole benefit of Landlord and Lender and no other Person shall have the right to rely on any such reports.

(b)     Tenant, at its sole cost and expense, will at all times promptly and faithfully abide by, discharge and perform all of the covenants, conditions and agreements contained in any Easement Agreement on the part of Landlord or the occupier to be kept and performed thereunder; provided, however, that Landlord will not enter into an Easement Agreement after the Commencement Date without the prior written consent of Tenant, which consent shall not be unreasonably withheld.  Tenant will not alter, modify, amend or terminate any Easement Agreement, give any consent or approval thereunder, or enter into any new Easement Agreement without, in each case, the prior written consent of Landlord.

(c)     Upon prior written notice from Landlord, Tenant shall permit such persons as Landlord may designate ("Site Reviewers") to visit the Leased Premises during normal business hours and in a manner which does not unreasonably interfere with Tenant's operations and perform, as agents of Landlord, and to conduct environmental site investigations and assessments ("Site Assessments") on the Leased Premises in any of the following circumstances:  (i) in connection with any sale, financing or refinancing of the Leased Premises, (ii) within the six month period prior to the expiration of the Term, (iii) if required by Lender or the terms of any credit facility to which Landlord is bound, (iv) if an Event of Default exists and is continuing beyond any applicable cure period, or (v) at any other time that, in the opinion of Landlord or Lender, a good faith, reasonable basis exists to believe that an Environmental Violation or any condition that could reasonably be expected to result in any Environmental Violation exists.  Such Site Assessments may include both above and below the ground testing for Environmental Violations and such other tests as may be necessary, in the opinion of the Site Reviewers, to conduct the Site Assessments.  Tenant shall supply to the Site Reviewers such historical and operational information regarding the Leased Premises as may be reasonably requested by the Site Reviewers to facilitate the Site Assessments, and shall make available for meetings with the Site Reviewers appropriate personnel having knowledge of such matters.  The cost of performing any Site Assessments in connection with the events described in the above subclauses (ii), (iv) and (v) shall be paid by Tenant.  The cost of performing any Site Assessments in connection with the event described in the above subclauses (i) and (iii) shall be paid by Landlord.

(d)     If an Environmental Violation occurs or is found to exist and, in Landlord's reasonable judgment, the cost of remediation of, or other response action with respect to, the same is likely to exceed $250,000, Tenant shall provide to Landlord, within ten (10) days

15

after Landlord's request therefor, adequate financial assurances that Tenant will effect such remediation in accordance with applicable Environmental Laws.  Such financial assurances shall be a bond or letter of credit reasonably satisfactory to Landlord in form and substance and in an amount equal to or greater than Landlord's reasonable estimate, based upon a Site Assessment performed pursuant to Paragraph 10(c), of the anticipated cost of such remedial action.

        (e)      Notwithstanding any other provision of this Lease, if an Environmental Violation occurs or is found to exist and the Term would otherwise terminate or expire, then, at the option of Landlord, the Term shall be automatically extended beyond the date of termination or expiration and this Lease shall remain in full force and effect beyond such date until the earlier to occur of (i) the completion of all remedial action in accordance with applicable Environmental Laws or (ii) the date specified in a written notice from Landlord to Tenant terminating this Lease.

        (f)      If Tenant fails to promptly commence and diligently pursue to complete the remediation of any Environmental Violation which occurs or is found to exist, Landlord shall have the right (but no obligation) to take any and all actions as Landlord shall deem necessary or advisable in order to cure such Environmental Violation.

        (g)      Tenant shall notify Landlord immediately after becoming aware of any Environmental Violation (or alleged Environmental Violation) or noncompliance with any of the covenants contained in this Paragraph 10 and shall forward to Landlord immediately upon receipt thereof copies of all orders, reports, notices, permits, applications or other communications relating to any such violation or noncompliance.

        (h)      All future leases, subleases or concession agreements relating to the Leased Premises entered into by Tenant shall contain covenants of the other party not to at any time (i) cause any Environmental Violation to occur or (ii) permit any Person occupying the Leased Premises through said subtenant or concessionaire to cause any Environmental Violation to occur.

      11.    <u>Liens; Recording</u>.

        (a)      Tenant shall not, directly or indirectly, create or permit to be created or to remain and shall promptly discharge or remove any lien, levy or encumbrance on any of the Leased Premises or on any Rent or any other sums payable by Tenant under this Lease, other than any Mortgage or Assignment, the Permitted Encumbrances and any mortgage, lien, encumbrance or other charge created by or resulting solely from any act or omission of Landlord.

        (b)      Tenant shall execute, deliver and record, file or register (collectively, "<u>record</u>") all such instruments as may be required or permitted by any present or future Law in order to evidence the respective interests of Landlord and Tenant in the Leased Premises, and shall cause a memorandum of this Lease (or, if such a memorandum cannot be recorded, this Lease), and any supplement hereto or thereto, to be recorded in such manner and in such places as may be required or permitted by any present or future Law in order to protect the validity and priority of this Lease.

12.    <u>Maintenance and Repair</u>.

(a)    Tenant shall at all times maintain the Leased Premises in as good repair and appearance as they are in on the date hereof and fit to be used for their intended use in accordance with the better of (i) the practices generally recognized as then acceptable by other companies in its industry or (ii) observed by Tenant with respect to the other real properties owned or operated by it, and, in the case of the Equipment, in as good mechanical condition as it was on the later of the date hereof or the date of its installation (provided that, in the case of (i) and (ii), ordinary wear and tear shall be excepted). Tenant shall take every other action necessary or appropriate for the preservation and safety of the Leased Premises. Tenant shall promptly make all Alterations of every kind and nature, whether foreseen or unforeseen, which may be required to comply with the foregoing requirements of this Paragraph 12(a). Landlord shall not be required to make any Alteration, whether foreseen or unforeseen, or to maintain any of the Leased Premises in any way, and Tenant hereby expressly waives any right which may be provided for in any Law now or hereafter in effect to make Alterations at the expense of Landlord or to require Landlord to make Alterations. Any Alteration made by Tenant pursuant to this Paragraph 12 shall be made in conformity with the provisions of Paragraph 13.

(b)    If any Improvement, now or hereafter constructed, shall (i) encroach upon any setback or any property, street or right-of-way adjoining the Leased Premises, (ii) violate the provisions of any restrictive covenant affecting the Leased Premises, (iii) hinder or obstruct any easement or right-of-way to which any of the Leased Premises is subject or (iv) impair the rights of others in, to or under any of the foregoing, Tenant shall, promptly after receiving notice or otherwise acquiring knowledge thereof, either (A) obtain from all necessary parties waivers or settlements of all claims, liabilities and damages resulting from each such encroachment, violation, hindrance, obstruction or impairment, whether the same shall affect Landlord, Tenant or both, or (B) take such action as shall be necessary to remove all such encroachments, hindrances or obstructions and to end all such violations or impairments, including, if necessary, making Alterations.

13.    <u>Alterations and Improvements</u>.

(a)    Tenant shall have the right, without having obtained the prior written consent of Landlord and Lender and provided that no Event of Default is continuing beyond any applicable cure period, (i) to make non-structural Alterations or a series of related non-structural Alterations to the Leased Premises that, as to any such Alterations or series of related Alterations, are not estimated to cost in excess of the Alterations Threshold Amount and (ii) to install Equipment in the Improvements or accessions to the Equipment that, as to such Equipment or accessions, are not estimated to cost excess of the Alterations Threshold Amount, so long as at the time of construction or installation of any such Equipment or Alterations no Event of Default exists and the value and utility of the Leased Premises is not diminished thereby. If the estimated cost of any non-structural Alterations, series of related non-structural Alterations, Equipment or accessions thereto is in excess of the Alterations Threshold Amount, or if Tenant desires to make structural Alterations to the Leased Premises, the prior written approval of Landlord and Lender shall be required, which approval shall not be unreasonably withheld, conditioned, or delayed. Tenant shall not construct upon the Land any additional buildings without having first obtained the prior written consent of Landlord and Lender. In the

17

event that this Lease expressly conditions any required approval of any Alterations upon the removal of such Alteration upon the expiration of the Term or earlier termination of this Lease, Landlord shall have the right to require Tenant to remove any such Alteration upon the expiration of the Term or earlier termination of this Lease (except for those Alterations required by Law or for which Landlord has agreed in writing that removal will not be required), in which event, Tenant shall repair any and all damage to the Leased Premises resulting from such removal.

(b)     If Tenant makes any Alterations pursuant to this Paragraph 13 or as required by Paragraph 12 or 17 (such Alterations and actions being hereinafter collectively referred to as "Work") whether or not Landlord's consent is required, then (i) the market value of the Leased Premises shall not be lessened by any such Work or its usefulness impaired, (ii) all such Work shall be performed by Tenant in a good and workmanlike manner, (iii) all such Work shall be expeditiously completed in compliance with all Legal Requirements, (iv) all such Work shall comply with the Insurance Requirements, (v) if any such Work involves the replacement of Equipment or parts thereto, all replacement Equipment or parts shall have a value and useful life equal to the greater of (A) the value and useful life on the date hereof of the Equipment being replaced or (B) the value and useful life of the Equipment being replaced immediately prior to the occurrence of the event which required its replacement (assuming such replaced Equipment was then in the condition required by this Lease), (vi) Tenant shall promptly discharge or remove all liens filed against any of the Leased Premises arising out of such Work, (vii) Tenant shall procure and pay for all permits and licenses required in connection with any such Work, (viii) all such Work shall be the property of Landlord and shall be subject to this Lease, and Tenant shall execute and deliver to Landlord any document reasonably requested by Landlord evidencing the assignment to Landlord of all estate, right, title and interest (other than the leasehold estate created hereby) of Tenant or any other Person thereto or therein, and (ix) Tenant shall comply, to the extent requested by Landlord or required by this Lease, with the provisions of Paragraphs 12(a) and 19(a), whether or not such Work involves restoration of the Leased Premises.

14.     Permitted Contests. Notwithstanding any other provision of this Lease, Tenant shall not be required to (a) pay any Imposition, (b) comply with any Legal Requirements, (c) discharge or remove any lien referred to in Paragraph 11 or 13 or (d) take any action with respect to any encroachment, violation, hindrance, obstruction or impairment referred to in Paragraph 12(b) (such non-compliance with the terms hereof being hereinafter referred to collectively as "Permitted Violations") and may dispute or contest the same, so long as at the time of such contest no Event of Default is continuing beyond any applicable notice and cure period and so long as Tenant shall contest, in good faith, the existence, amount or validity thereof, the amount of the damages caused thereby, or the extent of its or Landlord's liability therefor by appropriate proceedings which shall operate during the pendency thereof to prevent or stay (i) the collection of, or other realization upon, the Permitted Violation so contested, (ii) the sale, forfeiture or loss of any of the Leased Premises or any Rent to satisfy or to pay any damages caused by any Permitted Violation, (iii) any interference with the use or occupancy of any of the Leased Premises, (iv) any interference with the payment of any Rent, or (v) the cancellation or increase in the rate of any insurance policy or a statement by the carrier that coverage will be denied or (vi) the enforcement or execution of any injunction, order or Legal Requirement with respect to the Permitted Violation. Tenant shall provide Landlord security

which is satisfactory, in Landlord's reasonable judgment, to assure that such Permitted Violation is corrected, including all Costs, interest and penalties that may be incurred or become due in connection therewith.  While any proceedings which comply with the requirements of this Paragraph 14 are pending and the required security is held by Landlord, Landlord shall not have the right to correct any Permitted Violation thereby being contested unless Landlord is required by law to correct such Permitted Violation and Tenant's contest does not prevent or stay such requirement as to Landlord.  Each such contest shall be promptly and diligently prosecuted by Tenant to a final conclusion, except that Tenant, so long as the conditions of this Paragraph 14 are at all times complied with, has the right to attempt to settle or compromise such contest through negotiations.  Tenant shall pay any and all losses, judgments, decrees and Costs in connection with any such contest and shall, promptly after the final determination of such contest, fully pay and discharge the amounts which shall be levied, assessed, charged or imposed or be determined to be payable therein or in connection therewith, together with all penalties, fines, interest and Costs thereof or in connection therewith, and perform all acts the performance of which shall be ordered or decreed as a result thereof.  No such contest shall subject Landlord to the risk of any civil or criminal liability.  In respect to any Permitted Violation, which shall be the subject of a contest under and pursuant to this Paragraph 14, the non-payment thereof shall not be regarded as a breach of any covenant of this Lease so long as Tenant shall comply with the terms of this Paragraph 14, and Landlord shall not have the right to correct any Permitted Violation thereby being contested unless Landlord is required by law to correct such Permitted Violation and Tenant's contest does not prevent or stay such requirement as to Landlord.  Tenant, in all events, however, shall pay any such charges if payment is required in order to prevent the divesting of Landlord's title or other interest in the Leased Premises.

15.    Indemnification.

(a)    Tenant shall pay, protect, indemnify, defend, save and hold harmless Landlord, Lender and all other Persons described in Paragraph 30 (each an "Indemnitee") from and against any and all liabilities, losses, damages (but excluding punitive, consequential, special, and indirect damages), penalties, Costs (including attorneys' fees and costs), causes of action, suits, claims, demands or judgments of any nature whatsoever, howsoever caused, without regard to the form of action and whether based on strict liability, negligence or any other theory of recovery at law or in equity (each, a "Claim") arising from (i) any matter pertaining to the ownership, use, non-use, occupancy, operation, condition, design, construction, maintenance, repair or restoration of the Leased Premises, (ii) any casualty in any manner arising from the Leased Premises, whether or not Indemnitee has or should have knowledge or notice of any defect or condition causing or contributing to said casualty, (iii) any violation by Tenant of any provision of this Lease, any contract or agreement to which Tenant is a party, any Legal Requirement or any Permitted Encumbrance or any encumbrance Tenant consented to, or (iv) any alleged, threatened or actual Environmental Violation, including (A) liability for response costs and for costs of removal and remedial action incurred by the United States Government, any state or local governmental unit or any other Person, or damages from injury to or destruction or loss of natural resources, including the reasonable costs of assessing such injury, destruction or loss, incurred pursuant to Section 107 of CERCLA, or any successor section or act or provision of any similar state or local Law, (B) liability for costs and expenses of abatement, correction or clean-up, fines, damages, response costs or penalties which arise from the provisions of any of the other Environmental Laws and (C) liability for personal

injury or property damage arising under any statutory or common-law tort theory, including damages assessed for the maintenance of a public or private nuisance or for carrying on of a dangerous activity.

