## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| JOANN, INC., *et al.,*[1] | Case No. 25-10068 (CTG) |
| Debtors. | (Jointly Administered) |
| | **Re: D.I. 1483, 1484, 1651, 1653** |
| | **Hearing Date: September 9, 2025, at 1:00 pm ET** |

**LANDLORD'S REPLY TO: (A) PLAN ADMINISTRATOR'S OBJECTION TO MOTION OF CRAFTY (AL) LLC FOR ENTRY OF AN ORDER: (I) REQUIRING PAYMENT OF ADMINISTRATIVE CLAIM FOR UNPAID PRORATED 2025 REAL ESTATE TAXES; (II) COMPELLING PAYMENT OF CLAIM FOR REMOVAL OF IMPROPERLY "ABANDONED" PROPERTY AS EITHER AN ADMINISTRATIVE EXPENSE CLAIM AGAINST THE DEBTORS AND/OR LIABILITY OF PURCHASER; AND (III) GRANTING RELATED RELIEF; AND (B) GA JOANN RETAIL PARTNERSHIP, LLC's JOINDER TO PLAN ADMINISTRATOR'S OBJECTION**

CRAFTY (AL) LLC ("**Landlord**"), by and through its undersigned attorneys, hereby files this Reply to: (A) *Plan Administrator's Objection to Motion of Crafty (AL) LLC for Entry of an Order: (I) Requiring Payment of Administrative Claim for Unpaid Prorated 2025 Real Estate Taxes; (II) Compelling Payment of Claim for Removal of Improperly "Abandoned" Property as Either an Administrative Expense Claim against the Debtors and/or Liability of Purchaser; and (III) Granting Related Relief* [D.I. 1651] ("**PA Objection**"), and (B) *Joinder of GA Joann Retail*

---

[1]  The debtors (the "**Debtors**") in these chapter 11 cases together with the last four digits of each Debtor's federal tax identification number, are: JOANN Inc. (5540); Needle Holdings LLC (3814); Jo-Ann Stores, LLC (0629); Creative Tech Solutions LLC (6734); Creativebug, LLC (3208); WeaveUp, Inc. (5633); JAS Aviation, LLC (9570); joann.com, LLC (1594); JOANN Ditto Holdings Inc. (9652); Dittopatterns LLC (0452); JOANN Holdings 1, LLC (9030); JOANN Holdings 2, LLC (6408); and Jo-Ann Stores Support Center, Inc. (5027).  The Debtors' mailing address is 5555 Darrow Road, Hudson, OH 44236.

*Partnership LLC to* the PA Objection [D.I. 1653] ("**Purchaser's Joinder**"), and respectfully states as follows:[2]

## PRELIMINARY STATEMENT

1.       Through its Motion, Landlord seeks full payment of the Prorated RE Taxes and the Removal Costs for the Improperly Abandoned Assets.

2.       The Prorated RE Taxes are the Debtors' Lease payment obligation that accrued from the January 15, 2025 date that Debtors commenced their chapter 11 cases in this Court through the March 31, 2025 effective date of Debtors' rejection of the Lease. Their payment will be due in late 2025. As detailed below, the Debtors' estates received enormous benefits during that period from use of Landlord's Lease and distribution center through continuing the Debtors' operations, marketing their assets, obtaining a stalking horse bid, and ultimately obtaining a significantly higher bid from Purchaser. Notably, the over $550 million price paid by Purchaser was based in part on its ability to pick up the Debtors' operations in progress, utilize the Leased Premises during a transition period, and market the Lease.[3]  Further, the cost to pay the Prorated RE Taxes should be minimal to the Debtors because most of those taxes are a passthrough expense

---

[2]   Each term not otherwise defined herein shall have the same meaning ascribed to it in the *Motion of Crafty (AL) LLC for Entry of an Order: (I) Requiring Payment of Administrative Claim for Unpaid Prorated 2025 Real Estate Taxes; (II) Compelling Payment of Claim for Removal of Improperly "Abandoned" Property as Either an Administrative Expense Claim against the Debtors and/or Liability of Purchaser; and (III) Granting Related Relief* [D.I. 1483] (the "**Motion**"), or if not defined in the Motion, then the meaning ascribed to it in the PA Objection.

