# EXHIBIT A

# LEASE AGREEMENT

Between

**BEN CARTER PROPERTIES, LLC**
**LANDLORD**

And

**FCA OF OHIO, INC.**
**TENANT**

Dated: June 18, 2003

## LEASE

THIS LEASE, dated as of, June 18, 2003, by and between BEN CARTER PROPERTIES, LLC (or its nominee), a Georgia Limited Liability Company, having its address located at 950 E. Paces Ferry Road, Suite 900, Atlanta, Georgia (hereinafter called "Landlord"), and FCA OF OHIO, INC., an Ohio corporation, having its address located at 5555 Darrow Road, Hudson, Ohio 44236 (hereinafter called "Tenant").

### LANDLORD AND TENANT COVENANT AND AGREE AS FOLLOWS:

EXHIBITS TO LEASE

SECTION 1. (a) The following exhibits are attached to and made a part of this Lease, and are incorporated herein by reference:

Exhibit "A." The description of the lands upon which the Shopping Center is constructed.

Exhibit "B." The site plan showing the location of the Premises, as hereinafter defined, the Shopping Center buildings, parking areas, driveways and common areas and containing other general information relative to the development of the Shopping Center Site (the "Site Plan"). Any designation of the location, size, layout and other details of the building in which the Premises is located, any other buildings or improvements in the Shopping Center or occupants thereof or of any Common Areas, including any other buildings, structures, walkways, parking areas, landscaped areas, roadways or other areas not a part of the Premises shown hereon is an approximation or estimation of existing or proposed plans. Such designation shall not constitute any representation, covenant or agreement by Landlord as to the use or occupancy of or any other matter respecting such buildings, structures, or areas and such designations are subject to reasonable change, modification, alteration, addition, or deletion at any time by Landlord, without liability whatsoever to Tenant and without affecting the validity of the Lease, but subject however to the terms of the Lease.

Exhibit "C." The Premises Specific Block Plans prepared and provided by Tenant and approved by Landlord and Tenant, wherein are detailed Landlord's Work, as hereinafter defined, and Tenant's Work, as hereinafter defined, in the Premises (Exhibit C.1), the layout and Gross Leasable Area of the Premises (Exhibit C.2), the interior lighting layout, requirements and specifications (Exhibit C.3), and Tenant's exterior signs (Exhibit C.4).

Exhibit "D." The final plans and specifications detailing Landlord's Work and Tenant's Work in the Premises, as approved by Landlord and Tenant.

Exhibit "D-1." The final plans and specifications detailing Tenant's signs, as approved by Landlord and Tenant.

Exhibit "E." The project coordination guidelines.

Exhibit "F." The Guaranty of Lease.

Exhibit "G." The "OEA" means the Operation and Easement Agreement(s).

Exhibit "H." The approved Subordination Non-Disturbance and Attornment Agreement and Estoppel Certificate.

Exhibit "I." The Declaration governing the Town Center Tract.

Exhibit "J." The restricted uses governing the Shopping Center.

theretofore has been made at, in, from or upon the Premises, and/or for the purpose of depriving Landlord of the benefit of a sale which otherwise would be made at, in, from or upon the Premises; (iii) the amount of returns to shippers or manufacturers; (iv) sales to employees made at a discount; (which exclusion shall not exceed two percent (2%) of Tenant's annual Gross Sales per year); (v) non-sufficient funds check charges or financing charges to customers whether or not separately stated or billed; (vi) service charges to customers who buy a budget or deferred payment plan; (vii) revenue from gift certificates or gift cards until redeemed at the Premises; (viii) revenue from vending machines used solely for the benefit of employees; (ix) the amount of any cash or credit refund made upon any sale where the merchandise sold, or some part thereof, is thereafter returned by the purchaser and accepted by Tenant; (x) sales of fixtures; (xi) any and/or all sums and credits received in settlement of claims for loss or damage to merchandise; (xii) non-retail bulk sales of merchandise outside of the ordinary course of business on the Premises; (xiii) tax exempt sales or merchandise donated or sold at a discount to charitable or non-profit organizations; (xiv) fees for classes or demonstrations; (xv) the value attributed to merchandise taken in trade; (xvi) referrals to affiliates of or other divisions of Tenant; (xvii) fees for gift wrapping, mailing and other customer services provided on a not for profit basis; (xviii) sales of lottery tickets, special event tickets and the like (provided, however, that commissions paid to Tenant thereon shall be included in Gross Sales); (xix) the amount of credit sales and credit accounts incurred at the Premises which are written off as bad debts and deducted as an expense (but any such debts subsequently collected shall be then included in Gross Sales); or (xx) sale of patterns.

