**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| IN RE: | § | **Chapter 11** |
| | § | |
| | § | **CASE NO. 25-10068(CTG)** |
| JOANN, INC., et al | § | |
| Post-Effective Date Debtors. | § | **Jointly Administered** |

---

## DECLARATION OF BEN EPSTEIN IN SUPPORT OF BIRCH RUN STATION, LLC'S RESPONSE TO GUC TRUST'S FIFTH OMNIBUS (SUBSTANTIVE) OBJECTION TO CERTAIN CLAIMS (UNLIQUIDATED CLAIMS AND OVERSTATED CLAIMS)

---

I, Ben Epstein, pursuant to section 1726 of title 28 of the United States code, hereby declare as follows:

1.      My name is Ben Epstein, I am over 18 years of age, of sound mind and fully competent to make this Declaration. I have personal knowledge of each of the facts stated therein, and they are all true and correct.

2.      I am employed by Arizona Partners, as property manager of Birch Run Station shopping center, a designated agent of Birch Run Station, LLC which is the owner of Birch Run Shopping Center in the City of Maplewood County of Ramsey, Minnesota  for the relevant times in this bankruptcy.

3.      I submit this declaration (the "Declaration") in support of Birch Run Station, LLC's Response to GUC Trust's Fifth Omnibus (Substantive) Objection to Certain Claims (Unliquidated Claims and Overstated Claims)[ the "Birch Run Station, LLC Response "]. Except as otherwise indicated, the statements in this Declaration are based on: (a)  my personal knowledge of Birch Run Station, LLC's operations, financing arrangements, and business affairs;

1

(b) the books and records of Birch Run Station, LLC that reflect amounts owed by Debtor Jo-Ann Stores, LLC to Birch Run Station, LLC: ( c ) my review of the Birch Run Station, LLC Response; (d) my review of GUC Trust's Fifth Omnibus (Substantive)  Objection to Certain Claims (Unliquidated Claims and Overstated Claims)[the "Objection"]; (e) information provided to me by, or discussions with, Birch Run Station, LLC advisors; and (f) my general experience and knowledge.

4.      I am authorized to submit this declaration in  support of the Birch Run Station, LLC Response.  If called upon to testify, I can and would testify competently as to the facts set forth herein.

5.      I assisted in the preparation of the Birch Run Station, LLC Response.  Through my review or with the assistance of employees and professionals under my direction, I am personally and generally familiar with the amounts owed by Debtor Jo-Ann Stores, LLC to Birch Run Station, LLC. If called to testify, I could and would testify competently to the facts set forth in this declaration.

6.      I submit this declaration in support of the Birch Run Station, LLC Response, and state the information contained in the Birch Run Station, LLC Response  in the exhibits are true and correct to the best of my knowledge and belief and based upon the information and records available to me.

7.      On or about October 26, 2023  creditor landlord Birch Run Station, LLC and Debtor entered into an October 26, 2023  Lease, whereby Debtor agreed to lease from creditor landlord  Birch Run Station, LLC approximately 27,000  square feet of rentable floor area (the "Premises") located in Birch Run Station shopping center located in Maplewood, Minnesota for

2

Debtor's store. A true and correct copy of the October 26, 2023  Lease is attached hereto as Exhibit "A" and incorporated herein by this reference the same as if fully copied and set forth at length.

8.      In my opinion  Debtor Jo-Ann Stores, LLC breached section 27(a)(3) of the Lease by fraudulently obtaining $1,215,000.00 of cash funds from landlord Birch Run Station, LLC, the last payment of $915,000.00 was made by wire transfer on January 13, 2025, so that once it cleared Debtors were clear to file bankruptcy a mere  few hours later on January 15, 2025, relating to Debtor's store containing approximately 27,000  square feet of rentable floor area (the "Premises") located in Birch Run Station shopping center located in Maplewood Minnesota. A true and correct copy of the January 13, 2025 $915,000 wire transfer, the September 23, 2024 $300,000 wire transfer, Debtor's Notices dated December 20, 2024 and March 20, 2024 are together attached hereto as Exhibit "B" and incorporated herein by this reference the same as if fully copied and set forth at length. A true and correct copy of the October 26, 2023  Lease is attached hereto as Exhibit "A" and incorporated herein by this reference the same as if fully copied and set forth at length.

Pursuant to 28 USC section 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

April 6, 2026

/s/Ben Epstein

Ben Epstein

# LEASE AGREEMENT

### Between

### Birch Run Station, LLC
### "Landlord"

### and

### Jo-Ann Stores, LLC
### "Tenant"

## Exhibit A

#2596 Birch Run Station (Maplewood, MN)

TABLE OF CONTENTS

| SECTION | HEADING | PAGE |
|---|---|---|

| SECTION 1. | EXHIBITS TO LEASE | 1 |
| SECTION 2. | DEFINITIONS | 2 |
| SECTION 3. | PREMISES | 6 |
| SECTION 4. | TERM AND OPTIONS TO EXTEND | 8 |
| SECTION 5. | FIXED MINIMUM RENT | 9 |
| SECTION 6. | INTENTIONALLY DELETED | **Error! Bookmark not defined.** |
| SECTION 7. | INTENTIONALLY DELETED | 10 |
| SECTION 8. | TAXES | 10 |
| SECTION 9. | COMMON AREA COSTS | 12 |
| SECTION 10. | CONSTRUCTION OF PREMISES | 15 |
| SECTION 11. | USE | 18 |
| SECTION 12. | COMMON AREAS | 18 |
| SECTION 13. | UTILITIES | 19 |
| SECTION 14. | USE VIOLATION | 20 |
| SECTION 15. | CO-TENANCY | 21 |
| SECTION 16. | RULES AND REGULATIONS | 22 |
| SECTION 17. | ALTERATIONS, INSTALLATIONS AND IMPROVEMENTS BY TENANT | 23 |
| SECTION 18. | REPAIRS AND MAINTENANCE | 23 |
| SECTION 19. | INDEMNIFICATION | 25 |
| SECTION 20. | WAIVER OF CLAIMS | 26 |
| SECTION 21. | PROPERTY AND LIABILITY INSURANCE | 26 |
| SECTION 22. | SIGNS | 27 |
| SECTION 23. | ASSIGNMENT AND SUBLETTING | 28 |
| SECTION 24. | REPAIR AFTER CASUALTY | 28 |
| SECTION 25. | CONDEMNATION | 30 |
| SECTION 26. | REPRESENTATIONS AND COVENANTS OF LANDLORD | 31 |
| SECTION 27. | TENANT'S DEFAULT | 35 |
| SECTION 28. | RIGHTS OF LANDLORD | 37 |
| SECTION 29. | LANDLORD'S DEFAULT | 37 |
| SECTION 30. | MORTGAGE SUBORDINATION | 38 |
| SECTION 31. | NO WAIVER | 39 |
| SECTION 32. | SURRENDER OF PREMISES | 39 |
| SECTION 33. | SHORT FORM LEASE, COMMENCEMENT DATE AGREEMENT | 39 |
| SECTION 34. | NOTICE | 40 |
| SECTION 35. | HAZARDOUS MATERIALS | 41 |
| SECTION 36. | LIMITATION OF LANDLORD'S LIABILITY | 43 |
| SECTION 37. | DELIVERY OF SITE PLAN | 43 |
| SECTION 38. | INTENTIONALLY DELETED | 43 |
| SECTION 39. | ENTIRE AGREEMENT; WRITING REQUIRED | 43 |
| SECTION 40. | OPERATING COVENANT | 44 |
| SECTION 41. | APPLICABLE LAW AND CONSTRUCTION | 44 |

i

#2596 Birch Run Station (Maplewood, MN)

SECTION 42.    UNAVOIDABLE DELAYS.................................................................................... 45
SECTION 43.    REASONABLE CONSENT...................................................................................... 45
SECTION 44.    NO PARTNERSHIP ................................................................................................ 45
SECTION 45.    ESTOPPEL ............................................................................................................... 45
SECTION 46.    QUIET ENJOYMENT............................................................................................. 46
SECTION 47.    HOLDING OVER .................................................................................................... 46
SECTION 48.    BROKERS ................................................................................................................ 46
SECTION 49.    INTENTIONALLY DELETED ............................................................................... 46
SECTION 50.    CLAIMS LIMITATION ......................................................................................... 46
SECTION 51.    CAPTIONS ............................................................................................................... 47
SECTION 52.    VARIATION IN PRONOUNS................................................................................. 47
SECTION 53.    SECTION REFERENCES ...................................................................................... 47
SECTION 54.    BINDING EFFECT OF AGREEMENT ................................................................ 47
SECTION 55.    ATTORNEYS' FEES................................................................................................ 47
SECTION 56.    OFAC WARRANTY................................................................................................. 47
SECTION 57.    PDF/COUNTERPART SIGNATURE .................................................................... 48

ii

#2596 Birch Run Station (Maplewood, MN)

## LEASE AGREEMENT

This Lease is made as of ⟨October 26⟩ 2023 ("Effective Date"), between **Birch Run Station, LLC**, an Arizona limited liability company ("Landlord"), and **Jo-Ann Stores, LLC**, an Ohio limited liability company ("Tenant").

Landlord and Tenant covenant and agree as follows:

## SECTION 1. EXHIBITS TO LEASE

(a)    The following Exhibits are attached to and made a part of this Lease, and are incorporated herein by reference:

Exhibit A.    The description of the lands upon which the Shopping Center is located.

Exhibit B.    The site plan showing the Shopping Center, the location of the Premises, as hereafter defined, the Shopping Center building, the Protected Area (as defined below), the parking areas, driveways and common areas and containing other general information relative to the development of the Shopping Center Site (the "Site Plan").

Exhibit C.    Intentionally Deleted.

Exhibit D.    Intentionally Deleted.

Exhibit D-1.    Tenant's Signage Plans.

Exhibit E.    Intentionally Deleted.

Exhibit F.    Restricted Uses of Other Tenants.

Exhibit F-1.    Declaration of Easements and Restrictions.

Exhibit G.    Form of Subordination, Non-Disturbance and Attornment Agreement.

Exhibit H.    Form of Estoppel Certificate.

(b) If there is any conflict or ambiguity between the Approved Plans (as defined below), the language in this Lease or any Exhibit attached hereto, the order of precedence shall be the Approved Plans, then this Lease and finally the contents of the Exhibits unless expressly stated otherwise.

1

#2596 Birch Run Station (Maplewood, MN)

## SECTION 2.  DEFINITIONS

The terms listed below have the respective meanings as follows:

(a)    Additional Rent: Tenant's Proportionate Share of Taxes (Section 8), Tenant's Proportionate Share of Common Area Costs (Section 9), and Tenant's Proportionate Share of Insurance (Section 21).

(b)    Commencement Date: (1) the 180th day after the Delivery Date; or (2) the day that Tenant opens for business in the Premises, whichever day first occurs. Notwithstanding anything to the contrary in this Lease, unless Tenant otherwise opens for business, the Commencement Date shall not occur during any period that: (i) Tenant has not received all required governmental permits and approvals (temporary or final) necessary for Tenant's Work, certificates of occupancy or equivalents, provided Tenant promptly applies for such permits no later than ninety (90) days prior to the Estimated Delivery Date and diligently pursues obtaining such permits and approvals; or (ii) Tenant has not received the fully executed SNDA as defined in and required under Section 30(a) below. Tenant may elect to open for business during any period identified in the immediately preceding sentence, and in such case, Tenant shall be obligated to pay only Substitute Rent during said period. Also, notwithstanding the foregoing, in no event shall Tenant be required to open or commence the payment of Rent during the period commencing November 15th and ending the next occurring January 31st ("Blackout Period"); and, if the Commencement Date would otherwise occur in the Blackout Period (except for the reason that Tenant opens for business), the Commencement Date shall be deemed to be the first day after the expiration of the Blackout Period.  If Tenant opens during the Blackout Period, then Tenant is obligated to pay Fixed Minimum Rent, Additional Rent, and any other charges required under this Lease.

(c)    Common Areas: the parking areas, driveways, aisles, sidewalks, malls (whether enclosed or unenclosed), truck storage areas, mechanical rooms, and other common, service and related areas and improvements within the Shopping Center, whether open to the public generally or for the non-exclusive use of one or more tenants, and whether or not shown on Exhibit B, but excluding the roof(s).

(d)    Default Rate: an annual rate of interest equal to ten percent (10%).

(e)    Delivery Date: the date that Landlord delivers the Premises to Tenant with all of the Delivery Requirements (as defined below) satisfied and Tenant accepts said delivery by written acknowledgement signed by Tenant's Vice President or National Director of Real Estate or Director of Construction (Tenant's Representative).  Tenant shall not unreasonably delay, condition or refuse its acceptance of the Premises. The Delivery Date shall not occur prior to the Estimated Delivery Date (regardless of whether Landlord has satisfied the Delivery Requirements prior to that date), except with Tenant's express written consent, in its sole discretion.

(f)    "Delivery Requirements" means the following:

(1)    Landlord's Work is Substantially Complete (as defined below);

2

#2596 Birch Run Station (Maplewood, MN)

(2)     The Premises are delivered to Tenant free and clear of any Hazardous Material, including asbestos, and Landlord represents and warrants as such;

(3)     Intentionally deleted.

(4)     All Common Areas have been Substantially Completed and are in accordance with all applicable Laws, including, without limitation, all delivery areas, landscaping, paving striping of parking areas, and sidewalks;

(5)     Intentionally deleted

(6)     Intentionally deleted.

(g)     Intentionally deleted.

(h)     Estimated Delivery Date: Landlord's good faith estimate of the Delivery Date is February 19, 2024.

(i)     Existing Lease: the lease currently in effect between Landlord and Tenant for approximately 44,992 square feet within the Shopping Center ("Existing Premises"). The Existing Lease shall terminate upon Surrender (as defined herein) following Tenant's opening for business in the Premises ("Opening"). Tenant shall surrender the Existing Premises to Landlord within ten (10) days from Opening in broom clean condition and in accordance with the Existing Lease ("Surrender").

Landlord and Tenant hereby agree that if the Opening does not occur for any reason, then the Existing Lease shall remain in full force and effect.

(j)     Gross Leasable Area or GLA: the number of square feet of floor area (excluding non-retail mezzanine, basement and other such areas), measured from the exterior face of exterior walls, the exterior building line for sidewalk or mall frontage, and the center line of party walls, with no deduction for columns, stairs, elevators, or any interior construction or equipment areas used exclusively by Tenant for the Premises.

With respect to the Shopping Center, the Gross Leasable Area is the total constructed Gross Leasable Area available for the exclusive use and occupancy of tenants within the Shopping Center. With respect to the Premises, the Gross Leasable Area shall be the actual completed Gross Leasable Area, as the same exists from time to time.

Any change in Gross Leasable Area, whether of the Premises or Shopping Center, shall be deemed in effect on the first day of the next succeeding month following such change. Landlord covenants to advise Tenant of any increase or decrease in the Gross Leasable Area of the Shopping Center due to the construction or demolition of any buildings in the Shopping Center within sixty (60) days of any such change, together with a current Site Plan reflecting such change.

3

#2596 Birch Run Station (Maplewood, MN)

The GLA for the Shopping Center intended for exclusive use and occupancy as shown in the Site Plan is 279,343 square feet.

(k)    Hazardous Materials: See Section 35.

(l)    HVAC: heating, ventilating and air conditioning exclusively serving the Premises.

(m)    Landlord's Work: the work to be performed by or at the direction of Landlord in constructing and/or remodeling the Premises and related improvements as more particularly specified in in Section 10 and 18 below. Furthermore, Landlord's Work shall include the (i) repair or filling of any potholes and (ii) complete seal coating and stripping of the parking lot within Tenant's Protected Area of the Common Areas. Notwithstanding the foregoing, the repair or filling of any potholes and the seal coating and stripping of the parking lot in Tenant's Protected Area shall be completed prior to the Commencement Date based upon the weather conditions; Tenant acknowledges that such cannot be completed between the months of October through March.

(n)    Laws: any and all laws, codes, ordinances or regulations passed into existence by any Public Entity (as defined below) now or hereinafter in existence.

(o)    Lease Year: a period of twelve (12) consecutive calendar months during the Term. The first Lease Year (or Lease Year One) begins on the first day of February following the Commencement Date, unless the Commencement Date is the first day of February, in which event the first Lease Year begins on the Commencement Date. The first Lease Year shall include the first Partial Lease Year, if any. Rent and any limitations on such Rent for purposes of any Partial Lease Year shall be proportionately adjusted based upon the actual number of days of such Partial Lease Year in relation to the number of days in a full Lease Year.

(p)    Outside Delivery Date: February 19, 2024 (not subject to Unavoidable Delay).

(q)    Partial Lease Year: the period, if any, of fewer than twelve (12) consecutive calendar months between the Commencement Date and the next occurring February 1 and the period, if any, of less than twelve (12) consecutive calendar months between the last day of the last Lease Year and the expiration of the Term.

(r)    Permitted Use: the sale of fabrics of all kinds; goods sold by the yard; patterns; knitting supplies, needlepoint, macramé; art materials and supplies; finished crafts, craft materials and supplies; educational aids, materials and supplies; yarns; all types of notions; floral products, artificial flowers and accessories; scrapbooks and scrapbooking supplies and materials; framed artwork; picture frames, framing (both readymade and custom made) and framing materials and supplies; fabric care items; foam products; ceramics; wearable art and wearable art supplies; miniatures, dolls, hobby items; sewing machines, sewing machine furniture; irons, ironing boards; seasonal merchandise; custom services and custom products using arts and craft and sewing components including, but not limited to, quilting, bow-making, window treatments, floral design, fashion sewing, instructional classes, materials and services; and the incidental sale of (defined as no more than ten percent (10%) of any individual following item) baskets, wicker items;

-4-

#2596 Birch Run Station (Maplewood, MN)

housewares; linens, curtains, towels, pillows; drapery and upholstery materials; draperies, drapery hardware; blinds, shades, shutters and window treatments; do-it-yourself products and accessories related to sewing and crafting; bridal apparel and accessories (but not ready to wear), wedding supplies; gift items, cards, party supplies; paper goods, stationery; candles, candlesticks, brass and pottery; indoor and outdoor house decorating products and accessories; furniture; prepackaged and unpackaged food and food products, coffee, tea, and assorted beverages; instructional books and tapes; children's books; toys; vacuum cleaners, lamps, small household appliances; products, accessories related to all of the foregoing, and other items and services customarily offered for sale by a fabric, craft or general merchandise store, and such other related merchandise and services typically offered in the stores operated by Tenant under the name Jo-Ann, Jo-Ann Fabrics and Crafts, JOANN or such other name under which Tenant may operate in the state of Minnesota. The Permitted Use is subject to the Restrictive Uses of Other Tenants and the Exclusives and Declaration of Easements and Restrictions within the Shopping Center as provided for in Exhibit F and Exhibit F-1 respectively.

(s)     Premises: a portion of the Shopping Center as shown on the Site Plan and located within the Shopping Center, on the Shopping Center Site, consisting of space having approximately 27,000 square feet of Gross Leasable Area, with a minimum frontage of 144 feet (to the center of the side walls).

(t)     Protected Area: the area shown on the Exhibit B Site Plan.

(u)     Protected Use: As described in Section 14 of this Lease.

(v)     Intentionally deleted.

(w)     Public Entity: the federal, state, county, municipal or other governmental unit, however denominated, and any agency, division, department or public official thereof, now or hereafter having jurisdiction, in any respect, over the Premises, the Shopping Center or Shopping Center Site.

(x)     Rent: Fixed Minimum Rent, Additional Rent, and all other monetary obligations of Tenant to Landlord under this Lease.

(y)     Shopping Center: the Birch Run Station located in Maplewood, MN, consisting of all buildings including the Premises and Common Areas, and other improvements located upon the Shopping Center Site, and outlined on Exhibit B.

(z)     Shopping Center Site: the legal description set forth on Exhibit A, on which the Shopping Center is located.

(aa)     Substantially Complete: complete with the exception of minor Punchlist Items (as defined below) that can be completed within fourteen (14) days without interfering with the performance of Tenant's Work.

5

#2596 Birch Run Station (Maplewood, MN)

(bb)    Substitute Rent:  fifty percent (50%) of the Fixed Minimum Rent in lieu of the Fixed Minimum Rent and Additional Rent otherwise required to be paid under this Lease.  Tenant is not obligated to pay any Fixed Minimum Rent or Additional Rent at any time when Substitute Rent is payable pursuant to any provision of this Lease. In addition, Tenant shall not be obligated to be open or operating the Premises during any period it is entitled to pay Substitute Rent. Landlord acknowledges that certain violations of this Lease or specified events hereunder shall cause Tenant significant damage, but that actual damages shall be impossible to determine. Landlord agrees that the violations and other events specified in the Lease where Tenant is entitled to pay Substitute Rent are in fact cases where Tenant shall suffer significant damage, but that actual damages shall be impossible to determine.  Landlord has agreed to Substitute Rent as liquidated damages because actual damages are impossible to determine and so liquidated damages represent a fair compromise and is not a penalty. Landlord has agreed to these provisions (and the entire Lease) voluntarily and after consultation with legal counsel.

(cc)    Tenant's Proportionate Share: a fraction, the numerator of which is the Gross Leasable Area of the Premises and the denominator of which is the Gross Leasable Area of the Shopping Center. Notwithstanding the foregoing, if any portion of Common Area Costs, Taxes, or Insurance Costs are furnished or directly payable by an individual tenant or occupant as opposed to Landlord, the cost of the item(s) furnished or payable by such tenant or occupant shall not be included in Common Area Costs, Taxes, or Insurance Costs, as the case may be, and the square footage of the tenant or occupant furnishing or paying for such item(s) shall not be included in the calculation of Tenant's Proportionate Share of such item(s). Tenant's Proportionate Share shall be adjusted in the event of any increase or decrease in the Gross Leasable Area of all buildings within the Shopping Center or the Gross Leasable Area of the Premises.

(dd)    Tenant's Work: the work, if any, to be performed by or at the direction of Tenant in finishing the Premises as provided in Tenant's Approved Plans (as defined below).

(ee)    Term: the Initial Term, as hereafter defined, and each Extended Term, as hereafter defined, if any, and any renewals or period of holdover tenancy.

(ff)    Unavoidable Delay: A material delay beyond the reasonable control of the delayed party caused by labor strikes, lock-outs, extraordinary labor troubles, industry-wide inability to procure materials, or other national, state or local health emergency, extraordinary restrictive governmental laws or regulations (such as gas rationing), riots, war, martial law, military or usurped governmental power, acts of domestic terrorism, sabotage, material fire or other material casualty, natural disaster or an act of God (such as an epidemic or pandemic, tornado, flood or earthquake), but excluding inadequacy of insurance proceeds, litigation or other disputes, financial inability, lack of suitable financing, delays of the delayed party's contractor and failure to obtain approvals or permits unless otherwise caused by an event of Unavoidable Delay.