Notwithstanding the foregoing, unless a material Event of Default shall have occurred and be ongoing beyond any applicable notice and cure period, Tenant shall have no responsibility under this paragraph for any Claim resulting from the negligence or willful misconduct of an Indemnitee for damage to property or injury to persons resulting from acts of Landlord or its agents during their actual entry upon the Leased Premises (a "Landlord Violation"). Further, Landlord shall pay, protect, indemnify, defend, save and hold harmless Tenant from and against any and all liabilities, losses, damages (but excluding punitive, consequential, special, and indirect damages), penalties, Costs, causes of action, suits, claims, demands or judgments arising solely in connection with a Landlord Violation. For purposes of this paragraph only, a "material Event of Default" means an Event of Default in the payment of Rent or a failure by Tenant to perform any repair, replacement or maintenance obligation with respect to the Leased Premises, the reasonable cost of which exceeds $50,000.

(b)      In case any action or proceeding is brought against any Indemnitee by reason of any such claim, (i) Tenant may, except in the event of a conflict of interest or a dispute between Tenant and any such Indemnitee or during the continuance of an Event of Default, retain its own counsel and defend such action (it being understood that Landlord may employ counsel of its choice to monitor the defense of any such action, the cost of which shall be paid by Tenant) and (ii) such Indemnitee shall notify Tenant to resist or defend such action or proceeding by retaining counsel reasonably satisfactory to such Indemnitee, and such Indemnitee will cooperate and assist in the defense of such action or proceeding if reasonably requested so to do by Tenant. In the event of a conflict of interest or dispute or during the continuance of an Event of Default, Landlord shall have the right to select counsel, and the cost of such counsel shall by paid by Tenant.

(c)      The obligations of Landlord and Tenant under this Paragraph 15 shall survive any termination, expiration or rejection in bankruptcy of this Lease with respect to any claims or liability occurring prior to such expiration or termination.

16.    Insurance.

(a)      Tenant shall obtain, pay for and maintain the following insurance on or in connection with the Leased Premises:

(i)      Insurance against all risk of physical loss or damage to the Improvements and Equipment as provided under "Special Causes of Loss" form coverage, and including customarily excluded perils of hail, windstorm, flood coverage, earthquake and, to the extent required by Lender, mold insurance (subject to market availability at the time in question), in amounts no less than the actual replacement cost of the Improvements and Equipment; provided that, if Tenant's insurance company is unable or unwilling to include any of all of such excluded perils, Tenant shall have the option of purchasing coverage against such perils from another insurer on a "Difference in Conditions" form or through a stand-alone policy. Such policies shall contain Replacement Cost and Agreed Amount Endorsements and "Law and Ordinance" coverage (at full replacement cost). Such policies and endorsements shall contain

deductibles not more than $750,000 per occurrence,  such deductible amounts being subject to increase (x) by the Escalation Factor (as such term is defined in Paragraph 16(i) below) and (y) in the event a LC Backstop (as such term is defined in Paragraph 16(i) below) is provided to Landlord by Tenant or Guarantor.

        (ii)     Commercial General Liability Insurance and Business Automobile Liability Insurance (including Non-Owned and Hired Automobile Liability) against claims for personal and bodily injury, death or property damage occurring on, in or as a result of the use of the Leased Premises, in an amount not less than $15,000,000 per occurrence/annual aggregate, with no self-insured retention or deductible in excess of $350,000, on a claims occurrence basis, such deductible amounts being subject to increase (x) by the Escalation Factor (as such term is defined in Paragraph 16(i) below) and (y) in the event a LC Backstop (as such term is defined in Paragraph 16(i) below) is provided to Landlord by Tenant or Guarantor.

        (iii)     Workers' compensation insurance in the amount required by applicable Law and employers' liability insurance covering all persons employed by Tenant in connection with any work done on or about any of the Leased Premises.

        (iv)     Comprehensive Boiler and Machinery/Equipment Breakdown Insurance on any of the Equipment or any other equipment on or in the Leased Premises, in an amount not less than $5,000,000 per accident for damage to property (and which may be carried as part of the coverage required under clause (i) above or pursuant to a separate policy or endorsement).  Either such Boiler and Machinery policy or the Special Causes of Loss policy required in clause (i) above shall include at least $3,000,000 per incidence for Off-Premises Service Interruption, Expediting Expenses, and Hazardous Materials Clean-Up Expense, and may contain a deductible not to exceed $750,000.00; ,  such deductible amounts being subject to increase (x) by the Escalation Factor (as such term is defined in Paragraph 16(i) below) and (y) in the event a LC Backstop (as such term is defined in Paragraph 16(i) below) is provided to Landlord by Tenant or Guarantor.

        (v)     Business Income/Extra Expense Insurance at limits sufficient to cover 100% of the period of indemnity not less than eighteen (18) months from time of loss, including extended period of indemnity which provides that after the physical loss to the Improvements and Equipment has been repaired, the continued loss of income will be insured until such income either returns to the same level it was at prior to the loss, or the expiration of six (6) months from the date that the Leased Premises are repaired or replaced and operations are resumed, whichever first occurs.

        (vi)     During any period in which substantial Alterations at the Leased Premises are being undertaken, builder's risk insurance covering the total completed value, including all hard and soft costs (which shall include business interruption coverage) with respect to the Improvements being constructed, altered or repaired (on a completed value, non-reporting basis), replacement cost of work performed and equipment, supplies and materials furnished in connection with such construction, alteration or repair of Improvements or Equipment, together with such other endorsements as Landlord may reasonably require, and general liability, worker's compensation and automobile liability insurance with respect to the Improvements being constructed, altered or repaired.

(vii)    Such other insurance (or other or different terms with respect to any insurance required pursuant to this Paragraph 16, including without limitation amounts of coverage, deductibles, form of mortgagee clause, insurer rating) on or in connection with any of the Leased Premises as Landlord or Lender may reasonably require. In furtherance of the foregoing, notwithstanding anything to the contrary set forth in Section 16(a)(i)(ii) and (iv) of the Lease, if Landlord desires to obtain a Loan that will be secured by the Property and the Lender with respect to such Loan objects to the deductible amount contained in Tenant's then current insurance policy , then Tenant agrees to enter into good faith discussions with such Lender concerning the amount of such deductible. Landlord agrees to use commercially reasonable efforts to facilitate and schedule such discussions regarding the deductible between Tenant and Landlord.  If after five (5) Business Days from the date upon which Landlord has notified Tenant that the Lender has not agreed to accept Tenant's deductible or Tenant's proposed deductible, and provided appropriate Lender contact information, Lender has still not agreed to accept such deductible amount, Tenant shall promptly, but in all cases within ten (10) Business Days, procure and provide, from its then current carrier, evidence of a deductible in an amount satisfactory to Lender; provided that, in no event shall Tenant be required to maintain a deductible in an amount less than $300,000; and provided further that if Tenant is unable to maintain a deductible in an amount satisfactory to Lender for which is $300,000 or more, Tenant shall instead provide a letter of credit in commercially reasonable form in an amount equal to the difference between the amount of Tenant's deductible and Lender's required deductible amount. If Tenant is required by Lender to provide multiple letters of credit due to multiple unacceptable policy deductibles, Tenant may provide one letter of credit that amounts to the total of what otherwise would be each letter of credit combined.  In addition, with respect to the insurance coverages required to be maintained pursuant to clauses (i) through (vi) of this Paragraph 16(a), Tenant shall (i) use commercially reasonable efforts, consistent with those of prudent owners of institutional quality commercial real estate, to maintain insurance coverage against any loss, damage or injury, and (ii) maintain, if required by Lender, Flood insurance under the National Flood Insurance Program if any part of the Leased Premises is located in an area now or hereafter designated by the Federal Emergency Management Agency as a Zone "A" & "V" Special Hazard Area, or such other Special Hazard Area, and such additional flood coverage shall (i) be in an amount equal to (A) 100% of the full replacement cost of the Improvements at the Leased Premises (without any deduction for depreciation) or (B) such lesser amount as agreed to by Lender in its sole discretion.

(b)    The insurance required by Paragraph 16(a) shall be written by companies having a Best's rating of A:X or above and a claims paying ability rating of AA or better by Standard & Poor's Rating Services, a division of the McGraw Hill Companies, Inc. or equivalent rating agency approved by Landlord and Lender in their sole discretion and are authorized to write insurance policies by, the State Insurance Department (or its equivalent) for the State.  The insurance policies shall be in amounts sufficient at all times to satisfy any coinsurance requirements thereof. If said insurance or any part thereof shall expire, be withdrawn, become void, voidable, unreliable or unsafe for any reason, including a breach of any condition thereof by Tenant or the failure or impairment of the capital of any insurer, or if for any other commercially reasonable reason said insurance shall become reasonably unsatisfactory to Landlord, Tenant shall immediately obtain new or additional insurance reasonably satisfactory to Landlord.  The insurance referred to in Paragraphs 16(a)(i), 16(a)(iv) and 16(a)(vi) shall name Landlord as owner and Lender as loss payee and Tenant as its interest may appear.  The

insurance referred to in Paragraph 16(a)(ii) shall name Landlord and Lender as additional insureds, and the insurance referred to in Paragraph 16(a)(v) shall name Landlord as insured and Lender and Landlord as loss payee as its interest may appear.

(c)     Each insurance policy referred to in clauses (i), (iv), (v) and (vi) of Paragraph 16(a) shall contain standard non-contributory mortgagee clauses in favor of and acceptable to Lender.  Each policy required by any provision of Paragraph 16(a), except clause (iii) thereof, shall provide such endorsements as reasonably requested by Landlord and Lender, including a manuscript endorsement providing that each such policy may not be cancelled, substantially modified or allowed to lapse on any renewal date except after at least thirty (30) days' prior written notice to Landlord and Lender, with respect to any such modifications, or non-renewal or termination by either insurer or Tenant, or at least ten (10) days prior written notice with respect to cancellation for non-payment of premiums.  In each case, Landlord and Lender shall be entitled to the same notice as Tenant (as named insured) under each policy, and in any event such minimum notice required by applicable Law.

(d)     Tenant shall pay as they become due all premiums for the insurance required by Paragraph 16(a), shall renew or replace each policy and deliver to Landlord evidence of the payment of the full premium therefor or installment then due at least ten (10) days prior to the expiration date of such policy, and shall promptly deliver to Landlord all original certificates of insurance evidencing such coverages or, if required by Landlord or Lender, original or certified copies of policies or endorsement pages as requested.  All certificates of insurance (including liability coverage) provided to Landlord and Lender shall be on an appropriate ACORD Form acceptable to Landlord and Lender and shall be accompanied by the required notice endorsement required under Paragraph (c) above.

(e)     Anything in this Paragraph 16 to the contrary notwithstanding, any insurance which Tenant is required to obtain pursuant to Paragraph 16(a) may be carried under a "blanket" policy or policies covering other properties of Tenant or under an "umbrella" policy or policies covering other liabilities of Tenant, as applicable; provided that, such blanket or umbrella policy or policies otherwise comply with the provisions of this Paragraph 16, and upon request, Tenant shall provide to Landlord a Statement of Values which may be reviewed annually and shall be amended to the extent determined necessary by Landlord based on revised Replacement Cost Valuations.  The original or a certified copy of each such blanket or umbrella policy shall promptly be delivered to Landlord upon Landlord's written request.

(f)     Tenant shall not carry separate insurance concurrent in form or contributing in the event of a Casualty with that required in this Paragraph 16 unless (i) Landlord and Lender are included therein as named insureds, with loss payable as provided herein, and (ii) such separate insurance complies with the other provisions of this Paragraph 16.  Tenant shall immediately notify Landlord of such separate insurance and shall deliver to Landlord the original policies or certified copies thereof.

(g)     Each policy shall contain an effective waiver by the carrier against all claims for payment of insurance premiums against Landlord and shall contain a full waiver of subrogation against the Landlord.

      (h)    The proceeds of any insurance required under Paragraph 16(a) shall be payable as follows:

      (i)    proceeds payable under clauses (ii), (iii) and (iv) of Paragraph 16(a) and proceeds attributable to the general liability coverage of Builder's Risk insurance under clause (vi) of Paragraph 16(a) shall be payable to the Person entitled to receive such proceeds; and

      (ii)    proceeds of insurance required under clause (i) of Paragraph 16(a) and proceeds attributable to Builder's Risk insurance (other than its general liability coverage provisions) under clause (vi) of Paragraph 16(a) shall be payable to Landlord or Lender and applied as set forth in Paragraph 17 or, if applicable, Paragraph 18.  Tenant shall apply the Net Award to restoration of the Leased Premises in accordance with the applicable provisions of this Lease unless a Termination Event shall have occurred and Tenant has given a Termination Notice.

      (i)    For purposes of this Paragraph 16, the following definitions shall apply:

      (i)    "Escalation Factor" shall mean an increase equal to two percent (2%) per annum, effective on each anniversary of the Commencement Date.

      (ii)    "LC Backstop" shall mean a letter of credit in commercially reasonable form in an amount equal to the difference between the amount of Tenant's actual deductible and the deductible amount required pursuant to Paragraph 16(a)(i)(ii) and (iv), as the same may be increased by the Escalation Factor.