[3]   The purchase price consisted of "cash consideration in the amount necessary to pay in full the Prepetition ABL and FILO Facilities as well as a $105,000,000 Credit Bid of the [Debtors'] Prepetition Term Loan Facility in exchange for substantially all of the Debtors' Assets." *Notice of Winning Bidder for Certain of the Debtors' Assets,* p.1 [D.I. 480]. As of the commencement of these chapter 11 cases on January 15, 2025 (the "Petition Date"), the outstanding principal amounts owed by the Debtors under the ABL and FILO facilities totaled approximately $462.3 million. *See Declaration of Michael Prendergast, Interim Chief Executive Officer, in Support of Chapter 11 Petitions and First Day Motions,* ¶ 44 [D.I. 5].

to be funded by Purchaser.  Accordingly, Landlord is entitled to an allowed administrative claim under section 503(b) for all the Prorated RE Taxes.

3.       The Debtors' liability for the full Removal Costs is pursuant to both sections 365(d)(3) and 503(b). Central to such priority claims of are the following points the Plan Administrator and Purchaser cannot legitimately dispute: (a) the Improperly Abandoned Assets <u>were not property of the Debtors' estates</u> when those assets were abandoned to Landlord; and, therefore, (b) the abandonment was neither covered by nor permitted under section 554 and violated express prohibitions in this Court's Sale Order prohibiting abandonment of assets at Landlord's premises that were not the Debtors' property.  Critically, those facts exclude the situation here from the routine abandonment of a debtor's property under section 554 that the Debtors (and Purchaser) contend exists.

4.       As to section 365(d)(3), the abandonment of the Improperly Abandoned Assets in violation of the Lease and this Court's Sale Order occurred when the Debtors and Purchaser vacated and surrendered the Leased Premises during the day on March 31, 2025, before the Lease Rejection Order was entered on April 16 and the rejection related back to the end of the day on March 31.

5.       As to section 503(b), Purchaser's leaving the Improperly Abandoned Assets behind while Purchaser was the Debtors' invitee in the Leased Premises, was a direct product of all the benefits to the Debtors' estates from the over $550 million sale of the Debtors' assets to Purchaser and its use of the Leased Premises in connection with that sale. Meanwhile, the costs to the Debtors' estates from paying the Removal Costs appear minimal, if any, as Purchaser should have either direct liability for or a funding obligation for payment of the Removal Costs.

6.      Purchaser contests neither this Court's jurisdiction nor authority to impose such a payment obligation on Purchaser. Nor does Purchaser rebut the conclusions that the Improperly Abandoned Assets were not property of the Debtors' estates or that leaving those assets violated express provisions of this Court's Sale Order. Instead, Purchaser attempts to misdirect this Court with irrelevant distractions.

7.      Consequently, Landlord's Motion should be granted.

## ARGUMENT

### I.   THE PA OBJECTION TO LANDLORD'S ADMINISTRATIVE CLAIM FOR UNPAID PRORATED 2025 REAL ESTATE TAXES IS MERITLESS

#### A.  Landlord Seeks Payment Of The Prorated RE Taxes Under Section 503(b), Not Section 365(d)(3)

8.      The Plan Administrator first objects to Landlord's administrative claim for unpaid Prorated RE Taxes because even though those taxes accrued during the postpetition/prerejection period and their payment is the Debtor Tenant's Lease obligation, payment of the 2025 taxes is not due until after the Lease was rejected. See PA Objection ¶¶ 5, 7, 8.  The Plan Administrator notes the Third Circuit's Montgomery Ward decision held section 365(d)(3)'s requirement for a debtor/tenant to timely perform its lease obligations only mandates payment of lease obligations that come due during the postpetition/prerejection period. See In re Montgomery Ward Holding Corp., 268 F.3d 205, 209 (3d Cir. 2001). Landlord does not contend otherwise, and its Motion does not seek the Prorated RE Taxes based on section 365(d)(3).

9.      Instead, Landlord seeks payment of the Prorated RE Taxes under section 503(b). Courts in the Third Circuit routinely require payment of prorated lease obligations such as for stub rent that accrue during the postpetition/prerejection period, but are due pre-petition or post-rejection, and find that such requirement is not precluded by Montgomery Ward. See, e.g., In re

Goody's Family Clothing, Inc., 610 F.3d 812, 819 (3rd Cir. 2010) (holding that " [s]ection 365(d) does not preempt § 503" and, therefore, the debtor/tenant's landlords were entitled to "'stub rent' [for which the applicable payments accrued postpetition, but were due prepetition] as an actual and necessary expense for the benefit of the estate"); In re ZB Co., Inc., 302 B.R. 316, 319 (Bankr. D. Del. 2003) ("Section 503(b)(1)(A) fills the stub period gap created by section 365(d)(3). It is beyond dispute that all of the Debtors' landlords whose properties are occupied and used post-petition have valid administrative claims. . . . Absent evidence to the contrary, the contract rate is presumed to be the fair rental value.") (citations omitted).