(b) Tenant shall keep and maintain all books of account, documents, records, returns, papers and files pertaining to Gross Sales, including without limitation cash register tapes, sales slips, sales checks, tax reports, bank deposit records, sales journals or other supporting data, for a period of three (3) years after the close of each Lease Year and Partial Lease Year. Landlord shall have the right at any time within three (3) years after the close of each Lease Year and Partial Lease Year, but not more often than once with respect to any Lease Year and Partial Lease Year, to cause an audit to be made by any independent accountant designated in writing by Landlord of all of the books of account, documents, records, returns, papers and files of Tenant relating to Gross Sales for such Lease Year made at, in, on or from the Premises, and Tenant, upon at least three (3) days prior request of Landlord, shall make all such records available for such examination at the address specified in this Lease for notices to Tenant during regular business hours. Landlord agrees that any information obtained from all such records and reports examined by it or by its designated accountant shall be held in strict confidence, but Landlord shall be allowed to disclose such information to perspective purchasers and to Mortgagees; provided, however, they too must agree and thereafter keep such information held in strict confidence before they are given such information. All actions or claims by Landlord for additional Percentage Rent, and, if applicable, Common Area Costs, Taxes, Insurance, Fixed Minimum Rent and any other monetary obligations shall be barred after said three (3) year period if an audit has not commenced. Should an audit commence during such three (3) year period, then such period shall be extended until the issue is so resolved. If Landlord shall have such an audit made for any Lease Year or Partial Lease Year and the Gross Sales shown by Tenant's statement for such Lease Year or Partial Lease Year have been understated by more than three percent (3%) and if such understatement resulted in an underpayment of Percentage Rent, then Tenant, in addition to immediately paying the Landlord the full amount of the understated Percentage Rent as determined by such audit, shall pay the Landlord the reasonable cost of such audit together with interest at the Default Rate calculated from the due date of said Percentage Rent to the actual date of payment; otherwise said audit shall be at Landlord's sole cost and expense. Tenant makes no representation or warranty as to the sales which it expects to make in the Premises.

(c) The Gross Sales of any Lease Year or Partial Lease Year, as the case may be, and the Percentage Rent due thereon, if any, shall have no bearing on or connection with the Gross Sales of any other Lease Year or Partial Lease Year.

TAXES

SECTION 8. (a) Landlord covenants and warrants that the entire tax parcel on which the Shopping Center is located [tax parcel identification number(s), shall be provided to Tenant on or before the Commencement Date] (the "Tax Parcel") shall not extend beyond the perimeter of the Shopping Center Site and that the improvements comprising the Shopping Center (including the Premises and Common Areas) are the only improvements to be located thereon. Tenant agrees to pay to Landlord each year during the Term Tenant's Proportionate Share of real estate taxes ("Taxes") levied upon the Tax Parcel and paid by Landlord during each year of the Term (after reducing such Taxes by the amount of any contributions for such Taxes paid by any party having the right to use the Common Areas but not a tenant of the Shopping Center, and, further, reducing such amount by any rollback, credit or reduction which

has been granted or issued by any taxing authority or governmental group or agency). Statements assessing and prorating the Taxes, if any, shall be rendered by Landlord, together with copies of receipted tax bills for which reimbursement is sought and reasonable verification for the computation of Tenant's Proportionate Share. Tenant shall pay its Proportionate Share thereof within thirty (30) days of the receipt of such statements and receipts. Landlord shall pay such Taxes to the taxing authority before any penalties or interest accrue. In no event shall Tenant pay for Taxes for a time period longer than the Term. For example, if the Term is for ten (10) years, then notwithstanding if the Taxes are paid in advance, contemporaneously, or in arrears to the taxing authority, Tenant shall reimburse Landlord for Taxes paid during the ten (10) years of the Term regardless of when such Taxes are levied or the time period for when such Taxes are placed on the Shopping Center and/or the Premises.

(b)     Notwithstanding any provision herein to the contrary, the Taxes to which Tenant is required to contribute shall not include the following:

(i)     Any portion of the real estate taxes assessed against tenant improvements and tenant space completion work, whether constructed by Landlord or by any other party, or against additional buildings; and

(ii)    Any penalty, interest or other charge attributable to Landlord's payment of taxes later than the earliest permitted payment date, unless caused by Tenant's failure to timely pay Tenant's Proportionate Share of Taxes.

Any assessments included within the Taxes with respect to which reimbursement is sought shall be deemed to be paid, to the extent permitted by governmental authority, in installments over the longest permissible period. Landlord agrees to use commercially reasonable efforts to minimize the Taxes assessed against the Tax Parcel.

(c)     Tenant shall pay before delinquency all municipal, county and state taxes assessed during the Term against any leasehold interest and personal property of any kind, owned by or placed in, upon or about the Premises by Tenant, or any sales tax on Rent payable under the Lease.