## SECTION 3. PREMISES

(a)    For the Rent and upon the terms and conditions contained in this Lease, Landlord leases during the Term, and Tenant leases from Landlord during the Term, the following:

6

#2596 Birch Run Station (Maplewood, MN)

(1)    The Premises as outlined on the Site Plan and further described herein;

(2)    The right, in common with Landlord and all other tenants of the Shopping Center granted similar rights by Landlord, to the non-exclusive use of all Common Areas. The rights hereby granted with respect to the Common Areas shall constitute easements appurtenant to the Premises and a servitude upon the Shopping Center Site. The benefit and the burden of such easements shall run with and bind the Shopping Center Site;

(3)    Subject to Reciprocal Easement Agreements and Covenants, Conditions & Restrictions and local codes, the right, at no additional charge by Landlord, to place one (1) storage container during seasonal selling seasons and up to ten (10) storage containers with each container not exceeding eight (8) feet in width and twenty (20) feet in length, not to exceed two thousand (2,000) square feet during interior alterations, changes, improvements or remodel to the Premises ("Containers") in a location at, near, or next to Tenant's loading dock in the Protected Area or at any other location mutually agreed upon by Landlord and Tenant; up to four (4) curbside pickup parking lot signs to indicate that the parking space is for the exclusive use of Tenant's curbside pickup customers only; and two (2) shopping cart corrals ("Corrals") in Tenant's Protected Area in the parking lot and at, near or next to the outside of the Premises' entryway on the sidewalk. Tenant's Corrals shall take up no more than two (2) parking lot spaces. Tenant shall maintain the Containers and Corrals in good condition and repair. If Landlord receives notice that Tenant's Containers or Corrals violate any local code or ordinance, then after receipt of notice from the governing body, Tenant shall remove the violating Containers or Corrals, or move them to an acceptable location. Tenant may install up to four (4) curbside pickup parking lot signs to indicate the parking space is for the exclusive use of Tenant's curbside pickup customers only. In addition, Tenant shall have the right to store up to five (5) bales of cardboard at the exterior of the Premises and each bale has dimensions of approximately 5' x 5'; and

(4)    Notwithstanding anything contained herein, subject to Reciprocal Easement Agreements and Covenants, Conditions & Restrictions and local codes, Tenant has the right to display merchandise on the sidewalk on both sides of the storefront door of the Premises no more often than four (4) weeks in each calendar quarter (unless part of a chainwide event), provided that such display does not extend beyond thirty (30) feet in either direction and is at least 10 feet away from any adjacent tenant's premises.

(b)    Subject to the reasonable consent of Tenant, Landlord expressly reserves the right to maintain, use, repair and replace the pipes, ducts, conduits, utility lines, tunneling and wires leading through the ceiling, plenum areas, columns, partitions, and within or under the floor slabs comprising part of the Premises, but only to the extent that such installations (1) are reasonably necessary to serve the Premises or other parts of the Shopping Center; (2) are installed in locations

7

#2596 Birch Run Station (Maplewood, MN)

that shall not interfere with Tenant's use of the Premises or Tenant's permitted signage; (3) are not exposed within the selling area; and (4) do not decrease the ceiling height of the Premises. Similarly, notwithstanding anything to the contrary in this Lease, subject to the reasonable consent of Landlord, Tenant shall have the right to make installations around the Premises (e.g., the roof) which are consistent with Tenant's prototype plans for other similar stores operated by Tenant or which are part of Tenant's Leadership in Energy and Environmental Design initiative or other Tenant initiatives. In exercising the foregoing rights, neither Landlord nor Tenant shall interfere with the use or occupancy of the Premises or other tenant premises or commence any such work without first notifying the other party, at least ten (10) days in advance, of the commencement of such work. In no event may Landlord construct any improvements above the Premises or place signs on the exterior walls of the Premises.

(c)    The "Premises" excludes the exterior walls through to (but not including) the interior walls, roof, the floor slab (excluding floor covering installed by Tenant) and areas beneath the floor slab, and mezzanine in the Premises for the storage of inventory and/or fixtures, Tenant shall not pay any Rent on that space.

(d) At any time up to the Commencement Date, either party's architect may measure the Premises. If the Gross Leasable Area in such measurement varies from the GLA in this Lease, then all items of Rent shall be appropriately adjusted; provided, however, that in no event shall any item of Rent be increased by more than one percent (1%) because of a variance in area of the Premises, and in no event shall the Construction Allowance be reduced from the amount set forth herein. If neither party performs such measurement, then the area specified in this Lease shall be deemed to be the Gross Leasable Area of the Premises. If a party disputes the measurement, the disputing party shall notify the measuring party within five (5) days after  receipt of such measurement; if neither party timely objects to the measurement, then the measurement shall be deemed approved by both parties. If a party timely objects, the disputing party shall then have fifteen (15) days for its architect to measure the Premises. If the disputing party's architect disputes the findings of the measuring party's architect, both architects shall meet in good faith to agree on the number of leasable square feet.  If the architects cannot agree within fifteen (15) days, they shall in good faith select a third, independent architect (the "Resolution Architect") to measure the Premises, whose measurement shall be final and binding. All fees and costs payable to Landlord's architect shall be paid by Landlord. All fees and costs payable to Tenant's architect shall be paid by Tenant.  Tenant and Landlord shall each pay one-half of the fees and costs payable to the Resolution Architect.

## SECTION 4.  TERM AND OPTIONS TO EXTEND

(a)    The "Initial Term" begins on the Commencement Date and ends on the last day of the 10th Lease Year, unless sooner terminated as herein provided.

(b)    Landlord grants Tenant the right and option to extend this Lease for four (4) additional periods of five (5) years each (individually called an "Extended Term" and collectively called "Extended Terms"), commencing upon the expiration of the Initial Term or such prior Extended Term, as the case may be. Each Extended Term shall be upon the same terms, covenants

8

#2596 Birch Run Station (Maplewood, MN)

and conditions as the Term except for the option to extend then exercised and except for such changes, if any, in Rent or other Tenant charges as are expressly set forth in this Lease.

(c)    Tenant must deliver written notice to Landlord of its election to extend this Lease for an Extended Term on or before the later to occur of the following: (1) the date that is twelve (12) months before the expiration of the Term or the Extended Term, as the case may be; or (2) the date that is thirty (30) days after Tenant's receipt of written notice from Landlord indicating that the time period in which Tenant has to exercise its option has expired. If the Term expires before such notice from Landlord, and Tenant continues in possession of the Premises after such expiration, the Term shall be extended automatically on a month to month basis until thirty (30) days after the date Landlord has given such notice, or Tenant surrenders the Premises to Landlord, or Tenant exercises its option, in which case the Extended Term shall be deemed to have commenced upon the expiration of the Initial Term (or prior Extended Term, as the case may be). Concurrently with the exercise of the option by Tenant, Tenant shall pay Landlord any unpaid balance of the Rent due during the Extended Term that has accrued as of the date of such notice of extension.

## SECTION 5. FIXED MINIMUM RENT

(a)    From and after the Commencement Date, Tenant must pay to Landlord, without demand, at the address herein specified for notices to Landlord, Fixed Minimum Rent for the Premises as follows:

(1)    During Lease Years one through five of the Initial Term at the rate of $12.50 per square foot per year; and

(2)    During Lease Years six through ten of the Initial Term at the rate of $13.75 per square foot per year; and

(3)    During the first five-year Extended Term at the rate of $15.13 per square foot per year; and

(4)    During the second five-year Extended Term at the rate of $16.64 per square foot per year; and

(5)    During the third five-year Extended Term at the rate of $18.30 per square foot per year; and

(6)    During the fourth five-year Extended Term at the rate of $20.13 per square foot per year.

The amounts shall include and be in payment of all other charges not specifically set forth in this Lease.

(b)    Tenant must pay monthly installments of Fixed Minimum Rent in advance on or before the first day of each month during the Term, commencing on the first day of the first month

9

#2596 Birch Run Station (Maplewood, MN)

next following the Commencement Date (unless the Commencement Date is the first day of the month, in which event the first monthly installment shall be due on the Commencement Date). Notwithstanding the foregoing, Landlord must invoice Tenant, which invoicing shall not occur before the Commencement Date, for the first monthly installment of Fixed Minimum Rent. In no event shall the first rent installment be due until ten (10) days after Tenant's receipt of this initial invoice. Fixed Minimum Rent for the partial month, if any, after the Commencement Date shall be computed on a per diem basis (assuming a thirty (30) day month), and Tenant must pay the Fixed Minimum Rent for such partial month concurrently with the first monthly installment. If Tenant fails to pay Rent on the due date and Landlord notifies Tenant in writing of such failure twice in any Lease Year, then if Tenant fails to pay Rent on the due date thereafter in the same Lease Year, then the Landlord, in addition to the Rent then owed, is entitled to a late fee of One Hundred Dollars ($100.00) for such third late payment and any such other late payment of Rent thereafter during that Lease Year.

**SECTION 6.  INTENTIONALLY DELETED.**

**SECTION 7.  INTENTIONALLY DELETED.**

**SECTION 8.  TAXES**

(a)    Landlord covenants and warrants that the entire Shopping Center is located on tax parcel identification numbers 032922140015 and 0329221400600 (the "Tax Parcel"), that the Tax Parcel does not extend beyond the perimeter of the Shopping Center Site and that the improvements comprising the Shopping Center (including the Premises and Common Areas), as set forth on Exhibit B, are the only improvements now located thereon. Once or twice per Lease Year, depending on when tax bills are issued by the government authority, Tenant must pay to Landlord the Tenant's Proportionate Share of real estate taxes ("Taxes") levied upon the Tax Parcel and paid by Landlord during each year of the Term, after reducing Taxes (1) by the amount of any contributions for Taxes paid by any party having the right to use the Common Areas but not a tenant of the Shopping Center; and (2) by any rollback, discount for timely or early payment, credit or reduction that has been granted or issued by any taxing authority or governmental group or agency.

Notwithstanding the foregoing, if the Premises, or a portion of the Shopping Center including the Premises, is separately assessed, then Tenant shall pay, as Tenant's allocable share of Taxes, the lower of: (i) Tenant's Proportionate Share of Taxes; or (ii) Tenant's Fraction of Taxes, with Tenant's Fraction being a fraction whose numerator is the Gross Leasable Area of the Premises and whose denominator is the Gross Leasable Area of all buildings within such separately assessed parcel.

Tenant shall pay Tenant's Proportionate Share of Taxes within thirty (30) days after receipt of Landlord's statement assessing and prorating the Taxes, together with copies of receipted tax bills for which payment is sought and reasonable verification for the computation of Tenant's Proportionate Share. For the calendar year 2023, Tenant shall pay an estimated $1.32 per square foot of Gross Leasable Area of the Premises for Taxes; and, Landlord represents that said amount

10

#2596 Birch Run Station (Maplewood, MN)

is a good faith estimate of the actual Taxes that would be due if Tenant were paying Tenant's Proportionate Share of Taxes directly for said Lease Year.

(b)     Intentionally deleted.

(c)     In no event shall Tenant pay for Taxes for a time period longer than the Term.

(d)     The parties acknowledge that only Landlord has the right to dispute the assessed value of Shopping Center (which is the only way to attempt to control the real estate taxes). For this reason, Landlord shall have the duty to timely compare the then current value of the Shopping Center (utilizing the income approach, with a capitalization rate based upon recent sales(s) of comparable shopping centers) to the assessed value of the Shopping Center determined by the taxing authority. If variance is greater than seven and a half percent (7.5%), Landlord is required to pursue reduction. Tenant is responsible for its pro-rata share of all costs associated with pursuit. If Landlord fails to pursue, payment of Taxes shall be capped at seven and a half percent (7.5%) increase per year until Landlord pursues.

(e)     If any Taxes may be paid in installments, subject to the exclusions below, only the installments coming due during the Term shall be included within Taxes. Landlord must use best efforts to minimize the Taxes assessed against the Tax Parcel.

(f)     Tenant must pay before delinquency all municipal, county and state taxes assessed during the Term against any leasehold interest and personal property of any kind, owned by or placed in, upon or about the Premises by Tenant.

(g)     Notwithstanding anything to the contrary, the following are excluded from Taxes:

(1)     Any portion of the Taxes assessed: (A) against tenant improvements and tenant space completion work, whether constructed by Landlord or by any other party; or (B) against additional buildings or other taxable improvements not now constructed on the Tax Parcel; or (C) otherwise attributable to any increase in the assessed value of the Tax Parcel by reason of such improvements or work; except, in no event shall Tenant pay additional Taxes more frequently than once every five (5) years due to the modifications to, the Shopping Center that would cause an increase in the assessed value of the Shopping Center.;

(2)     Any portion of the Taxes attributable to a revaluation of the Tax Parcel arising out of a sale or other change in the ownership thereof or of any interest therein more than once every five (5) years;

(3)     Any portion of the Taxes in the nature of fees, charges or assessments for governmental services or improvements related to the initial construction or new renovation(s) performed after January 1, 2025;

(4)     Any tax or fee that applies generally to all business owners or operators, as opposed to owners of real property;

11

#2596 Birch Run Station (Maplewood, MN)

(5)      Any impact fee, user fee, exaction fee, environmental fee or other tax paid as a prerequisite to construction of the Shopping Center, or any addition or improvement thereto;

(6)      Estate tax, inheritance tax, succession tax, capital levy tax, corporate franchise tax, margin tax, rent tax, profits tax, gross receipts tax, income tax, conveyance fee or transfer tax and the like;

(7)      Any assessment, bond, tax, or other finance vehicle that is (A) imposed as a result of Landlord's initial construction of the Shopping Center; or (B) used to fund construction of additions or improvements to the Shopping Center; and

(8)      Any penalty, interest or other charge attributable to Landlord's late or delinquent payment of Taxes.

## SECTION 9. COMMON AREA COSTS

(a)      In addition to payment of the Fixed Minimum Rent, Tenant shall pay to Landlord Tenant's Proportionate Share of Landlord's reasonable and actual costs applicable to the Shopping Center for the operation and maintenance of the Common Areas ("Common Area Costs"), after reducing such Common Area Costs by (1) the amount of any contributions toward Common Area Costs paid by tenants paying such costs directly to a third-party provider or any party not a tenant of the Shopping Center; and (2) all fees and revenue collected or paid to Landlord for parking in, at, on, near or around the Shopping Center. Subject to the cap in Section 49, Tenant must pay to Landlord in twelve (12) equal installments, each in advance on the first day of every calendar month, an estimated sum toward Tenant's Proportionate Share of Common Area Costs. During the first Lease Year, the actual amount paid by Tenant is estimated at the rate of $2.38 per year multiplied by the Gross Leasable Area of the Premises, which represents Landlord's good faith estimate of actual Common Area Costs for 2023 calendar year. For Lease Years after the first Lease Year, the monthly sum may be adjusted annually by Landlord to reflect actual changes in the Common Area Costs, subject to the cap in Section 49 below.

(b)      On or before April 1 of each year, Landlord must provide Tenant with a statement assessing and prorating the Common Area Costs, together with a certified statement of the Gross Leasable Area of the Shopping Center and copies of all bills for which payment is sought. If Landlord fails to provide the annual reconciliation statement, then Tenant has the right to suspend payment of Common Area Costs until such statement is received. Tenant must pay to Landlord, within thirty (30) days of such receipt, any deficiency owed to Landlord. If Tenant's estimated payments are in excess of Tenant's Proportionate Share in any Lease Year, then such excess shall be applied to the following Lease Year unless such Lease Year is the final Lease Year of Tenant's occupancy, in which case Landlord must refund such overpayment to Tenant within thirty (30) days after delivery of the annual statement.

#2596 Birch Run Station (Maplewood, MN)

(c)      Notwithstanding anything to the contrary, after the Commencement Date, in no event shall Tenant's Proportionate Share of Common Area Costs increase by more than five percent (5%) per year (non-cumulative basis) above that amount actually paid by Tenant for the previous Lease Year, which cap shall specifically exclude snow and ice removal and Common Area utility costs.

(d)      Tenant and its agent have the right to audit and inspect Landlord's books and records pertaining to Common Area Costs, Taxes and Insurance Costs, at any time upon fifteen (15) days' written notice. If any audit or review of Landlord's books and records determines that Tenant has overpaid any Common Area Costs, Taxes or Insurance Costs, then Tenant has the right to offset any overpayment against Rent, but if Tenant is in the last Lease Year of the Term, then Landlord must refund the overpayment to Tenant within thirty (30) days after notice from Tenant. If any such audit or review determines that Tenant has overpaid any Common Area Costs, Taxes or Insurance by more than five percent (5%) when combined, then Landlord must pay to Tenant the reasonable cost of such audit or review; otherwise, the audit or review shall be at Tenant's sole cost and expense. Landlord shall be responsible for providing Tenant with books and records for Tenant's additional rent contribution for the preceding calendar year and such additional periods required under this Lease.

(e)      The payment of such Common Area Costs is in consideration of Landlord's maintenance and operation of the Common Areas, and Landlord must use such payment for that purpose.

(f)      Notwithstanding anything to the contrary, the following are excluded from Common Area Costs:

(1)      the original cost, or depreciation of the original cost, of constructing, erecting and installing the Shopping Center, the Common Areas, common facilities and related services;

(2)      principal and interest payments pursuant to any mortgage that encumbers the Premises or Shopping Center;

(3)      Taxes;

(4)      administrative charges, management fees, fees based upon a percentage calculation, leasing commissions or any other fee or charge regardless of the name (including, without limitation, salaries of all kinds, social security, taxes, insurance, part-time or full-time labor, any fees paid to manage the Shopping Center including those paid to a third party management company, and similar costs and expenses) that is greater than fifteen percent (15%) of Common Area Costs and related to the management and operation of the Shopping Center;

13

#2596 Birch Run Station (Maplewood, MN)

(5)    expenses incurred due to the negligence or willful misconduct of Landlord or any occupant of the Shopping Center or their respective agents or employees;

(6)    costs and expenses incurred for repairs or replacements due to faulty construction, faulty workmanship or structural defects;

(7)    expenses related to individual occupants of the Shopping Center or to a particular tenant space, or to buildings;

(8)    any cost, fees, fines or penalties, or interest thereon, related to violations by Landlord or any occupant of any Law; and the cost of compliance with Laws enacted after the date hereof;

(9)    capital expenditures (a capital expenditure is defined as an item or items costing Ten Thousand Dollars ($10,000.00) or more and having a useful life of at least one (1) year); other than a "Permitted Capital Expenditure." A Permitted Capital Expenditure is limited to the following:  repaving of the parking lot(s) not more frequently than once every seven (7) years; provided, however, that each Permitted Capital Expenditure must be amortized on a straight-line basis over the useful life of the related improvement based on GAAP, but in no event less than five (5) years, and only the amount of the annual amortization shall be included in Common Area Costs for any Lease Year within the useful life so determined;

(10)    reserves for replacement;

(11)    costs for insuring the Common Areas, but this exclusion does not limit Landlord's rights of reimbursement, if any, under Section 21;

(12)    cost of advertising, marketing, decorating, redecorating, or special cleaning or other services not provided on a regular basis;

(13)    all costs and expenses relative to the solicitation and execution of leases for space in the Shopping Center;

(14)    all costs and expenses related to the operation, maintenance and repair of any garage space in the Shopping Center;

(15)    the cost of any repair or replacement made by Landlord because of the total or partial destruction of the Shopping Center or the condemnation of a portion of the Shopping Center or the Shopping Center Site;

(16)    any operating expense paid to a related corporation, entity or person that is in excess of that amount that would have been paid absent such relationship;

14

#2596 Birch Run Station (Maplewood, MN)

(17)    the cost of overtime or other expenses incurred by or on behalf of Landlord to correct any default of Landlord or for work performed by or on behalf of Landlord where such work is expressly provided in this Lease or any other lease the cost of which was/is to be borne at Landlord's expense;

(18)    any cost that is paid or reimbursed by third parties, including warranties and guarantees and including any cost that is paid or reimbursed by insurance (or would have been covered by insurance required to be maintained by Landlord);

(19)    the amount of any insurance deductible or self-insured retentions;

(20)    payments made under any easement, operating agreement, license, restrictive covenant, or any instrument relating to the payment or sharing of costs among property owners;

(21)    costs disproportionately incurred by or on behalf of one or more tenants, including, without limitation, all costs relating to a food court area; and

(22)    costs and expenses incurred with respect to the correction, disposal, investigation, removal, transportation, or treatment of Hazardous Material.

(g)    Landlord must use best efforts to keep Common Area Costs to a minimum subject, however, to the obligation of Landlord to maintain the Shopping Center as a first-class retail project.

(h)    Landlord covenants that there shall be no duplication of costs between those payable by Tenant within this Section and under this Section and any other section of this Lease.

## SECTION 10.   CONSTRUCTION OF PREMISES

(a)    On or before the date which is seventy-five (75) days prior to the Estimated Delivery Date, Tenant, at its sole cost and expense, shall deliver to Landlord for Landlord's approval not to be unreasonably withheld, a copy of Tenant's proposed plans and specifications and sign drawings relating to Tenant's Work (the "Proposed Plans"). If Landlord fails to approve or disapprove, in writing, the Proposed Plans within fifteen (15) days after receipt thereof from Tenant and Landlord thereafter fails to respond in writing within seven (7) days after receiving a second written request from Tenant, then such approval shall be deemed to have been given. If Landlord furnishes Tenant a written response, Tenant shall resubmit revised Proposed Plans within ten (10) days after having received Landlord's response, and Landlord shall then have a ten (10) day period within which to review the same. If Landlord fails to respond within ten (10) days and Landlord thereafter fails to respond in writing within seven (7) days after receiving a second written request from Tenant, then such revision shall be deemed approved. Such review process shall continue until the Proposed Plans are acceptable to both Landlord and Tenant once approved by Landlord and Tenant such plans may be referred to herein as "Tenant's Approved

15

#2596 Birch Run Station (Maplewood, MN)

Plans"). Tenant's Approved Plans and Landlord's Approved Plans (if any) shall collectively be referred to as the "Approved Plans". If the parties do not reach agreement on the Tenant's Proposed Plans within ninety (90) days after their first submission to Landlord, Tenant may terminate this Lease upon written notice to the Landlord within fifteen (15) days after such ninety (90) day period. Within fifteen (15) days after Landlord and Tenant reach agreement on Tenant's Approved Plans, Tenant shall apply for all required governmental permits and approvals necessary to commence Tenant's Work (collectively, the "Tenant's Work Approvals"), and Tenant shall diligently pursue obtaining the Tenant's Work Approvals. If Tenant is unable to secure the Tenant's Work Approvals within sixty (60) days of Tenant's application therefor ("Permit Period") despite good faith efforts, then Landlord shall have the right, but not the obligation, to pursue the Tenant's Work Approvals on behalf of Tenant for an additional sixty (60) days (if Landlord elects to pursue such permits and approvals, said one hundred twenty (120) day period shall hereinafter referred to as the "Permit Period"). If the Tenant's Work Approvals have not been obtained during the Permit Period, despite good faith efforts by Tenant, Tenant shall have the right to terminate this Lease by delivering written notice to Landlord of its intent to terminate the Lease to the Landlord within thirty (30) days after the end of the Permit Period and the Existing Lease shall remain in full force and effect. If Tenant fails to exercise its right to terminate this Lease during said thirty (30) day period, the right to terminate established under this Section shall be null and void. After delivery of any termination notice to Landlord under this Section 10(a), Tenant shall be relieved of all obligations under this Lease (except for any obligations that survive the expiration or earlier termination of this Lease) and shall not be liable to Landlord for damages or otherwise as a result of such termination.

(b)     Subject to: (1) the repair and maintenance obligations of Landlord contained in Section 18 of this Lease; and (2) any other provisions of this Lease, Tenant shall take possession of the Premises on the Delivery Date on an "as is" "where is" basis, with all faults except that Landlord warrants and guarantees that the existing HVAC are, and shall be upon the Delivery Date, in compliance with Laws and in good working order and repair and that the Premises shall be free of all of Marshall's store fixtures; provided, however, Landlord shall not be required to remove any slat wall, offices, or the mezzanine and conveyor belt in the stockroom area..