    17.   Casualty and Condemnation.

      (a)    If any Casualty to the Leased Premises occurs, Tenant shall give Landlord and Lender immediate notice thereof.  Landlord and Lender are hereby authorized to adjust, collect and compromise, in their discretion and upon notice to Tenant (except that no notice to Tenant shall be required if an Event of Default has occurred and is continuing), all claims under any of the insurance policies required by Paragraph 16(a) (except public liability insurance claims payable to a Person other than Tenant, Landlord or Lender) and to execute and deliver on behalf of Tenant all necessary proofs of loss, receipts, vouchers and releases required by the insurers.  Provided that no Event of Default has occurred and is continuing, Tenant shall be entitled to participate with Landlord and Lender in any adjustment, collection and compromise of the Net Award payable in connection with a Casualty.  Tenant agrees to sign, upon the request of Landlord and Lender, all such proofs of loss, receipts, vouchers and releases. If Landlord or Lender so requests, Tenant shall adjust, collect and compromise any and all such claims, and Landlord and Lender shall have the right to join with Tenant therein.  Any adjustment, settlement or compromise of any such claim shall be subject to the prior written approval of Landlord and Lender (which said written approval shall not be unreasonably withheld, conditioned, or delayed), and Landlord and Lender shall have the right to prosecute or contest, or to require Tenant to prosecute or contest, any such claim, adjustment, settlement or compromise.  Each insurer is hereby authorized and directed to make payment under said

24

policies, including return or unearned premiums, directly to Landlord or, if required by the Mortgage, to Lender instead of to Landlord and Tenant jointly, and Tenant hereby appoints each of Landlord and Lender as Tenant's attorneys-in-fact to endorse any draft therefor. The rights of Landlord under this Paragraph 17(a) shall be extended to Lender if and to the extent that any Mortgage so provides.

        (b)      Tenant, immediately upon receiving a Condemnation Notice, shall notify Landlord and Lender thereof. Landlord and Lender are authorized to collect, settle and compromise, in their discretion (and, if no Event of Default exists, upon notice to Tenant), the amount of any Net Award. Provided that no Event of Default has occurred and is continuing, Tenant shall be entitled to participate with Landlord and Lender in any Condemnation proceeding or negotiations under threat thereof and to contest the Condemnation or the amount of the Net Award therefor. No agreement with any condemnor in settlement or under threat of any Condemnation shall be made by Tenant without the written consent of Landlord and Lender. Subject to the provisions of this Paragraph 17(b), Tenant hereby irrevocably assigns to Landlord any award or payment to which Tenant is or may be entitled by reason of any Condemnation, whether the same shall be paid or payable for Tenant's leasehold interest hereunder or otherwise; but nothing in this Lease shall impair Tenant's right to any award or payment on account of Tenant's trade fixtures, equipment or other tangible property which is not part of the Equipment, moving expenses or loss of business, if available, to the extent that and so long as (i) Tenant shall have the right to make, and does make, a separate claim therefor against the condemnor and (ii) such claim does not in any way reduce either the amount of the award otherwise payable to Landlord for the Condemnation of Landlord's fee interest in the Leased Premises or the amount of the award (if any) otherwise payable for the Condemnation of Tenant's leasehold interest hereunder. The rights of Landlord under this Paragraph 17(b) shall also be extended to Lender if and to the extent that any Mortgage so provides.

        18.     Restoration; Termination Events.

        (a)      If any Casualty (whether or not insured against) that is not a Landlord Casualty Event or Condemnation that is not a Total Condemnation shall occur, this Lease shall continue (subject to modification in accordance with Paragraph 18(c) below to the extent applicable), notwithstanding such event, and there shall be no abatement or reduction of any Monetary Obligations. Promptly after such Casualty or Condemnation, Tenant, as required in Paragraphs 12(a) and 13(b), shall commence and diligently continue to restore the Leased Premises as nearly as possible to its value, condition and character immediately prior to such event (assuming the Leased Premises to have been in the condition required by this Lease). So long as no Event of Default exists, any Net Award up to and including $100,000 shall be paid by Landlord to Tenant and Tenant shall restore the Leased Premises in accordance with the requirements of Paragraphs 12(a) and 13(b) of this Lease, and any balance shall promptly be refunded to Landlord. Any Net Award in excess of $100,000 shall be made available by Landlord (or Lender, if required by the terms of any Mortgage) to Tenant for the restoration of any of the Leased Premises pursuant to and in accordance with the provisions of Paragraph 19 hereof.

        (b)      If a Total Condemnation occurs this Lease shall terminate as of the later of the date actual physical possession is taken by the condemnor or the date on which the

right to compensation and damages accrues under the Law applicable to the Leased Premises and Landlord shall retain the Net Award (except for any award or payment made on account of the Excluded Property).

(c)     If a Total Casualty occurs during the last eighteen (18) months of the term of this Lease (and the term of this Lease has not automatically renewed), and if within thirty (30) days of such Casualty, Tenant determines that it is not commercially reasonable to restore the Leased Premises, and Tenant provides written notice of such election to Landlord within such thirty (30) day period ("Casualty Surrender Notice"), then Landlord shall retain the Net Award with respect to such Casualty and Tenant shall surrender the Leased Premises in accordance with Paragraph 26 of this Lease to the extent practicable in light of such Casualty on the date specified in the Casualty Surrender Notice (the date of such surrender being hereinafter referred to as the "Non-monetary Release Date").  Effective as of the Non-monetary Release Date, (A) Tenant shall not be responsible to maintain or repair the Leased Premises or maintain the insurance set forth in Paragraphs 16 (a)(i), (ii), (iii), (iv), (vi), or (vii) (but shall continue to cause the insurance required pursuant to Paragraph 16(a)(v) to remain in effect to the extent required to maintain rent loss coverage) and shall be released from any and all non-monetary obligations arising under this Lease with respect to the Leased Premises other than any obligations that expressly survive a termination by their terms under this Lease or arose prior to the Non-monetary Release Date but Tenant shall continue to be required to pay any and all Basic Rent and Additional Rent through the Expiration Date, and (B) Landlord shall indemnify, defend and hold harmless Tenant with respect to all matters first arising with respect to the Leased Premises from and after the Non-monetary Release Date (other than those obligations of Tenant under this Lease that survive termination of this Lease by their express terms or arose prior to the Non-monetary Release Date).

(d)     If a Landlord Casualty Event occurs, unless insurance proceeds are available pursuant to any contingent coverage that may be carried by Landlord and that which would allow for full restoration of the Leased Premises (in which case such proceeds would be made available to Tenant in accordance with Paragraph 19 below), then this Lease shall be deemed terminated upon the date of the applicable insurer's final determination that the Tenant's claim under the insurance provided for under Paragraph 16(a)(i) of this Lease is void, excluded or such claim is otherwise rejected on the basis of a Landlord Casualty Event, and Tenant shall be released from any and all obligations arising under this Lease with respect to the Leased Premises, except for Surviving Obligations.

19.    Restoration.

(a)     If any Net Award is in excess of $100,000, Landlord (or Lender if required by any Mortgage) shall hold the entire Net Award in a fund (the "Restoration Fund") and disburse amounts from the Restoration Fund only in accordance with the following conditions:

(i)     prior to commencement of restoration, (A) the architects, contracts, contractors, plans and specifications and a budget for the restoration shall have been approved by Landlord (which said approval shall not be unreasonably withheld, conditioned, or delayed), (B) Landlord and Lender shall be provided with mechanics' lien insurance (if available) and acceptable performance and payment bonds which insure satisfactory completion of and

payment for the restoration, are in an amount and form and have a surety acceptable to Landlord, and name Landlord and Lender as additional dual obligees, and (C) appropriate waivers of mechanics' and materialmen's liens with respect to Landlord's interest in the Leased Premises shall have been filed;

        (ii)     at the time of any disbursement, no Event of Default shall exist and no mechanics' or materialmen's liens shall have been filed against any of the Leased Premises and remain undischarged;

        (iii)     disbursements shall be made from time to time in an amount not exceeding the cost of the Work completed since the last disbursement, upon receipt of (A) satisfactory evidence, including architects' certificates, of the stage of completion, the estimated total cost of completion and performance of the Work to date in a good and workmanlike manner in accordance with the contracts, plans and specifications, (B) waivers of liens, (C) contractors' and subcontractors' sworn statements as to completed Work and the cost thereof for which payment is requested, (D) a satisfactory bringdown of title insurance and (E) other evidence of cost and payment so that Landlord can verify that the amounts disbursed from time to time are represented by Work that is completed, in place and free and clear of mechanics' and materialmen's lien claims;

        (iv)     each request for disbursement shall be accompanied by a certificate of Tenant, signed by the president or a vice president of Tenant, describing the Work for which payment is requested, stating the cost incurred in connection therewith, stating that Tenant has not previously received payment for such Work and, upon completion of the Work, also stating that the Work has been fully completed and complies with the applicable requirements of this Lease;

        (v)     Landlord may retain ten percent (10%) of the Restoration Fund until the Work is fully completed;

        (vi)     if the Restoration Fund is held by Landlord, the Restoration Fund shall not be commingled with Landlord's other funds and shall bear interest at a rate agreed to by Landlord and Tenant; and

        (vii)     such other reasonable conditions as Landlord or Lender may impose.

        (b)     Prior to commencement of restoration and at any time during restoration, if the estimated cost of completing the restoration Work free and clear of all liens, as reasonably determined by Landlord, exceeds the amount of the Net Award available for such restoration, the amount of such excess shall, upon demand by Landlord, be paid by Tenant to Landlord to be added to the Restoration Fund. Any sum so added by Tenant which remains in the Restoration Fund upon completion of restoration shall be refunded to Tenant. For purposes of determining the source of funds with respect to the disposition of funds remaining after the completion of restoration, the Net Award shall be deemed to be disbursed prior to any amount added by Tenant.

(c)     If any sum remains in the Restoration Fund after completion of the Work and any refund to Tenant pursuant to Paragraph 19(b), such sum (the "Remaining Sum") shall be retained by Landlord or, if required by a Note or Mortgage, paid by Landlord to a Lender.

20.     Procedures Upon Purchase.

(a)     If the Leased Premises is purchased by Tenant pursuant to any provision of this Lease, Landlord need not convey any better title thereto than that which was conveyed to Landlord, and Tenant shall accept such title, subject, however, to the Permitted Encumbrances and to all other liens, exceptions and restrictions on, against or relating to any of the Leased Premises and to all applicable Laws, but free of the lien of any security interest created by any Mortgage or Assignment and liens, exceptions and restrictions on, against or relating to the Leased Premises which have been created by or resulted solely from acts of Landlord after the date of this Lease, unless the same are Permitted Encumbrances or customary utility easements benefiting the Leased Premises or were created with the concurrence of Tenant or as a result of a default by Tenant under this Lease.

(b)     Upon the date fixed for any such purchase of the Leased Premises pursuant to any provision of this Lease (any such date the "Purchase Date"), Tenant shall pay to Landlord, or to any Person to whom Landlord directs payment, the Relevant Amount therefor specified herein, in Federal Funds, less any credit of the Net Award received and retained by Landlord or a Lender allowed against the Relevant Amount, and Landlord shall deliver to Tenant (i) a special warranty deed which describes the premises being conveyed and conveys the title thereto as provided in Paragraph 20(a), (ii) such other instruments as shall be necessary to transfer to Tenant or its designee any other property (or rights to any Net Award not yet received by Landlord or a Lender) then required to be sold by Landlord to Tenant pursuant to this Lease and (iii) any Net Award received by Landlord, not credited to Tenant against the Relevant Amount and required to be delivered by Landlord to Tenant pursuant to this Lease; provided, that if any Monetary Obligations remain outstanding on such date, then Landlord may deduct from the Net Award the amount of such Monetary Obligations; and further provided, that if any event has occurred which, in Landlord's reasonable judgment, is likely to subject any Indemnitee to any liability which Tenant is required to indemnify against pursuant to Paragraph 15, then an amount shall be deducted from the Net Award which, in Landlord's reasonable judgment, is sufficient to satisfy such liability, which amount shall be deposited in an escrow account with a financial institution reasonably satisfactory to Landlord and Tenant pending resolution of such matter. If on the Purchase Date any Monetary Obligations remain outstanding and no Net Award is payable to Tenant by Landlord or the amount of such Net Award is less than the amount of the Monetary Obligations, then Tenant shall pay to Landlord on the Purchase Date the amount of such Monetary Obligations. Upon the completion of such purchase, this Lease and all obligations and liabilities of Tenant hereunder shall terminate, except any Surviving Obligations.

(c)     If the completion of such purchase shall be delayed after (i) the Termination Date, in the event of a purchase pursuant to Paragraph 18 or, (ii) the date scheduled for such purchase, in the event of a purchase under any other provision of this Lease then (x) Rent shall continue to be due and payable until completion of such purchase and (y) at Landlord's sole option, Fair Market Value shall be redetermined and the Relevant Amount

payable by Tenant pursuant to the applicable provision of this Lease shall be adjusted to reflect such redetermination.

        (d)      Any prepaid Monetary Obligations paid to Landlord shall be prorated as of the Purchase Date, and the prorated unapplied balance shall be deducted from the Relevant Amount due to Landlord; provided, that no apportionment of any Impositions shall be made upon any such purchase.

        21.     Assignment and Subletting; Prohibition Against Leasehold Financing.

        (a)      Except as otherwise expressly provided to the contrary in this Paragraph 21, Tenant may not enter into any sublease or assign this Lease, voluntarily or involuntarily, whether by operation of law or otherwise (including through merger or consolidation) to any Person, other than an assignment to Person who is a Credit Entity, without the prior written consent of Landlord, which consent may be granted or withheld by Landlord in accordance with the provisions of Paragraphs 21(b) below.  Any purported sublease or assignment in violation of this Paragraph 21 shall be null and void.  In addition, notwithstanding anything to the contrary contained in this Paragraph 21, Tenant shall not have the right to assign this Lease (voluntarily or involuntarily, whether by operation of law or otherwise), or sublet any of the Leased Premises to any Person at any time that an Event of Default shall exist.  As used herein, a "Credit Entity" shall mean any Person that will have a publicly traded unsecured senior debt rating of "Baa3" or better from Moody's or a rating of "BBB-" or better from S&P (or, if such Person does not then have rated debt, a determination that by either of such rating agencies its unsecured senior debt would be so rated by such agency and will not be on "Negative Credit Watch"), and in the event both such rating agencies cease to furnish such ratings, then a comparable rating by any rating agency acceptable to Landlord.

        (b)      If Tenant desires to assign this Lease, whether by operation of law or otherwise, to a Person ("Non-Preapproved Assignee") that is not a Credit Entity (each a "Non-Preapproved Assignment") then Tenant shall, not less than ninety (90) days prior to the date on which it desires to make a Non-Preapproved Assignment, submit to Landlord and Lender information regarding the following with respect to the Non-Preapproved Assignee (collectively, the "Review Criteria"): (A) credit, (B) capital structure, (C) management, (D) operating history, (E) proposed use of the Leased Premises and (F) risk factors associated with the proposed use of the Leased Premises by the Non-Preapproved Assignee, taking into account factors such as environmental concerns, product liability and the like.  Landlord and Lender shall review such information and shall approve or disapprove the Non-Preapproved Assignee no later than the thirtieth (30th) day following receipt of all such information, and Landlord and Lender shall be deemed to have acted reasonably in granting or withholding consent if such grant or disapproval is based on their review of the Review Criteria applying prudent business judgment.  If a response is not received by Tenant by the expiration of such thirty (30) day period, such non-Preapproved Assignee shall be deemed disapproved.