**B. The Prorated RE Taxes Are Unquestionably Actual, Necessary Costs Or Expenses Of Preserving The Debtors' Estates**

10.    Despite such Third Circuit precedent, the Plan Administrator argues Landlord is not entitled to an allowed administrative claim for the Prorated RE Taxes under section 503(b) because Landlord allegedly did not demonstrate the Prorated RE Taxes are "actual, necessary costs or expenses of preserving the [Debtors'] estate."  PA Objection ¶ 9. Yet, the Plan Administrator does not dispute that the Debtors, until the sale closing, and thereafter, Purchaser, as the Debtors' invitee, continued to occupy and use the Leased Premises as a distribution center through at least March 31, 2025. The extensive benefits to the Debtors' estates from the postpetition use and occupancy of Landlord's premises (one of only four distribution centers then being used for the Debtors' operations)[4] by the Debtors and Purchaser (as Debtors' invitee) are self-evident.

11.    During the postpetition/prerejection period, the Debtors operated their business, marketed their assets, obtained a valuable stalking horse bid for the purchase of substantially all

---

[4]    See *Motion of Debtors for Entry of and Order (I) Authorizing and Approving the Conduct of Store Closing Sales, etc.* ¶ 6 [D.I. 385] ("**Store Closing Sales Motion**") ("JOANN currently operates in 49 states with approximately 800 stores and 4 distribution centers."); Agency Agreement, Ex. 1(a)(2) (listing Leased Premises among distribution centers subject to Agency Agreement).

the Debtors' assets (and the ability to pick and choose which leases to designate for assumption and assignment), and ultimately obtained a higher and better offer consisting of "cash consideration in the amount necessary to pay in full [the over $450 million due under the Debtors'] Prepetition ABL and FILO Facilities as well as a $105,000,000 Credit Bid of the [Debtors'] Prepetition Term Loan Facility in exchange for substantially all of the Debtors' Assets." *Notice of Winning Bidder for Certain of the Debtors' Assets,* p.1 [D.I. 480].

12.     The Debtors repeatedly trumpeted those significant benefits from operating and marketing their assets during the applicable postpetition/prerejection period:

- "The Debtors are seeking to sell all of their assets through one or multiple transactions, to the bidder(s) that present the ***greatest value maximizing alternative*** in the aggregate on a going concern or liquidation basis." Sale Motion ¶ 4 [D.I. 17] (Emphasis added).

- "The Debtors believe that the Sale Transactions will ***maximize the value of their Assets*** after exposing them to the market as part of a competitive, arm's length process." <u>Id.</u> ¶ 46 (Emphasis added).

- "Based on the status of the marketing process, as well as the Debtors' own assessment of its operations, the Debtors, with the assistance of their advisors, have developed a store closure plan centered on ***value maximization*** and an asset disposition strategy based on proceeds realizable through the sale of the [Debtors' assets]." Store Closing Sales Motion ¶ 8 (Emphasis added).

13.     Correspondingly, the Sale Order, which was largely drafted by the Debtors and Purchaser, contains findings concerning the extensive benefits to the Debtors' estates from their ongoing operations and the sales process conducted through and enabled by the continued use of the Debtors' facilities, including the Leased Premises:

- "The Debtors and their advisors engaged in a ***robust and extensive marketing and sale process***, both prior to the commencement of these chapter 11 cases and through the postpetition sale process in accordance with the Bidding Procedures Order and a sound exercise of the Debtors' business judgment." Sale Order ¶ I (emphasis added).

- "[T]he sale process conducted by the Debtors pursuant to the Bidding Procedures Order and the Bidding Procedures ***resulted in the highest or otherwise best value for the***

***Assets*** for the Debtors and their estates, and was in the ***best interest*** of the Debtors, their estates, and their creditors." Id. (emphasis added).