(d)     If at any time and from time to time during the Term of this Lease, Landlord is advised by its counsel or counsel to a tax exempt partner of the managing partner of Landlord that any provision of this Lease, including without limitation the provisions relating to the payment of Rent or the absence of any provision might give rise to unrelated business taxable income within the meaning of sections 512 of the Internal Revenue Code of 1986, as amended, or the regulations issued thereunder or may jeopardize the tax-exempt status of any partner in Landlord or any partner in a partnership that is a partner in Landlord, or may prevent any such partner from obtaining such tax-exempt status, then this Lease may be unilaterally amended by Landlord in such manner as shall meet the requirements specified by counsel for Landlord, and Tenant agrees that it will execute all such reasonable documents or instruments reasonably necessary to effect such amendments; provided, however, that no such amendment shall result in Tenant having to pay in the aggregate more on account of its occupancy of the Premises that it would be required to pay under the terms of this Lease, or having to receive fewer services or services of lesser quality that it is presently entitled to received under this Lease. Any services which Landlord is required to furnish pursuant to the provisions of this Lease may, at Landlord's option, be furnished from time to time, in whole or in part, by employees of Landlord or the managing agent of the Shopping Center or its employees or by one or more third persons hired by Landlord. Tenant agrees that upon Landlord's written request it will enter into direct agreements with the managing agent of the Shopping Center or other parties designated by Landlord for the furnishing of any such services required to be furnished by Landlord herein, in form and content approved by Landlord and Tenant; provided, however, that no such contract shall result in Tenant having to pay in the aggregate more money on account of its occupancy of the Premises under the term of this Lease, or having to receive fewer services or services of a lesser quality than Tenant is presently entitled to receive under this Lease.

COMMON AREA COSTS

SECTION 9.     (a)     In addition to payment of the Fixed Minimum Rent, Tenant shall pay to Landlord Tenant's Proportionate Share of Landlord's reasonable costs for the operation and maintenance of the Common Areas ("Common Area Costs") (after reducing such Common Area Costs by the amount of any contributions toward Common Area Costs paid by any party not a tenant of the Shopping Center, as well as any and/or all fees and/or revenue collected or paid to Landlord for parking in,

BINDING EFFECT OF AGREEMENT

    SECTION 55.  This Lease and all of the covenants, conditions, provisions and restrictions herein contained shall inure to the benefit of and be binding upon the heirs, executors, administrators, devisees, legatees, personal representatives, successors and assigns, respectively, of both the Landlord and Tenant. The term "Landlord" as used in this Lease in relation to covenants, agreements and conditions to be observed and performed by Landlord, shall be limited to mean and include only the owner or owners from time to time of Landlord's interest in this Lease. In the event of any transfer or transfers of such interest (except a transfer for security), Landlord named herein (or the transferor, in the case of a subsequent transfer) shall, after the date of such transfer, be released from all liability for performance of any covenant, agreement or condition on the part of the Landlord which accrues after such transfer. The transferee shall be deemed to have assumed (subject to the limitations of this paragraph and Section 36) all of the covenants, agreements and conditions herein to be observed by Landlord with the result that such covenants, agreements and conditions shall bind Landlord, its successors and assigns for those matters accruing during and in their respective periods of ownership.

    IN WITNESS WHEREOF, the parties hereto set their hands to four (4) counterparts hereof, each of which having the same force and effect, as of the date first hereinabove written.

Signed in the presence of:

_Tracy Ann Reece_

_Tami R. Tebedo_

BEN CARTER PROPERTIES, LLC,
a Delaware Corporation

By: _Paisley Boney_
   President

And: _[signature]_
   Executive Vice President

Federal Identification #: 58-2273555

LANDLORD

Signed in the presence of:

_[signature]_

_Bonita Marie Caesar_

FCA OF OHIO, INC.

By: _[signature]_

And: _[signature]_

TENANT

STATE OF ~~INDIANA~~ **GEORGIA** )
          )SS
COUNTY OF **FULTON** )

    BEFORE ME, a Notary Public in and for said County and State, personally appeared **Ben Carter Properties** by **Paisley Boney**, its **President** and **Frasier Smith**, its **Executive Vice President** who did sign the foregoing instrument on behalf of said corporation and that the same is their free act and deed of said corporation and of each of them personally and as such officers.

    IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at **Atlanta**, **Georgia**, this **16th** day of ~~June~~ July, 2003.

_Luella R. Anaya_
NOTARY PUBLIC

[Notary Seal: LUELLA R. ANAYA, NOTARY PUBLIC, FULTON COUNTY, GEORGIA, EXP. JAN. 14, 2007]

#2039, St. John's Town Center - Jacksonville, FL      31

STATE OF OHIO )
)SS
COUNTY OF SUMMIT )

      BEFORE ME, a Notary Public in and for said County and State, personally appeared FCA OF OHIO, INC., an Ohio corporation, by Alan Rosskamm, its President and Michael Edwards, its Exec. V.P. respectively, who acknowledged that they did sign the foregoing instrument on behalf of said corporation, and that the same is the free act and deed of said corporation and their free act and deed personally and as such officers.

      IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at Hudson, Ohio, this 20th day of June, 2003.

*Bonita Marie Caesar*
NOTARY PUBLIC

BONITA MARIE CAESAR
Notary Public – State of Ohio
Commission Expires 8/17/07