(c)     Following the Effective Date and Landlord's receipt of all required certificates of insurance from Tenant, but subject to all applicable Laws and requirements of any Public Entity, Tenant shall hereafter have access to the Premises for inspection, taking measurements, making plans, erecting temporary or permanent signs and the performance of Tenant's Work as may be appropriate or desirable by Tenant without being deemed thereby to have taken possession or accepted delivery of the Premises; provided, however, that Tenant shall indemnify, defend and hold Landlord harmless from and against any and all claims or losses arising from Tenant's entry upon the Premises, except to the extent caused by Landlord, its agents, employees or contractors. Tenant may, after the Effective Date, perform a slab moisture test to determine if the slab meets or exceeds the acceptable levels of slab moisture per ASTM 2170-2 (Rh ninety percent (90%) or below). If the test establishes that the slab moisture does not meet or exceed such level, Tenant, in its sole discretion, may remediate any slab moisture, at Tenant's sole cost and expense.

(d)     If the Delivery Date does not occur by the Estimated Delivery Date, , Landlord shall pay Tenant One Thousand Dollars ($1,000.00) for each day (the "Per Diem Payment") between

16

#2596 Birch Run Station (Maplewood, MN)

the Estimated Delivery Date and the earlier to occur of (1) the Delivery Date; or (2) the date Tenant terminates this Lease in accordance with Section 10(e). If Landlord fails to pay Tenant the Per Diem Payment, then Tenant shall have the right (without limiting any other right or remedy of Tenant to collect such payment) to deduct such amount, together with interest thereon at the Default Rate, from Rent. Landlord and Tenant agree that it shall be difficult to determine the precise amount of damages that Tenant shall incur as a result of the failure of the Delivery Date to occur by the Estimated Delivery Date. Therefore, Landlord and Tenant agree that the Per Diem Payment constitutes liquidated damages for such failure. If the Delivery Date does not occur by the Estimated Delivery Date, said liquidated damages shall be payable irrespective of the date Tenant actually opens for and conducts business in the Premises.

(e)     If the Delivery Date has not occurred on or before the Outside Delivery Date, then Tenant has the right to terminate this Lease by delivering written notice to Landlord at any time from and after the Outside Delivery Date but before the Delivery Date. After delivery of Tenant's notice of termination, Tenant shall be relieved of all obligations and liability hereunder. If Tenant so terminates this Lease, Landlord shall be liable to Tenant for all payments due Tenant under Section 10(d). In addition, Landlord shall immediately reimburse Tenant for all architectural fees not to exceed Thirty Thousand Dollars ($30,000.00) incurred by Tenant in connection with this Lease and the Existing Lease shall remain in full force and effect. This Section 10(e) survives the termination of this Lease.

(f)     If, as a result of, or as a condition to, Landlord's Work, any Hazardous Material is required by Law to be removed, abated, or otherwise remediated, then Landlord must perform such removal, abatement or remediation. If, as a result of, or as a condition to, Tenant's Work, any Hazardous Material is required by Law to be removed, abated, or otherwise remediated, then, provided such Hazardous Materials were not brought into the Premises by Tenant, its employees, contractors or agents or persons acting under Tenant's control, Landlord must reimburse Tenant within thirty (30) days for Tenant's reasonable cost of such removal, abatement or remediation, and if not so reimbursed, Tenant may deduct the cost from Rent. Notwithstanding anything to the contrary in this Lease, if removal, abatement or remediation is required under this Subsection 10(f) ("Remediation Period"), then the Commencement Date shall be delayed on a day for day basis for each day of the Remediation Period.

(g)     Landlord shall pay Tenant a "Construction Allowance" in the amount of One Million Two Hundred Fifteen Thousand and 0/100 Dollars ($1,215,000.00) ($45 per square foot), irrespective of costs, as follows: (1) Three Hundred Thousand and 0/100 Dollars ($300,000.00) to be paid to Tenant within forty-five (45) days of delivery of the Premises, provided that Tenant commenced Tenant's Work; (2) Three Hundred Thousand and 0/100 Dollars ($300,000.00) after Tenant provides invoices or purchase orders totaling said amount, and (3) the remaining balance within thirty (30) days after Tenant is open for business to the public and upon delivery to Landlord of unconditional lien waiver(s) equal to $10,000.00 or greater from Tenant's general contractor or construction manager, a list of the names of the subcontractors and the amounts paid to each subcontractor, along with a copy of the Certificate of Occupancy or equivalent; provided, however, if the unconditional lien waiver and release is not provided, in no event shall the balance of the Construction Allowance due to Tenant be withheld beyond the statutorily defined period in which liens may be filed, if no liens have been filed during said period. If Landlord fails to pay

17

Tenant any portion of the Construction Allowance in accordance with this Lease, then, after prior written notice, Tenant shall have the right (without limiting any other right or remedy of Tenant) to deduct such amount from Rent (as a setoff or as recoupment in the case of bankruptcy), together with interest thereon at the Default Rate. Landlord shall wire-transfer the Construction Allowance to Tenant's bank as follows: Bank of America, 100 West 33rd Street, New York, NY 10001, ABA: 026009593 (in the event Landlord elects to submit an ACH transmission, the number is: 111000012); JOANN Account No.: 4427216208;  Account Name: Jo-Ann Stores, LLC Store #2596.

## SECTION 11.  USE

The Premises may be used for the Permitted Use, provided the Premises shall not be used in violation of the Restricted Uses of Other Tenants as are set forth on Exhibit F attached hereto. Landlord represents that the use restrictions accurately reflect exclusives, uses and encumbrances that presently encumber the Premises as terms of existing leases of Shopping Center premises (the uses covered by such restrictions are collectively referred to as the "Restricted Uses" and individually as a "Restricted Use"). Upon the expiration or earlier termination of the lease or other written instrument containing a Restricted Use, the Premises shall not be subject to such Restricted Use under this Lease and such use shall no longer be a Restricted Use. Upon the request of Tenant, Landlord promptly shall advise Tenant which Restricted Uses still encumber the Premises and shall furnish to Tenant the documentary support therefor.

## SECTION 12.  COMMON AREAS

(a)    Landlord, at its own cost and expense (except as otherwise specified in Section 9 or Section 21) must construct, install, operate, manage, repair and maintain the Common Areas in a first-class, neat and clean condition for the benefit of Tenant and Tenant's customers, employees, licensees and invitees. Landlord's obligations with respect to the Common Areas include, but are not limited to:

(1)    Equipping and lighting the Common Areas;

(2)    Maintaining the surfaces of all sidewalks, restriping and maintenance of paved and parking areas in a level, smooth and evenly covered condition with the type of surfacing material originally installed or such substitute as shall in all respects be equal in quality to the original;

(3)    Removing all ice and snow, papers, mud and sand, debris, filth and refuse and thoroughly sweeping the Common Areas to keep them in a clean and orderly condition;

(4)    Placing, keeping in good condition and repair and replacing all utility lines, any necessary appropriate directional signs, markers and curbs;

18

#2596 Birch Run Station (Maplewood, MN)

(5)     Maintaining, trimming and watering, mowing and weeding all landscaped areas and making such replacements of shrubs and other landscaping as is necessary; and

(6)     Landlord shall make security arrangements including private police or similar services and functions if Landlord deems such arrangements to be necessary or prudent, in Landlord's commercially reasonable discretion. If Tenant provides written notice to Landlord of ongoing incidents (including documentation showing the nature of such ongoing incidents and when and where such incidents occurred) or reasonable concerns ("Security Concerns") relating to the safety or security of Tenant's employees or invitees, then such notice shall be deemed to have put Landlord on notice for the need for such security and Tenant shall pay its Proportionate Share of such security. If, after three (3) consecutive months of such security, there have been no Safety Concerns or minimum minor Safety Concerns, Landlord shall have the right to discontinue security service. If Safety Concerns reoccur after security has been discontinued, the process outlined above shall begin again.

(b)     Landlord may close any Common Areas temporarily, at such times as to cause the least possible interruption or interference with Tenant's business, to make repairs or changes, to prevent the acquisition of public rights in such Common Areas or to discourage non-customer parking; but, in no event shall the Protected Area be closed (except in the event of an emergency) without the prior reasonable consent of Tenant. In no event shall Landlord designate the Protected Area as an employee parking area or otherwise permit the Protected Area to be used for employee parking.

(c)     Landlord must keep the Common Areas clean and well lighted from dusk until at least one-half hour after the close of Tenant's business and remove snow from the parking areas, driveways and sidewalks as promptly as possible. Landlord cannot impose any parking charges for the parking of automobiles in the parking areas. Landlord cannot grant any rights in, or permit special or exclusive use of, the sidewalk space within ten (10) feet of the front of the Premises or parking areas or in the exterior area near the rear door of the Premises.

## SECTION 13.  UTILITIES

Landlord, at its sole cost and expense, shall cause all utilities furnished to the Premises (including Common Area lighting) to be separately metered so that only the service provided to the Premises shall be reflected in utility bills rendered to Tenant by the respective supplying public utility companies, except that water may be sub-metered and paid directly to Landlord. Tenant must pay, when due, bills for utilities furnished to the Premises by public utility companies from and after the Delivery Date, including water, gas, electricity, telephone and the like, as are separately metered and charged directly to Tenant. Tenant shall have the right, in its sole discretion, to choose its provider for telephone, internet, cable, and the like. If required, Landlord shall provide consent, not to be unreasonably withheld or delayed, to access the Premises for installation or repair of any such utilities.

19

#2596 Birch Run Station (Maplewood, MN)

**SECTION 14.  USE VIOLATION**

(a)      Landlord shall not lease, license or sell any space in the Shopping Center to a direct category competitor of Tenant, which is a fabric store, arts and crafts store or sewing machine store ("Protected Use"), such as by way of example and not limited to Michael's Arts & Crafts, AC Moore, Sierra Pacific Crafts, Ben Franklin Arts & Crafts, Beverly's, Hancock Fabrics, Calico Corners, Hobby Lobby, Archivers, Recollections, Aaron Brothers custom framing, Singer, Bernina, Viking White, Husqvarna and Pfaff.

(b)      If any portion of any Restricted Property (as defined below) is used or occupied for the Protected Use, or if any sales area therein is designated for the Protected Use (either event being referred to as a "Use Violation") for thirty (30) days or more, then, in addition to all remedies available at law and in equity, Tenant is obligated to pay only Substitute Rent until such Use Violation ceases. In addition, during the time that any Use Violation exists, Tenant has the right to terminate this Lease by giving sixty (60) days' written notice to Landlord, in which event all further obligations hereunder shall terminate on the date specified in Tenant's notice, and any Rent (including Substitute Rent) paid in advance by Tenant must be refunded to Tenant within thirty (30) days after termination of the Lease.

(c)      The foregoing restriction in Subsection (a) shall not (i) apply to any tenant of the Restricted Property under a lease executed prior to the date of this Lease (or their successors or assigns) to the extent such tenant's lease (as the same exists on the date hereof) permits it to sell items that are included in the Protected Use without Landlord's consent, provided however this exception shall not apply if Landlord permits such use or allows an expansion of such tenant's premises that includes a use that would violate this Section 14 or would exceed the "incidental" sale of the Protected Use, if Landlord reasonably and legally may refuse to grant such permission, and further Landlord covenants with Tenant not to modify or amend any such tenant's lease in any manner that would permit such tenant to sell any items comprising the Protected Use to an extent greater than such tenant is permitted to sell (including when not permitted to sell) such items under its existing lease; (ii) prohibit the "incidental" sale of any Protected Use or (iii) apply to any of the following retailers, Rainbow Shops, Crunch Fitness, HomeGoods, Shoe Depot., Sportsman's Warehouse, Five Below, Ross, Petco, or Ulta Cosmetics.  As used herein, the term "incidental" sale shall mean the combined sale by tenants of such Protected Use in an area of less than One Thousand (1,000) square feet of sales are in the aggregate (inclusive of adjacent aisles).

(d)      In the event that Tenant's Protected Use is violated, the computation of Substitute Rent shall commence on the first day of the violation of the Use Violation and shall be paid in monthly installments.

(e)      Notwithstanding anything to the contrary, in the event of a Use Violation by any tenant or occupant who conducts or operates in violation of the Protected Use without Landlord consenting to or granting such tenant or occupant the right to do so (a "rogue tenant"), then Tenant's right to pay Substitute Rent and terminate this Lease shall be deferred, provided that Landlord commences court action to cure or eliminate the Use Violation by the rogue tenant within sixty (60) days after notice from Tenant and diligently pursues same to completion, which

20

#2596 Birch Run Station (Maplewood, MN)

diligence by Landlord must include litigation to a final determination by a court of competent jurisdiction, excluding appeals therefrom. If Landlord is diligently and vigorously pursuing to cure the violation, then the sixty (60) day cure period shall be extended for a time period reasonably necessary to cure the violation. If Landlord does not take such action against the rogue tenant as described in the immediately preceding sentence, then Tenant may exercise its termination right and right to pay Substitute Rent at any time.

(f)     Tenant's failure to exercise the termination option is not a waiver of Tenant's continuing right to do so as long as such Use Violation continues. Without limiting Tenant's rights and remedies under this Section 14, Tenant has the right to equitable relief (including injunction) in the event of a Use Violation.

(g)     "Restricted Property" means the Shopping Center, any additions thereto or outparcels thereof.

(h)     Landlord covenants and agrees to use diligent, good faith, commercially reasonable efforts to cure any breach or violation of this Section, including, without limitation, seeking and diligently prosecuting all available legal and equitable remedies to compel or otherwise cause cessation of the Use Violation.

## SECTION 15.  CO-TENANCY

(a)     <u>Ongoing Co-Tenancy</u>.

(1)     The Ongoing Co-Tenancy Requirement means that Burlington or its permitted successor or assign (the "Anchor Tenants") or a suitable Replacement Tenant are open for business to the public during normal operating hours from substantially all the Anchor Tenant Premises.

(2)     If at any time beginning twelve (12) months after the Commencement Date, the Ongoing Co-Tenancy Requirement is not met for a period of sixty consecutive (60) days, except for temporary closures for repairs, remodeling, renovation or reconstruction which shall not exceed sixty (60) days, then Tenant may immediately pay Substitute Rent until the Ongoing Co-Tenancy Requirement is satisfied.

(3)     If the Ongoing Co-Tenancy requirement is not met within twelve (12) months from the date that the Anchor Tenant or its Replacement Tenant ceased doing business from Anchor Tenant Premises, then without limiting Tenant's right to pay Substitute Rent, Tenant may terminate this Lease upon ninety (90) days' written notice to Landlord If after twenty-four (24) months of paying Substitute Rent, Tenant does not terminate the Lease, Tenant shall commence payment of full Fixed Minimum Rent. If Tenant elects to terminate this Lease, all further obligations hereunder shall terminate effective ninety (90) days after the date of Tenant's notice, and in such event any Rent paid in advance shall be immediately refunded to Tenant.

21

#2596 Birch Run Station (Maplewood, MN)

(b)    Definitions.

(1)    "Replacement Anchor" means a single national or regional Retail Tenant suitable for occupancy in a first-class shopping center and operating under one trade name in fifty percent (50%) of the Anchor Tenant Premises and shall be deemed to be an "Anchor Tenant" after the commencement of such substitute operation, except that holiday, seasonal and other temporary tenants that occupy the Anchor Tenant Premises for less than one hundred eighty (180) consecutive days shall not be deemed an Anchor Tenant. Up to two (2) Retail Tenants, each occupying a minimum of 20,000 contiguous square feet within the Anchor Tenant Premises, suitable for occupancy in a first-class shopping center shall, on a collective basis, be deemed to be an "Anchor Tenant" after the commencement of such substitute operation by both tenants.

(2)    For purposes of this Lease, "national" shall mean a first-class retailer operating at least fifty (50) stores in multiple states, and "regional" shall mean a first-class retailer operating at least ten (10) stores in Minnesota and the states contiguous to Minnesota.

(3)    A "Retail Tenant" is a non-residential, non-office tenant, under a lease with a term of at least five (5) years who sells goods to consumers, provided that any tenant that has office space within its premises incidental to a retail use shall still be considered a Retail Tenant. Real estate or securities brokerage offices, financial or tax planning services, accounting offices, insurance or legal services, travel agencies, banks, cinemas, comedy clubs, medical offices, dental offices and the like shall not be considered Retail Tenants.

## SECTION 16.  RULES AND REGULATIONS

(a)    Landlord may, for the general welfare of the Shopping Center or the avoidance of nuisance, impose reasonable rules and regulations of general application governing the conduct of tenants in the Shopping Center and the use of the Common Areas (it is agreed and understood that such rules and regulations and any subsequent modifications thereto, notwithstanding anything to the contrary in this Lease, shall be subject and subordinate to the terms and conditions of the body of this Lease so that in the event of any conflict or inconsistency between the terms hereof and such rules and regulations, the terms hereof shall supersede and control.) Tenant shall comply with and perform any and all such rules and regulations imposed by Landlord so long as such rules and regulations do not limit the rights or expand the obligations of Tenant under this Lease and all occupants of the Shopping Center are subject to and comply with such rules and regulations.  Landlord must use best efforts to enforce such rules and regulations.

(b)    Tenant is not required to join or maintain membership in any tenant's business association sponsored by or for the Shopping Center, nor is Tenant required to pay any of the costs of the activities conducted by such association.

22

#2596 Birch Run Station (Maplewood, MN)

## SECTION 17.  ALTERATIONS, INSTALLATIONS AND IMPROVEMENTS BY TENANT

(a)  Tenant, without Landlord's consent, has the right to make such interior alterations, changes and improvements to the Premises as Tenant may desire for the conduct of Tenant's business and for the full beneficial use of the Premises; except for structural changes, alterations or improvements, which require Landlord's consent, which consent shall not be unreasonably withheld or delayed.  Tenant shall pay all costs and expenses of its improvements, shall make such changes, alterations and improvements in a good and workmanlike manner, in accordance with all applicable Laws and building regulations, and free and clear of any mechanic's liens or other liens or claims in connection with the making of such changes, alterations and improvements.

(b)  Except as otherwise provided, all signs, furnishings, trade fixtures, inventory, equipment and other removable property installed in the Premises by Tenant shall remain the personal property of Tenant, shall not be subject to any Landlord's lien or lien or security interest against the property of Landlord, and may be removed from the Premises by Tenant upon the termination of this Lease. If any of the foregoing is affixed to the Premises, Tenant shall repair any damage caused by removal.

## SECTION 18.  REPAIRS AND MAINTENANCE

(a)  Except as otherwise provided, Tenant shall maintain the interior, non-structural portion of the Premises, at its sole cost and expense, in an attractive, clean and sanitary condition.

(b)  Landlord warrants and guarantees that all structural portions of the Premises and the roof (water tight and leak free), utility cables, mains and conduits, electrical, gas, plumbing, sprinkler, and sewer systems are, and shall be upon the Delivery Date, in good working order and repair, meets code for retail purposes, and that the Premises and Common Areas surrounding the Premises are water tight (for example, there is no standing water outside or inside of the Premises), and there are not, and shall not be on the Delivery Date, any violations of any Laws. Landlord, at no cost to Tenant, must promptly correct any code violations subsequently found to exist (and provided the code violations are not due to Tenant's Work or Tenant's particular use of the Premises (as opposed to retail or mercantile purposes) and promptly replace or repair, in a good and workmanlike manner and using the highest quality materials, any defects in workmanship, material or equipment that may appear in, on or about Landlord's Work during the Term.

(c)  Subject to Section 18(d), and except for damage caused by fire or other casualties or taking by eminent domain or conveyance in lieu thereof: Tenant, at its sole cost and expense, must make all interior nonstructural repairs to the Premises, including doors and windows. Notwithstanding the foregoing, Tenant is not required to make any: (i) repairs of damage covered by insurance maintained or required to be maintained by Landlord; (ii) repairs necessitated by reason of the negligence, willful misconduct, or default of Landlord, its agents, employees or contractors; (iii) repairs to the plumbing, gas, electrical or other similar units and systems where such repairs would necessitate going through or into the floor slab, structural walls, or roof of the Premises; (iv) replacement of any plumbing, gas, electrical or similar units or systems; or (v)

23

#2596 Birch Run Station (Maplewood, MN)

repair or replacement of the sprinkler, life safety or other detection or suppression system, except for those installed by Tenant, which shall be Tenant's repair obligation. All of the repairs and replacements referred to in the immediately preceding sentence shall be performed by Landlord at its sole cost and expense unless such repairs or replacements are caused by the negligent acts or willful misconduct of Tenant, its agents, employees or contractors.

(d)     Landlord, at its sole cost and expense, must make all repairs to the Premises other than those that Tenant is required to make. Landlord's obligations include, but are not limited to, repairs to the structural portions of the Premises (both interior and exterior), the roof, floor slab, foundation, exterior walls, utility cables, mains and conduits and all major repairs or replacements to the (x) gas and plumbing systems or any portion thereof up to the exposed interior of the Premises, and (y) the electrical system up to (but not including) Tenant's electrical panel, all of which shall be part of Common Area Costs unless specifically excluded under Section 9. In making any repairs or replacements, Landlord must not unreasonably interfere with Tenant's normal operations and business. Landlord assigns to Tenant all warranties and guarantees, if any, with respect to any and all construction and equipment on the Premises to be maintained by Tenant.

(e)     Landlord shall deliver the existing HVAC units and system in working condition. Commencing on the Commencement Date, Tenant shall be responsible for all preventative maintenance, repairs and replacements of the HVAC unit(s). Notwithstanding anything to the contrary in the Lease, if Tenant should replace or repair major components of the existing HVAC system (compressors or heat exchangers) during the final two (2) years of the Initial Term or any Lease extension or renewal, if any, and not remain in possession of the Premises pursuant to a subsequent Lease extension or renewal, then Landlord shall reimburse Tenant, upon the lease termination date, for (1) the un-amortized cost of said replacement based on a straight-line amortization schedule over the useful life of the equipment in accordance with GAAP (in no event less than fifteen (15) years); or (2) the actual cost of the repair in excess of One Thousand Five Hundred Dollars ($1,500.00) (it being understood that Tenant is responsible for the first One Thousand Five Hundred Dollars ($1,500.00) of cost for any such repair), as the case may be.

(f)     Tenant shall maintain the Premises, at its expense, free and clear of all rubbish, garbage and trash and place such rubbish, garbage and trash in the containers provided by Tenant. Tenant, at its own cost and expense, shall dispose of all rubbish, garbage and trash on a timely basis with the provider of its choice. Landlord shall provide an area for Tenant's trash compactor or containers, at Landlord's sole cost and expense, within 20 feet of the rear of the back door to the Premises.

(g)     Subject to this Section 18, Tenant shall keep the Premises in an orderly and sanitary condition, free from vermin, rodents, bugs and other pests, and Landlord must keep the Common Areas in an orderly and sanitary condition, free from vermin, rodents, bugs and other pests. Notwithstanding the foregoing, Landlord is responsible for the extermination of termites, carpenter ants, and other insects capable of causing structural damage in, on or about the Premises, the Common Areas, and all parts of the Shopping Center. Landlord must require all tenants of the Shopping Center to keep their spaces in an orderly and sanitary condition, free from vermin, rodents, bugs and other pests.

24

#2596 Birch Run Station (Maplewood, MN)

(h)     Tenant is responsible for making any interior non-structural alterations of or improvements to the Premises that are required by any Public Entity after the Delivery Date, except to the extent that such responsibility is imposed upon Landlord in the next following sentence or otherwise under this Lease (including Section 18(c) above). Landlord is responsible, at its sole cost and expense, for making all alterations of or improvements to the Premises that are required by any Public Entity and that (1) are structural in nature; (2) relate to the exterior thereof, including the Common Areas; (3) relate to the sprinkler, utility or life safety systems therein; or (4) relate to the handicapped or disabled in the Common Areas. Notwithstanding the foregoing, Tenant shall be responsible for any interior "path of travel" alterations or improvements to the Premises specified in clauses (1) through (3) to the extent the same is caused by (directly or indirectly) (a) a change in the manner in which Tenant uses the Premises (i.e. not for retail or mercantile purpose) or (b) any interior modification of the Premises made by Tenant.