        (c)      Tenant shall have the right, upon thirty (30) days prior written notice to Landlord and Lender, to enter into, up to, but not more than two (2) subleases with any third parties that demise, in the aggregate, up to, but not to exceed twenty-five percent (25%) of the gross leasable area of the Improvements at the Leased Premises, with no consent or approval of

Landlord being required or necessary (each, a "Preapproved Sublet"). Other than pursuant to Preapproved Sublets, at no time during the Term shall subleases exist without the prior written consent of Landlord, which consent shall be granted or withheld based on a review of the Review Criteria as they relate to the proposed sublessee and the terms of the proposed sublease. Landlord and Lender shall be deemed to have acted reasonably in granting or withholding consent if such grant or disapproval is based on their review of the Review Criteria applying prudent business judgment.  In addition, Landlord and Lender shall not unreasonably condition or delay such granting or withholding of consent.

(d)    If Landlord consents to an assignment of this Lease by Tenant and Tenant assigns all its rights and interest under this Lease, or if this Lease is assigned to a Credit Entity, the assignee under such assignment shall expressly assume all the obligations of Tenant hereunder, actual or contingent, including obligations of Tenant which may have arisen on or prior to the date of such assignment, by a written instrument delivered to Landlord at the time of such assignment.  Each sublease of any of the Leased Premises shall (A) be expressly subject and subordinate to this Lease and any Mortgage encumbering the Leased Premises; (B) not extend beyond the then current Term minus one day; (C) terminate upon any termination of this Lease, unless Landlord elects in writing, to cause the sublessee to attorn to and recognize Landlord as the lessor under such sublease, whereupon such sublease shall continue as a direct lease between the sublessee and Landlord upon all the terms and conditions of such sublease; and (D) bind the sublessee to all covenants contained in Paragraph 4(a), 10 and 12 with respect to subleased premises to the same extent as if the sublessee were the Tenant.  No assignment or sublease shall affect or reduce any of the obligations of Tenant hereunder or of the Guarantor under the Guaranty, and all such obligations of Tenant and Guarantor shall continue in full force and effect as obligations of a principal and not as obligations of a guarantor, as if no assignment or sublease had been made.  Notwithstanding the foregoing, at Tenant's request, Landlord shall promptly release Tenant from its obligations under this Lease and Guarantor from its obligations under the Guaranty from and after the date of any assignment effectuated in accordance with the terms of this Paragraph 21 if such assignment is to a Credit Entity. No assignment or sublease shall impose any additional obligations on Landlord under this Lease.

(e)    Notwithstanding any provision in this Paragraph 21 or elsewhere in this Lease to the contrary, Tenant shall, upon the request of Landlord, provide and cause any proposed assignee or sublessee to provide, such information (including, without limitation, any certification) as to any proposed assignee or sublessee and its principals as may be required for Landlord and Tenant to comply with regulations administered by the Office of Foreign Asset Control ("OFAC") of the Department of the Treasury, codified at 31 C.F.R. Part 500 (including those named on OFAC's Specially Designated and Blocked Persons list) or under any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action regarding persons or entities with whom U.S. persons or entities are restricted from doing business (including persons or entities who have violated the U.S. Foreign Corrupt Practices Act 15 U.S.C. §§78dd-1, 78dd-2 and 78dd-3).

(f)    Tenant shall, within ten (10) days after the execution and delivery of any approved assignment or sublease, deliver a duplicate original copy thereof to Landlord which, in the event of an assignment, shall be in recordable form.

(g)     As security for performance of its obligations under this Lease, Tenant hereby grants, conveys and assigns to Landlord all right, title and interest of Tenant in and to all subleases now in existence or hereafter entered into for any or all of the Leased Premises, any and all extensions, modifications and renewals thereof and all rents, issues and profits therefrom.  Landlord hereby grants to Tenant a license to collect and enjoy all rents and other sums of money payable under any sublease of any of the Leased Premises; provided, however, that Landlord shall have the absolute right at any time upon notice to Tenant and any subtenants to revoke said license and to collect such rents and sums of money and to retain the same.  Any amounts collected shall be applied to Rent payments next due and owing.  Tenant shall not consent to, cause or allow any modification or alteration of any of the terms, conditions or covenants of any of the subleases or the termination thereof, without the prior written approval of Landlord which consent shall not be unreasonably withheld nor shall Tenant accept any rents more than thirty (30) days in advance of the accrual thereof.

(h)     With respect to any assignment to a Credit Entity, at least thirty (30) days prior to the effective date of such assignment, Tenant shall provide to Landlord information reasonably required by Landlord to establish that the Person involved in any such proposed assignment satisfies the criteria set forth in this Lease for an assignment to a Credit Entity.

(i)     Landlord may sell or transfer the Leased Premises at any time without Tenant's consent to any third party (each a "Third Party Purchaser").  In the event of any such transfer, Tenant shall attorn to any Third Party Purchaser as Landlord so long as such Third Party Purchaser and Landlord notify Tenant in writing of such transfer.  At the request of Landlord, Tenant will execute such documents confirming the agreement referred to above and such other agreements as Landlord may reasonably request, provided that such agreements do not increase the liabilities and obligations of Tenant hereunder.  All costs and expenses incurred in connection with such sale or transfer shall be borne by the Landlord.

(j)     Tenant shall not, in a single transaction or series of transactions (including any interim merger or consolidation), enter into an agreement to sell or convey, transfer or lease or sell or convey, transfer or lease all or substantially all of its assets (an "Asset Transfer") to any Person except pursuant to a Permitted Asset Transfer, and any such Asset Transfer that does not satisfy the foregoing exception shall be deemed an assignment in violation of this Lease.

For purposes of this paragraph:

"Permitted Asset Transfer" means an Asset Transfer that (a) constitutes the transfer of Tenant as a going business concern pursuant to a good faith, bona fide transaction that is not intended, directly or indirectly, to bypass or obviate the obligations of Tenant, or to impair, inhibit or diminish the rights of Landlord, under this Lease, (b) the structuring of such transaction as an asset sale (as opposed to a sale of equity) is required by the Person purchasing all or substantially all of the assets and such Person is effecting such asset purchase with the present intention of using such assets as a part of an operating business (as opposed to for auction or other resale purposes), and (b) such sale of all or substantially all of the assets shall include an assignment of this  Lease to the purchaser of such assets and an assumption of this Lease by such Person in

31

accordance with the terms of this Paragraph 21 (including the guaranty requirements set forth in (l)(ii) below).

(k)    Tenant shall pay to Landlord with each monthly installment of Basic Rent, as Additional Rent, one half of all Net Sublet Rent paid by any subtenant for the prior month under any sublease for all or any portion of the Leased Premises.  The term "Net Sublet Rent" as used in this Paragraph 21(b) shall mean the aggregate amount of all rent payable by all subtenants for any portion of the Leased Premises less (i) any operating expenses certified by Tenant relating to that portion of the Leased Premises sublet (ii) the cost of any improvements constructed and paid for by Tenant specifically for such subtenant and (iii) the product of (A) Basic Rent then in effect multiplied by (B) the percentage of the leaseable square feet of the Leased Premises sublet.

(l)    (i) Except as permitted in Paragraph 21(l)(ii) below, at no time during the Term shall any Person or "group" (within the meaning of Section 13(d) or Section 14(d) of the Securities Exchange Act of 1934, as amended) (a "Purchasing Entity") pursuant to a single transaction or series of transactions acquire direct or indirect Control of Tenant or Guarantor. Except as permitted in Paragraph 21(l)(ii) below, any such change of Control (by operation of law, merger, consolidation or otherwise) shall be deemed as an assignment of this Lease for which the approval of Landlord and Lender shall be required and any consummation of such assignment absent such approval shall be in violation of this Lease (provided, however, that a deemed assignment pursuant to the transfer of the outstanding capital stock of Guarantor shall not be deemed to include the sale of such stock by persons or parties through the "over-the-counter market" or through any recognized stock exchange, other than by those deemed to be a "control-person" within the meaning of the Securities Exchange Act of 1934).

(ii) Notwithstanding anything to the contrary contained in the above, nothing herein is intended to restrict a change of Control of Tenant or Guarantor (being an indirect change of Control of Tenant) and such change of Control of Tenant or Guarantor shall be permitted without the prior written consent of Landlord, so long as no Event of Default is continuing and such change of Control of Tenant or Guarantor is for a valid corporate purpose and not for the purposes of circumventing the anti-assignment provisions of this Lease, and provided further that, (A) if the Purchasing Entity is a Financial Buyer, the holding company used by such Financial Buyer to acquire Control of Tenant or Guarantor, shall deliver a guaranty satisfactory to Landlord pursuant to which it guarantees the payment and performance of the obligations of Tenant under this Lease (a "New Guaranty") and (B) if the Purchasing Entity is not a Financial Buyer, the ultimate parent company of the Purchasing Entity shall deliver such New Guaranty.

(iii) For purposes of this Paragraph 21(l), the following definitions shall apply:

(A)    "Control" shall mean ownership of more than fifty percent (50%) of the Equity Interests of such Person or the power to direct or cause the direction of the management or policies of such Person.

(B)    "Equity Interest" shall mean (a) in the case of any corporation, all capital stock and any securities exchangeable for or convertible into capital stock; (b) in the case of an association or business entity, any and all shares, interests, participation rights or other equivalents of corporate stock (however designated) in or to such association or entity; (c) in the case of a partnership, limited liability company or unlimited liability company, partnership or membership interests (whether general or limited), as applicable; and (d) any other ownership interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distribution of assets of, the issuing Person, and including, in all of the foregoing cases described in clauses (a), (b), (c) or (d), any warrants, rights or other options to purchase or otherwise acquire any of the interests described in any of the foregoing cases.

(C)    "Financial Buyer" shall mean any private equity, venture capital or similar buyout fund.

Events of Default.

(a)    The occurrence of any one or more of the following (after expiration of any applicable cure period as provided in Paragraph 22(b)) shall, at the sole option of Landlord, constitute an "Event of Default" under this Lease:

(i)    a failure by Tenant to make any payment of any Monetary Obligation on or prior to its due date, regardless of the reason for such failure;

(ii)    a failure by Tenant duly to perform and observe, or a violation or breach of, any other provision hereof not otherwise specifically mentioned in this Paragraph 22(a);

(iii)    any representation or warranty made by Tenant herein or in any certificate, demand or request made pursuant hereto proves to be incorrect, now or hereafter, in any material respect;

(iv)    a default beyond any applicable cure period or at maturity by Tenant in any payment of principal or interest on any obligations for borrowed money having an original principal balance of $50,000,000 or more in the aggregate, or in the performance of any other provision contained in any instrument under which any such obligation is created or secured (including the breach of any covenant thereunder), (x) if such payment is a payment at maturity or a final payment, or (y) if an effect of such default is to cause, or permit any Person to cause, such obligation to become due prior to its stated maturity;

(v)    a default by Tenant beyond any applicable cure period in the payment of rent under, or in the performance of any other material provision of, any other lease or leases that have, in the aggregate, rental obligations over the terms thereof of $50,000,000 or more;

(vi)    a final, non-appealable judgment or judgments for the payment of money in excess of $50,000,000 in the aggregate shall be rendered against Tenant and the same shall remain undischarged for a period of sixty (60) consecutive days;

(vii)    Tenant shall have assigned this lease in violation of Paragraph 21(a);

(viii)    Tenant shall (A) voluntarily be adjudicated a bankrupt or insolvent, (B) seek or consent to the appointment of a receiver or trustee for itself or for the Leased Premises, (C) file a petition seeking relief under the bankruptcy or other similar laws of the United States, any state or any jurisdiction, (D) make a general assignment for the benefit of creditors, or (E) be unable to pay its debts as they mature;

(ix)    a court shall enter an order, judgment or decree appointing, without the consent of Tenant, a receiver or trustee for it or for any of the Leased Premises or approving a petition filed against Tenant which seeks relief under the bankruptcy or other similar laws of the United States, any state or any jurisdiction, and such order, judgment or decree shall remain undischarged or unstayed sixty (60) days after it is entered;

(x)    the Leased Premises shall have been abandoned or vacated in violation of the terms of this Lease;

(xi)    Tenant shall be liquidated or dissolved or shall begin proceedings towards its liquidation or dissolution;

(xii)    the estate or interest of Tenant in any of the Leased Premises shall be levied upon or attached in any proceeding and such estate or interest is about to be sold or transferred or such process shall not be vacated or discharged within sixty (60) days after it is made;

(xiii)    a failure by Tenant to perform or observe, or a violation or breach of, or a misrepresentation by Tenant under any provision of any Assignment or any other document between Tenant and Lender or from Tenant to Lender, if such failure, violation, breach or misrepresentation gives rise to a default beyond any applicable cure period with respect to any Loan;

(xiv)    a failure by Tenant to maintain in effect any license or permit necessary for the use, occupancy or operation of the Leased Premises;

(xv)    a failure by Tenant to deliver the estoppel described in Paragraph 25 within the time period specified therein;

(xvi)    Tenant shall enter into an Asset Transfer in violation of Paragraph 21(j) or a change of Control shall occur in violation of Paragraph 21(l);

(xvii)    an Event of Default (as defined in the Guaranty) beyond any applicable cure period shall occur under the Guaranty; or

34

(xviii)  Tenant's failure to timely comply in any material respect with any of Tenant's Post-Closing Obligations and such failure continues for ten (10) days after written notice from Landlord.  For the avoidance of all doubt, any obligations with respect to the roof of the Building shall be deemed "material."