14.    Additionally, the extensive benefits to the Debtors' estates from that process and the use of the Debtors' facilities, including the Leased Premises, can be readily inferred from the fact the Debtors did not include Landlord's distribution center among the locations covered by the Debtors' Store Closing Sales Motion filed on February 12, 2025. That motion states: "[p]rior to the Petition Date and during the postpetition marketing process, the Debtors, with the assistance of their advisors, engaged in an extensive review of each of their stores to (a) identify underperforming stores; and (b) determine what stores may be of interest to potential bidders as a result of the Debtors' marketing process."  Store Closing Sales Motion ¶ 30. Yet despite that detailed real estate review resulting in hundreds of the Debtors' locations being scheduled to be closed, Landlord's distribution center was not included. See id. Schedule 1. Correspondingly, the Debtors and Purchaser continued to use the Leased Premises and accrue rent payment obligations, but did not seek to reject Landlord's Lease until late March 2025.

15.    Thus, the Debtors obtained postpetition/prerejection benefits from both: (a) use of Landlord's premises to assist in the Debtors' operations and sale marketing until the sale closed; and (b) receipt of the (over $550 million) purchase price for the Debtors' assets based in part on Purchaser's ability to: (x) pick up the Debtors' ongoing operations and liquidate the Debtors' assets; (y) use Landlord's premises to assist sales during a transition period; plus (z) analyze whether to designate Landlord's Lease for assumption and assignment.  See In re Energy Future Holdings Corp., 990 F.3d 728, 742 (3d Cir. 2021) ("the concept of 'necessary costs' in the 503(b)(1)(A) context is broader than one of absolute requirement, and 'less readily calculable benefits, such as the ability to conduct business as usual,' can qualify"); Pennsylvania Dep't of Envt'l Res. v. Tri-State Clinical Labs, Inc., 178 F.3d 685, 689 (3d Cir. 1999) (providing that

"'usual and necessary costs should include costs ordinarily incident to operation of a business, and not be limited to costs without which rehabilitation would be impossible.'") (quoting <u>Reading</u>) (hereinafter "<u>Tri-State</u>").

16.    For these reasons, the Plan Administrator incorrectly relies on <u>In re WCI Communities, Inc.</u>, No. 08-11643, 2010 WL 3523061, 2010 Bankr. LEXIS 2683 (Bankr. D. Del. Sept. 2, 2010). <u>See</u> PA Objection ¶ 9. Here, Landlord has made a substantial record concerning how the continued use and occupancy of Landlord's distribution center during the postpetition/prerejection period benefitted the Debtors' estates. In contrast, the <u>WCI Communities</u> landlord "offered neither argument nor evidence in support of its claim for an administrative expense under Bankruptcy Code §503(b)."  2010 Bankr. LEXIS 2683, at *11. Further, whereas here Landlord seeks an administrative claim only for the Prorated RE Taxes (*i.e.,* those for the 3 months through 3/31/2025), the <u>WCI Communities</u> landlord, despite relying on section 503(b), sought to recover ad valorem taxes for the entire year even though the Debtors' lease was rejected by February. <u>Id.</u> at *3 & 6-7. Accordingly, it was obvious the ad valorem taxes in <u>WCI Communities</u> had no connection to any benefit conferred upon the debtor's estate.

17.    Moreover, the fact Landlord's Lease ultimately was rejected is irrelevant as there was no purchase price adjustment based on whether Landlord's Lease was assumed. <u>See</u> Agency Agreement § 15.3 [D.I. 520-1] ("The delivery of a Dropout Notice [by Purchaser eliminating a lease from those that could be assumed and assigned] shall not result in a reduction of the Purchase Price payable hereunder.").

18.    Alone, those multiple benefits to the Debtors' estates warrant the Debtors' payment of the Prorated RE Taxes. Regardless, still another justification for such payment is that it appears

much of the Debtors' Prorated RE Tax obligation is a passthrough as Purchaser should be obligated

to fund payment of most of those taxes under section 4.1 of the Agency Agreement:

> [Purchaser] shall be responsible for all "Expenses, . . . .  As used herein, "Expenses" shall
> mean the actual operating expenses that arise solely after Closing through the Sale
> Termination Date, . . ., which are strictly limited to the following expenses:
>
> > * * *
> > (c) subject to <u>Section 6.1,</u> the actual Occupancy Expenses; [and]
> >
> > (l) the Distribution Center Expenses;
> >
> > (ii) "<u>Distribution Center Expenses</u>" means the actual costs and expenses, including
> > use and Occupancy Expenses . . . of the Distribution Centers, . . . .
> >
> > * * *
> > (iv) "<u>Occupancy Expenses</u>" means base rent. . . . , real estate and use taxes, . . . .