(i)     Landlord and Tenant acknowledge that responsibility for compliance with the terms and conditions of Title III of the Americans with Disabilities Act ("ADA") may be allocated between Landlord and Tenant. Notwithstanding anything to the contrary contained in the Lease, Landlord and Tenant agree that the responsibility for compliance with the ADA shall be allocated as follows: (1) Tenant shall be responsible for compliance with the provisions of Title III of the ADA with respect to the construction by Tenant of Tenant's Work, if any, and Tenant's alterations within the Premises; (2) Landlord shall be responsible for compliance with the provisions of Title III of the ADA in providing all of Landlord's Work required under this Lease, if any, and with respect to any structural matters within the Premises; and (3) Landlord shall be responsible for compliance with the provisions of Title III of the ADA with respect to the parking areas, sidewalks and walkways, together with all other Common Areas of the Shopping Center not included within the Premises and not otherwise part of Tenant's Work or Tenant's alterations within the Premises. Landlord and Tenant each agree to indemnify and hold each other harmless from and against any claims, damages, costs, and liabilities arising out of Landlord's or Tenant's failure, or alleged failure, as the case may be, to comply with Title III of the ADA as set forth above, which indemnification obligation shall survive the expiration or termination of the Lease. Landlord and Tenant each agree that the allocation of responsibility for ADA compliance shall not require Landlord or Tenant to supervise, monitor, or otherwise review the compliance activities of the other with respect to its assumed responsibilities for ADA compliance as set forth herein. The allocation of responsibility for ADA compliance between Landlord and Tenant, and the obligations of Landlord and Tenant established by such allocations, shall supersede any other provisions of the Lease that may contradict or otherwise differ from the requirements of this Section.

## SECTION 19.  INDEMNIFICATION

(a)     Subject to Section 20, Landlord shall indemnify, defend and hold Tenant harmless from and against any and all claims, demands, actions, damages, liability and expense, including reasonable attorneys' fees and expenses, in connection with the loss, damage or injury to persons or property, arising out of or related to: (1) the negligence or willful misconduct of the Landlord, Landlord's agents, contractors or employees; (2) the breach by Landlord of this Lease; or (3) the use or operation of the Common Areas and all other space in the Shopping Center not designated

25

#2596 Birch Run Station (Maplewood, MN)

for the exclusive use of one tenant.

(b)      Subject to Section 20, Tenant shall indemnify, defend and hold Landlord harmless from and against any and all claims, demands, actions, damages, liability and expense, including reasonable attorney's fees and expenses, in connection with the loss, damage or injury to persons or property, arising out of or related to: (1) the negligence or willful misconduct of Tenant, Tenant's agents, contractors or employees; (2) the breach by Tenant of this Lease; or (3) the use or operation of the Premises

This Section 19 survives the expiration or termination of this Lease.

## SECTION 20.  WAIVER OF CLAIMS

Notwithstanding any provision to the contrary, Landlord and Tenant waive any and all right of recovery, claim, action or cause of action against the other, their respective agents and employees, for any loss or damage that may occur to the Premises or the Shopping Center or any additions or improvements thereto, or any contents therein, by reason of fire, the elements or any other cause which could be insured against under the terms of a standard special form insurance policy or policies, or for which Landlord or Tenant may be reimbursed as a result of insurance coverage insuring any loss suffered by either party, regardless of cause or origin, including the negligence of Landlord or Tenant, or their respective agents and employees.  This waiver applies regardless of whether either party actually obtains property insurance, and regardless of whether any insurance proceeds are collected.  Notwithstanding the above, Landlord and Tenant agree and acknowledge that the waiver of claims herein contained shall expressly exclude any loss paid by the insured in the form of a deductible or self-insured retention. All property insurance policies required under this Lease covering the Premises or the Shopping Center must expressly waive any right on the part of the insurer against the other party for damage to or destruction of the Premises or the Shopping Center resulting from the acts or omissions of the other party.

## SECTION 21.  PROPERTY AND LIABILITY INSURANCE

(a)      Landlord must keep in full force and effect Commercial General Liability Insurance and Umbrella Insurance with respect to the Shopping Center, including the Common Areas, naming Tenant as an additional insured thereunder to the extent its interest may appear, with nationally recognized companies rated no lower than A-, IX by A.M. Best Company with total minimum limits to apply per location of $2 million on account of bodily injuries or death and/or property damage resulting from one occurrence. Landlord must deposit a certificate or other evidence of such insurance with Tenant.

(b)      Tenant must keep in full force and effect Commercial General Liability Insurance and Umbrella Insurance with respect to the Premises, naming Landlord as an additional insured to the extent its interest may appear, with nationally recognized companies rated no lower than A-, IX by A.M. Best Company with total minimum limits to apply per location of $2 million on account of bodily injuries or death and/or property damage resulting from one occurrence. Tenant's evidence of insurance is maintained by Tenant's insurer on the website of Tenant's

26

#2596 Birch Run Station (Maplewood, MN)

insurance broker, which can be accessed through Tenant's website, "www.joann.com/insurance."

(c)    Landlord must keep the Premises and the Shopping Center, including Common Areas, insured against loss or damage by fire, lightning, vandalism and malicious mischief, and such other perils as are now or may hereafter be comprehended in the term "All Risk Coverage" or "special form" coverage or "Special Form Cause of Loss" (or other terms that become the insurance industry standard in the future), including, without limitation, earthquake and flood, if in an area that is designated as an earthquake or flood zone, boiler and machinery, plate glass, power failure, mold, windstorm, terrorism, seepage or leakage and loss of rent damage, in amounts equal to at least eighty percent (80%) of the full replacement value thereof, or such greater amounts as may be required to prevent the application of co-insurance provisions. Such insurance must cover improvements in the Premises owned by Landlord to the extent that the same are customarily insurable as part of the realty, but shall not include the cost of restoration of Tenant's furniture, furnishings, inventory, equipment and other personal property. Notwithstanding anything to the contrary, Landlord is solely responsible for any and all deductibles and self-insured retentions.

(d)    In addition to the payment of Fixed Minimum Rent, Tenant must pay Tenant's Proportionate Share of the premium paid by Landlord for maintaining the insurance for the Shopping Center required under Subsections 21(a) and 21(c) (the "Insurance Costs"). During the first Lease Year, the insurance paid by Tenant is estimated to at the rate of $0.35 per year multiplied by the Gross Leasable Area of the Premises, which amount is Landlord's good faith estimate of the full amount of Tenant's Proportionate Share of Insurance Costs for year 2023 if Tenant were to pay Tenant's Proportionate Share of Insurance Costs directly for said period. This sum is subject to annual adjustments by Landlord to reflect actual changes in the Insurance Costs. On or before April 1 Landlord shall provide Tenant with a statement assessing and prorating the Insurance Costs together with copies of all bills for which payment is sought.

## SECTION 22.  SIGNS

(a)    Tenant has the right to install and maintain a sign or individual letters ("JOANN, handmade happiness" or any other name or slogan that Tenant may adopt) or signs on the front, side, rear or any other fascia of the Premises, as well as a sign or signs on the directory(ies) and pylon(s) including installation of a two-sided panel on the Beam Avenue pylon sign structure in its current position and two (2) one-sided panels on the Southlawn Drive pylon sign structure in its current positions, if any, located in or around the Shopping Center or for use by any of the tenants of the Shopping Center, and departmental signs on the front fascia in addition to its regular sign, all in accordance Tenant's Signage Plans attached hereto as Exhibit D-1.  All signs shall comply with all requirements of any Public Entity, and Tenant shall obtain all necessary permits or licenses. Notwithstanding the foregoing, Tenant is entitled to seek and receive a variance from any Public Entity so as to allow Tenant to have the size, color, number, etc., of signs that Tenant desires, including storefront signs, pylon signs, banner signs and monument signs. Landlord shall, at Tenant's sole cost, fully cooperate and assist Tenant with any such variance. Tenant's sole cost for the pylon and/or monument sign(s) shall be the cost to fabricate and install Tenant's panels

(b)    Tenant's sign package shall be approved in accordance with the same process for approval of the plans for Premises build-out as outlined in Section 10 hereof.  In no event shall

27

#2596 Birch Run Station (Maplewood, MN)

Landlord object to any part of Tenant's sign drawings to the extent the same is consistent with Tenant's Signage Plans attached hereto as Exhibit D-1.

(c)     In addition to the foregoing signs, Tenant has the right to install and maintain a professionally prepared banner sign periodically in front of the Premises, including but not limited to its standard "coming soon", "now hiring", "sidewalk sale", etc., provided same is in accordance with applicable Laws.

(d)     Tenant must maintain its signs in good condition and repair at all times, and must save the Landlord harmless from injury to person or property arising from the erection and maintenance of the signs. Upon vacating the Premises, Tenant must remove all signs and repair (exclusive of painting) all damage caused by such removal.

(e)     If Landlord renovates all or any portion of the Shopping Center, which renovation requires a change to the facade and/or the removal of any of Tenant's sign(s), Landlord shall not materially change the appearance of the façade without Tenant's consent and shall notify Tenant at least forty-five (45) days before the removal of sign(s). Landlord shall bear the cost of such removal and reinstallation, together with the cost of any damage to the sign(s) as a result of such removal or reinstallation. Further, Landlord must provide and install on or about the Shopping Center, at Landlord's sole cost and expense, a banner or other type of temporary sign(s) identifying Tenant's trade name, which banner or sign(s) must be equal in size to Tenant's existing sign and approved by Tenant before such installation.

## SECTION 23.  ASSIGNMENT AND SUBLETTING

Tenant has the right to assign this Lease or sublet all or any part of the Premises for any lawful purpose with the prior written consent of Landlord, which consent must not be unreasonably withheld or delayed, and which consent must not be denied in any event where (1) such assignment or subletting does not violate any existing exclusive of another tenant open and operating from the Shopping Center (Landlord must provide Tenant with a list of existing exclusives upon Tenant's request or consent is deemed given and Landlord indemnifies Tenant); (2) Tenant remains responsible for the payment of Rent, unless expressly released in writing by Landlord; and (3) in the case of assignment, such assignee assumes in writing all the terms and provisions of this Lease to be performed or observed by Tenant.  Notwithstanding the foregoing, Tenant may assign this Lease or sublet all or any part of the Premises, in each case without the prior consent of Landlord, but upon written notice to Landlord, to: (i) a parent; subsidiary; affiliated corporation; successor to Tenant; (ii) or the parent of Tenant by way of merger, reorganization, consolidation, corporate restructuring, purchase of stock or assets, or the like; or (iii) any entity that acquires a substantial number of Tenant's stores either generally or in the metropolitan area where the Premises are located.  Tenant may also sublet, without the consent of Landlord, not more than ten percent (10%) of the Gross Leasable area of the Premises for the operation of one or more departments within the business operation of Tenant.

## SECTION 24.  REPAIR AFTER CASUALTY

(a)     In the event of damage to or destruction of the Premises by casualty or any other cause whatsoever, then, except as otherwise provided in this Section, Landlord shall forthwith

#2596 Birch Run Station (Maplewood, MN)

proceed to repair such damage and restore the Premises to substantially their condition at the time of such damage or, at Tenant's option, Landlord shall repair, rebuild and restore the Premises in accordance with such plans and specifications as are then generally in use by Tenant for the construction of one of Tenant's prototypical stores and related structures so long as the repaired, rebuilt or replaced Premises shall have a value not less than its value just prior to said loss and Tenant shall pay any additional cost resulting from such change to the extent it is not covered by the insurance proceeds. Landlord must begin and diligently pursue to completion the restoration and repair within sixty (60) days of the event of damage or destruction. Any repair or restoration of the Premises must be completed within one hundred eighty (180) days after the event of damage or destruction. Within sixty (60) days after an event of damage or destruction, Landlord must deliver to Tenant notice of the anticipated period of restoration.

(b)    If forty percent (40%) or more of the Premises are destroyed or damaged during the last two years of the Term, then each of Landlord and Tenant has the right to terminate this Lease. Landlord may terminate this Lease as of the date of such damage or destruction by giving written notice thereof within sixty (60) days after the date of the damage or destruction. If Tenant, within thirty (30) days after receipt of Landlord's written notice of termination, gives Landlord written notice of its intention to extend this Lease for any additional Extended Term then available to Tenant, then the notice of Landlord to terminate this Lease shall be of no force and effect. If Tenant elects to extend this Lease for any additional Extended Terms then available to Tenant, Landlord must use its best efforts to restore the Premises to its former condition in accordance with Subsection (a) above. Tenant may terminate this Lease as of the date of such damage or destruction by giving written notice thereof to Landlord no later than sixty (60) days after Tenant's receipt of notice from Landlord providing the anticipated period of restoration.

(c)    In the event of any damage or destruction to the Premises, then all Rent shall be abated or reduced proportionately during any period in which, by reason of such damage or destruction, there is interference with the operation of the business of Tenant in the Premises, having due regard to the extent to which Tenant may be required to discontinue its business in the Premises, and such abatement or reduction shall continue for the period commencing with such destruction or damage and ending with: (1) the completion by Landlord of such work of repair or restoration as Landlord is obligated to do; and (2) the expiration of a period of one hundred fifty (150) days thereafter to enable Tenant to re-fixture the Premises and reopen for business, but said one hundred fifty (150) day period shall be deemed to have ended if Tenant shall reopen for business to the public prior to the expiration thereof. In the event of any unusually inclement weather or act of God or other event of Unavoidable Delay which in Tenant's reasonable business judgment makes it unsafe, inadvisable, or illegal to conduct business at the Premises, and as a result Tenant closes for business at the Premises, then all Rent shall be abated from the date of such event and closure until the date on which Tenant reasonably determines it can reopen for business at the Premises.

(d)    If any other portion of the Shopping Center is either partially or substantially damaged (irrespective of whether the Premises shall have been damaged or destroyed), Landlord shall proceed promptly to rebuild the same. During any period of time that by reason of such damage or destruction there is any interference with access to or parking for the Premises, Tenant may pay Substitute Rent; and, if it is impracticable for Tenant, in the reasonable exercise of its

29

#2596 Birch Run Station (Maplewood, MN)

business judgment, to remain open for business and Tenant elects to close down until such damage or destruction has been repaired or rubble, etc., removed, there shall be a full abatement of Rent and all other charges payable hereunder until Landlord's completion of the restoration work.

(e)     In any event, if Landlord shall not commence, in good faith, repair and restoration work within sixty (60) days after any damage which Landlord is required to repair pursuant to the terms of this Section 24 (which period shall be extended to ninety (90) days if required by Landlord's insurance policy), or if Landlord shall fail with all due diligence to continue with such repair and restoration work to completion (which completion shall in no event exceed one hundred eighty (180) days from the date of the casualty), then Tenant shall, in addition to all other available remedies at law or equity or otherwise provided herein, have the following rights, at its option:

(1)     to terminate this Lease by giving notice of its election to do so to Landlord; or

(2)     to the extent the damage is to the Premises or Protected Area, upon notice to Landlord to restore the Premises and/or Protected Area, as applicable, or have same done, in which event Landlord shall make the insurance proceeds available to Tenant for the completion of such restoration, and to the extent the insurance proceeds actually received by Tenant are insufficient to pay for all costs incurred by Tenant in connection with such restoration, Landlord shall reimburse Tenant for all restoration costs incurred by Tenant within thirty (30) days after Tenant's request. If Landlord has not reimbursed Tenant within such thirty (30) day period, Tenant may deduct all such costs, together with interest at the Default Rate herein, from the Rent next becoming due after the expiration of said thirty (30) day period.

(f)     If this Lease is terminated pursuant to this Section, Landlord must refund within fifteen (15) days of notice any Rent paid in advance.

(g)     If Landlord elects, or is required by this Section 24, to repair the Premises or the Shopping Center, then Landlord must notify Tenant in writing when the repairs are completed. The repairs shall not be deemed completed unless and until the repairs are actually completed in accordance with the terms of this Lease and Tenant has thereafter received written notice of such completion.

## SECTION 25.  CONDEMNATION

(a)     If fifty percent (50%) or more of the Gross Leasable Area of the Premises or fifty percent (50%) or more of the Gross Leasable Area of the Shopping Center is taken by condemnation or right of eminent domain or conveyed in lieu thereof or taken in any other manner for a period of three (3) months or longer  (a "Taking"), this Lease shall terminate at the option of either party as of the day possession is taken by or title vests in the taking authority, and both

30

#2596 Birch Run Station (Maplewood, MN)

parties shall be released from any further liability hereunder.

(b)     In the event of a Taking of less than fifty percent (50%), but more than five percent (5%), of the Gross Leasable Area of the Premises, or a Taking of any portion of the Protected Area, then Tenant has the right to terminate this Lease and any further liability hereunder if, in the reasonable determination of Tenant, the Premises cannot be economically operated for, or are unsuitable, for the intended purposes of this Lease. Any such termination is effective as of the day possession is taken by, or title to the portion taken vests in, the taking authority.

(c)     In the event of a Taking of less than fifty percent (50%), but more than five percent (5%), of the Gross Leasable Area of the Shopping Center (including the Common Areas), then (1) Tenant has the right to terminate this Lease and any further liability hereunder if, in Tenant's reasonable determination, the Premises cannot be economically operated for, or are unsuitable for, their intended purposes; and (2) Landlord has the right to terminate this Lease and any further liability hereunder if, in Landlord's reasonable determination, the Shopping Center cannot be economically operated for, or are unsuitable for, their intended purposes. Any such termination is effective as of the day possession is taken by, or title to the portion taken vests in, the taking authority

(d)     In the event of a Taking of any portion of the Premises or the Shopping Center, upon which this Lease is not terminated, Landlord must restore the remainder of the Premises and the Shopping Center (including the Common Areas), with reasonable speed to a complete architectural unit as nearly like its condition prior to such partial Taking as shall be practicable, and if during or after the work of restoration Tenant is deprived of all or a part of the use of the Premises, the Rent shall abate for so long as Tenant is deprived of such use and until Tenant has rebuilt, refixtured and restocked the Premises, as necessary, in the same proportion as that portion of the Premises taken bears to the entire Premises.

(e)     All damages awarded in connection with the Taking of the Premises, whether allowed as compensation for diminution in value to the leasehold or to the fee of the Premises, shall belong to the Landlord; but, if Tenant has made any material leasehold improvements to the Premises, or alterations or structural changes and repairs to the Premises, at its own expense (regardless of when made), Tenant and not Landlord is entitled to claim an award for the unamortized balance of Tenant's cost thereof. If the condemning authority does not make a separate award therefor, Landlord, subject to the rights of any Mortgagee (as defined in Section 30(b)), must assign a portion of its award equal to such unamortized cost to Tenant. If Landlord in obtaining its award uses Tenant's cost items, then Tenant is entitled, subject to the rights of any first Mortgagee, to a proportionate share of Landlord's award based upon the costs. Tenant is also entitled to claim an award for loss of business, damage to merchandise and fixtures, removal and reinstallation costs and moving expenses, in a separate action only.

## SECTION 26.   REPRESENTATIONS AND COVENANTS OF LANDLORD

(a)     On the date hereof and hereafter during the Term, Landlord represents, warrants

31

#2596 Birch Run Station (Maplewood, MN)

and covenants to Tenant as follows:

(1)     The Shopping Center Site is zoned to permit the use of the Shopping Center for general retail purposes, and the Premises are zoned to permit their use as a retail store conducting the Permitted Use, as of right (i.e., without any special permit, approval, variance or other waiver);

(2)     As of the Effective Date the legal description set forth on Exhibit A matches the Shopping Center depicted on the Site Plan (i.e., Exhibit B) and includes no additional property therein;

(3)     The Common Areas, Premises (excluding Tenant's Work or other alterations made by or on behalf of Tenant, but not excluding Landlord's Work or work directed by Landlord on or behalf of Tenant) and all structural portions of the Shopping Center comply with all Laws;

(4)     Landlord shall provide surface parking spaces in the Common Areas on an unreserved basis and without cost, with at least four and one-half (4.5) parking spaces being provided for each 1,000 square feet of Gross Leasable Area within the Shopping Center or the amount required by Laws, whichever is greater;

(5)     Except for the two (2) "Future Development Areas" shown on the Site Plan which shall not exceed combined 6,000 square feet and each building shall not exceed 27 feet in height, building, edifice or obstruction shall be placed on the Shopping Center Site and no addition or alteration shall be made to the Shopping Center (A) that diminishes the accessibility of the Premises to and from the parking areas within the Common Areas and the other stores in the Shopping Center; (B) that diminishes the visibility of the front of the Premises (including, without limitation, the signage thereon) from public highways, parking areas or other stores in the Shopping Center; (C) that diminishes the access to or the utility of the service areas serving the Premises; (D) that has the effect of increasing the monetary obligations of Tenant under this Lease; or (E) that otherwise adversely affects the conduct of business from the Premises or the rights of Tenant under this Lease. Without limiting the generality of the foregoing, in no event shall any improvement or alteration (including a reduction in size of the Protected Area through any means (except through an eminent domain proceeding), including, for example, a reduction in the Shopping Center or Shopping Center Site, or a change in the parking layout or configuration or traffic patterns of vehicles or pedestrians) be made to the "Protected Area" as shown on the Site Plan;

(6)     The Site Plan correctly and completely shows all current improvements on

32

#2596 Birch Run Station (Maplewood, MN)

the Shopping Center Site;

(7) The Shopping Center may be expanded or contracted provided that it does not increase Tenant's Proportionate Share of Additional Rent;

(8) Landlord shall maintain, operate and manage the Shopping Center as a first-class retail project in compliance with all Laws, and the Shopping Center shall be used and occupied only for normal retail uses customarily conducted in first-class shopping centers.

(9) In no event shall the Shopping Center or any portion thereof be used as or for any of the following:

(i) a movie theater within three hundred fifty (350) feet of the front and side perimeter walls of the Premises; auditorium; meeting or banquet hall;

(ii) church; bingo hall or a place of public assembly;

(iii) library or school except one (1) such tenant shall be permitted within the Shopping Center within two hundred fifty feet (250) feet of the side perimeter walls of the Premises (includes, but not limited to, a beauty school, barber college, reading room, place of instruction or any other operation serving primarily students or trainees rather than retail customers);

(iv) for the sale or service of automobiles or other vehicles;

(v) night club or bar serving alcoholic beverages except as incidental to a restaurant ("incidental" shall be defined as deriving less than forty percent (40%) of gross sales from the sale alcoholic beverages); or liquor or beverage store, except a national liquor store such as BevMo! or Total Wine & More within two hundred fifty (250) feet of the front and side perimeter walls of the Premises;

(vi) funeral parlor; massage parlor, except a national massage parlor such as Massage Envy provided they are located one hundred feet or more from the front door of the premises;

(vii) animal clinic or animal boarding (kennel), which shall not exceed 4,000 square feet and be located within two hundred fifty (250) feet from the side perimeter walls of the Premises;

(viii) discotheque; dance hall or otherwise for musical/dance reviews or topless/nude shows;

(ix) karate or dance studio, which shall not exceed 4,000 square feet and be within one hundred fifty (150) feet from the front and side perimeter walls of the Premises; gym or gymnasium, under 4,000 square feet can be located two hundred fifty (250) feet or more from the front and side perimeter walls of the Premises; bowling alley, within three hundred fifty (350) feet from the front and side

33

                perimeter walls of the Premises; or skating rink;

(x)      car wash;

(xi)     off-track betting establishment, gambling, gaming, video gaming, etc.;

(xii)    pool room, game room or amusement arcade, except for one (1) national tenant such as Chuck E Cheese or Dave & Busters, provided they are located two hundred fifty (250) feet or more from the front and side perimeter walls of the Premises (defined as any establishment containing more than a combination of three electronic, pinball or other games), gallery or store or pinball arcade. Notwithstanding the foregoing, in no event shall the Shopping Center or any portion thereof be used as or for indoor amusement or trampoline parks that is located within five hundred (500) feet from the front door of the Premises;

(xiii)   so-called "flea market"; or second hand. used goods or consignment store, except, subject to Section 26(a)(9)(xv) no more than one (1) second hand, used goods or consignment store is located two hundred fifty (250) feet or more from the front and side perimeter walls of the Premises;

(xiv)   store selling primarily distressed or damaged merchandise;

(xv)    So called close-out stores selling predominately discounted second quality or overrun merchandise;

(xvi)   health club, pickleball or spa, within three hundred fifty (350) feet from the front and side perimeter walls of the Premises;

(xvii)   so-called "head shop"; or night club;

(xviii) gun range or gun shop, except a business selling guns as an incidental part of their business such as Bass Pro, Cabela's or Sportsman's Warehouse and similar types of business provided they are located two hundred fifty (250) feet or more from the front and side perimeter walls of the Premises;

(xix)   for warehousing, except as incidental to a retail business;

(xx)   adult book store or store selling or exhibiting sexually explicit materials;

(xxi)   any business or use that emits offensive odors, fumes, dust or vapors or is a public or private nuisance or emits loud noise or objectionable sounds or creates fire, explosive or other hazard (e.g., motorized vehicle repair or body shop); provided, however, tire, battery or auto parts retail locations shall not be precluded under this Restricted Use;

(xxii)  abortion clinic, AIDs clinic, drug treatment facility or bodily fluid collection facility; homeless shelter or halfway house;

(xxiii) business office usage, except for business offices typically found in first class shopping centers such as insurance offices, real estate offices, chiropractors and doctor offices provided such premises are less than 10,000 square feet and are located one hundred fifty (150)

#2596 Birch Run Station (Maplewood, MN)

feet or more from the front door of the Premises;

(xxiv) animal kennel;

(xxv) laundromat;

(xxvi) except as allowed in this Subsection 8, any non-retail use;

(xxvii) marijuana dispensary; vape store or

(xxviii) tattoo parlor.