(b)      No notice or cure period shall be required in any one or more of the following events: (A) the occurrence of an Event of Default under clause (i) (except as otherwise set forth below), (iii), (iv), (v), (vi), (vii), (viii), (ix), (x), (xi), (xii), (xiii), (xv), (xvi), (xvii), or (xviii) of Paragraph 22(a); (B) the default consists of a failure to pay Basic Rent, a failure to provide any insurance required by Paragraph 16 or an assignment or sublease entered into in violation of Paragraph 21; or (C) the default is such that any delay in the exercise of a remedy by Landlord could reasonably be expected to cause irreparable harm to Landlord.  If the default consists of the failure to pay any Monetary Obligation under clause (i) of Paragraph 22(a), the applicable cure period shall be three (3) days from the date on which notice is given, but Landlord shall not be obligated to give notice of, or allow any cure period for, any such default more than two (2) times within any Lease Year.  If the default occurs under clause (xv) of Paragraph 22(a), the applicable cure period shall be five (5) Business Days from the date on which notice is given.  If the default consists of a default under clause (ii) of Paragraph 22(a), other than the events specified in clauses (B) and (C) of the first sentence of this Paragraph 22(b),  or if the default consists of a default under clause (xiv) of Paragraph 22(a), the applicable cure period shall be twenty (20) days from the date on which notice is given or, if the default cannot be cured within such twenty (20) day period and delay in the exercise of a remedy would not (in Landlord's reasonable judgment) cause any material adverse harm to Landlord or any of the Leased Premises, the cure period shall be extended for the period required to cure the default (but such cure period, including any extension, shall not in the aggregate exceed sixty (60) days), provided that Tenant shall commence to cure the default within the said twenty-day period and shall actively, diligently and in good faith proceed with and continue the curing of the default until it shall be fully cured.

23.    <u>Remedies and Damages upon Default</u>.

(a)      If an Event of Default shall have occurred and be continuing beyond the expiration of any applicable notice and/or cure period, then Landlord shall have the right, at its sole option, then or at any time thereafter, to exercise its remedies and to collect damages from Tenant in accordance with this Paragraph 23 without further demand upon or notice to Tenant, except as otherwise expressly provided below in this Paragraph 23 and, subject in all events, to any conditions and limitations (including any additional notice requirements) of applicable Law.

(i)      Landlord may terminate this Lease by giving Tenant written notice thereof; such termination to be effective as of the date specified in such notice unless a longer notice period is prescribed by applicable Law (in which event, such longer period shall deemed set forth in such notice and shall control).  Upon such date, this Lease, the estate hereby granted and all rights of Tenant hereunder shall expire and terminate and Tenant shall immediately surrender and deliver possession of the Leased Premises to Landlord in accordance with and in the condition required by Paragraph 26 hereof.  If Tenant does not so surrender and deliver possession of all of the Leased Premises, Landlord may re-enter and repossess any of the

35

Leased Premises not surrendered, with or without legal process, by peaceably entering any of the Leased Premises and changing locks or by summary proceedings, ejectment or any other lawful means or procedure.

(ii)    Landlord may terminate Tenant's right of possession (but not this Lease) and may repossess the Leased Premises by any available legal process without thereby releasing Tenant from any liability hereunder and without demand or notice of any kind to Tenant and without terminating this Lease.

(iii)    Upon or at any time after taking possession of any of the Leased Premises pursuant to Paragraph 23(a)(i) or 23(a)(ii), Landlord may, by peaceable means or legal process, remove any Persons or property therefrom.  Landlord shall be under no liability for or by reason of any such entry, repossession or removal.  Notwithstanding such entry or repossession, Landlord may collect the damages set forth in Paragraph 23(b)(i) and 23(b)(ii).

(iv)    After repossession of any of the Leased Premises pursuant to clause (i) or (ii) above, Landlord shall have the right to relet any of the Leased Premises to such tenant or tenants, for such term or terms, for such rent, on such conditions and for such uses as Landlord in its sole discretion may determine, and collect and receive any rents payable by reason of such reletting.  Landlord may make such Alterations in connection with such reletting as it may deem advisable in its sole discretion.  Notwithstanding any such reletting, Landlord may collect the damages set forth in Paragraph 23(b)(ii).  Landlord shall consider, in its good faith business judgment, any reputable tenants or subtenants proposed by Tenant that have a financial condition commensurate with the financial obligations that would be imposed by the proposed lease or sublease and are prepared to lease or sublet the Leased Premises, but Landlord shall be under no obligation to accept such proposed tenants or subtenants.

(v)    Landlord may, upon notice to Tenant, require Tenant to make an irrevocable offer to terminate this Lease in its entirety for an amount (the "Default Termination Amount") specified in the next sentence.  The "Default Termination Amount" shall be the greatest of (A) the sum of the Fair Market Value of the Leased Premises and the applicable Prepayment Premium which Landlord will be required to pay in prepaying any Loan with proceeds of the Default Termination Amount or (B) the sum of the Acquisition Cost and the applicable Prepayment Premium which Landlord will be required to pay in prepaying any Loan with proceeds of the Default Termination Amount or (C) an amount equal to the Present Value of the entire Basic Rent from the date of such purchase to the date on which the then Term would expire.  Upon such notice to Tenant, Tenant shall be deemed to have made such offer and shall, if requested by Landlord, within ten (10) days following such request, deposit with Landlord as payment against the Default Termination Amount the amount described in (B) above, and Landlord and Tenant shall promptly commence to determine Fair Market Value.  Within thirty (30) days after the Fair Market Value Date, Landlord shall accept or reject such offer.  If Landlord accepts such offer then, on the tenth (10th) Business Day after such acceptance, Tenant shall pay to Landlord the Default Termination Amount less any deposit paid to Landlord by Tenant as above provided and, at the request of Tenant, Landlord will convey the Leased Premises to Tenant or its designee in accordance with Paragraph 20.  Any rejection by Landlord of such offer shall have no effect on any other remedy Landlord may have under this Lease.

(vi)    Landlord may declare by notice to Tenant the entire Basic Rent (in the amount of Basic Rent then in effect plus increases of two percent (2%) on each Basic Rent Adjustment Date) for the remainder of the then current Term to be immediately due and payable.  Tenant shall immediately pay to Landlord all such Basic Rent discounted to its Present Value, all accrued Rent then due and unpaid, all other Monetary Obligations which are then due and unpaid and all Monetary Obligations which arise or become due by reason of such Event of Default (including any Costs of Landlord).  Upon receipt by Landlord of all such accelerated Basic Rent and Monetary Obligations, this Lease shall remain in full force and effect and Tenant shall have the right to possession of the Leased Premises from the date of such receipt by Landlord to the end of the Term, and subject to all the provisions of this Lease, including the obligation to pay all increases in Basic Rent and all Monetary Obligations that subsequently become due, except that (A) no Basic Rent which has been prepaid hereunder shall be due thereafter during the said Term, (B) Tenant shall have no option to extend or renew the Term.

(b)    The following constitute damages to which Landlord shall be entitled if Landlord exercises its remedies under Paragraph 23(a)(i), (ii) and (iii):

(i)    If Landlord exercises its remedy under Paragraphs 23(a)(i) or (ii) but not its remedy under Paragraph 23(a)(iv) (or attempts to exercise such remedy and is unsuccessful in reletting the Leased Premises) then, upon written demand from Landlord, Tenant shall pay to Landlord, as liquidated and agreed final damages for Tenant's default and in lieu of all current damages beyond the date of such demand (it being agreed that it would be impracticable or extremely difficult to fix the actual damages), an amount equal to the Present Value of the excess, if any, of (A) all Basic Rent from the date of such demand to the date on which the Term is scheduled to expire hereunder in the absence of any earlier termination, re-entry or repossession over (B) the then fair market rental value of the Leased Premises for the same period.  Tenant shall also pay to Landlord all accrued Rent then due and unpaid, all other Monetary Obligations which are then due and unpaid, all Monetary Obligations which arise or become due by reason of such Event of Default, including any Costs of Landlord in connection with the repossession of the Leased Premises and any attempted reletting thereof, including all brokerage commissions, legal expenses, reasonable attorneys' fees, employees' expenses, costs of Alterations and expenses and preparation for reletting.

(ii)    If Landlord exercises its remedy or remedies under Paragraphs 23(a)(i), (ii), (iii) or (iv), then Tenant shall, until the end of what would have been the Term in the absence of the termination of the Lease, and whether or not any of the Leased Premises shall have been relet, be liable to Landlord for, and shall pay to Landlord, as liquidated and agreed current damages all Monetary Obligations which would be payable under this Lease by Tenant in the absence of such termination less the net proceeds, if any, of any reletting pursuant to Paragraph 23(a)(iv), after deducting from such proceeds all of Landlord's Costs (including the items listed in the last sentence of Paragraph 23(b)(i) hereof) incurred in connection with such repossessing and reletting; provided, that if Landlord has not relet the Leased Premises, such Costs of Landlord shall be considered to be Monetary Obligations payable by Tenant.  Tenant shall be and remain liable for all sums aforesaid, and Landlord may recover such damages from Tenant and institute and maintain successive actions or legal proceedings against Tenant for the recovery of such damages.  Nothing herein contained shall be

deemed to require Landlord to wait to begin such action or other legal proceedings until the date when the Term would have expired by its own terms had there been no such Event of Default.

(iii)    Tenant shall be and remain liable for all sums aforesaid, and Landlord may recover such damages from Tenant and institute and maintain successive actions or legal proceedings against Tenant for the recovery of such damages.  Nothing herein contained shall be deemed to require Landlord to wait to begin such action or other legal proceedings until the date when the Term would have expired by its own terms had there been no such Event of Default.

(c)    Notwithstanding anything to the contrary herein contained, in lieu of or in addition to any of the foregoing remedies and damages, Landlord may exercise any remedies and collect any damages available to it at law or in equity.  If Landlord is unable to obtain full satisfaction pursuant to the exercise of any remedy, it may pursue any other remedy which it has hereunder or at law or in equity.

(d)    Landlord shall not be required to mitigate any of its damages hereunder unless required to by applicable Law.  If any Law shall validly limit the amount of any damages provided for herein to an amount which is less than the amount agreed to herein, Landlord shall be entitled to the maximum amount available under such Law.

(e)    No termination of this Lease, repossession or reletting of the Leased Premises, exercise of any remedy or collection of any damages pursuant to this Paragraph 23 shall relieve Tenant of any Surviving Obligations.

(f)    WITH RESPECT TO ANY REMEDY OR PROCEEDING OF LANDLORD OR TENANT HEREUNDER, LANDLORD AND TENANT HEREBY WAIVE ANY RIGHT TO A TRIAL BY JURY.

(g)    Upon the occurrence of any Event of Default, Landlord shall have the right (but no obligation) to perform any act required of Tenant hereunder and, if performance of such act requires that Landlord enter the Leased Premises, Landlord may enter the Leased Premises for such purpose.

(h)    No failure of Landlord (i) to insist at any time upon the strict performance of any provision of this Lease or (ii) to exercise any option, right, power or remedy contained in this Lease shall be construed as a waiver, modification or relinquishment thereof.  A receipt by Landlord of any sum in satisfaction of any Monetary Obligation with knowledge of the breach of any provision hereof shall not be deemed a waiver of such breach, and no waiver by Landlord of any provision hereof shall be deemed to have been made unless expressed in a writing signed by Landlord.

(i)    Tenant hereby waives and surrenders, for itself and all those claiming under it, including creditors of all kinds, (i) any right and privilege which it or any of them may have under any present or future Law to redeem any of the Leased Premises or to have a continuance of this Lease after termination of this Lease or of Tenant's right of occupancy or possession pursuant to any court order or any provision hereof, and (ii) the benefits of any present or future Law which exempts property from liability for debt or for distress for rent.

(j)     Except as otherwise provided herein, all remedies are cumulative and concurrent and no remedy is exclusive of any other remedy. Each remedy may be exercised at any time an Event of Default has occurred and is continuing and may be exercised from time to time. No remedy shall be exhausted by any exercise thereof.

24.    Notices. All notices, demands, requests, consents, approvals, offers, statements and other instruments or communications required or permitted to be given pursuant to the provisions of this Lease shall be in writing and shall be deemed to have been given and received for all purposes when delivered in person or by Federal Express or other reliable 24-hour delivery service or five (5) Business Days after being deposited in the United States mail, by registered or certified mail, return receipt requested, postage prepaid, addressed to the other party at its address stated on page one of this Lease or when delivery is refused. Notices sent to Landlord shall be to the attention of Director, Asset Management, and notices to Tenant shall be to the attention of General Counsel, with a copy at the same address to Vice President, Supply Chain and Logistics, 5555 Darrow Road, Hudson, Ohio 44236. A copy of any notice given by Tenant to Landlord shall be addressed to the attention of Director, Asset Management and shall simultaneously be given by Tenant to the attention of Legal Transactions Department, W. P. Carey Inc., One Manhattan West, 395 9th Avenue, 58th Floor, New York, New York, 10001. For the purposes of this Paragraph, any party may substitute another address stated above (or substituted by a previous notice) for its address by giving fifteen (15) days' notice of the new address to the other party, in the manner provided above.

25.    Estoppel Certificate. At any time upon not less than ten (10) days' prior written request by either Landlord or Tenant (the "Requesting Party") to the other party (the "Responding Party"), the Responding Party shall deliver to the Requesting Party a statement in writing, executed by an authorized officer of the Responding Party, certifying (a) that, except as otherwise specified, this Lease is unmodified and in full force and effect, (b) the dates to which Basic Rent, Additional Rent and all other Monetary Obligations have been paid, (c) that, to the knowledge of the signer of such certificate and except as otherwise specified, no Event of Default by either Landlord or Tenant exists hereunder, (d) such other matters as the Requesting Party may reasonably request, and (e) if Tenant is the Responding Party that, except as otherwise specified, there are no proceedings pending or, to the knowledge of the signer, threatened, against Tenant before or by any court or administrative agency which, if adversely decided, would materially and adversely affect the financial condition and operations of Tenant. Any such statements by the Responding Party may be relied upon by the Requesting Party, any Person whom the Requesting Party notifies the Responding Party in its request for the Certificate is an intended recipient or beneficiary of the Certificate, any Lender or their assignees and by any prospective purchaser or mortgagee of any of the Leased Premises. Any certificate required under this Paragraph 25 and delivered by Tenant shall state that, in the opinion of each person signing the same, he has made such examination or investigation as is necessary to enable him to express an informed opinion as to the subject matter of such certificate, and shall briefly state the nature of such examination or investigation.