Agency Agreement [D.I. 520-1] § 4.1(c), (l), (ii), (iv). Similarly, section 15.3 of the Agency

Agreement provides that: "[t]he costs of maintaining the Assets available for marketing and sale

shall constitute Expenses."  <u>See</u> <u>Energy Future Holdings Corp.,</u> 990 F.3d at 742 ("an analysis as

to whether a particular action benefitted an estate must weigh the costs to the estate against the

alleged benefits") (citations omitted).

19.    Consequently, there is overwhelming evidence of extensive benefits (and limited

costs) to the Debtors' estates from utilizing Landlord's Lease and premises that warrant allowance

of Landlord's administrative claim for the Prorated RE Taxes.

## II.    CONTRARY TO THE PA OBJECTION, LANDLORD IS ENTITLED TO AN ADMINISTRATIVE CLAIM FOR FULL PAYMENT OF THE COSTS OF REMOVING THE IMPROPERLY ABANDONED ASSETS

### A. Landlord Is Entitled To An Allowed Administrative Claim Under Section 365(d)(3) To Cover The Removal Costs

20.    In opposing Landlord's request under section 365(d)(3) for payment of the

Removal Costs, the Plan Administrator advocates an inappropriately narrow reading of Lease

paragraph 26. Specifically, the Plan Administrator argues that paragraph 26, which requires the Debtor/tenant to remove all property from the Leased Premises, only is triggered by Lease termination and, therefore, is inapplicable here as the Lease's rejection did not amount to termination. See PA Objection ¶¶ 11-13. Yet the Plan Administrator ignores that: (i) the Debtors surrendered the Leased Premises on March 31, 2025; (ii) paragraph 26 is titled "Surrender"; and (iii) Lease paragraph 26 provides that upon surrender, "Tenant shall (a) remove from the Leased Premises all property which is owned by Tenant or third parties other than Landlord . . . ." Lease ¶ 26. Thus, a fair reading of Lease paragraph 26's substance demonstrates it was triggered on March 31, 2025, in connection with the Debtors' surrender of the Leased Premises.

21.     Even assuming Lease paragraph 26 is inapplicable here, the Debtors breached other Lease provisions on March 31, 2025, that required the Debtor Tenant to remove all property from the Leased Premises before Lease termination. For example, Lease paragraph 10(a) provides that: "Tenant shall, at its expense, comply with and conform to, and cause the Leased Premises and any other Person occupying any part of the Leased Premises to comply with and conform to, all Insurance Requirements and Legal Requirements . . . ." The Lease definitions provide that: "'Legal Requirements' shall mean the requirements of all present and future Laws . . . ." and "'Law' shall mean any . . . order, judgment, decree, . . . of every duly constituted governmental authority, court or agency . . . ." Hence, the Debtors failed to timely perform their obligations under Lease paragraph 10(a) when the Debtors (and Purchaser, which was in the Leased Premises as the Debtors' invitee) violated the express prohibitions in this Court's Sale Order stating Purchaser "may not abandon any property at a Store or Distribution Center that does not belong to" the Debtors. Sale Order ¶¶ 20, 63.

22.     Moreover, in arguing the wrongful abandonment occurred after the postpetition/prerejection period, the Plan Administrator ignores the timing of the relevant occurrences here. Specifically, the Debtor Tenant filed the Notice of Rejection [D.I. 657] and surrendered the Leased Premises (with the Improperly Abandoned Property present) to Landlord on March 31, 2025. Meanwhile, the Lease Rejection Order [D.I. 703] was not entered until April 16, 2025, and then related back to March 31.

23.     Further, the Rejection Order, ¶ 2 [D.I. 713], authorized "abandonment" of property located on leased premises "pursuant to section 554 of the Bankruptcy Code," which applies only to "property of the estate." 11 U.S.C. § 554(a). Here, the property left behind at the Leased Premises was not property of the Debtors' estates under the Agency Agreement and Sale Order. As such, no abandonment "pursuant to section 554 of the Bankruptcy Code" occurred and the timing of such improper abandonment was not controlled by the Rejection Order, including its nunc pro tunc effectiveness as of March 31, 2025. Hence, the improper abandonment occurred when the Improperly Abandoned Assets were left behind, which occurred **before** the Lease had been rejected. Consequently, the Debtors breached the Lease and incurred the obligation to pay the Removal Costs during the postpetition/prerejection period.