(10) Landlord owns fee simple title to the Shopping Center free and clear of all liens and encumbrances except for the lien of the existing mortgage in favor of MidFirst Bank. There are no claims of other parties, restrictions, reservations, or defects in Landlord's title which could interfere with or impair Tenant's rights under this Lease or Tenant's use, occupancy, or enjoyment of the Premises;

(11) At the time of the Delivery Date, there are no planned or contemplated taxes and assessments, either general and specific, whether ad valorem, specific or otherwise, with respect to the Shopping Center; and,

(12) The Premises are free of Hazardous Material.

(b) The representations, warranties and covenants in this Lease are material considerations and inducements to Tenant in executing this Lease, the breach of which shall cause irreparable and severe harm to Tenant. Without limiting any other right or remedy of Tenant, in the event of a breach of the representations, warranties, and covenants, Tenant has the right after providing Landlord with thirty (30) days' prior written notice (1) to terminate this Lease at any time during the period of such breach; or (2) to pay Substitute Rent during the period of such breach.

## SECTION 27.  TENANT'S DEFAULT

(a) Landlord may, by written notice to Tenant, terminate this Lease, or without terminating this Lease re-enter the Premises, and may dispossess the Tenant if:

(1) Tenant fails to pay Rent on or before the due date and then fails to pay same within ten (10) days after receipt of written notice from Landlord sent to Tenant's notice address;

(2) Tenant is in material default in the performance of any of the covenants, terms, conditions and provisions of this Lease, and Tenant fails to remedy such default within thirty (30) days after receipt of written notice thereof (but Tenant shall not be deemed to be in default if Tenant commences to remedy the default within the thirty (30) day period and proceeds to cure with due diligence) from Landlord sent to Tenant's notice address;

(3) Tenant is adjudged bankrupt or makes an assignment for the benefit of creditors, or if a receiver of any property of Tenant in, upon or about the

35

#2596 Birch Run Station (Maplewood, MN)

Premises is appointed in any action, suit or proceeding by or against Tenant and is not removed within ninety (90) days (unless such ninety (90) day period is extended by court order, in which event the time period shall be as established by court order or established by such person(s) or entity acting under or for the court) after appointment; or

(4)     The interest of Tenant in the Premises is offered for sale or sold under execution or other legal process, and if not rescinded within ninety (90) days after written notice from Landlord to Tenant's notice address.

Landlord must mitigate its damages. In the event of re-entry Landlord must use best efforts to relet the Premises and, in the event of a reletting, must apply the rent therefrom first to the payment of Landlord's reasonable expenses incurred and paid by reason of Tenant's default, next to the reasonable expense of reletting, including, but not limited to, reasonably necessary repairs to the Premises, and then to the payment of Rent and all other sums due from Tenant, with Tenant remaining liable for any deficiency. Any and all deficiencies shall be payable by Tenant monthly on the date provided for the payment of Fixed Minimum Rent. Notwithstanding anything to the contrary in this Lease, if Tenant has in good faith disputed an alleged monetary default for an amount which is less than two months of Rent, and if Landlord obtains a final judgment adverse to Tenant with regard to said amount, wholly or in part, Tenant may within thirty (30) days of the date of the journalized final judgment pay the amount set forth in the final judgment to Landlord and retain the right to possession of the Premises and all of its rights under the Lease, notwithstanding any termination of the Lease pursuant to the Lease or at law or in equity, which may have occurred as a result of said monetary default.

(b)     In the event of a default by either party of any of the terms, provisions, covenants or conditions of this Lease, the other party has the right to invoke any remedy provided at law or in equity; except, however, Landlord is not entitled to terminate this Lease or to dispossess Tenant except for a material default and in no event is Landlord entitled to accelerate Rent. Notwithstanding anything contained herein, in no event is Landlord entitled to exercise self-help to lock out Tenant or forcibly retake possession of the Premises without due legal process and an appropriate court order. All remedies are cumulative and concurrent.

(c)     Notwithstanding anything to the contrary, with respect to any alleged default of Tenant other than a default in the payment of Rent, or other sums of money, if Tenant notifies the Landlord, within thirty (30) days after Landlord's notice of such default, that Tenant disputes such alleged default and Tenant files within the thirty (30) day period an action in a court of competent jurisdiction contesting such alleged default, then Tenant's cure period shall be extended pending a final judgment. If a final judgment is adverse to Tenant, wholly or in part, Tenant must immediately begin to correct the matters complained of by Landlord, or that portion thereof as to which such judgment shall have been adverse to Tenant, and complete the correction within thirty (30) days after such judgment, or if more than thirty (30) days are reasonably required to complete such correction, correct the same within thirty (30) days and prosecute the same to completion with reasonable diligence. If such judgment shall not be adverse to Tenant, then Tenant shall not

36

#2596 Birch Run Station (Maplewood, MN)

be deemed to be in default under this Lease.

## SECTION 28. RIGHTS OF LANDLORD

(a)    Landlord reserves the right at all reasonable times during Tenant's business hours and upon prior reasonable notice to Tenant (except in the event of emergency, when notice is not required) by itself or its duly authorized agents, to  inspect the Premises and, to make such repairs as Landlord is obligated to make to the Premises.  In exercising the foregoing right, Landlord must not interrupt or disrupt Tenant's business or unreasonably disrupt access to the Premises by Tenant, Tenant's employees, agents, invitees and customers.

(b)    If Landlord makes any payments on behalf of Tenant, which are Tenant's obligation, to fulfill Tenant's covenants, then any amount so paid by Landlord are declared to be "Additional Rent" and are due and payable to Landlord from Tenant with the next installment of Fixed Minimum Rent due thereafter, together with interest thereon at the Default Rate from the date of such advance to the repayment thereof in full.

(c)    Landlord has the right during the last two (2) months before the expiration of this Lease, so long as it does not interfere with Tenant's business, to exhibit the Premises and put up the usual notice "for rent" or "for sale", which notice shall not be removed or hidden by Tenant. No more than one sign shall be placed upon the Premises and the sign cannot exceed 12 feet square.

## SECTION 29.  LANDLORD'S DEFAULT

(a)    If Landlord fails to keep and perform any covenant or agreement in this Lease to be kept and performed by Landlord as they relate to the construction, maintenance, repair and replacement of the Premises and/or the Common Areas, and such failure continues for a period of thirty (30) days after receipt of written notice from Tenant (but Landlord shall not be deemed in default if Landlord diligently commences to remedy said defaults within said thirty (30) days period and proceeds therewith with due diligence), then Tenant, in addition to all other remedies now or hereafter afforded or provided by this Lease, at law or in equity, has the right to perform such covenant or agreement for or on behalf of Landlord or make good any such default, and any amount or amounts that the Tenant advances on Landlord's behalf must be repaid by Landlord to Tenant on demand, together with interest thereon at the Default Rate from the date of such advance to the repayment thereof in full.  In the event of any dispute related to self-help and any amounts offset by Tenant in connection therewith, Landlord may not default tenant under this Lease or Tenant's right to possession of the Premises in connection therewith unless (i) a court of competent jurisdiction determines that Tenant was not entitled to perform such self-help or that Tenant was not entitled to offset all or any portion of any amounts in connection therewith, and (ii) Tenant fails to pay such amounts that the court determines Tenant was not entitled to offset to Landlord within thirty (30) days following the entry of such order by such court.

(b)    Except in the event of emergency, before performing any covenant or agreement on behalf of Landlord, Tenant shall provide Landlord with written notice of Landlord's default and Tenant's intent to perform such covenant or agreement, and Landlord shall have thirty (30)

37

#2596 Birch Run Station (Maplewood, MN)

days within which to complete performance of the same (and Landlord shall not be deemed to be in default if Landlord commences to remedy the default within the thirty (30) day period and proceeds to cure with due diligence). For purposes hereof, "emergency" means (1) any event which poses immediate threat of injury or damage to persons or property; or (2) any event which, in Tenant's judgment, threatens Tenant's ability to open for business as scheduled or impairs or interferes with Tenant's business operations.

(c)    If Landlord fails to pay any sum to Tenant when due, and if such failure continues for ten (10) days after receipt of notice from Tenant, Tenant has the right, without forfeiture of its other rights hereunder, at its election, to setoff and deduct the same, together with interest thereon at the Default Rate, from Rent.  Notwithstanding the foregoing, Tenant's rights of offset under Section 10 hereof shall be governed by Section 10.

## SECTION 30. MORTGAGE SUBORDINATION

(a)    Landlord must obtain and deliver to Tenant a non-disturbance and attornment agreement, substantially in the form of Exhibit G (the "SNDA"), from any existing ground lessor, Mortgagee or lien holder.

(b)    Landlord reserves the right to request from Tenant a waiver of priority of Tenant's leasehold estate hereunder for the purpose of subordinating Tenant's leasehold estate in favor of a first mortgage lien or any refinancing or replacement of a first mortgage loan that Landlord may hereafter deem necessary or desirable.  Tenant, upon such request by Landlord, shall execute and deliver an agreement substantially in the form of Exhibit G. The word "mortgage" means (1) any lease of land only or of land and buildings in a sale-lease-back transaction involving all or any part of the Shopping Center; or (2) any mortgage, deed of trust or other similar security instruments constituting a lien upon all or any part of the Shopping Center, whether the same shall be in existence as of the date hereof or created hereafter, and any modifications, extensions, renewals and replacements thereof.  "Mortgagee" means a party having the benefit of a mortgage, whether as lessor, Mortgagee, trustee or note-holder.

(c)    After a change in ownership of all or any portion of the Shopping Center that requires a change in the Rent payee, or assignment of this Lease by Landlord that requires a change in the Rent payee, Tenant shall have no obligation to pay Rent to the new payee until Tenant receives written notice from Landlord confirming the name and address of the new payee.

(d)    If Tenant receives a written notice from any party claiming a collateral interest in this Lease or in the Rent and, by reason thereof, a present entitlement to collect the Rent, Tenant has the right either (1) to pay Rent to such party, which payment shall satisfy any and all liabilities of Tenant to Landlord with respect to such payment, without obligation on Tenant to make further inquiry but subject to such party's providing to Tenant a copy of the instrument pursuant to which such party claims entitlement and to such claim being plausible on the face of such instrument; or (2) to withhold Rent from Landlord and pay same to an escrow agent or a court pending the

38

#2596 Birch Run Station (Maplewood, MN)

determination by a court of competent jurisdiction of the entitlement thereto.

## SECTION 31. NO WAIVER

No waiver by either party of any of the terms, covenants, provisions or conditions in this Lease, and no waiver of any legal or equitable relief or remedy, shall be implied by the failure of either party to assert any rights, or to declare any forfeiture, or for any other reason. No waiver of any of the terms, provisions, covenants, rules and regulations herein shall be valid unless it is in writing signed by both parties. No waiver by either party, or forgiveness of performance by either party in respect to one or more tenants of the Shopping Center, shall constitute a waiver or forgiveness of performance in favor of Tenant, Landlord or any other tenant. The waiver or the forgiveness of performance of any one or more of the terms, provisions, conditions, rules and regulations of this Lease shall not be claimed or pleaded by Tenant or Landlord to excuse a subsequent failure of performance of any of the terms, provisions, conditions, covenants, rules and regulations of this Lease.

## SECTION 32.  SURRENDER OF PREMISES

(a)     Tenant must deliver up and surrender to Landlord possession of the Premises, including all Landlord's Work (and replacements thereof) and all improvements permanently attached to the Premises during the Term, upon the expiration of this Lease, or its termination in any way, in as good condition and repair as the same are in on the Commencement Date (excepting damage by fire or other casualty which could be covered by a standard "All-Risk Coverage" or "special form" insurance policy, ordinary wear and tear, authorized alterations and modifications, and decay, neglect, fault or default of Landlord and taking by eminent domain or conveyance in lieu thereof). Upon the expiration or earlier termination of this Lease, Tenant shall deliver the keys at the office of Landlord or Landlord's agent. Tenant shall have an additional ten-day Rent-free period after expiration or termination of the Lease to remove its signs, trade fixtures, furnishings, inventory, equipment, furniture and other personal property.

(b)     Tenant has the right, while the Lease remains in effect, to place a banner sign at the front of the Premises, in a place visible to Tenant's customers, directing Tenant's customers to another store of Tenant or providing Tenant's customers with information and a telephone number. If the Lease has terminated or expired, then Landlord must leave the sign at the front of the Premises until the earlier to occur of (1) ninety (90) days after Tenant vacates the Premises; or (2) a new tenant has taken possession of the Premises.

## SECTION 33.  SHORT FORM LEASE, COMMENCEMENT DATE AGREEMENT

(a)     Neither party may record this Lease, but if either party requests that a Short Form Lease or a Memorandum of Lease be recorded, then the other party must execute such agreement, which agreement shall contain the information set forth below. The Short Form Lease or Memorandum of Lease shall describe the Premises and the rights herein demised, the Term, and the extension rights (if any), any exclusive granted to Tenant and other provisions hereof reasonably requested by Tenant. The failure to record the Short Form Lease or Memorandum of Lease shall not affect or impair the validity and effectiveness of this Lease, and this Lease shall

#2596 Birch Run Station (Maplewood, MN)

control in the event of any inconsistency between the two.  The party requesting that the Short Form Lease or Memorandum of Lease be recorded must prepare and pay all costs of recording the Short Form Lease or Memorandum of Lease, and the other party must execute at any and all times such Short Form Lease or Memorandum of Lease and any other instruments as may be required for such recording.

(b)    At the time that the Commencement Date is established, the parties shall promptly enter into a Commencement Date agreement using Tenant's form or in a form acceptable to Tenant, setting forth the actual commencement and expiration of the Initial Term and any extensions thereof, any applicable kickout dates, the then current Gross Leasable Area of the Premises and the corresponding Rent, which Commencement Date agreement may be recorded by either party if both parties agree to said recordation in advance.  If the recipient of such request does not object to the Commencement Date specified in such request within thirty (30) days after receipt of the request, the date specified in such request shall be deemed to be the Commencement Date herein.

## SECTION 34.  NOTICE

Any notices, statements, acknowledgments and consents required to be given by or on behalf of either party to the other must be in writing and must be given by Certified U.S. Mail, or by private courier service requiring a signed acknowledgment of delivery (such as Federal Express) addressed as follows:

| | |
|---|---|
| if to the Landlord at: | Arizona Partners Retail Investment Group, LLC<br>c/o Birch Run Station, LLC<br>8300 N. Hayden Rd. Ste. A-200<br>Scottsdale, AZ 85258<br>Attn: Property Manager |
| if to the Tenant at: | Jo-Ann Stores, LLC, Store #2596<br>5555 Darrow Road<br>Hudson, Ohio 44236<br>Attn:  National Director of Real Estate |
| with a copy to: | Jo-Ann Stores, LLC, Store #2596<br>5555 Darrow Road<br>Hudson, Ohio 44236<br>Attn:  Legal Counsel |
| Estoppel and SNDA<br>requests to: | Estoppel-SNDA@joann.com |

or at such other address of Landlord or, Tenant as may be specified by such a notice.  Any notice sent by certified mail is deemed to have been served three days after deposit thereof with the U.S. Postal Service. Any notice sent by courier service is deemed to have been served as of the next

#2596 Birch Run Station (Maplewood, MN)

business day (excluding Saturdays, Sundays, and any federal government holidays). Notwithstanding the foregoing, the time period in which a response to any such notice must be given, or in which an action must be commenced or be taken, shall commence to run on the date of receipt by the addressee thereof as shown on the return receipt or acknowledgment of delivery for such notice. Rejection or other refusal to accept, or the inability to deliver because of changed address of which no notice was given, shall be deemed to be receipt of notice as of the date of such rejection, refusal or inability to deliver. Notwithstanding anything to the contrary, Tenant may give electronic notice of the need of emergency repairs, followed promptly by notice as required above.

## SECTION 35.   HAZARDOUS MATERIALS

(a)     Tenant must not cause or permit the escape, disposal or release of any Hazardous Material (as hereafter defined) in violation of Law. Tenant must not allow the storage or use of Hazardous Material in any manner not sanctioned by Law, nor allow to be brought into the Shopping Center any Hazardous Material except to use in the ordinary course of Tenant's business. Tenant must defend, indemnify and hold Landlord harmless from and against any and all claims, losses, liabilities, damages, penalties, fines and expenses (including, without limitation, consequential damages, cleanup and other remedial and restoration costs, fees for consultants and experts and reasonable attorneys' fees and other costs of litigation arising by reason of any of the aforesaid or any action against Landlord under this indemnity) arising directly or indirectly from, out of or by reason of the release of Hazardous Materials in the Shopping Center occurring during the Term caused by Tenant or Tenant's contractors, agents or employees or persons acting under Tenant. It is a condition to indemnification that Tenant receive notice of any claim by Landlord promptly after Landlord first has knowledge thereof. This indemnity survives the expiration or earlier termination of the Term.

(b)     Landlord must not cause or permit any Hazardous Material to exist in the Premises. unless such Hazardous Materials are brought into the Premises by Tenant. In addition, Landlord must not cause or permit any Hazardous Material to be sold, used, stored, brought upon or disposed of (collectively a "Use") in, on, under or about the Shopping Center (including the Premises, before the Delivery Date) without in each case: (1) obtaining all necessary permits required in connection therewith; (2) complying with all permit requirements; and (3) otherwise taking all appropriate steps and making adequate arrangements to assure that such Use is in the ordinary course of business in the operation of the Shopping Center. Such Use must be performed safely and without contamination of the Shopping Center and the Shopping Center Site or any portion thereof and fully in compliance with all applicable Laws. Landlord must defend, indemnify and hold Tenant harmless from and against any and all claims, losses, liabilities, damages, penalties, fines and expenses (including, without limitation, consequential damages, cleanup and other remedial and restoration costs, fees for consultants and experts and reasonable attorneys' fees and other costs of litigation arising by reason of any of the aforesaid or any action against Tenant under this indemnity) arising directly or indirectly from, out of or by reason of the release of Hazardous Materials in the Shopping Center occurring during the Term caused by Landlord or Landlord's contractors, agents or employees or persons acting under Landlord. It is a condition of this indemnification that Landlord receive notice of any such claim by Tenant promptly after Tenant first has knowledge thereof.  This indemnity survives the expiration or early

41

#2596 Birch Run Station (Maplewood, MN)

termination of this Lease.

(c)     If either party receives any written notice of Hazardous Discharge or Environmental Complaint that specifically identifies the Premises or the Common Areas or describes a condition that materially impairs or could materially impair the occupancy, use and enjoyment of the Premises, then the receiving party must give immediate oral and written notice of same to the other party detailing all relevant facts and circumstances within the knowledge of the receiving party.

(d)     If Tenant's use, occupancy and enjoyment ("Occupancy") of the Premises is materially interfered with by reason of this existence or remediation of any Hazardous Material located on, in or under the Shopping Center or on the Shopping Center Site (except for any Hazardous Material used by Tenant), then (1) throughout such period of interference, a fair and just proportion of the Rent and other charges payable (taking into account the nature of the interference to Tenant's Occupancy), shall be abated; and (2) if Tenant's occupancy is substantially impaired for three (3) months or more, then Tenant has the right to terminate this Lease by giving written notice to the other of its election to do so, whereupon this Lease shall automatically terminate and end effective as of the date of such notice and neither party shall have any further obligations hereunder. Landlord may nullify Tenant's notice of termination if Landlord is diligently corrects the Hazardous Material interference and completes the job in accordance with all applicable governmental laws, codes, regulations and requirements within three (3) months after the date of Tenant's termination notice. The abatement provided in clause (1) of this Subsection shall continue throughout the period of such correction by Landlord.

(e)     "Hazardous Material" means (1) any waste, pollutant, material, substance or contaminant which is or becomes listed, defined, or classified as having properties harmful to health, safety, or indoor or outdoor environment; (2) any substance or material that is or becomes regulated by any Public Entity by reason of the hazardous or toxic qualities of such substance or material; and (3) any other toxic or hazardous substance, regardless of whether the same is regulated, including, without limitation, so-called "black mold," any mycotoxin, and any other mold capable of producing a toxic or allergic reaction in humans (including, without limitation, Stachybotrys, S. atra, S. chartarum, Aspergillus, Fusarium, Coccidioides). Without limiting the generality of the foregoing, Hazardous Material includes oil, petroleum, petroleum-fraction or petroleum-derived substance; urea formaldehyde foam insulation; asbestos and asbestos-containing materials; and any electrical equipment that contains any oil or dye-electric fluid containing polychlorinated biphenyls.

(f)     "Hazardous Discharge" means the presence, use, release, dispersal, emission, spill, discharge or cleanup of any Hazardous Material (1) on or about or emanating from the Shopping Center or the Shopping Center Site; (2) arising out of the use and occupancy of or operations within the Shopping Center; or (3) caused by Landlord or other occupant of the Shopping Center or the employees, contractors, invitees or agents thereof.

(g)     "Environmental Complaint" means any complaint, investigation, order, citation, or action with regard to any Hazardous Discharge, air emissions, water discharges, noise emissions or any other environmental, health or safety matter pertaining to or emanating from the

42

#2596 Birch Run Station (Maplewood, MN)

Shopping Center from any Public Entity.

**SECTION 36. LIMITATION OF LANDLORD'S LIABILITY**

(a) If Landlord fails to perform any covenant, term or condition on Landlord's part to be performed, and as a consequence of such default Tenant recovers a money judgment against Landlord, such judgment shall be satisfied only out of (1) the proceeds of sale received upon execution of such judgment and levy thereon against the right, title and interest of Landlord in the Shopping Center; (2) the rents and other income from such property receivable by Landlord; and (3) the consideration received by Landlord for the sale or other disposition of all or any part of Landlord's right, title and interest in the Shopping Center, which consideration is deemed to include any assets at any time after such sale or disposition held by Landlord having a value not exceeding that of the proceeds of such sale or other disposition, and Landlord shall not be liable for any deficiency.