26.    Surrender. Upon the expiration or earlier termination of this Lease, Tenant shall peaceably leave and surrender the Leased Premises to Landlord in as good a condition as was maintained as of the commencement of this Lease (assuming the completion of the Post Closing Obligations), except as repaired, rebuilt, restored, altered, replaced or added to

as permitted or required by any provision of this Lease, ordinary wear and tear excepted. Upon such surrender, Tenant shall (a) remove from the Leased Premises all property which is owned by Tenant or third parties other than Landlord and Alterations required to be removed pursuant to Paragraph 13 hereof and (b) repair any damage caused by such removal. Property not so removed shall become the property of Landlord, and Landlord may thereafter cause such property to be removed from the Leased Premises. The cost of removing and disposing of such property and repairing any damage to any of the Leased Premises caused by such removal shall be paid by Tenant to Landlord upon demand. Landlord shall not in any manner or to any extent be obligated to reimburse Tenant for any such property which becomes the property of Landlord pursuant to this Paragraph 26.

27. <u>No Merger of Title</u>. There shall be no merger of the leasehold estate created by this Lease with the fee estate in any of the Leased Premises by reason of the fact that the same Person may acquire or hold or own, directly or indirectly, (a) the leasehold estate created hereby or any part thereof or interest therein and (b) the fee estate in any of the Leased Premises or any part thereof or interest therein, unless and until all Persons having any interest in the interests described in (a) and (b) above which are sought to be merged shall join in a written instrument effecting such merger and shall duly record the same.

28. <u>Books and Records</u>.

(a) Tenant shall keep adequate records and books of account with respect to the finances and business of Tenant generally and with respect to the Leased Premises, in accordance with generally accepted accounting principles ("<u>GAAP</u>") consistently applied, and shall permit Landlord and Lender by their respective agents, accountants and attorneys, upon reasonable notice to Tenant, to visit and inspect the Leased Premises and examine (and make copies of) the records and books of account and to discuss the finances and business with the officers of Tenant, at such reasonable times as may be requested by Landlord. Upon the request of Lender or Landlord (either telephonically or in writing), Tenant shall provide the requesting party with copies of any information to which such party would be entitled in the course of a personal visit.

(b) If and for so long as Tenant is a wholly-owned subsidiary of Guarantor, Tenant shall deliver to Landlord and to Lender within ninety (90) days of the close of each fiscal year of Guarantor, annual audited financial statements of the Tenant Group certified by a nationally recognized firm of independent certified public accountants. If, at any time during the Term Tenant is not a wholly-owned subsidiary of Guarantor, Tenant shall deliver to Landlord and Lender within ninety (90) days of the close of each fiscal year of Tenant annual audited financial statements of Tenant certified by a nationally recognized firm of independent certified public accountants. Tenant shall also furnish to Landlord (i) within forty-five (45) days after the end of each of the three remaining quarters unaudited financial statements certified by Tenant's chief financial officer and (ii) within twenty (20) days following receipt of Landlord's request any other information regarding Tenant or Tenant's Group historical or prospective, financial or otherwise, which Landlord (or any direct or indirect parent of Landlord) is required to provide to the SEC or any other regulatory agency. Notwithstanding any of the foregoing to the contrary, so long as the quarterly and annual financials which Tenant would be otherwise required to cause to be delivered hereinabove are available to Landlord via Intralinks or other

online service at no cost to Landlord, then Landlord agrees that it shall obtain such quarterly and annual financials through such service and Tenant shall not be required to make the physical deliveries required hereinabove. Notwithstanding the foregoing, for so long as the Guarantor of this Lease is a public company and the consolidated quarterly and annual financials of Guarantor (which must include Tenant as a part of the Tenant Group) which Tenant would be otherwise required to cause to be delivered hereinabove are available to Landlord via EDGAR or other online service at no cost to Landlord, then Landlord agrees that it shall obtain such quarterly and annual financials through such service and neither Tenant nor Guarantor shall be required to make the physical deliveries required hereinabove.

(c)     All financial statements shall be prepared in accordance with GAAP consistently applied. All annual audited financial statements shall be accompanied (i) by an opinion of said accounting firm stating that (A) there are no qualifications as to the scope of the audit and (B) the audit was performed in accordance with GAAP, and (ii) by a certification of the president or a vice president of Tenant, dated within five (5) days of the delivery of such statement, stating that (A) the person making the certification knows of no Event of Default, or event which, upon notice or the passage of time or both, would become an Event of Default which has occurred and is continuing hereunder or, if any such event has occurred and is continuing, specifying the nature and period of existence thereof and what action Tenant has taken or proposes to take with respect thereto and (B) except as otherwise specified in such certification, that Tenant has fulfilled all of its obligations under this Lease which are required to be fulfilled on or prior to the date of such certification.

(d)     Landlord, Lender and their respective agents, accountants and attorneys, shall consider and treat on a strictly confidential basis (i) any information contained in the books and records of Tenant, (ii) any copies of any books and records of Tenant, and any financial statements of delivered pursuant to Paragraph 28(b) or (c), and (iii) any documents or information which are delivered to or received by them and which are conspicuously stamped "CONFIDENTIAL". The restrictions contained in this Paragraph 28(d) shall not prevent disclosure by Landlord or Lender of any information in any of the following circumstances:

(i)     Upon the order of any court or administrative agency to the extent required by such order and not effectively stayed or by appeal or otherwise;

(ii)     Upon the request, demand or requirement of any regulatory agency or authority having jurisdiction over such party, including the Securities and Exchange Commission (whether or not such request or demand has the force of law);

(iii)     That has been publicly disclosed other than by breach of this Paragraph 28(d) by Lender or Landlord or by any other Person who has agreed with Landlord or Lender to abide by the provisions of this Paragraph 28(d);

(iv)     To counsel, accountants or consultants for such other Person who has agreed to abide by the provisions of this Paragraph 28(d) or counsel, accountants or consultants for Lender or Landlord;

41

(v)     While an Event of Default exists, in connection with the exercise of any right or remedy under this Lease or any other related document;

(vi)     Independently developed by Landlord or Lender to the extent that confidential information provided by Tenant is not used to develop such information;

(vii)     To any third party who enters into a confidentiality agreement with Landlord for the benefit of Tenant;

(viii)     With respect to financial information or other information that Landlord or its attorneys deem to be material in any reporting to the shareholders of Landlord or the shareholders or prospective shareholders (whether through a registered public offering or otherwise) of Landlord's parent company;

(ix)     In connection with any sale or financing of the Leased Premises, provided that any recipient of such information who is a prospective purchaser of the Leased Premises shall agree to be bound by the terms of Paragraph 28(d); or

(x)     As otherwise required by Law.

29.    Determination of Value.

(a)     Whenever a determination of Fair Market Value or Fair Market Rental Value is required pursuant to any provision of this Lease, such Fair Market Value or Fair Market Rental Value shall be determined in accordance with the following procedure:

(i)     Landlord and Tenant shall endeavor to agree upon such Fair Market Value within thirty (30) days after the date (the "Applicable Initial Date") on which (A) Landlord provides Tenant with notice of its intention to redetermine Fair Market Value pursuant to Paragraph 20(c), or (B) Landlord provides Tenant with notice of Landlord's intention to require Tenant to make an offer to terminate this Lease pursuant to Paragraph 23(a)(v). Landlord and Tenant shall endeavor to agree on Fair Market Rental Value on the date (also, an "Applicable Initial Date") which is six (6) calendar months prior to the expiration of the then current Term unless Tenant has previously exercised its option pursuant to Paragraph 5 not to have the Term automatically extended.  Upon reaching such agreement, the parties shall execute an agreement setting forth the amount of such Fair Market Value.

(ii)     If the parties shall not have signed such agreement within thirty (30) days after the Applicable Initial Date, Tenant shall within fifty (50) days after the Applicable Initial Date select an appraiser and notify Landlord in writing of the name, address and qualifications of such appraiser.  Within twenty (20) days following Landlord's receipt of Tenant's notice of the appraiser selected by Tenant, Landlord shall select an appraiser and notify Tenant of the name, address and qualifications of such appraiser.  Such two appraisers shall endeavor to agree upon Fair Market Value or Fair Market Rental Value based on a written appraisal made by each of them (and given to Landlord by Tenant) as of the Relevant Date.  If such two appraisers shall agree upon a Fair Market Value or Fair Market Rental Value, the amount of such Fair Market Value or Fair Market Rental Value as so agreed shall be binding and conclusive upon Landlord and Tenant.

(iii)     If such two appraisers shall be unable to agree upon a Fair Market Value or Fair Market Rental Value within thirty (30) days after the selection of an appraiser by Landlord, then such appraisers shall advise Landlord and Tenant of their respective determination of Fair Market Value or Fair Market Rental Value and shall select a third appraiser to make the determination of Fair Market Value or Fair Market Rental Value. The selection of the third appraiser shall be binding and conclusive upon Landlord and Tenant.

(iv)     If such two appraisers shall be unable to agree upon the designation of a third appraiser within ten (10) days after the expiration of the thirty (30) day period referred to in clause (iii) above, or if such third appraiser does not make a determination of Fair Market Value or Fair Market Rental Value within thirty (30) days after his selection, then such third appraiser or a substituted third appraiser, as applicable, shall, at the request of either party hereto, be appointed by the President or Chairman of the American Arbitration Association in New York, New York. The determination of Fair Market Value or Fair Market Rental Value made by the third appraiser appointed pursuant hereto shall be made within thirty (30) days after such appointment.

(v)     If a third appraiser is selected, Fair Market Value or Fair Market Rental Value shall be the average of the determination of Fair Market Value or Fair Market Rental Value made by the third appraiser and the determination of Fair Market Value or Fair Market Rental Value made by the appraiser (selected pursuant to Paragraph 29(a)(ii) hereof) whose determination of Fair Market Value or Fair Market Rental Value is nearest to that of the third appraiser. Such average shall be binding and conclusive upon Landlord and Tenant.

(vi)     All appraisers selected or appointed pursuant to this Paragraph 29(a) shall (A) be independent qualified MAI appraisers with at least 5 years' experience in leasing industrial real estate, (B) have no right, power or authority to alter or modify the provisions of this Lease, (C) utilize the factors set forth in (d) below, and (D) be registered in the State of Alabama if such state provides for or requires such registration.

(vii)     The Cost of the procedure described in this Paragraph 29(a) above shall be shared equally by Landlord and Tenant.

(b)     If, by virtue of any delay, Fair Market Value is not determined by the expiration or termination of the then current Term, then the date on which the Term would otherwise expire or terminate shall be extended to the date specified for termination in the particular provision of this Lease pursuant to which the determination of Fair Market Value is being made. If, by virtue of any delay, Fair Market Rental Value is not determined by the expiration or termination of the then current Term, then until Fair Market Rental Value is determined, Tenant shall continue to pay Basic Rent during the succeeding Renewal Term in the same amount which it was obligated under this Lease to pay prior to the commencement of the Renewal Term however subject to 2% mandated annual increase. When Fair Market Rental Value is determined, the appropriate Basic Rent shall be calculated retroactive to the commencement of the Renewal Term and Tenant shall pay any deficiency to Landlord (in the case of an underpayment).

43

(c)     In determining Fair Market Value as defined in clause (b) of the definition of Fair Market Value, the appraisers shall add (i) the present value of the Rent for the remaining Term, assuming the Term has been extended for all extension periods provided herein (with 2% mandated annual increases in Rent) using a discount rate (which may be determined by an investment banker retained by each appraiser) based on the creditworthiness of Tenant and (ii) the present value of the Leased Premises as of the end of such Term (having assumed the Term has been extended for all extension periods provided herein).  The appraisers shall further assume that (i) no default then exists under the Lease and (ii) Tenant has complied (and will comply) with all provisions of the Lease.

(d)     In determining Fair Market Rental Value, the appraisers shall determine with respect to the Leased Premises the amount that a willing tenant would pay, and a willing landlord of a comparable building located in a radius of sixty (60) miles of the Leased Premises would accept, at arm's length, to rent a building of comparable size and quality as the Improvements, taking into account: (i) the age, quality, condition (as required by the Lease) of the Improvements; (ii) that the Leased Premises will be leased as a whole or substantially as a whole to a single user; (iii) a lease term of ten (10) years; (iv) an absolute triple net lease; and (v) such other items that professional real estate appraisers customarily consider.

31.     <u>Non-Recourse as to Landlord</u>.  **Anything contained herein to the contrary notwithstanding, any claim based on or in respect of any liability of Landlord under this Lease shall be limited to actual damages and shall be enforced only against the Leased Premises and not against any other assets, properties or funds of (i) Landlord, (ii) any director, officer, member, general partner, shareholder, limited partner, beneficiary, employee or agent of Landlord or any members or general partners of Landlord (or any legal representative, heir, estate, successor or assign of any thereof), (iii) any predecessor or successor partnership or corporation (or other entity) of Landlord or any of its general partners, shareholders, officers, directors, members, employees or agents, either directly or through Landlord or its general partners, shareholders, officers, directors, employees or agents or any predecessor or successor partnership or corporation (or other entity), or (iv) any Person affiliated with any of the foregoing, or any director, officer, employee or agent of any thereof.**

31.     <u>Financing</u>.  (a) Tenant agrees to pay, not later than fifteen (15) Business Days following written request from Landlord (or upon the date of this Lease with respect to costs and expenses incurred as of such date): all costs and expenses incurred by Landlord and Tenant in connection with the initial purchase and leasing of the Leased Premises, including, without limitation, transfer taxes and recording fees and charges, UCC and related searches; owner's title insurance charges and premiums (including endorsements), except that Landlord shall pay the fees and expenses of its attorneys, the cost of appraisals, environmental reports, property condition report, zoning reports, surveys, and the costs of any updates to any of the foregoing or any reliance letters required in connection therewith.  Notwithstanding anything to the contrary set forth in this Paragraph 31(a), it is anticipated that the foregoing costs and expenses will be paid through settlement and reflected on the closing statement; to the extent that any such costs and expenses are not so reflected but are validly incurred, Tenant shall pay same not later than

44

the date occurring fifteen  (15) Business Days following written request from Landlord and invoice therefor.