## B.  Alternatively, Landlord Is Entitled To An Allowed Administrative Claim Under Section 503(b) Covering The Removal Costs

24.     The Plan Administrator states that which entity owned the Improperly Abandoned Assts and whether section 554 applies to those assets "are distinctions without a difference for purposes of determining whether [Landlord] is entitled to an administrative expense claim for the Removal Costs." See PA Objection ¶ 17. The Plan Administrator's position fails to address the central basis for Landlord's section 503(b) claim. See id. ¶¶ 18-20. First, the Plan Administrator effectively concedes that the Improperly Abandoned Assets were not property of the Debtors'

estates when the Leased Premises were surrendered and those assets were abandoned. That fact is established by detailed explanations in Landlord's Motion and further elaborated below. See Motion ¶¶ 18-22, 38-44. While the relevant documents, which were drafted by (and should be construed against) the Debtors and Purchaser, are unclear as to whether the Owned FF&E (as defined in Agency Agreement §§ 1(b), 8.4) at issue here were transferred outright to Purchaser or held in trust for Purchaser, what is certain is that after the Closing of the Debtors' asset sale to Purchaser, those assets no longer were property of the Debtors' estates.

25.     Second, the Plan Administrator ignores the significant legal consequences flowing from the fact the Improperly Abandoned Assets were not property of the Debtors' estates when abandoned to Landlord. Specifically, those assets are not covered by section 554 (which only applies to the Debtors' assets) and, therefore, the Debtors had no right or permission of this Court to abandon or permit Purchaser to abandon the Improperly Abandoned Assets at the Leased Premises. Further, by permitting Purchaser, as the Debtors' invitee, to leave the Improperly Abandoned Assets at the Leased Premises, the Debtors directly violated two paragraphs in the Sale Order expressly prohibiting Purchaser from doing so. See Sale Order ¶¶ 20, 63 (Purchaser "may not abandon any property at a Store or Distribution Center that does not belong to" the Debtors.).

26.     Seeking to circumvent those critical facts and their legal consequences, the Plan Administrator mischaracterizes the situation here as involving a "routine" claim of a landlord whose lease was rejected and who seeks damages for the costs of removing property a bankruptcy court authorized the applicable debtor/tenant to abandon under section 554. See PA Objection ¶ 15. Instead, Landlord's section 503(b) claim for the Removal Costs is based on the wrongful conduct of both the Debtor and Purchaser in leaving behind the Improperly Abandoned Assets in direct contravention of this Court's Sale Order and applicable law. That misconduct violated this

Court's express prohibitions (which were negotiated by the Debtors and accepted by Purchaser to resolve one of Landlord's objections to the Sale Motion and proposed order). Further, that misconduct is worse than most torts as it was knowing and intentional.[5]   Such wrongful conduct also constitutes a tort under Alabama law, such as for conversion on the case (by interfering with Landlord's right to possess and use the Leased Premises) or negligence (because the Debtor owed and breached a duty of care to Landlord).[6]   As such, even if the Debtors' estates are somehow deemed not to have received the benefit generally required by section 503(b) (which is untrue as those extensive benefits are described in Argument I of this Reply), Landlord's section 503(b) claim falls within (or by analogy to) the Reading exception to the general rule that a landlord's abandoned property removal claim is merely part of its unsecured prepetition lease rejection claim. Hence, no benefit to the Debtors' estates need be demonstrated to warrant allowance of Landlord's claim.

27.    Rather than address Landlord's central argument, the Plan Administrator merely discusses collateral points. First, the Plan Administrator attempts to distinguish the line of cases cited by Landlord allowing section 503(b) administrative claims based on a debtor/tenant's breach of repair and maintenance lease obligations. See PA Objection ¶¶ 18-19. Yet Landlord cited those cases simply to show that when evaluating the "benefit" to a debtor from performing a lease obligation such as repairs to the leased premises that provide no obvious benefit to the debtor, but

---

[5]    If Purchaser's wrongful actions were knowing and intentional, the Debtors should have contractual rights of indemnification against Purchaser under the Agency Agreement. See Agency Agreement, § 13.17(a) (requiring Purchaser to indemnify [the Debtors] for, among other things, its material contract breaches and willful misconduct).