(b) Notwithstanding Subsection (a), in the event of fraud or intentional misconduct on the part of Landlord or Landlord's failure to perform any covenant or obligation of Landlord under Sections 10, 12, 14, 24, 25 or 35, the aforesaid limitation on liability is inapplicable. This Section shall not be deemed to deny to Tenant, or limit its right to obtain, injunctive relief or specific performance of Landlord's covenants under this Lease or to avail itself of any other right or remedy (not involving a personal liability of Landlord in excess of the limits of personal liability fixed by this Section) which may be accorded Tenant by Law or under this Lease by reason of Landlord's failure to perform its obligations thereunder including, but not limited to, the rights and remedies granted Tenant under Section 29.

**SECTION 37. DELIVERY OF SITE PLAN**

Within thirty (30) days after Tenant's written request therefor, Landlord must provide Tenant with a copy of the most current available site plan of the Shopping Center, which must reflect: (a) the Gross Leasable Area of the Shopping Center as actually constructed; (b) the names and location and the Gross Leasable Area of the premises occupied by the respective tenants thereof; and (c) those premises in the Shopping Center, if any, which are not then currently occupied and open for business. If Landlord fails to provide this information within the period allowed, then Tenant has the right to suspend the payment of monthly installments of Additional Rent, or Rent if there is no Additional Rent, until delivery of the information, which Additional Rent or Rent, as the case may be, shall be paid in full upon Landlord's compliance with this Section 37.

**SECTION 38. INTENTIONALLY OMITTED**

**SECTION 39. ENTIRE AGREEMENT; WRITING REQUIRED**

This Lease contains all of the agreements of the parties with respect to any matter covered or mentioned in this Lease, and no prior agreement, understanding or representation pertaining to any such matter shall be effective for any purpose. No provision of this Lease may be changed,

#2596 Birch Run Station (Maplewood, MN)

deleted, modified or amended, except by an agreement in writing signed by the parties.

## SECTION 40.  OPERATING COVENANT

Tenant shall open from the Premises within ninety (90) days after the Commencement Date and continue to operate from the Premises during Tenant's normal business hours for a period of at least sixty (60) days (the "Operation Period"), but for an assignment or subletting, damage and destruction, remodeling, eminent domain, Unavoidable Delays, or such other right as provided for under this Lease or under law or equity.  After the Operation Period, notwithstanding anything contained in this Lease, expressly or impliedly, to the contrary, and notwithstanding the agreement for the payment by Tenant of Rent (including Substitute Rent or other percentage rent), Tenant is under no duty or obligation, either expressed or implied, to open, reopen, remain open, operate, or thereafter to continually conduct business from the Premises at any time during the Term.  After the Operation Period, Tenant's failure to open, reopen, remain open, operate, or thereafter to continually conduct business from the Premises shall not in any way be deemed an event of default under this Lease, nor shall such failure otherwise entitle Landlord to begin or to maintain any action, suit or proceeding, whether in law or in equity, relating in any way to Tenant's failure to open, reopen, remain open, operate, or thereafter to continually conduct business from the Premises.

If Tenant ceases to operate its business from the Premises for one hundred twenty (120) consecutive days, but for an assignment or subletting, damage and destruction, remodeling, eminent domain, Unavoidable Delays, or such other right as provided for under this Lease or under law or equity, then Landlord has the right to terminate the Lease upon ninety (90) days' prior written notice. Tenant shall have the right, within thirty (30) days of receipt of Landlord's termination notice, to advise Landlord that Tenant shall reopen for business from the Premises. If Tenant elects to reopen for business, then it must do so within sixty (60) days of its notice to Landlord or such greater time as is reasonably necessary under the circumstances; otherwise, Tenant's notice shall be null and void.  Tenant's obligations under this Lease shall terminate as of the date of such notice and payment.

## SECTION 41.  APPLICABLE LAW AND CONSTRUCTION

The laws of the state within which the Premises are located govern the validity, performance and enforcement of this Lease without regard to its conflicts of law principles.  If one or more of the provisions of this Lease is held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect or impair any other provision of this Lease, and this Lease shall be construed as if such invalid, illegal or unenforceable provision had not been contained herein. The submission of this document for examination does not constitute an offer to lease, or a reservation of or option for the Premises, and this Lease becomes effective only upon execution and delivery thereof by both Landlord and Tenant. This Lease has been negotiated by Landlord and Tenant and shall not be deemed to have been prepared by either Landlord or Tenant, but by both equally. All prior negotiations, considerations, representations and understandings between the parties are and shall be deemed to be incorporated and merged into this Lease and shall not be construed as having survived the execution hereof so that only the provisions of this Lease shall govern the respective rights and obligations of the parties hereto to

44

#2596 Birch Run Station (Maplewood, MN)

the same effect as if all such negotiations, considerations, representations and understandings shall have never been made or given by either party to the other party hereto.

## SECTION 42.  UNAVOIDABLE DELAYS

Except as otherwise expressly provided herein, if either party is delayed or hindered in or prevented from the performance of any obligation required hereunder by Unavoidable Delay, the time for performance of such obligation shall be extended for the period of the delay, provided that Unavoidable Delay shall not excuse prompt and timely payments, including Rent, when due under this Lease except when (a) the Commencement Date is delayed by reason of Unavoidable Delay; or (b) such payment is excused pursuant to other provisions of this Lease.  However, no delay shall be excused by this Section unless (x) the delayed party notifies the other party in writing of the delay within twenty-one (21) days of the event giving rise to such delay; (y) the delayed party has exhausted all other resources available at reasonable costs to avoid such delay; and (z) the delayed party diligently pursues completion of the activity that was delayed. Notwithstanding anything to the contrary in this Lease, under no circumstances shall Unavoidable Delay extend the time for performance of any obligation by more than ninety (90) days.

## SECTION 43.  REASONABLE CONSENT

Wherever either party's consent or approval is required, such consent or approval must not be unreasonably or arbitrarily withheld or delayed, unless otherwise expressly stated.

## SECTION 44.  NO PARTNERSHIP

Landlord and Tenant acknowledge that neither of them in any way or for any purpose becomes a partner or an associate of the other in the conduct of Tenant's business, the operation of the Shopping Center or otherwise, or a joint venture, or a member of a joint enterprise with the other.  Neither party is liable for payment of the debts or performance of any obligation of the other. The relationship is and shall be that of Landlord and Tenant.

## SECTION 45.  ESTOPPEL

Within thirty (30) days after request, Tenant shall execute and deliver to Landlord a Tenant Estoppel Certificate substantially in the form of Exhibit H. Within thirty (30) days after request, Landlord shall execute and deliver to Tenant a written instrument certifying that this Lease is unmodified and in full force and effect, or if there has been any modification, that this Lease is in full force and effect as modified and stating all such modifications; specifying the dates to which Rent has been paid; stating whether there exists any default in the performance by either party under any provision of this Lease; and certifying as to such other matters as Tenant reasonably may request. With regard to any estoppel certificates related to this Lease, the Lease shall take precedence over the contents of such estoppel certificates, should a conflict arise. Landlord shall be required to pay Tenant under this Lease a non-refundable fee in the amount of One Thousand Dollars ($1,000.00) for each additional Estoppel Certificate after the first Estoppel Certificate each year and each additional SNDA after the first SNDA each year requested from and provided by Tenant to cover Tenant's administrative, legal and other costs and expenses incurred in

45

#2596 Birch Run Station (Maplewood, MN)

processing, negotiating and drafting said documents and Tenant is hereby authorized to deduct said amount from Rent next due.

## SECTION 46.  QUIET ENJOYMENT

Landlord represents and warrants to Tenant that Landlord is well seized of fee simple title to the Premises and the Shopping Center and has full power and authority to execute and deliver this Lease. Landlord covenants to Tenant that Tenant shall at all times have peaceable and quiet enjoyment and possession of the Premises and of the rights granted hereunder without any manner of hindrance from Landlord or any other person or persons if Tenant performs all the covenants and agreements to be performed on Tenant's part.

## SECTION 47.  HOLDING OVER

If, at the expiration of the Term, Tenant continues to occupy the Premises, such holding over shall not constitute a renewal of this Lease, but Tenant shall be a tenant from month to month, at the same Rent and under the same terms and conditions as in effect immediately prior to the commencement of the month to month tenancy, and either party may terminate the Lease during said month to month tenancy upon ninety (90) days' prior written notice to the other party; provided, however, Landlord shall not specify a Lease termination date during the period commencing September 1 and ending on the immediately following January 31. If Tenant does not vacate the Premises within ninety (90) days after receiving such written notice from Landlord, Fixed Minimum Rent shall increase to one hundred twenty-five percent (125%) of the Fixed Minimum Rent in effect immediately prior.

## SECTION 48.  BROKERS

Each party represents to the other party that it has not dealt with any party with regard to the Premises or this Lease, except that Mid America Group MN represents  Tenant and Arizona Partners Retail Investment Group, LLC, represents Landlord in this transaction.  Landlord shall pay Tenant's broker costs pursuant to a separate agreement between Landlord and Tenant's broker and it is agreed that if Landlord does not pay Tenant's broker, Tenant shall have the right to pay Tenant's broker for fees due and set-off said amounts against Rent due Landlord. Each party shall indemnify and hold the other party harmless from and against any loss, cost, liability and expense, including reasonable attorneys' fees, arising out of a breach of its representation in this Section.

## SECTION 49.  INTENTIONALLY DELETED

## SECTION 50.  CLAIMS LIMITATION

All actions or claims by Landlord for Rent shall be barred three years after the end of each Lease Year or Partial Lease Year. All actions or claims by Tenant for recovery of excess payments of Rent shall be barred three years after the end of each Lease Year or Partial Lease Year, except that in the case of any component of Additional Rent, the same shall not be barred until three years after Tenant's receipt of Landlord's annual reconciliation statement furnished with respect to that Lease Year or Partial Lease Year. The foregoing limitations shall not apply in the event of

46

#2596 Birch Run Station (Maplewood, MN)

fraud or willful misstatement of the amounts so stated.

## SECTION 51.  CAPTIONS

Any paragraph titles or captions contained in this Lease are for convenience only and do not define, limit or otherwise modify the scope or intent of this Lease.

## SECTION 52.  VARIATION IN PRONOUNS

All the terms and words used in this Lease, regardless of the number and gender in which they are used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context or sense of this Lease or any paragraph or clause herein may require, the same as if such words had been fully and properly written the number and gender.

## SECTION 53.  SECTION REFERENCES

All references to any section number(s) refer to the section contained in this Lease.
## SECTION 54.  BINDING EFFECT OF AGREEMENT

This Lease and all of the covenants, conditions, provisions and restrictions herein inures to the benefit of and binds the heirs, executors, administrators, devisees, legatees, personal representatives, successors and assigns, respectively, of Landlord and Tenant.

## SECTION 55.  ATTORNEYS' FEES

If Landlord or Tenant commence any action or suit under or related to this Lease, then the non-prevailing party shall pay to the prevailing party all arbitration costs (if any), fees, expenses and court costs, including reasonable attorneys' fees and expenses, incurred or paid by the prevailing party. This provision applies to court costs and attorneys' fees and expenses incurred in any trial and appellate courts.

## SECTION 56.    OFAC WARRANTY

Each party represents and warrants to the other party that the representing party (a) is not acting, directly or indirectly, for or on behalf of any person, group, entity, or nation named by any Executive Order or the U.S. Treasury Department as a terrorist, "Specially Designated National and Blocked Person," or other banned or blocked person, entity, nation, or transaction pursuant to any law, order, rule, or regulation that is enforced or administered by the Office of Foreign Assets Control; and (b) is not engaged in this lease transaction, directly or indirectly, on behalf of, or instigating or facilitating this lease transaction, directly or indirectly, on behalf of any such person, group, entity or nation. The breaching party must defend, indemnify, and hold harmless the other party from and against all claims, damages, losses, risks, liabilities, and expenses (including reasonable attorneys' fees and costs) arising from or related to any breach of the

47

#2596 Birch Run Station (Maplewood, MN)

foregoing representation.

**SECTION 57.**         **PDF/COUNTERPART SIGNATURE**

This Lease may be executed in multiple counterparts, each of which shall constitute an original and all of which taken together shall constitute one and same agreement binding upon the parties, notwithstanding that all the parties are not signatories to the same counterpart. In order to facilitate the finalization of this Lease, the parties agree that signatures transmitted by e-mail in a "PDF" or similar format may be used in place of original signatures on this Lease.  Each party intends to be bound by such party's electronic or "PDF" format signature on this Lease, is aware that the other parties are relying on such party's electronic or "PDF" format signature, and hereby waives any defenses to the enforcement of this Lease based upon the form of signature.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

48

#2596 Birch Run Station (Maplewood, MN)

In witness whereof, the parties have signed this Lease as of the Effective Date.

**Signed in the Presence of:**

_Tonalea Johnston_

_[signature]_

**LANDLORD:**
**BIRCH RUN STATION, LLC**

By: Arizona Partners Retail Investment Group,
LLC, its authorized agent

By: _[signature]_

Name: Mark Burns

Title: Member

Employer Identification Number: 86-0994272

**Signed in the Presence of:**

_Anna Rostomyan_

_[signature]_

**TENANT:**
**JO-ANN STORES, LLC**

By: _[signature]_

Scott Sekella, Executive Vice President and
Chief Financial Officer

And

By: _[signature]_

Ann Aber, Chief Legal Officer and
Secretary

49

#2596 Birch Run Station (Maplewood, MN)

STATE OF ARIZONA        )
                                     ) SS

COUNTY OF MARICOPA    )

       BEFORE ME, a Notary Public in and for said County and State, personally appeared **Birch Run Station, LLC**, an Arizona limited liability company, by Mark Burns, its Member, who did sign the foregoing instrument on behalf of the limited liability company and that the same is his/her free act and deed of the company and personally and as such authorized representative.

       IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at Scottsdale, AZ, this 26th day of October, 2023.



GINA COLOMBO
Notary Public, State of Arizona
Maricopa County
Commission # 601047
My Commission Expires
April 15, 2025

NOTARY PUBLIC

STATE OF OHIO          )
                                   ) SS

COUNTY OF SUMMIT    )

       BEFORE ME, a Notary Public in and for said County and State, personally appeared **JO-ANN STORES, LLC**, an Ohio limited liability company, by Scott Sekella, Executive Vice President and Chief Financial Officer and Ann Aber, Chief Legal Officer and Secretary, who acknowledged that they did sign the foregoing instrument on behalf of said corporation and that the same is their free act and deed personally and as such officers.

       IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at Hudson, Ohio, this 23rd day of October, 2023.

NOTARY PUBLIC

Dana R. Saporito
Attorney at Law
Notary Public, State of Ohio
My Commission Has No Expiration Date
Sec 147.03 RC

50

#2596 Birch Run Station (Maplewood, MN)

## EXHIBIT A

**Legal Description of Shopping Center**

[REMAINDER OF THE PAGE INTENTIONALLY BLANK]

Legal Description

**Parcel 1:**

All that part of the Southeast Quarter of the Northeast Quarter of Section 3, Township 29, Range 22, Ramsey County, Minnesota, described as follows:

Commencing at the Southeast corner of said Southeast Quarter of the Northeast Quarter; thence on an assumed bearing of North 89 degrees 11 minutes 39 seconds West 1319.78 feet; thence North 00 degrees 26 minutes 21 seconds West 160.00 feet along the West line of said Southeast Quarter of the Northeast Quarter to the point of beginning of the tract to be described; thence continuing on a bearing of North 00 degrees 26 minutes 21 seconds West along said West line 1154.23 feet to the North line of the South One-half of the Northeast Quarter, thence South 89 degrees 16 minutes 25 seconds East along said North line of said South One-half 859.69 feet; thence South 00 degrees 26 minutes 16 seconds East 1255.41 feet; thence North 89 degrees 11 minutes 39 seconds West 299.48 feet; thence North 00 degrees 48 minutes 21 seconds East 12.00 feet; thence North 89 degrees 11 minutes 39 seconds West 480.46 feet; thence North 24 degrees 24 minutes 27 seconds West 98.23 feet; thence South 89 degrees 33 minutes 39 seconds West 40.00 feet to the point of beginning and there terminating.

Also all of Lot 8, Block 1, Maplewood Mall Addition, Ramsey County, Minnesota.

Also all that part of Lot 7, Block 1, Maplewood Mall Addition, Ramsey County, Minnesota, lying Southwesterly and Westerly of the following described line:

Commencing at the Southeast corner of said Lot 7, thence on assumed bearing of North 00 degrees 26 minutes 16 seconds West along the Easterly line of said Lot 7 a distance of 157.58 feet; thence Northerly, Northeasterly and Easterly along the Easterly line of said Lot 7 and along a tangential curve concave to the Southeast having a central angle of 81 degrees 29 minutes 26 seconds a radius of 173.04 feet, a chord bearing of North 40 degrees 18 minutes 27 seconds East a distance of 246.11 feet to the point of beginning of the line to be described; thence South 81 degrees 03 minutes 10 seconds West 30.00 feet; thence North 53 degrees 56 minutes 50 seconds West 52.54 feet; thence North 4 degrees 37 minutes 01 seconds West 418.57 feet to a point on the North line of said Lot 7 distant 460.09 feet East of the Northwest corner thereof and there terminating.

Except for those parcels described as follows:

*Toys -R- Us Parcel:*

All that part of the Southeast Quarter of the Northeast Quarter of Section 3, Township 29, Range 22, Ramsey County, Minnesota, described as follows:

Commencing at the Northwest corner of said Southeast Quarter of the Northeast Quarter; thence on an assumed bearing of South 00 degrees 26 minutes 21 seconds East 921.54 feet along the

Westerly line of said Southeast Quarter of the Northeast Quarter; thence South 89 degrees 16 minutes 25 seconds East 75.37 feet to the point of beginning of the parcel to be described; thence South 89 degrees 16 minutes 25 seconds East 214.00 feet; thence South 00 degrees 43 minutes 35 seconds West 7.00 feet; thence South 89 degrees 16 minutes 25 seconds East 350.00 feet; thence North 00 degrees 43 minutes 35 seconds East 116.00 feet; thence North 89 degrees 16 minutes 25 seconds West 533.00 feet; thence North 00 degrees 43 minutes 35 seconds East 82.00 feet; thence North 89 degrees 16 minutes 25 seconds West 31.00 feet; thence South 00 degrees 43 minutes 35 seconds West 191.00 feet to the point of beginning and there terminating.

### *Olive Garden Parcel:*

All that part of the Southeast Quarter of the Northeast Quarter of Section 3, Township 29, Range 22 and also all that part of Lots 7 and 8, Block 1, Maplewood Mall Addition all in Ramsey County, Minnesota, described as follows:

Commencing at the Northwest corner of said Southeast Quarter of the Northeast Quarter of said Section 3; thence Easterly on an assumed bearing of South 89 degrees 16 minutes 25 seconds East along the North line of said Southeast Quarter of the Northeast Quarter a distance of 987.04 feet; thence deflecting right 90 degrees 00 minutes 00 seconds on a bearing of South 00 degrees 43 minutes 35 seconds West a distance of 871.29 feet to the point of beginning of the parcel to be described; thence on a bearing of South 89 degrees 16 minutes 25 seconds East 300.42 feet to a point on the Easterly line of said Lot 8, Block 1, Maplewood Mall Addition; thence South 00 degrees 26 minutes 16 seconds East 285.22 feet along the Easterly line of Lot 8, thence South 40 degrees 13 minutes 50 seconds West 98.74 feet to the Southeast corner of Lot 8; thence North 89 degrees 11 minutes 39 seconds West 243.40 feet; thence North 00 degrees 43 minutes 35 seconds East 361.01 feet to the point of beginning and there terminating.

### *City of Maplewood Parcel:*

That part of Lot 7, Block 1, Maplewood Mall Addition described as follows:

Beginning at the Southeast corner of said Lot 7, Block 1, Maplewood Mall Addition; thence South 90 degrees 00 minutes 00 seconds West (assumed bearing), 1.98 feet along the Southerly line of said Lot 7; thence North 00 degrees 00 minutes 00 seconds East, 63.89 feet; thence Northwesterly 169.26 feet along the arc of a tangential curve concave to the Southwest having a central angle of 07 degrees 00 minutes 00 seconds and a radius of 1385.39 feet, the long chord of which bears North 03 degrees 30 minutes 00 seconds West, 169.15 feet; thence North 07 degrees 00 minutes 00 seconds West, 95.56 feet; thence Northwesterly 180.74 feet along the arc of a tangential curve concave to the Northeast having a central angle of 07 degrees 00 minutes 00 seconds and a radius of 1479.39 feet, the long chord of which bears North 03 degrees 30 minutes 00 seconds West 180.63 feet; thence North 01 degrees 25 minutes 56 seconds East, 266.66 feet to a point on the Northerly line of said Lot 7, Block 1; thence South 89 degrees 16 minutes 25 seconds East to the Southwest corner of Lot 6, Block 1, Maplewood Mall Addition; thence South 04 degrees 37 minutes 01 seconds East, 418.57 feet; thence South 53 degrees 56 minutes 50 seconds East, 52.54 feet; thence North 81 degrees 03 minutes 10 seconds East, 30.00 feet; thence Southwesterly along

the arc of a tangential curve concave to the Southeast having a central angle of 81 degrees 29 minutes 26 seconds, a radius of 173.04 feet, a distance of 246.11 feet; thence South 00 degrees 26 minutes, 16 seconds East, along the East line of said Lot 7,157.58 feet to the Southeast corner of Lot 7, being the point of beginning, and there terminating.

*McDonald's Parcel:*

That part of Lots 7 and 8, Block 1, Maplewood Mall Addition, according to the plat of record thereof, Ramsey County, Minnesota, described as follows:

Commencing at the Southeast corner of said Lot 7; thence South 89 degrees 33 minutes 44 seconds West, assumed bearing, along the South line of said Lot 7, a distance of 1.98 feet to the actual point of beginning; thence North 00 degrees 26 minutes 16 seconds West, a distance of 63.89 feet; thence Northerly along a tangential curve concave to the West having a central angle of 2 degrees 54 minutes 39 seconds and a radius of 1385.39 feet for an arc distance of 70.38 feet; thence North 89 degrees 16 minutes 25 seconds West, not tangent to said curve, a distance of 201.15 feet; thence South 00 degrees 47 minutes 19 seconds West, a distance of 231.69 feet to the North line of a parcel described in Document No. 2513246; thence South 89 degrees 16 minutes 25 seconds East along said North line, a distance of 204.87 feet to the East line of said Lot 8; thence North 00 degrees 26 minutes 16 seconds West along said East line, a distance of 97.48 feet to said South line of said Lot 7, thence North 89 degrees 33 minutes 44 seconds East, along said South line, a distance of 3.02 feet to the point of beginning.