(b) If Landlord desires to obtain or refinance any Loan, Tenant shall negotiate in good faith with Landlord concerning any request made by any Lender or proposed Lender for changes or modifications in this Lease.  In particular, Tenant shall agree, upon written request of Landlord, to supply any such Lender with such notices and information as Tenant is required to give to Landlord hereunder and to extend the rights of Landlord hereunder to any such Lender and to consent to such financing if such consent is requested by such Lender.

32.    Subordination, Non-Disturbance and Attornment . Provided that any mortgagee or secured party shall execute and deliver a non-disturbance agreement in the form as the Landlord, Tenant and the mortgagee or secured party may agree and subject to the terms and conditions set forth herein, this Lease and Tenant's interest hereunder shall be subordinate to any Mortgage or other security instrument hereafter placed upon the Leased Premises by Landlord, and to any and all advances made or to be made thereunder, to the interest thereon, and all renewals, replacements and extensions thereof.

33.    Tax Treatment; Reporting.  Landlord and Tenant each acknowledge that each shall treat this transaction as a true lease for state law purposes and shall report this transaction as a lease for Federal income tax purposes.  For Federal income tax purposes each shall report this Lease as a true lease with Landlord as the owner of the Leased Premises and Equipment and Tenant as the lessee of such Leased Premises and Equipment including: (1) treating Landlord as the owner of the property eligible to claim depreciation deductions under Section 167 or 168 of the Internal Revenue Code of 1986 (the "Code") with respect to the Leased Premises and Equipment, (2) Tenant reporting its Rent payments as rent expense under Section 162 of the Code, and (3) Landlord reporting the Rent payments as rental income.  For the avoidance of doubt, nothing in this Lease shall be deemed to constitute a guaranty, warranty or representation by either Landlord or Tenant as to the actual treatment of this transaction for state law purposes and for federal income tax purposes.

34.    Power and Authority.  Landlord hereby covenants and agrees with Tenant that Landlord has full power and authority to enter into this Lease and to perform all of its obligations hereunder.  The execution and delivery of this Lease and the performance by Landlord of its obligations hereunder have been duly authorized by all requisite action and no further action or approval is required in order to constitute this Lease as a binding and enforceable obligation of Landlord.

35.    Miscellaneous.

(a)    The paragraph headings in this Lease are used only for convenience in finding the subject matters and are not part of this Lease or to be used in determining the intent of the parties or otherwise interpreting this Lease.

(b)    As used in this Lease, the singular shall include the plural and any gender shall include all genders as the context requires and the following words and phrases shall have the following meanings:  (i) "including" shall mean "including without limitation";

(ii) "provisions" shall mean "provisions, terms, agreements, covenants and/or conditions"; (iii) "lien" shall mean "lien, charge, encumbrance, title retention agreement, pledge, security interest, mortgage and/or deed of trust"; (iv) "obligation" shall mean "obligation, duty, agreement, liability, covenant and/or condition"; (v) "any of the Leased Premises" shall mean "the Leased Premises or any part thereof or interest therein"; (vi) "any of the Land" shall mean "the Land or any part thereof or interest therein"; (vii) "any of the Improvements" shall mean "the Improvements or any part thereof or interest therein"; and (viii) "any of the Equipment" shall mean "the Equipment or any part thereof or interest therein".

       (c)     Any act which Landlord is permitted to perform under this Lease may be performed at any time and from time to time by Landlord or any person or entity designated by Landlord. Each appointment of Landlord as attorney-in-fact for Tenant hereunder is irrevocable and coupled with an interest. Landlord shall not unreasonably withhold or delay its consent whenever such consent is required under this Lease, except as otherwise provided herein and except that with respect to the construction of any additional buildings on the Land, or with respect to any assignment of this Lease or subletting of any Related Premises not expressly permitted by the terms of this Lease, Landlord may withhold its consent for any reason or no reason. In any instance in which Landlord agrees not to act unreasonably, Tenant hereby waives any claim for damages against or liability of Landlord which is based upon a claim that Landlord has unreasonably withheld or unreasonably delayed any consent or approval requested by Tenant, and Tenant agrees that its sole remedy shall be an action for a temporary restraining order, injunctive relief, or a declaratory judgment. If with respect to any required consent or approval Landlord is required by the express provisions of this Lease not to unreasonably withhold or delay its consent or approval, and if it is determined in any such proceeding referred to in the preceding sentence that Landlord acted unreasonably, the requested consent or approval shall be deemed to have been granted; however, Landlord shall have no liability whatsoever to Tenant for its refusal or failure to give such consent or approval. Tenant's sole remedy for Landlord's unreasonably withholding or delaying, consent or approval shall be as provided in this Paragraph. Time is of the essence with respect to the performance by Tenant of its obligations under this Lease.

       (d)     Landlord shall in no event be construed for any purpose to be a partner, joint venturer or associate of Tenant or of any subtenant, operator, concessionaire or licensee of Tenant with respect to any of the Leased Premises or otherwise in the conduct of their respective businesses.

       (e)     This Lease and any documents which may be executed by Tenant on or about the effective date hereof at Landlord's request constitute the entire agreement between the parties and supersede all prior understandings and agreements, whether written or oral, between the parties hereto relating to the Leased Premises and the transactions provided for herein. Landlord and Tenant are business entities having substantial experience with the subject matter of this Lease and have each fully participated in the negotiation and drafting of this Lease. Accordingly, this Lease shall be construed without regard to the rule that ambiguities in a document are to be construed against the drafter.

(f)     This Lease may be modified, amended, discharged or waived only by an agreement in writing signed by the party against whom enforcement of any such modification, amendment, discharge or waiver is sought.

(g)     The covenants of this Lease shall run with the land and bind Tenant, its successors and assigns and all present and subsequent encumbrancers and subtenants of any of the Leased Premises, and shall inure to the benefit of Landlord, its successors and assigns.  If there is more than one Tenant, the obligations of each shall be joint and several.

(h)     If any one or more of the provisions contained in this Lease shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Lease, but this Lease shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

(i)     Landlord and its direct or indirect parent shall be permitted to use Tenant's logo in its marketing materials.

(j)     All exhibits attached hereto are incorporated herein as if fully set forth.

(k)     This Lease shall be governed by and construed and enforced in accordance with the laws of the State.

(l)     (i) Tenant is not, nor will Tenant become a Person with whom U.S. persons or entities are restricted from doing business under regulations of the Office of Foreign Asset Control ("OFAC") of the Department of the Treasury (including those named on OFAC's Specially Designated and Blocked Persons list) or under any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action and (ii) neither Tenant nor its officers, directors, employees or any Person acting on its behalf is or will become a Person who violates the U.S. Foreign Corrupt Practices Act 15 U.S.C. §§78dd-1, 78dd-2 and 78dd-3, or the U.K. Bribery Act 2010 (c.23) (both, as amended from time to time) or any other similar Law or Legal Requirement and neither Tenant nor its officers, directors, employees or any Person acting on its behalf will engage in any dealings or transactions or be otherwise associated with any such Persons.

(m)     This Lease may be executed in a number of counterparts and by different parties hereto in separate counterparts each of which, when so executed, shall be deemed to be an original and all of which taken together shall constitute but one and the same agreement.

(n)     If either party hereto commences any action or proceeding against the other party with respect to the enforcement or interpretation of this Lease, then the prevailing party in such action shall be entitled to an award of its costs of litigation, including reasonable attorney's fees.

36.    <u>Post-Closing Obligations</u>. Pursuant to that Property Condition Assessment of the Leased Premises dated June 2, 2021 performed by Bureau Veritas (formerly known as EMG) (the "<u>PCA</u>") a copy of which Tenant acknowledges the receipt thereof, Tenant shall complete, remediate or obtain or caused to be completed, remediated or obtained, the maintenance and repair items detailed in the PCA (the "<u>Post-Closing Obligations</u>") in accordance with the timing requirements set forth therein.  Tenant shall provide Tenant's commercially reasonable proof of satisfactory completion of the obligations with respect to the roof of the Building, to Landlord at the following address:

CRAFTY (AL) LLC

c/o W. P. Carey Inc.

One Manhattan West

395 9th Avenue, 58th Floor

Attn: Director, Asset Management

37.    <u>Public Announcements</u>.

(a)    Subject to Paragraph 37(b) below, neither party shall make any public announcement (including press releases) concerning this Lease or the sale-leaseback transaction (the "<u>Transaction</u>").

(b)    Landlord and Tenant will consult and agree in advance with each other on the timing and tenor of any other public disclosure of the Transaction, except as required by Law or any stock exchange rules and regulations to which any of the parties, or any of their affiliates, is subject to. In the event a party fails to respond or unreasonably withholds or delays its consent to agree in advance to any such disclosure, the non-responding party's input or consent will not be required and shall not prevent the aforementioned disclosure to be made by the other party.

REMAINDER OF PAGE LEFT INTENTIONALLY BLANK

IN WITNESS WHEREOF, Landlord and Tenant have caused this Lease to be duly executed under seal as of the day and year first above written.

LANDLORD:

**CRAFTY (AL) LLC,**
a Delaware limited liability company,

By: WPC Holdco LLC,
a Maryland limited liability company,
its sole member

By: W. P. Carey Inc.,
a Maryland corporation, its sole member

By: _Joseph J. Mastrocole_
Name: Joseph Mastrocola
Title: Executive Director

STATE OF NEW YORK    )
                     )
COUNTY OF *KINGS*    )

I, the undersigned Notary Public in and for said County and State, hereby certify that Joseph Mastrocola, whose name as Executive Director of W. P. Carey Inc., a Maryland corporation, the sole member of WPC Holdco LLC, a Maryland limited liability company, the sole member of CRAFTY (AL) LLC, a Delaware limited liability company, is signed to the foregoing instrument, and who is known to me, acknowledged before me that this day, being informed of the contents of the instrument, he is such Executive Director and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand this the 2nd day of June, 2021.

Notary Public:

Sign: _____

GILLIAN RICHARDS-DESHONG
Notary Public, State of New York
Registration #01RI6319653
Qualified In Kings County
Commission Expires _____

TENANT:

**JO-ANN STORES, LLC,**
an Ohio limited liability company

By_____
Matt Susz, Senior Vice President and
Chief Financial Officer

And

By_____
Ann Aber, Senior Vice President,
General Counsel & Secretary

STATE OF ____Ohio____ )

COUNTY OF ____Summit____ )

    I, the undersigned Notary Public, in and for said county, and in said state, hereby certify that Matt Susz, whose name as Senior Vice President and Chief Financial Officer of JO-ANN STORES, LLC, an Ohio limited liability company, is signed to the foregoing instrument and who is known to me, acknowledge before me on this day that being informed of the contents of the instrument he/she, as such officer and with full authority executed the same voluntarily for and as the act of said limited liability company.

    Given under my hand and official seal this ___7th___ day of ___June___, 2021.

_____
Notary Public
My Commission Expires: _____

WENDY S. BLASICK
Notary Public. State of Ohio .
My Commission Expires 05-20-2024

STATE OF ____Ohio____ )

COUNTY OF ____Summit____ )

    I, the undersigned Notary Public, in and for said county, and in said state, hereby certify that Ann Aber, whose name as Senior Vice President, General Counsel & Secretary of JO-ANN STORES, LLC, an Ohio limited liability company, is signed to the foregoing instrument and who is known to me, acknowledge before me on this day that being informed of the contents of the instrument he/she, as such officer and with full authority executed the same voluntarily for and as the act of said limited liability company.

    Given under my hand and official seal this ___7th___ day of ___June___, 2021.

_____
Notary Public
My Commission Expires: _____

WENDY S. BLASICK
Notary Public. State of Ohio .
My Commission Expires 05-20-2024

EXHIBIT A

PREMISES

Lot 6A of the Northeast Opelika Industrial Park, Fourth Revision, as recorded on February 24, 2005 in Book 26, at Page 83, in the Office of the Judge of Probate of Lee County, Alabama.

Said property is more particularly described according to survey last revised June 15, 2011 and prepared by Robert Paul Banneman, PLS, Alabama Land Surveyor No. 29080, as follows:

Lot 6A, Northeast Opelika Industrial Park, Fourth Revision, a Revision of Lot 6 being located in the Southwest Quarter of Section 27, Township 20 North, Range 27 East, the City of Opelika, Lee County, Alabama and being more particularly described as follows:

Beginning at a concrete monument found at the Northeast corner of the Southwest Quarter of Section 27, Township 20 North, Range 27 East; thence South 00 degrees 21 minutes 22 seconds West, a distance of 667.27 feet to a concrete monument found; thence South 00 degrees 16 minutes 57 seconds West, a distance of 509.96 feet to a #4 rebar set; thence South 61 degrees 39 minutes 27 seconds West, a distance of 2,152.54 feet to a #4 rebar set; thence North 35 degrees 14 minutes 20 seconds West, a distance of 641.83 feet to a #4 rebar set; thence South 54 degrees 54 minutes 07 seconds West, a distance of 431.36 feet to a #4 rebar set; thence North 35 degrees 05 minutes 53 seconds West, a distance of 80.00 feet to a concrete monument found; thence North 01 degrees 14 minutes 10 seconds East, a distance of 1,855.62 feet to a concrete monument found; thence North 89 degrees 57 minutes 18 seconds East, a distance of 872.25 feet to a 1" steel pipe found; thence North 89 degrees 56 minutes 54 seconds East, a distance of 1,758.14 ft. to the point of beginning.

AND

That certain Easement from Opelika IDA to Tallapoosa River Electric Corporative, Inc., dated June 22, 2005 and filed for record in Book 2277, at Page 216, in the Office of the Judge of Probate of Lee County, Alabama, more particularly described as follows:

A 40-foot wide utility easement located on Lot 7 of the Northeast Opelika Industrial Park, as recorded in Plat Book 20, at Page 161, in the Office of the Judge of Probate of Lee County, Alabama and being more particularly described as follows: Commence at the southwest corner of the northeast quarter of Section 27, Township 20 North, Range 27 East in Lee County, Alabama; thence run South 00 degrees 20 minutes 04 seconds West 217.18 feet to the northerly margin of Jo-Ann Drive; thence run along said margin North 89 degrees 55 minutes 42 seconds East 50.00 feet to the point of beginning. FROM SAID POINT OF BEGINNING, thence run North 00 degrees 20 minutes 04 seconds East 932.71 feet; thence run North 67 degrees 53 minutes 15 seconds East

255.29 feet to the easterly property line of Lot 7, Northeast Opelika Industrial Park; thence run along said property line South 19 degrees 59 minutes 33 seconds East 40.03 feet; thence run South 67 degrees 53 minutes 15 seconds West 227.05 feet; thence run South 00 degrees 20 minutes 04 seconds West 905.67 feet to the said margin of Jo-Ann Drive; thence run along said margin South 89 degrees 55 minutes 42 seconds West 40.00 feet to the point of beginning, according to a survey dated February 24, 2005 and made by James L. McCrory, R.L.S, Alabama Registration No. 12493.