[6]    See, e.g., Combs v. Alabama Gas Corp., 577 So.2d 1269, 1271 (Ala. 1991) (Alabama Supreme Court describes abandonment of property on plaintiff's land as a trespass); Restatement (Second) of Torts § 158 (1965) ("One is subject to liability to another for trespass, irrespective of whether he thereby causes harm to any legally protected interest of the other, if he intentionally . . . (c) fails to remove from the land a thing he is under duty to remove.").

have been wrongfully withheld, courts are flexible in finding a relatively minor benefit such as the debtor's ability to use the funds that should have been spent on the repairs (just as the Debtors here were able to use funds that should have been spent on removing the Improperly Abandoned Assets). See Tri-State, 178 F.3d at 691 (Third Circuit reasons that in Reading the Supreme "Court believed that those who continue to transact business with the debtor during the Chapter 11 case, and who suffer financially as a result, are entitled to priority over other creditors who have not affirmatively assumed such risk. . . . The Court concluded that is simply is not fair to deny innocent victims compensation for injuries they would not have incurred had the law not allowed the debtor to continue operating its business.") (denying administrative claim only because it was for a criminal fine, not compensatory damages). In contrast, here the sale of substantially all the Debtors' assets to Purchaser facilitated by the Debtors' continued operations in distribution centers such as Landlord's plus Purchaser's ability to continue to operate in the Leased Premises and potentially sell Landlord's Lease were an enormous benefit to the Debtors' estates justifying allowance of Landlord's claim.  Moreover, under the Reading exception no benefit need be shown.

28.    The Plan Administrator next argues that Landlord's section 503(b) Removal Costs claim is unjustified because the Debtors' estates would not benefit from removal of assets the Debtors do not own. See PA Objection ¶¶ 19-20. This argument not only ignores the Reading exception to the requirement for any benefit, but also misconstrues any applicable section 503(b) benefit inquiry. That inquiry is whether the Debtors' estates benefitted from the dealings that gave rise to the claim so that "the estate benefitted by the actions taken." In re Women First Healthcare, Inc., 332 B.R. 115, 122 (Bankr. D. Del. 2005).[7]

---

[7]    See In re Philadelphia Newspapers, LLC, 690 F.3d 161,173 (3d Cir. 2012), as corrected (Oct. 25, 2012) ("fairness may call for the allowance of post-petition tort claims as administrative expenses if those claims arise from actions related to the preservation of a debtor's estate despite having no reasonable benefit to the estate.") (citing Reading Co. v. Brown, 391 U.S.

29.     Moreover, the Debtors' estates benefitted enormously from their postpetition use of the Leased Premises for both the Debtors' ongoing operations during the Debtors' asset sale marketing process and for the sale value (ultimately over $550 million) created in part by Purchaser's ability to use the Leased Premises during a transition period and to potentially sell the Lease. Hence, it was the Debtors' asset sale to Purchaser (for purposes of Purchaser's attempted resale) facilitated in part by use of Landlord's Lease and the Leased Premises that both enormously benefitted the Debtors and is inextricably intertwined with Purchaser's subsequent improper abandonment of assets it did not sell. Now the Debtors' estates (perhaps with funding from Purchaser) must bear the consequence of violating Landlord's express protections - in the Sale Order and applicable law - during consummation of the sale to Purchaser.

## III.    PURCHASER'S JOINDER IS A BLEND OF KEY OMISSIONS, IMPLICIT ADMISSIONS, AND MISLEADING ALLEGATIONS

30.     Purchaser's Joinder fails to address and, therefore, concedes Landlord's central allegations. Specifically, by failing to address this Court's jurisdiction and authority, Purchaser concedes this Court has the jurisdiction and authority to impose on Purchaser, should it be legally warranted, either direct liability to Landlord for and/or enforcement of Purchaser's contractual obligation to fund the Debtors' liability for, the Removal Costs.[8]

---

471, 477 (1968); In re Old Carco LLC, 424 B.R. 633, 643 (Bankr. S.D.N.Y. 2010) ("An exception to the requirement that there be an actual benefit to the estate before a claim can be accorded administrative claim priority has developed in the context of torts committed by the trustee or debtor-in-possession during the course of a chapter 11 proceeding.") (citations omitted); In re Unidigital, Inc., 262 B.R. 283, 290 (Bankr. D. Del. 2001) (citing Reading, 391 U.S. at 479-80, for the basis to allow an administrative claim without a benefit to the debtor's estate because if the debtor "was operating the property post-petition for the benefit of the debtor's unsecured creditors, the unsecured creditors should bear the burden associated with the post-petition operations.").