*Den-Way, Inc's Parcel:*

All that part of the Southeast Quarter of the Northeast Quarter of Section 3, Township 29, Range 22, and also all that part of Lot 8, Block 1, Maplewood Mall Addition, all in Ramsey County Minnesota, described as follows:

Commencing at the Northwest corner of said Southeast Quarter of the Northeast Quarter of said Section 3; thence Easterly on an assumed bearing of South 89 degrees 16 minutes 25 seconds East along the North line of said Southeast Quarter of the Northeast Quarter a distance of 987.04 feet; thence deflecting right 90 degrees 00 minutes 00 seconds on a bearing of South 00 degrees 43 minutes 35 seconds West a distance of 950.27 feet to the point of beginning of the parcel to be described; thence continuing on a bearing of South 00 degrees 43 minutes 35 seconds West a distance of 282.02 feet to the South line of said Lot 8; thence North 89 degrees 11 minutes 39 seconds West a distance of 102.33 feet to the Southwest corner of said Lot 8; thence South 0 degrees 26 minutes 16 seconds East a distance of 23.01 feet; thence North 89 degrees 11 minutes 39 seconds West a distance of 196.59 feet; thence North 0 degrees 44 minutes 18 seconds East a distance of 267.48 feet; thence South 89 degrees 28 minutes 25 seconds East a distance of 135.64 feet; thence South 89 degrees 01 minutes 07 seconds East a distance of 91.00 feet; thence Northeasterly 37.62 feet along the arc of a tangential curve concave to the North having a central angle of 35 degrees 38 minutes 02 seconds and a radius of 60.49 feet; thence North 55 degrees 20 minutes 50 seconds East tangent to said curve a distance of 44.72 feet to the point of beginning and there terminating.

*KTJ 69 Parcel:*

That part of Lots 7 and 8, Block 1, Maplewood Mall Addition, according to the recorded plat thereof and the Southeast Quarter of the Northeast Quarter of Section 3, Township 29, Range 22, Ramsey County, Minnesota, described as commencing at the southeast corner of said Lot 7; thence South 89 degrees 33 minutes 44 seconds West, assumed bearing, along the south line of said Lot 7, a distance of 1.98 feet; thence North 0 degrees 26 minutes, 16 seconds West a distance of 63.89 feet; thence northerly a distance of 70.38 feet along a tangential curve concave to the west having a central angle of 2 degrees 54 minutes 39 seconds and a radius of 1385.39 feet; thence North 89 degrees 16 minutes 25 seconds West, not tangent to said curve, a distance of 201.15 feet to the point of beginning of the land to be described; thence continuing North 89 degrees 16 minutes 25 seconds West a distance of 298.32 feet; thence South 77 degrees 32 minutes 21 seconds West a distance of 98.40 feet; thence South 0 degrees 44 minutes 18 seconds West a distance of 325.37 feet; thence South 89 degrees 28 minutes 25 seconds East a distance of 135.64 feet; thence South 89 degrees 01 minutes 07 seconds East a distance of 91.00 feet; thence Northeasterly a distance of 37.63 feet along a tangential curve, concave to the North and having a radius of 60.50 feet and a central angle of 35 degrees 38 minutes 03 seconds; thence North 55 degrees 20 minutes 50 seconds East, tangent to said curve a distance of 44.71 feet to the Southerly extension of Line "A" described below; thence North 0 degrees 43 minutes 35 seconds East along said Southerly extension of Line "A" a distance of 78.99 feet to the termination point of said Line "A"; thence South 89 degrees 16 minutes 25 seconds East a distance of 95.55 feet to the intersection with a line drawn South 0 degrees 47 minutes 19 seconds West from the point of beginning; thence North 0 degrees 47 minutes 19 seconds East a distance of 231.69 feet to the point of beginning.

Line "A" is described as commencing at the Northwest corner of said Southeast Quarter of the Northeast Quarter of said Section 3; thence Easterly on an assumed bearing of South 89 degrees 16 minutes 25 seconds East along the North line of said Southeast Quarter of the Northeast Quarter a distance of 987.04 feet to the point of beginning of said Line "A"; thence deflecting right 90 degrees 00 minutes 00 seconds on a bearing of South 00 degrees 43 minutes 35 seconds West a distance of 871.29 feet and said Line "A" there terminating.

Together with the benefits of easements contained in Roadway Easement Grant dated December 31, 1986, filed January 5, 1987, as Document No. 2354005.

Together with the benefits of easements contained in Roadway Easement Grant dated June 6, 1986, filed April 8, 1987, as Document No. 2372913.

Together with the benefits of easements contained in Declaration filed as Document No. 2513245, as amended by First Amendment to Declaration filed as Document No. 2585793, .as further amended by Document No. 2807611, and Document No. 3385113.

Together with the benefits of easements created by Reciprocal Easement Agreement filed as Document No. 2529217, as amended by Documents No. 2807610, 3085863 and 3385114.

Together with the benefits of easements created by Utility Easements and Expanded Usage Agreement filed January 5 , 1987, as Document No. 2354006.

Together with the appurtenant rights and restrictions contained in Declaration Document No. 2807612 (as to Outlet 3 defined therein.)

Together with the appurtenant rights and restrictions contained in Declaration Document No. 3320371 (as to Outlets 1 and 2 defined therein.)

Ramsey County, Minnesota Abstract Property

**Parcel 2:**

All that part of the Southeast Quarter of the Northeast Quarter of Section 3, Township 29, Range 22, Ramsey County, Minnesota, described as follows:

Commencing at the Northwest corner of said Southeast Quarter of the Northeast Quarter, thence on an assumed bearing of South 00 degrees 26 minutes 21 seconds East 921.54 feet along the Westerly line of said Southeast Quarter of the Northeast Quarter; thence South 89 degrees 16 minutes 25 seconds East 75.37 feet to the point of beginning of the parcel to be described; thence South 89 degrees 16 minutes 25 seconds East 214.00 feet; thence South 00 degrees 43 minutes 35 seconds West 7.00 feet; thence South 89 degrees 16 minutes 25 seconds East 350.00 feet; thence North 00 degrees 43 minutes 35 seconds East 116.00 feet; thence North 89 degrees 16 minutes 25 seconds West 533.00 feet; thence North 00 degrees 43 minutes 35 seconds East 82.00 feet; thence North 89 degrees 16 minutes 25 seconds West 31.00 feet; thence South 00 degrees 43 minutes 35 seconds West 191.00 feet to the point of beginning and there terminating.

**Parcel 3:**

Together with the benefits of easements contained in Declaration filed as Document No. 2513245, as amended by First Amendment to Declaration filed as Document No. 2585793, as further amended by Document No. 2807611 and Document No. 3385113.

Together with the benefits of easements created by Reciprocal Easement Agreement filed as Document No. 2529217, as amended by Documents No. 2807610, 3085863, 3385114 and 3926279. Ramsey County, Minnesota Abstract Property.

Exhibit B

**Site Plan**



Exhibit B

Exhibit C

[INTENTIONALLY DELETED]

Exhibit C

Exhibit D

[INTENTIONALLY DELETED]

<u>Exhibit D-1</u>

**Tenant's Signage Plans**

[REMAINDER OF THE PAGE INTENTIONALLY BLANK]

Exhibit D-1

**Beam Ave Monument Sign**



09/22/2023

Birch Run Station
Maplewood, MN



08/29/2022



# Birch Run Station

| Sign A | 42" Joann \| 16 1/4" Tagline |
|---|---|
| Sign Type: | Individual Channel Letters on Raceway |
| Illumination | Internally Illuminated w/ LEDs |
| Square Footage | 117.41 |
| To Grade: | Top of Sign to Grade = 20'-1 1/4"<br>Bottom of Sign to Grade = 13'-11 1/2" |





| | | Client: Joann | | | | | |
| | | Site #: JO-2596 | | | | | |
| | | Address: 1739 Beam Avenue | | | | | |
| | | Maplewood, MN 55109 | | | | | |
| | | Birch Run Station | | | | | |

| | 06/06/2023 | Original Renderings | AB |
|---|---|---|---|
| | 06/12/2023 | Added banners | AB |

This rendering is the property of Anchor Sign, Inc. It is for the exclusive use of Anchor Sign, Inc. and the party which requested the rendering. It is an unpublished original drawing not to be distributed, reproduced or exhibited without the consent of Anchor Sign, Inc. Please contact your account manager with questions regarding this statement

AnchorSign
1.800.213.3331

| Sign A | 42" Joann | 16 1/4" Tagline |
|---|---|
| Sign Type: | Individual Channel Letters on Raceway |
| Illumination: | Internally Illuminated w/ LEDs |
| Square Footage: | 117.41 |
| To Grade: | Top of Sign to Grade = 20'-1 1/4"<br>Bottom of Sign to Grade = 13'-11 1/2" |



**Existing**



**Front Elevation (East)**
Scale: 3/32" = 1'-0"

| Allowable Square Footage: | 124.00 |
|---|---|
| Formula: 124 square foot per MSP. | |
| Actual Square Footage this Elevation: | 117.41 |



| Client: | Joann |
|---|---|
| Site #: | JO-2596 |
| Address: | 1739 Beam Avenue |
| | Maplewood, MN 55109 |
| | Birch Run Station |

| | 06/06/2023 | Original Renderings | AB |
|---|---|---|---|
| | 06/12/2023 | Added banners | AB |

This rendering is the property of Anchor Sign, Inc. It is for the exclusive use of Anchor Sign, Inc. and the entity which requested the rendering. It is an unpublished original drawing not to be distributed, reproduced or exhibited without the consent of Anchor Sign, Inc. Please contact your account manager with questions regarding this statement.



| Sign A | 42" Joann | 16 1/4" Tagline |
|---|---|
| Sign Type: | Individual Channel Letters on Raceway |
| Illumination: | Internally Illuminated w/ LEDs |
| Square Footage: | 117.41 |
| To Grade: | Top of Sign to Grade = 20'-1 1/4" Bottom of Sign to Grade = 13'-11 1/2" |

19'-1 1/4" [229 1/4"]

13'-5 1/2" [161 1/2"]

42"

73 3/4"

68"

16 1/4"



## Sign Layout Detail
Scale: 3/8" = 1'-0"

5"     4 1/2"



¼" Drain holes at bottom of letter cans (2) per letter

## Section @ LED Channel Letter
Raceway (Center)                Scale: N.T.S.

### Electrical Detail:

White LEDs
(X) 60w Transformer [PLPS 12-60] @ 1.1 Amps
    Total Amps: X.X
(1) 20 amp 120V Circuit Req.            (UL) LISTED

### General Notes:

This sign is to be installed in accordance with
the requirements of Article 600 of the National
Electrical Code.

1) Grounded and bonded per NEC 600.7/NEC 250
2) Existing branch circuit in compliance with
   NEC 600.5, not to exceed 20 amps
3) Sign is to be UL listed per NEC 600.3
4) UL disconnect switch per NEC 600.6- required per
   sign component before leaving manufacturer*
   *For multiple signs, a disconnect is permitted but
   not required for each section

### Specifications: Channel Letters

1. Existing Facade: TBD
2. .040" Aluminum letter returns pre-painted white. 5" for Joann, 3" for tagline
3. 1"Jewelite trimcap (ptm PMS #376 Green) bonded to face, #8 pan head screws to returns.
   Note: 2" trimcaps for letters 54" and larger
4. 0.063" pre-finished white aluminum backs fastened to returns. Seal w/
   VOC compliant 360 white latex caulk to prevent moisture penetration.
   (interior of sign can painted white for maximum illumination)
5. White LEDs
6. 3/16" #7328 White Acrylic faces
7. Disconnect switch UL Outdoor rated toggle type w/ neoprene boot per NEC 600-6
8. Primary electrical feed in UL conduit / customer supplied UL junction box
9. Transformers within UL enclosure (removable lid), 1/4" x 1" min screws
10. Low profile extruded aluminum raceway (7" x 4 1/2") w/ watertight cover.
    Painted to match PMS #376 Green if on green painted façade.
11. 15" x 2" x 0.1875" Aluminum mounting tabs welded to raceway - Maximum 6" from
    each end and every 48" o.c.
12. #12 x 1" TEC screws with 1 1/4" fender washers
13. Mounting hardware to suit



| | Client: | Joann |
|---|---|---|
| | Site #: | JO-2596 |
| | Address: | 1739 Beam Avenue |
| | | Maplewood, MN 55109 |
| | | Birch Run Station |

| REVISION INFO | 06/06/2023 | Original Renderings | AB |
|---|---|---|---|
| | 08/12/2023 | Added banners | AB |



AnchorSign
1.800.213.3331

| Vinyl A | Joann |
|---|---|
| Type: | Door Graphics |
| Size: | 12" x 18" |
| Square Footage: | 1.50 |



## Sign Detail
Scale: 3" = 1'-0"

**QTY 1**
**1.50 SqFt**

### Specifications:

1. New .063 aluminum painted white
2. Digitally printed graphics, to match
   ■ PMS 376C Green, 3M #3630-106 Brilliant Green
3. Mounted w/ VHB tape & silicone

To be installed on exterior of each man door with buzzer.
If no man door & buzzer is next to roll up door - install
sign on door with buzzer at 70" above grade to c/l of sign



## Proposed Sign Location
Scale: 3/4" = 1'-0"



| Client: | Joann | | 06/06/2023 | Original Renderings | AB |
|---|---|---|---|---|---|
| Site #: | JO-2596 | | 06/12/2023 | Added banners | AB |
| Address: | 1739 Beam Avenue | | | | |
| | Maplewood, MN 55109 | | | | |
| | Birch Run Station | | | | |





| Vinyl B | Joann |
|---|---|
| Type: | Door Graphics |
| Size: | 10" x 30" |
| Square Footage: | 1.50 |



## Sign Detail
Scale: 3" = 1'-0"

**QTY 1**
**2.08 SqFt**

### Specifications:
1. New .063 aluminum painted white
2. Digitally printed graphics, to match
   ■ PMS 376C Green, 3M #3630-106 Brilliant Green
3. Mounted w/ VHB tape & silicone

To be installed on exterior of each steel man door
at 64" above grade to top of sign



## Proposed Sign Location
Scale: 3/4" = 1'-0"



| | Client: | Joann |
|---|---|---|
| | Site #: | JO-2596 |
| | Address: | 1739 Beam Avenue |
| | | Maplewood, MN 55109 |
| | | Birch Run Station |

| | | | |
|---|---|---|---|
| 06/06/2023 | Original Renderings | | AB |
| 06/12/2023 | Added banners | | AB |





The rendering is the property of Anchor Sign, Inc. It is for the exclusive use of Anchor Sign, Inc. and this party which requested the rendering. It is not to be reproduced or original drawing not to be distributed, reproduced, or exhibited without the consent of Anchor Sign, Inc. Please contact your account manager with questions regarding this statement.

| Banner A | Joann |
|---|---|
| Type: | S/F Banner w/ Applied Digital Graphics |
| Size: | 60" x 168" |
| Square Footage: | 70.00 |

**To supply 100 feet, 3/8" thick rope w/ wire**



168"

1" Hem top & bottom for rope channel
& grommets along top & bottom edge min. 24" on centers

12oz. mesh banner material - 85% material & 15% holes

60"

**70 SqFt S/F Banner Layout Detail**
Scale: 1/2" = 1'-0"

QTY: 1



| | | REVISION INFO | 06/06/2023 | Original Renderings | AB |
| | | | 06/12/2023 | Added banners | AB |

Client: Joann
Site #: JO-2596
Address: 1739 Beam Avenue
Maplewood, MN 55109
Birch Run Station

| Banner B | Joann |
|---|---|
| Type: | D/F Banner w/ Applied Digital Graphics |
| Size: | 60" x 168" |
| Square Footage: | 70.00 |

**To supply 100 feet, 3/8" thick rope w/ wire**

168"

60"

1" Hem top & bottom for rope channel
& grommets along top & bottom edge min. 24" on centers

12oz. mesh banner material - 85% material & 15% holes

# GRAND OPENING

Side A

60"

# WE'RE OPEN!

Side B

QTY: 1

**70 SqFt D/F Banner Layout Detail**
Scale: 1/2" = 1'-0"



| Client: | Joann |
|---|---|
| Site #: | JO-2596 |
| Address: | 1739 Beam Avenue |
| | Maplewood, MN 55109 |
| | Birch Run Station |

| | 06/06/2023 | Original Renderings | AB |
|---|---|---|---|
| | 06/12/2023 | Added banners | AB |

This rendering is the property of Anchor Sign, Inc. It is for the exclusive use of Anchor Sign, Inc. and the party which requested the rendering. It is an unpublished original drawing not to be distributed, reproduced or exhibited without the consent of Anchor Sign, Inc. Please contact your account manager with questions regarding this statement.



1.800.213.3331

| Banner C | Joann |
|---|---|
| Type: | Window Banner w/ Digital Graphics |
| Size: | 32" x 32" \| 28" x 28" |
| Square Footage: | 7.11 \| 5.44 |



Size Option A



13oz. banner material w/ 1" sewn hem & brass grommets on all (4) four corners; All corners to be reinforced

Mounted with suction cups in windows

Size Option B

### Window Banner Layout Detail    QTY: 1

Scale:  1" = 1'-0"

| | Client: | Joann | | 06/06/2023 | Original Renderings | AB |
|---|---|---|---|---|---|---|
| | Site #: | JO-2596 | | 06/12/2023 | Added banners | AB |
| | Address: | 1739 Beam Avenue | | | | |
| | | Maplewood, MN 55109 | | | | |
| | | Birch Run Station | | | | |

This rendering is the property of Anchor Sign, Inc. It is for the exclusive use of Anchor Sign, Inc. and the party which requested the rendering. It is an unpublished original drawing not to be distributed, reproduced or exhibited without the consent of Anchor Sign, Inc. Please contact your account manager with questions regarding this statement.



Exhibit E

[INTENTIONALLY DELETED]

Exhibit E

Exhibit F

**Restricted Uses of Other Tenants**

[REMAINDER OF THE PAGE INTENTIONALLY BLANK]

Exhibit F

## EXCLUSIVE USES

### AMERICA'S BEST CONTACTS & EYEGLASSES is Section 1.16 A

1.16.A. Exclusive Use: With the exception of those tenants currently existing in the Shopping Center who have the right to provide such services as of the date of this Lease, Landlord shall not, during the term of this Lease, lease any space in the Shopping Center to a tenant whose primary business is the retail sale of eyeglasses and contact lenses. This exclusive use does not apply to any existing tenants; provided, however,

notwithstansing the foregoing, to the extent Landlord has contractual consent or approval rights to assignments or sublets by existing tenants, Landlord shall not consent to an existing tenant assigning or subletting its lease to a tenant whose primary business is the retail sale of eyeglasses and contact lenses. This exclusive use does not apply to any existing tenants or any tenants over 10,000 square feet within the Shopping Center. In the event Tenant ceases to conduct the Permitted Use in the Premises for any reason other than casualty or, condemnation, force majeure, assignment and subletting for the Permitted Use, damage to the Premises or temporarily due to remodel of the Premises, the exclusive use granted to Tenant in this Section 1.16.A shall automatically be suspended until such time as Tenant resumes operations of the Premitted Use from the Premises.

### HOME CHOICE is Section 7 B.

B. Landlord agrees no other portion of the Shopping Center or any other land owned by Landlord adjacent to the Shopping Center, including any outparcels, shall be used or occupied for the operation of a furniture, electronic, specialty home theater or appliance business under 10,000 square feet (excluding cell phone and photography stores). If Landlord violates this provision, Tenant, in

### LAKESHORE LEARNING is Section 6.00

not conflict with any other trade name then in effect for the Shopping Center. Provided Tenant is not in default or has not gone dark, Landlord agrees not to lease space or to approve any assignment or subletting to any future tenant whose primary business is the sale of toys (primary use is defined as no more than 10% of a future tenant's store floor area); nor shall Landlord lease space to a future tenant for the retail sale of children's educational toys and/or other educational materials. This section shall not apply to existing tenants.

### MIRACLE EAR is Section 6

suitable for the uses permitted herein. Provided that Tenant is not then in default hereunder and further provided that Tenant has continually operated (and continues to operate) its business for the Permitted Use, Landlord agrees that, from the mutual execution of this Lease through the end of the Term, Landlord will not execute a lease for space in the Shopping Center with any person or entity whose primary business, which shall be defined as more than 15% of total sales, is the selling of hearing aids and related services ("Tenant's Exclusive Use"). Tenant's Exclusive Use (a) shall not apply to the uses of any current tenants or occupants of the Shopping Center and their successors, subtenants and assigns existing as of the mutual execution of this Lease and to any tenant occupying 10,000 or more square feet

### OCTAPHARMA PLASMA is Section 1.16 A

1.16.A. Exclusive Use: With the exception of those tenants currently existing in the Shopping Center who have the right to provide such services as of the date of this Lease, Landlord shall not, during the Term of this Lease, lease any space in the Shopping Center to a tenant to operate a blood plasma donation center, and Landlord will at no time during the Lease Term provide Landlord's consent to allow a tenant or occupant of the Shopping Center to operate a blood plasma collection center in the Shopping Center, except for any existing leases where Landlord does not have the right to prohibit such tenant or occupant from doing so. In

DOLLAR TREE is Section A 13 a and c.

a.  Exclusive Use. As long is Tenant is open and operating in the Premises and not in default beyond any applicable notice and cure periods, commencing as of the effective date of the Existing Lease and continuing throughout the Lease Term (including all renewals and extensions of this Lease), Tenant has and shall continue to have the exclusive right to operate a single price point variety retail store in the Shopping Center ("Exclusive" or "Exclusive Use"). Landlord shall not lease, rent, occupy or permit any other premises in the Shopping Center to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant, whose "principal business" (hereinafter defined) is the operation of a single price point variety retail store.

c.  For the purpose of Sections A.13.a and A.13.b hereof, "principal business" shall be defined as selling such merchandise in twenty-five percent (25%) or more of the sales floor area (including one-half [1/2] of the adjacent aisle space).

Notwithstanding the foregoing, this Section A.13 shall not apply to any current occupant or tenant of the Shopping Center whose use would not have resulted in a breach of the Existing Lease prior to the Effective Date; provided, however, in the event Landlord's consent is required for a change in permitted use or trade name, or Landlord has the ability to challenge a change of permitted use or trade name, or in the event Landlord re-leases the space occupied by such occupant or tenant, then Landlord shall not consent to a change of any tenant's use or trade name which would violate the Exclusive Use or Restricted Uses, and Landlord shall take affirmative action to protect Tenant's Exclusive Use and Restricted Uses so that no violation of the Exclusive Use or Restricted Uses shall occur.

SALLY BEAUTY SUPPLY LLC is Section 6.00

Landlord shall not enter into any leases for space in the Retail Development with tenants whose primary business is the sale of beauty supplies; provided, however, that nothing contained herein shall be deemed to apply to major or anchor tenants (being those tenants with premises in excess of 10,000 square feet) or prohibit or prevent Landlord from renewing or extending the leases of presently existing tenants of the Retail Development on substantially the same terms and conditions, and nothing contained herein shall be deemed to impose any liability upon the Landlord if any presently existing tenant of the Retail Development begins operations which compete with Tenant's business, provided, the lease of such pre-existing tenant allows such operation.

FIVE BELOW is Section 7.3

7.3   As of the date hereof and during the Term of this Lease, Landlord shall not lease, rent, occupy or permit to be occupied or used, any space in the Shopping Center primarily for the sale of variety and general merchandise which are specifically advertised at price points that are primarily Ten Dollars ($10.00) and less (the "Exclusive Items"). For purposes hereof, a store shall be deemed to be operating for such purpose if it uses more than fifteen percent (15%) of the sales space within its premises for the sale of Exclusive Items. If a store opens or operates in the

**FIVE BELOW CONTINUED:**

~~to expiration of such 12 month period is deemed an election pursuant to subparagraph ()~~ preceding sentence. The provisions of this Section shall not be construed to prohibit (i) any premises of 20,000 square feet or more, (ii) Ross Dress for Less or its permitted successors and assigns; (iii) a retailer of one (1) principal category of merchandise that devotes at least

seventy-five percent (75%) of its sales floor area to the sale of one (1) principal category of merchandise such as an electronics store, sporting goods store, office supply store, stationary store, book store, toy store, clothing store, video rental store, or health and beauty aids store; or (iv) any existing tenant (or their successors or assigns) situated within the Shopping Center which has, as of the Effective Date, the right to handle and sell such items, from handling and selling

**SHOE SHOW – Article 1:**

Landlord shall not enter into a lease with an entity in the Shopping Center whose Primary Use is the retail sale of shoes ("Exclusive Use"). Provided, however, the Exclusive Use shall not apply to: (i) any tenants existing ("Existing Tenants) as of the date of this Lease as shown on the attached Exhibit A (including any of their successors, assignees or replacements); (ii) an entity occupying Twenty Thousand (20,000) square feet or more of Floor Area and whose use is not the Primary Use; provided, however, that any such entity shall not have more than twenty percent (20%) of its gross leaseable area dedicated to the sale of shoes; and (iii) no more than one (1) single branded shoe store.