AND

That certain Stormwater Drainage Easement Agreement by and between Opelika IDA and Pine Lake Properties, Inc., dated August 27, 2008 and filed for record in Book 2339, at Page 955, in the Office of the Judge of Probate of Lee County, Alabama, over, across, through and upon the following described property which property is more particularly described as follows:

Commence at the Southwest corner of Section 27, Township 20 North, Range 27 East, Lee County, Alabama; thence run South 85 degrees 30 minutes East 948.3 feet to the northeasterly right-of-way of Lee County Highway No. 71 and being the point of beginning of the property herein to be described: From said point of beginning thence run South 85 degrees 30 minutes East for 2221.4 feet to a point; thence run North 15 degrees 36 minutes East for 2019.4 feet to a point; thence run North 89 degrees 0 minutes West for 1113.7 feet to a point; thence run South 1 degree 25 minutes West for 510.7 feet to a point; thence run South 65 degrees 44 minutes West for 2360.8 feet to a point on the Northeasterly right-of-way of the aforesaid highway; thence run Southeasterly along said right of way to the original point of beginning, and being described as Parcel 1 on plat survey prepared by Noah L. McCrory dated May 22, 1979, and revised June 20, 1979.

The above-described real property also includes Lot 1-B of Guy Subdivision according to that certain plat of said subdivision filed for record in the Office of the Judge of Probate of Lee County, Alabama in Plat Book 17, at Page 23.

LESS AND EXCEPT

A parcel of land lying in Section 27, Township 20 North, Range 27 East, Lee County, Alabama, and being more particularly described as follows: Commence at a found 1 inch pin locally accepted as the Southwest corner of Section 27, Township 20 North, Range 27 East; thence South 89 degrees 06 minutes 29 seconds East, 940.54 feet to the Northwest corner of Lot 1 Jim Joe Perry Subdivision as recorded in Plat Book 16, Page 136, in the Probate Office in Lee County, Alabama; said point being on the East right-of-way (RO.W.) Line of Anderson Road and the point of beginning; thence along said right-of-way the following courses: North 64 degrees 00 minutes 31 seconds West 166.40 feet North 65 degrees 15 minutes 20 seconds West, 25.18 feet to a point on the center line of a creek; thence along said centerline the following courses: North 39

degrees 20 minutes 51 seconds East 69.08 feet; North 06 degrees 55 minutes 35 seconds East 47.17 feet; North 50 degrees 05 minutes 52 seconds East 61.89 feet; North 89 degrees 09 minutes 46 seconds East 47.51 feet; South 22 degrees 42 minutes 04 seconds East, 54.07 feet; South 78 degrees 27 minutes 51 seconds East, 31.17 feet; North 63 degrees 00 minutes 16 seconds East 28.12 feet; North 26 degrees 31 minutes 23 seconds East 56.26 feet; North 60 degrees 05 minutes 59 seconds East 117.91 feet; North 77 degrees 37 minutes 47 seconds East 84.32 feet; South 71 degrees 41 minutes 07 seconds East 91.99 feet; North 81 degrees 01 minute 11 seconds East 68.09 feet; North 59 degrees 27 minutes 51 seconds East 39.30 feet; North 82 degrees 07 minutes 20 seconds East 81.94 feet; North 69 degrees 22 minutes 59 seconds East 97.41 feet; North 50 degrees 52 minutes 21 seconds East 91.11 feet; North 79 degrees 11 minutes 51 seconds East 56.05 feet; South 75 degrees 25 minutes 35 seconds East 34.42 feet; South 26 degrees 46 minutes 29 seconds East 50.56 feet; South 87 degrees 09 minutes 22 seconds East 111.55 feet; North 69 degrees 29 minutes 20 seconds East 184.69 feet; North 68 degrees 25 minutes 44 seconds East 116.51 feet; North 65 degrees 05 minutes 48 seconds East 108.79 feet; North 79 degrees 23 minutes 36 seconds East 165.48 feet; North 47 degrees 07 minutes 37 seconds East 219.45 feet; North 54 degrees 01 minute 29 seconds East 130.09 feet; North 28 degrees 21 minutes 08 seconds East 180.64 feet; North 08 degrees 26 minutes 37 seconds East 84.12 feet; North 25 degrees 10 minutes 48 seconds West 47.68 feet; North 39 degrees 08 minutes 15 seconds East 122.86 feet; North 77 degrees 44 minutes 38 seconds East 418.39 feet; North 74 degrees 07 minutes 25 seconds East 146.28 feet; North 76 degrees 03 minutes 43 seconds East 213.72 feet; thence leaving said creek centerline, South 16 degrees 04 minutes 56 seconds West 1428.28 feet to a found concrete monument; thence North 89 degrees 06 minutes 12 seconds West 383.04 feet to a found 1 inch open top pipe; thence North 89 degrees 05 minutes 23 seconds West 176.78 feet to a concrete monument found at the Northeast corner of said Lot 1 of Jim Joe Perry Subdivision; thence North 89 degrees 00 minutes 01 second West, along the North line of Lot 1, 1,678.20 feet to the point of beginning.

The above-described property includes Lot 1-B of Guy Subdivision according to that certain plat of said subdivision filed for record in the Office of the Judge of Probate of Lee County, Alabama, in Plat Book 17, at Page 23.

TOGETHER WITH the non-exclusive easement of access to and the use and enjoyment of the Common Areas as set forth in Northeast Opelika Industrial Park Covenants and Restrictions dated April 30, 2003 and recorded July 11, 2003 in Misc Book 1270 Page 599, as affected by Variance and Amendment to Northeast Opelika Industrial Park Covenants and Restrictions, dated August 21, 2019, recorded in Book _____, Page _____, in the aforesaid office.

EXHIBIT B

## MACHINERY AND EQUIPMENT

All fixtures, machinery, apparatus, equipment, fittings and appliances of every kind and nature whatsoever now or hereafter affixed or attached to or installed in any of the Leased Premises (except as hereafter provided), including all electrical, anti-pollution, heating, lighting (including hanging fluorescent lighting), incinerating, power, air cooling, air conditioning, humidification, sprinkling, plumbing, lifting, cleaning, fire prevention, fire extinguishing and ventilating systems, devices and machinery and all engines, pipes, pumps, tanks (including exchange tanks and fuel storage tanks), motors, conduits, ducts, steam circulation coils, blowers, steam lines, compressors, oil burners, boilers, doors, windows, loading platforms, lavatory facilities, stairwells, fencing (including cyclone fencing), passenger and freight elevators, overhead cranes and garage units, together with all additions thereto, substitutions therefor and replacements thereof required or permitted by this Lease, but excluding all personal property and all trade fixtures, machinery, office, manufacturing and warehouse equipment, racking, CCTV camera system and related equipment, ADT security system & burglar alarms, conveyors & related equipment, sorters, pick mods and related equipment, material handling equipment, dematic accumulation lines, strapping machines, carton flow shelving and receiving workstations, which are not necessary to the operation of the buildings which constitute part of the Leased Premises for the uses permitted under Paragraph 4(a) of this Lease.

EXHIBIT C

## PERMITTED ENCUMBRANCES

All recording references herein are to the records appearing in the Office of the Judge of Probate of Lee County, Alabama, unless otherwise indicated.

1. Intentionally deleted.

2. All taxes for 2021, and subsequent years, not yet due and payable.

3. Intentionally deleted.

4. Intentionally deleted.

5. Intentionally deleted.

6. Intentionally deleted.

7. Intentionally deleted.

8. Any reappraisal, adjustment, and/or escape taxes which may become due by virtue of any action of the Tax Assessor, Tax Collector, or Board of Equalization.

9. Minerals of whatsoever kind, subsurface and surface substances, including but not limited to coal, lignite, oil, gas, uranium, clay, rock, sand and gravel in, on, under and that may be produced from the Land, together with all rights, privileges, and immunities relating thereto, whether or not appearing in the Public Records or listed in Schedule B. The Company makes no representation as to the present ownership of any such interests. There may be leases, grants, exceptions or reservations of interests that are not listed.

10. Those certain Restrictive Covenants for Northeast Opelika Industrial Park, dated April 30, 2003 and filed for record in Book 1270, at Page 599, in the Office of the Judge of Probate of Lee County, Alabama, as affected by Variance and Amendment to Northeast Opelika Industrial Park Covenants and Restrictions, dated August 21, 2019, recorded in Book _____, Page _____, in the aforesaid office.

11. That certain Clarification to Restrictive Covenants for Northeast Opelika Industrial Park, dated June 1, 2008 and filed for record in Book 2335, at Page 429, in the Office of the Judge of Probate of Lee County, Alabama. (Affects appurtenant 40' Utility Easement described in the legal description)

12. Subject to plat of Northeast Opelika Industrial Park, Fourth Revision, as filed for record in Plat Book 26, at Page 83, in the Office of the Judge of Probate of Lee County, Alabama.

    a. 5' telecom easement as shown on the Survey

13. Subject to 50 ft. buffer and building line as shown on the plat of Northeast Opelika Industrial Park, Fourth Revision, as filed for record in Plat Book 26, at Page 83, in the Office of the Judge of Probate of Lee County, Alabama. (as shown on the Survey)

14. Subject to an easement granted to the City of Opelika and to any telephone companies serving the City of Opelika, for the purpose of installing, operating and maintaining

EXHIBIT C TO LEASE AGREEMENT FOR JOANN - 1

poles, lines, guy wires and other facilities. Said easement is to be ten (10) feet wide, being five (5) feet wide on each side of the front and side lot lines, as shown on the plat of Northeast Opelika Industrial Park, Fourth Revision, as filed for record in Plat Book 26, at Page 83, in the Office of the Judge of Probate of Lee County, Alabama. (as shown on the Survey)

15. Subject to Easement from W. H. Perry, Mary J. Perry and Lillie M. Jimmerson to Alabama Power Co., dated November 5, 1959 and filed for record in Book 539, at Page 17, in the Office of the Judge of Probate of Lee County, Alabama. (As to easement in Book 2339, at Page 955, in the Office of the Judge of Probate of Lee County, Alabama.) (Affects appurtenant Stormwater Drainage Easement)

16. Subject to Easement from Pine Lake Properties, Inc. to BellSouth Telecommunications Inc., dated February 15, 2006 and filed for record in Book 2289, at Page 621, in the Office of the Judge of Probate of Lee County, Alabama. (As to easement in Book 2339, at Page 955, in the Office of the Judge of Probate of Lee County, Alabama.) (Affects appurtenant Stormwater Drainage Easement)

17. Subject to Easement from Opelika IDA to WalMart Stores East Inc., dated June 22, 2005 and filed for record in Book 2184, at Page 912, in the Office of the Judge of Probate of Lee County, Alabama. (As to easement in Book 2277, at Page 216, in the Office of the Judge of Probate of Lee County, Alabama.) (as shown on the Survey)

18. Subject to plat of Northeast Opelika Industrial Park dated June 24, 1999 and filed for record in Plat Book 20, at Pages 168 through 171, in the Office of the Judge of Probate of Lee County, Alabama. (As to easement in Book 2277, at Page 216, in the Office of the Judge of Probate of Lee County, Alabama.) (Affects appurtenant 40' Utility Easement) (as shown on the Survey)

19. The following matters as shown on survey prepared by Andrew Kramer, PLS No. 29990, of Andrew Kramer Land Surveying, for EMG Corp., dated August 5, 2019, designated Project No. AL19-010, dated May 21, 2021; to wit:

    a.  Underground and overhead power lines

    b.  Water lines

    c.  Storm sewer lines

    d.  Gas lines

20. Terms and provisions of Lease Agreement dated _____, 2021 between Crafty (AL) LLC, as Landlord, and Jo-Ann Stores, LLC, as tenant, as evidenced by Memorandum of Lease of same date recorded _____, 2021, in Book ____ Page ____, in the Office of the Judge of Probate, Lee County, Alabama.

EXHIBIT C TO LEASE AGREEMENT FOR JOANN - 2

EXHIBIT D

BASIC RENT PAYMENTS

1.      Basic Rent.

(a)     Initial Term.  Subject to the adjustments provided for in Paragraph 2 below, Basic Rent payable in respect of the Term shall be $2,810,000 per annum, payable monthly in advance on each Basic Rent Payment Date, in equal installments of $234,166.66 each.  Per diem Basic Rent for the period from the date hereof through the last day of June 2021 shall be paid on the date hereof.

(b)     Renewal Term.  Annual Basic Rent for the first year of each Renewal Term shall be an amount equal to the greater of (x) the then escalated Basic Rent in effect for the Lease Year immediately preceding the commencement of such renewal Term and (y) Fair Market Rental Value as of the first day of the applicable renewal Term, as determined in accordance with Paragraph 29 of this Lease, shall be payable in equal monthly installments and shall be subject to the adjustments provided for in Paragraph 2 below.

(c)     Fair Market Rental Value Cap.  Notwithstanding anything to the contrary set forth in Paragraph 1(b) above, for purposes of clause (y) thereof, in no event shall Fair Market Rental Value exceed 120% of the then escalated Basic Rent in effect under the Lease.

2.      Basic Rent Adjustment.

(a)     Throughout the Term (including any Renewal Term), Basic Rent then due under this Lease for each Lease Year shall be increased by 2% annually commencing on the first anniversary of the first Basic Rent Payment Date (such date, the "First Full Basic Rent Payment Date") and, thereafter, on each anniversary of the First Full Basic Rent Payment Date (each such date being hereinafter referred to as the "Basic Rent Adjustment Date").

(b)     Effective as of a given Basic Rent Adjustment Date, Basic Rent payable under this Lease until the next succeeding Basic Rent Adjustment Date shall be the Basic Rent in effect after the adjustment provided for as of such Basic Rent Adjustment Date.