[8]   Purchaser incorrectly asserts Landlord may not request such relief by motion. See Purchaser's Joinder ¶ 2, fn. 2. No adversary proceeding is necessary to compel Purchaser to comply with this Court's Sale Order provisions prohibiting Purchaser from leaving the assets behind. See In re Lazy Days' RV Ctr. Inc., 724 F.3d 418, 426 (3d Cir. 2013) ("[A]n adversary proceeding is not necessary where the relief sought is the enforcement of an order previously obtained.")

31.     As Purchaser "joins and adopts the arguments and factual legal bases set forth in the [PA] Objection . . . ," Purchaser's Joinder ¶ 1, Purchaser also effectively concedes the Improperly Abandoned Assets were not property of the Debtors' estates when abandoned at the Leased Premises. Correspondingly, Purchaser fails to address and, therefore, concedes Landlord's positions that: (a) the Sale Order expressly prohibits Purchaser from leaving at the Leased Premises assets that are not property of the Debtors' estates; and (b) section 554's language limits its application to abandonment of the Debtors' property.

32.     Instead, Purchaser argues it "did not purchase or take legal title to the Abandoned FF&E (or any other assets of the Debtors) through the Sale Order."  Purchaser's Joinder ¶ 4. Further, Purchaser incorrectly suggests Landlord "concedes" this assertion. Id. In fact, Landlord quotes inconsistent provisions in the Agency Agreement and Sale Order stating both that: (a) the assets were held in trust for Purchaser; and (b) those assets were sold directly to Purchaser. See Motion ¶¶ 18-19 (e.g., while the Agency Agreement provides for the assets to be held "in trust," the Sale Order, which controls in any conflict with the Agency Agreement, provides that "the assets shall be vested in the Purchaser."). Regardless of whether Purchaser's assertion the assets were held in trust is true, at a minimum, when the Leased Premises were surrendered, those assets were not property of the Debtors' estates and were in the Purchaser's complete possession and control. Consequently, it was Purchaser (as the Debtors' invitee) that left those assets behind in violation of this Court's Sale Order.

33.     Purchaser attempts to distract from that fact by misleadingly asserting "Landlord further concedes that any such assets that were not designated for assignment by the conclusion of

---

(quoting In re WorldCorp, Inc., 252 B.R. 890, 895 (Bankr. D. Del. 2000)). If, however, an adversary proceeding is required, then Landlord reserves all rights to pursue direct claims against Purchaser.

the Debtors' going-out-of-business sale re-vested in the Debtors." <u>Id.</u> ¶ 5. In fact, while acknowledging the provision (Sale Order ¶ 18) addressing "reversion" of "ownership" of certain assets in the Debtors' estates (because it means the assets were <u>not</u> property of the Debtors' estates prior to such reversion), Landlord emphasizes that such provision <u>could not apply</u> to transfer ownership of the Improperly Abandoned Assets from Purchaser to the Debtors because those assets had been abandoned to Landlord <u>long before</u> any automatic reversion of ownership from Purchaser under that provision could have occurred. <u>See</u> Motion ¶¶ 23-27.

34.    Accordingly, Purchaser's Joinder offers no basis to deny Landlord's Motion.

## CONCLUSION

36.    WHEREFORE, Landlord respectfully requests that the Court: (a) overrule the PA Objection and Purchaser Joinder; (b) enter an order, in substantially the form submitted with the Motion, granting the relief requested therein; and (c) grant such other relief to Landlord as is just and proper under the circumstances.

Dated: September 4, 2025
      Wilmington, Delaware

**DORSEY WHITNEY (DELAWARE) LLP**

 */s/ Gregory W. Werkheiser*
Gregory W. Werkheiser (No. 3553)
300 Delaware Ave, Suite 1010
Wilmington, DE 19801
Telephone: (302) 425-7165
Werkheiser.Gregory@dorsey.com

*- and -*

**CHAFFETZ LINDSEY LLP**
Alan J. Lipkin
1700 Broadway, 33rd Floor
New York, NY  10019
Telephone: (212) 257-6960
Facsimile: (212) 257-6950
alan.lipkin@chaffetzlindsey.com

*Co-Counsel to CRAFTY (AL) LLC*