**ROSS:**

(a)       Without the prior written consent of Tenant, which consent may be withheld in the absolute and sole discretion of Tenant, no tenant or occupant of Landlord's Parcel (other than Tenant) may use, and Landlord, if it has the capacity to do so, shall not permit any other tenant or occupant of Landlord's Parcel to use its premises for the Off Price Sale (as hereinafter defined) of merchandise, (except for discount department stores in excess of forty-four thousand nine hundred (44,900) square feet of Leasable Floor Area). For purposes of this Section 15.3, "Off Price Sale" shall mean the retail sale of merchandise on an everyday basis at prices reduced from those charged by full price retailers, such as full price department stores; provided, however, this definition shall not prohibit sales events by a retailer at a price discounted from that retailer's everyday price. (As of the Effective Date, examples of Off Price Sale retailers include such retailers as T.J. Maxx, Marshalls, HomeGoods, Sierra, Homesense, Fallas Paredes, Nordstrom Rack, Factory 2U, Burlington, Macy's Backstage, Burkes Outlet, Gabe's and Bealls Outlet).

(b)       The restrictions set forth in Section 15.3(a) above shall not apply to one (1) of either a HomeGoods store or a Sierra store.

(c)       The restrictions set forth in Section 15.3(a) above shall not apply to the following tenants: Big Lots, Five Below, Maurices, DSW, Rack Room Shoes, Bath & Body Works, ACE Hardware, Rainbow, Sportsman's Warehouse or Shoe Dept.

(d)       The restrictions set forth in Section 15.3(a) above shall not apply to Off Price Sale retailers selling primarily (or primarily a combination of) any of the following: furniture, electronics and technology, beauty and personal care, sporting and fitness goods, jewelry and accessories, appliances, music and instruments, maternity and baby products, flooring, home improvements, mattresses, outdoor and adventure gear, office supplies, hardware, books, lighting, gifts and cards, shoes, vitamins, fabrics, hobby supplies, bridal stores, toys and games, or outdoor spas.

(e)       The restrictions set forth in Section 15.3(a) above shall not apply to Tenant and one (1) other business using its premises as an Off Price Sale retailer anywhere on Landlord's Parcel, including, but not limited to, the replacement of a premises currently occupied by a Co-Tenant Off Price retailer. The exception set forth in this Section 15.3(e) includes any of the retailers named in Section 15.3(a).

Except for those Exclusive Uses specifically set forth in **Exhibit H**, neither Tenant nor any Related Entity nor any of its subtenants, licensees, assignees, or other Transferees, or the use of the Store shall be subject to any exclusives or restrictions granted to or for the benefit of any other tenants or occupants in Landlord's Parcel. Except for those Exclusive Uses specifically set forth in

**OLIVE GARDEN – Restrictive Covenant dated 9/18/1989:**

·· ᴄᴜᴄ use of the

NOW, THEREFORE, in consideration of the above premises, Seller does hereby declare, create and establish the following Restrictive Covenant:

Seller shall not enter into a lease for any portion of the Shopping Center with a tenant for the operation of a food service establishment featuring or specializing in the sale, at retail, of Italian food in a manner similar to Purchaser. Featuring or specializing, for the purpose of this provision, shall mean that such items, as aforedescribed, shall be identifiable as major menu items in terms of sales volume or public identification. The aforesaid restriction shall not apply if Purchaser is no longer operation on the premises as a food service establishment featuring or specializing in the

sale, at retail, of Italian food. The aforesaid restriction shall not be applicable to any food service establishment or to any purveyor of unprepared foods intended for future, off-premises consumption. This covenant may not be waived without Purchaser's express written consent.

**MCDONALDS – Declaration of Covenants, Maintenance and Use Agreement is Section 7 D:**

~~restriction in Paragraph B no longer applies).~~

franchise chain. In addition, Developer further agrees that, so long as Outlot 3 is used as a McDonald's restaurant, neither Outlot 2 nor any future Outlot not identified herein shall be used for the purposes of a fast food restaurant facility which serves as its primary food product any of the following products:

Hamburgers or any other type of beef products served in sandwich form

and is generally deemed as being "fast food" and has a drive-through window for food service.

Any food service establishment which offers as the primary method of service, for all meal times, food and drink orders taken by and served by a waiter or waitress at the customer's table is excluded from the term "fast food restaurant."

In addition, and not by way of example, the following food service establishments operating under the listed trade names, or operating under any successor trade names are prohibited within Outlot 2, so long as the primary food product of these establishments is hamburgers or other types of beef products served in sandwich form:

| | |
|---|---|
| Arby's | In and Out Burgers |
| Burger Chef | Jack-in-the-Box |
| Burger King | Rally's |
| Carl's Jr. | Rax |
| Carrow's | Roy Rogers |
| Hot and Now | Wendy's |
| Hardee's | White Castle |

Exhibit F-1

**Declaration of Easements and Restrictions**

[ATTACHED SEPARATELY]

Exhibit F

Exhibit G

## Form of Subordination, Non-Disturbance and Attornment Agreement

**When recorded, return to:**

Jo-Ann Stores, LLC
Attn: Anna Rostomyan
5555 Darrow Road
Hudson, OH 44236

This **instrument was prepared by:**

Dana R. Saporito
Jo-Ann Stores, LLC
5555 Darrow Road
Hudson, OH 44236

_____ SPACE ABOVE THIS LINE FOR RECORDER'S USE
**SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT**

This Subordination, Non-Disturbance and Attornment Agreement (the "Agreement") is made as of _____, 20__, by **[LENDER]** ("Lender"), **[LANDLORD]** ("Landlord"), and **Jo-Ann Stores, LLC**, an Ohio limited liability company ("Tenant").

Reference is made to a loan (the "Mortgage") from Lender to Landlord, dated _____, and recorded on _____, as instrument number _____, in _____, _____ County, [State].

Reference is made to a lease dated _____, _____ [and all subsequent amendments and modifications] by and between Tenant and Landlord (the "Lease") of certain premises situated within the property known as [Shopping Center] located in [City], [ST], and as legally described on Exhibit A attached hereto and incorporated by reference herein and covered by said Mortgage.

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and in consideration of the mutual promises contained herein, the parties agree as follows:

Lender consents to the Lease and the provisions thereof.

Subject to the terms hereof, the Lease is and shall be subject and subordinate at all times to the lien of the Mortgage and to all renewals and extensions of the Mortgage ("Amendments") to the full extent of all amounts secured thereby and interest thereon, provided that such Amendments do not expand Tenant's obligations or limit Tenant's rights under the Lease (except as agreed to in this Agreement).

If the holder of the Mortgage, or any person claiming under the holder (whether by a foreclosure, deed in lieu of foreclosure, or otherwise), succeeds to the interest of Landlord in the Lease, then Tenant shall recognize and attorn to the holder, or such other person, as its landlord under the Lease.

In the event of foreclosure or other right asserted under the Mortgage by the holder thereof, the Lease and all of the rights of Tenant thereunder shall continue in full force and effect and shall not be

Exhibit G

terminated or disturbed (whether by a foreclosure, deed in lieu of foreclosure, or otherwise), except in the case of a material default by Tenant under the Lease continuing after notice to Tenant and beyond any applicable notice and cure period, and otherwise in accordance with the Lease. Tenant shall not be subject to any pre-foreclosure remedies asserted under the Mortgage or related loan documents. Lender shall not name or join Tenant as a defendant in any exercise of Lender's rights and remedies arising upon a default under the Mortgage, unless applicable law requires Tenant to be made a party as a condition to proceeding against Landlord or prosecuting such rights and remedies. In the latter case, Lender may join Tenant as a defendant in the action only for such purpose and not to terminate the Lease or otherwise adversely affect Tenant's rights under the Lease or this Agreement.

If Lender succeeds to the interest of Landlord under the Lease, Tenant shall have the same rights and remedies against Lender for any default under the Lease, but Lender shall not be:

(a)     liable for any act or omission of any prior landlord (including Landlord) under the Lease, except for non-monetary defaults of a continuing nature of which Lender has received notice, and latent or patent defects in construction to the same extent that any prior landlord would be liable, but nothing herein shall be construed to limit Lender's maintenance and repair obligations in its capacity as landlord under the Lease from and after the date Lender takes title to the Premises, whether or not the need for such repairs or maintenance accrued before or after such date;

(b)     subject to any off-sets or abatements against rent that Tenant may have against any prior landlord (including Landlord) under the Lease, except (1) for those which, as of the date of foreclosure, were already commenced or notice of their commencement was sent; (2) for the exercise of rights set forth in the Lease; and (3) for those relating to continuing defaults identified in Subsection (a) above;

(c)     bound by any Fixed Minimum Rent that Tenant might have paid for more than the current month to any prior landlord (including Landlord), except as expressly required under the Lease or actually received by Lender;

(d)     bound by any payment of rents, additional rents or other sums which Tenant may have paid more than one month in advance to Landlord or any prior landlord unless (1) such sums are actually received by Lender or (2) such prepayment was approved by Lender; and

(e)     bound by any amendment or modification to the Lease that shortens the term of the Lease or reduces the rent owed thereunder without the prior consent of Lender, and if Lender does not respond to such request within fifteen (15) days, then consent shall be deemed given by Lender; Landlord is responsible for securing all consents required by Lender.

In the event of any casualty or condemnation (eminent domain), the insurance proceeds or the condemnation award, as the case may be, shall be applied as required by the Lease.

Except as provided herein, this Agreement does not constitute a waiver by Lender of any of its rights under the Mortgage or related documents, and the Mortgage and any related documents remain in full force and effect and shall be complied with in all respects by Landlord.

No modification, amendment, waiver or release of any provision of this Agreement or of any right, obligation, claim or cause of action arising hereunder shall be valid or effective unless in writing and signed

Exhibit G

by the parties.

Nothing herein shall amend, waive or rescind any provision or condition of the Lease, or relieve the Landlord from any of its obligations under the Lease.

Tenant shall provide a courtesy copy concurrently to Lender of any notice of default (or breach) from Tenant to Landlord that would allow Tenant to terminate the Lease. Lender shall have the same time allowed to the Landlord, after Landlord's receipt of notice, to cure the default giving rise to the termination. The opportunity to cure granted to Lender shall be available to Lender only to the extent such opportunity to cure is available to Landlord under the Lease, and such cure period afforded to Lender shall run concurrently with the cure period available to Landlord. Notwithstanding the foregoing, Lender shall have no obligation to cure any default by Landlord except if Lender succeeds to title of the property.

Any notices from one party to the other must be in writing and sent via courier (e.g., UPS, Federal Express) or by certified U.S. mail to the following addresses:

|  |  |
|---|---|
| if to Tenant: | Jo-Ann Stores, LLC, Store #2596<br>Attn: National Director, Real Estate<br>5555 Darrow Road<br>Hudson, OH 44236 |
| With a copy to: | Jo-Ann Stores, LLC, Store #2596<br>Attn: Legal Counsel<br>5555 Darrow Road<br>Hudson, OH 44236 |
| Estoppel and SNDA Requests to: | Estoppel-SDNA@joann.com |
| if to Lender: | [LENDER] |
| with a copy: | _____ |

Landlord represents and warrants to Tenant that all prior mortgages and deeds of trust encumbering the Premises demised under the Lease have been satisfied or shall be satisfied with the proceeds of the Mortgage.

This Agreement inures to and binds the successors and assigns of the respective parties.

This Agreement shall not be effective against Tenant unless and until Tenant has received an original of this Agreement signed by all parties.

This Agreement shall be deemed to be a contract entered into under the laws of [State] and shall in all respects be governed, construed, applied and enforced in accordance with the laws of [State].

Exhibit G

This Agreement may be signed in multiple counterparts, each of which shall constitute an original and all of which taken together constitute one and same agreement.

[The remainder of this page is intentionally left blank]

Exhibit G

Each party's duly authorized representative has signed this Agreement as of the date written above.

LENDER:
**[LENDER]**

By:_____

Print Name:_____

Title:_____

LANDLORD:
**[LANDLORD]**

By:_____

Print Name:_____

Title:_____

TENANT:
**Jo-Ann Stores, LLC**

By: _____
    Ann Aber
    Chief Legal Officer and Secretary

*[Notary Signatures Follow on Next Page]*

Exhibit G

**Lender's Acknowledgment**

STATE OF _____ )
                                  ) SS
COUNTY OF _____ )

   BEFORE ME, a Notary Public in and for said County and State, personally appeared
_____, a[n] _____, by
_____, its _____, who acknowledged that
he/she did sign the foregoing instrument on behalf of said corporation and that the same is his/her free act
and deed personally and as such officer.

   IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at _____,
_____, this _____ day of _____, 20__.


                _____
                      NOTARY PUBLIC


**Landlord's Acknowledgment**

STATE OF _____ )
                                ) SS
COUNTY OF _____ )

   BEFORE ME, a Notary Public in and for said County and State, personally appeared
_____, a[n] _____, by
_____, its _____, who acknowledged that
he/she did sign the foregoing instrument on behalf of said corporation and that the same is his/her free act
and deed personally and as such officer.

   IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at _____,
_____, this _____ day of _____, 20__.


                _____
                      NOTARY PUBLIC

Exhibit G

**Jo-Ann's Acknowledgment**

STATE OF OHIO               )
                                          ) SS

COUNTY OF SUMMIT        )

BEFORE ME, a Notary Public in and for said County and State, personally appeared **Jo-Ann Stores, LLC**, an Ohio limited liability company, by Ann Aber, its Chief Legal Officer and Secretary, who acknowledged before me that she did sign the foregoing instrument on behalf of said limited liability company and that the same is her free act and deed personally and as such officers.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at Hudson, Ohio, this _____ day of _____, 20__.

_____
NOTARY PUBLIC

*[Notary Page to SNDA dated _____, 20__]*

Exhibit G

# EXHIBIT A

## Legal Description of Shopping Center

<u>Exhibit H</u>

**Form of Estoppel Certificate**

Shopping Center:

Landlord:

Tenant:                    Jo-Ann Stores, LLC, an Ohio limited liability company

Lease:                    Lease by and between Landlord and Tenant dated _____ ___, 20__, as modified by    (collectively, the "Lease")

Tenant represents that, as of the date hereof:

1.  The Lease constitutes the entire written agreement between Tenant and Landlord and has not been modified or amended, except as indicated herein.

2.  The Lease is in full force and effect.  The term commenced on _____ and expires on _____.  [Tenant has _____ ( ) 5-year options to renew the term thereof.] [Tenant has one 5-year option to renew remaining.] [Tenant has no options to renew the term of the Lease.]

3.  Tenant has taken possession of the premises demised under the Lease (the "Premises") and is occupying the Premises.

4.  To the undersigned's actual knowledge, without inquiry or investigation, the Landlord is not currently in default under the Lease, except as follows: _____, and Tenant reserves all rights and remedies with regard to the aforementioned issues [.] [; provided, however, that common area, tax and insurance reconciliation(s) have not been received from Landlord for the following years: [Insert Years]].  With regard to any and all common area, tax and insurance expenses, Tenant specifically reserves all rights and remedies with respect to any overpayments which may be discovered after the date of this Estoppel Certificate regardless of the year in which the overpayment occurred, including but not limited to, the right to seek reimbursement or offset for any overpayments.  [In addition, Tenant is auditing Landlord's common area, tax and insurance expenses; to date, there have been no findings, but the audit is still open, and Tenant reserves any and all rights and remedies with respect thereto.]

    Furthermore, Tenant has not inspected the physical condition of the Shopping Center, including the common areas, to verify that Landlord is in compliance with its obligations with respect thereto, and Tenant hereby reserves all rights regarding the same.

5.  The monthly Fixed Minimum Rent payable under the Lease is $[_____] and has not been prepaid by more than one month. [Tenant is not paying fixed monthly rent.  Rather, Tenant is paying Substitute Rent, as defined in the Lease. The monthly Substitute Rent varies each month according to store sales. Substitute Rent has not been prepaid.]

6.  No security deposit has been made in connection with the Lease.

7.  Tenant does not have any option or preferential right to purchase all or any part of the Shopping Center.

Exhibit H

8.  The address for notices to be sent to Tenant is as follows:

> Jo-Ann Stores, LLC, Store #2596
> Attn: National Director, Real Estate
> 5555 Darrow Road
> Hudson, OH 44236

> **with a copy to:**

> Jo-Ann Stores, LLC, Store #2596
> Attn: Legal Counsel
> 5555 Darrow Road
> Hudson, OH 44236

> **Estoppel and SNDA requests:**

> Estoppel-SDNA@joann.com

9.  Nothing contained herein shall: (a) amend, modify, waive or rescind any of the terms, conditions, covenants or obligations of the Lease; (b) waive or estop Tenant's right to declare a default based on facts of which Tenant does not have actual knowledge, without inquiry or investigation; (c) waive or estop Tenant's right to claim any offset, claim or counterclaim resulting from an audit of Landlord's business records or public records; (d) waive or estop any claims, defenses, rights or remedies of Tenant; or (e) relieve the Landlord from any of its obligations under the Lease.

10. Tenant's statements exclude certification as to any matter that may be disclosed by audit, inspection, or examination of Landlord's records or public records relating to charges and monetary items under the Lease.

11. If there is any conflict between this certificate and the Lease, the Lease shall control.

12. Tenant acknowledges that you are relying upon this Estoppel Certificate and the accuracy of the information contained herein. Nevertheless, Tenant shall not be liable to any party for damages of any kind whatsoever (whether direct, indirect, special, consequential or any other type) resulting from any statement in this certificate.

13. The undersigned representative of Tenant is duly authorized to execute this instrument on behalf of Tenant.

Dated: _____, 20__

**JO-ANN STORES, LLC**

By: _____
    Ann Aber
    Chief Legal Officer and Secretary

Exhibit H

MIDFIRST BANK

# Wire Confirmation

**The wire transfer request below has been approved and added to the transmit queue successfully. All approvals must be received before the request will be transmitted.**

Approved:              01/13/2025 11:28:42 am (ET)

Approved By:           WALKERZ

| Account | Template Name | Recipient Name | Amount | Currency | Effective Date | Confirmation Number | Approval Status |
|---|---|---|---|---|---|---|---|
| Zonapart LLC - dba: Birch Run Station - *0947 | Birch Run Joann TI Reimb | Jo-Ann Stores, LLC Store 2596 | 915,000.00 | USD | 01/13/2025 | 4209797075 | 1 of 2 received |



**Exhibit B**



Via FedEx
Via Email:

December 20, 2024

Arizona Partners Retail Investment Group, LLC
c/o Birch Run Station, LLC
8300 N. Hayden Rd., Ste. A-200
Scottsdale, AZ  85258
Attn: Property Manager

RE:     Jo-Ann Store #2596 – Maplewood, MN
        Birch Run Station
        **FINAL Construction Allowance Billing**

Dear Landlord:

Per Section 10(g) of the Lease dated October 26, 2022, Landlord shall pay Tenant a "Construction Allowance" in the (total) amount of $1,215,000.00.  As Landlord made payment in the amount of $300,000.00 on September 24, 2024, this letter is billing for the FINAL remaining Construction Allowance in the amount of $915,000.00.

Please find attached the required documentation and allow this letter to serve as formal request for the FINAL Allowance payment in the amount of $915,000.00 due within thirty (30) days of receipt of this letter.

Landlord shall wire-transfer the Construction Allowance to Tenant's bank as follows:  Bank of America, 100 West 33rd Street, New York, NY 10001, ABA: 026009593 (in the event Landlord elects to submit an ACH transmission, the number is: 111000012); Jo-Ann Account No.: 4427216208; Account Name: Jo-Ann Stores, LLC, Store #2596.

Should you have any questions, please contact me at (330) 463-6627 or via e-mail at velma.quinlan@joann.com

Thank you.
Sincerely,

Velma M. Quinlan
Lease Administration Department

ATTACHMENTS



Via FedEx
Via Email:


March 20, 2024


Arizona Partners Retail Investment Group, LLC
c/o Birch Run Station, LLC
8300 N. Hayden Rd., Ste. A-200
Scottsdale, AZ  85258


RE:    Jo-Ann Store #2596 – Maplewood, MN
       Birch Run Station
       **1ˢᵗ Construction Allowance Billing**


Dear Landlord:

Per Section 10(g) of the Lease dated October 26, 2022, Landlord shall pay Tenant a "Construction Allowance" in the (total) amount of $1,215,000.00 as follows: (i) $300,000.00 to be paid to Tenant within (45) days of delivery of the Premises, provided that Tenant commenced Tenant's Work.

Landlord delivered Premises on February 19, 2024, and Tenant commenced with construction on the same day. Please allow this letter to serve as formal invoicing for the 1ˢᵗ Allowance Draw in the amount of $300,000.00 which is due on or before April 4, 2024.

Landlord shall wire-transfer the Construction Allowance to Tenant's bank as follows:  Bank of America, 100 West 33rd Street, New York, NY 10001, ABA: 026009593 (in the event Landlord elects to submit an ACH transmission, the number is: 111000012); Jo-Ann Account No.: 4427216208; Account Name: Jo-Ann Stores, LLC, Store #2596.

Should you have any questions, please contact me at (330) 463-6627 or via e-mail at velma.quinlan@joann.com


Thank you.
Sincerely,


Velma M. Quinlan
Lease Administration Department

MidFirst Bank

## Completed Wire Details

### Debit Information

| | |
|---|---|
| Wire Type: | Domestic wire |
| Account: | Zonapart LLC - dba: Birch Run Station - *0947 |
| Effective Date: | 09/23/2024 |
| Amount: | 300,000.00 |
| Currency: | USD |
| Entered By: | WALKERZ |
| Entry Date/Time: | 09/23/2024 01:37:47 pm (ET) |
| Transmitted By: | KZENK |
| Transmit Date/Time: | 09/23/2024 01:41 PM (ET) |
| Status: | CONFIRMED |
| Confirmation Number: | 1312693644 |
| Reference Number: | 20240923J3B74T1C000293 |

### Recipient Information

| | |
|---|---|
| Bank ID Type: | ABA |
| Bank ID: | 026009593 |
| Bank Name: | BANK OF AMERICA, N.A., NY |
| Bank Address 1: | NEW YORK |
| Bank Address 2 : | NY |
| Recipient Account: | 4427216208 |
| Recipient Name: | Jo-Ann Stores, LLC Store 2596 |
| Recipient Address 1: | 1717 A Beam Avenue |
| Recipient Address 2: | Maplewood MN |

Additional Information for
Recipient:

TI Reimbursemnet Jo-Ann Stores #2596

## Wire Initiator Information

Wire Initiator Name:

Birch Run Station LLC

Wire Initiator Address 1:

8300 N HAYDEN RD SUITE A-200

Wire Initiator Address 2:

SCOTTSDALE, AZ 852582481

## Approval History Information

Approval Status: 2 of 2 received

| Action | User ID | Date | Time |
|---|---|---|---|
| Enter Request | WALKERZ | 09/23/2024 | 01:37:47 PM (ET) |
| Approve Request | WALKERZ | 09/23/2024 | 01:37:47 PM (ET) |
| Approve Request | KZENK | 09/23/2024 | 01:41:56 PM (ET) |